## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations** | **Misc. Action No. 13-mc-1288 (RLW)** |
| **THIS DOCUMENT RELATES TO: ALL CASES** | <u>CLASS ACTION</u><br><br>**CONSOLIDATED AMENDED CLASS ACTION AND DERIVATIVE COMPLAINT** |

## <u>TABLE OF CONTENTS</u>

**Page(s)**

NATURE AND SUMMARY OF THE ACTION .......................................................................... 1

JURISDICTION AND VENUE .............................................................................................. 12

THE PARTIES ..................................................................................................................... 12

ADDITIONAL PARTIES ....................................................................................................... 15

FACTS ............................................................................................................................... 16

I.       BACKGROUND OF FANNIE MAE AND FREDDIE MAC ......................................... 16

II.      FHFA PLACES THE COMPANIES INTO RECEIVERSHIP AND CAUSES
         THEM TO INITIATE MASSIVE WRITE-DOWNS ....................................................... 16

III.     THE COMPANIES RETURN TO PROFITABILITY ..................................................... 24

IV.      THE THIRD AMENDMENT BARS THE COMPANIES' SHAREHOLDERS
         FROM PARTICIPATING IN THE COMPANIES' RETURN TO PROFITABILITY .. 26

V.       THE THIRD AMENDMENT VIOLATED THE CONTRACTUAL RIGHTS OF
         HOLDERS OF THE COMPANIES' PREFERRED STOCK AND COMMON
         STOCK .................................................................................................................. 30

VI.      THE THIRD AMENDMENT WAS INCONSISTENT AND IN CONFLICT WITH
         FHFA'S STATUTORY RESPONSIBILITIES AS A CONSERVATOR ....................... 39

VII.     BY ENTERING INTO THE THIRD AMENDMENT, FHFA AND TREASURY
         VIOLATED THEIR FIDUCIARY OBLIGATIONS TO FANNIE MAE AND ITS
         PRIVATE SHAREHOLDERS ...................................................................................... 44

VIII.    BY ENTERING INTO THE THIRD AMENDMENT, FHFA AND TREASURY
         TOOK THE VESTED PROPERTY RIGHTS OF PLAINTIFFS AND THE
         TAKINGS CLASS WITHOUT JUST COMPENSATION ............................................. 47

CLASS ACTION ALLEGATIONS ......................................................................................... 48

DEMAND IS EXCUSED DUE TO THE FHFA'S MANIFEST CONFLICT OF INTEREST .. 52

CAUSES OF ACTION .......................................................................................................... 54

COUNT I
BREACH OF CONTRACT – FANNIE MAE PREFERRED STOCK
(AGAINST FANNIE MAE AND FHFA) .................................................................................. 54

i

COUNT II
BREACH OF CONTRACT – FREDDIE MAC PREFERRED STOCK
(AGAINST FREDDIE MAC AND FHFA) .................................................................. 55

COUNT III
BREACH OF CONTRACT – FREDDIE MAC COMMON STOCK
(AGAINST FREDDIE MAC AND FHFA) .................................................................. 56

COUNT IV
BREACH OF THE IMPLIED COVENANT  OF GOOD FAITH AND FAIR DEALING
FANNIE MAE PREFERRED STOCK
(AGAINST FANNIE MAE AND FHFA)..................................................................... 57

COUNT V
BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
FREDDIE MAC PREFERRED STOCK
(AGAINST FREDDIE MAC AND FHFA) .................................................................. 58

COUNT VI
BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALINGFREDDIE MAC COMMON STOCK
(AGAINST FREDDIE MAC AND FHFA) .................................................................. 59

COUNT VII
BREACH OF FIDUCIARY DUTY FANNIE MAE
(AGAINST TREASURY AND FHFA) ....................................................................... 60

COUNT VIII
JUST COMPENSATION UNDER THE FIFTH AMENDMENT
(AGAINST FHFA AND TREASURY) ....................................................................... 62

PRAYER FOR RELIEF ........................................................................................... 63

JURY TRIAL DEMANDED ...................................................................................... 65

Plaintiffs Melvin Bareiss, Joseph Cacciapalle, John Cane, Francis J. Dennis, Michelle M. Miller, Marneu Holdings, Co., United Equities Commodities, Co., and 111 John Realty Corp. (collectively "Plaintiffs"), by the undersigned attorneys, submit this Consolidated Amended Class Action and Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a class action brought by Plaintiffs on behalf of themselves and several classes (the "Classes," as defined herein) of holders of preferred stock or common stock issued by either the Federal National Mortgage Association ("Fannie Mae" or "Fannie") or the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie;" Fannie Mae and Freddie Mac together, the "Companies"), seeking damages and equitable relief, including rescission, for breach of contract and breach of the implied covenant of good faith and fair dealing, in connection with the Third Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated August 17, 2012 (the "Third Amendment"), between the Defendant United States Department of the Treasury ("Treasury") and the Defendant Federal Housing Finance Agency ("FHFA") in its capacity as conservator for Fannie Mae and Freddie Mac.

2.     This is also a class action brought by Plaintiffs on behalf of themselves and a sub-class (the "Takings Class," as defined herein) of certain holders of preferred stock or common stock issued by either Fannie Mae or Freddie Mac, seeking just compensation for the taking of private property in violation of the Takings Clause and Due Process Clause of the United States Constitution.

3.     This is also a derivative action brought by Plaintiffs on behalf of Fannie Mae, seeking damages and equitable relief, including rescission, for breach of fiduciary duty. Plaintiffs allege the following based upon personal knowledge as to themselves and their own

acts and upon information and belief as to all other matters.  Plaintiffs' information and belief is based on, inter alia, the investigation of Plaintiffs' counsel.

4.      Fannie Mae and Freddie Mac are government sponsored enterprises chartered by the U.S. Congress to facilitate liquidity and stability in the secondary market for home mortgages.  While they are commonly referred to as "Government Sponsored Enterprises" or "GSEs," Fannie Mae and Freddie Mac are not government agencies.  Instead, as private, for-profit corporations, the Companies have shareholders, directors, and officers like other non-governmental corporations, and their debt and equity securities have for years been privately owned and publicly traded, including by public pension funds, mutual funds, community banks, insurance companies, and myriad individual investors.

5.      Although both Fannie and Freddie were chartered by the U.S. Congress, the federal government did not guarantee, directly or indirectly, their securities or other obligations. Fannie and Freddie were stockholder-owned corporations, and, before the 2008 financial crisis, their businesses were self-sustaining and funded exclusively with private capital.

6.      To raise capital, the Companies issued several publicly traded securities including common stock and numerous classes of non-cumulative preferred stock ("Preferred Stock"). The Preferred Stock, which had the essential characteristics of a fixed income security, was long perceived to be a conservative investment paying modest but reliable rates of return and carrying high credit ratings.  The common stock, in turn, participated in the earnings of the Companies for many years.  By 2008, Fannie Mae and Freddie Mac were two of the largest privately owned financial institutions in the world, and had been consistently profitable for decades.

7.      In July 2008, in response to the crisis in the residential housing and mortgage markets, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA"), creating

FHFA to oversee the operations of Fannie Mae and Freddie Mac.  Congress empowered FHFA to serve as Conservator to the Companies when necessary to preserve their financial health. When acting as Conservator, FHFA is obligated to manage the Companies with the goal of putting them in a sound and solvent financial condition while preserving and conserving their assets. 12 U.S.C. § 4617(b)(2)(D).  Congress also authorized Treasury to provide limited financial assistance to the Companies by purchasing securities issued by the Companies if it determined that such purchases would help stabilize financial markets, prevent disruptions in the mortgage markets, and protect taxpayers.

8.      Just two months after HERA's enactment, on September 6, 2008, FHFA placed Fannie Mae and Freddie Mac into temporary conservatorship.  The objective of the conservatorship was to stabilize the institutions so they could return to their normal business operations.  Indeed, by statute, the purpose of appointing the conservator was "to preserve and conserve the [Companies'] assets and property and to put the [Companies] in a sound and solvent condition."  HERA expressly grants FHFA, as Conservator, the power to take such action as may be necessary to put the Companies in a "sound and solvent condition" and that is appropriate to "carry on the business of the Companies" and "preserve and conserve the[ir] assets and property."  FHFA itself vowed, at the time the Companies were placed into conservancy, that it was committed to operating the Companies "until they are stabilized" and that the conservatorship would be terminated upon successful completion of its plan to restore the Companies to "a safe and solvent condition."  The public was entitled to rely on these official statements of the purposes of the conservatorship, and public trading in the Companies' stock was allowed to, and did, continue.

9.      In connection with the appointment of FHFA as Conservator, Fannie Mae and Freddie Mac each entered into a Senior Preferred Stock Purchase Agreement ("PSPA") with Treasury.  Under these contracts, Treasury agreed to invest in a newly created class of securities in the Companies, known as Senior Preferred Stock ("Government Stock"), when and as necessary for the Companies to maintain a positive net worth.  In return for its commitment to purchase Government Stock, Treasury received $1 billion of Government Stock in each Company as a commitment fee and warrants to acquire 79.9% of the common stock of the Companies at a nominal price.  The Government Stock ranked senior in priority to all other series of Fannie Mae and Freddie Mac Preferred Stock, and would earn an annual dividend, paid quarterly, equal to 10% of the outstanding liquidation preference, i.e., the sum of the $1 billion commitment fee plus the total amount of Government Stock outstanding.  The warrants to acquire a 79.9% ownership stake in the Companies gave Treasury a significant "long" position – over and above the substantial 10% coupon on its Government Stock – which, if exercised, could result in enormous profits to the government in the event the Companies returned to profitability.

10.      Shortly after being placed into conservatorship, the Companies, under the control of FHFA, wrote down their assets significantly.  FHFA caused the Companies to declare large non-cash losses in the value of deferred tax assets, and to take out large loss reserves on their balance sheets. These accounting adjustments reflected exceedingly negative views about the Companies' future financial prospects and temporarily decreased the Companies' operating capital and their net worth by hundreds of billions of dollars.  To fill the holes in the Companies' balance sheets created by these significant write-downs, Treasury immediately began purchasing Government Stock.  By mid-2012, Treasury had invested approximately $189 billion in Government Stock, the majority attributable to these accounting adjustments, and the remainder

4

to repay Treasury the hefty 10% coupon on its outstanding Government Stock – dividends that had ballooned to approximately $19 billion annually, or nearly $5 billion quarterly.

11.      Treasury made its investment in Fannie Mae and Freddie Mac pursuant to temporary authority established under Section 1117 of HERA.   That authority expired on December 31, 2009.  Before the authority expired, Treasury and FHFA made two substantive amendments to the PSPAs (neither of which are challenged in this lawsuit).

12.      By the second quarter of 2012, both Fannie Mae and Freddie Mac had returned to profitability and were solvent.  The Companies made a combined quarterly profit of $8.3 billion in the second quarter of 2012, or approximately 170% of the $5 billion quarterly dividend payable to Treasury on its Government Stock.  Thus, by no later than the end of the second quarter of 2012, the Companies were generating sufficient profits to pay a dividend on the Preferred Stock, from available cash, to private investors.  And once the 10% coupon on the Government Stock was paid in full, and the Companies' satisfied their contractual obligations to holders of the Preferred Stock, Treasury would also be entitled to dividends with respect to its ownership of 79.9% of the Companies' common stock (assuming exercise of Treasury's warrants).

13.      Furthermore, as the housing market recovered, it became clear that the Companies' actual financial condition was never as bad as FHFA projected when it ordered the Companies to write down their balance sheets.  For example, between 2008 and 2012, the Companies' actual realized loan losses were far less – by about $100 billion – than their anticipated losses.  As their financial conditions have improved, the Companies have been able to reverse the earlier write-downs of their deferred tax assets and loss reserves.  Significantly, the excessive write-downs were what caused Treasury to inject surplus funds into the Companies in

5

the first place, triggering billions of dollars of payments back to Treasury under the 10% coupon on Government Stock, which, in turn, required further draw downs on Treasury's funding commitment.

14.     Consequently, by no later than the second quarter of 2012, Treasury was well-positioned to reap the fruits of its investment in Fannie Mae and Freddie Mac.  As the housing recovery gained traction, the stream of profits on Treasury's investments in the Companies was projected to continue, and grow, in the coming years.  Indeed, coupled with the expected reversal of loss reserves and the write-up in value of other assets, the Companies' net worth was poised to increase by several hundred billion dollars.  Treasury was entitled to a substantial 10% coupon on its Government Stock (now payable out of the Companies' available cash), and to 79.9% of the Companies' profits going forward, subject to the Companies' fulfillment of their contractual obligations to the holders of their Preferred Stock.  In addition, Treasury, through FHFA, as Conservator, could require Fannie Mae and Freddie Mac to begin repaying the principal of Treasury's investment in the Companies by redeeming Treasury's Government Stock.

15.     Instead, Treasury insisted on all of the Companies' profits, forever.  Accordingly, rather than exercising its right to purchase up to 79.9% of the Companies' common stock or taking steps to enable the Companies to redeem the Government Stock, FHFA, as Conservator, and Treasury acted together to ensure that Treasury would be the sole beneficiary, to the exclusion of all other shareholders, of the Companies as operating enterprises.

16.     Specifically, FHFA and Treasury announced the "Third Amendment" to the PSPAs.  The Third Amendment had devastating consequences for holders of the Preferred Stock and common stock.  In place of the 10% coupon due on Treasury's Government Stock, the Third Amendment changed the PSPAs so as to entitle Treasury to a dividend of 100% of all current

6

and future profits of the Companies. As a result of this purported "amendment" to the terms of the Companies' PSPAs with Treasury, Fannie Mae and Freddie Mac would be left with no funds to redeem Treasury's Government Stock or distribute to the holders of Preferred Stock or common stock, whether by dividend, redemption, or in a liquidation. Indeed, since the PSPAs provided that in the event of a liquidation of Fannie Mae or Freddie Mac, the Government would receive a liquidation preference that included the amount of any prior unpaid dividend, the Third Amendment guaranteed that even if the Companies were liquidated, Treasury would receive the full amount of their net worth in that liquidation.

17.    The Third Amendment, which Fannie Mae, Freddie Mac, and the Government implemented without seeking or obtaining the consent of the holders of Preferred Stock or common stock as contractually required, sidestepped the rules of priority, eliminated the contractual rights of the Preferred Stock and common stock holders, and expropriated for the Government the economic value of these privately-held securities. As Treasury stated on the day of the announcement, the Third Amendment was intended to ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will . . . benefit taxpayers."

18.    Neither the Companies nor their private investors received any meaningful value in return for the Third Amendment. As noted above, under the Third Amendment, the amount of cash the Companies transfer to Treasury as a dividend does not reduce the amount of the Government Stock outstanding. Furthermore, the Companies have not been permitted to redeem Treasury's Government Stock. Thus, regardless of how much money the Companies send to Treasury, all of the Government Stock will remain outstanding, and Treasury will continue to take substantially all of the Companies' net worth, as long as they remain in business. The Third Amendment thus enriches the federal government through a self-dealing arrangement, and

7

destroys tens of billions of dollars of value in the Companies' Preferred Stock and common stock. Treasury and FHFA effectively nationalized two of the nation's biggest financial institutions, after they returned to profitability and while FHFA was supposed to be serving as their Conservator.

19.     Treasury has reaped immense profits via the Third Amendment. On or about June 30, 2013, the Companies collectively paid Treasury a $66.3 billion dividend – more than fourteen times the $4.7 billion that Treasury would have received under the original 10% coupon on its Government Stock. Such large payments were not unexpected; shortly after the Third Amendment was executed, FHFA's Inspector General recognized that the new arrangement could result in an "extraordinary payment to Treasury." FHFA Office of Inspector General, Analysis of the 2012 Amendments to the Government Stock Purchase Agreements, at 15 (Mar. 20, 2013). Moreover, Treasury and FHFA maintain that this excess payment of $61.6 billion somehow does not represent a return on capital invested, and therefore do not take it into account as a repayment of funds that Treasury advanced to the Companies. Therefore, the liquidation preference of Treasury's Government Stock has not been reduced and stands at $189 billion (with approximately $117 billion attributable to Fannie Mae and $72 billion attributable to Freddie Mac) – i.e., the same amount as of the time of the Third Amendment. As a result of the Third Amendment, Treasury's annualized rate of return on its Government Stock for the quarter was a staggering 140%.

20.     Moreover, the Companies have continued to report strong earnings and the payment of enormous dividends to Treasury for the second and third quarters of 2013. For example, for the most recent quarter the Companies reported $39.2 billion in combined profits and announced that they will collectively pay $39 billion in dividends to Treasury for the third

quarter of 2013 under the Third Amendment.  Thus, by the end of this year, Fannie Mae will have paid an aggregate of approximately $113.9 billion in dividends to Treasury, and Freddie Mac will have paid approximately $71.345 billion – i.e., $9 million more than Freddie received from Treasury – for total dividend payments of $185.2 billion as of December 2013.

21.     The statutes and regulations governing Treasury and FHFA did not authorize them to enter into the Third Amendment, and in fact, FHFA's actions were contrary to its statutory responsibility as Conservator to take those actions "necessary to put the [Companies] in a sound and solvent condition" and "appropriate to carry on the business of the [Companies] and preserve and conserve [their] assets and property." 12 U.S.C. § 4617(b)(2)(D).

22.     The Third Amendment has stripped Fannie Mae and Freddie Mac of their ability to rebuild their capital reserves or to distribute dividends to Plaintiffs, the other members of the Classes, or other holders of Fannie Mae and Freddie Mac stock.  Moreover, by appropriating the entirety of the Companies' net worth for the government's coffers on a quarterly basis, the Third Amendment has effectively eliminated the property and contractual rights of Plaintiffs and the Classes to receive their liquidation preference upon the dissolution, liquidation or winding up of Fannie Mae and Freddie Mac.  FHFA and Treasury took away the Classes' rights:

   o  To receive dividend payments.  Under the terms of the Preferred Stock certificates of designation and the Freddie Common Stock certificate of designation ("Certificates" or "Certificates of Designation"), Fannie Mae and Freddie Mac owed Plaintiffs and the other members of the Classes dividends, if declared, to the extent that the Companies earned profits above and beyond their requirement to pay the 10% dividend on the Treasury's Senior Preferred Stock.  As of the second quarter of 2012, the quarters leading up to this filing, and for the foreseeable

future, Fannie Mae and Freddie Mac's profits have exceeded or will likely exceed that threshold;

o   To receive a liquidation distribution upon Fannie Mae and Freddie Mac's dissolution, liquidation or winding up, a right which was still worth a substantial amount of money even though it was junior to the liquidation preference of the Senior Preferred Stock; and

o   To vote upon changes to the Preferred Stock or common stock that were materially adverse to stockholders.

23.   Plaintiffs and the other members of the Classes paid valuable consideration in exchange for these contractual rights, and in doing so helped provide financial support for Fannie Mae and Freddie Mac's business both before and after the imposition of the conservatorship. Indeed, even after the imposition of the conservatorship, the contractual rights of Plaintiffs and the other members of the Classes had substantial market value – market value that swiftly dissipated in the wake of the Third Amendment.

24.   The current projections for the Companies' continued profitability show that by the first quarter of 2014, they will be able not only to repay all of the money the Companies drew down from Treasury, but also to pay the requisite 10% annual dividend.  But for the Third Amendment, Fannie Mae and Freddie Mac would be capable of paying billions in dollars in profits to the holders of their other Preferred Stock and their common stock, including the members of the Classes.  Due to the Third Amendment, that money will all accrue to Treasury instead.  Treasury will receive a massive surplus above and beyond its pre-Third Amendment contractual entitlements, and Plaintiffs and the other members of the Classes will receive nothing.

25.    Entry into the Third Amendment by Treasury and FHFA, in its capacity as Conservator for Fannie Mae and Freddie Mac, was not an arm's length agreement, and was in breach of the express terms of the Certificates of the Preferred Stock and of Freddie Mac Common Stock, and in breach of the implied covenant of good faith and fair dealing inherent in such Certificates.  This action seeks an award of compensatory damages for such breach to Plaintiffs and the other members of the Classes and/or equitable relief with respect to such breach, including rescission of the Third Amendment.

26.    Entry into the Third Amendment by Treasury and FHFA also constituted an unlawful taking of private property under the Takings Clause and Due Process Clause of the United States Constitution.  Even after the imposition of the conservatorship Plaintiffs and the Takings Class had a reasonable, investment-based expectation in the value of their dividend rights and liquidation preferences.  Treasury and FHFA violated their property rights by effectively expropriating these contractual rights without any compensation whatsoever.  This action seeks an award of just compensation to Plaintiffs and the other members of the Takings Class.

27.    Moreover, Treasury, as *de facto* controlling stockholder of the Companies, stood on both sides of the decision to implement the Third Amendment.  Although Treasury has gained, and will gain, enormous benefits from the Third Amendment, the Companies received nothing in return.  As such, the Third Amendment was, and is, waste and not entirely fair to Fannie Mae, and constituted a breach of the fiduciary duties owed to Fannie Mae by FHFA and Treasury, as Fannie Mae's controlling stockholder.  Furthermore, the Third Amendment was inconsistent and in conflict with FHFA's statutory responsibilities, as Conservator to the Companies, to put the Companies back into "a sound and solvent condition" and to "conserve

11

[their] assets and property." Accordingly, this action also seeks, derivatively on behalf of Fannie Mae, an award of compensatory damages and disgorgement for such breach and/or equitable relief with respect to such breach, including rescission of the Third Amendment.

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. §§ 1452(c), 1723a(a) and 4617, and 28 U.S.C. §§ 1343(a)(3) and 1346(a)(2). In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2)(A) in that Plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $5 million, exclusive of interest and costs. The Court also has subject matter jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

29. Venue is proper in this district under 28 U.S.C. §§ 1391(e)(1)(A) and (B), because this is an action against agencies of the United States; one or more of the Defendants reside in this district; and a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district. In addition, one or more of the Defendants maintains executive officers in this district, and Defendants have engaged in regular activities and conducted business here, which have had an effect in this district. Moreover, a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## THE PARTIES

30. Plaintiff Melvin Bareiss is a citizen of the state of Kansas, and is a holder of Fannie Mae 8.25% Series T Preferred Stock. Mr. Bareiss purchased Fannie Mae Preferred Stock in May 2008, and has been a holder of Fannie Mae Preferred Stock continuously since then.

31. Plaintiff Joseph Cacciapalle is a citizen of the state of New Jersey, and is a holder of Fannie Mae 8.25% Series S Preferred Stock, Fannie Mae 8.25% Series T Preferred Stock, and

Freddie Mac 8.375% Series Z Preferred Stock.  Mr. Cacciapalle purchased Fannie Mae Preferred Stock in January 2008, purchased Freddie Mac Preferred Stock in February 2008, and has been a holder of Fannie Mae Stock and Freddie Mac Preferred Stock continuously since then.

32.    Plaintiff John Cane is a citizen of the state of Vermont, and is a holder of Fannie Mae Preferred 8.25% Series T Preferred Stock.  Mr. Cane purchased Fannie Mae Preferred Stock in 2009, held Fannie Mae Preferred Stock as of August 17, 2012, and has been a holder of Fannie Mae Preferred Stock continuously since then.

33.    Plaintiff Francis J. Dennis is a citizen of the state of New Jersey, and is a holder of Fannie Mae 8.25% Series S Preferred Stock and Fannie Mae 8.25% Series T Preferred Stock. Mr. Dennis purchased Fannie Mae Preferred Stock in May 2008, and has been a holder of Fannie Mae Preferred Stock continuously since then.

34.    Plaintiff Michelle M. Miller is a citizen of the state of Missouri, and is a holder of Fannie Mae common stock and Freddie Mac common stock.  Ms. Miller purchased Fannie Mae common stock in July 2010 and Freddie Mac common stock in October 2009, and has been a holder of Fannie Mae common stock and Freddie Mac common stock continuously since then.

35.    Plaintiff Marneu Holdings, Co. is a New York general partnership, with offices in New York, N.Y.  Its partners are New York citizens, such that it is also a New York citizen. Marneu Holdings, Co. is a holder of Fannie Mae 5.375% Series I Preferred Stock, Fannie Mae Variable Rate Series P Preferred Stock, Fannie Mae 4.75% Series M Preferred Stock, Fannie Mae 8.25% Series S Preferred Stock, Fannie Mae 5.375% Convertible Series 2004-1 Preferred Stock, Freddie Mac Fixed-to-Floating Rate Series Z Preferred Stock, and Freddie Mac 6.02% Series X Preferred Stock.  Marneu Holdings, Co. purchased Fannie Mae Preferred Stock in

December 2009, and Freddie Mac Preferred Stock in October 2012, and has been a holder of Fannie Mae Preferred Stock and Freddie Mac Preferred Stock continuously since then.

36.     Plaintiff 111 John Realty Corp. is a New York "S" corporation, with offices in New York, New York, and is therefore a citizen of the state of New York.  111 John Realty Corp. is a holder of Fannie Mae 8.25% Series S Preferred Stock.  111 John Realty Corp. purchased Fannie Mae Preferred Stock in September 2012, and has been a holder of Fannie Mae Preferred Stock continuously since then.

37.     Plaintiff United Equities Commodities, Co. is a New York general partnership, with offices in New York, New York.  Its partners are New York citizens, such that it is also a New York citizen.  United Equities Commodities, Co. is a holder of Fannie Mae 8.25% Series T Preferred Stock and Freddie Mac Variable Rate Series M Preferred Stock.  United Equities Commodities, Co. purchased Fannie Mae Preferred Stock in June 2011, and Freddie Mac Preferred Stock in October 2012, and has been a holder of Fannie Mae Preferred Stock and Freddie Mac Preferred Stock continuously since then.

38.     Defendant FHFA, as Conservator of Fannie Mae, is an independent agency of the United States government with its headquarters located at Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024, and therefore is a citizen of the District of Columbia.  According to FHFA's strategic plan for fiscal years 2013-17, "[s]ince September 2008, FHFA has been the conservator of Fannie Mae and Freddie Mac… with responsibility of overseeing management and governance of the Enterprise[]."

39.     Defendant Treasury is an executive agency of the United States government with its headquarters located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220, and

therefore is a citizen of the District of Columbia.  The Department of the Treasury owns the Government Stock, and is a signatory to certain agreements central to this Complaint.

40.     Defendant and nominal defendant Fannie Mae is a federally-chartered Government Sponsored Enterprise with its principal executive offices located at 3900 Wisconsin Avenue, N.W., Washington, D.C. 20016, and therefore is a citizen of the District of Columbia.

41.     Defendant and nominal defendant Freddie Mac is a federally chartered Government Sponsored Enterprise with its principal executive offices located at 8200 Jones Branch Drive, McLean, Virginia, and is therefore a citizen of Virginia.

## ADDITIONAL PARTIES

42.     Plaintiff American European Insurance Company is a New Jersey corporation with offices in New York, New York, and is a holder of Fannie Mae 8.25% Series T Preferred Stock and Freddie Mac Variable Rate Series M Preferred Stock.  American European Insurance Company held Fannie Mae Preferred Stock in May 2008 and Freddie Mac Preferred Stock in January 2001, and has been a holder of Fannie Mae Preferred Stock and Freddie Mac Preferred Stock continuously since then.

43.     Plaintiff Barry P. Borodkin (acting individually and on behalf of his IRA and SEP IRA) is a citizen of the state of New York, and is a holder of Fannie Mae Variable Rate Series F Preferred Stock, Fannie Mae Variable Rate Series G Preferred Stock, Fannie Mae 5.81% Series H Preferred Stock, Fannie Mae 5.125% Series L Preferred Stock, Fannie Mae 4.75% Series M Preferred Stock, Fannie Mae 5.50% Series N Preferred Stock, Fannie Mae Variable Rate Series P Preferred Stock, Fannie Mae 6.75% Series Q Preferred Stock, Fannie Mae 7.625% Series R Preferred Stock, and Fannie Mae 8.25% Series S Preferred Stock and Fannie Mae 8.25% Series T Preferred Stock.  Mr. Borodkin held Fannie Mae Preferred Stock prior to August 2012, and has been a holder of Fannie Mae Preferred Stock continuously since then.

44.     Plaintiff Mary Meiya Liao is a citizen of the state of California, and is a holder of Fannie Mae 8.25% Series T. Preferred Stock.  Ms. Liao purchased Fannie Mae Preferred Stock in May 2008, and has been a holder of Fannie Mae Preferred Stock continuously since then.

<u>FACTS</u>

## I.      BACKGROUND OF FANNIE MAE AND FREDDIE MAC

45.     Fannie Mae and Freddie Mac are stockholder-owned corporations organized and existing under the Federal National Mortgage Act and the Federal Home Loan Corporation Act, respectively.  Fannie Mae was established in 1938 as a federal agency to provide the mortgage market with supplemental liquidity, and was converted to a private corporation in 1968.  Freddie Mac was created as an alternative to Fannie Mae to make the secondary mortgage market more competitive and efficient. Both Companies are Government Sponsored Enterprises, which are private corporations that Congress created to increase mortgage market liquidity.  They seek to accomplish this by purchasing mortgages that private banks originate and bundling them into mortgage-related securities to be sold to investors.  Through the creation of this secondary mortgage market, the Companies increase liquidity for private banks, which enables them to make additional loans to individuals for home purchases.

46.     Notwithstanding their government charters, private shareholders owned Fannie Mae and Freddie Mac until 2007.  Before 2007, the Companies were consistently profitable.  In fact, prior to that time, the most recent full-year loss for Fannie Mae was in 1985, while Freddie Mac had never experienced an annual loss, according to the Companies' regulator.

## II.     FHFA PLACES THE COMPANIES INTO RECEIVERSHIP
         AND CAUSES THEM TO INITIATE MASSIVE WRITE-DOWNS

47.     Beginning in 2006, an industry-wide financial crisis and nationwide declines in the housing market caused the Companies to suffer losses.  As the Office of Federal Housing

Enterprise Oversight (the "OFHEO"), which was Fannie Mae and Freddie Mac's regulator at that time, stated in its 2008 annual report to Congress:

> In 2007, a confluence of factors – turmoil in the housing and mortgage markets, loss of liquidity in the credit marks, and volatility in the capital markets adversely impacted the financial performance of financial institutions . . . with significant exposure to mortgage markets. The Enterprises' financial results suffered along with the results of other financial institutions. Both Enterprises were unprofitable in 2007 – Freddie Mac's first annual net loss ever, and Fannie Mae's first since 1985.

48.     Despite these losses, the OFHEO continued to assure the marketplace of the Companies' soundness. For example, in a March 19, 2008 statement, OFHEO director James Lockhart said that, "Fannie Mae and Freddie Mac have played a very important and beneficial role in the mortgage markets over the last year. Let me be clear – both companies have prudent cushions above the OFHEO-directed capital requirements and have increased their reserves. We believe they can play an even more positive role in providing the stability and liquidity the markets need right now." On that date, Lockhart also said that the idea of a bailout is "nonsense in my mind. The companies are safe and sound, and they will continue to be safe and sound." *As Crisis Grew, A Few Options Shrank To One*, N.Y. TIMES, Sept. 7, 2008. Similarly, on June 9, 2008, OFHEO published a news release stating that it classified Fannie Mae and Freddie Mac as "adequately capitalized as of March 31, 2008."

49.     In July 2008, Congress enacted HERA, establishing FHFA to replace the OFHEO as the Companies' regulator, and granting Treasury temporary authority to assist the Companies through the purchase of securities. HERA provided a specific list of enumerated circumstances under which FHFA would have the power to place the Companies into conservatorship or receivership. HERA was passed not because Fannie Mae or Freddie Mac was deemed to be insolvent or operating unsafely at that time, but rather, to provide the struggling mortgage and financial markets with added confidence. As Treasury Secretary Henry Paulson testified to a

Congressional panel, "If you've got a bazooka, and people know you've got it, you may not have to take it out." *Paulson's Itchy Finger, on the Trigger of a Bazooka*, N.Y. TIMES, Sept. 9, 2008. Indeed, on July 10, 2008, Paulson and Federal Reserve Chairman Ben Bernanke both testified before the House Financial Services committee that Fannie Mae and Freddie Mac were adequately capitalized, and on July 10, 2008, the OFHEO issued a statement that, as of March 31, 2008, Fannie Mae and Freddie Mac were "holding capital well in excess of the OFHEO-directed requirement[.]"

50.     Similarly, in support of HERA, Senator Isakson (R-GA) commented that:

The bill we are doing tomorrow is not a bailout to Freddie Mac and Fannie Mae or the institutions that made bad loans.  It is an infusion of confidence the financial markets need.  Fannie and Freddie suffer by perception from the difficulties of our mortgage market.  If anybody would take the time to go look at the default rates, for example, they would look at the loans Fannie Mae holds, and they are at 1.2 percent, well under what is considered a normal, good, healthy balance.  The subprime market's defaults are in the 4 to 6 to 8-point range.  That is causing the problem.  That wasn't Fannie Mae paper, and it wasn't securitized by Fannie Mae.  They have $50 billion in capital, when the requirement is to have $15 billion, so they are sound.  But the financial markets, because of the collapse of the mortgage market, have gotten worse.

51.     Nonetheless, on September 6, 2008, FHFA placed the Companies into conservatorship and, in a press release issued the next day, said that, "as the conservator, FHFA will assume the power of the Board and management."  As the Conservator for the Companies, FHFA became responsible for "preserv[ing] and conserv[ing] [their] assets and property" and managing them in a manner that would restore them to a "sound and solvent condition." 12 U.S.C. § 4617(b)(2)(D).  At the time, FHFA stated that the goal of this action was "to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and mitigate the systemic risk that has contributed directly to the instability in the current market."  According to FHFA's press release, the conservatorship was "a statutory process designed to stabilize a troubled institution with the objective of returning the entities to

normal business operations. FHFA will act as the conservator to operate the Enterprises until they are stabilized."   FHFA also issued a Fact Sheet indicating that, "[u]pon the [FHFA] Director's determination that the Conservator's plan to restore the Company to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship.   At present, there is no exact time frame that can be given as to when this conservatorship may end."

52.     The decision to place the Companies into conservatorship was driven not by analysis of the HERA statutory factors, but by broader macroeconomic and political concerns and the need to provide support for the struggling mortgage market.   As the *New York Times* stated, the administration sought "to shrink drastically [Fannie Mae and Freddie Mac's] outsize influence on Wall Street and on Capitol Hill while at the same time counting on them to pull the nation out of its worst housing crisis in decades."   *In Rescue To Stabilize Lending, U.S. Takes Over Mortgage Finance Titans*, N.Y. TIMES, Sept. 7, 2008.   "In the end, [Secretary of the Treasury] Mr. Paulson's decision seems to have been a philosophical one, rather than one forced by imminent crisis.   Of course, for stagecraft purposes, it was played as impending disaster." *Paulson's Itchy Finger, on the Trigger of a Bazooka*, N.Y. TIMES, Sept. 9, 2008.

53.     Regarding the securities held by private investors, FHFA's director told investors that, among the "components of [the] conservatorship[,]" "the common stock and preferred stock dividends will be eliminated, but the common and all preferred stocks will continue to remain outstanding.   Subordinated debt interest and principal payments will continue to be made."   In another statement issued that same day, Treasury Secretary Paulson likewise made clear that, "conservatorship does not eliminate the outstanding preferred stock, but does place preferred shareholders second, after the common shareholders, in absorbing losses."   And in a Form 8-K

filing issued by Freddie Mac on September 11, 2008, Freddie Mac stated that, "The holders of Freddie Mac's existing common stock and preferred stock . . . will retain all their rights in the financial worth of those instruments, as such worth is determined by the market." In a Form 8-K filing issued by Fannie Mae on September 11, 2008, Fannie Mae stated that:

> The Certificate of Designation for the Senior Preferred Stock provides that Fannie Mae may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the Senior Preferred Stock **unless** (a) full cumulative dividends on the outstanding Senior Preferred Stock in respect of the then-current dividend period and all past dividend periods (including any unpaid dividends added to the liquidation preference) have been declared and paid in cash, and (b) all amounts required to be paid with the net proceeds of any issuance of capital stock for cash have been paid in cash. (emphasis added)

54.     Thus, the conservatorship did not itself involve the appropriation of any Preferred Stock or common stock, amend any of the Certificates of Designation, or otherwise legally modify any contractual rights held by Plaintiffs or the other members of the Classes.  Moreover, FHFA stated that it was critical to complete key regulations "so that any new investor will understand the investment proposition," clearly implying that FHFA intended that private investors would continue to purchase Fannie Mae and Freddie Mac securities.

55.     Treasury was authorized under HERA to strengthen the Companies' balance sheets by purchasing their securities, within set time frames and consistent with prescribed statutory requirements.  Beginning with HERA's enactment in 2008 until the end of 2009, Congress authorized Treasury to "purchase any obligations and other securities issued by the [Companies] . . . on such terms and conditions as the Secretary may determine and in such amounts as the Secretary may determine." 12 U.S.C. §§ 1455(l)(1)(A), 1719(g)(1)(A).  To exercise this authority, the Secretary was required to determine that purchasing the Companies' securities was "necessary to . . . provide stability to the financial markets; prevent disruptions in

the availability of mortgage finance; and protect the taxpayer." 12 U.S.C. §§ 1455(l)(1)(B), 1719(g)(1)(B).   The Secretary was required to consider several factors in making these determinations:

> (i) [t]he need for preferences or priorities regarding payments to the Government; (ii) [l]imits on maturity or disposition of obligations or securities to be purchased; (iii) [t]he [Companies'] plan[s] for the orderly resumption of private market funding or capital market access; (iv) [t]he probability of the [Companies] fulfilling the terms of any such obligation or other security, including repayment; (v) [t]he need to maintain the [Companies'] status as private shareholder-owned compan[ies]; [and] (vi) Restrictions on the use of [the Companies'] resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

*Id.* §§ 1455(l)(1)(C), 1719(g)(1)(C).

56.   Treasury used its temporary authority under HERA to enter into the PSPAs with FHFA, which acted on behalf of both Companies.   The PSPAs are identical in all material respects.   Under the PSPAs, Treasury purchased 1 million shares of Government Stock from each company in exchange for allowing the Companies to draw up to $100 billion each from Treasury.   The Government Stock has a liquidation preference equal to $1 billion plus the sum of all draws by each company against Treasury's funding commitment.   The Government Stock is also entitled to a cumulative dividend equal to 10% of the outstanding liquidation preference.   If a company pays a dividend, the PSPAs require Treasury to be paid dividends declared in full, but not paid, for prior dividend periods, before any privately held securities may receive a dividend.   Indeed, the PSPAs explicitly prohibit any shareholder other than Treasury from being paid any dividend without Treasury's consent.   Further, if the Companies liquidate, no shareholder can recover anything before the Treasury recovers the full liquidation value of its shares.   Treasury also has the right under the PSPAs to purchase up to 79.9% of the Companies' common stock at a nominal price.

57.     On September 11, 2008, Fannie Mae filed with the U.S. Securities and Exchange Commission a Form 8-K disclosing further details regarding its conservatorship and the PSPA. Among other things, this Form 8-K stated that "FHFA, as Conservator, has the power to repudiate contracts entered into by Fannie Mae prior to the appointment of FHFA as Conservator if FHFA determines, in its sole discretion, that performance of the contract is burdensome and that repudiation of the contract promotes the orderly administration of Fannie Mae's affairs. FHFA's right to repudiate any contract must be exercised within a reasonable period of time after its appointment as Conservator."  FHFA did not, either within a reasonable period of time after its appointment as Conservator or at any other time before August 17, 2012, purport to repudiate any of the contracts governing the Companies' Preferred Stock or common stock.

58.     At the end of 2009, Treasury's statutory authority to purchase the Companies' securities expired. To enable Treasury to provide the Companies with liquidity beyond 2009, Treasury and FHFA amended the PSPAs twice.  First, in May 2009, Treasury agreed to expand its funding commitment to $200 billion per company from $100 billion per company.  Then, on December 24, 2009, just before the expiration of Treasury's temporary authority under HERA, it agreed to a funding commitment that would be sufficient to allow the Companies to satisfy their 2010, 2011, and 2012 capitalization requirements and a funding commitment up to a limit determined by an agreed-upon formula for subsequent years.

59.     Before FHFA placed the Companies into conservatorship, Fannie Mae and Freddie Mac Preferred Stock enjoyed strong credit ratings, with all three major credit rating agencies assigning high investment-grade ratings on the Preferred Stock from the dates of issuance until 2008.  Treasury and other federal agencies encouraged private entities to invest in

the Companies, and banking regulators permitted banks to carry the Companies' Preferred Stock on their balance sheets at a lower risk weighting than other companies' preferred stock.

60.     When the Companies entered conservatorship, FHFA suspended payment of dividends on all Preferred Stock and common stock, and the PSPAs explicitly prohibit payment of any such dividends without Treasury's consent.  As a result, no dividends have been paid to the holders of the Companies' Preferred Stock and common stock since 2008.

61.     Furthermore, after FHFA took control of the Companies, it decided that it did not expect them to be profitable, and that they would likely incur large losses in the coming years. FHFA therefore directed the Companies to book substantial loss reserves – recording loan losses before they were actually incurred – and required the Companies to eliminate from their balance sheets the value of non-cash deferred tax assets that would only be of use if the Companies became profitable.

62.     These write-downs and accounting decisions directed by FHFA led to a circular payment obligation requiring the Companies to draw down Treasury's funding commitment, which, in turn, required the Companies to pay increased dividends to Treasury.  Under the initial PSPAs, Treasury committed to make quarterly payments to the Companies in order to maintain a zero net worth.  Each quarter, FHFA looked to the Companies' financial statements to determine if their liabilities exceeded their assets.  If so, FHFA would request that Treasury draw down the Companies' funding commitment and provide funds equal to the net worth deficit.  Because of the impact of the accounting adjustments directed by FHFA, the Companies had less capital, and therefore needed capital from Treasury both to operate and to pay the quarterly dividends due under the PSPAs.  The Companies thus were required to draw additional funds from Treasury's funding commitment, thereby increasing the amount of Treasury's aggregate liquidation

preference, and thus the amount of dividends payable to Treasury. Between 2008 and 2012, under the PSPAs, as amended, Treasury provided approximately $187 billion to the Companies.

63.     Throughout this time, the Companies continued to be managed in conservatorship by FHFA. HERA empowered FHFA to force the Companies into receivership and to liquidate their assets under certain circumstances, 12 U.S.C. § 4617(b)(2)(E), but FHFA always has maintained that its relationship with the Companies is that of Conservator rather than liquidator. *See* News Release FHFA, *A Strategic Plan For Enterprise Conservatorships: The Next Chapter In A Story That Needs An Ending,* at 9 (Feb. 21, 2012) (asserting that "[w]ithout action by Congress, FHFA must continue to look to the existing statutory provisions that guide ***the conservatorships***.") (emphasis added).

## III.   THE COMPANIES RETURN TO PROFITABILITY

64.     In 2012, it became clear that FHFA had overestimated the Companies' likely losses and underestimated the possibility of a return to profitability. For example, the Companies' actual loan losses were far less than anticipated. Between the beginning of 2007 and the second quarter of 2012, more than $234 billion had been set aside by the Company to absorb anticipated loan losses, whereas loan losses of just over $125 billion were actually recognized during that period, such that the projected losses had been overestimated by $109 billion.

65.     Contrary to FHFA's 2008 projections, the Companies posted profits of more than $10 billion in the first two quarters of 2012. Even more importantly, the Companies disclosed that they expected to be consistently profitable for the foreseeable future, such that they would eventually be able to remove the valuation allowance against their deferred tax assets, worth approximately $100 billion.

66.     Thus, the Companies were positioned to pay back the government for the support they had received, with money left over to provide a financial return to their private investors.

Yet instead of either allowing the Government Stock to be redeemed or compensating private investors for the excess value that the Companies were providing, Treasury and FHFA instead implemented the Third Amendment to ensure that private investors would be locked out of this recovery.

67.     The return of Fannie Mae and Freddie Mac to profitability in 2012 led to a substantial increase in the trading prices of the Companies' Preferred Stock.  In fact, the price of each series of Fannie Mae Preferred Stock increased between 67% and 115%, with an average of 83%, from May 1, 2012, to August 17, 2012, up until the time that Treasury issued a news release announcing the Third Amendment.  The Series P Preferred Stock, for example, increased by 83% during that time period, only to decline significantly after the Third Amendment was announced:



68.     Similarly, the price of each series of Freddie Mac Preferred Stock increased an average of 86% from May 1, 2012, to August 17, 2012.  The Series X Preferred Stock, for

example, increased by 84% during that time period, but suffered a material decline after the

Third Amendment was announced:



## IV.    THE THIRD AMENDMENT BARS THE COMPANIES' SHAREHOLDERS FROM PARTICIPATING IN THE COMPANIES' RETURN TO PROFITABILITY

69.    With the Companies' return to consistent and record profitability, the holders of

the Preferred Stock and common stock had reason to believe and expect that they would in time

regain a return on their investment.  They also had a reasonable expectation that the Companies

would eventually be healthy enough to redeem the Government Stock, exit conservatorship, and

be "return[ed] to normal business operations," as FHFA's director had vowed when the

conservatorship was established.

70.    These reasonable and realistic expectations of the holders of the Preferred Stock

and common stock did not last long, however, due to the Government's own self-dealing rather

than any change in the outlook for the housing market, broader economy, or the financial

performance of the Companies.

71.     As noted above, FHFA agreed to sweep all the Companies' profits to Treasury exactly when they had returned to stable profitability.  At a dividend rate of 10%, Treasury's approximately $189 billion in outstanding Government Stock earns annual dividends of some $18.9 billion, payable in quarterly installments of approximately $4.7 billion.  Thus, in any quarter in which the Companies' combined profits exceed $4.7 billion (or more precisely, any quarter in which Fannie Mae or Freddie Mac's profits exceed the dividend owed on their Government Stock), that value would inure to the benefit of the private shareholders *but for the Third Amendment*.  As FORTUNE magazine reported:

> Why did the Treasury enact the so-called Third Amendment that so radically altered the preferred-stock agreement?  By mid-2012, Fannie and Freddie were beginning to generate what would become gigantic earnings as the housing market rebounded.  If the original agreement remained in place, the GSEs would build far more than $100 billion in retained earnings, and hence fresh capital, in 2013 alone.  That would exert pressure for Congress to allow Fannie and Freddie to pay back the government in full, and reemerge as private players.  Timothy Geithner was strongly opposed to the rebirth of the old Fannie and Freddie.  The "sweep clause" that grabbed the entire windfall in profits was specifically designed to ensure that Fannie and Freddie remained wards of the state that would eventually be liquidated.

*What's Behind Perry Capital's Fannie and Freddie Gambit*, FORTUNE, July 8, 2013.

72.     In an August 17, 2012 press release announcing the modification of the PSPA, Treasury said that the changes would "help expedite the wind down of Fannie Mae and Freddie Mac, make sure that every dollar of earnings each firm generates is used to benefit taxpayers, and support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market."  It called the amendment a full income sweep of "every dollar of profit that [the] firm earns going forward," and that the amendment will fulfill the "commitment made in the Administration's 2011 White Paper that [Fannie Mae and Freddie Mac] will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."  This language was in stark contrast to their earlier representations that they sought

only to "stabilize" the Companies and return them "to normal business operations" (as well as the February 2, 2010 statement of Edward DeMarco, Acting Director of FHFA, that "[t]here are a variety of options available for post-conservatorship outcomes, but the only one that FHFA may implement today under existing laws is to reconstitute the two companies under their current charters.").

73.     Treasury will receive a windfall in payments of dividends under the Third Amendment.  In 2012, the Companies made combined profits of more than $28 billion. In the first quarter of 2013, they posted combined profits of approximately $15 billion, Fannie Mae added approximately $51 billion to its balance sheet by reversing write-downs of deferred tax assets, and Freddie Mac may soon be able to recognize tens of billions of dollars in deferred tax assets as well.  At the end of the second quarter of 2013, the Third Amendment required the Companies to pay $66.3 billion to Treasury.  At the end of the third quarter of 2013, the Third Amendment required the Companies to pay $39 billion to Treasury.  In total, by the end of this year, Fannie Mae will have paid $113.9 billion in dividends to Treasury, and Freddie Mac will have paid $71.345 billion, *i.e.*, $9 million more than it received from the Government.  Thus, by December 2013, the Companies' will have paid back a total of $185.3 billion in the form of dividends to Treasury, or within about $2 billion of the $187.5 billion they received from the government.

74.     The President's proposed fiscal year 2014 budget estimates that Fannie Mae and Freddie Mac will together pay $238.5 billion in dividends to Treasury over the next ten years, far outstripping the government's investments.  Even this figure likely underestimates the total value of the dividends that Treasury is likely to receive via the Third Amendment, since the budget was released before Fannie Mae announced its decision to release its deferred tax assets.

75.     The Third Amendment is even capturing the Companies' recoveries on legal claims that preceded the conservatorships.   For example, on October 1, 2013, Freddie Mac announced that it had entered into a $1.3 billion settlement with three financial institutions concerning Freddie Mac's claims relating to representations and warranties on loans that it had purchased, and that FHFA, as Freddie Mac's Conservator, had approved the settlement.   The claims at issue involved loans that Freddie Mac purchased between 2000 and 2012, such that many of them preceded the conservatorship by years.   Yet none of the funds recouped will go to benefit Freddie Mac shareholders.   Rather, Freddie Mac's CEO stated that, "[w]ith these settlements, Freddie Mac is recouping funds effectively due to the nation's taxpayers."

76.     Moreover, FHFA has announced other, similar settlements with financial institutions relating to breaches of representations and warranties on loans purchased by Fannie Mae and Freddie Mac well before the conservatorship.   For example, on October 25, 2013, FHFA announced a $1.1 billion settlement, in its role as Conservator to Fannie Mae and Freddie Mac, with JP Morgan relating to claims that the bank repurchase breaching loans sold to Fannie and Freddie in the years leading up to the financial crisis. In addition, FHFA announced a separate $4 billion settlement with JP Morgan, also in FHFA's role as Conservator to the Companies, relating to claims that the bank violated the federal securities laws in the connection with the sales and securitizations of loans to the Companies from 2005 to 2007.  Similarly, on May 28, 2013, FHFA announced a $3.5 billion settlement, in its role as Conservator to the Companies with Citigroup, covering claims of alleged violations of federal and state securities laws in connection with private-label residential mortgage-backed securities purchased by Fannie Mae and Freddie Mac.  FHFA has announced similar settlements this year with General Electric ($549 million), UBS ($885 million) and Wells Fargo ($335 million).   Most recently, on

December 2, 2013, it was announced that Bank of America agreed to pay Freddie Mac a total of $404 million to settle claims related to breaches of representations and warranties on approximately 716,000 single-family loans originated between 2000 and 2009 and sold to Freddie Mac.

77.     In sum, the Government is now expropriating "every dollar of earnings that each firm earns" on a quarterly basis.  This guarantees that there can never be a distribution to the holders of Preferred Stock or common stock no matter how much income the Companies earn and no matter how much their assets are worth in any liquidation.  That is, the Preferred Stock and common stock holders' stake in the Companies has been taken, in quarterly installments, since the moment the Third Amendment took effect, and this taking of their property will continue until the last dime has been extracted from the Companies if, and when, they are wound up.

78.     Plaintiffs and other holders of the Preferred Stock and common stock had a reasonable, investment-backed expectation in the value of their right to a portion of the profits earned by the Companies and, thus, in the future dividends their stock would pay, if the Companies once again become profitable and restored to sound and solvent condition.  Just as the Federal Government cannot seize corporate assets for a public purpose without paying just compensation, so too it cannot seize corporate stock to accomplish the same end.

## V.     THE THIRD AMENDMENT VIOLATED THE CONTRACTUAL RIGHTS OF HOLDERS OF THE COMPANIES' PREFERRED STOCK AND COMMON STOCK

79.     The Companies have issued common stock and several series of Preferred Stock that are, as a result of the PSPAs, subordinate to the Government Stock. Prior to September 6, 2008, Fannie Mae had issued common stock and several series of Preferred Stock, including:

**FANNIE MAE STOCK**

| Security | CUSIP | Ticker Symbol |
|---|---|---|
| Common Stock | 313 586 109 | FNMA |
| 5.25% Non-Cumulative Preferred Stock, Series D | 313 586 505 | FDDXD |
| 5.10% Non-Cumulative Preferred Stock, Series E | 313 586 604 | FNMFM |
| Variable Rate Non-Cumulative Preferred Stock, Series F | 313 586 703 | FNMAP |
| Variable Rate Non-Cumulative Preferred Stock, Series G | 313 586 802 | FNMAO |
| 5.81% Non-Cumulative Preferred Stock, Series H | 313 586 885 | FNMAM |
| 5.375% Non-Cumulative Preferred Stock, Series I | 313 586 877 | FNMAG |
| 5.125% Non-Cumulative Preferred Stock, Series L | 313 586 844 | FNMAN |
| 4.75% Non-Cumulative Preferred Stock, Series M | 313 586 836 | FNMAL |
| 5.50% Non-Cumulative Preferred Stock, Series N | 313 586 828 | FNMAK |
| Variable Rate Non-Cumulative Preferred Stock, Series O | 313 586 794 | FNMFN |
| 5.375% Non-Cumulative Convertible Series 2004-1 Pref. Stock | 313 586 810 | FNMFO |
| Variable Rate Non-Cumulative Preferred Stock, Series P | 313 586 786 | FNMAH |
| 6.75% Non-Cumulative Preferred Stock, Series Q | 313 586 778 | FNMAI |
| 7.625% Non-Cumulative Preferred Stock, Series R | 313 586 760 | FNMAJ |
| Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S | 313 586 752 | FNMAS |
| 8.25% Non-Cumulative Preferred Stock, Series T | 313 586 737 | FNMAT |

31

80.     Likewise, prior to September 6, 2008, Freddie Mac had issued common stock and

several series of Preferred Stock, including:

### FREDDIE MAC STOCK

| Security | CUSIP | Ticker Symbol |
|---|---|---|
| Common Stock | 313 400 301 | FMCC |
| 5.1% Preferred Stock, due 12/31/2049 | 313 400 814 | FREJO |
| 5.3% Non-Cumulative Perpetual Preferred Stock | 313 400 822 | FREJP |
| 5.81% Perpetual Preferred Stock | 313 400 889 | FREGP |
| Variable-Rate Preferred Stock, Series B | 313 400 608 | FMCCI |
| 5% Preferred Stock, Series F | 313 400 863 | FMCKK |
| Variable-Rate Preferred Stock, Series G | 313 400 848 | FMCCG |
| 5.1% Preferred Stock, Series H | 313 400 855 | FMCCH |
| 5.79% Preferred Stock, Series K | 313 400 830 | FMCCK |
| Variable-Rate Preferred Stock, Series L | 313 400 798 | FMCCL |
| Variable-Rate Preferred Stock, Series M | 313 400 780 | FMCCM |
| Variable-Rate Preferred Stock, Series N | 313 400 764 | FMCCN |
| 5.81% Preferred Stock, Series O | 313 400 772 | FMCCO |
| 6% Preferred Stock, Series P | 313 400 749 | FMCCP |
| Variable-Rate, Series Q | 313 400 756 | FMCCJ |
| 5.7% Preferred Stock, Series R | 313 400 731 | FMCKP |
| Variable-Rate, Series S | 313 400 715 | FMCCS |

| | | |
|---|---|---|
| 6.42% Preferred Stock, Series T | 313 400 699 | FMCCT |
| 5.9% Preferred Stock, Series U | 313 400 681 | FMCKO |
| 5.57% Preferred Stock, Series V | 313 400 673 | FMCKM |
| 5.66% Preferred Stock, Series W | 313 400 665 | FMCKN |
| 6.02% Preferred Stock, Series X | 313 400 657 | FMCKL |
| 6.55% Preferred Stock, Series Y | 313 400 640 | FMCKI |
| Fixed-to-Floating Rate Preferred Stock, Series Z | 313 400 624 | FMCKJ |

81.     This Preferred Stock and common stock, which was issued prior to the issuance of the Government Stock, is held by private investors such as pension funds, community banks, insurance companies, and individual investors.   As of March 31, 2013, the Companies' outstanding Preferred Stock had an aggregate liquidation preference of $33 billion.  Each class of Preferred Stock has its own contractual dividend rate and liquidation value.

82.     Prior to September 8, 2008, each series of Fannie Mae Preferred Stock ranked on a parity with all other issued and outstanding series of Fannie Mae Preferred Stock as to the payment of dividends and the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, and each series of Freddie Mac Preferred Stock ranked on a parity with all other issued and outstanding series of Freddie Mac Preferred Stock as to the payment of dividends and the distribution of assets upon dissolution, liquidation, or winding up of Freddie Mac.   In other words, each series of Fannie Mae and Freddie Mac Preferred Stock carried equal contractual rights to with regards to the dividends, and each series of Fannie Mae and Freddie Mac Preferred Stock carried equal liquidation preferences (or their respective pro rata portions thereof) upon dissolution, liquidation, or winding up of Fannie Mae and Freddie Mac.   Prior to September 6,

2008, Fannie Mae and Freddie Mac each regularly declared and paid dividends on each series of their respective Preferred Stock.

83.     Delaware law applies to Fannie Mae pursuant to Section 1.05 of its bylaws, which provides that "the corporation has elected to follow the applicable corporate governance practices and procedures of the Delaware General Corporation Law."  Virginia law applies to Freddie Mac pursuant to Section 11.3 of its bylaws, which provides that, "[T]he Corporation shall follow the corporate governance practices and procedures of the law of the Commonwealth of Virginia[.]"  Under both Delaware and Virginia law, preferred stock designations are deemed as amendments to a corporation's charter and are therefore generally reviewed as contractual in nature.

84.     Thus, the Certificate of Designation for each series of Preferred Stock constitutes a contract with provisions governing the holders' dividend, liquidation rights and amendments to the terms of the Preferred Stock.   These provisions are materially similar to, for example, the Certificate of Designation for Fannie Mae's Series T Preferred Stock, as described below:

**1.     Dividends.**

(a)     Holders of record of Series T Preferred Stock (each individually a "Holder," or collectively the "Holders") ***will be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion out of funds legally available therefore, non-cumulative cash dividends at [specified rate] per annum of the [specified] stated value . . . of Series T Preferred Stock.***

* * *

**4.     Liquidation Rights.**

(a)     Upon any voluntary or involuntary dissolution, liquidation or winding up of Fannie Mae, after payment or provision for the liabilities of Fannie Mae and the expenses of such dissolution, liquidation or winding up, the Holders of outstanding shares of the Series T Preferred Stock ***will be entitled to receive out of the assets of Fannie Mae or proceeds thereof available for distribution to stockholders,*** before any payment or distribution of assets is made to holders of Fannie Mae's common stock (or any other stock of Fannie Mae ranking, as to the

distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, junior to the Series T Preferred Stock), *the amount of [the stated value] per share plus an amount . . . equal to the dividend (whether or not declared) for the then-current quarterly Dividend Period accrued to but excluding the date of such liquidation payment*, but without accumulation of unpaid dividends on the Series T Preferred Stock for prior Dividend Periods.

(b)      If the assets of Fannie Mae available for distribution in such event are insufficient to pay in full the aggregate amount payable to Holders of Series T Preferred Stock and holders of all other classes or series of stock of Fannie Mae, if any, ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, on a parity with the Series T Preferred Stock, the assets will be distributed to the Holders of Series T Preferred Stock and holders of all such other stock pro rata, based on the full respective preferential amounts to which they are entitled (but without, in the case of any non-cumulative preferred stock, accumulation of unpaid dividends for prior Dividend Periods).

* * *

**7.      Voting Rights; Amendments.**

* * *

(b)      Without the consent of the Holders of Series T Preferred Stock, Fannie Mae will have the right to amend, alter, supplement or repeal any terms of this Certificate or the Series T Preferred Stock (1) to cure any ambiguity, or to cure, correct or supplement any provision contained in this Certificate of Designation that may be defective or inconsistent with any other provision herein or (2) to make any other provision with respect to matters or questions arising with respect to the Series T Preferred Stock that is not inconsistent with the provisions of this Certificate of Designation *so long as such action does not materially and adversely affect the interests of the Holders of Series T Preferred Stock*; provided, however, that any increase in the amount of authorized or issued Series T Preferred Stock or the creation and issuance, or an increase in the authorized or issued amount, of any other class or series of stock of Fannie Mae, whether ranking prior to, on a parity with or junior to the Series T Preferred Stock, as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, or otherwise, will not be deemed to materially and adversely affect the interests of the Holders of Series T Preferred Stock.

(c)      *Except as set forth in paragraph (b) of this Section 7, the terms of this Certificate or the Series T Preferred Stock may be amended, altered, supplemented, or repealed only with the consent of the Holders of at least two-thirds of the shares of Series T Preferred Stock then outstanding,* given in person or by proxy, either in writing or at a meeting of stockholders at which the Holders of Series T Preferred Stock shall vote separately as a class. On matters

requiring their consent, Holders of Series T Preferred Stock will be entitled to one vote per share.[1]

85.     The Certificate of Designation for the common stock issued by Freddie Mac also constitutes a contract with provisions governing the holders' dividend, liquidation rights and amendments to the terms of the common stock.  These provisions provide, in pertinent part:

**2.      Dividends.**

(a) The holders of outstanding shares of Common Stock shall be entitled to receive, ratably, dividends (in cash, stock or other property), when, as and if declared by the Board of Directors out of assets legally available therefor.  The amount of dividends, if any, to be paid to holders of the outstanding Common Stock from time to time and the dates of payment shall be fixed by the Board of Directors of Freddie Mac (the "Board of Directors"). Each such dividend shall be paid to the holders of record of outstanding shares of the Common Stock as they appear in the books and records of Freddie Mac on such record date, not to be earlier than 45 days nor later than 10 days preceding the applicable dividend payment date, as shall be fixed in advance by the Board of Directors.

* * *

**8.      Liquidation Rights.**

(a) Upon the dissolution, liquidation or winding up of Freddie Mac, after payment of or provision for the liabilities of Freddie Mac and the expenses of such dissolution, liquidation or winding up, and after any payment or distribution shall have been made on any other class or series of stock of Freddie Mac ranking prior to the Common Stock upon liquidation, the holders of the outstanding shares of the Common Stock shall be entitled to receive out of the assets of Freddie Mac available for distribution to stockholders, before any payment or distribution shall be made on any other class or series of stock of Freddie Mac ranking junior to the Common Stock upon liquidation, the amount of $0.21 per share, plus a sum equal to all dividends declared but unpaid on such shares to the date of final distribution. The holders of the outstanding shares of any class or series of stock of Freddie Mac ranking prior to, on a parity with or junior to the Common Stock upon liquidation shall also receive out of such assets payment of any corresponding preferential amount to which the holders of such stock may. by the terms thereof, be entitled.   Thereafter, subject to the foregoing and to the provisions of paragraph (b) of this Section 8, the balance of any assets of Freddie Mac available for distribution to stockholders upon such dissolution, liquidation

---

[1] All emphasis added unless otherwise noted.

or winding up shall be distributed to the holders of outstanding Common Stock in the aggregate.

(b) Notwithstanding the foregoing, upon the dissolution, liquidation or winding up of Freddie Mac, the holders of shares of the Common Stock then outstanding shall not be entitled to be paid any amounts to which such holders are entitled pursuant to paragraph (a) of this Section 8 unless and until the holders of any classes or series of stock of Freddie Mac ranking prior upon liquidation to the Common Stock have been paid all amounts to which such classes or series of stock are entitled pursuant to their respective terms.

* * *

**10.     Miscellaneous.**

* * *

 (h)(ii) The affirmative vote by the holders of shares representing at least 66 2/3% of all of the shares of the Common Stock at the time outstanding and entitled to vote, voting together as a class, shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal of any of the provisions of this Certificate if such amendment, alteration, supplementation or repeal would materially and adversely affect the powers, preferences, rights, privileges, qualifications, limitations, restrictions, terms or conditions of the Common Stock.

86.     Thus, the Classes had a right to exclude the Companies from destroying their dividend, liquidation and voting rights, as the Companies were contractually barred from amending the terms of the Preferred Stock or Freddie Mac common stock held by the Classes in a manner that had a material and adverse impact on stockholders, unless they first received the permission of two-thirds of the affected holders.  The Companies neither sought nor obtained such permission before entering into the Third Amendment.  There can be no doubt that the Third Amendment made "materially adverse" changes to rights of the holders of Preferred Stock and Freddie Mac common stock, such that it violated the Classes' contractual rights.  The only exception to this requirement was if Fannie Mae or Freddie Mac issued a new class or series of stock.  In executing the Third Amendment, FHFA, Fannie Mae, and Freddie Mac have not purported to issue a new series of stock, and therefore the contractual provision against

amending the terms of the Preferred Stock and Freddie Mac common stock in a way that is materially adverse to stockholders has been violated. Indeed, if the Third Amendment in fact constituted the issuance of a new series of stock to the Treasury, then the Third Amendment was illegal, because the statutory authority allowing the Treasury to acquire new series of stock in Fannie Mae and Freddie Mac expired at the end of 2009. 12 U.S.C. §§ 1455(l)(4), 1719(g)(4).

87. Through the Third Amendment, Fannie Mae and Freddie Mac and their Conservator FHFA eliminated the Preferred Stockholders' and Freddie Mac common stockholders' contractual rights to receive dividends before the Government could receive any dividends in excess of its 10% cumulative dividend on the Government Stock, and to receive a pro rata distribution of any liquidation proceeds available after the Government received full recovery of the face amount of the Government Stock. Thus, the Third Amendment amended, altered, and repealed the terms of the Certificates of Designation, *e.g.,* the contractual terms governing the holders' rights to receive dividends and liquidation distributions, in a manner that materially and adversely affected – indeed, completely destroyed – the rights and interests of the holders of the Preferred Stock and Freddie Mac common stock.

88. In further breach of the terms of the Certificates of Designation, Fannie Mae and Freddie Mac and their Conservator FHFA did not seek or obtain the consent of two-thirds of the stockholders as required by the terms of the Certificates before amending, altering, and repealing the terms of the Certificates in a manner that materially and adversely affected the rights and interests of the holders of the Preferred Stock and Freddie Mac common stock.

89. Fannie Mae's and Freddie Mac's agreement to the Third Amendment did not purport to create and issue any other class or series of Fannie Mae or Freddie Mac stock, nor did it purport to be an increase in the authorized or issued amount of any other class or series of

Fannie Mae or Freddie Mac stock.  Rather, the Third Amendment to which the Companies agreed in August 2012 was described simply as an amendment to the terms of the Government Stock that Fannie Mae and Freddie Mac had issued in September 2008.  Accordingly, the amendment, alteration, and repeal of the terms of the Certificates via their agreement to the Third Amendment was not exempt from the two-thirds vote requirement set forth in the Certificates.

90.     In addition to their explicit terms, inherent in the Certificates was an implied covenant by Fannie Mae and Freddie Mac to deal fairly with the holders of Preferred Stock and Freddie Mac common stock and to fulfill the issuers' contractual obligations in good faith, *e.g.*, an implied promise that Fannie Mae and Freddie Mac would not take actions that would make it impossible for the holders of the Preferred Stock and Freddie Mac common stock to realize any value from their dividend and liquidation rights.

91.     Fannie Mae and Freddie Mac and their Conservator FHFA acted unfairly and in bad faith with respect to the holders of the Preferred Stock and Freddie Mac common stock and breached their implied covenant of good faith and fair dealing by agreeing to the Third Amendment, the purpose and effect of which was to make it impossible for the holders of the Preferred Stock and Freddie Mac common stock to realize any value from their dividend and liquidation rights, and thus to deny the holders of the Preferred Stock and Freddie Mac common stock the fruits of their agreements with Fannie Mae and Freddie Mac.

## VI.   THE THIRD AMENDMENT WAS INCONSISTENT AND IN CONFLICT WITH FHFA'S STATUTORY RESPONSIBILITIES AS A CONSERVATOR

92.     The Third Amendment is wholly inconsistent with, and in manifest conflict with, FHFA's statutory responsibilities as Conservator of Fannie Mae and Freddie Mac. As Conservator, FHFA is obligated to "take such action as may be – (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of

the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D). As FHFA itself has acknowledged, the agency "has a statutory charge to work to restore a regulated entity in conservatorship to a sound and solvent condition . . . ." Conservatorship and Receivership, 76 Fed. Reg. 35,727 (June 20, 2011). Accordingly, "allowing capital distributions to deplete the entity's conservatorship assets would be inconsistent with the agency's statutory goals, as they would result in removing capital at a time when the Conservator is charged with rehabilitating the regulated entity." *Id*. The Third Amendment's quarterly sweep of all net profits thus clearly harms, rather than promotes, the soundness and solvency of the Companies by effectively preventing them from rebuilding their capital. Nor can distributing the entire net worth of the Companies to Treasury be reconciled with FHFA's statutory obligation to preserve and conserve their assets and property. Indeed, Fannie Mae has identified the dividend obligations imposed by the Third Amendment as posing a "specific risk to [its] business" by prohibiting it from "build[ing] capital reserves." Fannie Mae, Universal Debt Facility, Offering Circular, at 11 (May 14, 2013).

93. Furthermore, on information and belief, FHFA agreed to the Third Amendment at the insistence and under the direction and supervision of Treasury. Treasury, however, lacks the authority to impose such direction and supervision, and FHFA lacks the authority to submit to it. Indeed, HERA expressly provides that "[w]hen acting as conservator, . . . [FHFA] shall not be subject to the direction or supervision of any other agency of the United States . . . ." 12 U.S.C. § 4617(a)(7).

94. Statements by both FHFA and Treasury provide further confirmation that the Third Amendment is inconsistent with FHFA's statutory powers and responsibilities as Conservator. Treasury, for example, stated the Third Amendment would "expedite the wind

down of Fannie Mae and Freddie Mac," and it emphasized that the "quarterly sweep of every dollar of profit that each firm earns going forward" would make "sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers."  Press Release, U.S. Dep't of Treasury, *Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac* (Aug. 17, 2012).  Indeed, Treasury emphasized that the Third Amendment would ensure that the Companies "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." *Id.*

95.     Likewise, FHFA Acting Director DeMarco stated that the Third Amendment reflected the agency's goal of "gradually contracting [the Companies'] operations." Edward J. DeMarco, Acting Director, FHFA, *Statement on Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements*.  DeMarco later informed a Senate Committee that the "recent changes to the [Purchase Agreements], replacing the 10 percent dividend with a net worth sweep, reinforce the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status."  Edward J. DeMarco, Acting Director, FHFA, Statement Before the U.S. Senate Comm. on Banking, Housing and Urban Affairs, at 3 (Apr. 18, 2013).  Likewise, in its 2012 report to Congress, FHFA explained that it had begun "prioritizing [its] actions to move the housing industry to a new state, one without Fannie Mae and Freddie Mac."  FHFA, Report to Congress 2012, at 13 (June 13, 2013).  Thus, according to FHFA, the Third Amendment "ensures all the [Companies'] earnings are used to benefit taxpayers" and "reinforces the fact that the [Companies] will not be building capital." *Id*. at 1, 13.

96.     The incredibly negative impact of the Third Amendment on the Companies' balance sheets is demonstrated by Fannie Mae's results in the first quarter of this year.  As explained above, at the end of the first quarter, Fannie Mae's net worth stood at $62.4 billion.

Under previous versions of the PSPAs, Fannie Mae would have been obligated to pay Treasury only $2.9 billion, and the balance – $59.5 billion – would have been credited to capital reserves. The Third Amendment, however, required Fannie Mae to pay Treasury $59.4 billion. This windfall was not unanticipated. Indeed, FHFA's Office of the Inspector General recognized that, as a result of the Third Amendment, reversal of the Companies' deferred tax valuation allowances could result in "an extraordinary payment to Treasury." FHFA Office of Inspector General, Analysis of the 2012 Amendments to the Government Stock Purchase Agreements, at 15 (Mar. 20, 2013).

97.     FHFA has announced that, during the conservatorship, existing statutory and FHFA-directed regulatory capital requirements will not be binding on the Companies. And at the end of 2012, Fannie Mae had a deficit of core capital in relation to statutory minimum capital of $141.2 billion. This deficit decreased to $88.3 billion by the end of the first quarter of 2013. When adjusted for the $59.4 billion dividend payment to Treasury, however, Fannie Mae's core capital deficit jumped back up to $147.7 billion. Thus, because of the Third Amendment, Fannie Mae is now in a worse position with respect to its core capital than it was before the record profitability it achieved in the first quarter of this year.

98.     Additionally, the dividend under the Government Stock must be paid to Treasury in cash, even though the net worth of the Companies may include non-cash assets, such as the deferred tax assets. As a result, the Companies have had to sell non-liquid assets or issue debt to pay the dividend, which has had the foreseeable effect of preventing them from maximizing the value of their assets. Borrowing money to pay a dividend on a paper profit is directly contrary to operating the Companies in a safe and sound manner and restoring them to financial health, as FHFA is statutorily required to do when it is acting as a conservator.

99.   Further, the Companies can never accumulate capital under the Third Amendment and can never redeem the Government Stock: so long as the Companies remain in operation, all of their net worth will be transferred to Treasury but the outstanding balance of the Government Stock will remain $189 billion.  Under the Third Amendment, none of the Companies' assets can be used to provide value to holders of their Preferred Stock or common stock.

100.   Accordingly, the Third Amendment is wholly inconsistent with, and presents a manifest conflict of interest with FHFA's statutorily prescribed powers, functions and responsibilities as Conservator to the Companies.

101.   Indeed, several related individual actions have been commenced against Defendants by holders of Fannie Mae and Freddie Mac preferred and common stock asserting FHFA and Treasury acted beyond their statutory powers and functions in adopting the Third Amendment.   These related actions, which are being coordinated and will be adjudicated concurrently with these consolidated actions, assert that (i) neither Treasury nor FHFA had authority to enter into the Third Amendment; and (ii) the Third Amendment was unlawful and should be set aside because the Treasury and FHFA acted arbitrarily and capriciously in entering into the Third Amendment.   For example, the related actions allege that FHFA is without authority to wind down the Companies pursuant to the Net Worth Sweep, as well as that the Third Amendment created new securities, and Treasury's purchase of those securities violated that clearly demarcated limit on its authority.   Moreover, the related actions allege that there is no public record or evidence that: (1) Treasury made the determinations or considered the factors that HERA requires before it executed the Third Amendment; (2) Treasury considered alternatives to the Third Amendment that would have been both consistent with its statutory obligations and less harmful to holders of the Companies' Preferred Stock and common stock,

including refinancing the Government Stock or allowing the Companies to resume paying dividends to holders of their Preferred Stock and common stock; (3) FHFA considered whether the Third Amendment is compatible with its statutory obligations as the Companies' Conservator; (4) FHFA considered alternatives to the Third Amendment that would have been both consistent with its statutory obligations and less harmful to holders of the Companies' Preferred Stock and common stock, including refinancing the Government Stock or allowing the Companies to resume paying dividends to holders of their Preferred Stock and common stock; and (5) that either Treasury or FHFA  considered whether the Third Amendment is consistent with their duties to holders of the Companies' Preferred Stock and common stock.

## VII.   BY ENTERING INTO THE THIRD AMENDMENT, FHFA AND TREASURY VIOLATED THEIR FIDUCIARY OBLIGATIONS TO FANNIE MAE AND ITS PRIVATE SHAREHOLDERS

102.   Delaware law applies to Fannie Mae pursuant to Section 1.05 of its bylaws. Under Delaware law, officers and directors of a corporation owe that corporation and its shareholders fiduciary obligations of due care, good faith, loyalty, and candor, and are required to use their utmost ability to control and manage the corporation in a fair, just, honest, and equitable manner.

103.   By reason of its purported conservatorship of Fannie Mae and because of its ability to control the business and corporate affairs of Fannie Mae, FHFA is a *de facto* officer or director of Fannie Mae, and therefore owed the Companies and their shareholders fiduciary obligations of due care, good faith, loyalty, and candor, and was and is required to use its utmost ability to control and manage Fannie Mae and Freddie Mac in a fair, just, honest, and equitable manner.

104.   As disclosed in Fannie Mae's 2012 Form 10-K filing, "Upon its appointment, the conservator [FHFA] immediately succeeded to all rights, titles, powers and privileges of Fannie

44

Mae, and of any shareholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and succeeded to the title to the books, records and assets of any other legal custodian of Fannie Mae.  As a result, our Board of Directors no longer had the power or duty to manage, direct or oversee our business and affairs."  Fannie Mae's current directors "serve on behalf of the conservator and exercise their authority as directed by and with the approval, where required, of the conservator.  FHFA has instructed Fannie Mae's directors to consult with it and obtain its written approval before taking action in a wide variety of areas, including but not limited to:

(a)  Engaging in redemptions or repurchases of subordinated debt;

(b)  Matters that relate to the Conservator's powers, Fannie Mae's conservatorship status, or the legal effect of the conservatorship on contracts;

(c)  Agreements relating to litigation, claims, regulatory proceedings, or tax-related matters where the value of the claim exceeds a specified threshold;

(d)  Actions that are likely to cause significant reputational risk;

(e)  Establishing the annual operating budget; and

(f)  Matters requiring the approval of or consultation with Treasury under the PSPAs.

105.  While Fannie Mae's officers are under FHFA's control, in a February 2, 2010 letter to Congress, the Director of FHFA confirmed that "Like other corporate executives, the Enterprises' executive officers are subject to the legal responsibility to use sound and prudent business judgment in their stewardship of their companies," and that FHFA had charged the Companies' boards with "ensuring normal corporate governance practices and procedures are in place."  FHFA was and is required to act in furtherance of the best interests of the Companies and their shareholders so as to benefit all shareholders equally and not in furtherance of the

personal interest or benefit of FHFA, Treasury, or the federal government.  Because of its position of control and authority as the purported conservator of Fannie Mae and Freddie Mac, FHFA was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

106.    Additionally, under Delaware law, a dominant or controlling shareholder owes fiduciary duties to the corporation and its minority shareholders, so long as that shareholder exercises actual control of corporate conduct.  *Kahn v. Lynch Communication Systems, Inc.*, 638 A.2d 1110 (Del. 1994).

107.    Treasury exercises *de facto* control over Fannie Mae, including through its Senior Preferred Stock, and warrants to purchase the Companies' common stock, as well as its control of the provision of funds to Fannie Mae.  As controlling stockholder of Fannie Mae, Treasury owed fiduciary duties of due care, good faith, loyalty, and candor, to Fannie Mae and its stockholders.  Because of Treasury's *de facto* position of control and authority over Fannie Mae, it stood on both sides of the decision to engage in the Third Amendment and it was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

108.    The Third Amendment offered no benefits whatsoever to Fannie Mae or its minority shareholders.  Rather, it was an egregiously self-dealing transaction, the benefits of which flowed entirely to the Treasury as Fannie Mae's controlling shareholder, and indirectly to FHFA through its status an agency of the federal government.

109.    The Third Amendment was in no way an exercise of valid business judgment or deemed to be in the best interests of Fannie Mae.  Indeed, it was specifically intended to ensure that Fannie Mae's shareholders could never again recover any value from their investments, and to ensure that the Company could not function as a private enterprise and would have to be

46

wound down.  By preventing Fannie Mae from rebuilding capital or returning to the market, as Treasury stated in its press release, the purpose and effects of the Third Amendment ran directly contrary to FHFA's purported statutory mission to "put the regulated entity in a sound and solvent condition," "carry on the business of the regulated entity," and "preserve and conserve the assets and property of the regulated entity."  12 U.S.C. § 4617(b)(2)(D).  As such, the Third Amendment was inconsistent and in manifest conflict with  FHFA's statutory functions and responsibilities as Conservator to the Companies.

## VIII.   BY ENTERING INTO THE THIRD AMENDMENT, FHFA AND TREASURY TOOK THE VESTED PROPERTY RIGHTS OF PLAINTIFFS AND THE TAKINGS CLASS WITHOUT JUST COMPENSATION

110.    In addition to violating the contractual rights of the Companies' shareholders, the Third Amendment also violated the Fifth Amendment by expropriating their interest in the Companies without just compensation.  The Government cannot evade the requirements of the Fifth Amendment by imposing a conservatorship – indeed, FHFA as the Companies' Conservator was legally bound to protect the interests of all the shareholders of the Companies under its stewardship, not just the interests of its fellow Government agency.

111.    The Government's unilateral imposition of the Third Amendment pursuant to FHFA's authority as Conservator of Fannie Mae and Freddie Mac cannot be characterized as "conserving" the Companies' assets or property.  On the contrary, as Treasury announced, the Third Amendment's purpose was to advance the Government's public policy goals of "benefit[ing] taxpayers," "[s]upporting the continued flow of mortgage credit," and "winding down Fannie Mae and Freddie Mac" in a manner that ensured Fannie Mae and Freddie Mac would never "retain profits, rebuild capital, and return to the market in their prior form." *See* Press Release, U.S. Dep't of Treasury, *Treasury Department Announces Further Steps to Expedite Down of Fannie Mae and Freddie Mac* (Aug. 17, 2012).

47

112.    Plaintiffs' ownership of Preferred Stock and common stock carries certain contractual and property rights, including, but not limited to, the right to receive a share of the Companies' future profits, in the form of dividend payments, and the right to receive a liquidation preference in accord with the liquidation schedule set forth in the Certificates of Designation or otherwise provided by the Companies' charter documents and applicable laws.

113.    As holders of Preferred Stock and common stock, Plaintiffs and the Takings Class had a reasonable investment-backed expectation that their contractual rights as stockholders would be preserved, including their liquidation preferences and their rights to dividends.  These contractual rights were important features of the Preferred Stock and common stock.

114.    Plaintiffs' property interest in their Preferred Stock and common stock, including the dividend and liquidation rights inherent in such stock ownership, are constitutionally cognizable property rights protected by the Fifth Amendment.

115.    The Government's imposition of the Third Amendment deprived Plaintiffs of their vested property rights by, among other things, expropriating for the Government the entire Preferred Stock and common stock holders' equity in the Companies, and by making it impossible for Plaintiffs and the Takings Class to realize any value from their contractual right to share in the Companies' future profits or from their liquidation preference.

116.    In short, the Third Amendment is designed to raise general revenue for the Government at the expense of the holders of the Preferred Stock and common stock, and thereby imposes on holders of Preferred Stock and common stock a disproportionate burden that should be shared by the entire population.

## CLASS ACTION ALLEGATIONS

117.    With respect to Counts I and IV hereof, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on

behalf of a Class consisting of all persons and entities who held shares of Fannie Mae Preferred Stock and who were damaged thereby (the "Fannie Preferred Class"). Excluded from the Fannie Preferred Class are the Defendants.

118.   With respect to Counts II and V hereof, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of a Class consisting of all persons and entities who held shares of Freddie Mac Preferred Stock and who were damaged thereby (the "Freddie Preferred Class"). Excluded from the Freddie Preferred Class are the Defendants.

119.   With respect to Counts III and VI hereof, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of a Class consisting of all persons and entities who held shares of Freddie Mac common stock and who were damaged thereby (the "Freddie Common Class"). Excluded from the Freddie Common Class are the Defendants.

120.   With respect to Count VIII hereof, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of a Class consisting of all persons and entities who held shares of Fannie Mae Preferred Stock, Fannie Mae common stock, Freddie Mac Preferred Stock, and/or Freddie Mac common stock as of the Third Amendment and who suffered less than $10,000 damages thereby, measured individually and not in the aggregate (the "Takings Class"). Excluded from the Class are the Defendants.

121.   The Fannie Preferred Class, Freddie Preferred Class, Freddie Common Class, and Takings Class are referred to herein as the "Classes."

122.    The members of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Classes.  As of August 17, 2012, and the date of the filing of this action, there were hundreds of millions of shares of Fannie Mae and Freddie Mac Preferred Stock and common stock outstanding.   As of February 28, 2013, there were 1,158,077,970 shares of Fannie Mae common stock outstanding, and as of December 31, 2012, there were 556 million shares of Fannie Mae Preferred Stock outstanding.  As of February 15, 2013, there were 650,038,674 shares of Freddie Mac common stock outstanding, and as of December 31, 2012, there were 464,170,000 shares of Freddie Mac Preferred Stock outstanding. Record owners and other members of the Classes may be identified from records maintained by Fannie Mae and Freddie Mac and/or their transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

123.    Plaintiffs' claims are typical of the claims of the other members of the Classes as all members of the Classes purchased or otherwise acquired Fannie Mae or Freddie Mac stock during the class period, and were similarly affected by Defendants' wrongful conduct that is complained of herein.

124.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes, and have retained counsel competent and experienced in class action, derivative, securities, and constitutional litigation.   Plaintiffs have no interests that are adverse or antagonistic to the Classes.

125.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Classes may be relatively small, and because the damages suffered by individual members of the Takings Class are relatively small by definition, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

126.   Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Classes are:

    a)   Whether one or more Defendants breached the terms of the Certificates for the Preferred Stock and common stock and/or the implied covenant of good faith and fair dealing inherent in those Certificates;

    b)   Whether Treasury breached its fiduciary duties to Fannie Mae and its shareholders;

    c)   Whether Treasury's and FHFA's conduct in entering into the Third Amendment violated the Takings Clause of the U.S. Constitution; and

    d)   Whether the members of the Classes are entitled to injunctive relief, including rescission, and/or one or more Defendants are liable for damages to the members of the Classes, and the proper measure thereof, for breaches of contract, the implied covenant of good faith and fair dealing, and/or breach of fiduciary duty.

127.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

128.    Defendants have acted on grounds generally applicable to the Classes with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Classes as a whole.

## DEMAND IS EXCUSED DUE TO THE
## FHFA'S MANIFEST CONFLICT OF INTEREST

129.    With respect to Count VII hereof, Plaintiffs bring action derivatively on behalf of and for the benefit of Fannie Mae to redress injuries suffered by Fannie Mae as a direct and proximate result of the breaches of fiduciary duty alleged herein.  For purposes of Count VII, Fannie Mae is named as a nominal defendant in a derivative capacity.

130.    Plaintiffs are holders of Fannie Mae Preferred Stock and common stock, and were holders such securities prior to September 6, 2008, including prior to and on August 17, 2012, and have been holders of said securities continuously since then.  Plaintiffs have retained counsel that is competent and experienced in class action, derivative and securities litigation.

131.    Plaintiffs intend to retain their shares of Preferred Stock and common stock throughout the duration of this litigation.

132.    The breaches of fiduciary duty complained of herein subject, and will persist in subjecting, Fannie Mae to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

133.    To the extent any demand requirement with respect to Fannie Mae's Board of Directors would otherwise be applicable in this context, such demand is excused and Plaintiffs are entitled to pursue the derivative claim alleged herein as a result of FHFA's domination of the Board.  Fannie Mae's 2012 Form 10-K discloses that "[o]ur directors do not have any fiduciary duties to any person or entity except to the conservator and, accordingly, are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders

of Fannie Mae MBS unless specifically directed to do so by the conservator."  Fannie Mae's Board of Directors is prohibited from taking action on "matters that relate to the conservator's powers" or "the legal effect of the conservatorship on contracts," such as this litigation, without prior written approval of FHFA.

134.    To the extent any demand requirement with respect to FHFA would otherwise be applicable in this context, such demand is excused and Plaintiffs are entitled to pursue the derivative claim alleged herein as a result of FHFA's manifest conflict of interest.

135.    Treasury exercises *de facto* control over Fannie Mae, including through its Senior Preferred Stock and warrants to purchase Fannie Mae common stock, as well as its control of the provision of funds to Fannie Mae.  The Secretary of the Treasury also sits on FHFA Oversight Board.  With such *de facto* power over the Companies' strategies and operations, the Treasury is in a position to, and does, direct FHFA with respect to determinations affecting the Companies and their stockholders.

136.    FHFA is interested in and benefits from the Third Amendment as an agency of the federal government, and cannot reasonably be expected to initiate litigation for the breaches of fiduciary duty alleged herein, which would be asserted against itself and the Treasury, Fannie Mae's controlling stockholder.  Indeed, Treasury and FHFA face a substantial threat of liability with respect to the breach of fiduciary duty claim.

137.    Notwithstanding its fiduciary duties to Fannie Mae and its stockholders, FHFA has expressly acknowledged that it does not act with the interests of Fannie Mae shareholders in mind.  Indeed, Fannie Mae's 2008 Form 10-K filing frankly disclosed that, since the imposition of the conservatorship, the company was "[n]o longer managed with a strategy to maximize common shareholder returns."

138.    Accordingly, FHFA has a manifest conflict of interest that makes it incapable of pursing the derivative claim for breach of fiduciary duty alleged herein.  Given Treasury's *de facto* controlling stockholder status and FHFA's close relationship to Treasury in connection with Fannie Mae matters, a derivative action offers the only reasonable avenue for the pursuit of the breach of fiduciary duty claim.

## CAUSES OF ACTION

### COUNT I

**BREACH OF CONTRACT – FANNIE MAE PREFERRED STOCK**
**(Against Fannie Mae and FHFA)**

139.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

140.    The Certificates for the Fannie Mae Preferred Stock were and are, for all purposes relevant hereto, contracts between the members of the Fannie Preferred Class and Fannie Mae.

141.    The Certificates for the Fannie Mae Preferred Stock provide for contractually-specified dividend rights and liquidation preferences for the holders of Preferred Stock.

142.    As Fannie Mae's Conservator, FHFA also became obligated to act consistently with Fannie Mae and Freddie Mac's responsibilities under the Certificates.

143.    By entering into the Third Amendment so as to effectively deprive Plaintiffs and the other members of the Fannie Preferred Class of any possibility of receiving dividends or a liquidation preference, Fannie Mae, acting through FHFA, breached the terms of the Certificates for the Fannie Mae Preferred Stock.  The Third Amendment amends, alters, supplements or repeals the contractually-specified dividend rights and liquidation preferences of the holders of Fannie Mae Preferred Stock in a manner that materially affects the interests of the holders of Fannie Mae Preferred Stock without the required consent.

144.     Plaintiffs and the other members of the Fannie Preferred Class suffered damages as a direct and proximate result of the forgoing breach of contact.

## COUNT II

### BREACH OF CONTRACT – FREDDIE MAC PREFERRED STOCK
### (Against Freddie Mac and FHFA)

145.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

146.     The Certificates for the Freddie Mac Preferred Stock were and are, for all purposes relevant hereto, contracts between the members of the Freddie Preferred Class and Freddie Mac.

147.     The Certificates for the Freddie Mac Preferred Stock provide for contractually-specified dividend rights and liquidation preferences for the holders of Freddie Mac Preferred Stock.

148.     As Freddie Mac's Conservator, FHFA also became obligated to act consistently with Freddie Mac's responsibilities under the Certificates.

149.     By entering into the Third Amendment so as to effectively deprive Plaintiffs and the other members of the Freddie Preferred Class of any possibility of receiving dividends or a liquidation preference, the Companies, acting through FHFA, breached the terms of the Certificates for the Freddie Mac Preferred Stock.   The Third Amendment amends, alters, supplements or repeals the contractually-specified dividend rights and liquidation preferences of the holders of Freddie Mac Preferred Stock in a manner that materially affects the interests of the holders of Freddie Mac Preferred Stock without the required consent.

150.     Plaintiffs and the other members of the Freddie Preferred Class suffered damages as a direct and proximate result of the forgoing breach of contact.

## COUNT III

**BREACH OF CONTRACT – FREDDIE MAC COMMON STOCK**
**(Against Freddie Mac and FHFA)**

151.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

152.     The Certificate for the Freddie Mac common stock was and is, for all purposes relevant hereto, a contract between the members of the Freddie Common Class and Freddie Mac.

153.     The Certificate for the Freddie Mac common stock provides for contractually-specified dividend rights and liquidation preferences for the holders of Freddie Mac common stock.

154.     As Freddie Mac's Conservator, FHFA also became obligated to act consistently with Freddie Mac's responsibilities under the Certificate.

155.     By entering into the Third Amendment so as to effectively deprive Plaintiffs and the other members of the Freddie Common Class of any possibility of receiving dividends or a liquidation preference, Freddie Mac, acting through FHFA, breached the terms of the Certificate for the Freddie Mac common stock.  The Third Amendment amends, alters, supplements or repeals the contractually-specified dividend rights and liquidation preferences of the holders of Freddie Mac common stock in a manner that materially affects the interests of the holders of Freddie Mac common stock without the required consent.

156.     Plaintiffs and the other members of the Freddie Common Class suffered damages as a direct and proximate result of the forgoing breach of contact.

## COUNT IV

**BREACH OF THE IMPLIED COVENANT
OF GOOD FAITH AND FAIR DEALING**

**FANNIE MAE PREFERRED STOCK
(Against Fannie Mae and FHFA)**

157.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

158.     The Certificates for Fannie Mae Preferred Stock were and are, for all purposes relevant hereto, contracts between the members of the Fannie Preferred Class and Fannie Mae.

159.     Inherent in these contracts was, and is, an implied covenant of good faith and fair dealing, requiring Fannie Mae to deal fairly with Plaintiffs and the other members of the Fannie Preferred Class, to fulfill their obligations to Plaintiffs and the Fannie Preferred Class in good faith, and not to deprive Plaintiffs and the Fannie Preferred Class of the fruits of their bargain.

160.     As Fannie Mae's Conservator, FHFA also became obligated to act consistently with Fannie Mae's responsibilities under the implied covenant of good faith and fair dealing.

161.     By entering into the Third Amendment with the purpose of effectively depriving Plaintiffs and the other members of the Fannie Preferred Class of any possibility of receiving dividends or a liquidation preference, Fannie Mae, acting through FHFA, breached the implied covenant of good faith and fair dealing inherent in the Certificates for the Preferred Stock. Through the implied covenant of good faith and fair dealing, Fannie Mae, acting through FHFA, was obligated not to eliminate the rights and interests of the Fannie Preferred Class in receiving dividends or a liquidation preference.  In effectively eliminating such rights and interests entirely through the Third Amendment, Fannie Mae, acting through FHFA, acted arbitrarily and unreasonably and not in good faith or with fair dealing toward the members of the Fannie Preferred Class.

162.    Plaintiffs and the other members of the Fannie Preferred Class suffered damages as a direct and proximate result of the forgoing breach of the implied covenant of good faith and fair dealing.

## COUNT V

## BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

### FREDDIE MAC PREFERRED STOCK
### (Against Freddie Mac and FHFA)

163.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

164.    The Certificates for Freddie Mac Preferred Stock were and are, for all purposes relevant hereto, contracts between the members of the Freddie Preferred Class and Freddie Mac.

165.    Inherent in these contracts was, and is, an implied covenant of good faith and fair dealing, requiring Freddie Mac to deal fairly with Plaintiffs and the other members of the Freddie Preferred Class, to fulfill their obligations to Plaintiffs and the Freddie Preferred Class in good faith, and not to deprive Plaintiffs and the Freddie Preferred Class of the fruits of their bargain.

166.    As Freddie Mac's Conservator, FHFA also became obligated to act consistently with Freddie Mac's responsibilities under the implied covenant of good faith and fair dealing.

167.    By entering into the Third Amendment with the purpose of effectively depriving Plaintiffs and the other members of the Freddie Preferred Class of any possibility of receiving dividends or a liquidation preference, Freddie Mac, acting through FHFA, breached the implied covenant of good faith and fair dealing inherent in the Certificates for the Freddie Mac Preferred Stock.  Through the implied covenant of good faith and fair dealing, Freddie Mac, acting through FHFA, was obligated not to eliminate the rights and interests of the Freddie Preferred Class in receiving dividends or a liquidation preference.  In effectively eliminating such rights and

58

interests entirely through the Third Amendment, Freddie Mac, acting through FHFA, acted arbitrarily and unreasonably and not in good faith or with fair dealing toward the members of the Freddie Preferred Class.

168.    Plaintiffs and the other members of the Freddie Preferred Class suffered damages as a direct and proximate result of the forgoing breach of the implied covenant of good faith and fair dealing.

**COUNT VI**

**BREACH OF THE IMPLIED COVENANT
OF GOOD FAITH AND FAIR DEALING**

**FREDDIE MAC COMMON STOCK
(Against Freddie Mac and FHFA)**

169.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

170.    The Certificate for Freddie Mac common stock was and is, for all purposes relevant hereto, a contract between the members of the Freddie Common Class and Freddie Mac.

171.    Inherent in this contract was, and is, an implied covenant of good faith and fair dealing, requiring Freddie Mac to deal fairly with Plaintiffs and the other members of the Freddie Common Class, to fulfill their obligations to Plaintiffs and the Freddie Common Class in good faith, and not to deprive Plaintiffs and the Freddie Common Class of the fruits of their bargain.

172.    As Freddie Mac's Conservator, FHFA also became obligated to act consistently with Freddie Mac's responsibilities under the implied covenant of good faith and fair dealing.

173.    By entering into the Third Amendment with the purpose of effectively depriving Plaintiffs and the other members of the Freddie Common Class of any possibility of receiving dividends or a liquidation preference, Freddie Mac, acting through FHFA, breached the implied covenant of good faith and fair dealing inherent in the Certificate for the Freddie Mac common

stock.  Through the implied covenant of good faith and fair dealing, Freddie Mac, acting through FHFA, was obligated not to eliminate the rights and interests of the Freddie Common Class in receiving dividends or a liquidation preference.  In effectively eliminating such rights and interests entirely through the Third Amendment, Freddie Mac, acting through FHFA, acted arbitrarily and unreasonably and not in good faith or with fair dealing toward the members of the Freddie Common Class.

174.    Plaintiffs and the other members of the Freddie Common Class suffered damages as a direct and proximate result of the forgoing breach of the implied covenant of good faith and fair dealing.

## COUNT VII

### BREACH OF FIDUCIARY DUTY

### FANNIE MAE
### (Against Treasury and FHFA)

175.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

176.    By imposing a conservatorship over Fannie Mae, through which FHFA assumed the powers of its officers and directors, FHFA assumed fiduciary duties of due care, good faith, loyalty, and candor, to Fannie Mae and its stockholders, including Plaintiffs and the other members of the Fannie Preferred Class, and was and is required to use its utmost ability to control and manage Fannie Mae in a fair, just, honest, and equitable manner.  FHFA was and is required to act in furtherance of the best interests of Fannie Mae and its shareholders so as to benefit all shareholders equally and not in furtherance of the personal interest or benefit of FHFA, Treasury, or the federal government.

177.    Treasury exercises *de facto* control over Fannie Mae, including through its Senior Preferred Stock and warrants to purchase Fannie Mae common stock, as well as its control of the provision of funds to Fannie Mae.  As controlling stockholder of Fannie Mae, Treasury owed fiduciary duties of due care, good faith, loyalty, and candor, to Fannie Mae and its other stockholders.

178.    The Third Amendment constituted a self-dealing transaction.  Treasury, as controlling stockholder of Fannie Mae, stood on both sides of the decision to implement the Third Amendment, to the benefit of Treasury and the detriment of Fannie Mae and its stockholders other than Treasury.  Moreover, as an agency of the federal government, FHFA was interested in and benefited from the Third Amendment.

179.    Through the Third Amendment, FHFA and Treasury breached their fiduciary duties to Fannie Mae.  The Third Amendment was not entirely fair to Fannie Mae, as it was neither the product of a fair process nor reflected a fair price.  Indeed, the Third Amendment, which effectively delivers all of Fannie Mae's profits to Treasury in perpetuity, was granted to benefit the Treasury, with no benefit to Fannie Mae in return.

180.    The Third Amendment was neither entirely nor intrinsically fair, nor did it further any valid business purpose of Fannie Mae, nor did it reflect a good faith business judgment as to what was in the best interests of Fannie Mae or its shareholders.

181.    The Third Amendment constituted waste and a gross abuse of discretion.

182.    As a direct and proximate result of the foregoing breach of fiduciary duty, Fannie Mae suffered damages.

**COUNT VIII**

**JUST COMPENSATION UNDER THE FIFTH AMENDMENT**
**(Against FHFA and Treasury)**

183.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

184.    Through the conduct alleged herein, FHFA and Treasury destroyed the rights and value of the property interests associated with the Preferred Stock and common stock of the Companies held by the Takings Class, without just compensation, and nullified the Takings Class' reasonable, investment-backed expectations, and violated the fundamental principles of the Due Process and Takings Clauses of the United States Constitution.

185.    The Fifth Amendment provides that no person shall, "be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation."

186.    FHFA and Treasury violated the statutory, contractual, and Constitutional rights of the Takings Class in taking private property as alleged herein without providing just compensation.  FHFA and Treasury took and/or exacted the property and legally cognizable property rights of the Companies' shareholders by, among other things, (1) improperly taking all of the net worth of the Companies; and (2) by improperly imposing the stock agreements and conservatorships over the Companies.

187.    By imposing the Third Amendment, FHFA and Treasury took the Takings Class' vested, legally cognizable property rights without just compensation, as alleged herein.  FHFA and Treasury entered into an agreement with each other to take "every dollar of earnings each firm generates . . . to benefit taxpayers."  One federal agency – FHFA, which was supposedly acting as Conservator for the Companies – struck a deal with another federal agency – Treasury

– to effectively confiscate the Preferred Stock and common stock held by private investors in Fannie Mae and Freddie Mac, with *all* future earnings of the Companies to be paid to Treasury in the form of quarterly dividends.

188.    The Takings Class had both a legally cognizable property interest and a reasonable, investment-backed expectation in their Preferred Stock and in the share of the Companies' future earnings to which they and other holders of Preferred Stock and common stock were contractually entitled.

189.    The Takings Class also had both a legally cognizable property interest and a reasonable, investment-backed expectation in the liquidation rights to which such Preferred Stock and common stock were contractually entitled in the event that Fannie Mae and Freddie Mac were dissolved or liquidated.

190.    By imposing the Third Amendment, Defendants took the Takings Class' vested, legally cognizable property rights and destroyed their reasonable, investment-backed expectations without paying just compensation.

191.    As a result of the Third Amendment, the Takings Class has been deprived of all economically beneficial uses of its Preferred Stock in Fannie Mae and Freddie Mac.

192.    The Takings Class is entitled to just compensation for FHFA and Treasury's taking of property.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

1.    Certifying that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Classes defined herein;

2.    Declaring that this action is a proper derivative action and that presuit demand is excused;

3.      Declaring that the Third Amendment was neither entirely nor intrinsically fair to Fannie Mae, did not further any valid business purpose of Fannie Mae, did not reflect a good faith business judgment as to what was in the best interests of Fannie Mae or its shareholders, and constituted waste and a gross abuse of discretion;

4.      Declaring that, through the Third Amendment, Defendants FHFA and Treasury breached their respective fiduciary duties to Fannie Mae;

5.      Awarding compensatory damages and disgorgement in favor of Fannie Mae against Defendants FHFA and Treasury, jointly and severally, as a result of such defendants' breach of their respective fiduciary duties, in an amount to be proven at trial, including interest thereon;

6.      Declaring that Defendants breached the terms of the certificates of designation and the implied covenant of good faith and fair dealing;

7.      Awarding Plaintiffs and the Classes the amount of damages they sustained as a result of Defendants' breaches of contract or breaches of the implied covenant of good faith and fair dealing;

8.      Granting appropriate equitable and injunctive relief to remedy Defendants' breaches of contract, and breaches of the implied covenant of good faith and fair dealing, including rescission of the Third Amendment;

9.      Declaring that, by entering into the Third Amendment, FHFA and Treasury have illegally taken the private property of the Takings Class without just compensation;

10.     Awarding the Takings Class the amount of just compensation that will adequately compensate it for the taking of its property;

11.     Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

12.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated:  December 3, 2013                    Respectfully Submitted,

                                            BERNSTEIN LITOWITZ BERGER
                                            & GROSSMANN LLP

                                            */s/ David L Wales*

                                            David L. Wales (Bar No. 417440)
                                            1285 Avenue of the Americas
                                            New York, NY 10019
                                            Tel:  (212) 554-1409
                                            Fax:  (212) 554-1444 (fax)
                                            dwales@blbglaw.com

                                            Blair A. Nicholas
                                            David R. Kaplan
                                            12481 High Bluff Drive, Suite 300
                                            San Diego, CA 92130
                                            Tel:  (858) 793-0070
                                            Fax:  (858) 793-0323
                                            blairn@blbglaw.com
                                            davidk@blbglaw.com

                                            BOIES, SCHILLER & FLEXNER LLP

                                            */s/ Hamish P.M. Hume*
                                            Hamish P.M. Hume
                                            5301 Wisconsin Ave., NW, Suite 800
                                            Washington, DC 20015
                                            Tel:  (202) 237-2727
                                            Fax:  (202) 237-6131
                                            hhume@bsfllp.com

GRANT & EISENHOFER P.A.

/s/ *Geoffrey C. Jarvis*

Jay W. Eisenhofer
485 Lexington Avenue
New York, NY  10017
Telephone:  (646) 722-8500
Facsimile:  (646) 722-8501
jeisenhofer@gelaw.com

Geoffrey C. Jarvis
Michael J. Barry
123 Justison Street
Wilmington, DE  19801
Telephone:  (302) 622-7000
Facsimile:  (302) 622-7100
gjarvis@gelaw.com
mbarry@gelaw.com

KESSLER TOPAZ MELTZER & CHECK, LLP

/s/ *Lee D. Rudy*
Lee D. Rudy
Eric L. Zagar
Matthew A. Goldstein
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
lrudy@ktmc.com
ezagar@ktmc.com
mgoldstein@ktmc.com

*Interim Co-Lead Class Counsel*

BOTTINI & BOTTINI, INC.

Frank A. Bottini
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002
fbottini@bottinilaw.com

FINKELSTEIN THOMPSON LLP

Michael G. McLellan (Bar #489217)
L. Kendall Satterfield (Bar # 393953)
Elizabeth R. Makris (Bar # 996760)
James Place
1077 30th Street, N.W.; Suite #150
Washington, DC 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090
mmclellan@finkelsteinthompson.com
ksatterfield@finkelsteinthompson.com
emakris@finkelsteinthompson.com

GLANCY BINKOW & GOLDBERG LLP

Lionel Z. Glancy
Michael M. Goldberg
Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
lgancy@glancylaw.com
mgoldberg@glancylaw.com
esams@glancylaw.com

LOWEY DANNENBERG COHEN & HART, P.C.

Barbara Hart (admitted *pro hac vice*)
Thomas M. Skelton
One North Broadway, Suite 509
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035

MEHRI & SKALET, PLLC

Craig L. Briskin (Bar # 980841)
Raymond C. Fay (Bar # 188649)
1250 Connecticut Avenue, NW Suite 300
Washington, D.C. 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4887

POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP

Jeremy A. Lieberman
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Additional Counsel for Plaintiffs*

**VERIFICATION**

I, Joseph Cacciapalle, hereby verify that I have authorized the filing of the attached Consolidated Amended Class Action Complaint, that I have reviewed the Consolidated Amended Class Action Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: /2 – 2 – 20/3

Joseph Cacciapalle

## **VERIFICATION**

I, Melvin Bareiss, hereby verify that I have authorized the filing of the attached Consolidated Amended Class Action and Derivative Complaint, that I have reviewed the Consolidated Amended Class Action and Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 12/3/2013

Melvin Bareiss