2009-SE-002712



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

ASSISTANT SECRETARY

May 6, 2009

## ACTION MEMORANDUM FOR SECRETARY GEITHNER

**FROM:**    Mario L. Ugoletti
                Acting Assistant Secretary (Financial Institutions)

**CC:**    Lee Sachs, Counselor

**SUBJECT:**    Amendments to the Senior Preferred Stock Purchase Agreement with Fannie Mae and Freddie Mac, and Related Determination

### Recommendation(s)

That you (1) execute the attached Amendments to the Amended and Restated Senior Preferred Stock Purchase Agreement (PSPA) between Treasury and Fannie Mae and Freddie Mac, and (2) execute the related Determination under Section 1117 of the Housing and Economic Recovery Act of 2007.

Approve  ___  Disapprove  _____  Let's Discuss  _____

### Background

Last fall, Treasury entered into an Amended and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008 with Fannie Mae and Freddie Mac, acting through the Federal Housing Finance Agency (FHFA) as its duly appointed conservator. Under the terms of the PSPAs, Treasury committed to provide to each of Freddie Mac and Fannie Mae immediately available funds in an amount up to but not in excess of the $100 billion through purchases of senior preferred stock of each of Freddie Mac and Fannie Mae.

Treasury is authorized to purchase "obligations and other securities" issued by Freddie Mac and Fannie Mae pursuant to Section 306(l) of the Federal Home Loan Mortgage Corporation Act, as amended (Freddie Mac Charter Act) and Section 304(g) of the Federal National Mortgage Association Act (Fannie Mae Charter Act), as those sections were added by Section 1117 of the Housing and Economic Recovery Act of 2008 (HERA). At the time that he executed the PSPAs, Secretary Paulson made a Determination, as required by HERA, after taking into consideration the matters set forth in Section 306(l)(l)(C) of the Freddie Mac Charter Act (as added by HERA) and Section 304(g)(1)(C) of the Fannie Mae Charter Act (as added by HERA), that the preferred stock purchases were necessary to (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayers.

The PSPAs provide for Treasury's purchase of up to $100 billion in senior preferred stock from each of Freddie Mac and Fannie Mae to help ensure that they each maintain a positive net worth. Treasury entered into the Agreements to improve market stability by providing additional security to Freddie Mac and Fannie Mae debt holders, senior and subordinated, and to improve mortgage availability by providing additional confidence to investors in mortgage-backed securities issued by Freddie Mac and Fannie Mae.  The Agreements also provide for Freddie Mac and Fannie Mae's to deliver to Treasury warrants for the future purchase of the common stock of Freddie Mac and Fannie Mae.

In February 2009, to increase market confidence in Fannie Mae and Freddie Mac in light of the potential for deteriorating housing market conditions, you announced Treasury's intent to increase funding available to Fannie Mae and Freddie Mac under the PSPAs from $100 billion to $200 billion per company.  The announcement also indicated that the permitted size of the retained mortgage portfolios of Fannie Mae and Freddie Mac under the PSPAs would be increased from $850 billion to $900 billion along with an increase in allowable debt outstanding.

**Amendments to the PSPAs**

The amendments to the PSPAs are described below.

(1) Size of the Treasury's Commitment – Increases funding available from $100 billion to $200 billion.

(2) Increase in Retained Portfolio – Increases from $850 billion to $900 billion.  This change increases the permitted size of the retained portfolio as December 31, 2009, but keeps in place the gradual reduction over time (90 percent of the prior year's retained portfolio until $250 billion is reached).

(3) Increase Allowable Debt Outstanding – Provision on allowable debt outstanding is changed from 110 percent of outstanding debt as of June 30, 2008, to 120 percent of the limit on mortgage assets.  Increasing the potential size of the retained portfolio requires expanded debt authority.  In addition, there was some inequity in the initial formulation in that Freddie Mac had a slightly higher level of debt outstanding as of June 30, 2008.  Also, FHFA has required increased liquidity holdings, which limits the amount of debt that can be used to fund the retained portfolio.  All these factors led to an increase in the allowable percentage, and a change in the base from a fixed debt amount to mortgage assets.

(4) Change Definition "Indebtedness" to Account for Potential Changes to FAS 140 – A technical change to add language that is included in the definition of "mortgage assets" regarding Financial Accounting Standard (FAS) 140 to the definition of "indebtedness" (i.e., FAS 140 changes are not considered in determining compliance with the indebtedness covenant).  Given the dollar cap on mortgage assets, these changes are necessary to address potential changes to FAS 140 that could require guaranteed mortgage-backed securities be brought on to the balance sheet of Fannie Mae and Freddie Mac.

2



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

**DETERMINATION**

**WHEREAS,** Section 1117 of the Housing and Economic Recovery Act of 2008 (the "Act") authorizes the Secretary of the Treasury (the "Secretary") to purchase any obligations and other securities ("purchase authority") issued by the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and any Federal Home Loan Bank (collectively, the "regulated entities"), on such terms and conditions as the Secretary may determine and in such amounts as the Secretary may determine;

**WHEREAS,** Section 1117 of the Act provides that in connection with the Secretary's use of his purchase authority, the Secretary must determine that such actions are necessary to: (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer;

**WHEREAS,** Section 1117 of the Act also provides that in making the determination that such actions are necessary to protect the taxpayer, the Secretary shall take into consideration: (i) the need for preferences or priorities regarding payments to the Government; (ii) limits on maturity or disposition of obligations or securities to be purchased; (iii) the regulated entities' plans for the orderly resumption of private market funding or capital market access; (iv) the probability of the regulated entities fulfilling the terms of any such obligation or other security, including repayment; (v) the need to maintain the regulated entities' status as private-shareholder owned companies; and (vi) restrictions on the use of regulated entity resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes; and

**WHEREAS,** on September 7, 2008, Henry M. Paulson, Jr., as the Secretary on that date, made the requisite determination, based on the three criteria described above and after having taken into consideration the six factors described above, in connection with certain other actions taken on that date, including the execution by the United States Department of the Treasury (the "Treasury") of the original Senior Preferred Stock Purchase Agreement with each of Fannie Mae and Freddie Mac dated as of that date (collectively, the "Original Agreements"), and, pursuant to the Original Agreements, the purchase of senior preferred stock and common stock warrants of Fannie Mae and Freddie Mac in amounts not to exceed the maximum amounts specified therein.

**NOW, THEREFORE, I HEREBY DETERMINE,** based on the three criteria described above and after taking into consideration the six factors described above and such other information available to me as I deem appropriate, that the execution by the Treasury of the Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement with each of Fannie Mae and Freddie Mac (collectively, the "Amendments")

and, pursuant to the Amendments, the purchase of additional senior preferred stock of Fannie Mae and Freddie Mac to provide them with additional funding in amounts not to exceed the increased maximum amounts specified therein, are necessary to provide stability to the financial markets, prevent disruptions in the availability of mortgage finance, and protect the taxpayer.

Timothy F. Geithner.
May ___, 2009

### AMENDMENT TO AMENDED AND RESTATED
### SENIOR PREFERRED STOCK PURCHASE AGREEMENT

AMENDMENT dated as of May 6, 2009, to the AMENDED AND RESTATED SENIOR PREFERRED STOCK PURCHASE AGREEMENT dated as of September 26, 2008, between the UNITED STATES DEPARTMENT OF THE TREASURY ("Purchaser"), and FEDERAL NATIONAL MORTGAGE ASSOCIATION ("Seller"), acting through the Federal Housing Finance Agency (the "Agency") as its duly appointed conservator (the Agency in such capacity, "Conservator").

### Background

A.   Purchaser and Seller have heretofore entered into the Amended and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008 (the "Amended and Restated Agreement").

B.   In the Amended and Restated Agreement, Purchaser committed itself to provide to Seller, on the terms and conditions provided in the Amended and Restated Agreement, immediately available funds in an amount as determined from time to time as provided in the Amended and Restated Agreement, but in no event in an aggregate amount exceeding $100,000,000,000.

C.   Purchaser and Seller now desire to enter into an amendment to the Amended and Restated Agreement for the purpose of increasing to $200,000,000,000 the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated Agreement, and for the purpose of amending the terms of the Amended and Restated Agreement in certain other respects.

D.   Purchaser and Seller are each authorized to enter into this Amendment to the Amended and Restated Agreement ("this Amendment") increasing to $200,000,000,000 the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated Agreement, and amending the terms of the Amended and Restated Agreement in certain other respects.

THEREFORE, for and in consideration of the mutual agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Purchaser and Seller agree as follows:

### Terms and Conditions

1.   **Definitions.**

Capitalized terms used and not defined in this Amendment shall have the respective meanings given such terms in the Amended and Restated Agreement.

- 1 -

2.    **Amendment to Section 1 (Relating to Definition of New Defined Term "Executive Officer").**

Section 1 of the Amended and Restated Agreement is hereby amended to insert the following new defined term and corresponding definition after the definition of the term "Exchange Act":

"*Executive Officer*" has the meaning given to such term in Exchange Act Rule 3b-7, as in effect on the date hereof.

3.    **Amendment to Section 1 (Relating to Definition of "Indebtedness").**

The definition of "Indebtedness" in Section 1 of the Amended and Restated Agreement is hereby amended to read as follows:

"*Indebtedness*" of any Person means, for purposes of Section 5.5 only, without duplication, (a) all obligations of such Person for money borrowed by such Person, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services, other than trade accounts payable, (e) all Capital Lease Obligations of such Person, (f) obligations, whether contingent or liquidated, in respect of letters of credit (including standby and commercial), bankers' and similar instruments, and (g) any obligation of such Person, contingent or otherwise, guaranteeing or having the economic effect of guaranteeing any Indebtedness of the types set forth in clauses (a) through (f) payable by another Person other than Mortgage Guarantee Obligations (and, for the avoidance of doubt, without giving effect to any change that may be made hereafter in respect of Statement of Financial Accounting Standards No. 140 or any similar accounting standard).

4.    **Amendment to Section 1 (Relating to Definition of "Maximum Amount").**

The definition of "Maximum Amount" in Section 1 of the Amended and Restated Agreement is hereby amended to read as follows:

"*Maximum Amount*" means, as of any date of determination, $200,000,000,000 (two hundred billion dollars), less the aggregate amount of funding under the Commitment prior to such date.

5.    **Amendment to Section 2.1 (Relating to the Commitment).**

Section 2.1 of the Amended and Restated Agreement is hereby amended to read as follows:

2.1 *Commitment*. Purchaser hereby commits to provide to Seller, on the terms and conditions set forth herein, immediately available funds in an amount up to but not in excess of the Available Amount, as determined from time to time (the "Commitment"); provided, that in no event shall the aggregate amount funded under the Commitment exceed $200,000,000,000 (two hundred billion

- 2 -

dollars).  The liquidation preference of Senior Preferred Stock shall increase in connection with draws on the Commitment, as set forth in Section 3.3 below.

6.  **Amendment to Section 2.5 (Relating to Termination of Purchaser's Obligations).**

Section 2.5 of the Amended and Restated Agreement is hereby amended to read as follows:

2.5  *Termination of Purchaser's Obligations.*  Subject to earlier termination pursuant to Section 6.7, all of Purchaser's obligations under and in respect of the Commitment shall terminate upon the earliest of:  (a) if the Liquidation End Date shall have occurred, (i) the payment in full of Purchaser's obligations with respect to any valid request for funds pursuant to Section 2.4 or (ii) if there is no Deficiency Amount on the Liquidation End Date or if no such request pursuant to Section 2.4 has been made, the close of business on the 15th Business Day following the determination of the Deficiency Amount, if any, as of the Liquidation End Date; (b) the payment in full of, defeasance of or other reasonable provision for all liabilities of Seller, whether or not contingent, including payment of any amounts that may become payable on, or expiry of or other provision for, all Mortgage Guarantee Obligations and provision for unmatured debts; and (c) the funding by Purchaser under the Commitment of an aggregate of $200,000,000,000 (two hundred billion dollars).  For avoidance of doubt, the Commitment shall *not* be terminable by Purchaser solely by reason of (i) the conservatorship, receivership or other insolvency proceeding of Seller or (ii) the Seller's financial condition or any adverse change in Seller's financial condition.

7.  **Amendment to Section 5.5 (Relating to Indebtedness).**

Section 5.5 of the Amended and Restated Agreement is hereby amended to read as follows:

5.5.  *Indebtedness.*  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, incur, assume or otherwise become liable for (a) any Indebtedness if, after giving effect to the incurrence thereof, the aggregate Indebtedness of Seller and its subsidiaries on a consolidated basis would exceed (i) through and including December 30, 2010, 120.0% of the amount of Mortgage Assets Seller is permitted by Section 5.7 to own on December 31, 2009; and (ii) beginning on December 31, 2010, and through and including December 30, 2011, and each year thereafter, 120.0% of the amount of Mortgage Assets Seller is permitted by Section 5.7 to own on December 31 of the immediately preceding calendar year, or (b) any Indebtedness if such Indebtedness is subordinated by its terms to any other Indebtedness of Seller or the applicable subsidiary.  For purposes of this covenant the acquisition of a subsidiary with Indebtedness will be deemed to be the incurrence of such Indebtedness at the time of such acquisition.

- 3 -

8.    **Amendment to Section 5.7 (Relating to Owned Mortgage Assets).**

Section 5.7 of the Amended and Restated Agreement is hereby amended to read as follows:

5.7. *Mortgage Assets.* Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2009, $900 billion, or (ii) on December 31 of each year thereafter, 90.0% of the aggregate amount of Mortgage Assets of Seller as of December 31 of the immediately preceding calendar year; provided, that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets.

9.    **Amendment to Section 5.10 (Relating to Executive Compensation).**

Section 5.10 of the Amended and Restated Agreement is hereby amended to read as follows:

5.10. *Executive Compensation.* Seller shall not, without the consent of the Director, in consultation with the Secretary of the Treasury, enter into any new compensation arrangements with, or increase amounts or benefits payable under existing compensation arrangements of, any Named Executive Officer or other Executive Officer of Seller.

10.    **Amended and Restated Agreement to Continue, as Amended.**

Except as expressly modified by this Amendment, the Amended and Restated Agreement shall continue in full force and effect.

11.    **Effective Date.**

This Amendment shall not become effective until it has been executed by both of Purchaser and Seller. When this Amendment has been so executed, it shall become effective as of the date first above written.

- 4 -

FEDERAL NATIONAL MORTGAGE
ASSOCIATION, by

Federal Housing Finance Agency,
its Conservator

James B. Lockhart III
Director

UNITED STATES DEPARTMENT
OF THE TREASURY

Timothy F. Geithner
Secretary of the Treasury

- 5 -

TREASURY-0169

**AMENDMENT TO AMENDED AND RESTATED**
**SENIOR PREFERRED STOCK PURCHASE AGREEMENT**

AMENDMENT dated as of May 6, 2009, to the AMENDED AND RESTATED SENIOR PREFERRED STOCK PURCHASE AGREEMENT dated as of September 26, 2008, between the UNITED STATES DEPARTMENT OF THE TREASURY ("Purchaser"), and FEDERAL HOME LOAN MORTGAGE CORPORATION ("Seller"), acting through the Federal Housing Finance Agency (the "Agency") as its duly appointed conservator (the Agency in such capacity, "Conservator").

### Background

A.   Purchaser and Seller have heretofore entered into the Amended and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008 (the "Amended and Restated Agreement").

B.   In the Amended and Restated Agreement, Purchaser committed itself to provide to Seller, on the terms and conditions provided in the Amended and Restated Agreement, immediately available funds in an amount as determined from time to time as provided in the Amended and Restated Agreement, but in no event in an aggregate amount exceeding $100,000,000,000.

C.   Purchaser and Seller now desire to enter into an amendment to the Amended and Restated Agreement for the purpose of increasing to $200,000,000,000 the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated Agreement, and for the purpose of amending the terms of the Amended and Restated Agreement in certain other respects.

D.   Purchaser and Seller are each authorized to enter into this Amendment to the Amended and Restated Agreement ("this Amendment") increasing to $200,000,000,000 the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated Agreement, and amending the terms of the Amended and Restated Agreement in certain other respects.

THEREFORE, for and in consideration of the mutual agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Purchaser and Seller agree as follows:

### Terms and Conditions

1.   **Definitions.**

Capitalized terms used and not defined in this Amendment shall have the respective meanings given such terms in the Amended and Restated Agreement.

- 1 -

2.   **Amendment to Section 1 (Relating to Definition of New Defined Term "Executive Officer").**

Section 1 of the Amended and Restated Agreement is hereby amended to insert the following new defined term and corresponding definition after the definition of the term "Exchange Act":

"*Executive Officer*" has the meaning given to such term in Exchange Act Rule 3b-7, as in effect on the date hereof.

3.   **Amendment to Section 1 (Relating to Definition of "Indebtedness").**

The definition of "Indebtedness" in Section 1 of the Amended and Restated Agreement is hereby amended to read as follows:

"*Indebtedness*" of any Person means, for purposes of Section 5.5 only, without duplication, (a) all obligations of such Person for money borrowed by such Person, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services, other than trade accounts payable, (e) all Capital Lease Obligations of such Person, (f) obligations, whether contingent or liquidated, in respect of letters of credit (including standby and commercial), bankers' and similar instruments, and (g) any obligation of such Person, contingent or otherwise, guaranteeing or having the economic effect of guaranteeing and Indebtedness of the types set forth in clauses (a) through (f) payable by another Person other than Mortgage Guarantee Obligations (and, for the avoidance of doubt, without giving effect to any change that may be made hereafter in respect of Statement of Financial Accounting Standards No. 140 or any similar accounting standard).

4.   **Amendment to Section 1 (Relating to Definition of "Maximum Amount").**

The definition of "Maximum Amount" in Section 1 of the Amended and Restated Agreement is hereby amended to read as follows:

"*Maximum Amount*" means, as of any date of determination, $200,000,000,000 (two hundred billion dollars), less the aggregate amount of funding under the Commitment prior to such date.

5.   **Amendment to Section 2.1 (Relating to the Commitment).**

Section 2.1 of the Amended and Restated Agreement is hereby amended to read as follows:

2.1 *Commitment.* Purchaser hereby commits to provide to Seller, on the terms and conditions set forth herein, immediately available funds in an amount up to but not in excess of the Available Amount, as determined from time to time (the "Commitment"); provided, that in no event shall the aggregate amount funded under the Commitment exceed $200,000,000,000 (two hundred billion

- 2 -

dollars).  The liquidation preference of Senior Preferred Stock shall increase in connection with draws on the Commitment, as set forth in Section 3.3 below.

6.    **Amendment to Section 2.5 (Relating to Termination of Purchaser's Obligations).**

Section 2.5 of the Amended and Restated Agreement is hereby amended to read as follows:

2.5  *Termination of Purchaser's Obligations.*  Subject to earlier termination pursuant to Section 6.7, all of Purchaser's obligations under and in respect of the Commitment shall terminate upon the earliest of:  (a) if the Liquidation End Date shall have occurred, (i) the payment in full of Purchaser's obligations with respect to any valid request for funds pursuant to Section 2.4 or (ii) if there is no Deficiency Amount on the Liquidation End Date or if no such request pursuant to Section 2.4 has been made, the close of business on the 15th Business Day following the determination of the Deficiency Amount, if any, as of the Liquidation End Date; (b) the payment in full of, defeasance of or other reasonable provision for all liabilities of Seller, whether or not contingent, including payment of any amounts that may become payable on, or expiry of or other provision for, all Mortgage Guarantee Obligations and provision for unmatured debts; and (c) the funding by Purchaser under the Commitment of an aggregate of $200,000,000,000 (two hundred billion dollars).  For avoidance of doubt, the Commitment shall *not* be terminable by Purchaser solely by reason of (i) the conservatorship, receivership or other insolvency proceeding of Seller or (ii) the Seller's financial condition or any adverse change in Seller's financial condition.

7.    **Amendment to Section 5.5 (Relating to Indebtedness).**

Section 5.5 of the Amended and Restated Agreement is hereby amended to read as follows:

5.5.  *Indebtedness.*  Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, incur, assume or otherwise become liable for (a) any Indebtedness if, after giving effect to the incurrence thereof, the aggregate Indebtedness of Seller and its subsidiaries on a consolidated basis would exceed (i) through and including December 30, 2010, 120.0% of the amount of Mortgage Assets Seller is permitted by Section 5.7 to own on December 31, 2009; and (ii) beginning on December 31, 2010, and through and including December 30, 2011, and each year thereafter, 120.0% of the amount of Mortgage Assets Seller is permitted by Section 5.7 to own on December 31 of the immediately preceding calendar year, or (b) any Indebtedness if such Indebtedness is subordinated by its terms to any other Indebtedness of Seller or the applicable subsidiary.  For purposes of this covenant the acquisition of a subsidiary with Indebtedness will be deemed to be the incurrence of such Indebtedness at the time of such acquisition.

- 3 -

8.     **Amendment to Section 5.7 (Relating to Owned Mortgage Assets).**

Section 5.7 of the Amended and Restated Agreement is hereby amended to read as follows:

5.7. *Mortgage Assets.* Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2009, $900 billion, or (ii) on December 31 of each year thereafter, 90.0% of the aggregate amount of Mortgage Assets of Seller as of December 31 of the immediately preceding calendar year; provided, that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets.

9.     **Amendment to Section 5.10 (Relating to Executive Compensation).**

Section 5.10 of the Amended and Restated Agreement is hereby amended to read as follows:

5.10. *Executive Compensation.* Seller shall not, without the consent of the Director, in consultation with the Secretary of the Treasury, enter into any new compensation arrangements with, or increase amounts or benefits payable under existing compensation arrangements of, any Named Executive Officer or other Executive Officer of Seller.

10.    **Amended and Restated Agreement to Continue, as Amended.**

Except as expressly modified by this Amendment, the Amended and Restated Agreement shall continue in full force and effect.

11.    **Effective Date.**

This Amendment shall not become effective until it has been executed by both of Purchaser and Seller.  When this Amendment has been so executed, it shall become effective as of the date first above written.

- 4 -

FEDERAL HOME LOAN MORTGAGE
CORPORATION, by

Federal Housing Finance Agency,
its Conservator

James B. Lockhart III
Director

UNITED STATES DEPARTMENT
OF THE TREASURY

Timothy F. Geithner
Secretary of the Treasury

- 5 -



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

December 22, 2009

## ACTION MEMORANDUM FOR SECRETARY GEITHNER

**FROM:**        Lee Sachs, Counselor to the Secretary, Office of Domestic Finance

                Michael S. Barr, Assistant Secretary, Financial Institutions

**SUBJECT:**     Expiration of HERA Authority and Amendments to the Preferred Stock Purchase
                Agreements (PSPAs) between Treasury and Fannie Mae and Freddie Mac

### Recommendation

That you approve that we enter into discussions with the Federal Housing Finance Agency, as conservator
of Fannie Mae and Freddie Mac, to amend the existing Preferred Stock Purchase Agreement ("PSPA")
contracts in the following manner:

1. Replace the existing fixed $200 billion cap on Treasury advances with a formulaic cap for the
   next three years that will automatically adjust upwards quarterly by the cumulative amount of any
   losses realized by either GSE and downward by the cumulative amount of any gains, but not
   below $200 billion, and will become fixed at the end of the three years.

   _____√_____Approve          _____Disapprove  _____Let's Discuss

2. Adjust the retained portfolio runoff requirements such that any reduction is measured from $900
   billion total portfolio size for each GSE and the target date for the first 10% reduction is
   postponed by one year to December 31, 2010.

   _____✓_____Approve          _____Disapprove  _____Let's Discuss

3. Other Issues: Delay the Periodic Commitment Fee setting process for one additional year to
   December 10, 2010. Make a technical change to the measurement definition of mortgage assets
   and indebtedness to address compliance issues.

   _____✓_____Approve          _____Disapprove  _____Let's Discuss

### Background

We face a set of decisions before the end of the year about how best to ensure that Fannie Mae and
Freddie Mac can continue to make housing finance available on reasonable terms during this crisis. We
are proposing several steps, most importantly an increase in the financial backstops that cover the losses
Fannie Mae and Freddie Mac are incurring from their very large exposure to the U.S. housing market.

Our plan is to announce this step before year end. The difficulty we face is that our increasing financial
commitment to Fannie Mae and Freddie Mac, while appropriate given the risks we face, is somewhat at
odds with our general approach and message of winding down support for the financial system.

## Context

The backdrop for our actions is that the government sponsored enterprises (GSEs) have moved from being a source of instability during the early stages of the crisis to a stable and critical source of mortgage financing to the market today. We are also acting in the context of the end of the Federal Reserve and Treasury's massive program to purchase Agency-guaranteed mortgage-backed securities (MBS) and debt, which has eased the GSEs' ability to raise funds in the market as it has lowered mortgage rates.

As you know, Fannie Mae and Freddie Mac were put into federal conservatorship on September 7, 2008 in the face of large and continuing losses on their mortgage holdings and deteriorating ability to fund themselves in the markets due to a loss of confidence in their solvency. At that time, the last Administration established three facilities to support Fannie Mae and Freddie Mac. First, Treasury entered into agreements with both firms to allow each one to maintain positive net worth by incrementally drawing up to $100 billion, in exchange for which Treasury received preferred stock that would increase in liquidation preference value by an amount equal to each drawdown (Preferred Stock Purchase Agreements, or PSPAs). Second, Treasury created a program to purchase MBS guaranteed by the GSEs, under which Treasury has purchased nearly $200 billion in aggregate MBS to date. Third, Treasury established an effectively unlimited short-term liquidity facility for Fannie Mae, Freddie Mac, and the Federal Home Loan Banks, but these facilities have not been used. These three actions enabled the GSEs to continue playing their role as a reliable guarantor of MBS, which increased the availability and affordability of mortgages in a stressed environment.

As the crisis intensified and our Administration came into office, we made the judgment that given the outlook for the housing market, an environment of deteriorating confidence, and an abundance of caution, we needed to take steps to ensure that there was no doubt that the GSEs could continue to perform their vital function. As a result, we decided to increase the $100 billion cap on Treasury's funding commitment to Fannie Mae and Freddie Mac under each PSPA to $200 billion and create some additional capacity for the GSEs to purchase MBS and buy non-performing loans out of the MBS they guarantee.

Our policies, combined with actions by the Federal Reserve, have worked. The prevailing rate for a 30-year mortgage has fallen from around 6.5 percent in the summer of 2008 to under 5.0 percent today. This has made it possible for many borrowers to refinance, reduce their payments, and make their mortgages more affordable. With our support, nearly 70 percent of all new credit formation in the residential real estate sector was either financed or guaranteed by Fannie Mae and Freddie Mac. In addition, the GSEs are at the forefront of the Administration's efforts to address foreclosures through the Home Affordable Refinance Program and Home Affordable Modification Program. The GSEs are also implementing recently announced initiatives for state and local housing finance agencies.

These actions were taken under the Housing and Economic Recovery Act of 2008 (HERA). HERA authorized Treasury to purchase obligations and other securities issued by the GSEs without any limit on dollar amount, but only up through December 31, 2009. To date, Fannie Mae and Freddie Mac have drawn only $60 billion and $51 billion, respectively, under the PSPAs. Current estimates for the fourth quarter provided to Treasury by the regulator of the GSEs (the Federal Housing Finance Agency, or FHFA) suggest that Fannie Mae could draw an additional $25 billion (bringing its total outstanding drawn amount to $85 billion total) and that Freddie Mac is unlikely to make an additional draw this quarter.

Their overall financial performance, however, is deteriorating at a concerning rate. Because of high unemployment and home price deterioration, both GSEs will continue to experience significant losses. We have worked with FHFA and the Federal Reserve to conduct stress tests to gauge their need for further support if the housing market deteriorates significantly and unemployment and underemployment

2

continue at elevated levels. While we do not believe that the GSEs will require the full $200 billion that we have already committed to each company, these stress tests found plausible "tail" scenarios that would result in Fannie Mae needing more than the existing $200 billion commitment. At least one mortgage market analyst (Barclays Capital) has reached similar conclusions in published research notes.

Treasury's authority to purchase GSE obligations and securities expires at year end. Therefore, after December 31, our ability to make further changes to the PSPAs, particularly with respect to the commitment amount, is constrained. This limitation poses several challenges:

1. Risk of outsized losses: Stress tests have found plausible "tail" scenarios that would result in Fannie Mae posting large enough losses that it needs more than the existing $200 billion commitment within 2 years. Since we can envision extreme, but plausible, scenarios with this outcome, market participants can do the same. In fact, some market analysts are projecting a need for an increase in the PSPAs. This can introduce uncertainty at a time of fragile economic recovery. Foreign holders of Agency securities remain concerned about the firms' financial stability and are sensitive to any perceptions in a change to the commitment of the U.S. Government to maintaining solvency.

2. Central role during crisis: The GSEs are supporting [70] percent of all mortgages originated in this country in 2009. For the foreseeable future, to avert further deterioration in housing markets, we need to support these companies to continue to play their customary role in financing home purchases and enabling mortgage refinancing.

3. Near term outlook for housing: We are likely to face a confluence of negative events in Q1 and Q2 of 2010 as "shadow" inventory moves to liquidation; transitions to permanent mortgage modifications under HAMP will likely be lower than many expected, and the Federal Reserve and Treasury buying programs for Agency-guaranteed MBS will be ending.

4. Conflicting message: Our short-term policy towards the GSEs, while necessary, is increasingly at odds with our overall message on TARP and regulatory reform. In the case of GSEs, we are allowing "failed" firms to continue to operate by injecting additional government support, rather than resolving them. We are increasing our support for these institutions, while ramping down other programs. We do not want to increase our support for the GSEs in such a way that the progress in winding down TARP is undermined.

5. Uncertain long term situation: It is clear that the timeline for legislating GSE reform is likely to be much longer than the previous Administration expected when the PSPAs were established. It is conceivable that this matter will not be taken up by Congress until 2011.

6. Chance of prejudicing longer term reform: Our Regulatory Reform White Paper suggested that we would publish a set of recommendations on long-term GSE reform with the President's Budget in February. We remain on track to deliver this report and outline the objectives of long-term reform. But moving forward on reform will likely require changes to the basic structure of the GSEs. We must be mindful that our actions in the near term do not either detract from our message in February or prejudice the ability to achieve long-term reform.

**Recommendation**
We considered many possible options, including taking no action, but concluded that the risks to the housing market warrant a policy response to ensure that we do not prematurely withdraw support before the recovery is self-sustaining.

Our plan is to announce the following steps before year-end:

1. Modify each PSPA so that the current fixed-dollar-amount cap on Treasury's funding commitment is replaced by a formula: the cap will be an amount equal to the sum of (a) $200 billion, plus (b) an amount equal to the cumulative losses less cumulative gains in net

3

worth realized by the respective GSE after the date of the PSPA modification. In no event, however, will the cap be reduced below $200 billion.

2. This formulaic cap will be maintained for three years. From there it will be fixed at: (a) $200 billion (if there were cumulative gains over the three year period), or (b) the cap amount resulting from the formula above, and will be available to absorb any additional losses realized after that three-year period.

3. As in February, we will allow the GSEs additional room to maintain or grow their portfolios for a limited time (one year). The presumption would be that the orderly natural runoff of the GSEs' retained portfolios already under way would occur in 2010 as previously planned. Creating this headroom in the retained portfolio could help confidence in mortgage markets by providing flexibility to increase their portfolio purchases with the approval of the FHFA and Treasury if the environment develops adversely and such purchases would have a meaningful stabilizing impact.

While the total amount of funding made available to Treasury under HERA is unlimited in dollar amount, this recommended set of increases may be controversial. However, it would be a strong statement that the U.S. Government will make sure that these institutions continue to function even during a possibly extended period before Congressional action on this matter and continued uncertainty about their financial situation is resolved.

Prior to announcement, we believe it would be appropriate to do some limited Congressional consultation (this matter is highly market sensitive). From a communications standpoint, our public framing of these actions will be critical. Our initial thoughts on basic messaging would involve:

- We have taken additional steps to ensure that the GSEs can serve the vital function they are playing today for American households. At a time of great difficulty for US homeowners, our support of these entities is critical to ensure accessible and affordable mortgage financing.
- In an environment where banks have been pulling back, the GSEs have supported origination of $400 billion of mortgages in 2009, approximately 70 percent of all mortgages originated in the country in 2009.
- The GSEs are today at the heart of our efforts to create more sustainable modifications and mortgages for troubled borrowers seeking to remain in their homes.
- We do not expect this additional authority to be used. It is unlikely that either GSE will reach the $200 billion existing cap unless the housing market worsens sharply from here. We expect the GSEs will continue to shrink their portfolios in the ordinary course.
- But this action is the financially responsible path to prepare for unlikely contingencies in the midst of this housing crisis.
- We view these measures as temporary. They are designed to support these institutions until Congress determines a more sustainable long-term path. We intend to provide principles and options for reform with the President's Budget in February.

Overall, we believe these measures will build on the progress we have made in the housing market and while extraordinary, we believe they are necessary and authorized by HERA.
Some market research has begun to anticipate a need for increases in the PSPAs to cover the risk of outsized losses, but this action is not broadly expected. It is not yet in the political sphere. We expect the following criticisms:

- Moral hazard. Some argue that a formula-based approach to the cap will alter the behavior of the GSEs and cause them to act in a way adverse to the taxpayer interest. We believe the cap generally, even at the $200 billion limit, has not particularly impacted GSE behavior positively or negatively. The GSEs operate under a strict conservatorship with FHFA responsible for supervising the companies with a "preservation of assets" mandate. Treasury will also fortify its

4

own contractual rights with respect to monitoring actions around the portfolio to protect taxpayers further.

- Fiscal irresponsibility:  Some will say we should wind-down the GSEs instead of continuing to allow them to operate in conservatorship.  This is entirely impractical in the current circumstances.
- Focus on GSEs:  This will fan the flames of the critique that the GSEs had a central role in causing the housing crisis.  Given their role in our mortgage modification program and initiatives such as our support for state and local housing finance agencies, some may say we want unlimited ability to use the GSEs to cover the costs of housing stabilization programs without seeking appropriations.  Our steps are designed to provide for market stability.
- Retained portfolio:  Market participants do not now expect retained portfolios to increase. Providing for additional capacity within the $900 billion cap will be noted..

5

**Background**

The Housing and Economic Recovery Act of 2008 (HERA), which was enacted on July 30, 2008, provided the Treasury with powers to ensure that Fannie Mae and Freddie Mac (government-sponsored enterprises, or GSEs) were able to serve their purpose of providing a stable and liquid mortgage market with broadly available access for consumers. HERA put no dollar limit on the Secretary's authority to purchase obligations and other securities issued by the GSEs, but it did set a sunset date of December 31, 2009.

Initially on September 7, 2008, Treasury and the regulator of the GSEs (Federal Housing Finance Agency, or FHFA) announced a set of joint actions under the authorities provided by HERA:

(a) Fannie Mae and Freddie Mac were placed into federal conservatorship with FHFA appointed as conservator;

(b) Treasury executed preferred stock purchase agreements (PSPAs) with Fannie Mae and Freddie Mac, under which Treasury purchased preferred stock issued by Fannie Mae and Freddie Mac and committed to advance funds that allowed them each to draw up to $100 billion from Treasury in order to maintain a positive net worth;

(c) Treasury committed to an effectively unlimited credit facility for each GSE to provide liquidity support; and

(d) Treasury announced its intent to purchase a substantial amount of GSE-guaranteed mortgage-backed securities (MBS) in the open market.

The PSPAs were specifically designed to provide comfort to the GSEs creditors and to investors in MBS guaranteed by the GSEs that both Fannie Mae and Freddie Mac would be able to meet their obligations on an ongoing basis. This had the dual benefit of helping to provide stability to the financial system and adding to mortgage affordability by providing additional reassurance to debt investors.

On February 19, 2009, Treasury increased the $100 billion cap on its funding commitment to Fannie Mae and Freddie Mac under the PSPAs to $200 billion and created some additional capacity for the GSEs in their own portfolios. As of today, Fannie Mae and Freddie Mac have drawn $60 billion and $51 billion, respectively, under the PSPAs. Current estimates for the fourth quarter provided to Treasury by FHFA suggest that Fannie Mae could draw an additional $25 billion ($85 billion total) and that Freddie Mac is unlikely to make an additional draw this quarter. The portfolios have continued to shrink despite the new authority. Thus far, the increases we put in place in February have indeed been precautionary and have not been used.

Both GSEs continue to experience losses driven chiefly by credit-related expenses. Serious delinquency rates (borrowers more than 90 days past due) on underlying mortgages have increased in the current environment of weak house prices and high unemployment and underemployment. Serious delinquency rates have reached 4.72 percent of outstanding loans for Fannie Mae and 3.33 percent for Freddie Mac.

6



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

December 24, 2009

## ACTION MEMORANDUM FOR SECRETARY GEITHNER

**FROM:**       Lee Sachs, Counselor to the Secretary, Office of Domestic Finance

Michael S. Barr, Assistant Secretary, Financial Institutions

**SUBJECT:**   Determination under Section 1117 of the Housing and Economic
Recovery Act of 2008 for Purchase of Obligations and Securities of
Regulated Entities

### Recommendation

That you approve and sign the proposed Determination relating to the purchase of obligations
and securities from the regulated entities.

_____ Approve                  _____ Disapprove                  _____ Let's Discuss

### Background

Section 1117 of the Housing and Economic Recovery Act of 2008 ("the Act") authorizes the
Treasury to purchase any obligations and other securities issued by the Federal National
Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation
("Freddie Mac") (collectively the Government Sponsored Enterprises or "Housing GSEs") and
the twelve Federal Home Loan Banks, on such terms and conditions and in such amounts as you
may determine.

In connection with exercising this authority, the Act requires you to make a determination that
such exercise is necessary to: (1) provide stability to the financial markets; (2) prevent
disruptions in the availability of mortgage finance; and (3) protect the taxpayer. The Act also
provides that in making the determination that the actions are necessary to protect the taxpayer,
you must take into consideration: (i) the need for preferences or priorities regarding payments to
the Government; (ii) limits on maturity or disposition of obligations or securities to be
purchased; (iii) the regulated entities' plans for the orderly resumption of private market funding
or capital market access; (iv) the probability of the regulated entities fulfilling the terms of any
such obligation or other security, including repayment; (v) the need to maintain the regulated
entities' status as private-shareholder owned companies; and (vi) restrictions on the use of
regulated entity resources, including limitations on the payment of dividends and executive
compensation and any such other terms and conditions as appropriate for those purposes.

The overall conditions in the mortgage and housing markets have been, and remain, challenging
for many market participants. Both Fannie Mae and Freddie Mac are exposed to these markets
through their guarantees of mortgage backed securities and mortgage investments in their
portfolios. As the assets supporting Fannie Mae's and Freddie Mac's guarantee and investment

1

portfolios have deteriorated, the costs of raising additional capital and funding themselves have risen. Both enterprises had experienced challenges in raising capital given current conditions. Given these concerns as well as other findings related to unsafe and unsound practices and conditions at both Housing GSEs, the Director of the Federal Housing Finance Agency ("FHFA") made the determination in September 2008 to place Fannie Mae and Freddie Mac in conservatorship.

Initially on September 7, 2008, Treasury and FHFA announced a set of joint actions under the authorities provided by HERA:

(a) Fannie Mae and Freddie Mac were placed into federal conservatorship with FHFA appointed as conservator;
(b) Treasury executed preferred stock purchase agreements (PSPAs) with Fannie Mae and Freddie Mac, under which Treasury purchased preferred stock issued by Fannie Mae and Freddie Mac and committed to advance funds that allowed them each to draw up to $100 billion from Treasury in order to maintain a positive net worth;
(c) Treasury committed to a short-term credit facility for each GSE to provide liquidity support (Government Sponsored Entity Credit Facility); and
(d) Treasury announced its intent to purchase a substantial amount of GSE-guaranteed mortgage-backed securities (MBS) in the open market (GSE Mortgage Backed Security Purchase Program).

The PSPAs were specifically designed to provide comfort to the Housing GSEs creditors and to investors in MBS guaranteed by the Housing GSEs that both Fannie Mae and Freddie Mac would be able to meet their obligations on an ongoing basis. This had the dual benefit of helping to provide stability to the financial system and adding to mortgage affordability by providing additional reassurance to debt investors.

In May 2009, Treasury increased the $100 billion cap on its funding commitment to Fannie Mae and Freddie Mac under the PSPAs to $200 billion and created some additional capacity for the Housing GSEs in their own portfolios. As of today, Fannie Mae and Freddie Mac have drawn $60 billion and $51 billion, respectively, under the PSPAs. Current estimates for the fourth quarter provided to Treasury by FHFA suggest that Fannie Mae could draw an additional $25 billion ($85 billion total) and that Freddie Mac is unlikely to make an additional draw this quarter.  The portfolios have continued to shrink despite the new authority. Thus far, the increases to Treasury's funding commitment and to the permitted retained portfolio size put in place in May have indeed been precautionary and have not been used.

Both Housing GSEs continue to experience losses driven chiefly by credit-related expenses. Serious delinquency rates (borrowers more than 90 days past due) on underlying mortgages have increased in the current environment of weak home prices and high unemployment and underemployment. Serious delinquency rates have reached 4.72 percent of outstanding loans for Fannie Mae and 3.33 percent for Freddie Mac.

2

**Exercise of Authority**

In order to provide stability to financial markets, prevent disruptions in mortgage finance availability, and protect the taxpayers, we recommend that you exercise the authority granted to Treasury by amending the PSPAs in three ways. First, the Treasury will replace the existing fixed $200 billion cap on Treasury advances with a formulaic cap for the next three years that will automatically adjust upwards quarterly by the cumulative amount of any losses realized by either Housing GSE and downward by the cumulative amount of any gains, but not below $200 billion, and will become fixed at the end of the three years. Second, Treasury will adjust the retained portfolio runoff requirements such that any reduction is measured from the $900 billion total permitted portfolio size for each Housing GSE and the target date for the first 10% reduction is postponed by one year to December 31, 2010. Third, Treasury will delay the Periodic Commitment Fee setting process for one additional year to December 10, 2010. Treasury will also make minor technical changes to the definitions of the terms "Mortgage Assets" and "Indebtedness" to address compliance issues.

The PSPAs provide for purchases in senior preferred stock from each Housing GSE to help ensure that they each maintain a positive net worth. The three changes to the PSPAs described above will further improve market stability by providing additional security to Housing GSE debt holders, senior and subordinated, and improve mortgage availability by providing additional confidence to investors in Housing GSE mortgage backed securities.

In designing these three changes to the PSPAs, specific steps were taken to protect the taxpayer. In particular, consideration was given to the six factors set forth in the Act.

*The need for preferences or priorities* – The PSPAs continue to protect the taxpayer by providing the Treasury with senior preferred stock that has a liquidation preference over all other classes of equity, including existing preferred stock. The PSPAs also continue to protect the taxpayer by: (i) prohibiting Fannie Mae and Freddie Mac from issuing any additional subordinated debt; and (ii) restricting Fannie Mae and Freddie Mac from increasing the aggregate amount of their indebtedness to more than 120% of the amount of their permitted mortgage portfolio size as of December 31, 2010. In addition, the terms of the PSPAs require Fannie Mae and Freddie Mac to remit to Treasury the net proceeds from the issuance of any equity which is to be applied to redeem amounts outstanding under the liquidation preference (and which shall be applied first against any accrued and unpaid dividends).

*Limits on maturity or disposition of obligations or securities* – In considering appropriate limits on the duration of the PSPAs, it was determined that in order to facilitate market stability the PSPAs should continue until the earlier of reaching a formulaic cap that will automatically adjust upwards quarterly by the cumulative amount of any losses realized by either Housing GSE and downward by the cumulative amount of any gains, but not below $200 billion or until all liabilities of Fannie Mae and Freddie Mac have been satisfied. In addition, beginning in 2011 the Treasury will begin to charge the Housing GSEs a periodic commitment fee that will be payable quarterly to compensate the taxpayers for the ongoing support provided to the Housing GSEs under the terms of the PSPAs.

3

*Housing GSEs plans for orderly resumption of private market funding or capital market access* – Under conservatorship, Fannie Mae and Freddie Mac continue to operate as going concerns, and the support of the PSPAs, and Treasury's corresponding capital commitment so that each Housing GSE maintains a positive net worth should continue to strengthen their ability to secure financing in the capital markets.

*Probability of the Housing GSEs fulfilling the terms of their obligations* - The structure of the PSPAs with their liquidation preference over all other equity, including preferred equity, combined with the PSPAs' restrictions on debt issuance, enhance the probability of both Fannie Mae and Freddie Mac ultimately repaying amounts owed.

*Need to maintain the Housing GSEs' status as private shareholder-owned companies* – Fannie Mae and Freddie Mac may emerge from conservatorship to resume independent operations, or they may emerge in some other form determined by Congress. Conservatorship preserves the status and claims of the preferred and common shareholders. The value of the warrants issued to the government under the terms of the PSPAs could potentially increase in value, thereby providing enhanced value to the taxpayers. Upon the government's exercise of the warrants, the Housing GSEs would be required under the terms of the PSPAs to apply the net cash proceeds to pay-down the liquidation preference of the senior preferred stock.

*Restrictions on the use of corporation resources* – The terms of the PSPAs prohibit Fannie Mae and Freddie Mac from declaring any dividends on outstanding preferred or common stock until the senior preferred stock has been fully redeemed. The PSPAs also prohibit the redemption of any outstanding preferred or common stock without the prior consent of the Treasury until the senior preferred stock has been fully redeemed. The PSPAs require that the Director of FHFA consult with the Treasury before entering into any new compensation arrangements or increasing amounts or benefits payable under existing compensation agreements with certain executive officers. Also, compensation at Fannie Mae and Freddie Mac has been made subject to review and approval by Treasury's Special Master for Execution Compensation, Kenneth R. Feinberg.

Attachments:

Tab 1: Determination
Tab 2: Summary of Senior Preferred Stock Purchase Agreements
Tab 3: Amendments to Amended and Restated Senior Preferred Stock Purchase Agreements

4

## SUMMARY
### Treasury Senior Preferred Stock Purchase Agreements

Fannie Mae and Freddie Mac (collectively, GSEs) debt and mortgage backed securities (MBS) outstanding today amount to about $5 trillion, and are held by central banks and investors around the world. Investors have purchased GSE securities in part because the ambiguities in their Congressional charters created a perception of government backing. These ambiguities helped to foster enormous growth in GSE debt outstanding, and the breadth of these holdings pose a systemic risk to our financial system. Because the US government contributed to these ambiguities, we have a responsibility both to avert and ultimately address the systemic risk now posed by the scale and breadth of the holdings of GSE debt and MBS.

Treasury established a Senior Preferred Stock Purchase Agreement (PSPA) with each GSE which ensures that each enterprise does not have a negative net worth. This measure adds to market stability by providing additional security to GSE debt holders – senior and subordinated – and increasing mortgage affordability by providing additional confidence to investors in GSE MBS. This commitment also will eliminate any mandatory triggering of receivership.

These PSPAs are the most effective means of averting systemic risk and protecting the taxpayer. They are more efficient than a one-time equity injection - Treasury will use them only as needed and on terms that Treasury deems appropriate.

The PSPAs provide significant protections for the taxpayer, in the form of senior preferred stock with a liquidation preference, an upfront $1 billion issuance of senior preferred stock from each GSE, quarterly dividend payments, warrants representing an ownership stake of 79.9% in each GSE going forward, and a quarterly fee starting in 2011.

### Terms of the PSPAs:

- The PSPAs are contracts between the Department of the Treasury and each GSE. They are indefinite in length. The PSPAs currently have a funding commitment cap of $200 billion each. The amendments to the PSPAs described in this memorandum will result in the PSPAs having a formulaic cap for the next three years that will automatically adjust upwards quarterly by the cumulative amount of any losses realized by either GSE and downward by the cumulative amount of any gains, but not below $200 billion, and will become fixed at the end of the three years. This cap has been chosen to demonstrate a strong commitment to the GSEs' creditors and MBS holders.

- If the Federal Housing Finance Agency determines that a GSE's liabilities have exceeded its assets under generally accepted accounting principles, Treasury will advance funds under its funding commitment to the GSE in an amount equal to the difference between liabilities and assets. The liquidation preference of the previous received senior preferred stock (discussed below) will automatically increase dollar-for-dollar by the amount of each Treasury advance of funds under its funding commitment. These PSPAs protect the senior and subordinated debt and mortgage backed securities of the GSEs. The GSEs' common stock and existing preferred shareholders will bear any loss ahead of the government.

- In exchange for entering into the PSPAs with the GSEs, Treasury immediately received the following compensation:
  - o  $1 billion of senior preferred stock in each GSE
  - o  Warrants for the purchase of common stock of each GSE representing 79.9% of the common stock of each GSE on a fully-diluted basis at a nominal price.

- The senior preferred stock accrues dividends at 10% per year. The rate shall increase to 12% if, in any quarter, the dividends are not paid in cash, until all accrued dividends have been paid in cash.

- The senior preferred stock is not entitled to voting rights. In a conservatorship, voting rights of all stockholders are vested in the Conservator.

- Under the proposed changes to the terms of the PSPAs, beginning March 31, 2011, the GSEs shall pay the Department of the Treasury on a quarterly basis a periodic commitment fee that will compensate the Treasury for the explicit support provided by the PSPAs. The Secretary of the Treasury and the conservator shall determine the periodic commitment fee in consultation with the Chairman of the Federal Reserve. The previous terms of the PSPAs provided that the GSEs would begin to pay the periodic commitment fee as of March 31, 2010.

- The following covenants apply to the GSEs as part of the PSPAs:
  - o  Without prior consent of the Treasury, the GSEs shall not:
    - Make any payment to purchase or redeem its capital stock (other than senior preferred stock), or pay any dividends (other than dividends on senior preferred stock)
    - Issue capital stock of any kind
    - Enter into any new or adjust any existing compensation agreements with "named executive officers" without consulting with the Treasury
    - Terminate conservatorship other than in connection with receivership
    - Sell, convey, or transfer any assets outside the ordinary course of business except as necessary to meet their obligation under the PSPAs to reduce their portfolio of retained mortgages and MBS
    - Increase its funded senior debt to more than 120% of its permitted mortgage portfolio size as of December 31, 2010
    - Consolidate, merge or sell substantially all of its assets

- Under the proposed changes to the terms of the PSPAs, each GSE's retained mortgage and MBS portfolio shall not exceed $900 billion as of December 31, 2010, and shall decline by 10% per year until the retained mortgage and MBS portfolio reaches $250 billion. The previous terms of the PSPAs provided that the cap on the MBS portfolio would be $850 billion as of December 31, 2009 and would begin to decline by 10% as of December 31, 2009.

## DETERMINATION

**WHEREAS**, Section 1117 of the Housing and Economic Recovery Act of 2008 (the "Act") authorizes the Secretary of the Treasury (the "Secretary") to purchase any obligations and other securities ("purchase authority") issued by the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and any Federal Home Loan Bank (collectively, the "regulated entities"), on such terms and conditions as the Secretary may determine and in such amounts as the Secretary may determine;

**WHEREAS**, Section 1117 of the Act provides that in connection with the Secretary's use of his purchase authority, the Secretary must determine that such actions are necessary to: (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer;

**WHEREAS**, Section 1117 of the Act also provides that in making the determination that such actions are necessary to protect the taxpayer, the Secretary shall take into consideration: (i) the need for preferences or priorities regarding payments to the Government; (ii) limits on maturity or disposition of obligations or securities to be purchased; (iii) the regulated entities' plans for the orderly resumption of private market funding or capital market access; (iv) the probability of the regulated entities fulfilling the terms of any such obligation or other security, including repayment; (v) the need to maintain the regulated entities' status as private-shareholder owned companies; and (vi) restrictions on the use of regulated entity resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes; and

**WHEREAS**, on September 7, 2008, Henry M. Paulson, Jr., as the Secretary on that date, made the requisite determination, based on the three criteria described above and after having taken into consideration the six factors described above, in connection with certain other actions taken on that date, including the execution by the United States Department of the Treasury (the "Treasury") of the original Senior Preferred Stock Purchase Agreement with each of Fannie Mae and Freddie Mac dated as of that date (collectively, the "Original Agreements"), and, pursuant to the Original Agreements, the purchase of senior preferred stock and common stock warrants of Fannie Mae and Freddie Mac in amounts not to exceed the maximum amounts specified therein.

**WHEREAS**, on May 6, 2009, I, as the Secretary, made the requisite determination, based on the three criteria described above and after having taken into consideration the six factors described above, in connection with the execution by the Treasury of the Amendment to the Amended and Restated Senior Preferred Stock Purchase Agreement with each of Fannie Mae and Freddie Mac dated as of that date, (collectively, the "First Amendments"), which First Amendments (i) increased Treasury's funding commitment to each of Fannie Mae and Freddie Mac to the amended maximum amounts specified therein, and (ii) amended the terms of the Original Agreements in certain other respects.

**NOW, THEREFORE, I HEREBY DETERMINE**, based on the three criteria described above and after taking into consideration the six factors described above and such other information available to me as I deem appropriate, that the execution by the Treasury of the Second Amendment to the Amended and Restated Senior Preferred Stock Purchase Agreement with each of Fannie Mae and Freddie Mac (collectively, the "Second Amendments"), which Second Amendments (i) modify the Treasury's funding commitment to each of Fannie Mae and Freddie Mac to provide them with additional funding in amounts not to exceed the new formulaic maximum amounts specified therein, and (ii) amend the terms of the Original Agreements, as previously amended, in certain other respects, are necessary to provide stability to the financial markets, prevent disruptions in the availability of mortgage finance, and protect the taxpayer.

Timothy F. Geithner.
December 24, 2009

**SECOND AMENDMENT TO AMENDED AND RESTATED
SENIOR PREFERRED STOCK PURCHASE AGREEMENT**

SECOND AMENDMENT dated as of December 24, 2009, to the AMENDED AND RESTATED SENIOR PREFERRED STOCK PURCHASE AGREEMENT dated as of September 26, 2008, between the UNITED STATES DEPARTMENT OF THE TREASURY ("Purchaser"), and FEDERAL NATIONAL MORTGAGE ASSOCIATION ("Seller"), acting through the Federal Housing Finance Agency (the "Agency") as its duly appointed conservator (the Agency in such capacity, "Conservator").

**Background**

A.  Purchaser and Seller have heretofore entered into the Amended and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008 (the "Amended and Restated Agreement").

B.  In the Amended and Restated Agreement, Purchaser committed itself to provide to Seller, on the terms and conditions provided in the Amended and Restated Agreement, immediately available funds in an amount as determined from time to time as provided in the Amended and Restated Agreement, but in no event in an aggregate amount exceeding $100,000,000,000.

C.  Purchaser and Seller have heretofore entered into the Amendment dated as of May 6, 2009, to the Amended and Restated Agreement (the "First Amendment").

D.  In the First Amendment, Purchaser increased to $200,000,000,000 the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated Agreement, and amended the terms of the Amended and Restated Agreement in certain other respects.

E.  Purchaser and Seller are each authorized to enter into this Second Amendment to the Amended and Restated Agreement ("this Second Amendment") (i) modifying the Treasury's funding commitment to Seller to provide it with additional funding in amounts not to exceed the new formulaic maximum amount specified herein, and (ii) amending the terms of the Amended and Restated Agreement, as previously amended, in certain other respects.

THEREFORE, for and in consideration of the mutual agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Purchaser and Seller agree as follows:

**Terms and Conditions**

**1.    Definitions.**

Capitalized terms used and not defined in this Amendment shall have the respective meanings given such terms in the Amended and Restated Agreement, as amended by the First Amendment (the Amended and Restated Agreement, as amended by the First Amendment, being the "Existing Agreement").

**2.    Amendment to Section 1 (Relating to Definition of "Indebtedness").**

The definition of "Indebtedness" in Section 1 of the Existing Agreement is hereby amended to read as follows:

*"Indebtedness"* of any Person means, for purposes of Section 5.5 only, without duplication, (a) all obligations of such Person for money borrowed by such Person, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services, other than trade accounts payable, (e) all Capital Lease Obligations of such Person, (f) obligations, whether contingent or liquidated, in respect of letters of credit (including standby and commercial), bankers' and similar instruments, and (g) any obligation of such Person, contingent or otherwise, guaranteeing or having the economic effect of guaranteeing and Indebtedness of the types set forth in clauses (a) through (f) payable by another Person other than Mortgage Guarantee Obligations (and, for the avoidance of doubt, without giving effect to any change that may be made hereafter in respect of Statement of Financial Accounting Standards No. 140, 166, or 167, or any similar accounting standard).  Indebtedness balances or amounts shall be measured at par value for purposes of Section 5.5 only.

**3.    Amendment to Section 1 (Relating to Definition of "Maximum Amount").**

The definition of "Maximum Amount" in Section 1 of the Existing Agreement is hereby amended to read as follows:

*"Maximum Amount"* means, as of any date of determination, the greater of (a) $200,000,000,000 (two hundred billion dollars), or (b) $200,000,000,000 plus the cumulative total of Deficiency Amounts determined for calendar quarters in calendar years 2010, 2011, and 2012, less any Surplus Amount determined as of December 31, 2012, and in the case of either (a) or (b), less the aggregate amount of funding under the Commitment prior to such date.

**4.    Amendment to Section 1 (Relating to Definition of "Mortgage Assets").**

The definition of "Mortgage Assets" in Section 1 of the Existing Agreement is hereby amended to read as follows:

*"Mortgage Assets"* of any Person means assets of such Person consisting of mortgages, mortgage loans, mortgage-related securities, participation

certificates, mortgage-backed commercial paper, obligations of real estate mortgage investment conduits and similar assets, in each case to the extent such assets would appear on the balance sheet of such Person in accordance with GAAP as in effect as of the date hereof (and, for the avoidance of doubt, without giving effect to any change that may be made hereafter in respect of Statement of Financial Accounting Standards No. 140, 166, or 167, or any similar accounting standard).  Mortgage Asset balances or amounts shall be measured at unpaid principal balance for purposes of Section 5.7 only.

5.    **Amendment to Section 1 (Adding Definition for New Defined Term "Surplus Amount").**

Section 1 of the Existing Agreement is hereby amended by inserting after the definition of the term "Senior Preferred Stock" the following:

"*Surplus Amount*" means, as of the date of determination, the amount if any by which (a) the total assets of Seller (such assets excluding the Commitment and any unfunded amounts thereof) exceed (b) the total liabilities of Seller, in each case as reflected on the balance sheet of Seller as of the applicable date set forth in the Agreement, prepared in accordance with GAAP.

6.    **Amendment to Section 2.1 (Relating to the Commitment).**

Section 2.1 of the Existing Agreement is hereby amended to read as follows:

2.1  *Commitment.*  Purchaser hereby commits to provide to Seller, on the terms and conditions set forth herein, immediately available funds in an amount up to but not in excess of the Available Amount, as determined from time to time (the "Commitment"); provided, that in no event shall the aggregate amount funded under the Commitment exceed the greater of (a) $200,000,000,000 (two hundred billion dollars), or (b) $200,000,000,000 plus the cumulative total of Deficiency Amounts determined for calendar quarters in calendar years 2010, 2011, and 2012, less any Surplus Amount determined as of December 31, 2012. The liquidation preference of Senior Preferred Stock shall increase in connection with draws on the Commitment, as set forth in Section 3.3 below.

7.    **Amendment to Section 2.5 (Relating to Termination of Purchaser's Obligations).**

Section 2.5 of the Existing Agreement is hereby amended to read as follows:

2.5  *Termination of Purchaser's Obligations.*  Subject to earlier termination pursuant to Section 6.7, all of Purchaser's obligations under and in respect of the Commitment shall terminate upon the earliest of:  (a) if the Liquidation End Date shall have occurred, (i) the payment in full of Purchaser's obligations with respect to any valid request for funds pursuant to Section 2.4 or (ii) if there is no Deficiency Amount on the Liquidation End Date or if no such request pursuant to Section 2.4 has been made, the close of business on the 15th Business Day following the determination of the Deficiency Amount, if any, as of the Liquidation End Date; (b) the payment in full of, defeasance of or other reasonable provision for all liabilities of Seller, whether or not contingent, including payment of any amounts that may become payable on, or expiry of or other provision for, all Mortgage Guarantee Obligations and provision for

- 3 -

unmatured debts; and (c) the funding by Purchaser under the Commitment of an aggregate equal to the greater of (a) $200,000,000,000 (two hundred billion dollars), or (b) $200,000,000,000 plus the cumulative total of Deficiency Amounts determined for calendar quarters in calendar years 2010, 2011, and 2012, less any Surplus Amount determined as of December 31, 2012.  For avoidance of doubt, the Commitment shall *not* be terminable by Purchaser solely by reason of (i) the conservatorship, receivership or other insolvency proceeding of Seller or (ii) the Seller's financial condition or any adverse change in Seller's financial condition.

8.     **Amendment to Section 3.2 (Relating to Periodic Commitment Fee).**

Section 3.2 of the Existing Agreement is hereby amended to read as follows:

3.2. *Periodic Commitment Fee.* (a) Commencing March 31, 2011, Seller shall pay to Purchaser quarterly, on the last day of March, June, September and December of each calendar year (each a "Periodic Fee Date"), a periodic commitment fee (the "Periodic Commitment Fee"). The Periodic Commitment Fee shall accrue from January 1, 2011.

(b) The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2010. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2010 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

(c) At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock so that the aggregate liquidation preference of all such outstanding shares of Senior Preferred Stock is increased by an amount equal to the Periodic Commitment Fee. Seller shall deliver notice of such election not later than three (3) Business Days prior to each Periodic Fee Date. If the Periodic Commitment Fee is not paid in cash by 12:00 pm (New York time) on the applicable Periodic Fee Date (irrespective of Seller's election pursuant to this subsection), Seller shall be deemed to have elected to pay the Periodic Commitment Fee by adding the amount thereof to the liquidation preference of the Senior Preferred Stock, and the aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall thereupon be automatically increased, in the manner contemplated by the first sentence of this section, by an aggregate amount equal to the Periodic Commitment Fee then due.

9.     **Amendment to Section 5.7 (Relating to Owned Mortgage Assets).**

Section 5.7 of the Existing Agreement is hereby amended to read as follows:

5.7. *Mortgage Assets.*  Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2009, $900 billion, or (ii) on December 31 of each year thereafter, 90.0% of the aggregate amount of Mortgage Assets that Seller was permitted to own as of December 31 of the immediately

preceding calendar year; <u>provided,</u> that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets.

**10.** **Existing Agreement to Continue, as Amended.**

Except as expressly modified by this Second Amendment, the Existing Agreement shall continue in full force and effect.

**11.** **Effective Date.**

This Second Amendment shall not become effective until it has been executed by both of Purchaser and Seller. When this Second Amendment has been so executed, it shall become effective as of the date first above written.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION, by

Federal Housing Finance Agency,
its Conservator


Edward J. DeMarco
Acting Director


UNITED STATES DEPARTMENT
OF THE TREASURY


Timothy F. Geithner
Secretary of the Treasury

TREASURY-0194

## SECOND AMENDMENT TO AMENDED AND RESTATED
## SENIOR PREFERRED STOCK PURCHASE AGREEMENT

SECOND AMENDMENT dated as of December 24, 2009, to the AMENDED AND RESTATED SENIOR PREFERRED STOCK PURCHASE AGREEMENT dated as of September 26, 2008, between the UNITED STATES DEPARTMENT OF THE TREASURY ("Purchaser"), and FEDERAL HOME LOAN MORTGAGE CORPORATION ("Seller"), acting through the Federal Housing Finance Agency (the "Agency") as its duly appointed conservator (the Agency in such capacity, "Conservator").

### Background

A.  Purchaser and Seller have heretofore entered into the Amended and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008 (the "Amended and Restated Agreement").

B.  In the Amended and Restated Agreement, Purchaser committed itself to provide to Seller, on the terms and conditions provided in the Amended and Restated Agreement, immediately available funds in an amount as determined from time to time as provided in the Amended and Restated Agreement, but in no event in an aggregate amount exceeding $100,000,000,000.

C.  Purchaser and Seller have heretofore entered into the Amendment dated as of May 6, 2009, to the Amended and Restated Agreement (the "First Amendment").

D.  In the First Amendment, Purchaser increased to $200,000,000,000 the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated Agreement, and amended the terms of the Amended and Restated Agreement in certain other respects.

E.  Purchaser and Seller are each authorized to enter into this Second Amendment to the Amended and Restated Agreement ("this Second Amendment") (i) modifying the Treasury's funding commitment to Seller to provide it with additional funding in amounts not to exceed the new formulaic maximum amount specified herein, and (ii) amending the terms of the Amended and Restated Agreement, as previously amended, in certain other respects.

THEREFORE, for and in consideration of the mutual agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Purchaser and Seller agree as follows:

**Terms and Conditions**

1. **Definitions.**

Capitalized terms used and not defined in this Amendment shall have the respective meanings given such terms in the Amended and Restated Agreement, as amended by the First Amendment (the Amended and Restated Agreement, as amended by the First Amendment, being the "Existing Agreement").

2. **Amendment to Section 1 (Relating to Definition of "Indebtedness").**

The definition of "Indebtedness" in Section 1 of the Existing Agreement is hereby amended to read as follows:

*"Indebtedness"* of any Person means, for purposes of Section 5.5 only, without duplication, (a) all obligations of such Person for money borrowed by such Person, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services, other than trade accounts payable, (e) all Capital Lease Obligations of such Person, (f) obligations, whether contingent or liquidated, in respect of letters of credit (including standby and commercial), bankers' and similar instruments, and (g) any obligation of such Person, contingent or otherwise, guaranteeing or having the economic effect of guaranteeing and Indebtedness of the types set forth in clauses (a) through (f) payable by another Person other than Mortgage Guarantee Obligations (and, for the avoidance of doubt, without giving effect to any change that may be made hereafter in respect of Statement of Financial Accounting Standards No. 140, 166, or 167, or any similar accounting standard). Indebtedness balances or amounts shall be measured at par value for purposes of Section 5.5 only.

3. **Amendment to Section 1 (Relating to Definition of "Maximum Amount").**

The definition of "Maximum Amount" in Section 1 of the Existing Agreement is hereby amended to read as follows:

*"Maximum Amount"* means, as of any date of determination, the greater of (a) $200,000,000,000 (two hundred billion dollars), or (b) $200,000,000,000 plus the cumulative total of Deficiency Amounts determined for calendar quarters in calendar years 2010, 2011, and 2012, less any Surplus Amount determined as of December 31, 2012, and in the case of either (a) or (b), less the aggregate amount of funding under the Commitment prior to such date.

4. **Amendment to Section 1 (Relating to Definition of "Mortgage Assets").**

The definition of "Mortgage Assets" in Section 1 of the Existing Agreement is hereby amended to read as follows:

*"Mortgage Assets"* of any Person means assets of such Person consisting of mortgages, mortgage loans, mortgage-related securities, participation

- 2 -

certificates, mortgage-backed commercial paper, obligations of real estate mortgage investment conduits and similar assets, in each case to the extent such assets would appear on the balance sheet of such Person in accordance with GAAP as in effect as of the date hereof (and, for the avoidance of doubt, without giving effect to any change that may be made hereafter in respect of Statement of Financial Accounting Standards No. 140, 166, or 167, or any similar accounting standard). Mortgage Asset balances or amounts shall be measured at unpaid principal balance for purposes of Section 5.7 only.

5.   **Amendment to Section 1 (Adding Definition for New Defined Term "Surplus Amount").**

Section 1 of the Existing Agreement is hereby amended by inserting after the definition of the term "Senior Preferred Stock" the following:

"*Surplus Amount*" means, as of the date of determination, the amount if any by which (a) the total assets of Seller (such assets excluding the Commitment and any unfunded amounts thereof) exceed (b) the total liabilities of Seller, in each case as reflected on the balance sheet of Seller as of the applicable date set forth in the Agreement, prepared in accordance with GAAP.

6.   **Amendment to Section 2.1 (Relating to the Commitment).**

Section 2.1 of the Existing Agreement is hereby amended to read as follows:

2.1 *Commitment.* Purchaser hereby commits to provide to Seller, on the terms and conditions set forth herein, immediately available funds in an amount up to but not in excess of the Available Amount, as determined from time to time (the "Commitment"); provided, that in no event shall the aggregate amount funded under the Commitment exceed the greater of (a) $200,000,000,000 (two hundred billion dollars), or (b) $200,000,000,000 plus the cumulative total of Deficiency Amounts determined for calendar quarters in calendar years 2010, 2011, and 2012, less any Surplus Amount determined as of December 31, 2012. The liquidation preference of Senior Preferred Stock shall increase in connection with draws on the Commitment, as set forth in Section 3.3 below.

7.   **Amendment to Section 2.5 (Relating to Termination of Purchaser's Obligations).**

Section 2.5 of the Existing Agreement is hereby amended to read as follows:

2.5 *Termination of Purchaser's Obligations.* Subject to earlier termination pursuant to Section 6.7, all of Purchaser's obligations under and in respect of the Commitment shall terminate upon the earliest of: (a) if the Liquidation End Date shall have occurred, (i) the payment in full of Purchaser's obligations with respect to any valid request for funds pursuant to Section 2.4 or (ii) if there is no Deficiency Amount on the Liquidation End Date or if no such request pursuant to Section 2.4 has been made, the close of business on the 15th Business Day following the determination of the Deficiency Amount, if any, as of the Liquidation End Date; (b) the payment in full of, defeasance of or other reasonable provision for all liabilities of Seller, whether or not contingent, including payment of any amounts that may become payable on, or expiry of or other provision for, all Mortgage Guarantee Obligations and provision for

- 3 -

unmatured debts; and (c) the funding by Purchaser under the Commitment of an aggregate equal to the greater of (a) $200,000,000,000 (two hundred billion dollars), or (b) $200,000,000,000 plus the cumulative total of Deficiency Amounts determined for calendar quarters in calendar years 2010, 2011, and 2012, less any Surplus Amount determined as of December 31, 2012. For avoidance of doubt, the Commitment shall *not* be terminable by Purchaser solely by reason of (i) the conservatorship, receivership or other insolvency proceeding of Seller or (ii) the Seller's financial condition or any adverse change in Seller's financial condition.

8.     **Amendment to Section 3.2 (Relating to Periodic Commitment Fee).**

Section 3.2 of the Existing Agreement is hereby amended to read as follows:

3.2. *Periodic Commitment Fee.* (a) Commencing March 31, 2011, Seller shall pay to Purchaser quarterly, on the last day of March, June, September and December of each calendar year (each a "Periodic Fee Date"), a periodic commitment fee (the "Periodic Commitment Fee"). The Periodic Commitment Fee shall accrue from January 1, 2011.

(b) The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2010. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2010 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

(c) At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock so that the aggregate liquidation preference of all such outstanding shares of Senior Preferred Stock is increased by an amount equal to the Periodic Commitment Fee. Seller shall deliver notice of such election not later than three (3) Business Days prior to each Periodic Fee Date. If the Periodic Commitment Fee is not paid in cash by 12:00 pm (New York time) on the applicable Periodic Fee Date (irrespective of Seller's election pursuant to this subsection), Seller shall be deemed to have elected to pay the Periodic Commitment Fee by adding the amount thereof to the liquidation preference of the Senior Preferred Stock, and the aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall thereupon be automatically increased, in the manner contemplated by the first sentence of this section, by an aggregate amount equal to the Periodic Commitment Fee then due.

9.     **Amendment to Section 5.7 (Relating to Owned Mortgage Assets).**

Section 5.7 of the Existing Agreement is hereby amended to read as follows:

5.7. *Mortgage Assets.* Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2009, $900 billion, or (ii) on December 31 of each year thereafter, 90.0% of the aggregate amount of Mortgage Assets that Seller was permitted to own as of December 31 of the immediately

preceding calendar year; <u>provided</u>, that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets.

**10.   <u>Existing Agreement to Continue, as Amended</u>.**

Except as expressly modified by this Second Amendment, the Existing Agreement shall continue in full force and effect.

**11.   <u>Effective Date</u>.**

This Second Amendment shall not become effective until it has been executed by both of Purchaser and Seller.  When this Second Amendment has been so executed, it shall become effective as of the date first above written.

FEDERAL HOME LOAN MORTGAGE
CORPORATION, by

Federal Housing Finance Agency,
its Conservator

_Edward J. De Marco_

Edward J. DeMarco
Acting Director


UNITED STATES DEPARTMENT
OF THE TREASURY

_Timothy F. Geithner_

Timothy F. Geithner
Secretary of the Treasury