**Section 4.05. Re- edies.**

Ql. 5f an Vzent of p efavlt oMMrs and is Mcontinviny x itu resceMto a Hl Hool2tue Tohders of Hl s recresentiny a 1 aSorit0 of tue re1 aininy crinMcah, ahanMd of svMd Hl Hool1 a02, 0 x ritten notiMd to greddie F aMre1 oze greddie F aMas Dd1 inistrator and no1 inate its svMdssor vnder tuis Dyree1 ent x itu resceMto svMd Hl Hool' Gue no1 inee sualh, e dee1 ed accointed as greddie F aMs svMdssor as Dd1 inistrator vnhess greddie F aMb, SeMs x ituin 9b da0s after svMd no1 ination' Rcon svMd o, SeMion:

Qi. Gue Dd1 inistrator 1 a0 cetition an0 Movrt of Md1 cetent SvrisdiMion for tue accoint1 ent of its svMdssorkor

Qii. Dn0 , ona fide Tohder tuat uas , een a Tohder for at least si) 1 ontus 1 a02on , eualf of svMd Tohder and alhotuers si1 iharl0 sitvated2cetition an0 svMd Movrt for accoint1 ent of tue Dd1 inistratorRs svMdssor'

Q. 5f a svMdssor Dd1 inistrator is accointed2tue Dd1 inistrator sualhsv, 1 it to its svMdssor a Md1 clete x ritten recort and aMMvntiny of tue F ortyayes in tue affeMed Hl Hoohand sualhtave alhotuer stecs neMssar0 or desira, he to transfer its interest in and ad1 inistration of svMd Hl Hoohto its svMdssor'

OMqv, SeMto tue greddie F aMDM2a svMdssor 1 a0 tawe an0 aMion x itu resceMto tue F ortyayes as 1 a0 , e reasona, he and accrocriate in tue MrMM1 stanMs' Hrior to tue desiynation of a svMdssor2tue Tohders of Hl s recresentiny a 1 aSorit0 of tue re1 aininy crinMcah, ahanMd of an0 affeMed Hl Hooh 1 a0 x aize an0 cast or Mrrent Vzent of p efavlt'

Ql. Dccoint1 ent of a svMdssor sualhnot rehieze greddie F aM2in its McaM0 as Avarantor2of its yvarantee o, hiyations as set fortu in tuis Dyree1 ent'

**Section 4.0p. Li- itation on Suits by Holders.**

Ql. J itu resceMto an0 Hl Hool2e) Mct as crozided in qeMion 7'bm2no Tohder sualhuaze an0 riyut to institvte an0 aMion or croMediny at hax or in eUvit0 or in , anwvctM0 or otuerx ise or seewan0 otuer re1 ed0 x uatsoezer ayainst greddie F aMor tue Grvstee x itu resceMto tuis Dyree1 ent or tue rehated Hl s or F ortyayes2vnhess:

Qi. qvMd Tohder creziovsl0 uas yizen tue Grvstee x ritten notiMd of an Vzent of p efavlt and tue MontinvanMd tuereofk

Qii. Gue Tohders of Hl s recresentiny a 1 aSorit0 of tue re1 aininy crinMcah, ahanMd of an0 affeMed Hl Hoohuaze 1 ade a x ritten reUvest to tue Grvstee to institvte an aMion or croMediny in its ox n na1 e and uaze offered tue Grvstee reasona, he inde1 nit0 ayainst tue Msts2e) censes and hia, ihities to , e inMrrredk

Qiii. Gue Grvstee uas faihed to institvte an0 svMd aMion or croMediny for 6b da0s after its reMict of tue x ritten notiM2reUvest and offer of inde1 nit0 desMfi, ed a, ozekand

Qz. Gue Grvstee uas not reMized fro1 svMd Tohders an0 direMion inMnsistent x itu tue x ritten reUvest desMfi, ed a, oze dvriny tue 6b8da0 ceriod'

Q. Bo Tohder sualhuaze an0 riyut vnder tuis Dyree1 ent to creSvdiM tue riyuts of an0 otuer Tohder2to o, tain or seewcreferenM or criorit0 ozer an0 otuer Tohder or to enforM an0 riyut vnder tuis Dyree1 ent2e) Mct for tue rata, he and Md1 1 on , enefit of alhTohders of Hl s recresentiny interests in an0 affeMed Hl Hool'

9j

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

OMgor tue croteMion and enforMent of tue crozisions of tuis qeMsion2greddie F aM2tue Grvstee and eaMn and ezer0 Tolder sualh, e entitled to svMd relief as Man , e yizen eituer at hax or in eUvit0' Botx itustanding tue foreyoiny2no TolderPs riyut to reMize ca01 ent Oor to institvte svit to enforMd ca01 ent. of crinMcahand interest as crozided uerein on or after tue dve date of svMd ca01 ent sualh, e i1 caired or affeMed x ituovt tue Monsent of tue Tolder'

# ARTICLE VI

## Trustee

**Section 6.01. Duties of Trustee.**

Q. 5f an Vzent of p efavlt uas oMMrred and is Montinviny x itu resceMt to a Hl Hool2tue Grvstee sualhe)erMse tue riyuts and cox ers zested in it , 0 tuis Dyree1 ent and vse tue sa1 e deyree of Mare and swilhin its e)erMse as a crvdent cerson x ovld e)erMse or vse vnder tue MrMw1 stanMds in tue MondvMd of svMd cersonPs ox n affairs'

Q. V)Mct dvriny tue MontinvanM of an Vzent of p efavlt2tue Grvstee vndertawes to cerfor1 svMd dvties and onl0 svMd dvties as are sceMfiMlH0 set fortu in tuis Dyree1 ent and sualhnot , e Hia, he e)Mct for tue cerfor1 anM of svMd dvties and o, liyations as are sceMfiMlH0 set fortu in tuis Dyree1 ent and no i1 clied Mzenants or o, liyations sualh, e read into tuis Dyree1 ent ayainst tue Grvstee'

OMd Gue Grvstee and its direMors2offiMrs2e1 clo0ees and ayents 1 a0 not , e croteMed fro1 Hia, ilit0 x uiMd x ovld otuerx ise , e i1 cosed , 0 reason of x ilhfvh1 isfeasanM2, ad faitu or yross neyliyenMd in tue cerfor1 anM of tueir resceMize dvties or , 0 reason of reMless disreyard of o, liyations and dvties vnder tuis Dyree1 ent2e)Mct tuat:

Q. tuis carayracu does not hi1 it tue effeMd of carayracu Q. of tuis qeMionk

Qi. tue Grvstee sualhnot , e Hia, he for an0 aMion tawen2or not tawen2, 0 tue Grvstee in yood faitu cvrsvant to tuis Dyree1 ent or for errors in S/dy1 entk and

Qii. tue Grvstee sualhnot , e reUvired to tawe notiM or , e dee1 ed to uaze notiM or wnox ledye of an0 defavlt or Vzent of p efavlt2vnless tue Grvstee o, tains aMwahvnox ledye or x ritten notiM of svMd defavlt or Vzent of p efavlt' 5n tue a, senM of svMd aMwahvnox ledye or notiM2tue Grvstee 1 a0 MonMhvsivel0 assv1 e tuat tuere is no defavlt or Vzent of p efavlt'

Qd. Vzer0 crozision of tuis Dyree1 ent sualh, e sv, SeMt to tue crozisions of tuis qeMion and qeMion 6'bm̄

Q. Gue Grvstee sualhnot , e Hia, he for inde, tedness eziden Md , 0 or arisiny vnder tuis Dyree1 ent2inMhdiny crinMcahof or interest on tue Hl s2or interest on an0 1 one0 reMized , 0 it e)Mct as tue Grvstee 1 a0 ayree in x ritiny'

QF. F one0 uehd in trvst , 0 tue Grvstee need not , e seyreyated fro1 otuer fvnds e)Mct to tue e)tent reUvired , 0 hax or tue ter1 s of tuis Dyree1 ent'

Q. Bo crozision of tuis Dyree1 ent sualhreUvire tue Grvstee to e)cend2adzanM or riswits ox n fvnds or otuerx ise inMr finanMahhia, ilit0 in tue cerfor1 anM of an0 of its dvties uerevnder or in tue e)erMse of an0 of its riyuts or cox ers2if it sualhuaze reasona, he yrovnds to , elieze tuat reca01 ent of svMd fvnds or adeUvate inde1 nit0 ayainst svMd riswor hia, ilit0 is not reasona, h0 assvred to it'

94

---

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Q. Gue Grvstee 1 a02, vt sualhnot , e o, liyated to2vndertawe an0 leyahaMion tuat it dee1 s neMssar0 or desira, he in tue interest of Tohters' Gue Grvstee 1 a0 , e rei1 , vrsed for tue leyahe)censes and Msts of svM aMion fro1  tue assets of tue rehated Hl  Hooli

**Section 6.05. Certain Matters Affecting the Trustee.**

Q. Gue Grvstee2and an0 direMor2offiMr2e1 cho0ee or ayent of tue Grvstee 1 a0 rel0 in yood faitu on an0 MrtifiMte2ocinion or ouer doM1 ent of an0 wind x uiM2cri1 a faMe2is crocerl0 e)eMted and sv, 1 itted , 0 an0 accrocriate Herson resceMiny an0 1 atters arisiny uerevnder' Gue Grvstee 1 a0 rel0 on an0 svM doM1 ents , eliezed , 0 it to , e yenvine and to uaze , een siyned or cresented , 0 tue crocer Herson and on tueir faM Monfor1 iny to tue reUvire1 ents of tuis Dyree1 ent' Gue Grvstee need not inzestiyate an0 faMor 1 atter stated in svM doM1 ents'

Q. - efore tue Grvstee aMs or refrains fro1  aMiny2it 1 a0 reUvire an offiMrB MrtifiMte or an ocinion of Movnsel2x uiM sualhnot , e at tue e)cense of tue Grvstee' Gue Grvstee sualhnot , e Iia, he for an0 aMion it tawes or o1 its to tawe in yood faitu in relianM on an offiMrB MrtifiMte or ocinion of Movnseli Gue riyut of tue Grvstee to cerfor1  an0 disMetionar0 aMenv1 erated in tuis Dyree1 ent sualhnot , e Monstrved as a dvt0 and tue Grvstee sualhnot , e ansx era, he for otuer tuan its x ilHfvh1 isfeasanM2, ad faitu or yross neyhiyenM in tue cerfor1 anM of svM aM'

QM Gue Grvstee 1 a0 e)eMte an0 of tue trvsts or cox ers uerevnder or cerfor1  an0 dvties uerevnder eituer direMl0 or , 0 or turovyu ayents or attorne0s or a Mstodian or no1 inee'

Q1. Gue Grvstee sualhnot , e Iia, he for an0 aMion it tawes or o1 its to tawe in yood faitx uiM it , eliezes to , e avtuori( ed or x ituin its riyuts or cox ersk crozided2tuat tue GrvsteeB MondvM does not Monstitvte x ilHfvh1 isfeasanM2, ad faitu or yross neyhiyenM' 5n no ezent sualhtue Grvstee uaze an0 Iia, ilit0 for MonseUventiahda1 ayes'

Q. Gue Grvstee 1 a0 Monsvlt x itu and rel0 on tue adziM of Movnsel2aMMovntants and ouer adzisors and sualhnot , e Iia, he for errors in Svdy1 ent or for an0tuiny it does or does not do in yood faitu if it so relies' Dn0 ocinion of Movnsehx itu resceMt to leyah1 atters rehatiny to tuis Dyree1 ent and tue Hl s sualh, e fvlhand M1 chete avtuori(ation and croteMion fro1  Iia, ilit0 in resceMt to an0 aMion taven2o1 itted or svffered , 0 it uerevnder in yood faitu and in aMordanM x itu an0 ocinion of svM Movnseli'

QI. Dn0 fees2e)censes and inde1 nities ca0a, he fro1  tue assets of an0 Hl  Hoohto greddie F aM2in its McaMt0 as Grvstee2in tue cerfor1 anM of its dvties and o, liyations uerevnder sualhnot affeM greddie F aMs yvarantee x itu resceMto tuat Hl  Hool2as set fortu in qeMion 3'bE'

**Section 6.0p. Trustee's Disclai- er.** Gue Grvstee sualhnot , e reconsi, he for and 1 aves no representation as to tue zahidit0 or adeUvaM0 of tuis Dyree1 ent2tue assets of tue Hl  Hoohor tue Hl s'

**Section 6.0j . Trustee May Own PCs.** qv, SeM to qeMion j 'b62tue Grvstee in its indizidvahor an0 otuer McaM0 1 a0 , eM1 e tue ox ner or chedyee of Hl s x itu tue sa1 e riyuts as it x ovhd uaze if it x ere not tue Grvstee'

**Section 6.04. Inde- nity.** VaM Hl  Hoohsualhinde1 nif0 tue Grvstee and tue GrvsteeB e1 cho0ees2direMors2offiMrs and ayents2as crozided in tuis Dyree1 ent2ayainst an0 alhMhai1 s2hosses2Iia, ihities or a)1 enses GnMhvdiny attorne0sPfees. inMrred , 0 it in MonneMion x itu tue ad1 inistration of tuis trvst and tue cerfor1 anM of its dvties vnder tuis Dyree1 ent Go tue e) tent not creziovsl0 rei1 , vrsed a, oze.2inMvdiny2x ituovt Ii1 itation2tue e)eMtion and fihiny of an0 federahor state ta) retvrns and infor1 ation retvrns and , einy tue 1 ortyayee of reMrd x itu resceMto tue rehated F ortyayes' Gue Grvstee sualh notif0 tue Dd1 inistrator cro1 ctl0 of an0 Mhai1  for x uiM it 1 a0 seewinde1 nit0' gaihvre , 0 tue Grvstee to so

9E

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1868

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

notif0 tue Dd1 inistrator sualihnot reiieze tue reiated Hl Hoohof its o, liyations uerevnder' D Hl Hoohsualihnot , e reUvired to rei1 , vrse an0 e) cense or inde1 nif0 ayainst an0 hsss2iia, ihit0 or e) cense inMrred , 0 tue Grvstee turovyu tue GrvsteeB ox n x ilHfvh1 isfeasanM2, ad faitu or yross neyliyenM'

Gue GrvsteeB riyuts cvrsvant to tuis qeMion sualihsvrzrize tue disMarye of tuis Dyree1 ent'

**Section 6.06. Re2lace- ent of Trustee.** Gue Grvstee 1 a0 resiyn at an0 ti1 e' Dn0 svMdssor Grvstee sualihresiyn if it Mases to , e eliyi, he in aMordanM x itu tue crozisions of qeMion 6'bE' 5n eituer Mase2tue resiynation of tue Grvstee sualih, eM1 e effeMize2and tue resiyniny Grvstee sualih, e disMaryed fro1 its o, liyations x itu resceMto tue Hl Hoohs Mcated vnder tuis Dyree1 ent , 0 yiziny Eb 0a0sPx ritten notiM of tue resiynation to tue p ecositor2tue Avarantor and tue Dd1 inistrator and vcon tue effeMizeness of an accoint1 ent of a svMdssor Grvstee2x uiM1 a0 , e as of a date crior to tue end of tue Eb8la0 ceriod' Rcon reMiziniy svM1 notiM of resiynation2tue p ecositor sualihcro1 ctl0 accoint one or 1 ore svMdssor Grvstees , 0 x ritten instrv1 ent2one Mc0 of x uiM is delizered to tue resiyniny Grvstee and one Mc0 of x uiM is delizered to tue svMdssor Grvstee' Gue svMdssor Grvstee need not , e tue sa1 e Herson for alhHl Hoohs' 5f no svMdssor Grvstee uas , een accointed for a Hl Hool2or one tuat uas , een accointed uas not aMMcted tue accoint1 ent x ituin Eb 0a0s after yiziny svM1 notiM of resiynation2tue resiyniny Grvstee 1 a0 cetition an0 Mvrt of M01 cetent SvrisdiMion for tue accoint1 ent of a svMdssor Grvstee'

Hrior to an Vzent of p efavlt2or if an Vzent of p efavlt uas oMMrred and uas , een Mrred x itu resceMto a Hl Hool2greddie F aMMannot , e re1 ozed as Grvstee x itu resceMto tuat Hl Hool' 5f an Vzent of p efavlt uas oMMrred and is Montinviny x uile greddie F aMis tue Grvstee2at tue direMion of T olders of Hl s recresentiny a 1 aSorit0 of tue re1 aininy crinMcah, ahanM of svM1 Hl Hool2greddie F aMsualihresiyn or , e re1 ozed as Grvstee2and to tue e) tent cer1 itted , 0 hx 2alhof tue riyuts and o, liyations of tue Grvstee x itu resceMto tue reiated Hl Hoohonl02x ilh, e ter1 inated , 0 notif0iny tue Grvstee in x ritiny' T olders of Hl s recresentiny a 1 aSorit0 of tue re1 aininy crinMcah, ahanM of tue Hl Hoohx ilhtuen , e avtuori(ed to na1 e and accoint one or 1 ore svMdssor Grvstees' Botx itustanding tue ter1 ination of tue Grvstee2its lia, ihit0 vnder tuis Dyree1 ent and arisiny crior to svM1 ter1 ination sualihsvrzrize svM1 ter1 ination'

5f a svMdssor Grvstee is serziny as tue Grvstee2tue folhox iny ezents are ; Grvstee Vzents of p efavlt" x itu resceMto a Hl Hool ;

Oi. tue Grvstee fails to M1 clt0 x itu qeMion 6'bEk

Oii. tue Grvstee is adSvdyed , anwrvct or insolzentk

Oiii. a reMizer or otuer cv, liMofficMr tawes Marye of tue Grvstee or its crocert0kor

Oz. tue Grvstee otuerx ise , eM1 es inMca, he of aMiny'

5f an a0 ti1 e a Grvstee Vzent of p efavlt uas oMMrred and is Montinviny2tue Avarantor Oor if an Vzent of p efavlt uas oMMrred and is Montinviny2tue p ecositor. 1 a02and if direMed , 0 T olders of Hl s recresentiny a 1 aSorit0 of tue re1 aininy crinMcah, ahanM of svM1 Hl Hool2sualih2re1 oze tue Grvstee as to svM1 Hl coohand accoint a svMdssor Grvstee , 0 x ritten instrv1 ent2one Mc0 of x uiM sualih, e delizered to tue Grvstee so re1 ozed and one Mc0 of x uiM sualih, e delizered to tue svMdssor Grvstee2and tue Avarantor Oor if an Vzent of p efavlt uas oMMrred and is Montinviny2tue p ecositor. sualihyize x ritten notiM of tue svMdssor Grvstee to tue T olders affeMed , 0 svM1 Mdssion' Botx itustandiny tue ter1 ination of tue Grvstee2its lia, ihit0 vnder tuis Dyree1 ent arisiny crior to svM1 ter1 ination x ilhsvrzrize svM1 ter1 ination'

5f tue Grvstee resiyns or is re1 ozed or if a zaManM e) ists in tue offiM of tue Grvstee for an0 reason Oue Grvstee in svM1 ezent , einy referred to uerein as tue retiriny Grvstee.2tue p ecositor sualihcro1 ctl0 accoint a svMdssor Grvstee tuat satisfies tue eliyi, ihit0 reUvire1 ents of qeMion 6'bE'

nb

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Gue retiriny Grvstee ayrees to Mocerate x itu tue p ecositor and an0 svMssor Grvstee in effeMiny tue ter1 ination of tue retiriny GrvsteeЋ responsi ilities and riyuts uerevnder and sualhcro1 ctl0 crozide svMd svMssor Grvstee alhdoM1 ents and reMrds reasona, l0 reUvested , 0 it to ena, he it to assv1 e tue GrvsteeЋ fvnMions uerevnder'

D svMdssor Grvstee sualhdelizer a x ritten aMectanM of its accoint1 ent to tue retiriny Grvstee and to tue p ecositor2tue Avarantor and tue Dd1 inistrator' Guerevcon tue resiynation or re1 ozahof tue retiriny Grvstee sualh, eM1 e effeMize2and tue svMssor Grvstee sualhuaze alhtue riyuts2cox ers and dvties of tue Grvstee vnder tuis Dyree1 ent x itu resceM to svM H1 Hooh' Gue svMssor Grvstee sualh1 aiha notiM of its svMssion to tue rehted Tohders' Gue retiriny Grvstee sualhcro1 ctl0 transfer alhcrocert0 uehd , 0 it as Grvstee to tue svMssor Grvstee'

5f a svMssor Grvstee does not taxe offiM x ituin 3b da0s after tue retiriny Grvstee resiyns or is re1 ozed2tue retiriny Grvstee or tue p ecositor 1 a0 cetition an0 Mvrt of M1 cetent SvrisdiMion for tue accoint1 ent of a svMssor Grvstee'

**Section 6.07. Successor Trustee By Merger.** 5f a svMssor Grvstee Monsolidates x itu21 eryes or Monzerts into2or transfers alhor sv, stantialh0 alhits Mrcorate trvst , vsiness or assets to2anotuer Mrcoration or , anviny assoMation2tue resvltiny2svrziziny or transferee Mrcoration x ituovt an0 fvrtuer aM sualh, e tue svMssor Grvsteekcrozided2tuat svMd Mrcoration or , anviny assoMation sualh, e otuerx ise Uvalified and ehiyi, he vnder qeMion 6'bE'

**Section 6.08. A22oint- ent of Co3Trustee or Se2arate Trustee.**

Q. Botx itustandiny an0 otuer crozisions of tuis Dyree1 ent2at an0 ti1 e2for tue cvrcose of 1 eetiny an0 heyahreUvire1 ent of an0 SvrisdiMion in x uiM an0 cart of a H1 Hooh1 a0 at tue ti1 e , e hoMted2tue Grvstee sualhuaze tue cox er and 1 a0 e) eMte and delizer alhinstrv1 ents to accoint one or 1 ore Hersons to aM as a M8rvstee or M8rvstees2or secarate trvstee or secarate trvstees2of alhor an0 cart of svM H1 Hoohand to zest in svM Herson or Hersons2in svM McaM0 and for tue , enefit of tue rehted Tohders2svM tithe to svM H1 Hooh2or an0 cart tuereof2and2sv, SeM to tue otuer crozisions of tuis qeMion2svM cox ers2 dvties2o, hiyations2riyuts and trvsts as tue Grvstee 1 a0 Monsider neMssar0 or desira, he' Bo M8rvstee or secarate trvstee uerevnder sualh, e reUvired to 1 eet tue ter1 s of ehiyi, ihit0 as a svMssor trvstee vnder qeMion 6'bE and no notiM to tue rehted Tohders of tue accoint1 ent of an0 M8rvstee or secarate trvstee sualh, e reUvired vnder qeMion 6'b6 uereof'

Q. J itu resceM to eaM H1 Hool2ezer0 secarate trvstee and M8rvstee sualh2to tue e) tent cer1 itted , 0 hax 2, e accointed and aMsv, SeM to tue folhox iny crozisions and Monditions:

Qi. alhriyuts2cox ers2dvties and o, hiyations Monferred or i1 cosed vcon tue Grvstee sualh, e Monferred or i1 cosed vcon and e) erMsed or cerfor1 ed , 0 tue Grvstee and svM secarate trvstee or M8rvstee Sointh0 Gt , einy vnderstood tuat svM secarate trvstee or M8rvstee is not avtuori( ed to aM secarateh0 x ituovt tue Grvstee Soininy in svM aM2e) Mct to tue e) tent tuat vnder an0 hax of an0 SvrisdiMion in x uiM an0 cartiMhar aM ars are to , e cerfor1 ed tue Grvstee sualh, e inM1 cetent or vnUvalified to cerfor1 svM aM or aMs2in x uiM ezent svM riyuts2cox ers2dvties and o, hiyations Onh0vdiny tue uohdiny of tithe to tue rehted H1 Hoohor an0 cortion tuereof in an0 svM SvrisdiMion. sualh, e e) erMsed and cerfor1 ed sinyh0 , 0 svM secarate trvstee or M8 trvstee2, vt soheh0 at tue direMion of tue Grvsteek

Qii. no trvstee uerevnder sualh, e cersonalh0 hia, he , 0 reason of an0 aM or o1 ission of an0 otuer trvstee uerevnderand

n9

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Oii. tue Grvstee 1 a0 at an0 ti1 e aM4ct tue resiynation of or re1 oze an0 secarate trvstee or M48trvstee'

OM Dn0 notiM2reUvest or otuer x ritiny yizen to tue Grvstee sualh, e dee1 ed to uaze , een yizen to eaM of tue tuen secarate trvstees and M48trvstees2as effeMizel0 as if yizen to eaM of tue1 ' Vzer0 instrv1 ent accointiny an0 secarate trvstee or M48trvstee sualhrefer to tuis Dyree1 ent and tue M0nditions of tuis DrtiMe L 5' VaM secarate trvstee and M48trvstee2vcon its aMdctanM of tue trvsts M0nferred2sualh, e zested x itu tue estates or crocert0 sceMfied in its instrv1 ent of accoint1 ent2eituer S0intl0 x itu tue Grvstee or secaratel02as 1 a0 , e crozided tuerein2sv, SeM to alhtue crozisions of tuis Dyree1 ent2 sceMfiMlH0 inMvdiny ezer0 crozision of tuis Dyree1 ent rehtiny to tue M0ndvM of2affeMiny tue lia, ihit0 of2or affordiny croteMtion to2tue Grvstee' Vzer0 svM instrv1 ent sualh, e fited x itu tue Grvstee'

Gd. Dn0 secarate trvstee or M48trvstee 1 a0 at an0 ti1 e M0nstitvte tue Grvstee2its ayent or attorne08in8faM x itu fvlhcox er and avtuorit02to tue e) tent not croui, ited , 0 hvx 2to do an0 hvx fvhaM vnder or in resceM of tuis Dyree1 ent on its , euahf and in its na1 e' 5f an0 secarate trvstee or M48trvstee sualhdie2 , eM1 e inMca, he of aMiny2resiyn or , e re1 ozed2alhof its estates2crocerties2riyuts2re1 edies and trvsts sualhzest in and , e e) erMsed , 0 tue Grvstee2to tue e) tent cer1 itted , 0 hvx 2x ituovt tue accoint1 ent of a nex or svMdssor trvstee'

**Section 6.09. Eligibility; Disqualification.** greddie F aMs eliyi, he to aMas tue Grvstee and is initialH0 tue Grvstee for tue H1 Hoohs Meated vnder tuis Dyree1 ent' Dn0 svMdssor to greddie F aMG0. at tue ti1 e of its accoint1 ent as Grvstee21 vst , e reasona, l0 aMdcta, he to greddie F aMand Oi. 1 vst , e oryani(ed as a M0rcoration or assoMation doiny , vsiness vnder tue hx s of tue Rnited qtates or an0 qtate tuereof2, e avtuori(ed vnder svM hx s to e) erMse M0rcorate trvst cox ers2uaze M1 , ined Mcitahand svrchvs of at least \$7b2bbb2bbb and , e sv, SeM to svcerzision or e)a1 ination , 0 federahor state finanMah reyvhator0 avtuorities' 5f an0 svMdssor Grvstee sualhMase to satisf0 tue eliyi, ihit0 reUvire1 ents set fortu in Oi. a, oze2tuat svMdssor Grvstee sualhresiyn i1 1 ediatel0 in tue 1 anner and x itu tue effeMsceMfied in qeMion 6'b6'

# ARTICLE VII

## Miscellaneous Provisions

**Section 7.01. Annual State- ents.** J ituin a reasona, he ti1 e after tue end of eaM Mlendar 0ear2tue Dd1 inistrator Q0r its ayent. sualhfvrnisu to eaM T0lder on an0 " eM0rd p ate dvriny svM 0ear infor1 ation tuat tue Dd1 inistrator dee1 s neMssar0 or desira, he to ena, he T0lders and , enefiMahox ners of H1 s to crecare tueir Rnited qtates federahinM1 e ta) retvrns2if acchM, he'

**Section 7.05. Li- itations on Liability.** Beituer greddie F aM2in its M0rcorate McaaM02nor an0 of its direMors2offiMrs2e1 cho0ees2avtuori(ed desiynees2recresentatizes or ayents Q0rehated cersonsR2. sualh, e lia, he to T0lders for an0 aMion tawen2or not tawen2, 0 tue1 or , 0 a serziMr in yood faitu cvrsvant to tuis Dyree1 ent or for errors in Svdy1 ent' Guis crozision sualhnot croteM greddie F aMor an0 rehated cerson ayainst an0 lia, ihit0 x uiM x ovld otuerx ise , e i1 cosed , 0 reason of x ihfvh1 isfeasanM2, ad faitu or yross neyhiyenM in tue cerfor1 anM of dvties or , 0 reason of reMhess disreyard of o, hiyations and dvties vnder tuis Dyree1 ent' 5n no ezent sualhgreddie F aMor an0 rehated cerson , e lia, he for an0 M0nseUventiahda1 ayes' greddie F aMand an0 rehated cerson 1 a0 refl0 in yood faitu on an0 doM1 ent or otuer M1 1 vniMation of an0 wind crocert0 e) eMted and sv, 1 itted , 0 an0 Herson x itu rescueM to an0 1 atter arisiny vnder tuis Dyree1 ent' greddie F aMuas no o, hiyation to accear in2croseMte or defend an0 leyahaMion x uiM is not inMdentahto its dvties to serziM or svcerzise tue serziMny of tue F ortyayes in aMordanM x itu tuis Dyree1 ent and x uiM in its ocinion 1 a0 inzolze an0 e) cense or lia, ihit0 for greddie F aM2greddie F aM1 a02in its disMetion2vndertawe or cartiMate in an0 aMion it dee1 s neMssar0 or

mm

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

desira, he x itu resceMd to an0 F ortyaye2tuis Dyree1 ent2tue HI s or tue riyuts and dvties of tue carties uereto and tue interests of tue Tohders uerevnder' 5n svMd ezent2tue heyahe) censes and Msts of svMd aMion and an0 resvltiny hia, iIit0 sualh, e e)censes for tue croteMion2creserzation and 1 aintenanMd of tue F ortyayes , orne cro rata , 0 greddie F aMand Tohders as crozided in qeMion 3'b4Q.'

**Section 7.0p. Li- itation on Rights of Holders.** Gue deatu or inMcaMt0 of an0 Herson uaziny an interest in a HI sualhnot ter1 inate tuis Dyree1 ent or an0 HI Hooli' qvMd deatu or inMcaMt0 sualhnot entitle tue heyahrecresentatizes or ueirs of svMd Herson2or an0 Tohder for svMd Herson2to Mai1 an aMdvntiny2 tawe an0 aMion or , riny an0 croMediny in an0 Mvrt for a cartition or x indiny vc of tue rehated HI Hool2nor ouuerx ise affeMtue riyuts2o, hiyations and hia, ihties of tue carties uereto or an0 of tue1 '

**Section 7.0j . Control by Holders.** J itu resceMd to an0 HI Hool2e) Mct as ouuerx ise crozided in DrtiMes L and L5and qeMions j 'b7 and j 'b62no Tohder sualhuaze an0 riyut to zote or to ouuerx ise Mantrohin an0 1 anner tue oceration and 1 anaye1 ent of tue F ortyayes inMvded in svMd HI Hool2or tue o, hiyations of tue carties uereto' Guis Dyree1 ent sualhnot , e Mnstrved so as to 1 awe tue Tohders fro1 ti1 e to ti1 e cartners or 1 e1 , ers of an assoMation' Tohders sualh not , e hia, he to an0 tuird cerson , 0 reason of an0 aMion tawen , 0 tue carties to tuis Dyree1 ent cvrsvant to an0 crozision uereof'

**Section 7.04. A- end- ent.**

Q. greddie F aMand tue Grvstee 1 a0 a1 end tuis Dyree1 ent OnMlvdiny an0 rehated Hoohqvcche1 ent. fro1 ti1 e to ti1 e x ituovt tue Mnsent of an0 Tohders to Qi. Mvre an0 a1 , iyvit0 or MvrreMor svcche1 ent an0 crozision in tuis Dyree1 ent2 *provided, however,* tuat an0 svMd a1 end1 ent sualhnot uaze a 1 ateriah adzerse effeMon an0 TohderkOii. 1 aintain tue Massifi Mation of an0 HI Hoohas a yrantor trvst for federahinM1 e ta) cvrcoseskor Oiii. azoid tue i1 cosition of an0 state or federahta) on a HI Hoolkiit , einy vnderstood tuat an0 a1 end1 ent cer1 ittiny tue recvrMase of a F ortyaye , 0 greddie F aMdve to a dehinUvenM0 of less tuan 9nb da0s2otuer tuan in tue MirM1 stanMs desMi, ed in qeMion 9'bn0MGii.21 a0 not , e adocted vnder tuis Mlavse Q. '

Q. V)Mct as crozided in qeMion j 'b7OM2greddie F aMand tue Grvstee 1 a0 a1 end tuis Dyree1 ent as to an0 HI Hool2x itu tue Mnsent of Tohders recresentiny not less tuan a 1 aSorit0 of tue re1 aininy crinMah, ahanMd of tue affeMed HI Hooli'

OM greddie F aMand tue Grvstee 1 a0 not a1 end tuis Dyree1 ent2x ituovt tue Mnsent of a Tohder2if svMd a1 end1 ent x ovhd i1 cair or affeMtue riyut of svMd Tohder to reMize ca01 ent of crinMcahand interest on or after tue dve date of svMd ca01 ent or to institvte svit for tue enforM1 ent of an0 svMd ca01 ent on or after svMd date'

Q. Go tue e)tent tuat an0 crozisions of tuis Dyree1 ent differ fro1 tue crozisions of an0 greddie F aMF ortyaye HartiMfication l ertifiMtes Dyree1 ent or HI F aster Grvst Dyree1 ent dated crior to tue date of tuis Dyree1 ent2tuis Dyree1 ent sualh, e dee1 ed to a1 end svMd crozisions of tue crior ayree1 ent2, vt onl0 to tue e)tent tuat greddie F aMvnder tue ter1 s of svMd crior ayree1 ent2Mvhd uaze effeMed svMd Manye as an a1 end1 ent of svMd crior ayree1 ent x ituovt tue Mnsent of Tohders of HI s tuerevnderk *provided, however,* tuat tue trvst deMlnarations and rehated crozisions set fortu in qeMion j 'b7Q1. of tue HI F aster Grvst Dyree1 ent dated as of p eM1 , er 392nbbj are uere, 0 reaffir1 ed x itu resceMd to eaMd HI HoohMeated , efore p eM1 , er 392nbbj '

Q. Botx itustandiny an0 otuer crozision of tuis qeMion2Q0. tue Dd1 inistrator On its ox n disMetion and in its ox n interest. and tue Grvstee Qat tue Dd1 inistrator's direMion. 1 a0 a1 end tuis Dyree1 ent to refleMan0 1 odifiMation in tue Dd1 inistrator's 1 etuodohoy0 of MlMatiny ca01 ents to Tohders2 inMlvdiny an0 1 odifiMations desMi, ed in qeMion 3'b7Ql. and qeMion 3'b6Ql. and tue 1 anner in x uiMd it distri, vtes creca01 ents to Tohders2Oi. tue Dd1 inistrator On its ox n disMetion and in its ox n interest. and tue Grvstee Qat tue Dd1 inistrator's direMion. 1 a0 a1 end tuis Dyree1 ent to Mvre an0 inMnsistenM0 , etx een tuis

n3

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Dyree1 ent and tue cro.zisions of tue Avide and Gii. tue p ecositor Gn its ox n disMetion and in its ox n interest. and tue Grvstee Gat tue Dd1 inistratorB direMion. 1 a0 a1 end an0 Hoohqvccle1 ent to 1 ave tue adSvst1 ents desMi, ed in qeMion 9'bmQ. to tue MiaraMeristiM of tue F ortyayes to , e transferred to a Hl Hoohor to tue related Hl s'

### Section 7.06. Voting Rights.

5f greddie F aMis aMiny as Dd1 inistrator or Grvstee and an Vzent of p efavlt uas oMvrrred and is Mntinviny2an0 Hl s uehl , 0 greddie F aMfor its ox n aMvxnt sualh, e disreyarded and dee1 ed not to , e ovtstandiny for cvrcoses of e) erMisiny tue re1 edies set fortu in qeMion 7'bmand tue seMond carayracu of qeMion 6'b6'

### Section 7.07. Persons Dee- ed Owners.

J itu resceMto eaMd Hl Hool2greddie F aMtue Grvstee2tue Dd1 inistrator and a gederah" eserze - anwQor an0 ayent of an0 of tue1 . 1 a0 dee1 and treat tue related TolderG. as tue a, solvte ox nerG. of a Hl and tue vndizided , enefiMahox nersuic interests in tue F ortyayes inMded in tue related Hl Hoohfor tue cvrcose of reMiziny ca01 ents and for alhotuer cvrcoses2and none of greddie F aMtue Grvstee2tue Dd1 inistrator or a gederah" eserze - anwQor an0 ayent of an0 of tue1 . sualh, e affeMed , 0 an0 notiM to tue Mntrar0' DIhca01 ents 1 ade to a Tolder2or vcon svMd TolderB order2sualh, e zalid2and2to tue e) tent of tue ca01 ent2sualhsatisf0 and disMarye tue related Hl HoohB ca01 ent o, hiyations x itu resceM to tue TolderB Hl ' Bone of greddie F aMtue Grvstee2tue Dd1 inistrator or an0 gederah" eserze - anwsualhuaze an0 direMo, hiyation to an0 , enefiMahox ner vnhess it is also tue Tolder of a Hl '

### Section 7.08. Governing Law.
GT 5q DA" VVF VBG DBp  GT V HD" G5VqP" 5AT Gq DBp  C- §5ADG5CBq J  5GT " VqHVl G GC Hl s2qT D§ § - V ACL V" BVp - Y GT V §DJ  q Cg GT V RB5GVp  qGDGVq' 5BqCgD" Dq GT V" V F DY - V BC DHH§5l D- §V H" Vl Vp VBG2DBp  5BqCgD" Dq GC p C qC J  CR§p  BCG g" RqG" DGV GT V HR" HCqVq Cg GT V g" Vp p 5V F Dl  Dl G C" DBY H" CL 5q5CB Cg GT 5q DA" VVF VBGC" GT V G" DBqDl G5CBq ACL V" BVp  T V" V- Y2GT V §Cl D§ §DJ  q Cg GT V qGDGV Cg BVJ   YC" K qT D§ § - V p VVF Vp  " Vg§Vl G5L VCg GT V §DJ  q Cg GT V RB5GVp  qGDGVq'

### Section 7.09. Grantor Trust Status.
Bo crozision in tuis Dyree1 ent sualh, e Mnstrved to yrant greddie F aMtue Grvstee or an0 otuer Herson avtuorit0 to aMin an0 1 anner x uiMd x ovhd Mvse a Hl Hoohnot to , e treated as a yrantor trvst for federahinM1 e ta) cvrcoses'

### Section 7.10. Pay- ents Due on Non3Business Days.
5f tue date fi) ed for an0 ca01 ent on an0 Hl is a da0 tuat is not a - vsiness p a02tuen svMd ca01 ent sualh, e 1 ade on tue ne) t svMMediny - vsiness p a02x itu tue sa1 e forM and effeMas tuovyu 1 ade on tue date fi) ed for svMd ca01 ent2and no interest sualhaMMve for tue ceriod after svMd date'

### Section 7.11. Successors.
Guis Dyree1 ent sualh, e , indiny vcon and invre to tue , enefit of tue carties and tueir resceMize svMMssors2inMdiny an0 svMMssor , 0 oceration of hux 2and cer1 itted assiyns'

### Section 7.15. Headings.
Gue ueadinys in tuis Dyree1 ent are for Mnzenien M onl0 and sualhnot affeM tue Mnstrv Mion of tuis Dyree1 ent'

### Section 7.1p. Notice and De- and.

Q. Dn0 notiM2de1 and or otuer M1 1 vniMtion reUvired or cer1 itted vnder tuis Dyree1 ent to , e yizen to or serzed vcon an0 Tolder 1 a0 , e yizen or serzed Gi. in x ritiny , 0 decosit in tue Rnited qtates 1 ail2costaye crecaid2and addressed to svMd Tolder as svMd TolderB na1 e and address 1 a0 accear on tue , oows and reMrds of a gederah" eserze - anwor Gi. , 0 trans1 ission to svMd Tolder turovyu tue M1 1 vniMtion s0ste1 of tue gederah" eserze - anw'. Dn0 notiM2de1 and or otuer M1 1 vniMtion to or

mI

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

vcon a T ohder sualh, e dee1 ed to uaze , een svffiMentl0 yizen or 1 ade2for alhcvrcoses2vcon 1 aihiny or trans1 ission'

Q . Dn0 notiM2de1 and or otuer M41 1 vniMtion x uiM4 is reUvired or cer1 itted to , e yizen to or serzed vnder tuis Dyree1 ent 1 a0 , e yizen in x ritiny addressed as fohhox s O4. in tue Mse of greddie F aMin its Morcorate McaMt02to greddie F aM24nbb Nones - ranM4 p rize2F Mjean2L iryinia mn9bm2Dttention: V) eMrtize LiM4 Hresident — Aenerah1 ovnsehand qeMetar0 and O4. in tue Mse of tue Grvstee2to: greddie F aM2as Grvstee.24nbb Nones - ranM4 p rize2 F Mjean2L iryinia mn9bm2Dttention: V) eMrtize LiM4 Hresident — Aenerah1 ovnsehand qeMetar0'

QM Dn0 notiM2de1 and or otuer M41 1 vniMtion to or vcon greddie F aMor tue Grvstee sualh, e dee1 ed to uaze , een svffiMentl0 yizen or 1 ade onl0 vcon its aMvahreMdict of tue x ritiny'

m7

---

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

GTV qD§ VCg D Hl  DBp " Vl V5HG DBp  Dl l VHGDBl VCg D Hl  - Y C" CB - VTD§g Cg D TC§ p V" 2J  5GTCRG DBY q5ABDGR" V C"
gR" GTV"  F DB5g VqGDG5CB Cg DqqVBG2qTD§ § l CBqG5GRGV GTV RBl CBp 5G5CBD§  Dl l VHGDBl V - Y GTVTC§ p V"  DBp  D§ §
CGTV" q TDL 5BA D - VBVg5l 5D§  5BGV" VqG 5B qRl T Hl  Cg D§ § GTV GV" F q DBp  H" CL 5q5CBq Cg GT 5q DA" VVF VBG GB1 §Rp 5BA GTV
" V§ DGVp  HCC§  qRHH§ VF VBG. DBp  GTV DA" VVF VBG Cg g" Vp p 5V F Dl 2qR1 T TC§ p V"  DBp  qR1 T CGTV" q GTDG GTCqV GV" F q
DBp  H" CL 5q5CBq qTD§ § - V - 5Bp 5BA2CHV" DG5L V DBp  Vgg Vl G5L V"

gVp V" D§  TCF V§ CDB F C" GADAV1 C" HC" DG5CB2
in its Mcrcorate Mcaml0 and as Grvstee

WW       F arwp ' Tanson       
Dvtuori( ed qiynator0

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 10.4

**EXECUTIVE MANAGEMENT COMPENSATION PROGRAM**

**Program Description**
**Amended and Restated as of June 2, 2011**

| | |
|---|---|
| *Objective* | To provide a compensation structure that addresses the Company's and the Federal Housing Finance Agency's ("FHFA") shared interests of motivating, retaining, and, in some instances, recruiting members of Executive Management while Freddie Mac is in conservatorship. |
| *Effective Period* | The Executive Management Compensation Program is intended to be effective for calendar years 2009, 2010, and thereafter as long as Freddie Mac remains in Conservatorship. The specific parameters of the Executive Management Compensation Program may be amended from time to time by the Compensation Committee of Freddie Mac's Board of Directors (the "Committee"), if approved by FHFA after consulting with the U.S. Department of the Treasury ("Treasury"), as appropriate. |
| *Covered Positions* | Freddie Mac's Chief Executive Officer ("CEO"), Chief Operating Officer ("COO"), Chief Financial Officer ("CFO"), Executive Vice Presidents ("EVPs"), and Senior Vice Presidents ("SVPs"), collectively referred to as "Executive Management," and, individually referred to as a "Covered Officer." |
| *Covered Position Participation Requirement* | Participation of a Covered Officer in the Executive Management Compensation Program is contingent upon the Covered Officer agreeing to be bound by the terms of the Executive Management Compensation Recapture Policy (the "Recapture Policy") that has been approved by both the Committee and FHFA. |
| *Composition of Total Direct Compensation* | The total direct compensation ("TDC") shall be comprised of two components, a "Base Salary" and a "Target Incentive Opportunity." Two-thirds (2/3) of the TDC amount shall be delivered in Base Salary and one-third (1/3) of the TDC shall be delivered in a Target Incentive Opportunity. The TDC for all participants will be approved by the Committee, FHFA, or the CEO, as appropriate, as of the effective date of this program. |
| | For an employee hired or promoted into a Covered Officer position subsequent to approval of the Executive Management Compensation Program, the Committee (for Executive Officers) or an Authorized Officer (for Non-Executive Officers) will recommend a TDC for such employee, which, for Executive Officers, will be subject to approval by FHFA after consulting with Treasury, as appropriate. |
| *Adjustments to TDC* | The Committee (for Executive Officers) or an Authorized Officer (for Non-Executive Officers) may recommend adjustments to TDC for Covered Officers. Any such recommendations for Executive Officers are subject to approval by FHFA after consulting with Treasury, as appropriate. An approved adjustment to a Covered Officer's TDC shall become effective as of the date specified in the approval document. |
| *Base Salary* | The Base Salary will consist of two components. One component will be paid in cash on a semi-monthly basis during each calendar year (the "Semi-Monthly Base Salary") and the other component will be earned on a semi-monthly basis during each calendar year, but subject to a deferral and payment schedule (the "Deferred Base Salary") as discussed below. |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Executive Management Compensation Program
Page 2 of 9
June 2, 2011

### Effective Date for Base Salary

For each employee who was a Covered Officer as of January 1, 2009, the Semi-Monthly Base Salary and Deferred Base Salary will be effective retroactive to January 1, 2009, subject to the exception provided in the section "Semi-Monthly Base Salary" below. For an employee who is hired into a Covered Officer position after January 1, 2009, the Semi-Monthly Base Salary and Deferred Base Salary shall be pro-rated effective as of the date of hire. For an employee who is promoted after January 1, 2009 into either a Covered Position or a Covered Position with increased scope and responsibility, the Semi-Monthly Base Salary and Deferred Base Salary shall be pro-rated effective as of the date of promotion.

*Semi-Monthly Base Salary*

Semi-Monthly Base Salary for any Covered Officer cannot exceed $500,000, except for the CEO, COO, and CFO, or other exceptions as approved from time to time by FHFA. In those instances, the Semi-Monthly Base Salary will be the amount approved by FHFA after consultation with Treasury, as appropriate, as of the Covered Officer's date of hire or promotion.

For any Covered Officer other than the CEO, COO, and CFO, with a Semi-Monthly Base Salary greater than $500,000 immediately prior to the adoption of the Executive Management Compensation Program, that Covered Officer's Semi-Monthly Base Salary will be reduced to $500,000 effective January 1, 2010.

### Form of Payout

Cash less applicable withholdings

### Treatment of Base Salary Under Freddie Mac's Benefit Plans

Semi-Monthly Base Salary will be considered compensation for purposes of the following Freddie Mac retirement or executive benefit plans that take base salary into consideration: the tax qualified Thrift/401(k) Savings Plan, the tax qualified Employees' Pension Plan, the non-qualified Supplemental Executive Retirement Plan, the Executive Deferred Compensation Plan, and the following welfare benefit plans: (1) the Flexible Benefits Plan (for purposes of calculating FlexDollars); (2) the Group Term Life Insurance Plan; (3) the Group Universal Life Insurance Program; (4) the Long-Term Disability Plan; (5) the Accidental Death and Personal Loss Plan; and (6) the purchase and payout of vacation.

*Deferred Base Salary*

The portion of Base Salary that is not paid in Semi-Monthly Base Salary shall be delivered in the form of Deferred Base Salary. The Deferred Base Salary, which is earned on a semi-monthly basis during each calendar year, shall be deferred and paid according to the applicable Approved Payment Schedule below.

### Approved Payment Schedule: Calendar Year 2009

Deferred Base Salary earned during each quarter of 2009 will be paid on the last business day of the corresponding quarter of 2010, provided the Covered Officer is actively employed by the Company on such payment date, or in the

TREASURY-1877

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 3 of 9
June 2, 2011

event that the Covered Officer dies, has a Long-Term Disability or Retires in 2010. For clarity, the 2009 Deferred Base Salary will not become non-forfeitable upon the Covered Officer's death, Long-Term Disability or Retirement, as provided below under "Treatment Upon Termination" if such event occurs in 2009. The 2009 Deferred Base Salary will, however, become non-forfeitable, subject to the Recapture Policy, if such event occurs in 2010.

**<u>Approved Payment Schedule: Calendar Year 2010 and Subsequent Years</u>**

Fifty percent (50%) of Deferred Base Salary earned during each quarter of a calendar year will be paid in a fixed amount on the last business day of the corresponding quarter of the immediately following calendar year.

The amount that will be paid for the remaining fifty percent (50%) of Deferred Base Salary earned during each quarter of a calendar year will be determined by the Committee's approved Deferred Base Salary funding level. The approved performance-based portion of the Deferred Base Salary funding level will be determined by the Committee's assessment of the following:

1. The Company's performance against the objectives on the short-term incentive ("STI") scorecard (i.e., for the STI plan applicable to employees at the level of Vice President and below for the performance year in which the performance-based portion of Deferred Base Salary is earned);

2. All other relevant internal and external factors and non-STI scorecard developments that affect our corporate condition and mission fulfillment; and,

3. Achievement of significant accomplishments beyond the STI scorecard objectives or adverse developments.

The approved funding level, expressed as a percentage that can range from 0% up to a maximum of 125%, will be equal to the aggregate amount of funds approved by the Committee for distribution to Covered Officers divided by the performance-based portion of Deferred Base Salary earned.

The amount of the performance-based portion of Deferred Base Salary that will be paid to a Covered Officer will be equal to the performance-based portion of Deferred Base Salary earned multiplied by Deferred Base Salary funding level.

For any Covered Officer for whom a separate division scorecard is approved by a Board committee, the performance-based portion of the Deferred Base Salary funding level will be based on the appropriate Board committee's assessment of performance against such separate division scorecard.

The performance-based portion of the Deferred Base Salary earned during each quarter of a calendar year will be adjusted in a manner consistent with the approved Deferred Base Salary funding level, and will be paid on the last business day of the corresponding quarter in the immediately following calendar year.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 4 of 9
June 2, 2011

**Form of Payout**

Cash less applicable withholdings.

**Treatment Under Freddie Mac's Benefit Plans**

Deferred Base Salary will be considered compensation for purposes of the Federal Home Loan Mortgage Corporation Supplemental Executive Retirement Plan (Thrift 401(k) and Pension SERP) when paid to an active Covered Officer, subject to the maximum described in "**Impact on Freddie Mac's Supplemental Executive Retirement Plan.**"

Deferred Base Salary will not be considered compensation for purposes of any of Freddie Mac's tax qualified retirement or executive benefit or welfare plans.

*Target Incentive Opportunity*

For each performance year, every Covered Officer will be provided an annual Target Incentive Opportunity, which will be equal to 1/3 of TDC.

**Effective Date for 2009 Target Incentive Opportunity**

For each employee who was in a Covered Officer position on January 1, 2009, the 2009 Target Incentive Opportunity will be effective retroactive to January 1, 2009 and will be equal to 1/3 of their TDC (i.e., the 2009 Target Incentive Opportunity will not be pro-rated).

For an employee who was hired into a Covered Officer position after January 1, 2009, the 2009 Target Incentive Opportunity shall be pro-rated based on their date of hire. For an employee who is promoted after January 1, 2009 into either a Covered Position or a Covered Position with increased scope and responsibility, the 2009 Target Incentive Opportunity shall be pro-rated effective as of the date of promotion.

**Effective Date for Target Incentive Opportunity in 2010 and Subsequent Years**

For each employee who is in a Covered Officer position as of January 1 of any calendar year, the Target Incentive Opportunity will be effective on January 1 of that calendar year and will be equal to 1/3 of their TDC.

For an employee who is hired into a Covered Officer position after January 1 of any calendar year, the Target Incentive Opportunity for that calendar year shall be pro-rated based on the date of promotion or hire. For an employee who is promoted after January 1 of any calendar year into either a Covered Position or a Covered Position with increased scope and responsibility, the Target Incentive Opportunity shall be pro-rated effective as of the date of promotion.

**Target Incentive Opportunity Payouts**

A Covered Officer will be eligible to be paid 50% of their annual Target Incentive Opportunity no later than March 15 of the calendar year immediately following the performance year (the "First Incentive Opportunity Payment"), and the remaining 50% no later than March 15 of the second calendar year immediately following the performance year (the "Second Incentive

TREASURY-1879

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 5 of 9
June 2, 2011

Opportunity Payment").

**2009 Target Incentive Opportunity (Payouts in 2010 and 2011)**

The amount of the annual Target Incentive Opportunity that is actually paid will be determined by the aggregate amount of funds approved by the Committee for distribution to Covered Officers for each payment. In determining the aggregate amount of funds approved for distribution, which can be greater than, less than, or equal to the aggregate Target Incentive Opportunity for the Covered Officers, the Committee will take into account the following:

1. The Company's performance against the objectives on the long-term incentive ("LTI") scorecard (i.e., for the LTI plan applicable to employees at the level of Vice President and below) for the LTI grant made in the same calendar year of the Covered Officers' annual Target Incentive Opportunity;

2. All other relevant internal and external factors and non-LTI scorecard developments that affect our corporate condition and mission fulfillment; and,

3. Achievement of significant accomplishments beyond the LTI scorecard objectives or adverse developments.

The approved funding level, expressed as a percentage that can range from 0% up to a maximum of 120%, will be equal to the aggregate amount of funds approved by the Committee for distribution to Covered Officers divided by the aggregate Target Incentive Opportunity for those same Covered Officers.

First Incentive Opportunity Payment — The amount actually paid will be equal 50% of the Covered Officer's annual Target Incentive Opportunity multiplied by the approved funding level for the first vesting.

Second Incentive Opportunity Payment — The amount actually paid will be equal to 50% of the Covered Officer's annual Target Incentive Opportunity multiplied by the approved funding level for the second vesting.

For Covered Officers who are members of the Freddie Mac Management Committee on the date the Committee approves the funding level, the amount of the Target Incentive Opportunity that is paid is also subject to an assessment of division and/or individual performance as determined by the CEO, for Covered Officers other than the CEO. For the CEO, Freddie Mac's Board of Directors conducts the assessment. This assessment can result in an increase or decrease to the amount payable of up to 25%. However, in no event can the aggregate amount paid to the Covered Officers who are members of the Management Committee for any First or Second Incentive Opportunity Payment exceed the aggregate Target Incentive Opportunities for those Covered Officers multiplied by the funding level.

**2010 and Subsequent Year Target Incentive Opportunities**

The Committee or the CEO will determine the actual amount that is paid to a Covered Officer (other than the CEO) for either the First or the Second

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 6 of 9
June 2, 2011

Incentive Opportunity Payments based on: (i) the aggregate amount of funds approved by the Committee for distribution to Covered Officers for each payment, (ii) an assessment of individual, group or enterprise performance; and (iii) any other relevant factors. For the CEO, the Committee determines the actual amount to be paid based on the same factors, after obtaining and considering the views of the other non-management members of the Board.

In determining the aggregate amount of funds approved for distribution, which can be greater than, less than, or equal to the aggregate Target Incentive Opportunity for the Covered Officers, the Committee will take into account the following:

1.  The Company's performance against the objectives on the long-term incentive ("LTI") scorecard (i.e., for the LTI plan applicable to employees at the level of Vice President and below) for the LTI grant made in the same calendar year of the Covered Officers' annual Target Incentive Opportunity;

2.  All other relevant internal and external factors and non-LTI scorecard developments that affect our corporate condition and mission fulfillment; and,

3.  Achievement of significant accomplishments beyond the LTI scorecard objectives or adverse developments.

The actual amount paid to a Covered Officer for each of the First and Second Incentive Opportunity Payments can range from 0% to 150% of his/her Target Incentive Opportunity. However, in no event can the aggregate amount paid to the Covered Officers for any First or Second Incentive Opportunity Payment exceed the aggregate amount of funds approved for distribution.

**Form of Payout**

Cash less applicable withholdings

**Treatment Under Freddie Mac's Benefit Plans**

The Target Incentive Opportunity will not be considered compensation for purposes of any Freddie Mac retirement benefit or welfare plans.

*Impact on Freddie Mac's Supplemental Executive Retirement Plan*

The Supplemental Executive Retirement Plan ("SERP") shall be modified effective January 1, 2010 to provide that the maximum covered compensation, for purposes of the plan, relative to Covered Officers only, may not exceed two times the Covered Officer's Semi-Monthly Base Salary. It is the intent of Freddie Mac and FHFA that, upon the conclusion of Conservatorship, the definition of "compensation" for purposes of accruals under the SERP will revert to the definition of "compensation" in place prior to the amendment to the SERP made to conform its terms to this Executive Management Compensation Program.

*Treatment Upon Termination:*

Under all termination events except death, Semi-Monthly Base Salary will terminate as of the date employment terminates. In the event of death, Semi-Monthly Base Salary will terminate at the end of the month in which the death occurs.

*Semi-Monthly Base Salary*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 7 of 9
June 2, 2011

*Treatment Upon Termination:*

*Deferred Base Salary*

**Death:** If a Covered Officer's employment is terminated due to death, any unpaid Deferred Base Salary will be paid as soon as administratively possible. If, at the time of the Covered Officer's death, the Deferred Base Salary funding level has not been determined, the performance-based portion of Deferred Base Salary will remain outstanding until such determination is made. The actual amount paid for the performance-based portion will be determined by the approved Deferred Base Salary funding level.

The date on which the Committee approves the Deferred Base Salary funding level is referred to as the "Deferred Base Salary Determination Date." Payment of any performance-based Deferred Base Salary will occur as soon as administratively possible after the Deferred Base Salary Determination Date.

**Long-Term Disability:** If a Covered Officer's employment is terminated due to Long-Term Disability, the Covered Officer's right to receive any unpaid Deferred Base Salary will become non-forfeitable, subject to the Recapture Policy, but will be paid no earlier than as called for in the Approved Payment Schedule above. The actual amount paid for the performance-based portion of Deferred Base Salary earned will be determined by the approved Deferred Base Salary funding level.

**Retirement:** If a Covered Officer terminates employment due to retirement (as defined in **Definitions**), the Covered Officer's right to receive any unpaid Deferred Base Salary will become non-forfeitable, subject to the Recapture Policy, and the Deferred Base Salary will be paid no earlier than as called for in the Approved Payment Schedule above. The actual amount paid for the performance-based portion of Deferred Base Salary will be determined by the approved Deferred Base Salary funding level.

**Involuntary Termination:** If a Covered Officer is involuntarily terminated, any unpaid Deferred Base Salary will be forfeited unless the Committee (for Executive Officers) or an Authorized Officer (for non-Executive Officers) recommends that the Covered Officer receive either all or a portion of the unpaid Deferred Base Salary. The Committee's recommendation for Executive Officers is subject to approval by FHFA after consulting with Treasury, as appropriate.

**Voluntary Termination:** If a Covered Officer voluntarily terminates employment, any unpaid Deferred Base Salary will be forfeited.

*Treatment Upon Termination:*

*Target Incentive Opportunity*

**Minimum Service Required:** In order to be eligible to receive any portion of an annual Target Incentive Opportunity upon termination, a Covered Officer must have been employed for a minimum of four (4) whole calendar months during the performance year for which the incentive is being earned.

**Death and Long-Term Disability:** If a Covered Officer's employment is terminated due to either death or Long-Term Disability, any earned but unpaid portion of the Target Incentive Opportunity will be paid as soon as administratively possible following the date of death or the first day of Long-Term Disability. The actual amount that is paid will be determined consistent with the process under Target Incentive Opportunity Payouts.

TREASURY-1882

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 8 of 9
June 2, 2011

If, at the time of the Covered Officer's death or Long-Term Disability, the Target Incentive Opportunity funding level has not been determined, the award will remain outstanding until such  determination is made. As soon as administratively possible after the Target Incentive Opportunity Payment Determination Date (which is the date on which the Committee approves the LTI funding level), but no later than March 15 of the calendar year  following each calendar year performance period, the Covered  Officer, or the Covered Officer's beneficiary(ies), will receive all unpaid portions of their Target Incentive Opportunity determined consistent with the process under Target Incentive Opportunity Payouts.

**Retirement:** If a Covered Officer terminates employment due to  Retirement (as defined in **Definitions**), any earned but unpaid portion of the Target Incentive Opportunity will be paid as soon as administratively possible. The actual amount paid will be determined consistent with the process under Target Incentive Opportunity Payouts.

If, at the time of the Covered Officer's termination, performance  against the performance measure(s) has not been determined, the Target Incentive Opportunity will remain outstanding until the  Target Incentive Opportunity Payment Determination Date. As soon as administratively possible after the Target Incentive Opportunity Determination Date, but no later than March 15 of the  calendar year following each calendar year performance period,  the Covered Officer's right to receive a pro-rata payment shall  become non-forfeitable, subject to the Recapture Policy. The Covered Officer is eligible to receive a pro-rata payment for the  performance year in which the Covered Officer was employed. If the Covered Officer is employed for less than four (4) whole  calendar months during a performance year, the Covered Officer will forfeit the Target Incentive Opportunity payment for that performance year. The pro-rata payment shall be calculated using  the following methodology:

Step 1. The number of whole months employed during the applicable  performance year (minimum of four months required)

Step 2. Divided by twelve (12), the number of whole months in the  performance year

Step 3. Multiplied by 50% of the Covered Officer's annual Target Incentive Opportunity and adjusted consistent with the process  under Target Incentive Opportunity Payouts.

The above formula will be applied separately to each of the of  the performance years for which a Covered Officer is eligible for a pro-rata payment of the Target Incentive Opportunity.

**Involuntary Termination:** If a Covered Officer is involuntarily  terminated, any unpaid portion of the Target Incentive Opportunity will be forfeited unless the Committee (for Executive  Officers) or an Authorized Officer (for non-Executive Officers) recommends that the Covered Officer receive either all or a  portion of the unpaid Target Incentive Opportunity. The Committee's recommendation for Executive Officers is subject to  approval by FHFA after consulting with Treasury, as appropriate.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 9 of 9
June 2, 2011

**Voluntary Termination:** If a Covered Officer voluntarily terminates employment, any unpaid portion of the Target Incentive Opportunity will be forfeited.

*Additional Forfeiture Provision*

Upon a "Forfeiture Event" (as defined in *Definitions*), any unearned or any unpaid Total Incentive Opportunity will be cancelled and the Covered Officer or former Covered Officer will be required to immediately repay Freddie Mac the gross value of the Target Incentive Opportunity that was paid during the 12 month period immediately prior to the Forfeiture Event.

In the event that a repayment is triggered under a current or former Covered Officer's Recapture Policy, any earned but unpaid amounts that are subject to recapture under the terms of the Recapture Policy will be forfeited.

*Regulatory Approval and Reservation of Rights*

Actual payment of any Deferred Base Salary or any Target Incentive Opportunity at the time of termination is conditioned on the prior approval of FHFA at the time of any proposed payment.

Freddie Mac reserves the right, subject to FHFA approval, to modify the terms and conditions set forth herein so long as such modifications reasonably and in good faith are not detrimental to the rights of the employee.

The terms of this program are subject to and shall be construed in accordance with applicable law and any applicable regulation, guidance or interpretation issued by FHFA or Treasury.

*Definitions*

**Authorized Officers:** Those officers deemed Authorized Officers in the Board of Directors resolution delegating authority to management on human resources matters, as may be amended or restated from time to time.

**Executive Officer:** Those officers defined as Executive Officers in the Compensation Committee Charter then in effect.

**Forfeiture Event:** A Forfeiture Event shall mean the Covered Officer or former Covered Officer directly or indirectly seeks or accepts employment with, or provides professional services to, a "Competitor" in violation of any non-competition covenant agreement between the Covered Officer and Freddie Mac in effect as of the date the Covered Officer receives a Target Incentive Opportunity.

**Long-Term Disability:** A Long-Term Disability shall be as defined in Freddie Mac's Long-Term Disability Plan.

**Retirement:** A Covered Officer is eligible to retire when s/he has attained or exceeded the Normal Retirement Age in the Freddie Mac Employees' Pension Plan, which is currently 65 years of age.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 10.5

**FIRST AMENDMENT**
**TO THE**
**FEDERAL HOME LOAN MORTGAGE CORPORATION**
**MANDATORY EXECUTIVE DEFERRED BASE SALARY PLAN**
**(As Effective January 1, 2009)**

FIRST AMENDMENT TO THE FEDERAL HOME LOAN MORTGAGE CORPORATION MANDATORY EXECUTIVE DEFERRED BASE SALARY PLAN (the "Plan") by the FEDERAL HOME LOAN MORTGAGE CORPORATION (the "Corporation"), a corporation organized and existing under the laws of the United States of America.

**W I T N E S S E T H :**

WHEREAS, the Plan was adopted effective January 1, 2009;

WHEREAS, on June 2, 2011 the Compensation Committee of the Board of Directors of the Corporation (the "Committee"), is expected to approve an amendment to the Executive Management Compensation Program delegating to certain members of senior management (the "Authorized Officers") the authority to approve termination benefits under that program for officers at the level of Senior Vice President or above who are not Executive Officers under the Committee charter (as approved in Resolution FHLMC 2011-06, or successor thereto);

WHEREAS, *provided that* the Committee adopts the amendment to the Executive Management Compensation Program, and the Federal Housing Finance Agency ("FHFA") approves that amendment, a corresponding conforming amendment to the Plan is appropriate;

WHEREAS, FHFA has indicated that its approval of the above-referenced amendment to the Executive Management Compensation Program is subject to guidance or interpretations issued by FHFA pursuant to 12 C.F.R. § 1770.3(g)(1) relating to the definition of Executive Officer.

WHEREAS, pursuant to the authority granted to the Committee to amend the Plan under section 8.1 thereof, the Committee has determined that, in light of the expected amendment to the Executive Management Compensation Program, and contingent upon the finalization of that amendment (including FHFA approval thereof) it would be appropriate to similarly amend the Plan to reflect the delegation to Authorized Officers of the authority to determine whether to pay certain amounts under the Plan in the case of Involuntary Termination (as defined in the Plan); and

WHEREAS, the appropriate officer of the Corporation has been duly authorized to execute this amendment.

NOW, THEREFORE, the Plan is amended, as follows, effective June 2, 2011:

1. Section 5.3(b) is amended in full to read as follows:

"(b) All Other Plan Years. If a Participant experiences a Termination of Employment other than for death, Disability or Retirement, any earned but unpaid portion of the Participant's Account shall be forfeited to the Corporation as of the Participant's termination

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

date; provided, however, that pursuant to Section 5.2(b)(3) in the event of an Involuntary Termination the Administrator (or its delegate) may provide that all or a part of the earned but unpaid portion of the Participant's Account shall not be forfeited, subject to FHFA approval for any Participant who is an Executive Officer (as defined in the charter of the Compensation Committee, as may be revised from time to time (the "Committee Charter") and consistent with FHFA guidance or interpretations issued pursuant to 12 C.F.R. § 1770.3(g)(1))."

2.   Section 7.1(b) and the text thereafter in Section 7.1 is amended to read as follows:

"(b) Delegate to designated employees or departments of the Corporation the authority to perform such of the Administrator's duties hereunder as may be delegated to such employees or departments.

Pursuant to this authority and subject, in each case, to the right of the Administrator to revoke such delegations in writing at any time, the recordkeeping and bookkeeping responsibilities under this Plan are hereby delegated to the Executive heading the Human Resources Division of the Corporation and/or such employees of that division as such Executive shall designate.

Further pursuant to this authority and subject to the right of the Administrator to revoke such delegation in writing at any time, the authority described in Section 5.2(b)(3) is hereby delegated to the Authorized Officers (as defined in the Executive Management Compensation Program, as amended from time to time) with respect to Participants who are not Executive Officers (as defined in the Committee Charter)."

IN WITNESS WHEREOF, the Corporation has caused this FIRST AMENDMENT TO THE FEDERAL HOME LOAN MORTGAGE CORPORATION MANDATORY EXECUTIVE DEFERRED BASE SALARY PLAN to be executed by its duly authorized representative this 29 day of July, 2011.

FEDERAL HOME
LOAN
MORTGAGE
CORPORATION


By: /s/ Scott Coolidge
    Scott Coolidge
    Vice President —
    Compensation &
    Benefits


ATTEST:

/s/ Alicia S. Myara
Alicia S. Myara
Assistant Secretary


2

TREASURY-1886

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 12.1

## RATIO OF EARNINGS TO FIXED CHARGES AND
## RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

| | Six Months Ended June 30, | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2011 | 2010 | 2010 | 2009 | 2008 | 2007 | 2006 |
| | | | (dollars in millions) | | | | |
| Net income (loss) before income tax benefit (expense) and cumulative effect of changes in accounting principles | $ (1,769) | $(11,791) | $(14,882) | $(22,384) | $(44,564) | $ (5,989) | $ 2,340 |
| Add: | | | | | | | |
| Low-income housing tax credit partnerships | — | — | — | 4,155 | 453 | 469 | 407 |
| Total interest expense | 41,562 | 47,758 | 92,131 | 22,150 | 33,332 | 38,482 | 37,270 |
| Interest factor in rental expenses | 3 | 3 | 5 | 7 | 8 | 7 | 6 |
| Earnings (loss), as adjusted | $39,796 | $ 35,970 | $ 77,254 | $ 3,928 | $ (10,771) | $ 32,969 | $ 40,023 |
| Fixed charges: | | | | | | | |
| Total interest expense | $ 41,562 | $47,758 | $ 92,131 | $ 22,150 | $ 33,332 | $38,482 | $37,270 |
| Interest factor in rental expenses | 3 | 3 | 5 | 7 | 8 | 7 | 6 |
| Capitalized interest | — | — | — | — | — | — | — |
| Total fixed charges | $ 41,565 | $ 47,761 | $ 92,136 | $ 22,157 | $ 33,340 | $38,489 | $37,276 |
| Senior preferred stock and preferred stock dividends[1] | 3,222 | 2,588 | 5,749 | 4,105 | 675 | 398 | 270 |
| Total fixed charges including preferred stock dividends | $44,787 | $ 50,349 | $ 97,885 | $ 26,262 | $ 34,015 | $38,887 | $37,546 |
| Ratio of earnings to fixed charges[2] | — | — | — | — | — | — | 1.07 |
| Ratio of earnings to combined fixed charges and preferred stock dividends[3] | — | — | — | — | — | — | 1.07 |

(1) Senior preferred stock and preferred stock dividends represent pre-tax earnings required to cover any senior preferred stock and preferred stock dividend requirements computed using our effective tax rate, whenever there is an income tax provision, for the relevant periods.

(2) Ratio of earnings to fixed charges is computed by dividing earnings (loss), as adjusted by total fixed charges. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $1.8 billion, $11.8 billion, $14.9 billion, $18.2 billion, $44.1 billion and $5.5 billion for the six months ended June 30, 2011 and 2010 and for the years ended December 31, 2010, 2009, 2008 and 2007, respectively.

(3) Ratio of earnings to combined fixed charges and preferred stock dividends is computed by dividing earnings (loss), as adjusted by total fixed charges including preferred stock dividends. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $5.0 billion, $14.4 billion, $20.6 billion, $22.3 billion, $44.8 billion and $5.9 billion for the six months ended June 30, 2011 and 2010 and for the years ended December 31, 2010, 2009, 2008 and 2007, respectively.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.1**

**CERTIFICATION**

**PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)**

I, Charles E. Haldeman, Jr., certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2011 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 8, 2011

/s/ Charles E. Haldeman, Jr.
Charles E. Haldeman, Jr.
Chief Executive Officer

TREASURY-1888

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.2**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Ross J. Kari, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2011 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 8, 2011

/s/  Ross J. Kari
_____
Ross J. Kari
Executive Vice President — Chief Financial Officer

TREASURY-1889

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 32.1

**CERTIFICATION**

**PURSUANT TO 18 U.S.C. SECTION 1350,**

**AS ENACTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q for the quarter ended June 30, 2011 of the Federal Home Loan Mortgage Corporation "the "( company)s, aS filed with the Securities and x. change ( ommiSSion on the date hereof "the "Report)s, I, ( harleS x J Haldeman, MJ, ( hief x. ecutive Officer of the ( ompany, certify, purSuant to 18 UJEJ( J Eection 1350, aS adopted purSuant to Eection 906 of the EarbaneS-O. ley Act of 2002, that to my knowledGe:

1J The Report fully complieS with the requirementS of Eection 13"as or 15"ds of the SecuritieS x. chanGe Act of 1934; and

2J The information contained in the Report fairly preSentS, in all  material reSpectS, the financial condition and reSultS of  operationS of the ( ompanyJ

Date: AuGuSt 8, 2011

/S/  ( harleS x J Haldeman, MJ
( harleS x J Haldeman, MJ
( hief x. ecutive Officer

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 32.2

## CERTIFICATION

## OF CHIEF FINANCIAL OFFICER PURSUANT TO 18 U.S.C. SECTION 1350,

## AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report on Form 10-Q for the quarter ended June 30, 2011 of the Federal Home Loan Mortgage Corporation (the "Company), as filed with the Securities and Exchange Commission on the date hereof (the "Report), I, Ross J. Kari, Executive Vice President — Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 8, 2011

/S/ Ross J. Kari
_____
Ross J. Kari
Executive Vice President — Chief Financial Officer

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1892

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠



## SECTOR COMMENT

# Plan To Raise Fannie Mae and Freddie Mac Guarantee Fees Raises Question of Support

Extracted from "Moody's Weekly Credit Outlook", dated September 26, 2011

Analyst Contacts:

NEW YORK                    1.212.553.1653

Brian Harris, CPA           1.212.553.4705
*Senior Vice President*
brian.harris@moodys.com

In a speech on 19 September at the American Mortgage Conference, Edward DeMarco, acting director of the Federal Housing Finance Agency (FHFA), the regulator of Fannie Mae and Freddie Mac (the government-sponsored enterprises, or GSEs), supported a series of periodic, gradual increases in GSE guarantee fees[1] with the goal of shrinking the GSEs' presence. This is consistent with the US government's goal as stated in a February 2011 Treasury report.[2] Actions that lessen the relevance of Fannie Mae and Freddie Mac are credit negative for GSE bondholders because the government is embarking on a process to reduce reliance on GSEs without clearly articulating, among other things, if bondholders will be protected beyond the current capital support.

In February 2011, the Treasury report stated the administration's intention to wind down Fannie Mae and Freddie Mac. One method mentioned was to gradually increase guarantee fees so as to enable private capital to more effectively compete with the GSEs. Less clear was the timing of the wind-down, whether bondholders might receive further protections, and the future role of the US government in the housing market.

Only the inadequacy of the GSEs capital base is clear, a point with which the FHFA seems to agree, based on Mr. DeMarco's comments at the conference: "It ought to be clear to everyone at this point, given the enterprises' losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that the enterprises will not be able to earn their way back to a condition that allows them to emerge from conservatorship."

Our Aaa ratings on Fannie Mae's and Freddie Mac's senior unsecured debt are entirely based on US government support, without which the GSEs' capitalization level and overall financial profile would not support. As shown in Exhibit 1, preferred shares outstanding and dividends will continue to increase even if Fannie Mae and Freddie Mac can break even after provisioning for credit losses. In effect, Fannie Mae and Freddie Mac will be borrowing money from the US Treasury in order to pay the US Treasury its 10% dividend on the senior preferred stock.

What is Moody's Weekly Credit Outlook?

Moody's Weekly Credit Outlook provides our research clients with timely opinions on breaking credit market developments and trends. Published every Monday morning, the newsletter will help you start your week informed of Moody's latest opinions from across the organization.

---

[1]   A 10-basis-point increase in guarantee fees was also included in President Obama's economic plan.
[2]   Reforming America's Housing Finance Market: A Report to Congress, February 2011.

EXHIBIT 1
**GSE Preferred Stock Outstanding and Dividend**



*Source: Fannie Mae and Freddie Mac financial statements, Moody's*

Furthermore, dividends on the US Treasury's senior preferred stock will eliminate Fannie Mae's contingent capital by 2019 and Freddie Mac's by 2022 (see Exhibit 2). This assumes that the GSEs are able to fully offset credit losses, which we believe is unlikely.

EXHIBIT 2
**Fannie Mae's and Freddie Mac's Contingent Capital**

*Source: Fannie Mae and Freddie Mac financial statements, Moody's*

Our view of US government support for Fannie Mae and Freddie Mac is predicated on the importance of the two institutions to mortgage finance and the importance of mortgage finance to the US economy. The government's actions to preserve Fannie Mae and Freddie Mac, as well as statements by senior government officials lead us to believe that the likely path of GSE reform will include further support for current creditors, if necessary.

However, if GSE reform proves too contentious to arrive at a consensus, or if it excludes explicit support and results in less relevant GSEs with insufficient contingent capital, it would be credit negative and prompt a review of their Aaa ratings. In this case, the GSEs' debt ratings would depend on the companies' capital position and financial profile, and would likely be multiple notches below the current Aaa ratings.

Report Number: 136281

| Author | Production Specialist |
|---|---|
| Brian Harris | Wing Chan |

© 2011 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ARE MOODY'S INVESTORS SERVICE, INC.'S ("MIS") CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MIS DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS DO NOT CONSTITUTE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS ARE NOT RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. CREDIT RATINGS DO NOT COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MIS ISSUES ITS CREDIT RATINGS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Any publication into Australia of this document is by MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657, which holds Australian Financial Services License no. 336969. This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001.

Notwithstanding the foregoing, credit ratings assigned on and after October 1, 2010 by Moody's Japan K.K. ("MJKK") are MJKK's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities. In such a case, "MIS" in the foregoing statements shall be deemed to be replaced with "MJKK".

MJKK is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO.

This credit rating is an opinion as to the creditworthiness or a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be dangerous for retail investors to make any investment decision based on this credit rating. If in doubt you should contact your financial or other professional adviser.



TREASURY-1895



**THE DEPUTY SECRETARY OF THE TREASURY**
WASHINGTON

September 30, 2011

The Honorable Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street NW
Washington, DC  20552-0003

Dear Acting Director DeMarco:

As you know, in the letter to you dated June 30, 2011, Treasury communicated to you its waiver, for the third quarter of Calendar Year (CY) 2011, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the fourth quarter of CY 2011, the PCF payable by each Enterprise.  Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set.  Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Neal S. Wolin

# FEDERAL HOUSING FINANCE AGENCY



## NEWS RELEASE

| For Immediate Release<br>October 27, 2011 | **Contact:** | Corinne Russell<br>Stefanie Johnson | (202) 414-6921<br>(202) 414-6376 |
|---|---|---|---|

## FHFA Updates Projections of Potential Draws for Fannie Mae and Freddie Mac

**Washington, DC** –The Federal Housing Finance Agency (FHFA) today released updated projections of the financial performance of Fannie Mae and Freddie Mac, including potential draws under the Senior Preferred Stock Purchase Agreements with the U.S. Department of the Treasury.  FHFA first released financial projections in October 2010, and these updated projections show similar results for two out of three scenarios, and a decrease in cumulative Treasury draws in one scenario.  Through the FHFA Conservator's Report, FHFA tracks actual performance versus projections on a quarterly basis.

(Attachment follows)

<p style="text-align:center">###</p>

*The Federal Housing Finance Agency regulates Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks. These government-sponsored enterprises provide more than $5.7 trillion in funding for the U.S. mortgage markets and financial institutions.*



# Federal Housing Finance Agency

## Projections of the Enterprises' Financial Performance

### October 2011

TREASURY-1898

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

# Contents

Summary................................................................ 3

Results ................................................................. 4

Comparison of Oct 2011 Projections to Oct 2010 Projections................. 8

Projection Scenarios .................................................... 11

House Price Assumptions ................................................ 12

Appendix............................................................... 14

TREASURY-1899

## Summary

- This report provides updated information on possible future Treasury draws by Fannie Mae and Freddie Mac (the "Enterprises") under specified scenarios, using consistent assumptions for both Enterprises.  FHFA published initial projections of the Enterprises' financial performance in October 2010.  The report on the initial projections can be found in FHFA's Projections of the Enterprises' Financial Performance, October 2010.  The projections have been updated to reflect the current outlook for house prices, interest rates, and recent trends in borrower behavior.  The projection period has been extended an additional year.

- To date, the Enterprises have drawn $169 billion from Treasury under the terms of the Senior Preferred Stock Purchase Agreements (PSPAs), as amended, between the Treasury and each of the Enterprises.  FHFA worked with the Enterprises to develop forward-looking financial projections across three possible house price paths.  **Under the three scenarios used in the projections, cumulative Treasury draws (including dividends) at the end of 2014 range from $220 billion to $311 billion.  In the initial projections released in October 2010, cumulative Treasury draws (including dividends) at the end of 2013 ranged from $221 billion to $363 billion.**

- The difference in the range of ending cumulative Treasury draws between the October 2010 projections and the October 2011 projections can be attributed primarily to the fact that actual results for the first year of the projection period in the October 2010 projections were substantially better than projected.  (See page 8 for further details.)

- The projections reported here are not expected outcomes.  They are modeled projections in response to "what if" exercises based on assumptions about Enterprise operations, loan performance, macroeconomic and financial market conditions, and house prices.  The projections do not define the full range of possible outcomes.  Actual outcomes may be very different.  This effort should be interpreted as a sensitivity analysis of future draws to possible house price paths.

- FHFA provided the Enterprises with key assumptions for each scenario. The Enterprises used their respective internal models to project their financial results based on the assumptions provided by FHFA.  While this effort achieves a degree of comparability between the Enterprises, it does not allow for actions that the Enterprises might undertake in response to the economic conditions specified in the scenarios.  Those Enterprise-specific business changes could lead to different results across the scenarios than are presented in these projections.

3

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

## Results

The assumptions used in each of the three scenarios are described on page 11.  The projected combined cumulative Treasury draws for both Enterprises through December 31, 2014 reach $220 billion under Scenario 1, $226 billion under Scenario 2, and $311 billion under Scenario 3.  Fannie Mae's cumulative draws are higher than Freddie Mac's in part because Fannie Mae's mortgage book of business is approximately fifty percent larger than Freddie Mac's.  In addition, Fannie Mae's serious delinquency rates are higher than Freddie Mac's.

**Figure 1: Cumulative Treasury Draws\*** *($ in billions)*



4

## Results (continued)

The Enterprises are required to pay a 10 percent dividend on the amount of funds drawn by the Enterprises under the Senior Preferred Stock Purchase Agreements (PSPAs) with Treasury. The PSPAs do not allow for dividends to reduce prior draws. However, for illustrative purposes, if dividend payments were subtracted from the projected cumulative draws, the net amounts would reach $121 billion under Scenario 1, $124 billion under Scenario 2, and $193 billion under Scenario 3. Most dividends to date have been paid from funds acquired with additional draws. The projections show a portion of future dividends being paid out of comprehensive income.

**Figure 2: Cumulative Treasury Draws less dividends paid** *($ in billions)*

Fannie Mae
Cumulative draw less dividends
$200
$160
$120
$80
$40
Scenario 3
Scenario 2
Scenario 1
$73
$80
$122
$105
$103
$158
$110
$104
$159
$102
$96
$144
$88
$85
2009
2010
2011
2012
2013
2014

Freddie Mac
Cumulative draw less dividends
$110
$90
$70
$50
$30
Scenario 2
Scenario 3
Scenario 1
$46
$54
$66
$59
$58
$65
$52
$51
$58
$44
$43
$49
$36
$36
2009
2010
2011
2012
2013
2014

**Cumulative Treasury Draw through 2014** (Fannie Mae)

| | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| Related to operating losses and other* | $105 | $110 | $161 |
| Related to senior preferred dividends | 40 | 40 | 58 |
| Cumulative Treasury Draw | $145 | $150 | $219 |
| Senior preferred dividends (not financed through Treasury Draws) | $20 | $22 | $18 |
| Total senior preferred dividends | $60 | $62 | $76 |

**Cumulative Treasury Draw through 2014** (Freddie Mac)

| | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| Related to operating losses and other* | $58 | $59 | $66 |
| Related to senior preferred dividends | 17 | 17 | 26 |
| Cumulative Treasury Draw | $75 | $76 | $92 |
| Senior preferred dividends (not financed through Treasury Draws) | $22 | $22 | $17 |
| Total senior preferred dividends | $39 | $39 | $43 |

*Operating losses and other refers to net losses reported on the income statement, changes in unrealized losses reported on the balance sheet, and the impact of other accounting changes for consolidation and security impairments.
In accordance with Senior Preferred Stock Purchase Agreements (PSPAs), the Enterprises are not permitted to paydown the Treasury draw amounts, even if the Enterprises generate positive net income or total comprehensive income.
Numbers may not foot due to rounding.

TREASURY-1902

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

## Results (continued)

Credit-related expenses, particularly the provision for credit losses, continue to drive projected Treasury draws across all three scenarios.  Fannie Mae's credit-related expenses increase by $57 billion from Scenario 1 to Scenario 3, and for Freddie Mac that increase amounts to $23 billion.  Thus $80 billion of the projected $92 billion difference in Treasury draws across those scenarios is directly related to credit-related expense projections.

**Figure 3: Cumulative Financial Results (2009-2014)** *($ in billions)*

|  | Fannie Mae | | | Freddie Mac | | |
|---|---|---|---|---|---|---|
|  | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 1 | Scenario 2 | Scenario 3 |
| Revenues | $112 | $112 | $110 | $104 | $104 | $103 |
| Provision for credit losses | (135) | (139) | (189) | (64) | (66) | (86) |
| Other credit-related expenses[1] | (35) | (35) | (38) | (26) | (26) | (27) |
| Total Credit-related Expenses/Losses | (170) | (174) | (227) | (90) | (92) | (113) |
| Other expenses[2] | (33) | (33) | (33) | (26) | (26) | (26) |
| Net Income (Loss) | ($91) | ($94) | ($150) | ($12) | ($14) | ($36) |
| Capital Change |  |  |  |  |  |  |
| Net Income | (91) | (94) | (150) | (12) | (14) | (36) |
| Dividends | (60) | (62) | (76) | (39) | (39) | (43) |
| Other[3] | 21 | 21 | 21 | 21 | 22 | 31 |
| Total Capital Change | (130) | (135) | (204) | (30) | (31) | (48) |
| Beginning Net Worth (12/31/2008) | (15) | (15) | (15) | (31) | (31) | (31) |
| Capital Deficit (2009-2014) | (145) | (150) | (219) | (61) | (62) | (79) |
| Senior Preferred Treasury Draw (2009-2014) | 145 | 150 | 219 | 61 | 62 | 79 |
| Cumulative Senior Preferred Treasury Draw[4] | $145 | $150 | $219 | $75 | $76 | $92 |
| Cumulative Draw less Dividends[4] | $85 | $88 | $144 | $36 | $36 | $49 |

[1] Consists of foreclosed property expenses, SOP 03-3 losses, net, and other than temporary impairments.

[2] Consists of mark-to-market gains/losses, net, tax expense/benefit and other expenses.

[3] Consists of change in accumulated other comprehensive income, and other accounting changes for consolidation and security impairments, less positive net worth as of 12/31/14, if any.

[4] Freddie Mac's cumulative draw includes $13.8 billion of Treasury draw received in 2008.

Projected financial results assume that the Senior Preferred Stock Purchase Agreement (PSPA) commitment fee has been waived at both Enterprises.

Numbers may not foot due to rounding.

6

## Results (continued)

The Enterprises have received $169 billion from Treasury to maintain positive net worth.  For the selected scenarios an additional $51 to $142 billion would be required to support the Enterprises over the projection period.  In Scenarios 1 and 2, dividend payments to Treasury exceed  additional Treasury draws.  Per the terms of the Senior Preferred Stock Purchase Agreements with Treasury, senior preferred stock accrues dividends at 10 percent per year.

**Figure 4: Additional Treasury Draws and Dividends (Jul 2011 through Dec 2014)** *($ in billions)*

|  | Current Draw as of 06/30/11 | | Scenario 1 | | Scenario 2 | | Scenario 3 | |
|---|---|---|---|---|---|---|---|---|
|  | Total Draw | Total Dividends | Additional Draw | Additional Dividends | Additional Draw | Additional Dividends | Additional Draw | Additional Dividends |
| Fannie Mae | $104 | $15 | $41 | $45 | $46 | $47 | $115 | $61 |
| Freddie Mac | 65 | 13 | 10 | 26 | 11 | 26 | 27 | 30 |
| Total | $169 | $28 | $51 | $71 | $57 | $73 | $142 | $91 |

7

## Comparison of October 2011 Projections to October 2010 Projections

- The projection period for the current projections and the previous projections runs three and a half years.  The current projection period runs through the end of 2014.  The prior projection period runs through the end of 2013.

- In the October 2011 projections, the ending combined cumulative Treasury draw is $1 billion lower for scenario 1 and $51 billion lower for scenario 3 than the ending cumulative Treasury draw in the October 2010 projections.  The difference can be attributed to three primary factors:

  o Actual results for the first year of the projection period were substantially better than projected. The actual combined Treasury draw was $19 billion lower for scenario 1 and $73 billion lower for scenario 3 than the projections (See Figure 5). This factor is partially offset by the next two factors.

  o Projected Treasury draws for the remainder of the initial projection period were $14 billion higher for scenario 1 and $16 billion higher for scenario 3 in the October 2011 projections; and

  o The projection period has been extended through 2014, adding $3 billion in Treasury draws for scenario 1 and $6 billion in Treasury draws for scenario 3.

- Drivers of the differences in the projected pattern of financial results include the following factors:

  o Recent observed trends show that borrowers with high MTM LTV loans and modified loans are performing better than previously projected.

  o The number of serious delinquent loans has declined as transition rates to later stages of delinquency are lower than previously projected.

  o Foreclosure delays pushed some defaults into later years of the projection period and beyond.

  o Recent observed trends indicate higher REO sales prices than previously projected.

  o Net interest income is higher in the current projection results due to lower interest rates, resulting in decreased funding costs and slightly higher average portfolio balances, driven by slower portfolio liquidations than previously projected.

  o The house price path in scenario 3 used in the current projections is better through the second quarter of 2012 and worse thereafter, compared to the corresponding house price path used in the October 2010 projections.

8

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

Comparison of October 2011 Projections to October 2010 Projections (continued)

**Figure 5: Comparison of Oct 2011 Projections to Oct 2010 Projections** *($ in billions)*

|  | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| **October 2010 Projections** | | | |
| Beginning Cumulative Draw 6/30/10 | 148 | 148 | 148 |
| Projected Treasury draw - Year 1 (Second half of 2010 and first half of 2011) | 39 | 50 | 93 |
| Projected Treasury draw - Years 2-3$^1/_2$ (Second half of 2011; 2012 and 2013) | 34 | 40 | 121 |
| **Ending Cumulative Draw 2013** | **221** | **238** | **363** |
| | | | |
| **October 2011 Projections** | | | |
| Beginning Cumulative Draw 6/30/10 | 148 | 148 | 148 |
| Actual Treasury draw - Year 1 (Second half of 2010 and first half of 2011) | 21 | 21 | 21 |
| Beginning Cumulative Draw 6/30/11 | 169 | 169 | 169 |
| Projected Treasury draw - Years 2-3$^1/_2$ (Second half of 2011; 2012 and 2013) | 48 | 56 | 137 |
| Projected Treasury draw - Year 3$^1/_2$-4$^1/_2$ (2014) | 3 | 1 | 6 |
| **Ending Cumulative Draw 2014** | **220** | **226** | **311** |
| | | | |
| **Difference in ending Cumulative Draw** | | | |
| Actual versus Projection - Year 1 (Second half of 2010 and first half of 2011) | (19) | (29) | (73) |
| Difference in Projections - Years 2-3$^1/_2$ (Second half of 2011; 2012 and 2013) | 14 | 16 | 16 |
| Additional year of Projection (2014) | 3 | 1 | 6 |
| **Total difference in ending cumulative draw** | **(1)** | **(12)** | **(51)** |

Numbers may not foot due to rounding

9

TREASURY-1906

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

Comparison of October 2011 Projections to October 2010 Projections (continued)

Actual and forecasted house price paths for Scenarios 1 and 2 used in the October 2011 projections are worse
compared to the corresponding house price paths used in the October 2010 projections.  The house price path in
Scenario 3 used in the October 2011 projections is better through the second quarter of 2012 and worse thereafter,
compared to the corresponding house price path used in the October 2010 projections.

**Figure 6: Comparison of Current and Previous House Price Paths**

Moody's house price paths (Case Shiller National Index; July 2011 vs. September 2010)



## Projection Scenarios

Key factors that influence the Enterprises' financial results are listed in Figure 7. FHFA requested that the Enterprises project financial results for three scenarios.  Because changes in house prices have had the largest impact on the Enterprises' financial results, we chose to change only this factor across the three scenarios.

## Figure 7: Scenario Assumptions

| Factor | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| House prices* | Moody's "Stronger Near-term Rebound" house price paths | Moody's "Current Baseline" house price paths | Moody's "Deeper Second Recession" house price paths |
| Interest rates | Future interest rates are implied by the forward curves as of June 30, 2011. | *Same as Scenario 1* | *Same as Scenario 1* |
| Securities prices | ABS and CMBS prices fall by 5 points at the beginning of the period | *Same as Scenario 1* | *Same as Scenario 1* |
| Agency MBS spreads | Agency MBS spreads to swaps remain unchanged. | *Same as Scenario 1* | *Same as Scenario 1* |
| Credit Guarantee growth | Zero growth in credit guarantees through year end 2014. | *Same as Scenario 1* | *Same as Scenario 1* |
| Retained Portfolio growth | Additions to retained portfolios are limited to nonperforming loans bought out of pools backing Fannie Mae's MBS and Freddie Mac's PCs. | *Same as Scenario 1* | *Same as Scenario 1* |

*Moody's house price paths as of July 2011

11

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

## House Price Assumptions

House price changes have been the major driver of credit losses at the Enterprises. A wide range of possible future paths exist for house prices at the national and local levels. Given the high level of uncertainty about overall economic conditions in general and the U.S. housing markets in particular, FHFA directed the Enterprises to project financial results for Moody's current baseline and two additional house price paths. Moody's considers "Deeper Second Recession" to be a downside alternative to the Current Baseline and "Stronger Near-term Rebound" to be an upside alternative to the Current Baseline.

**Figure 8: Moody's House Price Paths** *(Case-Shiller National Index; July 2011)*



## Descriptions

**Stronger Near-term Rebound** *(FHFA Scenario 1)*
An expansion of credit supports above-baseline growth. As a result, house prices start to increase after 2Q11, although additional increases are minimal in 2011 and 2012. The peak-to-trough decline is 33% based on the Case-Shiller National Index. From the trough in 2Q11 to the end of the forecast period house prices increase by 12%. Total new housing permits reach an annual pace above 1 million units by the first quarter of 2012.

**Current Baseline** *(FHFA Scenario 2)*
Remaining home price declines contribute to a 35% peak-to-trough decline based on the Case-Shiller National Index. From the trough in 1Q12 to the end of the forecast period, house prices increase by 15%. Total new housing permits reach an annual pace above 1 million units by the second quarter of 2012.

**Deeper Second Recession** *(FHFA Scenario 3)*
As a result of continuing high unemployment, the moderate rebound in housing construction that occurred over the first half of 2009 and then stalled reverses course. Housing starts resume their decline, bottoming out in mid-2012, more than 80% below their peak in 2005. The peak-to-trough decline is 46% based on the Case-Shiller National Index. From the trough in 4Q12 to the end of the forecast period house prices increase by 23%.

12

House Price Assumptions (continued)

**Selection of House Price Assumptions**

Figure 8 shows national-level paths for the Case-Shiller house price index associated with the selected Moody's house price paths. Scenario 2 uses house price paths associated with Moody's "Current Baseline (July 2011)." That house price path is derived from Moody's assumptions regarding monetary and fiscal policy, U.S. dollar, and energy prices. Scenario 1 and Scenario 3 use house price paths associated with better and worse economic performance relative to Moody's "Current Baseline (July 2011)."

Moody's describes the house price paths associated with "Stronger Near-term Rebound", as being consistent with "a 10% probability that the economy will perform better than in this scenario, broadly speaking, and a 90% probability that it will perform worse." Conversely, Moody's describes the house price paths associated with "Deeper Second Recession" as being consistent with "a 90% probability that the economy will perform better, broadly speaking, and a 10% probability that it will perform worse." FHFA chose the "Deeper Second Recession" house price path to ensure a stringent test that would provide information tied to a continued severe weakening in housing.

**Use of Moody's Localized Forecasts**

FHFA chose to base the scenarios on Moody's house price paths because Moody's is a widely used benchmark. Moody's provides a full set of quarterly, forward-looking house price paths for each of the 384 Metropolitan Statistical Areas (MSAs) and Divisions for which FHFA publishes a historical house price index. FHFA does not forecast house prices. Such localized forecasts enable the Enterprises to project credit losses on a more comparable basis as opposed to a simple national projection of peak-to-trough change in house prices, which would require each Enterprise to translate that house price path into its own local house price index.

Defining a house price path at just the national level for the Enterprises would limit the usefulness of the results because house prices often behave quite differently in different local markets. The mix of local market price projections associated with a given national average price projection can have a substantial impact on the aggregate loss projection for an Enterprise. Similarly, defining the path with only a peak-to-trough measure is problematic because the timing of the trough and the rate of recovery beyond the trough can also greatly affect expected losses.

13

## Appendix

## Financial Projections Procedures

FHFA directed the Enterprises to project revenue, mark-to-market gains and losses, credit-related expenses, administrative expenses, earnings, capital, and, ultimately, cumulative senior preferred Treasury draws under the three scenarios using their own respective models. Both Enterprises routinely prepare financial forecasts using their respective management assumptions. Modeling assumptions were changed at both Enterprises to conform to the assumptions listed in Figure 7.

FHFA directed that the projection period cover the remainder of 2011 and the next three years, similar to projection periods used by the Enterprises for routine management forecasts. Furthermore for the selected house price paths, by the end of the projection period the bulk of credit losses are recognized.

The Enterprises' models use projections of interest rates to calculate future net interest margins, gains and losses on the retained portfolio and derivatives used for hedging, and prepayment speeds on held or guaranteed mortgages, which influence both credit losses and guarantee fee revenue.

To project revenue, the Enterprises projected the size of the retained portfolios and credit guarantee books using assumptions provided by FHFA on business volume growth. Additions to retained portfolios were limited to nonperforming loans bought out of pools backing Fannie Mae's MBS and Freddie Mac's PCs. The balance of outstanding credit guarantees at each Enterprise remained unchanged over the forecast period.

Net interest income (which includes most of the Enterprises' guarantee fee income) is driven primarily by the size of the retained portfolio and net interest margin (the difference between yield on assets and funding costs). For this exercise, funding costs were influenced by the forward curve for swaps, and asset yields were influenced by the forward curve for swaps and the assumptions about the level of Agency MBS spreads to swaps.

Guarantee fee income is driven by the size of the credit guarantee book and guarantee fee pricing. To project the size of the credit guarantee books the Enterprises used assumptions provided by FHFA on new business volume and interest rates, which influence prepayment speeds on guaranteed mortgages. FHFA did not provide explicit assumptions about guarantee fee pricing. However, FHFA reviewed the pricing assumptions of each Enterprise for

14

the projection period for consistency. For both Enterprises, guarantee fee pricing remained relatively unchanged over the projection period.

Projections of mark-to-market losses reflect changes in the value of securities held in the retained portfolio and changes in the value of derivatives used for hedging. The Enterprises' models use assumptions about future interest rates, securities prices, and spreads to project gains and losses on securities held in the retained portfolio and on derivatives used to hedge interest rate risk.

To project credit-related expenses, each Enterprise uses a multistep process. First, a statistical loan transition model projects the unpaid principal balance (UPB) of loans expected to default over the projection period. House price projections are used to determine the mark-to-market loan-to-value ratios of the guaranteed mortgages, which in turn influence the probabilities of default, and projections of loss given default. Next, a second model projects the severity of losses associated with defaulted loans resolved through various processes. The projections of distressed UPB are combined with the projections of loss severities to arrive at credit losses for each quarter. Next, each Enterprise projected loan loss reserves based on projections of credit losses, to determine its future provisions for credit losses. Finally, projections of credit-related expenses incorporate projections of future provisions for credit losses, foreclosed property expenses, and expenses incurred after foreclosure on the property.

The Enterprises used their own respective management assumptions to project administrative expenses.

FHFA reviews models and methodologies for internal consistency and comprehensiveness as part of the continuing supervision of the Enterprises. However, as with other regulator-driven financial projections that rely on internal models of banks, the internal models of one Enterprise will produce different answers than those of the other given the same set of assumptions and other inputs.

This modeling exercise is not the same as, nor did it follow all the same control procedures as the process followed for formal financial reporting. For instance, the projections did not incorporate management judgment as to how the specific assumptions employed might produce other changes in model assumptions. Nonetheless, FHFA believes that the results of this exercise provide a reasonable indication of plausible future Treasury draws under the specified scenarios, using comparable key assumptions for each Enterprise.

15

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2011**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from              to**

**Commission File No.: 0-50231**

# Federal National Mortgage Association
*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(202) 752-7000**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑      No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑      No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐      Accelerated filer ☑      Non-accelerated filer ☐      Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐      No ☑

As of September 30, 2011, there were 1,158,227,237 shares of common stock of the registrant outstanding.

## TABLE OF CONTENTS

**Part I—Financial Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Item 1.   Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Condensed Consolidated Balance Sheets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Condensed Consolidated Statements of Operations and Comprehensive Loss . . . . . . . . . . . . 102

Condensed Consolidated Statements of Cash Flows . . . . . . . . . . . . . . . . . . . . . . . . . 103

Note 1—Summary of Significant Accounting Policies . . . . . . . . . . . . . . . . . . . . . . . 104

Note 2—Consolidations and Transfers of Financial Assets . . . . . . . . . . . . . . . . . . . . 115

Note 3—Mortgage Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

Note 4—Allowance for Loan Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

Note 5—Investments in Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

Note 6—Financial Guarantees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

Note 7—Acquired Property, Net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Note 8—Short-Term Borrowings and Long-Term Debt . . . . . . . . . . . . . . . . . . . . . . 141

Note 9—Derivative Instruments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Note 10—Segment Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

Note 11—Regulatory Capital Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

Note 12—Concentration of Credit Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

Note 13—Fair Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Note 14—Commitments and Contingencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Item 2.   Management's Discussion and Analysis of Financial Condition and Results of Operations . . . 1

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Legislative and Regulatory Developments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Critical Accounting Policies and Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Consolidated Results of Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Business Segment Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Consolidated Balance Sheet Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Supplemental Non-GAAP Information—Fair Value Balance Sheets . . . . . . . . . . . . . . . . . 55

Liquidity and Capital Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Off-Balance Sheet Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Risk Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Impact of Future Adoption of New Accounting Pronouncements . . . . . . . . . . . . . . . . . . 97

Forward-Looking Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Item 3.   Quantitative and Qualitative Disclosures about Market Risk . . . . . . . . . . . . . . . . . . 177

Item 4.   Controls and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

**PART II—Other Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Item 1.   Legal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Item 1A.  Risk Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

Item 2.   Unregistered Sales of Equity Securities and Use of Proceeds . . . . . . . . . . . . . . . . . . 188

Item 3.   Defaults Upon Senior Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Item 4.   [Removed and reserved] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Item 5.   Other Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

Item 6.   Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

i

### MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| 1 | Treasury Dividend Payments and Draw . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| 2 | Expected Lifetime Profitability of Single-Family Loans Acquired in 1991 through the First Nine Months of 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| 3 | Single-Family Serious Delinquency Rates by Year of Acquisition . . . . . . . . . . . . . . . . . . . . . | 8 |
| 4 | Credit Profile of Single-Family Conventional Loans Acquired . . . . . . . . . . . . . . . . . . . . . . . . | 9 |
| 5 | Credit Statistics, Single-Family Guaranty Book of Business . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| 6 | Level 3 Recurring Financial Assets at Fair Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| 7 | Summary of Condensed Consolidated Results of Operations . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
| 8 | Analysis of Net Interest Income and Yield . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25 |
| 9 | Rate/Volume Analysis of Changes in Net Interest Income . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| 10 | Impact of Nonaccrual Loans on Net Interest Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 |
| 11 | Fair Value (Losses) Gains, Net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 |
| 12 | Total Loss Reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31 |
| 13 | Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves) . . . . . . | 32 |
| 14 | Nonperforming Single-Family and Multifamily Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 |
| 15 | Credit Loss Performance Metrics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38 |
| 16 | Single-Family Credit Loss Sensitivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 39 |
| 17 | Single-Family Business Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41 |
| 18 | Multifamily Business Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43 |
| 19 | Capital Markets Group Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 45 |
| 20 | Capital Markets Group's Mortgage Portfolio Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 47 |
| 21 | Capital Markets Group's Mortgage Portfolio Composition . . . . . . . . . . . . . . . . . . . . . . . . . . | 49 |
| 22 | Summary of Condensed Consolidated Balance Sheets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50 |
| 23 | Summary of Mortgage-Related Securities at Fair Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 51 |
| 24 | Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities . . . . . . . . | 52 |
| 25 | Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 53 |
| 26 | Changes in Risk Management Derivative Assets (Liabilities) at Fair Value, Net . . . . . . . . . . . . . | 55 |
| 27 | Comparative Measures—GAAP Change in Stockholders' Deficit and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 56 |
| 28 | Supplemental Non-GAAP Consolidated Fair Value Balance Sheets . . . . . . . . . . . . . . . . . . . . | 58 |
| 29 | Activity in Debt of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 61 |
| 30 | Outstanding Short-Term Borrowings and Long-Term Debt . . . . . . . . . . . . . . . . . . . . . . . . . . | 63 |
| 31 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year . . . . . . . . . . . . | 64 |
| 32 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year . . . . . . . . | 65 |
| 33 | Cash and Other Investments Portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 65 |
| 34 | Fannie Mae Credit Ratings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 66 |
| 35 | Composition of Mortgage Credit Book of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 69 |

ii

| Table | Description | Page |
|---|---|---|
| 36 | Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 72 |
| 37 | Delinquency Status of Single-Family Conventional Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . | 77 |
| 38 | Single-Family Serious Delinquency Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 78 |
| 39 | Single-Family Conventional Serious Delinquency Rate Concentration Analysis . . . . . . . . . . . . . | 79 |
| 40 | Statistics on Single-Family Loan Workouts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 80 |
| 41 | Single-Family Loan Modification Profile . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 81 |
| 42 | Single-Family Foreclosed Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 82 |
| 43 | Single-Family Acquired Property Concentration Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . | 83 |
| 44 | Multifamily Serious Delinquency Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 85 |
| 45 | Multifamily Concentration Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 85 |
| 46 | Multifamily Foreclosed Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 86 |
| 47 | Mortgage Insurance Coverage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 89 |
| 48 | Unpaid Principal Balance of Financial Guarantees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 91 |
| 49 | Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 95 |
| 50 | Derivative Impact on Interest Rate Risk (50 Basis Points) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 96 |

TREASURY-1916

## PART I—FINANCIAL INFORMATION

**Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations**

*We have been under conservatorship, with the Federal Housing Finance Agency ("FHFA") acting as conservator, since September 6, 2008. As conservator, FHFA succeeded to all rights, titles, powers and privileges of the company, and of any shareholder, officer or director of the company with respect to the company and its assets. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. Our directors do not have any duties to any person or entity except to the conservator and, accordingly, are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator. We describe the rights and powers of the conservator, key provisions of our agreements with the U.S. Department of the Treasury ("Treasury"), and their impact on shareholders in our Annual Report on Form 10-K for the year ended December 31, 2010 ("2010 Form 10-K") in "Business—Conservatorship and Treasury Agreements."*

*You should read this Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in conjunction with our unaudited condensed consolidated financial statements and related notes and the more detailed information in our 2010 Form 10-K.*

*This report contains forward-looking statements that are based on management's current expectations and are subject to significant uncertainties and changes in circumstances. Please review "Forward-Looking Statements" for more information on the forward-looking statements in this report. Our actual results may differ materially from those reflected in these forward-looking statements due to a variety of factors including, but not limited to, those described in "Risk Factors" and elsewhere in this report and in "Risk Factors" in our 2010 Form 10-K.*

*You can find a "Glossary of Terms Used in This Report" in the "MD&A" of our 2010 Form 10-K.*

## INTRODUCTION

Fannie Mae is a government-sponsored enterprise ("GSE") that was chartered by Congress in 1938 to support liquidity, stability and affordability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold. Our charter does not permit us to originate loans or lend money directly to consumers in the primary mortgage market. Our most significant activity is securitizing mortgage loans originated by lenders into Fannie Mae mortgage-backed securities that we guarantee, which we refer to as Fannie Mae MBS. We also purchase mortgage loans and mortgage-related securities for our mortgage portfolio. We use the term "acquire" in this report to refer to both our guarantees and our purchases of mortgage loans. We obtain funds to support our business activities by issuing a variety of debt securities in the domestic and international capital markets.

We are a corporation chartered by the U.S. Congress. Our conservator is a U.S. government agency. Treasury owns our senior preferred stock and a warrant to purchase 79.9% of our common stock, and Treasury has made a commitment under a senior preferred stock purchase agreement to provide us with funds under specified conditions to maintain a positive net worth. The U.S. government does not guarantee our securities or other obligations.

Our common stock was delisted from the New York Stock Exchange and the Chicago Stock Exchange on July 8, 2010 and since then has been traded in the over-the-counter market and quoted on the OTC Bulletin Board under the symbol "FNMA." Our debt securities are actively traded in the over-the-counter market.

1

**EXECUTIVE SUMMARY**

In the first nine months of 2011, we continued our work to provide liquidity and support to the mortgage market, grow the strong new book of business we have been acquiring since January 1, 2009, and minimize losses on loans we acquired prior to 2009.

**Providing Liquidity and Support to the Mortgage Market**

*Our Liquidity and Support Activities*

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- We serve as a stable source of liquidity for purchases of homes and multifamily rental housing, as well as for refinancing existing mortgages. We provided approximately $2.1 trillion in liquidity to the mortgage market from January 1, 2009 through September 30, 2011 through our purchases and guarantees of loans, including over 7.6 million single-family mortgage loans, which enabled borrowers to purchase homes or refinance their mortgages, and multifamily loans that financed nearly 967,000 units of multifamily housing.

- We are a consistent market presence as we continue to provide liquidity to the mortgage market even when other sources of capital have exited the market, as evidenced by the events of the last few years. We estimate that we, Freddie Mac and Ginnie Mae have collectively guaranteed more than 80% of the single-family mortgages originated in the United States since January 1, 2009.

- We have strengthened our underwriting and eligibility standards to support sustainable homeownership. Our support enables borrowers to have access to a variety of conforming mortgage products, including long-term, fixed-rate mortgages, such as the prepayable 30-year fixed-rate mortgage that protects homeowners from interest rate swings.

- We helped more than 960,000 homeowners struggling to pay their mortgages work out their loans from January 1, 2009 through September 30, 2011, which helped to support neighborhoods, home prices and the housing market.

- We support affordability in the multifamily rental market. Over 85% of the multifamily units we financed during 2009 and 2010 were affordable to families earning at or below the median income in their area.

- Borrowers typically pay a lower interest rate on loans eligible for purchase or guarantee by Fannie Mae, Freddie Mac or Ginnie Mae. Mortgage originators are generally able to offer borrowers lower mortgage rates on conforming loan products, including ours, in part because of the value investors place on GSE-guaranteed mortgage-related securities.

- In addition to purchasing and guaranteeing loans, we provide funds to the mortgage market through short-term financing and other activities. These activities are described in more detail in our 2010 Form 10-K in "Business—Business Segments—Capital Markets."

*2011 Acquisitions and Market Share*

In the first nine months of 2011, we purchased or guaranteed approximately $445 billion in loans, measured by unpaid principal balance, which includes approximately $51 billion in delinquent loans we purchased from our single-family MBS trusts. These activities enabled our lender customers to finance approximately 1,826,000 single-family conventional loans and loans for approximately 289,000 units in multifamily properties during the first nine months of 2011.

We remained the largest single issuer of mortgage-related securities in the secondary market during the third quarter of 2011, with an estimated market share of new single-family mortgage-related securities issuances of 43.3%. Our estimated market share of new single-family mortgage-related securities issuances was 43.2% in the second quarter of 2011 and 44.5% in the third quarter of 2010.

2

We remained a constant source of liquidity in the multifamily market. We owned or guaranteed approximately 20% of the outstanding debt on multifamily properties as of June 30, 2011 (the latest date for which information was available).

**Summary of Our Financial Performance for the Third Quarter and First Nine Months of 2011**

Our financial results for the third quarter and the first nine months of 2011 reflect the continued weakness in the housing and mortgage markets, which remain under pressure from high levels of unemployment, underemployment and the prolonged decline in home prices since their peak in the third quarter of 2006. Credit-related expenses continue to be a key driver of our net losses for each period presented. Our credit-related expenses vary from period to period primarily based on changes in home prices, borrower payment behavior, the types and volumes of loss mitigation activities completed, and actual and estimated recoveries from our lender and mortgage insurer counterparties. The decline in interest rates during the third quarter of 2011 had a significant impact on the company's derivative losses; however, these losses were mostly offset by fair value gains in the period related to our hedged mortgage investments for which only a portion are recorded at fair value in our financial statements. Derivative instruments are an integral part of how we manage interest rate risk and an inherent part of the cost of funding and hedging our mortgage investments. We expect high levels of period-to-period volatility in our results because our derivatives are recorded at fair value in our financial statements while some of the instruments they hedge are not recorded at fair value in our financial statements.

*Comprehensive Loss*

We recognized a total comprehensive loss of $5.3 billion in the third quarter of 2011, consisting of a net loss of $5.1 billion and other comprehensive loss of $197 million. In comparison, we recognized a total comprehensive loss of $2.9 billion in the second quarter of 2011, consisting of a net loss of $2.9 billion and other comprehensive income of $2 million. We recognized a total comprehensive loss of $429 million in the third quarter of 2010, consisting of a net loss of $1.3 billion and other comprehensive income of $902 million (other comprehensive income in the third quarter of 2010 was primarily driven by a reduction in our unrealized losses due to significantly improved fair value of available-for-sale securities).

Our total comprehensive loss for the first nine months of 2011 was $14.5 billion, consisting of a net loss of $14.4 billion and other comprehensive loss of $14 million. In comparison, we recognized a total comprehensive loss of $10.1 billion in the first nine months of 2010, consisting of a net loss of $14.1 billion and other comprehensive income of $3.9 billion (other comprehensive income in the first nine months of 2010 was primarily driven by a reduction in our unrealized losses due to significantly improved fair value of available-for-sale securities).

*Net Loss*

*Third Quarter 2011 vs. Second Quarter 2011.*   The $2.2 billion increase in our net loss was primarily due to $4.5 billion in net fair value losses in the third quarter of 2011 primarily driven by losses on our risk management derivatives due to a significant decline in swap interest rates during the quarter, compared with $1.6 billion in net fair value losses in the second quarter of 2011 driven by losses on risk management derivatives. In addition, we recognized foreclosed property expense of $733 million in the third quarter of 2011 compared with foreclosed property income of $478 million in the second quarter of 2011 because our estimate of amounts due to us related to outstanding repurchase requests remained relatively flat during the third quarter compared with a substantial increase in the second quarter of 2011. These losses and expenses were partially offset by a $2.4 billion decrease in our provision for credit losses primarily driven by a lower provision on individually impaired loans as the continued lower interest rate environment improved our expected cash flow projections on those loans, therefore reducing our estimated impairment.

*Third Quarter 2011 vs. Third Quarter 2010.*   The $3.8 billion increase in our net loss was primarily due to $4.5 billion in net fair value losses in the third quarter of 2011 primarily driven by losses on our risk management derivatives due to a significant decline in swap interest rates during the quarter, compared with

3

$525 million in net fair value gains in the third quarter of 2010 primarily driven by gains on our trading securities. These losses were partially offset by a $677 million decrease in credit-related expenses which was primarily driven by a lower provision on individually impaired loans as the continued lower interest rate environment improved our expected cash flow projections on those loans, therefore reducing our estimated impairment. Additionally, there was a $410 million increase in net interest income primarily from lower interest expense on funding debt.

*Nine Months of 2011 vs. Nine Months of 2010.*   Our net loss remained flat for the first nine months of 2011 compared with the first nine months of 2010. The key components of our net loss in both the first nine months of 2011 and the first nine months of 2010 were credit-related expenses and fair value losses, which were partially offset by net interest income.

See "Consolidated Results of Operations" for more information on our results.

### Net Worth

Our net worth deficit of $7.8 billion as of September 30, 2011 reflects the recognition of our total comprehensive loss of $5.3 billion and our payment to Treasury of $2.5 billion in senior preferred stock dividends during the third quarter of 2011. The Acting Director of FHFA will submit a request to Treasury on our behalf for $7.8 billion to eliminate our net worth deficit.

In the third quarter of 2011, we received $5.1 billion in funds from Treasury to eliminate our net worth deficit as of June 30, 2011. Upon receipt of the additional funds requested to eliminate our net worth deficit as of September 30, 2011, the aggregate liquidation preference on the senior preferred stock will be $112.6 billion, which will require an annualized dividend payment of $11.3 billion. The amount of this dividend payment exceeds our reported annual net income for any year since our inception. Through September 30, 2011, we have paid an aggregate of $17.2 billion to Treasury in dividends on the senior preferred stock.

Table 1 below displays our senior preferred stock dividend payments to Treasury and Treasury draws since entering conservatorship on September 6, 2008.

**Table 1:   Treasury Dividend Payments and Draw**

| | 2008 | 2009 | 2010 | 2011 to date (first nine months) | Cumulative Total |
|---|---|---|---|---|---|
| | | | (Dollars in billions) | | |
| Senior preferred stock dividends[1] | $  — | $ 2.5 | $ 7.7 | $ 7.0 | $ 17.2 |
| Treasury draws[2][3] | 15.2 | 60.0 | 15.0 | 21.4 | 111.6 |
| Cumulative percentage of senior preferred stock dividends to Treasury draws | 0.2% | 3.3% | 11.3% | 15.4% | 15.4% |

[1]   Represents total quarterly cash dividends paid to Treasury, during the periods presented, based on an annual rate of 10% per year on the aggregate liquidation preference of the senior preferred stock.

[2]   Represents the total draws received from Treasury and / or currently requested based on our quarterly net worth deficits for the periods presented. Draw requests were funded in the quarter following each quarterly net worth deficit.

[3]   Treasury draws do not include the initial $1.0 billion liquidation preference of the senior preferred stock, for which we did not receive any cash proceeds.

### Total Loss Reserves

Our total loss reserves, which reflect our estimate of the probable losses we have incurred in our guaranty book of business, increased to $75.6 billion as of September 30, 2011 from $74.8 billion as of June 30, 2011 and increased from $66.3 billion as of December 31, 2010. Our total loss reserve coverage to total nonperforming loans was 37.07% as of September 30, 2011, compared with 36.91% as of June 30, 2011 and 30.85% as of December 31, 2010. The continued stress on a broad segment of borrowers from continued high levels of unemployment and underemployment and the prolonged decline in home prices have caused our total loss reserves to remain high for the past few years. Further, the shift in our nonperforming loan balance from

4

loans in our collective reserve to loans that are individually impaired has caused our coverage ratio to increase.

**Our Strong New Book of Business and Expected Losses on Our Legacy Book of Business**

We refer to the single-family loans we have acquired since the beginning of 2009 as our "new single-family book of business" and the single-family loans we acquired prior to 2009 as our "legacy book of business." In this section, we discuss our expectations regarding the profitability of our new single-family book of business, as well as the performance and credit profile of these loans to date. We also discuss our expectations regarding losses on the loans in our legacy book of business.

### *Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations*

We present a number of estimates and expectations in this executive summary regarding the profitability of single-family loans we have acquired, our single-family credit losses and credit-related expenses, and our draws from and dividends to be paid to Treasury. These estimates and expectations are forward-looking statements based on our current assumptions regarding numerous factors, including future home prices and the future performance of our loans. Home prices are a key factor affecting the amount of credit losses and profitability we expect. As home prices decline, the loan-to-value ratios on our loans shift higher, and both the probability of default and the severity of loss increase. Furthermore, the level of regional variation in home price declines affects our results, as we will incur greater credit losses if home prices decline more significantly in regions where we have a greater concentration of loans. Our future estimates of our performance, as well as the actual amounts, may differ materially from our current estimates and expectations as a result of the timing, level and regional variation in home price changes, changes in interest rates, unemployment, other macroeconomic variables, direct and indirect consequences resulting from failures by servicers to follow proper procedures in the administration of foreclosure cases, government policy, changes in generally accepted accounting principles ("GAAP"), credit availability, social behaviors, the volume of loans we modify, the effectiveness of our loss mitigation strategies, management of our real-estate owned ("REO") inventory and pursuit of contractual remedies, changes in the fair value of our assets and liabilities, impairments of our assets, and many other factors, including those discussed in "Risk Factors," "Forward-Looking Statements" and elsewhere in this report and in "Risk Factors" in our 2010 Form 10-K. For example, if the economy were to enter a deep recession, we would expect actual outcomes to differ substantially from our current expectations.

### *Building a Strong New Single-Family Book of Business*

*Expected Profitability of Our Single-Family Acquisitions*

Our new single-family book of business has a strong overall credit profile and is performing well. While it is too early to know how loans in our new single-family book of business will ultimately perform, given their strong credit risk profile, low levels of payment delinquencies shortly after acquisition, and low serious delinquency rates, we expect that, over their lifetime, these loans will be profitable, by which we mean our fee income on these loans will exceed our credit losses and administrative costs for them. Table 2 provides information about whether we expect loans we acquired in 1991 through the first nine months of 2011 to be profitable, and the percentage of our single-family guaranty book of business represented by these loans as of September 30, 2011. The expectations reflected in Table 2 are based on the credit risk profile of the loans we have acquired, which we discuss in more detail in "Table 4: Credit Profile of Single-Family Conventional Loans Acquired" and in "Table 36: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business." These expectations are also based on numerous other assumptions, including our expectations regarding home price declines set forth in "Outlook" and other macroeconomic factors. As shown in Table 2, we expect loans we have acquired in 2009, 2010 and the first nine months of 2011 to be profitable over their lifetime. If future macroeconomic conditions turn out to be more adverse than our expectations, these loans could become unprofitable. For example, we believe that credit losses on these loans would exceed guaranty fee revenue if home prices declined nationally by approximately 10% from their September 2011 levels over the next five years based on our home price index. See "Outlook" for our expectations regarding home price declines.

5

**Table 2:   Expected Lifetime Profitability of Single-Family Loans Acquired in 1991 through the First Nine Months of 2011**



As Table 2 shows, the years in which we acquired single-family loans that we expect will be unprofitable are 2004 through 2008. A substantial majority of our realized credit losses since the beginning of 2009 were attributable to loans we acquired in 2005 through 2008. Although the 2004 vintage has been profitable to date, we currently believe that this vintage will not be profitable over its lifetime. While we previously believed the 2004 vintage would perform close to break-even, in 2011 our expectations for long-term home price changes have worsened, which has changed our expectation of future borrower behavior regarding these loans. We expect the 2005 through 2008 vintages to be significantly more unprofitable than the 2004 vintage. The loans we acquired in 2004 were originated under more conservative acquisition policies than loans we acquired from 2005 through 2008; however, because our 2004 acquisitions were made during a time when home prices were rapidly increasing, their performance is expected to suffer from the significant decline in home prices since 2006. The ultimate long-term performance and profitability of the 2004 vintage will depend on many factors, including changes in home prices, other economic conditions and borrower behavior.

6

Loans we have acquired since the beginning of 2009 comprised 49% of our single-family guaranty book of business as of September 30, 2011. Our 2005 to 2008 acquisitions are becoming a smaller percentage of our single-family guaranty book of business, having decreased from 39% of our single-family guaranty book of business as of December 31, 2010 to 33% as of September 30, 2011. Our 2004 acquisitions constituted 5% of our single-family guaranty book of business as of September 30, 2011.

*Serious Delinquency Rates by Year of Acquisition*

In our experience, an early predictor of the ultimate performance of a portfolio of loans is the rate at which the loans become seriously delinquent (three or more months past due or in the foreclosure process) within a short period of time after acquisition. Loans we acquired in 2009 and 2010 have experienced historically low levels of delinquencies shortly after their acquisition. Table 3 shows, for single-family loans we acquired in each year from 2001 to 2010, the percentage that were seriously delinquent as of the end of the third quarter following the year of acquisition. Loans we acquired in 2011 are not included in this table because they were originated so recently that many of them could not yet have become seriously delinquent. As Table 3 shows, the percentage of our 2009 acquisitions that were seriously delinquent as of the end of the third quarter following their acquisition year was approximately nine times lower than the average comparable serious delinquency rate for loans acquired in 2005 through 2008. For loans originated in 2010, this percentage was approximately ten times lower than the average comparable rate for loans acquired in 2005 through 2008. Table 3 also shows serious delinquency rates for each year's acquisitions as of September 30, 2011. Except for 2008 acquisitions, whose performance has been affected by changes in underwriting and eligibility standards that became effective during the course of 2008, and more recent acquisition years, whose serious delinquency rates are likely lower than they will be after the loans have aged, Table 3 shows that the current serious delinquency rate generally tracks the trend of the serious delinquency rate as of the end of the third quarter following the year of acquisition. Below the table we provide information about the economic environment in which the loans were acquired, specifically home price appreciation and unemployment levels.

7

**Table 3:   Single-Family Serious Delinquency Rates by Year of Acquisition**



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Home Price Appreciation[1] | 6.3% | 7.5% | 7.7% | 10.6% | 11.3% | 2.9% | (3.3)% | (8.9)% | (4.7)% | (4.2)% | (0.9)% |
| Unemployment rate[2] | 4.7% | 5.8% | 6.0% | 5.5% | 5.1% | 4.6% | 4.6% | 5.8% | 9.3% | 9.6% | 9.0% |

[*]   For 2010, the serious delinquency rate as of September 30, 2011 is the same as the serious delinquency rate as of the end of the third quarter following the acquisition year.

[1]   Based on Fannie Mae's Home Price Index (HPI), which measures average price changes based on repeat sales on the same properties. For 2011, the data show an initial estimate based on purchase transactions in Fannie-Freddie acquisition and public deed data available through the end of September 2011, supplemented by preliminary data available for October 2011. Previously reported data have been revised to reflect additional available historical data. Including subsequently available data may lead to materially different results. We recently enhanced our home price estimates to identify and exclude a greater portion of foreclosed home sales. As a result, some period to period comparisons of home prices differ from those indicated by our prior estimates.

[2]   Based on the average national unemployment rates for each month reported in the labor force statistics current population survey (CPS), Bureau of Labor Statistics.

_Credit Profile of Our Single-Family Acquisitions_

Single-family loans we purchased or guaranteed from 2005 through 2008 were acquired during a period when home prices were rising rapidly, peaked, and then started to decline sharply, and underwriting and eligibility standards were more relaxed than they are now. These loans were characterized, on average and as discussed

8

below, by higher loan-to-value ("LTV") ratios and lower FICO credit scores than loans we have acquired since January 1, 2009. In addition, many of these loans were Alt-A loans or had other higher-risk loan attributes such as interest-only payment features. As a result of the sharp declines in home prices, 34% of the loans that we acquired from 2005 through 2008 had mark-to-market LTV ratios that were greater than 100% as of September 30, 2011, which means the principal balance of the borrower's primary mortgage exceeded the current market value of the borrower's home. This percentage is higher when second lien loans are included. The sharp decline in home prices, the severe economic recession that began in December 2007 and continued through June 2009, and continuing high unemployment and underemployment have significantly and adversely impacted the performance of loans we acquired from 2005 through 2008. We are continuing to take a number of actions to reduce our credit losses. We discuss these actions and our strategy in "Reducing Credit Losses on Our Legacy Book of Business" and "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management."

In 2009, we began to see the effect of actions we took, beginning in 2008, to significantly strengthen our underwriting and eligibility standards and change our pricing to promote sustainable homeownership and stability in the housing market. As a result of these changes and other market dynamics, we reduced our acquisitions of loans with higher-risk attributes. Compared with the loans we acquired in 2005 through 2008, the loans we have acquired since January 1, 2009 have had better overall credit risk profiles at the time we acquired them and their early performance has been strong. Our experience has been that loans with characteristics such as lower original LTV ratios (that is, more equity held by the borrowers in the underlying properties), higher FICO credit scores and more stable payments will perform better than loans with risk characteristics such as higher original LTV ratios, lower FICO credit scores, Alt-A underwriting and payments that may adjust over the term of the loan.

Table 4 shows the credit risk profile of the single-family loans we have acquired since January 1, 2009 compared to the loans we acquired from 2005 through 2008.

**Table 4:   Credit Profile of Single-Family Conventional Loans Acquired**[1]

| | Acquisitions from 2009 through the first nine months of 2011 | Acquisitions from 2005 through 2008 |
|---|---|---|
| Weighted average loan-to-value ratio at origination . . . . . . . | 68% | 73% |
| Weighted average FICO credit score at origination . . . . . . . | 761 | 722 |
| Fully amortizing, fixed-rate loans . . . . . . . . . . . . . . . . . . . . | 95% | 86% |
| Alt-A loans[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 14% |
| Interest-only . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 12% |
| Original loan-to-value ratio > 90% . . . . . . . . . . . . . . . . . | 6% | 11% |
| FICO credit score < 620 . . . . . . . . . . . . . . . . . . . . . . . . . . | * | 5% |

\*   Represents less than 0.5% of the total acquisitions.

[1]   Loans that meet more than one category are included in each applicable category.

[2]   Newly originated Alt-A loans acquired in 2009 through 2011 consist of the refinance of existing Alt-A loans.

Improvements in the credit risk profile of our acquisitions since the beginning of 2009 over acquisitions in prior years reflect changes that we made to our pricing and eligibility standards, as well as changes that mortgage insurers made to their eligibility standards. We discuss these changes in our 2010 Form 10-K in "Business—Executive Summary—Our Expectations Regarding Profitability, the Single-Family Loans We Acquired Beginning in 2009, and Credit Losses—Credit Profile of Our Single-Family Acquisitions."

The credit risk profile of our acquisitions since the beginning of 2009 has been influenced further by the significant percentage of refinanced loans. Historically, refinanced loans generally have better credit profiles than purchase money loans. As we discuss in "Outlook" below, we expect fewer refinancings in 2011 and 2012 than in 2010.

Since 2009, our acquisitions have included a significant number of loans refinanced under our Refi Plus™ initiative, which provides expanded refinance opportunities for eligible Fannie Mae borrowers. Our

TREASURY-1925

acquisitions under Refi Plus include our acquisitions under the Home Affordable Refinance Program ("HARP"), which was established by the Administration to help borrowers who may be unable to refinance the mortgage loan on their primary residence due to a decline in home values. The approximately 536,000 loans we acquired under Refi Plus in the first nine months of 2011 constituted approximately 27% of our total single-family acquisitions for the period, compared with approximately 23% of total single-family acquisitions in all of 2010. Under Refi Plus we acquire refinancings of performing Fannie Mae loans that have current LTV ratios up to 125% and, in some cases, lower FICO credit scores than we generally require. While it is too early to determine whether loans with higher risk characteristics refinanced under the Refi Plus program will perform differently from other refinanced loans, we expect Refi Plus loans will perform better than the loans they replace because Refi Plus loans reduce the borrowers' monthly payments or otherwise should provide more sustainability than the borrowers' old loans (for example, by having a fixed rate instead of an adjustable rate). Loans refinanced through the Refi Plus initiative in the first nine months of 2011 reduced borrowers' monthly mortgage payments by an average of $171. This figure reflects all refinancings under Refi Plus, even those that involved a reduced term, and therefore higher monthly payments.

The LTV ratios at origination for our 2010 and 2011 acquisitions are higher than for our 2009 acquisitions, primarily due to our acquisition of Refi Plus loans. The percentage of loans with LTV ratios at origination greater than 90% has increased from 4% for 2009 acquisitions to 7% for 2010 acquisitions and 10% for acquisitions in the first nine months of 2011. We expect our acquisition of loans with high LTV ratios will increase in 2012 as a result of recently announced changes to HARP, which we discuss in "Legislative and Regulatory Developments—Changes to the Home Affordable Refinance Program."

Despite the increases in LTV ratios at origination associated with Refi Plus, the overall credit profile of our 2010 and 2011 acquisitions, like that of our 2009 acquisitions, is significantly stronger than the credit profile of our 2005 through 2008 acquisitions. Whether the loans we acquire in the future will exhibit an overall credit profile similar to our acquisitions since the beginning of 2009 will depend on a number of factors, including our future eligibility standards and those of mortgage insurers, the percentage of loan originations representing refinancings, the volume and characteristics of loans we acquire under the recently announced changes to HARP terms, our future objectives, government policy, and market and competitive conditions.

### Expected Losses on Our Legacy Book of Business

The single-family credit losses we realized from January 1, 2009 through September 30, 2011, combined with the amounts we have reserved for single-family credit losses as of September 30, 2011, as described below, total approximately $135 billion. A substantial majority of these losses are attributable to single-family loans we purchased or guaranteed from 2005 through 2008.

While loans we acquired in 2005 through 2008 will give rise to additional credit losses that we will realize when the loans are charged off (upon foreclosure or our acceptance of a short sale or deed-in-lieu of foreclosure), we estimate that we have reserved for the substantial majority of the remaining losses on these loans. Even though we believe a substantial majority of the credit losses we have yet to realize on these loans has already been reflected in our results of operations as credit-related expenses, our credit-related expenses remain high as weakness in the housing and mortgage markets continues. We also expect that future defaults on loans in our legacy book of business and the resulting charge-offs will occur over a period of years. In addition, given the large current and anticipated supply of single-family homes in the market, we anticipate that it will take years before our REO inventory is reduced to pre-2008 levels.

We show how we calculate our realized credit losses in "Table 15: Credit Loss Performance Metrics." Our reserves for credit losses described in this discussion consist of (1) our allowance for loan losses, (2) our allowance for accrued interest receivable, (3) our allowance for preforeclosure property taxes and insurance receivables, and (4) our reserve for guaranty losses (collectively, our "total loss reserves"), plus the portion of fair value losses on loans purchased out of unconsolidated MBS trusts reflected in our condensed consolidated balance sheets that we estimate represents accelerated credit losses we expect to realize. For more information on our reserves for credit losses, see "Table 12: Total Loss Reserves."

TREASURY-1926

The fair value losses that we consider part of our reserves are not included in our "total loss reserves." We recorded the majority of these fair value losses prior to our adoption in 2010 of accounting standards on the transfers of financial assets and the consolidation of variable interest entities. Before we adopted these standards, upon our acquisition of credit-impaired loans out of unconsolidated MBS trusts, we recorded fair value loss charge-offs against our reserve for guaranty losses. The amount of these charge-offs was the amount by which the acquisition cost of these loans exceeded their estimated fair value. We expect to realize a portion of these fair value losses as credit losses in the future (for loans that eventually involve charge-offs or foreclosure), yet these fair value losses have already reduced the mortgage loan balances reflected in our condensed consolidated balance sheets and have effectively been recognized in our condensed consolidated statements of operations and comprehensive loss through our provision for guaranty losses. We consider these fair value losses as an "effective reserve," apart from our total loss reserves, to the extent that we expect to realize credit losses on the acquired loans in the future.

### Reducing Credit Losses on Our Legacy Book of Business

To reduce the credit losses we ultimately incur on our legacy book of business, we have been focusing our efforts on the following strategies:

- Reducing defaults by offering borrowers solutions that enable them to keep their homes ("home retention solutions");

- Pursuing "foreclosure alternatives," which help borrowers avoid foreclosure, to reduce the severity of the losses we incur;

- Efficiently managing timelines for home retention solutions, foreclosure alternatives, and foreclosures;

- Improving servicing standards and execution;

- Managing our REO inventory to minimize costs and maximize sales proceeds; and

- Pursuing contractual remedies from lenders, servicers and providers of credit enhancement.

As we work to reduce credit losses, we also seek to assist distressed borrowers, help stabilize communities, and support the housing market. In dealing with distressed borrowers, we first seek home retention solutions before turning to foreclosure alternatives. When there is no viable home retention solution or foreclosure alternative that can be applied, we seek to move to foreclosure expeditiously. Prolonged delinquencies can hurt local home values and destabilize communities, as these homes often go into disrepair. As a general rule, the longer borrowers remain delinquent, the greater our costs.

*Reducing Defaults.* Home retention solutions are a key element of our strategy to reduce defaults, and the majority of our home retention solutions are loan modifications. Successful modifications allow borrowers who were having problems making their pre-modification mortgage payments to remain in their homes. While loan modifications contribute to higher credit-related expenses in the near term, we believe that successful modifications (those that enable borrowers to remain current on their loans) will ultimately reduce our credit losses over the long term from what they otherwise would have been if we had taken the loans to foreclosure. We completed approximately 161,000 loan modifications in the first nine months of 2011, bringing the total number of loan modifications we have completed since January 2009 to over 660,000. The substantial majority of these modifications involved deferring or lowering borrowers' monthly mortgage payments, which we believe increases the likelihood borrowers will be able to remain current on their modified loans. Whether our modifications are ultimately successful depends heavily on economic factors, such as unemployment rates, household wealth and income, and home prices. See "Table 40: Statistics on Single-Family Loan Workouts" and the accompanying discussion for additional information on our home retention efforts, including our modifications, as well as our foreclosure alternatives. For a description of the impact of modifications on our credit-related expenses, see "Consolidated Results of Operations—Credit-Related Expenses—Provision for Credit Losses."

*Pursuing Foreclosure Alternatives.*   If we are unable to provide a viable home retention solution for a distressed borrower, we seek to offer a foreclosure alternative and complete it in a timely manner. Our

11

foreclosure alternatives are primarily preforeclosure sales, which are sometimes referred to as "short sales," as well as deeds-in-lieu of foreclosure. These alternatives are intended to reduce the severity of our loss resulting from a borrower's default while enabling the borrower to avoid going through a foreclosure. We provide information about the volume of foreclosure alternatives we completed in the first nine months of 2011 in "Table 5: Credit Statistics, Single-Family Guaranty Book of Business."

*Managing Timelines for Workouts and Foreclosures.*   We refer to home retention solutions and foreclosure alternatives as "workouts." We believe that home retention solutions are most effective in preventing defaults when completed at an early stage of delinquency. Similarly, our foreclosure alternatives are more likely to be successful in reducing our loss severity if they are executed expeditiously. Accordingly, it is important to us for our servicers to work with delinquent borrowers early in the delinquency to determine whether home retention solutions or foreclosure alternatives will be viable and, where no workout solution is viable, to reduce delays in proceeding to foreclosure.

Circumstances in the foreclosure environment have resulted in foreclosures proceeding at a slow pace. As a result of the housing market downturn that began in 2006 and significantly worsened in 2008, the volume of foreclosures to be processed by servicers and states significantly increased in 2009 and the first nine months of 2010. In October 2010, a number of single-family mortgage servicers temporarily halted some or all of the foreclosures they were processing after discovering deficiencies in their foreclosure processes and the processes of their service providers. In response to the foreclosure process deficiencies, some states changed their foreclosure processes to require additional review and verification of the accuracy of pending and future foreclosure filings. Some states also added requirements to the foreclosure process, including mediation processes and requirements to file new affidavits. Further, some state courts have issued rulings calling into question the validity of some existing foreclosure practices. These actions halted or significantly delayed not only existing, but new foreclosures. As an example, in December 2010, the New Jersey Supreme Court halted all uncontested residential foreclosure proceedings by six largest loan servicers for a period of approximately nine months until those servicers demonstrated that their foreclosure processes were compliant with law. New Jersey also imposed a new requirement that counsel certify the accuracy of all pending and future foreclosure complaints. In addition, in August 2011 a New Jersey appellate decision held that defects in notices of intent to foreclose required dismissal and restart of the pending foreclosure process rather than simply correcting the defective notices. We had more than 22,000 loans in foreclosure in New Jersey as of the beginning of the third quarter of 2011, but foreclosures during the quarter led to our acquiring only 151 REO properties.

While servicers have generally ended their outright foreclosure halts, they continue to process foreclosures at a slow pace as they update their procedures to remediate their process deficiencies and meet new legislative, regulatory and judicial requirements. In addition, servicers and states are dealing with the backlog of foreclosures resulting from these delays and from the elevated level of foreclosures resulting from the housing market downturn. For foreclosures completed in the third quarter of 2011, measuring from the last monthly period for which the borrowers fully paid their mortgages to when we added the related properties to our REO inventory, the average number of days it took in each state to ultimately foreclose ranged from 374 days in Missouri to 906 days in Florida. Florida accounted for 29% of our loans that were in the foreclosure process as of September 30, 2011.

These extended time periods to complete foreclosures increase our costs of holding these loans. In addition, to the extent home prices decline while foreclosure proceedings are drawn out, the proceeds we ultimately receive from the sale of the foreclosed properties will be lower. Slower foreclosures also result in loans remaining seriously delinquent in our book of business for a longer time, which has caused our serious delinquency rate to decrease more slowly in the last year than it would have if the pace of foreclosures had been faster. We believe the changes in the foreclosure environment discussed above will continue to negatively affect our single-family serious delinquency rates, foreclosure timelines and credit-related expenses. Moreover, we believe these conditions will delay the recovery of the housing market because it will take longer to clear the market's supply of distressed homes. Distressed homes typically sell at a discount compared to non-distressed homes and, therefore, a lingering population of distressed homes will continue to negatively affect overall home prices. See "Risk Factors" for further information about the potential impact of the foreclosure

TREASURY-1928

process deficiencies and resulting changes in the foreclosure environment on our business, results of operations, financial condition and net worth.

*Improving Servicing Standards and Execution.*   The performance of our mortgage servicers is critical to our success in reducing defaults, completing foreclosure alternatives and managing workout and foreclosure timelines efficiently, because servicers are the primary point of contact with borrowers. Improving servicing standards is therefore a key aspect of our strategy to reduce our credit losses. We have taken a number of steps to improve the servicing of our delinquent loans.

- In June 2011, we issued new standards for mortgage servicers under FHFA's Servicing Alignment Initiative. The initiative is aimed at establishing consistency in the servicing of delinquent loans owned or guaranteed by Fannie Mae and Freddie Mac. Among other things, the new servicing standards, which became effective October 1, 2011, are designed to result in earlier, more frequent and more effective contact with borrowers and to improve servicer performance by providing servicers monetary incentives for exceeding loan workout benchmarks and by imposing fees on servicers for failing to meet loan workout benchmarks or foreclosure timelines.

- In some cases, we transfer servicing on loan populations that include loans with higher-risk characteristics to special servicers with whom we have worked to develop high-touch protocols for servicing these loans. These protocols include lowering the ratio of loans per servicer employee, prescribing borrower outreach strategies to be used at earlier stages of delinquency, and providing distressed borrowers a single point of contact to resolve issues. Transferring servicing on higher-risk loans enables the borrowers (and loans) to benefit from these high-touch protocols while increasing the original servicer's capacity to service the remaining loans, creating an opportunity to improve service to the remaining borrowers.

- In September 2011, we issued our first ratings of servicers' performance under our Servicer Total Achievement and Rewards ("STAR") program. The STAR program is designed to encourage improvements in customer service and foreclosure prevention outcomes for homeowners by rating servicers on their performance in these areas.

While we believe these steps will improve the servicing on our loans, ultimately we are dependent on servicers' willingness, efficiency and ability to implement our home retention solutions and foreclosure alternatives, and to manage timelines for workouts and foreclosures.

*Managing Our REO Inventory.*   Efficient management of our REO inventory of homes acquired through deed-in-lieu of foreclosure or foreclosure is another critical element of our strategy for reducing credit losses. Since January 2009, we have strengthened our REO sales capabilities by increasing resources in this area, as we continue to manage our REO inventory to reduce costs and maximize sales proceeds. As Table 5 shows, in the first nine months of 2011 we have already disposed of as many properties as we did in all of 2010, and our dispositions in 2010 represented a 51% increase over our dispositions in 2009.

Neighborhood stabilization is a core principle in our approach to managing our REO inventory. In the first nine months of 2011, we completed repairs to approximately 69,300 properties sold from our single-family REO inventory, at an average cost of $6,122 per property. Repairing REO properties increases sales to owner occupants and increases financing options for REO buyers. In addition, our "First Look" marketing period contributes to neighborhood stabilization by encouraging homeownership. During this "First Look" period, owner occupants, some nonprofit organizations and public entities may submit offers and purchase properties without competition from investors. During the first nine months of 2011, approximately 113,900 of the single-family properties we sold were purchased by owner-occupants, nonprofit organizations or public entities.

We currently lease properties to tenants who occupied the properties before we acquired them into our REO inventory, which can minimize disruption by providing additional time to find alternate housing, help stabilize local communities, provide us with rental income, and support our compliance with federal and state laws protecting tenants in foreclosed properties. As of September 30, 2011, approximately 10,000 tenants leased our REO properties.

The changing foreclosure environment discussed above has delayed our acquisitions of REO properties. Given the large number of seriously delinquent loans in our single-family guaranty book of business and the large existing and anticipated supply of single-family homes in the market, we expect it will take years before our REO inventory approaches pre-2008 levels.

*Pursuing Contractual Remedies.*   We conduct targeted reviews of our loans and, when we discover loans that do not meet our underwriting or eligibility requirements, we may make demands for lenders to repurchase these loans or compensate us for losses sustained on the loans. We also make demands for lenders to repurchase or compensate us for loans for which the mortgage insurer rescinds coverage. The volume of our repurchase requests rose in 2010 as compared with 2009 and has remained high through the first nine months of 2011. During the first nine months of 2011, lenders repurchased from us or reimbursed us for losses on approximately $8.8 billion in loans, measured by unpaid principal balance, pursuant to their contractual obligations. In addition, as of September 30, 2011, we had outstanding requests for lenders to repurchase from us or reimburse us for losses on $9.5 billion in loans, of which 25.4% had been outstanding for more than 120 days.

These dollar amounts represent the unpaid principal balance of the loans underlying the repurchase requests, not the actual amounts we have received or requested from the lenders. When lenders pay us for these requests, they pay us either to repurchase the loans or else to make us whole for our losses in cases where we have acquired and disposed of the property underlying the loans. Make-whole payments are typically for less than the unpaid principal balance because we have already recovered some of the balance through the sale of the REO. As a result, our actual cash receipts relating to these outstanding repurchase requests are significantly lower than the unpaid principal balance of the loans.

We are also pursuing contractual remedies from providers of credit enhancement on our loans, including mortgage insurers. We received proceeds under our mortgage insurance policies for single-family loans of $4.6 billion for the first nine months of 2011. See "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" for a discussion of our repurchase and reimbursement requests and outstanding receivables from mortgage insurers, as well as the risk that one or more of these counterparties fails to fulfill its obligations to us.

We believe the actions we have taken to stabilize the housing market and minimize our credit losses will reduce our future credit losses below what they otherwise would have been. However, continuing change in broader market conditions makes it difficult to predict how effective these actions ultimately will be in reducing our credit losses. Moreover, it will be difficult to measure the ultimate impact of our actions, given that current conditions in the housing market are unprecedented.

For more information on the strategies and actions we are taking to minimize our credit losses, see "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management" in our 2010 Form 10-K and in this report.

## Credit Performance

Table 5 presents information for each of the last seven quarters about the credit performance of mortgage loans in our single-family guaranty book of business and our workouts. The workout information in Table 5 does not reflect repayment plans and forbearances that have been initiated but not completed, nor does it reflect trial modifications that have not become permanent.

TREASURY-1930

**Table 5:   Credit Statistics, Single-Family Guaranty Book of Business[1]**

| | 2011 | | | | 2010 | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Q3 YTD | Q3 | Q2 | Q1 | Full Year | Q4 | Q3 | Q2 | Q1 |
| | | | | | (Dollars in millions) | | | | |
| **As of the end of each period:** | | | | | | | | | |
| Serious delinquency rate[2] . . . . . . . . | 4.00% | 4.00% | 4.08% | 4.27% | 4.48% | 4.48% | 4.56% | 4.99% | 5.47% |
| Nonperforming loans[3] . . . . . . . . . . . | $ 202,522 | $202,522 | $200,793 | $206,098 | $ 212,858 | $212,858 | $212,305 | $217,216 | $222,892 |
| Foreclosed property inventory: | | | | | | | | | |
| Number of properties . . . . . . . . . | 122,616 | 122,616 | 135,719 | 153,224 | 162,489 | 162,489 | 166,787 | 129,310 | 109,989 |
| Carrying value . . . . . . . . . . . . . | $ 11,039 | $ 11,039 | $ 12,480 | $ 14,086 | $ 14,955 | $ 14,955 | $ 16,394 | $ 13,043 | $ 11,423 |
| Combined loss reserves[4] . . . . . . . . | $ 70,741 | $ 70,741 | $ 68,887 | $ 66,240 | $ 60,163 | $ 60,163 | $ 58,451 | $ 59,087 | $ 58,900 |
| Total loss reserves[5] . . . . . . . . . . . | $ 73,973 | $ 73,973 | $ 73,116 | $ 70,466 | $ 64,469 | $ 64,469 | $ 63,105 | $ 64,877 | $ 66,479 |
| **During the period:** | | | | | | | | | |
| Foreclosed property (number of properties): | | | | | | | | | |
| Acquisitions[6] . . . . . . . . . . . . | 152,440 | 45,194 | 53,697 | 53,549 | 262,078 | 45,962 | 85,349 | 68,838 | 61,929 |
| Dispositions . . . . . . . . . . . . . | (192,313) | (58,297) | (71,202) | (62,814) | (185,744) | (50,260) | (47,872) | (49,517) | (38,095) |
| Credit-related expenses[7] . . . . . . . . | $ 21,821 | $ 4,782 | $ 5,933 | $ 11,106 | $ 26,420 | $ 4,064 | $ 5,559 | $ 4,871 | $ 11,926 |
| Credit losses[8] . . . . . . . . . . . . . . . | $ 13,798 | $ 4,384 | $ 3,810 | $ 5,604 | $ 23,133 | $ 3,111 | $ 8,037 | $ 6,923 | $ 5,062 |
| Loan workout activity (number of loans): | | | | | | | | | |
| Home retention loan workouts[9] . . . | 188,205 | 68,227 | 59,019 | 60,959 | 440,276 | 89,691 | 113,367 | 132,192 | 105,026 |
| Preforeclosure sales and deeds-in-lieu of foreclosure . . . . . | 57,602 | 19,306 | 21,176 | 17,120 | 75,391 | 15,632 | 20,918 | 21,515 | 17,326 |
| Total loan workouts . . . . . . . . . . | 245,807 | 87,533 | 80,195 | 78,079 | 515,667 | 105,323 | 134,285 | 153,707 | 122,352 |
| Loan workouts as a percentage of delinquent loans in our guaranty book of business[10] . . . . . . . . . . | 26.58% | 28.39% | 25.71% | 25.01% | 37.30% | 30.47% | 37.86% | 41.18% | 31.59% |

[1]   Our single-family guaranty book of business consists of (a) single-family mortgage loans held in our mortgage portfolio, (b) single-family mortgage loans underlying Fannie Mae MBS, and (c) other credit enhancements that we provide on single-family mortgage assets, such as long-term standby commitments. It excludes non-Fannie Mae mortgage-related securities held in our mortgage portfolio for which we do not provide a guaranty.

[2]   Calculated based on the number of single-family conventional loans that are three or more months past due and loans that have been referred to foreclosure but not yet foreclosed upon, divided by the number of loans in our single-family conventional guaranty book of business. We include all of the single-family conventional loans that we own and those that back Fannie Mae MBS in the calculation of the single-family serious delinquency rate.

[3]   Represents the total amount of nonperforming loans including troubled debt restructurings and HomeSaver Advance ("HSA") first-lien loans. A troubled debt restructuring is a restructuring of a mortgage loan in which a concession is granted to a borrower experiencing financial difficulty. HSA first-lien loans are unsecured personal loans in the amount of past due payments used to bring mortgage loans current. We generally classify loans as nonperforming when the payment of principal or interest on the loan is two months or more past due.

[4]   Consists of the allowance for loan losses recognized in our condensed consolidated balance sheets and the reserve for guaranty losses related to both single-family loans backing Fannie Mae MBS that we do not consolidate in our condensed consolidated balance sheets and single-family loans that we have guaranteed under long-term standby commitments. For additional information on the change in our loss reserves see "Consolidated Results of Operations—Credit-Related Expenses—Provision for Credit Losses."

[5]   Consists of (a) the combined loss reserves, (b) allowance for accrued interest receivable, and (c) allowance for preforeclosure property taxes and insurance receivables.

[6]   Includes acquisitions through deeds-in-lieu of foreclosure.

[7]   Consists of the provision for loan losses, the provision (benefit) for guaranty losses and foreclosed property expense (income).

[8]   Consists of (a) charge-offs, net of recoveries and (b) foreclosed property expense; adjusted to exclude the impact of fair value losses resulting from credit-impaired loans acquired from MBS trusts.

15

[9]   Consists of (a) modifications, which do not include trial modifications or repayment plans or forbearances that have been initiated but not completed; (b) repayment plans and forbearances completed and (c) HomeSaver Advance first-lien loans. See "Table 40: Statistics on Single-Family Loan Workouts" in "Risk Management—Credit Risk Management" for additional information on our various types of loan workouts.

[10]  Calculated based on annualized problem loan workouts during the period as a percentage of delinquent loans in our single-family guaranty book of business as of the end of the period.

Our single-family serious delinquency rate has decreased each quarter since the first quarter of 2010. This decrease is primarily the result of home retention solutions, as well as foreclosure alternatives and completed foreclosures. The decrease is also attributable to our acquisition of loans with stronger credit profiles since the beginning of 2009, as these loans have become an increasingly larger portion of our single-family guaranty book of business, resulting in a smaller percentage of our loans becoming seriously delinquent.

Although our single-family serious delinquency rate has decreased significantly since the first quarter of 2010, our serious delinquency rate and the period of time that loans remain seriously delinquent has been negatively affected in recent periods by the increase in the average number of days it is taking to complete a foreclosure. As described in "Reducing Credit Losses on Our Legacy Book of Business—Managing Timelines for Workouts and Foreclosures," high levels of foreclosures, continuing issues in the servicer foreclosure process, changes in state foreclosure laws, and new court rules and proceedings have lengthened the time it takes to foreclose on a mortgage loan in many states. We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, the volume of loan modifications, and the extent to which borrowers with modified loans continue to make timely payments.

We provide additional information on our credit-related expenses in "Consolidated Results of Operations—Credit-Related Expenses" and on the credit performance of mortgage loans in our single-family book of business and our loan workouts in "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management."

### Housing and Mortgage Market and Economic Conditions

During the third quarter of 2011, economic activity picked up from the pace of the second quarter. The inflation-adjusted U.S. gross domestic product, or GDP, rose by 2.5% on an annualized basis during the quarter, according to the Bureau of Economic Analysis advance estimate. The overall economy gained an estimated 389,000 jobs in the third quarter as a result of employment growth in the private sector. According to the U.S. Bureau of Labor Statistics, as of October 2011, over the past 12 months through September there has been an increase of 1.6 million non-farm jobs. The unemployment rate was 9.1% in September 2011, compared with 9.2% in June 2011, based on data from the U.S. Bureau of Labor Statistics. Employment will likely need to post sustained improvement for an extended period to have a positive impact on housing. We estimate the likelihood of a recession by the end of next year at close to 50%.

Existing home sales remained weak during the third quarter of 2011, averaging slightly below second quarter levels. Sales of foreclosed homes and short sales ("distressed sales") continued to represent an outsized portion of the market. Distressed sales accounted for 30% of existing home sales in September 2011, down from 35% in September 2010, according to the National Association of REALTORS®. New home sales during the third quarter of 2011 were also below second quarter levels, remaining at historically low levels.

The overall mortgage market serious delinquency rate has trended down since peaking in the fourth quarter of 2009 but has remained historically high at 7.9% as of June 30, 2011, according to the Mortgage Bankers Association National Delinquency Survey. While the supply of new single-family homes as measured by the inventory/sales ratio declined to its long-term average level in September, the inventory/sales ratio for existing single-family homes remained above average. Properties that are vacant and held off the market, combined with the portion of properties backing seriously delinquent mortgages not currently listed for sale, represent a significant shadow inventory putting downward pressure on home prices.

16

We estimate that home prices on a national basis decreased by 0.2% in the third quarter of 2011 and have declined by 21.0% from their peak in the third quarter of 2006. We recently enhanced our method for estimating home price changes to exclude a greater portion of foreclosed home sales, as we discuss below in "Outlook." If these enhancements had been in place last quarter, instead of reporting a 21.6% decline in home prices through the second quarter of 2011 from their peak, we would have reported a 20.9% decline. Our home price estimates are based on preliminary data and are subject to change as additional data become available. The decline in home prices has left many homeowners with "negative equity" in their mortgages, which means their principal mortgage balance exceeds the current market value of their home. According to CoreLogic, approximately 11 million, or 23%, of all residential properties with mortgages were in a negative equity position in the second quarter of 2011. This increases the risk that borrowers might walk away from their mortgage obligations, causing the loans to become delinquent and proceed to foreclosure.

During the third quarter of 2011, national multifamily market fundamentals, which include factors such as effective rents and vacancy rates, continued to improve, benefiting from rental demand. Based on preliminary third-party data, we estimate that the national multifamily vacancy rate fell to 6.50% in the third quarter of 2011, after having fallen to 6.75% in the second quarter of 2011. In addition, we estimate that average asking rents increased for the sixth quarter in a row, climbing by 1.0% in the third quarter of 2011 on a national basis. As indicated by data from Axiometrics, Inc., multifamily concession rates, the rental discount rate as a percentage of asking rents, declined to about -3.0% as of September 2011. The increase in overall rental demand was also reflected in an estimated increase of 36,000 units in the net number of occupied rental units during the third quarter of 2011, according to preliminary data from Reis, Inc. Although national multifamily market fundamentals continued to improve, certain local markets and properties continued to underperform compared to the rest of the country due to localized underlying economic conditions.

## Outlook

*Overall Market Conditions.*   We expect weakness in the housing and mortgage markets to continue in the fourth quarter of 2011. The high level of delinquent mortgage loans will ultimately result in high levels of foreclosures, which is likely to add to the excess housing inventory. Home sales are unlikely to rise before the unemployment rate improves further.

We expect that single-family default and severity rates, as well as the level of single-family foreclosures, will remain high in 2011. Despite signs of multifamily sector improvement at the national level, we expect multifamily charge-offs in 2011 to remain generally commensurate with 2010 levels as certain local markets and properties continue to exhibit weak fundamentals. Conditions may worsen if the unemployment rate increases on either a national or regional basis.

Although we expect the recently announced changes to HARP will result in our acquiring more refinancings in 2012 than we would have acquired in the absence of the changes, we expect fewer refinancings overall in each of 2011 and 2012 than in 2010 as a result of the high number of mortgages that have already refinanced to low rates in recent years. As a result, we expect the pace of our loan acquisitions for each of 2011 and for 2012 will be lower than in 2010. Our loan acquisitions also could be negatively affected by the decrease in the fourth quarter of 2011 in the maximum size of loans we may acquire in specified high-cost areas from $729,750 to $625,500. In addition, if the Federal Housing Administration ("FHA") continues to be the lower-cost option for some consumers, and in some cases the only option, for loans with higher LTV ratios, our market share could be adversely impacted. As our acquisitions decline, our future revenues will be negatively impacted.

We estimate that total originations in the U.S. single-family mortgage market in 2011 will decrease from 2010 levels by approximately 23%, from an estimated $1.7 trillion to an estimated $1.3 trillion, and that the amount of originations in the U.S. single-family mortgage market that are refinancings will decline from approximately $1.1 trillion to approximately $905 billion. Refinancings comprised approximately 74% of our single-family business volume in the first nine months of 2011, compared with 78% for all of 2010.

*Home Price Declines.*   While the rate of decline in home prices has moderated in recent quarters, we continue to expect that home prices on a national basis will decline further before stabilizing in 2012. We

17

currently expect a peak-to-trough home price decline on a national basis ranging from 22% to 28%, and that it would take the occurrence of an additional adverse economic event to reach the high end of the range. Future home price changes may be very different from our estimates as a result of significant inherent uncertainty in the current market environment, including uncertainty about the effect of actions the federal government has taken and may take with respect to housing finance reform; the management of the Federal Reserve's MBS holdings; and the impact of those actions on home prices, unemployment and the general economic and interest rate environment. Because of these uncertainties, the actual home price decline we experience may differ significantly from these estimates. We also expect significant regional variation in home price declines and stabilization.

Our estimates of home price declines are based on our home price index, which is calculated differently from the S&P/Case-Shiller U.S. National Home Price Index and therefore results in different percentages for comparable declines. Our 22% to 28% peak-to-trough home price decline estimate corresponds to an approximate 32% to 40% peak-to-trough decline using the S&P/Case-Shiller index method. Our estimates differ from the S&P/Case-Shiller index in two principal ways: (1) our estimates weight expectations by number of properties, whereas the S&P/Case-Shiller index weights expectations based on property value, causing home price declines on higher priced homes to have a greater effect on the overall result; and (2) the S&P/Case-Shiller index includes sales of foreclosed homes while our estimates attempt to exclude foreclosed home sales, because we believe that differing maintenance practices and the forced nature of the sales make foreclosed home prices less representative of market values. We believe, however, that the impact of sales of foreclosed homes is indirectly reflected in our estimates as a result of their impact on the pricing of non-distressed sales. We recently enhanced our home price estimates to identify and exclude a greater portion of foreclosed home sales. As a result, some period to period comparisons of home prices differ from those indicated by our prior estimates. We calculate the S&P/Case-Shiller comparison numbers by modifying our internal home price estimates to account for weighting based on property value and the impact of foreclosed property sales. In addition to these differences, our estimates are based on our own internally available data combined with publicly available data, and are therefore based on data collected nationwide, whereas the S&P/Case-Shiller index is based on publicly available data, which may be limited in certain geographic areas of the country. Our comparative calculations to the S&P/Case-Shiller index provided above are not modified to account for this data pool difference.

*Credit-Related Expenses and Credit Losses.*   Our credit-related expenses, which include our provision for credit losses, reflect our recognition of losses on our loans. Through our provision for credit losses, we recognize credit-related expenses on loans in the period in which we determine that we have incurred a probable loss on the loans as of the end of the period, or in which we have granted concessions to the borrowers. Accordingly, our credit-related expenses are affected by changes in home prices, borrower payment behavior, the types and volumes of loss mitigation activities we complete, and estimated recoveries from our lender and mortgage insurer counterparties. Our credit losses, which include our charge-offs, net of recoveries, reflect our realization of losses on our loans. We realize losses on loans, through our charge-offs, when foreclosure sales are completed or when we accept short sales or deeds in lieu of foreclosure. We expect our credit losses in 2011 to be lower than in 2010, as delays in foreclosures keep us from realizing credit losses until later periods. We describe our credit loss outlook above under "Our Strong New Book of Business and Expected Losses on our Legacy Book of Business—Expected Losses on Our Legacy Book of Business."

*Uncertainty Regarding our Long-Term Financial Sustainability and Future Status.*   There is significant uncertainty in the current market environment, and any changes in the trends in macroeconomic factors that we currently anticipate, such as home prices and unemployment, may cause our future credit-related expenses and credit losses to vary significantly from our current expectations. Although Treasury's funds under the senior preferred stock purchase agreement permit us to remain solvent and avoid receivership, the resulting dividend payments are substantial. We do not expect to earn profits in excess of our annual dividend obligation to Treasury for the indefinite future. We expect to request additional draws under the senior preferred stock purchase agreement in future periods, which will further increase the dividends we owe to Treasury on the senior preferred stock. We expect that, over time, our dividend obligation to Treasury will

18

constitute an increasing portion of our future draws under the senior preferred stock purchase agreement. As a result of these factors, there is significant uncertainty about our long-term financial sustainability.

In addition, there is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. We expect this uncertainty to continue. On February 11, 2011 Treasury and the Department of Housing and Urban Development ("HUD") released a report to Congress on reforming America's housing finance market. The report states that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding long-term reform of the GSEs. See "Legislative and Regulatory Developments" in this report and "Legislation and GSE Reform" in our 2010 Form 10-K for discussions of recent legislative reform of the financial services industry and proposals for GSE reform that could affect our business. See "Risk Factors" in this report for a discussion of the risks to our business relating to the uncertain future of our company.

## LEGISLATIVE AND REGULATORY DEVELOPMENTS

### GSE Reform

As required by the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), on February 11, 2011, Treasury and HUD released their report to Congress on ending the conservatorships of Fannie Mae and Freddie Mac and reforming the housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions.

The report identifies a number of policy steps that could be used to wind down Fannie Mae and Freddie Mac, reduce the government's role in housing finance and help bring private capital back to the mortgage market. These steps include (1) increasing guaranty fees, (2) gradually increasing the level of required down payments so that any mortgages insured by Fannie Mae or Freddie Mac eventually have at least a 10% down payment, (3) reducing conforming loan limits to those established in the Federal Housing Finance Regulatory Reform Act of 2008 (the "2008 Reform Act"), (4) encouraging Fannie Mae and Freddie Mac to pursue additional credit loss protection and (5) reducing Fannie Mae's and Freddie Mac's portfolios, consistent with Treasury's senior preferred stock purchase agreements with the companies.

In addition, the report outlines three potential options for a new long-term structure for the housing finance system following the wind-down of Fannie Mae and Freddie Mac. The first option would privatize housing finance almost entirely. The second option would add a government guaranty mechanism that could scale up during times of crisis. The third option would involve the government offering catastrophic reinsurance behind private mortgage guarantors. Each of these options assumes the continued presence of programs operated by FHA, the Department of Agriculture and the Veterans Administration to assist targeted groups of borrowers. The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. A copy of the report can be found on the Housing Finance Reform section of Treasury's Web site, www.Treasury.gov. We are providing Treasury's Web site address solely for your information, and information appearing on Treasury's Web site is not incorporated into this quarterly report on Form 10-Q.

We expect that Congress will continue to hold hearings and consider legislation in the remainder of 2011 and in 2012 on the future status of Fannie Mae and Freddie Mac. Several bills have been introduced that would place the GSEs into receivership after a period of time and either grant federal charters to new entities to engage in activities similar to those currently engaged in by the GSEs or leave secondary mortgage market activities to entities in the private sector. For example, legislation has been introduced in both the House of

Representatives and the Senate that would require FHFA to make a determination within two years of enactment whether the GSEs were financially viable and, if the GSEs were determined not to be financially viable, to place them into receivership. As drafted, these bills may upon enactment impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of our existing and ongoing liabilities.

In addition to bills that seek to resolve the status of the GSEs, numerous bills have been introduced and considered in the House of Representatives that could constrain the current operations of the GSEs or alter the existing authority that FHFA or Treasury have over the enterprises. The Subcommittee on Capital Markets and Government Sponsored Enterprises of the Financial Services Committee has approved bills that would:

- suspend current compensation packages and apply a government pay scale for GSE employees;

- require the GSEs to increase guaranty fees;

- subject GSE loans to the risk retention standards in the Dodd-Frank Act;

- require a quicker reduction of GSE portfolios than required under the senior preferred stock purchase agreement;

- require Treasury to pre-approve all GSE debt issuances;

- repeal the GSEs' affordable housing goals;

- provide additional authority to FHFA's Inspector General;

- prohibit FHFA from approving any new GSE products during conservatorship or receivership, with certain exceptions;

- prevent Treasury from amending the senior preferred stock purchase agreement to reduce the current dividend rate on our senior preferred stock;

- abolish the Affordable Housing Trust Fund that the GSEs are required to fund except when such contributions have been temporarily suspended by FHFA;

- require FHFA to identify mission critical assets of the GSEs and require the GSEs to dispose of non-mission critical assets;

- cap the maximum aggregate amount of funds Treasury or any other agency or entity of the federal government can provide to the GSEs subject to certain qualifications;

- grant FHFA the authority to revoke the enterprises' charters following receivership under certain circumstances; and

- subject the GSEs to the Freedom of Information Act.

We expect additional legislation relating to the GSEs to be introduced and considered by Congress in the remainder of 2011 and in 2012. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs.

In sum, there continues to be uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. See "Risk Factors" for a discussion of the risks to our business relating to the uncertain future of our company. Also see "Risk Factors" in our 2010 Form 10-K for a discussion of how the uncertain future of our company may adversely affect our ability to retain and recruit well-qualified employees, including senior management.

### Changes to the Home Affordable Refinance Program

On October 24, 2011, FHFA, Fannie Mae, and Freddie Mac announced changes to HARP aimed at making refinancing under the program easier and potentially less expensive for qualifying homeowners and

encouraging lenders to participate in the program. While HARP previously limited eligibility to borrowers with mortgage loans that had LTV ratios no greater than 125%, the new HARP guidelines remove that ceiling when a borrower refinances into a new fixed-rate mortgage. Other changes to HARP include:

- eliminating certain risk-based fees for borrowers who refinance into shorter-term loans and lowering fees for other borrowers;

- eliminating the need for a new property appraisal in many cases;

- extending the ending date for HARP from June 2012 to December 2013; and

- reducing the extent to which lenders will be liable for violations of representations and warranties in connection with refinancings under HARP.

We are working with FHFA to finalize the fees that we will charge for loans refinanced under HARP's new terms. We expect these fees to be announced in the fourth quarter of 2011. At this time, we do not know how many eligible borrowers are likely to refinance under the program and, therefore, how many HARP loans we will acquire.

We may incur additional credit-related expenses as a result of these changes to HARP. However, we believe the expanded refinance opportunities for borrowers under HARP may help prevent future delinquencies and defaults, because loans refinanced under the program reduce the borrowers' monthly payments or otherwise should provide more sustainability than the borrowers' old loans (for example, by having a fixed rate instead of an adjustable rate). The extent to which these factors will impact our results of operations will depend on a number of factors, including the terms, credit profile and volume of our acquisitions under the revised program. See "Risk Factors" for a discussion of how efforts we may undertake in support of the housing market may affect us.

### Discontinuation of Our Retained Attorney Network

On October 18, 2011, FHFA directed us to phase out the practice of requiring mortgage servicers to use our network of retained attorneys to perform default- and foreclosure-related legal services for our loans. FHFA also directed us to work with Freddie Mac, through FHFA's Servicing Alignment Initiative, to develop and implement consistent requirements, policies and processes for default- and foreclosure-related legal services. As set forth in FHFA's directive, we will conduct these activities over a transitional period and will seek to minimize disruption to pending matters. During the transitional period, servicers will continue to be directly responsible for managing the foreclosure process and monitoring network firm performance, in accordance with our current requirements and contractual arrangements. Phasing out the use of our retained attorney network may make it more difficult for us to oversee the performance of default- and foreclosure-related legal services for our loans, which may adversely impact our efforts to reduce our credit losses.

### Proposed Changes to Our Single-Family Guaranty Fee Pricing

Consistent with the recommendation in the Administration's report on ending the conservatorships of Fannie Mae and Freddie Mac, we expect that single-family guaranty fees will increase in the coming years, although we do not know the timing, form or extent of these increases. There have been recent public discussions of potential fee increases by the Administration, members of Congress, and FHFA. On September 23, 2011, the Administration submitted a legislative proposal to the Joint Select Committee on Deficit Reduction which would, among other matters, mandate FHFA to require Fannie Mae and Freddie Mac to impose an additional fee, the Conservatorship Recoupment Guarantee Fee, on all single-family mortgages guaranteed on or after January 1, 2013. The proposal requires that the new fee be not less than 10 basis points. The proposal also provides discretion for FHFA to mandate the imposition of a delivery fee in lieu of a guaranty fee increase. Certain members of Congress have also recommended that the Joint Select Committee on Deficit Reduction mandate that FHFA require the GSEs to increase their guaranty fees. In addition, FHFA's Acting Director expressed in a public speech in September 2011 that he expects guaranty fees to increase beginning in 2012.

21

**Servicing Compensation Initiative**

In September 2011, FHFA issued a discussion paper to propose and seek comments on two new possible mortgage servicing compensation structures in connection with its joint initiative on servicing compensation announced earlier this year. The joint initiative, which FHFA directed Fannie Mae and Freddie Mac to work on in coordination with FHFA and HUD, was established to consider alternatives for future mortgage servicing structures and servicing compensation for single-family mortgage loans. One possible structure presented in the discussion paper, which FHFA described as representing a modest change to the current model, provides for a reduced minimum servicing fee accompanied by a reserve account. The reserve account would be available to offset unexpectedly high servicing costs resulting from extraordinary deteriorations in industry conditions. The second possible structure, which FHFA characterized as a fundamental change to the current model, introduces a fee for service structure that provides for a base servicing fee for performing loans and incentive compensation and compensatory fees for servicing non-performing loans, with the possibility of avoiding capitalization of mortgage servicing rights. We provide additional information on FHFA's initiative on servicing compensation in "Business—Business Segments—Single-Family Business—Single-Family Mortgage Servicing" in our 2010 Form 10-K.

For additional information on legislative and regulatory matters affecting us, refer to "Business—Legislation and GSE Reform" and "Business—Our Charter and Regulation of Our Activities" in our 2010 Form 10-K, "MD&A—Legislative and Regulatory Developments—Proposed Rules Implementing the Dodd-Frank Act" in our quarterly report for the quarter ended March 31, 2011 ("First Quarter 2011 Form 10-Q"), and "MD&A—Legislative and Regulatory Developments" in our quarterly report for the quarter ended June 30, 2011 ("Second Quarter 2011 Form 10-Q").

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in accordance with GAAP requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the condensed consolidated financial statements. Understanding our accounting policies and the extent to which we use management judgment and estimates in applying these policies is integral to understanding our financial statements. We describe our most significant accounting policies in "Note 1, Summary of Significant Accounting Policies" of this report and in our 2010 Form 10-K.

We evaluate our critical accounting estimates and judgments required by our policies on an ongoing basis and update them as necessary based on changing conditions. Management has discussed any significant changes in judgments and assumptions in applying our critical accounting policies with the Audit Committee of our Board of Directors. We have identified three of our accounting policies as critical because they involve significant judgments and assumptions about highly complex and inherently uncertain matters, and the use of reasonably different estimates and assumptions could have a material impact on our reported results of operations or financial condition. These critical accounting policies and estimates are as follows:

- Fair Value Measurement

- Total Loss Reserves

- Other-Than-Temporary Impairment of Investment Securities

See "MD&A—Critical Accounting Policies and Estimates" in our 2010 Form 10-K for a detailed discussion of these critical accounting policies and estimates. We provide below information about our Level 3 assets and liabilities as of September 30, 2011 as compared with December 31, 2010. We also describe any significant changes in the judgments and assumptions we made during the first nine months of 2011 in applying our critical accounting policies and significant changes to critical estimates.

**Fair Value Measurement**

The use of fair value to measure our assets and liabilities is fundamental to our financial statements and is a critical accounting estimate because we account for and record a portion of our assets and liabilities at fair

TREASURY-1938

value. In determining fair value, we use various valuation techniques. We describe the valuation techniques and inputs used to determine the fair value of our assets and liabilities and disclose their carrying value and fair value in "Note 13, Fair Value."

### Fair Value Hierarchy—Level 3 Assets and Liabilities

The assets and liabilities that we have classified as Level 3 consist primarily of financial instruments for which there is limited market activity and therefore little or no price transparency. As a result, the valuation techniques that we use to estimate the fair value of Level 3 instruments involve significant unobservable inputs, which generally are more subjective and involve a high degree of management judgment and assumptions. Our Level 3 assets and liabilities consist of certain mortgage- and asset-backed securities and residual interests, certain mortgage loans, certain acquired property, certain long-term debt arrangements and certain highly structured, complex derivative instruments.

Table 6 presents a comparison of the amount of financial assets carried in our condensed consolidated balance sheets at fair value on a recurring basis ("recurring assets") that were classified as Level 3 as of September 30, 2011 and December 31, 2010. The availability of observable market inputs to measure fair value varies based on changes in market conditions, such as liquidity. As a result, we expect the amount of financial instruments carried at fair value on a recurring basis and classified as Level 3 to vary each period.

**Table 6:   Level 3 Recurring Financial Assets at Fair Value**

|  | As of | |
|---|---|---|
|  | September 30, 2011 | December 31, 2010 |
|  | (Dollars in millions) | |
| Trading securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $    4,145 | $    4,576 |
| Available-for-sale securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29,519 | 31,934 |
| Mortgage loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,284 | 2,207 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 227 | 247 |
| Level 3 recurring assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  36,175 | $  38,964 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,213,877 | $3,221,972 |
| Total recurring assets measured at fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 161,093 | $ 161,696 |
| Level 3 recurring assets as a percentage of total assets . . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 1% |
| Level 3 recurring assets as a percentage of total recurring assets measured at fair value . . . | 22% | 24% |
| Total recurring assets measured at fair value as a percentage of total assets . . . . . . . . . . . . | 5% | 5% |

Assets measured at fair value on a nonrecurring basis and classified as Level 3, which are not presented in the table above, primarily include mortgage loans and acquired property. The fair value of Level 3 nonrecurring assets totaled $62.2 billion during the nine months ended September 30, 2011 and $63.0 billion during the year ended December 31, 2010.

Financial liabilities measured at fair value on a recurring basis and classified as Level 3 consisted of long-term debt with a fair value of $1.1 billion as of September 30, 2011 and $1.0 billion as of December 31, 2010, and other liabilities with a fair value of $173 million as of September 30, 2011 and $143 million as of December 31, 2010.

### Total Loss Reserves

Our total loss reserves consist of the following components:

- Allowance for loan losses;

- Allowance for accrued interest receivable;

- Reserve for guaranty losses; and

- Allowance for preforeclosure property tax and insurance receivable.

23

These components can be further divided into single-family portions, which collectively make up our single-family loss reserves, and multifamily portions, which collectively make up our multifamily loss reserves.

In the third quarter of 2011, we updated our allowance for loan loss models for individually impaired loans to incorporate more home price data at the regional level rather than at the national level. We believe this approach is a better estimation of possible home price paths and related default expectations; it has resulted in a decrease to our allowance for loan losses and a reduction of credit-related expenses of approximately $800 million.

In the second quarter of 2011, we updated our loan loss models to incorporate more recent data on prepayments of modified loans, which resulted in an increase to our allowance for loan losses and an increase to credit-related expenses of approximately $1.5 billion. The change resulted in slower expected prepayment speeds, which extended the expected lives of modified loans and lowered the present value of cash flows on those loans. Also in the second quarter of 2011, we updated our estimate of the reserve for guaranty losses related to private-label mortgage-related securities that we have guaranteed to increase our focus on earlier stage delinquency, rather than foreclosure trends, as the primary driver in estimating incurred losses. We believe delinquencies are a better indicator of incurred losses compared to foreclosure trends because the recent delays in the foreclosure process have interrupted the normal flow of delinquent mortgages into foreclosure. This update resulted in an increase to our reserve for guaranty losses included within "Other liabilities" and an increase to credit related-expenses of approximately $700 million.

## CONSOLIDATED RESULTS OF OPERATIONS

In this section we discuss our condensed consolidated results of operations for the periods indicated. You should read this section together with our condensed consolidated financial statements, including the accompanying notes.

Table 7 summarizes our condensed consolidated results of operations for the periods indicated.

**Table 7:   Summary of Condensed Consolidated Results of Operations**

|  | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
|  | 2011 | 2010 | Variance | 2011 | 2010 | Variance |
|  | (Dollars in millions) | | | | | |
| Net interest income | $ 5,186 | $ 4,776 | $ 410 | $ 15,118 | $ 11,772 | $ 3,346 |
| Fee and other income | 291 | 304 | (13) | 793 | 831 | (38) |
| **Net revenues** | **$ 5,477** | **$ 5,080** | **$ 397** | **$ 15,911** | **$ 12,603** | **$ 3,308** |
| Investment gains, net | 73 | 82 | (9) | 319 | 271 | 48 |
| Net other-than-temporary impairments | (262) | (326) | 64 | (362) | (699) | 337 |
| Fair value (losses) gains, net | (4,525) | 525 | (5,050) | (5,870) | (877) | (4,993) |
| Administrative expenses | (591) | (730) | 139 | (1,765) | (2,005) | 240 |
| Credit-related expenses[1] | (4,884) | (5,561) | 677 | (21,985) | (22,296) | 311 |
| Other non-interest expenses[2] | (373) | (410) | 37 | (787) | (1,147) | 360 |
| Loss before federal income taxes | (5,085) | (1,340) | (3,745) | (14,539) | (14,150) | (389) |
| Benefit for federal income taxes | — | 9 | (9) | 91 | 67 | 24 |
| **Net loss** | **(5,085)** | **(1,331)** | **(3,754)** | **(14,448)** | **(14,083)** | **(365)** |
| Less: Net income attributable to the noncontrolling interest | — | (8) | 8 | (1) | (4) | 3 |
| **Net loss attributable to Fannie Mae** | **$(5,085)** | **$(1,339)** | **$(3,746)** | **$(14,449)** | **$(14,087)** | **$ (362)** |
| Total comprehensive loss attributable to Fannie Mae | $(5,282) | $ (437) | $(4,845) | $(14,463) | $(10,143) | $(4,320) |

[1]   Consists of provision for loan losses, provision for guaranty losses, and foreclosed property expense.

[2]   Consists of debt extinguishment losses, net and other expenses.

24

**Net Interest Income**

Table 8 presents an analysis of our net interest income, average balances, and related yields earned on assets and incurred on liabilities for the periods indicated. For most components of the average balances, we used a daily weighted average of amortized cost. When daily average balance information was not available, such as for mortgage loans, we used monthly averages. Table 9 presents the change in our net interest income between periods and the extent to which that variance is attributable to: (1) changes in the volume of our interest-earning assets and interest-bearing liabilities or (2) changes in the interest rates of these assets and liabilities. In the fourth quarter of 2010, we changed the presentation to distinguish the change in net interest income of Fannie Mae from the change in net interest income of consolidated trusts. We have revised the presentation of results for prior periods to conform to the current period presentation.

**Table 8: Analysis of Net Interest Income and Yield**

| | For the Three Months Ended September 30, | | | | | |
| | 2011 | | | 2010 | | |
| | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid |
| | (Dollars in millions) | | | | | |
|---|---|---|---|---|---|---|
| Interest-earning assets: | | | | | | |
| Mortgage loans of Fannie Mae[1] . . . . . . . . . . | $ 386,067 | $ 3,701 | 3.83% | $ 408,523 | $ 3,859 | 3.78% |
| Mortgage loans of consolidated trusts[1] . . . . . . | 2,598,264 | 30,633 | 4.72 | 2,565,431 | 32,807 | 5.12 |
| Total mortgage loans. . . . . . . . . . . . . . . . | 2,984,331 | 34,334 | 4.60 | 2,973,954 | 36,666 | 4.93 |
| Mortgage-related securities . . . . . . . . . . . . . . | 312,482 | 3,930 | 5.03 | 368,886 | 4,681 | 5.08 |
| Elimination of Fannie Mae MBS held in portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . | (199,691) | (2,520) | 5.05 | (236,355) | (3,120) | 5.28 |
| Total mortgage-related securities, net . . . . . . . | 112,791 | 1,410 | 5.00 | 132,531 | 1,561 | 4.71 |
| Non-mortgage securities[2]. . . . . . . . . . . . . . . . | 72,333 | 24 | 0.13 | 102,103 | 62 | 0.24 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . | 27,217 | 7 | 0.10 | 14,193 | 10 | 0.28 |
| Advances to lenders . . . . . . . . . . . . . . . . . . . . | 3,417 | 19 | 2.18 | 3,643 | 21 | 2.26 |
| Total interest-earning assets . . . . . . . . . . . . . . . | $3,200,089 | $35,794 | 4.47% | $3,226,424 | $38,320 | 4.75% |
| Interest-bearing liabilities: | | | | | | |
| Short-term debt[3] . . . . . . . . . . . . . . . . . . . | $ 181,495 | $ 63 | 0.14% | $ 244,823 | $ 190 | 0.30% |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . . . | 552,191 | 3,385 | 2.45 | 578,775 | 4,472 | 3.09 |
| Total short-term and long-term funding debt . . | 733,686 | 3,448 | 1.88 | 823,598 | 4,662 | 2.26 |
| Debt securities of consolidated trusts . . . . . . . . . | 2,650,256 | 29,680 | 4.48 | 2,624,253 | 32,002 | 4.88 |
| Elimination of Fannie Mae MBS held in portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . | (199,691) | (2,520) | 5.05 | (236,355) | (3,120) | 5.28 |
| Total debt securities of consolidated trusts held by third parties . . . . . . . . . . . . . . . . . . . . . | 2,450,565 | 27,160 | 4.43 | 2,387,898 | 28,882 | 4.84 |
| Total interest-bearing liabilities . . . . . . . . . . . . . | $3,184,251 | $30,608 | 3.84% | $3,211,496 | $33,544 | 4.18% |
| Impact of net non-interest bearing funding . . . . . . | $ 15,838 | | 0.02% | $ 14,928 | | 0.02% |
| Net interest income/net interest yield . . . . . . . . . | | $ 5,186 | 0.65% | | $ 4,776 | 0.59% |
| Net interest income/net interest yield of consolidated trusts[4] . . . . . . . . . . . . . . . . . . | | $ 953 | 0.15% | | $ 805 | 0.13% |

25

| | For the Nine Months Ended September 30, | | | | | |
| | 2011 | | | 2010 | | |
| | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid |
| | (Dollars in millions) | | | | | |
|---|---|---|---|---|---|---|
| **Interest-earning assets:** | | | | | | |
| Mortgage loans of Fannie Mae[1] . . . . . . . . . . | $ 395,686 | $ 11,146 | 3.76% | $ 348,835 | $ 11,107 | 4.25% |
| Mortgage loans of consolidated trusts[1] . . . . . . | 2,601,710 | 94,111 | 4.82 | 2,634,064 | 100,810 | 5.10 |
| Total mortgage loans . . . . . . . . . . . . . . . . . | 2,997,396 | 105,257 | 4.68 | 2,982,899 | 111,917 | 5.00 |
| Mortgage-related securities. . . . . . . . . . . . . . | 321,979 | 12,204 | 5.05 | 399,890 | 15,271 | 5.09 |
| Elimination of Fannie Mae MBS held in portfolio . . . . . . . . . . . . . . . . . . . . . . . . | (206,176) | (7,956) | 5.15 | (259,740) | (10,306) | 5.29 |
| Total mortgage-related securities, net. . . . . . | 115,803 | 4,248 | 4.89 | 140,150 | 4,965 | 4.72 |
| Non-mortgage securities[2] . . . . . . . . . . . . . . | 76,266 | 99 | 0.17 | 93,548 | 165 | 0.23 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . . . . . . . . . . . . . . . . . . | 20,980 | 20 | 0.13 | 33,849 | 54 | 0.21 |
| Advances to lenders . . . . . . . . . . . . . . . . . . | 3,548 | 59 | 2.19 | 2,947 | 57 | 2.55 |
| Total interest-earning assets . . . . . . . . . . . . . . | $3,213,993 | $109,683 | 4.55% | $3,253,393 | $117,158 | 4.80% |
| **Interest-bearing liabilities:** | | | | | | |
| Short-term debt[3] . . . . . . . . . . . . . . . . . . . . | $ 160,961 | $    246 | 0.20% | $ 221,665 | $    470 | 0.28% |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . | 591,126 | 11,383 | 2.57 | 574,280 | 14,528 | 3.37 |
| Total short-term and long-term funding debt . . | 752,087 | 11,629 | 2.06 | 795,945 | 14,998 | 2.51 |
| Debt securities of consolidated trusts . . . . . . . . | 2,652,057 | 90,892 | 4.57 | 2,694,986 | 100,694 | 4.98 |
| Elimination of Fannie Mae MBS held in portfolio . . . . . . . . . . . . . . . . . . . . . . . . | (206,176) | (7,956) | 5.15 | (259,740) | (10,306) | 5.29 |
| Total debt securities of consolidated trusts held by third parties . . . . . . . . . . . . . . . . | 2,445,881 | 82,936 | 4.52 | 2,435,246 | 90,388 | 4.95 |
| Total interest-bearing liabilities. . . . . . . . . . . . . | $3,197,968 | $ 94,565 | 3.94% | $3,231,191 | $105,386 | 4.35% |
| Impact of net non-interest bearing funding . . . . . . | $   16,025 | | 0.02% | $   22,202 | | 0.03% |
| Net interest income/net interest yield . . . . . . . . . | | $ 15,118 | 0.63% | | $ 11,772 | 0.48% |
| Net interest income/net interest yield of consolidated trusts[4] . . . . . . . . . . . . . . . . . . . | | $  3,219 | 0.16% | | $   116 | 0.01% |

| | As of September 30, | |
| Selected benchmark interest rates[5] | 2011 | 2010 |
|---|---|---|
| 3-month LIBOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.37% | 0.30% |
| 2-year swap interest rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.58 | 0.60 |
| 5-year swap interest rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.26 | 1.51 |
| 30-year Fannie Mae MBS par coupon rate. . . . . . . . . . . . . . . . . . . . . . . . . | 2.96 | 3.39 |

[1] Interest income includes interest income on acquired credit-impaired loans of $545 million and $466 million for the three months ended September 30, 2011 and 2010, respectively, and $1.5 billion and $1.6 billion for the nine months ended September 30, 2011 and 2010, respectively. These amounts include accretion income of $288 million and $231 million for the three months ended September 30, 2011 and 2010, respectively, and $769 million and $785 million for the nine months ended September 30, 2011 and 2010, respectively, relating to a portion of the fair value losses recorded upon the acquisition of the loans. Average balance includes loans on nonaccrual status, for which interest income is recognized when collected.

[2] Includes cash equivalents.

[3] Includes federal funds purchased and securities sold under agreements to repurchase.

26

(4) Net interest income of consolidated trusts represents interest income from mortgage loans of consolidated trusts less interest expense from debt securities of consolidated trusts. Net interest yield is calculated based on net interest income from consolidated trusts divided by average balance of mortgage loans of consolidated trusts.

(5) Data from British Bankers' Association, Thomson Reuters Indices and Bloomberg L.P.

**Table 9:   Rate/Volume Analysis of Changes in Net Interest Income**

| | For the Three Months Ended September 30, 2011 vs. 2010 | | | For the Nine Months Ended September 30, 2011 vs. 2010 | | |
|---|---|---|---|---|---|---|
| | Total Variance | Variance Due to:[1] | | Total Variance | Variance Due to:[1] | |
| | | Volume | Rate | | Volume | Rate |
| | | | (Dollars in millions) | | | |
| Interest income: | | | | | | |
| Mortgage loans of Fannie Mae . . . . . . . . . . . . . . . | $ (158) | $(215) | $    57 | $     39 | $ 1,399 | $ (1,360) |
| Mortgage loans of consolidated trusts. . . . . . . . . . . | (2,174) | 415 | (2,589) | (6,699) | (1,226) | (5,473) |
| Total mortgage loans . . . . . . . . . . . . . . . . . . . . | (2,332) | 200 | (2,532) | (6,660) | 173 | (6,833) |
| Mortgage-related securities . . . . . . . . . . . . . . . . . . . | (751) | (710) | (41) | (3,067) | (2,954) | (113) |
| Elimination of Fannie Mae MBS held in portfolio . . | 600 | 467 | 133 | 2,350 | 2,074 | 276 |
| Total mortgage-related securities, net . . . . . . . . . | (151) | (243) | 92 | (717) | (880) | 163 |
| Non-mortgage securities[2] . . . . . . . . . . . . . . . . . . | (38) | (15) | (23) | (66) | (27) | (39) |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . | (3) | 6 | (9) | (34) | (17) | (17) |
| Advances to lenders . . . . . . . . . . . . . . . . . . . . . . . | (2) | (1) | (1) | 2 | 11 | (9) |
| Total interest income . . . . . . . . . . . . . . . . . . . . . . . . | (2,526) | (53) | (2,473) | (7,475) | (740) | (6,735) |
| Interest expense: | | | | | | |
| Short-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . | (127) | (40) | (87) | (224) | (111) | (113) |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,087) | (198) | (889) | (3,145) | 415 | (3,560) |
| Total short-term and long-term funding debt . . . . | (1,214) | (238) | (976) | (3,369) | 304 | (3,673) |
| Debt securities of consolidated trusts . . . . . . . . . . . | (2,322) | 314 | (2,636) | (9,802) | (1,583) | (8,219) |
| Elimination of Fannie Mae MBS held in portfolio . . | 600 | 467 | 133 | 2,350 | 2,074 | 276 |
| Total debt securities of consolidated trusts held by third parties . . . . . . . . . . . . . . . . . . . . . . . | (1,722) | 781 | (2,503) | (7,452) | 491 | (7,943) |
| Total interest expense . . . . . . . . . . . . . . . . . . . . . | (2,936) | 543 | (3,479) | (10,821) | 795 | (11,616) |
| Net interest income . . . . . . . . . . . . . . . . . . . . . . . . . | $   410 | $(596) | $ 1,006 | $  3,346 | $(1,535) | $  4,881 |

(1) Combined rate/volume variances are allocated to both rate and volume based on the relative size of each variance.

(2) Includes cash equivalents.

Net interest income increased in the third quarter and first nine months of 2011, as compared with the third quarter and first nine months of 2010, due to lower interest expense on debt, which was partially offset by lower interest income on loans and securities. The primary drivers of these changes were:

- a reduction in the interest expense of debt of consolidated trusts driven by a decrease in rates. The rate on debt of consolidated trusts is generally driven by mortgage rates of loans securitized in the MBS, and these mortgage rates declined in 2011.

- lower interest expense on funding debt due to lower borrowing rates which allowed us to continue to replace higher-cost debt with lower-cost debt;

- lower interest income on mortgage securities due to a decrease in the balance of our mortgage securities, as we continue to manage our portfolio requirements; and

27

- lower yields on mortgage loans as new business acquisitions continue to replace higher-yielding loans with loans issued at lower mortgage rates. The reduction in interest income on loans due to lower yields was partially offset by a reduction in the amount of interest income not recognized for nonaccrual mortgage loans, due to a decline in the balance of nonaccrual loans in our condensed consolidated balance sheets as we continue to complete a high number of loan modifications and foreclosures.

Additionally, our net interest income and net interest yield were higher than they would have otherwise been in both the third quarter and first nine months of 2011 and 2010 because our debt funding needs were lower than would otherwise have been required as a result of funds we received from Treasury under the senior preferred stock purchase agreement. Further, dividends paid to Treasury are not recognized in interest expense.

Table 10 displays the interest income not recognized for loans on nonaccrual status and the resulting reduction in our total yield from mortgage loans.

**Table 10:   Impact of Nonaccrual Loans on Net Interest Income**

| | For the Three Months Ended September 30, | | | | For the Nine Months Ended September 30, | | | |
| | 2011 | | 2010 | | 2011 | | 2010 | |
| | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] |
|---|---|---|---|---|---|---|---|---|
| | (Dollars in millions) | | | | | | | |
| Mortgage loans of Fannie Mae . . . . | $(1,078) | | $(1,512) | | $(3,623) | | $(3,317) | |
| Mortgage loans of consolidated trusts . . . . . . . . . . . . . . . . . . . | (212) | | (326) | | (690) | | (3,393) | |
| Total mortgage loans. . . . . . . . . . | $(1,290) | (16)bp | $(1,838) | (23)bp | $(4,313) | (18)bp | $(6,710) | (28)bp |

[1]   Amount includes cash received for loans on nonaccrual status.

[2]   Calculated based on annualized interest income not recognized divided by total interest-earning assets, expressed in basis points.

For a discussion of the interest income from the assets we have purchased and the interest expense from the debt we have issued, see the discussion of our Capital Markets group's net interest income in "Business Segment Results."

TREASURY-1944

**Fair Value (Losses) Gains, Net**

Table 11 presents the components of our fair value gains and losses.

**Table 11:   Fair Value (Losses) Gains, Net**

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (Dollars in millions) | | | |
| Risk management derivatives fair value (losses) gains attributable to: | | | | |
| Net contractual interest expense accruals on interest rate swaps . . . . | $  (497) | $(673) | $(1,790) | $(2,264) |
| Net change in fair value during the period . . . . . . . . . . . . . . . . . . . | (3,570) | 732 | (3,777) | 342 |
| Total risk management derivatives fair value (losses) gains, net . . | (4,067) | 59 | (5,567) | (1,922) |
| Mortgage commitment derivatives fair value losses, net . . . . . . . . . . . | (188) | (183) | (226) | (1,361) |
| Total derivatives fair value losses, net . . . . . . . . . . . . . . . . . . . . . . . . | (4,255) | (124) | (5,793) | (3,283) |
| Trading securities (losses) gains, net . . . . . . . . . . . . . . . . . . . . . . . . | (214) | 889 | 146 | 2,587 |
| Other, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (56) | (240) | (223) | (181) |
| Fair value (losses) gains, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(4,525) | $ 525 | $(5,870) | $  (877) |

| | | | **2011** | **2010** |
|---|---|---|---|---|
| 5-year swap interest rate: | | | | |
| As of January 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 2.18% | 2.98% |
| As of March 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 2.47 | 2.73 |
| As of June 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 2.03 | 2.06 |
| As of September 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 1.26 | 1.51 |

*Risk Management Derivatives Fair Value Gains (Losses), Net*

We supplement our issuance of debt securities with derivative instruments to further reduce duration and prepayment risks. We recorded risk management derivative fair value losses in the third quarter and first nine months of 2011 primarily as a result of a decrease in the fair value of our pay-fixed derivatives due to a significant decline in swap interest rates during the period.

We recorded risk management derivative gains in the third quarter of 2010 primarily due to gains on our foreign currency swaps, which were partially offset by time decay on our purchased options. Gains on our foreign currency swaps generally offset the fair value losses on our foreign currency denominated debt.

We recorded risk management derivative losses in the first nine months of 2010 primarily as a result of: (1) time decay on our purchased options; (2) a decrease in the fair value of our pay-fixed derivatives during the first quarter of 2010 due to a decline in swap interest rates during that period; and (3) a decrease in implied interest rate volatility, which reduced the fair value of our purchased options.

We present, by derivative instrument type, the fair value gains and losses on our derivatives for the three and nine months ended September 30, 2011 and 2010 in "Note 9, Derivative Instruments."

*Mortgage Commitment Derivatives Fair Value Gains (Losses), Net*

Commitments to purchase or sell some mortgage-related securities and to purchase single-family mortgage loans are generally accounted for as derivatives. For open mortgage commitment derivatives, we include changes in their fair value in our condensed consolidated statements of operations and comprehensive loss. When derivative purchase commitments settle, we include the fair value of the commitment on the settlement date in the cost basis of the loan or security we purchase. When derivative commitments to sell securities settle, we include the fair value of the commitment on the settlement date in the cost basis of the security we sell. Purchases of securities issued by our consolidated MBS trusts are treated as extinguishments of debt; we

29

recognize the fair value of the commitment on the settlement date as a component of debt extinguishment gains and losses. Sales of securities issued by our consolidated MBS trusts are treated as issuances of consolidated debt; we recognize the fair value of the commitment on the settlement date as a component of debt in the cost basis of the debt issued.

We recognized losses on our mortgage commitments in the third quarter and first nine months of both 2011 and 2010 primarily due to losses on commitments to sell mortgage-related securities as a result of a decline in interest rates during the commitment period.

### Trading Securities Gains (Losses), Net

Losses from our trading securities in the third quarter of 2011 were primarily driven by the widening of credit spreads on commercial mortgage-backed securities ("CMBS"). However, these credit spreads narrowed over the first nine months of 2011, which primarily drove gains on trading securities for the nine-month period.

Gains from our trading securities in the third quarter and first nine months of 2010 were primarily driven by a decrease in interest rates and narrowing of credit spreads on CMBS.

### Credit-Related Expenses

We refer to our provision for loan losses and the provision for guaranty losses collectively as our "provision for credit losses." Credit-related expenses consist of our provision for credit losses and foreclosed property expense.

### Provision for Credit Losses

Our total loss reserves provide for an estimate of credit losses incurred in our guaranty book of business as of each balance sheet date. We establish our loss reserves through the provision for credit losses for losses that we believe have been incurred and will eventually be reflected over time in our charge-offs. When we determine that a loan is uncollectible, typically upon foreclosure, we record a charge-off against our loss reserves. We record recoveries of previously charged-off amounts as a reduction to charge-offs, which results in an increase to our loss reserves.

Table 12 displays the components of our total loss reserves and our total fair value losses previously recognized on loans purchased out of unconsolidated MBS trusts reflected in our condensed consolidated balance sheets. Because these fair value losses lowered our recorded loan balances, we have fewer inherent losses in our guaranty book of business and consequently require lower total loss reserves. For these reasons, we consider these fair value losses as an "effective reserve," apart from our total loss reserves, to the extent that we expect to realize credit losses on the acquired loans in the future. We estimate that approximately two-thirds of this amount, as of September 30, 2011, represents credit losses we expect to realize in the future and approximately one-third will eventually be recovered, either through net interest income for loans that cure or through foreclosed property income for loans where the sale of the collateral exceeds our recorded investment in the loan. We exclude these fair value losses from our credit loss calculation as described in "Credit Loss Performance Metrics."

TREASURY-1946

**Table 12:   Total Loss Reserves**

| | As of | |
|---|---|---|
| | September 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Allowance for loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $71,435 | $61,556 |
| Reserve for guaranty losses[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 916 | 323 |
| Combined loss reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 72,351 | 61,879 |
| Allowance for accrued interest receivable . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,179 | 3,414 |
| Allowance for preforeclosure property taxes and insurance receivable[2] . . . . . . . | 1,111 | 958 |
| Total loss reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 75,641 | 66,251 |
| Fair value losses previously recognized on acquired credit impaired loans[3] . . . . | 16,961 | 19,171 |
| Total loss reserves and fair value losses previously recognized on acquired credit-impaired loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $92,602 | $85,422 |

[1]   Amount included in "Other liabilities" in our condensed consolidated balance sheets.

[2]   Amount included in "Other assets" in our condensed consolidated balance sheets.

[3]   Represents the fair value losses on loans purchased out of unconsolidated MBS trusts reflected in our condensed consolidated balance sheets.

We refer to our allowance for loan losses and reserve for guaranty losses collectively as our combined loss reserves. We summarize the changes in our combined loss reserves in Table 13.

TREASURY-1947

**Table 13:   Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves)**

| | For the Three Months Ended September 30, | | | | | |
| | 2011 | | | 2010 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | | | (Dollars in millions) | | | |
| **Changes in combined loss reserves:** | | | | | | |
| Allowance for loan losses: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . . . | $55,966 | $13,540 | $69,506 | $42,844 | $17,738 | $60,582 |
| Provision for loan losses . . . . . . . . . . . | (196) | 4,355 | 4,159 | 2,144 | 2,552 | 4,696 |
| Charge-offs[1][5] . . . . . . . . . . . . . . . . | (3,853) | (260) | (4,113) | (5,946) | (1,243) | (7,189) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . . | 848 | 35 | 883 | 205 | 304 | 509 |
| Transfers[2] . . . . . . . . . . . . . . . . . . . . . | 1,770 | (1,770) | — | 5,131 | (5,131) | — |
| Other[3] . . . . . . . . . . . . . . . . . . . . . . . | 863 | 137 | 1,000 | 895 | 247 | 1,142 |
| Ending balance[4] . . . . . . . . . . . . . . . . . | $55,398 | $16,037 | $71,435 | $45,273 | $14,467 | $59,740 |
| Reserve for guaranty losses: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . . . | $ 960 | $ — | $ 960 | $ 246 | $ — | $ 246 |
| Provision (benefit) for guaranty losses . . . | (8) | — | (8) | 78 | — | 78 |
| Charge-offs . . . . . . . . . . . . . . . . . . . . . | (38) | — | (38) | (48) | — | (48) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . . | 2 | — | 2 | — | — | — |
| Ending balance . . . . . . . . . . . . . . . . . . . | $ 916 | $ — | $ 916 | $ 276 | $ — | $ 276 |
| Combined loss reserves: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . . . | $56,926 | $13,540 | $70,466 | $43,090 | $17,738 | $60,828 |
| Total provision for credit losses . . . . . . . | (204) | 4,355 | 4,151 | 2,222 | 2,552 | 4,774 |
| Charge-offs[1][5] . . . . . . . . . . . . . . . . | (3,891) | (260) | (4,151) | (5,994) | (1,243) | (7,237) |
| Recoveries . . . . . . . . . . . . . . . . . . . . . . | 850 | 35 | 885 | 205 | 304 | 509 |
| Transfers[2] . . . . . . . . . . . . . . . . . . . . . | 1,770 | (1,770) | — | 5,131 | (5,131) | — |
| Other[3] . . . . . . . . . . . . . . . . . . . . . . . | 863 | 137 | 1,000 | 895 | 247 | 1,142 |
| Ending balance[4] . . . . . . . . . . . . . . . . . | $56,314 | $16,037 | $72,351 | $45,549 | $14,467 | $60,016 |

|  | For the Nine Months Ended September 30, | | | | | |
|  | 2011 | | | 2010 | | |
|  | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
|  | (Dollars in millions) | | | | | |
| **Changes in combined loss reserves:** | | | | | | |
| Allowance for loan losses: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . | $ 48,530 | $13,026 | $ 61,556 | $  8,078 | $  1,847 | $  9,925 |
| Adoption of new accounting standards . . . . . . . . . . . . . . . . . . | — | — | — | — | 43,576 | 43,576 |
| Provision for loan losses . . . . . . . . . | 10,003 | 10,545 | 20,548 | 11,008 | 9,922 | 20,930 |
| Charge-offs[1][5] . . . . . . . . . . . . . | (15,018) | (1,466) | (16,484) | (12,097) | (6,645) | (18,742) |
| Recoveries. . . . . . . . . . . . . . . . . . . | 3,197 | 1,537 | 4,734 | 367 | 872 | 1,239 |
| Transfers[2] . . . . . . . . . . . . . . . . . | 7,739 | (7,739) | — | 41,606 | (41,606) | — |
| Other[3] . . . . . . . . . . . . . . . . . . . . | 947 | 134 | 1,081 | (3,689) | 6,501 | 2,812 |
| Ending balance[4]. . . . . . . . . . . . . . . | $ 55,398 | $16,037 | $ 71,435 | $ 45,273 | $ 14,467 | $ 59,740 |
| Reserve for guaranty losses: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . | $    323 | $    — | $    323 | $ 54,430 | $    — | $ 54,430 |
| Adoption of new accounting standards . . . . . . . . . . . . . . . . . . | — | — | — | (54,103) | — | (54,103) |
| Provision for guaranty losses . . . . . . . | 694 | — | 694 | 111 | — | 111 |
| Charge-offs . . . . . . . . . . . . . . . . . . | (106) | — | (106) | (165) | — | (165) |
| Recoveries. . . . . . . . . . . . . . . . . . . | 5 | — | 5 | 3 | — | 3 |
| Ending balance . . . . . . . . . . . . . . . . | $    916 | $    — | $    916 | $    276 | $    — | $    276 |
| Combined loss reserves: | | | | | | |
| Beginning balance . . . . . . . . . . . . . . | $ 48,853 | $13,026 | $ 61,879 | $ 62,508 | $  1,847 | $ 64,355 |
| Adoption of new accounting standards . . . . . . . . . . . . . . . . . . | — | — | — | (54,103) | 43,576 | (10,527) |
| Total provision for credit losses . . . . . | 10,697 | 10,545 | 21,242 | 11,119 | 9,922 | 21,041 |
| Charge-offs[1][5] . . . . . . . . . . . . . | (15,124) | (1,466) | (16,590) | (12,262) | (6,645) | (18,907) |
| Recoveries. . . . . . . . . . . . . . . . . . . | 3,202 | 1,537 | 4,739 | 370 | 872 | 1,242 |
| Transfers[2] . . . . . . . . . . . . . . . . . | 7,739 | (7,739) | — | 41,606 | (41,606) | — |
| Other[3] . . . . . . . . . . . . . . . . . . . . | 947 | 134 | 1,081 | (3,689) | 6,501 | 2,812 |
| Ending balance[4]. . . . . . . . . . . . . . . | $ 56,314 | $16,037 | $ 72,351 | $ 45,549 | $ 14,467 | $ 60,016 |

33

| | As of | |
|---|---|---|
| | September 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| **Allocation of combined loss reserves:** | | |
| Balance at end of each period attributable to: | | |
| Single-family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $70,741 | $60,163 |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,610 | 1,716 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $72,351 | $61,879 |
| **Single-family and multifamily combined loss reserves as a percentage of applicable guaranty book of business:** | | |
| Single-family . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.49% | 2.10% |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.83 | 0.91 |
| **Combined loss reserves as a percentage of:** | | |
| Total guaranty book of business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.38% | 2.03% |
| Total nonperforming loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35.46 | 28.81 |

[1] Includes accrued interest of $289 million and $811 million for the three months ended September 30, 2011 and 2010, respectively, and $1.1 billion and $2.0 billion for the nine months ended September 30, 2011 and 2010, respectively.

[2] Includes transfers from trusts for delinquent loan purchases.

[3] Amounts represent the net activity recorded in our allowances for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers. The provision for credit losses, charge-offs, recoveries and transfer activity included in this table reflects all changes for both the allowance for loan losses and the valuation allowances for accrued interest and preforeclosure property taxes and insurance receivable that relate to the mortgage loans.

[4] Includes $334 million and $397 million as of September 30, 2011 and 2010, respectively, for acquired credit-impaired loans.

[5] While we purchase the substantial majority of loans that are four or more months delinquent from our MBS trusts, we do not exercise this option to purchase loans during a forbearance period. Accordingly, charge-offs of consolidated trusts generally represent loans that remained in our consolidated trusts at the time of default.

The continued stress on a broad segment of borrowers from continued high levels of unemployment and underemployment and the prolonged decline in home prices have caused our total loss reserves to remain high for the past few years. Our provision for credit losses continues to be a key driver of our net losses for each period presented. The amount of provision for credit losses varies from period to period based on changes in home prices, borrower payment behavior, the types and volumes of loss mitigation activities completed, and actual and estimated recoveries from our lender and mortgage insurer counterparties.

Our provision for credit losses decreased in the third quarter of 2011 compared with the third quarter of 2010 primarily due to a lower provision on individually impaired loans. The lower provision was driven, in part, by accelerated expected prepayment speeds due to the lower interest rate environment, which reduced the expected lives of loans and increased the present value of cash flows expected on those loans. In addition, our provision decreased in the third quarter of 2011 compared with the third quarter of 2010 because of an increase in estimated amounts due to us or received by us for outstanding repurchase requests. The decrease in the provision for credit losses in the third quarter of 2011 was partially offset by: (1) the implementation of a new accounting standard that increased our troubled debt restructuring ("TDR") population, which increased the number of loans that are individually impaired; and (2) a decrease in the estimated recovery amount from mortgage insurance coverage. A TDR is a loan restructuring that grants a concession to a borrower experiencing financial difficulties. For a detailed discussion of our mortgage insurer counterparties and the estimated recovery of mortgage insurance, see "Risk Management—Credit Risk Management—Institutional Counterparty Risk Management—Mortgage Insurers."

Our provision for credit losses slightly increased in the first nine months of 2011 compared with the first nine months of 2010. In addition to the reasons described above, our provision for credit losses in the first nine

34

months of 2011 was negatively impacted by higher loss severity rates and an increase in the average number of days loans remain delinquent.

In addition, during the third quarter and first nine months of 2011 and 2010 our provision for credit losses and loss reserves have been impacted by updates to our allowance for loan loss models that we use to estimate our loss reserves. For further information on estimates and assumptions that are used to calculate our loan loss reserves and the impacts of specific changes in estimates during 2010 and the first nine months of 2011, see "MD&A—Critical Accounting Policies and Estimates" in our 2010 Form 10-K and "Critical Accounting Policies and Estimates" in this report.

Because of the substantial volume of loan modifications we completed and the number of loans that entered a trial modification period in 2010 and the first nine months of 2011, approximately two-thirds of our total loss reserves are attributable to individual impairment rather than the collective reserve for loan losses. Individual impairment for a TDR is based on the restructured loan's expected cash flows over the life of the loan, taking into account the effect of any concessions granted to the borrower, discounted at the loan's original effective interest rate. The individual impairment model includes forward-looking assumptions using multiple scenarios of the future economic environment, including interest rates and home prices. Based on the structure of the modifications, in particular the size of the concession granted, and the performance of modified loans combined with the forward-looking assumptions used in our model, the allowance calculated for an individually impaired loan has generally been greater than the allowance that would be calculated under the collective reserve. Further, if we expect to recover our recorded investment in an individually impaired loan through probable foreclosure of the underlying collateral, we measure the impairment based on the fair value of the collateral.

In April 2011, the Financial Accounting Standards Board ("FASB") issued a new accounting standard regarding TDRs effective for the third quarter of 2011 that applies retrospectively to January 1, 2011. In the third quarter of 2011, we recognized an incremental increase of $514 million in our provision for credit losses due to loans that were reassessed as TDRs upon adoption of the new TDR standard. For additional information on the new TDR accounting standard, see "Note 1, Summary of Significant Accounting Policies."

For additional discussion of our loan workout activities, delinquent loans and concentrations, see "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management—Problem Loan Management." For a discussion of our charge-offs, see "Credit Loss Performance Metrics."

Our balance of nonperforming single-family loans remained high as of September 30, 2011 due to both high levels of delinquencies and an increase in TDRs. When a TDR occurs, the loan may return to a current status, but it will continue to be classified as a nonperforming loan as the loan is not performing in accordance with the original terms. The composition of our nonperforming loans is shown in Table 14, which is based on the carrying value of both our single-family and multifamily held-for-investment and held-for-sale mortgage loans. For individually impaired loans, the amount displayed is net of any impairment amount. For information on the impact of TDRs and other individually impaired loans on our allowance for loan losses, see "Note 3, Mortgage Loans."

35

**Table 14:   Nonperforming Single-Family and Multifamily Loans**

| | As of | |
|---|---|---|
| | September 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| On-balance sheet nonperforming loans including loans in consolidated Fannie Mae MBS trusts: | | |
| Nonaccrual loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $127,178 | $152,756 |
| Troubled debt restructurings on accrual status[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 76,729 | 61,907 |
| Total on-balance sheet nonperforming loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 203,907 | 214,663 |
| Off-balance sheet nonperforming loans in unconsolidated | | |
| Fannie Mae MBS trusts[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 147 | 89 |
| Total nonperforming loans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $204,054 | $214,752 |
| Accruing on-balance sheet loans past due 90 days or more[3] . . . . . . . . . . . . . . . . . . . . | $    769 | $    896 |

| | For the Nine Months Ended September 30, 2011 | For The Year Ended December 31, 2010 |
|---|---|---|
| | (Dollars in millions) | |
| Interest related to on-balance sheet nonperforming loans: | | |
| Interest income forgone[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $6,475 | $8,185 |
| Interest income recognized for the period[5] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,760 | 7,995 |

[1]   Includes HomeSaver Advance first-lien loans on accrual status.

[2]   Represents loans that would meet our criteria for nonaccrual status if the loans had been on-balance sheet.

[3]   Recorded investment in loans as of the end of each period that are 90 days or more past due and continuing to accrue interest. The majority of this amount consists of loans insured or guaranteed by the U.S. government and loans where we have recourse against the seller in the event of a default.

[4]   Represents the amount of interest income that would have been recorded during the period for on-balance sheet nonperforming loans as of the end of each period had the loans performed according to their original contractual terms.

[5]   Represents interest income recognized during the period for on-balance sheet loans classified as nonperforming as of the end of each period. Includes primarily amounts accrued while loan was performing and cash payments received on nonaccrual loans.

### *Foreclosed Property Expense*

Foreclosed property expense is displayed in Table 15. The decrease in foreclosed property expense in the third quarter and first nine months of 2011 compared with the third quarter and first nine months of 2010 was due, in part, to an increase in estimated amounts due to or received by us for outstanding repurchase requests. These amounts were recognized in our provision for credit losses and foreclosed property expense. In addition, we recorded lower valuation adjustments on our acquired property inventory in the third quarter and first nine months of 2011 because: (1) the rate of decline in home prices has moderated in recent quarters; and (2) the decrease in our REO inventory compared with the third quarter and first nine months of 2010 resulted in fewer properties subject to valuation adjustments. The decrease in foreclosed property expense was partially offset by a decrease in the estimated recovery amount from mortgage insurance coverage.

Foreclosed property expense in the first nine months of 2010 reflected the recognition of cash fees of $796 million from the cancellation and restructuring of some of our pool mortgage insurance coverage. The cancelled and restructured policies covered approximately $42 billion in unpaid principal balance. The fees represented an acceleration of, and discount on, claims expected to be received pursuant to the coverage net of premiums expected to be paid. These cancellations and restructurings resulted in operational savings from

36

reduced claims processing and mitigated our counterparty credit risk given the weakened financial condition of our mortgage insurer counterparties.

### *Credit Loss Performance Metrics*

Our credit-related expenses should be considered in conjunction with our credit loss performance. Our credit loss performance metrics, however, are not defined terms within GAAP and may not be calculated in the same manner as similarly titled measures reported by other companies. Because management does not view changes in the fair value of our mortgage loans as credit losses, we adjust our credit loss performance metrics for the impact associated with the acquisition of credit-impaired loans. We also exclude interest forgone on nonperforming loans in our mortgage portfolio, other-than-temporary impairment losses resulting from deterioration in the credit quality of our mortgage-related securities and accretion of interest income on acquired credit-impaired loans from credit losses.

Historically, management viewed our credit loss performance metrics, which include our historical credit losses and our credit loss ratio, as indicators of the effectiveness of our credit risk management strategies. As our credit losses are now at such high levels, management has shifted focus to our loss mitigation strategies and the reduction of our total credit losses and away from the credit loss ratio to measure performance. However, we believe that credit loss performance metrics may be useful to investors as the losses are presented as a percentage of our book of business and have historically been used by analysts, investors and other companies within the financial services industry. They also provide a consistent treatment of credit losses for on- and off-balance sheet loans. Moreover, by presenting credit losses with and without the effect of fair value losses associated with the acquisition of credit-impaired loans, investors are able to evaluate our credit performance on a more consistent basis among periods. Table 15 details the components of our credit loss performance metrics as well as our average single-family and multifamily default rate and initial charge-off severity rate.

**Table 15:   Credit Loss Performance Metrics**

| | For the Three Months Ended September 30, | | | | For the Nine Months Ended September 30, | | | |
| | 2011 | | 2010 | | 2011 | | 2010 | |
| | Amount | Ratio[1] | Amount | Ratio[1] | Amount | Ratio[1] | Amount | Ratio[1][2] |
| | | | | (Dollars in millions) | | | | |
| Charge-offs, net of recoveries . . . . . | $3,266 | 42.8 bp | $6,728 | 88.4 bp | $11,851 | 51.6 bp | $17,665 | 76.9 bp |
| Foreclosed property expense . . . . . . | 733 | 9.6 | 787 | 10.3 | 743 | 3.2 | 1,255 | 5.5 |
| Credit losses including the effect of fair value losses on acquired credit- impaired loans . . . . . . . . . | 3,999 | 52.4 | 7,515 | 98.7 | 12,594 | 54.8 | 18,920 | 82.4 |
| Less: Fair value losses resulting from acquired credit-impaired loans . . . . . . . . . . . . . . . . . . . . | (31) | (0.4) | (41) | (0.5) | (93) | (0.4) | (146) | (0.6) |
| Plus: Impact of acquired credit-impaired loans on charge-offs and foreclosed property expense . . . . | 492 | 6.5 | 750 | 9.9 | 1,577 | 6.9 | 1,642 | 7.1 |
| Credit losses and credit loss ratio . . | $4,460 | 58.5 bp | $8,224 | 108.1 bp | $14,078 | 61.3 bp | $20,416 | 88.9 bp |
| Credit losses attributable to: | | | | | | | | |
| Single-family . . . . . . . . . . . . . . . | $4,384 | | $8,037 | | $13,798 | | $20,022 | |
| Multifamily . . . . . . . . . . . . . . . . | 76 | | 187 | | 280 | | 394 | |
| Total . . . . . . . . . . . . . . . . . . . | $4,460 | | $8,224 | | $14,078 | | $20,416 | |
| Average single-family default rate . . | | 0.44% | | 0.63% | | 1.34% | | 1.63% |
| Average single-family initial charge-off severity rate[3] . . . . . . . . . . | | 34.20% | | 33.30% | | 35.00% | | 34.20% |
| Average multifamily default rate . . . | | 0.08% | | 0.24% | | 0.38% | | 0.48% |
| Average multifamily initial charge-off severity rate[3] . . . . . . . . . . | | 32.49% | | 39.31% | | 35.40% | | 39.63% |

[1]   Basis points are based on the annualized amount for each line item presented divided by the average guaranty book of business during the period.

[2]   Beginning in the second quarter of 2010, expenses relating to preforeclosure taxes and insurance were recorded as charge-offs. These expenses were recorded as foreclosed property expense in the first quarter of 2010. The impact of including these costs in charge-offs was 4.6 basis points for the nine months ended September 30, 2010.

[3]   Single-family and multifamily rates exclude fair value losses on credit-impaired loans acquired from MBS trusts and any costs, gains or losses associated with REO after initial acquisition through final disposition; single-family rate excludes charge-offs from preforeclosure sales.

The decrease in our credit losses in the third quarter and first nine months of 2011 compared with the third quarter and first nine months of 2010 was driven by a decrease in net charge-offs primarily due to a decrease in the number of defaults and an increase in estimated amounts due to or received by us related to outstanding repurchase requests. While charge-offs remain high, charge-offs in the third quarter and first nine months of 2011 were lower than they otherwise would have been due to delays in the foreclosure process.

Our 2009, 2010 and 2011 vintages accounted for approximately 3% of our single-family credit losses for the third quarter of 2011 and 2% of our single-family credit losses for the first nine months of 2011. Typically, credit losses on mortgage loans do not peak until later years in the loan cycle following origination. We provide more detailed credit performance information, including serious delinquency rates by geographic region, statistics on nonperforming loans and foreclosure activity in "Risk Management—Credit Risk Management—Mortgage Credit Risk Management."

*Regulatory Hypothetical Stress Test Scenario*

Under a September 2005 agreement with FHFA's predecessor, the Office of Federal Housing Enterprise Oversight, we are required to disclose on a quarterly basis the present value of the change in future expected

credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-family home prices for the entire United States. Although other provisions of the September 2005 agreement were suspended in March 2009 by FHFA until further notice, this disclosure requirement was not suspended. For purposes of this calculation, we assume that, after the initial 5% shock, home price growth rates return to the average of the possible growth rate paths used in our internal credit pricing models. The sensitivity results represent the difference between future expected credit losses under our base case scenario, which is derived from our internal home price path forecast, and a scenario that assumes an instantaneous nationwide 5% decline in home prices.

Table 16 compares the credit loss sensitivities for the periods indicated for first lien single-family whole loans we own or that back Fannie Mae MBS, before and after consideration of projected credit risk sharing proceeds, such as private mortgage insurance claims and other credit enhancements.

**Table 16:   Single-Family Credit Loss Sensitivity[1]**

| | As of | |
|---|---|---|
| | September 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Gross single-family credit loss sensitivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $   22,925 | $   25,937 |
| Less: Projected credit risk sharing proceeds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,907) | (2,771) |
| Net single-family credit loss sensitivity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $   21,018 | $   23,166 |
| Outstanding single-family whole loans and loans underlying Fannie Mae MBS . . . . . . . . . | $2,764,981 | $2,782,512 |
| Single-family net credit loss sensitivity as a percentage of outstanding single-family whole loans and Fannie Mae MBS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.76% | 0.83% |

[1]   Represents total economic credit losses, which consist of credit losses and forgone interest. Calculations are based on 97% of our total single-family guaranty book of business as of September 30, 2011 and December 31, 2010, respectively. The mortgage loans and mortgage-related securities that are included in these estimates consist of: (a) single-family Fannie Mae MBS (whether held in our mortgage portfolio or held by third parties), excluding certain whole loan REMICs and private-label wraps; (b) single-family mortgage loans, excluding mortgages secured only by second liens, subprime mortgages, manufactured housing chattel loans and reverse mortgages; and (c) long-term standby commitments. We expect the inclusion in our estimates of the excluded products may impact the estimated sensitivities set forth in this table.

Because these sensitivities represent hypothetical scenarios, they should be used with caution. Our regulatory stress test scenario is limited in that it assumes an instantaneous uniform 5% nationwide decline in home prices, which is not representative of the historical pattern of changes in home prices. Changes in home prices generally vary on a regional, as well as a local, basis. In addition, these stress test scenarios are calculated independently without considering changes in other interrelated assumptions, such as unemployment rates or other economic factors, which are likely to have a significant impact on our future expected credit losses.

**Financial Impact of the Making Home Affordable Program on Fannie Mae**

*Home Affordable Refinance Program*

Because we already own or guarantee the original mortgages that we refinance under HARP, our expenses under that program have consisted mostly of limited administrative costs. However, under recently announced changes to HARP we may incur additional losses. See "Legislative and Regulatory Developments," for a discussion on the recent changes to HARP.

*Home Affordable Modification Program*

We reduced our individually impaired allowance that relates to loans that had entered a trial modification under the Home Affordable Modification Program ("HAMP") by $906 million during the third quarter of 2011 compared with impairments of $2.0 billion during the third quarter of 2010. Loans receiving a trial modification under HAMP are accounted for as TDRs and assessed individually for impairment. The reduction of our

39

allowance on HAMP loans in the third quarter of 2011 was due to improved cash flow projections on existing HAMP loans, which more than offset the volume of new HAMP trial modifications during the period. We incurred impairments related to loans that had entered a trial modification under HAMP of $4.3 billion during the first nine months of 2011, compared with $11.8 billion during the first nine months of 2010. These include impairments on loans that entered into a trial modification under the program but that have not yet received, or that have been determined to be ineligible for, a permanent modification under the program. These impairments have been included in the calculation of our provision for loan losses in our condensed consolidated results of operations and comprehensive loss. The impairments do not include the reduction in our collective loss reserves which occurred as a result of beginning to individually assess the loan for impairment upon entering a trial modification. Please see "MD&A—Consolidated Results of Operations—Financial Impact of the Making Home Affordable Program on Fannie Mae" in our 2010 Form 10-K for a more detailed discussion on these impairments.

We paid or accrued HAMP incentive fees for servicers of $86 million during the third quarter of 2011 compared with $93 million during the third quarter of 2010. We paid or accrued HAMP incentive fees for servicers of $254 million during the first nine months of 2011, compared with $276 million during the first nine months of 2010. These fees were related to loans modified under HAMP, which we recorded as part of "Other expenses." Borrower incentive payments are included in the calculation of our allowance for loan losses for individually impaired loans. Additionally, our expenses under HAMP also include administrative costs.

### Overall Impact of the Making Home Affordable Program

Because of the unprecedented nature of the circumstances that led to the Making Home Affordable Program, we cannot quantify what the impact would have been on Fannie Mae if the Making Home Affordable Program had not been introduced. We do not know how many loans we would have modified under alternative programs, what the terms or costs of those modifications would have been, how many foreclosures would have resulted nationwide, and at what pace, or the impact on housing prices if the program had not been put in place. As a result, the amounts we discuss above are not intended to measure how much the program is costing us in comparison to what it would have cost us if we did not have the program at all. See "Risk Factors" for a discussion of how efforts we may undertake in support of the housing market may affect us.

## BUSINESS SEGMENT RESULTS

Results of our three business segments are intended to reflect each segment as if it were a stand-alone business. Under our segment reporting structure, the sum of the results for our three business segments does not equal our condensed consolidated results of operations as we separate the activity related to our consolidated trusts from the results generated by our three segments. In addition, because we apply accounting methods that differ from our condensed consolidated results for segment reporting purposes, we include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to our condensed consolidated results of operations. We describe the management reporting and allocation process used to generate our segment results in our 2010 Form 10-K in "Notes to Consolidated Financial Statements—Note 15, Segment Reporting." We are working on reorganizing our company by function rather than by business in order to improve our operational efficiencies and effectiveness. In future periods, we may change some of our management reporting and how we report our business segment results.

In this section, we summarize our segment results for the third quarter and first nine months of 2011 and 2010 in the tables below and provide a comparative discussion of these results. This section should be read together with our comparative discussion of our condensed consolidated results of operations in "Consolidated Results of Operations." See "Note 10, Segment Reporting" of this report for a reconciliation of our segment results to our condensed consolidated results.

### Single-Family Business Results

Table 17 summarizes the financial results of our Single-Family business for the periods indicated. The primary sources of revenue for our Single-Family business are guaranty fee income and fee and other income. Expenses primarily include credit-related expenses, net interest loss and administrative expenses.

**Table 17:   Single-Family Business Results**

| | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2011 | 2010 | Variance | 2011 | 2010 | Variance |
| | (Dollars in millions) | | | | | |
| Net interest loss . . . . . . . . . . . . . . . . . . . | $ (374) | $ (1,108) | $ 734 | $ (1,952) | $ (4,438) | $2,486 |
| Guaranty fee income[1] . . . . . . . . . . . . . . | 1,867 | 1,804 | 63 | 5,618 | 5,367 | 251 |
| Credit-related expenses[2] . . . . . . . . . . . . | (4,782) | (5,559) | 777 | (21,821) | (22,356) | 535 |
| Other expenses[3] . . . . . . . . . . . . . . . . . . . | (456) | (592) | 136 | (1,414) | (1,713) | 299 |
| Loss before federal income taxes . . . . . . . . | (3,745) | (5,455) | 1,710 | (19,569) | (23,140) | 3,571 |
| (Provision) benefit for federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . | (1) | 1 | (2) | 106 | 53 | 53 |
| Net loss attributable to Fannie Mae . . . . . . | $ (3,746) | $ (5,454) | $1,708 | $ (19,463) | $ (23,087) | $3,624 |
| Single-family effective guaranty fee rate (in basis points)[4] . . . . . . . . . . . . . . . . . . . | 26.1 | 25.2 | | 26.1 | 24.9 | |
| Single-family average charged guaranty fee on new acquisitions (in basis points)[5] . . | 31.1 | 25.3 | | 29.0 | 26.4 | |
| Average single-family guaranty book of business[6] . . . . . . . . . . . . . . . . . . . . . . | $2,859,814 | $2,857,917 | | $2,870,557 | $2,875,952 | |
| Single-family Fannie Mae MBS issues[7] . . . | $ 111,808 | $ 155,940 | | $ 381,135 | $ 391,754 | |

[1]   Guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive loss.

[2]   Consists of the provision for loan losses, provision for guaranty losses and foreclosed property expense.

[3]   Consists of investment gains and losses, fair value losses, fee and other income, administrative expenses and other expenses.

[4]   Calculated based on annualized Single-Family segment guaranty fee income divided by the average single-family guaranty book of business, expressed in basis points.

[5]   Calculated based on the average contractual fee rate for our single-family guaranty arrangements entered into during the period plus the recognition of any upfront cash payments ratably over an estimated average life, expressed in basis points.

[6]   Consists of single-family mortgage loans held in our mortgage portfolio, single-family mortgage loans held by consolidated trusts, single-family Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on single-family mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

[7]   Reflects unpaid principal balance of Fannie Mae MBS issued and guaranteed by the Single-Family segment during the period. Includes Housing Finance Agency (HFA) new issue bond program issuances, none of which occurred in 2011. There were HFA new issue bond program issuances of $3.1 billion in the first nine months of 2010, of which none occurred in the third quarter of 2010.

*Net Interest Loss*

Net interest loss for the Single-Family business segment primarily consists of: (1) the cost to reimburse the Capital Markets group for interest income not recognized for loans in our mortgage portfolio on nonaccrual status; (2) the cost to reimburse MBS trusts for interest income not recognized for loans in consolidated trusts on nonaccrual status; and (3) income from cash payments received on loans that have been placed on nonaccrual status.

Net interest loss decreased in the third quarter and first nine months of 2011 compared with the third quarter and first nine months of 2010 primarily due to a significant decrease in interest income not recognized for loans on nonaccrual status because of a decline in the total number of loans on nonaccrual status. This decline is due to loan workouts and foreclosures since the third quarter of 2010.

41

*Guaranty Fee Income*

Guaranty fee income increased in the third quarter and first nine months of 2011 compared with the third quarter and first nine months of 2010 due to an increase in the amortization of risk based pricing adjustments, reflecting the impact of higher risk based pricing associated with our more recent acquisition vintages.

Our average single-family guaranty book of business was relatively flat period over period despite our continued high market share because of the decline in U.S. residential mortgage debt outstanding, which is primarily due to foreclosures. Our estimated market share of new single-family mortgage-related securities issuances, which is based on publicly available data and excludes previously securitized mortgages, remained high at 43.3% for the third quarter and 45.5% for the first nine months of 2011.

*Credit-Related Expenses*

Credit-related expenses and credit losses in the Single-Family business represent the substantial majority of our consolidated totals. We provide a discussion of our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Expenses."

**Multifamily Business Results**

Table 18 summarizes the financial results of our Multifamily business for the periods indicated. The primary sources of revenue for our Multifamily business are guaranty fee income and fee and other income. Expenses and other items that impact income or loss primarily include credit-related expenses, administrative expenses and net operating losses from our partnership investments.

42

**Table 18:   Multifamily Business Results**

| | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2011 | 2010 | Variance | 2011 | 2010 | Variance |
| | | | (Dollars in millions) | | | |
| Guaranty fee income[1] . . . . . . . . . . . . . . . . . . . . . | $   226 | $   205 | $   21 | $   651 | $   594 | $   57 |
| Fee and other income . . . . . . . . . . . . . . . . . . . . . | 51 | 35 | 16 | 166 | 98 | 68 |
| (Losses) gains from partnership investments[2] . . . . | (30) | 39 | (69) | (8) | (41) | 33 |
| Credit-related (expense) income[3] . . . . . . . . . . . | (102) | (2) | (100) | (164) | 60 | (224) |
| Other expenses[4] . . . . . . . . . . . . . . . . . . . . . . . . | (73) | (97) | 24 | (178) | (298) | 120 |
| Income before federal income taxes . . . . . . . . . . . | 72 | 180 | (108) | 467 | 413 | 54 |
| Benefit (provision) for federal income taxes . . . . . . | — | 1 | (1) | (61) | (14) | (47) |
| Net income attributable to Fannie Mae . . . . . . . . . | $   72 | $   181 | $(109) | $   406 | $   399 | $   7 |
| Multifamily effective guaranty fee rate (in basis points)[5] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 47.0 | 43.9 | | 45.4 | 42.5 | |
| Credit loss performance ratio (in basis points)[6] . . . | 15.8 | 40.1 | | 19.5 | 28.2 | |
| Average multifamily guaranty book of business[7] . . | $192,357 | $186,766 | | $191,185 | $186,234 | |
| Multifamily new business volumes[8] . . . . . . . . . . | 6,500 | 4,540 | | 16,963 | 11,411 | |
| Multifamily units financed from new business volumes[9] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 110,000 | 84,000 | | 289,000 | 199,000 | |
| Fannie Mae multifamily MBS issuances[10] . . . . . . | $   7,756 | $   4,437 | | $ 24,466 | $ 11,238 | |
| Fannie Mae multifamily structured securities issuances (issued by Capital Markets group)[11] . . | 1,495 | 1,122 | | 4,517 | 3,715 | |
| Additional net interest income earned on Fannie Mae multifamily mortgage loans and MBS (included in Capital Markets Group's results)[12] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 210 | 206 | | 662 | 608 | |
| Average Fannie Mae multifamily mortgage loans and MBS in Capital Markets Group's portfolio[13] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 109,608 | 116,096 | | 112,092 | 116,744 | |

| | As of | |
|---|---|---|
| | September 30 2011 | December 31 2010 |
| | (Dollars in millions) | |
| Multifamily serious delinquency rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.57% | 0.71% |
| Percentage of guaranty book of business with credit enhancement . . . . . . . . . . . . . . . . . . . . | 90 | 89 |
| Fannie Mae percentage of total multifamily mortgage debt outstanding[14] . . . . . . . . . . . . | 20.8 | 20.5 |
| Fannie Mae multifamily MBS outstanding[15] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $94,398 | $77,251 |

[1] Guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive loss.

[2] (Losses) gains from partnership investments is included in other expenses in our condensed consolidated statements of operations and comprehensive loss.

[3] Consists of the benefit (provision) for loan losses, benefit (provision) for guaranty losses and foreclosed property expense.

[4] Consists of net interest income or loss, investment gains, other income or expenses, and administrative expenses.

[5] Calculated based on annualized Multifamily segment guaranty fee income divided by the average multifamily guaranty book of business, expressed in basis points.

[6] Calculated based on the annualized credit losses divided by the average multifamily guaranty book of business, expressed in basis points.

[7] Consists of multifamily mortgage loans held in our mortgage portfolio, multifamily mortgage loans held by consolidated trusts, multifamily Fannie Mae MBS issued from unconsolidated trusts held by either third parties or

43

within our retained portfolio, and other credit enhancements that we provide on multifamily mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

[8]  Reflects unpaid principal balance of multifamily Fannie Mae MBS issued (excluding portfolio securitizations) and multifamily loans purchased during the period. Includes HFA new issue bond program issuances, none of which occurred in 2011. There were HFA new issue bond program issuances of $1.0 billion in the first nine months of 2010, of which none occurred in the third quarter of 2010.

[9]  Excludes HFA new issue bond program.

[10]  Reflects unpaid principal balance of multifamily Fannie Mae MBS issued during the period. Includes: (a) issuances of new MBS, (b) $1.3 billion and $7.6 billion of Fannie Mae portfolio securitization transactions for the third quarter and first nine months of 2011, and (c) $69 million and $188 million of conversions of adjustable-rate loans to fixed-rate loans and DMBS securities to MBS securities for the third quarter and first nine months of 2011. There were $9 million and $265 million of new MBS issuances as a result of converting adjustable rate loans to fixed rate loans in the third quarter and first nine months of 2010. There were no Fannie Mae multifamily portfolio securitizations transactions for the third quarter or first nine months of 2010.

[11]  Reflects original unpaid principal balance of out-of-portfolio multifamily structured securities issuances by our Capital Markets Group.

[12]  Interest expense estimate based on allocated duration-matched funding costs. Net interest income was reduced by guaranty fees allocated to Multifamily from the Capital Markets Group on multifamily loans in Fannie Mae's portfolio.

[13]  Based on unpaid principal balance.

[14]  Includes mortgage loans and Fannie Mae MBS issued and guaranteed by the Multifamily segment. Information as of September 30, 2011 is through June 30, 2011 and is based on the Federal Reserve's September 2011 mortgage debt outstanding release, the latest date for which the Federal Reserve has estimated mortgage debt outstanding for multifamily residences. Prior period amount may have been changed to reflect revised historical data from the Federal Reserve.

[15]  Includes $26.5 billion and $19.9 billion of Fannie Mae multifamily MBS held in the mortgage portfolio, the vast majority of which have been consolidated to loans in our condensed consolidated balance sheets, as of September 30, 2011 and December 31, 2010, respectively; and $1.4 billion of bonds issued by HFAs as of both September 30, 2011 and December 31, 2010.

*Guaranty Fee Income*

Multifamily guaranty fee income increased in the third quarter and first nine months of 2011 compared with the third quarter and first nine months of 2010 primarily due to higher fees charged on new acquisitions in recent years. New acquisitions with higher guaranty fees have become an increasingly large part of our multifamily guaranty book of business.

*Credit-Related (Expense) Income*

Multifamily credit-related expenses increased in the third quarter and the first nine months of 2011 compared with 2010 primarily due to a stable allowance for loan losses in 2011 compared to a decrease in 2010. Although national multifamily market fundamentals continued to improve in the third quarter and first nine months of 2011, certain local markets and properties continued to underperform compared to the rest of the country due to localized economic conditions. In comparison, Multifamily credit-related expense in the third quarter of 2010 and credit-related income in the first nine months of 2010 were due to a decrease in the allowance for loan losses as credit trends stabilized.

Multifamily credit losses, which consist of net charge-offs and foreclosed property expense, were $76 million for the third quarter of 2011 compared with $187 million for the third quarter of 2010, and $280 million for the first nine months of 2011 compared with $394 million for the first nine months of 2010.

TREASURY-1960

*(Losses) Gains from Partnership Investments*

We incurred losses from partnership investments in the third quarter of 2011 compared with gains in the third quarter of 2010. Overall, the multifamily market has shown improvement but certain properties continued to show stress in the third quarter of 2011 resulting in a loss from partnership investments for the current quarter. Losses from partnership investments were lower in the first nine months of 2011 compared with the first nine months of 2010 as properties experienced improved operating performance due to stronger national multifamily market fundamentals.

*Provision for Federal Income Taxes*

In the second quarter of 2011, we reached an effective settlement of issues with the Internal Revenue Service relating to tax years 2007 and 2008, which reduced our total corporate tax liability. However, the reduction in our tax liability also reduced the low-income housing tax credits we were able to use, resulting in a provision for federal income taxes for the Multifamily segment in the first nine months of 2011.

### *Capital Markets Group Results*

Table 19 summarizes the financial results of our Capital Markets group for the periods indicated. Following the table we discuss the Capital Markets group's financial results and describe the Capital Markets group's mortgage portfolio. For a discussion of the debt issued by the Capital Markets group to fund its investment activities, see "Liquidity and Capital Management." For a discussion of the derivative instruments that Capital Markets uses to manage interest rate risk, see "Consolidated Balance Sheet Analysis—Derivative Instruments" in this report and "Risk Management—Market Risk Management, Including Interest Rate Risk Management—Derivative Instruments" and "Notes to Consolidated Financial Statements—Note 10, Derivative Instruments and Hedging Activities" in our 2010 Form 10-K. The primary sources of revenue for our Capital Markets group are net interest income and fee and other income. Expenses and other items that impact income or loss primarily include fair value gains and losses, investment gains and losses, allocated guaranty fee expense, other-than-temporary impairment and administrative expenses.

**Table 19:   Capital Markets Group Results**

| | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | **2011** | **2010** | **Variance** | **2011** | **2010** | **Variance** |
| | | | (Dollars in millions) | | | |
| Net interest income[1] . . . . . . . . . . . . . . . . . . . . . . | $ 3,904 | $4,065 | $  (161) | $11,481 | $10,671 | $   810 |
| Investment gains, net[2] . . . . . . . . . . . . . . . . . . . . | 801 | 1,270 | (469) | 2,589 | 2,841 | (252) |
| Net other-than-temporary impairments . . . . . . . . . . . | (262) | (323) | 61 | (361) | (696) | 335 |
| Fair value (losses) gains, net[3] . . . . . . . . . . . . . . . | (4,670) | 436 | (5,106) | (5,959) | (119) | (5,840) |
| Fee and other income . . . . . . . . . . . . . . . . . . . . . | 125 | 130 | (5) | 309 | 370 | (61) |
| Other expenses[4] . . . . . . . . . . . . . . . . . . . . . . . . | (610) | (755) | 145 | (1,723) | (1,716) | (7) |
| (Losses) income before federal income taxes . . . . . . . | (712) | 4,823 | (5,535) | 6,336 | 11,351 | (5,015) |
| Benefit for federal income taxes . . . . . . . . . . . . . . . | 1 | 7 | (6) | 46 | 28 | 18 |
| Net (loss) income attributable to Fannie Mae . . . . . . . | $  (711) | $4,830 | $(5,541) | $ 6,382 | $11,379 | $(4,997) |

---

[1]  Includes contractual interest income, excluding recoveries, on nonaccrual loans received from the Single-Family segment of $1.6 billion for the third quarter of 2011 compared with $2.1 billion for the third quarter of 2010. Includes contractual interest income, excluding recoveries, on nonaccrual loans received from the Single-Family segment of $5.1 billion for the first nine months of 2011 compared with $4.4 billion for the first nine months of 2010. Capital Markets net interest income is reported based on the mortgage-related assets held in the segment's portfolio and excludes interest income on mortgage-related assets held by consolidated MBS trusts that are owned by third parties and the interest expense on the corresponding debt of such trusts.

[2]  We include the securities that we own regardless of whether the trust has been consolidated in reporting of gains and losses on securitizations and sales of available-for-sale securities.

45

(3)   Includes primarily fair value gains or losses on derivatives and trading securities that we own, regardless of whether the trust has been consolidated.

(4)   Includes allocated guaranty fee expense, debt extinguishment gains or losses, net, administrative expenses, and other income or expenses. Gains or losses related to the extinguishment of debt issued by consolidated trusts are excluded from the Capital Markets group's results because purchases of securities are recognized as such.

*Net Interest Income*

The Capital Markets group reports interest income and amortization of cost basis adjustments only on securities and loans that are held in our portfolio. For mortgage loans held in our mortgage portfolio, when interest income is no longer recognized in accordance with our nonaccrual accounting policy, the Capital Markets group recognizes interest income reimbursements that the group receives, primarily from Single-Family, for the contractual interest due. The interest expense recognized on the Capital Markets group's statement of operations is limited to our funding debt, which is reported as "Debt of Fannie Mae" in our condensed consolidated balance sheets. Net interest expense also includes a cost of capital charge allocated among the three business segments.

The Capital Markets group's net interest income decreased in the third quarter of 2011 compared with the third quarter of 2010 primarily due to a decline in interest income from our mortgage portfolio that more than offset the decline in funding costs as we replaced higher cost debt with lower cost debt. Interest income from our mortgage portfolio decreased primarily due to the reduction in our balance of mortgage-related securities. Additionally, the interest rate earned on our mortgage loans decreased due to the decrease in the contractual rate of modified loans. Loan modifications subsequently led to a decrease in reimbursements from the Single-Family business for contractual interest income on non-accrual loans.

The Capital Markets group's net interest income increased in the first nine months of 2011 compared with the first nine months of 2010 primarily due to a decline in funding costs as we replaced higher cost debt with lower cost debt. This increase in net interest income due to lower funding costs was partially offset by a decline in interest income from our mortgage portfolio. The reimbursements of contractual interest due on nonaccrual loans from the Single-Family business were a significant portion of the Capital Markets group's interest income during the first nine months of 2011. However, the increase in these reimbursements was offset by the decline in interest income on our mortgage-related securities because our securities portfolio balance has declined.

Our net interest income and net interest yield were higher than they would have otherwise been in the third quarter and first nine months of both 2011 and 2010 because our debt funding needs were lower than would otherwise have been required as a result of funds we received from Treasury under the senior preferred stock purchase agreement. Further, dividends paid to Treasury are not recognized in interest expense.

We supplement our issuance of debt with interest rate-related derivatives to manage the prepayment and duration risk inherent in our mortgage investments. The effect of these derivatives, in particular the periodic net interest expense accruals on interest rate swaps, is not reflected in Capital Markets' net interest income but is included in our results as a component of "Fair value (losses) gains, net" and is shown in "Table 11: Fair Value (Losses) Gains, Net." If we had included the economic impact of adding the net contractual interest accruals on our interest rate swaps in our Capital Markets' interest expense, Capital Markets' net interest income would have decreased by $497 million for the third quarter of 2011 compared with a decrease of $673 million for the third quarter of 2010, and would have decreased $1.8 billion for the first nine months of 2011 compared with a decrease of $2.3 billion for the first nine months of 2010.

*Investments Gains, Net*

Investment gains decreased in the third quarter of 2011 compared with the third quarter of 2010 primarily due to a higher volume of securitizations in 2010. Investment gains decreased in the first nine months of 2011 compared with the first nine months of 2010 primarily due to decreased gains on sale of available-for-sale securities.

46

*Net Other-Than-Temporary Impairments*

The net other-than-temporary impairments recognized by the Capital Markets group are consistent with the amount reported in our condensed consolidated results of operations. See "Note 5, Investments in Securities" for information on our other-than-temporary impairments by major security type and primary drivers for other-than-temporary impairments recorded in the third quarter and first nine months of 2011.

*Fair Value (Losses) Gains, Net*

The derivative gains and losses that are reported for the Capital Markets group are consistent with the derivative gains and losses reported in our condensed consolidated results of operations. We discuss details of these components of fair value gains and losses in "Consolidated Results of Operations—Fair Value (Losses) Gains, Net."

*The Capital Markets Group's Mortgage Portfolio*

The Capital Markets group's mortgage portfolio consists of mortgage loans and mortgage-related securities that we own. Mortgage-related securities held by Capital Markets include Fannie Mae MBS and non-Fannie Mae mortgage-related securities. The Fannie Mae MBS that we own are maintained as securities on the Capital Markets group's balance sheets. Mortgage-related assets held by consolidated MBS trusts are not included in the Capital Markets group's mortgage portfolio.

We are restricted by our senior preferred stock purchase agreement with Treasury in the amount of mortgage assets that we may own. Each year on December 31, we are required to reduce our mortgage assets to 90% of the maximum allowable amount that we were permitted to own as of December 31 of the immediately preceding calendar year, until the amount of our mortgage assets reaches $250 billion. The maximum allowable amount of mortgage assets we may own was reduced to $810 billion as of December 31, 2010 and will be reduced to $729 billion as of December 31, 2011. As of September 30, 2011, we owned $722.2 billion in mortgage assets, compared with $788.8 billion as of December 31, 2010.

Table 20 summarizes our Capital Markets group's mortgage portfolio activity for the periods indicated.

**Table 20:   Capital Markets Group's Mortgage Portfolio Activity[1]**

|  | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | **2011** | **2010** | **2011** | **2010** |
|  | (Dollars in millions) | | | |
| **Mortgage loans:** |  |  |  |  |
| Beginning balance | $405,417 | $426,185 | $427,074 | $ 281,162 |
| Purchases | 36,169 | 54,136 | 102,533 | 254,725 |
| Securitizations[2] | (18,420) | (24,052) | (64,962) | (52,218) |
| Liquidations[3] | (19,361) | (26,436) | (60,840) | (53,836) |
| Mortgage loans, ending balance | 403,805 | 429,833 | 403,805 | 429,833 |
| **Mortgage securities:** |  |  |  |  |
| Beginning balance | $326,384 | $391,615 | $361,697 | $ 491,566 |
| Purchases[4] | 5,964 | 3,677 | 15,587 | 37,541 |
| Securitizations[2] | 18,420 | 24,052 | 64,962 | 52,218 |
| Sales | (17,936) | (25,598) | (74,997) | (140,986) |
| Liquidations[3] | (14,479) | (20,728) | (48,896) | (67,321) |
| Mortgage securities, ending balance | 318,353 | 373,018 | 318,353 | 373,018 |
| **Total Capital Markets mortgage portfolio** | $722,158 | $802,851 | $722,158 | $ 802,851 |

[1]   Based on unpaid principal balance.

[2]  Includes portfolio securitization transactions that do not qualify for sale treatment under the accounting standards on the transfers of financial assets.

[3]  Includes scheduled repayments, prepayments, foreclosures and lender repurchases.

[4]  Includes purchases of Fannie Mae MBS issued by consolidated trusts.

Purchases of mortgage loans decreased in the third quarter and first nine months of 2011 compared with both the third quarter and first nine months of 2010 because we purchased fewer loans that were four or more months delinquent from MBS trusts in the third quarter and first nine months of 2011. We significantly increased our purchases of delinquent loans in 2010 and purchased the substantial majority of our delinquent loan population during the first half of 2010, which included $127 billion of loans that were four or more months delinquent as of December 31, 2009.

We expect to continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other factors including the limit on the mortgage assets that we may own pursuant to the senior preferred stock purchase agreement. We purchased approximately 293,000 delinquent loans with an unpaid principal balance of approximately $51 billion from our single-family MBS trusts in the first nine months of 2011. As of September 30, 2011, the total unpaid principal balance of all loans in single-family MBS trusts that were delinquent as to four or more consecutive monthly payments was $5.9 billion. In October 2011, we purchased approximately 31,000 delinquent loans with an unpaid principal balance of $5.3 billion from our single-family MBS trusts.

Table 21 shows the composition of the Capital Markets group's mortgage portfolio as of September 30, 2011 and December 31, 2010.

48

**Table 21:   Capital Markets Group's Mortgage Portfolio Composition[1]**

| | As of | |
|---|---|---|
| | September 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| **Capital Markets group's mortgage loans:** | | |
| Single-family loans | | |
| Government insured or guaranteed | $ 41,619 | $ 51,783 |
| Conventional: | | |
| Long-term, fixed-rate | 245,282 | 237,096 |
| Intermediate-term, fixed-rate | 9,644 | 11,446 |
| Adjustable-rate | 25,092 | 31,526 |
| Total single-family conventional | 280,018 | 280,068 |
| **Total single-family loans** | 321,637 | 331,851 |
| Multifamily loans | | |
| Government insured or guaranteed | 379 | 431 |
| Conventional: | | |
| Long-term, fixed-rate | 3,746 | 4,413 |
| Intermediate-term, fixed-rate | 62,538 | 71,010 |
| Adjustable-rate | 15,505 | 19,369 |
| Total multifamily conventional | 81,789 | 94,792 |
| **Total multifamily loans** | 82,168 | 95,223 |
| **Total Capital Markets group's mortgage loans** | 403,805 | 427,074 |
| **Capital Markets group's mortgage-related securities:** | | |
| Fannie Mae | 224,687 | 260,429 |
| Freddie Mac | 15,516 | 17,332 |
| Ginnie Mae | 1,087 | 1,425 |
| Alt-A private-label securities | 20,286 | 22,283 |
| Subprime private-label securities | 16,909 | 18,038 |
| CMBS | 24,219 | 25,052 |
| Mortgage revenue bonds | 11,365 | 12,525 |
| Other mortgage-related securities | 4,284 | 4,613 |
| **Total Capital Markets group's mortgage-related securities[2]** | 318,353 | 361,697 |
| **Total Capital Markets group's mortgage portfolio** | $722,158 | $788,771 |

[1]   Based on unpaid principal balance.

[2]   The fair value of these mortgage-related securities was $324.7 billion and $365.8 billion as of September 30, 2011 and December 31, 2010, respectively.

The Capital Markets group's mortgage portfolio decreased from December 31, 2010 to September 30, 2011 primarily due to liquidations and sales, partially offset by purchases of delinquent loans from MBS trusts. The total unpaid principal balance of nonperforming loans in the Capital Markets group's mortgage portfolio was $233.0 billion as of September 30, 2011 and $228.0 billion as of December 31, 2010. This population includes loans that have been modified and have been classified as TDRs, as well as unmodified delinquent loans that are on nonaccrual status in our condensed consolidated financial statements. We expect our mortgage portfolio to continue to decrease due to the restrictions on the amount of mortgage assets we may own under the terms of our senior preferred stock purchase agreement with Treasury.

**CONSOLIDATED BALANCE SHEET ANALYSIS**

The section below provides a discussion of our condensed consolidated balance sheets as of the dates indicated. You should read this section together with our condensed consolidated financial statements, including the accompanying notes.

Table 22 displays a summary of our condensed consolidated balance sheets as of September 30, 2011 and December 31, 2010.

**Table 22:   Summary of Condensed Consolidated Balance Sheets**

| | As of | | |
| | September 30, 2011 | December 31, 2010 | Variance |
|---|---|---|---|
| | (Dollars in millions) | | |
| **Assets** | | | |
| Cash and cash equivalents and federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . . . . . . . . . . . . . . . | $  60,257 | $  29,048 | $ 31,209 |
| Restricted cash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 55,961 | 63,678 | (7,717) |
| Investments in securities[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 150,859 | 151,248 | (389) |
| Mortgage loans | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 385,503 | 407,482 | (21,979) |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,583,752 | 2,577,794 | 5,958 |
| Allowance for loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (71,435) | (61,556) | (9,879) |
| Mortgage loans, net of allowance for loan losses. . . . . . . . . . . . . . . . . . . | 2,897,820 | 2,923,720 | (25,900) |
| Other assets[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 48,980 | 54,278 | (5,298) |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,213,877 | $3,221,972 | $  (8,095) |
| **Liabilities and stockholders' deficit** | | | |
| Debt | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  744,803 | $  780,044 | $(35,241) |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,446,973 | 2,416,956 | 30,017 |
| Other liabilities[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29,892 | 27,489 | 2,403 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,221,668 | 3,224,489 | (2,821) |
| Senior preferred stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 104,787 | 88,600 | 16,187 |
| Other deficit[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (112,578) | (91,117) | (21,461) |
| Total stockholders' deficit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (7,791) | (2,517) | (5,274) |
| **Total liabilities and stockholders' deficit** . . . . . . . . . . . . . . . . . . . . . . . . | $3,213,877 | $3,221,972 | $  (8,095) |

[1]   Includes $43.2 billion as of September 30, 2011 and $32.8 billion as of December 31, 2010 of non-mortgage-related securities that are included in our other investments portfolio, which we present in "Table 33: Cash and Other Investments Portfolio."

[2]   Consists of accrued interest receivable, net; acquired property, net; and other assets.

[3]   Consists of accrued interest payable, federal funds purchased and securities sold under agreements to repurchase, and other liabilities.

[4]   Consists of preferred stock, common stock, accumulated deficit, accumulated other comprehensive loss, treasury stock, and noncontrolling interest.

**Cash and Other Investments Portfolio**

Cash and cash equivalents and federal funds sold and securities purchased under agreements to resell or similar arrangements are included in our cash and other investments portfolio. See "Liquidity and Capital

Management—Liquidity Management—Cash and Other Investments Portfolio" for additional information on our cash and other investments portfolio.

**Restricted Cash**

Restricted cash primarily includes unscheduled borrower payments received by the servicer or consolidated trusts due to be remitted to the MBS certificateholders in the subsequent month. Our restricted cash decreased as of September 30, 2011 compared with the balance as of December 31, 2010 primarily due to a decline in refinance activity, resulting in a decrease in unscheduled payments received.

**Investments in Mortgage-Related Securities**

Our investments in mortgage-related securities are classified in our condensed consolidated balance sheets as either trading or available-for-sale and are measured at fair value. Unrealized and realized gains and losses on trading securities are included as a component of "Fair value (losses) gains, net" and unrealized gains and losses on available-for-sale securities are included in "Other comprehensive (loss) income" in our condensed consolidated statements of operations and comprehensive loss. Realized gains and losses on available-for-sale securities are recognized when securities are sold in "Investment gains, net" in our condensed consolidated statements of operations and comprehensive loss. See "Note 5, Investments in Securities" for additional information on our investments in mortgage-related securities, including the composition of our trading and available-for-sale securities at amortized cost and fair value and the gross unrealized gains and losses related to our available-for-sale securities as of September 30, 2011. Table 23 displays the fair value of our investments in mortgage-related securities, including trading and available-for-sale securities, as of September 30, 2011 and December 31, 2010.

**Table 23:    Summary of Mortgage-Related Securities at Fair Value**

| | As of | |
| --- | --- | --- |
| | September 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Mortgage-related securities: | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 26,767 | $ 30,226 |
| Freddie Mac. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16,615 | 18,322 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,236 | 1,629 |
| Alt-A private-label securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13,741 | 15,573 |
| Subprime private-label securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,205 | 11,513 |
| CMBS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24,990 | 25,608 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11,325 | 11,650 |
| Other mortgage-related securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,760 | 3,974 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $107,639 | $118,495 |

*Investments in Private-Label Mortgage-Related Securities*

We classify private-label securities as Alt-A, subprime, multifamily or manufactured housing if the securities were labeled as such when issued. We have also invested in private-label subprime mortgage-related securities that we have resecuritized to include our guaranty ("wraps").

The continued negative impact of the current economic environment, including sustained weakness in the housing market and high unemployment, has adversely affected the performance of our Alt-A and subprime private-label securities. The unpaid principal balance of our investments in Alt-A and subprime securities was $37.2 billion as of September 30, 2011, of which $30.9 billion was rated below investment grade. Table 24 displays the unpaid principal balance and the fair value of our investments in Alt-A and subprime private-label securities along with an analysis of the cumulative losses on these investments as of September 30, 2011. As of September 30, 2011, we had realized actual cumulative principal shortfalls of approximately 5% compared

with 2% as of December 31, 2010 of the total cumulative credit losses reported in this table and reflected in our condensed consolidated financial statements.

**Table 24:   Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities**

| | As of September 30, 2011 | | | | |
| | Unpaid Principal Balance | Fair Value | Total Cumulative Losses[1] | Noncredit Component[2] | Credit Component[3] |
| --- | --- | --- | --- | --- | --- |
| | (Dollars in millions) | | | | |
| Trading securities:[4] | | | | | |
|   Alt-A private-label securities . . . . . . . . . . . . . . | $ 2,806 | $ 1,454 | $ (1,309) | $ (139) | $(1,170) |
|   Subprime private-label securities . . . . . . . . . . | 2,630 | 1,318 | (1,312) | (404) | (908) |
|   Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 5,436 | $ 2,772 | $ (2,621) | $ (543) | $(2,078) |
| Available-for-sale securities:[4] | | | | | |
|   Alt-A private-label securities . . . . . . . . . . . . . . | $17,480 | $12,287 | $ (5,574) | $(2,012) | $(3,562) |
|   Subprime private-label securities . . . . . . . . . . | 14,279 | 7,887 | (6,431) | (2,480) | (3,951) |
|   Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $31,759 | $20,174 | $(12,005) | $(4,492) | $(7,513) |
| Grand Total . . . . . . . . . . . . . . . . . . . . . . . . . . | $37,195 | $22,946 | $(14,626) | $(5,035) | $(9,591) |

[1] Amounts reflect the difference between the fair value and unpaid principal balance net of unamortized premiums, discounts and certain other cost basis adjustments.

[2] Represents the estimated portion of the total cumulative losses that is noncredit-related. We have calculated the credit component based on the difference between the amortized cost basis of the securities and the present value of expected future cash flows. The remaining difference between the fair value and the present value of expected future cash flows is classified as noncredit-related.

[3] For securities classified as trading, amounts reflect the estimated portion of the total cumulative losses that is credit-related. For securities classified as available-for-sale, amounts reflect the estimated portion of total cumulative other-than-temporary credit impairment losses, net of accretion, that are recognized in earnings.

[4] Excludes resecuritizations, or wraps, of private-label securities backed by subprime loans that we have guaranteed and hold in our mortgage portfolio as Fannie Mae securities.

Table 25 displays the 60 days or more delinquency rates and average loss severities for the loans underlying our Alt-A and subprime private-label mortgage-related securities for the most recent remittance period of the current reporting quarter. The delinquency rates and average loss severities are based on available data provided by Intex Solutions, Inc. ("Intex") and CoreLogic, LoanPerformance ("CoreLogic"). We also present the average credit enhancement and monoline financial guaranteed amount for these securities as of September 30, 2011. Based on the stressed condition of some of our financial guarantors, we believe some of these counterparties will not fully meet their obligation to us in the future. See "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management—Financial Guarantors" for additional information on our financial guarantor exposure and the counterparty risk associated with our financial guarantors.

TREASURY-1968

**Table 25:**   **Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps)**

| | As of September 30, 2011 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Unpaid Principal Balance | | | | | | Monoline Financial Guaranteed Amount[6] |
| | Trading | Available-for-Sale | Wraps[1] | ≥ 60 Days Delinquent[2][3] | Average Loss Severity[3][4] | Average Credit Enhancement[3][5] | |
| | | | | (Dollars in millions) | | | |
| **Private-label mortgage- related securities backed by:[7]** | | | | | | | |
| Alt-A mortgage loans: | | | | | | | |
| Option ARM Alt-A mortgage loans: | | | | | | | |
| 2004 and prior . . . . . . . . | $ — | $ 487 | $ — | 31.8% | 58.1% | 16.3% | $ — |
| 2005 . . . . . . . . . . . . . . | — | 1,324 | — | 44.9 | 60.9 | 39.0 | 257 |
| 2006 . . . . . . . . . . . . . . | — | 1,241 | — | 46.7 | 62.2 | 26.4 | 117 |
| 2007 . . . . . . . . . . . . . . | 1,949 | — | — | 45.4 | 70.4 | 55.8 | 684 |
| Other Alt-A mortgage loans: | | | | | | | |
| 2004 and prior . . . . . . . . | — | 6,309 | — | 10.5 | 51.6 | 12.4 | 12 |
| 2005 . . . . . . . . . . . . . . | 85 | 4,131 | 119 | 23.3 | 61.0 | 5.6 | — |
| 2006 . . . . . . . . . . . . . . | 65 | 3,868 | — | 28.3 | 61.6 | 0.6 | — |
| 2007 . . . . . . . . . . . . . . | 707 | — | 177 | 43.3 | 70.8 | 27.6 | 286 |
| 2008[8] . . . . . . . . . . . . | — | 120 | — | — | — | — | — |
| Total Alt-A mortgage loans: . . . . . . . . . . . . . . | 2,806 | 17,480 | 296 | | | | 1,356 |
| Subprime mortgage loans: | | | | | | | |
| 2004 and prior . . . . . . . . | — | 1,699 | 975 | 24.2 | 78.2 | 60.7 | 645 |
| 2005[8] . . . . . . . . . . . . | — | 179 | 1,327 | 42.0 | 77.1 | 58.2 | 226 |
| 2006 . . . . . . . . . . . . . . | — | 11,792 | — | 47.6 | 78.7 | 17.8 | 52 |
| 2007 . . . . . . . . . . . . . . | 2,630 | 609 | 5,516 | 47.8 | 77.4 | 22.2 | 177 |
| Total subprime mortgage loans: . . . . . . . . . . . . . . | 2,630 | 14,279 | 7,818 | | | | 1,100 |
| Total Alt-A and subprime mortgage loans: . . . . . . . | $5,436 | $31,759 | $8,114 | | | | $2,456 |

[1]   Represents our exposure to private-label Alt-A and subprime mortgage-related securities that have been resecuritized (or wrapped) to include our guarantee.

[2]   Delinquency data provided by Intex, where available, for loans backing Alt-A and subprime private-label mortgage-related securities that we own or guarantee. The reported Intex delinquency data reflect information from September 2011 remittances for August 2011 payments. For consistency purposes, we have adjusted the Intex delinquency data, where appropriate, to include all bankruptcies, foreclosures and REO in the delinquency rates.

[3]   The average delinquency, severity and credit enhancement metrics are calculated for each loan pool associated with securities where Fannie Mae has exposure and are weighted based on the unpaid principal balance of those securities.

[4]   Severity data obtained from CoreLogic, where available, for loans backing Alt-A and subprime private-label mortgage-related securities that we own or guarantee. The CoreLogic severity data reflect information from September 2011 remittances for August 2011 payments. For consistency purposes, we have adjusted the severity data, where appropriate.

[5]   Average credit enhancement percentage reflects both subordination and financial guarantees. Reflects the ratio of the current amount of the securities that will incur losses in the securitization structure before any losses are allocated to securities that we own or guarantee. Percentage generally calculated based on the quotient of the total unpaid principal balance of all credit enhancements in the form of subordination or financial guarantee of the security divided by the

53

total unpaid principal balance of all of the tranches of collateral pools from which credit support is drawn for the security that we own or guarantee.

[6] Reflects amount of unpaid principal balance supported by financial guarantees from monoline financial guarantors.

[7] Vintages are based on series date and not loan origination date.

[8] The unpaid principal balance includes private-label REMIC securities that have been resecuritized totaling $120 million for the 2008 vintage of other Alt-A loans and $17 million for the 2005 vintage of subprime loans. These securities are excluded from the delinquency, severity and credit enhancement statistics reported in this table.

## Mortgage Loans

The decrease in mortgage loans, net of an allowance for loan losses, in the first nine months of 2011 was primarily driven by lower acquisition volumes. For additional information on our mortgage loans, see "Note 3, Mortgage Loans." For additional information on the mortgage loan purchase and sale activities reported by our Capital Markets group, see "Business Segment Results—Capital Markets Group Results."

## Debt Instruments

Debt of Fannie Mae is the primary means of funding our mortgage investments. Debt of consolidated trusts represents our liability to third-party beneficial interest holders when we have included the assets of a corresponding trust in our condensed consolidated balance sheets. We provide a summary of the activity of the debt of Fannie Mae and a comparison of the mix between our outstanding short-term and long-term debt in "Liquidity and Capital Management—Liquidity Management—Debt Funding." Also see "Note 8, Short-Term Borrowings and Long-Term Debt" for additional information on our outstanding debt.

The increase in debt of consolidated trusts in the first nine months of 2011 was primarily driven by the sale of Fannie Mae MBS, which are accounted for as reissuances of debt of consolidated trusts in our condensed consolidated balance sheets, since the MBS certificate ownership is transferred from us to a third party.

## Derivative Instruments

We supplement our issuance of debt with interest rate related derivatives to manage the prepayment and duration risk inherent in our mortgage investments. We aggregate, by derivative counterparty, the net fair value gain or loss, less any cash collateral paid or received, and report these amounts in our condensed consolidated balance sheets as either assets or liabilities.

Our derivative assets and liabilities consist of these risk management derivatives and our mortgage commitments. We refer to the difference between the derivative assets and derivative liabilities recorded in our condensed consolidated balance sheets as our net derivative asset or liability. We present, by derivative instrument type, the estimated fair value of derivatives recorded in our condensed consolidated balance sheets and the related outstanding notional amounts as of September 30, 2011 and December 31, 2010 in "Note 9, Derivative Instruments." Table 26 provides an analysis of the factors driving the change from December 31, 2010 to September 30, 2011 in the estimated fair value of our net derivative liability related to our risk management derivatives recorded in our condensed consolidated balance sheets.

**Table 26:   Changes in Risk Management Derivative Assets (Liabilities) at Fair Value, Net**

| | For the Nine Months Ended September 30, 2011 |
|---|---|
| | (Dollars in millions) |
| Net risk management derivative liability as of December 31, 2010 . . . . . . . . . . . . . . . . . . . . . . | $  (789) |
| Effect of cash payments: | |
| Fair value at inception of contracts entered into during the period[1] . . . . . . . . . . . . . . . . . . | 51 |
| Fair value at date of termination of contracts settled during the period[2] . . . . . . . . . . . . . . . | 1,214 |
| Net collateral received . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (17) |
| Periodic net cash contractual interest payments[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,755 |
| Total cash payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,003 |
| Statement of operations impact of recognized amounts: | |
| Net contractual interest expense accruals on interest rate swaps . . . . . . . . . . . . . . . . . . . . . . | (1,790) |
| Net change in fair value during the period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (3,777) |
| Risk management derivatives fair value losses, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (5,567) |
| Net risk management derivative liability as of September 30, 2011 . . . . . . . . . . . . . . . . . . . . . . | $(3,353) |

---

[1] Cash receipts from sale of derivative option contracts increase the derivative liability recorded in our condensed consolidated balance sheets. Cash payments made to purchase derivative option contracts (purchased option premiums) increase the derivative asset recorded in our condensed consolidated balance sheets.

[2] Cash payments made to terminate derivative contracts reduce the derivative liability recorded in our condensed consolidated balance sheets. Primarily represents cash paid (received) upon termination of derivative contracts.

[3] Interest is accrued on interest rate swap contracts based on the contractual terms. Accrued interest income increases our derivative asset and accrued interest expense increases our derivative liability. The offsetting interest income and expense are included as components of derivatives fair value losses, net in our condensed consolidated statements of operations and comprehensive loss. Net periodic interest receipts reduce the derivative asset and net periodic interest payments reduce the derivative liability. Also includes cash paid (received) on other derivatives contracts.

For additional information on our derivative instruments, see "Consolidated Results of Operations—Fair Value (Losses) Gains, Net," "Risk Management—Market Risk Management, Including Interest Rate Risk Management" and "Note 9, Derivative Instruments."

**Stockholders' Deficit**

Our net deficit increased as of September 30, 2011 compared with December 31, 2010. See Table 27 in "Supplemental Non-GAAP Information—Fair Value Balance Sheets" for details of the change in our net deficit.

## SUPPLEMENTAL NON-GAAP INFORMATION—FAIR VALUE BALANCE SHEETS

As part of our disclosure requirements with FHFA, we disclose on a quarterly basis supplemental non-GAAP consolidated fair value balance sheets, which reflect our assets and liabilities at estimated fair value.

Table 27 summarizes changes in our stockholders' deficit reported in our GAAP condensed consolidated balance sheets and in the fair value of our net assets in our non-GAAP consolidated fair value balance sheets for the nine months ended September 30, 2011. The estimated fair value of our net assets is calculated based on the difference between the fair value of our assets and the fair value of our liabilities, adjusted for noncontrolling interests. We use various valuation techniques to estimate fair value, some of which incorporate internal assumptions that are subjective and involve a high degree of management judgment. We describe the specific valuation techniques used to determine fair value and disclose the carrying value and fair value of our financial assets and liabilities in "Note 13, Fair Value."

**Table 27:   Comparative Measures—GAAP Change in Stockholders' Deficit and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect)**

| | For the Nine Months Ended September 30, 2011 |
|---|---|
| | (Dollars in millions) |
| **GAAP consolidated balance sheets:** | |
| Fannie Mae stockholders' deficit as of December 31, 2010[1] | $   (2,599) |
| Total comprehensive loss | (14,462) |
| Capital transactions:[2] | |
|     Funds received from Treasury under the senior preferred stock purchase agreement | 16,187 |
|     Senior preferred stock dividends | (6,992) |
| Capital transactions, net | 9,195 |
| Other | 13 |
| Fannie Mae stockholders' deficit as of September 30, 2011[1] | $   (7,853) |
| **Non-GAAP consolidated fair value balance sheets:** | |
| Estimated fair value of net assets as of December 31, 2010 | $(120,294) |
| Capital transactions, net | 9,195 |
| Change in estimated fair value of net assets, excluding capital transactions | (2,270) |
| Increase in estimated fair value of net assets, net | 6,925 |
| Estimated fair value of net assets as of September 30, 2011 | $(113,369) |

[1] Our net worth, as defined under the senior preferred stock purchase agreement, is equivalent to the "Total deficit" amount reported in our condensed consolidated balance sheets. Our net worth, or total deficit, consists of "Total Fannie Mae's stockholders' deficit" and "Noncontrolling interests" reported in our condensed consolidated balance sheets.

[2] Represents capital transactions, which are reported in our condensed consolidated financial statements.

During the first nine months of 2011, the fair value of our net assets, excluding capital transactions, decreased $2.3 billion which was attributable to a net decrease in the fair value of the net portfolio principally related to widening of the option-adjusted spread levels, which were partially offset by an increase in fair value attributable to the positive impact of the spread between mortgage assets and associated debt and derivatives.

Fair value decreases during the first half of 2011 were primarily attributable to credit-related items, principally related to declining actual and expected home prices. These fair value decreases have been reduced in the third quarter primarily by a decline in interest rates, which decreased the probability of default due to a higher expectation of prepayments.

**Cautionary Language Relating to Supplemental Non-GAAP Financial Measures**

In reviewing our non-GAAP consolidated fair value balance sheets, there are a number of important factors and limitations to consider. The estimated fair value of our net assets is calculated as of a particular point in time based on our existing assets and liabilities. It does not incorporate other factors that may have a significant impact on our long-term fair value, including revenues generated from future business activities in which we expect to engage, the value from our foreclosure and loss mitigation efforts or the impact that legislation or potential regulatory actions may have on us. As a result, the estimated fair value of our net assets presented in our non-GAAP consolidated fair value balance sheets does not represent an estimate of our net realizable value, liquidation value or our market value as a whole. Amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary materially from the estimated fair values presented in our non-GAAP consolidated fair value balance sheets.

In addition, the fair value of our net assets attributable to common stockholders presented in our fair value balance sheet does not represent an estimate of the value we expect to realize from operating the company or what we expect to draw from Treasury under the terms of our senior preferred stock purchase agreement, primarily because:

- The estimated fair value of our credit exposures significantly exceeds our projected credit losses as fair value takes into account certain assumptions about liquidity and required rates of return that a market participant may demand in assuming a credit obligation. Because we do not intend to have another party assume the credit risk inherent in our book of business, and therefore would not be obligated to pay a market premium for its assumption, we do not expect the current market premium portion of our current estimate of fair value to impact future Treasury draws;

- The fair value balance sheet does not reflect amounts we expect to draw in the future to pay dividends on the senior preferred stock; and

- The fair value of our net assets reflects a point in time estimate of the fair value of our existing assets and liabilities, and does not incorporate the value associated with new business that may be added in the future.

The fair value of our net assets is not a measure defined within GAAP and may not be comparable to similarly titled measures reported by other companies.

**Supplemental Non-GAAP Consolidated Fair Value Balance Sheets**

We present our non-GAAP fair value balance sheets in Table 28 below.

57

**Table 28:   Supplemental Non-GAAP Consolidated Fair Value Balance Sheets**

| | As of September 30, 2011 | | | As of December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | GAAP Carrying Value | Fair Value Adjustment[1] | Estimated Fair Value | GAAP Carrying Value | Fair Value Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | | |
| **Assets:** | | | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . | $ 80,268 | $ — | $ 80,268 | $ 80,975 | $ — | $ 80,975 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . | 35,950 | — | 35,950 | 11,751 | — | 11,751 |
| Trading securities . . . . . . . . . . . . . . . . . . . . | 68,149 | — | 68,149 | 56,856 | — | 56,856 |
| Available-for-sale securities . . . . . . . . . . . . . . | 82,710 | — | 82,710 | 94,392 | — | 94,392 |
| Mortgage loans: | | | | | | |
| Mortgage loans held for sale . . . . . . . . . . . | 309 | — | 309 | 915 | — | 915 |
| Mortgage loans held for investment, net of allowance for loan losses: | | | | | | |
| Of Fannie Mae. . . . . . . . . . . . . . . . . . . | 329,848 | (25,895) | 303,953 | 358,698 | (39,331) | 319,367 |
| Of consolidated trusts . . . . . . . . . . . . . . | 2,567,663 | 95,780[2] | 2,663,443[3] | 2,564,107 | 46,038[2] | 2,610,145[3] |
| Total mortgage loans . . . . . . . . . . . . . . . . | 2,897,820 | 69,885 | 2,967,705[4] | 2,923,720 | 6,707 | 2,930,427[4] |
| Advances to lenders . . . . . . . . . . . . . . . . . | 5,145 | (116) | 5,029[5][6] | 7,215 | (225) | 6,990[5][6] |
| Derivative assets at fair value . . . . . . . . . . . | 723 | — | 723[5][6] | 1,137 | — | 1,137[5][6] |
| Guaranty assets and buy-ups, net . . . . . . . . . | 480 | 378 | 858[5][6] | 458 | 356 | 814[5][6] |
| Total financial assets . . . . . . . . . . . . . . . | 3,171,245 | 70,147 | 3,241,392[7] | 3,176,504 | 6,838 | 3,183,342[7] |
| Credit enhancements . . . . . . . . . . . . . . . . . . | 469 | 2,502 | 2,971[5][6] | 479 | 3,286 | 3,765[5][6] |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . | 42,163 | (281) | 41,882[5][6] | 44,989 | (261) | 44,728[5][6] |
| Total assets . . . . . . . . . . . . . . . . . . . . . . | $3,213,877 | $ 72,368 | $3,286,245 | $3,221,972 | $ 9,863 | $3,231,835 |
| **Liabilities:** | | | | | | |
| Federal funds purchased and securities sold under agreements to repurchase. . . . . . . . . . . . . . | $ — | $ — | $ — | $ 52 | $ (1) | $ 51 |
| Short-term debt: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . | 193,718 | 41 | 193,759 | 151,884 | 90 | 151,974 |
| Of consolidated trusts . . . . . . . . . . . . . . . . | 5,004 | — | 5,004 | 5,359 | — | 5,359 |
| Long-term debt: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . | 551,085[8] | 29,153 | 580,238 | 628,160[8] | 21,524 | 649,684 |
| Of consolidated trusts . . . . . . . . . . . . . . . . | 2,441,969[8] | 146,581[2] | 2,588,550 | 2,411,597[8] | 103,332[2] | 2,514,929 |
| Derivative liabilities at fair value . . . . . . . . . . | 4,273 | — | 4,273[9][10] | 1,715 | — | 1,715[9][10] |
| Guaranty obligations . . . . . . . . . . . . . . . . . . | 765 | 3,155 | 3,920[9][10] | 769 | 3,085 | 3,854[9][10] |
| Total financial liabilities . . . . . . . . . . . . . | 3,196,814 | 178,930 | 3,375,744[7] | 3,199,536 | 128,030 | 3,327,566[7] |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . | 24,854 | (1,046) | 23,808[9][10] | 24,953 | (472) | 24,481[9][10] |
| Total liabilities . . . . . . . . . . . . . . . . . . . | 3,221,668 | 177,884 | 3,399,552 | 3,224,489 | 127,558 | 3,352,047 |
| **Equity (deficit):** | | | | | | |
| Fannie Mae stockholders' equity (deficit): | | | | | | |
| Senior preferred[11] . . . . . . . . . . . . . . . . . . | 104,787 | — | 104,787 | 88,600 | — | 88,600 |
| Preferred . . . . . . . . . . . . . . . . . . . . . . . . . | 19,130 | (17,784) | 1,346 | 20,204 | (19,829) | 375 |
| Common . . . . . . . . . . . . . . . . . . . . . . . . . . . | (131,770) | (87,732) | (219,502) | (111,403) | (97,866) | (209,269) |
| **Total Fannie Mae stockholders' deficit/non-GAAP fair value of net assets** . . . . . . . . . | $ (7,853) | $(105,516) | $ (113,369) | $ (2,599) | $(117,695) | $ (120,294) |
| Noncontrolling interests . . . . . . . . . . . . . . . . | 62 | — | 62 | 82 | — | 82 |
| Total deficit . . . . . . . . . . . . . . . . . . . . . . | (7,791) | (105,516) | (113,307) | (2,517) | (117,695) | (120,212) |
| Total liabilities and equity (deficit) . . . . . . . . | $3,213,877 | $ 72,368 | $3,286,245 | $3,221,972 | $ 9,863 | $3,231,835 |

**Explanation and Reconciliation of Non-GAAP Measures to GAAP Measures**

[1]   Each of the amounts listed as a "fair value adjustment" represents the difference between the carrying value included in our GAAP condensed consolidated balance sheets and our best judgment of the estimated fair value of the listed item.

[2]   Fair value exceeds carrying value of consolidated loans and consolidated debt as a significant portion of these were consolidated at unpaid principal balance as of January 1, 2010, upon adoption of accounting standards on transfers of financial assets and

58

consolidation of variable interest entities ("VIEs"). Also impacting the difference between fair value and carrying value of the consolidated loans is the credit component included in consolidated loans, which has no corresponding impact on the consolidated debt.

[3] Includes certain mortgage loans that we elected to report at fair value in our GAAP condensed consolidated balance sheets of $3.4 billion and $3.0 billion as of September 30, 2011 and December 31, 2010, respectively.

[4] Performing loans had a fair value of $2.8 trillion and an unpaid principal balance of $2.7 trillion as of both September 30, 2011 and December 31, 2010. Nonperforming loans, which include loans that are delinquent by one or more payments, had a fair value of $133.8 billion and an unpaid principal balance of $232.1 billion as of September 30, 2011 compared with a fair value of $168.5 billion and an unpaid principal balance of $287.4 billion as of December 31, 2010. See "Note 13, Fair Value" for additional information on valuation techniques for performing and nonperforming loans.

[5] The following line items: (a) Advances to lenders; (b) Derivative assets at fair value; (c) Guaranty assets and buy-ups, net; (d) Credit enhancements; and (e) Other assets, together consist of the following assets presented in our GAAP condensed consolidated balance sheets: (a) Accrued interest receivable, net; (b) Acquired property, net; and (c) Other assets.

[6] "Other assets" include the following GAAP condensed consolidated balance sheets line items: (a) Accrued interest receivable, net and (b) Acquired property, net. The carrying value of these items in our GAAP condensed consolidated balance sheets totaled $23.1 billion and $27.5 billion as of September 30, 2011 and December 31, 2010, respectively. "Other assets" in our GAAP condensed consolidated balance sheets include the following: (a) Advances to Lenders; (b) Derivative assets at fair value; (c) Guaranty assets and buy-ups, net; and (d) Credit enhancements. The carrying value of these items totaled $6.8 billion and $9.3 billion as of September 30, 2011 and December 31, 2010, respectively.

[7] We determined the estimated fair value of these financial instruments in accordance with the fair value accounting standard as described in "Note 13, Fair Value."

[8] Includes certain long-term debt instruments that we elected to report at fair value in our GAAP condensed consolidated balance sheets of $4.7 billion and $3.2 billion as of September 30, 2011 and December 31, 2010, respectively.

[9] The following line items: (a) Derivative liabilities at fair value; (b) Guaranty obligations; and (c) Other liabilities, consist of the following liabilities presented in our GAAP condensed consolidated balance sheets: (a) Accrued interest payable and (b) Other liabilities.

[10] "Other liabilities" include Accrued interest payable in our GAAP condensed consolidated balance sheets. The carrying value of this item in our GAAP condensed consolidated balance sheets totaled $12.9 billion and $13.8 billion as of September 30, 2011 and December 31, 2010, respectively. We assume that certain other liabilities, such as deferred revenues, have no fair value. Although we report the "Reserve for guaranty losses" as part of "Other liabilities" in our GAAP condensed consolidated balance sheets, it is incorporated into and reported as part of the fair value of our guaranty obligations in our non-GAAP supplemental consolidated fair value balance sheets. "Other liabilities" in our GAAP condensed consolidated balance sheets include the following: (a) Derivative liabilities at fair value and (b) Guaranty obligations. The carrying value of these items totaled $5.0 billion and $2.5 billion as of September 30, 2011 and December 31, 2010, respectively.

[11] The amount included in "estimated fair value" of the senior preferred stock is the liquidation preference, which is the same as the GAAP carrying value, and does not reflect fair value.

## LIQUIDITY AND CAPITAL MANAGEMENT

### Liquidity Management

Our business activities require that we maintain adequate liquidity to fund our operations. Our liquidity risk management policy is designed to address our liquidity risk. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner. Liquidity risk management involves forecasting funding requirements, maintaining sufficient capacity to meet our needs based on our ongoing assessment of financial market liquidity and adhering to our regulatory requirements.

Our Treasury group is responsible for implementing our liquidity and contingency planning strategies. We conduct liquidity contingency planning to prepare for an event in which our access to the unsecured debt markets becomes limited. We plan for alternative sources of liquidity that are designed to allow us to meet our cash obligations without relying upon the issuance of unsecured debt. While our liquidity contingency planning attempts to address stressed market conditions and our status under conservatorship and Treasury support arrangements, we believe that our liquidity contingency plan may be difficult or impossible to execute for a company of our size in our circumstances. See "Liquidity and Capital Management—Liquidity Management—Liquidity Risk Management Practices and Contingency Planning" in our 2010 Form 10-K for a discussion of our liquidity contingency plans. Also see "Risk Factors" in this report for a description of the risks associated with our liquidity contingency planning.

TREASURY-1975

Our liquidity position could be adversely affected by many causes, both internal and external to our business, including: actions taken by the conservator, the Federal Reserve, U.S. Treasury or other government agencies; legislation relating to us or our business; a U.S. government payment default on its debt obligations; a downgrade in the credit ratings of our senior unsecured debt or the U.S. government's debt from any of the major ratings organizations; a systemic event leading to the withdrawal of liquidity from the market; an extreme market-wide widening of credit spreads; public statements by key policy makers; a significant further decline in our net worth; loss of demand for our debt, or certain types of our debt, from a major group of investors; a significant credit event involving one of our major institutional counterparties; a sudden catastrophic operational failure in the financial sector; or elimination of our GSE status.

### Debt Funding

We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt.

We have a diversified funding base of domestic and international investors. Purchasers of our debt securities are geographically diversified and include fund managers, commercial banks, pension funds, insurance companies, foreign central banks, corporations, state and local governments, and other municipal authorities.

Although our funding needs may vary from quarter to quarter depending on market conditions, we currently expect our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirement of the senior preferred stock purchase agreement that we reduce our mortgage portfolio 10% per year until it reaches $250 billion.

#### Fannie Mae Debt Funding Activity

Table 29 summarizes the activity in the debt of Fannie Mae for the periods indicated. This activity includes federal funds purchased and securities sold under agreements to repurchase but excludes the debt of consolidated trusts as well as intraday loans. The reported amounts of debt issued and paid off during the period represent the face amount of the debt at issuance and redemption, respectively. Activity for short-term debt of Fannie Mae relates to borrowings with an original contractual maturity of one year or less while activity for long-term debt of Fannie Mae relates to borrowings with an original contractual maturity of greater than one year.

TREASURY-1976

**Table 29:  Activity in Debt of Fannie Mae**

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (Dollars in millions) | | | |
| Issued during the period: | | | | |
| Short-term: | | | | |
| Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $134,500 | $102,778 | $362,752 | $389,709 |
| Weighted-average interest rate . . . . . . . . . . . . . . . . . . . . . . . . . | 0.12% | 0.25% | 0.12% | 0.25% |
| Long-term: | | | | |
| Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 81,284 | $138,672 | $162,708 | $341,526 |
| Weighted-average interest rate . . . . . . . . . . . . . . . . . . . . . . . . . | 1.39% | 1.62% | 1.81% | 2.04% |
| Total issued: | | | | |
| Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $215,784 | $241,450 | $525,460 | $731,235 |
| Weighted-average interest rate . . . . . . . . . . . . . . . . . . . . . . . . . | 0.60% | 1.03% | 0.65% | 1.08% |
| Paid off during the period: [1] | | | | |
| Short-term: | | | | |
| Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $102,760 | $139,706 | $320,962 | $370,713 |
| Weighted-average interest rate . . . . . . . . . . . . . . . . . . . . . . . . . | 0.16% | 0.23% | 0.21% | 0.23% |
| Long-term: | | | | |
| Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 93,274 | $132,407 | $242,852 | $316,009 |
| Weighted-average interest rate . . . . . . . . . . . . . . . . . . . . . . . . . | 1.96% | 2.91% | 2.49% | 3.15% |
| Total paid off: | | | | |
| Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $196,034 | $272,113 | $563,814 | $686,722 |
| Weighted-average interest rate . . . . . . . . . . . . . . . . . . . . . . . . . | 1.01% | 1.54% | 1.19% | 1.57% |

[1] Consists of all payments on debt, including regularly scheduled principal payments, payments at maturity, payments resulting from calls and payments for any other repurchases.

Debt funding activity in the third quarter and first nine months of 2011 decreased compared with the third quarter and first nine months of 2010 primarily due to lower funding needs as a result of (1) a reduction in the size of our mortgage portfolio pursuant to the requirements of the senior preferred stock purchase agreement, (2) a decrease in our redemption of debt with higher interest rates, which we replaced with issuances of debt with lower interest rates, and (3) a decrease in our purchases of delinquent loans from MBS trusts. Additionally, our debt funding needs were lower than would otherwise have been required as a result of funds we received from Treasury under the senior preferred stock purchase agreement.

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. For more information on GSE reform, see "Legislative and Regulatory Developments—GSE Reform."

In addition, due to our reliance on the U.S. government's support, our access to debt funding or the cost of our debt funding also could be materially adversely affected by a change or perceived change in the creditworthiness of the U.S. government. A downgrade in our credit ratings could reduce demand for our debt securities and increase our borrowing costs. Standard & Poor's Ratings Services' ("S&P") downgrade of our credit rating on August 8, 2011, which was a result of a similar action on the U.S. government's sovereign

TREASURY-1977

credit rating, has not adversely affected our access to debt funding or the cost of our debt funding. See our discussion of credit ratings in "Risk Factors" for information about factors that may lead to the U.S. government's long-term debt rating being lowered, and "Credit Ratings" below for further discussion of our dependence on our credit ratings.

Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations. See "Risk Factors" for a discussion of the risks we face relating to (1) the uncertain future of our company; (2) our reliance on the issuance of debt securities to obtain funds for our operations; and (3) our liquidity contingency plans.

*Outstanding Debt*

Total outstanding debt of Fannie Mae includes federal funds purchased and securities sold under agreements to repurchase and short-term and long-term debt, excluding debt of consolidated trusts.

As of September 30, 2011, our outstanding short-term debt, based on its original contractual maturity, as a percentage of our total outstanding debt increased to 26% from 19% as of December 31, 2010. For information on our outstanding debt maturing within one year, including the current portion of our long-term debt, as a percentage of our total debt, see "Maturity Profile of Outstanding Debt of Fannie Mae." In addition, the weighted-average interest rate on our long-term debt, based on its original contractual maturity, decreased to 2.58% as of September 30, 2011 from 2.77% as of December 31, 2010.

Pursuant to the terms of the senior preferred stock purchase agreement, our outstanding debt limit is 120% of the amount of mortgage assets we were allowed to own on December 31 of the immediately preceding calendar year. Our debt limit under the senior preferred stock purchase agreement was reduced to $972 billion in 2011. As of September 30, 2011, our aggregate indebtedness totaled $755.2 billion, which was $216.8 billion below our debt limit. The calculation of our indebtedness for purposes of complying with our debt limit reflects the unpaid principal balance and excludes debt basis adjustments and debt of consolidated trusts. Because of our debt limit, we may be restricted in the amount of debt we issue to fund our operations.

Table 30 displays information as of September 30, 2011 and December 31, 2010 on our outstanding short-term and long-term debt based on its original contractual terms.

TREASURY-1978

**Table 30:   Outstanding Short-Term Borrowings and Long-Term Debt[1]**

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | September 30, 2011 | | | December 31, 2010 | | |
| | Maturities | Outstanding | Weighted-Average Interest Rate | Maturities | Outstanding | Weighted-Average Interest Rate |
| | | (Dollars in millions) | | | | |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . | — | $ — | —% | — | $ 52 | 2.20% |
| Short-term debt: | | | | | | |
| Fixed-rate: | | | | | | |
| Discount notes . . . . . . . . . . . . . . . . . . | — | $ 193,385 | 0.13% | — | $ 151,500 | 0.32% |
| Foreign exchange discount notes . . . . . . | — | 333 | 2.01 | — | 384 | 2.43 |
| Total short-term debt of Fannie Mae[2] . . . . . | | 193,718 | 0.14 | | 151,884 | 0.32 |
| Debt of consolidated trusts . . . . . . . . . . . | — | 5,004 | 0.19 | — | 5,359 | 0.23 |
| Total short-term debt . . . . . . . . . . . . . . . . | | $ 198,722 | 0.14% | | $ 157,243 | 0.32% |
| Long-term debt: | | | | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds . . . . . . . . . | 2011 - 2030 | $ 281,876 | 2.90% | 2011 - 2030 | $ 300,344 | 3.20% |
| Medium-term notes. . . . . . . . . . . . . . . | 2011 - 2021 | 153,166 | 1.81 | 2011 - 2020 | 199,266 | 2.13 |
| Foreign exchange notes and bonds . . . . . | 2021 - 2028 | 667 | 5.22 | 2017 - 2028 | 1,177 | 6.21 |
| Other[3] . . . . . . . . . . . . . . . . . . . . . . . . | 2011 - 2040 | 44,241 | 5.59 | 2011 - 2040 | 44,893 | 5.64 |
| Total senior fixed . . . . . . . . . . . . . . | | 479,950 | 2.80 | | 545,680 | 3.02 |
| Senior floating: | | | | | | |
| Medium-term notes. . . . . . . . . . . . . . . | 2011 - 2016 | 62,970 | 0.30 | 2011 - 2015 | 72,039 | 0.31 |
| Other[3] . . . . . . . . . . . . . . . . . . . . . . . . | 2020 - 2037 | 421 | 6.61 | 2020 - 2037 | 386 | 4.92 |
| Total senior floating. . . . . . . . . . . . . | | 63,391 | 0.33 | | 72,425 | 0.34 |
| Subordinated fixed-rate: | | | | | | |
| Qualifying subordinated[4] . . . . . . . . . | 2012 - 2014 | 4,893 | 5.08 | 2011 - 2014 | 7,392 | 5.47 |
| Subordinated debentures . . . . . . . . . . . | 2019 | 2,851 | 9.91 | 2019 | 2,663 | 9.91 |
| Total subordinated fixed-rate . . . . . . . | | 7,744 | 6.86 | | 10,055 | 6.65 |
| Total long-term debt of Fannie Mae[5] . . . . . | | 551,085 | 2.58 | | 628,160 | 2.77 |
| Debt of consolidated trusts[3] . . . . . . . . . | 2011 - 2051 | 2,441,969 | 4.40 | 2011 - 2051 | 2,411,597 | 4.59 |
| Total long-term debt . . . . . . . . . . . . . . . . | | $2,993,054 | 4.06% | | $3,039,757 | 4.22% |
| Outstanding callable debt of Fannie Mae[6]. . . | | $ 158,150 | 2.40% | | $ 219,804 | 2.53% |

[1]   Outstanding debt amounts and weighted-average interest rates reported in this table include the effect of unamortized discounts, premiums and other cost basis adjustments. Reported amounts include fair value gains and losses associated with debt that we elected to carry at fair value. The unpaid principal balance of outstanding debt of Fannie Mae, which excludes unamortized discounts, premiums and other cost basis adjustments and debt of consolidated trusts, totaled $754.2 billion and $792.6 billion as of September 30, 2011 and December 31, 2010, respectively.

[2]   Short-term debt of Fannie Mae consists of borrowings with an original contractual maturity of one year or less and, therefore, does not include the current portion of long-term debt. Reported amounts include a net discount and other cost basis adjustments of $77 million and $128 million as of September 30, 2011 and December 31, 2010, respectively.

[3]   Includes a portion of structured debt instruments that is reported at fair value.

[4]   Consists of subordinated debt with an interest deferral feature.

[5]   Long-term debt of Fannie Mae consists of borrowings with an original contractual maturity of greater than one year. Reported amounts include the current portion of long-term debt that is due within one year, which totaled $99.9 billion and $95.4 billion as of September 30, 2011 and December 31, 2010, respectively. Reported amounts also include

TREASURY-1979

unamortized discounts, premiums and other cost basis adjustments of $9.5 billion and $12.4 billion as of September 30, 2011 and December 31, 2010, respectively. The unpaid principal balance of long-term debt of Fannie Mae, which excludes unamortized discounts, premiums, fair value adjustments and other cost basis adjustments and amounts related to debt of consolidated trusts, totaled $560.4 billion and $640.5 billion as of September 30, 2011 and December 31, 2010, respectively.

(6)  Consists of long-term callable debt of Fannie Mae that can be paid off in whole or in part at our option at any time on or after a specified date. Includes the unpaid principal balance, and excludes unamortized discounts, premiums and other cost basis adjustments.

*Maturity Profile of Outstanding Debt of Fannie Mae*

Table 31 presents the maturity profile, as of September 30, 2011, of our outstanding debt maturing within one year, by month, including amounts we have announced for early redemption. Our outstanding debt maturing within one year, including the current portion of our long-term debt, increased as a percentage of our total outstanding debt, excluding debt of consolidated trusts and federal funds purchased and securities sold under agreements to repurchase, to 39% as of September 30, 2011, compared with 32% as of December 31, 2010. The weighted-average maturity of our outstanding debt that is maturing within one year was 139 days as of September 30, 2011, compared with 116 days as of December 31, 2010.

**Table 31:    Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year(1)**



(1)  Includes unamortized discounts, premiums and other cost basis adjustments of $212 million as of September 30, 2011. Excludes debt of consolidated trusts maturing within one year of $8.0 billion as of September 30, 2011.

Table 32 presents the maturity profile, as of September 30, 2011, of the portion of our long-term debt that matures in more than one year, on a quarterly basis for one year and on an annual basis thereafter, excluding amounts we have announced for early redemption within one year. The weighted-average maturity of our outstanding debt maturing in more than one year was approximately 57 months as of September 30, 2011 compared with approximately 58 months as of December 31, 2010.

TREASURY-1980

**Table 32:   Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year**[1]



[1] Includes unamortized discounts, premiums and other cost basis adjustments of $9.3 billion as of September 30, 2011. Excludes debt of consolidated trusts of $2.4 trillion as of September 30, 2011.

We intend to repay our short-term and long-term debt obligations as they become due primarily through proceeds from the issuance of additional debt securities. We also intend to use funds we receive from Treasury under the senior preferred stock purchase agreement to pay our debt obligations and to pay dividends on the senior preferred stock.

### Cash and Other Investments Portfolio

Table 33 provides information on the composition of our cash and other investments portfolio for the periods indicated.

**Table 33:   Cash and Other Investments Portfolio**

| | As of | |
|---|---|---|
| | September 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Cash and cash equivalents | $ 24,307 | $17,297 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 35,950 | 11,751 |
| Non-mortgage-related securities: | | |
| U.S. Treasury securities[1] | 40,755 | 27,432 |
| Asset-backed securities[2] | 2,465 | 5,321 |
| Total non-mortgage-related securities | 43,220 | 32,753 |
| Total cash and other investments | $103,477 | $61,801 |

[1] Excludes $1.1 billion and $4.0 billion of U.S. Treasury securities which are a component of cash equivalents as of September 30, 2011 and December 31, 2010, respectively, as these securities had a maturity at the date of acquisition of three months or less.

[2] Includes securities primarily backed by credit cards loans, student loans and automobile loans.

Our cash and other investments portfolio increased from December 31, 2010 to September 30, 2011. We have increased the amount of cash and highly liquid non-mortgage securities held in our portfolio to further bolster our liquidity position.

TREASURY-1981

*Credit Ratings*

Our credit ratings from the major credit ratings organizations, as well as the credit ratings of the U.S. government, are primary factors that could affect our ability to access the capital markets and our cost of funds. In addition, our credit ratings are important when we seek to engage in certain long-term transactions, such as derivative transactions.

On August 5, 2011, S&P lowered the long-term sovereign credit rating on the U.S. to "AA+." As a result of this action, and because we directly rely on the U.S. government for capital support, on August 8, 2011, S&P lowered our long-term senior debt rating to "AA+" with a negative outlook. Previously, our long-term senior debt had been rated by S&P as "AAA" and had been on CreditWatch Negative. S&P affirmed our short-term senior debt rating of "A-1+" and removed it from CreditWatch Negative. If S&P further lowers the U.S. government's sovereign credit rating, we expect that it would lower our long-term debt rating correspondingly.

Fitch Ratings ("Fitch") affirmed its rating and stable outlook of our long-term debt and Moody's Investors Service ("Moody's") confirmed the U.S. government's rating and our long-term debt ratings. Moody's also removed the designation that these ratings were under review for possible downgrade and revised the rating outlook for both the U.S. government's rating and our long-term debt ratings to negative.

S&P, Moody's and Fitch have all indicated that, if they were to lower the sovereign credit ratings on the U.S, they would likely lower their ratings on the debt of Fannie Mae and certain other government-related entities. We cannot predict whether one or more of these ratings agencies will lower our debt ratings in the future. See "Risk Factors" for a discussion of the possibility of further downgrades and the risks to our business relating to a decrease in our credit ratings, which could include an increase in our borrowing costs, limits on our ability to issue debt, and additional collateral requirements under our derivatives contracts and other borrowing arrangements.

Table 34 displays the credit ratings issued by the three major credit rating agencies as of November 3, 2011.

**Table 34:  Fannie Mae Credit Ratings**

|  | As of November 3, 2011 | | |
|---|---|---|---|
|  | **S&P** | **Moody's** | **Fitch** |
| Long-term senior debt . . . . . | AA+ | Aaa | AAA |
| Short-term senior debt . . . . . | A-1+ | P-1 | F1+ |
| Qualifying subordinated debt . . . . . . . . . . . . . . . . | A | Aa2 | AA- |
| Preferred stock . . . . . . . . . . | C | Ca | C/RR6 |
| Bank financial strength rating . . . . . . . . . . . . . . . | — | E+ | — |
| Outlook . . . . . . . . . . . . . . . | Negative (for Long Term Senior Debt and Qualifying Subordinated Debt) | Negative (for Long Term Senior Debt and Qualifying Subordinated Debt) | Stable (for AAA rated Long Term Issuer Default Rating) |

*Cash Flows*

*Nine Months Ended September 30, 2011.*   Cash and cash equivalents increased from December 31, 2010 by $7.0 billion to $24.3 billion as of September 30, 2011. Net cash generated from investing activities totaled $327.8 billion, resulting primarily from proceeds received from repayments of loans held for investment. These net cash inflows were offset by net cash used in operating activities of $6.7 billion and net cash used in financing activities of $314.1 billion primarily attributable to a significant amount of debt redemptions in excess of proceeds received from the issuances of debt as well as proceeds received from Treasury under the senior preferred stock purchase agreement.

*Nine Months Ended September 30, 2010.*   Cash and cash equivalents increased from December 31, 2009 by $4.6 billion to $11.4 billion as of September 30, 2010. Net cash generated from investing activities totaled

TREASURY-1982

$381.4 billion, resulting primarily from proceeds received from repayments of loans held for investment. These net cash inflows were partially offset by net cash used in operating activities of $42.4 billion resulting primarily from purchases of trading securities. The net cash used in financing activities of $334.4 billion was primarily attributable to a significant amount of debt redemptions in excess of proceeds received from the issuances of debt as well as proceeds received from Treasury under the senior preferred stock purchase agreement.

**Capital Management**

*Regulatory Capital*

FHFA has announced that, during the conservatorship, our existing statutory and FHFA-directed regulatory capital requirements will not be binding and FHFA will not issue quarterly capital classifications. We submit capital reports to FHFA during the conservatorship and FHFA monitors our capital levels. We report our minimum capital requirement, core capital and GAAP net worth in our periodic reports on Form 10-Q and Form 10-K, and FHFA also reports them on its website. FHFA is not reporting on our critical capital, risk-based capital or subordinated debt levels during the conservatorship. For information on our minimum capital requirements see "Note 11, Regulatory Capital Requirements."

*Senior Preferred Stock Purchase Agreement*

As a result of the covenants under the senior preferred stock purchase agreement, Treasury's ownership of the warrant to purchase up to 79.9% of the total shares of our common stock outstanding and the uncertainty regarding our future, we effectively no longer have access to equity funding except through draws under the senior preferred stock purchase agreement.

Under the senior preferred stock purchase agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. We have received a total of $103.8 billion from Treasury pursuant to the senior preferred stock purchase agreement as of September 30, 2011. The Acting Director of FHFA will submit a request for $7.8 billion from Treasury under the senior preferred stock purchase agreement to eliminate our net worth deficit as of September 30, 2011, and request the receipt of those funds on or prior to December 31, 2011. Upon receipt of the requested funds, the aggregate liquidation preference of the senior preferred stock, including the initial aggregate liquidation preference of $1.0 billion, will equal $112.6 billion.

We expect to have a net worth deficit in future periods and therefore will be required to obtain additional funding from Treasury pursuant to the senior preferred stock purchase agreement.

The senior preferred stock purchase agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any net worth deficiencies attributable to periods during 2010, 2011 and 2012. If we do not have a positive net worth as of December 31, 2012, then the amount of funding available under the senior preferred stock purchase agreement after 2012 will be $124.8 billion ($200 billion less $75.2 billion in cumulative draws for net worth deficiencies through December 31, 2009).

In the event we have a positive net worth as of December 31, 2012, then the amount of funding available after 2012 under the senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, as follows:

- If our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less our positive net worth as of December 31, 2012.

- If our positive net worth as of December 31, 2012 is greater than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011 and 2012.

TREASURY-1983

As of November 7, 2011, the amount of the quarterly commitment fee payable by us to Treasury under the senior preferred stock purchase agreement had not been established; however, Treasury has waived the quarterly commitment fee under the senior preferred stock purchase agreement for each quarter of 2011 due to the continued fragility of the U.S. mortgage market and Treasury's belief that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury stated that it will reevaluate the situation during the next calendar quarter to determine whether to set the quarterly commitment fee for the first quarter of 2012.

### Dividends

Holders of the senior preferred stock are entitled to receive, when, as and if declared by our Board of Directors, cumulative quarterly cash dividends at the annual rate of 10% per year on the then-current liquidation preference of the senior preferred stock. Treasury is the current holder of our senior preferred stock. As conservator and under our charter, FHFA has authority to declare and approve dividends on the senior preferred stock. If at any time we do not pay cash dividends on the senior preferred stock when they are due, then immediately following the period we did not pay dividends and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year. Dividends on the senior preferred stock that are not paid in cash for any dividend period will accrue and be added to the liquidation preference of the senior preferred stock.

Our third quarter dividend of $2.5 billion was declared by the conservator and paid by us on September 30, 2011. Upon receipt of the additional funds from Treasury in December 2011 that FHFA will request on our behalf, the annualized dividend on the senior preferred stock will be $11.3 billion based on the 10% dividend rate. The level of dividends on the senior preferred stock will increase in future periods if, as we expect, the conservator requests additional funds on our behalf from Treasury under the senior preferred stock purchase agreement.

## OFF-BALANCE SHEET ARRANGEMENTS

Our maximum potential exposure to credit losses relating to our outstanding and unconsolidated Fannie Mae MBS and other financial guarantees is primarily represented by the unpaid principal balance of the mortgage loans underlying outstanding and unconsolidated Fannie Mae MBS and other financial guarantees of $58.9 billion as of September 30, 2011 and $56.9 billion as of December 31, 2010.

Under the temporary credit and liquidity facilities program in which we provide assistance to housing finance agencies ("HFAs") and in which Treasury has purchased participation interests, our outstanding commitments totaled $3.3 billion as of September 30, 2011 and $3.7 billion as of December 31, 2010. Our total outstanding liquidity commitments to advance funds for securities backed by multifamily housing revenue bonds totaled $17.4 billion as of September 30, 2011 and $17.8 billion as of December 31, 2010. As of both September 30, 2011 and December 31, 2010, there were no liquidity guarantee advances outstanding. For a description of these programs, see "MD&A—Off-Balance Sheet Arrangements—Treasury Housing Finance Agency Initiative" in our 2010 Form 10-K.

## RISK MANAGEMENT

Our business activities expose us to the following three major categories of financial risk: credit risk, market risk (including interest rate and liquidity risk) and operational risk. We seek to manage these risks and mitigate our losses by using an established risk management framework. Our risk management framework is intended to provide the basis for the principles that govern our risk management activities. In addition to these financial risks, there is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, which we discuss in more detail in "Legislative and Regulatory Developments—GSE Reform" and "Risk Factors." We are also subject to a number of other risks that could adversely impact our business, financial condition, earnings and cash flow, including model, legal and

TREASURY-1984

reputational risks that may arise due to a failure to comply with laws, regulations or ethical standards and codes of conduct applicable to our business activities and functions.

In this section we provide an update on our management of our major risk categories. For a more complete discussion of the financial risks we face and how we manage credit risk, market risk and operational risk, see "MD&A—Risk Management" in our 2010 Form 10-K and "Risk Factors" in our 2010 Form 10-K and in this report.

## Credit Risk Management

We are generally subject to two types of credit risk: mortgage credit risk and institutional counterparty credit risk. Continuing adverse market conditions have resulted in significant exposure to mortgage and institutional counterparty credit risk. The metrics used to measure credit risk are generated using internal models. Our internal models require numerous assumptions and there are inherent limitations in any methodology used to estimate macroeconomic factors such as home prices, unemployment and interest rates and their impact on borrower behavior. When market conditions change rapidly and dramatically, the assumptions of our models may no longer accurately capture or reflect the changing conditions. On a continuous basis, management makes judgments about the appropriateness of the risk assessments indicated by the models. See "Risk Factors" in our 2010 Form 10-K for a discussion of the risks associated with our use of models.

### *Mortgage Credit Risk Management*

Mortgage credit risk is the risk that a borrower will fail to make required mortgage payments. We are exposed to credit risk on our mortgage credit book of business because we either hold mortgage assets, have issued a guaranty in connection with the creation of Fannie Mae MBS backed by mortgage assets or provided other credit enhancements on mortgage assets. While our mortgage credit book of business includes all of our mortgage-related assets, both on- and off-balance sheet, our guaranty book of business excludes non-Fannie Mae mortgage-related securities held in our portfolio for which we do not provide a guaranty.

#### *Mortgage Credit Book of Business*

Table 35 displays the composition of our entire mortgage credit book of business as of the dates indicated. Our total single-family mortgage credit book of business accounted for 93% of our total mortgage credit book of business as of both September 30, 2011 and December 31, 2010.

**Table 35:   Composition of Mortgage Credit Book of Business[1]**

| | As of September 30, 2011 | | | As of December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Single-Family | Multifamily | Total | Single-Family | Multifamily | Total |
| | (Dollars in millions) | | | | | |
| Mortgage loans and Fannie Mae MBS[2] . . | $2,803,667 | $174,779 | $2,978,446 | $2,826,994 | $170,552 | $2,997,546 |
| Unconsolidated Fannie Mae MBS, held by third parties[3] . . . . . . . . . . . . . . . . . . | 17,899 | 1,754 | 19,653 | 19,468 | 1,855 | 21,323 |
| Other credit guarantees[4] . . . . . . . . . . . | 22,556 | 16,726 | 39,282 | 18,625 | 16,994 | 35,619 |
| Guaranty book of business . . . . . . . . . | $2,844,122 | $193,259 | $3,037,381 | $2,865,087 | $189,401 | $3,054,488 |
| Agency mortgage-related securities[5] . . . . | 16,574 | 33 | 16,607 | 18,797 | 24 | 18,821 |
| Other mortgage-related securities . . . . . . . | 44,330 | 32,732 | 77,062 | 48,678 | 34,205 | 82,883 |
| Mortgage credit book of business . . . . . | $2,905,026 | $226,024 | $3,131,050 | $2,932,562 | $223,630 | $3,156,192 |
| **Guaranty Book of Business Detail:** | | | | | | |
| Conventional Guaranty Book of Business[6] . . . . . . . . . . . . . . . . . . . | $2,771,191 | $190,760 | $2,961,951 | $2,790,590 | $186,712 | $2,977,302 |
| Government Guaranty Book of Business[7] . . . . . . . . . . . . . . . . . . | $    72,931 | $    2,499 | $    75,430 | $    74,497 | $    2,689 | $    77,186 |

69

---

(1) Based on unpaid principal balance. Prior period amounts have been reclassified to conform to the current period presentation.

(2) Consists of mortgage loans and Fannie Mae MBS recognized in our condensed consolidated balance sheets. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

(3) Reflects unpaid principal balance of unconsolidated Fannie Mae MBS, held by third-party investors. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

(4) Includes single-family and multifamily credit enhancements that we have provided and that are not otherwise reflected in the table.

(5) Consists of mortgage-related securities issued by Freddie Mac and Ginnie Mae.

(6) Refers to mortgage loans and mortgage-related securities that are not guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies.

(7) Refers to mortgage loans and mortgage-related securities guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies.

In the following sections, we discuss the mortgage credit risk of the single-family and multifamily loans in our guaranty book of business. The credit statistics reported below, unless otherwise noted, pertain generally to the portion of our guaranty book of business for which we have access to detailed loan-level information, which constituted approximately 99% of both our single-family conventional guaranty book of business and our multifamily guaranty book of business, excluding defeased loans, as of September 30, 2011 and December 31, 2010. We typically obtain this data from the sellers or servicers of the mortgage loans in our guaranty book of business and receive representations and warranties from them as to the accuracy of the information. While we perform various quality assurance checks by sampling loans to assess compliance with our underwriting and eligibility criteria, we do not independently verify all reported information and we rely on lender representations regarding the accuracy of the characteristics of loans in our guaranty book of business. See "Risk Factors" in our 2010 Form 10-K for a discussion of the risk that we could experience mortgage fraud as a result of this reliance on lender representations.

### Single-Family Mortgage Credit Risk Management

Our strategy in managing single-family mortgage credit risk consists of four primary components: (1) our acquisition and servicing policies and underwriting and servicing standards, including the use of credit enhancements; (2) portfolio diversification and monitoring; (3) management of problem loans; and (4) REO management. These strategies, which we discuss below, may increase our expenses and may not be effective in reducing our credit-related expenses or credit losses. We provide information on our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Expenses."

The credit risk profile of our single-family mortgage credit book of business is influenced by, among other things, the credit profile of the borrower, features of the loan, loan product type, the type of property securing the loan and the housing market and general economy. We focus more on loans that we believe pose a higher risk of default, which typically have been loans associated with higher mark-to-market LTV ratios, loans to borrowers with lower FICO credit scores and certain higher risk loan product categories, such as Alt-A loans. These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment.

Because we believe we have limited credit exposure on our government loans, the single-family credit statistics we focus on and report in the sections below generally relate to our single-family conventional guaranty book of business, which represents the substantial majority of our total single-family guaranty book of business.

We provide information on the performance of non-Fannie Mae mortgage-related securities held in our portfolio, including the impairment that we have recognized on these securities, in "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities."

TREASURY-1986

*Single-Family Acquisition and Servicing Policies and Underwriting and Servicing Standards*

In evaluating our single-family mortgage credit risk, we closely monitor changes in housing and economic conditions and the impact of those changes on the credit risk profile of our single-family mortgage credit book of business. We regularly update our underwriting standards and eligibility guidelines to take into consideration changing market conditions.

Our mortgage servicers are the primary points of contact for borrowers and perform a vital role in our efforts to reduce defaults and pursue foreclosure alternatives. In the second quarter of 2011, we issued new standards for mortgage servicers regarding the management of delinquent loans, default prevention and foreclosure time frames under FHFA's directive to align GSE policies for servicing delinquent mortgages. The new standards, reinforced by new incentives and compensatory fees, require servicers to take a more consistent approach for homeowner communications, loan modifications and other workouts, and, when necessary, foreclosures. The new standards are designed to: (1) achieve effective contact with the borrower, including creating a uniform standard for communicating with the homeowner, determining reasons for delinquency and assessing their ability to pay, and educating homeowners on the availability of foreclosure prevention options; (2) set clear timelines and establish clear and consistent policies in the foreclosure process; and (3) provide incentives to servicers to complete loan workouts earlier in the homeowner's delinquency and charge servicers compensatory fees when they fail to have the proper contact with the borrower. We believe these standards, which became effective October 1, 2011, will bring greater consistency, clarity, fairness and efficiency to the process, help improve servicer performance, and hold servicers accountable for their effectiveness in assisting homeowners.

In addition to these new standards, we have taken other steps to improve the servicing of our delinquent loans including: (1) updating our Servicing Guide, which should improve our servicers' ability to understand and comply with our requirements and allow them to complete workouts earlier in the delinquency process, thereby avoiding foreclosure; (2) implementing our STAR program, a servicer performance management system designed to encourage improvements in customer service and foreclosure prevention outcomes for homeowners by rating servicers on their performance in these areas; and (3) transferring servicing on loan populations that include loans with higher-risk characteristics to special servicers with whom we have worked to develop high-touch protocols for servicing these loans. For example, in the third quarter of 2011, we agreed to purchase from Bank of America, N.A. the mortgage servicing rights associated with up to $74 billion in unpaid principal balance of mortgage loans in our single-family guaranty book of business, which represented approximately 11% of our servicing portfolio with Bank of America as of September 30, 2011. We believe retaining special servicers to service these loans using high-touch protocols will reduce our future credit losses on the transferred loan portfolio, while enabling Bank of America to better focus on our remaining portfolio with them.

For discussion of our acquisition policy, underwriting standards, and use of mortgage insurance as a form of credit enhancement, see "MD&A—Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management" in our 2010 Form 10-K. For a discussion of our aggregate mortgage insurance coverage as of September 30, 2011 and December 31, 2010, see "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management—Mortgage Insurers."

*Single-Family Portfolio Diversification and Monitoring*

Diversification within our single-family mortgage credit book of business by product type, loan characteristics and geography is an important factor that influences credit quality and performance and may reduce our credit risk. We monitor various loan attributes, in conjunction with housing market and economic conditions, to determine if our pricing and our eligibility and underwriting criteria accurately reflect the risk associated with loans we acquire or guarantee. In some cases, we may decide to significantly reduce our participation in riskier loan product categories. We also review the payment performance of loans in order to help identify potential problem loans early in the delinquency cycle and to guide the development of our loss mitigation strategies.

71

Table 36 presents our single-family conventional business volumes and our single-family conventional guaranty book of business for the periods indicated, based on certain key risk characteristics that we use to evaluate the risk profile and credit quality of our single-family loans.

**Table 36:   Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business[1]**

| | Percent of Single-Family Conventional Business Volume[2] | | | | Percent of Single-Family Conventional Guaranty Book of Business[3][4] As of | |
|---|---|---|---|---|---|---|
| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | | September 30, 2011 | December 31, 2010 |
| | 2011 | 2010 | 2011 | 2010 | | |
| Original LTV ratio:[5] | | | | | | |
| <= 60% . . . . . . . . . . . . . | 26% | 30% | 28% | 30% | 24% | 24% |
| 60.01% to 70% . . . . . . . . . | 14 | 16 | 15 | 15 | 16 | 16 |
| 70.01% to 80% . . . . . . . . | 38 | 40 | 38 | 39 | 40 | 41 |
| 80.01% to 90%[6] . . . . . . . | 10 | 8 | 9 | 9 | 10 | 9 |
| 90.01% to 100%[6] . . . . . . . | 9 | 5 | 7 | 5 | 9 | 9 |
| Greater than 100%[6] . . . . . | 3 | 1 | 3 | 2 | 1 | 1 |
| Total . . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average . . . . . . | 71% | 68% | 70% | 69% | 71% | 71% |
| Average loan amount . . . . . . . | $202,476 | $218,328 | $205,186 | $219,551 | $155,769 | $155,531 |
| Estimated mark-to-market LTV ratio:[7] | | | | | | |
| <= 60% . . . . . . . . . . . . . | | | | | 28% | 28% |
| 60.01% to 70% . . . . . . . . . | | | | | 13 | 13 |
| 70.01% to 80% . . . . . . . . | | | | | 19 | 19 |
| 80.01% to 90% . . . . . . . . | | | | | 15 | 15 |
| 90.01% to 100% . . . . . . . | | | | | 9 | 9 |
| Greater than 100% . . . . . . . | | | | | 16 | 16 |
| Total . . . . . . . . . . . . . . | | | | | 100% | 100% |
| Weighted average . . . . . . | | | | | 78% | 77% |
| Product type: | | | | | | |
| Fixed-rate:[8] | | | | | | |
| Long-term . . . . . . . . . . . | 67% | 72% | 69% | 72% | 72% | 74% |
| Intermediate-term . . . . . | 25 | 22 | 24 | 21 | 15 | 14 |
| Interest-only . . . . . . . . . . | * | * | * | * | 2 | 2 |
| Total fixed-rate . . . . . . | 92 | 94 | 93 | 93 | 89 | 90 |
| Adjustable-rate: | | | | | | |
| Interest-only . . . . . . . . . . | 1 | 1 | 1 | 2 | 3 | 4 |
| Other ARMs . . . . . . . . | 7 | 5 | 6 | 5 | 8 | 6 |
| Total adjustable-rate. . . | 8 | 6 | 7 | 7 | 11 | 10 |
| Total . . . . . . . . . . . . . | 100% | 100% | 100% | 100% | 100% | 100% |

TREASURY-1988

| | Percent of Single-Family Conventional Business Volume[2] | | | | Percent of Single-Family Conventional Guaranty Book of Business[3][4] As of | |
| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | | | |
| | 2011 | 2010 | 2011 | 2010 | September 30, 2011 | December 31, 2010 |
|---|---|---|---|---|---|---|
| **Number of property units:** | | | | | | |
| 1 unit | 97% | 98% | 97% | 98% | 97% | 97% |
| 2-4 units | 3 | 2 | 3 | 2 | 3 | 3 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Property type:** | | | | | | |
| Single-family homes | 91% | 92% | 91% | 91% | 91% | 91% |
| Condo/Co-op | 9 | 8 | 9 | 9 | 9 | 9 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy type:** | | | | | | |
| Primary residence | 88% | 92% | 88% | 91% | 89% | 90% |
| Second/vacation home | 5 | 4 | 5 | 4 | 5 | 4 |
| Investor | 7 | 4 | 7 | 5 | 6 | 6 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **FICO credit score at origination:** | | | | | | |
| < 620 | 1% | *% | 1% | 1% | 3% | 4% |
| 620 to < 660 | 2 | 2 | 2 | 2 | 7 | 7 |
| 660 to < 700 | 8 | 6 | 8 | 7 | 14 | 15 |
| 700 to < 740 | 17 | 16 | 17 | 17 | 21 | 21 |
| >= 740 | 72 | 76 | 72 | 73 | 55 | 53 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average | 759 | 764 | 760 | 760 | 737 | 735 |
| **Loan purpose:** | | | | | | |
| Purchase | 32% | 27% | 26% | 26% | 32% | 33% |
| Cash-out refinance | 15 | 19 | 17 | 20 | 28 | 29 |
| Other refinance | 53 | 54 | 57 | 54 | 40 | 38 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Geographic concentration:[9]** | | | | | | |
| Midwest | 15% | 16% | 15% | 15% | 15% | 15% |
| Northeast | 19 | 19 | 20 | 20 | 19 | 19 |
| Southeast | 19 | 18 | 20 | 18 | 24 | 24 |
| Southwest | 16 | 15 | 16 | 15 | 15 | 15 |
| West | 31 | 32 | 29 | 32 | 27 | 27 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Origination year:** | | | | | | |
| <= 2001 | | | | | 2% | 2% |
| 2002 | | | | | 3 | 3 |
| 2003 | | | | | 9 | 11 |
| 2004 | | | | | 6 | 7 |
| 2005 | | | | | 7 | 9 |
| 2006 | | | | | 7 | 8 |
| 2007 | | | | | 10 | 12 |
| 2008 | | | | | 8 | 9 |
| 2009 | | | | | 18 | 21 |
| 2010 | | | | | 20 | 18 |
| 2011 | | | | | 10 | — |
| Total | | | | | 100% | 100% |

73

---

\*   Represents less than 0.5% of single-family conventional business volume or book of business.

[1]   We reflect second lien mortgage loans in the original LTV ratio calculation only when we own both the first and second lien mortgage loans or we own only the second lien mortgage loan. Second lien mortgage loans represented less than 0.5% of our single-family conventional guaranty book of business as of both September 30, 2011 and December 31, 2010. Second lien mortgage loans held by third parties are not reflected in the original LTV or mark-to-market LTV ratios in this table.

[2]   Calculated based on unpaid principal balance of single-family loans for each category at time of acquisition. Single-Family business volume refers to both single-family mortgage loans we purchase for our mortgage portfolio and single-family mortgage loans we guarantee.

[3]   Calculated based on the aggregate unpaid principal balance of single-family loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business as of the end of each period.

[4]   Our single-family conventional guaranty book of business includes jumbo-conforming and high-balance loans that represented approximately 4.6% of our single-family conventional guaranty book of business as of September 30, 2011 and 3.9% as of December 31, 2010. See "Business—Our Charter and Regulation of Our Activities—Charter Act—Loan Standards" in our 2010 Form 10-K and "Risk Management—Credit Risk Management—Single Family Mortgage Credit Risk Management—Credit Profile Summary" in this report for additional information on loan limits.

[5]   The original LTV ratio generally is based on the original unpaid principal balance of the loan divided by the appraised property value reported to us at the time of acquisition of the loan. Excludes loans for which this information is not readily available.

[6]   We purchase loans with original LTV ratios above 80% to fulfill our mission to serve the primary mortgage market and provide liquidity to the housing system. Except as permitted under Refi Plus, our charter generally requires primary mortgage insurance or other credit enhancement for loans that we acquire that have a LTV ratio over 80%.

[7]   The aggregate estimated mark-to-market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value. Excludes loans for which this information is not readily available.

[8]   Long-term fixed-rate consists of mortgage loans with maturities greater than 15 years, while intermediate-term fixed-rate has maturities equal to or less than 15 years. Loans with interest-only terms are included in the interest-only category regardless of their maturities.

[9]   Midwest consists of IL, IN, IA, MI, MN, NE, ND, OH, SD and WI. Northeast includes CT, DE, ME, MA, NH, NJ, NY, PA, PR, RI, VT and VI. Southeast consists of AL, DC, FL, GA, KY, MD, MS, NC, SC, TN, VA and WV. Southwest consists of AZ, AR, CO, KS, LA, MO, NM, OK, TX and UT. West consists of AK, CA, GU, HI, ID, MT, NV, OR, WA and WY.

## *Credit Profile Summary*

We continue to see the positive effects of actions we took beginning in 2008 to significantly strengthen our underwriting and eligibility standards and change our pricing to promote sustainable homeownership and stability in the housing market. The single-family loans we purchased or guaranteed in the first nine months of 2011 have a strong credit profile with a weighted average original LTV ratio of 70%, a weighted average FICO credit score of 760, and a product mix with a significant percentage of fully amortizing fixed-rate mortgage loans. Due to lower acquisition volume and the relatively high volume of Refi Plus loans (including HARP loans), the LTV ratios at origination for our 2011 acquisitions to date are higher than for our 2009 and 2010 acquisitions.

Whether our future acquisitions will exhibit the same credit profile as our recent acquisitions depends on many factors, including our future pricing and eligibility standards, our future objectives, mortgage insurers' eligibility standards, our future volume of Refi Plus acquisitions, which typically include higher LTV ratios and lower FICO credit scores, and future market conditions. We expect the ultimate performance of all our loans will be affected by macroeconomic trends, including unemployment, the economy, and home prices.

The credit profile of our acquisitions in the first nine months of 2011 was further influenced by our acquisitions of refinanced loans. Refinanced loans, which include Refi Plus loans, comprised 74% of our single-family acquisitions in the first nine months of 2011. Refinanced loans generally have a strong credit profile because refinancing indicates borrowers' ability to make their mortgage payment and desire to maintain homeownership, but Refi Plus loans, which may have original LTV ratios as high as 125% and in some cases lower FICO credit scores than we generally require, may not ultimately perform as well as traditional refinanced loans. However, it is too early to determine whether the performance of loans with higher risk characteristics refinanced under the Refi Plus program will perform differently from other refinanced loans. Refi Plus offers expanded refinance opportunities for eligible Fannie Mae borrowers that may help prevent

TREASURY-1990

future delinquencies and defaults. In the first quarter of 2011, our regulator granted our request for an extension of our ability to acquire loans under Refi Plus with LTV ratios greater than 80% and up to 125% for loans originated through June 2012. Approximately 19% of our total single-family conventional business volume for the first nine months of 2011 consisted of loans with LTV ratios higher than 80% at the time of purchase compared with 16% for the first nine months of 2010.

On October 24, 2011, FHFA, Fannie Mae, and Freddie Mac announced changes to HARP. While HARP previously limited eligibility to borrowers with mortgage loans that had LTV ratios no greater than 125 percent, the new HARP guidelines remove that ceiling when the refinancing is into a new fixed-rate mortgage. See "Legislative and Regulatory Developments" for a discussion on the changes to HARP.

The prolonged and severe decline in home prices has resulted in the overall estimated weighted average mark-to-market LTV ratio of our single-family conventional guaranty book of business to remain high at 78% as of September 30, 2011, and 77% as of December 31, 2010. The portion of our single-family conventional guaranty book of business with an estimated mark-to-market LTV ratio greater than 100% was 16% as of September 30, 2011 and December 31, 2010. If home prices decline further, more loans may have mark-to-market LTV ratios greater than 100%, which increases the risk of delinquency and default.

*Alt-A and Subprime Loans*

Our exposure to Alt-A and subprime loans included in our single-family conventional guaranty book of business, as defined in this section, does not include (1) our investments in private-label mortgage-related securities backed by Alt-A and subprime loans or (2) resecuritizations, or wraps, of private-label mortgage-related securities backed by Alt-A mortgage loans that we have guaranteed. See "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities" for a discussion of our exposure to private-label mortgage-related securities backed by Alt-A and subprime loans. As a result of our decision to discontinue the purchase of newly originated Alt-A loans, except for those that represent the refinancing of an existing Fannie Mae loan, we expect our acquisitions of Alt-A mortgage loans to continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A will continue to decrease over time. We are also not currently acquiring newly originated subprime loans.

We have classified a mortgage loan as Alt-A if the lender that delivered the loan to us classified the loan as Alt-A based on documentation or other features. We have classified a mortgage loan as subprime if the loan was originated by a lender specializing in subprime business or by a subprime division of a large lender. We exclude from the subprime classification loans originated by these lenders if we acquired the loans in accordance with our standard underwriting criteria, which typically require compliance by the seller with our Selling Guide (including standard representations and warranties) and/or evaluation of the loans through our Desktop Underwriter system. We apply our classification criteria in order to determine our Alt-A and subprime loan exposures; however, we have other loans with some features that are similar to Alt-A and subprime loans that we have not classified as Alt-A or subprime because they do not meet our classification criteria. The unpaid principal balance of Alt-A loans included in our single-family conventional guaranty book of business of $188.4 billion as of September 30, 2011, represented approximately 6.8% of our single-family conventional guaranty book of business. The unpaid principal balance of subprime loans included in our single-family conventional guaranty book of business of $6.0 billion as of September 30, 2011, represented approximately 0.2% of our single-family conventional guaranty book of business. See "Table 36: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for additional information on our single-family book of business.

*Jumbo-Conforming and High-Balance Loans*

The outstanding unpaid principal balance of our jumbo-conforming and high-balance loans was $125.8 billion, or 4.6% of our single-family conventional guaranty book of business, as of September 30, 2011 and $109.7 billion, or 3.9% of our single-family conventional guaranty book of business, as of December 31, 2010. The standard conforming loan limit for a one-unit property was $417,000 in 2011 and 2010. Our loan limits

were higher in specified high-cost areas, reaching as high as $729,750 for one-unit properties; however, our loan limits for loans originated after September 30, 2011 decreased in specified high-cost areas to an amount not to exceed $625,500 for one-unit properties. Unlike FHA, which is not subject to current loan limits for refinancing its existing loans above current limits, our current loan limits apply to all new acquisitions. Therefore, we expect refinances of our existing loans above current limits to be significantly reduced. See "Business—Our Charter and Regulation of Our Activities—Charter Act—Loan Standards" in our 2010 Form 10-K for additional information on our loan limits.

*Reverse Mortgages*

The outstanding unpaid principal balance of reverse mortgage whole loans and Fannie Mae MBS backed by reverse mortgage loans in our guaranty book of business was $50.9 billion as of September 30, 2011 and $50.8 billion as of December 31, 2010. The balance of our reverse mortgage loans could increase over time, as each month the scheduled and unscheduled payments, interest, mortgage insurance premium, servicing fee, and default-related costs accrue to increase the unpaid principal balance. The majority of these loans are home equity conversion mortgages insured by the federal government through the FHA. Because home equity conversion mortgages are insured by the federal government, we believe that we have limited exposure to losses on these loans. In December 2010, we communicated to our lenders that we are exiting the reverse mortgage business and will no longer acquire newly originated home equity conversion mortgages.

*Problem Loan Management*

Our problem loan management strategies are primarily focused on reducing defaults to avoid losses that would otherwise occur and pursuing foreclosure alternatives to attempt to minimize the severity of the losses we incur. If a borrower does not make required payments, or is in jeopardy of not making payments, we work with the servicers of our loans to offer workout solutions to minimize the likelihood of foreclosure as well as the severity of loss. Our loan workouts reflect our various types of home retention strategies, including loan modifications, repayment plans and forbearances, and foreclosure alternatives, including preforeclosure sales and deeds-in-lieu of foreclosure. When appropriate, we seek to move to foreclosure expeditiously. For additional discussion on our efforts to reduce defaults and credit losses, see "Executive Summary—Reducing Credit Losses on Our Legacy Book of Business."

In the following section, we present statistics on our problem loans, describe specific efforts undertaken to manage these loans and prevent foreclosures and provide metrics regarding the performance of our loan workout activities. We generally define single-family problem loans as loans that have been identified as being at imminent risk of payment default; early stage delinquent loans that are either 30 days or 60 days past due; and seriously delinquent loans, which are loans that are three or more monthly payments past due or in the foreclosure process. Unless otherwise noted, single-family delinquency data is calculated based on number of loans. We include single-family conventional loans that we own and that back Fannie Mae MBS in the calculation of the single-family delinquency rate. Percentage of book outstanding calculations are based on the unpaid principal balance of loans for each category divided by the unpaid principal balance of our total single-family guaranty book of business for which we have detailed loan-level information.

*Problem Loan Statistics*

The following table displays the delinquency status of loans in our single-family conventional guaranty book of business (based on number of loans) as of the dates indicated.

**Table 37: Delinquency Status of Single-Family Conventional Loans**

| | As of | | |
| --- | --- | --- | --- |
| | September 30, 2011 | December 31, 2010 | September 30, 2010 |
| As of period end: | | | |
| Delinquency status: | | | |
| 30 to 59 days delinquent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.16% | 2.32% | 2.40% |
| 60 to 89 days delinquent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.75 | 0.87 | 0.91 |
| Seriously delinquent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.00 | 4.48 | 4.56 |
| Percentage of seriously delinquent loans that have been delinquent for more than 180 days. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 71% | 67% | 66% |

The number of loans at risk of becoming seriously delinquent has diminished in 2011 as early stage delinquencies have decreased. As of September 30, 2011, the percentage and number of our single-family conventional loans that were seriously delinquent decreased, as compared with December 31, 2010, and has decreased every quarter since the first quarter of 2010. The decrease in our serious delinquency rate in 2010 and the first nine months of 2011 was primarily the result of home retention solutions, as well as foreclosure alternatives and completed foreclosures. The decrease is also attributable to our acquisition of loans with stronger credit profiles since the beginning of 2009, as these loans have become an increasingly larger portion of our single-family guaranty book of business, resulting in a smaller percentage of our loans becoming seriously delinquent.

Although our single-family serious delinquency rate has decreased since the first quarter of 2010, our serious delinquency rate and the period of time that loans remain seriously delinquent have been negatively affected in recent periods by the increase in the average number of days it is taking to complete a foreclosure. Continuing issues in the servicer foreclosure process, changes in state foreclosure laws, and new court rules and proceedings have lengthened the time it takes to foreclose on a mortgage loan in many states. In addition, servicers and states are dealing with the backlog of foreclosures resulting from these delays and from the elevated level of foreclosures resulting from the housing market downturn. For more information on the delays in the foreclosure process, see "Executive Summary—Reducing Credit Losses on Our Legacy Book of Business." We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, and the extent to which borrowers with modified loans continue to make timely payments.

Table 38 provides a comparison, by geographic region and by loans with and without credit enhancement, of the serious delinquency rates as of the dates indicated for single-family conventional loans in our single-family guaranty book of business.

TREASURY-1993

**Table 38:   Single-Family Serious Delinquency Rates**

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | September 30, 2011 | | December 31, 2010 | | September 30, 2010 | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate |
| Single-family conventional delinquency rates by geographic region:[1] | | | | | | |
| Midwest . . . . . . . . . . . . . . . . . . | 15% | 3.89% | 15% | 4.16% | 16% | 4.16% |
| Northeast . . . . . . . . . . . . . . . . . | 19 | 4.36 | 19 | 4.38 | 19 | 4.27 |
| Southeast . . . . . . . . . . . . . . . . | 24 | 5.78 | 24 | 6.15 | 24 | 6.19 |
| Southwest . . . . . . . . . . . . . . . . | 15 | 2.34 | 15 | 3.05 | 15 | 3.19 |
| West . . . . . . . . . . . . . . . . . . . . | 27 | 3.04 | 27 | 4.06 | 26 | 4.35 |
| Total single-family conventional loans . . . . . . . | 100% | 4.00% | 100% | 4.48% | 100% | 4.56% |
| Single-family conventional loans: | | | | | | |
| Credit enhanced . . . . . . . . . . . | 14% | 9.43% | 15% | 10.60% | 15% | 10.66% |
| Non-credit enhanced . . . . . . . . . | 86 | 3.10 | 85 | 3.40 | 85 | 3.45 |
| Total single-family conventional loans . . . . . . . | 100% | 4.00% | 100% | 4.48% | 100% | 4.56% |

[1]   See footnote 9 to "Table 36: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region.

While loans across our single-family guaranty book of business have been affected by the weak market conditions, loans in certain states, certain higher-risk loan categories, such as Alt-A loans, subprime loans and loans with higher mark-to-market LTVs, and our 2006 and 2007 loan vintages continue to exhibit higher than average delinquency rates and/or account for a disproportionate share of our credit losses. Some states in the Midwest have experienced prolonged economic weakness and California, Florida, Arizona and Nevada have experienced the most significant declines in home prices coupled with unemployment rates that remain high.

Table 39 presents the serious delinquency rates and other financial information for our single-family conventional loans with some of these higher-risk characteristics as of the periods indicated. The reported categories are not mutually exclusive.

**Table 39:   Single-Family Conventional Serious Delinquency Rate Concentration Analysis**

| | | As of | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | September 30, 2011 | | | | December 31, 2010 | | | | September 30, 2010 | | |
| | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] |
| | | | | (Dollars in millions) | | | | | | | |
| States: | | | | | | | | | | | |
| Arizona . . . . . . . $ | 67,562 | 2% | 3.78% | 110% $ | 71,052 | 2% | 6.23% | 105% $ | 71,636 | 2% | 6.39% | 104% |
| California . . . . . | 510,199 | 19 | 2.70 | 79 | 507,598 | 18 | 3.89 | 76 | 498,462 | 18 | 4.28 | 75 |
| Florida . . . . . . . | 178,036 | 6 | 11.90 | 107 | 184,101 | 7 | 12.31 | 107 | 186,010 | 7 | 12.10 | 104 |
| Nevada . . . . . . . | 29,200 | 1 | 7.53 | 135 | 31,661 | 1 | 10.66 | 128 | 32,195 | 1 | 11.24 | 127 |
| Select Midwest states[2] . . . . . . | 286,389 | 10 | 4.55 | 82 | 292,734 | 11 | 4.80 | 80 | 294,174 | 11 | 4.78 | 78 |
| All other states . . | 1,691,570 | 62 | 3.20 | 71 | 1,695,615 | 61 | 3.46 | 71 | 1,684,827 | 61 | 3.51 | 69 |
| Product type: | | | | | | | | | | | |
| Alt-A . . . . . . . . | 188,385 | 7 | 12.71 | 99 | 211,770 | 8 | 13.87 | 96 | 219,968 | 8 | 13.79 | 93 |
| Subprime . . . . . . | 5,968 | * | 23.91 | 108 | 6,499 | * | 28.20 | 103 | 6,665 | * | 28.50 | 100 |
| Vintages: | | | | | | | | | | | |
| 2006 . . . . . . . . | 196,843 | 7 | 11.81 | 108 | 232,009 | 8 | 12.19 | 104 | 246,502 | 9 | 11.84 | 101 |
| 2007 . . . . . . . . | 283,866 | 10 | 12.63 | 109 | 334,110 | 12 | 13.24 | 104 | 356,063 | 13 | 13.04 | 100 |
| All other vintages . . . . . | 2,282,247 | 83 | 2.41 | 71 | 2,216,642 | 80 | 2.62 | 70 | 2,164,739 | 78 | 2.64 | 68 |
| Estimated mark-to-market LTV ratio: | | | | | | | | | | | |
| Greater than 100%[1] . . . . . | 463,241 | 16 | 14.53 | 131 | 435,991 | 16 | 17.70 | 130 | 400,998 | 15 | 18.57 | 130 |
| Select combined risk characteristics: | | | | | | | | | | | |
| Original LTV ratio > 90% and FICO score < 620 . . . . | 19,587 | 1 | 18.99 | 112 | 21,205 | 1 | 21.41 | 109 | 21,806 | 1 | 21.80 | 107 |

---

*   Percentage is less than 0.5%.

[1]   Second lien mortgage loans held by third parties are not included in the calculation of the estimated mark-to-market LTV ratios.

[2]   Consists of Illinois, Indiana, Michigan and Ohio.

*Loan Workout Metrics*

The efforts of our mortgage servicers are critical in keeping people in their homes, preventing foreclosures and providing homeowner assistance. We continue to work with our servicers to implement our foreclosure prevention initiatives effectively and to find ways to enhance our workout protocols and their workflow processes. Partnering with our servicers, civic and community leaders and housing industry partners, we have launched a series of Mortgage Help Centers nationwide to accelerate the response time for struggling borrowers with loans owned by us. As of September 30, 2011, we have established 11 Mortgage Help Centers which completed nearly 4,100 home retention solutions in the first nine months of 2011. Additionally, we currently offer up to twelve months forbearance for those homeowners who are unemployed as an additional tool to help homeowners avoid foreclosure.

Our approach to workouts continues to focus on the large number of borrowers facing financial hardships. Accordingly, the vast majority of loan modifications we completed during the first nine months of 2011 were, as in recent periods, concentrated on deferring or lowering the borrowers' monthly mortgage payments to allow borrowers to work through their hardships.

TREASURY-1995

In addition, we continue to focus on alternatives to foreclosure for borrowers who are unable to retain their homes. Our servicers work with a borrower to sell their home prior to foreclosure in a preforeclosure sale or accept a deed-in-lieu of foreclosure whereby the borrower voluntarily signs over the title to their property to the servicer. These alternatives are designed to reduce our credit losses while helping borrowers avoid having to go through a foreclosure. Further, in cooperation with several Multiple Listing Services across the nation, we developed the Short Sale Assistance Desk to assist real estate professionals in handling post-offer short sale issues that may relate to servicer responsiveness, the existence of a second lien, or issues involving mortgage insurance.

Table 40 provides statistics on our single-family loan workouts that were completed, by type, for the periods indicated. These statistics include loan modifications but do not include trial modifications or repayment and forbearance plans that have been initiated but not completed.

**Table 40:    Statistics on Single-Family Loan Workouts**

| | For the Nine Months Ended September 30, 2011 | | For the Year Ended December 31, 2010 | | For the Nine Months Ended September 30, 2010 | |
|---|---|---|---|---|---|---|
| | Unpaid Principal Balance | Number of Loans | Unpaid Principal Balance | Number of Loans | Unpaid Principal Balance | Number of Loans |
| | | | (Dollars in millions) | | | |
| Home retention strategies: | | | | | | |
| Modifications . . . . . . . . . . . . . . . . . . . . . . . . | $32,658 | 161,404 | $ 82,826 | 403,506 | $66,206 | 321,814 |
| Repayment plans and forbearances completed . . . | 3,769 | 26,801 | 4,385 | 31,579 | 3,258 | 23,606 |
| HomeSaver Advance first-lien loans. . . . . . . . . . | — | — | 688 | 5,191 | 661 | 5,165 |
| | 36,427 | 188,205 | 87,899 | 440,276 | 70,125 | 350,585 |
| Foreclosure alternatives: | | | | | | |
| Preforeclosure sales . . . . . . . . . . . . . . . . . . . . . | 11,231 | 50,966 | 15,899 | 69,634 | 12,775 | 55,788 |
| Deeds-in-lieu of foreclosure . . . . . . . . . . . . . . . | 1,179 | 6,636 | 1,053 | 5,757 | 732 | 3,971 |
| | 12,410 | 57,602 | 16,952 | 75,391 | 13,507 | 59,759 |
| Total loan workouts. . . . . . . . . . . . . . . . . . . . . . | $48,837 | 245,807 | $104,851 | 515,667 | $83,632 | 410,344 |
| Loan workouts as a percentage of single-family guaranty book of business[1] . . . . . . . . . . . . . . . | 2.29% | 1.84% | 3.66% | 2.87% | 3.91% | 3.05% |

[1]   Calculated based on annualized loan workouts during the period as a percentage of our single-family guaranty book of business as of the end of the period.

The volume of workouts completed in the first nine months of 2011 decreased compared with the first nine months of 2010, primarily because we began to require that non-HAMP modifications go through a trial period, which initially lowers the number of modifications that can become permanent in any particular period. The number of foreclosure alternatives we agreed to during the first nine months of 2011 remains high as these are favorable solutions for a large number of borrowers. We expect the volume of our foreclosure alternatives to remain high throughout the remainder of 2011.

During the first nine months of 2011, we initiated approximately 165,000 trial modifications, including HAMP and non-HAMP, compared with approximately 135,000 trial modifications during the first nine months of 2010. We also initiated other types of workouts, such as repayment plans and forbearances. It is difficult to predict how many of these trial modifications and initiated plans will be completed.

Table 41 displays the profile of loan modifications (HAMP and non-HAMP) provided to borrowers for the periods indicated.

**Table 41:   Single-Family Loan Modification Profile**

| | 2011 | | | | Full Year |
| --- | --- | --- | --- | --- | --- |
| | YTD | Q3 | Q2 | Q1 | 2010 |
| Term extension, interest rate reduction, or combination of both[1] . . . . . . . . . . . . . | 98% | 100% | 99% | 96% | 93% |
| Initial reduction in monthly payment[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 96 | 97 | 97 | 94 | 91 |
| Estimated mark-to-market LTV ratio > 100% . . . . . . . . . . . . . . . . . . . . . . . . . . | 62 | 61 | 62 | 64 | 53 |
| Troubled debt restructurings[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100 | 100 | 98 | 97 | 94 |

---

[1]   Reported statistics for term extension, interest rate reduction or the combination include subprime adjustable-rate mortgage loans that have been modified to a fixed-rate loan.

[2]   These modification statistics do not include subprime adjustable-rate mortgage loans that were modified to a fixed-rate loan and were current at the time of the modification.

[3]   Percentage for the nine months ended September 30, 2011 reflects the impact of the new TDR accounting standard which was retrospectively adopted beginning January 1, 2011. Prior periods have not been revised.

The majority of our modifications in 2010 and the first nine months of 2011 were made to loans with a mark-to-market LTV ratio greater than 100% because these borrowers are typically unable to refinance their mortgages or sell their homes for a price that allows them to pay off their mortgage obligation as their mortgages are greater than the value of their homes. Additionally, the serious delinquency rate for these loans tends to be significantly higher than the overall average serious delinquency rate. As of September 30, 2011, the serious delinquency rate for loans with a mark-to-market LTV ratio greater than 100% was 15%, compared with our overall average single-family serious delinquency rate of 4.00%.

Approximately 69% of loans modified during the first nine months of 2010 were current or had paid off as of one year following the loan modification date. In comparison, 44% of loans modified during the first nine months of 2009 were current or had paid off as of one year following the loan modification date. There is significant uncertainty regarding the ultimate long term success of our current modification efforts and we believe the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and income, and home prices. Modifications, even those with reduced monthly payments, may also not be sufficient to help borrowers with second liens and other significant non-mortgage debt obligations. FHFA, other agencies of the U.S. government or Congress may ask us to undertake new initiatives to support the housing and mortgage markets should our current modification efforts ultimately not perform in a manner that results in the stabilization of these markets. See "Risk Factors" for a discussion of efforts we may be required or asked to undertake and their potential affect on us.

### *REO Management*

Foreclosure and REO activity affect the level of credit losses. Table 42 compares our foreclosure activity, by region, for the periods indicated. Regional REO acquisition and charge-off trends generally follow a pattern that is similar to, but lags, that of regional delinquency trends.

81

**Table 42:   Single-Family Foreclosed Properties**

| | For the Nine Months Ended September 30, | |
|---|---|---|
| | 2011 | 2010 |
| Single-family foreclosed properties (number of properties): | | |
| Beginning of period inventory of single-family foreclosed properties (REO)[1] . . . . . . . . . . . . | 162,489 | 86,155 |
| Acquisitions by geographic area:[2] | | |
| Midwest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32,074 | 48,930 |
| Northeast . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,091 | 12,022 |
| Southeast . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36,433 | 66,313 |
| Southwest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36,324 | 44,378 |
| West . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40,518 | 44,473 |
| Total properties acquired through foreclosure[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 152,440 | 216,116 |
| Dispositions of REO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (192,313) | (135,484) |
| End of period inventory of single-family foreclosed properties (REO)[1] . . . . . . . . . . . . . . . | 122,616 | 166,787 |
| Carrying value of single-family foreclosed properties (dollars in millions)[3] . . . . . . . . . . . . | $ 11,039 | $ 16,394 |
| Single-family foreclosure rate[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.15% | 1.61% |

[1]   Includes acquisitions through deeds-in-lieu of foreclosure.

[2]   See footnote 9 to "Table 36: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region.

[3]   Excludes foreclosed property claims receivables, which are reported in our condensed consolidated balance sheets as a component of "Acquired property, net."

[4]   Estimated based on the annualized total number of properties acquired through foreclosure or deeds-in-lieu of foreclosure as a percentage of the total number of loans in our single-family conventional guaranty book of business as of the end of each respective period.

The continued weak economy, as well as high unemployment rates, continues to result in a high level of mortgage loans that transition from delinquent to REO status, either through foreclosure or deed-in-lieu of foreclosure. Our foreclosure rates remain high; however, foreclosure levels were lower than what they otherwise would have been during the first nine months of 2011 due to delays in the processing of foreclosures caused by continuing foreclosure process issues encountered by our servicers, changes in state foreclosure laws, and new court rules and proceedings. Additionally, foreclosure levels were affected by our directive to servicers to delay foreclosure sales until the loan servicer verifies that the borrower is ineligible for a HAMP modification and that all other home retention and foreclosure prevention alternatives have been exhausted. The delay in potential foreclosures, as well as an increase in the number of dispositions of REO properties, has resulted in a decrease in the ending inventory of foreclosed properties since December 31, 2010.

The percentage of our single-family foreclosed properties that we determined were unable to market for sale was 46% as of September 30, 2011 compared with 41% as of December 31, 2010. The two largest concentrations of the unable to market for sale inventory are: (1) properties that are still occupied by the person or personal property, and the eviction process is not yet complete ("occupied status"); and (2) properties that are within the period during which state law allows the former mortgagor and second lien holders to redeem the property ("redemption status"). Being in occupied status lengthens the time a property remains in our REO inventory by an average of one to three months, and occupied status properties represented approximately 32% of our unable to market for sale inventory as of September 30, 2011 compared with approximately 40% as of December 31, 2010. Being in redemption status lengthens the time a property remains in our REO inventory by an average of two to six months, and redemption status properties represented approximately 26% of our unable to market for sale inventory as of September 30, 2011 compared with approximately 27% as of December 31, 2010. As we are unable to market a higher portion of our

TREASURY-1998

inventory, it slows the pace at which we can dispose of our properties and increases our foreclosed property expense related to costs associated with ensuring that the property is vacant and maintaining the property.

As shown in Table 43 we have experienced a disproportionate share of foreclosures in certain states as compared with their share of our guaranty book of business. This is primarily because these states have had significant home price depreciation or weak economies and, in the case of California and Florida specifically, a significant number of Alt-A loans.

**Table 43:   Single-Family Acquired Property Concentration Analysis**

| | As of | | For the Nine Months Ended | |
| | September 30, 2011 | December 31, 2010 | September 30, 2011 | September 30, 2010 |
| | Percentage of Book Outstanding[1] | Percentage of Book Outstanding[1] | Percentage of Properties Acquired by Foreclosure[2] | Percentage of Properties Acquired by Foreclosure[2] |
|---|---|---|---|---|
| States: | | | | |
| Arizona, California, Florida, and Nevada . . | 28% | 28% | 35% | 36% |
| Illinois, Indiana, Michigan, and Ohio . . . . | 10 | 11 | 16 | 18 |

[1]   Calculated based on the unpaid principal balance of loans, where we have detailed loan-level information, for each category divided by the unpaid principal balance of our single-family conventional guaranty book of business.

[2]   Calculated based on the number of properties acquired through foreclosure during the period divided by the total number of properties acquired through foreclosure.

*Multifamily Mortgage Credit Risk Management*

The credit risk profile of our multifamily mortgage credit book of business is influenced by: the structure of the financing; the type and location of the property; the condition and value of the property; the financial strength of the borrower and lender; market and sub-market trends and growth; and the current and anticipated cash flows from the property. These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment. We provide information on our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Expenses."

While our multifamily mortgage credit book of business includes all of our multifamily mortgage-related assets, both on- and off-balance sheet, our guaranty book of business excludes non-Fannie Mae multifamily mortgage-related securities held in our portfolio for which we do not provide a guaranty. Our multifamily guaranty book of business consists of: multifamily mortgage loans held in our mortgage portfolio; Fannie Mae MBS held in our portfolio or by third parties; and other credit enhancements that we provide on mortgage assets.

*Multifamily Acquisition Policy and Underwriting Standards*

Our Multifamily business, in conjunction with our Enterprise Risk Management division, is responsible for pricing and managing the credit risk on multifamily mortgage loans we purchase and on Fannie Mae MBS backed by multifamily loans (whether held in our portfolio or held by third parties). Our primary multifamily delivery channel is the Delegated Underwriting and Servicing, or DUS®, program, which is comprised of multiple lenders that span the spectrum from large financial institutions to smaller independent multifamily lenders. Multifamily loans that we purchase or that back Fannie Mae MBS are either underwritten by a Fannie Mae-approved lender or subject to our underwriting review prior to closing, depending on the product type and/or loan size. Loans delivered to us by DUS lenders and their affiliates represented 85% of our multifamily guaranty book of business as of September 30, 2011 compared with 84% as of December 31, 2010.

We use various types of credit enhancement arrangements for our multifamily loans, including lender risk-sharing, lender repurchase agreements, pool insurance, subordinated participations in mortgage loans or structured pools, cash and letter of credit collateral agreements, and cross-collateralization/cross-default provisions. The most prevalent form of credit enhancement on multifamily loans is lender risk-sharing.

83

Lenders in the DUS program typically share in loan-level credit losses in one of two ways: (1) they bear losses up to the first 5% of unpaid principal balance of the loan and share in remaining losses up to a prescribed limit; or (2) they share up to one-third of the credit losses on an equal basis with us. Other non-DUS lenders typically share or absorb credit losses based on a negotiated percentage of the loan or the pool balance.

For our purchase or guarantee of multifamily mortgage loans, we and our lender partners rely significantly on sound underwriting standards, which often include third party appraisals and actual cash flow analysis. Our standards for multifamily loans specify maximum original LTV ratio and minimum debt service coverage ratio ("DSCR") that vary based on the loan characteristics. Original LTV reflects the borrower equity in the transaction. Similarly, original DSCR reflects the anticipated cash flow on the transaction at underwriting, with additional measures taken to address higher risk loans. Original LTV and DSCR values have proven to be reliable indicators of future credit performance.

*Multifamily Portfolio Diversification and Monitoring*

Diversification within our multifamily mortgage credit book of business by geographic concentration, term-to-maturity, interest rate structure, borrower concentration and credit enhancement arrangement is an important factor that influences credit quality and performance and helps reduce our credit risk.

The weighted average original LTV ratio for our multifamily guaranty book of business was 66% as of September 30, 2011 and 67% as of December 31, 2010. The percentage of our multifamily guaranty book of business with an original LTV ratio greater than 80% was 5% as of both September 30, 2011 and December 31, 2010. We present the current risk profile of our multifamily guaranty book of business in "Note 6, Financial Guarantees."

We and our lender partners monitor the performance and risk concentrations of our multifamily loans and the underlying properties on an ongoing basis throughout the life of the investment at the loan, property and portfolio level. We track the physical condition of the property, the relevant local market and economic conditions that may signal changing risk or return profiles and other risk factors. For example, we closely monitor the rental payment trends and vacancy levels in local markets to identify loans that merit closer attention or loss mitigation actions, in addition to capitalization rates. We are managing our exposure to refinancing risk for multifamily loans maturing in the next several years. We have a team that proactively manages upcoming loan maturities to minimize losses on maturing loans. This team assists lenders and borrowers with timely and appropriate refinancing of maturing loans with the goal of reducing defaults and foreclosures related to loans maturing in the near term. For our investments in multifamily loans, the primary asset management responsibilities are performed by our DUS and other multifamily lenders. We periodically evaluate these lenders' and our other third party service providers' performance for compliance with our asset management criteria.

As a part of our ongoing credit risk management process, we have worked with our lender partners over the last two years to collect limited quarterly property operating measures from borrowers, in addition to more complete annual financial updates, for those loans where we are entitled contractually to receive such information. As part of our asset management process, we focus on loans with an estimated current DSCR below 1.0, as that is an indicator of heightened default risk. The percentage of loans in our multifamily guaranty book of business with a current debt service coverage ratio less than 1.0 was approximately 8% as of September 30, 2011 and approximately 10% as of December 31, 2010. Our estimates of current DSCRs are based on the latest available income information for these properties and our assessments of market conditions. Although we use the most recently available results of our multifamily borrowers, there is a significant lag in reporting as they prepare their results in the normal course of business.

*Problem Loan Management and Foreclosure Prevention*

The number of multifamily loans at risk of becoming seriously delinquent has decreased in 2011, as early-stage delinquencies have decreased. Since delinquency rates are a lagging indicator, we expect to continue to incur additional credit losses. We periodically refine our underwriting standards in response to market

conditions and enact proactive portfolio management and monitoring which are each designed to keep credit losses to a low level relative to our multifamily guaranty book of business.

*Problem Loan Statistics*

Table 44 provides a comparison of our multifamily serious delinquency rates for loans with and without credit enhancement in our multifamily guaranty book of business. We classify multifamily loans as seriously delinquent when payment is 60 days or more past due. We include the unpaid principal balance of multifamily loans that we own or that back Fannie Mae MBS and any housing bonds for which we provide credit enhancement in the calculation of the multifamily serious delinquency rate.

**Table 44:   Multifamily Serious Delinquency Rates**

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | September 30, 2011 | | December 31, 2010 | | September 30, 2010 | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate |
| Multifamily loans: | | | | | | |
| Credit enhanced . . . . . . . . | 90% | 0.54% | 89% | 0.67% | 89% | 0.60% |
| Non-credit enhanced . . . . . | 10 | 0.86 | 11 | 1.01 | 11 | 1.06 |
| Total multifamily loans . . . . . . . . . . . . | 100% | 0.57% | 100% | 0.71% | 100% | 0.65% |

The multifamily serious delinquency rate decreased as of September 30, 2011 compared with both December 31, 2010 and September 30, 2010 as national multifamily market fundamentals continued to improve. Table 45 provides a comparison of our multifamily serious delinquency rates for loans acquired through DUS lenders and loans acquired through non-DUS lenders.

**Table 45:   Multifamily Concentration Analysis**

| | As of | | | | | | Percentage of Multifamily Credit Losses For the Nine Months Ended September 30, | |
|---|---|---|---|---|---|---|---|---|
| | September 30, 2011 | | December 31, 2010 | | September 30, 2010 | | | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | 2011 | 2010 |
| DUS small balance loans[1] . . . . . | 8% | 0.64% | 8% | 0.55% | 8% | 0.57% | 7% | 7% |
| DUS non small balance loans[2] . . | 72 | 0.46 | 70 | 0.56 | 69 | 0.46 | 72 | 63 |
| Non-DUS small balance loans[1] . . | 9 | 1.27 | 10 | 1.47 | 11 | 1.58 | 14 | 6 |
| Non-DUS non small balance loans[2] . . . . . . . . . . . . . . . . | 11 | 0.67 | 12 | 0.97 | 12 | 0.95 | 7 | 24 |

[1]   Loans with original unpaid principal balances less than or equal to $3 million as well as loans in high cost markets with original unpaid principal balances less than or equal to $5 million.

[2]   Loans with original unpaid principal balances greater than $3 million as well as loans in high cost markets with original unpaid principal balances greater than $5 million.

The DUS loans in our guaranty book of business have lower delinquency rates when compared with the non-DUS loans in our guaranty book primarily due to the DUS model, which has several features that align our interest with those of the borrowers and lenders. Smaller balance non-DUS loans continue to represent a disproportionate share of delinquencies but they are generally covered by loss sharing arrangements, which limit the credit losses incurred by us.

In addition, Florida, Michigan, Nevada and Ohio have a disproportionate share of seriously delinquent loans compared with their share of the multifamily guaranty book of business as a result of slow economic recovery

in certain areas of these states. These states accounted for 45% of multifamily serious delinquencies but only 9% of the multifamily guaranty book of business as of September 30, 2011.

### REO Management

Foreclosure and REO activity affect the level of credit losses. Table 46 compares our held for sale multifamily REO balances for the periods indicated.

**Table 46:   Multifamily Foreclosed Properties**

| | For the Nine Months Ended September 30, | |
| --- | --- | --- |
| | **2011** | **2010** |
| Multifamily foreclosed properties (number of properties): | | |
| Beginning of period inventory of multifamily foreclosed properties (REO) . . . . . . . . . . . . . . . . . . . . . . | 222 | 73 |
| Total properties acquired through foreclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 190 | 160 |
| Disposition of REO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (138) | (49) |
| End of period inventory of multifamily foreclosed properties (REO) . . . . . . . . . . . . . . . . . . . . . . . . . | 274 | 184 |
| Carrying value of multifamily foreclosed properties (dollars in millions) . . . . . . . . . . . . . . . . . . . . . . | $ 561 | $523 |

The increase in our multifamily foreclosed property inventory reflects the continuing stress on our multifamily guaranty book of business as certain local markets and properties continue to exhibit weak fundamentals, though national multifamily market fundamentals have continued to improve in 2011.

### Institutional Counterparty Credit Risk Management

We rely on our institutional counterparties to provide services and credit enhancements, including primary and pool mortgage insurance coverage, risk sharing agreements with lenders and financial guaranty contracts that are critical to our business. Institutional counterparty credit risk is the risk that these institutional counterparties may fail to fulfill their contractual obligations to us, including seller/servicers who are obligated to repurchase loans from us or reimburse us for losses in certain circumstances. Defaults by a counterparty with significant obligations to us could result in significant financial losses to us.

See "MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" in our 2010 Form 10-K for additional information about our institutional counterparties, including counterparty risk we face from mortgage originators and investors, from debt security and mortgage dealers and from document custodians.

### Mortgage Seller/Servicers

Our business with our mortgage seller/servicers is concentrated. Our ten largest single-family mortgage servicers, including their affiliates, serviced 75% of our single-family guaranty book of business as of September 30, 2011, compared to 77% as of December 31, 2010. Our largest mortgage servicer is Bank of America, N.A. which, together with its affiliates, serviced approximately 24% of our single-family guaranty book of business as of September 30, 2011, compared with 26% as of December 31, 2010. In addition, we had two other mortgage servicers, JPMorgan Chase & Co. and Wells Fargo Bank, N.A., that, with their affiliates, each serviced over 10% of our single-family guaranty book of business as of September 30, 2011. In addition, Wells Fargo Bank serviced over 10% of our multifamily guaranty book of business as of both September 30, 2011 and December 31, 2010. Because we delegate the servicing of our mortgage loans to mortgage servicers and do not have our own servicing function, servicers' lack of appropriate process controls or the loss of business from a significant mortgage servicer counterparty could pose significant risks to our ability to conduct our business effectively. During the first nine months of 2011, our primary mortgage servicers have generally continued to meet their financial obligations to us. However, many of our largest servicer counterparties continue to reevaluate the effectiveness of their process controls. Many servicers are

subject to consent orders by their regulators that require the servicers to correct foreclosure process deficiencies and improve their servicing and foreclosure practices. This has resulted in extended foreclosure timelines and therefore, additional holding costs for us, such as property taxes and insurance, repairs and maintenance, and valuation adjustments due to home price changes.

Our mortgage seller/servicers are obligated to repurchase loans or foreclosed properties, or reimburse us for losses if the foreclosed property has been sold, under certain circumstances, such as if it is determined that the mortgage loan did not meet our underwriting or eligibility requirements, if loan representations and warranties are violated or if mortgage insurers rescind coverage. We refer to our demands that seller/servicers meet these obligations collectively as "repurchase requests." The number of our repurchase requests remained high during the first nine months of 2011. The aggregate unpaid principal balance of loans repurchased by our seller/servicers pursuant to their contractual obligations was approximately $8.8 billion in the first nine months of 2011, compared with $4.7 billion during the first nine months of 2010. In addition, as of September 30, 2011, we had $9.5 billion in outstanding repurchase requests related to loans that had been reviewed for potential breaches of contractual obligations, compared with $5.0 billion as of December 31, 2010. As of September 30, 2011, approximately 45% of our total outstanding repurchase requests had been made to one of our seller/servicers, compared with 41% as of December 31, 2010. As of September 30, 2011, 25% of our outstanding repurchase requests had been outstanding for more than 120 days from either the original repurchase request date or, for lenders remitting after the REO is disposed, the date of our final loss determination, compared with 30% as of December 31, 2010. As of September 30, 2011, approximately 48% of our repurchase requests outstanding for more than 120 days had been made to one of our seller/servicers, compared with 37% as of December 31, 2010.

The amount of our outstanding repurchase requests provided above is based on the unpaid principal balance of the loans underlying the repurchase request issued, not the actual amount we have requested from the lenders. In some cases, we allow lenders to remit payment equal to our loss, including imputed interest, on the loan after we have disposed of the REO, which is less than the unpaid principal balance of the loan. As a result, we expect our actual cash receipts relating to these outstanding repurchase requests to be significantly lower than the unpaid principal balance of the loan. In addition, amounts relating to repurchase requests originating from missing documentation or loan files are excluded from the total requests outstanding until the completion of a full underwriting review, once the documents and loan files are received.

In June 2011, we issued an announcement that (1) reminded lenders of their existing obligations with respect to mortgage insurance; (2) required lenders to report to us mortgage insurance rescissions, mortgage insurer-initiated cancellations, and claim denials; (3) confirmed our repurchase policies with respect to these actions; (4) temporarily extended from 30 to 90 days our timeframe within which lenders must repurchase loans and provided an appeal process; (5) required that all outstanding mortgage insurance-related repurchase demands as of April 30, 2011 be satisfactorily resolved by September 30, 2011; (6) reiterated our process for the redelivery of certain repurchased loans; and (7) reiterated our remedies if a lender fails to meet our repurchase requirements.

Not all outstanding mortgage insurance related repurchase demands as of April 30, 2011 were resolved by September 30, 2011. We entered into "tolling agreements" with three of our major lenders that required these lenders to post collateral based on their maximum exposure in exchange for an extension until June 2012 to resolve their outstanding mortgage insurance related repurchase demands. In addition, we provided some of our lenders that did not have a substantial amount of unresolved mortgage insurance related demands, an extension until December 2011. One of our mortgage seller/servicers has disputed these demands and accounts for nearly half of these unresolved mortgage insurance related requests.

We continue to aggressively pursue our contractual rights associated with these repurchase requests. If we are unable to resolve these matters to our satisfaction, we may seek additional remedies. Failure by a seller/servicer to repurchase a loan or to otherwise make us whole for our losses, may result in the imposition of certain sanctions including, but not limited to:

- requiring the posting of collateral,

- denying transfer of servicing requests or denying pledged servicing requests,

- imposing limits on trading desk transactions,

TREASURY-2003

- imposing compensatory fees,

- modifying or suspending any contract or agreement with a lender, or

- suspending or terminating a lender or imposing some other formal sanction on a lender.

If we are unable to resolve our repurchase requests, either through collection or additional remedies, we will not recover the losses we have recognized from the associated loans.

We continue to work with our mortgage seller/servicers to fulfill outstanding repurchase requests; however, as the volume of repurchase requests increases, the risk increases that affected seller/servicers will not be willing or able to meet the terms of their repurchase obligations and we may be unable to recover on all outstanding loan repurchase obligations resulting from seller/servicers' breaches of contractual obligations. We expect that the amount of our outstanding repurchase requests will remain high.

If a significant seller/servicer counterparty, or a number of seller/servicers, fails to fulfill its repurchase obligations to us, it could result in a significant increase in our credit losses and have a material adverse effect on our results of operations and financial condition. We estimate our allowance for loan losses assuming the benefit of repurchase demands only from those counterparties we determine have the financial capacity to fulfill this obligation. Accordingly, as of September 30, 2011, we do not believe that we have any exposure to seller/servicers that lacked the financial capacity to honor their contractual obligations as we assumed no benefit from repurchase demands due to us from these counterparties in estimating our allowance for loan loss.

We are exposed to the risk that a mortgage seller/servicer or another party involved in a mortgage loan transaction will engage in mortgage fraud by misrepresenting the facts about the loan. We have experienced financial losses in the past and may experience significant financial losses and reputational damage in the future as a result of mortgage fraud. See "Risk Factors" in our 2010 Form 10-K for additional discussion on risks of mortgage fraud to which we are exposed.

*Mortgage Insurers*

Table 47 presents our maximum potential loss recovery for the primary and pool mortgage insurance coverage on single-family loans in our guaranty book of business and our unpaid principal balance covered by insurance for our mortgage insurer counterparties as of September 30, 2011 and December 31, 2010. The table includes our top eight mortgage insurer counterparties, which provided over 99% of our total mortgage insurance coverage on single-family loans in our guaranty book of business as of both September 30, 2011 and December 31, 2010.

88

**Table 47:   Mortgage Insurance Coverage**

| Counterparty:[3] | Maximum Coverage[1] | | | | Unpaid Principal Balance Covered By Insurance[2] | |
| | As of September 30, 2011 | | | As of December 31, 2010 | As of September 30, 2011 | As of December 31, 2010 |
| | Primary | Pool | Total | | | |
| | (Dollars in millions) | | | | | |
| Mortgage Guaranty Insurance Corporation.... | $20,322 | $1,681 | $22,003 | $23,277 | $ 94,620 | $101,823 |
| Radian Guaranty, Inc.  ................. | 14,683 | 449 | 15,132 | 15,370 | 62,060 | 64,042 |
| United Guaranty Residential Insurance Company......................... | 13,913 | 202 | 14,115 | 14,044 | 58,345 | 58,416 |
| Genworth Mortgage Insurance Corporation ... | 13,655 | 66 | 13,721 | 14,331 | 55,161 | 57,845 |
| PMI Mortgage Insurance Co. ............ | 11,387 | 265 | 11,652 | 12,359 | 50,132 | 53,768 |
| Republic Mortgage Insurance Company ..... | 8,736 | 925 | 9,661 | 10,566 | 41,218 | 46,660 |
| Triad Guaranty Insurance Corporation....... | 2,612 | 892 | 3,504 | 3,809 | 14,620 | 16,974 |
| CMG Mortgage Insurance Company[4] ...... | 1,936 | — | 1,936 | 1,938 | 8,166 | 8,174 |
| Others................................ | 434 | — | 434 | 209 | 2,143 | 1,140 |
| Total............................... | $87,678 | $4,480 | $92,158 | $95,903 | $386,465 | $408,842 |
| Total as a percentage of single-family guaranty book of business .................... | | | | 3% | 3% | 14% | 14% |

[1] Maximum coverage refers to the aggregate dollar amount of insurance coverage (*i.e.*, "risk in force") on single-family loans in our guaranty book of business and represents our maximum potential loss recovery under the applicable mortgage insurance policies.

[2] Represents the unpaid principal balance of single-family loans in our guaranty book of business covered under the applicable mortgage insurance policies (*i.e.*, "insurance in force").

[3] Insurance coverage amounts provided for each counterparty may include coverage provided by consolidated affiliates and subsidiaries of the counterparty.

[4] CMG Mortgage Insurance Company is a joint venture owned by PMI Mortgage Insurance Co. and CUNA Mutual Insurance Society.

See "Risk Management—Credit Risk Management—Institutional Counterparty Risk Management—Mortgage Insurers" in our 2010 Form 10-K for a discussion on the credit ratings of our mortgage insurers.

We evaluate our mortgage insurer counterparties individually to determine whether or under what conditions they will remain eligible to insure new mortgages sold to us. Following issuance by the Arizona Department of Insurance of a supervisory order directing PMI Mortgage Insurance Co. ("PMI") and its subsidiary PMI Insurance Co. ("PIC") to cease offering new commitments for mortgage guaranty insurance after August 19, 2011 and to cease issuing certificates after September 16, 2011, we notified PMI on August 22, 2011 that, effective immediately, PMI and its subsidiaries, PIC and PMI Mortgage Assurance Co. ("PMAC"), were suspended nationwide as approved mortgage insurers. We simultaneously notified our mortgage sellers and servicers that we would not accept any mortgage loan insured by PMI, PIC or PMAC that is delivered after December 30, 2011, except for refinanced Fannie Mae loans where continuation of the coverage is effected through modification of an existing mortgage insurance certificate.

As reported by PMI, on October 20, 2011, PMI received from its regulator an order under which the regulator now has full possession, management and control of PMI. The regulator is also seeking to place PMI into receivership. Pursuant to the order, effective October 24, 2011, the regulator instituted a partial claim payment plan whereby all valid claims under PMI mortgage guaranty insurance policies will be paid 50% in cash and 50% deferred as a policyholder claim. It is uncertain when, and if, PMI's regulator will allow PMI to begin paying its deferred policyholder claims and/or increase the amount of cash PMI pays on claims.

On July 29, 2011, we notified Republic Mortgage Insurance Company ("RMIC") that, effective immediately, both RMIC and its affiliate, Republic Mortgage Insurance Company of North Carolina ("RMIC-NC"), were suspended nationwide as approved mortgage insurers. We also notified our mortgage sellers and servicers that

89

we would not accept any mortgage loan insured by RMIC or RMIC-NC that is delivered after November 30, 2011, except for refinanced Fannie Mae loans where continuation of the coverage is effected through modification of an existing mortgage insurance certificate. On October 12, 2011, RMIC and RMIC-NC each voluntarily entered into an agreement with their regulator to discontinue writing or assuming any new mortgage guaranty insurance business in all states. RMIC's parent company has indicated that it is more likely than not that the capital contributed to RMIC by its parent company will "continue on a path toward full depletion in relatively short order."

The already weak financial condition of many of our mortgage insurer counterparties deteriorated at an accelerated pace during the third quarter of 2011, which increased the significant risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. In addition to PMI and its subsidiaries, the claims obligations of Triad Guaranty Insurance Corporation ("Triad") have been partially deferred since June 2009 pursuant to an order from its regulator. The state regulator for RMIC and RMIC-NC could take additional corrective action following their orders to cease writing new business, which may include issuing an order to defer partial payment of claims and/or placing the entities into receivership. While our remaining mortgage insurers have continued to pay claims owed to us, there can be no assurance that they will continue do so given their current financial condition.

As of November 7, 2011, four of our mortgage insurers (Triad, RMIC, PMI and Genworth Mortgage Insurance Corporation) have publicly disclosed that they are either in run-off or, absent a waiver, estimate they would not meet state regulatory capital requirements for their main writing entity as of September 30, 2011. An additional two of our mortgage insurers (Mortgage Guaranty Insurance Corporation and Radian Guaranty, Inc.) have disclosed that, in the absence of additional capital contributions to their writing entity, their capital might fall below state regulatory capital requirements in the future. These six mortgage insurers provided a combined $75.7 billion, or 82%, of our risk in force mortgage insurance coverage of our single-family guaranty book of business as of September 30, 2011. If mortgage insurers are not able to raise capital and they exceed their risk-to-capital limits, they will likely be forced into run-off or receivership unless they can secure and maintain a waiver from their state regulator. In 2010, the parent companies of several of our largest mortgage insurer counterparties raised capital or made contributions in various forms to their respective mortgage insurance subsidiaries. While these actions improved the insurers' ability to meet state-imposed risk-to-capital limits and their ability to continue paying our claims in full as they came due to the extent of the capital raised or contributions made by the parent companies, our mortgage insurer counterparties' current financial condition is weak. We are unable to determine how long certain of our mortgage insurer counterparties will remain below their state-imposed risk-to-capital limits.

Our mortgage insurer counterparties have increased the number of mortgage loans for which they have rescinded coverage. In those cases where the mortgage insurer has rescinded coverage, we generally require the seller/servicer to repurchase the loan or indemnify us against loss. In 2010, some mortgage insurers disclosed that they entered into agreements with lenders whereby they agreed to waive certain rights to investigate claims for some of the lenders' insured loans in return for some compensation against loss. Although these agreements do not affect our rights to demand repurchase in the event of violations of lender representations and warranties, these agreements are likely to result in fewer mortgage insurance rescissions for certain groups of loans.

As a result, in April 2011, we issued an announcement which prohibited servicers from entering into any agreement that modifies the terms of an approved mortgage insurance master policy on loans delivered to us. We also required servicers to disclose any such agreements with mortgage insurers to us. With respect to our mortgage insurance counterparties, changes to the substance of their master policies have required our prior approval since 2005. In October 2010, we required our top mortgage insurers to notify us promptly of any agreement that affects their investigative or rescission rights. In April 2011, we further clarified and amended our mortgage insurer requirements to prohibit any agreement that has the effect of modifying a master policy, including any investigative or rescission rights, absent our approval. By taking these steps, we expect to mitigate the risk of loss for loans that would have resulted in mortgage insurance rescission, and—as a result—a lender repurchase, for loan defects that we may not have otherwise uncovered in our independent review process.

90

We evaluate the financial condition of our mortgage insurer counterparties to assess whether we have incurred probable losses in connection with our coverage. As of September 30, 2011, our allowance for loan losses of $71.4 billion, allowance for accrued interest receivable of $2.2 billion and reserve for guaranty losses of $916 million incorporated an estimated recovery amount of approximately $12.7 billion from mortgage insurance related both to loans that are individually measured for impairment and those that are collectively reserved. This amount is comprised of the contractual recovery of approximately $15.1 billion as of September 30, 2011 and an adjustment of approximately $2.4 billion which reduces the contractual recovery for our assessment of our mortgage insurer counterparties' inability to fully pay those claims. As of December 31, 2010, our allowance for loan losses of $61.6 billion, allowance for accrued interest receivable of $3.4 billion and reserve for guaranty losses of $323 million incorporated an estimated recovery amount of approximately $16.4 billion from mortgage insurance related both to loans that are individually measured for impairment and those that are collectively reserved. This amount is comprised of the contractual recovery of approximately $17.5 billion as of December 31, 2010 and an adjustment of approximately $1.2 billion, which reduces the contractual recovery for our assessment of our mortgage insurer counterparties' inability to fully pay those claims. Our valuation allowance for these receivables increased significantly from December 31, 2010 to September 30, 2011 as a result of our determination that our mortgage insurer counterparties' financial condition has deteriorated.

When an insured loan held in our mortgage portfolio subsequently goes into foreclosure, we charge off the loan, eliminating any previously-recorded loss reserves, and record REO and a mortgage insurance receivable for the claim proceeds deemed probable of recovery, as appropriate. However, if a mortgage insurer rescinds insurance coverage, the initial receivable becomes due from the mortgage seller/servicer. We had outstanding receivables of $3.7 billion as of September 30, 2011 and $4.4 billion as of December 31, 2010 related to amounts claimed on insured, defaulted loans that we have not yet received, of which $494 million as of September 30, 2011 and $648 million as of December 31, 2010 was due from our mortgage seller/servicers. We assessed the total outstanding receivables for collectibility, and they were recorded net of a valuation allowance of $589 million as of September 30, 2011 and $317 million as of December 31, 2010 in "Other assets." These mortgage insurance receivables are short-term in nature, having an average duration of approximately six months, and the valuation allowance reduces our claim receivable to the amount that we consider probable of collection. We received proceeds under our primary and pool mortgage insurance policies for single-family loans of $1.4 billion for the third quarter of 2011, $4.6 billion for the first nine months of 2011 and $6.4 billion for the year ended December 31, 2010.

### *Financial Guarantors*

We are the beneficiary of financial guarantees on non-agency securities held in our investment portfolio and on non-agency securities that have been resecuritized to include a Fannie Mae guaranty and sold to third parties. Table 48 displays the total unpaid principal balance of guaranteed non-agency securities in our portfolio as of September 30, 2011, and December 31, 2010.

**Table 48:   Unpaid Principal Balance of Financial Guarantees**

| | As of | |
|---|---|---|
| | September 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Alt-A private-label securities | $1,356 | $1,544 |
| Subprime private-label securities | 1,425 | 1,487 |
| Mortgage revenue bonds | 5,003 | 5,264 |
| Other mortgage-related securities | 324 | 347 |
| Non mortgage-related securities | 58 | 172 |
| Total | $8,166 | $8,814 |

With the exception of Ambac Assurance Corporation ("Ambac"), none of our financial guarantor counterparties has failed to repay us for claims under guaranty contracts. Ambac provided coverage on

91

$3.4 billion, or 41%, of our total guarantees, as of September 30, 2011. Based on the stressed financial condition of our financial guarantor counterparties, we believe that all but one of our other financial guarantor counterparties may not be able to fully meet their obligations to us in the future. We model our securities without assuming the benefit of financial guarantees. We then adjust results for those external financial guarantees from guarantors that we determine are creditworthy, although we continue to seek collection of any amounts due to us from all counterparties. As of September 30, 2011, when modeling our securities for impairments we did not assume the benefit of external financial guarantees from any counterparty.

We are also the beneficiary of financial guarantees included in securities issued by Freddie Mac, the federal government and its agencies that totaled $32.6 billion as of September 30, 2011 and $25.7 billion as of December 31, 2010.

*Lenders with Risk Sharing*

We enter into risk sharing agreements with lenders pursuant to which the lenders agree to bear all or some portion of the credit losses on the covered loans. Our maximum potential loss recovery from lenders under these risk sharing agreements on single-family loans was $13.3 billion as of September 30, 2011 and $15.6 billion as of December 31, 2010. As of September 30, 2011, 58% of our maximum potential loss recovery on single-family loans was from three lenders and as of December 31, 2010, 56% of our maximum potential loss recovery on single-family loans was from three lenders. Our maximum potential loss recovery from lenders under these risk sharing agreements on DUS and non-DUS multifamily loans was $31.6 billion as of September 30, 2011 and $30.3 billion as of December 31, 2010. As of September 30, 2011, 40% of our maximum potential loss recovery on multifamily loans was from three DUS lenders. As of December 31, 2010, 41% of our maximum potential loss recovery on multifamily loans was from three DUS lenders.

Unfavorable market conditions have adversely affected, and continue to adversely affect, the liquidity and financial condition of our lender counterparties. The percentage of single-family recourse obligations to lenders with investment grade credit ratings (based on the lower of S&P, Moody's and Fitch ratings) was 47% as of September 30, 2011 and 46% as of December 31, 2010. The percentage of these recourse obligations to lender counterparties rated below investment grade was 24% as of September 30, 2011 and 23% as of December 31, 2010. The remaining percentage of these recourse obligations were to lender counterparties that were not rated by rating agencies, which was 29% as of September 30, 2011 and 31% as of December 31, 2010. Given the stressed financial condition of some of our lenders, we expect in some cases we will recover less, perhaps significantly less, than the amount the lender is obligated to provide us under our risk sharing arrangement with them. Depending on the financial strength of the counterparty, we may require a lender to pledge collateral to secure its recourse obligations.

As noted above in "Multifamily Credit Risk Management," our primary multifamily delivery channel is our DUS program, which is comprised of lenders that span the spectrum from large depositories to independent non-bank financial institutions. As of September 30, 2011, approximately 53% of the unpaid principal balance of loans in our multifamily guaranty book of business serviced by our DUS lenders were from institutions with an external investment grade credit rating or a guarantee from an affiliate with an external investment grade credit rating. Given the recourse nature of the DUS program, the lenders are bound by eligibility standards that dictate, among other items, minimum capital and liquidity levels, and the posting of collateral at a highly rated custodian to secure a portion of the lenders' future obligations. We actively monitor the financial condition of these lenders to help ensure the level of risk remains within our standards.

*Custodial Depository Institutions*

A total of $52.1 billion in deposits for single-family payments were received and held by 286 institutions in the month of September 2011 and a total of $75.4 billion in deposits for single-family payments were received and held by 289 institutions in the month of December 2010. Of these total deposits, 93% as of September 30, 2011 and 92% as of December 31, 2010 were held by institutions rated as investment grade by S&P, Moody's and Fitch. Our ten largest custodial depository institutions held 93% of these deposits as of both September 30, 2011 and December 31, 2010.

If a custodial depository institution were to fail while holding remittances of borrower payments of principal and interest due to us in our custodial account, we would be an unsecured creditor of the depository for balances in excess of the deposit insurance protection and might not be able to recover all of the principal and interest payments being held by the depository on our behalf, or there might be a substantial delay in receiving these amounts. If this were to occur, we would be required to replace these amounts with our own funds to make payments that are due to Fannie Mae MBS certificate holders. Accordingly, the insolvency of one of our principal custodial depository counterparties could result in significant financial losses to us. In the month of September 2011, approximately $3.6 billion or 7% of our total deposits for single-family payments received and held by these institutions was in excess of the deposit insurance protection limit compared with approximately $6.2 billion or 8% in the month of December 2010. These amounts can vary as they are calculated based on individual payments of mortgage borrowers and we must estimate which borrowers are paying their regular principal and interest payments and other types of payments, such as prepayments from refinancing or sales.

### Issuers of Investments Held in our Cash and Other Investments Portfolio

Our cash and other investments portfolio primarily consists of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell or similar arrangements, U.S. Treasury securities and asset-backed securities. Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. See "Liquidity and Capital Management—Liquidity Management—Cash and Other Investments Portfolio" for more detailed information on our cash and other investments portfolio.

Our cash and other investments portfolio, which totaled $103.5 billion as of September 30, 2011, included $41.9 billion of U.S. Treasury securities and $5.0 billion of unsecured positions. As of December 31, 2010, our cash and other investments portfolio totaled $61.8 billion and included $31.5 billion of U.S. Treasury securities and $10.3 billion of unsecured positions. As of both September 30, 2011 and December 31, 2010, all of our unsecured positions were short-term deposits with financial institutions which had short-term credit ratings of A-1, P-1, F1 (or equivalent) or higher from Standard & Poor's, Moody's and Fitch ratings, respectively.

### Derivatives Counterparties

Our derivative credit exposure relates principally to interest rate and foreign currency derivatives contracts. We estimate our exposure to credit loss on derivative instruments by calculating the replacement cost, on a present value basis, to settle at current market prices all outstanding derivative contracts in a net gain position by counterparty where the right of legal offset exists, such as master netting agreements, and by transaction where the right of legal offset does not exist. The fair value of derivatives in a gain position is included in our condensed consolidated balance sheets in "Other assets." Typically, we seek to manage credit exposure by contracting with experienced counterparties that are rated A- (or its equivalent) or better by the major ratings organizations. We also manage our exposure by requiring counterparties to post collateral. The collateral includes cash, U.S. Treasury securities, agency debt and agency mortgage-related securities.

Our net credit exposure on derivatives contracts increased to $164 million as of September 30, 2011, from $152 million as of December 31, 2010. We had outstanding interest rate and foreign currency derivative transactions with 15 counterparties as of both September 30, 2011 and December 31, 2010. Derivatives transactions with nine of our counterparties accounted for approximately 90% of our total outstanding notional amount as of September 30, 2011, with each of these counterparties accounting for between approximately 6% and 16% of the total outstanding notional amount. In addition to the 15 counterparties with whom we had outstanding notional amounts and master netting agreements as of September 30, 2011, we had a master netting agreement with one more counterparty with whom we may enter into interest rate derivative or foreign currency derivative transactions in the future.

We expect that, under the Dodd-Frank Act, we will be required in the future to submit certain interest rate swaps for clearing to a derivatives clearing organization. In anticipation of those requirements, we have cleared a small number of new interest rate swap transactions with the Chicago Mercantile Exchange, Inc.

TREASURY-2009

("CME"), a derivatives clearing organization. As a result, we are exposed to the institutional credit risk of CME and its members that execute and submit our transactions for clearing. Our institutional credit risk exposure to the CME or other comparable exchanges or trading facilities, as well as their members, is likely to increase in the future.

See "Note 9, Derivative Instruments" for information on the outstanding notional amount and additional information on our risk management derivative contracts as of September 30, 2011 and December 31, 2010, as well as a discussion of our collateral requirements under our derivatives contracts. See "Risk Factors" for a discussion of the impact of decreases in our credit ratings on our collateral obligations under our derivatives contracts. Also see "Risk Factors" in our 2010 Form 10-K for a discussion of the risks to our business posed by interest rate risk and a discussion of the risks to our business as a result of the concentration of our institutional counterparties.

### Market Risk Management, Including Interest Rate Risk Management

We are subject to market risk, which includes interest rate risk, spread risk and liquidity risk. These risks arise from our mortgage asset investments. Interest rate risk is the risk of loss in value or expected future earnings that may result from changes to interest rates. Spread risk is the resulting impact of changes in the spread between our mortgage assets and our debt and derivatives we use to hedge our position. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner. We describe our sources of interest rate risk exposure and our strategy for managing interest rate risk and spread risk in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management" in our 2010 Form 10-K.

#### *Measurement of Interest Rate Risk*

Below we present two quantitative metrics that provide estimates of our interest rate exposure: (1) fair value sensitivity of net portfolio to changes in interest rate levels and slope of yield curve; and (2) duration gap. The metrics presented are calculated using internal models that require standard assumptions regarding interest rates and future prepayments of principal over the remaining life of our securities. These assumptions are derived based on the characteristics of the underlying structure of the securities and historical prepayment rates experienced at specified interest rate levels, taking into account current market conditions, the current mortgage rates of our existing outstanding loans, loan age and other factors. On a continuous basis, management makes judgments about the appropriateness of the risk assessments and will make adjustments as necessary to properly assess our interest rate exposure and manage our interest rate risk. The methodologies used to calculate risk estimates are periodically changed on a prospective basis to reflect improvements in the underlying estimation process.

##### *Interest Rate Sensitivity to Changes in Interest Rate Level and Slope of Yield Curve*

As part of our disclosure commitments with FHFA, we disclose on a monthly basis the estimated adverse impact on the fair value of our net portfolio that would result from the following hypothetical situations:

- A 50 basis point shift in interest rates.

- A 25 basis point change in the slope of the yield curve.

In measuring the estimated impact of changes in the level of interest rates, we assume a parallel shift in all maturities of the U.S. LIBOR interest rate swap curve.

In measuring the estimated impact of changes in the slope of the yield curve, we assume a constant 7-year rate and a shift of 16.7 basis points for the 1-year rate and 8.3 basis points for the 30-year rate. We believe the aforementioned interest rate shocks for our monthly disclosures represent moderate movements in interest rates over a one-month period.

TREASURY-2010

*Duration Gap*

Duration gap measures the price sensitivity of our assets and liabilities to changes in interest rates by quantifying the difference between the estimated durations of our assets and liabilities. Our duration gap analysis reflects the extent to which the estimated maturity and repricing cash flows for our assets are matched, on average, over time and across interest rate scenarios to the estimated cash flows of our liabilities. A positive duration gap indicates that the duration of our assets exceeds the duration of our liabilities. We disclose duration gap on a monthly basis under the caption "Interest Rate Risk Disclosures" in our Monthly Summaries, which are available on our website and announced in a press release.

The sensitivity measures presented in Table 49, which we disclose on a quarterly basis as part of our disclosure commitments with FHFA, are an extension of our monthly sensitivity measures. There are three primary differences between our monthly sensitivity disclosure and the quarterly sensitivity disclosure presented below: (1) the quarterly disclosure is expanded to include the sensitivity results for larger rate level shocks of plus or minus 100 basis points; (2) the monthly disclosure reflects the estimated pre-tax impact on the market value of our net portfolio calculated based on a daily average, while the quarterly disclosure reflects the estimated pre-tax impact calculated based on the estimated financial position of our net portfolio and the market environment as of the last business day of the quarter; and (3) the monthly disclosure shows the most adverse pre-tax impact on the market value of our net portfolio from the hypothetical interest rate shocks, while the quarterly disclosure includes the estimated pre-tax impact of both up and down interest rate shocks.

In addition, Table 49 also provides the average, minimum, maximum and standard deviation for duration gap and for the most adverse market value impact on the net portfolio for non-parallel and parallel interest rate shocks for the three months ended September 30, 2011 and 2010.

**Table 49:   Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve**[1]

| | As of | |
|---|---|---|
| | September 30, 2011 | December 31, 2010 |
| | (Dollars in billions) | |
| Rate level shock: | | |
| -100 basis points | $0.1 | $(0.8) |
| -50 basis points | — | (0.2) |
| +50 basis points | — | (0.2) |
| +100 basis points | — | (0.5) |
| Rate slope shock: | | |
| -25 basis points (flattening) | — | (0.1) |
| +25 basis points (steepening) | — | 0.1 |

| | For the Three Months Ended September 30, 2011 | | |
|---|---|---|---|
| | Duration Gap | Rate Slope Shock 25 Bps | Rate Level Shock 50 Bps |
| | | Exposure | |
| | (In months) | (Dollars in billions) | |
| Average | 0.1 | $0.1 | $0.2 |
| Minimum | (0.7) | — | — |
| Maximum | 0.8 | 0.2 | 0.3 |
| Standard deviation | 0.3 | 0.1 | 0.1 |

TREASURY-2011

|  | For the Three Months Ended September 30, 2010 | | |
|--|:--:|:--:|:--:|
|  | Duration Gap | Rate Slope Shock 25 Bps | Rate Level Shock 50 Bps |
|  |  | Exposure | |
|  | (In months) | (Dollars in billions) | |
| Average . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.2 | $ — | $0.2 |
| Minimum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (0.6) | — | — |
| Maximum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.7 | 0.1 | 0.4 |
| Standard deviation . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.3 | — | 0.1 |

[1] Computed based on changes in LIBOR swap rates.

A majority of the interest rate risk associated with our mortgage-related securities and loans is hedged with our debt issuance, which includes callable debt. We use derivatives to help manage the residual interest rate risk exposure between our assets and liabilities. Derivatives have enabled us to keep our interest rate risk exposure at consistently low levels in a wide range of interest-rate environments. Table 50 shows an example of how derivatives impacted the net market value exposure for a 50 basis point parallel interest rate shock.

**Table 50:   Derivative Impact on Interest Rate Risk (50 Basis Points)**

|  | Before Derivatives | After Derivatives | Effect of Derivatives |
|--|:--:|:--:|:--:|
|  | (Dollars in billions) | | |
| As of September 30, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(1.4) | $ — | $1.4 |
| As of December 31, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(0.9) | $(0.2) | $0.7 |

<u>Other Interest Rate Risk Information</u>

The interest rate risk measures discussed above exclude the impact of changes in the fair value of our net guaranty assets resulting from changes in interest rates. We exclude our guaranty business from these sensitivity measures based on our current assumption that the guaranty fee income generated from future business activity will largely replace guaranty fee income lost due to mortgage prepayments.

In "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management—Measurement of Interest Rate Risk—Other Interest Rate Risk Information" in our 2010 Form 10-K, we provided additional interest rate sensitivities including separate disclosure of the potential impact on the fair value of our trading assets and other financial instruments. As of September 30, 2011, these sensitivities were relatively unchanged as compared with December 31, 2010. The fair value of our trading financial instruments and our other financial instruments as of September 30, 2011 and December 31, 2010 can be found in "Note 13, Fair Value."

**Liquidity Risk Management**

See "Liquidity and Capital Management—Liquidity Management" for a discussion on how we manage liquidity risk.

TREASURY-2012

## IMPACT OF FUTURE ADOPTION OF NEW ACCOUNTING PRONOUNCEMENTS

We identify and discuss the expected impact on our condensed consolidated financial statements of recently issued accounting pronouncements in "Note 1, Summary of Significant Accounting Policies."

## FORWARD-LOOKING STATEMENTS

This report includes statements that constitute forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934 ("Exchange Act"). In addition, our senior management may from time to time make forward-looking statements orally to analysts, investors, the news media and others. Forward-looking statements often include words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," "forecast," "project," "would," "should," "could," "likely," "may," or similar words.

Among the forward-looking statements in this report are statements relating to:

- Our expectation that loans in our new single-family book of business will be profitable over their lifetime;

- Our belief that credit losses on loans we have acquired since 2009 would exceed guaranty fee revenue if home prices declined nationally by approximately 10% from their September 2011 levels over the next five years, based on our home price index;

- Our expectations regarding whether loans we acquired in specific years will be profitable or unprofitable;

- Our expectations regarding the performance and profitability of loans we acquired in 2004 and the factors that will impact the performance and profitability of these loans;

- Our expectation that our 2005 through 2008 vintages will be significantly more unprofitable than our 2004 vintage;

- Our expectation that our acquisitions of loans with high LTV ratios will increase in 2012 as a result of recently announced changes to HARP;

- Our expectations regarding the credit profile of loans we acquire in the future, and the factors that will influence their credit profile;

- Our estimate that, while single-family loans that we acquired from 2005 through 2008 will give rise to additional credit losses that we will realize when the loans are charged off (upon foreclosure or our acceptance of a short sale or deed-in-lieu of foreclosure), we have reserved for the substantial majority of the remaining losses on these loans;

- Our expectation that future defaults on loans in our legacy book of business and the resulting charge-offs will occur over a period of years;

- Our expectation that it will take years before our REO inventory is reduced to pre-2008 levels;

- Our expectation that we will realize as credit losses an estimated two-thirds of the fair value losses on loans purchased out of MBS trusts that are reflected in our condensed consolidated balance sheets, and eventually recover the remaining one-third, either through net interest income for loans that cure or through foreclosed property income for loans where the sale of the collateral exceeds our recorded investment in the loan;

- Our belief that successful modifications will ultimately reduce our credit losses over the long term from what they otherwise would have been if we had taken the loans to foreclosure;

- Our expectation that serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, the volume of loan modifications and the extent to which borrowers with modified loans continue to make timely payments;

TREASURY-2013

- Our belief that foreclosure delays resulting from changes in the foreclosure environment will continue to negatively impact our foreclosure timelines, credit-related expenses and single-family serious delinquency rates, and will delay the recovery of the housing market;

- Our expectation that employment will likely need to post sustained improvement for an extended period to have a positive impact on housing;

- Our expectation that weakness in the housing and mortgage markets will continue in the fourth quarter of 2011;

- Our expectation that home sales are unlikely to increase until the unemployment rate improves further;

- Our estimate that the likelihood of a recession by the end of next year is close to 50%;

- Our expectation that single-family default and severity rates, as well as the level of single-family foreclosures, will remain high in 2011;

- Our expectation that multifamily charge-offs in 2011 will remain generally commensurate with 2010 levels as certain local markets and properties continue to exhibit weak fundamentals;

- Our expectations that the recently announced changes to HARP will result in our acquiring more refinancings in 2012 than we would have acquired in the absence of the changes, but that we will acquire fewer refinancings overall in each of 2011 and 2012 than in 2010 as a result of the high number of mortgages that have already refinanced to low rates in recent years;

- Our expectation that the pace of our loan acquisitions overall for each of 2011 and 2012 will be lower than in 2010;

- Our belief that our loan acquisitions could be negatively affected by the decrease in our maximum loan limit in the fourth quarter of 2011;

- Our expectation that if FHA continues to be the lower-cost option for some consumers, and in some cases the only option, for loans with higher LTV ratios, our market share could be adversely impacted;

- Our expectation that our future revenues will be negatively impacted to the extent our acquisitions decline;

- Our estimation that total originations in the U.S. single-family mortgage market in 2011 will decrease from 2010 levels by approximately 23%, from an estimated $1.7 trillion to an estimated $1.3 trillion, and that the amount of originations in the U.S. single-family mortgage market that are refinancings will decline from approximately $1.1 trillion to approximately $905 billion;

- Our expectation that home prices on a national basis will decline further, with greater declines in some geographic areas than others, before stabilizing in 2012;

- Our expectations regarding regional variations in home price declines and stabilization;

- Our expectation of a peak-to-trough home price decline on a national basis ranging from 22% to 28%, and our expectation that it would take the occurrence of an additional adverse economic event to reach the high end of the range;

- Our expectation that our credit losses will be lower in 2011 than in 2010;

- Our expectation that we will not earn profits in excess of our annual dividend obligation to Treasury for the indefinite future;

- Our expectation that the Acting Director of FHFA will submit a request to Treasury on our behalf for $7.8 billion to eliminate our net worth deficit as of September 30, 2011;

98

- Our expectation that we will request additional draws under the senior preferred stock purchase agreement in future periods, which will further increase the dividends we owe to Treasury on the senior preferred stock;

- Our expectation that over time our dividend obligation to Treasury will constitute an increasing portion of our future draws under the senior preferred stock purchase agreement;

- Our expectation that uncertainty regarding the future of our company will continue;

- Our expectation that Congress will continue to hold hearings and consider legislation in the remainder of 2011 and in 2012 on the future status of Fannie Mae and Freddie Mac;

- Our belief that, as drafted, bills introduced in Congress that would require FHFA to make a determination within two years of enactment whether the GSEs were financially viable and, if the GSEs were determined to be not financially viable, to place them into receivership may upon enactment impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of our existing and ongoing liabilities;

- Our expectations regarding when fees for loans refinanced under HARP's revised terms will be announced;

- Our expectation that our single-family guaranty fees will increase in the coming years;

- Our expectations regarding a transitional period as we phase out the practice of requiring mortgage servicers to use our network of retained attorneys to perform default- and foreclosure-related legal services for our loans;

- Our expectation that we will continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other factors, including the limit on mortgage assets that we may own pursuant to the senior preferred stock purchase agreement;

- Our expectation that our mortgage portfolio will continue to decrease due to the restrictions on the amount of mortgage assets we may own under the terms of our senior preferred stock purchase agreement with Treasury;

- Our expectation that the current market premium portion of our current estimate of fair value will not impact future Treasury draws, which is based on our intention not to have another party assume the credit risk inherent in our book of business;

- Our expectation that our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirement of the senior preferred stock purchase agreement;

- Our intention to repay our short-term and long-term debt obligations as they become due primarily through proceeds from the issuance of additional debt securities;

- Our intention to use funds we receive from Treasury under the senior preferred stock purchase agreement to pay our debt obligations and to pay dividends on the senior preferred stock;

- Our expectations regarding our credit ratings and their impact on us;

- Our expectation that our acquisitions of Alt-A mortgage loans will continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A will continue to decrease over time;

- Our expectation that the volume of our foreclosure alternatives will remain high throughout the remainder of 2011;

- Our belief that the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and income, and home prices;

TREASURY-2015

- Our expectation that the amount of our outstanding repurchase requests to seller/servicers will remain high, and that we may be unable to recover on all outstanding loan repurchase obligations resulting from seller/servicers' breaches of contractual obligations;

- Our expectations regarding recoveries from our lenders under risk sharing arrangements, and the possibility that we may require a lender to pledge collateral to secure its recourse obligations;

- Our belief that one or more of our financial guarantor counterparties may not be able to fully meet their obligations to us in the future;

- Our expectation that we will be required to submit certain interest rate swaps for clearing to a derivatives clearing organization in the future and that our institutional credit risk exposure to the Chicago Mercantile Exchange or other comparable exchanges or trading facilities and their members is likely to increase in the future;

- Our expectation that we will continue to need funding from Treasury to avoid triggering FHFA's obligation to place us into receivership; and

- Our belief that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding.

Forward-looking statements reflect our management's expectations, forecasts or predictions of future conditions, events or results based on various assumptions and management's estimates of trends and economic factors in the markets in which we are active, as well as our business plans. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. Our actual results and financial condition may differ, possibly materially, from the anticipated results and financial condition indicated in these forward-looking statements. There are a number of factors that could cause actual conditions, events or results to differ materially from those described in the forward-looking statements contained in this report, including, but not limited to the following: the uncertainty of our future; legislative and regulatory changes affecting us; challenges we face in retaining and hiring qualified employees; the deteriorated credit performance of many loans in our guaranty book of business; the conservatorship and its effect on our business; the investment by Treasury and its effect on our business; adverse effects from activities we undertake to support the mortgage market and help borrowers; a decrease in our credit ratings; limitations on our ability to access the debt capital markets; further disruptions in the housing and credit markets; defaults by one or more institutional counterparties; our reliance on mortgage servicers; deficiencies in servicer foreclosure processes and the consequences of those deficiencies; guidance by the FASB; operational control weaknesses; our reliance on models; the level and volatility of interest rates and credit spreads; changes in the structure and regulation of the financial services industry; and those factors described in "Risk Factors" in this report and in our 2010 Form 10-K, as well as the factors described in "Executive Summary—Our Strong New Book of Business and Expected Losses on our Legacy Book of Business— Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations" in this report.

Readers are cautioned to place forward-looking statements in this report or that we make from time to time into proper context by carefully considering the factors discussed in "Risk Factors" in our 2010 Form 10-K and in this report. Our forward-looking statements speak only as of the date they are made, and we undertake no obligation to update any forward-looking statement because of new information, future events or otherwise, except as required under the federal securities laws.

TREASURY-2016

**Item 1.   Financial Statements**

<div align="center">

**FANNIE MAE**

**(In conservatorship)**

**Condensed Consolidated Balance Sheets—(Unaudited)**
(Dollars in millions, except share amounts)

</div>

| | As of | |
|---|---|---|
| | September 30, 2011 | December 31, 2010 |
| **ASSETS** | | |
| Cash and cash equivalents (includes $3 and $348, respectively, related to consolidated trusts) . . . . . . . | $ 24,307 | $ 17,297 |
| Restricted cash (includes $51,774 and $59,619, respectively, related to consolidated trusts). . . . . . . . . | 55,961 | 63,678 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements . . . . . . | 35,950 | 11,751 |
| Investments in securities: | | |
| Trading, at fair value (includes $20 and $21, respectively, related to consolidated trusts) . . . . . . . | 68,149 | 56,856 |
| Available-for-sale, at fair value (includes $1,429 and $1,055, respectively, related to consolidated trusts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 82,710 | 94,392 |
| Total investments in securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 150,859 | 151,248 |
| Mortgage loans: | | |
| Loans held for sale, at lower of cost or fair value (includes $53 and $661, respectively, related to consolidated trusts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 309 | 915 |
| Loans held for investment, at amortized cost: | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 385,247 | 407,228 |
| Of consolidated trusts (includes $3,361 and $2,962, respectively, at fair value and loans pledged as collateral that may be sold or repledged of $6,993 and $2,522, respectively) . . . . . . . . . | 2,583,699 | 2,577,133 |
| Total loans held for investment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,968,946 | 2,984,361 |
| Allowance for loan losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (71,435) | (61,556) |
| Total loans held for investment, net of allowance . . . . . . . . . . . . . . . . . . . . . . . . . | 2,897,511 | 2,922,805 |
| Total mortgage loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,897,820 | 2,923,720 |
| Accrued interest receivable, net (includes $8,451 and $8,910, respectively, related to consolidated trusts) . . . | 10,862 | 11,279 |
| Acquired property, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,195 | 16,173 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25,923 | 26,826 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,213,877 | $3,221,972 |
| **LIABILITIES AND DEFICIT** | | |
| Liabilities: | | |
| Accrued interest payable (includes $9,449 and $9,712, respectively, related to consolidated trusts) . . | $ 12,928 | $ 13,764 |
| Federal funds purchased and securities sold under agreements to repurchase . . . . . . . . . . . . . . . . | — | 52 |
| Debt: | | |
| Of Fannie Mae (includes $845 and $893, respectively, at fair value) . . . . . . . . . . . . . . . . . . . | 744,803 | 780,044 |
| Of consolidated trusts (includes $3,840 and $2,271, respectively, at fair value) . . . . . . . . . . . | 2,446,973 | 2,416,956 |
| Other liabilities (includes $674 and $893, respectively, related to consolidated trusts) . . . . . . . . . . | 16,964 | 13,673 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,221,668 | 3,224,489 |
| Commitments and contingencies (Note 14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — |
| Fannie Mae stockholders' equity (deficit): | | |
| Senior preferred stock, 1,000,000 shares issued and outstanding . . . . . . . . . . . . . . . . . . . . . . | 104,787 | 88,600 |
| Preferred stock, 700,000,000 shares are authorized—555,374,922 and 576,868,139 shares issued and outstanding, respectively . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19,130 | 20,204 |
| Common stock, no par value, no maximum authorization—1,308,762,703 and 1,270,092,708 shares issued, respectively; 1,157,757,042 and 1,118,504,194 shares outstanding, respectively . . . . . . . . . | 687 | 667 |
| Accumulated deficit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (123,359) | (102,986) |
| Accumulated other comprehensive loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,696) | (1,682) |
| Treasury stock, at cost, 151,005,661 and 151,588,514 shares, respectively . . . . . . . . . . . . . . . . | (7,402) | (7,402) |
| Total Fannie Mae stockholders' deficit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (7,853) | (2,599) |
| Noncontrolling interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 62 | 82 |
| Total deficit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (7,791) | (2,517) |
| Total liabilities and deficit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,213,877 | $3,221,972 |

<div align="center">

See Notes to Condensed Consolidated Financial Statements

101

</div>

**FANNIE MAE**
**(In conservatorship)**

**Condensed Consolidated Statements of Operations and Comprehensive Loss—(Unaudited)**
(Dollars and shares in millions, except per share amounts)

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| **Interest income:** | | | | |
| Trading securities | $ 274 | $ 310 | $ 822 | $ 955 |
| Available-for-sale securities | 1,160 | 1,313 | 3,525 | 4,175 |
| Mortgage loans (includes $30,633 and $32,807, respectively, for the three months ended and $94,111 and $100,810, respectively, for the nine months ended related to consolidated trusts) | 34,334 | 36,666 | 105,257 | 111,917 |
| Other | 26 | 31 | 79 | 111 |
| Total interest income | 35,794 | 38,320 | 109,683 | 117,158 |
| **Interest expense:** | | | | |
| Short-term debt (includes $3 and $4, respectively, for the three months ended and $8 and $9, respectively, for the nine months ended related to consolidated trusts) | 66 | 194 | 254 | 479 |
| Long-term debt (includes $27,157 and $28,878, respectively, for the three months ended and $82,928 and $90,379, respectively, for the nine months ended related to consolidated trusts) | 30,542 | 33,350 | 94,311 | 104,907 |
| Total interest expense | 30,608 | 33,544 | 94,565 | 105,386 |
| Net interest income | 5,186 | 4,776 | 15,118 | 11,772 |
| Provision for loan losses | (4,159) | (4,696) | (20,548) | (20,930) |
| Net interest income (loss) after provision for loan losses | 1,027 | 80 | (5,430) | (9,158) |
| Investment gains, net | 73 | 82 | 319 | 271 |
| Other-than-temporary impairments | (232) | (366) | (317) | (600) |
| Noncredit portion of other-than-temporary impairments recognized in other comprehensive income | (30) | 40 | (45) | (99) |
| Net other-than-temporary impairments | (262) | (326) | (362) | (699) |
| Fair value (losses) gains, net | (4,525) | 525 | (5,870) | (877) |
| Debt extinguishment losses, net | (119) | (214) | (149) | (497) |
| Fee and other income | 291 | 304 | 793 | 831 |
| Non-interest (loss) income | (4,542) | 371 | (5,269) | (971) |
| **Administrative expenses:** | | | | |
| Salaries and employee benefits | 323 | 325 | 953 | 973 |
| Professional services | 173 | 305 | 531 | 759 |
| Occupancy expenses | 46 | 43 | 131 | 124 |
| Other administrative expenses | 49 | 57 | 150 | 149 |
| Total administrative expenses | 591 | 730 | 1,765 | 2,005 |
| (Benefit) provision for guaranty losses | (8) | 78 | 694 | 111 |
| Foreclosed property expense | 733 | 787 | 743 | 1,255 |
| Other expenses | 254 | 196 | 638 | 650 |
| Total expenses | 1,570 | 1,791 | 3,840 | 4,021 |
| Loss before federal income taxes | (5,085) | (1,340) | (14,539) | (14,150) |
| Benefit for federal income taxes | — | 9 | 91 | 67 |
| Net loss | (5,085) | (1,331) | (14,448) | (14,083) |
| **Other comprehensive (loss) income:** | | | | |
| Changes in unrealized losses on available-for-sale securities, net of reclassification adjustments and taxes | (198) | 901 | (20) | 3,938 |
| Other | 1 | 1 | 6 | 6 |
| Total other comprehensive (loss) income | (197) | 902 | (14) | 3,944 |
| Total comprehensive loss | (5,282) | (429) | (14,462) | (10,139) |
| Less: Comprehensive income attributable to the noncontrolling interest | — | (8) | (1) | (4) |
| Total comprehensive loss attributable to Fannie Mae | $(5,282) | $ (437) | $(14,463) | $(10,143) |
| Net loss | $(5,085) | $(1,331) | $(14,448) | $(14,083) |
| Less: Net income attributable to the noncontrolling interest | — | (8) | (1) | (4) |
| Net loss attributable to Fannie Mae | (5,085) | (1,339) | (14,449) | (14,087) |
| Preferred stock dividends | (2,494) | (2,116) | (6,992) | (5,550) |
| Net loss attributable to common stockholders | $(7,579) | $(3,455) | $(21,441) | $(19,637) |
| Loss per share—Basic and Diluted | $ (1.32) | $ (0.61) | $ (3.74) | $ (3.45) |
| Weighted-average common shares outstanding—Basic and Diluted | 5,760 | 5,695 | 5,730 | 5,694 |

See Notes to Condensed Consolidated Financial Statements

102

TREASURY-2018

**FANNIE MAE**
**(In conservatorship)**

**Condensed Consolidated Statements of Cash Flows—(Unaudited)**
(Dollars in millions)

| | For the Nine Months Ended September 30, | |
|---|---|---|
| | **2011** | **2010** |
| **Net cash used in operating activities** | $ (6,714) | $ (42,447) |
| **Cash flows provided by investing activities:** | | |
| Purchases of trading securities held for investment | (2,483) | (7,984) |
| Proceeds from maturities and paydowns of trading securities held for investment | 1,672 | 1,997 |
| Proceeds from sales of trading securities held for investment | 837 | 21,488 |
| Purchases of available-for-sale securities | (44) | (262) |
| Proceeds from maturities and paydowns of available-for-sale securities | 9,995 | 12,927 |
| Proceeds from sales of available-for-sale securities | 2,590 | 7,096 |
| Purchases of loans held for investment | (44,276) | (52,048) |
| Proceeds from repayments of loans held for investment of Fannie Mae | 18,467 | 14,749 |
| Proceeds from repayments of loans held for investment of consolidated trusts | 364,500 | 378,662 |
| Net change in restricted cash | 7,717 | (11,111) |
| Advances to lenders | (43,363) | (44,951) |
| Proceeds from disposition of acquired property and preforeclosure sales | 36,280 | 28,079 |
| Net change in federal funds sold and securities purchased under agreements to resell or similar agreements | (24,199) | 33,219 |
| Other, net | 137 | (476) |
| Net cash provided by investing activities | 327,830 | 381,385 |
| **Cash flows used in financing activities:** | | |
| Proceeds from issuance of debt of Fannie Mae | 572,828 | 890,570 |
| Payments to redeem debt of Fannie Mae | (609,399) | (848,438) |
| Proceeds from issuance of debt of consolidated trusts | 157,280 | 191,665 |
| Payments to redeem debt of consolidated trusts | (444,160) | (587,963) |
| Payments of cash dividends on senior preferred stock to Treasury | (6,992) | (5,554) |
| Proceeds from senior preferred stock purchase agreement with Treasury | 16,187 | 25,200 |
| Net change in federal funds purchased and securities sold under agreements to repurchase | — | 185 |
| Other, net | 150 | (33) |
| Net cash used in financing activities | (314,106) | (334,368) |
| **Net increase in cash and cash equivalents** | 7,010 | 4,570 |
| Cash and cash equivalents at beginning of period | 17,297 | 6,812 |
| Cash and cash equivalents at end of period | $ 24,307 | $ 11,382 |
| **Cash paid during the period for interest** | $ 97,592 | $ 107,537 |

See Notes to Condensed Consolidated Financial Statements

103

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

## 1.  Summary of Significant Accounting Policies

*Organization*

We are a stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act (the "Charter Act" or our "charter"). We are a government-sponsored enterprise ("GSE") and subject to government oversight and regulation. Our regulators include the Federal Housing Finance Agency ("FHFA"), the U.S. Department of Housing and Urban Development ("HUD"), the U.S. Securities and Exchange Commission ("SEC"), and the U.S. Department of the Treasury ("Treasury"). The U.S. government does not guarantee our securities or other obligations.

*Conservatorship*

On September 7, 2008, the Secretary of the Treasury and the Director of FHFA announced several actions taken by Treasury and FHFA regarding Fannie Mae, which included: (1) placing us in conservatorship; (2) the execution of a senior preferred stock purchase agreement by our conservator, on our behalf, and Treasury, pursuant to which we issued to Treasury both senior preferred stock and a warrant to purchase common stock; and (3) Treasury's agreement to establish a temporary secured lending credit facility that was available to us and the other GSEs regulated by FHFA under identical terms until December 31, 2009.

Under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Federal Housing Finance Regulatory Reform Act of 2008, (together, the "GSE Act"), the conservator immediately succeeded to (1) all rights, titles, powers and privileges of Fannie Mae, and of any stockholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and (2) title to the books, records and assets of any other legal custodian of Fannie Mae. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. The conservator retains the authority to withdraw its delegations at any time.

We were directed by FHFA to voluntarily delist our common stock and each listed series of our preferred stock from the New York Stock Exchange and the Chicago Stock Exchange. The last trading day for the listed securities on the New York Stock Exchange and the Chicago Stock Exchange was July 7, 2010, and since July 8, 2010, the securities have been traded on the over-the-counter market.

The conservator has the power to transfer or sell any asset or liability of Fannie Mae (subject to limitations and post-transfer notice provisions for transfers of qualified financial contracts) without any approval, assignment of rights or consent of any party. The GSE Act, however, provides that mortgage loans and mortgage-related assets that have been transferred to a Fannie Mae mortgage-backed securities ("MBS") trust must be held by the conservator for the beneficial owners of the Fannie Mae MBS and cannot be used to satisfy the general creditors of the company. As of November 8, 2011, FHFA has not exercised this power.

Neither the conservatorship nor the terms of our agreements with Treasury change our obligation to make required payments on our debt securities or perform under our mortgage guaranty obligations.

On June 20, 2011, FHFA issued a final rule establishing a framework for conservatorship and receivership operations for the GSEs. The final rule, which became effective on July 20, 2011, establishes procedures for conservatorship and receivership, and priorities of claims for contract parties and other claimants. The final rule is part of FHFA's implementation of the powers provided by the Federal Housing Finance Regulatory Reform Act of 2008, and does not seek to anticipate or predict future conservatorships or receiverships.

The conservatorship has no specified termination date and there continues to be uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred

104

FANNIE MAE
(In conservatorship)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(UNAUDITED)

stockholders will hold in us after the conservatorship is terminated. Under the GSE Act, FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations or if we have not been paying our debts, in either case, for a period of 60 days. In addition, the Director of FHFA may place us in receivership at his discretion at any time for other reasons, including conditions that FHFA has already asserted existed at the time the former Director of FHFA placed us into conservatorship. Placement into receivership would have a material adverse effect on holders of our common stock, preferred stock, debt securities and Fannie Mae MBS. Should we be placed into receivership, different assumptions would be required to determine the carrying value of our assets, which could lead to substantially different financial results. We are not aware of any plans of FHFA to significantly change our business model or capital structure in the near-term.

*Impact of U.S. Government Support*

We are dependent upon the continued support of Treasury to eliminate our net worth deficit, which avoids our being placed into receivership. Based on consideration of all the relevant conditions and events affecting our operations, including our dependence on the U.S. government, we continue to operate as a going concern and in accordance with our delegation of authority from FHFA.

Pursuant to the amended senior preferred stock purchase agreement, Treasury has committed to provide us with funding as needed to help us maintain a positive net worth thereby avoiding the mandatory receivership trigger described above. We have received a total of $103.8 billion as of September 30, 2011 under Treasury's funding commitment and the Acting Director of FHFA will submit a request for an additional $7.8 billion from Treasury to eliminate our net worth deficit as of September 30, 2011. The aggregate liquidation preference of the senior preferred stock was $104.8 billion as of September 30, 2011 and will increase to $112.6 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of September 30, 2011.

The amended senior preferred stock purchase agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any net worth deficiencies attributable to periods during 2010, 2011, and 2012. If we do not have a positive net worth as of December 31, 2012, then the amount of funding available under the amended senior preferred stock purchase agreement after 2012 will be $124.8 billion ($200 billion less $75.2 billion in cumulative draws for net worth deficiencies through December 31, 2009).

In the event we have a positive net worth as of December 31, 2012, then the amount of funding available after 2012 under the amended senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011, and 2012, as follows:

- If our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011, and 2012, then the amount of available funding will be $124.8 billion less our positive net worth as of December 31, 2012.

- If our positive net worth as of December 31, 2012 is greater than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011, and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011, and 2012.

As of November 7, 2011, the amount of the quarterly commitment fee payable by us to Treasury under the senior preferred stock purchase agreement had not been established; however, Treasury has waived the quarterly commitment fee under the senior preferred stock purchase agreement for each quarter of 2011 due to the continued fragility of the U.S. mortgage market and Treasury's belief that imposing the commitment fee

105

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

would not generate increased compensation for taxpayers. Treasury stated that it will reevaluate the situation during the next calendar quarter to determine whether to set the quarterly commitment fee for the first quarter of 2012.

We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt. Our ability to issue long-term debt has been strong primarily due to actions taken by the federal government to support us and the financial markets.

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. In addition, due to our reliance on the U.S. government's support, our access to debt funding or the cost of debt funding also could be materially adversely affected by a change or perceived change in the creditworthiness of the U.S. government. A downgrade in our credit ratings could reduce demand for our debt securities and increase our borrowing costs. Standard & Poor's Ratings Services' ("S&P") downgrade of our credit rating on August 8, 2011, which was a result of a similar action on the U.S. government's sovereign credit rating, has not adversely affected our access to debt funding or the cost of our debt funding. Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations.

On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. We expect that Congress will continue to hold hearings and consider legislation in 2011 on the future status of Fannie Mae and Freddie Mac, including proposals that would result in a substantial change to our business structure, or our operations, or that would involve Fannie Mae's liquidation or dissolution. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs.

***Basis of Presentation***

The accompanying unaudited interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and with the SEC's instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and note disclosures required by GAAP for complete consolidated financial statements. In the opinion of management, all adjustments of a normal recurring nature considered necessary for a fair presentation have been included. Intercompany accounts and transactions have been eliminated. Results for the three and nine months ended September 30, 2011 may not necessarily be indicative of the results for the year ending December 31, 2011. The unaudited interim condensed consolidated financial statements as of and for the three and nine months ended September 30, 2011 should be read in conjunction with our audited consolidated financial statements and related notes included in our Annual Report on Form 10-K for the year ended December 31, 2010 ("2010 Form 10-K"), filed with the SEC on February 24, 2011.

TREASURY-2022

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Related Parties*

As a result of our issuance to Treasury of the warrant to purchase shares of Fannie Mae common stock equal to 79.9% of the total number of shares of Fannie Mae common stock, we and the Treasury are deemed related parties. As of September 30, 2011, Treasury held an investment in our senior preferred stock with an aggregate liquidation preference of $104.8 billion. Our administrative expenses were reduced by $30 million and $90 million for the three and nine months ended September 30, 2011, respectively, due to reimbursements from Treasury and Freddie Mac for expenses incurred as program administrator for the Home Affordable Modification Program ("HAMP") and other initiatives under the Making Home Affordable Program.

During the nine months ended September 30, 2011, we received a refund of $1.1 billion from the Internal Revenue Service ("IRS"), a bureau of Treasury, related to the carryback of our 2009 operating loss to the 2008 and 2007 tax years. In addition, in June 2011, we effectively settled our 2007 and 2008 tax years with the IRS and as a result, we have recognized an income tax benefit of $90 million in our condensed consolidated statements of operations and comprehensive loss for the nine months ended September 30, 2011.

Under a temporary credit and liquidity facilities ("TCLF") program, we had $3.3 billion and $3.7 billion outstanding, which include principal and interest, of three-year standby credit and liquidity support as of September 30, 2011 and December 31, 2010, respectively. Treasury has purchased participating interests in these temporary credit and liquidity facilities. Under a new issue bond ("NIB") program, we had $7.5 billion and $7.6 billion outstanding of pass-through securities backed by single-family and multifamily housing bonds issued by housing finance agencies ("HFAs") as of September 30, 2011 and December 31, 2010, respectively. Treasury bears the initial loss of principal under the TCLF program and the NIB program up to 35% of the total principal on a combined program-wide basis.

FHFA's control of both us and Freddie Mac has caused us and Freddie Mac to be related parties. No transactions outside of normal business activities have occurred between us and Freddie Mac. As of September 30, 2011 and December 31, 2010, we held Freddie Mac mortgage-related securities with a fair value of $16.6 billion and $18.3 billion, respectively, and accrued interest receivable of $76 million and $93 million, respectively. We recognized interest income on Freddie Mac mortgage-related securities held by us of $174 million and $239 million for the three months ended September 30, 2011 and 2010, respectively, and $534 million and $851 million for the nine months ended September 30, 2011 and 2010, respectively. In addition, Freddie Mac may be an investor in variable interest entities that we have consolidated, and we may be an investor in variable interest entities that Freddie Mac has consolidated.

*Use of Estimates*

Preparing condensed consolidated financial statements in accordance with GAAP requires management to make estimates and assumptions that affect our reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities as of the dates of our condensed consolidated financial statements, as well as our reported amounts of revenues and expenses during the reporting periods. Management has made significant estimates in a variety of areas including, but not limited to, valuation of certain financial instruments, and other assets and liabilities, the allowance for loan losses and reserve for guaranty losses, and other-than-temporary impairment of investment securities. Actual results could be different from these estimates.

In the three months ended September 30, 2011, we updated our allowance for loan loss models for individually impaired loans to incorporate more home price data at the regional level rather than at the national level. We believe this approach is a better estimation of possible home price paths and related default

107

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

expectations; it has resulted in a decrease to our allowance for loan losses and a reduction in our provision for loan losses of approximately $800 million.

In the three months ended June 30, 2011, we updated our loan loss models to incorporate more recent data on prepayments of modified loans which contributed to an increase to our allowance of loan losses of approximately $1.5 billion. The change resulted in slower expected prepayment speeds, which extended the expected lives of modified loans and lowered the present value of cash flows on those loans. Also in the three months ended June 30, 2011, we updated our estimate of the reserve for guaranty losses related to private-label mortgage-related securities that we have guaranteed to increase our focus on earlier stage delinquency, rather than foreclosure trends, as the primary driver in estimating incurred losses. We believe delinquencies are a better indicator of incurred losses compared to foreclosure trends because the recent delays in the foreclosure process have interrupted the normal flow of delinquent mortgages into foreclosure. This update resulted in an increase to our reserve for guaranty losses included within "Other liabilities" of approximately $700 million.

In addition, in the three months ended June 30, 2011, we revised our estimate for amounts due to us related to outstanding repurchase requests to incorporate additional loan-level attributes which resulted in a decrease in our provision for loan losses and foreclosed property expense of $1.5 billion.

### Principles of Consolidation

Our condensed consolidated financial statements include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated. The typical condition for a controlling financial interest is ownership of a majority of the voting interests of an entity. A controlling financial interest may also exist in entities through arrangements that do not involve voting interests, such as a variable interest entity ("VIE").

### Cash and Cash Equivalents and Statements of Cash Flows

During 2010, we identified certain servicer and consolidation related transactions that were not appropriately reflected in our condensed consolidated statements of cash flows for the nine months ended September 30, 2010. We evaluated the effects of these misstatements, both quantitatively and qualitatively, on our previously reported condensed consolidated statements of cash flows for the nine months ended September 30, 2010 and concluded that this previously reported prior period was not materially misstated. We also reclassified amounts in our condensed consolidated statements of cash flows for the nine months ended September 30, 2010. The following table displays the line item adjustments and reclassifications in our condensed consolidated statement of cash flows for the nine months ended September 30, 2010. As a result of the adjustments, our condensed consolidated statement of cash flows for the nine months ended September 30, 2010 includes a $6.6 billion adjustment to increase net cash used in operating activities, a $7.0 billion adjustment to increase

TREASURY-2024

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

net cash provided by investing activities, and a $357 million adjustment to increase net cash used in financing activities.

| | For the Nine Months Ended September 30, 2010 | | | |
|---|---|---|---|---|
| | As Previously Reported | Adjustments | Reclassifications | As Adjusted |
| | | | (Dollars in millions) | |
| **Reclassified and adjusted line items:** | | | | |
| **Cash flows used in operating activities:** | | | | |
| Other, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (6,222) | $(6,601) | $ — | $ (12,823) |
| **Cash flows provided by investing activities:** | | | | |
| Proceeds from sales of available-for-sale securities . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,680 | 416 | — | 7,096 |
| Purchases of loans held for investment . . . . . . . . | (59,145) | 7,097 | — | (52,048) |
| Proceeds from repayments of loans held for investment of Fannie Mae . . . . . . . . . . . . . . | 15,025 | (276) | — | 14,749 |
| Proceeds from repayments of loans held for investment of consolidated trusts . . . . . . . . . | 378,941 | (279) | — | 378,662 |
| **Cash flows used in financing activities:** | | | | |
| Proceeds from issuance of short-term debt of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . | 555,422 | — | (555,422) | — |
| Proceeds from issuance of long-term debt of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . | 335,115 | — | (335,148) | — |
| Proceeds from issuance of debt of Fannie Mae . . | — | — | 890,570 | 890,570 |
| Payments to redeem short-term debt of Fannie Mae. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (537,181) | — | 537,181 | — |
| Payments to redeem long-term debt of Fannie Mae. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (311,257) | — | 311,257 | — |
| Payments to redeem debt of Fannie Mae . . . . . . | — | — | (848,438) | (848,438) |
| Proceeds from issuance of short-term debt of consolidated trusts . . . . . . . . . . . . . . . . . . . . . | 10,067 | — | (10,067) | — |
| Proceeds from issuance of long-term debt of consolidated trusts . . . . . . . . . . . . . . . . . . . . . | 182,014 | (416) | (181,598) | — |
| Proceeds from issuance of debt of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 191,665 | 191,665 |
| Payments to redeem short-term debt of consolidated trusts . . . . . . . . . . . . . . . . . . . . . | (27,852) | — | 27,852 | — |
| Payments to redeem long-term debt of consolidated trusts . . . . . . . . . . . . . . . . . . . . . | (560,170) | 59 | 560,111 | — |
| Payments to redeem debt of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | (587,963) | (587,963) |
| Other, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | (33) | (33) |

109

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Collateral*

*Cash Collateral*

The following table displays cash collateral accepted and pledged as of September 30, 2011 and December 31, 2010.

|  | As of | |
|---|---|---|
|  | September 30, 2011 | December 31, 2010 |
|  | (Dollars in millions) | |
| Cash collateral accepted[1] . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,360 | $3,101 |
| Cash collateral pledged . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $6,199 | $5,884 |
| Cash collateral pledged related to derivatives activities . . . . . . | 3,486 | 3,453 |
| Total cash collateral pledged. . . . . . . . . . . . . . . . . . . . . . . | $9,685 | $9,337 |

[1] Includes restricted cash of $2.7 billion and $2.5 billion as of September 30, 2011 and December 31, 2010, respectively.

*Non-Cash Collateral*

The following table displays non-cash collateral pledged and accepted as of September 30, 2011 and December 31, 2010.

|  | As of | |
|---|---|---|
|  | September 30, 2011 | December 31, 2010 |
|  | (Dollars in millions) | |
| Non-cash collateral pledged where the secured party has the right to sell or repledge: | | |
| Held-for-investment loans of consolidated trusts . . . . . . . . . . | $ 6,993 | $2,522 |
| Non-cash collateral accepted with the right to sell or repledge[1] . . . | $20,050 | $7,500 |
| Non-cash collateral accepted without the right to sell or repledge . . | $28,256 | $6,744 |

[1] None of this collateral was sold or repledged as of September 30, 2011 and December 31, 2010.

Additionally, we provide early funding to lenders on a collateralized basis and account for the advances as secured lending arrangements in "Other assets" in our condensed consolidated balance sheets. These amounts totaled $5.1 billion as of September 30, 2011 and $7.2 billion at December 31, 2010.

Our liability to third-party holders of Fannie Mae MBS that arises as the result of a consolidation of a securitization trust is collateralized by the underlying loans and/or mortgage-related securities.

When securities sold under agreements to repurchase meet all of the conditions of a secured financing, we report the collateral of the transferred securities at fair value, excluding accrued interest. The fair value of these securities is classified in "Investments in securities" in our condensed consolidated balance sheets. We had no repurchase agreements outstanding as of September 30, 2011 and $49 million in repurchase agreements outstanding as of December 31, 2010.

TREASURY-2026

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Mortgage Loans*

*Nonaccrual Loans*

We discontinue accruing interest on loans when we believe collectability of principal or interest is not reasonably assured, which for single-family loans we have determined, based on our historical experience, to be when the loan becomes two months or more past due according to its contractual terms. We place multifamily loans on nonaccrual status when the loan is deemed to be individually impaired, unless the loan is well secured such that collectability of principal and accrued interest is reasonably assured.

When a loan is placed on nonaccrual status, interest previously accrued but not collected becomes part of our recorded investment in the loan and is collectively reviewed for impairment. For single-family loans, we recognize interest income for loans on non-accrual status when cash is received. For multifamily loans that are individually impaired, we apply any payment received on a cost recovery basis to reduce principal on the mortgage loan unless the loan is determined to be well secured.

We return a single-family loan to accrual status at the point that the borrower has made sufficient payments to reduce their delinquency below our nonaccrual threshold. For modified single-family loans, the loan is not returned to accrual status until the borrower successfully makes all required payments during the trial period (generally three to four months) and the modification is made permanent. We return a multifamily loan to accrual status when the borrower cures the delinquency of the loan or we otherwise determine that the loan is well secured such that collectability is reasonably assured.

*Restructured Loans*

A modification to the contractual terms of a loan that results in granting a concession to a borrower experiencing financial difficulties is considered a troubled debt restructuring ("TDR"). Our loss mitigation programs primarily include modifications that result in the capitalization of past due amounts in combination with interest rate reductions below market and/or the extension of the loan's maturity date. Such restructurings are granted to borrowers in financial difficulty on either a permanent or contingent basis, as in the case of modifications with a trial period. We consider these types of loan restructurings to be TDRs.

We do not currently include principal or past due interest forgiveness as part of our loss mitigation programs, and as a result, we do not charge off any outstanding principal or accrued interest amounts at the time of loan modification. We believe that the loan underwriting activities we perform as a part of our loan modification process coupled with the borrower's successful performance during any required trial period provide us reasonable assurance regarding the collectability of the principal and interest due in accordance with the loan's modified terms, which include any past due interest amounts that are capitalized at the time of modification. As such, the loan is returned to accrual status when the loan modification is completed (*i.e.*, at the end of the trial period), and we accrue interest thereafter in accordance with our interest accrual policy. If the loan was on nonaccrual status prior to entering the trial period, it remains on nonaccrual status until the borrower demonstrates performance via the trial period and the modification is finalized.

In addition to these loan modifications, we also engage in other loss mitigation activities with troubled borrowers, which include repayment plans, forbearance arrangements, and the capitalization only of past due amounts. Repayment plans and forbearance arrangements are informal agreements with the borrower that do not result in the legal modification of the loan. For all of these activities, we consider the deferral or capitalization of three or fewer missed payments to represent only an insignificant delay, and thus not a TDR. If we defer or capitalize more than three missed payments, the delay is no longer considered insignificant, and the restructuring is accounted for as a TDR.

111

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

We measure impairment of a loan restructured in a TDR individually based on the excess of the recorded investment in the loan over the present value of the expected future cash inflows discounted at the loan's original effective interest rate. Costs incurred to complete a TDR are expensed as incurred.

In April 2011, the Financial Accounting Standards Board ("FASB") issued a new standard effective for the three months ended September 30, 2011 that applies retrospectively to the beginning of the annual period of adoption. The new guidance clarifies how to determine when a borrower is experiencing financial difficulty, when a concession is granted by a creditor, and when a delay in payment is considered insignificant. The primary impact to us of adopting this new guidance was the refinement of how we define an insignificant delay. As a result, we lowered our threshold for an insignificant delay from approximately nine missed payments to three missed payments and thus this type of additional loss mitigation activity that had previously been excluded is now considered a TDR. This refinement was necessary in order to conform our policy to the new guidance on insignificant delay provided by the FASB.

As a result of adopting the new TDR accounting standard, we identified approximately 22,000 loan restructurings for the nine months ended September 30, 2011 that had not defaulted as of September 30, 2011 and were not previously considered TDRs. The impact of this was an increase in our provision for loan losses of $514 million in our condensed consolidated statements of operations and comprehensive loss for the three months ended September 30, 2011. This amount includes the net increase in our allowance for loan losses due to identifying these restructurings as TDRs and measuring their impairment on an individual basis offset by the elimination of our allowance for loan loss measured on a collective basis related to these loans.

*Fair Value (Losses) Gains, Net*

The following table displays the composition of "Fair value (losses) gains, net" for the three and nine months ended September 30, 2011 and 2010.

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | | (Dollars in millions) | | |
| Derivatives fair value losses, net .................... | $(4,255) | $(124) | $(5,793) | $(3,283) |
| Trading securities (losses) gains, net ................. | (214) | 889 | 146 | 2,587 |
| Other, net ........................................ | (56) | (240) | (223) | (181) |
| Fair value (losses) gains, net ..................... | $(4,525) | $ 525 | $(5,870) | $ (877) |

112

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Reclassifications*

To conform to our current period presentation, we have reclassified and condensed certain amounts reported in our condensed consolidated financial statements. The following table displays the line items that were reclassified and condensed in our condensed consolidated balance sheet as of December 31, 2010.

|  | As of December 31, 2010 | |
|---|---|---|
|  | Before Reclassification | After Reclassification |
|  | (Dollars in millions) | |
| **Reclassified lines to:** | | |
| **Assets:** | | |
| Servicer and MBS trust receivable . . . . . . . . . . . . . . . . . . . . . . | $      951 | $ |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25,875 | 26,826 |
| **Liabilities:** | | |
| Short-term debt: | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 151,884 | |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,359 | |
| Long-term debt: | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 628,160 | |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,411,597 | |
| Debt: | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 780,044 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 2,416,956 |
| Reserve for guaranty losses. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 323 | |
| Servicer and MBS trust payable . . . . . . . . . . . . . . . . . . . . . . . . | 2,950 | |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,400 | 13,673 |

113

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table represents the line items that we reclassified and condensed in our condensed consolidated statements of operations and comprehensive loss for the three and nine months ended September 30, 2010.

| | For the Three Months Ended September 30, 2010 | | For the Nine Months Ended September 30, 2010 | |
|---|---|---|---|---|
| | Before Reclassification | After Reclassification | Before Reclassification | After Reclassification |
| | (Dollars in millions) | | | |
| **Reclassified lines to:** | | | | |
| Interest income: | | | | |
| Mortgage loans: | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . | $ 3,859 | $ | $ 11,107 | $ |
| Of consolidated trusts . . . . . . . . . . . | 32,807 | | 100,810 | |
| Mortgage loans (includes $32,807 and $100,810, respectively, related to consolidated trusts) . . . . . . . . . . . . . . | | 36,666 | | 111,917 |
| Interest expense: | | | | |
| Short-term debt: | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . | 190 | | 470 | |
| Of consolidated trusts . . . . . . . . . . . | 4 | | 9 | |
| Long-term debt: | | | | |
| Of Fannie Mae . . . . . . . . . . . . . . . . | 4,472 | | 14,528 | |
| Of consolidated trusts . . . . . . . . . . . | 28,878 | | 90,379 | |
| Short-term debt (includes $4 and $9, respectively, related to consolidated trusts) . . . . . . . . . . . . . . . . . . . . . . . | | 194 | | 479 |
| Long-term debt (includes $28,878 and $90,379, respectively, related to consolidated trusts) . . . . . . . . . . . . . . | | 33,350 | | 104,907 |
| Guaranty fee income . . . . . . . . . . . . . . . . . | 51 | | 157 | |
| Fee and other income . . . . . . . . . . . . . . . . | 253 | 304 | 674 | 831 |
| Income (losses) from partnership investments . . . . . . . . . . . . . . . . . . . . . . | 47 | | (37) | |
| Other expenses . . . . . . . . . . . . . . . . . . . . . | 243 | 196 | 613 | 650 |

*New Accounting Pronouncements*

In May 2011, the FASB issued amendments to the guidance pertaining to fair value measurement and disclosure. The amendments create a common definition of fair value for GAAP and International Financial Reporting Standards ("IFRS") and align the measurement and disclosure requirements. These amendments provide further guidance on some of the principles for measuring fair value and expand the disclosure requirements specifically for Level 3 fair value measurements. The new requirements are effective for us on January 1, 2012 and will be applied prospectively. We do not expect that the adoption of these amendments will have a material impact on our consolidated financial statements.

114

TREASURY-2030

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

**2.   Consolidations and Transfers of Financial Assets**

We have interests in various entities that are considered to be VIEs. The primary types of entities are securitization trusts guaranteed by us via lender swap and portfolio securitization transactions, mortgage and asset-backed trusts that were not created by us, as well as housing partnerships that are established to finance the acquisition, construction, development or rehabilitation of affordable multifamily and single-family housing. These interests include investments in securities issued by VIEs, such as Fannie Mae MBS created pursuant to our securitization transactions and our guaranty to the entity. We consolidate the substantial majority of our single-class securitization trusts.

As of September 30, 2011, we consolidated certain Fannie Mae securities that were not consolidated as of December 31, 2010 because we now hold in our portfolio a substantial portion of the certificates. As a result of consolidating these securities, which had combined total assets of $2.9 billion in unpaid principal balance as of September 30, 2011, we derecognized our investment in these trusts and recognized the assets and liabilities of the consolidated trusts at their fair value.

As of September 30, 2011, we deconsolidated VIEs that were consolidated as of December 31, 2010. These VIEs were Fannie Mae securitization trusts and were deconsolidated because we no longer hold in our portfolio a substantial portion of the certificates. As a result of deconsolidating these trusts, which had combined total assets of $446 million in unpaid principal balance as of December 31, 2010, we derecognized the assets and liabilities of the trusts and recognized at fair value our retained interests as securities in our condensed consolidated balance sheet.

*Unconsolidated VIEs*

We also have interests in VIEs that we do not consolidate because we are not deemed to be the primary beneficiary. These unconsolidated VIEs include securitization trusts, as well as other investment entities. The following table displays the carrying amount and classification of our assets and liabilities that relate to our involvement with unconsolidated VIEs as of September 30, 2011 and December 31, 2010, as well as our maximum exposure to loss and the total assets of those unconsolidated VIEs.

| | As of September 30, 2011 | | |
|---|---|---|---|
| | Mortgage-Backed Trusts | Asset-Backed Trusts | Limited Partnership Investments |
| | (Dollars in millions) | | |
| **Assets and liabilities recorded in our condensed consolidated balance sheets:** | | | |
| Assets: | | | |
| Available-for-sale securities[1] . . . . . . . . . . . . . . . . . . . . | $ 73,814 | $   — | $   — |
| Trading securities[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24,862 | 2,465 | — |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 270 | — | 131 |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,257 | — | 150 |
| **Net carrying amount** . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 97,689 | $ 2,465 | $  (19) |
| **Maximum exposure to loss**[1] . . . . . . . . . . . . . . . . . . . . . | $104,477 | $ 2,465 | $ 117 |
| **Total assets of unconsolidated VIEs**[1] . . . . . . . . . . . . . . . | $674,599 | $323,035 | $13,119 |

115

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

|  | As of December 31, 2010[2] | | |
|---|---|---|---|
|  | Mortgage-Backed Trusts | Asset-Backed Trusts | Limited Partnership Investments |
|  | (Dollars in millions) | | |
| **Assets and liabilities recorded in our condensed consolidated balance sheets:** | | | |
| Assets: | | | |
| Available-for-sale securities[1] . . . . . . . . . . . . . . . . . . . | $ 84,770 | $    — | $    — |
| Trading securities[1] . . . . . . . . . . . . . . . . . . . . . . . . . | 24,021 | 5,321 | — |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 257 | — | 94 |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 773 | — | 170 |
| Net carrying amount . . . . . . . . . . . . . . . . . . . . . . . . . | $108,275 | $  5,321 | $   (76) |
| Maximum exposure to loss[1] . . . . . . . . . . . . . . . . . . . | $111,004 | $  5,321 | $   319 |
| Total assets of unconsolidated VIEs[1] . . . . . . . . . . . . . . | $740,387 | $363,721 | $13,102 |

[1] Contains securities exposed through consolidation which may also represent an interest in other unconsolidated VIEs.

[2] Certain prior period amounts have been reclassified to conform to the current period presentation.

Our maximum exposure to loss generally represents the greater of our recorded investment in the entity or the unpaid principal balance of the assets covered by our guaranty. However, our securities issued by Fannie Mae multi-class resecuritization trusts that are not consolidated do not give rise to any additional exposure to loss as we already consolidate the underlying collateral.

**Transfers of Financial Assets**

We issue Fannie Mae MBS through portfolio securitization transactions by transferring pools of mortgage loans or mortgage-related securities to one or more trusts or special purpose entities. We are considered to be the transferor when we transfer assets from our own portfolio in a portfolio securitization transaction. For the three months ended September 30, 2011 and 2010, the unpaid principal balance of portfolio securitizations was $22.0 billion and $35.1 billion, respectively. For the nine months ended September 30, 2011 and 2010, the unpaid principal balance of portfolio securitizations was $78.7 billion and $68.0 billion, respectively.

The following table displays some key characteristics of the securities retained in unconsolidated portfolio securitization trusts.

|  | Fannie Mae Single-class MBS & Fannie Mae Megas | REMICS & SMBS |
|---|---|---|
|  | (Dollars in millions) | |
| **As of September 30, 2011** | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $      618 | $    14,008 |
| Fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 683 | 15,320 |
| Weighted-average coupon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.21% | 5.96% |
| Weighted-average loan age . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5.1 years | 4.5 years |
| Weighted-average maturity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23.8 years | 19.5 years |
| **As of December 31, 2010** | | |
| Unpaid principal balance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $       63 | $    15,771 |
| Fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 68 | 16,745 |
| Weighted-average coupon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.58% | 6.28% |
| Weighted-average loan age . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.2 years | 4.4 years |
| Weighted-average maturity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25.6 years | 22.0 years |

TREASURY-2032

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

For the three months ended September 30, 2011 and 2010, the principal and interest received on retained interests was $777 million and $855 million, respectively. For the nine months ended September 30, 2011 and 2010, the principal and interest received on retained interests was $2.2 billion and $2.6 billion, respectively.

*Managed Loans*

We define "managed loans" as on-balance sheet mortgage loans as well as mortgage loans that we have securitized in unconsolidated portfolio securitization trusts. The following table displays the unpaid principal balances of managed loans, including those managed loans that are delinquent as of September 30, 2011 and December 31, 2010.

|  | As of | | | |
|---|---|---|---|---|
|  | September 30, 2011 | | December 31, 2010 | |
|  | Unpaid Principal Balance | Principal Amount of Delinquent Loans[1] | Unpaid Principal Balance | Principal Amount of Delinquent Loans[1] |
|  | (Dollars in millions) | | | |
| Loans held for investment |  |  |  |  |
|   Of Fannie Mae . . . . . . . . . . . . | $  401,610 | $124,595 | $  423,686 | $141,342 |
|   Of consolidated trusts . . . . . . . | 2,567,502 | 25,808 | 2,565,347 | 34,080 |
| Loans held for sale . . . . . . . . . . | 335 | 60 | 964 | 127 |
| Securitized loans . . . . . . . . . . . . | 2,219 | 66 | 2,147 | 78 |
|   Total loans managed . . . . . . . . | $2,971,666 | $150,529 | $2,992,144 | $175,627 |

[1] Represents the unpaid principal balance of loans held for investment, loans held for sale and securitized loans for which we are no longer accruing interest and loans 90 days or more delinquent which are continuing to accrue interest.

*Qualifying Sales of Portfolio Securitizations*

The majority of our portfolio securitization transactions do not qualify for sale treatment. We report the assets and liabilities of consolidated trusts created via portfolio securitization transactions that do not qualify as sales in our condensed consolidated balance sheets. Our continuing involvement in the form of guaranty assets and guaranty liabilities with assets that were transferred into unconsolidated trusts is not material.

We recognize assets obtained and liabilities incurred in a portfolio securitization at fair value. Proceeds from the initial sale of securities from portfolio securitizations were $143 million and $169 million for the three months ended September 30, 2011 and 2010, respectively. Proceeds from the initial sale of securities from portfolio securitizations were $764 million and $544 million for the nine months ended September 30, 2011 and 2010, respectively.

117

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

### 3.  Mortgage Loans

The following table displays our mortgage loans as of September 30, 2011 and December 31, 2010.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | September 30, 2011 | | | December 31, 2010 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| Single-family | $319,756 | $2,474,912 | $2,794,668 | $328,824 | $2,490,623 | $2,819,447 |
| Multifamily | 82,136 | 92,643 | 174,779 | 95,157 | 75,393 | 170,550 |
| Total unpaid principal balance of mortgage loans | 401,892 | 2,567,555 | 2,969,447 | 423,981 | 2,566,016 | 2,989,997 |
| Cost basis and fair value adjustments, net | (16,389) | 16,197 | (192) | (16,498) | 11,777 | (4,721) |
| Allowance for loan losses for loans held for investment | (55,398) | (16,037) | (71,435) | (48,530) | (13,026) | (61,556) |
| Total mortgage loans | $330,105 | $2,567,715 | $2,897,820 | $358,953 | $2,564,767 | $2,923,720 |

During the three months ended September 30, 2011, we did not redesignate any loans from held for investment ("HFI") to held for sale ("HFS"). During the nine months ended September 30, 2011, we redesignated loans with a carrying value of $561 million from HFI to HFS.

The following tables display an aging analysis of the total recorded investment in our HFI mortgage loans, excluding loans for which we have elected the fair value option, by portfolio segment and class as of September 30, 2011 and December 31, 2010.

| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | Recorded Investment in Loans Over 90 Days Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
|---|---|---|---|---|---|---|---|---|
| | As of September 30, 2011[1] | | | | | | | |
| | (Dollars in millions) | | | | | | | |
| Single-family: | | | | | | | | |
| Primary[3] | $43,721 | $15,523 | $ 82,808 | $142,052 | $2,330,328 | $2,472,380 | $122 | $ 98,154 |
| Government[4] | 105 | 46 | 312 | 463 | 51,458 | 51,921 | 312 | — |
| Alt-A | 7,445 | 3,261 | 30,126 | 40,832 | 143,126 | 183,958 | 15 | 33,366 |
| Other[5] | 3,586 | 1,556 | 11,940 | 17,082 | 75,753 | 92,835 | 101 | 13,305 |
| Total single-family | 54,857 | 20,386 | 125,186 | 200,429 | 2,600,665 | 2,801,094 | 550 | 144,825 |
| Multifamily[6] | 519 | NA | 753 | 1,272 | 175,761 | 177,033 | — | 698 |
| Total | $55,376 | $20,386 | $125,939 | $201,701 | $2,776,426 | $2,978,127 | $550 | $145,523 |

118

FANNIE MAE
(In conservatorship)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(UNAUDITED)

| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | Recorded Investment in Loans Over 90 Days Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
|---|---|---|---|---|---|---|---|---|
| | | | | As of December 31, 2010[1] | | | | |
| | | | | (Dollars in millions) | | | | |
| **Single-family:** | | | | | | | | |
| Primary[3] . . . . . . . . | $47,048 | $18,055 | $ 93,302 | $158,405 | $2,299,080 | $2,457,485 | $139 | $110,758 |
| Government[4] . . . . . | 125 | 58 | 371 | 554 | 51,930 | 52,484 | 354 | — |
| Alt-A . . . . . . . . . . . | 8,547 | 4,097 | 37,557 | 50,201 | 156,951 | 207,152 | 21 | 41,566 |
| Other[5] . . . . . . . . . | 3,785 | 1,831 | 15,290 | 20,906 | 84,473 | 105,379 | 80 | 17,022 |
| Total single-family. . | 59,505 | 24,041 | 146,520 | 230,066 | 2,592,434 | 2,822,500 | 594 | 169,346 |
| Multifamily [6] . . . . . . | 382 | NA | 1,132 | 1,514 | 171,000 | 172,514 | — | 1,012 |
| Total . . . . . . . . | $59,887 | $24,041 | $147,652 | $231,580 | $2,763,434 | $2,995,014 | $594 | $170,358 |

[1] Recorded investment consists of (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments; and (c) accrued interest receivable.

[2] Single-family seriously delinquent loans are loans that are 90 days or more past due or in the foreclosure process. Multifamily seriously delinquent loans are loans that are 60 days or more past due.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A. Primarily consists of reverse mortgages which due to their nature are not aged and are included in the current column.

[5] Includes loans with higher-risk loan characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[6] Multifamily loans 60-89 days delinquent are included in the seriously delinquent column.

The following table displays the total recorded investment in our single-family HFI loans, excluding loans for which we have elected the fair value option, by class and credit quality indicator as of September 30, 2011 and December 31, 2010. The single-family credit quality indicator is updated quarterly.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | September 30, 2011[1][2] | | | December 31, 2010[1][2] | | |
| | Primary[3] | Alt-A | Other[4] | Primary[3] | Alt-A | Other[4] |
| | (Dollars in millions) | | | | | |
| **Estimated mark-to-market LTV ratio:**[5] | | | | | | |
| Less than or equal to 80% . . . . . . . . . . . . . . . . | $1,543,118 | $ 68,340 | $26,170 | $1,561,202 | $ 79,305 | $ 29,854 |
| 80.01% to 90% . . . . . . . . . . . . . . . . . . . . . . . . | 377,448 | 23,146 | 10,371 | 376,414 | 27,472 | 13,394 |
| 90.01% to 100% . . . . . . . . . . . . . . . . . . . . . . . | 223,477 | 20,355 | 10,111 | 217,193 | 24,392 | 12,935 |
| 100.01% to 110% . . . . . . . . . . . . . . . . . . . . . . | 117,339 | 16,051 | 9,275 | 112,376 | 18,022 | 11,400 |
| 110.01% to 120% . . . . . . . . . . . . . . . . . . . . . . | 66,747 | 11,974 | 7,980 | 62,283 | 12,718 | 8,967 |
| 120.01% to 125% . . . . . . . . . . . . . . . . . . . . . . | 23,692 | 4,878 | 3,368 | 21,729 | 5,083 | 3,733 |
| Greater than 125% . . . . . . . . . . . . . . . . . . . . . | 120,559 | 39,214 | 25,560 | 106,288 | 40,160 | 25,096 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,472,380 | $183,958 | $92,835 | $2,457,485 | $207,152 | $105,379 |

[1] Recorded investment consists of the following: (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments; and (c) accrued interest receivable.

[2] Excludes $51.9 billion and $52.5 billion as of September 30, 2011 and December 31, 2010, respectively, of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A

119

TREASURY-2035

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

loans. The segment class is primarily reverse mortgages for which we do not calculate an estimated mark-to-market LTV.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Includes loans with higher-risk loan characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[5] The aggregate estimated mark-to-market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value.

The following table displays the total recorded investment in our multifamily HFI loans, excluding loans for which we have elected the fair value option, by credit quality indicator as of September 30, 2011 and December 31, 2010. We stratify multifamily loans into different internal risk rating categories based on the credit risk inherent in each individual loan. We categorize loan credit risk based on relevant observable data about a borrower's ability to pay, including multifamily market economic fundamentals, review of available current borrower financial information (e.g. current debt service coverage ratios), operating statements on the underlying collateral, historical payment experience, estimates of the current collateral values and other related credit documentation. As a result of this analysis, multifamily loans are categorized based on management's judgment into the following categories: (1) Green (loan with acceptable risk); (2) Yellow (loan with signs of potential weakness); (3) Orange (loan with a well defined weakness that may jeopardize the timely full repayment); and (4) Red (loan with a weakness that makes timely collection or liquidation in full highly questionable based on existing conditions and values). We evaluate loans in the orange and red risk rating categories to determine which ones are individually impaired. The multifamily credit quality indicator is updated quarterly.

| | As of | |
|---|---|---|
| | September 30, 2011[1] | December 31, 2010[1] |
| | (Dollars in millions) | |
| Credit risk profile by internally assigned grade: | | |
| Green | $127,551 | $117,388 |
| Yellow[2] | 29,567 | 34,651 |
| Orange | 17,924 | 18,075 |
| Red | 1,991 | 2,400 |
| Total | $177,033 | $172,514 |

[1] Recorded investment consists of the following:   (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments; and (c) accrued interest receivable.

[2] Includes approximately $9.1 billion and $9.7 billion of unpaid principal balance as of September 30, 2011 and December 31, 2010, respectively, classified solely due to past due financial information.

TREASURY-2036

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

### Individually Impaired Loans

Individually impaired loans include TDRs, acquired credit-impaired loans, and other multifamily loans regardless of whether we are currently accruing interest. The following tables display the total recorded investment, unpaid principal balance, and related allowance as of September 30, 2011 and December 31, 2010 and interest income recognized and average recorded investment for the three and nine months ended September 30, 2011 for individually impaired loans.

| | As of September 30, 2011 | | | | For the Three Months Ended September 30, 2011 | | | For the Nine Months Ended September 30, 2011 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Unpaid Principal Balance | Total Recorded Investment[1] | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable | Average Recorded Investment | Total Interest Income Recognized[2] | Interest Income Recognized on a Cash Basis | Average Recorded Investment | Total Interest Income Recognized [2] | Interest Income Recognized on a Cash Basis |
| | | | | | (Dollars in millions) | | | | | |
| Individually impaired loans: | | | | | | | | | | |
| With related allowance recorded: | | | | | | | | | | |
| Single-family: | | | | | | | | | | |
| Primary[3] . . . . . . . . . . . . . . . | $115,961 | $108,489 | $28,709 | $ 639 | $102,555 | $ 949 | $183 | $ 99,495 | $2,764 | $550 |
| Government[4] . . . . . . . . . . . . | 247 | 247 | 58 | 7 | 280 | 3 | — | 270 | 9 | — |
| Alt-A . . . . . . . . . . . . . . . . . . | 34,034 | 31,159 | 10,865 | 277 | 29,755 | 247 | 45 | 29,459 | 728 | 143 |
| Other[5] . . . . . . . . . . . . . . . . . | 16,088 | 15,237 | 5,175 | 101 | 14,630 | 111 | 22 | 14,295 | 323 | 69 |
| Total single-family . . . . . . . . . | 166,330 | 155,132 | 44,807 | 1,024 | 147,220 | 1,310 | 250 | 143,519 | 3,824 | 762 |
| Multifamily . . . . . . . . . . . . . . | 2,877 | 2,896 | 704 | 27 | 2,485 | 26 | 2 | 2,324 | 74 | 5 |
| Total individually impaired loans with related allowance recorded . . . . . . | 169,207 | 158,028 | 45,511 | 1,051 | 149,705 | 1,336 | 252 | 145,843 | 3,898 | 767 |
| With no related allowance recorded:[6] | | | | | | | | | | |
| Single-family: | | | | | | | | | | |
| Primary[3] . . . . . . . . . . . . . . . | 8,284 | 5,624 | — | — | 7,118 | 175 | 58 | 6,019 | 427 | 146 |
| Government[4] . . . . . . . . . . . . | 19 | 12 | — | — | 21 | 2 | — | 14 | 6 | — |
| Alt-A . . . . . . . . . . . . . . . . . . | 2,962 | 1,467 | — | — | 1,832 | 68 | 21 | 1,443 | 154 | 47 |
| Other[5] . . . . . . . . . . . . . . . . . | 638 | 342 | — | — | 483 | 18 | 6 | 403 | 39 | 13 |
| Total single-family . . . . . . . . . | 11,903 | 7,445 | — | — | 9,454 | 263 | 85 | 7,879 | 626 | 206 |
| Multifamily . . . . . . . . . . . . . . | 908 | 914 | — | — | 836 | 12 | 2 | 799 | 37 | 7 |
| Total individually impaired loans with no related allowance recorded . . . . . . | 12,811 | 8,359 | — | — | 10,290 | 275 | 87 | 8,678 | 663 | 213 |
| Total individually impaired loans[7] . . . . | $182,018 | $166,387 | $45,511 | $1,051 | $159,995 | $1,611 | $339 | $154,521 | $4,561 | $980 |

121

TREASURY-2037

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | Unpaid Principal Balance | Total Recorded Investment[1] | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable | For the Year Ended December 31, 2010 Average Recorded Investment |
|---|---|---|---|---|---|
| | | | (Dollars in millions) | | |
| Individually impaired loans: | | | | | |
| With related allowance recorded: | | | | | |
| Single-family: | | | | | |
| Primary[3] . . . . . . . . . . . . . . . . . | $ 99,838 | $ 93,024 | $23,565 | $ 772 | $ 81,258 |
| Government[4] . . . . . . . . . . . . . | 240 | 248 | 38 | 7 | 141 |
| Alt-A . . . . . . . . . . . . . . . . . . . . | 30,932 | 28,253 | 9,592 | 368 | 25,361 |
| Other[5] . . . . . . . . . . . . . . . . . . . | 14,429 | 13,689 | 4,479 | 137 | 12,094 |
| Total single-family . . . . . . . . | 145,439 | 135,214 | 37,674 | 1,284 | 118,854 |
| Multifamily . . . . . . . . . . . . . . . . . | 2,372 | 2,371 | 556 | 23 | 1,496 |
| Total individually impaired loans with related allowance recorded . . | 147,811 | 137,585 | 38,230 | 1,307 | 120,350 |
| With no related allowance recorded:[6] | | | | | |
| Single-family: | | | | | |
| Primary[3] . . . . . . . . . . . . . . . . . | 10,586 | 7,237 | — | — | 7,860 |
| Government[4] . . . . . . . . . . . . . | 19 | 13 | — | — | 11 |
| Alt-A . . . . . . . . . . . . . . . . . . . . | 3,600 | 1,884 | — | — | 2,091 |
| Other[5] . . . . . . . . . . . . . . . . . . . | 879 | 512 | — | — | 589 |
| Total single-family . . . . . . . . | 15,084 | 9,646 | — | — | 10,551 |
| Multifamily . . . . . . . . . . . . . . . . . | 789 | 811 | — | — | 642 |
| Total individually impaired loans with no related allowance recorded . . . . . . . . . . . . . . . . . | 15,873 | 10,457 | — | — | 11,193 |
| Total individually impaired loans[7] . . . | $163,684 | $148,042 | $38,230 | $1,307 | $131,543 |

[1] Recorded investment consists of the following: (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments; and (c) accrued interest receivable.

[2] Total single-family interest income recognized of $1.6 billion for the three months ended September 30, 2011 consists of $1.1 billion of contractual interest and $427 million of effective yield adjustments. Total single-family interest income recognized of $4.5 billion for the nine months ended September 30, 2011 consists of $3.3 billion of contractual interest and $1.2 billion of effective yield adjustments.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

[5] Includes loans with higher-risk characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[6] The discounted cash flows or collateral value equals or exceeds the carrying value of the loan and, as such, no valuation allowance is required.

122

FANNIE MAE
(In conservatorship)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(UNAUDITED)

[7] Includes single-family loans restructured in a TDR with a recorded investment of $159.0 billion and $140.1 billion as of September 30, 2011 and December 31, 2010, respectively. Includes multifamily loans restructured in a TDR with a recorded investment of $1.0 billion and $939 million as of September 30, 2011 and December 31, 2010, respectively.

Interest income recognized on impaired loans was $1.4 billion for the three months ended September 30, 2010 and $4.1 billion for the nine months ended September 30, 2010. Interest income recognized on a cash basis on impaired loans was $511 million for the three months ended September 30, 2010 and $1.4 billion for the nine months ended September 30, 2010.

*Troubled Debt Restructurings*

A modification to the contractual terms of a loan that results in granting a concession to a borrower experiencing financial difficulties is considered a TDR. In addition to formal loan modifications, we also engage in other loss mitigation activities with troubled borrowers, which include repayment plans and forbearance arrangements, both of which represent informal agreements with the borrower that do not result in the legal modification of the loan's contractual terms. As described in our "Summary of Significant Accounting Policies," we account for these informal restructurings as a TDR if we defer more than three missed payments. The substantial majority of the loan modifications we complete result in term extensions, interest rate reductions or a combination of both. During the three and nine months ended September 30, 2011, the average term extension of a modified loan was 103 and 82 months, respectively, and the average interest rate reduction of a modified loan was 2.63 and 3.14 percentage points, respectively.

Upon adoption of the new TDR standard, we reassessed all modifications, forbearance arrangements, and repayment plans that occurred on or after January 1, 2011 through June 30, 2011 that were not previously considered TDRs and for which the allowance for loan losses was measured on a collective basis ("the transition population"). As of September 30, 2011, the recorded investment related to restructurings in the transition population that were not previously considered TDRs was $2.3 billion and the individually impaired allowance for loan losses on this population was $605 million.

The following table displays the number of loans and recorded investment in our loans restructured in a TDR during the three and nine months ended September 30, 2011.

| | For the Three Months Ended September 30, 2011[5] | | For the Nine Months Ended September 30, 2011 | |
|---|---|---|---|---|
| | Number of Loans | Recorded Investment[1] | Number of Loans | Recorded Investment[1] |
| | (Dollars in millions) | | | |
| Single-family | | | | |
| Primary[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 60,725 | $10,594 | 132,682 | $23,783 |
| Government[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 201 | 24 | 497 | 86 |
| Alt-A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,932 | 2,691 | 27,722 | 5,958 |
| Other[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,429 | 1,324 | 12,424 | 3,095 |
| Total Single-family . . . . . . . . . . . . . . . . . . . . . . . . . | 79,287 | 14,633 | 173,325 | 32,922 |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 | 39 | 42 | 214 |
| Total troubled debt restructurings . . . . . . . . . . . . . . . | 79,300 | $14,672 | 173,367 | $33,136 |

[1] Consists of the following: (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments and fair value adjustments; and (c) accrued interest receivable on HFI loans. Based on the nature of our modification programs, which do not include principal or interest forgiveness, there is not a material difference

123

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

between the recorded investment in our loans pre- and post- modification, therefore amounts represent recorded investment post-modification.

[2] Consists of mortgage loans that are not included in other loan classes.

[3] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

[4] Includes loans with higher-risk characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[5] Includes recorded investment related to transition population.

The following table displays the number of loans and recorded investment of TDRs that had a payment default during the three and nine months ended September 30, 2011 and were modified in a TDR in the twelve months prior to the payment default. For purposes of this disclosure, we define loans that had a payment default as single-family and multifamily loans with completed TDRs that liquidated during the period, either through foreclosure, deed-in-lieu of foreclosure or a preforeclosure sale, single-family loans with completed modifications that are two or more months delinquent during the period or multifamily loans with completed modifications that are one or more months delinquent during the period.

| | For the Three Months Ended September 30, 2011 | | For the Nine Months Ended September 30, 2011 | |
|---|---|---|---|---|
| | Number of Loans | Recorded Investment[1] | Number of Loans | Recorded Investment[1] |
| | | (Dollars in millions) | | |
| Single-family | | | | |
| Primary[2] .............................. | 14,545 | $2,531 | 52,532 | $ 9,227 |
| Government[3] ........................... | 70 | 17 | 252 | 68 |
| Alt-A[4] ................................ | 2,929 | 620 | 11,625 | 2,499 |
| Other[4] ............................... | 1,519 | 378 | 5,384 | 1,315 |
| Total single-family ..................... | 19,063 | 3,546 | 69,793 | 13,109 |
| Multifamily.............................. | — | — | 8 | 49 |
| Total TDRs that subsequently defaulted ........... | 19,063 | $3,546 | 69,801 | $13,158 |

[1] Consists of the following: (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments; and (c) fair value adjustments and accrued interest receivable on HFI loans. Represents our recorded investment in the loan at time of payment default.

[2] Consists of mortgage loans that are not included in other loan classes.

[3] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

[4] Includes loans with higher-risk characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

*Loans Acquired in a Transfer*

We acquired delinquent loans from unconsolidated trusts and long-term standby commitments with an unpaid principal balance plus accrued interest of $48 million and $67 million for the three months ended September 30, 2011 and 2010, respectively, and $144 million and $227 million for the nine months ended September 30, 2011 and 2010, respectively. The following table displays the outstanding unpaid principal balance and accrued interest receivable, carrying amount by accrual status and accretable yield of acquired

124

FANNIE MAE
(In conservatorship)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(UNAUDITED)

credit-impaired loans as of September 30, 2011 and December 31, 2010, excluding loans that were modified as TDRs subsequent to their acquisition from MBS trusts.

| | As of | |
| --- | --- | --- |
| | September 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Outstanding contractual balance | $5,563 | $8,519 |
| Carrying amount: | | |
| Loans on accrual status | $1,758 | $2,029 |
| Loans on nonaccrual status | 1,392 | 2,449 |
| Total carrying amount of loans | $3,150 | $4,478 |
| Accretable yield | $1,584 | $2,412 |

The following table displays interest income recognized and the impact to the "Provision for loan losses" related to loans that are still being accounted for as acquired credit-impaired loans, as well as loans that have been subsequently modified as a TDR, for the three and nine months ended September 30, 2011 and 2010.

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2011 | 2010 | 2011 | 2010 |
| | (Dollars in millions) | | | |
| Accretion of fair value discount[1] | $ 288 | $ 231 | $ 769 | $ 785 |
| Interest income on loans returned to accrual status or subsequently modified as TDRs | 257 | 235 | 777 | 854 |
| Total interest income recognized on acquired credit-impaired loans | $ 545 | $ 466 | $1,546 | $1,639 |
| (Decrease) increase in "Provision for loan losses" subsequent to the acquisition of credit-impaired loans | $(275) | $(125) | $ 684 | $ 319 |

[1] Represents accretion of the fair value discount that was recorded on acquired credit-impaired loans.

## 4.   Allowance for Loan Losses

We maintain an allowance for loan losses for HFI loans in our mortgage portfolio and loans backing Fannie Mae MBS issued from consolidated trusts. When calculating our allowance for loan losses, we consider only our net recorded investment in the loan at the balance sheet date, which includes interest income only while the loan was on accrual status. The allowance for loan losses is calculated based on our estimate of incurred losses as of the balance sheet date. Determining the adequacy of our allowance for loan losses is complex and requires judgment about the effect of matters that are inherently uncertain.

125

TREASURY-2041

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Allowance for Loan Losses*

The following table displays changes in both single-family and multifamily allowance for loan losses for the three and nine months ended September 30, 2011 and total allowance for loan losses for the three and nine months ended September 30, 2011 and 2010.

| | For the Three Months Ended September 30, | | | | | |
| | 2011 | | | 2010 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
|---|---|---|---|---|---|---|
| **Single-family allowance for loan losses:** | | | | | | |
| Beginning balance | $54,949 | $13,078 | $68,027 | | | |
| Provision for loan losses | (235) | 4,318 | 4,083 | | | |
| Charge-offs[1][6] | (3,802) | (260) | (4,062) | | | |
| Recoveries | 848 | 35 | 883 | | | |
| Transfers[2] | 1,764 | (1,764) | — | | | |
| Other[3] | 860 | 137 | 997 | | | |
| Ending balance | $54,384 | $15,544 | $69,928 | | | |
| **Multifamily allowance for loan losses:** | | | | | | |
| Beginning balance | $ 1,017 | $ 462 | $ 1,479 | | | |
| Provision for loan losses | 39 | 37 | 76 | | | |
| Charge-offs[1] | (51) | — | (51) | | | |
| Transfers[2] | 6 | (6) | — | | | |
| Other[3] | 3 | — | 3 | | | |
| Ending balance | $ 1,014 | $ 493 | $ 1,507 | | | |
| **Total allowance for loan losses:** | | | | | | |
| Beginning balance | $55,966 | $13,540 | $69,506 | $42,844 | $17,738 | $60,582 |
| Total provision for loan losses | (196) | 4,355 | 4,159 | 2,144 | 2,552 | 4,696 |
| Charge-offs[1][6] | (3,853) | (260) | (4,113) | (5,946) | (1,243) | (7,189) |
| Recoveries | 848 | 35 | 883 | 205 | 304 | 509 |
| Transfers[2] | 1,770 | (1,770) | — | 5,131 | (5,131) | — |
| Other[3] | 863 | 137 | 1,000 | 895 | 247 | 1,142 |
| Ending balance[4][5] | $55,398 | $16,037 | $71,435 | $45,273 | $14,467 | $59,740 |

126

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | For the Nine Months Ended September 30, | | | | | |
|---|---|---|---|---|---|---|
| | **2011** | | | **2010** | | |
| | **Of Fannie Mae** | **Of Consolidated Trusts** | **Total** | **Of Fannie Mae** | **Of Consolidated Trusts** | **Total** |
| | | | (Dollars in millions) | | | |
| **Single-family allowance for loan losses:** | | | | | | |
| Beginning balance . . . . . . . . . | $ 47,377 | $12,603 | $ 59,980 | | | |
| Provision for loan losses . . . | 9,962 | 10,410 | 20,372 | | | |
| Charge-offs[(1)(6)] . . . . . . . . | (14,766) | (1,466) | (16,232) | | | |
| Recoveries . . . . . . . . . . . . | 3,197 | 1,537 | 4,734 | | | |
| Transfers[(2)] . . . . . . . . . . | 7,676 | (7,676) | — | | | |
| Other[(3)] . . . . . . . . . . . . . | 938 | 136 | 1,074 | | | |
| Ending balance . . . . . . . . . . | $ 54,384 | $15,544 | $ 69,928 | | | |
| **Multifamily allowance for loan losses:** | | | | | | |
| Beginning balance . . . . . . . . . | $  1,153 | $    423 | $  1,576 | | | |
| Provision for loan losses . . . | 41 | 135 | 176 | | | |
| Charge-offs[(1)] . . . . . . . . . . | (252) | — | (252) | | | |
| Transfers[(2)] . . . . . . . . . . | 63 | (63) | — | | | |
| Other[(3)] . . . . . . . . . . . . . | 9 | (2) | 7 | | | |
| Ending balance . . . . . . . . . . | $  1,014 | $    493 | $  1,507 | | | |
| **Total allowance for loan losses:** | | | | | | |
| Beginning balance . . . . . . . . . | $ 48,530 | $13,026 | $ 61,556 | $  8,078 | $  1,847 | $  9,925 |
| Adoption of new accounting standards . . . . . . . . . . . | — | — | — | — | 43,576 | 43,576 |
| Total provision for loan losses . . . . . . . . . . . . . | 10,003 | 10,545 | 20,548 | 11,008 | 9,922 | 20,930 |
| Charge-offs[(1)(6)] . . . . . . . . | (15,018) | (1,466) | (16,484) | (12,097) | (6,645) | (18,742) |
| Recoveries . . . . . . . . . . . . | 3,197 | 1,537 | 4,734 | 367 | 872 | 1,239 |
| Transfers[(2)] . . . . . . . . . . | 7,739 | (7,739) | — | 41,606 | (41,606) | — |
| Other[(3)] . . . . . . . . . . . . . | 947 | 134 | 1,081 | (3,689) | 6,501 | 2,812 |
| Ending balance[(4)(5)] . . . . . . . | $ 55,398 | $16,037 | $ 71,435 | $ 45,273 | $ 14,467 | $ 59,740 |

[(1)] Total charge-offs include accrued interest of $289 million and $811 million for the three months ended September 30, 2011 and 2010, respectively and $1.1 billion and $2.0 billion for the nine months ended September 30, 2011 and 2010, respectively. Single-family charge-offs include accrued interest of $279 million and $1.1 billion for the three and nine months ended September 30, 2011, respectively. Multifamily charge-offs include accrued interest of $10 million and $34 million for the three and nine months ended September 30, 2011, respectively.

[(2)] Includes transfers from trusts for delinquent loan purchases.

[(3)] Amounts represent the net activity recorded in our allowances for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers. The provision for credit losses, charge-offs, recoveries and transfer activity included in this table reflects all changes for both the allowance for loan losses and the valuation allowances for accrued interest and preforeclosure property taxes and insurance receivable that relate to the mortgage loans.

TREASURY-2043

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

[4] Includes $334 million and $397 million as of September 30, 2011 and 2010, respectively, for acquired credit-impaired loans.

[5] Total single-family allowance for loan losses was $58.3 billion as of September 30, 2010. Total multifamily allowance for loan losses was $1.4 billion as of September 30, 2010.

[6] While we purchase the substantial majority of loans that are four or more months delinquent from our MBS trusts, we do not exercise this option to purchase loans during a forbearance period. Accordingly, charge-offs of consolidated trusts generally represent loans that remained in our consolidated trusts at the time of default.

As of September 30, 2011, the allowance for accrued interest receivable for loans of Fannie Mae was $1.9 billion and for loans of consolidated trusts was $304 million. As of December 31, 2010, the allowance for accrued interest receivable for loans of Fannie Mae was $3.0 billion and for loans of consolidated trusts was $439 million.

In the three month period ended June 30, 2010, we identified that for a portion of our delinquent loans we had not estimated and recorded our obligation to reimburse servicers for advances they made on our behalf for preforeclosure property taxes and insurance. We previously recognized these expenses when we reimbursed servicers. We also did not record a receivable from borrowers for these payments or assess the collectibility of the receivable. The nine month period ended September 30, 2010 includes an out-of-period adjustment of $1.1 billion to our condensed consolidated statements of operations reflecting our assessment of the collectibility of the receivable from borrowers.

The following table displays the allowance for loan losses and total recorded investment in our HFI loans, excluding loans for which we have elected the fair value option, by impairment or reserve methodology and portfolio segment as of September 30, 2011 and December 31, 2010.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | September 30, 2011 | | | December 31, 2010 | | |
| | Single-Family | Multifamily | Total | Single-Family | Multifamily | Total |
| | (Dollars in millions) | | | | | |
| Allowance for loan losses by segment: | | | | | | |
| Individually impaired loans . . | $ 44,475 | $ 702 | $ 45,177 | $ 37,296 | $ 549 | $ 37,845 |
| Collectively reserved loans. . . | 25,121 | 803 | 25,924 | 22,306 | 1,020 | 23,326 |
| Acquired credit-impaired loans . . . . . . . . . . . . . . . | 332 | 2 | 334 | 378 | 7 | 385 |
| Total allowance for loan losses . . . . . . . . . . . . . | $ 69,928 | $ 1,507 | $ 71,435 | $ 59,980 | $ 1,576 | $ 61,556 |
| Recorded investment in loans by segment:[1] . . . . . . . . . . . . . | | | | | | |
| Individually impaired loans . . | $ 159,031 | $ 3,760 | $ 162,791 | $ 140,062 | $ 3,074 | $ 143,136 |
| Collectively reserved loans. . . | 2,638,517 | 173,223 | 2,811,740 | 2,677,640 | 169,332 | 2,846,972 |
| Acquired credit-impaired loans . . . . . . . . . . . . . . . | 3,546 | 50 | 3,596 | 4,798 | 108 | 4,906 |
| Total recorded investment in loans. . . . . . . . . . . . | $2,801,094 | $177,033 | $2,978,127 | $2,822,500 | $172,514 | $2,995,014 |

[1] Recorded investment consists of the following: (a) unpaid principal balance; (b) unamortized premiums, discounts and other cost basis adjustments; and (c) accrued interest receivable.

128

FANNIE MAE
(In conservatorship)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(UNAUDITED)

## 5.   Investments in Securities

### *Trading Securities*

Trading securities are recorded at fair value with subsequent changes in fair value recorded as "Fair value (losses) gains, net" in our condensed consolidated statements of operations and comprehensive loss. The following table displays our investments in trading securities and the cumulative amount of net losses recognized from holding these securities as of September 30, 2011 and December 31, 2010.

| | As of | |
|---|---|---|
| | September 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Mortgage-related securities: | | |
| Fannie Mae | $ 7,529 | $ 7,398 |
| Freddie Mac | 2,866 | 1,326 |
| Ginnie Mae | 297 | 590 |
| Alt-A private-label securities | 1,454 | 1,683 |
| Subprime private-label securities | 1,318 | 1,581 |
| CMBS | 10,600 | 10,764 |
| Mortgage revenue bonds | 718 | 609 |
| Other mortgage-related securities | 147 | 152 |
| Total | 24,929 | 24,103 |
| Non-mortgage-related securities: | | |
| U.S. Treasury securities | 40,755 | 27,432 |
| Asset-backed securities | 2,465 | 5,321 |
| Total | 43,220 | 32,753 |
| Total trading securities | $68,149 | $56,856 |
| Losses in trading securities held in our portfolio, net | $ 1,986 | $ 2,149 |

The following table displays information about our net trading gains and losses for the three and nine months ended September 30, 2011 and 2010.

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (Dollars in millions) | | | |
| Net trading (losses) gains: | | | | |
| Mortgage-related securities | $(209) | $879 | $151 | $2,497 |
| Non-mortgage-related securities | (5) | 10 | (5) | 90 |
| Total | $(214) | $889 | $146 | $2,587 |
| Net trading (losses) gains recorded in the period related to securities still held at period end: | | | | |
| Mortgage-related securities | $(206) | $872 | $145 | $2,368 |
| Non-mortgage-related securities | — | 7 | 2 | 71 |
| Total | $(206) | $879 | $147 | $2,439 |

129

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

*Available-for-Sale Securities*

We measure AFS securities at fair value with unrealized gains and losses recorded as a component of "Other comprehensive (loss) income," net of tax, and we record realized gains and losses from the sale of AFS securities in "Investment gains, net" in our condensed consolidated statements of operations and comprehensive loss.

The following table displays the gross realized gains, losses and proceeds on sales of AFS securities for the three and nine months ended September 30, 2011 and 2010.

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (Dollars in millions) | | | |
| Gross realized gains . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 15 | $170 | $ 148 | $ 515 |
| Gross realized losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 | 101 | 75 | 280 |
| Total proceeds[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 597 | 978 | 1,826 | 6,552 |

[1] Excludes proceeds from the initial sale of securities from new portfolio securitizations included in "Note 2, Consolidations and Transfers of Financial Assets." For the nine months ended September 30, 2010, proceeds were increased by $416 million, from what was previously disclosed, related to deconsolidated REMICs that were previously presented as proceeds from issuance of long-term debt of consolidated trusts.

The following tables display the amortized cost, gross unrealized gains and losses and fair value by major security type for AFS securities we held as of September 30, 2011 and December 31, 2010.

| | As of September 30, 2011 | | | | |
|---|---|---|---|---|---|
| | **Total Amortized Cost[1]** | **Gross Unrealized Gains** | **Gross Unrealized Losses - OTTI[2]** | **Gross Unrealized Losses - Other[3]** | **Total Fair Value** |
| | (Dollars in millions) | | | | |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . | $17,698 | $1,559 | $    (4) | $    (15) | $19,238 |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . | 12,781 | 968 | — | — | 13,749 |
| Ginnie Mae . . . . . . . . . . . . . . . . . . . . . . . . . | 807 | 132 | — | — | 939 |
| Alt-A private-label securities . . . . . . . . . . . . . | 14,299 | 215 | (1,989) | (238) | 12,287 |
| Subprime private-label securities . . . . . . . . . . . | 10,367 | 3 | (2,040) | (443) | 7,887 |
| CMBS[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,598 | 62 | — | (270) | 14,390 |
| Mortgage revenue bonds . . . . . . . . . . . . . . . . . | 10,635 | 180 | (25) | (183) | 10,607 |
| Other mortgage-related securities . . . . . . . . . . . | 3,771 | 144 | (21) | (281) | 3,613 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $84,956 | $3,263 | $(4,079) | $(1,430) | $82,710 |

TREASURY-2046

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | As of December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Total Amortized Cost[1] | Gross Unrealized Gains | Gross Unrealized Losses - OTTI[2] | Gross Unrealized Losses - Other[3] | Total Fair Value |
| | (Dollars in millions) | | | | |
| Fannie Mae | $21,428 | $1,453 | $ (9) | $ (44) | $22,828 |
| Freddie Mac | 15,986 | 1,010 | — | — | 16,996 |
| Ginnie Mae | 909 | 130 | — | — | 1,039 |
| Alt-A private-label securities | 15,789 | 177 | (1,791) | (285) | 13,890 |
| Subprime private-label securities | 11,323 | 54 | (997) | (448) | 9,932 |
| CMBS[4] | 15,273 | 25 | — | (454) | 14,844 |
| Mortgage revenue bonds | 11,792 | 47 | (64) | (734) | 11,041 |
| Other mortgage-related securities | 4,098 | 106 | (44) | (338) | 3,822 |
| Total | $96,598 | $3,002 | $(2,905) | $(2,303) | $94,392 |

[1] Amortized cost includes unamortized premiums, discounts and other cost basis adjustments as well as the credit component of other-than-temporary impairments (OTTI) recognized in our condensed consolidated statements of operations and comprehensive loss.

[2] Represents the noncredit component of other-than-temporary impairment losses recorded in "Accumulated other comprehensive loss" as well as cumulative changes in fair value for securities for which we previously recognized the credit component of an other-than-temporary impairment.

[3] Represents the gross unrealized losses on securities for which we have not recognized an other-than-temporary impairment.

[4] Amortized cost includes $725 million and $848 million as of September 30, 2011 and December 31, 2010, respectively, of increase to the carrying amount from previous fair value hedge accounting.

The following tables display additional information regarding gross unrealized losses and fair value by major security type for AFS securities in an unrealized loss position that we held as of September 30, 2011 and December 31, 2010.

| | As of September 30, 2011 | | | |
|---|---|---|---|---|
| | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
| | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
| | (Dollars in millions) | | | |
| Fannie Mae | $ (6) | $ 758 | $ (13) | $ 186 |
| Alt-A private-label securities | (157) | 1,544 | (2,070) | 7,072 |
| Subprime private-label securities | (206) | 992 | (2,277) | 6,843 |
| CMBS | (110) | 7,572 | (160) | 2,982 |
| Mortgage revenue bonds | (9) | 311 | (199) | 2,718 |
| Other mortgage-related securities | (12) | 264 | (290) | 1,508 |
| Total | $(500) | $11,441 | $(5,009) | $21,309 |

131

TREASURY-2047

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of December 31, 2010 | | | |
| | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
| | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
| | (Dollars in millions) | | | |
| Fannie Mae | $ (35) | $ 1,461 | $ (18) | $ 211 |
| Alt-A private-label securities | (104) | 1,915 | (1,972) | 9,388 |
| Subprime private-label securities | (47) | 627 | (1,398) | 8,493 |
| CMBS | (15) | 1,774 | (439) | 10,396 |
| Mortgage revenue bonds | (206) | 5,009 | (592) | 3,129 |
| Other mortgage-related securities | (2) | 262 | (380) | 2,014 |
| Total | $(409) | $11,048 | $(4,799) | $33,631 |

### Other-Than-Temporary Impairments

We recognize the credit component of other-than-temporary impairments of our debt securities in our condensed consolidated statements of operations and comprehensive loss and the noncredit component in "Other comprehensive (loss) income" for those securities that we do not intend to sell and for which it is not more likely than not that we will be required to sell before recovery.

The fair value of our securities varies from period to period due to changes in interest rates, in the performance of the underlying collateral and in the credit performance of the underlying issuer, among other factors. $5.0 billion of the $5.5 billion of gross unrealized losses on AFS securities as of September 30, 2011 have existed for a period of 12 consecutive months or longer. Gross unrealized losses on AFS securities as of September 30, 2011 include unrealized losses on securities with other-than-temporary impairment in which a portion of the impairment remains in "Accumulated other comprehensive loss." The securities with unrealized losses for 12 consecutive months or longer, on average, had a fair value as of September 30, 2011 that was 81% of their amortized cost basis. Based on our review for impairments of AFS securities, which includes an evaluation of the collectibility of cash flows and any intent or requirement to sell the securities, we have concluded that we do not have an intent to sell and we believe it is not more likely than not that we will be required to sell the securities. Additionally, our projections of cash flows indicate that we will recover a portion or the majority of these unrealized losses over the lives of the securities.

The following table displays our net other-than-temporary impairments by major security type recognized in our condensed consolidated statements of operations and comprehensive loss for the three and nine months ended September 30, 2011 and 2010.

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
| | 2011 | 2010[1] | 2011 | 2010[1] |
| | (Dollars in millions) | | | |
| Alt-A private-label securities | $238 | $153 | $329 | $310 |
| Subprime private-label securities | 2 | 171 | 2 | 365 |
| Other | 22 | 2 | 31 | 24 |
| Net other-than-temporary impairments | $262 | $326 | $362 | $699 |

[1] Certain prior period amounts have been reclassified to conform to the current period presentation.

132

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

For the three and nine months ended September 30, 2011, we recorded net other-than-temporary impairment of $262 million and $362 million, respectively. The net other-than-temporary impairment charges recorded in the three month period ended September 30, 2011 were primarily driven by an increase in collateral losses on certain Alt-A private-label securities, which resulted in a decrease in the present value of our cash flow projections on these Alt-A private-label securities.

The following table displays activity related to the unrealized credit component on debt securities held by us and recognized in earnings for the three and nine months ended September 30, 2011 and 2010. A related unrealized non-credit component has been recognized in "Accumulated other comprehensive loss."

|  | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2011 | 2010 | 2011 | 2010 |
|  | (Dollars in millions) | | | |
| Balance, beginning of period | $7,876 | $8,181 | $8,215 | $8,191 |
| Additions for the credit component on debt securities for which OTTI was not previously recognized | — | 6 | 8 | 21 |
| Additions for credit losses on debt securities for which OTTI was previously recognized | 262 | 320 | 354 | 678 |
| Reductions for securities no longer in portfolio at period end | (5) | (102) | (5) | (154) |
| Reductions for amortization resulting from increases in cash flows expected to be collected over the remaining life of the securities | (253) | (137) | (692) | (468) |
| Balance, end of period | $7,880 | $8,268 | $7,880 | $8,268 |

As of September 30, 2011, those debt securities with other-than-temporary impairment for which we recognized in our condensed consolidated statements of operations and comprehensive loss only the amount of loss related to credit consisted predominantly of Alt-A and subprime securities. We evaluate Alt-A (including option adjustable rate mortgage ("ARM")) and subprime private-label securities for other-than-temporary impairment by discounting the projected cash flows from econometric models to estimate the portion of loss in value attributable to credit. Separate components of a third-party model project regional home prices, unemployment and interest rates. The model combines these factors with available current information regarding attributes of loans in pools backing the private-label mortgage-related securities to project prepayment speeds, conditional default rates, loss severities and delinquency rates. It incorporates detailed information on security-level subordination levels and cash flow priority of payments to project security level cash flows. We model securities assuming the benefit of those external financial guarantees that we determined are creditworthy. We have recorded other-than-temporary impairments for the three and nine months ended September 30, 2011 based on this analysis, with amounts related to credit loss recognized in our condensed consolidated statements of operations and comprehensive loss. For securities we determined were not other-than-temporarily impaired, we concluded that either the bond had no projected credit loss or if we projected a loss, that the present value of expected cash flows was greater than the security's cost basis.

133

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays the modeled attributes, including default rates and severities, which are used to determine whether our senior interests in certain non-agency mortgage-related securities will experience a cash shortfall. Assumption of voluntary prepayment rates is also an input to the present value of expected losses.

| | | As of September 30, 2011 | | | |
| | | Alt-A | | | |
| | Subprime | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
| | | | (Dollars in millions) | | |
| **Vintage Year** | | | | | |
| **2004 & Prior:** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . | $ 1,699 | $  487 | $3,497 | $  501 | $2,311 |
| Weighted average collateral default[1] . . . . . . . | 36.6% | 36.6% | 10.5% | 31.4% | 16.0% |
| Weighted average collateral severities[2]. . . . . . | 59.8 | 51.9 | 47.0 | 41.1 | 38.6 |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6.9 | 11.6 | 12.7 | 9.2 | 12.5 |
| Average credit enhancement[4] . . . . . . . . . . . | 51.1 | 16.3 | 12.1 | 22.3 | 10.5 |
| **2005** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . | $  179 | $1,324 | $1,202 | $  540 | $2,389 |
| Weighted average collateral default[1] . . . . . . . | 71.2% | 56.3% | 38.3% | 53.5% | 37.8% |
| Weighted average collateral severities[2]. . . . . . | 72.1 | 59.8 | 62.1 | 57.0 | 46.8 |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.5 | 6.4 | 9.3 | 7.4 | 9.1 |
| Average credit enhancement[4] . . . . . . . . . . . | 65.3 | 24.8 | 1.4 | 17.9 | 5.1 |
| **2006** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . | $11,792 | $1,241 | $  533 | $1,619 | $1,716 |
| Weighted average collateral default[1] . . . . . . . | 76.3% | 70.9% | 38.6% | 58.3% | 31.0% |
| Weighted average collateral severities[2]. . . . . . | 72.2 | 62.6 | 64.6 | 57.8 | 49.8 |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.5 | 3.4 | 8.4 | 6.5 | 9.8 |
| Average credit enhancement[4] . . . . . . . . . . . | 17.5 | 17.0 | 2.3 | 0.2 | 0.6 |
| **2007 & After:** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . | $  609 | $  — | $  — | $  — | $  120 |
| Weighted average collateral default[1] . . . . . . . | 78.8% | N/A | N/A | N/A | 40.9% |
| Weighted average collateral severities[2]. . . . . . | 68.7 | N/A | N/A | N/A | 57.7 |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.0 | N/A | N/A | N/A | 9.0 |
| Average credit enhancement[4] . . . . . . . . . . . | 33.7 | N/A | N/A | N/A | 26.1 |
| **Total** | | | | | |
| Unpaid principal balance . . . . . . . . . . . . . . . | $14,279 | $3,052 | $5,232 | $2,660 | $6,536 |
| Weighted average collateral default[1] . . . . . . . | 71.6% | 59.1% | 19.7% | 52.2% | 28.4% |
| Weighted average collateral severities[2]. . . . . . | 70.6 | 59.7 | 52.3 | 54.5 | 44.9 |
| Weighted average voluntary prepayment rates[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.0 | 6.0 | 11.5 | 7.2 | 10.5 |
| Average credit enhancement[4] . . . . . . . . . . . | 22.8 | 20.3 | 8.6 | 7.9 | 6.2 |

[1]  The expected remaining cumulative default rate of the collateral pool backing the securities, as a percentage of the current collateral unpaid principal balance, weighted by security unpaid principal balance.

134

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

[2]   The expected remaining loss given default of the collateral pool backing the securities, calculated as the ratio of remaining cumulative loss divided by cumulative defaults, weighted by security unpaid principal balance.

[3]   The average monthly voluntary prepayment rate, weighted by security unpaid principal balance.

[4]   The average percent current credit enhancement provided by subordination of other securities. Excludes excess interest projections and monoline bond insurance.

*Maturity Information*

The following table displays the amortized cost and fair value of our AFS securities by major security type and remaining maturity, assuming no principal prepayments, as of September 30, 2011. Contractual maturity of mortgage-backed securities is not a reliable indicator of their expected life because borrowers generally have the right to prepay their obligations at any time.

|  | | | One Year or Less | | After One Year Through Five Years | | After Five Years Through Ten Years | | After Ten Years | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Total Amortized Cost | Total Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
|  | (Dollars in millions) | | | | | | | | | |
| Fannie Mae | $17,698 | $19,238 | $ — | $ — | $ 6 | $ 6 | $ 2,645 | $ 2,832 | $15,047 | $16,400 |
| Freddie Mac | 12,781 | 13,749 | 1 | 1 | 46 | 48 | 1,331 | 1,439 | 11,403 | 12,261 |
| Ginnie Mae | 807 | 939 | — | — | — | — | 5 | 6 | 802 | 933 |
| Alt-A private-label securities | 14,299 | 12,287 | — | — | 1 | 1 | 249 | 252 | 14,049 | 12,034 |
| Subprime private-label securities | 10,367 | 7,887 | — | — | — | — | — | — | 10,367 | 7,887 |
| CMBS | 14,598 | 14,390 | 62 | 63 | 5,255 | 5,244 | 8,678 | 8,500 | 603 | 583 |
| Mortgage revenue bonds | 10,635 | 10,607 | 59 | 59 | 366 | 377 | 743 | 756 | 9,467 | 9,415 |
| Other mortgage-related securities | 3,771 | 3,613 | — | — | — | — | — | — | 3,771 | 3,599 |
| Total | $84,956 | $82,710 | $122 | $123 | $5,674 | $5,676 | $13,651 | $13,799 | $65,509 | $63,112 |

*Accumulated Other Comprehensive Loss*

The following table displays our accumulated other comprehensive loss by major categories as of September 30, 2011 and December 31, 2010.

|  | As of | |
|---|---|---|
|  | September 30, 2011 | December 31, 2010 |
|  | (Dollars in millions) | |
| Net unrealized gains on available-for-sale securities for which we have not recorded other-than-temporary impairment, net of tax | $ 1,049 | $   304 |
| Net unrealized losses on available-for-sale securities for which we have recorded other-than-temporary impairment, net of tax | (2,509) | (1,736) |
| Other losses | (236) | (250) |
| Accumulated other comprehensive loss | $(1,696) | $(1,682) |

135

FANNIE MAE
(In conservatorship)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(UNAUDITED)

The following table displays the activity in other comprehensive (loss) income, net of tax, by major categories for the three and nine months ended September 30, 2011 and 2010.

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2011 | 2010 | 2011 | 2010 |
| | (Dollars in millions) | | | |
| Comprehensive loss: | | | | |
| Net loss | $(5,085) | $(1,331) | $(14,448) | $(14,083) |
| Other comprehensive (loss) income, net of tax: | | | | |
| Changes in net unrealized losses on available-for-sale securities (net of tax benefit of $210 and tax of $380, respectively, for the three months ended and net of tax benefit of $142 and tax of $1,889, respectively, for the nine months ended) | (391) | 705 | (264) | 3,507 |
| Reclassification adjustment for other-than-temporary impairments recognized in net loss (net of tax of $92 and $113, respectively, for the three months ended and net of tax of $120 and $239, respectively, for the nine months ended) | 170 | 213 | 242 | 460 |
| Reclassification adjustment for losses (gains) included in net loss (net of tax benefit of $10 and tax of $10, respectively, for the three months ended and net of tax of $1 and $16, respectively, for the nine months ended) | 23 | (17) | 2 | (29) |
| Other | 1 | 1 | 6 | 6 |
| Other comprehensive (loss) income | (197) | 902 | (14) | 3,944 |
| Total comprehensive loss | $(5,282) | $ (429) | $(14,462) | $(10,139) |

## 6.  Financial Guarantees

For our guarantees to unconsolidated trusts and other guaranty arrangements, we recognize a guaranty obligation for our obligation to stand ready to perform on these guarantees. For those guarantees recognized in our condensed consolidated balance sheets, our maximum potential exposure under these guarantees is primarily comprised of the unpaid principal balance of the underlying mortgage loans, which totaled $56.5 billion and $52.4 billion as of September 30, 2011 and December 31, 2010, respectively. The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees recognized in our condensed consolidated balance sheets was $14.0 billion and $12.6 billion as of September 30, 2011 and December 31, 2010, respectively. In addition, we had exposure of $9.5 billion and $10.3 billion for other guarantees not recognized in our condensed consolidated balance sheets as of September 30, 2011 and December 31, 2010, respectively. The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees not recognized in our condensed consolidated balance sheets was $4.1 billion and $3.9 billion as of September 30, 2011 and December 31, 2010, respectively. Recoverability of such credit enhancements and recourse is subject to, among other factors, our mortgage insurers' and financial guarantors' ability to meet their obligations to us.

The fair value of our guaranty obligations associated with the Fannie Mae MBS included in "Investments in securities" was $2.2 billion and $2.0 billion as of September 30, 2011 and December 31, 2010, respectively.

TREASURY-2052

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Risk Characteristics of our Book of Business*

We gauge our performance risk under our guaranty based on the delinquency status of the mortgage loans we hold in portfolio, or in the case of mortgage-backed securities, the mortgage loans underlying the related securities. Management also monitors the serious delinquency rate, which is the percentage of single-family loans three or more months past due or in the foreclosure process, and the percentage of multifamily loans 60 days or more past due, of loans that also have higher risk characteristics, such as high mark-to-market loan-to-value ratios on single-family loans and low original debt service coverage ratios on multifamily loans. We use this information, in conjunction with housing market and economic conditions, to structure our pricing and our eligibility and underwriting criteria to reflect the current risk of loans with these higher-risk characteristics, and in some cases we decide to significantly reduce our participation in riskier loan product categories. Management also uses this data together with other credit risk measures to identify key trends that guide the development of our loss mitigation strategies.

The following tables display the current delinquency status and certain higher risk characteristics of our single-family conventional and total multifamily guaranty book of business as of September 30, 2011 and December 31, 2010.

| | As of September 30, 2011[1] | | | As of December 31, 2010[1] | | |
|---|---|---|---|---|---|---|
| | 30 Days Delinquent | 60 Days Delinquent | Seriously Delinquent[2] | 30 Days Delinquent | 60 Days Delinquent | Seriously Delinquent[2] |
| Percentage of single-family conventional guaranty book of business[3] ................. | 2.00% | 0.75% | 4.64% | 2.19% | 0.89% | 5.37% |
| Percentage of single-family conventional loans[4] .......... | 2.16 | 0.75 | 4.00 | 2.32 | 0.87 | 4.48 |

137

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | As of September 30, 2011[1] | | As of December 31, 2010[1] | |
|---|---|---|---|---|
| | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent[2][4] | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent[2][4] |
| **Estimated mark-to-market loan-to-value ratio:** | | | | |
| Less than 100% | 84% | 2.35% | 84% | 2.62% |
| 100.01% to 110% | 5 | 9.50 | 5 | 11.60 |
| 110.01% to 120% | 3 | 12.16 | 3 | 14.74 |
| 120.01% to 125% | 1 | 13.64 | 1 | 16.86 |
| Greater than 125% | 7 | 19.83 | 7 | 24.71 |
| **Geographical distribution:** | | | | |
| Arizona | 2 | 3.78 | 2 | 6.23 |
| California | 19 | 2.70 | 18 | 3.89 |
| Florida | 6 | 11.90 | 7 | 12.31 |
| Nevada | 1 | 7.53 | 1 | 10.66 |
| Select Midwest states[5] | 10 | 4.55 | 11 | 4.80 |
| All other states | 62 | 3.20 | 61 | 3.46 |
| **Product distribution (not mutually exclusive):** [6] | | | | |
| Alt-A | 7 | 12.71 | 8 | 13.87 |
| Subprime | * | 23.91 | * | 28.20 |
| Negatively amortizing adjustable rate | * | 7.79 | * | 9.02 |
| Interest only | 5 | 15.70 | 6 | 17.85 |
| Investor property | 6 | 4.34 | 6 | 4.79 |
| Condo/Coop | 9 | 4.74 | 9 | 5.37 |
| Original loan-to-value ratio >90%[7] | 10 | 8.42 | 10 | 10.04 |
| FICO credit score <620[7] | 3 | 13.56 | 4 | 14.63 |
| Original loan-to-value ratio >90% and FICO credit score <620[7] | 1 | 18.99 | 1 | 21.41 |
| **Vintages:** | | | | |
| 2005 | 7 | 7.13 | 9 | 7.20 |
| 2006 | 7 | 11.81 | 8 | 12.19 |
| 2007 | 10 | 12.63 | 12 | 13.24 |
| 2008 | 8 | 5.34 | 9 | 4.88 |
| All other vintages | 68 | 1.60 | 62 | 1.73 |

\* Represents less than 0.5% of the single-family conventional guaranty book of business.

[1] Consists of the portion of our single-family conventional guaranty book of business for which we have detailed loan level information, which constituted approximately 99% of our total single-family conventional guaranty book of business as of both September 30, 2011 and December 31, 2010.

[2] Consists of single-family conventional loans that were three months or more past due or in the foreclosure process, as of the periods indicated.

138

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

[3] Calculated based on the aggregate unpaid principal balance of single-family conventional loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business.

[4] Calculated based on the number of single-family conventional loans that were delinquent divided by the total number of loans in our single-family conventional guaranty book of business.

[5] Consists of Illinois, Indiana, Michigan, and Ohio.

[6] Categories are not mutually exclusive. Loans with multiple product features are included in all applicable categories.

[7] Includes housing goals-oriented products such as MyCommunityMortgage® and Expanded Approval®.

| | As of September 30, 2011[1][2] | | As of December 31, 2010[1][2] | |
|---|---|---|---|---|
| | 30 Days Delinquent | Seriously Delinquent[3] | 30 Days Delinquent | Seriously Delinquent[3] |
| Percentage of multifamily guaranty book of business . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.20% | 0.57% | 0.21% | 0.71% |

| | As of September 30, 2011[1][2] | | As of December 31, 2010[1][2] | |
|---|---|---|---|---|
| | Percentage of Multifamily Guaranty Book of Business | Percentage Seriously Delinquent[3] | Percentage of Multifamily Guaranty Book of Business | Percentage Seriously Delinquent[3] |
| **Original loan-to-value ratio:** | | | | |
| Greater than 80% . . . . . . . . . . . . . . . . | 5% | 1.52% | 5% | 0.59% |
| Less than or equal to 80% . . . . . . . . . . . | 95 | 0.53 | 95 | 0.71 |
| **Original debt service coverage ratio:** | | | | |
| Less than or equal to 1.10 . . . . . . . . . . . | 8 | 0.17 | 9 | 0.27 |
| Greater than 1.10 . . . . . . . . . . . . . . . . . | 92 | 0.61 | 91 | 0.75 |
| **Acquisition loan size distribution:** | | | | |
| Less than or equal to $750,000 . . . . . . . . | 2 | 1.37 | 2 | 1.61 |
| Greater than $750,000 and less than or equal to $3 million . . . . . . . . . . . . . . | 11 | 1.11 | 12 | 1.17 |
| Greater than $3 million and less than or equal to $5 million . . . . . . . . . . . . . . | 9 | 0.80 | 9 | 0.88 |
| Greater than $5 million and less than or equal to $25 million . . . . . . . . . . . . . | 42 | 0.63 | 42 | 0.88 |
| Greater than $25 million . . . . . . . . . . . . | 36 | 0.23 | 35 | 0.24 |
| **Maturing dates:** | | | | |
| Maturing in 2011 . . . . . . . . . . . . . . . . . | 1 | 3.68 | 3 | 0.68 |
| Maturing in 2012 . . . . . . . . . . . . . . . . . | 6 | 0.41 | 7 | 0.42 |
| Maturing in 2013 . . . . . . . . . . . . . . . . . | 10 | 0.45 | 11 | 0.54 |
| Maturing in 2014 . . . . . . . . . . . . . . . . . | 8 | 0.56 | 8 | 0.67 |
| Maturing in 2015 . . . . . . . . . . . . . . . . . | 9 | 0.45 | 9 | 0.57 |

[1] Consists of the portion of our multifamily guaranty book of business for which we have detailed loan level information, which constituted 99% of our total multifamily guaranty book of business as of both September 30, 2011 and December 31, 2010 excluding loans that have been defeased. Defeasance is a pre-payment of a loan through substitution of collateral.

[2] Calculated based on the aggregate unpaid principal balance of multifamily loans for each category divided by the aggregate unpaid principal balance of loans in our multifamily guaranty book of business.

[3] Consists of multifamily loans that were 60 days or more past due as of the periods indicated.

TREASURY-2055

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

**7.   Acquired Property, Net**

Acquired property, net consists of held for sale foreclosed property received in full satisfaction of a loan net of a valuation allowance for declines in the fair value of foreclosed properties after initial acquisition. We classify as held for sale those properties that we intend to sell and are actively marketed for sale. The following table displays the activity in acquired property and the related valuation allowance for the three and nine months ended September 30, 2011 and 2010.

| | For the Three Months Ended September 30, 2011 | | | For the Nine Months Ended September 30, 2011 | | |
|---|---|---|---|---|---|---|
| | Acquired Property | Valuation Allowance[1] | Acquired Property, Net | Acquired Property | Valuation Allowance[1] | Acquired Property, Net |
| | | | (Dollars in millions) | | | |
| Balance as of beginning of period . . . . . . . | $14,915 | $(1,323) | $13,592 | $ 18,054 | $(1,881) | $ 16,173 |
| Additions . . . . . . . . . . . . . . . . . . . . . . . . | 4,066 | (144) | 3,922 | 13,953 | (422) | 13,531 |
| Disposals . . . . . . . . . . . . . . . . . . . . . . . | (5,606) | 601 | (5,005) | (18,632) | 2,119 | (16,513) |
| Write-downs, net of recoveries . . . . . . . . | — | (314) | (314) | — | (996) | (996) |
| Balance as of end of period . . . . . . . . . . | $13,375 | $(1,180) | $12,195 | $ 13,375 | $(1,180) | $ 12,195 |

| | For the Three Months Ended September 30, 2010 | | | For the Nine Months Ended September 30, 2010 | | |
|---|---|---|---|---|---|---|
| | Acquired Property | Valuation Allowance[1] | Acquired Property, Net | Acquired Property | Valuation Allowance[1] | Acquired Property, Net |
| | | | (Dollars in millions) | | | |
| Balance as of beginning of period . . . . . . . | $15,141 | $(1,120) | $14,021 | $ 9,716 | $ (574) | $ 9,142 |
| Additions . . . . . . . . . . . . . . . . . . . . . . . . | 8,586 | (339) | 8,247 | 22,176 | (629) | 21,547 |
| Disposals . . . . . . . . . . . . . . . . . . . . . . . | (4,618) | 390 | (4,228) | (12,783) | 915 | (11,868) |
| Write-downs, net of recoveries . . . . . . . . | — | (450) | (450) | — | (1,231) | (1,231) |
| Balance as of end of period . . . . . . . . . . | $19,109 | $(1,519) | $17,590 | $ 19,109 | $(1,519) | $ 17,590 |

[1]   Reflects activities in the valuation allowance for acquired properties held primarily by our Single-Family segment.

140

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

**8.  Short-Term Borrowings and Long-Term Debt**

*Short-Term Borrowings*

The following table displays our outstanding short-term borrowings (borrowing with an original contractual maturity of one year or less) and weighted-average interest rates of these borrowings as of September 30, 2011 and December 31, 2010.

| | As of | | | |
| | September 30, 2011 | | December 31, 2010 | |
| | Outstanding | Weighted-Average Interest Rate[1] | Outstanding | Weighted-Average Interest Rate[1] |
| --- | --- | --- | --- | --- |
| | (Dollars in millions) | | | |
| Federal funds purchased and securities sold under agreements to repurchase.......................... | $     — | —% | $      52 | 2.20% |
| Fixed-rate short-term debt: | | | | |
| Discount notes................................. | $193,385 | 0.13% | $151,500 | 0.32% |
| Foreign exchange discount notes ................. | 333 | 2.01 | 384 | 2.43 |
| Total short-term debt of Fannie Mae ............ | 193,718 | 0.14 | 151,884 | 0.32 |
| Debt of consolidated trusts ...................... | 5,004 | 0.19 | 5,359 | 0.23 |
| Total short-term debt ........................ | $198,722 | 0.14% | $157,243 | 0.32% |

---

[1]   Includes the effects of discounts, premiums, and other cost basis adjustments.

141

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

*Long-Term Debt*

Long-term debt represents borrowings with an original contractual maturity of greater than one year. The following table displays our outstanding long-term debt as of September 30, 2011 and December 31, 2010.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | September 30, 2011 | | | December 31, 2010 | | |
| | Maturities | Outstanding | Weighted-Average Interest Rate[1] | Maturities | Outstanding | Weighted-Average Interest Rate[1] |
| | | | (Dollars in millions) | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds . . . . . . | 2011-2030 | $ 281,876 | 2.90% | 2011-2030 | $ 300,344 | 3.20% |
| Medium-term notes . . . . . . . . . . . | 2011-2021 | 153,166 | 1.81 | 2011-2020 | 199,266 | 2.13 |
| Foreign exchange notes and bonds . . | 2021-2028 | 667 | 5.22 | 2017-2028 | 1,177 | 6.21 |
| Other[2] . . . . . . . . . . . . . . . . . . . . . | 2011-2040 | 44,241 | 5.59 | 2011-2040 | 44,893 | 5.64 |
| Total senior fixed . . . . . . . . . . . | | 479,950 | 2.80 | | 545,680 | 3.02 |
| Senior floating: | | | | | | |
| Medium-term notes . . . . . . . . . . . | 2011-2016 | 62,970 | 0.30 | 2011-2015 | 72,039 | 0.31 |
| Other[2] . . . . . . . . . . . . . . . . . . . . . | 2020-2037 | 421 | 6.61 | 2020-2037 | 386 | 4.92 |
| Total senior floating . . . . . . . . . . | | 63,391 | 0.33 | | 72,425 | 0.34 |
| Subordinated fixed: | | | | | | |
| Qualifying subordinated[3] . . . . . . . . | 2012-2014 | 4,893 | 5.08 | 2011-2014 | 7,392 | 5.47 |
| Subordinated debentures . . . . . . . . . | 2019 | 2,851 | 9.91 | 2019 | 2,663 | 9.91 |
| Total subordinated fixed . . . . . . . | | 7,744 | 6.86 | | 10,055 | 6.65 |
| Total long-term debt of Fannie Mae[4] . . . . . . . . . . . . . . . . . . . | | 551,085 | 2.58 | | 628,160 | 2.77 |
| Debt of consolidated trusts[2] . . . . . . . | 2011-2051 | 2,441,969 | 4.40 | 2011-2051 | 2,411,597 | 4.59 |
| Total long-term debt . . . . . . . . . | | $2,993,054 | 4.06% | | $3,039,757 | 4.22% |

[1] Includes the effects of discounts, premiums and other cost basis adjustments.

[2] Includes a portion of structured debt instruments that is reported at fair value.

[3] Consists of subordinated debt issued with an interest deferral feature.

[4] Reported amounts include a net discount and other cost basis adjustments of $9.5 billion and $12.4 billion as of September 30, 2011 and December 31, 2010, respectively.

*Intraday Lines of Credit*

We periodically use secured and unsecured intraday funding lines of credit provided by several large financial institutions. We post collateral which, in some circumstances, the secured party has the right to repledge to third parties. As these lines of credit are uncommitted intraday loan facilities, we may be unable to draw on them if and when needed. We had secured uncommitted lines of credit of $25.0 billion and unsecured uncommitted lines of credit of $500 million as of September 30, 2011 and December 31, 2010. We had no borrowings outstanding from these lines of credit as of September 30, 2011 and December 31, 2010.

TREASURY-2058

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

## 9.  Derivative Instruments

Derivative instruments are an integral part of our strategy in managing interest rate risk. Derivative instruments may be privately negotiated contracts, which are often referred to as over-the-counter derivatives, or they may be listed and traded on an exchange. We typically do not settle the notional amount of our risk management derivatives; rather, notional amounts provide the basis for calculating actual payments or settlement amounts. The derivatives we use for interest rate risk management purposes consist primarily of interest rate swaps, interest rate options, foreign currency swaps and futures.

We enter into forward purchase and sale commitments that lock in the future delivery of mortgage loans and mortgage-related securities at a fixed price or yield. Certain commitments to purchase mortgage loans and purchase or sell mortgage-related securities meet the criteria of a derivative. We typically settle the notional amount of our mortgage commitments that are accounted for as derivatives.

We recognize all derivatives as either assets or liabilities in our condensed consolidated balance sheets at their fair value on a trade date basis. Fair value amounts, which are netted to the extent a legal right of offset exists and is enforceable by law at the counterparty level and are inclusive of the right or obligation associated with the cash collateral posted or received, are recorded in "Other assets" or "Other liabilities" in our condensed consolidated balance sheets. We record all derivative gains and losses, including accrued interest, in "Fair value (losses) gains, net" in our condensed consolidated statements of operations and comprehensive loss.

### *Notional and Fair Value Position of our Derivatives*

The following table displays the notional amount and estimated fair value of our asset and liability derivative instruments as of September 30, 2011 and December 31, 2010.

| | As of September 30, 2011 | | | | As of December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Asset Derivatives | | Liability Derivatives | | Asset Derivatives | | Liability Derivatives | |
| | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value |
| | (Dollars in millions) | | | | | | | |
| Risk management derivatives: | | | | | | | | |
| Swaps: | | | | | | | | |
| Pay-fixed . . . . . . . . . . . . . | $ 36,990 | $ 46 | $156,892 | $(17,154) | $ 49,085 | $ 1,812 | $228,142 | $(14,115) |
| Receive-fixed . . . . . . . . . . | 144,603 | 7,740 | 35,205 | (63) | 172,174 | 6,493 | 52,003 | (578) |
| Basis . . . . . . . . . . . . . . . . | 332 | 122 | 6,665 | (18) | 435 | 29 | 50 | — |
| Foreign currency . . . . . . . . | 457 | 135 | 542 | (82) | 1,274 | 164 | 286 | (51) |
| Swaptions: | | | | | | | | |
| Pay-fixed . . . . . . . . . . . . . | 64,150 | 191 | 48,500 | (275) | 66,200 | 482 | 30,950 | (1,773) |
| Receive-fixed . . . . . . . . . . | 38,845 | 6,707 | 48,500 | (3,036) | 48,340 | 4,992 | 30,275 | (673) |
| Interest rate caps . . . . . . . . . | 7,000 | 2 | — | — | 7,000 | 24 | — | — |
| Other[1] . . . . . . . . . . . . . . . | 639 | 52 | 150 | (4) | 909 | 75 | 25 | (1) |
| Total gross risk management derivatives . . . . . . . . . . . | 293,016 | 14,995 | 296,454 | (20,632) | 345,417 | 14,071 | 341,731 | (17,191) |
| Accrued interest receivable (payable) . . . . . . . . . . . . . | — | 770 | — | (1,319) | — | 1,288 | — | (1,805) |
| Netting adjustment[2] . . . . . . . | — | (15,539) | — | 18,372 | — | (15,175) | — | 18,023 |
| Total net risk management derivatives . . . . . . . . . . . | $293,016 | $ 226 | $296,454 | $ (3,579) | $345,417 | $ 184 | $341,731 | $ (973) |

143

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | As of September 30, 2011 | | | | As of December 31, 2010 | | | |
| | Asset Derivatives | | Liability Derivatives | | Asset Derivatives | | Liability Derivatives | |
| | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value |
|---|---|---|---|---|---|---|---|---|
| | | | | (Dollars in millions) | | | | |
| Mortgage commitment derivatives: | | | | | | | | |
| Mortgage commitments to purchase whole loans . . . . . | $ 9,434 | $  84 | $ 2,991 | $   (12) | $ 2,880 | $  19 | $ 4,435 | $  (105) |
| Forward contracts to purchase mortgage-related securities . . | 30,447 | 365 | 18,370 | (86) | 19,535 | 123 | 27,697 | (468) |
| Forward contracts to sell mortgage-related securities . . | 15,077 | 48 | 50,896 | (596) | 40,761 | 811 | 24,562 | (169) |
| Total mortgage commitment derivatives. . . . . . . . . . . | $ 54,958 | $  497 | $ 72,257 | $  (694) | $ 63,176 | $  953 | $ 56,694 | $  (742) |
| Derivatives at fair value . . . . | $347,974 | $  723 | $368,711 | $ (4,273) | $408,593 | $ 1,137 | $398,425 | $ (1,715) |

---

(1)  Includes futures, swap credit enhancements and mortgage insurance contracts that we account for as derivatives. The mortgage insurance contracts have payment provisions that are not based on a notional amount.

(2)  The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, as well as cash collateral receivable and payable. Cash collateral receivable was $3.5 billion as of September 30, 2011 and December 31, 2010. Cash collateral payable was $653 million and $604 million as of September 30, 2011 and December 31, 2010, respectively.

A majority of our derivative instruments contain provisions that require our senior unsecured debt to maintain a minimum credit rating from S&P, Moody's or Fitch. If our senior unsecured debt were to fall below established thresholds in our governing agreements, which range from A- to BBB+, we would be in violation of these provisions, and the counterparties to the derivative instruments could request immediate payment or demand immediate collateralization on derivative instruments in net liability positions. The aggregate fair value of all derivatives with credit-risk-related contingency features that were in a net liability position as of September 30, 2011 was $7.0 billion, for which we posted collateral of $6.9 billion in the normal course of business. Had all of the credit-risk-related contingency features underlying these agreements been triggered, an additional $182 million of collateral would have been required to be posted as collateral or to immediately settle our positions based on the individual agreements and our fair value position at September 30, 2011.

The aggregate fair value of all derivatives with credit risk-related contingent features that were in a net liability position as of December 31, 2010 was $4.4 billion, for which we posted collateral of $3.5 billion in the normal course of business. Had all of the credit risk-related contingency features underlying these agreements been triggered, an additional $891 million would have been required to be posted as collateral or to immediately settle our positions based on the individual agreements and our fair value position at December 31, 2010.

TREASURY-2060

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following table displays, by type of derivative instrument, the fair value gains and losses, net on our derivatives for the three and nine months ended September 30, 2011 and 2010.

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2011 | 2010 | 2011 | 2010 |
| | (Dollars in millions) | | | |
| Risk management derivatives: | | | | |
| Swaps: | | | | |
|   Pay-fixed | $(11,334) | $(8,034) | $(16,206) | $(24,811) |
|   Receive-fixed | 4,577 | 6,126 | 7,105 | 18,642 |
|   Basis | 75 | 43 | 104 | 73 |
|   Foreign currency | 31 | 149 | 114 | 138 |
| Swaptions: | | | | |
|   Pay-fixed | 533 | 17 | 805 | (1,342) |
|   Receive-fixed | 2,091 | 1,778 | 2,591 | 5,460 |
| Interest rate caps | (4) | (16) | (22) | (115) |
| Other[1] | (36) | (4) | (58) | 33 |
|   Total risk management derivatives fair value (losses) gains, net | (4,067) | 59 | (5,567) | (1,922) |
| Mortgage commitment derivatives fair value losses, net | (188) | (183) | (226) | (1,361) |
|   Total derivatives fair value losses, net | $ (4,255) | $ (124) | $ (5,793) | $ (3,283) |

[1] Includes futures, swap credit enhancements and mortgage insurance contracts.

### Derivative Counterparty Credit Exposure

Our derivative counterparty credit exposure relates principally to interest rate and foreign currency derivative contracts. We are exposed to the risk that a counterparty in a derivative transaction will default on payments due to us. If there is a default, we may need to acquire a replacement derivative from a different counterparty at a higher cost or may be unable to find a suitable replacement. We estimate our exposure to credit loss on derivative instruments by calculating the replacement cost, on a present value basis, to settle at current market prices all outstanding derivative contracts in a net gain position by counterparty where the right of legal offset exists, such as master netting agreements, and by transaction where the right of legal offset does not exist. Typically, we seek to manage credit exposure by contracting with experienced counterparties that are rated A- (or its equivalent) or better by S&P, Moody's or Fitch. We also manage our exposure by requiring counterparties to post collateral. The collateral includes cash, U.S. Treasury securities, agency debt and agency mortgage-related securities.

145

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

The table below displays our credit exposure on outstanding risk management derivative instruments in a gain position by counterparty credit ratings, as well as the notional amount outstanding and the number of counterparties for all risk management derivatives as of September 30, 2011 and December 31, 2010.

| | As of September 30, 2011 | | | | |
| | Credit Rating[1] | | | | |
| | AA+/AA/AA- | A+/A | Subtotal[2] | Other[3] | Total |
| | (Dollars in millions) | | | | |
| Credit loss exposure[4] . . . . . . . . . . . . . . . . . | $ 587 | $ 232 | $ 819 | $ 49 | $ 868 |
| Less: Collateral held[5] . . . . . . . . . . . . . . . . . | 515 | 189 | 704 | — | 704 |
| Exposure net of collateral . . . . . . . . . . . . . . . | $ 72 | $ 43 | $ 115 | $ 49 | $ 164 |
| Additional information: | | | | | |
| Notional amount . . . . . . . . . . . . . . . . . . . . . | $152,829 | $434,712 | $587,541 | $1,929 | $589,470 |
| Number of counterparties . . . . . . . . . . . . . . | 7 | 8 | 15 | | |

| | As of December 31, 2010 | | | | |
| | Credit Rating[1] | | | | |
| | AA+/AA/AA- | A+/A | Subtotal[2] | Other[3] | Total |
| | (Dollars in millions) | | | | |
| Credit loss exposure[4] . . . . . . . . . . . . . . . . . | $ 350 | $ 325 | $ 675 | $ 75 | $ 750 |
| Less: Collateral held[5] . . . . . . . . . . . . . . . . . | 273 | 325 | 598 | — | 598 |
| Exposure net of collateral . . . . . . . . . . . . . . . | $ 77 | $ — | $ 77 | $ 75 | $ 152 |
| Additional information: | | | | | |
| Notional amount . . . . . . . . . . . . . . . . . . . . . | $208,898 | $476,766 | $685,664 | $1,484 | $687,148 |
| Number of counterparties . . . . . . . . . . . . . . | 7 | 8 | 15 | | |

[1]  We manage collateral requirements based on the lower credit rating of the legal entity, as issued by S&P and Moody's. The credit rating reflects the equivalent S&P's rating for any ratings based on Moody's scale.

[2]  We had exposure to 4 and 3 interest rate and foreign currency derivative counterparties in a net gain position as of September 30, 2011 and December 31, 2010, respectively. Those interest rate and foreign currency derivatives had notional balances of $135.1 billion and $106.5 billion as of September 30, 2011 and December 31, 2010, respectively.

[3]  Includes defined benefit mortgage insurance contracts and swap credit enhancements accounted for as derivatives where the right of legal offset does not exist. Also includes exchange-traded derivatives, such as futures and interest rate swaps, which are settled daily through a clearinghouse.

[4]  Represents the exposure to credit loss on derivative instruments, which we estimate using the fair value of all outstanding derivative contracts in a gain position. We net derivative gains and losses with the same counterparty where a legal right of offset exists under an enforceable master netting agreement. This table excludes mortgage commitments accounted for as derivatives.

[5]  Represents both cash and non-cash collateral posted by our counterparties to us. Does not include collateral held in excess of exposure. We reduce the value of non-cash collateral in accordance with the counterparty agreements to help ensure recovery of any loss through the disposition of the collateral.

**10.  Segment Reporting**

Our three reportable segments are: Single-Family, Multifamily, and Capital Markets. We use these three segments to generate revenue and manage business risk, and each segment is based on the type of business activities it performs. We are working on reorganizing our company by function rather than by business in order to improve our operational efficiencies and effectiveness. In future periods, we may change some of our management reporting and how we report our business segment results.

146

FANNIE MAE
(In conservatorship)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
(UNAUDITED)

Under our segment reporting, the sum of the results for our three business segments does not equal our condensed consolidated statements of operations and comprehensive loss, as we separate the activity related to our consolidated trusts from the results generated by our three segments. Our segment financial results include directly attributable revenues and expenses. Additionally, we allocate to each of our segments: (1) capital using FHFA minimum capital requirements adjusted for over- or under-capitalization; (2) indirect administrative costs; and (3) a provision or benefit for federal income taxes. In addition, we allocate intracompany guaranty fee income as a charge from the Single-Family and Multifamily segments to Capital Markets for managing the credit risk on mortgage loans held by the Capital Markets group. We also include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to net loss in our condensed consolidated statements of operations and comprehensive loss.

The following tables display our segment results for the three and nine months ended September 30, 2011 and 2010.

| | For the Three Months Ended September 30, 2011 | | | | | |
| | Business Segments | | | Other Activity/ Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments[2] | Total Results |
| | (Dollars in millions) | | | | | |
| Net interest (loss) income . . . . . . . . . . . | $ (374) | $ (7) | $ 3,904 | $ 1,210 | $ 453[3] | $ 5,186 |
| Provision for loan losses . . . . . . . . . . . . . | (4,083) | (76) | — | — | — | (4,159) |
| Net interest (loss) income after provision for loan losses . . . . . . . . . . . . . . . . . . . | (4,457) | (83) | 3,904 | 1,210 | 453 | 1,027 |
| Guaranty fee income (expense) . . . . . . . . | 1,867 | 226 | (369) | (1,124)[4] | (551)[4] | 49[4] |
| Investment gains (losses), net. . . . . . . . . . | 3 | 5 | 801 | (89) | (647)[5] | 73 |
| Net other-than-temporary impairments . . . | — | — | (262) | — | — | (262) |
| Fair value losses, net. . . . . . . . . . . . . . . . . | (2) | — | (4,670) | (17) | 164[6] | (4,525) |
| Debt extinguishment losses, net . . . . . . . . | — | — | (107) | (12) | — | (119) |
| Losses from partnership investments . . . . . | — | (30) | — | — | — | (30)[7] |
| Fee and other income (expenses) . . . . . . . | 136 | 51 | 125 | (67) | (3) | 242 |
| Administrative expenses . . . . . . . . . . . . . . | (409) | (62) | (120) | — | — | (591) |
| Benefit (provision) for guaranty losses . . . | 11 | (3) | — | — | — | 8 |
| Foreclosed property expense . . . . . . . . . . | (710) | (23) | — | — | — | (733) |
| Other expenses. . . . . . . . . . . . . . . . . . . . . | (184) | (9) | (14) | — | (17) | (224) |
| (Loss) income before federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . | (3,745) | 72 | (712) | (99) | (601) | (5,085) |
| (Provision) benefit for federal income taxes . . . . . . . . . . . . . . . . . . . . . . . . . | (1) | — | 1 | — | — | — |
| Net (loss) income attributable to Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . | $(3,746) | $ 72 | $ (711) | $ (99) | $(601) | $(5,085) |

147

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | For the Nine Months Ended September 30, 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Business Segments | | | Other Activity/ Reconciling Items | | |
| | Single- Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments[2] | Total Results |
| | (Dollars in millions) | | | | | |
| Net interest (loss) income . . . . . . . . . | $ (1,952) | $ (27) | $11,481 | $ 4,098 | $ 1,518[3] | $ 15,118 |
| Provision for loan losses . . . . . . . . . . . | (20,372) | (176) | — | — | — | (20,548) |
| Net interest (loss) income after provision for loan losses . . . . . . . . | (22,324) | (203) | 11,481 | 4,098 | 1,518 | (5,430) |
| Guaranty fee income (expense) . . . . . . | 5,618 | 651 | (1,159) | (3,350)[4] | (1,611)[4] | 149[4] |
| Investment (losses) gains, net . . . . . . . | (2) | 10 | 2,589 | (258) | (2,020)[5] | 319 |
| Net other-than-temporary impairments . . | — | — | (361) | (1) | — | (362) |
| Fair value losses, net . . . . . . . . . . . . . | (5) | — | (5,959) | (122) | 216[6] | (5,870) |
| Debt extinguishment (losses) gains, net . . . . . . . . . . . . . . . . . . . . . . . . | — | — | (186) | 37 | — | (149) |
| Losses from partnership investments . . . | — | (8) | — | — | 1 | (7)[7] |
| Fee and other income (expense) . . . . . . | 397 | 166 | 309 | (222) | (6) | 644 |
| Administrative expenses . . . . . . . . . . . | (1,225) | (194) | (346) | — | — | (1,765) |
| (Provision) benefit for guaranty losses . . | (732) | 38 | — | — | — | (694) |
| Foreclosed property expense . . . . . . . . | (717) | (26) | — | — | — | (743) |
| Other (expenses) income . . . . . . . . . . | (579) | 33 | (32) | — | (53) | (631) |
| (Loss) income before federal income taxes . . . . . . . . . . . . . . . . . . . . . . | (19,569) | 467 | 6,336 | 182 | (1,955) | (14,539) |
| Benefit (provision) for federal income taxes . . . . . . . . . . . . . . . . . . . . . . | 106 | (61) | 46 | — | — | 91 |
| Net (loss) income . . . . . . . . . . . . . | (19,463) | 406 | 6,382 | 182 | (1,955) | (14,448) |
| Less: Net income attributable to noncontrolling interest . . . . . . . . . | — | — | — | — | (1)[8] | (1) |
| Net (loss) income attributable to Fannie Mae . . . . . . . . . . . . . . . . | $(19,463) | $ 406 | $ 6,382 | $ 182 | $(1,956) | $(14,449) |

148

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | For the Three Months Ended September 30, 2010 | | | | | |
|---|---|---|---|---|---|---|
| | Business Segments | | | Other Activity/ Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments[2] | Total Results |
| | (Dollars in millions) | | | | | |
| Net interest (loss) income . . . . . . . . . . . | $(1,108) | $ — | $4,065 | $ 1,246 | $   573[3] | $ 4,776 |
| (Provision) benefit for loan losses . . . . . . | (4,702) | 6 | — | — | — | (4,696) |
| Net interest (loss) income after provision for loan losses . . . . . . . . . . . . . . . . . | (5,810) | 6 | 4,065 | 1,246 | 573 | 80 |
| Guaranty fee income (expense) . . . . . . . . | 1,804 | 205 | (402) | (1,095)[4] | (461)[4] | 51[4] |
| Investment gains (losses), net . . . . . . . . . | 3 | 4 | 1,270 | (165) | (1,030)[5] | 82 |
| Net other-than-temporary impairments . . . | — | — | (323) | (3) | — | (326) |
| Fair value gains (losses), net. . . . . . . . . . | — | — | 436 | (89) | 178[6] | 525 |
| Debt extinguishment losses, net. . . . . . . . | — | — | (185) | (29) | — | (214) |
| Gains from partnership investments . . . . . | — | 39 | — | — | 8 | 47[7] |
| Fee and other income (expense) . . . . . . . | 93 | 35 | 130 | (4) | (1) | 253 |
| Administrative expenses . . . . . . . . . . . . | (471) | (94) | (165) | — | — | (730) |
| (Provision) benefit for guaranty losses . . . | (79) | 1 | — | — | — | (78) |
| Foreclosed property expense. . . . . . . . . . | (778) | (9) | — | — | — | (787) |
| Other expense . . . . . . . . . . . . . . . . . . . | (217) | (7) | (3) | — | (16) | (243) |
| (Loss) income before federal income taxes . . . . . . . . . . . . . . . . . . . . . . . | (5,455) | 180 | 4,823 | (139) | (749) | (1,340) |
| Benefit for federal income taxes . . . . . . . | 1 | 1 | 7 | — | — | 9 |
| Net (loss) income . . . . . . . . . . . . . . | (5,454) | 181 | 4,830 | (139) | (749) | (1,331) |
| Less: Net income attributable to noncontrolling interests . . . . . . . . . . | — | — | — | — | (8)[8] | (8) |
| Net (loss) income attributable to Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . | $(5,454) | $181 | $4,830 | $ (139) | $  (757) | $(1,339) |

149

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | For the Nine Months Ended September 30, 2010 | | | | | |
| | Business Segments | | | Other Activity/ Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments[2] | Total Results |
| | (Dollars in millions) | | | | | |
| Net interest (loss) income | $ (4,438) | $ 9 | $10,671 | $ 3,767 | $ 1,763[3] | $ 11,772 |
| (Provision) benefit for loan losses | (20,966) | 36 | — | — | — | (20,930) |
| Net interest (loss) income after provision for loan losses | (25,404) | 45 | 10,671 | 3,767 | 1,763 | (9,158) |
| Guaranty fee income (expense) | 5,367 | 594 | (1,041) | (3,422)[4] | (1,341)[4] | 157[4] |
| Investment gains (losses), net | 7 | 3 | 2,841 | (348) | (2,232)[5] | 271 |
| Net other-than-temporary impairments | — | — | (696) | (3) | — | (699) |
| Fair value losses, net | — | — | (119) | (113) | (645)[6] | (877) |
| Debt extinguishment losses, net | — | — | (368) | (129) | — | (497) |
| Losses from partnership investments | — | (41) | — | — | 4 | (37)[7] |
| Fee and other income (expense) | 225 | 98 | 370 | (18) | (1) | 674 |
| Administrative expenses | (1,297) | (286) | (422) | — | — | (2,005) |
| (Provision) benefit for guaranty losses | (163) | 52 | — | — | — | (111) |
| Foreclosed property expense | (1,227) | (28) | — | — | — | (1,255) |
| Other (expenses) income | (648) | (24) | 115 | — | (56) | (613) |
| (Loss) income before federal income taxes | (23,140) | 413 | 11,351 | (266) | (2,508) | (14,150) |
| Benefit (provision) for federal income taxes | 53 | (14) | 28 | — | — | 67 |
| Net (loss) income | (23,087) | 399 | 11,379 | (266) | (2,508) | (14,083) |
| Less: Net income attributable to noncontrolling interests | — | — | — | — | (4)[8] | (4) |
| Net (loss) income attributable to Fannie Mae | $(23,087) | $ 399 | $11,379 | $ (266) | $(2,512) | $(14,087) |

[1] Represents activity related to the assets and liabilities of consolidated trusts in our condensed consolidated balance sheets.

[2] Represents the elimination of intercompany transactions occurring between the three business segments and our consolidated trusts, as well as other adjustments to reconcile to our condensed consolidated results.

[3] Represents the amortization expense of cost basis adjustments on securities that we own in our portfolio that on a GAAP basis are eliminated.

[4] Represents the guaranty fees paid from consolidated trusts to the Single-Family and Multifamily segments. The adjustment to guaranty fee income in the Eliminations/Adjustments column represents the elimination of the amortization of deferred cash fees related to consolidated trusts that were re-established for segment reporting. Total guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive loss.

[5] Primarily represents the removal of realized gains and losses on sales of Fannie Mae MBS classified as available-for-sale securities that are issued by consolidated trusts and retained in the Capital Markets portfolio. The adjustment also includes the removal of securitization gains (losses) recognized in the Capital Markets segment relating to portfolio securitization transactions that do not qualify for sale accounting under GAAP.

[6] Represents the removal of fair value adjustments on consolidated Fannie Mae MBS classified as trading that are retained in the Capital Markets portfolio.

[7] Gains (losses) from partnership investments are included in other expenses in our condensed consolidated statements of operations and comprehensive loss.

TREASURY-2066

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

[8]   Represents the adjustment from equity method accounting to consolidation accounting for partnership investments that are consolidated in our condensed consolidated balance sheets.

## 11.   Regulatory Capital Requirements

FHFA has announced that our existing statutory and FHFA-directed regulatory capital requirements will not be binding during the conservatorship, and that FHFA will not issue quarterly capital classifications during the conservatorship. We submit capital reports to FHFA during the conservatorship and FHFA monitors our capital levels.

The following table displays our regulatory capital classification measures as of September 30, 2011 and December 31, 2010.

|  | As of | |
| --- | --- | --- |
|  | September 30, 2011[1] | December 31, 2010[1] |
|  | (Dollars in millions) | |
| Core capital[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(110,943) | $ (89,516) |
| Statutory minimum capital requirement[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 32,697 | 33,676 |
| Deficit of core capital over statutory minimum capital requirement . . . . . . . . . . . . . | $(143,640) | $(123,192) |

[1]   Amounts as of September 30, 2011 and December 31, 2010 represent estimates that we have submitted to FHFA.

[2]   The sum of (a) the stated value of our outstanding common stock (common stock less treasury stock); (b) the stated value of our outstanding non-cumulative perpetual preferred stock; (c) our paid-in capital; and (d) our retained earnings (accumulated deficit). Core capital does not include: (a) accumulated other comprehensive income (loss) or (b) senior preferred stock.

[3]   Generally, the sum of (a) 2.50% of on-balance sheet assets, except those underlying Fannie Mae MBS held by third parties; (b) 0.45% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and (c) up to 0.45% of other off-balance sheet obligations, which may be adjusted by the Director of FHFA under certain circumstances (See 12 CFR 1750.4 for existing adjustments made by the Director).

## 12.   Concentration of Credit Risk

*Mortgage Seller/Servicers.*   Mortgage servicers collect mortgage and escrow payments from borrowers, pay taxes and insurance costs from escrow accounts, monitor and report delinquencies, and perform other required activities on our behalf. Our business with mortgage servicers is concentrated. Our ten largest single-family mortgage servicers, including their affiliates, serviced 75% of our single-family guaranty book of business as of September 30, 2011, compared with 77% as of December 31, 2010. Our ten largest multifamily mortgage servicers, including their affiliates, serviced 68% of our multifamily guaranty book of business as of September 30, 2011, compared with 70% as of December 31, 2010.

If one of our principal mortgage seller/servicers fails to meet its obligations to us, it could increase our credit-related expenses and credit losses, result in financial losses to us and have a material adverse effect on our earnings, liquidity, financial condition and net worth.

*Mortgage Insurers.*   Mortgage insurance "risk in force" represents our maximum potential loss recovery under the applicable mortgage insurance policies. We had total mortgage insurance coverage risk in force of $92.2 billion on the single-family mortgage loans in our guaranty book of business as of September 30, 2011, which represented approximately 3% of our single-family guaranty book of business. Our primary and pool mortgage insurance coverage risk in force on single-family mortgage loans in our guaranty book of business represented $87.7 billion and $4.5 billion, respectively, as of September 30, 2011, compared with $91.2 billion

151

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

and $4.7 billion, respectively, as of December 31, 2010. Eight mortgage insurance companies provided over 99% of our mortgage insurance as of both September 30, 2011 and December 31, 2010.

Increases in mortgage insurance claims due to higher defaults and credit losses in recent periods have adversely affected the financial results and financial condition of many mortgage insurers. During the three month period ending September 30, 2011, we notified PMI Mortgage Insurance Co. ("PMI") and Republic Mortgage Insurance Company ("RMIC"), two of our mortgage insurer counterparties, that they were suspended nationwide as approved mortgage insurers.

As reported by PMI, on October 20, 2011, PMI received from its regulator an order under which the regulator now has full possession, management and control. The regulator is also seeking to place PMI into receivership. Pursuant to the order, effective October 24, 2011, the regulator instituted a partial claim payment plan whereby all valid claims under PMI mortgage guaranty insurance policies will be paid 50% in cash and 50% deferred as a policyholder claim. It is uncertain when, and if, PMI's regulator will allow PMI to begin paying its deferred policyholder claims and/or increase the amount of cash PMI pays on claims. On October 12, 2011, RMIC voluntarily entered into an agreement with its regulator to discontinue writing or assuming any new mortgage guaranty insurance business in all states.

As of November 7, 2011, four of our mortgage insurers (Triad, RMIC, PMI and Genworth Mortgage Insurance Corporation) have publicly disclosed that they are either in run-off or, absent a waiver, estimate they would not meet state regulatory capital requirements for their main writing entity as of September 30, 2011. An additional two of our mortgage insurers (Mortgage Guaranty Insurance Corporation and Radian Guaranty, Inc.) have disclosed that, in the absence of additional capital contributions to their writing entity, their capital might fall below state regulatory capital requirements in the future. These six mortgage insurers provided a combined $75.7 billion, or 82%, of our risk in force mortgage insurance coverage of our single-family guaranty book of business as of September 30, 2011.

The current weakened financial condition of our mortgage insurer counterparties creates an increased risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. If we determine that it is probable that we will not collect all of our claims from one or more of these mortgage insurer counterparties, it could result in an increase in our loss reserves, which could adversely affect our earnings, liquidity, financial condition and net worth.

As of September 30, 2011, our allowance for loan losses of $71.4 billion, allowance for accrued interest receivable of $2.2 billion and reserve for guaranty losses of $916 million incorporated an estimated recovery amount of approximately $12.7 billion from mortgage insurance related both to loans that are individually measured for impairment and those that are collectively reserved. This amount is comprised of the contractual recovery of approximately $15.1 billion as of September 30, 2011 and an adjustment of approximately $2.4 billion which reduces the contractual recovery for our assessment of our mortgage insurer counterparties' inability to fully pay those claims. As of December 31, 2010, our allowance for loan losses of $61.6 billion, allowance for accrued interest receivable of $3.4 billion and reserve for guaranty losses of $323 million incorporated an estimated recovery amount of approximately $16.4 billion from mortgage insurance related both to loans that are individually measured for impairment and those that are collectively reserved. This amount is comprised of the contractual recovery of approximately $17.5 billion as of December 31, 2010 and an adjustment of approximately $1.2 billion, which reduces the contractual recovery for our assessment of our mortgage insurer counterparties' inability to fully pay those claims.

TREASURY-2068

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

We had outstanding receivables of $3.7 billion recorded in "Other assets" in our condensed consolidated balance sheets as of September 30, 2011 and $4.4 billion as of December 31, 2010 related to amounts claimed on insured, defaulted loans that we have not yet received, of which $494 million as of September 30, 2011 and $648 million as of December 31, 2010 was due from our mortgage seller/servicers. We assessed the total outstanding receivables for collectibility, and they are recorded net of a valuation allowance of $589 million as of September 30, 2011 and $317 million as of December 31, 2010. These mortgage insurance receivables are short-term in nature, having an average duration of approximately six months, and the valuation allowance reduces our claim receivable to the amount which is considered probable of collection as of September 30, 2011 and December 31, 2010.

We received proceeds under our primary and pool mortgage insurance policies for single-family loans of $1.4 billion and $4.6 billion for the three and nine months ended September 30, 2011, respectively, and $6.4 billion for the year ended December 31, 2010. We negotiated the cancellation and restructurings of some of our mortgage insurance coverage in exchange for a fee. The cash fees received of $796 million for the year ended December 31, 2010 are included in our total insurance proceeds amount; there were no such cash fees received in the nine months ended September 30, 2011. These fees represented an acceleration of, and discount on, claims to be paid pursuant to the coverage in order to reduce future exposure to our mortgage insurers and were recorded as a reduction to our "Foreclosed property expense" in our condensed consolidated statements of operations and comprehensive loss.

*Financial Guarantors.*   We are the beneficiary of financial guarantees on non-agency securities held in our investment portfolio and on non-agency securities that have been resecuritized to include a Fannie Mae guaranty and sold to third parties. The following table displays the total unpaid principal balance of guaranteed non-agency securities in our portfolio as of September 30, 2011, and December 31, 2010.

| | As of | |
| --- | --- | --- |
| | September 30, 2011 | December 31, 2010 |
| | (Dollars in millions) | |
| Alt-A private-label securities | $1,356 | $1,544 |
| Subprime private-label securities | 1,425 | 1,487 |
| Mortgage revenue bonds | 5,003 | 5,264 |
| Other mortgage-related securities | 324 | 347 |
| Non mortgage-related securities | 58 | 172 |
| Total | $8,166 | $8,814 |

With the exception of Ambac Assurance Corporation ("Ambac"), none of our financial guarantor counterparties has failed to repay us for claims under guaranty contracts. Ambac provided coverage on $3.4 billion, or 41%, of our total guarantees, as of September 30, 2011. We are also the beneficiary of financial guarantees included in securities issued by Freddie Mac, the federal government and its agencies that totaled $32.6 billion as of September 30, 2011 and $25.7 billion as of December 31, 2010. If a financial guarantor fails to meet its obligations to us with respect to the securities for which we have obtained financial guarantees, it could reduce the fair value of our mortgage-related securities and result in financial losses to us, which could have a material adverse effect on our earnings, liquidity, financial condition and net worth.

We model our securities without assuming the benefit of financial guarantees. We then adjust results for those external financial guarantees from guarantors that we determine are creditworthy, although we continue to seek collection of any amounts due to us from all counterparties. As of September 30, 2011, when modeling our securities for impairments we did not assume the benefit of external financial guarantees from any counterparty.

153

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Lenders with Risk Sharing.*   We enter into risk sharing agreements with lenders pursuant to which the lenders agree to bear all or some portion of the credit losses on the covered loans. Our maximum potential loss recovery from lenders under these risk sharing agreements on single-family loans was $13.3 billion as of September 30, 2011 and $15.6 billion as of December 31, 2010. As of September 30, 2011, 58% of our maximum potential loss recovery on single-family loans was from three lenders. As of December 31, 2010, 56% of our maximum potential loss recovery on single-family loans was from three lenders. Our maximum potential loss recovery from lenders under these risk sharing agreements on both DUS and non-DUS multifamily loans was $31.6 billion as of September 30, 2011 and $30.3 billion as of December 31, 2010. As of September 30, 2011 and December 31, 2010, 40% and 41%, respectively, of our maximum potential loss recovery on multifamily loans was from three DUS lenders.

*Custodial Depository Institutions.*   A total of $52.1 billion in deposits for single-family payments were received and held by 286 institutions in the month of September 2011 and a total of $75.4 billion in deposits for single-family payments were received and held by 289 institutions in the month of December 2010. Of these total deposits, 93% as of September 30, 2011 and 92% as of December 31, 2010 were held by institutions rated as investment grade by S&P, Moody's and Fitch. Our ten largest custodial depository institutions held 93% of these deposits as of both September 30, 2011 and December 31, 2010. In the month of September 2011, approximately $3.6 billion or 7% of our total deposits for single-family payments received and held by these institutions was in excess of the deposit insurance protection limit compared with approximately $6.2 billion or 8% in the month of December 2010. These amounts can vary as they are calculated based on individual payments of mortgage borrowers and we must estimate which borrowers are paying their regular principal and interest payments and other types of payments, such as prepayments from refinancing or sales.

## 13.   Fair Value

We use fair value measurements for the initial recording of certain assets and liabilities and periodic remeasurement of certain assets and liabilities on a recurring or nonrecurring basis.

### Fair Value Measurement

Fair value measurement guidance defines fair value, establishes a framework for measuring fair value and expands disclosures around fair value measurements. This guidance applies whenever other accounting standards require or permit assets or liabilities to be measured at fair value. The guidance establishes a three-level fair value hierarchy that prioritizes the inputs into the valuation techniques used to measure fair value. The fair value hierarchy gives the highest priority, Level 1, to measurements based on unadjusted quoted prices in active markets for identical assets or liabilities. The next highest priority, Level 2, is given to measurements of assets and liabilities based on limited observable inputs or observable inputs for similar assets and liabilities. The lowest priority, Level 3, is given to measurements based on unobservable inputs.

TREASURY-2070

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

*Recurring Changes in Fair Value*

The following tables display our assets and liabilities measured in our condensed consolidated balance sheets at fair value on a recurring basis subsequent to initial recognition, including instruments for which we have elected the fair value option as of September 30, 2011 and December 31, 2010. Specifically, total assets measured at fair value on a recurring basis and classified as Level 3 were $36.2 billion, or 1% of "Total assets," and $39.0 billion, or 1% of "Total assets," in our condensed consolidated balance sheets as of September 30, 2011 and December 31, 2010, respectively.

| | Fair Value Measurements as of September 30, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| Assets: | | | | | |
| Cash equivalents[2] | $ 1,150 | $ 5,000 | $ — | $ — | $ 6,150 |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 5,668 | 1,861 | — | 7,529 |
| Freddie Mac | — | 2,866 | — | — | 2,866 |
| Ginnie Mae | — | 261 | 36 | — | 297 |
| Alt-A private-label securities | — | 1,242 | 212 | — | 1,454 |
| Subprime private-label securities | — | — | 1,318 | — | 1,318 |
| CMBS | — | 10,600 | — | — | 10,600 |
| Mortgage revenue bonds | — | — | 718 | — | 718 |
| Other | — | 147 | — | — | 147 |
| Non-mortgage-related securities: | | | | | |
| U.S. Treasury securities | 40,755 | — | — | — | 40,755 |
| Asset-backed securities | — | 2,465 | — | — | 2,465 |
| Total trading securities | 40,755 | 23,249 | 4,145 | — | 68,149 |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 18,441 | 797 | — | 19,238 |
| Freddie Mac | — | 13,737 | 12 | — | 13,749 |
| Ginnie Mae | — | 939 | — | — | 939 |
| Alt-A private-label securities | — | 5,662 | 6,625 | — | 12,287 |
| Subprime private-label securities | — | — | 7,887 | — | 7,887 |
| CMBS | — | 14,390 | — | — | 14,390 |
| Mortgage revenue bonds | — | 8 | 10,599 | — | 10,607 |
| Other | — | 14 | 3,599 | — | 3,613 |
| Total available-for-sale securities | — | 53,191 | 29,519 | — | 82,710 |
| Mortgage loans of consolidated trusts | — | 1,077 | 2,284 | — | 3,361 |
| Other assets: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | — | 8,657 | 156 | — | 8,813 |
| Swaptions | — | 6,898 | — | — | 6,898 |
| Interest rate caps | — | 2 | — | — | 2 |
| Other | 2 | — | 50 | — | 52 |
| Netting adjustment | — | — | — | (15,539) | (15,539) |
| Mortgage commitment derivatives | — | 476 | 21 | — | 497 |
| Total other assets | 2 | 16,033 | 227 | (15,539) | 723 |
| Total assets at fair value | $41,907 | $98,550 | $36,175 | $(15,539) | $161,093 |

TREASURY-2071

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | Fair Value Measurements as of September 30, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| Liabilities: | | | | | |
| Long-term debt: | | | | | |
| Of Fannie Mae: | | | | | |
| Senior fixed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $— | $   439 | $   — | $    — | $   439 |
| Senior floating . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 406 | — | 406 |
| Total of Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . | — | 439 | 406 | — | 845 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . | — | 3,112 | 728 | — | 3,840 |
| Total long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 3,551 | 1,134 | — | 4,685 |
| Other liabilities: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 18,476 | 160 | — | 18,636 |
| Swaptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 3,311 | — | — | 3,311 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | — | — | — | 4 |
| Netting adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (18,372) | (18,372) |
| Mortgage commitment derivatives . . . . . . . . . . . . . . . . . . | — | 681 | 13 | — | 694 |
| Total other liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 22,468 | 173 | (18,372) | 4,273 |
| Total liabilities at fair value . . . . . . . . . . . . . . . . . . . . | $  4 | $26,019 | $1,307 | $(18,372) | $  8,958 |

156

TREASURY-2072

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
|---|---|---|---|---|---|
| | | Fair Value Measurements as of December 31, 2010 | | | |
| | | | (Dollars in millions) | | |
| Assets: | | | | | |
| Cash equivalents[2] | $ 4,049 | $ 2,300 | $ — | $ — | $ 6,349 |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 5,196 | 2,202 | — | 7,398 |
| Freddie Mac | — | 1,326 | — | — | 1,326 |
| Ginnie Mae | — | 590 | — | — | 590 |
| Alt-A private-label securities | — | 1,663 | 20 | — | 1,683 |
| Subprime private-label securities | — | — | 1,581 | — | 1,581 |
| CMBS | — | 10,764 | — | — | 10,764 |
| Mortgage revenue bonds | — | — | 609 | — | 609 |
| Other | — | — | 152 | — | 152 |
| Non-mortgage-related securities: | | | | | |
| U.S. Treasury securities | 27,432 | — | — | — | 27,432 |
| Asset-backed securities | — | 5,309 | 12 | — | 5,321 |
| Total trading securities | 27,432 | 24,848 | 4,576 | — | 56,856 |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 22,714 | 114 | — | 22,828 |
| Freddie Mac | — | 16,993 | 3 | — | 16,996 |
| Ginnie Mae | — | 1,039 | — | — | 1,039 |
| Alt-A private-label securities | — | 6,841 | 7,049 | — | 13,890 |
| Subprime private-label securities | — | — | 9,932 | — | 9,932 |
| CMBS | — | 14,844 | — | — | 14,844 |
| Mortgage revenue bonds | — | 11 | 11,030 | — | 11,041 |
| Other | — | 16 | 3,806 | — | 3,822 |
| Total available-for-sale securities | — | 62,458 | 31,934 | — | 94,392 |
| Mortgage loans of consolidated trusts | — | 755 | 2,207 | — | 2,962 |
| Other assets: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | — | 9,623 | 163 | — | 9,786 |
| Swaptions | — | 5,474 | — | — | 5,474 |
| Interest rate caps | — | 24 | — | — | 24 |
| Other | 3 | — | 72 | — | 75 |
| Netting adjustment | — | — | — | (15,175) | (15,175) |
| Mortgage commitment derivatives | — | 941 | 12 | — | 953 |
| Total other assets | 3 | 16,062 | 247 | (15,175) | 1,137 |
| Total assets at fair value | $31,484 | $106,423 | $38,964 | $(15,175) | $161,696 |

157

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | Fair Value Measurements as of December 31, 2010 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| Liabilities: | | | | | |
| Long-term debt: | | | | | |
| Of Fannie Mae: | | | | | |
| Senior fixed . . . . . . . . . . . . . . . . . . . . . . . . . . | $— | $    472 | $    — | $    — | $    472 |
| Senior floating . . . . . . . . . . . . . . . . . . . . . . . | — | — | 421 | — | 421 |
| Total of Fannie Mae . . . . . . . . . . . . . . . . . . . . . | — | 472 | 421 | — | 893 |
| Of consolidated trusts . . . . . . . . . . . . . . . . . . . . | — | 1,644 | 627 | — | 2,271 |
| Total long-term debt. . . . . . . . . . . . . . . . . . . . . . | — | 2,116 | 1,048 | — | 3,164 |
| Other liabilities: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 16,436 | 113 | — | 16,549 |
| Swaptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 2,446 | — | — | 2,446 |
| Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | — | — | — | 1 |
| Netting adjustment . . . . . . . . . . . . . . . . . . . . . | — | — | — | (18,023) | (18,023) |
| Mortgage commitment derivatives . . . . . . . . . . . . | — | 712 | 30 | — | 742 |
| Total other liabilities . . . . . . . . . . . . . . . . . . . . . . | 1 | 19,594 | 143 | (18,023) | 1,715 |
| Total liabilities at fair value . . . . . . . . . . . . . . . | $    1 | $21,710 | $1,191 | $(18,023) | $    4,879 |

---

[1] Derivative contracts are reported on a gross basis by level. The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, as well as cash collateral.

[2] Cash equivalents is comprised of U.S. Treasuries that are classified as Level 1 as well as money market funds and certificate of deposits that are classified as Level 2.

158

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The following tables display a reconciliation of all assets and liabilities measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the three and nine months ended September 30, 2011 and 2010. The tables also display gains and losses due to changes in fair value, including both realized and unrealized gains and losses, recognized in our condensed consolidated statements of operations and comprehensive loss for Level 3 assets and liabilities for the three and nine months ended September 30, 2011 and 2010. When assets and liabilities are transferred between levels, we recognize the transfer as of the end of the period.

Fair Value Measurements Using Significant Unobservable Inputs (Level 3)
For the Three Months Ended September 30, 2011

| | Balance, July 1, 2011 | Total Gains or (Losses) (Realized/Unrealized) Included in Net Loss | Included in Other Comprehensive (Loss) Income | Purchases[1] | Sales[1] | Issuances[2] | Settlements[2] | Transfers out of Level 3[3] | Transfers into Level 3[3] | Balance, September 30, 2011 | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of September 30, 2011[4] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (Dollars in millions) | | | | | | | |
| Trading securities: | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 1,679 | $ 19 | $ — | $322 | $ (3) | $— | $(115) | $ (41) | $ — | $ 1,861 | $ 41 |
| Ginnie Mae | — | — | — | — | — | — | — | — | 36 | 36 | — |
| Alt-A private-label securities | 126 | 7 | — | — | — | — | (13) | (73) | 165 | 212 | 10 |
| Subprime private-label securities | 1,459 | (96) | — | — | — | — | (45) | — | — | 1,318 | (95) |
| Mortgage revenue bonds | 616 | 105 | — | — | — | — | (3) | — | — | 718 | 106 |
| Other | 154 | (4) | — | — | — | — | (3) | (147) | — | — | — |
| Total trading securities | $ 4,034 | $ 31 | $ — | $322 | $ (3) | $— | $(179) | $(261) | $ 201 | $ 4,145 | $ 62 |
| Available-for-sale securities: | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 635 | $ (1) | $ 16 | $853 | $(344) | $— | $ (9) | $(374) | $ 21 | $ 797 | $ — |
| Freddie Mac | 12 | — | — | — | — | — | (1) | — | 1 | 12 | — |
| Alt-A private-label securities | 6,652 | (20) | (15) | — | — | — | (250) | (431) | 689 | 6,625 | — |
| Subprime private-label securities | 8,909 | 148 | (484) | — | (363) | — | (323) | — | — | 7,887 | — |
| Mortgage revenue bonds | 10,464 | (5) | 429 | — | (1) | — | (288) | — | — | 10,599 | — |
| Other | 3,707 | (10) | 9 | — | — | — | (107) | — | — | 3,599 | — |
| Total available-for-sale securities | $30,379 | $112 | $ (45) | $853 | $(708) | $— | $(978) | $(805) | $ 711 | $29,519 | $ — |
| Mortgage loans of consolidated trusts | $ 2,365 | $ 8 | $ — | $ 45 | $ — | $— | $(101) | $ (56) | $ 23 | $ 2,284 | $ 6 |
| Net derivatives | 79 | 118 | — | — | — | (1) | (72) | (70) | — | 54 | 33 |
| Long-term debt: | | | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | | | |
| Senior floating | $ (402) | $(74) | $ — | $ — | $ — | $— | $ 70 | $ — | $ — | $ (406) | $(74) |
| Of consolidated trusts | (646) | 1 | — | — | 4 | (4) | 18 | 35 | (136) | (728) | 6 |
| Total long-term debt | $(1,048) | $(73) | $ — | $ — | $ 4 | $(4) | $ 88 | $ 35 | $(136) | $(1,134) | $(68) |

159

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

Fair Value Measurements Using Significant Unobservable Inputs (Level 3)
For the Nine Months Ended September 30, 2011

| | Balance, December 31, 2010 | Included in Net Loss | Included in Other Comprehensive (Loss) Income | Purchases[1] | Sales[1] | Issuances[2] | Settlements[2] | Transfers out of Level 3[3] | Transfers into Level 3[3] | Balance, September 30, 2011 | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of September 30, 2011[4] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (Dollars in millions) | | | | | | | |
| Trading securities: | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 2,202 | $ 7 | $ — | $ 446 | $ (18) | $ — | $ (344) | $ (432) | $ — | $ 1,861 | $ 32 |
| Ginnie Mae | — | — | — | — | — | — | — | — | 36 | 36 | — |
| Alt-A private-label securities | 20 | 8 | — | — | — | — | (14) | (73) | 271 | 212 | 12 |
| Subprime private-label securities | 1,581 | (126) | — | — | — | — | (137) | — | — | 1,318 | (126) |
| Mortgage revenue bonds | 609 | 126 | — | — | — | — | (17) | — | — | 718 | 129 |
| Other | 152 | 1 | — | — | — | — | (6) | (147) | — | — | — |
| Non-mortgage-related: | | | | | | | | | | | |
| Asset-backed securities | 12 | — | — | — | — | — | (5) | (9) | 2 | — | — |
| Total trading securities | $ 4,576 | $ 16 | $ — | $ 446 | $ (18) | $ — | $ (523) | $ (661) | $ 309 | $ 4,145 | $ 47 |
| Available-for-sale securities: | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 114 | $ (1) | $ 28 | $1,742 | $(383) | $ — | $ (11) | $ (843) | $ 151 | $ 797 | $ — |
| Freddie Mac | 3 | — | — | — | — | — | (1) | — | 10 | 12 | — |
| Alt-A private-label securities | 7,049 | (19) | 63 | — | — | — | (725) | (1,495) | 1,752 | 6,625 | — |
| Subprime private-label securities | 9,932 | 408 | (1,089) | — | (363) | — | (1,001) | — | — | 7,887 | — |
| Mortgage revenue bonds | 11,030 | (8) | 723 | — | (107) | — | (1,039) | — | — | 10,599 | — |
| Other | 3,806 | (7) | 120 | — | — | — | (320) | — | — | 3,599 | — |
| Total available-for-sale securities | $31,934 | $ 373 | $ (155) | $1,742 | $(853) | $ — | $(3,097) | $(2,338) | $1,913 | $29,519 | $ — |
| Mortgage loans of consolidated trusts | $ 2,207 | $ 38 | $ — | $ 102 | $ — | $ — | $ (251) | $ (93) | $ 281 | $ 2,284 | $ 28 |
| Net derivatives | 104 | 123 | — | — | — | (2) | (101) | (70) | — | 54 | 49 |
| Long-term debt: | | | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | | | |
| Senior floating | $ (421) | $ (88) | $ — | $ — | $ — | $ — | $ 103 | $ — | $ — | $ (406) | $ (89) |
| Of consolidated trusts | (627) | (28) | — | — | 4 | (44) | 66 | 112 | (211) | (728) | (11) |
| Total long-term debt | $(1,048) | $(116) | $ — | $ — | $ 4 | $(44) | $ 169 | $ 112 | $ (211) | $(1,134) | $(100) |

160

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | Fair Value Measurements Using Significant Unobservable Inputs (Level 3) For the Three Months Ended September 30, 2010 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Total Gains or (Losses) (Realized/Unrealized) | | | | | | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of September 30, 2010[4] |
| | Balance, July 1, 2010 | Included in Net Loss | Included in Other Comprehensive (Loss) Income | Purchases, Sales, Issuances, and Settlements, Net | Transfers out of Level 3[3] | Transfers into Level 3[3] | Balance, September 30, 2010 | |
| | | | | (Dollars in millions) | | | | |
| Trading securities: | | | | | | | | |
| Mortgage-related: | | | | | | | | |
| Fannie Mae | $ 58 | $ (7) | $ — | $ 80 | $ (12) | $1,925 | $ 2,044 | $ (1) |
| Freddie Mac | 4 | — | — | — | — | — | 4 | — |
| Ginnie Mae | — | — | — | 1 | — | — | 1 | — |
| Alt-A private-label securities | 119 | 174 | — | (11) | (24) | 216 | 474 | 176 |
| Subprime private-label securities | 1,645 | (1) | — | (53) | — | — | 1,591 | (1) |
| Mortgage revenue bonds | 650 | 28 | — | — | — | — | 678 | 30 |
| Other | 160 | (2) | — | (3) | — | — | 155 | (2) |
| Non-mortgage-related: | | | | | | | | |
| Asset-backed securities | 24 | 1 | — | (10) | — | — | 15 | — |
| Total trading securities | $ 2,660 | $ 193 | $ — | $ 4 | $ (36) | $2,141 | $ 4,962 | $202 |
| Available-for-sale securities: | | | | | | | | |
| Mortgage-related: | | | | | | | | |
| Fannie Mae | $ 53 | $ — | $ — | $ 65 | $ (51) | $ 11 | $ 78 | $ — |
| Freddie Mac | 21 | — | — | (14) | — | — | 7 | — |
| Ginnie Mae | 125 | — | (1) | — | — | — | 124 | — |
| Alt-A private-label securities | 7,777 | (59) | 264 | (259) | (490) | 1,878 | 9,111 | — |
| Subprime private-label securities | 10,255 | (96) | 183 | (402) | — | — | 9,940 | — |
| Mortgage revenue bonds | 12,428 | 3 | 172 | (369) | (2) | — | 12,232 | — |
| Other | 3,890 | 2 | 103 | (119) | — | — | 3,876 | — |
| Total available-for-sale securities | $34,549 | $(150) | $721 | $(1,098) | $(543) | $1,889 | $35,368 | $ — |
| Mortgage loans of consolidated trusts | $ — | $ (9) | $ — | $ 62 | $ — | $ — | $ 53 | $ (9) |
| Net derivatives | 226 | 65 | — | (69) | — | — | 222 | 21 |
| Guaranty assets and buy-ups | 15 | (1) | — | 3 | — | — | 17 | (2) |
| Long-term debt: | | | | | | | | |
| Of Fannie Mae: | | | | | | | | |
| Senior floating | $ (585) | $ (37) | $ — | $ 155 | $ — | $ — | $ (467) | $(38) |
| Of consolidated trusts | (105) | 8 | — | 2 | 48 | (22) | (69) | 4 |
| Total long-term debt | $ (690) | $ (29) | $ — | $ 157 | $ 48 | $ (22) | $ (536) | $(34) |

161

TREASURY-2077

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

| | Balance, December 31, 2009 | Impact of New Accounting Standards | Total Gains or (Losses) (Realized/Unrealized) Included in Net Loss | Included in Other Comprehensive (Loss) Income | Purchases, Sales, Issuances, and Settlements, Net | Transfers out of Level 3[3] | Transfers into Level 3[3] | Balance, September 30, 2010 | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of September 30, 2010[4] |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Dollars in millions) | | | | |
| Trading securities: | | | | | | | | | |
| Mortgage-related: | | | | | | | | | |
| Fannie Mae . . . . . . . . . . . | $ 5,656 | $ (2) | $ (3) | $ — | $ (162) | $(5,375) | $1,930 | $ 2,044 | $ (3) |
| Freddie Mac . . . . . . . . . . | — | — | — | — | — | — | 4 | 4 | — |
| Ginnie Mae . . . . . . . . . . . | — | — | — | — | 1 | — | — | 1 | — |
| Alt-A private-label securities . . . . . . . . . . | 564 | 62 | 206 | — | (59) | (613) | 314 | 474 | 186 |
| Subprime private-label securities . . . . . . . . . . | 1,780 | — | (1) | — | (188) | — | — | 1,591 | (1) |
| Mortgage revenue bonds . . . | 600 | — | 127 | — | (49) | — | — | 678 | 126 |
| Other . . . . . . . . . . . . . . . | 154 | — | 6 | — | (5) | — | — | 155 | 6 |
| Non-mortgage-related: | | | | | | | | | |
| Asset-backed securities . . . . | 107 | — | 1 | — | (59) | (47) | 13 | 15 | 2 |
| Total trading securities . . . . . . . | $ 8,861 | $ 60 | $ 336 | $ — | $ (521) | $(6,035) | $2,261 | $ 4,962 | $316 |
| Available-for-sale securities: | | | | | | | | | |
| Mortgage-related: | | | | | | | | | |
| Fannie Mae . . . . . . . . . . . | $ 596 | $ (203) | $ (1) | $ 4 | $ 147 | $ (514) | $ 49 | $ 78 | $ — |
| Freddie Mac . . . . . . . . . . | 27 | — | — | (1) | (25) | — | 6 | 7 | — |
| Ginnie Mae . . . . . . . . . . . | 123 | — | — | 2 | (1) | — | — | 124 | — |
| Alt-A private-label securities . . . . . . . . . . | 8,312 | 471 | (40) | 998 | (934) | (2,746) | 3,050 | 9,111 | — |
| Subprime private-label securities . . . . . . . . . . | 10,746 | (118) | (106) | 768 | (1,350) | — | — | 9,940 | — |
| Mortgage revenue bonds . . . | 12,820 | 21 | 2 | 675 | (1,284) | (2) | — | 12,232 | — |
| Other . . . . . . . . . . . . . . . | 3,530 | 366 | (4) | 357 | (373) | — | — | 3,876 | — |
| Total available-for-sale securities . . | $36,154 | $ 537 | $(149) | $2,803 | $(3,820) | $(3,262) | $3,105 | $35,368 | $ — |
| Mortgage loans of consolidated trusts . . . . . . . | $ — | $ — | $ (9) | $ — | $ 62 | $ — | $ — | $ 53 | $ (9) |
| Net derivatives . . . . . . . . . . . . | 123 | — | 232 | — | (128) | — | (5) | 222 | 85 |
| Guaranty assets and buy-ups . . . | 2,577 | (2,568) | 2 | 1 | 5 | — | — | 17 | 2 |
| Long-term debt: | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | |
| Senior floating . . . . . . . . . | $ (601) | $ — | $ (26) | $ — | $ 160 | $ — | $ — | $ (467) | $(21) |
| Of consolidated trusts . . . . . | — | (77) | 15 | — | (36) | 59 | (30) | (69) | 11 |
| Total long-term debt . . . . . . . . | $ (601) | $ (77) | $ (11) | $ — | $ 124 | $ 59 | $ (30) | $ (536) | $(10) |

[1] Purchases and sales include activity related to the consolidation and deconsolidation of assets of securitization trusts.

[2] Issuances and settlements include activity related to the consolidation and deconsolidation of liabilities of securitization trusts.

[3] Transfers out of Level 3 consisted primarily of Fannie Mae guaranteed mortgage-related securities and private-label mortgage-related securities backed by Alt-A loans. Prices for these securities were obtained from multiple third-party vendors supported by market observable inputs. Transfers into Level 3 consisted primarily of Fannie Mae guaranteed

162

TREASURY-2078

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

mortgage-related securities and private-label mortgage-related securities backed by Alt-A loans. Prices for these securities are based on inputs from a single source or inputs that were not readily observable.

[4] Amount represents temporary changes in fair value. Amortization, accretion and other-than-temporary impairments are not considered unrealized and are not included in this amount.

The following tables display realized and unrealized gains and losses included in our condensed consolidated statements of operations and comprehensive loss for the three and nine months ended September 30, 2011 and 2010, for our Level 3 assets and liabilities measured in our condensed consolidated balance sheets at fair value on a recurring basis.

| | Interest Income | Fair Value (Losses) Gains, net | Net Other-than-Temporary Impairments | Other | Total |
|---|---|---|---|---|---|
| **For the Three Months Ended September 30, 2011** | | | | | |
| | | | (Dollars in millions) | | |
| Total realized and unrealized gains (losses) included in net loss | $158 | $98 | $(62) | $ 2 | $196 |
| Net unrealized (losses) gains related to Level 3 assets and liabilities still held as of September 30, 2011 | $ (1) | $34 | $ — | $— | $ 33 |
| **For the Nine Months Ended September 30, 2011** | | | | | |
| | | | (Dollars in millions) | | |
| Total realized and unrealized gains (losses) included in net loss | $428 | $82 | $(85) | $ 9 | $434 |
| Net unrealized (losses) gains related to Level 3 assets and liabilities still held as of September 30, 2011 | $ (2) | $26 | $ — | $— | $ 24 |
| **For the Three Months Ended September 30, 2010** | | | | | |
| | | | (Dollars in millions) | | |
| Total realized and unrealized gains (losses) included in net loss | $70 | $222 | $(235) | $12 | $ 69 |
| Net unrealized gains (losses) related to Level 3 assets and liabilities still held as of September 30, 2010 | $— | $180 | $ — | $ (2) | $178 |
| **For the Nine Months Ended September 30, 2010** | | | | | |
| | | | (Dollars in millions) | | |
| Total realized and unrealized gains (losses) included in net loss | $282 | $547 | $(454) | $26 | $401 |
| Net unrealized gains related to Level 3 assets and liabilities still held as of September 30, 2010 | $ — | $382 | $ — | $ 2 | $384 |

163

TREASURY-2079

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

We use valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs. The following is a description of the valuation techniques we use for assets and liabilities measured at fair value on a recurring basis, as well as our basis for classifying these assets and liabilities as Level 1, Level 2 or Level 3. These valuation techniques are also used to estimate the fair value of financial instruments not carried at fair value but disclosed as part of the fair value of financial instruments.

*Cash Equivalents, Trading Securities and Available-for-Sale Securities*—These securities are recorded in our condensed consolidated balance sheets at fair value on a recurring basis. Fair value is measured using quoted market prices in active markets for identical assets, when available. Securities, such as U.S. Treasuries, whose value is based on quoted market prices in active markets for identical assets are classified as Level 1. If quoted market prices in active markets for identical assets are not available, we use prices provided by up to four third-party pricing services that are calibrated to the quoted market prices in active markets for similar securities, and assets valued in this manner are classified as Level 2. In the absence of prices provided by third-party pricing services supported by observable market data, fair values are estimated using quoted prices of securities with similar characteristics or discounted cash flow models that use inputs such as spread, prepayment speed, yield, and loss severity based on market assumptions where available. Such instruments are generally classified as Level 2. Where there is limited activity or less transparency around inputs to the valuation, securities are classified as Level 3.

*Mortgage Loans Held for Investment*—The majority of HFI performing loans and nonperforming loans that are not individually impaired are reported in our condensed consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments and an allowance for loan losses. We elected the fair value option for certain loans containing embedded derivatives that would otherwise require bifurcation and consolidated loans of senior-subordinate trust structures, which are recorded in our condensed consolidated balance sheets at fair value on a recurring basis.

Fair value of performing loans represents an estimate of the prices we would receive if we were to securitize those loans and is determined based on comparisons to Fannie Mae MBS with similar characteristics, either on a pool or loan level. We use the observable market values of our Fannie Mae MBS determined from third-party pricing services and other observable market data as a base value, from which we add or subtract the fair value of the associated guaranty asset, guaranty obligation and master servicing arrangement. We classify these valuations primarily within Level 2 of the valuation hierarchy given that the market values of our Fannie Mae MBS are calibrated to the quoted market prices in active markets for similar securities. To the extent that significant inputs are not observable or determined by extrapolation of observable points, the loans are classified within Level 3. Certain loans that do not qualify for Fannie Mae MBS securitization are valued using market-based data including, for example, credit spreads, severities and prepayment speeds for similar loans, through third-party pricing services or through a model approach incorporating both interest rate and credit risk simulating a loan sale via a synthetic structure.

Fair value of single-family nonperforming loans represents an estimate of the prices we would receive if we were to sell these loans in the nonperforming whole-loan market. We calculate the fair value of nonperforming loans based on assumptions about key factors, including loan performance, collateral value, foreclosure related expenses, disposition timeline, and mortgage insurance repayment. Using these assumptions, along with indicative bids for a representative sample of nonperforming loans, we compute a market calibrated fair value. The bids on sample loans are obtained from multiple active market participants. Fair value for loans that are four or more months delinquent, in an open modification period, or in a closed modification and that have performed for nine or fewer months, is estimated directly from a model calibrated to these indicative bids. Fair value for loans that are one to three months delinquent is estimated by an interpolation method using three

164

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

inputs: (1) the fair value estimate as a performing loan; (2) the fair value estimate as a nonperforming loan; and (3) the delinquency transition rate corresponding to the loan's current delinquency status.

Fair value of a portion of our single-family nonperforming loans is measured using the value of the underlying collateral. These valuations leverage our proprietary distressed home price model. The model assigns a value using comparable transaction data. In determining what comparables to use in the calculations, the model measures three key characteristics relative to the target property: (1) distance from target property, (2) time of the transaction and (3) comparability of the nondistressed value. A portion of the nonperforming loans that are impaired is measured at fair value in our condensed consolidated balance sheets on a nonrecurring basis. These loans are classified within Level 3 of the valuation hierarchy because significant inputs are unobservable.

Fair value of multifamily nonperforming loans is determined by external third-party valuations when available. If third-party valuations are unavailable, we determine the value of the collateral based on a derived property value estimation method using current net operating income of the property and capitalization rates.

*Derivatives Assets and Liabilities (collectively "derivatives")*—Derivatives are recorded in our condensed consolidated balance sheets at fair value on a recurring basis. The valuation process for the majority of our risk management derivatives uses observable market data provided by third-party sources, resulting in Level 2 classification. Interest rate swaps are valued by referencing yield curves derived from observable interest rates and spreads to project and discount swap cash flows to present value. Option-based derivatives use a model that projects the probability of various levels of interest rates by referencing swaption and caplet volatilities provided by market makers/dealers. The projected cash flows of the underlying swaps of these option-based derivatives are discounted to present value using yield curves derived from observable interest rates and spreads. Exchange-traded futures are valued using market quoted prices, resulting in Level 1 classification. Certain highly complex structured derivatives use only a single external source of price information due to lack of transparency in the market and may be modeled using observable interest rates and volatility levels as well as significant assumptions, resulting in Level 3 classification. Mortgage commitment derivatives use observable market data, quotes and actual transaction price levels adjusted for market movement, and are typically classified as Level 2. Adjustments for market movement based on internal model results that cannot be corroborated by observable market data are classified as Level 3.

*Guaranty Assets and Buy-ups*—Guaranty assets related to our portfolio securitizations are recorded in our condensed consolidated balance sheets at fair value on a recurring basis and are classified within Level 3 of the valuation hierarchy. Guaranty assets in lender swap transactions are recorded in our condensed consolidated balance sheets at the lower of cost or fair value. These assets, which are measured at fair value on a nonrecurring basis, are classified within Level 3 of the fair value hierarchy.

We estimate the fair value of guaranty assets based on the present value of expected future cash flows of the underlying mortgage assets using management's best estimate of certain key assumptions, which include prepayment speeds, forward yield curves, and discount rates commensurate with the risks involved. These cash flows are projected using proprietary prepayment, interest rate and credit risk models. Because guaranty assets are like an interest-only income stream, the projected cash flows from our guaranty assets are discounted using one-month LIBOR plus the option-adjusted spread ("OAS") for interest-only trust securities. The interest-only OAS is calibrated using prices of a representative sample of interest-only trust securities. We believe the remitted fee income is less liquid than interest-only trust securities and more like an excess servicing strip. We take a further haircut of the present value for liquidity considerations. This discount is based on market quotes from dealers.

165

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

The fair value of the guaranty assets includes the fair value of any associated buy-ups, which is estimated in the same manner as guaranty assets but is recorded separately as a component of "Other assets" in our condensed consolidated balance sheets. While the fair value of the guaranty assets reflects all guaranty arrangements, the carrying value primarily reflects only those arrangements entered into subsequent to our adoption of the accounting standard on guarantor's accounting and disclosure requirements for guarantees.

*Debt*—The majority of debt of Fannie Mae is recorded in our condensed consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments. We elected the fair value option for certain structured debt instruments, which are recorded in our condensed consolidated balance sheets at fair value on a recurring basis.

We use third-party pricing services that reference observable market data such as interest rates and spreads to measure the fair value of debt, and thus classify that debt as Level 2. When third-party pricing is not available, we use a discounted cash flow approach based on a yield curve derived from market prices observed for Fannie Mae Benchmark Notes and adjusted to reflect fair values at the offer side of the market.

For structured debt instruments that are not valued by third-party pricing services, cash flows are evaluated taking into consideration any structured derivatives through which we have swapped out of the structured features of the notes. The resulting cash flows are discounted to present value using a yield curve derived from market prices observed for Fannie Mae Benchmark Notes and adjusted to reflect fair values at the offer side of the market. Market swaption volatilities are also referenced for the valuation of callable structured debt instruments. Given that the derivatives considered in the valuations of these structured debt instruments are classified as Level 3, the valuations of the structured debt instruments result in a Level 3 classification.

Consolidated MBS debt is traded in the market as MBS assets. Accordingly, we estimate the fair value of our consolidated MBS debt using quoted market prices in active markets for similar liabilities when traded as assets. The valuation methodology and inputs used in estimating the fair value of MBS assets are described under "Cash Equivalents, Trading Securities and Available-for-Sale Securities." Certain consolidated MBS debt with embedded derivatives is recorded in our condensed consolidated balance sheets at fair value on a recurring basis.

166

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

*Nonrecurring Changes in Fair Value*

The following tables display assets and liabilities measured in our condensed consolidated balance sheets at fair value on a nonrecurring basis; that is, the instruments are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances (for example, when we evaluate for impairment), and the gains or losses recognized for these assets and liabilities for the three and nine months ended September 30, 2011 and 2010 as a result of fair value measurements.

| | Fair Value Measurements For the Nine Months Ended September 30, 2011 | | | | For the Three Months Ended September 30, 2011 | For the Nine Months Ended September 30, 2011 |
|---|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | Total Losses | Total Losses |
| | (Dollars in millions) | | | | | |
| Assets: | | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value . . . . . . . . . . . | $— | $ 2 | $   204 | $   206[1] | $    (3) | $   (16) |
| Single-family mortgage loans held for investment, at amortized cost: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . | — | — | 40,280 | 40,280[2] | (1,045) | (2,125) |
| Of consolidated trusts . . . . . . . . | — | — | 885 | 885[2] | (33) | (131) |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . . | — | — | 1,708 | 1,708[2] | (183) | (291) |
| Acquired property, net: | | | | | | |
| Single-family . . . . . . . . . . . . . . | — | — | 17,642 | 17,642[3] | (635) | (2,147) |
| Multifamily . . . . . . . . . . . . . . . | — | — | 315 | 315[3] | (32) | (81) |
| Other assets . . . . . . . . . . . . . . . . | — | — | 1,138 | 1,138[4] | (29) | (94) |
| Total assets at fair value . . . . . . . . | $— | $ 2 | $62,172 | $62,174 | $(1,960) | $(4,885) |

167

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

| | Fair Value Measurements For the Nine Months Ended September 30, 2010 | | | | For the Three Months Ended September 30, 2010 | For the Nine Months Ended September 30, 2010 |
|---|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | Total (Losses) Gains | Total Losses |
| | (Dollars in millions) | | | | | |
| Assets: | | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value . . . . . . . . . . | $— | $6,884 | $   550 | $ 7,434[1][5] | $    (1) | $   (91)[5] |
| Single-family mortgage loans held for investment, at amortized cost: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . | — | — | 27,329 | 27,329[2] | (408) | (1,216) |
| Of consolidated trusts . . . . . . . . | — | — | 1,039 | 1,039[2] | (79) | (182) |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | | | |
| Of Fannie Mae . . . . . . . . . . . | — | — | 1,132 | 1,132[2] | 95 | (142) |
| Acquired property, net: | | | | | | |
| Single-family . . . . . . . . . . . . . . | — | — | 15,546 | 15,546[3] | (768) | (1,772) |
| Multifamily . . . . . . . . . . . . . . . | — | — | 196 | 196[3] | (5) | (37) |
| Other Assets: | | | | | | |
| Guaranty assets . . . . . . . . . . . . . | — | — | 28 | 28 | (2) | (6) |
| Partnership investments . . . . . . . . | — | — | 109 | 109 | (15) | (104) |
| Other assets . . . . . . . . . . . . . . . | — | — | 51 | 51[4] | (8) | (8) |
| Total assets at fair value . . . . . . . . | $— | $6,884 | $45,980 | $52,864 | $(1,191) | $(3,558) |

_____

[1] Includes $72 million and $7.1 billion of mortgage loans held for sale that were sold, deconsolidated, retained as a mortgage-related security or redesignated to mortgage loans held for investment as of September 30, 2011 and 2010, respectively.

[2] Includes $5.7 billion and $1.6 billion of mortgage loans held for investment that were liquidated or transferred to foreclosed properties as of September 30, 2011 and 2010, respectively.

[3] Includes $11.8 billion and $7.2 billion of acquired properties that were sold or transferred as of September 30, 2011 and 2010, respectively.

[4] Includes $285 million and $4 million of other assets that were sold or transferred as of September 30, 2011 and 2010, respectively.

[5] Includes $7.1 billion of estimated fair value and $68 million in losses due to the adoption of the new accounting standards.

The following is a description of the fair valuation techniques we use for assets and liabilities measured at fair value on a nonrecurring basis under the accounting standard for fair value measurements as well as our basis for classifying these assets and liabilities as Level 1, Level 2 or Level 3. We also use these valuation techniques to estimate the fair value of financial instruments not carried at fair value but disclosed as part of the fair value of financial instruments.

*Mortgage Loans Held for Sale*—Loans are reported at the lower of cost or fair value in our condensed consolidated balance sheets. The valuation methodology and inputs used in estimating the fair value of HFS loans are described under "Mortgage Loans Held for Investment" and these loans are classified as Level 2 to

168

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

the extent that significant inputs are observable. To the extent that significant inputs are unobservable or determined by extrapolation of observable points, the loans are classified within Level 3.

*Acquired Property, Net and Other Assets*—Acquired property, net mainly represents foreclosed property received in full satisfaction of a loan net of a valuation allowance. Acquired property is initially recorded in our condensed consolidated balance sheets at its fair value less its estimated cost to sell. The initial fair value of foreclosed properties is determined using a hierarchy based on the reliability of available information. The fair value estimate is based on the best information available at the time of valuation. The hierarchy includes offers accepted, third-party interior appraisals, independent broker opinions, proprietary home price model values and exterior broker price opinions. Estimated cost to sell is based upon historical sales cost at a geographic level.

Subsequent to initial measurement, the foreclosed properties that we intend to sell are reported at the lower of the carrying amount or fair value less estimated costs to sell. Foreclosed properties classified as held for use, included in other assets, are depreciated and are impaired when circumstances indicate that the carrying amount of the property is no longer recoverable. The fair value of our single-family foreclosed properties on an ongoing basis is determined using the same information hierarchy used at the point of initial fair value. The fair value of our multifamily properties is derived using third-party valuations. When third-party valuations are not available, we estimate the fair value using current net operating income of the property and capitalization rates.

Acquired property is classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

***Fair Value of Financial Instruments***

The following table displays the carrying value and estimated fair value of our financial instruments as of September 30, 2011 and December 31, 2010. The fair value of financial instruments we disclose, includes commitments to purchase multifamily and single-family mortgage loans, which are off-balance sheet financial instruments that we do not record in our condensed consolidated balance sheets. The fair values of these commitments are included as "Mortgage loans held for investment, net of allowance for loan losses." The disclosure excludes certain financial instruments, such as plan obligations for pension and postretirement health care benefits, employee stock option and stock purchase plans, and also excludes all non-financial

169

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

instruments. As a result, the fair value of our financial assets and liabilities does not represent the underlying fair value of our total consolidated assets and liabilities.

| | As of | | | |
| --- | --- | --- | --- | --- |
| | September 30, 2011 | | December 31, 2010 | |
| | Carrying Value | Estimated Fair Value | Carrying Value | Estimated Fair Value |
| | (Dollars in millions) | | | |
| **Financial assets:** | | | | |
| Cash and cash equivalents[1] | $ 80,268 | $ 80,268 | $ 80,975 | $ 80,975 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 35,950 | 35,950 | 11,751 | 11,751 |
| Trading securities | 68,149 | 68,149 | 56,856 | 56,856 |
| Available-for-sale securities | 82,710 | 82,710 | 94,392 | 94,392 |
| Mortgage loans held for sale | 309 | 309 | 915 | 915 |
| Mortgage loans held for investment, net of allowance for loan losses: | | | | |
| Of Fannie Mae | 329,848 | 303,953 | 358,698 | 319,367 |
| Of consolidated trusts | 2,567,663 | 2,663,443 | 2,564,107 | 2,610,145 |
| Mortgage loans held for investment | 2,897,511 | 2,967,396 | 2,922,805 | 2,929,512 |
| Advances to lenders | 5,145 | 5,029 | 7,215 | 6,990 |
| Derivative assets at fair value | 723 | 723 | 1,137 | 1,137 |
| Guaranty assets and buy-ups | 480 | 858 | 458 | 814 |
| Total financial assets | $3,171,245 | $3,241,392 | $3,176,504 | $3,183,342 |
| **Financial liabilities:** | | | | |
| Federal funds purchased and securities sold under agreements to repurchase | $ — | $ — | $ 52 | $ 51 |
| Short-term debt: | | | | |
| Of Fannie Mae | 193,718 | 193,759 | 151,884 | 151,974 |
| Of consolidated trusts | 5,004 | 5,004 | 5,359 | 5,359 |
| Long-term debt: | | | | |
| Of Fannie Mae | 551,085 | 580,238 | 628,160 | 649,684 |
| Of consolidated trusts | 2,441,969 | 2,588,550 | 2,411,597 | 2,514,929 |
| Derivative liabilities at fair value | 4,273 | 4,273 | 1,715 | 1,715 |
| Guaranty obligations | 765 | 3,920 | 769 | 3,854 |
| Total financial liabilities | $3,196,814 | $3,375,744 | $3,199,536 | $3,327,566 |

---

[1] Includes restricted cash of $56.0 billion and $63.7 billion as of September 30, 2011 and December 31, 2010, respectively.

The following are valuation techniques for items not subject to the fair value hierarchy either because they are not measured at fair value other than for the purpose of the above table or because they are only measured at fair value at inception.

*Financial Instruments for which fair value approximates carrying value*—We hold certain financial instruments that are not carried at fair value but for which the carrying value approximates fair value due to the short-term nature and negligible credit risk inherent in them. These financial instruments include cash and cash equivalents, federal funds and securities sold/purchased under agreements to repurchase/resell (exclusive of dollar roll repurchase transactions) and the majority of advances to lenders.

*Advances to Lenders*—The carrying value for the majority of our advances to lenders approximates the fair value due to the short-term nature of the specific instruments. Other instruments include loans for which the

TREASURY-2086

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

carrying value does not approximate fair value. These loans are valued using collateral values of similar loans as a proxy.

*Guaranty Obligations*—The fair value of all guaranty obligations ("GO"), measured subsequent to their initial recognition, is our estimate of a hypothetical transaction price we would receive if we were to issue our guaranty to an unrelated party in a standalone arm's-length transaction at the measurement date. We estimate the fair value of the GO using our internal GO valuation models, which calculate the present value of expected cash flows based on management's best estimate of certain key assumptions such as current mark-to-market LTV ratios, future house prices**,** default rates, severity rates and required rate of return. We further adjust the model values based on our current market pricing when such transactions reflect credit characteristics that are similar to our outstanding GO. While the fair value of the GO reflects all guaranty arrangements, the carrying value primarily reflects only those arrangements entered into subsequent to our adoption of the accounting standard on guarantor's accounting and disclosure requirements for guarantees.

### Fair Value Option

We elected the fair value option for certain consolidated loans and debt instruments recorded in our condensed consolidated balance sheets as a result of consolidating VIEs. These instruments contain embedded derivatives that would otherwise require bifurcation. Under the fair value option, we elected to carry these instruments at fair value instead of bifurcating the embedded derivative from the respective loan or debt instrument.

We elected the fair value option for all long-term structured debt instruments that are issued in response to specific investor demand and have interest rates that are based on a calculated index or formula and are economically hedged with derivatives at the time of issuance. By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from the accounting asymmetry created by recording these structured debt instruments at cost while recording the related derivatives at fair value.

We elected the fair value option for the financial assets and liabilities of the consolidated senior-subordinate trust structures. By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from different accounting treatment between loans at cost and debt at cost.

Interest income for the mortgage loans is recorded in "Mortgage loans interest income" and interest expense for the debt instruments is recorded in "Long-term debt interest expense" in our condensed consolidated statements of operations and comprehensive loss.

The following table displays the fair value and unpaid principal balance of the financial instruments for which we have made fair value elections as September 30, 2011 and December 31, 2010.

| | As of | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | September 30, 2011 | | | December 31, 2010 | | |
| | Loans of Consolidated Trusts[(1)] | Long-Term Debt of Fannie Mae | Long-Term Debt of Consolidated Trusts[(2)] | Loans of Consolidated Trusts[(1)] | Long-Term Debt of Fannie Mae | Long-Term Debt of Consolidated Trusts[(2)] |
| | (Dollars in millions) | | | | | |
| Fair value .......................... | $3,361 | $845 | $3,840 | $2,962 | $893 | $2,271 |
| Unpaid principal balance ............... | 3,853 | 712 | 3,952 | 3,456 | 829 | 2,572 |

---

[(1)] Includes nonaccrual loans with a fair value of $211 million and $219 million as of September 30, 2011 and December 31, 2010, respectively. The difference between unpaid principal balance and the fair value of these nonaccrual loans as of September 30, 2011 is $227 million. Includes loans that are 90 days past due with a fair value

TREASURY-2087

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(UNAUDITED)**

of $367 million and $369 million as of September 30, 2011 and December 31, 2010, respectively. The difference between unpaid principal balance and the fair value of these 90 or more days past due loans as of September 30, 2011 is $256 million.

(2) Includes interest-only debt instruments with no unpaid principal balance and a fair value of $123 million and $151 million as of September 30, 2011 and December 31, 2010, respectively.

*Changes in Fair Value under the Fair Value Option Election*

The following table displays fair value gains and losses, net, including changes attributable to instrument-specific credit risk, for loans and debt for which the fair value election was made. Amounts are recorded as a component of "Fair value (losses) gains, net" in our condensed consolidated statements of operations and comprehensive loss for the periods ended September 30, 2011 and 2010.

| | For the Three Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | **2011** | | | **2010** |
| | Loans | Long-Term Debt | Total Gains (Losses) | Long-Term Debt |
| | (Dollars in millions) | | | |
| Changes in instrument-specific credit risk | $ 27 | $ 8 | $ 35 | $ (3) |
| Other changes in fair value | (30) | (79) | (109) | (44) |
| Fair value losses, net | $ (3) | $(71) | $ (74) | $(47) |

| | For the Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | **2011** | | | **2010** |
| | Loans | Long-Term Debt | Total Gains (Losses) | Long-Term Debt |
| | (Dollars in millions) | | | |
| Changes in instrument-specific credit risk | $(184) | $ 12 | $(172) | $ 5 |
| Other changes in fair value | 111 | (72) | 39 | (70) |
| Fair value losses, net | $ (73) | $(60) | $(133) | $(65) |

In determining the changes in the instrument-specific credit risk for loans, the changes in the associated credit-related components of these loans, primarily the guaranty obligation, were taken into consideration with the overall change in the fair value of the loans for which we elected the fair value option for financial instruments. In determining the changes in the instrument-specific credit risk for debt, the changes in Fannie Mae debt spreads to LIBOR that occurred during the period were taken into consideration with the overall change in the fair value of the debt for which we elected the fair value option for financial instruments. Specifically, cash flows are evaluated taking into consideration any derivatives through which Fannie Mae has swapped out of the structured features of the notes and thus created a floating-rate LIBOR-based debt instrument. The change in value of these LIBOR-based cash flows based on the Fannie Mae yield curve at the beginning and end of the period represents the instrument-specific risk.

**14.   Commitments and Contingencies**

We are party to various types of legal actions and proceedings, including actions brought on behalf of various classes of claimants. We also are subject to regulatory examinations, inquiries and investigations and other information gathering requests. In some of the matters, indeterminate amounts are sought. Modern pleading practice in the U.S. permits considerable variation in the assertion of monetary damages or other relief. Jurisdictions may permit claimants not to specify the monetary damages sought or may permit claimants to state only that the amount sought is sufficient to invoke the jurisdiction of the trial court. This variability in pleadings, together with our and our counsel's actual experience in litigating or settling claims, leads us to

172

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

conclude that the monetary relief that may be sought by plaintiffs bears little relevance to its merits or disposition value.

On a quarterly and annual basis, we review relevant information about all pending legal actions and proceedings for the purpose of evaluating and revising our contingencies, reserves and disclosures.

Legal actions and proceedings of all types are subject to many uncertain factors that generally cannot be predicted with assurance. Accordingly, the outcome of any given matter and the amount or range of potential loss at particular points in time is frequently difficult to ascertain. Uncertainties can include how fact finders will evaluate documentary evidence and the credibility and effectiveness of witness testimony, and how trial and appellate courts will apply the law. Disposition valuations are also subject to the uncertainty of how opposing parties and their counsel view the evidence and applicable law. Further, FHFA adopted a regulation on June 20, 2011, which provides, in part, that while we are in conservatorship, FHFA will not pay claims by our current or former shareholders, unless the Director of FHFA determines it is in the interest of the conservatorship. The presence of this regulation and the Director of FHFA's assertion that it will not pay claims asserted in certain cases discussed below while we are in conservatorship creates additional uncertainty in those cases.

We have established a reserve for those matters where a loss is probable and where we can reasonably estimate the amount of such loss. Reserves have been established for certain of the matters noted below. These reserves did not have a material adverse effect on our financial statements. We note, however, that in light of the uncertainties involved in such actions and proceedings, there is no assurance that the ultimate resolution of these matters will not significantly exceed the reserves we have currently accrued.

For the remaining legal actions or proceedings, including those where there is only a reasonable possibility that a loss may be incurred, we are not currently able to estimate the reasonably possible losses or ranges of losses and we have not established a reserve with respect to those actions or proceedings. We are often unable to estimate the possible loss or range of loss, particularly for proceedings that are in their early stages of development, where plaintiffs seek substantial or indeterminate damages, or where there may be novel or unsettled legal questions relevant to the proceedings or settlement negotiations have not occurred or progressed. Further, as noted above, FHFA's regulation and the Director of FHFA's assertion creates additional uncertainty with respect to certain cases.

Given the uncertainties involved in any action or proceeding, regardless of whether we have established a reserve, the ultimate resolution of certain of these matters may be material to our operating results for a particular period, depending on, among other factors, the size of the loss or liability imposed and the level of our net income or loss for that period. Based on our current knowledge with respect to the matters described below, we believe we have valid defenses to the claims in these proceedings and intend to defend these matters vigorously regardless of whether or not we have recorded a loss reserve.

In addition to the matters specifically described below, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that we do not expect will have a material impact on our business or financial condition. We have advanced fees and expenses of certain current and former officers and directors in connection with various legal proceedings pursuant to indemnification agreements.

*In re Fannie Mae Securities Litigation*

Fannie Mae is a defendant in a consolidated class action lawsuit initially filed in 2004 and currently pending in the U.S. District Court for the District of Columbia. In the consolidated complaint filed on March 4, 2005, lead plaintiffs Ohio Public Employees Retirement System and the State Teachers Retirement System of Ohio

TREASURY-2089

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

allege that we and certain former officers, as well as our former outside auditor, made materially false and misleading statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder. Plaintiffs contend that Fannie Mae's accounting statements were inconsistent with GAAP requirements relating to hedge accounting and the amortization of premiums and discounts, and seek unspecified compensatory damages, attorneys' fees, and other fees and costs. On January 7, 2008, the court defined the class as all purchasers of Fannie Mae common stock and call options and all sellers of publicly traded Fannie Mae put options during the period from April 17, 2001 through December 22, 2004. On October 17, 2008, FHFA, as conservator for Fannie Mae, intervened in this case. On August 18, 2011, the parties filed various motions for summary judgment.

On October 7, 2011, FHFA, as conservator, filed a motion to stay this case for the duration of our conservatorship based on a regulation FHFA adopted on June 20, 2011, which provides in part that while we are in conservatorship, FHFA will not pay claims by our current or former shareholders, unless the Director of FHFA determines it is in the interest of the conservatorship. The Acting Director of FHFA has determined it will not pay the claims asserted in this case while we are in conservatorship. FHFA maintains, therefore, that continuing litigation of this matter would be a waste of resources. Alternatively, FHFA has stated it will seek a stay of this case, while a separate lawsuit challenging the regulation is decided.

In September and December, 2010, plaintiffs served expert reports claiming damages to plaintiffs under various scenarios ranging cumulatively from $2.2 billion to $8.6 billion. Given the substantial and novel legal questions that remain, including those raised by FHFA's regulation and the Director of FHFA's determination, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation.

*2008 Class Action Lawsuits*

Fannie Mae is a defendant in two consolidated class actions filed in 2008 and currently pending in the U.S. District Court for the Southern District of New York—*In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. On February 11, 2009, the Judicial Panel on Multidistrict Litigation ordered that the cases be coordinated for pretrial proceedings. Given the early status of these matters, the absence of a specified demand or claim by the plaintiffs and the substantial and novel legal questions that remain, we are currently unable to estimate the reasonably possible loss or range of loss arising from these lawsuits.

*In re Fannie Mae 2008 Securities Litigation*

In a consolidated complaint filed on June 22, 2009, lead plaintiffs Massachusetts Pension Reserves Investment Management Board and Boston Retirement Board (for common shareholders) and Tennessee Consolidated Retirement System (for preferred shareholders) allege that we, certain of our former officers, and certain of our underwriters violated Sections 12(a)(2) and 15 of the Securities Act of 1933. Lead plaintiffs also allege that we, certain of our former officers, and our outside auditor, violated Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Securities Exchange Act of 1934. Lead plaintiffs seek various forms of relief, including rescission, damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. On October 13, 2009, the Court entered an order allowing FHFA to intervene.

On November 24, 2009, the Court granted the defendants' motion to dismiss the Securities Act claims as to all defendants. On September 30, 2010, the Court granted in part and denied in part the defendants' motions to dismiss the Securities Exchange Act claims. As a result of the partial denial, some of the Securities Exchange Act claims remain pending against us and certain of our former officers. On October 14, 2010, we and certain other defendants filed motions for reconsideration of those portions of the Court's September 30, 2010 order denying in part the defendants' motions to dismiss. Fannie Mae filed its answer to the consolidated

174

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

complaint on December 31, 2010. Defendants' motions for reconsideration were denied on April 11, 2011. On July 28, 2011 lead plaintiffs filed motions to certify a class of persons who, between November 8, 2006 and September 5, 2008, inclusive, purchased or acquired (a) Fannie Mae common stock and options or (b) Fannie Mae preferred stock.

On October 12, 2011, FHFA, as conservator, filed a letter with the court requesting a pre-motion conference to discuss FHFA's intention to file a motion to stay this case for the duration of our conservatorship based on a regulation FHFA adopted on June 20, 2011, which provides in part that while we are in conservatorship, FHFA will not pay claims by our current or former shareholders, unless the Director of FHFA determines it is in the interest of the conservatorship. The Acting Director of FHFA has determined it will not pay the claims asserted in this case while we are in conservatorship. FHFA maintains, therefore, that continuing litigation of this matter is a waste of resources. Alternatively, FHFA will seek a stay of this case while a separate lawsuit challenging the regulation is decided.

*In re 2008 Fannie Mae ERISA Litigation*

In a consolidated complaint filed on September 11, 2009, plaintiffs allege that certain of our current and former officers and directors, including former members of Fannie Mae's Benefit Plans Committee and the Compensation Committee of Fannie Mae's Board of Directors, as fiduciaries of Fannie Mae's Employee Stock Ownership Plan ("ESOP"), breached their duties to ESOP participants and beneficiaries by investing ESOP funds in Fannie Mae common stock when it was no longer prudent to continue to do so. Plaintiffs purport to represent a class of participants and beneficiaries of the ESOP whose accounts invested in Fannie Mae common stock beginning April 17, 2007. The plaintiffs seek unspecified damages, attorneys' fees and other fees and costs and injunctive and other equitable relief. On November 2, 2009, defendants filed motions to dismiss these claims, which are now fully briefed and remain pending. On November 2, 2011, we filed a letter notifying the court of two recent decisions by the U.S. Court of Appeals for the Second Circuit that are relevant to the defendants' motions to dismiss.

*Comprehensive Investment Services v. Mudd, et al.*

This individual securities action was originally filed on May 13, 2009, by plaintiff Comprehensive Investment Services, Inc. against certain of our former officers and directors, and certain of our underwriters in the Southern District of Texas. On July 7, 2009, this case was transferred to the Southern District of New York for coordination with *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. Plaintiff filed an amended complaint on May 11, 2011 against us, certain of our former officers, and certain of our underwriters. The amended complaint alleges violations of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; violations of §20(a) of the Securities Exchange Act of 1934; and violations of the Texas Business and Commerce Code, common law fraud, and negligent misrepresentation in connection with Fannie Mae's May 2008 $2.0 billion offering of 8.25% non-cumulative preferred Series T stock. Plaintiff seeks relief in the form of rescission, actual damages, punitive damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. On July 11, 2011, defendants filed motions to dismiss the amended complaint, which are now fully briefed and remain pending. Given the preliminary stage of this lawsuit, the absence of a specified demand or claim by the plaintiff and the substantial and novel legal questions that remain, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation.

TREASURY-2091

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(UNAUDITED)**

*Smith v. Fannie Mae, et al.*

This individual securities action was originally filed on February 25, 2010, by plaintiff Edward Smith against Fannie Mae and certain of its former officers as well as several underwriters in the Central District of California. On April 12, 2010, this case was transferred to the Southern District of New York for coordination with *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. Plaintiff filed an amended complaint on April 19, 2011, which alleges violations of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; violations of §20(a) of the Securities Exchange Act of 1934; common law fraud and negligence claims; and California state law claims for misrepresentation in connection with Fannie Mae's December 2007 $7.0 billion offering of 7.75% fixed-to-floating rate non-cumulative preferred Series S stock. Plaintiff seeks relief in the form of rescission, actual damages (including interest), and exemplary and punitive damages. On July 11, 2011, defendants filed motions to dismiss the amended complaint, which are now fully briefed and remain pending. Given the preliminary stage of this lawsuit, the absence of a specified demand or claim by the plaintiff and the substantial and novel legal questions that remain, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation.

*Alenick v. Merrill Lynch, et al.*

On May 12, 2011, Zeke Alenick filed an individual securities action against one of our former officers, certain of our underwriters, and an employee of one of our underwriters in New York State Court. Plaintiff alleges common law fraud, recklessness, negligence, and violations of §349 of the New York General Business Law in connection with Fannie Mae's May 2008 $2.0 billion offering of 8.25% non-cumulative preferred Series T stock. The complaint seeks various forms of relief, including damages, punitive damages, and rescission. On June 13, 2011, the case was removed to the United States District Court for the Southern District of New York and accepted as related to *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. On July 18 and 25, 2011, Alenick filed motions to dismiss voluntarily all defendants. The court granted those motions on July 25 and 28, 2011, and closed the case.

*Investigation by the Securities and Exchange Commission*

On September 26, 2008, we received notice of an ongoing investigation into Fannie Mae by the SEC regarding certain accounting and disclosure matters. On January 8, 2009, the SEC issued a formal order of investigation. We are cooperating with this investigation.

*Investigation by the Department of Justice*

On September 26, 2008, we received notice of an ongoing federal investigation by the U.S. Attorney for the Southern District of New York into certain accounting, disclosure and corporate governance matters. In connection with that investigation, Fannie Mae received a Grand Jury subpoena for documents. That subpoena was subsequently withdrawn. However, we were informed that the Department of Justice was continuing an investigation and on March 15, 2010, we received another Grand Jury subpoena for documents. We are cooperating with this investigation.

TREASURY-2092

**Item 3.   Quantitative and Qualitative Disclosures about Market Risk**

Information about market risk is set forth in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management."

**Item 4.   Controls and Procedures**

**Overview**

We are required under applicable laws and regulations to maintain controls and procedures, which include disclosure controls and procedures as well as internal control over financial reporting, as further described below.

**Evaluation of Disclosure Controls and Procedures**

*Disclosure Controls and Procedures*

Disclosure controls and procedures refer to controls and other procedures designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission ("SEC"). Disclosure controls and procedures include, without limitation, controls and procedures designed to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding our required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management was required to apply its judgment in evaluating and implementing possible controls and procedures.

*Evaluation of Disclosure Controls and Procedures*

As required by Rule 13a-15 under the Exchange Act, management has evaluated, with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures as in effect as of September 30, 2011, the end of the period covered by this report. As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective at a reasonable assurance level as of September 30, 2011 or as of the date of filing this report.

Our disclosure controls and procedures were not effective as of September 30, 2011 or as of the date of filing this report because they did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. As a result, we were not able to rely upon the disclosure controls and procedures that were in place as of September 30, 2011 or as of the date of this filing, and we continue to have a material weakness in our internal control over financial reporting. This material weakness is described in more detail below under "Description of Material Weakness." Based on discussions with FHFA and the structural nature of the weakness in our disclosure controls and procedures, it is likely that we will not remediate this material weakness while we are under conservatorship.

**Description of Material Weakness**

The Public Company Accounting Oversight Board's Auditing Standard No. 5 defines a material weakness as a deficiency or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

Management has determined that we continued to have the following material weakness as of September 30, 2011 and as of the date of filing this report:

- *Disclosure Controls and Procedures.*   We have been under the conservatorship of FHFA since September 6, 2008. Under the 2008 Reform Act, FHFA is an independent agency that currently functions as both our conservator and our regulator with respect to our safety, soundness and mission. Because of the nature of the conservatorship under the 2008 Reform Act, which places us under the "control" of FHFA (as that term is defined by securities laws), some of the information that we may need to meet our disclosure obligations may be solely within the knowledge of FHFA. As our conservator, FHFA has the power to take actions without our knowledge that could be material to our shareholders and other stakeholders, and could significantly affect our financial performance or our continued existence as an ongoing business. Although we and FHFA attempted to design and implement disclosure policies and procedures that would account for the conservatorship and accomplish the same objectives as a disclosure controls and procedures policy of a typical reporting company, there are inherent structural limitations on our ability to design, implement, test or operate effective disclosure controls and procedures. As both our regulator and our conservator under the 2008 Reform Act, FHFA is limited in its ability to design and implement a complete set of disclosure controls and procedures relating to Fannie Mae, particularly with respect to current reporting pursuant to Form 8-K. Similarly, as a regulated entity, we are limited in our ability to design, implement, operate and test the controls and procedures for which FHFA is responsible.

  Due to these circumstances, we have not been able to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our condensed consolidated financial statements. As a result, we did not maintain effective controls and procedures designed to ensure complete and accurate disclosure as required by GAAP as of September 30, 2011 or as of the date of filing this report. Based on discussions with FHFA and the structural nature of this weakness, it is likely that we will not remediate this material weakness while we are under conservatorship.

**Mitigating Actions Relating to Material Weakness**

As described above under "Description of Material Weakness," we continue to have a material weakness in our internal control over financial reporting relating to our disclosure controls and procedures. However, we and FHFA have engaged in the following practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the conservator.

- We have provided drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also have provided drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, have reviewed our SEC filings prior to filing, including this quarterly report on Form 10-Q for the quarter ended September 30, 2011 ("Third Quarter 2011 Form 10-Q"), and engaged in discussions regarding issues associated with the information contained in those filings. Prior to filing our Third Quarter 2011 Form 10-Q, FHFA provided Fannie Mae management with a written acknowledgement that it had reviewed the Third Quarter 2011 Form 10-Q, and it was not aware of any material misstatements or omissions in the Third Quarter 2011 Form 10-Q and had no objection to our filing the Third Quarter 2011 Form 10-Q.

- The Acting Director of FHFA and our Chief Executive Officer have been in frequent communication, typically meeting on at least a bi-weekly basis.

178

- FHFA representatives attend meetings frequently with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, credit and market risk management, liquidity, external communications and legal matters.

- Senior officials within FHFA's Office of the Chief Accountant have met frequently with our senior finance executives regarding our accounting policies, practices and procedures.

## Changes in Internal Control over Financial Reporting

*Overview*

Management is required to evaluate, with the participation of our Chief Executive Officer and Chief Financial Officer, whether any changes in our internal control over financial reporting that occurred during our last fiscal quarter have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Below we describe changes in our internal control over financial reporting since June 30, 2011 that management believes have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*Changes in Management*

During the third quarter of 2011, Susan R. McFarland became our new Chief Financial Officer, succeeding David C. Hisey as our principal financial officer. Mr. Hisey continued to serve as our principal accounting officer until the fourth quarter of 2011, when Gregory A. Fink, Senior Vice President and Controller of Fannie Mae, was appointed as our principal accounting officer. Mr. Hisey continues to serve as our Executive Vice President and Deputy Chief Financial Officer.

In addition, John Nichols, who had previously been our interim Chief Risk Officer, was appointed our Chief Risk Officer in the third quarter of 2011.

TREASURY-2095

## PART II—OTHER INFORMATION

### Item 1.   Legal Proceedings

The information in this item supplements information regarding certain legal proceedings set forth in "Legal Proceedings" in our 2010 Form 10-K and First Quarter 2011 Form 10-Q and Second Quarter Form 10-Q. We also provide information regarding material legal proceedings in "Note 14, Commitments and Contingencies," which is incorporated herein by reference. In addition to the matters specifically described or incorporated by reference in this item, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that do not have a material impact on our business. Litigation claims and proceedings of all types are subject to many factors that generally cannot be predicted accurately.

We record reserves for legal claims when losses associated with the claims become probable and the amounts can reasonably be estimated. The actual costs of resolving legal claims may be substantially higher or lower than the amounts reserved for those claims. For matters where the likelihood or extent of a loss is not probable or cannot be reasonably estimated, we have not recognized in our condensed consolidated financial statements the potential liability that may result from these matters. We presently cannot determine the ultimate resolution of the matters described or incorporated by reference in this item or in our 2010 Form 10-K, First Quarter 2011 Form 10-Q or Second Quarter 2011 Form 10-Q. We have recorded a reserve for legal claims related to those matters for which we were able to determine a loss was both probable and reasonably estimable. If certain of these matters are determined against us, it could have a material adverse effect on our results of operations, liquidity and financial condition, including our net worth.

### *FHFA Private-Label Mortgage-Related Securities Litigation*

In the third quarter of 2011, FHFA, as conservator for us and for Freddie Mac, filed 16 lawsuits on behalf of us and Freddie Mac against various financial institutions, their officers and unaffiliated underwriters who were responsible for marketing and selling private-label mortgage-related securities to us. The lawsuits seek to recover losses we and Freddie Mac incurred on the securities. FHFA filed 13 of these lawsuits in the U.S. District Court for the Southern District of New York—against Bank of America Corp.; Barclays Bank PLC; Citigroup, Inc.; Credit Suisse Holdings (USA), Inc.; Deutsche Bank AG; First Horizon National Corporation; Goldman, Sachs & Co.; HSBC North America Holdings Inc.; JPMorgan Chase & Co.; Merrill Lynch & Co.; Nomura Holding America Inc.; SG Americas, Inc.; and UBS Americas Inc. and against certain related entities and individuals. Two lawsuits—against Countrywide Financial Corporation and Morgan Stanley—were filed in the Supreme Court of the State of New York for the County of New York, and one—against The Royal Bank of Scotland Group PLC—was filed in the U.S. District Court for the District of Connecticut. The lawsuit against UBS was filed on July 27, 2011, and all the others were filed on September 2, 2011. The lawsuits allege that the defendants violated federal securities laws and state common law by making material misstatements and omissions in the offering documents for the securities that were sold to Fannie Mae and Freddie Mac regarding the characteristics of the loans underlying the securities. Some of the complaints also allege state securities law violations and common law fraud. The complaints seek, among other things, rescission and recovery of consideration paid for the securities at issue in the lawsuits, monetary damages and, in certain cases, punitive damages for common law fraud.

### *Investigation by Office of the Inspector General of FHFA and U.S. Attorney for the Eastern District of Virginia*

On October 27, 2011, we received notice of an ongoing investigation by the Office of the Inspector General of FHFA ("FHFA OIG") and the U.S. Attorney for the Eastern District of Virginia with regard to a multifamily agreement with The Related Companies, L.P. The financial impact of the agreement was not material to our financial statements. In connection with the investigation, we received a subpoena for documents from the FHA OIG. We are cooperating with this investigation.

TREASURY-2096

**Item 1A.   Risk Factors**

In addition to the information in this report, you should carefully consider the risks relating to our business that we identify in "Risk Factors" in our 2010 Form 10-K. This section supplements and updates that discussion and, for a complete understanding of the subject, you should read both together. Please also refer to "MD&A—Risk Management" in this report and in our 2010 Form 10-K for more detailed descriptions of the primary risks to our business and how we seek to manage those risks.

The risks we face could materially adversely affect our business, results of operations, financial condition, liquidity and net worth, and could cause our actual results to differ materially from our past results or the results contemplated by forward-looking statements contained in this report. However, these are not the only risks we face. In addition to the risks we discuss below, we face risks and uncertainties not currently known to us or that we currently believe are immaterial.

*The future of our company is uncertain.*

There is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated.

On February 11, 2011, Treasury and HUD released a report to Congress on ending the conservatorships of the GSEs and reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report also addresses three options for a reformed housing finance system. The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period.

The Subcommittee on Capital Markets and Government Sponsored Enterprises of the Financial Services Committee has approved numerous bills that could constrain the current operations of the GSEs or alter the existing authority that FHFA or Treasury have over the enterprises. In addition, several bills have been introduced in the Senate and House of Representatives that would place the GSEs into receivership after a period of time and either grant federal charters to new entities to engage in activities similar to those currently engaged in by the GSEs or leave secondary mortgage market activities to entities in the private sector. We expect that Congress will continue to hold hearings and consider legislation in the remainder of 2011 and in 2012 on the future status of Fannie Mae and Freddie Mac, including proposals that would result in a substantial change to our business structure, our operations, or that involve Fannie Mae's liquidation or dissolution. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs. See "MD&A—Legislative and Regulatory Developments—GSE Reform" for more information about the Treasury report and Congressional proposals regarding reform of the GSEs.

*Our regulator is authorized or required to place us into receivership under specified conditions, which would result in the liquidation of our assets. Amounts recovered from the liquidation will likely be insufficient to repay the liquidation preference of any series of our preferred stock or to provide any proceeds to common shareholders.*

FHFA has an obligation to place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations for a period of 60 days after the filing deadline for our Form 10-K or Form 10-Q with the SEC. Because of the credit-related expenses we expect to incur on our legacy book of business and our dividend obligation to Treasury, we will continue to need funding from Treasury to avoid triggering FHFA's obligation. Although Treasury committed to providing us funds in accordance with the

TREASURY-2097

terms of the senior preferred stock purchase agreement, Treasury may not provide these funds to us within the required 60 days if it has exhausted its borrowing authority or if there is a government shutdown. In addition, we could be put into receivership at the discretion of the Director of FHFA at any time for other reasons, including conditions that FHFA has already asserted existed at the time the former Director of FHFA placed us into conservatorship.

A receivership would terminate the conservatorship. In addition to the powers FHFA has as our conservator, the appointment of FHFA as our receiver would terminate all rights and claims that our shareholders and creditors may have against our assets or under our charter arising from their status as shareholders or creditors, except for their right to payment, resolution or other satisfaction of their claims as permitted under the GSE Act. Unlike a conservatorship, the purpose of which is to conserve our assets and return us to a sound and solvent condition, the purpose of a receivership is to liquidate our assets and resolve claims against us.

To the extent we are placed into receivership and do not or cannot fulfill our guaranty to the holders of our Fannie Mae MBS, the MBS holders could become unsecured creditors of ours with respect to claims made under our guaranty.

In the event of a liquidation of our assets, only after payment of the administrative expenses of the receiver and the immediately preceding conservator, the secured and unsecured claims against the company (including repaying all outstanding debt obligations), and the liquidation preference of the senior preferred stock, would any liquidation proceeds be available to repay the liquidation preference on any other series of preferred stock. Finally, only after the liquidation preference on all series of preferred stock is repaid would any liquidation proceeds be available for distribution to the holders of our common stock. It is unlikely that there would be sufficient proceeds to repay the liquidation preference of any series of our preferred stock or to make any distribution to the holders of our common stock.

***Efforts that we undertake, including those we are required or asked to undertake by FHFA, other government agencies or Congress, in pursuit of providing liquidity, stability and affordability to the mortgage market and providing assistance to struggling homeowners, or in pursuit of other goals, may adversely affect our business, results of operations, financial condition, liquidity and net worth.***

Prior to the conservatorship, our business was managed with a strategy to maximize shareholder returns, while fulfilling our mission. Our conservator has directed us to focus primarily on minimizing our credit losses from delinquent mortgages and providing assistance to struggling homeowners to help them remain in their homes. As a result, we may continue to take a variety of actions designed to address this focus that could adversely affect our economic returns, possibly significantly, such as: reducing our guaranty fees and modifying loans to extend the maturity, lower the interest rate or defer or forgive principal owed by the borrower. These activities may have short- and long-term adverse effects on our business, results of operations, financial condition, liquidity and net worth. For example, while we do not at this time know the ultimate impact on us of the changes to HARP described in "MD&A—Legislative and Regulatory Developments," we expect we may incur additional credit-related expenses as a result of acquiring refinancings made under HARP's revised terms. The amount of any additional credit-related expenses we incur depends on a number of factors, including the terms, credit profile and volume of our acquisitions under the revised program. At this time, we do not know how many of these refinancings we will acquire. We have also incurred substantial costs in connection with HAMP, as we discuss in "MD&A—Consolidated Results of Operations—Financial Impact of the Making Home Affordable Program on Fannie Mae" in our 2010 Form 10-K. Other agencies of the U.S. government or Congress also may ask us to undertake significant efforts to support the housing and mortgage markets, as well as struggling homeowners.

TREASURY-2098

***Limitations on our ability to access the debt capital markets could have a material adverse effect on our ability to fund our operations and generate net interest income.***

Our ability to fund our business depends primarily on our ongoing access to the debt capital markets. Our level of net interest income depends on how much lower our cost of funds is compared to what we earn on our mortgage assets. Market concerns about matters such as the extent of government support for our business, the future of our business (including future profitability, future structure, regulatory actions and GSE status) and the creditworthiness of the U.S. government could cause a severe negative effect on our access to the unsecured debt markets, particularly for long-term debt. We believe that our ability in 2010 and the first nine months of 2011 to issue debt of varying maturities at attractive pricing resulted from federal government support of us and the financial markets, including the Federal Reserve's purchases of our debt and MBS. As a result, we believe that our status as a GSE and continued federal government support is essential to maintaining our access to debt funding. Changes or perceived changes in the government's support of us or the markets could have a material adverse effect on our ability to fund our operations. As recently as September 2011, the Federal Reserve announced that, to help support conditions in mortgage markets, it will now reinvest principal payments from its holdings of agency debt and agency mortgage-backed securities in agency mortgage-backed securities. However, there can be no assurance that the government will continue to support us or the markets, or that our current level of access to debt funding will continue. In addition, due to our reliance on the U.S. government's support, our access to debt funding also could be materially adversely affected by a change or perceived change in the creditworthiness of the U.S. government.

Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, as well as our liquidity position. If we are unable to issue both short- and long-term debt securities at attractive rates and in amounts sufficient to operate our business and meet our obligations, it likely would interfere with the operation of our business and have a material adverse effect on our liquidity, results of operations, financial condition and net worth.

***Our liquidity contingency plans may be difficult or impossible to execute during a liquidity crisis.***

We believe that our liquidity contingency plans may be difficult or impossible to execute during a liquidity crisis. If we cannot access the unsecured debt markets, our ability to repay maturing indebtedness and fund our operations could be significantly impaired. In this event, our alternative sources of liquidity—consisting of our cash and other investments portfolio and the unencumbered mortgage assets in our mortgage portfolio—may not be sufficient to meet our liquidity needs.

We believe that the amount of mortgage-related assets that we could successfully borrow against or sell in the event of a liquidity crisis or significant market disruption is substantially lower than the amount of mortgage-related assets we hold. Due to the large size of our portfolio of mortgage assets, current market conditions and the significant amount of distressed assets in our mortgage portfolio, there likely would be insufficient market demand for large amounts of these assets over a prolonged period of time, which would limit our ability to borrow against or sell these assets.

To the extent that we are able to obtain funding by pledging or selling mortgage-related securities as collateral, we anticipate that a discount would be applied that would reduce the value assigned to those securities. Depending on market conditions at the time, this discount could result in proceeds significantly lower than the current market value of these securities and could thereby reduce the amount of financing we obtain. In addition, our primary source of collateral is Fannie Mae MBS that we own. In the event of a liquidity crisis in which the future of our company is uncertain, counterparties may be unwilling to accept Fannie Mae MBS as collateral. As a result, we may not be able to sell or borrow against these securities in sufficient amounts to meet our liquidity needs.

TREASURY-2099

***A decrease in the credit ratings on our senior unsecured debt could have an adverse effect on our ability to issue debt on reasonable terms and trigger additional collateral requirements, and would likely do so if such a decrease were not based on a similar action on the credit ratings of the U.S. government.***

Credit ratings on our senior unsecured debt, as well as the credit ratings of the U.S. government, are primary factors that could affect our borrowing costs and our access to the debt capital markets. Credit ratings on our debt are subject to revision or withdrawal at any time by the rating agencies. Actions by governmental entities impacting the support we receive from Treasury could adversely affect the credit ratings on our senior unsecured debt.

On August 5, 2011, S&P lowered the long-term sovereign credit rating on the U.S. to "AA+." As a result of this action, and because we directly rely on the U.S. government for capital support, on August 8, 2011, S&P lowered our long-term senior debt rating to "AA+" with a negative outlook. Previously, our long-term senior debt had been rated by S&P as "AAA" and had been on CreditWatch Negative. S&P affirmed our short-term senior debt rating of "A-1+" and removed it from CreditWatch Negative. In assigning a negative outlook on the U.S. government's long-term debt rating, S&P noted that it may lower the U.S. government's long-term debt rating to "AA" within the next two years if it sees less reduction in spending than agreed to or higher interest rates, or if new fiscal pressures during the period result in a higher general government debt trajectory than S&P currently assumes. If S&P further lowers the U.S. government's long-term debt rating, we expect that S&P would lower our long-term debt rating correspondingly.

After the U.S. government's statutory debt limit was raised on August 2, 2011, Fitch affirmed its rating and stable outlook of our long-term debt, and Moody's confirmed the U.S. government's rating and our long-term debt ratings. Moody's also removed the designation that these ratings were under review for possible downgrade. Moody's revised the outlook for both the U.S. government's rating and our long-term debt ratings to negative. In assigning the negative outlook to the U.S. government's rating, Moody's indicated there would be a risk of a downgrade if (1) there is a weakening in fiscal discipline in the coming year; (2) further fiscal consolidation measures are not adopted in 2013; (3) the economic outlook deteriorates significantly; or (4) there is an appreciable rise in the U.S. government's funding costs over and above what is currently expected. As of November 3, 2011, our long-term debt continued to be rated "Aaa" by Moody's and "AAA" by Fitch.

S&P, Moody's and Fitch have all indicated that they would likely lower their ratings on the debt of Fannie Mae and certain other government-related entities if they were to lower their ratings on the U.S. government.

We currently cannot predict whether one or more of these rating agencies will downgrade our debt ratings in the future, nor can we predict the potential impact. Although S&P's downgrade of our credit rating has not increased our borrowing costs or limited our access to the debt capital markets to date, an additional reduction in our credit ratings could have a material adverse impact on our access to debt funding or on the cost of our debt funding, and would likely do so if it were not based on a similar action on the credit ratings of the U.S. government. An additional reduction in our credit ratings may also trigger additional collateral requirements under our derivatives contracts and other borrowing arrangements, reduce our earnings and materially adversely affect our liquidity, our ability to conduct our normal business operations, our financial condition and results of operations. Our credit ratings and ratings outlook are included in "MD&A—Liquidity and Capital Management—Liquidity Management—Credit Ratings."

***Further deterioration in the credit quality of, or defaults by, one or more of our mortgage insurer counterparties could result in nonpayment of claims under mortgage insurance policies, business disruptions and increased concentration risk.***

We rely heavily on mortgage insurers to provide insurance against borrower defaults on single-family conventional mortgage loans with LTV ratios over 80% at the time of acquisition. The already weak financial condition of many of our mortgage insurer counterparties deteriorated at an accelerated pace during the third

quarter of 2011, which increases the significant risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. Since January 1, 2009, the insurer financial strength ratings of all of our major mortgage insurer counterparties have been downgraded multiple times to reflect their weakened financial condition. In 2008, one of our top eight mortgage insurer counterparties, Triad Guaranty Insurance Corporation ("Triad"), ceased issuing commitments for new mortgage insurance, and, under an order received from its regulator, is now paying all valid claims 60% in cash and 40% by the creation of a deferred payment obligation, which may be paid in the future. Since June 30, 2011, two more of our top eight insurer counterparties, PMI Mortgage Insurance Co. ("PMI") and Republic Mortgage Insurance Company ("RMIC") were ordered to or agreed with their regulators to cease issuing commitments for new mortgage insurance. RMIC's parent company has announced that RMIC is in run-off operating mode. RMIC's parent company has also indicated that it is more likely than not that the capital contributed to RMIC by its parent company will "continue on a path toward full depletion in relatively short order." PMI has received an order from its regulator under which the regulator now has full possession, management and control of PMI. The regulator is also seeking to place PMI into receivership. The regulator instituted a partial claim payment plan whereby all valid claims under PMI's mortgage guaranty insurance policies will be paid 50% in cash and 50% deferred as a policyholder claim. RMIC's state regulators could take additional corrective action, which may include the issuance of an order to defer payment of claims and/or placement of the mortgage insurance writing entity into receivership. It is uncertain when, and if, Triad's or PMI's regulator will allow deferred policyholder claims to be paid and/or increase the amount of cash paid on claims.

As of November 7, 2011, four of our mortgage insurers (Triad, RMIC, PMI and Genworth Mortgage Insurance Corporation) have publicly disclosed that they are either in run-off or, absent a waiver, estimate they would not meet state regulatory capital requirements for their main writing entity as of September 30, 2011. An additional two of our mortgage insurers (Mortgage Guaranty Insurance Corporation and Radian Guaranty, Inc.) have disclosed that, in the absence of additional capital contributions to their writing entity, their capital might fall below state regulatory capital requirements in the future. These six mortgage insurers provided a combined $75.7 billion, or 82%, of our risk in force mortgage insurance coverage of our single-family guaranty book of business as of September 30, 2011. If mortgage insurers are not able to raise capital and they exceed their risk-to-capital limits, they will likely be forced into run-off or receivership unless they can secure and maintain a waiver from their state regulator. This would increase the risk that they will fail to pay our claims under insurance policies, and could also cause the quality and speed of their claims processing to deteriorate. We are unable to determine how long certain of our mortgage insurer counterparties will remain below their state-imposed risk-to-capital limits.

Some mortgage insurers have been exploring corporate restructurings, intended to provide relief from risk-to-capital limits in certain states. A restructuring plan that would involve contributing capital to a subsidiary would result in less liquidity available to its parent company to pay claims on its existing book of business and an increased risk that its parent company will not pay its claims in full in the future.

If our assessment of one or more of our mortgage insurer counterparty's ability to fulfill its obligations to us worsens and our internal credit rating for the insurer is further downgraded, it could result in a significant increase in our loss reserves and increase our credit losses.

Many mortgage insurers stopped insuring new mortgages with higher loan-to-value ratios or with lower borrower credit scores or on select property types, which has contributed to the reduction in our business volumes for high loan-to-value ratio loans. As our charter generally requires us to obtain credit enhancement on single-family conventional mortgage loans with loan-to-value ratios over 80% at the time of purchase, an inability to find suitable credit enhancement may inhibit our ability to pursue new business opportunities, meet our housing goals and otherwise support the housing and mortgage markets. For example, where mortgage insurance or other credit enhancement is not available, we may be hindered in our ability to refinance loans into more affordable loans. In addition, access to fewer mortgage insurer counterparties will increase our concentration risk with the remaining mortgage insurers in the industry.

TREASURY-2101

*Changes in the foreclosure environment and our reliance on servicers and their counsel and other service providers to complete foreclosures could continue to have a material adverse effect on our business, results of operations, financial condition and net worth.*

Circumstances in the foreclosure environment over the last few years have resulted in foreclosures proceeding at a slow pace. As a result of the housing market downturn that began in 2006 and significantly worsened in 2008, the volume of foreclosures to be processed by servicers and states significantly increased in 2009 and the first nine months of 2010. In October 2010, a number of single-family mortgage servicers temporarily halted some or all of the foreclosures they were processing after discovering deficiencies in their and their service providers' foreclosure processes. Although servicers have generally ended their outright foreclosure halts, the processing of foreclosures continues to be slow in many states due to continuing issues in the servicer foreclosure process, including efforts by servicers to comply with regulatory consent orders, recent changes in state foreclosure laws, court rules and proceedings, and the pipeline of foreclosures resulting from these delays and the elevated level of foreclosures caused by the housing market downturn. In addition, court budget cuts in Florida and other states could further delay the processing of foreclosures.

These changes in the foreclosure environment have negatively affected our foreclosure timelines, credit-related expenses and single-family serious delinquency rates, and we expect they will continue to do so. We believe these changes also will delay the recovery of the housing market. These changes could also negatively affect the value of the private-label securities we hold and result in additional impairments on these securities. In addition, the failure of our servicers or their service providers to apply prudent and effective process controls and to comply with legal and other requirements in the foreclosure process poses operational, reputational and legal risks for us. The servicer foreclosure process deficiencies have generated significant concern and are currently being reviewed by various government agencies and the various state attorneys general, which could lead to additional new laws, regulation, rules or agreements that negatively affect our ability to foreclose expeditiously or increase our costs.

In addition, FHFA directed us in October 2011 to phase out the practice of requiring mortgage servicers to use our network of retained attorneys to perform default- and foreclosure-related legal services for our loans. Phasing out the requirement that servicers use our retained attorney network may negatively impact the performance of default- and foreclosure-related legal services for our loans, which may adversely impact our efforts to reduce our credit losses.

*Challenges to the MERS® company, system and processes could pose operational, reputational and legal risks for us.*

MERSCORP, Inc. ("MERSCORP") is a privately held company that maintains an electronic registry (the "MERS System") that tracks servicing rights and ownership of loans in the United States. Mortgage Electronic Registration Systems, Inc. ("MERS"), a wholly owned subsidiary of MERSCORP, Inc., can serve as a nominee for the owner of a mortgage loan and, in that role, become the mortgagee of record for the loan in local land records. Fannie Mae seller/servicers may choose to use MERS as a nominee; however, we have prohibited servicers from initiating foreclosures on Fannie Mae loans in MERS's name. Approximately half of the loans we own or guarantee are registered in MERS's name and the related servicing rights are tracked in the MERS System. The MERS System is widely used by participants in the mortgage finance industry. Along with a number of other organizations in the mortgage finance industry, we are a shareholder of MERSCORP.

Several legal challenges have been made disputing MERS 's ability to initiate foreclosures, act as nominee in local land records, and/or assign mortgages or take other action on behalf of the loan owner. These challenges seek judicial relief ranging from money damages to injunctive/declaratory relief seeking the prevention of mortgage assignments by MERS and/or the voiding of completed foreclosures in which MERS appeared in the chain of title. These challenges have focused public attention on MERS and on how loans are recorded in local land records. As a result, these challenges could negatively affect MERS's ability to serve as the mortgagee of record in some jurisdictions, which could cause additional costs and time in the recordation

TREASURY-2102

process. These challenges also could result in court decisions that substantially delay new or pending foreclosures, or void completed foreclosures in certain jurisdictions, which would require that we re-foreclose on the affected properties, thereby increasing our costs and lengthening the time it takes for us to foreclose on and dispose of the properties.

In addition, where MERS is the mortgagee of record, it must execute assignments of mortgages, affidavits and other legal documents in connection with foreclosure proceedings. As a result, investigations by governmental authorities and others into the servicer foreclosure process deficiencies discussed above may impact MERS. On April 13, 2011, federal banking regulators and FHFA announced that they were taking enforcement action against MERS and MERSCORP to address significant weaknesses in, among other things, oversight, management supervision and corporate governance at MERS and MERSCORP that were uncovered as part of the regulators' review of mortgage servicers' foreclosure processing. Failures by MERS or MERSCORP to apply prudent and effective process controls and to comply with legal and other requirements could pose counterparty, operational, reputational and legal risks for us. If investigations or new regulation or legislation restricts servicers' use of MERS, our counterparties may be required to record all mortgage transfers in land records, incurring additional costs and time in the recordation process. At this time, we cannot predict the ultimate outcome of these legal challenges to, or the enforcement action against, MERS and MERSCORP or the impact on our business, results of operations and financial condition.

***A failure in our operational systems or infrastructure, or those of third parties, could materially adversely affect our business, impair our liquidity, cause financial losses and harm our reputation.***

Shortcomings or failures in our internal processes, people or systems could have a material adverse effect on our risk management, liquidity, financial statement reliability, financial condition and results of operations; disrupt our business; and result in legislative or regulatory intervention, liability to customers, financial losses and damage to our reputation. For example, our business is highly dependent on our ability to manage and process, on a daily basis, an extremely large number of transactions, many of which are highly complex, across numerous and diverse markets and in an environment in which we must make frequent changes to our core processes in response to changing external conditions. These transactions are subject to various legal, accounting and regulatory standards. Our financial, accounting, data processing or other operating systems and facilities may fail to operate properly or become disabled, adversely affecting our ability to process these transactions. In addition, we rely on information provided by third parties in processing many of our transactions, and that information may be incorrect or we may fail to properly manage or analyze it.

We rely upon business processes that are highly dependent on people, legacy technology and the use of numerous complex systems and models to manage our business and produce books and records upon which our financial statements are prepared. This reliance increases the risk that we may be exposed to financial, reputational or other losses as a result of inadequately designed internal processes or systems, or failed execution of our systems. While we continue to enhance our technology, operational controls and organizational structure in order to reduce our operational risk, these actions may not be effective to manage these risks and may create additional operational risk as we execute these enhancements. In addition, as our use of third-party service providers for some of our business functions increases, we increasingly face the risk of an operational failure with respect to these third parties.

We also face the risk of operational failure, termination or capacity constraints of any of the clearing agents, exchanges, clearinghouses or other financial intermediaries we use to facilitate our securities and derivatives transactions. Any such failure, termination or constraint could adversely affect our ability to effect transactions or manage our exposure to risk, and could have a significant adverse impact on our business, liquidity, financial condition, net worth and results of operations.

Our operations rely on the secure processing, storage and transmission of confidential and other information in our computer systems and networks. Our computer systems, software and networks may be vulnerable to breaches, unauthorized access, misuse, computer viruses or other malicious code and other events that could

187

have a security impact. If one or more of such events occur, this potentially could jeopardize our or our customers' or counterparties' confidential and other information processed and stored in, and transmitted through, our computer systems and networks, or otherwise cause interruptions or malfunctions in our, our customers', our counterparties' or third parties' operations, which could result in significant losses, reputational damage, litigation, regulatory fines or penalties, or adversely affect our business, financial condition or results of operations. In addition, we may be required to expend significant additional resources to modify our protective measures or to investigate and remediate vulnerabilities or other exposures arising from operational and security risks.

In addition, we have experienced, and expect we may continue to experience, substantial changes in management, employees and our business structure and practices since the conservatorship began. These changes could increase our operational risk and result in business interruptions and financial losses. In addition, due to events that are wholly or partially beyond our control, our systems could fail to operate properly, which could lead to financial losses, business disruptions, legal and regulatory sanctions and reputational damage.

## Item 2.   Unregistered Sales of Equity Securities and Use of Proceeds

### Recent Sales of Unregistered Securities

Under the terms of our senior preferred stock purchase agreement with Treasury, we are prohibited from selling or issuing our equity interests, other than as required by (and pursuant to) the terms of a binding agreement in effect on September 7, 2008, without the prior written consent of Treasury.

We previously provided stock compensation to employees and members of the Board of Directors under the Fannie Mae Stock Compensation Plan of 1993 and the Fannie Mae Stock Compensation Plan of 2003 (the "Plans"). During the quarter ended September 30, 2011, 583 restricted stock units vested, as a result of which 403 shares of common stock were issued, and 180 shares of common stock that otherwise would have been issued were withheld by us in lieu of requiring the recipients to pay us the withholding taxes due upon vesting. All of these restricted stock units were granted prior to our entering into conservatorship. Restricted stock units granted under the Plans typically vest in equal annual installments over three or four years beginning on the first anniversary of the date of grant. Each restricted stock unit represents the right to receive a share of common stock at the time of vesting. As a result, restricted stock units are generally similar to restricted stock, except that restricted stock units do not confer voting rights on their holders. All restricted stock units were granted to persons who were employees or members of the Board of Directors of Fannie Mae.

The securities we issue are "exempted securities" under laws administered by the SEC to the same extent as securities that are obligations of, or are guaranteed as to principal and interest by, the United States, except that, under the GSE Act, our equity securities are not treated as exempted securities for purposes of Section 12, 13, 14 or 16 of the Exchange Act. As a result, our securities offerings are exempt from SEC registration requirements and we do not file registration statements or prospectuses with the SEC under the Securities Act of 1933 with respect to our securities offerings.

### Information about Certain Securities Issuances by Fannie Mae

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

TREASURY-2104

To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars or prospectuses (or supplements thereto) that we post on our Web site or in a current report on Form 8-K, in accordance with a "no-action" letter we received from the SEC staff in 2004. In cases where the information is disclosed in a prospectus or offering circular posted on our Web site, the document will be posted on our Web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The Web site address for disclosure about our debt securities is www.fanniemae.com/debtsearch. From this address, investors can access the offering circular and related supplements for debt securities offerings under Fannie Mae's universal debt facility, including pricing supplements for individual issuances of debt securities.

Disclosure about our obligations pursuant to some of the MBS we issue, some of which may be off-balance sheet obligations, can be found at www.fanniemae.com/mbsdisclosure. From this address, investors can access information and documents about our MBS, including prospectuses and related prospectus supplements.

We are providing our Web site address solely for your information. Information appearing on our Web site is not incorporated into this report.

## Our Purchases of Equity Securities

The following table shows shares of our common stock we repurchased during the third quarter of 2011.

| Period | Total Number of Shares Purchased[1] | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program[2] | Maximum Number of Shares that May Yet be Purchased Under the Program[2] |
|---|---|---|---|---|
| | | | (Shares in thousands) | |
| **2011** | | | | |
| July 1-31 . . . . . . . . . . . . . . . . . . . . . . . . | 2 | $0.34 | — | — |
| August 1-31 . . . . . . . . . . . . . . . . . . . . . . | — | 0.27 | — | — |
| September 1-30 . . . . . . . . . . . . . . . . . . . . | — | 0.27 | — | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | | | |

[1] Consists of shares of common stock reacquired from employees to pay an aggregate of $576 in withholding taxes due upon the vesting of previously issued restricted stock.

[2] We do not have any publicly announced share repurchase programs under which we could purchase our common stock.

## Dividend Restrictions

Our payment of dividends is subject to the following restrictions:

*Restrictions Relating to Conservatorship.*   Our conservator announced on September 7, 2008 that we would not pay any dividends on the common stock or on any series of preferred stock, other than the senior preferred stock. In addition, FHFA's regulations relating to conservatorship and receivership operations, which became effective July 20, 2011, prohibit us from paying any dividends while in conservatorship unless authorized by the Director of FHFA. The Acting Director of FHFA directs us to make dividend payments on the senior preferred stock on a quarterly basis.

*Restrictions under Senior Preferred Stock Purchase Agreement.*   The senior preferred stock purchase agreement prohibits us from declaring or paying any dividends on Fannie Mae equity securities (other than the senior preferred stock) without the prior written consent of Treasury.

189

*Statutory Restrictions.*   Under the GSE Act, FHFA has authority to prohibit capital distributions, including payment of dividends, if we fail to meet our capital requirements. If FHFA classifies us as significantly undercapitalized, approval of the Director of FHFA is required for any dividend payment. Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized, except the Director of FHFA may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition.

*Restrictions Relating to Qualifying Subordinated Debt.*   During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock.

*Restrictions Relating to Preferred Stock.*   Payment of dividends on our common stock is also subject to the prior payment of dividends on our preferred stock and our senior preferred stock. Payment of dividends on all outstanding preferred stock, other than the senior preferred stock, is also subject to the prior payment of dividends on the senior preferred stock.

## Item 3.   Defaults Upon Senior Securities

None.

## Item 4.   [Removed and reserved]

## Item 5.   Other Information

On November 4, 2011, Gregory A. Fink, Senior Vice President and Controller of Fannie Mae, was appointed as the company's principal accounting officer, effective on that date. As of that date, David C. Hisey no longer serves as the company's principal accounting officer. Mr. Hisey continues to serve as the company's Executive Vice President and Deputy Chief Financial Officer.

Gregory A. Fink, 44, has been Senior Vice President—Finance of Fannie Mae since April 2009, as well as the company's Controller since September 2010. Mr. Fink previously served as Vice President—Financial Reporting from October 2006 to April 2009. Mr. Fink joined Fannie Mae in March 2006 as Vice President—Accounting Policy.

## Item 6.   Exhibits

An index to exhibits has been filed as part of this report beginning on page E-1 and is incorporated herein by reference.

190

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Federal National Mortgage Association

By: /s/  Michael J. Williams
    Michael J. Williams
    President and Chief Executive Officer

Date: November 8, 2011

By: /s/  Susan R. McFarland
    Susan R. McFarland
    Executive Vice President and
    Chief Financial Officer

Date: November 8, 2011

191

### INDEX TO EXHIBITS

| <u>Item</u> | <u>Description</u> |
|---|---|
| 3.1 | Fannie Mae Charter Act (12 U.S.C. § 1716 et seq.) as amended through July 30, 2008 (Incorporated by reference to Exhibit 3.1 to Fannie Mae's Annual Report on Form 10-K, filed February 24, 2011.) |
| 3.2 | Fannie Mae Bylaws, as amended through January 30, 2009 (Incorporated by reference to Exhibit 3.2 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.) |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101. INS | XBRL Instance Document* |
| 101. SCH | XBRL Taxonomy Extension Schema* |
| 101. CAL | XBRL Taxonomy Extension Calculation* |
| 101. LAB | XBRL Taxonomy Extension Labels* |
| 101. PRE | XBRL Taxonomy Extension Presentation* |
| 101. DEF | XBRL Taxonomy Extension Definition* |

* The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Fannie Mae, except to the extent, if any, expressly set forth by specific reference in such filing.

E-1

Exhibit 31.1

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Michael J. Williams, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended September 30, 2011 of Fannie Mae (formally, the Federal National Mortgage Association);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   Michael J. Williams
Michael J. Williams
President and Chief Executive Officer

Date: November 8, 2011

Exhibit 31.2

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Susan R. McFarland, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended September 30, 2011 of Fannie Mae (formally, the Federal National Mortgage Association);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   Susan R. McFarland
_____

Susan R. McFarland
Executive Vice President and
Chief Financial Officer

Date: November 8, 2011

**Exhibit 32.1**

**CERTIFICATION**

In connection with the Quarterly Report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association) for the quarter ended September 30, 2011, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael J. Williams, President and Chief Executive Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350 that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.


/s/  Michael J. Williams

Michael J. Williams
President and Chief Executive Officer

Date: November 8, 2011

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.

**Exhibit 32.2**

## CERTIFICATION

In connection with the Quarterly Report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association) for the quarter ended September 30, 2011, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Susan R. McFarland, Executive Vice President and Chief Financial Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.


/s/  Susan R. McFarland
Susan R. McFarland
Executive Vice President and
Chief Financial Officer

Date: November 8, 2011

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.



**FR008**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-Q

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

For the quarterly period ended September 30, 2011

or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

For the transition period from            to

Commission File Number: 001-34139

# Federal Home Loan Mortgage Corporation

*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| | |
|---|---|
| **Federally chartered corporation** | **52-0904874** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **8200 Jones Branch Drive, McLean, Virginia** | **22102-3110** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(703) 903-2000**

*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.  ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                                                                    Accelerated filer ☒

Non-accelerated filer (Do not check if a smaller reporting company) ☐                        Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  ☐ Yes  ☒ No

As of October 21, 2011, there were 649,722,580 shares of the registrant's common stock outstanding.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2114                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| **PART I — FINANCIAL INFORMATION** | | |
| Item 1. | Financial Statements | 103 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 1 |
| | Executive Summary | 1 |
| | Selected Financial Data | 13 |
| | Consolidated Results of Operations | 14 |
| | Consolidated Balance Sheets Analysis | 33 |
| | Risk Management | 49 |
| | Liquidity and Capital Resources | 83 |
| | Fair Value Measurements and Analysis | 89 |
| | Off-Balance Sheet Arrangements | 91 |
| | Critical Accounting Policies and Estimates | 92 |
| | Forward-Looking Statements | 92 |
| | Risk Management and Disclosure Commitments | 94 |
| | Legislative and Regulatory Matters | 95 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 99 |
| Item 4. | Controls and Procedures | 100 |
| **PART II — OTHER INFORMATION** | | |
| Item 1. | Legal Proceedings | 192 |
| Item 1A. | Risk Factors | 192 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 195 |
| Item 6. | Exhibits | 195 |
| **SIGNATURES** | | 196 |
| **GLOSSARY** | | 197 |
| **EXHIBIT INDEX** | | E-1 |

i                                                                                     *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| — | Selected Financial Data | 13 |
| 1 | Total Single-Family Loan Workout Volumes | 2 |
| 2 | Single-Family Credit Guarantee Portfolio Data by Year of Origination | 5 |
| 3 | Credit Statistics, Single-Family Credit Guarantee Portfolio | 6 |
| 4 | Mortgage-Related Investments Portfolio | 11 |
| 5 | Summary Consolidated Statements of Income and Comprehensive Income | 14 |
| 6 | Net Interest Income/Yield and Average Balance Analysis | 15 |
| 7 | Derivative Gains (Losses) | 19 |
| 8 | Other Income | 20 |
| 9 | Non-Interest Expense | 21 |
| 10 | REO Operations Expense, REO Inventory, and REO Dispositions | 21 |
| 11 | Composition of Segment Mortgage Portfolios and Credit Risk Portfolios | 24 |
| 12 | Segment Earnings and Key Metrics — Investments | 25 |
| 13 | Segment Earnings and Key Metrics — Single-Family Guarantee | 27 |
| 14 | Segment Earnings Composition — Single-Family Guarantee Segment | 29 |
| 15 | Segment Earnings and Key Metrics — Multifamily | 31 |
| 16 | Investments in Securities | 34 |
| 17 | Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets | 35 |
| 18 | Total Mortgage-Related Securities Purchase Activity | 36 |
| 19 | Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics | 37 |
| 20 | Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans | 38 |
| 21 | Net Impairment on Available-For-Sale Mortgage-Related Securities Recognized in Earnings | 39 |
| 22 | Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS | 41 |
| 23 | Mortgage Loan Purchase and Other Guarantee Commitment Activity | 43 |
| 24 | Derivative Fair Values and Maturities | 44 |
| 25 | Changes in Derivative Fair Values | 45 |
| 26 | Freddie Mac Mortgage-Related Securities | 47 |
| 27 | Issuances and Extinguishments of Debt Securities of Consolidated Trusts | 48 |
| 28 | Changes in Total Equity (Deficit) | 48 |
| 29 | Mortgage Insurance by Counterparty | 54 |
| 30 | Bond Insurance by Counterparty | 55 |
| 31 | Derivative Counterparty Credit Exposure | 57 |
| 32 | Characteristics of the Single-Family Credit Guarantee Portfolio | 60 |
| 33 | Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio | 63 |
| 34 | Single-Family Home Affordable Modification Program Volume | 65 |
| 35 | Single-Family Refinance Loan Volume | 66 |
| 36 | Single-Family Loan Workouts, Serious Delinquency, and Foreclosure Volumes | 68 |
| 37 | Reperformance Rates of Modified Single-Family Loans | 69 |
| 38 | Single-Family Serious Delinquency Rates | 71 |
| 39 | Credit Concentrations in the Single-Family Credit Guarantee Portfolio | 71 |
| 40 | Single-Family Credit Guarantee Portfolio by Attribute Combinations | 73 |
| 41 | Single-Family Credit Guarantee Portfolio by Year of Loan Origination | 75 |
| 42 | Multifamily Mortgage Portfolio — by Attribute | 76 |
| 43 | Non-Performing Assets | 78 |
| 44 | REO Activity by Region | 79 |
| 45 | Credit Loss Performance | 81 |
| 46 | Single-Family Credit Loss Sensitivity | 82 |
| 47 | Other Debt Security Issuances by Product, at Par Value | 86 |
| 48 | Other Debt Security Repurchases, Calls, and Exchanges | 86 |
| 49 | Freddie Mac Credit Ratings | 87 |
| 50 | Summary of Assets and Liabilities at Fair Value on a Recurring Basis | 89 |
| 51 | Summary of Change in the Fair Value of Net Assets | 91 |
| 52 | PMVS Results | 100 |
| 53 | Derivative Impact on PMVS-L (50 bps) | 100 |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011    TREASURY-2116    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Freddie Mac Consolidated Statements of Income and Comprehensive Income | 104 |
| Freddie Mac Consolidated Balance Sheets | 105 |
| Freddie Mac Consolidated Statements of Equity (Deficit) | 106 |
| Freddie Mac Consolidated Statements of Cash Flows | 107 |
| Note 1: Summary of Significant Accounting Policies | 108 |
| Note 2: Conservatorship and Related Matters | 110 |
| Note 3: Variable Interest Entities | 113 |
| Note 4: Mortgage Loans and Loan Loss Reserves | 119 |
| Note 5: Individually Impaired and Non-Performing Loans | 123 |
| Note 6: Real Estate Owned | 130 |
| Note 7: Investments in Securities | 132 |
| Note 8: Debt Securities and Subordinated Borrowings | 140 |
| Note 9: Financial Guarantees | 142 |
| Note 10: Retained Interests in Mortgage-Related Securitizations | 144 |
| Note 11: Derivatives | 145 |
| Note 12: Freddie Mac Stockholders' Equity (Deficit) | 150 |
| Note 13: Income Taxes | 151 |
| Note 14: Employee Benefits | 152 |
| Note 15: Segment Reporting | 152 |
| Note 16: Regulatory Capital | 159 |
| Note 17: Concentration of Credit and Other Risks | 160 |
| Note 18: Fair Value Disclosures | 167 |
| Note 19: Legal Contingencies | 185 |
| Note 20: Earnings (Loss) Per Share | 190 |
| Note 21: Selected Financial Statement Line Items | 191 |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## PART I — FINANCIAL INFORMATION

*We continue to operate under the conservatorship that commenced on September 6, 2008, under the direction of FHFA as our Conservator. The Conservator succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any shareholder, officer or director thereof, with respect to the company and its assets. The Conservator has delegated certain authority to our Board of Directors to oversee, and management to conduct, day-to-day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator. See "BUSINESS — Conservatorship and Related Matters" in our Annual Report on Form 10-K for the year ended December 31, 2010, or 2010 Annual Report, for information on the terms of the conservatorship, the powers of the Conservator, and related matters, including the terms of our Purchase Agreement with Treasury.*

*This Quarterly Report on Form 10-Q includes forward-looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward-looking statements are made as of the date of this Form 10-Q and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Form 10-Q. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in: (a) "MD&A — FORWARD-LOOKING STATEMENTS," and "RISK FACTORS" in this Form 10-Q and in the comparably captioned sections of our 2010 Annual Report and our Quarterly Reports on Form 10-Q for the first and second quarters of 2011; and (b) the "BUSINESS" section of our 2010 Annual Report.*

*Throughout this Form 10-Q, we use certain acronyms and terms which are defined in the Glossary.*

### ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this MD&A in conjunction with our consolidated financial statements and related notes for the three and nine months ended September 30, 2011 included in "FINANCIAL STATEMENTS," and our 2010 Annual Report.*

## EXECUTIVE SUMMARY

### Overview

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments. During the worst housing and financial crisis since the Great Depression, we are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures. We believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure.

### *Summary of Financial Results*

Our financial performance in the third quarter of 2011 was impacted by the ongoing weakness in the economy, including in the mortgage market, and by a significant reduction in long-term interest rates and changes in OAS levels during the quarter. Our total comprehensive income (loss) was $(4.4) billion and $1.4 billion for the third quarters of 2011 and 2010, respectively, consisting of: (a) $(4.4) billion and $(2.5) billion of net income (loss), respectively; and (b) $46 million and $3.9 billion of total other comprehensive income, respectively.

Our total equity (deficit) was $(6.0) billion at September 30, 2011 and includes our total comprehensive income (loss) of $(4.4) billion for the third quarter of 2011 and our dividend payment of $1.6 billion on our senior preferred stock on September 30, 2011. To address our deficit in net worth, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement for $6.0 billion. Following receipt of the draw, the aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $72.2 billion.

### Our Primary Business Objectives

Under conservatorship, we are focused on: (a) meeting the needs of the U.S. residential mortgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in the MHA Program initiatives, including HAMP and HARP, and through our non-HAMP workout and refinancing initiatives; (c) minimizing our credit losses; (d) maintaining the credit quality of the loans we purchase and guarantee; and (e) strengthening our infrastructure and improving overall efficiency. Our business objectives

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-2118

Table of Contents

reflect, in part, direction we have received from the Conservator. We also have a variety of different, and potentially competing, objectives based on our charter, public statements from Treasury and FHFA officials, and other guidance and directives from our Conservator. For more information, see "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business*" in our 2010 Annual Report.

### Providing Mortgage Liquidity and Conforming Loan Availability

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- Our support enables borrowers to have access to a variety of conforming mortgage products, including the prepayable 30-year fixed-rate mortgage, which historically has represented the foundation of the mortgage market.

- Our support provides lenders with a constant source of liquidity. We estimate that we, Fannie Mae, and Ginnie Mae collectively guaranteed more than 90% of the single-family conforming mortgages originated during the third quarter of 2011.

- Our consistent market presence provides assurance to our customers that there will be a buyer for their conforming loans that meet our credit standards. We believe this provides our customers with confidence to continue lending in difficult environments.

- We are an important counter-cyclical influence as we stay in the market even when other sources of capital have pulled out, as evidenced by the events of the last three years.

During the three and nine months ended September 30, 2011, we guaranteed $68.2 billion and $226.1 billion in UPB of single-family conforming mortgage loans, respectively, representing more than 312,000 and 1,022,000 borrowers, respectively, who purchased homes or refinanced their mortgages.

Borrowers typically pay a lower interest rate on loans acquired or guaranteed by Freddie Mac, Fannie Mae, or Ginnie Mae. Mortgage originators are generally able to offer homebuyers and homeowners lower mortgage rates on conforming loan products, including ours, in part because of the value investors place on GSE-guaranteed mortgage-related securities. Prior to 2007, mortgage markets were less volatile, home values were stable or rising, and there were many sources of mortgage funds. We estimate that prior to 2007 the average effective interest rates on conforming, fixed-rate single-family mortgage loans were about 30 basis points lower than on non-conforming loans. Since 2007, we estimate that , at times, interest rates on conforming, fixed-rate loans, excluding conforming jumbo loans, have been lower than those on non-conforming loans by as much as 184 basis points. In September 2011, we estimate that borrowers were paying an average of 53 basis points less on these conforming loans than on non-conforming loans. These estimates are based on data provided by HSH Associates, a third-party provider of mortgage market data.

### Reducing Foreclosures and Keeping Families in Homes

We are focused on reducing the number of foreclosures and helping to keep families in their homes. In addition to our participation in HAMP, we introduced several new initiatives during the last few years to help eligible borrowers keep their homes or avoid foreclosure, including our relief refinance mortgage initiative (which is our implementation of HARP). Since the beginning of 2011, we have helped more than 164,000 borrowers either stay in their homes or sell their properties and avoid foreclosure through HAMP and our various other workout initiatives. Table 1 presents our recent single-family loan workout activities.

### Table 1 — Total Single-Family Loan Workout Volumes[1]

| | For the Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | 09/30/2011 | 06/30/2011 | 03/31/2011 | 12/31/2010 | 09/30/2010 |
| | | | (number of loans) | | |
| Loan modifications | 23,919 | 31,049 | 35,158 | 37,203 | 39,284 |
| Repayment plans | 8,333 | 7,981 | 9,099 | 7,964 | 7,030 |
| Forbearance agreements[2] | 4,262 | 3,709 | 7,678 | 5,945 | 6,976 |
| Short sales and deed-in-lieu transactions | 11,744 | 11,038 | 10,706 | 12,097 | 10,472 |
| Total single-family loan workouts | 48,258 | 53,777 | 62,641 | 63,209 | 63,762 |

(1) Based on actions completed with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment, and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent, or effective, such as loans in the trial period under HAMP. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period.

(2) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2119          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We continue to execute a high volume of loan workouts. Highlights of these efforts include the following:

- We completed 48,258 single-family loan workouts during the third quarter of 2011, including 23,919 loan modifications and 11,744 short sales and deed-in-lieu transactions.

- Based on information provided by the MHA Program administrator, our servicers had completed 143,739 loan modifications under HAMP from the introduction of the initiative in 2009 through September 30, 2011 and, as of September 30, 2011, 13,785 loans were in HAMP trial periods (this figure only includes borrowers who made at least their first payment under the trial period).

We continue to directly assist troubled borrowers through targeted outreach and other efforts. In addition, on April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie Mae. This servicing alignment initiative will result in consistent processes for both HAMP and non-HAMP loan modifications. We implemented most aspects of this initiative effective October 1, 2011. As part of this initiative, we introduced a new non-HAMP standard loan modification process in the fourth quarter of 2011 that requires borrowers to complete a three month trial period and permits forbearance (but not forgiveness) of principal. This new standard modification will replace our existing non-HAMP modification initiative. We believe that the servicing alignment initiative, which will establish a uniform framework and requirements for servicing non-performing loans owned or guaranteed by us and Fannie Mae, will ultimately change the way servicers communicate and work with troubled borrowers, bring greater consistency and accountability to the servicing industry, and help more distressed homeowners avoid foreclosure. For information on changes to mortgage servicing and foreclosure practices that could adversely affect our business, see "LEGISLATIVE AND REGULATORY MATTERS —Developments Concerning Single-Family Servicing Practices."

On October 24, 2011 FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers who can benefit from refinancing their home mortgage. The Acting Director of FHFA stated that the goal of pursuing these changes is to create refinancing opportunities for more borrowers whose mortgage is owned or guaranteed by the GSEs while reducing risk for the GSEs and bringing a measure of stability to housing markets. The revisions to HARP enable us to expand the assistance we provide to homeowners by making their mortgage payments more affordable through one or more of the following ways: (a) a reduction in payment; (b) a reduction in rate; (c) movement to a more stable mortgage product type (*i.e.*, from an adjustable-rate mortgage to a fixed-rate mortgage); or (d) a reduction in amortization term.

For more information about HAMP, other loan workout programs, our HARP and relief refinance mortgage initiative, and other initiatives to help eligible borrowers keep their homes or avoid foreclosure, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — MHA Program" and "— Single-Family Loan Workouts*."

### Minimizing Credit Losses

We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure.

To help minimize the credit losses related to our guarantee activities, we are focused on:

- pursuing a variety of loan workouts, including foreclosure alternatives, in an effort to reduce the severity of losses we experience over time;

- managing foreclosure timelines to the extent possible, given the increasingly lengthy foreclosure process in many states;

- managing our inventory of foreclosed properties to reduce costs and maximize proceeds; and

- pursuing contractual remedies against originators, lenders, servicers, and insurers, as appropriate.

We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans that have been originated under specified underwriting standards. If we subsequently discover that contractual standards were not followed, we can exercise certain contractual remedies to mitigate our credit losses. These contractual remedies include requiring the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan. The amount we expect to collect on the outstanding requests is significantly less than the UPB amount primarily because many of these requests will likely be satisfied by the seller/servicers reimbursement to us for realized credit losses. These requests also may be rescinded in the course of the contractual appeals process. As of

3

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2120

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

September 30, 2011, the UPB of loans subject to repurchase requests issued to our single-family seller/servicers was approximately $2.7 billion, and approximately 40% of these requests were outstanding for more than four months since issuance of our initial repurchase request.

Our credit loss exposure is also partially mitigated by mortgage insurance, which is a form of credit enhancement. Primary mortgage insurance is required to be purchased, typically at the borrower's expense, for certain mortgages with higher LTV ratios. As of September 30, 2011, we had mortgage insurance coverage on loans that represent approximately 13% of the UPB of our single-family credit guarantee portfolio. We received payments under primary and other mortgage insurance of $0.7 billion and $2.0 billion in the three and nine months ended September 30, 2011, respectively, which helped to mitigate our credit losses. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Table 4.5 — Recourse and Other Forms of Credit Protection" for more detail. The financial condition of certain of our mortgage insurers continued to deteriorate in the third quarter of 2011. In August 2011, we suspended Republic Mortgage Insurance Company, or RMIC, and PMI Mortgage Insurance Co., or PMI, and their respective affiliates as approved mortgage insurers for our loans. PMI has been put under state supervision, and PMI's state regulator has petitioned for judicial action to place PMI into receivership. Triad Guaranty Insurance Corp., or Triad, has been operating under regulatory supervision since 2009. In addition to Triad, RMIC, and PMI, we believe that certain mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as they emerge. Our loan loss reserves reflect our estimates of expected insurance recoveries. As of September 30, 2011, only six insurance companies remained as eligible insurers for Freddie Mac loans, which makes it likely that, in the future, our mortgage insurance exposure will be concentrated among a smaller number of counterparties.

See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for further information on our agreements with our seller/servicers and our exposure to mortgage insurers.

### Maintaining the Credit Quality of New Loan Purchases and Guarantees

We continue to focus on maintaining credit policies, including our underwriting guidelines, that allow us to purchase and guarantee loans made to qualified borrowers that we believe will provide management and guarantee fee income, over the long-term, that exceeds our expected credit-related and administrative expenses on such loans.

As of September 30, 2011 and December 31, 2010, approximately 50% and 39%, respectively, of our single-family credit guarantee portfolio consisted of mortgage loans originated after 2008. Loans in our single-family credit guarantee portfolio originated after 2008 have experienced lower serious delinquency trends in the early years of their terms than loans originated in 2005 through 2008.

The credit quality of the single-family loans we acquired in the nine months ended September 30, 2011 (excluding relief refinance mortgages, which represented approximately 26% of our single family purchase volume during the nine months ended September 30, 2011) is significantly better than that of loans we acquired from 2005 through 2008, as measured by early delinquency rate trends, original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. The improvement in credit quality of loans we have purchased since 2008 is primarily the result of the combination of: (a) changes in our credit policies, including changes in our underwriting guidelines; (b) fewer purchases of loans with higher risk characteristics; and (c) changes in mortgage insurers' and lenders' underwriting practices.

Approximately 91% of our single-family purchase volume in the nine months ended September 30, 2011 consisted of fixed-rate amortizing mortgages. Approximately 67% and 75% of our single-family purchase volumes in the three and nine months ended September 30, 2011, respectively, were refinance mortgages, including approximately 22% and 26%, respectively, that were relief refinance mortgages, based on UPB. Relief refinance mortgages with LTV ratios above 80% may not perform as well as refinance mortgages with LTV ratios of 80% and below over time due, in part, to the continued high LTV ratios of these loans. Approximately 11% and 13% of our single-family purchase volume in the three and nine months ended September 30, 2011, respectively, was relief refinance mortgages with LTV ratios above 80%. Relief refinance mortgages comprised approximately 10% and 7% of the UPB in our total single-family credit guarantee portfolio at September 30, 2011 and December 31, 2010, respectively.

<div style="text-align:center">4</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 2 presents the composition, loan characteristics, and serious delinquency rates of loans in our single-family credit guarantee portfolio, by year of origination at September 30, 2011.

### Table 2 — Single-Family Credit Guarantee Portfolio Data by Year of Origination[1]

| | | At September 30, 2011 | | | | |
|---|---|---|---|---|---|---|
| Year of Origination | % of Portfolio | Average Credit Score[2] | Original LTV Ratio | Current LTV Ratio[3] | Current LTV Ratio >100%[3][4] | Serious Delinquency Rate[5] |
| 2011 | 10% | 752 | 71% | 70% | 5% | 0.03% |
| 2010 | 20 | 755 | 70 | 70 | 5 | 0.17 |
| 2009 | 20 | 754 | 68 | 72 | 5 | 0.41 |
| 2008 | 7 | 726 | 74 | 91 | 33 | 5.20 |
| 2007 | 10 | 706 | 77 | 112 | 59 | 11.21 |
| 2006 | 7 | 710 | 75 | 111 | 54 | 10.54 |
| 2005 | 8 | 717 | 73 | 95 | 37 | 6.20 |
| 2004 and prior | 18 | 720 | 71 | 60 | 9 | 2.63 |
| Total | 100% | 735 | 72 | 79 | 19 | 3.51 |

(1) Based on the loans remaining in the portfolio, which totaled $1,784 billion at September 30, 2011, rather than all loans originally guaranteed by us and originated in the respective year.

(2) Based on FICO credit score of the borrower as of the date of loan origination and may not be indicative of the borrowers' credit worthiness at September 30, 2011. Excludes $10 billion in UPB of loans where the FICO scores at origination were not available at September 30, 2011.

(3) We estimate current market values by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination.

(4) Calculated as a percentage of the aggregate UPB of loans with LTV ratios greater than 100% in relation to the total UPB of loans in the category.

(5) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Delinquencies*" for further information about our reported serious delinquency rates.

Mortgages originated after 2008 represent an increasingly large proportion of our single-family credit guarantee portfolio, as the amount of older vintages in the portfolio, which have a higher composition of loans with higher-risk characteristics, continues to decline due to liquidations, which include prepayments, refinancing activity, foreclosure transfers, and foreclosure alternatives. We currently expect that, over time, the replacement of older vintages should positively impact the serious delinquency rates and credit-related expenses of our single-family credit guarantee portfolio. However, the rate at which this replacement occurs slowed beginning in 2010, due to a decline in the volume of home purchase mortgage originations, an increase in the proportion of relief refinance mortgage activity, and delays in the foreclosure process. See "Table 14 — Segment Earnings Composition — Single-Family Guarantee Segment" for an analysis of the contribution to Segment Earnings (loss) by loan origination year.

### *Strengthening Our Infrastructure and Improving Overall Efficiency*

In conjunction with our Conservator, we are working to both enhance the quality of our infrastructure and improve our efficiency in order to preserve the taxpayers' investment. As such, we are focusing our resources primarily on key projects. Many of these projects will likely take several years to fully implement and focus on making significant improvements to our systems infrastructure in order to: (a) respond to mandatory initiatives from FHFA or other regulatory bodies; (b) replace legacy hardware or software systems at the end of their lives and strengthen our disaster recovery capabilities; and (c) improve our data collection and administration as well as our ability to assist in the servicing of loans. As a result of these efforts, we expect to have an infrastructure in place that is more efficient, flexible and well-controlled, which will assist us in our continued efforts to serve the mortgage market and reduce administrative expenses and other costs.

We continue to actively manage our general and administrative expenses, while also continuing to focus on retaining key talent. Our general and administrative expenses declined for the three and nine months ended September 30, 2011 compared to the three and nine months ended September 30, 2010.

### Single-Family Credit Guarantee Portfolio

In discussing our credit performance, we often use the terms "credit losses" and "credit-related expenses." These terms are significantly different. Our "credit losses" consist of charge-offs and REO operations income (expense), net of recoveries, while our "credit-related expenses" consist of our provision for credit losses and REO operations income (expense).

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $70.5 billion, and have recorded an additional $4.4 billion in losses on loans purchased from PC trusts, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2122                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

incurred and, thus have not been provisioned for, we believe that, as of September 30, 2011, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations.

The UPB of our single-family credit guarantee portfolio declined approximately 2%, on an annualized basis, during the nine months ended September 30, 2011. This reflects that the amount of single-family loan liquidations has exceeded new loan purchase and guarantee activity in 2011, which we believe is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market. Table 3 provides certain credit statistics for our single-family credit guarantee portfolio.

## Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio

|  | As of | | | | |
|---|---|---|---|---|---|
|  | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 | 9/30/2010 |
| Payment status — |  |  |  |  |  |
| One month past due | 1.94% | 1.92% | 1.75% | 2.07% | 2.11% |
| Two months past due | 0.70% | 0.67% | 0.65% | 0.78% | 0.80% |
| Seriously delinquent[1] | 3.51% | 3.50% | 3.63% | 3.84% | 3.80% |
| Non-performing loans (in millions)[2] | $119,081 | $114,819 | $115,083 | $115,478 | $112,746 |
| Single-family loan loss reserve (in millions)[3] | $39,088 | $38,390 | $38,558 | $39,098 | $37,665 |
| REO inventory (in properties) | 59,596 | 60,599 | 65,159 | 72,079 | 74,897 |
| REO assets, net carrying value (in millions) | $5,539 | $5,834 | $6,261 | $6,961 | $7,420 |

|  | For the Three Months Ended | | | | |
|---|---|---|---|---|---|
|  | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 | 9/30/2010 |
|  |  |  | (in units, unless noted) |  |  |
| Seriously delinquent loan additions[1] | 93,850 | 87,813 | 97,646 | 113,235 | 115,359 |
| Loan modifications[4] | 23,919 | 31,049 | 35,158 | 37,203 | 39,284 |
| Foreclosure starts ratio[5] | 0.56% | 0.55% | 0.58% | 0.73% | 0.75% |
| REO acquisitions | 24,378 | 24,788 | 24,707 | 23,771 | 39,053 |
| REO disposition severity ratio[6] |  |  |  |  |  |
| California | 45.5% | 44.9% | 44.5% | 43.9% | 41.9% |
| Arizona | 48.7% | 51.3% | 50.8% | 49.5% | 46.6% |
| Florida | 53.3% | 52.7% | 54.8% | 53.0% | 54.9% |
| Nevada | 53.2% | 55.4% | 53.1% | 53.1% | 51.6% |
| Michigan | 48.1% | 48.5% | 48.3% | 49.7% | 49.2% |
| Total U.S. | 41.9% | 41.7% | 43.0% | 41.3% | 41.5% |
| Single-family credit losses (in millions) | $3,440 | $3,106 | $3,226 | $3,086 | $4,216 |

(1) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Delinquencies*" for further information about our reported serious delinquency rates.

(2) Consists of the UPB of loans in our single-family credit guarantee portfolio that have undergone a TDR or that are seriously delinquent. As of September 30, 2011 and December 31, 2010, approximately $42.2 billion and $26.6 billion in UPB of TDR loans, respectively, were no longer seriously delinquent.

(3) Consists of the combination of: (a) our allowance for loan losses on mortgage loans held for investment; and (b) our reserve for guarantee losses associated with non-consolidated single-family mortgage securitization trusts and other guarantee commitments.

(4) Represents the number of completed modifications under agreement with the borrower during the quarter. Excludes forbearance agreements, repayment plans, and loans in the trial period under HAMP.

(5) Represents the ratio of the number of loans that entered the foreclosure process during the respective quarter divided by the number of loans in the single-family credit guarantee portfolio at the end of the quarter. Excludes Other Guarantee Transactions and mortgages covered under other guarantee commitments.

(6) Calculated as the amount of our losses recorded on disposition of REO properties during the respective quarterly period, excluding those subject to repurchase requests made to our seller/servicers, divided by the aggregate UPB of the related loans. The amount of losses recognized on disposition of the properties is equal to the amount by which the UPB of the loans exceeds the amount of sales proceeds from disposition of the properties. Excludes sales commissions and other expenses, such as property maintenance and costs, as well as applicable recoveries from credit enhancements, such as mortgage insurance.

The quarterly number of seriously delinquent loan additions declined steadily from the fourth quarter of 2009 through the second quarter of 2011; however, we experienced a small increase in the quarterly number of seriously delinquent loan additions during the third quarter of 2011. Several factors, including delays in foreclosure due to concerns about the foreclosure process, have resulted in loans remaining in serious delinquency for longer periods than prior to 2008, particularly in states that require a judicial foreclosure process. As of September 30, 2011 and December 31, 2010, the percentage of seriously delinquent loans that have been delinquent for more than six months was 70% and 66%, respectively. The UPB of our non-performing loans increased during the nine months ended September 30, 2011, primarily due to an increase in single-family loans classified as TDRs. The credit losses and loan loss reserve associated with our single-family credit guarantee portfolio remained elevated for this period, due in part to:

- Losses associated with the continued high volume of foreclosures and foreclosure alternatives. These actions relate to the continued efforts of our servicers to resolve our large inventory of seriously delinquent loans. Due to the length of time necessary for servicers either to complete the foreclosure process or pursue foreclosure alternatives

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2123

on seriously delinquent loans in our portfolio, we expect our credit losses will continue to remain high even if the volume of new serious delinquencies declines.

- Continued negative impact of certain loan groups within the single-family credit guarantee portfolio, such as those underwritten with certain lower documentation standards and interest-only loans, as well as other 2005 through 2008 vintage loans. These groups continue to be large contributors to our credit losses.

- Cumulative declines in national home prices during the last five years, based on our own index, which resulted in approximately 19% of our single-family credit guarantee portfolio, based on UPB, consisting of loans with estimated current LTV ratios in excess of 100% (underwater loans) as of September 30, 2011.

- Deterioration in the financial condition of certain of our mortgage insurers, which reduced our estimates of expected recoveries from these counterparties.

Our REO inventory (measured in number of properties) declined in each of the last four quarters due to an increase in the volume of REO dispositions and slowdowns in REO acquisition volume as foreclosure timelines have been lengthening. Dispositions of REO increased 16% for the nine months ended September 30, 2011 compared to the nine months ended September 30, 2010, based on the number of properties sold. We also have continued to experience high REO disposition severity ratios on sales of our REO inventory in the nine months ended September 30, 2011. We believe our single-family REO acquisition volume and single-family credit losses beginning in the fourth quarter of 2010 have been less than they otherwise would have been due to delays in the single-family foreclosure process. See "Mortgage Market and Economic Conditions — *Delays in the Foreclosure Process for Single-Family Mortgages*" for further information.

**Conservatorship and Government Support for our Business**

We have been operating under conservatorship, with FHFA acting as our conservator, since September 6, 2008. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition, and results of operations.

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

While the conservatorship has benefited us, we are subject to certain constraints on our business activities imposed by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement and by FHFA, as our Conservator.

To address our net worth deficit of $6.0 billion at September 30, 2011, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $6.0 billion. FHFA will request that we receive these funds by December 31, 2011. Upon funding of the draw request: (a) our aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $72.2 billion; and (b) the corresponding annual cash dividend owed to Treasury will increase to $7.2 billion.

We pay cash dividends to Treasury at an annual rate of 10%. Through September 30, 2011, we paid aggregate cash dividends to Treasury of $14.9 billion, an amount equal to 23% of our aggregate draws received under the Purchase Agreement. As of September 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock exceeded our annual historical earnings in all but one period. As a result, we expect to make additional draws in future periods, even if our operating performance generates net income or comprehensive income.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The $200 billion cap on Treasury's funding commitment will increase as necessary to eliminate any net worth deficits we may have during 2010, 2011, and 2012. We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

On August 5, 2011, S&P lowered the long-term credit rating of the U.S. government to "AA+" from "AAA" and assigned a negative outlook to the rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating. While this could adversely affect our liquidity and the supply and cost of debt financing available to us in the future, we have not yet experienced such adverse effects. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Other Debt Securities — Credit Ratings*."

Neither the U.S. government nor any other agency or instrumentality of the U.S. government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities or other obligations.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2124                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

For information on conservatorship, the Purchase Agreement, and the impact of credit ratings, see "BUSINESS — Conservatorship and Related Matters" in our 2010 Annual Report and "RISK FACTORS — *A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business. Our business could also be adversely affected if there is a downgrade in the credit ratings of the U.S. government or a payment default by the U.S. government" and "— If Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth, FHFA could be required to place us into receivership*" in our Quarterly Report on Form 10-Q for the second quarter of 2011.

**Consolidated Financial Results**

Net loss was $4.4 billion and $2.5 billion for the three months ended September 30, 2011 and 2010, respectively. Key highlights of our financial results include:

- Net interest income for the three months ended September 30, 2011 increased to $4.6 billion from $4.3 billion for the three months ended September 30, 2010, mainly due to lower funding costs, partially offset by a decline in the average balances of mortgage-related securities.

- Provision for credit losses for the three months ended September 30, 2011 decreased to $3.6 billion, compared to $3.7 billion for the three months ended September 30, 2010. The slight decline in provision for credit losses for the three months ended September 30, 2011 reflects a decline in the volume of early (*i.e.*, one or two months past due) and seriously delinquent loans, which was substantially offset by higher loss severity, primarily due to lower expectations from mortgage insurance recoveries due to the deterioration in the financial condition of certain of these counterparties, compared to the three months ended September 30, 2010. The provision for credit losses in the three months ended September 30, 2010 also reflected a higher volume of completed loan modifications that were classified as TDRs.

- Non-interest income (loss) was $(4.8) billion for the three months ended September 30, 2011, compared to $(2.6) billion for the three months ended September 30, 2010 largely due to derivative losses in both periods. However, there was a significant decline in net impairments of available-for-sale securities recognized in earnings during the three months ended September 30, 2011 compared to the three months ended September 30, 2010.

- Non-interest expense was $(687) million and $(828) million in the three months ended September 30, 2011 and 2010, respectively, and reflects reduced REO operations expense in the three months ended September 30, 2011, compared to the three months ended September 30, 2010.

- Total comprehensive income (loss) was $(4.4) billion for the three months ended September 30, 2011 compared to $1.4 billion for the three months ended September 30, 2010. Total comprehensive income (loss) for the three months ended September 30, 2011 primarily reflects the $(4.4) billion net loss.

**Mortgage Market and Economic Conditions**

*Overview*

The housing market continued to experience challenges during the third quarter of 2011 due primarily to continued weakness in the employment market and a significant inventory of seriously delinquent loans and REO properties in the market. The U.S. real gross domestic product rose by 2.5% on an annualized basis during the third quarter of 2011, compared to 1.3% during the second quarter of 2011, according to the Bureau of Economic Analysis estimates. The national unemployment rate was 9.1% in September 2011, compared to 9.2% in June 2011 and 8.8% in March 2011, based on data from the U.S. Bureau of Labor Statistics.

*Single-Family Housing Market*

We believe the overall number of potential home buyers in the market combined with the volume of homes offered for sale will determine the direction of home prices. Within the industry, existing home sales are important for assessing the rate at which the mortgage market might absorb the inventory of listed, but unsold, homes in the U.S. (including listed REO properties). Additionally, we believe new home sales can be an indicator of certain economic trends, such as the potential for growth in gross domestic product and total U.S. mortgage debt outstanding. Sales of existing homes in the third quarter of 2011 averaged 4.88 million (at a seasonally adjusted annual rate), unchanged from the second quarter of 2011. New home sales in the third quarter of 2011 averaged 302,000 homes (at a seasonally adjusted annual rate) decreasing approximately 2.3% from an average seasonally adjusted annual rate of approximately 309,000 homes in the second quarter of 2011.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011        TREASURY-2125        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We estimate that home prices (on a non-seasonally adjusted basis) decreased approximately 1.0% nationwide during the nine months ended September 30, 2011, which includes a 0.7% decrease in the third quarter of 2011. Seasonal factors typically result in stronger house-price appreciation during the second and third quarters. These estimates are based on our own index of mortgage loans in our single-family credit guarantee portfolio. Other indexes of home prices may have different results, as they are determined using different pools of mortgage loans and calculated under different conventions than our own.

### Multifamily Housing Market

Multifamily market fundamentals continued to improve on a national level during the third quarter of 2011. This improvement continues a trend of favorable movements in key indicators such as vacancy rates and effective rents. Vacancy rates and effective rents are important to loan performance because multifamily loans are generally repaid from the cash flows generated by the underlying property and these factors significantly influence those cash flows. These improving fundamentals, perceived optimism about demand for multifamily housing, and lower capitalization rates have helped improve property values in most markets. However, the broader economy continues to be challenged by persistently high unemployment, which has delayed a more comprehensive recovery of the multifamily housing market.

### Delays in the Foreclosure Process for Single-Family Mortgages

In the fall of 2010, several large single-family seller/servicers announced issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits. As a result, a number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in the latter part of 2010 in certain states in which they do business, and we temporarily suspended certain REO sales in November 2010. During the first quarter of 2011, we fully resumed marketing and sales of REO properties. While the larger servicers generally resumed foreclosure proceedings in the first quarter of 2011, we continued to experience significant delays in the foreclosure process for single-family mortgages in the nine months ended September 30, 2011, as compared to before these issues arose, particularly in states that require a judicial foreclosure process. More recently, regulatory developments impacting mortgage servicing and foreclosure practices have also contributed to these delays. We believe that these delays have caused the volume of our single-family REO acquisitions in the nine months ended September 30, 2011 to be less than it otherwise would have been. We expect these delays in the foreclosure process to continue into 2012. We generally refer to these issues as the concerns about the foreclosure process. For information on recent regulatory developments affecting foreclosures, see "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices."

## Mortgage Market and Business Outlook

Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties. For example, a number of factors could cause the actual performance of the housing and mortgage markets and the U.S. economy during the remainder of 2011 to be significantly worse than we expect, including adverse changes in consumer confidence, national or international economic conditions and changes in the federal government's fiscal policies. See "FORWARD-LOOKING STATEMENTS" for additional information.

### Overview

We continue to expect key macroeconomic drivers of the economy — such as income growth, employment, and inflation — will affect the performance of the housing and mortgage markets into 2012. As a result of the weak payroll employment growth during the third quarter of 2011 and the continued high unemployment rate, near-term demand for housing will likely remain weak. Further, consumer confidence measures, while up from recession lows, remain below long-term averages and suggest that households will likely be more cautious in home buying. We also expect rates on fixed-rate single-family mortgages to remain historically low into 2012, which may extend the recent high level of refinancing activity (relative to new purchase lending activity). Lastly, many large financial institutions experienced delays in the foreclosure process for single-family loans in late 2010 and throughout 2011. To the extent a large volume of loans completes the foreclosure process in a short period of time, the resulting REO inventory could have a negative impact on the housing market.

Our expectation for home prices, based on our own index, is that national average home prices will continue to remain weak and will likely decline over the near term before a long-term recovery in housing begins, due to, among

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                                                 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

other factors: (a) our expectation for a sustained volume of distressed sales, which include short sales and sales by financial institutions of their REO properties; and (b) the likelihood that unemployment rates will remain high.

### Single-Family

We expect our provision for credit losses and charge-offs will likely remain elevated into 2012. This is in part due to the substantial number of underwater mortgage loans in our single-family credit guarantee portfolio, as well as the substantial inventory of seriously delinquent loans. For the near term, we also expect:

- REO disposition severity ratios to remain relatively high, as market conditions, such as home prices and the rate of home sales, continue to remain weak;

- non-performing assets, which include loans deemed TDRs, to continue to remain high;

- the volume of loan workouts to remain high; and

- continued high volume of loans in the foreclosure process as well as prolonged foreclosure timelines.

### Multifamily

The most recent market data available continues to reflect improving national apartment fundamentals, including decreasing vacancy rates and increasing effective rents. However, some geographic areas in which we have investments in multifamily loans, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We own or guarantee loans in these states that we believe are at risk of default. We expect our multifamily delinquency rate to remain relatively stable in the remainder of 2011.

Recent market data shows a significant increase in multifamily loan activity, compared to prior year periods, and reflects that the multifamily sector has experienced greater stability in market fundamentals and investor demand than other real estate sectors. Our purchase and guarantee of multifamily loans increased approximately 46%, to $12.4 billion for the nine months ended September 30, 2011, compared to $8.5 billion during the same period in 2010. We expect our purchase and guarantee activity to continue to increase, but at a more moderate pace in the remainder of 2011.

### Changes to the Home Affordable Refinance Program

On October 24, 2011 FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers who can benefit from refinancing their home mortgage. The Acting Director of FHFA stated that the goal of pursuing these changes is to create refinancing opportunities for more borrowers whose mortgage is owned or guaranteed by the GSEs while reducing risk for the GSEs and bringing a measure of stability to housing markets. The revisions to HARP enable us to expand the assistance we provide to homeowners by making their mortgage payments more affordable through one or more of the following ways: (a) a reduction in payment; (b) a reduction in rate; (c) movement to a more stable mortgage product type (i.e., from an adjustable-rate mortgage to a fixed-rate mortgage); or (d) a reduction in amortization term.

The revisions to HARP will continue to be available to borrowers with loans that were sold to the GSEs on or before May 31, 2009 and who have current LTV ratios above 80%. The October 24, 2011 announcement stated that the GSEs will issue guidance with operational details about the HARP changes to mortgage lenders and servicers by November 15, 2011. We are working collectively with FHFA and Fannie Mae on several operational details of the program. We are also waiting to receive details from FHFA regarding the fees that we may charge associated with the refinancing program. Since industry participation in HARP is not mandatory, we anticipate that implementation schedules will vary as individual lenders, mortgage insurers and other market participants modify their processes. At this time we do not know how many eligible borrowers are likely to refinance under the program.

The recently announced revisions to HARP will help to reduce our exposure to credit risk to the extent that HARP refinances strengthen the borrowers' capacity to repay their mortgages and, in some cases, reduce the terms of their mortgages. These revisions to HARP could also reduce our credit losses to the extent that the revised program contributes to bringing stability to the housing market. However, with our release of certain representations and warranties to lenders, credit losses associated with loans identified with defects will not be recaptured through loan buybacks. We could also experience declines in the fair values of certain agency mortgage-related security investments classified as available-for-sale or trading resulting from changes in expectations of mortgage prepayments and lower net interest yields over time on other mortgage-related investments. As a result, we cannot currently estimate these impacts until more details about the program and the level of borrower participation can be reasonably assured. See "RISK FACTORS — *The MHA Program and other efforts to reduce foreclosures, modify loan terms and refinance mortgages, including HARP, may fail to mitigate our credit losses and may adversely affect our results of operations or financial condition*" for additional information.

10                                                                                                                         *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

*Long-Term Financial Sustainability*

There is significant uncertainty as to our long-term financial sustainability. The Acting Director of FHFA stated on September 19, 2011 that "it ought to be clear to everyone at this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship."

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will regularly generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived in the future. Treasury waived the fee for all quarters of 2011, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the quarterly commitment fee has not yet been established and could be substantial.

There continues to be significant uncertainty in the current mortgage market environment, and continued high levels of unemployment, weakness in home prices, adverse changes in interest rates, mortgage security prices, spreads and other factors could lead to additional draws. For discussion of other factors that could result in additional draws, see "LIQUIDITY AND CAPITAL RESOURCES — Capital Resources."

There is also significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Obama Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations. As discussed below in "Legislative and Regulatory Developments," on February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market.

## Limits on Mortgage-Related Investments Portfolio

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $810 billion as of December 31, 2010 and may not exceed $729 billion as of December 31, 2011. FHFA has stated that we will not be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio, except for purchases of delinquent mortgages out of PC trusts. FHFA has also indicated that the portfolio reduction targets under the Purchase Agreement and FHFA regulation should be viewed as minimum reductions and has encouraged us to reduce the mortgage-related investments portfolio at a faster rate than required, consistent with FHFA guidance, safety and soundness and the goal of conserving and preserving assets.

Table 4 presents the UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation.

## Table 4 — Mortgage-Related Investments Portfolio[1]

| | September 30, 2011 | | December 31, 2010 |
|---|---|---|---|
| | | (in millions) | |
| Investments segment — Mortgage investments portfolio | $ 473,630 | $ | 481,677 |
| Single-family Guarantee segment — Single-family unsecuritized mortgage loans[2] | 63,237 | | 69,766 |
| Multifamily segment — Mortgage investments portfolio | 142,266 | | 145,431 |
| Total mortgage-related investments portfolio | $ 679,133 | $ | 696,874 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Represents unsecuritized nonaccrual single-family loans managed by the Single-family Guarantee segment.

The UPB of our mortgage-related investments portfolio declined from December 31, 2010 to September 30, 2011, primarily due to liquidations, partially offset by the purchase of $34.8 billion of seriously delinquent loans from PC trusts.

Our mortgage-related investments portfolio includes assets that are less liquid than agency securities, including unsecuritized performing single-family mortgage loans, multifamily mortgage loans, CMBS, and housing revenue bonds. Our less liquid assets collectively represented approximately 30% of the UPB of the portfolio at September 30, 2011. Our mortgage-related investments portfolio also includes illiquid assets, including unsecuritized seriously delinquent and modified single-family mortgage loans which we purchased from PC trusts, and our investments in non-agency mortgage-

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

related securities backed by subprime, option ARM, and Alt-A and other loans. Our illiquid assets collectively represented approximately 28% of the UPB of the portfolio at September 30, 2011. The liquidity of our assets, as described above, is based on our own internal expectations given current market conditions. Challenging market conditions are expected to continue and may rapidly and adversely affect the liquidity of our assets at any given time.

We disclose our mortgage assets on the basis used to determine the cap under the caption "Mortgage-Related Investments Portfolio — Ending Balance" in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC.

We are providing our web site addresses here and elsewhere in this Form 10-Q solely for your information. Information appearing on our web site is not incorporated into this Form 10-Q.

### Legislative and Regulatory Developments

A number of bills have been introduced in Congress that would bring about changes in Freddie Mac and Fannie Mae's business model. In addition, on February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, and states that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

On August 10, 2011, FHFA, in consultation with Treasury and HUD, announced a request for information seeking input on new options for sales and rentals of single-family REO properties held by Freddie Mac, Fannie Mae and FHA. According to the announcement, the objective of the request for information is to help address current and future REO inventory. The request for information solicited alternatives for maximizing value to taxpayers and increasing private investment in the housing market, including approaches that support rental and affordable housing needs.

On September 19, 2011, the Acting Director of FHFA stated that he would anticipate Freddie Mac and Fannie Mae will continue the gradual process of increasing guarantee fees. He stated that this will not happen immediately but should be expected in 2012. In addition, the Acting Director indicated that FHFA will be considering other alternatives to reduce our long-term risk exposure. President Obama's Plan for Economic Growth and Deficit Reduction, announced on September 19, 2011, contained a proposal to increase the guarantee fees charged by Freddie Mac and Fannie Mae by 10 basis points.

On September 27, 2011, FHFA announced that it is seeking public comment on two alternative mortgage servicing compensation structures detailed in a discussion paper. One proposal would establish a reserve account within the current servicing compensation structure. The other proposal would create a new fee for service compensation structure (*i.e.* a flat per-loan fee). We cannot predict what changes to the current structure will emerge from this process, or the extent to which our business may be impacted by them.

On October 19, 2011, FHFA announced that it has directed Freddie Mac and Fannie Mae to transition away from current foreclosure attorney network programs and move to a system where mortgage servicers select qualified law firms that meet certain minimum, uniform criteria. The changes will be implemented after a transition period in which input will be taken from servicers, regulators, lawyers, and other market participants. We cannot predict the scope of these changes, or the extent to which our business will be impacted by them.

See "LEGISLATIVE AND REGULATORY MATTERS" for information on the Obama Administration's February 2011 report, recent developments in GSE reform legislation, recently initiated rulemakings under the Dodd-Frank Act, and other regulatory developments, including revisions to HARP announced on October 24, 2011.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2129

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# SELECTED FINANCIAL DATA(1)

The selected financial data presented below should be reviewed in conjunction with MD&A and our consolidated financial statements and related notes for the three and nine months ended September 30, 2011.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (dollars in millions, except share-related amounts) | | | |
| **Statements of Income and Comprehensive Income Data** | | | | |
| Net interest income | $ 4,613 | $ 4,279 | $ 13,714 | $ 12,540 |
| Provision for credit losses | (3,606) | (3,727) | (8,124) | (14,152) |
| Non-interest income (loss) | (4,798) | (2,646) | (9,907) | (11,127) |
| Non-interest expense | (687) | (828) | (1,930) | (1,974) |
| Net loss attributable to Freddie Mac | (4,422) | (2,511) | (5,885) | (13,912) |
| Total comprehensive income (loss) attributable to Freddie Mac | (4,376) | 1,436 | (2,736) | (874) |
| Net loss attributable to common stockholders | (6,040) | (4,069) | (10,725) | (18,058) |
| Loss per common share: | | | | |
| Basic | (1.86) | (1.25) | (3.30) | (5.56) |
| Diluted | (1.86) | (1.25) | (3.30) | (5.56) |
| Cash dividends per common share | — | — | — | — |
| Weighted average common shares outstanding (in thousands):(2) | | | | |
| Basic | 3,244,496 | 3,248,794 | 3,245,473 | 3,249,753 |
| Diluted | 3,244,496 | 3,248,794 | 3,245,473 | 3,249,753 |

| | September 30, 2011 | December 31, 2010 |
|---|---|---|
| | (dollars in millions) | |
| **Balance Sheets Data** | | |
| Mortgage loans held-for-investment, at amortized cost by consolidated trusts (net of allowances for loan losses) | $ 1,611,580 | $ 1,646,172 |
| Total assets | 2,172,336 | 2,261,780 |
| Debt securities of consolidated trusts held by third parties | 1,488,036 | 1,528,648 |
| Other debt | 674,421 | 713,940 |
| All other liabilities | 15,870 | 19,593 |
| Total stockholders' equity (deficit) | (5,991) | (401) |
| **Portfolio Balances(3)** | | |
| Mortgage-related investments portfolio | $ 679,133 | $ 696,874 |
| Total Freddie Mac mortgage-related securities(4) | 1,667,842 | 1,712,918 |
| Total mortgage portfolio(5) | 2,114,169 | 2,164,859 |
| Non-performing assets(6) | 127,903 | 125,405 |

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| **Ratios(7)** | | | | |
| Return on average assets(8)(11) | (0.8)% | (0.4)% | (0.4)% | (0.8)% |
| Non-performing assets ratio(9) | 6.6 | 6.2 | 6.6 | 6.2 |
| Equity to assets ratio(10)(11) | (0.2) | — | (0.1) | (0.2) |

(1) See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report and this Form 10-Q for information regarding our accounting policies and the impact of new accounting policies on our consolidated financial statements.

(2) Includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included in basic loss per share, because it is unconditionally exercisable by the holder at a cost of $0.00001 per share.

(3) Represents the UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(4) See "Table 26 — Freddie Mac Mortgage-Related Securities" for the composition of this line item.

(5) See "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios" for the composition of our total mortgage portfolio.

(6) See "Table 43 — Non-Performing Assets" for a description of our non-performing assets.

(7) The return on common equity ratio is not presented because the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit), net of preferred stock (at redemption value), is less than zero for all periods presented. The dividend payout ratio on common stock is not presented because we are reporting a net loss attributable to common stockholders for all periods presented.

(8) Ratio computed as annualized net income (loss) attributable to Freddie Mac divided by the simple average of the beginning and ending balances of total assets.

(9) Ratio computed as non-performing assets divided by the ending UPB of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities.

(10) Ratio computed as the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit) divided by the simple average of the beginning and ending balances of total assets.

(11) To calculate the simple averages for the nine months ended September 30, 2010, the beginning balances of total assets, and total Freddie Mac stockholders' equity are based on the January 1, 2010 balances included in "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES — Table 2.1 — Impact of the Change in Accounting for Transfers of Financial Assets and Consolidation of Variable Interest Entities on Our Consolidated Balance Sheet" in our 2010 Annual Report, so that both the beginning and ending balances reflect changes in accounting principles.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                TREASURY-2130                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported results of operations.

### Table 5 — Summary Consolidated Statements of Income and Comprehensive Income

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Net interest income | $ 4,613 | $ 4,279 | $ 13,714 | $ 12,540 |
| Provision for credit losses | (3,606) | (3,727) | (8,124) | (14,152) |
| Net interest income (loss) after provision for credit losses | 1,007 | 552 | 5,590 | (1,612) |
| Non-interest income (loss): | | | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (310) | (66) | (212) | (160) |
| Gains (losses) on retirement of other debt | 19 | (50) | 34 | (229) |
| Gains (losses) on debt recorded at fair value | 133 | (366) | 15 | 525 |
| Derivative gains (losses) | (4,752) | (1,130) | (8,986) | (9,653) |
| Impairment of available-for-sale securities: | | | | |
| Total other-than-temporary impairment of available-for-sale securities | (459) | (523) | (1,743) | (1,054) |
| Portion of other-than-temporary impairment recognized in AOCI | 298 | (577) | 37 | (984) |
| Net impairment of available-for-sale securities recognized in earnings | (161) | (1,100) | (1,706) | (2,038) |
| Other gains (losses) on investment securities recognized in earnings | (541) | (503) | (452) | (1,176) |
| Other income | 814 | 569 | 1,400 | 1,604 |
| Total non-interest income (loss) | (4,798) | (2,646) | (9,907) | (11,127) |
| Non-interest expense: | | | | |
| Administrative expenses | (381) | (388) | (1,126) | (1,197) |
| REO operations expense | (221) | (337) | (505) | (456) |
| Other expenses | (85) | (103) | (299) | (321) |
| Total non-interest expense | (687) | (828) | (1,930) | (1,974) |
| Loss before income tax benefit | (4,478) | (2,922) | (6,247) | (14,713) |
| Income tax benefit | 56 | 411 | 362 | 800 |
| Net loss | (4,422) | (2,511) | (5,885) | (13,913) |
| Other comprehensive income, net of taxes and reclassification adjustments: | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | (80) | 3,781 | 2,764 | 12,524 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 124 | 164 | 391 | 520 |
| Changes in defined benefit plans | 2 | 2 | (6) | (6) |
| Total other comprehensive income, net of taxes and reclassification adjustments | 46 | 3,947 | 3,149 | 13,038 |
| Comprehensive income (loss) | (4,376) | 1,436 | (2,736) | (875) |
| Less: Comprehensive loss attributable to noncontrolling interest | — | — | — | 1 |
| Total comprehensive income (loss) attributable to Freddie Mac | $ (4,376) | $ 1,436 | $ (2,736) | $ (874) |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Net Interest Income

Table 6 presents an analysis of net interest income, including average balances and related yields earned on assets and incurred on liabilities.

### Table 6 — Net Interest Income/Yield and Average Balance Analysis

| | Three Months Ended September 30, | | | | | |
| | 2011 | | | 2010 | | |
| | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate |
|---|---|---|---|---|---|---|
| | (dollars in millions) | | | | | |
| Interest-earning assets: | | | | | | |
| Cash and cash equivalents | $ 51,225 | $ 4 | 0.03% | $ 43,171 | $ 24 | 0.21% |
| Federal funds sold and securities purchased under agreements to resell | 16,434 | 4 | 0.08 | 51,439 | 24 | 0.19 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities(3) | 443,135 | 5,050 | 4.56 | 500,500 | 6,058 | 4.84 |
| Extinguishment of PCs held by Freddie Mac | (166,356) | (1,918) | (4.61) | (195,890) | (2,543) | (5.19) |
| Total mortgage-related securities, net | 276,779 | 3,132 | 4.53 | 304,610 | 3,515 | 4.62 |
| Non-mortgage-related securities(3) | 18,175 | 18 | 0.40 | 28,631 | 42 | 0.59 |
| Mortgage loans held by consolidated trusts(4) | 1,626,583 | 19,140 | 4.71 | 1,706,329 | 21,473 | 5.03 |
| Unsecuritized mortgage loans(4) | 243,162 | 2,282 | 3.75 | 221,442 | 2,305 | 4.16 |
| Total interest-earning assets | $2,232,358 | $ 24,580 | 4.41 | $2,355,622 | $ 27,383 | 4.65 |
| Interest-bearing liabilities: | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 1,641,905 | $(18,633) | (4.54) | $ 1,723,095 | $ (21,264) | (4.94) |
| Extinguishment of PCs held by Freddie Mac | (166,356) | 1,918 | 4.61 | (195,890) | 2,543 | 5.19 |
| Total debt securities of consolidated trusts held by third parties | 1,475,549 | (16,715) | (4.53) | 1,527,205 | (18,721) | (4.90) |
| Other debt: | | | | | | |
| Short-term debt | 188,004 | (70) | (0.14) | 207,673 | (143) | (0.27) |
| Long-term debt(5) | 495,188 | (3,002) | (2.42) | 542,842 | (4,002) | (2.94) |
| Total other debt | 683,192 | (3,072) | (1.79) | 750,515 | (4,145) | (2.20) |
| Total interest-bearing liabilities | 2,158,741 | (19,787) | (3.67) | 2,277,720 | (22,866) | (4.01) |
| Income (expense) related to derivatives(6) | — | (180) | (0.03) | — | (238) | (0.04) |
| Impact of net non-interest-bearing funding | 73,617 | — | 0.12 | 77,902 | — | 0.13 |
| Total funding of interest-earning assets | $2,232,358 | $(19,967) | (3.58) | $2,355,622 | $ (23,104) | (3.92) |
| Net interest income/yield | | $ 4,613 | 0.83 | | $ 4,279 | 0.73 |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011        TREASURY-2132        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Nine Months Ended September 30, | | | | | |
| | 2011 | | | 2010 | | |
| | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate |
| | (dollars in millions) | | | | | |
| **Interest-earning assets:** | | | | | | |
| Cash and cash equivalents | $ 40,817 | $ 30 | 0.10% | $ 52,008 | $ 59 | 0.15% |
| Federal funds sold and securities purchased under agreements to resell | 32,174 | 30 | 0.12 | 46,774 | 56 | 0.16 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities[3] | 450,227 | 15,581 | 4.61 | 544,797 | 19,769 | 4.84 |
| Extinguishment of PCs held by Freddie Mac | (166,734) | (5,947) | (4.76) | (224,397) | (8,897) | (5.29) |
| Total mortgage-related securities, net | 283,493 | 9,634 | 4.53 | 320,400 | 10,872 | 4.52 |
| Non-mortgage-related securities[3] | 24,520 | 74 | 0.40 | 27,130 | 158 | 0.78 |
| Mortgage loans held by consolidated trusts[4] | 1,640,276 | 58,986 | 4.79 | 1,741,092 | 66,319 | 5.08 |
| Unsecuritized mortgage loans[4] | 242,063 | 6,890 | 3.80 | 198,047 | 6,445 | 4.34 |
| Total interest-earning assets | $2,263,343 | $ 75,644 | 4.46 | $2,385,451 | $ 83,909 | 4.69 |
| **Interest-bearing liabilities:** | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 1,654,554 | $(57,326) | (4.62) | $ 1,754,713 | $(66,309) | (5.04) |
| Extinguishment of PCs held by Freddie Mac | (166,734) | 5,947 | 4.76 | (224,397) | 8,897 | 5.29 |
| Total debt securities of consolidated trusts held by third parties | 1,487,820 | (51,379) | (4.60) | 1,530,316 | (57,412) | (5.00) |
| Other debt: | | | | | | |
| Short-term debt | 192,326 | (280) | (0.19) | 225,745 | (421) | (0.25) |
| Long-term debt[5] | 504,603 | (9,690) | (2.56) | 553,701 | (12,791) | (3.08) |
| Total other debt | 696,929 | (9,970) | (1.91) | 779,446 | (13,212) | (2.26) |
| Total interest-bearing liabilities | 2,184,749 | (61,349) | (3.74) | 2,309,762 | (70,624) | (4.08) |
| Income (expense) related to derivatives[6] | — | (581) | (0.04) | — | (745) | (0.04) |
| Impact of net non-interest-bearing funding | 78,594 | — | 0.13 | 75,689 | — | 0.13 |
| Total funding of interest-earning assets | $2,263,343 | $ (61,930) | (3.65) | $2,385,451 | $(71,369) | (3.99) |
| Net interest income/yield | | $ 13,714 | 0.81 | | $ 12,540 | 0.70 |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) We calculate average balances based on amortized cost.
(3) Interest income (expense) includes accretion of the portion of impairment charges recognized in earnings where we expect a significant improvement in cash flows.
(4) Non-performing loans, where interest income is generally recognized when collected, are included in average balances.
(5) Includes current portion of long-term debt.
(6) Represents changes in fair value of derivatives in cash flow hedge relationships that were previously deferred in AOCI and have been reclassified to earnings as the associated hedged forecasted issuance of debt affects earnings.

Net interest income increased $334 million and $1.2 billion during the three and nine months ended September 30, 2011, respectively, compared to the three and nine months ended September 30, 2010. Net interest yield increased 10 basis points and 11 basis points during the three and nine months ended September 30, 2011, respectively, compared to the three and nine months ended September 30, 2010. The primary driver underlying the increases was lower funding costs from the replacement of debt at lower rates and favorable rate resets on floating-rate debt. In addition, the increases in net interest income and net interest yield for the nine months ended September 30, 2011 compared to the nine months ended September 30, 2010 were partially driven by the impact of a change in practice announced in February 2010 to purchase substantially all 120 day delinquent loans from PC trusts, as the average funding rate of the other debt used to purchase such loans from PC trusts is significantly less than the average funding rate of the debt securities of consolidated trusts held by third parties. These factors were partially offset by the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations and limited purchase activity.

We do not recognize interest income on non-performing loans that have been placed on nonaccrual status, except when cash payments are received. We refer to this interest income that we do not recognize as foregone interest income, and it includes interest income not recognized due to interest rate concessions granted on certain modified loans. Foregone interest income and reversals of previously recognized interest income, net of cash received, related to non-performing loans was $1.0 billion and $2.9 billion during the three and nine months ended September 30, 2011, respectively, compared to $1.1 billion and $3.6 billion during the three and nine months ended September 30, 2010, respectively, primarily due to the decreased volume of non-performing loans on nonaccrual status.

During the three and nine months ended September 30, 2011, spreads on our debt and our access to the debt markets remained favorable relative to historical levels. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                TREASURY-2133                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Provision for Credit Losses**

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $70.5 billion, and have recorded an additional $4.4 billion in losses on loans purchased from our PCs, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred, and thus have not been provisioned for, we believe that, as of September 30, 2011, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for certain quarterly credit statistics for our single-family credit guarantee portfolio.

Our provision for credit losses was $3.6 billion for the third quarter of 2011 compared to $3.7 billion for the third quarter of 2010, and was $8.1 billion in the nine months ended September 30, 2011 compared to $14.2 billion in the nine months ended September 30, 2010. The provision for credit losses in the third quarter of 2011 reflects a decline in the volume of early and seriously delinquent loans, while the provision for credit losses in the nine months ended September 30, 2011 reflects declines in the rate at which delinquent loans transition into serious delinquency. The provision for credit losses in the three and nine months ended September 30, 2011 also reflects higher loss severity, primarily due to lower expectations for mortgage insurance recoveries, which is due to deterioration in the financial condition of certain of these counterparties during the 2011 periods. The provision for credit losses in the three and nine months ended September 30, 2010 also reflected a higher volume of completed loan modifications that were classified as TDRs. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for further information on our mortgage insurance counterparties.

During the nine months ended September 30, 2011, our charge-offs, net of recoveries for single-family loans, exceeded the amount of our provision for credit losses. Our charge-offs in the nine months ended September 30, 2011 remained elevated, but reflect suppression of activity due to delays in the foreclosure process and because market conditions, such as home prices and the rate of home sales, continue to remain weak. We believe the level of our charge-offs will continue to remain high in the remainder of 2011 and may increase in 2012. As of September 30, 2011 and December 31, 2010, the UPB of our single-family non-performing loans was $119.1 billion and $115.5 billion, respectively. These amounts include $42.2 billion and $26.6 billion, respectively, of single-family TDRs that are reperforming (*i.e.*, less than three months past due). See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, and our non-performing assets.

We continued to experience a high volume of completed loan modifications involving concessions to borrowers during the nine months ended September 30, 2011, but the volume of such modifications was less than the volume during the nine months ended September 30, 2010. See "Table 37 — Reperformance Rates of Modified Single-Family Loans" for information on the performance of our modified loans.

We adopted new accounting guidance related to the classification of loans as TDRs in the third quarter of 2011, which significantly increases the population of loans we account for and disclose as TDRs. The impact of this change in guidance on our results for the third quarter of 2011 was not significant. We expect that the number of loans that newly qualify as TDRs in the remainder of 2011 will remain high, primarily because we anticipate that the majority of our modifications, both completed and those still in trial periods will be considered TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for additional information on our TDR loans, including our implementation of changes to the accounting guidance for recognition of TDR loans.

While the total number of seriously delinquent loans declined approximately 10.5% during the nine months ended September 30, 2011, in part due to a significant volume of loan modifications, our serious delinquency rate remains high compared to historical levels due to the continued weakness in home prices, persistently high unemployment, extended foreclosure timelines and foreclosure suspensions in many states, and continued challenges faced by servicers processing large volumes of problem loans. Upon completion of a modification, a delinquent single-family loan is given a current payment status.

Our seller/servicers have an active role in our loan workout activities, including under the MHA Program, and a decline in their performance could result in a failure to realize the anticipated benefits of our loss mitigation plans. We believe that the servicing alignment initiative, which will establish a uniform framework and requirements for servicing non-performing loans owned or guaranteed by us and Fannie Mae, will ultimately change the way servicers communicate

<div align="center">17</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
TREASURY-2134
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

and work with troubled borrowers, bring greater consistency and accountability to the servicing industry, and help more distressed homeowners avoid foreclosure.

Our provision (benefit) for credit losses associated with our multifamily mortgage portfolio was $(37) million and $19 million for the third quarters of 2011 and 2010, respectively, and was $(110) million in the nine months ended September 30, 2011 compared to $167 million in the nine months ended September 30, 2010. Our loan loss reserves associated with our multifamily mortgage portfolio were $656 million and $828 million as of September 30, 2011 and December 31, 2010, respectively. The decline in loan loss reserves for multifamily loans was driven primarily by positive market trends in vacancy rates and effective rents reflected over the past several consecutive quarters, as well as stabilizing or improved property values. However, some states in which we have investments in multifamily mortgage loans, including Nevada, Arizona, and Georgia, continue to exhibit weaker than average apartment fundamentals.

**Non-Interest Income (Loss)**

*Gains (Losses) on Extinguishment of Debt Securities of Consolidated Trusts*

When we purchase PCs that have been issued by consolidated PC trusts, we extinguish a pro rata portion of the outstanding debt securities of the related consolidated trusts. We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to extinguish the debt security differs from its carrying value. For the three months ended September 30, 2011 and 2010, we extinguished debt securities of consolidated trusts with a UPB of $22.8 billion and $10.7 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount), and our gains (losses) on extinguishment of these debt securities of consolidated trusts were $(310) million and $(66) million, respectively. The losses during the third quarter of 2011 were primarily due to the repurchase of our debt securities at larger net premiums driven by a decrease in interest rates during the period. For the nine months ended September 30, 2011 and 2010, we extinguished debt securities of consolidated trusts with a UPB of $69.8 billion and $13.2 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount), and our gains (losses) on extinguishment of these debt securities of consolidated trusts were $(212) million and $(160) million, respectively. The losses for the nine months ended September 30, 2011 were due to the repurchases of our debt securities at a net premium during the second and third quarters of 2011 driven by a decrease in interest rates during those periods. See "Table 18 — Total Mortgage-Related Securities Purchase Activity" for additional information regarding purchases of mortgage-related securities, including those issued by consolidated PC trusts.

*Gains (Losses) on Retirement of Other Debt*

Gains (losses) on retirement of other debt were $19 million and $(50) million during the three months ended September 30, 2011 and 2010, respectively, and $34 million and $(229) million during the nine months ended September 30, 2011 and 2010, respectively. We recognized gains on debt retirements for the third quarter and first nine months of 2011, compared to losses for the third quarter and first nine months of 2010, because we purchased debt with higher associated discounts in 2010 relative to the comparable periods in 2011.

*Gains (Losses) on Debt Recorded at Fair Value*

Gains (losses) on debt recorded at fair value primarily relate to changes in the fair value of our foreign-currency denominated debt. For the three and nine months ended September 30, 2011, we recognized gains on debt recorded at fair value of $133 million and $15 million, respectively, primarily due to the U.S. dollar strengthening relative to the Euro. For the three and nine months ended September 30, 2010, we recognized gains (losses) on debt recorded at fair value of $(366) million and $525 million, respectively, primarily due to the U.S. dollar strengthening relative to the Euro during the first six months of 2010, followed by the U.S. dollar weakening relative to the Euro during the third quarter of 2010. We mitigate changes in the fair value of our foreign-currency denominated debt by using foreign currency swaps and foreign-currency denominated interest-rate swaps.

*Derivative Gains (Losses)*

Table 7 presents derivative gains (losses) reported in our consolidated statements of income and comprehensive income. See "NOTE 11: DERIVATIVES — Table11.2 — Gains and Losses on Derivatives" for information about gains and losses related to specific categories of derivatives. Changes in fair value and interest accruals on derivatives not in hedge accounting relationships are recorded as derivative gains (losses) in our consolidated statements of income and comprehensive income. At September 30, 2011 and December 31, 2010, we did not have any derivatives in hedge accounting relationships; however, there are amounts recorded in AOCI related to discontinued cash flow hedges. Amounts recorded in AOCI associated with these closed cash flow hedges are reclassified to earnings when the forecasted

<div align="center">18</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

transactions affect earnings. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the forecasted transaction is reclassified into earnings immediately.

While derivatives are an important aspect of our strategy to manage interest-rate risk, they generally increase the volatility of reported net income (loss), because, while fair value changes in derivatives affect net income, fair value changes in several of the types of assets and liabilities being hedged do not affect net income.

**Table 7 — Derivatives Gains (Losses)**

| | Derivative Gains (Losses) | | | |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
|---|---|---|---|---|
| Interest-rate swaps | $(8,278) | $(3,963) | $(10,304) | $(14,235) |
| Option-based derivatives[1] | 5,887 | 3,303 | 6,682 | 8,585 |
| Other derivatives[2] | (1,092) | 475 | (1,494) | (498) |
| Accrual of periodic settlements[3] | (1,269) | (945) | (3,870) | (3,505) |
| Total | $ (4,752) | $ (1,130) | $(8,986) | $ (9,653) |

(1) Primarily includes purchased call and put swaptions and purchased interest-rate caps and floors.

(2) Includes futures, foreign-currency swaps, commitments, swap guarantee derivatives, and credit derivatives. Foreign-currency swaps are defined as swaps in which net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars. Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(3) Includes imputed interest on zero-coupon swaps.

Gains (losses) on derivatives not accounted for in hedge accounting relationships are principally driven by changes in: (a) interest rates and implied volatility; and (b) the mix and volume of derivatives in our derivatives portfolio.

During the three and nine months ended September 30, 2011, we recognized losses on derivatives of $4.8 billion and $9.0 billion, respectively, primarily due to declines in interest rates in the second and third quarters. Specifically, during the three and nine months ended September 30, 2011, we recognized fair value losses on our pay-fixed swap positions of $19.1 billion and $22.4 billion, respectively, partially offset by fair value gains on our receive-fixed swaps of $10.8 billion and $12.1 billion, respectively. We also recognized fair value gains of $5.9 billion and $6.7 billion during the three and nine months ended September 30, 2011, respectively, on our option-based derivatives, resulting from gains on our purchased call swaptions as interest rates decreased during the second and third quarters of 2011. Additionally, we recognized losses related to the accrual of periodic settlements during the three and nine months ended September 30, 2011 due to our net pay-fixed swap position in the current interest rate environment.

During the three and nine months ended September 30, 2010, the yield curve flattened, with declining interest rates, resulting in a loss on derivatives of $1.1 billion and $9.7 billion, respectively. Specifically, for the three and nine months ended September 30, 2010, the decrease in interest rates resulted in fair value losses on our pay-fixed swaps of $11.5 billion and $34.9 billion, respectively, partially offset by fair value gains on our receive-fixed swaps of $7.5 billion and $20.6 billion, respectively. We recognized fair value gains for the three and nine months ended September 30, 2010 of $3.3 billion and $8.6 billion, respectively, on our option-based derivatives, resulting from gains on our purchased call swaptions primarily due to the declines in interest rates during these periods.

**Investment Securities-Related Activities**

*Impairments of Available-For-Sale Securities*

We recorded net impairments of available-for-sale securities recognized in earnings, which were related to non-agency mortgage-related securities, of $161 million and $1.7 billion during the three and nine months ended September 30, 2011, respectively, compared to $1.1 billion and $2.0 billion during the three and nine months ended September 30, 2010, respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" and "NOTE 7: INVESTMENTS IN SECURITIES" for information regarding the accounting principles for investments in debt and equity securities and the other-than-temporary impairments recorded during the three and nine months ended September 30, 2011 and 2010.

*Other Gains (Losses) on Investment Securities Recognized in Earnings*

Other gains (losses) on investment securities recognized in earnings primarily consists of gains (losses) on trading securities. We recognized $(547) million and $(473) million related to gains (losses) on trading securities during the three

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2136                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

and nine months ended September 30, 2011, respectively, compared to $(561) million and $(1.3) billion related to gains (losses) on trading securities during the three and nine months ended September 30, 2010, respectively.

The losses on trading securities for all periods presented were primarily due to the movement of securities with unrealized gains towards maturity, partially offset by fair value gains due to a decline in interest rates.

During the three and nine months ended September 30, 2011 the decreased losses on trading securities as compared to the three and nine months ended September 30, 2010 were primarily due to a tightening of OAS levels on agency securities and a decline in interest rates.

### Other Income

Table 8 summarizes the significant components of other income.

### Table 8 — Other Income

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | | (in millions) | | |
| Other income: | | | | |
| Guarantee-related income | $ 40 | $ 58 | $ 175 | $ 177 |
| Gains on sale of mortgage loans | 46 | 28 | 302 | 244 |
| Gains on mortgage loans recorded at fair value | 216 | 128 | 319 | 154 |
| Recoveries on loans impaired upon purchase | 119 | 247 | 376 | 643 |
| All other | 393 | 108 | 228 | 386 |
| Total other income | $ 814 | $ 569 | $1,400 | $1,604 |

Other income increased to $814 million in the three months ended September 30, 2011, compared to $569 million in the three months ended September 30, 2010, primarily due to the recognition of a gain from the settlement of our claim in the bankruptcy of TBW, one of our former seller/servicers, and an adjustment to the amount recorded in the prior period to correct an accounting error.

Other income declined during the nine months ended September 30, 2011, compared to the same period in 2010, primarily due to lower recoveries on loans impaired upon purchase during the 2011 period and a decline in all other income. All other income declined to $228 million during the nine months ended September 30, 2011, compared to $386 million during the nine months ended September 30, 2010, primarily due to the correction in 2011 of certain prior period accounting errors not material to our financial statements. During the nine months ended September 30, 2011, other income includes the correction of prior period accounting errors associated with the accrual of interest income for certain impaired mortgage-related securities during 2010 and 2009. This correction reduced other income in 2011 by approximately $293 million in the second quarter of 2011, and increased other income by $122 million in the third quarter of 2011 for a net decrease of approximately $171 million in the nine months ended September 30, 2011. Partially offsetting the decline in other income was an increase in gains on mortgage loans recorded at fair value during the nine months ended September 30, 2011, which was primarily due to declines in interest rates combined with higher balances of loans recorded at fair value during the 2011 period.

During the third quarters of 2011 and 2010, recoveries on loans impaired upon purchase were $119 million and $247 million, respectively, and were $376 million in the nine months ended September 30, 2011, compared to $643 million in the nine months ended September 30, 2010. The declines in the 2011 periods were due to a lower volume of foreclosure transfers associated with loans impaired upon purchase. These recoveries principally relate to impaired loans purchased prior to January 1, 2010, due to a change in accounting guidance effective on that date. Consequently, our recoveries on loans impaired upon purchase will generally continue to decline over time.

20

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Non-Interest Expense**

Table 9 summarizes the components of non-interest expense.

**Table 9 — Non-Interest Expense**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Administrative expenses:(1) | | | | |
| Salaries and employee benefits | $ 212 | $ 224 | $ 638 | $ 688 |
| Professional services | 73 | 72 | 193 | 220 |
| Occupancy expense | 14 | 16 | 44 | 47 |
| Other administrative expense | 82 | 76 | 251 | 242 |
| Total administrative expenses | 381 | 388 | 1,126 | 1,197 |
| REO operations expense | 221 | 337 | 505 | 456 |
| Other expenses | 85 | 103 | 299 | 321 |
| Total non-interest expense | $ 687 | $ 828 | $1,930 | $1,974 |

(1) Commencing in the first quarter of 2011, we reclassified certain expenses from other expenses to professional services expense. Prior period amounts have been reclassified to conform to the current presentation.

*Administrative Expenses*

Administrative expenses decreased for the three and nine months ended September 30, 2011, compared to the three and nine months ended September 30, 2010, due in part to our ongoing focus on cost reduction measures, particularly with regard to salaries and employee benefits. We expect our administrative expenses will decline for the full year of 2011 when compared to 2010.

*REO Operations Expense*

The table below presents the components of our REO operations expense, and REO inventory and disposition information.

**Table 10 — REO Operations Expense, REO Inventory, and REO Dispositions**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (dollars in millions) | | | |
| REO operations expense: | | | | |
| Single-family: | | | | |
| REO property expenses(1) | $ 298 | $ 336 | $ 906 | $ 820 |
| Disposition (gains) losses, net(2)(3) | 29 | 33 | 211 | 7 |
| Change in holding period allowance, dispositions | (87) | (40) | (371) | (167) |
| Change in holding period allowance, inventory(4) | 127 | 250 | 283 | 367 |
| Recoveries(5) | (141) | (242) | (511) | (575) |
| Total single-family REO operations expense | 226 | 337 | 518 | 452 |
| Multifamily REO operations expense (income) | (5) | — | (13) | 4 |
| Total REO operations expense | $ 221 | $ 337 | $ 505 | $ 456 |
| REO inventory (in properties), at September 30: | | | | |
| Single-family | 59,596 | 74,897 | 59,596 | 74,897 |
| Multifamily | 20 | 13 | 20 | 13 |
| Total | 59,616 | 74,910 | 59,616 | 74,910 |
| REO property dispositions (in properties) | 25,387 | 26,336 | 86,370 | 74,621 |

(1) Consists of costs incurred to acquire, maintain or protect a property after it is acquired in a foreclosure transfer, such as legal fees, insurance, taxes, and cleaning and other maintenance charges.
(2) Represents the difference between the disposition proceeds, net of selling expenses, and the fair value of the property on the date of the foreclosure transfer.
(3) Commencing in the first quarter of 2011, we reclassified expenses related to the disposition of REO underlying Other Guarantee Transactions from REO property expense to disposition (gains) losses, net. Prior periods have been revised to conform to the current presentation.
(4) Represents the (increase) decrease in the estimated fair value of properties that were in inventory during the period.
(5) Includes recoveries from primary mortgage insurance, pool insurance and seller/servicer repurchases.

REO operations expense was $221 million for the third quarter of 2011, as compared to $337 million during the third quarter of 2010, and was $505 million in the nine months ended September 30, 2011 compared to $456 million for the nine months ended September 30, 2010. The decline in REO operations expense in the third quarter of 2011, compared to the third quarter of 2010, was primarily due to the impact of a less significant decline in home prices resulting in lower write-downs of single-family REO inventory, partially offset by lower recoveries on sold properties during the third

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
TREASURY-2138
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

quarter of 2011. Although REO operations expense was relatively unchanged for the nine months ended September 30, 2011, compared to the nine months ended September 30, 2010, the 2011 period reflects higher single-family property expenses and lower recoveries on sold properties partially offset by lower write-downs of single-family REO inventory, compared to the 2010 period. We expect REO property expenses to continue to remain high in the remainder of 2011 and into 2012 due to expected continued high levels of single-family REO acquisitions and inventory.

In recent periods, the volume of our single-family REO acquisitions has been less than it otherwise would have been due to delays caused by concerns about the foreclosure process, including deficiencies in foreclosure documentation practices, particularly in states that require a judicial foreclosure process. The acquisition slowdown, coupled with high disposition levels, led to an approximate 17% reduction in REO property inventory from December 31, 2010 to September 30, 2011. We expect these delays in the foreclosure process will likely continue into 2012. For more information on how concerns about foreclosure documentation practices could adversely affect our REO operations expense, see "RISK FACTORS — Operational Risks — *We have incurred and will continue to incur expenses and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process*" in our 2010 Annual Report. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

**Other Expenses**

Other expenses consist primarily of HAMP servicer incentive fees, costs related to terminations and transfers of mortgage servicing, and other miscellaneous expenses. Other expenses were lower in the three and nine months ended September 30, 2011 compared to the three and nine months ended September 30, 2010, primarily due to lower expenses associated with transfers and terminations of mortgage servicing, partially offset by higher servicer incentive fees associated with HAMP during the 2011 periods.

**Income Tax Benefit**

For the three months ended September 30, 2011 and 2010, we reported an income tax benefit of $56 million and $411 million, respectively. For the nine months ended September 30, 2011 and 2010, we reported an income tax benefit of $362 million and $800 million, respectively. See "NOTE 13: INCOME TAXES" for additional information.

**Total Comprehensive Income (Loss)**

Our total comprehensive income (loss) was $(4.4) billion and $1.4 billion for the three months ended September 30, 2011 and 2010, respectively, consisting of: (a) $(4.4) billion and $(2.5) billion of net income (loss), respectively; and (b) $46 million and $3.9 billion of total other comprehensive income, respectively.

Our total comprehensive income (loss) was $(2.7) billion and $(0.9) billion for the nine months ended September 30, 2011 and 2010, respectively, consisting of: (a) $(5.9) billion and $(13.9) billion of net income (loss), respectively; and (b) $3.1 billion and $13.0 billion of total other comprehensive income, respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Total Equity (Deficit)" for additional information regarding total other comprehensive income (loss).

**Segment Earnings**

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. Certain activities that are not part of a reportable segment are included in the All Other category.

The Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans funded by other debt issuances and hedged using derivatives. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. The Investments segment also reflects the impact of changes in fair value of CMBS and multifamily held-for-sale loans associated with changes in interest rates.

The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related securities in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less the credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2139          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, our purchases of such loans have declined significantly since 2010 and our purchases of such CMBS have declined significantly since 2008. Currently, our primary strategy is to purchase multifamily mortgage loans for purposes of aggregation and then securitization. We guarantee the senior tranches of these securitizations. The Multifamily segment does not issue REMIC securities but does issue Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less allocated funding costs, the credit-related expenses, and administrative expenses. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated only with factors other than changes in interest rates, such as liquidity and credit.

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. The financial performance of our segments is measured based on each segment's contribution to GAAP net income (loss). In addition, our Investments segment is measured on its contribution to GAAP total comprehensive income (loss). The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods. The All Other category also includes the deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward.

In presenting Segment Earnings, we make significant reclassifications to certain financial statement line items in order to reflect a measure of net interest income on investments, and a measure of management and guarantee income on guarantees, that is in line with how we manage our business. We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of income and comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments.

As a result of these reclassifications and allocations, Segment Earnings for our reportable segments differs significantly from, and should not be used as a substitute for, net income (loss) as determined in accordance with GAAP. Our definition of Segment Earnings may differ from similar measures used by other companies. However, we believe that Segment Earnings provides us with meaningful metrics to assess the financial performance of each segment and our company as a whole.

See "NOTE 17: SEGMENT REPORTING" in our 2010 Annual Report for further information regarding our segments, including the descriptions and activities of the segments and the reclassifications and allocations used to present Segment Earnings.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2140

Table of Contents

Table 11 provides information about our various segment mortgage portfolios at September 30, 2011 and December 31, 2010. For a discussion of each segment's portfolios, see "*Segment Earnings — Results*."

## Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios[1]

| | September 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| **Segment mortgage portfolios:** | | |
| *Investments — Mortgage investments portfolio:* | | |
| Single-family unsecuritized mortgage loans[2] | $ 98,115 | $ 79,097 |
| Freddie Mac mortgage-related securities | 251,242 | 263,152 |
| Non-agency mortgage-related securities | 88,857 | 99,639 |
| Non-Freddie Mac agency mortgage-related securities | 35,416 | 39,789 |
| Total Investments — Mortgage investments portfolio | 473,630 | 481,677 |
| *Single-family Guarantee — Managed loan portfolio:*[3] | | |
| Single-family unsecuritized mortgage loans[4] | 63,237 | 69,766 |
| Single-family Freddie Mac mortgage-related securities held by us | 251,242 | 261,508 |
| Single-family Freddie Mac mortgage-related securities held by third parties | 1,394,200 | 1,437,399 |
| Single-family other guarantee commitments[5] | 11,437 | 8,632 |
| Total Single-family Guarantee — Managed loan portfolio | 1,720,116 | 1,777,305 |
| *Multifamily — Guarantee portfolio:*[3] | | |
| Multifamily Freddie Mac mortgage-related securities held by us | 2,813 | 2,095 |
| Multifamily Freddie Mac mortgage related securities held by third parties | 19,587 | 11,916 |
| Multifamily other guarantee commitments[5] | 9,812 | 10,038 |
| Total Multifamily — Guarantee portfolio | 32,212 | 24,049 |
| *Multifamily — Mortgage investments portfolio*[3] | | |
| Multifamily investment securities portfolio | 60,675 | 59,548 |
| Multifamily loan portfolio | 81,591 | 85,883 |
| Total Multifamily — Mortgage investments portfolio | 142,266 | 145,431 |
| Total Multifamily portfolio | 174,478 | 169,480 |
| Less : Freddie Mac single-family and certain multifamily securities[6] | (254,055) | (263,603) |
| **Total mortgage portfolio** | $ 2,114,169 | $ 2,164,859 |
| **Credit risk portfolios:**[7] | | |
| *Single-family credit guarantee portfolio:* | | |
| Single-family mortgage loans, on-balance sheet | $ 1,771,717 | $ 1,799,256 |
| Non-consolidated Freddie Mac mortgage-related securities | 10,884 | 11,268 |
| Other guarantee commitments | 11,437 | 8,632 |
| Less: HFA-related guarantees[8] | (8,885) | (9,322) |
| Less: Freddie Mac mortgage-related securities backed by Ginnie Mae certificates[8] | (817) | (857) |
| Total single-family credit guarantee portfolio | $ 1,784,336 | $ 1,808,977 |
| *Multifamily mortgage portfolio:* | | |
| Multifamily mortgage loans, on-balance sheet | $ 81,591 | $ 85,883 |
| Non-consolidated Freddie Mac mortgage-related securities | 22,400 | 14,011 |
| Other guarantee commitments | 9,812 | 10,038 |
| Less: HFA-related guarantees[8] | (1,449) | (1,551) |
| Total multifamily mortgage portfolio | $ 112,354 | $ 108,381 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Excludes unsecuritized non-accrual single-family loans managed by the Single-family Guarantee segment. However, the Single-family Guarantee segment continues to earn management and guarantee fees associated with unsecuritized single-family loans in the Investments segment.
(3) The balances of the mortgage-related securities in these portfolios are based on the UPB of the security, whereas the balances of our single-family credit guarantee and multifamily mortgage portfolios presented in this report are based on the UPB of the mortgage loans underlying the related security. The differences in the loan and security balances result from the timing of remittances to security holders, which is typically 45 or 75 days after the mortgage payment cycle of fixed-rate and ARM PCs, respectively.
(4) Represents unsecuritized non-accrual single-family loans managed by the Single-family Guarantee segment.
(5) Represents the UPB of mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.
(6) Freddie Mac single-family mortgage-related securities held by us are included in both our Investments segment's mortgage investments portfolio and our Single-family Guarantee segment's managed loan portfolio, and Freddie Mac multifamily mortgage-related securities held by us are included in both the multifamily investment securities portfolio and the multifamily guarantee portfolio. Therefore, these amounts are deducted in order to reconcile to our total mortgage portfolio.
(7) Represents the UPB of loans for which we present characteristics, delinquency data, and certain other statistics in this report. See "GLOSSARY" for further description.
(8) We exclude HFA-related guarantees and our resecuritizations of Ginnie Mae certificates from our credit risk portfolios and most related statistics because these guarantees do not expose us to meaningful amounts of credit risk due to the credit enhancement provided on these by the U.S. government.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2141          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Segment Earnings — Results

*Investments*

Table 12 presents the Segment Earnings of our Investments segment.

**Table 12 — Segment Earnings and Key Metrics — Investments[1]**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (dollars in millions) | | | |
| Segment Earnings: | | | | |
| Net interest income | $ 1,905 | $ 1,667 | $ 5,384 | $ 4,487 |
| Non-interest income (loss): | | | | |
| Net impairment of available-for-sale securities | (116) | (934) | (1,284) | (1,637) |
| Derivative gains (losses) | (3,144) | 192 | (4,197) | (4,703) |
| Other non-interest income (loss) | 178 | (768) | 657 | (496) |
| Total non-interest income (loss) | (3,082) | (1,510) | (4,824) | (6,836) |
| Non-interest expense: | | | | |
| Administrative expenses | (97) | (110) | (293) | (343) |
| Other non-interest expense | (1) | (1) | (2) | (14) |
| Total non-interest expense | (98) | (111) | (295) | (357) |
| Segment adjustments[2] | 137 | 272 | 466 | 1,076 |
| Segment Earnings (loss) before income tax benefit (expense) | (1,138) | 318 | 731 | (1,630) |
| Income tax benefit (expense) | 59 | (34) | 337 | 192 |
| Segment Earnings (loss), net of taxes, including noncontrolling interest | (1,079) | 284 | 1,068 | (1,438) |
| Less: Net (income) loss — noncontrolling interest | — | — | — | (2) |
| Segment Earnings (loss), net of taxes | (1,079) | 284 | 1,068 | (1,440) |
| Total other comprehensive income, net of taxes | 1,347 | 3,317 | 3,106 | 10,051 |
| Total comprehensive income | $ 268 | $ 3,601 | $ 4,174 | $ 8,611 |
| Key metrics — Investments: | | | | |
| *Portfolio balances:* | | | | |
| Average balances of interest-earning assets:[3][4][5] | | | | |
| Mortgage-related securities[6] | $387,428 | $439,073 | $393,301 | $482,660 |
| Non-mortgage-related investments[7] | 85,819 | 123,241 | 97,505 | 125,912 |
| Unsecuritized single-family loans | 97,059 | 64,517 | 91,638 | 53,753 |
| Total average balances of interest-earning assets | $ 570,306 | $626,831 | $582,444 | $662,325 |
| *Return:* | | | | |
| Net interest yield — Segment Earnings basis (annualized) | 1.34% | 1.06% | 1.23% | 0.90% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15: SEGMENT REPORTING — Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."
(2) For a description of our segment adjustments, see "NOTE 15: SEGMENT REPORTING — Segment Earnings."
(3) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(4) Excludes non-performing single-family mortgage loans.
(5) We calculate average balances based on amortized cost.
(6) Includes our investments in single-family PCs and certain Other Guarantee Transactions, which have been consolidated under GAAP on our consolidated balance sheet since January 1, 2010.
(7) Includes the average balances of interest-earning cash and cash equivalents, non-mortgage-related securities, and federal funds sold and securities purchased under agreements to resell.

Our total comprehensive income for our Investments segment was $268 million and $4.2 billion for the three and nine months ended September 30, 2011, respectively, consisting of: (a) $(1.1) billion and $1.1 billion of Segment Earnings (loss), respectively; and (b) $1.3 billion and $3.1 billion of total other comprehensive income, respectively.

Our total comprehensive income for our Investments segment was $3.6 billion and $8.6 billion for the three and nine months ended September 30, 2010, respectively, consisting of: (a) $284 million and $(1.4) billion of Segment Earnings (loss), respectively; and (b) $3.3 billion and $10.1 billion of total other comprehensive income, respectively.

During the three and nine months ended September 30, 2011, the UPB of the Investments segment mortgage investments portfolio decreased at an annualized rate of 3.0% and 2.2%, respectively. We held $286.7 billion of agency securities and $88.9 billion of non-agency mortgage-related securities as of September 30, 2011 compared to $302.9 billion of agency securities and $99.6 billion of non-agency mortgage-related securities as of December 31, 2010. The decline in UPB of agency securities is due mainly to liquidations, including prepayments and selected sales. The decline in UPB of non-agency mortgage-related securities is due mainly to the receipt of monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral, representing a partial return of our investments in these securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for additional information regarding our mortgage-related securities.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2142          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Segment Earnings net interest income increased $238 million and $897 million, and Segment Earnings net interest yield increased 28 basis points and 33 basis points during the three and nine months ended September 30, 2011, respectively, compared to the three and nine months ended September 30, 2010. The primary driver was lower funding costs, primarily due to the replacement of debt at lower rates and favorable rate resets on floating-rate debt. These lower funding costs were partially offset by the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations.

Segment Earnings non-interest income (loss) was $(3.1) billion for the three months ended September 30, 2011 compared to $(1.5) billion for the three months ended September 30, 2010. This increase in non-interest loss was primarily attributable to increased derivative losses, partially offset by decreased impairments of available-for-sale securities. Segment Earnings non-interest income (loss) was $(4.8) billion for the nine months ended September 30, 2011 compared to $(6.8) billion for the nine months ended September 30, 2010. This decrease in non-interest loss was mainly due to decreased derivative losses, primarily due to a smaller decline in interest rates, and decreased losses on trading securities, primarily due to a smaller decline in interest rates coupled with tightening OAS levels on agency securities, during the nine months ended September 30, 2011, compared to the nine months ended September 30, 2010.

We recorded derivative gains (losses) for this segment of $(3.1) billion and $(4.2) billion during the three and nine months ended September 30, 2011, respectively, compared to $192 million and $(4.7) billion during the three and nine months ended September 30, 2010. While derivatives are an important aspect of our strategy to manage interest-rate risk, they generally increase the volatility of reported Segment Earnings, because while fair value changes in derivatives affect Segment Earnings, fair value changes in several of the types of assets and liabilities being hedged do not affect Segment Earnings. During the three and nine months ended September 30, 2011 and the three and nine months ended September 30, 2010, swap interest rates decreased, resulting in fair value losses on our pay-fixed swaps that were partially offset by fair value gains on our receive-fixed swaps and purchased call swaptions. See "Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for additional information on our derivatives.

Impairments recorded in our Investments segment decreased by $818 million and $353 million during the three and nine months ended September 30, 2011, compared to the three and nine months ended September 30, 2010. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" for additional information on our impairments.

Our Investments segment's total other comprehensive income was $1.3 billion and $3.1 billion for the three and nine months ended September 30, 2011, respectively. Net unrealized losses in AOCI on our available-for-sale securities decreased by $1.2 billion and $2.7 billion during the three and nine months ended September 30, 2011, respectively, primarily attributable to the impact of declining interest rates, resulting in fair value gains on our agency and CMBS securities, and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities, partially offset by the impact of widening of OAS levels on our non-agency mortgage-related securities. The impact of widening of OAS levels on our CMBS securities is reflected in the Multifamily segment.

Our Investments segment's total other comprehensive income was $3.3 billion and $10.1 billion during the three and nine months ended September 30, 2010, respectively. Net unrealized losses in AOCI on our available-for-sale securities decreased by $3.2 billion and $9.5 billion during the three and nine months ended September 30, 2010, respectively, primarily attributable to the impact of declining interest rates, resulting in fair value gains on our agency, CMBS, and non-agency mortgage-related securities. In addition, the impact of widening OAS levels during these periods was offset by fair value gains related to the movement of securities with unrealized losses towards maturity and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities.

The objectives set forth for us under our charter and conservatorship, restrictions set forth in the Purchase Agreement and restrictions imposed by FHFA have negatively impacted, and will continue to negatively impact, our Investments segment results. For example, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. This will likely cause a corresponding reduction in our net interest income from these assets and therefore negatively affect our Investments segment results. FHFA also stated that we will not be a substantial buyer of mortgages for our mortgage-related investments portfolio, except for purchases of seriously delinquent mortgages out of PC trusts. FHFA has also indicated that the portfolio reduction targets under the Purchase Agreement and FHFA regulation should be viewed as minimum reductions and has encouraged us to reduce the mortgage-related investments portfolio at a faster rate than required, consistent with FHFA guidance, safety and soundness and the goal of conserving and preserving assets. We are also subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2143                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

For information on the impact of the requirement to reduce the mortgage-related investments portfolio limit by 10% annually, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Impact of the Purchase Agreement and FHFA Regulation on the Mortgage-Related Investments Portfolio."

*Single-Family Guarantee*

Table 13 presents the Segment Earnings of our Single-family Guarantee segment.

**Table 13 — Segment Earnings and Key Metrics — Single-Family Guarantee[1]**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (dollars in millions) | | | |
| Segment Earnings: | | | | |
| Net interest income (expense) | $ (98) | $ (4) | $ (28) | $ 106 |
| Provision for credit losses | (4,008) | (3,980) | (9,178) | (15,315) |
| Non-interest income: | | | | |
| Management and guarantee income | 913 | 922 | 2,631 | 2,635 |
| Other non-interest income | 331 | 307 | 750 | 785 |
| Total non-interest income | 1,244 | 1,229 | 3,381 | 3,420 |
| Non-interest expense: | | | | |
| Administrative expenses | (227) | (224) | (670) | (695) |
| REO operations (expense) income | (226) | (337) | (518) | (452) |
| Other non-interest expense | (69) | (85) | (241) | (254) |
| Total non-interest expense | (522) | (646) | (1,429) | (1,401) |
| Segment adjustments[2] | (161) | (245) | (489) | (666) |
| Segment Earnings (loss) before income tax (expense) benefit | (3,545) | (3,646) | (7,743) | (13,856) |
| Income tax (expense) benefit | — | 508 | (8) | 617 |
| Segment Earnings (loss), net of taxes | (3,545) | (3,138) | (7,751) | (13,239) |
| Total other comprehensive income (loss), net of taxes | — | 1 | (3) | 2 |
| Total comprehensive income (loss) | $ (3,545) | $ (3,137) | $ (7,754) | $ (13,241) |
| Key metrics — Single-family Guarantee: | | | | |
| *Balances and Growth (in billions, except rate):* | | | | |
| Average balance of single-family credit guarantee portfolio | $ 1,800 | $ 1,858 | $ 1,811 | $ 1,873 |
| Issuance — Single-family credit guarantees[3] | $ 68 | $ 91 | $ 226 | $ 261 |
| Fixed-rate products — Percentage of purchases[4] | 88.6% | 95.0% | 91.4% | 95.6% |
| Liquidation rate — Single-family credit guarantees (annualized)[5] | 19.9% | 26.2% | 21.6% | 26.9% |
| *Management and Guarantee Fee Rate (in bps, annualized):* | | | | |
| Contractual management and guarantee fees | 13.8 | 13.5 | 13.7 | 13.4 |
| Amortization of delivery fees | 6.5 | 6.4 | 5.7 | 5.4 |
| Segment Earnings management and guarantee income | 20.3 | 19.9 | 19.4 | 18.8 |
| *Credit:* | | | | |
| Serious delinquency rate, at end of period | 3.51% | 3.80% | 3.51% | 3.80% |
| REO inventory, at end of period (number of properties) | 59,596 | 74,897 | 59,596 | 74,897 |
| Single-family credit losses, in bps (annualized)[6] | 76.3 | 91.0 | 71.9 | 78.4 |
| *Market:* | | | | |
| Single-family mortgage debt outstanding (total U.S. market, in billions)[7] | $ 9,920 | $ 10,094 | $ 9,920 | $ 10,094 |
| 30-year fixed mortgage rate[8] | 4.0% | 4.3% | 4.0% | 4.3% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15: SEGMENT REPORTING — Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."

(2) For a description of our segment adjustments, see "NOTE 15: SEGMENT REPORTING — Segment Earnings."

(3) Based on UPB.

(4) Excludes Other Guarantee Transactions.

(5) Represents principal repayments relating to loans underlying Freddie Mac mortgage-related securities and other guarantee commitments. Also includes our purchases of seriously delinquent and modified mortgage loans and balloon/reset mortgage loans out of PC pools.

(6) Calculated as the amount of single-family credit losses divided by the sum of the average carrying value of our single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees. Credit losses are equal to charge-offs, plus REO operations income (expense).

(7) Source: Federal Reserve Flow of Funds Accounts of the United States of America dated September 16, 2011. The outstanding amount for September 30, 2011 reflects the balance as of June 30, 2011, which is the latest available information.

(8) Based on Freddie Mac's Primary Mortgage Market Survey rate for the last week in the period, which represents the national average mortgage commitment rate to a qualified borrower exclusive of any fees and points required by the lender. This commitment rate applies only to financing on conforming mortgages with LTV ratios of 80%.

*Financial Results*

For the three and nine months ended September 30, 2011, Segment Earnings (loss) for our Single-family Guarantee segment was $(3.5) billion and $(7.8) billion, respectively, compared to $(3.1) billion and $(13.2) billion for the three and nine months ended September 30, 2010, respectively. Segment Earnings (loss) for our Single-family Guarantee segment worsened for the three months ended September 30, 2011 compared to the three months ended September 30, 2010

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011       TREASURY-2144       Powered by Morningstar® Document Research℠

The information contained herein may be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2145

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

primarily due to a decrease in recognized income tax benefit.  Segment Earnings (loss) for our Single-family Guarantee segment  improved for the nine months ended September 30, 2011 compared to the nine months ended September 30, 2010  primarily due to a decline in provision for credit losses.

During the three and nine months ended September 30, 2011,  our provision for credit losses for the Single-family Guarantee  segment was $4.0 billion and $9.2 billion,  respectively, compared to $4.0 billion and $15.3 billion during the three and nine months ended  September 30, 2010, respectively. The Segment Earnings provision for credit losses in the third quarter of 2011  reflects a decline in the volume of early and seriously delinquent loans, while the provision for credit losses in the  nine months ended September 30, 2011 reflects declines in the rate at which delinquent loans transition into serious  delinquency. The Segment Earnings provision for credit losses in the three and nine months ended September 30, 2011 also reflects higher loss severity, primarily due to lower  expectations for mortgage insurance recoveries, which is due to deterioration in the financial condition of certain of these  counterparties during the 2011 periods. See "RISK  MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for further information on our mortgage  insurance counterparties. The Segment Earnings provision for  credit losses in the three and nine months ended  September 30, 2010 also reflected a higher volume of  completed loan modifications that were classified as TDRs.

We adopted new accounting guidance on the classification of loans as TDRs in the third quarter of 2011, which significantly  increases the population of loans we account for and disclose as  TDRs. The impact of this change in guidance on our results for  the third quarter of 2011 was not significant. We expect that the number of loans that newly qualify as TDRs in the remainder  of 2011 will remain high, primarily because we anticipate that the majority of our modifications, both completed and those  still in trial periods will be considered TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for additional information on our TDR  loans, including our implementation of changes to the accounting  guidance for recognition of TDR loans.

Segment Earnings management and guarantee income decreased  slightly in the three and nine months ended September 30,  2011, as compared to the three and nine months ended  September 30, 2010, primarily due to lower average balances  of the single-family credit guarantee portfolio during the 2011 periods.

On September 19, 2011, the Acting Director of FHFA stated that he would anticipate Freddie Mac and Fannie Mae will  continue the gradual process of increasing guarantee fees. He stated that this will not happen immediately but should be  expected in 2012. President Obama's Plan for Economic Growth and Deficit Reduction, announced on September 19,  2011, contained a proposal to increase the guarantee fees  charged by Freddie Mac and Fannie Mae by 10 basis points.

TREASURY-2146

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 14 provides summary information about the composition of Segment Earnings (loss) for this segment in the three and nine months ended September 30, 2011.

**Table 14 — Segment Earnings Composition — Single-Family Guarantee Segment**

| | Three Months Ended September 30, 2011 | | | | |
| | Segment Earnings Management and Guarantee Income(1) | | Credit Expenses(2) | | Net Amount(4) |
| | Amount | Average Rate(3) | Amount | Average Rate(3) | |
| | (dollars in millions, rates in bps) | | | | |
| Year of origination:(5) | | | | | |
| 2011 | $ 111 | 22.2 | $ (25) | 5.7 | $ 86 |
| 2010 | 186 | 22.0 | (85) | 9.8 | 101 |
| 2009 | 176 | 20.5 | (97) | 11.0 | 79 |
| 2008 | 89 | 22.4 | (466) | 141.3 | (377) |
| 2007 | 87 | 18.2 | (1,426) | 320.1 | (1,339) |
| 2006 | 57 | 18.4 | (991) | 296.7 | (934) |
| 2005 | 66 | 18.3 | (631) | 165.6 | (565) |
| 2004 and prior | 141 | 18.9 | (513) | 61.9 | (372) |
| Total | $ 913 | 20.3 | $ (4,234) | 94.0 | $ (3,321) |
| Administrative expenses | | | | | (227) |
| Net interest income (expense) | | | | | (98) |
| Other non-interest income and expenses, net | | | | | 101 |
| Segment Earnings (loss), net of taxes | | | | | $ (3,545) |

| | Nine Months Ended September 30, 2011 | | | | |
| | Segment Earnings Management and Guarantee Income(1) | | Credit Expenses(2) | | Net Amount(4) |
| | Amount | Average Rate(3) | Amount | Average Rate(3) | |
| | (dollars in millions, rates in bps) | | | | |
| Year of origination:(5) | | | | | |
| 2011 | $ 202 | 19.9 | $ (40) | 5.0 | $ 162 |
| 2010 | 555 | 21.2 | (199) | 7.4 | 356 |
| 2009 | 498 | 18.7 | (211) | 7.7 | 287 |
| 2008 | 292 | 23.1 | (879) | 83.7 | (587) |
| 2007 | 283 | 18.6 | (3,320) | 236.8 | (3,037) |
| 2006 | 172 | 17.4 | (2,483) | 237.4 | (2,311) |
| 2005 | 194 | 17.1 | (1,525) | 127.3 | (1,331) |
| 2004 and prior | 435 | 18.3 | (1,039) | 39.5 | (604) |
| Total | $ 2,631 | 19.4 | $ (9,696) | 71.4 | $ (7,065) |
| Administrative expenses | | | | | (670) |
| Net interest income (expense) | | | | | (28) |
| Other non-interest income and expenses, net | | | | | 12 |
| Segment Earnings (loss), net of taxes | | | | | $ (7,751) |

(1) Includes amortization of delivery fees of $293 and $769 million for the three and nine months ended September 30, 2011, respectively.

(2) Consists of the aggregate of the Segment Earnings provision for credit losses and Segment Earnings REO operations expense. Historical rates of average credit expenses may not be representative of future results.

(3) Calculated as the annualized amount of Segment Earnings management and guarantee income or credit expenses, respectively, divided by the sum of the average carrying values of the single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees.

(4) Calculated as Segment Earnings management and guarantee income less credit expenses.

(5) Segment Earnings management and guarantee income is presented by year of guarantee origination, whereas credit expenses are presented based on year of loan origination.

During the nine months ended September 30, 2011, the guarantee-related revenue from mortgage guarantees we issued after 2008 exceeded the credit-related and administrative expenses associated with these guarantees. We currently believe our management and guarantee fee rates for guarantee issuances after 2008, when coupled with the higher credit quality of the mortgages within our new guarantee issuances, will provide management and guarantee fee income, over the long term, that exceeds our expected credit-related and administrative expenses associated with the underlying loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to incur expenses on these loans beyond our current expectations. Our management and guarantee fee rates associated with guarantee issuances in 2005 through 2008 have not been adequate to provide income to cover the credit and administrative expenses associated with such loans, primarily due to the high rate of defaults on the loans originated in those years coupled with a high volume of refinancing since 2008. High levels of refinancing and delinquency since 2008 have significantly reduced the balance of performing loans from those years that remain in our portfolio and consequently

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-2147

Table of Contents

reduced management and guarantee income associated with loans originated in 2005 through 2008 (we do not recognize Segment Earnings management and guarantee income on non-accrual mortgage loans). We also believe that the management and guarantee fees associated with originations after 2008 will not be sufficient to offset the future expenses associated with our 2005 to 2008 guarantee issuances for the foreseeable future. Consequently, we expect to continue reporting net losses for the Single-family Guarantee segment for the remainder of 2011 and into 2012.

*Key Metrics*

The UPB of the Single-family Guarantee managed loan portfolio declined to $1.7 trillion at September 30, 2011 from $1.8 trillion at December 31, 2010. This reflects that the amount of single-family loan liquidations has exceeded new loan purchase and guarantee activity in 2011, which we believe is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market. Additionally, our loan purchase and guarantee activity in the nine months ended September 30, 2011 was at the lowest level we have experienced in the last several years. During the three and nine months ended September 30, 2011 our annualized liquidation rate on our securitized single-family credit guarantees was approximately 20% and 22%, respectively.

Refinance volumes continued to be high due to continued low interest rates, and, based on UPB, represented 67% and 75% of our single-family mortgage purchase volume during the three and nine months ended September 30, 2011, respectively, compared to 76% and 75% of our single-family mortgage purchase volume during the three and nine months ended September 30, 2010, respectively. Relief refinance mortgages comprised approximately 40% and 35% of our total refinance volume during the nine months ended September 30, 2011 and 2010, respectively, based on number of loans.

The serious delinquency rate on our single-family credit guarantee portfolio declined to 3.51% as of September 30, 2011 from 3.84% as of December 31, 2010 due to a high volume of loan modifications and foreclosure transfers, as well as a slowdown in new serious delinquencies. The quarterly number of seriously delinquent loan additions declined steadily from the fourth quarter of 2009 through the second quarter of 2011; however, we experienced a small increase in the quarterly number of seriously delinquent loan additions during the third quarter of 2011. Our serious delinquency rate remains high compared to historical levels, reflecting continued stress in the housing and labor markets.

As of September 30, 2011 and December 31, 2010, approximately 50% and 39%, respectively, of our single-family credit guarantee portfolio is comprised of mortgage loans originated after 2008. Excluding relief refinance mortgages, these new vintages reflect a combination of changes in underwriting practices and improved borrower and loan characteristics, and represent an increasingly large proportion of our single-family credit guarantee portfolio. The proportion of the portfolio represented by 2005 through 2008 vintages, which have a higher composition of loans with higher-risk characteristics, continues to decline principally due to liquidations resulting from prepayments, foreclosure events, and foreclosure alternatives. We currently expect that, over time, the replacement of older vintages should positively impact the serious delinquency rates and credit-related expenses of our single-family credit guarantee portfolio. However, the rate at which this replacement occurs slowed beginning in 2010, due to a decline in the volume of home purchase mortgage originations, an increase in the proportion of relief refinance mortgage activity, and delays in the foreclosure process. Relief refinance mortgages with LTV ratios above 80% represented approximately 13% and 12% of our single-family mortgage purchase volume during the nine months ended September 30, 2011 and 2010, respectively, based on UPB. Relief refinance mortgages with LTV ratios above 80% may not perform as well as refinance mortgages with LTV ratios of 80% or less over time due, in part, to the continued high LTV ratios of these loans.

Single-family credit losses as a percentage of the average balance of the single-family credit guarantee portfolio and HFA-related guarantees was 76.3 basis points in the third quarter of 2011, compared to 91.0 basis points for the third quarter of 2010, and was 71.9 basis points for the nine months ended September 30, 2011, compared to 78.4 basis points for the nine months ended September 30, 2010. Charge-offs, net of recoveries, associated with the single-family loans declined to $3.2 billion in the third quarter of 2011, from $3.9 billion for the third quarter of 2010. Charge-offs, net of recoveries, were $9.3 billion and $10.5 billion in the nine months ended September 30, 2011 and 2010, respectively. Our net charge-offs in the three and nine months ended September 30, 2011 remained elevated, but reflect suppression of activity due to delays in the foreclosure process. We believe that the level of our charge-offs will continue to remain high in the remainder of 2011 and may increase in 2012 due to the large number of single-family non-performing loans that will likely be resolved as our servicers work through their foreclosure-related issues and because market conditions, such as home prices and the rate of home sales, continue to remain weak. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, and our non-performing assets.

TREASURY-2148

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Multifamily*

Table 15 presents the Segment Earnings of our Multifamily segment.

**Table 15 — Segment Earnings and Key Metrics — Multifamily(1)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (dollars in millions) | | | |
| Segment Earnings: | | | | |
| Net interest income | $ 314 | $ 290 | $ 897 | $ 806 |
| (Provision) benefit for credit losses | 37 | (19) | 110 | (167) |
| Non-interest income (loss): | | | | |
| Management and guarantee income | 32 | 25 | 90 | 74 |
| Net impairment of available-for-sale securities | (27) | (5) | (344) | (77) |
| Derivative gains (losses) | (1) | 1 | 3 | 5 |
| Other non-interest income (loss) | (83) | 185 | 215 | 348 |
| Total non-interest income (loss) | (79) | 206 | (36) | 350 |
| Non-interest expense: | | | | |
| Administrative expenses | (57) | (54) | (163) | (159) |
| REO operations income (expense) | 5 | — | 13 | (4) |
| Other non-interest expense | (15) | (17) | (56) | (53) |
| Total non-interest expense | (67) | (71) | (206) | (216) |
| Segment Earnings before income tax benefit | 205 | 406 | 765 | 773 |
| Income tax benefit (expense) | — | (25) | (1) | (24) |
| Segment Earnings, net of taxes, including noncontrolling interest | 205 | 381 | 764 | 749 |
| Less: Net (income) loss — noncontrolling interest | — | — | — | 3 |
| Segment Earnings, net of taxes | 205 | 381 | 764 | 752 |
| Total other comprehensive income (loss), net of taxes | (1,301) | 629 | 46 | 2,989 |
| Total comprehensive income (loss) | $ (1,096) | $ 1,010 | $ 810 | $ 3,741 |
| Key metrics — Multifamily: | | | | |
| *Balances and Growth:* | | | | |
| Average balance of Multifamily loan portfolio | $82,128 | $83,232 | $83,875 | $82,932 |
| Average balance of Multifamily guarantee portfolio | $ 31,283 | $ 22,428 | $28,566 | $ 21,206 |
| Average balance of Multifamily investment securities portfolio | $60,868 | $60,988 | $ 61,873 | $ 61,835 |
| Liquidation rate — Multifamily loan portfolio (annualized) | 12.4% | 5.7% | 9.2% | 4.3% |
| Growth rate (annualized)(2) | 5.8% | 5.4% | 4.7% | 6.3% |
| *Yield and Rate:* | | | | |
| Net interest yield — Segment Earnings basis (annualized) | 0.87% | 0.80% | 0.82% | 0.74% |
| Average Management and guarantee fee rate, in bps (annualized)(3) | 41.5 | 50.0 | 43.5 | 50.7 |
| *Credit:* | | | | |
| Delinquency rate: | | | | |
| Credit-enhanced loans, at period end | 0.77% | 0.86% | 0.77% | 0.86% |
| Non-credit-enhanced loans, at period end | 0.18% | 0.18% | 0.18% | 0.18% |
| Total Delinquency rate, at period end | 0.33% | 0.31% | 0.33% | 0.31% |
| Allowance for loan losses and reserve for guarantee losses, at period end | $ 656 | $ 931 | $ 656 | $ 931 |
| Allowance for loan losses and reserve for guarantee losses, in bps | 57.6 | 87.8 | 57.6 | 87.8 |
| Credit losses, in bps (annualized)(4) | 4.0 | 9.0 | 5.3 | 9.2 |

(1) For reconciliations of Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15: SEGMENT REPORTING — Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."
(2) Based on the aggregate UPB of the Multifamily loan and guarantee portfolios.
(3) Represents Multifamily Segment Earnings — management and guarantee income, excluding prepayment and certain other fees, divided by the sum of the average balance of the multifamily guarantee portfolio and the average balance of guarantees associated with the HFA initiative, excluding certain bonds under the NIBP.
(4) Calculated as the amount of multifamily credit losses divided by the sum of the average carrying value of our multifamily loan portfolio and the average balance of the multifamily guarantee portfolio, including multifamily HFA initiative guarantees. Credit losses are equal to charge-offs, plus REO operations income (expense).

Our purchase and guarantee of multifamily loans increased by approximately 46%, to $12.4 billion for the nine months ended September 30, 2011, compared to $8.5 billion during the same period in 2010. We completed Other Guarantee Transactions securitizing $10.1 billion and $5.2 billion in UPB of multifamily loans in the nine months ended September 30, 2011 and 2010, respectively. The UPB of the total multifamily portfolio increased to $174.5 billion at September 30, 2011 from $169.5 billion at December 31, 2010, primarily due to increased issuance of Other Guarantee Transactions, partially offset by maturities and other repayments of multifamily held-for-investment mortgage loans.

During the third quarter of 2011, Multifamily Segment Earnings were negatively impacted by the widening of OAS levels on multifamily investments, which we believe was primarily due to increased global economic uncertainty. Although widening of OAS levels was largely offset by a decline in interest rates during the quarter, the financial impact associated with the decline in interest rates is included in Segment Earnings of the Investments segment, while the non-interest rate component of the change in fair value is recognized in the Multifamily segment.

31

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2149          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Segment Earnings for our Multifamily segment decreased to $205 million for the third quarter of 2011 from $381 million for the third quarter of 2010 primarily due to lower other non-interest income, partially offset by recognition of benefit for credit losses and higher net interest income in the third quarter of 2011. Segment Earnings for our Multifamily segment slightly increased to $764 million for the nine months ended September 30, 2011, compared to $752 million for the nine months ended September 30, 2010, primarily due to improvement of provision (benefit) for credit losses, which was substantially offset by higher security impairments on CMBS in the 2011 period. We currently expect to generate positive Segment Earnings in the Multifamily segment in the remainder of 2011 and 2012.

Our total comprehensive income (loss) for our Multifamily segment was $(1.1) billion and $0.8 billion for the three and nine months ended September 30, 2011, respectively, consisting of: (a) Segment Earnings of $0.2 billion and $0.8 billion, respectively; and (b) $(1.3) billion and $46 million, respectively, of total other comprehensive income (loss), which was mainly attributable to widening OAS levels on available-for-sale CMBS. Our total comprehensive income for our Multifamily segment was $1.0 billion and $3.7 billion for the three and nine months ended September 30, 2010, respectively, consisting of: (a) Segment Earnings of $0.4 billion and $0.7 billion, respectively; and (b) $0.6 billion and $3.0 billion, respectively, of total other comprehensive income, primarily resulting from improved fair values resulting from tightening of OAS levels on available-for-sale CMBS.

Segment Earnings net interest income increased to $314 million in the third quarter of 2011 from $290 million in the third quarter of 2010, and was $897 million and $806 million in the nine months ended September 30, 2011 and 2010, respectively. These increases were primarily attributable to higher interest income relative to allocated funding costs in the 2011 periods.

Within Segment Earnings non-interest income (loss), we recognized higher security impairments on CMBS that were partially offset by higher gains on sale of mortgage loans during the nine months ended September 30, 2011, compared to the nine months ended September 30, 2010. CMBS impairments during the nine months ended September 30, 2011 and 2010 totaled $344 million and $77 million, respectively, representing an increase of $267 million. We recognized $302 million in gains on sales of $10.1 billion in UPB of multifamily loans during the nine months ended September 30, 2011, compared to $244 million of gains on sales of $5.4 billion in UPB of multifamily loans during the nine months ended September 30, 2010. Gains on sales of multifamily loans in the multifamily segment are presented net of changes in fair value due to changes in interest rates.

The most recent market data available continues to reflect improving national apartment fundamentals, including decreasing vacancy rates and increasing effective rents. However, the broader economy continues to be challenged by persistently high unemployment, which has delayed a more comprehensive recovery of the multifamily housing market. Some geographic areas in which we have investments in multifamily loans, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We expect our multifamily delinquency rate to remain relatively stable in the remainder of 2011. For further information on delinquencies, including geographical and other concentrations, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS."

Our Multifamily segment recognized a provision (benefit) for credit losses of $(37) million and $(110) million for the three and nine months ended September 30, 2011 compared to a provision for credit losses of $19 million and $167 million, for the three and nine months ended September 30, 2010, respectively. Our loan loss reserves associated with multifamily mortgage portfolio were $656 million and $828 million as of September 30, 2011 and December 31, 2010, respectively. The decline in our loan loss reserves in the nine months ended September 30, 2011 was driven by positive trends in vacancy rates and effective rents, as well as stabilizing or improved property values. For loans where we identified deteriorating collateral performance characteristics, such as estimated current LTV ratio and DSCRs, we evaluate each individual loan, using estimates of the property's current value, to determine if a specific loan loss reserve is needed. Although we use the most recently available results of our multifamily borrowers to estimate a property's current value, there may be a significant lag in reporting, which could be six months or more, as they prepare their results in the normal course of business.

The credit quality of the multifamily mortgage portfolio remains strong, as evidenced by low delinquency rates and credit losses, and we believe reflects prudent underwriting practices. The delinquency rate for loans in the multifamily mortgage portfolio was 0.33% and 0.26% as of September 30, 2011 and December 31, 2010, respectively. As of September 30, 2011, more than half of the multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two or more monthly payments past due had credit enhancements that we currently believe will mitigate our expected losses on those loans. The multifamily delinquency rate of credit-enhanced loans as of September 30, 2011 and December 31, 2010, was 0.77% and 0.85%, respectively, while the delinquency rate for non-credit-enhanced loans

32

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

was 0.18% and 0.12%, respectively. See "RISK MANAGEMENT -Credit Risk -*Mortgage Credit Risk - Multifamily Mortgage Credit Risk*" for further information about our reported multifamily delinquency rates, including factors that can positively impact such rates.

Multifamily credit losses as a percentage of the combined average balance of our multifamily loan and guarantee portfolios declined from 9.0 basis points in the third quarter of 2010 to 4.0 basis points in the third quarter of 2011. Charge-offs, net of recoveries, associated with multifamily loans decreased to $16 million in the third quarter of 2011, compared to $23 million in the third quarter of 2010, and decreased to $57 million in the nine months ended September 30, 2011, compared to $68 million in the nine months ended September 30, 2010, due to a decline in loss severities in the 2011 periods.

<h2 align="center">CONSOLIDATED BALANCE SHEETS ANALYSIS</h2>

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also, see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported financial position.

### Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell

Cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and other liquid assets discussed in "Investments in Securities — *Non-Mortgage-Related Securities*," are important to our cash flow and asset and liability management, and our ability to provide liquidity and stability to the mortgage market. We use these assets to help manage recurring cash flows and meet our other cash management needs. We consider federal funds sold to be overnight unsecured trades executed with commercial banks that are members of the Federal Reserve System. Securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities.

The short-term assets on our consolidated balance sheets also include those related to our consolidated VIEs, which are comprised primarily of restricted cash and cash equivalents at September 30, 2011. These short-term assets decreased by $11.7 billion from December 31, 2010 to September 30, 2011, primarily due to a relative decline in the level of refinancing activity.

Excluding amounts related to our consolidated VIEs, we held $18.2 billion and $37.0 billion of cash and cash equivalents, $0 billion and $1.4 billion of federal funds sold, and $10.6 billion and $15.8 billion of securities purchased under agreements to resell at September 30, 2011 and December 31, 2010, respectively. The aggregate decrease in these assets was primarily driven by a decline in funding needs for debt redemptions. In addition, excluding amounts related to our consolidated VIEs, we held on average $37.7 billion and $33.2 billion of cash and cash equivalents and $12.9 billion and $21.0 billion of federal funds sold and securities purchased under agreements to resell during the three and nine months ended September 30, 2011, respectively.

In the beginning of the third quarter of 2011, we made a temporary change in the composition of our portfolio of liquid assets to more cash and overnight investments given the market's concerns about the potential for a downgrade in the credit ratings of the U.S. government and the potential that the U.S. would exhaust its borrowing authority under the statutory debt limit. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

### Investments in Securities

Table 16 provides detail regarding our investments in securities as of September 30, 2011 and December 31, 2010. Table 16 does not include our holdings of single-family PCs and certain Other Guarantee Transactions. For information on our holdings of such securities, see "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

<div align="center">33</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 16 — Investments in Securities**

| | Fair Value | |
|---|---|---|
| | September 30, 2011 | December 31, 2010 |
| | (in millions) | |
| Investments in securities: | | |
| Available-for-sale: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | $ 84,021 | $ 85,689 |
| Subprime | 28,888 | 33,861 |
| CMBS | 56,265 | 58,087 |
| Option ARM | 6,168 | 6,889 |
| Alt-A and other | 11,443 | 13,168 |
| Fannie Mae | 20,580 | 24,370 |
| Obligations of states and political subdivisions | 8,132 | 9,377 |
| Manufactured housing | 816 | 897 |
| Ginnie Mae | 271 | 296 |
| Total available-for-sale mortgage-related securities | 216,584 | 232,634 |
| Total investments in available-for-sale securities | 216,584 | 232,634 |
| Trading: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | 16,588 | 13,437 |
| Fannie Mae | 17,603 | 18,726 |
| Ginnie Mae | 161 | 172 |
| Other | 78 | 31 |
| Total trading mortgage-related securities | 34,430 | 32,366 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 276 | 44 |
| Treasury bills | 1,000 | 17,289 |
| Treasury notes | 17,159 | 10,122 |
| FDIC-guaranteed corporate medium-term notes | 2,433 | 441 |
| Total trading non-mortgage-related securities | 20,868 | 27,896 |
| Total investments in trading securities | 55,298 | 60,262 |
| Total investments in securities | $ 271,882 | $ 292,896 |

(1) For information on the types of instruments that are included, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report.

### *Non-Mortgage-Related Securities*

Our investments in non-mortgage-related securities provide an additional source of liquidity for us. We held investments in non-mortgage-related securities classified as trading of $20.9 billion and $27.9 billion as of September 30, 2011 and December 31, 2010, respectively. While balances may fluctuate from period to period, we continue to meet required liquidity and contingency levels.

### *Mortgage-Related Securities*

We are primarily a buy-and-hold investor in mortgage-related securities, which consist of securities issued by Fannie Mae, Ginnie Mae, and other financial institutions. We also invest in our own mortgage-related securities. However, the single-family PCs and certain Other Guarantee Transactions we purchase are not accounted for as investments in securities because we recognize the underlying mortgage loans on our consolidated balance sheets through consolidation of the related trusts.

Table 17 provides the UPB of our investments in mortgage-related securities classified as available-for-sale or trading on our consolidated balance sheets. Table 17 does not include our holdings of our own single-family PCs and certain Other Guarantee Transactions. For further information on our holdings of such securities, see "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets**

| | September 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Fixed Rate | Variable Rate(1) | Total | Fixed Rate | Variable Rate(1) | Total |
| | (in millions) | | | | | |
| Freddie Mac mortgage-related securities:(2) | | | | | | |
| Single-family | $ 76,432 | $ 9,086 | $ 85,518 | $ 79,955 | $ 8,118 | $ 88,073 |
| Multifamily | 1,009 | 1,804 | 2,813 | 339 | 1,756 | 2,095 |
| Total Freddie Mac mortgage-related securities | 77,441 | 10,890 | 88,331 | 80,294 | 9,874 | 90,168 |
| Non-Freddie Mac mortgage-related securities: | | | | | | |
| Agency securities:(3) | | | | | | |
| Fannie Mae: | | | | | | |
| Single-family | 19,380 | 15,666 | 35,046 | 21,238 | 18,139 | 39,377 |
| Multifamily | 62 | 77 | 139 | 228 | 88 | 316 |
| Ginnie Mae: | | | | | | |
| Single-family | 264 | 106 | 370 | 296 | 117 | 413 |
| Multifamily | 27 | — | 27 | 27 | — | 27 |
| Total agency securities | 19,733 | 15,849 | 35,582 | 21,789 | 18,344 | 40,133 |
| Non-agency mortgage-related securities: | | | | | | |
| Single-family:(4) | | | | | | |
| Subprime | 341 | 49,857 | 50,198 | 363 | 53,855 | 54,218 |
| Option ARM | — | 14,351 | 14,351 | — | 15,646 | 15,646 |
| Alt-A and other | 2,190 | 15,065 | 17,255 | 2,405 | 16,438 | 18,843 |
| CMBS | 20,228 | 35,379 | 55,607 | 21,401 | 37,327 | 58,728 |
| Obligations of states and political subdivisions(5) | 8,131 | 23 | 8,154 | 9,851 | 26 | 9,877 |
| Manufactured housing | 854 | 134 | 988 | 930 | 150 | 1,080 |
| Total non-agency mortgage-related securities(6) | 31,744 | 114,809 | 146,553 | 34,950 | 123,442 | 158,392 |
| Total UPB of mortgage-related securities | $128,918 | $141,548 | 270,466 | $137,033 | $ 151,660 | 288,693 |
| Premiums, discounts, deferred fees, impairments of UPB and other basis adjustments | | | (11,908) | | | (11,839) |
| Net unrealized (losses) on mortgage-related securities, pre-tax | | | (7,544) | | | (11,854) |
| Total carrying value of mortgage-related securities | | | $ 251,014 | | | $ 265,000 |

(1) Variable-rate mortgage-related securities include those with a contractual coupon rate that, prior to contractual maturity, is either scheduled to change or is subject to change based on changes in the composition of the underlying collateral.

(2) When we purchase REMICs and Other Structured Securities and certain Other Guarantee Transactions that we have issued, we account for these securities as investments in debt securities as we are investing in the debt securities of a non-consolidated entity. We do not consolidate our resecuritization trusts since we are not deemed to be the primary beneficiary of such trusts. We are subject to the credit risk associated with the mortgage loans underlying our Freddie Mac mortgage-related securities. Mortgage loans underlying our issued single-family PCs and certain Other Guarantee Transactions are recognized on our consolidated balance sheets as held-for-investment mortgage loans, at amortized cost. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report for further information.

(3) Agency securities are generally not separately rated by nationally recognized statistical rating organizations, but have historically been viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities AAA-rated or equivalent.

(4) For information about how these securities are rated, see "Table 22 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS."

(5) Consists of housing revenue bonds. Approximately 38% and 50% of these securities held at September 30, 2011 and December 31, 2010, respectively, were AAA-rated as of those dates, based on the lowest rating available.

(6) Credit ratings for most non-agency mortgage-related securities are designated by no fewer than two nationally recognized statistical rating organizations. Approximately 21% and 23% of total non-agency mortgage-related securities held at September 30, 2011 and December 31, 2010, respectively, were AAA-rated as of those dates, based on the UPB and the lowest rating available.

The total UPB of our investments in mortgage-related securities on our consolidated balance sheets decreased from $288.7 billion at December 31, 2010 to $270.5 billion at September 30, 2011 primarily as a result of liquidations exceeding our purchase activity during the nine months ended September 30, 2011.

Table 18 summarizes our mortgage-related securities purchase activity for the three and nine months ended September 30, 2011 and 2010. The purchase activity includes single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated. Purchases of single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated are recorded as an extinguishment of debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2153

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 18 — Total Mortgage-Related Securities Purchase Activity**[1]

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Non-Freddie Mac mortgage-related securities purchased for resecuritization: | | | | |
| Ginnie Mae Certificates | $ 1 | $ 40 | $ 73 | $ 53 |
| Non-agency mortgage-related securities purchased for Other Guarantee Transactions[2] | 2,088 | 969 | 8,600 | 8,653 |
| Total non-Freddie Mac mortgage-related securities purchased for resecuritization | 2,089 | 1,009 | 8,673 | 8,706 |
| Non-Freddie Mac mortgage-related securities purchased as investments in securities: | | | | |
| Agency securities: | | | | |
| *Fannie Mae:* | | | | |
| Fixed-rate | 1,550 | — | 4,750 | — |
| Variable-rate | 927 | 209 | 1,155 | 373 |
| *Total agency securities* | 2,477 | 209 | 5,905 | 373 |
| Non-agency mortgage-related securities: | | | | |
| *CMBS:* | | | | |
| Fixed-rate | — | — | 14 | — |
| Variable-rate | 6 | 40 | 52 | 40 |
| *Total non-agency mortgage-related securities* | 6 | 40 | 66 | 40 |
| *Total non-Freddie Mac mortgage-related securities purchased as investments in securities* | 2,483 | 249 | 5,971 | 413 |
| Total non-Freddie Mac mortgage-related securities purchased | $ 4,572 | $ 1,258 | $ 14,644 | $ 9,119 |
| Freddie Mac mortgage-related securities purchased: | | | | |
| *Single-family:* | | | | |
| Fixed-rate | $23,607 | $17,344 | $ 84,590 | $23,389 |
| Variable-rate | 587 | 79 | 3,591 | 282 |
| *Multifamily:* | | | | |
| Fixed-rate | 125 | 31 | 176 | 216 |
| Variable-rate | 52 | — | 117 | 41 |
| *Total Freddie Mac mortgage-related securities purchased* | $24,371 | $17,454 | $88,474 | $23,928 |

(1) Based on UPB. Excludes mortgage-related securities traded but not yet settled.

(2) Purchases for the nine months ended September 30, 2010 include HFA bonds we acquired and resecuritized under the NIBP. See "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS"in our 2010 Annual Report for further information on this component of the HFA initiative.

During the three and nine months ended September 30, 2011, we engaged in mortgage-related security transactions in which we entered into an agreement to purchase and subsequently resell (or sell and subsequently repurchase) agency securities. We engaged in these transactions primarily to support the market and pricing of our PC securities. When these transactions involve our consolidated PC trusts, the purchase and sale represents an extinguishment and issuance of debt securities, respectively, and impacts our net interest income and recognition of gain or loss on the extinguishment of debt on our consolidated statements of income and comprehensive income. These transactions can cause short-term fluctuations in the balance of our mortgage-related investments portfolio. The increase in our purchases of agency securities in the three and nine months ended September 30, 2011, reflected in Table 18 is attributed primarily to these transactions.

*Unrealized Losses on Available-For-Sale Mortgage-Related Securities*

At September 30, 2011, our gross unrealized losses, pre-tax, on available-for-sale mortgage-related securities were $20.8 billion, compared to $23.1 billion at December 31, 2010. The improvement in unrealized losses was primarily due to the impact of a decline in interest rates, resulting in fair value gains on our agency and CMBS securities, partially offset by the impact of widening OAS levels on our CMBS and other non-agency mortgage-related securities. Additionally, net unrealized losses recorded in AOCI decreased due to the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities. We believe the unrealized losses related to these securities at September 30, 2011 were mainly attributable to poor underlying collateral performance, limited liquidity and large risk premiums in the market for residential non-agency mortgage-related securities. All available-for-sale securities in an unrealized loss position are evaluated to determine if the impairment is other-than-temporary. See "Total Equity (Deficit)" and "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding unrealized losses on our available-for-sale securities.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2154

Table of Contents

### Higher-Risk Components of Our Investments in Mortgage-Related Securities

As discussed below, we have exposure to subprime, option ARM, interest-only, and Alt-A and other loans as part of our investments in mortgage-related securities as follows:

- *Single-family non-agency mortgage-related securities:* We hold non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans.

- *Single-family Freddie Mac mortgage-related securities:* We hold certain Other Guarantee Transactions as part of our investments in securities. There are subprime and option ARM loans underlying some of these Other Guarantee Transactions. For more information on single-family loans with certain higher-risk characteristics underlying our issued securities, see "RISK MANAGEMENT — Credit Risk — Mortgage Credit Risk."

### Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, and Alt-A Loans

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. Since the first quarter of 2008, we have not purchased any non-agency mortgage-related securities backed by subprime, option ARM, or Alt-A loans. Tables 19 and 20 present information about our holdings of these securities.

**Table 19 —**  **Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics[1]**

| | 9/30/2011 | 6/30/2011 | As of 3/31/2011 | 12/31/2010 | 9/30/2010 |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| UPB: | | | | | |
| Subprime first lien[2] | $49,794 | $ 51,070 | $ 52,403 | $ 53,756 | $55,250 |
| Option ARM | 14,351 | 14,778 | 15,232 | 15,646 | 16,104 |
| Alt-A[3] | 14,643 | 15,059 | 15,487 | 15,917 | 16,406 |
| Gross unrealized losses, pre-tax:[4] | | | | | |
| Subprime first lien[2] | $ 14,132 | $ 13,764 | $ 12,481 | $ 14,026 | $16,446 |
| Option ARM | 3,216 | 3,099 | 3,170 | 3,853 | 4,815 |
| Alt-A[3] | 2,468 | 2,171 | 1,941 | 2,096 | 2,542 |
| Present value of expected future credit losses:[5] | | | | | |
| Subprime first lien[2] | $ 5,414 | $ 6,487 | $ 6,612 | $ 5,937 | $ 4,364 |
| Option ARM | 4,434 | 4,767 | 4,993 | 4,850 | 4,208 |
| Alt-A[3] | 2,204 | 2,310 | 2,401 | 2,469 | 2,101 |
| Collateral delinquency rate:[6] | | | | | |
| Subprime first lien[2] | 42% | 42% | 44% | 45% | 45% |
| Option ARM | 44 | 44 | 44 | 44 | 44 |
| Alt-A[3] | 25 | 26 | 26 | 27 | 26 |
| Average credit enhancement:[7] | | | | | |
| Subprime first lien[2] | 22% | 23% | 24% | 25% | 25% |
| Option ARM | 8 | 10 | 11 | 12 | 12 |
| Alt-A[3] | 7 | 8 | 8 | 9 | 9 |
| Cumulative collateral loss:[8] | | | | | |
| Subprime first lien[2] | 21% | 20% | 19% | 18% | 17% |
| Option ARM | 16 | 15 | 14 | 13 | 11 |
| Alt-A[3] | 8 | 7 | 7 | 6 | 6 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities.

(2) Excludes non-agency mortgage-related securities backed by subprime second liens. We held $404 million of UPB of these securities at September 30, 2011.

(3) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.

(4) Represents the aggregate of the amount by which amortized cost, after other-than-temporary impairments, exceeds fair value measured at the individual lot level.

(5) Represents our estimate of future contractual cash flows that we do not expect to collect, discounted at the effective interest rate implicit in the security at the date of acquisition. This discount rate is only utilized to analyze the cumulative credit deterioration for securities since acquisition and may be lower than the discount rate used to measure ongoing other-than-temporary impairment to be recognized in earnings for securities that have experienced a significant improvement in expected cash flows since the last recognition of other-than-temporary impairment recognized in earnings.

(6) Determined based on the number of loans that are two monthly payments or more past due that underlie the securities using information obtained from a third-party data provider.

(7) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by bond insurance, overcollateralization and other forms of credit enhancement.

(8) Based on the actual losses incurred on the collateral underlying these securities. Actual losses incurred on the securities that we hold are significantly less than the losses on the underlying collateral as presented in this table, as non-agency mortgage-related securities backed by subprime first lien, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011       TREASURY-2155                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 20 — Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans**[1]

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | 9/30/2011 | 6/30/2011 | 3/31/2011 (in millions) | 12/31/2010 | 9/30/2010 |
| Net impairment of available-for-sale securities recognized in earnings: | | | | | |
| Subprime — first and second liens | $ 31 | $ 70 | $ 734 | $ 1,207 | $ 213 |
| Option ARM | 19 | 65 | 281 | 668 | 577 |
| Alt-A and other | 80 | 32 | 40 | 372 | 296 |
| Principal repayments and cash shortfalls:[2] | | | | | |
| Subprime — first and second liens: | | | | | |
| Principal repayments | $1,287 | $ 1,341 | $ 1,361 | $ 1,512 | $1,685 |
| Principal cash shortfalls | 6 | 10 | 14 | 6 | 8 |
| Option ARM: | | | | | |
| Principal repayments | $ 318 | $ 331 | $ 315 | $ 347 | $ 377 |
| Principal cash shortfalls | 109 | 123 | 100 | 111 | 122 |
| Alt-A and other: | | | | | |
| Principal repayments | $ 425 | $ 464 | $ 452 | $ 537 | $ 582 |
| Principal cash shortfalls | 81 | 84 | 81 | 62 | 56 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities.
(2) In addition to the contractual interest payments, we receive monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral of these securities representing a partial return of our investment in these securities.

As discussed below, we recognized impairment in earnings on our holdings of such securities during the three and nine months ended September 30, 2011 and 2010. See "Table 21 — Net Impairment on Available-For-Sale Mortgage-Related Securities Recognized in Earnings" for more information.

For purposes of our cumulative credit deterioration analysis, our estimate of the present value of expected future credit losses on our portfolio of non-agency mortgage-related securities decreased to $12.9 billion at September 30, 2011 from $14.4 billion at June 30, 2011. All of these amounts have been reflected in our net impairment of available-for-sale securities recognized in earnings in this period or prior periods. The decline in the present value of expected future credit losses was primarily due to the impact of a decline in interest rates resulting in a benefit from expected structural credit enhancements on these securities.

Since the beginning of 2007, we have incurred actual principal cash shortfalls of $1.3 billion on impaired non-agency mortgage-related securities, of which $202 million and $630 million related to the three and nine months ended September 30, 2011. Many of the trusts that issued non-agency mortgage-related securities we hold were structured so that realized collateral losses in excess of structural credit enhancements are not passed on to investors until the investment matures. We currently estimate that the future expected principal and interest shortfalls on non-agency mortgage-related securities we hold will be significantly less than the fair value declines experienced on these securities.

The investments in non-agency mortgage-related securities we hold backed by subprime first lien, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements. Bond insurance is an additional credit enhancement covering some of the non-agency mortgage-related securities. These credit enhancements are the primary reason we expect our actual losses, through principal or interest shortfalls, to be less than the underlying collateral losses in aggregate. It is difficult to estimate the point at which structural credit enhancements will be exhausted and we will incur actual losses. During the three and nine months ended September 30, 2011, we continued to experience the erosion of structural credit enhancements on many securities backed by subprime first lien, option ARM, and Alt-A loans due to poor performance of the underlying collateral. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers*."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*

Table 21 provides information about the mortgage-related securities for which we recognized other-than-temporary impairments for the three months ended September 30, 2011 and 2010.

**Table 21 — Net Impairment on Available-For-Sale Mortgage-Related Securities Recognized in Earnings**

| | | Three Months Ended September 30, | | |
| | 2011 | | 2010 | |
| | UPB | Net Impairment of Available-For-Sale Securities Recognized in Earnings | UPB | Net Impairment of Available-For-Sale Securities Recognized in Earnings |
|---|---|---|---|---|
| | | (in millions) | | |
| Subprime: | | | | |
| 2006 & 2007 first lien | $ 1,431 | $          29 | $12,847 | $          204 |
| Other years — first and second liens(1) | 77 | 2 | 496 | 9 |
| Total subprime — first and second liens | 1,508 | 31 | 13,343 | 213 |
| Option ARM: | | | | |
| 2006 & 2007 | 1,446 | 15 | 10,721 | 526 |
| Other years | 555 | 4 | 1,509 | 51 |
| Total option ARM | 2,001 | 19 | 12,230 | 577 |
| Alt-A: | | | | |
| 2006 & 2007 | 1,311 | 29 | 4,971 | 227 |
| Other years | 1,212 | 10 | 2,607 | 59 |
| Total Alt-A | 2,523 | 39 | 7,578 | 286 |
| Other loans | 1,202 | 41 | 841 | 10 |
| Total subprime, option ARM, Alt-A and other loans | 7,234 | 130 | 33,992 | 1,086 |
| CMBS | 788 | 27 | 312 | 6 |
| Manufactured housing | 245 | 4 | 460 | 8 |
| Total available-for-sale mortgage-related securities | $8,267 | $          161 | $34,764 | $          1,100 |

(1) Includes all second liens.

We recorded net impairment of available-for-sale mortgage-related securities recognized in earnings of $161 million and $1.7 billion during the three and nine months ended September 30, 2011, respectively, compared to $1.1 billion and $2.0 billion during the three and nine months ended September 30, 2010, as our estimate of the present value of expected future credit losses on certain individual securities increased during the periods. These impairments include $130 million and $1.4 billion of impairments related to securities backed by subprime, option ARM, and Alt-A and other loans during the three and nine months ended September 30, 2011, respectively, compared to $1.1 billion and $1.9 billion during the three and nine months ended September 30, 2010. In addition, during the three and nine months ended September 30, 2011, these impairments include recognition of the fair value declines related to certain investments in CMBS of $27 million and $181 million, respectively, as an impairment charge in earnings, as we have the intent to sell these securities. For more information, see "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-for-Sale Securities."

While it is reasonably possible that collateral losses on our available-for-sale mortgage-related securities where we have not recorded an impairment charge in earnings could exceed our credit enhancement levels, we do not believe that those conditions were likely at September 30, 2011. Based on our conclusion that we do not intend to sell our remaining available-for-sale mortgage-related securities in an unrealized loss position and it is not more likely than not that we will be required to sell these securities before a sufficient time to recover all unrealized losses and our consideration of other available information, we have concluded that the reduction in fair value of these securities was temporary at September 30, 2011 and have recorded these fair value losses in AOCI.

The credit performance of loans underlying our holdings of non-agency mortgage-related securities has declined since 2007. This decline has been particularly severe for subprime, option ARM, and Alt-A and other loans. Economic factors negatively impacting the performance of our investments in non-agency mortgage-related securities include high unemployment, a large inventory of seriously delinquent mortgage loans and unsold homes, tight credit conditions, and weak consumer confidence during the three and nine months ended September 30, 2011 and 2010. In addition, subprime, option ARM, and Alt-A and other loans backing the securities we hold have significantly greater concentrations in the states that are undergoing the greatest economic stress, such as California and Florida. Loans in these states undergoing economic stress are more likely to become seriously delinquent and the credit losses associated with such loans are likely to be higher than in other states.

*Freddie Mac*

TREASURY-2157

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                                                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our investments in non-agency mortgage-related securities. We have determined that there is substantial uncertainty surrounding certain bond insurers' ability to pay our future claims on expected credit losses related to our non-agency mortgage-related security investments. This uncertainty contributed to the impairments recognized in earnings during the three and nine months ended September 30, 2011 and 2010. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers*" and "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

Our assessments concerning other-than-temporary impairment require significant judgment and the use of models, and are subject to potentially significant change. In addition, changes in the performance of the individual securities and in mortgage market conditions may also affect our impairment assessments. Depending on the structure of the individual mortgage-related security and our estimate of collateral losses relative to the amount of credit support available for the tranches we own, a change in collateral loss estimates can have a disproportionate impact on the loss estimate for the security. Additionally, servicer performance, loan modification programs and backlogs, bankruptcy reform and other forms of government intervention in the housing market can significantly affect the performance of these securities, including the timing of loss recognition of the underlying loans and thus the timing of losses we recognize on our securities. Foreclosure processing suspensions can also affect our losses. For example, while defaulted loans remain in the trusts prior to completion of the foreclosure process, the subordinate classes of securities issued by the securitization trusts may continue to receive interest payments, rather than absorbing default losses. This may reduce the amount of funds available for the tranches we own. Given the extent of the housing and economic downturn, it is difficult to estimate the future performance of mortgage loans and mortgage-related securities with high assurance, and actual results could differ materially from our expectations. Furthermore, various market participants could arrive at materially different conclusions regarding estimates of future cash shortfalls. For more information on how delays in the foreclosure process, including delays related to concerns about deficiencies in foreclosure documentation practices, could adversely affect the values of, and the losses on, the non-agency mortgage-related securities we hold, see "RISK FACTORS — Operational Risks — *We have incurred and will continue to incur expenses and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process*" in our 2010 Annual Report.

For information regarding our efforts to mitigate losses on our investments in non-agency mortgage-related securities, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*."

*Ratings of Non-Agency Mortgage-Related Securities*

Table 22 shows the ratings of non-agency mortgage-related securities backed by subprime, option ARM, Alt-A and other loans, and CMBS held at September 30, 2011 based on their ratings as of September 30, 2011, as well as those held at December 31, 2010 based on their ratings as of December 31, 2010 using the lowest rating available for each security.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 22 —   Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime,  Option ARM, Alt-A and Other Loans, and CMBS**

| Credit Ratings as of September 30, 2011 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Bond Insurance Coverage(1) |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| **Subprime loans:** | | | | | |
| AAA-rated | $ 1,099 | 2% | $ 1,099 | $ (127) | $ 23 |
| Other investment grade | 2,773 | 6 | 2,773 | (429) | 387 |
| Below investment grade(2) | 46,326 | 92 | 39,103 | (13,583) | 1,680 |
| Total | $ 50,198 | 100% | $ 42,975 | $ (14,139) | $ 2,090 |
| **Option ARM loans:** | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 89 | 1 | 89 | (10) | 89 |
| Below investment grade(2) | 14,262 | 99 | 9,277 | (3,206) | 42 |
| Total | $ 14,351 | 100% | $ 9,366 | $ (3,216) | $ 131 |
| **Alt-A and other loans:** | | | | | |
| AAA-rated | $ 366 | 2% | $ 364 | $ (19) | $ 6 |
| Other investment grade | 2,303 | 13 | 2,327 | (357) | 323 |
| Below investment grade(2) | 14,586 | 85 | 11,386 | (2,299) | 2,204 |
| Total | $ 17,255 | 100% | $ 14,077 | $ (2,675) | $ 2,533 |
| **CMBS:** | | | | | |
| AAA-rated | $ 25,995 | 47% | $ 26,041 | $ — | $ 42 |
| Other investment grade | 26,202 | 47 | 26,168 | (388) | 1,651 |
| Below investment grade(2) | 3,410 | 6 | 2,918 | (147) | 1,699 |
| Total | $ 55,607 | 100% | $ 55,127 | $ (535) | $ 3,392 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS:** | | | | | |
| AAA-rated | $ 27,460 | 20% | $ 27,504 | $ (146) | $ 71 |
| Other investment grade | 31,367 | 23 | 31,357 | (1,184) | 2,450 |
| Below investment grade(2) | 78,584 | 57 | 62,684 | (19,235) | 5,625 |
| Total | $ 137,411 | 100% | $121,545 | $(20,565) | $ 8,146 |
| Total investments in mortgage-related securities | $ 270,466 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 51% | | | | |

| Credit Ratings as of December 31, 2010 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Bond Insurance Coverage(1) |
|---|---|---|---|---|---|
| **Subprime loans:** | | | | | |
| AAA-rated | $ 2,085 | 4% | $ 2,085 | $ (199) | $ 31 |
| Other investment grade | 3,407 | 6 | 3,408 | (436) | 449 |
| Below investment grade(2) | 48,726 | 90 | 42,423 | (13,421) | 1,789 |
| Total | $ 54,218 | 100% | $ 47,916 | $ (14,056) | $ 2,269 |
| **Option ARM loans:** | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 139 | 1 | 140 | (18) | 129 |
| Below investment grade(2) | 15,507 | 99 | 10,586 | (3,835) | 50 |
| Total | $ 15,646 | 100% | $ 10,726 | $ (3,853) | $ 179 |
| **Alt-A and other loans:** | | | | | |
| AAA-rated | $ 1,293 | 7% | $ 1,301 | $ (87) | $ 7 |
| Other investment grade | 2,761 | 15 | 2,765 | (362) | 368 |
| Below investment grade(2) | 14,789 | 78 | 11,498 | (2,002) | 2,443 |
| Total | $ 18,843 | 100% | $ 15,564 | $ (2,451) | $ 2,818 |
| **CMBS:** | | | | | |
| AAA-rated | $ 28,007 | 48% | $ 28,071 | $ (52) | $ 42 |
| Other investment grade | 26,777 | 45 | 26,740 | (676) | 1,655 |
| Below investment grade(2) | 3,944 | 7 | 3,653 | (1,191) | 1,704 |
| Total | $ 58,728 | 100% | $ 58,464 | $ (1,919) | $ 3,401 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS:** | | | | | |
| AAA-rated | $ 31,385 | 21% | $ 31,457 | $ (338) | $ 80 |
| Other investment grade | 33,084 | 23 | 33,053 | (1,492) | 2,601 |
| Below investment grade(2) | 82,966 | 56 | 68,160 | (20,449) | 5,986 |
| Total | $ 147,435 | 100% | $132,670 | $(22,279) | $ 8,667 |
| Total investments in mortgage-related securities | $288,693 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 51% | | | | |

(1) Represents the amount of UPB covered by bond insurance.  This  amount does not represent the maximum amount of losses we could  recover, as the bond insurance also covers interest.

(2) Includes securities with S&P credit ratings below BBB– and certain securities that are no longer rated.

41

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Mortgage Loans

The UPB of mortgage loans on our consolidated balance sheet  declined to $1,853 billion as of September 30, 2011  from $1,885 billion as of December 31, 2010. This reflects that the amount of single-family loan liquidations has  exceeded new loan purchase and guarantee activity in 2011, which we believe is due, in part, to declines in the amount of  single-family mortgage debt outstanding in the market. Our  single-family loan purchase and guarantee activity in the nine  months ended September 30, 2011 was at the lowest level we  have experienced in the last several years. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further detail about the mortgage loans on our consolidated balance sheets.

The UPB of unsecuritized single-family mortgage loans increased  by $12.5 billion, to $161.4 billion at  September 30, 2011 from $148.9 billion at December 31, 2010, primarily due to our continued purchases  of seriously delinquent and modified loans from the mortgage pools underlying our PCs. Based on the amount of the recorded  investment of these loans, approximately $73.1 billion, or  4.1%, of the single-family mortgage loans on our consolidated  balance sheet as of September 30, 2011 were seriously  delinquent, as compared to $84.2 billion, or 4.7%, as of December 31, 2010. This decline was primarily due to  modifications, foreclosure transfers, and short sale activity. The majority of these seriously delinquent loans are  unsecuritized, and were purchased by us from our PC trusts. As  guarantor, we have the right to purchase mortgages that back our PCs from the underlying loan pools under certain circumstances.  See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information on our purchases of  single-family loans from PC trusts.

The UPB of unsecuritized multifamily mortgage loans was  $81.6 billion at September 30, 2011 and $85.9 billion at December 31, 2010. Our multifamily loan activity in the three and nine  months ended September 30, 2011 primarily consisted of purchases of  loans intended for securitization and subsequently sold through  Other Guarantee Transactions. We expect to continue to purchase and subsequently securitize multifamily loans, which supports  liquidity for the multifamily market and affordability for  multifamily rental housing, as our primary multifamily business strategy.

Table 23 summarizes our purchase and guarantee activity in  mortgage loans. This activity consists of: (a) mortgage  loans underlying consolidated single-family PCs issued in the  period (regardless of whether such securities are held by us or  third parties); (b) single-family and multifamily mortgage loans purchased, but not securitized, in the period; and  (c) mortgage loans underlying our mortgage-related financial guarantees issued in the period, which are not  consolidated on our balance sheets.

TREASURY-2160

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 23 — Mortgage Loan Purchase and Other Guarantee Commitment Activity[1]**

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| | 2011 | | 2010 | | 2011 | | 2010 | |
| | UPB Amount | % of Total | UPB Amount | % of Total | UPB Amount | % of Total | UPB Amount | % of Total |
|---|---|---|---|---|---|---|---|---|
| | | | | (dollars in millions) | | | | |
| Mortgage loan purchases and guarantee issuances: | | | | | | | | |
| Single-family: | | | | | | | | |
| 30-year or more amortizing fixed-rate | $42,743 | 56% | $62,573 | 65% | $145,986 | 60% | $181,848 | 68% |
| 20-year amortizing fixed-rate | 3,880 | 5 | 6,316 | 6 | 13,910 | 6 | 13,545 | 5 |
| 15-year amortizing fixed-rate | 16,385 | 22 | 18,990 | 20 | 51,496 | 21 | 48,841 | 18 |
| Adjustable-rate[2] | 8,150 | 11 | 4,544 | 5 | 20,016 | 8 | 10,327 | 4 |
| Interest-only[3] | — | — | 89 | < 1 | — | — | 909 | 1 |
| FHA/VA and other governmental | 121 | <1 | 177 | < 1 | 325 | <1 | 3,309 | 1 |
| *Total single-family*[4] | 71,279 | 94 | 92,689 | 96 | 231,733 | 95 | 258,779 | 97 |
| Multifamily | 4,888 | 6 | 3,435 | 4 | 12,449 | 5 | 8,502 | 3 |
| *Total mortgage loan purchases and other guarantee commitment activity*[5] | $76,167 | 100% | $96,124 | 100% | $244,182 | 100% | $267,281 | 100% |
| Percentage of mortgage purchases and other guarantee commitment activity with credit enhancements[6] | 10% | | 8% | | 8% | | 10% | |

(1) Based on UPB. Excludes mortgage loans traded but not yet settled. Excludes seriously delinquent loans and balloon/reset mortgages purchased out of PC trusts. Includes other guarantee commitments associated with mortgage loans. See endnote (5) for further information.

(2) Includes amortizing ARMs with 1-, 3-, 5-, 7- and 10-year initial fixed-rate periods. We did not purchase any option ARM loans during the nine months ended September 30, 2011 or 2010.

(3) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed-rate and variable-rate interest-only loans.

(4) Includes $20.1 billion and $16.7 billion of mortgage loans in excess of $417,000, which we refer to as conforming jumbo mortgages, for the nine months ended September 30, 2011 and 2010, respectively.

(5) Includes issuances of other guarantee commitments on single-family loans of $3.9 billion and $3.1 billion and issuances of other guarantee commitments on multifamily loans of $0.5 billion and $1.2 billion during the nine months ended September 30, 2011 and 2010, respectively, which include our unsecuritized guarantees of HFA bonds under the TCLFP in 2010.

(6) See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for further details on credit enhancement of mortgage loans in our multifamily mortgage and single-family credit guarantee portfolios.

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" and "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Table 17.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio" for information about mortgage loans in our single-family credit guarantee portfolio that we believe have higher-risk characteristics.

**Derivative Assets and Liabilities, Net**

The composition of our derivative portfolio changes from period to period as a result of derivative purchases, terminations, or assignments prior to contractual maturity, and expiration of the derivatives at their contractual maturity. We also classify net derivative interest receivable or payable, trade/settle receivable or payable, and cash collateral held or posted on our consolidated balance sheets in derivative assets, net and derivative liabilities, net. See "NOTE 11: DERIVATIVES" for additional information regarding our derivatives.

Table 24 shows the fair value for each derivative type, the weighted average fixed rate of our pay-fixed and receive-fixed swaps, and the maturity profile of our derivative positions as of September 30, 2011. A positive fair value in Table 24 for each derivative type is the estimated amount, prior to netting by counterparty, that we would be entitled to receive if the derivatives of that type were terminated. A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if the derivatives of that type were terminated.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2161                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 24 — Derivative Fair Values and Maturities**

| | | | September 30, 2011 | | | |
| | | | Fair Value[1] | | | |
| | Notional or Contractual Amount[2] | Total Fair Value[3] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
|---|---|---|---|---|---|---|
| | | | (dollars in millions) | | | |
| **Interest-rate swaps:** | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 200,465 | $ 10,986 | $ 24 | $ 537 | $ 1,999 | $ 8,426 |
| Weighted average fixed rate[4] | | | 0.90% | 1.07% | 2.24% | 3.26% |
| Forward-starting swaps[5] | 20,203 | 2,039 | — | — | — | 2,039 |
| Weighted average fixed rate[4] | | | — | 0.60% | 0.84% | 3.53% |
| Total receive-fixed | 220,668 | 13,025 | 24 | 537 | 1,999 | 10,465 |
| Basis (floating to floating) | 2,725 | (3) | — | (5) | 2 | — |
| Pay-fixed: | | | | | | |
| Swaps | 279,437 | (33,716) | (93) | (1,221) | (6,686) | (25,716) |
| Weighted average fixed rate[4] | | | 2.00% | 2.07% | 3.32% | 3.99% |
| Forward-starting swaps[5] | 14,246 | (3,204) | — | — | — | (3,204) |
| Weighted average fixed rate[4] | | | — | — | — | 5.29% |
| Total pay-fixed | 293,683 | (36,920) | (93) | (1,221) | (6,686) | (28,920) |
| Total interest-rate swaps | 517,076 | (23,898) | (69) | (689) | (4,685) | (18,455) |
| **Option-based:** | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 89,875 | 14,387 | 6,621 | 4,183 | 832 | 2,751 |
| Written | 26,525 | (2,763) | (188) | (2,340) | (235) | — |
| Put swaptions | | | | | | |
| Purchased | 68,175 | 725 | 16 | 90 | 203 | 416 |
| Written | — | — | — | — | — | — |
| Other option-based derivatives[6] | 50,958 | 2,116 | (7) | — | — | 2,123 |
| Total option-based | 235,533 | 14,465 | 6,442 | 1,933 | 800 | 5,290 |
| Futures | 72,262 | — | — | — | — | — |
| Foreign-currency swaps | 1,779 | 154 | 54 | 100 | — | — |
| Commitments[7] | 39,429 | (107) | (107) | — | — | — |
| Swap guarantee derivatives | 3,722 | (36) | — | (1) | (1) | (34) |
| Subtotal | 869,801 | (9,422) | $ 6,320 | $ 1,343 | $ (3,886) | $ (13,199) |
| Credit derivatives | 10,988 | (5) | | | | |
| Subtotal | 880,789 | (9,427) | | | | |
| Derivative interest receivable (payable), net | | (1,341) | | | | |
| Trade/settle receivable (payable), net | | 6 | | | | |
| Derivative cash collateral (held) posted, net | | 10,728 | | | | |
| Total | $ 880,789 | $ (34) | | | | |

(1) Fair value is categorized based on the period from September 30, 2011 until the contractual maturity of the derivative.

(2) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.

(3) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net, and includes derivative interest receivable or (payable), net, trade/settle receivable or (payable), net and derivative cash collateral (held) or posted, net.

(4) Represents the notional weighted average rate for the fixed leg of the swaps.

(5) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to fifteen years.

(6) Primarily includes purchased interest-rate caps and floors.

(7) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

    At September 30, 2011, the net fair value of our total derivative portfolio was $(34) million, as compared to $(1.1) billion at December 31, 2010. During the nine months ended September 30, 2011, the fair value of our total derivative portfolio increased primarily due to additional cash collateral we posted to our counterparties during this period, partially offset by the impact of declines in interest rates. See "NOTE 11: DERIVATIVES" for the notional or contractual amounts and related fair values of our total derivative portfolio by product type at September 30, 2011 and December 31, 2010, as well as derivative collateral posted and held.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2162

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 25 summarizes the changes in derivative fair values.

**Table 25 — Changes in Derivative Fair Values**

| | Nine Months Ended September 30 (1) | |
| | 2011 | 2010 |
|---|---|---|
| | (in millions) | |
| Beginning balance, at January 1 — Net asset (liability) | $ (6,560) | $ (2,267) |
| Net change in: | | |
| Commitments(2) | (87) | (16) |
| Credit derivatives | (12) | (5) |
| Swap guarantee derivatives | — | (3) |
| Other derivatives:(3) | | |
| Changes in fair value | (3,778) | (6,217) |
| Fair value of new contracts entered into during the period(4) | 604 | (1) |
| Contracts realized or otherwise settled during the period | 406 | (1,845) |
| Ending balance, at September 30 — Net asset (liability) | $ (9,427) | $(10,354) |

(1) Refer to "Table 24 — Derivative Fair Values and Maturities" for a reconciliation of net fair value to the amounts presented on our consolidated balance sheets as of September 30, 2011. At September 30, 2010, fair value in this table excludes derivative interest receivable or (payable), net of $(1.1) billion, trade/settle receivable or (payable), net of $3 million, and derivative cash collateral posted, net of $10.5 billion.
(2) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.
(3) Includes fair value changes for interest-rate swaps, option-based derivatives, futures, and foreign-currency swaps.
(4) Consists primarily of cash premiums paid or received on options.

See "CONSOLIDATED RESULTS OF OPERATIONS —Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for a description of gains (losses) on our derivative positions.

**REO, Net**

As a result of borrower default on mortgage loans that we own, or for which we have issued our financial guarantee, we acquire properties which are recorded as REO assets on our consolidated balance sheets. The balance of our REO, net, declined to $5.6 billion at September 30, 2011 from $7.1 billion at December 31, 2010. In recent periods, the volume of our single-family REO acquisitions has been less than it otherwise would have been due to delays caused by concerns about the foreclosure process. These delays in foreclosures continued in the nine months ended September 30 2011, particularly in states that require a judicial foreclosure process. We expect these delays in the foreclosure process will likely continue into 2012. However, we expect our REO inventory to remain at elevated levels, as we have a large inventory of significantly delinquent loans in our single-family credit guarantee portfolio, many of which will likely complete the foreclosure process and transition to REO during the next few quarters as our servicers work through their foreclosure-related issues. To the extent a large volume of loans completes the foreclosure process in a short period of time, the resulting REO inventory could have a negative impact on the housing market. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

**Deferred Tax Assets, Net**

In connection with our entry into conservatorship, we determined that it was more likely than not that a portion of our net deferred tax assets would not be realized due to our inability to generate sufficient taxable income and, therefore, we recorded a valuation allowance. After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, and related difficulty in forecasting future profit levels, we reached a similar conclusion in all subsequent quarters, including in the third quarter of 2011. Our valuation allowance increased by $2.4 billion during the nine months ended September 30, 2011 to $35.8 billion, primarily attributable to an increase in temporary differences during the period. As of September 30, 2011, after consideration of the valuation allowance, we had a net deferred tax asset of $3.9 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities. We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered.

*IRS Examinations*

Prior to 2011, the IRS completed its examinations of tax years 1998 to 2007. We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices. The principal matter of controversy involves questions of timing and potential penalties regarding our tax accounting method for certain hedging transactions. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. On July 6, 2011, the U.S. Tax Court

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2163                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

issued a Notice Setting Case for Trial and a Standing Pretrial Order. The trial date set forth in the Notice was December 12, 2011, and is now proposed for continuance to November 5, 2012. We believe appropriate reserves have been provided for settlement on reasonable terms. For additional information, see "NOTE 13: INCOME TAXES."

**Other Assets**

Other assets consist of the guarantee asset related to non-consolidated trusts and other guarantee commitments, accounts and other receivables, and other miscellaneous assets. Other assets decreased to $10.6 billion as of September 30, 2011 from $10.9 billion as of December 31, 2010 primarily because of a decrease in other receivables. See "NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

**Total Debt, Net**

PCs and Other Guarantee Transactions issued by our consolidated trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets. Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated trusts. The debt securities of our consolidated trusts may be prepaid without penalty at any time.

Other debt consists of unsecured short-term and long-term debt securities we issue to third parties to fund our business activities. It is classified as either short-term or long-term based on the contractual maturity of the debt instrument. See "LIQUIDITY AND CAPITAL RESOURCES" for a discussion of our management activities related to other debt.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

Table 26 presents the UPB for Freddie Mac issued mortgage-related securities by the underlying mortgage product type based on the UPB of the securities.

### Table 26 — Freddie Mac Mortgage-Related Securities[1][2]

| | September 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total |
| | | | (in millions) | | | |
| Single-family: | | | | | | |
| 30-year or more amortizing fixed-rate | $1,166,874 | $    — | $1,166,874 | $1,213,448 | $    — | $1,213,448 |
| 20-year amortizing fixed-rate | 67,817 | — | 67,817 | 65,210 | — | 65,210 |
| 15-year amortizing fixed-rate | 252,011 | — | 252,011 | 248,702 | — | 248,702 |
| Adjustable-rate[3] | 67,921 | — | 67,921 | 61,269 | — | 61,269 |
| Interest-only[4] | 63,011 | — | 63,011 | 79,835 | — | 79,835 |
| FHA/VA and other governmental | 3,394 | — | 3,394 | 3,369 | — | 3,369 |
| *Total single-family* | 1,621,028 | — | 1,621,028 | 1,671,833 | — | 1,671,833 |
| Multifamily | — | 4,582 | 4,582 | — | 4,603 | 4,603 |
| *Total single-family and multifamily* | 1,621,028 | 4,582 | 1,625,610 | 1,671,833 | 4,603 | 1,676,436 |
| Other Guarantee Transactions: | | | | | | |
| HFA bonds:[5] | | | | | | |
| Single-family | — | 6,135 | 6,135 | — | 6,168 | 6,168 |
| Multifamily | — | 1,084 | 1,084 | — | 1,173 | 1,173 |
| Total HFA bonds | — | 7,219 | 7,219 | — | 7,341 | 7,341 |
| Other: | | | | | | |
| Single-family[6] | 13,530 | 3,932 | 17,462 | 15,806 | 4,243 | 20,049 |
| Multifamily | — | 16,734 | 16,734 | — | 8,235 | 8,235 |
| Total Other Guarantee Transactions | 13,530 | 20,666 | 34,196 | 15,806 | 12,478 | 28,284 |
| REMICs and Other Structured Securities backed by Ginnie Mae Certificates[7] | — | 817 | 817 | — | 857 | 857 |
| Total Freddie Mac Mortgage-Related Securities | $1,634,558 | $  33,284 | $1,667,842 | $1,687,639 | $  25,279 | $1,712,918 |
| Less: Repurchased Freddie Mac Mortgage-Related Securities[8] | (163,583) | | | (170,638) | | |
| Total UPB of debt securities of consolidated trusts held by third parties | $1,470,975 | | | $1,517,001 | | |

(1) Based on UPB of the securities and excludes mortgage-related debt traded, but not yet settled.

(2) Excludes other guarantee commitments for mortgage assets held by third parties that require us to purchase loans from lenders when these loans meet certain delinquency criteria.

(3) Includes $1.2 billion and $1.3 billion in UPB of option ARM mortgage loans as of September 30, 2011 and December 31, 2010, respectively. See endnote (6) for additional information on option ARM loans that back our Other Guarantee Transactions.

(4) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed- and variable-rate interest-only loans.

(5) Consists of bonds we acquired and resecuritized under the NIBP.

(6) Backed by non-agency mortgage-related securities that include prime, FHA/VA and subprime mortgage loans and also include $7.6 billion and $8.4 billion in UPB of securities backed by option ARM mortgage loans at September 30, 2011 and December 31, 2010, respectively.

(7) Backed by FHA/VA loans.

(8) Represents the UPB of repurchased Freddie Mac mortgage-related securities that are consolidated on our balance sheets and includes certain remittance amounts associated with our security trust administration that are payable to third-party mortgage-related security holders. Our holdings of non-consolidated Freddie Mac mortgage-related securities are presented in "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets."

Excluding Other Guarantee Transactions, the percentage of amortizing fixed-rate single-family loans underlying our consolidated trust debt securities, based on UPB, was approximately 92% at both September 30, 2011 and December 31, 2010. The majority of newly issued Freddie Mac single-family mortgage-related securities during the nine months ended September 30, 2011 were backed by refinance mortgages. During the nine months ended September 30, 2011, the UPB of Freddie Mac mortgage-related securities issued by consolidated trusts declined approximately 4.2%, on an annualized basis, as the volume of our new issuances has been less than the volume of liquidations of these securities. The UPB of multifamily Other Guarantee Transactions, excluding HFA-related securities, increased to $16.7 billion as of September 30, 2011 from $8.2 billion as of December 31, 2010, due to increased multifamily loan securitization activity.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2165

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 27 presents issuances and extinguishments of debt securities of our consolidated trusts held by third parties during the three and nine months ended September 30, 2011 and 2010.

**Table 27 — Issuances and Extinguishments of Debt Securities of Consolidated Trusts**[1]

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (in millions) | | | |
| Beginning balance of debt securities of consolidated trusts held by third parties | $1,484,416 | $1,536,949 | $ 1,517,001 | $1,564,093 |
| Issuances to third parties of debt securities of consolidated trusts: | | | | |
| Issuances based on underlying mortgage product type: | | | | |
| 30-year or more amortizing fixed-rate | 37,821 | 61,099 | 136,129 | 183,126 |
| 20-year amortizing fixed-rate | 3,600 | 6,882 | 12,990 | 13,761 |
| 15-year amortizing fixed-rate | 17,252 | 18,944 | 52,766 | 46,321 |
| Adjustable-rate | 8,179 | 4,333 | 20,041 | 9,938 |
| Interest-only | — | 8 8 | 152 | 845 |
| FHA/VA | — | — | 160 | 1,075 |
| Debt securities of consolidated trusts retained by us at issuance | (100) | (5,225) | (6,758) | (8,016) |
| Net issuances of debt securities of consolidated trusts | 66,752 | 86,121 | 215,480 | 247,050 |
| Reissuances of debt securities of consolidated trusts previously held by us[2] | 16,765 | 20,323 | 53,318 | 36,683 |
| Total issuances to third parties of debt securities of consolidated trusts | 83,517 | 106,444 | 268,798 | 283,733 |
| Extinguishments, net[3] | (96,958) | (110,328) | (314,824) | (314,761) |
| Ending balance of debt securities of consolidated trusts held by third parties | $1,470,975 | $1,533,065 | $1,470,975 | $1,533,065 |

(1) Based on UPB.

(2) Represents our sales of PCs and certain Other Guarantee Transactions previously held by us.

(3) Represents: (a) UPB of our purchases from third parties of PCs and Other Guarantee Transactions issued by our consolidated trusts; (b) principal repayments related to PCs and Other Guarantee Transactions issued by our consolidated trusts; and (c) certain remittance amounts associated with our trust security administration that are payable to third-party mortgage-related security holders as of September 30, 2011 and 2010.

**Other Liabilities**

Other liabilities consist of the guarantee obligation, the reserve for guarantee losses on non-consolidated trusts and other mortgage-related financial guarantees, servicer liabilities, accounts payable and accrued expenses, and other miscellaneous liabilities. Other liabilities decreased to $6.9 billion as of September 30, 2011 from $8.1 billion as of December 31, 2010 primarily because of a decrease in servicer advanced interest liabilities due to a decrease in seriously delinquent loans and a decrease in accounts payable and accrued expenses during the nine months ended September 30, 2011. See "NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

**Total Equity (Deficit)**

Table 28 presents the changes in total equity (deficit) and certain capital-related disclosures.

**Table 28 — Changes in Total Equity (Deficit)**

| | Three Months Ended | | | | | Nine Months Ended |
|---|---|---|---|---|---|---|
| | **9/30/2011** | **6/30/2011** | **3/31/2011** | **12/31/2010** | **9/30/2010** | **9/30/2011** |
| | (in millions) | | | | | |
| Beginning balance | $ (1,478) | $ 1,237 | $ (401) | $ (58) | $(1,738) | $ (401) |
| Net income (loss) | (4,422) | (2,139) | 676 | (113) | (2,511) | (5,885) |
| Other comprehensive income (loss), net of taxes: | | | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | (80) | 903 | 1,941 | 1,097 | 3,781 | 2,764 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 124 | 135 | 132 | 153 | 164 | 391 |
| Changes in defined benefit plans | 2 | 1 | (9) | 19 | 2 | (6) |
| Total comprehensive income (loss) | (4,376) | (1,100) | 2,740 | 1,156 | 1,436 | (2,736) |
| Capital draw funded by Treasury | 1,479 | — | 500 | 100 | 1,800 | 1,979 |
| Senior preferred stock dividends declared | (1,618) | (1,617) | (1,605) | (1,603) | (1,561) | (4,840) |
| Other | 2 | 2 | 3 | 4 | 5 | 7 |
| Total equity (deficit)/Net worth | $ (5,991) | $ (1,478) | $ 1,237 | $ (401) | $ (58) | $ (5,991) |
| Aggregate draws under the Purchase Agreement[1] | $ 65,179 | $ 63,700 | $63,700 | $ 63,200 | $ 63,100 | $ 65,179 |
| Aggregate senior preferred stock dividends paid to Treasury in cash | $14,866 | $13,248 | $11,631 | $ 10,026 | $ 8,423 | $ 14,866 |
| Percentage of dividends paid to Treasury in cash to aggregate draws | 23% | 21% | 18% | 16% | 13% | 23% |

(1) Does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was required.

Net unrealized losses in AOCI on our available-for-sale securities increased by $80 million during the three months ended September 30, 2011, primarily due to the impact of widening OAS levels on our non-agency mortgage-related

48

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

securities, partially offset by the impact of a decline in interest rates on our agency securities and CMBS. Net unrealized losses in AOCI on our available-for-sale securities decreased by $2.8 billion during the nine months ended September 30, 2011, primarily due to the impact of a decline in interest rates, resulting in fair value gains on our agency and CMBS securities, partially offset by the impact of widening OAS levels on our CMBS and other non-agency mortgage-related securities. Additionally, net unrealized losses recorded in AOCI decreased due to the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities. Net unrealized losses in AOCI on our closed cash flow hedge relationships decreased by $124 million and $391 million during the three and nine months ended September 30, 2011, respectively, primarily attributable to the reclassification of losses into earnings related to our closed cash flow hedges as the originally forecasted transactions affected earnings.

## RISK MANAGEMENT

Our investment and credit guarantee activities expose us to three broad categories of risk: (a) credit risk; (b) interest-rate risk and other market risk; and (c) operational risk. See "RISK FACTORS" in our 2010 Annual Report, our Quarterly Reports on Form 10-Q for the first and second quarters of 2011, and in this Form 10-Q for additional information regarding these and other risks.

### Credit Risk

We are subject primarily to two types of credit risk: institutional credit risk and mortgage credit risk. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee. We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment.

#### *Institutional Credit Risk*

In recent periods, challenging market conditions have adversely affected the liquidity and financial condition of our counterparties. The concentration of our exposure to our counterparties increased in recent periods due to industry consolidation and counterparty failures.

Our exposure to single-family mortgage seller/servicers remained high during the nine months ended September 30, 2011 with respect to their repurchase obligations arising from breaches of representations and warranties made to us for loans they underwrote and sold to us. We rely on our single-family seller/servicers to perform loan workout activities as well as foreclosures on loans that they service for us. Our credit losses could increase to the extent that our seller/servicers do not fully perform these obligations in a prudent and timely manner.

The financial condition of certain of our mortgage insurers continued to deteriorate during the third quarter of 2011. In addition, our exposure to derivatives counterparties remains highly concentrated as compared to historical levels.

We continue to face challenges in reducing our risk concentrations with counterparties. Efforts we take to reduce exposure to financially weakened counterparties could further increase our exposure to other individual counterparties. The failure of any of our significant counterparties to meet their obligations to us could have a material adverse effect on our results of operations, financial condition, and our ability to conduct future business.

#### Non-Agency Mortgage-Related Security Issuers

Our investments in securities expose us to institutional credit risk to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform their obligations. Our investments in non-Freddie Mac mortgage-related securities include both agency and non-agency securities. However, agency securities have historically presented minimal institutional credit risk due to the guarantee provided by those institutions.

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non-agency mortgage-related securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. The effectiveness of our efforts is highly uncertain and any potential recoveries may take significant time to realize.

As previously disclosed, we joined an investor group that delivered a notice of non-performance in 2010 to The Bank of New York Mellon, as Trustee, and Countrywide Home Loans Servicing LP (now known as BAC Home Loans Servicing, LP), related to the possibility that certain mortgage pools backing certain mortgage-related securities issued by

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2167                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Countrywide Financial Corporation and related entities include mortgages that may have been ineligible for inclusion in the pools due to breaches of representations or warranties.

On June 29, 2011, Bank of America Corporation announced that it, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and Countrywide Home Loans, Inc. entered into a settlement agreement with The Bank of New York Mellon, as trustee, to resolve all outstanding and potential claims related to alleged breaches of representations and warranties (including repurchase claims), substantially all historical loan servicing claims and certain other historical claims with respect to 530 Countrywide first-lien and second-lien residential mortgage-related securitization trusts. Bank of America indicated that the settlement is subject to final court approval and certain other conditions, including the receipt of a private letter ruling from the IRS. There can be no assurance that final court approval of the settlement will be obtained or that all conditions will be satisfied. Bank of America noted that, given the number of investors and the complexity of the settlement, it is not possible to predict the timing or ultimate outcome of the court approval process, which could take a substantial period of time. We have investments in certain of these Countrywide securitization trusts and would expect to benefit from this settlement, if final court approval is obtained.

In connection with the settlement, Bank of America Corporation entered into an agreement with the investor group. Under this agreement, the investor group agreed, among other things, to use reasonable best efforts and to cooperate in good faith to effectuate the settlement, including to obtain final court approval. Freddie Mac was not a party to this agreement, but agreed to retract any previously delivered notices of non-performance upon final court approval of the settlement.

The Bank of New York Mellon, as trustee, filed the settlement in state court in New York and planned to seek approval at a hearing, which approval would bind all investors in the related trusts. On August 30, 2011, FHFA announced that, in its capacity as conservator, it had filed an appearance and conditional objection regarding the settlement, in order to obtain any additional pertinent information developed in the matter. In the announcement, FHFA, as conservator, stated that it is aware of no basis upon which it would raise a substantive objection to the settlement at this time, but that it believes it prudent not only to receive additional information as it continues its due diligence of the settlement, but also to reserve its capability to voice a substantive objection in the unlikely event that necessity should arise.

On August 26, 2011, the case was removed to Federal court. The trustee filed a motion to remand the case back to state court. On October 19, 2011, the Federal court denied the trustee's motion to remand. The trustee has the right to appeal this decision; there is no assurance that the trustee would be successful on any such appeal.

On September 2, 2011, FHFA announced that it, as conservator for Freddie Mac and Fannie Mae, has filed lawsuits against 17 financial institutions and related defendants alleging violations of federal securities laws and common law in the sale of residential non-agency mortgage-related securities to Freddie Mac and Fannie Mae. FHFA, as conservator, filed a similar lawsuit against UBS Americas, Inc. and related defendants on July 27, 2011. FHFA seeks to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non-agency mortgage-related securities issued by these financial institutions.

See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for additional information on credit risk associated with our investments in mortgage-related securities, including higher-risk components and impairment charges we recognized in the three and nine months ended September 30, 2011 related to these investments. For information about institutional credit risk associated with our investments in non-mortgage-related securities, see "NOTE 7: INVESTMENTS IN SECURITIES — Table 7.9 — Trading Securities" as well as "Cash and Other Investments Counterparties" below.

### Single-family Mortgage Seller/Servicers

We acquire a significant portion of our single-family mortgage purchase volume from several large lenders, or seller/servicers. Our top 10 single-family seller/servicers provided approximately 84% of our single-family purchase volume during the nine months ended September 30, 2011. Wells Fargo Bank, N.A., JPMorgan Chase Bank, N.A. and Bank of America, N.A. accounted for 27%, 14%, and 10%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume for the nine months ended September 30, 2011.

We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans that have been originated under specified underwriting standards. If we subsequently discover that contractual standards were not followed, we can exercise certain contractual remedies to mitigate our credit losses. These contractual remedies

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2168          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

include the ability to require the seller/servicer to repurchase  the loan at its current UPB or make us whole for any credit  losses realized with respect to the loan.

We are exposed to institutional credit risk arising from the  potential insolvency or non-performance by our mortgage  seller/servicers, including non-performance of their repurchase  obligations arising from breaches of the representations and  warranties made to us for loans they underwrote and sold to us  or failure to honor their recourse and indemnification  obligations to us. Pursuant to their repurchase obligations, our seller/servicers are obligated to repurchase mortgages sold to  us when there has been a breach of the representations and  warranties made to us with respect to the mortgages. In lieu of  repurchase, we may choose to allow a seller/servicer to  indemnify us against losses realized on such mortgages or  otherwise compensate us for the risk of continuing to hold the  mortgages. In some cases, the ultimate amounts of recovery payments we have received from seller/servicers may be  significantly less than the amount of our estimates of potential  exposure to losses related to their obligations. If a  seller/servicer does not satisfy its repurchase or  indemnification obligations with respect to a loan, we will be  subject to the full range of credit risks posed by the loan if  the loan fails to perform, including the risk that a mortgage  insurer may deny or rescind coverage on the loan (if the loan is  insured) and the risk that we will incur credit losses on the  loan through the workout or foreclosure process.

Our contracts require that a seller/servicer repurchase a  mortgage after we issue a repurchase request, unless the  seller/servicer avails itself of an appeals process provided for  in our contracts, in which case the deadline for repurchase is  extended until we decide the appeal. Some of our seller/servicers have failed to fully perform their repurchase  obligations due to lack of financial capacity, while others,  including many of our larger seller/servicers, have not fully  performed their repurchase obligations in a timely manner. The  UPB of loans subject to repurchase requests issued to our  single-family seller/servicers declined to approximately  $2.7 billion as of September 30, 2011 from $3.8 billion as of December 31, 2010, primarily because resolved requests of $8.4  billion exceeded our  issuance of $7.3 billion of new requests  for the nine months ended September 30, 2011. As measured by  UPB, approximately 40% and 34% of the repurchase requests  outstanding  at September 30, 2011 and December 31, 2010,  respectively, were outstanding for four months or more since  issuance of the initial request. The amount we expect to collect  on the outstanding requests is significantly less than the UPB  of the loans subject to repurchase requests primarily because many of these requests will likely be satisfied by  reimbursement of our realized credit losses by seller/servicers.  These  requests may be rescinded in the course of the  contractual  appeal process. Based on our historical loss  experience and the  fact that many of these loans are covered by  credit enhancements, we expect the actual credit losses  experienced by  us should we fail to collect on these repurchase  requests to  also be less than the UPB of the loans. As of  September 30,  2011, a significant portion of the repurchase  requests  outstanding more than four months relates to requests  made  because the mortgage insurer rescinded the mortgage  insurance  on  the loan or denied the mortgage insurance  claim. Our actual credit losses could increase should the  mortgage insurance  coverage not be reinstated and we fail to  collect on these  repurchase requests.

During the nine months ended September 30, 2011, we  recovered amounts that covered losses with respect to  $3.5 billion of UPB of loans subject to our repurchase requests.  At September 30, 2011 and December 31, 2010,  four of our  largest single-family seller/servicers collectively had  approximately 43% and 32%, respectively, of their repurchase  obligations outstanding for more than four months since  issuance  of our initial repurchase request, as measured by the  UPB of loans associated with our repurchase requests. During  2010, we  entered into agreements with certain of our  seller/servicers to  release specified loans from certain  repurchase obligations in  exchange for one-time cash payments. In a memorandum to the FHFA Office of Inspector General dated  September 19, 2011, FHFA stated that earlier this year it had  "suspended certain future repurchase agreements [with  seller/servicers concerning  their repurchase obligations]  pending the outcome" of a  review by Freddie Mac of its loan  sampling methodology. We are in discussions with FHFA  concerning our review of our sampling methodology. We cannot  predict when this process will be completed or whether or when  FHFA will terminate or revise its suspension.

In order to resolve outstanding repurchase requests on a more  timely basis with our single-family seller/servicers in the  future, we have begun to require certain of our larger  seller/servicers to commit to plans for completing repurchases,  with financial consequences or with stated remedies for  non-compliance, as part of the annual renewals of our contracts  with them. We continue to review loans and pursue our rights to  issue repurchase requests to our counterparties, as appropriate.

As part of our expansion of HARP, we have agreed to waive  certain future potential representation and warranties claims,  which could be significant. For more information, see  "LEGISLATIVE AND REGULATORY MATTERS —*Changes to  the Home Affordable Refinance Program*."

Our estimate of recoveries from seller/servicer repurchase  obligations is considered in our allowance for loan losses as of  September 30, 2011 and December 31, 2010; however, our actual  recoveries may be different than our estimates.

<div align="center">51</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for further information.

On August 24, 2009, Taylor, Bean & Whitaker Mortgage Corp., or TBW, filed for bankruptcy. Prior to that date, we had terminated TBW's status as a seller/servicer of our loans. We had exposure to TBW with respect to its loan repurchase obligations. We also had exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac. Colonial Bank was placed into receivership by the FDIC in August 2009.

On or about June 14, 2010, we filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, approximately $1.15 billion related to current and projected repurchase obligations and approximately $440 million related to funds deposited with Colonial Bank, or with the FDIC as its receiver, which were attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represented miscellaneous costs and expenses incurred in connection with the termination of TBW's status as a seller/servicer of our loans.

With the approval of FHFA, as Conservator, we entered into a proposed settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement, which is discussed below, was filed with the Bankruptcy Court for the Middle District of Florida on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011, which became effective on August 10, 2011.

Under the terms of the settlement, we have been granted an unsecured claim in the TBW bankruptcy estate in the amount of $1.022 billion, largely representing our claims to past and future loan repurchase exposures. We estimate that this claim may result in a distribution to us of approximately $40-45 million, which is based on the plan of liquidation and disclosure statement filed with the court by TBW, indicating that general unsecured creditors are likely to receive a distribution of 3.3 to 4.4 cents on the dollar. The settlement provides that $6.3 million of this amount is to be paid to certain creditors of TBW. In addition, pursuant to the settlement, we have received net proceeds of $156 million through September 30, 2011 relating to various funds on deposit, net of amounts we were required to assign or pay to other parties. The settlement also allows for our sale of TBW-related mortgage servicing rights and provides a formula for determining the amount of the proceeds, if any, to be allocated to third parties that have asserted interests in those rights. During the third quarter of 2011, we recognized a $0.2 billion gain, primarily representing the difference between the amounts that we assigned, or paid, to TBW and their creditors and the liability previously recorded on our consolidated balance sheet.

At the time of settlement, we estimated our uncompensated loss exposure to TBW to be approximately $0.7 billion. This estimated exposure largely relates to outstanding repurchase claims that have already been adjusted in our financial statements through our provision for loan losses. Our ultimate losses could exceed our recorded estimate. Potential changes in our estimate of uncompensated loss exposure or the potential for additional claims as discussed below could cause us to record additional losses in the future.

We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors, may file an action to recover certain funds paid to us prior to the TBW bankruptcy. However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to recover assets. Based on court filings and other information, we understand that Ocala or its creditors may attempt to assert fraudulent transfer and other possible claims totaling approximately $840 million against us related to funds that were allegedly transferred from Ocala to Freddie Mac custodial accounts. We also understood that Ocala might attempt to make claims against us asserting ownership of a large number of loans that we purchased from TBW. The order approving the settlement provides that nothing in the settlement shall be construed to limit, waive or release Ocala's claims against Freddie Mac, except for TBW's claims and claims arising from the allocation of the loans discussed above to Freddie Mac.

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds insuring against loss resulting from dishonest acts by TBW's officers, directors, and employees. Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder. Discovery is proceeding.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top five single-family loan servicers, Wells Fargo Bank N.A., Bank of America N.A., JPMorgan Chase Bank, N.A., Citimortgage, Inc., and U.S. Bank, N.A., together serviced approximately 67% of our single-family mortgage loans as of September 30,

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2170          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

2011. Wells Fargo Bank N.A., Bank of America N.A., and JPMorgan Chase Bank, N.A. serviced approximately 26%, 13%, and 13%, respectively, of our single-family mortgage loans, as of September 30, 2011. Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

During the second half of 2010, a number of our single-family servicers, including several of our largest, announced that they were evaluating the potential extent of issues relating to the possible improper execution of documents associated with foreclosures of loans they service, including those they service for us. Some of these companies temporarily suspended foreclosure proceedings in certain states in which they do business. While these servicers generally resumed foreclosure proceedings in the first quarter of 2011, the rate at which they are effecting foreclosures has been slower than prior to the suspensions. See "RISK FACTORS — Operational Risks — *We have incurred and will continue to incur expenses and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process*" in our 2010 Annual Report.

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loan workout efforts, including under the MHA Program and the recent servicing alignment initiative, and therefore, we also have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans. During the nine months ended September 30, 2011, there have been several regulatory developments that have affected and will continue to significantly impact our single-family mortgage servicers. For more information on regulatory and other developments in mortgage servicing, and how these developments may impact our business, see "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices."

While we have legal remedies against seller/servicers who fail to comply with our contractual servicing requirements, we are exposed to institutional credit risk in the event of their insolvency or if, for other causes, seller/servicers fail to perform their obligations to repurchase affected mortgages, indemnify us for losses resulting from any breach, or pay damages for any breach. In the event a seller/servicer does not fulfill its repurchase or other responsibilities, we may seek partial recovery of amounts owed by the seller/servicer by transferring the applicable mortgage servicing rights of the seller/servicer to a different servicer. However, this option may be difficult to accomplish with respect to our largest seller/servicers due to the operational and capacity challenges of transferring a large servicing portfolio.

*Multifamily Mortgage Seller/Servicers*

As of September 30, 2011, our top four multifamily servicers, Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., CBRE Capital Markets, Inc., and Deutsche Bank Berkshire Mortgage, each serviced more than 10% of our multifamily mortgage portfolio and together serviced approximately 51% of our multifamily mortgage portfolio. For the nine months ended September 30, 2011, our top three multifamily sellers, CBRE Capital Markets, Inc., Berkadia Commercial Mortgage LLC, and NorthMarq Capital, LLC accounted for 21%, 11%, and 11%, respectively, of our multifamily purchase volume. Our top 10 multifamily lenders represented an aggregate of approximately 85% of our multifamily purchase volume for the nine months ended September 30, 2011.

In our multifamily business, we are exposed to the risk that multifamily seller/servicers could come under financial pressure, which could potentially cause degradation in the quality of servicing they provide to us or, in certain cases, reduce the likelihood that we could recover losses through recourse agreements or other credit enhancements, where applicable. This risk primarily relates to multifamily loans that we hold on our consolidated balance sheets where we retain all of the related credit risk. We monitor the status of all our multifamily seller/servicers in accordance with our counterparty credit risk management framework.

*Mortgage Insurers*

We have institutional credit risk relating to the potential insolvency of or non-performance by mortgage insurers that insure single-family mortgages we purchase or guarantee. As a guarantor, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. If any of our mortgage insurers that provide credit enhancement fail to fulfill their obligation, we could experience increased credit losses.

Table 29 summarizes our exposure to mortgage insurers as of September 30, 2011. In the event that a mortgage insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses resulting from such failure. As of September 30, 2011, most of the coverage outstanding from mortgage insurance shown in Table 29 is attributed to primary policies rather than pool insurance policies.

*Freddie Mac*

TREASURY-2171

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 29 — Mortgage Insurance by Counterparty

| Counterparty Name | Credit Rating(1) | Credit Rating Outlook(1) | As of September 30, 2011 | | |
|---|---|---|---|---|---|
| | | | Primary Insurance(2) | Pool Insurance(2) (in billions) | Coverage Outstanding(3) |
| Mortgage Guaranty Insurance Corporation (MGIC) | B+ | Negative | $   50.1 | $   29.8 | $   13.1 |
| Radian Guaranty Inc | B+ | Negative | 37.1 | 11.9 | 10.6 |
| Genworth Mortgage Insurance Corporation | BB− | Negative | 31.7 | 0.9 | 8.1 |
| United Guaranty Residential Insurance Co. | BBB | Stable | 28.9 | 0.3 | 7.1 |
| PMI Mortgage Insurance Co. (PMI) | R | N/A | 25.7 | 1.4 | 6.5 |
| Republic Mortgage Insurance Company (RMIC) | CC | Negative | 21.1 | 2.1 | 5.3 |
| Triad Guaranty Insurance Corp(4) | Not Rated | N/A | 8.9 | 0.9 | 2.2 |
| CMG Mortgage Insurance Co. | BBB | Negative | 2.9 | 0.1 | 0.7 |
| Essent Guaranty, Inc. | Not Rated | N/A | 0.5 | — | 0.1 |
| Total | | | $ 206.9 | $  47.4 | $  53.7 |

(1) Except for RMIC, latest rating available as of October 21, 2011. RMIC's credit rating and credit rating outlook reflect an S&P action on October 28, 2011. Represents the lower of S&P and Moody's credit ratings and outlooks. In this table, the rating and outlook of the legal entity is stated in terms of the S&P equivalent.

(2) Represents the amount of UPB at the end of the period for our single-family credit guarantee portfolio covered by the respective insurance type.

(3) Represents the remaining aggregate contractual limit for reimbursement of losses under policies of both primary and pool insurance. These amounts are based on our gross coverage without regard to netting of coverage that may exist to the extent an affected mortgage is covered under both types of insurance.

(4) Beginning on June 1, 2009, Triad began paying valid claims 60% in cash and 40% in deferred payment obligations under order of its state regulator.

We received proceeds of $2.0 billion and $1.2 billion during the nine months ended September 30, 2011 and 2010, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers, net of associated reserves, of $1.1 billion and $1.5 billion as of September 30, 2011 and December 31, 2010, respectively.

The UPB of single-family loans covered by pool insurance declined approximately 16% during the nine months ended September 30, 2011, primarily due to prepayments and other liquidation events. We did not purchase pool insurance on single-family loans during the nine months ended September 30, 2011. In recent periods, we also reached the maximum limit of recovery on certain of these policies.

Based on information we received from MGIC, we understand that MGIC may challenge our future claims under certain of their pool insurance policies. We believe that our pool insurance policies with MGIC provide us with the right to obtain recoveries for losses up to the aggregate limit indicated in Table 29. However, MGIC's interpretation of these policies would result in claims coverage approximately $0.6 billion lower than the coverage outstanding amount set forth in Table 29. We expect this difference to increase but not to exceed approximately $0.7 billion.

The financial condition of certain of our mortgage insurers continued to deteriorate during the third quarter of 2011. In August 2011, we suspended PMI and its affiliates and RMIC and its affiliates as approved mortgage insurers, making loans insured by either company ineligible for sale to Freddie Mac. During the third quarter of 2011, RMIC announced that its waiver of state regulatory capital requirements expired, and it ceased writing new business. PMI, which had exceeded its risk to capital requirements, also ceased writing new business during the third quarter of 2011. PMI has been put under state supervision, and PMI's state regulator has petitioned for judicial action to place PMI into receivership. PMI has announced that, effective October 24, 2011, it instituted a partial claim payment plan, under which claim payments will be made at 50%, with the remaining amount deferred as a policyholder claim. Given the difficulties in the mortgage insurance industry, we believe it is likely that other companies may also exceed their regulatory capital limit in the future. In the future, our mortgage insurance exposure will likely be concentrated among a smaller number of counterparties.

As part of the estimate of our loan loss reserves, we evaluate the near term recovery from insurance policies for mortgage loans that we hold on our consolidated balance sheet as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments. Triad is continuing to pay claims 60% in cash and 40% in deferred payment obligations under orders of its state regulator. To date, the state regulator has not allowed Triad to begin paying its deferred payment obligations, and it is uncertain when or if Triad will be permitted to do so. If Triad does not pay its deferred payment obligations, we would lose a significant portion of the coverage provided by Triad shown in Table 29 above. In addition to Triad, RMIC, and PMI, we believe that certain mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as they emerge.

At least one of our largest servicers entered into arrangements with two of our mortgage insurance counterparties for settlement of future rescission activity for certain mortgage loans. Under such agreements, servicers pay and/or indemnify

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2172

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

mortgage insurers in exchange for the mortgage insurers agreeing not to issue mortgage insurance rescissions and /or denials of coverage related to origination defects on Freddie Mac-owned mortgages. For loans covered by these agreements, we may be at risk of additional loss to the extent we do not independently uncover loan defects and require lender repurchase for loans that otherwise would have resulted in mortgage insurance rescission. Additionally, this type of activity could result in negative financial impacts on our mortgage insurers' ability to pay in some economic scenarios. In April 2011, we issued an industry letter to our servicers reminding them that they may not enter into these types of agreements without our consent. It is unclear how widespread this type of agreement between our servicers and mortgage insurers has become or how many loans it may impact. For more information, see "RISK FACTORS — *We could incur increased credit losses if our seller/servicers enter into arrangements with mortgage insurers for settlement of future rescission activity and such agreements could potentially reduce the ability of mortgage insurers to pay claims to us*."

### *Bond Insurers*

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering certain of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. Bond insurance exposes us to the risk that the bond insurer will be unable to satisfy claims.

Table 30 presents our coverage amounts of bond insurance, including secondary coverage, for the non-agency mortgage-related securities we hold. In the event a bond insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses related to such a failure.

### Table 30 — Bond Insurance by Counterparty

| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | September 30, 2011 Coverage Outstanding[2] (dollars in billions) | Percent of Total[2] |
|---|---|---|---|---|
| Ambac Assurance Corporation (Ambac)[3] | Not rated | N/A | $ 4.4 | 44% |
| Financial Guaranty Insurance Company (FGIC)[3] | Not rated | N/A | 1.8 | 18 |
| MBIA Insurance Corp. | B− | Negative | 1.3 | 13 |
| Assured Guaranty Municipal Corp. | AA− | Negative | 1.1 | 12 |
| National Public Finance Guarantee Corp. | BBB | Developing | 1.2 | 12 |
| Syncora Guarantee Inc.[3] | Not rated | N/A | 0.1 | 1 |
| Total | | | $ 9.9 | 100% |

(1) Latest ratings available as of October 21, 2011. Represents the lower of S&P and Moody's credit ratings. In this table, the rating and outlook of the legal entity is stated in terms of the S&P equivalent.
(2) Represents the remaining contractual limit for reimbursement of losses, including lost interest and other expenses, on non-agency mortgage-related securities.
(3) Ambac, FGIC, and Syncora Guarantee Inc. are currently operating under regulatory supervision.

We monitor the financial strength of our bond insurers in accordance with our risk management policies. Some of our larger bond insurers are in runoff mode where no new business is being issued. We expect to receive substantially less than full payment of our claims from FGIC and Ambac due to adverse developments concerning these companies, both of which are currently not paying any of their claims. We believe that we will likely receive substantially less than full payment of our claims from some of our other bond insurers, because we believe they also lack sufficient ability to fully meet all of their expected lifetime claims-paying obligations to us as such claims emerge. In the event one or more of these bond insurers were to become subject to a regulatory order or insolvency proceeding, our ability to recover certain unrealized losses on our mortgage-related securities would be further negatively impacted, which may result in further impairment losses to be recognized on our investments in securities. We considered our expectations regarding our bond insurers' ability to meet their obligations, including those of Ambac and FGIC, in making our impairment determinations at September 30, 2011 and December 31, 2010. See "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-For-Sale Securities" for additional information regarding impairment losses on securities covered by bond insurers.

### *Cash and Other Investments Counterparties*

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. As of September 30, 2011 and December 31, 2010, there were $54.5 billion and $91.6 billion, respectively, of cash and other

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2173          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

non- mortgage assets invested in financial instruments with  institutional counterparties or deposited with the Federal  Reserve Bank. See "NOTE 17: CONCENTRATIONS OF CREDIT AND OTHER RISKS" for further information.

*Derivative Counterparties*

We are exposed to institutional credit risk arising from the  possibility that a derivative counterparty will not be able to  meet its contractual obligations. We are also an active user of exchange-traded derivatives, such as Treasury and Eurodollar futures. Exchange-traded derivatives do not measurably increase our institutional credit risk to derivative counterparties  because changes in the value of open exchange-traded contracts are settled daily through a financial clearinghouse established  by each exchange. OTC derivatives, however, expose us to  institutional credit risk because transactions are executed and  settled directly between us and the counterparty. When our net position with an OTC counterparty subject to a master netting agreement has a market value above zero at  a given date (*i.e.*, it is an asset reported as derivative assets, net  on our consolidated balance sheets), then the counterparty could  potentially be obligated to deliver cash, securities, or a  combination of both having that market value necessary to satisfy its net obligation to us under the  derivatives (subject  to a threshold).

The Dodd-Frank Act will require central clearing and trading on  exchanges or comparable trading facilities of many types of  derivatives. Pursuant to the Dodd-Frank Act, the U.S. Commodity Futures Trading  Commission, or CFTC, is in  the process of determining the types of derivatives that must be subject to this requirement. See "LEGISLATIVE AND REGULATORY MATTERS — Dodd-Frank Act" for more information. We continue to work with the Chicago Mercantile Exchange and others to implement a central clearing platform for  interest rate derivatives. We will be exposed to institutional credit risk with respect to the Chicago Mercantile Exchange or  other comparable exchanges or trading facilities in the future, to the extent we use them to clear  and trade derivatives, and to  the members of such clearing organizations that execute and submit our transactions for clearing.

We seek to manage our exposure to institutional credit risk  related to our OTC derivative counterparties using several  tools, including:

- review of external rating analyses;

- strict standards for approving new derivative counterparties;

- ongoing monitoring and internal analysis of our positions with,  and credit rating of, each counterparty;

- managing diversification mix among counterparties;

- master netting agreements and collateral agreements; and

- stress-testing to evaluate potential exposure under possible  adverse market scenarios.

On an ongoing basis, we review the credit fundamentals of all of  our OTC derivative counterparties to confirm that they continue  to meet our internal standards. We assign internal ratings, credit capital, and  exposure limits to each counterparty based  on quantitative and qualitative analysis, which we update and  monitor on a regular basis. We conduct additional reviews when  market conditions dictate or certain events affecting an individual counterparty occur.

All of our OTC derivative counterparties are major financial  institutions and are experienced participants in the OTC  derivatives market. A large number of OTC derivative  counterparties had credit ratings of A+ or below as of October  21, 2011. For counterparties with credit ratings of A+ or below, we require them to post collateral if our net  exposure to them on derivative contracts exceeds  $1 million. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

The relative concentration of our derivative exposure among our  primary derivative counterparties remains high. This  concentration has increased significantly since 2008 due to industry  consolidation and the failure of certain  counterparties, and could further increase. Table 31 summarizes our exposure to our derivative counterparties, which  represents the net positive fair value of derivative contracts,  related accrued interest and collateral held by us from our  counterparties, after netting by counterparty as applicable  (*i.e.*, net amounts due to us under derivative contracts which are recorded as derivative assets). In  addition, we have  derivative liabilities where we post collateral to  counterparties. Pursuant to certain derivative agreements, the  amount of collateral that we are required to post to derivative  counterparties is based on the credit rating of our long-term senior unsecured debt securities from S&P  or Moody's. The lowering or withdrawal of our credit rating by  S&P or Moody's may increase our obligation to post collateral,  depending on the amount of the counterparty's exposure to  Freddie Mac with respect to the derivative transactions. As a result of S&P's downgrade of  Freddie Mac's credit rating of long-term senior unsecured debt  from AAA to AA+ on August 8, 2011, we posted additional collateral to certain  derivative counterparties in accordance with the terms of the  derivative agreements. At September 30, 2011, our collateral posted exceeded our  collateral held. See "CONSOLIDATED BALANCE SHEETS

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2174

Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

ANALYSIS — Derivative Assets and Liabilities, Net" and "Table 24 — Derivative Fair Values and Maturities" for a reconciliation of fair value to the amounts presented on our consolidated balance sheets as of September 30, 2011, which includes both cash collateral held and posted by us, net.

**Table 31 — Derivative Counterparty Credit Exposure**

| Rating[1] | | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
|---|---|---|---|---|---|---|---|
| | | | | As of September 30, 2011 | | | |
| | | | | (dollars in millions) | | | |
| AA | | 2 | $  46,947 | $    — | $     9 | 5.5 | $10 million or less |
| AA- | | 5 | 216,362 | 2,384 | 117 | 6.1 | $10 million or less |
| A+ | | 7 | 295,892 | 20 | 10 | 6.1 | $1 million or less |
| A | | 4 | 172,030 | 15 | 81 | 5.5 | $1 million or less |
| Subtotal[7] | | 18 | 731,231 | 2,419 | 217 | 5.9 | |
| Other derivatives[8] | | | 106,407 | — | — | | |
| Commitments[9] | | | 39,429 | 65 | 65 | | |
| Swap guarantee derivatives | | | 3,722 | — | — | | |
| Total derivatives[10] | | | $ 880,789 | $ 2,484 | $   282 | | |

| Rating[1] | | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
|---|---|---|---|---|---|---|---|
| | | | | As of December 31, 2010 | | | |
| | | | | (dollars in millions) | | | |
| AA | | 3 | $  53,975 | $    — | $    — | 6.8 | $10 million or less |
| AA- | | 4 | 270,694 | 1,668 | 29 | 6.4 | $10 million or less |
| A+ | | 7 | 441,004 | 460 | 1 | 6.2 | $1 million or less |
| A | | 3 | 177,277 | 16 | 2 | 5.2 | $1 million or less |
| Subtotal[7] | | 17 | 942,950 | 2,144 | 32 | 6.1 | |
| Other derivatives[8] | | | 244,640 | — | — | | |
| Commitments[9] | | | 14,292 | 103 | 103 | | |
| Swap guarantee derivatives | | | 3,614 | — | — | | |
| Total derivatives[10] | | | $1,205,496 | $ 2,247 | $   135 | | |

(1) We use the lower of S&P and Moody's ratings to manage collateral requirements. In this table, the rating of the legal entity is stated in terms of the S&P equivalent.
(2) Based on legal entities. Affiliated legal entities are reported separately.
(3) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged.
(4) For each counterparty, this amount includes derivatives with a net positive fair value (recorded as derivative assets, net), including the related accrued interest receivable/payable (net) and trade/settle fees.
(5) Calculated as Total Exposure at Fair Value less cash collateral held as determined at the counterparty level. Includes amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level.
(6) Counterparties are required to post collateral when their exposure exceeds agreed-upon collateral posting thresholds. These thresholds are typically based on the counterparty's credit rating and are individually negotiated.
(7) Consists of OTC derivative agreements for interest-rate swaps, option-based derivatives (excluding certain written options), foreign-currency swaps, and purchased interest-rate caps.
(8) Consists primarily of exchange-traded contracts, certain written options, and certain credit derivatives. Written options do not present counterparty credit exposure, because we receive a one-time up-front premium in exchange for giving the holder the right to execute a contract under specified terms, which generally puts us in a liability position.
(9) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.
(10) The difference between the exposure, net of collateral column above and derivative assets, net on our consolidated balance sheets primarily represents exchange-traded contracts which are settled daily through a clearinghouse, and thus, do not present counterparty credit exposure.

Over time, our exposure to individual counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps varies depending on changes in fair values, which are affected by changes in period-end interest rates, the implied volatility of interest rates, foreign-currency exchange rates, and the amount of derivatives held. If all of our counterparties for these derivatives defaulted simultaneously on September 30, 2011, the combined amount of our uncollateralized and overcollateralized exposure to these counterparties, or our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately $217 million. Our similar exposure as of December 31, 2010 was $32 million. Four counterparties each accounted for greater than 10% and collectively accounted for 90% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at September 30, 2011. These counterparties were Barclays Bank PLC, Goldman Sachs Bank USA, JP Morgan Chase Bank, N.A., and Bank of America N.A., all of which were rated "A" or above by S&P as of October 21, 2011.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011        TREASURY-2175        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may not be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Approximately 95% of our counterparty credit exposure for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps was collateralized at September 30, 2011 (excluding amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level). The remaining exposure was primarily due to exposure amounts below the applicable counterparty collateral posting threshold, as well as market movements during the time period between when a derivative was marked to fair value and the date we received the related collateral. In some instances, these market movements result in us having provided collateral that has fair value in excess of our obligation, which represents our overcollateralization exposure. Collateral is typically transferred within one business day based on the values of the related derivatives.

In the event a derivative counterparty defaults, our economic loss may be higher than the uncollateralized exposure of our derivatives if we are not able to replace the defaulted derivatives in a timely and cost-effective fashion. We could also incur economic loss if the collateral held by us cannot be liquidated at prices that are sufficient to recover the amount of such exposure. We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps will increase under certain adverse market conditions by performing daily market stress tests. These tests, which involve significant management judgment, evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties on OTC derivatives contracts assuming certain changes in the level and implied volatility of interest rates and certain changes in foreign currency exchange rates over a brief time period. Our actual exposure could vary significantly from amounts forecasted by these tests.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives for accounting purposes, was $65 million and $103 million at September 30, 2011 and December 31, 2010, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis in an effort to ensure that they continue to meet our internal risk-management standards.

### Mortgage Credit Risk

We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment. Mortgage credit risk is primarily influenced by the credit profile of the borrower on the mortgage, the features of the mortgage itself, the type of property securing the mortgage, and general economic conditions. All mortgages that we purchase or guarantee have an inherent risk of default.

#### Single-Family Mortgage Credit Risk

Through our delegated underwriting process, single-family mortgage loans and the borrowers' ability to repay the loans are evaluated using several critical risk characteristics, including but not limited to the borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the original LTV ratio, the type of mortgage product and the occupancy type of the loan. Despite the improvements in underwriting standards and borrower and loan credit characteristics since 2008, our single-family quality control sampling and review continues to find loans with underwriting deficiencies. We meet with our larger seller/servicers that have higher than average rates of loans with deficiencies from our sampling to help ensure they make changes appropriate to their underwriting process. See "BUSINESS — Our Business" and "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Underwriting Requirements and Quality Control Standards*" in our 2010 Annual Report for information about our charter requirements for single-family loans purchases, delegated underwriting, and our quality control monitoring.

Conditions in the mortgage market continued to remain challenging during the nine months ended September 30, 2011. Most single-family mortgage loans, especially those originated from 2005 through 2008, have been affected by the compounding pressures on household wealth caused by significant declines in home values that began in 2006 and the ongoing weak employment environment. Our serious delinquency rates remained high in the nine months ended September 30, 2011 compared to historical levels, primarily due to economic factors which adversely affected borrowers. Also contributing to high serious delinquency rates were: (a) delays related to servicer processing capacity constraints and, in states that require a judicial foreclosure process, court backlogs; (b) delays associated with the modification process; and (c) delays caused by concerns about the foreclosure process and other delays imposed by third parties. These delays lengthen the period of time in which loans remain in seriously delinquent status, as the delays extend the time it takes for seriously delinquent loans to be modified, foreclosed upon or otherwise resolved and thus transition out of seriously

<div align="center">58</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

delinquent status. The UPB of our single-family non-performing loans remained at high levels during the nine months ended September 30, 2011.

*Characteristics of the Single-Family Credit Guarantee Portfolio*

The average UPB of loans in our single-family credit guarantee portfolio was approximately $151,000 and $150,000 at September 30, 2011 and December 31, 2010, respectively. Our single-family mortgage purchases and other guarantee commitment activity in the third quarter of 2011 decreased by 23% to $71.3 billion, as compared to $92.7 billion in the third quarter of 2010. Approximately 88% of the single-family mortgages we purchased in the third quarter of 2011 were fixed-rate amortizing mortgages, based on UPB. Approximately 67% and 75% of the single-family mortgages we purchased in the three and nine months ended September 30, 2011 were refinance mortgages, including approximately 22% and 26%, respectively, that were relief refinance mortgages, based on UPB.

An important safeguard against credit losses on mortgage loans in our single-family credit guarantee portfolio is provided by the borrowers' equity in the underlying properties. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and, based upon historical information, is more likely to default than other borrowers due to limits in the ability to sell or refinance. The percentage of borrowers in our single-family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 19% and 18% as of September 30, 2011 and December 31, 2010, respectively. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 12.7% and 14.9% as of September 30, 2011 and December 31, 2010, respectively. Due to declines in home prices since 2006, we estimate that, as of September 30, 2011, approximately 46% of the loans originated in 2005 through 2008 that remained in our single-family credit guarantee portfolio as of that date had current LTV ratios greater than 100%. In recent periods, loans with current LTV ratios greater than 100% contributed disproportionately to our credit losses. In addition, as of September 30, 2011 and December 31, 2010, for the loans in our single-family credit guarantee portfolio with greater than 80% estimated current LTV ratios, the borrowers had a weighted average credit score at origination of 724 and 721, respectively.

A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of September 30, 2011 and December 31, 2010, approximately 15% and 14% of loans in our single-family credit guarantee portfolio had second lien financing at the time of origination of the first mortgage, and we estimate that these loans comprised 18% and 19%, respectively, of our seriously delinquent loans, based on UPB. However, borrowers are free to obtain second lien financing after origination and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

Table 32 provides additional characteristics of single-family mortgage loans purchased during the three and nine months ended September 30, 2011 and 2010, and of our single-family credit guarantee portfolio at September 30, 2011 and December 31, 2010.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                                                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio(1)**

| | Purchases During the Three Months Ended September 30, | | Purchases During the Nine Months Ended September 30, | | Portfolio(2) at | |
|---|---|---|---|---|---|---|
| Original LTV Ratio Range(3)(4) | 2011 | 2010 | 2011 | 2010 | September 30, 2011 | December 31, 2010 |
| 60% and below | 27% | 29% | 30% | 30% | 23% | 23% |
| Above 60% to 70% | 15 | 17 | 17 | 16 | 16 | 16 |
| Above 70% to 80% | 47 | 46 | 44 | 46 | 43 | 43 |
| Above 80% to 90% | 6 | 5 | 5 | 5 | 9 | 9 |
| Above 90% to 100% | 5 | 3 | 4 | 3 | 8 | 8 |
| Above 100% | <1 | <1 | <1 | <1 | 1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average original LTV ratio | 69% | 68% | 68% | 68% | 72% | 71% |
| **Estimated Current LTV Ratio Range(5)** | | | | | | |
| 60% and below | | | | | 26% | 27% |
| Above 60% to 70% | | | | | 12 | 12 |
| Above 70% to 80% | | | | | 18 | 17 |
| Above 80% to 90% | | | | | 15 | 16 |
| Above 90% to 100% | | | | | 10 | 10 |
| Above 100% to 110% | | | | | 6 | 6 |
| Above 110% to 120% | | | | | 4 | 4 |
| Above 120% | | | | | 9 | 8 |
| Total | | | | | 100% | 100% |
| Weighted average estimated current LTV ratio: | | | | | | |
| Relief refinance mortgages(6) | | | | | 78% | 78% |
| All other mortgages | | | | | 80% | 78% |
| Total mortgages | | | | | 79% | 78% |
| **Credit Score(3)(7)** | | | | | | |
| 740 and above | 73% | 74% | 73% | 71% | 54% | 53% |
| 700 to 739 | 18 | 17 | 18 | 18 | 21 | 21 |
| 660 to 699 | 7 | 7 | 7 | 8 | 15 | 15 |
| 620 to 659 | 2 | 2 | 2 | 2 | 7 | 7 |
| Less than 620 | <1 | <1 | <1 | 1 | 3 | 3 |
| Not available | <1 | <1 | <1 | <1 | <1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average credit score: | | | | | | |
| Relief refinance mortgages(6) | 740 | 749 | 742 | 744 | 743 | 745 |
| All other mortgages | 757 | 759 | 757 | 755 | 734 | 732 |
| Total mortgages | 753 | 756 | 753 | 752 | 735 | 733 |
| **Loan Purpose** | | | | | | |
| Purchase | 33% | 24% | 25% | 25% | 30% | 31% |
| Cash-out refinance | 16 | 19 | 18 | 21 | 28 | 29 |
| Other refinance(8) | 51 | 57 | 57 | 54 | 42 | 40 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Property Type** | | | | | | |
| Detached/townhome(9) | 94% | 94% | 94% | 94% | 92% | 92% |
| Condo/Co-op | 6 | 6 | 6 | 6 | 8 | 8 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | | | |
| Primary residence | 91% | 92% | 91% | 92% | 91% | 91% |
| Second/vacation home | 4 | 4 | 4 | 4 | 5 | 5 |
| Investment | 5 | 4 | 5 | 4 | 4 | 4 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

(1) Purchases and ending balances are based on the UPB of the single-family credit guarantee portfolio. Other Guarantee Transactions with ending balances of $2 billion at both September 30, 2011 and December 31, 2010, are excluded from portfolio balance data since these securities are backed by non-Freddie Mac issued securities for which the loan characteristics data was not available.

(2) Includes loans acquired under our relief refinance initiative, which began in 2009.

(3) Purchases columns exclude mortgage loans acquired under our relief refinance initiative. See "Table 35 — Single-Family Refinance Loan Volume" for further information on the LTV ratios of these loans.

(4) Original LTV ratios are calculated as the amount of the mortgage we guarantee including the credit-enhanced portion, divided by the lesser of the appraised value of the property at the time of mortgage origination or the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien mortgage reduces the borrower's equity in the home and, therefore, can increase the risk of default.

(5) Current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination. Estimated current LTV ratio range is not applicable to purchase activity, and excludes any secondary financing by third parties.

(6) Relief refinance mortgages comprised approximately 10% and 7% of our single-family credit guarantee portfolio by UPB as of September 30, 2011 and December 31, 2010, respectively.

(7) Credit score data is based on FICO scores. Although we obtain updated credit information on certain borrowers after the origination of a mortgage, such as those borrowers seeking a modification, the scores presented in this table represent only the credit score of the borrower at the time of loan origination.

(8) Other refinance transactions include: (a) refinance mortgages with "no cash-out" to the borrower; and (b) refinance mortgages for which the delivery data provided was not sufficient for us to determine whether the mortgage was a cash-out or a no cash-out refinance transaction.

(9) Includes manufactured housing and homes within planned unit development communities. The UPB of manufactured housing mortgage loans purchased in the nine months ended September 30, 2011 and 2010 was $282 million and $277 million, respectively.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2178                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Attribute Combinations*

Certain combinations of loan characteristics often can indicate a higher degree of credit risk. For example, single-family mortgages with both high LTV ratios and borrowers who have lower credit scores typically experience higher rates of serious delinquency and default. We estimate that there were $11.4 billion and $11.8 billion at September 30, 2011 and December 31, 2010, respectively, of loans in our single-family credit guarantee portfolio with both original LTV ratios greater than 90% and FICO scores less than 620 at the time of loan origination. Certain mortgage product types, including interest-only or option ARM loans, that have additional higher risk characteristics, such as lower credit scores or higher LTV ratios, will also have a higher risk of default than those same products without these characteristics. The presence of a second lien mortgage can also increase the risk that a borrower will default.

*Single-Family Mortgage Product Types*

The primary mortgage products in our single-family credit guarantee portfolio are first lien, fixed-rate mortgage loans. The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts to a new rate that is fixed for the remaining life of the loan. We classified these loans as fixed-rate products for presentation within this Form 10-Q and elsewhere in our reporting even though they have a one-time rate adjustment provision, because the change in rate is determined at the time of modification rather than at a future date.

The following paragraphs provide information on the interest-only, option ARM and conforming jumbo loans in our single-family credit guarantee portfolio. Interest-only and option ARM loans have experienced significantly higher serious delinquency rates than fixed-rate amortizing mortgage products.

Interest-Only Loans

Interest-only loans have an initial period during which the borrower pays only interest, and at a specified date the monthly payment changes to begin reflecting repayment of principal until maturity. Interest-only loans represented approximately 4% and 5% of the UPB of our single-family credit guarantee portfolio at September 30, 2011 and December 31, 2010, respectively. We purchased a limited number of interest-only loans after 2008 and fully discontinued purchasing such loans on September 1, 2010.

Option ARM Loans

Most option ARM loans have initial periods during which the borrower has various options as to the amount of each monthly payment, until a specified date, when the terms are recast. At both September 30, 2011 and December 31, 2010, option ARM loans represented less than 1% of the UPB of our single-family credit guarantee portfolio. Included in this exposure was $7.6 billion and $8.4 billion of option ARM securities underlying certain of our Other Guarantee Transactions at September 30, 2011 and December 31, 2010, respectively. While we have not categorized these option ARM securities as either subprime or Alt-A securities for presentation within this Form 10-Q and elsewhere in our reporting, they could exhibit similar credit performance to collateral identified as subprime or Alt-A. We have not purchased option ARM loans in our single-family credit guarantee portfolio since 2007. For information on our exposure to option ARM loans through our holdings of non-agency mortgage-related securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Conforming Jumbo Loans

We purchased $20.1 billion and $16.7 billion of conforming jumbo loans during the nine months ended September 30, 2011 and 2010, respectively. The UPB of conforming jumbo loans in our single-family credit guarantee portfolio as of September 30, 2011 and December 31, 2010 was $48.4 billion and $37.8 billion, respectively. The average size of these loans was approximately $545,000 and $548,000 at September 30, 2011 and December 31, 2010, respectively. Our purchases of conforming jumbo loans should decline beginning in the fourth quarter of 2011 since the temporary increase in limits on the size of loans we may purchase expired on September 30, 2011. See "LEGISLATIVE AND REGULATORY MATTERS" for further information on the conforming loan limits.

*Other Categories of Single-Family Mortgage Loans*

While we classified certain loans as subprime or Alt-A for purposes of the discussion below and elsewhere in this Form 10-Q, there is no universally accepted definition of subprime or Alt-A, and our classification of such loans may differ from those used by other companies. For example, some financial institutions may use FICO credit scores to delineate certain residential mortgages as subprime. In addition, we do not rely primarily on these loan classifications to evaluate the credit risk exposure relating to such loans in our single-family credit guarantee portfolio.

TREASURY-2179

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Subprime Loans

Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see "*Higher Risk Loans in the Single-Family Credit Guarantee Portfolio*" and "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for further information).

We estimate that approximately $2.3 billion and $2.5 billion of security collateral underlying our Other Guarantee Transactions at September 30, 2011 and December 31, 2010, respectively, were identified as subprime based on information provided to us when we entered into these transactions.

We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions. At September 30, 2011 and December 31, 2010, we held $50.2 billion and $54.2 billion, respectively, in UPB of non-agency mortgage-related securities backed by subprime loans. These securities were structured to provide credit enhancements, and 8% and 10% of these securities were investment grade at September 30, 2011 and December 31, 2010, respectively. The credit performance of loans underlying these securities deteriorated significantly beginning in 2008. For more information on our exposure to subprime mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

## Alt-A Loans

Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. The UPB of Alt-A loans in our single-family credit guarantee portfolio declined to $99.1 billion as of September 30, 2011 from $115.5 billion as of December 31, 2010. The UPB of our Alt-A loans declined in the nine months ended September 30, 2011 primarily due to refinancing into other mortgage products, foreclosure transfers, and other liquidation events. As of September 30, 2011, for Alt-A loans in our single-family credit guarantee portfolio, the average FICO credit score at origination was 718. Although Alt-A mortgage loans comprised approximately 6% of our single-family credit guarantee portfolio as of September 30, 2011, these loans represented approximately 28% and 29% of our credit losses during the three and nine months ended September 30, 2011, respectively. During the first quarter of 2011, we identified approximately $0.6 billion in UPB of single-family loans underlying certain Other Guarantee Transactions that had been previously reported in both the Alt-A and subprime categories. Commencing March 31, 2011, we no longer report these loans as Alt-A (but continue to report them as subprime) and we revised the prior periods to conform to the current period presentation.

We did not purchase any new single-family Alt-A mortgage loans in our single-family credit guarantee portfolio during the nine months ended September 30, 2011. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. However, in the event we purchase a refinance mortgage in one of these programs and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. From the time the product became available in 2009 to September 30, 2011, we purchased approximately $14.4 billion of relief refinance mortgages that were previously categorized as Alt-A loans in our portfolio, including $4.1 billion during the nine months ended September 30, 2011.

We also hold investments in non-agency mortgage-related securities backed by single-family Alt-A loans. At September 30, 2011 and December 31, 2010, we held investments of $17.3 billion and $18.8 billion, respectively, of non-agency mortgage-related securities backed by Alt-A and other mortgage loans and 15% and 22%, respectively, of these securities were categorized as investment grade. The credit performance of loans underlying these securities deteriorated significantly since the beginning of 2008 and continued to deteriorate during the nine months ended September 30, 2011. We categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2180                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

based on information provided to us when we entered into these transactions. For more information on our exposure to Alt-A mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Higher-Risk Loans in the Single-Family Credit Guarantee Portfolio

Table 33 presents information about certain categories of single-family mortgage loans within our single-family credit guarantee portfolio that we believe have certain higher-risk characteristics. These loans include categories based on product type and borrower characteristics present at origination. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Mortgage loans with higher LTV ratios have a higher risk of default, especially during housing and economic downturns, such as the one the U.S. has experienced since 2007.

**Table 33 — Certain Higher-Risk[1] Categories in the Single-Family Credit Guarantee Portfolio**

| | As of September 30, 2011 | | | |
|---|---|---|---|---|
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | | (dollars in billions) | | |
| Loans with one or more specified characteristics | $ 350.3 | 105% | 6.9% | 9.3% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 99.1 | 106 | 8.1 | 11.8 |
| Interest-only[6] | 76.6 | 119 | 0.2 | 17.7 |
| Option ARM[7] | 8.6 | 119 | 3.8 | 21.2 |
| Original LTV ratio greater than 90%, non-relief refinance mortgages[8] | 110.7 | 108 | 7.8 | 8.3 |
| Original LTV ratio greater than 90%, relief refinance mortgages[8] | 55.1 | 103 | 0.1 | 1.0 |
| Lower original FICO scores (less than 620)[8] | 57.1 | 93 | 12.9 | 12.7 |

| | As of December 31, 2010 | | | |
|---|---|---|---|---|
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | | (dollars in billions) | | |
| Loans with one or more specified characteristics | $368.8 | 100% | 5.5% | 10.3% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 115.5 | 99 | 5.7 | 12.2 |
| Interest-only[6] | 95.4 | 112 | 0.5 | 18.4 |
| Option ARM[7] | 9.4 | 115 | 3.1 | 21.2 |
| Original LTV ratio greater than 90%, non-relief refinance mortgages[8] | 117.8 | 105 | 6.3 | 9.1 |
| Original LTV ratio greater than 90%, relief refinance mortgages[8] | 36.5 | 101 | 0.1 | 0.7 |
| Lower original FICO scores (less than 620)[8] | 61.2 | 89 | 10.4 | 13.9 |

(1) Categories are not additive and a single loan may be included in multiple categories if more than one characteristic is associated with the loan. Loans with a combination of these characteristics will have an even higher risk of default than those with an individual characteristic.

(2) See endnote (5) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of current LTV ratios.

(3) Represents the percentage of loans based on loan count in our single-family credit guarantee portfolio that have been modified under agreement with the borrower, including those with no changes in the interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan. Excludes loans underlying certain Other Guarantee Transactions for which data was not available.

(4) See "Delinquencies" for further information about our reported serious delinquency rates.

(5) Loans within the Alt-A category continue to remain in that category following modification, even though the borrower may have provided full documentation of assets and income to complete the modification.

(6) The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post-modification), primarily due to delays in processing.

(7) Loans within the option ARM category continue to remain in that category following modification, even though the modified loan no longer provides for optional payment provisions.

(8) See endnotes (4) and (7) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios and use of FICO scores, respectively.

Loans with one or more of the above characteristics comprised approximately 20% of our single-family credit guarantee portfolio as of both September 30, 2011 and December 31, 2010. The total UPB of loans in our single-family credit guarantee portfolio with one or more of these characteristics declined approximately 5%, to $350.3 billion as of September 30, 2011 from $368.8 billion as of December 31, 2010. This decline was principally due to liquidations resulting from prepayments, refinancing activity, and liquidations resulting from foreclosure events and foreclosure alternatives, but was partially offset by increases in loans with original LTV ratios greater than 90% due to our relief refinance mortgage activity in the nine months ended September 30, 2011. The serious delinquency rates associated with these loans declined to 9.3% as of September 30, 2011 from 10.3% as of December 31, 2010.

*Credit Enhancements*

Our charter requires that single-family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests. However, as discussed below, under HARP we allow eligible

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2181          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

borrowers who have mortgages with high current LTV ratios to refinance their mortgages without obtaining new mortgage insurance in excess of what was already in place. Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements.

At September 30, 2011 and December 31, 2010, our credit-enhanced mortgages represented 14% and 15%, respectively, of our single-family credit guarantee portfolio, excluding those backing Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative. Freddie Mac securities backed by Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative are excluded because we consider the incremental credit risk to which we are exposed to be insignificant. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities*" for credit enhancement and other information about our investments in non-Freddie Mac mortgage-related securities.

We had recoveries associated with charged-off single-family loans of $2.1 billion and $2.4 billion during the nine months ended September 30, 2011 and 2010, respectively, under our primary and pool mortgage insurance policies and other credit enhancements. During the nine months ended September 30, 2011, the credit enhancement coverage for new purchases was lower than in periods before 2009, primarily as a result of high refinance activity. Refinance loans (other than relief refinance mortgages) typically have lower LTV ratios, and are more likely to have a LTV ratio below 80% and not require credit protection as specified in our charter. In addition, we have been purchasing significant amounts of relief refinance mortgages. These mortgages allow for the refinance of existing loans guaranteed by us under terms such that we may not have mortgage insurance for some or all of the UPB of the mortgage in excess of 80% of the value of the property for certain of these loans.

See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protection and other forms of credit enhancements covering loans in our single-family credit guarantee portfolio as of September 30, 2011 and December 31, 2010.

*Other Credit Risk Management Activities*

To compensate us for higher levels of risk in some mortgage products, we may charge upfront delivery fees above a base management and guarantee fee, which are calculated based on credit risk factors such as the mortgage product type, loan purpose, LTV ratio and other loan or borrower characteristics. We announced delivery fee increases in the fourth quarter of 2010 that became effective March 1, 2011 (or later, as outstanding contracts permit) for loans with higher LTV ratios. These increased fees do not apply to relief refinance mortgages with settlement dates on or after July 1, 2011. In July 2011, FHFA informed us that it expects us, going forward, to have in our agreements with single-family sellers the ability to change base guarantee fees upon 90 days notice to sellers, if directed to do so by FHFA. FHFA and the Obama Administration recently announced the potential for guarantee fee increases in the future. See "LEGISLATIVE AND REGULATORY MATTERS."

*MHA Program*

The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. Participation in the MHA Program is an integral part of our mission of providing stability to the housing market. Through our participation in this program, we help borrowers maintain home ownership. Some of the key initiatives of this program include:

Home Affordable Modification Program

HAMP commits U.S. government, Freddie Mac and Fannie Mae funds to help eligible homeowners avoid foreclosures and keep their homes through mortgage modifications, where possible. Under this program, we offer loan modifications to financially struggling homeowners with mortgages on their primary residences that reduce the monthly principal and interest payments on their mortgages. HAMP applies both to delinquent borrowers and to current borrowers at risk of imminent default. See "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risks — Portfolio Management Activities — MHA Program*" in our 2010 Annual Report for further information on HAMP.

**TREASURY-2182**

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 34 presents the number of single-family loans that completed modification or were in trial periods under HAMP as of September 30, 2011 and December 31, 2010.

**Table 34 — Single-Family Home Affordable Modification Program Volume**(1)

|  | As of September 30, 2011 | | As of December 31, 2010 | |
|---|---|---|---|---|
|  | Amount(2) | Number of Loans | Amount(2) | Number of Loans |
|  | (dollars in millions) | | | |
| Completed HAMP modifications(3) | $31,706 | 143,739 | $23,635 | 107,073 |
| Loans in the HAMP trial period | $ 2,981 | 13,785 | $ 4,905 | 22,352 |

(1) Based on information reported by our servicers to the MHA Program administrator.

(2) For loans in the HAMP trial period, this reflects the loan balance prior to modification. For completed HAMP modifications, the amount represents the balance of loans after modification under HAMP.

(3) Completed HAMP modifications are those where the borrower has made the last trial period payment, has provided the required documentation to the servicer and the modification has become effective. Amounts presented represent completed HAMP modifications with effective dates since our implementation of HAMP in 2009 through September 30, 2011 and December 31, 2010, respectively.

As of September 30, 2011, the borrower's monthly payment was reduced on average by an estimated $563, which amounts to an average of $6,756 per year, and a total of $971 million in annual reductions for all of our completed HAMP modifications (these amounts are calculated by multiplying the number of completed modifications by the average reduction in monthly payment, and have not been adjusted to reflect the actual performance of the loans following modification). Except in limited instances, each borrower's reduced payment will remain in effect for a minimum of five years, and borrowers whose payments were adjusted below current market levels will have their payment gradually increased after the fifth year to a rate consistent with the market rate at the time of modification. We bear the cost associated with the borrowers' payment reductions. Although mortgage investors under the MHA Program are entitled to certain subsidies from Treasury for reducing the borrowers' monthly payments from 38% to 31% of the borrower's income, we do not receive such subsidies on modified mortgages owned or guaranteed by us.

The number of our loans in the HAMP trial period declined to 13,785 as of September 30, 2011 from 22,352 as of December 31, 2010. A large number of borrowers entered into trial period plans when the program was initially introduced in 2009, and significantly fewer new borrowers entered into trial period plans after 2009. Consequently, we expect fewer borrowers will complete a HAMP modification during 2011 than 2010, since a large number of the delinquent borrowers that were eligible for the program have already completed the trial period or attempted to do so, but failed. When a borrower's HAMP trial period is cancelled, the loan is considered for our other workout activities. HAMP currently will expire on December 31, 2012 and only applies to loans originated on or before January 1, 2009 provided the trial period begins by December 31, 2012. For more information on our HAMP modifications, including redefault rates on these loans, see "*Single-Family Loan Workouts.*"

Home Affordable Refinance Program

HARP gives eligible homeowners, with loans owned or guaranteed by us or Fannie Mae, an opportunity to refinance into loans with more affordable monthly payments and/or fixed-rate terms. Under HARP, we allow eligible borrowers who have mortgages with current LTV ratios up to 125% to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place.

The relief refinance initiative is our implementation of HARP. HARP is targeted at borrowers with current LTV ratios above 80%; however, our program also allows borrowers with LTV ratios of 80% and below to participate. HARP loans may not perform as well as other refinance mortgages over time due, in part, to the continued high LTV ratios of these loans. Through our relief refinance initiative, we offer this refinancing option only for qualifying mortgage loans that we hold or guarantee. We continue to bear the credit risk for refinanced loans under this program, to the extent that such risk is not covered by existing mortgage insurance or other existing credit enhancements.

The implementation of the relief refinance mortgage initiative resulted in a higher volume of purchases and increased delivery fees from the new loans than we would expect in the absence of the program. However, we believe the net effect of the refinance activity on our financial results has not been significant.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2183                      Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 35 below presents the composition of our purchases of refinanced single-family loans during the nine months ended September 30, 2011 and 2010.

**Table 35 — Single-Family Refinance Loan Volume[1]**

| | Nine Months Ended September 30, 2011 | | | Nine Months Ended September 30, 2010 | | |
|---|---|---|---|---|---|---|
| | Amount | Number of Loans | Percent | Amount | Number of Loans | Percent |
| | (dollars in millions) | | | | | |
| Relief refinance mortgages: | | | | | | |
| Above 105% LTV ratio | $ 6,597 | 29,069 | 3.5% | $ 2,487 | 10,333 | 1.1% |
| Above 80% to 105% LTV ratio | 24,630 | 115,488 | 13.8 | 29,234 | 126,876 | 13.6 |
| 80% and below LTV ratio | 30,024 | 188,402 | 22.6 | 34,305 | 191,289 | 20.5 |
| Total relief refinance mortgages | $ 61,251 | 332,959 | 39.9% | $ 66,026 | 328,498 | 35.2% |
| Total refinance loan volume[2] | $172,839 | 834,888 | 100% | $193,097 | 934,472 | 100% |

(1) Consists of all single-family refinance mortgage loans that we either purchased or guaranteed during the period, excluding those associated with other guarantee commitments and Other Guarantee Transactions.

(2) Consists of relief refinance mortgages and other refinance mortgages.

Relief refinance mortgages comprised approximately 40% and 35%, based on the number of loans, of our total refinance volume during the nine months ended September 30, 2011 and 2010, respectively. Relief refinance mortgages with LTV ratios above 80% represented approximately 13% and 12% of our total single-family credit guarantee portfolio purchases, based on UPB, during the nine months ended September 30, 2011 and 2010, respectively. Relief refinance mortgages comprised approximately 10% and 7% of the UPB in our total single-family credit guarantee portfolio at September 30, 2011 and December 31, 2010, respectively.

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers who can benefit from refinancing their home mortgage. For more information, see "LEGISLATIVE AND REGULATORY MATTERS —*Changes to the Home Affordable Refinance Program.*"

Home Affordable Foreclosure Alternatives Program

HAFA is designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales, if such borrowers did not qualify for or participate in a HAMP trial period, failed to complete their HAMP trial period, or defaulted on their HAMP modification. HAFA also provides a process for borrowers to convey title to their homes through a deed in lieu of foreclosure. HAFA took effect in April 2010 and ends on December 31, 2012. We began our implementation of this program in August 2010. We completed a small number of HAFA transactions on our single-family mortgage loans during the nine months ended September 30, 2011.

Hardest Hit Fund

In 2010, the federal government created the Hardest Hit Fund, which provides funding for state HFAs to create programs to assist homeowners in those states that have been hit hardest by the housing crisis and economic downturn. To the extent our borrowers participate in the HFA unemployment assistance programs and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency. Based on information provided to us by our seller/servicers, we believe participation in these programs by our borrowers has been limited through September 30, 2011.

*Impact of the MHA Program on Freddie Mac*

As previously discussed, HAMP is intended to provide borrowers the opportunity to obtain more affordable monthly payments and to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our credit losses by reducing or eliminating a portion of the costs related to foreclosed properties. We believe our overall loss mitigation programs, including efforts outside of the MHA Program, could reduce our ultimate credit losses over the long term. However, we cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives.

The costs we incur related to loan modifications and other activities under HAMP have been, and will likely continue to be, significant for the following reasons:

- Except for certain Other Guarantee Transactions and loans underlying our other guarantee commitments, we bear the full cost of the monthly payment reductions related to modifications of loans we own or guarantee and all

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2184                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

servicer and borrower incentives, and we will not receive a reimbursement of these costs from Treasury. We paid $52 million and $127 million of servicer incentives during the three and nine months ended September 30, 2011, respectively, as compared to $33 million and $113 million of such incentives during the three and nine months ended September 30, 2010, respectively. As of September 30, 2011, we accrued $62 million for both initial and recurring servicer incentives not yet due. We paid $33 million and $71 million of borrower incentives during the three and nine months ended September 30, 2011, respectively, as compared to $14 million and $20 million of these incentives during the three and nine months ended September 30, 2010, respectively. As of September 30, 2011, we accrued $44 million for borrower incentives not yet due. We also have the potential to incur additional servicer incentives and borrower incentives as long as the borrower remains current on a loan modified under HAMP.

• Under HAMP, we typically provide concessions to borrowers, which generally include interest rate reductions and often also provide for forbearance (but not forgiveness) of principal. To the extent borrowers continue to participate in HAMP, we will continue to experience high volumes of TDRs.

• Some borrowers will fail to complete the HAMP trial period and others will default on their HAMP modified loans. For those borrowers who redefault or who do not complete the trial period and do not qualify for another loan workout, HAMP will have delayed the resolution of the loans through the foreclosure process. If home prices decline while these events take place, such delay in the foreclosure process may increase the losses we recognize on these loans, to the extent the prices we ultimately receive for the foreclosed properties are less than the prices we could have received had we foreclosed upon the properties earlier.

• Non-GSE mortgages modified under HAMP include mortgages backing our investments in non-agency mortgage-related securities. Such modifications reduce the monthly payments due from affected borrowers, and thus reduce the payments we receive on these securities (to the extent the payment reductions have not been absorbed by subordinated investors or by other credit enhancement).

We began the implementation of a new non-HAMP standard loan modification during the fourth quarter of 2011. For more information, see "Single-Family Loan Workouts."

*Single-Family Loan Workouts*

Loan workout activities are a key component of our loss mitigation strategy for managing and resolving troubled assets and lowering credit losses. Our single-family loss mitigation strategy emphasizes early intervention by servicers in delinquent mortgages and provides alternatives to foreclosure. Other single-family loss mitigation activities include providing our single-family servicers with default management tools designed to help them manage non-performing loans more effectively and to assist borrowers in retaining home ownership where possible, or facilitate foreclosure alternatives when continued homeownership is not an option. Loan workouts are intended to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the additional credit losses that likely would be incurred in a REO sale. See "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Loss Mitigation and Workout Activities*" in our 2010 Annual Report for a general description of our loan workouts.

We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure. During the nine months ended September 30, 2011, we helped more than 164,000 borrowers either stay in their homes or sell their properties and avoid foreclosures through our various workout programs, including HAMP, and we completed approximately 92,000 foreclosures.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-2185

Table of Contents

Table 36 presents volumes of single-family loan workouts, serious delinquency, and foreclosures for the three and nine months ended September 30, 2011 and 2010.

**Table 36 — Single-Family Loan Workouts, Serious Delinquency, and Foreclosure Volumes**[1]

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| | 2011 | | 2010 | | 2011 | | 2010 | |
| | Number of Loans | Loan Balances | Number of Loans | Loan Balances | Number of Loans | Loan Balances | Number of Loans | Loan Balances |
| | | | | (dollars in millions) | | | | |
|---|---|---|---|---|---|---|---|---|
| Home retention actions: | | | | | | | | |
| Loan modifications[2] | | | | | | | | |
| with no change in terms[3] | 1,140 | $ 206 | 999 | $ 173 | 3,463 | $ 615 | 2,948 | $ 493 |
| with term extension | 3,765 | 711 | 5,017 | 872 | 13,573 | 2,507 | 14,472 | 2,469 |
| with reduction of contractual interest rate | 6,642 | 1,453 | 11,753 | 2,622 | 24,727 | 5,530 | 39,928 | 8,867 |
| with rate reduction and term extension | 7,814 | 1,713 | 15,199 | 3,293 | 32,478 | 7,207 | 50,909 | 11,139 |
| with rate reduction, term extension and principal forbearance | 4,558 | 1,214 | 6,316 | 1,648 | 15,885 | 4,239 | 24,817 | 6,485 |
| Total loan modifications[4] | 23,919 | 5,297 | 39,284 | 8,608 | 90,126 | 20,098 | 133,074 | 29,453 |
| Repayment plans[5] | 8,333 | 1,194 | 7,030 | 1,015 | 25,413 | 3,637 | 23,246 | 3,372 |
| Forbearance agreements[6] | 4,262 | 859 | 6,976 | 1,415 | 15,649 | 3,088 | 28,649 | 5,966 |
| Total home retention actions: | 36,514 | 7,350 | 53,290 | 11,038 | 131,188 | 26,823 | 184,969 | 38,791 |
| Foreclosure alternatives: | | | | | | | | |
| Short sale | 11,580 | 2,662 | 10,373 | 2,441 | 33,095 | 7,665 | 26,780 | 6,290 |
| Deed-in-lieu transactions | 164 | 28 | 99 | 17 | 393 | 68 | 298 | 48 |
| Total foreclosure alternatives | 11,744 | 2,690 | 10,472 | 2,458 | 33,488 | 7,733 | 27,078 | 6,338 |
| Total single-family loan workouts | 48,258 | $10,040 | 63,762 | $13,496 | 164,676 | $ 34,556 | 212,047 | $ 45,129 |
| Seriously delinquent loan additions | 93,850 | | 115,359 | | 279,309 | | 389,475 | |
| Single-family foreclosures[7] | 30,786 | | 43,604 | | 92,012 | | 113,623 | |
| Seriously delinquent loans, at period end | 413,859 | | 464,367 | | 413,859 | | 464,367 | |

(1) Based on completed actions with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent, or effective, such as loans in the trial period under HAMP. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period (see endnote 6).

(2) Substantially all of the completed loan modifications during the three months ended September 30, 2011 were classified as TDRs. As a result of new accounting guidance on the classification of loans as TDRs, which became effective in the third quarter of 2011, the population of loans we account for as TDRs significantly increased due to the inclusion of loans that were not previously considered TDRs, including those loans that were subject to workout activities that occurred during the first half of 2011. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information.

(3) Under this modification type, past due amounts are added to the principal balance and reamortized based on the original contractual loan terms.

(4) Includes completed loan modifications under HAMP; however, the number of such completions differs from that reported by the MHA Program administrator in part due to differences in the timing of recognizing the completions by us and the administrator.

(5) Represents the number of borrowers as reported by our seller/servicers that have completed the full term of a repayment plan for past due amounts. Excludes the number of borrowers that are actively repaying past due amounts under a repayment plan, which totaled 20,733 and 22,662 borrowers as of September 30, 2011 and 2010, respectively.

(6) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.

(7) Represents the number of our single-family loans that complete foreclosure transfers, including third-party sales at foreclosure auction in which ownership of the property is transferred directly to a third-party rather than to us.

We experienced declines in home retention actions, particularly loan modifications, and increases in short sales during the three and nine months ended September 30, 2011, compared to the three and nine months ended September 30, 2010, respectively. Loan modifications may include the additions of past due amounts to principal, interest rate reductions, term extensions and principal forbearance. Although HAMP contemplates that some servicers will also make use of principal reduction to achieve reduced payments for borrowers, we only used principal forbearance in the nine months ended September 30, 2011 and 2010, and did not use principal reduction in modifying our loans. We bear the costs of these activities, including the cost of any monthly payment reductions.

The UPB of loans in our single-family credit guarantee portfolio for which we have completed a loan modification increased to $66 billion as of September 30, 2011 from $52 billion as of December 31, 2010. The number of modified loans in our single-family credit guarantee portfolio has been increasing and such loans comprised approximately 2.8% and 2.1% of our single-family credit guarantee portfolio as of September 30, 2011 and December 31, 2010, respectively. The estimated current LTV ratio for all modified loans in our single-family credit guarantee portfolio was 123% and the serious delinquency rate on these loans was 17% as of September 30, 2011. Table 37 presents the reperformance rate of modified single-family loans in each of the last eight quarterly periods.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2186                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 37 — Reperformance Rates[1] of Modified Single-Family Loans**

| | Quarter of Loan Modification Completion[2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **HAMP loan modifications:** | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 96% | 95% | 94% | 93% | 94% | 95% | 94% | 96% |
| 6 to 8 months | | 93 | 92 | 92 | 91 | 93 | 93 | 93 |
| 9 to 11 months | | | 89 | 90 | 89 | 90 | 90 | 92 |
| 12 to 14 months | | | | 87 | 87 | 88 | 88 | 91 |
| 15 to 17 months | | | | | 85 | 86 | 86 | 89 |
| 18 to 20 months | | | | | | 84 | 85 | 87 |
| 21 to 23 months | | | | | | | 82 | 85 |
| 24 to 26 months | | | | | | | | 83 |

| | Quarter of Loan Modification Completion[2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Non-HAMP loan modifications:** | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 92% | 93% | 94% | 93% | 93% | 94% | 90% | 88% |
| 6 to 8 months | | 86 | 89 | 90 | 86 | 87 | 82 | 78 |
| 9 to 11 months | | | 83 | 85 | 82 | 80 | 75 | 71 |
| 12 to 14 months | | | | 81 | 78 | 77 | 69 | 66 |
| 15 to 17 months | | | | | 74 | 74 | 66 | 61 |
| 18 to 20 months | | | | | | 70 | 64 | 59 |
| 21 to 23 months | | | | | | | 61 | 57 |
| 24 to 26 months | | | | | | | | 54 |

| | Quarter of Loan Modification Completion[2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Total (HAMP and Non-HAMP):** | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 95% | 95% | 94% | 93% | 94% | 95% | 92% | 89% |
| 6 to 8 months | | 90 | 90 | 91 | 90 | 92 | 88 | 79 |
| 9 to 11 months | | | 86 | 88 | 88 | 88 | 84 | 72 |
| 12 to 14 months | | | | 84 | 85 | 86 | 80 | 67 |
| 15 to 17 months | | | | | 82 | 84 | 78 | 62 |
| 18 to 20 months | | | | | | 81 | 76 | 61 |
| 21 to 23 months | | | | | | | 73 | 59 |
| 24 to 26 months | | | | | | | | 56 |

(1) Represents the percentage of loans that are current or less than three monthly payments past due as well as those paid-in-full or repurchased. Excludes loans in the trial period under HAMP.

(2) Loan modifications are recognized as completed in the quarterly period in which the servicer has reported the modification as effective and the agreement has been accepted by us, which in certain cases may be delayed by a backlog in servicer processing of modifications. In the second quarter of 2011, we revised the calculation of reperformance rates to better account for re-modified loans, or those where a borrower has received a second modification. The revised calculation reflects the status of each modification separately. In the case of a remodified loan where the borrower is performing, the previous modification would be presented as being in default in the applicable period.

The redefault rate is the percentage of our modified loans that became seriously delinquent, transitioned to REO, or completed a loss-producing foreclosure alternative, and is the inverse of the reperformance rate. As of September 30, 2011, the redefault rate for all of our single-family loan modifications (including those under HAMP) completed during the first half of 2011, and full years 2010, 2009, and 2008 was 8%, 17%, 49%, and 66%, respectively. Many of the borrowers that received modifications in 2008 and 2009 were negatively affected by worsening economic conditions, including high unemployment rates during the last several years. As of September 30, 2011, the redefault rate for loans modified under HAMP in the first half of 2011, and full years 2010 and 2009 was approximately 6%, 14% and 17%, respectively. These redefault rates may not be representative of the future performance of modified loans, including those modified under HAMP. We believe the redefault rate for loans modified in 2011, 2010, 2009, and 2008, including those modified under HAMP, is likely to increase, particularly since the housing and economic environments remain challenging.

In February 2011, FHFA directed Freddie Mac and Fannie Mae to develop consistent requirements, policies and processes for the servicing of non-performing loans. This directive was designed to create greater consistency in servicing practices and to build on the best practices of each of the GSEs. In April 2011, pursuant to this directive, FHFA announced a new set of aligned standards (known as the servicing alignment initiative) for servicing non-performing loans owned or guaranteed by Freddie Mac and Fannie Mae that are designed to help servicers do a better job of communicating and working with troubled borrowers and to bring greater accountability to the servicing industry. We announced our detailed requirements for this initiative on June 30, 2011, with implementation beginning for loans that were delinquent as of October 1, 2011. These standards provide for earlier and more frequent communication with delinquent borrowers, consistent requirements for collecting documents from borrowers, consistent timelines for

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2187

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

responding to borrowers, and consistent timelines for processing foreclosures. These standards are expected to result in greater alignment of servicer processes for both HAMP and most non-HAMP workouts.

Under these new servicing standards, we will pay incentives to servicers that exceed certain performance standards with respect to servicing delinquent loans. We will also assess compensatory fees from servicers if they do not achieve a minimum performance benchmark with respect to servicing delinquent loans. These incentives may result in our payment of increased fees to our seller/servicers, but these fees may be at least partially mitigated by the compensatory fees paid to us by our servicers that do not perform as required.

As part of the servicing alignment initiative, we began implementation of a new non-HAMP standard loan modification initiative. This new standard modification will replace our existing non-HAMP modification initiative beginning January 1, 2012. The new standard modification requires a three month trial period. Servicers may begin offering standard modification trial period plans with effective dates on or after October 1, 2011. We expect to experience a temporary decline in completed modification volume in the fourth quarter of 2011 and first quarter of 2012, below what otherwise would be expected, as many borrowers will be in the process of completing the trial period under the new standard modification initiative. This new standard modification program is expected to result in a higher volume of modifications where we partially forbear (but do not forgive) principal until the borrower sells the home or refinances or pays off the mortgage. The standard modification provides an extension of the loan's term to 480 months. In addition, the new modification initiative provides for a standard modified interest rate of 5% (the program may be changed in the future to reflect market interest rates). Our previous non-HAMP modification initiative allowed for reduction of contractual interest rates to as low as 2% and did not permit principal forbearance. This new initiative will also provide for a different fee schedule for non-HAMP modifications that will provide greater incentives to our servicers to modify loans on a more timely basis, which may cause the costs associated with our modification activities to increase in the future.

*Delinquencies*

We report single-family serious delinquency rate information based on the number of loans that are three monthly payments or more past due or in the process of foreclosure, as reported by our servicers. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the borrower is current under the modified terms. Single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower. To the extent our borrowers participate in the HFA unemployment assistance initiatives and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency.

Our single-family delinquency rates include all single-family loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by either Ginnie Mae Certificates or HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancements provided on them by the U.S. government.

Some of our loss mitigation activities create fluctuations in our delinquency statistics. For example, single-family loans that we report as seriously delinquent before they enter the HAMP trial period continue to be reported as seriously delinquent for purposes of our delinquency reporting until the modifications become effective and the loans are removed from delinquent status by our servicers. However, under our previous non-HAMP modifications, the borrower would return to a current payment status sooner, because these modifications do not have trial periods. Consequently, the volume, timing, and type of loan modifications impact our reported serious delinquency rate. As discussed above in "Single-Family Loan Workouts," the new non-HAMP standard loan modification initiative includes a trial period comparable to that of our HAMP modification initiative. In addition, there may be temporary timing differences, or lags, in the reporting of payment status and modification completion due to differing practices of our servicers that can affect our delinquency reporting.

Temporary actions to suspend foreclosure transfers of occupied homes, increases in foreclosure process timeframes, process requirements of HAMP, general constraints on servicer capacity, and court backlogs (in states that require a judicial foreclosure process) caused loans to remain in seriously delinquent status for longer periods than prior to 2008, before such actions and delays arose. This has caused our single-family serious delinquency rates to be higher in recent periods than they otherwise would have been. Delays in foreclosure relating to the concerns about the foreclosure process also had a similar effect on our single-family serious delinquency rates. As of September 30, 2011 and December 31, 2010, the percentage of seriously delinquent loans that have been delinquent for more than six months was 70% and 66%, respectively.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2188                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 38 presents serious delinquency rates for our single-family credit guarantee portfolio.

**Table 38 — Single-Family Serious Delinquency Rates**

| | As of September 30, 2011 | | As of December 31, 2010 | |
|---|---|---|---|---|
| | Percentage of Portfolio | Serious Delinquency Rate | Percentage of Portfolio | Serious Delinquency Rate |
| Single-family: | | | | |
| Non-credit-enhanced | 86% | 2.77% | 85% | 3.01% |
| Credit-enhanced | 14 | 7.70 | 15 | 8.27 |
| Total single-family credit guarantee portfolio(1) | 100% | 3.51 | 100% | 3.84 |

(1) As of September 30, 2011 and December 31, 2010, approximately 68% and 61%, respectively, of the single-family loans reported as seriously delinquent were in the process of foreclosure.

Serious delinquency rates of our single-family credit guarantee portfolio declined slightly to 3.51% as of September 30, 2011 from 3.84% as of December 31, 2010. Serious delinquency rates for interest-only and option ARM products, which together represented approximately 5% of our total single-family credit guarantee portfolio at September 30, 2011, were 17.7% and 21.2%, respectively, at September 30, 2011, compared with 18.4% and 21.2%, respectively, at December 31, 2010. Serious delinquency rates of single-family 30-year, fixed rate amortizing loans, which is a more traditional mortgage product, were approximately 3.7% and 4.0% at September 30, 2011, and December 31, 2010, respectively. The slight improvement in our single-family serious delinquency rate at September 30, 2011, compared to December 31, 2010, reflects a high volume of loan modifications and foreclosure transfers, as well as a slowdown in new serious delinquencies. See "Table 37 — Reperformance Rates of Modified Single-Family Loans" for information on the performance of modified loans.

In certain states, our single-family serious delinquency rates have remained persistently high. As of September 30, 2011, single-family loans in Arizona, California, Florida, and Nevada comprised 25% of our single-family credit guarantee portfolio, and the serious delinquency rate of loans in these states was 6.2%. During the nine months ended September 30, 2011, we also continued to experience high serious delinquency rates on single-family loans originated between 2005 and 2008. We purchased significant amounts of loans with higher-risk characteristics in those years. In addition, those borrowers are more susceptible to the declines in home prices since 2006 than those homeowners that have built up equity in their homes over time.

Table 39 presents credit concentrations for certain loan groups in our single-family credit guarantee portfolio.

**Table 39 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio**

| | As of September 30, 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Alt-A UPB | Non Alt-A UPB (in billions) | Total UPB | Estimated Current LTV Ratio(1) | Percentage Modified(2) | Serious Delinquency Rate |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 40 | $ 413 | $ 453 | 93% | 4.3% | 6.2% |
| All other states | 59 | 1,272 | 1,331 | 75 | 2.4 | 2.8 |
| Year of origination: | | | | | | |
| 2011 | — | 171 | 171 | 70 | — | <0.1 |
| 2010 | — | 347 | 347 | 70 | <0.1 | 0.2 |
| 2009 | <1 | 348 | 348 | 72 | 0.1 | 0.4 |
| 2008 | 8 | 123 | 131 | 91 | 3.9 | 5.2 |
| 2007 | 30 | 146 | 176 | 112 | 9.3 | 11.2 |
| 2006 | 27 | 104 | 131 | 111 | 8.5 | 10.5 |
| 2005 | 18 | 133 | 151 | 95 | 4.6 | 6.2 |
| 2004 and prior | 16 | 313 | 329 | 60 | 2.3 | 2.6 |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2189

Table of Contents

| | Alt-A UPB | Non Alt-A UPB (in billions) | Total UPB | Estimated Current LTV Ratio[1] | Percentage Modified[2] | Serious Delinquency Rate |
|---|---|---|---|---|---|---|
| | | | As of September 30, 2010 | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 50 | $  415 | $   465 | 8 8% | 2.8% | 7.2% |
| All other states | 74 | 1,298 | 1,372 | 72 | 1.6 | 2.9 |
| Year of origination: | | | | | | |
| 2010 | — | 209 | 209 | 71 | — | <0.1 |
| 2009 | <1 | 427 | 427 | 68 | <0.1 | 0.2 |
| 2008 | 11 | 169 | 180 | 83 | 1.7 | 4.3 |
| 2007 | 38 | 186 | 224 | 100 | 5.1 | 11.0 |
| 2006 | 33 | 136 | 169 | 100 | 4.8 | 9.8 |
| 2005 | 22 | 171 | 193 | 87 | 2.7 | 5.7 |
| 2004 and prior | 20 | 415 | 435 | 57 | 1.5 | 2.3 |

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 (in millions) | 2011 | 2010 (in millions) |
| **Credit Losses** | | | | |
| Geographical distribution: | | | | |
| Arizona, California, Florida, and Nevada | $1,995 | $2,551 | $ 5,946 | $ 6,743 |
| All other states | 1,445 | 1,665 | 3,826 | 4,231 |
| Year of origination: | | | | |
| 2011 | <1 | — | <1 | — |
| 2010 | 23 | — | 37 | — |
| 2009 | 59 | 23 | 126 | 37 |
| 2008 | 268 | 303 | 752 | 692 |
| 2007 | 1,219 | 1,427 | 3,534 | 3,704 |
| 2006 | 923 | 1,275 | 2,753 | 3,328 |
| 2005 | 624 | 782 | 1,728 | 2,201 |
| 2004 and prior | 324 | 406 | 842 | 1,012 |

(1) See endnote (5) to "Table 32 — Characteristics of the Single-Family Credit Guarantee  Portfolio" for information on our calculation of estimated  current LTV ratios.

(2) Represents the percentage of loans, based on loan count in our  single-family credit guarantee portfolio, that have been  modified under agreement with the borrower, including those with no changes in interest rate or maturity date, but where past due  amounts are added to the outstanding principal balance of the  loan.

72                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2190

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 40 presents statistics for combinations of certain characteristics of the mortgages in our single-family credit guarantee portfolio as of September 30, 2011 and December 31, 2010.

## Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations

| | September 30, 2011 | | | | | | | | |
| | Current LTV Ratio ≤ 80[1] | | Current LTV Ratio of > 80 to 100[1] | | Current LTV > 100[1] | | Current LTV Ratio All Loans[1] | | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
|---|---|---|---|---|---|---|---|---|---|
| **By Product Type** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 0.9% | 7.9% | 0.8% | 13.1% | 1.0% | 23.5% | 2.7% | 15.8% | 13.8% |
| 15- year amortizing fixed-rate | 0.2 | 4.3 | <0.1 | 10.5 | <0.1 | 17.2 | 0.2 | 2.0 | 4.8 |
| ARMs/adjustable rate[4] | 0.1 | 11.2 | <0.1 | 17.5 | <0.1 | 25.0 | 0.1 | 9.2 | 15.7 |
| Interest-only[5] | <0.1 | 16.6 | <0.1 | 23.2 | 0.1 | 35.7 | 0.1 | 0.5 | 30.9 |
| Other[6] | <0.1 | 3.6 | <0.1 | 8.0 | 0.1 | 12.7 | 0.1 | 4.0 | 5.4 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.3 | 1.2 | 23.9 | 3.2 | 12.9 | 12.7 |
| FICO scores of 620 to 659: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 2.1 | 5.0 | 1.5 | 8.6 | 2.0 | 18.0 | 5.6 | 10.8 | 9.7 |
| 15- year amortizing fixed-rate | 0.6 | 2.5 | <0.1 | 6.5 | <0.1 | 14.4 | 0.6 | 1.0 | 2.9 |
| ARMs/adjustable rate[4] | 0.1 | 5.5 | 0.1 | 11.9 | 0.1 | 23.9 | 0.3 | 1.5 | 12.7 |
| Interest-only[5] | <0.1 | 10.9 | 0.1 | 19.1 | 0.1 | 32.3 | 0.4 | 0.4 | 27.5 |
| Other[6] | <0.1 | 2.7 | <0.1 | 4.2 | <0.1 | 5.0 | <0.1 | 1.3 | 4.1 |
| Total FICO scores of 620 to 659 | 2.8 | 4.3 | 1.7 | 8.9 | 2.4 | 19.2 | 6.9 | 8.5 | 9.2 |
| FICO scores of >=660: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 35.8 | 0.9 | 19.8 | 2.4 | 12.1 | 9.0 | 67.7 | 2.5 | 2.6 |
| 15- year amortizing fixed-rate | 12.8 | 0.4 | 0.9 | 1.2 | 0.1 | 6.0 | 13.8 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 2.3 | 1.2 | 0.8 | 4.6 | 0.8 | 15.1 | 3.9 | 0.3 | 4.7 |
| Interest-only[5] | 0.5 | 3.7 | 0.8 | 9.7 | 2.5 | 21.0 | 3.8 | 0.2 | 16.2 |
| Other[6] | <0.1 | 1.6 | <0.1 | 1.7 | 0.1 | 1.8 | 0.1 | 0.4 | 1.7 |
| Total FICO scores >= 660 | 51.4 | 0.8 | 22.3 | 2.6 | 15.6 | 10.7 | 89.3 | 1.8 | 2.5 |
| FICO scores not available | 0.3 | 4.4 | 0.1 | 11.3 | 0.2 | 21.6 | 0.6 | 5.2 | 8.5 |
| All FICO scores: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 38.9 | 1.5 | 22.1 | 3.4 | 15.2 | 11.3 | 76.2 | 3.8 | 3.7 |
| 15- year amortizing fixed-rate | 13.5 | 0.6 | 0.9 | 1.7 | 0.2 | 7.2 | 14.6 | 0.2 | 0.7 |
| ARMs/adjustable rate[4] | 2.6 | 1.9 | 0.9 | 5.9 | 1.0 | 16.6 | 4.5 | 0.8 | 5.7 |
| Interest-only[5] | 0.6 | 4.4 | 0.9 | 11.0 | 2.8 | 22.5 | 4.3 | 0.2 | 17.7 |
| Other[6] | 0.1 | 8.2 | 0.1 | 8.1 | 0.2 | 7.5 | 0.4 | 6.5 | 8.0 |
| Total Single-family Credit Guarantee Portfolio[7] | 55.7% | 1.2% | 24.9% | 3.6% | 19.4% | 12.7% | 100.0% | 2.8% | 3.5% |
| **By Region[8]** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| North Central | 0.2% | 6.2% | 0.2% | 11.8% | 0.2% | 20.2% | 0.6% | 12.9% | 11.9% |
| Northeast | 0.4 | 9.1 | 0.2 | 18.4 | 0.3 | 28.1 | 0.9 | 13.6 | 14.2 |
| Southeast | 0.2 | 7.8 | 0.2 | 13.9 | 0.3 | 28.9 | 0.7 | 13.3 | 15.6 |
| Southwest | 0.2 | 5.1 | 0.1 | 10.6 | 0.1 | 19.3 | 0.4 | 9.1 | 7.8 |
| West | 0.2 | 4.6 | 0.1 | 9.7 | 0.3 | 20.0 | 0.6 | 15.5 | 12.2 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.3 | 1.2 | 23.9 | 3.2 | 12.9 | 12.7 |
| FICO scores of 620 to 659: | | | | | | | | | |
| North Central | 0.4 | 3.9 | 0.4 | 8.0 | 0.5 | 14.9 | 1.3 | 8.3 | 8.2 |
| Northeast | 0.9 | 5.5 | 0.5 | 13.0 | 0.4 | 22.4 | 1.8 | 8.5 | 9.8 |
| Southeast | 0.6 | 5.1 | 0.2 | 9.2 | 0.6 | 23.8 | 1.4 | 8.6 | 12.0 |
| Southwest | 0.5 | 3.0 | 0.3 | 6.7 | 0.1 | 13.0 | 0.9 | 5.6 | 4.9 |
| West | 0.4 | 3.0 | 0.3 | 6.7 | 0.8 | 17.9 | 1.5 | 11.4 | 10.1 |
| Total FICO scores of 620 to 659 | 2.8 | 4.3 | 1.7 | 8.9 | 2.4 | 19.2 | 6.9 | 8.5 | 9.2 |
| FICO scores of >=660: | | | | | | | | | |
| North Central | 8.7 | 0.7 | 4.6 | 2.3 | 2.7 | 7.4 | 16.0 | 1.5 | 2.0 |
| Northeast | 15.4 | 1.0 | 5.3 | 4.1 | 1.8 | 12.1 | 22.5 | 1.5 | 2.2 |
| Southeast | 7.2 | 1.1 | 3.9 | 2.8 | 3.8 | 14.0 | 14.9 | 1.9 | 4.1 |
| Southwest | 7.3 | 0.6 | 2.8 | 1.9 | 0.4 | 6.0 | 10.5 | 0.9 | 1.1 |
| West | 12.8 | 0.5 | 5.7 | 1.7 | 6.9 | 10.2 | 25.4 | 2.8 | 3.0 |
| Total FICO scores >= 660 | 51.4 | 0.8 | 22.3 | 2.6 | 15.6 | 10.7 | 89.3 | 1.8 | 2.5 |
| Total FICO scores not available | 0.3 | 4.4 | 0.1 | 11.3 | 0.2 | 21.6 | 0.6 | 5.2 | 8.5 |
| All FICO scores: | | | | | | | | | |
| North Central | 9.4 | 1.0 | 5.2 | 3.2 | 3.4 | 9.5 | 18.0 | 2.5 | 2.9 |
| Northeast | 16.8 | 1.6 | 6.1 | 5.6 | 2.4 | 15.2 | 25.3 | 2.5 | 3.2 |
| Southeast | 7.9 | 1.8 | 4.4 | 3.9 | 4.8 | 16.5 | 17.1 | 3.2 | 5.4 |
| Southwest | 8.1 | 1.0 | 3.2 | 3.0 | 0.6 | 9.1 | 11.9 | 1.8 | 1.8 |
| West | 13.5 | 0.7 | 6.0 | 2.2 | 8.2 | 11.4 | 27.7 | 3.6 | 3.7 |
| Total Single-family Credit Guarantee Portfolio[7] | 55.7% | 1.2% | 24.9% | 3.6% | 19.4% | 12.7% | 100.0% | 2.8% | 3.5% |

TREASURY-2191

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

|  | As of December 31, 2010 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Current LTV Ratio ≤ 80[1] | | Current LTV Ratio of > 80 to 100[1] | | Current LTV > 100[1] | | Current LTV Ratio All Loans[1] | | |
|  | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 1.1% | 8.6% | 0.8% | 15.1% | 0.9% | 27.5% | 2.8% | 12.9% | 15.1% |
| 15- year amortizing fixed-rate | 0.2 | 4.6 | <0.1 | 11.8 | <0.1 | 22.2 | 0.2 | 1.8 | 5.1 |
| ARMs/adjustable rate[4] | 0.1 | 12.2 | <0.1 | 18.4 | <0.1 | 28.6 | 0.1 | 7.6 | 16.9 |
| Interest only[5] | <0.1 | 17.6 | 0.1 | 25.3 | 0.1 | 39.9 | 0.2 | 0.9 | 33.3 |
| Other[6] | <0.1 | 3.7 | <0.1 | 8.5 | 0.1 | 13.2 | 0.1 | 3.1 | 5.6 |
| Total FICO scores < 620 | 1.4 | 7.6 | 0.9 | 15.3 | 1.1 | 27.9 | 3.4 | 10.4 | 13.9 |
| FICO scores of 620 to 659: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 2.4 | 5.2 | 1.7 | 9.8 | 1.8 | 20.5 | 5.9 | 8.3 | 10.3 |
| 15- year amortizing fixed-rate | 0.6 | 2.6 | <0.1 | 7.3 | <0.1 | 16.6 | 0.6 | 0.9 | 3.0 |
| ARMs/adjustable rate[4] | 0.1 | 6.0 | 0.1 | 13.5 | 0.1 | 25.9 | 0.3 | 1.5 | 13.6 |
| Interest only[5] | <0.1 | 10.9 | 0.2 | 20.6 | 0.3 | 35.6 | 0.5 | 0.9 | 29.2 |
| Other[6] | <0.1 | 2.6 | <0.1 | 5.4 | <0.1 | 5.3 | <0.1 | 1.0 | 1.3 |
| Total FICO scores of 620 to 659 | 3.1 | 4.5 | 2.0 | 10.3 | 2.2 | 22.0 | 7.3 | 6.5 | 9.9 |
| FICO scores of >=660: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 36.5 | 1.0 | 20.0 | 2.8 | 10.4 | 10.4 | 66.9 | 1.9 | 2.8 |
| 15- year amortizing fixed-rate | 12.5 | 0.4 | 0.9 | 1.4 | 0.1 | 7.3 | 13.5 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 1.9 | 1.6 | 0.8 | 5.4 | 0.8 | 17.0 | 3.5 | 0.4 | 5.6 |
| Interest only[5] | 0.7 | 3.7 | 1.2 | 10.3 | 2.8 | 23.1 | 4.7 | 0.4 | 16.7 |
| Other[6] | <0.1 | 2.1 | <0.1 | 2.0 | 0.1 | 1.3 | 0.1 | 0.4 | 1.7 |
| Total FICO scores >= 660 | 51.6 | 0.8 | 22.9 | 3.1 | 14.2 | 12.6 | 88.7 | 1.3 | 2.7 |
| FICO scores not available | 0.4 | 4.6 | 0.1 | 11.9 | 0.1 | 23.7 | 0.6 | 4.1 | 8.8 |
| All FICO scores: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 40.2 | 1.6 | 22.6 | 3.9 | 13.2 | 13.1 | 76.0 | 2.9 | 4.0 |
| 15- year amortizing fixed-rate | 13.3 | 0.6 | 0.9 | 2.0 | 0.2 | 8.8 | 14.4 | 0.2 | 0.8 |
| ARMs/adjustable rate[4] | 2.1 | 2.4 | 1.0 | 7.0 | 0.9 | 18.7 | 4.0 | 0.8 | 6.7 |
| Interest only[5] | 0.7 | 4.5 | 1.3 | 11.7 | 3.2 | 24.9 | 5.2 | 0.5 | 18.4 |
| Other[6] | 0.2 | 9.3 | 0.1 | 8.6 | 0.1 | 7.3 | 0.4 | 5.2 | 8.6 |
| Total Single-family Credit Guarantee Portfolio[7] | 56.5% | 1.4% | 25.9% | 4.3% | 17.6% | 14.9% | 100.0% | 2.1% | 3.8% |
| **By Region[8]** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| North Central | 0.2% | 7.1% | 0.2% | 13.7% | 0.2% | 22.5% | 0.6% | 10.9% | 13.0% |
| Northeast | 0.5 | 9.4 | 0.3 | 19.9 | 0.2 | 30.5 | 1.0 | 10.7 | 14.5 |
| Southeast | 0.2 | 8.4 | 0.2 | 15.5 | 0.3 | 31.9 | 0.7 | 10.7 | 16.4 |
| Southwest | 0.3 | 5.9 | 0.1 | 12.7 | 0.1 | 24.1 | 0.5 | 7.6 | 9.2 |
| West | 0.2 | 5.6 | 0.1 | 13.5 | 0.3 | 28.0 | 0.6 | 12.3 | 15.8 |
| Total FICO scores < 620 | 1.4 | 7.6 | 0.9 | 15.3 | 1.1 | 27.9 | 3.4 | 10.4 | 13.9 |
| FICO scores of 620 to 659: | | | | | | | | | |
| North Central | 0.6 | 4.3 | 0.4 | 9.6 | 0.4 | 16.6 | 1.4 | 6.6 | 8.9 |
| Northeast | 0.9 | 5.4 | 0.6 | 13.7 | 0.3 | 23.2 | 1.8 | 6.4 | 9.6 |
| Southeast | 0.5 | 5.3 | 0.4 | 10.0 | 0.6 | 25.5 | 1.5 | 6.6 | 12.1 |
| Southwest | 0.6 | 3.4 | 0.3 | 8.1 | 0.1 | 15.3 | 1.0 | 4.5 | 5.6 |
| West | 0.5 | 3.5 | 0.3 | 9.6 | 0.8 | 23.7 | 1.6 | 8.5 | 12.7 |
| Total FICO scores of 620 to 659 | 3.1 | 4.5 | 2.0 | 10.3 | 2.2 | 22.0 | 7.3 | 6.5 | 9.9 |
| FICO scores of >=660: | | | | | | | | | |
| North Central | 8.9 | 0.7 | 4.9 | 2.8 | 2.3 | 7.9 | 16.1 | 1.2 | 2.1 |
| Northeast | 15.0 | 1.0 | 5.6 | 4.4 | 1.5 | 12.0 | 22.1 | 1.1 | 2.1 |
| Southeast | 7.4 | 1.2 | 4.1 | 3.0 | 3.6 | 15.1 | 15.1 | 1.4 | 4.1 |
| Southwest | 7.3 | 0.7 | 2.9 | 2.3 | 0.3 | 6.8 | 10.5 | 0.7 | 1.2 |
| West | 13.0 | 0.6 | 5.4 | 2.7 | 6.5 | 13.8 | 24.9 | 2.1 | 3.9 |
| Total FICO scores >= 660 | 51.6 | 0.8 | 22.9 | 3.1 | 14.2 | 12.6 | 88.7 | 1.3 | 2.7 |
| FICO scores not available | 0.4 | 4.6 | 0.1 | 11.9 | 0.1 | 23.7 | 0.6 | 4.1 | 8.8 |
| All FICO scores: | | | | | | | | | |
| North Central | 9.6 | 1.2 | 5.6 | 3.9 | 3.0 | 10.5 | 18.2 | 2.0 | 3.1 |
| Northeast | 16.6 | 1.6 | 6.4 | 6.0 | 2.0 | 15.4 | 25.0 | 1.9 | 3.2 |
| Southeast | 8.2 | 1.9 | 4.7 | 4.3 | 4.5 | 17.8 | 17.4 | 2.4 | 5.6 |
| Southwest | 8.2 | 1.2 | 3.4 | 3.6 | 0.5 | 10.9 | 12.1 | 1.5 | 2.1 |
| West | 13.9 | 0.9 | 5.8 | 3.4 | 7.6 | 15.5 | 27.3 | 2.7 | 4.7 |
| Total Single-family Credit Guarantee Portfolio[7] | 56.5% | 1.4% | 25.9% | 4.3% | 17.6% | 14.9% | 100.0% | 2.1% | 3.8% |

(1)  The current LTV ratios are our estimates. See endnote (5) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information.
(2)  Based on UPB of the single-family credit guarantee portfolio.
(3)  See endnote (2) to "Table 39 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio."
(4)  Includes balloon/resets and option ARM mortgage loans.
(5)  Includes both fixed rate and adjustable rate loans. The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post-modification), primarily due to delays in processing.
(6)  Consist of FHA/VA and other government guaranteed mortgages.
(7)  The total of all FICO scores categories may not sum due to the inclusion of loans where FICO scores are not available in the respective totals for all loans. See endnote (7) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information about our use of FICO scores.
(8)  Presentation with the following regional designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC,MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); and Southwest (AR, CO, KS, LA, MO, NE, NM,  OK, TX, WY).

74

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2192          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 41 presents delinquency and default rate information for loans in our single-family credit guarantee portfolio based on year of origination.

**Table 41  Single-Family Credit Guarantee Portfolio by Year of Loan Origination**

| | As of September 30, 2011 | | | As of December 31, 2010 | | |
|---|---|---|---|---|---|---|
| Year of Loan Origination | Percentage of Portfolio | Serious Delinquency Rate | Foreclosure and Short Sale Rate[1] | Percentage of Portfolio | Serious Delinquency Rate | Foreclosure and Short Sale Rate[1] |
| 2011 | 10% | 0.03% | <0.01% | —% | —% | —% |
| 2010 | 20 | 0.17 | 0.03 | 18 | 0.05 | — |
| 2009 | 20 | 0.41 | 0.13 | 21 | 0.26 | 0.04 |
| 2008 | 7 | 5.20 | 1.97 | 9 | 4.89 | 1.26 |
| 2007 | 10 | 11.21 | 6.84 | 11 | 11.63 | 4.92 |
| 2006 | 7 | 10.54 | 6.47 | 9 | 10.46 | 5.00 |
| 2005 | 8 | 6.20 | 3.79 | 10 | 6.04 | 2.95 |
| 2004 and prior[2] | 18 | 2.63 | 1.00 | 22 | 2.46 | 0.88 |
| Total | 100% | 3.51% | | 100% | 3.84% | |

(1) Calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries during the period from origination to September 30, 2011 and December 31, 2010, respectively, divided by the number of loans in our single-family credit guarantee portfolio originated in that year.

(2) The foreclosure and short sale rate for "2004 and prior" represents the rate associated with loans originated from 2000 to 2004.

At September 30, 2011, approximately 32% of our single-family credit guarantee portfolio consisted of mortgage loans originated from 2005 through 2008. Loans originated during these years have experienced higher serious delinquency rates in the earlier years of their terms as compared to our historical experience. We attribute this serious delinquency performance to a number of factors, including: (a) the expansion of credit terms under which loans were underwritten during these years; (b) an increase in the origination and our purchase of interest-only and Alt-A mortgage products in these years; and (c) an environment of decreasing home sales and broadly declining home prices in the period following the loans' origination. Interest-only and Alt-A products have higher inherent credit risk than traditional fixed-rate mortgage products.

The UPB of loans originated after 2008 comprised 50% of our portfolio as of September 30, 2011. Approximately 91% of the loans we purchased in our single-family credit guarantee portfolio during the nine months ended September 30, 2011 were amortizing fixed-rate mortgage products.

*Multifamily Mortgage Credit Risk*

Portfolio diversification, particularly by product and geographical area, is an important aspect of our strategy to manage mortgage credit risk for multifamily loans. We monitor a variety of mortgage loan characteristics that may affect the default experience on our multifamily mortgage portfolio, such as the LTV ratio, DSCR, geographic location and loan duration. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for more information about the loans in our multifamily mortgage portfolio. We also monitor the performance and risk concentrations of our multifamily loans and the underlying properties throughout the life of the loan.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2193                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 42 provides certain attributes of our multifamily mortgage portfolio at September 30, 2011 and December 31, 2010.

**Table 42 — Multifamily Mortgage Portfolio — by Attribute**

| | UPB[1] at | | Delinquency Rate[2] at | |
|---|---|---|---|---|
| | September 30, 2011 | December 31, 2010 | September 30, 2011 | December 31, 2010 |
| | (dollars in billions) | | | |
| **Original LTV Ratio[3]** | | | | |
| Below 75% | $    75.9 | $    72.0 | 0.18% | 0.08% |
| 75% to 80% | 30.1 | 29.8 | 0.21 | 0.24 |
| Above 80% | 6.4 | 6.6 | 2.65 | 2.30 |
| Total | $    112.4 | $    108.4 | 0.33% | 0.26% |
| Weighted average LTV ratio at origination | 70% | 70% | | |
| | | | | |
| **Maturity Dates** | | | | |
| 2011 | $    0.4 | $    2.3 | 5.83% | 0.97% |
| 2012 | 3.4 | 4.1 | — | 0.82 |
| 2013 | 5.9 | 6.8 | 1.05 | — |
| 2014 | 8.0 | 8.5 | 0.03 | 0.02 |
| 2015 | 11.5 | 12.0 | 0.16 | 0.09 |
| Beyond 2015 | 83.2 | 74.7 | 0.32 | 0.29 |
| Total | $    112.4 | $    108.4 | 0.33% | 0.26% |
| | | | | |
| **Year of Acquisition or Guarantee[4]** | | | | |
| 2004 and prior | $    13.4 | $    15.9 | 0.37% | 0.31% |
| 2005 | 7.6 | 7.9 | 0.08 | — |
| 2006 | 11.0 | 11.6 | 0.35 | 0.25 |
| 2007 | 20.1 | 20.8 | 1.01 | 0.97 |
| 2008 | 21.5 | 23.0 | 0.35 | 0.03 |
| 2009 | 14.4 | 15.2 | — | — |
| 2010 | 12.7 | 14.0 | — | — |
| 2011 | 11.7 | N/A | — | N/A |
| Total | $    112.4 | $    108.4 | 0.33% | 0.26% |
| | | | | |
| **Current Loan Size Distribution** | | | | |
| Above $25 million | $    40.6 | $    39.6 | 0.22% | 0.07% |
| Above $5 million to $25 million | 62.4 | 59.4 | 0.39 | 0.38 |
| $5 million and below | 9.4 | 9.4 | 0.48 | 0.37 |
| Total | $    112.4 | $    108.4 | 0.33% | 0.26% |
| | | | | |
| **Legal Structure** | | | | |
| Unsecuritized loans | $    81.7 | $    85.9 | 0.17% | 0.11% |
| Non-consolidated Freddie Mac mortgage-related securities | 21.3 | 12.8 | 1.00 | 1.30 |
| Other guarantee commitments | 9.4 | 9.7 | 0.19 | 0.23 |
| Total | $    112.4 | $    108.4 | 0.33% | 0.26% |
| | | | | |
| **Credit Enhancement** | | | | |
| Credit-enhanced | $    28.9 | $    20.9 | 0.77% | 0.85% |
| Non-credit-enhanced | 83.5 | 87.5 | 0.18 | 0.12 |
| Total | $    112.4 | $    108.4 | 0.33% | 0.26% |

(1) Beginning in the second quarter of 2011, we exclude non-consolidated mortgage-related securities for which we do not provide our guarantee. The prior period has been revised to conform to the current period presentation.

(2) See "Delinquencies" below for more information about our multifamily delinquency rates.

(3) Original LTV ratios are calculated as the UPB of the mortgage, divided by the lesser of the appraised value of the property at the time of mortgage origination or, except for refinance loans, the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.

(4) Based on either: (a) the year of acquisition, for loans recorded on our consolidated balance sheets; or (b) the year that we issued our guarantee, for the remaining loans in our multifamily mortgage portfolio.

Our multifamily mortgage portfolio consists of product types that are categorized based on loan terms. Multifamily loans may be interest-only or amortizing, fixed or variable rate, or may switch between fixed and variable rate over time. However, our multifamily loans generally have balloon maturities ranging from five to ten years. Amortizing loans reduce our credit exposure over time because the UPB declines with each mortgage payment. As of September 30, 2011 and

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2194

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

December 31, 2010, approximately 84% and 85%, respectively, of the multifamily loans on our consolidated balance sheets had fixed interest rates while the remaining loans had variable interest rates.

Because most multifamily loans require a significant lump sum payment of unpaid principal at maturity, the inability to refinance or pay off the loan at maturity is a serious concern for lenders. Although property values increased in recent quarters, in some instances they are still well below the highs of a few years ago and are lower than when the loans were originally underwritten, particularly in areas where economic conditions remain weak. As a result, if property values do not continue to improve, borrowers may experience significant difficulty refinancing as their loans approach maturity, which could increase borrower defaults or increase modification volumes. As of September 30, 2011, approximately 91% of UPB in our multifamily mortgage portfolio matures in 2014 and beyond.

In certain cases, we may provide short-term loan extensions of up to 12 months for certain borrowers. Modifications and extensions of loans are performed in an effort to minimize our losses. During the nine months ended September 30, 2011, we extended and modified unsecuritized multifamily loans totaling $315 million in UPB, compared with $390 million during the nine months ended September 30, 2010. Multifamily unsecuritized loan modifications during the nine months ended September 30, 2011 included: (a) $84 million in UPB for short-term loan extensions; and (b) $231 million in UPB for loan modifications. Where we have granted a concession to borrowers experiencing financial difficulties, we account for these loans as TDRs. When we execute a modification classified as a TDR, the loan is then classified as nonperforming for the life of the loan regardless of its delinquency status. At September 30, 2011, we had $1.0 billion of multifamily loan UPB classified as TDRs on our consolidated balance sheets.

### Delinquencies

Our multifamily delinquency rates include all multifamily loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancement provided by the U.S. government. We report multifamily delinquency rates based on UPB of mortgage loans that are two monthly payments or more past due or in the process of foreclosure, as reported by our servicers. Our delinquency rates for multifamily loans are positively impacted to the extent we have been successful in working with troubled borrowers to modify their loans prior to becoming delinquent or by providing temporary relief through loan modifications, including short-term extensions. Some geographic areas in which we have investments in multifamily loans, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We own or guarantee loans in these states that are non-performing, or we believe are at risk of default. For further information regarding concentrations in our multifamily mortgage portfolio, including regional geographic composition, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS."

Our multifamily mortgage portfolio delinquency rate increased to 0.33% at September 30, 2011 from 0.26% at December 31, 2010. Our delinquency rate for credit-enhanced loans was 0.77% and 0.85% at September 30, 2011 and December 31, 2010, respectively, and for non-credit-enhanced loans was 0.18% and 0.12% at September 30, 2011 and December 31, 2010, respectively. As of September 30, 2011, more than one-half of our multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two monthly payments or more past due had credit enhancements that we currently believe will mitigate our expected losses on those loans. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections and other forms of credit enhancements covering loans in our multifamily mortgage portfolio as of September 30, 2011 and December 31, 2010.

### Non-Performing Assets

Non-performing assets consist of single-family and multifamily loans that have undergone a TDR, single-family seriously delinquent loans, multifamily loans that are three or more payments past due or in the process of foreclosure, and REO assets, net. Non-performing assets also include multifamily loans that are deemed impaired based on management judgment. We place non-performing loans on non-accrual status when we believe the collectability of interest and principal on a loan is not reasonably assured, unless the loan is well secured and in the process of collection. When a loan is placed on non-accrual status, any interest income accrued but uncollected is reversed. Thereafter, interest income is recognized only upon receipt of cash payments. We did not accrue interest on any loans three monthly payments or more past due or if the loan is in the process of foreclosure during the three and nine months ended September 30, 2011.

We classify TDRs as those loans where we have granted a concession to a borrower that is experiencing financial difficulties. TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further information about our TDRs.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 43 provides detail on non-performing loans and REO assets on our consolidated balance sheets and non-performing loans underlying our financial guarantees.

**Table 43 — Non-Performing Assets**[1]

| | September 30, 2011 | As of<br>December 31, 2010<br>(dollars in millions) | September 30, 2010 |
|---|---|---|---|
| Non-Performing mortgage loans — on balance sheet: | | | |
| Single-family TDRs: | | | |
| Reperforming (*i.e.*; less than three monthly payments past due) | $ 42,156 | $ 26,612 | $ 22,526 |
| Seriously delinquent | 10,509 | 3,144 | 2,239 |
| Multifamily TDRs[2] | 1,045 | 911 | 343 |
| Total TDRs | 53,710 | 30,667 | 25,108 |
| Other single-family non-performing loans[3] | 65,179 | 84,272 | 86,443 |
| Other multifamily non-performing loans[4] | 1,853 | 1,750 | 1,580 |
| Total non-performing mortgage loans — on balance sheet | 120,742 | 116,689 | 113,131 |
| Non-performing mortgage loans — off-balance sheet: | | | |
| Single-family loans | 1,237 | 1,450 | 1,538 |
| Multifamily loans | 294 | 198 | 177 |
| Total non-performing mortgage loans — off-balance sheet | 1,531 | 1,648 | 1,715 |
| Real estate owned, net | 5,630 | 7,068 | 7,511 |
| Total non-performing assets | $ 127,903 | $ 125,405 | $ 122,357 |
| Loan loss reserves as a percentage of our non-performing mortgage loans | 32.5% | 33.7% | 33.6% |
| Total non-performing assets as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | 6.6% | 6.4% | 6.2% |

(1) Mortgage loan amounts are based on UPB and REO, net is based on carrying values.
(2) As of September 30, 2011, approximately $1.0 billion in UPB of these loans were current.
(3) Represents loans recognized by us on our consolidated balance sheets, including loans purchased from PC trusts due to the borrower's serious delinquency.
(4) Of this amount, $1.7 billion, $1.6 billion, and $1.3 billion of UPB were current at September 30, 2011, December 31, 2010, and September 30, 2010, respectively.

The amount of non-performing assets increased to $127.9 billion as of September 30, 2011, from $125.4 billion at December 31, 2010, primarily due to an increase in single-family loans classified as TDRs. However, during the nine months ended September 30, 2011, there was a decline in the rate at which loans transitioned into serious delinquency. Our serious delinquency rate has remained high compared to historical levels due to the impact of continued weakness in home prices and persistently high unemployment, extended foreclosure timelines and foreclosure suspensions in many states, and challenges faced by servicers in processing large volumes of problem loans. The UPB of loans categorized as TDRs increased to $53.7 billion at September 30, 2011 from $30.7 billion at December 31, 2010, largely due to a continued high volume of loan modifications during the nine months ended September 30, 2011 in which we decreased the contractual interest rate, deferred the balance on which contractual interest is computed, or made a combination of both of these changes. TDRs during the third quarter of 2011 include HAMP and non-HAMP loan modifications as well as trial period modifications and certain other loss mitigation actions. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for information about our implementation of new accounting guidance on classification of loans as TDRs in the third quarter of 2011. In recent periods, our non-HAMP modifications comprised a greater portion of our completed loan modification volume and the volume of HAMP modifications declined. We expect this trend to continue in 2012. We expect our non-performing assets, including loans deemed to be TDRs, to remain at elevated levels into 2012.

Table 44 provides detail by region for REO activity. Our REO activity relates almost entirely to single-family residential properties. Consequently, our regional REO acquisition trends generally follow a pattern that is similar to, but lags, that of regional serious delinquency trends of our single-family credit guarantee portfolio. See "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for information about regional serious delinquency rates.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2196

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Table 44 — REO Activity by Region[1]

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (number of properties) | | | |
| **REO Inventory** | | | | |
| Beginning property inventory | 60,618 | 62,190 | 72,093 | 45,052 |
| Adjustment to beginning balance[2] | — | — | — | 1,340 |
| Properties acquired by region: | | | | |
| Northeast | 1,705 | 3,673 | 5,111 | 9,403 |
| Southeast | 6,475 | 11,301 | 16,340 | 28,929 |
| North Central | 6,527 | 8,759 | 19,307 | 24,077 |
| Southwest | 3,274 | 4,442 | 9,775 | 11,133 |
| West | 6,404 | 10,881 | 23,360 | 29,597 |
| Total properties acquired | 24,385 | 39,056 | 73,893 | 103,139 |
| Properties disposed of by region: | | | | |
| Northeast | (1,914) | (2,263) | (7,002) | (6,405) |
| Southeast | (5,921) | (7,450) | (22,675) | (19,586) |
| North Central | (5,870) | (5,783) | (19,963) | (16,618) |
| Southwest | (3,116) | (2,688) | (10,135) | (7,832) |
| West | (8,566) | (8,152) | (26,595) | (24,180) |
| Total properties disposed of | (25,387) | (26,336) | (86,370) | (74,621) |
| Ending property inventory | 59,616 | 74,910 | 59,616 | 74,910 |

(1) See endnote (8) to "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for a description of these regions.

(2) Represents REO assets associated with previously non-consolidated mortgage trusts recognized upon adoption of the amendment to the accounting guidance for consolidation of VIEs on January 1, 2010.

Our REO property inventory declined 17% from December 31, 2010 to September 30, 2011, primarily due to a decline in the volume of single-family foreclosures caused by delays in the foreclosure process, including delays related to concerns about the foreclosure process, combined with continued strong levels of REO disposition activity during the period. The average length of time for foreclosure of a Freddie Mac loan significantly increased in recent years due to temporary suspensions, delays, and other factors. The nationwide average for completion of a foreclosure (as measured from the date of the last scheduled payment made by the borrower) on our single-family delinquent loans, excluding those underlying our Other Guarantee Transactions, was 516 days and 472 days for foreclosures completed during the three months ended September 30, 2011 and 2010, respectively.

We expect the pace of our REO acquisitions will continue to be affected by delays in the foreclosure process into 2012. However, we expect the volume of our REO acquisitions will likely remain elevated, in part due to the resumption earlier in the year of foreclosure activity by servicers following the suspensions over concerns about documentation practices. We have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio, many of which will likely complete the foreclosure process and transition to REO during the next few quarters as our servicers work through their foreclosure-related issues. This inventory of seriously delinquent loans arose due to various factors and events that have lengthened the problem loan resolution process and delayed the transition of such loans to a workout or foreclosure transfer (and then, to REO). These factors and events include the effect of HAMP, suspensions of foreclosure transfers, and the increasingly lengthy foreclosure process in many states.

Our single-family REO acquisitions during the nine months ended September 30, 2011 were most significant in the states of California, Michigan, Arizona, Georgia, and Florida, which collectively represented 44% of total REO acquisitions based on the number of properties. The states with the most properties in our REO inventory are Michigan and California. At September 30, 2011, our REO inventory in Michigan and California comprised 12% and 11%, respectively, of total REO property inventory, based on the number of properties.

We are limited in our REO disposition efforts by the capacity of the market to absorb large numbers of foreclosed properties. An increasing portion of our REO acquisitions are: (a) located in jurisdictions that require a period of time after foreclosure during which the borrower may reclaim the property; or (b) occupied and we have either retained the tenant under an existing lease or begun the process of eviction. During the period when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property. This generally extends our holding period for up to three additional months. As of September 30, 2011 and December 31, 2010, approximately 31% and 28%, respectively, of our REO property inventory was not marketable due to the above conditions. Our temporary suspension of certain REO sales during the fourth quarter of 2010 (for up to three months) due to concerns about deficiencies in foreclosure documentation practices also caused the holding period to increase. Primarily for these reasons, the average holding period of our REO property increased in recent periods, though it varies significantly in different states. Excluding any post-foreclosure period during which borrowers may reclaim a foreclosed property, the average

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

holding period associated with our REO dispositions during the nine months ended September 30, 2011 and 2010 was 201 days and 151 days, respectively. As of September 30, 2011 and December 31, 2010, the percentage of our single-family REO property inventory that had been held for sale longer than one year was 8.2% and 3.4%, respectively. We continue to actively market these properties through our established initiatives. All of these factors have resulted in an increase in the aging of our inventory.

The composition of interest-only and Alt-A loans in our single-family credit guarantee portfolio, based on UPB, was approximately 4% and 6%, respectively, at September 30, 2011 and was 8% on a combined basis. The percentage of our REO acquisitions in the nine months ended September 30, 2011 that had been secured by either of these loan types represented approximately 31% of our total REO acquisitions, based on loan amount prior to acquisition.

On August 10, 2011, FHFA, in consultation with Treasury and HUD, announced a request for information seeking input on new options for sales and rentals of single-family REO properties held by Freddie Mac, Fannie Mae and FHA. According to the announcement, the objective of the request for information is to help address current and future REO inventory. The request for information solicited alternatives for maximizing value to taxpayers and increasing private investment in the housing market, including approaches that support rental and affordable housing needs. It is too early to determine the impact this initiative may have on the levels of our REO property inventory, the process for disposing of REO property or our REO operations expense.

### _Credit Loss Performance_

Many loans that are seriously delinquent, or in foreclosure, result in credit losses. Table 45 provides detail on our credit loss performance associated with mortgage loans and REO assets on our consolidated balance sheets and underlying our non-consolidated mortgage-related financial guarantees.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2198

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 45 — Credit Loss Performance**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (dollars in millions) | | | |
| **REO** | | | | |
| REO balances, net: | | | | |
| Single-family | $ 5,539 | $ 7,420 | $ 5,539 | $ 7,420 |
| Multifamily | 91 | 91 | 91 | 91 |
| Total | $ 5,630 | $ 7,511 | $ 5,630 | $ 7,511 |
| REO operations (income) expense: | | | | |
| Single-family | $ 226 | $ 337 | $ 518 | $ 452 |
| Multifamily | (5) | — | (13) | 4 |
| Total | $ 221 | $ 337 | $ 505 | $ 456 |
| **Charge-offs** | | | | |
| Single-family: | | | | |
| Charge-offs, gross[1] (including $3.7 billion, $4.8 billion, $11.0 billion, and $12.6 billion relating to loan loss reserves, respectively) | $3,823 | $ 4,936 | $11,347 | $12,967 |
| Recoveries[2] | (609) | (1,057) | (2,093) | (2,445) |
| Single-family, net | $ 3,214 | $3,879 | $ 9,254 | $10,522 |
| Multifamily: | | | | |
| Charge-offs, gross[1] (including $8 million, $23 million, $49 million, and $68 million relating to loan loss reserves, respectively) | $ 16 | $ 23 | $ 57 | $ 68 |
| Recoveries[2] | — | — | — | — |
| Multifamily, net | $ 16 | $ 23 | $ 57 | $ 68 |
| Total Charge-offs: | | | | |
| Charge-offs, gross[1] (including $3.7 billion, $4.8 billion, $11.1 billion, and $12.6 billion relating to loan loss reserves, respectively) | $3,839 | $ 4,959 | $11,404 | $13,035 |
| Recoveries[2] | (609) | (1,057) | (2,093) | (2,445) |
| Total Charge-offs, net | $ 3,230 | $ 3,902 | $ 9,311 | $10,590 |
| **Credit losses[3]** | | | | |
| Single-family | $ 3,440 | $ 4,216 | $ 9,772 | $10,974 |
| Multifamily | 11 | 23 | 44 | 72 |
| Total | $ 3,451 | $ 4,239 | $ 9,816 | $11,046 |
| Total (in bps)[4] | 72.1 | 86.5 | 68.0 | 74.8 |

(1) Represent the carrying amount of a loan that has been discharged in order to remove the loan from our consolidated balance sheets at the time of resolution, regardless of when the impact of the credit loss was recorded on our consolidated statements of income and comprehensive income through the provision for credit losses or losses on loans purchased. Charge-offs primarily result from foreclosure transfers and short sales and are generally calculated as the recorded investment of a loan at the date it is discharged less the estimated value in final disposition or actual net sales in a short sale.

(2) Recoveries of charge-offs primarily result from foreclosure transfers and short sales on loans where a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements.

(3) Excludes foregone interest on non-performing loans, which reduces our net interest income but is not reflected in our total credit losses. In addition, excludes other market-based credit losses: (a) incurred on our investments in mortgage loans and mortgage-related securities; and (b) recognized in our consolidated statements of income and comprehensive income.

(4) Calculated as credit losses divided by the average carrying value of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates.

Our credit loss performance metric generally measures losses at the conclusion of the loan and related collateral resolution process. There is a significant lag in time from the implementation of problem loan workout activities until the final resolution of seriously delinquent mortgage loans and REO assets. Our credit loss performance is based on our charge-offs and REO expenses. We primarily record charge-offs at the time we take ownership of a property through foreclosure and at the time of settlement of foreclosure alternative transactions. Single-family charge-offs, gross, for the three and nine months ended September 30, 2011 were $3.8 billion and $11.3 billion, respectively, compared to $4.9 billion and $13.0 billion for the three and nine months ended September 30, 2010, respectively. Our net charge-offs in the three and nine months ended September 30, 2011 remained elevated, but reflect suppression of activity due to delays in the foreclosure process. We expect our charge-offs and credit losses to remain high in the remainder of 2011 and may increase in 2012, due to the large number of single-family non-performing loans that will likely be resolved as our servicers work through their foreclosure-related issues and because market conditions, such as home prices and the rate of home sales, continue to remain weak.

Our credit losses during the three months ended September 30, 2011 continued to be disproportionately high in those states that experienced significant declines in property values since 2006, such as California, Florida, Nevada, and Arizona, which collectively comprised approximately 58% and 61% of our total credit losses in the three and nine months ended September 30, 2011, respectively. California accounted for 16% of loans in our single-family credit guarantee

81

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

portfolio as of September 30, 2011. In addition, although Alt-A loans comprised approximately 6% of our single-family credit guarantee portfolio at both September 30, 2011 and December 31, 2010, respectively, these loans accounted for approximately 28% and 29% of our credit losses for the three and nine months ended September 30, 2011, respectively. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for information on REO disposition severity ratios, and see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about our credit losses.

*Credit Risk Sensitivity*

Under a 2005 agreement with FHFA, then OFHEO, we are required to disclose the estimated increase in the NPV of future expected credit losses for our single-family credit guarantee portfolio over a ten year period as the result of an immediate 5% decline in home prices nationwide, followed by a stabilization period and return to the base case. This sensitivity analysis is hypothetical and may not be indicative of our actual results. We do not use this analysis for determination of our reported results under GAAP. As shown in Table 46, our credit loss sensitivity declined in the third quarter of 2011, primarily due to the effects of a decline in mortgage interest rates, which affected recent and future expectations of refinancing activity.

**Table 46 — Single-Family Credit Loss Sensitivity**

| | Before Receipt of Credit Enhancements(1) | | After Receipt of Credit Enhancements(2) | |
| --- | --- | --- | --- | --- |
| | NPV(3) | NPV Ratio(4) | NPV(3) | NPV Ratio(4) |
| | | (dollars in millions) | | |
| At: | | | | |
| September 30, 2011 | $8,824 | 49.5 bps | $8,229 | 46.1 bps |
| June 30, 2011 | $10,203 | 56.5 bps | $9,417 | 52.2 bps |
| March 31, 2011 | $9,832 | 54.2 bps | $8,999 | 49.6 bps |
| December 31, 2010 | $9,926 | 54.9 bps | $9,053 | 50.0 bps |
| September 30, 2010 | $9,099 | 49.5 bps | $8,187 | 44.6 bps |

(1) Assumes that none of the credit enhancements currently covering our mortgage loans has any mitigating impact on our credit losses.
(2) Assumes we collect amounts due from credit enhancement providers after giving effect to certain assumptions about counterparty default rates.
(3) Based on the single-family credit guarantee portfolio, excluding REMICs and Other Structured Securities backed by Ginnie Mae Certificates.
(4) Calculated as the ratio of NPV of increase in credit losses to the single-family credit guarantee portfolio, defined in note (3) above.

**Interest Rate and Other Market Risks**

For a discussion of our interest rate and other market risks, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

**Operational Risks**

We may face increased operational risk due to the requirement that we and Fannie Mae align certain single-family mortgage servicing practices for non-performing loans. On April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie Mae. Implementing this servicing alignment initiative has become a top priority for the company, but may pose significant short-term operational challenges in data management and place additional strain on existing systems, processes, and key resources, particularly if the requirements were to change or new requirements were to be imposed on servicers whether through government directives or servicer settlements with the state attorneys general. See "Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Single-Family Loan Workouts*" for more information. There also have been a number of other regulatory developments in recent periods impacting single-family mortgage servicing and foreclosure practices. The servicing model for single-family mortgages may face significant changes in the future. As a result, we may be required to make additional significant changes to our practices, which could further increase our operational risk. See "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices" for more information.

Our business decision-making, risk management, and financial reporting are highly dependent on our use of models. In recent periods, external market factors have increasingly contributed to a growing risk associated with the use of these models. For example, certain economic events or the implementation of government policies could create increased model uncertainty as models may not fully capture these events, which makes it more difficult to assess model performance and requires a higher degree of management judgment. We have taken certain actions to mitigate this risk to the extent possible, including additional efforts in the area of model oversight and governance pertaining to clarifying roles, aligning model resources, and providing more transparency to management over model issues and changes.

Our risks related to employee retention are high. We have experienced elevated levels of voluntary turnover, and expect this trend to continue as the public debate regarding the future role of the GSEs continues. This has led to

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2200

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

concerns about staffing inadequacies and management depth. A number of senior officers left the company in 2011, including our Chief Operating Officer, our Executive Vice President — Single-Family Credit Guarantee, our Executive Vice President — Investments and Capital Markets and Treasurer, our Executive Vice President — Multifamily, our Senior Vice President — Operations & Technology, our Executive Vice President — General Counsel & Corporate Secretary, and our Executive Vice President — Chief Credit Officer. In addition, our Senior Vice President — Interim General Counsel & Corporate Secretary will be leaving the company in November 2011. Because we have maintained succession plans for our senior management positions, we were able to fill some of these senior management positions quickly, or eliminated them through reorganizations. However, we may not be able to continue to do so in the future. Disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in any of our operations, affect our execution capabilities, cause delays in the implementation of critical technology and other projects, and erode our business, modeling, internal audit, risk management, information security, financial reporting, and compliance expertise and capabilities.

On October 26, 2011, FHFA announced that our Chief Executive Officer has expressed his desire to step down in the coming year, and that the Board and FHFA will be developing a succession plan.

We made two significant internal reorganizations during the second quarter of 2011, as we combined our Single-Family Credit Guarantee, Single-Family Portfolio Management, and Operations & Technology divisions into a new Single-Family Business and Information Technology division, and we merged our Credit Management division into our Enterprise Risk Management division. During the third quarter of 2011, we further reorganized our Single-Family Business and Information Technology division. In the near term, this change could increase our operational risk as employees become accustomed to new roles and responsibilities. Over time, we expect to realize expense efficiencies and improve our effectiveness and overall risk profile as a result of these changes.

Freddie Mac management has determined that current business recovery capabilities may not be effective in the event of a catastrophic regional business event and could result in a significant business disruption and inability to process transactions through normal business processes. While management has developed a remediation plan that will address the current capability gaps, any measures we take to mitigate this risk may not be sufficient to respond to the full range of catastrophic events that may occur. The remediation plan is designed to improve Freddie Mac's ability to recover normal business operations during a regional business disruption, such as a terrorist event, natural disaster, loss of infrastructure services, denial of access, and/or a pandemic. For more information, see "RISK FACTORS — *A failure in our operational systems or infrastructure, or those of third parties, could impair our liquidity, disrupt our business, damage our reputation and cause losses*" in our 2010 Annual Report.

Management, including the company's Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were not effective as of September 30, 2011, at a reasonable level of assurance, because our disclosure controls and procedures did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. We have not been able to update our disclosure controls and procedures to provide reasonable assurance that information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure. For additional information, see "CONTROLS AND PROCEDURES."

## LIQUIDITY AND CAPITAL RESOURCES

### Liquidity

Our business activities require that we maintain adequate liquidity to fund our operations, which may include the need to make payments of principal and interest on our debt securities, including securities issued by our consolidated trusts; make payments upon the maturity, redemption or repurchase of our debt securities; make net payments on derivative instruments; pay dividends on our senior preferred stock; purchase mortgage-related securities and other investments; and purchase mortgage loans, including modified or seriously delinquent loans from PC trusts. For more information on our liquidity needs and liquidity management, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES" in our 2010 Annual Report.

We fund our cash requirements primarily by issuing short-term and long-term debt. Other sources of cash include:

- receipts of principal and interest payments on securities or mortgage loans we hold;

- other cash flows from operating activities, including the management and guarantee fees we receive in connection with our guarantee activities;

TREASURY-2201

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- borrowings against mortgage-related securities and other investment securities we hold; and

- sales of securities we hold.

We have also received substantial amounts of cash from Treasury pursuant to draws under the Purchase Agreement, which are made to address deficits in our net worth. We received $1.5 billion in cash from Treasury during the third quarter of 2011 due to our negative net worth at June 30, 2011.

We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

As a result of the potential that the U.S. would exhaust its borrowing authority under the statutory debt limit and market concerns regarding the potential for a downgrade in the credit rating of the U.S. government, in the beginning of the third quarter of 2011 we made a temporary change in the composition of our portfolio of liquid assets to more cash and overnight investments. On August 5, 2011, S&P lowered the long-term credit rating of the U.S. government to "AA+" from "AAA" and assigned a negative outlook to the rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating. While this could adversely affect our liquidity, and the supply and cost of debt financing available to us in the future, we have not yet experienced such adverse effects. For more information, see "*Other Debt Securities — Credit Ratings*" and "RISK FACTORS — *A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business. Our business could also be adversely affected if there is a downgrade in the credit ratings of the U.S. government or a payment default by the U.S. government*" in our Quarterly Report on Form 10-Q for the second quarter of 2011.

### Liquidity Management

Maintaining sufficient liquidity is of primary importance and we continually strive to enhance our liquidity management practices and policies. Under these practices and policies, we maintain an amount of cash and cash equivalent reserves in the form of liquid, high quality short-term investments that is intended to enable us to meet ongoing cash obligations for an extended period, in the event we do not have access to the short- or long-term unsecured debt markets. We also actively manage the concentration of debt maturities and closely monitor our monthly maturity profile. In the second quarter of 2011, we revised our liquidity management practices and policies such that they no longer require us to maintain a back-up core portfolio of liquid non-mortgage-related securities with a market value of $10 billion. This requirement was no longer deemed to be necessary due to improvements in our ability to forecast cash flows. Our remaining liquidity management policies include the requirement to maintain funds sufficient to cover our maximum cash liquidity needs for at least the following 35 calendar days. For a discussion of our liquidity management practices and policies, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Liquidity Management*" in our 2010 Annual Report.

Throughout the third quarter of 2011, we complied with all requirements under our liquidity management policies. Furthermore, the majority of the funds used to cover our short-term cash liquidity needs is invested in short-term assets with a rating of A-1/P-1 or AAA or is issued by a counterparty with that rating. In the event of a downgrade of a position or counterparty, as applicable, below minimum rating requirements, our credit governance policies require us to exit from the position within a specified period.

We also continue to manage our debt issuances to remain in compliance with the aggregate indebtedness limits set forth in the Purchase Agreement.

To facilitate cash management, we forecast cash outflows. These forecasts help us to manage our liabilities with respect to asset purchases and runoff, when financial markets are not in crisis. For further information on our management of interest-rate risk associated with asset and liability management, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

Notwithstanding these practices and policies, our ability to maintain sufficient liquidity, including by pledging mortgage-related and other securities as collateral to other financial institutions, could cease or change rapidly and the cost of the available funding could increase significantly due to changes in market confidence and other factors. For more information, see "RISK FACTORS — Competitive and Market Risks — *Our business may be adversely affected by limited availability of financing and increased funding costs*" in our 2010 Annual Report.

TREASURY-2202

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Actions of Treasury and FHFA

Since our entry into conservatorship, Treasury and FHFA have taken a number of actions that affect our cash requirements and ability to fund those requirements. The conservatorship, and the resulting support we received from Treasury, has enabled us to access debt funding on terms sufficient for our needs.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The Purchase Agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009). In the event we have a capital surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

• If the year-end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

• If the year-end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws.

While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 2012. The costs of our debt funding could also increase due to the downgrades discussed above or in the event of any future downgrades in our credit ratings or the credit ratings of the U.S. government. Upon funding of the draw request that FHFA will submit to eliminate our net worth deficit at September 30, 2011, our aggregate funding received from Treasury under the Purchase Agreement will increase to $71.2 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. Commencing in the second quarter of 2011, our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. In addition, we are required to pay a quarterly commitment fee to Treasury under the Purchase Agreement, as discussed below.

For more information on these actions, see "BUSINESS — Conservatorship and Related Matters" and "— Regulation and Supervision" in our 2010 Annual Report.

### Dividend Obligation on the Senior Preferred Stock

Following funding of the draw request related to our net worth deficit at September 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $6.6 billion to $7.2 billion, which exceeds our annual historical earnings in all but one period. The senior preferred stock accrues quarterly cumulative dividends at a rate of 10% per year or 12% per year in any quarter in which dividends are not paid in cash until all accrued dividends have been paid in cash. We paid a quarterly dividend of $1.6 billion in cash on the senior preferred stock on September 30, 2011 at the direction of our Conservator. Through September 30, 2011, we paid aggregate cash dividends to Treasury of $14.9 billion, an amount equal to 23% of our aggregate draws received under the Purchase Agreement. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth and will increasingly drive future draws. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived in the future. Treasury has waived the fee for all quarters of 2011, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the fee has not yet been established and could be substantial.

The payment of dividends on our senior preferred stock in cash reduces our net worth. For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all.

As discussed in "Capital Resources," we expect to make additional draws under the Purchase Agreement in future periods. Further draws will increase the liquidation preference of and the dividends we owe on the senior preferred stock.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                                                 Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Other Debt Securities

Spreads on our debt and our access to the debt markets remained favorable relative to historical levels during the three and nine months ended September 30, 2011, due largely to support from the U.S. government. As a result, we were able to replace certain higher cost debt with lower cost debt. Our short-term debt was 27% of outstanding other debt at September 30, 2011 as compared to 28% at both December 31, 2010 and June 30, 2011.

Because of the debt limit under the Purchase Agreement, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Our debt cap under the Purchase Agreement is $972 billion in 2011 and will decline to $874.8 billion in 2012. As of September 30, 2011, we estimate that the par value of our aggregate indebtedness totaled $689.9 billion, which was approximately $282.1 billion below the applicable debt cap. As of December 31, 2010, we estimate that the par value of our aggregate indebtedness totaled $728.2 billion, which was approximately $351.8 billion below the then applicable limit of $1.08 trillion. Our aggregate indebtedness is calculated as the par value of other debt. We disclose the amount of our indebtedness on this basis monthly under the caption "Other Debt Activities — Total Debt Outstanding" in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC.

#### Other Debt Issuance Activities

Table 47 summarizes the par value of other debt securities we issued, based on settlement dates, during the three and nine months ended September 30, 2011 and 2010.

#### Table 47 — Other Debt Security Issuances by Product, at Par Value[1]

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Other short-term debt: | | | | |
| Reference Bills® securities and discount notes | $115,723 | $124,526 | $323,769 | $381,460 |
| Medium-term notes — callable | — | 1,500 | — | 1,500 |
| Medium-term notes — non-callable[2] | — | — | 450 | 1,065 |
| Total other short-term debt | 115,723 | 126,026 | 324,219 | 384,025 |
| Other long-term debt: | | | | |
| Medium-term notes — callable | 52,965 | 52,687 | 124,012 | 179,383 |
| Medium-term notes — non-callable | 18,408 | 12,825 | 66,065 | 64,025 |
| U.S. dollar Reference Notes® securities — non-callable | 15,000 | 9,000 | 33,000 | 26,500 |
| Total other long-term debt | 86,373 | 74,512 | 223,077 | 269,908 |
| Total other debt issued | $202,096 | $200,538 | $547,296 | $653,933 |

(1) Excludes federal funds purchased and securities sold under agreements to repurchase and lines of credit. Also excludes debt securities of consolidated trusts held by third parties.

(2) Includes $0.5 billion and 1.1 billion of medium-term notes — non-callable issued for the nine months ended September 30, 2011 and 2010, respectively, which were accounted for as debt exchanges. No such debt exchanges were included in the three month periods.

#### Other Debt Retirement Activities

We repurchase, call, or exchange our outstanding medium- and long-term debt securities from time to time to help support the liquidity and predictability of the market for our other debt securities and to manage our mix of liabilities funding our assets.

Table 48 provides the par value, based on settlement dates, of other debt securities we repurchased, called, and exchanged during the three and nine months ended September 30, 2011 and 2010.

#### Table 48 — Other Debt Security Repurchases, Calls, and Exchanges[1]

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Repurchases of outstanding €Reference Notes® securities | $ 259 | $ — | $ 259 | $ 262 |
| Repurchases of outstanding medium-term notes | 3,915 | — | 7,683 | 4,054 |
| Calls of callable medium-term notes | 59,080 | 78,384 | 144,612 | 217,118 |
| Exchanges of medium-term notes | — | — | 450 | 1,065 |

(1) Excludes debt securities of consolidated trusts held by third parties.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2204

Table of Contents

*Credit Ratings*

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, is highly dependent upon our credit ratings. Table 49 indicates our credit ratings as of October 21, 2011.

**Table 49 — Freddie Mac Credit Ratings**

| | Nationally Recognized Statistical Rating Organization | | |
| --- | --- | --- | --- |
| | S&P | Moody's | Fitch |
| Senior long-term debt(1) | AA+/Negative | Aaa/Negative | AAA |
| Short-term debt(2) | A-1+ | P-1 | F1+ |
| Subordinated debt(3) | A/Negative | Aa2/Negative | AA- |
| Preferred stock(4) | C | Ca | C/RR6 |

(1) Consists of medium-term notes, U.S. dollar Reference Notes® securities and €Reference Notes® securities.
(2) Consists of Reference Bills® securities and discount notes.
(3) Consists of Freddie SUBS® securities.
(4) Does not include senior preferred stock issued to Treasury.

On August 2, 2011, President Obama signed the Budget and Control Act of 2011 which raised the U.S. government's statutory debt limit. The raising of the statutory debt limit and details outlined in the legislation to reduce the deficit resulted in the following rating actions on our debt ratings and the ratings of the U.S. government.

- On August 2, 2011, Moody's confirmed our senior long-term debt and subordinated debt ratings and assigned a negative outlook to the ratings. This action accompanied Moody's confirmation of the U.S. government's long-term credit rating and assignment of a negative outlook to the rating.

- On August 5, 2011, S&P lowered the long-term credit rating of the United States to "AA+" from "AAA" and affirmed the short-term rating of "A-1+." S&P also assigned a negative outlook to the U.S. government's long-term credit rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating.

- On August 16, 2011, Fitch affirmed our senior long-term debt rating, as well as our short-term debt, subordinated debt, and preferred stock debt ratings, with a stable outlook. This action followed Fitch's affirmation of the U.S. government's long-term credit rating with a stable outlook. Fitch noted that, by the end of 2011, it will review its fiscal projections in light of the outcome of the deliberations of the Joint Select Committee (formed as a result of the Budget and Control Act of 2011) due on November 23, 2011, as well as its near and medium-term economic outlook for the U.S. Fitch indicated that an upward revision to its medium to long-term projections for public debt as a result of weaker than expected economic recovery or the failure of the Joint Select Committee to reach an agreement on at least $1.2 trillion of deficit-reduction measures would likely result in a negative rating action. The rating action would most likely be a revision of the rating outlook to negative.

For information about factors that could lead to future ratings actions and the potential impact of a downgrade in our credit ratings, see "RISK FACTORS — *A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business. Our business could also be adversely affected if there is a downgrade in the credit ratings of the U.S. government or a payment default by the U.S. government*" in our Quarterly Report on Form 10-Q for the second quarter of 2011.

A security rating is not a recommendation to buy, sell or hold securities. It may be subject to revision or withdrawal at any time by the assigning rating organization. Each rating should be evaluated independently of any other rating.

### Cash and Cash Equivalents, Federal Funds Sold, Securities Purchased Under Agreements to Resell, and Non-Mortgage-Related Securities

Excluding amounts related to our consolidated VIEs, we held $49.6 billion in the aggregate of cash and cash equivalents, securities purchased under agreements to resell, and non-mortgage-related securities at September 30, 2011. These investments are important to our cash flow and asset and liability management and our ability to provide liquidity and stability to the mortgage market. At September 30, 2011, our non-mortgage-related securities primarily consisted of FDIC-guaranteed corporate medium-term notes, Treasury notes, and Treasury bills that we could sell to provide us with an additional source of liquidity to fund our business operations. For additional information on these assets, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell" and "— Investments in Securities — *Non-Mortgage-Related Securities*."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2205                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Mortgage Loans and Mortgage-Related Securities

We invest principally in mortgage loans and mortgage-related securities, certain categories of which are largely unencumbered and highly liquid. Our primary source of liquidity among these mortgage assets is our holdings of agency securities. In addition, our unsecuritized performing single-family mortgage loans are also a potential source of liquidity. Our holdings of CMBS are less liquid than agency securities. Our holdings of non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans are not liquid due to market conditions and the continued poor credit quality of the underlying assets. Our holdings of unsecuritized seriously delinquent and modified single-family mortgage loans are also illiquid.

We are subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. See "CONSOLIDATED RESULTS OF OPERATIONS — Segment Earnings — *Segment Earnings — Results — Investments*" for more information.

### Cash Flows

Our cash and cash equivalents decreased $18.8 billion to $18.2 billion during the nine months ended September 30, 2011 and decreased $36.8 billion to $27.9 billion during the nine months ended September 30, 2010. Cash flows provided by operating activities during the nine months ended September 30, 2011 and 2010 were $9.4 billion and $10.4 billion, respectively, primarily driven by net interest income. Cash flows provided by investing activities during the nine months ended September 30, 2011 and 2010 were $263.6 billion and $244.5 billion, respectively, primarily resulting from net proceeds received as a result of repayments of single-family held-for-investment mortgage loans. Cash flows used for financing activities during the nine months ended September 30, 2011 and 2010 were $291.8 billion and $291.6 billion, respectively, largely attributable to funds used to repay debt securities of consolidated trusts held by third parties.

### Capital Resources

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA. To address our net worth deficit of $6.0 billion at September 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $6.0 billion, and will request that we receive these funds by December 31, 2011. See "BUSINESS — Regulation and Supervision — *Federal Housing Finance Agency — Receivership*" in our 2010 Annual Report for additional information on mandatory receivership. See also "RISK FACTORS — *If Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth, FHFA could be required to place us into receivership*" in our Quarterly Report on Form 10-Q for the second quarter of 2011.

We expect to make further draws under the Purchase Agreement in future periods. Given the substantial senior preferred stock dividend obligation to Treasury, which will increase with additional draws, senior preferred stock dividend payments will increasingly drive our future draw requests under the Purchase Agreement with Treasury.

The size and timing of our future draws will be determined by our dividend obligation on the senior preferred stock and a variety of other factors that could adversely affect our net worth. These other factors include how long and to what extent the housing market, including home prices, remains weak, which could increase credit expenses and cause additional other-than-temporary impairments of the non-agency mortgage-related securities we hold; foreclosure prevention efforts and foreclosure processing delays, which could increase our expenses; adverse changes in interest rates, the yield curve, implied volatility or mortgage-to-debt OAS, which could increase realized and unrealized mark-to-fair-value losses recorded in earnings or AOCI; required reductions in the size of our mortgage-related investments portfolio and other limitations on our investment activities that reduce the earnings capacity of our investment activities; quarterly commitment fees payable to Treasury; adverse changes to our funding costs and limited availability of financing; establishment of additional valuation allowances for our remaining net deferred tax asset; changes in accounting practices or guidance; the effect of the MHA Program and other government initiatives; limitations on our ability to develop new products; the introduction of additional public mission-related initiatives that may adversely impact our financial results; or changes in business practices resulting from legislative and regulatory developments.

For more information on the Purchase Agreement, its effect on our business and capital management activities, and the potential impact of making additional draws, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Dividend Obligation on the Senior Preferred Stock*," "BUSINESS — Executive Summary — *Long-Term Financial Sustainability and Future Status*" and "RISK FACTORS" in our 2010 Annual Report.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                TREASURY-2206                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## FAIR VALUE MEASUREMENTS AND ANALYSIS

### Fair Value Measurements

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. For additional information regarding the fair value hierarchy and measurements and validation processes, see "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS" in our 2010 Annual Report.

We categorize assets and liabilities measured and reported at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation process used to derive their fair values and our judgments regarding the observability of the related inputs. Those judgments are based on our knowledge and observations of the markets relevant to the individual assets and liabilities and may vary due to changes in market conditions. In making our judgments, we review ranges of third-party prices and transaction volumes, and hold discussions with dealers and pricing service vendors to understand and assess the extent of market benchmarks available and the judgments or modeling required in their processes. Based on these factors, we determine whether the inputs are observable and whether the principal markets are active or inactive.

Our Level 3 fair value measurements (*i.e.*, valued using significant inputs that are unobservable) primarily consist of non-agency mortgage-related securities. The market for non-agency mortgage-related securities continued to be illiquid during the third quarter of 2011, with low transaction volumes, wide credit spreads, and limited transparency. We value the non-agency mortgage-related securities we hold based primarily on prices received from pricing services and dealers. The techniques used by these pricing services and dealers to develop the prices generally are either: (a) a comparison to transactions involving instruments with similar collateral and risk profiles; or (b) industry standard modeling, such as a discounted cash flow model. For a large majority of the non-agency mortgage-related securities we value using dealers and pricing services, we obtain multiple independent prices, which are non-binding both to us and our counterparties. When multiple prices are received, we use the median of the prices. The models and related assumptions used by the dealers and pricing services are owned and managed by them. However, we have an understanding of the processes they use to develop the prices provided to us based on our ongoing due diligence. We periodically have discussions with our dealers and pricing service vendors to maintain a current understanding of the processes and inputs they use to develop prices. We make no adjustments to the individual prices we receive from third-party pricing services or dealers for non-agency mortgage-related securities beyond calculating median prices and discarding certain prices that are determined not to be valid based on our validation processes.

Table 50 below summarizes our assets and liabilities measured at fair value on a recurring basis at September 30, 2011 and December 31, 2010.

### Table 50 — Summary of Assets and Liabilities at Fair Value on a Recurring Basis

| | September 30, 2011 | | December 31, 2010 | |
| --- | --- | --- | --- | --- |
| | Total GAAP Recurring Fair Value | Percentage in Level 3 | Total GAAP Recurring Fair Value | Percentage in Level 3 |
| | (dollars in millions) | | | |
| **Assets:** | | | | |
| Investments in securities: | | | | |
| Available-for-sale, at fair value | $216,584 | 28% | $232,634 | 30% |
| Trading, at fair value | 55,298 | 5 | 60,262 | 5 |
| Mortgage loans: | | | | |
| Held-for-sale, at fair value | 6,275 | 100 | 6,413 | 100 |
| Derivative assets, net[1] | 295 | — | 143 | — |
| Other assets: | | | | |
| Guarantee assets, at fair value | 674 | 100 | 541 | 100 |
| Total assets carried at fair value on a recurring basis[1] | $279,126 | 23 | $299,993 | 25 |
| **Liabilities:** | | | | |
| Debt securities recorded at fair value | $  3,291 | —% | $  4,443 | —% |
| Derivative liabilities, net[1] | 329 | — | 1,209 | 3 |
| Total liabilities carried at fair value on a recurring basis[1] | $  3,620 | — | $  5,652 | 2 |

(1) Percentages by level are based on gross fair value of derivative assets and derivative liabilities before counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2207

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Changes in Level 3 Recurring Fair Value Measurements

At September 30, 2011 and December 31, 2010, we measured and recorded at fair value on a recurring basis, assets of $71.2 billion and $79.8 billion, respectively, or approximately 23% and 25% of total assets carried at fair value on a recurring basis, using significant unobservable inputs (Level 3), before the impact of counterparty and cash collateral netting. Our Level 3 assets at September 30, 2011 primarily consist of non-agency mortgage-related securities. At September 30, 2011 and December 31, 2010, we also measured and recorded at fair value on a recurring basis, Level 3 derivative liabilities of $0.1 billion and $0.8 billion, or less than 1% and 2%, respectively, of total liabilities carried at fair value on a recurring basis, before the impact of counterparty and cash collateral netting.

During the three and nine months ended September 30, 2011, the fair value of our Level 3 assets decreased due to: (a) monthly remittances of principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) the widening of OAS levels on these securities. During the three and nine months ended September 30, 2011, we had a net transfer into Level 3 assets of $98 million and $94 million, respectively, resulting from a change in valuation method for certain mortgage-related securities due to a lack of relevant price quotes from dealers and third-party pricing services.

See "NOTE 18: FAIR VALUE DISCLOSURES — Table 18.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs" for the Level 3 reconciliation. For discussion of types and characteristics of mortgage loans underlying our mortgage-related securities, see "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets" and "RISK MANAGEMENT — Credit Risk."

### Consideration of Credit Risk in Our Valuation

We consider credit risk in the valuation of our assets and liabilities through consideration of credit risk of the counterparty in asset valuations and through consideration of our own institutional credit risk in liability valuations on our GAAP consolidated balance sheets.

We consider credit risk in our valuation of investments in securities based on fair value measurements that are largely the result of price quotes received from multiple dealers or pricing services. Some of the key valuation drivers of such fair value measurements can include the collateral type, collateral performance, credit quality of the issuer, tranche type, weighted average life, vintage, coupon, and interest rates. We also make adjustments for items such as credit enhancements or other types of subordination and liquidity, where applicable. In cases where internally developed models are used, we maximize the use of market-based inputs or calibrate such inputs to market data.

We also consider credit risk when we evaluate the valuation of our derivative positions. The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. For derivatives that are in an asset position, we hold collateral against those positions in accordance with agreed upon thresholds. The amount of collateral held depends on the credit rating of the counterparty and is based on our credit risk policies. Similarly, for derivatives that are in a liability position, we post collateral to counterparties in accordance with agreed upon thresholds. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties*" for a discussion of our counterparty credit risk.

See "NOTE 18: FAIR VALUE DISCLOSURES — Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information regarding the valuation of our assets and liabilities.

### Consolidated Fair Value Balance Sheets Analysis

Our consolidated fair value balance sheets present our estimates of the fair value of our financial assets and liabilities. See "NOTE 18: FAIR VALUE DISCLOSURES — Table 18.6 — Consolidated Fair Value Balance Sheets" for our fair value balance sheets. In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" in this Form 10-Q and our 2010 Annual Report, and "RISK FACTORS" and "RISK MANAGEMENT — Operational Risks" in our 2010 Annual Report for information concerning the risks associated with these models.

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report and "NOTE 18: FAIR VALUE DISCLOSURES" in this Form 10-Q for more information on fair values.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011        TREASURY-2208        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Discussion of Fair Value Results**

Table 51 summarizes the change in the fair value of net assets for the nine months ended September 30, 2011 and 2010.

**Table 51 — Summary of Change in the Fair Value of Net Assets**

|  | Nine Months Ended September 30, | |
|---|---|---|
|  | **2011** | **2010** |
|  | (in billions) | |
| Beginning balance | $(58.6) | $(62.5) |
| Changes in fair value of net assets, before capital transactions | (7.0) | (2.3) |
| Capital transactions: | | |
| Dividends and share issuances, net(1) | (2.9) | 8.3 |
| Ending balance | $(68.5) | $(56.5) |

(1) Includes the funds received from Treasury of $2.0 billion and $12.4 billion for the nine months ended September 30, 2011 and 2010, respectively, under the Purchase Agreement, which increased the liquidation preference of our senior preferred stock.

During the nine months ended September 30, 2011, the fair value of net assets, before capital transactions, decreased by $7.0 billion, compared to a $2.3 billion decrease during the nine months ended September 30, 2010. The decrease in the fair value of net assets, before capital transactions, during the nine months ended September 30, 2011, was primarily due to a decrease in the fair value of our single-family loans due to a decline in seasonally adjusted home prices and a continued weak credit environment, as well as unrealized losses from the widening of OAS levels on our non-agency mortgage-related securities and CMBS securities. The decrease in fair value was partially offset by a tightening of OAS levels on our agency securities and high estimated core spread income.

During the nine months ended September 30, 2010, the decrease in the fair value of net assets, before capital transactions, was primarily due to an increase in the risk premium related to our single-family loans in the continued weak credit environment. The decrease in fair value was partially offset by high estimated core spread income and an increase in the fair value of our investments in mortgage-related securities driven by the tightening of CMBS OAS levels.

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other market factors being equal. However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset. The reverse is true when the OAS on a given asset tightens — current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. However, as market conditions change, our estimate of expected fair value gains and losses from OAS may also change, and the actual core spread income recognized in future periods could be significantly different from current estimates.

## OFF-BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction. These off-balance sheet arrangements may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets.

**Securitization Activities and Other Guarantee Commitments**

We have off-balance sheet arrangements related to our securitization activities involving guaranteed mortgages and mortgage-related securities. Our off-balance sheet arrangements related to these securitization activities primarily consisted of: (a) Freddie Mac mortgage-related securities backed by multifamily loans; and (b) certain single-family Other Guarantee Transactions. We also have off-balance sheet arrangements related to other guarantee commitments, including long-term standby commitments and liquidity guarantees.

We guarantee the payment of principal and interest on Freddie Mac mortgage-related securities we issue and on mortgage loans covered by our other guarantee commitments. Therefore, our maximum potential off-balance sheet exposure to credit losses relating to these securitization activities and the other guarantee commitments is primarily represented by the UPB of the underlying loans and securities, which was $54.5 billion and $43.9 billion at September 30, 2011 and December 31, 2010, respectively. Our off-balance sheet arrangements related to securitization activity have been significantly reduced from historical levels due to accounting guidance for transfers of financial assets and the consolidation of VIEs, which we adopted on January 1, 2010. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report and "NOTE 9: FINANCIAL GUARANTEES" in this Form 10-Q for more information on our off-balance sheet securitization activities and other guarantee commitments.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2209          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our exposure to losses on the transactions described above would be partially mitigated by the recovery we would receive through exercising our rights to the collateral backing the underlying loans and the available credit enhancements, which may include recourse and primary insurance with third parties. In addition, we provide for incurred losses each period on these guarantees within our provision for credit losses.

**Other Agreements**

We own an interest in numerous entities that are considered to be VIEs for which we are not the primary beneficiary and which we do not consolidate in accordance with the accounting guidance for the consolidation of VIEs. These VIEs relate primarily to our investment activity in mortgage-related assets and non-mortgage assets, and include LIHTC partnerships, certain Other Guarantee Transactions, and certain asset-backed investment trusts. Our consolidated balance sheets reflect only our investment in the VIEs, rather than the full amount of the VIEs' assets and liabilities. See "NOTE 3: VARIABLE INTEREST ENTITIES" for additional information related to our variable interests in these VIEs.

As part of our credit guarantee business, we routinely enter into forward purchase and sale commitments for mortgage loans and mortgage-related securities. Some of these commitments are accounted for as derivatives. Their fair values are reported as either derivative assets, net or derivative liabilities, net on our consolidated balance sheets. We also have purchase commitments primarily related to our mortgage purchase flow business, which we principally fulfill by issuing PCs in swap transactions, and, to a lesser extent, commitments to purchase or guarantee multifamily mortgage loans that are not accounted for as derivatives and are not recorded on our consolidated balance sheets. These non-derivative commitments totaled $262.7 billion, and $220.7 billion in notional value at September 30, 2011 and December 31, 2010, respectively.

In connection with the execution of the Purchase Agreement, we, through FHFA, in its capacity as Conservator, issued a warrant to Treasury to purchase 79.9% of our common stock outstanding on a fully diluted basis on the date of exercise. See "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report for further information.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts within our consolidated financial statements. Certain of our accounting policies, as well as estimates we make, are critical, as they are both important to the presentation of our financial condition and results of operations and require management to make difficult, complex, or subjective judgments and estimates, often regarding matters that are inherently uncertain. Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements.

Our critical accounting policies and estimates relate to: (a) allowances for loan losses and reserve for guarantee losses; (b) fair value measurements; (c) impairment recognition on investments in securities; and (d) realizability of net deferred tax assets. For additional information about our critical accounting policies and estimates and other significant accounting policies, including recently issued accounting pronouncements, see "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES" in our 2010 Annual Report and "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in this Form 10-Q.

## FORWARD-LOOKING STATEMENTS

We regularly communicate information concerning our business activities to investors, the news media, securities analysts and others as part of our normal operations. Some of these communications, including this Form 10-Q, contain "forward-looking statements," including statements pertaining to the conservatorship, our current expectations and objectives for our efforts under the MHA Program and other programs to assist the U.S. residential mortgage market, the servicing alignment initiative, future business plans, liquidity, capital management, economic and market conditions and trends, market share, the effect of legislative and regulatory developments, implementation of new accounting guidance, credit losses, internal control remediation efforts, and results of operations and financial condition on a GAAP, Segment Earnings, and fair value basis. Forward-looking statements are often accompanied by, and identified with, terms such as "objective," "expect," "trend," "forecast," "anticipate," "believe," "intend," "could," "future," "may," "will," and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties, including those described in the

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-2210

"RISK FACTORS" sections of this Form 10-Q, our 2010 Annual Report, and our Quarterly Reports on Form 10-Q for the first and second quarters of 2011, and:

- the actions FHFA, Treasury, the Federal Reserve, the Obama Administration, Congress, and our management may take;
- the impact of the restrictions and other terms of the conservatorship, the Purchase Agreement, the senior preferred stock, and the warrant on our business, including our ability to pay: (a) the dividend on the senior preferred stock; and (b) any quarterly commitment fee that we are required to pay to Treasury under the Purchase Agreement;
- our ability to maintain adequate liquidity to fund our operations, including following any changes in the support provided to us by Treasury or FHFA, a change in the credit ratings of our debt securities or a change in the credit rating of the U.S. government;
- changes in our charter or applicable legislative or regulatory requirements, including any restructuring or reorganization in the form of our company, whether we will remain a stockholder-owned company or continue to exist and whether we will be wound down or placed under receivership, regulations under the GSE Act, the Reform Act, or the Dodd-Frank Act, regulatory or legislative actions taken to implement the Obama Administration's plan to reform the housing finance system, changes to affordable housing goals regulation, reinstatement of regulatory capital requirements, or the exercise or assertion of additional regulatory or administrative authority;
- changes in the regulation of the mortgage and financial services industries, including changes caused by the Dodd-Frank Act, or any other legislative, regulatory, or judicial action at the federal or state level;
- enforcement actions against mortgage servicers and other mortgage industry participants by federal or state authorities;
- the scope of the recently expanded HARP program and our various other initiatives designed to help in the housing recovery (including the extent to which borrowers participate in the MHA Program and new non-HAMP standard loan modification initiative), and the impact of such programs on our credit losses, expenses, and the size and composition of our mortgage-related investments portfolio;
- the impact of any deficiencies in foreclosure documentation practices and related delays in the foreclosure process;
- the ability of our financial, accounting, data processing, and other operating systems or infrastructure, and those of our vendors to process the complexity and volume of our transactions;
- changes in accounting or tax guidance or in our accounting policies or estimates, and our ability to effectively implement any such changes in guidance, policies, or estimates;
- changes in general regional, national, or international economic, business, or market conditions and competitive pressures, including changes in employment rates and interest rates, and changes in the federal government's fiscal and monetary policy;
- changes in the U.S. residential mortgage market, including changes in the rate of growth in total outstanding U.S. residential mortgage debt, the size of the U.S. residential mortgage market, and home prices;
- our ability to effectively implement our business strategies, including our efforts to improve the supply and liquidity of, and demand for, our products, and restrictions on our ability to offer new products or engage in new activities;
- our ability to recruit and retain executive officers and other key employees;
- our ability to effectively identify and manage credit, interest-rate, operational, and other risks in our business, including changes to the credit environment and the levels and volatilities of interest rates, as well as the shape and slope of the yield curves;
- the effects of internal control deficiencies and our ability to effectively identify, assess, evaluate, manage, mitigate, or remediate control deficiencies and risks, including material weaknesses and significant deficiencies, in our internal control over financial reporting and disclosure controls and procedures;
- incomplete or inaccurate information provided by customers and counterparties;
- consolidation among, or adverse changes in the financial condition of, our customers and counterparties;
- the failure of our customers and counterparties to fulfill their obligations to us, including the failure of seller/servicers to meet their obligations to repurchase loans sold to us in breach of their representations and warranties;

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011 Powered by Morningstar® Document Research℠

*The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.*

Table of Contents

- changes in our judgments, assumptions, forecasts, or estimates regarding the volume of our business and spreads we expect to earn;

- the availability of options, interest-rate and currency swaps, and other derivative financial instruments of the types and quantities, on acceptable terms, and with acceptable counterparties needed for investment funding and risk management purposes;

- changes in pricing, valuation or other methodologies, models, assumptions, judgments, estimates and/or other measurement techniques, or their respective reliability;

- changes in mortgage-to-debt OAS;

- the potential impact on the market for our securities resulting from any sales by the Federal Reserve or Treasury of Freddie Mac debt and mortgage-related securities they have purchased;

- adverse judgments or settlements in connection with legal proceedings, governmental investigations, and IRS examinations;

- volatility of reported results due to changes in the fair value of certain instruments or assets;

- the development of different types of mortgage servicing structures and servicing compensation;

- preferences of originators in selling into the secondary mortgage market;

- changes to our underwriting or servicing requirements (including servicing alignment efforts under the servicing alignment initiative), our practices with respect to the disposition of REO properties, or investment standards for mortgage-related products;

- investor preferences for mortgage loans and mortgage-related and debt securities compared to other investments;

- borrower preferences for fixed-rate mortgages or adjustable-rate mortgages;

- the occurrence of a major natural or other disaster in geographic areas in which our offices or portions of our total mortgage portfolio are concentrated;

- other factors and assumptions described in this Form 10-Q, in our 2010 Annual Report, and our Quarterly Reports on Form 10-Q for the first and second quarters of 2011;

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their impacts; and

- market reactions to the foregoing.

Forward-looking statements speak only as of the date they are made, and we undertake no obligation to update any forward-looking statements we make to reflect events or circumstances occurring after the date of this Form 10-Q.

## RISK MANAGEMENT AND DISCLOSURE COMMITMENTS

In October 2000, we announced our adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with FHFA, then OFHEO, that updated these commitments and set forth a process for implementing them. A copy of the letters between us and OFHEO dated September 1, 2005 constituting the written agreement has been filed as an exhibit to our Registration Statement on Form 10, filed with the SEC on July 18, 2008, and is available on the Investor Relations page of our web site at www.freddiemac.com/investors/sec_filings/index.html.

In November 2008, FHFA suspended our periodic issuance of subordinated debt disclosure commitment during the term of conservatorship and thereafter until directed otherwise. In March 2009, FHFA suspended the remaining disclosure commitments under the September 1, 2005 agreement until further notice, except that: (a) FHFA will continue to monitor our adherence to the substance of the liquidity management and contingency planning commitment through normal supervision activities; and (b) we will continue to provide interest-rate risk and credit risk disclosures in our periodic public reports. For the nine months ended September 30, 2011, our duration gap averaged zero months, PMVS-L averaged $390 million and PMVS-YC averaged $22 million. Our 2011 monthly average duration gap, PMVS results and related disclosures are provided in our Monthly Volume Summary reports, which are available on our web site, www.freddiemac.com/investors/volsum and in current reports on Form 8-K we file with the SEC. For disclosures concerning credit risk sensitivity, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Credit Risk Sensitivity*."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011        TREASURY-2212        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## LEGISLATIVE AND REGULATORY MATTERS

**Obama Administration Report on Reforming the U.S. Housing Finance Market**

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, stating that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Obama Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Obama Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements. These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations and financial condition.

On September 19, 2011, the Acting Director of FHFA stated that he would anticipate Freddie Mac and Fannie Mae will continue the gradual process of increasing guarantee fees. He stated this will not happen immediately but should be expected in 2012. President Obama's Plan for Economic Growth and Deficit Reduction, announced on September 19, 2011, contained a proposal to increase the guarantee fees charged by Freddie Mac and Fannie Mae by ten basis points. We cannot currently predict the extent to which our business will be impacted by the potential increase in guarantee fees. In addition, as discussed below in "Conforming Loan Limits," the temporary high-cost area loan limits expired on September 30, 2011.

We cannot predict the extent to which the other recommendations will be implemented or when any actions to implement them may be taken. However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term.

**Changes to the Home Affordable Refinance Program**

On October 24, 2011 FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers who can benefit from refinancing their home mortgage. The Acting Director of FHFA stated that the goal of pursuing these changes is to create refinancing opportunities for more borrowers whose mortgage is owned or guaranteed by the GSEs while reducing risk for the GSEs and bringing a measure of stability to housing markets. The revisions to HARP enable us to expand the assistance we provide to homeowners by making their mortgage payments more affordable through one or more of the following ways: (a) a reduction in payment; (b) a reduction in rate; (c) movement to a more stable mortgage product type (*i.e.*, from an adjustable-rate mortgage to a fixed-rate mortgage); or (d) a reduction in amortization term.

The revisions to HARP will continue to be available to borrowers with loans that were sold to the GSEs on or before May 31, 2009 and who have current LTV ratios above 80%. The program enhancements include:

- eliminating certain risk-based fees for borrowers who refinance into shorter-term mortgages and lowering fees for other borrowers;

- removing the current 125% LTV ceiling for fixed-rate mortgages backed by the GSEs;

- waiving certain representations and warranties that lenders commit to in making loans owned or guaranteed by the GSEs;

- eliminating the need for a new property appraisal where there is a reliable automated valuation model estimate provided by the GSEs; and

- extending the end date for HARP until December 31, 2013.

*Freddie Mac*

TREASURY-2213
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The October 24, 2011 announcement stated that the GSEs will issue guidance with operational details about the HARP changes to mortgage lenders and servicers by November 15, 2011. We are working collectively with FHFA and Fannie Mae on several operational details of the program. We are also waiting to receive details from FHFA regarding the fees that we may charge associated with the refinancing program. Since industry participation in HARP is not mandatory, we anticipate that implementation schedules will vary as individual lenders, mortgage insurers and other market participants modify their processes. At this time we do not know how many eligible borrowers are likely to refinance under the program.

The recently announced revisions to HARP will help to reduce our exposure to credit risk to the extent that HARP refinances strengthen the borrowers' capacity to repay their mortgages and, in some cases, reduce the terms of their mortgages. These revisions to HARP could also reduce our credit losses to the extent that the revised program contributes to bringing stability to the housing market. However, with our release of certain representations and warranties to lenders, credit losses associated with loans identified with defects will not be recaptured through loan buybacks. We could also experience declines in the fair values of certain agency mortgage-related security investments classified as available-for-sale or trading resulting from changes in expectations of mortgage prepayments and lower net interest yields over time on other mortgage-related investments. As a result, we cannot currently estimate these impacts until more details about the program and the level of borrower participation can be reasonably assured. See "RISK FACTORS — *The MHA Program and other efforts to reduce foreclosures, modify loan terms and refinance mortgages, including HARP, may fail to mitigate our credit losses and may adversely affect our results of operations or financial condition*" for additional information.

**Legislation Related to Reforming Freddie Mac and Fannie Mae**

Our future structure and role will be determined by the Obama Administration and Congress, and there are likely to be significant changes beyond the near-term. Since July 2011, there have not been any significant developments with respect to legislation related to reforming Freddie Mac and Fannie Mae.

A number of bills were introduced in the Senate and House in 2011 concerning the future state of Freddie Mac and Fannie Mae. Several of these bills take a comprehensive approach that would wind down Freddie Mac and Fannie Mae (or completely restructure the companies), while other bills would revise the companies' operations in a limited manner. While there have not been any significant developments with respect to these bills since July 2011, Congress continues to hold hearings related to the long-term future of housing finance including the role of Freddie Mac and Fannie Mae. For more information on these bills, see "MD&A — LEGISLATIVE AND REGULATORY DEVELOPMENTS — Legislation Related to Reforming Freddie Mac and Fannie Mae" in our Form 10-Q for the second quarter of 2011.

On October 27, 2011, the Chairman of the House Financial Services Subcommittee on Capital Markets and Government Sponsored Enterprises announced a proposal that would reform the secondary mortgage market by facilitating continued standardization and uniformity of mortgage securitization, ensuring legal certainty, and providing transparency and disclosure. The proposal is intended to promote private investment in the U.S. mortgage market without a government guarantee. We expect the Chairman will introduce legislation to implement the proposal.

We expect additional legislation relating to Freddie Mac and Fannie Mae to be introduced and considered by Congress; however, we cannot predict whether or when any such legislation will be enacted.

Some of the bills introduced in 2011, if enacted, would materially affect the role of the company, our business model and our structure, and could have an adverse effect on our financial results and operations as well as our ability to retain and recruit management and other valuable employees. Under several of the bills, our charter would be revoked and/or we would be wound down or placed into receivership. Such legislation could impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent an explicit guarantee of our existing and ongoing liabilities by the U.S. government. A number of the other bills introduced in 2011 would adversely affect our ability to conduct business under our current business model, including by subjecting us to new requirements that could increase costs, reduce revenues and limit or prohibit current business activities.

**Dodd-Frank Act**

The Dodd-Frank Act, which was signed into law on July 21, 2010, significantly changed the regulation of the financial services industry, including by creating new standards related to regulatory oversight of systemically important financial companies, derivatives, capital requirements, asset-backed securitization, mortgage underwriting, and consumer financial protection. The Dodd-Frank Act has and will directly affect the business and operations of Freddie Mac by subjecting us to new and additional regulatory oversight and standards, including with respect to our activities and products. We may also be affected by provisions of the Dodd-Frank Act and implementing regulations that affect the

TREASURY-2214

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

activities of banks, savings institutions, insurance companies, securities dealers, and other regulated entities that are our customers and counterparties.

At this time, it is difficult to assess fully the impact of the Dodd-Frank Act on Freddie Mac and the financial services industry. Implementation of the Dodd-Frank Act is being accomplished through numerous rulemakings, many of which are still in process. The final effects of the legislation will not be known with certainty until these rulemakings are complete. The Dodd-Frank Act also mandates the preparation of studies on a wide range of issues, which could lead to additional legislation or regulatory changes.

Developments since the end of the second quarter of 2011 with respect to rulemakings that may have a significant impact on Freddie Mac include the following:

- Designation of systemically important nonbank financial companies — The Financial Stability Oversight Council, or FSOC, released a proposed rule and guidance that describe the processes and procedures that the FSOC intends to follow in making a determination that a nonbank financial company is systemically important. Pursuant to the Dodd-Frank Act, the FSOC may designate a nonbank financial company to be subject to the supervision of the Federal Reserve Board and subject to additional prudential standards if the FSOC determines that material financial distress at the nonbank financial company, or the nature, scope, size, scale, concentration, interconnectedness, or mix of the activities of the company, could pose a threat to the financial stability of the United States. If Freddie Mac is designated as a systemically important nonbank financial company under the standards ultimately adopted by the FSOC, we could be subject to additional oversight and prudential standards.

- Resolution Plans — The Federal Reserve Board and the FDIC have approved a final rule to implement a requirement under the Dodd-Frank Act that requires large bank holding companies and systemically important nonbank financial companies to submit annual resolution plans to the Federal Reserve and the FDIC. Resolution plans must describe the company's strategy for rapid and orderly resolution in bankruptcy during times of financial distress, and must include a strategic analysis of the plan's components, a description of the range of specific actions the company proposes to take during resolution, and a description of the company's organizational structure, material entities, interconnections and interdependencies, and management information systems. If we are designated as a systemically important nonbank financial company under the standards ultimately adopted by the FSOC, we will be required to submit annual resolution plans pursuant to the requirements of this rule.

- Derivatives Rulemakings — The Chairman of the Commodity Futures Trading Commission announced on September 8, 2011 that numerous proposed derivatives rules likely will not be finalized until the first quarter of 2012, including rules relating to capital and margin requirements, client clearing documentation and risk management, and swap execution facilities. When finalized, these rules may have a significant impact on our derivatives trading activities.

We continue to review and assess the impact of rulemakings and other activities under the Dodd-Frank Act. For more information, see "RISK FACTORS — Legal and Regulatory Risks — *The Dodd-Frank Act and related regulation may adversely affect our business activities and financial results*" in our 2010 Annual Report.

**SEC Regulation on Disclosure for Asset-Backed Securities**

On January 20, 2011, the SEC adopted Rule 15Ga-1, which requires issuers of asset-backed securities to disclose specified information concerning fulfilled and unfulfilled repurchase requests relating to the assets backing such securities, including certain historical information. This disclosure will first be required to be reported by February 14, 2012 (containing information covering the three year period ended December 31, 2011), with subsequent filings due each quarter thereafter.

We currently believe compliance with the disclosure requirements of this new rule will likely present significant operational challenges for us. Since Rule 15Ga-1 was adopted by the SEC in January 2011, we have been assessing its requirements to determine how we will comply with the Rule and complete Form ABS-15G, which is the report securitizers are required to file. In many cases, our existing systems may not collect the data required to be disclosed under the Rule in the form required by Form ABS-15G. We have devoted substantial resources to examining our systems and operations, and developing internal requirements and software in order to file with the SEC by February 14, 2012.

**Conforming Loan Limits**

On September 30, 2011, the temporary high-cost area loan limits established by Congress for certain high-cost areas were permitted to expire. Accordingly, the permanent high-cost area loan limits set out in the Reform Act apply with respect to loans originated on or after October 1, 2011 in high-cost areas. Congress has been considering legislation that

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2215

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

would re-establish higher temporary loan limits for higher-cost  areas, however, we cannot predict whether or when such  legislation will be enacted.

**Developments Concerning Single-Family Servicing Practices**

There have been a number of regulatory developments in recent  periods impacting single-family mortgage servicing and  foreclosure practices, including those discussed below. These  developments caused delays in the foreclosure process for  single-family mortgages, which caused the volume of our single-family REO acquisitions to be less than it otherwise would have been. It is possible that these developments will result in significant changes to mortgage servicing and  foreclosure practices that could adversely affect our business.  New compliance requirements placed on servicers as a result of these developments could expose Freddie Mac to financial risk as  a result of further extensions of foreclosure timelines if home prices remain weak or decline. We may need to make additional  significant changes to our practices, which could increase our operational risk. It is difficult to predict other impacts on  our business of these changes, though such changes could  adversely affect our credit losses and costs of servicing, and  make it more difficult for us to transfer mortgage servicing  rights to a successor servicer should we need to do so. The regulatory developments and changes include the following:

- On April 13, 2011, the OCC, the Federal Reserve, the FDIC,  and the Office of Thrift Supervision entered into consent orders  with 14 large servicers regarding their foreclosure and loss  mitigation practices. These institutions service the majority of the  single-family mortgages we own or guarantee. The consent  orders require the servicers to submit comprehensive action  plans relating to, among other items, use of foreclosure documentation, staffing of foreclosure and loss mitigation  activities, oversight of third parties, use of the Mortgage Electronic Registration System, or the MERS System, and  communications with borrowers. We will not be able to assess the impact of these actions on our business until the  servicers' comprehensive action plans are publicly available.

- On April 28, 2011, FHFA announced a new set of aligned standards for servicing delinquent mortgages owned or guaranteed  by Freddie Mac and Fannie Mae. We implemented most aspects of this initiative effective October 1, 2011. We have also  implemented a new standard modification initiative that will  replace our existing non-HAMP modification program beginning  January 1, 2012. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts.*" FHFA has also directed us and Fannie Mae to work on a joint initiative to consider alternatives for  future mortgage servicing structures and servicing compensation. The development of further alternatives could impact our ability  to conduct current initiatives. On September 27, 2011, FHFA announced that it is seeking public comment on two alternative  mortgage servicing compensation structures detailed in a discussion paper. One proposal would establish a reserve account  within the current servicing compensation structure. The other proposal would create a new fee for service compensation  structure (*i.e.*, a flat per-loan fee).

- On June 30, 2011, the OCC issued Supervisory Guidance  regarding the OCC's expectations for the oversight and  management of mortgage foreclosure activities by national banks.  The Supervisory Guidance contains several elements from the  consent orders with the 14 major servicers that will now be  applied to all national banks. In the Supervisory Guidance, the  OCC directed all national banks to conduct a self-assessment of foreclosure management practices by September 30, 2011.  Additionally, the Guidance sets forth foreclosure management standards that mirror the broad categories of the servicing  guidelines contained in the consent orders. During Congressional testimony on July 7, 2011, an OCC official indicated that  there is an active interagency effort under way to develop  comprehensive, nationally applicable mortgage servicing  standards, and that this effort involves federal bank regulatory  agencies, HUD and FHFA.

- A group consisting of state attorneys general and state bank and  mortgage regulators is in discussions with a number of large seller/servicers concerning a global settlement of certain  issues related to mortgage servicing practices. It has been  reported that this settlement could include changes to mortgage  servicing practices.

- On July 21, 2011, new MERS membership rules with respect to  the foreclosure of mortgages registered on the MERS System were adopted. Subject to certain limited exceptions, these rules  require the assignment of a mortgage out of MERS' name  prior to the initiation of foreclosure or certain other legal  proceedings. This may further extend Freddie Mac's foreclosure timelines.

- Several localities have adopted ordinances that would expand the  responsibilities and liability for registering and maintaining  vacant properties to servicers and assignees. These laws could  significantly expand mortgage costs and liabilities in those  areas.

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

For more information on operational risks related to these developments in mortgage servicing, see "RISK MANAGEMENT — Operational Risks."

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

### Interest-Rate Risk and Other Market Risks

Our investments in mortgage loans and mortgage-related securities expose us to interest-rate risk and other market risks arising primarily from the uncertainty as to when borrowers will pay the outstanding principal balance of mortgage loans and mortgage-related securities, known as prepayment risk, and the resulting potential mismatch in the timing of our receipt of cash flows related to our assets versus the timing of payment of cash flows related to our liabilities used to fund those assets. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" in our 2010 Annual Report for more information on our exposure to interest-rate and other market risks, including our use of derivatives as part of our efforts to manage certain of these risks.

### *PMVS and Duration Gap*

Our primary interest-rate risk measures are PMVS and duration gap.

PMVS is an estimate of the change in the market value of our net assets and liabilities from an instantaneous 50 basis point shock to interest rates, assuming no rebalancing actions are undertaken and assuming the mortgage-to-LIBOR basis does not change. We do not actively manage overall basis risk, also referred to as mortgage-to-debt OAS risk or spread risk, arising from funding mortgage-related assets with our debt securities. Recently our agency-to-swap basis risk exposure has increased due to the increased use of floating rate debt. Agency-to-swap basis risk impacts the debt component of our mortgage-to-debt OAS risk. PMVS is measured in two ways, one measuring the estimated sensitivity of our portfolio market value to parallel movements in interest rates (PMVS-Level or PMVS-L) and the other to nonparallel movements (PMVS-YC).

The 50 basis point shift and 25 basis point change in slope of the LIBOR yield curve used for our PMVS measures reflect reasonably possible near-term changes that we believe provide a meaningful measure of our interest-rate risk sensitivity. Our PMVS measures assume instantaneous shocks. Therefore, these PMVS measures do not consider the effects on fair value of any rebalancing actions that we would typically expect to take to reduce our risk exposure.

Duration gap measures the difference in price sensitivity to interest rate changes between our assets and liabilities, and is expressed in months relative to the market value of assets. For example, assets with a six-month duration and liabilities with a five-month duration would result in a positive duration gap of one month. A duration gap of zero implies that the duration of our assets approximates the duration of our liabilities. Multiplying duration gap (expressed as a percentage of a year) by the fair value of our assets will provide an indication of the change in the fair value of our equity resulting from a 1% change in interest rates.

### *Limitations of Market Risk Measures*

Our PMVS and duration gap estimates are determined using models that involve our best judgment of interest-rate and prepayment assumptions. Accordingly, while we believe that PMVS and duration gap are useful risk management tools, they should be understood as estimates rather than as precise measurements. While PMVS and duration gap estimate our exposure to changes in interest rates, they do not capture the potential impact of certain other market risks, such as changes in volatility, basis, and foreign-currency risk.

There are inherent limitations in any methodology used to estimate exposure to changes in market interest rates. Our sensitivity analyses for PMVS and duration gap contemplate only certain movements in interest rates and are performed at a particular point in time based on the estimated fair value of our existing portfolio. These sensitivity analyses do not consider other factors that may have a significant effect on our financial instruments, most notably business activities and strategic actions that management may take in the future to manage interest-rate risk. As such, these analyses are not intended to provide precise forecasts of the effect a change in market interest rates would have on the estimated fair value of our net assets.

In addition, it is more difficult to measure and manage the interest rate risk related to mortgage assets as risk for prepayment model error remains high due to uncertainty regarding default rates, unemployment, loan modification, and the volatility and impact of home price movements on mortgage durations. Mis-estimation of prepayments could result in hedging-related losses.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2217                              Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Duration Gap and PMVS Results

Table 52 provides duration gap, estimated point-in-time and minimum and maximum PMVS-L and PMVS-YC results, and an average of the daily values and standard deviation for the three and nine months ended September 30, 2011 and 2010. Table 52 also provides PMVS-L estimates assuming an immediate 100 basis point shift in the LIBOR yield curve. We do not hedge the entire prepayment risk exposure embedded in our mortgage assets. The interest rate sensitivity of a mortgage portfolio varies across a wide range of interest rates. Therefore, the difference between PMVS at 50 basis points and 100 basis points is non-linear. As shown in Table 52, the PMVS-L results based on both 50 basis point and 100 basis point shifts in the LIBOR curve as of September 30, 2011 were significantly lower than corresponding amounts as of December 31, 2010 due to a low mortgage interest rate environment that resulted in a lower convexity on our mortgage portfolio.

### Table 52 — PMVS Results

| | PMVS-YC | PMVS-L | |
| | 25 bps | 50 bps | 100 bps |
| | | (in millions) | |
| Assuming shifts of the LIBOR yield curve: | | | |
| September 30, 2011 | $ 13 | $ 29 | $ 49 |
| December 31, 2010 | $ 35 | $ 588 | $ 1,884 |

| | Three Months Ended September 30, | | | | | |
| | 2011 | | | 2010 | | |
| | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
| | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Average | (0.1) | $ 21 | $ 304 | 0.1 | $ 26 | $ 91 |
| Minimum | (0.8) | $ — | $ — | (0.2) | $ 1 | $ — |
| Maximum | 0.5 | $ 77 | $ 514 | 0.6 | $ 83 | $ 321 |
| Standard deviation | 0.3 | $ 18 | $ 136 | 0.2 | $ 18 | $ 86 |

| | Nine Months Ended September 30, | | | | | |
| | 2011 | | | 2010 | | |
| | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
| | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Average | (0.1) | $ 22 | $ 390 | 0.0 | $ 22 | $ 325 |
| Minimum | (1.0) | $ — | $ — | (0.7) | $ — | $ — |
| Maximum | 0.6 | $ 77 | $ 721 | 0.7 | $ 83 | $ 668 |
| Standard deviation | 0.3 | $ 15 | $ 121 | 0.3 | $ 17 | $ 190 |

Derivatives have historically enabled us to keep our interest-rate risk exposure at consistently low levels in a wide range of interest-rate environments. Table 53 shows that the PMVS-L risk levels for the periods presented would generally have been higher if we had not used derivatives to manage our interest-rate risk exposure.

### Table 53 — Derivative Impact on PMVS-L (50 bps)

| | Before Derivatives | After Derivatives | Effect of Derivatives |
| | | (in millions) | |
| At: | | | |
| September 30, 2011 | $ 1,612 | $ 29 | $ (1,583) |
| December 31, 2010 | $ 3,614 | $ 588 | $ (3,026) |

The disclosure in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC, reflects the average of the daily PMVS-L, PMVS-YC and duration gap estimates for a given reporting period (a month, quarter or year).

## ITEM 4. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC rules and forms and that such information is accumulated and communicated to senior management, as appropriate, to allow timely decisions regarding required disclosure. In designing our disclosure controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and we must apply judgment in implementing possible controls and procedures.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011    TREASURY-2218    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of September 30, 2011. As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of September 30, 2011, at a reasonable level of assurance, because our disclosure controls and procedures did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. We have not been able to update our disclosure controls and procedures to provide reasonable assurance that information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure. Based on discussions with FHFA and the structural nature of this continued weakness, it is likely that we will not remediate this weakness in our disclosure controls and procedures while we are under conservatorship. As noted below, we also consider this situation to be a continuing material weakness in our internal control over financial reporting.

**Changes in Internal Control Over Financial Reporting During the Quarter Ended September 30, 2011**

We evaluated the changes in our internal control over financial reporting that occurred during the quarter ended September 30, 2011 and concluded that the following matters have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

A number of senior officers have left the company since June 30, 2011, including Michael C. May, Executive Vice President — Multifamily, Joseph A. Rossi, Senior Vice President — Operations & Technology, Robert E. Bostrom, Executive Vice President — General Counsel & Corporate Secretary, and Raymond G. Romano, Executive Vice President — Chief Credit Officer. In addition, John R. Dye, Senior Vice President — Interim General Counsel & Corporate Secretary will be leaving the company in November 2011. Because we have maintained succession plans for our senior management positions, we were able to fill some of these senior management positions quickly, or eliminated them through reorganizations. However, we may not be able to continue to do so in the future. Disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in any of our operations, affect our execution capabilities, cause delays in the implementation of critical technology and other projects, and erode our business, modeling, internal audit, risk management, financial reporting, and compliance expertise and capabilities.

On October 26, 2011, FHFA announced that Charles E. Haldeman Jr., Chief Executive Officer, has expressed his desire to step down in the coming year, and that the Board and FHFA will be developing a succession plan.

FHFA also announced on October 26, 2011, that two Board members, John Koskinen (Chairman) and Robert Glauber (Chairman, Governance and Nominating Committee), have reached the company's mandatory retirement age and will be stepping down from the Board at the end of the current term in February 2012. In order to promote a smooth transition, FHFA announced that Christopher Lynch, currently Chairman of the Audit Committee, will assume the chairmanship of the Board effective at the December 2011 Board meeting. A third Board member, Laurence E. Hirsch, notified the company on October 18, 2011 that he will not seek re-election to the Board when his term expires.

During the third quarter of 2011, we further reorganized our Single-Family Business and Information Technology division. In the near term, this change could increase our operational risk as employees become accustomed to new roles and responsibilities. Over time, we expect this change will improve our effectiveness and overall risk profile.

**Mitigating Actions Related to the Material Weakness in Internal Control Over Financial Reporting**

We have not remediated the material weakness in internal control over financial reporting related to our disclosure controls and procedures as of September 30, 2011. Given the structural nature of this continued weakness, we believe it is likely that we will not remediate this material weakness while we are under conservatorship. However, both we and FHFA have continued to engage in activities and employ procedures and practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws. These include the following:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the Conservator.
- We provide drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also provide drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.
- FHFA personnel, including senior officials, review our SEC filings prior to filing, including this quarterly report on Form 10-Q, and engage in discussions regarding issues associated with the information contained in those filings.

101

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2219          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Prior to filing this quarterly report on Form 10-Q, FHFA provided us with a written acknowledgement that it had reviewed the quarterly report on Form 10-Q, was not aware of any material misstatements or omissions in the quarterly report on Form 10-Q, and had no objection to our filing the quarterly report on Form 10-Q.

• The Acting Director of FHFA is in frequent communication with our Chief Executive Officer, typically meeting (in person or by phone) on a weekly basis.

• FHFA representatives hold frequent meetings, typically weekly, with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, capital markets management, external communications and legal matters.

• Senior officials within FHFA's accounting group meet frequently, typically weekly, with our senior financial executives regarding our accounting policies, practices and procedures.

In view of our mitigating actions related to the material weakness, we believe that our interim consolidated financial statements for the quarter ended September 30, 2011 have been prepared in conformity with GAAP.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Table of Contents**

## ITEM 1. FINANCIAL STATEMENTS

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2221                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME**
**(UNAUDITED)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions, except share-related amounts) | | | |
| **Interest income** | | | | |
| Mortgage loans: | | | | |
| Held by consolidated trusts | $ 19,140 | $ 21,473 | $ 58,986 | $ 66,319 |
| Unsecuritized | 2,282 | 2,305 | 6,890 | 6,445 |
| Total mortgage loans | 21,422 | 23,778 | 65,876 | 72,764 |
| Investments in securities | 3,150 | 3,557 | 9,708 | 11,030 |
| Other | 8 | 48 | 60 | 115 |
| Total interest income | 24,580 | 27,383 | 75,644 | 83,909 |
| **Interest expense** | | | | |
| Debt securities of consolidated trusts | (16,715) | (18,721) | (51,379) | (57,412) |
| Other debt | (3,072) | (4,145) | (9,970) | (13,212) |
| Total interest expense | (19,787) | (22,866) | (61,349) | (70,624) |
| Expense related to derivatives | (180) | (238) | (581) | (745) |
| Net interest income | 4,613 | 4,279 | 13,714 | 12,540 |
| Provision for credit losses | (3,606) | (3,727) | (8,124) | (14,152) |
| Net interest income (loss) after provision for credit losses | 1,007 | 552 | 5,590 | (1,612) |
| **Non-interest income (loss)** | | | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (310) | (66) | (212) | (160) |
| Gains (losses) on retirement of other debt | 19 | (50) | 34 | (229) |
| Gains (losses) on debt recorded at fair value | 133 | (366) | 15 | 525 |
| Derivative gains (losses) | (4,752) | (1,130) | (8,986) | (9,653) |
| Impairment of available-for-sale securities: | | | | |
| Total other-than-temporary impairment of available-for-sale securities | (459) | (523) | (1,743) | (1,054) |
| Portion of other-than-temporary impairment recognized in AOCI | 298 | (577) | 37 | (984) |
| Net impairment of available-for-sale securities recognized in earnings | (161) | (1,100) | (1,706) | (2,038) |
| Other gains (losses) on investment securities recognized in earnings | (541) | (503) | (452) | (1,176) |
| Other income | 814 | 569 | 1,400 | 1,604 |
| Non-interest income (loss) | (4,798) | (2,646) | (9,907) | (11,127) |
| **Non-interest expense** | | | | |
| Salaries and employee benefits | (212) | (224) | (638) | (688) |
| Professional services | (73) | (72) | (193) | (220) |
| Occupancy expense | (14) | (16) | (44) | (47) |
| Other administrative expenses | (82) | (76) | (251) | (242) |
| Total administrative expenses | (381) | (388) | (1,126) | (1,197) |
| Real estate owned operations expense | (221) | (337) | (505) | (456) |
| Other expenses | (85) | (103) | (299) | (321) |
| Non-interest expense | (687) | (828) | (1,930) | (1,974) |
| Loss before income tax benefit | (4,478) | (2,922) | (6,247) | (14,713) |
| Income tax benefit | 56 | 411 | 362 | 800 |
| Net loss | (4,422) | (2,511) | (5,885) | (13,913) |
| Other comprehensive income, net of taxes and reclassification adjustments: | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | (80) | 3,781 | 2,764 | 12,524 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 124 | 164 | 391 | 520 |
| Changes in defined benefit plans | 2 | 2 | (6) | (6) |
| Total other comprehensive income, net of taxes and reclassification adjustments | 46 | 3,947 | 3,149 | 13,038 |
| Comprehensive income (loss) | (4,376) | 1,436 | (2,736) | (875) |
| Less: Comprehensive loss attributable to noncontrolling interest | — | — | — | 1 |
| Total comprehensive income (loss) attributable to Freddie Mac | $ (4,376) | $ 1,436 | $ (2,736) | $ (874) |
| Net loss | $ (4,422) | $ (2,511) | $ (5,885) | $ (13,913) |
| Less: Net loss attributable to noncontrolling interest | — | — | — | 1 |
| Net loss attributable to Freddie Mac | (4,422) | (2,511) | (5,885) | (13,912) |
| Preferred stock dividends | (1,618) | (1,558) | (4,840) | (4,146) |
| Net loss attributable to common stockholders | $ (6,040) | $ (4,069) | $ (10,725) | $ (18,058) |
| Loss per common share: | | | | |
| Basic | $ (1.86) | $ (1.25) | $ (3.30) | $ (5.56) |
| Diluted | $ (1.86) | $ (1.25) | $ (3.30) | $ (5.56) |
| Weighted average common shares outstanding (in thousands): | | | | |
| Basic | 3,244,496 | 3,248,794 | 3,245,473 | 3,249,753 |
| Diluted | 3,244,496 | 3,248,794 | 3,245,473 | 3,249,753 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2222

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED BALANCE SHEETS**
**(UNAUDITED)**

| | September 30, 2011 | December 31, 2010 |
|---|---:|---:|
| | (in millions, except share-related amounts) | |
| **Assets** | | |
| Cash and cash equivalents (includes $1 and $1, respectively, related to our consolidated VIEs) | $   18,174 | $   37,012 |
| Restricted cash and cash equivalents (includes $25,180 and $7,514, respectively, related to our consolidated VIEs) | 25,695 | 8,111 |
| Federal funds sold and securities purchased under agreements to resell (includes $- and $29,350, respectively, related to our consolidated VIEs) | 10,596 | 46,524 |
| *Investments in securities:* | | |
| Available-for-sale, at fair value (includes $224 and $817, respectively, pledged as collateral that may be repledged) | 216,584 | 232,634 |
| Trading, at fair value | 55,298 | 60,262 |
| Total investments in securities | 271,882 | 292,896 |
| *Mortgage loans:* | | |
| Held-for-investment, at amortized cost: | | |
| By consolidated trusts (net of allowances for loan losses of $8,696 and $11,644, respectively) | 1,611,580 | 1,646,172 |
| Unsecuritized (net of allowances for loan losses of $30,848 and $28,047, respectively) | 199,382 | 192,310 |
| Total held-for-investment mortgage loans, net | 1,810,962 | 1,838,482 |
| Held-for-sale, at lower-of-cost-or-fair-value (includes $6,275 and $6,413 at fair value, respectively) | 6,275 | 6,413 |
| *Total mortgage loans, net* | 1,817,237 | 1,844,895 |
| Accrued interest receivable (includes $6,535 and $6,895, respectively, related to our consolidated VIEs) | 8,327 | 8,713 |
| Derivative assets, net | 295 | 143 |
| Real estate owned, net (includes $64 and $118, respectively, related to our consolidated VIEs) | 5,630 | 7,068 |
| Deferred tax assets, net | 3,909 | 5,543 |
| Other assets (Note 21) (includes $6,158 and $6,001, respectively, related to our consolidated VIEs) | 10,591 | 10,875 |
| *Total assets* | $   2,172,336 | $   2,261,780 |
| **Liabilities and equity (deficit)** | | |
| *Liabilities* | | |
| Accrued interest payable (includes $6,120 and $6,502, respectively, related to our consolidated VIEs) | $   8,603 | $   10,286 |
| *Debt, net:* | | |
| Debt securities of consolidated trusts held by third parties | 1,488,036 | 1,528,648 |
| Other debt (includes $3,291 and $4,443 at fair value, respectively) | 674,421 | 713,940 |
| Total debt, net | 2,162,457 | 2,242,588 |
| Derivative liabilities, net | 329 | 1,209 |
| Other liabilities (Note 21) (includes $3,636 and $3,851, respectively, related to our consolidated VIEs) | 6,938 | 8,098 |
| *Total liabilities* | 2,178,327 | 2,262,181 |
| Commitments and contingencies (Notes 9, 11, and 19) | | |
| *Equity (deficit)* | | |
| Senior preferred stock, at redemption value | 66,179 | 64,200 |
| Preferred stock, at redemption value | 14,109 | 14,109 |
| Common stock, $0.00 par value, 4,000,000,000 shares authorized, 725,863,886 shares issued and 649,718,089 shares and 649,179,789 shares outstanding, respectively | — | — |
| Additional paid-in capital | 2 | 7 |
| Retained earnings (accumulated deficit) | (73,489) | (62,733) |
| *AOCI, net of taxes, related to:* | | |
| Available-for-sale securities (includes $10,646 and $10,740, respectively, related to net unrealized losses on securities for which other-than-temporary impairment has been recognized in earnings) | (6,914) | (9,678) |
| Cash flow hedge relationships | (1,848) | (2,239) |
| Defined benefit plans | (120) | (114) |
| *Total AOCI, net of taxes* | (8,882) | (12,031) |
| Treasury stock, at cost, 76,145,797 shares and 76,684,097 shares, respectively | (3,910) | (3,953) |
| *Total equity (deficit)* | (5,991) | (401) |
| *Total liabilities and equity (deficit)* | $   2,172,336 | $   2,261,780 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

TREASURY-2223

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# FREDDIE MAC
## CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT)
### (UNAUDITED)

|  | Shares Outstanding | | | Senior Preferred Stock, at Redemption Value | Preferred Stock, at Redemption Value | Common Stock, at Par Value | Additional Paid-in Capital | Retained Earnings (Accumulated Deficit) | AOCI, Net of Tax | Treasury Stock, at Cost | Noncontrolling Interest | Total Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Senior Preferred Stock | Preferred Stock | Common Stock | | | | | | | | | |
|  |  |  |  | (in millions) | | | | | | | | |
| Balance as of December 31, 2009 | 1 | 464 | 649 | $ 51,700 | $ 14,109 | — | $ 57 | $ (33,921) | $ (23,648) | $ (4,019) | 94 | $ 4,372 |
| Cumulative effect of change in accounting principle | — | — | — | — | — | — | — | (9,011) | (2,690) | — | (2) | (11,703) |
| Balance as of January 1, 2010 | 1 | 464 | 649 | 51,700 | 14,109 | — | 57 | (42,932) | (26,338) | (4,019) | 92 | (7,331) |
| *Comprehensive income (loss):* | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (13,912) | — | — | (1) | (13,913) |
| Other comprehensive income (loss), net of taxes | — | — | — | — | — | — | — | — | 13,038 | — | — | 13,038 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | (13,912) | 13,038 | — | (1) | (875) |
| Increase in liquidation preference | — | — | — | 12,400 | — | — | — | — | — | — | — | 12,400 |
| Stock-based compensation | — | — | — | — | — | — | 20 | — | — | — | — | 20 |
| Income tax benefit from stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | — | 1 |
| Common stock issuances | — | — | — | — | — | — | (66) | — | — | 65 | — | (1) |
| Noncontrolling interest purchase | — | — | — | — | — | — | (31) | — | — | — | (89) | (120) |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 23 | (23) | — | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (4,146) | — | — | — | (4,146) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (4) | — | — | — | (4) |
| Dividends and other | — | — | — | — | — | — | — | — | — | — | (2) | (2) |
| Ending balance at September 30, 2010 | 1 | 464 | 649 | $ 64,100 | $ 14,109 | — | $ 4 | (61,017) | $ (13,300) | $ (3,954) | — | $ (58) |
| Balance as of December 31, 2010 | 1 | 464 | 649 | $ 64,200 | $ 14,109 | — | $ 7 | (62,733) | $ (12,031) | $ (3,953) | — | $ (401) |
| *Comprehensive income (loss):* | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (5,885) | — | — | — | (5,885) |
| Other comprehensive income (loss), net of taxes | — | — | — | — | — | — | — | — | 3,149 | — | — | 3,149 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | (5,885) | 3,149 | — | — | (2,736) |
| Increase in liquidation preference | — | — | — | 1,979 | — | — | — | — | — | — | — | 1,979 |
| Stock-based compensation | — | — | — | — | — | — | 9 | — | — | — | — | 9 |
| Income tax benefit from stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | — | 1 |
| Common stock issuances | — | — | 1 | — | — | — | (43) | — | — | 43 | — | — |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 28 | (28) | — | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (4,840) | — | — | — | (4,840) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (3) | — | — | — | (3) |
| Ending balance at September 30, 2011 | 1 | 464 | 650 | $ 66,179 | $ 14,109 | — | $ 2 | (73,489) | $ (8,882) | $ (3,910) | — | $ (5,991) |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-2224

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(UNAUDITED)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2011 | 2010 |
| | (in millions) | |
| **Cash flows from operating activities** | | |
| Net loss | $ (5,885) | $ (13,913) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Derivative losses | 5,117 | 6,148 |
| Asset related amortization — premiums, discounts, and basis adjustments | 1,201 | (34) |
| Debt related amortization — premiums and discounts on certain debt securities and basis adjustments | (686) | 1,321 |
| Net discounts paid on retirements of other debt | (627) | (1,750) |
| Net premiums received from issuance of debt securities of consolidated trusts | 2,955 | 2,991 |
| Losses on extinguishment of debt securities of consolidated trusts and other debt | 178 | 389 |
| Provision for credit losses | 8,124 | 14,152 |
| Losses on investment activity | 1,537 | 2,816 |
| Gains on debt recorded at fair value | (15) | (525) |
| Deferred income tax benefit | (46) | (594) |
| Purchases of held-for-sale mortgage loans | (9,553) | (5,117) |
| Sales of mortgage loans acquired as held-for-sale | 10,283 | 5,637 |
| Repayments of mortgage loans acquired as held-for-sale | 29 | 15 |
| Change in: | | |
| Accrued interest receivable | 386 | 535 |
| Accrued interest payable | (1,461) | (1,958) |
| Income taxes payable | (315) | (15) |
| Other, net | (1,824) | 280 |
| *Net cash provided by operating activities* | 9,398 | 10,378 |
| **Cash flows from investing activities** | | |
| Purchases of trading securities | (36,143) | (46,126) |
| Proceeds from sales of trading securities | 28,742 | 9,259 |
| Proceeds from maturities of trading securities | 11,835 | 37,112 |
| Purchases of available-for-sale securities | (9,548) | (1,792) |
| Proceeds from sales of available-for-sale securities | 2,390 | 2,020 |
| Proceeds from maturities of available-for-sale securities | 25,742 | 33,917 |
| Purchases of held-for-investment mortgage loans | (27,515) | (43,407) |
| Repayments of mortgage loans acquired as held-for-investment | 245,323 | 272,141 |
| (Increase) decrease in restricted cash | (17,584) | 9,229 |
| Net proceeds from mortgage insurance and acquisitions and dispositions of real estate owned | 9,875 | 8,691 |
| Net decrease (increase) in federal funds sold and securities purchased under agreements to resell | 35,928 | (30,445) |
| Derivative premiums and terminations and swap collateral, net | (5,445) | (6,114) |
| Purchase of noncontrolling interest | — | (23) |
| *Net cash provided by investing activities* | 263,600 | 244,462 |
| **Cash flows from financing activities** | | |
| Proceeds from issuance of debt securities of consolidated trusts held by third parties | 67,248 | 70,014 |
| Repayments of debt securities of consolidated trusts held by third parties | (316,458) | (317,334) |
| Proceeds from issuance of other debt | 799,561 | 884,074 |
| Repayments of other debt | (839,290) | (936,416) |
| Increase in liquidation preference of senior preferred stock | 1,979 | 12,400 |
| Repurchase of REIT preferred stock | — | (100) |
| Payment of cash dividends on senior preferred stock | (4,840) | (4,146) |
| Excess tax benefits associated with stock-based awards | 1 | 1 |
| Payments of low-income housing tax credit partnerships notes payable | (37) | (96) |
| *Net cash used in financing activities* | (291,836) | (291,603) |
| Net decrease in cash and cash equivalents | (18,838) | (36,763) |
| Cash and cash equivalents at beginning of period | 37,012 | 64,683 |
| *Cash and cash equivalents at end of period* | $ 18,174 | $ 27,920 |
| **Supplemental cash flow information** | | |
| Cash paid (received) for: | | |
| Debt interest | $ 64,837 | $ 73,462 |
| Net derivative interest carry | 3,352 | 3,013 |
| Income taxes | (1) | (191) |
| Non-cash investing and financing activities: | | |
| Underlying mortgage loans related to guarantor swap transactions | 206,328 | 220,435 |
| Debt securities of consolidated trusts held by third parties established for guarantor swap transactions | 206,328 | 220,435 |
| Transfers from held-for-investment mortgage loans to held-for-sale mortgage loans | — | 196 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

TREASURY-2225

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Freddie Mac was chartered by Congress in 1970 to stabilize the nation's residential mortgage market and expand opportunities for home ownership and affordable rental housing. Our statutory mission is to provide liquidity, stability and affordability to the U.S. housing market. We are a GSE regulated by FHFA, the SEC, HUD, and the Treasury. For more information on the roles of FHFA and the Treasury, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" in this Form 10-Q and "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS" in our Annual Report on our Form 10-K for the year ended December 31, 2010, or our 2010 Annual Report.

We are involved in the U.S. housing market by participating in the secondary mortgage market. We do not participate directly in the primary mortgage market. Our participation in the secondary mortgage market includes providing our credit guarantee for mortgages originated by mortgage lenders in the primary mortgage market and investing in mortgage loans and mortgage-related securities.

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Single-family Guarantee, Investments, and Multifamily. Our Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we acquire and securitize mortgage loans by issuing PCs to third-party investors and we also guarantee the payment of principal and interest on single-family mortgage loans and mortgage-related securities. We also resecuritize mortgage-related securities that are issued by us or Ginnie Mae as well as private (non-agency) entities. Our Investments segment reflects results from our investment, funding, and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family mortgage loans. These activities are funded by debt issuances. We manage the interest-rate risk associated with these investment and funding activities using derivatives. Our Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. In our Multifamily segment, we purchase multifamily mortgage loans primarily for securitization. We also guarantee the payment of principal and interest on multifamily mortgage-related securities and mortgages underlying multifamily housing revenue bonds. See "NOTE 15: SEGMENT REPORTING" for additional information.

Under conservatorship, we are focused on the following primary business objectives: (a) meeting the needs of the U.S. residential mortgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in the MHA Program initiatives, including HAMP and HARP, and through our non-HAMP workout and foreclosure avoidance initiatives; (c) minimizing our credit losses; (d) maintaining the credit quality of the loans we purchase and guarantee; and (e) strengthening our infrastructure and improving overall efficiency.

In addition to our primary business objectives discussed above, we have a variety of different, and potentially competing, objectives based on our charter, public statements from Treasury and FHFA officials, and other guidance from our Conservator. For information regarding these objectives, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Business Objectives."

Throughout our consolidated financial statements and related notes, we use certain acronyms and terms which are defined in the Glossary.

For additional information regarding our significant accounting policies, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

### Basis of Presentation

The accompanying unaudited consolidated financial statements have been prepared in accordance with GAAP for interim financial information and include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated. These unaudited consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes in our 2010 Annual Report. We are operating under the basis that we will realize assets and satisfy liabilities in the normal course of business as a going concern and in accordance with the delegation of authority from FHFA to our Board of Directors and management. Certain financial information that is normally included in annual financial statements prepared in conformity with GAAP but is not required for interim reporting purposes has been condensed or omitted. Certain amounts in prior periods' consolidated financial statements have been reclassified to conform to the current presentation. In the opinion of management, all adjustments, which include only normal recurring adjustments, have been recorded for a fair statement of our unaudited consolidated financial statements.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2226

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We recorded the cumulative effect of certain miscellaneous errors related to previously reported periods as corrections in the three and nine months ended September 30, 2011. We concluded that these errors are not material individually or in the aggregate to our previously issued consolidated financial statements for any of the periods affected, or to our estimated earnings for the full year ending December 31, 2011 or to the trend of earnings. The cumulative effect, net of taxes, of the errors corrected during the three and nine months ended September 30, 2011 was $22 million and $2 million, respectively.

## Use of Estimates

The preparation of financial statements requires us to make estimates and assumptions that affect: (a) the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements; and (b) the reported amounts of revenues and expenses and gains and losses during the reporting period. Management has made significant estimates in preparing the financial statements, including, but not limited to, establishing the allowance for loan losses and reserve for guarantee losses, valuing financial instruments and other assets and liabilities, assessing impairments on investments, and assessing the realizability of net deferred tax assets. Actual results could be different from these estimates.

### Recently Adopted Accounting Guidance

#### *A Creditor's Determination of Whether a Restructuring is a Troubled Debt Restructuring*

On July 1, 2011, we adopted an amendment to the accounting guidance related to the classification of loans as TDRs, which clarifies when a restructuring such as a loan modification is considered a TDR. This amendment clarifies the guidance regarding a creditor's evaluation of whether a debtor is experiencing financial difficulty and whether a creditor has granted a concession to a debtor for purposes of determining if a restructuring constitutes a TDR.

Both single-family and multifamily loans that experience restructurings resulting in a concession being granted to a borrower experiencing financial difficulties are considered TDRs. The amendment provides guidance to determine whether a borrower is experiencing financial difficulties, which is largely consistent with the guidance for debtors. As we had previously analogized to the guidance for debtors, this change does not have a significant impact on our determination of whether a borrower is experiencing financial difficulties. Pursuant to this amendment, a concession is deemed to have been granted when, as a result of the restructuring, we do not expect to collect all amounts due, including interest accrued, at the original contractual interest rate. As appropriate, we also consider other qualitative factors in determining whether a concession is deemed to have been granted, including whether the borrower's modified interest rate is consistent with that of a non-troubled borrower. We do not consider restructurings that result in a delay in payment that is insignificant to be a concession. We generally consider a delay in payment amount or timing that is three months or less to be insignificant. The amendment also specifies that a concession shall not be determined by comparing the borrower's pre-restructuring effective interest rate to the post-restructuring effective interest rate. These changes result in a significant impact on our determination of whether a concession has been granted. Accordingly, a concession typically includes one or more of the following being granted to the borrower: (a) a trial period modification where the expected permanent modification will change our expectation of collecting all amounts due at the original contract rate; (b) a delay in payment that is more than insignificant; (c) a reduction in the contractual interest rate; (d) interest forbearance for a period of time that is not insignificant or forgiveness of accrued but uncollected interest amounts; and (e) a reduction in the principal amount of the loan.

The amendment was effective for interim and annual periods beginning on or after June 15, 2011 and applied as of July 1, 2011 to restructurings occurring on or after January 1, 2011. As of September 30, 2011, the total recorded investment in loans identified as TDRs during the third quarter of 2011 which relate to modifications or agreements entered into between January 1, 2011 and June 30, 2011 was $7.5 billion, and the allowance for credit losses related to those loans was $1.7 billion. We recognized additional provision for credit losses of $0.2 billion during the third quarter of 2011 due to the population of restructurings occurring in the first half of 2011 that are now considered TDRs.

Please refer to "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further disclosures regarding our loan restructurings accounted for and disclosed as TDRs and for discussion regarding how modifications and other loss mitigation activities are factored into our allowance for loan losses.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2227

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Recently Issued Accounting Guidance, Not Yet Adopted Within These Consolidated Financial Statements**

*Fair Value Measurement*

In May 2011, the FASB issued amendments to the accounting guidance pertaining to fair value measurement and disclosure. These amendments provide both: (a) clarification about the FASB's intent about the application of existing fair value measurement and disclosure requirements; and (b) changes to some of the principles or requirements for measuring fair value or for disclosing information about fair value measurements. These amendments are effective for interim and annual periods beginning after December 15, 2011 and are to be applied prospectively, with early adoption not permitted by public companies. We do not expect that the adoption of these amendments will have a material impact on our consolidated financial statements.

*Reconsideration of Effective Control for Repurchase Agreements*

In April 2011, the FASB issued an amendment to the guidance for transfers and servicing with regard to repurchase agreements and other agreements that both entitle and obligate a transferor to repurchase or redeem financial assets before their maturity. This amendment removes the criterion related to collateral maintenance from the transferor's assessment of effective control. It focuses the assessment of effective control on the transferor's rights and obligations with respect to the transferred financial assets and not whether the transferor has the practical ability to perform in accordance with those rights or obligations. The amendment is effective for interim and annual periods beginning on or after December 15, 2011. We do not expect that the adoption of this amendment will have a material impact on our consolidated financial statements.

<h3 style="text-align:center;">NOTE 2: CONSERVATORSHIP AND RELATED MATTERS</h3>

**Business Objectives**

We continue to operate under the conservatorship that commenced on September 6, 2008, conducting our business under the direction of FHFA, as our Conservator. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations. Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets. The Conservator also succeeded to the title to all books, records, and assets of Freddie Mac held by any other legal custodian or third party. During the conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and management to conduct, day-to-day operations so that the company can continue to operate in the ordinary course of business. The directors serve on behalf of, and exercise authority as directed by, the Conservator.

We are also subject to certain constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent.

Our business objectives and strategies have in some cases been altered since we were placed into conservatorship, and may continue to change. These changes to our business objectives and strategies may not contribute to our profitability. Based on our charter, public statements from Treasury and FHFA officials and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives, including:

- providing liquidity, stability and affordability in the mortgage market;
- continuing to provide additional assistance to the struggling housing and mortgage markets;
- reducing the need to draw funds from Treasury pursuant to the Purchase Agreement;
- returning to long-term profitability; and
- protecting the interests of taxpayers.

In a letter to the Chairmen and Ranking Members of the Senate Banking and House Financial Services Committees dated February 2, 2010, the Acting Director of FHFA stated that the focus of the conservatorship is on conserving assets, minimizing corporate losses, ensuring Freddie Mac continues to serve its mission, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed. The Acting Director of FHFA stated that minimizing our credit losses is our central goal and that we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship. The Acting Director stated that permitting us to offer new products is inconsistent with the goals of the conservatorship.

<div style="text-align:center;">110</div>

<div style="text-align:right;"><em>Freddie Mac</em></div>

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

These objectives create conflicts in strategic and day-to-day decision making that will likely lead to suboptimal outcomes for one or more, or possibly all, of these objectives. We regularly receive direction from our Conservator on how to pursue our objectives under conservatorship, including direction to focus our efforts on assisting homeowners in the housing and mortgage markets. The Conservator and Treasury have also not authorized us to engage in certain business activities and transactions, including the purchase or sale of certain assets, which we believe may have had a beneficial impact on our results of operations or financial condition, if executed. Our inability to execute such transactions may adversely affect our profitability, and thus contribute to our need to draw additional funds from Treasury. However, we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

Given the important role the Obama Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions and our public mission, we may be required to take additional actions that could have a negative impact on our business, operating results, or financial condition. The Acting Director of FHFA stated that FHFA does not expect we will be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio, except for purchases of seriously delinquent mortgages from PC trusts. We are also subject to limits on the amount of assets we can sell from our mortgage-related investments portfolio in any calendar month without review and approval by FHFA and, if FHFA determines, Treasury.

Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives, but may not contribute to our profitability. Some of these changes increase our expenses, while others require us to forego revenue or other opportunities. In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the Purchase Agreement, have adversely impacted and may continue to adversely impact our financial results, including our segment results. For example, our efforts to help struggling homeowners and the mortgage market, in line with our public mission, may help to mitigate our credit losses, but in some cases may increase our expenses or require us to forgo revenue opportunities in the near term. There is significant uncertainty as to the ultimate impact that our efforts to aid the housing and mortgage markets, including our efforts in connection with the MHA Program, will have on our future capital or liquidity needs. We are allocating significant internal resources to the implementation of the various initiatives under the MHA Program and to the servicing alignment initiative as directed by FHFA on April 28, 2011, which has increased, and will continue to increase, our expenses. We cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of loan defaults and foreclosures due to these initiatives.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following our conservatorship, including whether we will continue to exist. Our future structure and role will be determined by the Obama Administration and Congress. We have no ability to predict the outcome of these deliberations.

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, and states that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Obama Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Obama Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase

<div align="center">111</div>

<div align="right">*Freddie Mac*</div>

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

agreements. These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations, and financial condition.

On September 19, 2011, the Acting Director of FHFA stated that he would anticipate Freddie Mac and Fannie Mae will continue the gradual process of increasing guarantee fees. He stated this will not happen immediately but should be expected in 2012. President Obama's Plan for Economic Growth and Deficit Reduction, announced on September 19, 2011, contained a proposal to increase the guarantee fees charged by Freddie Mac and Fannie Mae by ten basis points. We cannot currently predict the extent to which our business will be impacted by the potential increase in guarantee fees. In addition, the temporary high-cost area loan limits expired on September 30, 2011.

We cannot predict the extent to which the other recommendations will be implemented or when any actions to implement them may be taken. However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term.

On October 24, 2011 FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers who can benefit from refinancing their home mortgage. The revisions to HARP will continue to be available to borrowers with loans that were sold to the GSEs on or before May 31, 2009 and who have current LTV ratios above 80%.

The October 24, 2011 announcement stated that the GSEs will issue guidance with operational details about the HARP changes to mortgage lenders and servicers by November 15, 2011. We are working collectively with FHFA and Fannie Mae on several operational details of the program. We are also waiting to receive details from FHFA regarding the fees that we may charge associated with the refinancing program. Since industry participation in HARP is not mandatory, we anticipate that implementation schedules will vary as individual lenders, mortgage insurers and other market participants modify their processes. At this time we do not know how many eligible borrowers are likely to refinance under the program.

The recently announced revisions to HARP will help to reduce our exposure to credit risk to the extent that HARP refinances strengthen the borrowers' capacity to repay their mortgages and, in some cases, reduce the terms of their mortgages. These revisions to HARP could also reduce our credit losses to the extent that the revised program contributes to bringing stability to the housing market. However, with our release of certain representations and warranties to lenders, credit losses associated with loans identified with defects will not be recaptured through loan buybacks. We could also experience declines in the fair values of certain agency mortgage-related security investments classified as available-for-sale or trading resulting from changes in expectations of mortgage prepayments and lower net interest yields over time on other mortgage-related investments. As a result, we cannot currently estimate these impacts until more details about the program and the level of borrower participation can be reasonably assured.

Management is continuing its efforts to identify and evaluate actions that could be taken to reduce the significant uncertainties surrounding our business, as well as the level of future draws under the Purchase Agreement; however, our ability to pursue such actions may be limited by market conditions and other factors. Our future draws are dictated by the terms of the Purchase Agreement. Any actions we take will likely require approval by FHFA and possibly Treasury before they are implemented. FHFA will regulate any actions we take related to the uncertainties surrounding our business. In addition, FHFA, Treasury, or Congress may have a different perspective from management and may direct us to focus our efforts on supporting the mortgage markets in ways that make it more difficult for us to implement any such actions.

**Impact of the Purchase Agreement and FHFA Regulation on the Mortgage-Related Investments Portfolio**

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $810 billion as of December 31, 2010 and may not exceed $729 billion as of December 31, 2011. The UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation, was $679.1 billion at September 30, 2011. The annual 10% reduction in the size of our mortgage-related investments portfolio is calculated based on the maximum allowable size of the mortgage-related investments portfolio, rather than the actual UPB of the mortgage-related investments portfolio, as of December 31 of the preceding year. The limitation is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                TREASURY-2230                                    Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## Government Support for our Business

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

Significant recent developments with respect to the support we receive from the government include the following:

• On March 31, 2011, we received $500 million in funding from Treasury under the Purchase Agreement relating to our quarterly net worth deficit at December 31, 2010. No cash was received from Treasury under the Purchase Agreement during the second quarter of 2011 due to our positive net worth at March 31, 2011. On September 30, 2011, we received $1.5 billion in funding from Treasury under the Purchase Agreement relating to our quarterly net worth deficit at June 30, 2011, which increased our aggregate liquidation preference of the senior preferred stock to $66.2 billion as of September 30, 2011.

• On March 31, 2011, June 30, 2011 and September 30, 2011, we paid dividends of $1.6 billion in cash on the senior preferred stock to Treasury at the direction of the Conservator.

To address our net worth deficit of $6.0 billion at September 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $6.0 billion, and will request that we receive these funds by December 31, 2011. Commencing in the second quarter of 2011, our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. Following funding of the draw request related to our net worth deficit at September 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $6.6 billion to $7.2 billion, which exceeds our annual historical earnings in all but one period.

Through September 30, 2011, we paid $14.9 billion in cash dividends on the senior preferred stock. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth. In addition, cash payment of quarterly commitment fees payable to Treasury will negatively impact our future net worth over the long-term. Treasury waived the fee for all quarters of 2011. The amount of the fee has not yet been established and could be substantial. As a result of additional draws and other factors: (a) the liquidation preference of, and the dividends we owe on, the senior preferred stock would increase and, therefore, we may need additional draws from Treasury in order to pay our dividend obligations; and (b) there is significant uncertainty as to our long-term financial sustainability.

See "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS," "NOTE 9: DEBT SECURITIES AND SUBORDINATED BORROWINGS," and "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report for more information on the terms of the conservatorship and the Purchase Agreement.

### NOTE 3: VARIABLE INTEREST ENTITIES

We use securitization trusts in our securities issuance process, and are required to evaluate the trusts for consolidation. For VIEs, our policy is to consolidate all entities in which we hold a controlling financial interest and are therefore deemed to be the primary beneficiary. The accounting guidance related to the consolidation of VIEs states that an enterprise will be deemed to have a controlling financial interest in, and thus be the primary beneficiary of, a VIE if it has both: (a) the power to direct the activities of the VIE that most significantly impact the VIE's economic performance; and (b) the right to receive benefits from the VIE that could potentially be significant to the VIE or the obligation to absorb losses of the VIE that could potentially be significant to the VIE. We perform ongoing assessments of whether we are the primary beneficiary of a VIE. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Consolidation and Equity Method of Accounting" in our 2010 Annual Report for further information regarding the consolidation of certain VIEs.

Based on our evaluation, we determined that we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions. Therefore, we consolidate on our balance sheet the assets and liabilities of these trusts. In addition to our PC trusts, we are involved with numerous other entities that meet the definition of a VIE, as discussed below.

## VIEs for which We are the Primary Beneficiary

### Single-family PC Trusts

Our single-family PC trusts issue pass-through securities that represent undivided beneficial interests in pools of mortgages held by these trusts. For our fixed-rate PCs, we guarantee the timely payment of interest and principal. For our ARM PCs, we guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage

<div style="text-align:center">113</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.
Powered by Morningstar® Document Research℠

Table of Contents

loans and the full and final payment of principal; we do not guarantee the timely payment of principal on ARM PCs. In exchange for providing this guarantee, we may receive a management and guarantee fee and up-front delivery fees. We issue most of our single-family PCs in transactions in which our customers exchange mortgage loans for PCs. We refer to these transactions as guarantor swaps.

PCs are designed so that we bear the credit risk inherent in the loans underlying the PCs through our guarantee of principal and interest payments on the PCs. The PC holders bear the interest rate or prepayment risk on the mortgage loans and the risk that we will not perform on our obligation as guarantor. For purposes of our consolidation assessments, our evaluation of power and economic exposure with regard to PC trusts focuses on credit risk because the credit performance of the underlying mortgage loans was identified as the activity that most significantly impacts the economic performance of these entities. We have the power to impact the activities related to this risk in our role as guarantor and master servicer.

Specifically, in our role as master servicer, we establish requirements for how mortgage loans are serviced and what steps are to be taken to avoid credit losses (*e.g.*, modification, foreclosure). Additionally, in our capacity as guarantor, we have the ability to purchase defaulted mortgage loans out of the PC trust to help manage credit losses. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further information regarding our purchase of mortgage loans out of PC trusts. These powers allow us to direct the activities of the VIE (*i.e.*, the PC trust) that most significantly impact its economic performance. In addition, we determined that our guarantee to each PC trust to provide principal and interest payments obligates us to absorb losses that could potentially be significant to the PC trusts. Accordingly, we concluded that we are the primary beneficiary of our single-family PC trusts.

At September 30, 2011 and December 31, 2010, we were the primary beneficiary of, and therefore consolidated, single-family PC trusts with assets totaling $1.6 trillion and $1.7 trillion, respectively, as measured using the UPB of issued PCs. The assets of each PC trust can be used only to settle obligations of that trust. In connection with our PC trusts, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancement. We also have credit protection for certain of our PC trusts that issue PCs backed by loans or certificates of federal agencies (such as FHA, VA, and USDA). See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for additional information regarding third-party credit enhancements related to our PC trusts.

### Other Guarantee Transactions

Other Guarantee Transactions are mortgage-related securities that we issue to third parties in exchange for non-Freddie Mac mortgage-related securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for information on the nature of Other Guarantee Transactions. The degree to which our involvement with securitization trusts that issue Other Guarantee Transactions provides us with power to direct the activities that most significantly impact the economic performance of these VIEs (*e.g.*, the ability to mitigate credit losses on the underlying assets of these entities) and exposure to benefits or losses that could potentially be significant to the VIEs (*e.g.*, the existence of third party credit enhancements) varies by transaction. Our consolidation determination took into consideration the specific facts and circumstances of our involvement with each of these entities, including our ability to direct or influence the performance of the underlying assets and our exposure to potentially significant variability based upon the design of each entity and its governing contractual arrangements. As a result, we have concluded that we are the primary beneficiary of certain Other Guarantee Transactions with underlying assets totaling $13.5 billion and $15.8 billion at September 30, 2011 and December 31, 2010, respectively. For those Other Guarantee Transactions that we do consolidate, the investors in these securities have recourse only to the assets of those VIEs.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                     TREASURY-2232                     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Consolidated VIEs*

Table 3.1 represents the carrying amounts and classification of the assets and liabilities of consolidated VIEs on our consolidated balance sheets.

**Table 3.1 — Assets and Liabilities of Consolidated VIEs**

| Consolidated Balance Sheets Line Item | September 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| Cash and cash equivalents | $ 1 | $ 1 |
| Restricted cash and cash equivalents | 25,180 | 7,514 |
| Federal funds sold and securities purchased under agreements to resell | — | 29,350 |
| Mortgage loans held-for-investment by consolidated trusts | 1,611,580 | 1,646,172 |
| Accrued interest receivable | 6,535 | 6,895 |
| Real estate owned, net | 64 | 118 |
| Other assets | 6,158 | 6,001 |
| Total assets of consolidated VIEs | $ 1,649,518 | $ 1,696,051 |
| Accrued interest payable | $ 6,120 | $ 6,502 |
| Debt securities of consolidated trusts held by third parties | 1,488,036 | 1,528,648 |
| Other liabilities | 3,636 | 3,851 |
| Total liabilities of consolidated VIEs | $ 1,497,792 | $ 1,539,001 |

**VIEs for which We are not the Primary Beneficiary**

Table 3.2 represents the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Our involvement with VIEs for which we are not the primary beneficiary generally takes one of two forms: (a) purchasing an investment in these entities; or (b) providing a guarantee to these entities. Our maximum exposure to loss for those VIEs in which we have purchased an investment is calculated as the maximum potential charge that we would recognize in our consolidated statements of income and comprehensive income if that investment were to become worthless. This amount does not include other-than-temporary impairments or other write-downs that we previously recognized through earnings. Our maximum exposure to loss for those VIEs for which we have provided a guarantee represents the contractual amounts that could be lost under the guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements. We do not believe the maximum exposure to loss disclosed in the table below is representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation, including possible recoveries under credit enhancement arrangements.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2233

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 3.2 — Variable Interests in VIEs for which We are not the Primary Beneficiary**

| | | September 30, 2011 | | | |
| | | Mortgage-Related Security Trusts | | Unsecuritized | |
| | Asset-Backed Investment Trusts(1) | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | Multifamily Loans(3) | Other(1)(4) |
| | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 1,957 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 55 | — | 26 | 157 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 84,021 | 124,431 | — | — |
| Trading, at fair value | 276 | 16,588 | 17,830 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 74,892 | — |
| Held-for-sale | — | — | — | 6,275 | — |
| Accrued interest receivable | — | 498 | 456 | 342 | 6 |
| Derivative assets, net | — | — | — | — | 1 |
| Other assets | — | 386 | — | 423 | 401 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (1) | — | — | (42) |
| Other liabilities | — | (525) | — | (31) | (679) |
| **Maximum Exposure to Loss** | $ 2,233 | $ 33,976 | $ 160,126 | $ 81,958 | $ 11,155 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 25,440 | $ 38,721 | $ 1,024,419 | $132,157 | $ 25,374 |

| | | December 31, 2010 | | | |
| | | Mortgage-Related Security Trusts | | Unsecuritized | |
| | Asset-Backed Investment Trusts(1) | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | Multifamily Loans(3) | Other(1)(4) |
| | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 9,909 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 52 | — | 34 | 464 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 85,689 | 137,568 | — | — |
| Trading, at fair value | 44 | 13,437 | 18,914 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 78,448 | — |
| Held-for-sale | — | — | — | 6,413 | — |
| Accrued interest receivable | — | 419 | 717 | 372 | 5 |
| Derivative assets, net | — | — | — | — | 2 |
| Other assets | — | 277 | 6 | 23 | 381 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (2) | — | — | (41) |
| Other liabilities | — | (408) | (3) | (36) | (1,034) |
| **Maximum Exposure to Loss** | $ 9,953 | $ 26,392 | $ 176,533 | $ 85,290 | $ 11,375 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 129,479 | $ 29,368 | $ 1,036,975 | $138,330 | $ 25,875 |

(1) For our involvement with non-consolidated asset-backed investment trusts, non-Freddie Mac security trusts and certain other VIEs where we do not provide a guarantee, our maximum exposure to loss is computed as the carrying amount if the security is classified as trading or the amortized cost if the security is classified as available-for-sale for our investments and related assets recorded on our consolidated balance sheets, including any unrealized amounts recorded in AOCI for securities classified as available-for-sale.

(2) Freddie Mac securities include our variable interests in single-family multiclass REMICs and Other Structured Securities, multifamily PCs, multifamily Other Structured Securities, and Other Guarantee Transactions that we do not consolidate. For our variable interests in non-consolidated Freddie Mac security trusts for which we have provided a guarantee, our maximum exposure to loss is the outstanding UPB of the underlying mortgage loans or securities that we have guaranteed, which is the maximum contractual amount under such guarantees. However, our investments in single-family REMICs and Other Structured Securities that are not consolidated do not give rise to any additional exposure to loss as we already consolidate the underlying collateral.

(3) For unsecuritized multifamily loans, our maximum exposure to loss is based on the UPB of these loans, as adjusted for loan level basis adjustments, any associated allowance for loan losses, accrued interest receivable, and fair value adjustments on held-for-sale loans.

(4) For other non-consolidated VIEs where we have provided a guarantee, our maximum exposure to loss is the contractual amount that could be lost under the guarantee if the counterparty or borrower defaulted, without consideration of possible recoveries under credit enhancement arrangements.

(5) Represents the remaining UPB of assets held by non-consolidated VIEs using the most current information available, where our continuing involvement is significant. We do not include the assets of our non-consolidated trusts related to single-family REMICs and Other Structured Securities in this amount as we already consolidate the underlying collateral of these trusts on our consolidated balance sheets.

*Asset-Backed Investment Trusts*

We invest in a variety of short-term non-mortgage-related, asset-backed investment trusts. These short-term investments represent interests in trusts consisting of a pool of receivables or other financial assets, typically credit card receivables, auto loans, or student loans. These trusts act as vehicles to allow originators to securitize assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011        TREASURY-2234        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the deal create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our asset-backed investments.

At September 30, 2011 and December 31, 2010, we had investments in 10 and 23 asset-backed investment trusts in which we had a variable interest but were not considered the primary beneficiary, respectively. Our investments in these asset-backed investment trusts as of September 30, 2011 were made in 2010 and 2011. At both September 30, 2011 and December 31, 2010, we were not the primary beneficiary of any such trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. As such, our investments in these asset-backed investment trusts are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report. Our investments in these trusts totaled $2.2 billion and $10.0 billion as of September 30, 2011 and December 31, 2010, respectively, and are included as cash and cash equivalents, available-for-sale securities or trading securities on our consolidated balance sheets. At both September 30, 2011 and December 31, 2010, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment.

**Mortgage-Related Security Trusts**

*Freddie Mac Securities*

Freddie Mac securities related to our variable interests in non-consolidated VIEs primarily consist of our REMICs and Other Structured Securities and Other Guarantee Transactions. REMICs and Other Structured Securities are created by using PCs or previously issued REMICs and Other Structured Securities as collateral. Our involvement with the resecuritization trusts that issue these securities does not provide us with rights to receive benefits or obligations to absorb losses nor does it provide any power that would enable us to direct the most significant activities of these VIEs because the ultimate underlying assets are PCs for which we have already provided a guarantee (*i.e.*, all significant rights, obligations and powers are associated with the underlying PC trusts). As a result, we have concluded that we are not the primary beneficiary of these resecuritization trusts.

Other Guarantee Transactions are created by using non-Freddie Mac mortgage-related securities as collateral. At both September 30, 2011 and December 31, 2010, our involvement with certain Other Guarantee Transactions does not provide us with the power to direct the activities that most significantly impact the economic performance of these VIEs. As a result, we hold a variable interest in, but are not the primary beneficiary of, certain Other Guarantee Transactions.

For non-consolidated REMICs and Other Structured Securities and Other Guarantee Transactions, our investments are primarily included in either available-for-sale securities or trading securities on our consolidated balance sheets. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

*Non-Freddie Mac Securities*

We invest in a variety of mortgage-related securities issued by third-parties, including non-Freddie Mac agency securities, CMBS, other private-label securities backed by various mortgage-related assets, and obligations of states and political subdivisions. These investments typically represent interests in trusts that consist of a pool of mortgage-related assets and act as vehicles to allow originators to securitize those assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the deal create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our non-Freddie Mac securities.

Our investments in these non-Freddie Mac securities at September 30, 2011 were made between 1994 and 2011. We are not generally the primary beneficiary of non-Freddie Mac securities trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. We were not the primary beneficiary of any significant non-Freddie Mac securities trusts as of September 30, 2011 and December 31, 2010. Our investments in non-consolidated non-Freddie Mac mortgage-related securities are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report. At both September 30, 2011 and December 31, 2010, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment. Our

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2236                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

**Unsecuritized Multifamily Loans**

We purchase loans made to various multifamily real estate entities. We primarily purchase such loans for securitization, and to a lesser extent, investment purposes. These real estate entities are primarily single-asset entities (typically partnerships or limited liability companies) established to acquire, construct, rehabilitate, or refinance residential properties, and subsequently to operate the properties as residential rental real estate. The loans we acquire usually make up 80% or less of the value of the related underlying property at origination. The remaining 20% of value is typically funded through equity contributions by the partners or members of the borrower entity. In certain cases, the 20% not funded through the loan we acquire also includes subordinate loans or mezzanine financing from third-party lenders.

We held more than 7,000 unsecuritized multifamily loans at both September 30, 2011 and December 31, 2010. The UPB of our investments in these loans was $81.6 billion and $85.9 billion as of September 30, 2011 and December 31, 2010, respectively, and was included in unsecuritized held-for-investment mortgage loans, at amortized cost, and held-for-sale mortgage loans at fair value on our consolidated balance sheets. We are not generally the primary beneficiary of the multifamily real estate borrowing entities because the loans we acquire are passive in nature and do not provide us with the power to direct the activities of these entities that most significantly impact their economic performance. However, when a multifamily loan becomes delinquent, we may become the primary beneficiary of the borrowing entity depending upon the structure of this entity and the rights granted to us under the governing legal documents. At September 30, 2011 and December 31, 2010, the amount of loans for which we could be considered the primary beneficiary of the underlying borrowing entity was not material. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2010 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for more information.

**_Other_**

Our involvement with other VIEs includes our investments in LIHTC partnerships, certain other mortgage-related guarantees, and certain short-term default and other guarantee commitments that we account for as derivatives:

- _Investments in LIHTC Partnerships:_  We hold equity investments in various LIHTC partnerships that invest in lower-tier or project partnerships that are single asset entities. In February 2010, the Acting Director of FHFA, after consultation with Treasury, informed us that we may not sell or transfer our investments in LIHTC assets and that he sees no other disposition options. As a result, we wrote down the carrying value of our LIHTC investments to zero as of December 31, 2009, as we will not be able to realize any value from these investments either through reductions to our taxable income and related tax liabilities or through a sale to a third party.

- _Certain other mortgage-related guarantees:_  We have other guarantee commitments outstanding on multifamily housing revenue bonds that were issued by third parties. As part of certain other mortgage-related guarantees, we also provide commitments to advance funds, commonly referred to as "liquidity guarantees," which require us to advance funds to enable third parties to purchase variable-rate multifamily housing revenue bonds, or certificates backed by such bonds, that cannot be remarketed within five business days after they are tendered by their holders.

- _Certain short-term default and other guarantee commitments accounted for as derivatives_: Our involvement in these VIEs includes our guarantee of the performance of interest-rate swap contracts in certain circumstances and credit derivatives we issued to guarantee the payments on multifamily loans or securities.

At September 30, 2011 and December 31, 2010, we were the primary beneficiary of one and three, respectively, credit-enhanced multifamily housing revenue bonds that were not deemed to be material. We were not the primary beneficiary of the remainder of other VIEs because our involvement in these VIEs is passive in nature and does not provide us with the power to direct the activities of the VIEs that most significantly impact their economic performance. See Table 3.2 for the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in these non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Also see "NOTE 9: FINANCIAL GUARANTEES" for additional information about our involvement with the VIEs related to mortgage-related guarantees and short-term default and other guarantee commitments discussed above.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                TREASURY-2237                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES

We own both single-family mortgage loans, which are secured by one to four family residential properties, and multifamily mortgage loans, which are secured by properties with five or more residential rental units. For a discussion of our significant accounting policies regarding our mortgage loans and loan loss reserves, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

Table 4.1 summarizes the types of loans on our consolidated balance sheets as of September 30, 2011 and December 31, 2010.

### Table 4.1 — Mortgage Loans

| | September 30, 2011 | | | December 31, 2010 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Unsecuritized | Held by Consolidated Trusts | Total | Unsecuritized | Held by Consolidated Trusts | Total |
| | (in millions) | | | | | |
| Single-family:[1] | | | | | | |
| Fixed-rate | | | | | | |
| Amortizing | $ 142,089 | $1,464,388 | $ 1,606,477 | $ 126,561 | $ 1,493,206 | $ 1,619,767 |
| Interest-only | 3,313 | 15,841 | 19,154 | 4,161 | 19,616 | 23,777 |
| Total fixed-rate | 145,402 | 1,480,229 | 1,625,631 | 130,722 | 1,512,822 | 1,643,544 |
| Adjustable-rate | | | | | | |
| Amortizing | 3,535 | 66,807 | 70,342 | 3,625 | 59,851 | 63,476 |
| Interest-only | 11,006 | 46,533 | 57,539 | 13,018 | 58,792 | 71,810 |
| Total adjustable-rate | 14,541 | 113,340 | 127,881 | 16,643 | 118,643 | 135,286 |
| Other Guarantee Transactions backed by non-Freddie Mac securities | — | 13,415 | 13,415 | — | 15,580 | 15,580 |
| FHA/VA and other governmental | 1,409 | 3,381 | 4,790 | 1,498 | 3,348 | 4,846 |
| Total single-family | 161,352 | 1,610,365 | 1,771,717 | 148,863 | 1,650,393 | 1,799,256 |
| Multifamily:[1] | | | | | | |
| Fixed-rate | 68,288 | — | 68,288 | 72,679 | — | 72,679 |
| Adjustable-rate | 13,300 | — | 13,300 | 13,201 | — | 13,201 |
| Other governmental | 3 | — | 3 | 3 | — | 3 |
| Total multifamily | 81,591 | — | 81,591 | 85,883 | — | 85,883 |
| Total UPB of mortgage loans | 242,943 | 1,610,365 | 1,853,308 | 234,746 | 1,650,393 | 1,885,139 |
| Deferred fees, unamortized premiums, discounts and other cost basis adjustments | (6,611) | 9,911 | 3,300 | (7,665) | 7,423 | (242) |
| Lower of cost or fair value adjustments on loans held-for-sale[2] | 173 | — | 173 | (311) | — | (311) |
| Allowance for loan losses on mortgage loans held-for-investment | (30,848) | (8,696) | (39,544) | (28,047) | (11,644) | (39,691) |
| Total mortgage loans, net | $ 205,657 | $ 1,611,580 | $1,817,237 | $ 198,723 | $1,646,172 | $1,844,895 |
| Mortgage loans, net: | | | | | | |
| Held-for-investment | $ 199,382 | $ 1,611,580 | $1,810,962 | $ 192,310 | $1,646,172 | $1,838,482 |
| Held-for-sale | 6,275 | — | 6,275 | 6,413 | — | 6,413 |
| Total mortgage loans, net | $ 205,657 | $ 1,611,580 | $1,817,237 | $ 198,723 | $1,646,172 | $1,844,895 |

(1) Based on UPB and excluding mortgage loans traded, but not yet settled.
(2) Consists of fair value adjustments associated with mortgage loans for which we have made a fair value election.

We purchased UPB of $69.9 billion of single-family mortgage loans and $0.7 billion of multifamily loans that were classified as held-for-investment at purchase in the three months ended September 30, 2011. We purchased UPB of $227.9 billion of single-family mortgage loans and $2.3 billion of multifamily loans that were classified as held-for-investment at purchase in the nine months ended September 30, 2011. Our sales of multifamily mortgage loans occur primarily through the issuance of multifamily Other Guarantee Transactions. See "NOTE 9: FINANCIAL GUARANTEES" for more information. We did not sell a significant amount of held-for-investment loans during the three and nine months ended September 30, 2011. We did not have significant reclassifications of mortgage loans into held-for-sale in the three and nine months ended September 30, 2011.

### Credit Quality of Mortgage Loans

We evaluate the credit quality of single-family loans using different criteria than the criteria we use to evaluate multifamily loans. The current LTV ratio is one key factor we consider when estimating our loan loss reserves for single-family loans. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2238                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may not be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

more likely to default than other borrowers. A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of September 30, 2011 and December 31, 2010, approximately 15% and 14%, respectively, of loans in our single-family credit guarantee portfolio had second lien financing at the time of origination of the first mortgage, and we estimate that these loans comprised 18% and 19%, respectively, of our seriously delinquent loans, based on UPB. However, borrowers are free to obtain second lien financing after origination, and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

Table 4.2 presents information on the estimated current LTV ratios of single-family loans on our consolidated balance sheets, all of which are held-for-investment. Our current LTV ratio estimates are based on available data through the end of each respective period.

## Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio

| | As of September 30, 2011 | | | | As of December 31, 2010 | | | |
| | Estimated Current LTV Ratio[1] | | | | Estimated Current LTV Ratio[1] | | | |
| | <= 80 | > 80 – 100 | > 100[2] | Total | <= 80 | > 80 – 100 | > 100[2] | Total |
| | (in millions) | | | | | | | |
| Single-family loans: | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[3] | $676,849 | $383,667 | $246,662 | $1,307,178 | $ 704,882 | $393,853 | $216,388 | $ 1,315,123 |
| 15-year amortizing fixed-rate | 236,370 | 16,447 | 2,948 | 255,765 | 233,422 | 16,432 | 2,523 | 252,377 |
| Adjustable-rate[3][4] | 42,745 | 12,820 | 9,398 | 64,963 | 34,252 | 13,273 | 9,149 | 56,674 |
| Alt-A, interest-only, and option ARM[5] | 33,552 | 31,899 | 81,651 | 147,102 | 45,068 | 44,540 | 85,213 | 174,821 |
| Total single-family loans | $989,516 | $444,833 | $340,659 | 1,775,008 | $1,017,624 | $468,098 | $ 313,273 | 1,798,995 |
| Multifamily loans | | | | 75,498 | | | | 79,178 |
| Total recorded investment of held-for-investment loans | | | | $1,850,506 | | | | $1,878,173 |

(1) The current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since that time. The value of a property at origination is based on the sales price for purchase mortgages and third-party appraisal for refinance mortgages. Changes in market value are derived from our internal index which measures price changes for repeat sales and refinancing activity on the same properties using Freddie Mac and Fannie Mae single-family mortgage acquisitions, including foreclosure sales. Estimates of the current LTV ratio include the credit-enhanced portion of the loan and exclude any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.

(2) The serious delinquency rate for the total of single-family mortgage loans with estimated current LTV ratios in excess of 100% was 12.7% and 14.9% as of September 30, 2011 and December 31, 2010, respectively.

(3) The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate for presentation even though they have a one-time rate adjustment provision, because the change in rate is determined at the time of the modification rather than at a future date.

(4) Includes balloon/reset mortgage loans and excludes option ARMs.

(5) We discontinued purchases of Alt-A loans on March 1, 2009 (or later, as customers' contracts permitted), and interest-only loans effective September 1, 2010, and have not purchased option ARM loans since 2007. Modified loans within the Alt-A category remain as such, even though the borrower may have provided full documentation of assets and income to complete the modification. Modified loans within the option ARM category remain as such even though the modified loan no longer provides for optional payment provisions.

For information about the payment status of single-family and multifamily mortgage loans, including the amount of such loans we deem impaired, see "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS." For a discussion of certain indicators of credit quality for the multifamily loans on our consolidated balance sheets, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Multifamily Mortgage Portfolio."

### Allowance for Loan Losses and Reserve for Guarantee Losses, or Loan Loss Reserve

We maintain an allowance for loan losses on mortgage loans that we classify as held-for-investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage-related securities backed by multifamily loans, certain single-family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk.

During the second quarter of 2010, we identified a backlog related to the processing of loan workouts reported to us by our servicers, principally loan modifications and short sales, which impacted our allowance for loan losses. For additional information, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Basis of Presentation — *Out-of-Period Accounting Adjustment*" in our 2010 Annual Report.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011        TREASURY-2239        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 4.3 summarizes loan loss reserve activity.

## Table 4.3 — Detail of Loan Loss Reserves

### Three Months Ended September 30,

| | 2011 | | | | 2010 | | | |
| | Allowance for Loan Losses | | | | Allowance for Loan Losses | | | |
| | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses(1) | Total | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses(1) | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | (in millions) | | | |
| **Single-family:** | | | | | | | | |
| Beginning balance | $ 29,283 | $ 8,948 | $ 159 | $ 38,390 | $ 22,787 | $ 14,476 | $ 121 | $ 37,384 |
| Provision for credit losses | 1,597 | 2,051 | (5) | 3,643 | 1,513 | 2,185 | 10 | 3,708 |
| Charge-offs(3) | (1,446) | (275) | (2) | (3,723) | (4,363) | (414) | (3) | (4,780) |
| Recoveries(3) | 549 | 60 | — | 609 | 912 | 145 | — | 1,057 |
| Transfers, net(4)(5) | 2,259 | (2,088) | (2) | 169 | 3,469 | (3,164) | (9) | 296 |
| Ending balance | 30,242 | 8,696 | 150 | 39,088 | 24,318 | 13,228 | 119 | 37,665 |
| **Multifamily:** | | | | | | | | |
| Beginning balance | $ 636 | $ — | $ 69 | $ 705 | $ 879 | $ — | $ 56 | $ 935 |
| Provision (benefit) for credit losses | (22) | — | (15) | (37) | (1) | — | 20 | 19 |
| Charge-offs(3) | (8) | — | — | (8) | (23) | — | — | (23) |
| Transfers, net(5) | — | — | (4) | (4) | — | — | — | — |
| Ending balance | 606 | — | 50 | 656 | 855 | — | 76 | 931 |
| **Total:** | | | | | | | | |
| Beginning balance | $ 29,919 | $ 8,948 | $ 228 | $ 39,095 | $ 23,666 | $ 14,476 | $ 177 | $ 38,319 |
| Provision for credit losses | 1,575 | 2,051 | (20) | 3,606 | 1,512 | 2,185 | 30 | 3,727 |
| Charge-offs(3) | (3,454) | (275) | (2) | (3,731) | (4,386) | (414) | (3) | (4,803) |
| Recoveries(3) | 549 | 60 | — | 609 | 912 | 145 | — | 1,057 |
| Transfers, net(4)(5) | 2,259 | (2,088) | (6) | 165 | 3,469 | (3,164) | (9) | 296 |
| Ending balance | 30,848 | 8,696 | 200 | 39,744 | 25,173 | 13,228 | 195 | 38,596 |

### Nine Months Ended September 30,

| | 2011 | | | | 2010 | | | |
| | Allowance for Loan Losses | | | | Allowance for Loan Losses | | | |
| | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses(1) | Total | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses(1) | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | (in millions) | | | |
| **Single-family:** | | | | | | | | |
| Beginning balance | $ 27,317 | $ 11,644 | $ 137 | $ 39,098 | $ 693 | $ — | $ 32,333 | $ 33,026 |
| Adjustments to beginning balance(2) | | | | | | 32,006 | (32,192) | (186) |
| Provision for credit losses | 2,322 | 5,885 | 27 | 8,234 | 6,035 | 7,930 | 20 | 13,985 |
| Charge-offs(3) | (10,320) | (712) | (6) | (11,038) | (9,605) | (2,937) | (8) | (12,550) |
| Recoveries(3) | 1,986 | 107 | — | 2,093 | 1,878 | 567 | — | 2,445 |
| Transfers, net(4)(5) | 8,937 | (8,228) | (8) | 701 | 25,317 | (24,338) | (34) | 945 |
| Ending balance | 30,242 | 8,696 | 150 | 39,088 | 24,318 | 13,228 | 119 | 37,665 |
| **Multifamily:** | | | | | | | | |
| Beginning balance | $ 730 | $ — | $ 98 | $ 828 | $ 748 | $ — | $ 83 | $ 831 |
| Provision (benefit) for credit losses | (75) | — | (35) | (110) | 175 | — | (8) | 167 |
| Charge-offs(3) | (49) | — | — | (49) | (68) | — | — | (68) |
| Transfers, net(5) | — | — | (13) | (13) | — | — | 1 | 1 |
| Ending balance | 606 | — | 50 | 656 | 855 | — | 76 | 931 |
| **Total:** | | | | | | | | |
| Beginning balance | $ 28,047 | $ 11,644 | $ 235 | $ 39,926 | $ 1,441 | $ — | $ 32,416 | $ 33,857 |
| Adjustments to beginning balance(2) | | | | | | 32,006 | (32,192) | (186) |
| Provision for credit losses | 2,247 | 5,885 | (8) | 8,124 | 6,210 | 7,930 | 12 | 14,152 |
| Charge-offs(3) | (10,369) | (712) | (6) | (11,087) | (9,673) | (2,937) | (8) | (12,618) |
| Recoveries(3) | 1,986 | 107 | — | 2,093 | 1,878 | 567 | — | 2,445 |
| Transfers, net(4)(5) | 8,937 | (8,228) | (21) | 688 | 25,317 | (24,338) | (33) | 946 |
| Ending balance | 30,848 | 8,696 | 200 | 39,744 | 25,173 | 13,228 | 195 | 38,596 |

| | 2011 | 2010 |
|---|---|---|
| Total loan loss reserve as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | 2.06% | 1.94% |

(1)  All of these loans are collectively evaluated for impairments.  Beginning January 1, 2010, our reserve for guarantee losses  is included in other liabilities.

(2)  Adjustments relate to the adoption of the accounting guidance  for transfers of financial assets and consolidation of VIEs. See  "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information.

(3)  Charge-offs represent the carrying amount of a loan that has  been discharged to remove the loan from our consolidated balance  sheet principally due to either foreclosure transfers or short sales. Charge-offs exclude $108 million and $156 million for the three months ended September 30, 2011 and 2010, respectively, related to certain loans purchased under financial guarantees and recorded as losses on loans purchased within other expenses on our consolidated statements of  income and comprehensive income. Charge-offs exclude $317 million and $417 million for the nine months  ended September 30, 2011 and 2010, respectively, related to certain loans purchased under financial guarantees and recorded  as losses on loans purchased within other expenses on our consolidated statements of income and comprehensive income. Recoveries of charge-offs primarily result from foreclosure transfers and short sales on loans where a share of default risk  has been assumed by mortgage insurers, servicers or other third parties through credit enhancements.

(4)  In February 2010, we announced that we would purchase  substantially all single-family mortgage loans that are  120 days or more delinquent from our PC trusts. We purchased $9.5 billion and $16.2 billion in UPB of loans from PC trusts during the three months  ended  September 30, 2011 and 2010, respectively. We purchased $34.8 billion and $113.0 billion in UPB of loans from PC trusts during the nine months ended September 30, 2011 and 2010, respectively. As a result of these purchases, related amounts of our loan loss reserves were transferred from the  allowance for loan losses — held by consolidated trusts and the reserve for guarantee losses into the allowance for loan losses — unsecuritized. We record charge-offs and recoveries on loans held by consolidated trusts when a loss event (such as a short sale or foreclosure) occurs on a loan  held in a consolidated trust prior to that loan reaching 120 days past due.

(5)  Consist primarily of: (a) approximately $2.1 billion and $3.1 billion during the three months ended September 30, 2011 and 2010, respectively, and $8.2 billion and $24.5 billion during the nine months ended September 30, 2011 and 2010, respectively, of reclassified single-family reserves related to our purchases during the periods of loans previously held by consolidated trusts (as discussed in footnote (4) above); (b) amounts related to agreements with seller/servicers  where the transfer represents recoveries received under these  agreements to compensate us for previously incurred and  recognized losses; (c) the transfer of a proportional amount of the recognized reserves for guarantee losses  associated with loans purchased from non-consolidated Freddie  Mac mortgage-related securities and other guarantee commitments; and (d) net amounts attributable to recapitalization of  past due interest on modified mortgage loans.

121

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2240                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 4.4 presents our allowance for loan losses and our recorded investment in mortgage loans, held-for-investment, by impairment evaluation methodology.

### Table 4.4 — Net Investment in Mortgage Loans

| | September 30, 2011 | | | December 31, 2010 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Single-family | Multifamily | Total | Single-family | Multifamily | Total |
| | (in millions) | | | | | |
| *Recorded investment:* | | | | | | |
| Collectively evaluated | $1,717,932 | $ 72,622 | $1,790,554 | $ 1,762,490 | $ 76,541 | $ 1,839,031 |
| Individually evaluated | 57,076 | 2,876 | 59,952 | 36,505 | 2,637 | 39,142 |
| Total recorded investment | 1,775,008 | 75,498 | 1,850,506 | 1,798,995 | 79,178 | 1,878,173 |
| *Ending balance of the allowance for loan losses:* | | | | | | |
| Collectively evaluated | (24,451) | (323) | (24,774) | (30,477) | (382) | (30,859) |
| Individually evaluated | (14,487) | (283) | (14,770) | (8,484) | (348) | (8,832) |
| Total ending balance of the allowance | (38,938) | (606) | (39,544) | (38,961) | (730) | (39,691) |
| Net investment in mortgage loans | $1,736,070 | $ 74,892 | $1,810,962 | $ 1,760,034 | $ 78,448 | $1,838,482 |

A significant number of unsecuritized single-family mortgage loans on our consolidated balance sheets are individually evaluated for impairment and substantially all single-family mortgage loans held by our consolidated trusts are collectively evaluated for impairment. The ending balance of the allowance for loan losses associated with our held-for-investment unsecuritized mortgage loans represented approximately 13.4% and 12.7% of the recorded investment in such loans at September 30, 2011 and December 31, 2010, respectively. The ending balance of the allowance for loan losses associated with mortgage loans held by our consolidated trusts represented approximately 0.5% and 0.7% of the recorded investment in such loans as of September 30, 2011 and December 31, 2010, respectively.

### Credit Protection and Other Forms of Credit Enhancement

In connection with many of our mortgage loans held-for-investment and other mortgage-related guarantees, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancements.

Table 4.5 presents the UPB of loans on our consolidated balance sheets or underlying our financial guarantees with credit protection and the maximum amounts of potential loss recovery by type of credit protection.

### Table 4.5 — Recourse and Other Forms of Credit Protection[1]

| | UPB at | | Maximum Coverage[2] at | |
| --- | --- | --- | --- | --- |
| | September 30, 2011 | December 31, 2010 | September 30, 2011 | December 31, 2010 |
| | (in millions) | | | |
| Single-family: | | | | |
| Primary mortgage insurance | $ 206,912 | $ 217,133 | $ 50,611 | $ 52,899 |
| Lender recourse and indemnifications | 8,978 | 10,064 | 8,736 | 9,566 |
| Pool insurance | 31,693 | 37,868 | 2,474 | 2,966 |
| HFA indemnification[3] | 8,885 | 9,322 | 3,110 | 3,263 |
| Subordination[4] | 3,359 | 3,889 | 683 | 825 |
| Other credit enhancements | 132 | 223 | 107 | 118 |
| Total | $ 259,959 | $ 278,499 | $ 65,721 | $ 69,637 |
| Multifamily: | | | | |
| HFA indemnification[3] | $ 1,449 | $ 1,551 | $ 507 | $ 543 |
| Subordination[4] | 20,766 | 12,252 | 2,860 | 1,414 |
| Other credit enhancements | 8,474 | 9,004 | 2,642 | 2,930 |
| Total | $ 30,689 | $ 22,807 | $ 6,009 | $ 4,887 |

(1) Includes the credit protection associated with unsecuritized mortgage loans, loans held by our consolidated trusts as well as our non-consolidated mortgage guarantees and excludes FHA/VA and other governmental loans. Except for subordination coverage, these amounts exclude credit protection associated with $17.3 billion and $19.8 billion in UPB of single-family loans underlying Other Guarantee Transactions as of September 30, 2011 and December 31, 2010, respectively, for which the information was not available.

(2) Except for subordination, this represents the remaining amount of loss recovery that is available subject to terms of counterparty agreements.

(3) Represents the amount of potential reimbursement of losses on securities we have guaranteed that are backed by state and local HFA bonds, under which Treasury bears initial losses on these securities up to 35% of those issued under the HFA initiative on a combined basis. Treasury will also bear losses of unpaid interest.

(4) Represents Freddie Mac issued mortgage-related securities with subordination protection, excluding those backed by HFA bonds. Excludes mortgage-related securities where subordination coverage was exhausted or maximum coverage amounts were limited to the remaining UPB at that date. Prior period amounts have been revised to conform to current period presentation.

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. Pool insurance contracts generally provide insurance on a group, or pool, of mortgage loans up to a stated aggregate loss limit. We did not buy pool insurance during the nine

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2241                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

months ended September 30, 2011. In recent periods, we also reached the maximum limit of recovery on certain of these contracts.

We also have credit protection for certain of the mortgage loans on our consolidated balance sheets that are covered by insurance or partial guarantees issued by federal agencies (such as FHA, VA, and USDA). The total UPB of these loans was $4.8 billion as of both September 30, 2011 and December 31, 2010.

## NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS

**Individually Impaired Loans**

Individually impaired single-family loans include performing and non-performing TDRs, as well as loans acquired under our financial guarantees with deteriorated credit quality. Individually impaired multifamily loans include TDRs, loans three monthly payments or more past due, and loans that are impaired based on management judgment. For a discussion of our significant accounting policies regarding impaired and non-performing loans, which are applied consistently for multifamily loans and single-family loan classes, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

Total loan loss reserves consist of a specific valuation allowance related to individually impaired mortgage loans, and a general reserve for other probable incurred losses. Our recorded investment in individually impaired mortgage loans and the related specific valuation allowance are summarized in Table 5.1 by product class (for single-family loans).

**Table 5.1 — Individually Impaired Loans**

| | Balance at September 30, 2011 | | | | For the Three Months Ended September 30, 2011 | | For the Nine Months Ended September 30, 2011 | |
|---|---|---|---|---|---|---|---|---|
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized | Average Recorded Investment | Interest Income Recognized |
| | | | | (in millions) | | | | |
| Single-family — | | | | | | | | |
| *With no specific allowance recorded*(1): | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 7,341 | $ 3,298 | $ — | $ 3,298 | $ 3,332 | $ 84 | $ 3,406 | $ 256 |
| 15-year amortizing fixed-rate(2) | 102 | 43 | — | 43 | 44 | 2 | 45 | 5 |
| Adjustable rate(3) | 15 | 7 | — | 7 | 7 | — | 7 | — |
| Alt-A, interest-only, and option ARM(4) | 2,085 | 921 | — | 921 | 932 | 16 | 967 | 55 |
| Total with no specific allowance recorded | $ 9,543 | $ 4,269 | $ — | $ 4,269 | $ 4,315 | $ 102 | $ 4,425 | $ 316 |
| *With specific allowance recorded:* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 42,066 | $ 40,939 | $ (10,774) | $ 30,165 | $ 40,035 | $ 268 | $ 33,172 | $ 596 |
| 15-year amortizing fixed-rate(2) | 396 | 370 | (40) | 330 | 337 | 4 | 208 | 8 |
| Adjustable rate(3) | 273 | 260 | (55) | 205 | 234 | 2 | 139 | 3 |
| Alt-A, interest-only, and option ARM(4) | 11,556 | 11,238 | (3,618) | 7,620 | 10,766 | 58 | 8,763 | 110 |
| Total with specific allowance recorded | $ 54,291 | $ 52,807 | $ (14,487) | $ 38,320 | $ 51,372 | $ 332 | $ 42,282 | $ 717 |
| *Combined single-family:* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 49,407 | $ 44,237 | $ (10,774) | $ 33,463 | $ 43,367 | $ 351 | $ 36,578 | $ 852 |
| 15-year amortizing fixed-rate(2) | 498 | 413 | (40) | 373 | 381 | 6 | 253 | 13 |
| Adjustable rate(3) | 288 | 267 | (55) | 212 | 241 | 2 | 146 | 3 |
| Alt-A, interest-only, and option ARM(4) | 13,641 | 12,159 | (3,618) | 8,541 | 11,698 | 75 | 9,730 | 165 |
| Total single-family | 63,834 | 57,076 | (14,487) | 42,589 | 55,687 | 434 | 46,707 | 1,033 |
| Total multifamily | 2,898 | 2,876 | (283) | 2,593 | 2,878 | 37 | 3,247 | 109 |
| Total single-family and multifamily | $ 66,732 | $ 59,952 | $ (14,770) | $ 45,182 | $ 58,565 | $ 471 | $ 49,954 | $ 1,142 |

TREASURY-2242

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

|  | Balance at December 31, 2010 | | | |
|  | UPB | Recorded Investment | Associated Allowance | Net Investment |
|  | | | (in millions) | |
| Single-family — | | | | |
| *With no specific allowance recorded*[1] | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 8,462 | $ 3,721 | $ — | $ 3,721 |
| 15-year amortizing fixed-rate[2] | 119 | 50 | — | 50 |
| Adjustable rate[3] | 20 | 9 | — | 9 |
| Alt-A, interest-only, and option ARM[4] | 2,525 | 1,098 | — | 1,098 |
| Total with no specific allowance recorded | $ 11,126 | $ 4,878 | $ — | $ 4,878 |
| *With specific allowance recorded:* | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 25,504 | $ 24,502 | $ (6,283) | $ 18,219 |
| 15-year amortizing fixed-rate[2] | 229 | 198 | (17) | 181 |
| Adjustable rate[3] | 168 | 153 | (23) | 130 |
| Alt-A, interest-only, and option ARM[4] | 7,035 | 6,774 | (2,161) | 4,613 |
| Total with specific allowance recorded | $32,936 | $ 31,627 | $(8,484) | $ 23,143 |
| *Combined single-family:* | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $33,966 | $28,223 | $ (6,283) | $ 21,940 |
| 15-year amortizing fixed-rate[2] | 348 | 248 | (17) | 231 |
| Adjustable rate[3] | 188 | 162 | (23) | 139 |
| Alt-A, interest-only, and option ARM[4] | 9,560 | 7,872 | (2,161) | 5,711 |
| Total single-family | 44,062 | 36,505 | (8,484) | 28,021 |
| Total multifamily | 2,661 | 2,637 | (348) | 2,289 |
| Total single-family and multifamily | $46,723 | $ 39,142 | $(8,832) | $ 30,310 |

(1) Individually impaired loans with no specific related valuation allowance primarily represent mortgage loans purchased out of PC pools and accounted for in accordance with the accounting guidance for loans and debt securities acquired with deteriorated credit quality that have not experienced further deterioration.

(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

(3) Includes balloon/reset mortgage loans and excludes option ARMs.

(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

The average recorded investment in individually impaired loans for the three and nine months ended September 30, 2010 was approximately $31.9 billion and $25.0 billion, respectively. We recognized interest income on individually impaired loans of $338 million and $860 million for the three and nine months ended September 30, 2010, respectively. Interest income foregone on individually impaired loans was approximately $441 million and $193 million for the three months ended September 30, 2011 and 2010, respectively. Interest income foregone on individually impaired loans was approximately $1.1 billion and $532 million for the nine months ended September 30, 2011 and 2010, respectively.

**Mortgage Loan Performance**

We do not accrue interest on loans three months or more past due or if the loan is in the process of foreclosure.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2243                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 5.2 presents the recorded investment of our single-family and multifamily mortgage loans, held-for-investment, by payment status.

**Table 5.2 — Payment Status of Mortgage Loans(1)**

| | September 30, 2011 | | | | | |
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 1,227,293 | $ 24,503 | $ 9,204 | $ 46,178 | $ 1,307,178 | $ 46,058 |
| 15-year amortizing fixed-rate(2) | 252,486 | 1,487 | 381 | 1,411 | 255,765 | 1,405 |
| Adjustable-rate(3) | 62,061 | 725 | 277 | 1,900 | 64,963 | 1,896 |
| Alt-A, interest-only, and option ARM(4) | 116,354 | 4,763 | 2,326 | 23,659 | 147,102 | 23,625 |
| Total single-family | 1,658,194 | 31,478 | 12,188 | 73,148 | 1,775,008 | 72,984 |
| Total multifamily | 75,353 | 2 | 17 | 126 | 75,498 | 1,916 |
| Total single-family and multifamily | $ 1,733,547 | $ 31,480 | $ 12,205 | $ 73,274 | $ 1,850,506 | $ 74,900 |

| | December 31, 2010 | | | | | |
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 1,226,874 | $ 26,442 | $ 10,203 | $ 51,604 | $ 1,315,123 | $ 51,507 |
| 15-year amortizing fixed-rate(2) | 248,572 | 1,727 | 450 | 1,628 | 252,377 | 1,622 |
| Adjustable-rate(3) | 53,205 | 826 | 335 | 2,308 | 56,674 | 2,303 |
| Alt-A, interest-only, and option ARM(4) | 137,395 | 5,701 | 3,046 | 28,679 | 174,821 | 28,620 |
| Total single-family | 1,666,046 | 34,696 | 14,034 | 84,219 | 1,798,995 | 84,052 |
| Total multifamily | 79,044 | 41 | 7 | 86 | 79,178 | 1,751 |
| Total single-family and multifamily | $ 1,745,090 | $ 34,737 | $ 14,041 | $ 84,305 | $ 1,878,173 | $ 85,803 |

(1) Based on recorded investment in the loan. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as past due as long as the borrower is current under the modified terms. The payment status of a loan may be affected by temporary timing differences, or lags, in the reporting of this information to us by our servicers.
(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."
(3) Includes balloon/reset mortgage loans and excludes option ARMs.
(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

We have the option under our PC agreements to purchase mortgage loans from the loan pools that underlie our PCs under certain circumstances to resolve an existing or impending delinquency or default. Since the first quarter of 2010, our practice generally results in our purchase of loans from PC trusts when the loans have been delinquent for four months or more. As of September 30, 2011, there were $3.0 billion in UPB of loans underlying our PCs that were four monthly payments past due, and that met our purchase criteria. Generally, we purchase these delinquent loans, and thereby extinguish the related PC debt, at the next scheduled PC payment date, unless the loans proceed to foreclosure transfer, complete a foreclosure alternative or are paid in full by the borrower before such date.

When we purchase mortgage loans from consolidated trusts, we reclassify the loans from mortgage loans held-for-investment by consolidated trusts to unsecuritized mortgage loans held-for-investment and record an extinguishment of the corresponding portion of the debt securities of the consolidated trusts. We purchased $9.5 billion and $16.2 billion in UPB of loans from PC trusts during the three months ended September 30, 2011 and 2010, respectively. We purchased $34.8 billion and $113.0 billion in UPB of loans from PC trusts during the nine months ended September 30, 2011 and 2010, respectively.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.
Powered by Morningstar® Document Research℠

TREASURY-2244

Table of Contents

Table 5.3 summarizes the delinquency rates of mortgage loans within our single-family credit guarantee and multifamily mortgage portfolios.

## Table 5.3 — Delinquency Rates[1]

| | September 30, 2011 | | December 31, 2010 | |
|---|---|---|---|---|
| Delinquencies: | | | | |
| *Single-family:* | | | | |
| Non-credit-enhanced portfolio: | | | | |
| Serious delinquency rate | | 2.72% | | 2.97% |
| Total number of seriously delinquent loans | | 269,081 | | 296,397 |
| Credit-enhanced portfolio: | | | | |
| Serious delinquency rate | | 7.27% | | 7.83% |
| Total number of seriously delinquent loans | | 124,316 | | 144,116 |
| Total portfolio, excluding Other Guarantee Transactions | | | | |
| Serious delinquency rate | | 3.39% | | 3.73% |
| Total number of seriously delinquent loans | | 393,397 | | 440,513 |
| Other Guarantee Transactions:[2] | | | | |
| Serious delinquency rate | | 10.25% | | 9.86% |
| Total number of seriously delinquent loans | | 20,462 | | 21,926 |
| Total single-family: | | | | |
| Serious delinquency rate | | 3.51% | | 3.84% |
| Total number of seriously delinquent loans | | 413,859 | | 462,439 |
| *Multifamily:[3]* | | | | |
| Non-credit-enhanced portfolio: | | | | |
| Delinquency rate | | 0.18% | | 0.12% |
| UPB of delinquent loans (in millions) | $ | 152 | $ | 106 |
| Credit-enhanced portfolio: | | | | |
| Delinquency rate | | 0.77% | | 0.85% |
| UPB of delinquent loans (in millions) | $ | 225 | $ | 182 |
| Total Multifamily: | | | | |
| Delinquency rate | | 0.33% | | 0.26% |
| UPB of delinquent loans (in millions) | $ | 377 | $ | 288 |

(1) Single-family mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as seriously delinquent if the borrower is less than three monthly payments past due under the modified terms. Serious delinquencies on single-family mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice.

(2) Other Guarantee Transactions generally have underlying mortgage loans with higher risk characteristics, but some Other Guarantee Transactions may provide inherent credit protections from losses due to underlying subordination, excess interest, overcollateralization and other features.

(3) Multifamily delinquency performance is based on UPB of mortgage loans that are two monthly payments or more past due or those in the process of foreclosure and includes multifamily Other Guarantee Transactions. Excludes mortgage loans whose contractual terms have been modified under an agreement with the borrower as long as the borrower is less than two monthly payments past due under the modified contractual terms.

We continue to implement a number of initiatives to modify and restructure loans, including the MHA Program. Our implementation of the MHA Program, for our loans, includes the following: (a) an initiative to allow mortgages currently owned or guaranteed by us to be refinanced without obtaining additional credit enhancement beyond that already in place for the loan (our relief refinance mortgage, which is our implementation of HARP); (b) an initiative to modify mortgages for both homeowners who are in default and those who are at risk of imminent default (HAMP); and (c) an initiative designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales or to complete a deed in lieu transaction (HAFA). As part of accomplishing certain of these initiatives, we pay various incentives to servicers and borrowers. We will bear the full costs associated with these loan workout and foreclosure alternatives on mortgages that we own or guarantee and will not receive a reimbursement for any component from Treasury. We cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives.

**Troubled Debt Restructurings**

On July 1, 2011, we adopted an amendment to the accounting guidance for receivables, which clarifies the guidance regarding a creditor's evaluation of when a restructuring is considered a TDR. While our adoption of this amendment did not have an impact on how we account for TDRs, it did have a significant impact on the population of loans that we account for as TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Adopted Accounting Guidance" for further information on our implementation of this guidance.

*Single-Family TDRs*

We rely on our single-family servicers to contact borrowers who are in default and to identify an alternative to foreclosure in accordance with our requirements. We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2245                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

best opportunity for minimizing our credit losses. We require our single-family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure.

Repayment plans are agreements between the servicer and the borrower that give the borrower a defined period of time to reinstate the mortgage by paying regular payments plus an additional agreed upon amount in repayment of the past due amount. These agreements are considered TDRs if they result in a delay in payment that is considered to be more than insignificant.

Forbearance agreements are agreements between the servicer and the borrower where reduced payments or no payments are required during a defined period. These agreements are considered TDRs if they result in a delay in payment that is considered to be more than insignificant.

In the case of borrowers considered for modifications, our servicers obtain information on income, assets, and other borrower obligations to determine modified loan terms. Under HAMP, the goal of a single-family loan modification is to reduce the borrower's monthly mortgage payments to a specified percentage of the borrower's gross monthly income (31% for HAMP loans), which may be achieved through a combination of methods, including: (a) interest rate reductions; (b) term extensions; and (c) principal forbearance. Principal forbearance is when a portion of the principal is non-interest bearing, but this does not represent principal forgiveness. Although HAMP contemplates that some servicers will also make use of principal forgiveness to achieve reduced payments for borrowers, we have only used forbearance of principal and have not used principal forgiveness in modifying our loans.

HAMP requires that each borrower complete a trial period during which the borrower will make monthly payments based on the estimated amount of the modification payments. Trial periods are required for at least three months. After the final trial-period payment is received by our servicer, the borrower and servicer enter into the modification.

HAMP applies to loans originated on or before January 1, 2009, provided the trial period begins by December 31, 2012. With the adoption of the new accounting guidance for TDRs in the third quarter of 2011, we began to consider restructurings under HAMP as TDRs at the inception of the trial period if the expected modification will result in a change in our expectation to collect all amounts due at the original contract rate.

Our HAMP and non-HAMP modification initiatives are available for borrowers experiencing what is generally expected to be a longer-term financial hardship. Historically, for our non-HAMP modifications, our single-family servicers have generally taken an approach to modifying the loan's terms in the following order of priority until the borrower's monthly payment amount is reduced to a sustainable level given the borrower's individual circumstances: (a) extend the term of the loan; and (b) reduce the interest rate of the loan. As discussed below, this non-HAMP modification initiative will be replaced by the standard modification effective January 1, 2012.

In February 2011, FHFA directed Freddie Mac and Fannie Mae to develop consistent requirements, policies and processes for the servicing of non-performing loans. This directive was designed to create greater consistency in servicing practices and to build on the best practices of each of the GSEs. In April 2011, pursuant to this directive, FHFA announced a new set of aligned standards for servicing non-performing loans owned or guaranteed by Freddie Mac and Fannie Mae that are designed to help servicers do a better job of communicating and working with troubled borrowers and to bring greater accountability to the servicing industry. As part of the servicing alignment initiative, we began implementation of a new non-HAMP standard loan modification initiative. This new standard modification will replace our existing non-HAMP modification initiative beginning January 1, 2012. The new standard modification requires a three month trial period. Servicers may begin offering standard modification trial period plans with effective dates on or after October 1, 2011.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                           Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In Table 5.4, we provide information about our single-family loans that were initially classified as TDRs during the three and nine months ended September 30, 2011.

**Table 5.4 — Single-Family TDRs, by Type**

| | Three Months Ended September 30, 2011 | | | Nine Month Ended September 30, 2011 | | |
|---|---|---|---|---|---|---|
| | Number of Loans | Pre-TDR Recorded Investment | Percentage of Recorded Investment | Number of Loans | Pre-TDR Recorded Investment | Percentage of Recorded Investment |
| **Type of completed loan modification:** | | | | | | |
| No change in terms(1)(2) | 3,053 | $    499 | 4% | 3,053 | $    499 | 2% |
| Extension of term(2) | 11,834 | 1,922 | 15 | 11,834 | 1,922 | 8 |
| Reduction of contractual interest rate | 3,013 | 615 | 5 | 20,341 | 4,214 | 18 |
| Rate reduction and extension of term | 5,146 | 1,030 | 8 | 28,465 | 5,826 | 24 |
| Rate reduction, extension of term, and principal forbearance | 2,048 | 495 | 4 | 12,806 | 3,097 | 13 |
| Subtotal-loan modification activity(3) | 25,094 | 4,561 | 36 | 76,499 | 15,558 | 65 |
| **Other activity:** | | | | | | |
| Trial period modifications(4) | 17,891 | 3,752 | 29 | 17,891 | 3,752 | 16 |
| Forbearance agreement(2) | 16,129 | 3,099 | 24 | 16,129 | 3,099 | 13 |
| Repayment plan(2) | 8,497 | 1,348 | 11 | 8,497 | 1,348 | 6 |
| Subtotal-other activity | 42,517 | 8,199 | 64 | 42,517 | 8,199 | 35 |
| Total single-family TDRs | 67,611 | $ 12,760 | 100% | 119,016 | $23,757 | 100% |

(1) Under this modification type, past due amounts are added to the principal balance and reamortized based on the original contractual loan terms, and no other change is made to the terms of the loan.

(2) Represents only those agreements or plans that result in more than an insignificant delay, which is generally considered by us as more than three monthly payments under the original terms.

(3) Includes loans that were in the trial period at June 30, 2011 and completed modification in July 2011.

(4) Represents loans that entered the trial period for modification, regardless if the borrower completed the trial period during the third quarter of 2011 or remained in the trial period as of September 30, 2011. Beginning in the third quarter of 2011, we began to classify loans as TDRs when they entered a trial period rather that at the time the trial period is completed.

Table 5.4 presents completed modification activity based on the following types of modification:

- No change in terms:  This involves the addition of past due amounts, including delinquent monthly principal and interest payments, to the remaining principal balance and allows for amortization of such past due amounts over the loan's remaining original contractual life with no other change in terms. These restructurings are considered TDRs if they result in a delay in payment that is considered to be more than insignificant.

- Extension of term:  This involves resetting the contractual life of the loan to a longer term, and the longer amortization period results in a reduced monthly payment compared to the pre-modified terms. These restructurings are considered TDRs if they result in a delay in payment that is considered to be more than insignificant.

- Reduction of contractual interest rate:  These modifications are considered TDRs as they result in a concession being granted to the borrower as we do not expect to collect all amounts due, including accrued interest at the original contractual interest rate.

- Principal forbearance:  This involves the separation of a portion of the principal balance and does not calculate this portion of the principal in determination of monthly payment of amortized principal and interest. No interest accrues on this portion of the principal and repayment is delayed until either the final payoff of the mortgage, the maturity date, or the transfer of the property. Accordingly, this reduces the monthly payment amount compared to the pre-modified terms. These restructurings are considered TDRs as they result in a concession being granted to the borrower as we do not expect to collect all amounts due, including accrued interest at the original contractual interest rate.

During the three and nine months ended September 30, 2011, the average term extension was 95 and 96 months and the average interest rate reduction was 2.6% and 2.7%, respectively, on completed modifications classified as TDRs.

*Multifamily TDRs*

We monitor a variety of mortgage loan characteristics for multifamily loans, such as the LTV ratio, DSCR, and geographic location, among others, that help us assess the financial performance of the property and the borrower's ability to repay the loan. In certain cases, we may provide short-term loan extensions of up to 12 months with no changes to the effective borrowing rate. In other cases we may make more significant modifications of terms for borrowers experiencing financial difficulty, such as reducing the interest rate or extending the maturity for longer than 12 months. In cases where

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2247                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

we do modify the contractual terms of the loan, the changes in terms may be similar to those of single-family loans, such as an extension of the term, reduction of contractual rate, principal forbearance, or some combination of these features.

The assessment as to whether a multifamily loan restructuring is considered a TDR contemplates the unique facts and circumstances of each loan. This assessment considers qualitative factors such as whether the borrower's modified interest rate is consistent with that of a non-troubled enterprise.

*TDR Activity and Performance*

Table 5.5 provides additional information about both our single-family and multifamily TDR activity during the three and nine months ended September 30, 2011, based on the original category of the loan before modification. Our presentation of TDR activity includes all loans that were newly classified as a TDR during the respective periods. Prior to classification as a TDR, these loans were previously evaluated for impairment, including our estimation for loan losses, on a collective basis. Loans classified as a TDR in one period may be subject to further action (such as a modification or remodification) in a subsequent period. In such cases, the subsequent activity would not be reflected in Table 5.5 since the loan would already have been classified as a TDR.

**Table 5.5 — TDR Activity, by Segment**

| | Three Months Ended September 30, 2011 | | Nine Months Ended September 30, 2011 | |
|---|---|---|---|---|
| | # of Loans | Post-TDR Recorded Investment | # of Loans | Post-TDR Recorded Investment |
| | (in millions, except number of loans modified) | | | |
| *Single-family* | | | | |
| 20 and 30-year or more, amortizing fixed-rate | 48,595 | $ 8,869 | 84,790 | $ 16,374 |
| 15-year amortizing fixed-rate | 3,724 | 360 | 5,358 | 544 |
| Adjustable-rate(1) | 1,789 | 347 | 2,714 | 550 |
| Alt-A, interest-only, and option ARM | 13,503 | 3,554 | 26,154 | 7,040 |
| Total Single-family | 67,611 | 13,130 | 119,016 | 24,508 |
| *Multifamily* | 6 | 82 | 17 | 196 |
| Total | 67,617 | $ 13,212 | 119,033 | $ 24,704 |

(1) Includes balloon/reset mortgage loans.

The aggregate recorded investment of single-family TDRs during the three and nine months ended September 30, 2011 was higher post-modification (as shown in Table 5.5) than the aggregate recorded investment of the pre-modified loans (as shown in Table 5.4) since past due amounts are added to the principal balance at the time of restructuring.

The measurement of impairment for TDRs is based on the excess of our recorded investment in the loans over the present value of the loan's expected future cash flows. Generally, restructurings that are TDRs have a higher allowance for loan losses than restructurings that are not considered TDRs because TDRs involve a concession being granted to the borrower. Our process for determining the appropriate allowance for loan losses in both our segments considers the impact that our loss mitigation activities, such as loan restructurings, have on probabilities of default.

Table 5.6 presents the performance of our TDRs based on the original category of the loan before modification. Modified loans within the Alt-A category remain as such, even though the borrower may have provided full documentation of assets and income before completing the modification. Modified loans within the option ARM category remain as such even though the modified loan no longer provides for optional payment provisions. Substantially all of our completed single-family loan modifications classified as a TDR during the nine months ended September 30, 2011 resulted in the modified loan with a fixed interest rate or one that is fixed below market for five years and then gradually adjusts to a market rate (determined at the time of modification) and remains fixed at that new rate for the remaining term. Table 5.6 reflects only performance of completed modifications and excludes loans subject to other loss mitigation activity that were classified as TDRs.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
TREASURY-2248
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 5.6 — Payment Defaults of Completed TDR Modifications,  by Segment(1)**

| | Three Months Ended September 30, 2011 | | Nine Months Ended September 30, 2011 | |
| | # of Loans | Post-TDR Recorded Investment(2) | # of Loans | Post-TDR Recorded Investment(2) |
|---|---|---|---|---|
| | | (in millions, except number of loans modified) | | |
| *Single-family* | | | | |
| 20 and 30-year or more, amortizing fixed-rate | 6,235 | $ 1,158 | 17,584 | $ 3,302 |
| 15-year amortizing fixed-rate | 233 | 24 | 643 | 67 |
| Adjustable-rate | 131 | 27 | 376 | 79 |
| Alt-A, interest-only, and option ARM | 1,508 | 399 | 4,543 | 1,204 |
| Total single-family | 8,107 | $ 1,608 | 23,146 | $ 4,652 |
| *Multifamily* | 7 | $ 18 | 7 | $ 18 |

(1) Represents TDR loans that experienced a payment default during  the period and had completed a modification event in the twelve  months prior to the payment default. A payment default occurs when a borrower either: (a) became two or more months  delinquent; or (b) completed a loss event, such as a short  sale or foreclosure. We only include payment defaults for a single loan once during each quarterly period; however, a  single  loan will be reflected more than once if the borrower experienced another payment default in a subsequent quarter.

(2) Represents the recorded investment at the end of the period in  which the loan was modified and does not represent the recorded  investment as of September 30, 2011.

During the three months ended September 30, 2011, there  were 1,289 loans with other loss mitigation activities (*i.e.*, repayment plan, forbearance agreement, or trial  period modifications) accounted for as TDRs, with a post-TDR  recorded investment of $230 million, that returned to a current payment status, and then subsequently became two months  delinquent. In addition, during the three months ended September 30, 2011, there were 1,508 loans with other loss  mitigation activities accounted for as TDRs, with a post-TDR  recorded investment of $257 million, that subsequently  experienced a loss event, such as a short sale or a foreclosure  transfer.

### NOTE 6: REAL ESTATE OWNED

We obtain REO properties when we are the highest bidder at  foreclosure sales of properties that collateralize  non-performing single-family and multifamily mortgage loans owned by us or when a delinquent borrower chooses to transfer  the mortgaged property to us in lieu of going through the foreclosure process. Upon acquiring single-family properties, we  establish a marketing plan to sell the property as soon as practicable by either listing it with a sales broker or by other  means, such as arranging a real estate auction. However, certain  jurisdictions require a period of time after foreclosure during  which the borrower may reclaim the property. During the period  when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property.  This generally extends our holding period for up to three additional months. As of September 30, 2011 and December 31, 2010, approximately 31% and 28%, respectively,  of our REO property inventory was not marketable due to the  above conditions. Upon acquiring multifamily properties, we may  operate them with third-party property-management firms for a  period to stabilize value and then sell the properties through  commercial real estate brokers. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report for a discussion of our significant accounting policies for REO.

<div align="center">130</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 6.1 provides a summary of the change in the carrying value of our combined single-family and multifamily REO balances. For the periods presented in Table 6.1, the weighted average holding period for our disposed properties was less than one year.

**Table 6.1 — REO**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Beginning balance — REO, gross | $ 6,533 | $6,855 | $ 7,908 | $ 5,125 |
| Adjustments to beginning balance[1] | — | — | — | 158 |
| Additions | 2,346 | 4,196 | 7,207 | 10,839 |
| Dispositions | (2,623) | (2,671) | (8,859) | (7,742) |
| Ending balance — REO, gross | 6,256 | 8,380 | 6,256 | 8,380 |
| Beginning balance, valuation allowance | (601) | (557) | (840) | (433) |
| Adjustment to beginning balance[1] | — | — | — | (11) |
| Change in valuation allowance | (25) | (312) | 214 | (425) |
| Ending balance, valuation allowance | (626) | (869) | (626) | (869) |
| Ending balance — REO, net | $ 5,630 | $ 7,511 | $ 5,630 | $ 7,511 |

(1) Adjustment to the beginning balance related to the adoption of new accounting guidance for transfers of financial assets and consolidation of VIEs. See "Note 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information.

The REO balance, net at September 30, 2011 and December 31, 2010 associated with single-family properties was $5.5 billion and $7.0 billion, respectively, and the balance associated with multifamily properties was $91 million and $107 million, respectively. The West region represented approximately 26% and 28% of our single-family REO additions during the three months ended September 30, 2011 and 2010, respectively, based on the number of properties, and the North Central region represented approximately 27% and 22% of our single-family REO additions during these periods. Our single-family REO inventory consisted of 59,596 properties and 72,079 properties at September 30, 2011 and December 31, 2010, respectively. The pace of our REO acquisitions slowed beginning in the fourth quarter of 2010 due to delays in the foreclosure process, including delays related to concerns about the foreclosure process. These delays in foreclosures continued in the nine months ended September 30, 2011, particularly in states that require a judicial foreclosure process. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Seller/Servicers" for information about regional concentration of our portfolio as well as further details about delays in the single-family foreclosure process.

Our REO operations expenses includes REO property expenses, net losses incurred on disposition of REO properties, adjustments to the holding period allowance associated with REO properties to record them at the lower of their carrying amount or fair value less the estimated costs to sell, and recoveries from insurance and other credit enhancements. An allowance for estimated declines in the REO fair value during the period properties are held reduces the carrying value of REO property. Excluding holding period valuation adjustments, we recognized a loss of $25 million and $33 million on REO dispositions during the three months ended September 30, 2011 and 2010, respectively, and recognized a loss of $199 million and a gain of $7 million on REO dispositions during the nine months ended September 30, 2011 and 2010, respectively. We increased our valuation allowance for properties in our REO inventory by $127 million and $250 million in the three months ended September 30, 2011 and 2010, respectively. We increased our valuation allowance for properties in our REO inventory by $283 million and $368 million in the nine months ended September 30, 2011 and 2010, respectively.

REO property acquisitions that result from extinguishment of our mortgage loans held on our consolidated balance sheets are treated as non-cash transfers. The amount of non-cash acquisitions of REO properties during the nine months ended September 30, 2011 and 2010 was $7.0 billion and $10.9 billion, respectively.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2250          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 7: INVESTMENTS IN SECURITIES

Table 7.1 summarizes amortized cost, estimated fair values, and corresponding gross unrealized gains and gross unrealized losses for available-for-sale securities by major security type. At September 30, 2011 and December 31, 2010, all available-for-sale securities are mortgage-related securities.

### Table 7.1 — Available-For-Sale Securities

| September 30, 2011 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| | | (in millions) | | |
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 77,238 | $ 6,845 | $ (62) | $ 84,021 |
| Subprime | 42,975 | 52 | (14,139) | 28,888 |
| CMBS | 55,065 | 1,735 | (535) | 56,265 |
| Option ARM | 9,366 | 18 | (3,216) | 6,168 |
| Alt-A and other | 14,075 | 43 | (2,675) | 11,443 |
| Fannie Mae | 19,272 | 1,311 | (3) | 20,580 |
| Obligations of states and political subdivisions | 8,145 | 89 | (102) | 8,132 |
| Manufactured housing | 847 | 12 | (43) | 816 |
| Ginnie Mae | 239 | 32 | — | 271 |
| Total available-for-sale securities | $227,222 | $ 10,137 | $(20,775) | $216,584 |

| December 31, 2010 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 80,742 | $ 5,142 | $ (195) | $ 85,689 |
| Subprime | 47,916 | 1 | (14,056) | 33,861 |
| CMBS | 58,455 | 1,551 | (1,919) | 58,087 |
| Option ARM | 10,726 | 16 | (3,853) | 6,889 |
| Alt-A and other | 15,561 | 58 | (2,451) | 13,168 |
| Fannie Mae | 23,025 | 1,348 | (3) | 24,370 |
| Obligations of states and political subdivisions | 9,885 | 31 | (539) | 9,377 |
| Manufactured housing | 945 | 13 | (61) | 897 |
| Ginnie Mae | 268 | 28 | — | 296 |
| Total available-for-sale securities | $247,523 | $ 8,188 | $(23,077) | $232,634 |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Available-For-Sale Securities in a Gross Unrealized Loss Position**

Table 7.2 shows the fair value of available-for-sale securities in a gross unrealized loss position, and whether they have been in that position less than 12 months, or 12 months or greater, including the non-credit-related portion of other-than-temporary impairments which have been recognized in AOCI.

**Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position**

| September 30, 2011 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | |
| | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total |
| | | | | | (in millions) | | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $ 707 | $ — | $ (3) | $ (3) | $ 1,887 | $ — | $ (59) | $ (59) | $ 2,594 | $ — | $ (62) | $ (62) |
| Subprime | 8 | (1) | — | (1) | 28,729 | (11,301) | (2,837) | (14,138) | 28,737 | (11,302) | (2,837) | (14,139) |
| CMBS | 715 | (1) | (36) | (37) | 3,638 | — | (498) | (498) | 4,353 | (1) | (534) | (535) |
| Option ARM | 90 | (5) | — | (5) | 6,031 | (3,120) | (91) | (3,211) | 6,121 | (3,125) | (91) | (3,216) |
| Alt-A and other | 1,112 | (74) | (4) | (78) | 9,511 | (2,016) | (581) | (2,597) | 10,623 | (2,090) | (585) | (2,675) |
| Fannie Mae | 233 | — | — | — | 13 | — | — | — | 246 | — | (3) | (3) |
| Obligations of states and political subdivisions | 944 | — | (16) | (16) | 2,376 | — | (3) | (3) | 3,320 | — | (102) | (102) |
| Manufactured housing | 40 | (2) | — | (2) | 365 | (31) | (10) | (41) | 405 | (33) | (10) | (43) |
| Total available-for-sale securities in a gross unrealized loss position | $ 3,849 | $ (83) | $ (59) | $ (142) | $ 52,550 | $ (16,468) | $ (4,165) | $ (20,633) | $ 56,399 | $ (16,551) | $ (4,224) | $ (20,775) |

| December 31, 2010 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | |
| | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total |
| | | | | | (in millions) | | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $ 2,494 | $ — | $ (70) | $ (70) | $ 1,880 | $ — | $ (125) | $ (125) | $ 4,374 | $ — | $ (195) | $ (195) |
| Subprime | 6 | — | — | — | 33,839 | (10,041) | (4,015) | (14,056) | 33,845 | (10,041) | (4,015) | (14,056) |
| CMBS | 2,950 | — | (51) | (51) | 8,894 | (844) | (1,024) | (1,868) | 11,844 | (844) | (1,075) | (1,919) |
| Option ARM | 3 | (1) | — | (1) | 6,838 | (3,744) | (108) | (3,852) | 6,841 | (3,745) | (108) | (3,853) |
| Alt-A and other | 42 | — | (3) | (3) | 12,025 | (1,846) | (602) | (2,448) | 12,067 | (1,846) | (605) | (2,451) |
| Fannie Mae | 54 | — | — | — | 14 | — | — | — | 68 | — | (3) | (3) |
| Obligations of states and political subdivisions | 3,953 | — | (163) | (163) | 3,402 | — | (376) | (376) | 7,355 | — | (539) | (539) |
| Manufactured housing | 8 | (1) | — | (1) | 507 | (45) | (15) | (60) | 515 | (46) | (15) | (61) |
| Total available-for-sale securities in a gross unrealized loss position | $ 9,510 | $ (2) | $ (287) | $ (289) | $ 67,399 | $ (16,520) | $ (6,268) | $ (22,788) | $ 76,909 | $ (16,522) | $ (6,555) | $ (23,077) |

(1) Represents the gross unrealized losses for securities for which we have previously recognized other-than-temporary impairments in earnings.
(2) Represents the gross unrealized losses for securities for which we have not previously recognized other-than-temporary impairments in earnings.

At September 30, 2011, total gross unrealized losses on available-for-sale securities were $20.8 billion. The gross unrealized losses relate to 1,762 individual lots representing 1,699 separate securities, including securities with non-credit-related other-than-temporary impairments recognized in AOCI. We purchase multiple lots of individual securities at different times and at different costs. We determine gross unrealized gains and gross unrealized losses by specifically evaluating investment positions at the lot level; therefore, some of the lots we hold for a single security may be in an unrealized gain position while other lots for that security may be in an unrealized loss position, depending upon the amortized cost of the specific lot.

**Impairment Recognition on Investments in Securities**

We recognize impairment losses on available-for-sale securities within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other-than-temporary.

We conduct quarterly reviews to evaluate each available-for-sale security that has an unrealized loss for other-than-temporary impairment. An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis. We recognize other-than-temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security. If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recognize only the credit component of other-than-temporary impairment in earnings and the amounts attributable to all other factors are recognized in AOCI. The credit component represents the amount by which the present value of expected future cash flows to be collected from the security is less than the amortized cost basis of the security. The present value of expected future cash flows represents our estimate of future contractual cash flows that

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

we expect to collect, discounted at the effective interest rate implicit in the security at the date of acquisition or the effective interest rate determined based on significantly improved cash flows subsequent to initial impairment.

Our net impairment of available-for-sale securities recognized in earnings on our consolidated statements of income and comprehensive income for the three and nine months ended September 30, 2011 and 2010, includes amounts related to certain securities where we have previously recognized other-than-temporary impairments through AOCI, but upon the recognition of additional credit losses, these amounts were reclassified out of non-credit losses in AOCI and charged to earnings. In certain instances, we recognized credit losses in excess of unrealized losses in AOCI.

The determination of whether unrealized losses on available-for-sale securities are other-than-temporary involves the evaluation of numerous factors. We perform an evaluation on a security-by-security basis considering all available information. The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment. Important factors include, but are not limited to:

- whether we intend to sell the security and it is not more likely than not that we will be required to sell the security before sufficient time elapses to recover all unrealized losses;

- loan level default modeling for single-family residential mortgages that considers individual loan characteristics, including current LTV ratio, FICO score, and delinquency status, requires assumptions about future home prices and interest rates, and employs internal default models and prepayment assumptions. The modeling for CMBS employs third-party models that require assumptions about the economic conditions in the areas surrounding each individual property; and

- security loss modeling combining the modeled performance of the underlying collateral relative to its current and projected credit enhancements to determine the expected cash flows for each evaluated security.

For the majority of our available-for-sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other-than-temporary and is recorded within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings.

See "Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position" for the length of time our available-for-sale securities have been in an unrealized loss position. Also see "Table 7.3 — Significant Modeled Attributes for Certain Non-Agency Mortgage-Related Securities" for the modeled default rates and severities that were used to determine whether our senior interests in certain non-agency mortgage-related securities would experience a cash shortfall.

### Freddie Mac and Fannie Mae Securities

We record the purchase of mortgage-related securities issued by Fannie Mae as investments in securities in accordance with the accounting guidance for investments in debt and equity securities. In contrast, our purchase of mortgage-related securities that we issued (*e.g.*, PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions) is recorded as either investments in securities or extinguishment of debt securities of consolidated trusts depending on the nature of the mortgage-related security that we purchase. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for additional information.

We hold these investments in securities that are in an unrealized loss position at least to recovery and typically to maturity. As the principal and interest on these securities are guaranteed and we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses, we consider these unrealized losses to be temporary.

### Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans

We believe the unrealized losses on the non-agency mortgage-related securities we hold are a result of poor underlying collateral performance, limited liquidity, and large risk premiums. We consider securities to be other-than-temporarily impaired when future credit losses are deemed likely.

Our review of the securities backed by subprime, option ARM, and Alt-A and other loans includes loan level default modeling and analyses of the individual securities based on underlying collateral performance, including the collectability of amounts that would be recovered from primary bond insurers. In the case of bond insurers, we also consider factors such as the availability of capital, generation of new business, pending regulatory action, credit ratings, security prices,

<div align="center">134</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

and credit default swap levels traded on the insurers. We consider loan level information including estimated current LTV ratios, FICO scores, and other loan level characteristics. We also consider the differences between the loan level characteristics of the performing and non-performing loan populations.

Table 7.3 presents the modeled default rates and severities, without regard to subordination, that are used to determine whether our senior interests in certain non-agency mortgage-related securities will experience a cash shortfall. Our proprietary default model requires assumptions about future home prices, as defaults and severities are modeled at the loan level and then aggregated. The model uses projections of future home prices at the state level. Assumptions of voluntary prepayment rates are also an input to the present value of expected cash flows and are discussed below.

**Table 7.3 — Significant Modeled Attributes for Certain Non-Agency Mortgage-Related Securities**

| | September 30, 2011 | | | | |
| | | | | Alt-A(1) | |
| | Subprime first lien | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
| | | | (dollars in millions) | | |
| **Issuance Date** | | | | | |
| 2004 and prior: | | | | | |
| UPB | $ 1,247 | $ 121 | $ 905 | $ 529 | $ 2,236 |
| Weighted average collateral defaults(2) | 34% | 34% | 8% | 42% | 23% |
| Weighted average collateral severities(3) | 56% | 55% | 47% | 51% | 40% |
| Weighted average voluntary prepayment rates(4) | 6% | 7% | 19% | 7% | 8% |
| Average credit enhancement(5) | 41% | 16% | 14% | 18% | 15% |
| 2005: | | | | | |
| UPB | $ 6,615 | $ 2,945 | $ 1,240 | $ 865 | $ 4,025 |
| Weighted average collateral defaults(2) | 53% | 52% | 24% | 52% | 38% |
| Weighted average collateral severities(3) | 66% | 64% | 54% | 58% | 50% |
| Weighted average voluntary prepayment rates(4) | 4% | 6% | 15% | 7% | 8% |
| Average credit enhancement(5) | 52% | 14% | 4% | 27% | 6% |
| 2006: | | | | | |
| UPB | $ 20,248 | $ 6,883 | $ 568 | $ 1,164 | $ 1,215 |
| Weighted average collateral defaults(2) | 63% | 63% | 38% | 60% | 50% |
| Weighted average collateral severities(3) | 71% | 70% | 62% | 67% | 58% |
| Weighted average voluntary prepayment rates(4) | 7% | 6% | 15% | 9% | 8% |
| Average credit enhancement(5) | 16% | 3% | 7% | (1)% | 1% |
| 2007: | | | | | |
| UPB | $ 21,684 | $ 4,402 | $ 162 | $ 1,392 | $ 342 |
| Weighted average collateral defaults(2) | 60% | 62% | 60% | 60% | 60% |
| Weighted average collateral severities(3) | 72% | 71% | 67% | 67% | 67% |
| Weighted average voluntary prepayment rates(4) | 7% | 7% | 12% | 9% | 8% |
| Average credit enhancement(5) | 17% | 12% | 13% | (6)% | —% |
| Total: | | | | | |
| UPB | $ 49,794 | $ 14,351 | $ 2,875 | $ 3,950 | $ 7,818 |
| Weighted average collateral defaults(2) | 60% | 60% | 23% | 56% | 37% |
| Weighted average collateral severities(3) | 71% | 69% | 58% | 64% | 51% |
| Weighted average voluntary prepayment rates(4) | 6% | 6% | 16% | 8% | 8% |
| Average credit enhancement(5) | 22% | 8% | 8% | 6% | 7% |

(1) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.
(2) The expected cumulative default rate expressed as a percentage of the current collateral UPB.
(3) The expected average loss given default calculated as the ratio of cumulative loss over cumulative default rate for each security.
(4) The security's voluntary prepayment rate represents the average of the monthly voluntary prepayment rate weighted by the security's outstanding UPB.
(5) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by bond insurance, overcollateralization and other forms of credit enhancement. Negative values are shown when collateral losses that have yet to be applied to the tranches exceed the remaining credit enhancement, if any.

In evaluating the non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans for other-than-temporary impairment, we noted that the percentage of securities that were AAA-rated and the percentage that were investment grade declined significantly since acquisition. While these ratings have declined, the ratings themselves are not determinative that a loss is more or less likely. While we consider credit ratings in our analysis, we believe that our detailed security-by-security analyses provide a more consistent view of the ultimate collectability of contractual amounts due to us. As such, we have impaired securities with current ratings ranging from CCC to AAA and have determined that other securities within the same ratings were not other-than-temporarily impaired. However, we carefully consider individual ratings, especially those below investment grade, including changes since September 30, 2011.

Our analysis is subject to change as new information regarding delinquencies, severities, loss timing, prepayments, and other factors becomes available. While it is reasonably possible that, under certain conditions, collateral losses on our

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                              TREASURY-2254                              Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

remaining available-for-sale securities for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of September 30, 2011.

### Commercial Mortgage-Backed Securities

CMBS are exposed to stresses in the commercial real estate market. We use external models to identify securities that may have an increased risk of failing to make their contractual payments. We then perform an analysis of the underlying collateral on a security-by-security basis to determine whether we will receive all of the contractual payments due to us. During the three and nine months ended September 30, 2011, we recognized the unrealized fair value losses related to certain investments in CMBS of $27 million and $181 million, respectively, as an impairment charge in earnings because we have the intent to sell these securities. While it is reasonably possible that, under certain conditions, collateral losses on our CMBS for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of September 30, 2011. We do not intend to sell the remaining CMBS and it is not more likely than not that we will be required to sell such securities before recovery of the unrealized losses.

### Obligations of States and Political Subdivisions

These investments consist of housing revenue bonds. We believe the unrealized losses on obligations of states and political subdivisions are primarily a result of movements in interest rates and liquidity and risk premiums. We have determined that the impairment of these securities is temporary based on our conclusion that we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses. We believe that any credit risk related to these securities is minimal because of the issuer guarantees provided on these securities.

### Bond Insurance

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our non-agency mortgage-related securities. Circumstances in which it is likely a principal and interest shortfall will occur and there is substantial uncertainty surrounding a primary bond insurer's ability to pay all future claims can give rise to recognition of other-than-temporary impairment recognized in earnings. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

### Other-Than-Temporary Impairments on Available-for-Sale Securities

Table 7.4 summarizes our net impairments of available-for-sale securities recognized in earnings by security type.

### Table 7.4 — Net Impairment of Available-For-Sale Securities Recognized in Earnings

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings | | | |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Available-for-sale securities: | | | | |
| Subprime | $ (31) | $ (213) | $ (835) | $ (562) |
| Option ARM | (19) | (577) | (365) | (727) |
| Alt-A and other | (80) | (296) | (152) | (648) |
| CMBS[1] | (27) | (6) | (345) | (78) |
| Manufactured housing | (4) | (8) | (9) | (23) |
| Total other-than-temporary impairments on available-for-sale securities | $ (161) | $ (1,100) | $ (1,706) | $ (2,038) |

(1) Includes $27 million and $181 million of other-than-temporary impairments recognized in earnings for the three and nine months ended September 30, 2011, respectively, as we have the intent to sell the related security before recovery of its amortized cost basis.

Table 7.5 presents the changes in the unrealized credit-related other-than-temporary impairment component of the amortized cost related to available-for-sale securities: (a) that we have written down for other-than-temporary impairment; and (b) for which the credit component of the loss is recognized in earnings. The credit-related other-than-temporary impairment component of the amortized cost represents the difference between the present value of expected future cash flows, including the estimated proceeds from bond insurance, and the amortized cost basis of the security prior to considering credit losses. The beginning balance represents the other-than-temporary impairment credit loss component related to available-for-sale securities for which other-than-temporary impairment occurred prior to January 1, 2011, but will not be realized until the securities are sold, written off, or mature. Net impairment of available-for-sale securities

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                   TREASURY-2255

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

recognized in earnings is presented as additions in two components based upon whether the current period is: (a) the first time the debt security was credit-impaired; or (b) not the first time the debt security was credit-impaired. The credit loss component is reduced if we sell, intend to sell or believe we will be required to sell previously credit-impaired available-for-sale securities. Additionally, the credit loss component is reduced by the amortization resulting from significant increases in cash flows expected to be collected that are recognized over the remaining life of the security.

### Table 7.5 — Other-Than-Temporary Impairments Related to Credit Losses on Available-For-Sale Securities[1]

|  | Nine Months Ended September 30, 2011 (in millions) |
| --- | --- |
| Credit-related other-than-temporary impairments on available-for-sale securities recognized in earnings: |  |
| Beginning balance — remaining credit losses to be realized on available-for-sale securities held at the beginning of the period where other-than-temporary impairments were recognized in earnings | $   15,049 |
| Additions: |  |
| Amounts related to credit losses for which an other-than-temporary impairment was not previously recognized | 49 |
| Amounts related to credit losses for which an other-than-temporary impairment was previously recognized | 1,506 |
| Reductions: |  |
| Amounts related to securities which were sold, written off or matured | (756) |
| Amounts previously recognized in other comprehensive income that were recognized in earnings because we intend to sell the security or it is more likely than not that we will be required to sell the security before recovery of its amortized cost basis | (161) |
| Amounts related to amortization resulting from significant increases in cash flows expected to be collected that are recognized over the remaining life of the security | (56) |
| Ending balance — remaining credit losses to be realized on available-for-sale securities held at period end where other-than-temporary impairments were recognized in earnings | $   15,631 |

(1) Excludes other-than-temporary impairments on securities that we intend to sell or it is more likely than not that we will be required to sell before recovery of the unrealized losses.

### Realized Gains and Losses on Sales of Available-For-Sale Securities

Table 7.6 below illustrates the gross realized gains and gross realized losses received from the sale of available-for-sale securities.

### Table 7.6 — Gross Realized Gains and Gross Realized Losses on Sales of Available-For-Sale Securities

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2011 | 2010 | 2011 | 2010 |
|  | | (in millions) | | |
| **Gross realized gains** |  |  |  |  |
| Mortgage-related securities: |  |  |  |  |
| Freddie Mac | $   — | $   — | $   77 | $   26 |
| Fannie Mae | — | 54 | 14 | 54 |
| Obligations of states and political subdivisions | 6 | 1 | 10 | 2 |
| Total mortgage-related securities gross realized gains | 6 | 55 | 101 | 82 |
| Non-mortgage-related securities: |  |  |  |  |
| Asset-backed securities | — | 3 | — | 3 |
| Total non-mortgage-related securities gross realized gains | — | 3 | — | 3 |
| Gross realized gains | 6 | 58 | 101 | 85 |
| **Gross realized losses** |  |  |  |  |
| Mortgage related securities:[1] |  |  |  |  |
| CMBS | — | — | (80) | — |
| Option ARM | — | — | — | (6) |
| Total mortgage-related securities gross realized losses | — | — | (80) | (6) |
| Gross realized losses | — | — | (80) | (6) |
| Net realized gains (losses) | $   6 | $   58 | $   21 | $   79 |

(1) These individual sales do not change our conclusion that we do not intend to sell the majority of our remaining mortgage-related securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses.

137

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Maturities of Available-For-Sale Securities**

Table 7.7 summarizes the remaining contractual maturities of available-for-sale securities.

**Table 7.7 — Maturities of Available-For-Sale Securities[1]**

| September 30, 2011 | Amortized Cost | Fair Value |
|---|---|---|
| | (in millions) | |
| Available-for-sale securities: | | |
| Due within 1 year or less | $      39 | $      39 |
| Due after 1 through 5 years | 1,243 | 1,298 |
| Due after 5 through 10 years | 5,755 | 6,048 |
| Due after 10 years | 220,185 | 209,199 |
| Total available-for-sale securities | $  227,222 | $216,584 |

(1) Maturity information provided is based on contractual maturities, which may not represent expected life as obligations underlying these securities may be prepaid at any time without penalty.

**AOCI Related to Available-For-Sale Securities**

Table 7.8 presents the changes in AOCI related to available-for-sale securities. The net unrealized holding gains represent the net fair value adjustments recorded on available-for-sale securities throughout the periods presented, after the effects of our federal statutory tax rate of 35%. The net reclassification adjustment for net realized losses represents the amount of those fair value adjustments, after the effects of our federal statutory tax rate of 35%, that have been recognized in earnings due to a sale of an available-for-sale security or the recognition of an impairment loss.

**Table 7.8 — AOCI Related to Available-For-Sale Securities**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2011 | 2010 |
| | (in millions) | |
| Beginning balance | $(9,678) | $(20,616) |
| Adjustment to initially apply the adoption of amendments to accounting guidance for transfers of financial assets and the consolidation of VIEs(1) | — | (2,683) |
| Net unrealized holding gains(2) | 1,669 | 11,249 |
| Net reclassification adjustment for net realized losses(3)(4) | 1,095 | 1,275 |
| Ending balance | $ (6,914) | $(10,775) |

(1) Net of tax benefit of $1.4 billion for the nine months ended September 30, 2010.
(2) Net of tax expense of $899 million and $6.1 billion for the nine months ended September 30, 2011 and 2010, respectively.
(3) Net of tax benefit of $589 million and $686 million for the nine months ended September 30, 2011 and 2010, respectively.
(4) Includes the reversal of previously recorded unrealized losses that have been recognized on our consolidated statements of income and comprehensive income as impairment losses on available-for-sale securities of $1.1 billion and $1.3 billion, net of taxes, for the nine months ended September 30, 2011 and 2010, respectively.

**Trading Securities**

Table 7.9 summarizes the estimated fair values by major security type for trading securities.

**Table 7.9 — Trading Securities**

| | September 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| Mortgage-related securities: | | |
| Freddie Mac | $      16,588 | $      13,437 |
| Fannie Mae | 17,603 | 18,726 |
| Ginnie Mae | 161 | 172 |
| Other | 78 | 31 |
| Total mortgage-related securities | 34,430 | 32,366 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 276 | 44 |
| Treasury bills | 1,000 | 17,289 |
| Treasury notes | 17,159 | 10,122 |
| FDIC-guaranteed corporate medium-term notes | 2,433 | 441 |
| Total non-mortgage-related securities | 20,868 | 27,896 |
| Total fair value of trading securities | $      55,298 | $      60,262 |

For the three months ended September 30, 2011 and 2010, we recorded net unrealized losses on trading securities held at September 30, 2011 and 2010 of $583 million and $544 million, respectively. For the nine months ended

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2257

September 30, 2011 and 2010, we recorded net unrealized losses on trading securities held at September 30, 2011 and 2010 of $547 million and $1.3 billion, respectively.

Total trading securities include $2.1 billion and $2.5 billion, respectively, of hybrid financial assets as defined by the derivative and hedging accounting guidance regarding certain hybrid financial instruments as of September 30, 2011 and December 31, 2010. Gains (losses) on trading securities on our consolidated statements of income and comprehensive income include $(13) million and $(42) million, respectively, related to these hybrid financial securities for the three and nine months ended September 30, 2011. Gains (losses) on trading securities include gains of $33 million and $34 million related to these trading securities for the three and nine months ended September 30, 2010, respectively.

### Collateral Pledged

#### Collateral Pledged to Freddie Mac

Our counterparties are required to pledge collateral for securities purchased under agreements to resell transactions, and most derivative instruments are subject to collateral posting thresholds generally related to a counterparty's credit rating. We consider the types of securities being pledged to us as collateral when determining how much we lend related to securities purchased under agreements to resell transactions. Additionally, we subsequently and regularly review the market values of these securities compared to amounts loaned in an effort to ensure our exposure to losses is minimized. We had cash and cash equivalents pledged to us related to derivative instruments of $2.3 billion and $2.2 billion at September 30, 2011 and December 31, 2010, respectively. Although it is our practice not to repledge assets held as collateral, a portion of the collateral may be repledged based on master agreements related to our derivative instruments. At September 30, 2011 and December 31, 2010, we did not have collateral in the form of securities pledged to and held by us under these master agreements. Also at September 30, 2011 and December 31, 2010, we did not have securities pledged to us for securities purchased under agreements to resell transactions that we had the right to repledge. From time to time we may obtain pledges of collateral from certain seller/servicers as additional security for their obligations to us, including their obligations to repurchase mortgages sold to us in breach of representations and warranties. These pledges may take the form of cash, cash equivalents, or agency securities.

In addition, we hold cash and cash equivalents as collateral in connection with certain of our multifamily guarantees as credit enhancements. The cash and cash equivalents held as collateral related to these transactions at September 30, 2011 and December 31, 2010 was $232 million and $550 million, respectively.

#### Collateral Pledged by Freddie Mac

We are required to pledge collateral for margin requirements with third-party custodians in connection with secured financings and derivative transactions with some counterparties. The level of collateral pledged related to our derivative instruments is determined after giving consideration to our credit rating. As a result of S&P's downgrade of our senior long-term debt credit rating from AAA to AA+ on August 8, 2011, we posted additional collateral to certain derivative counterparties in accordance with the terms of the derivative agreements. As of September 30, 2011, we had one secured, uncommitted intraday line of credit with a third party in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs, in connection with our use of the Fedwire system. In certain circumstances, the line of credit agreement gives the secured party the right to repledge the securities underlying our financing to other third parties, including the Federal Reserve Bank. We pledge collateral to meet our collateral requirements under the line of credit agreement upon demand by the counterparty.

Table 7.10 summarizes all securities pledged as collateral by us, including assets that the secured party may repledge and those that may not be repledged.

### Table 7.10 — Collateral in the Form of Securities Pledged

|  | September 30, 2011 | | December 31, 2010 |
| --- | --- | --- | --- |
|  | (in millions) | | |
| Securities pledged with the ability for the secured party to repledge: |  |  |  |
| Debt securities of consolidated trusts held by third parties[1] | $ | 10,348 | $    9,915 |
| Available-for-sale securities |  | 224 | 817 |
| Securities pledged without the ability for the secured party to repledge: |  |  |  |
| Debt securities of consolidated trusts held by third parties[1] |  | 354 | 5 |
| Total securities pledged | $ | 10,926 | $  10,737 |

(1) Represents PCs held by us in our Investments segment mortgage investments portfolio and pledged as collateral which are recorded as a reduction to debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2258          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Securities Pledged with the Ability of the Secured Party to Repledge*

At September 30, 2011, we pledged securities with the ability of the secured party to repledge of $10.6 billion, of which $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

At December 31, 2010, we pledged securities with the ability of the secured party to repledge of $10.7 billion, of which $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

There were no borrowings against the line of credit at September 30, 2011 or December 31, 2010. The remaining $0.1 billion and $0.2 billion of collateral posted with the ability of the secured party to repledge at September 30, 2011 and December 31, 2010, respectively, was posted in connection with our margin account related to futures transactions.

*Securities Pledged without the Ability of the Secured Party to Repledge*

At September 30, 2011 and December 31, 2010, we pledged securities without the ability of the secured party to repledge of $354 million and $5 million, respectively, at a clearinghouse in connection with the trading and settlement of securities.

*Collateral in the Form of Cash Pledged*

At September 30, 2011, we pledged $13.3 billion of collateral in the form of cash and cash equivalents, all but $277 million of which related to our derivative agreements as we had $13.0 billion of such derivatives in a net loss position. At December 31, 2010, we pledged $8.5 billion of collateral in the form of cash and cash equivalents, all but $40 million of which related to our derivative agreements as we had $9.3 billion of such derivatives in a net loss position. The remaining $277 million and $40 million was posted at clearinghouses in connection with our securities and other derivative transactions at September 30, 2011 and December 31, 2010, respectively.

## NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS

Debt securities that we issue are classified on our consolidated balance sheets as either debt securities of consolidated trusts held by third parties or other debt. We issue other debt to fund our operations.

Under the Purchase Agreement, without the prior written consent of Treasury, we may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. Because of this debt limit, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Under the Purchase Agreement, the amount of our "indebtedness" is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs. Therefore, "indebtedness" does not include debt securities of consolidated trusts held by third parties. We also cannot become liable for any subordinated indebtedness, without the prior consent of Treasury.

Our debt cap under the Purchase Agreement is $972 billion in 2011 and will decline to $874.8 billion in 2012. As of September 30, 2011, we estimate that the par value of our aggregate indebtedness totaled $689.9 billion, which was approximately $282.1 billion below the applicable debt cap. Our aggregate indebtedness is calculated as the par value of other debt.

In Tables 8.1 and 8.2, the categories of short-term debt (due within one year) and long-term debt (due after one year) are based on the original contractual maturity of the debt instruments classified as other debt.

**TREASURY-2259**

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 8.1 summarizes the interest expense and the balances of total debt, net per our consolidated balance sheets.

**Table 8.1 — Total Debt, Net**

| | Interest Expense for the | | | | Balance, Net[1] | |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | | September 30, 2011 | December 31, 2010 |
| | 2011 | 2010 | 2011 | 2010 | | |
| | (in millions) | | | | (in millions) | |
|---|---|---|---|---|---|---|
| Other debt: | | | | | | |
| Short-term debt | $ 70 | $ 143 | $ 280 | $ 421 | $ 180,752 | $ 197,106 |
| Long-term debt: | | | | | | |
| Senior debt | 2,995 | 3,990 | 9,665 | 12,756 | 493,305 | 516,123 |
| Subordinated debt | 7 | 12 | 25 | 35 | 364 | 711 |
| Total long-term debt | 3,002 | 4,002 | 9,690 | 12,791 | 493,669 | 516,834 |
| Total other debt | 3,072 | 4,145 | 9,970 | 13,212 | 674,421 | 713,940 |
| Debt securities of consolidated trusts held by third parties | 16,715 | 18,721 | 51,379 | 57,412 | 1,488,036 | 1,528,648 |
| Total debt, net | $19,787 | $22,866 | $61,349 | $70,624 | $ 2,162,457 | $ 2,242,588 |

(1) Represents par value, net of associated discounts, premiums and hedge-related basis adjustments, with $0.4 billion and $0.9 billion, respectively, of other short-term debt, and $2.8 billion and $3.6 billion, respectively, of other long-term debt that represents the fair value of debt securities with the fair value option elected at September 30, 2011 and December 31, 2010.

For the three and nine months ended September 30, 2011, we recognized fair value gains (losses) of $134 million and $16 million, respectively, on our foreign-currency denominated debt, of which $146 million and $(17) million, respectively, are gains (losses) related to our net foreign-currency translation.

**Other Debt**

Table 8.2 summarizes the balances and effective interest rates for other debt. We had no balances in federal funds purchased and securities sold under agreements to repurchase at either September 30, 2011 or December 31, 2010.

**Table 8.2 — Other Debt**

| | September 30, 2011 | | | December 31, 2010 | | |
| | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] |
| | | (dollars in millions) | | | (dollars in millions) | |
|---|---|---|---|---|---|---|
| Other short-term debt: | | | | | | |
| Reference Bills® securities and discount notes | $ 180,360 | $ 180,302 | 0.13% | $194,875 | $ 194,742 | 0.24% |
| Medium-term notes | 450 | 450 | 0.12 | 2,364 | 2,364 | 0.31 |
| Total other short-term debt | 180,810 | 180,752 | 0.13 | 197,239 | 197,106 | 0.25 |
| Other long-term debt: | | | | | | |
| Original maturities on or before December 31, | | | | | | |
| 2011 | 25,607 | 25,606 | 0.60% | 120,951 | 120,959 | 2.13% |
| 2012 | 127,417 | 127,386 | 1.80 | 138,474 | 138,418 | 1.79 |
| 2013 | 126,657 | 126,446 | 1.60 | 79,177 | 78,886 | 2.64 |
| 2014 | 75,261 | 75,090 | 2.18 | 36,328 | 36,142 | 3.46 |
| 2015 | 33,483 | 33,455 | 3.00 | 45,779 | 45,752 | 2.99 |
| Thereafter | 120,683 | 105,686 | 4.21 | 110,269 | 96,677 | 4.77 |
| Total other long-term debt[3] | 509,108 | 493,669 | 2.34 | 530,978 | 516,834 | 2.78 |
| Total other debt | $689,918 | $ 674,421 | | $728,217 | $ 713,940 | |

(1) Represents par value, net of associated discounts, premiums, and hedging-related adjustments.
(2) Represents the weighted average effective rate that remains constant over the life of the instrument, which includes the amortization of discounts or premiums, issuance costs, and hedging-related basis adjustments.
(3) Balance, net for other long-term debt includes callable debt of $116.8 billion and $142.6 billion at September 30, 2011 and December 31, 2010, respectively.

**Debt Securities of Consolidated Trusts Held by Third Parties**

Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated securitization trusts (i.e., single-family PC trusts and Other Guarantee Transactions).

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2260          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 8.3 summarizes the debt securities of consolidated trusts held by third parties based on underlying mortgage product type.

**Table 8.3 — Debt Securities of Consolidated Trusts Held by Third Parties**[1]

| | September 30, 2011 | | | | December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Contractual Maturity[2] | UPB | Balance, Net | Weighted Average Coupon[2] | Contractual Maturity[2] | UPB | Balance, Net | Weighted Average Coupon[2] |
| | | (dollars in millions) | | | | (dollars in millions) | | |
| Single-family: | | | | | | | | |
| 30-year or more, fixed-rate | 2011 - 2048 | $1,056,643 | $ 1,068,244 | 4.97% | 2011 - 2048 | $1,110,943 | $ 1,118,994 | 5.03% |
| 20-year fixed-rate | 2012 - 2031 | 66,352 | 67,394 | 4.63 | 2012 - 2031 | 63,941 | 64,752 | 4.78 |
| 15-year fixed-rate | 2011 - 2026 | 237,725 | 241,247 | 4.21 | 2011 - 2026 | 227,269 | 229,510 | 4.41 |
| Adjustable-rate | 2011 - 2047 | 58,983 | 59,763 | 3.29 | 2011 - 2047 | 50,904 | 51,351 | 3.69 |
| Interest-only[3] | 2026 - 2041 | 49,140 | 49,222 | 5.03 | 2026 - 2040 | 61,773 | 61,830 | 5.30 |
| FHA/VA | 2012 - 2041 | 2,132 | 2,166 | 5.69 | 2011 - 2040 | 2,171 | 2,211 | 5.88 |
| Total debt securities of consolidated trusts held by third parties[4] | | $1,470,975 | $1,488,036 | | | $1,517,001 | $1,528,648 | |

(1) Debt securities of consolidated trusts held by third parties are prepayable without penalty.
(2) Based on the contractual maturity and interest rate of debt securities of our consolidated trusts held by third parties.
(3) Includes interest-only securities and interest-only mortgage loans that allow the borrowers to pay only interest for a fixed period of time before the loans begin to amortize.
(4) The effective rate for debt securities of consolidated trusts held by third parties was 4.44% and 4.57% as of September 30, 2011 and December 31, 2010, respectively.

**Lines of Credit**

At both September 30, 2011 and December 31, 2010, we had one secured, uncommitted intraday line of credit with a third party totaling $10 billion. We use this line of credit regularly to provide us with additional liquidity to fund our intraday activities through the Fedwire system in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs. No amounts were drawn on this line of credit at September 30, 2011 or December 31, 2010. We expect to continue to use the current facility to satisfy our intraday financing needs; however, as the line is uncommitted, we may not be able to draw on it if and when needed.

**Subordinated Debt Interest and Principal Payments**

In a September 23, 2008 statement concerning the conservatorship, the Director of FHFA stated that we would continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels. As a result, the terms of any of our subordinated debt that provide for us to defer payments of interest under certain circumstances, including our failure to maintain specified capital levels, are no longer applicable.

### NOTE 9: FINANCIAL GUARANTEES

We securitize substantially all of the single-family mortgage loans we purchase and issue securities backed by such mortgage loans, which we guarantee. During the nine months ended September 30, 2011 and 2010, we issued and guaranteed $222.3 billion and $255.1 billion, respectively, in UPB of Freddie Mac mortgage-related securities backed by single-family mortgage loans (excluding those backed by HFA bonds).

Beginning January 1, 2010, we no longer recognize a financial guarantee for such arrangements as we instead recognize both the mortgage loans and the debt securities of these securitization trusts on our consolidated balance sheets. Table 9.1 presents our maximum potential exposure, our recognized liability, and the maximum remaining term of our financial guarantees that are not consolidated on our balance sheets.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2261                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 9.1 — Financial Guarantees

| | September 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Maximum Exposure(1) | Recognized Liability | Maximum Remaining Term | Maximum Exposure(1) | Recognized Liability | Maximum Remaining Term |
| | | | (dollars in millions, terms in years) | | | |
| Non-consolidated Freddie Mac securities(2) | $ 33,284 | $   276 | 42 | $ 25,279 | $   202 | 41 |
| Other guarantee commitments(3) | 21,249 | 464 | 38 | 18,670 | 427 | 38 |
| Derivative instruments | 42,816 | 2,816 | 34 | 37,578 | 301 | 35 |
| Servicing-related premium guarantees | 141 | — | 5 | 172 | — | 5 |

(1) Maximum exposure represents the contractual amounts that could be lost under the non-consolidated guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements, such as recourse provisions, third-party insurance contracts, or from collateral held or pledged. The maximum exposure disclosed above is not representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation. The maximum exposure for our liquidity guarantees is not mutually exclusive of our default guarantees on the same securities; therefore, these amounts are included within the maximum exposure of non-consolidated Freddie Mac securities and other guarantee commitments.

(2) As of September 30, 2011 and December 31, 2010, the UPB of non-consolidated Freddie Mac securities associated with single-family mortgage loans was $10.9 billion and $11.3 billion, respectively. The remaining balances relate to multifamily mortgage loans.

(3) As of September 30, 2011 and December 31, 2010, the UPB of other guarantee commitments associated with single-family mortgage loans was $11.4 billion and $8.6 billion, respectively. The remaining balances relate to multifamily mortgage loans.

### Non-consolidated Freddie Mac Securities

We issue three types of mortgage-related securities: (a) PCs; (b) REMICs and Other Structured Securities; and (c) Other Guarantee Transactions. We guarantee the payment of principal and interest on these securities, which are backed by pools of mortgage loans, irrespective of the cash flows received from the borrowers. Commencing January 1, 2010, only our guarantees issued to non-consolidated securitization trusts are accounted for in accordance with the accounting guidance for guarantees (i.e., a guarantee asset and guarantee obligation are recognized).

Our securities issued in resecuritizations of our PCs and other previously issued REMICs and Other Structured Securities are not consolidated as they do not give rise to any additional exposure to loss as we already consolidate the underlying collateral. The securities issued in these resecuritizations consist of single-class and multiclass securities backed by PCs, REMICs, interest-only strips, and principal-only strips. Since these resecuritizations do not increase our credit-related exposure, no guarantee asset or guarantee obligation is recognized for these transactions and they are excluded from the table above.

We recognize a guarantee asset, guarantee obligation and a reserve for guarantee losses, as necessary, for securities issued by non-consolidated securitization trusts and other guarantee commitments for which we are exposed to incremental credit risk. Our guarantee obligation represents the recognized liability, net of cumulative amortization, associated with our guarantee of PCs and certain Other Guarantee Transactions issued to non-consolidated securitization trusts. In addition to our guarantee obligation, we recognize a reserve for guarantee losses, which is included within other liabilities on our consolidated balance sheets, which totaled $0.2 billion at both September 30, 2011 and December 31, 2010, respectively. For many of the loans underlying our non-consolidated guarantees, there are credit protections from third parties, including subordination, covering a portion of our exposure. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections on loans we guarantee. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information about our accounting for financial guarantees.

During the three and nine months ended September 30, 2011 we issued approximately $2.1 billion and $8.8 billion, respectively, compared to $1.1 billion and $4.8 billion for the three and nine months ended September 30, 2010, respectively, in UPB of non-consolidated Freddie Mac securities primarily backed by multifamily mortgage loans, for which a guarantee asset and guarantee obligation were recognized. During the nine months ended September 30, 2010, we also issued $4.0 billion in UPB of non-consolidated Other Guarantee Transactions backed by HFA bonds as part of the NIBP, for which a guarantee asset and guarantee obligation were recognized.

In connection with transfers of financial assets to non-consolidated securitization trusts that are accounted for as sales and for which we have incremental credit risk, we recognize our guarantee obligation in accordance with the accounting guidance for guarantees. Additionally, we may retain an interest in the transferred financial assets (e.g., a beneficial interest issued by the securitization trust). See "NOTE 10: RETAINED INTERESTS IN MORTGAGE-RELATED SECURITIZATIONS" for further information on these retained interests.

### Other Guarantee Commitments

We provide long-term standby commitments to certain of our customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements. During the three and nine months ended September 30, 2011, we

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2262                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

issued and guaranteed $1.4 billion and $3.9 billion, respectively, in UPB of long-term standby commitments. These other guarantee commitments totaled $8.7 billion and $5.5 billion of UPB at September 30, 2011 and December 31, 2010, respectively. We also had other guarantee commitments on multifamily housing revenue bonds that were issued by HFAs of $9.4 billion and $9.7 billion in UPB at September 30, 2011 and December 31, 2010, respectively. In addition, as of September 30, 2011 and December 31, 2010, respectively, we had issued guarantees under the TCLFP on securities backed by HFA bonds with UPB of $3.1 billion and $3.5 billion, respectively. In September 2011, Treasury announced that it intended to consent to a three year extension of the expiration date of the TCLFP.

### Derivative Instruments

Derivative instruments include written options, written swaptions, interest-rate swap guarantees, and short-term default guarantee commitments accounted for as credit derivatives. See "NOTE 11: DERIVATIVES" for further discussion of these derivative guarantees.

We guarantee the performance of interest-rate swap contracts in two circumstances. First, we guarantee that a borrower will perform under an interest-rate swap contract linked to a borrower's adjustable-rate mortgage. And second, in connection with our issuance of certain REMICs and Other Structured Securities, which are backed by tax-exempt bonds, we guarantee that the sponsor of the transaction will perform under the interest-rate swap contract linked to the senior variable-rate certificates that we issued.

We also have issued REMICs and Other Structured Securities with stated final maturities that are shorter than the stated maturity of the underlying mortgage loans. If the underlying mortgage loans to these securities have not been purchased by a third party or fully matured as of the stated final maturity date of such securities, we will sponsor an auction of the underlying assets. To the extent that purchase or auction proceeds are insufficient to cover unpaid principal amounts due to investors in such REMICs and Other Structured Securities, we are obligated to fund such principal. Our maximum exposure on these guarantees represents the outstanding UPB of the REMICs and Other Structured Securities subject to stated final maturities.

### Servicing-Related Premium Guarantees

We provide guarantees to reimburse servicers for premiums paid to acquire servicing in situations where the original seller is unable to perform under its separate servicing agreement. The liability associated with these agreements was not material at September 30, 2011 and December 31, 2010.

### Other Indemnifications

In connection with certain business transactions, we may provide indemnification to counterparties for claims arising out of breaches of certain obligations (*e.g.*, those arising from representations and warranties) in contracts entered into in the normal course of business. Our assessment is that the risk of any material loss from such a claim for indemnification is remote and there are no significant probable and estimable losses associated with these contracts. Therefore, we have not recorded any liabilities related to these indemnifications on our consolidated balance sheets at September 30, 2011 and December 31, 2010.

As part of the guarantee arrangements pertaining to multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees." These guarantees require us to advance funds to enable others to repurchase any tendered tax-exempt and related taxable bonds that are unable to be remarketed. Any such advances are treated as loans and are secured by a pledge to us of the repurchased securities until the securities are remarketed. We hold cash and cash equivalents on our consolidated balance sheets for the amount of these commitments. No advances under these liquidity guarantees were outstanding at September 30, 2011 and December 31, 2010.

### NOTE 10: RETAINED INTERESTS IN MORTGAGE-RELATED SECURITIZATIONS

Beginning January 1, 2010, in accordance with the amendment to the accounting guidance for consolidation of VIEs, we consolidated our single-family PC trusts and certain Other Guarantee Transactions. As a result, a large majority of our transfers of financial assets that historically qualified as sales (*e.g.*, the transfer of mortgage loans to our single-family PC trusts) are no longer treated as such because the financial assets are transferred to a consolidated entity. In addition, to the extent that we receive newly-issued PCs or Other Guarantee Transactions in connection with such a transfer, we extinguish a proportional amount of the debt securities of the consolidated trust. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information regarding the impacts of consolidation of our single-family PC trusts and certain Other Guarantee Transactions.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2263

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Certain of our transfers of financial assets to non-consolidated trusts and third parties may continue to qualify as sales. In connection with our transfers of financial assets that qualify as sales, we may retain certain interests in the transferred assets. Our retained interests are primarily beneficial interests issued by non-consolidated securitization trusts (*e.g.*, multifamily PCs and multiclass resecuritization securities). These interests are included in investments in securities on our consolidated balance sheets. In addition, our guarantee asset recognized in connection with non-consolidated securitization transactions also represents a retained interest. For more information about our retained interests in mortgage-related securitizations, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report. These transfers and our resulting retained interests are not significant to our consolidated financial statements in the nine months ended September 30, 2011 and 2010.

## NOTE 11: DERIVATIVES

### Use of Derivatives

We use derivatives primarily to:

- hedge forecasted issuances of debt;

- synthetically create callable and non-callable funding;

- regularly adjust or rebalance our funding mix in order to more closely match changes in the interest-rate characteristics of our mortgage assets; and

- hedge foreign-currency exposure.

### *Hedge Forecasted Debt Issuances*

When we commit to purchase mortgage investments, such commitments are typically for a future settlement ranging from two weeks to three months after the date of the commitment. To facilitate larger and more predictable debt issuances that contribute to lower funding costs, we use interest-rate derivatives to economically hedge the interest-rate risk exposure from the time we commit to purchase a mortgage to the time the related debt is issued.

### *Create Synthetic Funding*

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. For example, the combination of a series of short-term debt issuances over a defined period and a pay-fixed interest rate swap with the same maturity as the last debt issuance is the substantive economic equivalent of a long-term fixed-rate debt instrument of comparable maturity. Similarly, the combination of non-callable debt and a call swaption, or option to enter into a receive-fixed interest rate swap, with the same maturity as the non-callable debt, is the substantive economic equivalent of callable debt. These derivatives strategies increase our funding flexibility and allow us to better match asset and liability cash flows, often reducing overall funding costs.

### *Adjust Funding Mix*

We generally use interest-rate swaps to mitigate contractual funding mismatches between our assets and liabilities. We also use swaptions and other option-based derivatives to adjust the contractual terms of our debt funding in response to changes in the expected lives of our investments in mortgage-related assets. As market conditions dictate, we take rebalancing actions to keep our interest-rate risk exposure within management-set limits. In a declining interest-rate environment, we typically enter into receive-fixed interest rate swaps or purchase Treasury-based derivatives to shorten the duration of our funding to offset the declining duration of our mortgage assets. In a rising interest-rate environment, we typically enter into pay-fixed interest rate swaps or sell Treasury-based derivatives in order to lengthen the duration of our funding to offset the increasing duration of our mortgage assets.

### *Foreign-Currency Exposure*

We use foreign-currency swaps to eliminate virtually all of our exposure to fluctuations in exchange rates related to our foreign-currency denominated debt by entering into swap transactions that effectively convert foreign-currency denominated obligations into U.S. dollar-denominated obligations.

### Types of Derivatives

We principally use the following types of derivatives:

- LIBOR- and Euribor-based interest-rate swaps;

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2264

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- LIBOR- and Treasury-based options (including swaptions);

- LIBOR- and Treasury-based exchange-traded futures; and

- Foreign-currency swaps.

In addition to swaps, futures and purchased options, our derivative positions include the following:

### Written Options and Swaptions

Written call and put swaptions are sold to counterparties allowing them the option to enter into receive- and pay-fixed interest rate swaps, respectively. Written call and put options on mortgage-related securities give the counterparty the right to execute a contract under specified terms, which generally occurs when we are in a liability position. We use these written options and swaptions to manage convexity risk over a wide range of interest rates. Written options lower our overall hedging costs, allow us to hedge the same economic risk we assume when selling guaranteed final maturity REMICs with a more liquid instrument, and allow us to rebalance the options in our callable debt and REMICs portfolios. We may, from time to time, write other derivative contracts such as caps, floors, interest-rate futures and options on buy-up and buy-down commitments.

### Commitments

We routinely enter into commitments that include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts. Most of these commitments are considered derivatives and therefore are subject to the accounting guidance for derivatives and hedging.

### Swap Guarantee Derivatives

In connection with some of the guarantee arrangements pertaining to multifamily housing revenue bonds and multifamily pass-through certificates, we may also guarantee the sponsor's or the borrower's obligations as a counterparty on any related interest-rate swaps used to mitigate interest-rate risk, which are accounted for as swap guarantee derivatives.

### Credit Derivatives

We entered into credit-risk sharing agreements for certain credit enhanced multifamily housing revenue bonds held by third parties in exchange for a monthly fee. In addition, we have purchased mortgage loans containing debt cancellation contracts, which provide for mortgage debt or payment cancellation for borrowers who experience unanticipated losses of income dependent on a covered event. The rights and obligations under these agreements have been assigned to the servicers. However, in the event the servicer does not perform as required by contract, under our guarantee, we would be obligated to make the required contractual payments.

For a discussion of our significant accounting policies related to derivatives, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Derivatives" in our 2010 Annual Report.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Derivative Assets and Liabilities at Fair Value**

Table 11.1 presents the location and fair value of derivatives reported in our consolidated balance sheets.

**Table 11.1 — Derivative Assets and Liabilities at Fair Value**

|  | At September 30, 2011 | | | At December 31, 2010 | | |
|  | Notional or Contractual Amount | Derivatives at Fair Value | | Notional or Contractual Amount | Derivatives at Fair Value | |
|  |  | Assets(1) | Liabilities(1) |  | Assets(1) | Liabilities(1) |
|---|---|---|---|---|---|---|
|  |  |  | (in millions) |  |  |  |
| Total derivative portfolio |  |  |  |  |  |  |
| *Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging*(2) |  |  |  |  |  |  |
| Interest-rate swaps: |  |  |  |  |  |  |
| Receive-fixed | $ 220,668 | $ 13,099 | $ (74) | $ 324,590 | $ 6,952 | $ (3,267) |
| Pay-fixed | 293,683 | 27 | (36,947) | 394,294 | 3,012 | (24,210) |
| Basis (floating to floating) | 2,725 | 2 | (5) | 2,375 | 6 | (2) |
| Total interest-rate swaps | 517,076 | 13,128 | (37,026) | 721,259 | 9,970 | (27,479) |
| Option-based: |  |  |  |  |  |  |
| Call swaptions: |  |  |  |  |  |  |
| Purchased | 89,875 | 14,387 | — | 114,110 | 8,391 | — |
| Written | 26,525 | — | (2,763) | 11,775 | — | (244) |
| Put Swaptions |  |  |  |  |  |  |
| Purchased | 68,175 | 725 | — | 59,975 | 1,404 | — |
| Written | — | — | — | 6,000 | — | (8) |
| Other option-based derivatives(3) | 50,958 | 2,128 | (12) | 47,234 | 1,460 | (10) |
| Total option-based | 235,533 | 17,240 | (2,775) | 239,094 | 11,255 | (262) |
| Futures | 72,262 | 6 | (6) | 212,383 | 3 | (170) |
| Foreign-currency swaps | 1,779 | 154 | — | 2,021 | 172 | — |
| Commitments(4) | 39,429 | 65 | (172) | 14,292 | 103 | (123) |
| Credit derivatives | 10,988 | 1 | (6) | 12,833 | 12 | (5) |
| Swap guarantee derivatives | 3,722 | — | (36) | 3,614 | — | (36) |
| Total Derivatives not designated as hedging instruments | 880,789 | 30,594 | (40,021) | 1,205,496 | 21,515 | (28,075) |
| Netting adjustments(5) |  | (30,299) | 39,692 |  | (21,372) | 26,866 |
| Total derivative portfolio, net | $880,789 | $ 295 | $ (329) | $1,205,496 | $ 143 | $ (1,209) |

(1) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net.

(2) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.

(3) Primarily includes purchased interest-rate caps and floors.

(4) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(5) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $10.7 billion and $6 million, respectively, at September 30, 2011. The net cash collateral posted and net trade/settle receivable were $6.3 billion and $1 million, respectively, at December 31, 2010. The net interest (payable) of derivative assets and derivative liabilities was approximately $(1.3) billion and $(0.8) billion at September 30, 2011 and December 31, 2010, respectively, which was mainly related to interest-rate swaps that we have entered into.

The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable and net trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net asset position are reported as derivative assets, net. Similarly, derivatives in a net liability position are reported as derivative liabilities, net. Cash collateral we obtained from counterparties to derivative contracts that has been offset against derivative assets at September 30, 2011 and December 31, 2010 was $2.3 billion and $2.2 billion, respectively. Cash collateral we posted to counterparties to derivative contracts that has been offset against derivative liabilities at September 30, 2011 and December 31, 2010 was $13.0 billion and $8.5 billion, respectively. We are subject to collateral posting thresholds based on the credit rating of our long-term senior unsecured debt securities from S&P or Moody's. The lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative transactions. As a result of S&P's downgrade of Freddie Mac's credit rating of our long-term senior unsecured debt from AAA to AA+ on August 8, 2011, we posted additional collateral to certain derivative counterparties in accordance with the terms of the derivative agreements.

The aggregate fair value of all derivative instruments with credit-risk-related contingent features that were in a liability position on September 30, 2011, was $13.0 billion for which we posted collateral of $13.0 billion in the normal course of business. Since we were fully collateralized as of September 30, 2011, we would not have had to post additional collateral on that day if the credit-risk-related contingent features underlying these agreements were triggered.

147

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

At September 30, 2011 and December 31, 2010, there were no amounts of cash collateral that were not offset against derivative assets, net or derivative liabilities, net, as applicable. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information related to our derivative counterparties.

TREASURY-2267

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Gains and Losses on Derivatives

Table 11.2 presents the gains and losses on derivatives reported in our consolidated statements of income and comprehensive income.

### Table 11.2 — Gains and Losses on Derivatives

| Derivatives in Cash Flow Hedging Relationships[1] | Three Months Ended September 30, | | | | | |
|---|---|---|---|---|---|---|
| | Amount of Gain or (Loss) Recognized in AOCI on Derivatives (Effective Portion) | | Amount of Gain or (Loss) Reclassified from AOCI into Earnings (Effective Portion) | | Amount of Gain or (Loss) Recognized in Other Income (Ineffective Portion and Amount Excluded from Effectiveness Testing) | |
| | 2011 | 2010 | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | | | |
| Closed cash flow hedges[2] | $ — | $ — | $ (185) | $ (245) | $ — | $ — |

| Derivatives in Cash Flow Hedging Relationships[1] | Nine Months Ended September 30, | | | | | |
|---|---|---|---|---|---|---|
| | Amount of Gain or (Loss) Recognized in AOCI on Derivatives (Effective Portion) | | Amount of Gain or (Losses) Reclassified from AOCI into Earnings (Effective Portion) | | Amount of Gain or (Loss) Recognized in Other Income (Ineffective Portion and Amount Excluded from Effectiveness Testing) | |
| | 2011 | 2010 | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | | | |
| Closed cash flow hedges[2] | $ — | $ — | $ (583) | $ (781) | $ — | $ — |

| Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging[4] | Derivative Gains (Losses)[3] | | | |
|---|---|---|---|---|
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Interest-rate swaps: | | | | |
| Receive-fixed | | | | |
| Foreign-currency denominated | $ 3 | $ (31) | $ (37) | $ (96) |
| U.S. dollar denominated | 10,811 | 7,571 | 12,168 | 20,670 |
| Total receive-fixed swaps | 10,814 | 7,540 | 12,131 | 20,574 |
| Pay-fixed | (19,086) | (11,503) | (22,430) | (34,883) |
| Basis (floating to floating) | (6) | — | (5) | 74 |
| Total interest-rate swaps | (8,278) | (3,963) | (10,304) | (14,235) |
| Option based: | | | | |
| Call swaptions | | | | |
| Purchased | 8,210 | 4,055 | 9,552 | 11,086 |
| Written | (1,959) | (525) | (2,117) | (802) |
| Put swaptions | | | | |
| Purchased | (1,025) | (243) | (1,502) | (2,030) |
| Written | 1 | 9 | 8 | 8 |
| Other option-based derivatives[5] | 660 | 7 | 741 | 243 |
| Total option-based | 5,887 | 3,303 | 6,682 | 8,585 |
| Futures | (33) | (128) | (173) | (140) |
| Foreign-currency swaps[6] | (141) | 382 | 15 | (433) |
| Commitments[7] | (917) | 219 | (1,338) | 70 |
| Credit derivatives | (2) | 3 | (1) | 5 |
| Swap guarantee derivatives | 1 | (1) | 3 | — |
| Subtotal | (3,483) | (185) | (5,116) | (6,148) |
| Accrual of periodic settlements:[8] | | | | |
| Receive-fixed interest-rate swaps[9] | 997 | 1,650 | 3,309 | 4,870 |
| Pay-fixed interest-rate swaps | (2,276) | (2,610) | (7,208) | (8,400) |
| Foreign-currency swaps | 7 | 3 | 17 | 15 |
| Other | 3 | 12 | 12 | 10 |
| Total accrual of periodic settlements | (1,269) | (945) | (3,870) | (3,505) |
| Total | $ (4,752) | $ (1,130) | $ (8,986) | $ (9,653) |

(1) Derivatives that meet specific criteria may be accounted for as cash flow hedges. Net deferred gains and losses on closed cash flow hedges (i.e., where the derivative is either terminated or redesignated) are also included in AOCI until the related forecasted transaction affects earnings or is determined to be probable of not occurring.

(2) Amounts reported in AOCI related to changes in the fair value of commitments to purchase securities that were designated as cash flow hedges are recognized as basis adjustments to the related assets, which are amortized in earnings as interest income. Amounts linked to interest payments on long-term debt are recognized in other debt interest expense and amounts not linked to interest payments on long-term debt are recorded in expense related to derivatives.

(3) Gains (losses) are reported as derivative gains (losses) on our consolidated statements of income and comprehensive income.

(4) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.

(5) Primarily includes purchased interest-rate caps and floors.

(6) Foreign-currency swaps are defined as swaps in which the net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars.

(7) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(8) For derivatives not in qualifying hedge accounting relationships, the accrual of periodic cash settlements is recorded in derivative gains (losses) on our consolidated statements of income and comprehensive income.

(9) Includes imputed interest on zero-coupon swaps.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2268                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2269

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

## Hedge Designation of Derivatives

At September 30, 2011 and December 31, 2010, we did not have any derivatives in hedge accounting relationships; however, there are deferred net losses recorded in AOCI related to closed cash flow hedges. As shown in Table 11.3, the total AOCI related to derivatives designated as cash flow hedges was a loss of $1.8 billion and $2.4 billion at September 30, 2011 and 2010, respectively, composed of deferred net losses on closed cash flow hedges. Closed cash flow hedges involve derivatives that have been terminated or are no longer designated as cash flow hedges. Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI relating to losses on closed cash flow hedges.

The previous deferred amount related to closed cash flow hedges remains in our AOCI balance and will be recognized into earnings over the expected time period for which the forecasted transactions impact earnings. Over the next 12 months, we estimate that approximately $438 million, net of taxes, of the $1.8 billion of cash flow hedge losses in AOCI at September 30, 2011 will be reclassified into earnings. The maximum remaining length of time over which we have hedged the exposure related to the variability in future cash flows on forecasted transactions, primarily forecasted debt issuances, is 23 years. However, over 70% and 90% of AOCI relating to closed cash flow hedges at September 30, 2011, will be reclassified to earnings over the next five and ten years, respectively.

Table 11.3 presents the changes in AOCI related to derivatives designated as cash flow hedges. Net reclassifications of losses to earnings represents the AOCI amount that was recognized in earnings as the originally hedged forecasted transactions affected earnings, unless it was deemed probable that the forecasted transaction would not occur. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the hedge related to the forecasted transaction would be reclassified into earnings immediately.

### Table 11.3 — AOCI Related to Cash Flow Hedge Relationships

| | Nine Months Ended September 30, | |
| | 2011 | 2010 |
| | (in millions) | |
|---|---|---|
| Beginning balance(1) | $ (2,239) | $ (2,905) |
| Cumulative effect of change in accounting principle(2) | — | (7) |
| Net reclassifications of losses to earnings(3) | 391 | 520 |
| Ending balance(1) | $(1,848) | $(2,392) |

(1) Represents net deferred gains and losses on closed (i.e., terminated or redesignated) cash flow hedges.
(2) Represents adjustment to initially apply the accounting guidance for accounting for transfers of financial assets and consolidation of VIEs, as well as a change in the amortization method for certain related deferred items. Net of tax benefit of $4 million for the nine months ended September 30, 2010.
(3) Net of tax benefit of $192 million and $261 million for the nine months ended September 30, 2011 and 2010, respectively.

## NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)

### Senior Preferred Stock

To address our net worth deficit of $6.0 billion at September 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $6.0 billion. We received $500 million in March 2011 and $1.5 billion in September 2011 pursuant to draw requests that FHFA submitted to Treasury on our behalf to address the deficit in our net worth as of December 31, 2010 and June 30, 2011, respectively. No cash was received from Treasury under the Purchase Agreement during the second quarter of 2011 due to our positive net worth at March 31, 2011. The aggregate liquidation preference on the senior preferred stock owned by Treasury was $66.2 billion and $64.2 billion as of September 30, 2011 and December 31, 2010, respectively. See "NOTE 16: REGULATORY CAPITAL" for additional information.

### Stock Repurchase and Issuance Programs

We did not repurchase or issue any of our common shares or non-cumulative preferred stock during the nine months ended September 30, 2011, except for issuances of treasury stock as reported on our consolidated statements of equity (deficit) relating to stock-based compensation granted prior to conservatorship. Common stock delivered under these stock-based compensation plans consists of treasury stock. During the nine months ended September 30, 2011, restrictions lapsed on 840,402 restricted stock units, all of which were granted prior to conservatorship. For a discussion regarding our stock-based compensation plans, see "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011        TREASURY-2270        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Dividends Declared During 2011**

No common dividends were declared in 2011. On March 31, 2011, June 30, 2011, and September 30, 2011, we paid dividends of $1.6 billion in cash on the senior preferred stock at the direction of our Conservator for each period. We did not declare or pay dividends on any other series of Freddie Mac preferred stock outstanding during the nine months ended September 30, 2011.

## NOTE 13: INCOME TAXES

**Income Tax Benefit**

For the three months ended September 30, 2011 and 2010, we reported an income tax benefit of $56 million and $411 million, respectively, resulting in effective tax rates of 1.3% and 14.1%, respectively. For the nine months ended September 30, 2011 and 2010, we reported an income tax benefit of $362 million and $800 million, respectively, representing effective tax rates of 5.8% and 5.4%, respectively. For the three and nine months ended September 30, 2011 and 2010, our effective tax rate was different from the statutory rate of 35% primarily due to changes in the valuation allowance recorded against a portion of our net deferred tax assets.

**Deferred Tax Assets, Net**

We use the asset and liability method to account for income taxes in accordance with the accounting guidance for income taxes. Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates. Valuation allowances are recorded to reduce net deferred tax assets when it is more likely than not that a tax benefit will not be realized. The realization of our net deferred tax assets is dependent upon the generation of sufficient taxable income in available carryback years from current operations and unrecognized tax benefits, and upon our intent and ability to hold available-for-sale debt securities until the recovery of any temporary unrealized losses.

In connection with our entry into conservatorship, we determined that it was more likely than not that a portion of our net deferred tax assets would not be realized due to our inability to generate sufficient taxable income and, therefore, we recorded a valuation allowance. After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, and related difficulty in forecasting future profit levels, we reached a similar conclusion in subsequent quarters, including the third quarter of 2011. Our valuation allowance increased by $2.4 billion to $35.8 billion in the nine months ended September 30, 2011, primarily attributable to an increase in temporary differences during the period. As of September 30, 2011, after consideration of the valuation allowance, we had a net deferred tax asset of $3.9 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities. We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered.

As of September 30, 2011, we had net operating loss and LIHTC carryforwards that will expire over multiple years beginning in 2027 and ending in 2031 and alternative minimum tax credit carryforwards that will not expire.

**Unrecognized Tax Benefits**

At September 30, 2011, we had total unrecognized tax benefits, exclusive of interest, of $1.4 billion. This amount relates to tax positions for which ultimate deductibility is highly certain, but for which there is uncertainty as to the timing of such deductibility. If favorably resolved, $1.2 billion of unrecognized tax benefits would have a positive impact on the effective tax rate due to the reversal of the valuation allowance established against deferred tax assets created by the uncertain tax positions. This favorable impact would be offset by a $186 million tax expense related to the establishment of a valuation allowance against credits that have been carried forward. A valuation allowance has not currently been recorded against this amount because a portion of the unrecognized tax benefits was used as a source of taxable income in our realization assessment of our net deferred tax assets.

We continue to recognize interest and penalties, if any, in income tax expense. There has been no material change during the quarter in total accrued interest payable allocable to unrecognized tax benefits.

The period for assessment under the statute of limitations for federal income tax purposes is open on corporate income tax returns filed for tax years 1998 to 2010. Prior to 2011, the IRS completed its examinations of tax years 1998 to 2007. We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Notices. The principal matter of controversy involves questions of timing and potential penalties regarding our tax accounting method for certain hedging transactions. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. On July 6, 2011, the U.S. Tax Court issued a Notice Setting Case for Trial and a Standing Pretrial Order. The trial date set forth in the Notice was December 12, 2011. On September 7, 2011, a joint motion for continuance was filed with the U.S. Tax Court. The joint motion was granted, and, on October 11, 2011, the parties submitted a status report and proposed a revised trial date of November 5, 2012. In light of the revised trial date and the fact that no settlement discussions have occurred for an extended period of time, we do not believe it is reasonably possible that the hedge accounting method issue will be resolved within the next 12 months. We believe appropriate reserves have been provided for settlement on reasonable terms. However, changes could occur in the gross balance of unrecognized tax benefits that could have a material impact on income tax expense in the period the issue is resolved if the outcome reached is not in our favor and the assessment is in excess of the amount currently reserved. Based upon information currently available, we do not have the ability to reasonably estimate the amount that our unrecognized tax benefits could change within the next 12 months.

## NOTE 14: EMPLOYEE BENEFITS

### Defined Benefit Plans

We maintain a tax-qualified, funded defined benefit pension plan, or Pension Plan, covering substantially all of our employees. We also maintain a nonqualified, unfunded defined benefit pension plan for our officers as part of our SERP (we refer to this plan and the Pension Plan as our Defined Benefit Pension Plans). We also maintain a defined benefit postretirement health care plan, or Retiree Health Plan, that generally provides postretirement health care benefits on a contributory basis to retired employees age 55 or older who meet certain minimum service and other eligibility requirements. Our Retiree Health Plan is currently unfunded and the benefits are paid from our general assets. This plan and our Defined Benefit Pension Plans are collectively referred to as the Defined Benefit Plans.

In June 2011, we amended our Defined Benefit Pension Plans. Under those amendments, eligibility for the pension benefit under our Defined Benefit Pension Plans will be limited to eligible employees hired on or before December 31, 2011. The amendments are effective January 1, 2012.

Table 14.1 presents the components of the net periodic benefit cost with respect to pension and postretirement health care benefits for the three and nine months ended September 30, 2011 and 2010. Net periodic benefit cost is included in salaries and employee benefits on our consolidated statements of income and comprehensive income.

### Table 14.1 — Net Periodic Benefit Cost Detail

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| Pension Benefits | | (in millions) | | |
| Service cost | $    9 | $    8 | $    26 | $    24 |
| Interest cost on benefit obligation | 10 | 9 | 30 | 28 |
| Expected return on plan assets | (12) | (10) | (36) | (30) |
| Recognized net actuarial loss | 2 | 3 | 5 | 8 |
| Net periodic benefit cost | $    9 | $    10 | $    25 | $    30 |
| Postretirement Health Care Benefits | | | | |
| Service cost | $    3 | $    2 | $    6 | $    5 |
| Interest cost on benefit obligation | 2 | 3 | 7 | 7 |
| Recognized prior service credit | — | (1) | — | (1) |
| Net periodic benefit cost | $    5 | $    4 | $    13 | $    11 |

### Cash Flows Related to Defined Benefit Plans

Our general practice is to contribute to our Pension Plan an amount equal to at least the minimum required contribution, if any, but no more than the maximum amount deductible for federal income tax purposes each year. A contribution to our Pension Plan is not required in calendar year 2011.

## NOTE 15: SEGMENT REPORTING

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for additional information about the conservatorship. The financial performance of our segments is measured

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2272          Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

based on each segment's contribution to GAAP net income (loss). In addition, our Investments segment is measured on its contribution to GAAP total comprehensive income (loss).

We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of income and comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments. These reclassifications and allocations are described in "NOTE 17: SEGMENT REPORTING" in our 2010 Annual Report.

We do not consider our assets by segment when evaluating segment performance or allocating resources. We conduct our operations solely in the U.S. and its territories. Therefore, we do not generate any revenue from geographic locations outside of the U.S. and its territories.

## Segments

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. The chart below provides a summary of our three reportable segments and the All Other category. As reflected in the chart, certain activities that are not part of a reportable segment are included in the All Other category. The All Other category consists of material corporate level expenses that are: (a) non-recurring in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods.

TREASURY-2273

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| Segment | Description | Activities/Items |
|---|---|---|
| Investments | Segment Earnings for the Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans funded by other debt issuances and hedged using derivatives. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. The Investments segment also reflects the impact of changes in fair value of CMBS and multifamily held-for-sale loans associated with changes in interest rates. | • Investments in mortgage-related securities and single-family performing mortgage loans<br><br>• Investments in asset-backed securities<br><br>• All other traded instruments / securities, excluding CMBS and multifamily housing revenue bonds<br><br>• Debt issuances<br><br>• All asset / liability management returns<br><br>• Guarantee buy-ups / buy-downs, net of execution gains / losses<br><br>• Cash and liquidity management<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated administrative expenses and taxes |
| Single-Family Guarantee | Segment Earnings for the Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related security in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less the credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses. | • Management and guarantee fees on PCs, including those retained by us, and single-family mortgage loans in the mortgage investments portfolio<br><br>• Up-front credit delivery fees<br><br>• Adjustments for security performance<br><br>• Credit losses on all single-family assets<br><br>• Expected net float income or expense on the single-family credit guarantee portfolio<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated debt costs, administrative expenses and taxes |
| Multifamily | Segment Earnings for the Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, our purchases of such loans have declined significantly since 2010 and our purchases of such CMBS have declined significantly since 2008. Currently, our primary strategy is to purchase multifamily mortgage loans for purposes of aggregation and then securitization. We guarantee the senior tranches of these securitizations. The Multifamily segment does not issue REMIC securities but does issue Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less allocated funding costs, the credit-related expenses, and administrative expenses. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in the fair value of CMBS and held-for-sale loans associated only with factors other than changes in interest rates, such as liquidity and credit. | • Multifamily mortgage loans held-for-sale and associated securitization activities<br><br>• Investments in CMBS, multifamily housing revenue bonds, and multifamily mortgage loans held-for-investment<br><br>• Allocated debt costs, administrative expenses and taxes<br><br>• Other guarantee commitments on multifamily mortgage loans<br><br>• LIHTC and valuation allowance<br><br>• Deferred tax asset valuation allowance |
| All Other | The All Other category consists of corporate-level expenses that are material and infrequent in nature and based on management decisions outside the control of the reportable segments. | • LIHTC write-down<br><br>• Tax settlements, as applicable<br><br>• Legal settlements, as applicable<br><br>• The deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward. |

## Segment Earnings

The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac. However, the accounting principles we apply to present certain financial statement line items in Segment Earnings for our reportable segments, in particular Segment Earnings net interest income and management and guarantee income, differ

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

significantly from those applied in preparing the comparable line items in our  consolidated financial statements prepared in accordance with GAAP. Accordingly, the results of such line items differ significantly from, and should not be used as a substitute for,  the comparable line items as determined in accordance with GAAP. For reconciliations of the Segment Earnings line items to the  comparable line items in our consolidated financial statements  prepared in accordance with GAAP, see "Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."

<div align="center">154</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In presenting Segment Earnings net interest income and management and guarantee income, we make adjustments to better reflect how management measures and assesses the performance of each segment and the company as a whole. These adjustments relate to amounts that, effective January 1, 2010, are no longer reflected in net income (loss) as determined in accordance with GAAP as a result of the adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. These adjustments are reversed through the segment adjustments line item within Segment Earnings, so that Segment Earnings (loss) for each segment equals GAAP net income (loss) attributable to Freddie Mac for each segment. Segment adjustments consist of the following:

- We adjust our Segment Earnings net interest income for the Investments segment to include the amortization of cash premiums and discounts and buy-up and buy-down fees on the consolidated Freddie Mac mortgage-related securities we purchase as investments. As of September 30, 2011, the unamortized balance of such premiums and discounts and buy-up and buy-down fees was $2.2 billion. These adjustments are necessary to reflect the economic yield realized on investments in consolidated Freddie Mac mortgage-related securities purchased at a premium or discount or with buy-up or buy-down fees.

- We adjust our Segment Earnings management and guarantee income for the Single-family Guarantee segment to include the amortization of delivery fees recorded in periods prior to the January 1, 2010 adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. As of September 30, 2011, the unamortized balance of such fees was $2.4 billion. We consider such fees to be part of the effective rate of the guarantee fee on guaranteed mortgage loans. This adjustment is necessary in order to better reflect the realization of revenue associated with guarantee contracts over the life of the underlying loans.

Table 15.1 presents Segment Earnings by segment.

**Table 15.1 — Summary of Segment Earnings and Total Comprehensive Income (Loss)[1]**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Segment Earnings (loss), net of taxes: | | | | |
| Investments | $ (1,079) | $ 284 | $ 1,068 | $ (1,440) |
| Single-family Guarantee | (3,545) | (3,138) | (7,751) | (13,239) |
| Multifamily | 205 | 381 | 764 | 752 |
| All Other | (3) | (38) | 34 | 15 |
| Total Segment Earnings (loss), net of taxes | (4,422) | (2,511) | (5,885) | (13,912) |
| Net income (loss) attributable to Freddie Mac | $(4,422) | $ (2,511) | $(5,885) | $(13,912) |
| Total comprehensive income (loss) of segments: | | | | |
| Investments | $ 268 | $ 3,601 | $ 4,174 | $ 8,611 |
| Single-family Guarantee | (3,545) | (3,137) | (7,754) | (13,241) |
| Multifamily | (1,096) | 1,010 | 810 | 3,741 |
| All Other | (3) | (38) | 34 | 15 |
| Total comprehensive income (loss) of segments | (4,376) | 1,436 | (2,736) | (874) |
| Total comprehensive income (loss) attributable to Freddie Mac | $(4,376) | $ 1,436 | $ (2,736) | $ (874) |

(1) The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.
Powered by Morningstar® Document Research℠

TREASURY-2276

Table of Contents

Table 15.2 presents detailed financial information by financial statement line item for our reportable segments and All Other.

## Table 15.2 — Segment Earnings and Reconciliation to GAAP Results

### Three Months Ended September 30, 2011

| | Net Interest Income | (Provision) Benefit for Credit Losses | Non-Interest Income (Loss): Management and Guarantee Income[1] | Non-Interest Income (Loss): Security Impairments | Non-Interest Income (Loss): Derivative Gains (Loss) | Non-Interest Income (Loss): Other Non-Interest Income (Loss) | Non-Interest Expense: Administrative Expenses | Non-Interest Expense: REO Operations Income (Expense) | Non-Interest Expense: Other Non-Interest Expense | Segment Adjustments[2] | Income Tax (Expense) Benefit | Net Income (Loss) | Less: Net (Income) Loss – Noncontrolling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | (in millions) | | | | | | | | |
| Investments | $ 1,905 | $ — | $ — | (116) | $ (3,144) | $ 178 | (97) | — | $ (1) | 137 | $ 59 | (1,079) | $ — | (1,079) | $ 1,347 | 268 |
| Single-family Guarantee | (98) | (4,008) | 913 | — | — | 331 | (227) | (226) | (69) | (161) | — | (3,545) | — | (3,545) | — | (3,545) |
| Multifamily | 314 | 37 | 32 | (27) | (1) | (83) | (57) | 5 | (15) | — | — | 205 | — | 205 | (1,301) | (1,096) |
| All Other | — | — | — | — | — | — | — | — | — | — | (3) | (3) | — | (3) | — | (3) |
| Total Segment Earnings (loss), net of taxes | 2,121 | (3,971) | 945 | (143) | (3,145) | 426 | (381) | (221) | (85) | (24) | 56 | (4,422) | — | (4,422) | 46 | (4,376) |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications[1] | 2,355 | 365 | (741) | (18) | (1,607) | (354) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments[2] | 137 | — | (161) | — | — | — | — | — | — | 24 | — | — | — | — | — | — |
| Total reconciling items | 2,492 | 365 | (902) | (18) | (1,607) | (354) | — | — | — | 24 | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $ 4,613 | (3,606) | 43 | (161) | (4,752) | 72 | (381) | (221) | (85) | — | 56 | (4,422) | — | (4,422) | 46 | (4,376) |

### Nine Months Ended September 30, 2011

| | Net Interest Income | (Provision) Benefit for Credit Losses | Non-Interest Income (Loss): Management and Guarantee Income[1] | Non-Interest Income (Loss): Security Impairments | Non-Interest Income (Loss): Derivative Gains (Loss) | Non-Interest Income (Loss): Other Non-Interest Income (Loss) | Non-Interest Expense: Administrative Expenses | Non-Interest Expense: REO Operations Income (Expense) | Non-Interest Expense: Other Non-Interest Expense | Segment Adjustments[2] | Income Tax (Expense) Benefit | Net Income (Loss) | Less: Net (Income) Loss – Noncontrolling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | (in millions) | | | | | | | | |
| Investments | $ 5,384 | $ — | $ — | (1,284) | $ (4,197) | $ 657 | (293) | — | $ (2) | 466 | $ 337 | $ 1,068 | $ — | 1,068 | $ 3,106 | 4,174 |
| Single-family Guarantee | (28) | (9,178) | 2,631 | — | — | 750 | (670) | (518) | (241) | (489) | (8) | (7,751) | — | (7,751) | (3) | (7,754) |
| Multifamily | 897 | 110 | 90 | (344) | 3 | 215 | (163) | 13 | (56) | — | (1) | 764 | — | 764 | 46 | 810 |
| All Other | — | — | — | — | — | — | — | — | — | — | 34 | 34 | — | 34 | — | 34 |
| Total Segment Earnings (loss), net of taxes | 6,253 | (9,068) | 2,721 | (1,628) | (4,194) | 1,622 | (1,126) | (505) | (299) | (23) | 362 | (5,885) | — | (5,885) | 3,149 | (2,736) |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications[1] | 6,995 | 944 | (2,110) | (78) | (4,792) | (959) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments[2] | 466 | — | (489) | — | — | — | — | — | — | 23 | — | — | — | — | — | — |
| Total reconciling items | 7,461 | 944 | (2,599) | (78) | (4,792) | (959) | — | — | — | 23 | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $ 13,714 | (8,124) | 122 | (1,706) | (8,986) | 663 | (1,126) | (505) | (299) | — | 362 | (5,885) | — | (5,885) | 3,149 | (2,736) |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2277                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Three Months Ended September 30, 2010**

| | Net Interest Income | Provision for Credit Losses | Non-Interest Income (Loss) | | | | Non-Interest Expense | | | Segment Adjustments[2] | Income Tax (Expense) Benefit | Net Income (Loss) | Less: Net (Income) Loss – Noncontrolling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
| | | | Management and Guarantee Income[1] | Security Impairments | Derivative Gains (Losses) | Other Non-Interest Income (Loss) | Administrative Expenses | REO Operations Expense | Other Non-Interest Expense | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | (in millions) | | | | | | | |
| Investments | $ 1,667 | $ — | $ — | $ (934) | $ 192 | $ (768) | $ (110) | $ — | $ (1) | $ 272 | $ (34) | $ 284 | $ — | $ 284 | $ 3,317 | $ 3,601 |
| Single-family Guarantee | (4) | (3,980) | 922 | — | — | 307 | (224) | (337) | (85) | (245) | 508 | (3,138) | — | (3,138) | 1 | (3,137) |
| Multifamily | 290 | (19) | 25 | (5) | 1 | 185 | (54) | — | (17) | — | (25) | 381 | — | 381 | 629 | 1,010 |
| All Other | — | — | — | — | — | — | — | — | — | — | (38) | (38) | — | (38) | — | (38) |
| Total Segment Earnings (loss), net of taxes | 1,953 | (3,999) | 947 | (939) | 193 | (276) | (388) | (337) | (103) | 27 | 411 | (2,511) | — | (2,511) | 3,947 | 1,436 |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications[3] | 2,054 | 272 | (667) | (161) | (1,323) | (175) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments[2] | 272 | — | (245) | — | — | — | — | — | — | (27) | — | — | — | — | — | — |
| Total reconciling items | 2,326 | 272 | (912) | (161) | (1,323) | (175) | — | — | — | (27) | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $ 4,279 | $ (3,727) | $ 35 | $ (1,100) | $ (1,130) | $ (451) | $ (388) | $ (337) | $ (103) | $ — | $ 411 | $ (2,511) | $ — | $ (2,511) | $ 3,947 | $ 1,436 |

**Nine Months Ended September 30, 2010**

| | Net Interest Income | Provision for Credit Losses | Non-Interest Income (Loss) | | | | Non-Interest Expense | | | Segment Adjustments[2] | Income Tax (Expense) Benefit | Net Income (Loss) | Less: Net (Income) Loss – Noncontrolling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
| | | | Management and Guarantee Income[1] | Security Impairments | Derivative Gains (Losses) | Other Non-Interest Income (Loss) | Administrative Expenses | REO Operations Expense | Other Non-Interest Expense | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | (in millions) | | | | | | | |
| Investments | $ 4,487 | $ — | $ — | $ (1,637) | $ (4,703) | $ (496) | $ (343) | $ — | $ (14) | $ 1,076 | $ 192 | $ (1,438) | $ (2) | $ (1,440) | $ 10,051 | $ 8,611 |
| Single-family Guarantee | 106 | (15,315) | 2,635 | — | — | 785 | (695) | (452) | (254) | (666) | 617 | (13,239) | — | (13,239) | (2) | (13,241) |
| Multifamily | 806 | (167) | 74 | (77) | 5 | 348 | (159) | (4) | (53) | — | (24) | 749 | 3 | 752 | 2,989 | 3,741 |
| All Other | — | — | — | — | — | — | — | — | — | — | 15 | 15 | — | 15 | — | 15 |
| Total Segment Earnings (loss), net of taxes | 5,399 | (15,482) | 2,709 | (1,714) | (4,698) | 637 | (1,197) | (456) | (321) | 410 | 800 | (13,913) | 1 | (13,912) | 13,038 | (874) |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications[3] | 6,065 | 1,330 | (1,936) | (324) | (4,955) | (180) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments[2] | 1,076 | — | (666) | — | — | — | — | — | — | (410) | — | — | — | — | — | — |
| Total reconciling items | 7,141 | 1,330 | (2,602) | (324) | (4,955) | (180) | — | — | — | (410) | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $ 12,540 | $ (14,152) | $ 107 | $ (2,038) | $ (9,653) | $ 457 | $ (1,197) | $ (456) | $ (321) | $ — | $ 800 | $ (13,913) | $ 1 | $ (13,912) | $ 13,038 | $ (874) |

(1) Management and guarantee income total per consolidated statements of income and comprehensive income is included in other income on our GAAP consolidated statements of income and comprehensive income.

(2) See "Segment Earnings" for additional information regarding these adjustments.

(3) See "NOTE 17: SEGMENT REPORTING — Segment Earnings — *Investment Activity-Related Reclassifications*" and "— *Credit Guarantee Activity-Related Reclassifications*" in our 2010 Annual Report for information regarding these reclassifications.

*Freddie Mac*

TREASURY-2278

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 15.3 presents total comprehensive income (loss) by segment.

### Table 15.3 — Total Comprehensive Income (Loss) of Segments[1]

#### Three Months Ended September 30, 2011

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ (1,079) | $ 1,221 | $ 124 | $ 2 | $ 1,347 | $ 268 |
| Single-family Guarantee | (3,545) | — | — | — | — | (3,545) |
| Multifamily | 205 | (1,301) | — | — | (1,301) | (1,096) |
| All Other | (3) | — | — | — | — | (3) |
| Total per consolidated statements of income and comprehensive income | $ (4,422) | $ (80) | $ 124 | $ 2 | $ 46 | $ (4,376) |

#### Nine Months Ended September 30, 2011

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 1,068 | $ 2,718 | $ 390 | $ (2) | $ 3,106 | $ 4,174 |
| Single-family Guarantee | (7,751) | — | — | (3) | (3) | (7,754) |
| Multifamily | 764 | 46 | 1 | (1) | 46 | 810 |
| All Other | 34 | — | — | — | — | 34 |
| Total per consolidated statements of income and comprehensive income | $ (5,885) | $ 2,764 | $ 391 | $ (6) | $ 3,149 | $ (2,736) |

#### Three Months Ended September 30, 2010

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 284 | $ 3,152 | $ 164 | $ 1 | $ 3,317 | $ 3,601 |
| Single-family Guarantee | (3,138) | — | — | 1 | 1 | (3,137) |
| Multifamily | 381 | 629 | — | — | 629 | 1,010 |
| All Other | (38) | — | — | — | — | (38) |
| Total per consolidated statements of income and comprehensive income | $ (2,511) | $ 3,781 | $ 164 | $ 2 | $ 3,947 | $ 1,436 |

#### Nine Months Ended September 30, 2010

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ (1,440) | $ 9,533 | $ 520 | $ (2) | $ 10,051 | $ 8,611 |
| Single-family Guarantee | (13,239) | — | — | (2) | (2) | (13,241) |
| Multifamily | 752 | 2,991 | — | (2) | 2,989 | 3,741 |
| All Other | 15 | — | — | — | — | 15 |
| Total per consolidated statements of income and comprehensive income | $ (13,912) | $ 12,524 | $ 520 | $ (6) | $ 13,038 | $ (874) |

(1) The sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

*Freddie Mac*

TREASURY-2279

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## NOTE 16: REGULATORY CAPITAL

On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship in light of the Purchase Agreement. FHFA continues to closely monitor our capital levels, but the existing statutory and FHFA-directed regulatory capital requirements are not binding during conservatorship. We continue to provide our submission to FHFA on minimum capital.

Our regulatory minimum capital is a leverage-based measure that is generally calculated based on GAAP and reflects a 2.50% capital requirement for on-balance sheet assets and 0.45% capital requirement for off-balance sheet obligations. Based upon our adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs, we determined that, under the new consolidation guidance, we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions and, therefore, effective January 1, 2010, we consolidated on our balance sheet the assets and liabilities of these trusts. Pursuant to regulatory guidance from FHFA, our minimum capital requirement was not automatically affected by adoption of these amendments. Specifically, upon adoption of these amendments, FHFA directed us, for purposes of minimum capital, to continue reporting single-family PCs and certain Other Guarantee Transactions held by third parties using a 0.45% capital requirement. FHFA reserves the authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities. On March 3, 2011, FHFA issued a final rule setting forth procedures and standards in the event FHFA were to make such a temporary increase in minimum capital levels. Table 16.1 summarizes our minimum capital requirements and deficits and net worth.

### Table 16.1 — Net Worth and Minimum Capital

| | September 30, 2011 | | December 31, 2010 | |
| --- | ---: | --- | ---: | --- |
| | (in millions) | | | |
| GAAP net worth[1] | $ | (5,991) | $ | (401) |
| Core capital (deficit)[2][3] | $ | (63,288) | $ | (52,570) |
| Less: Minimum capital requirement[2] | | 24,603 | | 25,987 |
| Minimum capital surplus (deficit)[2] | $ | (87,891) | $ | (78,557) |

(1) Net worth (deficit) represents the difference between our assets and liabilities under GAAP.
(2) Core capital and minimum capital figures for September 30, 2011 are estimates. FHFA is the authoritative source for our regulatory capital.
(3) Core capital excludes certain components of GAAP total equity (deficit) (*i.e.*, AOCI, liquidation preference of the senior preferred stock) as these items do not meet the statutory definition of core capital.

Following our entry into conservatorship, we have focused our risk and capital management, consistent with the objectives of conservatorship, on, among other things, maintaining a positive balance of GAAP equity in order to reduce the likelihood that we will need to make additional draws on the Purchase Agreement with Treasury, while returning to long-term profitability. The Purchase Agreement provides that, if FHFA determines as of quarter end that our liabilities have exceeded our assets under GAAP, Treasury will contribute funds to us in an amount equal to the difference between such liabilities and assets.

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has advised us that, if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination. If funding has been requested under the Purchase Agreement to address a deficit in our net worth, and Treasury is unable to provide us with such funding within the 60-day period specified by FHFA, FHFA would be required to place us into receivership if our assets remain less than our obligations during that 60-day period.

To address our net worth deficit of $6.0 billion at September 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $6.0 billion, and will request that we receive these funds by December 31, 2011. Commencing in the second quarter of 2011, our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. Upon funding of this draw request, our aggregate funding received from Treasury under the Purchase Agreement will increase to $71.2 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. As a result of the additional $6.0 billion draw request, the aggregate liquidation preference on the senior preferred stock owned by Treasury will increase from $66.2 billion at September 30, 2011 to $72.2 billion. We paid a quarterly dividend of $1.6 billion, $1.6 billion, and $1.6 billion on the senior preferred stock in cash on March 31, 2011, June 30, 2011, and September 30, 2011, respectively, at the direction of the Conservator. Following funding of the draw request related to our net worth deficit at

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2280

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

September 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $6.6 billion to $7.2 billion, which exceeds our annual historical earnings in all but one period.

## NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS

**Single-family Credit Guarantee Portfolio**

Our business activity is to participate in and support the residential mortgage market in the United States, which we pursue by both issuing guaranteed mortgage securities and investing in mortgage loans and mortgage-related securities.

Table 17.1 summarizes the concentration by year of origination and geographical area of the approximately $1.8 trillion UPB of our single-family credit guarantee portfolio at both September 30, 2011 and December 31, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" and "NOTE 7: INVESTMENTS IN SECURITIES" for more information about credit risk associated with loans and mortgage-related securities that we hold.

**Table 17.1 — Concentration of Credit Risk — Single-Family Credit Guarantee Portfolio**

|  | September 30, 2011 | | December 31, 2010 | | Percent of Credit Losses[1] Nine Months Ended | |
|  | Percentage of Portfolio[2] | Serious Delinquency Rate[3] | Percentage of Portfolio[2] | Serious Delinquency Rate[3] | September 30, 2011 | September 30, 2010 |
|---|---|---|---|---|---|---|
| **Year of Origination** | | | | | | |
| 2011 | 10% | <0.1% | N/A | N/A | — | N/A |
| 2010 | 20 | 0.2 | 18% | 0.1% | <1% | — |
| 2009 | 20 | 0.4 | 21 | 0.3 | 1 | <1% |
| 2008 | 7 | 5.2 | 9 | 4.9 | 8 | 6 |
| 2007 | 10 | 11.2 | 11 | 11.6 | 36 | 34 |
| 2006 | 7 | 10.5 | 9 | 10.5 | 28 | 31 |
| 2005 | 8 | 6.2 | 10 | 6.0 | 18 | 20 |
| 2004 and prior | 18 | 2.6 | 22 | 2.5 | 9 | 9 |
| Total | 100% | 3.5% | 100% | 3.8% | 100% | 100% |
| **Region[4]** | | | | | | |
| West | 28% | 3.7% | 27% | 4.7% | 54% | 47% |
| Northeast | 25 | 3.2 | 25 | 3.2 | 7 | 9 |
| North Central | 18 | 2.9 | 18 | 3.1 | 15 | 16 |
| Southeast | 17 | 5.4 | 18 | 5.6 | 20 | 25 |
| Southwest | 12 | 1.8 | 12 | 2.1 | 4 | 3 |
| Total | 100% | 3.5% | 100% | 3.8% | 100% | 100% |
| **State[5]** | | | | | | |
| California | 16% | 3.5% | 16% | 4.9% | 30% | 26% |
| Florida | 6 | 10.7 | 6 | 10.5 | 12 | 19 |
| Illinois | 5 | 4.6 | 5 | 4.6 | 4 | 6 |
| Georgia | 3 | 3.4 | 3 | 4.1 | 4 | 3 |
| Michigan | 3 | 2.3 | 3 | 3.0 | 5 | 5 |
| Arizona | 2 | 4.3 | 3 | 6.1 | 12 | 11 |
| Nevada | 1 | 10.3 | 1 | 11.9 | 7 | 5 |
| All other | 64 | N/A | 63 | N/A | 26 | 25 |
| Total | 100% | 3.5% | 100% | 3.8% | 100% | 100% |

(1) Credit losses consist of the aggregate amount of charge-offs, net of recoveries, and REO operations expense in each of the respective periods and exclude foregone interest on non-performing loans and other market-based losses recognized on our consolidated statements of income and comprehensive income.

(2) Based on the UPB of our single-family credit guarantee portfolio, which includes unsecuritized single-family mortgage loans held by us on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities, or covered by our other guarantee commitments.

(3) Serious delinquencies on mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice.

(4) Region designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

(5) States presented based on those with the highest percentage of credit losses during the nine months ended September 30, 2011. Our top seven states based on the highest percentage of UPB as of September 30, 2011 are: California (16%), Florida (6%), Illinois (5%), New York (5%), Texas (5%), New Jersey (4%), and Virginia (4%), and comprised 45% of our single-family credit guarantee portfolio as of September 30, 2011.

**Credit Performance of Certain Higher Risk Single-Family Loan Categories**

Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011    TREASURY-2281    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

or asset documentation requirements compared to a full documentation mortgage loan, or both. However, there is no universally accepted definition of subprime or Alt-A. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as Alt-A in Table 17.2 because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred.

Although we do not categorize single-family mortgage loans we purchase or guarantee as prime or subprime, we recognize that there are a number of mortgage loan types with certain characteristics that indicate a higher degree of credit risk. For example, a borrower's credit score is a useful measure for assessing the credit quality of the borrower. Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores.

Presented below is a summary of the serious delinquency rates of certain higher-risk categories of single-family loans in our single-family credit guarantee portfolio. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Loans with a combination of these attributes will have an even higher risk of delinquency than those with isolated characteristics.

### Table 17.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio[1]

| | Percentage of Portfolio[1] | | Serious Delinquency Rate | |
|---|---|---|---|---|
| | September 30, 2011 | December 31, 2010 | September 30, 2011 | December 31, 2010 |
| Interest-only | 4% | 5% | 17.7% | 18.4% |
| Option ARM | <1 | 1 | 21.2 | 21.2 |
| Alt-A[2] | 6 | 6 | 11.8 | 12.2 |
| Original LTV ratio greater than 90%[3] | 9 | 9 | 6.7 | 7.8 |
| Lower original FICO scores (less than 620) | 3 | 3 | 12.7 | 13.9 |

(1) Based on UPB.

(2) Alt-A loans may not include those loans that were previously classified as Alt-A and that have been refinanced as either a relief refinance mortgage or in another refinance mortgage initiative.

(3) Based on our first lien exposure on the property. Includes the credit-enhanced portion of the loan and excludes any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, increases the risk of default.

The percentage of borrowers in our single-family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 19% and 18% at September 30, 2011 and December 31, 2010, respectively. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is more likely to default than other borrowers. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 12.7% and 14.9% as of September 30, 2011 and December 31, 2010, respectively.

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on these categories and other concentrations in our investments in securities.

### Multifamily Mortgage Portfolio

Table 17.3 summarizes the concentration of multifamily mortgages in our multifamily mortgage portfolio by certain attributes. Information presented for multifamily mortgage loans includes certain categories based on loan or borrower characteristics present at origination. The table includes a presentation of each category in isolation. A single loan may fall within more than one category (for example, a non-credit enhanced loan may also have an original LTV ratio greater than 80%).

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2282          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 17.3 — Concentration of Credit Risk — Multifamily Mortgage Portfolio**

| | September 30, 2011 | | December 31, 2010 | |
|---|---|---|---|---|
| | UPB(1) | Delinquency Rate(2) | UPB(1) | Delinquency Rate(2) |
| State | | | | |
| California | $ 19.6 | 0.02% | $ 19.3 | 0.06% |
| Texas | 13.7 | 0.67 | 12.7 | 0.52 |
| New York | 9.3 | — | 9.2 | — |
| Florida | 6.9 | 0.05 | 6.4 | 0.56 |
| Georgia | 5.7 | 2.06 | 5.5 | 0.98 |
| Maryland | 5.6 | 1.11 | 5.3 | — |
| All other states | 51.6 | 0.19 | 50.0 | 0.24 |
| Total | $112.4 | 0.33% | $108.4 | 0.26% |
| Region(3) | | | | |
| Northeast | $ 31.6 | 0.22% | $ 31.1 | —% |
| West | 29.1 | 0.05 | 28.3 | 0.07 |
| Southwest | 21.6 | 0.66 | 20.2 | 0.61 |
| Southeast | 20.3 | 0.68 | 19.2 | 0.59 |
| North Central | 9.8 | 0.13 | 9.6 | 0.30 |
| Total | $112.4 | 0.33% | $108.4 | 0.26% |
| Category(4) | | | | |
| Original LTV ratio greater than 80% | $ 6.4 | 2.65% | $ 6.6 | 2.30% |
| Original DSCR below 1.10 | 2.9 | 3.26 | 3.2 | 1.22 |
| Non-credit enhanced loans | 83.5 | 0.18 | 87.5 | 0.12 |

(1) Beginning in the second quarter of 2011, we exclude non-consolidated mortgage-related securities for which we do not provide our guarantee. The prior period has been revised to conform to the current period presentation.

(2) Based on the UPB of multifamily mortgages two monthly payments or more delinquent or in foreclosure.

(3) See endnote (4) to "Table 17.1 — Concentration of Credit Risk — Single-family Credit Guarantee Portfolio" for a description of these regions.

(4) These categories are not mutually exclusive and a loan in one category may also be included within another.

One indicator of risk for mortgage loans in our multifamily mortgage portfolio is the amount of a borrower's equity in the underlying property. A borrower's equity in a property decreases as the LTV ratio increases. Higher LTV ratios negatively affect a borrower's ability to refinance or sell a property for an amount at or above the balance of the outstanding mortgage. The DSCR is another indicator of future credit performance. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

Our multifamily mortgage portfolio includes certain loans for which we have credit enhancement. Credit enhancement significantly reduces our exposure to a potential credit loss. As of September 30, 2011, more than one-half of the multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two monthly payments or more past due had credit enhancements that we currently believe will mitigate our expected losses on those loans.

We estimate that the percentage of loans in our multifamily mortgage portfolio with a current LTV ratio of greater than 100% was approximately 6% and 8% at September 30, 2011 and December 31, 2010, respectively, and our estimate of the current average DSCR for these loans was 1.1 at both September 30, 2011 and December 31, 2010. We estimate that the percentage of loans in our multifamily mortgage portfolio with a current DSCR less than 1.0 was 5% and 7% at September 30, 2011 and December 31, 2010, respectively, and the average current LTV ratio of these loans was 107% and 108%, respectively. Our estimates of current DSCRs are based on the latest available income information for these properties and our assessments of market conditions. Our estimates of the current LTV ratios for multifamily loans are based on values we receive from a third-party service provider as well as our internal estimates of property value, for which we may use changes in tax assessments, market vacancy rates, rent growth and comparable property sales in local areas as well as third-party appraisals for a portion of the portfolio. We periodically perform our own valuations or obtain third-party appraisals in cases where a significant deterioration in a borrower's financial condition has occurred, the borrower has applied for refinancing, or in certain other circumstances where we deem it appropriate to reassess the property value. Although we use the most recently available results of our multifamily borrowers to estimate a property's value, there may be a significant lag in reporting, which could be six months or more, as they complete their results in the normal course of business. Our internal estimates of property valuation are derived using techniques that include income capitalization, discounted cash flows, sales comparables, or replacement costs.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-2283

Table of Contents

### Seller/Servicers

We acquire a significant portion of our single-family mortgage purchase volume from several large seller/servicers with whom we have entered into mortgage purchase volume commitments that provide for the lenders to deliver us up to a specified dollar amount of mortgages during a specified period of time. Our top 10 single-family seller/servicers provided approximately 84% of our single-family purchase volume during the nine months ended September 30, 2011. Wells Fargo Bank, N.A., JPMorgan Chase Bank, N.A., and Bank of America, N.A., accounted for 27%, 14%, and 10%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume during the nine months ended September 30, 2011. We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated without replacement from other lenders.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our seller/servicers of their obligations to repurchase mortgages or (at our option) indemnify us in the event of: (a) breaches of the representations and warranties they made when they sold the mortgages to us; or (b) failure to comply with our servicing requirements. Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts. As of September 30, 2011 and December 31, 2010, the UPB of loans subject to our repurchase requests issued to our single-family seller/servicers was approximately $2.7 billion and $3.8 billion, and approximately 40% and 34% of these requests, respectively, were outstanding for more than four months since issuance of our initial repurchase request as measured by the UPB of the loans subject to the requests. During the three and nine months ended September 30, 2011, respectively, we recovered amounts that covered losses with respect to $1.1 billion and $3.5 billion of UPB on loans subject to our repurchase requests.

On August 24, 2009, one of our single-family seller/servicers, Taylor, Bean & Whitaker Mortgage Corp., or TBW, filed for bankruptcy and announced its plan to wind down its operations. We had exposure to TBW with respect to its loan repurchase obligations. We also had exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac. Colonial Bank was placed into receivership by the FDIC in August 2009.

With the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement was filed with the bankruptcy court on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011, which became effective on August 10, 2011. We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors, may file an action to recover certain funds paid to us prior to the TBW bankruptcy. See "NOTE 19: LEGAL CONTINGENCIES" for additional information on the settlement, our claims arising from TBW's bankruptcy, and Ocala's potential claims.

As previously disclosed, we joined an investor group that delivered a notice of non-performance in 2010 to The Bank of New York Mellon, as Trustee, and Countrywide Home Loans Servicing LP (now known as BAC Home Loans Servicing, LP), related to the possibility that certain mortgage pools backing certain mortgage-related securities issued by Countrywide Financial Corporation and related entities include mortgages that may have been ineligible for inclusion in the pools due to breaches of representations or warranties.

On June 29, 2011, Bank of America Corporation announced that it, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and Countrywide Home Loans, Inc. entered into a settlement agreement with The Bank of New York Mellon, as trustee, to resolve all outstanding and potential claims related to alleged breaches of representations and warranties (including repurchase claims), substantially all historical loan servicing claims and certain other historical claims with respect to 530 Countrywide first-lien and second-lien residential mortgage-related securitization trusts. Bank of America indicated that the settlement is subject to final court approval and certain other conditions, including the receipt of a private letter ruling from the IRS. There can be no assurance that final court approval of the settlement will be obtained or that all conditions will be satisfied. Bank of America noted that, given the number of investors and the complexity of the settlement, it is not possible to predict the timing or ultimate outcome of the court approval process, which could take a substantial period of time. We have investments in certain of these Countrywide securitization trusts and would expect to benefit from this settlement, if final court approval is obtained.

In connection with the settlement, Bank of America Corporation entered into an agreement with the investor group. Under this agreement, the investor group agreed, among other things, to use reasonable best efforts and to cooperate in good faith to effectuate the settlement, including to obtain final court approval. Freddie Mac was not a party to this

<div align="center">163</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

agreement, but agreed to retract any previously delivered notices of non-performance upon final court approval of the settlement.

The Bank of New York Mellon, as trustee, filed the settlement in state court in New York and planned to seek approval at a hearing, which approval would bind all investors in the related trusts. The court directed that any objections to the settlement be filed no later than August 30, 2011. On August 30, 2011, FHFA announced that, in its capacity as conservator, it had filed an appearance and conditional objection regarding the settlement, in order to obtain any additional pertinent information developed in the matter. In the announcement, FHFA, as conservator, stated that it is aware of no basis upon which it would raise a substantive objection to the settlement at this time, but that it believes it prudent not only to receive additional information as it continues its due diligence of the settlement, but also to reserve its capability to voice a substantive objection in the unlikely event that necessity should arise.

On August 26, 2011, the case was removed to Federal court. The trustee filed a motion to remand the case back to state court. On October 19, 2011, the Federal court denied the trustee's motion to remand. The trustee has the right to appeal this decision; there is no assurance that the trustee would be successful on any such appeal.

On September 2, 2011, FHFA announced that it, as conservator for Freddie Mac and Fannie Mae, has filed lawsuits against 17 financial institutions and related defendants alleging violations of federal securities laws and common law in the sale of residential non-agency mortgage-related securities to Freddie Mac and Fannie Mae. FHFA, as conservator, filed a similar lawsuit against UBS Americas, Inc. and related defendants on July 27, 2011. FHFA seeks to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non-agency mortgage-related securities issued by these financial institutions.

The ultimate amounts of recovery payments we receive from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations. Our estimate of probable incurred losses for exposure to seller/servicers for their repurchase obligations is considered in our allowance for loan losses as of September 30, 2011 and December 31, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for further information. We believe we have appropriately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at September 30, 2011 and December 31, 2010; however, our actual losses may exceed our estimates.

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loss mitigation efforts, including under the MHA Program, and therefore, we have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top five single-family loan servicers, Wells Fargo Bank N.A., Bank of America N.A., JPMorgan Chase Bank, N.A., Citimortgage, Inc., and U.S. Bank, N.A., together serviced approximately 67% of our single-family mortgage loans as of September 30, 2011. Wells Fargo Bank N.A., Bank of America N.A., and JPMorgan Chase Bank, N.A. serviced approximately 26%, 13% and 13%, respectively, of our single-family mortgage loans, as of September 30, 2011. Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

During the second half of 2010, a number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in some or all states in which they do business. These seller/servicers announced these suspensions were necessary while they evaluated and addressed issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits. While these servicers generally resumed foreclosure proceedings in the first quarter of 2011, the rate at which they are effecting foreclosures has been slower than prior to the suspensions. See "NOTE 7: REAL ESTATE OWNED" in our 2010 Annual Report for additional information.

As of September 30, 2011 our top four multifamily servicers, Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., CBRE Capital Markets, Inc., and Deutsche Bank Berkshire Mortgage, each serviced more than 10% of our multifamily mortgage portfolio and together serviced approximately 51% of our multifamily mortgage portfolio.

In our multifamily business, we are exposed to the risk that multifamily seller/servicers could come under financial pressure, which could potentially cause degradation in the quality of servicing they provide to us or, in certain cases, reduce the likelihood that we could recover losses through recourse agreements or other credit enhancements, where applicable. This risk primarily relates to multifamily loans that we hold on our consolidated balance sheets where we

<div align="center">164</div>

<div align="right">*Freddie Mac*</div>

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

retain all of the related credit risk. We monitor the status of all our multifamily seller/servicers in accordance with our counterparty credit risk management framework.

**Mortgage Insurers**

We have institutional credit risk relating to the potential insolvency of or non-performance by mortgage insurers that insure single-family mortgages we purchase or guarantee. We evaluate the recovery from insurance policies for mortgage loans that we hold for investment as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments as part of the estimate of our loan loss reserves. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for additional information. As of September 30, 2011, these insurers provided coverage, with maximum loss limits of $53.7 billion, for $254.3 billion of UPB, in connection with our single-family credit guarantee portfolio. Our top six mortgage insurer counterparties, Mortgage Guaranty Insurance Corporation (or MGIC), Radian Guaranty Inc., Genworth Mortgage Insurance Corporation, United Guaranty Residential Insurance Co., PMI Mortgage Insurance Co. (or PMI), and Republic Mortgage Insurance Co. (or RMIC) each accounted for more than 10% and collectively represented approximately 94% of our overall mortgage insurance coverage at September 30, 2011. All our mortgage insurance counterparties are rated BBB or below as of October 21, 2011, based on the lower of the S&P or Moody's rating scales and stated in terms of the S&P equivalent.

We received proceeds of $2.0 billion and $1.2 billion during the nine months ended September 30, 2011 and 2010, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers of $2.0 billion and $2.3 billion as of September 30, 2011 and December 31, 2010, respectively. The balance of our outstanding accounts receivable from mortgage insurers, net of associated reserves, was approximately $1.1 billion and $1.5 billion as of September 30, 2011 and December 31, 2010, respectively.

In August 2011, we suspended RMIC and its affiliates, and PMI and its affiliates, as approved mortgage insurers for Freddie Mac loans, making loans insured by either company ineligible for sale to Freddie Mac. During the third quarter of 2011, RMIC announced that its waiver of state regulatory capital requirements expired, and it ceased writing new business. PMI, which had exceeded its risk to capital requirements, also ceased writing new business during the third quarter of 2011. PMI has been put under state supervision, and PMI's state regulator has petitioned for judicial action to place PMI into receivership. PMI has announced that, effective October 24, 2011, it instituted a partial claim payment plan, under which claim payments will be made at 50%, with the remaining amount deferred as a policyholder claim. In the future, our mortgage insurance exposure will likely be concentrated among a smaller number of mortgage insurer counterparties.

As part of the estimate of our loan loss reserves, we evaluate the near term recovery from insurance policies for mortgage loans that we hold on our consolidated balance sheet as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments. Triad Guaranty Insurance Corp., or Triad, is continuing to pay claims 60% in cash and 40% in deferred payment obligation under orders of its state regulator. To date, the state regulator has not allowed Triad to begin paying its deferred payment obligations, and it is uncertain when or if Triad will be permitted to do so.

**Bond Insurers**

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering some of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. At September 30, 2011, we had coverage, including secondary policies, on non-agency mortgage-related securities totaling $9.9 billion of UPB. At September 30, 2011, our top five bond insurers, Ambac Assurance Corporation (or Ambac), Financial Guaranty Insurance Company (or FGIC), MBIA Insurance Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp., each accounted for more than 10% of our overall bond insurance coverage and collectively represented approximately 99% of our total coverage.

We evaluate the recovery from primary bond insurance policies as part of our impairment analysis for our investments in securities. FGIC and Ambac are currently not paying any claims. If a bond insurer fails to meet its obligations on our investments in securities, then the fair values of our securities may further decline, which could have a material adverse effect on our results and financial condition. We recognized other-than-temporary impairment losses during 2010 and 2011 related to investments in mortgage-related securities covered by bond insurance as a result of our uncertainty over whether or not certain insurers will meet our future claims in the event of a loss on the securities. See

<div align="center">165</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

"NOTE 7: INVESTMENTS IN SECURITIES" for further information on our evaluation of impairment on securities covered by bond insurance.

## Cash and Other Investments Counterparties

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. As of September 30, 2011 and December 31, 2010, there were $54.5 billion and $91.6 billion, respectively, of cash and other non- mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. As of September 30, 2011, these included:

- $4.2 billion of cash equivalents invested in 18 counterparties that had short-term credit ratings of A-1 or above on the S&P or equivalent scale;

- $3.1 billion of securities purchased under agreements to resell with two counterparties that had short-term S&P ratings of A-1 or above;

- $7.5 billion of securities purchased under agreements to resell with three counterparties that had short-term S&P ratings of A-2; and

- $39.0 billion of cash deposited with the Federal Reserve Bank.

## Derivative Portfolio

### Derivative Counterparties

Our use of derivatives exposes us to institutional credit risk, which arises from the possibility that the derivative counterparty will not be able to meet its contractual obligations. Exchange-traded derivatives, such as futures contracts, do not measurably increase our institutional credit risk because changes in the value of open exchange-traded contracts are settled daily through a financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk because transactions are executed and settled between us and our counterparty. Our use of OTC interest-rate swaps, option-based derivatives, and foreign-currency swaps is subject to rigorous internal credit and legal reviews. All of our OTC derivatives counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

### Master Netting and Collateral Agreements

We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest-rate swaps, option-based derivatives, and foreign-currency swaps. Master netting agreements provide for the netting of amounts receivable and payable from an individual counterparty, which reduces our exposure to a single counterparty in the event of default. On a daily basis, the market value of each counterparty's derivatives outstanding is calculated to determine the amount of our net credit exposure, which is equal to derivatives in a net gain position by counterparty after giving consideration to collateral posted. Our collateral agreements require most counterparties to post collateral for the amount of our net exposure to them above the applicable threshold. Bilateral collateral agreements are in place for the majority of our counterparties. Collateral posting thresholds are tied to a counterparty's credit rating. Derivative exposures and collateral amounts are monitored on a daily basis using both internal pricing models and dealer price quotes. Collateral is typically transferred within one business day based on the values of the related derivatives. This time lag in posting collateral can affect our net uncollateralized exposure to derivative counterparties.

Collateral posted by a derivative counterparty is typically in the form of cash, although U.S. Treasury securities, Freddie Mac mortgage-related securities, or our debt securities may also be posted. In the event a counterparty defaults on its obligations under the derivatives agreement and the default is not remedied in the manner prescribed in the agreement, we have the right under the agreement to direct the custodian bank to transfer the collateral to us or, in the case of non-cash collateral, to sell the collateral and transfer the proceeds to us.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our uncollateralized exposure to counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest-rate caps, after applying netting agreements and collateral, was $217 million and $32 million at September 30, 2011 and December 31, 2010, respectively. In the event that all of our counterparties for these derivatives were to have defaulted simultaneously on September 30, 2011, our maximum loss for accounting purposes would have been approximately $217 million. Four counterparties each accounted for greater than 10% and collectively accounted for 90% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at September 30, 2011. These counterparties were Barclays Bank PLC, Goldman Sachs Bank USA, JP Morgan Chase Bank, N.A., and Bank of America, N.A., all of which were rated "A" or above by S&P as of October 21, 2011.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives, was $65 million and $103 million at September 30, 2011 and December 31, 2010, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis to ensure that they continue to meet our internal risk-management standards.

### NOTE 18: FAIR VALUE DISCLOSURES

**Fair Value Hierarchy**

The accounting guidance for fair value measurements and disclosures establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. Assets and liabilities are classified in their entirety within the fair value hierarchy based on the lowest level input that is significant to the fair value measurement. Table 18.1 sets forth by level within the fair value hierarchy assets and liabilities measured and reported at fair value on a recurring basis in our consolidated balance sheets at September 30, 2011 and December 31, 2010.

167 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2288

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 18.1 — Assets and Liabilities Measured at Fair Value on a Recurring Basis**

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) (in millions) | Netting Adjustment(1) | Total |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $ — | $ 81,986 | $ 2,035 | $ — | $ 84,021 |
| Subprime | — | — | 28,888 | — | 28,888 |
| CMBS | — | 52,788 | 3,477 | — | 56,265 |
| Option ARM | — | — | 6,168 | — | 6,168 |
| Alt-A and other | — | 11 | 11,432 | — | 11,443 |
| Fannie Mae | — | 20,158 | 422 | — | 20,580 |
| Obligations of states and political subdivisions | — | — | 8,132 | — | 8,132 |
| Manufactured housing | — | — | 816 | — | 816 |
| Ginnie Mae | — | 258 | 13 | — | 271 |
| Total available-for-sale securities, at fair value | — | 155,201 | 61,383 | — | 216,584 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 14,490 | 2,098 | — | 16,588 |
| Fannie Mae | — | 16,982 | 621 | — | 17,603 |
| Ginnie Mae | — | 137 | 24 | — | 161 |
| Other | — | 60 | 18 | — | 78 |
| Total mortgage-related securities | — | 31,669 | 2,761 | — | 34,430 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 276 | — | — | 276 |
| Treasury bills | 1,000 | — | — | — | 1,000 |
| Treasury notes | 17,159 | — | — | — | 17,159 |
| FDIC-guaranteed corporate medium-term notes | — | 2,433 | — | — | 2,433 |
| Total non-mortgage-related securities | 18,159 | 2,709 | — | — | 20,868 |
| Total trading securities, at fair value | 18,159 | 34,378 | 2,761 | — | 55,298 |
| Total investments in securities | 18,159 | 189,579 | 64,144 | — | 271,882 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 6,275 | — | 6,275 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 13,036 | 92 | — | 13,128 |
| Option-based derivatives | 4 | 17,236 | — | — | 17,240 |
| Other | 6 | 164 | 56 | — | 226 |
| Subtotal, before netting adjustments | 10 | 30,436 | 148 | — | 30,594 |
| Netting adjustments(1) | — | — | — | (30,299) | (30,299) |
| Total derivative assets, net | 10 | 30,436 | 148 | (30,299) | 295 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 674 | — | 674 |
| Total assets carried at fair value on a recurring basis | $ 18,169 | $ 220,015 | $ 71,241 | $ (30,299) | $ 279,126 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ — | $ 3,291 | $ — | $ — | $ 3,291 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 37,005 | 21 | — | 37,026 |
| Option-based derivatives | 11 | 2,763 | 1 | — | 2,775 |
| Other | 6 | 162 | 52 | — | 220 |
| Subtotal, before netting adjustments | 17 | 39,930 | 74 | — | 40,021 |
| Netting adjustments(1) | — | — | — | (39,692) | (39,692) |
| Total derivative liabilities, net | 17 | 39,930 | 74 | (39,692) | 329 |
| Total liabilities carried at fair value on a recurring basis | $ 17 | $ 43,221 | $ 74 | $ (39,692) | $ 3,620 |

*Freddie Mac*

TREASURY-2289

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Fair Value at December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment(1) | Total |
| | | | (in millions) | | |
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $ — | $ 83,652 | $ 2,037 | $ — | $ 85,689 |
| Subprime | — | — | 33,861 | — | 33,861 |
| CMBS | — | 54,972 | 3,115 | — | 58,087 |
| Option ARM | — | — | 6,889 | — | 6,889 |
| Alt-A and other | — | 13 | 13,155 | — | 13,168 |
| Fannie Mae | — | 24,158 | 212 | — | 24,370 |
| Obligations of states and political subdivisions | — | — | 9,377 | — | 9,377 |
| Manufactured housing | — | — | 897 | — | 897 |
| Ginnie Mae | — | 280 | 16 | — | 296 |
| Total available-for-sale securities, at fair value | — | 163,075 | 69,559 | — | 232,634 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 11,138 | 2,299 | — | 13,437 |
| Fannie Mae | — | 17,872 | 854 | — | 18,726 |
| Ginnie Mae | — | 145 | 27 | — | 172 |
| Other | — | 11 | 20 | — | 31 |
| Total mortgage-related securities | — | 29,166 | 3,200 | — | 32,366 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 44 | — | — | 44 |
| Treasury bills | 17,289 | — | — | — | 17,289 |
| Treasury notes | 10,122 | — | — | — | 10,122 |
| FDIC-guaranteed corporate medium-term notes | — | 441 | — | — | 441 |
| Total non-mortgage-related securities | 27,411 | 485 | — | — | 27,896 |
| Total trading securities, at fair value | 27,411 | 29,651 | 3,200 | — | 60,262 |
| Total investments in securities | 27,411 | 192,726 | 72,759 | — | 292,896 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 6,413 | — | 6,413 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 9,921 | 49 | — | 9,970 |
| Option-based derivatives | — | 11,255 | — | — | 11,255 |
| Other | 3 | 266 | 21 | — | 290 |
| Subtotal, before netting adjustments | 3 | 21,442 | 70 | — | 21,515 |
| Netting adjustments(1) | — | — | — | (21,372) | (21,372) |
| Total derivative assets, net | 3 | 21,442 | 70 | (21,372) | 143 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 541 | — | 541 |
| Total assets carried at fair value on a recurring basis | $ 27,414 | $ 214,168 | $ 79,783 | $ (21,372) | $ 299,993 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ — | $ 4,443 | $ — | $ — | $ 4,443 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 26,856 | 623 | — | 27,479 |
| Option-based derivatives | 8 | 252 | 2 | — | 262 |
| Other | 170 | 28 | 136 | — | 334 |
| Subtotal, before netting adjustments | 178 | 27,136 | 761 | — | 28,075 |
| Netting adjustments(1) | — | — | — | (26,866) | (26,866) |
| Total derivative liabilities, net | 178 | 27,136 | 761 | (26,866) | 1,209 |
| Total liabilities carried at fair value on a recurring basis | $ 178 | $ 31,579 | $ 761 | $ (26,866) | $ 5,652 |

(1) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $10.7 billion and $6 million, respectively, at September 30, 2011. The net cash collateral posted and net trade/settle receivable were $6.3 billion and $1 million, respectively, at December 31, 2010. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.3) billion and $(0.8) billion at September 30, 2011 and December 31, 2010, respectively, which was mainly related to interest rate swaps that we have entered into.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                TREASURY-2290                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Recurring Fair Value Changes**

For the three and nine months ended September 30, 2011, we did not have any significant transfers between Level 1 and Level 2 assets or liabilities.

Our Level 3 items mainly consist of non-agency mortgage-related securities. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information about the valuation methods and assumptions used in our fair value measurements.

During the three and nine months ended September 30, 2011, the fair value of our Level 3 assets decreased due to: (a) monthly remittances of principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) the widening of OAS levels on these securities. During the three and nine months ended September 30, 2011, we had a net transfer into Level 3 assets of $98 million and $94 million, respectively, resulting from a change in valuation method for certain mortgage-related securities due to a lack of relevant price quotes from dealers and third-party pricing services.

During the third quarter of 2010, the fair value of our Level 3 assets increased due to: (a) a decline in market interest rates; and (b) fair value gains related to the movement of securities with unrealized losses towards maturity. For the nine months ended September 30, 2010, the fair value of our Level 3 assets decreased primarily due to the adoption of the amendments to the accounting standards for transfers of financial assets and consolidation of VIEs. These accounting changes resulted in the elimination of $28.8 billion in our Level 3 assets on January 1, 2010, including the elimination of certain mortgage-related securities issued by our consolidated trusts that are held by us and the guarantee asset for guarantees issued to our consolidated trusts. In addition, we transferred $0.3 billion of Level 3 assets to Level 2 during the nine months ended September 30, 2010, resulting from improved liquidity and availability of price quotes received from dealers and third-party pricing services.

Table 18.2 provides a reconciliation of the beginning and ending balances for assets and liabilities measured at fair value using significant unobservable inputs (Level 3).

TREASURY-2291

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 18.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs**

| | Balance, June 30, 2011 | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1) | Total | Purchases | Issuances | Sales | Settlements, net(5) | Net transfers in and/or out of Level 3(6) | Balance, September 30, 2011 | Unrealized gains (losses) still held(7) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **Realized and unrealized gains (losses)** | | | | | | | | | |
| | | | | | **(in millions)** | | | | | | |
| **Investments in securities:** | | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | $ 1,983 | $  — | $ 28 | $ 28 | $ 101 | $  — | $  — | $ (14) | $ (63) | $ 2,035 | $  — |
| Subprime | 30,491 | (31) | (348) | (379) | — | — | — | (1,224) | — | 28,888 | (31) |
| CMBS | 3,207 | — | 273 | 273 | — | — | — | (3) | — | 3,477 | — |
| Option ARM | 6,591 | (19) | (128) | (147) | — | — | — | (276) | — | 6,168 | (19) |
| Alt-A and other | 12,197 | (80) | (294) | (374) | — | — | — | (391) | — | 11,432 | (80) |
| Fannie Mae | 187 | — | (2) | (2) | 246 | — | — | (9) | — | 422 | — |
| Obligations of states and political subdivisions | 8,560 | 9 | 253 | 262 | — | — | (413) | (277) | — | 8,132 | — |
| Manufactured housing | 844 | (4) | 5 | 1 | — | — | — | (29) | — | 816 | (4) |
| Ginnie Mae | 14 | — | — | — | — | — | — | (1) | — | 13 | — |
| Total available-for-sale mortgage-related securities | 64,074 | (125) | (213) | (338) | 347 | — | (413) | (2,224) | (63) | 61,383 | (134) |
| Trading, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | 2,622 | (637) | — | (637) | 69 | — | — | (58) | 102 | 2,098 | (638) |
| Fannie Mae | 843 | (268) | — | (268) | — | — | — | (13) | 59 | 621 | (268) |
| Ginnie Mae | 26 | — | — | — | — | — | — | (2) | — | 24 | — |
| Other | 18 | (1) | — | (1) | — | 5 | (3) | (1) | — | 18 | (1) |
| Total trading mortgage-related securities | 3,509 | (906) | — | (906) | 69 | 5 | (3) | (74) | 161 | 2,761 | (907) |
| **Mortgage loans:** | | | | | | | | | | | |
| Held-for-sale, at fair value | 4,463 | 261 | — | 261 | 4,119 | — | (2,561) | (7) | — | 6,275 | 170 |
| Net derivatives(8) | (319) | 534 | — | 534 | — | (23) | — | (118) | — | 74 | 279 |
| **Other assets:** | | | | | | | | | | | |
| Guarantee asset(9) | 667 | (27) | — | (27) | — | 48 | — | (14) | — | 674 | (27) |

171                                                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                                                 Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

|  | Balance, January 1, 2011 | Included in earnings[1][2][3][4] | Included in other comprehensive income[1] | Total | Purchases | Issuances | Sales | Settlements, net[5] | Net transfers in and/or out of Level 3[6] | Balance, September 30, 2011 | Unrealized gains (losses) still held[7] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Nine Months Ended September 30, 2011** (in millions) | | | | | | | | | | | |
| **Investments in securities:** | | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | $ 2,037 | $ — | $ 67 | $ 67 | $ 101 | $ — | $ — | $ (71) | $ (99) | $ 2,035 | $ — |
| Subprime | 33,861 | (835) | (33) | (868) | — | — | — | (4,105) | — | 28,888 | (835) |
| CMBS | 3,115 | — | 385 | 385 | — | — | — | (23) | — | 3,477 | — |
| Option ARM | 6,889 | (365) | 640 | 275 | — | — | — | (996) | — | 6,168 | (365) |
| Alt-A and other | 13,155 | (152) | (238) | (390) | — | — | — | (1,333) | — | 11,432 | (152) |
| Fannie Mae | 212 | — | — | — | 246 | — | — | (31) | (5) | 422 | — |
| Obligations of states and political subdivisions | 9,377 | 13 | 495 | 508 | — | — | (608) | (1,145) | — | 8,132 | — |
| Manufactured housing | 897 | (9) | 17 | 8 | — | — | — | (89) | — | 816 | (9) |
| Ginnie Mae | 16 | — | — | — | — | — | — | (3) | — | 13 | — |
| Total available-for-sale mortgage-related securities | 69,559 | (1,348) | 1,333 | (15) | 347 | — | (608) | (7,796) | (104) | 61,383 | (1,361) |
| Trading, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | 2,299 | (629) | — | (629) | 451 | — | (55) | (155) | 187 | 2,098 | (630) |
| Fannie Mae | 854 | (270) | — | (270) | 56 | — | — | (30) | 11 | 621 | (270) |
| Ginnie Mae | 27 | — | — | — | — | — | — | (3) | — | 24 | — |
| Other | 20 | (2) | — | (2) | — | 6 | (3) | (3) | — | 18 | (2) |
| Total trading mortgage-related securities | 3,200 | (901) | — | (901) | 507 | 6 | (58) | (191) | 198 | 2,761 | (902) |
| Mortgage loans: | | | | | | | | | | | |
| Held-for-sale, at fair value | 6,413 | 621 | — | 621 | 9,553 | — | (10,283) | (29) | — | 6,275 | 203 |
| Net derivatives[8] | (691) | 927 | — | 927 | — | (45) | — | (119) | 2 | 74 | 378 |
| Other assets: | | | | | | | | | | | |
| Guarantee asset[9] | 541 | (22) | — | (22) | — | 193 | — | (38) | — | 674 | (22) |

172

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Balance, June 30, 2010 | Realized and unrealized gains (losses) | | | Purchases, issuances, sales and settlements, net(5) | Net transfers in and/or out of Level 3(6) | Balance, September 30, 2010 | Unrealized gains (losses) still held(7) |
| | | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1) | Total | | | | |
| | | | | (in millions) | | | | |
| **Investments in securities:** | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | |
| Mortgage-related securities: | | | | | | | | |
| Freddie Mac | $ 2,099 | $ — | $ 55 | $ 55 | $ 32 | $ (110) | $ 2,076 | $ — |
| Subprime | 34,554 | (213) | 1,316 | 1,103 | (1,583) | — | 34,074 | (213) |
| CMBS | 58,129 | (6) | 2,040 | 2,034 | (861) | — | 59,302 | (6) |
| Option ARM | 6,897 | (577) | 951 | 374 | (346) | — | 6,925 | (577) |
| Alt-A and other | 12,958 | (296) | 1,218 | 922 | (571) | — | 13,309 | (296) |
| Fannie Mae | 289 | — | 1 | 1 | (77) | — | 213 | — |
| Obligations of states and political subdivisions | 10,743 | 1 | 162 | 163 | (555) | — | 10,351 | — |
| Manufactured housing | 892 | (8) | 49 | 41 | (30) | — | 903 | (8) |
| Ginnie Mae | 3 | — | — | — | — | — | 3 | — |
| Total available-for-sale mortgage-related securities | 126,564 | (1,099) | 5,792 | 4,693 | (3,991) | (110) | 127,156 | (1,100) |
| Trading, at fair value: | | | | | | | | |
| Mortgage-related securities: | | | | | | | | |
| Freddie Mac | 3,041 | (319) | — | (319) | 177 | (54) | 2,845 | (327) |
| Fannie Mae | 918 | (166) | — | (166) | (12) | — | 740 | (166) |
| Ginnie Mae | 28 | 1 | — | 1 | (1) | — | 28 | 1 |
| Other | 23 | — | — | — | 34 | — | 57 | — |
| Total trading mortgage-related securities | 4,010 | (484) | — | (484) | 198 | (54) | 3,670 | (492) |
| **Mortgage loans:** | | | | | | | | |
| Held-for-sale, at fair value | 1,656 | 157 | — | 157 | 1,051 | — | 2,864 | 82 |
| Net derivatives(8) | 199 | 149 | — | 149 | (212) | — | 136 | 61 |
| **Other assets:** | | | | | | | | |
| Guarantee asset(9) | 485 | (1) | — | (1) | 22 | — | 506 | (1) |

<div align="center">173</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Balance, December 31, 2009 | Cumulative effect of change in accounting principle(10) | Balance, January 1, 2010 | Realized and unrealized gains (losses) Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1) | Total | Purchases, issuances, sales and settlements, net(5) | Net transfers in and/or out of Level 3(6) | Balance, September 30, 2010 | Unrealized gains (losses) still held(7) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in millions) | | | | | |
| Investments in securities: | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | |
| Freddie Mac | $ 20,807 | $ (18,775) | $ 2,032 | $ — | $ 72 | $ 72 | $ (28) | $ — | $ 2,076 | $ — |
| Subprime | 35,721 | — | 35,721 | (562) | 4,581 | 4,019 | (5,666) | — | 34,074 | (562) |
| CMBS | 54,019 | — | 54,019 | (78) | 7,701 | 7,623 | (2,340) | — | 59,302 | (78) |
| Option ARM | 7,236 | — | 7,236 | (734) | 1,648 | 914 | (1,225) | — | 6,925 | (727) |
| Alt-A and other | 13,391 | — | 13,391 | (648) | 2,381 | 1,733 | (1,815) | — | 13,309 | (648) |
| Fannie Mae | 338 | — | 338 | — | (1) | (1) | (124) | — | 213 | — |
| Obligations of states and political subdivisions | 11,477 | — | 11,477 | 3 | 374 | 377 | (1,503) | — | 10,351 | — |
| Manufactured housing | 911 | — | 911 | (23) | 104 | 81 | (89) | — | 903 | (23) |
| Ginnie Mae | 4 | — | 4 | — | — | — | (1) | — | 3 | — |
| Total available-for-sale mortgage-related securities | 143,904 | (18,775) | 125,129 | (2,042) | 16,860 | 14,818 | (12,791) | — | 127,156 | (2,038) |
| Trading, at fair value: | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | |
| Freddie Mac | 2,805 | (5) | 2,800 | (947) | — | (947) | 1,275 | (283) | 2,845 | (970) |
| Fannie Mae | 1,343 | — | 1,343 | (564) | — | (564) | (37) | (2) | 740 | (564) |
| Ginnie Mae | 27 | — | 27 | 2 | — | 2 | (1) | — | 28 | 2 |
| Other | 28 | (1) | 27 | (2) | — | (2) | 32 | — | 57 | (1) |
| Total trading mortgage-related securities | 4,203 | (6) | 4,197 | (1,511) | — | (1,511) | 1,269 | (285) | 3,670 | (1,534) |
| Mortgage loans: | | | | | | | | | | |
| Held-for-sale, at fair value | 2,799 | — | 2,799 | 379 | — | 379 | (314) | — | 2,864 | 80 |
| Net derivatives(8) | (430) | — | (430) | 824 | — | 824 | (258) | — | 136 | 236 |
| Other assets: | | | | | | | | | | |
| Guarantee asset(9) | 10,444 | (10,024) | 420 | (8) | — | (8) | 94 | — | 506 | (8) |

(1) Changes in fair value for available-for-sale investments are recorded in AOCI, while gains and losses from sales are recorded in other gains (losses) on investments on our consolidated statements of income and comprehensive income. For mortgage-related securities classified as trading, the realized and unrealized gains (losses) are recorded in other gains (losses) on investments on our consolidated statements of income and comprehensive income.

(2) Changes in fair value of derivatives are recorded in derivative gains (losses) on our consolidated statements of income and comprehensive income for those not designated as accounting hedges.

(3) Changes in fair value of the guarantee asset are recorded in other income on our consolidated statements of income and comprehensive income.

(4) For held-for-sale mortgage loans with fair value option elected, gains (losses) on fair value changes and sale of mortgage loans are recorded in other income on our consolidated statements of income and comprehensive income.

(5) For non-agency mortgage-related securities, primarily represents principal repayments.

(6) Transfer in and/or out of Level 3 during the period is disclosed as if the transfer occurred at the beginning of the period.

(7) Represents the amount of total gains or losses for the period, included in earnings, attributable to the change in unrealized gains (losses) related to assets and liabilities classified as Level 3 that were still held at September 30, 2011 and 2010, respectively. Included in these amounts are credit-related other-than-temporary impairments recorded on available-for-sale securities.

(8) Net derivatives include derivative assets and derivative liabilities prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

(9) We estimate that all amounts recorded for unrealized gains and losses on our guarantee asset relate to those amounts still in position. The amounts reflected as included in earnings represent the periodic fair value changes of our guarantee asset.

(10) Represents adjustment to adopt the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs.

174

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2295

Table of Contents

**Non-recurring Fair Value Changes**

Certain assets are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances. We consider the fair value measurement related to these assets to be non-recurring. These assets include impaired held-for-investment multifamily mortgage loans and REO, net. These fair value measurements usually result from the write-down of individual assets to current fair value amounts due to impairments.

The fair value of impaired multifamily held-for-investment mortgage loans is generally based on the value of the underlying property. Given the relative illiquidity in the markets for these impaired loans, and differences in contractual terms of each loan, we classified these loans as Level 3 in the fair value hierarchy. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Mortgage Loans, Held-for-Investment*" for additional details.

REO is initially measured at its fair value less costs to sell. In subsequent periods, REO is reported at the lower of its carrying amount or fair value less costs to sell. Subsequent measurements of fair value less costs to sell are estimated values based on relevant current and historical factors, which are considered to be unobservable inputs. As a result, REO is classified as Level 3 under the fair value hierarchy. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *REO, Net*" for additional details.

Table 18.3 presents assets measured and reported at fair value on a non-recurring basis in our consolidated balance sheets by level within the fair value hierarchy at September 30, 2011 and December 31, 2010, respectively.

**Table 18.3 — Assets Measured at Fair Value on a Non-Recurring Basis**

| | Fair Value at September 30, 2011 | | | | Fair Value at December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| | | | | (in millions) | | | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | | | | | |
| Mortgage loans:[1] | | | | | | | | |
| Held-for-investment | $  — | $  — | $ 1,448 | $1,448 | $  — | $  — | $ 1,560 | $1,560 |
| REO, net[2] | — | — | 4,622 | 4,622 | — | — | 5,606 | 5,606 |
| Total assets measured at fair value on a non-recurring basis | $  — | $  — | $ 6,070 | $ 6,070 | $  — | $  — | $ 7,166 | $7,166 |

| | Total Gains (Losses)[3] | | | |
|---|---|---|---|---|
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| | | (in millions) | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | |
| Mortgage loans:[1] | | | | |
| Held-for-investment | $  (23) | $  (11) | $  (32) | $ (134) |
| REO, net[2] | (115) | (243) | (162) | (276) |
| Total gains (losses) | $ (138) | $ (254) | $ (194) | $ (410) |

(1) Represents carrying value and related write-downs of loans for which adjustments are based on the fair value amounts. These loans include impaired multifamily mortgage loans that are classified as held-for-investment and have a related valuation allowance.

(2) Represents the fair value and related losses of foreclosed properties that were measured at fair value subsequent to their initial classification as REO, net. The carrying amount of REO, net was written down to fair value of $4.6 billion, less estimated costs to sell of $325 million (or approximately $4.3 billion) at September 30, 2011. The carrying amount of REO, net was written down to fair value of $5.6 billion, less estimated costs to sell of $406 million (or approximately $5.2 billion) at December 31, 2010.

(3) Represents the total net gains (losses) recorded on items measured at fair value on a non-recurring basis as of September 30, 2011 and 2010, respectively.

**Fair Value Election**

We elected the fair value option for certain types of securities, multifamily held-for-sale mortgage loans, foreign-currency denominated debt, and certain other debt.

***Certain Available-for-Sale Securities with Fair Value Option Elected***

We elected the fair value option for certain available-for-sale mortgage-related securities to better reflect the natural offset these securities provide to fair value changes recorded historically on our guarantee asset at the time of our election. In addition, upon adoption of the accounting guidance for the fair value option, we elected this option for available-for-sale securities within the scope of the accounting guidance for investments in beneficial interests in securitized financial assets to better reflect any valuation changes that would occur subsequent to impairment write-downs

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2296

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

previously recorded on these instruments. By electing the fair value option for these instruments, we reflect valuation changes through our consolidated statements of income and comprehensive income in the period they occur, including any increases in value.

For mortgage-related securities and investments in securities that were selected for the fair value option and subsequently classified as trading securities, the change in fair value is recorded in other gains (losses) on investment securities recognized in earnings in our consolidated statements of income and comprehensive income. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding the net unrealized gains (losses) on trading securities, which include gains (losses) for other items that are not selected for the fair value option. Related interest income continues to be reported as interest income in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report for additional information about the measurement and recognition of interest income on investments in securities.

### Debt Securities with Fair Value Option Elected

We elected the fair value option for foreign-currency denominated debt and certain other debt securities. In the case of foreign-currency denominated debt, we have entered into derivative transactions that effectively convert these instruments to U.S. dollar denominated floating rate instruments. The fair value changes on these derivatives were recorded in derivative gains (losses) in our consolidated statements of income and comprehensive income. We elected the fair value option on these debt instruments to better reflect the economic offset that naturally results from the debt due to changes in interest rates. We also elected the fair value option for certain other debt securities containing potential embedded derivatives that required bifurcation.

The changes in fair value of debt securities with the fair value option elected were $133 million and $15 million for the three and nine months ended September 30, 2011, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of income and comprehensive income. The changes in fair value related to fluctuations in exchange rates and interest rates were $137 million and $21 million for the three and nine months ended September 30, 2011, respectively. The remaining changes in the fair value of $(4) million and $(6) million were attributable to changes in credit risk for the three and nine months ended September 30, 2011, respectively.

The changes in fair value of debt securities with the fair value option elected were $(366) million and $525 million for the three and nine months ended September 30, 2010, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of income and comprehensive income. The changes in fair value related to fluctuations in exchange rates and interest rates were $(351) million and $526 million for the three and nine months ended September 30, 2010, respectively. The remaining changes in the fair value of $(15) million and $(1) million were attributable to changes in credit risk for the three and nine months ended September 30, 2010, respectively.

The change in fair value attributable to changes in credit risk was primarily determined by comparing the total change in fair value of the debt to the total change in fair value of the interest-rate and foreign-currency derivatives used to hedge the debt. Any difference in the fair value change of the debt compared to the fair value change in the derivatives is attributed to credit risk.

The difference between the aggregate fair value and aggregate UPB for long-term debt securities with fair value option elected was $62 million and $108 million at September 30, 2011 and December 31, 2010, respectively. Related interest expense continues to be reported as interest expense in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Debt Securities Issued" in our 2010 Annual Report for additional information about the measurement and recognition of interest expense on debt securities issued.

### Multifamily Held-For-Sale Mortgage Loans with Fair Value Option Elected

We elected the fair value option for multifamily mortgage loans that were purchased for securitization. Through this channel, we acquire loans that we intend to securitize and sell to CMBS investors. While this is consistent with our overall strategy to expand our multifamily business, it differs from our traditional buy-and-hold strategy with respect to multifamily loans held-for-investment. Therefore, these multifamily mortgage loans were classified as held-for-sale mortgage loans in our consolidated balance sheets to reflect our intent to sell in the future.

We recorded $261 million and $621 million from the change in fair value in gains (losses) on mortgage loans recorded at fair value in other income in our consolidated statements of income and comprehensive income for the three and nine months ended September 30, 2011, respectively. We recorded fair value changes of $157 million and

176                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

$379 million in other income in our consolidated statements of income and comprehensive income for the three and nine months ended September 30, 2010, respectively. The changes in fair value of these loans were primarily attributable to changes in interest rates and other non-credit related items such as liquidity. The changes in fair value attributable to credit risk were not material given that these loans were generally originated within the past six to twelve months and have not seen a change in their credit characteristics.

The difference between the aggregate fair value and the aggregate UPB for multifamily held-for-sale loans with the fair value option elected was $173 million and $(311) million at September 30, 2011 and December 31, 2010, respectively. Related interest income continues to be reported as interest income in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2010 Annual Report for additional information about the measurement and recognition of interest income on our mortgage loans.

## Valuation Methods and Assumptions Subject to Fair Value Hierarchy

We categorize assets and liabilities that we measure and report at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation process used to derive the fair value and our judgment regarding the observability of the related inputs.

### Investments in Securities

#### Agency Securities

Fixed-rate agency securities are valued based on dealer-published quotes for a base TBA security, adjusted to reflect the measurement date as opposed to a forward settlement date ("carry") and pay-ups for specified collateral. The base TBA price varies based on agency, term, coupon, and settlement month. The carry adjustment converts forward settlement date prices to spot or same-day settlement date prices such that the fair value is estimated as of the measurement date, and not as of the forward settlement date. The carry adjustment uses our internal prepayment and interest rate models. A pay-up is added to the base TBA price for characteristics that are observed to be trading at a premium versus TBAs; this currently includes seasoning and low-loan balance attributes. Haircuts are applied to a small subset of positions that are less liquid and are observed to trade at a discount relative to TBAs; this includes securities that are not eligible for delivery into TBA trades.

Adjustable-rate agency securities are valued based on the median of prices from multiple pricing services. The key valuation drivers used by the pricing services include the interest rate cap structure, term, agency, remaining term, and months-to-next coupon reset, coupled with prevailing market conditions, namely interest rates.

Because fixed-rate and adjustable-rate agency securities are generally liquid and contain observable pricing in the market, they generally are classified as Level 2.

Multiclass structures are valued using a variety of methods, depending on the product type. The predominant valuation methodology uses the median prices from multiple pricing services. This method is used for structures for which there is typically significant, relevant market activity. Some of the key valuation drivers used by the pricing services are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. Other tranche types that are more challenging to price are valued using the median prices from multiple dealers. These include structured interest-only, structured principal-only, inverse floaters, and inverse interest-only structures. Some of the key valuation drivers used by the dealers are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. In addition, there is a subset of tranches for which there is a lack of relevant market activity that are priced using a proxy relationship where the position is matched to the closest dealer-priced tranche, then valued by calculating an OAS using our proprietary prepayment and interest rate models from the dealer-priced tranche. If necessary, our judgment is applied to estimate the impact of differences in prepayment uncertainty or other unique cash flow characteristics related to that particular security. We then determine the fair values for these securities by using the estimated OAS as an input to the valuation calculation in conjunction with interest-rate and prepayment models to calculate the NPV of the projected cash flows. These positions typically have smaller balances and are more difficult for dealers to value. There is also a subset of positions for which prices are published on a daily basis; these include trust interest-only and trust principal-only strips. These are fairly liquid tranches and are quoted on a regular settlement date basis. In order to align the regular settlement date price with the balance sheet date, the OAS is calculated based on the published prices. Then the tranche is valued using that OAS applied to the balance sheet date.

Multiclass agency securities are classified as Level 2 or 3 depending on the significance of the inputs that are not observable.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2298

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Commercial Mortgage-Backed Securities*

CMBS are valued based on the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the collateral type, collateral performance, capital structure, issuer, credit enhancement, coupon, and weighted average life, coupled with the observed spread levels on trades of similar securities. The weighted average coupon of the collateral underlying our CMBS investments was 5.7% as of both September 30, 2011 and December 31, 2010. The weighted-average life of the collateral underlying our CMBS investments was 3.8 years and 4.3 years, respectively, as of September 30, 2011 and December 31, 2010. Many of these securities have significant prepayment lockout periods or penalty periods that limit the window of potential prepayment to a relatively narrow band. These securities are primarily classified as Level 2.

*Subprime, Option ARM, and Alt-A and Other (Mortgage-Related)*

These private-label investments are valued using either the median of multiple dealer prices or the median prices from multiple pricing services. Some of the key valuation drivers used by the dealers and pricing services include the product type, vintage, collateral performance, capital structure, credit enhancements, and coupon, coupled with interest rates and spreads observed on trades of similar securities, where possible. The market for non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans is highly illiquid, resulting in wide price ranges as well as wide credit spreads. These securities are primarily classified as Level 3.

Table 18.4 below presents the fair value of subprime, option ARM, and Alt-A and other investments we held by origination year.

**Table 18.4 — Fair Value of Subprime, Option ARM, and Alt-A and Other Investments by Origination Year**

| | Fair Value at | |
| --- | --- | --- |
| Year of Origination | September 30, 2011 | December 31, 2010 |
| | (in millions) | |
| 2004 and prior | $ 4,449 | $ 4,998 |
| 2005 | 10,973 | 13,126 |
| 2006 | 16,799 | 19,333 |
| 2007 | 14,278 | 16,461 |
| 2008 and beyond | — | — |
| Total | $ 46,499 | $ 53,918 |

*Obligations of States and Political Subdivisions*

These primarily represent housing revenue bonds, which are valued by taking the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the structure of the bond, call terms, cross-collateralization features, and tax-exempt features coupled with municipal bond rates, credit ratings, and spread levels. These securities are unique, resulting in low trading volumes and are classified as Level 3 in the fair value hierarchy.

*Manufactured Housing*

Securities backed by loans on manufactured housing properties are dealer-priced and we arrive at the fair value by taking the median of multiple dealer prices. Some of the key valuation drivers include the collateral's performance and vintage. These securities are classified as Level 3 in the fair value hierarchy because key inputs are unobservable in the market due to low levels of liquidity.

*Asset-Backed Securities (Non-Mortgage-Related)*

These private-label non-mortgage-related securities are valued based on prices from pricing services. Some of the key valuation drivers include the discount margin, subordination level, and prepayment speed, coupled with interest rates. They are classified as Level 2 because of their liquidity and tight pricing ranges.

*Treasury Bills and Treasury Notes*

Treasury bills and Treasury notes are classified as Level 1 in the fair value hierarchy since they are actively traded and price quotes are widely available at the measurement date for the exact security we are valuing.

*FDIC-Guaranteed Corporate Medium-Term Notes*

Since these securities carry the FDIC guarantee, they are considered to have no credit risk. They are valued based on yield analysis. They are classified as Level 2 because of their high liquidity and tight pricing ranges.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2299

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Mortgage Loans, Held-for-Sale

Mortgage loans, held-for-sale represent multifamily mortgage loans with the fair value option elected. Thus, all held-for-sale mortgage loans are measured at fair value on a recurring basis.

The fair value of multifamily mortgage loans is generally based on market prices obtained from a third-party pricing service provider for similar actively traded mortgages, adjusted for differences in loan characteristics and contractual terms. The pricing service aggregates observable price points from two markets: agency and non-agency. The agency market consists of purchases made by the GSEs of loans underwritten by our counterparties in accordance with our guidelines while the non-agency market generally consists of secondary market trades between banks and other financial institutions of loans that were originated and initially held in portfolio by these institutions. The pricing service blends the observable price data obtained from these two distinct markets into a final composite price based on the expected probability that a given loan will trade in one of these two markets. This estimated probability is largely a function of the loan's credit quality, as determined by its current LTV ratio and DSCR. The result of this blending technique is that lower credit quality loans receive a lower percentage of agency price weighting and higher credit quality loans receive a higher percentage of agency price weighting.

Given the relative illiquidity in the marketplace for multifamily mortgage loans and differences in contractual terms, these loans are classified as Level 3 in the fair value hierarchy.

### Mortgage Loans, Held-for-Investment

Mortgage loans, held-for-investment measured at fair value on a non-recurring basis represent impaired multifamily mortgage loans, which are not measured at fair value on an ongoing basis but have been written down to fair value due to impairment. The valuation technique we use to measure the fair value of impaired multifamily mortgage loans, held-for-investment is based on the value of the underlying property and may include assessment of third-party appraisals, environmental, and engineering reports that we compare with relevant market performance to arrive at a fair value. Our valuation technique incorporates one or more of the following methods: income capitalization, discounted cash flow, sales comparables, and replacement cost. We consider the physical condition of the property, rent levels, and other market drivers, including input from sales brokers and the property manager. We classify impaired multifamily mortgage loans, held-for-investment as Level 3 in the fair value hierarchy as their valuation includes significant unobservable inputs.

### Derivative Assets, Net

Derivative assets largely consist of interest-rate swaps, option-based derivatives, futures, and forward purchase and sale commitments that we account for as derivatives. The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable, trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net unrealized gain position are reported as derivative assets, net. Similarly, derivatives in a net unrealized loss position are reported as derivative liabilities, net.

#### Interest-Rate Swaps and Option-Based Derivatives

The fair values of interest-rate swaps are determined by using the appropriate yield curves to discount the expected cash flows of both the fixed and variable rate components of the swap contracts. In doing so, we first observe publicly available market spot interest rates, such as money market rates, Eurodollar futures contracts and LIBOR swap rates. The spot curves are translated to forward curves using internal models. From the forward curves, the periodic cash flows are calculated on the pay and receive side of the swap and discounted back at the relevant forward rates to arrive at the fair value of the swap. Since the fair values of the swaps are determined by using observable inputs from active markets, these are generally classified as Level 2 under the fair value hierarchy.

Option-based derivatives include call and put swaptions and other option-based derivatives, the majority of which are European options. The fair values of the European call and put swaptions are calculated by using market observable interest rates and dealer-supplied interest rate volatility grids as inputs to our option-pricing models. Within each grid, prices are determined based on the option term of the underlying swap and the strike rate of the swap. Derivatives with embedded American options are valued using dealer-provided pricing grids. The grids contain prices corresponding to specified option terms of the underlying swaps and the strike rate of the swaps. Interpolation is used to calculate prices for positions for which specific grid points are not provided. Derivatives with embedded Bermudan options are valued based on prices provided directly by counterparties. Swaptions are classified as Level 2 under the fair value hierarchy. Other option-based derivatives include exchange-traded options that are valued by exchange-published daily closing prices. Therefore, exchange-traded options are classified as Level 1 under the fair value hierarchy. Other option-based

179

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

derivatives also include purchased interest-rate cap and floor contracts that are valued by using observable market interest rates and cap and floor rate volatility grids obtained from dealers, and cancellable interest rate swaps that are valued by using dealer prices. Cap and floor contracts are classified as Level 2 and cancellable interest rate swaps with fair values using significant unobservable inputs are classified as Level 3 under the fair value hierarchy.

Table 18.5 below shows the fair value, prior to counterparty and cash collateral netting adjustments, for our interest-rate swaps and option-based derivatives and the maturity profile of our derivative positions. It also provides the weighted-average fixed rates of our pay-fixed and receive-fixed swaps. As of September 30, 2011 and December 31, 2010 our option-based derivatives had a remaining weighted-average life of 4.4 years and 4.5 years, respectively.

**Table 18.5 — Fair Values and Maturities for Interest-Rate Swaps and Option-Based Derivatives**

| | September 30, 2011 | | | | | |
| | | | Fair Value(1) | | | |
| | Notional or Contractual Amount | Total Fair Value(2) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
|---|---|---|---|---|---|---|
| | | | (dollars in millions) | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 200,465 | $ 10,986 | $ 24 | $ 537 | $ 1,999 | $ 8,426 |
| Weighted average fixed rate(3) | | | 0.90% | 1.07% | 2.24% | 3.26% |
| Forward-starting swaps(4) | 20,203 | 2,039 | — | | | 2,039 |
| Weighted average fixed rate(3) | | | | 0.60% | 0.84% | 3.53% |
| Basis (floating to floating) | 2,725 | (3) | — | (5) | 2 | — |
| Pay-fixed: | | | | | | |
| Swaps | 279,437 | (33,716) | (93) | (1,221) | (6,686) | (25,716) |
| Weighted-average fixed rate(3) | | | 2.00% | 2.07% | 3.32% | 3.99% |
| Forward-starting swaps(4) | 14,246 | (3,204) | — | — | — | (3,204) |
| Weighted-average fixed rate(3) | | | | | | 5.29% |
| Total interest-rate swaps | $ 517,076 | $(23,898) | $ (69) | $ (689) | $ (4,685) | $(18,455) |
| Option-based derivatives: | | | | | | |
| Call swaptions | $ 116,400 | $ 11,624 | $6,433 | $1,843 | $ 597 | $ 2,751 |
| Put swaptions | 68,175 | 725 | 16 | 90 | 203 | 416 |
| Other option-based derivatives(5) | 50,958 | 2,116 | (7) | — | — | 2,123 |
| Total option-based | $ 235,533 | $ 14,465 | $6,442 | $ 1,933 | $ 800 | $ 5,290 |

| | December 31, 2010 | | | | | |
| | | | Fair Value(1) | | | |
| | Notional or Contractual Amount | Total Fair Value(2) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
|---|---|---|---|---|---|---|
| | | | (dollars in millions) | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 302,178 | $ 3,314 | $ 137 | $ 534 | $ 1,269 | $ 1,374 |
| Weighted-average fixed rate(3) | | | 1.54% | 1.12% | 2.39% | 3.66% |
| Forward-starting swaps(4) | 22,412 | 371 | — | 123 | (9) | 257 |
| Weighted-average fixed rate(3) | | | | 3.47% | 1.88% | 4.19% |
| Basis (floating to floating) | 2,375 | 4 | — | | 4 | — |
| Pay-fixed: | | | | | | |
| Swaps | 338,035 | (17,189) | (273) | (1,275) | (3,297) | (12,344) |
| Weighted average fixed rate(3) | | | 3.11% | 2.21% | 3.04% | 4.02% |
| Forward-starting swaps(4) | 56,259 | (4,009) | — | — | — | (4,009) |
| Weighted average fixed rate(3) | | | | | | 4.54% |
| Total interest-rate swaps | $ 721,259 | $(17,509) | $ (136) | $ (618) | $ (2,033) | $(14,722) |
| Option-based derivatives: | | | | | | |
| Call swaptions | $ 125,885 | $ 8,147 | $2,754 | $2,661 | $ 1,246 | $ 1,486 |
| Put swaptions | 65,975 | 1,396 | 136 | 451 | 226 | 583 |
| Other option-based derivatives(5) | 47,234 | 1,450 | (8) | — | (1) | 1,459 |
| Total option-based | $ 239,094 | $ 10,993 | $2,882 | $ 3,112 | $ 1,471 | $ 3,528 |

(1) Fair value is categorized based on the period from September 30, 2011 and December 31, 2010, respectively, until the contractual maturity of the derivatives.
(2) Represents fair value for each product type, prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable adjustments.
(3) Represents the notional weighted average rate for the fixed leg of the swaps.
(4) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to fifteen years.
(5) Primarily includes purchased interest rate caps and floors.

180

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2301                              Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Other Derivatives*

Other derivatives mainly consist of exchange-traded futures, foreign-currency swaps, certain forward purchase and sale commitments, and credit derivatives. The fair value of exchange-traded futures is based on end-of-day closing prices obtained from third-party pricing services; therefore, they are classified as Level 1 under the fair value hierarchy. The fair value of foreign-currency swaps is determined by using the appropriate yield curves to calculate and discount the expected cash flows for the swap contracts; therefore, they are classified as Level 2 under the fair value hierarchy since the fair values are determined through models that use observable inputs from active markets.

Certain purchase and sale commitments are also considered to be derivatives and are classified as Level 2 or Level 3 under the fair value hierarchy, depending on the fair value hierarchy classification of the purchased-or sold item, whether a security or loan. Such valuation techniques are further discussed in the *"Investments in Securities"* section above and "Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy — *Mortgage Loans*."

Credit derivatives primarily include purchased credit default swaps and certain short-term default guarantee commitments, which are valued using prices from the respective counterparty and verified using third-party dealer credit default spreads at the measurement date. We classify credit derivatives as Level 3 under the fair value hierarchy due to the inactive market and significant divergence among prices obtained from the dealers.

*Consideration of Credit Risk in Our Valuation of Derivatives*

The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. Additionally, the fair value of derivative liabilities considers the impact of our institutional credit risk. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for a discussion of our counterparty credit risk.

**Other Assets, Guarantee Asset**

Our guarantee asset is valued either through obtaining dealer quotes on similar securities or through an expected cash flow approach. Because of the broad range of liquidity discounts applied by dealers to these similar securities and because the expected cash flow valuation approach uses significant unobservable inputs, we classified the guarantee asset as Level 3.

**REO, Net**

REO is carried at the lower of its carrying amount or fair value less costs to sell. The fair value of REO is calculated using an internal model that considers state and collateral level data to produce an estimate of fair value based on REO dispositions in the most recent three months. We use the actual disposition prices on REO and the current loan UPB to estimate the current fair value of REO. Certain adjustments, such as state specific adjustments, are made to the estimated fair value, as applicable. Due to the use of unobservable inputs, REO is classified as Level 3 under the fair value hierarchy.

**Debt Securities Recorded at Fair Value**

We elected the fair value option for foreign-currency denominated debt instruments and certain other debt securities. See "Fair Value Election — *Debt Securities with Fair Value Option Elected"* for additional information. We determine the fair value of these instruments by obtaining multiple quotes from dealers. Since the prices provided by the dealers consider only observable data such as interest rates and exchange rates, these fair values are classified as Level 2 under the fair value hierarchy.

**Derivative Liabilities, Net**

See discussion under *"Derivative Assets, Net"* above.

**Consolidated Fair Value Balance Sheets**

The supplemental consolidated fair value balance sheets in Table 18.6 present our estimates of the fair value of our financial assets and liabilities at September 30, 2011 and December 31, 2010. The valuations of financial instruments on our consolidated fair value balance sheets are in accordance with the accounting guidance for fair value measurements and disclosures and the accounting guidance for financial instruments. The consolidated fair value balance sheets do not

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                TREASURY-2302                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

purport to present our net realizable, liquidation, or market value as a whole. Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.

**Table 18.6 — Consolidated Fair Value Balance Sheets**

| | September 30, 2011 | | December 31, 2010 | |
| --- | --- | --- | --- | --- |
| | Carrying Amount(1) | Fair Value | Carrying Amount(1) | Fair Value |
| | | (in billions) | | |
| **Assets** | | | | |
| Cash and cash equivalents | $ 18.2 | $ 18.2 | $ 37.0 | $ 37.0 |
| Restricted cash and cash equivalents | 25.7 | 25.7 | 8.1 | 8.1 |
| Federal funds sold and securities purchased under agreements to resell | 10.6 | 10.6 | 46.5 | 46.5 |
| *Investments in securities:* | | | | |
| Available-for-sale, at fair value | 216.6 | 216.6 | 232.6 | 232.6 |
| Trading, at fair value | 55.3 | 55.3 | 60.3 | 60.3 |
| *Total investments in securities* | 271.9 | 271.9 | 292.9 | 292.9 |
| *Mortgage loans:* | | | | |
| Mortgage loans held by consolidated trusts | 1,611.6 | 1,661.4 | 1,646.2 | 1,667.5 |
| Unsecuritized mortgage loans | 205.6 | 198.5 | 198.7 | 191.5 |
| *Total mortgage loans* | 1,817.2 | 1,859.9 | 1,844.9 | 1,859.0 |
| Derivative assets, net | 0.3 | 0.3 | 0.1 | 0.1 |
| Other assets | 28.4 | 28.9 | 32.3 | 37.2 |
| Total assets | $ 2,172.3 | $ 2,215.5 | $2,261.8 | $2,280.8 |
| **Liabilities** | | | | |
| *Debt, net:* | | | | |
| Debt securities of consolidated trusts held by third parties | $1,488.0 | $ 1,572.4 | $1,528.7 | $ 1,589.5 |
| Other debt | 674.5 | 695.9 | 713.9 | 729.7 |
| *Total debt, net* | 2,162.5 | 2,268.3 | 2,242.6 | 2,319.2 |
| Derivative liabilities, net | 0.3 | 0.3 | 1.2 | 1.2 |
| Other liabilities | 15.5 | 15.4 | 18.4 | 19.0 |
| Total liabilities | 2,178.3 | 2,284.0 | 2,262.2 | 2,339.4 |
| **Net assets** | | | | |
| Senior preferred stockholders | 66.2 | 66.2 | 64.2 | 64.2 |
| Preferred stockholders | 14.1 | 1.0 | 14.1 | 0.3 |
| Common stockholders | (86.3) | (135.7) | (78.7) | (123.1) |
| Total net assets | (6.0) | (68.5) | (0.4) | (58.6) |
| Total liabilities and net assets | $ 2,172.3 | $ 2,215.5 | $2,261.8 | $2,280.8 |

(1) Equals the amount reported on our GAAP consolidated balance sheets.

**Limitations**

Our consolidated fair value balance sheets do not capture all elements of value that are implicit in our operations as a going concern because our consolidated fair value balance sheets only capture the values of the current investment and securitization portfolios as of the dates presented. For example, our consolidated fair value balance sheets do not capture the value of new investment and securitization business that would likely replace prepayments as they occur, nor do they include any estimation of intangible or goodwill values. Thus, the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets does not represent an estimate of our net realizable, liquidation or market value as a whole.

The fair value of certain financial instruments is based on our assumed current principal exit market as of the dates presented. As new markets are developed, our assumed principal exit market may change. The use of different assumptions and methodologies to determine the fair values of certain financial instruments, including the use of different principal exit markets, could have a material impact on the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets.

We report certain assets and liabilities that are not financial instruments (such as property and equipment and REO), as well as certain financial instruments that are not covered by the disclosure requirements in the accounting guidance for financial instruments, such as pension liabilities, at their carrying amounts in accordance with GAAP on our consolidated fair value balance sheets. We believe these items do not have a significant impact on our overall fair value results. Other non-financial assets and liabilities on our GAAP consolidated balance sheets represent deferrals of costs and revenues that are amortized in accordance with GAAP, such as deferred debt issuance costs and deferred fees. Cash receipts and payments related to these items are generally recognized in the fair value of net assets when received or paid, with no basis reflected on our fair value balance sheets.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                 TREASURY-2303                                        Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy**

The following are valuation assumptions and methods for items not subject to the fair value hierarchy either because they are not measured at fair value other than on the fair value balance sheet or are only measured at fair value at inception.

### Cash and Cash Equivalents

Cash and cash equivalents largely consist of highly liquid investment securities with an original maturity of three months or less used for cash management purposes, as well as cash held at financial institutions and cash collateral posted by our derivative counterparties. Given that these assets are short-term in nature with limited market value volatility, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

### Federal Funds Sold and Securities Purchased Under Agreements to Resell

Federal funds sold and securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities and federal funds sold. Given that these assets are short-term in nature, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

### Mortgage Loans

Single-family mortgage loans are not subject to the fair value hierarchy since they are classified as held-for-investment and recorded at amortized cost. Certain multifamily mortgage loans are subject to the fair value hierarchy since these are either recorded at fair value with the fair value option elected or they are held for investment and recorded at fair value upon impairment, which is based upon the fair value of the collateral as multifamily loans are collateral-dependent.

#### Single-Family Loans

We determine the fair value of single-family mortgage loans as an estimate of the price we would receive if we were to securitize those loans, as we believe this represents the principal market for such loans. This includes both those held by consolidated trusts and unsecuritized loans and excludes single-family loans for which a contractual modification has been completed. Our estimate of fair value is based on comparisons to actively traded mortgage-related securities with similar characteristics. We adjust to reflect the excess coupon (implied management and guarantee fee) and credit obligation related to performing our guarantee.

To calculate the fair value, we begin with a security price derived from benchmark security pricing for similar actively traded mortgage-related securities, adjusted for yield, credit, and liquidity differences. This security pricing process is consistent with our approach for valuing similar securities retained in our investment portfolio or issued to third parties. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Investments in Securities*."

We estimate the present value of the additional cash flows on the mortgage loan coupon in excess of the coupon on the mortgage-related securities. Our approach for estimating the fair value of the implied management and guarantee fee at September 30, 2011 used third-party market data as practicable. The valuation approach for the majority of implied management and guarantee fee that relates to fixed-rate loan products with coupons at or near current market rates involves obtaining dealer quotes on hypothetical securities constructed with collateral from our single-family credit guarantee portfolio. The remaining implied management and guarantee fee relates to underlying loan products for which comparable market prices were not readily available. These amounts relate specifically to ARM products, highly seasoned loans, or fixed-rate loans with coupons that are not consistent with current market rates. This portion of the implied management and guarantee fee is valued using an expected cash flow approach, including only those cash flows expected to result from our contractual right to receive management and guarantee fees.

The implied management and guarantee fee for single-family mortgage loans is also net of the related credit and other costs (such as general and administrative expense) and benefits (such as credit enhancements) inherent in our guarantee obligation. We use delivery and guarantee fees charged by us as a market benchmark for all guaranteed loans that would qualify for purchase under current underwriting guidelines (used for the majority of the guaranteed loans, but accounts for a small share of the overall fair value of the guarantee obligation). For loans that do not qualify for purchase based on current underwriting guidelines, we use our internal credit models, which incorporate factors such as loan characteristics, loan performance status information, expected losses, and risk premiums without further adjustment (used for less than a majority of the guaranteed loans, but accounts for the largest share of the overall fair value of the guarantee obligation).

*Freddie Mac*

TREASURY-2304

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

For single-family mortgage loans for which a contractual modification has been approved, we estimate fair value based on our estimate of prices we would receive if we were to sell these loans in the whole loan market, as this represents our current principal market for modified loans. These prices are obtained from multiple dealers who reference market activity, where available, for modified loans and use internal models and their judgment to determine default rates, severity rates, and risk premiums.

The fair value of single family mortgage loans is a fair value measurement with limited market benchmarks and significant unobservable inputs. In determining the fair value of single family mortgage loans, there is a wide range of variability and valuation outcomes based on management judgments used in determining a principal exit market, modeling assumptions and inputs used to determine variables including risk premiums, credit costs, security pricing and implied management and guarantee fees, and management decisions regarding those judgments and assumptions.

*Multifamily Loans*

For a discussion of the techniques used to determine the fair value of held-for-sale, and both impaired and non-impaired held-for-investment multifamily loans, see "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Mortgage Loans, Held-for-Investment*" and "*— Mortgage Loans, Held-for-Sale,*" respectively.

**Other Assets**

Our other assets are not financial instruments required to be valued at fair value under the accounting guidance for disclosures about the fair value of financial instruments, such as property and equipment. For most of these non-financial instruments in other assets, we use the carrying amounts from our GAAP consolidated balance sheets as the reported values on our consolidated fair value balance sheets, without any adjustment. These assets represent an insignificant portion of our GAAP consolidated balance sheets. Certain non-financial assets in other assets on our GAAP consolidated balance sheets are assigned a zero value on our consolidated fair value balance sheets. This treatment is applied to deferred items such as deferred debt issuance costs.

We adjust the GAAP-basis deferred taxes reflected on our consolidated fair value balance sheets to include estimated income taxes on the difference between our consolidated fair value balance sheet net assets attributable to common stockholders, including deferred taxes from our GAAP consolidated balance sheets, and our GAAP consolidated balance sheets equity attributable to common stockholders. To the extent the adjusted deferred taxes are a net asset, this amount is included in other assets. In addition, if our net deferred tax assets on our consolidated fair value balance sheets, calculated as described above, exceed our net deferred tax assets on our GAAP consolidated balance sheets that have been reduced by a valuation allowance, our net deferred tax assets on our consolidated fair value balance sheets are limited to the amount of our net deferred tax assets on our GAAP consolidated balance sheets. If the adjusted deferred taxes are a net liability, this amount is included in other liabilities.

Accrued interest receivable is one of the components included within other assets on our consolidated fair value balance sheets. On our GAAP consolidated balance sheets, we reverse accrued but uncollected interest income when a loan is placed on non-accrual status. There is no such reversal performed for the fair value of accrued interest receivable disclosed on our consolidated fair value balance sheets. Rather, we include in our disclosure the amount we deem to be collectible. As a result, there is a difference between the accrued interest receivable GAAP-basis carrying amount and its fair value disclosed on our consolidated fair value balance sheets.

**Total Debt, Net**

Total debt, net represents debt securities of consolidated trusts held by third parties and other debt that we issued to finance our assets. On our consolidated GAAP balance sheets, total debt, net, excluding debt securities for which the fair value option has been elected, is reported at amortized cost, which is net of deferred items, including premiums, discounts, and hedging-related basis adjustments.

For fair value balance sheet purposes, we use the dealer-published quotes for a base TBA security, adjusted for the carry and pay-up price adjustments, to determine the fair value of the debt securities of consolidated trusts held by third parties. The valuation techniques we use are similar to the approach we use to value our investments in agency securities for GAAP purposes. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Investments in Securities — Agency Securities*" for additional information regarding the valuation techniques we use.

Other debt includes both non-callable and callable debt, as well as short-term zero-coupon discount notes. The fair value of the short-term zero-coupon discount notes is based on a discounted cash flow model with market inputs. The valuation of other debt securities represents the proceeds that we would receive from the issuance of debt and is generally based on market prices obtained from broker/dealers or reliable third-party pricing service providers. We elected the fair

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

value option for foreign-currency denominated debt and certain other debt securities and reported them at fair value on our GAAP consolidated balance sheets. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Debt Securities Recorded at Fair Value*" for additional information.

### Other Liabilities

Other liabilities consist of accrued interest payable on debt securities, the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities, the reserve for guarantee losses on non-consolidated trusts, servicer advanced interest payable and certain other servicer liabilities, accounts payable and accrued expenses, payables related to securities, and other miscellaneous liabilities. We believe the carrying amount of these liabilities is a reasonable approximation of their fair value, except for the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities. The technique for estimating the fair value of our guarantee obligation related to the credit component of the loan's fair value is described in the "Mortgage Loans — Single-Family Loans" section.

Furthermore, certain deferred items reported as other liabilities on our GAAP consolidated balance sheets are assigned zero value on our consolidated fair value balance sheets, such as deferred fees. Also, as discussed in "Other Assets," other liabilities may include a deferred tax liability adjusted for fair value balance sheet purposes.

### Net Assets Attributable to Senior Preferred Stockholders

Our senior preferred stock held by Treasury in connection with the Purchase Agreement is recorded at the stated liquidation preference for purposes of the consolidated fair value balance sheets. As the senior preferred stock is restricted as to its redemption, we consider the liquidation preference to be the most appropriate measure for purposes of the consolidated fair value balance sheets.

### Net Assets Attributable to Preferred Stockholders

To determine the preferred stock fair value, we use a market-based approach incorporating quoted dealer prices.

### Net Assets Attributable to Common Stockholders

Net assets attributable to common stockholders is equal to the difference between the fair value of total assets and the sum of total liabilities reported on our consolidated fair value balance sheets, less the value of net assets attributable to senior preferred stockholders and the fair value attributable to preferred stockholders.

## NOTE 19: LEGAL CONTINGENCIES

We are involved as a party to a variety of legal and regulatory proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment-related litigation and other legal proceedings incidental to our business. We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures. From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and/or service mortgages for, us. In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories. In addition, we are sometimes sued in connection with the origination or servicing of mortgages. These suits typically involve claims alleging wrongful actions of seller/servicers. Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions with respect to mortgages sold to Freddie Mac.

Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction. In accordance with the accounting guidance for contingencies, we reserve for litigation claims and assessments asserted or threatened against us when a loss is probable and the amount of the loss can be reasonably estimated.

**Putative Securities Class Action Lawsuits**

*Ohio Public Employees Retirement System ("OPERS") vs. Freddie Mac, Syron, et al.* This putative securities class action lawsuit was filed against Freddie Mac and certain former officers on January 18, 2008 in the U.S. District Court for the Northern District of Ohio purportedly on behalf of a class of purchasers of Freddie Mac stock from August 1, 2006 through November 20, 2007. The plaintiff alleges that the defendants violated federal securities laws by making false and misleading statements concerning our business, risk management and the procedures we put into place to protect the company from problems in the mortgage industry. On April 10, 2008, the Court appointed OPERS as lead plaintiff and approved its choice of counsel. On September 2, 2008, defendants filed a motion to dismiss plaintiff's amended complaint. On November 7, 2008, the plaintiff filed a second amended complaint, which removed certain allegations

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2306

Table of Contents

against Richard Syron, Anthony Piszel, and Eugene McQuade, thereby leaving insider-trading allegations against only Patricia Cook. The second amended complaint also extends the damages period, but not the class period. The plaintiff seeks unspecified damages and interest, and reasonable costs and expenses, including attorney and expert fees. On November 19, 2008, the Court granted FHFA's motion to intervene in its capacity as Conservator. On April 6, 2009, defendants filed motions to dismiss the second amended complaint, which motions remain pending.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential impact on our business, financial condition, or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre-trial litigation; the fact that the Court has not yet ruled upon the defendants' motions to dismiss the second amended complaint; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

*Kuriakose vs. Freddie Mac, Syron, Piszel and Cook.* Another putative class action lawsuit was filed against Freddie Mac and certain former officers on August 15, 2008 in the U.S. District Court for the Southern District of New York for alleged violations of federal securities laws purportedly on behalf of a class of purchasers of Freddie Mac stock from November 21, 2007 through August 5, 2008. The plaintiffs claim that defendants made false and misleading statements about Freddie Mac's business that artificially inflated the price of Freddie Mac's common stock, and seek unspecified damages, costs, and attorneys' fees. On February 6, 2009, the Court granted FHFA's motion to intervene in its capacity as Conservator. On May 19, 2009, plaintiffs filed an amended consolidated complaint, purportedly on behalf of a class of purchasers of Freddie Mac stock from November 30, 2007 through September 7, 2008. Freddie Mac filed a motion to dismiss the complaint on February 24, 2010. On March 30, 2011, the Court granted without prejudice Freddie Mac's motion to dismiss all claims, and allowed the plaintiffs the option to file a new complaint, which they did on July 15, 2011. The defendants have filed motions to dismiss the second amended complaint.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential impact on our business, financial condition, or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre-trial litigation; the fact that the Court has not yet ruled upon the defendants' motions to dismiss the second amended complaint; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

**Energy Lien Litigation**

On July 14, 2010, the State of California filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging that Fannie Mae and Freddie Mac committed unfair business practices in violation of California law by asserting that property liens arising from government-sponsored energy initiatives such as California's Property Assessed Clean Energy, or PACE, program cannot take priority over a mortgage to be sold to Fannie Mae or Freddie Mac. The lawsuit contends that the PACE programs create liens superior to such mortgages and that, by affirming Fannie Mae and Freddie Mac's positions, FHFA has violated the National Environmental Policy Act, or NEPA, and the Administrative Procedure Act, or APA. The complaint seeks declaratory and injunctive relief, costs and such other relief as the court deems proper.

Similar complaints have been filed by other parties. On July 26, 2010, the County of Sonoma filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging similar violations of California law, NEPA, and the APA. In a filing dated September 23, 2010, the County of Placer moved to intervene in the Sonoma County lawsuit as a party plaintiff seeking to assert similar claims, which motion was granted on November 1, 2010. On October 1, 2010, the City of Palm Desert filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA in the Northern District of California. On October 8, 2010, Leon County and the Leon County Energy Improvement District filed a similar complaint against Fannie Mae, Freddie Mac, FHFA, and others in the Northern District of Florida. On October 12, 2010, FHFA filed a motion before the Judicial Panel on Multi-District Litigation seeking an order transferring these cases as well as a related case filed only against FHFA, for coordination or consolidation of pretrial proceedings. This motion was denied on February 8, 2011. On October 14, 2010, the defendants filed a motion to dismiss the lawsuits pending in the Northern District of California. Also on October 14, 2010, the County of Sonoma filed a motion for preliminary injunction seeking to enjoin the defendants from giving any force or

186                                                                                           *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

effect in Sonoma County to certain directives by FHFA regarding energy retrofit loan programs and other related relief. On October 26, 2010, the Town of Babylon filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA, as well as the Office of the Comptroller of the Currency, in the U.S. District Court for the Eastern District of New York.

The defendants have filed motions to dismiss these lawsuits. The courts have entered stipulated orders dismissing the individual officers of Freddie Mac and Fannie Mae from the cases. On December 17, 2010, the judge handling the cases in the Northern District of California requested a position statement from the United States, which was filed on February 8, 2011. On June 13, 2011, the complaint filed by the Town of Babylon was dismissed. On August 11, 2011, the Town of Babylon filed a notice of appeal to the U.S. Court of Appeals for the Second Circuit. On August 26, 2011, the California federal court granted in part defendants' motion to dismiss, leaving only plaintiffs' APA and NEPA claims against FHFA.

Sonoma County's motion for preliminary injunction was granted in part, requiring FHFA to provide a notice and comment period with regard to its directives. FHFA filed an appeal of the injunction on September 15, 2011, and the District Court granted FHFA a 10-day stay of the injunction to allow FHFA to request a further stay from the U.S. Court of Appeals for the Ninth Circuit, which occurred on October 11, 2011. While Freddie Mac believes that the intent of the Court's order in the California cases was to dismiss Freddie Mac from the case entirely, for the sake of clarity, the company has asked the City of Palm Desert to dismiss any such claims voluntarily as to Freddie Mac, and the City of Palm Desert has agreed to do so. The complaint filed by Leon County was dismissed by the Court on September 30, 2011. The time for appeal has yet to run.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matters due to the following factors, among others: the inherent uncertainty of pre-trial litigation; the fact that the Second Circuit has not ruled on the appeal filed by the Town of Babylon; and the fact that Leon County still has time to file an appeal.

## Government Investigations and Inquiries

On September 26, 2008, Freddie Mac received notice from the Staff of the Enforcement Division of the SEC that it is also conducting an inquiry to determine whether there has been any violation of federal securities laws, and directing the company to preserve documents. On October 21, 2008, the SEC issued to the company a request for documents. The SEC staff has also conducted interviews of company employees. Beginning January 23, 2009, the SEC issued subpoenas to Freddie Mac and certain of its employees pursuant to a formal order of investigation. Freddie Mac is cooperating fully in these matters.

Freddie Mac was informed by Donald J. Bisenius, former Executive Vice President — Single-Family Credit Guarantee, that on February 10, 2011, he received a "Wells Notice" from the SEC staff in connection with the investigation. The Wells Notice indicates that the staff is considering recommending that the SEC bring civil enforcement action against Mr. Bisenius for possible violations of the federal securities laws and related rules that are alleged to have occurred in 2007 and 2008.

Under the SEC's procedures, a recipient of a Wells Notice has an opportunity to respond in the form of a written submission that seeks to persuade the SEC staff that no action should be commenced. Mr. Bisenius has informed the company that he has made such a submission.

## Related Third Party Litigation and Indemnification Requests

On December 15, 2008, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York against certain former Freddie Mac officers and others styled *Jacoby v. Syron, Cook, Piszel, Banc of America Securities LLC, JP Morgan Chase & Co., and FTN Financial Markets.* The complaint, as amended on December 17, 2008, contends that the defendants made material false and misleading statements in connection with Freddie Mac's September 2007 offering of non-cumulative, non-convertible, perpetual fixed-rate preferred stock, and that such statements "grossly overstated Freddie Mac's capitalization" and "failed to disclose Freddie Mac's exposure to mortgage-related losses, poor underwriting standards and risk management procedures." The complaint further alleges that Syron, Cook, and Piszel made additional false statements following the offering. Freddie Mac is not named as a defendant in this lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel. The case is currently dormant and we believe plaintiff may have abandoned it.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2308

Table of Contents

By letter dated October 17, 2008, Freddie Mac received formal notification of a putative class action securities lawsuit, *Mark v. Goldman, Sachs & Co., J.P. Morgan Chase & Co., and Citigroup Global Markets Inc.,* filed on September 23, 2008, in the U.S. District Court for the Southern District of New York, regarding the company's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock.

On January 29, 2009, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York styled *Kreysar v. Syron, et al.* On April 30, 2009, the Court consolidated the Mark case with the Kreysar case, and the plaintiffs filed a consolidated class action complaint on July 2, 2009. The consolidated complaint alleged that three former Freddie Mac officers, certain underwriters and Freddie Mac's auditor violated federal securities laws by making material false and misleading statements in connection with the company's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock. The complaint further alleged that certain defendants and others made additional false statements following the offering. The complaint named as defendants Syron, Piszel, Cook, Goldman, Sachs & Co., JPMorgan Securities Inc., Banc of America Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Morgan Stanley & Co. Incorporated, UBS Securities LLC and PricewaterhouseCoopers LLP.

The defendants filed a motion to dismiss the consolidated class action complaint on September 30, 2009. On January 14, 2010, the Court granted the defendants' motion to dismiss the consolidated action with leave to file an amended complaint on or before March 15, 2010. On March 15, 2010, plaintiffs filed their amended consolidated complaint against these same defendants. The defendants moved to dismiss the amended consolidated complaint on April 28, 2010. On July 29, 2010, the Court granted the defendants' motion to dismiss, without prejudice, and allowed the plaintiffs leave to replead. On August 16, 2010, the plaintiffs filed their second amended consolidated complaint against these same defendants. The defendants moved to dismiss the second amended consolidated complaint on September 16, 2010. On October 22, 2010, the Court granted the defendants' motion to dismiss, without prejudice, again allowing the plaintiffs leave to replead. On November 14, 2010, the plaintiffs filed a third amended consolidated complaint against PricewaterhouseCoopers LLP, Syron and Piszel, omitting Cook and the underwriter defendants. On January 11, 2011, the Court granted the remaining defendants' motion to dismiss the complaint with respect to PricewaterhouseCoopers LLP, but denied the motion with respect to Syron and Piszel. On April 4, 2011, Piszel filed a motion for partial judgment on the pleadings. The Court granted that motion on April 28, 2011. The plaintiffs moved for class certification on June 30, 2011, but withdrew this motion on July 5, 2011. The plaintiffs again moved for class certification on August 30, 2011. No decision has been issued on the motion.

Freddie Mac is not named as a defendant in the consolidated lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the underwriting agreement in this case, including reimbursement of fees and disbursements of their legal counsel. At present, it is not possible for us to predict the probable outcome of the lawsuit or any potential impact on our business, financial condition or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the inherent uncertainty of pre-trial litigation and the fact that the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

On July 6, 2011, plaintiffs filed a lawsuit in the U.S. District Court for Massachusetts styled *Liberty Mutual Insurance Company, Peerless Insurance Company, Employers Insurance Company of Wausau, Safeco Corporation and Liberty Life Assurance Company of Boston v. Goldman, Sachs & Co*. The complaint alleges that Goldman, Sachs & Co. made materially misleading statements and omissions in connection with Freddie Mac's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock. Freddie Mac is not named as a defendant in this lawsuit.

**Lehman Bankruptcy**

On September 15, 2008, Lehman filed a chapter 11 bankruptcy petition in the Bankruptcy Court for the Southern District of New York. Thereafter, many of Lehman's U.S. subsidiaries and affiliates also filed bankruptcy petitions (collectively, the "Lehman Entities"). Freddie Mac had numerous relationships with the Lehman Entities which give rise to several claims. On September 22, 2009, Freddie Mac filed proofs of claim in the Lehman bankruptcies aggregating approximately $2.1 billion. On April 14, 2010, Lehman filed its chapter 11 plan and disclosure statement, providing for the liquidation of the bankruptcy estate's assets over the next three years. On January 25, 2011, Lehman filed its first amended plan and disclosure statement. Lehman filed its second amended joint plan and disclosure statement on June 29,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2309

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

2011. On August 31, 2011, Lehman filed its third amended joint plan and disclosure statement. The disclosure statement was approved on September 1, 2011. Votes on and objections to the plan are due November 4, 2011. Hearings on confirmation of the plan are currently scheduled for December 6, 2011.

**Taylor, Bean & Whitaker Bankruptcy**

On August 24, 2009, TBW filed for bankruptcy in the Bankruptcy Court for the Middle District of Florida. Prior to that date, Freddie Mac had terminated TBW's status as a seller/servicer of loans. On or about June 14, 2010, Freddie Mac filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, about $1.15 billion related to current and projected repurchase obligations and about $440 million related to funds deposited with Colonial Bank, or with the FDIC as its receiver, which were attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represented miscellaneous costs and expenses incurred in connection with the termination of TBW's status as a seller/servicer.

With the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement, which is discussed below, was filed with the bankruptcy court on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011, which became effective on August 10, 2011.

Under the terms of the settlement, we have been granted an unsecured claim in the TBW bankruptcy estate in the amount of $1.022 billion, largely representing our claims to past and future loan repurchase exposures. We estimate that this claim may result in a distribution to us of approximately $40-45 million, which is based on the plan of liquidation and disclosure statement filed with the court by TBW indicating that general unsecured creditors are likely to receive a distribution of 3.3 to 4.4 cents on the dollar. The settlement provides that $6.3 million of this amount is to be paid to certain creditors of TBW. In addition, pursuant to the settlement, we have received net proceeds of $156 million through September 30, 2011 relating to various funds on deposit, net of amounts we were required to assign or pay to other parties. The settlement also allows for our sale of TBW-related mortgage servicing rights and provides a formula for determining the amount of the proceeds, if any, to be allocated to third parties that have asserted interests in those rights. During the third quarter of 2011, we recognized a $0.2 billion gain, primarily representing the difference between the amounts we assigned, or paid, to TBW and their creditors and the liability recorded on our consolidated balance sheet.

At the time of settlement, we estimated our uncompensated loss exposure to TBW to be approximately $0.7 billion. This estimated exposure largely relates to outstanding repurchase claims that have already been adjusted in our financial statements through our provision for loan losses. Our ultimate losses could exceed our recorded estimate. Potential changes in our estimate of uncompensated loss exposure or the potential for additional claims as discussed below could cause us to record additional losses in the future.

We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors, may file an action to recover certain funds paid to us prior to the TBW bankruptcy. However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to recover assets. Based on court filings and other information, we understand that Ocala or its creditors may attempt to assert fraudulent transfer and other possible claims totaling approximately $840 million against us related to funds that were allegedly transferred from Ocala to Freddie Mac custodial accounts. We also understood that Ocala might attempt to make claims against us asserting ownership of a large number of loans that we purchased from TBW. The order approving the settlement provides that nothing in the settlement shall be construed to limit, waive or release Ocala's claims against Freddie Mac, except for TBW's claims and claims arising from the allocation of the loans discussed above to Freddie Mac.

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds insuring against loss resulting from dishonest acts by TBW's officers, directors, and employees. Several excess insurers on the bonds thereafter filed similar claims in that action. Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder. Discovery is proceeding.

**IRS Litigation**

We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. On July 6, 2011, the U.S. Tax Court issued a Notice Setting Case for Trial and a Standing Pretrial Order. The trial date set forth in the Notice

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2310                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

was December 12, 2011. On September 7, 2011, a joint motion for continuance was filed with the U.S. Tax Court. The joint motion for continuance was granted, and, on October 11, 2011, the parties submitted a status report and proposed a revised trial date of November 5, 2012. In light of the revised trial date and the fact that no settlement discussions have occurred for an extended period of time, we do not believe it is reasonably possible that this issue will be resolved within the next 12 months. We believe appropriate reserves have been provided for settlement on reasonable terms. For information on this matter, see "NOTE 13: INCOME TAXES."

## NOTE 20: EARNINGS (LOSS) PER SHARE

We have participating securities related to options and restricted stock units with dividend equivalent rights that receive dividends as declared on an equal basis with common shares but are not obligated to participate in undistributed net losses. Consequently, in accordance with accounting guidance for earnings per share, we use the "two-class" method of computing earnings per share. Basic earnings per common share are computed by dividing net loss attributable to common stockholders by weighted average common shares outstanding — basic for the period. The weighted average common shares outstanding — basic during the three and nine months ended September 30, 2011 and 2010 include the weighted average number of shares during the periods that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement since the warrant is unconditionally exercisable by the holder at a minimal cost. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for further information.

Diluted loss per common share is computed as net loss attributable to common stockholders divided by weighted average common shares outstanding — diluted for the period, which considers the effect of dilutive common equivalent shares outstanding. For periods with net income, the effect of dilutive common equivalent shares outstanding includes: (a) the weighted average shares related to stock options; and (b) the weighted average of restricted shares and restricted stock units. Such items are included in the calculation of weighted average common shares outstanding — diluted during periods of net income, when the assumed conversion of the share equivalents has a dilutive effect. Such items are excluded from the weighted average common shares outstanding — basic. For a discussion of our significant accounting policies regarding our calculation of earnings per common share, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Earnings Per Common Share" in our 2010 Annual Report.

### Table 20.1 — Loss Per Common Share — Basic and Diluted

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (dollars in millions, except per share amounts) | | | |
| Net loss attributable to Freddie Mac | $ (4,422) | $ (2,511) | $ (5,885) | $ (13,912) |
| Preferred stock dividends[1] | (1,618) | (1,558) | (4,840) | (4,146) |
| Net loss attributable to common stockholders | $ (6,040) | $ (4,069) | $ (10,725) | $ (18,058) |
| Weighted average common shares outstanding — basic (in thousands)[2] | 3,244,496 | 3,248,794 | 3,245,473 | 3,249,753 |
| Dilutive potential common shares (in thousands) | — | — | — | — |
| Weighted average common shares outstanding — diluted (in thousands) | 3,244,496 | 3,248,794 | 3,245,473 | 3,249,753 |
| Antidilutive potential common shares excluded from the computation of dilutive potential common shares (in thousands) | 3,095 | 4,875 | 3,588 | 5,469 |
| Basic loss per common share | $ (1.86) | $ (1.25) | $ (3.30) | $ (5.56) |
| Diluted loss per common share | $ (1.86) | $ (1.25) | $ (3.30) | $ (5.56) |

(1) Consistent with the covenants of the Purchase Agreement, we paid dividends on our senior preferred stock, but did not declare dividends on any other series of preferred stock outstanding subsequent to entering conservatorship.

(2) Includes the weighted average number of shares during the periods that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included in shares outstanding — basic, since it is unconditionally exercisable by the holder at a minimal cost of $0.00001 per share.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2311

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS

Table 21.1 below presents the major components of other assets and other liabilities on our consolidated balance sheets.

### Table 21.1 — Other Assets and Other Liabilities on Consolidated Balance Sheets

| | September 30, 2011 | | December 31, 2010 |
| --- | ---: | --- | ---: |
| | (in millions) | | |
| Other assets: | | | |
| Guarantee asset | $ 674 | $ | 541 |
| Accounts and other receivables | 8,519 | | 8,734 |
| All other | 1,398 | | 1,600 |
| Total other assets | $ 10,591 | $ | 10,875 |
| Other liabilities: | | | |
| Guarantee obligation | $ 741 | $ | 625 |
| Servicer liabilities | 3,771 | | 4,456 |
| Accounts payable and accrued expenses | 1,039 | | 1,760 |
| All other | 1,387 | | 1,257 |
| Total other liabilities | $ 6,938 | $ | 8,098 |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## PART II OTHER INFORMATION

### ITEM 1. LEGAL PROCEEDINGS

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business. See "NOTE 19: LEGAL CONTINGENCIES" for more information regarding our involvement as a party to various legal proceedings.

### ITEM 1A. RISK FACTORS

This Form 10-Q should be read together with the "RISK FACTORS" sections in our Quarterly Reports on Form 10-Q for the first and second quarters of 2011, and our 2010 Annual Report, which describe various risks and uncertainties to which we are or may become subject, and is supplemented by the discussion below. These risks and uncertainties could, directly or indirectly, adversely affect our business, financial condition, results of operations, cash flows, strategies and/or prospects.

***We could incur increased credit losses if our seller/servicers enter into arrangements with mortgage insurers for settlement of future rescission activity and such agreements could potentially reduce the ability of mortgage insurers to pay claims to us.***

Under our contracts with our seller/servicers, the rescission or denial of mortgage insurance on a loan is grounds for us to make a repurchase request to the seller/servicer. At least one of our largest servicers has entered into arrangements with two of our mortgage insurance counterparties under which the servicer pays and/or indemnifies the insurer in exchange for the mortgage insurer agreeing not to issue mortgage insurance rescissions or denials of coverage on Freddie Mac mortgages. When such an agreement is in place, we are unable to make repurchase requests based solely on a rescission of insurance or denial of coverage. Thus, there is a risk that we will experience higher credit losses if we do not independently identify other areas of noncompliance with our contractual requirements and require lenders to repurchase the loans we own. Additionally, there could be a negative financial impact on our mortgage insurers' ability to pay their other obligations to us if the payments they receive from the seller/servicers are insufficient to compensate them for the insurance claims paid that would have otherwise been denied. As guarantor of the insured loans, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligation to reimburse us for claims, and this could increase our credit losses.

***We may not be able to protect the security of our systems or the confidentiality of our information from cyber attack and other unauthorized access.***

Our operations rely on the secure receipt, processing, storage and transmission of confidential and other information in our computer systems and networks and with our business partners. Our computer systems, software and networks may be vulnerable to internal or external cyber attack, unauthorized access, computer viruses or other malicious code, computer denial of service attacks or other attempts to harm our systems or misuse our confidential information. Our employees may be vulnerable to social engineering efforts that cause a breach in our security that otherwise would not exist as a technical matter. If one or more of such events occur, this potentially could jeopardize or result in the unauthorized disclosure, misuse or corruption of confidential and other information, including nonpublic personal information and other sensitive business data processed, stored in, or transmitted through, our computer systems and networks, or otherwise cause interruptions or malfunctions in our operations or the operations of our customers or counterparties. This could result in significant losses or reputational damage, adversely affect our relationships with our customers and counterparties, and adversely affect our ability to purchase loans, issue securities or enter into and execute other business transactions. We could also face regulatory action. Internal or external attackers may seek to steal, corrupt or disclose confidential financial assets, intellectual property and other sensitive information. We may be required to expend significant additional resources to modify our protective measures or to investigate and remediate vulnerabilities or other exposures, and we may be subject to litigation and financial losses that are not fully insured. Because the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently and often are not recognized until launched against a target, and because some techniques involve social engineering attempts addressed to employees who may have insufficient knowledge to recognize them, we may be unable to anticipate these techniques or to implement adequate preventative measures. While we have invested significant resources in our information security program, there is a risk that it could prove to be inadequate to protect our computer systems, software, and networks.

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

***The MHA Program and other efforts to reduce foreclosures, modify loan terms and refinance mortgages, including HARP, may fail to mitigate our credit losses and may adversely affect our results of operations or financial condition.***

The MHA Program and other loss mitigation activities are a key component of our strategy for managing and resolving troubled assets and lowering credit losses. However, there can be no assurance that any of our loss mitigation strategies will be successful and that credit losses will not continue to escalate. To the extent that borrowers participate in HAMP in large numbers, it is likely that the costs we incur related to loan modifications and other activities under HAMP will be substantial because we will bear the full cost of the monthly payment reductions related to modifications of loans we own or guarantee, and all servicer and borrower incentive fees. We will not be reimbursed for these costs by Treasury.

FHFA has directed us to implement HAMP for troubled mortgages we own or guarantee. It is possible that Treasury could make changes to HAMP that, to the extent we were required to or elected to implement them, could make the program more costly to us, both in terms of credit expenses and the cost of implementing and operating the program. We could also be required or elect to make changes to our implementation of our other loss mitigation activities that could make these activities more costly to us. For example, we could be required to, or elect to, use principal reduction to achieve reduced payments for borrowers. This could further increase our losses, as we could bear the full costs of such reductions.

In June 2010, Treasury announced an initiative under which servicers will be required to consider an alternative modification approach that includes a possible reduction of principal for loans with LTV ratios over 115%. Mortgage investors will receive incentives based on the amount of reduced principal. In October 2010, Treasury provided guidance with respect to applying this alternative for borrowers who have already received permanent modifications or are in trial plans. Holders of mortgages and mortgage-related securities are not required to agree to a reduction of principal, but servicers must have a process for considering the approach. We do not currently have plans to apply these changes to mortgages that we own or guarantee. However, it is possible that FHFA might direct us to implement some or all of these changes. Our credit losses could increase to the extent we apply these changes.

A significant number of loans are in the trial period of HAMP. Although the ultimate completion rate remains uncertain, a large number of loans have failed to complete the trial period or qualify for any of our other loan modification and loss mitigation programs. It is possible that, in the future, additional loans will fail to complete the trial period or qualify for these other programs. For these loans, HAMP will have effectively delayed the foreclosure process and could increase our losses, to the extent the prices we ultimately receive for the foreclosed properties are less than the prices we could have received had we foreclosed upon the properties earlier, due to continued home price declines. These delays in foreclosure could also cause our REO operations expense to increase, perhaps substantially.

Our seller/servicers have a key role in the success of our loss mitigation activities. The continued increases in seriously delinquent loan volume, the ongoing weak conditions of the mortgage market during 2009 and 2010, and the number and variety of additions and changes to HAMP have placed a strain on the loss mitigation resources of many of our seller/servicers. This has also increased the operational complexity of the servicing function, as well as the risk that errors will occur. A decline in the performance of seller/servicers in mitigation efforts could result in missed opportunities for successful loan modifications, an increase in our credit losses and damage to our reputation.

Mortgage modifications on the scale of HAMP, particularly any new focus on principal reductions, have the potential to change borrower behavior and mortgage underwriting. This, coupled with the phenomenon of widespread underwater mortgages, could significantly affect borrower attitudes towards homeownership, the commitment of borrowers to making their mortgage payments, the way the market values residential mortgage assets, the way in which we conduct business and, ultimately, our financial results.

On October 24, 2011 FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers who can benefit from refinancing their home mortgage. The Acting Director of FHFA stated that the goal of pursuing these changes is to create refinancing opportunities for more borrowers whose mortgage is owned or guaranteed by the GSEs while reducing risk for the GSEs and bringing a measure of stability to housing markets. However, there can be no assurance that the revisions to HARP will be successful in achieving these objectives or that any benefits from the revised program will exceed our costs. Because we will be releasing lenders from certain representations and warranties, credit losses associated with loans identified with defects will not be recaptured through loan buybacks. In addition, changes in expectations of mortgage prepayments could result in declines in the fair value of our investments in certain agency mortgage-related securities and lower net interest yields over time on other mortgage-related investments. The ultimate impact of the HARP revisions on our financial results will be driven by the level of borrower participation and the volume of loans with high loan-to-value ratios that we acquire under the program.

<div align="center">193</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Depending on the type of loss mitigation activities we pursue, those activities could result in accelerating or slowing prepayments on our PCs and REMICs and Other Structured Securities, either of which could negatively affect the pricing of such securities.

We are devoting significant internal resources to the implementation of the various initiatives under the MHA Program, which has, and will continue to, increase our expenses. The size and scope of our effort under the MHA Program may also limit our ability to pursue other business opportunities or corporate initiatives.

<div align="center">194</div>

*Freddie Mac*

---

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

**Recent Sales of Unregistered Securities**

The securities we issue are "exempted securities" under the Securities Act of 1933, as amended. As a result, we do not file registration statements with the SEC with respect to offerings of our securities.

Following our entry into conservatorship, we suspended the operation of and ceased making grants under equity compensation plans. Previously, we had provided equity compensation under those plans to employees and members of our Board of Directors. Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms.

No stock options were exercised during the three months ended September 30, 2011. However, restrictions lapsed on 16,797 restricted stock units.

See "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report for more information.

**Dividend Restrictions**

Our payment of dividends on Freddie Mac common stock or any series of Freddie Mac preferred stock (other than senior preferred stock) is subject to certain restrictions as described in "MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES — Dividends and Dividend Restrictions" in our 2010 Annual Report.

**Information about Certain Securities Issuances by Freddie Mac**

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Freddie Mac's securities offerings are exempted from SEC registration requirements. As a result, we are not required to and do not file registration statements or prospectuses with the SEC with respect to our securities offerings. To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars (or supplements thereto) that we post on our web site or in a current report on Form 8-K, in accordance with a "no-action" letter we received from the SEC staff. In cases where the information is disclosed in an offering circular posted on our web site, the document will be posted on our web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The web site address for disclosure about our debt securities, other than debt securities of consolidated trusts, is www.freddiemac.com/debt. From this address, investors can access the offering circular and related supplements for debt securities offerings under Freddie Mac's global debt facility, including pricing supplements for individual issuances of debt securities.

Disclosure about the mortgage-related securities we issue, some of which are off-balance sheet obligations, can be found at www.freddiemac.com/mbs. From this address, investors can access information and documents about our mortgage-related securities, including offering circulars and related offering circular supplements.

## ITEM 6. EXHIBITS

The exhibits are listed in the Exhibit Index at the end of this Form 10-Q.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Federal Home Loan Mortgage Corporation

By: /s/  Charles E. Haldeman, Jr.
      Charles E. Haldeman, Jr.
      Chief Executive Officer

Date: November 3, 2011

By: /s/  Ross J. Kari
      Ross J. Kari
      Executive Vice President — Chief Financial Officer
      (Principal Financial Officer)

Date: November 3, 2011

196                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# GLOSSARY

**Agency securities** — Generally refers to mortgage-related securities issued by the GSEs or government agencies.

**Alt-A loan** — Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. In determining our Alt-A exposure on loans underlying our single-family credit guarantee portfolio, we classified mortgage loans as Alt-A if the lender that delivers them to us classified the loans as Alt-A, or if the loans had reduced documentation requirements, as well as a combination of certain credit characteristics and expected performance characteristics at acquisition which, when compared to full documentation loans in our portfolio, indicate that the loan should be classified as Alt-A. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. For non-agency mortgage-related securities that are backed by Alt-A loans, we categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions.

**AOCI** — Accumulated other comprehensive income (loss), net of taxes

**ARM** — Adjustable-rate mortgage — A mortgage loan with an interest rate that adjusts periodically over the life of the mortgage loan based on changes in a benchmark index.

**Bond insurers** — Companies that provide credit insurance principally covering securitized assets in both the primary issuance and secondary markets.

**BPS** — Basis points — One one-hundredth of 1%. This term is commonly used to quote the yields of debt instruments or movements in interest rates.

**Cash and other investments portfolio** — Our cash and other investments portfolio is comprised of our cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and investments in non-mortgage-related securities.

**Charter** — The Federal Home Loan Mortgage Corporation Act, as amended, 12 U.S.C. § 1451 et seq.

**CMBS** — Commercial mortgage-backed security — A security backed by mortgages on commercial property (often including multifamily rental properties) rather than one-to-four family residential real estate. Although the mortgage pools underlying CMBS can include mortgages financing multifamily properties and commercial properties, such as office buildings and hotels, the classes of CMBS that we hold receive distributions of scheduled cash flows only from multifamily properties. Military housing revenue bonds are included as CMBS within investments-related disclosures. We have not identified CMBS as either subprime or Alt-A securities.

**Conforming loan/Conforming jumbo loan/Conforming loan limit** — A conventional single-family mortgage loan with an original principal balance that is equal to or less than the applicable conforming loan limit, which is a dollar amount cap on the size of the original principal balance of single-family mortgage loans we are permitted by law to purchase or securitize. The conforming loan limit is determined annually based on changes in FHFA's housing price index. Any decreases in the housing price index are accumulated and used to offset any future increases in the housing price index so that conforming loan limits do not decrease from year-to-year. Since 2006, the base conforming loan limit for a one-family residence has been set at $417,000 with higher limits in certain "high-cost" areas.

Beginning in 2008, the conforming loan limits were increased for mortgages originated in certain "high-cost" areas above the conforming loan limits. In addition, conforming loan limits for certain high-cost areas were increased temporarily (up to $729,250 for a one-family residence) for loans originated prior to October 1, 2011. Actual loan limits are set by FHFA for each county (or equivalent) and the loan limit for specific high-cost areas may be lower than the maximum amounts. We refer to loans that we have purchased with UPB exceeding $417,000 as conforming jumbo loans.

**Conservator** — The Federal Housing Finance Agency, acting in its capacity as conservator of Freddie Mac.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011          TREASURY-2318                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Convexity** — A measure of how much a financial instrument's duration changes as interest rates change.

**Core spread income** — Refers to a fair value estimate of the net current period accrual of income from the spread between mortgage-related investments and debt, calculated on an option-adjusted basis.

**Credit enhancement** — Any number of different financial arrangements that are designed to reduce credit risk by partially or fully compensating an investor in the event of certain financial losses. Examples of credit enhancements include mortgage insurance, overcollateralization, indemnification agreements, and government guarantees.

**Credit losses** — Consists of charge-offs and REO operations income (expense), net of recoveries.

**Credit-related expenses** — Consists of our provision for credit losses and REO operations income (expense).

**Deed in lieu of foreclosure** — An alternative to foreclosure in which the borrower voluntarily conveys title to the property to the lender and the lender accepts such title (sometimes together with an additional payment by the borrower) in full satisfaction of the mortgage indebtedness.

**Delinquency** — A failure to make timely payments of principal or interest on a mortgage loan. For single-family mortgage loans, we generally report delinquency rate information for loans that are seriously delinquent. For multifamily loans, we report delinquency rate information based on the UPB of loans that are two monthly payments or more past due or in the process of foreclosure.

**Derivative** — A financial instrument whose value depends upon the characteristics and value of an underlying financial asset or index, such as a security or commodity price, interest or currency rates, or other financial indices.

**Dodd-Frank Act** — Dodd-Frank Wall Street Reform and Consumer Protection Act.

**DSCR** — Debt Service Coverage Ratio — An indicator of future credit performance for multifamily loans. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

**Duration** — The weighted average maturity of a financial instrument's cash flows. Duration is used as a measure of a financial instrument's price sensitivity to changes in interest rates.

**Duration gap** — One of our primary interest-rate risk measures. Duration gap is a measure of the difference between the estimated durations of our interest rate sensitive assets and liabilities. We present the duration gap of our financial instruments in units expressed as months. A duration gap of zero implies that the change in value of our interest rate sensitive assets from an instantaneous change in interest rates would be expected to be accompanied by an equal and offsetting change in the value of our debt and derivatives, thus leaving the net fair value of equity unchanged.

**Effective rent** — The average rent paid by the tenant over the term of a lease.

**Euribor** — Euro Interbank Offered Rate

**Exchange Act** — Securities and Exchange Act of 1934, as amended

**Fannie Mae** — Federal National Mortgage Association

**FDIC** — Federal Deposit Insurance Corporation

**Federal Reserve** — Board of Governors of the Federal Reserve System

**FHA** — Federal Housing Administration

**FHFA** — Federal Housing Finance Agency — FHFA is an independent agency of the U.S. government established by the Reform Act with responsibility for regulating Freddie Mac, Fannie Mae, and the FHLBs.

**FHLB** — Federal Home Loan Bank

**FICO score** — A credit scoring system developed by Fair, Isaac and Co. FICO scores are the most commonly used credit scores today. FICO scores are ranked on a scale of approximately 300 to 850 points with a higher value indicating a lower likelihood of credit default.

*Freddie Mac*

TREASURY-2319

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                           Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Fixed-rate mortgage** — Refers to a mortgage originated at a specific rate of interest that remains constant over the life of the loan.

**Foreclosure alternative** — A workout option pursued when a home retention action is not successful or not possible. A foreclosure alternative is either a short sale or deed in lieu of foreclosure.

**Foreclosure transfer** — Refers to our completion of a transaction provided for by the foreclosure laws of the applicable state, in which a delinquent borrower's ownership interest in a mortgaged property is terminated and title to the property is transferred to us or to a third party. State foreclosure laws commonly refer to such transactions as foreclosure sales, sheriff's sales, or trustee's sales, among other terms. When we, as mortgage holder, acquire a property in this manner, we pay for it by extinguishing some or all of the mortgage debt.

**Freddie Mac mortgage-related securities** — Securities we issue and guarantee, including PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions.

**GAAP** — Generally accepted accounting principles

**Ginnie Mae** — Government National Mortgage Association

**GSE Act** — The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Reform Act.

**GSEs** — Government sponsored enterprises — Refers to certain legal entities created by the U.S. government, including Freddie Mac, Fannie Mae, and the FHLBs.

**Guarantee fee** — The fee that we receive for guaranteeing the payment of principal and interest to mortgage security investors.

**HAFA** — Home Affordable Foreclosures Alternative program — In 2009, the Treasury Department introduced the HAFA program to provide an option for HAMP-eligible homeowners who are unable to keep their homes. The HAFA program took effect on April 5, 2010 and we implemented it effective August 1, 2010.

**HAMP** — Home Affordable Modification Program — Refers to the effort under the MHA Program whereby the U.S. government, Freddie Mac and Fannie Mae commit funds to help eligible homeowners avoid foreclosure and keep their homes through mortgage modifications.

**HARP** — Home Affordable Refinance Program — Refers to the effort under the MHA Program that seeks to help eligible borrowers with loans guaranteed by us or Fannie Mae refinance into loans with more affordable monthly payments and/or fixed-rate terms. Under HARP, we allow eligible borrowers who have mortgages with current LTV ratios from 80% up to 125% to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place. The relief refinance initiative is our implementation of HARP for our loans, under which we also allow borrowers with LTV ratios of 80% and below to participate.

**HFA** — State or local Housing Finance Agency

**HUD** — U.S. Department of Housing and Urban Development — Prior to the enactment of the Reform Act, HUD had general regulatory authority over Freddie Mac, including authority over our affordable housing goals and new programs. Under the Reform Act, FHFA now has general regulatory authority over us, though HUD still has authority over Freddie Mac with respect to fair lending.

**Implied volatility** — A measurement of how the value of a financial instrument changes due to changes in the market's expectation of potential changes in future interest rates. A decrease in implied volatility generally increases the estimated fair value of our mortgage assets and decreases the estimated fair value of our callable debt and options-based derivatives, while an increase in implied volatility generally has the opposite effect.

**Interest-only loan** — A mortgage loan that allows the borrower to pay only interest (either fixed-rate or adjustable-rate) for a fixed period of time before principal amortization payments are required to begin. After the end of the interest-only period, the borrower can choose to refinance the loan, pay the principal balance in total, or begin paying the monthly scheduled principal due on the loan.

TREASURY-2320

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                           Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**IRS** — Internal Revenue Service

**LIBOR** — London Interbank Offered Rate

**LIHTC partnerships** — Low-income housing tax credit partnerships — Prior to 2008, we invested as a limited partner in LIHTC partnerships, which are formed for the purpose of providing funding for affordable multifamily rental properties. These LIHTC partnerships invest directly in limited partnerships that own and operate multifamily rental properties that generate federal income tax credits and deductible operating losses.

**Liquidation preference** — Generally refers to an amount that holders of preferred securities are entitled to receive out of available assets, upon liquidation of a company. The initial liquidation preference of our senior preferred stock was $1.0 billion. The aggregate liquidation preference of our senior preferred stock includes the initial liquidation preference plus amounts funded by Treasury under the Purchase Agreement. In addition, dividends and periodic commitment fees not paid in cash are added to the liquidation preference of the senior preferred stock. We may make payments to reduce the liquidation preference of the senior preferred stock only in limited circumstances.

**LTV ratio** — Loan-to-value ratio — The ratio of the unpaid principal amount of a mortgage loan to the value of the property that serves as collateral for the loan, expressed as a percentage. Loans with high LTV ratios generally tend to have a higher risk of default and, if a default occurs, a greater risk that the amount of the gross loss will be high compared to loans with lower LTV ratios. We report LTV ratios based solely on the amount of the loan purchased or guaranteed by us, generally excluding any second lien mortgages (unless we own or guarantee the second lien).

**MD&A** — Management's Discussion and Analysis of Financial Condition and Results of Operations

**MHA Program** — Making Home Affordable Program — Formerly known as the Housing Affordability and Stability Plan, the MHA Program was announced by the Obama Administration in February 2009. The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. The MHA Program includes HARP and HAMP.

**Mortgage assets** — Refers to both mortgage loans and the mortgage-related securities we hold in our mortgage-related investments portfolio.

**Mortgage-related investments portfolio** — Our investment portfolio, which consists principally of mortgage-related securities and single-family and multifamily mortgage loans. The size of our mortgage-related investments portfolio under the Purchase Agreement is determined without giving effect to the January 1, 2010 change in accounting guidance related to transfers of financial assets and consolidation of VIEs. Accordingly, for purposes of the portfolio limit, when PCs and certain Other Guarantee Transactions are purchased into the mortgage-related investments portfolio, this is considered the acquisition of assets rather than the reduction of debt.

**Mortgage-to-debt OAS** — The net OAS between the mortgage and agency debt sectors. This is an important factor in determining the expected level of net interest yield on a new mortgage asset. Higher mortgage-to-debt OAS means that a newly purchased mortgage asset is expected to provide a greater return relative to the cost of the debt issued to fund the purchase of the asset and, therefore, a higher net interest yield. Mortgage-to-debt OAS tends to be higher when there is weak demand for mortgage assets and lower when there is strong demand for mortgage assets.

**Multifamily mortgage** — A mortgage loan secured by a property with five or more residential rental units.

**Multifamily mortgage portfolio** — Consists of multifamily mortgage loans held by us on our consolidated balance sheets as well as those underlying non-consolidated Freddie Mac mortgage-related securities, and other guarantee commitments, but excluding those underlying our guarantees of HFA bonds under the HFA Initiative.

**Net worth (deficit)** — The amount by which our total assets exceed (or are less than) our total liabilities as reflected on our consolidated balance sheets prepared in conformity with GAAP.

**NIBP** — New Issue Bond Program

**NPV** — Net present value

**OAS** — Option-adjusted spread — An estimate of the incremental yield spread between a particular financial instrument (*e.g.*, a security, loan or derivative contract) and a benchmark yield curve (*e.g.*, LIBOR or agency or U.S. Treasury securities). This includes consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011       TREASURY-2321       Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**OCC** — Office of the Comptroller of the Currency

**OFHEO** — Office of Federal Housing Enterprise Oversight

**Option ARM loan** — Mortgage loans that permit a variety of repayment options, including minimum, interest-only, fully amortizing 30-year and fully amortizing 15-year payments. The minimum payment alternative for option ARM loans allows the borrower to make monthly payments that may be less than the interest accrued for the period. The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance. For our non-agency mortgage-related securities that are backed by option ARM loans, we categorize securities as option ARM if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM securities as either subprime or Alt-A securities.

**OTC** — Over-the-counter

**Other guarantee commitments** — Mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.

**Other Guarantee Transactions** — Transactions in which third parties transfer non-Freddie Mac mortgage-related securities to trusts specifically created for the purpose of issuing mortgage-related securities, or certificates, in the Other Guarantee Transactions.

**PCs** — Participation Certificates — Securities that we issue as part of a securitization transaction. Typically we purchase mortgage loans from parties who sell mortgage loans, place a pool of loans into a PC trust and issue PCs from that trust. The PCs are generally transferred to the seller of the mortgage loans in consideration of the loans or are sold to third party investors if we purchased the mortgage loans for cash.

**Pension Plan** — Employees' Pension Plan

**PMVS** — Portfolio Market Value Sensitivity — One of our primary interest-rate risk measures. PMVS measures are estimates of the amount of average potential pre-tax loss in the market value of our net assets due to parallel (PMVS-L) and non-parallel (PMVS-YC) changes in LIBOR.

**Primary mortgage market** — The market where lenders originate mortgage loans and lend funds to borrowers. We do not lend money directly to homeowners, and do not participate in this market.

**Purchase Agreement / Senior Preferred Stock Purchase Agreement** — An agreement the Conservator, acting on our behalf, entered into with Treasury on September 7, 2008, which was subsequently amended and restated on September 26, 2008 and further amended on May 6, 2009 and December 24, 2009.

**Recorded Investment** — The dollar amount of a loan recorded on our consolidated balance sheets, excluding any valuation allowance, such as the allowance for loan losses, but which does reflect direct write-downs of the investment. For mortgage loans, direct write-downs consist of valuation allowances associated with recording our initial investment in loans acquired with evidence of credit deterioration at the time of purchase.

**Reform Act** — The Federal Housing Finance Regulatory Reform Act of 2008, which, among other things, amended the GSE Act by establishing a single regulator, FHFA, for Freddie Mac, Fannie Mae, and the FHLBs.

**Relief refinance mortgage** — A single-family mortgage loan delivered to us for purchase or guarantee that meets the criteria of the Freddie Mac Relief Refinance Mortgagesm initiative. This initiative is our implementation of HARP for our loans. Although HARP is targeted at borrowers with current LTV ratios above 80% (and up to a maximum of 125%), our initiative also allows borrowers with LTV ratios of 80% and below to participate.

**REMIC** — Real Estate Mortgage Investment Conduit — A type of multiclass mortgage-related security that divides the cash flows (principal and interest) of the underlying mortgage-related assets into two or more classes that meet the investment criteria and portfolio needs of different investors.

**REMICs and Other Structured Securities** (or in the case of Multifamily securities, **Other Structured Securities**) — Single- and multiclass securities issued by Freddie Mac that represent beneficial interests in pools of PCs and certain other types of mortgage-related assets. REMICs and Other Structured Securities that are single-class securities pass through the cash flows (principal and interest) on the underlying mortgage-related assets. REMICs and Other Structured Securities that are multiclass securities divide the cash flows of the underlying mortgage-related assets into two or more

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.
Powered by Morningstar® Document ResearchSM

TREASURY-2322

Table of Contents

classes designed to meet the investment criteria and portfolio needs of different investors. Our principal multiclass securities qualify for tax treatment as REMICs.

**REO** — Real estate owned — Real estate which we have acquired through foreclosure or through a deed in lieu of foreclosure.

**S&P** — Standard & Poor's

**SEC** — Securities and Exchange Commission

**Secondary mortgage market** — A market consisting of institutions engaged in buying and selling mortgages in the form of whole loans (*i.e.*, mortgages that have not been securitized) and mortgage-related securities. We participate in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities for investment and by issuing guaranteed mortgage-related securities, principally PCs.

**Senior preferred stock** — The shares of Variable Liquidation Preference Senior Preferred Stock issued to Treasury under the Purchase Agreement.

**Seriously delinquent** — Single-family mortgage loans that are three monthly payments or more past due or in the process of foreclosure as reported to us by our servicers.

**SERP** — Supplemental Executive Retirement Plan

**Short sale** — Typically an alternative to foreclosure consisting of a sale of a mortgaged property in which the homeowner sells the home at market value and the lender accepts proceeds (sometimes together with an additional payment or promissory note from the borrower) that are less than the outstanding mortgage indebtedness in full satisfaction of the loan.

**Single-family credit guarantee portfolio** — Consists of unsecuritized single-family loans, single-family loans held by consolidated trusts, and single-family loans underlying non-consolidated Other Guarantee Transactions and covered by other guarantee commitments. Excludes our REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates and our guarantees under the HFA Initiative.

**Single-family mortgage** — A mortgage loan secured by a property containing four or fewer residential dwelling units.

**Spread** — The difference between the yields of two debt securities, or the difference between the yield of a debt security and a benchmark yield, such as LIBOR.

**Strips** — Mortgage pass-through securities created by separating the principal and interest payments on a pool of mortgage loans. A principal-only strip entitles the security holder to principal cash flows, but no interest cash flows, from the underlying mortgages. An interest-only strip entitles the security holder to interest cash flows, but no principal cash flows, from the underlying mortgages.

**Subprime** — Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Subprime generally refers to the credit risk classification of a loan. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include, among other factors, a combination of high LTV ratios, low credit scores or originations using lower underwriting standards, such as limited or no documentation of a borrower's income. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk. Notwithstanding our historical characterizations of the single family credit guarantee portfolio, certain security collateral underlying our Other Guarantee Transactions have been identified as subprime based on information provided to Freddie Mac when the transactions were entered into. We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions.

**Swaption** — An option contract to enter into an interest-rate swap. In exchange for an option premium, a buyer obtains the right but not the obligation to enter into a specified swap agreement with the issuer on a specified future date.

TREASURY-2323

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**TBA** — To be announced

**TCLFP** — Temporary Credit and Liquidity Facility Program

**TDR** — Troubled debt restructuring — A type of loan modification in which the changes to the contractual terms result in concessions to borrowers that are experiencing financial difficulties.

**Total comprehensive income (loss)** — Consists of net income (loss) plus the after-tax changes in: (a) the unrealized gains and losses on available-for-sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans.

**Total other comprehensive income (loss)** — Consists of the after-tax changes in: (a) the unrealized gains and losses on available-for-sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans.

**Total mortgage portfolio** — Includes mortgage loans and mortgage-related securities held on our consolidated balance sheets as well as the balances of our non-consolidated issued and guaranteed single-class and multiclass securities, and other mortgage-related financial guarantees issued to third parties.

**Treasury** — U.S. Department of the Treasury

**UPB** — Unpaid principal balance

**USDA** — U.S. Department of Agriculture

**VA** — U.S. Department of Veteran Affairs

**VIE** — Variable Interest Entity — A VIE is an entity: (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by another party; or (b) where the group of equity holders does not have: (i) the ability to make significant decisions about the entity's activities; (ii) the obligation to absorb the entity's expected losses; or (iii) the right to receive the entity's expected residual returns.

**Warrant** — Refers to the warrant we issued to Treasury on September 8, 2008 pursuant to the Purchase Agreement. The warrant provides Treasury the ability to purchase shares of our common stock equal to 79.9% of the total number of shares of Freddie Mac common stock outstanding on a fully diluted basis on the date of exercise.

**Workout, or loan workout** — A workout is either: (a) a home retention action, which is either a loan modification, repayment plan, or forbearance agreement; or (b) a foreclosure alternative, which is either a short sale or a deed in lieu of foreclosure.

**XBRL** — eXtensible Business Reporting Language

**Yield curve** — A graphical display of the relationship between yields and maturity dates for bonds of the same credit quality. The slope of the yield curve is an important factor in determining the level of net interest yield on a new mortgage asset, both initially and over time. For example, if a mortgage asset is purchased when the yield curve is inverted, with short-term rates higher than long-term rates, our net interest yield on the asset will tend to be lower initially and then increase over time. Likewise, if a mortgage asset is purchased when the yield curve is steep, with short-term rates lower than long-term rates, our net interest yield on the asset will tend to be higher initially and then decrease over time.

TREASURY-2324

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 10.1 | PC Master Trust Agreement dated September 22, 2011 |
| 10.2 | First Amendment To The Federal Home Loan Mortgage Corporation Mandatory Executive Deferred Base Salary Plan (As Effective January 1, 2009) (incorporated by reference to Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2011, as filed on August 8, 2011) |
| 12.1 | Statement re: computation of ratio of earnings to fixed charges and computation of ratio of earnings to combined fixed charges and preferred stock dividends |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101.INS | XBRL Instance Document[1] |
| 101.SCH | XBRL Taxonomy Extension Schema[1] |
| 101.CAL | XBRL Taxonomy Extension Calculation[1] |
| 101.LAB | XBRL Taxonomy Extension Labels[1] |
| 101.PRE | XBRL Taxonomy Extension Presentation[1] |
| 101.DEF | XBRL Taxonomy Extension Definition[1] |

(1) The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Freddie Mac, except to the extent, if any, expressly set forth by specific reference in such filing.

E-1

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 10.1**

5Freeir d M1

c P d CASET STRAS CUTEEd EGS

SNHAc P d CASET STRAS CUTEEd EGS  is entered into as of Nevtember 2292, 009b1 and amony greddie F aMin its Morvorate MavaN1 as c evositor9p dministrator and DAarantor9greddie F aMin its MavaN1 as GrAstee9and tue Tolders of tue Hl s offered from time to time vArsAant to greddie F aMs Cfferiny l irMnar referred to uerein'

## I  NETECAW

Q1. greddie F aMis a Morvoration dAhl oryani( ed and e) istiny Ander and b1 zirtAe of tue greddie F aMp M and uas fAhh Morvorate vox er and aAtuorit1 to enter into tuis p yreement and to Andertave tue obliyations Andertawen b1 it uereinkand

Q0. greddie F aMma1 from time to time Q1 vArMase F ortyayes9in aMMordanM x itu tue avvliMble vrozisions of tue greddie F aMp M9Qii. as c evositor9 transfer and devosit sAMd F ortyayes into zarioAs trAst fAnds tuat are establisued vArsAant to tuis p yreement and tuat are referred to uerein as ; Hl  Hoolh9' Qii. as GrAstee9Meate and issAe uere9Ander9on beualf of tue related Hl  Hool9Hl s revresentiny Andizided benefiMahox nersuiv interests in tue assets of tuat Hl  Hoohand otuerx ise aMt as trAstee for eaMd sAMd Hl  Hool9Qz. as DAarantor9Yarantee tue va1ment of interest and vrinMivahfor tue benefit of tue Tolders of sAMd Hl s and Q1. as p dministrator9administer tue affairs of eaMd sAMd Hl  Hool'

**G: I  QS NETE5:**  TE9in Monsideration of tue vremises and mAtAahM zenants Montained in tuis p yreement9tue varties to tuis p yreement9do uereb1 deMhare and establisu tuis p yreement and do uereb1 Andertave and otuerx ise ayree as folhox s x itu resveMt to tue transfer of tue F ortyayes to zarioAs Hl  Hoolh9 tue issAanM of tue Hl s and tue establisument of tue riyuts and obliyations of tue varties'

## , rDfitinf o

Gue folhox iny terms Ased in tuis p yreement uaze tue resveMtize meaninys set fortu behox '

*Accrual Period:* p s to an1 Hl  and an1 Ha1ment c ate9Q1 tue Mhendar montu vreMMdiny tue montu of tue Ha1ment c ate for Dohd Hl s or Qii. tue seMMnd Mhendar montu vreMMdiny tue montu of tue Ha1ment c ate for p " F  Hl s'

*Administrator:* greddie F aMin its Morvorate MavaN19as administrator of tue Hl  Hoolh Meated Ander tuis p yreement'

*Agreement:* Guis Hl  F aster GrAst p yreement9dated as of Nevtember 2292, 009b1 and amony greddie F aMin its Morvorate MavaN1 as c evositor9 p dministrator and DAarantor9greddie F aMin its MavaN1 as GrAstee9and tue Tolders of tue zarioAs Hl  s9as oriyinalhl e) eMMted9or as modified9amended or sAvvlemented in aMMordanM x itu tue vrozisions set fortu uerein' Rnhess tue MMnte) t reUAires otuerx ise9tue term ; p yreement" sualhbe deemed to inMlAde an1 avvliMble HoohNAvvlement entered into vArsAant to NeMMion 0', 0 of tuis p yreement'

*ARM:* p n adqAstable rate F ortyaye'

0

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*ARM PC:* p HI x itu a Ha1ment c eha1 of Sj da1s and x uiM is baMed b1 p " F s' p " F HI s inMAde c eferred 7nterest HI s'

*Book-Entry Rules:* Gue vrozisions from time to time in effeM9Marrenthl Montained in Gitle 259Hart I 09NAbvart T of tue l ode of gederah" ey-Antions9 settiny fortu tue terms and Monditions Ander x uiM greddie F aMma1 issAe seMrities on tue boow4entr1 s1stem of tue gederah" eserze 8 anws and aAtuori(iny a gederah" eserze 8 anwto aMas its ayent in MonneMion x itu sAMd seMrities'

*Business Day:* p da1 otuer tuan Gi. a NatArda1 or NAnda1 and Gii. a da1 x uen tue gederah" eserze 8 anwof - ex Borw Qr otuer ayent aMiny as greddie F aMs fisMhayent. is Mosed or9as to an1 Tolder9a da1 x uen tue gederah" eserze 8 anwtuat maintains tue TolderB aMdAnt is Mosed'

*Conventional Mortgage:* p F ortyaye tuat is not yAaranteed or insAred b1 tue Rnited Nates or an1 ayenM or instrAmentalit1 of tue Rnited Nates'

*Custodial Account:* p s defined in NeMion Y, j Q. of tuis p yreement'

*Deferred Interest:* Gue amoAnt b1 x uiM tue interest dAe on a F ortyaye e) Meds tue borrox erB3 montuhl va1ment9x uiM amoAnt is added to tue Anvaid vrinMavahbalanM of tue F ortyaye'

*Deferred Interest PC:* p HI revresentiny an Andizided benefiMahox nersuiv interest in a HI Hoohtuat inMAdes F ortyayes vrozidiny for neyatize amorti(ation'

*Depositor:* greddie F aM9in its Morvorate MavaMit9as devositor of F ortyayes into tue HI Hoohs Meated Ander tuis p yreement'

*Eligible Investments:* p n1 one or more of tue foHox iny obliyations9seMrities or uoldinys matAriny on or before tue Ha1ment c ate avvliMble to tue fAnds so inzested3

Gi. obliyations of9or obliyations yAaranteed as to tue fAhand timehl va1ment of vrinMavahand interest b19tue Rnited Natesk

Gii. obliyations of an1 ayenM or instrAmentalit1 of tue Rnited Nates Qtuer tuan greddie F aM or ta) able debt obliyations of an1 state or hoMhyozernment Qer vohitiMhsAbdizision tuereof. tuat uaze a hony4term ratiny or a suort4term ratiny9as avvliMble9from N: H9F ood1B3 or gitM in an1 Mase in one of its tx o uiyuest ratiny Mteyories for hony4term seMrities or in its uiyuest ratinys Mteyor1 for suort4term seMritiesk

Giii. time devosits of an1 devositor1 institAtion or trAst Momvan1 domiMhed in tue l a1man 7slands or - assaAand affiliated x itu a finanMahinstitAtion tuat is a member of tue gederah" eserze N1stem9vrozided tuat tue suort4term seMrities of tue devositor1 institAtion or trAst Momvan1 are rated b1 N: H9 F ood1B3 or gitM in tue uiyuest avvliMble ratinys Mteyor1 for suort4term seMritiesk

Gz. federahfAnds9MrtifiMtes of devosit9time devosits and banwersPaMMAvtanMs x itu a fi) ed matArit1 of no more tuan Y&j da1s of an1 devositor1 institAtion or trAst Momvan19vrozided tuat tue suort4term seMrities of tue devositor1 institAtion or trAst Momvan1 are rated b1 N: H9F ood1B3 or gitM in tue uiyuest avvliMble ratinys Mteyor1 for suort4term seMritiesk

Q.. MommerMahvaver x itu a fi) ed matArit1 of no more tuan 2S, da1s9of an1 Morvoration tuat is rated b1 N: H9F ood1B3 or gitM in its uiyuest suort4 term ratinys Mteyor1k

2

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(i). debt seMrities tuat uaze a lony4term ratiny or a suort4term ratiny9as avvliMble9from N: H9F ood1B· or gitM49in an1 Mse in one of its tx o uiyuest ratinys Mteyories for lony4term seMrities or in its uiyuest ratinys Mteyor1 for suort4term seMritiesk

(ii). mone1 marvet fAnds tuat are reyistered Ander tue 7nzestment l omvan1 p M of 065, 9as amended9are entitled9vArsAant to " Ae 2a4S of tue NeMrities and E) Manye l ommission9or an1 sAMAssor to tuat rAe9to uold tuemselzes oAt to inzestors as mone1 marvet fAnds9and are rated b1 N: H9 F ood1B· or gitM in one of its tx o uiyuest ratinys Mteyories for mone1 marvet fAndsk

(iii). asset4baMed MommerMalvaver tuat is rated b1 N: H9F ood1B· or gitM in its uiyuest suort4term ratinys Mteyor1k

(i). revArMase agreements on obliyations tuat are eituer sveMfied in an1 of NluAses Q.9Qi.9Qz.9Q.9Qii. or Qiii. aboze or are mortyaye4baMed seMrities insAred or yAaranteed b1 an entit1 tuat is an ayenM or instrAmentalit1 of tue Rnited Nateskvrozided tuat tue MAntervart1 to tue revArMase ayreement is an entit1 x uose suort4term debt seMrities are rated b1 N: H9F ood1B· or gitM in its uiyuest ratinys Mteyor1 for suort4term seMritieskand

(i). an1 otuer inzestment x ituoAt ovtions tuat is avvrozed b1 greddie F aMand is x ituin tue tx o uiyuest ratinys Mteyories of tue avvliMble ratiny ayenM for lony4term seMrities or tue uiyuest ratinys Mteyor1 of tue avvliMble ratiny ayenM for suort4term seMrities'

Gue ratiny reUAirement x iltbe satisfied if tue relezant seMrit19issAe or fAnd at tue time of vArMase reMizes at least tue minimAm stated ratiny from at least one of N: H9F ood1B· or gitM' Gue ratiny reUAirement x iltnot be satisfied b1 a ratiny tuat is tue minimAm ratiny folHox ed b1 a minAs siyn or b1 a ratiny box er tuan p a2 from F ood1B·'

*Event of Default:* p s defined in NeMion j ', 0 of tuis p yreement'

*FHA/VA Mortgage:* p F ortyaye insAred b1 tue gederahT oAsiny p dministration or b1 tue c ewartment of p yriMAtAre " Arahc ezelowment Gormerl1 tue " ArahT oAsiny NerziM. or yAaranteed b1 tue c ewartment of Veterans p ffairs or tue c ewartment of T oAsiny and Rrban c ezelowment'

*Final Payment Date:* p s to an1 Hl 9tue first da1 of tue latest montu in x uiM tue related HoohgaMor x iltbe redAMed to (ero' Gue p dministrator vAblisues tue yinahHa1ment c ate Avon formation of tue related Hl Hool1'

*Fitch:* gitM49TM9also wnox n as gitM " atinys9or an1 sAMAssor tuereto'

*Freddie Mac:* Gue gederahT ome Loan F ortyaye l orvoration9a Morvoration Meated vArsAant to tue greddie F aMp M for tue vArvose of establisuiny and sAvvortiny a seMndar1 marvet in residentiahmortyayes' Rnless tue Monte1 t reUAires otuerx ise9tue term ; greddie F aM suaHbe deemed to refer to greddie F aM aMiny in one or more of its Morvorate MavaMties9as sveMfied or as vrozided in Monte1 t9and not in its MavaM1 as GrAstee'

*Freddie Mac Act:* Gitle 777 of tue EmeryenM T ome ginanMp M of 06S, 9as amended902 R 'N1 ' §§05j 0405j 6'

*Gold PC:* p Hl x itu a Ha1ment c ern1 of 5j da1s and x uiM is baMed b1 fi)ed4rate F ortyayes'

*Guarantor:* greddie F aM9in its Morvorate MavaMt19as yArantor of tue Hl s issAed b1 eaM Hl Hool1'

Y

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Guide:* greddie F aM8 Ninyle4gamihl Nelter/Nerzi1Mr DAide9as sAvvlemented and amended from time to time9in x uiM1 greddie F aMsets fortu its mortyaye vArM1ase standards9Medit9avvraisahand Anderx ritiny yAidelines and serziM1ny voliMes'

*Holder:* Witu resveM1to an1 Hl Hool9an1 entit1 tuat avvears on tue reM1rds of a gederah" eserze 8 anwas a uolder of tue rehated Hl s'

*Monthly Reporting Period:* Gue veriod9x uiM1 veriod tue p dminnistrator uas tue riyut to M1anye as vrozided in NeM1ion Y', j Ql. of tuis p yreement9dAriny x uiM1 serziM1rs revort F ortyaye va1ments to tue p dminnistrator9yenerahl M1nsistiny of3

Qi. in tue M1se of alhva1ments otuer tuan fAlhvreva1ments on tue F ortyayes9tue one4montu veriod Qp . endiny on tue 0j ᵗᵘ of tue montu vreM1diny tue rehated Ha1ment c ate for Dohd Hl s and Q8 . endiny on tue 0j ᵗᵘ of tue seM1nd montu vreM1diny tue rehated Ha1ment c ate for p " F Hl skand

Qi. in tue M1se of fAlhvreva1ments on tue F ortyayes QnM1diny revArM1ases of tue F ortyayes vArsAant to NeM1ion 0', 2QM of tuis p yreement. 9tue M1lendar montu vreM1diny tue rehated Ha1ment c ate for Dohd Hl s and tue seM1nd M1lendar montu vreM1diny tue rehated Ha1ment c ate for p " F Hl sk *provided, however* 9tuat x itu resveM1to fAlhvreva1ments on Hl s issAed before Nevtember 09066j 9tue F ontuhl " evortiny Heriod yenerahl is from tue 0&ᵗᵘ of a montu turoAyu tue 0j ᵗᵘ of tue ne) t montu'

*Moody's:* F ood1P7nzestors Nerzi1M1 97nM9or an1 sAM1essor tuereto'

*Mortgage:* p mortyaye loan or a varti1M1vation interest in a mortyaye loan tuat is seM1red b1 a first or seM1nd lien on a one4o4foAr famihl dx elliny and tuat uas been vArM1ased b1 tue c evositor and transferred b1 tue c evositor to tue GrAstee for inM1sion in tue rehated Hl Hool9 Witu resveM1to eaM1 Hl Hool9tue F ortyayes to be inM1ded tuerein sualhbe identified on tue boows and reM1rds of tue c evositor and tue p dminnistrator'

*Mortgage Coupon:* Gue ver annAm fi)ed or adqAstable interest rate of a F ortyaye'

*MultiLender Swap Program:* p vroyram Ander x uiM1 greddie F aMvArM1ases F ortyayes from one or more sellers in e)M1anye for Hl s revresentiny Andizided benefiM1ahox nersuiv interests in a Hl Hooh M1nsistiny of F ortyayes tuat ma1 or ma1 not be tuose delizered b1 tue sellerG9. '

*Negative Amortization Factor:* Witu resveM1to Hl s baM1ed b1 F ortyayes vrozidiny for neyatize amorti(ation9a trAnM1ted eiyut4diiyit deM1mahnAmber tuat reflteM1s tue amoAnt of c eferred 7nterest added to tue vrinM1vahbalanM1s of tue rehated F ortyayes in tue vreM1diny montu'

*Offering Circular:* greddie F aM8 F ortyaye HartiM1vation l ertifiM1tes Cfferiny l irM1lar dated JAne 2, 92, 009as amended and sAvvlemented b1 an1 NAvvlements issAed from time to time9or an1 sAM1essor tuereto9as it ma1 be amended and sAvvlemented from time to time'

*Payment Date:* Gue 0j tu of eaM1 montu or9if tue 0j tu is not a 8 Asiness c a19tue ne) t 8 Asiness c a1'

*Payment Delay:* Gue deha1 betx een tue first da1 of tue p MM1ahHeriod for a Hl and tue rehated Ha1ment c ate'

*PC:* Witu resveM1to eaM1 Hl Hool9a F ortyaye HartiM1vation l ertifiM1te issAed vArsAant to tuis p yreement9revresentiny a benefiM1ahox nersuiv interest in sAM1 Hl Hool9 Gue term ; Hl l PPinM1Ades a Dohd Hl or an p " F Hl Anless tue M1nte) t reqAires otuerx ise'

5

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*PC Coupon:* Gue ver annAm fi) ed or adoMstable rate of a HI MdhNmted as desMribed in tue Cfferiny l irMMar or tue avvliMble HoohNAvvlement9MomvAted on tue basis of a Y& 4da1 1ear of tx efxe Y, 4da1 montus'

*PC Issue Date:* Witu resveMto eaMd HI Hool9tue date sveMified in tue related HoohNAvvlement or9if not sveMified tuerein9tue date on x uiMd greddie F aM issAes a HI in e) Manye for tue F ortyayes delizered b1 a dealer or otuer Mastomer'

*PC Pool:* Witu resveMto eaMd HI 9tue MorvAs of tue related trAst fAnd Mreated b1 tuis p yreement9Mnsistiny of G1 tue related F ortyayes and alhvroMeds tuereof9Gi. amoAnts on devosit in tue l Astodiahp Md9Ant9to tue e) tent alhoMble to sAMd HI Hool9Gii. tue riyut to reMize va1ments Ander tue related yAarantee and G1z. an1 otuer assets sveMified in tue related HoohNAvvlement9e) MAdiny an1 inzestment earninys on an1 of tue assets of tuat HI Hooli Witu resveMto eaMd HI Hool9and Anless e) vresshl stated otuerx ise9tue vrozisions of tuis p yreement x ilhbe intervreted as referriny onhl to tue F ortyayes inMAded in tuat HI Hool9 tue HI s issAed b1 tuat HI Hoohand tue Tolders of tuose HI s'

*Person:* p n1 heyahverson9inMAdiny an1 indizidAal9Mrvoration9vartnersuiv9limited liabilit1 Mmvan19finanMahinstitAtion9qint zentAre9assoMation9 qint stoMoMmvan19trAst9AninMrvorated oryani(ation or yozernmentahAnit or vohitiMahsAbdizision of an1 yozernmentahAnit'

*Pool Factor:* Witu resveMto eaMd HI Hool9a trAnMted eiyut4diyit deMmahMhNmted for eaMd montu b1 tue p dministrator x uiMd9x uen mAttivlied b1 tue oriyinahvrinMvahbahmMd of tue related HI s9x iherUAntueir remaininy vrinMvahamoAnt' Gue HoohgaMor for an1 montu refleMs tue remaininy vrinMvah amoAnt after tue va1ment to be made on tue Ha1ment c ate in tue same montu for Dold HI s or in tue folhox iny montu for p '' F HI s'

*Pool Supplement:* p n1 vu1siMhor eleMroniMdoMMment or reMrd Gt uiMd ma1 be a Avvlement to tue Cfferiny l irMMar or an1 otuer Avvlementah doMMment vrevared b1 greddie F aMfor tue related HI s.9x uiMd9toyetuer uerex itu9ezidenMs tue establisument of a HI Hoohand modifies9amends or sAvvlements tue vrozisions uereof in an1 resveMx uatsoezer' Gue HoohNAvvlement for a vartiMMar HI Hoohsuahbe bindiny and effeMize Avon formation of tue related HI Hoohand issAanMd of tue related HI s9x uetuer or not sAMd HoohNAvvlement is e) eMAted9delizered or vMbissued b1 greddie F aM

*Purchase Documents:* Gue mortyaye vArMase agreements betx een greddie F aMand its F ortyaye selhers and serziMrs9x uiMd are tue MontraMs tuat yozern tue vArMase and serziMny of F ortyayes and x uiMd inMMAde9amony otuer tuinys9tue DAide and an1 neyotiated modifiMtions9amendments or sAvvlements to tue DAide'

*Record Date:* p s to an1 Ha1ment c ate9tue Mlose of bAsiness on tue hast da1 of G1 tue vreMdiny montu for Dold HI s or Gi. tue seMnd vreMdiny montu for p '' F HI s'

*S&P:* Mandard : HoorP's '' atinys NerziMs9a dizision of Gue F MDrax 4Tilh1 omvanies97nM9or an1 sAMMssor tuereto'

*Trustee:* greddie F aMin its MavaMt1 as trAstee of eaMd HI Hoohformed Ander tuis p yreement9and its sAMMssors and assiyns9x uiMd x ilhuaze tue trAstee resvonsibilities sveMified in tuis p yreement9as amended or sAvvlemented from time to time'

*Trustee Event of Default:* p s defined in NeMion &, &of tuis p yreement'

j

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## CTSHPs E H

### Pnf LrvMar nDd nRyMyrogP FrMinf nDc P cnn;o

**Aratinf 1.01. , ra;MFMinf nDS H otgS FMoDF nDd nRyMyro.** Gue c evositor9b1 deliizeriny an1 F ortyayes vArsAunt to tuis p yreement9AnMonditionalHl 9 absolMtehl and irrezoMbhl uereb1 transfers9assiyns9sets ozer and otuerx ise Monze1s to tue GrAstee9on beualf of tue rehated Tohlders9alhof tue c evositorl's riyut9tithe and interest in and to sAM F ortyayes9inMdiiny alhva1ments of vrinMvahand interest tuereon reMized after tue montu in x uiMd tue Hl  7ssAe c ate oMMrs' CnMd F ortyayes uaze been identified as beiny vart of a rehated Hl  Hoohfor x uiMd at least one Hl  uas been issAed9tue1 sualhremain in tuat Hl  Hooh Anhess remozed in a manner Monsistent x itu tuis p yreement' l onMArrenthl x itu tue c evositorl's transferriny9assiyniny9settiny ozer and otuerx ise Monze1iny tue F ortyayes to tue GrAstee for a Hl  Hool9tue GrAstee uereb1 aMMvts tue F ortyayes so Monze1ed and aMknox hedyes tuat it uolds tue entire MorvAs of eaMd Hl  Hoohin trAst for tue e) Mhisize benefit of tue rehated Tohlders and sualhdeliizer to9or on tue order of9tue c evositor9tue Hl  s issAed b1 sAM Hl  Hool' Gue p dminstrator ayrees to administer tue rehated Hl  Hoohand sAM Hl  s in aMMordanMd x itu tue terms of tuis p yreement' Cn tue rehated Hl  7ssAe c ate and Avon va1ment to tue c evositor for an1 sAM Hl  b1 a Tohlder9sAM Tohlder sualh9b1 zirtAe tuereof9aMknox hedye9aMMdvt and ayree to be boAnd b1 alhof tue terms and Monditions of tuis p yreement'

p  AhoohNAvvhement sualhezidenMd tue establishment of a vartiMlhar Hl  Hoohand sualhrehate to sveMlfiMHl  s revresentiny tue entire benefiMahox nersuiv interests in sAM Hl  Hool' 7f for an1 reason tue Meation of a HoohNAvvhement is deha1ed9greddie F aMisualhMeate one as soon as vraMfiMlbhe9and sAM deha1 sualhnot affeMt tue zahidit1 and e) istenM of tue Hl  Hoohor tue rehated Hl  s' Witu resveMt to eaMd Hl  Hool9tue MdfteMize terms uereof and of tue rehated Hooh NAvvhement sualhyozern tue issAanM and administration of tue Hl  s rehated to sAM Hl  Hool9and alhmatters rehated tuereto9and sualhuaize no avvhiMbilit1 to an1 otuer Hl  Hoohor Hl  s' p s avvhied to eaMd Hl  Hool9tue MdfteMize terms uereof and of tue rehated HoohNAvvhement sualhMonstitAte an agreement as if tue MdfteMize terms of tuose instrAments x ere set fortu in a sinyhe instrAment' 7n tue ezent of a MonfliMt betx een tue terms uereof and tue terms of a HoohNAvvhement for a Hl  Hool9tue terms of tue HoohNAvvhement sualhMontrohx itu resveMt to tuat Hl  Hool' p HoohNAvvhement is not Monsidered an amendment to tuis p yreement reUAiriny avvrozahvArsAant to NeMion S', j '

### Aratinf 1.0u. Herf titv nDthr d nRyMyrogAl botitl tinf Mle Tr2l FahMr.

Q. 7n Monsideration for transfer of tue rehated F ortyayes b1 tue c evositor to a Hl  Hool9tue c evositor Q. sualhreMize tue Hl  s issAed b1 sAM Hl  Hooh and Qi. ma1 retain sAM Hl  s or transfer tuem to tue rehated F ortyaye selher or otuerx ise9as tue c evositor deems avvrovriate'

Qh. p fter tue Hl  7ssAe c ate bAt vrior to tue first Ha1ment c ate9tue c evositor ma19in aMMordanM x itu its Mastomar1 mortyaye vArMase and voohiny vroMdAres9adqi'st tue amoAnt and identit1 of tue F ortyayes to be transferred to a Hl  Hool9tue Hl  l oAvon and/or tue oriyinahAnvaid vrinMvahbahanM of tue Hl  s and tue F ortyayes in tue Hl  Hool9vrozided tuat an1 Manyes to tue MaraMeristiM of tue Hl  s sualhbe ezidenMd b1 an amendment or sAvvhement to tue rehated HoohNAvvhement'

QMt E) Mdvt as vrozided in tuis NeMion 0', 2 or in NeMion 0', Y9onMd tue c evositor uas transferred a F ortyaye to a vartiMlhar Hl  Hool9sAM F ortyaye ma1 not be transferred oAt of sAM Hl  Hool9e) Mdvt Qi'. if a mortyaye insArer e) erMses an ovtion Ander an insAranM Montra Mt to vArMase sAM F ortyaye or Qi.. in tue Mse of revArMase b1 tue DArantor9tue p dministrator or tue rehated F ortyaye selher or serziMr9Ander tue folhox iny MirMmstanMds3

Q. Gue DArantor ma1 revArMase from tue rehated Hl  Hooha F ortyaye in MonneMion x itu a yArantee va1ment Ander NeMion Y, 6Q.Qi. '

&

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused or limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(vi). The Administrator may revoke lease from the related HFI pool or require or permit a Fund payee seller or servicer to revoke lease and/or a Fund payee if a revoke lease is necessary or advisable (i) to maintain servicing of the Fund payee in accordance with the provisions of the Guide and/or (ii) to maintain the status of the HFI pool as a grantor trust for federal income tax purposes.

(vii). The Guarantor may revoke lease from the related HFI pool or require or permit a Fund payee seller or servicer to revoke lease and/or a Fund payee if (i) a Fund payee is 02, or more days delinquent, or (ii) the Guarantor determines, on the basis of information from the related borrower or servicer, that loss of ownership of the property is likely or default is imminent due to borrower insolvency, death, or pursuit of other extraordinary circumstances that may affect the payments on a Fund payee and/or is impossible.

(z). The Guarantor may revoke lease from the related HFI pool a Fund payee if a bankruptcy court orders a plan that materially affects the terms of the Fund payee or authorizes a transfer or substitution of the underlying property.

(i). The Administrator may require or permit a Fund payee seller or servicer to revoke lease from the related HFI pool and Fund payee or (ii) in si) montus of the issuance of the related HFI s. substitute for an Fund payee or servicer (i) a material breach of warranty by the Fund payee seller or servicer or (ii) a material defect in documentation as to such Fund payee or (iii) a failure by a seller or servicer to comply with requirements or terms set forth in the Guide and/or applicable other Arm lease commitments.

(ii). The Administrator shall revoke lease from the related HFI pool a Fund payee or (ii) in tx o lears of the issuance of the related HFI s. substitute for an Fund payee a Fund payee of comparable tlive/Anvaid value/balance, remaining term and yield/if (i) a Fund payee of competent jurisdiction or a federal government agency and/or authorities to oversee or regulate the greddie Fund mortgage business determines that greddie Fund revoke lease of such Fund payee as an authority and greddie Fund determines that a Fund is not available without an unreasonable effort or (ii) value or (iii) such Fund payee or government agency requires revoke lease of such Fund payee.

(iii). To the extent a HFI pool includes Nonconvertible p ″F s or 8 alloon/″ eset Fund payees (as defined in the Offering Circular related thereto) the Administrator shall revoke lease from the related HFI pool or require or permit a Fund payee seller or servicer to revoke lease such Fund payees (i) a xen due borrow or (ii) requires its option to convert the related interest rate from an adjustable rate to a fixed rate in the case of a Convertible p ″F and (ii) shortly before such Fund payee reaches its scheduled balloon revaluation date in the case of a 8 alloon/″ eset Fund payee.

(vi). The revoke lease or revaluation of a Fund payee by a Fund payee seller or servicer shall be (i) without the then Anvaid value/balance of such Fund payee (ii) less any revaluation such Fund payee that the Fund payee seller or servicer advanced to the case or to the investor or the Administrator. The revoke lease or revaluation of a Fund payee revoke lease by the Administrator or the Guarantor under this agreement shall be (i) without the then Anvaid value/balance of such Fund payee, (ii) less any outstanding advances of revaluation such Fund payee that the Administrator, on behalf of the Grantee, distributed to Tholders. The Administrator, on behalf of the Grantee, agrees to release any Fund payee from the HFI pool Anvaon valuation of the applicable revoke lease value.

(i). In determining whether a Fund payee shall be revoke lease from the related HFI pool as described in this section 0′, the Guarantor and the Administrator may consider such factors as they deem appropriate, including the reduction of administrative costs on the case of the Administrator, or possible exposure as Guarantor under its guarantee on the case of the Guarantor.

S

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Aratinf  1.0p. c not3Artt;r– rf t cl FahMr Cemhot– rf to**

0l.  Gue p dministrator sualhmave an1 vost4settlement vArMase adqAstments neMssar1 to refleMtue aMAahayyreyate Anvaid vrinMvahbahanM of tue rehated F ortyayes or ouer F ortyaye MaraMeristiMs as of tue date of tueir vArMase b1 tue c evositor or tueir delizer1 to tue GrAstee in e) Manye for Hl s9as tue Mase ma1 be'

0h.  Host4settlement adqAstments ma1 be made in sAMe manner as tue p dministrator deems avvrovriate9bAt sualhnot adzersehl affeMan1 Tolder Rs riyuts to montuhl va1ments of interest at tue Hl 1 oAovon9an1 Tolder Rs vro rata suare of vrinMvahor an1 Tolder Rs riyuts Ander tue DAurantor Rs yAarantees' p n1 redAMion in tue vrinMvahbahanM of tue F ortyayes uehd b1 a Hl Hoohsualhbe refleMed b1 tue p dministrator as a Morresvondiny redAMion in tue vrinMvah bahanM of tue rehated Hl s x itu a Morresvondiny vrinMvahva1ment to tue rehated Tolders9on a vro rata basis'

**Aratinf  1.0j . Pl otnev nDd nFtyMyr , nal – rf to.**  Witu resveMto eaMl Hl Hool9tue p dministrator9a MAstodian aMiny as its ayent Gt uiMl ma1 be a tuird vart1 or a trAst or MAstod1 devartment of tue rehated selIer or serziMr.9or tue oriyinator or selIer of tue F ortyaye ma1 uohd tue rehated F ortyaye doMAments9 inMlAdiny F ortyaye notes and vartiMvation MertifiMtes ezidenMiny tue GrAstee Rs leyahox nersuiv interest in tue F ortyayes' Gue p dministrator ma1 adovt and modif1 its voliMes and vroMdAres for tue MAstod1 of F ortyaye doMAments at an1 time9vrozided sAMl modifiMtions are vrAdent and do not materialHl and adzersehl affeMtue Tolders Pinterests'

**Aratinf  1.04. Hf trFroto Nr;e nFCaql iFre bv 5Freeir d Ml.**  greddie F aMsualhuaze tue riyut to vArMase and uohd for its ox n aMMAnt an1 Hl s' NAbqeMl to NeMtion S', &9Hl s uehd or aMlAired b1 greddie F aMIrom time to time and Hl s uehd b1 ouer Tolders sualhuaze eUAahand vrovortionate benefits9x ituoAt vreferenM9vriorit1 or distinMion' 7n tue ezent tuat greddie F aMretains an1 interest in a F ortyaye9tue remaininy interest in x uiMl is vart of a Hl Hool9greddie F aMs interest in sAMl F ortyaye sualhranweUAahl x itu tuat of tue rehated Hl Hool9x ituoAt vreferenM9vriorit1 or distinMion' – o Tolder sualhuaze an1 vriorit1 ozer an1 ouer Tolder'

**Aratinf  1.06. Hf trf ere PhMFMtrFizMinf . 7**t is intended tuat tue Mnze1anM9transfer9assiynment and settiny ozer of tue F ortyayes b1 tue c evositor to tue GrAstee vArsAant to tuis p yreement be a trAe9absohAte and AnMonditionahsale of tue rehated F ortyayes b1 tue c evositor to tue GrAstee9and not a vIedye of tue F ortyayes to seMAre a debt or ouer obliyation of tue c evositor9and tuat tue Tolders of tue rehated Hl s sualhbe tue benefiMahox ners of sAMl F ortyayes' – otx itustandiny tuis e)vress intention9uox ezer9if tue F ortyayes are determined b1 a MAArt of Momvetent qArisdiMion or ouer Momvetent aAtuorit1 to be tue vrovert1 of tue c evositor9tuen it is intended tuat3GA. tuis p yreement be deemed to be a seMArit1 ayreement x ituin tue meaniny of p rtiMIes I and 6 of tue Rniform l ommerMahl odeK0h. tue Mnze1anMs vrozided for in NeMtion 0', 0 sualhbe deemed to be 0l. a yrant b1 tue c evositor to tue GrAstee on beualf of tue rehated Tolders of a seMArit1 interest in alhof tue c evositor Rs riyut GnMIAdiny tue vox er to Mnze1 titIe tuereto.9titIe and interest9x uetuer nox ox ned or uereafter aMlAired9in and to tue rehated F ortyayes9an1 alhyeneerahintanyibhes Monsistiny of9arisiny from or rehatiny to an1 of tue foreyoiny9and alhvroMeds of tue Mnzersion9zohAntar1 or inzohAntar19of tue foreyoiny into Msu9instrAments9seMArities or ouer vrovert19inMlAdiny x ituoAt limitation alhamoAnts from time to time uehd or inzested in tue l Astodiahp MMAnt and alhoMMthe to sAMl F ortyayes9x uetuer in tue form of Msu9instrAments9seMArities or ouer vrovert1 and 0l. an assiynment b1 tue c evositor to tue GrAstee on beualf of tue rehated Tolders of an1 seMArit1 interest in an1 alhof tue c evositor Rs riyut GnMIAdiny tue vox er to Mnze1 titIe tuereto.9titIe and interest9x uetuer nox ox ned or uereafter aMlAired9in and to tue vrovert1 desMibed in tue foreyoiny NAAse 0h.kand 0Ml notifiMtions to Hersons uohdiny sAMl vrovert19and aMMnox Iedyments9reMivts or Monfirmations from Hersons uohdiny sAMl vrovert19sualhbe deemed notifiMtions to9or aMMnox Iedyments9reMivts or Monfirmations from9finanMahintermediaries9bailees or ayents Gas avvliMahbe. of tue GrAstee on beualf of tue rehated Tolders9for tue vArvose of verfeMiny sAMl seMArit1 interest Ander avvliMahbe hx '

I

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2333

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Aratinf 1.07. Ef al - bFMaro. E) Mvt as ma1 ouerx ise be vrozided e) vresshl in tuis p yreement9neituer greddie F aMnor tue GrAstee sualhdireMhl or indireMhl9assiyn9sell9disvose of or transfer alhor an1 vortion of or interest in an1 HI  Hool9or vermit alhor an1 vortion of an1 HI  Hoohto be sAbqeMto an1 lien9Mhaim9mortyaye9seMvrit1 interest9vledye or otuer enMmbranM of an1 otuer Herson' Guis NeMion sualhnot be MnstrAed as a limitation on greddie F aMs riyuts x itu resveMto HI s ueldi b1 it in its Mrvorate MdvaMd1'

## CTSHPs E HI

### Ce- if iotFMinf Me ArFLiaif y nDthr d nFtyMfro

Aratinf u.01. S hr Ce- if iotFMinFMnFMe Fi- MFv ArFLiarF. Witu resveMto eaMd HI  Hool9tue p dminastor sualhserziM or sAverzise serziMny of tue related F ortayes and administer9on beualf of tue GrAstee9in aMordanM x itu tue vrozisions of tue DAide and tuis p yreement9inMMdiny management of an1 vrovert1 aMAired turo9yu foreMbsAre or otuerx ise9alhfor tue benefit of tue related Toldes' Gue p dminastor sualhuaze fAhvox er and aAtuorit1 to do or MdAse to be done an1 and alhtuinys in MnneMion x itu sAMd serziMny and administration tuat tue p dminastor deems neMssar1 or desirable' Gue p dminastor sualhseewfrom tue GrAstee9as revresentatize of tue related Tolders9an1 Mnsents or avvrozals relatiny to tue Mntrol9management and serziMny of tue F ortayes inMMded in an1 HI  Hoohand tuat are reUAired uereAnder'

Aratinf u.0u. ArFLiaif y Tro2nf oibi;itiro. Witu resveMto eaMd HI  Hool9tue p dminastor sualhserziM or sAverzise serziMny of tue related F ortayes in a manner Mnsistent x itu vrAdent serziMny standards and in sAbstantialhl tue same manner as tue p dminastor serziMs or sAverzises tue serziMny of Ansohl mortyayes tue same t1ve in its vortfolio' 7n verforminy its serziMny resvonsibilities uereAnder9tue p dminastor ma1 enyaye serziMrs9sAbserziMrs and otuer indevendent MntraMors or ayents' Gue p dminastor ma1 disMarye its resvonsibilit1 to sAverzise serziMny of tue F ortayes b1 monitoriny serziMrsP verformanM on a revortiny and e) Mdvtion basis' E) Mvt as vrozided in p rtiMes V and V7and NeMions S', j and S', &of tuis p yreement9greddie F aMas p dminastor sualhnot be sAbqeMto tue Mntrohof tue Tolders in tue disMarye of its resvonsibilities vArsAant to tuis p rtiMe' E) Mvt x itu reyard to its yAarantee obliyations vArsAant to NeMion V, 6 x itu resveMto a HI  Hool9tue p dminastor sualhuaze no liabilit1 to an1 related Tolder for tue p dminastorPs aMions or omissions in disMariny its resvonsibilities Ander tuis p rtiMe 77otuer tuan for an1 direMdamaye resAltiny from its failAre to e) erMse tuat deyree of ordinar1 Mre it e) erMses in tue MondAM and management of its ox n affairs' 7n no ezent sualhtue p dminastor uaze an1 liabilit1 for MnseUAentialhdamayes'

Aratinf u.0p. TrMizMinf R2nf, rDM;tre d nFtyMfro. Witu resveMto eaMd HI  Hool9Anless tue p dminastor deems tuat anotuer MdArse of aMion Q'y'9 Marye4off. x oAld be in tue best eMnomiMinterest of tue Tolders9tue p dminastor Mor its aAtuori(ed desiynee or revresentatize. sualhfolhox sAMd vraMMes or vroMdAres as it deems neMssar1 or adzisable and Mnsistent x itu yenerahmortyaye serziMny standards'

Aratinf u.0j. Cl tn– Mia Caar;rFMinf Me Cool – 2tinf o.

Q. Witu resveMto eaMd HI  Hool9to tue e) tent vrozided in tue DAide9tue p dminastor sualhenforM tue terms of eaMd avvliMble F ortaye tuat yizes tue mortyayee tue riyut to demand fAhva1ment of tue Anvaid vrinMvahbalanM of tue F ortaye Avon sale or transfer of tue vrovert1 seMriny tue F ortaye reyardless of tue Meditx ortuiness of tue transferee Qi riyut of ; aAtomatiMaMMeleration77.9sAbqeMto avvliMble state and federalhhx  and tue p dminastorPs tuen4MArrent serziMny voliMes'

6

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be best adequate, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(b). Witu resveMto eaMHl Hool9tue p dministrator suaHvermit tue assAmvtion b1 a nex mortyayor of an gTp/Vp F ortyaye Avon tue sahe or transfer of tue Anderhliny vrovert19as reUAired b1 avvliMdble reyAhtions' p n1 sAMd assAmvtion suaHbe in aMordanM x itu avvliMble reyAhtions9voliMes9vroMdAres and Medit reUAirements and suaHnot resAlt in hoss or imvairment of an1 insAranM or yAarant1'

**Aratinf u.04. c Fr2M- rf t c rf Mtiro.** Rnless otuerx ise vrozided in tue HoohNAvvhement for a Hl Hool9tue rehated Tohders suaHnot be entitled to reMize an1 vreva1ment venahties9assAmvtion fees or otuer fees Maryed on tue F ortyayes inMAded in sAMd Hl Hool9and eituer tue rehated serziMr or tue p dministrator suaHretain sAMd amoAnts'

**Aratinf u.06. d nFtyMyr Hf ol FMar Me Ul MFM trro.**

(a). Witu resveMto eaMHl Hool9if a l onzentionahF ortyaye is insAred b1 a mortyaye insAAer and tue mortyaye insAranM voliM is an asset of sAMd Hl Hool9tue rehated Tohders aMnox ledye tuat tue insAAer suaHhuaze no obliyation to reMyni( e or deahx itu an1 Herson otuer tuan tue p dministrator9tue GrAstee9 or tueir resveMize aAuori( ed desiynees or revresentatizes reyardiny tue mortyayeeB riyuts9benefits and obliyations Ander tue rehated insAranM MntraM'

(b). Witu resveMto eaMHl Hool9eaMd gTp/Vp F ortyaye suaHnuaze in fAthforMd and effeMa MrtifiMte or otuer satisfaMor1 ezidenM of insAranM or yAarant19as tue Mse ma1 be9as ma1 be issAed b1 tue avvliMble yozernment ayenM from time to time' - one of tuese ayenMes uas an1 obliyation to reMyni( e or deahx itu an1 Herson otuer tuan tue p dministrator9tue GrAstee9or tueir resveMize aAuori( ed desiynees or revresentatizes x itu reyard to tue riyuts9benefits and obliyations of tue mortyayee Ander tue MntraM of insAranM or yAarant1 rehatiny to eaMd gTp/Vp F ortyaye inMAded in sAMd Hl Hool

## CTS HPs E HHI

## , iotFibl tinf o tn Nn;er FogUl MFM trro

**Aratinf p.01. d nf th;v Tr2nRif y c rFine.** gor vArvoses of tuis p yreement x itu resveMto an1 Hl Hool9an1 va1ment or an1 ezent x itu resveMto an1 F ortyaye inMAded in sAMd Hl Hooltuat is revorted to tue p dministrator b1 tue rehated serziMr as uaziny been made or uaziny oMArred x ituin a F ontuhl '' evortiny Heriod suaHbe deemed to uaze been reMized b1 tue p dministrator or to uaze in faMoMArred x ituin sAMd F ontuhl '' evortiny Heriod Ased b1 tue p dministrator for sAMd vArvoses' Ha1ments revorted to b1 serziMrs inMAde alhvrinMvahand interest va1ments and b1 a borrox er9insAranM vroMeeds9 liUAidation vroMeeds and revArMase vroMeeds' Ezents revorted b1 serziMrs inMAde foreMhosAre sahes9va1ments of insAranM Mhaims and va1ments of yAarantee Mhaims'

**Aratinf p.0u. Nn;er FoRf eiLie re Brf rDaiM; wf rFohi2 Hf trFrot.** Witu resveMto eaMHl Hool9tue Tohder of a Hl on tue '' eMord c ate suaHbe tue ox ner of reMord of a vro rata Andizided benefiMahox nersuiv interest in tue remaininy vrinMvahbahanM of tue F ortyayes in tue rehated Hl Hoohas of sAMd date and suaHbe entitled to interest at tue Hl l oAvon on sAMd vro rata Andizided benefiMahox nersuiv interest9in eaMd Mse on tue rehated Ha1ment c ate' NAMd vro rata Andizided benefiMahox nersuiv interest suaHManye aMMordinyhl if an1 F ortyaye is added to or remozed from sAMd Hl Hoohin aMMordanM x itu tuis p yreement' p TohderB vro rata Andizided benefiMahox nersuiv interest in tue F ortyayes inMAded in a Hl Hoohis MMnMnted b1 dizidiny tue oriyinahAnvaid vrinMvahbahanM of tue TohderB Hl b1 tue oriyinahAnvaid vrinMvahbahanM of alhtue F ortyayes in tue rehated Hl Hool

**Aratinf p.0p. , iotFibl tinf o nDe Rf ai2M.** Witu resveMto eaMHl Hool9tue p dministrator9on beuahf of tue GrAstee9suaHhx itudrax from tue l Astodiah p MMAnt and suaHdistribAte to eaMd rehated Tohder its vro rata suare of vrinMvahMheMtions x itu resveMto tue F ortyayes in sAMd Hl Hool9inMAdiny9if avvliMble9eaMd TohderB vro rata suare of tue ayyreyate amoAnt of an1 c eferred 7interest tuat uas been

0,

---

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

added to tue vrinMvahbahanMt of tue rehated F ortyayesk *provided, however* 9tuat x itu resveMt to yAarantee va1ments 9tue DAarantorB obli1ations uerein sualh be sAbqpMt to its sAbroyation riyuts vArsAant to NeMion Y0, ' Gue p dminístrator ma1 retain from an1 vreva1ment or delinUAent vrinMvahva1ment on an1 F ortyaye 9for reimbArsement to tue DAarantor 9an1 amoAnt not vrezioAshl reMized x itu resveMt to sAMd F ortyaye bAt vaid b1 tue DAarantor to tue rehated Tohders Ander its yAarantee' gor F ortyayes vArMased b1 tue c evositor in e) Manye for HI s Ander its F AltiLender Nx av Hroyram 9tue c evositor sualhretain vrinMvahva1ments made on sAMd F ortyayes in tue amoAnt of an1 differenMt betx een tue ayyreyate Anvaid vrinMvahbahanMt of tue F ortyayes as of delizer1 b1 tue selHer and tue ayyreyate Anvaid vrinMvahbahanMt as of tue HI 7ssAe c ate 9and tue c evositor sualhvAMase additionahF ortyayes x itu sAMd vrinMvah va1mentsksAMd additionahF ortyayes ma1 or ma1 not be inMhded in tue rehated HI Hoohrevresented b1 tue HI s reMized b1 tue selHer'

**Aratinf p.0j . , iotFibl tinf o nDHf trFrot.** Witu resveMt to eaMt HI Hool 9tue p dminístrator 9on beualf of tue GrAstee 9sualhx itudrax from tue l Astodiah p MdoAnt and sualhdistribAte to eaMt rehated Tohder its vro rata suare of interest MdHeMions x itu resveMt to F ortyayes inMhded in sAMd HI Hool 9at a rate eUAahto tue HI 1 oAvon Q) MdAdiny 9if avvhiMble 9eaMt Tohder Hool 9RB vro rata suare of an1 c eferred 7nterest tuat uas been added to tue vrinMvahbahanMt of tue rehated F ortyayes.' 7nterest sualhaMtMAe dAriny tue avvhiMble p MdAahHeriods' Gue p dminístrator ma1 retain from an1 delinUAent interest va1ment on an1 F ortyaye 9for reimbArsement to tue DAarantor 9an1 amoAnt not vrezioAshl reMized x itu resveMt to sAMd F ortyaye bAt vaid b1 tue DAarantor to tue rehated Tohders Ander its yAarantee' Witu resveMt to eaMt HI Hool 9a vartiahmontuB interest retained b1 greddie F aMbr remitted to tue rehated Tohders x itu resveMt to vreva1ments sualhMonstitAte an adqAstment to tue fee va1abhe to tue p dminístrator and tue DAarantor vArsAant to NeMion Y, I Q. for sAMd HI Hool'

**Aratinf p.04. c M~ rf to.**

Q. Witu resveMt to eaMt HI Hool 9distribAtions of vrinMvahand interest on tue rehated HI s sualhbeyin in tue montu after issAanMt for Dohd HI s and in tue seMond montu after issAanMt for p " F HI s' Gue p dminístrator 9on beualf of tue GrAstee 9sualhMdHeMnate 9or MdAse to be MdHeMnated 9for eaMt HI tue distribAtion amoAnt for tue Mrrent Mdendar montu'

Qb. Cn or before eaMt Ha1ment c ate 9tue p dminístrator 9on beualf of tue GrAstee 9sualhinstrAMt tue gederah" eserze 8 anvs to Medit va1ments on HI s from tue l Astodiahp MdoAnt to tue avvrovriate TohdersPaMdAnts' Gue rehated HI HoolB va1ment obliyations sualhbe met Avon transmittahof tue p dminístratorB va1ment order to tue gederah" eserze 8 anvs vrozided sAffiMent fAnds are tuen on devosit in tue l Astodiahp MdoAnt' p Tohder sualhreMize tue va1ment of vrinMval 9if avvhiMble 9and interest on eaMt Ha1ment c ate on eaMt HI ueld b1 sAMd Tohder as of tue rehated " eMord c ate'

QMd. Gue p dminístrator relies on serziMrsPrevorts of mortyaye aMbizit1 to vrevare tue HoohgaMbrs' Guere ma1 be deha1s or errors in vroMbssiny mortyaye information 9sAMt as a serziMrB faihAre to file an aMbArate or timehl revort of its MdHeMions of vrinMvah vor its uaziny filed a revort tuat Mbnnot be vroMbssed' 7n tuese sitAations tue p dminístratorB MdHeMnation of sMedAhed vrinMvahto be made on Dohd HI s ma1 not refheMaMbAhva1ments on tue rehated F ortyayes' Gue p dminístrator sualhaMboAnt for and reMonMbhe an1 differenMbs as soon as vraMbMble'

Ql. Gue p dminístrator reserzes tue riyut to Manye tue veriod dAriny x uiMt a serziMbr ma1 uohd fAnds vrior to va1ment to tue p dminístrator 9as x ehhas tue veriod for x uiMt serziMbrs revort va1ments to tue p dminístrator 9inMhAdiny adqAstments to tue F ontuhl " evortiny Heriod' Eituer Manye ma1 Manye tue time at x uiMt vreva1ments are distribAted to Tohders' p n1 sAMt Manye 9uox ezer 9sualhnot imvair TohdersPriyuts to va1ments as otuerx ise vrozided in tuis NeMion'

Q. Gue p dminístrator sualhmaintain one or more aMboAnts Goyetuer 9tue ; 1 Astodiahp MboAnt".9seyreyated from tue yenerahfAnds of greddie F aMb in its Mrvorate MbvaMt 19for tue devosit of MbHeMions of

00

vrinMvahOnMrAdiny fAthand vartiahvrinMvahvreva1ments. and interest reMized from or adzanMd b1 tue serziMrs in resveMof tue F ortyayes' F ortyaye MlteMions in resveMof tue HI Hoohs establisued b1 greddie F aMvander tuis p yreement or trAst fAnds establisued b1 greddie F aMvArsAunt to an1 otuer trAst ayreements ma1 be Momminyted in tue l Astodiahp MdsAnt9vrozided tuat tue p dministrator weevs9or MdAses to be wevt9sevarate reMrds of fAnds x itu resveM to eaMi sAMd HI Hoohand otuer trAst fAnd'1 oHeMions dAe to greddie F aMin its Mrvorate MvaMt1 as ox ner of mortyayes uehd in its vortfolio9ma1 also be Momminyted in tue l Astodiahp MdsAnt9vrozided tuat tue p dministrator sualhx itudrax  sAMd amoAnts for remittanMd to greddie F aMon a montuhl basis' gAnds on devosit in tue l Astodiahp MdsAnt ma1 be inzested b1 tue p dministrator in Eliyibhe 7nzestments' 7nzestment earninys on devosits in tue l Astodiahp MdsAnt sualhbe for tue benefit of tue p dministrator9and an1 losses on sAMd inzestments sualhbe vaid b1 tue p dministrator' Cn eaMd Ha1ment c ate9amoAnts on devosit in tue l Astodiahp MdsAnt sualhbe x itudrax n Avon tue order of tue p dministrator9on beualf of tue GrAstee9for tue vArvose of maxiny distribAtions to tue rehated Tohders9in aMordanMs x itu tuis p yreement'

**Aratinf  p.06. c nn; 5MdtnFo.**

Q. Gue p dministrator9on beualf of tue GrAstee9sualhMdhMhate and mave va1ments to Tolders on eaMd Ha1ment c ate based on tue montuhl HoohgaMors OnMrAdiny - eyatize p morti(ation gaMors. AntihsAMd time as tue p dministrator determines tuat a more aMMurate and vraMiMhble metuod for MdhMhatiny sAMd va1ments is azaihahbe and imvhements tuat metuod' HArsAunt to NeMeion S', j Q.9tue p dministrator ma1 modif1 tue HoohgaMor metuodoloy1 from time to time9 x ituoAt tue Monsent of Tolders' Witu resveMt to eaMd HI  Hoohl9tue p dministrator9on beualf of tue GrAstee9sualhdo tue folHox iny3

Qi. Gue p dministrator sualhvAblisu or MdAse to be vAblisued for eaMd montu a HoohgaMor x itu resveMto eaMd HI  Hoohl 8 eyinniny in tue montu after formation of a HI  Hool9HoohgaMors sualhbe vAblisued on or aboAt tue fiftu 8 Asiness c a1 of tue montu9x uiMd HoohgaMors ma1 refteMd vreva1ments reverted to tue p dministrator after tue end of tue rehated F ontuhl "evortiny Heriod and before tue vAbliMation of tue avvhiMhble HoohgaMors' Tox ezer9tue p dministrator ma19in its ox n disMetion9vAblisu HoohgaMors on an1 otuer 8 Asiness c a1' Gue HoohgaMor for tue montu in x uiMd tue HI  Hoohis establisued is 0', , , , , , , , and need not be vAblisued'

Qii. Gue p dministrator sualhdistribAte vrinMvahaheaMd montu to a Tolder of a Dohd HI  in an amoAnt eUAahto sAMd Tolder₿s vro rata suare of sAMd vrinMvah9MdhMhated b1 mAltivhi1iny tue oriyinahvrinMvahbahanMd of tue Dohd HI  b1 tue differenMd betx een its HoohgaMors for tue vreMdiny and Mrrent montus'

Qiii. Gue p dministrator sualhdistribAte vrinMvahaheaMd montu to a Tolder of an p " F  HI  in an amoAnt eUAahto sAMd Tolder₿s vro rata suare of sAMd vrinMvah9MdhMhated b1 mAltivhi1iny tue oriyinahvrinMvahbahanMd of tue p " F  HI  b1 tue differenMd betx een its HoohgaMors for tue tx o vreMdiny montus'

Qz. Gue p dministrator sualhdistribAte interest eaMd montu in arrears to a Tolder QassAminy no c eferred 7nterest. in an amoAnt eUAahto 0/02tu of tue avvhiMhble HI  1 oAvon mAltivhied b1 sAMd Tolder₿s vro rata suare of vrinMvah9MdhMhated b1 mAltivhi1iny tue oriyinahvrinMvahbahanMd of sAMd Tolder₿s HI  b1 tue vreMdiny montu₿s HoohgaMor for Dohd HI s or b1 tue seMond vreMdiny montu₿s HoohgaMor for p " F  HI s'

Q. gor an1 montu tuat c eferred 7nterest uas aMMAed on a c eferred 7nterest HI 9tue p dministrator sualhdistribAte vrinMvahOf an1 is dAe. to a Tolder in an amoAnt eUAahto sAMd Tolder₿s vro rata suare of vrinMvah9MdhMhated b1 Q. sAbtraMiny tue vreMdiny montu₿s HoohgaMor from tue seMond vreMdiny montu₿s HoohgaMor9O0. addiny to tue differenMd tue - eyatize p morti(ation gaMor for tue vreMdiny montu and O1. mAltivhi1iny tue resAltiny sAm b1 tue oriyinahHI  vrinMvahbahanMd' Gue interest va1ment on tue c eferred 7nterest HI  in tuat montu sualhbe Q. 0/02tu of tue HI 1 oAvon

02

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2337

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

mAtivlied b1 Gii. tue oriyinahvrinMvahbahanMd of tue TohderP's Hl  mAtivlied b1 Gii. tue vreMdiny montuP's HoohgaMor minAs tue vreMdiny montuP's
- eyatize p morti(ation gaMor'

Ob. Witu resveMto eaMd Hl  Hool9a HoohgaMor suaHhrefteMd vreva1ments revorted for tue avvhiMble F ontuhl '' evortiny Heriod' Gue p dministrator9on beuaHf of tue GrAstee9ma1 ahso9in its disMetion9refteMd in a HoohgaMor an1 vreva1ments revorted after tue end of tue avvhiMble F ontuhl '' evortiny Heriod' Go tue e)tent a yizen HoohgaMor Gidqa'sted as neMssar1 for va1ments made vArsAant to tue DAarantorP's yAarantee of timehl va1ment of sMedAted vrinMvahon Dohd Hl  s. does not refteMtue aMAvahAnvaid vrinMvahbahanMd of tue rehated F ortayayes9tue p dministrator suaHhaMdAnt for an1 differenMd b1 adqA'stiny sAbseUAent HoohgaMors as soon as vraMtiMble'

OM7n tue Mase of a Hl  Hoohtuat is Mdmvrised of p ''F s9a HoohgaMor suaHhbe based Avon tue Anvaid vrinMvahbahanMd of tue rehated F ortayayes tuat serziMrs revort to tue p dministrator for tue F ontuhl '' evortiny Heriod tuat ended in tue seMnd montu vreMdiny tue montu in x uiMt tue HoohgaMor is vAbhisued' Gue p dministrator9on beuaHf of tue GrAstee9ma1 ahso9in its disMetion9inMrAde as vart of tue ayyreyate vrinMvahva1ment in an1 montu an1 vreva1ments reMized after tue F ontuhl '' evortiny Heriod tuat ended in tue seMnd montu vreMdiny tue montu in x uiMt tue HoohgaMor is vAbhisued' Go tue e)tent a yizen HoohgaMor does not refteMtue aMAhayyreyate Anvaid vrinMvahbahanMd of tue F ortayayes9tue p dministrator suaHhaMdAnt for an1 differenMd b1 adqA'stiny sAbseUAent HoohgaMors as soon as vraMtiMble'

Ol. Gue HoohgaMor metuod for a Hl  Hoohma1 affeMtue timiny of reMivt of va1ments b1 rehated Tohders bAt suaHhnot affeMtue DAarantorP's yAarantee x itu resveMto sAMd Hl  Hool9as set fortu in NeMion Y, 6' Gue DAarantorP's yAarantee suaHhnot be affeMed b1 tue imvlementation of an1 different metuod for MdMAntiny and va1ment of vrinMvahand interest for an1 Hl  Hool9as vermitted b1 tuis NeMion Y, &

### Aratinf p.07. ArFLiaif y 5 rrogTrtMf re Hf trFrot.

O1. Go tue e)tent vrozided b1 MdntraMAaharranyement x itu tue p dministrator9x itu resveMto eaMd Hl  Hool9tue rehated serziMr of eaMd F ortyaye inMAded in sAMd Hl  Hoohsuahbe entitled to retain eaMd montu9as a serziMny fee9an1 interest va1able b1 tue borrox er on a F ortyaye tuat e)Meds tue serziMrP's reUAired remittanMd x itu resveMto sAMd F ortyaye' EaMd serziMr is reUAired to va1 alhe) venses inMrred b1 it in MonneMion x itu its serziMny aMdizities and suaHhnot be entitled to reimbArsement for tuose e)venses9e)Mivt as vrozided in NeMion Y, I OM'7f a serziMr adzanMds an1 vrinMvahand/or interest on a F ortyaye to tue p dministrator vrior to tue reMivt of sAMd fAnds from tue borrox er9tue serziMr ma1 retain O1. from vreva1ments or MdHeMions of delinUAent vrinMvahon sAMd F ortyaye an1 va1ments of vrinMvahso adzanMd9or Oi. from MdHeMions of delinUAent interest on sAMd F ortyaye an1 va1ments of interest so adzanMd' Go tue e)tent vermitted b1 its serziMny ayreement9tue serziMr is entitled to retain as additionahMdmvensation Mdrtain inMidentahfees rehated to F ortayayes it serziMs'

Ob. Witu resveMto a Hl  Hool9vArsAant to tue rehated HArMase c oMments9a seHher ma1 retain eaMd montu as e) tra Mdmvensation a fi) ed amoAnt of interest on a F ortyaye inMAded in sAMd Hl  Hool'7n sAMd ezent9tue rehated serziMr suaHhretain eaMd montu as a serziMny fee tue e)Mss of an1 interest va1able b1 tue borrox er on sAMd F ortyaye Oess tue seHherP's retained interest amoAnt. ozer tue serziMrP's reUAired remittanMd x itu resveMto sAMd F ortyaye'

### Aratinf p.08. Ce- if iotFMinf 5 rrgUl MFMtrr 5rr.

O1. NAbqeMto an1 adqA'stments reUAired b1 NeMion Y, 59x itu resveMto an1 Hl  Hool9tue p dministrator and tue DAarantor suaHhbe entitled to reMize from montuhl interest va1ments on eaMd rehated F ortyaye a fee Gio be ahhoMated betx een tue p dministrator and tue DAarantor as tue1 ma1 ayree. eUAahto tue e)Mss of an1 interest reMized b1 tue p dministrator from tue serziMr ozer tue amoAnt of interest va1able to tue rehated Tohdersk *provided, however,* tuat tue ayyreyate fee amoAnt suaHhbe aAtomatiMahhl adqA'sted x itu resveMto eaMd Hl  Hoohto tue e)tent a HoohgaMor does not refteMtue Anvaid vrinMvah

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
TREASURY-2338
Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

bahanMd of tue F ortiayes' p n1 sAMd adqYstment sualheUaAhtue differenMd betxeen Gi. interest at tue avvliMable HI l oAvon MdmviAted on tue ayyreyate Anvaid vrinMdvahbahanMd of tue F ortiayes for sAMd montu based on montuhl vrinMdvahva1ments aMAadhhl reMdized b1 tue p dministrator and Gii. interest at tue avvliMable HI l oAvon MdmviAted on tue remaininy bahanMd of tue F ortiayes inMAded in tue HI Hoohderized from tue HoohgaMor' Gue p dministrator sualh Gi. x itudrax tue ayyreyate fee amoAnt from tue l Astodiahp MdAAnt vrior to distribAtions to tue related Tohders9Gii. retain its vortion of tue fee for tue p dministratorP's ox n aMAAAnt and Giii. remit tue remaininy vortion of tue fee to tue DAarantor as tue yAarantee fee' 7n addition9tue p dministrator is entitled to retain as additionahMdmvensation Mdrtain inMdentahfees on tue F ortiayes as vrozided in NeMdion 2', j  and Mdrtain inzestment earninys as vrozided in NeMdion Y', j Gb.'

Gb. Gue c evositor sualhva1 alhe) venses inMdrred in MdnneMdion x itu tue transfer of tue F ortiayes9tue establhisument and administration of eaMd HI Hooh and tue issAanMd of tue HI s' p n1 amoAnts GmNMdainy attorheP's fees.  e) vended b1 tue GrAstee or tue p dministrator Oor tue serziMdrs on tue p dministratorP's beualf. for tue vroteMdion9vreserzation or maintenanMd of tue F ortiayes9or of tue reahvrovert1 seMdriny tue F ortiayes9or of vrovert1 reMdized in hiUAidation of or reahi(ation Avon tue F ortiayes9sualhbe e) venses to be borne vro rata b1 tue p dministrator and tue Tohders in aMdordanMd x itu tueir interests in eaMd F ortiaye' Gue p dministrator9on beualf of tue GrAstee9ma1 retain an amoAnt sAffiMdent to va1 tue vortion of sAMd e) venses borne vro rata b1 tue c evositor and tue Tohders from va1ments otuerx ise dAe to Tohders9x uiMd ma1 affeMdtue timiny of reMdivt of va1ments b1 Tohders bAt sualhnot affeMdtue DAarantorP's obliyations Ander NeMdion Y', 6'

OMd Gue p dministrator sualhreimbArse a serziMdr for an1 amoAnt GmNMdainy attorhe1P's fees.  it e) vends Oon tue p dministratorP's beualf and x itu its avvrozah for tue vroteMdion9vreserzation or maintenanMd of tue F ortiayes9or of tue reahvrovert1 seMriny tue F ortiayes9or of vrovert1 reMdized in hiUAidation of or reahi(ation Avon tue F ortiayes' NAMd e) venses sualhbe reimbArsable to tue serziMdr from tue assets of tue related HI Hooh9to tue e) tent vrozided in tue DAide'

Gd. for va1 fees and e) venses desMdibed aboze sualhnot affeMdtue DAarantorP's yAarantee x itu resveMd to an1 HI Hooh9as set fortu in NeMdion Y', 6'

**Aratinf p.09. UI MdeMdtrro.**

Gb. Witu resveMd to eaMd HI Hooh9tue DAarantor yAarantees to tue GrAstee and to eaMd Tohder of a HI 3

Gi. tue timehl va1ment of interest at tue avvliMable HI l oAvonk

Gii. tue fAhand finahva1ment of vrinMdvahva1on Anderhl iny F ortiayes on or before tue Ha1ment c ate tuat fahs Gp . in tue montu of its ginahHa1ment c ate9for Dohd HI s9or Gb . in tue montu after its ginahHa1ment c ate9for p " F HI skand

Giii. for Dohd HI s onhl9tue timehl va1ment of sMdedAted vrinMdvahva1on Anderhl iny F ortiayes'

7n tue Mase of c eferred 7nterest HI s9tue DAarantorP's yAarantee of vrinMdvahinMAdes9and its yAarantee of interest e) MAdes9an1 c eferred 7nterest added to tue vrinMdvahbahanMds of tue related F ortiayes' Gue DAarantor sualhmaxe va1ments of an1 yAaranteed amoAnts b1 transfer to tue l Astodiahp MdAAAnt for distribAtion to tue related Tohders9in aMdordanMd x itu NeMdions Y', Yand Y', 5' Gue yAarantees vArsAant to tuis NeMdion x ihhinAre to tue benefit of eaMd HI Hooh and its related Tohders9and sualhbe enforMdable b1 tue GrAstee of tuat HI Hoohand b1 sAMd Tohders9as vrozided in p rtiMe V of tuis y reement'

Gb. Gue DAarantor sualhMdmmvAte yAaranteed sMdedAted montuhl vrinMdvahva1ments on an1 Dohd HI 9sAbmeMd to an1 avvliMable adqYstments9in aMdordanMd x itu vroMdedAres advoted b1 tue DAarantor from time to time' Witu resveMd to eaMd HI Hooh9an1 va1ment tue DAarantor maxes to tue p dministrator9on beualf

05

of tue GrAstee9on aMAMAnt of tue DAarantorB yAarantee of sMedAted vrinMvahva1ments sualhbe Mnsidered to be a va1ment of vrinMvahfor vArvoses of MMMhtiny tue HoohgaMor for sAM HI Hoohand tue ToHderB vro rata suare of tue remaininy Anvaid vrinMvahbahanMt of tue rehated F ortyayes'

OM Gue DAarantorB yAarantees sualhMntinAe to be effeMize or sualhbe reinstated Oi in tue ezent tuat an1 vrinMvahor interest va1ment made to a ToHder is for an1 reason retArned b1 tue Hohder vArsAant to an order9deMee or qAdyment of an1 MAArt of Mmvetent qArisdiMion tuat tue ToHder x as not entitled to retain sAM va1ment vArsAant to tuis p yreement and Oi notx itustandiny an1 vrozision uereof vermittiny fees9e) venses9indemnities or otuer amoAnts to be vaid from tue assets of an1 HI Hooli

**Aratinf p.10. Al bFnyMdinf .** Witu resveM to eaM HI Hool9tue DAarantor sualhbe sAbroyated to alhtue riyuts9interests9remedies9vox ers and vrizileyes of eaM rehated ToHder in resveM of an1 F ortyaye inMAded in sAM HI Hoohon x uiM it uas made yAarantee va1ments of vrinMvahand/or interest to tue e) tent of sAM va1ments' - otuiny in tuis NeMion sualhimvair tue DAarantorB riyut to reMize distribAtions in its MvaMit as ToHder9if it is a ToHder of an1 HI s'

**Aratinf p.11. SrF- if Minf R2nf 5if Mjc M- rf t.** EaM HI Hoohis irrezoMable and x ilhterminate onh1 in aMMordanMd x itu tue terms of tuis p yreement' E) Mvt as vrozided in NeMions Y, j OI9&, &and S', 09x itu resveM to eaM HI Hool9greddie F aM and tue GrAsteeB obliyations and resvonsibilities Ander tuis p yreement sualhterminate as to a HI Hoohand its ToHders Avon Oi tue fAlh va1ment to sAM ToHders of alhvrinMvahand interest dAe to tue ToHders based on tue HoohgaMors or b1 reason of tue DAarantorB yAarantees or Oi tue va1ment to tue ToHder of alhamoAnts uehd b1 greddie F aMand tue GrAstee9 resveMizeh19and retAired to be vaid uereAnderk *provided, however*9tuat in no ezent sualhan1 HI Hoohheated uereb1 Mntinde be1ond tue e) viration of 20 1ears from tue deatu of tue sArzizor of tue desMndants of Josevu H' Kenned19tue hate ambassador of tue Rnited Nates to tue l oArt of N' JamesB9hiziny on tue date uereof'

**Aratinf p.1u. EDDat nD5if Mjc M- rf t , Mr.** Gue aMAanhfinahva1ment on a HI ma1 oMMr vrior to tue Ha1ment c ate sveMfied in NeMion Y, 6OI.Oi. dAe to vreva1 ments of vrinMval9inMAdiny vreva1ments made in MnneMion x itu tue revArMase of an1 F ortyaye from tue rehated HI Hooli

**Aratinf p.1p. c M- rf t EFFnF P nFFratinf o.** 7n tue ezent of a vrinMvahor interest va1ment error9tue p dministrator9in its sohe disMretion9ma1 effeM MorreMions b1 tue adqAstment of va1ments to be made on fAtAre Ha1ment c ates or in sAM otuer manner as it deems avvrovriate'

<p style="text-align:center">**CTS HPs E HV**</p>

<p style="text-align:center">c P o</p>

**Aratinf j.01. 5nF- Me , rf n- if Minf o.** Witu resveM to eaM HI Hool9tue vrinMvahbahanMs9HI l oAvons and otuer MaraMeristiM of tue HI s to be issAed sualhbe sveMfied in tue rehated HoohNAvvhement' c elizer1 of tue HI s of a HI Hoohsualh Mnstitute tue issAanM of tue HI s for tuat HI Hooli HI s sualh be issAed9uehd and transferable onh1 on tue boowMentr1 s1stem of tue gederah" eserze 8 anws in minimAm oriyinahvrinMvahamoAnts of $0Q , , and additionah inMements of $0' HI s sualhat alhtimes remain on devosit x itu a gederah" eserze 8 anwin aMMordanMd x itu tue vrozisions of tue 8 oow4Entr1 "Ahes' p gederah" eserze 8 anwx ilhmaintain a boowMentr1 reMordweeviny s1stem for alhtransaMions in HI s x itu resveM to ToHders'

**Aratinf j.0u. SFMMoDFnDc P o.** HI s ma1 be transferred onh1 in minimAm oriyinahvrinMvahamoAnts of $0Q , , and additionahinMements of $0' HI s ma1 not be transferred if9as a resAt of tue transfer9tue

<p style="text-align:center">0j</p>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

transferor or tue nex  Tolder x oAd uaze on devosit in its aMdAnt Hl s of tue same issAe x itu an oriyinahvrinMvahamoAnt of less tuan $0% , , 'Gue transfer9 e)Marye or vledye of Hl s sualhbe yozerned b1 tue fisMhayenM agreement betx een greddie F aMand a gederah" eserze 8 anw9tue 8 oow4Entr1 " Ales and sAM otuer vroMdAres as sualhbe agreed Avon from time to time b1 greddie F aMand a gederah" eserze 8 anw' p gederah" eserze 8 anwsualhbeMonhl Avon tue instrAMsons of tue Tolder in reMrdiny transfers of a Hl ' p  Marye ma1 be made for an1 transfer of a Hl  and sualhbe made for an1 ta)  or otuer yozernmentah Marye imvosed in MonneMson x itu a transfer of a Hl ' greddie F aMuereb1 assiyns to tue GrAstee greddie F aMR riyuts Ander eaMd fisMhayenM ayreement x itu resveMto Hl s issAed b1 an1 Hl  Hooh'

**Aratinf  j.0p. TranFe , Mr.** Gue "eMord c ate for eaMd Ha1ment c ate sualhbe tue Mbse of bAsiness on tue hast da1 of tue vreMdiny montu for Dohd Hl s and tue seMond vreMdiny montu for p " F  Hl s' p  Tolder of a Hl  on tue boows and reMrds of a gederah" eserze 8 anwon tue " eMord c ate sualhbe entitled to va1ment of vrinMvahand interest on tue rehated Ha1ment c ate' p  transfer of a Hl  made on or before tue " eMord c ate in a montu sualhbe reMdyni(ed as effeMize as of tue first da1 of sAMd montu'

### CTSHPs E V

### Tr- reiro

**Aratinf  4.01. ELrf to nD, rDM ;t.** Witu resveMto eaMd Hl  Hooh9an ; Ezent of c efaAhtPmeans an1 one of tue folhox iny ezents3

Q. c efaAlt b1 tue DAarantor or tue p dministrator in tue va1ment of interest or vrinMvahto tue rehated Tolders as and x uen tue same sualhbeMome dAe and va1abhe as vrozided in tuis p yreement9and tue MontinAanMd of sAMd defaAlt for a veriod of Y, da1s'

Qb. gaihAre b1 tue DAarantor or tue p dministrator to obserze or verform an1 otuer Mzenants of tuis p yreement rehatiny to tueir resveMize obhiyations9and tue MontinAanMd of sAMd faihAre for a veriod of & da1s after tue date of reMivt b1 sAMd vart1 of x ritten notiM of sAMd faihAre and a demand for remed1 b1 tue affeMed Tolders revresentiny not less tuan &j verMnt of tue remaininy vrinMvahbahanMd of an1 affeMed Hl  Hooh'

QM Gue entr1 b1 an1 MAart uaziny qArisdiMson ozer tue DAarantor or tue p dministrator of a deMee or order for rehief in an inzohAntar1 Mse Ander an1 avvhiMbhe banwrAvtM9insohzenM or otuer simihar hax  nox  or uereafter in effeM9or tue avvointment of a reMizer9hiUAidator9assiynee9Mstodian or seUAestrator Qor otuer simihar offiMah of tue DAarantor or tue p dministrator or for an1 sAbstantiahvart of its vrovert19or for tue x indiny Av or hiUAidation of its affairs9if sAMd deMee or order remains Ansta1ed and in effeM for a veriod of &  MonseMtize da1s'

Qd. l ommenMMment b1 tue DAarantor or tue p dministrator of a zohAntar1 Mse Ander an1 avvhiMbhe banwrAvtM9insohzenM or otuer simihar hax  nox  or uereafter in effeM9or Monsent b1 tue DAarantor or tue p dministrator to tue entr1 of an order for rehief in an inzohAntar1 Mse Ander an1 sAMd hax 9or its Monsent to tue avvointment of or tawiny vossession b1 a reMizer9hiUAidator9assiynee9rAstee9Mstodian or seUAestrator Qor otuer simihar offiMah of tue DAarantor or tue p dministrator or for an1 sAbstantiahvart of tueir resveMize vroverties9or an1 yenerahassiynment made b1 tue DAarantor or tue p dministrator for tue benefit of Mditors9or faihAre b1 tue DAarantor or tue p dministrator yenerahhl to va1 tueir debts as tue1 beMome dAe'

Gue avvointment of a Monserzator Qor otuer simihar offiMah b1 a reyAhator uaziny qArisdiMson ozer tue DAarantor or tue p dministrator9x uetuer or not sAMd vart1 Monsents to sAMd avvointment9sualhnot Monstit Ate an Ezent of c efaAlt'

0&

---

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Aratinf  4.0u. Tr-  re iro.**

Q. 7f an Ezent of c efaAlt oMars and is MontinAiny x itu resveMl to a HI Hool9tue Tolders of HI s revresentiny a maqprit1 of tue remaininy vrinMvahbahanMl of sAMl HI Hoohma19b1 x ritten notiM to greddie F aM9remoze greddie F aMas p dministrator and nominate its sAMdssor Ander tuis p yreement x itu resveMl to sAMl HI Hooli Gue nominee sualhbe deemed avvointed as greddie F aMR sAMdssor as p dministrator Anless greddie F aMobqeMs x ituin 0, da1s after sAMl nomination' Rvon sAMl obqeMion3

Qi. Gue p dministrator ma1 vetition an1 MoArt of Mompvetent qArisdiMion for tue avvointment of its sAMssorkor

Qii. p n1 bona fide Tolder tuat uas been a Tolder for at least si) montus ma19on beualf of sAMl Tolder and alhotuers similarhl sitAated9vetition an1 sAMl MoArt for avvointment of tue p dministratoRs sAMdssor'

Qb. 7f a sAMdssor p dministrator is avvointed9tue p dministrator sualhsAbmit to its sAMdssor a Momvlete x ritten revort and aMd4Antiny of tue F ortyayes in tue affeMed HI Hoohand sualhtawe alhotuer stevs neMssar1 or desirable to transfer its interest in and administration of sAMl HI Hoohto its sAMdssor'

OMl NAbqeMt to tue greddie F aMp M9a sAMdssor ma1 tawe an1 aMion x itu resveMl to tue F ortyayes as ma1 be reasonable and avvrovriate in tue NfMumstanMs' Hior to tue desiynation of a sAMdssor9tue Tolders of HI s revresentiny a maqprit1 of tue remaininy vrinMvahbahanMl of an1 affeMed HI Hooh ma1 x aize an1 vast or MArrent Ezent of c efaAlt'

Ql. p vvointment of a sAMdssor sualhnot relieze greddie F aM9in its MvaAit1 as DArarantor9of its yAarantee obliyations as set fortu in tuis p yreement'

**Aratinf  4.0p. s i-  itMinf  nf  Al ito bv Nn;erFo.**

Q. Witu resveMl to an1 HI Hool9e) Mvt as vrozided in NeMion j ', 29no Tolder sualhuaze an1 riyut to institAte an1 aMion or vroMediny at hax  or in eUAit1 or in banwrAvtM or otuerx ise or seewan1 otuer remed1 x uatsoezer ayainst greddie F aMor tue GrAstee x itu resveMl to tuis p yreement or tue related HI s or F ortyayes9Anless3

Qi. NAMl Tolder vrezioAshl uas yizen tue GrAstee x ritten notiM of an Ezent of c efaAlt and tue MontinAanMl tuereofk

Qii. Gue Tolders of HI s revresentiny a maqprit1 of tue remaininy vrinMvahbahanMl of an1 affeMed HI Hoohuaze made a x ritten reUAest to tue GrAstee to institAte an aMion or vroMediny in its ox n name and uaze offered tue GrAstee reasonable indemnit1 ayainst tue Msts9e) venses and liabilities to be inMArredk

Qiii. Gue GrAstee uas failed to institAte an1 sAMl aMion or vroMediny for & da1s after its reMdivt of tue x ritten notiM9reUAest and offer of indemnit1 desMibed abozekand

Qz. Gue GrAstee uas not reMdized from sAMl Tolders an1 direMion inMonsistent x itu tue x ritten reUAest desMibed aboze dAriny tue & 4da1 veriod'

Qb. - o Tolder sualhuaze an1 riyut Ander tuis p yreement to vreqAdiMtue riyuts of an1 otuer Tolder9to obtain or seewvreferenM or vriorit1 ozer an1 otuer Tolder or to enforM an1 riyut Ander tuis p yreement9e) Mvt for tue ratable and Mommon benefit of alhTolders of HI s revresentiny interests in an1 affeMed HI Hooli

0S

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Md gor tue vroteMion and enforMment of tue vrozisions of tuis NeMrion9greddie F aMtue GrAstee and eaMd and ezer1 Tohder sualhbe entitled to sAMd relief as Man be yizen eituer at hax or in eUAit1' - otx itustanding tue foreyoiny9no TohderPs riyut to reMize va1ment Qor to institAte sAit to enforMd va1ment. of vrinMvahand interest as vrozided uerein on or after tue dAe date of sAMd va1ment sualhbe imvaired or affeMed x ituoAt tue Mnsent of tue Tohder'

## CTS IPs E VH

### S H otrr

**Aratinf 6.01. , l tiro nDS H otrr.**

Q. Tf an Ezent of c efaAlt uas oMMrred and is MontinAiny x itu resveMt to a Hl Hool9tue GrAstee sualhe) erMse tue riyuts and vox ers zested in it b1 tuis p yreement and Mse tue same deyree of Mre and swilhin its e) erMse as a vrAdent verson x oMd e) erMse or Ase Ander tue MrMmmstanMs in tue MondAM of sAMd versonPs ox n affairs'

Qb. E) Mvt dAriny tue MontinAanM of an Ezent of c efaAlt9tue GrAstee Andertawes to verform sAMd dAties and onhl sAMd dAties as are sveMifiMlhl set fortu in tuis p yreement and sualhnot be liable e) Mvt for tue verformanM of sAMd dAties and obliyations as are sveMifiMlhl set fortu in tuis p yreement and no imvhied Mzenants or obliyations sualhbe read into tuis p yreement ayainst tue GrAstee'

Md Gue GrAstee and its direMors9offiMrs9emvho1ees and ayents ma1 not be vroteMed from liabilit1 x uiMd x oAd otuerx ise be imvosed b1 reason of x ilhfAhmisfeasanM9bad faitu or yross neyhiyenM in tue verformanM of tueir resveMize dAties or b1 reason of reMless disreyard of obliyations and dAties Ander tuis p yreement9e) Mvt tuat3

Q. tuis varayravu does not limit tue effeM of varayravu Qb. of tuis NeMronk

Qi. tue GrAstee sualhnot be liable for an1 aMion tawen9or not tawen9b1 tue GrAstee in yood faitu vArsAant to tuis p yreement or for errors in qAdymentk and

Qii. tue GrAstee sualhnot be reUAired to tawe notiM or be deemed to uaze notiM or wnox hedye of an1 defaAlt or Ezent of c efaAlt9Anless tue GrAstee obtains aMAahwnox hedye or x ritten notiM of sAMd defaAlt or Ezent of c efaAlt' 7n tue absenM of sAMd aMAahwnox hedye or notiM49tue GrAstee ma1 MonMhAsizehl assAme tuat tuere is no defaAlt or Ezent of c efaAlt'

Qd. Ezer1 vrozision of tuis p yreement sualhbe sAbqeM to tue vrozisions of tuis NeMrion and NeMrion &, 2'

Qe. Gue GrAstee sualhnot be liable for indebtedness ezidenMd b1 or arisiny Ander tuis p yreement9inMhAdiny vrinMvahof or interest on tue Hl s9or interest on an1 mone1 reMized b1 it e) Mvt as tue GrAstee ma1 ayree in x ritiny'

Qf. F one1 uehd in trAst b1 tue GrAstee need not be seyreyated from otuer fAnds e) Mvt to tue e) tent reUAired b1 hax or tue terms of tuis p yreement'

Qy. - o vrozision of tuis p yreement sualhreUAire tue GrAstee to e) vend9adzanM or riswits ox n fAnds or otuerx ise inMr finanMahhiabilit1 in tue verformanM of an1 of its dAties uereAnder or in tue e) erMse of an1 of its riyuts or vox ers9if it sualhuaze reasonable yroAnds to beliexe tuat reva1ment of sAMd fAnds or adeUAate indemnit1 ayainst sAMd riswor hiabilit1 is not reasonabhl assAred to it'

0I

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(a) The Trustee may but shall not be obligated to undertake any legal action that it deems necessary or desirable in the interest of Holders. The Trustee may be reimbursed for the legal expenses and costs of such action from the assets of the related MBS Pool.

**Section 6.03. Certain Matters Affecting the Trustee.**

(a) The Trustee and any director, officer, employee or agent of the Trustee may rely in good faith on any certificate, opinion or other document of any kind which prima facie is properly executed and submitted by any appropriate Person respecting any matters arising hereunder. The Trustee may rely on any such documents believed by it to be genuine and to have been signed or presented by the proper Person and on their face conforming to the requirements of this Agreement. The Trustee need not investigate any fact or matter stated in such documents.

(b) Before the Trustee acts or refrains from acting, it may require an officer's certificate or an opinion of Counsel which shall not be at the expense of the Trustee. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on an officer's certificate or opinion of Counsel. The right of the Trustee to perform any discretionary act enumerated in this Agreement shall not be construed as a duty and the Trustee shall not be answerable for other than its willful misfeasance, bad faith or gross negligence.

(c) The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys or a custodian or nominee.

(d) The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers, provided that the Trustee's conduct does not constitute willful misfeasance, bad faith or gross negligence. In no event shall the Trustee have any liability for consequential damages.

(e) The Trustee may consult with and rely on the advice of Counsel, accountants and other advisors and shall not be liable for errors in judgment or for anything it does or does not do in good faith if it so relies. Any opinion of Counsel with respect to any matters relating to this Agreement and the MBS shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with any opinion of such Counsel.

(f) Any fees, expenses and indemnities payable from the assets of any MBS Pool to Freddie Mac in its capacity as Trustee in the performance of its duties and obligations hereunder shall not affect Freddie Mac's guarantee with respect to that MBS Pool as set forth in Section 8.02.

**Section 6.05. Trustee's Disclaimer.** The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Agreement, the Pool or the MBS.

**Section 6.06. Trustee May Own MBS.** Subject to Section 9.01, the Trustee in its individual or any other capacity may become the owner or pledgee of MBS with the same rights as it would have if it were not the Trustee.

**Section 6.04. Indemnity.** Each MBS Pool shall indemnify the Trustee and the Trustee's employees, directors, officers and agents as provided in this Agreement against any and all claims, losses, liabilities or expenses (including attorneys' fees, incurred by it in connection with the administration of this trust and the performance of its duties under this Agreement to the extent not previously reimbursed above, including, without limitation, the execution and filing of any federal or state tax returns and information returns and being the mortgagee of record with respect to the related Mortgages). The Trustee shall notify the Administrator promptly of any claim for which it may seek indemnity. Failure by the Trustee to so

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

TREASURY-2344

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

notif1 tue p dministrator sualhnot relieze tue related Hl Hoohof its obliyations uereAnder'p Hl Hoohsualhnot be reUAired to reimbArse an1 e) vense or indemnif1 ayainst an1 hoss9hiabilit1 or e) vense inMrred b1 tue GrAstee turoAyu tue GrAsteeB ox n x ilHfAhmisfeasanM9bad faitu or yross neyhiyenM'

Gue GrAsteeB riyuts vArsAant to tuis NeMion sualhsArzize tue disMarye of tuis p yreement'

**Aratinf 6.06. Tr2;Mir- rf t nDSH otrr.** Gue GrAstee ma1 resiyn at an1 time'p n1 sAMssor GrAstee sualhresiyn if it Mases to be eliyible in aMordanM x itu tue vrozisions of NeMion &, 6' 7n eituer Mse9tue resiynation of tue GrAstee sualhbeMme effeMize9and tue resiyniny GrAstee sualhbe disMaryed from its obliyations x itu tue resveMt to tue Hl Hoohs Mceated Ander tuis p yreement b1 yiziny 6, da1sPx ritten notiM of tue resiynation to tue c evositor9tue DAarantor and tue p dministrator and Avon tue effeMizeness of an avvointment of a sAMssor GrAstee9x uiM ma1 be as of a date vrior to tue end of tue 6, 4da1 veriod'Rvon reMiziny sAM notiM of resiynation9tue c evositor sualhvromvthl avvoint one or more sAMssor GrAstees b1 x ritten instrAment9one Mv1 of x uiM is delizered to tue resiyniny GrAstee and one Mv1 of x uiM is delizered to tue sAMssor GrAstee' Gue sAMssor GrAstee need not be tue same Herson for alhHl Hoohs' 7f no sAMssor GrAstee uas been avvointed for a Hl Hool9or one tuat uas been avvointed uas not aMdvted tue avvointment x ituin 6, da1s after yiziny sAM notiM of resiynation9tue resiyniny GrAstee ma1 vetition an1 MsArt of Mmvetent qArisdiMion for tue avvointment of a sAMssor GrAstee'

Hrior to an Ezent of c efaAlt9or if an Ezent of c efaAlt uas oMMrred and uas been Mrred x itu resveMt to a Hl Hool9greddie F aMMnnot be removed as GrAstee x itu resveMt to tuat Hl Hool9 7f an Ezent of c efaAlt uas oMMrred and is MontinAiny x uile greddie F aMis tue GrAstee9at tue direMion of Tolders of Hl s revresentiny a maqvrit1 of tue remaininy vrinMvahbahanMl of sAM Hl Hool9greddie F aMsualhresiyn or be removed as GrAstee9and to tue e) tent vermitted b1 hx 9alhof tue riyuts and obliyations of tue GrAstee x itu resveMt to tue related Hl Hoohonhl9x ilhbe terminated b1 notif1iny tue GrAstee in x ritiny' Tolders of Hl s revresentiny a maqvrit1 of tue remaininy vrinMvahbahanM of tue Hl Hoohx ilhtuen be aAuori( ed to name and avvoint one or more sAMssor GrAstees' - otx itustandiny tue termination of tue GrAstee9its hiabilit1 Ander tuis p yreement and arisiny vrior to sAM termination sualhsArzize sAM termination'

7f a sAMssor GrAstee is serziny as tue GrAstee9tue foltox iny ezents are ; GrAstee Ezents of c efaAlt" x itu resveMt to a Hl Hool9

O. tue GrAstee fails to Mmvvhl x itu NeMion &, 6k

Oi. tue GrAstee is adqAdyed banwrAvt or insolzentk

Oii. a reMizer or otuer vAbliMoffiMr tawes Marye of tue GrAstee or its vrovert1kor

Oz. tue GrAstee otuerx ise beMmes inMvable of aMiny'

7f at an1 time a GrAstee Ezent of c efaAlt uas oMMrred and is MontinAiny9tue DAarantor Qor if an Ezent of c efaAlt uas oMMrred and is MontinAiny9tue c evositor. ma19and if direMed b1 Tolders of Hl s revresentiny a maqvrit1 of tue remaininy vrinMvahbahanMl of sAM Hl Hool9sualh9remoze tue GrAstee as to sAM Hl voohand avvoint a sAMssor GrAstee b1 x ritten instrAment9one Mv1 of x uiM sualhbe delizered to tue GrAstee so removed and one Mv1 of x uiM sualhbe delizered to tue sAMssor GrAstee9and tue DAarantor Qor if an Ezent of c efaAlt uas oMMrred and is MontinAiny9tue c evositor. sualhyize x ritten notiM of tue sAMssor GrAstee to tue Tolders affeMed b1 tue sAMssion' - otx itustandiny tue termination of tue GrAstee9its hiabilit1 Ander tuis p yreement arisiny vrior to sAM termination x ilhsArzize sAM termination'

7f tue GrAstee resiyns or is removed or if a zaMnM e) ists in tue offiM of tue GrAstee for an1 reason Que GrAstee in sAM ezent beiny referred to uerein as tue retiriny GrAstee. 9tue c evositor sualhvromvthl avvoint a sAMssor GrAstee tuat satisfies tue eliyibilit1 reUAirements of NeMion &, 6'

2,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    TREASURY-2345                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Gue retiriny GrAstee ayrees to Mooverate x itu tue c evositor and an1 sAMdassor GrAstee in effeMiny tue termination of tue retiriny GrAsteeP's resvonsibilities and riyuts uereAnder and sualhvromvthl vrozide sAMd sAMdassor GrAstee alhdoMments and reMrds reasonablhl reUAested b1 it to enablre it to assAme tue GrAsteeP's fAnMions uereAnder'

p  sAMdassor GrAstee sualhdelizer a x ritten aMdvtanM of its avvointment to tue retiriny GrAstee and to tue c evositor9tue DAarantor and tue p dministrator' GuereAvon tue resiynation or remozahof tue retiriny GrAstee sualhbeMme effeMize9and tue sAMdassor GrAstee sualhuaze alhtue riyuts9vox ers and dAties of tue GrAstee Ander tuis p yreement x itu resveMt to sAMd Hl Hoolr'Gue sAMdassor GrAstee sualhmaiha notiM of its sAMMssion to tue rehated Tohders' Gue retiriny GrAstee sualhvromvthl transfer alhvrovert1 uehd b1 it as GrAstee to tue sAMdassor GrAstee'

7f a sAMdassor GrAstee does not tawe offiM x ituin Y,  da1s after tue retiriny GrAstee resiyns or is remozed9tue retiriny GrAstee or tue c evositor ma1 vetition an1 MAurt of Mmvetent qArisdiMion for tue avvointment of a sAMdassor GrAstee'

**Aratinf  6.07.  Al aaroonFS Hl otrr Bv d rFyrF.**  7f a sAMdassor GrAstee Monsohidates x itu9meryes or Monzerts into9or transfers alhor sAbstantiahl alhits Mrvorate trAst bAsiness or assets to9anotuer Mrvoration or banviny assoMation9tue resAltiny9sArziziny or transferee Mrvoration x ituoAt an1 fArtuer aM sualhbe tue sAMdassor GrAsteekvrozided9tuat sAMd Mrvoration or banviny assoMation sualhbe otuerx ise UAahified and ehiyibhe Ander NeMion &, 6'

**Aratinf  6.08.  C22nif t– rf t nDP n3S Hl otrr nF Ar2MMr S Hl otrr.**

Q.  - otx itustanding an1 otuer vrozisions of tuis p yreement9at an1 time9for tue vArvose of meetiny an1 heyahreUAirement of an1 qArisdiMion in x uiM an1 vart of a Hl Hoohma1 at tue time be loMted9tue GrAstee sualhuaze tue vox er and ma1 e)eMte and delizer alhinstrAments to avvoint one or more Hersons to aMas a M4trAstee or M4trAstees9or sevarate trAstee or sevarate trAstees9of alhor an1 vart of sAMd Hl Hoohand to zest in sAMd Herson or Hersons9in sAMd MvaMt1 and for tue benefit of tue rehated Tohders9sAMd tithe to sAMd Hl Hoolr9or an1 vart tuereof9and9sAbqeMt to tue otuer vrozisions of tuis NeMion9sAMd vox ers9dAties9obhiyations9riyuts and trAsts as tue GrAstee ma1 Monsider neMssar1 or desirabhe' - o M4trAstee or sevarate trAstee uereAnder sualhbe reUAired to meet tue terms of ehiyibihit1 as a sAMdassor GrAstee Ander NeMion &, 6 and no notiM to tue rehated Tohders of tue avvointment of an1 M4trAstee or sevarate trAstee sualhbe reUAired Ander NeMion &, &uereof'

Qb.  Witu resveMt to eaM Hl Hoolr9ezer1 sevarate trAstee and M4trAstee sualh9to tue e) tent vermitted b1 hax 9be avvointed and aMd9aAqeMt to tue folrox iny vrozisions and Monditions3

Qi.  alhriyuts9vox ers9dAties and obhiyations Monferred or imvosed Avon tue GrAstee sualhbe Monferred or imvosed Avon tue and e)erMsed or verformed b1 tue GrAstee and sAMd sevarate trAstee or M4trAstee qointhl 9oit beiny Anderstood tuat sAMd sevarate trAstee or M4trAstee is not aAtuori( ed to aMsevaratehl x ituoAt tue GrAstee qoininy in sAMd aM9e) Mvt to tue e) tent tuat Ander an1 hax  of an1 qArisdiMion in x uiM an1 vartiMArr aM9or aMs are to be verformed tue GrAstee sualhbe inMmvetent or AnUAahified to verform sAM aM or aMs9in x uiM ezent sAM riyuts9vox ers9dAties and obhiyations9inMhAdiny tue uohdiny of tithe to tue rehated Hl Hoohor an1 vortion tuereof in an1 sAM qArisdiMion. sualhbe e) erMsed and verformed sinyhl b1 sAM sevarate trAstee or M4trAstee9bAt sohehl at tue direMion of tue GrAsteek

Qii.  no trAstee uereAnder sualhbe versonahhl hiabhe b1 reason of an1 aM or omission of an1 otuer trAstee uereAnderkand

20

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Gii. tue GrAstee ma1 at an1 time aMdevt tue resiynation of or remoxe an1 sevarate trAstee or M44rAstee'

OM p n1 noti9reUEest or otuer x ritiny yizen to tue GrAstee sualhbe deemed to uaze been yizen to eaM of tue tuen sevarate trAstees and M44rAstees9as effeMizehl as if yizen to eaM of tuem' Ezer1 instrAment avvointiny an1 sevarate trAstee or M44rAstee sualhrefer to tuis p yreement and tue Monditions of tuis p rtiMe V7 EaM sevarate trAstee and M44rAstee9Avon its aMdevtanM of tue trAsts Mnferred9sualhbe zested x itu tue estates or vrovert1 sveMified in its instrAment of avvointment9eituer qpinthl x itu tue GrAstee or sevaratehl9as ma1 be vrozided tuerein9s AbqeMto alhtue vrozisions of tuis p yreement9 sveMifiMlhl inMdiny ezer1 vrozision of tuis p yreement rehtiny to tue MndAMof9affeMiny tue hiabilit1 of9or affordiny vroteMion to9tue GrAstee' Ezer1 sAM instrAment sualhbe fifed x itu tue GrAstee'

Gl. p n1 sevarate trAstee or M44rAstee ma1 at an1 time MnstitAte tue GrAstee9its ayent or attorne14n4faMx itu fAlhvox er and aAtuorit19to tue e) tent not vrouibited b1 hax 9to do an1 hux fAhaMd Ander or in resveM of tuis p yreement on its beuahf and in its name' 7f an1 sevarate trAstee or M44rAstee sualhdie9 beMome inMavable of aMiny9resiyn or be remozed9alhof its estates9vroverties9riyuts9remedies and trAsts sualhzest in and be e) erMised b1 tue GrAstee9to tue e) tent vermitted b1 hax 9x ituoAt tue avvointment of a nex or sAMMssor trAstee'

**Aratinf 6.09. E;iyibi;itvg, ioql MIDaMinf .** greddie F aMs eliyible to aMas tue GrAstee and is initiahl tue GrAstee for tue Hl Hoohs Mleated Ander tuis p yreement' p n1 sAMMssor to greddie F aMO. at tue time of its avvointment as GrAstee9mAst be reasonabhl aMdvtable to greddie F aMand Gii. mAst be oryani(ed as a Morvoration or assoMiation doiny bAsiness Ander tue hax s of tue Rnited Nates or an1 Nate tuereof9be aAtuori(ed Ander sAM hax s to e) erMise Morvorate trAst vox ers9uaze Mombined Mvitahand sArvhAs of at least $j , 9 , , 9 , , and be sAbqeMto sAverzision or e) amination b1 federahor state finanMah rey Antor1 aAtuorities' 7f an1 sAMMssor GrAstee sualhMase to satisf1 tue eliyibilit1 reUAirements set fortu in Gii. aboze9tuat sAMMssor GrAstee sualhresiyn immediatehl in tue manner and x itu tue effeMsveMified in NeMion &, &

## CTSHPs E VHH

### d ioar;;Mrnl o c FnLioinfo

**Aratinf 7.01. Cf f 1 M AtMr– rf to.** Wituin a reasonable time after tue end of eaM Mlendar 1ear9tue p dministrator Gor its ayent. sualhfArnisu to eaM Tolder on an1 '' eMord c ate dAriny sAM 1ear information tuat tue p dministrator deems neMssar1 or desirable to enable Tolders and benefiMahox ners of Hl s to vrevare tueir Rnited Nates federahinMome ta) retArns9if avvhiMable'

**Aratinf 7.0u. s i– itMinf o nf s iMbi;itv.** – eituer greddie F aM9in its Morvorate MavaMt19nor an1 of its direMors9offiMrs9emvlo1ees9aAtuori(ed desiynees9revresentatizes or ayents Qrehated versons9P: sualhbe hiable to Tolders for an1 aMion tawen9or not tawen9b1 tuem or b1 a serziMr in yood faitu vArsAant to tuis p yreement or for errors in qMdyment' Guis vrozision sualhnot vroteMgreddie F aMor an1 rehated verson ayainst an1 hiabilit1 x uiM x oAd otuerx ise be imvosed b1 reason of x ilhfAhmisfeasanM9bad faitu or yross neyhiyenM in tue verformanM of dAties or b1 reason of reMhess disreyard of obliyations and dAties Ander tuis p yreement' 7n no ezent sualhgreddie F aMor an1 rehated verson be hiable for an1 MonseUAentiahdamayes' greddie F aMand an1 rehated verson ma1 rehl in yood faitu on an1 doMment or otuer MommAniMation of an1 wind vroverhl e) eMted and sAbmitted b1 an1 Herson x itu resveMto an1 matter arisiny Ander tuis p yreement' greddie F aMas no obliyation to avvear in9vroseMAte or defend an1 heyahaMion x uiM is not inMidentahto its dAties to serziM or sAverzise tue serziMiny of an1 of tue F ortyayes in aMMordanM x itu tuis p yreement and x uiM in its ovinion ma1 inzolze an1 e) vense or hiabilit1 for greddie F aMgreddie F aMma19in its disMetion9Andertawe or vartiMvate in an1 aMion it deems neMssar1 or

22

desirable x itu resveМ to an1 F ortyaye9tuis p yreement9tue HI s or tue riyuts and dАties of tue varties uereto and tue interests of tue Tоlders uereАnder' 7n sАМ ezent9tue leyahe) venses and Мsts of sАМ aМon and an1 resАtiny liabilit1 sualhbe e) venses for tue vroteМon9vreserzation and maintenanМ of tue F ortayaes borne vro rata b1 greddie F aМand Tоlders as vrozided in NeМon Y, I Ол.'

**Аratinf 7.0p. s i- itМinf nf Tiyhto nDN n;e rFо.** Gue deatu or inМvaМt1 of an1 Herson uaziny an interest in a HI sualhnot terminate tuis p yreement or an1 HI Hool1 NАМ deatu or inМvaМt1 sualhnot entitle tue leyahrevresentatizes or ueirs of sАМ Herson9or an1 Tоlder for sАМ Herson9to Мaim an аМ Аntiny9 tawe an1 aМon or briny an1 vroМediny in an1 МАrt for a vartition or x indiny Аv of tue rehated HI Hool9nor otuerx ise affeМtue riyuts9obliyations and liabilities of tue varties uereto or an1 of tuem'

**Аratinf 7.0j. P nf tFn; bv Nn;e rFо.** Witu resveМ to an1 HI Hool9e) Мvt as otuerx ise vrozided in p rtiМes V and V7and NeМions S', j and S', &9no Tоlder sualhuaze an1 riyut to zote or to otuerx ise Мntrohin an1 manner tue overation and management of tue F ortayes inМАded in sАМ HI Hool9or tue obliyations of tue varties uereto' Guis p yreement sualhnot be МnstrАed so as to mawe tue Tоlders from time to time vartners or members of an assoМation' Tоlders sualh not be liabhe to an1 tuird verson b1 reason of an1 aМon tawen b1 tue varties to tuis p yreement vАrsАant to an1 vrozision uereof'

**Аratinf 7.04. C- rf e- rf t.**

Оl. greddie F aМand tue GrАstee ma1 amend tuis p yreement Он МАdiny an1 rehated Hooh NАvvlement. from time to time x ituoАt tue Мnsent of an1 Tоlders to Ол. Мvre an1 ambiyАit1 or МorreМor sАvvhement an1 vrozision in tuis p yreement9 *provided, however,* tuat an1 sАМ amendment sualhnot uaze a materiah adzerse effeМon an1 TоlderkОii. maintain tue Мlassifiмation of an1 HI Hoohas a yrantor trАst for federahinМome ta) vАrvoseskor Оiii. azoid tue imvosition of an1 state or federahta) on a HI Hoolkit beiny Аnderstood tuat an1 amendment vermittiny tue revАrМase of a F ortaye b1 greddie F aМdАe to a dehinUАenМ of hess tuan 02, da1s9otuer tuan in tue МrМumstanМs desМibed in NeМion 0', 2OzfОii.9ma1 not be adovted Аnder tuis NbАse Оl. '

Оb. E) Мvt as vrozided in NeМion S', j Ол9greddie F aМand tue GrАstee ma1 amend tuis p yreement as to an1 HI Hool9x itu tue Мnsent of Tоlders revresentiny not hess tuan a maqprit1 of tue remaininy vrinМvahbahanМ of tue affeМed HI Hool'

Оl greddie F aМand tue GrАstee ma1 not amend tuis p yreement9x ituoАt tue Мnsent of a Tоlder9if sАМ amendment x oАld imvair or affeМtue riyut of sАМ Tоlder to reМize va1ment of vrinМvahand interest on or after tue dАe date of sАМ va1ment or to institАte sАit for tue enforМment of an1 sАМ va1ment on or after sАМ date'

Оl. Go tue e) tent tuat an1 vrozisions of tuis p yreement differ from tue vrozisions of an1 greddie F aМ F ortayae HartiМvation l ertifiМates p yreement or HI F aster GrАst p yreement dated vrior to tue date of tuis p yreement9tuis p yreement sualhbe deemed to amend sАМ vrozisions of tue vrior agreement9bАt onhl to tue e) tent tuat greddie F aМ9Аnder tue terms of sАМ vrior agreement9Мd Аld uaze effeМed sАМ Мanye as an amendment of sАМ vrior agreement x ituoАt tue Мnsent of Tоlders of HI s tuereАnderk *provided, however,* tuat tue trАst deМarations and rehated vrozisions set fortu in NeМion S', j Ол. of tue HI F aster GrАst p yreement dated as of c eМember Y092, , S are uereb1 reaffirmed x itu resveМ to eaМ HI HoohМated before c eМember Y092, , S'

Оl. - otx itustandiny an1 otuer vrozision of tuis NeМion9Ол. tue p dministrator Он its ox n disМetion and in its ox n interest. and tue GrАstee Оat tue p dministrator's direМtion. ma1 amend tuis p yreement to refleМan1 modifiМation in tue p dministrator's metuodoloy1 of МАlМАtiny va1ments to Tоlders9inМАdiny an1 modifiМations desМibed in NeМion Y, j Ол. and NeМion Y, &Ол. and tue manner in x uiМ it distribАtes vreva1ments to Tоlders9Оi. tue p dministrator Он its ox n disМetion and in its ox n interest. and tue GrАstee Оat tue p dministrator's direМion. ma1 amend tuis p yreement to Мvre an1 inМnsistenМ betx een tuis

2Y

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

p yreement and tue vrozisions of tue DAide and Oii. tue c evositor Oin its ox n disMetion and in its ox n interest. and tue GrAstee Oit tue p dministratorⁱs direMtion. ma1 amend an1 HoohNAvvlement to mave tue adqⁱstments desMibed in NeMtion 0', 2Oi. to tue MiaraMeristiM of tue F ortyayes to be transferred to a HI Hoohor to tue related HI s'

**Aratinf 7.06. Vntif y Tiyhto.**

7f greddie F aMis aMiny as p dministrator or GrAstee and an Ezent of c efaAlt uas oMAvrred and is MontinAiny9an1 HI s uehd b1 greddie F aMfor its ox n aMoAAnt sualhbe disreyarded and deemed not to be oAtstandiny for vArvoses of e)erMisiny tue remedies set fortu in NeMtion j ', 2 and tue seMond varayravu of NeMtion &, &

**Aratinf 7.07. c rRonf o, rr- re : wf rFo.** Witu resveMt to eaMi HI Hool9greddie F aMtue GrAstee9tue p dministrator and a gederah" eserze 8 anwOor an1 ayent of an1 of tuem. ma1 deem and treat tue related TolderOi. as tue absolAte ox nerOi. of a HI and tue Aindizided benefiMahox nersuiv interests in tue F ortyayes inMAded in tue related HI Hoohfor tue vArvose of reMiziny va1ments and for alhotuer vArvoses9and none of greddie F aMtue GrAstee9tue p dministrator or a gederah" eserze 8 anwOor an1 ayent of an1 of tuem. sualhbe affeMed b1 an1 notiM to tue Montrar1' p Hhva1ments made to a Tolder9or Avon sAMI Tolderⁱs order9sualhbe zalid9and9to tue e)tent of tue va1ment9sualhsatisf1 and disMiarye tue related HI Hoolⁱs va1ment obliyations x itu resveMt to tue TolderⁱS HI ' - one of greddie F aMtue GrAstee9tue p dministrator or an1 gederah" eserze 8 anwsualhuaze an1 direMobliyation to an1 benefiMahox ner Anhess it is also tue Tolder of a HI '

**Aratinf 7.08. UnLrPf if y s Mv.** GT 7Np D" EEF E- G p - c GT E Hp " G7ENP" 7DT GNp - c C8 L7Dp G7C- NW7GT " ENHEl G GC HI s9NT p LL 8 E DCVE" - Ec 8 B GT E Lp WNCg GT E R- 7GEc NGp GEN' 7- NCgp " p NGT E" E F p B 8 E - C p HHL7l p 8 LE H" El Ec E- G9p - c 7- NCgp " p NGC c C NC WCRLc - CGg" RNG"p GE GT E HR" HCNENCg GT E g" Ec c 7E F p 1 p1 GC" p - B H" CV7N7C- Cg GT 7Np D" EEF E- G C" GT E G"p - Np 1 G7C- NDCVE" - Ec T E" E8 B9GT E LCl p L Lp WNCg GT E NGp GE Cg - EW BC" K NT p LL 8 E c EEF Ec " EgLEl G7VE Cg GT E Lp WNCg GT E R- 7GEc NGp GEN'

**Aratinf 7.09. UFM tnFS Fl ot AtMl o.** - o vrozision in tuis p yreement sualhbe MonstrAed to yrant greddie F aMtue GrAstee or an1 otuer Herson aAtuorit1 to aMin an1 manner x uiMi x oAld MAAse a HI Hoohnot to be treated as a yrantor trAst for federahinMome ta) vArvoses'

**Aratinf 7.10. c M - rf to, l r nf Gnf 3Bl oif roo, Mro.** 7f tue date fi) ed for an1 va1ment on an1 HI is a da1 tuat is not a 8 Asiness c a19tuen sAMi va1ment sualhbe made on1 t sAMi edediny 8 Asiness c a19x itu tue same forMi and effeMi as tuoAyu made on tue date fi) ed for sAMi va1ment9and no interest sualhaMMrAe for tue veriod after sAMi date'

**Aratinf 7.11. Al aaroonFo.** Guis p yreement sualhbe bindiny Avon and inAre to tue benefit of tue varties and tueir resveMize sAMIessors9inMhAdiny an1 sAMIessor b1 overation of hnx 9and vermitted assiyns'

**Aratinf 7.1u. NrMif if yo.** Gue ueadinys in tuis p yreement are for Monzenien Mi onhl and sualhnot affeMi tue MonstrAMion of tuis p yreement'

**Aratinf 7.1p. Gntiar Mi e , r- Mi e.**

Oi. p n1 notiMi9demand or otuer MimmAniMation reUAired or vermitted Ander tuis p yreement to be yizen to or serzed Avon an1 Tolder ma1 be yizen or serzed Oi. in x ritiny b1 devosit in tue RAited Nates mail9vostaye vrevaid9and addressed to sAMi Tolder as sAMi TolderⁱS name and address ma1 avvear on tue boows and reMords of a gederah" eserze 8 anwor Oi. b1 transmission to sAMi Tolder turoAyu tue MimmAniMation s1stem of tue gederah" eserze 8 anws' p n1 notiMi9demand or otuer MimmAniMation to or

25

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Avon a T older suallhbe deemed to uaze been sAffiMenthl yizen or made9for alhvArvoses9Avon mailiny or transmission'

Ob. p n1 notiM49demand or outer MmmAniMtion x uiMl is reUAired or vermitted to be yizen to or serzed Ander tuis p yreement ma1 be yizen in x ritiny addressed as folhox s Ob. in tue Mse of greddie F aMin its Morvorate MvaMt19to greddie F aMI2, ,  Jones 8 ranMd c rize9F MLean9Viryinia 220, 29p ttention3 E) eMRtize ViMl Hresident — Denerah1 oAnsehand NeMetar1 and Oh. in tue Mse of tue GrAstee9to3greddie F aMDas GrAstee.9I2, ,  Jones 8 ranMd c rize9 F MLean9Viryinia 220, 29p ttention3E) eMRtize ViMl Hresident — Denerah1 oAnsehand NeMetar1'

OMp n1 notiM49demand or otuer MmmAniMtion to or Avon greddie F aMor tue GrAstee sualhbe deemed to uaze been sAffiMenthl yizen or made onhl Avon its aMAahreMdivt of tue x ritiny'

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

GTE E Np LE Cg p Hl  p - c  "El E7HGp - c p l l EHGp - l E Cg p Hl  8 B C" C-  8 ETp Lg Cg p  TCLc E" 9W7GTCRGp - B N7D- p GR" E C"
gR" GT E"  F p - 7gENGp G7C-  Cg p NNE- G9NTp LL l C- NG7GR GE GTE R- l C- c 7G7C- p L p l l EHGp - l E 8 B GTE TCLc E"  p - c  p LL
CGT E" NT p V7- D p  8 E- Eg7l 7p L 7- GE" ENG 7-  NR l T Hl  Cg p LL GTE GE" F Np - c  H" CV7N7C- NCg GT 7Np D" EEF E- G O7- l LRc 7- D GTE
" ELp GEc  HCCL NRHHLEF E- G. p - c  GTE p D" EEF E- G Cg g"  Ec c 7E F p l 9NR l T  TCLc E"  p - c  NR l T  CGT E" NGT p G GT CNE GE" F N
p - c  H" CV7N7C- NNT p LL 8 E 8 7- c 7- D9CHE" p G7VE p - c  EggE l G7VE'

gEc  E" p L TCF E LCp -  F C" GDp DE l  C" HC" p G7C- 9in its

Mrvorate MrvaMrl and as GrAstee

/s/ _____ F arwc ' T anson _____

p Atuori(ed Nrynator1

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 12.1

## RATIO OF EARNINGS TO FIXED CHARGES AND
## RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

| | Nine Months Ended September 30, | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2011 | 2010 | 2010 | 2009 | 2008 | 2007 | 2006 |
| | | | (dollars in millions) | | | | |
| Net Income (loss) before income tax benefit (expense) and cumulative effect of changes in accounting principles | $(14,82) | $(384235) | $(38466,) | $(,,4568) | $(884918) | $ (94060) | $ ,458A |
| : ddL | | | | | | | |
| wo- -income housing tax credit partnerships | 7 | 7 | 7 | 84399 | 895 | 810 | 8A2 |
| Total interest expense | 134580 | 2A4,8 | 0,4853 | ,,489A | 55455, | 56486, | 524 2A |
| Interest factor in rental expenses | 5 | 8 | 9 | 2 | 6 | 2 | 1 |
| Earnings (loss) as adjusted | $ 994BA9 | $ 994039 | $ 224.98 | $ 540,6 | $ (3A4223) | $ 5,4010 | $ 8AAA,5 |
| Fixed chargesL | | | | | | | |
| Total interest expense | $134580 | $ 2A4,8 | $ 0,4853 | $ ,,489A | $ 55455, | $ 56486, | $ 524 2A |
| Interest factor in rental expenses | 5 | 8 | 9 | 2 | 6 | 2 | 1 |
| Capitalized interest | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| Total fixed charges | $13459, | $ 2A4,6 | $ 0,4851 | $ ,,4892 | $ 55458A | $ 564860 | $524 21 |
| Senior preferred stock and preferred stock dividends(3) | 8468A | 84481 | 94280 | 84BA9 | 129 | 506 | ,2A |
| Total fixed charges including preferred stock dividends | $11480, | $28A228 | $ 024669 | $ ,141, | $ 584439 | $564662 | $524981 |
| Ratio of earnings to fixed charges(,) | 7 | 7 | 7 | 7 | 7 | 7 | 3.A2 |
| Ratio of earnings to combined fixed charges and preferred stock dividends(5) | 7 | 7 | 7 | 7 | 7 | 7 | 3.A2 |

(3) Senior preferred stock and preferred stock dividends represent pre-tax earnings required to cover any senior preferred stock and preferred stock dividend requirements computed using our effective tax rate4- henever there is an income tax provision4 for the relevant periods.

(,) Ratio of earnings to fixed charges is computed by dividing earnings (loss) as adjusted by total fixed charges. For the ratio to equal 3.A4 earnings (loss) as adjusted must increase by $1., billion4$38.2 billion4$38.0 billion4$36., billion4$8.3 billion and 9.9 billion for the nine months ended September 5A4, A33 and , A3A and for the years ended December 534, A3A4, AA04, AA6 and , AA24 respectively.

(5) Ratio of earnings to combined fixed charges and preferred stock dividends is computed by dividing earnings (loss) as adjusted by total fixed charges including preferred stock dividends. For the ratio to equal 3.A4 earnings (loss) as adjusted must increase by $33.3 billion4$36.0 billion4$, .5 billion4 $88.6 billion and $9.0 billion for the nine months ended September 5A4, A33 and , A3A4 and for the years ended December 534, A3A4 , AA04, AA6 and , AA24 respectively.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.1**

**CERTIFICATION**

**PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)**

I, Charles E. Haldeman, Jr., certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended September 30, 2011 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 3, 2011

/s/  Charles E. Haldeman, Jr.
Charles E. Haldeman, Jr.
Chief Executive Officer

TREASURY-2353

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.2**

## CERTIFICATION

## PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Ross J. Kari, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended September 30, 2011 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 3, 2011

/s/  Ross J. Kari
_____
Ross J. Kari
Executive Vice President — Chief Financial Officer

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 32.1**

**CERTIFICATION**

**PURSUANT TO 18 U.S.C. SECTION 1350,**

**AS ENACTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q for the quarter ended September 30, 2011 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Charles E. Haldeman, Jr., Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 3, 2011

/s/ Charles E. Haldeman, Jr.
Charles E. Haldeman, Jr.
Chief Executive Officer

**TREASURY-2355**

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 32.2**

**1 ECRTI TI FRTAO**

**NP CUP F OR RA S8 P .U1 . UE1 RTAO S350,**

**F U EOF 1 RED BY UE1 RTAO 906 A1  RHE UF CBF OEU-AXLEY F 1 R AI  2002**

In connection with the Quarterly Report on Form 10-Q for the quarter ended September 30, 2011 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date  hereof (the "Report"), I, Ross J. Kari, Executive Vice President — Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1. The Report fully complies with the requirements of  Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all  material respects, the financial condition and results of  operations of the Company.

Date: November 3, 2011

/s/  Ross J. Kari
Ross J. Kari
Executive Vice President — Chief Financial Officer

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, November 03, 2011

Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-2357

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

December 21, 2011

**ACTION MEMORANDUM FOR SECRETARY GEITHNER**

**FROM**:   Cyrus Amir-Mokri, Assistant Secretary for Financial Institutions
Mary Miller, Assistant Secretary for Financial Markets

**SUBJECT**:   2012 Periodic Commitment Fee for GSE Preferred Stock Purchase Agreements

In December 2010, Treasury decided to waive the Periodic Commitment Fee (PCF) for calendar year 2011.  (See attached Action Memo with your approval.)  This memo seeks your approval to waive the PCF for calendar year 2012.

**RECOMMENDATION**

That you approve a waiver of the Periodic Commitment Fee (PCF) for calendar year 2012 and you instruct Treasury staff to communicate the PCF waiver to the Federal Housing Finance Agency (FHFA) on a quarterly basis.

_____ Approve    _____ Disapprove    _____ Let's Discuss

**BACKGROUND**

The Periodic Commitment Fee is intended to compensate taxpayers for the ongoing financial support that Treasury provides to Fannie Mae and Freddie Mac through the Preferred Stock Purchase Agreement (PSPA).  Setting the PCF requires mutual agreement by Treasury and FHFA, in consultation with the Federal Reserve.  However, in its sole discretion, Treasury may waive the PCF for up to one year at a time based on adverse conditions in the mortgage market.

On December 22, 2010, you approved the waiver of the PCF for calendar year 2011.  The basis for the decision was that the expected financial draws by Fannie Mae and Freddie Mac were forecast to exceed the dividends those firms pay back to taxpayers under the PSPAs, and that, accordingly, setting the PCF would not produce any additional income for taxpayers.  Last year's waiver did not generate significant interest from the media or others.

In approving the waiver for calendar year 2011, Treasury also decided that it would nevertheless re-evaluate the continued need for the waiver on a quarterly basis and would communicate that quarterly waiver assessment to FHFA in writing.  (Deputy Secretary Wolin signed the most recent such communication to FHFA dated September 30, 2011 – see attachment.)  No PCF has been set or paid to date.

## REASONS THAT WAIVER OF THE PCF REMAINS APPROPRIATE

***Given the size of current and expected GSE draws over time, imposing the PCF would not generate increased return for taxpayers because it would lead the GSEs to increase their Treasury draws***

- Over the longer term, the GSEs are not expected to generate enough net income to cover required dividend payments and forecasted losses.

- Even if the GSEs generated positive net income after dividends in the near term, that income could be used to offset potential draws in future quarters.

***Imposing the PCF could place greater strain on housing market recovery, which remains fragile***

- Private capital has not adequately returned to the market and Fannie Mae, Freddie Mac, and FHA/GNMA continue to account for approximately 90% of mortgage originations – versus less than 40% five years ago.

- More than 10 million borrowers remain underwater on their mortgages.

Waiving the PCF at year-end preserves full optionality to set the PCF next year, if housing markets stabilize and the GSEs generate positive net income in excess of their dividend commitments.  Consistent with the approach taken for calendar year 2011, we plan to communicate quarterly Treasury's waiver decision to FHFA in writing.

## ATTACHMENTS

1. Secretary Geithner December 2010 Action Letter approving waiver for CY 2011
2. 3Q 2011 Letter to FHFA indicating approval of waiver for 3Q 2011
3. 4Q 2011 Letter to FHFA indicating approval of waiver for 4Q 2011
4. 1Q 2012 Draft Letter to FHFA indicating approval of waiver for 1Q 2012

TREASURY-2359



**DEPARTMENT OF THE TREASURY**
**WASHINGTON, D.C. 20220**

December 20, 2010

**ACTION MEMORANDUM FOR SECRETARY GEITHNER**

**FROM:**     Jeffrey A. Goldstein
             Under Secretary for Domestic Finance

**SUBJECT:**   Periodic Commitment Fee for GSE Preferred Stock Purchase Agreements (PSPAs)

**Recommendation**

That you waive the Periodic Commitment Fee (PCF) for 2011 and reconsider next year.

_____ Approve    _____ Disapprove    _____ Let's Discuss

**Background:**
- The amended PSPA agreements between Treasury and GSEs specify that a Periodic Commitment Fee (PCF) be set by December 31, 2010.
- The date for setting the PCF was previously moved from December 31, 2009 to December 31, 2010 as part of the broader amendments to the PSPAs on December 24, 2009.  Therefore, no PCF has been set or paid to date.
- Treasury may waive the PCF for one year at a time in its sole discretion based on adverse conditions in the mortgage market.
- The PCF is to be mutually agreed to by Treasury and FHFA, in consultation with the Federal Reserve.  The PCF was designed to fully compensate Treasury for providing its ongoing financial commitment.

**Considerations:**

<u>**Reasons to Waive the PCF for 2011**</u>

*Housing markets remain fragile*
- Private capital has yet to return to the market
  - Fannie Mae, Freddie Mac, and FHA/GNMA currently account for over 95% of mortgage originations – the historic average is around 40%
  - The spread between prime jumbos and conforming mortgages is still elevated and is currently around 100 basis points – the historic average is closer to 20 basis points
  - Since September 2008, there has only been one private label new issue securitization to come to the market (Redwood Sequoia deal)
- Nearly 11 million borrowers are underwater on their mortgages
- Mortgage delinquency rates remain elevated (5.2% for prime, 36.5% for subprime, and 11.9% for FHA)
- Foreclosure starts and completions remain elevated

1

***Given the size of current GSE draws, imposing a PCF would only lead to increased Treasury draws and not generate increased return for the taxpayer***
- According to the FHFA stress tests in the base case, both GSEs are expected to require additional draws through the end of 2011 to cover net income losses and required dividend payments (although projected draws are < $1 billion for Freddie Mac in Q3 and Q4) (see appendix)

***Other than timing, no real additional taxpayer value is created***
- Even if the GSEs generated positive surplus of net income after dividends, that surplus can be used to offset potential draws in future quarters

***Potentially confusing message to the market***
- Last year we stated that the fragility of the housing market was one of the rationales for postponing setting the commitment fee; by setting the fee this year (at any level), we could be viewed as implicitly making an affirmative statement on the health of the housing market

***Waiving the PCF for 2011 preserves full optionality to set the PCF next year if housing markets are more stable and if the GSEs are generating positive net income in excess of their dividend commitments***


## Reasons to Set the PCF
- Makes clear the Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the GSEs in the future
- Illustrates further commitment to recouping taxpayer support

**If you decided to set the PCF, there are two potential options:**
Option 1 – Set the PCF as a percentage of the liquidation preference of the outstanding preferred stock
Option 2 – Set the PCF equal to any generated positive net income (subject to further legal review)
*These would have to be mutually agreed by FHFA in consultation with the Federal Reserve*

TREASURY-2361

**Appendix:**

**FHFA "Base Case" (Scenario 2) Projections - FNMA**
**($ in billions)**

|  | Gross Draw | Dividend | Net Income | AOCI (1) Change | Cumulative Gross Draw |
|---|---|---|---|---|---|
| 4Q10 |  |  |  |  | $104.6 |
| 1Q11 | $9.6 | $2.3 | -$7.6 | $0.3 | 114.2 |
| 2Q11 | 8.8 | 2.6 | -6.4 | 0.3 | 122.9 |
| 3Q11 | 7.9 | 2.9 | -5.4 | 0.3 | 130.9 |
| 4Q11 | 8.7 | 3.1 | -5.8 | 0.3 | 139.6 |

**FHFA "Base Case" (Scenario 2) Projections - FHLMC**
**($ in billions)**

|  | Gross Draw | Dividend | Net Income | AOCI (1) Change | Cumulative Gross Draw |
|---|---|---|---|---|---|
| 4Q10 |  |  |  |  | $72.6 |
| 1Q11 | $1.2 | $1.8 | -$0.4 | $0.9 | 73.8 |
| 2Q11 | 1.3 | 1.8 | -0.4 | 0.9 | 75.1 |
| 3Q11 | 0.6 | 1.9 | 0.4 | 0.9 | 75.7 |
| 4Q11 | 0.2 | 1.9 | 0.7 | 0.9 | 75.9 |

(1) AOCI = Accumulated Other Comprehensive Income
Retained earnings changes from changes in the value of certain AFS assets

TREASURY-2362



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.  20220

June 30, 2011

The Honorable Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street NW
Washington, DC  20552-0003

Dear Acting Director DeMarco:

As you know, in my letter to you dated March 31, 2011, I communicated to you our waiver, for the second quarter of Calendar Year (CY) 2011, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the third quarter of CY 2011, the PCF payable by each Enterprise.  Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set.  Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Jeffrey A. Goldstein



**THE DEPUTY SECRETARY OF THE TREASURY**
WASHINGTON

September 30, 2011

The Honorable Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street NW
Washington, DC  20552-0003

Dear Acting Director DeMarco:

As you know, in the letter to you dated June 30, 2011, Treasury communicated to you its waiver, for the third quarter of Calendar Year (CY) 2011, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the fourth quarter of CY 2011, the PCF payable by each Enterprise.  Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set.  Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Neal S. Wolin



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

December 31, 2011

The Honorable Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street, NW
Washington, DC 20552-0003

Dear Acting Director DeMarco:

As you know, in the letter to you dated September 30, 2011, Treasury communicated to you its waiver, for the fourth quarter of Calendar Year (CY) 2011, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the first quarter of CY 2012, the PCF payable by each Enterprise.  Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set.  Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Cyrus Amir-Mokri



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

ASSISTANT SECRETARY

December 21, 2011

Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street, NW
Washington, DC 20552-0003

Dear Acting Director DeMarco:

As you know, in the letter to you dated September 30, 2011, Treasury communicated to you its waiver, for the fourth quarter of Calendar Year (CY) 2011, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the first quarter of CY 2012, the PCF payable by each Enterprise. Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set. Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Cyrus Amir-Mokri