# Moody's Approach to Estimating Credit Losses

1. Trend Analysis Calculator for Projecting Lifetime Portfolio Residential Mortgage Losses

    – Assuming future home price and unemployment projections, estimates future lifetime cumulative losses based on the lender's recent delinquency and loss performance

2. Framework of the model is generally based on Moody's US RMBS Surveillance's Loss Methodology

MOODY'S
INVESTORS SERVICE

# Lifetime Loss Calculations

1. For loans currently seriously delinquent or modified last year, "pipeline losses" are equal to the product of
   i. Percent of such loans
   ii. Assumed default rate
   iii. Estimated severity rate

2. For all other loans, lifetime cumulative losses are equal to:
   i. For each of the next 5 years, losses are equal to the product of:
      a. Estimated rate of new 60+ delinquencies (Transition Rate)
         1. This is based on the rate of loans that went seriously delinquent over the last year as well as our home price and unemployment assumptions
      b. Assumed default rate
      c. Estimated severity rate
   ii. For losses beyond year 5, multiply year 5 losses by 3

MOODY'S
INVESTORS SERVICE

Meeting with U.S. Treasury, April 4, 2012   4

# Credit Loss Estimates

*(handwritten: 147, 285)*

*(handwritten: Dec 31, 2010    Dec 2011)*

## Fannie Mae

| Actual Year that Loss is Realized | | Losses From Loans Going Seriously Delinquent in Year | | | | Scenario # | | 1 | |
|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | 5 | 6+ | | Total |
| 1 | $ 32,898 | $ 1,176 | | | | | | | $ 34,074 |
| 2 | $ 24,647 | $ 3,497 | $ 833 | | | | | | $ 28,977 |
| 3 | $ 12,313 | $ 5,802 | $ 2,477 | $ 550 | | | | | $ 21,143 |
| 4 | $ 8,209 | $ 5,802 | $ 4,110 | $ 1,636 | $ 269 | | | | $ 20,026 |
| 5 | $ 4,104 | $ 4,642 | $ 4,110 | $ 2,713 | $ 799 | $ 109 | | | $ 16,478 |
| 6 | | $ 1,160 | $ 3,288 | $ 2,713 | $ 1,326 | $ 324 | $ 328 | | $ 9,139 |
| 7 | | $ 1,160 | $ 822 | $ 2,171 | $ 1,326 | $ 537 | $ 972 | | $ 6,987 |
| 8 | | | $ 822 | $ 543 | $ 1,061 | $ 537 | $ 1,610 | | $ 4,572 |
| 9 | | | | $ 543 | $ 265 | $ 429 | $ 1,610 | | $ 2,847 |
| 10 | | | | - | $ 265 | $ 215 | $ 1,932 | | $ 2,412 |
| Total | $ 82,171 | $ 23,240 | $ 16,462 | $ 10,869 | $ 5,311 | $ 2,150 | $ 6,451 | | $ 146,654 |

*(handwritten circled: $0563)*

## Freddie Mac

| Actual Year that Loss is Realized | | Losses From Loans Going Seriously Delinquent in Year | | | | Scenario # | | 1 | |
|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | 5 | 6+ | | Total |
| 1 | $ 15,371 | $ 803 | | | | | | | $ 16,175 |
| 2 | $ 11,528 | $ 2,410 | $ 567 | | | | | | $ 14,506 |
| 3 | $ 5,764 | $ 4,017 | $ 1,702 | $ 377 | | | | | $ 11,859 |
| 4 | $ 3,843 | $ 4,017 | $ 2,837 | $ 1,130 | $ 187 | | | | $ 12,012 |
| 5 | $ 1,921 | $ 3,213 | $ 2,837 | $ 1,883 | $ 560 | $ 77 | | | $ 10,492 |
| 6 | | $ 803 | $ 2,269 | $ 1,883 | $ 933 | $ 232 | $ 232 | | $ 6,353 |
| 7 | | $ 803 | $ 567 | $ 1,506 | $ 933 | $ 387 | $ 697 | | $ 4,894 |
| 8 | | | $ 567 | $ 377 | $ 746 | $ 387 | $ 1,161 | | $ 3,238 |
| 9 | | | | $ 377 | $ 187 | $ 310 | $ 1,161 | | $ 2,034 |
| 10 | | | | - | $ 187 | $ 155 | $ 1,393 | | $ 1,735 |
| Total | $ 38,428 | $ 16,067 | $ 11,346 | $ 7,532 | $ 3,732 | $ 1,548 | $ 4,644 | | $ 83,297 |

MOODY'S
INVESTORS SERVICE

Meeting with U.S. Treasury, April 4, 2012    5

# Moody's Approach to Estimating Earnings

» Net interest income

– Held margin constant (Fannie Mae at 60 bps reported in FY 2011; Freddie Mac at 82 bps)

– Mortgage book shrinks by single digits % through 2014 and by 10% per year thereafter.

» Credit losses, the allowance and provisions

– Annual credit losses (shown on pages 5) are forecasted as charge-offs in the earnings model.

– The allowance is a fixed percentage of the mortgage book.

– The allowance shrinks to 1.0% of the mortgage book by 2019.

– The provision is a plug.

» Derivative

– losses every year approximate average over the past nine years (incorporate OCI and MTM securities)

– Losses shrink in proportion to the shrinkage in the mortgage portfolio

» Admin expense

– Shrinks modestly until 2015.  Held constant thereafter.

Meeting with U.S. Treasury, April 4, 2012    6

MOODY'S
INVESTORS SERVICE

# Fannie Mae's Projected Capital Position

| Fannie Mae Model in $ millions | FY2010 | FY2011 | Proj FY2012 | Proj FY2013 | Proj FY2014 | Proj FY2015 | Proj FY2016 | Proj FY2017 | Proj FY2018 | Proj FY2019 | Proj FY2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Interest Earning Assets | 3,242,914 | 3,205,393 | 3,045,123 | 2,892,867 | 2,603,580 | 2,343,222 | 2,108,900 | 1,898,010 | 1,708,209 | 1,537,388 | 1,383,649 |
| Interest earning assets YoY growth | | -1.2% | -5.0% | -5.0% | -10.0% | -10.0% | -10.0% | -10.0% | -10.0% | -10.0% | -10.0% |
| Net interest income | 16,409 | 19,281 | 18,317 | 17,401 | 15,661 | 14,095 | 12,685 | 11,417 | 10,275 | 9,248 | 8,323 |
| Net interest margin before guaranty fees | 0.51% | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% |
| Net interest income with guaranty fees | 16,409 | 19,281 | 18,317 | 17,401 | 15,661 | 14,095 | 12,685 | 11,417 | 10,275 | 9,248 | 8,323 |
| Net interest margin with guaranty fees | 0.51% | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% |
| Provision for loan losses | 24,702 | 25,914 | 20,017 | 14,813 | 12,622 | 7,919 | 1,824 | 627 | (838) | (1,756) | 1,074 |
| Net interest income after provision | (8,293) | (6,633) | (1,700) | 2,588 | 3,039 | 6,175 | 10,861 | 10,790 | 11,113 | 11,003 | 7,249 |
| Fees and other income | 1,084 | 1,163 | 1,131 | 1,075 | 995 | 895 | 806 | 725 | 653 | 587 | 529 |
| Derivatives losses | (511) | (6,621) | (4,800) | (4,560) | (4,104) | (3,694) | (3,324) | (2,992) | (2,693) | (2,423) | (2,181) |
| Total other losses / expenses | (6,380) | (4,854) | (4,719) | (4,483) | (4,150) | (3,910) | (3,719) | (3,547) | (3,393) | (3,253) | (3,128) |
| Income before taxes | (14,100) | (16,945) | (10,088) | (5,380) | (4,220) | (533) | 4,623 | 4,976 | 5,680 | 5,914 | 2,468 |
| Income tax expense | (82) | (90) | - | - | - | - | - | - | - | - | - |
| Net Income | (14,018) | (16,855) | (10,088) | (5,380) | (4,220) | (533) | 4,623 | 4,976 | 5,680 | 5,914 | 2,468 |
| Less: Preferred stock dividends | (7,704) | (9,614) | (11,258) | (13,398) | (15,278) | (17,228) | (19,008) | (20,448) | (21,998) | (23,638) | (25,418) |
| Net income available to common stockholders | (21,718) | (26,469) | (21,346) | (18,778) | (19,498) | (17,761) | (14,384) | (15,472) | (16,318) | (17,724) | (22,949) |
| Remaining contingent capital | | | | 106,000 | 86,500 | 68,700 | 54,300 | 38,800 | 22,400 | 4,600 | |
| Senior preferred outstanding | | 112,578 | 133,978 | 152,778 | 172,278 | 190,078 | 204,478 | 219,978 | 236,378 | 254,178 | 277,178 |
| Allowance for loan losses | 61,556 | 72,156 | 63,328 | 56,151 | 48,129 | 38,985 | 31,188 | 24,560 | 18,947 | 14,210 | 12,789 |
| Allowance for loan losses as % of guaranty book | 2.07% | 2.44% | 2.25% | 2.10% | 2.00% | 1.80% | 1.60% | 1.40% | 1.20% | 1.00% | 1.00% |

TREASURY-3291

MOODY'S
INVESTORS SERVICE

Meeting with U.S. Treasury, April 4, 2012   7

# Freddie Mac's Projected Capital Position

| Freddie Mac Model<br>in $ millions | FY2010 | FY2011 | Proj<br>FY2012 | Proj<br>FY2013 | Proj<br>FY2014 | Proj<br>FY2015 | Proj<br>FY2016 | Proj<br>FY2017 | Proj<br>FY2018 | Proj<br>FY2019 | Proj<br>FY2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Average interest earning assets | 2,365,377 | 2,249,299 | 2,136,834 | 2,029,992 | 1,826,993 | 1,644,294 | 1,479,864 | 1,331,878 | 1,198,690 | 1,078,821 | 970,939 |
| *Earning assets YoY growth rate* | | -4.9% | -5.0% | -5.0% | -10.0% | -10.0% | -10.0% | -10.0% | -10.0% | -10.0% | -10.0% |
| Net interest income | 16,856 | 18,397 | 17,477 | 16,603 | 14,943 | 13,449 | 12,104 | 10,893 | 9,804 | 8,824 | 7,941 |
| *Net interest margin before guarantee fee increase* | 0.71% | 0.82% | 0.82% | 0.82% | 0.82% | 0.82% | 0.82% | 0.82% | 0.82% | 0.82% | 0.82% |
| Guaranty fees | | | | | | | | | | | |
| Net interest income with guaranty fees | 16,856 | 18,397 | 17,477 | 16,603 | 14,943 | 13,449 | 12,104 | 10,893 | 9,804 | 8,824 | 7,941 |
| *Net interest margin with guaranty fees* | 0.71% | 0.82% | 0.82% | 0.82% | 0.82% | 0.82% | 0.82% | 0.82% | 0.82% | 0.82% | 0.82% |
| Provision for loan losses | 17,218 | 10,702 | 12,426 | 8,617 | 7,474 | 6,613 | 3,005 | 1,930 | 671 | (1,194) | 796 |
| Net interest income after provision | (362) | 7,695 | 5,051 | 7,986 | 7,469 | 6,836 | 9,099 | 8,963 | 9,133 | 10,018 | 7,146 |
| Derivatives losses | (8,085) | (9,752) | (5,200) | (4,940) | (4,446) | (4,001) | (3,601) | (3,241) | (2,917) | (2,625) | (2,363) |
| Total other losses / expenses | (6,435) | (3,609) | (3,415) | (3,269) | (3,111) | (2,945) | (2,745) | (2,561) | (2,440) | (2,281) | (2,183) |
| Income before taxes | (14,882) | (5,666) | (3,564) | (223) | (88) | (110) | 2,752 | 3,161 | 3,776 | 5,112 | 2,600 |
| Provision for income taxes | (856) | (400) | | | | | | | | | |
| Net income | (14,026) | (5,266) | (3,564) | (223) | (88) | (110) | 2,752 | 3,161 | 3,776 | 5,112 | 2,600 |
| Less: Preferred stock dividends | (5,749) | (6,498) | (7,217) | (8,297) | (9,157) | (10,087) | (11,107) | (11,947) | (12,827) | (13,737) | (14,607) |
| Net income available to common stockholders | (19,774) | (11,764) | (10,781) | (8,520) | (9,245) | (10,197) | (8,355) | (8,786) | (9,051) | (8,626) | (12,007) |
| Remaining contingent capital | | | 140,700 | 131,400 | 121,200 | 112,800 | 104,000 | 94,900 | 86,200 | 74,100 | |
| Senior preferred outstanding | | 72,171 | 82,971 | 91,571 | 100,871 | 111,071 | 119,471 | 128,271 | 137,371 | 146,071 | 158,171 |
| Allowance for loan losses | 39,926 | 39,461 | 35,489 | 31,842 | 26,972 | 22,757 | 19,116 | 15,976 | 13,272 | 9,954 | 8,959 |
| *Allowance as % of mortgage book* | 1.84% | 1.90% | 1.80% | 1.70% | 1.60% | 1.50% | 1.40% | 1.30% | 1.20% | 1.00% | 1.00% |

Moody's
INVESTORS SERVICE

Meeting with U.S. Treasury, April 4, 2012    8

moodys.com

**MOODY'S**
INVESTORS SERVICE



©2009 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved. ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY COPYRIGHT LAW AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER. Each rating or other opinion must be weighed solely as one factor in any investment decision made by or on behalf of any user of the information contained herein, and each such user must accordingly make its own study and evaluation of each security and of each issuer and guarantor of, and each provider of credit support for, each security that it may consider purchasing, holding or selling.

Moody's Investors Service, Inc. ("MIS"), a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

MOODY'S
INVESTORS SERVICE



**DEPARTMENT OF THE TREASURY**
**WASHINGTON, D.C.  20220**

April 13, 2012

**INFORMATION MEMORANDUM FOR SECRETARY GEITHNER**

**FROM**:        Mary John Miller, Under Secretary for Domestic Finance

**SUBJECT**:        GSE Budgeting and Cost Estimates

This memorandum was prepared in response to your inquiry for an explanation on how Treasury staff developed the $28 billion net investment cost estimate of the Senior Preferred Stock Purchase Agreements (PSPAs) with Fannie Mae and Freddie Mac (the GSEs).

**BACKGROUND**

As part of the Administration's annual reporting and budgeting requirements, Treasury engaged Grant Thornton to prepare independent, third-party financial projections for the GSEs.  Grant Thornton developed their forecasts based upon the Projections of the Enterprises' Financial Performance report published by FHFA in October 2011.  Their analysis projects forward the expected net income, PSPA draws, and required dividend payments under an optimistic, base, and downside case.  For the purposes of the President's FY 2013 Budget, which requires a 10 year forecast, Treasury and the Office of Management and Budget (OMB) relied upon Grant Thornton's base case scenario to develop a cost estimate using the key assumptions listed on the next page.

As highlighted in the bottom right of Exhibit 1, the President's FY2013 Budget forecast implies cumulative net payments by Treasury to the GSEs of approximately $28 billion through 2022. This represents the difference between $226 billion cumulative liquidity payments and $197 billion cumulative dividends payments from the GSEs.  At OMB's request, the figures presented in the FY 2013 budget only show expected liquidity payments and dividend payments separately through 2014; thereafter, expected liquidity payments and dividend payments are netted into the dividend payments line.

**Exhibit 1**

**2013 Budgetary Cost of Treasury Support for Fannie Mae and Freddie Mac**
(In billions of dollars)

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Totals 2013-2017 | Totals 2013-2022 | Totals 2009-2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Transactions between Treasury and Fannie Mae/ Freddie Mac** | | | | | | | | | | | | | | | | | |
| Senior Preferred Liquidity Payments to Fannie/Freddie...... | 96 | 53 | 21 | 40 | 13 | 4 | | | | | | | | | 16.8 | 16.8 | 225.5 |
| Senior Preferred Dividend Payments from Fannie/Freddie... | -4 | -12 | -16 | -19 | -22 | -23 | -20 | -17 | -13 | -11 | -10 | -10 | -10 | -10 | -94.8 | -146.4 | -197.3 |
| Net Payments............................................ | 91 | 40 | 5 | 21 | -9 | -18 | -20 | -17 | -13 | -11 | -10 | -10 | -10 | -10 | -78.0 | -129.6 | 28.3 |

## CRITICAL ASSUMPTIONS

Key assumptions used in Grant Thornton's analysis include:

1. *Utilized the Federal Housing Finance Agency (FHFA) modeling assumptions* – Grant Thornton applied the same assumptions as those used by FHFA in their report published in October 2011.  FHFA forecasted gross draws and dividends at the GSEs through 2014 using a series of assumptions regarding housing prices, interest rates, securities prices, default and recovery rates, and growth of the guarantee and retained portfolio books of business.  Importantly, the FHFA base case assumed home price declines of 35 percent from peak-to-trough based on the Case-Shiller National House Price Index and a 15 percent home price increase from the trough in 1Q 2012 through the end of the FHFA forecast period in 2014.  FHFA's base case scenario was used by Grant Thornton to calculate their base case 10-year forecast, which corresponds to the $28 billion cumulative net payment in the President's FY 2013 Budget.

2. *No Guarantee Fee Increases* – Subsequent to the passage of the Temporary Payroll Tax Cut Continuation Act of 2011 (H.R. 3765) passed by Congress in December 2011, the Grant Thornton analysis was adjusted to exclude incremental revenue generated by any increase in guarantee fees.  Grant Thornton agreed to use this conservative approach because the timing, magnitude and ability to retain revenue from future guarantee fee increases remains uncertain.  The 10 basis point guarantee fee increase to fund the Temporary Payroll Tax Cut Continuation Act is estimated to generate $35.7 billion in incremental proceeds that will be deposited directly to Treasury.  This amount is not taken into account in the $28 billion cost estimate.

3. *No Change to the Size of the Guarantee Book of Business* – As shown in the attachment, Grant Thornton assumed the average size of the guarantee book of business at both GSEs remains approximately the same through the entire forecast period.  Fannie Mae's guarantee book is expected to remain approximately $2.9 trillion and Freddie Mac's guarantee book is expected to remain approximately $1.8 trillion.  Higher guarantee fees, changes in loan limits or other actions may reduce the number of loans guaranteed by the GSEs – and hence the size of the GSEs guarantee book of business – but these changes are not accounted for in the forecasts.

4. *Retained Portfolio Book of Business Reduced to $250 billion* – Consistent with Section 5.7 of the PSPAs, Grant Thornton's forecast reduces the retained mortgage book of business at both GSEs by 10 percent a year until each one reaches $250 billion in notional principal outstanding (which is expected to occur around 2020).

5. *No Discounting* – The $28 billion figure is not discounted on a present value basis.  In present value terms, depending on the discount rate assumed, the overall cost of the PSPAs would be higher.

**CONGRESSIONAL BUDGET OFFICE (CBO) SCORING METHODOLOGY**

CBO calculates the net investment cost of the PSPAs differently than OMB.[1]  The Administration treats Fannie Mae and Freddie Mac as nongovernmental organizations and records payments between them and Treasury on a cash basis.  In contrast, CBO projects the budgetary impact of Fannie Mae's and Freddie Mac's operations as if they were being conducted by a federal agency, because of the degree of management and financial control that the government exercises over the two entities.  Therefore, CBO estimates the net subsidy costs of preexisting commitments and new loans and guarantees to be issued by the entities.  It counts those costs as "federal outlays" in the year of issuance.

The CBO methodology includes several steps.  First, they forecast the new book of guarantee business per annum at the GSEs based on CBO's annual projection of total mortgage loan originations and a constant market share at the GSEs.  They then project the net cash flows (fee income less claims paid) for each year's new guarantee book of business through the life of the book.  Third, they calculate a net present value (NPV) based upon their projections by discounting the relevant net cash flows using a fair-value estimate that uses a rate a private entity would need to be paid to voluntarily take on the commitments of the GSEs without any federal backing (the adjusted credit reform treatment).  A similar approach is required by law to be used in estimating subsidies for the Troubled Assets Relief Program.[2]

This methodology estimates the total future cost of the GSEs from the 2012 through 2022 vintages will be $43 billion.[3]  CBO also assessed a subsidy of $88 billion for the 2009-2011 vintages[4] and a $248 billion subsidy on preexisting commitments when the GSEs entered conservatorship.  Collectively, these add up to a total aggregate cost of government support of $379 billion.  To reiterate, CBO's methodology is different than the OMB and Grant Thornton approach and therefore the two cost estimates are difficult to compare.

**CONCLUSION**

The $28 billion value was generated by Grant Thornton and used primarily for budgetary purposes.  The assumptions that underlie this estimate should be kept in mind when using it.  Estimates for the cost of the PSPAs can and will vary given the inherent uncertainty about housing market conditions as well as what happens to the GSEs over the next ten years.  Please let us know if you would like to discuss these methodologies, or other cost projections, further.

**ATTACHMENTS**

1. FHFA Projections of the Enterprises' Financial Performance, released October 2011
2. CBO's Budgetary Treatment of Fannie Mae and Freddie Mac, dated January 2010

---

[1]  See Congressional Budget Office reports on CBO's Budgetary Treatment of Fannie Mae and Freddie Mac (Jan. 2010), and Fannie Mae, Freddie Mac, and the Federal Role in the Secondary Mortgage Market (Dec. 2010).

[2] See section 123 of the Emergency Economic Stabilization Act of 2008 (part of Public Law 110- 343) and title IV of the Supplemental Appropriations Act of 2009 (P.L. 111-32).

[3] As estimated by the CBO's updated budget projections for fiscal years 2012 to 2022, dated March 13, 2012.

[4] CBO calculated a subsidy for the GSEs of $43 billion in 2009, $40 billion in 2010, and $5 billion in 2011.

# FEDERAL HOUSING FINANCE AGENCY



## NEWS RELEASE

| For Immediate Release | **Contact:** | Corinne Russell | (202) 414-6921 |
|---|---|---|---|
| October 27, 2011 | | Stefanie Johnson | (202) 414-6376 |

## FHFA Updates Projections of Potential Draws for Fannie Mae and Freddie Mac

**Washington, DC —**The Federal Housing Finance Agency (FHFA) today released updated projections of the financial performance of Fannie Mae and Freddie Mac, including potential draws under the Senior Preferred Stock Purchase Agreements with the U.S. Department of the Treasury.  FHFA first released financial projections in October 2010, and these updated projections show similar results for two out of three scenarios, and a decrease in cumulative Treasury draws in one scenario.  Through the FHFA Conservator's Report, FHFA tracks actual performance versus projections on a quarterly basis.

(Attachment follows)

*###*

*The Federal Housing Finance Agency regulates Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks.*
*These government-sponsored enterprises provide more than $5.7 trillion in funding for the U.S. mortgage markets*
*and financial institutions.*



Federal Housing Finance Agency

Projections of the Enterprises' Financial Performance

October 2011

TREASURY-3299

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

# Contents

Summary.................................................................... 3

Results ..................................................................... 4

Comparison of Oct 2011 Projections to Oct 2010 Projections............ 8

Projection Scenarios ...................................................... 11

House Price Assumptions ................................................. 12

Appendix................................................................... 14

2

## Summary

- This report provides updated information on possible future Treasury draws by Fannie Mae and Freddie Mac (the "Enterprises") under specified scenarios, using consistent assumptions for both Enterprises. FHFA published initial projections of the Enterprises' financial performance in October 2010. The report on the initial projections can be found in FHFA's Projections of the Enterprises' Financial Performance, October 2010. The projections have been updated to reflect the current outlook for house prices, interest rates, and recent trends in borrower behavior. The projection period has been extended an additional year.

- To date, the Enterprises have drawn $169 billion from Treasury under the terms of the Senior Preferred Stock Purchase Agreements (PSPAs), as amended, between the Treasury and each of the Enterprises. FHFA worked with the Enterprises to develop forward-looking financial projections across three possible house price paths. **Under the three scenarios used in the projections, cumulative Treasury draws (including dividends) at the end of 2014 range from $220 billion to $311 billion. In the initial projections released in October 2010, cumulative Treasury draws (including dividends) at the end of 2013 ranged from $221 billion to $363 billion.**

- The difference in the range of ending cumulative Treasury draws between the October 2010 projections and the October 2011 projections can be attributed primarily to the fact that actual results for the first year of the projection period in the October 2010 projections were substantially better than projected. (See page 8 for further details.)

- The projections reported here are not expected outcomes. They are modeled projections in response to "what if" exercises based on assumptions about Enterprise operations, loan performance, macroeconomic and financial market conditions, and house prices. The projections do not define the full range of possible outcomes. Actual outcomes may be very different. This effort should be interpreted as a sensitivity analysis of future draws to possible house price paths.

- FHFA provided the Enterprises with key assumptions for each scenario. The Enterprises used their respective internal models to project their financial results based on the assumptions provided by FHFA. While this effort achieves a degree of comparability between the Enterprises, it does not allow for actions that the Enterprises might undertake in response to the economic conditions specified in the scenarios. Those Enterprise-specific business changes could lead to different results across the scenarios than are presented in these projections.

TREASURY-3301

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

## Results

The assumptions used in each of the three scenarios are described on page 11.  The projected combined cumulative Treasury draws for both Enterprises through December 31, 2014 reach $220 billion under Scenario 1, $226 billion under Scenario 2, and $311 billion under Scenario 3.  Fannie Mae's cumulative draws are higher than Freddie Mac's in part because Fannie Mae's mortgage book of business is approximately fifty percent larger than Freddie Mac's.  In addition, Fannie Mae's serious delinquency rates are higher than Freddie Mac's.

### Figure 1: Cumulative Treasury Draws* (*$ in billions*)



Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

## Results (continued)

The Enterprises are required to pay a 10 percent dividend on the amount of funds drawn by the Enterprises under the Senior Preferred Stock Purchase Agreements (PSPAs) with Treasury. The PSPAs do not allow for dividends to reduce prior draws. However, for illustrative purposes, if dividend payments were subtracted from the projected cumulative draws, the net amounts would reach $121 billion under Scenario 1, $124 billion under Scenario 2, and $193 billion under Scenario 3. Most dividends to date have been paid from funds acquired with additional draws. The projections show a portion of future dividends being paid out of comprehensive income.

**Figure 2: Cumulative Treasury Draws less dividends paid** *($ in billions)*



### Cumulative Treasury Draw through 2014 (Fannie Mae)

| | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| Related to operating losses and other* | $105 | $110 | $161 |
| Related to senior preferred dividends | 40 | 40 | 58 |
| Cumulative Treasury Draw | $145 | $150 | $219 |
| Senior preferred dividends (not financed through Treasury Draws) | $20 | $22 | $18 |
| Total senior preferred dividends | $60 | $62 | $76 |

### Cumulative Treasury Draw through 2014 (Freddie Mac)

| | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| Related to operating losses and other* | $58 | $59 | $66 |
| Related to senior preferred dividends | 17 | 17 | 26 |
| Cumulative Treasury Draw | $75 | $76 | $92 |
| Senior preferred dividends (not financed through Treasury Draws) | $22 | $22 | $17 |
| Total senior preferred dividends | $39 | $39 | $43 |

*Operating losses and other refers to net losses reported on the income statement, changes in unrealized losses reported on the balance sheet, and the impact of other accounting changes for consolidation and security impairments. In accordance with Senior Preferred Stock Purchase Agreements (PSPAs), the Enterprises are not permitted to paydown the Treasury draw amounts, even if the Enterprises generate positive net income or total comprehensive income. Numbers may not foot due to rounding.

5

TREASURY-3303

Federal Housing Finance Agency

## Results (continued)

Credit-related expenses, particularly the provision for credit losses, continue to drive projected Treasury draws across all three scenarios. Fannie Mae's credit-related expenses increase by $57 billion from Scenario 1 to Scenario 3, and for Freddie Mac that increase amounts to $23 billion. Thus $80 billion of the projected $92 billion difference in Treasury draws across those scenarios is directly related to credit-related expense projections.

**Figure 3: Cumulative Financial Results (2009-2014)** *($ in billions)*

| | Fannie Mae | | | Freddie Mac | | |
|---|---|---|---|---|---|---|
| | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 1 | Scenario 2 | Scenario 3 |
| Revenues | $112 | $112 | $110 | $104 | $104 | $103 |
| Provision for credit losses | (135) | (139) | (189) | (64) | (66) | (86) |
| Other credit-related expenses[1] | (35) | (35) | (38) | (26) | (26) | (27) |
| Total Credit-related Expenses/Losses | (170) | (174) | (227) | (90) | (92) | (113) |
| Other expenses[2] | (33) | (33) | (33) | (26) | (26) | (26) |
| Net Income (Loss) | ($91) | ($94) | ($150) | ($12) | ($14) | ($36) |
| **Capital Change** | | | | | | |
| Net Income | (91) | (94) | (150) | (12) | (14) | (36) |
| Dividends | (60) | (62) | (76) | (39) | (39) | (43) |
| Other[3] | 21 | 21 | 21 | 21 | 22 | 31 |
| Total Capital Change | (130) | (135) | (204) | (30) | (31) | (48) |
| Beginning Net Worth (12/31/2008) | (15) | (15) | (15) | (31) | (31) | (31) |
| Capital Deficit (2009-2014) | (145) | (150) | (219) | (61) | (62) | (79) |
| Senior Preferred Treasury Draw (2009-2014) | 145 | 150 | 219 | 61 | 62 | 79 |
| Cumulative Senior Preferred Treasury Draw[4] | $145 | $150 | $219 | $75 | $76 | $92 |
| Cumulative Draw less Dividends[4] | $85 | $88 | $144 | $36 | $36 | $49 |

[1] Consists of foreclosed property expenses, SOP 03-3 losses, net, and other than temporary impairments.

[2] Consists of mark-to-market gains/losses, net, administrative expenses, tax expense/benefit and other expenses.

[3] Consists of change in accumulated other comprehensive income, and other accounting changes for consolidation and security impairments, less positive net worth as of 12/31/14, if any.

[4] Freddie Mac's cumulative draw includes $13.8 billion of Treasury draw received in 2008.

Projected financial results assume that the Senior Preferred Stock Purchase Agreement (PSPA) commitment fee has been waived at both Enterprises.

Numbers may not foot due to rounding.

TREASURY-3304

## Results (continued)

The Enterprises have received $169 billion from Treasury to maintain positive net worth.  For the selected scenarios an additional $51 to $142 billion would be required to support the Enterprises over the projection period.  In Scenarios 1 and 2, dividend payments to Treasury exceed  additional Treasury draws.  Per the terms of the Senior Preferred Stock Purchase Agreements with Treasury, senior preferred stock accrues dividends at 10 percent per year.

**Figure 4: Additional Treasury Draws and Dividends (Jul 2011 through Dec 2014)** *($ in billions)*

|  | Current Draw as of 06/30/11 | | Scenario 1 | | Scenario 2 | | Scenario 3 | |
|---|---|---|---|---|---|---|---|---|
|  | Total Draw | Total Dividends | Additional Draw | Additional Dividends | Additional Draw | Additional Dividends | Additional Draw | Additional Dividends |
| Fannie Mae | $104 | $15 | $41 | $45 | $46 | $47 | $115 | $61 |
| Freddie Mac | 65 | 13 | 10 | 26 | 11 | 26 | 27 | 30 |
| Total | $169 | $28 | $51 | $71 | $57 | $73 | $142 | $91 |

7

## Comparison of October 2011 Projections to October 2010 Projections

- The projection period for the current projections and the previous projections runs three and a half years.  The current projection period runs through the end of 2014.  The prior projection period runs through the end of 2013.

- In the October 2011 projections, the ending combined cumulative Treasury draw is $1 billion lower for scenario 1 and $51 billion lower for scenario 3 than the ending cumulative Treasury draw in the October 2010 projections.  The difference can be attributed to three primary factors:

  o Actual results for the first year of the projection period were substantially better than projected. The actual combined Treasury draw was $19 billion lower for scenario 1 and $73 billion lower for scenario 3 than the projections (See Figure 5). This factor is partially offset by the next two factors.

  o Projected Treasury draws for the remainder of the initial projection period were $14 billion higher for scenario 1 and $16 billion higher for scenario 3 in the October 2011 projections; and

  o The projection period has been extended through 2014, adding $3 billion in Treasury draws for scenario 1 and $6 billion in Treasury draws for scenario 3.

- Drivers of the differences in the projected pattern of financial results include the following factors:

  o Recent observed trends show that borrowers with high MTM LTV loans and modified loans are performing better than previously projected.

  o The number of serious delinquent loans has declined as transition rates to later stages of delinquency are lower than previously projected.

  o Foreclosure delays pushed some defaults into later years of the projection period and beyond.

  o Recent observed trends indicate higher REO sales prices than previously projected.

  o Net interest income is higher in the current projection results due to lower interest rates, resulting in decreased funding costs and slightly higher average portfolio balances, driven by slower portfolio liquidations than previously projected.

  o The house price path in scenario 3 used in the current projections is better through the second quarter of 2012 and worse thereafter, compared to the corresponding house price path used in the October 2010 projections.

8

Comparison of October 2011 Projections to October 2010 Projections (continued)

**Figure 5: Comparison of Oct 2011 Projections to Oct 2010 Projections** *($ in billions)*

|  | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| **October 2010 Projections** | | | |
| Beginning Cumulative Draw 6/30/10 | 148 | 148 | 148 |
| Projected Treasury draw - Year 1 (Second half of 2010 and first half of 2011) | 39 | 50 | 93 |
| Projected Treasury draw - Years 2-3$^1$/$_2$ (Second half of 2011; 2012 and 2013) | 34 | 40 | 121 |
| **Ending Cumulative Draw 2013** | **221** | **238** | **363** |
| | | | |
| **October 2011 Projections** | | | |
| Beginning Cumulative Draw 6/30/10 | 148 | 148 | 148 |
| Actual Treasury draw - Year 1 (Second half of 2010 and first half of 2011) | 21 | 21 | 21 |
| Beginning Cumulative Draw 6/30/11 | 169 | 169 | 169 |
| Projected Treasury draw - Years 2-3$^1$/$_2$ (Second half of 2011; 2012 and 2013) | 48 | 56 | 137 |
| Projected Treasury draw - Year 3$^1$/$_2$-4$^1$/$_2$ (2014) | 3 | 1 | 6 |
| **Ending Cumulative Draw 2014** | **220** | **226** | **311** |
| | | | |
| **Difference in ending Cumulative Draw** | | | |
| Actual versus Projection - Year 1 (Second half of 2010 and first half of 2011) | (19) | (29) | (73) |
| Difference in Projections - Years 2-3$^1$/$_2$ (Second half of 2011; 2012 and 2013) | 14 | 16 | 16 |
| Additional year of Projection (2014) | 3 | 1 | 6 |
| **Total difference in ending cumulative draw** | **(1)** | **(12)** | **(51)** |

Numbers may not foot due to rounding

9

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

## Comparison of October 2011 Projections to October 2010 Projections (continued)

Actual and forecasted house price paths for Scenarios 1 and 2 used in the October 2011 projections are worse compared to the corresponding house price paths used in the October 2010 projections. The house price path in Scenario 3 used in the October 2011 projections is better through the second quarter of 2012 and worse thereafter, compared to the corresponding house price path used in the October 2010 projections.

### Figure 6: Comparison of Current and Previous House Price Paths

Moody's house price paths (Case Shiller National Index; July 2011 vs. September 2010)



TREASURY-3308

## Projection Scenarios

Key factors that influence the Enterprises' financial results are listed in Figure 7. FHFA requested that the Enterprises project financial results for three scenarios.  Because changes in house prices have had the largest impact on the Enterprises' financial results, we chose to change only this factor across the three scenarios.

## Figure 7: Scenario Assumptions

| Factor | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| House prices* | Moody's "Stronger Near-term Rebound" house price paths | Moody's "Current Baseline" house price paths | Moody's "Deeper Second Recession" house price paths |
| Interest rates | Future interest rates are implied by the forward curves as of June 30, 2011. | *Same as Scenario 1* | *Same as Scenario 1* |
| Securities prices | ABS and CMBS prices fall by 5 points at the beginning of the period | *Same as Scenario 1* | *Same as Scenario 1* |
| Agency MBS spreads | Agency MBS spreads to swaps remain unchanged. | *Same as Scenario 1* | *Same as Scenario 1* |
| Credit Guarantee growth | Zero growth in credit guarantees through year end 2014. | *Same as Scenario 1* | *Same as Scenario 1* |
| Retained Portfolio growth | Additions to retained portfolios are limited to nonperforming loans bought out of pools backing Fannie Mae's MBS and Freddie Mac's PCs. | *Same as Scenario 1* | *Same as Scenario 1* |

*Moody's house price paths as of July 2011

11

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

## House Price Assumptions

House price changes have been the major driver of credit losses at the Enterprises. A wide range of possible future paths exist for house prices at the national and local levels. Given the high level of uncertainty about overall economic conditions in general and the U.S. housing markets in particular, FHFA directed the Enterprises to project financial results for Moody's current baseline and two additional house price paths. Moody's considers "Deeper Second Recession" to be a downside alternative to the Current Baseline and "Stronger Near-term Rebound" to be an upside alternative to the Current Baseline.

**Figure 8: Moody's House Price Paths** *(Case-Shiller National Index; July 2011)*



### Descriptions

**Stronger Near-term Rebound** *(FHFA Scenario 1)*
An expansion of credit supports above-baseline growth. As a result, house prices start to increase after 2Q11, although additional increases are minimal in 2011 and 2012. The peak-to-trough decline is 33% based on the Case-Shiller National Index. From the trough in 2Q11 to the end of the forecast period house prices increase by 12%. Total new housing permits reach an annual pace above 1 million units by the first quarter of 2012.

**Current Baseline** *(FHFA Scenario 2)*
Remaining home price declines contribute to a 35% peak-to-trough decline based on the Case-Shiller National Index. From the trough in 1Q12 to the end of the forecast period, house prices increase by 15%. Total new housing permits reach an annual pace above 1 million units by the second quarter of 2012.

**Deeper Second Recession** *(FHFA Scenario 3)*
As a result of continuing high unemployment, the moderate rebound in housing construction that occurred over the first half of 2009 and then stalled reverses course. Housing starts resume their decline, bottoming out in mid-2012, more than 80% below their peak in 2005. The peak-to-trough decline is 46% based on the Case-Shiller National Index. From the trough in 4Q12 to the end of the forecast period house prices increase by 23%.

12

TREASURY-3310

House Price Assumptions (continued)

**Selection of House Price Assumptions**

Figure 8 shows national-level paths for the Case-Shiller house price index associated with the selected Moody's house price paths.  Scenario 2 uses house price paths associated with Moody's "Current Baseline (July 2011)."  That house price path is derived from Moody's assumptions regarding monetary and fiscal policy, U.S. dollar, and energy prices. Scenario 1 and Scenario 3 use house price paths associated with better and worse economic performance relative to Moody's "Current Baseline (July 2011)."

Moody's describes the house price paths associated with "Stronger Near-term Rebound", as being consistent with "a 10% probability that the economy will perform better than in this scenario, broadly speaking, and a 90% probability that it will perform worse."  Conversely, Moody's describes the house price paths associated with "Deeper Second Recession" as being consistent with "a 90% probability that the economy will perform better, broadly speaking, and a 10% probability that it will perform worse."  FHFA chose the "Deeper Second Recession" house price path to ensure a stringent test that would provide information tied to a continued severe weakening in housing.

**Use of Moody's Localized Forecasts**

FHFA chose to base the scenarios on Moody's house price paths because Moody's is a widely used benchmark. Moody's provides a full set of quarterly, forward-looking house price paths for each of the 384 Metropolitan Statistical Areas (MSAs) and Divisions for which FHFA publishes a historical house price index.  FHFA does not forecast house prices.  Such localized forecasts enable the Enterprises to project credit losses on a more comparable basis as opposed to a simple national projection of peak-to-trough change in house prices, which would require each Enterprise to translate that house price path into its own local house price index.

Defining a house price path at just the national level for the Enterprises would limit the usefulness of the results because house prices often behave quite differently in different local markets.  The mix of local market price projections associated with a given national average price projection can have a substantial impact on the aggregate loss projection for an Enterprise.  Similarly, defining the path with only a peak-to-trough measure is problematic because the timing of the trough and the rate of recovery beyond the trough can also greatly affect expected losses.

13

## Appendix

## Financial Projections Procedures

FHFA directed the Enterprises to project revenue, mark-to-market gains and losses, credit-related expenses, administrative expenses, earnings, capital, and, ultimately, cumulative senior preferred Treasury draws under the three scenarios using their own respective models. Both Enterprises routinely prepare financial forecasts using their respective management assumptions. Modeling assumptions were changed at both Enterprises to conform to the assumptions listed in Figure 7.

FHFA directed that the projection period cover the remainder of 2011 and the next three years, similar to projection periods used by the Enterprises for routine management forecasts. Furthermore for the selected house price paths, by the end of the projection period the bulk of credit losses are recognized.

The Enterprises' models use projections of interest rates to calculate future net interest margins, gains and losses on the retained portfolio and derivatives used for hedging, and prepayment speeds on held or guaranteed mortgages, which influence both credit losses and guarantee fee revenue.

To project revenue, the Enterprises projected the size of the retained portfolios and credit guarantee books using assumptions provided by FHFA on business volume growth. Additions to retained portfolios were limited to nonperforming loans bought out of pools backing Fannie Mae's MBS and Freddie Mac's PCs. The balance of outstanding credit guarantees at each Enterprise remained unchanged over the forecast period.

Net interest income (which includes most of the Enterprises' guarantee fee income) is driven primarily by the size of the retained portfolio and net interest margin (the difference between yield on assets and funding costs). For this exercise, funding costs were influenced by the forward curve for swaps, and asset yields were influenced by the forward curve for swaps and the assumptions about the level of Agency MBS spreads to swaps.

Guarantee fee income is driven by the size of the credit guarantee book and guarantee fee pricing. To project the size of the credit guarantee books the Enterprises used assumptions provided by FHFA on new business volume and interest rates, which influence prepayment speeds on guaranteed mortgages. FHFA did not provide explicit assumptions about guarantee fee pricing. However, FHFA reviewed the pricing assumptions of each Enterprise for

14

the projection period for consistency. For both Enterprises, guarantee fee pricing remained relatively unchanged over the projection period.

Projections of mark-to-market losses reflect changes in the value of securities held in the retained portfolio and changes in the value of derivatives used for hedging. The Enterprises' models use assumptions about future interest rates, securities prices, and spreads to project gains and losses on securities held in the retained portfolio and on derivatives used to hedge interest rate risk.

To project credit-related expenses, each Enterprise uses a multistep process. First, a statistical loan transition model projects the unpaid principal balance (UPB) of loans expected to default over the projection period. House price projections are used to determine the mark-to-market loan-to-value ratios of the guaranteed mortgages, which in turn influence the probabilities of default, and projections of loss given default. Next, a second model projects the severity of losses associated with defaulted loans resolved through various processes. The projections of distressed UPB are combined with the projections of loss severities to arrive at credit losses for each quarter. Next, each Enterprise projected loan loss reserves based on projections of credit losses, to determine its future provisions for credit losses. Finally, projections of credit-related expenses incorporate projections of future provisions for credit losses, foreclosed property expenses, and expenses incurred after foreclosure on the property.

The Enterprises used their own respective management assumptions to project administrative expenses.

FHFA reviews models and methodologies for internal consistency and comprehensiveness as part of the continuing supervision of the Enterprises. However, as with other regulator-driven financial projections that rely on internal models of banks, the internal models of one Enterprise will produce different answers than those of the other given the same set of assumptions and other inputs.

This modeling exercise is not the same as, nor did it follow all the same control procedures as the process followed for formal financial reporting. For instance, the projections did not incorporate management judgment as to how the specific assumptions employed might produce other changes in model assumptions. Nonetheless, FHFA believes that the results of this exercise provide a reasonable indication of plausible future Treasury draws under the specified scenarios, using comparable key assumptions for each Enterprise.

15



## Congressional Budget Office

## Background Paper

# CBO's Budgetary Treatment of Fannie Mae and Freddie Mac

**January 2010**

THE CONGRESS OF THE UNITED STATES

TREASURY-3314

Pub. No. 4023



# CBO's Budgetary Treatment of Fannie Mae and Freddie Mac

January 2010

The Congress of the United States ■ Congressional Budget Office

TREASURY-3316

# Note

Numbers in the text and tables of this report may not add up to totals because of rounding.



# Preface

After the U.S. government assumed control in 2008 of Fannie Mae and Freddie Mac—two federally chartered institutions that provide credit guarantees for almost half of the outstanding residential mortgages in the United States—the Congressional Budget Office (CBO) concluded that the institutions had effectively become government entities whose operations should be included in the federal budget. As a result, CBO incorporated estimates of the budgetary costs of the two entities in the baseline budget projections it published in 2009. This background paper describes CBO's budgetary treatment of Fannie Mae and Freddie Mac and the methods CBO used to estimate their costs. (CBO will issue new baseline projections for Fannie Mae and Freddie Mac in *The Budget and Economic Outlook* to be published in late January 2010.)

Damien Moore wrote the paper under the supervision of Kim Kowalewski and Robert Dennis. Kim Cawley, Chad Chirico, Peter Fontaine, Jeffrey Kling, Deborah Lucas, Joe Mattey, Larry Ozanne, and Aurora Swanson provided helpful comments on earlier drafts, as did Marvin Phaup of the Pew Economic Policy Group and James L. Blum. (The assistance of outside reviewers implies no responsibility for the final product, which rests solely with CBO.)

Chris Howlett edited the paper, and Kate Kelly proofread it. Maureen Costantino prepared the paper for publication, with assistance from Jeanine Rees. Lenny Skutnik produced the printed copies, Linda Schimmel coordinated the print distribution, and Simone Thomas prepared the electronic versions for CBO's Web site (www.cbo.gov).

*Douglas W. Elmendorf*

Douglas W. Elmendorf
Director

January 2010

# Contents

**Summary and Introduction**  *1*

**Background to Federal Conservatorship for Fannie Mae and Freddie Mac**  *4*

**New Treasury Authority and Resulting Federal Actions**  *6*

**CBO's Budget Projections for Fannie Mae and Freddie Mac**  *6*
> Estimating Subsidy Costs for Existing Business  *10*
> Estimating Subsidy Costs for New Business  *12*
> Comparison with Cash Budgetary Treatment  *13*

**Appendix: Projecting Mortgage Cash Flows and Valuing Mortgage Guarantees**  *15*


**Tables**

1. The Treasury's Purchases of Preferred Stock from Fannie Mae and Freddie Mac Under the Conservatorship   7

2. Summary of CBO's August 2009 Baseline Budget Projections for Fannie Mae and Freddie Mac   8


**Figure**

A-1. Spread Between Interest Rates on Jumbo and Conforming Mortgages   22

TREASURY-3320

TREASURY-3321

# CBO's Budgetary Treatment of Fannie Mae and Freddie Mac

## Summary and Introduction

In September 2008, the Director of the Federal Housing Finance Agency placed into conservatorship two large government-sponsored enterprises, the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac).[1] At the same time, the Secretary of the Treasury took a major ownership interest in both entities. In taking those steps, federal officials were exercising authority provided in the Housing and Economic Recovery Act of 2008.[2] In the judgment of the Congressional Budget Office (CBO), those actions make Fannie Mae and Freddie Mac part of the government and imply that their operations should be reflected in the federal budget.

Fannie Mae and Freddie Mac were chartered by the Congress to provide liquidity and stability to the secondary market for residential mortgages (the market in which those mortgages are bought and sold). In carrying out their charters, the two entities purchase mortgage loans made by lenders and package them into mortgage-backed securities (MBSs), which can be sold to investors along with a guarantee that principal and interest on the underlying mortgages will be paid in full. The two entities also invest directly in mortgages and MBSs, which they hold in their portfolios. To fund those holdings, they issue debt securities that they sell in the international capital markets.[3]

Despite having a unique legal status and a long history linking them closely to the federal government, Fannie Mae and Freddie Mac have been considered private firms owned by their shareholders. Now, however, the federal government controls both entities and is operating them to fulfill the public purpose of supporting the housing and mortgage markets.[4] Moreover, both entities rely on federal backing to maintain

---

1. Conservatorship is the legal process by which an entity (in this case, the government) establishes control and oversight of a company to put it in a sound and solvent condition.

2. Public Law 110-289.

3. A debt security (such as a bill, bond, or note) represents a fixed amount of money that has been borrowed and must be repaid, usually at a specific rate of interest.

4. For more information about the various ways in which the federal government helps the housing market, see Congressional Budget Office, *An Overview of Federal Support for Housing,* Issue Brief (November 3, 2009).

their low-cost access to financial markets. Although they are not legally government agencies, and their employees are not civil servants, CBO believes it is appropriate and useful to policymakers to include their financial transactions alongside all other federal activities in the budget.[5]

In the baseline budget projections it published in 2009, CBO accounted for the cost of the entities' operations in the federal budget as if they were being conducted by a federal agency. That is, CBO's baseline treated the mortgages owned or guaranteed by Fannie Mae and Freddie Mac as loans and loan guarantees of the federal government. For the entities' new loan and guarantee commitments, CBO projected budget outlays equal to the estimated subsidy inherent in the commitments at the time they are made. For the entities' outstanding loans and guarantees at the start of fiscal year 2009, CBO recorded a subsidy equal to the shortfall between the current value of the mortgages and the liabilities used to fund them at the time the baseline projections were prepared.

Using the budgetary treatment of the transactions of the Troubled Asset Relief Program as a model, CBO calculated the subsidies for Fannie Mae and Freddie Mac by estimating the net cash flows associated with the two entities' mortgage commitments and converting those estimates into present values using discount rates that reflect the expected rate of return the government could earn on investments or securities of comparable risk. That procedure is conceptually equivalent to the methods that private companies use to compute the fair value of certain assets and liabilities under generally accepted accounting principles.[6] For the two entities' administrative costs, such as employees' salaries, CBO estimated and recorded costs separately on a cash basis, in keeping with the federal budget's treatment of other credit programs.

The operations of Fannie Mae and Freddie Mac added $291 billion to CBO's August 2009 baseline estimate of the federal deficit for fiscal year 2009 and $99 billion to the total deficit projected for the 2010–2019 period.[7] The estimate for 2009 recognized expected losses from transactions originated before the conservatorship, plus an

---

5. The Administration's Office of Management and Budget makes the ultimate decision about whether Fannie Mae and Freddie Mac will be included in the federal budget. Although the President's budget documents have not included the activities of Fannie Mae and Freddie Mac in the budget totals, they have provided financial information about the two entities for several years; see, for example, *Budget of the U.S. Government, Fiscal Year 2010: Appendix*, pp. 1339–1340.

6. The fair value of an asset is the price that would be received from selling the asset in an orderly transaction between market participants at the measurement date; see Financial Accounting Standards Board, *Financial Accounting Standards No. 157: Fair Value Measurements* (September 2006), p. 2.

7. When this report was written, the most recent baseline projections were the ones issued in August 2009; see Congressional Budget Office, *The Budget and Economic Outlook: An Update* (August 2009), Table 1-1 and Box 1-1. CBO will publish new baseline projections for Fannie Mae and Freddie Mac in *The Budget and Economic Outlook: Fiscal Years 2010 to 2020,* to be released in late January 2010.

additional subsidy for new mortgage commitments in 2009. Because of their federal backing, Fannie Mae and Freddie Mac provide capital and guarantees to the mortgage market at lower prices than private financial institutions can offer, which ultimately transfers risk from the two entities to taxpayers. The subsidy recorded for the entities' mortgage commitments captures the value of that federal backing.

The Administration has taken a different approach to recording the impact of Fannie Mae and Freddie Mac on the federal budget. In conjunction with the conservatorship, the Treasury signed agreements with the two entities intended to ensure that they could continue to support the mortgage market. In exchange for making direct cash infusions into the entities, the Treasury received shares of their preferred stock and warrants to purchase their common stock. The Administration's Office of Management and Budget (OMB) continues to treat Fannie Mae and Freddie Mac as outside the budget, and it records and projects outlays equal to the amount of those cash infusions. As a result, the Administration has not included in its budget figures subsidy costs that would be directly comparable to CBO's $291 billion estimate of such costs in 2009. Instead, because the Treasury provided a total of $95.6 billion in cash outlays to the two entities in fiscal year 2009, the government's final report of spending for 2009 included that amount, which is similar to CBO's August 2009 estimate of cash infusions for that year ($112 billion).[8] OMB has estimated that cash outlays from the Treasury to the two entities will total another $65 billion over the 2010–2019 period.[9]

In contrast, because CBO has concluded that Fannie Mae and Freddie Mac should be treated in the federal budget as government entities, it considers transactions between them and the Treasury to be effectively intragovernmental payments, which do not affect net federal outlays. Adding those transactions to the subsidy costs that CBO has estimated for the entities would amount to double-counting.

Neither CBO nor OMB incorporates debt securities or mortgage-backed securities issued by Fannie Mae and Freddie Mac in estimates of federal debt held by the public. In budget documents, debt held by the public is defined narrowly as including only debt issued directly by the Treasury. Excluding the two entities' debt is consistent with the exclusion of other federal obligations, such as those of the Tennessee Valley Authority or commitments made under federal loan guarantee programs. Moreover, CBO's treatment of the entities' debt does not constitute a statement about whether or not that debt should be considered federal debt. Such a determination depends on how narrowly or broadly one interprets the concept of federal debt and for what purpose. Nevertheless, recent events clearly indicate a strengthening of the federal government's commitment to the obligations of Fannie Mae and Freddie Mac.

---

8. See Department of the Treasury, *Combined Statement of Receipts, Outlays, and Balances of the United States Government* (November 2009).

9. See *Budget of the U.S. Government, Fiscal Year 2010: Analytical Perspectives, Supplemental Materials,* Table 27-1.

Budget projections for the two entities are inherently uncertain. Some key factors—such as how sensitive mortgage default rates are to changes in house prices, or what discount rates apply to certain cash flows—are difficult to estimate precisely. In addition, such projections are likely to vary considerably over time as the prices of various mortgage-related securities fluctuate and as the two entities realize mortgage losses. Updates to CBO's estimates of subsidy costs will reflect any changes in discount rates and expectations about future mortgage losses, as well as possible refinements in the underlying methodology.

## Background to Federal Conservatorship for Fannie Mae and Freddie Mac

Fannie Mae and Freddie Mac were federally chartered four decades ago as private companies with a public mission to provide liquidity and stability to the secondary market for residential mortgages. Their activities are largely confined to providing guarantees against credit losses on pools of conforming mortgages (loans that conform to certain underwriting criteria) and maintaining an investment portfolio of mortgages and MBSs funded by selling debt securities to the public.[10] Through those activities, the two entities help maintain an active secondary mortgage market and thereby help improve lenders' access to financing to make new loans. Together, the mortgages guaranteed or owned by Fannie Mae and Freddie Mac total approximately $5 trillion and account for almost half of all outstanding residential mortgages.

Historically, their federal charters have allowed the two entities to borrow at interest rates lower than those paid by comparable finance companies without such a charter and close to those paid by the Treasury. Investors viewed the charters as an implicit federal guarantee of the entities' debt obligations, despite the government's assertions to the contrary.[11] Reinforcing that view, Fannie Mae and Freddie Mac were subject to less onerous capital requirements than other regulated financial institutions.[12] The lower borrowing costs enjoyed by the two entities flowed to participants in the housing market in the form of lower mortgage rates and to the entities' stockholders in the form of higher profits.

---

10. Credit losses in this case refer to the losses experienced by a holder of a mortgage or MBS when a borrower defaults.

11. For previous discussions of the entities' federal support, see Congressional Budget Office, *Federal Subsidies and the Housing GSEs* (May 2001), and the statement of Douglas Holtz-Eakin, Director, Congressional Budget Office, before the Senate Committee on Banking, Housing, and Urban Affairs, *Regulation of the Housing Government-Sponsored Enterprises* (October 23, 2003).

12. Under the federal conservatorship, capital requirements for Fannie Mae and Freddie Mac have been suspended. The injections of cash from the Treasury in exchange for senior preferred stock ensure that, on the basis of generally accepted accounting principles, the entities have sufficient assets to cover their liabilities.

The activities of Fannie Mae and Freddie Mac carry several risks. In their guarantee business and their investment portfolios, the entities incur losses when property owners default on mortgages.[13] Their mortgage portfolios also expose the entities to interest rate risk and prepayment risk—that is, the possibility of losses when fluctuating interest rates and prepayments of mortgages create a gap between the value of the entities' asset portfolios and the value of the debt used to fund them.

Following the housing bust that began in 2007, Fannie Mae and Freddie Mac experienced unprecedented losses on mortgages and MBSs. Initial losses came from their holdings of "private-label" securities—MBSs issued by private companies without government backing. The entities' shift toward buying risky private-label securities had begun in 2001, but their holdings swelled significantly after 2004, especially those of Freddie Mac.[14] Some of the mortgage loans underlying those securities were made to low-income households and thus helped the entities meet their affordable-housing goals.

In early 2008, Fannie Mae and Freddie Mac held approximately $200 billion in private-label securities backed by risky subprime and Alt-A mortgages.[15] Declines in the value of those securities accounted for most of the entities' losses through mid-2008. The private companies that issued subprime and Alt-A securities made those securities acceptable to Fannie Mae and Freddie Mac by creating structures that required other investors to take the first losses on the underlying mortgages.[16] The value of those securities plummeted, however, with the prospect that losses on the underlying mortgages would exceed the protection provided by such structures.

At the beginning of 2008, the two entities also directly held or guaranteed more than $500 billion worth of mortgages that were comparable in risk to mortgages typically designated as subprime or Alt-A loans. Large losses are expected on those mortgages as well, but because the mortgages are not held in the form of securities, the losses

---

13. Some of those losses are borne by third parties: for example, when private insurers bear some of the credit losses on individual mortgages or mortgage pools, or when either Fannie Mae or Freddie Mac holds securities issued by the Government National Mortgage Association (Ginnie Mae), a wholly owned government corporation.

14. See Office of Federal Housing Enterprise Oversight, *Report to Congress 2008* (April 15, 2008).

15. Subprime and Alt-A mortgages are extended to borrowers who do not meet the qualifications for a prime mortgage (one extended to the least risky borrowers) because of one or more risk factors, such as a low credit rating, insufficient documentation of income, or the ability to make only a small down payment. Typically, Alt-A mortgages are offered to borrowers who have high credit scores but no proof of income, whereas subprime loans are offered to borrowers who have low credit scores (with or without income verification).

16. For a discussion of those financial instruments and how they contributed to the financial crisis, see Markus K. Brunnermeier, "Deciphering the Liquidity and Credit Crunch, 2007–2008," *Journal of Economic Perspectives,* vol. 23, no. 1 (Winter 2009), pp. 77–100.

recorded so far have been smaller and recognized later than for the securities.[17] In addition, Fannie Mae and Freddie Mac have experienced unprecedented loss rates on their conforming mortgages because of the severity of the economic downturn.

## New Treasury Authority and Resulting Federal Actions

In response to turmoil in the housing and mortgage markets, the Housing and Economic Recovery Act of 2008 gave the Treasury the power to buy an unlimited amount of securities from Fannie Mae and Freddie Mac if the Treasury Secretary determined that "such actions are necessary to (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer."[18] The unlimited authority was designed to reassure investors that the federal government was committed to maintaining the solvency of the two entities.[19]

With Fannie Mae and Freddie Mac facing substantial losses that threatened their solvency, the Federal Housing Finance Agency placed them into conservatorship in September 2008, giving control of the entities to the federal government. The Treasury used its authority to write "keep-well" agreements with the entities in which the Treasury would provide up to $100 billion in capital to each institution.[20] Those agreements were recently amended to allow unlimited capital infusions over the next three years. The infusions of capital are made on a quarterly basis in an amount equal to the negative equity (the extent to which the value of liabilities exceeds the value of assets) that each entity reports on its balance sheet. In exchange, the entities give the Treasury senior preferred stock that pays annual dividends of 10 percent. As part of the September 2008 agreements, the Treasury was also granted $1 billion in preferred stock from both Fannie Mae and Freddie Mac as well as warrants entitling the government to 79.9 percent of each entity's common shares. As of December 2009, the Treasury had injected a total of $110.6 billion into the two entities (see Table 1).

## CBO's Budget Projections for Fannie Mae and Freddie Mac

Consistent with the principles expressed by the 1967 President's Commission on Budget Concepts, CBO has concluded that Fannie Mae and Freddie Mac should now

---

17. Under generally accepted accounting principles, companies report holdings of securities, but not loans and guarantees, on a fair-value basis. Companies recognize income or loss over time as they change their estimates of the value of securities with fluctuations in market prices. However, financial institutions are not required to report the value of loans and guarantees on a fair-value basis, which typically results in the recognition of only those losses that are imminent.

18. Public Law 110-289, section 1117.

19. That authority also applies to the Federal Home Loan Banks, but to date they have not received any assistance under it.

20. A keep-well agreement is a contract between a guarantor and a beneficiary in which the guarantor agrees to provide necessary financing to the beneficiary for a predetermined period in exchange for compensation, such as an ownership stake in the beneficiary. Such agreements are intended to make the beneficiary appear more creditworthy.

**Table 1.**

# The Treasury's Purchases of Preferred Stock from Fannie Mae and Freddie Mac Under the Conservatorship

(By calendar year, in billions of dollars)

| Reporting Period | Fannie Mae | Freddie Mac | Total |
|---|---|---|---|
| **2008** | | | |
| Third quarter | 0 | 13.8 | 13.8 |
| Fourth quarter | 15.2 | 30.8 | 46.0 |
| **2009** | | | |
| First quarter | 19.0 | 6.1 | 25.1 |
| Second quarter | 10.7 | 0 | 10.7 |
| Third quarter | 15.0 | 0 | 15.0 |
| **Total** | **59.9** | **50.7** | **110.6** |

Source:   Congressional Budget Office.

Note:   Fannie Mae and Federal Mac were placed in federal conservatorship on September 6, 2008. The Treasury's purchases of their senior preferred stock are intended to offset the two entities' reported losses by injecting cash to help them maintain sufficient capital. The actual cash injections occur in the quarter after the reporting period used to calculate them.

be included in the federal budget. The commission's landmark report asserted that "The federal budget should, as a general rule, be comprehensive of the full range of federal activities. Borderline entities and transactions should be included in the budget unless there are exceptionally persuasive reasons for exclusion."[21] The commission identified several key questions to use in determining whether to include programs in the budget: "Who owns the agency? Who supplies its capital? Who selects its managers? Do the Congress and the President have control over the agency's program and budget, or are the agency's policies the responsibility of the Congress or the President only in some broad ultimate sense?" The report recommended that "Government-sponsored enterprises be omitted from the budget when such enterprises are completely privately owned." CBO believes that the federal government's current financial and operational relationship with Fannie Mae and Freddie Mac warrants their inclusion in the budget.

Consequently, in the baseline budget projections that it published in 2009, CBO accounted for the costs of the two entities' operations as if they were being conducted by a federal agency. In that accounting, the mortgages owned or guaranteed by Fannie Mae and Freddie Mac were treated as loans and guarantees of the federal government. CBO estimated budget outlays for the new loan and guarantee commitments projected to be made each year; those outlays were estimates of the lifetime subsidy

---

21. President's Commission on Budget Concepts, *Report of the President's Commission on Budget Concepts* (October 1967), pp. 25, 30.

**Table 2.**

## Summary of CBO's August 2009 Baseline Budget Projections for Fannie Mae and Freddie Mac

(By fiscal year, in billions of dollars)

|  | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Subsidy Costs (Federal outlays)[a] | 291 [b] | 25 | 21 | 16 | 14 | 5 | 5 | 4 | 3 | 3 | 3 | 389 |
| Components of the Subsidy Estimate |  |  |  |  |  |  |  |  |  |  |  |  |
| Mortgage commitments | [b] | 1,175 | 1,097 | 889 | 890 | 940 | 1,083 | 1,118 | 1,147 | 1,172 | 1,234 | n.a. |
| Subsidy rate (Percent)[c] | 4.4 [b] | 1.9 | 1.5 | 1.2 | 1.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | n.a. |
| **Memorandum:** |  |  |  |  |  |  |  |  |  |  |  |  |
| Administrative Costs | 5 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 46 |
| Treasury Borrowing to Fund |  |  |  |  |  |  |  |  |  |  |  |  |
| Purchases of Preferred Stock[d] | 112 | 25 | 17 | 8 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 163 |

Source:   Congressional Budget Office.

Note:   n.a. = not applicable.

a.   Includes subsidies for aid to homeowners provided through the Administration's Making Home Affordable plan.

b.   Includes all mortgage commitments made before fiscal year 2009 and new commitments made in 2009. The estimated subsidy on the preexisting commitments was $248 billion on $5 trillion of outstanding mortgages. The subsidy on new commitments was $43 billion on $1.6 trillion of new mortgage commitments in 2009.

c.   The subsidy rate is equal to federal outlays (excluding outlays for the Making Home Affordable plan) divided by new mortgage commitments.

d.   The Treasury's actual purchases of senior preferred stock in fiscal year 2009 totaled $95.6 billion. The Treasury has already committed to $15 billion in purchases for 2010.

inherent in the loan or guarantee commitments for that year (see Table 2). In addition, CBO projected the entities' administrative costs and the incremental Treasury borrowing that will be needed to fund the Treasury's purchases of preferred stock. In those projections, CBO assumed that federal conservatorship of the two entities would continue throughout the 10-year baseline projection period (at that time, through fiscal year 2019).

In its August 2009 baseline, CBO projected that the operations of Fannie Mae and Freddie Mac would have a total budgetary cost of $389 billion between 2009 and 2019. (That cost includes subsidies for assistance to homeowners under the Administration's Making Home Affordable plan.)[22] The bulk of the outlays ($291 billion) were estimated to occur in 2009. That figure reflects the recognition of substantial losses on the entire outstanding stock of mortgages held or guaranteed by Fannie Mae and Freddie Mac at that time. It closely corresponds to the entities' own estimates of the deterioration in their fair-value net worth—from a surplus of $7 billion in June 2008 for the two entities combined to a deficit of $258 billion in June 2009. CBO's much smaller estimate of outlays for 2010 and beyond (a total of $99 billion over 10 years) captures the cost of new mortgage commitments in those years, when a more stable mortgage market is expected to help reduce subsidy costs.

Although it anticipates that the mortgage market will eventually normalize, CBO expects the federal government to continue subsidizing that market through Fannie Mae and Freddie Mac throughout the projection period. In other words, although the entities' fees and other income on new commitments may be sufficient to cover average losses on those commitments, they are not high enough to fully cover the cost of the risks associated with the commitments. Before the conservatorship, CBO and others recognized that such subsidies existed, but those subsidies were never included in federal budget estimates.[23]

CBO's treatment of the cost of the entities' mortgage loan commitments is similar, though not identical to, the budgetary treatment of federal credit programs required by the Federal Credit Reform Act of 1990. Under that law, the budget records a subsidy cost for the loan commitments made by every federal credit program each year, including programs that make loans directly or guarantee loans made by third parties. The subsidy calculation measures the lifetime cost of the loan or guarantee as of the year of disbursement and counts that cost as a federal outlay in that year. The total budgetary cost is computed by projecting all federal cash flows associated with a cohort of loans or guarantees and discounting those cash flows to the year of

---

22. For information about that plan, see Congressional Budget Office, *The Budget and Economic Outlook: An Update,* Appendix B, Table B-3.

23. See Congressional Budget Office, *Federal Subsidies and the Housing GSEs*; and S. Wayne Passmore, *The GSE Implicit Subsidy and the Value of Government Ambiguity,* Finance and Economics Discussion Series Working Paper No. 2005-05 (Board of Governors of the Federal Reserve, January 2005), available at *www.federalreserve.gov/pubs/feds/2005/index.html*.

disbursement by applying discount rates that correspond to the interest rates on Treasury securities of comparable maturity. The direct federal administrative costs of those programs are generally excluded from the subsidy estimates and accounted for separately on a cash basis.

In the case of Fannie Mae's and Freddie Mac's mortgage commitments, CBO departs from that credit reform accounting by replacing the Treasury discount rates with discount rates that measure the cost of the risk inherent in those entities' credit obligations. In that approach, the budgetary cost is a "fair-value" estimate that measures what a private entity would need to be paid to voluntarily take on the commitments of Fannie Mae and Freddie Mac without any federal backing. Using such discount rates produces a broader measure of the cost of supporting the entities because it attaches a price to the cost of bearing the risk from the entities' losses. A similar approach is required by law to be used in estimating subsidies for the Troubled Assets Relief Program (it was also required by law to be used in estimating the cost of increasing the U.S. quota in the International Monetary Fund).[24]

CBO's estimate of subsidy costs for 2009 included a one-time charge for the shortfall between the value of the entities' assets and liabilities at the start of the conservatorship.[25] That one-time charge, $248 billion, accounted for more than 80 percent of the 2009 subsidy estimate; the rest, $43 billion, was the subsidy cost for new business conducted in 2009. CBO used slightly different methods to estimate the entities' existing and new commitments.

### Estimating Subsidy Costs for Existing Business

The subsidy cost for the entities' existing business at the beginning of the conservatorship is the difference between the values of their assets and their obligations (debt and other private claims on the entities' assets, including the value of any shareholder equity).[26] CBO used different methods to estimate that cost for different types of obligations. For the entities' preexisting credit obligations—mortgages they held directly or guaranteed—CBO estimated subsidy costs using an adjusted credit reform treatment, as described below. For the entities' other preexisting obligations—including holdings of private-label securities, financial-derivatives obligations, holdings of their

---

24. See section 123 of the Emergency Economic Stabilization Act of 2008 (part of Public Law 110-343) and title IV of the Supplemental Appropriations Act of 2009 (P.L. 111-32). In addition, CBO estimated the costs of a bill dealing with student loans on a fair-value basis; see Congressional Budget Office, *letter to the Honorable Judd Gregg on the subsidy costs of direct and guaranteed student loans* (July 27, 2009).

25. For reasons explained later in the paper, CBO did not attempt to make separate estimates of subsidies for future transactions involving those assets and liabilities.

26. Since the conservatorship, the claims of private shareholders have been reduced to negligible value, which simply leaves the difference between the value of assets and liabilities (net worth) as a claim held by taxpayers.

own and other federally backed MBSs, and the debt used to fund those obligations—CBO relied on the entities' own fair-value disclosures to estimate subsidy costs.[27]

CBO did not rely on fair-value disclosures to estimate the cost of assuming the entities' existing mortgage credit obligations because, in CBO's view, those disclosures systematically understate subsidy costs. The difference arises primarily because the entities assume that the prices they charge for assuming credit and other risk when they purchase mortgages represent fair values, whereas CBO believes that because of the entities' perceived government backing (whether implicit before the conservatorship or more explicit now), they purchase mortgages at above-market prices and thereby subsidize the mortgage market. That difference is most apparent for credit guarantees, where the fees charged by Fannie Mae and Freddie Mac are below those offered by private financial institutions. The resources to provide such subsidies arise from the entities' federal backing, which lowers their borrowing costs relative to those of private financial institutions exposed to similar investment risks.

CBO's estimate of the subsidy on the entities' existing mortgage credit obligations is based on the difference between the value of conforming MBSs, which includes the value of the credit guarantee, and the value of the pool of conforming mortgages underlying those MBSs, which have no credit guarantee.[28] CBO estimated the values of the MBSs and the underlying mortgages in two steps: first projecting their expected cash flows and then discounting the cash flows to present values using discount rates that capture their respective risk exposures.

To project cash flows associated with the MBSs and the underlying loan pools, CBO used standard empirical models of mortgage prepayments and defaults, calibrated to match current and projected market conditions.[29] In those models, given an initial set of characteristics about the mortgages, subsequent changes in the rate of prepayment are strongly influenced by prevailing interest rates, and an increase in the likelihood of mortgage default is largely driven by declining house prices. Combining CBO's projections of interest rates and house prices with estimates from the empirical literature of how sensitive prepayment and default rates are to changes in house prices and

---

27. A financial derivative is a financial instrument, such as an option or futures contract, whose value depends in part on the value and characteristics of an underlying asset, such as a stock, bond, or commodity.

28. CBO's methodology treats the exposures to credit losses on whole loans and loan guarantees equivalently.

29. See, for example, Yongheng Deng, John M. Quigley, and Robert van Order, "Mortgage Terminations, Heterogeneity, and the Exercise of Mortgage Options," *Econometrica,* vol. 68, no. 2 (2000); Michelle A. Danis and Anthony N. Pennington-Cross, *The Delinquency of Subprime Mortgages,* Working Paper No. 2005-022A (Federal Reserve Bank of St. Louis, March 2005), available at *http://ssrn.com/abstract=761804*; and Shane M. Sherlund, *The Past, Present, and Future of Subprime Mortgages,* Finance and Economics Discussion Series Working Paper No. 2008-63 (Board of Governors of the Federal Reserve, December 2008), available at *www.federalreserve.gov/pubs/feds/2008/index.html.*

interest rates allowed CBO to forecast mortgage cash flows for representative groups of the two entities' MBSs and mortgage pools. (For more details about that method, see the Appendix.) The projected cash flows of the MBSs mimic those of the underlying mortgage pools, with two exceptions: MBS holders do not suffer the losses experienced by the holders of a mortgage pool when borrowers default, and the cash flow of the mortgage pool includes the guarantee fees charged by the entities, which are not paid to MBS holders.

To discount the cash flows associated with the MBSs and mortgage pools, CBO applied different discount rates to account for the differing risks of those cash flows. Investing in either a loan pool or an MBS is riskier than investing in Treasury securities; hence, investors would require a risk premium—that is, a higher rate of return on the riskier investments than they could earn on Treasury securities. The mortgage pools in turn are riskier than the MBSs because the holders of a mortgage pool risk credit losses. The holders of MBSs are protected through the entities' guarantees from both the expected value of credit losses and the variability of potential losses. Thus, besides being compensated for expected credit losses, holders of a mortgage pool should demand a higher rate of return than that earned on the MBSs. The estimates of the required rates of return on the MBSs and mortgage pools are used to discount the corresponding cash flows. (A more detailed discussion of CBO's estimate of discount rates can be found in the Appendix.)

### Estimating Subsidy Costs for New Business

CBO projected the subsidy costs for Fannie Mae's and Freddie Mac's new mortgage purchases and guarantee commitments using a methodology similar to that used for the entities' existing business. The amount of new business projected for each year was based on CBO's forecast of total mortgage originations (which depended on its forecasts of interest rates and housing market conditions) and on the share of total originations expected to be held or guaranteed by the two entities. CBO then converted those cash flow projections into subsidies by discounting the relevant cash flows (including the guarantee fee income that the entities received and the guarantee claim payments that they made). The discount rates were estimated in the same way as for existing business, except that they were based on CBO's projections of interest rates and risk premiums at the time of the disbursements rather than on the 2009 values used for existing business. CBO assumed that in 2010, risk premiums would start to decline toward their historical averages.

For the two entities' guarantee business, CBO estimated that income from guarantee fees would remain a stable proportion of the dollar amount of the entities' outstanding guaranteed mortgages. CBO also projected that the entities would guarantee an increasing share of the mortgage market until the end of 2010 (about 60 percent), after which their share would gradually decline to the historical level (approximately 40 percent). In CBO's August 2009 economic forecast, the housing market begins to recover after 2010, at which time interest rates on nonconforming mortgages are expected to decline and the percentage of mortgages that are nonconforming is

expected to increase (though not completely to the precrisis percentage). CBO expects that in coming years, Fannie Mae and Freddie Mac will acquire or guarantee very few, if any, mortgages as risky as the subprime and Alt-A loans and securities in their current portfolios because of tighter underwriting standards.

Federal conservatorship has caused a shift in the recipients of the subsidy provided by the entities' federal backing. On one hand, the conservatorship has resulted in an increase in the subsidy provided to the mortgage market. The entities' guarantee fees as a percentage of outstanding mortgages have changed little from the levels seen before the crisis in the mortgage market, despite the higher risk of losses, and the entities are expected to continue to guarantee a large share of that market.

On the other hand, by giving the federal government a complete claim to the equity of Fannie Mae and Freddie Mac, the conservatorship has eliminated a source of profit to shareholders that had been associated with the entities' portfolio-funding strategy. The values of the entities' portfolio holdings of mortgages and MBSs have different sensitivities to interest rates than the debt and other liabilities used to fund them, which exposes the entities to potential losses. In exchange for bearing that risk, the entities earn additional income (a risk premium). Historically, shareholders received a disproportionate share of that risk premium because taxpayers were not compensated for their exposure to portfolio-related risks that stemmed from the entities' federal backing. That subsidy from taxpayers to shareholders has been significantly reduced because the government now has first claim to almost any amount of earnings on the entities' portfolios, which partially compensates for the risk of future losses.

CBO's estimates of the costs of new commitments do not include some sources of subsidy that are unrelated to the two entities' guarantee business. For instance, on mortgages held in their portfolios, a subsidy cost could arise if the entities overpaid for mortgages relative to the prepayment risk they assumed, or if they overpaid for derivatives used to hedge against interest rate risk and prepayment risk.

**Comparison with Cash Budgetary Treatment**
The Office of Management and Budget considers Fannie Mae and Freddie Mac to be nongovernmental entities for federal budgeting purposes. Consequently, OMB records the Treasury's cash infusions to the two entities as outlays in the budget. In fiscal year 2009, the budget recorded $95.6 billion in such outlays. OMB projects additional cash infusions totaling $65 billion between 2010 and 2019. If CBO adopted a similar cash treatment, its estimate of outlays for payments to the two entities would total about $51 billion over the 2010–2019 period (the sum of the estimated cash infusions for that period shown at the bottom of Table 2). The difference between those $65 billion and $51 billion cash estimates stems from differing assumptions and modeling choices.

CBO projected the cash infusions using estimates of the shortfall between the forecast value of the entities' assets and liabilities calculated according to generally accepted

accounting principles (GAAP). In CBO's projections, most of the infusions are expected to occur over the next few years, which reflects CBO's forecasts for the overall economy, financial markets, and mortgage markets. As the housing and mortgage markets recover, Fannie Mae and Freddie Mac are expected to generate revenues greater than their losses and other costs. However, in CBO's estimation, the two entities' current dividend commitments to the Treasury exceed their future earnings capacity, making losses on the Treasury's current and future holdings of their senior preferred stock likely.

The total amount that CBO projected for the Treasury's cash infusions from 2009 to 2019—$163 billion—falls well short of the $389 billion in subsidy outlays projected in CBO's baseline for that period. As an approximation, one can think of the infusion estimates as capturing only the expected cash shortfalls between the entities' fees and losses. The subsidy estimates, in comparison, incorporate both the expected cash shortfalls and the risk premium that a private investor would demand for bearing the risk that those shortfalls could be much larger than expected.

CBO projected that the entities' portfolio holdings would have a significant positive impact on their GAAP balance sheets (which would reduce the required cash infusions from the Treasury). The mismatch between the rates paid on those portfolio holdings and the debt used to fund them is expected to generate positive net income, which is attributable to the entities' federal backing.

Two key assumptions underlie the portfolio projections: that guarantee fees will hold steady at current rates, and that the combined portfolio holdings of Fannie Mae and Freddie Mac will remain at about $1.5 trillion until the end of fiscal year 2010 and then gradually decline, as the entities' agreements with the Treasury require. New purchases are assumed to be confined to conforming mortgages and to MBSs issued by the two entities or by Ginnie Mae, rather than subprime or Alt-A securities. CBO assumed that subprime and Alt-A mortgages that terminate early would default, be refinanced privately, or be refinanced through the Federal Housing Administration.

# Appendix:
# Projecting Mortgage Cash Flows and Valuing Mortgage Guarantees

The model that the Congressional Budget Office (CBO) uses to estimate the value of Fannie Mae's and Freddie Mac's exposure to losses on their mortgage credit business proceeds in several steps. First, CBO estimates the cash flows associated with the two entities' mortgage pools and mortgage-backed securities (MBSs). Those cash flows depend on changes in interest rates and house prices. Second, to establish the subsidy for each cohort of mortgages, CBO computes the net present value of those cash flows using discount rates that reflect the risk inherent in the flows. The subsidy for the pool of mortgage guarantees is the present value of the net losses to the entities, which is equal to the difference between the present values of the MBSs held by investors and of the mortgage pools held in trust by the entities. To the extent possible, CBO tries to calibrate its estimates of certain variables (such as mortgage loss rates and the value of assets and liabilities related to a guarantee) to estimates reported by the entities themselves.

The estimated subsidy costs in CBO's August 2009 baseline projections were computed using a simplified version of the model presented in this appendix. In the full model, cash flows are simulated with a series of equations that include fluctuating interest rates and house prices—variables that have been shown to be key drivers of mortgage cash flows. Accounting for the effect of those variables can be crucial in estimating the costs of certain policy proposals. In describing CBO's modeling methods, this appendix alerts readers to the aspects of the model that were simplified for the baseline estimates.

## Simulating Cash Flows in the Mortgage Portfolio

For Fannie Mae's and Freddie Mac's existing business at the time the baseline is prepared, CBO's model divides the entities' mortgage book into representative pools of mortgages by year of origination and loan type and projects baseline default and prepayment rates for each pool using simulations.[1] For the purposes of CBO's baseline calculations, the projected default rate for each pool takes into account the hump-shaped pattern of default typically experienced over the life of a mortgage cohort, the

---

1. The mortgage book consists of all mortgages directly held or guaranteed by the entities for which the entities bear the costs when borrowers default. The book does not include mortgages held indirectly through privately issued securities. For those securities, CBO relied on the entities' reported fair-value estimates.

experience with losses to date, a forecast of aggregate changes in house prices, and estimates of how sensitive default rates are to changes in those prices. The projected prepayment rate varies over time with CBO's forecast of interest rates. For new mortgages, CBO uses the same procedure but replaces actual levels of macroeconomic variables and mortgage characteristics with forecasts to determine the initial conditions and evolution of the simulation.

A mortgage pool is described by the type of loan (prime, Alt-A or exotic, or subprime), its vintage, the current loan-to-value ratio, and the amount of third-party mortgage insurance. Those features determine the expected path of cash flows over the remaining life of the loans, and simulations result in a distribution of paths around the expected one. Given a dollar amount of loan principal outstanding at the valuation date, $L_0$, and a remaining loan term of $n$ periods, the remaining outstanding principal evolves according to the following formula:

$$L_t = (1 + r_{t-1})(1 - d_t - p_t)L_{t-1} - R_t, \qquad t = 1,\ldots,n \qquad (1)$$

where $t$ is the time elapsed since the valuation date, $r_t$ is the mortgage interest rate (which may vary over time), $d_t$ is the fraction of loans between $t-1$ and $t$ that enter default, $p_t$ is the fraction of loans that are prepaid between $t-1$ and $t$, and $R_t$ is the scheduled repayment at the start of period $t$. Repayments follow a standard amortization schedule based on a representative maturity:

$$R_t = \frac{r_{t-1}(1 - d_t - p_t)L_{t-1}}{1 - (1 + r_{t-1})^{t-n}} \qquad (2)$$

In principle, $r_t$, $d_t$, and $p_t$ could be randomly determined quantities that fluctuate from period to period. However, to simplify the calculations for the purposes of the baseline, CBO used deterministic interest rates and set deterministic time paths for prepayment (although both were adjusted for CBO's forecast of interest rates, which allows for the possibility that prepayment rates will vary by time and mortgage cohort).

## Default Rates
For this analysis, default is defined as an event that causes Fannie Mae or Freddie Mac to suffer a loss on a mortgage it holds directly or to pay a claim on a mortgage it guarantees. In the full version of CBO's model, conditional default rates in year $t$ are specified as

$$d_t = 1 - (1 - d_{bt})^{\exp(\delta_0 + \delta_{SHORT}\Delta r_{St} + \delta_{LONG}\Delta r_{Lt} + \delta_{LTV}\Delta LTV_t)} \qquad (3)$$

The baseline default rate ($d_{bt}$) exhibits a hump-shaped pattern with the peak at about five years, which is derived from historical patterns of mortgage defaults. That baseline rate is adjusted for the characteristics of the mortgage pool and information conveyed by default experience to date ($\delta_0$), as well as for deviations of interest rates

(short-term rate $\Delta r_{St}$ and long-term rate $\Delta r_{Lt}$) and of loan-to-value ratios ($\Delta LTV_t$) from their trend paths. Empirically, the sensitivity to changes in loan-to-value ratios is by far the most important of the time-varying factors that determine default rates. Consequently, only that factor has been included in CBO's baseline projections. Changes in interest rates and unemployment have been shown to play some role in default rates, but neither is included in the baseline calculations.[2]

The current loan-to-value ratio, which affects the borrower's prepayment and default rates, is defined as

$$LTV_t = \frac{L_t}{h_t} \tag{4}$$

To simulate the path of house prices ($h_t$), CBO drew annual random shocks from a simple random-walk model of house prices, with the central drift tied to CBO's forecast of house prices and assumptions about aggregate and idiosyncratic volatility. That is,

$$h_{t+1} = h_t(1 + a_{t+1} + E_{t+1} + e_{t+1}) \tag{5}$$

where $h_{t+1}$ is next year's house price, $h_t$ is the current year's house price, $a_{t+1}$ is the forecast for growth in house prices between $t$ and $t+1$, $E_{t+1}$ is the aggregate shock to the house price index, and $e_{t+1}$ is the idiosyncratic shock to individual house prices that captures the price volatility for a representative home in the loan pool. The two shocks are independent random draws from normal distributions that have means of zero and fixed standard deviations.

## Losses on Defaulted Loans

When a default occurs, the loss to Fannie Mae or Freddie Mac equals the shortfall between the unpaid balance of the mortgage and the value of the house, after taking into account recovery costs and receipts from third-party insurance. Historically, the entities have reported loss rates in the range of 30 percent to 50 percent of the outstanding loan balance. Loss rates are likely to be higher, however, when the housing market is in decline. To capture the impact of a decline in house prices, CBO assumed that the amount the entities' would recover on a defaulted mortgage would be a fixed fraction of the appraised value of the house plus receipts from insurance.[3]

---

2. Although unemployment does not enter CBO's simulation model directly, its effects are implicit in the baseline adjustment ($\delta_0$), interest rates, and house prices (because interest rates and house prices are generally low when unemployment is high). In principle, other time-varying factors could be included in the specification of default and prepayment rates given sufficient data or other evidence from which to reliably estimate sensitivity parameters.

3. CBO used a representative interest rate from loans over the historical period, and it did not try to model any effect that changing interest rates might have on credit losses.

The entities partially protect themselves from losses by requiring borrowers who do not make a 20 percent down payment to take out mortgage insurance with third-party insurers. For example, a borrower with a 10 percent down payment might be required to hold mortgage insurance for 15 percent of the property amount, reducing the entities' exposure to losses to 75 percent of the amount borrowed.

Each period, the net loss to the entities is thus

$$d_t\{L_{t-1}(1 + r_t) - [L_{t-1}(1 + r_t)i_t + \alpha_t h_t]\} \tag{6}$$

That is, of the fraction of loans that default each period, the entities pay the outstanding amount to the MBS holder $[L_{t-1}(1 + r_t)]$, recoup an insured amount from the third-party insurer $[L_{t-1}(1 + r_t)i_t$, where $i_t$ is the fraction insured$]$, and recover a stream of payments whose present value is a fraction of the value of the house ($\alpha_t h_t$, where $\alpha_t$ is the fraction recovered).

## Prepayment Rates

In the full model, simulated prepayment rates for each segment of the entities' books obey the following equation:

$$p_t = 1 - (1 - p_{bt})^{\exp(\beta_0 + \beta_{SHORT}\Delta r_{St} + \beta_{LONG}\Delta r_{Lt} + \beta_{LTV}\Delta LTV_t)} \tag{7}$$

That is, the rate of prepayment fluctuates around a baseline rate, $p_{bt}$, with an adjustment for the characteristics of the loan pool and its experience to the valuation date ($\beta_0$) and deviations driven by changes in short- and long-term interest rates or the current loan-to-value ratio away from their trend levels. The base conditional prepayment rate, $p_{bt}$, steadily rises with the age of the loan, reaching a plateau after five years, which is consistent with past studies of mortgage performance.

Although not included for CBO's baseline projections, the model can also incorporate the sensitivity of prepayment rates to interest rates and changes in property values. Previous empirical research has found that prepayment rates depend on interest rates.[4] A borrower has a strong incentive to refinance a loan if the refinance rate is sufficiently lower than the current contract interest rate.[5] That difference is captured by the pair of interest rates in the specification: the long-term rate ($r_{Lt}$) and the short-term rate ($r_{St}$), which are described below. Another finding is that prepayment rates decline with an increase in the current loan-to-value ratio ($LTV_t$). That outcome may

---

4.  See, for example, Eduardo S. Schwartz and Walter N. Torous, "Prepayment and the Valuation of Mortgage-Backed Securities," *Journal of Finance*, vol. 44, no. 2 (June 1989), pp. 375–392; and Yongheng Deng, John M. Quigley, and Robert van Order, "Mortgage Terminations, Heterogeneity, and the Exercise of Mortgage Options," *Econometrica*, vol. 68, no. 2 (March 2000), pp. 275–307.

5.  The decision to refinance can be less straightforward when variable-rate and fixed-rate mortgages are being compared.

reflect reduced opportunities to refinance a mortgage when the loan amount is close to or greater than the value of the home.

For its baseline projections, CBO did not use the full specification of the model; instead, it simply selected prepayment rates that reflected current market conditions. Mortgages originated before the housing downturn are expected to be prepaid at a slightly faster rate than seen in the past, whereas mortgages originated after the start of the downturn are expected to be prepaid at slower rates because borrowers are locking in historically low interest rates now. Note that for the purposes of valuing mortgage guarantees, precisely modeling prepayment is of secondary importance because the value of the guarantee is most sensitive to changes in default rates and assumptions about losses.

### Simulated Interest Rates and Discounting

For the baseline projections, interest rates ($r_t$, $r_{St}$, or $r_{Lt}$) in each period of the model are tied to CBO's forecasts of short- and long-term interest rates. In the full version of the model, interest rates can fluctuate randomly up or down. The projected or simulated interest rates are used to discount risk-free nominal cash flows of various maturities, such as the cash flows from Treasury securities. For cash flows affected by risk, such as the risk of default or prepayment, a premium is added (as explained at the end of this appendix). The mortgage contract rate is estimated from current and past relationships between mortgage interest rates and rates on Treasury securities.

## Valuing the Subsidy

In principle, the value of the federal subsidy for Fannie Mae's and Freddie Mac's MBS guarantees could be calculated as the net present value of the entities' gains or losses on those guarantees in each period. Obtaining the appropriate discount rate for those net gains or losses is difficult, however. There is no single traded asset whose cash flows mimic those of the entities' guarantees. Instead, the value of the subsidy for each guarantee is calculated from the difference between the values of the MBS and the underlying mortgage pool. Rates can be more readily established for each of those assets.

After Fannie Mae and Freddie Mac have packaged and sold MBSs, their remaining financial exposure—and therefore the subsidy provided by the federal government in covering net losses—exists through the MBS guarantees. As guarantor, the two entities ensure that MBS holders receive timely payment of principal and interest on the underlying mortgages. Thus, the value of the subsidy can be computed as the difference between the present value of the payments to MBS holders and the present value of payments from the underlying pool of mortgages. CBO uses the separate estimates of discount rates for MBS payments and for pool payments and applies them to the respective payment streams.

The stream of payments from the mortgage pool (net of various third-party servicing fees) is

$$R_{POOL,1}, R_{POOL,2}, R_{POOL,3}, \ldots \qquad (8)$$

Suppose the MBS payment stream is

$$R_{MBS,1}, R_{MBS,2}, R_{MBS,3}, \ldots \qquad (9)$$

When a borrower defaults, the entities remove that mortgage from the pool and pay the MBS holder the outstanding amount. Thus, in each period, the difference between the MBS payments and the payments from the pool (net of various fees and insurance payments) equals the losses incurred by the entities:

$$R_{MBS,t} = R_{POOL,t} + d_t\{L_{t-1}(1+r_t) - [L_{t-1}(1+r_t)i_t + \alpha_t h_t]\} \qquad (10)$$

Note that CBO made additional adjustments to those cash flows for guarantee fees, third-party insurance premiums, and other payments.

## Estimating Discount Rates

Because the loan-pool payments are risky, it is not appropriate simply to discount them using the risk-free discount rates from the interest rate simulation model. Instead, CBO values the cash flow stream in two pieces: the discounted value of the MBS payment stream minus the discounted value of the payment stream from the mortgage pool. The discount rate used for the MBS payment stream comes from the interest rate simulation, with an additional premium: the add-on required to equate the market price of the MBSs with the simulated net present value (when averaged across interest rate, prepayment, and default scenarios) of the stream of MBS payments. That premium reflects risks, or other MBS pricing anomalies, that could not be captured in the simulation model. Historically, the premium has ranged from a few hundredths of a percentage point at certain times to several percentage points at the height of the recent financial crisis.

The mortgage-pool payment stream has an additional exposure to market risk because of volatility in the size of mortgage losses. MBS investors face minimal credit risks; hence, a lower discount rate applies to the MBS payments. (That discount rate will be lower to the extent that the entities have capital to cushion losses or, failing that, investors have faith in the entities' federal backing.)

CBO used an estimate of the difference (or spread) between interest rates on jumbo and conforming mortgages as a proxy for the extra risk premium that would be required by an investor in the underlying mortgage pool. Fannie Mae and Freddie Mac purchase and securitize conforming mortgages from private lenders, but lenders must rely on private arrangements to fund jumbo mortgages (which exceed the size

limit on conforming mortgages). Thus, a major driver of the difference between interest rates on jumbo and conforming mortgages is the funding advantage of the two entities. However, other differences between jumbo and conforming loans that affect the interest rate spread must be accounted for, such as differing borrower characteristics, underwriting standards, and geographic concentrations.[6] In adjusting for those differences, CBO relied on the work of staff economists at the Federal Reserve Board whose findings suggest that approximately half of the mortgage rate spread has been attributable to factors other than the entities' funding advantage.[7]

The spread between conforming and jumbo rates averaged about 30 basis points (0.30 percentage points) from 2000 to 2007 (see Figure A-1). Since the onset of the financial crisis, however, the spread has been much greater, peaking at 180 basis points. That increase reflects the market risk of losses faced by holders of non-conforming mortgages. For the baseline projections published in January, March, and August 2009, CBO used the observed spread in January 2009, adjusted downward to account for differences between jumbo and conforming mortgages that are not related to the funding advantage of Fannie Mae and Freddie Mac. By November 2009, the jumbo-conforming spread had fallen from its peak to about 100 basis points.

For the entities' existing mortgages, CBO applied a risk premium of 70 basis points to all outstanding loans, regardless of their characteristics. For new mortgage commitments, CBO used its forecast of the adjusted spread in the year of the commitment. Those projected spreads are generally lower than the current spread, reflecting CBO's expectation that mortgage markets, interest rates, and spreads will gradually return to historical levels.

The choice of an appropriate risk premium for each mortgage pool is a critical input in CBO's valuation model. The estimate of the risk premium has varied considerably over time and is currently very high relative to past trends. Moreover, the methods used to disentangle the federal subsidy from other factors that drive the jumbo-

---

6. A further complication is that during the conservatorship, Fannie Mae and Freddie Mac may be directed to charge fees that are lower than they would charge otherwise. That would result in a larger jumbo-conforming spread, but the cost would already be accounted for in the entities' cash flows and should not count toward the risk premium. In the other direction, the jumbo-conforming spread may not be a complete measure of the federal subsidy because the jumbo market is indirectly subsidized through the federal benefits that commercial banks receive, such as deposit insurance. See, for example, Anthony B. Sanders, *Measuring the Benefits of Fannie Mae and Freddie Mac to Consumers: Between De Minimis and Small?* Wharton Financial Institutions Working Paper No. 05-36 (Philadelphia: University of Pennsylvania, July 2005), available at http://fic.wharton.upenn.edu/fic/papers/05/p0536.html.

7. See Wayne Passmore, Shane M. Sherlund, and Gillian Burgess, *The Effect of Housing Government-Sponsored Enterprises on Mortgage Rates,* Finance and Economics Discussion Series Working Paper No. 2005-06 (Board of Governors of the Federal Reserve, January 2005); and Shane M. Sherlund, *The Jumbo-Conforming Spread: A Semiparametric Approach,* Finance and Economics Discussion Series Working Paper No. 2008-1 (Board of Governors of the Federal Reserve, January 2008), both available at www.federalreserve.gov/pubs/feds/index.html.

**Figure A-1.**

## Spread Between Interest Rates on Jumbo and Conforming Mortgages

(Percentage points)



Source:    Congressional Budget Office based on data from Bloomberg L.P.

Note:    Conforming mortgages are loans eligible for sale to Fannie Mae or Freddie Mac because the original mortgage amount does not exceed an annually adjusted dollar limit (in much of the United States, $417,000 for a single-family home in 2009). Jumbo mortgages are loans that exceed the dollar limit for conforming mortgages.

conforming spread introduce another source of uncertainty. If, instead of 70 basis points, the risk premium was 50 basis points higher (or lower), the subsidy for the entities' existing business would be approximately $70 billion higher (or lower) than the $290 billion in CBO's August 2009 baseline. CBO continues to evaluate its projections of the risk premium and the methods used to compute them.

Table of Contents

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-Q

☑   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2012**

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission File No.: 0 50231**

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(202) 752-7000**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S T (§ 232 405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non accelerated filer, or a smaller reporting company  See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule  2b 2 of the Exchange Act

Large accelerated filer ☐          Accelerated filer ☑          Non accelerated filer ☐          Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b 2 of the Exchange Act)   Yes ☐   No ☑

As of March 31, 2012, there were 1,158,069,699 shares of common stock of the registrant outstanding.

# TABLE OF CONTENTS

**Part I    Financial Information**                                                                                                          1

Item            Financial Statements
                Condensed Consolidated Balance Sheets                                                                                        84
                Condensed Consolidated Statements of Operations and Comprehensive Income (Loss)                                              85
                Condensed Consolidated Statements of Cash Flows                                                                              86
                Note 1    Summary of Significant Accounting Policies                                                                         87
                Note 2    Consolidations and Transfers of Financial Assets                                                                   91
                Note 3    Mortgage Loans                                                                                                      94
                Note 4    Allowance for Loan Losses                                                                                          101
                Note 5    Investments in Securities                                                                                          105
                Note 6    Financial Guarantees                                                                                               112
                Note 7    Acquired Property, Net                                                                                              115
                Note 8    Short Term Borrowings and Long Term Debt                                                                           116
                Note 9    Derivative Instruments                                                                                             117
                Note  0    Segment Reporting                                                                                                 121
                Note 11    Concentrations of Credit Risk                                                                                      124
                Note 12    Fair Value                                                                                                         125
                Note 13    Commitments and Contingencies                                                                                      151
Item 2          Management's Discussion and Analysis of Financial Condition and Results of Operations                                         1
                Introduction                                                                                                                  1
                Executive Summary                                                                                                             1
                Legislative and Regulatory Developments                                                                                      12
                Critical Accounting Policies and Estimates                                                                                    16
                Consolidated Results of Operations                                                                                            17
                Business Segment Results                                                                                                       28
                Consolidated Balance Sheet Analysis                                                                                            36
                Supplemental Non GAAP Information    Fair Value Balance Sheets                                                                 40
                Liquidity and Capital Management                                                                                               44
                Off Balance Sheet Arrangements                                                                                                 52
                Risk Management                                                                                                                52
                Forward Looking Statements                                                                                                     79
Item 3          Quantitative and Qualitative Disclosures about Market Risk                                                                    155
Item 4          Controls and Procedures                                                                                                       155
**PART II    Other Information**                                                                                                             158
Item            Legal Proceedings                                                                                                             158
Item  A         Risk Factors                                                                                                                  159
Item 2          Unregistered Sales of Equity Securities and Use of Proceeds                                                                   163
Item 3          Defaults Upon Senior Securities                                                                                               165
Item 4          Mine Safety Disclosures                                                                                                       165
Item 5          Other Information                                                                                                             165
Item 6          Exhibits                                                                                                                      165

i

Table of Contents

# MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| 1 | Treasury Draws and Dividend Payments | 4 |
| 2 | Selected Credit Characteristics of Single Family Conventional Loans Held, by Acquisition Period | 6 |
| 3 | Credit Statistics, Single Family Guaranty Book of Business | 8 |
| 4 | Level 3 Recurring Financial Assets at Fair Value | 17 |
| 5 | Summary of Condensed Consolidated Results of Operations | 18 |
| 6 | Analysis of Net Interest Income and Yield | 19 |
| 7 | Rate/Volume Analysis of Changes in Net Interest Income | 20 |
| 8 | Impact of Nonaccrual Loans on Net Interest Income | 21 |
| 9 | Fair Value Gains, Net | 21 |
| 0 | Total Loss Reserves | 23 |
| 11 | Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves) | 24 |
| 12 | Nonperforming Single Family and Multifamily Loans | 26 |
| 3 | Credit Loss Performance Metrics | 27 |
| 4 | Single Family Credit Loss Sensitivity | 28 |
| 15 | Single Family Business Results | 29 |
| 16 | Multifamily Business Results | 30 |
| 17 | Capital Markets Group Results | 32 |
| 18 | Capital Markets Group's Mortgage Portfolio Activity | 34 |
| 19 | Capital Markets Group's Mortgage Portfolio Composition | 35 |
| 20 | Summary of Condensed Consolidated Balance Sheets | 36 |
| 21 | Summary of Mortgage Related Securities at Fair Value | 37 |
| 22 | Analysis of Losses on Alt A and Subprime Private Label Mortgage Related Securities | 38 |
| 23 | Credit Statistics of Loans Underlying Alt A and Subprime Private Label Mortgage Related Securities (Including Wraps) | 39 |
| 24 | Comparative Measures   GAAP Change in Stockholders' Deficit and Non GAAP Change in Fair Value of Net Assets (Net of Tax Effect) | 4 |
| 25 | Supplemental Non GAAP Consolidated Fair Value Balance Sheets | 43 |
| 26 | Activity in Debt of Fannie Mae | 45 |
| 27 | Outstanding Short Term Borrowings and Long Term Debt | 47 |
| 28 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year | 48 |
| 29 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year | 49 |
| 30 | Cash and Other Investments Portfolio | 49 |
| 3 | Fannie Mae Credit Ratings | 50 |
| 32 | Composition of Mortgage Credit Book of Business | 53 |
| 33 | Risk Characteristics of Single Family Conventional Business Volume and Guaranty Book of Business | 5 5 |
| 34 | Delinquency Status of Single Family Conventional Loans | 5 9 |
| 35 | Single Family Serious Delinquency Rates | 60 |
| 36 | Single Family Conventional Serious Delinquency Rate Concentration Analysis | 61 |
| 37 | Statistics on Single Family Loan Workouts | 62 |
| 38 | Percentage of Loan Modifications That Were Current or Paid Off at One and Two Years Post Modification | 63 |

ii

**Table of Contents**

| Table | Description | Page |
|---|---|---|
| 39 | Single Family Foreclosed Properties | 64 |
| 40 | Single Family Foreclosed Property Status | 65 |
| 4 | Multifamily Lender Risk Sharing | 66 |
| 42 | Multifamily Guaranty Book of Business Key Risk Characteristics | 66 |
| 43 | Multifamily Concentration Analysis | 67 |
| 44 | Multifamily Foreclosed Properties | 68 |
| 45 | Repurchase Request Activity | 70 |
| 46 | Outstanding Repurchase Requests | 70 |
| 47 | Mortgage Insurance Coverage | 72 |
| 48 | Rescission Rates of Mortgage Insurance Claims | 73 |
| 49 | Estimated Mortgage Insurance Benefit | 74 |
| 50 | Unpaid Principal Balance of Financial Guarantees | 74 |
| 51 | Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve | 78 |
| 52 | Derivative Impact on Interest Rate Risk (50 Basis Points) | 79 |

iii

Table of Contents

## PART I   FINANCIAL INFORMATION

**Item 2.   Management's Discussion and Analysis of Financial Condition and Results of Operations**

*We have been under conservatorship, with the Federal Housing Finance Agency ("FHFA") acting as conservator, since September 6, 2008. As conservator, FHFA succeeded to all rights, titles, powers and privileges of the company, and of any shareholder, officer or director of the company with respect to the company and its assets. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. Our directors do not have any duties to any person or entity except to the conservator and, accordingly, are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator. We describe the rights and powers of the conservator, key provisions of our agreements with the U.S. Department of the Treasury ("Treasury"), and their impact on shareholders in our Annual Report on Form 10 K for the year ended December 31, 2011 ("2011 Form 10 K") in "Business   Conservatorship and Treasury Agreements."*

*You should read this Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in conjunction with our unaudited condensed consolidated financial statements and related notes and the more detailed information in our 2011 Form 10 K.*

*This report contains forward looking statements that are based on management's current expectations and are subject to significant uncertainties and changes in circumstances. Please review "Forward Looking Statements" for more information on the forward looking statements in this report. Our actual results may differ materially from those reflected in these forward looking statements due to a variety of factors including, but not limited to, those described in "Risk Factors" and elsewhere in this report and in "Risk Factors" in our 2011 Form 10 K.*

*You can find a "Glossary of Terms Used in This Report" in the "MD&A" of our 2011 Form 10 K.*

## INTRODUCTION

Fannie Mae is a government sponsored enterprise ("GSE") that was chartered by Congress in 1938. Our public mission is to support liquidity and stability in the secondary mortgage market, where existing mortgage related assets are purchased and sold, and increase the supply of affordable housing  Our charter does not permit us to originate loans and lend money directly to consumers in the primary mortgage market  Our most significant activity is securitizing mortgage loans originated by lenders into Fannie Mae mortgage backed securities that we guarantee, which we refer to as Fannie Mae MBS  We also purchase mortgage loans and mortgage related securities for our mortgage portfolio  We use the term "acquire" in this report to refer to both our guarantees and our purchases of mortgage loans  We obtain funds to support our business activities by issuing a variety of debt securities in the domestic and international capital markets.

We are a corporation chartered by the U.S. Congress. Our conservator, FHFA, is a U.S. government agency. Treasury owns our senior preferred stock and a warrant to purchase 79.9% of our common stock. Moreover, Treasury has made a commitment under a senior preferred stock purchase agreement to provide us with funds under specified conditions and, after 2012, up to a maximum amount, to maintain a positive net worth. The U.S. government does not guarantee our securities or other obligations

Our common stock is traded in the over the counter market and quoted on the OTC Bulletin Board under the symbol "FNMA " Our debt securities are actively traded in the over the counter market

## EXECUTIVE SUMMARY

The actions we have been taking since 2009 to provide liquidity and support to the market, grow a strong new book of business and minimize losses on loans we acquired prior to 2009 are having a positive impact on our business and our performance:

- *Financial Results.*   Despite ongoing weakness in the housing and mortgage markets, we experienced significant improvement in our financial results for the first quarter of 2012, as compared with the first

1

Table of Contents

quarter of 2011  As described under "Summary of Our Financial Performance for the First Quarter of 2012," we generated positive net worth for the quarter and were not required to draw funds from Treasury for the quarter under the senior preferred stock purchase agreement  We expect our financial results for 2012 to be significantly better than our 2011 results.

- *Strong New Book of Business.*    Single family loans we have acquired since the beginning of 2009 constituted 56% of our single family guaranty book of business as of March 31, 2012, while the single family loans we acquired prior to 2009 shrank to 44% of our single family book of business. We refer to the single family loans we have acquired since the beginning of 2009 as our "new single family book of business" and the single family loans we acquired prior to 2009 as our "legacy book of business " As described below in "Our Strong New Book of Business," we expect that our new single family book of business will be profitable over its lifetime

- *Credit Performance.*    Our single family serious delinquency rate has steadily declined each quarter since the first quarter of 2010, and was 3.67% as of March 31, 2012, compared with 5 47% as of March 31, 2010  See "Credit Performance" below for additional information about the credit performance of the mortgage loans in our single family guaranty book of business

- *Reducing Credit Losses and Helping Homeowners.*    We continued to execute on our strategies for reducing credit losses on our legacy book of business, which are described below under "Reducing Credit Losses on Our Legacy Book of Business " As part of our strategy to reduce defaults, we provided nearly 78,000 workouts to help homeowners retain their homes or otherwise avoid foreclosure in the first quarter of 20  2

- *Providing Liquidity and Support to the Mortgage Market.*    We continued to be a leading provider of liquidity to the mortgage market in the first quarter of 2012  As described below under "Providing Liquidity and Support to the Mortgage Market," we remained the largest single issuer of mortgage related securities in the secondary mortgage market in the first quarter of 20  2 and remained a constant source of liquidity in the multifamily market.

- *Helping to Build a New Housing Finance System.*    We also continued our work during the first quarter of 2012 to help build a new housing finance system, including pursuing the strategic goals identified by our conservator: build a new infrastructure for the secondary mortgage market; gradually contract our dominant presence in the marketplace while simplifying and shrinking our operations; and maintain foreclosure prevention activities and credit availability for new and refinanced mortgages  For more information on our strategic goals, see "Business   Executive Summary   Our Business Objectives and Strategy" in our 2011 Form 10 K and "Executive Compensation   Compensation Discussion and Analysis   2012 Executive Compensation Program   20 2 Corporate Performance Objectives" in Amendment No   on Form   0 K/A to our Annual Report on Form   0 K for the year ended December 3 , 20   (the "20   Form   0 K/A")

## Providing Liquidity and Support to the Mortgage Market

### *Our Liquidity and Support Activities*

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- We serve as a stable source of liquidity for purchases of homes and financing of multifamily rental housing, as well as for refinancing existing mortgages. We provided approximately $2.6 trillion in liquidity to the mortgage market from January 1, 2009 through March 31, 2012 through our purchases and guarantees of loans, which enabled borrowers to refinance 7 4 million mortgages and purchase 2 1 million homes, and provided financing for over 1.2 million units of multifamily housing.

- We have strengthened our underwriting and eligibility standards to support sustainable homeownership  As a result, our new single family book of business has a strong credit risk profile  Our support enables borrowers to have access to a variety of conforming mortgage products, including long term, fixed rate mortgages, such as the prepayable 30 year fixed rate mortgage that protects homeowners from interest rate swings

2

Table of Contents

- We helped over 1,000,000 homeowners retain their homes or otherwise avoid foreclosure from January 1, 2009 through March 31, 2012, which helped to support neighborhoods, home prices and the housing market  Moreover, borrowers' ability to pay their modified loans has improved in recent periods as we have enhanced the structure of our modifications  One year after modification, 74% of the modifications we made in the first quarter of 20    were current or paid off, compared with 65% of the modifications we made in the first quarter of 2010

- We helped borrowers refinance loans through our Refi Plus™ initiative, which includes loans refinanced under the Obama Administration's Home Affordable Refinance Program ("HARP")  The Refi Plus initiative provides expanded refinance opportunities for eligible Fannie Mae borrowers  From April 1, 2009, the date we began accepting delivery of Refi Plus loans, through March 31, 2012, we have acquired approximately 2,000,000 loans refinanced under our Refi Plus initiative  Refinances delivered to us through Refi Plus in the first quarter of 20 2 reduced borrowers' monthly mortgage payments by an average of $191  Some borrowers' monthly payments increased as they took advantage of the ability to refinance through Refi Plus to reduce the term of their loan, to switch from an adjustable rate mortgage to a fixed rate mortgage, or to switch from an interest only mortgage to a fully amortizing mortgage

- We support affordability in the multifamily rental market  Over 85% of the multifamily units we financed from 2009 through 2011 were affordable to families earning at or below the median income in their area

- In addition to purchasing and guaranteeing loans, we provide funds to the mortgage market through short term financing and other activities  These activities are described in more detail in our 2011 Form 10 K in "Business    Business Segments    Capital Markets."

### 2012 Acquisitions and Market Share

In the first quarter of 2012, we purchased or guaranteed approximately $221 billion in loans, measured by unpaid principal balance, which includes $14.2 billion in delinquent loans we purchased from our single family MBS trusts  These activities enabled our lender customers to finance approximately 934,000 single family conventional loans and loans for approximately 117,000 units in multifamily properties during the first quarter of 2012

We remained the largest single issuer of mortgage related securities in the secondary market during the first quarter of 20 2, with an estimated market share of new single family mortgage related securities issuances of 5  %  Our estimated market share of new single family mortgage related securities issuances was 54% in the fourth quarter of 2011 and 49% in the first quarter of 2011.

We remained a constant source of liquidity in the multifamily market  We owned or guaranteed approximately 21% of the outstanding debt on multifamily properties as of December 3 , 20   (the latest date for which information was available)

### Summary of Our Financial Performance for the First Quarter of 2012

We experienced a significant improvement in our financial results in the first quarter of 2012 compared with the first quarter of 2011, even though our results continued to be impacted by weakness in the housing and mortgage markets

### Total Comprehensive Income (Loss)

We recognized total comprehensive income of $3   billion in the first quarter of 20 2, consisting of net income of $2 7 billion and other comprehensive income of $362 million. In comparison, we recognized a total comprehensive loss of $6.3 billion in the first quarter of 2011, consisting of a net loss of $6.5 billion and other comprehensive income of $181 million

The significant improvement in our financial results in the first quarter of 2012 compared with the first quarter of 2011 was due to an $8.7 billion decrease in our credit related expenses, primarily driven by: (1) a less significant decline in home prices as the housing market continued to stabilize; we estimate that home prices declined by

3

Table of Contents

0 8% in the first quarter of 2012 compared with a 2 0% decline in the first quarter of 2011, which represented over half of the 2011 home price decline; (2) a 25% decline in our inventory of single family real estate owned ("REO") properties compared with the first quarter of 20    coupled with improved sales prices on dispositions of our REO properties resulting from strong demand in markets with limited REO supply; and (3) lower single family serious delinquency rates, which declined to 3 67% as of the end of the first quarter of 2012 from 4 27% as of the end of the first quarter of 2011  We discuss below our expectations regarding our future credit related expenses and loss reserves

See "Consolidated Results of Operations" for more information on our results

### Net Worth

Our net worth of $268 million as of March 31, 2012 reflects our total comprehensive income of $3 1 billion largely offset by our payment to Treasury of $2.8 billion in senior preferred stock dividends during the first quarter of 2012.

In the first quarter of 2012, we received $4 6 billion in funds from Treasury to eliminate our net worth deficit as of December 31, 2011  As a result of our positive net worth as of March 31, 2012, we will not request a draw this quarter from Treasury under the senior preferred stock purchase agreement  The aggregate liquidation preference on the senior preferred stock remains at $117 1 billion, which requires an annualized dividend payment of $11 7 billion  The amount of this dividend payment exceeds our reported annual net income for every year since our inception  As of March 3 , 20 2, we have paid an aggregate of $22.6 billion to Treasury in dividends on the senior preferred stock.

Table 1 below displays our senior preferred stock dividend payments to Treasury and Treasury draws since entering conservatorship on September 6, 2008.

**Table 1:   Treasury Draws and Dividend Payments**

| | 2008 | 2009 | 2010 | 2011 | 2012 (first quarter) | Cumulative Total |
|---|---|---|---|---|---|---|
| | | | | (Dollars in billions) | | |
| Treasury draws( (2 | $15.2 | $ 60.0 | $15.0 | $25.9 | $ | $ 116.1 |
| Senior preferred stock dividends(3 | | 2.5 | 7.7 | 9.6 | 2.8 | 22.6 |
| Treasury draws less senior preferred stock dividends | $15.2 | $57.5 | $ 7 3 | $ 16.3 | $  (2.8) | $  93.5 |
| Cumulative percentage of senior preferred stock dividends to Treasury draws | 0 2% | 3 3% | 11.3% | 17.1% | 19.5% | 19.5% |

( Represents the total draws received from Treasury and / or being requested based on our quarterly net worth deficits for the periods presented  Draw requests are funded in the quarter following each quarterly net worth deficit

(2 Treasury draws do not include the initial $1 0 billion liquidation preference of the senior preferred stock, for which we did not receive any cash proceeds

(3 Represents total quarterly cash dividends paid to Treasury during the periods presented based on an annual rate of 10% per year on the aggregate liquidation preference of the senior preferred stock

### Total Loss Reserves

Our total loss reserves consist of ( ) our allowance for loan losses, (2) our allowance for accrued interest receivable, (3) our allowance for preforeclosure property taxes and insurance receivables, and (4) our reserve for guaranty losses  Our total loss reserves, which reflect our estimate of the probable losses we have incurred in our guaranty book of business, including concessions we granted borrowers upon modification of their loans, decreased to $74.6 billion as of March 31, 2012 from $76.9 billion as of December 31, 2011. Our total loss reserve coverage to total nonperforming loans was 30% as of March 31, 2012, compared with 31% as of December 31, 2011

4

Table of Contents

### *Our Expectations Regarding Future Loss Reserves and Credit Related Expenses*

We expect the trends of stabilizing home prices and declining single family serious delinquency rates to continue  As a result, we believe that our total loss reserves peaked as of December 3 , 20   and will not increase above $76 9 billion in the foreseeable future  We also believe that our credit related expenses will be lower in 2012 than in 2011

Although we expect these positive trends to continue, the amount of credit related expenses we incur in future periods could vary significantly from period to period and may be affected by many different factors, such as those described below  Moreover, although we believe that our total loss reserves peaked as of December 3 , 20   , we expect our loss reserves will remain significantly elevated relative to historical levels for an extended period because ( ) we expect future defaults on loans that we acquired prior to 2009 and the resulting charge offs will occur over a period of years and (2) a significant portion of our reserves represents concessions granted to borrowers upon modification of their loans and will remain in our reserves until the loans are fully repaid or default

Our expectations regarding our future credit related expenses and loss reserves are based on our current expectations and assumptions about many factors that are subject to change  Factors that could result in higher credit related expenses and loss reserves than we currently expect include: a drop in actual or expected home prices; an increase in our serious delinquency rate; an increase in interest rates; an increase in unemployment rates; future legislative or regulatory requirements that have a significant impact on our business, such as a requirement that we implement a principal forgiveness program; future updates to our models relating to our loss reserves, including the assumptions used by these models; future changes to accounting policies relating to our loss reserves; significant changes in modification and foreclosure activity; changes in borrower behavior, such as an increasing number of underwater borrowers who strategically default on their mortgage loan; failures by our mortgage seller/servicers to fulfill their repurchase obligations to us; and many other factors, including those discussed in "Outlook   Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations" in this report and in "Risk Factors" in both this report and in our 2011 Form 10 K. Due to the large size of our guaranty book of business, even small changes in these factors could have a significant impact on our financial results for a particular period

In addition, in April 2012, FHFA issued an Advisory Bulletin that could have an impact on the amount of our future credit related expenses and loss reserves; however, we are still assessing the impact of the Advisory Bulletin  See "Legislative and Regulatory Developments    FHFA Advisory Bulletin Regarding Framework for Adversely Classifying Loans" for additional information

### Our Strong New Book of Business

Since 2009, we have seen the effect of actions we took, beginning in 2008, to significantly strengthen our underwriting and eligibility standards and change our pricing to promote sustainable homeownership and stability in the housing market  Given their strong credit risk profile and based on their performance so far, we expect that the single family loans we have acquired since the beginning of 2009, in the aggregate, will be profitable over their lifetime, by which we mean that we expect our fee income on these loans to exceed our credit losses and administrative costs for them  In contrast, we expect that the single family loans we acquired from 2005 through 2008, in the aggregate, will not be profitable over their lifetime  Loans we have acquired since the beginning of 2009 comprised 56% of our single family guaranty book of business as of March 31, 2012. Our 2005 through 2008 acquisitions are becoming a smaller percentage of our single family guaranty book of business and, as shown in Table 2 below, have decreased to 29% of our single family guaranty book of business as of March 31, 2012.

Our expectations regarding the ultimate performance of our loans are based on numerous expectations and assumptions, including those relating to expected changes in regional and national home prices, borrower behavior, public policy and other macroeconomic factors  If future conditions are more unfavorable than our expectations, the loans we acquired since the beginning of 2009 could become unprofitable  For example, home prices are a key factor affecting the profitability we expect  As home prices decline, the loan to value ("LTV") ratios on our loans increase, and both the probability of default and the estimated severity of loss increase  If

5

Table of Contents

home prices decline significantly from March 20 2 levels, the loans we acquired since the beginning of 2009 could become unprofitable See "Outlook Home Price Declines" for our current expectations regarding home price declines Also see "Outlook Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations" in this report and "Risk Factors" in both this report and our 2011 Form 10 K for a discussion of factors that could cause our expectations regarding the performance of the loans in our new single family book of business to change

Table 2 below displays information regarding the credit characteristics of the loans in our single family conventional guaranty book of business as of March 31, 2012 by acquisition period, which illustrates the improvement in the credit risk profile of loans we acquired beginning in 2009 compared with loans we acquired in 2005 through 2008

**Table 2:   Selected Credit Characteristics of Single Family Conventional Loans Held, by Acquisition Period**

| | As of March 31, 2012 | | | |
|---|---|---|---|---|
| | % of Single-Family Conventional Guaranty Book of Business[1] | Current Estimated Mark-to-Market LTV Ratio[1] | Current Mark-to-Market LTV Ratio >100%[1] [2] | Serious Delinquency Rate[3] |
| Year of Acquisition: | | | | |
| New Single Family Book of Business: | | | | |
|   2012 | 7% | 70% | 4% | |
|   2011 | 18 | 71 | 5 | 0.09% |
|   20 0 | 16 | 73 | 7 | 0.36 |
|   2009 | 15 | 74 | 8 | 0.69 |
| Total New Single Family Book of Business | 5 6 | 72 | 6 | 0 32 |
| Legacy Book of Business: | | | | |
|   2005 2008 | 29 | 105 | 48 | 9.25 |
|   2004 and prior | 15 | 61 | 9 | 3 3 |
| Total Single Family Book of Business | 00% | 80% | 19% | 3.67% |

[1]   Calculated based on the aggregate unpaid principal balance of single family loans for each category divided by the aggregate unpaid principal balance of loans in our single family conventional guaranty book of business as of March 31, 2012.

[2]   The majority of loans in our new single family book of business as of March 31, 2012 with mark to market LTV ratios over 100% were loans acquired under our Refi Plus initiative See "Risk Management Credit Risk Management Single Family Mortgage Credit Risk Management" for further information on Refi Plus

[3]   The serious delinquency rate of loans acquired in 20 2 is zero because they were originated so recently that most of them could not yet become seriously delinquent The serious delinquency rates for loans acquired in more recent years will be higher after the loans have aged, but we do not expect them to approach the levels of the March 31, 2012 serious delinquency rates of loans in our legacy book of business

The single family loans that we acquired in the first quarter of 20 2 had a weighted average FICO credit score at origination of 763 and an average original LTV ratio of 70% Of the single family loans we acquired in the first quarter of 2012, approximately 11% had an original LTV ratio greater than 90% and 1% had a FICO credit score at origination of less than 620 See Table 2 in our 2011 Form 10 K for information regarding the credit risk profile of the single family conventional loans we acquired during specified previous periods

Since 2009, our acquisitions have included a significant number of loans refinanced under our Refi Plus ᔆᔆ initiative, which provides expanded refinance opportunities for eligible Fannie Mae borrowers Our acquisitions under Refi Plus include our acquisitions under HARP, which was established by the Administration to help borrowers who may otherwise be unable to refinance the mortgage loan on their primary residence due to a decline in home values The approximately 239,000 loans we acquired under Refi Plus in the first quarter of 2012 constituted approximately 22% of our total single family acquisitions for the period, measured by unpaid principal balance, compared with approximately 24% of total single family acquisitions in all of 2011 Under

6

Table of Contents

Refi Plus we acquire refinancings of performing Fannie Mae loans that, in some cases, have higher LTV ratios and/or lower FICO credit scores than we generally require  As a result, while it is too early to determine the ultimate performance of these Refi Plus loans, they may not perform as well as the other loans we have acquired since the beginning of 2009  However, we expect Refi Plus loans will perform better than the loans they replace because Refi Plus loans reduce the borrowers' monthly payments or otherwise should provide more stability than the borrowers' old loans (for example, by refinancing into a mortgage with a fixed interest rate instead of an adjustable rate)

Whether the loans we acquire in the future will exhibit an overall credit profile similar to our more recent acquisitions will depend on a number of factors, including our future pricing and eligibility standards and those of mortgage insurers and the Federal Housing Administration ("FHA"), the percentage of loan originations representing refinancings, our future objectives, government policy, market and competitive conditions, and the volume and characteristics of loans we acquire under HARP

See "Business   Executive Summary   Our Strong New Book of Business and Expected Losses on our Legacy Book of Business   Building a Strong New Single Family Book of Business" in our 2011 Form 10 K for a more detailed discussion of the changes in the credit profile of our single family acquisitions In addition, see "MD&A   Risk Management   Credit Risk Management   Single Family Mortgage Credit Risk Management" for more detail regarding the credit risk characteristics of our single family guaranty book of business.

**Reducing Credit Losses on Our Legacy Book of Business**

To reduce the credit losses we ultimately incur on our legacy book of business, we have been focusing our efforts on the following strategies:

- Helping underwater and other eligible Fannie Mae borrowers refinance to a more sustainable loan through our Refi Plus initiative;

- Reducing defaults by offering borrowers solutions that enable them to keep their homes ("home retention solutions");

- Pursuing "foreclosure alternatives," which help borrowers avoid foreclosure and reduce the severity of the losses we incur overall;

- Efficiently managing timelines for home retention solutions, foreclosure alternatives, and foreclosures;

- Improving servicing standards and servicers' execution and consistency;

- Managing our REO inventory to minimize costs and maximize sales proceeds; and

- Pursuing contractual remedies from lenders, servicers and providers of credit enhancement

See "Business   Executive Summary   Reducing Credit Losses on our Legacy Book of Business" in our 2011 Form 10 K, as well as "Risk Management   Credit Risk Management   Single Family Mortgage Credit Risk Management" in both this report and our 2011 Form 10 K, for more information on the strategies and actions we are taking to minimize our credit losses

**Credit Performance**

Table 3 presents information for each of the last five quarters about the credit performance of mortgage loans in our single family guaranty book of business and our workouts  The term "workouts" refers to home retention solutions and foreclosure alternatives  The workout information in Table 3 does not reflect repayment plans and forbearances that have been initiated but not completed, nor does it reflect trial modifications that have not become permanent

7

Table of Contents

**Table 3:   Credit Statistics, Single Family Guaranty Book of Business**[1]

| | 2012 | 2011 | | | | |
|---|---|---|---|---|---|---|
| | Q1 | Full Year | Q | Q3 | Q2 | Q1 |
| | | | | (Dollars in millions) | | |
| **As of the end of each period:** | | | | | | |
| Serious delinquency rate[2] | 3.67% | 3.91% | 3.91% | 4 00% | 4 08% | 4.27% |
| Seriously delinquent loan count | 650,918 | 690,911 | 690,911 | 708,847 | 729,772 | 767,161 |
| Nonperforming loans[3] | $ 243,981 | $ 248,379 | $ 248,379 | $ 248,134 | $ 245,848 | $ 248,444 |
| Foreclosed property inventory: | | | | | | |
| Number of properties | 114,157 | 118,528 | 118,528 | 122,616 | 135,719 | 153,224 |
| Carrying value | $ 9,721 | $ 9,692 | $ 9,692 | $ 11,039 | $ 12,480 | $ 14,086 |
| Combined loss reserves[4] | $ 69,633 | $ 71,512 | $ 71,512 | $ 70,741 | $ 68,887 | $ 66,240 |
| Total loss reserves[5] | $ 73,119 | $ 75,264 | $ 75,264 | $ 73,973 | $ 73,116 | $ 70,466 |
| **During the period:** | | | | | | |
| Foreclosed property (number of properties): | | | | | | |
| Acquisitions[6] | 47,700 | 199,696 | 47,256 | 45,194 | 53,697 | 53,549 |
| Dispositions | (52,071) | (243,657) | (51,344) | (58,297) | (71,202) | (62,814) |
| Credit related expenses[7] | $ 2,385 | $ 27,218 | $ 5,397 | $ 4,782 | $ 5,933 | $ 11,106 |
| Credit losses[8] | $ 4,955 | $ 18,346 | $ 4,548 | $ 4,384 | $ 3,810 | $ 5,604 |
| **Loan workout activity (number of loans):** | | | | | | |
| Home retention loan workouts[9] | 55,535 | 248,658 | 60,453 | 68,227 | 59,019 | 60,959 |
| Short sales and deeds in lieu of foreclosure | 22,213 | 79,833 | 22,231 | 19,306 | 21,176 | 17,120 |
| Total loan workouts | 77,748 | 328,491 | 82,684 | 87,533 | 80,195 | 78,079 |
| Loan workouts as a percentage of delinquent loans in our guaranty book of business[10] | 28.85% | 27.05% | 27.24% | 28.39% | 25.71% | 25.01% |

[1] Our single family guaranty book of business consists of (a) single family mortgage loans held in our mortgage portfolio, (b) single family mortgage loans underlying Fannie Mae MBS, and (c) other credit enhancements that we provide on single family mortgage assets, such as long term standby commitments  It excludes non Fannie Mae mortgage related securities held in our mortgage portfolio for which we do not provide a guaranty

[2] Calculated based on the number of single family conventional loans that are three or more months past due and loans that have been referred to foreclosure but not yet foreclosed upon, divided by the number of loans in our single family conventional guaranty book of business  We include all of the single family conventional loans that we own and those that back Fannie Mae MBS in the calculation of the single family serious delinquency rate

[3] Represents the total amount of nonperforming loans including troubled debt restructurings  A troubled debt restructuring is a restructuring of a mortgage loan in which a concession is granted to a borrower experiencing financial difficulty  We generally classify loans as nonperforming when the payment of principal or interest on the loan is two months or more past due

[4] Consists of the allowance for loan losses for loans recognized in our condensed consolidated balance sheets and the reserve for guaranty losses related to both single family loans included in Fannie Mae MBS that we do not consolidate in our condensed consolidated balance sheets and single family loans that we have guaranteed under long term standby commitments  For additional information on the change in our loss reserves see "Consolidated Results of Operations   Credit Related Expenses   Provision for Credit Losses "

[5] Consists of (a) the combined loss reserves, (b) allowance for accrued interest receivable, and (c) allowance for preforeclosure property taxes and insurance receivables

[6] Includes acquisitions through deeds in lieu of foreclosure

[7] Consists of (a) the provision (benefit) for credit losses and (b) foreclosed property expense (income)

[8] Consists of (a) charge offs, net of recoveries and (b) foreclosed property expense, adjusted to exclude the impact of fair value losses resulting from credit impaired loans acquired from MBS trusts.

8

Table of Contents

⁽⁹⁾ Consists of (a) modifications, which do not include trial modifications or repayment plans or forbearances that have been initiated but not completed and (b) repayment plans and forbearances completed  See "Table 37: Statistics on Single Family Loan Workouts" in "Risk Management   Credit Risk Management  Single Family Mortgage Credit Risk Management  Problem Loan Management  Loan Workout Metrics" for additional information on our various types of loan workouts.

⁽¹⁰⁾ Calculated based on annualized problem loan workouts during the period as a percentage of delinquent loans in our single family guaranty book of business as of the end of the period

Our single family serious delinquency rate has decreased each quarter since the first quarter of 2010  The decrease in our serious delinquency rate is primarily the result of home retention solutions, foreclosure alternatives and completed foreclosures, as well as our acquisition of loans with stronger credit profiles since the beginning of 2009, as these loans are now 56% of our single family guaranty book of business, resulting in a smaller percentage of our loans becoming seriously delinquent

Although our single family serious delinquency rate has decreased significantly since the first quarter of 2010, our serious delinquency rate and the period of time that loans remain seriously delinquent has been negatively affected in recent periods by the increase in the average number of days it is taking to complete a foreclosure. As described in "Business   Executive Summary   Reducing Credit Losses on Our Legacy Book of Business   Managing Timelines for Workouts and Foreclosures" in our 2011 Form 10 K, high levels of foreclosures, continuing issues in the servicer foreclosure process and changing legislative, regulatory and judicial requirements have lengthened the time it takes to foreclose on a mortgage loan in many states  We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, the volume of loan modifications, and the extent to which borrowers with modified loans continue to make timely payments  We expect the number of our single family loans that are seriously delinquent to remain well above pre 2008 levels for years  In addition, given the large anticipated supply of single family homes in the market, we anticipate that it will take a significant amount of time before our REO inventory is reduced to pre 2008 levels

We provide additional information on our credit related expenses in "Consolidated Results of Operations   Credit Related Expenses" and on the credit performance of mortgage loans in our single family book of business and our loan workouts in "Risk Management   Credit Risk Management   Single Family Mortgage Credit Risk Management "

**Housing and Mortgage Market and Economic Conditions**

Economic growth slowed in the first quarter of 2012 compared with the fourth quarter of 2011. The inflation adjusted U.S. gross domestic product, or GDP, rose by 2 2% on an annualized basis in the first quarter of 2012, according to the Bureau of Economic Analysis advance estimate, compared with an increase of 3 0% in the fourth quarter of 2011  The overall economy gained an estimated 688,000 jobs in the first quarter  According to the U S  Bureau of Labor Statistics, over the past 12 months ending in March 2012, the economy created 2.0 million non farm jobs. The unemployment rate was 8.2% in March 2012, compared with 8 5% in December 20    We expect that housing will start to recover if the employment market continues to improve

Housing activity showed some improvement during the first quarter of 2012  Total existing home sales averaged 4 6 million units annualized in the first quarter of 2012, a 4 7% increase from the fourth quarter of 2011, according to data available through March 2012 from the National Association of REALTORS®  Sales of foreclosed homes and preforeclosure, or "short," sales (together, "distressed sales") accounted for 29% of existing home sales in March 2012, compared with 32% in December 2011 and 40% in March 2011  New single family home sales strengthened during the quarter, averaging an annualized rate of 337,000 units, a 3 7% increase from the prior quarter

The overall mortgage market serious delinquency rate, which has trended down since peaking in the fourth quarter of 2009, remained historically high at 7 7% as of December 31, 2011, according to the Mortgage Bankers Association National Delinquency Survey  According to the National Association of REALTORS® April 2012 Existing Home Sales Report, the months' supply of existing unsold homes was 6.3 months as of March 31, 2012, compared with 6.4 months as of December 31, 2011 and 8.5 months as of March 31, 2011. Properties that are

9

Table of Contents

vacant and held off the market, combined with a portion of properties backing seriously delinquent mortgages not currently listed for sale, represent a significant shadow inventory putting downward pressure on home prices

We estimate that home prices on a national basis declined by 0 8% in the first quarter of 2012 and have declined by 23 9% from their peak in the third quarter of 2006  Our home price estimates are based on preliminary data and are subject to change as additional data become available  The decline in home prices over the past several years has left many homeowners with "negative equity" in their homes, which means their principal mortgage balance exceeds the current market value of their home  This increases the likelihood that borrowers will walk away from their mortgage obligations and that the loans will become delinquent and proceed to foreclosure  According to CoreLogic, approximately      million, or 23%, of all residential properties with mortgages were in a negative equity position in the fourth quarter of 2011  This potential supply also weighs on the supply/demand balance putting downward pressure on both home prices and rents. See "Risk Factors" in our 2011 Form 10 K for a description of risks to our business associated with the weak economy and housing market.

During the first quarter of 2012, the multifamily sector remained fairly stable and continued to benefit from ongoing rental demand, positive job growth and limited new apartment supply  Preliminary third party data for the first quarter of 2012 indicates that the national multifamily vacancy rate for institutional investment type apartment properties decreased to an estimated 6 0% as of March 31, 2012, compared to an estimated 6 3% as of December 31, 2011 and an estimated 7.0% as of March 31, 2011. In addition, asking rents increased in the first quarter of 2012 by an estimated 1% on a national basis. As indicated by data from Axiometrics, multifamily concession rates, the rental discount rate as a percentage of asking rents, declined during the first quarter to  2 7% as of March 2012, after having increased slightly during fourth quarter of 2011 to end the year at  3 5%  The increase in rental demand is also reflected in an estimated positive net absorption, or increase in the number of occupied rental units after deducting new supply added during the period, of more than 36,000 units during the first quarter, according to preliminary data from Reis, Inc.

**Outlook**

*Overall Market Conditions.*   We expect weakness in the housing and mortgage markets to continue in 20  2  The high level of delinquent mortgage loans will ultimately result in high levels of foreclosures, which is likely to add to the excess housing inventory

We expect that single family default and severity rates will remain high in 2012, but will be lower than in 2011  Despite signs of multifamily sector improvement at the national level, we expect multifamily foreclosures in 20  2 to remain generally commensurate with 20    levels as certain local markets and properties continue to exhibit weak fundamentals  Conditions may worsen if the unemployment rate increases on either a national or regional basis

We expect that changes to HARP announced in October 2011 will result in our acquisition of more refinancings in 2012 than we would have acquired in the absence of the changes; however, we expect fewer refinancings overall in 20  2 than in 20     For a description of the changes to HARP announced in October 2011, see "Business   Making Home Affordable Program   Changes to the Home Affordable Refinance Program" in our 2011 Form 10 K  Our loan acquisitions also have been negatively affected by the decrease in the maximum size of loans we may acquire in specified high cost areas from $729,750 to $625,500, which went into effect in the fourth quarter of 2011. As a result of these factors, we expect our loan acquisitions for 2012 will be lower than in 2011.

We estimate that total originations in the U S  single family mortgage market in 20  2 will decrease from 20     levels by approximately 8%, from an estimated $1 36 trillion to an estimated $1 26 trillion, and that the amount of originations in the U S  single family mortgage market that are refinancings will decline from approximately $900 billion to approximately $800 billion  Refinancings comprised approximately 83% of our single family business volume in the first quarter of 2012, compared with approximately 76% for all of 2011.

*Home Price Declines.*   We estimate that U S  home prices have declined by 23 9% from their peak in the third quarter of 2006  While the rate of decline in home prices has moderated in recent quarters, we expect that home prices on a national basis will decline further before stabilizing in 20  3  We currently expect a peak  to  trough home price decline on a national basis ranging from 24% to 30%, but believe that it would take the occurrence of

0

Table of Contents

an additional adverse economic event to reach the high end of the range  Future home price changes may be very different from our estimates as a result of significant inherent uncertainty in the current market environment, including uncertainty about the effect of actions the federal government has taken and may take with respect to tax policies, mortgage finance programs and policies, and housing finance reform; the management of the Federal Reserve's MBS holdings; and the impact of those actions on home prices, unemployment and the general economic and interest rate environment  Because of these uncertainties, the actual home price decline we experience may differ significantly from these estimates  We also expect significant regional variation in home price declines and stabilization

Our estimates of home price declines are based on our home price index, which is calculated differently from the S&P/Case Shiller U S  National Home Price Index and therefore results in different percentages for comparable declines  Our 24% to 30% peak to trough home price decline estimate corresponds to an approximate 34% to 4  % peak to trough decline using the S&P/Case Shiller index method  Our estimates differ from the S&P/Case Shiller index in two principal ways: ( ) our estimates weight expectations by number of properties, whereas the S&P/Case Shiller index weights expectations based on property value, causing home price changes on higher priced homes to have a greater effect on the overall result; and (2) the S&P/Case Shiller index includes sales of foreclosed homes while our estimates attempt to exclude foreclosed home sales, because we believe that differing maintenance practices and the forced nature of the sales make foreclosed home prices less representative of market values  We believe, however, that the impact of sales of foreclosed homes is indirectly reflected in our estimates as a result of their impact on the pricing of non distressed sales  We estimate S&P/Case Shiller comparison numbers by adjusting our internal home price estimates to compensate for the differences between our method and the S&P/Case Shiller index method  In addition to these differences, our estimates are based on our own internally available data combined with publicly available data, and are therefore based on data collected nationwide, whereas the S&P/Case Shiller index is based on publicly available data, which may be limited in certain geographic areas of the country  Our comparative calculations to the S&P/Case Shiller index provided above are not adjusted to compensate for this data pool difference

*Credit Related Expenses and Credit Losses.*    Our credit related expenses, which include our provision for credit losses, reflect our recognition of losses on our loans  Through our provision for credit losses, we recognize credit related expenses on loans in the period in which we determine that we have incurred a probable loss on the loans as of the end of the period, or in which we have granted concessions to the borrowers  Accordingly, our credit related expenses in each period are affected by changes in actual and expected home prices, borrower payment behavior, the types and volumes of loss mitigation activities and foreclosures we complete, and estimated recoveries from our lender and mortgage insurer counterparties  Our credit losses, which include our charge offs, net of recoveries, reflect our realization of losses on our loans  We realize losses on loans, through our charge offs, when foreclosure sales are completed or when we accept short sales or deeds in lieu of foreclosure

We expect that our credit related expenses will remain high in 20  2 but that, overall, our credit related expenses will be lower in 20  2 than in 20     In addition, we expect our credit losses to remain high in 20  2  To the extent delays in foreclosures continue in 20  2, our realization of some credit losses will be delayed  We further describe our outlook for credit related expenses in "Summary of Our Financial Performance for the First Quarter of 2012   Our Expectations Regarding Future Loss Reserves and Credit Related Expenses "

*Uncertainty Regarding our Future Status and Long Term Financial Sustainability.*    There is significant uncertainty in the current market environment, and any changes in the trends in macroeconomic factors that we currently anticipate, such as home prices and unemployment, may cause our future credit related expenses and credit losses to vary significantly from our current expectations  Although Treasury's funds under the senior preferred stock purchase agreement permit us to remain solvent and avoid receivership, the resulting dividend payments are substantial  We expect to request additional draws under the senior preferred stock purchase agreement in future periods, which will further increase the dividends we owe to Treasury on the senior preferred stock  We expect that, over time, our dividend obligation to Treasury will increasingly drive our future draws under the senior preferred stock purchase agreement  Although we may experience period to period volatility in earnings and comprehensive income, we do not expect to generate net income or comprehensive income in excess of our annual dividend obligation to Treasury over the long term  As a result of these factors, there is significant uncertainty about our long term financial sustainability.

11

Table of Contents

In addition, there is significant uncertainty regarding the future of our company, including how long the company will continue to be in its current form, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated  We expect this uncertainty to continue  In February 2011, Treasury and the Department of Housing and Urban Development ("HUD") released a report to Congress on reforming America's housing finance market  The report states that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac  The report emphasizes the importance of providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period  In February 2012, Treasury Secretary Geithner stated that the Administration intended to release new details in the spring of 2012 around approaches to housing finance reform, including winding down Fannie Mae and Freddie Mac, and to work with Congressional leaders to explore options for legislation, but that he does not expect housing finance reform legislation to be enacted in 2012

We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding long term reform of the GSEs  See "Legislative and Regulatory Developments" in this report and "Business   Legislative and Regulatory Developments" in our 2011 Form 10 K for discussions of recent legislative reform of the financial services industry and proposals for GSE reform that could affect our business. See "Risk Factors" in our 2011 Form 10 K for a discussion of the risks to our business relating to the uncertain future of our company.

*Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations.*      We present a number of estimates and expectations in this executive summary, including estimates and expectations regarding our future financial results, the profitability of single family loans we have acquired, our single family credit losses, our loss reserves and credit related expenses, and our draws from and dividends to be paid to Treasury. These estimates and expectations are forward looking statements based on our current assumptions regarding numerous factors, including future home prices and the future performance of our loans  Our future estimates of our performance, as well as the actual amounts, may differ materially from our current estimates and expectations as a result of: the timing and level of, as well as regional variation in, home price changes; changes in interest rates, unemployment rates and other macroeconomic variables; government policy; the length of time it takes to complete foreclosures; changes in generally accepted accounting principles ("GAAP"); credit availability; borrower behavior; the volume of loans we modify; the effectiveness of our loss mitigation strategies, management of our REO inventory and pursuit of contractual remedies; whether our counterparties meet their obligations to us; changes in the fair value of our assets and liabilities; impairments of our assets; and many other factors, including those discussed in "Risk Factors," "Forward Looking Statements" and elsewhere in this report, and in "Risk Factors" in our 20   Form   0 K  For example, if the economy were to enter a deep recession, we would expect actual outcomes to differ substantially from our current expectations

## LEGISLATIVE AND REGULATORY DEVELOPMENTS

The information in this section updates and supplements information regarding legislative and regulatory developments set forth in "Business   Legislative and Regulatory Developments" and "Business   Our Charter and Regulation of Our Activities" in our 2011 Form 10 K

### GSE Reform

Policymakers and others have focused significant attention in recent years on how to reform the nation's housing finance system, including what role, if any, the GSEs should play  The Dodd Frank Wall Street Reform and Consumer Protection Act (the "Dodd Frank Act"), which was signed into law in July 2010, calls for enactment of meaningful structural reforms of Fannie Mae and Freddie Mac  The Dodd Frank Act also required the Treasury Secretary to submit a report to Congress with recommendations for ending the conservatorships of Fannie Mae and Freddie Mac

In February 2011, Treasury and HUD released their report to Congress on reforming America's housing finance market  The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions.

12

Table of Contents

The report identifies a number of policy steps that could be used to wind down Fannie Mae and Freddie Mac, reduce the government's role in housing finance and help bring private capital back to the mortgage market  These steps include (1) increasing guaranty fees, (2) gradually increasing the level of required down payments so that any mortgages insured by Fannie Mae or Freddie Mac eventually have at least a 10% down payment, (3) reducing conforming loan limits to those established in the Federal Housing Finance Regulatory Reform Act of 2008 (the "2008 Reform Act"), (4) encouraging Fannie Mae and Freddie Mac to pursue additional credit loss protection and (5) reducing Fannie Mae's and Freddie Mac's portfolios, consistent with Treasury's senior preferred stock purchase agreements with the companies

In addition, the report outlines three potential options for a new long term structure for the housing finance system following the wind down of Fannie Mae and Freddie Mac  The first option would privatize housing finance almost entirely  The second option would add a government guaranty mechanism that could scale up during times of crisis  The third option would involve the government offering catastrophic reinsurance behind private mortgage guarantors  Each of these options assumes the continued presence of programs operated by FHA, the Department of Agriculture and the Veterans Administration to assist targeted groups of borrowers  The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system  The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period  A copy of the report can be found on the Housing Finance Reform section of Treasury's Web site, www.Treasury.gov. We are providing Treasury's Web site address solely for your information, and information appearing on Treasury's Web site is not incorporated into this quarterly report on Form 10 Q

In February 2012, Treasury Secretary Geithner stated that the Administration intended to release new details in the spring of 2012 around approaches to housing finance reform, including winding down Fannie Mae and Freddie Mac, and to work with Congressional leaders to explore options for legislation, but that he does not expect housing finance reform legislation to be enacted in 20  2

During 2011, Congress held hearings on the future status of Fannie Mae and Freddie Mac, and members of Congress offered legislative proposals relating to the future status of the GSEs  We expect hearings on GSE reform to continue in 2012 and additional legislation to be considered and proposals to be discussed, including proposals that would result in a substantial change to our business structure or that involve Fannie Mae's liquidation or dissolution. Several bills have been introduced that would place the GSEs into receivership after a period of time and either grant federal charters to new entities to engage in activities similar to those currently engaged in by the GSEs or leave secondary mortgage market activities to entities in the private sector  For example, legislation has been introduced in both the House of Representatives and the Senate that would require FHFA to make a determination within two years of enactment regarding whether the GSEs were financially viable and, if the GSEs were determined not to be financially viable, to place them into receivership  As drafted, these bills may upon enactment impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of our existing and future liabilities

In addition to bills that seek to resolve the status of the GSEs, numerous bills have been introduced and considered that could constrain the current operations of the GSEs or alter the existing authority that FHFA or Treasury has over the enterprises  For example, the Subcommittee on Capital Markets and Government Sponsored Enterprises of the House Financial Services Committee has approved bills that would:

- suspend current compensation packages and apply a government pay scale for GSE employees;

- require the GSEs to increase guaranty fees;

- subject GSE loans to the risk retention standards in the Dodd Frank Act;

- require a quicker reduction of GSE portfolios than required under the senior preferred stock purchase agreement;

- require Treasury to pre approve all GSE debt issuances;

- repeal the GSEs' affordable housing goals;

3

Table of Contents

- provide additional authority to FHFA's Inspector General;

- prohibit FHFA from approving any new GSE products during conservatorship or receivership, with certain exceptions;

- prevent Treasury from amending the senior preferred stock purchase agreement to reduce the current dividend rate on our senior preferred stock;

- abolish the Affordable Housing Trust Fund that the GSEs are required to fund except when such contributions have been temporarily suspended by FHFA;

- require FHFA to identify mission critical assets of the GSEs and require the GSEs to dispose of non mission critical assets;

- cap the maximum aggregate amount of funds Treasury or any other agency or entity of the federal government can provide to the GSEs subject to certain qualifications;

- grant FHFA the authority to revoke the enterprises' charters following receivership under certain circumstances; and

- subject the GSEs to the Freedom of Information Act

Of these bills that passed at a subcommittee level, the only one that has passed the full committee is the bill that would put GSE employees on a government pay scale  We expect additional legislation relating to the GSEs to be introduced and considered by Congress in 20 2  We cannot predict the prospects for the enactment, timing or content of legislative proposals concerning the future status of the GSEs, their regulation or operations

In sum, there continues to be uncertainty regarding the future of our company, including how long the company will continue to exist in its current form, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated  See "Risk Factors" in our 2011 Form 10 K for a discussion of the risks to our business relating to the uncertain future of our company  Also see "Risk Factors" in this report for a discussion of how the uncertain future of our company may adversely affect our ability to retain and recruit well qualified employees, including senior management

**Compensation**

In April 2012, the Stop Trading on Congressional Knowledge Act (the "STOCK Act") was enacted, which includes a provision that prohibits senior executives at Fannie Mae and Freddie Mac from receiving bonuses during any period of conservatorship on or after the date of enactment of the law  Congress has also considered other legislation that would alter the compensation for Fannie Mae and Freddie Mac employees  In 20   , the House Financial Services Committee passed a bill that would place all Fannie Mae and Freddie Mac employees on a pay scale similar to that provided for federal government employees  Additional legislative proposals related to compensation for Fannie Mae and Freddie Mac employees may be considered by Congress in 20 2

If legislation is adopted that results in a significant reduction in compensation to our employees, it could cause a substantial number of our most skilled and experienced employees to leave and significantly impede our ability to retain and attract employees in a competitive marketplace, as we discuss in "Risk Factors "

**Enhanced Supervision and Prudential Standards under the Dodd Frank Act**

The Dodd Frank Act established the Financial Stability Oversight Council (the "FSOC"), chaired by the Secretary of the Treasury, to ensure that all financial companies whose failure could pose a threat to the financial stability of the United States   not just banks   will be subject to strong oversight  Under the Dodd Frank Act, the FSOC is responsible for designating systemically important nonbank financial companies, while the Federal Reserve is to establish stricter prudential standards that will apply to certain bank holding companies and to systemically important nonbank financial companies. The Federal Reserve must establish standards related to risk based capital, leverage limits, liquidity, credit concentrations, resolution plans, reporting credit exposures and other risk management measures  On December 20, 20   , the Board of Governors of the Federal Reserve

4

Table of Contents

System issued proposed rules addressing a number of these enhanced prudential standards  The Federal Reserve may also impose other standards related to contingent capital, enhanced public disclosure, short term debt limits and other requirements as appropriate

On April 11, 2012, the FSOC published a final rule and interpretive guidance describing the manner in which it intends to apply the statutory standards and procedures for determining whether a nonbank financial company will be subject to supervision by, and the prudential standards of, the Federal Reserve Board  The rule outlines the evaluation process that the FSOC intends to use in making these determinations  In making its determinations, factors the FSOC may consider include: company size, leverage, interconnectedness, liquidity risk, maturity mismatch, importance to the economic system, and the extent to which a company is already regulated

Depending on the scope and final form of the Federal Reserve's enhanced standards, and the extent to which they apply to us if we are designated by the FSOC as a systemically important nonbank financial company, or to our customers and other counterparties, their adoption and application could increase our costs, pose operational challenges and adversely affect demand for our debt and Fannie Mae MBS

**FHFA Advisory Bulletin Regarding Framework for Adversely Classifying Loans**

On April 9, 2012, FHFA issued an Advisory Bulletin, "Framework for Adversely Classifying Loans, Other Real Estate Owned, and Other Assets and Listing Assets for Special Mention," which was effective upon issuance and is applicable to Fannie Mae, Freddie Mac and the Federal Home Loan Banks  The Advisory Bulletin establishes guidelines for adverse classification and identification of specified assets and off balance sheet credit exposures  The Advisory Bulletin indicates that this guidance considers and is generally consistent with the *Uniform Retail Credit Classification and Account Management Policy* issued by the federal banking regulators in June 2000

Among other requirements, the Advisory Bulletin requires that we classify the portion of an outstanding single family loan balance in excess of the fair value of the underlying property, less costs to sell, as "loss" when the loan is no more than 180 days delinquent, except in certain specified circumstances (such as properly secured loans with an LTV ratio equal to or less than 60%), and charge off the portion of the loan classified as "loss." The Advisory Bulletin also specifies that, if we subsequently receive full or partial payment of a previously charged off loan, we may report a recovery of the amount, either through our loss reserves or as a reduction in our foreclosed property expenses

The accounting methods outlined in FHFA's Advisory Bulletin are different from our current methods of accounting for single family loans that are 180 days or more delinquent  As described in "Risk Factors," we believe that implementation of these changes in our accounting methods present significant operational challenges for us  We have not yet determined when we will implement the accounting changes specified in the Advisory Bulletin  We are currently assessing the impact of implementing these accounting changes on our future financial results

For additional information on legislative and regulatory matters affecting us, refer to "Business   Legislative and Regulatory Developments" and "Business   Our Charter and Regulation of Our Activities" in our 2011 Form 10 K. Also see "Risk Factors" in this report and our 2011 Form 10 K for a discussion of risks relating to our business relating to legislative and regulatory matters

15

Table of Contents

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in accordance with GAAP requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the condensed consolidated financial statements  Understanding our accounting policies and the extent to which we use management judgment and estimates in applying these policies is integral to understanding our financial statements  We describe our most significant accounting policies in "Note 1, Summary of Significant Accounting Policies" of this report and in our 2011 Form 10 K

We evaluate our critical accounting estimates and judgments required by our policies on an ongoing basis and update them as necessary based on changing conditions. Management has discussed any significant changes in judgments and assumptions in applying our critical accounting policies with the Audit Committee of our Board of Directors  We have identified three of our accounting policies as critical because they involve significant judgments and assumptions about highly complex and inherently uncertain matters, and the use of reasonably different estimates and assumptions could have a material impact on our reported results of operations or financial condition  These critical accounting policies and estimates are as follows:

- Fair Value Measurement
- Total Loss Reserves
- Other Than Temporary Impairment of Investment Securities

See "MD&A   Critical Accounting Policies and Estimates" in our 2011 Form 10 K for a detailed discussion of these critical accounting policies and estimates  We provide below information about our Level 3 assets and liabilities as of March 31, 2012 as compared with December 31, 2011

### Fair Value Measurement

The use of fair value to measure our assets and liabilities is fundamental to our financial statements and is a critical accounting estimate because we account for and record a portion of our assets and liabilities at fair value  In determining fair value, we use various valuation techniques  We describe the valuation techniques and inputs used to determine the fair value of our assets and liabilities and disclose their carrying value and fair value in "Note 12, Fair Value "

#### *Fair Value Hierarchy   Level 3 Assets and Liabilities*

The assets and liabilities that we have classified as Level 3 consist primarily of financial instruments for which there is limited market activity and therefore little or no price transparency  As a result, the valuation techniques that we use to estimate the fair value of Level 3 instruments involve significant unobservable inputs, which generally are more subjective and involve a high degree of management judgment and assumptions  Our Level 3 assets and liabilities consist of certain mortgage backed securities and residual interests, certain mortgage loans, certain acquired property, certain long term debt arrangements and certain highly structured, complex derivative instruments

Table 4 presents a comparison of the amount of financial assets carried in our condensed consolidated balance sheets at fair value on a recurring basis ("recurring assets") that were classified as Level 3 as of March 31, 2012 and December 31, 2011  The availability of observable market inputs to measure fair value varies based on changes in market conditions, such as liquidity. As a result, we expect the amount of financial instruments carried at fair value on a recurring basis and classified as Level 3 to vary each period

16

Table of Contents

**Table 4:   Level 3 Recurring Financial Assets at Fair Value**

| | As of | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Trading securities | $    2,756 | $    4,238 |
| Available for sale securities | 27,853 | 29,492 |
| Mortgage loans | 2,271 | 2,319 |
| Other assets | 203 | 238 |
| Level 3 recurring assets | $    33,083 | $    36,287 |
| Total assets | $3,209,940 | $  3,211,484 |
| Total recurring assets measured at fair value | $  157,492 | $  156,552 |
| Level 3 recurring assets as a percentage of total assets | 1% | 1% |
| Level 3 recurring assets as a percentage of total recurring assets measured at fair value | 21% | 23% |
| Total recurring assets measured at fair value as a percentage of total assets | 5% | 5% |

Assets measured at fair value on a nonrecurring basis and classified as Level 3, which are not presented in the table above, primarily include mortgage loans and acquired property. The fair value of Level 3 nonrecurring assets totaled $28.5 billion as of March 31, 2012 and $69.0 billion for the year ended December 31, 2011

Financial liabilities measured at fair value on a recurring basis and classified as Level 3 consisted of long term debt with a fair value of $1 3 billion as of March 31, 2012 and $1.2 billion as of December 31, 2011, and other liabilities with a fair value of $159 million as of March 31, 2012 and $173 million as of December 31, 2011

## CONSOLIDATED RESULTS OF OPERATIONS

The section below provides a discussion of our condensed consolidated results of operations for the periods indicated and should be read together with our condensed consolidated financial statements, including the accompanying notes

Table 5 displays our condensed consolidated results of operations for the periods indicated

17

Table of Contents

**Table 5:   Summary of Condensed Consolidated Results of Operations**

| | For the Three Months Ended March 31, | | |
| | 2012 | 2011 | Variance |
| --- | --- | --- | --- |
| | (Dollars in millions) | | |
| Net interest income | $5,197 | $ 4,960 | $ 237 |
| Fee and other income | 375 | 237 | 138 |
| **Net revenues** | **$ 5,572** | **$ 5,197** | **$ 375** |
| Investment gains, net | 116 | 75 | 4 |
| Net other than temporary impairments | (64) | (44) | (20) |
| Fair value gains, net | 283 | 289 | (6) |
| Administrative expenses | (564) | (605) | 4 |
| Credit related expenses | | | |
|     Provision for credit losses | (2,000) | (10,554) | 8,554 |
|     Foreclosed prope ty expense | (339) | (488) | 149 |
|         Total credit related expenses | (2,339) | (11,042) | 8,703 |
| Other non interest expenses[(] | (286) | (339) | 53 |
| Income (loss) before federal income taxes | 2,718 | (6,469) | 9,187 |
| Provision for federal income taxes | — | (2) | 2 |
| **Net income (loss)** | **2,718** | **(6,471)** | **9,189** |
| Less: Net loss attributable to the noncontrolling interest | 1 | — | 1 |
| **Net income (loss) attributable to Fannie Mae** | **$ 2,719** | **$ (6,471)** | **$ 9,190** |
| Total comprehensive income (loss) attributable to Fannie Mae | $ 3,081 | $ (6,290) | $9,371 |

[(]   Consists of debt extinguishment (losses) gains, net and other expenses

**Net Interest Income**

Table 6 displays an analysis of our net interest income, average balances, and related yields earned on assets and incurred on liabilities for the periods indicated  For most components of the average balances, we use a daily weighted average of amortized cost  When daily average balance information is not available, such as for mortgage loans, we use monthly averages  Table 7 displays the change in our net interest income between periods and the extent to which that variance is attributable to: ( ) changes in the volume of our interest earning assets and interest bearing liabilities or (2) changes in the interest rates of these assets and liabilities.

18

Table of Contents

**Table 6:    Analysis of Net Interest Income and Yield**

| | For the Three Months Ended March 31, | | | | | |
| | 2012 | | | 2011 | | |
| | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid |
|---|---|---|---|---|---|---|
| | (Dollars in millions) | | | | | |
| Interest earning assets: | | | | | | |
| Mortgage loans of Fannie Mae | $   378,344 | $  3,569 | 3.77% | $   405,820 | $  3,725 | 3.67% |
| Mortgage loans of consolidated trusts | 2,600,221 | 29,001 | 4.46 | 2,598,508 | 31,865 | 4.91 |
| Total mortgage loans | 2,978,565 | 32,570 | 4 37 | 3,004,328 | 35,590 | 4 74 |
| Mo tgage related securities | 288,449 | 3,458 | 4 80 | 334,057 | 4,245 | 5.08 |
| Elimination of Fannie Mae MBS held in portfolio | (186,214) | (2,305) | 4.95 | (2 4,370) | (2,793) | 5.21 |
| Total mortgage related securities, net | 102,235 | 1,153 | 4.51 | 119,687 | 1,452 | 4.85 |
| Non mortgage securities( | 68,936 | 23 | 0 3 | 79,719 | 45 | 0 23 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 37,485 | 3 | 0 4 | 13,743 | 7 | 0 20 |
| Advances to lenders | 5,050 | 25 | 1.96 | 4,089 | 21 | 2.05 |
| Total interest earning assets | $ 3,192,271 | $ 33,784 | 4 23% | $3,221,566 | $37,115 | 4.61% |
| Interest bearing liabilities: | | | | | | |
| Short term debt(2 | $    33,307 | $    4 | 0.12% | $  138,848 | $    04 | 0 30% |
| Long term debt | 578,155 | 3,185 | 2.20 | 631,917 | 4,196 | 2.66 |
| Total short term and long term funding debt | 711,462 | 3,226 | 1.81 | 770,765 | 4,300 | 2.23 |
| Debt securities of consolidated trusts | 2,666,552 | 27,666 | 4.15 | 2,652,024 | 30,648 | 4.62 |
| Elimination of Fannie Mae MBS held in portfolio | (186,214) | (2,305) | 4.95 | (2 4,370) | (2,793) | 5.21 |
| Total debt securities of consolidated trusts held by third parties | 2,480,338 | 25,361 | 4.09 | 2,437,654 | 27,855 | 4.57 |
| Total interest bearing liabilities | $ 3,191,800 | $28,587 | 3.58% | $3,208,419 | $32,155 | 4 0 % |
| Impact of net non interest bearing funding | $      471 | | 0 00% | $   13,147 | | 0 02% |
| Net interest income/net interest yield | | $  5,197 | 0.65% | | $  4,960 | 0.62% |
| Net interest income/net interest yield of consolidated trusts (3 | | $  1,335 | 0.21% | | $  1,217 | 0.19% |

| | As of March 31, | |
| Selected benchmark interest rates(4) | 2012 | 2011 |
|---|---|---|
| 3 month LIBOR | 0 47% | 0 30% |
| 2 year swap rate | 0.58 | 00 |
| 5 year swap rate | 1.27 | 2.47 |
| 30 year Fannie Mae MBS par coupon rate | 3.06 | 4 30 |

( Includes cash equivalents.

(2 Includes federal funds purchased and securities sold under agreements to repurchase

(3 Net interest income of consolidated trusts represents interest income from mortgage loans of consolidated trusts less interest expense from debt securities of consolidated trusts Net interest yield is calculated based on net interest income from consolidated trusts divided by average balance of mortgage loans of consolidated trusts.

(4 Data from British Bankers' Association, Thomson Reuters Indices and Bloomberg L.P.

19

Table of Contents

**Table 7:   Rate/Volume Analysis of Changes in Net Interest Income**

| | For the Three Months Ended March 31, 2012 vs. 2011 | | |
| | Total Variance | Variance Due to [1] | |
| | | Volume | Rate |
| | | (Dollars in millions) | |
| Interest income: | | | |
| Mortgage loans of Fannie Mae | $   (156) | $ (257) | $    101 |
| Mortgage loans of consolidated trusts | (2,864) | 21 | (2,885) |
| Total mortgage loans | (3,020) | (236) | (2,784) |
| Mo tgage related securities | (787) | (556) | (23 ) |
| Elimination of Fannie Mae MBS held in portfolio | 488 | 354 | 34 |
| Total mortgage related securities, net | (299) | (202) | (97) |
| Non mortgage securities[2] | (22) | (5) | (17) |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 6 | 9 | (3) |
| Advances to lenders | 4 | 5 | ( ) |
| Total interest income | (3,33 ) | (429) | (2,902) |
| Interest expense: | | | |
| Short term debt[3] | (63) | (4) | (59) |
| Long term debt | (1,011) | (337) | (674) |
| Total short term and long term funding debt | ( ,074) | (34 ) | (733) |
| Debt securities of consolidated trusts | (2,982) | 167 | (3,149) |
| Elimination of Fannie Mae MBS held in portfolio | 488 | 354 | 34 |
| Total debt securities of consolidated trusts held by third parties | (2,494) | 521 | (3,015) |
| Total interest expense | (3,568) | 180 | (3,748) |
| Net interest income | $    237 | $ (609) | $    846 |

[1]   Combined rate/volume variances are allocated to both rate and volume based on the relative size of each variance

[2]   Includes cash equivalents.

[3]   Includes federal funds purchased and securities sold under agreements to repurchase

Net interest income increased in the first quarter of 2012, as compared with the first quarter of 2011, primarily due to lower interest expense on debt, which was partially offset by lower interest income on loans and securities  The primary drivers of these changes were:

- lower interest expense on funding debt due to lower funding needs and lower borrowing rates, which allowed us to continue to replace higher cost debt with lower cost debt;

- lower interest income on mortgage securities due to lower interest rates and a decrease in the balance of our mortgage securities, as we continue to manage our portfolio requirements; and

- lower interest income on mortgage loans we hold in our portfolio due to a decrease in average balance and new business acquisitions which continued to replace higher yielding loans with loans issued at lower mortgage rates  The reduction in interest income was partially offset by a reduction in the amount of interest income not recognized for nonaccrual mortgage loans, due to a decline in the balance of nonaccrual loans in our condensed consolidated balance sheets as we continue to complete a high number of loan modifications and foreclosures

Additionally, our net interest income and net interest yield were higher than they would have otherwise been in the first quarter of 20 2 and 20    because our debt funding needs were lower than would otherwise have been required as a result of funds we received from Treasury under the senior preferred stock purchase agreement  Further, dividends paid to Treasury are not recognized as interest expense

Table 8 displays the interest income not recognized for loans on nonaccrual status and the resulting reduction in our net interest yield on total interest earning assets for the periods indicated

20

Table of Contents

**Table 8:   Impact of Nonaccrual Loans on Net Interest Income**

| | For the Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] |
| --- | --- | --- | --- | --- |
| | (Dollars in millions) | | | |
| Mortgage loans of Fannie Mae | $   (982) | | $ (1,362) | |
| Mortgage loans of consolidated trusts | (  80) | | (258) | |
| Total mortgage loans | $(1,162) | (15)bp | $ (1,620) | (20)bp |

[1]   Amount includes cash received for loans on nonaccrual status.

[2]   Calculated based on annualized interest income not recognized divided by total interest earning assets, expressed in basis points

For a discussion of the interest income from the assets we have purchased and the interest expense from the debt we have issued, see the discussion of our Capital Markets group's net interest income in "Business Segment Results "

**Fair Value Gains, Net**

Table 9 displays the components of our fair value gains and losses.

**Table 9:   Fair Value Gains, Net**

| | For the Three Months Ended March 31, | |
| | 2012 | 2011 |
| --- | --- | --- |
| | (Dollars in millions) | |
| Risk management derivatives fair value gains (losses) attributable to: | | |
| Net contractual interest expense accruals on interest rate swaps | $   (374) | $   (635) |
| Net change in fair value during the period | 553 | 751 |
| Total risk management derivatives fair value gains, net | 179 | 116 |
| Mortgage commitment derivatives fair value (losses) gains, net | (205) | 23 |
| Total derivatives fair value (losses) gains, net | (26) | 139 |
| Trading securities gains, net | 284 | 225 |
| Other, net[1] | 25 | (75) |
| Fair value gains, net | $   283 | $   289 |

| | 2012 | 2011 |
| --- | --- | --- |
| 5 year swap rate: | | |
| As of January 1 | 1.22% | 2.18% |
| As of March 31 | 1.27 | 2.47 |

[1]   Consists of debt fair value gains (losses), net, debt foreign exchange gains (losses), net, and mortgage loans fair value gains (losses), net

We can expect high levels of period to period volatility in our results of operations and financial condition due to changes in market conditions that result in periodic fluctuations in the estimated fair value of financial instruments that we mark to market through our earnings. These instruments include trading securities and derivatives  The estimated fair value of our trading securities and derivatives may fluctuate substantially from

21

Table of Contents

period to period because of changes in interest rates, credit spreads and interest rate volatility, as well as activity related to these financial instruments  While the estimated fair value of our derivatives may fluctuate, some of the financial instruments that the derivatives hedge are not recorded at fair value in our condensed consolidated financial statements

### *Risk Management Derivatives Fair Value Gains, Net*

Risk management derivative instruments are an integral part of our interest rate risk management strategy  We supplement our issuance of debt securities with derivative instruments to further reduce duration risk, which includes prepayment risk. We recorded risk management derivative fair value gains in the first quarter of 2012 and 2011 primarily as a result of an increase in the fair value of our pay fixed derivatives due to an increase in swap rates  The gains in the first quarter of 2011 were partially offset by fair value losses due to time decay on our purchased options

We present, by derivative instrument type, the fair value gains and losses on our derivatives for the three months ended March 31, 2012 and 2011 in "Note 9, Derivative Instruments "

### *Mortgage Commitment Derivatives Fair Value (Losses) Gains, Net*

We recognized fair value losses on our mortgage commitments in the first quarter of 20 2 primarily due to losses on commitments to sell mortgage related securities as a result of an increase in prices as interest rates decreased during the commitment period  We recognized fair value gains on our mortgage commitments in the first quarter of 20    primarily due to gains on commitments to sell mortgage related securities as a result of a decrease in prices as interest rates increased during the commitment period

### *Trading Securities Gains, Net*

The gains from our trading securities in the first quarter of 2012 and 2011 were primarily driven by the narrowing of credit spreads on commercial mortgage backed securities ("CMBS").

### Credit Related Expenses

We refer to our provision for loan losses and our provision for guaranty losses collectively as our "provision for credit losses " Credit related expenses consist of our provision for credit losses and foreclosed property expense

### *Provision for Credit Losses*

Our total loss reserves provide for an estimate of credit losses incurred in our guaranty book of business, including concessions we granted borrowers upon modification of their loans, as of each balance sheet date  We establish our loss reserves through our provision for credit losses for losses that we believe have been incurred and will eventually be reflected over time in our charge offs  When we determine that a loan is uncollectible, typically upon foreclosure, we record a charge off against our loss reserves  We record recoveries of previously charged off amounts as a reduction to charge offs

Table 10 displays the components of our total loss reserves and our total fair value losses previously recognized on loans purchased out of unconsolidated MBS trusts reflected in our condensed consolidated balance sheets  Because these fair value losses lowered our recorded loan balances, we have fewer inherent losses in our guaranty book of business and consequently require lower total loss reserves  For these reasons, we consider these fair value losses as an "effective reserve," apart from our total loss reserves, to the extent that we expect to realize these amounts as credit losses on the acquired loans in the future  As of March 3  , 20 2, we estimate that nearly two thirds of this amount represents credit losses we expect to realize in the future and over one third will eventually be recovered, either through net interest income for loans that cure or through foreclosed property income for loans where the sale of the collateral exceeds our recorded investment in the loan  We exclude these fair value losses from our credit loss calculation as described in "Credit Loss Performance Metrics "

22

Table of Contents

**Table 10:   Total Loss Reserves**

| | As of | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Allowance for loan losses | $ 70,109 | $ 72,156 |
| Reserve for guaranty losses[1] | 997 | 994 |
| Combined loss reserves | 71,106 | 73,150 |
| Allowance for accrued interest receivable | 2,223 | 2,496 |
| Allowance for preforeclosure property taxes and insurance receivable [2] | 1,282 | 1,292 |
| Total loss reserves | 74,611 | 76,938 |
| Fair value losses previously recognized on acquired credit impaired loans [3] | 15,609 | 16,273 |
| Total loss reserves and fair value losses previously recognized on acquired credit impaired loans | $ 90,220 | $ 93,211 |

[1]   Amount included in "Other liabilities" in our condensed consolidated balance sheets

[2]   Amount included in "Other assets" in our condensed consolidated balance sheets

[3]   Represents the fair value losses on loans purchased out of previously unconsolidated MBS trusts reflected in our condensed consolidated balance sheets

23

Table of Contents

The following table displays changes in the total allowance for loan losses, reserve for guaranty losses and the total combined loss reserves for the three months ended March 31, 2012 and 2011.

**Table 11:   Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves)**

| | For the Three Months Ended March 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2012 | | | 2011 | | |
| | Fannie Mae | Consolidated Trusts | Total | Fannie Mae | Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| **Changes in combined loss reserves:** | | | | | | |
| Allowance for loan losses⁽ : | | | | | | |
| Beginning balance | $ 57,309 | $ 14,847 | $72,156 | $ 48,530 | $ 13,026 | $61,556 |
| Provision for loan losses | 1,383 | 597 | 1,980 | 7,159 | 3,428 | 10,587 |
| Charge offs⁽2 ⁽3 | (4,533) | (263) | (4,796) | (5,705) | (448) | (6,153) |
| Recover es | 421 | 6 5 | 486 | 530 | 952 | 1,482 |
| Transfers⁽4 | 2,201 | (2,201) | | 3,207 | (3,207) | |
| Other⁽ | 220 | 63 | 283 | ( 3) | 98 | 85 |
| Ending balance⁽6 | $ 57,001 | $ 13,108 | $ 70,109 | $ 53,708 | $ 13,849 | $67,557 |
| Reserve for guaranty losses: | | | | | | |
| Beginning balance | $   994 | $ | $   994 | $   323 | $ | $   323 |
| Provision (benefit) for guaranty losses | 20 | | 20 | (33) | | (33) |
| Charge offs | (51) | | (51) | (35) | | (35) |
| Recover es | 34 | | 34 | 2 | | 2 |
| Ending balance | $   997 | $ | $   997 | $   257 | $ | $   257 |
| Combined loss reserves⁽ : | | | | | | |
| Beginning balance | $ 58,303 | $ 14,847 | $ 73,150 | $ 48,853 | $ 13,026 | $61,879 |
| Total provision for credit losses | ,403 | 597 | 2,000 | 7,126 | 3,428 | 10,554 |
| Charge offs⁽2 ⁽3 | (4,584) | (263) | (4,847) | (5,740) | (448) | (6,188) |
| Recover es | 455 | 6 5 | 520 | 532 | 952 | 1,484 |
| Transfers⁽4 | 2,201 | (2,201) | | 3,207 | (3,207) | |
| Other⁽ | 220 | 63 | 283 | ( 3) | 98 | 85 |
| Ending balance⁽6 | $57,998 | $ 13,108 | $ 71,106 | $53,965 | $ 13,849 | $ 67,814 |

| | As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| **Allocation of combined loss reserves:** | | |
| Balance at end of each period attributable to: | | |
| Single family | $69,633 | $ 71,512 |
| Multifamily | 1,473 | 1,638 |
| Total | $71,106 | $ 73,150 |
| **Single family and multifamily combined loss reserves as a percentage of applicable guaranty book of business:** | | |
| Single family | 2 44% | 2.52% |
| Multifamily | 0.75 | 0 84 |
| **Combined loss reserves as a percentage of:** | | |
| Total guaranty book of business | 2 33% | 2.41% |
| Recorded investment in nonperforming loans | 28.79 | 29.03 |

24

Table of Contents

[1] Includes an out of period adjustment of $548 million to increase the provision for loan losses for the three months ended March 31, 2012

[2] Includes accrued interest of $273 million and $386 million for the three months ended March 31, 2012 and 2011, respectively.

[3] While we purchase the substantial majority of loans that are four or more months delinquent from our MBS trusts, we do not exercise this option to purchase loans during a forbearance period  Accordingly, charge offs of consolidated trusts generally represent loans that remained in our consolidated trusts at the time of default

[4] Includes transfers from trusts for delinquent loan purchases.

[5] Amounts represent the net activity recorded in our allowances for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers  The provision for credit losses, charge offs, recoveries and transfer activity included in this table reflects all changes for both the allowance for loan losses and the valuation allowances for accrued interest and preforeclosure property taxes and insurance receivable that relate to the mortgage loans

[6] Includes $353 million and $412 million as of March 31, 2012 and 2011, respectively, for acquired credit impaired loans.

Our provision for credit losses continues to be a key driver of our results for each period presented  The amount of our provision for credit losses varies from period to period based on changes in actual and expected home prices, borrower payment behavior, the types and volumes of loss mitigation activities and foreclosures completed, and actual and estimated recoveries from our lender and mortgage insurer counterparties  See "Risk Management   Credit Risk Management   Institutional Counterparty Credit Risk Management" for information on mortgage insurers and outstanding mortgage seller/servicer repurchase obligations  In addition, our provision for credit losses and our loss reserves can be impacted by updates to our allowance for loan loss models that we use to estimate our loss reserves

In April 2012, FHFA issued an Advisory Bulletin that could have an impact on our provision for credit losses in the future; however, we are still assessing the impact of the Advisory Bulletin  See "Legislative and Regulatory Developments    FHFA Advisory Bulletin Regarding Framework for Adversely Classifying Loans" for additional information.

Our provision for credit losses significantly decreased in the first quarter of 2012 compared with the first quarter of 2011 primarily due to: (1) a less significant decline in home prices as the housing market continued to stabilize; we estimate that home prices declined by 0 8% in the first quarter of 2012 compared with a 2 0% decline in the first quarter of 2011, which represented over half of the 2011 home price decline; (2) improved sales prices on dispositions of our REO inventory resulting from strong demand in markets with limited REO supply; and (3) lower single family serious delinquency rates, which declined to 3 67% as of the end of the first quarter of 2012 from 4 27% as of the end of the first quarter of 2011  We discuss our expectations regarding our future credit related expenses and loss reserves in "Executive Summary    Summary of Our Financial Performance for the First Quarter of 2012    Our Expectations Regarding Future Loss Reserves and Credit Related Expenses "

We continue to experience high volumes of loan modifications involving concessions to borrowers, which are considered troubled debt restructurings ("TDRs")  Individual impairment for a TDR is based on the restructured loan's expected cash flows over the life of the loan, taking into account the effect of any concessions granted to the borrower, discounted at the loan's original effective interest rate  The allowance calculated for an individually impaired loan has generally been greater than the allowance that would be calculated under the collective reserve

*Nonperforming Loans*

Our balance of nonperforming single family loans remained high as of March 31, 2012 due to both high levels of delinquencies and an increase in TDRs  When a TDR occurs, the loan may return to a current status, but it will continue to be classified as a nonperforming loan as the loan is not performing in accordance with its original terms  Table 12 displays the composition of our nonperforming loans, which includes our single family and multifamily held for investment and held for sale mortgage loans  For information on the impact of TDRs and other individually impaired loans on our allowance for loan losses, see "Note 3, Mortgage Loans "

25

Table of Contents

**Table 12:   Nonperforming Single Family and Multifamily Loans**

| | As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| On balance sheet nonperforming loans including loans in consolidated Fannie Mae MBS trusts: | | |
| Nonaccrual loans | $ 131,764 | $ 142,998 |
| Troubled debt restructurings on accrual status[(] | 115,069 | 108,797 |
| Total on balance sheet nonperforming loans | 246,833 | 251,795 |
| Off balance sheet nonperforming loans in unconsolidated | | |
| Fannie Mae MBS trusts[(2] | 149 | 154 |
| Total nonperforming loans | 246,982 | 251,949 |
| Allowance for loan losses and allowance for accrued interest receivable related to individually impaired on balance sheet nonperforming loans | (47,720) | (47,711) |
| Total nonperforming loans, net of allowance | $199,262 | $ 204,238 |
| Accruing on balance sheet loans past due 90 days or more [(3] | $      757 | $      768 |

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (Dollars in millions) | |
| Interest related to on balance sheet nonperforming loans: | | |
| Interest income forgone[(4] | $ 2,300 | $2,827 |
| Interest income recognized for the period[(] | ,433 | 1,388 |

[(]   Includes HomeSaver Advance first lien loans on accrual status

[(2]   Represents loans that would meet our criteria for nonaccrual status if the loans had been on balance sheet

[(3]   Recorded investment in loans that, as of the end of each period, are 90 days or more past due and continuing to accrue interest  The majority of this amount consists of loans insured or guaranteed by the U S  government and loans for which we have recourse against the seller in the event of a default

[(4]   Represents the amount of interest income we did not record but would have recorded during the period for on balance sheet nonperforming loans as of the end of each period had the loans performed according to their original contractual terms

[(]   Represents interest income recognized during the period for on balance sheet loans classified as nonperforming as of the end of each period  Includes primarily amounts accrued while the loans were performing and cash payments received on nonaccrual loans

### Foreclosed Property Expense

Foreclosed property expense decreased in the first quarter of 2012 compared with the first quarter of 2011 primarily due to improved sales prices on dispositions of our REO properties resulting from strong demand in markets with limited REO supply, and a 25% decline in our inventory of single family REO properties  We had fewer REO properties in the first quarter of 2012 compared with the first quarter of 2011, primarily driven by delays in the foreclosure process, which resulted in lower foreclosed property expense

### Credit Loss Performance Metrics

Our credit related expenses should be considered in conjunction with our credit loss performance metrics  Our credit loss performance metrics, however, are not defined terms within GAAP and may not be calculated in the same manner as similarly titled measures reported by other companies  Because management does not view changes in the fair value of our mortgage loans as credit losses, we adjust our credit loss performance metrics for the impact associated with our acquisition of credit impaired loans from unconsolidated MBS trusts  We also exclude interest forgone on nonperforming loans in our mortgage portfolio, other than temporary impairment losses resulting from deterioration in the credit quality of our mortgage related securities and accretion of interest

26

Table of Contents

income on acquired credit impaired loans from credit losses  We believe that credit loss performance metrics may be useful to investors as the losses are presented as a percentage of our book of business and have historically been used by analysts, investors and other companies within the financial services industry  Moreover, by presenting credit losses with and without the effect of fair value losses associated with the acquisition of credit impaired loans, investors are able to evaluate our credit performance on a more consistent basis among periods

Table 13 displays the components of our credit loss performance metrics as well as our average single family and multifamily default rate and initial charge off severity rate

**Table 13:   Credit Loss Performance Metrics**

| | For the Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | Amount | Ratio[1] | Amount | Ratio[1] |
| | | (Dollars in millions) | | |
| Charge offs, net of recoveries | $ 4,327 | 56.8bp | $ 4,704 | 61.2bp |
| Foreclosed property expense | 339 | 4.5 | 488 | 6.4 |
| Credit losses including the effect of fair value losses on acquired credit impaired loans | 4,666 | 61.3 | 5,192 | 67.6 |
| Plus: Impact of acquired credit impaired loans on charge offs, foreclosed property expense [2] | 425 | 5.6 | 494 | 6.5 |
| Credit losses and credit loss ratio | $5,091 | 66.9bp | $5,686 | 74.1bp |
| Credit losses attributable to: | | | | |
|    Single family | $4,955 | | $ 5,604 | |
|    Multifamily | 136 | | 82 | |
|    Total | $5,091 | | $5,686 | |
| Single family default rate | | 0 4 % | | 0 44% |
| Single family initial charge off severity rate[3] | | 33 43% | | 35.93% |
| Average multifamily default rate | | 0.15% | | 0.12% |
| Average multifamily initial charge off severity rate[3] | | 43.95% | | 36.85% |

[1]  Basis points are based on the annualized amount for each line item presented divided by the average guaranty book of business during the period

[2]  Includes fair value losses from acquired credit impaired loans

[3]  Single family and multifamily rates exclude fair value losses on credit impaired loans acquired from MBS trusts and any costs, gains or losses associated with REO after initial acquisition through final disposition; single family rate excludes charge offs from short sales

Credit losses decreased in the first quarter of 2012 compared with the first quarter of 2011 primarily due to: (1) improved sales prices on dispositions of our REO property; and (2) lower REO acquisitions primarily due to delays in the foreclosure process

Our 2009 through first quarter of 2012 vintages accounted for approximately 3% of our single family credit losses for the first quarter of 2012  Credit losses on mortgage loans typically do not peak until the third through sixth years following origination; however, this range can vary based on many factors, including changes in macroeconomic conditions and foreclosure timelines  We provide more detailed credit performance information, including serious delinquency rates by geographic region and foreclosure activity, in "Risk Management    Credit Risk Management    Mortgage Credit Risk Management "

*Regulatory Hypothetical Stress Test Scenario*

Under a September 2005 agreement with FHFA's predecessor, the Office of Federal Housing Enterprise Oversight, we are required to disclose on a quarterly basis the present value of the change in future expected credit losses from our existing single family guaranty book of business from an immediate 5% decline in single

27

Table of Contents

family home prices for the entire United States followed by a return to the average of the possible growth rate paths used in our internal credit pricing models The sensitivity results represent the difference between future expected credit losses under our base case scenario, which is derived from our internal home price path forecast, and a scenario that assumes an instantaneous nationwide 5% decline in home prices.

Table 14 displays the credit loss sensitivities as of the dates indicated for first lien single family whole loans we own or that back Fannie Mae MBS, before and after consideration of projected credit risk sharing proceeds, such as private mortgage insurance claims and other credit enhancements

**Table 14:   Single Family Credit Loss Sensitivity[(1)]**

| | As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Gross single family credit loss sensitivity | $   23,861 | $   21,922 |
| Less: Projected credit risk sharing proceeds | (1,787) | (1,690) |
| Net single family credit loss sensitivity | $   22,074 | $   20,232 |
| Outstanding single family whole loans and loans underlying Fannie Mae MBS | $2,785,358 | $2,769,454 |
| Single family net credit loss sensitivity as a percentage of outstanding single family whole loans and Fannie Mae MBS | 0.79% | 0 73% |

[(   Represents total economic credit losses, which consist of credit losses and forgone interest  Calculations are based on 97% of our total single family guaranty book of business as of March 31, 2012 and December 31, 2011  The mortgage loans and mortgage related securities that are included in these estimates consist of: (a) family Fannie Mae MBS (whether held in our mortgage portfolio or held by third parties), excluding certain whole loan REMICs and private label wraps; (b) single family mortgage loans, excluding mortgages secured only by second liens, manufactured housing chattel loans and reverse mortgages; and (c) long term standby commitments  We expect the inclusion in our estimates of the excluded products may impact the estimated sensitivities set forth in this table

Because these sensitivities represent hypothetical scenarios, they should be used with caution  Our regulatory stress test scenario is limited in that it assumes an instantaneous uniform 5% nationwide decline in home prices, which is not representative of the historical pattern of changes in home prices  Changes in home prices generally vary on a regional, as well as a local, basis  In addition, these stress test scenarios are calculated independently without considering changes in other interrelated assumptions, such as unemployment rates or other economic factors, which are likely to have a significant impact on our future expected credit losses

## BUSINESS SEGMENT RESULTS

Results of our three business segments are intended to reflect each segment as if it were a stand alone business  Under our segment reporting structure, the sum of the results for our three business segments does not equal our condensed consolidated results of operations as we separate the activity related to our consolidated trusts from the results generated by our three segments  In addition, because we apply accounting methods that differ from our condensed consolidated results for segment reporting purposes, we include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to our condensed consolidated results of operations  We describe the management reporting and allocation process used to generate our segment results in our 20   Form   0 K in "Notes to Consolidated Financial Statements   Note   4, Segment Reporting " We are working on reorganizing our company by function rather than by business in order to improve our operational efficiencies and effectiveness  In future periods, we may change some of our management reporting and how we report our business segment results

In this section, we summarize our segment results for the first quarter of 2012 and 2011 in the tables below and provide a comparative discussion of these results  This section should be read together with our comparative discussion of our condensed consolidated results of operations in "Consolidated Results of Operations " See "Note   0, Segment Reporting" of this report for a reconciliation of our segment results to our condensed consolidated results

28

Table of Contents

### Single Family Business Results

Table 15 displays the financial results of our Single Family business for the periods indicated. The primary source of revenue for our Single Family business is guaranty fee income. Expenses primarily include credit related expenses, net interest loss and administrative expenses.

**Table 15:   Single Family Business Results**

| | For the Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2012 | 2011 | Variance |
| | (Dollars in millions) | | |
| Net interest loss | $ (379) | $ (898) | $ 519 |
| Guaranty fee income[1] | 1,911 | 1,871 | 40 |
| Credit related expenses[2] | (2,385) | (11,106) | 8,721 |
| Other expenses[3] | (415) | (586) | 171 |
| Loss before federal income taxes | (1,268) | (10,719) | 9,451 |
| Provision for federal income taxes | — | (2) | 2 |
| Net loss attributable to Fannie Mae | $ (1,268) | $ (10,721) | $9,453 |
| Single family effective guaranty fee rate (in basis points)[4] | 26.8 | 26.0 | |
| Single family average charged guaranty fee on new acquisitions (in basis points)[5] | 28.9 | 26.1 | |
| Average single family guaranty book of business[6] | $2,850,007 | $2,881,300 | |
| Single family Fannie Mae MBS issuances[7] | $ 196,755 | $ 166,673 | |

[1]   Guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive income (loss).

[2]   Consists of the provision for credit losses and foreclosed property expense.

[3]   Consists of investment gains, net, fair value losses, fee and other income, administrative expenses and other expenses.

[4]   Calculated based on annualized Single Family segment guaranty fee income divided by the average single family guaranty book of business, expressed in basis points.

[5]   Calculated based on the average contractual fee rate for our single family guaranty arrangements entered into during the period plus the recognition of any upfront cash payments ratably over an estimated average life, expressed in basis points.

[6]   Consists of single family mortgage loans held in our mortgage portfolio, single family mortgage loans held by consolidated trusts, single family Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on single family mortgage assets. Excludes non Fannie Mae mortgage related securities held in our investment portfolio for which we do not provide a guaranty.

[7]   Reflects unpaid principal balance of Fannie Mae MBS issued and guaranteed by the Single Family segment during the period.

Our average single family guaranty book of business was relatively flat period over period despite our continued high market share because of the decline in U.S. residential mortgage debt outstanding. Our estimated market share of new single family mortgage related securities issuances, which excludes previously securitized mortgages, remained high at 51% for the first quarter of 2012 compared with 49% for the first quarter of 2011.

### Net Interest Loss

Net interest loss for the Single Family business segment primarily consists of: (1) the cost to reimburse the Capital Markets group for interest income not recognized for loans in our mortgage portfolio on nonaccrual status; (2) the cost to reimburse MBS trusts for interest income not recognized for loans in consolidated trusts on nonaccrual status; and (3) income from cash payments received on loans that have been placed on nonaccrual status.

29

Table of Contents

Net interest loss decreased in the first quarter of 2012 compared with the first quarter of 2011 primarily due to a significant decrease in interest income not recognized for loans on nonaccrual status as high loan workout volumes over the past several quarters have driven the decline in the number of loans on nonaccrual status.

*Credit Related Expenses*

Credit related expenses and credit losses in the Single Family business represent the substantial majority of our consolidated totals  We provide a discussion of our credit related expenses and credit losses in "Consolidated Results of Operations   Credit Related Expenses "

**Multifamily Business Results**

Multifamily business results primarily reflect our multifamily guaranty business. Our multifamily business results also include activity relating to our low income housing tax credit ("LIHTC") and equity investments  Although we are no longer making new LIHTC or equity investments, we continue to make contractually required contributions for our legacy investments  Activity from multifamily products is also reflected in the Capital Markets group results, which include net interest income related to multifamily loans and securities, gains and losses from the sale of multifamily Fannie Mae MBS and re securitizations, and other miscellaneous income  Estimated net interest income earned on multifamily mortgage loans and multifamily Fannie Mae MBS in the Capital Markets group results was $204 million for the three months ended March 31, 2012 and $230 million for the three months ended March 31, 2011.

Table 16 displays the financial results of our Multifamily business for the periods indicated. The primary sources of revenue for our Multifamily business are guaranty fee income and fee and other income  Expenses primarily include administrative expenses

**Table 16:   Multifamily Business Results**

| | For the Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2012 | 2011 | Variance |
| | (Dollars in millions) | | |
| Guaranty fee income[1] | $   243 | $   209 | $   34 |
| Fee and other income | 47 | 58 | (11) |
| Gains (losses) from partnership investments [2] | 11 | (12) | 23 |
| Credit related income[3] | 46 | 64 | (18) |
| Other expenses[4] | (68) | (67) | ( ) |
| Income before federal income taxes | 279 | 252 | 27 |
| Provision for federal income taxes | | (5) | 5 |
| Net income attributable to Fannie Mae | $   279 | $   247 | $   32 |
| Multifamily effective guaranty fee rate (in basis points)[5] | 49.6 | 44 0 | |
| Multifamily credit loss performance ratio (in basis points) [6] | 27.8 | 17.3 | |
| Average multifamily guaranty book of business[7] | $196,019 | $190,012 | |
| Multifamily new business volumes[8] | $   7,159 | $   5,024 | |
| Multifamily units financed from new business volumes | 117,000 | 83,000 | |
| Multifamily Fannie Mae MBS issuances[9] | $   8,851 | $   8,581 | |
| Multifamily Fannie Mae structured securities issuances (issued by Capital Markets group) [10] | $   2,238 | $   ,400 | |
| Additional net interest income earned on Fannie Mae multifamily mortgage loans and MBS (included in Capital Markets Group's results)[11] | $   204 | $   230 | |
| Average Fannie Mae multifamily mortgage loans and MBS in Capital Markets Group's portfolio [12] | $ 103,989 | $114,375 | |

30

Table of Contents

| | As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Multifamily serious delinquency rate | 0 37% | 0.59% |
| Percentage of multifamily guaranty book of business with credit enhancement | 90% | 90% |
| Fannie Mae percentage of total multifamily mortgage debt outstanding [3] | 21.2% | 21.0% |
| Multifamily Fannie Mae MBS outstanding [4] | $107,868 | $101,574 |

[1]   Guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive income (loss)

[2]   Gains (losses) from partnership investments are included in other expenses in our condensed consolidated statements of operations and comprehensive income (loss)  Gains (losses) from partnership investments are reported using the equity method of accounting  As a result, net income (loss) attributable to noncontrolling interest from partnership investments is not included in income (loss) for the Multifamily segment

[3]   Consists of the benefit for credit losses and foreclosed property expense

[4]   Consists of net interest loss, investment gains, administrative expenses, and other expenses

[5]   Calculated based on annualized Multifamily segment guaranty fee income divided by the average multifamily guaranty book of business, expressed in basis points.

[6]   Calculated based on the annualized Multifamily credit losses divided by the average multifamily guaranty book of business, expressed in basis points.

[7]   Consists of multifamily mortgage loans held in our mortgage portfolio, multifamily mortgage loans held by consolidated trusts, multifamily Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on multifamily mortgage assets  Excludes non Fannie Mae mortgage related securities held in our investment portfolio for which we do not provide a guaranty

[8]   Reflects unpaid principal balance of multifamily Fannie Mae MBS issued (excluding portfolio securitizations) and multifamily loans purchased during the period

[9]   Reflects unpaid principal balance of multifamily Fannie Mae MBS issued during the period. Includes: (a) issuances of new MBS, (b) $1.6 billion and $3.5 billion of Fannie Mae portfolio securitization transactions for the three months ended March 31, 2012 and 2011, respectively, and (c) $163 million and $119 million of conversions of adjustable rate loans to fixed rate loans and discount MBS ("DMBS") to MBS for the three months ended March 31, 2012 and 2011, respectively.

[10]   Reflects original unpaid principal balance of out of portfolio multifamily structured securities issuances by our Capital Markets Group

[11]   Interest expense estimate based on allocated duration matched funding costs  Net interest income was reduced by guaranty fees allocated to Multifamily from the Capital Markets Group on multifamily loans in Fannie Mae's portfolio

[12]   Based on unpaid principal balance.

[13]   Includes mortgage loans and Fannie Mae MBS issued and guaranteed by the Multifamily segment  Information as of March 31, 2012 is as of December 3 , 20   and is based on the Federal Reserve's December 20   mortgage debt outstanding release, the latest date for which the Federal Reserve has estimated mortgage debt outstanding for multifamily residences  Information as of December 31, 2011 is as of September 30, 2011 and is based on the Federal Reserve's September 20   mortgage debt outstanding release  Prior period amounts may have been changed to reflect revised historical data from the Federa  Reserve

[14]   Includes $29 3 billion and $28 3 billion of Fannie Mae multifamily MBS held in the mortgage portfolio, the vast majority of which have been consolidated to loans in our condensed consolidated balance sheets, as of March 31, 2012 and December 31, 2011, respectively; and $1.4 billion of bonds issued by HFAs as of March 31, 2012 and December 31, 2011.

*Guaranty Fee Income*

Multifamily guaranty fee income increased in the first quarter of 2012 compared with the first quarter of 2011 primarily due to higher fees charged on new acquisitions  New acquisitions with higher guaranty fees have become an increasingly large part of our multifamily guaranty book of business

*Credit Related Income*

Multifamily credit related income decreased in the first quarter of 2012 compared with the first quarter of 2011, primarily driven by a lower decrease in the reserve for guaranty losses than in the first quarter of 2011.

3

Table of Contents

Multifamily credit losses, which consist of net charge offs and foreclosed property expense, were $136 million for the first quarter of 2012 compared with $82 million for the first quarter of 2011. Although national multifamily market fundamentals continued to improve in the first quarter of 2012, certain local markets and properties continued to underperform compared to the rest of the nation

### *Capital Markets Group Results*

Table 17 displays the financial results of our Capital Markets group for the periods indicated  Following the table we discuss the Capital Markets group's financial results and describe the Capital Markets group's mortgage portfolio  For a discussion of the debt issued by the Capital Markets group to fund its investment activities, see "Liquidity and Capital Management " For a discussion of the derivative instruments that Capital Markets uses to manage interest rate risk, see "Consolidated Balance Sheet Analysis   Derivative Instruments" and "Risk Management   Market Risk Management, Including Interest Rate Risk Management   Derivative Instruments" in our 2011 Form 10 K and "Notes to Consolidated Financial Statements   Note 9, Derivative Instruments" in both this report and our 2011 Form 10 K  The primary sources of revenue for our Capital Markets group are net interest income and fee and other income  Expenses and other items that impact income or loss primarily include fair value gains and losses, investment gains and losses, allocated guaranty fee expense, other than temporary impairments and administrative expenses

### Table 17:   Capital Markets Group Results

|  | For the Three Months Ended March 31, | | |
|---|---|---|---|
|  | **2012** | **2011** | **Variance** |
|  | (Dollars in millions) | | |
| Net interest income[ | $ 3,541 | $  3,710 | $  (169) |
| Investment gains, net[2 | 1,007 | 870 | 137 |
| Net other than temporary impairments | (64) | (44) | (20) |
| Fair value gains, net[3 | 170 | 218 | (48) |
| Fee and other income | 180 | 75 | 105 |
| Other expenses[4 | (530) | (553) | 23 |
| Income before federal income taxes | 4,304 | 4,276 | 28 |
| Benefit for federal income taxes | | 5 | (5) |
| Net income attributable to Fannie Mae | $  4,304 | $  4,281 | $   23 |

[   Includes contractual interest income, excluding recoveries, on nonaccrual loans received from the Single Family segment of $  4 billion and $2 0 billion for the three months ended March 3  , 20  2 and 20    , respectively  Capital Markets net interest income is reported based on the mortgage related assets held in the segment's portfolio and excludes interest income on mortgage related assets held by consolidated MBS trusts that are owned by third parties and the interest expense on the corresponding debt of such trusts

[2   We include the securities that we own regardless of whether the trust has been consolidated in reporting of gains and losses on securitizations and sales of available for sale securities

[3   Includes fair value gains or losses on derivatives and trading securities that we own, regardless of whether the trust has been consolidated

[4   Includes allocated guaranty fee expense, debt extinguishment losses, net, administrative expenses, and other expenses  Gains or losses related to the extinguishment of debt issued by consolidated trusts are excluded from the Capital Markets group's results because purchases of securities are recognized as such.

### *Net Interest Income*

The Capital Markets group reports interest income and amortization of cost basis adjustments only on securities and loans that are held in our portfolio  For mortgage loans held in our mortgage portfolio, when interest income is no longer recognized in accordance with our nonaccrual accounting policy, the Capital Markets group

TREASURY-3379

Table of Contents

recognizes interest income reimbursements that the group receives, for the contractual interest due on nonaccrual loans from the Single Family and Multifamily businesses  These reimbursements decreased in the first quarter of 2012 due to the decrease of nonaccrual loans in our portfolio  The interest expense recognized on the Capital Markets group's statement of operations primarily relates to the cost of our funding debt which is reported as "Debt of Fannie Mae" in our condensed consolidated balance sheets  Net interest income also includes a cost of capital charge allocated among the three business segments

The Capital Markets group's net interest income decreased in the first quarter of 2012 compared with the first quarter of 2011 primarily due to a decrease in the balance of mortgage related securities and lower interest rates on loans in our mortgage portfolio  This decrease in interest income on our interest earning assets was partially offset by a decline in interest expense due to lower funding needs and lower borrowing rates, which allowed us to continue to replace higher cost debt with lower cost debt

Our net interest income and net interest yield were higher than they would have otherwise been in the first quarter of 20  2 and 20    because our debt funding needs were lower than would otherwise have been required as a result of funds we received from Treasury under the senior preferred stock purchase agreement  Further, dividends paid to Treasury are not recognized as interest expense

We supplement our issuance of debt securities with derivative instruments to further reduce duration risk, which includes prepayment risk. The effect of these derivatives, in particular the periodic net interest expense accruals on interest rate swaps, is not reflected in Capital Markets' net interest income but is included in our results as a component of "Fair value gains, net" and is displayed in "Table 9: Fair Value Gains, Net." If we had included the economic impact of adding the net contractual interest accruals on our interest rate swaps in our Capital Markets' interest expense, Capital Markets' net interest income would have decreased by $374 million in the first quarter of 2012 compared with a decrease of $635 million in the first quarter of 2011

*Investment Gains, Net*

Investment gains increased in the first quarter of 2012 compared with the first quarter of 2011 due to a higher volume of securitizations and increased gains on sale of available for sale ("AFS") securities

*Fair Value Gains, Net*

The derivatives fair value gains and losses that are reported for the Capital Markets group are consistent with the same gains and losses reported in our condensed consolidated results of operations  We discuss our derivatives fair value gains and losses in "Consolidated Results of Operations    Fair Value Gains, Net."

The gains on our trading securities for the segment during the first quarter of 2012 and 2011 were attributable to a narrowing of credit spreads on CMBS, partially offset by losses on agency MBS due to an increase in interest rates during the periods

*The Capital Markets Group's Mortgage Portfolio*

The Capital Markets group's mortgage portfolio consists of mortgage loans and mortgage related securities that we own  Mortgage related securities held by Capital Markets include Fannie Mae MBS and non Fannie Mae mortgage related securities  The Fannie Mae MBS that we own are maintained as securities on the Capital Markets group's balance sheet  Mortgage related assets held by consolidated MBS trusts are not included in the Capital Markets group's mortgage portfolio

The amount of mortgage assets that we may own is restricted by our senior preferred stock purchase agreement with Treasury  By December 31 of each year, we are required to reduce our mortgage assets to 90% of the maximum allowable amount that we were permitted to own as of December 3  of the immediately preceding calendar year, until the amount of our mortgage assets reaches $250 billion  The maximum allowable amount of mortgage assets we may own was reduced to $729 billion as of December 31, 2011 and will be reduced to $656.1 billion as of December 31, 2012. As of March 31, 2012, we owned $691.7 billion in mortgage assets, compared with $708 4 billion as of December 31, 2011

33

Table of Contents

Table 18 displays our Capital Markets group's mortgage portfolio activity for the periods indicated

**Table 18:   Capital Markets Group's Mortgage Portfolio Activity**[1]

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (Dollars in millions) | |
| Mortgage loans: | | |
| Beginning balance | $ 398,271 | $ 427,074 |
| Purchases | 53,925 | 38,074 |
| Securitizations[2] | (38,372) | (23,983) |
| Liquidations[3] | (19,047) | (19,309) |
| Mortgage loans, ending balance | 394,777 | 421,856 |
| Mortgage securities: | | |
| Beginning balance | 3 0, 43 | 361,697 |
| Purchases[4] | 4,971 | 5,090 |
| Securitizations[2] | 38,372 | 23,983 |
| Sales | (41,246) | (35,426) |
| Liquidations[3] | (15,354) | (19,582) |
| Mortgage securities, ending balance | 296,886 | 335,762 |
| Total Capital Markets mortgage portfolio | $691,663 | $757,618 |

[1]  Based on unpaid principal balance.
[2]  Includes portfolio securitization transactions that do not qualify for sale treatment under GAAP
[3]  Includes scheduled repayments, prepayments, foreclosures and lender repurchases.
[4]  Includes purchases of Fannie Mae MBS issued by consolidated trusts.

34

Table of Contents

Table 19 displays the composition of the Capital Markets group's mortgage portfolio as of March 31, 2012 and December 31, 2011.

**Table 19:    Capital Markets Group's Mortgage Portfolio Composition** [1]

| | As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Capital Markets group's mortgage loans: | | |
| Single family loans | | |
| Government insured or guaranteed | $  41,592 | $  41,555 |
| Conventional: | | |
| Long term, fixed rate | 248,326 | 245,810 |
| Intermediate term, fixed rate | 10,189 | 10,289 |
| Adjustable rate | 21,990 | 23,490 |
| Total single family conventional | 280,505 | 279,589 |
| Total single family loans | 322,097 | 321,144 |
| Multifamily loans | | |
| Government insured or guaranteed | 349 | 362 |
| Conventional: | | |
| Long term, fixed rate | 3,512 | 3,629 |
| Intermediate term, fixed rate | 55,281 | 58,885 |
| Adjustable rate | 13,538 | 14,251 |
| Total multifamily conventional | 72,331 | 76,765 |
| Total multifamily loans | 72,680 | 77,127 |
| Total Capital Markets group's mortgage loans | 394,777 | 398,271 |
| Capital Markets group's mortgage related securities: | | |
| Fannie Mae | 209,834 | 220,061 |
| Freddie Mac | 13,504 | 14,509 |
| Ginnie Mae | 1,015 | ,043 |
| Alt A private label securities | 19,056 | 19,670 |
| Subprime private label securities | 16,175 | 16,538 |
| CMBS | 22,674 | 23,226 |
| Mortgage revenue bonds | 10,518 | 10,899 |
| Other mortgage related securities | 4,110 | 4,197 |
| Total Capital Markets group's mortgage related securities [2] | 296,886 | 3 0, 43 |
| Total Capital Markets group's mortgage portfolio | $691,663 | $ 708,414 |

[1]    Based on unpaid principal balance.

[2]    The fair value of these mortgage related securities was $303 8 billion and $316 5 billion as of March 31, 2012 and December 31, 2011, respectively

The Capital Markets group's mortgage portfolio decreased as of March 31, 2012 compared with December 31, 2011 primarily due to liquidations, partially offset by purchases of delinquent loans from MBS trusts. The total unpaid principal balance of nonperforming loans in the Capital Markets group's mortgage portfolio was $236.2 billion as of March 31, 2012 and December 31, 2011. This population includes loans that have been modified and have been classified as TDRs, as well as unmodified delinquent loans that are on nonaccrual status in our condensed consolidated financial statements.

35

Table of Contents

We expect to continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other factors including the limit on the mortgage assets that we may own pursuant to the senior preferred stock purchase agreement  We purchased approximately 84,900 delinquent loans with an unpaid principal balance of $14 2 billion from our single family MBS trusts in the first quarter of 2012. As of March 31, 2012, the total unpaid principal balance of all loans in single family MBS trusts that were delinquent as to four or more consecutive monthly payments was $4 6 billion

## CONSOLIDATED BALANCE SHEET ANALYSIS

The section below provides a discussion of our condensed consolidated balance sheets as of the dates indicated and should be read together with our condensed consolidated financial statements, including the accompanying notes

Table 20 displays a summary of our condensed consolidated balance sheets as of March 31, 2012 and December 31, 2011.

**Table 20:   Summary of Condensed Consolidated Balance Sheets**

| | As of | | |
| | March 31, 2012 | December 31, 2011 | Variance |
|---|---|---|---|
| | (Dollars in millions) | | |
| **Assets** | | | |
| Cash and cash equivalents and federal funds sold and securities purchased under agreements to resell or similar arrangements | $   37,049 | $   63,539 | $(26,490) |
| Restricted cash | 55,921 | 50,797 | 5,124 |
| Investments in securities⁽ | 149,585 | 151,780 | (2,195) |
| Mortgage loans: | | | |
| Of Fannie Mae | 377,257 | 380,379 | (3,122) |
| Of consolidated trusts | 2,616,577 | 2,590,398 | 26,179 |
| Allowance for loan losses | (70,109) | (72,156) | 2,047 |
| Mortgage loans, net of allowance for loan losses | 2,923,725 | 2,898,621 | 25,104 |
| Other assets⁽² | 43,660 | 46,747 | (3,087) |
| Total assets | $ 3,209,940 | $ 3,211,484 | $  (1,544) |
| **Liabilities and equity (deficit)** | | | |
| Debt: | | | |
| Of Fannie Mae | $  685,974 | $  732,444 | $ (46,470) |
| Of consolidated trusts | 2,498,233 | 2,457,428 | 40,805 |
| Other liabilities⁽³ | 25,465 | 26,183 | (718) |
| Total liabilities | 3,209,672 | 3,216,055 | (6,383) |
| Senior preferred stock | 117,149 | 112,578 | 4,571 |
| Other deficit⁽⁴ | (116,881) | (117,149) | 268 |
| Total equity (deficit) | 268 | (4,571) | 4,839 |
| **Total liabilities and equity (deficit)** | $ 3,209,940 | $ 3,211,484 | $  (1,544) |

⁽    Includes $51 9 billion as of March 31, 2012 and $49 8 billion as of December 31, 2011 of non mortgage related securities that are included in our other investments portfolio, which we present in "Table 30: Cash and Other Investments Portfolio "

⁽²   Consists of accrued interest receivable, net; acquired property, net; and other assets

⁽³   Consists of accrued interest payable and other liabilities

⁽⁴   Consists of preferred stock, common stock, accumulated deficit, accumulated other comprehensive loss, treasury stock, and noncontrolling interest.

36

Table of Contents

**Cash and Other Investments Portfolio**

Our cash and other investments portfolio consists of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell or similar arrangements, and investments in non mortgage related securities  See "Liquidity and Capital Management   Liquidity Management   Cash and Other Investments Portfolio" for additional information on our cash and other investments portfolio

**Restricted Cash**

Restricted cash primarily includes unscheduled borrower payments received by the servicer or consolidated trusts due to be remitted to the MBS certificateholders in the subsequent month  Our restricted cash increased as of March 31, 2012 compared with the balance as of December 31, 2011 primarily due to an increase in refinance activity, resulting in an increase in unscheduled payments received

**Investments in Mortgage Related Securities**

Our investments in mortgage related securities are classified in our condensed consolidated balance sheets as either trading or available for sale and are measured at fair value  Unrealized and realized gains and losses on trading securities are included as a component of "Fair value gains, net" and unrealized gains and losses on available for sale securities are included in "Other comprehensive income" in our condensed consolidated statements of operations and comprehensive income (loss)  Realized gains and losses on available for sale securities are recognized when securities are sold in "Investment gains, net" in our condensed consolidated statements of operations and comprehensive income (loss)  See "Note 5, Investments in Securities" for additional information on our investments in mortgage related securities, including the composition of our trading and available for sale securities at amortized cost and fair value and the gross unrealized gains and losses related to our available for sale securities as of March 31, 2012 and December 31, 2011

Table 21 displays the fair value of our investments in mortgage related securities, including trading and available for sale securities, as of the dates indicated

**Table 21:   Summary of Mortgage Related Securities at Fair Value**

| | As of | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Mortgage related securities: | | |
| Fannie Mae | $ 21,793 | $  24,274 |
| Freddie Mac | 14,518 | 15,555 |
| Ginnie Mae | 1,152 | 1,189 |
| Alt A private label securities | 12,927 | 13,032 |
| Subprime private label securities | 8,900 | 8,866 |
| CMBS | 24,485 | 24,437 |
| Mortgage revenue bonds | 10,407 | 10,978 |
| Other mortgage related securities | 3,477 | 3,601 |
| Total | $97,659 | $101,932 |

*Investments in Private Label Mortgage Related Securities*

We classify private label securities as Alt A, subprime, multifamily or manufactured housing if the securities were labeled as such when issued  We have also invested in private label subprime mortgage related securities that we have resecuritized to include our guaranty ("wraps")

37

Table of Contents

The continued negative impact of the current economic environment, including sustained weakness in the housing market and high unemployment, has adversely affected the performance of our Alt A and subprime private label securities  The unpaid principal balance of our investments in Alt A and subprime securities was $35.2 billion as of March 31, 2012, of which $29.5 billion was rated below investment grade. Table 22 displays the unpaid principal balance and the fair value of our investments in Alt A and subprime private label securities along with an analysis of the cumulative losses on these investments as of March 31, 2012. As of March 31, 2012 and December 31, 2011, we had realized actual cumulative principal shortfalls of approximately 6% of the total cumulative credit losses reported in this table and reflected in our condensed consolidated financial statements

**Table 22:   Analysis of Losses on Alt A and Subprime Private Label Mortgage Related Securities**

| | As of March 31, 2012 | | | | |
| | Unpaid Principal Balance | Fair Value | Total Cumulative Losses[1] | Noncredit Component[2] | Credit Component[3] |
|---|---|---|---|---|---|
| | | | (Dollars in millions) | | |
| Trading securities:[4] | | | | | |
| Alt A private label securities | $ 2,629 | $  1,338 | $ (1,251) | $   ( 02) | $ (1,149) |
| Subprime private label securities | 2,558 | 1,305 | (1,252) | (344) | (908) |
| Total | 5,187 | 2,643 | (2,503) | (446) | (2,057) |
| Available for sale securities:[4] | | | | | |
| Alt A private label securities | 16,427 | 11,589 | (5,409) | (1,306) | (4, 03) |
| Subprime private label securities | 13,617 | 7,595 | (6,061) | (1,668) | (4,393) |
| Total | 30,044 | 19,184 | (11,470) | (2,974) | (8,496) |
| Grand Total | $35,231 | $ 21,827 | $(13,973) | $  (3,420) | $ (10,553) |

[1]  Amounts reflect the difference between the fair value and unpaid principal balance net of unamortized premiums, discounts and certain other cost basis adjustments.

[2]  Represents the estimated portion of the total cumulative losses that is noncredit related  We have calculated the credit component based on the difference between the amortized cost basis of the securities and the present value of expected future cash flows  The remaining difference between the fair value and the present value of expected future cash flows is classified as noncredit related

[3]  For securities classified as trading, amounts reflect the estimated portion of the total cumulative losses that is credit related  For securities classified as available for sale, amounts reflect the estimated portion of total cumulative other than temporary credit impairment losses, net of accretion, that are recognized in our condensed consolidated statements of operations and comprehensive income (loss)

[4]  Excludes resecuritizations, or wraps, of private label securities backed by subprime loans that we have guaranteed and hold in our mortgage portfolio as Fannie Mae securities

Table 23 displays the 60 days or more delinquency rates and average loss severities for the loans underlying our Alt A and subprime private label mortgage related securities for the most recent remittance period of the current reporting quarter  The delinquency rates and average loss severities are based on available data provided by Intex Solutions, Inc  ("Intex") and CoreLogic, LoanPerformance ("CoreLogic")  We also present the average credit enhancement and monoline financial guaranteed amount for these securities as of March 31, 2012  Based on the stressed condition of our non governmental financial guarantors, we believe that all but one of these counterparties may not be able to fully meet their obligations to us in the future  See "Risk Management   Credit Risk Management   Institutional Counterparty Credit Risk Management   Financial Guarantors" for additional information on our financial guarantor exposure and the counterparty risk associated with our financial guarantors.

38

Table of Contents

**Table 23:   Credit Statistics of Loans Underlying Alt A and Subprime Private Label Mortgage Related Securities (Including Wraps)**

| | As of March 31, 2012 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Unpaid Principal Balance | | | | | | Monoline Financial Guaranteed Amount[6] |
| | Trading | Available-for-Sale | Wraps[1] | ≥ 60 Days Delinquent[2][3] | Average Loss Severity[3][4] | Average Credit Enhancement[3][5] | |
| | | | | (Dollars in millions) | | | |
| **Private label mortgage related securities backed by:** [7] | | | | | | | |
| Alt A mortgage loans: | | | | | | | |
| Option ARM Alt A mortgage loans: | | | | | | | |
| 2004 and prior | $ | $ 469 | $ | 30 0% | 60.3% | 15.3% | $ |
| 2005 | | 1,267 | | 40 7 | 62.9 | 37 3 | 241 |
| 2006 | | 1,136 | | 43 4 | 68.2 | 25.5 | 85 |
| 2007 | 1,819 | | | 44 3 | 65.2 | 54.7 | 602 |
| Other Alt A mo tgage loans: | | | | | | | |
| 2004 and prior | | 5,885 | | 0 3 | 54.4 | 12.4 | 12 |
| 2005 | 82 | 3,911 | 108 | 21.7 | 60.3 | 5.4 | |
| 2006 | 60 | 3,646 | | 26.3 | 60.9 | 0.6 | |
| 2007 | 668 | | 162 | 39.4 | 71.7 | 32.9 | 266 |
| 2008[8 | | 113 | | | | | |
| Total Alt A mortgage loans: | 2,629 | 16,427 | 270 | | | | 1,206 |
| Subprime mortgage loans: | | | | | | | |
| 2004 and prior | | 1,580 | 940 | 22.4 | 82.9 | 60.9 | 601 |
| 2005[8 | | 163 | 1,221 | 39.5 | 79.0 | 57.4 | 223 |
| 2006 | | 11,283 | | 46.3 | 81.7 | 17.3 | 52 |
| 2007 | 2,558 | 591 | 5,326 | 45.9 | 77.3 | 21.5 | 173 |
| Total subprime mortgage loans: | 2,558 | 13,617 | 7,487 | | | | 1,049 |
| Total Alt A and subprime mortgage loans: | $ 5,187 | $ 30,044 | $7,757 | | | | $ 2,255 |

[1]   Represents our exposure to private label Alt A and subprime mortgage related securities that have been resecuritized (or wrapped) to include our guarantee

[2]   Delinquency data provided by Intex, where available, for loans backing Alt A and subprime private label mortgage related securities that we own or guarantee  The reported Intex delinquency data reflect information from March 2012 remittances for February 2012 payments  For consistency purposes, we have adjusted the Intex delinquency data, where appropriate, to include all bankruptcies, foreclosures and REO in the delinquency rates

[3]   The average delinquency, severity and credit enhancement metrics are calculated for each loan pool associated with securities where Fannie Mae has exposure and are weighted based on the unpaid principal balance of those securities

[4]   Severity data obtained from CoreLogic, where available, for loans backing Alt A and subprime mortgage related securities that we own or guarantee  The CoreLogic severity data reflect information from March 2012 remittances for February 2012 payments  For consistency purposes, we have adjusted the severity data, where appropriate

[5]   Average credit enhancement percentage reflects both subordination and financial guarantees  Reflects the ratio of the current amount of the securities that will incur losses in the securitization structure before any losses are allocated to securities that we own or guarantee  Percentage generally calculated based on the quotient of the total unpaid principal balance of all credit enhancements in the form of subordination or financial guarantee of the security divided by the total unpaid principal balance of all of the tranches of collateral pools from which credit support is drawn for the security that we own or guarantee  Beginning in March 20 2, in calculating the weighted average credit enhancement percentage for bonds in the population that show negative credit enhancement in Intex due to under collateralization, the negative credit enhancement amounts have been replaced with zero values

[6]   Reflects amount of unpaid principal balance supported by financial guarantees from monoline financial guarantors

39

Table of Contents

[7  Vintages are based on series date and not loan origination date

[8  The unpaid principal balance includes private label Real Estate Mortgage Investment Conduit ("REMIC") securities that have been resecuritized totaling $  3 million for the 2008 vintage of other Alt A loans and $  4 million for the 2005 vintage of subprime loans  These securities are excluded from the delinquency, severity and credit enhancement statistics reported in this table

**Mortgage Loans**

The increase in mortgage loans, net of the allowance for loan losses, in the first quarter of 2012 was primarily driven by securitization activity from our lender swap and portfolio securitization programs  For additional information on our mortgage loans, see "Note 3, Mortgage Loans " For additional information on the mortgage loan purchase and sale activities reported by our Capital Markets group, see "Business Segment Results    Capital Markets Group Results "

**Debt**

Debt of Fannie Mae is the primary means of funding our mortgage investments  We provide a summary of the activity of the debt of Fannie Mae and a comparison of the mix between our outstanding short term and long term debt in "Liquidity and Capital Management    Liquidity Management    Debt Funding " Also see "Note 8, Short Term Borrowings and Long Term Debt" for additional information on our outstanding debt

Debt of consolidated trusts represents the amount of Fannie Mae MBS issued from consolidated trusts and held by third party certificateholders  The increase in debt of consolidated trusts in the first quarter of 2012 was primarily driven by securitization activity from our lender swap and portfolio securitization programs.

**SUPPLEMENTAL NON GAAP INFORMATION    FAIR VALUE BALANCE SHEETS**

As part of our disclosure requirements with FHFA, we disclose on a quarterly basis supplemental non GAAP consolidated fair value balance sheets, which reflect our assets and liabilities at estimated fair value

Table 24 summarizes changes in our stockholders' equity (deficit) reported in our GAAP condensed consolidated balance sheets and in the estimated fair value of our net assets in our non GAAP consolidated fair value balance sheets for the three months ended March 31, 2012  The estimated fair value of our net assets is calculated based on the difference between the fair value of our assets and the fair value of our liabilities, adjusted for noncontrolling interests  We use various valuation techniques to estimate fair value, some of which incorporate internal assumptions that are subjective and involve a high degree of management judgment  We describe the specific valuation techniques used to determine fair value and disclose the carrying value and fair value of our financial assets and liabilities in "Note 12, Fair Value."

40

Table of Contents

Table 24:   Comparative Measures—GAAP Change in Stockholders' Equity (Deficit) and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect)

| | | For the Three Months Ended March 31, 2012 |
|---|---|---|
| | | (Dollars in millions) |
| **GAAP consolidated balance sheets:** | | |
| Fannie Mae stockholders' deficit as of December 31, 2011 ( | $ | (4,624) |
| Total comprehensive income | | 3,080 |
| Capital transactions:(2 | | |
| Funds received from Treasury under the senior preferred stock purchase agreement | | 4,571 |
| Senior preferred stock dividends | | (2,819) |
| Capital transactions, net | | 1,752 |
| Other | | 2 |
| Fannie Mae stockholders' equity as of March 31, 2012 ( | $ | 210 |
| **Non GAAP consolidated fair value balance sheets:** | | |
| Estimated fair value of net assets as of December 31, 2011 | $ | (127,848) |
| Capital transactions, net | | 1,752 |
| Change in estimated fair value of net assets, excluding capital transactions | | (11,549) |
| Decrease in estimated fair value of net assets, net | | (9,797) |
| Estimated fair value of net assets as of March 31, 2012 | $ | (137,645) |

( Our net worth, as defined under the senior preferred stock purchase agreement, is equivalent to the "Total equity (deficit)" amount reported in our condensed consolidated balance sheets  Our net worth, or total deficit, consists of "Total Fannie Mae's stockholders' equity (deficit)" and "Noncontrolling interest" reported in our condensed consolidated balance sheets

(2  Represents capital transactions, which are reported in our condensed consolidated financial statements

During the first quarter of 2012, the estimated fair value of our net assets, excluding capital transactions, decreased by $11.5 billion. We adopted ASU 2011 04, *Amendments to Achieve Common Fair Value Measurements and Disclosure Requirements in U.S. GAAP and IFRS* related to fair value measurement, which resulted in our determination to reflect the fair value of modified loans and certain delinquent loans in the principal markets for whole loans versus the GSE securitization market  This adoption resulted in a net decrease to fair value of $24 4 billion  This decrease was offset by an enhanced estimation process used to value HARP loans that resulted in an increase of $7 4 billion to the fair value of these loans

Excluding the impact of the changes described above, the estimated fair value of our net assets, excluding capital transactions, increased primarily attributable to income from the spread between our mortgage assets and associated debt and derivatives as well as a tightening of the option adjusted spread levels  These increases in fair value were partially offset by credit related items due to declining actual home prices and an increase in interest rates which increased the weighted average life of the guaranty book of business

### Cautionary Language Relating to Supplemental Non GAAP Financial Measures

In reviewing our non GAAP consolidated fair value balance sheets, there are a number of important factors and limitations to consider  The estimated fair value of our net assets is calculated as of a particular point in time based on our existing assets and liabilities  It does not incorporate other factors that may have a significant impact on our long term fair value, including revenues generated from future business activities in which we expect to engage, the value from our foreclosure and loss mitigation efforts or the impact that legislation or potential regulatory actions may have on us  As a result, the estimated fair value of our net assets presented in our non GAAP consolidated fair value balance sheets does not represent an estimate of our net realizable value, liquidation value or our market value as a whole  Amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary materially from the estimated fair values presented in our non GAAP consolidated fair value balance sheets

4

Table of Contents

In addition, the fair value of our net assets attributable to common stockholders presented in our fair value balance sheet does not represent an estimate of the value we expect to realize from operating the company or what we expect to draw from Treasury under the terms of our senior preferred stock purchase agreement, primarily because:

- The estimated fair value of our credit exposures significantly exceeds our projected credit losses as fair value takes into account certain assumptions about liquidity and required rates of return that a market participant may demand in assuming a credit obligation  Because we do not generally intend to have other parties assume the credit risk inherent in our book of business, and therefore would not be obligated to pay a market premium for its assumption, we do not expect the current market premium portion of our current estimate of fair value to impact future Treasury draws;

- The fair value balance sheet does not reflect amounts we expect to draw in the future to pay dividends on the senior preferred stock; and

- The fair value of our net assets reflects a point in time estimate of the fair value of our existing assets and liabilities, and does not incorporate the value associated with new business that may be added in the future.

The fair value of our net assets is not a measure defined within GAAP and may not be comparable to similarly titled measures reported by other companies

**Supplemental Non GAAP Consolidated Fair Value Balance Sheets**

We display our non GAAP fair value balance sheets as of the dates indicated in Table 25

42

Table of Contents

**Table 25:   Supplemental Non-GAAP Consolidated Fair Value Balance Sheets**

| | As of March 31, 2012 | | | As of December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | GAAP Carrying Value | Fair Value Adjustment[1] | Estimated Fair Value | GAAP Carrying Value | Fair Value Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | | |
| **Assets** | | | | | | |
| Cash and cash equivalents | $ 77,970 | $ — | $ 77,970 | $ 68,336 | $ — | $ 68,336 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 15,000 | — | 15,000 | 6,000 | — | 6,000 |
| Trading securities | 75,806 | — | 75,806 | 74,198 | — | 74,198 |
| Available-for-sale securities | 73,779 | — | 73,779 | 77,582 | — | 77,582 |
| Mortgage loans | | | | | | |
| Mortgage loans held for sale | 282 | | 286 | 311 | 1 | |
| Mortgage loans held for investment, net of allowance for loan losses | | | | | | |
| Of Fannie Mae | 320,032 | ( 7,953) | 272,079 | 322,825 | (27,829) | 294,996 |
| Of consolidated trusts | 2,603,411 | 69,620[2] | 2,673,031[3] | 2,575,485 | 76,540[2] | 2,652,025[3] |
| Total mortgage loans | 2,923,725 | 21,671 | 2,945,396[4] | 2,898,621 | 48,725 | 2,947,346[4] |
| Advances to lenders | 3,548 | (89) | 3,459[6] | 5,538 | (118) | 5,420[6] |
| Derivative assets at fair value | 365 | — | 365[6] | 561 | — | 561[6] |
| Guaranty assets and buy-ups, net | 97 | 423 | 920[6] | 503 | 398 | 901[6] |
| Total financial assets | 3,170,690 | 22,005 | 3,192,695[7] | 3,171,339 | 49,005 | 3,220,344[7] |
| Credit enhancements | 453 | 2,396 | 2,849[6] | 455 | 2,550 | 3,005[6] |
| Other assets | 38,797 | (242) | 38,555[6] | 39,690 | (258) | 39,432[6] |
| Total assets | $ 3,209,940 | $ 24,159 | $ 3,234,099 | $ 3,211,484 | $ 51,297 | $ 3,262,781 |
| **Liabilities** | | | | | | |
| Short-term debt | | | | | | |
| Of Fannie Mae | $ 110,852 | $ 13 | $ 110,865 | $ 146,752 | $ 30 | $ 146,782 |
| Of consolidated trusts | 4,495 | — | 4,495 | ,973 | — | ,973 |
| Long-term debt | | | | | | |
| Of Fannie Mae | 575,122[8] | 25,370 | 600,492 | 585,692[8] | 28,291 | 613,983 |
| Of consolidated trusts | 2,493,738[8] | 134,754[2] | 2,628,492 | 2,452,455[8] | 144,202[2] | 2,596,657 |
| Derivative liabilities at fair value | 522 | — | 522[9][10] | 916 | — | 916[9][10] |
| Guaranty obligations | 799 | 3,016 | 3,815[9][10] | 811 | 3,133 | 3,9 [9][10] |
| Total financial liabilities | 3,185,528 | 163,153 | 3,348,681[7] | 3,191,599 | 175,656 | 3,367,255[7] |
| Other liabilities | 24,144 | (1,139) | 23,005[9][10] | 24,456 | (1,135) | 23,321[9][10] |
| Total liabilities | 3,209,672 | 162,014 | 3,371,686 | 3,216,055 | 174,521 | 3,390,576 |
| **Equity (deficit):** | | | | | | |
| Fannie Mae stockholders' equity (deficit): | | | | | | |
| Senior preferred | 117,1 9 | — | 117,1 9 | 112,578 | — | 112,578 |
| Preferred | 19,130 | (18,252) | 878 | 19,130 | (18,163) | 967 |
| Common | (136,069) | (119,603) | (255,672) | (136,332) | (105,061) | (2 1,393) |
| **Total Fannie Mae stockholders' equity (deficit)/non-GAAP fair value of net assets** | $ 210 | $ (137,855) | $ (137,645) | $ ( ,62 ) | $ (123,224) | $ (127,848) |
| Noncontrolling interest | 58 | | 58 | 53 | | 53 |
| Total equity (deficit) | 268 | (137,855) | (137,587) | ( 571) | (123,224) | (127,795) |
| Total liabilities and equity (deficit) | $ 3,209,940 | $ 24,159 | $ 3,234,099 | $ 3,211,484 | $ 51,297 | $ 3,262,781 |

**Explanation and Reconciliation of Non-GAAP Measures to GAAP Measures**

(   each of the amounts listed as a "fair value adjustment" represents the difference between the carrying value included in our GAAP condensed consolidated balance sheets and our best judgment of the estimated fair value of the listed item

(2   Fair value of consolidated loans is impacted by credit risk, which has no corresponding impact on the consolidated debt

(4   Includes certain mortgage loans that we elected to report at fair value in our GAAP condensed consolidated balance sheets of $ 3 billion and $3 6 billion as of March 31, 2012 and December 31, 2011, respectively

(4   Performing loans had both a fair value and an unpaid principal balance of $2 8 trillion as of March 31, 2012 compared with a fair value of $2 8 trillion and an unpaid principal balance of $2 7 trillion as of December 31, 2011 Nonperforming loans, which for the purposes of our

43

non-GAAP air va ue ba ance sheets consists o oans that are de inquent by one or more payments, had a air va ue o $121 0 bi ion and an unpaid principa ba ance o $220 5 bi ion as o March 31, 2012 compared with a air va ue o $128 9 bi ion and an unpaid principa ba ance o $226 5 bi ion as o December 31, 2011 See Note 12, Fair Va ue" or additiona n ormation on va uation techniques or per orming and nonper orming oans

( he fo owing ine items (a) Advances to enders (b) Derivative assets at fair va ue (c) Guaranty assets and buy-ups, net (d) Credit enhancements and (e) Other assets, together consist of the fo owing assets presented in our GAAP condensed conso idated ba ance sheets (a) Accrued interest receivab e, net (b) Acquired property, net and (c) Other assets

(6 Other assets" inc ude the fo owing GAAP condensed conso idated ba ance sheets ine items (a) Accrued interest receivab e, net and (b) Acquired property, net The carrying va ue of these items in our GAAP condensed conso idated ba ance sheets tota ed $20 6 bi ion and $21 bi ion as o March 31, 2012 and December 31, 2011, respective y Other assets" in our GAAP condensed conso idated ba ance sheets inc ude the o owing (a) Advances to enders (b) Derivative assets at air va ue (c) Guaranty assets and buy-ups, net and (d) Credit enhancements The carrying va ue o these items tota ed $4 9 bi ion and $7 1 bi ion as o March 31, 2012 and December 31, 2011, respective y

(7 We estimated the fair va ue of these financia instruments in accordance with the fair va ue accounting guidance as described in Note 12, Fair Va ue "

(8 nc udes certain ong-term debt instruments that we e ected to report at air va ue in our GAAP condensed conso idated ba ance sheets o $5 1 bi ion and $4 8 bi ion as o March 31, 2012 and December 31, 2011, respect ve y

(9 he fo owing ine items (a) Derivative iabi ities at fair va ue (b) Guaranty ob igations and (c) Other iabi ities, consist of the fo owing iabi ities presented in our GAAP condensed conso idated ba ance sheets (a) Accrued interest payab e and (b) Other iabi ities

( 0 Other iabi ities" inc ude Accrued interest payab e in our GAAP condensed conso idated ba ance sheets The carrying va ue of this item in our GAAP condensed conso idated ba ance sheets tota ed $12 bi ion and $12 6 bi ion as of March 31, 2012 and December 31, 2011, respective y We assume that certain other iabi ities, such as deferred revenues, have no fair va ue A though we report the Reserve for guaranty osses" as part of Other iabi ities" in our GAAP condensed conso idated ba ance sheets, it is incorporated into and reported as part of the fair va ue of our guaranty ob igations in our non-GAAP supp ementa conso idated fair va ue ba ance sheets Other iabi ities" in our GAAP condensed conso idated ba ance sheets inc ude the fo owing (a) Derivative iabi ities at fair va ue and (b) Guaranty ob igations The carrying va ue of these items tota ed $1 3 bi ion and $1 7 bi ion as o March 31, 2012 and December 31, 2011, respective y

( he amount inc uded in "estimated fair va ue" of the senior preferred stock is the iquidation preference, which is the same as the GAAP carrying va ue, and does not ref ect fair va ue

## LIQUIDITY AND CAPITAL MANAGEMENT

### Liquidity Management

Our business activities require that we maintain adequate liquidity to fund our operations Our liquidity risk management policy is designed to address our liquidity risk. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner. Liquidity risk management involves forecasting funding requirements, maintaining sufficient capacity to meet our needs based on our ongoing assessment of financial market liquidity and adhering to our regulatory requirements

Our treasury function resides within the Capital Markets group and is responsible for implementing our liquidity and contingency planning strategies We conduct liquidity contingency planning to prepare for an event in which our access to the unsecured debt markets becomes limited We plan for alternative sources of liquidity that are designed to allow us to meet our cash obligations without relying upon the issuance of unsecured debt While our liquidity contingency planning attempts to address stressed market conditions and our status under conservatorship and Treasury support arrangements, we believe that our liquidity contingency plan may be difficult or impossible to execute for a company of our size in our circumstances See "Liquidity and Capital Management Liquidity Management Liquidity Risk Management Practices and Contingency Planning" in our 2011 Form 10 K for a discussion of our liquidity contingency plans. Also see "Risk Factors" in our 2011 Form 10 K for a description of the risks associated with our liquidity risk and liquidity contingency planning

Our liquidity position could be adversely affected by many factors, both internal and external to our business, including: actions taken by our conservator, the Federal Reserve, U S Treasury or other government agencies; legislation relating to us or our business; a U S government payment default on its debt obligations; a downgrade in the credit ratings of our senior unsecured debt or the U S government's debt from the major ratings organizations; a systemic event leading to the withdrawal of liquidity from the market; an extreme market wide widening of credit spreads; public statements by key policy makers; a significant decline in our net worth; potential investor concerns about the adequacy of funding available to us under the senior preferred stock

44

Table of Contents

purchase agreement after 2012; loss of demand for our debt, or certain types of our debt, from a major group of investors; a significant credit event involving one of our major institutional counterparties; a sudden catastrophic operational failure in the financial sector; or elimination of our GSE status

### Debt Funding

We fund our business primarily through the issuance of short term and long term debt securities in the domestic and international capital markets  Because debt issuance is our primary funding source, we are subject to "roll over," or refinancing, risk on our outstanding debt.

We have a diversified funding base of domestic and international investors  Purchasers of our debt securities are geographically diversified and include fund managers, commercial banks, pension funds, insurance companies, foreign central banks, corporations, state and local governments, and other municipal authorities

Although our funding needs may vary from quarter to quarter depending on market conditions, we currently expect our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirement of the senior preferred stock purchase agreement that we reduce our mortgage portfolio   0% per year until it reaches $250 billion

### Fannie Mae Debt Funding Activity

Table 26 displays the activity in debt of Fannie Mae for the periods indicated. This activity excludes the debt of consolidated trusts and intraday loans. The reported amounts of debt issued and paid off during the period represent the face amount of the debt at issuance and redemption, respectively  Activity for short term debt of Fannie Mae relates to borrowings with an original contractual maturity of one year or less while activity for long term debt of Fannie Mae relates to borrowings with an original contractual maturity of greater than one year

**Table 26:   Activity in Debt of Fannie Mae**

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (Dollars in millions) | |
| Issued during the period: | | |
| Short term: | | |
| Amount | $ 45,594 | $ 88,201 |
| Weighted average interest rate | 0.11% | 0.15% |
| Long term: | | |
| Amount | $ 59,464 | $ 51,737 |
| Weighted average interest rate | 1.45% | 2.13% |
| Total issued: | | |
| Amount | $ 105,058 | $ 139,938 |
| Weighted average interest rate | 0.87% | 0.88% |
| Paid off during the period: | | |
| Short term: | | |
| Amount | $ 81,506 | $ 93,031 |
| Weighted average interest rate | 0.12% | 0.26% |
| Long term: | | |
| Amount | $ 71,310 | $ 66,857 |
| Weighted average interest rate | 2.51% | 2.82% |
| Total paid off: | | |
| Amount | $ 152,816 | $ 159,888 |
| Weighted average interest rate | 1.24% | 33% |

Consists o  a  payments on debt, inc uding regu ar y schedu ed principa  payments, payments at maturity, payments resu ting  rom ca  s and payments  or any other repurchases  Ca  s and repurchases o  zero-coupon debt are reported at origina  ace va ue, which does not equa  the amount o  actua  cash payment

45

Table of Contents

Overall debt funding activity decreased in the first quarter of 2012 compared with the first quarter of 2011  As interest rates declined in the first quarter of 20 2, we issued long term debt with lower interest rates to replace redemptions of long term debt with higher interest rates  This long term debt activity, however, was more than offset by the decrease in our short term debt activity as we redeemed more short term debt than was issued during the quarter  Our debt funding activity is likely to continue to decline in future periods as the size of our mortgage portfolio decreases

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding  Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. In February 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market  The report provides that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac  The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period  For more information on GSE reform, see "Legislative and Regulatory Developments   GSE Reform" in this report and in our 20    Form   0 K

In addition, due to our reliance on the U S  government's support, our access to debt funding or the cost of our debt funding could be materially adversely affected by a change or perceived change in the creditworthiness of the U S  government  A downgrade in our credit ratings could reduce demand for our debt securities and increase our borrowing costs  See our discussion of credit ratings in "Risk Factors" in our 2011 Form 10 K for information about factors that may lead to the U S  government's long term debt rating being lowered, and "Credit Ratings" for further discussion of our dependence on our credit ratings

Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll over risk and have a material adverse impact on our liquidity, financial condition and results of operations. See "Risk Factors" in our 2011 Form 10 K for a discussion of the risks we face relating to (1) the uncertain future of our company; (2) our reliance on the issuance of debt securities to obtain funds for our operations and the relative cost to obtain these funds; and (3) our liquidity contingency plans

_Outstanding Debt_

Total outstanding debt of Fannie Mae includes short term and long term debt, excluding debt of consolidated trusts

As of March 31, 2012, our outstanding short term debt, based on its original contractual maturity, as a percentage of our total outstanding debt decreased to 16% from 20% as of December 31, 2011  For information on our outstanding debt maturing within one year, including the current portion of our long term debt, as a percentage of our total debt, see "Maturity Profile of Outstanding Debt of Fannie Mae " In addition, the weighted average interest rate on our long term debt, based on its original contractual maturity, decreased to 2.32% as of March 31, 2012 from 2.42% as of December 31, 2011.

Pursuant to the terms of the senior preferred stock purchase agreement, we are prohibited from issuing debt without the prior consent of Treasury if it would result in our aggregate indebtedness exceeding our outstanding debt limit, which is  20% of the amount of mortgage assets we were allowed to own on December 3  of the immediately preceding calendar year  Our debt limit under the senior preferred stock purchase agreement was reduced to $874 8 billion in 2012. As of March 31, 2012, our aggregate indebtedness totaled $694.5 billion, which was $180.3 billion below our debt limit. The calculation of our indebtedness for purposes of complying with our debt limit reflects the unpaid principal balance and excludes debt basis adjustments and debt of consolidated trusts  Because of our debt limit, we may be restricted in the amount of debt we issue to fund our operations

Table 27 displays information as of the dates indicated on our outstanding short term and long term debt based on its original contractual terms

46

Table of Contents

**Table 27:   Outstanding Short Term Borrowings and Long Term Debt[1]**

| | | As of | | | | | |
|---|---|---|---|---|---|---|---|
| | | March 31, 2012 | | Weighted-Average Interest Rate | | December 31, 2011 | Weighted-Average Interest Rate |
| | Maturities | Outstanding | | | Maturities | Outstanding | |
| | | (Dollars in millions) | | | | | |
| **Short term debt:** | | | | | | | |
| Fixed-rate | | | | | | | |
| Discount notes | | $ 110,350 | 0.12% | | | $ 146,301 | 0.3% |
| Foreign exchange discount notes | | 422 | 2.05 | | | 371 | 1.88 |
| Other[2] | | 80 | 0.04 | | | 80 | 0.04 |
| Total short term debt of Fannie Mae[3] | | 110,852 | 0.3 | | | 146,752 | 0.3 |
| Debt of consolidated trusts | | 4,495 | 0.11 | | | 4,973 | 0.09 |
| Total short term debt | | $ 115,347 | 0.3% | | | $ 151,725 | 0.3% |
| **Long term debt:** | | | | | | | |
| Senior fixed: | | | | | | | |
| Benchmark notes and bonds | 2012-2030 | $275,342 | 2.67% | 2012-2030 | | $277,146 | 2.81% |
| Medium term notes[4] | 2012-2022 | 170,219 | 1.55 | 2012-2021 | | 176,886 | 1.61 |
| Foreign exchange notes and bonds | 2021-2028 | 683 | 5.40 | 2021-2028 | | 662 | 5.44 |
| Other[5][6] | 2012-2040 | 47,034 | 5.29 | 2012-2040 | | 50,912 | 5.29 |
| Total senior fixed | | 493,278 | 2.53 | | | 505,606 | 2.64 |
| Senior floating: | | | | | | | |
| Medium term notes[4] | 2012-2019 | 73,187 | 0.32 | 2012-2016 | | 71,855 | 0.32 |
| Other[5][6] | 2020-2037 | 364 | 8.18 | 2020-2037 | | 420 | 8.01 |
| Total senior floating | | 73,551 | 0.36 | | | 72,275 | 0.35 |
| Subordinated fixed rate: | | | | | | | |
| Qualifying subordinated[7] | 2012-2014 | 4,894 | 5.08 | 2012-2014 | | 4,894 | 5.08 |
| Subordinated debentures | 2019 | 2,984 | 9.91 | 2019 | | 2,917 | 9.91 |
| Total subordinated fixed rate | | 7,878 | 6.91 | | | 7,811 | 6.88 |
| Secured borrowings[8] | 2021-2022 | 415 | 1.87 | | | | |
| Total long term debt of Fannie Mae[9] | | 575,122 | 2.32 | | | 585,692 | 2.42 |
| Debt of consolidated trusts[6] | 2012-2052 | 2,493,738 | 4.04 | 2012-2051 | | 2,452,455 | 4.18 |
| Total long term debt | | $3,068,860 | 3.71% | | | $3,038,147 | 3.84% |
| Outstanding callable debt of Fannie Mae[10] | | $177,972 | 2.05% | | | $187,937 | 2.17% |

[1]  Outstanding debt amounts and weighted average interest rates reported in this table include the effect of unamortized discounts, premiums and other cost basis adjustments. Reported amounts include fair value gains and losses associated with debt that we elected to carry at fair value. The unpaid principal balance of outstanding debt of Fannie Mae, which excludes unamortized discounts, premiums and other cost basis adjustments, and debt of consolidated trusts, totaled $693.8 billion and $741.6 billion as of March 31, 2012 and December 31, 2011, respectively.

[2]  Includes foreign exchange discount notes denominated in U.S. dollars

[3]  Short term debt of Fannie Mae consists of borrowings with an original contractual maturity of one year or less and, therefore, does not include the current portion of long term debt. Reported amounts include a net discount and other cost basis adjustments of $40 million and $53 million as of March 31, 2012 and December 31, 2011, respectively

47

Table of Contents

(4  Includes long term debt with an original contractual maturity of greater than   year and up to   0 years, excluding zero coupon debt

(   Includes long term debt that is not included in other debt categories

(6  Includes a portion of structured debt instruments that is reported at fair value

(7  Consists of subordinated debt with an interest deferral feature

(8  Represents remaining liability for transfer of financial assets from our condensed consolidated balance sheets that did not qualify as a sale

(9  Long term debt of Fannie Mae consists of borrowings with an original contractual maturity of greater than one year  Reported amounts include the current portion of long term debt that is due within one year, which totaled $140.6 billion and $134.3 billion as of March 31, 2012 and December 31, 2011, respectively. Reported amounts also include unamortized discounts, premiums and other cost basis adjustments of $8.4 billion and $9.2 billion as of March 31, 2012 and December 31, 2011, respectively  The unpaid principal balance of long term debt of Fannie Mae, which excludes unamortized discounts, premiums, fair value adjustments and other cost basis adjustments and amounts related to debt of consolidated trusts, totaled $583.4 billion and $594.8 billion as of March 31, 2012 and December 31, 2011, respectively.

( 0  Consists of long term callable debt of Fannie Mae that can be paid off in whole or in part at our option or the option of the investor at any time on or after a specified date. Includes the unpaid principal balance, and excludes unamortized discounts, premiums and other cost basis adjustments.

*Maturity Profile of Outstanding Debt of Fannie Mae*

Table 28 displays the maturity profile, as of March 31, 2012, of our outstanding debt maturing within one year, by month, including amounts we have announced for early redemption  Our outstanding debt maturing within one year, including the current portion of our long term debt, decreased as a percentage of our total outstanding debt, excluding debt of consolidated trusts, to 37% as of March 31, 2012, compared with 38% as of December 31, 2011  The weighted average maturity of our outstanding debt that is maturing within one year was 150 days as of March 31, 2012, compared with 158 days as of December 31, 2011

**Table 28:   Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year**(1)



(   Includes unamortized discounts, premiums and other cost basis adjustments of $101 million as of March 31, 2012. Excludes debt of consolidated trusts maturing within one year of $7.4 billion as of March 31, 2012.

48

Table of Contents

Table 29 displays the maturity profile, as of March 31, 2012, of the portion of our long term debt that matures in more than one year, on a quarterly basis for one year and on an annual basis thereafter, excluding amounts we have announced for early redemption within one year  The weighted average maturity of our outstanding debt maturing in more than one year was approximately 59 months as of March 31, 2012 and December 31, 2011.

**Table 29:   Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year**[1]



[1]   Includes unamortized discounts, premiums and other cost basis adjustments of $8.3 billion as of March 31, 2012. Excludes debt of consolidated trusts of $2.5 trillion as of March 31, 2012.

We intend to repay our short term and long term debt obligations as they become due primarily through proceeds from the issuance of additional debt securities

### *Cash and Other Investments Portfolio*

Table 30 displays information on the composition of our cash and other investments portfolio as of the dates indicated

**Table 30:   Cash and Other Investments Portfolio**

|  | As of | |
| --- | --- | --- |
|  | March 31, 2012 | December 31, 2011 |
|  | (Dollars in millions) | |
| Cash and cash equivalents | $ 22,049 | $ 17,539 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 15,000 | 46,000 |
| Non mortgage related securities: | | |
| U.S. Treasury securities [1] | 50,030 | 47,737 |
| Asset backed securities [2] | 1,896 | 2,111 |
| Total non mortgage related securities | 51,926 | 49,848 |
| Total cash and other investments | $ 88,975 | $ 113,387 |

[1]   Excludes $3.2 billion and $600 million of U.S. Treasury securities which are a component of cash equivalents as of March 31, 2012 and December 31, 2011, respectively, as these securities had a maturity at the date of acquisition of three months or less

[2]   Includes securities primarily backed by credit cards loans and student loans.

49

Table of Contents

Our cash and other investments portfolio decreased from December 31, 2011 to March 31, 2012  The balance of our cash and other investments portfolio fluctuates based on changes in our cash flows, overall liquidity in the fixed income markets and our liquidity risk management policies and practices  See "Risk Management   Credit Risk Management   Institutional Counterparty Credit Risk Management   Issuers of Investments Held in our Cash and Other Investments Portfolio" for additional information on the risks associated with the assets in our cash and other investments portfolio

### Credit Ratings

Our credit ratings from the major credit ratings organizations, as well as the credit ratings of the U S  government, are primary factors that could affect our ability to access the capital markets and our cost of funds  In addition, our credit ratings are important when we seek to engage in certain long term transactions, such as derivative transactions. Standard & Poor's Ratings Services ("S&P"), Moody's Investors Service ("Moody's") and Fitch Ratings Limited ("Fitch") have all indicated that, if they were to lower the sovereign credit ratings on the U S, they would likely lower their ratings on the debt of Fannie Mae and certain other government related entities  We cannot predict whether one or more of these ratings agencies will lower our debt ratings in the future. See "Risk Factors" in our 2011 Form 10 K for a discussion of the possibility of further downgrades and the risks to our business relating to a decrease in our credit ratings, which could include an increase in our borrowing costs, limits on our ability to issue debt, and additional collateral requirements under our derivatives contracts and other borrowing arrangements

Table 31 displays the credit ratings issued by the three major credit rating agencies as of May 2, 2012

### Table 31:   Fannie Mae Credit Ratings

| | As of May 2, 2012 | | |
| --- | --- | --- | --- |
| | S&P | Moody's | Fitch |
| Long term senior debt | AA | Aaa | AAA |
| Short term senior debt | A | P | F + |
| Qualifying subordinated debt | A | Aa2 | AA- |
| Preferred stock | C | Ca | C/RR6 |
| Bank financial strength rating | | E+ | |
| Outlook | Negative (for Long Term Senior Debt and Qualifying Subordinated Debt) | Negative (for Long Term Senior Debt and Qualifying Subordinated Debt) | Negative (for AAA rated Long Term Issuer Default Rating) |

### Cash Flows

_Three Months Ended March 31, 2012_   Cash and cash equivalents increased from December 31, 2011 by $4.5 billion to $22.0 billion as of March 31, 2012  Net cash generated from investing activities totaled $157 5 billion, resulting primarily from proceeds received from repayments of loans held for investment. These net cash inflows were offset by net cash used in operating activities of $114 million and net cash used in financing activities of $152.9 billion primarily attributable to a significant amount of debt redemptions in excess of proceeds received from the issuance of debt as well as proceeds received from Treasury under the senior preferred stock purchase agreement

_Three Months Ended March 31, 2011_   Cash and cash equivalents increased from December 31, 2010 by $2.5 billion to $19.8 billion as of March 31, 2011  Net cash generated from investing activities totaled $123 8 billion, resulting primarily from proceeds received from repayments of loans held for investment  Net cash from operating activities totaled $2 6 billion  These net cash inflows were partially offset by net cash used in financing activities of $123 9 billion primarily attributable to a significant amount of debt redemptions in excess of proceeds received from the issuances of debt as well as proceeds received from Treasury under the senior preferred stock purchase agreement

50

Table of Contents

**Capital Management**

*Regulatory Capital*

FHFA has announced that, during the conservatorship, our existing statutory and FHFA directed regulatory capital requirements will not be binding and that FHFA will not issue quarterly capital classifications  We submit capital reports to FHFA and FHFA monitors our capital levels  The deficit of core capital over statutory minimum capital was $147.8 billion as of March 31, 2012 and $148.4 billion as of December 31, 2011.

*Senior Preferred Stock Purchase Agreement*

As a result of the covenants under the senior preferred stock purchase agreement, Treasury's ownership of the warrant to purchase up to 79 9% of the total shares of our common stock outstanding and the uncertainty regarding our future, we effectively no longer have access to equity funding except through draws under the senior preferred stock purchase agreement

Under the senior preferred stock purchase agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. We have received a total of $116.1 billion from Treasury pursuant to the senior preferred stock purchase agreement as of March 31, 2012. The aggregate liquidation preference of the senior preferred stock, including the initial aggregate liquidation preference of $ 0 billion, remains at $  7  billion

While we had a positive net worth as of March 3 , 20 2, in some future periods we expect to have a net worth deficit and therefore will be required to obtain additional funding from Treasury pursuant to the senior preferred stock purchase agreement.

The senior preferred stock purchase agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any net worth deficiencies attributable to periods during 20 0, 20    and 20 2  If we do not have a positive net worth as of December 3 , 2012, then the amount of funding available under the senior preferred stock purchase agreement after 2012 will be $124 8 billion ($200 billion less $75 2 billion in cumulative draws for net worth deficiencies through December 31, 2009)

In the event we have a positive net worth as of December 31, 2012, then the amount of funding available after 2012 under the senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 20 0, 20 and 2012, as follows:

- If our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124 8 billion less our positive net worth as of December 31, 2012

- If our positive net worth as of December 3 , 20 2 is greater than the cumulative draws for net worth deficiencies attributable to periods during 20 0, 2011 and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011 and 2012.

As of May 9, 2012, the amount of the quarterly commitment fee payable by us to Treasury under the senior preferred stock purchase agreement had not been established; however, Treasury has waived the quarterly commitment fee under the senior preferred stock purchase agreement for each quarter of 2011 and the first and second quarters of 2012 due to the continued fragility of the U S  mortgage market and Treasury's belief that imposing the commitment fee would not generate increased compensation for taxpayers  Treasury stated that it will reevaluate the situation during the next calendar quarter to determine whether the quarterly commitment fee should then be set

*Dividends*

Our first quarter dividend of $2.8 billion was declared by the conservator and paid by us on March 30, 2012. The annualized dividend on the senior preferred stock remains at $11 7 billion based on the 10% dividend rate  The level of dividends on the senior preferred stock will increase in future periods if, as we expect, the conservator requests additional funds on our behalf from Treasury under the senior preferred stock purchase agreement

51

Table of Contents

## OFF BALANCE SHEET ARRANGEMENTS

Our maximum potential exposure to credit losses relating to our outstanding and unconsolidated Fannie Mae MBS and other financial guarantees is primarily represented by the unpaid principal balance of the mortgage loans underlying outstanding and unconsolidated Fannie Mae MBS and other financial guarantees of $61.5 billion as of March 31, 2012 and $62.0 billion as of December 31, 2011.

We also provide assistance to housing finance agencies ("HFAs") under the temporary credit and liquidity facilities programs in which Treasury has purchased participation interests  For a description of these programs, see "MD&A   Off Balance Sheet Arrangements   Treasury Housing Finance Agency Initiative" in our 2011 Form 10 K

## RISK MANAGEMENT

Our business activities expose us to the following three major categories of financial risk: credit risk, market risk (including interest rate and liquidity risk) and operational risk. We seek to actively monitor and manage these risks by using an established risk management framework. Our risk management framework is intended to provide the basis for the principles that govern our risk management activities  In addition to these financial risks, there is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, which we discuss in more detail in "Legislative and Regulatory Developments   GSE Reform" in this report and in "Risk Factors" in our 2011 Form 10 K  We are also subject to a number of other risks that could adversely impact our business, financial condition, earnings and cash flow, including model, legal and reputational risks that may arise due to a failure to comply with laws, regulations or ethical standards and codes of conduct applicable to our business activities and functions

In this section we provide an update on our management of our major risk categories  For a more complete discussion of the financial risks we face and how we manage credit risk, market risk and operational risk, see "MD&A   Risk Management" in our 2011 Form 10 K and "Risk Factors" in our 2011 Form 10 K and in this report.

### Credit Risk Management

We are generally subject to two types of credit risk: mortgage credit risk and institutional counterparty credit risk  Mortgage credit risk is the risk that a borrower will fail to make required mortgage payments  Institutional counterparty credit risk is the risk that our institutional counterparties may fail to fulfill their contractual obligations to us, including seller/servicers who are obligated to repurchase loans from us or reimburse us for losses in certain circumstances

#### *Mortgage Credit Risk Management*

We are exposed to credit risk on our mortgage credit book of business because we either hold mortgage assets, have issued a guaranty in connection with the creation of Fannie Mae MBS backed by mortgage assets or provided other credit enhancements on mortgage assets  While our mortgage credit book of business includes all of our mortgage related assets, both on  and off balance sheet, our guaranty book of business excludes non Fannie Mae mortgage related securities held in our portfolio for which we do not provide a guaranty  We provide information on the performance of non Fannie Mae mortgage related securities held in our portfolio, including the impairment that we have recognized on these securities, in "Consolidated Balance Sheet Analysis   Investments in Mortgage Related Securities   Investments in Private Label Mortgage Related Securities "

#### *Mortgage Credit Book of Business*

Table 32 displays the composition of our entire mortgage credit book of business as of the dates indicated  Our total single family mortgage credit book of business accounted for 93% of our total mortgage credit book of business as of March 31, 2012 and December 31, 2011.

52

Table of Contents

**Table 32:   Composition of Mortgage Credit Book of Business**[1]

| | As of March 31, 2012 | | | As of December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Single-Family | Multifamily | Total | Single-Family | Multifamily | Total |
| | | | (Dollars in millions) | | | |
| Mortgage loans and Fannie Mae MBS[2] | $ 2,814,217 | $ 178,794 | $ 2,993,011 | $ 2,798,633 | $ 176,898 | $ 2,975,531 |
| Unconsolidated Fannie Mae MBS, held by third parties[3] | 17,276 | 1,654 | 18,930 | 17,910 | 1,702 | 19,612 |
| Other credit guarantees[4] | 26,154 | 16,407 | 42,561 | 25,824 | 16,582 | 42,406 |
| Guaranty book of business | $ 2,857,647 | $ 196,855 | $ 3,054,502 | $ 2,842,367 | $ 195,182 | $ 3,037,549 |
| Agency mortgage-related securities[5] | 14,486 | 33 | 14,519 | 15,522 | 33 | 15,555 |
| Other mortgage-related securities[6] | 41,829 | 30,704 | 72,533 | 43,019 | 31,511 | 74,530 |
| Mortgage credit book of business | $ 2,913,962 | $ 227,592 | $ 3,141,554 | $ 2,900,908 | $ 226,726 | $ 3,127,634 |
| **Guaranty Book of Business Detail** | | | | | | |
| Conventional Guaranty Book of Business[7] | $ 2,785,819 | $ 194,560 | $ 2,980,379 | $ 2,769,919 | $ 192,797 | $ 2,962,716 |
| Government Guaranty Book of Business[8] | $ 71,828 | $ 2,295 | $ 74,123 | $ 72,448 | $ 2,385 | $ 74,833 |

[1]   Based on unpaid principal balance.

[2]   Consists of mortgage loans and Fannie Mae MBS recognized in our condensed consolidated balance sheets. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

[3]   Reflects unpaid principal balance of unconsolidated Fannie Mae MBS, held by third party investors. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

[4]   Includes single-family and multifamily credit enhancements that we have provided and that are not otherwise reflected in the table.

[5]   Consists of mortgage-related securities issued by Freddie Mac and Ginnie Mae.

[6]   Consists primarily of mortgage revenue bonds, manufactured housing bonds and CMBS.

[7]   Refers to mortgage loans and mortgage-related securities that are not guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies.

[8]   Refers to mortgage loans and mortgage-related securities guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies.

In the following sections, we discuss the mortgage credit risk of the single-family and multifamily loans in our guaranty book of business. The credit statistics reported below, unless otherwise noted, pertain generally to the portion of our guaranty book of business for which we have access to detailed loan-level information, which constituted approximately 99% of each of our single-family conventional guaranty book of business and our multifamily guaranty book of business, excluding defeased loans, as of March 31, 2012 and December 31, 2011. We typically obtain this data from the sellers or servicers of the mortgage loans in our guaranty book of business and receive representations and warranties from them as to the accuracy of the information. While we perform various quality assurance checks by sampling loans to assess compliance with our underwriting and eligibility criteria, we do not independently verify all reported information and we rely on lender representations regarding the accuracy of the characteristics of loans in our guaranty book of business. See "Risk Factors" in our 2011 Form 10-K for a discussion of the risk that we could experience mortgage fraud as a result of this reliance on lender representations.

53

Table of Contents

***Single-Family Mortgage Credit Risk Management***

Our strategy in managing single family mortgage credit risk consists of four primary components: (1) our acquisition and servicing policies along with our underwriting and servicing standards, including the use of credit enhancements; (2) portfolio diversification and monitoring; (3) management of problem loans; and (4) REO management  These strategies may increase our expenses and may not be effective in reducing our credit related expenses or credit losses  We provide information on our credit related expenses and credit losses in "Consolidated Results of Operations   Credit Related Expenses "

In evaluating our single family mortgage credit risk, we closely monitor changes in housing and economic conditions and the impact of those changes on the credit risk profile of our single family mortgage credit book of business  We regularly review and provide updates to our underwriting standards and eligibility guidelines that take into consideration changing market conditions  The credit risk profile of our single family mortgage credit book of business is influenced by, among other things, the credit profile of the borrower, features of the loan, loan product type, the type of property securing the loan and the housing market and general economy  We focus more on loans that we believe pose a higher risk of default, which typically have been loans associated with higher mark to market LTV ratios, loans to borrowers with lower FICO credit scores and certain higher risk loan product categories, such as Alt A loans  These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment

Because we believe we have limited credit exposure on our government loans, the single family credit statistics we focus on and report in the sections below generally relate to our single family conventional guaranty book of business, which represents the substantial majority of our total single family guaranty book of business.

Table 33 displays our single family conventional business volumes and our single family conventional guaranty book of business for the periods indicated, based on certain key risk characteristics that we use to evaluate the risk profile and credit quality of our single family loans

54

Table of Contents

**Table 33:   Risk Characteristics of Single Family Conventional Business Volume and Guaranty Book of Business** [1]

| | Percent of Single-Family Conventional Business Volume[2] For the Three Months Ended March 31, | | Percent of Single-Family Conventional Guaranty Book of Business[3][4] As of | |
| --- | --- | --- | --- | --- |
| | **2012** | **2011** | **March 31, 2012** | **December 31, 2011** |
| Original LTV ratio:[5] | | | | |
| <= 60% | 29% | 30% | 24% | 24% |
| 60 0  % to 70% | 16 | 16 | 15 | 16 |
| 70 0  % to 80% | 35 | 38 | 4 | 40 |
| 80 0  % to 90% [6] | 9 | 8 | 0 | 0 |
| 90 0  % to  00% [6] | 7 | 6 | 9 | 9 |
| Greater than  00% [6] | 4 | 2 | 1 | 1 |
| Total | 00% | 00% | 00% | 00% |
| Weighted average | 70% | 6 9% | 72% | 71% |
| Average loan amount | $ 214,216 | $ 213,710 | $ 156,697 | $   156,194 |
| Estimated mark to market LTV ratio:[7] | | | | |
| <= 60% | | | 25% | 26% |
| 60 0  % to 70% | | | 12 | 12 |
| 70 0  % to 80% | | | 18 | 18 |
| 80 0  % to 90% | | | 16 | 16 |
| 90 0  % to  00% | | | 0 | 0 |
| Greater than  00% | | | 19 | 18 |
| Total | | | 00% | 00% |
| Weighted average | | | 80% | 79% |
| Product type: | | | | |
| F xed-rate [8] | | | | |
| Long term | 72% | 68% | 72% | 73% |
| Intermed ate-term | 24 | 25 | 16 | 15 |
| Interest only | * | * | 1 | 1 |
| Total fixed rate | 9 6 | 93 | 89 | 89 |
| Adjustable rate: | | | | |
| Interest only | * | 1 | 3 | 3 |
| Other ARMs | 4 | 6 | 8 | 8 |
| Total adjustable rate | 4 | 7 | 11 | 11 |
| Total | 00% | 00% | 00% | 00% |
| Number of property units: | | | | |
| 1 unit | 98% | 98% | 97% | 97% |
| 2 4 units | 2 | 2 | 3 | 3 |
| Total | 00% | 00% | 00% | 00% |
| Property type: | | | | |
| Single family homes | 91% | 91% | 91% | 91% |
| Condo/Co op | 9 | 9 | 9 | 9 |
| Total | 00% | 00% | 00% | 00% |

5 5

Table of Contents

|  | Percent of Single-Family Conventional Business Volume[2] For the Three Months Ended March 31, | | Percent of Single-Family Conventional Guaranty Book of Business[3][4] As of | |
|---|---|---|---|---|
|  | 2012 | 2011 | March 31, 2012 | December 31, 2011 |
| **Occupancy type:** | | | | |
| Primary residence | 89% | 89% | 89% | 89% |
| Second/vacation home | 4 | 5 | 5 | 5 |
| Investor | 7 | 6 | 6 | 6 |
| Total | 00% | 00% | 00% | 00% |
| **FICO credit score at origination:** | | | | |
| < 620 | 1% | *% | 3% | 3% |
| 620 to < 660 | 2 | 2 | 7 | 7 |
| 660 to < 700 | 6 | 7 | 3 | 3 |
| 700 to < 740 | 15 | 17 | 20 | 20 |
| > 740 | 76 | 74 | 57 | 57 |
| Total | 00% | 00% | 00% | 00% |
| Weighted average | 763 | 762 | 739 | 738 |
| **Loan purpose:** | | | | |
| Purchase | 17% | 18% | 30% | 3 % |
| Cash out refinance | 16 | 19 | 26 | 27 |
| Other refinance | 67 | 63 | 44 | 42 |
| Total | 00% | 00% | 00% | 00% |
| **Geographic concentration:[(9]** | | | | |
| Midwest | 15% | 15% | 15% | 15% |
| Northeast | 19 | 20 | 19 | 19 |
| Southeast | 19 | 20 | 23 | 24 |
| Southwest | 15 | 15 | 16 | 15 |
| West | 32 | 30 | 27 | 27 |
| Total | 00% | 00% | 00% | 00% |
| **Origination year:** | | | | |
| <= 200 | | | 2% | 2% |
| 2002 | | | 2 | 2 |
| 2003 | | | 8 | 9 |
| 2004 | | | 5 | 5 |
| 2005 | | | 7 | 7 |
| 2006 | | | 6 | 7 |
| 2007 | | | 9 | 0 |
| 2008 | | | 6 | 7 |
| 2009 | | | 15 | 17 |
| 20 0 | | | 17 | 18 |
| 2011 | | | 18 | 16 |
| 2012 | | | 5 | |
| Total | | | 00% | 00% |

\*   Represents less than 0 5% of single family conventional business volume or book of business

(   We reflect second lien mortgage loans in the original LTV ratio calculation only when we own both the first and second lien mortgage loans or we own only the second lien mortgage loan  Second lien mortgage loans represented less than 0 5%

5 6

Table of Contents

of our single family conventional guaranty book of business as of March 31, 2012 and December 31, 2011  Second lien mortgage loans held by third parties are not reflected in the original LTV or mark to market LTV ratios in this table

[2] Calculated based on unpaid principal balance of single family loans for each category at time of acquisition  Single family business volume refers to both single family mortgage loans we purchase for our mortgage portfolio and single family mortgage loans we guarantee

[3] Calculated based on the aggregate unpaid principal balance of single family loans for each category divided by the aggregate unpaid principal balance of loans in our single family conventional guaranty book of business as of the end of each period

[4] Our single family conventional guaranty book of business includes jumbo conforming and high balance loans that represented 5% of our single family conventional guaranty book of business as of March 31, 2012 and December 31, 2011. See "Business   Our Charter and Regulation of Our Activities   Charter Act   Loan Standards" and "Risk Management   Credit Risk Management   Single Family Mortgage Credit Risk Management   Credit Profile Summary" in our 2011 Form 10 K for additional information on loan limits.

[5] The original LTV ratio generally is based on the original unpaid principal balance of the loan divided by the appraised property value reported to us at the time of acquisition of the loan  Excludes loans for which this information is not readily available

[6] We purchase loans with original LTV ratios above 80% to fulfill our mission to serve the primary mortgage market and provide liquidity to the housing system  Except as permitted under Refi Plus, our charter generally requires primary mortgage insurance or other credit enhancement for loans that we acquire that have an LTV ratio over 80%

[7] The aggregate estimated mark to market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value  Excludes loans for which this information is not readily available

[8] Long term fixed rate consists of mortgage loans with maturities greater than  5 years, while intermediate term fixed rate has maturities equal to or less than  5 years  Loans with interest only terms are included in the interest only category regardless of their maturities

[9] Midwest consists of IL, IN, IA, MI, MN, NE, ND, OH, SD and WI. Northeast includes CT, DE, ME, MA, NH, NJ, NY, PA, PR, RI, VT and VI. Southeast consists of AL, DC, FL, GA, KY, MD, MS, NC, SC, TN, VA and WV. Southwest consists of AZ, AR, CO, KS, LA, MO, NM, OK, TX and UT. West consists of AK, CA, GU, HI, ID, MT, NV, OR, WA and WY.

*Credit Profile Summary*

The single family loans we purchased or guaranteed in the first quarter of 20 2 have a strong credit profile with a weighted average original LTV ratio of 70%, a weighted average FICO credit score of 763, and a product mix with a significant percentage of fully amortizing fixed rate mortgage loans  Due to an increase in the volume of Refi Plus loans (including HARP loans) with higher LTV ratios, the weighted average LTV ratio at origination for our acquisitions in the first quarter of 2012 was higher than for our acquisitions in the first quarter of 2011.

Whether our future acquisitions will exhibit the same credit profile as our recent acquisitions depends on many factors, including our future pricing and eligibility standards, our future objectives, mortgage insurers' eligibility standards, our future volume of Refi Plus acquisitions, which typically include higher LTV ratios and lower FICO credit scores, and future market conditions  We expect the ultimate performance of all our loans will be affected by macroeconomic trends, including unemployment, the economy, and home prices

The credit profile of our acquisitions has been influenced by historically low mortgage rates in recent periods, which has resulted in an increase in the percentage of acquisitions that are refinanced loans  Refinanced loans, which include Refi Plus loans, comprised 83% of our single family acquisitions in the first quarter of 20 2  Refinanced loans generally have a strong credit profile because refinancing indicates borrowers' ability to make their mortgage payment and desire to maintain homeownership, but it is uncertain if Refi Plus loans, which may have lower FICO credit scores and higher LTV ratios than we generally require, will ultimately perform as well as traditional refinanced loans  Under our Refi Plus initiative, which offers expanded refinance opportunities for eligible Fannie Mae borrowers and includes but is not limited to HARP, we allow our borrowers who have mortgage loans with current LTV ratios above 80% to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place  Refi Plus constituted approximately 22% of our total single family acquisitions in the first quarter of 2012, compared with approximately 24% of total single family

57

Table of Contents

acquisitions in all of 20   It is too early to determine whether the ultimate performance of loans with higher risk characteristics refinanced under the Refi Plus program will be different than the performance of other refinanced loans; however, we do expect Refi Plus loans will perform better than the loans they replace because Refi Plus loans should reduce the borrowers' monthly payments or otherwise provide more sustainability than the borrowers' old loans (for example, by refinancing into a mortgage with a fixed interest rate instead of an adjustable rate)   Approximately 20% of our total single family conventional business volume for the first quarter of 2012 consisted of loans with LTV ratios higher than 80% at the time of purchase compared with 16% for the first quarter of 2011.

The prolonged and severe decline in home prices over the past several years has resulted in the overall estimated weighted average mark to market LTV ratio of our single family conventional guaranty book of business to remain high at 80% as of March 31, 2012, and 79% as of December 31, 2011. The portion of our single family conventional guaranty book of business with an estimated mark to market LTV ratio greater than 100% was 19% as of March 31, 2012, and 18% as of December 31, 2011  If home prices decline further, more loans may have mark to market LTV ratios greater than 100%, which increases the risk of delinquency and default.

*Alt A and Subprime Loans*

Our exposure to Alt A and subprime loans included in our single family conventional guaranty book of business, as defined in this section, does not include ( ) our investments in private label mortgage related securities backed by Alt A and subprime loans or (2) resecuritizations, or wraps, of private label mortgage related securities backed by Alt A mortgage loans that we have guaranteed  See "Consolidated Balance Sheet Analysis   Investments in Mortgage Related Securities   Investments in Private Label Mortgage Related Securities" for a discussion of our exposure to private label mortgage related securities backed by Alt A and subprime loans  As a result of our decision to discontinue the purchase of newly originated Alt A loans, except for those that represent the refinancing of an existing Fannie Mae loan, we expect our acquisitions of Alt A mortgage loans to continue to be minimal in future periods and the percentage of the book of business attributable to Alt A will continue to decrease over time  We are also not currently acquiring newly originated subprime loans

We have classified a mortgage loan as Alt A if the lender that delivered the loan to us classified the loan as Alt A based on documentation or other features  We have classified a mortgage loan as subprime if the loan was originated by a lender specializing in subprime business or by a subprime division of a large lender; however, we exclude loans originated by these lenders from the subprime classification if we acquired the loans in accordance with our standard underwriting criteria, which typically require compliance by the seller with our Selling Guide (including standard representations and warranties) and/or evaluation of the loans through our Desktop Underwriter system  We apply our classification criteria in order to determine our Alt A and subprime loan exposures; however, we have other loans with some features that are similar to Alt A and subprime loans that we have not classified as Alt A or subprime because they do not meet our classification criteria  The unpaid principal balance of Alt A loans included in our single family conventional guaranty book of business of $175.9 billion as of March 31, 2012, represented approximately 6.3% of our single family conventional guaranty book of business. The unpaid principal balance of subprime loans included in our single family conventional guaranty book of business of $5.6 billion as of March 31, 2012, represented approximately 0 2% of our single family conventional guaranty book of business

*Problem Loan Management*

Our problem loan management strategies are primarily focused on reducing defaults to avoid losses that would otherwise occur and pursuing foreclosure alternatives to attempt to minimize the severity of the losses we incur  If a borrower does not make required payments, or is in jeopardy of not making payments, we work with the servicers of our loans to offer workout solutions to minimize the likelihood of foreclosure as well as the severity of loss  Our loan workouts reflect our various types of home retention solutions, including loan modifications, repayment plans and forbearances, and foreclosure alternatives, including short sales and deeds in lieu of foreclosure  When appropriate, we seek to move to foreclosure expeditiously

58

Table of Contents

Loan modifications involve changes to the original mortgage terms such as product type, interest rate, amortization term, maturity date and/or unpaid principal balance  Additionally, we currently offer up to twelve months of forbearance for those homeowners who are unemployed as an additional tool to help homeowners avoid foreclosure

Foreclosure alternatives may be more appropriate if the borrower has experienced a significant adverse change in financial condition due to events such as unemployment or reduced income, divorce, or unexpected issues like medical bills and is therefore no longer able to make the required mortgage payments  Since the cost of foreclosure can be significant to both the borrower and Fannie Mae, to avoid foreclosure and satisfy the first lien mortgage obligation, our servicers work with a borrower to sell their home prior to foreclosure in a short sale or accept a deed in lieu of foreclosure whereby the borrower voluntarily signs over the title to their property to the servicer  These alternatives are designed to reduce our credit losses while helping borrowers avoid having to go through a foreclosure

In the following section, we present statistics on our problem loans, describe specific efforts undertaken to manage these loans and prevent foreclosures and provide metrics regarding the performance of our loan workout activities  Unless otherwise noted, single family delinquency data is calculated based on number of loans  We include single family conventional loans that we own and that back Fannie Mae MBS in the calculation of the single family delinquency rate  Seriously delinquent loans are loans that are three or more monthly payments past due or in the foreclosure process  Percentage of book outstanding calculations are based on the unpaid principal balance of loans for each category divided by the unpaid principal balance of our total single family guaranty book of business for which we have detailed loan level information

*Problem Loan Statistics*

The following table displays the delinquency status of loans in our single family conventional guaranty book of business (based on number of loans) as of the dates indicated

**Table 34:   Delinquency Status of Single Family Conventional Loans**

| | As of | | |
|---|---|---|---|
| | March 31, 2012 | December 31, 2011 | March 31, 2011 |
| Delinquency status: | | | |
| 30 to 59 days delinquent | 1.78% | 2.17% | 1.93% |
| 60 to 89 days delinquent | 0.59 | 0 74 | 0 70 |
| Seriously delinquent | 3.67 | 3.91 | 4.27 |
| Percentage of seriously delinquent loans that have been delinquent for more than   80 days | 73% | 70% | 71% |

Our single family serious delinquency rate has decreased each quarter since the first quarter of 2010  The decrease in our serious delinquency rate is primarily the result of home retention solutions, foreclosure alternatives and completed foreclosures, as well as our acquisition of loans with stronger credit profiles since the beginning of 2009, as these loans are now 56% of our single family guaranty book of business, resulting in a smaller percentage of our loans becoming seriously delinquent

Although our single family serious delinquency rate has decreased significantly since the first quarter of 2010, our serious delinquency rate and the period of time that loans remain seriously delinquent have been negatively affected in recent periods by the increase in the average number of days it is taking to complete a foreclosure  Continuing issues in the servicer foreclosure process and changing legislative, regulatory and judicial requirements have lengthened the time it takes to foreclose on a mortgage loan in many states  In addition, servicers and states are dealing with the backlog of foreclosures resulting from these delays and from the elevated level of foreclosures resulting from the housing market downturn  Longer foreclosure timelines result in these loans remaining in our book of business for a longer time, which has caused our serious delinquency rate to decrease more slowly in the last year than it would have if the pace of foreclosures had been faster  We believe the changes in the foreclosure environment will continue to negatively affect our single family serious

59

Table of Contents

delinquency rates, foreclosure timelines and credit related expenses  We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, the volume of loan modifications and the extent to which borrowers with modified loans continue to make timely payments  We expect the number of our single family loans that are seriously delinquent to remain well above pre 2008 levels for years

Table 35 displays a comparison, by geographic region and by loans with and without credit enhancement, of the serious delinquency rates as of the dates indicated for single family conventional loans in our single family guaranty book of business  Serious delinquency rates vary by geographic region due to many factors including regional home prices, unemployment, economic conditions and state foreclosure timelines

**Table 35:   Single Family Serious Delinquency Rates**

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | March 31, 2012 | | December 31, 2011 | | March 31, 2011 | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate |
| Single family conventional delinquency rates by geographic region:(1) | | | | | | |
| Midwest | 15% | 3.39% | 15% | 3 73% | 15% | 3.99% |
| Northeast | 19 | 4 30 | 19 | 4 43 | 19 | 4 30 |
| Southeast | 23 | 5.36 | 24 | 5.68 | 24 | 6.08 |
| Southwest | 16 | 2.10 | 15 | 2 30 | 15 | 2.73 |
| West | 27 | 2.72 | 27 | 2.87 | 27 | 3.61 |
| Total single family conventional loans | 00% | 3.67% | 00% | 3.91% | 00% | 4.27% |
| Single family conventional loans: | | | | | | |
| Credit enhanced | 4% | 8.35% | 4% | 9.10% | 15% | 0  3% |
| Non credit enhanced | 86 | 2.93 | 86 | 3 07 | 85 | 3.26 |
| Total single family conventional loans | 00% | 3.67% | 00% | 3.91% | 00% | 4.27% |

(1)   See footnote 9 to "Table 33: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region

While loans across our single family guaranty book of business have been affected by the weak market conditions, loans in certain states, certain higher risk loan categories, such as Alt A loans and loans with higher mark to market LTVs, and our 2005 through 2008 loan vintages continue to exhibit higher than average delinquency rates and/or account for a disproportionate share of our credit losses  California, Florida, Arizona, Nevada and some states in the Midwest have experienced more significant declines in home prices coupled with unemployment rates that remain high

Table 36 displays the serious delinquency rates and other financial information for our single family conventional loans with some of these higher risk characteristics as of the dates indicated  The reported categories are not mutually exclusive

60

Table of Contents

**Table 36:   Single Family Conventional Serious Delinquency Rate Concentration Analysis**

| | As of | | | | | | | | | | | |
| | March 31, 2012 | | | | December 31, 2011 | | | | March 31, 2011 | | | |
| | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio[1] |
| | (Dollars in millions) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **States** | | | | | | | | | | | | |
| Arizona | $ 66,544 | 2% | 3.22% | 105% | $ 66,875 | 2% | 3.65% | 109% | $ 70,055 | 2% | 5.16% | 110% |
| California | 523,745 | 19 | 2.24 | 81 | 516,608 | 19 | 2.46 | 81 | 518,569 | 19 | 3.35 | 78 |
| Florida | 173,178 | 6 | 11.35 | 106 | 175,344 | 6 | 11.80 | 108 | 182,943 | 7 | 12.40 | 110 |
| Nevada | 28,405 | 1 | 7.06 | 138 | 28,766 | 1 | 7.42 | 138 | 30,856 | 1 | 9.40 | 133 |
| Select Midwest states [2] | 283,725 | 10 | 4.02 | 85 | 284,060 | 10 | 4.39 | 84 | 294,182 | 10 | 4.62 | 82 |
| All other states | 1,701,671 | 62 | 3.01 | 7 | 1,689,846 | 62 | 3.18 | 73 | 1,718,421 | 61 | 3.34 | 73 |
| **Product type** | | | | | | | | | | | | |
| Alt-A | 175,908 | 6 | 12.03 | 103 | 182,236 | 7 | 12.43 | 101 | 203,709 | 7 | 13.45 | 100 |
| Subprime | 5,609 | * | 21.67 | 113 | 5,791 | * | 23.18 | 111 | 6,328 | * | 27.47 | 108 |
| **Vintages** | | | | | | | | | | | | |
| 2005 | 178,996 | 7 | 7.23 | 97 | 190,521 | 7 | 7.27 | 95 | 222,662 | 8 | 7.17 | 93 |
| 2006 | 176,489 | 6 | 11.58 | 113 | 186,835 | 7 | 11.81 | 111 | 218,938 | 8 | 12.12 | 109 |
| 2007 | 253,587 | 9 | 12.27 | 114 | 269,012 | 10 | 12.62 | 112 | 315,420 | 11 | 13.08 | 109 |
| 2008 | 176,632 | 6 | 5.74 | 9 | 192,713 | 7 | 5.64 | 92 | 238,391 | 8 | 5.10 | 88 |
| All other vintages | 1,991,564 | 72 | 1.49 | 70 | 1,922,418 | 69 | 1.59 | 69 | 1,819,614 | 65 | 1.64 | 67 |
| **Estimated mark-to-market LTV ratio** | | | | | | | | | | | | |
| Greater than 100%( | 515,774 | 19 | 12.77 | 130 | 493,762 | 18 | 13.76 | 131 | 499,432 | 18 | 15.72 | 130 |
| **Select combined risk characteristics** | | | | | | | | | | | | |
| Original LTV ratio > 90% and FICO score < 620 | 18,663 | 1 | 16.83 | 117 | 18,992 | 1 | 18.67 | 115 | 20,656 | 1 | 20.20 | 113 |

\*   Percentage is less than 0.5%

(1   Second lien mortgage loans held by third parties are not included in the calculation of the estimated mark-to-market LTV ratios

(2   Consists of Illinois, Indiana, Michigan and Ohio.

*Loan Workout Metrics*

Table 37 displays statistics on our single family loan workouts that were completed, by type, for the periods indicated  These statistics include loan modifications but do not include trial modifications or repayment and forbearance plans that have been initiated but not completed

61

Table of Contents

**Table 37:   Statistics on Single Family Loan Workouts**

| | For the Three Months Ended March 31, 2012 | | For the Three Months Ended March 31, 2011 | |
| | Unpaid Principal Balance | Number of Loans | Unpaid Principal Balance | Number of Loans |
| --- | --- | --- | --- | --- |
| | | (Dollars in millions) | | |
| Home retention solutions: | | | | |
| Modifications | $ 8,881 | 46,671 | $10,668 | 51,043 |
| Repayment plans and forbearances completed ⁽ | 1,292 | 8,864 | 1,374 | 9,916 |
| | 10,173 | 55,535 | 12,042 | 60,959 |
| Foreclosure alternatives: | | | | |
| Short sales | 4,009 | 18,614 | 3,415 | 15,344 |
| Deeds in lieu of foreclosure | 613 | 3,599 | 318 | 1,776 |
| | 4,622 | 22,213 | 3,733 | 17,120 |
| Total loan workouts | $14,795 | 77,748 | $15,775 | 78,079 |
| Loan workouts as a percentage of single family guaranty book of business ⁽2 | 2.07% | 1.75% | 2.18% | 1.73% |

⁽    Repayment plans reflect only those plans associated with loans that were 60 days or more delinquent  Forbearances reflect loans that were 90 days or more delinquent

⁽2    Calculated based on annualized loan workouts during the period as a percentage of our single family guaranty book of business as of the end of the period

The volume of home retention solutions completed in the first quarter of 2012 decreased compared with the first quarter of 2011, primarily due to a decline in the number of seriously delinquent loans in the first quarter of 2012, compared with the first quarter of 2011.

During the first quarter of 2012, we initiated approximately 41,100 trial modifications, including Home Affordable Modification Program ("HAMP") and non HAMP, compared with approximately 49,700 trial modifications during the first quarter of 2011. We also initiated other types of workouts, such as repayment plans and forbearances  It is difficult to predict how many of these trial modifications and initiated plans will be completed

HAMP guidance directs servicers either to cancel or to convert trial modifications after three or four monthly payments, depending on the borrower's circumstances  As of March 31, 2012, 54% of our HAMP trial modifications had been converted to permanent HAMP modifications since the inception of the program  The conversion rate for HAMP modifications since June 1, 2010, when servicers were required to perform a full verification of a borrower's eligibility prior to offering a HAMP trial modification, was 85% as of March 31, 2012  The average length of a trial period for HAMP modifications initiated after June 1, 2010 was four months.

In addition to our home retention solutions, we continue to focus on alternatives to foreclosure for borrowers who are unable to retain their homes  The number of foreclosure alternatives we agreed to during the first quarter of 20 2 remained high as these are favorable solutions for a large number of borrowers  We expect the volume of our home retention solutions and foreclosure alternatives to remain high throughout the remainder of 20 2

We continue to work with our servicers to implement our home retention and foreclosure prevention initiatives  Our approach to workouts continues to focus on the large number of borrowers facing financial hardships  Accordingly, the vast majority of loan modifications we have completed since 2009 have been concentrated on deferring or lowering the borrowers' monthly mortgage payments to allow borrowers to work through their hardships

62

Table of Contents

Table 38 displays the percentage of our loan modifications completed during the first quarter of 2011, 2010 and the second half of 2009 that were current or paid off one year after modification, as well as the percentage of our loan modifications completed during the first quarter of 2010 and the second half of 2009 that were current or paid off two years after modification  We implemented HAMP in early 2009, and thus did not complete a significant number of modifications under this program until the third quarter of 2009.

**Table 38:   Percentage of Loan Modifications That Were Current or Paid Off at One and Two Years Post Modification**[1]

|  | 2011 | 2010 | | | | 2009 | |
|---|---|---|---|---|---|---|---|
|  | Q1 | Q | Q3 | Q2 | Q1 | Q | Q3 |
| **One Year Post Modification** | | | | | | | |
| HAMP Modifications | 77% | 74% | 74% | 74% | 76% | 73% | 71% |
| Non HAMP Modifications | 69 | 67 | 67 | 65 | 55 | 50 | 39 |
| Total | 74 | 69 | 70 | 70 | 65 | 58 | 42 |
| **Two Years Post Modification** | | | | | | | |
| HAMP Modifications | | | | | 70% | 67% | 64% |
| Non HAMP Modifications | | | | | 52 | 48 | 37 |
| Total | | | | | 60 | 55 | 39 |

[1]  Excludes loans that were classified as subprime ARMs that were modified into fixed rate mortgages and were current at the time of modification  Modifications included permanent modifications, but do not reflect loans currently in trial modifications

We began changing the structure of our non HAMP modifications in 20 0 to lower borrowers' monthly mortgage payments to a greater extent, which improved the performance of our non HAMP modifications overall  In addition, because post modification performance was greater for our HAMP modifications than for our non HAMP modifications, we began in September 20 0 to include trial periods for our non HAMP modifications

There is significant uncertainty regarding the ultimate long term success of our current modification efforts  We believe the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and income, and home prices  Modifications, even those with reduced monthly payments, may also not be sufficient to help borrowers with second liens and other significant non mortgage debt obligations   FHFA, other agencies of the U S  government or Congress may ask us to undertake new initiatives to support the housing and mortgage markets should our current modification efforts ultimately not perform in a manner that results in the stabilization of these markets  See "Risk Factors" in our 2011 Form 10 K for a discussion of efforts we may be required or asked to undertake and their potential effect on us

_REO Management_

Foreclosure and REO activity affect the amount of credit losses we realize in a given period  Table 39 displays our foreclosure activity, by region, for the periods indicated  Regional REO acquisition and charge off trends generally follow a pattern that is similar to, but lags, that of regional delinquency trends

Table of Contents

**Table 39:   Single Family Foreclosed Properties**

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| Single family foreclosed properties (number of properties): | | |
| Beginning of period inventory of single family foreclosed properties (REO) ( | 118,528 | 162,489 |
| Acquisitions by geographic area: (2 | | |
| Midwest | 14,713 | 11,285 |
| Northeast | 3,219 | 2,004 |
| Southeast | 15,470 | 10,976 |
| Southwest | 7,946 | 13,666 |
| West | 6,352 | 15,618 |
| Total properties acquired through foreclosure( | 47,700 | 53,549 |
| Dispositions of REO | (52,071) | (62,814) |
| End of period inventory of single family foreclosed properties (REO) ( | 114,157 | 153,224 |
| Carrying value of single family foreclosed properties (dollars in millions) (3 | $ 9,721 | $ 14,086 |
| Single family foreclosure rate(4 | 1.07% | 1.19% |

( Includes acquisitions through deeds in lieu of foreclosure

(2 See footnote 9 to "Table 33: Risk Characteristics of Single Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region

(3 Excludes foreclosed property claims receivables, which are reported in our condensed consolidated balance sheets as a component of "Acquired property, net "

(4 Estimated based on the annualized total number of properties acquired through foreclosure or deeds in lieu of foreclosure as a percentage of the total number of loans in our single family guaranty book of business as of the end of each respective period

The ongoing weak economy, as well as high unemployment rates, continues to result in a high level of mortgage loans that transition from delinquent to REO status, either through foreclosure or deed in lieu of foreclosure  Our foreclosure rates remain high; however, foreclosure levels were lower than they would have been during the first quarter of 2012 due to delays in the processing of foreclosures caused by continuing foreclosure process issues encountered by our servicers and changing legislative, regulatory and judicial requirements  The delay in foreclosures, as well as an increase in the number of dispositions of REO properties, has resulted in a decrease in the inventory of foreclosed properties since December 3 , 20 0

We continue to manage our REO inventory to minimize costs and maximize sales proceeds  However, as we are unable to market and sell a higher portion of our inventory, the pace at which we can dispose of our properties slows, resulting in higher foreclosed property expenses related to costs associated with ensuring that the property is vacant and costs of maintaining the property

Table 40 displays the current status of our single family foreclosed property inventory, including the percentage of our inventory that we are unable to market, as of the dates indicated

64

Table of Contents

**Table 40:   Single Family Foreclosed Property Status**

| | Percent of Single-Family Foreclosed Properties As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| Available for sale | 22% | 28% |
| Offer accepted⁽ | 20 | 17 |
| Appraisal stage⁽² | 0 | 8 |
| Unable to market: | | |
|     Redemption status⁽³ | 3 | 12 |
|     Occupied status⁽⁴ | 4 | 15 |
|     Rental property⁽ | 8 | 7 |
|     Properties being repaired | 5 | 6 |
|     Other | 8 | 7 |
| Total unable to market | 48 | 47 |
| Total | 00% | 00% |

⁽   Properties for which an offer has been accepted, but the property has not yet been sold

⁽²  Properties that are pending appraisals and being prepared to be listed for sale

⁽³  Properties that are within the period during which state laws allows the former mortgagor and second lien holders to redeem the property

⁽⁴  Properties that are still occupied, and for which the eviction process is not yet complete

⁽   Properties with a tenant living in the home under our Tenant in Place or Deed for Lease programs

In February 2012, FHFA announced the pilot of an REO initiative that will allow qualified investors to purchase pools of foreclosed properties from us with the requirement to rent the purchased properties for a specified number of years  The pilot will involve the sale of pools of various types of assets including rental properties, vacant properties and nonperforming loans with a focus on the hardest hit areas  The first pilot transaction will involve the sale of approximately 2,500 properties located in eight geographic areas, including Atlanta, Chicago, Las Vegas, Los Angeles, Phoenix, and parts of Florida  We do not yet know whether this initiative will have a material impact on our future REO sales and REO inventory levels

*Multifamily Mortgage Credit Risk Management*

The credit risk profile of our multifamily mortgage credit book of business is influenced by the structure of the financing, the type and location of the property, the condition and value of the property, the financial strength of the borrower and lender, market and sub market trends and growth, and the current and anticipated cash flows from the property  These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment  We provide information on our credit related expenses and credit losses in "Business Segment Results
   Multifamily Business Results."

*Multifamily Acquisition Policy and Underwriting Standards*

Our Multifamily business, together with our Enterprise Risk Management division, which provides independent risk oversight of the Multifamily business, is responsible for pricing and managing the credit risk on multifamily mortgage loans we purchase and on Fannie Mae MBS backed by multifamily loans (whether held in our portfolio or held by third parties)  Our primary multifamily delivery channel is the Delegated Underwriting and Servicing, or DUS  ®, program, which is comprised of multiple lenders that span the spectrum from large financial institutions to smaller independent multifamily lenders  Multifamily loans that we purchase or that back Fannie Mae MBS are either underwritten by a Fannie Mae approved lender or subject to our underwriting review prior to closing, depending on the product type and/or loan size  Loans delivered to us by DUS lenders and their

6 5

Table of Contents

affiliates represented 86% of our multifamily guaranty book of business as of March 31, 2012 and December 31, 2011.

We use various types of credit enhancement arrangements for our multifamily loans, including lender risk sharing, lender repurchase agreements, pool insurance, subordinated participations in mortgage loans or structured pools, cash and letter of credit collateral agreements, and cross collateralization/cross default provisions. The most prevalent form of credit enhancement on multifamily loans is lender risk sharing. Lenders in the DUS program typically share in loan level credit losses in one of two ways: (1) they bear losses up to the first 5% of unpaid principal balance of the loan and share in remaining losses up to a prescribed limit; or (2) they share up to one third of the credit losses on an equal basis with us  Non DUS lenders typically share or absorb credit losses based on a negotiated percentage of the loan or the pool balance

Table 41 displays the percentage of the unpaid principal balance of loans in our multifamily guaranty book of business with lender risk sharing and with no recourse to the lender as of the dates indicated

**Table 41:   Multifamily Lender Risk Sharing**

|  | As of | |
| --- | --- | --- |
|  | March 31, 2012 | December 31, 2011 |
| Lender risk sharing | | |
| DUS | 6 9% | 68% |
| Non DUS negotiated | 0 | 11 |
| No recourse to the lender | 21 | 21 |

At the time of our purchase or guarantee of multifamily mortgage loans, we and our lenders rely significantly on sound underwriting standards, which often include third party appraisals and cash flow analysis. Our standards for multifamily loans specify maximum original LTV and minimum original debt service coverage ratio ("DSCR") values that vary based on loan characteristics  Our experience has been that original LTV and DSCR values have been reliable indicators of future credit performance

Table 42 displays original LTV and DSCR metrics for our multifamily guaranty book of business as of the dates indicated.

**Table 42:   Multifamily Guaranty Book of Business Key Risk Characteristics**

|  | As of | | |
| --- | --- | --- | --- |
|  | March 31, 2012 | December 31, 2011 | March 31, 2011 |
| Weighted average original LTV | 6 6% | 6 6% | 6 6% |
| Original LTV greater than 80% | 4 | 5 | 5 |
| Original DSCR less than or equal to 1 10 | 8 | 8 | 9 |

*Multifamily Portfolio Diversification and Monitoring*

Diversification within our multifamily mortgage credit book of business by geographic concentration, term to maturity, interest rate structure, borrower concentration, and credit enhancement coverage is an important factor that influences credit performance and helps reduce our credit risk

We and our lenders monitor the performance and risk concentrations of our multifamily loans and the underlying properties on an ongoing basis throughout the life of the loan; at the loan, property, and portfolio level  We monitor loans with an estimated current DSCR below 1 0, as that is an indicator of heightened default risk. The percentage of loans in our multifamily guaranty book of business with a current DSCR ratio less than 1.0 was approximately 7% as of March 31, 2012 and December 31, 2011.

66

Table of Contents

*Problem Loan Management and Foreclosure Prevention*

The number of multifamily loans at risk of becoming seriously delinquent has continued to decrease in the first quarter of 2012, as early stage delinquencies have decreased  Since delinquency rates are a lagging indicator, we expect to continue to incur additional credit losses  We periodically refine our underwriting standards in response to market conditions and enact proactive portfolio management and monitoring which are each designed to keep credit losses to a low level relative to our multifamily guaranty book of business

*Problem Loan Statistics*

We classify multifamily loans as seriously delinquent when payment is 60 days or more past due. We include the unpaid principal balance of multifamily loans that we own or that back Fannie Mae MBS and any housing bonds for which we provide credit enhancement in the calculation of the multifamily serious delinquency rate

Table 43 displays a comparison of our multifamily serious delinquency rates for loans acquired through DUS lenders versus loans acquired through non DUS lenders and the percentage of total multifamily credit losses they represent

**Table 43:   Multifamily Concentration Analysis**

| | As of | | | | | | Percentage of Multifamily Credit Losses For the Three Months Ended March 31, | |
| | March 31, 2012 | | December 31, 2011 | | March 31, 2011 | | | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | 2012 | 2011 |
|---|---|---|---|---|---|---|---|---|
| DUS small balance loans[ | 8% | 0 42% | 8% | 0.45% | 8% | 0.68% | 4% | 8% |
| DUS non small balance loans[2 | 73 | 0.25 | 72 | 0.51 | 70 | 0 48 | 88 | 70 |
| Non DUS small balance loans[ | 8 | 1.22 | 9 | 1.38 | 0 | 1.41 | 8 | 15 |
| Non DUS non small balance loans[2 | 11 | 0.55 | 11 | 0.57 | 12 | 0.88 | — | 7 |
| Total multifamily loans | 00 | 0 37 | 00 | 0.59 | 00 | 0.64 | 00 | 00 |

[   Loans with original unpaid principal balances up to $3 million as well as loans in high cost markets with original unpaid principal balances up to $5 million

[2   Loans with original unpaid principal balances greater than $3 million as well as loans in high cost markets with original unpaid principal balances greater than $5 million.

The multifamily serious delinquency rate decreased as of March 31, 2012 compared with December 31, 2011 as national multifamily market fundamentals continued to improve  The DUS loans in our guaranty book of business have lower delinquency rates when compared with the non DUS loans in our guaranty book primarily due to the DUS model, which has several features that more closely align our interests with those of the lenders  Small balance non DUS loans continue to represent a disproportionately large share of delinquencies, but they are generally covered by loss sharing arrangements that limit the credit losses we incur

Multifamily loans with an original balance of up to $3 million nationwide or $5 million in high cost markets, which we refer to as small balance loans, acquired through non DUS lenders continue to exhibit higher delinquencies than small balance loans acquired through DUS lenders  These small balance non DUS loans account for 27% of our multifamily serious delinquencies and 8% of our multifamily guaranty book of business as of March 31, 2012 compared with 20% of our multifamily serious delinquencies and 9% of our multifamily guaranty book of business as of December 31, 2011. These small balance non DUS loan acquisitions were most common in 2007 and 2008 and have not been a significant portion of our total multifamily acquisitions since 2008  Although our 2007 and early 2008 acquisitions were underwritten to our then current credit standards and required borrower cash equity, they were acquired near the peak of multifamily housing values  During the second half of 2008, our underwriting standards were adjusted to reflect the evolving market trends at that time

67

Table of Contents

In addition, Florida, Nevada, and Ohio have a disproportionately high share of seriously delinquent loans compared with their share of the multifamily guaranty book of business as a result of slow economic recovery in certain areas of these states  These states accounted for 36% of multifamily serious delinquencies but only 8% of the multifamily guaranty book of business as of March 31, 2012.

*REO Management*

Foreclosure and REO activity affect the level of our credit losses  Table 44 displays our held for sale multifamily REO activity for the periods indicated

**Table 44:   Multifamily Foreclosed Properties**

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | **2012** | **2011** |
| Multifamily foreclosed properties (number of properties): | | |
| Beginning of period inventory of multifamily foreclosed properties (REO) | 260 | 222 |
|   Total properties acquired through foreclosure | 61 | 50 |
|   Disposition of REO | (58) | (37) |
| End of period inventory of multifamily foreclosed properties (REO) | 263 | 235 |
| Carrying value of multifamily foreclosed properties (dollars in millions) ⁽ | $646 | $576 |

⁽  Excludes DUS lender risk sharing receivables, which are reported in our condensed consolidated balance sheets as a component of "Acquired property, net "

The increase in our multifamily foreclosed property inventory reflects the continuing stress on our multifamily guaranty book of business as certain local markets and properties continue to exhibit weak fundamentals, though national multifamily market fundamentals continued to improve in the first quarter of 2012.

**Institutional Counterparty Credit Risk Management**

We rely on our institutional counterparties to provide services and credit enhancements, including primary and pool mortgage insurance coverage, risk sharing agreements with lenders and financial guaranty contracts that are critical to our business  Institutional counterparty credit risk is the risk that these institutional counterparties may fail to fulfill their contractual obligations to us, including seller/servicers who are obligated to repurchase loans from us or reimburse us for losses in certain circumstances. Defaults by a counterparty with significant obligations to us could result in significant financial losses to us.

See "MD&A   Risk Management   Credit Risk Management   Institutional Counterparty Credit Risk Management" in our 2011 Form 10 K for additional information about our institutional counterparties, including counterparty risk we face from mortgage originators and investors, from debt security and mortgage dealers, and from document custodians

*Mortgage Seller/Servicers*

Our primary exposures to institutional counterparty risk are with mortgage seller/servicers that service the loans we hold in our mortgage portfolio or that back our Fannie Mae MBS, as well as seller/servicers that are obligated to repurchase loans from us or reimburse us for losses in certain circumstances  We rely on mortgage seller/servicers to meet our servicing standards and fulfill their servicing and repurchase obligations

68

Table of Contents

Our business with our mortgage seller/servicers is concentrated  Our ten largest single family mortgage servicers, including their affiliates, serviced 74% of our single family guaranty book of business as of March 31, 2012, compared to 75% as of December 31, 2011. Our largest mortgage servicer is Bank of America, N.A. which, together with its affiliates, serviced approximately 20% of our single family guaranty book of business as of March 31, 2012, compared with 21% as of December 31, 2011. In addition, we had two other mortgage servicers, JPMorgan Chase Bank, N.A. and Wells Fargo Bank, N.A., that, with their affiliates, each serviced over 10% of our single family guaranty book of business as of March 31, 2012 and December 31, 2011. In addition, Wells Fargo Bank serviced over 10% of our multifamily guaranty book of business as of March 31, 2012 and December 31, 2011. Although our business with our mortgage seller/servicers is concentrated, a number of our largest mortgage seller/servicer counterparties have recently reduced or eliminated their purchases of mortgage loans from mortgage brokers and correspondent lenders  As a result, we are acquiring an increasing portion of our business volume directly from smaller financial institutions and some of our servicing volume is shifting to smaller or non traditional servicers that may not have the same financial strength or operational capacity as our largest servicers  See "Risk Factors" for a description of the risks to our business associated with a decrease in the concentration of our business with large institutions

Because we delegate the servicing of our mortgage loans to mortgage servicers and do not have our own servicing function, servicers' lack of appropriate process controls or the loss of business from a significant mortgage servicer counterparty could pose significant risks to our ability to conduct our business effectively  Many of our largest servicer counterparties continue to reevaluate the effectiveness of their process controls  Many servicers are also subject to consent orders by their regulators that require the servicers to correct foreclosure process deficiencies and improve their servicing and foreclosure practices. This has resulted in extended foreclosure timelines and, therefore, additional holding costs for us, such as property taxes and insurance, repairs and maintenance, and valuation adjustments due to home price changes  See "Executive Summary" in our 2011 Form 10 K for a discussion of managing foreclosure timelines

Our mortgage seller/servicers are obligated to repurchase loans or foreclosed properties, or reimburse us for losses if the foreclosed property has been sold, under certain circumstances, such as if it is determined that the mortgage loan did not meet our underwriting or eligibility requirements, if loan representations and warranties are violated or if mortgage insurers rescind coverage  We refer to our demands that seller/servicers meet these obligations collectively as "repurchase requests " The number of our repurchase requests remained high during the first quarter of 2012, and we expect that the amount of our outstanding repurchase requests will remain high  As the volume of repurchase requests increases, so does the risk that affected seller/servicers will not meet the terms of their repurchase obligations, and we may be unable to recover on all outstanding loan repurchase obligations resulting from seller/servicers' breaches of contractual obligations  Failure by a significant seller/servicer counterparty, or a number of seller/servicers, to fulfill repurchase obligations to us could result in a significant increase in our credit losses and have a material adverse effect on our results of operations and financial condition  In addition, actions we take to pursue our contractual remedies could increase our costs, reduce our revenues, or otherwise have a material adverse effect on our results of operations or financial condition  We estimate our allowance for loan losses assuming the benefit of repurchase demands only from those counterparties we determine have the financial capacity to fulfill this obligation  Accordingly, as of March 31, 2012, in estimating our allowance for loan losses we assumed no benefit from repurchase demands due to us from seller/servicers that lacked the financial capacity to honor their contractual obligations

Table 45 displays repurchase request activity, measured by unpaid principal balance, during the three months ended March 31, 2012 and 2011. The dollar amounts of our outstanding repurchase requests provided below are based on the unpaid principal balance of the loans underlying the repurchase request issued, not the actual amount we have requested from the lenders  In some cases, we allow lenders to remit payment equal to our loss, including imputed interest, on the loan after we have disposed of the REO, which is less than the unpaid principal balance of the loan  As a result, we expect our actual cash receipts relating to these outstanding repurchase requests to be significantly lower than the unpaid principal balance of the loan  Amounts relating to repurchase requests originating from missing documentation or loan files are excluded from the total requests outstanding until the completion of a full underwriting review, once the documents and loan files are received

69

Table of Contents

**Table 45:   Repurchase Request Activity**

|  | For the Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2012 | 2011 |
|  | (Dollars in millions) | |
| Beginning outstanding repurchase requests | $  0,400 | $  5,007 |
| Issuances | 6,556 | 6,350 |
| Collections | (2,361) | (1,595) |
| Other resolutions( | (2,105) | (886) |
| Total successfully resolved | (4,466) | (2,481) |
| Cancellations | (337) | (227) |
| Ending outstanding repurchase requests | $  12,153 | $  8,649 |

( Includes repurchase requests that were successfully resolved through reimbursement of losses or other remedies such as, but not limited to, loan pricing adjustments, indemnification or future repurchase agreements, lender corrective action, or negotiated settlements

Table 46 displays our top five mortgage seller/servicers by outstanding repurchase requests based on the unpaid principal balance of the loans underlying repurchase requests issued as of March 31, 2012 and December 31, 2011  Table 46 also displays the mortgage seller/servicers balance and percentage of our repurchase requests that were over 120 days outstanding, and the seller/servicers' repurchase requests outstanding over 120 days as a percentage of total repurchase requests outstanding over 120 days, as of March 31, 2012 and December 31, 2011.

**Table 46:   Outstanding Repurchase Requests(1)**

|  | Outstanding Repurchase Requests as of | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | March 31, 2012 | | | | December 31, 2011 | | | |
|  | Total Outstanding Balance(3) | Over 120 Days(2) | | | Total Outstanding Balance(3) | Over 120 Days(2) | | |
|  |  | Balance(3) | % | % o  Total |  | Balance(3) | % | % o  Total |
|  | (Dollars in millions) | | | | | | | |
| **Mortgage Seller/Servicer Counterparty:** | | | | | | | | |
| Bank of America, N.A. | $  7,057 | $ 3,039 | 43% | 71% | $  5,449 | $1,841 | 34% | 5 9% |
| JPMorgan Chase Bank, N.A. | 1,251 | 187 | 15 | 4 | 1,136 | 197 | 17 | 6 |
| CitiMortgage( (4 | 9 5 5 | 249 | 26 | 6 | 917 | 226 | 25 | 7 |
| Wells Fargo Bank, N.A.( (4 | 797 | 231 | 29 | 5 | 830 | 259 | 3 | 8 |
| SunTrust Bank, Inc.( (4 | 380 | 75 | 20 | 2 | 430 | 40 | 9 | 1 |
| Other( | 1,713 | 478 | 28 | 12 | 1,638 | 576 | 35 | 19 |
| Total | $12,153 | $4,259 |  | 00% | $  0,400 | $3,139 |  | 00% |

( Amounts relating to repurchase requests originating from missing documentation or loan files are excluded from the outstanding repurchase requests until the completion of a full underwriting review

(2 Measured from either the original repurchase request date or, for lenders remitting after the property is disposed, the date of our final loss determination

(3 Based on the unpaid principal balance of the loans underlying the repurchase request issued  In some cases, lenders remit payment equal to our loss on sale of the loan as REO, which includes imputed interest, and is significantly lower than the unpaid principal balance of the loan  Also includes repurchase requests resulting from the rescission of mortgage insurance coverage

(4 Seller/servicer has entered into a plan with us to resolve certain outstanding repurchase requests and/or has posted collateral to us

( Includes some seller/servicers that have entered into a plan with us to resolve outstanding repurchase requests and/or have posted collateral to us

70

Table of Contents

We continue to aggressively pursue our contractual rights associated with outstanding repurchase requests  Failure by a seller/servicer to repurchase a loan or to otherwise make us whole for our losses may result in the imposition of certain sanctions including, but not limited to:

- requiring the posting of collateral,

- denying transfer of servicing requests or denying pledged servicing requests,

- modifying or suspending any contract or agreement with a lender, or

- suspending or terminating a lender or imposing some other formal sanction on a lender

If we are unable to resolve these matters to our satisfaction, we may seek additional remedies  If we are unable to resolve our repurchase requests, either through collection or additional remedies, we will not recover the losses we have recognized from the associated loans

Since the fourth quarter of 2011, Bank of America, the seller/servicer with which we have the most repurchase requests outstanding, slowed the pace of its repurchases  As a result of Bank of America's failure to honor its contractual obligations in a timely manner, the already high volume of our outstanding repurchase requests with Bank of America increased substantially. Measured by unpaid principal balance, Bank of America accounted for approximately 58% of our total outstanding repurchase requests as of March 31, 2012, compared with 52% as of December 31, 2011 and 41% as of December 31, 2010. Similarly, Bank of America accounted for 71% of our repurchase requests that had been outstanding for more than 120 days as of March 31, 2012, compared with 59% as of December 31, 2011 and 37% as of December 31, 2010. We are taking steps to address Bank of America's delays in honoring our repurchase requests  For example, we did not renew our existing loan delivery contract with Bank of America at the end of January 2012, which significantly restricts the types of loans it can deliver to us  Bank of America, however, can continue delivering loans to us under our Refi Plus initiative, including HARP loans  Bank of America's failure to honor repurchase obligations in a timely manner has not caused us to change our estimate of the amounts we expect to collect from them ultimately, and we continue to work with Bank of America to resolve these issues  If we collect less than the amount we expect from Bank of America, we may be required to seek additional funds from Treasury under our senior preferred stock purchase agreement. Table 46 above displays our top five mortgage seller/servicers by outstanding repurchase requests based on the unpaid principal balance of the loans underlying repurchase requests issued as of March 3 , 20 2  We do not expect the change in our loan delivery agreement with Bank of America to be material to our business or results of operations as Bank of America represented less than 5% of our loan delivery volume in the quarter ended December 31, 2011

We are also exposed to the risk that a mortgage seller/servicer or another party involved in a mortgage loan transaction will engage in mortgage fraud by misrepresenting the facts about the loan  We have experienced financial losses in the past and may experience significant financial losses and reputational damage in the future as a result of mortgage fraud  See "Risk Factors" in our 2011 Form 10 K for additional discussion on risks of mortgage fraud to which we are exposed

### *Mortgage Insurers*

We use several types of credit enhancement to manage our single family mortgage credit risk, including primary and pool mortgage insurance coverage  Table 47 displays our maximum potential loss recovery for the primary and pool mortgage insurance coverage on single family loans in our guaranty book of business and our unpaid principal balance covered by insurance for our mortgage insurer counterparties as of March 31, 2012 and December 31, 2011. The table includes our top nine mortgage insurer counterparties, which provided over 99% of our total mortgage insurance coverage on single family loans in our guaranty book of business as of March 31, 2012 and December 31, 2011. See "Risk Management   Credit Risk Management   Institutional Counterparty Risk Management   Mortgage Insurers" in our 2011 Form 10 K for a discussion on the credit ratings of our mortgage insurers

71

Table of Contents

**Table 47:   Mortgage Insurance Coverage**

| Counterparty:[3] | Maximum Coverage[1] | | | | Unpaid Principal Balance Covered By Insurance[2] | |
| | As of March 31, 2012 | | | As of December 31, 2011 | As of March 31, 2012 | As of December 31, 2011 |
| | Primary | Pool | Total | | | |
| | (Dollars in millions) | | | | | |
| Mortgage Guaranty Insurance Corporation | $ 19,736 | $1,555 | $21,291 | $ 21,479 | $ 87,833 | $ 89,872 |
| Radian Guaranty, Inc. | 15,660 | 333 | 15,993 | 15,505 | 65,630 | 63,534 |
| United Guaranty Residential Insurance Company | 14,936 | 129 | 15,065 | 14,579 | 61,199 | 59,233 |
| Genworth Mortgage Insurance Corporation | 13,540 | 58 | 13,598 | 13,628 | 54,822 | 54,893 |
| PMI Mortgage Insurance Co | 10,374 | 238 | 10,612 | 11,128 | 45,428 | 47,734 |
| Republic Mortgage Insurance Company | 7,923 | 872 | 8,795 | 9,219 | 37,108 | 39,130 |
| Triad Guaranty Insurance Corporation | 2,390 | 637 | 3,027 | 3,150 | 11,924 | 12,400 |
| CMG Mortgage Insurance Company[4] | 1,968 | | 1,968 | 1,951 | 8,314 | 8,241 |
| Essent Guaranty, Inc. | 601 | | 601 | 395 | 2,556 | 1,685 |
| Others | 217 | | 217 | 217 | 1,222 | 1,214 |
| Total | $ 87,345 | $ 3,822 | $91,167 | $ 91,251 | $376,036 | $377,936 |
| Total as a percentage of single family guaranty book of business | | | 3% | 3% | 3% | 3% |

[1]   Maximum coverage refers to the aggregate dollar amount of insurance coverage (that is, "risk in force") on single family loans in our guaranty book of business and represents our maximum potential loss recovery under the applicable mortgage insurance policies

[2]   Represents the unpaid principal balance of single family loans in our guaranty book of business covered under the applicable mortgage insurance policies (that is, "insurance in force").

[3]   Insurance coverage amounts provided for each counterparty may include coverage provided by consolidated affiliates and subsidiaries of the counterparty

[4]   CMG Mortgage Insurance Company is a joint venture owned by PMI Mortgage Insurance Co  and CUNA Mutual Insurance Society

As of May 9, 2012, one of our mortgage insurance counterparties, PMI Mortgage Insurance Co  ("PMI"), has publicly disclosed that it is now in receivership  Three of our mortgage insurance counterparties   Triad Guaranty Insurance Corporation ("Triad"), Republic Mortgage Insurance Company ("RMIC"), and PMI   have publicly disclosed that they are in run off  A mortgage insurer that is in run off continues to collect premiums and pay claims on its existing insurance business, but no longer writes new insurance  One mortgage insurer, Genworth Mortgage Insurance Corporation ("Genworth"), is currently operating pursuant to a waiver it received from its regulator of the state regulatory capital requirements applicable to its main insurance writing entity  An additional two of our mortgage insurers   Mortgage Guaranty Insurance Corporation ("MGIC") and Radian Guaranty, Inc  ("Radian")   have disclosed that, in the absence of additional capital contributions to their insurance writing entity, their capital might fall below state regulatory capital requirements in the future  In April 20  2, Radian announced that it had entered into a reinsurance agreement with an external reinsurance provider to proactively manage its mortgage insurance risk to capital position  These six mortgage insurers provided a combined $73 3 billion, or 80%, of our risk in force mortgage insurance coverage of our single family guaranty book of business as of March 31, 2012

We are unable to determine how long our mortgage insurer counterparties that are operating under a waiver will continue to operate under a waiver, or that are currently below their state imposed risk to capital limits will remain below these limits  If these mortgage insurers are not able to raise capital and they exceed their

72

Table of Contents

risk to capital limits, they will likely be forced into run off or receivership unless they can secure and maintain a waiver from their state regulator  This would increase the risk that these mortgage insurers will fail to pay our claims under insurance policies, and could also cause the quality and speed of their claims processing to deteriorate

The weak financial condition of many of our mortgage insurer counterparties increases the significant risk that these counterparties will fail to fulfill their obligations to pay our claims under insurance policies  If we determine that it is probable that we will not collect all of our claims from one or more of these mortgage insurer counterparties, it could result in an increase in our loss reserves, which could adversely affect our earnings, liquidity, financial condition and net worth

We evaluate each of our mortgage insurer counterparties individually to determine whether or under what conditions it will remain eligible to insure new mortgages sold to us  Based on our evaluation, we may impose additional terms and conditions of approval on some of our mortgage insurers, including: limiting the volume and types of loans they may insure for us; requiring them to obtain our consent prior to entering into risk sharing arrangements with mortgage lenders; requiring them to meet certain financial conditions, such as maintaining a minimum level of policyholders' surplus, a maximum risk to capital ratio, a maximum combined ratio, or a minimum amount of acceptable liquid assets; or requiring that they secure parental or other capital support agreements

The claims obligations of RMIC, PMI and Triad have been partially deferred pursuant to orders from their state regulators  State regulators could take additional corrective actions against RMIC and Triad, including placing them into receivership  While our remaining mortgage insurers have continued to pay claims owed to us in full, there can be no assurance that they will continue to do so given their current financial condition

Some mortgage insurers have explored corporate restructurings designed to provide relief from risk to capital limits in certain states  We have approved several restructurings so that certain of our mortgage insurer counterparties or their subsidiaries could continue to write new business  Additionally, mortgage insurers continue to approach us with various proposed corporate restructurings that would require our approval of affiliated mortgage insurance writing entities

The number of mortgage loans for which our mortgage insurer counterparties have rescinded coverage decreased but remained high in the first quarter of 20 2  In those cases where the mortgage insurer has rescinded coverage, we require the seller/servicer to repurchase the loan or indemnify us against loss  The table below displays cumulative rescission rates as of March 31, 2012, by the period in which the claim was filed. We do not present information for claims filed in the most recent two quarters to allow sufficient time for a substantial percentage of the claims filed to be resolved

**Table 48:   Rescission Rates of Mortgage Insurance Claims**

| | As of March 31, 2012 | |
| --- | --- | --- |
| | Cumulative Rescission Rate[1] | Cumulative Claims Resolution Percentage[2] |
| **Primary mortgage insurance claims filed in:** | | |
| 20 0 | 11% | 90 % |
| First nine months of 2011 | 8 | 6 5 |
| **Pool mortgage insurance claims filed in:** | | |
| 20 0 | 4% | 9 9% |
| First nine months of 2011 | 0 | 91 |

[1]   Represents claims filed during the period that have been rescinded as of March 31, 2012, divided by total claims filed during the same period  Denied claims are excluded

[2]   Represents claims filed during the period that have been resolved as of March 31, 2012, divided by the total claims filed during the same period  Claims resolved mainly consist of claims for which we have settled and claims for which coverage has been rescinded by the mortgage insurer

73

Table of Contents

When we estimate the credit losses that are inherent in our mortgage loan portfolio and under the terms of our guaranty obligations, we also consider the recoveries that we will receive on primary mortgage insurance, as mortgage insurance recoveries would reduce the severity of the loss associated with defaulted loans  We evaluate the financial condition of our mortgage insurer counterparties and adjust the contractually due recovery amounts to ensure that only probable losses as of the balance sheet date are included in our loss reserve estimate  As a result, if our assessment of one or more of our mortgage insurer counterparties' ability to fulfill their respective obligations to us worsens, it could result in an increase in our loss reserves

The following table displays our estimated benefit from mortgage insurer recoveries

**Table 49:   Estimated Mortgage Insurance Benefit**

| | As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Contractual mortgage insurance benefit | $ 15,237 | $ 15,099 |
| Less: Collectability adjustment⁽ | 2,571 | 2,867 |
| Estimated benefit included in total loss reserves | $ 12,666 | $ 12,232 |

⁽    Represents an adjustment that reduces the contractual benefit for our assessment of our mortgage insurer counterparties' inability to fully pay the contractual mortgage insurance claims

When an insured loan held in our mortgage portfolio subsequently goes into foreclosure, we charge off the loan, eliminating any previously recorded loss reserves, and record REO and a mortgage insurance receivable for the claim proceeds deemed probable of recovery, as appropriate  However, if a mortgage insurer rescinds insurance coverage, the initial receivable becomes due from the mortgage seller/servicer  We had outstanding receivables of $3 7 billion as of March 31, 2012 and $3 6 billion as of December 31, 2011 related to amounts claimed on insured, defaulted loans that we have not yet received, of which $894 million as of March 31, 2012 and $639 million as of December 31, 2011 was due from our mortgage seller/servicers. We assessed the total outstanding receivables for collectibility, and they were recorded net of a valuation allowance of $786 million as of March 31, 2012 and $570 million as of December 31, 2011 in "Other assets " These mortgage insurance receivables are short term in nature, having an average duration of approximately six months, and the valuation allowance reduces our claim receivable to the amount that we consider probable of collection  We received proceeds under our primary and pool mortgage insurance policies for single family loans of $1 3 billion during the first quarter of 2012 compared with $1 6 billion during the first quarter of 2011

*Financial Guarantors*

We are the beneficiary of financial guarantees on non agency securities held in our investment portfolio and on non agency securities that have been resecuritized to include a Fannie Mae guaranty and sold to third parties  Table 50 displays the total unpaid principal balance of guaranteed non agency securities in our portfolio as of March 31, 2012 and December 31, 2011.

**Table 50:   Unpaid Principal Balance of Financial Guarantees**

| | As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Alt A private label securities | $ 1,206 | $ 1,279 |
| Subprime private label securities | 1,367 | 1,398 |
| Mortgage revenue bonds | 4,897 | 4,931 |
| Other mortgage related securities | 311 | 317 |
| Non mortgage related securities | | 46 |
| Total | $ 7,781 | $ 7,971 |

74

Table of Contents

With the exception of Ambac Assurance Corporation ("Ambac"), none of our financial guarantor counterparties has failed to repay us for claims under guaranty contracts  Ambac provided coverage on $3 2 billion, or 41%, of our total non governmental guarantees, as of March 31, 2012  However, based on the stressed financial condition of our non governmental financial guarantor counterparties, we believe that all but one of these counterparties may not be able to fully meet their obligations to us in the future  We model our securities without assuming the benefit of non governmental financial guarantees  We then adjust results for those external financial guarantees from guarantors that we determine are creditworthy, although we continue to seek collection of any amounts due to us from all counterparties  As of March 31, 2012, when modeling our securities for impairments we did not assume the benefit of external financial guarantees from any non governmental counterparties  See "Note 5, Investments in Securities" for a further discussion of our model methodology and key inputs used to determine other than temporary impairment

We are also the beneficiary of financial guarantees included in securities issued by Freddie Mac, the federal government and its agencies that totaled $30 3 billion as of March 31, 2012 and $31.4 billion as of December 31, 2011.

*Lenders with Risk Sharing*

We enter into risk sharing agreements with lenders pursuant to which the lenders agree to bear all or some portion of the credit losses on the covered loans  Our maximum potential loss recovery from lenders under these risk sharing agreements on single family loans was $12.3 billion as of March 31, 2012 and $12.8 billion as of December 31, 2011  As of March 31, 2012, 59% of our maximum potential loss recovery on single family loans was from three lenders and as of December 31, 2011, 58% of our maximum potential loss recovery on single family loans was from the same three lenders  Our maximum potential loss recovery from lenders under risk sharing agreements on DUS and non DUS multifamily loans was $32.7 billion as of March 31, 2012 and $32.1 billion as of December 31, 2011  As of March 31, 2012 and December 31, 2011, 40% of our maximum potential loss recovery on multifamily loans was from three DUS lenders.

Unfavorable market conditions have adversely affected, and continue to adversely affect, the liquidity and financial condition of our lender counterparties  The percentage of single family recourse obligations to lenders with investment grade credit ratings (based on the lower of S&P, Moody's and Fitch ratings) was 46% as of March 3 , 20 2 and December 3 , 20     The percentage of these recourse obligations to lender counterparties rated below investment grade was 26% as of March 3 , 20 2 and December 3 , 20     The remaining percentage of these recourse obligations were to lender counterparties that were not rated by rating agencies, which was 28% as of March 31, 2012 and December 31, 2011  Given the stressed financial condition of some of our lenders, we expect in some cases we will recover less, perhaps significantly less, than the amount the lender is obligated to provide us under our risk sharing arrangement with them  Depending on the financial strength of the counterparty, we may require a lender to pledge collateral to secure its recourse obligations

As noted above in "Multifamily Credit Risk Management," our primary multifamily delivery channel is our DUS program, which is comprised of lenders that span the spectrum from large depositories to independent non bank financial institutions. Approximately 42% as of March 31, 2012, and 51% as of December 31, 2011, of the unpaid principal balance of loans in our multifamily guaranty book of business serviced by our DUS lenders was from institutions with an external investment grade credit rating or a guarantee from an affiliate with an external investment grade credit rating   Given the recourse nature of the DUS program, the lenders are bound by eligibility standards that dictate, among other items, minimum capital and liquidity levels, and the posting of collateral at a highly rated custodian to secure a portion of the lenders' future obligations  We actively monitor the financial condition of these lenders to help ensure the level of risk remains within our standards and to ensure required capital levels are maintained and are in alignment with actual and modeled loss projections

*Custodial Depository Institutions*

A total of $65.5 billion in deposits for single family payments were received and held by 284 institutions in the month of March 2012 and a total of $66 4 billion in deposits for single family payments were received and held by 284 institutions in the month of December 2011  Of these total deposits, 93% as of March 31, 2012 and 92%

75

Table of Contents

as of December 31, 2011 were held by institutions rated as investment grade by S&P, Moody's and Fitch. Our transactions with custodial depository institutions is concentrated  Our ten largest custodial depository institutions held 93% of these deposits as of March 31, 2012 and 92% of these deposits as of December 31, 2011

If a custodial depository institution were to fail while holding remittances of borrower payments of principal and interest due to us in our custodial account, we would be an unsecured creditor of the depository for balances in excess of the deposit insurance protection and might not be able to recover all of the principal and interest payments being held by the depository on our behalf, or there might be a substantial delay in receiving these amounts  If this were to occur, we would be required to replace these amounts with our own funds to make payments that are due to Fannie Mae MBS certificateholders  Accordingly, the insolvency of one of our principal custodial depository counterparties could result in significant financial losses to us  In the month of March 2012, approximately $5 9 billion or 9% of our total deposits for single family payments received and held by these institutions was in excess of the deposit insurance protection limit compared with approximately $6 1 billion or 9% in the month of December 2011  These amounts can vary as they are calculated based on individual payments of mortgage borrowers and we must estimate which borrowers are paying their regular principal and interest payments and other types of payments, such as prepayments from refinancing or sales.

*Issuers of Investments Held in our Cash and Other Investments Portfolio*

Our cash and other investments portfolio consists of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell or similar arrangements, U.S. Treasury securities and asset backed securities. Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank  We held no unsecured positions with financial institutions as of March 31, 2012 or December 31, 2011  See "Liquidity and Capital Management   Liquidity Management   Cash and Other Investments Portfolio" for more detailed information on our cash and other investments portfolio

*Derivative Counterparty Credit Exposure*

Our derivative counterparty credit exposure relates principally to interest rate and foreign currency derivatives contracts  We estimate our exposure to credit loss on derivative instruments by calculating the replacement cost, on a present value basis, to settle at current market prices all outstanding derivative contracts in a net gain position at the counterparty level where the right of legal offset exists  For derivative instruments where the right of legal offset does not exist, we calculate the replacement cost of the outstanding derivative contracts in a gain position at the transaction level  The fair value of derivatives in a gain position is included in our condensed consolidated balance sheets in "Other assets "  We manage our credit exposure by requiring counterparties to post collateral, which includes cash, U S  Treasury securities, agency debt and agency mortgage related securities

Our net counterparty credit exposure on derivatives contracts decreased to $59 million as of March 31, 2012, from $96 million as of December 31, 2011. We had outstanding interest rate and foreign currency derivative transactions with 16 counterparties as of March 31, 2012 and December 31, 2011  Derivatives transactions with 10 of our counterparties accounted for approximately 95% of our total outstanding notional amount as of March 31, 2012, with each of these counterparties accounting for between approximately 6% and 16% of the total outstanding notional amount  As of March 31, 2012, we had outstanding notional amounts and master netting agreements with 16 counterparties

See "Note 9, Derivative Instruments" for information on the outstanding notional amount and additional information on our risk management derivative contracts as of March 31, 2012 and December 31, 2011, as well as a discussion of our collateral requirements including the impact of decreases in our credit ratings on our collateral obligations under our derivatives contracts

**Market Risk Management, Including Interest Rate Risk Management**

We are subject to market risk, which includes interest rate risk, spread risk and liquidity risk. These risks arise from our mortgage asset investments. Interest rate risk is the risk of loss in value or expected future earnings that may result from changes to interest rates  Spread risk is the resulting impact of changes in the spread between our

76

Table of Contents

mortgage assets and our debt and derivatives we use to hedge our position  Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner. We describe our sources of interest rate risk exposure and our strategy for managing interest rate risk and spread risk in "MD&A   Risk Management   Market Risk Management, Including Interest Rate Risk Management" in our 2011 Form 10 K

### Measurement of Interest Rate Risk

Below we present two quantitative metrics that provide estimates of our interest rate exposure: ( ) fair value sensitivity of net portfolio to changes in interest rate levels and slope of yield curve; and (2) duration gap  The metrics presented are calculated using internal models that require standard assumptions regarding interest rates and future prepayments of principal over the remaining life of our securities  These assumptions are derived based on the characteristics of the underlying structure of the securities and historical prepayment rates experienced at specified interest rate levels, taking into account current market conditions, the current mortgage rates of our existing outstanding loans, loan age and other factors  On a continuous basis, management makes judgments about the appropriateness of the risk assessments and will make adjustments as necessary to properly assess our interest rate exposure and manage our interest rate risk  The methodologies used to calculate risk estimates are periodically changed on a prospective basis to reflect improvements in the underlying estimation process

### Interest Rate Sensitivity to Changes in Interest Rate Level and Slope of Yield Curve

As part of our disclosure commitments with FHFA, we disclose on a monthly basis the estimated adverse impact on the fair value of our net portfolio that would result from the following hypothetical situations:

- A 50 basis point shift in interest rates.

- A 25 basis point change in the slope of the yield curve

In measuring the estimated impact of changes in the level of interest rates, we assume a parallel shift in all maturities of the U S  LIBOR interest rate swap curve

In measuring the estimated impact of changes in the slope of the yield curve, we assume a constant 7 year rate and a shift of 16 7 basis points for the 1 year rate and 8 3 basis points for the 30 year rate  We believe the aforementioned interest rate shocks for our monthly disclosures represent moderate movements in interest rates over a one month period

### Duration Gap

Duration gap measures the price sensitivity of our assets and liabilities to changes in interest rates by quantifying the difference between the estimated durations of our assets and liabilities  Our duration gap analysis reflects the extent to which the estimated maturity and repricing cash flows for our assets are matched, on average, over time and across interest rate scenarios to the estimated cash flows of our liabilities  A positive duration gap indicates that the duration of our assets exceeds the duration of our liabilities  We disclose duration gap on a monthly basis under the caption "Interest Rate Risk Disclosures" in our Monthly Summary, which is available on our website and announced in a press release.

The sensitivity measures presented in Table 51, which we disclose on a quarterly basis as part of our disclosure commitments with FHFA, are an extension of our monthly sensitivity measures  There are three primary differences between our monthly sensitivity disclosure and the quarterly sensitivity disclosure presented below: (1) the quarterly disclosure is expanded to include the sensitivity results for larger rate level shocks of plus or minus 100 basis points; (2) the monthly disclosure reflects the estimated pre tax impact on the market value of our net portfolio calculated based on a daily average, while the quarterly disclosure reflects the estimated pre tax impact calculated based on the estimated financial position of our net portfolio and the market environment as of the last business day of the quarter; and (3) the monthly disclosure shows the most adverse pre tax impact on the market value of our net portfolio from the hypothetical interest rate shocks, while the quarterly disclosure includes the estimated pre tax impact of both up and down interest rate shocks

Table of Contents

In addition, Table 51 also provides the average, minimum, maximum and standard deviation for duration gap and for the most adverse market value impact on the net portfolio for non parallel and parallel interest rate shocks for the three months ended March 31, 2012 and 2011

**Table 51:   Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve** [1]

| | As of | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in billions) | |
| Rate level shock: | | |
| 100 basis points | $      0.5 | $      0 3 |
| 50 basis points | 0 | 0 |
| +50 basis points | | (0   ) |
| +100 basis points | (0 3) | (0 4) |
| Rate slope shock: | | |
| 25 basis points (flattening) | | |
| +25 basis points (steepening) | | 0 |

The duration gap for the three months ended March 31, 2012 averaged zero months which is similar to the results for the three months ended March 31, 2011

| | For the Three Months Ended March 31, 2012 | | |
|---|---|---|---|
| | Duration Gap | Rate Slope Shock 25 Bps | Rate Level Shock 50 Bps |
| | | Exposure | |
| | (In months) | (Dollars in billions) | |
| Average | (0   ) | $ | $ |
| Minimum | (0.9) | | |
| Maximum | 0 4 | 0 | 0 2 |
| Standard deviation | 0 3 | | 0 |

| | For the Three Months Ended March 31, 2011 | | |
|---|---|---|---|
| | Du ation Gap | Rate Slope Shock 25 Bps | Rate Level Shock 50 Bps |
| | | Exposure | |
| | (In months) | (Dollars in billions) | |
| Average | 0 4 | $      0 | $      0 2 |
| Minimum | (0 4) | | 0 |
| Maximum | 0 8 | 0 2 | 0 4 |
| Standard deviation | 0 2 | | 0 |

[1]   Computed based on changes in LIBOR swap rates

A majority of the interest rate risk associated with our mortgage related securities and loans is hedged with our debt issuances, which includes callable debt We use derivatives to help manage the residual interest rate risk exposure between our assets and liabilities  Derivatives have enabled us to keep our interest rate risk exposure at consistently low levels in a wide range of interest rate environments  Table 52 displays an example of how derivatives impacted the net market value exposure for a 50 basis point parallel interest rate shock

78

Table of Contents

**Table 52:   Derivative Impact on Interest Rate Risk (50 Basis Points)**

| | Before Derivatives | After Derivatives | Effect of Derivatives |
|---|---|---|---|
| | | (Dollars in billions) | |
| As of March 31, 2012 | $    (1.1) | $ | $    1.1 |
| As of December 31, 2011 | $   (  3) | $    (0  ) | $    1.2 |

_Other Interest Rate Risk Information_

The interest rate risk measures discussed above exclude the impact of changes in the fair value of our net guaranty assets resulting from changes in interest rates  We exclude our guaranty business from these sensitivity measures based on our current assumption that the guaranty fee income generated from future business activity will largely replace guaranty fee income lost due to mortgage prepayments

In "MD&A   Risk Management   Market Risk Management, Including Interest Rate Risk Management   Measurement of Interest Rate Risk   Other Interest Rate Risk Information" in our 2011 Form 10 K, we provided additional interest rate sensitivities including separate disclosure of the potential impact on the fair value of our trading assets and other financial instruments  As of March 31, 2012, these sensitivities were relatively unchanged as compared with December 31, 2011. The fair value of our trading financial instruments and our other financial instruments as of March 31, 2012 and December 31, 2011 can be found in "Note 12, Fair Value."

**_Liquidity Risk Management_**

See "Liquidity and Capital Management   Liquidity Management" for a discussion on how we manage liquidity risk

**_Operational Risk Management_**

See "Risk Management   Operational Risk Management" in our 2011 Form 10 K for more information on our framework for managing operational risk

**FORWARD LOOKING STATEMENTS**

This report includes statements that constitute forward looking statements within the meaning of Section 2  E of the Securities Exchange Act of  934 (the "Exchange Act")  In addition, our senior management may from time to time make forward looking statements orally to analysts, investors, the news media and others  Forward looking statements often include words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," "forecast," "project," "would," "should," "could," "likely," "may," or similar words.

Among the forward looking statements in this report are statements relating to:

- Our expectation that our financial results for 2012 will be significantly better than our 2011 results;

- Our expectation that housing will start to recover if the employment market continues to improve;

- Our expectation of high levels of period to period volatility in our results of operations and financial condition because our derivatives are recorded at fair value in our financial statements while some of the instruments they hedge are not recorded at fair value in our financial statements;

- Our expectation that the single family loans we have acquired since the beginning of 2009, in the aggregate, will be profitable over their lifetime, by which we mean that we expect our fee income on these loans to exceed our credit losses and administrative costs for them;

- Our expectation that the single family loans we acquired from 2005 through 2008, in the aggregate, will not be profitable over their lifetime;

79

Table of Contents

- Our expectation that the serious delinquency rates for single family loans acquired in recent years will be higher after the loans have aged, but not as high as the March 31, 2012 serious delinquency rates of loans in our legacy book of business;

- Our expectations regarding the credit profile of loans we acquire in the future, and the factors that will influence their credit profile;

- Our expectation that the trends of stabilizing home prices and declining single family serious delinquency rates will continue;

- Our belief that our total loss reserves peaked as of December 31, 2011 and will not increase above $76 9 billion in the foreseeable future;

- Our expectation that our loss reserves will remain significantly elevated relative to historical levels for an extended period because ( ) we expect future defaults on loans we acquired prior to 2009 and the resulting charge offs will occur over a period of years and (2) a significant portion of our reserves represents concessions granted to borrowers upon modification of their loans and will remain in our reserves until the loans are fully paid or default;

- Our expectation that it will take a significant amount of time before our REO inventory is reduced to pre 2008 levels;

- Our estimate that we will realize as credit losses nearly two thirds of the fair value losses on loans purchased out of unconsolidated MBS trusts that are reflected in our condensed consolidated balance sheets, and eventually recover the remaining over one third, either through net interest income for loans that cure or through foreclosed property income for loans where the sale of the collateral exceeds our recorded investment in the loan;

- Our belief that the changes in the foreclosure environment will continue to negatively affect our single family serious delinquency rates, foreclosure timelines and credit related expenses;

- Our expectation that serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process, the volume of loan modifications and the extent to which borrowers with modified loans continue to make timely payments;

- Our expectation that the number of our single family loans that are seriously delinquent will remain well above pre 2008 levels for years;

- Our belief that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding;

- Our expectation that changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations;

- Our belief that our liquidity contingency plan may be difficult or impossible to execute for a company of our size in our circumstances;

- Our expectation that weakness in the housing and mortgage markets will continue in 2012;

- Our expectation that the high level of delinquent mortgage loans will ultimately result in high levels of foreclosures, which is likely to add to the excess housing inventory;

- Our expectation that single family default and severity rates will remain high in 2012, but will be lower than in 2011;

- Our expectation that multifamily foreclosures in 2012 will remain generally commensurate with 2011 levels as certain local markets and properties continue to exhibit weak fundamentals;

- Our expectations that changes to HARP announced in October 2011 will result in our acquisition of more refinancings in 2012 than we would have acquired in the absence of the changes, but that we will acquire fewer refinancings overall in 2012 than in 2011;

80

Table of Contents

- Our expectation that our loan acquisitions for 2012 will be lower than in 2011;

- Our estimation that total originations in the U S  single family mortgage market in 2012 will decrease from 2011 levels by approximately 8%, from an estimated $1 36 trillion to an estimated $1 26 trillion, and that the amount of originations in the U S  single family mortgage market that are refinancings will decline from approximately $900 billion to approximately $800 billion;

- Our expectation that home prices on a national basis will decline further before stabilizing in 20  3;

- Our expectation of a peak  to trough home price decline on a national basis ranging from 24% to 30%, with the occurrence of an additional adverse economic event needed to reach the high end of the range;

- Our expectations regarding regional variations in home price declines and stabilization;

- Our expectation that our credit related expenses will remain high in 20  2 but that, overall, our credit related expenses will be lower in 20  2 than in 2011;

- Our expectation that our credit losses will remain high in 2012;

- Our expectation that our realization of some credit losses will be delayed to the extent delays in foreclosures continue in 20  2;

- Our expectation that we will request additional draws under the senior preferred stock purchase agreement in future periods, which will further increase the dividends we owe to Treasury on the senior preferred stock;

- Our expectation that, over time, our dividend obligation to Treasury will increasingly drive our future draws under the senior preferred stock purchase agreement;

- Our expectation that, although we may experience period to period volatility in earnings and comprehensive income, we will not generate net income or comprehensive income in excess of our annual dividend obligation to Treasury over the long term;

- Our expectation that uncertainty regarding the future of our company will continue;

- Our expectation that we will continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other factors, including the limit on the mortgage assets that we may own pursuant to the senior preferred stock purchase agreement;

- Our expectation that Congressional hearings on GSE reform will continue in 20  2 and additional legislation will be considered and proposals will be discussed, including proposals that would result in a substantial change to our business structure or that involve Fannie Mae's liquidation or dissolution;

- Our expectation that, as drafted, bills introduced in Congress that would require FHFA to make a determination within two years of enactment regarding whether the GSEs were financially viable and, if the GSEs were determined to be not financially viable, to place them into receivership may upon enactment impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of our existing and future liabilities;

- Our expectation that our acquisitions of Alt A mortgage loans (which are limited to refinancings of existing Fannie Mae loans) will continue to be minimal in future periods and the percentage of the book of business attributable to Alt A will continue to decrease over time;

- Our belief that Refi Plus loans may not perform as well as the other loans we have acquired since the beginning of 2009;

- Our expectation that Refi Plus loans will perform better than the loans they replace because Refi Plus loans reduce the borrowers' monthly payments or otherwise should provide more stability than the borrowers' old loans (for example, by refinancing into a mortgage with a fixed interest rate instead of an adjustable rate)

81

Table of Contents

- Our expectation that the current market premium portion of our current estimate of the fair value of our book of business will not impact future Treasury draws, which is based on our intention generally not to have other parties assume the credit risk inherent in our book of business;

- Our expectation that, although our funding needs may vary from quarter to quarter depending on market conditions, our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirement of the senior preferred stock purchase agreement;

- Our expectation that our debt funding activity will likely continue to decline in future periods as the size of our mortgage portfolio decreases;

- Our intention to repay our short term and long term debt obligations as they become due primarily through proceeds from the issuance of additional debt securities;

- Our expectations regarding our credit ratings and their impact on us as set forth in "MD&A   Liquidity and Capital Management   Liquidity Management   Credit Ratings";

- Our expectation that the volume of our home retention solutions and foreclosure alternatives will remain high throughout the remainder of 20 2;

- Our belief that the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and income, and home prices;

- Our expectation that the amount of our outstanding repurchase requests to seller/servicers will remain high, and that we may be unable to recover on all outstanding loan repurchase obligations resulting from seller/servicers' breaches of contractual obligations;

- Our expectation that the change in our loan delivery agreement with Bank of America will not be material to our business or results of operations;

- Our expectations regarding recoveries from our lenders under risk sharing arrangements, and the possibility that we may require a lender to pledge collateral to secure its recourse obligations;

- Our beliefs regarding whether our financial guarantor counterparties will be able to fully meet their obligations to us in the future;

- Our belief that we have limited credit exposure on government loans;

- Our expectation that the ultimate performance of all our loans will be affected by macroeconomic trends, including unemployment, the economy, and home prices;

- Our expectation that implementing recent Congressional and FHFA directives will increase our operational risk and may potentially result in one or more significant deficiencies or material weaknesses in our internal control over financial reporting in a future period; and

- Our belief that none of the seven lawsuits relating to the payment of transfer taxes described in "Note 13, Commitments and Contingencies" is likely to have a material impact on our business, either individually or in the aggregate

Forward looking statements reflect our management's expectations, forecasts or predictions of future conditions, events or results based on various assumptions and management's estimates of trends and economic factors in the markets in which we are active, as well as our business plans. They are not guarantees of future performance  By their nature, forward looking statements are subject to risks and uncertainties  Our actual results and financial condition may differ, possibly materially, from the anticipated results and financial condition indicated in these forward looking statements  There are a number of factors that could cause actual conditions, events or results to differ materially from those described in the forward looking statements contained in this report, including, but not limited to, the following: the uncertainty of our future; legislative and regulatory changes affecting us; challenges we face in retaining and hiring qualified employees; the deteriorated credit performance of many loans in our guaranty book of business; the conservatorship and its effect on our business; the investment by Treasury and its effect on our business; adverse effects from activities we undertake to support the mortgage market and help borrowers; a decrease in our credit ratings; limitations on our ability to access the debt capital

82

Table of Contents

markets; further disruptions in the housing and credit markets; defaults by one or more institutional counterparties; our reliance on mortgage servicers; guidance by the Financial Accounting Standards Board ("FASB"); operational control weaknesses; our reliance on models; the level and volatility of interest rates and credit spreads; changes in the structure and regulation of the financial services industry; and those factors described in "Risk Factors" in this report and in our 2011 Form 10 K, as well as the factors described in "Executive Summary   Outlook   Factors that Could Cause Actual Results to be Materially Different from our Estimates and Expectations" in this report

Readers are cautioned to place forward looking statements in this report or that we make from time to time into proper context by carefully considering the factors discussed in "Risk Factors" in our 2011 Form 10 K and in this report  These forward looking statements are representative only as of the date they are made, and we undertake no obligation to update any forward looking statement as a result of new information, future events or otherwise, except as required under the federal securities laws

83

Table of Contents

**Item 1.      Financial Statements**

## FANNIE MAE
### (In conservatorship)

**Condensed Consolidated Balance Sheets    (Unaudited)**

**(Dollars in millions, except share amounts)**

| | As of | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| **ASSETS** | | |
| Cash and cash equiva ents | $  22,049 | $  17,539 |
| Restricted cash (inc udes $51,3 7 and $ 5,900, respective y, re ated to conso idated trusts) | 55,921 | 50,797 |
| Federa  unds so d and securities purchased under agreements to rese  or simi ar arrangements | 15,000 | 6,000 |
| nvestments in securities | | |
| Trading, at  air va ue | 75,806 | 74,198 |
| Avai ab e-for-sa e, at fair va ue (inc udes $1,091 and $1,191, respective y, re ated to  conso idated trusts) | 73,779 | 77,582 |
| ota  investments in securities | 149,585 | 151,780 |
| Mortgage  oans | | |
|  oans he d for sa e, at  ower of cost or fair va ue (inc udes $56 and $66, respective y, re ated to conso idated trusts) | 282 | 311 |
|  oans he d or investment, at amortized cost | | |
| Of Fannie Mae | 377,031 | 380,134 |
| O  conso idated trusts (inc udes $4,292 and $3,611, respective y, at  air va ue and  oans p edged as co atera  that may be so d or rep edged o  $749 and $798, respect ve y) | 2,616,521 | 2,590,332 |
|  ota  oans he d for investment | 2,993,552 | 2,970,466 |
| A  owance  or  oan  osses | (70,109) | (72,156) |
|  ota  oans he d for investment, net of a  owance | 2,923,443 | 2,898,310 |
| Tota  mortgage  oans | 2,923,725 | 2,898,621 |
| Accrued interest receivab e, net (inc udes $8, 16 and $8, 66, respective y, re ated to conso idated trusts) | 10,018 | 10,000 |
| Acquired property, net | 10,619 | 11,373 |
| Other assets (inc udes cash p edged as co atera  of $1,159 and $1,109, respective y) | 23,023 | 25,374 |
| Tota  assets | $ 3,209,940 | $  3,211,484 |
| **LIABILITIES AND EQUITY (DEFICIT)** | | |
|  iabi ities | | |
| Accrued interest payab e (inc udes $9,227 and $9,302, respective y, re ated to conso idated trusts) | $  12,442 | $  12,648 |
| Deb | | |
| O  Fannie Mae (inc udes $825 and $838, respective y, at  air va ue) | 685,974 | 732,444 |
| Of conso idated trusts (inc udes $ ,279 and $3,939, respective y, at fair va ue) | 2,498,233 | 2,457,428 |
| Other  iabi ities (inc udes $581 and $629, respective y, re ated to conso idated trusts) | 13,023 | 13,535 |
|  ota  iabi ities | 3,209,672 | 3,216,055 |
| Commitments and contingencies (Note 13) | — | — |
| Fannie Mae stockho ders' equity (deficit) | | |
| Senior pre erred stock, 1,000,000 shares issued and outstanding | 117,1 9 | 112,578 |
| Pre erred stock, 700,000,000 shares are authorized—555,374,922 shares issued and outstanding | 19,130 | 19,130 |
| Common s ock, no par va ue, no max mum au hor za  on—1,308,762,703 shares  ssued and 1,158,069,699 and 1,157,767,  00 shares outstanding, respective y | 687 | 687 |
| Accumu ated de icit | (128,482) | (128,381) |
| Accumu ated other comprehensive  oss | (873) | (1,235) |
| Treasury stock, at cost, 150,693,00  and 150,995,303 shares, respective y | (7, 01) | (7, 03) |
|  ota  Fannie Mae stockho ders  equity (deficit) | 210 | ( ,62 ) |
| Noncontro  ng  nterest | 58 | 53 |
| Tota  equ ty (def c t) | 268 | ( ,571) |
|  ota   iabi ities and equity (deficit) | $ 3,209,940 | $  3,211,484 |

See Notes to Condensed Consolidated Financial Statements

84

Table of Contents

**FANNIE MAE**

**(In conservatorship)**

**Condensed Consolidated Statements of Operations and Comprehensive Income (Loss)   (Unaudited)**

(Dollars and shares in millions, except per share amounts)

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| Interest income | | |
| Trading securities | $ 9 | $ 284 |
| Available-for-sale securities | 727 | 1,213 |
| Mortgage loans (includes $29,001 and $31,865, respectively, related to consolidated trusts) | 32,570 | 35,590 |
| Other | 38 | 28 |
| Total interest income | 33,784 | 37,115 |
| Interest expense | | |
| Short-term debt (includes $1 and $3, respectively, related to consolidated trusts) | 42 | 107 |
| Long-term debt (includes $25,360 and $27,852, respectively, related to consolidated trusts) | 28,545 | 32,048 |
| Total interest expense | 28,587 | 32,155 |
| Net interest income | 5,197 | 960 |
| Provision for credit losses | (2,000) | (10,554) |
| Net interest income (loss) after provision for credit losses | 3,197 | (5,594) |
| Investment gains, net | 116 | 75 |
| Other-than-temporary impairments | (80) | (57) |
| Noncredit portion of other-than-temporary impairments recognized in other comprehensive income | 16 | 13 |
| Net other-than-temporary impairments | (6 ) | ( ) |
| Fair value gains, net | 283 | 289 |
| Debt extinguishment (losses) gains, net | (3 ) | 13 |
| Fee and other income | 375 | 237 |
| Non-interest income | 676 | 570 |
| Administrative expenses | | |
| Salaries and employee benefits | 306 | 320 |
| Professional services | 168 | 189 |
| Occupancy expense | 3 | 42 |
| Other administrative expenses | 7 | 54 |
| Total administrative expenses | 564 | 605 |
| Foreclosed property expense | 339 | 488 |
| Other expenses | 252 | 352 |
| Total expenses | 1,155 | 1,445 |
| Income (loss) before federal income taxes | 2,718 | (6,469) |
| Provision for federal income taxes | — | 2 |
| Net income (loss) | 2,718 | (6,471) |
| Other comprehensive income | | |
| Changes in unrealized losses on available-for-sale securities, net of reclassification adjustments and taxes | 355 | 179 |
| Other | 7 | 2 |
| Total other comprehensive income | 362 | 181 |
| Total comprehensive income (loss) | 3,080 | (6,290) |
| Less: Comprehensive loss attributable to the noncontrolling interest | 1 | — |
| Total comprehensive income (loss) attributable to Fannie Mae | $ 3,081 | $ (6,290) |
| Net income (loss) | $ 2,718 | $ (6,471) |
| Less: Net loss attributable to the noncontrolling interest | 1 | — |
| Net income (loss) attributable to Fannie Mae | 2,719 | (6,471) |
| Preferred stock dividends | (2,817) | (2,216) |
| Net loss attributable to common stockholders | $ (98) | $ (8,687) |
| Loss per share—Basic and Diluted | $ (0.02) | $ (1.52) |
| Weighted-average common shares outstanding—Basic and Diluted | 5,761 | 5,698 |

See Notes to Condensed Consolidated Financial Statements

85

Table of Contents

**FANNIE MAE**

**(In conservatorship)**

**Condensed Consolidated Statements of Cash Flows    (Unaudited)**

**(Dollars in millions)**

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| **Net cash (used in) provided by operating activities** | $    ( 4) | $   2,566 |
| **Cash flows provided by investing activities:** | | |
| Purchases of trading securities held for investment | (226) | (185) |
| Proceeds from maturities and paydowns of trading securities held for investment | 756 | 522 |
| Proceeds from sales of trading securities held for investment | 4 3 | 409 |
| Purchases of available for sale securities | (9) | (44) |
| Proceeds from maturities and paydowns of available for sale securities | 2,929 | 3,851 |
| Proceeds from sales of available for sale securities | 40 | 498 |
| Purchases of loans held for investment | (38,276) | (15,745) |
| Proceeds from repayments of loans held for investment of Fannie Mae | 6,856 | 5,381 |
| Proceeds from repayments of loans held for investment of consolidated trusts | 174,954 | 121,533 |
| Net change in restricted cash | (5,124) | 26,948 |
| Advances to lenders | (26,131) | (15,646) |
| Proceeds from disposition of acquired property and short sales | 10,195 | 10,979 |
| Net change in federal funds sold and securities purchased under agreements to resell or similar agreements | 3 ,000 | (14,499) |
| Other, net | (208) | (163) |
| Net cash provided by investing activities | 157,530 | 123,839 |
| **Cash flows used in financing activities:** | | |
| Proceeds from issuance of debt of Fannie Mae | 167,848 | 163,776 |
| Payments to redeem debt of Fannie Mae | (214,701) | ( 83,073) |
| Proceeds from issuance of debt of consolidated trusts | 80,933 | 72,567 |
| Payments to redeem debt of consolidated trusts | (188,730) | (177,551) |
| Payments of cash dividends on senior preferred stock to Treasury | (2,819) | (2,216) |
| Proceeds from senior preferred stock purchase agreement with Treasury | 4,571 | 2,600 |
| Net change in federal funds purchased and securities sold under agreements to repurchase | | 26 |
| Other, net | (8) | |
| Net cash used in financing activities | (152,906) | (123,871) |
| **Net increase in cash and cash equivalents** | 4,510 | 2,534 |
| Cash and cash equivalents at beginning of period | 17,539 | 17,297 |
| Cash and cash equivalents at end of period | $   22,049 | $   19,831 |
| **Cash paid during the period for interest** | $   30,590 | $   32,689 |

See Notes to Condensed Consolidated Financial Statements

86

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

## 1.   Summary of Significant Accounting Policies

### *Organization*

We are a stockholder owned corporation organized and existing under the Federal National Mortgage Association Charter Act (the "Charter Act" or our "charter")  We are a government sponsored enterprise ("GSE"), and we are subject to government oversight and regulation  Our regulators include the Federal Housing Finance Agency ("FHFA"), the U S  Department of Housing and Urban Development ("HUD"), the U S  Securities and Exchange Commission ("SEC"), and the U S  Department of the Treasury ("Treasury")  The U S  government does not guarantee our securities or other obligations

### *Conservatorship*

On September 7, 2008, the Secretary of the Treasury and the Director of FHFA announced several actions taken by Treasury and FHFA regarding Fannie Mae, which included: (1) placing us in conservatorship and (2) the execution of a senior preferred stock purchase agreement by our conservator, on our behalf, and Treasury, pursuant to which we issued to Treasury both senior preferred stock and a warrant to purchase common stock.

Under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Federal Housing Finance Regulatory Reform Act of 2008, (together, the "GSE Act"), the conservator immediately succeeded to (1) all rights, titles, powers and privileges of Fannie Mae, and of any stockholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and (2) title to the books, records and assets of any other legal custodian of Fannie Mae  The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day to day operations  The conservator retains the authority to withdraw its delegations at any time

The conservator has the power to transfer or sell any asset or liability of Fannie Mae (subject to limitations and post transfer notice provisions for transfers of qualified financial contracts) without any approval, assignment of rights or consent of any party. The GSE Act, however, provides that mortgage loans and mortgage related assets that have been transferred to a Fannie Mae mortgage backed securities ("MBS") trust must be held by the conservator for the beneficial owners of the Fannie Mae MBS and cannot be used to satisfy the general creditors of Fannie Mae  As of May 9, 2012, FHFA has not exercised this power

Neither the conservatorship nor the terms of our agreements with Treasury change our obligation to make required payments on our debt securities or perform under our mortgage guaranty obligations  FHFA issued a rule establishing a framework for conservatorship and receivership operations for the GSEs, which became effective in 2011  The rule established procedures for conservatorship and receivership, and priorities of claims for contract parties and other claimants  This rule is part of FHFA's implementation of the powers provided by the Federal Housing Finance Regulatory Reform Act of 2008, and does not seek to anticipate or predict future conservatorships or receiverships

FHFA has announced that, during the conservatorship, our existing statutory and FHFA directed regulatory capital requirements will not be binding and that FHFA will not issue quarterly capital classifications  We submit capital reports to FHFA and FHFA monitors our capital levels  The deficit of core capital over statutory minimum capital was $147.8 billion as of March 31, 2012 and $148.4 billion as of December 31, 2011.

The conservatorship has no specified termination date and there continues to be uncertainty regarding the future of our company, including how long the company will continue to exist in its current form, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated  Under the GSE Act, FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations or if we have not been paying our debts, in either case, for a period of 60 days  In addition, the Director of FHFA

87

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**

**(UNAUDITED)**

may place us in receivership at his discretion at any time for other reasons, including conditions that FHFA has already asserted existed at the time the former Director of FHFA placed us into conservatorship  Placement into receivership would have a material adverse effect on holders of our common stock, preferred stock, debt securities and Fannie Mae MBS  Should we be placed into receivership, different assumptions would be required to determine the carrying value of our assets, which could lead to substantially different financial results  We are not aware of any plans of FHFA to significantly change our business model or capital structure in the near term

### *Impact of U.S. Government Support*

We are dependent upon the continued support of Treasury to eliminate our net worth deficit, which avoids our being placed into receivership  Based on consideration of all the relevant conditions and events affecting our operations, including our dependence on the U S  government, we continue to operate as a going concern and in accordance with our delegation of authority from FHFA

Pursuant to the senior preferred stock purchase agreement, Treasury has committed to provide us with funding as described below to help us maintain a positive net worth thereby avoiding the mandatory receivership trigger described above  We have received a total of $116 1 billion from Treasury pursuant to the senior preferred stock purchase agreement as of March 3 , 20 2  The aggregate liquidation preference of the senior preferred stock, including the initial aggregate liquidation preference of $1 0 billion, remains at $117 1 billion

The senior preferred stock purchase agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any net worth deficiencies attributable to periods during 2010, 2011, and 2012  If we do not have a positive net worth as of December 31, 2012, then the amount of funding available under the amended senior preferred stock purchase agreement after 2012 will be $124 8 billion ($200 billion less $75 2 billion in cumulative draws for net worth deficiencies through December 31, 2009)

In the event we have a positive net worth as of December 3 , 20 2 under the amended senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011, and 2012, as follows:

• If our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011, and 2012, then the amount of available funding will be $124 8 billion less our positive net worth as of December 31, 2012

• If our positive net worth as of December 3 , 20 2 is greater than the cumulative draws for net worth deficiencies attributable to periods during 20 0, 2011, and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011, and 2012.

We were scheduled to begin paying a quarterly commitment fee to Treasury under the senior preferred stock purchase agreement beginning on March 3 , 2011; however, Treasury waived the quarterly commitment fee for each quarter of 2011 and the first and second quarters of 2012 due to the continued fragility of the U S  mortgage market and Treasury's belief that the imposition of the quarterly commitment fee would not generate increased compensation for taxpayers  In its notification to FHFA that it had waived the quarterly commitment fee for the second quarter of 2012, Treasury indicated that it will reevaluate the situation during the next calendar quarter to determine whether the quarterly commitment fee should then be set  The agreement provides that Treasury may waive the periodic commitment fee for up to one year at a time, in its sole discretion, based on adverse conditions in the U S  mortgage market

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

We fund our business primarily through the issuance of short term and long term debt securities in the domestic and international capital markets  Because debt issuance is our primary funding source, we are subject to "roll over," or refinancing, risk on our outstanding debt. Our ability to issue long term debt has been strong primarily due to actions taken by the federal government to support us and the financial markets

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding  Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations  In addition, due to our reliance on the U S  government's support, our access to debt funding or the cost of debt funding also could be materially adversely affected by a change or perceived change in the creditworthiness of the U S  government  A downgrade in our credit ratings could reduce demand for our debt securities and increase our borrowing costs. Standard & Poor's Ratings Services' ("S&P") downgrade of our credit rating on August 8, 2011, which was a result of a similar action on the U.S. government's sovereign credit rating, has not adversely affected our access to debt funding or the cost of our debt funding  Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll over risk and have a material adverse impact on our liquidity, financial condition and results of operations

In February 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market  The report provides that the Obama Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions  The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period  In February 2012, Treasury Secretary Geithner stated that the Administration intended to release new details in the spring of 2012 around approaches to housing finance reform including winding down Fannie Mae and Freddie Mac and to work with Congressional leaders to explore options for legislation, but that he does not expect housing finance reform legislation to be enacted in 20 2  We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs

### *Basis of Presentation*

The accompanying unaudited interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and with the SEC's instructions to Form 10 Q and Article 10 of Regulation S X  Accordingly, they do not include all of the information and note disclosures required by GAAP for complete consolidated financial statements  In the opinion of management, all adjustments of a normal recurring nature considered necessary for a fair presentation have been included  The accompanying condensed consolidated financial statements include our accounts as well as the accounts of other entities in which we have a controlling financial interest  All intercompany accounts and transactions have been eliminated  Results for the three months ended March 31, 2012 may not necessarily be indicative of the results for the year ending December 31, 2012  The unaudited interim condensed consolidated financial statements as of and for the three months ended March 31, 2012 should be read in conjunction with our audited consolidated financial statements and related notes included in our Annual Report on Form 10 K for the year ended December 31, 2011 ("2011 Form 10 K"), filed with the SEC on February 29, 2012

### *Related Parties*

As a result of our issuance to Treasury of the warrant to purchase shares of Fannie Mae common stock equal to 79.9% of the total number of shares of Fannie Mae common stock, we and Treasury are deemed related parties

89

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

As of March 31, 2012, Treasury held an investment in our senior preferred stock with an aggregate liquidation preference of $117.1 billion. Our administrative expenses were reduced by $22 million and $35 million for the three months ended March 31, 2012 and 2011, respectively, due to reimbursements from Treasury and Freddie Mac for expenses incurred as program administrator for Treasury's Home Affordable Modification Program ("HAMP") and other initiatives under Treasury's Making Home Affordable Program

During the three months ended March 31, 2011, we received a refund of $1 1 billion from the Internal Revenue Service ("IRS") related to the carryback of our 2009 operating loss to the 2008 and 2007 tax years

Under the temporary credit and liquidity facilities ("TCLF") program, we had $2.6 billion and $3.0 billion outstanding, which include principal and interest, of three year standby credit and liquidity support as of March 31, 2012 and December 31, 2011, respectively. Under the new issue bond ("NIB") program, we had $7.3 billion and $7.5 billion outstanding of pass through securities backed by single family and multifamily housing bonds issued by housing finance agencies ("HFAs") as of March 31, 2012 and December 31, 2011, respectively. Treasury will bear any initial losses of principal under the TCLF program and the NIB program up to 35% of the total original principal on a combined program wide basis, and thereafter we will bear the losses of principal that are attributable to the TCLF and the securities we have issued  Treasury will also bear any losses of unpaid interest under the two programs  As of March 31, 2012, there had been no losses of principal or interest under the TCLF program or the NIB program

FHFA's control of both us and Freddie Mac has caused us and Freddie Mac to be related parties  No transactions outside of normal business activities have occurred between us and Freddie Mac  As of March 3 , 20 2 and December 3 , 20  , we held Freddie Mac mortgage related securities with a fair value of $14.5 billion and $15.6 billion, respectively, and accrued interest receivable of $64 million and $69 million, respectively. We recognized interest income on these securities held by us of $153 million and $188 million for the three months ended March 31, 2012 and 2011, respectively. In addition, Freddie Mac may be an investor in variable interest entities that we have consolidated, and we may be an investor in variable interest entities that Freddie Mac has consolidated

*Use of Estimates*

Preparing condensed consolidated financial statements in accordance with GAAP requires management to make estimates and assumptions that affect our reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities as of the dates of our condensed consolidated financial statements, as well as our reported amounts of revenues and expenses during the reporting periods  Management has made significant estimates in a variety of areas including, but not limited to, valuation of certain financial instruments, and other assets and liabilities, the allowance for loan losses and reserve for guaranty losses, and other than temporary impairment of investment securities  Actual results could be different from these estimates

*Collateral*

Our liability to third party holders of Fannie Mae MBS that arises as the result of a consolidation of a securitization trust is collateralized by the underlying loans and/or mortgage related securities

We had reverse repurchase agreements outstanding of $26.0 billion and $49.5 billion as of March 31, 2012 and December 31, 2011, respectively. The fair value of non cash collateral we accepted was $26.1 billion and $50.1 billion as of March 31, 2012 and December 31, 2011, respectively, of which we were permitted to sell or repledge $20 0 billion as of March 3 , 20 2 and December 3 , 20    None of the underlying collateral was sold or repledged as of March 31, 2012 or December 31, 2011.

We had no repurchase agreements outstanding as of March 31, 2012 or December 31, 2011

90

Table of Contents

**FANNIE MAE**
(In conservatorship)

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**   (Continued)
(UNAUDITED)

*Reclassifications*

To conform to our current period presentation, we have reclassified certain amounts reported in our condensed consolidated financial statements

*Adoption of New Accounting Guidance*

Effective January 1, 2012, we prospectively adopted guidance issued by the Financial Accounting Standards Board ("FASB") related to fair value measurement  The new guidance does not expand the use of fair value; instead, it provides guidance about how fair value should be determined where it already is required or permitted under U S  GAAP  The new fair value guidance changes certain fair value principles and clarifies the FASB's intent on certain items, including a clarification that the principal market should be determined based on the market the entity has access to with the greatest volume and level of activity for the asset or liability  It also expands the disclosures about fair value measurements  The adoption of this guidance did not have a material impact on our condensed consolidated financial statements; however, it required us to expand our fair value disclosures  See "Note 12, Fair Value," for additional information regarding the impact upon adoption of this guidance

**2.   Consolidations and Transfers of Financial Assets**

We have interests in various entities that are considered to be variable interest entities ("VIEs")  The primary types of entities are securitization trusts guaranteed by us via lender swap and portfolio securitization transactions, mortgage and asset backed trusts that were not created by us, as well as housing partnerships that are established to finance the acquisition, construction, development or rehabilitation of affordable multifamily and single family housing  These interests include investments in securities issued by VIEs, such as Fannie Mae MBS created pursuant to our securitization transactions and our guaranty to the entity  We consolidate the substantial majority of our single class securitization trusts because our role as guarantor and master servicer provides us with the power to direct matters (primarily the servicing of mortgage loans) that impact the credit risk to which we are exposed  In contrast, we do not consolidate single class securitization trusts when other organizations have the power to direct these activities

As of March 31, 2012, we consolidated certain VIEs that were not consolidated as of December 31, 2011, generally due to increases in the amount of the certificates issued by the entity that are held in our portfolio (for example, when we hold a substantial portion of the securities issued by Fannie Mae multi class resecuritization trusts). As a result of consolidating these entities, which had combined total assets of $1.7 billion in unpaid principal balance as of March 3 , 20 2, we derecognized our investment in these entities and recognized the assets and liabilities of the consolidated entities at fair value

As of March 3 , 20 2, we also deconsolidated certain VIEs that were consolidated as of December 3 , 20  , generally due to decreases in the amount of the certificates issued by the entity that are held in our portfolio  As a result of deconsolidating these entities, which had combined total assets of $102 million in unpaid principal balance as of December 3 , 20  , we derecognized the assets and liabilities of the entities and recognized at fair value our retained interests as securities in our condensed consolidated balance sheets

*Unconsolidated VIEs*

We do not consolidate VIEs when we are not deemed to be the primary beneficiary  Our unconsolidated VIEs include securitization trusts, as well as other investment entities  The following table displays the carrying amount and classification of our assets and liabilities that relate to our involvement with unconsolidated VIEs as of March 31, 2012 and December 31, 2011, as well as our maximum exposure to loss and the total assets of those unconsolidated VIEs

91

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

| | As of March 31, 2012 | | |
| | Mortgage-Backed Trusts | Asset-Backed Trusts | Limited Partnership Investments |
| | (Dollars in millions) | | |
| **Assets and liabilities recorded in our condensed consolidated balance sheets:** | | | |
| Assets: | | | |
| Available for sale securities( | $    65,640 | $ | $ |
| Trading securities( | 23,824 | 1,896 | |
| Other assets | 271 | | 118 |
| Other liabilities | (1,362) | | ( 48) |
| **Net carrying amount** | $    88,373 | $   1,896 | $      (30) |
| Maximum exposure to loss[1] | $    97,103 | $   1,896 | $    115 |
| Total assets of unconsolidated VIEs[1] | $  609,941 | $ 244,148 | $ 12,058 |

| | As of December 31, 2011 | | |
| | Mortgage-Backed Trusts | Asset-Backed Trusts | Limited Partnership Investments |
| | (Dollars in millions) | | |
| **Assets and liabilities recorded in our condensed consolidated balance sheets:** | | | |
| Assets: | | | |
| Available for sale securities( | $    69,101 | $ | $ |
| Trading securities( | 24,292 | 2,111 | |
| Other assets | 271 | | 145 |
| Other liabilities | ( .347) | | (153) |
| **Net carrying amount** | $    92,317 | $   2,111 | $        (8) |
| Maximum exposure to loss[1] | $  100,146 | $   2,111 | $    137 |
| Total assets of unconsolidated VIEs[1] | $  641,346 | $256,845 | $ 12,256 |

(   Contains securities recognized in our condensed consolidated balance sheets due to consolidation of certain multi class resecuritization trusts

Our maximum exposure to loss generally represents the greater of our recorded investment in the entity or the unpaid principal balance of the assets covered by our guaranty  However, our securities issued by Fannie Mae multi class resecuritization trusts that are not consolidated do not give rise to any additional exposure to loss as we already consolidate the underlying collateral

**Transfers of Financial Assets**

We issue Fannie Mae MBS through portfolio securitization transactions by transferring pools of mortgage loans or mortgage related securities to one or more trusts or special purpose entities  We are considered to be the transferor when we transfer assets from our own portfolio in a portfolio securitization transaction  For the three months ended March 31, 2012 and 2011, the unpaid principal balance of portfolio securitizations was $41.7 billion and $29.3 billion, respectively

TREASURY-3439

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

The following table displays some key characteristics of the securities retained in unconsolidated portfolio securitization trusts

| | Fannie Mae Single-class MBS & Fannie Mae Megas | REMICS & SMBS[(1)] |
|---|---|---|
| | (Dollars in millions) | |
| **As of March 31, 2012** | | |
| Unpaid principal balance | $ 556 | $ 11,138 |
| Fair value | 619 | 12,388 |
| Weighted average coupon | 6.21% | 5.68% |
| We ghted-average oan age | 5.7 years | 4 2 years |
| Weighted average maturity | 23 3 years | 16.9 years |
| **As of December 31, 2011** | | |
| Unpaid principal balance | $ 588 | $ 12,697 |
| Fair value | 654 | 4,043 |
| Weighted average coupon | 6.21% | 5.86% |
| We ghted-average oan age | 5.4 years | 4.5 years |
| Weighted average maturity | 23.5 years | 18.6 years |

( Consists of Real Estate Mortgage Investment Conduits ("REMICs") and stripped mortgage backed securities ("SMBS")

For the three months ended March 31, 2012 and 2011, the principal and interest received on retained interests was $694 million and $750 million, respectively

*Managed Loans*

We define "managed loans" as on balance sheet mortgage loans as well as mortgage loans that we have securitized in unconsolidated portfolio securitization trusts. The following table displays the unpaid principal balances of managed loans, including those managed loans that were delinquent as of March 31, 2012 and December 31, 2011.

| | As of | | | |
|---|---|---|---|---|
| | March 31, 2012 | | December 31, 2011 | |
| | Unpaid Principal Balance | Principal Amount of Delinquent Loans[(1)] | Unpaid Principal Balance | Principal Amount of Delinquent Loans[(1)] |
| | (Dollars in millions) | | | |
| Loans held for investment | | | | |
| Of Fannie Mae | $ 392,988 | $ 115,708 | $ 396,276 | $ 122,392 |
| Of consolidated trusts | 2,591,235 | 20,018 | 2,570,339 | 24,893 |
| Loans held for sale | 283 | 60 | 312 | 57 |
| Securitized loans | 2,307 | 72 | 2,273 | 71 |
| Total loans managed | $2,986,813 | $ 135,858 | $2,969,200 | $ 147,413 |

( Represents the unpaid principal balance of loans held for investment, loans held for sale and securitized loans for which we are no longer accruing interest and loans 90 days or more delinquent which are continuing to accrue interest

*Qualifying Sales of Portfolio Securitizations*

The majority of our portfolio securitization transactions do not qualify for sale treatment, as we consolidate the substantial majority of our single class MBS trusts  We report assets and liabilities of consolidated trusts created via portfolio securitization transactions that do not qualify as sales in our condensed consolidated balance sheets

93

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**    **(Continued)**
**(UNAUDITED)**

We recognize assets obtained and liabilities incurred in qualifying sales of portfolio securitizations at fair value  Proceeds from the initial sale of securities from portfolio securitizations were $133 million and $108 million for the three months ended March 31, 2012 and 2011, respectively  Our continuing involvement in the form of guaranty assets and guaranty liabilities with assets that were transferred into unconsolidated trusts is not material to our condensed consolidated financial statements

*Other Securitizations*

We also completed other portfolio securitization transactions that did not qualify as sales during the three months ended March 31, 2012 and were accounted for as secured borrowings  Proceeds from these transactions were $42  million and were recorded as long term debt of Fannie Mae in our condensed consolidated balance sheet. As of March 31, 2012, the fair value of trading securities underlying these transactions was $213 million, and the unpaid principal balance of mortgage loans of consolidated trusts underlying these transactions was $239 million  The related assets have been transferred to MBS trusts and are restricted solely for the purpose of servicing the related MBS  We did not complete any securitizations of this type during the first quarter of 2011.

**3.    Mortgage Loans**

The following table displays our mortgage loans as of March 31, 2012 and December 31, 2011

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | March 31, 2012 | | | December 31, 2011 | | |
| | O Fannie Mae | O Consolidated Trusts | Total | O Fannie Mae | O Consolidated T usts | Total |
| | (Dollars in millions) | | | | | |
| Single family | $320,635 | $ 2,485,077 | $2,805,712 | $319,496 | $ 2,470,533 | $ 2,790,029 |
| Multifamily | 72,580 | 106,214 | 178,794 | 77,026 | 99,872 | 176,898 |
| Total unpaid principal balance of mortgage loans | 393,215 | 2,591,291 | 2,984,506 | 396,522 | 2,570,405 | 2,966,927 |
| Cost basis and fair value adjustments, net | (15,958) | 25,286 | 9,328 | (16,143) | 19,993 | 3,850 |
| Allowance for loan losses for loans held for investment | (57,001) | (13,108) | (70,109) | (57,309) | (14,847) | (72,156) |
| Total mortgage loans | $320,256 | $ 2,603,469 | $2,923,725 | $ 323,070 | $2,575,551 | $ 2,898,621 |

During the three months ended March 3  , 20 2, we did not redesignate any loans from held for investment ("HFI") to held for sale ("HFS")  During the three months ended March 31, 2011, we redesignated loans with a carrying value of $561 million from HFI to HFS.

*Nonaccrual Loans*

We discontinue accruing interest on loans when we believe collectibility of principal or interest is not reasonably assured, which for single family loans we have determined, based on our historical experience, to be when the loan becomes two months or more past due according to its contractual terms  We generally place multifamily loans on nonaccrual status when the loan is deemed to be individually impaired, unless the loan is well secured such that collectibility of principal and accrued interest is reasonably assured.

When a loan is placed on nonaccrual status, interest previously accrued but not collected becomes part of our recorded investment in the loan and is collectively reviewed for impairment  For single family loans, we

94

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

recognize interest income for loans on nonaccrual status when cash is received  For multifamily loans, we apply any payment received on a cost recovery basis to reduce principal on the mortgage loan unless the loan is determined to be well secured

We return a single family loan to accrual status at the point that the borrower has made sufficient payments to reduce their delinquency below our nonaccrual threshold  For modified single family loans, the loan is not returned to accrual status until the borrower successfully makes all required payments during the trial period (generally three to four months) and the modification is made permanent  We generally return a multifamily loan to accrual status when the borrower cures the delinquency of the loan or we otherwise determine that the loan is well secured such that collectibility is reasonably assured

### Aging Analysis

The following tables display an aging analysis of the total recorded investment in our HFI mortgage loans, excluding loans for which we have elected the fair value option, by portfolio segment and class as of March 31, 2012 and December 31, 2011.

| | As of March 31, 2012[1] | | | | | | Recorded Investment in Loans 90 Days or More Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
|---|---|---|---|---|---|---|---|---|
| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | | |
| | | | | (Dollars in millions) | | | | |
| Single-family | | | | | | | | |
| Primary[3] | $ 36,0 1 | $ 12,415 | $ 76,561 | $ 125,017 | $ 2,385,647 | $ 2,510,664 | $ 102 | $ 88,813 |
| Government[4] | 8 5 | 35 | 330 | 450 | 51,373 | 51,823 | 330 | — |
| Alt-A | 6,1 1 | 2,572 | 26,427 | 35,140 | 136,578 | 171,718 | 15 | 28,978 |
| Other[5] | 2,732 | 1,153 | 10,510 | 14,395 | 71,228 | 85,623 | 8 5 | 11,505 |
| Total single-family | ,999 | 16,175 | 113,828 | 175,002 | 2,644,826 | 2,819,828 | 532 | 129,296 |
| Multifamily[6] | 159 | NA | 707 | 866 | 180,359 | 181,225 | 1 | 2,059 |
| Total | $ 45,158 | $ 16,175 | $ 114,535 | $ 175,868 | $ 2,825,185 | $ 3,001,053 | $ 533 | $ 131,355 |

| | As of December 31, 2011[1] | | | | | | Recorded Investment in Loans 90 Days or More Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
|---|---|---|---|---|---|---|---|---|
| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | | |
| | | | | (Dollars in millions) | | | | |
| Single-family | | | | | | | | |
| Primary[3] | $ 43,516 | $ 15,282 | $ 80,712 | $ 139,510 | $ 2,341,646 | $ 2,481,156 | $ 111 | $ 95,959 |
| Government[4] | 109 | 9 | 327 | 485 | 51,391 | 51,876 | 327 | — |
| Alt-A | 7,155 | 3,054 | 28,323 | 38,532 | 138,880 | 177,412 | 1 | 31,356 |
| Other[5] | 3, 03 | 1, 31 | 11,277 | 16,111 | 73,115 | 89,226 | 96 | 12,533 |
| Total single-family | 54,183 | 19,816 | 120,639 | 194,638 | 2,605,032 | 2,799,670 | 548 | 139,848 |
| Multifamily[6] | 210 | NA | 1,105 | 1,315 | 177,906 | 179,221 | — | 2,764 |
| Total | $ 54,393 | $ 19,816 | $ 121,744 | $ 195,953 | $ 2,782,938 | $ 2,978,891 | $ 548 | $ 142,612 |

9 5

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

( Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable

(2 Single family seriously delinquent loans are loans that are 90 days or more past due or in the foreclosure process  Multifamily seriously delinquent loans are loans that are 60 days or more past due.

(3 Consists of mortgage loans that are not included in other loan classes

(4 Consists of mortgage loans guaranteed or insured, in whole or in part, by the U S  government or one of its agencies that are not Alt A  Primarily consists of reverse mortgages which due to their nature are not aged and are included in the current column

( Includes loans with higher risk loan characteristics, such as interest only loans and negative amortizing loans that are neither government nor Alt A

(6 Multifamily loans 60 89 days delinquent are included in the seriously delinquent column.

### Credit Quality Indicators

The following table displays the total recorded investment in our single family HFI loans, excluding loans for which we have elected the fair value option, by class and credit quality indicator as of March 31, 2012 and December 31, 2011. The single family credit quality indicator is updated quarterly.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | March 31, 2012(1)(2) | | | December 31, 2011(1 2) | | |
| | Prima y(3) | Alt-A | Other(4) | Primary(3) | Alt-A | Other(4) |
| | (Dollars in millions) | | | | | |
| Estimated mark to market LTV ratio:( | | | | | | |
| Less than or equal to 80% | $ 1,440,871 | $ 57,093 | $21,777 | $ 1,464,348 | $ 61,618 | $ 23,414 |
| Greater than 80% and less than or equal to 90% | 424,475 | 20,019 | 8,251 | 412,342 | 21,369 | 9,224 |
| Greater than 90% and less than or equal to 100% | 263,111 | 18,713 | 8,657 | 246,648 | 19,790 | 9,445 |
| Greater than  00% and less than or equal to    0% | 138,458 | 16,042 | 8,364 | 128,428 | 16,164 | 8,951 |
| Greater than 110% and less than or equal to 120% | 79,367 | 12,759 | 7,703 | 73,836 | 12,534 | 7,912 |
| Greater than 120% and less than or equal to 125% | 27,927 | 5,261 | 3,513 | 25,750 | 5,087 | 3,557 |
| Greater than 125% | 136,455 | 41,831 | 27,358 | 129,804 | 40,850 | 26,723 |
| Total | $2,510,664 | $171,718 | $85,623 | $2,481,156 | $177,412 | $89,226 |

( Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable

(2 Excludes $51.8 billion and $51.9 billion as of March 31, 2012 and December 31, 2011, respectively, of mortgage loans guaranteed or insured, in whole or in part, by the U S  government or one of its agencies that are not Alt A loans  The segment class is primarily reverse mortgages for which we do not calculate an estimated mark to market LTV

(3 Consists of mortgage loans that are not included in other loan classes

(4 Includes loans with higher risk loan characteristics, such as interest only loans and negative amortizing loans that are neither government nor Alt A

( The aggregate estimated mark to market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value

96

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

The following table displays the total recorded investment in our multifamily HFI loans, excluding loans for which we have elected the fair value option, by credit quality indicator as of March 31, 2012 and December 31, 2011. The multifamily credit quality indicator is updated quarterly.

| | As of | |
| --- | --- | --- |
| | March 31, 2012[1] | December 31, 2011[1] |
| | (Dollars in millions) | |
| Credit risk profile by internally assigned grade: [2] | | |
| Green | $       135,879 | $       131,740 |
| Yellow[3] | 26,461 | 28,354 |
| Orange | 17,463 | 17,355 |
| Red | 1,422 | 1,772 |
| Total | $       181,225 | $       179,221 |

[1]   Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable

[2]   Green (loan with acceptable risk); yellow (loan with signs of potential weakness); orange (loan with a well defined weakness that may jeopardize the timely full repayment); and red (loan with a weakness that makes timely collection or liquidation in full more questionable based on existing conditions and values).

[3]   Includes approximately $6.2 billion and $6.9 billion of unpaid principal balance as of March 31, 2012 and December 31, 2011, respectively, classified as yellow due to no available financial information

97

Table of Contents

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**

**(UNAUDITED)**

### Individually Impaired Loans

Individually impaired loans include TDRs, acquired credit impaired loans, and other multifamily loans regardless of whether we are currently accruing interest  The following tables display the total recorded investment, unpaid principal balance, and related allowance as of March 31, 2012 and December 31, 2011 and interest income recognized and average recorded investment for the three months ended March 31, 2012 and 2011 for individually impaired loans

| | As of | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **March 31, 2012** | | | | **December 31, 2011** | | | |
| | Unpaid Principal Balance | Total Recorded Investment(1) | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable | Unpaid Principal Balance | Total Recorded Investment(1) | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable |
| | (Dollars in millions) | | | | | | | |
| Individual impaired loans | | | | | | | | |
| With related allowance recorded | | | | | | | | |
| Single-family | | | | | | | | |
| Primary(2) | $118,225 | $ 110,913 | $ 29,927 | $ 610 | $116,825 | $ 109,684 | $ 29,598 | $ 67 |
| Government(3 | 263 | 264 | 76 | 9 | 258 | 258 | 67 | 8 |
| Alt-A | 34,511 | 31,633 | 11,110 | 239 | 34,318 | 31,516 | 11,121 | 268 |
| Other(4 | 16,102 | 15,270 | 5,300 | 87 | 16,181 | 15,363 | 5,353 | 99 |
| Total single-family | 169,101 | 158,080 | 6,113 | 945 | 167,582 | 156,821 | 6,139 | 1,019 |
| Multifamily | 2,478 | 2,504 | 557 | 15 | 2,832 | 2,855 | 718 | 32 |
| Total individually impaired loans with related allowance recorded | 171,579 | 160,584 | 7,000 | 960 | 170,1 | 159,676 | 46,857 | 1,081 |
| With no related allowance recorded ( | | | | | | | | |
| Single-family | | | | | | | | |
| Primary(2) | 9,171 | 6,535 | — | — | 9,370 | 6,71 | — | — |
| Government(3 | 28 | 21 | — | — | 25 | 17 | — | — |
| Alt-A | 2,928 | 1,523 | — | — | 3,056 | 1,538 | — | — |
| Other(4 | 650 | 363 | — | — | 680 | 367 | — | — |
| Total single-family | 12,777 | 8,442 | — | — | 13,131 | 8,393 | — | — |
| Multifamily | 1,648 | 1,661 | — | — | 1,759 | 1,771 | — | — |
| Total individually impaired loans with no related allowance recorded | 14,425 | 10,103 | — | — | 14,890 | 10,16 | — | — |
| Total individual impaired loans(6 | $ 186,004 | $ 170,687 | $ 7,000 | $ 960 | $185,304 | $ 169,840 | $ 46,857 | $ 1,081 |

98

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

| | For the Three Months Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2012** | | | **2011** | | |
| | Average Recorded Investment | Total Interest Income Recognized[7] | Interest Income Recognized on a Cash Basis | Average Recorded Investment | Total Interest Income Recognized[7] | Interest Income Recognized on a Cash Basis |
| | (Dollars in millions) | | | | | |
| Individual impaired loans | | | | | | |
| With related allowance recorded | | | | | | |
| Single-family | | | | | | |
| Primary[2] | $ 109,970 | $ 973 | $ 173 | $ 95,087 | $ 90 | $ 1 |
| Government[3] | 260 | 3 | — | 232 | 3 | — |
| Alt-A | 31,509 | 253 | 39 | 28,567 | 242 | 2 |
| Other[4] | 15,255 | 110 | 18 | 13,889 | 106 | 6 |
| Total single-family | 156,994 | 1,339 | 230 | 137,775 | 1,255 | 9 |
| Multifamily | 2,673 | 31 | — | 2,202 | 25 | 1 |
| Total individually impaired loans with related allowance recorded | 159,667 | 1,370 | 230 | 139,977 | 1,280 | 50 |
| With no related allowance recorded[6] | | | | | | |
| Single-family | | | | | | |
| Primary[2] | 6,608 | 184 | 54 | 7,139 | 108 | 57 |
| Government[3] | 20 | 2 | — | 12 | 1 | — |
| Alt-A | 1,558 | 51 | 15 | 1,863 | 33 | 19 |
| Other[4] | 37 | 19 | 7 | 513 | 8 | |
| Total single-family | 8,560 | 256 | 76 | 9,527 | 150 | 80 |
| Multifamily | 1,71? | 21 | 1 | 754 | 15 | 3 |
| Total individually impaired loans with no related allowance recorded | 10,274 | 277 | 77 | 10,281 | 165 | 83 |
| Total individually impaired loans | $ 169,91? | $ 1,6? | $ 307 | $ 150,258 | $ 1,445 | $ 133 |

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable

[2] Consists of mortgage loans that are not included in other loan classes

[3] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U S  government or one of its agencies that are not Alt A

[4] Includes loans with higher risk characteristics, such as interest only loans and negative amortizing loans that are neither government nor Alt A

[5] The discounted cash flows or collateral value equals or exceeds the carrying value of the loan and, as such, no valuation allowance is required

[6] Includes single family loans restructured in a TDR with a recorded investment of $163.5 billion and $161.9 billion as of March 31, 2012 and December 31, 2011, respectively. Includes multifamily loans restructured in a TDR with a recorded investment of $992 million and $956 million as of March 31, 2012 and December 31, 2011, respectively.

[7] Total single  family interest income recognized of $1 6 billion for the three months ended March 31, 2012 consists of $1 2 billion of contractual interest and $387 million of effective yield adjustments  Total single family interest income recognized of $1 4 billion for the three months ended March 31, 2011 consists of $1.1 billion of contractual interest and $352 million of effective yield adjustments.

99

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

*Troubled Debt Restructurings*

A modification to the contractual terms of a loan that results in granting a concession to a borrower experiencing financial difficulties is considered a TDR  In addition to formal loan modifications, we also engage in other loss mitigation activities with troubled borrowers, which include repayment plans and forbearance arrangements, both of which represent informal agreements with the borrower that do not result in the legal modification of the loan's contractual terms  We account for these informal restructurings as a TDR if we defer more than three missed payments  The substantial majority of the loan modifications we complete result in term extensions, interest rate reductions or a combination of both  During the three months ended March 3  , 20  2 and 20    , the average term extension of a modified loan was 128 and 64 months, respectively, and the average interest rate reduction was 2 28 and 3 53 percentage points, respectively

The following table displays the number of loans and recorded investment in loans restructured in a TDR for the three months ended March 31, 2012 and 2011.

|  | For the Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2012 | | 2011 | |
|  | Number of Loans | Recorded Investment[(1)] | Number of Loans | Recorded Investment[(1)] |
|  | (Dollars in millions) | | | |
| Single family |  |  |  |  |
| Primary[(2] | 26,884 | $   4,587 | 36,765 | $   6,824 |
| Government[(3] | 110 | 4 | 174 | 4 |
| Alt-A | 4,645 | 967 | 7,498 | 1,681 |
| Other[(4] | 1,660 | 409 | 3,596 | 920 |
| Total single family | 33,299 | 5,977 | 48,033 | 9,466 |
| Multifamily | 3 | 68 | 0 | 66 |
| Total troubled debt restructurings | 33,312 | $   6,045 | 48,043 | $   9,532 |

[(1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable  Based on the nature of our modification programs, which do not include principal or interest forgiveness, there is not a material difference between the recorded investment in our loans pre  and post  modification, therefore amounts represent recorded investment post modification

[(2] Consists of mortgage loans that are not included in other loan classes

[(3] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U S  government or one of its agencies that are not Alt A

00

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS** (Continued)
**(UNAUDITED)**

[4 Includes loans with higher risk characteristics, such as interest only and negative amortizing loans that are neither government nor Alt A

The following table displays the number of loans and recorded investment in loans that had a payment default for the three months ended March 31, 2012 and 2011 and were modified in a TDR in the twelve months prior to the payment default For purposes of this disclosure, we define loans that had a payment default as single family and multifamily loans with completed TDRs that liquidated during the period, either through foreclosure, deed in lieu of foreclosure or a short sale, single family loans with completed modifications that are two or more months delinquent during the period or multifamily loans with completed modifications that are one or more months delinquent during the period

|  | For the Three Months Ended March 31, | | | |
|  | 2012 | | 2011 | |
|  | Number of Loans | Recorded Investment[1] | Number of Loans | Recorded Investment[1] |
| --- | --- | --- | --- | --- |
|  | | (Dollars in millions) | | |
| Single family | | | | |
| Primary[2 | 11,872 | $ 2,074 | 21,946 | $ 3,874 |
| Government[3 | 50 | 0 | 78 | 21 |
| Alt-A | 2,243 | 466 | 5,009 | 1,066 |
| Other[4 | 1,195 | 288 | 2,192 | 530 |
| Total single family | 15,360 | 2,838 | 29,225 | 5,491 |
| Multifamily | 1 | 2 | 3 | 24 |
| Total TDRs that subsequently defaulted | 15,361 | $ 2,840 | 29,228 | $ 5,515 |

[1 Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable Represents our recorded investment in the loan at time of payment default

[2 Consists of mortgage loans that are not included in other loan classes

[3 Consists of mortgage loans guaranteed or insured, in whole or in part, by the U S government or one of its agencies that are not Alt A

[4 Includes loans with higher risk characteristics, such as interest only loans and negative amortizing loans that are neither government nor Alt A

## 4. Allowance for Loan Losses

Our allowance for loan losses is a valuation allowance that reflects an estimate of incurred credit losses related to our recorded investment in both single family and multifamily HFI loans. This population includes both HFI loans held by Fannie Mae and by consolidated Fannie Mae MBS trusts. When calculating our loan loss allowance, we consider only our net recorded investment in the loan at the balance sheet date, which includes the loan's unpaid principal balance and accrued interest recognized while the loan was on accrual status and any applicable cost basis adjustments We record charge offs as a reduction to the allowance for loan losses when losses are confirmed through the receipt of assets in full satisfaction of a loan, such as the underlying collateral upon foreclosure or cash upon completion of a short sale

We aggregate single family HFI loans that are not individually impaired based on similar risk characteristics, for purposes of estimating incurred credit losses and establish a collective single family loss reserve using an econometric model that derives an overall loss reserve estimate We base our allowance and reserve methodology

101

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

on historical events and trends, such as loss severity (in event of default), default rates, and recoveries from mortgage insurance contracts and other credit enhancements  In addition, management performs a review of the observable data used in its estimate to ensure it is representative of prevailing economic conditions and other events existing as of the balance sheet date

Individually impaired single family loans currently include those restructured in a TDR and acquired credit impaired loans  When a loan has been restructured, we measure impairment using a cash flow analysis discounted at the loan's original effective interest rate  However, if we expect to recover our recorded investment in an individually impaired loan through probable foreclosure of the underlying collateral, we measure impairment based on the fair value of the collateral, reduced by estimated disposal costs and adjusted for estimated proceeds from mortgage, flood, or hazard insurance or similar sources

We identify multifamily loans for evaluation for impairment through a credit risk assessment process  Based on this evaluation, we determine for loans that are not in homogeneous pools whether or not a loan is individually impaired  If we determine that a multifamily loan is individually impaired, we generally measure impairment on that loan based on the fair value of the underlying collateral less estimated costs to sell the property  If we determine that an individual loan that was specifically evaluated for impairment is not individually impaired, we include the loan as part of a pool of loans with similar characteristics that are evaluated collectively for incurred losses

102

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

The following table displays changes in our single family, multifamily, and total allowance for loan losses for the three months ended March 31, 2012 and 2011.

| | For the Three Months Ended March 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2012** | | | **2011** | | |
| | O Fannie Mae | O Consolidated Trusts | Total | O Fannie Mae | O Consolidated T usts | Total |
| | | | (Dollars in millions) | | | |
| Single family allowance for loan losses( : | | | | | | |
| Beginning balance | $56,294 | $ 14,339 | $ 70,633 | $ 47,377 | $ 12,603 | $ 59,980 |
| Provision for loan losses(2 | ,400 | 620 | 2,020 | 7,243 | 3,369 | 10,612 |
| Charge offs(3 (4 | (4,404) | (263) | (4,667) | (5,623) | (448) | (6,071) |
| Recover es | 421 | 6 5 | 486 | 530 | 952 | 1,482 |
| Transfers( | 2,193 | (2,193) | | 3,162 | (3,162) | |
| Other(6 | 204 | 62 | 266 | (18) | 9 9 | 81 |
| Ending balance | $56,108 | $ 12,630 | $ 68,738 | $52,671 | $ 13,413 | $ 66,084 |
| Multifamily allowance for loan losses: | | | | | | |
| Beginning balance | $  1,015 | $      508 | $  1,523 | $  1,153 | $      423 | $  1,576 |
| (Benefit) provision for loan losses(2 | (17) | (23) | (40) | (84) | 5 9 | (25) |
| Charge offs(3 (4 | (129) | | (129) | (82) | | (82) |
| Transfers( | 8 | (8) | | 45 | (45) | |
| Other(6 | 16 | 1 | 17 | 5 | ( ) | 4 |
| Ending balance | $      893 | $      478 | $  1,371 | $  1,037 | $      436 | $   1,473 |
| Total allowance for loan losses( : | | | | | | |
| Beginning balance | $ 57,309 | $ 14,847 | $72,156 | $ 48,530 | $ 13,026 | $61,556 |
| Provision for loan losses(2 | 1,383 | 597 | 1,980 | 7,159 | 3,428 | 10,587 |
| Charge offs(3 (4 | (4,533) | (263) | (4,796) | (5,705) | (448) | (6,153) |
| Recover es | 421 | 6 5 | 486 | 530 | 952 | 1,482 |
| Transfers( | 2,201 | (2,201) | | 3,207 | (3,207) | |
| Other(6 | 220 | 63 | 283 | ( 3) | 98 | 85 |
| Ending balance(7 | $ 57,001 | $ 13,108 | $ 70,109 | $ 53,708 | $ 13,849 | $67,557 |

(   Includes an out of period adjustment of $548 million to increase the provision for loan losses for the three months ended March 31, 2012

(2   Provision for loan losses is included in provision for credit losses in our condensed consolidated statements of operations and comprehensive income (loss)

(3   While we purchase the substantial majority of loans that are four or more months delinquent from our MBS trusts, we do not exercise this option to purchase loans during a forbearance period  Accordingly, charge offs of consolidated trusts generally represent loans that remained in our consolidated trusts at the time of default

(4   Single family charge offs include accrued interest of $258 million and $377 million for the three months ended March 31, 2012 and 2011, respectively  Multifamily charge offs include accrued interest of $15 million and $9 million for the three months ended March 31, 2012 and 2011, respectively. Total charge offs include accrued interest of $273 million and $386 million for the three months ended March 31, 2012 and 2011, respectively.

(   Includes transfers from trusts for delinquent loan purchases.

03

Table of Contents

**FANNIE MAE**
(In conservatorship)

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**   (Continued)
(UNAUDITED)

[6]   Amounts represent the net activity recorded in our allowances for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers  The provision for loan losses, charge offs, recoveries and transfer activity included in this table reflects all changes for both the allowance for loan losses and the valuation allowances for accrued interest and preforeclosure property taxes and insurance receivable that relate to the mortgage loans

[7]   Total allowance for loan losses includes $353 million and $412 million as of March 31, 2012 and 2011, respectively, for acquired credit impaired loans.

As of March 31, 2012, the allowance for accrued interest receivable for loans of Fannie Mae was $1.9 billion and for loans of consolidated trusts was $273 million  As of December 31, 2011, the allowance for accrued interest receivable for loans of Fannie Mae was $2 2 billion and for loans of consolidated trusts was $336 million.

The following table displays the allowance for loan losses and total recorded investment in our HFI loans, excluding loans for which we have elected the fair value option, by impairment or reserve methodology and portfolio segment as of March 31, 2012 and December 31, 2011

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | March 31, 2012 | | | December 31, 2011 | | |
| | Single-Family | Multifamily | Total | Single-Family | Multifamily | Total |
| | (Dollars in millions) | | | | | |
| Allowance for loan losses by segment: | | | | | | |
| Individually impaired loans | $ 46,091 | $ 556 | $ 46,647 | $ 45,765 | $ 717 | $ 46,482 |
| Collectively reserved loans | 22,295 | 814 | 23,109 | 24,494 | 805 | 25,299 |
| Acquired credit impaired loans | 352 | 1 | 353 | 374 | 1 | 375 |
| Total allowance for loan losses | $ 68,738 | $ 1,371 | $ 70,109 | $ 70,633 | $ 1,523 | $ 72,156 |
| Recorded investment in loans by segment: [ | | | | | | |
| Individually impaired loans | $ 163,487 | $ 4,121 | $ 167,608 | $ 161,942 | $ 4,579 | $ 166,521 |
| Collectively reserved loans | 2,653,306 | 177,060 | 2,830,366 | 2,634,456 | 174,595 | 2,809,051 |
| Acquired credit impaired loans | 3,035 | 44 | 3,079 | 3,272 | 47 | 3,319 |
| Total recorded investment in loans | $2,819,828 | $181,225 | $ 3,001,053 | $2,799,670 | $179,221 | $2,978,891 |

[   Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable

04

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

**5.   Investments in Securities**

*Trading Securities*

Trading securities are recorded at fair value with subsequent changes in fair value recorded as "Fair value gains, net" in our condensed consolidated statements of operations and comprehensive income (loss)  The following table displays our investments in trading securities as of March 31, 2012 and December 31, 2011

| | As of | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Mortgage related securities: | | |
| Fannie Mae | $  7,168 | $   7,424 |
| Freddie Mac | 2,575 | 2,732 |
| Ginnie Mae | 286 | 287 |
| Alt A private label securities | 1,338 | 1,349 |
| Subprime private label securities | 1,305 | 1,280 |
| CMBS | 10,417 | 10,411 |
| Mortgage revenue bonds | 668 | 724 |
| Other mortgage related securities | 123 | 43 |
| Total | 23,880 | 24,350 |
| Non mo tgage related securities: | | |
| U.S. Treasury securities | 50,030 | 47,737 |
| Asset backed securities | 1,896 | 2,111 |
| Total | 51,926 | 49,848 |
| Total trading securities | $ 75,806 | $ 74,198 |

The following table displays information about our net trading gains and losses for the three months ended March 31, 2012 and 2011.

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (Dollars in millions) | |
| Net trading gains (losses): | | |
| Mortgage related securities | $ 296 | $  229 |
| Non mortgage related securities | (12) | (4) |
| Total | $  284 | $  225 |
| Net trading gains (losses) recorded in the period related to securities still held at period end: | | |
| Mortgage related securities | $  33 | $  222 |
| Non mortgage related securities | (12) | (5) |
| Total | $ 319 | $ 217 |

105

Table of Contents

**FANNIE MAE**
(In conservatorship)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)
(UNAUDITED)

*Available-for-Sale Securities*

We measure available for sale ("AFS") securities at fair value with unrealized gains and losses recorded as a component of "Other comprehensive income," net of tax, and we record realized gains and losses from the sale of AFS securities in "Investment gains, net" in our condensed consolidated statements of operations and comprehensive income (loss)

The following table displays the gross realized gains, losses and proceeds on sales of AFS securities for the three months ended March 31, 2012 and 2011

|  | For the Three Months Ended March 31, | |
|---|---|---|
|  | 2012 | 2011 |
|  | (Dollars in millions) | |
| Gross realized gains | $ 18 | $ 60 |
| Gross realized losses | 9 | 6 |
| Total proceeds | 268 | 390 |

ᵗ   Excludes proceeds from the initial sale of securities from new portfolio securitizations included in "Note 2, Consolidations and Transfers of Financial Assets."

The following table displays the amortized cost, gross unrealized gains and losses, and fair value by major security type for AFS securities we held as of March 31, 2012 and December 31, 2011.

| | As of March 31, 2012 | | | | |
|---|---|---|---|---|---|
| | Total Amortized Cost[1] | Gross Unrealized Gains | Gross Unrealized Losses - OTTI[2] | Gross Unrealized Losses - Other[3] | Total Fair Value |
| | (Dollars in millions) | | | | |
| Fannie Mae | $ 13,501 | $1,141 | $ (2) | $ (15) | $14,625 |
| Freddie Mac | 11,053 | 890 | | | 11,943 |
| Ginnie Mae | 744 | 122 | | | 866 |
| Alt A private label securities | 12,895 | 219 | (1,325) | (200) | 11,589 |
| Subprime private label securities | 9,263 | 35 | (1,296) | (407) | 7,595 |
| CMBS[4] | 13,612 | 491 | | (35) | 14,068 |
| Mortgage revenue bonds | 9,793 | 138 | (79) | ( 3) | 9,739 |
| Other mortgage related securities | 3,610 | 84 | (32) | (308) | 3,354 |
| Total | $ 74,471 | $ 3,120 | $ (2,734) | $(1,078) | $ 73,779 |

| | As of December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Total Amortized Cost[1] | Gross Unrealized Gains | Gross Unrealized Losses - OTTI[2] | Gross Unrealized Losses - Other[3] | Total Fair Value |
| | (Dollars in millions) | | | | |
| Fannie Mae | $15,486 | $1,381 | $ (3) | $ ( 4) | $16,850 |
| Freddie Mac | 11,906 | 917 | | | 12,823 |
| Ginnie Mae | 775 | 127 | | | 902 |
| Alt A private label securities | 13,314 | 233 | (1,618) | (246) | 11,683 |
| Subprime private label securities | 9,556 | 17 | (1,534) | (453) | 7,586 |
| CMBS[4] | 13,949 | 181 | | ( 04) | 14,026 |
| Mortgage revenue bonds | 10,172 | 202 | (56) | (64) | 10,254 |
| Other mortgage related securities | 3,687 | 92 | (39) | (282) | 3,458 |
| Total | $ 78,845 | $3,150 | $ (3,250) | $(1,163) | $ 77,582 |

106

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

[1]  Amortized cost includes unamortized premiums, discounts and other cost basis adjustments as well as the credit component of other than temporary impairments recognized in our condensed consolidated statements of operations and comprehensive income (loss)

[2]  Represents the noncredit component of other than temporary impairment losses recorded in "Accumulated other comprehensive loss" as well as cumulative changes in fair value of securities for which we previously recognized the credit component of an other than temporary impairment

[3]  Represents the gross unrealized losses on securities for which we have not recognized an other than temporary impairment

[4]  Amortized cost includes $649 million and $686 million as of March 31, 2012 and December 31, 2011, respectively, of increase to the carrying amount from previous fair value hedge accounting

The following table displays additional information regarding gross unrealized losses and fair value by major security type for AFS securities in an unrealized loss position that we held as of March 31, 2012 and December 31, 2011.

| | As of March 31, 2012 | | | |
| --- | --- | --- | --- | --- |
| | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
| | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
| | (Dollars in millions) | | | |
| Fannie Mae | $      (5) | $   636 | $      (12) | $    202 |
| Alt A private label securities | (4 ) | 1,339 | ( ,484) | 6,534 |
| Subprime private label securities | (28) | 389 | (1,675) | 6,599 |
| CMBS | ( ) | 259 | (34) | 534 |
| Mortgage revenue bonds | (56) | ,003 | (136) | 1,280 |
| Other mortgage related securities | (12) | 499 | (328) | 1,614 |
| Total | $   ( 43) | $4,125 | $(3,669) | $16,763 |

| | As of December 31, 2011 | | | |
| --- | --- | --- | --- | --- |
| | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
| | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
| | (Dollars in millions) | | | |
| Fannie Mae | $      (4) | $   519 | $      ( 3) | $    208 |
| Alt A private label securities | ( 33) | 1,414 | (1,731) | 6,525 |
| Subprime private label securities | (73) | 471 | (1,914) | 6,686 |
| CMBS | (20) | 1,458 | (84) | 2,790 |
| Mortgage revenue bonds | (4) | 114 | (116) | 1,971 |
| Other mortgage related securities | (21) | 547 | (300) | 1,588 |
| Total | $ (255) | $4,523 | $ (4,158) | $19,768 |

107

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

*Other Than Temporary Impairments*

We recognize the credit component of other than temporary impairments of our debt securities in "Net other than temporary impairments" and the noncredit component in "Other comprehensive income" in our condensed consolidated statements of operations and comprehensive income (loss) for those securities that we do not intend to sell and for which it is not more likely than not that we will be required to sell before recovery

The fair value of our securities varies from period to period due to changes in interest rates, in the performance of the underlying collateral and in the credit performance of the underlying issuer, among other factors  As of March 31, 2012, $3 7 billion of the $3 8 billion of gross unrealized losses on AFS securities had existed for a period of 12 consecutive months or longer  Gross unrealized losses on AFS securities as of March 31, 2012 include unrealized losses on securities with other than temporary impairment in which a portion of the impairment remains in "Accumulated other comprehensive loss " The securities with unrealized losses for 12 consecutive months or longer, on average, had a fair value as of March 31, 2012 that was 82% of their amortized cost basis. Based on our review for impairments of AFS securities, which includes an evaluation of the collectibility of cash flows and any intent or requirement to sell the securities, we have concluded that we do not have an intent to sell and we believe it is not more likely than not that we will be required to sell the securities  Additionally, our projections of cash flows indicate that we will recover these unrealized losses over the lives of the securities

The following table displays our net other than temporary impairments by major security type recognized in our condensed consolidated statements of operations and comprehensive income (loss) for the three months ended March 31, 2012 and 2011

|  | For the Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2012 | 2011 |
|  | (Dollars in millions) | |
| Alt A private label securities | $  43 | $  37 |
| Subprime private label securities | 19 | |
| Other | 2 | 7 |
| Net other than temporary impairments | $  64 | $  44 |

The net other than temporary impairment charges recorded in the three months ended March 3 , 20 2 were primarily driven by a decrease in the expected cash flows on Alt A and subprime securities

108

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

The following table displays activity related to the unrealized credit component on debt securities held by us and recognized in our condensed consolidated statements of operations and comprehensive income (loss) for the three months ended March 31, 2012 and 2011  A related unrealized noncredit component has been recognized in "Other comprehensive income "

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (Dollars in millions) | |
| Balance, January 1 | $8,915 | $8,215 |
| Additions for the credit component on debt securities for which OTTI was not previously recognized | | 8 |
| Additions for credit losses on debt securities for which OTTI was previously recognized | 64 | 36 |
| Reductions for amortization resulting from changes in cash flows expected to be collected over the remaining life of the securities | (109) | (219) |
| Balance, March 31 | $ 8,870 | $ 8,040 |

As of March 3 , 20 2, those debt securities with other than temporary impairment for which we recognized in our condensed consolidated statements of operations and comprehensive income (loss) the amount of loss related to credit consisted predominantly of Alt A and subprime securities  We evaluate Alt A (including option adjustable rate mortgage ("ARM")) and subprime private label securities for other than temporary impairment by discounting the projected cash flows from econometric models to estimate the portion of loss in value attributable to credit  Separate components of a third party model project regional home prices, unemployment and interest rates  The model combines these factors with available current information regarding attributes of loans in pools backing the private label mortgage related securities to project prepayment speeds, conditional default rates, loss severities and delinquency rates  It incorporates detailed information on security level subordination levels and cash flow priority of payments to project security level cash flows  We have recorded other than temporary impairments for the three months ended March 3 , 20 2 based on this analysis  For securities we determined were not other than temporarily impaired, we concluded that either the bond had no projected credit loss or if we projected a loss, that the present value of expected cash flows was greater than the security's cost basis

109

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

The following table displays the modeled attributes, including default rates and severities, which are used to determine whether our senior interests in certain non agency mortgage related securities will experience a cash shortfall as of March 31, 2012  Assumption of voluntary prepayment rates is also an input to the present value of expected losses

| | | | As of March 31, 2012 | | |
| | | | Alt-A | | |
| | Subprime | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
| | | | (Dollars in millions) | | |
|---|---|---|---|---|---|
| **Vintage Year** | | | | | |
| **2004 & Prior:** | | | | | |
| Unpaid principal balance | $ 1,580 | $ 469 | $ 3,237 | $ 474 | $ 2,174 |
| Weighted average collateral default[(] | 38.8% | 36.8% | 11.5% | 32 0% | 16.5% |
| Weighted average collateral severities[(2] | 60.5 | 53.1 | 49.4 | 43.5 | 40 4 |
| Weighted average voluntary prepayment rates[(3] | 6.5 | 10.9 | 12.4 | 9.1 | 12.6 |
| Average credit enhancement[(4] | 51.5 | 14.6 | 12.2 | 22.7 | 10.2 |
| **2005** | | | | | |
| Unpaid principal balance | $ 163 | $ 1,267 | $ 1,139 | $ 513 | $ 2,259 |
| Weighted average collateral default[(] | 71.3% | 55.0% | 40 8% | 52.4% | 38 0% |
| Weighted average collateral severities[(2] | 71.6 | 61.8 | 64.6 | 59.2 | 48.5 |
| Weighted average voluntary prepayment rates[(3] | 2 3 | 6.3 | 8.5 | 7.5 | 9.1 |
| Average credit enhancement[(4] | 65.6 | 23.7 | 1.1 | 15.9 | 5.0 |
| **2006** | | | | | |
| Unpaid principal balance | $ 11,283 | $ 1,136 | $ 507 | $ 1,534 | $ 1,605 |
| Weighted average collateral default[(] | 77.0% | 69.6% | 40.5% | 57.9% | 30.9% |
| Weighted average collateral severities[(2] | 72.8 | 63.6 | 64.8 | 58.8 | 51.3 |
| Weighted average voluntary prepayment rates[(3] | 2.2 | 3.6 | 7.6 | 6.3 | 9.9 |
| Average credit enhancement[(4] | 16.6 | 18.2 | 0.5 | 0 | |
| **2007 & After:** | | | | | |
| Unpaid principal balance | $ 591 | $ | $ | $ | $ 113 |
| Weighted average collateral default[(] | 77.6% | N/A | N/A | N/A | 42.2% |
| Weighted average collateral severities[(2] | 66.8 | N/A | N/A | N/A | 59.5 |
| Weighted average voluntary prepayment rates[(3] | 1.8 | N/A | N/A | N/A | 8 4 |
| Average credit enhancement[(4] | 32 4 | N/A | N/A | N/A | 25.3 |
| **Total** | | | | | |
| Unpaid principal balance | $ 13,617 | $ 2,872 | $ 4,883 | $ 2,521 | $ 6,151 |
| Weighted average collateral default[(] | 72.5% | 57.8% | 21.3% | 51.9% | 28.6% |
| Weighted average collateral severities[(2] | 71.1 | 61.1 | 54.6 | 56.0 | 46.6 |
| Weighted average voluntary prepayment rates[(3] | 2.7 | 5.9 | 11.0 | 7 0 | 10.6 |
| Average credit enhancement[(4] | 21.9 | 20.1 | 8 4 | 8.1 | 5.9 |

[(]   The expected remaining cumulative default rate of the collateral pool backing the securities, as a percentage of the current collateral unpaid principal balance, weighted by security unpaid principal balance.

[(2]   The expected remaining loss given default of the collateral pool backing the securities, calculated as the ratio of remaining cumulative loss divided by cumulative defaults, weighted by security unpaid principal balance.

[(3]   The average monthly voluntary prepayment rate, weighted by security unpaid principal balance

[(4]   The average percent current credit enhancement provided by subordination of other securities  Excludes excess interest projections and monoline bond insurance.

110

TREASURY-3457

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

*Maturity Information*

The following table displays the amortized cost and fair value of our AFS securities by major security type and remaining maturity, assuming no principal prepayments, as of March 31, 2012  Contractual maturity of mortgage backed securities is not a reliable indicator of their expected life because borrowers generally have the right to prepay their obligations at any time

| | | | | As of March 31, 2012 | | | | | | |
| | Total Amortized Cost | Total Fair Value | One Year or Less | | After One Year Through Five Years | | After Five Years Through Ten Years | | After Ten Years | |
| | | | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
| | | | | | (Dollars in millions) | | | | | |
| Fannie Mae | $ 13,501 | $14,625 | $ — | $ — | $ 28 | $ 29 | $ 1,544 | $1,6 1 | $ 11,929 | $12,955 |
| Freddie Mac | 11,053 | 11,9 3 | 2 | 2 | 6 | 9 | 1,125 | 1,211 | 9,880 | 10,681 |
| Ginnie Mae | 7 | 866 | — | — | 1 | 1 | — | 5 | 739 | 860 |
| A t-A private- abe securities | 12,895 | 11,589 | — | — | 1 | 1 | 218 | 222 | 12,676 | 11,366 |
| Subprime private- abe securities | 9,263 | 7,595 | — | — | — | — | — | — | 9,263 | 7,595 |
| CMBS | 13,612 | 14,068 | 62 | 6 | 8,248 | 8,588 | 5,003 | 5,133 | 299 | 283 |
| Mortgage revenue bonds | 9,793 | 9,739 | 58 | 59 | 3 6 | 355 | 729 | 7 | 8,660 | 8,581 |
| Other mortgage-re ated securities | 3,610 | 3,354 | — | — | — | — | — | 12 | 3,610 | 3,342 |
| ota | $ 7, 71 | $73,779 | $ 122 | $125 | $ 8,670 | $ 9,023 | $ 8,623 | $8,968 | $ 57,056 | $55,663 |

*Accumulated Other Comprehensive Loss*

The following table displays our accumulated other comprehensive loss by major categories as of March 31, 2012 and December 31, 2011

| | As of | |
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Net unrealized gains on available for sale securities for which we have not recorded other than temporary impairment, net of tax | $ 1,201 | $ 1,152 |
| Net unrealized losses on available for sale securities for which we have recorded other than temporary impairment, net of tax | (1,647) | (1,953) |
| Other losses | (427) | (434) |
| Accumulated other comprehensive loss | $ (873) | $ (1,235) |

111

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

The following table displays the activity in other comprehensive income, net of tax, by major categories for the three months ended March 31, 2012 and 2011

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (Dollars in millions) | |
| Comprehensive income (loss): | | |
| Net income (loss) | $2,718 | $ (6,471) |
| Other comprehensive income (loss), net of tax: | | |
| Changes in net unrealized losses on available for sale securities (net of tax of $196 and $87, respectively) | 319 | 161 |
| Reclassification adjustment for other than temporary impairments recognized in net income (loss) (net of tax of $22 and $13, respectively) | 42 | 32 |
| Reclassification adjustment for gains included in net income (loss) (net of tax of $3 and $8, respectively) | (6) | ( 4) |
| Other | 7 | 2 |
| Other comprehensive income | 362 | 181 |
| Total comprehensive income (loss) | $ 3,080 | $(6,290) |

**6.   Financial Guarantees**

We recognize a guaranty obligation for our obligation to stand ready to perform for our guarantees to unconsolidated trusts and other guaranty arrangements These guarantees expose us to credit losses on the mortgage loans or, in the case of mortgage related securities, the underlying mortgage loans of the related securities  The contractual terms of our guarantees range from 30 days to 40 years  However, the actual term of each guaranty may be significantly less than the contractual term based on the prepayment characteristics of the related mortgage loans

For those guarantees recognized in our condensed consolidated balance sheets, our maximum potential exposure under these guarantees is primarily comprised of the unpaid principal balance of the underlying mortgage loans, which totaled $59.2 billion and $59.4 billion as of March 31, 2012 and December 31, 2011, respectively.

In addition, we had maximum potential exposure of $9 0 billion and $9 3 billion for other guarantees not recognized in our condensed consolidated balance sheets as of March 31, 2012 and December 31, 2011, respectively, which primarily represents the unpaid principal balance of loans underlying guarantees issued prior to the effective date of current accounting guidance on guaranty accounting

The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees recognized in our condensed consolidated balance sheets was $14 1 billion as of March 31, 2012 and December 31, 2011  The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees not recognized in our condensed consolidated balance sheets was $3 9 billion and $4 0 billion as of March 31, 2012 and December 31, 2011, respectively  Recoverability of such credit enhancements and recourse is subject to, among other factors, our mortgage insurers' and financial guarantors' ability to meet their obligations to us

The fair value of our guaranty obligations associated with the Fannie Mae MBS included in "Investments in securities" was $2.1 billion and $2.2 billion as of March 31, 2012 and December 31, 2011, respectively.

112

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

*Risk Characteristics of our Book of Business*

We gauge our performance risk under our guaranty based on the delinquency status of the mortgage loans we hold in portfolio, or in the case of mortgage backed securities, the mortgage loans underlying the related securities

For single family loans, management monitors the serious delinquency rate, which is the percentage of single family loans three or more months past due or in the foreclosure process, and loans that have higher risk characteristics, such as high mark to market LTV ratios.

For multifamily loans, management monitors the serious delinquency rate, which is the percentage of loans 60 days or more past due and loans that have higher risk characteristics, to determine our overall credit quality indicator  Higher risk characteristics include, but are not limited to, original debt service coverage ratios ("DSCR") below 1 10, current DSCR below 1 0, and high original and current estimated LTV ratios  We stratify multifamily loans into different internal risk categories based on the credit risk inherent in each individual loan

For single and multifamily loans, we use this information, in conjunction with housing market and economic conditions, to structure our pricing and our eligibility and underwriting criteria to reflect the current risk of loans with these higher risk characteristics, and in some cases we decide to significantly reduce our participation in riskier loan product categories  Management also uses this data together with other credit risk measures to identify key trends that guide the development of our loss mitigation strategies

The following tables display the current delinquency status and certain higher risk characteristics of our single family conventional and total multifamily guaranty book of business as of March 31, 2012 and December 31, 2011.

| | As of March 31, 2012[1] | | | As of December 31, 2011[1] | | |
|---|---|---|---|---|---|---|
| | 30 Days Delinquent | 60 Days Delinquent | Seriously Delinquent[2] | 30 Days Delinquent | 60 Days Delinquent | Seriously Delinquent[2] |
| Percentage of single family conventional guaranty book of business[3] | 1.64% | 0.59% | 4.19% | 1.98% | 0 73% | 4 47% |
| Percentage of single family conventional loans[4] | 1.78 | 0.59 | 3.67 | 2.17 | 0 74 | 3.91 |

113

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

| | As of | | | |
|---|---|---|---|---|
| | March 31, 2012[1] | | December 31, 2011[1] | |
| | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent [2][4] | Percentage of Single-Family Conventional Guaranty Book of Business[3] | Percentage Seriously Delinquent[2][4] |
| Estimated mark to market | | | | |
| loan to value ratio | | | | |
| greater than 00% | 19% | 12.77% | 18% | 13.76% |
| **Geographical distribution:** | | | | |
| Arizona | 2 | 3.22 | 2 | 3.65 |
| California | 19 | 2.24 | 19 | 2.46 |
| Florida | 6 | 11.35 | 6 | 11.80 |
| Nevada | 1 | 7.06 | 1 | 7.42 |
| Select Midwest states( | 0 | 4 02 | 0 | 4.39 |
| All other states | 62 | 3 0 | 62 | 3.18 |
| **Product distribution:** | | | | |
| Alt-A | 6 | 2 03 | 7 | 2 43 |
| Subprime | * | 21.67 | * | 23.18 |
| **Vintages:** | | | | |
| 2005 | 7 | 7.23 | 7 | 7.27 |
| 2006 | 6 | 11.58 | 7 | 11.81 |
| 2007 | 9 | 12.27 | 0 | 12.62 |
| 2008 | 6 | 5.74 | 7 | 5.64 |
| All other vintages | 72 | 1.49 | 6 9 | 1.59 |

Represents less than 0 5% of the single family conventional guaranty book of business

(   Consists of the portion of our single family conventional guaranty book of business for which we have detailed loan level information, which constituted approximately 99% of our total single family conventional guaranty book of business as of March 31, 2012 and December 31, 2011.

[2   Consists of single family conventional loans that were three months or more past due or in the foreclosure process, as of the dates indicated

[3   Calculated based on the aggregate unpaid principal balance of single family conventional loans for each category divided by the aggregate unpaid principal balance of loans in our single family conventional guaranty book of business

[4   Calculated based on the number of single family conventional loans that were delinquent divided by the total number of loans in our single family conventional guaranty book of business.

(   Consists of Illinois, Indiana, Michigan, and Ohio.

| | As of | | | |
|---|---|---|---|---|
| | March 31, 2012[1][2] | | December 31, 2011[1][2] | |
| | 30 Days Delinquent | Seriously Delinquent[3] | 30 Days Delinquent | Seriously Delinquent[3] |
| Percentage of multifamily guaranty book of business | 0.09% | 0 37% | 0.11% | 0.59% |

114

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

| | As of | | | |
|---|---|---|---|---|
| | March 31, 2012[(1)(2)] | | December 31, 2011[(1)(2)] | |
| | Percentage of Multifamily Guaranty Book of Business | Percentage Seriously Delinquent[(3)] | Percentage of Multifamily Guaranty Book of Business | Percentage Seriously Delinquent[(3)] |
| **Original loan to value ratio:** | | | | |
| Greater than 80% | 4% | 0.75% | 5% | 2.51% |
| Less than or equal to 80% | 9 6 | 0.36 | 9 5 | 0.49 |
| **Original debt service coverage ratio:** | | | | |
| Less than or equal to 1 10 | 8 | 0.17 | 8 | 0 24 |
| Greater than    0 | 92 | 0.39 | 92 | 0.62 |
| Current debt service coverage ratio | | | | |
| less than 1.0[(4] | 7 | 2.45 | 7 | 3.66 |

[1]   Consists of the portion of our multifamily guaranty book of business for which we have detailed loan level information, which constituted approximately 99% of our total multifamily guaranty book of business as of March 31, 2012 and December 31, 2011, excluding loans that have been defeased.

[2]   Calculated based on the aggregate unpaid principal balance of multifamily loans for each category divided by the aggregate unpaid principal balance of loans in our multifamily guaranty book of business.

[3]   Consists of multifamily loans that were 60 days or more past due as of the dates indicated.

[4]   Our estimates of current DSCRs are based on the latest available income information for these properties  Although we use the most recently available results of our multifamily borrowers, there is a lag in reporting, which typically can range from 6 to 18 months as they prepare their results in the normal course of business.

## 7.   Acquired Property, Net

Acquired property, net consists of held for sale foreclosed property received in full satisfaction of a loan, net of a valuation allowance for declines in the fair value of the properties after initial acquisition  We classify properties as held for sale when we intend to sell the property and are actively marketing it for sale  The following table displays the activity in acquired property and the related valuation allowance for the three months ended March 31, 2012, and 2011

| | For the Three Months Ended March 31, 2012 | | | For the Three Months Ended March 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Acquired Property | Valuation Allowance[(1)] | Acquired Prope ty, Net | Acquired Property | Valuation Allowance[(1)] | Acquired Property, Net |
| | (Dollars in millions) | | | | | |
| Beginning balance, January 1 | $ 12,401 | $ (1,028) | $  11,373 | $ 18,054 | $ (1,881) | $  16,173 |
| Additions | 3,826 | (121) | 3,705 | 4,889 | (129) | 4,760 |
| Disposals | (4,818) | 518 | (4,300) | (6,015) | 730 | (5,285) |
| Write downs, net of recoveries | | (159) | (159) | | (384) | (384) |
| Ending Balance, March 31 | $11,409 | $   (790) | $ 10,619 | $16,928 | $ (1,664) | $ 15,264 |

[1]   Reflects activities in the valuation allowance for acquired properties held primarily by our single family segment

115

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**   (Continued)
**(UNAUDITED)**

**8.   Short Term Borrowings and Long Term Debt**

*Short Term Borrowings*

The following table displays our outstanding short term borrowings (borrowings with an original contractual maturity of one year or less) and weighted average interest rates of these borrowings as of March 31, 2012 and December 31, 2011

| | As of | | | |
| | March 31, 2012 | | December 31, 2011 | |
| | Outstanding | Weighted-Average Interest Rate[1] | Outstanding | Weighted-Average Interest Rate[1] |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| Fixed rate short term debt: | | | | |
| Discount notes[2] | $ 110,350 | 0.12% | $ 146,301 | 0 3% |
| Foreign exchange discount notes[3] | 422 | 2.05 | 371 | 1.88 |
| Other[4] | 80 | 0 04 | 80 | 0 04 |
| Total short term debt of Fannie Mae | 110,852 | 0 3 | 146,752 | 0 3 |
| Debt of consolidated trusts | 4,495 | 0.11 | 4,973 | 0.09 |
| Total short term debt | $115,347 | 0 3% | $151,725 | 0 3% |

[1]   Includes the effects of discounts, premiums, and other cost basis adjustments.

[2]   Represents unsecured general obligations with maturities ranging from overnight to 360 days from the date of issuance

[3]   Represents foreign exchange discount notes we issue in the Euro commercial paper market with maturities ranging from 5 to 360 days which enable investors to hold short term investments in different currencies  We do not incur foreign exchange risk on these transactions, as we simultaneously enter into foreign currency swaps that have the effect of converting debt that we issue in foreign denominated currencies into U S  dollars

[4]   Includes foreign exchange discount notes denominated in U S  dollars

*Intraday Lines of Credit*

We periodically use secured and unsecured intraday funding lines of credit provided by several large financial institutions  We post collateral which, in some circumstances, the secured party has the right to repledge to third parties  As these lines of credit are uncommitted intraday loan facilities, we may be unable to draw on them if and when needed  We had secured uncommitted lines of credit of $25 0 billion and unsecured uncommitted lines of credit of $500 million as of March 31, 2012 and December 31, 2011. We had no borrowings outstanding from these lines of credit as of March 31, 2012.

*Long-Term Debt*

Long term debt represents borrowings with an original contractual maturity of greater than one year  The following table displays our outstanding long term debt as of March 31, 2012 and December 31, 2011.

116

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

| | | | As of | | | |
|---|---|---|---|---|---|---|
| | March 31, 2012 | | | December 31, 2011 | | |
| | Maturities | Outstanding | Weighted-Average Interest Rate[1] | Maturities | Outstanding | Weighted-Average Interest Rate[1] |
| | | | (Dollars in millions) | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds | 20 2 2030 | $ 275,342 | 2.67% | 20 2 2030 | $ 277,146 | 2.81% |
| Medium term notes[2] | 2012 2022 | 170,219 | 1.55 | 2012 2021 | 176,886 | 1.61 |
| Foreign exchange notes and bonds | 2021 2028 | 683 | 5.40 | 2021 2028 | 662 | 5.44 |
| Other[3][4] | 20 2 2040 | 47,034 | 5.29 | 20 2 2040 | 50,912 | 5.29 |
| Total senior fixed | | 493,278 | 2.53 | | 505,606 | 2.64 |
| Senior floating: | | | | | | |
| Medium term notes[2] | 2012 2019 | 73,187 | 0 32 | 2012 2016 | 71,855 | 0 32 |
| Other[3][4] | 2020 2037 | 364 | 8.18 | 2020 2037 | 420 | 8.01 |
| Total senior floating | | 73,551 | 0.36 | | 72,275 | 0.35 |
| Subordinated fixed: | | | | | | |
| Qualifying subordinated[5] | 20 2 20 4 | 4,894 | 5.08 | 20 2 20 4 | 4,894 | 5.08 |
| Subordinated debentures | 2019 | 2,984 | 9.91 | 2019 | 2,917 | 9.91 |
| Total subordinated fixed | | 7,878 | 6.91 | | 7,811 | 6.88 |
| Secured borrowings[6] | 2021 2022 | 415 | 1.87 | | | |
| Total long term debt of Fannie Mae[7] | | 575,122 | 2.32 | | 585,692 | 2.42 |
| Debt of consolidated trusts[4] | 2012 2052 | 2,493,738 | 4 04 | 2012 2051 | 2,452,455 | 4.18 |
| Total long term debt | | $3,068,860 | 3.71% | | $ 3,038,147 | 3 84% |

[1]   Includes the effects of discounts, premiums and other cost basis adjustments.

[2]   Includes long term debt with an original contractual maturity of greater than  year and up to  0 years, excluding zero coupon debt

[3]   Includes long term debt that is not included in other debt categories

[4]   Includes a portion of structured debt instruments that is reported at fair value

[5]   Consists of subordinated debt issued with an interest deferral feature

[6]   Represents remaining liability for transfer of financial assets from our condensed consolidated balance sheets that did not qualify as a sale

[7]   Reported amounts include a net discount and other cost basis adjustments of $8.4 billion and $9.2 billion as of March 31, 2012 and December 31, 2011, respectively

## 9.   Derivative Instruments

Derivative instruments are an integral part of our strategy in managing interest rate risk  Derivative instruments may be privately negotiated contracts, which are often referred to as over the counter derivatives, or they may be listed and traded on an exchange  We typically do not settle the notional amount of our risk management derivatives; rather, notional amounts provide the basis for calculating actual payments or settlement amounts  The derivatives we use for interest rate risk management purposes consist primarily of interest rate swaps, interest rate options and foreign currency swaps.

117

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

We enter into forward purchase and sale commitments that lock in the future delivery of mortgage loans and mortgage related securities at a fixed price or yield  Certain commitments to purchase mortgage loans and purchase or sell mortgage related securities meet the criteria of a derivative  We typically settle the notional amount of our mortgage commitments that are accounted for as derivatives

We recognize all derivatives as either assets or liabilities in our condensed consolidated balance sheets at their fair value on a trade date basis  Fair value amounts, which are netted to the extent a legal right of offset exists and is enforceable by law at the counterparty level and are inclusive of the right or obligation associated with the cash collateral posted or received, are recorded in "Other assets" or "Other liabilities" in our condensed consolidated balance sheets

***Notional and Fair Value Position of our Derivatives***

The following table displays the notional amount and estimated fair value of our asset and liability derivative instruments as of March 31, 2012 and December 31, 2011

118

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

| | As of March 31, 2012 | | | | As of December 31, 2011 | | | |
| | Asset Derivatives | | Liability Derivatives | | Asset Derivatives | | Liability Derivatives | |
| | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value |
| | | | | (Dollars in millions) | | | | |
| Risk management derivatives: | | | | | | | | |
| Swaps: | | | | | | | | |
| Pay fixed | $ 33,300 | $ 241 | $ 173,007 | $(15,510) | $ 30,950 | $ 102 | $155,807 | $(17,391) |
| Rece ve-f xed | 194,880 | 7,742 | 55,442 | (230) | 170,668 | 8,118 | 59,027 | (93) |
| Basis | 4,532 | 118 | 14,141 | (7) | 382 | 122 | 9,240 | (44) |
| Foreign currency | 601 | 146 | 503 | (56) | 581 | 155 | 451 | (62) |
| Swaptions: | | | | | | | | |
| Pay fixed | 37,850 | 154 | 17,875 | (206) | 48,600 | 165 | 47,750 | (194) |
| Rece ve-f xed | 24,395 | 4,129 | 17,875 | ( ,843) | 33,695 | 6,371 | 47,750 | (3,238) |
| Other[(] | 7,752 | 5 9 | 437 | (5) | 8,214 | 52 | 75 | |
| Total gross risk management derivatives | 303,3 0 | 12,589 | 279,280 | (17,857) | 293,090 | 15,085 | 320, 00 | (21,022) |
| Accrued interest receivable (payable) | | 1,081 | | (1,455) | | 920 | | (1,238) |
| Netting adjustment[(2] | | (13,524) | | 19,053 | | (15,829) | | 21,898 |
| Total net risk management derivatives | $ 303,3 0 | $ 146 | $279,280 | $ (259) | $ 293,090 | $ 176 | $ 320, 00 | $ (362) |
| Mortgage commitment derivatives: | | | | | | | | |
| Mortgage commitments to purchase whole loans | $ 3,623 | $ 15 | $ 8,723 | $ (38) | $ 9,710 | $ 73 | $ 422 | $ |
| Forward contracts to purchase mortgage related securities | 23,609 | 69 | 26,436 | ( 00) | 32,707 | 309 | 2,570 | (6) |
| Forward contracts to sell mortgage related securities | 41,663 | 135 | 35,231 | (125) | 1,370 | 3 | 54,656 | (548) |
| Total mortgage commitment derivatives | $ 68,895 | $ 219 | $ 70,390 | $ (263) | $ 43,787 | $ 385 | $ 57,648 | $ (554) |
| Derivatives at fair value | $372,205 | $ 365 | $349,670 | $ (522) | $336,877 | $ 561 | $ 377,748 | $ (916) |

[(]  Includes interest rate caps, futures, swap credit enhancements and mortgage insurance contracts that we account for as derivatives  The mortgage insurance contracts have payment provisions that are not based on a notional amount

[(2]  The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, as well as cash collateral posted and received. Cash collateral posted was $6.0 billion and $6.8 billion as of March 31, 2012 and December 31, 2011, respectively. Cash collateral received was $515 million and $779 million as of March 31, 2012 and December 31, 2011, respectively

A majority of our derivative instruments contain provisions that require our senior unsecured debt to maintain a minimum credit rating from S&P and Moody's  If our senior unsecured debt were to fall below established thresholds in our governing agreements, which range from A  to BBB+, we could be required to provide additional collateral to or terminate transactions with certain counterparties  The aggregate fair value of all derivatives with credit risk related contingent features that were in a net liability position as of March 31, 2012 was $6 1 billion, for which we posted collateral of $6 0 billion in the normal course of business  Had all of the credit risk related contingency features underlying these agreements been triggered, an additional $87 million of collateral would have been required to be posted as collateral or to immediately settle our positions based on the individual agreements and our fair value position as of March 31, 2012.

119

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

The aggregate fair value of all derivatives with credit risk related contingent features that were in a net liability position as of December 3 , 20    was $7 2 billion, for which we posted collateral of $6 8 billion in the normal course of business  Had all of the credit risk related contingency features underlying these agreements been triggered, an additional $362 million would have been required to be posted as collateral or to immediately settle our positions based on the individual agreements and our fair value position as of December 31, 2011

We record all derivative gains and losses, including accrued interest, in "Fair value gains, net" in our condensed consolidated statements of operations and comprehensive income (loss)  The following table displays, by type of derivative instrument, the fair value gains and losses, net on our derivatives for the three months ended March 31, 2012 and 2011.

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | **2012** | **2011** |
| | (Dollars in millions) | |
| Risk management derivatives: | | |
| Swaps: | | |
| Pay fixed | $1,175 | $ 602 |
| Rece ve-f xed | (918) | (256) |
| Basis | 38 | 19 |
| Foreign currency | 1 | 30 |
| Swaptions: | | |
| Pay fixed | (22) | (55) |
| Rece ve-f xed | (94) | (233) |
| Other⁽ | ( ) | 9 |
| Total risk management derivatives fair value gains, net | 179 | 116 |
| Mortgage commitment derivatives fair value (losses) gains, net | (205) | 23 |
| Total derivatives fair value (losses) gains, net | $  (26) | $ 139 |

⁽   Includes interest rate caps, futures, swap credit enhancements and mortgage insurance contracts

### Derivative Counterparty Credit Exposure

Our derivative counterparty credit exposure relates principally to interest rate and foreign currency derivative contracts  We are exposed to the risk that a counterparty in a derivative transaction will default on payments due to us  If there is a default, we may need to acquire a replacement derivative from a different counterparty at a higher cost or may be unable to find a suitable replacement  We estimate our exposure to credit loss on derivative instruments by calculating the replacement cost, on a present value basis, to settle at current market prices all outstanding derivative contracts in a net gain position at the counterparty level where the right of legal offset exists  For derivative instruments where the right of legal offset does not exist, we calculate the replacement cost of the outstanding derivative contracts in a gain position at the transaction level  We manage our exposure by requiring counterparties to post collateral, which includes cash, U S  Treasury securities, agency debt and agency mortgage related securities

120

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

The table below displays our counterparty credit exposure on outstanding risk management derivative instruments in a gain position by counterparty credit ratings, as well as the notional amount outstanding and the number of counterparties for all risk management derivatives as of March 31, 2012 and December 31, 2011

| | As of March 31, 2012 | | | | |
| | Credit Rating[1] | | | | |
| | AA /AA/AA- | A /A | Subtotal[2] | Other[3] | Total |
|---|---|---|---|---|---|
| | (Dollars in millions) | | | | |
| Credit loss exposure[4] | $    5 | $    392 | $    397 | $    54 | $    451 |
| Less: Collateral held[ | | 392 | 392 | | 392 |
| Exposure net of collateral | $    5 | $ | $    5 | $    54 | $    59 |
| Additional information: | | | | | |
| Notional amount | $ 63,771 | $511,039 | $574,810 | $7,780 | $582,590 |
| Number of counterparties | 6 | 0 | 16 | | |

| | As of December 31, 2011 | | | | |
| | Credit Rating[1] | | | | |
| | AA /AA/AA- | A /A | Subtotal[2] | Other[3] | Total |
|---|---|---|---|---|---|
| | (Dollars in millions) | | | | |
| Credit loss exposure[4] | $ | $    885 | $    885 | $    51 | $    936 |
| Less: Collateral held[ | | 840 | 840 | | 840 |
| Exposure net of collateral | $ | $    45 | $    45 | $    51 | $    96 |
| Additional information: | | | | | |
| Notional amount | $ 63,294 | $546,967 | $610,261 | $2,929 | $613,190 |
| Number of counterparties | 6 | 0 | 16 | | |

[1]   We manage collateral requirements based on the lower credit rating of the legal entity, as issued by S&P and Moody's  The credit rating reflects the equivalent S&P's rating for any ratings based on Moody's scale.

[2]   We had exposure to 2 and 4 counterparties for interest rate and foreign currency derivatives in a net gain position as of March 31, 2012 and December 31, 2011, respectively. Those interest rate and foreign currency derivatives had notional balances of $2.4 billion and $127.5 billion as of March 31, 2012 and December 31, 2011, respectively

[3]   Includes defined benefit mortgage insurance contracts and swap credit enhancements accounted for as derivatives where the right of legal offset does not exist  Also includes exchange traded derivatives, such as futures and interest rate swaps, which are settled daily through a clearinghouse

[4]   Represents the exposure to credit loss on derivative instruments, which we estimate using the fair value of all outstanding derivative contracts in a gain position  We net derivative gains and losses with the same counterparty where a legal right of offset exists under an enforceable master netting agreement  This table excludes mortgage commitments accounted for as derivatives

[   Represents both cash and non cash collateral posted by our counterparties to us  Does not include collateral held in excess of exposure  We reduce the value of non cash collateral in accordance with the counterparty agreements to help ensure recovery of any loss through the disposition of the collateral

**10.   Segment Reporting**

Our three reportable segments are: Single Family, Multifamily, and Capital Markets  We use these three segments to generate revenue and manage business risk, and each segment is based on the type of business activities it performs. We are working on reorganizing our company by function rather than by business in order

121

Table of Contents

**FANNIE MAE**
(In conservatorship)

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**   (Continued)
(UNAUDITED)

to improve our operational efficiencies and effectiveness  In future periods, we may change some of our management reporting and how we report our business segment results

Under our segment reporting, the sum of the results for our three business segments does not equal our condensed consolidated statements of operations and comprehensive income (loss), as we separate the activity related to our consolidated trusts from the results generated by our three segments  Our segment financial results include directly attributable revenues and expenses  Additionally, we allocate to each of our segments: ( ) capital using FHFA minimum capital requirements adjusted for over  or under capitalization; (2) indirect administrative costs; and (3) a provision or benefit for federal income taxes  In addition, we allocate intracompany guaranty fee income as a charge from the Single Family and Multifamily segments to Capital Markets for managing the credit risk on mortgage loans held by the Capital Markets group  We also include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to net income (loss) in our condensed consolidated statements of operations and comprehensive income (loss)

The following tables display our segment results for the three months ended March 31, 2012 and 2011

| | For the Three Months Ended March 31, 2012 | | | | | |
| | Business Segments | | | Other Activity/Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments[2] | Total Results |
| | (Dollars in millions) | | | | | |
| Net interest (loss) income | $   (379) | $    (7) | $3,541 | $ 1,569 | $    473[3] | $5,197 |
| (Provision) benefit for credit losses | (2,053) | 53 | | | | (2,000) |
| Net interest (loss) income after provision for credit losses | (2,432) | 46 | 3,541 | 1,569 | 473 | 3,197 |
| Guaranty fee income (expense) | 1,911 | 243 | (332) | (1,159)( | (601)( | 62( |
| Investment gains, net | 1 | 6 | 1,007 | 27 | (925)[6] | 116 |
| Net other than temporary impairments | | | (64) | | | (64) |
| Fair value (losses) gains, net | ( ) | | 170 | 52 | 62[7] | 283 |
| Debt extinguishment (losses) gains, net | | | (70) | 36 | | (34) |
| Gains from partnership investments | | 11 | | | ( ) | 0[8 |
| Fee and other income (expense) | 200 | 47 | 180 | ( 08) | (6) | 3 3 |
| Administrative expenses | (380) | (64) | ( 20) | | | (564) |
| Foreclosed property expense | (332) | (7) | | | | (339) |
| Other expenses | (235) | (3) | (8) | | (16) | (262) |
| Net (loss) income | (1,268) | 279 | 4,304 | 417 | ( ,0 ) | 2,718 |
| Less: Net loss attributable to noncontrolling interest | | | | | 1[9 | 1 |
| Net (loss) income attributable to Fannie Mae | $(1,268) | $    279 | $ 4,304 | $    417 | $   ( ,0 3 | $2,719 |

122

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

| | For the Three Months Ended March 31, 2011 | | | | | |
| | Business Segments | | | Other Activity/Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/Adjustments[2] | Total Results |
|---|---|---|---|---|---|---|
| | (Dollars in millions) | | | | | |
| Net interest (loss) income | $ (898) | $ (9) | $ 3,710 | $ 1,574 | $ 583[3] | $ 4,960 |
| (Provision) benefit for credit losses [4] | (10,618) | 64 | | | | (10,554) |
| Net interest (loss) income after provision for credit losses | (11,516) | 55 | 3,710 | 1,574 | 583 | (5,594) |
| Guaranty fee income (expense) | 1,871 | 209 | (399) | (1,110)[ | (521)[ | 50[ |
| Investment gains (losses), net | 1 | 4 | 870 | (26) | (774)[6] | 75 |
| Net other than temporary impairments | | | (44) | | | (44) |
| Fair value gains (losses), net | | | 218 | (33) | 04[7] | 289 |
| Debt extinguishment (losses) gains, net | | | (24) | 37 | | 3 |
| Losses from partnership investments | | (12) | | | | (12)[8] |
| Fee and other income (expense) | 147 | 58 | 75 | (92) | ( ) | 187 |
| Administrative expenses | (416) | (68) | (121) | | | (605) |
| Foreclosed property expense | (488) | | | | | (488) |
| Other (expenses) income | (38) | 6 | (9) | | (19) | (340) |
| (Loss) income before federal income taxes | (10,719) | 252 | 4,276 | 350 | (628) | (6,469) |
| (Provision) benefit for federal income taxes | (2) | (5) | 5 | | | (2) |
| Net (loss) income attributable to Fannie Mae | $ (10,721) | $ 247 | $4,281 | $ 350 | $ (628) | $ (6,471) |

[1]   Represents activity related to the assets and liabilities of consolidated trusts in our condensed consolidated balance sheets

[2]   Represents the elimination of intercompany transactions occurring between the three business segments and our consolidated trusts, as well as other adjustments to reconcile to our consolidated results

[3]   Represents the amortization expense of cost basis adjustments on securities that we own in our portfolio that on a GAAP basis are eliminated

[4]   Prior period amounts have been reclassified to conform to the current period presentation

[    Represents the guaranty fees paid from consolidated trusts to the Single Family and Multifamily segments  The adjustment to guaranty fee income in the Eliminations/Adjustments column represents the elimination of the amortization of deferred cash fees related to consolidated trusts that were re established for segment reporting  Total guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive income (loss)

[6]   Primarily represents the removal of realized gains and losses on sales of Fannie Mae MBS classified as available for sale securities that are issued by consolidated trusts and retained in the Capital Markets portfolio  The adjustment also includes the removal of securitization gains (losses) recognized in the Capital Markets segment relating to portfolio securitization transactions that do not qualify for sale accounting under GAAP

[7]   Represents the removal of fair value adjustments on consolidated Fannie Mae MBS classified as trading that are retained in the Capital Markets portfolio

[8]   Gains (losses) from partnership investments are included in other expenses in our condensed consolidated statements of operations and comprehensive income (loss)

[9]   Represents the adjustment from equity method accounting to consolidation accounting for partnership investments that are consolidated in our condensed consolidated balance sheets

123

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

**11.   Concentrations of Credit Risk**

*Mortgage Seller/Servicers.*   Mortgage servicers collect mortgage and escrow payments from borrowers, pay taxes and insurance costs from escrow accounts, monitor and report delinquencies, and perform other required activities on our behalf  Our mortgage seller/servicers are also obligated to repurchase loans or foreclosed properties, or reimburse us for losses if the foreclosed property has been sold, under certain circumstances, such as if it is determined that the mortgage loan did not meet our underwriting or eligibility requirements, if loan representations and warranties are violated or if mortgage insurers rescind coverage  Our business with mortgage servicers is concentrated  Our ten largest single family mortgage servicers, including their affiliates, serviced 74% of our single family guaranty book of business as of March 31, 2012, compared with 75% as of December 31, 2011. Our ten largest multifamily mortgage servicers, including their affiliates, serviced 66% of our multifamily guaranty book of business as of March 31, 2012, compared with 67% as of December 31, 2011

If a significant seller/servicer counterparty, or a number of seller/servicers fails to meet its obligations to us, it could result in a significant increase in our credit losses and have a material adverse affect on our results of operations, liquidity, financial condition and net worth

*Mortgage Insurers.*   Mortgage insurance "risk in force" represents our maximum potential loss recovery under the applicable mortgage insurance policies  We had total mortgage insurance coverage risk in force of $91 2 billion on the single family mortgage loans in our guaranty book of business as of March 31, 2012 and December 31, 2011, which represented 3% of our single family guaranty book of business  Our primary mortgage insurance coverage risk in force was $87.3 billion as of March 31, 2012 and December 31, 2011. Our pool mortgage insurance coverage risk in force was $3.8 billion and $3.9 billion as of March 31, 2012 and December 31, 2011, respectively  Nine mortgage insurance companies provided over 99% of our mortgage insurance as of March 31, 2012 and December 31, 2011.

As of May 9, 2012, one of our mortgage insurance counterparties, PMI Mortgage Insurance Co  ("PMI"), has publicly disclosed that it is now in receivership  Three of our mortgage insurance counterparties   Triad Guaranty Insurance Corporation ("Triad"), Republic Mortgage Insurance Company ("RMIC"), and PMI  have publicly disclosed that they are in run off  One mortgage insurer, Genworth Mortgage Insurance Corporation ("Genworth"), is currently operating pursuant to a waiver it received from its regulator of the state regulatory capital requirements applicable to its main insurance writing entity  An additional two of our mortgage insurers   Mortgage Guaranty Insurance Corporation ("MGIC") and Radian Guaranty, Inc  ("Radian")   have disclosed that, in the absence of additional capital contributions to their insurance writing entity, their capital might fall below state regulatory capital requirements in the future  These six mortgage insurers provided a combined $73 3 billion, or 80%, of our risk in force mortgage insurance coverage of our single family guaranty book of business as of March 31, 2012.

The current weakened financial condition of our mortgage insurer counterparties creates an increased risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies  If we determine that it is probable that we will not collect all of our claims from one or more of these mortgage insurer counterparties, it could result in an increase in our loss reserves, which could adversely affect our earnings, liquidity, financial condition and net worth

Our total loss reserves incorporate an estimated recovery amount from mortgage insurance coverage  We evaluate the financial condition of our mortgage insurer counterparties and adjust the contractually due mortgage insurance benefit for collectability in order to ensure that our total loss reserves reflect probable losses as of the balance sheet date  The following table displays our estimated benefit from mortgage insurers as of March 31, 2012, and December 31, 2011 that reduce our total loss reserves

124

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**   (Continued)
**(UNAUDITED)**

| | As of | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Contractual mortgage insurance benefit | $ 15,237 | $ 15,099 |
| Less: Collectability adjustment⁽ | 2,571 | 2,867 |
| Estimated benefit included in total loss reserves | $12,666 | $ 12,232 |

⁽   Represents an adjustment that reduces the contractual benefit for our assessment of our mortgage insurer counterparties' inability to fully pay the contractual mortgage insurance claims

We had outstanding receivables of $3 7 billion recorded in "Other assets" in our condensed consolidated balance sheets as of March 31, 2012 and $3 6 billion as of December 31, 2011 related to amounts claimed on insured, defaulted loans that we have not yet received, of which $894 million as of March 31, 2012 and $639 million as of December 31, 2011 was due from our mortgage seller/servicers  We assessed the total outstanding receivables for collectability, and they are recorded net of a valuation allowance of $786 million as of March 31, 2012 and $570 million as of December 31, 2011  These mortgage insurance receivables are short term in nature, having an average duration of approximately six months, and the valuation allowance reduces our claim receivable to the amount which is considered probable of collection as of March 31, 2012 and December 31, 2011

We received proceeds under our primary and pool mortgage insurance policies for single family loans of $1 3 billion during the three months ended March 31, 2012 and $1.6 billion during the three months ended March 31, 2011.

*Derivatives Counterparties.*   For information on credit risk associated with our derivatives transactions refer to "Note 9, Derivative Instruments "

**12.   Fair Value**

We use fair value measurements for the initial recording of certain assets and liabilities and periodic remeasurement of certain assets and liabilities on a recurring or nonrecurring basis.

*Fair Value Measurement*

Fair value measurement guidance defines fair value, establishes a framework for measuring fair value and sets forth disclosures around fair value measurements  This guidance applies whenever other accounting guidance requires or permits assets or liabilities to be measured at fair value  The guidance establishes a three level fair value hierarchy that prioritizes the inputs into the valuation techniques used to measure fair value  The fair value hierarchy gives the highest priority, Level 1, to measurements based on unadjusted quoted prices in active markets for identical assets or liabilities  The next highest priority, Level 2, is given to measurements of assets and liabilities based on limited observable inputs or observable inputs for similar assets and liabilities  The lowest priority, Level 3, is given to measurements based on unobservable inputs

Effective January 1, 2012, we adopted new accounting guidance that requires enhanced disclosures about fair value measurement  Upon adoption of the new fair value guidance, we made changes to the principal markets that we use to estimate the fair value of the following categories of mortgage loans: (a) for loans that have been modified but have been reperforming for nine months or more, we changed to the whole loan market; (b) for loans that are one month delinquent, we changed to the GSE securitization market; and (c) for loans that are two months and three months delinquent, we changed to the whole loan market  The impact of making these changes to our principal markets was a net decrease in the estimated fair value of our loans of $24 4 billion as of March 31, 2012.

125

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

In addition, we enhanced our fair value estimation process for HARP loans as of March 31, 2012 to use the modified build up approach, as described in "Fair Value of Financial Instruments    HARP Loans " Previously, we measured the fair value of these loans using our standard build up approach   The impact of this enhancement was an increase in the estimated fair value of HARP loans of $7 4 billion as of March 31, 2012

*Recurring Changes in Fair Value*

The following tables display our assets and liabilities measured in our condensed consolidated balance sheets at fair value on a recurring basis subsequent to initial recognition, including instruments for which we have elected the fair value option as of March 31, 2012 and December 31, 2011

126

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
|---|---|---|---|---|---|
| | | | (Dollars in millions) | | |
| **Recurring fair value measurements:** | | | | | |
| Assets: | | | | | |
| Cash equivalents[2] | $   3,250 | $ | $ | $ | $   3,250 |
| Trading securities: | | | | | |
| Mortgage related securities: | | | | | |
| Fannie Mae | | 7,079 | 89 | | 7,168 |
| Freddie Mac | | 2,573 | 2 | | 2,575 |
| Ginnie Mae | | 286 | | | 286 |
| Alt A private label securities | | 769 | 569 | | 1,338 |
| Subprime private label securities | | | 1,305 | | 1,305 |
| CMBS | | 10,417 | | | 10,417 |
| Mortgage revenue bonds | | | 668 | | 668 |
| Other | | | 123 | | 123 |
| Non mortgage related securities: | | | | | |
| U.S. Treasury securities | 50,030 | | | | 50,030 |
| Asset backed securities | | 1,896 | | | 1,896 |
| Total trading securities | 50,030 | 23,020 | 2,756 | | 75,806 |
| Available for sale securities: | | | | | |
| Mortgage related securities: | | | | | |
| Fannie Mae | | 14,588 | 37 | | 14,625 |
| Freddie Mac | | 11,932 | 11 | | 11,943 |
| Ginnie Mae | | 866 | | | 866 |
| Alt A private label securities | | 4,453 | 7,136 | | 11,589 |
| Subprime private label securities | | | 7,595 | | 7,595 |
| CMBS | | 14,068 | | | 14,068 |
| Mortgage revenue bonds | | 7 | 9,732 | | 9,739 |
| Other | | 12 | 3,342 | | 3,354 |
| Total available for sale securities | | 45,926 | 27,853 | | 73,779 |
| Mortgage loans of consolidated trusts | | 2,021 | 2,271 | | 4,292 |
| Other assets: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | | 9,181 | 147 | | 9,328 |
| Swaptions | | 4,283 | | | 4,283 |
| Other | 5 | | 54 | | 59 |
| Netting adjustment | | | | (13,524) | (13,524) |
| Mortgage commitment derivatives | | 217 | 2 | | 219 |
| Total other assets | 5 | 13,681 | 203 | (13,524) | 365 |
| Total assets at fair value | $ 53,285 | $ 84,648 | $ 33,083 | $ (13,524) | $157,492 |

127

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**   **(Continued)**
**(UNAUDITED)**

|  | Fair Value Measurements as of March 31, 2012 | | | | |
|---|---|---|---|---|---|
|  | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
|  | (Dollars in millions) | | | | |
| **Liabilities:** | | | | | |
| Long term debt: | | | | | |
| Of Fannie Mae: | | | | | |
| Senior fixed | $ | $     426 | $ | $ | $     426 |
| Senior floating | | | 399 | | 399 |
| Total of Fannie Mae | | 426 | 399 | | 825 |
| Of consolidated trusts | | 3,329 | 950 | | 4,279 |
| Total long term debt | | 3,755 | 1,349 | | 5,104 |
| Other liabilities: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | | 17,116 | 142 | | 17,258 |
| Swaptions | | 2,049 | | | 2,049 |
| Other | 5 | | | | 5 |
| Netting adjustment | | | | (19,053) | (19,053) |
| Mortgage commitment derivatives | | 246 | 17 | | 263 |
| Total other liabilities | 5 | 19,411 | 159 | (19,053) | 522 |
| Total liabilities at fair value | $     5 | $23,166 | $  1,508 | $ (19,053) | $  5,626 |

128

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
|---|---|---|---|---|---|
| | | | (Dollars in millions) | | |
| Assets: | | | | | |
| Cash equivalents[2] | $ 600 | $ | $ | $ | $ 600 |
| Trading securities: | | | | | |
| Mortgage related securities: | | | | | |
| Fannie Mae | | 5,687 | 1,737 | | 7,424 |
| Freddie Mac | | 2,732 | | | 2,732 |
| Ginnie Mae | | 278 | 9 | | 287 |
| Alt A private label securities | | ,004 | 345 | | 1,349 |
| Subprime private label securities | | | 1,280 | | 1,280 |
| CMBS | | 10,411 | | | 10,411 |
| Mortgage revenue bonds | | | 724 | | 724 |
| Other | | | 43 | | 43 |
| Non mortgage related securities: | | | | | |
| U.S. Treasury securities | 47,737 | | | | 47,737 |
| Asset backed securities | | 2,111 | | | 2,111 |
| Total trading securities | 47,737 | 22,223 | 4,238 | | 74,198 |
| Available for sale securities: | | | | | |
| Mortgage related securities: | | | | | |
| Fannie Mae | | 15,904 | 946 | | 16,850 |
| Freddie Mac | | 12,811 | 12 | | 12,823 |
| Ginnie Mae | | 902 | | | 902 |
| Alt A private label securities | | 4,427 | 7,256 | | 11,683 |
| Subprime private label securities | | | 7,586 | | 7,586 |
| CMBS | | 14,026 | | | 14,026 |
| Mortgage revenue bonds | | 7 | 10,247 | | 10,254 |
| Other | | 3 | 3,445 | | 3,458 |
| Total available for sale securities | | 48,090 | 29,492 | | 77,582 |
| Mortgage loans of consolidated trusts | | 1,292 | 2,319 | | 3,611 |
| Other assets: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | | 9,247 | 170 | | 9,417 |
| Swaptions | | 6,536 | | | 6,536 |
| Other | | 1 | 51 | | 52 |
| Netting adjustment | | | | (15,829) | (15,829) |
| Mortgage commitment derivatives | | 368 | 17 | | 385 |
| Total other assets | | 16,152 | 238 | (15,829) | 561 |
| Total assets at fair value | $ 48,337 | $ 87,757 | $ 36,287 | $ (15,829) | $156,552 |

129

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

| | Fair Value Measurements as of December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[(1)] | Estimated Fair Value |
| | | | (Dollars in millions) | | |
| Liabilities: | | | | | |
| Long term debt: | | | | | |
|   Of Fannie Mae: | | | | | |
|     Senior fixed | $ | $    432 | $ | $ | $    432 |
|     Senior floating | | | 406 | | 406 |
|   Total of Fannie Mae | | 432 | 406 | | 838 |
|   Of consolidated trusts | | 3,174 | 765 | | 3,939 |
| Total long term debt | | 3,606 | 1,171 | | 4,777 |
| Other liabilities: | | | | | |
|   Risk management derivatives: | | | | | |
|     Swaps | | 18,661 | 167 | | 18,828 |
|     Swaptions | | 3,432 | | | 3,432 |
|     Netting adjustment | | | | (21,898) | (21,898) |
|   Mortgage commitment derivatives | | 548 | 6 | | 554 |
| Total other liabilities | | 22,641 | 173 | (21,898) | 916 |
|     Total liabilities at fair value | $ | $ 26,247 | $    ,344 | $ (21,898) | $  5,693 |

[(1]   Derivative contracts are reported on a gross basis by level  The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, as well as cash collateral

[(2]   Cash equivalents are comprised of U.S. Treasury Bills that are classified as Level 1.

30

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

The following tables display a reconciliation of all assets and liabilities measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the three months ended March 31, 2012 and 2011  The tables also display gains and losses due to changes in fair value, including both realized and unrealized gains and losses, recognized in our condensed consolidated statements of operations and comprehensive income (loss) for Level 3 assets and liabilities for the three months ended March 31, 2012 and 2011  When assets and liabilities are transferred between levels, we recognize the transfer as of the end of the period

|  | Balance, December 31, 2011 | Total Gains or (Losses) (Realized/Unrealized) Included in Net Income (Loss) | Included in Other Comprehensive Income(1) | Purchases(2) | Sales(2) | Issues(3) | Settlements(3) | Transfers out of Level 3(4) | Transfers into Level 3(4) | Balance, March 31, 2012 | Net Unrealized Gains (Losses) Included in Net Income (Loss) Related to Assets and Liabilities Still Held as of March 31, 2012(5) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (Dollars in millions) | | | | | | | |
| Trading securities | | | | | | | | | | | |
| Mortgage-re ated | | | | | | | | | | | |
| Fannie Mae | $ 1,737 | $ 5 | $ — | $ — | $ (33) | $ — | (10) | $ (1,581) | $ 65 | $ 89 | $ — |
| Freddie Mac | — | — | — | — | — | — | — | — | 2 | 2 | — |
| Ginnie Mae | 9 | — | — | — | — | — | — | (9) | — | — | — |
| A t-A private- abe securities | 345 | 13 | — | — | — | — | (17) | — | 228 | 569 | 13 |
| Subprime private- abe securities | 1,280 | 59 | — | — | — | — | (3) | — | — | 1,305 | 59 |
| Mortgage revenue bonds | 724 | (54) | — | — | — | — | (2) | — | — | 668 | (55) |
| Other | 1 3 | (19) | — | — | — | — | (1) | — | — | 123 | (19) |
| ota trading securities | $ 4,238 | $ | $ | $ | $ (33) | $ | (158) | $ (1,590) | $ 295 | $ 2,756 | $ (2) |
| Avai ab e- or-sa e securities | | | | | | | | | | | |
| Mortgage-re ated | | | | | | | | | | | |
| Fannie Mae | $ 9 6 | $ — | $ (8) | 1 | $ (1) | $ — | (16) | $ (895) | $ 10 | $ 37 | $ — |
| Freddie Mac | 12 | — | — | — | — | — | (1) | — | — | 11 | — |
| A t-A private- abe securities | 7,256 | (17) | 166 | — | — | — | (262) | (985) | 978 | 7,136 | — |
| Subprime private- abe securities | 7,586 | 35 | 303 | — | — | — | (329) | — | — | 7,595 | — |
| Mortgage revenue bonds | 10,247 | 2 | (137) | — | (24) | — | (356) | — | — | 9,732 | — |
| Other | 3,445 | 6 | (26) | — | — | — | (83) | — | — | 3,342 | — |
| ota avai ab e-for-sa e securities | $ 29,492 | $ 26 | $ 298 | $ 1 | $ (25) | $ | (1,0 7) | $ (1,880) | $ 988 | $ 27,853 | $ — |
| Mortgage oans of conso idated trusts | 2,319 | 73 | — | 245 | $ | $ | (59) | $ (318) | $ 11 | $ 2,271 | 17 |
| Net derivatives | 65 | 7 | — | — | | (3) | (25) | | | | 3 |
| Long- erm deb | | | | | | | | | | | |
| Of Fannie Mae | | | | | | | | | | | |
| Senior f oating | $ ( 06) | $ 7 | $ — | $ — | $ — | $ — | — | $ — | $ — | $ (399) | $ 7 |
| Of conso idated trusts | (765) | (9) | — | — | — | (267) | 28 | 110 | ( 7) | (950) | (8) |
| Tota ong-term debt | $ (1,171) | $ (2) | $ | $ | $ | (267) | 28 | 110 | ( 7) | $ (1,3 9) | $ (1) |

131

Table of Contents

**FANNIE MAE**

**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**

**(UNAUDITED)**

Fair Value Measurements Using Significant Unobservable Inputs (Level 3)
For the Three Months Ended March 31, 2011

| | Balance, December 31, 2010 | Included in Net Income (Loss) | Included in Other Comprehensive Income[1] | Purchases[2] | Sales[2] | Settlements[3] | Transfers out of Level 3[4] | Transfers into Level 3[4] | Balance, March 31, 2011 | Net Unrealized Gains (Losses) Included in Net Income (Loss) Related to Assets and Liabilities Still Held as of March 31, 2011[5] |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Dollars in millions) | | | | | |
| **Trading securities** | | | | | | | | | | |
| Mortgage-related | | | | | | | | | | |
| Fannie Mae | $ 2,202 | $ (13) | $ — | $ — | $ (15) | $ (132) | $ (391) | $ — | $ 1,651 | $ (10) |
| Alt-A private-label securities | 20 | — | — | — | — | — | — | — | 20 | — |
| Subprime private-label securities | 1,581 | 11 | — | — | — | (45) | — | — | 1,547 | 11 |
| Mortgage revenue bonds | 609 | — | — | — | — | (3) | — | — | 606 | 3 |
| Other | 152 | — | — | — | — | (1) | — | — | 155 | |
| Non-mortgage-related | | | | | | | | | | |
| Asset-backed securities | 12 | — | — | — | — | (3) | (9) | 2 | 2 | — |
| Total trading securities | $ 4,576 | $ 2 | $ — | $ — | $ (15) | $ (184) | $ (400) | $ 2 | $ 3,981 | $ 8 |
| **Available-for-sale securities** | | | | | | | | | | |
| Mortgage-related | | | | | | | | | | |
| Fannie Mae | $ 114 | $ — | $ — | $ 16 | $ (15) | $ (2) | $ (101) | $ 130 | $ 546 | $ — |
| Freddie Mac | 3 | | | | | | | 9 | 12 | |
| Alt-A private-label securities | 7,049 | (2) | 10 | — | — | (258) | (317) | 660 | 7,236 | — |
| Subprime private-label securities | 9,932 | 130 | (58) | — | (42) | (3 ) | — | — | 9,660 | — |
| Mortgage revenue bonds | 11,030 | (2) | 21 | — | — | (475) | — | — | 10,532 | — |
| Other | 3,806 | 1 | 71 | — | — | (102) | — | — | 3,776 | — |
| Total available-for-sale securities | $ 31,934 | $ 127 | $ 142 | $ 16 | $ (57) | $ (1,181) | $ (418) | $ 799 | $ 31,762 | $ — |
| Mortgage loans of consolidated trusts | $ 2,207 | $ 11 | $ — | $ 15 | $ — | $ (79) | $ (6) | $ 73 | $ 2,221 | $ 11 |
| Net derivatives | 10 | 1 | — | — | — | — | — | — | 118 | 5 |
| **Long-term debt** | | | | | | | | | | |
| Of Fannie Mae | | | | | | | | | | |
| Senior floating | $ (421) | $ (22) | $ — | $ — | $ — | $ 20 | $ — | $ — | $ (423) | $ (22) |
| Of consolidated trusts | (627) | (35) | — | — | — | 22 | 22 | — | (667) | (35) |
| Total long-term debt | $ (1,048) | $ (57) | $ — | $ — | $ — | $ 42 | $ 22 | $ ( 9) | $ (1,090) | $ (57) |

[1] Gains (losses) included in other comprehensive income are included in "Changes in unrealized losses on available for sale securities, net of reclassification adjustments and taxes" in the condensed consolidated statement of operations and comprehensive income (loss)

[2] Purchases and sales include activity related to the consolidation and deconsolidation of assets of securitization trusts

132

Table of Contents

**FANNIE MAE**
**(In conservatory)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

(3    Issues and settlements include activity related to the consolidation and deconsolidation of liabilities of securitization trusts

(4    Transfers out of Level 3 consisted primarily of Fannie Mae guaranteed mortgage related securities and private label mortgage related securities backed by Alt A loans  Prices for these securities were obtained from third party vendors supported by market observable inputs  Transfers into Level 3 consisted primarily of private label mortgage related securities backed by Alt A loans  Prices for these securities are based on inputs from a single source or inputs that were not readily observable

(    Amount represents temporary changes in fair value  Amortization, accretion and other than temporary impairments are not considered unrealized and are not included in this amount.

The following tables display realized and unrealized gains and losses included in our condensed consolidated statements of operations and comprehensive income (loss) for the three months ended March 31, 2012 and 2011, for our Level 3 assets and liabilities measured in our condensed consolidated balance sheets at fair value on a recurring basis.

| | For the Three Months Ended March 31, 2012 | | | | |
| | Interest Income | Fair Value Gains, net | Net Other-than-Temporary Impairments | Other | Total |
| | (Dollars in millions) | | | | |
| Total realized and unrealized gains (losses) included in net income (loss) | $ 66 | $   87 | $   (51) | $ 6 | $108 |
| Net unrealized gains related to Level 3 assets and liabilities still held as of March 31, 2012 | $ | $   17 | $ | $ | $ 17 |

| | For the Three Months Ended March 31, 2011 | | | | |
| | Interest Income | Fair Value Gains, net | Net Other-than-Temporary-Impairments | Other | Total |
| | (Dollars in millions) | | | | |
| Total realized and unrealized gains (losses) included in net income (loss) | $135 | $   (24) | $   (17) | $ 3 | $ 97 |
| Net unrealized losses related to Level 3 assets and liabilities still held as of March 31, 2011 | $ | $   (33) | $ | $ | $ (33) |

33

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**    **(Continued)**
**(UNAUDITED)**

*Nonrecurring Changes in Fair Value*

The following table displays assets and liabilities measured in our condensed consolidated balance sheets at fair value on a nonrecurring basis; that is, the instruments are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances (for example, when we evaluate for impairment) as of March 31, 2012.

| | Fair Value Measurements As of March 31, 2012 | | | |
| --- | --- | --- | --- | --- |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value |
| | (Dollars in millions) | | | |
| **Nonrecurring fair value measurements:** | | | | |
| Assets: | | | | |
| Single family mortgage loans held for investment, at amortized cost: ( | | | | |
|     Of Fannie Mae | $ | $ | $ 22,180 | $22,180 |
|     Of consolidated trusts | | | 274 | 274 |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | |
|     Of Fannie Mae | | | 1,539 | 1,539 |
| Acquired property, net: | | | | |
|     Single family | | | 4,009 | 4,009 |
|     Multifamily | | | 61 | 61 |
| Other assets | | | 438 | 438 |
|     Total nonrecurring fair value measurements | $ | $ | $ 28,501 | $28,501 |

(    Excludes estimated recoveries from mortgage insurance proceeds

34

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

The following table displays assets and liabilities measured in our condensed consolidated balance sheets at fair value on a nonrecurring basis and the gains or losses recognized for these assets and liabilities for the three months ended March 31, 2011

| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | For the Three Months Ended March 31, 2011 Total Losses |
|---|---|---|---|---|---|
| | | | (Dollars in millions) | | |
| Assets: | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value | $ | $     89 | $     131 | $     220 | $        (5) |
| Single family mortgage loans held for investment, at amortized cost: | | | | | |
|     Of Fannie Mae | | | 27,265 | 27,265⁽ | ( ,0 4) |
|     Of consolidated trusts | | | 633 | 633⁽ | (80) |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | | |
|     Of Fannie Mae | | | 1,028 | 1,028⁽ | (80) |
| Acquired property, net: | | | | | |
|     Single family | | | 12,114 | 12,114⁽2 | (811) |
|     Multifamily | | | 93 | 93⁽2 | (16) |
| Other assets | | | 1,402 | 1,402 | (30) |
|     Total assets at fair value | $ | $     89 | $ 42,666 | $42,755 | $     (2,036) |

⁽   Includes $1 3 billion of mortgage loans held for investment that were liquidated or transferred to foreclosed properties as of March 31, 2011

⁽2   Includes $4 1 billion of acquired properties that were sold or transferred as of March 31, 2011

The following table displays valuation techniques and the range and weighted average of significant unobservable inputs for our Level 3 assets and liabilities measured at fair value on a recurring basis as of March 31, 2012.

135

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

| | Valuation Techniques | Significant Unobservable Inputs[1] | Range[1] | | Weighted-Average[1] | Fair Value |
|---|---|---|---|---|---|---|
| | | (Dollars in millions) | | | | |
| **Recurring fair value measurements:** | | | | | | |
| Trading securities: | | | | | | |
| Mo tgage related securities: | | | | | | |
| Agency[2] | Consensus | | | | | $    91 |
| Alt A private label securities | Discounted Cash Flow | Default Rate (%) | 5.2 | 18.1 | 13.6 | |
| | | Prepayment Speed (%) | 0.1 | 2.6 | 1.2 | |
| | | Severity (%) | 65.0 | 70.0 | 68.9 | |
| | | Spreads (bps) | 558.0 | 682.0 | 638.9 | 278 |
| | Single Vendor | | | | | 239 |
| | Other | | | | | 52 |
| Total Alt A private label securities | | | | | | 569 |
| Subprime private label securities | Discounted Cash Flow | Default Rate (%) | 11.3 | 24.1 | 16.4 | |
| | | Prepayment Speed (%) | 0 0 | 8 3 | 1.5 | |
| | | Severity (%) | 80 0 | | 80 0 | |
| | | Spreads (bps) | 597.0 | 790.0 | 653.8 | 543 |
| | Consensus | Default Rate (%) | 15 0 | 20 4 | 17.4 | |
| | | Prepayment Speed (%) | 0 0 | 5 3 | 2.2 | |
| | | Severity (%) | 80 0 | | 80 0 | |
| | | Spreads (bps) | 595.0 | 786.0 | 644.2 | 387 |
| | Consensus | | | | | 375 |
| Total subprime private label securities | | | | | | 1,305 |
| Mortgage revenue bonds | Discounted Cash Flow | Spreads (bps) | 250.0 | 375.0 | 3 3 4 | 612 |
| | Other | | | | | 56 |
| Total mortgage revenue bonds | | | | | | 668 |
| Other | Other | | | | | 123 |
| Total trading securities | | | | | | $2,756 |

136

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

| | Valuation Techniques | Significant Unobservable Inputs[1] | Range[1] | Weighted-Average[1] | Fair Value |
|---|---|---|---|---|---|
| | | **Fair Value Measurements as of March 31, 2012** | | | |
| | | *(Dollars in millions)* | | | |
| Available-for-sale securities | | | | | |
| Mortgage-related securities | | | | | |
| Agency[2] | Other | | | | $ 48 |
| Alt-A private-label securities | Consensus | Default Rate (%) | 0.0 - 13.1 | 1.8 | |
| | | Prepayment Speed (%) | 0.1 - 23.6 | 10.5 | |
| | | Severity (%) | 50.0 - 70.0 | 52.4 | |
| | | Spreads (bps) | 295.0 - 725.0 | 441.6 | 3,045 |
| | Consensus | | | | 1,501 |
| | Discounted Cash Flow | Default Rate (%) | 0.0 - 29.4 | 8.0 | |
| | | Prepayment Speed (%) | 0.0 - 40.6 | 4.9 | |
| | | Severity (%) | 50.0 - 70.0 | 58.5 | |
| | | Spreads (bps) | 308.0 - 786.0 | 548.7 | 2,010 |
| | Single Vendor | | | | 350 |
| | Single Vendor | Default Rate (%) | 2.5 - 22.0 | 12.4 | |
| | | Prepayment Speed (%) | 0.4 - 3.0 | 1.1 | |
| | | Severity (%) | 65.0 | 65.0 | |
| | | Spreads (bps) | 555.0 - 821.0 | 673.3 | 142 |
| | Other | | | | 88 |
| Total Alt-A private-label securities | | | | | 7,136 |
| Subprime private-label securities | Consensus | Default Rate (%) | 0.0 - 25.9 | 15.1 | |
| | | Prepayment Speed (%) | 0.0 - 13.4 | 1.9 | |
| | | Severity (%) | 65.0 - 80.0 | 76.9 | |
| | | Spreads (bps) | 0.0 - 834.0 | 658.1 | 2,795 |
| | Consensus | | | | 2,296 |
| | Discounted Cash Flow | Default Rate (%) | 0.0 - 27.5 | 16.9 | |
| | | Prepayment Speed (%) | 0.0 - 10.9 | 1.7 | |
| | | Severity (%) | 65.0 - 80.0 | 77.9 | |
| | | Spreads (bps) | 527.0 - 840.0 | 652.4 | 2,098 |
| | Other | | | | 406 |
| Total subprime private-label securities | | | | | 7,595 |
| Mortgage revenue bonds | Single Vendor | | | | 7,746 |
| | Discounted Cash Flow | Spreads (bps) | 143.0 - 375.0 | 299.9 | 1,766 |
| | Other | | | | 220 |
| Total mortgage revenue bonds | | | | | 9,732 |
| Other | Consensus | Default Rate (%) | 5.0 - 12.1 | 5.0 | |
| | | Prepayment Speed (%) | 3.0 - 5.0 | 3.0 | |
| | | Severity (%) | 65.0 - 85.0 | 84.9 | |
| | | Spreads (bps) | 572.0 - 792.0 | 662.3 | 827 |
| | Consensus | | | | 825 |
| | Discounted Cash Flow | Default Rate (%) | 0.2 - 5.0 | 4.8 | |
| | | Prepayment Speed (%) | 3.0 - 11.0 | 3.4 | |
| | | Severity (%) | 50.0 - 85.0 | 84.0 | |
| | | Spreads (bps) | 541.0 - 786.0 | 632.9 | 713 |
| | Single Vendor | | | | 195 |
| | Other | | | | 782 |
| Total Other | | | | | 3,342 |
| Total available-for-sale securities | | | | | $ 27,853 |

137

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**   (Continued)
**(UNAUDITED)**

| | Valuation Techniques | Significant Unobservable Inputs[1] | Range[1] | | Weighted-Average[1] | Fair Value |
|---|---|---|---|---|---|---|
| | | | Fair Value Measurements as of March 31, 2012 | | | |
| | | (Dollars in millions) | | | | |
| **Mortgage loans of consolidated trusts:** | | | | | | |
| Single family | Build Up | Default Rate (%) | 0.1 | 97.2 | 16.0 | |
| | | Prepayment Speed (%) | 8.4 | 96.7 | 30 | |
| | | Severity (%) | 8 7 | 00 0 | 39.2 | $ 1,437 |
| | Discounted Cash Flow | Default Rate (%) | 2.4 | 9.2 | 6.6 | |
| | | Prepayment Speed (%) | 0.0 | 8.9 | 5.0 | |
| | | Severity (%) | 50 0 | 70 0 | 61.9 | |
| | | Spreads (bps) | 0 0 | 789 0 | 641.5 | 284 |
| | Consensus | | | | | 216 |
| | Consensus | Default Rate (%) | 0.0 | 6.7 | 4 0 | |
| | | Prepayment Speed (%) | 0 0 | 32 5 | 4.9 | |
| | | Severity (%) | 65.0 | 70.0 | 66.5 | |
| | | Spreads (bps) | 516.0 | 772.0 | 678.8 | 145 |
| | Single Vendor | | | | | 50 |
| Total single family | | | | | | 2,132 |
| Multifamily | Build Up | Spreads (bps) | 88.0 | 357.4 | 172.2 | 139 |
| Total mortgage loans of consolidated trusts | | | | | | $ 2,271 |
| Net derivatives | Dealer Mark | | | | | $  148 |
| | Internal Model | | | | | (84) |
| | Other | | | | | (20) |
| Total net derivatives | | | | | | $   44 |
| Long term debt: | | | | | | |
| Of Fannie Mae: | | | | | | |
| Senior floating | Discounted Cash Flow | | | | | $ (399) |
| Of consolidated trusts | Consensus | | | | | (32 ) |
| | Consensus | Default Rate (%) | 0.0 | 6.7 | 4 0 | |
| | | Prepayment Speed (%) | 0 0 | 32 5 | 4.9 | |
| | | Severity (%) | 50 0 | 70 0 | 66.4 | |
| | | Spreads (bps) | 516.0 | 772.0 | 676.9 | (157) |
| | Discounted Cash Flow | Default Rate (%) | 2 4 | 0 0 | 5.8 | |
| | | Prepayment Speed (%) | 0 0 - | 00 0 | 22.8 | |
| | | Severity (%) | 50 0 | 70 0 | 60.9 | |
| | | Spreads (bps) | 0 0 | 789 0 | 545.5 | (315) |
| | Single Vendor | | | | | (96) |
| | Other | | | | | (61) |
| Total of consolidated trusts | | | | | | (950) |
| Total long term debt | | | | | | $(1,349) |

[1]   Valuation techniques for which no unobservable inputs are disclosed generally reflect the use of third party pricing services or dealers, and the range of unobservable inputs applied by these sources is not readily available or cannot be reasonably estimated  Where we have disclosed unobservable inputs for consensus and single vendor techniques, those inputs are based on our validations performed at the security level

[2]   Includes Fannie Mae and Freddie Mac securities

138

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**    (Continued)
**(UNAUDITED)**

The following table displays valuation techniques for our Level 3 assets measured at fair value on a nonrecurring basis as of March 31, 2012. The significant unobservable inputs related to these techniques primarily relate to collateral dependent valuations  The related ranges and weighted averages are not meaningful when aggregated as they vary significantly from property to property

| | Fair Value Measurements as of March 31, 2012 | |
|---|---|---|
| | Valuation Techniques | Fair Value |
| | (Dollars in millions) | |
| **Nonrecurring fair value measurements:** | | |
| Level 3 Assets: | | |
| Single family mortgage loans held for investment, at amortized cost: | | |
| Of Fannie Mae | Internal Model | $        22,180 |
| Of consolidated trusts | Internal Model | 274 |
| Multifamily mortgage loans held for investment, at amortized cost: | | |
| Of Fannie Mae | Appraisals | 276 |
| | Broker Price Opinions | 488 |
| | Asset Manager Estimate | 740 |
| | Other | 35 |
| Total of Fannie Mae | | 1,539 |
| Acquired property, net: | | |
| Single family | Accepted Offers | 1,092 |
| | Appraisals | 569 |
| | Walk Forwards | 1,202 |
| | Internal Model | 1,058 |
| | Other | 88 |
| Total single family | | 4,009 |
| Multifamily | Accepted Offers | 16 |
| | Appraisals | 20 |
| | Broker Price Opinions | 25 |
| Total multifamily | | 61 |
| Other assets | Accepted Offers | 176 |
| | Appraisals | 36 |
| | Walk Forwards | 38 |
| | Internal Model | 77 |
| | Other | 111 |
| Total other assets | | 438 |
| Total nonrecurring assets at fair value | | $        28,501 |

We use valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs  The following is a description of the valuation techniques we use for fair value measurement and disclosure as well as our basis of classifying these measurements as Level 1, Level 2 or Level 3 of the valuation hierarchy

139

TREASURY-3486

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

*Cash Equivalents, Trading Securities and Available for Sale Securities*    These securities are recorded in our condensed consolidated balance sheets at fair value on a recurring basis. Fair value is measured using quoted market prices in active markets for identical assets, when available. Securities, such as U.S. Treasury Bills, whose value is based on quoted market prices in active markets for identical assets are classified as Level 1 of the valuation hierarchy.

We classify securities as Level 2 of the valuation hierarchy if quoted market prices in active markets for identical assets are not available  To estimate fair value, we use vendor prices provided by as many as three third party pricing services which are calibrated to the quoted market prices in active markets for similar securities  The single vendor valuation technique utilizes one vendor price to estimate fair value  The consensus valuation technique utilizes an average of two or more vendors' prices to estimate fair value  In the absence of prices provided by third party pricing services supported by observable market data, fair values are estimated using quoted prices of securities with similar characteristics or a discounted cash flow technique that uses inputs such as default rates, prepayment speed, loss severity and spreads based on market assumptions where available. Such instruments are generally classified as Level 2 of the valuation hierarchy

For all valuation techniques used for securities where there is limited activity or less transparency around these inputs to the valuation, these securities are classified as Level 3 of the valuation hierarchy

For agency and private label securities, an increase in unobservable prepayment speeds in isolation would generally result in an increase in fair value, and an increase in unobservable spreads, severity rates or default rates in isolation would generally result in a decrease in fair value  For mortgage revenue bonds classified as Level 3 of the valuation hierarchy, an increase in unobservable spreads would result in a decrease in fair value  Although the sensitivities of the fair value of our recurring Level 3 securities of the valuation hierarchy to various unobservable inputs are discussed above in isolation, interrelationships exist among these inputs such that a change in one unobservable input typically results in a change to one or more of the other inputs

*Mortgage Loans Held for Investment*    The majority of HFI loans are reported in our condensed consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments and an allowance for loan losses  We estimate the fair value of HFI loans using the build up and consensus valuation techniques, as discussed below, for periodic disclosure of financial instruments as required by GAAP. For our remaining loans, which include those containing embedded derivatives that would otherwise require bifurcation and consolidated loans of senior subordinated trust structures, we elect the fair value option and therefore, we record these loans at fair value in our condensed consolidated balance sheets  We measure these loans on a recurring basis using the build up, consensus, discounted cash flow and single vendor price techniques. Certain impaired loans are measured at fair value on a nonrecurring basis by using the fair value of their underlying collateral  Specific techniques used include internal models, broker price opinions and appraisals

A description of our valuation techniques is as follows:

Build Up:    The fair value of performing loans represents an estimate of the prices we would receive if we were to securitize those loans and is determined based on comparisons to Fannie Mae MBS with similar characteristics, either on a pool or loan level  We use the observable market values of our Fannie Mae MBS determined primarily from third party pricing services, quoted market prices in active markets for similar securities, and other observable market data as a base value  In the build up valuation technique we start with the base value for our Fannie Mae MBS then we add or subtract the fair value of the associated guaranty asset, guaranty obligation ("GO") and master servicing arrangement  We set the GO equal to the estimated fair value we would receive if we were to issue our guaranty to an unrelated party in a stand alone arm's length transaction at the measurement date  We estimate the fair value of the GO using our internal GO valuation models, which calculate the present value of expected cash flows based on management's best estimate of certain key

40

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

assumptions such as current mark to market LTV ratios, future house prices, default rates, severity rates and required rate of return. We may further adjust the model values based on our current market pricing when such transactions reflect credit characteristics that are similar to our outstanding GO  These loans are generally classified as Level 2 of the valuation hierarchy to the extent that significant inputs are observable  To the extent that unobservable inputs are significant, the loans are classified as Level 3 of the valuation hierarchy

Consensus:   The fair value of single family nonperforming loans represents an estimate of the prices we would receive if we were to sell these loans in the nonperforming whole loan market  These nonperforming loans are either two or more months delinquent, in an open modification period, or in a closed modification state and have performed for twelve or fewer months  We calculate the fair value of nonperforming loans based on assumptions about key factors, including collateral value and mortgage insurance repayment  Collateral value is derived from the current mark to market LTV ratio of the individual loan along with a state level distressed property sales discount  Mortgage insurance is estimated by taking the loan level coverage and adjusting it by the probability of repayment by the associated mortgage insurer  This probability is based on the credit rating of the mortgage insurance company  Using these assumptions, along with indicative bids for a representative sample of nonperforming loans, we estimate the fair value  The bids on sample loans are obtained from multiple active market participants  Fair value is estimated from the extrapolation of these indicative sample bids plus an amount for the recovery of any associated mortgage insurance estimated through our GO valuation models as described above  These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable

Discounted Cash Flow:   We estimate the fair value of a portion of our senior subordinated trust structures using discounted cash flow at the security level as a proxy for estimating loan fair value. This valuation technique uses unobservable inputs such as prepayment speeds, default rates, spreads, and loss severities to estimate the fair value of our securities  These inputs are weighted in a model that calculates the expected cash flow of the security which is used as the basis of fair value  These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable

Single Vendor:   We estimate the fair value of a portion of our senior subordinated trust structures using the single vendor valuation technique at the security level as a proxy for estimating loan fair value  This valuation technique estimates fair value based upon prices received from one specific vendor  These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable

Inte nal Model:   We estimate the fair value of a portion of our single family nonperforming loans using the value of the underlying collateral  The inputs into this internal model include property level data such as prior sales prices, tax assessment values, property characteristics, and historical foreclosure sales data. This internal model takes one of two approaches when valuing foreclosed properties  The first approach relies on comparable foreclosed property sales, where the value of the target property is the weighted average price of comparable foreclosed property sales  The weights in the comparable sales approach are determined by various factors such as geographic distance, transaction time, and the value difference  The second approach relies on model calibrations that consider the target property's attributes such as prior sales prices, tax assessment values, and property characteristics to derive the foreclosed property values  In the second approach, we build separate predictive models for each Metropolitan Statistical Area ("MSA")  Specifically, we use the data of prior sales prices, tax assessment values, property characteristics, and historical foreclosure sales to calibrate the models in each MSA  We can use the available data about that property and our MSA level model to estimate the fair value for a given property  The majority of the internal model valuations come from the comparable sales approach  The determination of whether the internal model valuations in a particular geographic area should use the comparable sales approach or model calibration is based on the quarterly evaluation of these two approaches for valuation accuracy  The unobservable inputs used in this technique include model weights based upon

141

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

geographic distance, transaction time, and metropolitan statistics  When a physical address is not available, we estimate fair value using state average foreclosed property values  These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable

Appraisals:    For a portion of our multifamily loans, we use appraisals to estimate the fair value of the loan  There are three approaches used to estimate fair value of a specific property: (1) cost, (2) income capitalization and (3) sales comparison  This technique uses an average of the three estimates  The cost approach uses the insurable value as a basis. The unobservable inputs used in this model include the estimated cost to construct or replace multifamily properties in the closest localities available  The income capitalization approach estimates the fair value using the present value of the future cash flow expectations by applying an appropriate overall capitalization rate to the forecasted net operating income  The significant unobservable inputs used in this calculation include rental income, fees associated with rental income, expenses associated with the property including taxes, payroll, insurance and other items, and the capitalization rates which are determined through market extraction and DSCR  The sales comparison approach compares the prices paid for similar properties, the prices asked by owners and offers made. The unobservable inputs to this methodology include ratios of sales prices to annual gross income, price paid per unit and adjustments made based on financing, conditions of sale, and physical characteristics of the property. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable

Broker Price Opinion ("BPO"):    For a portion of our multifamily loans, we use BPO to estimate the fair value of the loan  This technique uses both current property value and the property value adjusted for stabilization  These approaches compute net operating income based on current rents and expenses and use a range of market capitalization rates to estimate property value  The unobservable inputs used in this technique are property net operating income and market capitalization rates to estimate property value  These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable

Asset Manager Estimate ("AME"):    For a portion of our multifamily loans, AME is used to estimate the fair value of the loan  This technique uses the net operating income and tax assessments of the specific property as well as MSA specific market capitalization rates and average per unit sales values to estimate property fair value  These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable

An increase in prepayment speeds in isolation would generally result in an increase in the fair value of our mortgage loans classified as Level 3 of the valuation hierarchy, and an increase in severity rates, default rates, or spreads in isolation would generally result in a decrease in fair value  Although the sensitivities of the fair value of mortgage loans classified as Level 3 of the valuation hierarchy to various unobservable inputs are discussed above in isolation, interrelationships exist among these inputs such that a change in one unobservable input typically results in a change to one or more of the other inputs

*Acquired Property, Net and Other Assets*    Acquired property, net represents foreclosed property received in full satisfaction of a loan net of a valuation allowance  Acquired property is initially recorded in our condensed consolidated balance sheets at its fair value less its estimated cost to sell  The initial fair value of foreclosed properties is determined using a hierarchy based on the reliability of available information  The hierarchy for single family acquired property includes accepted offers, appraisals, broker price opinions and proprietary home price model values. The hierarchy for multifamily acquired property includes accepted offers, appraisals, and broker price opinions  We consider an accepted offer on a specific foreclosed property to be the best estimate of its fair value  If we have not accepted an offer on the property we use the highest available valuation methodology as described in our valuation hierarchy to determine fair value  While accepted offers represent an agreement in principle to transact, a significant portion of these agreements do not get executed for various reasons, and are therefore classified as Level 3 of the valuation hierarchy

142

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

Third party valuations can be obtained from either an appraisal or a broker price opinion. These valuations are kept current using a monthly walk forward process that updates them for any change in the value of the property  When accepted offers or third party valuations are not available, we generally utilize the home price values determined using an internal model

Subsequent to initial measurement, the foreclosed properties that we intend to sell are reported at the lower of the carrying amount or fair value less estimated costs to sell  Foreclosed properties classified as held for use, included in "Other Assets" in our condensed consolidated balance sheets, are depreciated and impaired when circumstances indicate that the carrying amount of the property is no longer recoverable  The fair values of our single family foreclosed properties subsequent to initial measurement are determined using the same information hierarchy used for the initial fair value measurement

The most commonly used techniques in our valuation of acquired property are proprietary home price model and appraisals (both current and walk forward)  Based on the number of properties measured as of March 31, 2012, these methodologies comprised approximately 75% of our valuations, while accepted offers comprised approximately 23% of our valuations

Acquired property is classified as Level 3 of the valuation hierarchy because significant inputs are unobservable

A description of our valuation techniques to estimate the fair value of our acquired property is as follows

*Single family acquired property valuation techniques*

Appraisal:    An appraisal is an estimate of the value of a specific property by a certified or licensed appraiser, in accordance with the Uniform Standards of Professional Appraisal Practice  Data most commonly used is from the local Multiple Listing Service and includes properties currently listed for sale, properties under contract, and closed transactions. The appraiser performs an analysis that starts with these data points and then adjusts for differences between the comparable properties and the property being appraised, to arrive at an estimated value for the specific property  Adjustments are made for differences between comparable properties for unobservable inputs such as square footage, location, and condition of the property  The appraiser typically uses recent historical data for the estimate of value

Broker Price Opinion:    This technique provides an estimate of what the property is worth based upon a real estate broker's knowledge  The broker uses research of pertinent data in the appropriate market, and a sales comparison approach that is similar to the appraisal process. The broker typically has insight into local market trends, such as the number of and terms of offers, lack of offers, increasing supply, shortage of inventory and overall interest in buying a home. This information, all of which is unobservable, is used along with recent and pending sales and current listings of similar properties to arrive at an estimate of value

Appraisal and Broker Price Opinion Walk Forwards ("Walk Forwards"):    We use these techniques to adjust appraisal and broker price opinion valuations for changing market conditions by applying a walk forward factor based on local price movements since the time the third party value was obtained  The majority of third party values are updated by comparing the difference in our internal home price model from the month of the original appraisal/broker price opinion to the current period and by applying the resulting percentage change to the original value  If a price is not determinable through our internal home price model, we use our zip code level home price index to update the valuations

Inte nal Model:    We use an internal model to estimate fair value for distressed properties  The valuation methodology and inputs used are described under "Mortgage Loans Held for Investment "

43

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**   **(Continued)**
**(UNAUDITED)**

*Multifamily acquired property valuation techniques*

<u>Appraisals:</u>   We use this method to estimate property values for distressed properties  The valuation methodology and inputs used are described under "Mortgage Loans Held for Investment "

<u>Broker Price Opinions:</u>   We use this method to estimate property values for distressed properties  The valuation methodology and inputs used are described under "Mortgage Loans Held for Investment "

*Derivatives Assets and Liabilities (collectively "Derivatives")*    Derivatives are recorded in our condensed consolidated balance sheets at fair value on a recurring basis. The valuation process for the majority of our risk management derivatives uses observable market data provided by third party sources, resulting in Level 2 classification of the valuation hierarchy  Interest rate swaps are valued by referencing yield curves derived from observable interest rates and spreads to project and discount swap cash flows to present value  Option based derivatives use a model that projects the probability of various levels of interest rates by referencing swaption and caplet volatilities provided by market makers/dealers  The projected cash flows of the underlying swaps of these option based derivatives are discounted to present value using yield curves derived from observable interest rates and spreads  Exchange traded futures are valued using market quoted prices, resulting in Level 1 classification of the valuation hierarchy. Certain highly complex structured swaps primarily use a single dealer mark due to lack of transparency in the market and may be modeled using observable interest rates and volatility levels as well as significant unobservable assumptions, resulting in Level 3 classification of the valuation hierarchy  Mortgage commitment derivatives use observable market data, quotes and actual transaction price levels adjusted for market movement, and are typically classified as Level 2 of the valuation hierarchy  Mortgage commitment derivatives that include adjustments for market movement that cannot be corroborated by observable market data are classified as Level 3 of the valuation hierarchy.

*Debt*    The majority of debt of Fannie Mae is recorded in our condensed consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments  We elected the fair value option for certain structured debt instruments, which are recorded in our condensed consolidated balance sheets at fair value on a recurring basis.

We use third party pricing services that reference observable market data such as interest rates and spreads to measure the fair value of debt, and thus classify that debt as Level 2 of the valuation hierarchy

For structured debt instruments that are not valued by third party pricing services, cash flows are evaluated taking into consideration any structured derivatives through which we have swapped out of the structured features of the notes  The resulting cash flows are discounted to present value using a yield curve derived from market prices observed for Fannie Mae Benchmark Notes and adjusted to reflect fair values at the offer side of the market  Market swaption volatilities are also referenced for the valuation of callable structured debt instruments  Since the derivatives considered in the valuations of these structured debt instruments are classified as Level 3 of the valuation hierarchy, the valuations of the structured debt instruments result in a Level 3 classification.

Certain consolidated MBS debt with embedded derivatives is recorded in our condensed consolidated balance sheets at fair value on a recurring basis  Consolidated MBS debt is traded in the market as MBS assets  Accordingly, we estimate the fair value of our consolidated MBS debt using quoted market prices in active markets for similar liabilities when traded as assets. The valuation methodology and inputs used in estimating the fair value of MBS assets are described under "Cash Equivalents, Trading Securities and Available for Sale Securities "

44

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

*Valuation Control Processes*

We have control processes that are designed to ensure that our fair value measurements are appropriate and reliable, that they are based on observable inputs wherever possible and that our valuation approaches are consistently applied and the assumptions used are reasonable  Our control processes consist of a framework that provides for a segregation of duties and oversight of our fair value methodologies and valuations, as well as validation procedures

The Pricing Group within our Finance Division is responsible for estimating the fair value of the majority of our financial assets and financial liabilities  These fair values are verified by our Price Verification Group, which is a control group separate from the group responsible for obtaining prices  Our Modeling and Analytics Group develops models that are used in estimating the fair value of assets and liabilities for financial reporting purposes  In addition, our Model Oversight Committee ("MOC") facilitates the cross functional coordination and effectiveness of our modeling efforts in terms of research, model use and risk governance  The MOC is comprised of senior representatives from Underwriting and Pricing, Capital Markets, Credit Portfolio Management, Enterprise Risk Management, Finance and Modeling & Analytics and is chaired by our Chief Risk Officer. Our Model Risk Oversight Group is responsible for establishing risk management controls and for reviewing, validating and approving models used in the determination of fair value measurements for financial reporting  Fair value measurements for acquired property and collateral dependent loans are determined by other valuation groups in the Finance division

Our Valuation Oversight Committee ("VOC") includes senior representation from our Capital Markets segment, our Enterprise Risk Office and our Finance division, and is responsible for providing overall governance for our valuation processes and results  The composition of the VOC is determined by the VOC chair, our Chief Financial Officer, with the objective of obtaining appropriate representation from finance, risk and select business units within Fannie Mae  Based on its review of valuation methodologies and fair value results for various financial instruments used for financial reporting, the VOC is responsible for advising the VOC Committee chair, who has the ultimate responsibility over all valuation processes and results  The VOC also reviews trend analysis for various financial assets and liabilities on a quarterly basis.

We use third party vendor prices and dealer quotes to estimate fair value of some of our financial assets and liabilities  Third party vendor prices are primarily used to estimate fair value for trading securities, available for sale securities, debt of Fannie Mae, and consolidated MBS debt  Our Pricing Group performs various review and validation procedures prior to utilizing these prices in our fair value estimation process  We verify selected prices, using a variety of methods, including corroborating the prices by reference to other independent market data, such as non binding broker or dealer quotations, relevant benchmark indices, and prices of similar instruments. We also review prices for reasonableness based on variations from prices provided in previous periods, comparing prices to internally estimated prices, using primarily a discounted cash flow approach, and conducting relative value comparisons based on specific characteristics of securities

We have discussions with the pricing services as part of our due diligence process in order to maintain a current understanding of the valuation processes and related assumptions and inputs that these vendors use in developing prices  The prices provided to us by third party pricing services reflect the existence of market reliance upon credit enhancements, if any, and the current lack of liquidity in the marketplace  If we determine that a price provided to us is outside established parameters, we will further examine the price, including having follow up discussions with the pricing service or dealer  If we conclude that a price is not valid, we will adjust the price for various factors, such as liquidity, bid ask spreads and credit considerations. All of these procedures are executed before we use the prices in preparing our financial statements .

Our Price Verification Group is responsible for performing monthly independent price verification, primarily related to financial assets and financial liabilities that are priced by our Pricing Group. This is generally

145

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

accomplished by comparing the value that the Price Verification Group obtains through its own sources and methods with values provided by the Pricing Group  Alternatively, the Price Verification Group may perform reviews of the assumptions used by the Pricing Group to estimate the fair value of products we hold that have material estimation risk because observable market based inputs do not exist  This group provides an update to the VOC on results, relevant market information and pricing trends, and significant valuation challenges and resolution of those challenges with the Pricing Group on a quarterly basis

We have an internal property valuation function that utilizes an internal model to compare the values received on a property and assign a risk rating based on several factors including the deviation between the various values  Property valuations with risk ratings above a specified threshold are reviewed for reasonableness by a team of property valuation experts  The internal model that is used to assign a risk rating and the threshold specified is subject to VOC oversight  In addition, our Quality Control Group reviews the overall work performed and inspects a portion of the properties in major markets, for which the third party valuations are obtained, in order to assess the quality of the valuations.

We calibrate the performance of our proprietary internal model using actual offers on our properties and recent observed transactions  The internal model's performance is reviewed on a monthly basis by the REO valuation team and is compared with the review performed by our Modeling and Analytics team on a quarterly basis  These review results are presented to the Model Risk Oversight Group, who performs a review and evaluation of the model performance on a quarterly basis  The results of the validation are also reviewed with the VOC on a quarterly basis

Our Appraisal Review Group reviews appraisals to determine whether they have been performed in accordance with appraisal standards and the results are consistent with our observed transactions on similar properties  We and/or third party servicers review broker price opinions to determine whether the values provided are consistent with our observed transactions on similar properties  We conduct quarterly portfolio reviews, annual audits and periodic reviews of the counterparties that provide services to review broker price opinions  In addition, valuation results and trend analyses are reviewed at least monthly by REO management

146

Table of Contents

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

### Fair Value of Financial Instruments

The following table displays the carrying value and estimated fair value of our financial instruments as of March 31, 2012 and December 31, 2011. The fair value of financial instruments we disclose includes commitments to purchase multifamily and single family mortgage loans which are off balance sheet financial instruments that we do not record in our condensed consolidated balance sheets  The fair values of these commitments are included as "Mortgage loans held for investment, net of allowance for loan losses " The disclosure excludes certain financial instruments, such as plan obligations for pension and postretirement health care benefits, employee stock option and stock purchase plans, and also excludes all non financial instruments  As a result, the fair value of our financial assets and liabilities does not represent the underlying fair value of our total consolidated assets and liabilities

| | As of | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | March 31, 2012 | | | | | | December 31, 2011 | |
| | Car ying Value | Quoted Price in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjust-ment | Estimated Fair Value | Car ying Value | Estimated Fair Value |
| | | | (Dollars in millions) | | | | | |
| **Financial assets** | | | | | | | | |
| Cash and cash equiva ents and restricted cash | $ 77,970 | $ 66,970 | $ 11,000 | $ — | $ — | $ 77,970 | $ 68,336 | $ 68,336 |
| Federa  unds so d and securities purchased under agreements to rese  or simi ar arrangemen s | 15,000 | — | 15,000 | — | — | 15,000 | 6,000 | 6,000 |
| Trading securities | 75,806 | 50,030 | 23,020 | 2,756 | — | 75,806 | 74,198 | 74,198 |
| Ava  ab e-for-sa e secur t es | 73,779 | — | 45,926 | 27,853 | — | 73,779 | 77,582 | 77,582 |
| Mortgage  oans he d for sa e | 282 | — | 198 | 88 | — | 286 | 311 | 325 |
| Mortgage  oans he d for investment, net of a  owance for  oan  osses | | | | | | | | |
| Of Fannie Mae | 320,032 | — | 35,805 | 236,274 | — | 272,079 | 322,825 | 294,996 |
| Of conso idated trusts | 2,603,411 | — | 2,345,292 | 327,739 | — | 2,673,031 | 2,575,485 | 2,652,025 |
| Mortgage  oans he d for investment | 2,923,443 | — | 2,381,097 | 564,013 | — | 2,945,110 | 2,898,310 | 2,947,021 |
| Advances to  enders | 3,548 | — | 2,819 | 6 0 | — | 3,459 | 5,538 | 5,420 |
| Derivative assets at fair va ue | 365 | 5 | 13,681 | 203 | (13,524) | 365 | 561 | 561 |
| Guaran y asse s and buy-ups | 97 | — | — | 920 | — | 920 | 503 | 901 |
| Tota  f nanc a  assets | $ 3,170,690 | $ 117,005 | $ 2,492,741 | $ 596,473 | $(13,524) | $ 3,192,695 | $ 3,171,339 | $ 3,220,344 |
| **Financial liabilities:** | | | | | | | | |
| Shor - erm deb | | | | | | | | |
| Of Fannie Mae | $ 110,852 | $ — | $ 110,865 | $ — | $ — | $ 110,865 | $ 146,752 | $ 146,782 |
| Of conso idated trusts | 4,495 | — | — | 4,495 | — | 4,495 | ,973 | ,973 |
| Long- erm deb | | | | | | | | |
| Of Fannie Mae | 575,122 | — | 599,427 | 1,065 | — | 600,492 | 585,692 | 613,983 |
| Of conso idated trusts | 2,493,738 | — | 2,615,986 | 12,506 | — | 2,628,492 | 2,452,455 | 2,596,657 |
| Derivative  iabi ities at fair va ue | 522 | 5 | 19, 11 | 159 | (19,053) | 522 | 916 | 916 |
| Guaranty ob igations | 799 | — | — | 3,815 | — | 3,815 | 811 | 3,9 |
| Tota  financia  iabi ities | $3,185,528 | $ 5 | $ 3,345,689 | $ 22,040 | $(19,053) | $ 3,348,681 | $ 3,191,599 | $ 3,367,255 |

147

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

*Financial Instruments for which fair value approximates carrying value*   We hold certain financial instruments that are not carried at fair value but for which the carrying value approximates fair value due to the short term nature and negligible credit risk inherent in them  These financial instruments include cash and cash equivalents, the majority of advances to lenders and federal funds and securities sold/purchased under agreements to repurchase/resell (exclusive of dollar roll repurchase transactions)

*Federal funds and securities sold/purchased under agreements to repurchase/resell*   The carrying value for the majority of these specific instruments approximates the fair value due to the short term nature and the negligible inherent credit risk, as they involve the exchange of liquid collateral  Were we to calculate the fair value of these instruments we would use observable inputs resulting in Level 2 classification

*Mortgage Loans Held for Sale*   Loans are reported at the lower of cost or fair value in our condensed consolidated balance sheets  The valuation methodology and inputs used in estimating the fair value of HFS loans are the same as for our HFI loans and are described under "Fair Value Measurement  Mortgage Loans Held for Investment" and these loans are classified as Level 2 of the valuation hierarchy to the extent that significant inputs are observable  To the extent that significant inputs are unobservable, the loans are classified within Level 3 of the valuation hierarchy

*Advances to Lenders*   The carrying value for the majority of our advances to lenders approximates fair value due to the short term nature and the negligible inherent credit risk  Were we to calculate the fair value of these instruments we would use discounted cash flow models that use observable inputs such as spreads based on market assumptions, resulting in Level 2 classification.

Advances to Lenders also include loans for which the carrying value does not approximate fair value  These loans do not qualify for Fannie Mae MBS securitization and are valued using market based techniques including credit spreads, severities and prepayment speeds for similar loans, through third party pricing services or through a model approach incorporating both interest rate and credit risk simulating a loan sale via a synthetic structure  We classify these valuations as Level 3 given that significant inputs are not observable or are determined by extrapolation of observable points

*Guaranty Assets and Buy ups*   Guaranty assets related to our portfolio securitizations are recorded in our condensed consolidated balance sheets at fair value on a recurring basis and are classified within Level 3 of the valuation hierarchy  Guaranty assets in lender swap transactions are recorded in our condensed consolidated balance sheets at the lower of cost or fair value  These assets, which are measured at fair value on a nonrecurring basis, are classified within Level 3 of the fair value hierarchy

We estimate the fair value of guaranty assets based on the present value of expected future cash flows of the underlying mortgage assets using management's best estimate of certain key assumptions, which include prepayment speeds, forward yield curves, and discount rates commensurate with the risks involved. These cash flows are projected using proprietary prepayment, interest rate and credit risk models  Because guaranty assets are like an interest only income stream, the projected cash flows from our guaranty assets are discounted using one month LIBOR plus the option adjusted spread ("OAS") for interest only trust securities  The interest only OAS is calibrated using prices of a representative sample of interest only trust securities  We believe the remitted fee income is less liquid than interest only trust securities and more like an excess servicing strip  We take a further discount of the present value for these liquidity considerations. This discount is based on market quotes from dealers.

The fair value of the guaranty assets includes the fair value of any associated buy ups, which is estimated in the same manner as guaranty assets but is recorded separately as a component of "Other assets" in our condensed consolidated balance sheets

148

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

*Guaranty Obligations*    The fair value of all guaranty obligations, measured subsequent to their initial recognition, is our estimate of a hypothetical transaction price we would receive if we were to issue our guaranty to an unrelated party in a standalone arm's length transaction at the measurement date  These obligations are classified within Level 3  The valuation methodology and inputs used in estimating the fair value of the guaranty obligation are described under "Fair Value Measurement  Mortgage Loans Held for Investment  Build up."

*HARP Loans*    We measure the fair value of loans that are delivered under the Home Affordable Refinance Program ("HARP") using a modified build up approach while the loan is performing  Under this modified approach, we set the credit component of the consolidated loans (i e , the guaranty obligation) equal to the compensation we would currently receive for a loan delivered to us under the program because the total compensation for these loans is equal to their current exit price in the GSE securitization market  For a description of the build up valuation methodology, refer to "Fair Value Measurement    Mo tgage Loans Held for Investment " We will continue to use this pricing methodology as long as the HARP program is available to market participants  If, subsequent to delivery, the refinanced loan becomes past due or is modified as a part of a troubled debt restructuring, the fair value of the guaranty obligation is then measured consistent with other loans that have these characteristics

The total compensation that we receive for the delivery of a HARP loan reflects the pricing that we are willing to offer because HARP is a part of a broader government program intended to provide assistance to homeowners and prevent foreclosures  If these benefits were not reflected in the pricing for these loans (that is, if the loans were valued using our standard build up approach), the fair value disclosed in the table above would be lower by $7 4 billion as of March 31, 2012  The total fair value of the loans in our portfolio that have been refinanced under HARP as of March 31, 2012 as presented in the table above is $142.9 billion.

### Fair Value Option

We elected the fair value option for certain consolidated loans and debt instruments recorded in our condensed consolidated balance sheets  These instruments contain embedded derivatives that would otherwise require bifurcation  Under the fair value option, we elected to carry these instruments at fair value instead of bifurcating the embedded derivative from the respective loan or debt instrument

We elected the fair value option for all long term structured debt instruments that are issued in response to specific investor demand and have interest rates that are based on a calculated index or formula and are economically hedged with derivatives at the time of issuance  By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from the accounting asymmetry created by recording these structured debt instruments at cost while recording the related derivatives at fair value

We elected the fair value option for the financial assets and liabilities of the consolidated senior subordinate trust structures  By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from different accounting treatment between loans at cost and debt at cost.

Interest income for the mortgage loans is recorded in "Mortgage loans interest income" and interest expense for the debt instruments is recorded in "Long term debt interest expense" in our condensed consolidated statements of operations and comprehensive income (loss)

149

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

The following table displays the fair value and unpaid principal balance of the financial instruments for which we have made fair value elections as of March 31, 2012 and December 31, 2011.

| | As of | | | | | |
| | March 31, 2012 | | | December 31, 2011 | | |
| | Loans of Consolidated Trusts [1] | Long-Term Debt of Fannie Mae | Long-Term Debt of Consolidated Trusts [2] | Loans of Consolidated Trusts [1] | Long-Term Debt of Fannie Mae | Long-Term Debt of Consolidated Trusts [2] |
|---|---|---|---|---|---|---|
| | (Dollars in millions) | | | | | |
| Fair value | $ 4,292 | $ 825 | $ 4,279 | $ 3,611 | $ 838 | $ 3,939 |
| Unpaid principal balance | 4,758 | 712 | 4,391 | 4,122 | 712 | 4,012 |

[1] Includes nonaccrual loans with a fair value of $231 million and $195 million as of March 31, 2012 and December 31, 2011, respectively. The difference between unpaid principal balance and the fair value of these nonaccrual loans as of March 31, 2012 and December 31, 2011 is $232 million. Includes loans that are 90 days past due with a fair value of $382 million and $310 million as of March 31, 2012 and December 31, 2011, respectively. The difference between unpaid principal balance and the fair value of these 90 or more days past due loans as of March 31, 2012 and December 31, 2011 is $263 million and $262 million, respectively.

[2] Includes interest only debt instruments with no unpaid principal balance and a fair value of $115 million as of March 31, 2012 and December 31, 2011.

*Changes in Fair Value under the Fair Value Option Election*

The following table displays fair value gains and losses, net, including changes attributable to instrument specific credit risk, for loans and debt for which the fair value election was made  Amounts are recorded as a component of "Fair value gains, net" in our condensed consolidated statements of operations and comprehensive income (loss) for the three months ended March 31, 2012 and 2011

| | For the Three Months Ended March 31, | | | | | |
| | 2012 | | | 2011 | | |
| | Loans | Long-Term Debt | Total Gains (Losses) | Loans | Long-Term Debt | Total Gains (Losses) |
|---|---|---|---|---|---|---|
| | (Dollars in millions) | | | | | |
| Changes in instrument specific credit risk | $ 66 | $ (2) | $ 64 | $(217) | $ (4) | $ (221) |
| Other changes in fair value | (65) | 60 | (5) | 65 | 33 | 98 |
| Fair value gains, net | $ 1 | $ 58 | $ 59 | $(152) | $ 29 | $ ( 23) |

In determining the changes in the instrument specific credit risk for loans, the changes in the associated credit related components of these loans, primarily the guaranty obligation, were taken into consideration with the overall change in the fair value of the loans for which we elected the fair value option for financial instruments  In determining the changes in the instrument specific credit risk for debt, the changes in Fannie Mae debt spreads to LIBOR that occurred during the period were taken into consideration with the overall change in the fair value of the debt for which we elected the fair value option for financial instruments  Specifically, cash flows are evaluated taking into consideration any derivatives through which Fannie Mae has swapped out of the structured features of the notes and thus created a floating rate LIBOR based debt instrument  The change in value of these LIBOR based cash flows based on the Fannie Mae yield curve at the beginning and end of the period represents the instrument specific risk

150

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

**13.   Commitments and Contingencies**

We are party to various types of legal actions and proceedings, including actions brought on behalf of various classes of claimants  We also are subject to regulatory examinations, inquiries and investigations and other information gathering requests  In some of the matters, indeterminate amounts are sought  Modern pleading practice in the U S  permits considerable variation in the assertion of monetary damages or other relief  Jurisdictions may permit claimants not to specify the monetary damages sought or may permit claimants to state only that the amount sought is sufficient to invoke the jurisdiction of the trial court  This variability in pleadings, together with our and our counsel's actual experience in litigating or settling claims, leads us to conclude that the monetary relief that may be sought by plaintiffs bears little relevance to the merits or disposition value of claims

On a quarterly and annual basis, we review relevant information about all pending legal actions and proceedings for the purpose of evaluating and revising our contingencies, reserves and disclosures

Legal actions and proceedings of all types are subject to many uncertain factors that generally cannot be predicted with assurance  Accordingly, the outcome of any given matter and the amount or range of potential loss at particular points in time is frequently difficult to ascertain  Uncertainties can include how fact finders will evaluate documentary evidence and the credibility and effectiveness of witness testimony, and how trial and appellate courts will apply the law  Disposition valuations are also subject to the uncertainty of how opposing parties and their counsel view the evidence and applicable law  Further, FHFA adopted a regulation on June 20, 2011, which provides, in part, that while we are in conservatorship, FHFA will not pay claims by our current or former shareholders, unless the Director of FHFA determines it is in the interest of the conservatorship  The presence of this regulation and the Director of FHFA's assertion that FHFA will not pay claims asserted in certain cases discussed below while we are in conservatorship creates additional uncertainty in those cases

We establish a reserve for those matters when a loss is probable and we can reasonably estimate the amount of such loss  Reserves have been established for certain of the matters noted below  These reserves did not have a material adverse effect on our financial statements  We note, however, that in light of the uncertainties involved in such actions and proceedings, there is no assurance that the ultimate resolution of these matters will not significantly exceed the reserves we have currently accrued

For the remaining legal actions or proceedings, including those where there is only a reasonable possibility that a loss may be incurred, we are not currently able to estimate the reasonably possible losses or ranges of losses and we have not established a reserve with respect to those actions or proceedings  We are often unable to estimate the possible losses or ranges of losses, particularly for proceedings that are in their early stages of development, where plaintiffs seek substantial or indeterminate damages, where there may be novel or unsettled legal questions relevant to the proceedings, or where settlement negotiations have not occurred or progressed  Further, as noted above, FHFA's regulation and the Director of FHFA's assertion creates additional uncertainty with respect to certain cases

Given the uncertainties involved in any action or proceeding, regardless of whether we have established a reserve, the ultimate resolution of certain of these matters may be material to our operating results for a particular period, depending on, among other factors, the size of the loss or liability imposed and the level of our net income or loss for that period  Based on our current knowledge with respect to the matters described below, we believe we have valid defenses to the claims in these proceedings and intend to defend these matters vigorously regardless of whether or not we have recorded a loss reserve

In addition to the matters specifically described below, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that we do not expect will have a material impact on our business or financial condition  We have advanced fees and expenses of certain current and former officers and directors in connection with various legal proceedings pursuant to indemnification agreements

151

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS   (Continued)**
**(UNAUDITED)**

*In re Fannie Mae Securities Litigation*

Fannie Mae is a defendant in a consolidated class action lawsuit initially filed in 2004 and currently pending in the U S  District Court for the District of Columbia  In the consolidated complaint filed on March 4, 2005, lead plaintiffs Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio allege that we and certain former officers, as well as our former outside auditor, made materially false and misleading statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b 5 promulgated thereunder  Plaintiffs contend that Fannie Mae's accounting statements were inconsistent with GAAP requirements relating to hedge accounting and the amortization of premiums and discounts, and seek unspecified compensatory damages, attorneys' fees, and other fees and costs. On January 7, 2008, the court defined the class as all purchasers of Fannie Mae common stock and call options and all sellers of publicly traded Fannie Mae put options during the period from April 17, 2001 through December 22, 2004  On October 17, 2008, FHFA, as conservator for Fannie Mae, intervened in this case. On August 18, 2011, the parties filed various motions for summary judgment, which are fully briefed

On October 7, 2011, FHFA, as conservator, filed a motion to stay this case for the duration of our conservatorship based on a regulation FHFA adopted on June 20, 2011, which provides in part that while we are in conservatorship, FHFA will not pay claims by our current or former shareholders, unless the Director of FHFA determines it is in the interest of the conservatorship  The Acting Director of FHFA has determined it will not pay the claims asserted in this case while we are in conservatorship  FHFA maintains, therefore, that continuing litigation of this matter would be a waste of resources  FHFA's motion was denied on November 14, 2011  FHFA's regulation has been challenged by lead plaintiffs in a separate lawsuit also pending in the U S  District Court for the District of Columbia.

In September and December 2010, plaintiffs served expert reports claiming damages to plaintiffs under various scenarios ranging cumulatively from $2 2 billion to $8 6 billion  Given the substantial and novel legal questions that remain, including those raised by FHFA's regulation and the Director of FHFA's determination, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation

*2008 Class Action Lawsuits*

Fannie Mae is a defendant in two consolidated class actions filed in 2008 and currently pending in the U S  District Court for the Southern District of New York   *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. On February 11, 2009, the Judicial Panel on Multidistrict Litigation ordered that the cases be coordinated for pretrial proceedings

Given the early status of these matters, the absence of a specified demand or claim by the plaintiffs, and the substantial and novel legal questions that remain, including those raised by FHFA's regulation and the Director of FHFA's determination, we are currently unable to estimate the reasonably possible loss or range of loss arising from these lawsuits.

*In re Fannie Mae 2008 Securities Litigation*

In a consolidated complaint filed on June 22, 2009, lead plaintiffs Massachusetts Pension Reserves Investment Management Board and Boston Retirement Board (for common shareholders) and Tennessee Consolidated Retirement System (for preferred shareholders) allege that we, certain of our former officers, and certain of our underwriters violated Sections 12(a)(2) and 15 of the Securities Act of 1933  Lead plaintiffs also allege that we, certain of our former officers, and our outside auditor, violated Sections 10(b) (and Rule 10b 5 promulgated thereunder) and 20(a) of the Securities Exchange Act of 1934  Lead plaintiffs seek various forms of relief, including rescission, damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. On October  3, 2009, the Court entered an order allowing FHFA to intervene

152

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

On November 24, 2009, the Court granted the defendants' motion to dismiss the Securities Act claims as to all defendants  On September 30, 2010, the Court granted in part and denied in part the defendants' motions to dismiss the Securities Exchange Act claims  As a result of the partial denial, some of the Securities Exchange Act claims remain pending against us and certain of our former officers  On October 14, 2010, we and certain other defendants filed motions for reconsideration of those portions of the Court's September 30, 2010 order denying in part the defendants' motions to dismiss  Fannie Mae filed its answer to the consolidated complaint on December 31, 2010  Defendants' motions for reconsideration were denied on April 11, 2011  On July 28, 2011, lead plaintiffs filed motions to certify a class of persons who, between November 8, 2006 and September 5, 2008, inclusive, purchased or acquired (a) Fannie Mae common stock and options or (b) Fannie Mae preferred stock

On February 1, 2012, plaintiffs sought leave to amend their complaint to add new factual allegations and the court granted plaintiffs' motion  Briefing on the pending motions for class certification will be held in abeyance pending resolution of motions to dismiss the amended complaint  Plaintiffs filed an amended complaint on March 2, 2012 and added FHFA as a defendant. On April 4, 2012, defendants filed motions to dismiss the amended complaint.

*In re 2008 Fannie Mae ERISA Litigation*

In a consolidated complaint filed on September 11, 2009, plaintiffs allege that certain of our current and former officers and directors, including former members of Fannie Mae's Benefit Plans Committee and the Compensation Committee of Fannie Mae's Board of Directors, as fiduciaries of Fannie Mae's Employee Stock Ownership Plan ("ESOP"), breached their duties to ESOP participants and beneficiaries by investing ESOP funds in Fannie Mae common stock when it was no longer prudent to continue to do so  Plaintiffs purport to represent a class of participants and beneficiaries of the ESOP whose accounts invested in Fannie Mae common stock beginning April 17, 2007. The plaintiffs seek unspecified damages, attorneys' fees and other fees and costs, and injunctive and other equitable relief  On November 2, 2009, defendants filed motions to dismiss these claims  On November 2, 2011, we filed a letter notifying the court of two recent decisions by the U S  Court of Appeals for the Second Circuit that are relevant to defendants' motions to dismiss  On February 1, 2012, plaintiffs sought leave to amend their complaint to add new factual allegations and the court granted plaintiffs' motion  Plaintiffs filed an amended complaint on March 2, 2012 adding two current Board members and CEO Michael J. Williams as defendants. On April 4, 2012, defendants filed motions to dismiss the amended complaint

*Comprehensive Investment Services v. Mudd, et al.*

This individual securities action was originally filed on May 13, 2009, by plaintiff Comprehensive Investment Services, Inc. against certain of our former officers and directors, and certain of our underwriters in the U.S. District Court for the Southern District of Texas. On July 7, 2009, this case was transferred to the Southern District of New York for coordination with *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. Plaintiff filed an amended complaint on May 11, 2011 against us, certain of our former officers, and certain of our underwriters. The amended complaint alleges violations of Section  0(b) of the Securities Exchange Act of  934 and Rule  0b 5 promulgated thereunder; violations of Section 20(a) of the Securities Exchange Act of 1934; and violations of the Texas Business and Commerce Code, common law fraud, and negligent misrepresentation in connection with Fannie Mae's May 2008 $2 0 billion offering of 8 25% non cumulative preferred Series T stock  Plaintiff seeks relief in the form of rescission, actual damages, punitive damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. On July 11, 2011, defendants filed motions to dismiss the amended complaint  On February 1, 2012, plaintiff sought leave to amend its complaint to add new factual allegations and the court granted plaintiff's motion. Plaintiff filed an amended complaint on March 2, 2012. On April 4, 2012, defendants filed motions to dismiss the amended complaint.

153

Table of Contents

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS    (Continued)**
**(UNAUDITED)**

Given the preliminary stage of this lawsuit, the absence of a specified demand or claim by the plaintiff, and the substantial and novel legal questions that remain, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation

_Smith v. Fannie Mae, et al._

This individual securities action was originally filed on February 25, 2010, by plaintiff Edward Smith against Fannie Mae and certain of its former officers as well as several underwriters in the U.S. District Court for the Central District of California. On April 12, 2010, this case was transferred to the Southern District of New York for coordination with _In re Fannie Mae 2008 Securities Litigation_ and _In re 2008 Fannie Mae ERISA Litigation_. Plaintiff filed an amended complaint on April 19, 2011, which alleges violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b 5 promulgated thereunder; violations of Section 20(a) of the Securities Exchange Act of 1934; common law fraud and negligence claims; and California state law claims for misrepresentation in connection with Fannie Mae's December 2007 $7 0 billion offering of 7 75% fixed to floating rate non cumulative preferred Series S stock. Plaintiff seeks relief in the form of rescission, actual damages (including interest), and exemplary and punitive damages. On February 1, 2012, plaintiff sought leave to amend his complaint to add new factual allegations and the court granted plaintiff's motion  Plaintiff filed an amended complaint on March 2, 2012. On April 4, 2012, defendants filed motions to dismiss the amended complaint.

Given the preliminary stage of this lawsuit, the absence of a specified demand or claim by the plaintiff, and the substantial and novel legal questions that remain, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation

_Transfer Tax Litigation_

Seven lawsuits have been filed against us in four states challenging our right to claim an exemption under our charter from transfer taxes in connection with the recordation of deeds upon transfers of real property by sale or foreclosure  The plaintiff in one of these lawsuits seeks to represent a nationwide class of localities  If these lawsuits are decided against us, we may be required to pay past transfer taxes, damages, fees and/or costs  Although we believe that our charter provides us with an exemption from these taxes and therefore we have a valid defense in these lawsuits, in March 2012 a federal district court in Michigan held in two cases that we are not exempt from Michigan transfer taxes under our charter  We plan to appeal these two Michigan decisions  We believe that none of these seven lawsuits are likely to have a material impact on our business, either individually or in the aggregate; however, these lawsuits may lead to additional lawsuits relating to the more than thirty states that impose these taxes  We are currently unable to estimate the reasonably possible loss or range of losses arising from these lawsuits given the following factors: (a) taxing authorities may conclude that our charter provides us with an exemption from these taxes, (b) existing opinions from taxing authorities in some jurisdictions may preclude retroactive collection, (c) no plaintiff has demanded a stated amount of damages, and (d) the scope of permissible claims has not yet been determined in any jurisdiction

154

Table of Contents

**Item 3.    Quantitative and Qualitative Disclosures about Market Risk**

Information about market risk is set forth in "MD&A    Risk Management    Market Risk Management, Including Interest Rate Risk Management "

**Item 4.    Controls and Procedures**

**Overview**

We are required under applicable laws and regulations to maintain controls and procedures, which include disclosure controls and procedures as well as internal control over financial reporting, as further described below

**Evaluation of Disclosure Controls and Procedures**

*Disclosure Controls and Procedures*

Disclosure controls and procedures refer to controls and other procedures designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission ("SEC")  Disclosure controls and procedures include, without limitation, controls and procedures designed to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding our required disclosure  In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management was required to apply its judgment in evaluating and implementing possible controls and procedures

*Evaluation of Disclosure Controls and Procedures*

As required by Rule 13a 15 under the Exchange Act, management has evaluated, with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures as in effect as of March 31, 2012, the end of the period covered by this report  As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective at a reasonable assurance level as of March 31, 2012 or as of the date of filing this report

Our disclosure controls and procedures were not effective as of March 31, 2012 or as of the date of filing this report because they did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws  As a result, we were not able to rely upon the disclosure controls and procedures that were in place as of March 31, 2012 or as of the date of this filing, and we continue to have a material weakness in our internal control over financial reporting  This material weakness is described in more detail below under "Description of Material Weakness." Based on discussions with FHFA and the structural nature of the weakness in our disclosure controls and procedures, it is likely that we will not remediate this material weakness while we are under conservatorship

**Description of Material Weakness**

The Public Company Accounting Oversight Board's Auditing Standard No  5 defines a material weakness as a deficiency or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis

155

Table of Contents

Management has determined that we continued to have the following material weakness as of March 3 , 20 2 and as of the date of filing this report:

- *Disclosure Controls and Procedures.* We have been under the conservatorship of FHFA since September 6, 2008  Under the 2008 Reform Act, FHFA is an independent agency that currently functions as both our conservator and our regulator with respect to our safety, soundness and mission  Because of the nature of the conservatorship under the 2008 Reform Act, which places us under the "control" of FHFA (as that term is defined by securities laws), some of the information that we may need to meet our disclosure obligations may be solely within the knowledge of FHFA  As our conservator, FHFA has the power to take actions without our knowledge that could be material to our shareholders and other stakeholders, and could significantly affect our financial performance or our continued existence as an ongoing business  Although we and FHFA attempted to design and implement disclosure policies and procedures that would account for the conservatorship and accomplish the same objectives as a disclosure controls and procedures policy of a typical reporting company, there are inherent structural limitations on our ability to design, implement, test or operate effective disclosure controls and procedures  As both our regulator and our conservator under the 2008 Reform Act, FHFA is limited in its ability to design and implement a complete set of disclosure controls and procedures relating to Fannie Mae, particularly with respect to current reporting pursuant to Form 8 K  Similarly, as a regulated entity, we are limited in our ability to design, implement, operate and test the controls and procedures for which FHFA is responsible

  Due to these circumstances, we have not been able to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our condensed consolidated financial statements  As a result, we did not maintain effective controls and procedures designed to ensure complete and accurate disclosure as required by GAAP as of March 31, 2012 or as of the date of filing this report  Based on discussions with FHFA and the structural nature of this weakness, it is likely that we will not remediate this material weakness while we are under conservatorship.

## Mitigating Actions Relating to Material Weakness

As described above under "Description of Material Weakness," we continue to have a material weakness in our internal control over financial reporting relating to our disclosure controls and procedures  However, we and FHFA have engaged in the following practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the conservator

- We have provided drafts of our SEC filings to FHFA personnel for their review and comment prior to filing  We also have provided drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release

- FHFA personnel, including senior officials, have reviewed our SEC filings prior to filing, including this quarterly report on Form 10 Q for the quarter ended March 31, 2012 ("First Quarter 2012 Form 10 Q"), and engaged in discussions regarding issues associated with the information contained in those filings  Prior to filing our First Quarter 20 2 Form  0 Q, FHFA provided Fannie Mae management with a written acknowledgement that it had reviewed the First Quarter 2012 Form 10 Q, and it was not aware of any material misstatements or omissions in the First Quarter 2012 Form 10 Q and had no objection to our filing the First Quarter 2012 Form 10 Q

- The Acting Director of FHFA and our Chief Executive Officer have been in frequent communication, typically meeting on at least a bi weekly basis

- FHFA representatives attend meetings frequently with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, credit and market risk management, external communications and legal matters

156

Table of Contents

- Senior officials within FHFA's Office of the Chief Accountant have met frequently with our senior finance executives regarding our accounting policies, practices and procedures

**Changes in Internal Control over Financial Reporting**

*Overview*

Management has evaluated, with the participation of our Chief Executive Officer and Chief Financial Officer, whether any changes in our internal control over financial reporting that occurred during our last fiscal quarter have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting  Below we describe changes in our internal control over financial reporting since December 3 , 20   that management believes have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting

*Change in Management*

In the first quarter of 2012, Michael J  Williams, our President and Chief Executive Officer, announced that he will step down from his position when our Board of Directors names a successor

157

Table of Contents

## PART II   OTHER INFORMATION

### Item 1.   Legal Proceedings

The information in this item supplements and updates information regarding certain legal proceedings set forth in "Legal Proceedings" in our 2011 Form 10 K  We also provide information regarding material legal proceedings in "Note  3, Commitments and Contingencies," which is incorporated herein by reference  In addition to the matters specifically described or incorporated by reference in this item, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that do not have a material impact on our business  Litigation claims and proceedings of all types are subject to many factors that generally cannot be predicted accurately

We record reserves for legal claims when losses associated with the claims become probable and the amounts can be reasonably estimated  The actual costs of resolving legal claims may be substantially higher or lower than the amounts reserved for those claims  For matters where the likelihood or extent of a loss is not probable or cannot be reasonably estimated, we do not recognize in our condensed consolidated financial statements the potential liability that may result from these matters  We presently cannot determine the ultimate resolution of the matters described below or incorporated by reference into this item or in our 20   Form   0 K  We have recorded a reserve for legal claims related to those matters when we were able to determine a loss was both probable and reasonably estimable  If certain of these matters are determined against us, it could have a material adverse effect on our results of operations, liquidity and financial condition, including our net worth

#### *Shareholder Derivative Litigation*

Three shareholder derivative cases were filed at various times between June 2007 and June 2008 naming certain of our current and former directors and officers as defendants, and Fannie Mae as a nominal defendant  These cases were pending before the U S  Court of Appeals for the District of Columbia Circuit: *Kellmer v. Raines, et al.* (filed June 29, 2007); *Middleton v. Raines, et al.* (filed July 6, 2007); and *Agnes v. Raines, et al.* (filed June 25, 2008). The cases relied on factual allegations that Fannie Mae's accounting statements were inconsistent with the GAAP requirements relating to hedge accounting and the amortization of premiums and discounts.  *Agnes* relied on factual allegations that defendants wrongfully failed to disclose our exposure to the subprime mortgage crisis and that the Board improperly authorized the company to buy back $100 million in shares while the stock price was artificially inflated  Plaintiffs sought, on behalf of Fannie Mae, various forms of monetary and non monetary relief, including unspecified money damages (including restitution, legal fees and expenses, disgorgement and punitive damages); corporate governance changes; an accounting; and attaching, impounding or imposing a constructive trust on the individual defendants' assets.

Pursuant to a June 25, 2009 order, FHFA, as our conservator, substituted itself for shareholder plaintiffs in all of these actions. On July 27, 2010, the U.S. District Court for the District of Columbia dismissed *Kellmer* and *Middleton* with prejudice and *Agnes* without prejudice  FHFA filed motions to reconsider the decisions dismissing *Kellmer* and *Middleton* with prejudice, and those motions were denied on October 22, 20  0  FHFA appealed that denial on November 22, 2010. Plaintiffs Kellmer and Agnes also appealed the substitution and the dismissal orders. On January 20, 2011, the U.S. Court of Appeals for the District of Columbia Circuit issued an order in the *Kellmer* appeal granting FHFA's motions for the voluntary dismissal of defendants Kenneth M. Duberstein, Frederic Malek and Patrick Swygert. On that same day, in the *Middleton* appeal, the Court of Appeals issued an order granting FHFA's motions for the voluntary dismissal of defendants Stephen Ashley, Kenneth Duberstein, Thomas Gerrity, Ann Korologos, Frederic Malek, Donald Marron, Anne Mulcahy, Joe Pickett, Leslie Rahl, Patrick Swygert, and John Wulff. On March 30, 2012, the Court of Appeals affirmed the orders allowing FHFA to substitute itself for shareholder plaintiffs Kellmer and Agnes  Also, the Court of Appeals reversed the district court's dismissal with prejudice of the *Kellmer* and *Middleton* actions, and remanded with instructions for dismissal without prejudice.

#### *FHFA Private-Label Mortgage-Related Securities Litigation*

In the third quarter of 2011, FHFA, as conservator for us and for Freddie Mac, filed 16 lawsuits on behalf of us and Freddie Mac against various financial institutions, their officers and affiliated and unaffiliated underwriters

158

Table of Contents

who were responsible for marketing and selling private label mortgage related securities to us  The lawsuits seek to recover losses we and Freddie Mac incurred on the securities. FHFA filed 13 of these lawsuits in the U.S. District Court for the Southern District of New York   against Bank of America Corp.; Barclays Bank PLC; Citigroup, Inc.; Credit Suisse Holdings (USA), Inc.; Deutsche Bank AG; First Horizon National Corporation; Goldman, Sachs & Co.; HSBC North America Holdings Inc.; JPMorgan Chase & Co.; Merrill Lynch & Co.; Nomura Holding America Inc.; SG Americas, Inc.; and UBS Americas Inc. ("UBS") and against certain related entities and individuals. Two lawsuits   against Countrywide Financial Corporation ("Countrywide") and Morgan Stanley   were filed in the Supreme Court of the State of New York for the County of New York, and one   against The Royal Bank of Scotland Group PLC ("RBS")   was filed in the U.S. District Court for the District of Connecticut. The lawsuit against UBS was filed on July 27, 2011, and all the others were filed on September 2, 2011  The lawsuits allege that the defendants violated federal securities laws and state common law by making material misstatements and omissions in the offering documents for the securities that were sold to Fannie Mae and Freddie Mac regarding the characteristics of the loans underlying the securities  The complaints also allege state securities law violations and some allege common law fraud  The complaints seek, among other things, rescission and recovery of consideration paid for the securities at issue in the lawsuits, monetary damages and, in certain cases, punitive damages for common law fraud.

Defendants in the two cases filed in New York state court removed those cases to the U S  District Court for the Southern District of New York and FHFA filed motions to remand the cases back to state court  On February 7, 2012, the Joint Panel on Multidistrict Litigation transferred the Countrywide case to the U S  District Court for the Central District of California for inclusion in a multidistrict proceeding involving other actions pending against Countrywide  On April 6, 2012, the court denied FHFA's motion to remand the Countrywide case

On November 16, 2011, all of the cases pending in the Southern District of New York were transferred to one judge in the district, Judge Cote  The court stayed the time to answer or move to dismiss all of the cases except the UBS case  On December 21, 2011, FHFA filed an amended complaint in the UBS case. On January 20, 2012, defendants in the UBS case filed a motion to dismiss the amended complaint. On May 4, 2012, the court denied defendants' motion to dismiss in the UBS case with respect to the federal and state securities law claims and granted defendants' motion to dismiss with respect to the negligent misrepresentation claim

On February 1, 2012, FHFA filed an amended complaint in the RBS case. On March  2, 2012, defendants in the RBS case filed a motion to dismiss the amended complaint

## Item 1A.    Risk Factors

In addition to the information in this report, you should carefully consider the risks relating to our business that we identify in "Risk Factors" in our 2011 Form 10 K  This section supplements and updates that discussion  For a complete understanding of the subject, you should read both together  Please also refer to "MD&A   Risk Management" in this report and in our 2011 Form 10 K for more detailed descriptions of the primary risks to our business and how we seek to manage those risks

The risks we face could materially adversely affect our business, results of operations, financial condition, liquidity and net worth, and could cause our actual results to differ materially from our past results or the results contemplated by forward looking statements contained in this report  However, these are not the only risks we face  In addition to the risks we discuss below, we face risks and uncertainties not currently known to us or that we currently believe are immaterial

***Our business and results of operations may be materially adversely affected if we are unable to retain and hire qualified employees.***

Our business processes are highly dependent on the talents and efforts of our employees  The conservatorship, the uncertainty of our future, limitations on employee compensation, the heightened scrutiny of our actions by Congress and regulators and the working environment created thereby, and negative publicity concerning the GSEs have had and are likely to continue to have an adverse effect on our ability to retain and recruit well qualified employees  We have already had significant departures by various members of executive

159

Table of Contents

management since shortly before we entered into conservatorship in September 2008, including two Chief Executive Officers and three Chief Financial Officers  In addition, in January 2012, our current Chief Executive Officer announced that he will step down from his position when our Board of Directors names a successor  Further turnover in key management positions and challenges in integrating new management could harm our ability to manage our business effectively and ultimately adversely affect our financial performance

Actions taken by Congress, FHFA and Treasury to date, or that may be taken by them or other government agencies in the future, may have an adverse effect on the retention and recruitment of senior executives, management, and other valuable employees  We are subject to significant restrictions on the amount and type of compensation we may pay our executives and other employees under conservatorship  For example, in April 2012, the STOCK Act was enacted, which includes a provision that prohibits senior executives at Fannie Mae and Freddie Mac from receiving bonuses during any period of conservatorship on or after the date of enactment of the law  In addition, FHFA has directed us to maintain individual salaries and wage rates for all employees at 20 0 levels for 20   and 20 2 (except in the case of promotions or significant changes in responsibilities)  We are also unable to offer equity based compensation

Congress has also considered other legislation that would alter the compensation for Fannie Mae and Freddie Mac employees  In 20  , the Financial Services Committee of the House of Representatives approved a bill that would put our employees on a federal government pay scale  If this or similar legislation were to become law, our employees could experience a sudden and sharp decrease in compensation  The Acting Director of FHFA stated on November  5, 20   that this "would certainly risk a substantial exodus of talent, the best leaving first in many instances. [Fannie Mae and Freddie Mac] likely would suffer a rapidly growing vacancy list and replacements with lesser skills and no experience in their specific jobs. A significant increase in safety and soundness risks and in costly operational failures would, in my opinion, be highly likely " The Acting Director observed, "Should the risks I fear materialize, FHFA might well be forced to limit [Fannie Mae and Freddie Mac's] business activities      Some of the business [Fannie Mae and Freddie Mac] would be unable to undertake might simply not occur, with potential disruption in housing markets and the economy."

We face competition from within the financial services industry and from businesses outside of the financial services industry for qualified employees  Additionally, an improving economy is likely to put additional pressures on turnover, as attractive opportunities become available to our employees  Our competitors for talent are able to provide market based compensation and to link employees' pay to performance  The constraints on our compensation could adversely affect our ability to attract qualified candidates  While we engage in succession planning for our senior management and other critical positions and have been able to fill a number of important positions internally, our inability to offer market based compensation may limit our ability to attract and retain qualified employees below the senior executive level that could fill our senior executive level positions if there is further turnover

If we are unable to retain, promote and attract employees with the necessary skills and talent, we would face increased risks for operational failures  Our ability to conduct our business and our results of operations would likely be materially adversely affected

***We expect our operational risk to increase as a result of recent FHFA and Congressional directives.***

We recently have been directed by FHFA and Congress to take specified actions that present significant operational challenges for us  We believe that implementing these directives will increase our operational risk and may potentially result in one or more significant deficiencies or material weaknesses in our internal control over financial reporting in a future period

As described in "Business   Legislative and Regulatory Developments   Changes to Our Single Family Guaranty Fee Pricing" in our 2011 Form 10 K, in December 2011, Congress enacted the Temporary Payroll Tax Cut Continuation Act of 2011 which, among other provisions, requires that we increase our single family guaranty fees by at least 10 basis points and remit the additional revenue to Treasury  In addition, as described in "Legislative and Regulatory Developments   FHFA Advisory Bulletin Regarding Framework for Adversely Classifying Loans," in April 2012, FHFA issued supervisory guidance requiring that we change our method of accounting for delinquent loans  Each of these directives creates significant operational burdens and costs for us

160

Table of Contents

We are also currently working on implementing a number of other FHFA initiatives that may increase our operational burdens and our costs, including those described in "Executive Compensation   Compensation Discussion and Analysis   2012 Executive Compensation Program   2012 Corporate Performance Objectives" of our 2011 Form 10 K/A

While implementation of each individual directive creates operational challenges, implementing multiple directives significantly increases these challenges  Implementing these directives requires a substantial time commitment from management and the employees responsible for implementing the changes, which could adversely affect our ability to retain these employees  In addition, some of these directives require significant changes to our accounting methods and systems  Due to the operational complexity associated with these changes and the limited time periods for implementing them, we believe there is a significant risk that implementing these changes may result in one or more significant deficiencies or material weaknesses in our internal control over financial reporting in a future period  If this were to occur, we could experience material errors in our reported financial results

In addition to the directives described above, FHFA, other agencies of the U S  government or Congress may direct us to take additional actions in the future that could further increase our operational risk  For example, FHFA may require us to change our accounting policies to align more closely with those of Freddie Mac or we may be required to implement a principal forgiveness program

***Changes in accounting standards and policies can be difficult to predict and can materially impact how we record and report our financial results.***

Our accounting policies and methods are fundamental to how we record and report our financial condition and results of operations  From time to time, the FASB, the SEC or FHFA changes the financial accounting and reporting standards or the policies that govern the preparation of our financial statements  These changes can be difficult to predict and expensive to implement, and can materially impact how we record and report our financial condition and results of operations  We could be required to apply new or revised guidance retrospectively, which may result in the revision of prior period financial statements by material amounts  The implementation of new or revised accounting guidance could have a material adverse effect on our net worth and result in or contribute to the need for additional draws from Treasury under the senior preferred stock purchase agreement

In addition, FHFA may require us to change our accounting policies to align more closely with those of Freddie Mac  FHFA may also require that we and Freddie Mac have the same independent public accounting firm  Either of these events could significantly increase our expenses and require a substantial amount of management's attention

***Given the deteriorated credit quality of many of our mortgage insurer counterparties, we may incur losses as a result of claims under our mortgage insurance policies not being paid in full or at all, and we may face business disruptions and increased concentration risk.***

We rely heavily on mortgage insurers to provide insurance against borrower defaults on single family conventional mortgage loans with LTV ratios over 80% at the time of acquisition  The already weak financial condition of many of our mortgage insurer counterparties continued to deteriorate in the first quarter of 2012, which increased the risk that these counterparties will fail to fulfill their obligations to pay our claims under insurance policies

As of May 9, 2012, three of our mortgage insurance counterparties   Triad, RMIC and PMI   have publicly disclosed that they are in run off  A mortgage insurer that is in run off continues to collect premiums on its existing insurance business, but no longer writes new insurance. This increases the risk that the mortgage insurer will fail to pay our claims under insurance policies, and could also cause the quality and speed of its claims processing to deteriorate  Triad, RMIC and PMI are currently paying only a portion of policyholder claims and deferring the remaining portion. As of May 9, 2012, Triad is paying only 60% of claims under its mortgage guaranty insurance policies and deferring the remaining 40%, and both PMI and RMIC are paying 50% of claims and deferring the remaining 50%  It is uncertain when, or if, regulators for Triad, RMIC or PMI will allow deferred policyholder claims to be paid or increase the amount paid on claims. In addition, PMI has publicly disclosed that it is in receivership.

161

Table of Contents

In addition to our three mortgage insurers in run off, one mortgage insurer, Genworth, is currently operating pursuant to a waiver it received from its regulator of the state regulatory capital requirements applicable to its main insurance writing entity  An additional two of our mortgage insurance counterparties (MGIC and Radian) have disclosed that, in the absence of additional capital contributions to their insurance writing entity, their capital might fall below state regulatory capital requirements in the future  These three mortgage insurers, together with our three mortgage insurers in run off, provided a combined $73 3 billion, or 80%, of our risk in force mortgage insurance coverage of our single family guaranty book of business as of March 31, 2012  We do not know how long certain of our mortgage insurer counterparties will remain below their state imposed risk to capital limits  If mortgage insurers are not able to raise capital and they exceed their risk to capital limits, they will likely be forced into run off or receivership unless they can secure and maintain waivers from their state regulators

Some mortgage insurers have explored corporate restructurings, which are intended to provide relief from risk to capital limits in certain states  A restructuring plan that would involve contributing capital to a subsidiary would result in less liquidity available to its parent company to pay claims on its existing book of business and an increased risk that its parent company will not pay its claims in full in the future.

Our loss reserves take into account our assessment of our mortgage insurer counterparties' ability to fulfill their obligations to us  If our assessment of their ability to pay claims deteriorates significantly, it could result in a significant increase in our loss reserves and our credit losses

Many mortgage insurers stopped insuring new mortgages with higher LTV ratios or with lower borrower FICO credit scores or on select property types  As our charter generally requires us to obtain credit enhancement on single family conventional mortgage loans with loan to value ratios over 80% at the time of purchase, an inability to find suitable credit enhancement may inhibit our ability to pursue new business opportunities, meet our housing goals and otherwise support the housing and mortgage markets  For example, where mortgage insurance or other credit enhancement is not available, we may be hindered in our ability to refinance loans into more affordable loans  In addition, access to fewer mortgage insurer counterparties will increase our concentration risk with the remaining mortgage insurers in the industry

### Changes in the mortgage industry may negatively impact our business.

A number of our largest mortgage seller/servicer counterparties have reduced or eliminated their purchases of mortgage loans from mortgage brokers and correspondent lenders  As a result, we are acquiring an increasing portion of our business volume directly from smaller financial institutions that may not have the same financial strength as our largest counterparties  Our top five lender customers in terms of single family business acquisition volume, in the aggregate, accounted for approximately 54% of our single family business acquisition volume in the first quarter of 2012, compared with approximately 65% of our single family business acquisition volume in the first quarter of 2011  In addition, only three of our top five lender customers for the first quarter of 2011 remained in our top five for the first quarter of 2012  Similarly, some of our servicing volume is shifting to smaller or non traditional servicers  Our ten largest single family mortgage servicers, including their affiliates, serviced 74% of our single family guaranty book of business as of March 31, 2012, compared to 76% as of March 31, 2011. These smaller servicers may not have the same financial strength or operational capacity as our largest servicers, which could negatively affect their ability to service the loans on our behalf or to satisfy their repurchase or compensatory fee obligations  This decrease in the concentration of our business with large institutions could increase both our institutional counterparty credit risk and our mortgage credit risk, and could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.

### If we become subject to state and local taxes on the transfer of real property in a large number of states, it would increase our costs going forward and could have an adverse effect on our financial results.

As of May 9, 2012, seven lawsuits have been filed against us in four states challenging our right to claim an exemption under our charter from transfer taxes in connection with the recordation of deeds upon transfers of real property by sale or foreclosure  The plaintiff in one of these lawsuits seeks to represent a nationwide class of localities  If these lawsuits are decided against us, we may be required to pay past transfer taxes, damages, fees and/or costs  In addition, we would be subject to payment of transfer taxes in these states going forward, which

162

Table of Contents

would increase our costs  Although we believe that our charter provides us with an exemption from these taxes and therefore we have a valid defense in these lawsuits, in March 2012, a federal district court in Michigan held in two cases that we are not exempt from Michigan transfer taxes under our charter  We plan to appeal these two Michigan decisions

More than thirty states impose a tax on the transfer of real property by sale or foreclosure  Accordingly, additional lawsuits relating to state or local transfer taxes could be filed against us in the future  Also, various state taxing authorities from other jurisdictions could seek to impose these transfer taxes  If we were to become subject to real property transfer taxes in a large number of states and localities, and if we were required to pay a number of years of past transfer taxes in these states and localities, it would increase our costs going forward and could have an adverse effect on our financial results

## Item 2.   Unregistered Sales of Equity Securities and Use of Proceeds

### Recent Sales of Unregistered Securities

Under the terms of our senior preferred stock purchase agreement with Treasury, we are prohibited from selling or issuing our equity interests, other than as required by (and pursuant to) the terms of a binding agreement in effect on September 7, 2008, without the prior written consent of Treasury

We previously provided stock compensation to employees and members of the Board of Directors under the Fannie Mae Stock Compensation Plan of 1993 and the Fannie Mae Stock Compensation Plan of 2003 (the "Plans"). During the quarter ended March 31, 2012, 40,786 restricted stock units vested, as a result of which 26,989 shares of common stock were issued, and 13,797 shares of common stock that otherwise would have been issued were withheld by us in lieu of requiring the recipients to pay us the withholding taxes due upon vesting  All of these restricted stock units were granted prior to our entering into conservatorship  Restricted stock units granted under the Plans typically vest in equal annual installments over three or four years beginning on the first anniversary of the date of grant  Each restricted stock unit represents the right to receive a share of common stock at the time of vesting  As a result, restricted stock units are generally similar to restricted stock, except that restricted stock units do not confer voting rights on their holders  All restricted stock units were granted to persons who were employees or members of the Board of Directors of Fannie Mae

The securities we issue are "exempted securities" under laws administered by the SEC to the same extent as securities that are obligations of, or are guaranteed as to principal and interest by, the United States, except that, under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Federal Housing Finance Regulatory Reform Act of 2008 (together, the "GSE Act"), our equity securities are not treated as exempted securities for purposes of Section 12, 13, 14 or 16 of the Exchange Act  As a result, our securities offerings are exempt from SEC registration requirements and we do not file registration statements or prospectuses with the SEC under the Securities Act of  933 with respect to our securities offerings

### Information about Certain Securities Issuances by Fannie Mae

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off balance sheet arrangement  The disclosure must be made in a current report on Form 8 K under Item 2 03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Because the securities we issue are exempted securities under the Securities Act of  933, we do not file registration statements or prospectuses with the SEC with respect to our securities offerings  To comply with the disclosure requirements of Form 8 K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars or prospectuses (or supplements thereto) that we post on our Web site or in a current report on Form 8 K that we file with the SEC, in accordance with a "no action" letter we received from the SEC staff in 2004  In cases where the information is disclosed in a prospectus or offering circular posted on our Web site, the document will be posted on our Web site within the same time period that a prospectus for a non exempt securities offering would be required to be filed with the SEC

Table of Contents

The Web site address for disclosure about our debt securities is www fanniemae com/debtsearch  From this address, investors can access the offering circular and related supplements for debt securities offerings under Fannie Mae's universal debt facility, including pricing supplements for individual issuances of debt securities

Disclosure about our obligations pursuant to some of the MBS we issue, some of which may be off balance sheet obligations, can be found at www.fanniemae.com/mbsdisclosure. From this address, investors can access information and documents about our MBS, including prospectuses and related prospectus supplements.

We are providing our Web site address solely for your information  Information appearing on our Web site is not incorporated into this report

### Our Purchases of Equity Securities

The following table displays shares of our common stock we repurchased during the first quarter of 2012.

| Period | Total Number of Shares Purchased[1] | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program[2] | Maximum Number of Shares that May Yet be Purchased Under the Program[2] |
|---|---|---|---|---|
| **2012** | | | | |
| January 1 31 | 169,738 | $  0 23 | | |
| February 1 29 | 82 | 0.21 | | |
| March 1 31 | | | | |
| Total | 169,820 | | | |

[1]  Consists of shares of common stock reacquired from employees to pay an aggregate of $38,386 in withholding taxes due upon the vesting of previously issued restricted stock.

[2]  We do not have any publicly announced share repurchase programs under which we could purchase our common stock.

### Dividend Restrictions

Our payment of dividends is subject to the following restrictions:

*Restrictions Relating to Conservatorship.*    Our conservator announced on September 7, 2008 that we would not pay any dividends on the common stock or on any series of preferred stock, other than the senior preferred stock  In addition, FHFA's regulations relating to conservatorship and receivership operations, which became effective July 20, 2011, prohibit us from paying any dividends while in conservatorship unless authorized by the Director of FHFA  The Acting Director of FHFA directs us to make dividend payments on the senior preferred stock on a quarterly basis

*Restrictions under Senior Preferred Stock Purchase Agreement.*    The senior preferred stock purchase agreement prohibits us from declaring or paying any dividends on Fannie Mae equity securities (other than the senior preferred stock) without the prior written consent of Treasury

*Statutory Restrictions.*    Under the GSE Act, FHFA has authority to prohibit capital distributions, including payment of dividends, if we fail to meet our capital requirements  If FHFA classifies us as significantly undercapitalized, approval of the Director of FHFA is required for any dividend payment  Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized, except the Director of FHFA may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition

*Restrictions Relating to Qualifying Subordinated Debt.*    During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock.

164

TREASURY-3511

Table of Contents

*Restrictions Relating to Preferred Stock.*   Payment of dividends on our common stock is also subject to the prior payment of dividends on our preferred stock and our senior preferred stock  Payment of dividends on all outstanding preferred stock, other than the senior preferred stock, is also subject to the prior payment of dividends on the senior preferred stock

**Item 3.   Defaults Upon Senior Securities**

None

**Item 4.   Mine Safety Disclosures**

None

**Item 5.   Other Information**

None

**Item 6.   Exhibits**

An index to exhibits has been filed as part of this report beginning on page E    and is incorporated herein by reference

165

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized

Federal National Mortgage Association

By:  /s/   Michael J. Williams
     Michael J  Williams
     President and Chief Executive Officer

Date: May 9, 2012

By:  /s/   Susan R. McFarland
     Susan R. McFarland
     Executive Vice President and
     Chief Financial Officer

Date: May 9, 2012

166

Table of Contents

## INDEX TO EXHIBITS

| Item | Description |
|------|-------------|
| 3.1 | Fannie Mae Charter Act (12 U S C  § 1716 et seq ) as amended through July 30, 2008 (Incorporated by reference to Exhibit 3 1 to Fannie Mae's Annual Report on Form 10 K, filed February 24, 2011 ) |
| 3.2 | Fannie Mae Bylaws, as amended through January 30, 2009 (Incorporated by reference to Exhibit 3 2 to Fannie Mae's Annual Report on Form 10 K for the year ended December 31, 2008, filed February 26, 2009 ) |
| 0 43 | Termination Agreement and General Release, effective as of February 28, 2012, by and between David C  Hisey and Fannie Mae |
| 0 44 | Repayment Provisions For SEC Executive Officers, amended and restated as of March 8, 2012 |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule  3a  4(a) |
| 31.2 | Certification of Chief Financial Officer pursuant to Securities Exchange Act Rule  3a  4(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U S C  Section 1350 |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101.INS | XBRL Instance Document* |
| 101.SCH | XBRL Taxonomy Extension Schema* |
| 101.LAB | XBRL Taxonomy Extension Labels* |
| 0  PRE | XBRL Taxonomy Extension Presentation* |
| 101 DEF | XBRL Taxonomy Extension Definition* |

\* The financial information contained in these XBRL documents is unaudited  The information in these exhibits shall not be deemed "filed" for purposes of Section  8 of the Securities Exchange Act of  934, or otherwise subject to the liabilities of Section  8, nor shall they be deemed incorporated by reference into any disclosure document relating to Fannie Mae, except to the extent, if any, expressly set forth by specific reference in such filing

E

Table of Contents



**FR010**

Exhibit 10.43

**CONFIDENTIAL**
**TERMINATION AGREEMENT AND GENERAL RELEASE**

This AGREEMENT AND GENERAL RELEASE (the "Agreement"), dated February 17, 2012, is made and entered into by and between David C. Hisey, ("you" or "Hisey") and Fannie Mae (collectively, the "Parties")

WHEREAS, you have been an at will employee employed by Fannie Mae as Executive Vice President and Deputy Chief Financial Officer; and

WHEREAS, you have been informed that due to corporate changes, your position will be eliminated and your employment will terminate on Friday, February 24, 2012 (your "Termination Date")  You will continue to perform the duties of your position through your Termination Date, including, without limitation, providing support to Fannie Mae's Chief Financial Officer

NOW, THEREFORE, in consideration of the mutual promises, covenants and undertakings as set forth in this Agreement, the sufficiency of which the Parties acknowledge, the Parties agree as follows:

1. <u>Fannie Mae Consideration</u>  In exchange for your promises, covenants and undertakings made in this Agreement, and contingent upon your execution of and compliance with the terms of this Agreement and your return of all Fannie Mae property, Fannie Mae will provide you with the following consideration:

(a) *Payments*: Following your Termination Date, you will receive cash payments totaling Nine Hundred Sixty six Thousand, Six Hundred Twenty five dollars ($966,625.00), which will be paid to you in three equal installments of Two Hundred Forty one Thousand, Six Hundred Fifty six dollars ($241,656.00), and one installment of Two Hundred Forty one Thousand, Six Hundred Fifty seven dollars ($241,657.00). The four cash payments represent each of your quarterly 20   Deferred pay targets, with 50% of each target payment adjusted for 20   corporate performance  You are not eligible for, and you will not receive, any other Deferred Pay, compensation, or Long term Incentives, and you will not receive any payments other than the payments expressly provided for in this Paragraph 1(a)  The amounts to be paid under this Paragraph 1(a) will be made at the same time other 2011 Deferred pay recipients receive their quarterly payouts in 2012, unless the payments to be made to you are required to be paid at another time pursuant to Paragraph 15(f) of this Agreement

(b) *Outplacement*  You may receive officer level outplacement services with an estimated value of eighteen thousand dollars ($  8,000) from a firm chosen by Fannie Mae  The outplacement services must be used within twelve (12) months from the Termination Date and fees will be paid directly to the outplacement vendor  You may not receive cash in lieu of such outplacement services; and

(c) *COBRA Assistance*  If you elect to continue your medical and/or dental coverage under COBRA, Fannie Mae will pay a portion of the premium for up to eighteen (  8) months from the Termination Date  You agree to notify Fannie Mae promptly if you become eligible for another

*David C. Hisey*
*February 17, 2012*
*Page 2 of 7*

comparable group plan during this eighteen month period  If you do become so eligible, Fannie Mae will cease its COBRA assistance to you and you agree to reimburse Fannie Mae for any payments made by Fannie Mae when you were eligible for such other comparable group plan, but before you provided the required notice to Fannie Mae  During the period covered by this Paragraph 1(c), you will pay the portion of the premium in the amount that you would have paid as an active employee, and Fannie Mae will pay the remainder of the premium  To activate coverage, you must timely complete and return the COBRA forms, which will be forwarded to you separately  If you fail to timely complete and return the COBRA forms you may lose your eligibility for COBRA coverage

2. <u>Effective Date</u>  This Agreement will become effective and enforceable on the date you sign it (the "Effective Date"), unless you timely revoke it in accordance with Paragraph 13, below  You will have twenty one (21) calendar days in which to consider, sign, and return this Agreement to Judith C  Dunn, Fannie Mae's Senior Vice President and Principal Deputy General Counsel  Your 2   day consideration period will begin on the day after you receive this Agreement  Your signed Agreement will not be accepted if it is not returned on time

3  <u>Sufficient Consideration</u>  You agree that, absent your entry into, and compliance with, this Agreement, you would not be entitled to the consideration set forth in Paragraphs 1(a) through 1(c), above  Among other requirements for the payment of 2011 Deferred Pay, you understand that, absent this Agreement you would be required to be employed at the time of payment and therefore you would be ineligible for such payments  The consideration to be provided to you under this Agreement is solely in exchange for your promises in this Agreement, including your release of claims, and represents consideration to which you are otherwise not entitled

4  <u>Vacation Pay/Benefits</u>. After your Termination Date, Fannie Mae will pay you a lump sum, less legally required deductions, for any accrued and unused vacation leave you may have under Fannie Mae policy  You will not be paid for any unused carryover leave  You will also receive all other benefits you are already entitled to as a result of your employment with Fannie Mae

5. <u>Release of Claims</u>. You unconditionally release, waive, settle and forever discharge any and all suits, actions, and claims, known and unknown (including claims for damages, attorneys fees, expenses and/or costs) that you may have against Fannie Mae, including its past and present directors, agents, conservator and employees (in their individual or representative capacities), and any past, present or successor of the Fannie Mae pension or benefit plans and its officers, directors, trustees, administrators, fiduciaries, agents or employees, (collectively, the "Released Parties") for any actions, omissions or decisions, up to and including the date you sign this Agreement, directly or indirectly relating to your employment or termination from Fannie Mae  However, you do not waive any rights or claims that cannot be waived under applicable law and you do not waive any rights or claims associated with the performance of the provisions of this Agreement or that arise after you sign the Agreement  You agree that this release includes claims that you presently do not know of or suspect to exist, even if you would not have entered into this Agreement had you known of those claims  You also understand that this release means that you are giving up the right to sue Fannie Mae on any claim released

*David C. Hisey*
*February 17, 2012*
*Page 3 of 7*

6. <u>Release Includes Claims Under Federal, State, Local and Common Law</u> .

(a) You agree that your general release of the Released Parties in Paragraph 5 above is comprehensive and includes all claims and potential claims to the maximum extent permitted by law, and includes, but is not limited to: (i) releasable claims under any federal statute, ordinance, regulation or executive order, as amended, including, but not limited to, the Civil Rights Act of 1866, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, 42 U.S.C. Section 1981, the Equal Pay Act of 1963, the Lily Ledbetter Fair Pay Act of 2009, the Americans with Disabilities Act of 1990, the ADA Amendments Act of 2008, the Sarbanes Oxley Act of 2002, the Dodd Frank Act of 20 0, all other federal whistleblower protection statutes, the Employee Retirement Income Security Act of 1974, the Rehabilitation Act of 1973, the Family and Medical Leave Act of 1993, the Worker Adjustment and Retraining Notification Act of 1988, Executive Order 11246, the Occupational Safety and Health Act of 1970 and the National Labor Relations Act; (ii) any claims under any state or local statute, ordinance or regulation, as amended, including, but not limited to, the District of Columbia Human Rights Act, the District of Columbia Family and Medical Leave Act, the District of Columbia Accrued Sick and Safe Leave Act, the Virginia Human Rights Law, the Maryland Fair Employment Practices Act, the California Fair Employment and Housing Act, and any state or local fair employment, human rights, leave, wage payment or civil rights statutes in the jurisdictions where you are (or were) assigned to work, and (iii) any claims under common law, including, but not limited to, claims for breach of contract, wrongful discharge, tort and equitable relief

(b) You knowingly and voluntarily waive any rights and claims under the Federal Age Discrimination in Employment Act of 1967, as amended, the Older Workers Benefit Protection Act of 1990, as amended, and under the specific statutes and laws stated in Paragraph 6 (a).

(c) By signing this Agreement, you further affirm the following: (i) That you have reported to Fannie Mae's Offices of Ethics or Investigations any conduct or action by Fannie Mae (or its employees or agents, including you) which Fannie Mae may need to remediate, report, or investigate, or which may violate any law or any rights you may have; (ii) You have not suffered any work related injury for which you have not already filed a claim; (iii) That you have been paid all wages that you are owed by Fannie Mae; and (iv) That you have fully complied with your reporting obligations under Fannie Mae's Code of Conduct and Fraud Risk Management Policy (including any amended version of these policies in effect during your employment)

(d) You agree not to make any oral or written statement concerning your employment or termination from Fannie Mae to any third party that would tend to disparage, denigrate, ridicule or otherwise impugn Fannie Mae's reputation

7. <u>No Complaints or Charges</u>  You represent that you have not filed any complaints or charges against Fannie Mae or any of the other Releasees with any federal, state, local court, administrative agency or arbitration forum  You waive any and all rights to recover in any lawsuit, judicial action or administrative or other proceeding relating to Fannie Mae brought on your behalf by the U S  Equal Employment Opportunity Commission, the U S  Department of Labor, the Office of Federal Contract Compliance Programs, the District of Columbia Commission on Human Rights, the District of

*David C. Hisey*
*February 17, 2012*
*Page 4 of 7*

Columbia Office of Human Rights, or any other federal, state or local administrative or fair employment rights enforcement agency  You agree that if any administrative agency or court maintains or assumes jurisdiction of any charge or complaint against any of the Releasees on your behalf, you will promptly request that agency or court to withdraw from the matter  By entering into this Agreement, you further withdraw any pending complaints and charges initiated by or relating to you in Fannie Mae's Office of Investigations

8.  Cooperation  You agree that you will fully cooperate with any investigation conducted by Fannie Mae, by its auditor, by the Federal Housing Finance Agency, or by any federal, state or local government authority relating to Fannie Mae  Nothing contained in this Agreement precludes you from communicating or cooperating with any federal, state or local governmental authority or from taking any action required by law  Fannie Mae agrees that it will not construe any assertion of privilege applicable to you individually as failure to cooperate  You understand that Fannie Mae's privileges may only be asserted or waived by Fannie Mae

9.  Confidentiality  In addition to your ethical obligations to preserve as confidential any information that is preserved by the attorney work product privilege or attorney client privilege (which, to the extent it pertains to Fannie Mae, you may not waive), you and your heirs, assigns and attorneys agree to keep confidential and not to disclose any of the terms, conditions, or any other details of this Agreement or any Confidential Information (as described in Fannie Mae's Confidential Information Policy) relating to your employment at Fannie Mae to any person or entity  However, you may make disclosure relating to this Agreement to the following individuals, provided that they also agree to keep the terms and conditions of this Agreement confidential: (i) to your attorney or other representative consulted by you to understand the interpretation, application or legal effect of this Agreement; (ii) to your family; or (iii) to the extent that such disclosure is required by law  You shall instruct those to whom you provide information about this Agreement pursuant to subparts (i) (iii) of this paragraph that they are obligated to keep it confidential, except as required by law  In the event that you receive a request for disclosure of Confidential Information other than as set forth in subparts (i) (iii), above, you shall promptly notify Fannie Mae and shall cooperate fully with Fannie Mae in responding or objecting to such request  As set forth in Paragraph 8 of this Agreement, this undertaking does not preclude you from fully cooperating with any action or investigation brought by a governmental authority

10  Continuing Obligations under the Code  You acknowledge that you remain bound to the terms and conditions of the Code of Conduct, the Confidential Information Policy and the Intellectual Property Policy (collectively, the "Code") applicable to all current and former Fannie Mae employees  You also acknowledge your continuing obligations under the Code and applicable federal and state laws which prohibit you from disclosing Confidential Information to third parties, removing Confidential Information from Fannie Mae's premises (including by electronic forwarding outside of Fannie Mae's networks) or copying or duplicating Fannie Mae's Confidential Information

11. Non Competition/No Rehire  You agree that, for a period of twelve (  2) months immediately following the Termination Date, you will not solicit or accept employment or act in any way, directly or indirectly, to solicit or obtain employment or work for Freddie Mac, whether such employment is to be as a Freddie Mac employee, consultant, or advisor  You also agree that you will not seek to do

*David C. Hisey*
*February 17, 2012*
*Page 5 of 7*

business (or do business) with Fannie Mae, either directly as an employee of Fannie Mae, or indirectly as a contractor, consultant or vendor working solely on Fannie Mae matters  You acknowledge that these restrictions (and the restrictions in your surviving other agreements, see Paragraph   5(e)) are necessary to protect Fannie Mae's legitimate business interests, including retaining its personnel and preserving confidentiality of proprietary information that you have acquired in the course of your employment with Fannie Mae, and that these restrictions do not improperly restrict your right or ability to earn a living  You understand and agree that Fannie Mae will stop payments under Paragraph 1(a) (and require the re payment of any sums previously paid to you thereunder) if you violate, or attempt to violate any of the above restrictions

12. <u>Time to Consider and Consult With an Attorney</u>  You confirm that you have been given at least twenty one (2  ) calendar days to consider this Agreement, which time is sufficient and satisfies any notification requirements that may exist  You are hereby strongly advised to consult with an attorney before executing this Agreement and by signing this Agreement you confirm that you have had a fair and full opportunity to do so  You further understand that Fannie Mae is not responsible for any expenses you may incur in consulting an attorney

13  <u>Revocation</u>  You may revoke your acceptance of this Agreement within seven (7) calendar days after you sign it  Revocation is effective only by providing written notice to Judith C  Dunn, Fannie Mae's Senior Vice President and Principal Deputy General Counsel, at 3900 Wisconsin Avenue, NW, Washington, DC 20016, or by email to judith_dunn@fanniemae com  If you timely revoke your execution of this Agreement, the Agreement will be null and void, and your employment will remain terminated as of the Termination Date  A mailed revocation notice must be post marked no later than the seventh (7th) day after the date you signed the Agreement

14  <u>FHFA Approval</u>  The financial terms of this Agreement have been approved by the FHFA

15.  <u>Miscellaneous</u>.  The following provisions also apply:

   (a) Any controversy, dispute or claim arising out of or relating to this Agreement, breach thereof, or any of the circumstances relating to any matter not released pursuant to Paragraphs 5 and 6, above, shall first be addressed through good faith negotiation  If the dispute cannot be settled through negotiation, the Parties agree to mutually binding arbitration administered by JAMS, or its successor, pursuant to its Employment Arbitration Rules & Procedures and subject to JAMS' Policy on Employment Arbitration Minimum Standards of Procedural Fairness  Judgment on the Award may be entered in any court having jurisdiction.

   (b) The laws of the jurisdiction where you were primarily assigned to work at the time of your termination shall govern this Agreement  Should any provision of this Agreement be declared or be determined by any arbitrator to be illegal or invalid, that provision will be deemed modified to the extent necessary to be valid and enforceable  Should such modification not be possible, any illegal or invalid part, term or provision will be deemed not to be a part of this Agreement and the validity of the remaining parts, terms and provisions will not be affected

*David C. Hisey*
*February 17, 2012*
*Page 6 of 7*

(c) Except as provided otherwise in sub paragraph (e) below regarding other written agreements between the Parties, this Agreement supersedes any prior written or oral employment agreement between you and Fannie Mae, and any such agreement is terminated effective upon execution of this Agreement  You and Fannie Mae understand and agree that the terms and conditions of this Agreement constitute your full and complete understandings, agreements and promises to each other, and that there are no oral or written understandings, agreements, promises or inducements made or offered with respect to the subject matter covered in this Agreement other than those set forth in writing in this Agreement, and this Agreement merges and supersedes any and all prior agreements, understandings and representations on the subject matter covered herein

(d) No modification of this Agreement shall be valid unless in writing and signed by each of the Parties

(e) The terms of the following types of prior written agreement(s) between the Parties (if any) shall remain in effect following the execution of this Agreement: Any Indemnification Agreement, any Agreement on Ideas, Inventions and Confidential Information, and any Director and Officer Insurance applicable to you and in effect during your employment  In the event of a conflict between the terms of this Agreement and the terms of any other surviving written agreement between the parties, this Agreement shall prevail  **The existing terms of the "Repayment Provisions that apply to SEC officers" shall continue to apply.** There are no oral agreements between the Parties that will remain in effect after execution of this Agreement

(f) The cash payments described in Paragraph 1(a) above, will be subject to all legally required deductions  Federal taxes on these payments will be withheld at the IRS supplemental rate (which is currently 25% for most employees), and any applicable state and/or local taxes also will be withheld  These payments are not eligible earnings for the purpose of Fannie Mae's retirement plans  The employer paid portion of your COBRA benefit for months  3   8 will be a taxable benefit to you and you are responsible for any required taxes

(ii) This Agreement is intended to comply with the requirements of Section 409A of the Code  To the extent any provisions of this Agreement are ambiguous, they shall be interpreted in a manner that renders the payment or benefit in question exempt from Section 409A of the Internal Revenue Code (if possible), or otherwise, compliant with Section 409A of the Code

(g) By entering into this Agreement, the Company is not admitting to have violated any of your rights, or to have violated any of the duties or obligations owed to you, or to have engaged in any conduct in violation of the common law or the above referenced statutes, ordinances, executive orders or regulations  You agree that except as necessary to enforce this Agreement, or as otherwise required by law, neither this Agreement, nor any of its terms shall be offered as evidence in any action or proceeding or utilized in any other matter whatsoever as an admission or concession of liability or wrongdoing of any nature by the Company.

*David C. Hisey*
*February 17, 2012*
*Page 7 of 7*

(h) This Agreement will be binding on you and Fannie Mae and upon your respective heirs, representatives, executors, trustees, directors, employees, successors and assigns, and will run to the benefit of you, Fannie Mae and each of the Releasees and the Parties' respective heirs, administrators, representatives, executors, trustees, directors, employees, successors and assigns.

16. <u>Execution</u>  You acknowledge and agree that your decision to enter into this Agreement is wholly knowing, voluntary and absent any pressure or undue influence by Fannie Mae  You further acknowledge that you have carefully read and fully understand all of the provisions of this Agreement, that you have had an opportunity to review it with your attorney, and that you intend to be legally bound by this Agreement

**PLEASE READ CAREFULLY. THIS AGREEMENT AND GENERAL RELEASE CONTAINS A RELEASE OF KNOWN AND UNKNOWN CLAIMS.**

**FANNIE MAE:**

By: _____ /s/   Brian P. McQuaid _____
      Brian P. McQuaid
      Senior Vice President and
      Chief Human Resources Officer

Date _____ 2 28 2012 _____

**DAVID C. HISEY:**

_____ /s/   David C. Hisey _____
Signature

Date _____ 2 28 12 _____

Exhibit 10.44

**Repayment Provisions**
**For SEC Executive Officers**
**Amended and Restated as of March 8, 2012**

(1) <u>Termination for Cause</u>  For the purposes of these repayment provisions, Fannie Mae may terminate Executive for Cause if Fannie Mae determines that Executive has:

   (a) materially harmed Fannie Mae by, in connection with Executive's performance of his or her duties for Fannie Mae, engaging in gross misconduct or performing Executive's duties in a grossly negligent manner, or

   (b) been convicted of, or pleaded nolo contendere with respect to, a felony

Fannie Mae, by written notice, may terminate Executive's employment at any time following the occurrence of an event described in (b)

Executive shall not be deemed to have been terminated for Cause following the occurrence of an event described in (a) unless Fannie Mae shall have provided: (i) reasonable notice to Executive setting forth Fannie Mae's intention to terminate for Cause, (ii) where remedial action is appropriate and feasible, a reasonable opportunity for such action, (iii) an opportunity for Executive, together with Executive's counsel, to be heard before the Board of Directors, and (iv) Executive with a notice of termination stating that Executive was guilty of the conduct set forth in this section and specifying the particulars thereof in detail

(2) <u>Forfeiture Upon Termination for Cause</u>  Upon termination of Executive's employment with Fannie Mae for Cause, Executive shall immediately forfeit all Deferred Salary and Incentive Payments that as of the date of termination of Executive's employment (a) in the case of stock options, stock appreciation rights, restricted stock and stock units, have not yet vested, and (b) in the case of other awards, have not yet become payable (determined without giving effect to a voluntary election to defer the payment date)  "Incentive Payment" means: (i) severance payments and bonus payments, (ii) stock options and stock appreciation rights, (iii) restricted stock and stock units, (iv) long term awards whether or not vested, and (v) deferred cash awards. Deferred Salary means both the awards made under the deferred pay program established in 2009 and deferred salary under the executive compensation program established in 2012

Page

(3) <u>Subsequent Determination of "Cause" for Termination of Employment</u>  If, after the termination of Executive's employment (other than an involuntary termination of employment by Fannie Mae for Cause) and within the "applicable determination period" as hereinafter defined, the Board of Directors determines and notifies Executive in writing that circumstances existed at the time of termination of Executive's employment that would have justified a termination for Cause, including for this purpose the occurrence of a felony for which Executive has subsequently been convicted or to which Executive has subsequently pleaded nolo contendere, and the officer's actions materially harmed the business or reputation of Fannie Mae, Executive shall repay or forfeit, as appropriate, any or all Deferred Salary and Incentive Payments to the extent the Board of Directors, acting in its discretion deems such forfeiture or repayment to be appropriate under the circumstances  The Board may require the forfeiture or repayment of Deferred Salary and any or all Incentive Payments (including amounts in the nature of dividends or other earnings in respect of the Incentive Payments) received by Executive such that Executive is in the same economic position (without regard to the effect of taxes) as if Executive had been terminated for Cause as of the date of Executive's termination of employment  For purposes of this Section (3) and for purposes of Section (4), "applicable determination period" means (i) in the case of Executive's conviction of or a plea of nolo contendere to a felony, the ninety day period following the date on which the Board of Directors first learns of the conviction or plea, and (ii) in every other case, the twenty four month period commencing on the date of termination of Executive's employment  The Board of Directors shall provide Executive with: (I) notice in writing of the Board of Director's intent to invoke this forfeiture/repayment provision, which notice shall set forth in reasonable detail the circumstances pursuant to which the Board of Directors intends to invoke this provision, and (II) a chance to be heard before the Board of Directors, together with Executive's counsel, prior to the time the Board of Directors makes a final decision to invoke this provision

Page 2

(4) <u>Effect of Willful Misconduct</u>.

    (a) The provisions of this Section (4) shall apply if (i) Fannie Mae terminates Executive's employment under Section (  ) or if the Board of Directors makes a determination within the "applicable determination period" under Section (3) that a basis for such a termination existed, and (ii) the basis for such termination or determination is an act described in Section (  )(a) consisting of willful misconduct by Executive in connection with Executive's performance of Executive's duties with the Corporation or a felony described in Section (  )(b) consisting of an act of willful misconduct in the performance of Executive's duties with Fannie Mae, in either case which, in the determination of the Board of Directors (made in connection with Fannie Mae's termination of Executive or the Board of Directors' determination under Section (3), as the case may be), has materially harmed the business or reputation of Fannie Mae  Misconduct is not considered willful unless it is done or omitted to be done by Executive in bad faith or without reasonable belief that Executive's action or omission was in the best interest of Fannie Mae

    (b) If Section (4)(a) applies, then in addition to any forfeiture or repayment required by the terms of Section (2) or Section (3) there shall also be forfeited or repaid, as the case may be, Other Incentive Payments to the extent the Board of Directors, acting in its discretion in connection with its termination of Executive or in connection with its determination under Section (3), as the case may be, deems such forfeiture or repayment to be appropriate under the circumstances  As used in the immediately preceding sentence, "Other Incentive Payments" means Deferred Salary and annual incentives or long term awards, whether already paid or payable to Executive in the future but excluding any such amounts paid to Executive more than two (2) years prior to the date of the termination of Executive's employment

(5) <u>Role of Compensation Committee</u>  In exercising its discretion or otherwise acting under Sections (  ), (3), or (4) above, the Board of Directors shall consider the recommendation of the Compensation Committee

(6) <u>FHFA's Authority</u>  Nothing in these repayment provisions limits FHFA's authority with respect to executives covered by these provisions

(7) <u>Sarbanes Oxley Act Reimbursement</u>  [To be included only for CEO and CFO ] Executive acknowledges that certain of his or her bonus or other incentive based or equity based compensation may be subject to a requirement that they be reimbursed to Fannie Mae in the event that Section 304 of the Sarbanes Oxley Act of 2002 applies to that compensation, and Executive agrees to comply with the requirements of that section

Page 3

(8) <u>Materially Inaccurate Financial Statements or Materially Inaccurate Performance Metric Criteria</u>   If the Executive has been granted Deferred Salary or Incentive Payments based on materially inaccurate financial statements (which includes but is not limited to, statements of earnings, revenues, or gains) or any other materially inaccurate performance metric criteria, the Executive shall forfeit or repay any amounts granted in excess of the amounts that the Board determines would likely have been granted using accurate metrics

(9) These provisions, as amended and restated, are effective beginning with compensation for the 2012 performance year

Page 4

**Exhibit 31.1**

**CERTIFICATION**

**PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a 14(a)**

I, Michael J. Williams, certify that:

1. I have reviewed this Quarterly Report on Form 0 Q for the quarter ended March 3 , 20 2 of Fannie Mae (formally, the Federal National Mortgage Association);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a 15(e) and 15d 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a 15(f) and 15d 15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

/s/   Michael J. Williams
_____
Michael J. Williams
President and Chief Executive Officer

Date: May 9, 2012

Exhibit 31.2

**CERTIFICATION**

**PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a 14(a)**

I, Susan R. McFarland, certify that:

1.    I have reviewed this Quarterly Report on Form  0 Q for the quarter ended March 3  , 20  2 of Fannie Mae (formally, the Federal National Mortgage Association);

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a 15(e) and 15d 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a 15(f) and 15d 15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

/s/   Susan R. McFarland
_____
Susan R. McFarland
Executive Vice President and
Chief Financial Officer

Date: May 9, 2012

**Exhibit 32.1**

## CERTIFICATION

In connection with the Quarterly Report on Form   0 Q of Fannie Mae (formally, the Federal National Mortgage Association) for the quarter ended March 3  , 2012, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael J  Williams, President and Chief Executive Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350 that to my knowledge:

1.     The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2.     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae

/s/ Michael J. Williams
Michael J. Williams
President and Chief Executive Officer

Date: May 9, 2012

The foregoing certification is being furnished solely pursuant to 18 U S C  Section 1350 and is not being filed as part of the Report or as a separate disclosure document

**Exhibit 32.2**

**CERTIFICATION**

In connection with the Quarterly Report on Form  0 Q of Fannie Mae (formally, the Federal National Mortgage Association) for the quarter ended March 3  , 2012, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Susan R  McFarland, Executive Vice President and Chief Financial Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350, that to my knowledge:

1.     The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2.     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae

/s/ Susan R. McFarland
Susan R. McFarland
Executive Vice President and
Chief Financial Officer

Date: May 9, 2012

The foregoing certification is being furnished solely pursuant to 18 U S C  Section 1350 and is not being filed as part of the Report or as a separate disclosure document

TREASURY-3531

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended March 31, 2012**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from         to**

**Commission File Number: 001-34139**

# Federal Home Loan Mortgage Corporation
*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| | | | |
|---|---|---|---|
| **Federally chartered corporation** | **8200 Jones Branch Drive** McLean, Virginia 22102-3110 | **52-0904874** | **(703) 903-2000** |
| *(State or other jurisdiction of incorporation or organization)* | *(Address of principal executive offices, including zip code)* | *(I.R.S. Employer Identification No.)* | *(Registrant's telephone number, including area code)* |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 3 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, eve y Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S T (§232 405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non accelerated filer, or a smaller reporting company See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 2b 2 of the Exchange Act

Large accelerated filer ☐ Accelerated filer ☒

Non accelerated filer (Do no check f a smalle epo ng company) ☐ Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 2b 2 of the Exchange Act). ☐ Yes ☒ No

As of April 23, 2012, there were 650,033,623 shares of the registrant's common stock outstanding.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **PART I** | **FINANCIAL INFORMATION** | |
| Item | Financial Statements | 00 |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 1 |
| | Executive Summary | 1 |
| | Selected Financial Data | 12 |
| | Consolidated Results of Operations | 3 |
| | Consolidated Balance Sheets Analysis | 30 |
| | Risk Management | 46 |
| | Liquidity and Capital Resources | 80 |
| | Fair Value Measurements and Analysis | 85 |
| | Off Balance Sheet Arrangements | 88 |
| | Critical Accounting Policies and Estimates | 89 |
| | Forward Looking Statements | 89 |
| | Risk Management and Disclosure Commitments | 91 |
| | Legislative and Regulatory Matters | 91 |
| Item 3 | Quantitative and Qualitative Disclosures About Market Risk | 95 |
| Item 4 | Controls and Procedures | 97 |
| **PART II** | **OTHER INFORMATION** | |
| Item | Legal Proceedings | 183 |
| Item A | Risk Factors | 183 |
| Item 2 | Unregistered Sales of Equity Securities and Use of Proceeds | 183 |
| Item 6 | Exhibits | 185 |
| **SIGNATURES** | | 186 |
| **GLOSSARY** | | 187 |
| **EXHIBIT INDEX** | | E |

i                                                                    *Freddie Mac*

**TREASURY-3533**

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| | Selected Financial Data | 12 |
| 1 | Total Single Family Loan Workout Volumes | 3 |
| 2 | Single Family Credit Guarantee Portfolio Data by Year of Origination | 5 |
| 3 | Credit Statistics, Single Family Credit Guarantee Portfolio | 6 |
| 4 | Mortgage Related Investments Portfolio | 11 |
| 5 | Summary Consolidated Statements of Comprehensive Income | 3 |
| 6 | Net Interest Income/Yield and Average Balance Analysis | 4 |
| 7 | Derivative Gains (Losses) | 16 |
| 8 | Other Income | 17 |
| 9 | Non Interest Expense | 18 |
| 0 | REO Operations Expense, REO Inventory, and REO Dispositions | 19 |
| 11 | Composition of Segment Mortgage Portfolios and Credit Risk Portfolios | 22 |
| 12 | Segment Earnings and Key Metrics — Investments | 23 |
| 3 | Segment Earnings and Key Metrics — Single Family Guarantee | 25 |
| 4 | Segment Earnings Composition — Single Family Guarantee Segment | 26 |
| 15 | Segment Earnings and Key Metrics — Multifamily | 29 |
| 16 | Investments in Securities | 3 |
| 17 | Characteristics of Mortgage Related Securities on Our Consolidated Balance Sheets | 32 |
| 18 | Additional Characteristics of Mortgage Related Securities on Our Consolidated Balance Sheets | 33 |
| 19 | Mortgage Related Securities Purchase Activity | 34 |
| 20 | Non Agency Mortgage Related Securities Backed by Subprime First Lien, Option ARM, and Alt A Loans and Certain Related Credit Statistics | 35 |
| 21 | Non Agency Mortgage Related Securities Backed by Subprime, Option ARM, Alt A and Other Loans | 36 |
| 22 | Net Impairment of Available For Sale Mortgage Related Securities Recognized in Earnings | 37 |
| 23 | Ratings of Non Agency Mortgage Related Securities Backed by Subprime, Option ARM, Alt A and Other Loans, and CMBS | 39 |
| 24 | Mortgage Loan Purchase and Other Guarantee Commitment Activity | 4 |
| 25 | Derivative Fair Values and Maturities | 42 |
| 26 | Changes in Derivative Fair Values | 43 |
| 27 | Freddie Mac Mortgage Related Securities | 44 |
| 28 | Issuances and Extinguishments of Debt Securities of Consolidated Trusts | 45 |
| 29 | Changes in Total Equity (Deficit) | 45 |
| 30 | Repurchase Request Activity | 47 |
| 3 | Mortgage Insurance by Counterparty | 50 |
| 32 | Bond Insurance by Counterparty | 51 |
| 33 | Derivative Counterparty Credit Exposure | 53 |
| 34 | Characteristics of the Single Family Credit Guarantee Portfolio | 57 |
| 35 | Certain Higher Risk Categories in the Single Family Credit Guarantee Portfolio | 61 |
| 36 | Single Family Home Affordable Modification Program Volume | 63 |
| 37 | Single Family Refinance Loan Volume | 65 |
| 38 | Single Family Loan Workouts, Serious Delinquency, and Foreclosures Volumes | 66 |
| 39 | Quarterly Percentages of Modified Single Family Loans — Current and Performing | 67 |
| 40 | Single Family Serious Delinquency Rates | 68 |
| 4 | Credit Concentrations in the Single Family Credit Guarantee Portfolio | 69 |
| 42 | Single Family Credit Guarantee Portfolio by Attribute Combinations | 70 |
| 43 | Single Family Credit Guarantee Portfolio by Year of Loan Origination | 72 |
| 44 | Multifamily Mortgage Portfolio — by Attribute | 73 |
| 45 | Non Performing Assets | 75 |
| 46 | REO Activity by Region | 76 |
| 47 | Credit Loss Performance | 78 |
| 48 | Single Family Impaired Loans with Specific Reserve Recorded | 79 |
| 49 | Single Family Credit Loss Sensitivity | 80 |
| 50 | Other Debt Security Issuances by Product, at Par Value | 83 |
| 51 | Other Debt Security Repurchases, Calls, and Exchanges | 83 |
| 52 | Freddie Mac Credit Ratings | 84 |
| 53 | Summary of Assets and Liabilities Measured at Fair Value on a Recurring Basis in Our Consolidated Balance Sheets | 86 |
| 54 | Summary of Change in the Fair Value of Net Assets | 87 |
| 5 5 | PMVS Results | 96 |
| 5 6 | Derivative Impact on PMVS L (50 bps) | 96 |

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3534                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

# FINANCIAL STATEMENTS

| | Page |
|---|---|
| Freddie Mac Consolidated Statements of Comprehensive Income | 101 |
| Freddie Mac Consolidated Balance Sheets | 102 |
| Freddie Mac Consolidated Statements of Equity (Deficit) | 03 |
| Freddie Mac Consolidated Statements of Cash Flows | 04 |
| Note 1: Summary of Significant Accounting Policies | 105 |
| Note 2: Conservatorship and Related Matters | 106 |
| Note 3: Variable Interest Entities | 109 |
| Note 4: Mortgage Loans and Loan Loss Reserves | 114 |
| Note 5: Individually Impaired and Non Performing Loans | 118 |
| Note 6: Real Estate Owned | 124 |
| Note 7: Investments in Securities | 126 |
| Note 8: Debt Securities and Subordinated Borrowings | 34 |
| Note 9: Financial Guarantees | 136 |
| Note  0: Derivatives | 138 |
| Note 11: Freddie Mac Stockholders' Equity (Deficit) | 142 |
| Note  2: Income Taxes | 43 |
| Note  3: Segment Reporting | 43 |
| Note  4: Regulatory Capital | 147 |
| Note 15: Concentration of Credit and Other Risks | 148 |
| Note 16: Fair Value Disclosures | 154 |
| Note  7: Legal Contingencies | 176 |
| Note 18: Significant Components of Other Assets and Other Liabilities on our Consolidated Balance Sheets | 182 |

iii                                                                                               *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## PART I    FINANCIAL INFORMATION

*We continue to operate under the conservatorship that commenced on September 6, 2008, under the direction of FHFA as our Conservator. The Conservator succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any shareholder, officer or director thereof, with respect to the company and its assets. The Conservator has delegated certain authority to our Board of Directors to oversee, and management to conduct, day to day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator. See "BUSINESS    Conservatorship and Related Matters" in our Annual Report on Form 10 K for the year ended December 31, 2011, or 2011 Annual Report, for information on the terms of the conservatorship, the powers of the Conservator, and related matters, including the terms of our Purchase Agreement with Treasury.*

*This Quarterly Report on Form 10 Q includes forward looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward looking statements are made as of the date of this Form 10 Q and we undertake no obligation to update any forward looking statement to reflect events or circumstances after the date of this Form 10 Q. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in: (a) "MD&A    FORWARD LOOKING STATEMENTS" in this Form 10 Q and in the comparably captioned section of our 2011 Annual Report; and (b) the "BUSINESS" and "RISK FACTORS" sections of our 2011 Annual Report.*

*Throughout this Form 10 Q, we use certain acronyms and terms that are defined in the "GLOSSARY."*

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this MD&A in conjunction with our consolidated financial statements and related notes for the three months ended March 31, 2012 included in "FINANCIAL STATEMENTS," and our 2011 Annual Report.*

## EXECUTIVE SUMMARY

### Overview

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments  We are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures  We believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure, where feasible

### *Summary of Financial Results*

Our financial performance in the first quarter of 2012 was impacted by the ongoing weakness in the economy, including in the mortgage market, and changes in interest rates. Our comprehensive income was $1.8 billion and $2.7 billion for the first quarters of 2012 and 2011, respectively, consisting of: (a) $577 million and $676 million of net income, respectively; and (b) $1.2 billion and $2 1 billion of total other comprehensive income, respectively

Our total equity (deficit) was $(18) million at March 31, 2012, reflecting our comprehensive income of $1.8 billion for the first quarter of 2012 and our dividend payment of $1.8 billion on our senior preferred stock in March 2012. To address our deficit in net worth, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement for $19 million. Following receipt of the draw, the aggregate liquidation preference on the senior preferred stock owned by Treasury will be $72.3 billion.

### Our Primary Business Objectives

We are focused on the following primary business objectives: (a) developing mortgage market enhancements in support of a new infrastructure for the secondary mortgage market; (b) contracting the dominant presence of the GSEs in the marketplace; (c) providing credit availability for new or refinanced mortgages and maintaining foreclosure prevention activities; (d) minimizing our credit losses; (e) maintaining sound credit quality of the loans we purchase or guarantee; and (f) strengthening our infrastructure and improving overall efficiency while also focusing on retention of key employees

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3537

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our business objectives reflect direction we have received from the Conservator. On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that established objectives, performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan for Freddie Mac and Fannie Mae We are aligning our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard See "LEGISLATIVE AND REGULATORY MATTERS    FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard." Based on our charter, other legislation, public statements from Treasury and FHFA officials, and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives For more information, see "BUSINESS    Conservatorship and Related Matters    *Impact of Conservatorship and Related Actions on Our Business*" in our 2011 Annual Report.

### Developing Mortgage Market Enhancements in Support of a New Infrastructure for the Secondary Mortgage Market

In the first quarter of 2012, we continued our efforts to build value for the industry and build the infrastructure for a future housing finance system These efforts include the implementation of the Uniform Mortgage Data Program, or UMDP, which provides us with the ability to collect additional data that we believe will improve our risk management practices. The UMDP creates standard terms and definitions to be used throughout the industry and establishes standard reporting protocols. The UMDP is a key building block in developing a future secondary mortgage market In the first quarter of 2012, we completed a key milestone of the UMDP with the launch of the Uniform Collateral Data Portal for the electronic submission of appraisal reports for conventional mortgages We are also working with FHFA and others to develop a plan for the design and building of a single securitization platform that can be used in a future secondary mortgage market FHFA also directed us and Fannie Mae to discuss harmonizing our seller/servicer contracts

### Contracting the Dominant Presence of the GSEs in the Marketplace

We continue to take steps toward the goal of gradually shifting mortgage credit risk from Freddie Mac to private investors, while simplifying and shrinking certain of our operations. In the case of single family credit guarantees, we are exploring several ways to accomplish this goal, including increasing guarantee fees, establishing loss sharing arrangements, and evaluating new risk sharing transactions beyond the traditional charter required mortgage insurance coverage In addition, we are studying the steps necessary for our competitive disposition of certain investment assets, including non performing loans. To evaluate how to accomplish the goal of contracting our operations in the multifamily business, we are conducting a market analysis of the viability of our multifamily operations without government guarantees

### Providing Credit Availability for New or Refinanced Mortgages and Maintaining Foreclosure Prevention Activities

We provide liquidity and support to the U S mortgage market in a number of important ways:

• Our support enables borrowers to have access to a variety of conforming mortgage products, including the prepayable 30-year f xed-rate mortgage, which historically has represented the foundation of the mortgage market

• Our support provides lenders with a constant source of liquidity for conforming mortgage products We estimate that we, Fannie Mae, and Ginnie Mae collectively guaranteed more than 90% of the single family conforming mortgages originated during the first quarter of 2012.

• Our consistent market presence provides assurance to our customers that there will be a buyer for their conforming loans that meet our credit standards. We believe this liquidity provides our customers with confidence to continue lending in difficult environments.

• We are an important counter cyclical influence as we stay in the market even when other sources of capital have withdrawn

During the first quarters of 2012 and 2011, we guaranteed $105.1 billion and $97.6 billion in UPB of single family conforming mortgage loans, respectively, representing approximately 491,000 and 461,000 loans, respectively

Borrowers typically pay a lower interest rate on loans acquired or guaranteed by Freddie Mac, Fannie Mae, or Ginnie Mae Mortgage originators are generally able to offer homebuyers and homeowners lower mortgage rates on conforming loan products, including ours, in part because of the value investors place on GSE guaranteed mortgage related securities Prior to 2007, mortgage markets were less volatile, home values were stable or rising, and there were many sources of mortgage funds We estimate that, for 20 years prior to 2007, the average effect ve interest rates on conforming, fixed rate single family mortgage loans were about 30 basis points lower than on non conforming loans Since 2007, this gap has widened, and, we estimate that interest rates on conforming, fixed rate loans, excluding conforming jumbo loans, have been lower than those on non conforming loans by as much as 184 basis points. In March 2012, we estimate that

2

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

borrowers were paying an average of 54 basis points less on  these conforming loans than on non conforming loans  These  estimates are based on data provided by HSH Associates, a third party provider of mortgage market data

We are focused on reducing the number of foreclosures and  helping to keep families in their homes  In addition to our  participation in HAMP, we introduced several new initiatives during the last few years to help eligible borrowers keep their  homes or avoid foreclosure  Our relief refinance initiative, including HARP (which is the portion of our relief refinance  initiative for loans with LTV ratios above 80%), is a significant part of our effort to keep families in their homes  Relief refinance loans have been provided to more than 565,000  borrowers with LTV ratios above 80% since the initiative began  in 2009, including approximately 85,000 such loans during the  first quarter of 2012.

A number of FHFA directed changes to HARP were announced in late 20     These changes are intended to allow more borrowers to participate in the program and benefit from refinancing their  home mortgages  Since industry participation in HARP is not  mandatory, implementation schedules have varied as individual  lenders, mortgage insurers, and other market participants modify  their processes  It is too early to estimate how many eligible  borrowers are likely to refinance under the revised program

We have also implemented the FHFA directed servicing alignment initiative, which included a new non HAMP standard loan  modification initiative

The table below presents our single family loan workout  activities for the last five quarters

**Table 1     Total Single Family Loan Workout Volumes**(1)

| | or the Three Months  nded | | | | |
| | 03/31/2012 | 12/31/2011 | 09/30/2011 | 06/30/2011 | 03/31/2011 |
| | | | (number of loans) | | |
| Loan mod f ca  ons | 13,677 | 19,048 | 23,919 | 31,049 | 35,158 |
| Repaymen  p ans | 10,575 | 8,008 | 8,333 | 7,981 | 9,099 |
| Fo bea ance ag eemen s(2 | 3,656 | 3,867 | 4,262 | 3,709 | 7,678 |
| Sho  sa es and deed n eu of fo ec osu e  ansac  ons | 12,245 | 12,675 | 11,744 | 11,038 | 10,706 |
| To al s ngle-fam ly loan wo kou s | 40,153 | 43,598 | 48,258 | 53,777 | 62,641 |

(1) Based on ac  ons comple ed w h bo  owe s fo  loans w h n ou  s ngle-fam ly c ed  gua an ee po  fol o  Excludes  hose mod f ca on, epaymen , and fo bea ance  ac v es fo wh ch  e o owe  ass a ed  e ou  ed p ocess,   e ac o s have no been  ade pe  anen o effec ve, such as oans n mod  ca on  a  pe ods  A so exc udes ce a n  oan wo kou s whe e ou  s ngle-fam ly selle /se v ce s have execu ed ag ee en s n ec  en o po e ods,  b ese  ave no  been  nco po a ed n o ou  ope a ona  sys ems, due  o de ays n p ocess ng  These ca ego es a e no  mu ua y exclus ve and a loan n one ca ego y may also  be  c  ded w   ano he ca ego y n he same pe od

(2) Excludes loans w h long- e m fo bea ance unde  a comple ed loan mod f ca on  Many bo  owe s comple e a sho  - e m fo bea ance ag eemen  befo e ano he  loan  wo ko    s p s edo co  p  eed  We only  epo  fo bea ance ac v y fo  a s ngle loan once du ng each qua  e y pe od  howeve , a s ng e  oan   ay be  nc uded unde  sepa a e fo bea ance ag eemen s n sepa a e p  ods

Highlights of our loan workout efforts include the following:

•  We completed approximately 40,000 single family loan workouts during the first quarter of 2012, including 13,677 loan  modifications (HAMP and non HAMP) and 12,245 short sales and  deed in lieu of foreclosure transactions

•  Based on information provided by the MHA Program administrator,  our servicers had completed 158,688 loan modifications under HAMP from the introduction of the initiative in 2009 through  March 31, 2012.

•  As of March 31, 2012, approximately 16,000 borrowers were  in modification trial periods, consisting of approximately 5,000  borrowers in trial periods for our non HAMP standard  modification and approximately 11,000 borrowers in HAMP trial  periods

For more information about HAMP, the servicing alignment initiative and our non HAMP standard loan modification, other  loan workout programs, our relief refinance mortgage initiative  (including HARP), and other initiatives to help eligible  borrowers keep their homes or avoid foreclosure, see "RISK MANAGEMENT     Credit Risk     *Mortgage Credit Risk     Single Family Mortgage Credit Risk     Single Family Loan Workouts and the MHA Program.*"

***Minimizing Our Credit Losses***

To help minimize the credit losses related to our guarantee  activities, we are focused on:

•  pursuing a variety of loan workouts, including foreclosure  alternatives, in an effort to reduce the severity of losses we  exper ence over time;

•  managing foreclosure timelines to the extent possible, given the  prolonged foreclosure process in many states;

•  managing our inventory of foreclosed properties to reduce costs  and maximize proceeds; and

•  pursuing contractual remedies against originators, lenders,  servicers, and insurers, as appropriate.

Source   D RA  HOM  OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3539                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for credit losses  We require our single family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification  If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure

We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans, and represent and warrant that those loans have been originated under specified underwriting standards. If we subsequently discover that the representations and warranties were breached (*i.e.*, contractual standards were not followed), we can exercise certain contractual remedies to mitigate our actual or potential credit losses  These contractual remedies include the ability to require the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan  The amount we expect to collect on outstanding repurchase requests is significantly less than the UPB of the loans subject to the repurchase requests primarily because many of these requests will likely be satisfied by the seller/servicers reimbursing us for realized credit losses  Some of these requests also may be rescinded in the course of the contractual appeals process. As of March 31, 2012, the UPB of loans subject to repurchase requests issued to our single family seller/servicers was approximately $3 2 billion, and approximately 38% of these requests were outstanding for more than four months since issuance of our initial repurchase request (this figure includes repurchase requests for which appeals were pending)  Of the total amount of repurchase requests outstanding at March 31, 2012, approximately $ 2 billion were issued due to mortgage insurance rescission or mortgage insurance claim denial

Our credit loss exposure is also partially mitigated by mortgage insurance, which is a form of credit enhancement. Primary mo tgage insurance is required to be purchased, typically at the borrower's expense, for certain mortgages with higher LTV ratios  We received payments under primary and other mortgage insurance of $491 million and $587 million in the first quarters of 2012 and 2011, respectively, which helped to mitigate our credit losses  The financial condition of many of our mortgage insurers remained weak in the first quarter of 2012. We expect to receive substantially less than full payment of our claims from Triad Guaranty Insurance Corp., Republic Mortgage Insurance Company, and PMI Mortgage Insurance Co., which are three of our mortgage insurance counterparties  We believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as those claims emerge  Our loan loss reserves reflect our estimates of expected insurance recoveries related to probable incurred losses.

See "RISK MANAGEMENT    Credit Risk    *Institutional Credit Risk*" for further information on our agreements with our seller/servicers and our exposure to mortgage insurers

### Maintaining Sound Credit Quality of the Loans We Purchase or Guarantee

We continue to focus on maintaining credit policies, including our underwriting standards, that allow us to purchase and guarantee loans made to qualified borrowers that we believe will provide management and guarantee fee income (excluding the amounts associated with the Temporary Payroll Tax Cut Continuation Act of 20   ), over the long term, that exceeds our expected credit related and administrative expenses on such loans.

Approximately 95% of our single family purchase volume in the first quarter of 2012 consisted of fixed rate, first lien, amortizing mortgages  Approximately 87% and 85% of our single family purchase volumes in the first quarters of 2012 and 2011, respectively, were refinance mortgages, and approximately 3 % and 36%, respectively, of these refinance loans were relief refinance mortgages, based on UPB

The credit quality of the single family loans we acquired in the first quarter of 20 2 (excluding relief refinance mortgages, which represented approximately 26% of our single family purchase volume during the first quarter of 2012) is significantly better than that of loans we acquired from 2005 through 2008, as measured by original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income  The improvement in credit quality of loans we have purchased since 2008 (excluding relief refinance mortgages) is primarily the result of: (a) changes in our credit policies, including changes in our underwriting standards; (b) fewer purchases of loans with higher risk characteristics; and (c) changes in mortgage insurers' and lenders' underwriting practices

Our underwriting procedures for relief refinance mortgages are limited in many cases, and such procedures generally do not include all of the changes in underwriting standards we have implemented in the last several years  As a result, relief refinance mortgages generally reflect many of the credit risk attributes of the original loans  However, borrower participation in our relief refinance mortgage initiative may help reduce our exposure to credit risk in cases where borrower payments under their mortgages are reduced, thereby strengthening the borrower's potential to make their mortgage payments

4

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Over time, relief refinance mortgages with LTV ratios above 80% (*i.e.*, HARP loans) may not perform as well as other refinance mortgages because the continued high LTV ratios of these loans increases the probability of default  In addition,  relief refinance mortgages may not be covered by mortgage insurance for the full excess of their UPB over 80%  Approximately 16% and 15% of our single family purchase volume in the first quarters of 2012 and 2011, respectively, was relief refinance mortgages with LTV ratios above 80%  Relief refinance mortgages of all LTV ratios comprised approximately 13% and 11% of the UPB in our total single family credit guarantee portfolio  at March 31, 2012 and December 31, 2011, respectively

The table below presents the composition, loan characteristics,  and serious delinquency rates of loans in our single family  credit guarantee portfolio, by year of origination at  March 31, 2012.

**Table 2      Single Family Credit Guarantee Portfolio Data by Year of Origination**[1]

| | | At March 31, 2012 | | | | |
| Year of Origination | % of Portfolio | Average Credit Score[2] | Original LTV Ratio[3] | Current LTV Ratio[4] | Current LTV Ratio >100%[4][5] | Serious Delinquency Rate[6] |
|---|---|---|---|---|---|---|
| 2012 | 4% | 758 | 72% | 71% | 8% | % |
| 2011 | 16 | 755 | 72 | 70 | 5 | 0 09 |
| 2010 | 18 | 754 | 71 | 72 | 6 | 0 32 |
| 2009 | 16 | 753 | 69 | 73 | 7 | 0 60 |
| 2008 | 6 | 724 | 74 | 93 | 37 | 5 94 |
| 2007 | 9 | 704 | 77 | 114 | 62 | 11 72 |
| 2006 | 7 | 709 | 75 | 112 | 57 | 10 92 |
| 2005 | 8 | 715 | 73 | 96 | 39 | 6 66 |
| 2004 and prior | 16 | 718 | 71 | 61 | 9 | 2 88 |
| Total | 100% | 736 | 72 | 80 | 20 | 3 51 |

(1) Based on the loans remaining in the portfolio as of March 31, 2012, which, other than a loans originally guaranteed by us and originated in the respective year  Includes loans acquired under our relief refinance initiative, which began in 2009

(2) Based on FICO score of the borrower as of the date of loan origination and may not be indicative of the borrower's credit worthiness  As of March  31, 2012  As of March  31, 2011, average credit score for all of our relief refinance loans was 743, compared to an average of 735 for all other loans in the portfolio

(3) See note (4) of "Table 34  Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios

(4) We estimate current market value by adjusting the value of a property at origination based on changes in the market value of homes in the same geographical area since origination  See note (5) of "Table 34  Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of current LTV ratios  As of March  31, 2011,  average current  LTV ratio of all of our relief refinance loans was 80%

(5) Calculated as a percentage of the aggregate UPB of loans with LTV ratios greater than 100% in each origination year or category

(6) See "RISK MANAGEMENT  Credit Risk  *Mortgage Credit Risk  Single-family Mortgage Credit Risk  Delinquencies*" for further information about our reported serious delinquency rates

As of March 31, 2012 and December 31, 2011, approximately 54% and 51%, respectively, of our single family  credit guarantee portfolio consisted of mortgage loans originated after 2008, which have experienced lower serious  delinquency trends in the early years of their terms than loans originated in 2005 through 2008

***Strengthening Our Infrastructure and Improving Overall Efficiency While Also  Focusing On Retention of Key Employees***

We are working to both enhance the quality of our infrastructure  and improve our efficiency in order to preserve the  taxpayers' investment  We are focusing our resources primarily on key projects, many of which will likely take  several years to fully implement, and on making significant improvements to our systems infrastructure in order to: (a) implement mandatory initiatives from FHFA or other governmental bodies; (b) replace legacy hardware or  software systems at the end of their lives and to strengthen our  disaster recovery capabilities; and (c) improve our data collection and administration as well as our ability to oversee  the servicing of loans

We continue to actively manage our general and administrative  expenses, while also continuing to focus on retaining key  talent  Our general and administrative expenses declined in  the  first quarter of 2012 compared to the first quarter of 2011,  largely due to a reduction in the number of our employees and changes in our compensation plans  We currently expect that our general and administrative  expenses for the full year 2012 will be approximately equivalent to those we experienced in the  full year 2011, with lower salaries and employee benefits  expense offset by increased professional services expense,  in  part due to: (a) the continually changing mortgage market;  (b) an environment in which we are subject to increased regulatory oversight and mandates; and (c) strategic  arrangements that we may enter into with outside firms to  provide operational capability and staffing for key functions,  if needed  We believe the initiatives we are pursuing under the 2012 conservatorship scorecard and other FHFA mandated initiatives may require additional resources and affect our  level of administrative expenses going forward

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012          TREASURY-3541                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We believe our risks related to employee turnover and low employee engagement remain elevated  Uncertainty surrounding our  future business model, organizational structure, and compensation has contributed to elevated levels of voluntary  employee turnover and low employee engagement  Disruptive levels of turnover at both the executive and non executive levels and  low employee engagement have contributed to a deterioration in our control environment and may lead to breakdowns in many of  our operations  To help mitigate the uncertainty surrounding compensation, we introduced a new compensation program for  employees  We continue to explore various strategic arrangements  with outside firms to provide operational capability and  staffing for key functions, if needed  However, these or other efforts to manage this risk to the enterprise may not be successful  For more information on the risks related to  employee turnover, see "CONTROLS AND PROCEDURES," and for recent legislative and regulatory developments affecting  these risks, see "LEGISLATIVE AND REGULATORYMATTERS Legislative and Regulatory Developments Concerning Executive Compensation "

**Single Family Credit Guarantee Portfolio**

The UPB of our single family credit guarantee portfolio declined  approximately 1% during the first quarter of 2012, as the amount  of single family loan liquidations exceeded new loan purchase  and guarantee activity  We believe this is due, in part, to declines in the amount of single family mortgage debt outstanding in the market and our competitive position compared  to other market participants  The table below provides certain credit statistics for our single family credit guarantee  portfolio

**Table 3    Credit Statistics, Single Family Credit Guarantee  Portfolio**

| | As of | | | | |
|---|---|---|---|---|---|
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| Pay  e   s a   s | | | | | |
| One   on   pas  due | 1 63% | 2 02% | 1 94% | 1 92% | 1 75% |
| Two   o   s pas d  e | 0 57% | 0 70% | 0 70% | 0 67% | 0 65% |
| Se  ous y de  nquen (1 | 3 51% | 3 58% | 3 51% | 3 50% | 3 63% |
| Non-pe fo m ng loans ( n mi  ions)(2 | $119,599 | $120,514 | $119,081 | $114,819 | $115,083 |
| S ngle-fam ly loan loss  ese ve ( n mi  ions)(3 | $ 37,771 | $ 38,916 | $39,088 | $ 38,390 | $38,558 |
| REO  nven o y ( n p ope  es) | 59,307 | 60,535 | 59,596 | 60,599 | 65,159 |
| REO asse s, ne  ca  y ng va ue ( n m  ons) | $  5,333 | $  5,548 | $  5,539 | $  5,834 | $  6,261 |

| | or the Three Months  nded | | | | |
|---|---|---|---|---|---|
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| | | | (in units, unless noted) | | |
| Se  ous y de  nquen  oan add  ons(1 | 80,815 | 95,661 | 93,850 | 87,813 | 97,646 |
| Loan mod  ca  ons( | 13,677 | 19,048 | 23,919 | 31,049 | 35,158 |
| Fo ec osu e s a s ra o( | 0 53% | 0 54% | 0 56% | 0 55% | 0 58% |
| REO acqu s  ons | 23,805 | 24,758 | 24,378 | 24,788 | 24,707 |
| REO d spos  on seve  y a o (6 | | | | | |
| Ca  fo na | 44 2% | 44 6% | 45 5% | 44 9% | 44 5% |
| A  zona | 45 0% | 46 7% | 48 7% | 51 3% | 50 8% |
| F o da | 48 6% | 50 1% | 53 3% | 52 7% | 54 8% |
| Nevada | 56 5% | 54 2% | 53 2% | 55 4% | 53 1% |
|   no s | 49 3% | 51 2% | 50 5% | 49 4% | 49 5% |
| To a  U S | 40 3% | 41 2% | 41 9% | 41 7% | 43 0% |
| S ng e-fam y c ed   osses ( n m   ons) | $  3,435 | $  3,209 | $  3,440 | $  3,106 | $  3,226 |

(1) See "RISK MANAGEMENT    C ed t R sk    *Mortgage Credit Risk    Single-Family Mortgage Credit Risk    Delinquencies"* fo  fu he  nfo ma on abou
     o    epo  ed se o s de nq ency  a es
(2) Cons s s of  he UPB of loans  n ou  s ngle-fam ly c ed   gua an ee po  fo  o ha  have unde gone a TDR o  ha  a e se  o s y de  q e   As of Ma c  31, 2012 a d
     Decembe  31, 2011, app ox ma ely $46 1 b ll on and $44 4 b    o    UPB of TDR oa s, espec  ve y, we e  onge se  ous y de  nquen
(3) Cons s s of  he comb na on of (a) ou  allowance fo  loan losses on mo  gage loans held fo   nves men  and (b) ou   ese ve fo  gua an ee  osses assoc a ed w h non-
     consol da ed s ngle-fam ly mo  gage secu   za on  us s and n he  gua an ee  comm  men s
(4) Rep esen s  he numbe  of mod f ca on ag eemen s w h bo  owe s comp e ed du ng  he qua  e   Exc udes fo bea ance ag eemen s,  epay en p ans, and  oans  n
     mod f ca on   a  pe  ods
(5) Rep ese  s e a oo f e    be of oa s  a  e  ed  e fo ec osu e p ocess du ng  he espec ve qua  e d v ded by  he numbe  of loans  n he s ngle-fam ly
      c ed   gua an ee po  fo o a     e ed of  e q a e   Exc  des O  G a  e  e T a  sac o s and mo  gages cove ed unde  o he  gua an ee comm  men s
(6) S a es p ese  ed w h  he h ghes    ef ves a es w w o  c ed    osses we e  e ag es du ng  he 2011 and he f s qua e of 2012  Ca cu a ed as he a  oun  of ou   osses
      eco ded on d spos  on of REO p ope  es du ng  he espec  ve qua  e y pe  od, exc  d  g  dose s  bjec  o ep  c ase  eq es s  ade o o   selle /se v ce s, d v ded
     by  he agg ega e UPB of  he  e a ed loans  The amoun of losses  ecogn zed on d spos  on of  he p ope  es seq a o  e acon byw c  e UPB of  e  oans
     exceeds  he amoun  of sales p oceeds f om d spos  on of  he p ope  es  Exc udes sa es co     ss ons and o he  expenses, such as p ope  y  a ntenance and cos s, as
     well as appl cable  ecove es f om c ed  enhancemen s, such as mo  gage  nsu ance

In discussing our credit performance, we often use the terms  "credit losses" and "credit related expenses "  These terms are significantly different. Our "credit losses" consist of charge offs and REO operations income (expense), while our "credit related expenses" consist of our provision for credit losses and REO operations income (expense)

Since the beginning of 2008, on an aggregate basis, we have  recorded provision for credit losses associated with  single family loans of approximately $75.0 billion, and have recorded an additional $4 2 billion in losses on loans

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3542                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

purchased from PC trusts, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008 While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred and, thus, have not yet been provisioned for, we believe that, as of March 31, 2012, we have reserved for or charged off the majority of the total expected credit losses for these loans Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations

Borrower payment performance (for all early stages of delinquency) improved at March 31, 2012, compared to December 31, 2011 In addition, the number of seriously delinquent loan additions declined during the first quarter of 2012. However, several factors, including delays in the foreclosure process, have resulted in loans remaining in serious delinquency for longer periods than prior to 2008, particularly in states that require a judicial foreclosure process As of March 31, 2012 and December 31, 2011, the percentage of seriously delinquent loans that have been delinquent for more than six months was 73% and 70%, respectively.

The credit losses and loan loss reserves associated with our single family credit guarantee portfolio remained elevated in the first quarter of 2012, due in part to:

- Losses associated with the continued high volume of foreclosures and foreclosure alternatives These actions relate to the continued efforts of our servicers to resolve our large inventory of seriously delinquent loans Due to the length of time necessary for servicers either to complete the foreclosure process or pursue foreclosure alternatives on seriously delinquent loans in our portfolio, we expect our credit losses will continue to remain high even if the volume of new serious delinquencies continues to decline

- Continued negative impact of certain loan groups within the single family credit guarantee portfolio, such as those underwritten with certain lower documentation standards and interest only loans, as well as 2005 through 2008 vintage loans These groups continue to be large contributors to our credit losses Loans originated in 2005 through 2008 comprised approximately 30% and 36% of our single family credit guarantee portfolio, based on UPB at March 31, 2012 and 2011, respectively; however, these loans accounted for approximately 88% and 91% of our credit losses during the three months ended March 31, 2012 and 2011, respectively.

- Cumulative decline in national home prices of 28% since June 2006, based on our own index. As a result of this price decline, approximately 20% of loans in our single family credit guarantee portfolio, based on UPB, had estimated current LTV ratios in excess of 00% (*i.e.*, underwater loans) as of March 31, 2012.

- Weak financial condition of many of our mortgage insurers, which has reduced our estimates of expected recoveries from these counterparties

Some of our loss mitigation activities create fluctuations in our delinquency statistics For example, loans that we report as seriously delinquent before they enter a modification trial period continue to be reported as seriously delinquent until the modifications become effective and the loans are removed from delinquent status by our servicers. See "RISK MANAGEMENT     Credit Risk     *Mortgage Credit Risk Single family Mortgage Credit Risk     Credit Performance     Delinquencies*" for further information about factors affecting our reported delinquency rates

### Conservatorship and Government Support for our Business

We have been operating under conservatorship, with FHFA acting as our conservator, since September 6, 2008. The conservatorship and related matters have had a wide ranging impact on us, including our regulatory supervision, management, business, financial condition, and results of operations

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

While the conservatorship has benefited us, we are subject to certain constraints on our business activities imposed by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement and by FHFA, as our Conservator

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The $200 billion cap on Treasury's funding commitment will increase as necessary to eliminate any net worth deficits we may have during 2010, 2011, and 2012. We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

We received cash proceeds of $146 million from our draw under Treasury's funding commitment during the first quarter of 20 2 related to a quarterly deficit in equity at December 31, 2011 To address our net worth deficit of

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3543                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

$18 million at March 31, 2012, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $19 million. FHFA will request that we receive these funds by June 30, 2012  Upon funding of the draw request: (a) our aggregate liquidation preference on the senior preferred stock owned by Treasury will be $72.3 billion; and (b) the corresponding annual cash dividend owed to Treasury will be $7.23 billion.

We pay cash dividends to Treasury at an annual rate of 10%. Through March 31, 2012, we paid aggregate cash dividends to Treasury of $18.3 billion, an amount equal to 26% of our aggregate draws received under the Purchase Agreement  As of March 31, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock exceeded our annual  historical earnings in all but one period  As a result, we expect to make additional draws in future periods, even if our operating performance generates net income or comprehensive income

Neither the U S  government nor any other agency or  instrumentality of the U S  government is obligated to fund  our mortgage purchase or financing activities or to guarantee  our securities or other obligations

For more information on conservatorship and the Purchase  Agreement, see "BUSINESS     Conservatorship and  Related Matters" in our 2011 Annual Report

## Consolidated Financial Results

Net income was $577 million and $676 million for the  first quarters of 2012 and 2011, respectively. Key highlights of our financial results include:

- Net interest income was $4.5 billion for both the first  quarters of 2012 and 2011, reflecting the impact of a reduction  in the average balances of our higher yielding mortgage related assets offset by lower funding costs in the first quarter of  2012 compared to the first quarter of 2011.

- Provision for credit losses for the first quarter of 2012  declined to $1.8 billion, compared to $2.0 billion for  the first quarter of 2011. The provision for credit losses for the first quarter of 20 2 reflects stabilizing expected loss  severity on single family loans and a decline in the number of seriously delinquent loan additions

- Non interest income (loss) was $(1.5) billion for the first  quarter of 2012, compared to $(1.3) billion for the first  quarter of 2011, largely driven by an increase in derivative  losses, partially offset by a decline in net impairments of  available for sale securities recognized in earnings during the  first quarter of 2012 compared to the first quarter of 2011.

- Non interest expense declined to $596 million in the first  quarter of 2012, from $697 million in the first quarter of  2011, primarily due to a reduction in REO operations expense

- Comprehensive income was $1.8 billion for the first quarter  of 2012 compared to $2.7 billion for the first quarter of  2011. Comprehensive income for the first quarter of 2012 was  driven by the $577 million net income and a reduction in  net unrealized losses related to our available for sale securities

## Mortgage Market and Economic Conditions

### Overview

The U.S. real gross domestic product rose by 2.2% on an  annualized basis during the first quarter of 2012, compared to  1.6% during 2011, according to the Bureau of Economic Analysis. The national unemployment rate was 8.2% in March 2012, compared  to 8.5% in December 2011, based on data from the U.S. Bureau of Labor Statistics. In the data underlying the  unemployment rate, an average of over 210,000 monthly net new jobs were added to the economy during the first quarter of  2012, which shows evidence of a slow, but steady positive trend for the economy and the labor market

### Single-Family Housing Market

The single family housing market continued to experience  challenges in the first quarter of 2012 primarily due to  continued weakness in the employment market and a significant  inventory of seriously delinquent loans and REO properties in  the market.

Based on data from the National Association of Realtors, sales  of existing homes in the first quarter of 20 2 averaged  4 57 million (at a seasonally adjusted annual rate), increasing from 4 37 million in the fourth quarter of 2011  Based on data from the U.S. Census Bureau and HUD, new home sales in the first quarter of 2012 averaged 337,000 (at a  seasonally adjusted annual rate) increasing approximately 4%  from approximately 325,000 in the fourth quarter of 2011  We estimate that home prices remained relatively stable during the  first quarter of 2012, with our nationwide index registering  approximately a 0 3% decline from December 20    through March  2012 without adjustment for seasonality. This estimate was based on our own price index of mortgage loans on one family homes  funded by us or Fannie Mae.

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Other indices of home prices may have different results, as they are determined using different pools of mortgage loans and calculated under different conventions than our own

The foreclosure process continues to experience delays, due to a number of factors, but particularly in states that require a judicial foreclosure process  Delays in the foreclosure process (and in certain cases the removal of such delays) may also  adversely affect trends in home prices in certain geographic areas  There have been a number of regulatory developments in recent periods impacting single family mortgage servicing and foreclosure practices  It is possible that these developments  will result in significant changes to mortgage servicing and foreclosure practices that could adversely affect our business. For information on these matters, see "RISK FACTORS    Operational Risks    *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report and "LEGISLATIVE AND REGULATORY MATTERS    Developments Concerning Single Family Servicing Practices "

### Multifamily Housing Market

Multifamily market fundamentals continued to improve on a national level during the first quarter of 2012. This improvement continues a trend of favorable movements in key indicators such as vacancy rates and effective rents that generally began in early 2010  Vacancy rates and effective rents are important to loan performance because multifamily loans are generally repaid from the cash flows generated by the underlying property and these factors significantly influence those cash flows. These improving fundamentals and perceived optimism in recent periods about demand for multifamily housing have contributed to improvement in property values in most markets

### Mortgage Market and Business Outlook

Forward looking statements involve known and unknown risks and uncertainties, some of which are beyond our control  These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections  Actual results may differ significantly from those described in or implied by such forward looking statements due to various factors and uncertainties  For example, a number of factors could cause the actual performance of the housing and mortgage markets and the U S  economy during the remainder of 2012 to be significantly worse than we expect, including adverse changes in consumer confidence, national or international economic conditions and changes in the federal government's fiscal policies  See "FORWARD LOOKING STATEMENTS" for additional information

### Overview

We continue to expect key macroeconomic drivers of the economy    such as income growth, employment, and inflation    will affect the performance of the housing and mortgage markets in the remainder of 20 2  Since we expect that economic and job growth will likely be stronger in 2012 than in 2011, we believe that housing affordability will remain relatively high in 2012 for potential home buyers  We also expect that the volume of home sales will likely increase in 2012, compared to the volume in 2011, but still remain relatively weak compared to historical levels  Important factors that we believe will continue to negatively impact single family housing demand are the relatively high unemployment rate and relatively low consumer confidence measures  Consumer confidence measures, while up from recession lows, remain below long term averages and suggest that households will likely continue to be cautious in home buying  We also expect interest rates on f xed-rate single family mortgages to remain historically low in 20 2, which may extend the recent high level of refinancing activity (relative to new purchase lending activity). The recently expanded and streamlined HARP initiative may result in a high level of refinancing, particularly for borrowers that are underwater on their current loans  For information on this initiative, see "RISK MANAGEMENT    Credit Risk    Mortgage Credit Risk    Single Family Mortgage Credit Risk    Single Family  Loan Workouts and the MHA Program."

While home prices remain at significantly lower levels from their peak in most areas, estimates of the inventory of unsold homes, including those held by financial institutions and financially distressed borrowers, remain high  To the extent a large volume of loans complete the foreclosure process in a short time period the resulting REO inventory could have a negative impact on the housing market  Due to these and other factors, our expectation for home prices, based on our own index, is that national average home prices will continue to remain weak and may decline on a seasonally adjusted basis over the near term before a long term recovery in housing begins

### Single-Family

Our provision for credit losses and charge offs were elevated during the first quarter of 2012, and we expect they will likely remain elevated during the remainder of 2012. This is in part due to the substantial number of underwater mortgage

TREASURY-3545

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                        Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

loans in our single family credit guarantee portfolio, as well as the substantial inventory of seriously delinquent loans. For the near term, we also expect

- REO disposition severity ratios to remain near their historical highs, as market conditions, such as home prices and the rate of home sales continue to remain weak;

- non performing assets, which include loans, deemed TDRs, to continue to remain high;

- the volume of loan workouts to remain high; and

- continued high volume of loans in the foreclosure process as well as prolonged foreclosure timelines

### Multifamily

The most recent market data available continues to reflect improving national apartment fundamentals, including decreasing vacancy rates and increasing effective rents As a result, we expect our multifamily delinquency rate to remain relatively low during the remainder of 2012

Our purchase and guarantee of multifamily loans increased to $5.8 billion for the first quarter of 2012, compared to $3 0 billion during the same period in 2011, as strong volumes from late in 2011 carried into the first quarter of 20 2 However, we anticipate the growth in our purchase and guarantee volumes will slow for the remainder of the year, ultimately reflecting a more modest increase in 20 2, compared to 2011.

### Long-Term Financial Sustainability

There is significant uncertainty as to our long term financial sustainability The Acting Director of FHFA stated on September 19, 2011 that "it ought to be clear to everyone at this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship."

We expect to request additional draws under the Purchase Agreement in future periods Over time, our dividend obligation to Treasury will increasingly drive future draws Although we may experience period to period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term

There continues to be significant uncertainty in the current mortgage market environment, and continued high levels of unemployment, weakness in home prices, and adverse changes in interest rates, mortgage security prices, and spreads could lead to additional draws For discussion of other factors that could result in additional draws, see "RISK FACTORS      Conservatorship and Related Matters     *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition*" in our 2011 Annual Report

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near term Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near term We have no ability to predict the outcome of these deliberations For a discussion of FHFA's strategic plan for us, see "LEGISLATIVE AND REGULATORY MATTERS    FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard "

### Limits on Investment Activity and Our Mortgage Related Investments Portfolio

The conservatorship has significantly impacted our investment activity Under the terms of the Purchase Agreement and FHFA regulation, our mortgage related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 31, 2012. FHFA has indicated that such portfolio reduction targets should be viewed as minimum reductions and has encouraged us to reduce the mortgage related investments portfolio at a faster rate than required, consistent with FHFA guidance, safety and soundness and the goal of conserving and preserving assets We are also subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury We are working with FHFA to identify ways to prudently accelerate the rate of contraction of the portfolio

TREASURY-3546

Source   D RA  HOM   OAN MORTGAG CORP, 10 Q, May 03, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents the UPB of our mortgage related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation

**Table 4    Mortgage Related Investments Portfolio**[1]

| | March 31, 2012 | | December 31, 2011 |
|---|---|---|---|
| | | (in millions) | |
| Investments segment — Mortgage investments portfolio | $ 417,015 | $ | 449,273 |
| Single-family Guarantee segment — Single-family unsecuritized mortgage loans[2] | 61,903 | | 62,469 |
| Multifamily segment — Mortgage investments portfolio | 139,380 | | 141,571 |
| Total mortgage-related investments portfolio — related, securities estimated, not yet settled | $ 618,298 | $ | 653,313 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities estimated, but not yet settled
(2) Represents unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment

FHFA has stated that we will not be a substantial buyer or seller of mortgages for our mortgage related investments portfolio  FHFA also stated that, given the size of our current  mortgage related investments portfolio and the potential volume  of delinquent mortgages to be removed from PC pools, it expects that any net additions to our mortgage related investments  portfolio would be related to that activity  We expect that our holdings of unsecuritized single family loans could increase in  the remainder of 2012

We consider the liquidity of our assets in our mortgage related  investments portfolio based on three categories: (a) agency  securities; (b) assets that are less liquid than agency  securities; and (c) illiquid assets. Assets that are less  liquid than agency securities include unsecuritized performing single family mortgage loans, multifamily mortgage loans, CMBS,  and housing revenue bonds. Our less liquid assets collectively represented approximately 33% of the UPB of the portfolio at  March 31, 2012, as compared to 32% as of December 31, 2011. Illiquid assets include unsecuritized seriously delinquent  and modified single family mortgage loans which we removed from  PC trusts, and our investments in non agency mortgage related  securities backed by subprime, option ARM, and Alt A and other loans. Our illiquid assets collectively represented approximately 30% of the UPB of the portfolio at March 3 ,  2012, as compared to 29% as of December 31, 2011. The changing composition of our mortgage related investments  portfolio to a greater proportion of illiquid assets may  influence our decisions regarding funding and hedging. The description above of the liquidity of our assets is based on our  own internal expectations given current market conditions. Changes in market conditions could adversely affect the  liquidity of our assets at any given time.

11                                                                                                    *Freddie Mac*

Source   DRA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## SELECTED FINANCIAL DATA[1]

The selected financial data presented below should be reviewed in conjunction with MD&A and our consolidated financial statements and related notes for the three months ended March 31, 2012.

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (dollars in millions, except share-related amounts) | |
| **Statements of Comprehensive Income Data** | | |
| Net interest income | $ 4,500 | $ 4,540 |
| Provision for credit losses | (1,825) | (1,989) |
| Non-interest income (loss) | (1,516) | (1,252) |
| Non-interest expense | (596) | (697) |
| Net income | 577 | 676 |
| Comprehensive income | 1,789 | 2,740 |
| Net loss attributable to common stockholders | (1,227) | (929) |
| Net loss per common share | | |
| Basic | (0.38) | (0.29) |
| Diluted | (0.38) | (0.29) |
| Cash dividends per common share | | |
| Weighted average common shares outstanding (in thousands) [2] | | |
| Basic | 3,241,502 | 3,246,985 |
| Diluted | 3,241,502 | 3,246,985 |

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| | (dollars in millions) | |
| **Balance Sheets Data** | | |
| Mortgage loans held-for-investment, at amortized cost by consolidated trusts (net of allowances for loan losses) | $ 1,555,067 | $ 1,564,131 |
| Total assets | 2,114,944 | 2,147,216 |
| Debt securities of consolidated trusts held by third parties | 1,481,622 | 1,471,437 |
| Other debt | 618,629 | 660,546 |
| All other liabilities | 14,711 | 15,379 |
| Total Freddie Mac stockholders' equity (deficit) | (18) | (146) |
| **Portfolio Balances** [3] | | |
| Mortgage-related investments portfolio | $ 618,298 | $ 653,313 |
| Total Freddie Mac mortgage-related securities [4] | 1,617,595 | 1,624,684 |
| Total mortgage portfolio [5] | 2,056,501 | 2,075,394 |
| Non-performing assets [6] | 127,951 | 129,152 |

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| **Ratios** [7] | | |
| Return on average assets [8] | 0.1% | 0.1% |
| Non-performing assets ratio [9] | 6.8 | 6.4 |
| Equity to assets ratio [10] | | |

(1) See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for information on our significant accounting policies and the impact of new accounting policies on our consolidated financial statements.

(2) Includes the weighted average number of shares that have a associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. These shares are included in basic and diluted per share, because they are unconditionally exercisable by the holder at a cost of $0.00001 per share.

(3) Represents the UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(4) See "Table 27: Freddie Mac Mortgage-Related Securities" for the composition of this line item.

(5) See "Table 11: Composition of Segment Mortgage Portfolios and Credit Risk Portfolios" for the composition of our total mortgage portfolio.

(6) See "Table 45: Non-Performing Assets" for a description of our non-performing assets.

(7) The dividend payout ratio on common stock is not presented because we are reporting a net loss attributable to common stockholders for all periods presented.

(8) Ratio computed as net income divided by the simple average of the beginning and ending balances of total assets.

(9) Ratio computed as non-performing assets divided by the ending UPB of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities.

(10) Ratio computed as the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit) divided by the simple average of the beginning and ending balances of total assets.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3548

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes  Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported results of operations

### Impact of Legislated Increase to Guarantee Fees

Effective April 1, 2012, the guarantee fee on all single family residential mortgages sold to Freddie Mac was increased by 10 basis points. Guarantee fees related to mortgage loans held by our consolidated trusts, including those attributable to the 10 basis point increase, will continue to be reported within our GAAP consolidated statements of comprehensive income in net interest income and the remittance of the additional fees to Treasury will be reported in non interest expense  For additional information, see "LEGISLATIVE AND REGULATORY MATTERS  Legislated Increase to Guarantee Fees "

**Table 5**     **Summary Consolidated Statements of Comprehensive Income**

| | Three Months  nded March 31, | |
| --- | --- | --- |
| | **2012** | **2011** |
| | (in millions) | |
| Ne  n e es  ncome | $ 4,500 | $ 4,540 |
| P ov s on fo  c ed  losses | (1,825) | (1,989) |
| Ne  n e es  ncome af e  p ov s on fo  c ed  losses | 2,675 | 2,551 |
| Non- n e es  ncome (loss) | | |
| Ga ns ( osses) on ex  ngu shmen  of deb  secu    es of conso da ed  us s | (4) | 223 |
| Ga ns (losses) on e  emen  of o he  deb | (21) | 12 |
| Ga ns ( osses) on deb  eco ded a  fa  va ue | (17) | (81) |
| De  va  ve ga ns (losses) | (1,056) | (427) |
| Impa  men  of ava lable-fo -sale secu   es | | |
| To al o he - han- empo a y  mpa  men  of ava lable-fo -sale secu    es | (475) | (1,054) |
| Po  on of o he - han- empo a y  mpa  men  ecogn zed n AOCI | (89) | (139) |
| Ne  mpa  men  of ava lable-fo -sale secu   es  ecogn zed n ea n ngs | (564) | (1,193) |
| O he  ga ns (losses) on  nves men  secu   es  ecogn zed n ea n ngs | (288) | (120) |
| O he  ncome | 434 | 334 |
| To al non- n e es  ncome (loss) | (1,516) | (1,252) |
| Non- n e es  expense | | |
| Adm n s a ve expenses | (337) | (361) |
| REO ope a  ons expense | (171) | (257) |
| O he  expenses | (88) | (79) |
| To al non- n e es  expense | (596) | (697) |
| Income befo e  ncome  ax benef | 563 | 602 |
| Income  ax benef | 14 | 74 |
| Ne  ncome | 577 | 676 |
| O he  comp ehens ve  ncome, ne  of  axes and  eclass f ca on adj s  e s | | |
| Changes  n un ea zed ga ns ( osses)  e a ed o  ava lable-fo -sale secu   es | 1,147 | 1,941 |
| Changes  n un ea zed ga ns ( osses)  e a ed o  cash f ow hedge  ela onsh ps | 111 | 132 |
| Changes  n def ned benef  p ans | (46) | (9) |
| To al o he  comp ehens ve  ncome, ne  of  axes and  eclass f ca on ad us men s | 1,212 | 2,064 |
| Comp ehens ve  ncome | $ 1,789 | $ 2,740 |

3

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Net Interest Income**

The table below presents an analysis of net interest income, including average balances and related yields earned on assets and incurred on liabilities

**Table 6     Net Interest Income/Yield and Average Balance Analysis**

| | Three Months Ended March 31, | | | | | |
| | 2012 | | | 2011 | | |
| | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate |
|---|---|---|---|---|---|---|
| | (dollars in millions) | | | | | |
| Interest-earning assets | | | | | | |
| Cash and cash equivalents | $ 51,029 | $ 4 | 0 03% | $ 37,561 | $ 16 | 0 17% |
| Federal funds sold and securities purchased under agreements to resell | 26,057 | 9 | 0 14 | 47,861 | 18 | 0 15 |
| Mortgage-related securities | | | | | | |
| Mortgage-related securities(3) | 383,227 | 4,363 | 4 55 | 456,972 | 5,316 | 4 65 |
| Extinguishment of PCs held by Freddie Mac | (125,363) | (1,441) | (4 60) | (167,528) | (2,063) | (4 93) |
| Total mortgage-related securities, net | 257,864 | 2,922 | 4 53 | 289,444 | 3,253 | 4 50 |
| Non-mortgage-related securities(3) | 28,464 | 16 | 0 23 | 29,309 | 30 | 0 41 |
| Mortgage loans held by consolidated trusts(4) | 1,559,823 | 17,468 | 4 48 | 1,650,567 | 20,064 | 4 86 |
| Unsecuritized mortgage loans(4) | 254,877 | 2,312 | 3 63 | 240,557 | 2,334 | 3 88 |
| Total interest-earning assets | $ 2,178,114 | $ 22,731 | 4 18 | $2,295,299 | $ 25,715 | 4 48 |
| Interest-bearing liabilities | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 1,580,749 | $(16,694) | (4 22) | $ 1,665,608 | $ (19,466) | (4 67) |
| Extinguishment of PCs held by Freddie Mac | (125,363) | 1,441 | 4 60 | (167,528) | 2,063 | 4 93 |
| Total debt securities of consolidated trusts held by third parties | 1,455,386 | (15,253) | (4 19) | 1,498,080 | (17,403) | (4 65) |
| Other debt | | | | | | |
| Short-term debt | 149,130 | (40) | (0 11) | 194,822 | (115) | (0 24) |
| Long-term debt (5) | 496,644 | (2,776) | 2 23 | 518,034 | (3,450) | (2 66) |
| Total other debt | 645,774 | (2,816) | (1 74) | 712,856 | (3,565) | (2 00) |
| Total interest-bearing liabilities | 2,101,160 | (18,069) | (3 44) | 2,210,936 | (20,968) | (3 79) |
| Expense related to derivatives(6) | | (162) | (0 03) | | (207) | (0 04) |
| Impact of net non-interest-bearing funding | 76,954 | | 0 12 | 84,363 | | 0 14 |
| Total funding of interest-earning assets | $ 2,178,114 | $ (18,231) | (3 35) | $2,295,299 | $ (21,175) | (3 69) |
| Net interest income/yield | | $ 4,500 | 0 83 | | $ 4,540 | 0 79 |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled
(2) We calculate average balances based on amortized cost
(3) Interest income (expense) includes accretion of the portion of impairment changes recognized in earnings where we expect a significant improvement in cash flows
(4) Non-performing loans, where interest income is generally recognized when collected, are included in average balances
(5) Includes current portion of long-term debt
(6) Represents changes in fair value of derivatives in closed cash flow hedge relationships we have previously deferred in AOCI and have been reclassified to earnings as the associated hedged forecasted issuance of debt affects earnings

Net interest income decreased by $40 million and net interest yield increased by 4 basis points during the three months ended March 31, 2012, compared to the three months ended March 31, 2011. The primary driver underlying the decrease in net interest income was the reduction in the average balance of higher yielding mortgage related assets due to continued liquidations and limited purchase activity, partially offset by lower funding costs from the replacement of debt at lower rates The increase in net interest yield was primarily due to the benefits of lower funding costs, partially offset by the negative impact of the reduction in the average balance of higher yielding mortgage assets

We do not recognize interest income on non performing loans that have been placed on non accrual status, except when cash payments are received We refer to this interest income that we do not recognize as foregone interest income Foregone interest income and reversals of previously recognized interest income, net of cash received, related to non performing loans was $0.9 billion and $1.0 billion during the three months ended March 31, 2012 and 2011, respectively. This reduction was primarily due to the decreased volume of non performing loans on non accrual status.

During the three months ended March 31, 2012, spreads on our debt and our access to the debt markets remained favorable relative to historical levels For more information, see "LIQUIDITY AND CAPITAL RESOURCES     Liquidity."

TREASURY-3550

Source   D RA HOM   OAN MORTGAG CORP, 10 Q, May 03, 2012                                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses may not be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Provision for Credit Losses**

We maintain loan loss reserves at levels we believe are appropriate to absorb probable incurred losses on mortgage loans held for investment and loans underlying our financial guarantees  Our loan loss reserves are increased through the provision for credit losses and are reduced by net charge offs

Our provision for credit losses declined to $1.8 billion in the first quarter of 2012, compared to $2.0 billion in the first quarter of 2011. The provision for credit losses for the first quarter of 2012 reflects stabilizing expected loss severity on single family loans and a decline in the number of seriously delinquent loan additions, while the first quarter of 20  reflects worsening expected loss severity and higher modification volumes offset by a decline in the rate at which seriously delinquent loans ultimately transition to a loss event

During the first quarter of 2012, our charge offs, net of recoveries for single family loans, exceeded the amount of our provision for credit losses. Our charge offs in the first quarter of 20 2 were less than they otherwise would have been because of the suppression of loan and collateral resolution activity due to delays in the foreclosure process  We believe the level of our charge offs will continue to remain high and may increase in the remainder of 2012

As of March 31, 2012 and December 31, 2011, the UPB of our single family non performing loans was $119.6 billion and $120.5 billion, respectively. These amounts include $46.1 billion and $44.4 billion, respectively, of single family TDRs that are reperforming (*i.e.*, less than three months past due)  TDRs remain categorized as non performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification  See "RISK MANAGEMENT  Credit Risk    *Mortgage Credit Risk*" for further information on our single family credit guarantee portfolio, including credit performance, charge offs, our loan loss reserves balance, and our non performing assets

The total number of seriously delinquent loans declined approximately 3% and 6% during the first quarters of 2012 and 2011, respectively. However, our serious delinquency rate remains high compared to historical levels due to the continued weakness in home prices, persistently high unemployment, extended foreclosure timelines, and continued challenges faced by servicers processing large volumes of problem loans  Our seller/servicers have an active role in our loan workout activities, including under the servicing alignment initiative and the MHA Program, and a decline in their performance could result in a failure to realize the anticipated benefits of our loss mitigation plans.

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single family loans of approximately $75.0 billion, and have recorded an additional $4.2 billion in losses on loans purchased from our PCs, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008  While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred, and thus have not been provisioned for, we believe that, as of March 31, 2012, we have reserved for or charged off the majority of the total expected credit losses for these loans  Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations  See "Table 3    Credit Statistics, Single Family Credit Guarantee Portfolio" for certain quarterly credit statistics for our single family credit guarantee portfolio

Our provision for credit losses and amount of charge offs in the future will be affected by a number of factors, including: (a) the actual level of mortgage defaults; (b) the impact of the MHA Program and other loss mitigation efforts, including any requirement to utilize principal forgiveness in our loan modification initiatives; (c) any government actions or programs that impact the ability of troubled borrowers to obtain modifications, including legislative changes to bankruptcy laws; (d) changes in property values; (e) regional economic conditions, including unemployment rates; (f) delays in the foreclosure process, including those related to the concerns about deficiencies in foreclosure documentation practices; (g) third party mortgage insurance coverage and recoveries; and (h) the realized rate of seller/servicer repurchases  In addition, in April 2012, FHFA issued an advisory bulletin that could have an impact on our provision for credit losses in the future; however, we are still assessing the operational and accounting impacts of the bulletin. See "LEGISLATIVE AND REGULATORY DEVELOPMENTS    FHFA Advisory Bulletin" for additional information. See "RISK MANAGEMENT    Credit Risk    *Institutional Credit Risk*" for information on mortgage insurers and seller/servicer repurchase obligations

We recognized a benefit for credit losses associated with our multifamily mortgage portfolio of $19 million and $60 million for the first quarters of 2012 and 2011, respectively  Our loan loss reserves associated with our multifamily mortgage portfolio were $525 million and $545 million as of March 31, 2012 and December 31, 2011, respectively  The decline in loan loss reserves for multifamily loans in the first quarter of 2012 was driven primarily by the increased seasoning of our portfolio and the lower level of estimated incurred credit losses based on our historical experience

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3551                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Non-Interest Income (Loss)**

### Gains (Losses) on Extinguishment of Debt Securities of Consolidated Trusts

When we purchase PCs that have been issued by consolidated PC trusts, we extinguish a pro rata portion of the outstanding debt securities of the related consolidated trusts  We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to extinguish the debt security differs from its carrying value  Gains (losses) on extinguishment of debt securities of consolidated trusts were $(4) million and $223 million for the three months ended March 31, 2012 and 2011, respectively  For the three months ended March 31, 2012 and 2011, we extinguished debt securities of consolidated trusts with a UPB of $692 million and $24 8 billion, respectively (representing our purchase of single family PCs with a corresponding UPB amount)  The decrease in purchases of single family PCs was primarily due to a lower volume of dollar roll transactions to support the market and pricing of our single family PCs  See "Table 9   Mortgage Related Securities Purchase Activity" for additional information regarding purchases of mortgage related securities, including those issued by consolidated PC trusts.

### Gains (Losses) on Retirement of Other Debt

Gains (losses) on retirement of other debt were $(21) million and $12 million during the three months ended March 31, 2012 and 2011, respectively  We recognized losses on debt retirements in the first quarter of 2012 primarily due to write offs of unamortized deferred issuance costs  We recognized gains on debt retirements in the first quarter of 2011 primarily due to the repurchase of other debt securities at a discount. For more information, see "LIQUIDITY AND CAPITAL RESOURCES   Liquidity   *Other Debt Securities   Other Debt Retirement Activities*."

### Gains (Losses) on Debt Recorded at Fair Value

Gains (losses) on debt recorded at fair value primarily relate to changes in the fair value of our foreign currency denominated debt  During the first three months of 2012 and 2011, we recognized losses on debt recorded at fair value of $17 million and $81 million, respectively, primarily due to a combination of the U S dollar weakening relative to the Euro and changes in interest rates  We mitigate changes in the fair value of our foreign currency denominated debt by using foreign currency swaps and foreign currency denominated interest rate swaps

### Derivative Gains (Losses)

The table below presents derivative gains (losses) reported in our consolidated statements of comprehensive income  See "NOTE 10: DERIVATIVES   Table 10.2   Gains and Losses on Derivatives" for information about gains and losses related to specific categories of derivatives. Changes in fair value and interest accruals on derivatives not in hedge accounting relationships are recorded as derivative gains (losses) in our consolidated statements of comprehensive income  At March 31, 2012 and December 31, 2011, we did not have any derivatives in hedge accounting relationships; however, there are amounts recorded in AOCI related to discontinued cash flow hedges  Amounts recorded in AOCI associated with these closed cash flow hedges are reclassified to earnings when the forecasted transactions affect earnings  If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the forecasted transaction is reclassified into earnings immediately

While derivatives are an important aspect of our strategy to manage interest rate risk, they generally increase the volatility of reported net income because, while fair value changes in derivatives affect net income, fair value changes in several of the types of assets and liabilities being hedged do not affect net income  Beginning in the fourth quarter of 2011, we started issuing a higher percentage of long term debt  This allows us to take advantage of attractive long term rates while decreasing our reliance on interest rate swaps

### Table 7   Derivative Gains (Losses)

| | Derivative Gains (Losses) | |
|---|---|---|
| | Three Months  nded March 31, | |
| | 2012 | 2011 |
| | (in millions) | |
| In e es - a e swaps | $ 1,208 | $ 1,723 |
| Op on-based de va ves(1 | (1,077) | (807) |
| O he de va ves(2 | (111) | (94) |
| Acc ual of pe od c se lemen s(3 | (1,076) | (1,249) |
| o a | $ (1,056) | $ (427) |

(1) P a y nc udes pu chased ca and pu swap ons and pu chased n ees - a e caps and f oo s
(2) I c des f es, fo e g -c e cy swaps, co e s, swap gua an ee de va ves, and c ed de va ves
(3) Inc udes pu ed e e ons on ze o-coupon swaps

16

*Freddie Mac*

Source   D RA  HOM  OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Gains (losses) on derivatives not accounted for in hedge accounting relationships are principally driven by changes in: (a) interest rates and implied volatility; and (b) the mix and volume of derivatives in our derivative portfolio

During the three months ended March 31, 2012, we recognized losses on derivatives of $1.1 billion primarily due to losses related to the accrual of periodic settlements on interest rate swaps as we were in a net pay fixed swap position We recognized fair value gains on our pay fixed swaps of $3 8 billion, which were largely offset by: (a) fair value losses on our receive fixed swaps of $2.6 billion; and (b) fair value losses on our option based derivatives of $1.1 billion resulting from losses on our purchased call swaptions due to an increase in long term interest rates The fair value of derivatives during the three months ended March 31, 2012 reflects a decline in short term interest rates and an increase in long term interest rates compared to the three months ended March 31, 2011, when both short term and long term interest rates increased

During the three months ended March 31, 2011, we recognized losses on derivatives of $0 4 billion primarily due to $1.2 billion of losses related to the accrual of periodic settlements on interest rate swaps as we were in a net pay fixed swap position, partially offset by the improvement in derivative fair values as interest rates increased. As a result, we recognized fair value gains of $4 0 billion on our pay fixed swaps, partially offset by fair value losses on our receive fixed swaps of $2 2 billion We recognized fair value losses of $0.8 billion on our option based derivatives, resulting from losses on our purchased call swaptions primarily due to the increase in interest rates

### Investment Securities-Related Activities

#### Impairments of Available For Sale Securities

We recorded net impairments of available for sale securities recognized in earnings, which were related to non agency mo tgage-re ated securities, of $564 million and $1.2 billion during the three months ended March 31, 2012 and 2011, respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities    *Mortgage Related Securities    Other Than Temporary Impairments on Available For Sale Mortgage Related Securities*" and "NOTE 7: INVESTMENTS IN SECURITIES" for information regarding the accounting principles for investments in debt and equity securities and the other than temporary impairments recorded during the three months ended March 31, 2012 and 2011.

#### Other Gains (Losses) on Investment Securities Recognized in Earnings

Other gains (losses) on investment securities recognized in earnings primarily consists of gains (losses) on trading securities. Trading securities mainly include Treasury securities, agency fixed rate and variable rate pass through mortgage related securities, and agency REMICs, including inverse floating rate, interest only and principal only securities We recognized $(377) million and $(200) million related to gains (losses) on trading securities during the three months ended March 31, 2012 and 2011, respectively.

Losses in both periods are primarily due to the movement of securities with unrealized gains towards maturity. The losses during the three months ended March 31, 2011 were partially offset by larger fair value gains, compared to the three months ended March 31, 2012, due to a tightening of OAS levels on agency securities

### Other Income

The table below summarizes the significant components of other income

**Table 8    Other Income**

| | Three Months nded March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in millions) | |
| O he ncome | | |
| Ga ns (losses) on sale of mo gage loans | $ 40 | $ 95 |
| Ga ns (losses) on mo gage loans eco ded a fa value | 139 | (33) |
| Recove es on loans mpa ed upon pu chase | 89 | 125 |
| Gua an ee- ela ed ncome, e (1 | 70 | 54 |
| All o he | 96 | 93 |
| To a o he ncome | $ 434 | $ 334 |

(1) Mos of ou gua an ee- ela ed ncome ela es o secu zed mul fam ly mo gage loans whe e we have no consol da ed he secu za on us s on ou conso da ed ba ance shee s

17                                              *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Gains (Losses) on Sale of Mortgage Loans*

In the first quarters of 2012 and 2011, we recognized $40 million and $95 million, respectively, of gains on sale of mortgage loans with associated UPB of $3.7 billion and $3 4 billion, respectively  All such amounts relate to our securitizations of multifamily loans which we had e ected to carry at fair value while they were held on our consolidated balance sheet  We had lower gains on sale of mortgage loans in the first quarter of 2012, compared to the first quarter of  2011, as a significant portion of the improved fair value of the loans was instead recognized within gains (losses) on mortgage loans recorded at fair value during periods prior to the loans' securitization

*Gains (Losses) on Mortgage Loans Recorded at Fair Value*

In the first quarters of 2012 and 2011, we recognized $139 million and $(33) million, respectively, of gains (losses) on mortgage loans recorded at fair value  We held higher balances of multifamily loans on our consolidated balance  sheets that were designated for subsequent securitization during the first quarter of 2012, compared to the first quarter of 2011  which, when combined with improving fair values on those loans, resulted in gains during the first quarter of 2012.

*Recoveries on Loans Impaired upon Purchase*

Recoveries on loans impaired upon purchase represent the  recapture into income of previously recognized losses associated  with purchases of delinquent loans from our PCs in conjunction  with our guarantee activities  Recoveries occur when a  non performing loan is repaid in full or when at the time of foreclosure the estimated fair value of the acquired property,  less costs to sell, exceeds the carrying value of the loan  For impaired loans where the borrower has made required payments  that return the loan to less than three months past due, the  recovery amounts are instead recognized as interest income over  time as periodic payments are received

During the first quarters of 2012 and 2011, we recognized  recoveries on loans impaired upon purchase of $89 million  and $125 million, respectively  Our recoveries on loans impaired upon purchase declined in the first quarter of 2012,  compared to the first quarter of 2011, due to a lower volume of foreclosure transfers and payoffs associated with loans impaired  upon purchase.

*All Other*

All other income consists primarily of transactional fees, fees  assessed to our servicers, such as for technology use and late  fees or other penalties, and other miscellaneous income

**Non-Interest Expense**

The table below summarizes the components of non interest  expense

**Table 9     Non Interest Expense**

|  | Three Months nded March 31, | |
| --- | --- | --- |
|  | 2012 | 2011 |
|  | (in millions) | |
| Adm n s  a  ve expenses |  |  |
| Sala es and employee benef  s | $ 176 | $ 207 |
| P ofess onal se v ces | 71 | 56 |
| Occupancy expense | 14 | 15 |
| O he  adm n s  a ve expense | 76 | 83 |
| To al adm n s  a ve expenses | 337 | 361 |
| REO ope a ons expense | 171 | 257 |
| O he  expenses | 8 8 | 79 |
| To al non- n e es  expense | $596 | $697 |

*Administrative Expenses*

Administrative expenses decreased during the three months ended  March 31, 2012 compared to the three months ended  March 31, 2011, largely due to a reduction in salaries and  employee benefits expense  We currently expect that our general  and administrative expenses for the full year 2012 will be approximately equivalent to those we experienced in the  full year 2011, with lower salaries and employee benefits  expense offset by increased professional services expense, in  part due to: (a) the continually changing mortgage market;  (b) an environment in which we are subject to increased regulatory oversight and mandates; and (c) strategic  arrangements that we may enter into with outside firms to  provide operational capability and staffing for key functions,  if needed  We believe the initiatives we are pursuing under the 2012

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

conservatorship scorecard and other FHFA mandated initiatives may require additional resources and affect our level of administrative expenses going forward

### REO Operations Expense

The table below presents the components of our REO operations expense, and REO inventory and disposition information

**Table 10    REO Operations Expense, REO Inventory, and REO Dispositions**

| | Three Months ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (dollars in millions) | |
| REO ope a ons expense | | |
| S ng e-fam y | | |
| REO p ope y expenses(1 | $ 378 | $ 308 |
| D spos on (ga ns) losses, e (2 | (78) | 126 |
| Change n hold ng pe od allowance, d spos ons | (57) | (155) |
| Change n hold ng pe od allowance, nven o y(3 | 1 | 151 |
| Recove es( | (72) | (173) |
| To al s ngle-fam ly REO ope a ons expense | 172 | 257 |
| Mul fam ly REO ope a ons expense ( ncome) | (1) | — |
| To al REO ope a ons expense | $ 171 | $ 257 |
| REO nven o y ( n p ope es), a Ma ch 31 | | |
| S ng e- am y | 59,307 | 65,159 |
| Mu fam y | 16 | 15 |
| o a | 59,323 | 65,174 |
| REO p ope y d spos ons ( n p ope es) | | |
| S ng e- am y | 25,033 | 31,627 |
| Mu fam y | 4 | 1 |
| o a | 25,037 | 31,628 |

(1) Cons s s of cos s ncu ed o acqu e, a n a n o p ote t a p ope y af e s acqu ed a fo ec os e a sfe , s c a ega fees, s a ce, axes, a d c ea g and o he ma n enance cha ges

(2) Rep esen s e d ffe ence be ween e d spos on p oceeds, ne of se g expe ses, a d e fa va ue of e p ope y o e da e of he fo ec osu e ansfe

(3) Rep esen s he ( nc ease) dec ease n he es a ed fa va ue of p ope es ha we e n nven o y du ng he pe od

(4) Includes ecove es f om p ma y mo gage nsu ance, pool nsu ance and se e /se v ce epu chases

REO operations expense declined to $ 7  million in the first quarter of 2012, as compared to $257 million in the first quarter of 2011, primarily due to stabilizing home prices in certain geographical areas with significant REO activity, which resulted in gains on disposition of properties as well as lower write downs of single family REO inventory during the first quarter of 20 2  However, we also experienced lower recoveries on REO properties during the first quarter of 2012,  compared to the first quarter of 2011, primarily due to reduced recoveries from mortgage insurers, in part due to the continued weakness in the financial condition of our mortgage insurance  counterparties, and a decline in reimbursements of losses from seller/servicers associated with repurchase requests

Although our servicers have resumed the foreclosure process in most areas, we believe the volume of our single family REO acquisitions during the first quarter of 2012 was less than it otherwise would have been due to delays in the foreclosure process, particularly in states that require a judicial foreclosure process  The lower acquisition rate, coupled with high disposition levels, led to a lower REO property inventory level at March 31, 2012, compared to March 31, 2011.  We expect that the length of the foreclosure process will continue to remain above historical levels  See "RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Non Performing Assets*" for additional information about our REO activity

### Other Expenses

Other expenses were $88 million and $79 million in the first quarters of 2012 and 2011, respectively. Other expenses consist primarily of HAMP servicer incentive fees, costs related to terminations and transfers of mortgage servicing, and other miscellaneous expenses

### Income Tax Benefit

For the three months ended March 31, 2012 and 2011, we reported an income tax benefit of $ 4 million and $74 million, respectively  See "NOTE 12: INCOME TAXES" for additional information.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3555

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Comprehensive Income

Our comprehensive income was $1.8 billion and $2.7 billion for the three months ended March 31, 2012 and 2011, respectively, consisting of: (a) $577 million and $676 million of net income, respectively; and (b) $1.2 billion and $2 1 billion of total other comprehensive income, respectively, primarily due to a reduction in net unrealized losses related to our available for sale securities  See "CONSOLIDATED BALANCE SHEETS ANALYSIS    Total Equity (Deficit)" for additional information regarding total other comprehensive income

## Segment Earnings

Our operations consist of three reportable segments, which are based on the type of business activities each performs    Investments, Single family Guarantee, and Multifamily  Certain activities that are not part of a reportable segment are included in the All Other category

The Investments segment reflects results from our investment, funding and hedging activities  In our Investments segment, we invest principally in mortgage related securities and single family performing mortgage loans, which are funded by other debt issuances and hedged using derivatives. In our Investments segment, we also provide funding and hedging management services to the Single family Guarantee and Multifamily segments  The Investments segment reflects changes in the fair value of the Multifamily segment assets that are associated with changes in interest rates  Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses

The Single family Guarantee segment reflects results from our single family credit guarantee activities  In our Single family Guarantee segment, we purchase single family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage related securities  We guarantee the payment of principal and interest on the mortgage related securities in exchange for management and guarantee fees  Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less credit related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses

The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities  Although we hold multifamily mortgage loans and non agency CMBS that we purchased for investment, our purchases of such multifamily mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008. The only CMBS that we have purchased since 2008 have been senior, mezzanine, and interest-only tranches related to certain of our securitization transactions, and these purchases have not been significant.  Currently, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization  We guarantee the senior tranches of these securitizations in Other Guarantee Transactions. Our Multifamily segment also issues Other Structured Securities, but does not issue REMIC securities  Our Multifamily segment also enters into other guarantee commitments for multifamily HFA bonds and housing revenue bonds held by third parties. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less credit related expenses, administrative expenses, and allocated funding costs  In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held for sale loans associated only with market factors other than changes in interest rates, such as liquidity and credit.

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator  The financial performance of our Single family Guarantee segment and Multifamily segment are measured based on each segment's contribution to GAAP net income (loss)  Our Investments segment is measured on its contribution to GAAP comprehensive income (loss), which consists of the sum of its contribution to: (a) GAAP net income (loss); and (b) GAAP total other comprehensive income (loss), net of taxes  The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss)  Likewise, the sum of comprehensive income (loss) for each segment and the All Other category equals GAAP comprehensive income (loss)

The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments  By recording these types of activities to the All Other category, we be eve the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods  The All Other category also includes the deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward

20

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In presenting Segment Earnings, we make significant reclassifications to certain financial statement line items in order to reflect a measure of net interest income on investments and a measure of management and guarantee income on guarantees that is in line with how we manage our business. We present Segment Earnings by: (a) reclassifying certain investment related activities and credit guarantee related activities between various line items on our GAAP consolidated statements of comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments

As a result of these reclassifications and allocations, Segment Earnings for our reportable segments differs significantly from, and should not be used as a substitute for, net income (loss) as determined in accordance with GAAP Our definition of Segment Earnings may differ from similar measures used by other companies However, we believe that Segment Earnings provides us with meaningful metrics to assess the financial performance of each segment and our company as a whole

See "NOTE 14: SEGMENT REPORTING" in our 2011 Annual Report for further information regarding our segments, including the descriptions and activities of the segments and the reclassifications and allocations used to present Segment Earnings.

Beginning in 2012, under guidance from FHFA we began to curtail mortgage related investments portfolio purchase and retention activities that are undertaken for the primary purpose of supporting the price performance of our PCs, which may result in a significant decline in the market share of our single family guarantee business, lower comprehensive income, and a more rapid decline in the size of our total mortgage portfolio

21

*Freddie Mac*

Source    D RA HOM    OAN MORTGAG CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides information about our various segment mortgage portfolios at March 31, 2012 and December 31, 2011. For a discussion of each segment's portfolios, see "*Segment Earnings    Results*."

**Table 11    Composition of Segment Mortgage Portfolios and Credit Risk  Portfolios[1]**

| | March 31, 2012 | | December 31, 2011 |
|---|---|---|---|
| | (in millions) | | |
| **Segmen  mor gage por fo  os:** | | | |
| *Investments    Mortgage investments portfolio* | | | |
| S ngle-fam ly unsecu   zed mo  gage  oans[2] | $ 103,593 | $ | 109,190 |
| F  edd e Mac mo  gage- ela ed secu  es | 199,132 | | 220,659 |
| Non-agency mo  gage- ela ed secu  es | 84,180 | | 86,526 |
| Non-F edd e Mac agency secu   es | 30,110 | | 32,898 |
| Total Investments    Mortgage investments portfolio | 417,015 | | 449,273 |
| *Single-family Guarantee    Managed loan portfolio* [3] | | | |
| S ngle-fam ly unsecu   zed mo  gage  oans[ | 61,903 | | 62,469 |
| S ngle-fam ly F  edd e Mac mo  gage- ela ed secu   es held by us | 199,132 | | 220,659 |
| S ngle-fam ly F  edd e Mac mo  gage- ela ed secu   es held by  h  d pa  es | 1,390,328 | | 1,378,881 |
| S ngle-fam ly o he  gua an ee comm  men s[ | 12,498 | | 11,120 |
| Total Single-family Guarantee    Managed loan portfolio | 1,663,861 | | 1,673,129 |
| *Multifamily    Guarantee portfolio:* | | | |
| Mu  fam  y F  edd e Mac mo  gage  e a ed secu   es held by us | 2,614 | | 3,008 |
| Mul fam ly F  edd e Mac mo  gage- ela ed secu   es held by  h  d pa   es | 25,521 | | 22,136 |
| Mul fam ly o he  gua an ee comm  men s[ | 9,856 | | 9,944 |
| Total Multifamily    Guarantee portfolio | 37,991 | | 35,088 |
| *Multifamily    Mortgage investments portfolio* | | | |
| Mul fam ly nves men  secu   es po  fol o | 56,891 | | 59,260 |
| Mu  fam  y  oan po  fo  o | 82,489 | | 82,311 |
| Total Multifamily    Mortgage investments portfolio | 139,380 | | 141,571 |
| Total Multifamily portfolio | 177,371 | | 176,659 |
| Less  F  edd e Mac s ngle-fam ly and ce  a n mul  fam ly secu   es[6] | (201,746) | | (223,667) |
| Total mortgage portfolio | $ 2,056,501 | $ | 2,075,394 |
| **Cred t r sk po t olios:**[7] | | | |
| *Single-family credit guarantee portfolio* [3] | | | |
| S ngle-fam ly mo  gage loans, on-balance shee | $ 1,714,182 | $ | 1,733,215 |
| Non-consol da ed F  edd e Mac mo  gage- ela ed secu   es | 10,437 | | 10,735 |
| O he  gua an ee comm  men s | 12,498 | | 11,120 |
| Less  HFA- e a ed gua an ees[8] | (8,142) | | (8,637) |
| Less  F  edd e Mac mo  gage- e a ed secu   es backed by G nn e  Mae ce  f ca es[8] | (748) | | (779) |
| Total single-family credit guarantee portfolio | $ 1,728,227 | $ | 1,745,654 |
| *Multifamily mortgage portfolio* | | | |
| Mul fam ly mo  gage loans, on-balance shee | $ 82,489 | $ | 82,311 |
| Non-consol da ed F  edd e Mac mo  gage- ela ed secu   es | 28,135 | | 25,144 |
| O he  gua an ee comm  men s | 9,856 | | 9,944 |
| Less  HFA- e a ed gua an ees[8] | (1,235) | | (1,331) |
| *Total multifamily mortgage portfolio* | $ 119,245 | $ | 116,068 |

(1) Based on UPB and excludes mo  gage loans and mo  gage- ela ed sec   t es  t ated,   t ot yet sett ed

(2) Exc udes unsecu   zed se  ous y de  nquen  s ng-fam  y  oans managed by he S ng e-fam  y Gua an ee segmen  Howeve , he S ngle-fam ly Gua an ee segmen con  nues  o ea n managemen  and gua an ee fees assoc a ed w  h unsecu   zed s ngle-fam ly loans  n he Inves men s segmen 's mo  gage men s po  fol o

(3) The balances of  he mo  gage- ela ed secu   es n he S ngle-fam ly Gua an ee managed loan po  fol o a e based on  he UPB of  e secu   y, w  e eas  e ba a ces of ou  s ng e-fam  y c ed  gua an ee po  fo  o p esen ed n h s  epo  a e based on  he UPB of  he mo  gage  oans unde  y ng he  e a ed secu  y  The d ffe ences n  he  oan and secu   y ba ances  esu  f om he  m ng of em  ances o secu  y ho de s, wh ch s  yp cally 45 o  75 days a e  he mo  gage paymen  cycle of f xed- a e a d ARM PCs,  espec  ve y

(4) Rep esen s unsecu   zed se  ous y de  nquen  s ng-efam  y loans managed by he S ngle-fam ly Gua an ee segmen

(5) Rep esen s  he UPB of  o  gage- e a ed asse s held by  h  d pa  es fo  wh ch we p ov de ou  gua an ee  ou  secu   za on of he  e a ed asse s

(6) F edd e Mac's ngle-fam ly mo  gage- ela ed secu   es held by us a e  ncluded n bo h ou  Inves men s segmen 's mo  gage  nves men s po  fol o and ou  S ngle-fam ly G a a  ee segmen 's managed loan po  fol o, and F  edd e Mac mul  fam ly mo  gage- ela ed secu   es held by us a e  ncluded  n bo h he mul  fam ly  nves men secu   es po  fo  o and  he mul  fam ly gua an ee po  fol o  The efo e,  hese amoun s a e  deduc ed  n o  e conc le o ou  o al mo  gage po  fol o

(7) Rep ese  s  e UPB of ou  s fo w  c  we p ese  c a ce s ics, de  q e c y da a, a zo  e o  e ass s  c s     s  epo  See "GLOSSARY" fo  f   e desc  p on

(8) We exc ude HFA- e a ed gua an ees and ou  secu   za ons of G nn e  Mae ce  f ca es f om ou  c ed   sk po  fol os and mos  e a ed s a  s cs beca se  ese g a a   ees do  o  expose  s o mean ngfu  amoun s of c ed   sk due  o he c ed  enhancemen  p ov ded on he   by  he U S  gove n en

22

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Segment Earnings     Results*

*Investments*

The table below presents the Segment Earnings of our Investments  segment

**Table 12     Segment Earnings and Key Metrics      Investments(1)**

| | Three Months ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (dollars in millions) | |
| Segment Earnings | | |
| Net interest income | $ 1,763 | $ 1,653 |
| Non-interest income (loss) | | |
| Net impairment of available-for-sale securities recognized in earnings | (496) | (1,029) |
| Derivative gains (losses) | 200 | 1,103 |
| Gains (losses) on trading securities | (398) | (234) |
| Gains (losses) on sale of mortgage loans | (14) | 12 |
| Gains (losses) on mortgage loans recorded at fair value | (38) | (83) |
| Other non-interest income | 513 | 541 |
| Total non-interest income (loss) | (233) | 310 |
| Non-interest expense | | |
| Administrative expenses | (92) | (95) |
| Total non-interest expense | (92) | (95) |
| Segment adjustments(2 | 155 | 203 |
| Segment Earnings before income tax benefit | 1,593 | 2,071 |
| Income tax benefit | 35 | 66 |
| Segment Earnings, net of taxes | 1,628 | 2,137 |
| Total other comprehensive income, net of taxes | 335 | 1,126 |
| Comprehensive income | $ 1,963 | $ 3,263 |
| Key metrics | | |
| *Portfolio balances* | | |
| Average balances of interest-earning assets (3 ( | | |
| Mortgage-related securities( | $ 330,593 | $ 399,113 |
| Non-mortgage-related investments(6 | 105,539 | 114,732 |
| Unsecuritized single-family loans(7 | 109,306 | 85,515 |
| Total average balances of interest-earning assets | $545,438 | $599,360 |
| *Return* | | |
| Net interest yield   Segment Earnings basis (annualized) | 1 29% | 1 10% |

(1) For reconciliation of the Segment Earnings line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13 SEGMENT REPORTING   Table 13 2   Segment Earnings and Reconciliation to GAAP Results"

(2) For a description of our segment adjustments, see "NOTE 14 SEGMENT REPORTING   Segment Earnings" in our 2011 Annual Report

(3) Excludes mortgage loans and mortgage-related securities traded, but not yet settled

(4) We calculate average balances based on amortized cost

(5) Includes our investments in single-family PCs and certain Other Guarantee Transactions, which have been consolidated under GAAP on our consolidated balance sheets since January 1, 2010

(6) Includes the average balances of interest-earning cash and cash equivalents, non-mortgage-related securities, and federal funds sold and securities purchased under agreements to resell

(7) Excludes unsecuritized seriously delinquent single-family mortgage loans

Segment Earnings for our Investments segment decreased by  $509 million to $1.6 billion during the three months ended March 31, 2012, compared to $2.1 billion during the three months ended March 31, 2011, primarily due to decreased derivative gains, partially offset by a decrease in net impairments of available for sale securities recognized in earnings  Comprehensive income for our Investments segment decreased by $1.3 billion to $2.0 billion during the three months ended March 31, 2012, compared to $3 3 billion during the three months ended March 31, 2011, primarily due to a smaller improvement in the fair value of available for sale securities

During the three months ended March 31, 2012, the UPB of the Investments segment mortgage investments portfolio decreased at an annualized rate of 28.7%. We held $229.2 billion of agency securities and $84 2 billion of non agency  mortgage related securities as of March 31, 2012, compared to $253.6 billion of agency securities and $86 5 billion of non agency mortgage related securities as of December 31, 2011  The decline in UPB of agency securities is due mainly to liquidations, including prepayments and selected sales  The decline in UPB of non agency mortgage related securities is due mainly to the receipt of  monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral, representing  a partial return of our investments in these securities  Since the beginning of 2007, we have incurred actual principal cash shortfalls of $1.8 billion on impaired non agency mortgage related securities in the Investments segment  See "CONSOLIDATED BALANCE SHEETS ANALYSIS     Investments in Securities" for additional information regarding our mortgage related securities

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3559

Table of Contents

Segment Earnings net interest income and net interest yield  increased by $110 million and 19 basis points,  respectively, during the three months ended March 31, 2012,  compared to the three months ended March 31, 2011. The primary driver was lower funding costs, primarily due to the replacement of debt at lower rates  These lower funding costs  were partially offset by the reduction in the average balance of  higher yielding mortgage related assets due to continued  liquidations and limited purchase activity.

Segment Earnings non interest income (loss) was  $(233) million during the three months ended March 31,  2012, compared to $310 million during the three months  ended March 31, 2011. This change was mainly due to  decreased derivative gains, partially offset by a decrease in  net impairments of available for sale securities recognized in  earnings

Impairments recorded in our Investments segment were  $496 million during the three months ended March 31,  2012, compared to $1.0 billion during the three months  ended March 31, 2011. Impairments recorded in both periods  were primarily due to our expectation of slower prepayments, which resulted in higher credit  losses, on our non agency  mortgage related securities  Increasing interest rates also contributed to the impairments recorded during the three months  ended March 31, 2011, while lower interest rates during the  three months ended March 31, 2012 resulted in a slight benefit  from expected structural credit enhancements on the  available for sale securities  See "CONSOLIDATED BALANCE SHEETS ANALYSIS      Investments in Securities     *Mortgage Related Securities    Other Than Temporary Impairments on Available For Sale Mortgage Related Securities*" for additional information on our impairments

We recorded losses on trading securities of $398 million  during the three months ended March 31, 2012, compared to  $234 million during the three months ended March 31, 2011   Losses in both periods were primarily due to the movement  of securities with unrealized gains towards maturity. The losses during the three months ended March 31, 2011  were partially  offset by larger fair value gains compared to the three months ended March 31, 2012, due to a tightening of OAS levels on  agency securities

We recorded derivative gains for this segment of $200  million during the three months ended March 31, 2012,  compared to $1.1 billion during the three months ended March 31, 2011. While derivatives are an important  aspect of our  strategy to manage interest rate risk, they generally increase the volatility of reported Segment Earnings,  because while fair  value changes in derivatives affect Segment Earnings, fair value changes in several of the types of assets  and liabilities being  hedged do not affect Segment Earnings  During the three months ended March 31, 2012 and 2011, swap interest rate changes  resulted in fair value gains on our  pay fixed swaps, largely offset by: (a) fair value losses on our receive fixed swaps; and (b)  fair value losses on  our option based derivatives resulting from losses on our  purchased call swaptions, due to an increase in long term  interest rates  The fair value of derivatives during the three  months ended March 31, 2012 reflects a decline in  short term interest rates and an increase in longer term  interest rates compared to the three months ended March 31,  2011, when both short term and longer term interest rates increased  See "Non Interest Income (Loss)     *Derivative Gains (Losses)"* for additional information on our derivatives

Our Investments segment's total other comprehensive  income  was $335 million during the three months ended  March 31, 2012, compared to $1.1 billion during the three months ended March 31, 2011. Net unrealized losses in  AOCI on our available for sale securities decreased by $242 million during the three months ended March 31,  2012, primarily due to the impact of fair value gains related to  the movement of non agency mortgage related securities with  unrealized losses towards maturity and the recognition in  earnings of other than temporary impairments on our non agency mortgage related securities, partially offset by fair value  losses related to the movement of agency securities with  unrealized gains towards maturity  Net unrealized losses in AOCI on our available for sale securities decreased by $1 0  billion during the three months ended March 31, 2011, primarily attributable to the recognition in earnings of  other than temporary impairments on our non agency mortgage-related securities. The changes in fair value of CMBS,  excluding impacts from the changes in interest rates, are  reflected in the Multifamily segment

For a discussion of items that may impact our Investments  segment net interest income over time, see "EXECUTIVE  SUMMARY    Limits on Investment Activity and Our Mortgage Related Investments Portfolio "

TREASURY-3560

Source    D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### *Single Family Guarantee*

The table below presents the Segment Earnings of our Single family Guarantee segment

**Table 13     Segment Earnings and Key Metrics     Single Family Guarantee**[1]

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (dollars in millions) | |
| **Segment Earnings** | | |
| Net interest income (expense) | $ (32) | $ 100 |
| Provision for credit losses | (2,184) | (2,284) |
| Non-interest income | | |
| Management and guarantee income | 1,011 | 870 |
| Other non-interest income | 181 | 211 |
| Total non-interest income | 1,192 | 1,081 |
| Non-interest expense | | |
| Administrative expenses | (193) | (215) |
| REO operations expense | (172) | (257) |
| Other non-interest expense | (73) | (66) |
| Total non-interest expense | (438) | (538) |
| Segment adjustments[2] | (196) | (185) |
| Segment Earnings (loss) before income tax (expense) benefit | (1,658) | (1,826) |
| Income tax (expense) benefit | (17) | 6 |
| Segment Earnings (loss), net of taxes | (1,675) | (1,820) |
| Total other comprehensive income (loss), net of taxes | (23) | (4) |
| Comprehensive income (loss) | $(1,698) | $(1,824) |
| **Key metrics** | | |
| *Balances and Volume (in billions, except rate)* | | |
| Average balance of single-family credit guarantee portfolio and HFA guarantees | $ 1,741 | $ 1,819 |
| Issuance – Single-family credit guarantees[3] | $ 111 | $ 96 |
| Fixed-rate products – Percentage of purchases( | 95% | 94% |
| Liquidation rate – Single-family credit guarantees (annualized)( | 30% | 28% |
| *Management and Guarantee Fee Rate (in bps, annualized)* | | |
| Contractual management and guarantee fees | 14.3 | 13.6 |
| Amortization of deferred fees | 8.9 | 5.5 |
| Segment Earnings management and guarantee income | 23.2 | 19.1 |
| *Credit* | | |
| Serious delinquency rate, at end of period | 3.51% | 3.63% |
| REO inventory, at end of period (number of properties) | 59,307 | 65,159 |
| Single-family credit losses, in bps (annualized)[6] | 78.6 | 71.0 |
| *Market:* | | |
| Single-family mortgage debt outstanding (total US market, in billions)[7] | $ 10,291 | $ 10,453 |
| 30-year fixed mortgage rate[8] | 4.0% | 4.9% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13 SEGMENT REPORTING – Table 13.2 – Segment Earnings and Reconciliation to GAAP Results"

(2) For a description of our segment adjustments, see "NOTE 14 SEGMENT REPORTING – Segment Earnings" in our 2011 Annual Report

(3) Based on UPB

(4) Excludes Other Guarantee Transactions

(5) Represents principal repayments relating to loans underlying Freddie Mac mortgage-related securities and other guarantee commitments, including those related to our removal of seriously delinquent and modified mortgage loans and balloon/reset mortgage loans out of PC pools

(6) Calculated as the amount of single-family credit losses divided by the sum of the average carrying value of our single-family credit guarantee portfolio and the average balance of our single-family HFA non-active guarantees

(7) Source: Federal Reserve Flow of Funds Accounts of the United States of America dated March 8, 2012 The most recent data is as of March 31, 2012 reflects the balance as of December 31, 2011

(8) Based on Freddie Mac's Primary Mortgage Market Survey, which are four-week period, which represents a national average mortgage commitment rate on a qualified borrower exclusive of any fees and points required by the lender This commitment rate applies only to financing on conforming mortgages with LTVs of 80%

Segment Earnings (loss) for our Single family Guarantee segment improved to $(1.7) billion in the first quarter of 2012 compared to $(1.8) billion in the first quarter of 2011, primarily due to an increase in management and guarantee income and a decline in Segment Earnings provision for credit losses

25

*Freddie Mac*

Source   DRA HOM OAN MORTGAG CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides summary information about the composition of Segment Earnings (loss) for this segment for the three months ended March 31, 2012 and 2011.

**Table 14   Segment Earnings Composition   Single Family Guarantee Segment**

| | Three Months Ended March 31, 2012 | | | | |
| | Segment Earnings Management and Guarantee Income(1) | | Credit Expenses(2) | | Net Amount(4) |
| | Amount | Average Rate(3) | Amount | Average Rate(3) | Amount |
| | | (dollars in millions, rates in bps) | | | |
|---|---|---|---|---|---|
| Year of origination | | | | | |
| 2012 | $   17 | 13.9 | $    (4) | 2.6 | $     13 |
| 2011 | 185 | 25.3 | (53) | 7.4 | 132 |
| 2010 | 195 | 26.1 | (103) | 13.4 | 92 |
| 2009 | 199 | 27.4 | (106) | 14.7 | 93 |
| 2008 | 86 | 25.1 | (204) | 73.5 | (118) |
| 2007 | 83 | 19.0 | (791) | 200.3 | (708) |
| 2006 | 53 | 18.9 | (463) | 157.2 | (410) |
| 2005 | 61 | 19.1 | (451) | 135.3 | (390) |
| 2004 and prior | 132 | 20.4 | (181) | 25.4 | (49) |
| Total | $ 1,011 | 23.2 | $(2,356) | 53.9 | $ (1,345) |
| Administrative expenses | | | | | (193) |
| Net interest income (expense) | | | | | (32) |
| Other non-interest income and expenses, net | | | | | (105) |
| Segment Earnings (loss), net of taxes | | | | | $ (1,675) |

| | Three Months Ended March 31, 2011 | | | | |
| | Segment Earnings Management and Guarantee Income(1) | | Credit Expenses(2) | | Net Amount(4) |
| | Amount | Average Rate(3) | Amount | Average Rate(3) | Amount |
| | | (dollars in millions, rates in bps) | | | |
|---|---|---|---|---|---|
| Year of origination | | | | | |
| 2011 | $   26 | 15.0 | $    (3) | 3.2 | $     23 |
| 2010 | 184 | 20.6 | (52) | 5.6 | 132 |
| 2009 | 170 | 18.5 | (56) | 6.0 | 114 |
| 2008 | 110 | 24.6 | (228) | 61.6 | (118) |
| 2007 | 101 | 18.8 | (888) | 181.1 | (787) |
| 2006 | 59 | 17.0 | (788) | 215.2 | (729) |
| 2005 | 66 | 16.6 | (418) | 100.2 | (352) |
| 2004 and prior | 154 | 18.4 | (108) | 11.7 | 46 |
| Total | $ 870 | 19.1 | $(2,541) | 55.9 | $ (1,671) |
| Administrative expenses | | | | | (215) |
| Net interest income (expense) | | | | | 100 |
| Other non-interest income and expenses, net | | | | | (34) |
| Segment Earnings (loss), net of taxes | | | | | $ (1,820) |

(1) Includes amortization of deferred fees of $388 million and $252 million for the first quarters of 2012 and 2011, respectively.

(2) Consists of the aggregate of the Segment Earnings provision for credit losses and Segment Earnings REO operations expense. Historical amounts of average credit expenses may not be representative of future periods. In the first quarter of 2012, we enhanced our method of allocating credit expenses by loan origination year, so prior period amounts have been revised to conform to the current period presentation.

(3) Calculated as the annualized amount of Segment Earnings management and guarantee income or credit expenses, respectively, divided by the sum of the average carrying values of the single-family credit guarantee portfolio and the average balance of our single-family HFA-related guarantees.

(4) Calculated as Segment Earnings management and guarantee income less credit expenses.

(5) Segment Earnings management and guarantee income is presented by year of guarantee origination, whereas credit expenses are presented based on year of loan origination.

As of March 31, 2012, loans originated after 2008 have, on a cumulative basis, provided management and guarantee fee income that has exceeded the credit related and administrative expenses associated with these loans. We currently believe our management and guarantee fee rates for guarantee issuances after 2008, when coupled with the higher credit quality of the mortgages within these new guarantee issuances, will provide management and guarantee fee income, over the long term, that exceeds our expected credit related and administrative expenses associated with the underlying loans. Nevertheless, various factors, such as continued high unemployment rates, further declines in home prices, or negative impacts of HARP loans originated in recent years (which may not perform as well as other refinance mortgages, due in part to the high LTV ratios of the loans), could require us to incur expenses on these loans beyond our current expectations.

*Freddie Mac*

Source   FEDERAL HOME LOAN MORTGAGE CORP, 10 Q, May 03, 2012

TREASURY-3562

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Based on our historical experience, we expect that the performance of the loans in an individual origination year will vary over time The aggregate UPB of the loans from an origination year will decline over time due to repayments, refinancing, and other liquidation events, resulting in declining management and guarantee fee income from the loans in that origination year in future periods In addition, we expect that the credit related expenses related to the remaining loans in the origination year will increase over time, as some borrowers experience financial difficulties and default on their loans As a result, there will likely be periods when an origination year is not profitable, though it may remain profitable on a cumulative basis.

Our management and guarantee fee income associated with guarantee issuances in 2005 through 2008 has not been adequate to cover the credit and administrative expenses associated with such loans, primarily due to the high rate of defaults on the loans originated in those years coupled with a high volume of refinancing since 2008 High levels of refinancing and delinquency since 2008 have significantly reduced the balance of performing loans from those years that remain in our portfolio and consequently reduced management and guarantee income associated with loans originated in 2005 through 2008 (we do not recognize Segment Earnings management and guarantee income on non accrual mortgage loans) We also believe that the management and guarantee fees associated with originations after 2008 will not be sufficient to offset the future expenses associated with our 2005 to 2008 guarantee issuances for the foreseeable future Consequently, we expect to continue reporting net losses for the Single family Guarantee segment throughout 20 2

Segment Earnings management and guarantee income increased in the first quarter of 2012, as compared to the first quarter of 2011, primarily due to an increase in amortization of delivery fees This was driven by a higher volume of delivery fees and the lower interest rate environment during the first quarter of 2012, which increased refinance activity.

The UPB of the Single family Guarantee managed loan portfolio was $1.7 trillion at both March 31, 2012 and December 31, 2011. The annualized liquidation rate on our securitized single family credit guarantees was approximately 30% and 28% for the first quarters of 2012 and 2011, respectively, and remained high in the first quarter of 2012 due to significant refinancing activity We expect the size of our Single family Guarantee managed loan portfolio will continue to decline during 2012

Refinance volumes were high during the first quarter of 2012 due to continued low interest rates, and represented 87% of our single family mortgage purchase volume during the first quarter of 2012, compared to 85% of our single family mortgage purchase volume during the first quarter of 2011, based on UPB. Relief refinance mortgages comprised approximately 3 % and 36% of our total refinance volume during the first quarters of 2012 and 20 , respectively Over time, relief refinance mortgages with LTV ratios above 80% (i.e., HARP loans) may not perform as well as other refinance mortgages because the continued high LTV ratios of these loans increases the probability of default Based on our historical experience, there is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80%. In addition, relief refinance mortgages may not be covered by mortgage insurance for the full excess of their UPB over 80% Approximately 6% and 15% of our single family purchase volume in the first quarters of 2012 and 2011, respectively, was relief refinance mortgages with LTV ratios above 80% Relief refinance mortgages of all LTV ratios comprised approximately 13% and 11% of the UPB in our total single family credit guarantee portfolio at March 31, 2012 and December 31, 2011, respectively

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages For more information about our relief refinance mortgage initiative, see "RISK MANAGEMENT   Credit Risk   *Mortgage Credit Risk   Single Family Mortgage Credit Risk   Single Family Loan Workouts and the MHA Program.*"

Similar to our purchases in 2009 through 2011, the credit quality of the single family loans we acquired in the first quarter of 2012 (excluding relief refinance mortgages) is significantly better than that of loans we acquired from 2005 through 2008, as measured by original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income Mortgages originated after 2008, including re ef refinance mortgages, represent more than half of the UPB of our single family credit guarantee portfolio as of March 3 , 2012, and their composition of that portfolio continues to grow

Provision for credit losses for the Single family Guarantee segment declined to $2 2 billion in the first quarter of 2012, compared to $2.3 billion in the first quarter of 2011. The provision for credit losses for the first quarter of 20 2 reflects stabilizing expected loss severity and a decline in the number of seriously delinquent loan additions, while the first quarter of 20 reflects worsening expected loss severity and higher modification volumes offset by a decline in the rate at which seriously delinquent loans ultimately transition to a loss event

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                      Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Single family credit losses as a percentage of the average  balance of the single family credit guarantee portfolio and  HFA related guarantees were 79 basis points and 71 basis points for the first quarters of 2012 and 2011,  respectively  Charge offs, net of recoveries, associated with single family loans were $3 3 billion and $3 0 billion  in the first quarters of 2012 and 2011, respectively. See "RISK MANAGEMENT Credit Risk     *Mortgage Credit Risk      Single Family Mortgage Credit Risk"* for further information on our single family credit guarantee portfolio, including credit performance, charge offs, and our non performing assets.

The serious delinquency rate on our single family credit  guarantee portfolio was 3.51% and 3.58% as of March 31,  2012 and December 31, 2011, respectively, and declined during the first quarter of 2012 primarily due to a high volume  of foreclosure transfers and a slowdown in new serious delinquencies  Our serious delinquency rate remains high  compared to historical levels due to the continued weakness in  home prices, persistently high unemployment, extended  foreclosure timelines, and continued challenges faced by  servicers processing large volumes of problem loans  In addition, our serious delinquency rate was adversely impacted by  the decline in the size of our single family credit guarantee portfolio in the first quarter of 2012 because this rate is  calculated on a smaller number of loans at the end of the period

Segment Earnings REO operations expense was $172 million  and $257 million in the first quarters of 2012, and 2011,  respectively  The decrease in the first quarter of 2012,  compared to the first quarter of 2011, was primarily due to  stabilizing home prices in certain geographical areas with significant REO activity, which resulted in gains on disposition  of properties as well as lower write downs of single family REO inventory during the first quarter of 2012  However, we  experienced lower recoveries on REO properties during the first  quarter of 2012, compared to the first quarter of 2011, primarily due to reduced recoveries from mortgage insurers due,  in part to the continued weakness in the financial condition of our mortgage insurance counterparties, and a decline in  reimbursements of losses from seller/servicers associated with repurchase requests.

Our REO inventory (measured in number of properties) declined 2%  from December 31, 2011 to March 31, 2012 as the volume  of single family REO dispositions exceeded the volume of  single family REO acquisitions  We continued to experience high REO disposition severity ratios on sales of our REO inventory  during the first quarter of 2012  We believe our single family REO acquisition volume and single family credit losses in the first quarter of 2012 have been less than they otherwise would  have been due to delays in the single family foreclosure process, particularly in states that require a judicial  foreclosure process

*Multifamily*

The table below presents the Segment Earnings of our Multifamily  segment

28

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 15    Segment Earnings and Key Metrics    Multifamily(1)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (dollars in millions) | |
| Segment Earnings | | |
| Net interest income | $ 318 | $ 279 |
| (Provision) benefit for credit losses | 19 | 60 |
| Non-interest income (loss) | | |
| Management and guarantee income | 33 | 28 |
| Net impairment of available-for-sale securities recognized in earnings | (16) | (135) |
| Gains (losses) on sale of mortgage loans | 54 | 83 |
| Gains (losses) on mortgage loans recorded at fair value | 177 | 50 |
| Other non-interest income (loss) | 109 | 56 |
| Total non-interest income (loss) | 357 | 82 |
| Non-interest expense | | |
| Administrative expenses | (52) | (51) |
| REO operations income (expense) | 1 | |
| Other non-interest expense | (15) | (13) |
| Total non-interest expense | (66) | (64) |
| Segment Earnings before income tax benefit (expense) | 628 | 357 |
| Income tax benefit (expense) | (4) | 2 |
| Segment Earnings, net of taxes | 624 | 359 |
| Total other comprehensive income, net of taxes | 900 | 942 |
| Comprehensive income | $ 1,524 | $ 1,301 |
| Key metrics | | |
| *Balances and Volume* | | |
| Average balance of Multifamily loan portfolio | $ 83,130 | $85,779 |
| Average balance of Multifamily guarantee portfolio | $ 36,645 | $ 25,312 |
| Average balance of Multifamily investments securities portfolio | $58,028 | $62,842 |
| Multifamily new loan purchase and Other guarantee commitment volume | $ 5,751 | $ 3,049 |
| Multifamily units financed from new volume activity | 86,431 | 52,641 |
| Multifamily Other Guarantee Transaction issuance | $ 3,139 | $ 2,906 |
| *Yield and Rate* | | |
| Net interest yield — Segment Earnings basis (annualized) | 0 90% | 0 75% |
| Average Management and guarantee fee rate, in bps (annualized)(2) | 38 7 | 46 8 |
| *Credit* | | |
| Delinquency rate | | |
| Credit-enhanced loans, at period end | 0 39% | 0 75% |
| Non-credit-enhanced loans, at period end | 0 16% | 0 25% |
| Total delinquency rate, at period end(3) | 0 23% | 0 36% |
| Allowance for loan losses and reserve for guarantee losses, at period end | $ 525 | $ 747 |
| Allowance for loan losses and reserve for guarantee losses, in bps | 43 6 | 67 4 |
| Credit losses, in bps (annualized)(4) | | 4 2 |
| REO inventory, at average carrying value | $ 121 | $ 115 |
| REO inventory, at period end (number of properties) | 16 | 15 |

(1) For reconciliations of Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13 SEGMENT REPORTING    Table 13 2    Segment Earnings and Reconciliation to GAAP Results"

(2) Represents Multifamily Segment Earnings   management and guarantee income, excluding prepayment and certain other fees, divided by the   of average balance of the multifamily guarantee portfolio and the average balance of guarantees associated with HFA initiative, excluding non-cancelable debt of NIBP

(3) See "RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Multifamily Mortgage Credit Risk*" for information on our  reported multifamily delinquency rate

(4) Calculated as the amount of multifamily credit losses divided by the sum of the average carrying value of our multifamily loan portfolio and the average balance of the multifamily guarantee portfolio, including multifamily HFA initiative guarantees

Segment Earnings for our Multifamily segment increased to $624 million in the first quarter of 2012, compared to $359 million in the first quarter of 2011, primarily due to lower impairment associated with available for sale CMBS and higher gains on mortgage loans recorded at fair value in the first quarter of 2012  Our comprehensive income for our Multifamily segment was $1.5 billion in the first quarter of 2012, consisting of: (a) Segment Earnings of $0.6 billion; and (b) $0.9 billion of total other comprehensive income, which was mainly attributable to favorable changes in fair value of available for sale CMBS in the first quarter of 2012.

Our multifamily loan purchase and guarantee volume increased to $5.8 billion for first quarter of 2012, compared to $3 0 billion during the first quarter of 2011, as strong volumes from late in 2011 carried into the first quarter of 20 2  However, we anticipate the growth in our purchase and guarantee volumes will slow for the remainder of the year, ultimately reflecting a more modest increase in 20 2, compared to 2011  We completed Other Guarantee Transactions of $3.1 billion and $2.9 billion in UPB of multifamily loans in the first quarters of 2012 and 2011, respectively. The UPB of the total multifamily portfolio increased slightly to $177.4 billion at March 31, 2012 from $176.7 billion at December 31, 2011

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3565

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Segment Earnings net interest income increased by $39 million, or 14%, to $318 million, in the first quarter of 2012 from $279 million in the first quarter of 2011, primarily due to the cumulative effect of new business volumes since 2008 which have higher yields relative to allocated funding costs. Net interest yield was 90 and 75 basis points in the first quarters of 2012 and 2011, respectively

Segment Earnings non interest income (loss) was $357 million and $82 million in the first quarters of 2012 and 2011, respectively. The increase in the first quarter of 2012 was primarily driven by lower security impairments on CMBS and increased gains recognized on mortgage loans recorded at fair value, reflecting favorable market spread movements and higher amounts of loans held for subsequent securitization Segment Earnings gains (losses) on mortgage loans recorded at fair value are presented net of changes in fair value due to changes in interest rates

While our Multifamily Segment Earnings management and guarantee income increased 18% in the first quarter of 2012 compared to the first quarter of 2011, the average management and guarantee fee rate on our guarantee portfolio declined to 39 basis points in the first quarter of 2012 from 47 basis points in the first quarter of 2011 The decline in our average management and guarantee fee rate in the first quarter of 20 2 reflects the impact from our increased volume of Other Guarantee Transactions, which have lower credit risk associated with our guarantee (and thus we charge a lower rate) relative to other issued guarantees because these transactions contain significant levels of credit enhancement through subordination.

Multifamily credit losses as a percentage of the combined average balance of our multifamily loan and guarantee portfolios were 0 and 4 basis points in the first quarters of 2012 and 20  , respectively Our Multifamily segment recognized a benefit for credit losses of $19 million and $60 million in the first quarters of 2012 and 2011, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $525 million and $545 million as of March 31, 2012 and December 31, 2011, respectively The decline in our loan loss reserves in the first quarter of 2012 was primarily driven by the increased seasoning of our portfolio and the lower level of estimated incurred credit losses based on our historical experience

The credit quality of the multifamily mortgage portfolio remains strong, as evidenced by low delinquency rates and credit losses, which we believe reflects prudent underwriting practices The delinquency rate for loans in the multifamily mortgage portfolio was 0.23% and 0.22%, as of March 31, 2012 and December 31, 2011, respectively. As of March 31, 2012, approximately half of the multifamily loans that were two or more monthly payments past due, measured on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on those loans We expect our multifamily delinquency rate to remain relatively low during the remainder of 2012 See "RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Multifamily Mortgage Credit Risk*" for further information about our reported multifamily delinquency rates and credit enhancements on multifamily loans For further information on delinquencies, including geographical and other concentrations, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

## CONSOLIDATED BALANCE SHEETS ANALYSIS

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes Also, see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported financial position

### Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell

Cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and other liquid assets discussed in "Investments in Securities    *Non Mortgage Related Securities*," are important to our cash flow and asset and liability management, and our ability to provide liquidity and stability to the mortgage market We use these assets to help manage recurring cash flows and meet our other cash management needs We consider federal funds sold to be overnight unsecured trades executed with commercial banks that are members of the Federal Reserve System Securities purchased under agreements to resell principally consist of short term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities

The short term assets on our consolidated balance sheets also include those related to our consolidated VIEs, which are comprised primarily of restricted cash and cash equivalents at March 31, 2012. These short term assets, related to our consolidated VIEs, increased by $2.7 billion from December 31, 2011 to March 31, 2012, primarily due to an increase in the level of refinancing activity

TREASURY-3566

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                                         Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Excluding amounts related to our consolidated VIEs, we held $8.6 billion and $28.4 billion of cash and cash equivalents, no federal funds sold, and $21.3 billion and $12 0 billion of securities purchased under agreements to resell at March 31, 2012 and December 31, 2011, respectively The aggregate decrease in these assets was primarily driven by a decline in funding needs for debt redemptions. In addition, excluding amounts related to our consolidated VIEs, we held on average $27.6 billion of cash and cash equivalents and $24.4 billion of federal funds sold and securities purchased under agreements to resell during the three months ended March 31, 2012

For information regarding our liquidity management practices and policies, see "LIQUIDITY AND CAPITAL RESOURCES."

### Investments in Securities

The table below provides detail regarding our investments in securities as of March 31, 2012 and December 31, 2011. The table does not include our holdings of single family PCs and certain Other Guarantee Transactions as of March 31, 2012 and December 31, 2011 For information on our holdings of such securities, see "Table 11   Composition of Segment Mortgage Portfolios and Credit Risk Portfolios "

**Table 16    Investments in Securities**

| | Fair Value | |
|---|---|---|
| | March 31, 2012 | December 31, 2011 |
| | (in millions) | |
| Investments in securities | | |
| Available-for-sale | | |
| Mortgage-related securities | | |
| Freddie Mac(1) | $  76,163 | $  81,092 |
| Subprime | 27,145 | 27,999 |
| CMBS | 54,753 | 55,663 |
| Option ARM | 5,818 | 5,865 |
| Alt-A and other | 11,094 | 10,879 |
| Fannie Mae | 18,897 | 20,322 |
| Obligations of states and political subdivisions | 7,565 | 7,824 |
| Manufactured housing | 748 | 766 |
| Ginnie Mae | 239 | 249 |
| To al available-for-sale mortgage-related securities | 202,422 | 210,659 |
| Total investments in available-for-sale securities | 202,422 | 210,659 |
| Trading | | |
| Mortgage-related securities | | |
| Freddie Mac(1) | 14,504 | 16,047 |
| Fannie Mae | 13,692 | 15,165 |
| Ginnie Mae | 151 | 156 |
| Other | 153 | 164 |
| Total trading mortgage-related securities | 28,500 | 31,532 |
| Non-mortgage-related securities | | |
| Asset-backed securities | 695 | 302 |
| Treasury bills | 3,000 | 100 |
| Treasury notes | 23,164 | 24,712 |
| FDIC-guaranteed corporate medium-term notes | 2,960 | 2,184 |
| Total non-mortgage-related securities | 29,819 | 27,298 |
| Total investments in trading securities | 58,319 | 58,830 |
| Total investments in securities | $  260,741 | $  269,489 |

(1)  For information on the types of instruments that have been included, see "NOTE 1  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES   Investments in Securities" in our 2011 Annual Report

### Non-Mortgage-Related Securities

Our investments in non mortgage related securities provide an additional source of liquidity  We held investments in non-mortgage-related securities classified as trading of $29.8 billion and $27.3 billion as of March 31, 2012 and December 31, 2011, respectively. While balances may fluctuate from period to period, we continue to meet required liquidity and contingency levels

### Mortgage-Related Securities

Our investments in mortgage related securities consist of securities issued by Fannie Mae, Ginnie Mae, and other financial institutions. We also invest in our own mortgage related securities  However, the single family PCs and certain Other Guarantee Transactions we purchase as investments are not accounted for as investments in securities because we recognize the underlying mortgage loans on our consolidated balance sheets through consolidation of the related trusts

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides the UPB of our investments in mortgage related securities classified as available for sale or trading on our consolidated balance sheets. The table below does not include our holdings of our own single family PCs and certain Other Guarantee Transactions. For further information on our holdings of such securities, see "Table — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

**Table 17   Characteristics of Mortgage Related Securities on Our Consolidated Balance Sheets**

| | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Fixed Rate | Variable Rate(1) | Total | Fixed Rate | Variable Rate(1) | Total |
| | | | (in millions) | | | |
| Freddie Mac mortgage-related securities (2) | | | | | | |
| Single-family | $68,545 | $9,064 | $77,609 | $72,795 | $9,753 | $82,548 |
| Multifamily | 859 | 1,755 | 2,614 | 1,216 | 1,792 | 3,008 |
| Total Freddie Mac mortgage-related securities | 69,404 | 10,819 | 80,223 | 74,011 | 11,545 | 85,556 |
| Non-Freddie Mac mortgage-related securities | | | | | | |
| Agency securities (3) | | | | | | |
| Fannie Mae | | | | | | |
| Single-family | 14,859 | 14,908 | 29,767 | 16,543 | 15,998 | 32,541 |
| Multifamily | 47 | 76 | 123 | 52 | 76 | 128 |
| Ginnie Mae | | | | | | |
| Single-family | 243 | 100 | 343 | 253 | 104 | 357 |
| Multifamily | 16 | | 16 | 16 | | 16 |
| Total Non-Freddie Mac agency securities | 15,165 | 15,084 | 30,249 | 16,864 | 16,178 | 33,042 |
| Non-agency mortgage-related securities | | | | | | |
| Single-family (4) | | | | | | |
| Subprime | 332 | 47,519 | 47,851 | 336 | 48,696 | 49,032 |
| Option ARM | | 13,508 | 13,508 | | 13,949 | 13,949 |
| Alt-A and other | 2,047 | 14,272 | 16,319 | 2,128 | 14,662 | 16,790 |
| CMBS | 19,113 | 33,122 | 52,235 | 19,735 | 34,375 | 54,110 |
| Obligations of states and political subdivisions (5) | 7,448 | 22 | 7,470 | 7,771 | 22 | 7,793 |
| Manufactured housing | 797 | 138 | 935 | 831 | 129 | 960 |
| Total non-agency mortgage-related securities (6) | 29,737 | 108,581 | 138,318 | 30,801 | 111,833 | 142,634 |
| Total UPB of mortgage-related securities | $114,306 | $134,484 | 248,790 | $121,676 | $139,556 | 261,232 |
| Premiums, discounts, deferred fees, payments on UPB and other basis adjustments | | | (12,724) | | | (12,363) |
| Net unrealized gains (losses) on mortgage-related securities, pre-tax | | | (5,144) | | | (6,678) |
| Total carrying value of mortgage-related securities | | | $230,922 | | | $242,191 |

(1) Variable-rate mortgage-related securities include those where the actual coupon rate will change based on changes in the composition of the underlying collateral.

(2) We separately present REMICs and Other Structured Securities issued as a Other Guarantee Transactions as we have assessed, we account for these securities as investments in debt securities as we are investing in the debt securities of a non-consolidated entity. We do not consolidate these securitization trusts since we are not deemed to be the primary beneficiary of such trusts. We also are subject to the credit risk associated with the mortgage loans underlying our Freddie Mac mortgage-related securities. Mortgage loans underlying our issued single-family PCs and certain Other Guarantee Transactions are recognized on our consolidated balance sheets as held-for-investment mortgage loans, as amortized cost. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2011 Annual Report for further information.

(3) Agency securities are generally not separately rated by a nationally recognized statistical rating organization, but have historically been viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities rated AAA- and/or equivalent.

(4) For information on how these securities are rated, see "Table 23 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS."

(5) Consists of housing revenue bonds. Approximately 36% and 37% of these securities had a March 31, 2012 and December 31, 2011, respectively, were AAA-rated as of those dates, based on the UPB and the lower of available.

(6) Credit ratings for most non-agency mortgage-related securities are designated by no fewer than two nationally recognized statistical rating organizations. Approximately 21% of total non-agency mortgage-related securities held at both March 31, 2012 and December 31, 2011 were AAA-rated as of those dates, based on the UPB and the lowest rating available.

32

*Freddie Mac*

Source: D RA HOM OAN MORTGAG CORP, 10 Q, May 03, 2012   TREASURY-3568   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides the UPB and fair value of our investments in mortgage related securities classified as available for sale or trading on our consolidated balance sheets

**Table 18    Additional Characteristics of Mortgage Related Securities on Our Consolidated Balance Sheets**

| | March 31, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
| | UPB | Fair Value | UPB | Fair Value |
| | | (in millions) | | |
| Agency pass-through securities(1) | $ 22,093 | $ 23,940 | $ 24,283 | $ 26,193 |
| Agency REMICs and Other Structured Securities | | | | |
| Interest-only securities(2) | | 2,725 | | 2,863 |
| Principal-only securities(3) | 3,284 | 3,057 | 3,569 | 3,344 |
| Inverse floating-rate securities( | 4,439 | 6,165 | 4,839 | 6,826 |
| Other Structured Securities | 80,656 | 87,759 | 85,907 | 93,805 |
| Total agency securities | 110,472 | 123,646 | 118,598 | 133,031 |
| Non-agency securities( | 138,318 | 107,276 | 142,634 | 109,160 |
| Total mortgage-related securities classified as available for sale or pools of mortgages | $248,790 | $230,922 | $261,232 | $242,191 |

(1) Represents assets individually held before effect of consolidation of trusts and pools of mortgages
(2) Represents securities where the holder receives only the interest cash flows
(3) Represents securities where the holder receives only the principal cash flows
(4) Represents securities where the holder receives interest cash flows that change inversely with the reference rate (i.e. higher cash flows when interest rates are low and lower cash flows when interest rates are high) Additionally, these securities receive a portion of principal cash flows associated with the underlying collateral
(5) Includes fair values of $3 million and $2 million of interest-only securities at March 31, 2012 and December 31, 2011, respectively

The total UPB of our investments in mortgage related securities on our consolidated balance sheets decreased from $261.2 billion at December 31, 2011 to $248.8 billion at March 31, 2012, while the fair value of these investments decreased from $242 2 billion at December 31, 2011 to $230.9 billion at March 31, 2012. The reduction resulted from our purchase activity remaining less than liquidations, consistent with our efforts to reduce our mortgage related investments portfolio, as described in "EXECUTIVE SUMMARY     Limits on Investment Activity and Our Mortgage Related Investments Portfolio "

The table below summarizes our mortgage related securities purchase activity for the three months ended March 31, 2012 and 2011. The purchase activity includes single family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated  Purchases of single family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated are recorded as an extinguishment of debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

33                                                          *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 19    Mortgage Related Securities Purchase Activity(1)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in millions) | |
| Non-Freddie Mac mortgage-related securities purchased for securitization | | |
| Ginnie Mae Certificates | $ 5 | $ 16 |
| Non-agency mortgage-related securities purchased for Other Guarantee Transactions | 3,124 | 2,879 |
| Total non-Freddie Mac mortgage-related securities purchased for securitization | 3,129 | 2,895 |
| Non-Freddie Mac mortgage-related securities purchased as investments in securities | | |
| Agency securities | | |
| *Fannie Mae:* | | |
| Fixed-rate | | 1,019 |
| Variable-rate | 50 | 168 |
| *Total agency securities* | 50 | 1,187 |
| Non-agency mortgage-related securities | | |
| *CMBS* | | |
| Variable-rate | 10 | |
| *Total non-agency mortgage-related securities* | 10 | |
| *Total non-Freddie Mac mortgage-related securities purchased as investments in securities* | 60 | 1,187 |
| Total non-Freddie Mac mortgage-related securities purchased | $3,189 | $ 4,082 |
| Freddie Mac mortgage-related securities purchased | | |
| *Single-family:* | | |
| Fixed-rate | $3,465 | $36,679 |
| Variable-rate | 132 | 2,542 |
| *Multifamily* | | |
| Fixed-rate | | 25 |
| *Total Freddie Mac mortgage-related securities purchased* | $3,597 | $39,246 |

(1) Based on UPB. Excludes mortgage-related securities traded but not yet settled.

During the three months ended March 31, 2012, we reduced our participation in dollar roll transactions, which were primarily used to support the market and pricing of our PCs, as compared to the three months ended March 31, 2011. When these transactions involve our consolidated PC trusts, the purchase and sale represents an extinguishment and issuance of debt securities, respectively, and impacts our net interest income and recognition of gain or loss on the extinguishment of debt on our consolidated statements of comprehensive income. These transactions can cause short term fluctuations in the balance of our mortgage related investments portfolio. The purchases during the three months ended March 31, 2011 reflected in "Table 9 Mortgage Related Securities Purchase Activity" are attributed primarily to these transactions. For more information, see "BUSINESS Our Business Segments *Investments Segment PC Support Activities*" and "RISK FACTORS Competitive and Market Risks *Any decline in the price performance of or demand for our PCs could have an adverse effect on the volume and profitability of our new single family guarantee business*" in our 2011 Annual Report.

*Unrealized Losses on Available For Sale Mortgage Related Securities*

At March 31, 2012, our gross unrealized losses, pre tax, on available for sale mortgage related securities were $18.7 billion, compared to $20.1 billion at December 31, 2011. The decrease was primarily due to fair value gains related to the movement of non agency mortgage-related securities with unrealized losses towards maturity and the recognition in earnings of other than temporary impairments on our non agency mortgage related securities. We believe the unrealized losses related to these securities at March 31, 2012 were mainly attributable to poor underlying collateral performance, limited liquidity and large risk premiums in the market for residential non agency mortgage related securities. All available for sale securities in an unrealized loss position are evaluated to determine if the impairment is other than temporary. See "Total Equity (Deficit)" and "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding unrealized losses on our available for sale securities.

*Higher Risk Components of Our Investments in Mortgage Related Securities*

As discussed below, we have exposure to subprime, option ARM, interest only, and Alt A and other loans as part of our investments in mortgage-related securities as follows:

- *Single family non agency mortgage related securities:* We hold non agency mortgage related securities backed by subprime, option ARM, and Alt A and other loans

34

*Freddie Mac*

Source: D RA HOM OAN MORTGAG CORP, 10 Q, May 03, 2012

TREASURY-3570

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- *Single family Freddie Mac mortgage related securities:*  We hold certain Other Guarantee Transactions as part of our investments in securities  There are subprime and option ARM loans underlying some of these Other Guarantee Transactions  For more information on single family loans with certain higher risk characteristics underlying our issued securities, see "RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk*."

*Non Agency Mortgage Related Securities Backed by Subprime, Option ARM, and Alt A Loans*

We categorize our investments in non agency mortgage related securities as subprime, option ARM, or Alt A if the securities were identified as such based on information provided to us when we entered into these transactions  We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either  subprime or Alt A securities. Since the first quarter of 2008, we have not purchased any non agency mortgage related securities backed by  subprime, option ARM, or Alt A loans. The two tables below present information about our holdings of our available for sale non agency mortgage related securities  backed by subprime, option ARM and Alt A loans.

**Table 20    Non Agency Mortgage Related Securities Backed by Subprime First  Lien, Option ARM, and Alt A Loans and Certain Related Credit Statistics[1]**

| | As of | | | | |
| --- | --- | --- | --- | --- | --- |
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| | | | (dollars in millions) | | |
| **UPB** | | | | | |
| Subprime first lien[2] | $47,478 | $48,644 | $49,794 | $ 51,070 | $ 52,403 |
| Option ARM | 13,508 | 13,949 | 14,351 | 14,778 | 15,232 |
| Alt-A[3] | 13,885 | 14,260 | 14,643 | 15,059 | 15,487 |
| **Gross unrealized losses, pre-tax[4]** | | | | | |
| Subprime first lien[2] | $ 12,661 | $ 13,401 | $ 14,132 | $13,764 | $12,481 |
| Option ARM | 2,909 | 3,169 | 3,216 | 3,099 | 3,170 |
| Alt-A[3] | 2,094 | 2,612 | 2,468 | 2,171 | 1,941 |
| **Present value of expected credit losses[5]** | | | | | |
| Subprime first lien[2] | $ 7,325 | $ 6,746 | $ 5,414 | $ 6,487 | $ 6,612 |
| Option ARM | 3,908 | 4,251 | 4,434 | 4,767 | 4,993 |
| Alt-A[3] | 2,237 | 2,235 | 2,204 | 2,310 | 2,401 |
| **Collateral delinquency rate[6]** | | | | | |
| Subprime first lien[2] | 42% | 42% | 42% | 42% | 44% |
| Option ARM | 43 | 44 | 44 | 44 | 44 |
| Alt-A[3] | 25 | 25 | 25 | 26 | 26 |
| **Average credit enhancement[7]** | | | | | |
| Subprime first lien[2] | 20% | 21% | 22% | 23% | 24% |
| Option ARM | 6 | 7 | 8 | 10 | 11 |
| Alt-A[3] | 6 | 7 | 7 | 8 | 8 |
| **Cumulative collateral loss[8]** | | | | | |
| Subprime first lien[2] | 23% | 22% | 21% | 20% | 19% |
| Option ARM | 18 | 17 | 16 | 15 | 14 |
| Alt-A[3] | 9 | 8 | 8 | 7 | 7 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information on about these securities

(2) Excludes non-agency mortgage-related securities backed exclusively by subprime second liens  Certain securities identified as subprime first liens may be backed in part by subprime second lien loans, as the underlying loans of these securities were deemed to include a small percentage of subprime second lien loans

(3) Excludes non-agency mortgage-related securities backed by the loans, which are primarily comprised of securities backed by home equity lines of credit

(4) Represents the aggregate of the amount by which amortized cost, after other-than-temporary impairments, exceeds fair value measured at the individual security level

(5) Represents losses, after our economic cash flows we expect to occur, discounted at the effectiveness rate  per cent the security as at the date of acquisition  These discounted amounts are determined on an individual security-by-security basis and may be lowered and discounts are used to measure on a going-in or other-than-temporary impairment basis  the recognized earnings for securities that have experienced a significant impairment in expected cash flows since the last recognition of other-than-temporary impairment  recognized earnings

(6) Determined based on the number of loans that are two or more months past due or has entered a deferred due status or based on information obtained from a third-party data provider

(7) Reflects the amount of the current principal amount of the securities issued that are subordinated and allocated losses to us before any losses are allocated to securities that we own  Percentages are generally calculated based on (a) the amount of UPB of securities we own that are divided by (b) the amount of UPB of all of these securities issued to us (excluding non-bond balances)  Only includes credit enhancement provided by subordinated securities excludes credit enhancement provided by bond insurance, over collateralization and other forms of credit enhancement

(8) Based on the actual losses incurred on the collateral underlying the securities  Actual losses could decrease the securities that we hold as significant if any less than the losses on the underlying collateral as presented in this table, as non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A loans were issued to decrease the credit enhancement, particularly, through subordination as a result of losses

For purposes of our cumulative credit deterioration analysis,  our estimate of the present value of expected future credit losses on our non agency mortgage related securities increased to $14.2 billion at March 31, 2012 from $14 0 billion at December 31, 2011  All of these amounts have been reflected in our net impairment of available for sale

*Freddie Mac*

Source   FEDERAL HOME LOAN MORTGAGE CORP, 10 Q, May 03, 2012                    TREASURY-3571                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

securities recognized in earnings in this period or prior periods  The increase in the present value of expected future credit losses was primarily due to our expectation of slower prepayments on our non agency mortgage related securities

**Table 21     Non Agency Mortgage Related Securities Backed by Subprime, Option ARM, Alt A and Other Loans**[1]

| | Three Months ended | | | | |
|---|---|---|---|---|---|
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| | | | (in millions) | | |
| Principal prepayments and cash shortfalls [2] | | | | | |
| Subprime | | | | | |
| Principal prepayments | $1,175 | $ 1,159 | $ 1,287 | $1,341 | $1,361 |
| Principal cash shortfalls | 6 | 7 | 6 | 10 | 14 |
| Option ARM | | | | | |
| Principal prepayments | $ 272 | $ 298 | $ 318 | $ 331 | $ 315 |
| Principal cash shortfalls | 169 | 103 | 109 | 123 | 100 |
| Alt-A and other | | | | | |
| Principal prepayments | $ 374 | $ 385 | $ 425 | $ 464 | $ 452 |
| Principal cash shortfalls | 97 | 80 | 81 | 84 | 81 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities
(2) In addition to the contractual interest payments, we receive monthly remittances of principal prepayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary prepayments of the underlying collateral of these securities representing a partial return of our investment in these securities

Since the beginning of 2007, we have incurred actual principal cash shortfalls of $1.8 billion on impaired non agency mortgage-related securities, of which $275 million related to the three months ended March 31, 2012  Many of the trusts that issued non agency mortgage related securities we hold were structured so that realized collateral losses in excess of structural credit enhancements are not passed on to investors until the investment matures  We currently estimate that the future expected principal and interest shortfalls on non agency mortgage related securities we hold will be significantly less than the fair value declines experienced on these securities

The investments in non agency mortgage related securities we hold backed by subprime, option ARM, and Alt A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements. Bond insurance is an additional credit enhancement covering some of the non agency mortgage related securities  These credit enhancements are the primary reason we expect our actual losses, through principal or interest shortfalls, to be less than the underlying collateral losses in the aggregate  It is difficult to estimate the point at which structural credit enhancements will be exhausted and we will incur actual losses  During the three months ended March 31, 2012, we continued to experience the erosion of structural credit enhancements on many securities backed by subprime, option ARM, and Alt A loans due to poor performance of the underlying collateral  For more information, see "RISK MANAGEMENT     Credit Risk     *Institutional Credit Risk     Bond Insurers.*"

36                                                                                                                    *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3572

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Other Than Temporary Impairments on Available For Sale Mortgage Related Securities*

The table below provides information about the mortgage related securities for which we recognized other than temporary impairments in earnings

**Table 22    Net Impairment of Available For Sale Mortgage Related Securities Recognized in Earnings**

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings | | | | |
| | Three Months ended | | | | |
| | 3/31/2012 | 12/31/2011 | 9/30/2011 (in millions) | 6/30/2011 | 3/31/2011 |
|---|---|---|---|---|---|
| Subp me (1 | | | | | |
| 2006 & 2007 | $ 433 | $ 472 | $ 29 | $ 67 | $ 717 |
| O he  yea s | 8 | 8 | 2 | 3 | 17 |
| To al subp me | 441 | 480 | 31 | 70 | 734 |
| Op on ARM | | | | | |
| 2006 & 2007 | 32 | 40 | 15 | 43 | 232 |
| O he  yea s | 16 | 19 | 4 | 22 | 49 |
| To al op on ARM | 48 | 59 | 19 | 65 | 281 |
| A -A | | | | | |
| 2006 & 2007 | 16 | 22 | 29 | 16 | 15 |
| O he  yea s | 36 | 21 | 10 | 15 | 23 |
| To al Al -A | 52 | 43 | 39 | 31 | 38 |
| O he  loans | 5 | 3 | 41 | 1 | 2 |
| To a s bp  e, op o  ARM, Al -A a  d o he  loans | 546 | 585 | 130 | 167 | 1,055 |
| CMBS | 16 | 8 | 27 | 183 | 135 |
| Ma  fac  ed o s g | 2 | 2 | 4 | 2 | 3 |
| To a  ava  abe-fo -sa e mo  gage- e a ed secu  es | $ 564 | $ 595 | $ 161 | $ 352 | $ 1,193 |

(1) Inc udes a  f s and second ens

We recorded net impairment of available for sale mortgage related securities recognized in earnings of $564 million during the three months ended March 31, 2012, compared to $1.2 billion during the three months ended March 31, 2011 We recorded these impairments because our estimate of the present value of expected future credit losses on certain individual securities increased during the period. These impairments include $546 million related to securities backed by subprime, option ARM, and Alt A and other loans during the three months ended March 31, 2012, compared to $1 1 billion during the three months ended March 31, 2011. For more information, see "NOTE 7: INVESTMENTS IN SECURITIES     Other Than Temporary Impairments on Available for Sale Securities "

While it is reasonably possible that collateral losses on our  available for sale mortgage related securities where we have not  recorded an impairment charge in earnings could exceed our  credit enhancement levels, we do not believe that those  conditions were likely at March 31, 2012. Based on our conclusion that we do not intend to sell our remaining  available for sale mortgage related securities in an unrealized  loss position and it is not more likely than not that we will be  required to sell these securities before a sufficient time to  recover all unrealized losses and our consideration of other available information, we have concluded that the reduction in  fair value of these securities was temporary at March 31, 2012 and have recorded these fair value losses in AOCI

The credit performance of loans underlying our holdings of  non agency mortgage related securities has declined since 2007  This decline has been particularly severe for subprime, option  ARM, and Alt A and other loans  Economic factors negatively impacting the  performance of our investments in non agency mortgage related  securities include high unemployment, a large inventory of  seriously delinquent mortgage loans and unsold homes, tight credit conditions, and weak consumer confidence during recent  years. In addition, subprime, option ARM, and Alt A and other loans backing the securities we hold have significantly  greater concentrations in the states that are undergoing the  greatest economic stress, such as California and Florida. Loans  in these states undergoing economic stress are more likely to  become seriously delinquent and the credit losses associated with such loans are likely to be higher than in other states

We rely on bond insurance, including secondary coverage, to  provide credit protection on some of our investments in  non agency mortgage related securities  We have determined that there is substantial uncertainty surrounding certain bond  insurers' ability to pay our future claims on expected credit losses related to our non agency mortgage related  security investments. This uncertainty contributed to the  impairments recognized in earnings during the three months ended March 31, 2012 and 2011. See "RISK MANAGEMENT     Credit Risk     *Institutional Credit Risk     Bond Insurers*" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS     Bond Insurers" for additional information

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3573                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our assessments concerning other than temporary impairment require significant judgment and the use of models, and are subject to potentially significant change  In addition, changes in the performance of the individual securities and in mortgage market conditions may also affect our impairment assessments. Depending on the structure of the individual mortgage related security and our estimate of collateral losses relative to the amount of credit support available for the tranches we own, a change in collateral loss estimates can have a disproportionate impact on the loss estimate for the security  Additionally, servicer performance, loan modification programs and backlogs, bankruptcy reform and other forms of government intervention in the housing market can significantly affect the performance of these securities, including the timing of loss recognition of the underlying loans and thus the timing of losses we recognize on our securities  Impacts related to changes in interest rates may also affect our losses due to the structural credit enhancements on our investments in non agency mortgage related securities  Foreclosure processing suspensions can also affect our losses  For example, while defaulted loans remain in the trusts prior to completion of the foreclosure process, the subordinate classes of securities issued by the securitization trusts may continue to receive interest payments, rather than absorbing default losses. This may reduce the amount of funds available for the tranches we own  Given the extent of the housing and economic downturn, it is difficult to estimate the future performance of mortgage loans and mortgage related securities with high assurance, and actual results could differ materially from our expectations  Furthermore, various market participants could arrive at materially different conclusions regarding estimates of future cash shortfalls

For more information on risks associated with the use of models, see "RISK FACTORS    Operational Risks    *We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting purposes, to make business decisions, and to manage risks. Market conditions have raised these risks and uncertainties*" in our 2011 Annual Report  For more information on how delays in the foreclosure process, including delays related to concerns about deficiencies in foreclosure documentation practices, could adversely affect the values of, and the losses on, the non agency mortgage related securities we hold, see "RISK FACTORS  Operational Risks    *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report

For information regarding our efforts to mitigate losses on our investments in non agency mortgage related securities, see "RISK MANAGEMENT    Credit Risk    *Institutional Credit Risk*."

*Ratings of Non Agency Mortgage Related Securities*

The table below shows the ratings of non agency mortgage related securities backed by subprime, option ARM, Alt A and other loans, and CMBS held at March 31, 2012 based on their ratings as of March 31, 2012, as well as those held at December 31, 2011 based on their ratings as of December 31, 2011 using the lowest rating available for each security

38

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                          Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 23  Ratings of Non-Agency Mortgage Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS**

| Credit Ratings as of March 31, 2012 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Bond Insurance Coverage(1) |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| **Subprime loans** | | | | | |
| AAA-rated | $ 599 | 1% | $ 599 | $ (65) | $ 18 |
| Other investment grade | 2,292 | 5 | 2,292 | (291) | 383 |
| Below investment grade(2) | 44,960 | 94 | 36,859 | (12,310) | 1,603 |
| Total | $ 47,851 | 100% | $ 39,750 | $ (12,666) | $ 2,004 |
| **Option ARM loans** | | | | | |
| AAA-rated | $ | % | $ | $ | $ |
| Other investment grade | 63 | | 63 | (6) | 63 |
| Below investment grade(2) | 13,445 | 100 | 8,651 | (2,903) | 36 |
| Total | $ 13,508 | 100% | $ 8,714 | $ (2,909) | $ 99 |
| **Alt-A and other loans** | | | | | |
| AAA-rated | $ 109 | 1% | $ 109 | $ (6) | $ 6 |
| Other investment grade | 2,395 | 14 | 2,413 | (302) | 296 |
| Below investment grade(2) | 13,815 | 85 | 10,723 | (1,945) | 2,067 |
| Total | $ 16,319 | 100% | $ 13,245 | $ (2,253) | $ 2,369 |
| **CMBS** | | | | | |
| AAA-rated | $ 25,479 | 49% | $ 25,517 | $ (17) | $ 41 |
| Other investment grade | 23,801 | 45 | 23,754 | (220) | 1,584 |
| Below investment grade(2) | 2,955 | 6 | 2,833 | (463) | 1,695 |
| Total | $ 52,235 | 100% | $ 52,104 | $ (700) | $ 3,320 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS** | | | | | |
| AAA-rated | $ 26,187 | 20% | $ 26,225 | $ (88) | $ 65 |
| Other investment grade | 28,551 | 22 | 28,522 | (819) | 2,326 |
| Below investment grade(2) | 75,175 | 58 | 59,066 | (17,621) | 5,401 |
| Total | $ 129,913 | 100% | $113,813 | $(18,528) | $ 7,792 |
| Total investments in mortgage-related securities | $248,790 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | | 52% | | | |

| Credit Ratings as of December 31, 2011 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Bond Insurance Coverage(1) |
|---|---|---|---|---|---|
| **Subprime loans** | | | | | |
| AAA-rated | $ 1,000 | 2% | $ 1,000 | $ (115) | $ 23 |
| Other investment grade | 2,643 | 5 | 2,643 | (399) | 383 |
| Below investment grade(2) | 45,389 | 93 | 37,704 | (12,894) | 1,641 |
| Total | $ 49,032 | 100% | $ 41,347 | $ (13,408) | $ 2,047 |
| **Option ARM loans** | | | | | |
| AAA-rated | $ | % | $ | $ | $ |
| Other investment grade | 76 | 1 | 76 | (8) | 76 |
| Below investment grade(2) | 13,873 | 99 | 8,943 | (3,161) | 39 |
| Total | $ 13,949 | 100% | $ 9,019 | $ (3,169) | $ 115 |
| **Alt-A and other loans** | | | | | |
| AAA-rated | $ 350 | 2% | $ 348 | $ (20) | $ 6 |
| Other investment grade | 2,237 | 13 | 2,260 | (371) | 310 |
| Below investment grade(2) | 14,203 | 85 | 11,053 | (2,421) | 2,139 |
| Total | $ 16,790 | 100% | $ 13,661 | $ (2,812) | $ 2,455 |
| **CMBS** | | | | | |
| AAA-rated | $ 25,499 | 47% | $ 25,540 | $ (22) | $ 42 |
| Other investment grade | 25,421 | 47 | 25,394 | (346) | 1,585 |
| Below investment grade(2) | 3,190 | 6 | 2,851 | (180) | 1,697 |
| Total | $ 54,110 | 100% | $ 53,785 | $ (548) | $ 3,324 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS** | | | | | |
| AAA-rated | $ 26,849 | 20% | $26,888 | $ (157) | $ 71 |
| Other investment grade | 30,377 | 23 | 30,373 | (1,124) | 2,354 |
| Below investment grade(2) | 76,655 | 57 | 60,551 | (18,656) | 5,516 |
| Total | $133,881 | 100% | $117,812 | $(19,937) | $ 7,941 |
| Total investments in mortgage-related securities | $261,232 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | | 51% | | | |

(1) Represents the area of UPB covered by bond insurance. This amount does not represent the maximum amount of losses we could recover, as the bond insurance also covers interest.

(2) Includes securities with S&P equivalent ratings at or below BBB and certain securities that have no longer rated.

39

*Freddie Mac*

Source DIRAC HOME LOAN MORTGAGE CORP, 10 Q, May 03, 2012 Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Mortgage Loans

The UPB of mortgage loans on our consolidated balance sheets declined to $1.80 trillion as of March 31, 2012, as compared to $1.82 trillion as of December 31, 2011. This decline reflects that the amount of single family loan liquidations has exceeded new loan purchase and guarantee activity, which we believe is due, in part, to declines in the amount of single family mortgage debt outstanding in the market and our competitive position compared to other market participants.

The UPB of unsecuritized single family mortgage loans declined by $6.2 billion to $165.5 billion at March 31, 2012, from $171.7 billion at December 31, 2011, primarily due to our net loan securitization volume exceeding the amount of delinquent loans we removed from PC trusts during the first quarter of 2012  We expect that our holdings of unsecuritized single family loans could increase in the remainder of 2012

Based on the amount of the recorded investment of single family loans on our consolidated balance sheets, approximately $70.0 billion, or 4.1%, of these loans as of March 31, 2012 were seriously delinquent, as compared to $72.4 billion, or 4.2%, as of December 31, 2011. This decline was primarily due to modifications, foreclosure transfers, and short sale activity. The majority of these seriously delinquent loans are unsecuritized, and were removed by us from our PC trusts. As guarantor, we have the right to remove mortgages that back our PCs from the underlying loan pools under certain circumstances. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS" for more information on our removal of single family loans from PC trusts

The UPB of unsecuritized multifamily mortgage loans was $82.5 billion at March 31, 2012 and $82.3 billion at December 31, 2011. Our multifamily loan activity in the first quarters of 2012 and 2011 primarily consisted of purchases of loans intended for securitization and subsequent sale through Other Guarantee Transactions. To pursue our primary multifamily business strategy, we expect to continue to purchase and then securitize multifamily loans, which provides liquidity for the multifamily market, supports affordability for multifamily rental housing, and helps us manage our credit risks.

We maintain an allowance for loan losses on mortgage loans that we classify as held for investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage related securities backed by multifamily loans, certain single family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk  Collectively, we refer to our allowance for loan losses and our reserve for guarantee losses as our loan loss reserves  Our loan loss reserves were $38 3 billion and $39.5 billion at March 31, 2012 and December 31, 2011, respectively, including $37.8 billion and $38 9 billion, respectively, related to single family loans  At March 31, 2012 and December 31, 2011, our loan loss reserves, as a percentage of our total mortgage portfolio, excluding non Freddie Mac securities, were 2 0% and 2 1%, respectively, and as a percentage of the UPB associated with our non performing loans was 31 3% and 32 0%, respectively  See "RISK MANAGEMENT     Credit Risk     *Mortgage Credit Risk"* and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further detail about the mortgage loans and associated allowance for loan losses recorded on our consolidated balance sheets

The table below summarizes our purchase and guarantee activity in mortgage loans  This activity consists of: (a) mortgage loans underlying consolidated single family PCs issued in the period (regardless of whether such securities are held by us or third parties); (b) single family and multifamily mortgage loans purchased, but not securitized, in the

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

period; and (c) mortgage loans underlying our mortgage related financial guarantees issued in the period, which are not consolidated on our balance sheets

**Table 24    Mortgage Loan Purchase and Other Guarantee Commitment Activity[1]**

| | Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | UPB Amount | % of Total | UPB Amount | % of Total |
| | | (dollars in millions) | | |
| Mo gage oan pu chases and gua an ee ssuances | | | | |
| S ng e-fam y | | | | |
| 30-yea o mo e amo z ng f xed- a e | $ 61,847 | 56% | $62,898 | 62% |
| 20-yea amo z ng f xed- a e | 8,410 | 8 | 6,715 | 7 |
| 15-yea amo z ng f xed- a e | 29,574 | 26 | 22,110 | 22 |
| Adj s ab e- a e[2] | 5,152 | 5 | 5,741 | 6 |
| FHA/VA and o he  gove nmen al | 90 | <1 | 87 | <1 |
| *Total single-family(3)* | 105,073 | 95 | 97,551 | 97 |
| Mu fam y | 5,751 | 5 | 3,049 | 3 |
| *Total mortgage loan purchases and other guarantee commitment activity(4)* | $110,824 | 100% | $ 100,600 | 100% |
| Pe cen age of mo gage pu chases and o he gua an ee comm men ac v y w h c ed enhancemen s( | | 9% | | 7% |

(1) Based o  UPB  Exc  des  o  gage oa s  aded b   o  ye  se  ed  Exc udes he  e  ova of se ou s y de  nquen  oans and ba oon/ ese mo gages ou of PC  us s  I c  des o e  gua an ee comm men s assoc a ed w h mo gage loans  See endno e (4) fo fu he  nfo ma on
(2) I c  des a o t z  g ARMs w t  1-, 3-, 5-, 7-, a d 10-yea  n  a f xed- a e pe ods  We d d no  pu chase any op  on ARM  u ng he f s qua e s of 2012 o  2011
(3) Inc udes $8 6 b  on and $7 3 b  on of mo gage  oans n excess of $417,000, wh ch we ef e  o as confo m ng  umbo mo gages, fo  he f s qua e s of 2012 and  2011, espec vely
(4) Includes  ssuances of o he  gua an ee comm men s on s ngle-fam ly loans of $2 3 b ll on and $1 8 b ll on and  ssuances of o he  gua an ee comm men s on mul fam ly  oans of $0 1 b  on and $0 2 b  on du ng he f s qua e s of 2012 and 2011,  espec ve y
(5) See "NOTE 4  MORTGAGE LOANS AND LOAN LOSS RESERVES  C ed  P o e c on and O e  Fo  s of C ed  Enhancemen " fo fu he  de a s on c ed  enhancemen  of mo gage oans n ou mu  fam y mo gage and s ng e-fam y c ed  gua an ee po  fol os

See "RISK MANAGEMENT   Credit Risk   *Mortgage Credit Risk*" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS   Table 15.2   Certain Higher Risk Categories in the Single Family Credit Guarantee Portfolio" for information about mortgage loans in our single family credit guarantee portfolio that we believe have higher risk characteristics.

**Derivative Assets and Liabilities, Net**

The composition of our derivative portfolio changes from period to period as a result of derivative purchases, terminations, or assignments prior to contractual maturity, and expiration of the derivatives at their contractual maturity  We classify net derivative interest receivable or payable, trade/settle receivable or payable, and cash collateral held or posted on our consolidated balance sheets in derivative assets, net and derivative liabilities, net  See "NOTE 10: DERIVATIVES" for additional information regarding our derivatives

The table below shows the fair value for each derivative type, the weighted average fixed rate of our pay fixed and receive fixed swaps, and the maturity profile of our derivative positions reconciled to the amounts presented on our consolidated balance sheets as of March 31, 2012. A positive fair value in the table below for each derivative type is the estimated amount, prior to netting by counterparty, that we would be entitled to receive if the derivatives of that type we e

Source  D RA  HOM  OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3577

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

terminated  A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if the derivatives of that type were terminated

**Table 25    Derivative Fair Values and Maturities**

| | | | March 31, 2012 | | | |
| | | | Fair Value(1) | | | |
| | Notional or Contractual Amount(2) | Total Fair Value(3) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| Interest-rate swaps | | | | | | |
| Receive-fixed | | | | | | |
| Swaps | $236,803 | $ 9,080 | $ 59 | $ 519 | $ 3,538 | $ 4,964 |
| Weighted average fixed rate(4) | | | 1 52% | 0 92% | 2 24% | 3 10% |
| Forward-starting swaps(5) | 11,650 | 792 | | | | 792 |
| Weighted average fixed rate(4) | | | % | % | % | 3 83% |
| Total receive-fixed | 248,453 | 9,872 | 59 | 519 | 3,538 | 5,756 |
| Basis (floating to floating) | 2,400 | 2 | (1) | | 3 | |
| Pay-fixed | | | | | | |
| Swaps | 280,869 | (26,292) | (38) | (2,647) | (5,112) | (18,495) |
| Weighted average fixed rate(4) | | | 0 95% | 3 11% | 2 83% | 3 68% |
| Forward-starting swaps(5) | 15,704 | (1,490) | | | | (1,490) |
| Weighted average fixed rate(4) | | | % | % | % | 3 80% |
| Total pay-fixed | 296,573 | (27,782) | (38) | (2,647) | (5,112) | (19,985) |
| Total interest-rate swaps | 547,426 | (17,908) | 20 | (2,128) | (1,571) | (14,229) |
| Option-based | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 52,500 | 7,766 | 1,789 | 3,382 | 555 | 2,040 |
| Written | 12,025 | (886) | (172) | (557) | (157) | |
| Put swaptions | | | | | | |
| Purchased | 49,450 | 527 | 6 | 35 | 134 | 352 |
| Written | 250 | (5) | (5) | | | |
| Other option-based derivatives(6) | 34,365 | 2,029 | | | | 2,029 |
| Total option-based | 148,590 | 9,431 | 1,618 | 2,860 | 532 | 4,421 |
| Futures | 44,281 | (66) | (66) | | | |
| Foreign-currency swaps | 1,179 | 84 | 59 | 25 | | |
| Commitments | 22,298 | (37) | (37) | | | |
| Swap guarantee derivatives | 3,631 | (36) | | (1) | (1) | (34) |
| Subtotal | 767,405 | (8,532) | $1,594 | $ 756 | $ (1,040) | $ (9,842) |
| Credit derivatives | 9,338 | (4) | | | | |
| Subtotal | 776,743 | (8,536) | | | | |
| Derivative interest receivable (payable), net | | (1,089) | | | | |
| Trade/settlement receivable (payable), net | | 299 | | | | |
| Derivative cash collateral (held) posted, net | | 9,212 | | | | |
| Total | $776,743 | $ (114) | | | | |

(1) Fair value is categorized based on the period from March 31, 2012    the economic maturity of the derivative
(2) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received and/or paid and generally do not represent actual amounts to be exchanged  Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets
(3) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net, and it includes derivative   es receivable or (payable), net, trade/settlement receivable or (payable), net, and derivative cash collateral (held) or posted, net
(4) Represents the notional weighted average for the fixed leg of the swaps
(5) Represents one interest-rate swap agreement has a scheduled to begin on future dates ranging from less than one year to    ee years as of March 31, 2012
(6) May include purchased interest-rate caps and floors

At March 31, 2012, the net fair value of our total  derivative portfolio was $(114) million, as compared to  $(317) million at December 31, 2011  During the three months ended March 31, 2012, the net fair value of our total derivative portfolio increased primarily due to the impact of an increase in long term interest rates on our net pay fixed swap portfolio, partially offset by the impact of the increase in long term interest rates on our receive fixed swap and option based derivatives  See "NOTE 10: DERIVATIVES" for the notional or contractual amounts and related fair values of our total derivative portfolio by product type at March 31, 2012 and December 31, 2011, as well as derivative collateral posted and held

*Freddie Mac*

Source  DRA  HOM  OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3578

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below summarizes the changes in derivative fair values

**Table 26      Changes in Derivative Fair Values**

| | Three Months Ended March 31, | |
| | 2012(1) | 2011(2) |
| | (in millions) | |
| Beginning balance, at January 1  Net asset (liability) | $(8,662) | $(6,560) |
| Net change in | | |
| Commitments | 19 | 20 |
| Credit derivatives | | (5) |
| Swap guarantee derivatives | 1 | |
| Other derivatives (3) | | |
| Changes in fair value | 76 | 986 |
| Fair value of new commitments entered into during the period | | 233 |
| Contracts realized or otherwise settled during the period | 30 | (291) |
| Ending balance, at March 31  Net asset (liability) | $(8,536) | $(5,617) |

(1) Refer to "Table 25  Derivative Fair Values and Maturities" for a reconciliation of net fair value to the amounts presented on our consolidated balance sheets as of March 31, 2012

(2) As of March 31, 2011, fair value amounts exclude derivative interest receivable (payable), net of $(16) billion, and/or receivable (payable), net of $3 million, and derivative cash collateral posted, net of $65 billion

(3) Includes fair value changes for interest-rate swaps, option-based derivatives, foreign-currency swaps

(4) Consists primarily of cash premiums paid or received on options

See "CONSOLIDATED RESULTS OF OPERATIONS    Non Interest Income (Loss)    *Derivative Gains (Losses)*" for a description of gains (losses) on our derivative positions

**REO, Net**

We acquire properties, which are recorded as REO assets on our consolidated balance sheets, typically as a result of borrower default on mortgage loans that we own, or for which we have issued our financial guarantee. The balance of our REO, net, declined to $5.5 billion at March 31, 2012 from $5 7 billion at December 31, 2011  We believe the volume of our single family REO acquisitions in the first quarter of 2012 was less than it otherwise would have been due to delays in the foreclosure process, particularly in states that require a judicial foreclosure process  We expect that the length of the foreclosure process will continue to remain above historical levels  Additionally, we expect our REO activity to remain at elevated levels, as we have a large inventory of seriously delinquent loans in our single family credit guarantee portfolio  To the extent a large volume of loans completes the foreclosure process in a short period of time, the resulting REO inventory could have a negative impact on the housing market. See "RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Non Performing Assets*" for additional information about our REO activity

**Deferred Tax Assets, Net**

After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, related difficulty in forecasting future profit levels, and our assertion that we have the intent and ability to hold our available for sale securities until any temporary unrealized losses are recovered, we continue to record a valuation allowance on a portion of our net deferred tax assets. See "NOTE 12: INCOME TAXES" for additional information

**Other Assets**

Other assets consist of the guarantee asset related to non consolidated trusts and other guarantee commitments, accounts and other receivables, and other miscellaneous assets  Other assets increased to $10.8 billion as of March 31, 2012 from $10.5 billion as of December 31, 2011 primarily due to an increase in servicer receivables resulting from an increase in the proceeds of mortgage loans paid off by borrowers at the end of the quarter that had not yet been remitted to us  See "NOTE 18: SIGNIFICANT COMPONENTS OF OTHER ASSETS AND OTHER LIABILITIES ON OUR CONSOLIDATED BALANCE SHEETS" for additional information.

**Total Debt, Net**

PCs and Other Guarantee Transactions issued by our consolidated trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets  Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated trusts. The debt securities of our consolidated trusts may be prepaid without penalty at any time

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                TREASURY-3579                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from this use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Other debt consists of unsecured short term and long term debt securities we issue to third parties to fund our business activities It is classified as either short term or long term based on the contractual maturity of the debt instrument See "MD&A     LIQUIDITY AND CAPITAL RESOURCES" in our 2011 Annual Report for a discussion of our management activities related to other debt

The table below presents the UPB for Freddie Mac issued mortgage related securities by the underlying mortgage product type

**Table 27     Freddie Mac Mortgage Related Securities(1)**

| | March 31, 2012 | | | December 31, 2011 | | |
| | Issued by Consolidated Trusts | Issued by Non Consolidated Trusts | Total | Issued by Consolidated Trusts | Issued by Non Consolidated Trusts | Total |
| | | | (in millions) | | | |
| Single-family | | | | | | |
| 30-year amortizing fixed-rate | $ 1,103,277 | $ | $ 1,103,277 | 1,123,105 | $ | $ 1,123,105 |
| 20-year amortizing fixed-rate | 72,108 | | 72,108 | 68,584 | | 68,584 |
| 15-year amortizing fixed-rate | 262,377 | | 262,377 | 252,563 | | 252,563 |
| Adjustable-rate(2) | 70,641 | | 70,641 | 69,402 | | 69,402 |
| Interest-only(3) | 55,253 | | 55,253 | 59,007 | | 59,007 |
| FHA/VA and other governmental | 3,139 | | 3,139 | 3,267 | | 3,267 |
| *Total single-family* | 1,566,795 | | 1,566,795 | 1,575,928 | | 1,575,928 |
| Multifamily | | 4,458 | 4,458 | | 4,496 | 4,496 |
| *Total single-family and multifamily* | 1,566,795 | 4,458 | 1,571,253 | 1,575,928 | 4,496 | 1,580,424 |
| Other Guarantee Transactions | | | | | | |
| HFA bonds( | | | | | | |
| Single-family | | 5,950 | 5,950 | | 6,118 | 6,118 |
| Multifamily | | 933 | 933 | | 966 | 966 |
| Total HFA bonds | | 6,883 | 6,883 | | 7,084 | 7,084 |
| Other | | | | | | |
| Single-family( | 12,228 | 3,739 | 15,967 | 12,877 | 3,838 | 16,715 |
| Multifamily | | 22,744 | 22,744 | | 19,682 | 19,682 |
| Total Other Guarantee Transactions | 12,228 | 26,483 | 38,711 | 12,877 | 23,520 | 36,397 |
| REMICs and Other Structured Securities backed by Ginnie Mae Certificates(6) | | 748 | 748 | | 779 | 779 |
| Total Freddie Mac Mortgage-Related Securities | $1,579,023 | $ 38,572 | $1,617,595 | $1,588,805 | $ 35,879 | $1,624,684 |
| Less Repurchased Freddie Mac Mortgage-Related Securities(7) | (119,658) | | | (136,329) | | |
| Total UPB of debt securities of consolidated trusts held by third parties | $1,459,365 | | | $1,452,476 | | |

(1) Amounts are based on UPB of these securities and exclude other mortgage-related debt traded, but are not yet issued
(2) Includes $1 1 billion and $1 2 billion in UPB of option ARM loans as of March 31, 2012 and December 31, 2011, respectively See endnote (5) for additional information on option ARM loans that back our Other Guarantee Transactions
(3) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments Includes both fixed- and variable-rate interest-only loans
(4) Consists of debt we acquired and deseceritized de re NIBP
(5) Backed by non-agency mortgage-related securities that include prime, FHA/VA, and subprime mortgage loans and also include $7 1 billion and $7 3 billion in UPB of securities backed by option ARM mortgage loans as March 31, 2012 and December 31, 2011, respectively
(6) Backed by FHA/VA loans
(7) Represents the UPB of repurchased Freddie Mac mortgage-related securities that have a consolidated on our balance sheet and includes certain enhancement amounts associated with our securities used as a on have a payable on hold-pay or mortgage-related securities we hold s Our holdings of non-consolidated Freddie Mac mortgage-related securities are presented in "Table 17   Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets"

Excluding Other Guarantee Transactions, the percentage of amortizing fixed rate single family loans underlying our consolidated trust debt securities, based on UPB, was approximately 92% at both March 31, 2012 and December 3 , 20    Freddie Mac single family mortgage-related securities that we issued during the three months ended March 31, 2012 were backed by a significant proportion of refinance mortgages During the three months ended March 31, 2012, the UPB of Freddie Mac mortgage related securities issued by consolidated trusts declined approximately 0.6%, as the volume of our new issuances has been less than the volume of liquidations of these securities The UPB of multifamily Other Guarantee Transactions, excluding HFA related securities, increased to $22.7 billion as of March 31, 2012 from $19.7 billion as of December 31, 2011, due to multifamily loan securitization activity

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3580

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents additional details regarding our issued and guaranteed mortgage related securities

**Table 28    Issuances and Extinguishments of Debt Securities of Consolidated Trusts[1]**

| | Three Months Ended March 31, | |
| | 2012 | 2011 |
| | (in millions) | |
|---|---|---|
| Beginning balance of debt securities of consolidated trusts held by third parties | $1,452,476 | $ 1,517,001 |
| Issuances of third parties of debt securities of consolidated trusts | | |
| Issuances based on underlying mortgage product type | | |
| 30-year or more amortizing fixed-rate | 64,041 | 61,791 |
| 20-year amortizing fixed-rate | 8,395 | 6,243 |
| 15-year amortizing fixed-rate | 30,672 | 19,866 |
| Adjustable-rate | 5,148 | 5,646 |
| Interest-only | | 152 |
| FHA/VA | | 160 |
| Debt securities of consolidated trusts issued by us as issuance | (2,905) | (6,345) |
| Net issuances of debt securities of consolidated trusts | 105,351 | 87,513 |
| Reissuances of debt securities of consolidated trusts previously extinguished by us[2] | 11,642 | 24,576 |
| Total issuances of third parties of debt securities of consolidated trusts | 116,993 | 112,089 |
| Extinguishments, net[3] | (110,104) | (131,241) |
| Ending balance of debt securities of consolidated trusts held by third parties | $1,459,365 | $1,497,849 |

(1) Based on UPB
(2) Represents issuances of PCs and other Guarantee Transactions previously held by us
(3) Represents (a) UPB of our purchases of debt securities of PCs and other Guarantee Transactions issued by consolidated trusts (b) principal repayments on the debt securities of PCs and other Guarantee Transactions issued by consolidated trusts and (c) cancellations of amounts associated with our seller/servicer obligations related to our payable for unsecuritized mortgage-related securities held as of March 31, 2012 and 2011

## Other Liabilities

Other liabilities consist of the guarantee obligation, the reserve for guarantee losses on non consolidated trusts and other mortgage-related financial guarantees, servicer liabilities, accounts payable and accrued expenses, and other miscellaneous liabilities Other liabilities increased to $6.3 billion as of March 31, 2012 from $6.0 billion as of December 31, 2011 primarily because of an increase in: (a) credit loss related liabilities, largely due to third party sales adjustments for accrued estimated losses on unsettled foreclosure alternative transactions at quarter end; and (b) real estate services payable relating to estimated taxes and insurance on REO properties held in inventory at quarter end  See "NOTE 18: SIGNIFICANT COMPONENTS OF OTHER ASSETS AND OTHER LIABILITIES ON OUR CONSOLIDATED BALANCE SHEETS" for additional information

## Total Equity (Deficit)

The table below presents the changes in total equity (deficit) and certain capital related disclosures

**Table 29    Changes in Total Equity (Deficit)**

| | Three Months Ended | | | | |
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| | | | (in millions) | | |
|---|---|---|---|---|---|
| Beginning balance | $ (146) | $ (5,991) | $ (1,478) | $ 1,237 | $ (401) |
| Net income (loss) | 577 | 619 | (4,422) | (2,139) | 676 |
| Other comprehensive income (loss), net of taxes | | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 1,147 | 701 | (80) | 903 | 1,941 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 111 | 118 | 124 | 135 | 132 |
| Changes in defined benefit plans | (46) | 68 | 2 | 1 | (9) |
| Comprehensive income (loss) | 1,789 | 1,506 | (4,376) | (1,100) | 2,740 |
| Capital draw from Treasury | 146 | 5,992 | 1,479 | | 500 |
| Senior preferred stock dividends declared | (1,807) | (1,655) | (1,618) | (1,617) | (1,605) |
| Other | | | 2 | 2 | 3 |
| Total equity (deficit)/Net worth | $ (18) | $ (146) | $ (5,991) | $ (1,478) | $ 1,237 |
| Aggregate draws under the Purchase Agreement (as of period end)[1] | $ 71,317 | $ 71,171 | $ 65,179 | $ 63,700 | $63,700 |
| Aggregate senior preferred stock dividends paid to Treasury in cash (as of period end) | $18,328 | $ 16,521 | $14,866 | $13,248 | $11,631 |
| Percentage of dividends paid to Treasury in cash to aggregate draws (as of period end) | 26% | 23% | 23% | 21% | 18% |

(1) Does not include the initial $10 billion liquidation preference of senior preferred stock  a we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received

Source   DRA HOM   OAN MORTGAG CORP, 10 Q, May 03, 2012

TREASURY-3581

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

We will request a $19 million draw from Treasury under the Purchase Agreement to eliminate the quarterly equity deficit as of March 31, 2012. In addition, we paid cash dividends to Treasury of $1.8 billion during the three months ended March 31, 2012.

Net unrealized losses on our available for sale securities in AOCI decreased by $1 1 billion during the three months ended March 31, 2012. The decrease for the three months ended March 31, 2012 was primarily due to the impact of fair value gains related to the movement of non agency mortgage related securities with unrealized losses towards maturity and the impact of tightening OAS levels on our CMBS. Net unrealized losses on our closed cash flow hedge relationships in AOCI decreased by $111 million during the three months ended March 31, 2012, respectively, primarily attributable to the reclassification of losses into earnings related to our closed cash flow hedges as the originally forecasted transactions affected earnings

## RISK MANAGEMENT

Our investment and credit guarantee activities expose us to three broad categories of risk: (a) credit risk; (b) interest rate risk and other market risk; and (c) operational risk. See "RISK FACTORS" in our 2011 Annual Report for additional information regarding these and other risks.

### Credit Risk

We are subject primarily to two types of credit risk: institutional credit risk and mortgage credit risk. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations  Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee  We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage related security, or other guarantee commitment

#### *Institutional Credit Risk*

Our exposure to single family mortgage seller/servicers remained high during the first quarter of 2012 with respect to their repurchase obligations arising from breaches of representations and warranties made to us for loans they underwrote and sold to us  We rely on our single family seller/servicers to perform loan workout activities as well as foreclosures on loans that they service for us  Our credit losses could increase to the extent that our seller/servicers do not fully perform these obligations in a timely manner  The financial condition of the mo tgage insurance industry remained weak during the first quarter of 2012, and the substantial majority of our mortgage insurance exposure is concentrated with four counterparties, all of which are under significant financial stress. In addition, our exposure to derivatives counterparties remains highly concentrated as compared to historical levels  The failure of any of our significant counterparties to meet their obligations to us could have a material adverse effect on our results of operations, financial condition, and our ability to conduct future business.

#### <u>Non Agency Mortgage Related Security Issuers</u>

Our investments in securities expose us to institutional credit risk to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform their obligations  Our investments in non Freddie Mac mortgage related securities include both agency and non agency securities  However, agency securities have historically presented minimal institutional credit risk due to the guarantee provided by those institutions, and the U.S. government's support of those institutions.

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non agency mo tgage-re ated securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. The effectiveness of our efforts is highly uncertain and any potential recoveries may take significant time to realize  See "MD&A RISK MANAGEMENT     Credit Risk     *Institutional Credit Risk     Non Agency Mortgage Related Security Issuers*" in our 2011 Annual Report for information about these efforts

See "CONSOLIDATED BALANCE SHEETS ANALYSIS     Investments in Securities" for information on credit risk associated with our investments in mortgage related securities, including higher risk components and impairment charges we recognized in the first quarters of 2012 and 2011 related to these investments  For information about institutional credit risk associated with our investments in non mortgage related securities, see "NOTE 7: INVESTMENTS IN SECURITIES     Table 7.9     Trading Securities" as well as "Cash and Other Investments Counterparties" below

46                                                                                    *Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Single family Mortgage Seller/Servicers*

We acquire a significant portion of our single family mortgage purchase volume from several large lenders, or seller/servicers  Our top 10 single family seller/servicers provided approximately  79% of our single family purchase volume during the first  quarter of 2012  Wells Fargo Bank, N.A. and U.S. Bank, N.A.  accounted for 28% and 13%, respectively, of our single family  mortgage purchase volume and were the only single family seller/servicers that comprised 10% or more of our purchase  volume during the three months ended March 31, 2012  In  recent periods, certain large seller/servicers curtailed their  lending activities, which may impact the concentration of our  purchase volume in the remainder of 2012

We are exposed to institutional credit risk arising from the  potential insolvency or non performance by our mortgage seller/servicers, including non performance of their repurchase  obligations arising from breaches of the representations and  warranties made to us for loans they underwrote and sold to us or failure to honor their recourse and indemnification  obligations to us  We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage  loans, and represent and warrant that those loans have been  originated under specified underwriting standards. If we subsequently discover that the representations and warranties  were breached (*i.e.*, that contractual standards were not followed), we can exercise certain contractual remedies to  mitigate our actual or potential credit losses  These  contractual remedies include the ability to require the seller/servicer to repurchase the loan at its current UPB or  make us whole for any credit losses realized with respect to the loan  As part of our expansion of HARP, we have agreed not to require lenders to provide us with certain representations and  warranties that they would ordinarily be required to commit to  in selling loans to us  As a result, we may face greater  exposure to credit and other losses on these HARP loans  For more information, see "*Mortgage Credit Risk     Single Family Mortgage Credit Risk     Single Family Loan Workouts and the MHA Program     Home Affordable Refinance Program.*"

Our contracts require that a seller/servicer repurchase a  mortgage after we issue a repurchase request, unless the  seller/servicer avails itself of an appeals process provided for  in our contracts, in which case the deadline for repurchase is  extended until we decide the appeal  In recent periods, some of our seller/servicers have failed to fully perform their  repurchase obligations in a timely manner, and to a lesser  extent, certain others have failed to perform on their obligations due to their weakened financial capacity  The table  below provides a summary of our repurchase request activity  for the three months ended March 31, 2012 and 2011.

**Table 30     Repurchase Request Activity**[1]

| | Three Months  ded March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in millions) | |
| Beg nn ng balance, Decembe  31, | $ 2,716 | $ 3,807 |
| New  eq ests ss ed | 2,625 | 2,801 |
| Req ests co  ec ed[2] | (854) | (1,248) |
| Req ests cance ed[3] | (1,224) | (1,902) |
| O he  ( | (34) | (15) |
| E d  g ba a ce, Ma c  31, | $ 3,229 | $ 3,443 |

(1)  Beg nn ng and end ng ba ances  ep esen  he UPB of  he  oans assoc a ed w     e ep c  ase  eq es s  New  eq es s ss ed a d  eques s  cance  ed  ep esen  he  a o   of  eq es , w  e  eques s co  ec ed  ep esen  he amoun  of cash paymen   ece ved
(2)  Reques s co  ec ed  nc ude paymen s  ece ved upon fu f  men  of   e ep c  ase  eq es es , e   b  se  e  of osses fo   eq es s assoc a ed w  h fo eclosed mo  gage  oans, nego a ed se  emen s, and o he  a  e na  ve  emed es
(3)  Cons s  p    a   y of  hose  eques s  ha we e  esc nded by  he  se v ce  p ov d ng ms ng documen a  on o  a successful appeal of  e  eq est
(4)  O he   nc udes   e s ha  affec  he UPB of  he oan wh e  he  ep c  ase  eq est s o tsta d g, s  c as c a ges    UPB d e  o  paymen s made on  he loan  Also     c  des  eq es s dee  ed unco  ec b e due o  he nso vency o  o he  fa u e of he co   e pa y

As shown in the table above, the UPB of loans subject to open  repurchase requests increased to approximately $3 2 billion  as of March 31, 2012 from $2.7 billion as of December 3 , 20   because the volume of new request  issuances exceeded the combined volume of requests collected and cancelled. As measured by UPB, approximately 38% and 39% of  the repurchase requests outstanding at March 31, 2012 and December 31, 2011, respectively, were outstanding for four  months or more since issuance of the initial request (these  figures include repurchase requests for which appeals were pending). As of March 31, 2012, two of our largest seller/servicers had aggregate repurchase requests outstanding, based on UPB, of $1.7 billion, and approximately 47% of  these requests were outstanding for four months or more since  issuance of the initial request  The amount we expect to collect  on the outstanding requests is significantly less than the UPB  of the loans subject to the repurchase requests primarily  because many of these requests will likely be satisfied by  reimbursement of our realized credit losses by seller/servicers, instead of repurchase of loans at their UPB  Some of these  requests also may be rescinded in the course of the contractual  appeal process  Based on our historical loss experience and the  fact that many of these loans are covered by credit enhancements (*e.g.*, mortgage insurance), we expect the actual

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3583

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

credit losses experienced by us should we fail to collect on these repurchase requests will also be less than the UPB of the loans.

Repurchase requests related to mortgage insurance rescission and claim denial tend to be outstanding longer than other repurchase requests. Of the total amount of repurchase requests outstanding at both March 31, 2012 and December 31, 2011, approximately $1 2 billion were issued due to mortgage insurance rescission or mortgage insurance claim denial Our actual credit losses could increase should the mortgage insurance coverage not be reinstated and we fail to collect on these repurchase requests

During 20 0 and 2009, we entered into agreements with certain of our seller/servicers to release specified loans from certain repurchase obligations in exchange for one time cash payments As of March 31, 2012, loans totaling $155.8 billion in UPB, representing 9% of our single family credit guarantee portfolio, were subject to such negotiated agreements In a memorandum to the FHFA Office of Inspector General dated September 19, 2011, FHFA stated that in 2011 it had "suspended certain future repurchase agreements with seller/servicers concerning their repurchase obligations pending the outcome" of a review by Freddie Mac of its loan sampling methodology We did not enter into any agreements with seller/servicers concerning release of their repurchase obligations during 2011 or the first quarter of 2012. During the first quarter of 2012, we revised our loan sampling methodology for 20 2 Our methodology in 20 2 expands the coverage of our loan reviews as compared to our prior sampling methodology and may result in higher levels of repurchase requests We are continuing to discuss our loan sampling methodology with FHFA We cannot predict when this process will be completed or whether or when FHFA will terminate or revise its suspension with respect to our entering into agreements concerning repurchase obligations with seller/servicers It is possible that our loan sampling methodology could further change in ways that further increase our repurchase request volumes with our seller/servicers

We meet with our larger seller/servicers with deficiencies identified during our performing loan sampling to help ensure they make appropriate changes to their underwriting processes In addition, for all of our largest seller/servicers, we actively manage the current quality of loan originations by providing monthly written and oral communications regarding loan defect rates and the drivers of those defects as identified in our performing loan quality control sampling reviews If necessary, we work with seller/servicers to develop an appropriate plan of corrective action Our contracts with some seller/servicers give us the right to levy certain compensatory fees when mortgage loans delivered to us fail to meet our aggregate loan quality metrics

Our estimate of recoveries from seller/servicer repurchase obligations is considered in our allowance for loan losses as of March 31, 2012 and December 31, 2011; however, our actual recoveries may be different than our estimates See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2011 Annual Report for further information We believe we have appropriately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at March 31, 2012 and December 31, 2011; however, our actual losses may exceed our estimates

A significant portion of our single family mortgage loans are serviced by several large seller/servicers Our top three single family loan servicers, Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A. serviced approximately 26%, 12%, and 11%, respectively, of our single family mortgage loans as of March 31, 2012, and together serviced approximately 49% of our single family mortgage loans Because we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, our business and financial results could be adversely affected We also continue to be adversely affected by delays in the foreclosure process See "RISK FACTORS     Operational Risks     *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report and "LEGISLATIVE AND REGULATORY MATTERS     Developments Concerning Single Family Servicing Practices "

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses For example, our seller/servicers have an active role in our loan workout efforts, including under the MHA Program and the recent servicing alignment initiative, and therefore, we also have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans We significantly revised our monitoring program for servicer performance during 2011. In March 2012, we announced changes to our monitoring program in order to provide for the assessment of certain fees to compensate us for deficiencies in servicer performance These fees will go into effect on June 1, 2012 and September 1, 2012.

Source    D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3584                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused by wilful default or fraud and may not be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Multifamily Mortgage Seller/Servicers*

We are exposed to certain institutional credit risks arising from the potential non performance by our multifamily mortgage servicers and our multifamily lenders, or customers. A significant portion of our multifamily mortgage loans are serviced by several large multifamily servicers As of March 31, 2012, our top three multifamily servicers, Berkadia Commercial Mortgage LLC, CBRE Capital Markets, Inc., and Wells Fargo Bank, N.A., each serviced more than 10% of our multifamily mortgage portfolio, and together serviced approximately 40% of our multifamily mortgage portfolio We acquire a significant portion of our multifamily purchase volume from several large customers For the three months ended March 31, 2012, our top multifamily seller, CBRE Capital Markets, Inc., accounted for 26% of our multifamily purchase volume Our top 0 multifamily lenders represented an aggregate of approximately 87% of our multifamily purchase volume for the three months ended March 31, 2012.

*Mortgage Insurers*

We have institutional credit risk relating to the potential insolvency of, or non performance by, mortgage insurers that insure single family mortgages we purchase or guarantee As a guarantor, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. If any of our mortgage insurers that provide credit enhancement fail to fulfill their obligation, we could experience increased credit losses

As part of the estimate of our loan loss reserves, we evaluate the recovery and collectability related to mortgage insurance policies for mortgage loans that we hold on our consolidated balance sheets as well as loans underlying our non consolidated Freddie Mac mortgage related securities or covered by other guarantee commitments We also evaluate the collectability of outstanding receivables from these counterparties related to outstanding and unpaid claims. We believe that many of our mortgage insurers are not sufficiently capitalized to withstand the stress of the current weak economic environment Additionally, a number of our mortgage insurers have exceeded risk to capital ratios required by their state insurance regulators. In many cases, such states have issued waivers to allow the companies to continue writing new business in their states Most waivers are temporary in duration or contain other conditions that the companies may be unable to continue to meet due to their weakened condition or other factors Given the difficulties in the mortgage insurance industry, we believe it is likely that other mortgage insurers may exceed their regulatory capital limit in the future As a result of these and other factors, we reduced our estimates of recovery associated with the expected amount of our claims for several of these insurers in determining our allowance for loan losses associated with our single family loans on our consolidated balance sheets at March 31, 2012 and December 31, 2011.

The table below summarizes our exposure to mortgage insurers as of March 31, 2012 In the event that a mortgage insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses resulting from such failure Our most significant exposure to these insurers is through primary mortgage insurance, and, as of March 31, 2012, we had primary mortgage insurance coverage on loans that represent approximately 11% of the UPB of our single family credit guarantee portfolio

49

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 31    Mortgage Insurance by Counterparty**

| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | Primary Insurance[2] | Pool Insurance[2] (in billions) | Coverage Outstanding[3] |
|---|---|---|---|---|---|
| Mortgage Guaranty Insurance Corporation (MGIC) | B | Negative | $ 46.0 | $ 23.1 | $ 11.8 |
| Radian Guaranty Inc. | B | Negative | 35.8 | 6.6 | 9.9 |
| Genworth Mortgage Insurance Corporation | B | Negative | 28.6 | 0.8 | 7.2 |
| United Guaranty Residential Insurance Co. | BBB | Stable | 28.7 | 0.2 | 7.1 |
| PMI Mortgage Insurance Co. (PMI)[4] | CCC | Negative | 22.5 | 0.8 | 5.7 |
| Republic Mortgage Insurance Company (RMIC)[5] | No Rated | N/A | 18.2 | 1.7 | 4.6 |
| Triad Guaranty Insurance Corp. (Triad)[6] | No Rated | N/A | 7.7 | 0.5 | 1.9 |
| CMG Mortgage Insurance Co. | BBB | Negative | 3.0 | 0.1 | 0.7 |
| Essent Guaranty, Inc. | No Rated | N/A | 1.3 | | 0.3 |
| Total | | | $ 191.8 | $ 33.8 | $ 49.2 |

(1) Represents the rating and exposure for the counterparty only which we have here as gross exposure. Coverage amounts may include coverage provided by consolidated affiliates and subsidiaries of the counterparty. Latest ratings available as of April 23, 2012. Represents the lower of S&P and Moody's credit ratings and outlooks based on the S&P equivalent.

(2) Represents the amount of UPB and the end of the period for our single-family loans that are guaranteed or covered by the respective insurance type. These amounts are based on our gross coverage without regard to any netting of coverage that may exist or the existence of an affected coverage amount covered under both types of insurance. See "Table 4.5 Recourse and Other Forms of Credit Protection" in "NOTE 4 MORTGAGE LOANS AND LOAN LOSS RESERVES" for further information.

(3) Represents the remaining aggregate coverage on actual limits for reimbursement of losses under pool coverage for both primary and pool insurance. Coverage amounts are based on our gross coverage without regard to netting of coverage that may exist or the existence of an affected mortgage coverage amount under both types of insurance.

(4) In October 2011, PMI began paying valid claims 50% in cash and 50% in deferred payments obligations under order of the state regulator.

(5) In January 2012, RMIC began paying valid claims 50% in cash and 50% in deferred payments obligations under order of the state regulator.

(6) In June 2009, Triad began paying valid claims 60% in cash and 40% in deferred payments obligations under order of the state regulator.

We received proceeds of $491 million and $587 million during the three months ended March 31, 2012 and 2011, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single family loans. We had outstanding receivables from mortgage insurers, net of associated reserves, of $1.0 billion as of both March 31, 2012 and December 31, 2011.

The UPB of single family loans covered by pool insurance declined approximately 15% during the three months ended March 31, 2012, primarily due to prepayments and other liquidation events. We did not purchase pool insurance on single family loans during the three months ended March 31, 2012. In recent periods, we also reached the maximum limit of recovery on certain pool insurance policies.

Based on information we have received from MGIC, we understand that MGIC may challenge our current and future claims under certain of their pool insurance policies. We believe that our pool insurance policies with MGIC provide us with the right to obtain recoveries for losses up to the aggregate limit indicated in the table above. However, MGIC's interpretation of these policies would result in claims coverage approximately $0.6 billion lower than the amount of coverage outstanding set forth in the table above. This difference may increase, but we do not expect it to exceed approximately $0.7 billion.

In August 2011, we suspended PMI and its affiliates and RMIC and its affiliates as approved mortgage insurers, due to adverse developments concerning the companies. As a result, loans insured by either company (except relief refinance loans with pre existing insurance) are ineligible for sale to Freddie Mac. Both PMI and RMIC recently instituted partial claim payment plans, under which claim payments will be made 50% in cash, with the remaining amount deferred. We and FHFA are in discussions with the state regulators of PMI and RMIC concerning future payments of our claims. It is not yet clear how the state regulators of PMI and RMIC will administer their respective deferred payment plans. In addition, to date, the state regulator has not allowed Triad to begin paying its deferred payment obligations, and it is uncertain when or if Triad will be permitted to do so. If Triad, PMI, and RMIC do not pay their deferred payment obligations, we would lose a significant portion of the coverage from these counterparties shown in the table above.

In addition to Triad, RMIC, and PMI, we believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as those claims emerge. In the future, we believe our mortgage insurance exposure will likely be concentrated among a smaller number of counterparties.

*Bond Insurers*

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering certain of the non agency mortgage related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. Bond insurance exposes us to the risk that the bond insurer will be unable to satisfy claims.

50                                                                    *Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents our coverage amounts of bond insurance, including secondary coverage, for the non agency mortgage-re ated securities we hold  In the event a bond insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses related to such a failure

**Table 32      Bond Insurance by Counterparty**

| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[2] | As of March 31, 2012 Coverage Outstanding[2] | Percent of Total[2] |
|---|---|---|---|---|
| | | | (dollars in billions) | |
| Ambac Assu ance Co po a on (Ambac)[3] | No  Ra ed | N/A | $        4 2 | 45% |
| F nanc a  Gua an y Insu ance Co  pany (FGIC)[3] | No  Ra ed | N/A | 1 7 | 18 |
| MBIA I s  a ce Co p | B | Unde  Rev ew | 1 3 | 13 |
| Ass  ed G a a ty M   c pa Co p | AA | Nega ve | 1 1 | 11 |
| Na  ona  Pub c F nance Gua an ee Co p | BBB | Nega ve | 1 1 | 12 |
| Sy  co a G a a  ee I c [3] | CC | Deve op ng | 0 1 | 1 |
| Rad a  G a a  y I c (Rad a ) | B | Nega ve | 0 1 | <1 |
| o a | | | $        9 5 | 100% |

(1) Rep esen s he  a ng and exposu e fo  he co po a e en  y o  w c  we ave  av e g e a es expos e, w c    so e cases s a hold ng company  Cove age amoun s may  nclude cove age p ov ded by conso  da ed aff  a es and subs d a  es of he coun e pa y  La es   a ngs ava ab e as of Ap  23, 2012 Rep esen s he lowe of S&P a d Moody's c ed  a  gss a ed  es of he S&P eq va e

(2) Rep esen s he  ema n ng con ac ual l m  fo e mbu semen of osses,  c  d g os  es a d o e  expe ses, o  non-agency mo gage- ela ed secu  es

(3) A  bac, FGIC, a d Sy co a G a a ee I c a e c  e y ope a  g  unde  egu a o y supe v s on

We monitor the financial strength of our bond insurers in accordance with our risk management policies  Some of our larger bond insurers are in runoff mode where no new business is being written  We expect to receive substantially less than full payment of our claims from several of our bond insurers, including Ambac and FGIC, due to adverse developments concerning these companies  Ambac and FGIC are currently not paying any of their claims  We believe that we will likely receive substantially less than full payment of our claims from some of our other bond insurers, because we believe they also lack sufficient ability to fully meet all of their expected lifetime claims paying obligations to us as such claims emerge  In the event one or more of our other bond insurers were to become  subject to a regulatory order or insolvency proceeding, our ability to recover certain unrealized losses on our mortgage related securities would be negatively impacted  We considered our expectations regarding our bond insurers' ability to meet their obligations in making our impairment determinations at March 31, 2012 and December 31, 2011. See "NOTE 7: INVESTMENTS IN SECURITIES    Other Than Temporary Impairments on Available For Sale Securities" for additional information regarding impairment losses on securities covered by bond insurers.

*Cash and Other Investments Counterparties*

We are exposed to institutional credit risk arising from the potential insolvency or non performance of counterparties of non-mortgage-re ated investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily major financial institutions and the Federal Reserve Bank  As of March 31, 2012 and December 31, 2011, there were $60.7 billion and $68.5 billion, respectively, of cash and other non mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information on counterparty credit ratings and concentrations within our cash and other investments.

*Derivative Counterparties*

We use exchange traded derivatives and OTC derivatives and are exposed to institutional credit risk with respect to both types of derivatives  We are an active user of exchange traded derivatives, such as Treasury and Eurodollar futures, and are required to post initial and maintenance margin with our clearing firm in connection with such transactions. The posting of this margin exposes us to institutional credit risk in the event that our clearing firm or the exchange's clearinghouse fail to meet their obligations  However, the use of exchange traded derivatives lessens our institutional credit risk exposure to individual counterparties because a central counterparty is substituted for individual counterparties, and changes in the value of open exchange traded contracts are settled daily via payments made through the financial clearinghouse established by each exchange  OTC derivatives, however, expose us to institutional credit risk to individual counterparties because transactions are executed and settled directly between us and each counterparty, exposing us to potential losses if a counterparty fails to meet its contractual obligations. When our net position with a counterparty in OTC derivatives subject to a master netting agreement has a market value above zero (*i.e.*, it is an asset reported as

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                   TREASURY-3587                       Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

derivative assets, net on our consolidated balance sheets), the  counterparty is obligated to deliver collateral in the form of  cash, securities, or a combination of both, in an amount equal  to that market value (less a small unsecured "threshold" amount) as necessary to satisfy its net obligation to us under the master agreement

All of our OTC derivative counterparties are major financial  institutions and are experienced participants in the OTC  derivatives market  A large number of OTC derivative counterparties had credit ratings of A+, A, or A   as of April 23, 2012. We require counterparties with such credit ratings to post collateral if our net exposure to them on  derivative contracts exceeds $  million  See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

The relative concentration of our derivative exposure among our  primary derivative counterparties remains high. This  concentration has increased significantly since 2008 primarily  due to industry consolidation and the failure or weakening of  certain counterparties, and could further increase  The table below summarizes our exposure to our derivative counterparties,  which represents the net positive fair value of derivative contracts, related accrued interest and collateral held by us  from our counterparties, after netting by counterparty as  applicable (*i.e.*, net amounts due to us under derivative  contracts which are recorded as derivative assets). In addition,  we have derivative liabilities where we post collateral to counterparties  Pursuant to certain collateral agreements we  have with derivative counterparties, the amount of collateral  that we are required to post is based on the credit rating of  our long term senior unsecured debt securities from S&P or  Moody's  The lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative  transactions. At March 31, 2012, our collateral posted  exceeded our collateral held. See "CONSOLIDATED BALANCE SHEETS ANALYSIS     Derivative Assets and Liabilities, Net" and "Table 25 Derivative Fair Values and Maturities" for a reconciliation of fair value to the amounts presented on our consolidated balance sheets as  of March 31, 2012, which includes both cash collateral held  and posted by us, net.

52                                    *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 33     Derivative Counterparty Credit Exposure**

| Rating[1] | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
|---|---|---|---|---|---|---|
| | | | As of March 31, 2012 | | | |
| | | | (dollars in millions) | | | |
| AA | 5 | $ 71,261 | $ 499 | $ 36 | 5 5 | $10 m...on o...ess |
| A | 6 | 307,792 | 1,668 | 25 | 6 2 | $1 m...on o...ess |
| A | 7 | 268,535 | 135 | 96 | 5 8 | $1 m...on o...ess |
| A | 1 | 42,942 | | | 6 4 | $1 m...on o...ess |
| S...o a[7] | 19 | 690,530 | 2,302 | 157 | 6 0 | |
| Fu u es and c ea nghouse-se ed de va es | | 44,581 | 2 | 2 | | |
| Comm men s | | 22,298 | 22 | 22 | | |
| Swap gua an ee de va es | | 3,631 | | | | |
| O he de va es[8] | | 15,703 | 1 | 1 | | |
| To al de va es | | $ 776,743 | $ 2,327 | $ 182 | | |

| Rating[1] | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
|---|---|---|---|---|---|---|
| | | | As of December 31, 2011 | | | |
| | | | (dollars in millions) | | | |
| AA | 5 | $ 73,277 | $ 536 | $ 19 | 5 0 | $10 m...on o...ess |
| A | 6 | 337,013 | 2,538 | 1 | 5 8 | $1 m...on o...ess |
| A | 5 | 208,416 | 12 | 51 | 6 2 | $1 m...on o...ess |
| A | 2 | 89,284 | | | 5 5 | $1 m...on o...ess |
| S...o a[7] | 18 | 707,990 | 3,086 | 71 | 5 8 | |
| Fu u es and c ea nghouse-se ed de va es | | 43,831 | 8 | 8 | | |
| Comm men s | | 14,318 | 38 | 38 | | |
| Swap gua an ee de va es | | 3,621 | | | | |
| O he de va es[8] | | 18,489 | 1 | 1 | | |
| To al de va es | | $788,249 | $ 3,133 | $ 118 | | |

(1) We use he owe of S&P and Moody's a ngs o manage co a ea equ emen s In h s ab e, he Moody's a ng of he ega en y s s a ed ne s of he S&P equ va e

(2) Based on egal en es

(3) No ona o con ac ua amoun s a e used o ca cu a e he pe od c se emen amoun s o be ece ved o pa d and gene a y do no ep esen ac ua amoun s o be exchanged

(4) Fo eac co e pa y, s a o c des de va ves w a pos ve fa va ue (eco ded as de va ve asse s, e ), ncud ng he e a ed acc ued ne es ece vab e/payab e, when app cab e Fo co e pa es c ded es b o a, pos ons a s shown ne da he coun e pa y eve ncud ng acc ued ne es ece vab e/payab e and ade/se e fees

(5) Ca cu a ed as To a Exposu e a Fa Va ue ess cash o co a e a he d as de e ned a he coun e pa y eve Inc udes a coun s e a ed o ou pos ng of cash co a e a excess of de va ve ab y as de e ned a he coun e pa y eve Fo de va ves c ded h ough an exchange o c ea nghouse, exc udes cons de a on of ma n enance ma g n pos ed by ou co e pa y

(6) Coun e pa y a e equ ed o pos co a e a when he expos e exceeds an ag eed-upon co a e a pos ng h esholds These h esholds a e yp ca y based e coun e pa y's c ed a ng and a e nd v dua y nego a ed

(7) Cons s s of OTC n e es a e swaps, op on-based de va ves (exc ud ng ce a n w en op ons), fo e g -c e cy swaps, a d p c ased ne es - a e caps

(8) Cons s s p ma y of ce a n w en op ons, and ce a n c ed de va ves W en op ons do no p esen coun e pa y c ed exposu e, because we ece ve a one-me me up-f on p em um n exchange fo g v ng he ho de he gh o execu e a co ac de spec f ed e s, w c gea e y p s s a ab y pos on

Over time, our exposure to individual counterparties for OTC interest rate swaps, option based derivatives, foreign currency swaps, and purchased interest rate caps varies depending on changes in fair values, which are affected by changes in period end interest rates, the implied volatility of interest rates, foreign currency exchange rates, and the amount of derivatives held If all of our counterparties for these derivatives had defaulted simultaneously on March 31, 2012, the combined amount of our uncollateralized and overcollateralized exposure to these counterparties, or our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately $157 million. Our similar exposure as of December 31, 2011 was $71 million. Four counterparties each accounted for greater than 10% and collectively accounted for 83% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at March 31, 2012. These counterparties were BNP Paribas, Deutsche Bank, A.G., Royal Bank of Scotland, and UBS AG., all of which were rated "A" or above by S&P as of April 23, 2012.

Approximately 97% of our counterparty credit exposure for OTC interest rate swaps, option based derivatives, foreign currency swaps, and purchased interest rate caps was collateralized at March 31, 2012 (excluding amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level) The remaining exposure was primarily due to exposure amounts below the applicable counterparty collateral posting threshold,

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3589

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any losses or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

as well as market movements during the time period between when a derivative was marked to fair value and the date we received the related collateral In some instances, these market movements result in us having provided collateral that has fair value in excess of our obligation, which represents our overcollateralization exposure Collateral is typically transferred within one business day based on the values of the re ated derivatives

In the event a derivative counterparty defaults, our economic loss may be higher than the uncollateralized exposure of our derivatives if we are not able to replace the defaulted derivatives in a timely and cost effective fashion We could also incur economic loss if the collateral held by us cannot be liquidated at prices that are sufficient to recover the amount of such exposure We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest rate swaps, option based derivatives, foreign currency swaps, and purchased interest rate caps will increase under certain adverse market conditions by performing daily market stress tests. These tests, which involve significant management judgment, evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties on OTC derivatives contracts assuming certain changes in the level and implied volatility of interest rates and certain changes in foreign currency exchange rates over a brief time period Our actual exposure could vary significantly from amounts forecasted by these tests

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives for accounting purposes, was $22 million and $38 million at March 31, 2012 and December 31, 2011, respectively. These commitments are uncollateralized Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis in an effort to ensure that they continue to meet our internal risk management standards.

_Selected European Sovereign and Non Sovereign Exposures_

The sovereign debt of Spain, Italy, Ireland, Portugal, and Greece (which we refer to herein as the "troubled European countries") and the credit status of financial institutions with significant exposure to the troubled European countries has been adversely impacted due to weaknesses in the economic and fiscal situations of those countries In recent periods, Moody's and S&P downgraded a number of European countries, including Italy, Spain, and Portugal. We are monitoring our exposures to these countries and institutions

As of March 31, 2012, we did not hold any debt issued by the governments of the troubled European countries and did not hold any financial instruments entered into with sovereign governments in those countries As of that date, we also did not hold any debt issued by corporations or financial institutions domiciled in the troubled European countries and did not hold any other financial instruments entered into with corporations or financial institutions domiciled in those countries For purposes of this discussion, we consider an entity to be domiciled in a country if its parent entity is headquartered in that country.

Our derivative portfolio and cash and other investments portfolio counterparties include a number of major European and non European financial institutions. Many of these institutions operate in Europe, and we believe that all of these financial institutions have direct or indirect exposure to the troubled European countries For many of these institutions, their direct and indirect exposures to the troubled European countries change on a daily basis We monitor our major counterparties' exposures to the troubled European countries, and adjust our exposures and risk limits to individual counterparties accordingly Our exposures to derivative portfolio and cash and other investments portfolio counterparties are described in "Derivative Counterparties," "Cash and Other Investments Counterparties" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

We took a number of actions in 2011 designed to reduce our exposures to certain derivative portfolio and cash and other investments portfolio counterparties due to their exposure to the troubled European countries, including substantially reducing our derivative exposure limits, our limits on the amount of unsecured overnight deposits, and our limits for asset backed commercial paper For certain repurchase counterparties, we reduced the credit limit and restricted the term of such transactions to overnight We also ceased investing in prime money funds that could hold substantial amounts of non U S sovereign debt

It is possible that continued adverse developments in Europe could significantly impact our counterparties that have direct or indirect exposure to the troubled European countries In turn, this could adversely affect their ability to meet their obligations to us For more information, see "RISK FACTORS Competitive and Market Risks *We depend on our institutional counterparties to provide services that are critical to our business, and our results of operations or*

54                                                                                                           *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                          Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*financial condition may be adversely affected if one or more of our institutional counterparties do not meet their obligations to us"* in our 2011 Annual Report

### Mortgage Credit Risk

We are exposed to mortgage credit risk principally in our single family credit guarantee and multifamily mortgage portfolios because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage related security, or other guarantee commitment We are also exposed to mortgage credit risk related to our investments in non Freddie Mac mortgage related securities All mortgages that we purchase or guarantee have an inherent risk of default For information about our holdings of these securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities    *Mortgage Related Securities."*

### Single Family Mortgage Credit Risk

Single family mortgage credit risk is primarily influenced by the credit profile of the borrower of the mortgage loan (*e.g.*, credit score, credit history, and monthly income relative to debt payments), documentation level, the number of borrowers, the features of the mortgage itself, the purpose of the mortgage, occupancy type, property type, the LTV ratio, and local and regional economic conditions, including home prices and unemployment rates Through our delegated underwriting process, single family mortgage loans and the borrowers' ability to repay the loans are evaluated using several critical risk characteristics, including, but not limited to, the borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the original LTV ratio, the type of mortgage product, and the occupancy type of the loan

In the first quarter of 2012, we continued our efforts to build value for the industry and build the infrastructure for a future housing finance system These efforts include the implementation of the UMDP which provides us with the ability to collect additional data that we believe will improve our risk management practices. The UMDP creates standard terms and definitions to be used throughout the industry and establishes standard reporting protocols. The UMDP is a key building block in developing a future secondary mortgage market In the first quarter of 2012, we completed a key milestone of the UMDP with the launch of the Uniform Collateral Data Portal for the electronic submission of appraisal reports for conventional mortgages FHFA also directed us and Fannie Mae to discuss harmonizing our seller/servicer contracts.

As part of our quality control process, after our purchase of the loans, we review the underwriting documentation for a sample of loans for compliance with our contractual standards. The most common underwriting deficiencies found in our reviews during 20  were related to insufficient income and inadequate or missing documentation to support borrower qualification The next most common deficiency was inaccurate data entered into Loan Prospector, our automated underwriting system We are continuing to perform quality control sampling for loans we purchased in 2011 and have not yet compiled our results.

For loans with identified underwriting deficiencies, we may require immediate repurchase or allow performing loans to remain in our portfolio subject to our continued right to issue a repurchase request to the seller/servicers, depending on the facts and circumstances. Our right to request repurchase by seller/servicers is intended to protect us against deficiencies in underwriting by our seller/servicers While this protection is intended to reduce our mortgage credit risk, it increases our institutional risk exposure to seller/servicers See "*Institutional Credit Risk    Single Family Mortgage Seller/Servicers"* for further information on repurchase requests.

Conditions in the mortgage market improved in certain geographical areas but continued to remain challenging during the first quarter of 2012 Most single family mortgage loans, especially those originated from 2005 through 2008, have been affected by the compounding pressures on household wealth caused by significant declines in home values that began in 2006 and the ongoing weak employment environment. As of March 31, 2012 and December 31, 2011, the serious delinquency rate for loans originated in 2005 through 2008 in our single family credit guarantee portfolio was 8.93% and 8.75%, respectively, whereas the serious delinquency rate for loans originated in 2009 through 2011 was 0 34% and 0 30%, respectively Our serious delinquency rates remained high in the first quarter of 2012 compared to historical levels, as discussed in "Credit Performance    Delinquencies " The UPB of our single family non performing loans remained at high levels during the first quarter of 2012.

TREASURY-3591

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Characteristics of the Single Family Credit Guarantee Portfolio*

The average UPB of loans in our single family credit guarantee portfolio was approximately $151,000 at both March 31, 2012 and December 31, 2011 We purchased or guaranteed approximately 491,000 and 461,000 single family loans totaling $105.1 billion and $97.6 billion of UPB during the first quarters of 2012 and 2011, respectively. Our single family credit guarantee portfolio predominately consists of first lien, fixed rate mortgage loans secured by the borrower's primary residence Our guarantees related to second lien mortgage loans in the single family credit guarantee portfolio are insignificant.

The percentage of home purchase loans in our loan acquisition volume continued to remain at low levels and refinance activity remained high during the first quarter of 2012 Approximately 95% of the single family mortgages we purchased in the first quarter of 20 2 were fixed rate amortizing mortgages, based on UPB Approximately 87% of the single family mortgages we purchased in the first quarter of 2012 were refinance mortgages, and approximately 3 % of these refinance mortgages were relief refinance mortgages, based on UPB

The table below provides additional characteristics of single family mortgage loans purchased during the first quarters of 2012 and 2011, and of our single family credit guarantee portfolio at March 31, 2012 and December 31, 2011.

5 6                                                                                          *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 34      Characteristics of the Single Family Credit Guarantee Portfolio[1]**

| | Purchases During the Three Months Ended March 31, | | Portfolio Balance at[2] | |
|---|---|---|---|---|
| | 2012 | 2011 | March 31, 2012 | December 31, 2011 |
| **Original LTV Ratio Range[3][4]** | | | | |
| 60% and below | 33% | 33% | 23% | 23% |
| Above 60% to 70% | 18 | 18 | 15 | 16 |
| Above 70% to 80% | 0 | 2 | 2 | 2 |
| Above 80% to 90% | 5 | | 10 | 9 |
| Above 90% to 100% | | 3 | 8 | 8 |
| Above 100% | <1 | <1 | 2 | 2 |
| Total | 100% | 100% | 100% | 100% |
| Weighted average original LTV ratio | 66% | 66% | 72% | 72% |
| **Estimated Current LTV Ratio Range[5]** | | | | |
| 60% and below | | | 25% | 25% |
| Above 60% to 70% | | | 12 | 12 |
| Above 70% to 80% | | | 18 | 18 |
| Above 80% to 90% | | | 15 | 15 |
| Above 90% to 100% | | | 10 | 10 |
| Above 100% to 110% | | | 6 | 6 |
| Above 110% to 120% | | | | |
| Above 120% | | | 10 | 10 |
| Total | | | 100% | 100% |
| Weighted average estimated current LTV ratio | | | | |
| Relief refinance mortgages[6] | | | 80% | 79% |
| All other mortgages | | | 80% | 80% |
| Total mortgages | | | 80% | 80% |
| **Credit Score[3][7]** | | | | |
| 740 and above | 78% | 74% | 55% | 55% |
| 700 to 739 | 15 | 18 | 21 | 21 |
| 660 to 699 | 6 | 7 | 1 | 1 |
| 620 to 659 | 1 | 1 | 7 | 7 |
| Less than 620 | <1 | <1 | 3 | 3 |
| Total | 100% | 100% | 100% | 100% |
| Weighted average credit score | | | | |
| Relief refinance mortgages[6] | 773 | 775 | 773 | 771 |
| All other mortgages | 763 | 758 | 735 | 734 |
| Total mortgages | 758 | 755 | 736 | 735 |
| **Loan Purpose** | | | | |
| Purchase | 13% | 15% | 29% | 30% |
| Cash-out refinance | 16 | 19 | 26 | 27 |
| Other refinance[8] | 71 | 66 | 5 | 3 |
| Total | 100% | 100% | 100% | 100% |
| **Property Type** | | | | |
| Detached townhome[9] | 95% | 94% | 92% | 92% |
| Condo/Co-op | 5 | 6 | 8 | 8 |
| Total | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | |
| Primary residence | 92% | 92% | 91% | 91% |
| Second/vacation home | | | 5 | 5 |
| Investment | | | | |
| Total | 100% | 100% | 100% | 100% |

(1) Purchases are divided into guarantees based on the UPB of the single-family credit guarantee portfolio. Our Guarantee transactions when ending balances of $2 billion on at March 31, 2012 and December 31, 2011, are excluded from portfolio balance data since these securities are backed by non-Freddie Mac issued securities for which we do not have characteristics data as was not available.

(2) Includes loans acquired under our Refinance initiative, which began in 2009.

(3) Purchase columns exclude modification loans acquired under our Relief refinance initiative, unless otherwise noted. See "Table 37 — Single-Family Relief Refinance Loan Volume" for further information on our Relief refinance initiative, which began in 2009.

(4) Original LTV is a ratio calculated as the amount of the mortgage we guarantee including the credit-enhanced portion, divided by the lesser of the appraised value of the property or the home mortgage origination or home mortgage purchase price. Second lien mortgages guaranteed by us are excluded from the LTV ratio calculation because we generally do not receive data about them. The existence of a second lien mortgage decreases the borrower's equity in the home and, therefore, can increase the risk of default.

(5) Current LTV is a range estimate, which are updated on a monthly basis. Current market values are estimated by adjusting original value of the property using an index based on changes in the market value of homes in the value of homes for which calc data exists. Second lien mortgages guaranteed by us are excluded from the LTV range since not applicable to our purchase activity, and excludes any second lien financing by third parties.

(6) Relief refinance mortgages of all LTV ratios comprised approximately 13% and 11% of our single-family credit guarantee portfolio by UPB as of March 31, 2012 and December 31, 2011, respectively.

(7) Credit score data is based on FICO scores. Although we obtain updated credit information once a borrower's safe at the origination of a mortgage, such as those borrowers seeking a modification, the scores presented in this table represent the credit score of the borrower at the time of loan origination and may not be indicative of borrower's current credit worthiness. As of March 31, 2012 Excludes less a portion of our portfolio because the FICO scores at origination were not available at March 31, 2012.

(8) Other refinance transactions include (a) refinance mortgages which "no cash-out" to the borrower and (b) refinance mortgages for which the delivery data provided was not sufficient for us to determine whether the mortgage was a cash-out or a no cash-out refinance transaction.

(9) Includes manufactured housing and homes in planned unit development communities. The UPB of manufactured housing mortgage loans purchased during the three months ended March 31, 2012 and 2011, was $139 million and $123 million, respectively.

57

*Freddie Mac*

Source  DIRA  HOME LOAN MORTGAGE CORP, 10 Q, May 03, 2012                TREASURY-3593                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses can be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or sell the property for an amount at or above the balance of the outstanding mortgage loan  Based on our historical experience, there is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80%. The UPB of mortgages in our single family credit guarantee portfolio with estimated current  LTV ratios greater than   00% was 20% of the total at both March 31, 2012 and December 31, 2011, and the serious delinquency rate for these loans was 12.6% and 12.8%,  respectively  Due to declines in home prices since 2006, we estimate that as of March 31, 2012 and December 31,  2011, approximately 50% and 49%, respectively, of the loans  originated in 2005 through 2008 that remained in our  single family credit guarantee portfolio as of those dates had  current LTV ratios greater than 100%  In recent years, loans with current LTV ratios greater than 100% have contributed disproportionately to our credit losses

A second lien mortgage reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or  above the combined balances of the first and second mortgages  As of both March 31, 2012 and December 31, 2011, approximately 15% of loans in our single family credit guarantee  portfolio had second lien financing by third parties at the time of origination of the first mortgage, and we estimate that these  loans comprised 17% of our seriously delinquent loans at both  dates, based on UPB  However, borrowers are free to obtain  second lien financing after origination and we are not entitled  to receive notification when a borrower does so  Therefore, it is likely that additional borrowers have post origination second  lien mo tgages

<u>Attribute Combinations</u>

Certain combinations of loan characteristics often can indicate  a higher degree of credit risk  For example, single family  mortgages with both high LTV ratios and borrowers who have lower credit scores typically experience higher rates of serious  delinquency and default  We estimate that there were $11.2 billion and $11.1 billion at March 31, 2012 and December 31, 2011, respectively, of loans in our single family credit  guarantee portfolio with both original LTV ratios greater than 90% and FICO scores less than 620 at the  time of loan origination  Certain mortgage product types, including interest only or option ARM loans, that have  additional higher risk characteristics, such as lower credit scores or higher LTV ratios, will also have a higher risk of default than those same products without these characteristics  See "Table 42 Single Family Credit Guarantee Portfolio by Attribute Combinations" for  information about certain attribute combinations of  single family mortgage loans

*Single Family Mortgage Product Types*

Product mix affects the credit risk profile of our total  mortgage portfolio  The primary mortgage products in our  single family credit guarantee portfolio are first lien, fixed rate mortgage loans  In general, 15 year amortizing fixed rate mortgages exhibit the lowest default rate among the types of mortgage loans we securitize and purchase,  due to the accelerated rate of principal amortization on these  mortgages and the credit profiles of borrowers who seek and  qualify for them  In a rising interest rate environment,  balloon/reset and ARM borrowers typically default at a higher rate than fixed rate borrowers  However, in recent years, during  which interest rates have generally remained relatively low, our delinquency and default rates on adjustable rate and  balloon/reset mortgage loans continue to be as high as, or  higher than, those on fixed rate loans because these borrowers  also have been affected by declining housing and economic  conditions and/or had other higher risk characteristics  Interest only and option ARM loans are higher risk mortgage products based on the features of  these types of loans  See "*Other Categories of Single Family Mortgage Loans*" below for additional information on higher risk mortgages in our single family credit  guarantee portfolio

In recent periods, we experienced a high volume of loan  modifications, as troubled borrowers were able to take advantage  of the various programs that we offered  The majority of our loan modifications result in new terms that include  predetermined interest rates for the remaining term of the loan  For example, our HAMP loan modifications result in an initial  below market interest rate that after five years gradually  adjusts to a new rate that is fixed for the remaining life of the loan  We have classified these loans as fixed rate products  for presentation within this Form   0 Q and elsewhere in our reporting even though they have a rate  adjustment provision because the future rates are determined at  the time of modification rather than at a subsequent date

The following paragraphs provide information on the  interest only, option ARM, and conforming jumbo loans in our single family credit guarantee portfolio  Interest only and option ARM loans have experienced significantly higher serious  delinquency rates than fixed rate amortizing mortgage products

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                 TREASURY-3594                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Interest Only Loans

Interest only loans have an initial period during which the borrower pays only interest, and at a specified date the monthly payment increases to begin reflecting repayment of principal  Interest only loans represented approximately 4% of the UPB of our single family credit guarantee portfolio at both March 31, 2012 and December 31, 2011. We fully discontinued purchasing such loans on September 1, 2010.

Option ARM Loans

Most option ARM loans have initial periods during which the borrower has various options as to the amount of each monthly payment, until a specified date, when the terms are recast  At both March 31, 2012 and December 31, 2011, option ARM loans represented less than 1% of the UPB of our single family credit guarantee portfolio  Included in this exposure was $7.1 billion and $7.3 billion of option ARM securities underlying certain of our Other Guarantee Transactions at March 31, 2012 and December 31, 2011, respectively. While we have not categorized these option ARM securities as either subprime or Alt A securities for presentation within this Form  0 Q and elsewhere in our reporting, they could exhibit similar credit performance to collateral identified as subprime or Alt A  We have not purchased option ARM loans in our single family credit guarantee portfolio since 2007  For information on our exposure to option ARM loans through our holdings of non agency mortgage-related securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities."

Conforming Jumbo Loans

We purchased $8.6 billion and $7.3 billion of conforming jumbo loans during the first quarters of 2012 and  2011, respectively. The UPB of conforming jumbo loans in our single family credit guarantee portfolio as of March 3 , 2012 and December 31, 2011 was $52.5 billion and $49.8 billion, respectively, or 3% of the UPB of our single family credit guarantee portfolio at both dates  The average size of these loans was approximately $541,000 and $545,000 at March 31, 2012 and December 31, 2011, respectively  For loans originated after September 30, 2011, conforming jumbo loans on a one family residence have UPB at origination that is greater than $417,000 and up to $625,500 in certain "high cost" areas  See "BUSINESS    Regulation and Supervision    *Legislative and Regulatory Developments*" in our 2011 Annual Report for further information on the conforming loan limits

*Other Categories of Single Family Mortgage Loans*

While we have classified certain loans as subprime or Alt A for purposes of the discussion below and elsewhere in this Form 10 Q, there is no universally accepted definition of subprime or Alt A, and our classification of such loans may differ from those used by other companies  For example, some financial institutions may use FICO scores to delineate certain residential mortgages as subprime  In addition, we do not rely primarily on these loan classifications to evaluate the credit risk exposure relating to such loans in our single family credit guarantee portfolio  For a definition of the subprime and Alt A single family loans and securities in this Form 10 Q, see "GLOSSARY "

Subprime Loans

Participants in the mortgage market may characterize single family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime  While we have not historically characterized the loans in our single family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see *Higher Risk Loans in the Single Family Credit Guarantee Portfolio*" and "Table 42    Single Family Credit Guarantee Portfolio by Attribute Combinations" for further information  In addition, we estimate that approximately $2.2 billion and $2.3 billion of security collateral underlying our Other Guarantee Transactions at March 31, 2012 and December 31, 2011, respectively, were identified as subprime based on information provided to us when we entered into these transactions

We also categorize our investments in non agency mortgage related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions. At March 31, 2012 and December 31, 2011, we held $47.9 billion and $49.0 billion, respectively, in UPB of non agency mortgage related securities backed by subprime loans. These securities were structured to provide credit enhancements, and 6% and 7% of these securities were investment grade at March 31, 2012 and December 31, 2011, respectively  The credit performance of loans underlying these securities has deteriorated significantly since 2008 and further deteriorated during the first quarter of 20 2  For more information on our exposure to subprime mortgage loans through our investments in non agency mortgage related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities."

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3595                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Alt A Loans

Although there is no universally accepted definition of Alt A, many mortgage market participants classify single family loans with credit characteristics that range between their prime and subprime categories as Alt A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. The UPB of Alt A loans in our single family credit guarantee portfolio declined to $89.4 billion as of March 31, 2012 from $94.3 billion as of December 31, 2011. The UPB of our Alt A loans declined in the first quarter of 2012 primarily due to refinancing into other mortgage products, foreclosure transfers, and other liquidation events. As of March 31, 2012, for Alt A loans in our single family credit guarantee portfolio, the average FICO score at origination was 717 Although Alt A mortgage loans comprised approximately 5% of our single family credit guarantee portfolio as of March 31, 2012, these loans represented approximately 24% of our credit losses during the first quarter of 2012.

Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre existing mortgage (including Alt A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in one of these programs and the original loan had been previously identified as Alt A, such refinance loan may no longer be categorized or reported as an Alt A mortgage in this Form 0 Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt A loan As a result, our reported Alt A balances may be lower than would otherwise be the case had such refinancing not occurred From the time the relief refinance initiative began in 2009 to March 31, 2012, we purchased approximately $16 7 billion of relief refinance mortgages that were previously categorized as Alt A loans in our portfolio, including $1.4 billion during the first quarter of 2012.

We also hold investments in non agency mortgage related securities backed by single family Alt A loans. At March 31, 2012 and December 31, 2011, we held investments of $16.3 billion and $16.8 billion, respectively, of non agency mortgage related securities backed by Alt A and other mortgage loans and 5% of these securities were categorized as investment grade at both dates The credit performance of loans underlying these securities has deteriorated significantly since 2008 and experienced further deterioration during the first quarter of 2012 We categor ze our investments in non agency mortgage related securities as Alt A if the securities were identified as such based on information provided to us when we entered into these transactions For more information on our exposure to Alt A mortgage loans through our investments in non agency mortgage related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities."

Higher Risk Loans in the Single Family Credit Guarantee Portfolio

The table below presents information about certain categories of single family mortgage loans within our single family credit guarantee portfolio that we believe have certain higher risk characteristics These loans include categories based on product type and borrower characteristics present at origination The table includes a presentation of each higher risk category in isolation A single loan may fall within more than one category (for example, an interest only loan may also have an original LTV ratio greater than 90%)

60                                                                                          *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 35    Certain Higher Risk Categories in the Single Family Credit Guarantee Portfolio[1]**

| | As of March 31, 2012 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | (dollars in billions) | | | |
| Loans with one or more specified characteristics | $342.2 | 105% | 7.3% | 9.0% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 89.4 | 107 | 9.4 | 11.8 |
| Interest-only[6] | 67.3 | 120 | 0.2 | 17.2 |
| Option ARM[7] | 8.1 | 117 | 6.1 | 19.6 |
| Original LTV ratio greater than 90%, non-HARP mortgages[8] | 105.2 | 107 | 8.4 | 8.3 |
| Original LTV ratio greater than 90%, HARP mortgages[8] | 70.0 | 105 | 0.1 | 1.3 |
| Lower FICO scores at origination (less than 620)[8] | 54.4 | 93 | 13.8 | 12.6 |

| | As of December 31, 2011 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | (dollars in billions) | | | |
| Loans with one or more specified characteristics | $342.9 | 105% | 7.2% | 9.3% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 94.3 | 107 | 8.8 | 11.9 |
| Interest-only[6] | 72.0 | 120 | 0.2 | 17.6 |
| Option ARM[7] | 8.4 | 119 | 5.5 | 20.5 |
| Original LTV ratio greater than 90%, non-HARP mortgages[8] | 107.9 | 108 | 8.1 | 8.5 |
| Original LTV ratio greater than 90%, HARP mortgages[8] | 59.3 | 104 | 0.1 | 1.3 |
| Lower FICO scores at origination (less than 620)[8] | 55.6 | 93 | 13.4 | 12.9 |

(1) Loan categories are not additive and a single loan may be included in multiple categories if more than one loan characteristic is associated with it. In the table, Loans with a combination of these characteristics will have an even higher risk of default than those with an individual characteristic.

(2) See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of current LTV ratios.

(3) Represents the percentage of loans based on loan count in our single-family credit guarantee portfolio that have been modified under agreements where the borrower, including those who have not yet been required to make a payment due, are currently, or may previously have been, added to the housing and principal balance of the loan. Excludes loans under a young receivership and the Guarantee Transactions for which data was not available.

(4) See "Credit Performance — Delinquencies" for further information about our reported serious delinquency rates.

(5) Loans with an Alt-A category continue to remain in that category following modification, even though the borrower may have provided full documentation of assets and income to complete the modification.

(6) The percentages of interest-only loans which have been modified and are reported end of effect... a number of these loans are no longer being assigned to the new product category (post-modification), primarily due to delays in processing.

(7) Loans within the option ARM category continue to remain in that category following modification, even though the modified loan no longer provides for optional payment provisions.

(8) See endnotes (4) and (7) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios and our presentation of FICO scores, respectively.

A significant portion of the loans in the higher risk categories presented in the table above were originated in 2005 through 2008. Except for HARP loans with LTV ratios greater than 90%, we purchased a limited amount of loans in the higher risk categories presented above since the beginning of 2009, and have fully discontinued purchases of Alt-A (effective March 1, 2009), interest only (effective September 1, 2010), and option ARM (since 2007) loans. The UPB of loans originated in 2005 to 2008 within our single family credit guarantee portfolio, which have a higher composition of loans with higher risk characteristics, continues to decline primarily due to repayments and other liquidations, including completed foreclosure alternatives and foreclosure transfers. We currently expect that, over time, the replacement (other than through relief refinance activity) of the 2005 to 2008 vintages should positively impact the serious delinquency rates and credit related expenses of our single family credit guarantee portfolio. However, the rate at which this replacement is occurring remains slow, primarily due to low volumes of home purchase mortgage originations and delays in the foreclosure process. For the first quarter of 2012, loans originated in 2005 through 2008 in our single family credit guarantee portfolio comprised approximately 88% of our credit losses.

Loans within one or more of the higher risk categories presented in the table above comprised approximately 20% of our single family credit guarantee portfolio as of both March 31, 2012 and December 31, 2011. The total UPB of loans in our single family credit guarantee portfolio with one or more of these characteristics declined slightly to $342.2 billion as of March 31, 2012 from $342.9 billion as of December 31, 2011. This decline was principally due to repayments and other liquidations, including completed foreclosure alternatives and foreclosure transfers, but was substantially offset by increases in loans with original LTV ratios greater than 90% due to significant relief refinance mortgage activity during the first quarter of 2012. The serious delinquency rates associated with loans with one or more of the above characteristics declined to 9.0% as of March 31, 2012 from 9.3% as of December 31, 2011.

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   DRA HOM  OAN MORTGAG CORP, 10 Q, May 03, 2012          TREASURY-3597          Powered by Morningstar® Document Research℠

Table of Contents

*Credit Enhancements*

The portfolio information below excludes our holdings of non Freddie Mac mortgage related securities  See "CONSOLIDATED BALANCE SHEETS ANALYSIS    Investments in Securities    *Mortgage Related Securities*" for credit enhancement and other information about our investments in non Freddie Mac mo tgage related securities

Our charter requires that single family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests  However, as discussed below, under HARP, we allow eligible borrowers who have mortgages with high current LTV ratios to refinance their mortgages without obtaining new mortgage insurance in excess of what was already in place. Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single family credit guarantee portfolio, and is typically provided on a loan level basis  In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements  Our credit losses could increase if an entity that provides credit enhancement fails to fulfill its obligation, as this would reduce the amount of our recoveries

At March 31, 2012 and December 31, 2011, our credit enhanced mortgages represented 3% and 4%, respectively, of our single family credit guarantee portfolio, excluding those backing Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative  Freddie Mac securities backed by Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative are excluded because we consider the incremental credit risk to which we are exposed to be insignificant

We recognized recoveries (excluding reimbursements for our expenses) of $515 million and $684 million that reduced our charge offs of single family loans during the three months ended March 31, 2012 and 2011, respectively. These amounts include $298 million and $435 million during the three months ended March 31, 2012 and 2011, respectively, in recognized recoveries associated with our primary and pool mortgage insurance policies  We recognized additional recoveries associated with our primary and pool mortgage insurance policies that reduced our single family REO operations expenses by $23 million and $86 million for the three months ended March 31, 2012 and 2011, respectively  During the three months ended March 31, 2012 and 2011, the percentage of our single family loan purchases with credit enhancement coverage was lower than in periods before 2009, primarily as a result of high refinance activity. Refinance loans (other than relief refinance mortgages) typically have lower LTV ratios, and are more likely to have an LTV ratio below 80% and not require credit protection as specified in our charter  In addition, we have been purchasing significant amounts of relief refinance mortgages  These mortgages allow for the refinance of existing loans guaranteed by us under terms such that we may not have mortgage insurance for some or all of the UPB of the mortgage in excess of 80% of the value of the property

See "RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Single Family Mortgage Credit Risk    Credit Enhancements*" in our 2011 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for additional information about credit protection and other forms of credit enhancements covering loans in our single family credit guarantee portfolio  See "Institutional Credit Risk" for information about our counterparties that provide credit enhancement on loans in our single family credit guarantee portfolio

*Single Family Loan Workouts and the MHA Program*

Loan workout activities are a key component of our loss mitigation strategy for managing and resolving troubled assets and lowering credit losses. Our loan workouts consist of: (a) forbearance agreements; (b) repayment plans; (c) loan modifications; and (d) foreclosure alternatives (*e.g.*, short sales or deed in lieu of foreclosure transactions)  Our single family loss mitigation strategy emphasizes early intervention by servicers in delinquent mortgages and provides alternatives to foreclosure  Other single family loss mitigation activities include providing our single family servicers with default management tools designed to help them manage non performing loans more effectively and to assist borrowers in maintaining home ownership where possible, or facilitate foreclosure alternatives when continued homeownership is not an option  See "BUSINESS    Our Business Segments    *Single Family Guarantee Segment    Loss Mitigation and Loan Workout Activities*" in our 2011 Annual Report for a general description of our loan workouts

Loan workouts are intended to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the additional credit losses that likely would be incurred in a REO sale  While we incur costs in the short term to execute our loan workout initiatives, we believe that, overall, these initiatives could reduce our ultimate credit losses over the long term  During the three months ended March 31, 2012, we helped approximately 40,000 borrowers either stay in their homes or sell their properties and avoid foreclosures through our various workout programs, including HAMP, and we completed approximately 29,000 foreclosures. HAMP and our new non HAMP standard loan modification

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012          TREASURY-3598          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

are important components of our loan workout program and have many similar features, including the initial incentive fees paid to servicers upon completion of a modification

Our seller/servicers have a significant role in servicing loans in our single family credit guarantee portfolio, which includes an active role in our loss mitigation efforts  Therefore, a decline in their performance could impact the overall quality of our credit performance (including through missed opportunities for mortgage modifications), which could adversely affect our financial condition or results of operations and have significant impacts on our ability to mitigate credit losses  The risk of such a decline in performance remains high.

The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts, and set market standards. Participation in the MHA Program is an integral part of our mission of providing stability to the housing market. Through our participation in this program, we help borrowers maintain home ownership  Some of the key initiatives of this program include HAMP and HARP, which are discussed below

Home Affordable Modification Program

HAMP commits U S  government, Freddie Mac and Fannie Mae funds to help eligible homeowners avoid foreclosures and keep their homes through mortgage modifications, where possible  Under this program, we offer loan modifications to financially struggling homeowners with mortgages on their primary residences that reduce the monthly principal and interest payments on their mortgages  HAMP requires that each borrower complete a trial period during which the borrower will make monthly payments  based on the estimated amount of the modification payments. Trial periods are required for at least three months  After the final trial period payment is received by our servicer and the  borrower has provided necessary documentation, the borrower and  servicer will enter into the modification  We bear the costs of these activities, including the cost of any monthly payment reductions  HAMP applies to loans originated on or before January 1, 2009.

On January 27, 2012, Treasury announced enhancements to HAMP, including extending the end date to December 3 , 20 3, expanding the program's eligibility criteria for modifications, increasing incentives paid to investors who engage in principal reduction, and extending to the GSEs the opportunity to receive investor incentives for principal reduction. Treasury has not yet published details about the  incentives that will be available to the GSEs  FHFA announced that the GSEs will extend their use of HAMP until December 3 , 20 3, and continue to offer the standard modification under the servicing alignment initiative  FHFA noted that Treasury's expanded eligibility criteria for HAMP modifications are consistent with our standard non HAMP  modification

FHFA announced that it has been asked to consider new HAMP incentives available to the GSEs for principal reduction  FHFA  previously released an analysis concluding that principal  forgiveness does not provide benefits that are greater than principal forbearance as a loss mitigation tool  FHFA stated that its assessment of the investor incentives now being offered by Treasury will follow its previous analysis, including consideration of the eligible universe, operational costs to  implement such changes, and potential borrower incentive effects

The table below presents the number of single family loans that  completed modification or were in trial periods under HAMP as of March 31, 2012 and December 31, 2011.

**Table 36      Single Family Home Affordable Modification Program  Volume[1]**

|  | As of March 31, 2012 | | As of December 31, 2011 | |
|---|---|---|---|---|
|  | Amount[2] | Number of Loans | Amount[2] | Number of Loans |
|  | | (dollars in millions) | | |
| Comp e ed HAMP mod  ca ons[3] | $35,011 | 158,688 | $33,681 | 152,519 |
| Loans  n  he HAMP    a  pe  od | $ 2,359 | 11,038 | $  2,790 | 12,802 |

(1) Based on nfo ma on epo ed by ou  se v ce s o  he MHA    og am adm n s a o

(2) Fo  oans  n  he HAMP    a  pe  od,  h s  ef ec s  he  oan balance  p o  o mod f ca on  Fo  comple ed HAMP mod f ca ons,  he amoun   ep esen s  he ba ance of  oans af e  mod f ca on    de  HAMP

(3) Amoun s p esen ed  ep esen  comple ed HAMP mod f ca ons w h  effec  ve da es s nce ou  mplemen a on of HAMP  n 2009  h ough Ma c  31, 2012 a d Decembe  31, 2011,  espec ve y

As of March 31, 2012, the borrower's monthly payment  was reduced on average by an estimated $565, which amounts to an  average of $6,785 per year, and a total of $1.1 billion in annual reductions for all of our completed HAMP modifications  (these amounts are calculated by multiplying the number of completed modifications by the average reduction in monthly  payment, and have not been adjusted to reflect the actual performance of the loans following modification)

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                        TREASURY-3599                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Approximately 32% of our loans in the HAMP trial period as of March 31, 2012 have been in the trial period for more than the minimum duration of three months  Based on information provided by the MHA Program administrator, the average length of the trial period for loans in the program as of March 31, 2012 was five months  When a borrower's HAMP trial period is cancelled, the loan is considered for our other workout activities  For information about the percentage of completed loan modifications that remained current, see "Table 39     Quarterly Percentages of Modified Single Family Loans     Current and Performing "

HAMP is one modification option for single family loans, but we also have completed a large volume of modifications through our non HAMP loan modification initiatives

The costs we incur related to HAMP have been, and will likely continue to be, significant. We paid $46 million of servicer incentives during the first quarter of 2012, as compared to $39 million of such incentives during the first quarter of 2011. As of March 31, 2012, we accrued $79 million for both initial and recurring servicer incentives not yet due  We paid $30 million of borrower incentives during the first quarter of 2012, as compared to $21 million of these incentives during the first quarter of 2011. As of March 31, 2012, we accrued $63 million for borrower incentives not yet due  We also have the potential to incur additional servicer incentives and borrower incentives as long as the borrower remains current on a loan modified under HAMP. See "MD&A     RISK MANAGEMENT     Credit Risk     *Mortgage Credit Risk     Single family Mortgage Credit Risk     Single Family Loan Workouts and the MHA Program*" in our 2011 Annual Report for additional information about the costs associated with HAMP

### Servicing Alignment Initiative and Non HAMP Standard Modifications

Under the direction of FHFA, we recently implemented a new set of standards for servicing non performing loans owned or guaranteed by Freddie Mac that aligns with standards for loans owned or guaranteed by Fannie Mae  The servicing alignment initiative provides for consistent ongoing processes for non HAMP loan modifications  We believe that the servicing alignment initiative will ultimately: (a) change, among other things, the way servicers communicate and work with troubled borrowers; (b) bring greater consistency and accountability to the servicing industry; and (c) help more distressed homeowners avoid foreclosure  We provided standards to our servicers under this initiative that require they initiate earlier and more frequent communication with delinquent borrowers, employ consistent requirements for collecting documents from borrowers, and follow consistent timelines for responding to borrowers, and consistent timelines for processing foreclosures. These standards are expected to result in greater alignment of servicer processes for both HAMP and most non HAMP workouts.

Under these new servicing standards, we will pay incentives to servicers that exceed certain performance standards with respect to servicing delinquent loans  We will also assess compensatory fees from servicers if they do not achieve a minimum performance benchmark with respect to servicing delinquent loans  These incentives may result in our payment of increased fees to our seller/servicers, the cost of which may be at least partially mitigated by the compensatory fees paid to us by our servicers that do not perform as required

As part of the servicing alignment initiative, we have implemented a new non HAMP standard loan modification initiative. This standard modification replaced our previous non HAMP modification initiative beginning January 1, 2012  The standard modification requires a three month trial period  Servicers were permitted to begin offering standard modification trial period plans with effective dates on or after October 1, 2011. As of March 31, 2012, approximately 400 borrowers had completed this type of modification with aggregate UPB of $78 million, and approximately 5,000 borrowers were in the modification trial period  We experienced a decline in completed modification volume in the first quarter of 20 2 and expect continued relatively low volumes in the second quarter of 20 2, below what otherwise would be expected, as servicers transition to the new standard modification initiative and borrowers complete the trial period  We expect to complete a significant number of these non HAMP standard loan modifications in the future and the costs we incur related to these modifications will likely be significant  See "MD&A     RISK MANAGEMENT     Credit Risk     *Mortgage Credit Risk     Single family Mortgage Credit Risk     Single Family Loan Workouts and the MHA Program*" in our 2011 Annual Report for information about the costs associated with our non HAMP standard loan modifications  While we incur costs in the short term to execute our non HAMP standard modifications, we believe that, overall, our non HAMP standard modifications could reduce our ultimate credit losses over the long term

### Home Affordable Refinance Program and Relief Refinance Mortgage Initiative

Our relief refinance mortgage initiative, including HARP (which is the portion of our relief refinance initiative for loans with LTV ratios above 80%), gives eligible homeowners (whose monthly payments are current) with existing loans that are owned or guaranteed by us an opportunity to refinance into loans with more affordable monthly payments and/or

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3600

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

fixed rate terms  HARP is targeted at borrowers with current LTV ratios above 80%; however, our relief refinance initiative also  allows borrowers with LTV ratios of 80% and below to participate

A number of FHFA directed changes to HARP were announced in late 20    These changes are intended to allow more borrowers to participate in the program and benefit from refinancing their  home mortgages  These revisions to HARP will help to reduce our  exposure to credit risk to the extent that HARP refinancing strengthens the borrowers' capacity to repay their mortgages and, in some cases, reduce the payments under their mortgages  These revisions to HARP could also reduce our credit  losses to the extent that the revised program contributes to  bringing stability to the housing market  However, we may face  greater exposure to credit and other losses on these HARP loans  because we are not requiring lenders to provide us with certain  representations and warranties on the refinanced HARP loans  As of March 31, 2012, we had purchased approximately $5 billion in UPB of HARP loans with reduced  representations and warranties  We could also experience declines in the  fair values of certain agency security  investments classified as available  for sale or trading  resulting from changes in expectations of mortgage prepayments and lower net interest yields over time on other  mortgage related investments

We began purchasing HARP loans under the expanded program in January 2012. However, since industry participation in HARP is  not mandatory, implementation schedules have varied as  individual lenders, mortgage insurers and other market  participants modify their processes  It is too early to estimate how many eligible borrowers are likely to refinance under the  revised program. There can be no assurance that the benefits from the revised program will exceed our costs

Our underwriting procedures for relief refinance mortgages are  limited in many cases, and such procedures generally do not  include all of the changes in underwriting standards we have  implemented in the last several years  As a result, relief refinance mortgages generally reflect many of the credit risk attributes of the original loans  However, borrower participation in our relief refinance mortgage initiative may  help reduce our exposure to credit risk in cases where borrower  payments under their mortgages are reduced, thereby  strengthening the borrowers' potential to make their mortgage payments

Over time, relief refinance mortgages with LTV ratios above 80%  (*i.e.*, HARP loans) may not perform as well as other  refinance mortgages because the continued high LTV ratios of these loans increase the probability of default  Our relief  refinance initiative is only for qualifying mortgage loans that we already hold or guarantee  We continue to bear the credit risk for refinanced loans under this program, to the extent that such risk is not covered by existing mortgage insurance or other  existing credit enhancements

The table below presents the composition of our purchases of  refinanced single family loans during the three months ended  March 31, 2012 and 2011.

**Table 37     Single Family Refinance Loan Volume**(1)

|  | Three Months Ended March 31, 2012 | | | Three Months Ended March 31, 2011 | | |
|---|---|---|---|---|---|---|
|  | Amount | Number of Loans | Percent(2) | Amount | Number of Loans | Percent(2) |
|  | | | (dollars in millions) | | | |
| Re ef ef nance mo gages |  |  |  |  |  |  |
| Above 125% LTV  a  o | $     476 | 2,217 | 0 5% | $ | | % |
| Above 105%  o 125% LTV  a  o | 4,447 | 21,113 | 5 0 | 2,527 | 10,747 | 3 1 |
| Above 80%  o 105% LTV  a  o | 12,331 | 61,954 | 13 8 | 12,006 | 54,974 | 14 7 |
| 80% and be ow LTV  a  o | 10,218 | 66,824 | 11 5 | 14,573 | 87,025 | 17 8 |
| o a  e ef ef nance mo  gages | $ 27,472 | 152,108 | 30 8% | $ 29,106 | 152,746 | 35 6% |
| To al  ef nance loan vo ume(3 | $89,278 | 416,497 | 100% | $81,757 | 390,008 | 100% |

(1) Cons s s of all s ngle-fam ly  ef nance mo  gage loans ha  we e   p c ased o g a a  eed d      g  epe od, exc  d  g  hose assoc a ed w h o he  gua an ee comm  men s and O he  G  a an ee T ansac  ons

(2) Based o  UPB

(3) Cons s s of  el ef ef nance mo  gages and o he    ef nance  mor gages

Relief refinance mortgages comprised approximately 3  % and 36% of our total refinance volume in the first quarter of 2012 and  2011, respectively, based on UPB  Relief refinance mortgages with LTV ratios above 80% represented approximately 16% and 15% of our total single family credit guarantee portfolio purchases  during the three months ended March 31, 2012 and 2011,  respectively  Relief refinance mortgages of all LTV ratios comprised approximately 13% and 11% of the UPB in our total  single family credit guarantee portfolio at March 3  , 20  2  and December 31, 2011, respectively. As of March 31, 2012, the serious delinquency rates for relief refinance loans  were as follows: (a) 0 3% for loans with LTV ratios of 80% or less; (b) 0.9% for loans with LTV ratios from 80% to 100%; (c) 1 4% for loans with LTV ratios of more than   00%; and (d) 0 6% for the total of all relief refinance  mortgages

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3601                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Loan Workout Volumes and Modification Performance

The table below presents volumes of single family loan workouts, serious delinquency, and foreclosures for the three months ended March 31, 2012 and 2011.

**Table 38    Single Family Loan Workouts, Serious Delinquency, and Foreclosures Volumes**[1]

| | Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | Number of Loans | Loan Balances | Number of Loans | Loan Balances |
| | | (dollars in millions) | | |
| Home retention actions | | | | |
| Loan modifications | | | | |
| with no change in terms[2] | 446 | $ 82 | 1,265 | $ 219 |
| with extension | 1,171 | 222 | 5,280 | 961 |
| with reduction of contract rate and, in certain cases, term extension | 8,863 | 1,908 | 22,968 | 5,167 |
| with rate reduction, term extension and principal forbearance | 3,197 | 863 | 5,645 | 1,505 |
| Total loan modifications[3] | 13,677 | 3,075 | 35,158 | 7,852 |
| Repayment plans[3] | 10,575 | 1,477 | 9,099 | 1,286 |
| Forbearance agreements[5] | 3,656 | 692 | 7,678 | 1,526 |
| Total home retention actions | 27,908 | 5,244 | 51,935 | 10,664 |
| Foreclosure alternatives | | | | |
| Short sales | 12,052 | 2,731 | 10,621 | 2,488 |
| Deed in lieu of foreclosure transactions | 193 | 33 | 85 | 15 |
| Total foreclosure alternatives | 12,245 | 2,764 | 10,706 | 2,503 |
| Total single-family loan workouts | 40,153 | $8,008 | 62,641 | $13,167 |
| Serious delinquent loan additions | 80,815 | | 97,464 | |
| Single-family foreclosures[6] | 28,954 | | 31,087 | |
| Serious delinquent loans, at period end | 400,787 | | 436,314 | |

(1) Based on completed actions with borrowers for loans where our single-family credit guarantee portfolio. These loan workout activities, repayment and forbearance activities for which the borrower has started the required process, are not been adequately and or effective, such as loans in modification or in repayment process. As such, unless certain loan workouts where our single-family loan activities have executed agreements in our credit guarantee portfolio, these are not been incorporated once in any of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be coded with another category in the same period (see endnote 5).

(2) Under this modification type, past due or near sale added to the principal balance and amortized based on the original contractual loan terms.

(3) Includes completed loan modifications under HAMP however, the number of such completed modifications differs from that reported by the MHA Program administration and may be due to differences in the timing of recognizing the completions by us and the administration.

(4) Represents the number of borrowers who reported the full amount of a repayment plan for past due amounts. Excludes the number of borrowers who are actively repaying past due amounts under a repayment plan, which comprised 19,981 and 20,592 borrowers as of March 31, 2012 and 2011, respectively.

(5) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout or is processed to complete. We only report forbearance activity for single-family loans once during each quarterly period however, a single loan may be included under separate forbearance agreements in separate periods.

(6) Represents the number of our single-family loans that complete a foreclosure transfer, including the third-party sales as a foreclosure auction on which changes ownership of the property as a safe deed decry or a deed-in-payment plans.

We experienced declines in most home retention actions, particularly loan modifications, in the first quarter of 2012 compared to the first quarter of 2011, primarily due to declines in the number of seriously delinquent loan additions and in borrower participation in HAMP. The implementation of the non HAMP standard modification also negatively impacted the number of completed modifications in the first quarter of 2012, as servicers have had to transition borrowers to the new modification initiative and borrowers now need to complete a trial period before receiving the final modification. The decline in loan modifications during the first quarter of 2012 is also due to a reduction in the volume of loans transitioning to serious delinquency, compared to the fourth quarter of 2011, which has contributed to a reduction in the inventory of problem loans in our single family credit guarantee portfolio. Foreclosure alternative volume increased 4% in the first quarter of 2012, compared to the first quarter of 2011, and we expect the volume of foreclosure alternatives to remain high in the remainder of 2012 primarily because we offer incentives to servicers to complete short sales instead of foreclosures. We plan to introduce additional initiatives during the remainder of 2012 designed to help more distressed borrowers avoid foreclosure through short sales and deed in lieu of foreclosure transactions.

The UPB of loans in our single family credit guarantee portfolio for which we have completed a loan modification increased to $70 billion as of March 31, 2012 from $69 billion as of December 31, 2011. The number of modified loans in our single family credit guarantee portfolio continued to increase and such loans comprised approximately 3.0% and 2.9% of our single family credit guarantee portfolio as of March 31, 2012 and December 31, 2011, respectively. The estimated current LTV ratio for all modified loans in our single family credit guarantee portfolio was 123% and the serious delinquency rate on these loans was 17 1% as of March 31, 2012. Approximately $42 billion in UPB of our

Source   FEDERAL HOME LOAN MORTGAGE CORP, 10 Q, May 03, 2012                    TREASURY-3602                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

completed loan modifications at March 31, 2012 had  provisions for reduced interest rates that remain fixed for the  first five years of the modification and then increase at a rate  of one percent per year (or such lesser amount as may be needed)  until the interest rate has been adjusted to a market rate (determined at the time of the modification)

The table below presents the percentage of modified  single family loans that were current and performing in each of  the last eight quarterly periods

**Table 39    Quarterly Percentages of Modified Single Family Loans    Current and Performing(1)**

| HAMP loan modifications: | Quarter of loan Modification Completion(2) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 |
| Time since modification: | | | | | | | | |
| 3 to 5 months | 89% | 86% | 87% | 86% | 85% | 82% | 81% | 85% |
| 6 to 8 months | | 84 | 82 | 83 | 82 | 81 | 78 | 81 |
| 9 to 11 months | | | 82 | 79 | 78 | 78 | 79 | 78 |
| 12 to 14 months | | | | 80 | 76 | 76 | 76 | 79 |
| 15 to 17 months | | | | | 76 | 73 | 73 | 76 |
| 18 to 20 months | | | | | | 74 | 71 | 73 |
| 21 to 23 months | | | | | | | 72 | 71 |
| 24 to 26 months | | | | | | | | 72 |

| Non-HAMP loan modifications: | Quarter of loan Modification Completion(2) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 |
| Time since modification: | | | | | | | | |
| 3 to 5 months | 78% | 73% | 76% | 78% | 80% | 77% | 73% | 75% |
| 6 to 8 months | | 70 | 67 | 69 | 71 | 74 | 66 | 65 |
| 9 to 11 months | | | 67 | 63 | 66 | 68 | 65 | 59 |
| 12 to 14 months | | | | 64 | 61 | 64 | 61 | 60 |
| 15 to 17 months | | | | | 63 | 61 | 56 | 56 |
| 18 to 20 months | | | | | | 62 | 54 | 52 |
| 21 to 23 months | | | | | | | 56 | 50 |
| 24 to 26 months | | | | | | | | 52 |

| Total (HAMP and Non-HAMP): | Quarter of loan Modification Completion(2) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 |
| Time since modification: | | | | | | | | |
| 3 to 5 months | 86% | 81% | 83% | 83% | 82% | 80% | 79% | 83% |
| 6 to 8 months | | 79 | 77 | 77 | 76 | 78 | 75 | 78 |
| 9 to 11 months | | | 76 | 73 | 72 | 74 | 75 | 74 |
| 12 to 14 months | | | | 73 | 68 | 71 | 71 | 75 |
| 15 to 17 months | | | | | 69 | 68 | 68 | 72 |
| 18 to 20 months | | | | | | 69 | 66 | 69 |
| 21 to 23 months | | | | | | | 68 | |
| 24 to 26 months | | | | | | | | 68 |

(1) In the first quarter of 2012, we revised our presentation to reflect the percentage of loans that are current and performing (less than one month past due) or have been paid off. Excludes loans no longer outstanding and loans in modification trial periods. Prior period amounts have been revised to conform to our current period presentation.

(2) Loan modifications are recognized as completed in the quarterly period in which the servicer has reported the modification as effective and the agreement has been accepted by us. For loans that have been re-modified (e.g., where a borrower has received a new modification on a previous default on the prior modification) we are reflecting the status of each modification separately. For example, in the case of a re-modified loan where the borrower stopped performing, the previous modification would be presented as being in default. The reapplication...

The redefault rate is the percentage of our modified loans that  have become seriously delinquent (i.e., three months or more delinquent or in foreclosure), transitioned to REO, or completed a loss producing foreclosure alternative. As of March 31, 2012, the redefault rate for all of our single family loan modifications (including those under HAMP) completed during 2011, 2010 and 2009 was 11%, 21%, and 51%, respectively. Many of the borrowers that received modifications  in 2009 were negatively affected by worsening economic conditions, including high unemployment rates during the last  several years. As of March 31, 2012, the redefault rate for  loans modified under HAMP in 2011, 2010, and 2009 was approximately 8%, 18%, and 20%, respectively. These redefault  rates may not be representative of the future performance of modified loans, including those modified under HAMP. We believe the redefault rate for loans modified in the last three years,  including those modified under HAMP, is likely to increase, particularly since the housing and economic environments remain  challenging

*Credit Performance*

Delinquencies

We report single family serious delinquency rate information  based on the number of loans that are three monthly payments or  more past due or in the process of foreclosure, as reported by  our servicers. Mortgage loans whose contractual terms have been  modified under agreement with the borrower are not counted as  delinquent as long as the

*Freddie Mac*

Source    FREDDIE MAC, FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3603

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

borrower is current under the modified terms  Single family  loans for which the borrower is subject to a forbearance  agreement will continue to reflect the past due status of the borrower  To the extent our borrowers participate in the HFA unemployment assistance initiatives and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into  further delinquency

Our single family delinquency rates include all single family  loans that we own, that back Freddie Mac securities, and that  are covered by our other guarantee commitments, except financial  guarantees that are backed by either Ginnie Mae Certificates or  HFA bonds because these securities do not expose us to  meaningful amounts of credit risk due to the guarantee or credit  enhancements provided on them by the U.S. government.

Some of our workout and other loss mitigation activities create  fluctuations in our delinquency statistics. For example,  single family loans that we report as seriously delinquent  before they enter a trial period under HAMP or our new non HAMP  standard modification continue to be reported as seriously delinquent for purposes of our delinquency reporting until the  modifications become effective and the loans are removed from delinquent status by our servicers. However, under our previous  non HAMP modifications, the borrower would return to a current payment status sooner, because these modifications did not have  trial periods. Consequently, the volume, timing, and type of  loan modifications impact our reported serious delinquency rate  In addition, there may be temporary timing differences, or lags,  in the reporting of payment status and modification completion  due to differing practices of our servicers that can affect our  delinquency reporting

Our serious delinquency rates have been affected by delays,  including those due to temporary actions to suspend foreclosure  transfers of occupied homes, increases in foreclosure process  timeframes, process requirements of HAMP, general constraints on  servicer capacity (which affects the rate at which servicers modify or foreclose upon  loans), and court backlogs (in states  that require a judicial foreclosure process) These delays lengthen the period of time in which loans remain in seriously  delinquent status, as the delays extend the time it takes for  seriously delinquent loans to be modified, foreclosed upon or  otherwise resolved and thus transition out of seriously  delinquent status. As a result, we believe our single family serious delinquency rates were higher in the first quarter of 20 2 than otherwise would have been  As of March 31, 2012 and December 31, 2011, the percentage of seriously  delinquent loans that have been delinquent for more than six  months was 73% and 70%, respectively

The table below presents serious delinquency rates for our  single family credit guarantee portfolio

**Table 40    Single Family Serious Delinquency Rates**

| | As of | | | |
|---|---|---|---|---|
| | March 31, 2012 | | December 31, 2011 | |
| | Percentage of Portfolio | Serious Delinquency Rate | Percentage of Portfolio | Serious Delinquency Rate |
| S ng e-fam  y | | | | |
| Non-c ed  -enhanced | 87% | 2 80% | 86% | 2 84% |
| C ed  -enhanced(1) | 13 | 8 02 | 14 | 8 03 |
| To al s ngle-fam ly c ed  gua an ee por o o(2 | 100% | 3 51 | 100% | 3 58 |

(1) See "Ins  u  ona C ed  R sk" fo  nfo ma on abou  ou  coun pa  es ha  p ov de c ed  enhancemen  on  oans n  ou  s ngle-fam ly c ed  gua an ee po  fol o
(2) As of Ma c  31, 2012 a d Dece  be  31, 2011, app ox ma e y 71% and 68%,  espec ve y, of  he s ng e-fam  y  oans  epo ed as se  ous y de  nquen  we e n  he  p ocess of fo ec osu e

Serious delinquency rates of our single family credit guarantee  portfolio declined to 3.51% as of March 31, 2012 from 3.58%  as of December 31, 2011  Our serious delinquency rate  remains high compared to historical levels due to continued  weakness in home prices, persistently high unemployment,  extended foreclosure timelines, and continued challenges faced  by servicers processing large volumes of problem loans  In addition, our serious delinquency rate was adversely impacted by  the decline in the size of our single family credit guarantee portfolio in the first quarter of 2012 because this rate is  calculated on a smaller number of loans at the end of the period

Serious delinquency rates for interest only and option ARM  products, which together represented approximately 4% of our  total single family credit guarantee portfolio at March 31,  2012, were 17.2% and 19.6%, respectively, as compared with  17.6% and 20.5% at December 31, 2011  Serious delinquency rates of single family 30 year, fixed rate amortizing loans, a more  traditional mortgage product, were approximately 3.9% at both  March 31, 2012 and  December 31, 2011

The tables below present serious delinquency rates categorized  by borrower and loan characteristics, including geographic  region and origination year, which indicate that certain  concentrations of loans have been more adversely affected by  declines in home prices and weak economic conditions since 2006  In certain states, our single family serious

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                         TREASURY-3604                         Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may not be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

delinquency rates have remained persistently high  As of March 31, 2012, single family loans in Arizona, California,  Florida, and Nevada comprised 25% of our single family credit  guarantee portfolio, and the serious delinquency rate of loans  in these states was 6 0%  During the three months ended March 31, 2012, we also continued to experience high  serious delinquency rates on single family loans originated  between 2005 and 2008. We purchased significant amounts of loans with higher risk characteristics in those years. In addition,  those borrowers are more susceptible to the declines in home  prices and weak economic conditions since 2006 than those  homeowners that have built up equity in their homes over a longer period of time

The table below presents credit concentrations for certain loan  groups in our single family credit guarantee portfolio

**Table 41    Credit Concentrations in the Single Family Credit Guarantee  Portfolio**

| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio(1) | Percentage Modified(2) | Serious Delinquency Rate |
|---|---|---|---|---|---|---|
| | | As of March 31, 2012 | | | | |
| | | (dollars in billions) | | | | |
| Geog aph cal d s bu on | | | | | | |
| A zona, Ca fo n a, F o  da, and Nevada | $ 36 | $    404 | $    440 | 91% | 4 8% | 6 0% |
| A  o he  s a es | 53 | 1,235 | 1,288 | 76 | 2 6 | 2 8 |
| Yea  of  o g na on | | | | | | |
| 2012 | | 61 | 61 | 71 | | |
| 2011 | | 281 | 281 | 70 | | <0 1 |
| 2010 | | 304 | 304 | 72 | <0 1 | 0 3 |
| 2009 | <1 | 285 | 285 | 73 | 0 1 | 0 6 |
| 2008 | 7 | 103 | 110 | 93 | 4 9 | 5 9 |
| 2007 | 27 | 129 | 156 | 114 | 11 0 | 11 7 |
| 2006 | 24 | 93 | 117 | 112 | 10 0 | 10 9 |
| 2005 | 17 | 115 | 132 | 96 | 5 5 | 6 7 |
| 2004 and p  o | 14 | 268 | 282 | 61 | 2 6 | 2 9 |

| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio(1) | Percentage Modified(2) | Serious Delinquency Rate |
|---|---|---|---|---|---|---|
| | | As of December 31, 2011 | | | | |
| | | (dollars in billions) | | | | |
| Geog aph cal d s bu on | | | | | | |
| A zona, Ca fo n a, F o  da, and Nevada | $ 38 | $    406 | $    444 | 93% | 4 6% | 6 2% |
| A  o he  s a es | 56 | 1,246 | 1,302 | 75 | 2 5 | 2 9 |
| Yea  of  o g na on | | | | | | |
| 2011 | | 250 | 250 | 70 | | 0 1 |
| 2010 | | 324 | 324 | 71 | <0 1 | 0 3 |
| 2009 | <1 | 315 | 315 | 72 | 0 1 | 0 5 |
| 2008 | 7 | 113 | 120 | 92 | 4 4 | 5 7 |
| 2007 | 29 | 138 | 167 | 113 | 10 2 | 11 6 |
| 2006 | 25 | 99 | 124 | 112 | 9 3 | 10 8 |
| 2005 | 18 | 124 | 142 | 96 | 5 1 | 6 5 |
| 2004 and p  o | 15 | 289 | 304 | 61 | 2 5 | 2 8 |

| | Three Months  nded March 31, 2012 | | | Three Months  nded March 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Alt-A | Non Alt-A | Total | Alt-A | Non Alt-A | Total |
| | (in millions) | | | (in millions) | | |
| **Cred  Losses** | | | | | | |
| Geog aph cal d s bu on | | | | | | |
| A zona, Ca fo n a, F o  da, and Nevada | $ 561 | $ 1,318 | $ 1,879 | $  737 | $ 1,247 | $ 1,984 |
| A  o he  s a es | 269 | 1,287 | 1,556 | 273 | 969 | 1,242 |
| Yea  of  o g na on | | | | | | |
| 2012 | | | | | | |
| 2011 | | 5 | 5 | | | |
| 2010 | | 32 | 32 | | | |
| 2009 | | 58 | 58 | <1 | 32 | 32 |
| 2008 | 27 | 273 | 300 | 28 | 222 | 250 |
| 2007 | 310 | 960 | 1,270 | 404 | 774 | 1,178 |
| 2006 | 294 | 588 | 882 | 364 | 568 | 932 |
| 2005 | 171 | 407 | 578 | 193 | 376 | 569 |
| 2004 and p  o | 28 | 282 | 310 | 21 | 244 | 265 |

(1) See e  d o e (5)  o "Tab e 34    Cha  ac e  s cs of  he S ng e-Fam y C ed  Gua an ee Po  fo o" fo  nfo ma on on ou  calcula on of es ma ed c  e  LTV  a os
(2) Rep ese  s  e pec  e  age of  oa s, based o  oa  co  , o  s ngle-fam ly c ed  gua an ee po  fo o ha  have been mod f ed unde  ag ee en  w h  he bo owe ,  nc ud ng  hose w h no c a ges     e es  a  eo a    y da e,   w e e pa s ed  a  o  ounts a e added  o  he ou s and ng p nc pa  ba ance of  he loan

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents statistics for combinations of certain characteristics of the mortgages in our single family credit guarantee portfolio as of March 31, 2012 and December 31, 2011

**Table 42     Single Family Credit Guarantee Portfolio by Attribute Combinations**

As of March 31, 2012

| | Current LTV Ratio ≤ 80[1] | | Current LTV Ratio of > 80 to 100[1] | | Current LTV 100[1] | | Current LTV Ratio All Loans[1] | | |
|---|---|---|---|---|---|---|---|---|---|
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | |
| CO scores < 620 | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 0.9% | 7.9% | 0.8% | 2.9% | 0% | 23.3% | 2.7% | 7 % | 3.9% |
| 5 year amortizing fixed rate | 0.2 | 4 | 0 | 9 | 0 | 6.4 | 0.2 | 2 | 4 |
| ARMs adjustable rate[4] | 0 | 0.4 | 0 | 7.0 | 0 | 24.9 | 0 | 0.2 | 5.0 |
| interest only[5] | 0 | 4.8 | 0 | 22 | 0 | 34 | 0 | 0.4 | 29.7 |
| Other[6] | 0 | 3.8 | 0 | 6 | 0 | 12 | 0 | 4.4 | |
| Total CO scores < 620 | 2 | 6.9 | 0.8 | 3.0 | | 23 | 3 | 13.8 | 2.6 |
| CO scores 620 to 6.9 | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 2.0 | | | 8.8 | 9 | 18.2 | 4 | 9 | 0.0 |
| 5 year amortizing fixed rate | 0 | 2.4 | 0 | 6.4 | 0 | 4.3 | 0.6 | 0.6 | 2.8 |
| ARMs adjustable rate[4] | 0 | 4 | 0 | 0 | 0.2 | 23.1 | 0.4 | 2 | 12.2 |
| interest only[5] | 0 | 0.7 | 0 | 7.6 | 0.2 | 30.7 | 0.3 | 0.3 | 26.4 |
| Other[6] | 0 | 2.2 | 0 | 4.6 | 0 | 4.2 | 0 | 6 | 3.6 |
| Total CO scores 620 to 6.9 | 2.6 | 4.3 | 7 | 9.0 | 2.4 | 9 | 6.7 | 9.3 | 9.3 |
| CO scores 660 | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 34.7 | 0 | 9.9 | 2.4 | 12 | 9.2 | 67 | 2.9 | 2.8 |
| 5 year amortizing fixed rate | 3.7 | 0.4 | 0 | | 0 | 0.2 | 3 | 4.9 | 0 | 0 |
| ARMs adjustable rate[4] | 2.6 | | 0.8 | 4.0 | 0.8 | 4.3 | 4.2 | 0 | 4.2 |
| interest only[5] | 0.4 | 3 | 0.7 | 9.0 | 2.3 | 20.2 | 3.4 | 0 | 1.8 |
| Other[6] | 0 | 8 | 0 | | 0 | 8.2 | 0 | 0 | 8 |
| Total CO scores 660 | 5.4 | 0.8 | 22 | 2.6 | 5.9 | 0.6 | 89.7 | 2.0 | 2 |
| F CO scores not available | 0.3 | 4.8 | 0 | 12.2 | 0 | 2.7 | 0 | 7 | 8.9 |
| All CO scores | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 37.8 | 6 | 22.1 | 3.4 | 1 | 4 | 75.4 | 4.2 | 3.9 |
| 5 year amortizing fixed rate | 4.4 | 0.6 | | | 0 | 0.2 | 6 | 5.7 | 0 | 0.7 |
| ARMs adjustable rate[4] | 2.8 | 7 | 0.9 | 2 | 0.9 | 5.9 | 4.6 | 0 | |
| interest only[5] | 0.4 | 4.3 | 0.8 | 0.2 | 2.7 | 2.6 | 3.9 | 0.2 | 7.2 |
| Other[6] | 0 | 9.0 | 0 | 8.2 | 0.2 | 8.2 | 0 | 4.4 | 7.0 | 8.6 |
| Total single family credit guarantee portfolio[7] | % | 3% | 2.0% | 3 % | 9.5% | 2.6% | 00.0% | 3.0% | 3 % |
| **By Region[8]** | | | | | | | | | |
| CO scores < 620 | | | | | | | | | |
| North Central | 0.2% | 6.0% | 0.2% | 0.8% | 0.2% | 8.9% | 0.6% | 3.7% | 3% |
| Northeast | 0.4 | 9.2 | 0.2 | 8.7 | 0.2 | 29.4 | 0.8 | 4.7 | 5.0 |
| Southeast | 0.2 | 7.7 | 0.2 | 3.6 | 0.3 | 28.7 | 0.7 | 4.3 | 1 |
| Southwest | 0.2 | 0 | 0 | 0.5 | 0 | 18.8 | 0.4 | 9.6 | 7.7 |
| West | 0.2 | 4 | 0 | 8.9 | 0.3 | 9 | 0.6 | 6.7 | |
| Total CO scores < 620 | 2 | 6.9 | 0.8 | 3.0 | | 23 | 3 | 13.8 | 2.6 |
| CO scores 620 to 6.9 | | | | | | | | | |
| North Central | 0.4 | 3.8 | 0.3 | 7.9 | 0 | 4.5 | 2 | 8.9 | 8.0 |
| Northeast | 0.8 | 8 | 0 | 3.0 | 0.4 | 2.2 | 7 | 9.4 | 0.6 |
| Southeast | 0 | 2 | 0.3 | 9.4 | 0.6 | 23.7 | 4 | 9 | 2.0 |
| Southwest | 0 | 3.0 | 0.3 | 7.0 | 0 | 13.2 | 0.9 | 6 | 4.9 |
| West | 0.4 | 3.0 | 0.3 | 6.8 | 0.8 | 7.0 | | 2.4 | 9.6 |
| Total CO scores 620 to 6.9 | 2.6 | 4.3 | 7 | 9.0 | 2.4 | 9 | 6.7 | 9.3 | 9.3 |
| CO scores 660 | | | | | | | | | |
| North Central | 8.6 | 0.7 | 4.6 | 2.2 | 2.9 | 7 | 6 | 6 | 9 |
| Northeast | 4.9 | 0 | 7 | 3.9 | 2 | 3 | 22.7 | 7 | 2.4 |
| Southeast | 7.2 | 2 | 3.9 | 2.8 | 3.7 | 4 | 4.8 | 2.2 | 4 |
| Southwest | 7 | 0.6 | 2.6 | 9 | 0.4 | 6.0 | 0.5 | 0.9 | |
| West | 13.2 | 0 | 6 | 7 | 6.8 | 9.9 | 2.6 | 3.0 | 29 |
| Total CO scores 660 | 5.4 | 0.8 | 22 | 2.6 | 5.9 | 0.6 | 89.7 | 2.0 | 2 |
| Total CO scores not available | 0.3 | 4.8 | 0 | 12.2 | 0 | 2.7 | 0 | 7 | 8.9 |
| All CO scores | | | | | | | | | |
| North Central | 9.2 | 0 | | 3 | 3.6 | 9 | 7.9 | 2.7 | 2.8 |
| Northeast | 6.3 | 6 | 6.4 | 3 | 2.7 | 6.3 | 2 | 2.8 | 3 |
| Southeast | 7.9 | 8 | 4.4 | 4.0 | 4.7 | 6.5 | 7.0 | 3 | 4 |
| Southwest | 8.2 | 0 | 3 | 3.0 | 0.6 | 9.0 | 9 | 9 | 8 |
| West | 3.9 | 0.7 | 6.0 | 2.2 | 7.9 | 0 | 27.8 | 3.9 | 3 |
| Total single family credit guarantee portfolio[7] | % | 3% | 2.0% | 3 % | 9.5% | 2.6% | 00.0% | 3.0% | 3 % |

70

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3606

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Current LTV Ratio< 80[1] | | Current LTV Ratio of > 80 to [1] | | Current LTV 00[1] | | Current LTV Ratio All Loans[1] | | |
|---|---|---|---|---|---|---|---|---|---|
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | |
| CO scores < 620 | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 0 9% | 8 % | 0 8% | 3 4% | 0% | 23 7% | 2 7% | 6 6% | 4 2% |
| 5 year amortizing fixed rate | 0 2 | 4 2 | 0 | 0 | 0 | 7 6 | 0 2 | 2 | 4 7 |
| ARMs adjustable rate[4] | 0 | 0 8 | 0 | 7 2 | 0 | 2 | 0 | 9 8 | 5 4 |
| interest only[5] | 0 | 6 0 | 0 | 22 | 0 | 34 9 | 0 | 0 4 | 30 3 |
| Other[6] | 0 | 3 6 | 0 | 7 4 | 0 | 4 | 0 | 4 2 | 6 |
| Total CO scores < 620 | 2 | 7 0 | 0 8 | 13 | 2 | 24 2 | 3 2 | 3 4 | 2 9 |
| CO scores of 620 to 6 9 | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 2 0 | 2 | | 8 9 | 2 0 | 8 4 | | | 0 0 |
| 5 year amortizing fixed rate | 0 6 | 2 | 0 | 6 | 0 | 5 | 0 6 | 0 6 | 2 8 |
| ARMs adjustable rate[4] | 0 | 0 | 0 | 7 | 0 | 23 6 | 0 3 | 2 0 | 2 6 |
| interest only[5] | 0 | 0 4 | 0 | 8 6 | 0 3 | 3 7 | 0 4 | 0 3 | 27 2 |
| Other[6] | 0 | 2 8 | 0 | 4 8 | 0 | | 0 | 4 | 4 |
| Total CO scores of 620 to 6 9 | 2 7 | 4 4 | 7 | 9 | 2 4 | 9 4 | 6 8 | 8 9 | 9 4 |
| CO scores of 660 | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 34 6 | 0 | 20 3 | 2 4 | 2 4 | 9 2 | 67 3 | 2 7 | 2 8 |
| 5 year amortizing fixed rate | 3 | 0 4 | 0 | | 0 2 | 6 0 | 4 3 | 0 | 0 |
| ARMs adjustable rate[4] | 2 | | 0 8 | 4 3 | 0 8 | 4 8 | 4 | 0 0 | 4 |
| interest only[5] | 0 4 | 3 7 | 0 7 | 9 2 | 2 | 20 7 | 3 6 | 0 2 | 6 2 |
| Other[6] | 0 | 2 0 | 0 | 2 0 | 0 | 8 4 | 0 | 0 | 2 0 |
| Total CO scores of 660 | 50 6 | 0 8 | 22 8 | 2 6 | 6 0 | 0 8 | 89 4 | 9 | 2 6 |
| F CO scores not available | 0 3 | 4 8 | 0 2 | 9 | 0 | 2 4 | 0 6 | | 8 9 |
| All CO scores | | | | | | | | | |
| 20 and 30 year or more amortizing fixed rate | 37 7 | 6 | 22 | 3 4 | 5 6 | | 7 8 | 4 | 3 9 |
| 5 year amortizing fixed rate | 13 8 | 0 6 | | | 0 2 | 7 3 | 5 | 0 | 0 7 |
| ARMs adjustable rate[4] | 2 7 | 8 | 0 | 0 | 0 9 | 6 4 | 4 6 | 0 | |
| interest only[5] | 0 | 4 4 | 0 8 | 0 5 | 2 8 | 22 2 | 4 | 0 2 | 7 6 |
| Other[6] | 0 | 8 9 | 0 | 8 4 | 0 2 | 8 4 | 0 4 | 6 8 | 8 6 |
| Total single family credit guarantee portfolio[7] | 8% | 3% | 2 % | 3 6% | 9 7% | 12 8% | 00 0% | 2 9% | 3 6% |
| **By Region[8]** | | | | | | | | | |
| CO scores < 620 | | | | | | | | | |
| North Central | 0 2% | 6 3% | 0 2% | 7% | 0 2% | 20 % | 0 6% | 3 4% | 2 0% |
| Northeast | 0 4 | 9 3 | 0 2 | 9 0 | 0 3 | 28 9 | 0 9 | 4 3 | 4 9 |
| Southeast | 0 2 | 7 9 | 0 2 | 3 9 | 0 3 | 29 | 0 7 | 3 9 | 5 9 |
| Southwest | 0 2 | | 0 | 0 | 0 | 6 2 | 0 4 | 9 4 | 8 0 |
| West | 0 2 | 4 6 | 0 | 9 | 0 3 | 9 5 | 0 6 | 6 2 | 8 |
| Total CO scores < 620 | 2 | 7 0 | 0 8 | 13 | 2 | 24 2 | 3 2 | 3 4 | 2 9 |
| CO scores of 620 to 6 9 | | | | | | | | | |
| North Central | 0 | 4 0 | 0 3 | 8 2 | 0 | 5 | 3 | 8 7 | 8 4 |
| Northeast | 0 8 | 8 | 0 | 2 9 | 0 4 | 23 3 | 7 | 9 | 0 3 |
| Southeast | 0 | 2 | 0 3 | 9 | 0 4 | 24 | 4 | 9 | 12 2 |
| Southwest | 0 | 3 | 0 3 | 7 0 | 0 | 3 6 | 0 9 | 9 | |
| West | 0 4 | 3 | 0 3 | 6 8 | 0 8 | 7 6 | | 2 0 | 0 0 |
| Total CO scores of 620 to 6 9 | 2 7 | 4 4 | 7 | 9 | 2 4 | 9 4 | 6 8 | 8 9 | 9 4 |
| CO scores of 660 | | | | | | | | | |
| North Central | 8 | 0 7 | 4 7 | 2 3 | 2 8 | 7 4 | 6 0 | 6 | 2 0 |
| Northeast | 4 9 | 0 | 7 | 3 9 | 2 0 | 2 6 | 22 6 | 6 | 2 3 |
| Southeast | 7 | 2 | 3 9 | 2 8 | 3 8 | 4 4 | 4 8 | 2 | 4 2 |
| Southwest | 7 4 | 0 6 | 2 7 | 2 0 | 0 4 | 6 2 | 0 5 | 0 9 | |
| West | 2 7 | 0 | 8 | 7 | 7 0 | 0 | 2 | 2 9 | 3 0 |
| Total CO scores 660 | 50 6 | 0 8 | 22 8 | 2 6 | 6 0 | 0 8 | 89 4 | 9 | 2 6 |
| Total CO scores not available | 0 3 | 4 8 | 0 2 | 9 | 0 | 2 4 | 0 6 | | 8 9 |
| All CO scores | | | | | | | | | |
| North Central | 9 | 0 | 3 | 3 2 | 3 6 | 9 | 8 0 | 2 6 | 2 9 |
| Northeast | 6 | 6 | 6 4 | 3 | 2 7 | 1 8 | 2 2 | 2 7 | 3 4 |
| Southeast | 7 9 | 8 | 8 | 4 4 | 4 0 | 4 7 | 6 8 | 7 0 | 3 4 |
| Southwest | 8 2 | | 3 2 | 3 | 0 6 | 9 4 | 2 0 | 8 | 8 |
| West | 13 | 0 7 | 6 2 | 2 | 8 | 3 | 27 8 | 3 8 | 3 6 |
| Total single family credit guarantee portfolio[7] | 8% | 3% | 2 % | 3 6% | 9 7% | 12 8% | 00 0% | 2 9% | 3 6% |

(1) The current LTV ratios are estimates. See endnote (5) to "Table 34 Characteristics of the Single-Family Credit Guarantee Portfolio" for further information

(2) Based on UPB of the single-family credit guarantee portfolio

(3) See endnote (2) to "Table 41 Credit Concentrations in the Single-Family Credit Guarantee portfolio"

(4) Includes balloon/reset and option ARM mortgage loans

(5) Includes both fixed-rate and adjustable-rate loans The percentages of interest-only loans which have been modified as a period end reflect that a number of these loans have only recently been assigned to the new product category (post-modification), primarily due to delays in processing

(6) Consists of FHA/VA and other government guaranteed mortgages

(7) The total of a FICO score category may not sum due to the inclusion of loans where a FICO score is either not available or the respective value is also for all loans See endnote (7) to "Table 34 Characteristics of the Single-Family Credit Guarantee Portfolio" for further information about our presentation of FICO scores

(8) Presentation of the following regional designations Wes (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); North east (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); South east (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); and South west (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY)

71

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012          TREASURY-3607          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents delinquency and default rate information for loans in our single family credit guarantee portfolio based on year of origination

**Table 43     Single Family Credit Guarantee Portfolio by Year of Loan Origination**

| Year of Loan Origination | As of March 31, 2012 | | As of December 31, 2011 | |
|---|---|---|---|---|
| | Percentage of Portfolio | Foreclosure and Short Sale Rate(1) | Percentage of Portfolio | Foreclosure and Short Sale Rate(1) |
| 2012 | 4% | % | N/A | N/A |
| 2011 | 16 | 0 01 | 14% | % |
| 2010 | 18 | 0 08 | 19 | 0 05 |
| 2009 | 16 | 0 21 | 18 | 0 17 |
| 2008 | 6 | 2 49 | 7 | 2 23 |
| 2007 | 9 | 8 09 | 10 | 7 49 |
| 2006 | 7 | 7 41 | 7 | 6 95 |
| 2005 | 8 | 4 35 | 8 | 4 07 |
| 2000 h ough 2004 | 16 | 1 08 | 17 | 1 04 |
| o a | 100% | | 100% | |

(1) Calcula ed fo  each yea  of o  g na  on as  he numbe  of loans  ha  have p oceeded  o fo ec osu e  ansfe  o  sho  sa e and  es  ed  a c ed  oss, exc  d g a  y s  bseq e    ecove  es du  ng  he pe  od f om o  g na  on on Ma ch 31, 2012 and Dece  be  31, 2011, espec  ve y, d v ded by  he nu  be  of loans  n ou  s ngle-fam ly c ed  gua an ee po  fol o o  g na ed      a  yea

The UPB of loans originated after 2008 comprised 54% of our portfolio as of March 31, 2012, including 13% of our portfolio that were relief refinance mortgages (regardless of LTV ratio). At March 31, 2012, approximately 30% of our single family credit guarantee portfolio consisted of mortgage loans originated from 2005 through 2008  Loans originated from  2005 through 2008 have experienced higher serious delinquency rates in the earlier years of their terms as compared to our  historical experience  We attribute this serious delinquency performance to a number of factors, including: (a) the  expansion of credit terms under which loans were underwritten  during these years; (b) an increase in the origination and our purchase of interest only and Alt A mortgage products in these years; and (c) an environment of  persistently high unemployment, decreasing home sales, and broadly declining home prices in the period following the  loans' origination  Interest only and Alt A products have higher inherent credit risk than traditional  fixed rate mortgage products

*Multifamily Mortgage Credit Risk*

To manage our multifamily mortgage portfolio credit risk, we focus on several key areas: (a) underwriting standards and  quality control process; (b) selling significant portions  of credit risk through subordination in our Other Guarantee  Transactions; (c) portfolio diversification, particularly by product and geographical  area; and (d) portfolio  management activities, including loss mitigation and use of  credit enhancements  We monitor the loan performance, the underlying properties and a variety of mortgage loan  characteristics that may affect the default experience on our multifamily mortgage portfolio, such as the LTV ratio, DSCR, geographic location and loan maturity  See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for more information about the loans in our multifamily mortgage  portfolio

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides certain attributes of our multifamily mortgage portfolio at March 31, 2012 and December 31, 2011.

**Table 44     Multifamily Mortgage Portfolio   by Attribute**

| | UPB at | | Delinquency Rate[1] at | |
|---|---|---|---|---|
| | March 31, 2012 | December 31, 2011 | March 31, 2012 | December 31, 2011 |
| | (dollars in billions) | | | |
| **Original LTV ra io[2]** | | | | |
| Be ow 75% | $ 81 2 | $ 78 8 | 0 10% | 0 10% |
| 75% o 80% | 31 6 | 30 9 | 0 14 | 0 08 |
| Above 80% | 6 4 | 6 4 | 2 23 | 2 34 |
| o a | $ 119 2 | $ 116 1 | 0 23% | 0 22% |
| We gh ed ave age LTV  a o a o  g na  on | 70% | 70% | | |
| **Maturity Dates** | | | | |
| 2012 | $ 2 6 | $ 3 0 | 0 44% | 1 35% |
| 2013 | 5 2 | 5 6 | | |
| 2014 | 7 5 | 7 6 | 0 38 | 0 03 |
| 2015 | 10 9 | 11 0 | 0 17 | 0 17 |
| 2016 | 13 3 | 13 5 | 0 21 | 0 06 |
| Beyond 2016 | 79 7 | 75 4 | 0 23 | 0 25 |
| o a | $ 119 2 | $ 116 1 | 0 23% | 0 22% |
| **Year of Acqu s t on or Guarantee[3]** | | | | |
| 2004 and p  o | $ 11 7 | $ 12 4 | 0 18% | 0 40% |
| 2005 | 7 1 | 7 2 | 0 34 | 0 20 |
| 2006 | 10 5 | 10 8 | 0 46 | 0 25 |
| 2007 | 19 7 | 19 8 | 0 66 | 0 74 |
| 2008 | 20 3 | 20 6 | 0 22 | 0 09 |
| 2009 | 13 5 | 13 8 | | |
| 2010 | 12 5 | 12 7 | | |
| 2011 | 18 2 | 18 8 | | |
| 2012 | 5 7 | N/A | | N/A |
| o a | $ 119 2 | $ 116 1 | 0 23% | 0 22% |
| **Current Loan S ze D str but on** | | | | |
| Above $25 m ll on | $ 44 2 | $ 42 8 | 0 12% | 0 06% |
| Above $5 m ll on  o $25 m ll on | 65 7 | 64 0 | 0 29 | 0 31 |
| $5 m ll on and below | 9 3 | 9 3 | 0 25 | 0 31 |
| o a | $ 119 2 | $ 116 1 | 0 23% | 0 22% |
| **Legal Structure** | | | | |
| Unsecu   zed loans | $ 82 4 | $ 82 3 | 0 16% | 0 10% |
| Non-consol da ed F edd e Mac mo  gage- ela ed secu    es | 27 2 | 24 2 | 0 45 | 0 64 |
| O he  gua an ee comm  men s | 9 6 | 9 6 | 0 18 | 0 18 |
| o a | $ 119 2 | $ 116 1 | 0 23% | 0 22% |
| **Cred t Enhancement** | | | | |
| C ed  -enhanced | $ 34 7 | $ 31 6 | 0 39% | 0 52% |
| Non-c ed  -enhanced | 84 5 | 84 5 | 0 16 | 0 11 |
| o a | $ 119 2 | $ 116 1 | 0 23% | 0 22% |

(1) See "Del nquenc es" below fo  mo e nfo ma on abou  ou  mul fam ly del nquency  a es
(2) O g nal LTV  a os a e calcula ed as  he UPB of  he mo  gage, d v ded by   e esse  e app a sed va ue of   e p ope y a  he of mo  gage o g na on o ,
    excep  fo   e nance  oans,  he mo  gage bo  owe 's pu chase p  ce Second l ens no  owned o  gua an eed by us a e exc uded f o    e LTV  a o calcula on The
    ex s ence of a second  en educes he bo  owe 's eq  y   e p ope y a d,  e efo e, ca   ne ease he  sk of defau
(3) Based on e  he  (a) he yea  of acqu s  on, fo   oans eco ded on ou  conso  da ed ba ance shee s o  (b) he yea  ha  we ssued ou  gua an ee, fo   he e a n ng
    loans n ou  mu  fam y mo  gage po  fo o

Our multifamily mortgage portfolio consists of product types  that are categorized based on loan terms  Multifamily loans may  be interest only or amortizing, fixed or variable rate, or may  switch between fixed and variable rate over time  However, our multifamily loans generally have balloon maturities ranging from five to ten years  Amortizing loans reduce our credit exposure over time because the UPB declines with each mortgage payment  Fixed rate loans may also create less risk for us because the  borrower's payments are determined at origination, and, therefore, the risk that the monthly mortgage payment could  increase if interest rates rise is eliminated  As of both March 31, 2012 and December 31, 2011, approximately 85% of the multifamily loans on our consolidated balance sheets  had fixed interest rates while the remaining loans had variable  interest rates

*Freddie Mac*

TREASURY-3609

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Because most multifamily loans require a significant lump sum (*i.e.*, balloon) payment of unpaid principal at maturity, the borrower's potential inability to refinance or pay off the loan at maturity is a serious concern for us. Borrowers may be less able to refinance their obligations during periods of rising interest rates, which could lead to default if the borrower is unable to find affordable refinancing  Loan size at origination does not generally indicate the degree of a loan's risk, but it does indicate our potential exposure to default

We use credit enhancements to mitigate risk of loss on certain multifamily mortgages and housing revenue bonds  For example, we may require credit enhancements during construction or rehabilitation in cases where we commit to purchase or guarantee a permanent loan upon completion and in cases where occupancy has not yet reached a level that produces the operating income that was the basis for underwriting the mortgage

Our primary business strategy in the multifamily segment is to purchase multifamily mortgage loans for aggregation and then securitization  Currently, our most significant multifamily securitization activity involves our guarantee of the senior tranches of these securitizations in Other Guarantee Transactions. The subordinate tranches, that we do not guarantee, provide credit loss protection to the senior classes that we do guarantee  Subordinated classes are allocated credit losses prior to the senior classes  See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections and other forms of credit enhancements covering loans in our multifamily mortgage portfolio as of March 31, 2012 and December 31, 2011.

Although property values increased in recent quarters, they are still below the highs of 2007 and are lower than when many of the loans were originally underwritten, particularly in areas where economic conditions remain weak  As a result, if property values do not continue to improve, borrowers may experience significant difficulty refinancing as their loans approach maturity, which could increase borrower defaults or increase modification volumes. Of the $119.2 billion in UPB of our multifamily mortgage portfolio as of March 31, 2012, approximately 87% will mature in 2015 and beyond.

In certain cases, we may provide short term loan extensions of up to 12 months for certain borrowers  Modifications of loans (including short term loan extensions) are performed in an effort to minimize our losses  During the three months ended March 31, 2012, we modified unsecuritized multifamily loans totaling $82 million in UPB, compared with $13 million during the three months ended March 31, 2011. Multifamily unsecuritized loan modifications in the first quarter 2012 included: (a) $14 million in UPB for short term loan extensions; and (b) $68 million in UPB for other loan modifications  Where we have granted a concession to borrowers experiencing financial difficulties, we account for these loans as TDRs  When we execute a modification classified as a TDR, the loan is then classified as nonperforming for the life of the loan regardless of its delinquency status. At March 31, 2012, we had $848 million in UPB of multifamily loans classified as TDRs on our consolidated balance sheets

*Delinquencies*

Our multifamily delinquency rates include all multifamily loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancement provided by the U S government  We report multifamily delinquency rates based on UPB of mortgage loans that are two monthly payments or more past due or in the process of foreclosure, as reported by our servicers  Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the borrower is current under the modified terms. In addition, multifamily loans are not counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement, whereas single family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower, if applicable.

Our multifamily mortgage portfolio delinquency rate was 0 23% at March 31, 2012 and 0.22% at December 31, 2011. Our delinquency rate for credit enhanced loans was 0.39% and 0.52% at March 31, 2012 and December 31, 2011, respectively, and for non credit enhanced loans was 0.16% and 0.11% at March 31, 2012 and December 31, 2011, respectively. As of March 31, 2012, approximately one half of our multifamily loans that were two or more monthly payments past due, measured on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on those loans.

Our delinquency rates have remained relatively low compared to other industry participants, which we believe to be, in part, the result of our prudent underwriting standards versus those used by others in the industry. Our delinquency rates for multifamily loans are positively impacted to the extent we have been successful in working with troubled borrowers to modify their loans prior to becoming delinquent or by providing temporary relief through loan modifications, including short term extensions  The most recent market data available continues to reflect improving national apartment

Source    D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3610                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

fundamentals, including decreasing vacancy rates and increasing effective rents  As a result we expect our multifamily delinquency rate to remain relatively low during the remainder of 2012  For further information regarding concentrations in our  multifamily mortgage portfolio, including regional geographic composition, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

### Non Performing Assets

Non performing assets consist of single family and multifamily loans that have undergone a TDR, single family seriously delinquent loans, multifamily loans that are three or more payments past due or in the process of foreclosure, and REO assets, net. Non performing assets also include multifamily loans that are deemed impaired based on management judgment  We place non performing loans on non accrual status when we believe the collectability of interest and principal on a loan is not reasonably assured, unless the loan is well secured and in the process of collection  When a loan is placed on non accrual status, any interest income accrued but uncollected is reversed  Thereafter, interest income is recognized only upon receipt of cash payments  We did not accrue interest on any loans three monthly payments or more past due during the three months ended March 31, 2012 and 2011, respectively.

We classify TDRs as those loans where we have granted a concession to a borrower that is experiencing financial difficulties. TDRs remain categorized as non performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS" for further information about our TDRs.

The table below provides detail on non performing loans and REO assets on our consolidated balance sheets and non performing loans underlying our financial guarantees

**Table 45    Non-Performing Assets[1]**

| | March 31, 2012 | December 31, 2011 | March 31, 2011 |
|---|---|---|---|
| | | (dollars in millions) | |
| Non-performing mortgage loans on balance sheet | | | |
| Single-family TDRs | | | |
| Reperforming (i.e., essentially on a current payment status and due) | $ 46,118 | $  44,440 | $ 32,205 |
| Seriously delinquent | 12,708 | 11,639 | 3,325 |
| Multifamily TDRs[2] | 848 | 893 | 897 |
| Total TDRs | 59,674 | 56,972 | 36,427 |
| Other non-accrual single-family loans[3] | 59,558 | 63,205 | 78,182 |
| Other non-accrual multifamily loans[4] | 1,782 | 1,819 | 1,874 |
| Total non-performing mortgage loans on balance sheet | 121,014 | 121,996 | 116,483 |
| Non-performing mortgage loans off-balance sheet | | | |
| Single-family loans | 1,215 | 1,230 | 1,371 |
| Multifamily loans | 268 | 246 | 208 |
| Total non-performing mortgage loans off-balance sheet | 1,483 | 1,476 | 1,579 |
| Real estate owned, net | 5,454 | 5,680 | 6,376 |
| Total non-performing assets | $127,951 | $ 129,152 | $124,438 |
| Loan loss reserves as a percentage of our non-performing mortgage loans | 31 3% | 32 0% | 33 3% |
| Total non-performing assets as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | 6 8% | 6 8% | 6 4% |

(1) Mortgage loan amounts are on a net basis based on UPB and REO, net is based on carrying values
(2) As of March 31, 2012, approximately $822 million in UPB of these loans were current
(3) Represents loans recognized by us on our consolidated balance sheets, includes loans acquired from our PCs, issued on or before owner's seriously delinquency
(4) Of a total, $1.7 billion, $1.8 billion, and $1.7 billion of UPB were current as a March 31, 2012, December 31, 2011, and March 31, 2011, respectively

The amount of non performing assets declined to $128.0 billion as of March 31, 2012, from $129.2 billion as of December 31, 2011, primarily due to a decline in the rate at which loans transitioned into serious delinquency during the first quarter of 2012 combined with continued high levels of foreclosures and REO dispositions  The UPB of loans categorized as TDRs increased to $59.7 billion at March 31, 2012 from $57.0 billion at December 31, 2011, largely due to the significant volume of loan modifications and loans entering a modification trial period during the first quarter of 2012. TDRs during the first quarter of 2012 include HAMP and non HAMP loan modifications as well as loans in modification trial periods and certain other loss mitigation actions  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report, and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS" for information about TDRs, including our implementation of an amendment to the accounting

Source  FEDERAL HOME LOAN MORTGAGE CORP, 10 Q, May 03, 2012                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3611

Table of Contents

guidance on classification of loans as TDRs in the third quarter of 2011  We expect our non performing assets, including loans deemed to be TDRs, to remain at elevated levels for the  remainder of 2012

The table below provides detail by region for REO activity  Our REO activity consists almost entirely of single family  residential properties  Consequently, our regional REO acquisition trends generally follow a pattern that is similar  to, but lags, that of regional serious delinquency trends of our single family credit guarantee portfolio  See "Table 42     Single Family Credit Guarantee Portfolio by Attribute Combinations" for information about regional serious delinquency rates

**Table 46     REO Activity by Region**[(1)]

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (number of properties) | |
| **REO Inventory** | | |
| Beginning property inventory | 60,555 | 72,093 |
| Properties acquired by region | | |
| Northeast | 1,825 | 1,485 |
| Southeast | 7,067 | 4,734 |
| North Central | 7,638 | 6,375 |
| Southwest | 2,770 | 3,113 |
| West | 4,505 | 9,002 |
| Total properties acquired | 23,805 | 24,709 |
| Properties disposed by region | | |
| Northeast | (1,922) | (2,661) |
| Southeast | (6,287) | (9,214) |
| North Central | (6,837) | (7,292) |
| Southwest | (3,253) | (3,480) |
| West | (6,738) | (8,981) |
| Total properties disposed | (25,037) | (31,628) |
| Ending property inventory | 59,323 | 65,174 |

(1) See endnote (8) to "Table 42    Single Family Credit Guarantee Portfolio by Attribute Combinations" for a description of these regions

Our REO inventory (measured in number of properties) declined 2%  from December 31, 2011 to March 31, 2012 as the volume  of single family REO dispositions exceeded the volume of  single family REO acquisitions  We believe our single family REO acquisition volume in the first quarter of 2012 has been less than it otherwise would have been due to delays in the  single family foreclosure process, particularly in states that require a judicial foreclosure process  The average length of  time for foreclosure of a Freddie Mac loan significantly  increased in recent years due to temporary suspensions, delays,  and other factors. During the first quarters of 2012 and 2011,  the nationwide average for completion of a foreclosure (as measured from the date of the last scheduled payment made by the  borrower) on our single family delinquent loans, excluding those underlying our Other Guarantee Transactions, was 603 days  and 456 days, respectively, which included: (a) an average of 770 days and 548 days, respectively, for foreclosures completed in states that require a judicial  foreclosure process; and (b) an average of 464 days  and 425 days, respectively, for foreclosures completed in  states that do not require a judicial foreclosure process  We continue to experience significant variability in the average time  for foreclosure by state  For example, during the three  months ended March 31, 2012, the average time for completion of foreclosures associated with loans in our  single family credit guarantee portfolio, excluding Other  Guarantee Transactions, ranged from 336 days in Wyoming to 1,007 days in Florida. As of March 31, 2012, our  serious delinquency rate for the aggregate of those states that require a judicial foreclosure and all other states was 4 37%  and 2.62%, respectively, compared to 4.47% and 2.74%,  respectively, as of December 31, 2011

We expect the pace of our REO acquisitions will continue to be affected by delays in the foreclosure process for the remainder  of 2012, particularly in states with a judicial foreclosure  process  However, we expect the volume of our REO acquisitions  will likely remain elevated, as we have a large inventory of seriously delinquent loans in our single family credit guarantee  portfolio  Our single family REO acquisitions in the first quarter of 2012 were most significant in the states of Florida,  Illinois, California, Michigan, and Georgia, which collectively  represented 43% of total REO acquisitions based on the number of  properties  The states with the most properties in our REO  inventory as of March 31, 2012 were Michigan and Illinois,  which comprised 12% and 10%, respectively, of total REO property  inventory, based on the number of properties

The percentage of interest only and Alt A loans in our single family credit guarantee portfolio, based on UPB,  was approximately 4% and 5%, respectively, at March 31, 2012 and was 8% on a combined basis. The percentage of our REO

76                                    *Freddie Mac*

Source   D RA HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

acquisitions in the first quarter of 2012 that had been financed by either of these loan types represented approximately 26% of our total REO acquisitions, based on loan amount prior to acquisition.

We are limited in our single family REO disposition efforts by the capacity of the market to absorb large numbers of foreclosed properties A significant portion of our REO acquisitions are: (a) located in jurisdictions that require a period of time after foreclosure during which the borrower may reclaim the property; or (b) occupied and we have either retained the tenant under an existing lease or begun the process of eviction All of these factors resulted in an increase in the aging of our inventory During the period when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property. As of March 31, 2012 and December 31, 2011, approximately 32% and 33%, respectively, of our REO properties were not marketable due to the above conditions. Though it varied significantly in different states, the average holding period of our single family REO properties was little changed during the first quarter of 2012 Excluding any post foreclosure period during which borrowers may reclaim a foreclosed property, the average holding period associated with our single family REO dispositions during the first quarters of 2012 and 2011 was 201 days and 191 days, respectively. As of March 31, 2012 and December 31, 2011, the percentage of our single family REO property inventory that had been held for sale longer than one year was 6.6% and 7.1%, respectively We continue to actively market these properties through our established initiatives

We also have a variety of alternative methods for REO sales that we employ from time to time, as appropriate, including bulk sales and auctions; however, we did not use bulk sales and auction sales represented an insignificant portion of our REO dispositions in the first quarter of 20 2 We are continuing to participate in discussions with FHFA and other agencies on new options for sales and rentals of our single family REO properties It is too early to determine the impact any potential new initiatives may have on the levels of our REO property inventory, the process for disposing of REO property or our REO operations expense

*Credit Loss Performance*

Many loans that are seriously delinquent, or in foreclosure, result in credit losses The table below provides detail on our credit loss performance associated with mortgage loans and REO assets on our consolidated balance sheets and underlying our non consolidated mo tgage related financial guarantees

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3613

Table of Contents

**Table 47    Credit Loss Performance**

| | Three Months Ended March 31, | |
|---|---|---|
| | **2012** | **2011** |
| | (dollars in millions) | |
| **REO** | | |
| REO balances, net | | |
| Single-family | $ 5,333 | $ 6,261 |
| Multifamily | 121 | 115 |
| Total | $ 5,454 | $ 6,376 |
| REO operations (income) expense | | |
| Single-family | $ 172 | $ 257 |
| Multifamily | (1) | — |
| Total | $ 171 | $ 257 |
| **Charge-offs** | | |
| Single-family | | |
| Charge-offs, gross(1) (including $37 billion and $35 billion, respectively, of loan loss reserves, respectively) | $ 3,778 | $ 3,653 |
| Recoveries(2) | (515) | (684) |
| Single-family, net | $ 3,263 | $ 2,969 |
| Multifamily | | |
| Charge-offs, gross(1) (including $1 million and $12 million, respectively, of loan loss reserves, respectively) | $ 1 | $ 12 |
| Recoveries(2) | — | — |
| Multifamily, net | $ 1 | $ 12 |
| Total Charge-offs | | |
| Charge-offs, gross(1) (including $37 billion and $36 billion, respectively, of loan loss reserves, respectively) | $ 3,779 | $ 3,665 |
| Recoveries(2) | (515) | (684) |
| Total Charge-offs, net | $ 3,264 | $ 2,981 |
| **Credit Losses(3)** | | |
| Single-family | $ 3,435 | $ 3,226 |
| Multifamily | — | 12 |
| Total (in bps)(4) | $ 3,435 | $ 3,238 |
| | 73.6 | 67.1 |

(1) Represents the carrying amount of a loan that has been discharged, net of our removal of the loan from our consolidated balance sheet, at the time of resolution, regardless of when the impact of the credit loss was recorded on our consolidated statements of comprehensive income through the provision for credit losses or losses on loans purchased. Charge-offs primarily result from foreclosure transfers and short sales and a portion of our acquired as held on our acquired assets. Amounts are based on the difference between the estimated fair value of the final disposition or actual sales price and our sale...and discharged losses are less the estimated value of final disposition or actual sales price also a portion of our sale...

(2) Recoveries of charge-offs primarily result from foreclosure and short sales on loans where a share of default risk has been assumed by a guarantee issuer, service, or other third parties through our credit enhancements.

(3) Excludes foregone interest on non-performing loans, which is reduced to...credit costs on reflected on...and credit losses. In addition, excludes other market-based credit losses (a) incurred on our investments in non-mortgage loans and mortgage-related securities and (b) recognized on our consolidated statements of comprehensive income.

(4) Calculated as credit losses divided by the average carrying value of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and held portion of REMICs and other Structured Securities and the amount backed by Ginnie Mae Certificates.

Our credit loss performance metric generally measures losses at the conclusion of the loan and related collateral resolution process. There is a significant lag in time from the implementation of problem loan workout activities until the final resolution of seriously delinquent mortgage loans and REO assets. Our credit loss performance is based on our charge-offs and REO expenses. We primarily record charge-offs at the time we take ownership of a property through foreclosure and at the time of settlement of foreclosure alternative transactions. Single-family charge-offs, gross, for the three months ended March 31, 2012 and 2011 were $3.8 billion and $3.7 billion, respectively, and were associated with approximately $7.4 billion and $8.0 billion, respectively, in UPB of loans. Our net charge-offs and credit losses in the first quarter of 2012 remained elevated, but were less than they otherwise would have been because of the suppression of loan and collateral resolution activity due to delays in the foreclosure process. We expect our charge-offs and credit losses to remain high in the remainder of 2012, and they may increase, due to the large number of single-family non-performing loans that will likely be resolved and because market conditions, such as home prices, continue to remain weak.

Our credit losses during the first quarter of 2012 continued to be disproportionately high in those states that experienced significant declines in property values since 2006, such as California, Florida, Nevada, and Arizona, which collectively comprised approximately 55% of our total credit losses during the three months ended March 31, 2012. Loans originated in 2005 through 2008 comprised approximately 30% and 36% of our single-family credit guarantee portfolio, based on UPB at March 31, 2012 and 2011, respectively; however, these loans accounted for approximately 88% and 91% of our credit losses during the three months ended March 31, 2012 and 2011, respectively. Due to declines in property values since 2006, we continued to experience high REO disposition severity ratios on sales of our REO inventory. In

78

*Freddie Mac*

Source   DRA HOM   OAN MORTGAG CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

addition, although Alt A loans comprised approximately 5% and 6% of our single family credit guarantee portfolio at March 31, 2012 and 2011, respectively, these loans accounted for approximately 24% and 3 % of our credit losses during the three months ended March 31, 2012 and 2011, respectively. See "Table 3   Credit Statistics, Single Family Credit Guarantee Portfolio" for information on REO disposition severity ratios, and see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about our credit losses

*Loan Loss Reserves*

We maintain mortgage related loan loss reserves at levels we believe appropriate to absorb probable incurred losses on mortgage loans held for investment on our consolidated balance sheets and those underlying Freddie Mac mortgage related securities and other guarantee commitments  Determining the loan loss reserves is complex and requires significant management judgment about matters that involve a high degree of subjectivity. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for additional information on our accounting policies for loan loss reserves and TDR loans, including our implementation of changes to the accounting guidance related to the classification of loans as TDRs. In recent periods, the portion of our loan loss reserves attributable to individually impaired loans has increased while the portion of our loan loss reserves determined on a collective basis has declined. As of March 31, 2012 and December 31, 2011, the recorded investment of individually impaired single family mortgage loans was $62.4 billion and $60.0 billion, respectively, and the loan loss reserves associated with these loans was $15.9 billion and $15.1 billion, respectively. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS" for additional information about our TDR loans.

The table below summarizes our allowance for loan loss activity for individually impaired single family mortgage loans on our consolidated balance sheets for which we have recorded a specific reserve

**Table 48     Single Family Impaired Loans with Specific Reserve Recorded**

|  | As of March 31, 2012 | |
|---|---|---|
|  | # o  Loans | Amount |
|  |  | (in millions) |
| TDRs ( eco ded  nves men ) |  |  |
| Decembe  31, 2011 balance | 252,749 | $ 53,494 |
| New add  ons | 19,380 | 3,642 |
| Repaymen s | (1,054) | (276) |
| Loss eve   s(1 | (3,688) | (739) |
| O he | 552 | 65 |
| Ma ch 31, 2012 ba ance | 267,939 | 56,186 |
| O he  ( eco ded  nves men )(2 | 24,308 | 2,289 |
| Ma ch 31, 2012 ba ance | 292,247 | 58,475 |
| To al allowance fo  loan losses fo  nd v dually  mpa ed s ng e-fam  y  oans |  | (15,851) |
| Ne   nves men |  | $ 42,624 |

(1) Cons s s of fo ec osu e  ansfe  o fo ec osu e es a e na ve, such as a deed n  eu of fo ec osu e o sho  sa e  ansac on

(2) Cons s s of  oans  mpa ed upon pu chase wh ch expe  enced fu he  de e o a on n bo  owe  c ed

See "CONSOLIDATED RESULTS OF OPERATIONS     Provision for Credit Losses," for a discussion of our provision for credit losses and charge off activity

*Credit Risk Sensitivity*

Under a 2005 agreement with FHFA, then OFHEO, we are required to disclose the estimated increase in the NPV of future expected credit losses for our single family credit guarantee portfolio over a ten year period as the result of an immediate 5% decline in home prices nationwide, followed by a stabilization period and return to the base case. This sensitivity analysis is hypothetical and may not be indicative of our actual results. We do not use this analysis for determination of our reported results under GAAP.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from this use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-3615

Table of Contents

**Table 49    Single Family Credit Loss Sensitivity**

| | Before Receipt of Credit Enhancements(1) | | After Receipt of Credit Enhancements(2) | |
| | NPV(3) | NPV Ratio(4) | NPV(3) | NPV Ratio(4) |
|---|---|---|---|---|
| | | (dollars in millions) | | |
| At | | | | |
| Ma c  31, 2012 | $8,568 | 49 6  ps | $8,095 | 46 8  ps |
| Decembe  31, 2011 | $8,328 | 47 7  ps | $7,842 | 44 9  ps |
| Sep embe  30, 2011 | $8,824 | 49 5  ps | $8,229 | 46 1  ps |
| J   e 30, 2011 | $10,203 | 56 5  ps | $ 9,417 | 52 2  ps |
| Ma ch 31, 2011 | $9,832 | 54 2  ps | $8,999 | 49 6  ps |

(1) Assumes  ha  none of  he c ed  enhancemen s cu  en  y cove  ng ou  mo  gage loans has any m  ga  ng  mpac  on ou  c ed  losses
(2) Assumes we collec  amoun s due f om c ed  enhancemen  p ov de s af e  g v ng effec  o ce  a n assump  ons abou  coun e pa  y defa    a es
(3) Based on  he s ngle-fam  y c ed  gua an ee po  fol o, exclud ng REMICs a d O  e  S  c  ed Sec    es  acked  y G    e Mae Ce  f ca es
(4) Ca cu a ed as  he  a o of NPV of nc ease  n c ed  osses  o  he s ngle-fam y c ed  gua an ee po  fol o, def ned  n no e (3) above

## Interest Rate and Other Market Risks

For a discussion of our interest rate and other market risks,  see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

## Operational Risks

We face significant levels of operational risk, due to a variety  of factors, including: (a) employee turnover and low  employee engagement; (b) the level and pace of organizational change within our company; (c) the  complexity of our business operations; (d) weaknesses in our core systems; and (e) the fact that we face a variety of different, and potentially competing, business objectives and  new FHFA mandated activities For more information on these matters and other operational risks that we face, see "MD&A     RISK MANAGEMENT     Operational Risks" and "RISK FACTORS     Operational Risks" in our 2011 Annual Repo t

As a result of the elevated risk of employee turnover and low  employee engagement, we continue to explore various strategic  arrangements with outside firms to provide operational  capability and staffing for key functions, if needed. Should we  experience significant turnover in key areas, we may need to exercise these strategic arrangements and significantly increase  the number of outside firms and consultants used in our business operations, limit certain business activities,  and/or increase our operational costs. The use of outside firms and  consultants could increase our operational risk in the near term  as consultants become accustomed to new roles and  responsibilities  These or other efforts to manage this risk to the enterprise may not be successful  To help mitigate the  uncertainty surrounding compensation, we introduced a new compensation program for employees  For more information on  recent legislative and regulatory developments affecting these  risks, see "LEGISLATIVE AND REGULATORY MATTERS     Legislative and Regulatory Developments Concerning Executive  Compensation "

Our Executive Vice President     Single Family Business, Operations and Technology has informed us that he will resign  from his position effective May 11, 2012.

Management, including the company's Chief Executive Officer  and Chief Financial Officer, conducted an evaluation of the  effectiveness of our disclosure controls and procedures as of  March 31, 2012. As of March 31, 2012, we had two  material weaknesses in our internal control over financial reporting causing us to conclude that our disclosure controls  and procedures were not effective as of March 31, 2012, at a reasonable level of assurance  For additional information, see  "CONTROLS AND PROCEDURES."

## LIQUIDITY AND CAPITAL RESOURCES

## Liquidity

Our business activities require that we maintain adequate  liquidity to fund our operations, which may include the need to  make payments of principal and interest on our debt securities,  including securities issued by our consolidated trusts, and  otherwise make payments related to our guarantees of mortgage assets; make payments upon the maturity, redemption or  repurchase of our other debt securities; make net payments on derivative instruments; pay dividends on our senior preferred  stock; purchase mortgage related securities and other  investments; purchase mortgage loans; and remove modified or  seriously delinquent loans from PC trusts.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012           TREASURY-3616           Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We fund our cash requirements primarily by issuing short term and long term debt  Other sources of cash include:

- receipts of principal and interest payments on securities or mortgage loans we hold;

- other cash flows from operating activities, including the management and guarantee fees we receive in connection with our guarantee activities (excluding those we must remit to Treasury pursuant to the Temporary Payroll Tax Cut Continuation Act of 2011, which commenced in April 2012);

- borrowings against mortgage related securities and other investment securities we hold; and

- sales of securities we hold

We have also received substantial amounts of cash from Treasury pursuant to draws under the Purchase Agreement, which are made to address deficits in our net worth  We received $146 million in cash from Treasury during the three months ended March 31, 2012 pursuant to a draw under the Purchase Agreement

We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

### Liquidity Management

Maintaining sufficient liquidity is of primary importance and we continually strive to enhance our liquidity management practices and policies  Under these practices and policies, we maintain an amount of cash and cash equivalent reserves in the form of liquid, high quality short term investments that is intended to enable us to meet ongoing cash obligations for an extended period, in the event we do not have access to the short or long term unsecured debt markets  We also actively manage the concentration of debt maturities and closely monitor our monthly maturity profile. For a discussion of our liquidity management practices and policies, see "MD&A      LIQUIDITY AND CAPITAL RESOURCES      Liquidity      *Liquidity Management*" in our 2011 Annual Report

Throughout the three months ended March 31, 2012, we complied with all requirements under our liquidity management policies or FHFA guidance, as applicable  Furthermore, the majority of the funds used to cover our short term cash liquidity needs was invested in short term assets with a rating of A  /P   or AAA or was issued by a counterparty with that rating  In the event of a downgrade of a position or counterparty, as applicable, below minimum rating requirements, our credit governance policies require us to exit from the position within a specified period

We also continue to manage our debt issuances to remain in compliance with the aggregate indebtedness limits set forth in the Purchase Agreement

We continue to monitor events related to the troubled European countries and took a number of actions in 2011 designed to reduce our exposures, including exposures related to certain derivative portfolio and cash and other investments portfolio counterparties  For more information, see "RISK MANAGEMENT      Credit Risk      *Institutional Credit Risk      Selected European Sovereign and Non Sovereign Exposures.*"

To facilitate cash management, we forecast cash outflows  These forecasts help us to manage our liabilities with respect to asset purchases and runoff, when financial markets are not in crisis  For further information on our management of interest rate risk associated with asset and liability management, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

Notwithstanding these practices and policies, our ability to maintain sufficient liquidity, including by pledging mo tgage related and other securities as collateral to other financial institutions, could cease or change rapidly and the cost of the available funding could increase significantly due to changes in market confidence and other factors  For more information, see "RISK FACTORS      Competitive and Market Risks      *Our investment activities may be adversely affected by limited availability of financing and increased funding costs*" in our 2011 Annual Report

### Actions of Treasury and FHFA

Since our entry into conservatorship, Treasury and FHFA have taken a number of actions that affect our cash requirements and ability to fund those requirements. The conservatorship, and the resulting support we received from Treasury, has enabled us to access debt funding on terms sufficient for our needs

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth  The Purchase Agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3617                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009)  In the event we have a capital surplus at the end of 2012, then the  amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits  during 2010 to 2012, as follows:

- If the year end 2012 surplus is lower than the cumulative draws  needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year end 2012 surplus exceeds the cumulative draws for  2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws

While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our  access to the debt markets and to have adequate liquidity to  conduct our normal business activities, the costs of our debt  funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of  funding available to us under the Purchase Agreement after 20 2  The costs of our debt funding could also increase in the event  of any future downgrades in our credit ratings or the credit ratings of the U.S. government. Upon funding of the draw  request that FHFA will submit to eliminate our net worth deficit at March 31, 2012, our aggregate funding received from Treasury under the Purchase Agreement will be $71 3 billion  This aggregate funding amount does not include the initial $  0 billion liquidation preference of  senior preferred stock that we issued to Treasury in September  2008 as an initial commitment fee and for which no cash was  received  Our draw request represents our net worth deficit at  quarter end rounded up to the nearest $1 million.

We are required to pay a quarterly commitment fee to Treasury under the Purchase Agreement, as discussed below in "*Dividend Obligation on the Senior Preferred Stock*."

For more information on these matters, see "BUSINESS     Conservatorship and Related Matters" and "     Regulation and Supervision" in our 2011 Annual Report

### Dividend Obligation on the Senior Preferred Stock

Following funding of the draw request related to our net worth  deficit at March 31, 2012, our annual cash dividend  obligation to Treasury on the senior preferred stock will be $7.23 billion, which exceeds our annual historical earnings  in all but one period  The senior preferred stock accrues quarterly cumulative dividends at a rate of 10% per year or 12%  per year in any quarter in which dividends are not paid in cash  until all accrued dividends have been paid in cash. We paid dividends of $1.8 billion in cash on the senior preferred  stock during the three months ended March 31, 2012 at the direction of our Conservator. Through March 31, 2012, we paid aggregate cash dividends to Treasury of $18.3 billion, an amount equal to 26% of our aggregate draws received under the  Purchase Agreement  Continued cash payment of senior preferred dividends will have an adverse impact on our future financial  condition and net worth and will increasingly drive future  draws. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could  contribute to future draws if the fee is not waived. Treasury waived the fee for all quarters of 2011 and the first and second  quarters of 2012, but has indicated that it remains committed to protecting taxpayers and ensuring that our future positive  earnings are returned to taxpayers as compensation for their investment  The amount of the fee has not yet been established  and could be substantial.

The payment of dividends on our senior preferred stock in cash  reduces our net worth  For periods in which our earnings and  other changes in equity do not result in positive net worth,  draws under the Purchase Agreement effectively fund the cash  payment of senior preferred dividends to Treasury. Under the Purchase Agreement, our ability to repay the liquidation  preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all

As discussed in "Capital Resources," we expect to make  additional draws under the Purchase Agreement in future periods  Further draws will increase the liquidation preference of and  the dividends we owe on the senior preferred stock

### Other Debt Securities

Spreads on our debt and our access to the debt markets remained  favorable relative to historical levels during the three months  ended March 31, 2012, due largely to support from the U S  government  As a result, we were able to replace  certain higher cost debt with lower cost debt  Our short term debt was 22% of outstanding other debt at March 31, 2012 as  compared to 24% at December 3 , 20   Beginning in the fourth quarter of 2011, we started issuing a higher percentage  of long term debt  This allows us to take advantage of  attractive long term rates while decreasing our reliance on  interest rate swaps

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3618              Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Because of the debt limit under the Purchase Agreement, we may be restricted in the amount of debt we are allowed to issue to fund our operations  Our debt cap under the Purchase Agreement is $874.8 billion in 2012 and will decline to $787.3 billion on January 1, 2013. As of March 31, 2012, we estimate that the par value of our aggregate indebtedness totaled $629 3 billion, which was approximately $245.5 billion below the applicable debt cap  As of December 31, 2011, we estimate that the par value of our aggregate indebtedness totaled $674 3 billion, which was approximately $297 7 billion below the then applicable limit of $972 billion  Our aggregate indebtedness is calculated as the par value of other debt  We disclose the amount of our indebtedness on this basis monthly under the caption "Other Debt Activities    Total Debt Outstanding" in our Monthly Volume Summary reports, which are available on our web site at www freddiemac com and in current reports on Form 8 K we file with the SEC

*Other Debt Issuance Activities*

The table below summarizes the par value of other debt securities we issued, based on settlement dates, during the three months ended March 31, 2012 and 2011.

**Table 50    Other Debt Security Issuances by Product, at Par Value**[1]

|  | Three Months ended March 31, | |
|---|---|---|
|  | 2012 | 2011 |
|  | (in millions) | |
| Other short- erm debt |  |  |
| Reference B lls® sec  es a d d sco  o es | $ 64,163 | $103,846 |
| Med um- e m no es  non-ca ab e[2] |  | 200 |
| To al o he short- erm debt | 64,163 | 104,046 |
| Other long- erm debt |  |  |
| Med um- e m no es  callable | 37,498 | 37,801 |
| Med um- e m no es  non-callable | 10,704 | 29,175 |
| U S do ar Reference No es® secu  es  non-callable | 21,500 | 10,000 |
| To al o he long- erm debt | 69,702 | 76,976 |
| To a o he debt ssued | $133,865 | $ 181,022 |

(1) Exc des fede a f  ds p ced ased a d sec  es so d  de ag ee en s o epu chase, and  nes of ced  A so exc udes deb  secu  es of conso da ed  us s he d by  d pa es

(2) Includes $0 m ll on and $200 m ll on of med um- e m no es  non-ca ab e ssued fo  he h ee  on hs ended Ma c  31, 2012 and 2011, espec  ve y, w  c  we e ela ed o deb  exchanges

*Other Debt Retirement Activities*

We repurchase, call, or exchange our outstanding medium  and long term debt securities from time to time to help support the liquidity and predictability of the market for our other debt securities and to manage our mix of liabilities funding our assets.

The table below provides the par value, based on settlement dates, of other debt securities we repurchased, called, and exchanged during the three months ended March 31, 2012 and 2011.

**Table 51    Other Debt Security Repurchases, Calls, and Exchanges**[1]

|  | Three Months ended March 31, | |
|---|---|---|
|  | 2012 | 2011 |
|  | (in millions) | |
| Repu chases of ou s and ng med um- e m no es | $ 1,697 | $ 2,738 |
| Calls of callable med um- e m no es | 49,028 | 39,835 |
| Exchanges of med um- e m no es |  | 200 |

(1) Exc des deb  sec  es of co so da ed  s s e d by  d pa es

Source  D RA  HOM  OAN MORTGAG  CORP, 10 Q, May 03, 2012
TREASURY-3619
Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Credit Ratings*

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, is highly dependent upon our credit ratings  The table below indicates our credit ratings as of April 23, 2012.

**Table 52     Freddie Mac Credit Ratings**

| | Nationally Recognized Statistical Rating Organization | | |
| | S&P | Moody s | Fitch |
|---|---|---|---|
| Sen o  ong- e m de   (1 | AA+ | Aaa | AAA |
| Sho  - e m de  (2 | A-1 | -1 | F1 |
| S  o  d a ed de  (3 | A | Aa2 | AA |
| P efe  ed s ock( | C | Ca | C/RR6 |
| Ou look | Nega ve (fo  sen o long- e m deb a d s bo d a ed deb ) | Nega ve (fo  sen o long- e m deb a d s bo d a ed deb ) | Nega ve (fo  AAA- a ed long- e m Issue Defau  Ra ng) |

(1) Cons s s of med um- e m no es, U S  do a  Refe ence No es® secu  es and €Refe ence No es® secu  es
(2) Cons s s of Refe ence B  s® sec   es a d d sco   o es
(3) Cons s s of F edd e SUBS® secu  es
(4) Does no  nc ude sen o  p efe  ed s ock ssued  o T easu y

For information about our ratings downgrade by S&P in 2011, factors that could lead to future ratings actions, and the potential impact of a downgrade in our credit ratings, see "RISK FACTORS   Competitive and Market Risks   *Any downgrade in the credit ratings of the U.S. government would likely be followed by a downgrade in our credit ratings. A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business*" in our 2011 Annual Report.

A security rating is not a recommendation to buy, sell or hold securities  It may be subject to revision or withdrawal at any time by the assigning rating organization  Each rating should be evaluated independently of any other rating

### *Cash and Cash Equivalents, Federal Funds Sold, Securities Purchased Under Agreements to Resell, and Non Mortgage Related Securities*

Excluding amounts related to our consolidated VIEs, we held $59.7 billion in the aggregate of cash and cash equivalents, securities purchased under agreements to resell, and non mortgage related securities at March 3 , 20 2  These investments are important to our cash flow and asset and liability management and our ability to provide liquidity and stability to the mortgage market. At March 31, 2012, our non mortgage related securities primarily consisted of FDIC guaranteed corporate medium term notes, Treasury bills, and Treasury notes that we could sell to provide us with an additional source of liquidity to fund our business operations.  For additional information on these assets, see "CONSOLIDATED BALANCE SHEETS ANALYSIS   Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell" and "   Investments in Securities   *Non Mortgage Related Securities* ."

### *Mortgage Loans and Mortgage-Related Securities*

We invest principally in mortgage loans and mortgage related securities, certain categories of which are largely unencumbered and highly liquid. Our primary source of liquidity among these mortgage assets is our holdings of agency securities  In addition, our unsecuritized performing single family mortgage loans are also a potential source of liquidity  Our holdings of CMBS are less liquid than agency securities. Our holdings of non agency mortgage related securities backed by subprime, option ARM, and Alt A and other loans are not liquid due to market conditions and the continued poor credit quality of the underlying assets  Our holdings of unsecuritized seriously delinquent and modified single family mortgage loans are also illiquid

We are subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. See "EXECUTIVE SUMMARY   Limits on Investment Activity and Our Mortgage Related Investments Portfolio" for more information on the relative liquidity of our mortgage assets

### Cash Flows

Our cash and cash equivalents decreased $19.9 billion to $8.6 billion during the three months ended March 31, 2012 and decreased $2.7 billion to $34.3 billion during the three months ended March 31, 2011. Cash flows provided by operating activities during the three months ended March 31, 2012 and 2011 were $1.4 billion and $4.2 billion, respectively, primarily driven by cash proceeds from net interest income. Cash flows provided by investing activities during the three months ended March 31, 2012 and 2011 were $102.0 billion and $96.2 billion, respectively, primarily

Source   D RA  HOM  OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3620                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

resulting from net proceeds received as a result of repayments of single family held for investment mortgage loans Cash flows used for financing activities during the three months ended March 31, 2012 and 2011 were $123.2 billion and $103 2 billion, respectively, largely attributable to funds used to repay debt securities of consolidated trusts held by third parties. In addition, during the three months ended March 31, 2012, our net repayments of other debt were $42.1 billion.

## Capital Resources

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA. At March 31, 2012, our liabilities exceeded our assets under GAAP by $18 million Accordingly, we must obtain funding from Treasury pursuant to its commitment under the Purchase Agreement in order to avoid being placed into receivership by FHFA. FHFA, as Conservator, will submit a draw request to Treasury under the Purchase Agreement in the amount of $19 million, which we expect to receive by June 30, 2012. See "BUSINESS    Regulation and Supervision    *Federal Housing Finance Agency    Receivership*" in our 2011 Annual Report for additional information on mandatory receivership

We expect to request additional draws under the Purchase Agreement in future periods  Over time, our dividend obligation to Treasury on the senior preferred stock will increasingly drive future draws  Although we may experience period to period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term  In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if Treasury does not continue to waive the fee  See "Liquidity    *Dividend Obligation on the Senior Preferred Stock*" for more information

The size and timing of our future draws will be determined by our dividend obligation on the senior preferred stock and a variety of other factors that could adversely affect our net worth  For more information on these other factors, see "RISK FACTORS    Conservatorship and Re ated Matters    *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition*" in our 2011 Annual Report.

For more information on the Purchase Agreement, its effect on our business and capital management activities, and the potential impact of making additional draws, see "MD&A    LIQUIDITY AND CAPITAL RESOURCES    Liquidity    *Dividend Obligation on the Senior Preferred Stock*," "BUSINESS    Executive Summary    *Government Support for Our Business*" and "RISK FACTORS" in our 2011 Annual Report

### FAIR VALUE MEASUREMENTS AND ANALYSIS

## Fair Value Measurements

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date  For additional information regarding the fair value hierarchy and measurements and validation processes, see "MD&A    FAIR VALUE MEASUREMENTS AND ANALYSIS" in our 2011 Annual Report.

We categorize assets and liabilities measured and reported at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation processes used to derive their fair values and our judgment regarding the observability of the related inputs  Those judgments are based on our knowledge and observations of the markets relevant to the individual assets and liabilities and may vary based on current market conditions  In applying our judgments, we review ranges of third party prices and transaction volumes, and hold discussions with dealers and pricing service vendors to understand and assess the extent of market benchmarks available and the judgments or modeling required in their processes  Based on these factors, we determine whether the inputs are observable and whether the principal markets are active or inactive

Our Level 3 assets recorded at fair value primarily consist of non agency mortgage related securities  The non agency mo tgage-re ated securities market continued to be illiquid during the first quarter of 2012, with low transaction volumes, wide credit spreads, and limited transparency  We value the non agency mortgage related securities we hold based primarily on prices received from pricing services and dealers  The techniques used by these pricing services and dealers to develop the prices generally are either: (a) a comparison to transactions involving instruments with similar collateral and risk profiles; or (b) industry standard modeling, such as a discounted cash flow model  For a large majority of the securities we value using dealers and pricing services, we obtain multiple independent prices, which are non binding both to us and our counterparties  When multiple prices are received, we use the median of the prices  The models and related

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012          TREASURY-3621          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

assumptions used by the dealers and pricing services are owned  and managed by them  However, we have an understanding of their  processes used to develop the prices provided to us based on our  ongoing due diligence  We periodically have discussions with our  dealers and pricing service vendors to maintain a current  understanding of the processes and inputs they use to develop  prices  We make no adjustments to the individual prices we receive from third party pricing services or dealers for  non agency mortgage related securities beyond calculating median prices and discarding certain prices that are determined not to  be valid based on our validation processes

The table below summarizes our assets and liabilities measured  at fair value on a recurring basis in our consolidated balance  sheets at March 31, 2012 and December 31, 2011.

**Table 53     Summary of Assets and Liabilities Measured at Fair Value on a Recurring Basis in Our Consolidated Balance Sheets**

| | March 31, 2012 | | December 31, 2011 | |
| | Total GAAP Recurring Fair Value | Percentage in Level 3 | Total GAAP Recurring Fair Value | Percentage in Level 3 |
|---|---|---|---|---|
| | | (dollars in millions) | | |
| **Assets:** | | | | |
| Investments in securities | | | | |
| Available-for-sale, at fair value | $202,422 | 28% | $210,659 | 28% |
| Trading, at fair value | 58,319 | 4 | 58,830 | 4 |
| Mortgage loans | | | | |
| Held-for-sale, at fair value | 11,337 | 100 | 9,710 | 100 |
| Derivative assets, net (1) | 182 | | 118 | |
| Other assets | | | | |
| Guarantee asset, at fair value | 798 | 100 | 752 | 100 |
| All other, at fair value | 143 | 100 | 151 | 100 |
| Total assets carried at fair value on a recurring basis (1) | $273,201 | 25 | $280,220 | 23 |
| **Liabilities:** | | | | |
| Debt securities recorded at fair value | $ 2,221 | 100% | $ 3,015 | % |
| Derivative liabilities, net (1) | 296 | | 435 | |
| Other liabilities | | | | |
| All other, at fair value | 4 | 100 | | |
| Total liabilities carried at fair value on a recurring basis (1) | $ 2,521 | 7 | $ 3,450 | |

(1) Percentages by level are based on gross fair value of derivative assets and derivative liabilities before counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative net asset or payable

### Changes in Level 3 Recurring Fair Value Measurements

At March 31, 2012 and December 31, 2011, we measured and recorded at fair value on a recurring basis, assets of  $72.1 billion and $72.5 billion, respectively, or approximately 25% and 23% of total assets carried at fair value  on a recurring basis, using significant unobservable inputs (Level 3), before the impact of counterparty and cash  collateral netting  Our Level 3 assets at March 31,  2012 primarily consist of non agency mortgage related securities. At March 31, 2012 and December 31, 2011,  we also measured and recorded at fair value on a recurring basis, Level 3 liabilities of $2.3 billion and  $0.1 billion, or 7% and less than 1%, respectively, of total liabilities carried at fair value on a recurring basis, before the impact of counterparty and cash  collateral netting  Our Level 3 liabilities at March 31, 2012 primarily consist of foreign currency denominated and certain other debt  securities recorded at fair value

See "NOTE 16: FAIR VALUE DISCLOSURES     Recurring Fair Value Changes" for a discussion of changes in our  Level 3 assets and liabilities and "  Table 16.2     Fair Value Measurements of Assets and Liabilities Using  Significant Unobservable Inputs" for the Level 3 reconciliation  For discussion of types and characteristics of  mortgage loans underlying our mortgage related securities, see "Table 17     Characteristics of Mortgage Related  Securities on Our Consolidated Balance Sheets" and "RISK MANAGEMENT     *Credit Risk Mortgage Credit Risk     Single Family Mortgage Credit Risk.*"

### Consideration of Credit Risk in Our Valuation

We consider credit risk in the valuation of our assets and  liabilities through consideration of credit risk of the  counterparty in asset valuations and through consideration of  our own institutional credit risk in liability valuations on our  GAAP consolidated balance sheets

We consider credit risk in our valuation of investments in  securities based on fair value measurements that are largely the  result of price quotes received from multiple dealers or pricing  services. Some of the key valuation drivers of such fair value  measurements can include the collateral type, collateral  performance, credit quality of the issuer, tranche type,

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

weighted average life, vintage, coupon, and interest rates  We also make adjustments for items such as credit enhancements or other types of subordination and liquidity, where applicable. In cases where internally developed models are used, we maximize the use of market based inputs or calibrate such inputs to market data.

We also consider credit risk when we evaluate the valuation of our derivative positions  The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation  For derivatives that are in an asset position, we hold collateral against those positions in accordance with agreed upon thresholds  The amount of collateral held depends on the credit rating of the counterparty and is based on our credit risk policies. Similarly, for derivatives that are in a liability position, we post collateral to counterparties in accordance with agreed upon thresholds. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment grade credit ratings of A or above  See "RISK MANAGEMENT    Credit Risk    *Institutional Credit Risk    Derivative Counterparties*" for a discussion of our counterparty credit risk.

See "NOTE 16: FAIR VALUE DISCLOSURES    Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets" for additional information regarding the valuation of our assets and liabilities

**Consolidated Fair Value Balance Sheets Analysis**

Our consolidated fair value balance sheets present our estimates of the fair value of our financial assets and liabilities  See "NOTE 16: FAIR VALUE DISCLOSURES    Table 16.7    Consolidated Fair Value Balance Sheets" for our fair value balance sheets  In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models  See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK    Interest Rate Risk and Other Market Risks," in this form 10 Q and our 2011 Annual Report, and "RISK FACTORS" and "RISK MANAGEMENT    Operational Risks" in our 2011 Annual Report for information concerning the risks associated with these models

During the first quarter of 2012, our fair value results were impacted by several improvements in our approach for estimating the fair value of certain financial instruments  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report and "NOTE 16: FAIR VALUE DISCLOSURES" in this form 10 Q for more information on fair values

*Discussion of Fair Value Results*

The table below summarizes the change in the fair value of net assets for the three months ended March 31, 2012 and 2011.

**Table 54    Summary of Change in the Fair Value of Net Assets**

|  | Three Months ended March 31, | |
|---|---|---|
|  | 2012 | 2011 |
|  | (in billions) | |
| Beg nn ng balance | $(78 4) | $(58 6) |
| Changes n fa r va ue of ne asse s, befo e cap a ansac ons | (9 1) | 3 3 |
| Cap a ansac ons |  |  |
| D v de ds a d s a e ss a ces, e t (1 | (1 7) | (1 1) |
| End ng balance | $(89 2) | $(56 4) |

(1) Inc udes he funds ece ved f o T easu y of $0 1 b on and $0 5 b on fo e ee on s ended Ma c 31, 2012 a d 2011, espec ve y, de e P c ase Ag eemen , wh ch ncreased he l qu da on p efe ence of ou sen o p efe ed s ock

During the first quarter of 2012, the fair value of net assets, before capital transactions, decreased by $9.1 billion, compared to a $3 3 billion increase during the first quarter of 2011. The decrease in the fair value of net assets, before capital transactions, during the first quarter of 2012 was primarily due to a decrease of $13 8 billion in the fair value of our single family mortgage loans as the result of the adoption of an amendment to the guidance pertaining to fair value measurements and disclosure. This was coupled with a decline in expected home prices that had a negative impact on the fair value of our single family mortgage loans  The decrease in fair value was partially offset by high core spread income and a tightening of OAS levels on our agency securities, CMBS securities, and multifamily loans. See "NOTE 16: FAIR VALUE DISCLOSURES    Consolidated Fair Value Balance Sheets" for additional details

For loans that have been refinanced under HARP, we value our guarantee obligation using the delivery and guarantee fees currently charged by us under that initiative. If, subsequent to delivery, the refinanced loan no longer qualifies for

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

purchase based on current underwriting standards (such as becoming past due or being modified as a part of a troubled debt restructuring), the fair value of the guarantee obligation is then measured using our internal credit models or third party market pricing. See "NOTE 16: FAIR VALUE DISCLOSURES    Valuation Methods and Assumptions for Assets and Liabilities Not Measured at Fair Value in Our Consolidated Balance Sheets, but for Which the Fair Value is Disclosed    Mortgage Loans    *Single Family Loans*" for additional details

During the first quarter of 2011, the increase in the fair value of net assets, before capital transactions was primarily due to high core spread income and an increase in the fair value of our investments in mortgage related securities driven by tightening of OAS levels of agency mortgage related securities and CMBS. The increase in fair value was partially offset by an increase in the risk premium related to our single family loans due to the continued weak credit environment and tightening of OAS levels on other debt related to agency mortgage related securities

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other market factors being equal However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset The reverse is true when the OAS on a given asset tightens    current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. However, as market conditions change, our estimate of expected fair value gains and losses from OAS may also change, and the actual core spread income recognized in future periods could be significantly different from current estimates

## OFF BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction These off balance sheet arrangements may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets

### Securitization Activities and Other Guarantee Commitments

We have certain off balance sheet arrangements related to our securitization activities involving guaranteed mortgages and mortgage-re ated securities, though most of our securitization activities are on balance sheet Our off balance sheet arrangements related to these securitization activities primarily consist of: (a) Freddie Mac mortgage related securities backed by multifamily loans; and (b) certain single family Other Guarantee Transactions. We also have off balance sheet arrangements related to other guarantee commitments, including long term standby commitments and liquidity guarantees

We guarantee the payment of principal and interest on Freddie Mac mortgage related securities we issue and on mortgage loans covered by our other guarantee commitments Therefore, our maximum potential off balance sheet exposure to credit losses relating to these securitization activities and the other guarantee commitments is primarily represented by the UPB of the underlying loans and securities, which was $60.9 billion and $56.9 billion, at March 31,2012 and December 31, 2011, respectively Our exposure to losses on securitization and other guarantee commitment activities would be partially mitigated by the recovery we would receive through exercising our rights to the collateral backing the underlying loans and the available credit enhancements, which may include recourse and primary insurance with third parties. We provide for incurred losses each period on these guarantees within our provision for credit losses. See "NOTE 9: FINANCIAL GUARANTEES" for more information on our off balance sheet securitization activities and other guarantee commitments

### Other Agreements

We own interests in numerous entities that are considered to be VIEs for which we are not the primary beneficiary and which we do not consolidate in accordance with the accounting guidance for the consolidation of VIEs These VIEs relate primarily to our investment activity in mortgage related assets and non mortgage assets, and include LIHTC partnerships, certain Other Guarantee Transactions, and certain asset backed investment trusts Our consolidated balance sheets reflect only our investment in these VIEs, rather than the full amount of the VIEs' assets and liabilities. See "NOTE 3: VARIABLE INTEREST ENTITIES" for additional information related to our variable interests in these VIEs

As part of our credit guarantee business, we routinely enter into forward purchase and sale commitments for mortgage loans and mortgage related securities Some of these commitments are accounted for as derivatives Their fair values are reported as either derivative assets, net or derivative liabilities, net on our consolidated balance sheets For more information, see "RISK MANAGEMENT    Credit Risk *Institutional Credit Risk    Derivative Counterparties* " We also have purchase commitments primarily related to our mortgage purchase flow business, which we principally fulfill by issuing PCs in swap transactions, and, to a lesser extent, commitments to purchase or guarantee multifamily mortgage loans that are not accounted for as derivatives and are not recorded on our consolidated balance sheets These non

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

derivative commitments totaled $211 3 billion and $271.8 billion, in notional value at March 31, 2012 and December 31, 2011, respectively

In connection with the execution of the Purchase Agreement, we, through FHFA, in its capacity as Conservator, issued a warrant to Treasury to purchase 79.9% of our common stock outstanding on a fully diluted basis on the date of exercise See "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report for further information

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts within our consolidated financial statements Certain of our accounting policies, as well as estimates we make, are critical, as they are both important to the presentation of our financial condition and results of operations and require management to make difficult, complex, or subjective judgments and estimates, often regarding matters that are inherently uncertain Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements

Our critical accounting policies and estimates relate to: (a) allowances for loan losses and reserve for guarantee losses; (b) fair value measurements; (c) impairment recognition on investments in securities; and (d) realizability of net deferred tax assets For additional information about our critical accounting policies and estimates and other significant accounting policies, including recently issued accounting guidance, see "MD&A     CRITICAL ACCOUNTING POLICIES AND ESTIMATES" in our 2011 Annual Report and "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in this Form 10 Q

## FORWARD LOOKING STATEMENTS

We regularly communicate information concerning our business activities to investors, the news media, securities analysts, and others as part of our normal operations Some of these communications, including this Form 10 Q, contain "forward looking statements," including statements pertaining to the conservatorship, our current expectations and objectives for our efforts under the MHA Program, the servicing alignment initiative and other programs to assist the U.S. residential mortgage market, future business plans, liquidity, capital management, economic and market conditions and trends, market share, the effect of legislative and regulatory developments, implementation of new accounting guidance, credit losses, internal control remediation efforts, and results of operations and financial condition on a GAAP, Segment Earnings, and fair value basis. Forward looking statements involve known and unknown risks and uncertainties, some of which are beyond our control Forward looking statements are often accompanied by, and identified with, terms such as "objective," "expect," "trend," "forecast," "anticipate," "believe," "intend," "could," "future," "may," "will," and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward looking statements due to various factors and uncertainties, including those described in the "RISK FACTORS" section of our 2011 Annual Report, and:

- the actions FHFA, Treasury, the Federal Reserve, the SEC, HUD, the Administration, Congress, and our management may take, including actions related to implementing FHFA's strategic plan for Freddie Mac and Fannie Mae's conservatorships;

- the impact of the restrictions and other terms of the conservatorship, the Purchase Agreement, the senior preferred stock, and the warrant on our business, including our ability to pay: (a) the dividend on the senior preferred stock; and (b) any quarterly commitment fee that we are required to pay to Treasury under the Purchase Agreement;

- our ability to maintain adequate liquidity to fund our operations, including following any changes in the support provided to us by Treasury or FHFA, a change in the credit ratings of our debt securities or a change in the credit rating of the U S government;

- changes in our charter or applicable legislative or regulatory requirements, including any restructuring or reorganization in the form of our company, whether we will remain a stockholder owned company or continue to exist and whether we will be wound down or placed under receivership, regulations under the GSE Act, the Reform Act, or the Dodd Frank Act, regulatory or legislative actions taken to implement the Administration's plan to reform the housing finance system, regulatory or legislative actions that require us to support non mortgage market initiatives, changes to affordable housing goals regulation, reinstatement of regulatory capital requirements, or the exercise or assertion of additional regulatory or administrative authority;

Source   D RA HOM   OAN MORTGAG CORP, 10 Q, May 03, 2012                    TREASURY-3625                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- changes in the regulation of the mortgage and financial services  industries, including changes caused by the Dodd Frank Act, or  any other legislative, regulatory, or judicial action at the  federal or state level;

- enforcement actions against mortgage servicers and other  mortgage industry participants by federal or state authorities;

- the scope of various initiatives designed to help in the housing  recovery (including the extent to which borrowers participate in  the recently expanded HARP, the MHA Program and the non HAMP standard loan modification initiative), and the impact of such  programs on our credit losses, expenses, and the size and  composition of our mortgage related investments portfolio;

- the impact of any deficiencies in foreclosure documentation  practices and related delays in the foreclosure process;

- the ability of our financial, accounting, data processing, and  other operating systems or infrastructure, and those of our  vendors to process the complexity and volume of our transactions;

- changes in accounting or tax guidance or in our accounting  policies or estimates, and our ability to effectively implement  any such changes in guidance, policies, or estimates;

- changes in general regional, national, or international  economic, business, or market conditions and competitive  pressures, including changes in employment rates and interest  rates, and changes in the federal government's fiscal and  monetary policy;

- changes in the U S  residential mortgage market, including  changes in the rate of growth in total outstanding  U S  residential mortgage debt, the size of the U.S. residential  mortgage market, and home prices;

- our ability to effectively implement our business strategies,  including any efforts to improve the supply and liquidity of,  and demand for, our securities, and restrictions on our ability  to offer new products or engage in new activities;

- our ability to recruit, retain, and engage executive officers  and other key employees;

- our ability to effectively identify and manage credit,  interest rate, operational, and other risks in our business,  including changes to the credit environment and the levels and  volatilities of interest rates, as well as the shape and slope  of the yield curves;

- the effects of internal control deficiencies and our ability to  effectively identify, assess, evaluate, manage, mitigate, or  remediate control deficiencies and risks, including material  weaknesses and significant deficiencies, in our internal control  over financial reporting and disclosure controls and procedures;

- incomplete or inaccurate information provided by customers and  counterparties;

- consolidation among, or adverse changes in the financial  condition of, our customers and counterparties;

- the failure of our customers and counterparties to fulfill their  obligations to us, including the failure of seller/servicers to  meet their obligations to repurchase loans sold to us in breach  of their representations and warranties, and the potential cost  and difficulty of legally enforcing those obligations;

- changes in our judgments, assumptions, forecasts, or estimates  regarding the volume of our business and spreads we expect to  earn;

- the availability of options, interest rate and currency swaps,  and other derivative financial instruments of the types and  quantities, on acceptable terms, and with acceptable  counterparties needed for investment funding and risk management  purposes;

- changes in pricing, valuation or other methodologies, models,  assumptions, judgments, estimates and/or other measurement  techniques, or their respective reliability;

- changes in mortgage to debt OAS;

- the potential impact on the market for our securities resulting  from any purchases or sales by the Federal Reserve of Freddie  Mac debt or mortgage related securities;

- adverse judgments or settlements in connection with legal  proceedings, governmental investigations, and IRS examinations;

- volatility of reported results due to changes in the fair value  of certain instruments or assets;

- the development of different types of mortgage servicing  structures and servicing compensation;

- preferences of originators in selling into the secondary  mortgage market;

90                                                             *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- changes to our underwriting or servicing requirements (including servicing alignment efforts under the servicing alignment initiative), our practices with respect to the disposition of REO properties, or investment standards for mortgage related products;

- investor preferences for mortgage loans and mortgage related and debt securities compared to other investments;

- borrower preferences for fixed rate mortgages versus ARMs;

- the occurrence of a major natural or other disaster in geographic areas in which our offices or portions of our total mortgage portfolio are concentrated;

- other factors and assumptions described in this Form 0 Q and our 2011 Annual Report, including in the "MD&A" sections;

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their impacts; and

- market reactions to the foregoing

Forward looking statements speak only as of the date they are made, and we undertake no obligation to update any forward looking statements we make to reflect events or circumstances occurring after the date of this Form 10 Q

## RISK MANAGEMENT AND DISCLOSURE COMMITMENTS

In October 2000, we announced our adoption of a series of commitments designed to enhance market discipline, liquidity and capital In September 2005, we entered into a written agreement with FHFA, then OFHEO, that updated these commitments and set forth a process for implementing them A copy of the letters between us and OFHEO dated September 1, 2005 constituting the written agreement has been filed as an exhibit to our Registration Statement on Form 10, filed with the SEC on July 18, 2008, and is available on the Investor Relations page of our web site at www freddiemac com/investors/sec_filings/index html

In November 2008, FHFA suspended our periodic issuance of subordinated debt disclosure commitment during the term of conservatorship and thereafter until directed otherwise In March 2009, FHFA suspended the remaining disclosure commitments under the September 1, 2005 agreement until further notice, except that: (a) FHFA will continue to monitor our adherence to the substance of the liquidity management and contingency planning commitment through normal supervision activities; and (b) we will continue to provide interest rate risk and credit risk disclosures in our periodic public reports.

For the three months ended March 31, 2012, our duration gap averaged zero months, PMVS L averaged $223 million and PMVS YC averaged $16 million. Our 2012 monthly average duration gap, PMVS results and related disclosures are provided in our Monthly Volume Summary reports, which are available on our web site, www freddiemac com/investors/volsum and in current reports on Form 8 K we file with the SEC. For disclosures concerning credit risk sensitivity, see "RISK MANAGEMENT    Credit Risk    *Mortgage Credit Risk    Credit Risk Sensitivity*."

## LEGISLATIVE AND REGULATORY MATTERS

### Administration Report on Reforming the U.S. Housing Finance Market

On February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long term role in a housing finance system in which the private sector is the dominant provider of mortgage credit The report recommends winding down Freddie Mac and Fannie Mae, stating that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations The report states the Administration's belief that, under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

91                                                                                          *Freddie Mac*

Source   D RA HOM   OAN MORTGAG CORP, 10 Q, May 03, 2012                    TREASURY-3627

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations and financial condition Recent developments include the following:

- As discussed below in "Legislated Increase to Guarantee Fees," we recently raised our guarantee fees at the direction of FHFA

- The temporary high cost area loan limits expired on September 30, 2011

- We are working with FHFA to identify ways to prudently accelerate the rate of contraction of our mortgage related investments portfolio

We cannot predict the extent to which the other recommendations in the report will be implemented or when any actions to implement them may be taken However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near term FHFA's strategic plan for us is described below

### FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard

On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac and Fannie Mae The plan sets forth objectives and steps FHFA is taking or will take to meet FHFA's obligations as Conservator FHFA states that the steps envisioned in the plan are consistent with each of the housing finance reform frameworks set forth in the report delivered by the Administration to Congress in February 2011, as well as with the leading congressional proposals introduced to date FHFA indicates that the plan leaves open all options for Congress and the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future

FHFA's plan provides lawmakers and the public with an outline of how FHFA as Conservator intends to guide Freddie Mac and Fannie Mae over the next few years, and identifies three strategic goals:

- **Build.** Build a new infrastructure for the secondary mortgage market;

- **Contract.** Gradually contract Freddie Mac and Fannie Mae's dominant presence in the marketplace while simplifying and shrinking their operations; and

- **Maintain.** Maintain foreclosure prevention activities and credit availability for new and refinanced mo tgages

The first of these goals establishes the steps FHFA, Freddie Mac, and Fannie Mae will take to create the necessary infrastructure, including a securitization platform and national standards for mortgage securitization, that Congress and market participants may use to develop the secondary mortgage market of the future As part of this process, FHFA would determine how Freddie Mac and Fannie Mae can work together to build a single securitization platform that would replace their current separate proprietary systems.

The second goal describes steps that FHFA plans to take to gradually shift mortgage credit risk from Freddie Mac and Fannie Mae to private investors and eliminate the direct funding of mortgages by the enterprises The plan states that the goal of gradually shifting mortgage credit risk from Freddie Mac and Fannie Mae to private investors could be accomplished, in the case of single family credit guarantees, in several ways, including increasing guarantee fees, establishing loss sharing arrangements and expanding reliance on mortgage insurance To evaluate how to accomplish the goal of contracting enterprise operations in the multifamily business, the plan states that Freddie Mac and Fannie Mae will each undertake a market analysis of the viability of its respective multifamily operations without government guarantees

For the third goal, the plan states that programs and strategies to ensure ongoing mortgage credit availability, assist troubled homeowners, and minimize taxpayer losses while restoring stability to housing markets continue to require energy, focus, and resources. The plan states that activities that must be continued and enhanced include: (a) successful implementation of HARP, including the significant program changes announced by FHFA in October 2011; (b) continued implementation of the Servicing Alignment Initiative; (c) renewed focus on short sales, deeds in lieu, and deeds for lease options that enable households and Freddie Mac and Fannie Mae to avoid foreclosure; and (d) further development and implementation of the REO disposition initiative announced by FHFA in 2011.

On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that established objectives and performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan for

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                          Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Freddie Mac and Fannie Mae  We are aligning our resources and  internal business plans to meet the goals and objectives laid  out in the 2012 conservatorship scorecard  See "OTHER  INFORMATION      2012 Conservatorship Scorecard" in our 2011 Annual Report for further information

**Legislated Increase to Guarantee Fees**

On December 23, 2011, President Obama signed into law the  Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than   0 basis points above the average guarantee fees charged in 2011 on single family mortgage backed securities  Under the law,  the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies.  Effective April 1, 2012, at the direction of FHFA, the guarantee fee on all single family residential mortgages sold to  Freddie Mac and Fannie Mae was increased by 10 basis points.

Our business and financial condition will not benefit from the  increases in guarantee fees under this law, as we must remit the  proceeds from such increases to Treasury. It is currently unclear what effect this increase or any further guarantee fee  increases or other fee adjustments associated with this law will have on the future profitability and operations of our  single family guarantee business. FHFA has informed us that, if we raise fees for other purposes in 20  2, we will be allowed to  retain the related revenue

**Legislation Related to Reforming Freddie Mac and Fannie Mae**

Our future structure and role will be determined by the  Administration and Congress, and there are likely to be  significant changes beyond the near term  Congress continues to hold hearings and consider legislation on the future state of  Freddie Mac and Fannie Mae

A number of bills were introduced in Congress in 2011 and early  2012 relating to reforming Freddie Mac and Fannie Mae, and the  secondary mortgage market. See "BUSINESS      Regulation and Supervision      *Legislative and Regulatory Developments      Legislation Related to Reforming Freddie Mac and Fannie Mae*" in our 2011 Annual Report  We cannot predict whether or when any of the bills discussed therein might be enacted  We expect additional bills relating to Freddie Mac and Fannie Mae to be introduced  and considered by Congress during the remainder of 2012  On February 2, 2012, the Administration announced that it  expects to provide more detail concerning approaches to reform the U.S. housing finance market in the spring, and that it  plans to begin exploring options for legislation more  intensively with Congress

**Legislative and Regulatory Developments Concerning Executive  Compensation**

Congress, the Administration, and FHFA recently took significant action related to compensation at Freddie Mac  These  developments followed extensive public debate in Congress  concerning our compensation structure, including whether senior  executives should be entitled to bonuses or whether all employees should be placed on the government pay scale

- On April 4, 2012, the President signed the Stop Trading on Congressional Knowledge Act of 2012, or STOCK Act, which became effective immediately. The STOCK Act includes a provision that expressly prohibits senior executives at Freddie Mac and Fannie  Mae from receiving bonuses during any period of conservatorship

- On March 8, 2012, as we reported in our 2011 Annual Report, FHFA approved a new executive compensation program for Freddie Mac. FHFA stated that the new compensation program strikes the balance between prudent executive pay, including the elimination of bonuses, with the need to safeguard quality staffing in order  to protect the taxpayers' investment and achieve the objectives in FHFA's 2012 conservatorship scorecard.

We believe our risks related to employee turnover and employee  engagement remain elevated  It is uncertain how the developments  discussed above will affect our ability to manage these risks

**Dodd Frank Act**

The Dodd Frank Act, which was signed into law on July 21,  2010, significantly changed the regulation of the financial  services industry, including by creating new standards related to regulatory oversight of systemically important financial  companies, derivatives, capital requirements, asset backed securitization, mortgage underwriting, and consumer financial  protection  The Dodd Frank Act has directly affected and will continue to directly affect the business and operations of  Freddie Mac by subjecting us to new and additional regulatory  oversight and standards, including with respect to our  activities and products. We may also be affected by provisions of the Dodd Frank Act and implementing regulations that affect the activities of banks, savings institutions, insurance  companies, securities dealers, and other regulated entities that are our customers and counterparties

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3629                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Implementation of the Dodd Frank Act is being accomplished through numerous rulemakings, many of which are still in process. Accordingly, it is difficult to assess fully the impact of the Dodd Frank Act on Freddie Mac and the financial services industry at this time. The final effects of the legislation will not be known with certainty until these rulemakings are complete  The Dodd Frank Act also mandates the preparation of studies on a wide range of issues, which could lead to additional legislation or regulatory changes

Recent developments with respect to Dodd Frank rulemakings that may have a significant impact on Freddie Mac include several final rules on derivatives promulgated by the Commodity Futures Trading Commission, or CFTC.

- On April 18, 2012, the CFTC, in conjunction with the SEC (collectively, the "Commissions"), approved a joint final rule further defining certain swap related terms, including "major swap participant" (MSP), the text of which was released on April 27, 2012. We are analyzing the final rule, but have not yet determined whether Freddie Mac meets the criteria of an MSP  If Freddie Mac meets the criteria of an MSP, we would be required to register with the CFTC, and we would face significant regulations, including those relating to reporting, recordkeeping, and business conduct standards.

- The CFTC also recently promulgated final rules on real time public reporting of swap transaction data, which might increase the costs of our swaps transactions. Furthermore, the CFTC released final rules relating to recordkeeping, reporting, and clearing customer documentation, each of which may increase Freddie Mac's administrative and compliance costs

We continue to review and assess the impact of rulemakings and other activities under the Dodd Frank Act  For more information, see "RISK FACTORS    Legal and Regulatory Risks    *The Dodd Frank Act and related regulation may adversely affect our business activities and financial results*" in our 2011 Annual Report.

## Developments Concerning Single Family Servicing Practices

There have been a number of regulatory developments in recent periods impacting single family mortgage servicing and foreclosure practices, including those discussed below and in "BUSINESS    Regulation and Supervision    *Legislative and Regulatory Developments    Developments Concerning Single Family Servicing Practices*" in our 2011 Annual Report. It is possible that these developments will result in significant changes to mortgage servicing and foreclosure practices that could adversely affect our business. New compliance requirements placed on servicers as a result of these developments could expose Freddie Mac to financial risk as a result of further extensions of foreclosure timelines if home prices remain weak or decline  We may need to make additional significant changes to our practices, which could increase our operational risk  It is difficult to predict other impacts on our business of these changes, though such changes could adversely affect our credit losses and costs of servicing, and make it more difficult for us to transfer mortgage servicing rights to a successor servicer should we need to do so  Recent regulatory developments and changes include the February 9, 2012 announcement from a coalition of state attorneys general and federal agencies that it had entered into a settlement with five large seller/servicers concerning certain issues related to mortgage servicing practices. Under the settlement, which is currently in effect, these companies agreed to changes in their mortgage servicing practices  Certain of these changes will apply to loans they service on our behalf

For more information on operational risks related to these developments in mortgage servicing, see "MD&A    RISK MANAGEMENT    Operational Risks" in our 2011 Annual Report.

## Rule Concerning Private Transfer Fees

On March 16, 2012, FHFA issued a final rule that prohibits Freddie Mac, Fannie Mae, and the FHLBs from purchasing, investing, or otherwise dealing in mortgages on properties encumbered by certain types of private transfer fee covenants and in certain related securities  Private transfer fee covenants run with the land or bind current owners or their successors in title, and obligate the transferee or transferor of the property to pay a fee upon the transfer of the property  The rule becomes effective on July 16, 2012. The full impact of this regulation is unclear at this time

## FHFA Advisory Bulletin

On April 9, 2012, FHFA issued an advisory bulletin, "Framework for Adversely Classifying Loans, Other Real Estate Owned, and Other Assets and Listing Assets for Special Mention," which was effective upon issuance and is applicable to Freddie Mac, Fannie Mae, and the FHLBs. The advisory bulletin establishes guidelines for adverse classification and identification of specified assets and off balance sheet credit exposures. The Advisory Bulletin indicates that this guidance considers and is generally consistent with the *Uniform Retail Credit Classification and Account Management Policy* issued by the federal banking regulators in June 2000  Among other provisions, the advisory bulletin requires that we classify a single family loan as "loss" when the loan is no more than 180 days delinquent. The advisory bulletin specifies that, once

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

a loan is classified as "loss," we generally are required to charge off the portion of the loan balance that exceeds the fair value of the property, less cost to sell  The advisory bulletin also specifies that, if we subsequently receive full or partial payment of a previously charged off loan, we may report a recovery of the amount, either through our loan loss reserves or as a reduction in REO operations expenses  The accounting methods outlined in FHFA's advisory bulletin are significantly different from our current methods of accounting for single family loans that are 180 days or more delinquent  We are currently assessing the operational and accounting impacts of this advisory bulletin, and have not yet determined when we will implement this bulletin or its impact on our consolidated financial statements

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

**Interest Rate Risk and Other Market Risks**

Our investments in mortgage loans and mortgage related securities expose us to interest rate risk and other market risks arising primarily from the uncertainty as to when borrowers will pay the outstanding principal balance of mortgage loans and mortgage related securities, known as prepayment risk, and the resulting potential mismatch in the timing of our receipt of cash flows related to our assets versus the timing of payment of cash flows related to our liabilities used to fund those assets. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK    Interest Rate Risk and Other Market Risks" in our 2011 Annual Report for a discussion of our market risk exposures, including those related to derivatives, institutional counterparties, and other market risks.

*PMVS and Duration Gap*

Our primary interest rate risk measures are PMVS and duration gap

PMVS is an estimate of the change in the market value of our net assets and liabilities from an instantaneous 50 basis point shock to interest rates, assuming no rebalancing actions are undertaken and assuming the mortgage to LIBOR basis does not change  PMVS is measured in two ways, one measuring the estimated sensitivity of our portfolio market value to parallel movements in interest rates (PMVS Level or PMVS L) and the other to nonparallel movements (PMVS YC)

Duration gap measures the difference in price sensitivity to interest rate changes between our assets and liabilities, and is expressed in months relative to the market value of assets  For example, assets with a six month duration and liabilities with a five month duration would result in a positive duration gap of one month  A duration gap of zero implies that the duration of our assets equals the duration of our liabilities  Multiplying duration gap (expressed as a percentage of a year) by the fair value of our assets will provide an indication of the change in the fair value of our equity to be expected from a  % change in interest rates

The 50 basis point shift and 25 basis point change in slope of the LIBOR yield curve used for our PMVS measures reflect reasonably possible near term changes that we believe provide a meaningful measure of our interest rate risk sensitivity. Our PMVS measures assume instantaneous shocks. Therefore, these PMVS measures do not consider the effects on fair value of any rebalancing actions that we would typically expect to take to reduce our risk exposure

*Limitations of Market Risk Measures*

Our PMVS and duration gap estimates are determined using models that involve our best judgment of interest rate and prepayment assumptions  Accordingly, while we believe that PMVS and duration gap are useful risk management tools, they should be understood as estimates rather than as precise measurements  While PMVS and duration gap estimate our exposure to changes in interest rates, they do not capture the potential impact of certain other market risks, such as changes in volatility, basis, and foreign currency risk. The impact of these other market risks can be significant.

There are inherent limitations in any methodology used to estimate exposure to changes in market interest rates  Our sensitivity analyses for PMVS and duration gap contemplate only certain movements in interest rates and are performed at a particular point in time based on the estimated fair value of our existing portfolio  These sensitivity analyses do not consider other factors that may have a significant effect on our financial instruments, most notably business activities and strategic actions that management may take in the future to manage interest rate risk. As such, these analyses are not intended to provide precise forecasts of the effect a change in market interest rates would have on the estimated fair value of our net assets.

In addition, it has been more difficult in recent years to measure and manage the interest rate risk related to mortgage assets as risk for prepayment model error remains high due to uncertainty regarding default rates, unemployment, loan modification, and the volatility and impact of home price movements on mortgage durations  Misestimation of prepayments could result in hedging related losses

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar ® Document Research℠

TREASURY-3631

Table of Contents

### Duration Gap and PMVS Results

The table below provides duration gap, estimated point in time and minimum and maximum PMVS L and PMVS YC results, and an average of the daily values and standard deviation for the three months ended March 31, 2012 and 2011. The table below also provides PMVS L estimates assuming an immediate 100 basis point shift in the LIBOR yield curve  We do not hedge the entire prepayment risk exposure embedded in our mortgage assets  The interest rate sensitivity of a mortgage portfolio varies across  a wide range of interest rates  Therefore, the difference between PMVS at 50 basis points and 100 basis points is non linear. Our PMVS L (50 basis points) exposure at March 31, 2012 was $339 million; approximately half was driven by our duration exposure and the other half was  driven by our negative convexity exposure  The PMVS L at March 31, 2012 declined compared to December 31, 2011  primarily due to a decline in our duration exposure  On an  average basis for the three months ended March, 31, 2012, our  PMVS L (50 basis points) was $223 million, which was  primarily driven by our negative convexity exposure on our mortgage assets

### Table 55    PMVS Results

|  | | PMVS-YC | PMVS-L | |
|---|---|---|---|---|
|  | | 25 bps | 50 bps | 100 bps |
|  | | | (in millions) | |
| Ass  ng s  f s of  e LIBOR y e d c  ve | | | | |
| Ma c  31, 2012 | | $  14 | $339 | $ 1,051 |
| Decembe  31, 2011 | | $   7 | $465 | $1,349 |

|  | Three Months Ended March 31, | | | | | | |
|---|---|---|---|---|---|---|---|
|  | 2012 | | | 2011 | | | |
|  | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | |
|  | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | | |
| Ave age | 0 0 | $  16 | $ 223 | (0 3) | $  21 | $ 448 | |
| M n mum | (0 3) | $   1 | $ 130 | (1 0) | $ | $ 280 | |
| Max mum | 0 6 | $  57 | $ 379 | 0 4 | $  51 | $ 721 | |
| S anda d dev a  on | 0 2 | $  12 | $  47 | 0 3 | $  13 | $  101 | |

Derivatives have historically enabled us to keep our  interest rate risk exposure at consistently low levels in a wide  range of interest rate environments  The table below shows that  the PMVS L risk levels for the periods presented would generally have been higher if we had not used derivatives  The derivative impact on our PMVS L (50 basis points) was  $(1.2) billion at March 31, 2012, a decline of $0.8 billion from December 31, 2011  The decline was primarily driven by an increase in the percentage of long term  debt we have been issuing, beginning in the fourth quarter of 2011  This allows us to take advantage of attractive long term  interest rates while decreasing our reliance on interest rate  swaps. In order to remain within our risk management limits, we  rebalanced our mortgage related investments portfolio with  receive fixed swaps, which lowered our derivative duration  exposure

### Table 56    Derivative Impact on PMVS L (50 bps)

|  | Before Derivatives | After Derivatives | ffect of Derivatives |
|---|---|---|---|
|  | | (in millions) | |
| At | | | |
| Ma c  31, 2012 | $ 1,574 | $  339 | $(1,235) |
| Decembe  31, 2011 | $ 2,470 | $  465 | $ (2,005) |

The disclosure in our Monthly Volume Summary reports, which are available on our website at www freddiemac com and in current  reports on Form 8 K we file with the SEC, reflects the average of the daily PMVS L,  PMVS YC and duration gap estimates for a given reporting period (a month, quarter or year).

TREASURY-3632

Source    D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## ITEM 4. CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Disclosure controls and procedures include, without limitation,  controls and procedures designed to ensure that the information  we are required to disclose in reports that we file or submit  under the Exchange Act is recorded, processed, summarized  and reported within the time periods specified by the SEC's rules and forms and that such information is accumulated and  communicated to management of the company, including the company's Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding  required disclosure. In designing our disclosure controls and  procedures, we recognize that any controls and procedures, no  matter how well designed and operated, can provide only  reasonable assurance of achieving the desired control  objectives, and we must apply judgment in implementing possible controls and procedures

Management, including the company's Chief Executive Officer  and Chief Financial Officer, conducted an evaluation of the  effectiveness of our disclosure controls and procedures as of  March 31, 2012. As a result of management's evaluation, our  Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures  were not effective as of March 31, 2012, at a reasonable  eve of assurance due to the two material weaknesses in our  internal control over financial reporting discussed below

- The first material weakness relates to our inability to update  our disclosure controls and procedures in a manner that  adequately ensures the accumulation and communication to  management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities  laws,  including disclosures affecting our consolidated financial  statements  We have not been able to update our disclosure controls and procedures to provide reasonable assurance that  information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a  manner that allows for timely decisions regarding our required  disclosure  Based on discussions with FHFA and the structural nature of this continuing weakness, we believe it is likely that we will not  remed ate this material weakness while we are under  conservatorship  We consider this situation to be a material  weakness in our internal control over financial reporting

- The second material weakness relates to our inability to  effectively manage information technology changes and maintain  adequate controls over information security monitoring,  resulting from elevated levels of employee turnover  We are finding it difficult to retain and engage critical employees and attract people with the skills and experience we need  While we  have been able to leverage succession plans and reassign  responsibilities to maintain sound internal control over  financial reporting in most areas, as a result of elevated  levels of employee turnover, we experienced a significant  increase in the number of control breakdowns within certain  areas of our information technology division, specifically  within groups responsible for information change management and  information security  We identified deficiencies in the following areas: (a) approval and monitoring of changes to  certain technology applications and infrastructure; (b) monitoring of select privileged user activities; and  (c) monitoring user activities performed on certain technology hardware systems  These control breakdowns could have  impacted applications which support our financial reporting  processes  Elevated levels of employee turnover contributed to  ineffective management oversight of controls in these areas  resulting in these deficiencies  We believe that these issues aggregate to a material weakness in our  internal control over  financial reporting

**Changes in Internal Control Over Financial Reporting During the Quarter  Ended March 31, 2012**

We evaluated the changes in our internal control over financial  reporting that occurred during the quarter ended March 31,  2012 and concluded that the following matters have materially  affected, or are reasonably likely to materially affect, our  internal control over financial reporting

We have experienced elevated levels of voluntary turnover in the  first quarter of 2012 and earlier periods, and expect this trend  to continue as the public debate regarding the future role of the  GSEs continues  We continue to have concerns about staffing inadequacies, management depth, and low employee engagement  Disruptive levels of turnover at both the executive and  non executive levels have contributed to a deterioration in our control environment and may lead to breakdowns in any of our  operations, affect our execution capabilities, cause delays in the  implementation of critical technology and other projects, and erode our business, modeling, internal audit, risk  management, information security, financial reporting, legal, compliance, and other capabilities  For more information on  recent legislative and regulatory developments affecting these risks, see "MD&A     LEGISLATIVE AND REGULATORY MATTERS     Legislative and Regulatory Developments Concerning Executive Compensation "

Two Board members, John A. Koskinen (Chairman) and Robert R  Glauber (Chairman, Governance and Nominating  Committee), reached the company's mandatory retirement age and stepped down from the Board in March 2012. In order

Source    D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                          Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

to promote a smooth transition, Christopher S. Lynch, previously the Chairman of the Audit Committee, assumed the position of Non Executive Chairman of the Board effective at the December 2011 Board meeting  A third Board member, Laurence E. Hirsch, did not seek re election to the Board when his term expired in March 2012. In addition, Clayton S  Rose (Chairman of the Audit Committee) resigned from the Board of Directors effective as of 6:00 pm Eastern Standard Time on March 9, 2012. Carolyn H. Byrd assumed the position of Chairperson of the Audit Committee effective March 15, 2012, on an interim basis. Subsequent to March 31, 2012, we were informed by Anthony N. Renzi, Executive Vice President     Single Family Business, Operations and Technology, that he will resign from his position effective May 11, 2012.

**Mitigating Actions Related to the Material Weaknesses in Internal Control Over Financial Reporting**

As described under "Evaluation of Disclosure Controls and Procedures," we have two material weaknesses in internal control over financial reporting as of March 31, 2012 that we have not remediated

Given the structural nature of the material weakness related to our inability to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, we believe it is likely that we will not remediate this material weakness while we are under conservatorship  However, both we and FHFA have continued to engage in activities and employ procedures and practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws  These include the following:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the Conservator

- We provide drafts of our SEC filings to FHFA personnel for their review and comment prior to filing  We also provide drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release

- FHFA personnel, including senior officials, review our SEC filings prior to filing, including this quarterly report on Form 10 Q, and engage in discussions regarding issues associated with the information contained in those filings  Prior to filing this quarterly report on Form 10 Q, FHFA provided us with a written acknowledgement that it had reviewed the quarterly report on Form 10 Q, was not aware of any material misstatements or omissions in the quarterly report on Form 10 Q, and had no objection to our filing the quarterly report on Form 10 Q

- The Acting Director of FHFA is in frequent communication with our Chief Executive Officer, typically meeting (in person or by phone) on a weekly basis.

- FHFA representatives hold frequent meetings, typically weekly, with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, capital markets management, external communications, and legal matters.

- Senior officials within FHFA's accounting group meet frequently, typically weekly, with our senior financial executives regarding our accounting policies, practices, and procedures

We have performed the following mitigating actions regarding the material weakness related to our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from increased levels of employee turnover:

- Reviewed potential unauthorized changes to applications supporting our financial statements for proper approvals.

- Reviewed and approved user access capabilities for applications supporting our financial reporting processes

- Maintained effective business process controls over financial reporting

- Filled the vacant positions or reassigned responsibilities within the information change management group

- Took select actions targeted to reduce employee attrition in key control areas

- Continued to explore various strategic arrangements with outside firms to provide operational capability and staffing for these functions, if needed

We also intend to take the following remediation actions related to this material weakness:

- Assess staffing requirements to ensure appropriate staffing over information security controls and develop cross training programs within this area to mitigate the risk to the internal control environment should we continue to experience high levels of employee turnover

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3634

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- Fill the vacant positions or reassign responsibilities within the information security monitoring group

- Improve automation capabilities for the identification and resolution of potential unauthorized system changes

- Update our policies and procedures to document control processes

- Provide, on an on going basis, additional training to IT individuals that execute or manage change management and security controls

In view of our mitigating actions related to these material weaknesses, we believe that our interim consolidated financial statements for the quarter ended March 31, 2012 have been prepared in conformity with GAAP

99

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## ITEM 1. FINANCIAL STATEMENTS

00                                                                                    *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# FREDDIE MAC
## CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME
### (UNAUDITED)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in millions, except share-related amounts) | |
| *Interest income* | | |
| Mo  gage loans | | |
| He d by conso da ed  us s | $  17,468 | $  20,064 |
| Unsecu zed | 2,312 | 2,334 |
| *Total mortgage loans* | 19,780 | 22,398 |
| Inves men s n secu  es | 2,938 | 3,283 |
| O he | 13 | 34 |
| *Total interest income* | 22,731 | 25,715 |
| *Interest expense* | | |
| Deb secu  es of conso da ed  us s | (15,253) | (17,403) |
| O he  deb | (2,816) | (3,565) |
| *Total interest expense* | (18,069) | (20,968) |
| Expense  e a ed o de  va ves | (162) | (207) |
| *Net interest income* | 4,500 | 4,540 |
| P ov s on fo  c ed  losses | (1,825) | (1,989) |
| *Net interest income after provision for credit losses* | 2,675 | 2,551 |
| *Non-interest income (loss)* | | |
| Ga ns ( osses) on ex  ngu shmen  of deb secu  es of conso da ed  us s | (4) | 223 |
| Ga ns (losses) on e  emen  of o he  deb | (21) | 12 |
| Ga ns ( osses) on deb  eco ded a  fa  va ue | (17) | (81) |
| De  va ve ga ns (losses) | (1,056) | (427) |
| Impa  men  of ava lable-fo -sale secu  es | | |
| To al o he  -han- empo a y mpa men  of ava lable-fo -sale secu  es | (475) | (1,054) |
| Po  on of o he  -han- empo a y mpa men  ecogn zed n AOCI | (89) | (139) |
| Ne  mpa  men  of ava lable-fo -sale secu  es  ecogn zed n ea n ngs | (564) | (1,193) |
| O he  ga ns (losses) on nves men  secu  es  ecogn zed n ea n ngs | (288) | (120) |
| O he  ncome | 434 | 334 |
| *Non-interest income (loss)* | (1,516) | (1,252) |
| *Non-interest expense* | | |
| Sala  es and employee benef  s | (176) | (207) |
| P ofess onal se v ces | (71) | (56) |
| Occupancy expense | (14) | (15) |
| O he  adm n s a  ve expenses | (76) | (83) |
| To al adm n s a  ve expenses | (337) | (361) |
| Rea es a e owned ope a  ons expense | (171) | (257) |
| O he  expenses | (88) | (79) |
| *Non-interest expense* | (596) | (697) |
| Income befo e ncome  ax benef | 563 | 602 |
| Income  ax benef | 14 | 74 |
| *Net income* | 577 | 676 |
| O he  comp ehens ve ncome, ne  of  axes and  eclass f ca on adj  s  e  s | | |
| Changes n un ea zed ga ns ( osses)  e a ed o ava lable-fo -sale secu  es | 1,147 | 1,941 |
| Changes n un ea zed ga ns ( osses)  e a ed o cash f ow hedge  ela onsh ps | 111 | 132 |
| Changes n def ned benef  p ans | (46) | (9) |
| To al o he  comp ehens ve ncome, ne  of  axes and  eclass f ca on ad us men s | 1,212 | 2,064 |
| Comp ehens ve ncome | $  1,789 | $  2,740 |
| *Net income* | $  577 | $  676 |
| P efe  ed s ock d v dends | (1,804) | (1,605) |
| *Net loss attributable to common stockholders* | $  (1,227) | $  (929) |
| Ne  loss pe  common sha e | | |
| Bas c | $  (0 38) | $  (0 29) |
| D u ed | $  (0 38) | $  (0 29) |
| We gh ed ave age common sha es ou s and ng ( n  housands) | | |
| Bas c | 3,241,502 | 3,246,985 |
| D u ed | 3,241,502 | 3,246,985 |

*The accompanying notes are an integral part of these consolidated financial statements.*

Source  D RA  HOM  OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3637

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED BALANCE SHEETS**
**(UNAUDITED)**

| | | March 31, 2012 | | December 31, 2011 |
|---|---|---|---|---|
| | | (in millions, except share-related amounts) | | |
| **Assets** | | | | |
| Cas  a d cas  eq  va  ts (  c  des $1 a d $2,  espect ve y,  e a ed o ou conso  da ed VIEs) | $ | 8,569 | $ | 28,442 |
| Rest  cted cas  a d cas  eq  va  ts (  c  des $27,332 a d $27,675,  espec ve y,  e a ed o o   co  so  da ed VIEs) | | 27,790 | | 28,063 |
| Fede  a  f  ds so d a d sec   es p  c ased   de  ag ee  e s o  ese  (  c  des $3,000 a d $0,  espec  ve y,  e a ed o o  conso  da ed VIEs) | | 24,349 | | 12,044 |
| *Investments in securities* | | | | |
| Ava  ab e-fo -sa e, a  fa  va  e (  c  des $187 a d $204,  espec  vely, pledged as colla  al  ha  may be  epledged) | | 202,422 | | 210,659 |
| T ad  g, a  fa  va  e | | 58,319 | | 58,830 |
| *Total investments in securities* | | 260,741 | | 269,489 |
| *Mortgage loans* | | | | |
| Held-fo - nves men , a  amo   zed cos | | | | |
| By conso  da ed  us s (ne  of a  owances fo   oan  osses of $7,139 a d $8,351,  espect ve y) | | 1,555,067 | | 1,564,131 |
| Unsecu   zed (ne  of a  owances fo   oan  osses of $30,925 a d $30,912,  espec  ve y) | | 199,945 | | 207,418 |
| To al held-fo - nves men  mo  gage loans, ne | | 1,755,012 | | 1,771,549 |
| He d-fo -sa e, a  owe  -of-cos -o -fa   va ue (  nc udes $11,337 a d $9,710 a  fa   va  e,  espec ve y) | | 11,337 | | 9,710 |
| *Total mortgage loans, net* | | 1,766,349 | | 1,781,259 |
| Acc ed  te est ece va  e (  c  des $6,079 a d $6,242,  espec ve y,  e a ed o ou conso  da ed VIEs) | | 7,820 | | 8,062 |
| De  va  ve asse s,  e | | 182 | | 118 |
| Rea  estate ow ed,  et (  c  des $67 a d $60,  espect ve y,  e a ed o ou conso  da ed VIEs) | | 5,454 | | 5,680 |
| Defe  ed tax assets,  et | | 2,929 | | 3,546 |
| Ot e  assets (Note 18) (  c  des $6,227 a d $6,083,  espec  ve y,  e a ed o ou conso  da ed VIEs) | | 10,761 | | 10,513 |
| *Total assets* | $ | 2,114,944 | $ | 2,147,216 |
| **Liabilities and equity (deficit)** | | | | |
| *Liabilities* | | | | |
| Acc  ed  te est paya  e (  c  des $5,832 a d $5,943,  espec ve y,  e a ed o ou conso  da ed VIEs) | $ | 8,129 | $ | 8,898 |
| *Debt, net:* | | | | |
| Deb  secu   es of conso  da ed  us s  ed by   d pa  es | | 1,481,622 | | 1,471,437 |
| Ot e  de t (  c  des $2,221 a d $3,015 at fa  va  e,  espec  vely) | | 618,629 | | 660,546 |
| *Total debt, net* | | 2,100,251 | | 2,131,983 |
| De  va  ve l ab l  es,  ne | | 296 | | 435 |
| O e   ab   es (No e 18) (  c  des $2 a d $3,  espec ve y,  e a ed o ou conso  da ed VIEs) | | 6,286 | | 6,046 |
| *Total liabilities* | | 2,114,962 | | 2,147,362 |
| Comm  men s and con  ngenc es (No es 9, 10, and 17) | | | | |
| *Equity (deficit)* | | | | |
| Sen o  p efe  ed s ock, a  edemp  on va ue | | 72,317 | | 72,171 |
| P efe  ed s ock, a  edemp  on va ue | | 14,109 | | 14,109 |
| Co   on s ock, $0 00 pa  va ue, 4,000,000,000 sha es a   o  zed, 725,863,886 s a es  ss ed a d 650,033,623 s a es a d 649,725,302 s a es o  tsta d  g,  espec  vely | | | | |
| Add  onal pa d- n cap al | | | | 3 |
| Re a ned ea n ngs (accumula ed def c ) | | (75,775) | | (74,525) |
| *AOCI, net of taxes, related to:* | | | | |
| Ava  ab e-fo -sa e sec   es (  c  des $9,625 a d $10,334,  espec ve y,  e a ed o ne un ea  zed  osses on secu   es fo   wh c  o he  -han- empo a y  mpa  men  has been  ecogn zed  n ea n ngs) | | (5,066) | | (6,213) |
| Cash flow hedge  ela  onsh ps | | (1,619) | | (1,730) |
| Def ned benef   p ans | | (98) | | (52) |
| *Total AOCI, net of taxes* | | (6,783) | | (7,995) |
| T eas  y stock, at cost, 75,830,263 s a es a d 76,138,584 s a es,  espect ve y | | (3,886) | | (3,909) |
| *Total equity (deficit)* | | (18) | | (146) |
| *Total liabilities and equity (deficit)* | $ | 2,114,944 | $ | 2,147,216 |

*The accompanying notes are an integral part of these consolidated financial statements.*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3638

Table of Contents

# FREDDIE MAC
## CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT)
## (UNAUDITED)

| | Freddie Mac Stockholders' Equity (Deficit) | | | | | | | | | | |
| | Shares Outstanding | | | Senior Preferred Stock, at Redemption Value | Preferred Stock, at Redemption Value | Common Stock, at Par Value | Additional Paid In Capital | Retained Earnings (Accumulated Deficit) | AOCI, Net of Tax | Treasury Stock, at Cost | Total Equity (Deficit) |
| | Senior Preferred Stock | Preferred Stock | Common Stock | | | (in millions) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2010** | 1 | 6 | 649 | $ 6,200 | $ 1,109 | $ — | $ 7 | $ (62,733) | $ (12,031) | $ (3,953) | $ (01 |
| *Comprehensive income:* | | | | | | | | | | | |
| Net income | — | — | — | — | — | — | — | 676 | — | — | 676 |
| Other comprehensive income, net of taxes | — | — | — | — | — | — | — | — | 2,06 | — | 2,06 |
| *Comprehensive income* | — | — | — | — | — | — | — | 676 | 2,06 | — | 2,7 0 |
| Increase in liquidation preference | — | — | — | 500 | — | — | — | — | — | — | 500 |
| Stock-based compensation | — | — | — | — | — | — | 6 | — | — | — | 6 |
| Common stock issuances | — | — | 1 | — | — | — | ( 1 | — | — | 1 | — |
| Transfer from retained earnings (accumulated deficit) to additional paid in capital | — | — | — | — | — | — | 28 | (28 | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (1,605 | — | — | (1,605 |
| Dividend equivalent payments on exercised stock options | — | — | — | — | — | — | — | (3 | — | — | (3 |
| **Ending balance at March 31, 2011** | 1 | 6 | 650 | $ 6,700 | $ 1,109 | $ — | $ — | $ (63,693 | $ (9,967 | $ (3,912 | $ 1,237 |
| **Balance as of December 31, 2011** | 1 | 6 | 650 | $ 72,171 | $ 1,109 | $ — | $ 3 | $ (7,525 | $ (7 99 | $ (3 909 | $ (1 6 |
| *Comprehensive income:* | | | | | | | | | | | |
| Net income | — | — | — | — | — | — | — | 577 | — | — | 577 |
| Other comprehensive income, net of taxes | — | — | — | — | — | — | — | — | 1,212 | — | 1,212 |
| *Comprehensive income* | — | — | — | — | — | — | — | 577 | 1,212 | — | 1,789 |
| Increase in liquidation preference | — | — | — | 1 6 | — | — | — | — | — | — | 1 6 |
| Stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | 1 |
| Common stock issuances | — | — | — | — | — | — | (23 | — | — | 23 | — |
| Transfer from retained earnings (accumulated deficit) to additional paid in capital | — | — | — | — | — | — | 19 | (19 | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (1,807 | — | — | (1,807 |
| Dividend equivalent payments on exercised stock options | — | — | — | — | — | — | — | (1 | — | — | (1 |
| **Ending balance at March 31, 2012** | 1 | 6 | 650 | $ 72,317 | $ 1,109 | $ — | $ — | $ (75,775 | $ (6,783 | $ (3,886 | $ (18 |

*The accompanying notes are an integral part of these consolidated financial statements.*

03

*Freddie Mac*

Source   D RA HOM   OAN MORTGAG CORP, 10 Q, May 03, 2012

TREASURY-3639

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# FREDDIE MAC
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### (UNAUDITED)

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in millions) | |
| **Cash flows from operating activities** | | |
| Net income | $ 577 | $ 676 |
| Adjustments to reconcile net income to net cash provided by operating activities | | |
| Deferred fee gains | (19) | (822) |
| Asset-related amortization, premiums, discounts, and basis adjustments | 900 | 250 |
| Debt-related amortization, premiums and discounts on certain debt securities and basis adjustments | (1,030) | (190) |
| Net discounts paid on extinguishment of other debt | (136) | (251) |
| Net premiums received from issuance of debt securities of consolidated trusts | 1,200 | 1,214 |
| Losses (gains) on extinguishment of debt securities of consolidated trusts and other debt | 25 | (235) |
| Provision for credit losses | 1,825 | 1,989 |
| Losses on investment activity | 673 | 1,250 |
| Losses on debt recorded at fair value | 17 | 81 |
| Deferred income tax benefit | (54) | (65) |
| Purchases of held-for-sale mortgage loans | (5,367) | (2,164) |
| Sales of mortgage loans acquired as held-for-sale | 3,903 | 3,321 |
| Repayments of mortgage loans acquired as held-for-sale | 16 | 13 |
| Change in | | |
| Accrued interest receivable | 242 | 53 |
| Accrued interest payable | (717) | (850) |
| Income taxes payable | 147 | (8) |
| Other, net | (798) | (48) |
| *Net cash provided by operating activities* | 1,404 | 4,214 |
| **Cash flows from investing activities** | | |
| Purchases of trading securities | (6,126) | (19,192) |
| Proceeds from sales of trading securities | 1,962 | 12,746 |
| Proceeds from maturities of trading securities | 4,237 | 4,609 |
| Purchases of available-for-sale securities | — | (5,868) |
| Proceeds from sales of available-for-sale securities | 644 | 958 |
| Proceeds from maturities of available-for-sale securities | 8,901 | 9,540 |
| Purchases of held-for-investment mortgage loans | (16,726) | (11,180) |
| Repayments of mortgage loans acquired as held-for-investment | 118,395 | 90,717 |
| Decrease in restricted cash | 273 | 1,927 |
| Net proceeds from mortgage insurance and acquisitions and dispositions of real estate owned | 2,831 | 3,413 |
| Net (increase) decrease in federal funds sold and securities purchased under agreements to resell | (12,305) | 8,732 |
| Derivative premiums and terminations and swap collateral, net | (125) | (155) |
| *Net cash provided by investing activities* | 101,961 | 96,247 |
| **Cash flows from financing activities** | | |
| Proceeds from issuance of debt securities of consolidated trusts held by third parties | 30,641 | 27,152 |
| Repayments of debt securities of consolidated trusts held by third parties | (110,135) | (130,729) |
| Proceeds from issuance of other debt | 196,918 | 264,444 |
| Repayments of other debt | (239,000) | (262,924) |
| Increase in liquidation preference of senior preferred stock | 146 | 500 |
| Payment of cash dividends on senior preferred stock | (1,807) | (1,605) |
| Excess tax benefits associated with share-based awards | — | 1 |
| Payments of low-income housing tax credit partnership notes payable | (1) | (14) |
| *Net cash used in financing activities* | (123,238) | (103,175) |
| Net decrease in cash and cash equivalents | (19,873) | (2,714) |
| Cash and cash equivalents at beginning of period | 28,442 | 37,012 |
| *Cash and cash equivalents at end of period* | $ 8,569 | $ 34,298 |
| **Supplemental cash flow information** | | |
| Cash paid (received) for | | |
| Debt interest | $ 20,285 | $ 22,479 |
| Net derivative interest cash pay | 1,058 | 472 |
| Income taxes | (108) | (1) |
| Non-cash investing and financing activities | | |
| Underlying mortgage loans related to guarantor swap transactions | 89,741 | 85,035 |
| Debt securities of consolidated trusts issued by third parties established for guarantor swap transactions | 89,741 | 85,035 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source DRA HOM LOAN MORTGAG CORP, 10 Q, May 03, 2012                          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Freddie Mac was chartered by Congress in 1970 to stabilize the nation's residential mortgage market and expand opportunities for home ownership and affordable rental housing. Our statutory mission is to provide liquidity, stability and affordability to the U.S. housing market. We are a GSE regulated by FHFA, the SEC, HUD, and the Treasury, and are currently operating under the conservatorship of FHFA For more information on the roles of FHFA and the Treasury, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" in this Form 0 Q and in our Annual Report on our Form 0 K for the year ended December 31, 2011, or our 2011 Annual Report

We are involved in the U.S. housing market by participating in the secondary mortgage market We do not participate directly in the primary mortgage market Our participation in the secondary mortgage market includes providing our credit guarantee for mortgages originated by mortgage lenders in the primary mortgage market and investing in mortgage loans and mortgage related securities

Our operations consist of three reportable segments, which are based on the type of business activities each performs     Single family Guarantee, Investments, and Multifamily Our Single family Guarantee segment reflects results from our single family credit guarantee activities In our Single family Guarantee segment, we purchase single family mortgage loans originated by our seller/servicers in the primary mortgage market In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage related securities We guarantee the payment of principal and interest on the mortgage related securities in exchange for management and guarantee fees Our Investments segment reflects results from our investment, funding, and hedging activities In our Investments segment, we invest principally in mortgage related securities and single family performing mortgage loans, which are funded by debt issuances and hedged using derivatives. Our Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities In our Multifamily segment, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization See "NOTE 13: SEGMENT REPORTING" for additional information

We are focused on the following primary business objectives: (a) developing mortgage market enhancements in support of a new infrastructure for the secondary mortgage market; (b) contracting the dominant presence of the GSEs in the marketplace; (c) providing credit availability for new or refinanced mortgages and maintaining foreclosure prevention activities; (d) minimizing our credit losses; (e) maintaining sound credit quality of the loans we purchase or guarantee; and (f) strengthening our infrastructure and improving overall efficiency while also focusing on retention of key employees Our business objectives reflect direction we have received from the Conservator On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that established objectives, performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan for Freddie Mac and Fannie Mae We are aligning our resources and internal business plans to meet the goals and objectives laid out in the 20 2 conservatorship scorecard. Based on our charter, other legislation, public statements from Treasury and FHFA officials, and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives For information regarding these objectives, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS     Business Objectives."

Throughout our consolidated financial statements and related notes, we use certain acronyms and terms which are defined in the "GLOSSARY "

## Basis of Presentation

The accompanying unaudited consolidated financial statements have been prepared in accordance with GAAP for interim financial information and include our accounts as well as the accounts of other entities in which we have a controlling financial interest All intercompany balances and transactions have been eliminated These unaudited consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes in our 2011 Annual Report We are operating under the basis that we will realize assets and satisfy liabilities in the normal course of business as a going concern and in accordance with the delegation of authority from FHFA to our Board of Directors and management Certain financial statement information that is normally included in annual financial statements prepared in conformity with GAAP but is not required for interim reporting purposes has been condensed or omitted Certain amounts in prior periods' consolidated financial statements have been reclassified to conform to the current presentation In the opinion of management, all adjustments, which include only normal recurring adjustments, have been recorded for a fair statement of our unaudited consolidated financial statements

We recorded the cumulative effect of certain miscellaneous errors related to previously reported periods as corrections in the first quarter of 2012 We concluded that these errors are not material individually or in the aggregate to

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3641

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

our previously issued consolidated financial statements for any of the periods affected, or to our estimated earnings for the full year ended December 31, 2012, or to the trend of earnings The impact to earnings, net of taxes, for the quarter ended March 31, 2012 was $6 million.

## Use of Estimates

The preparation of financial statements requires us to make estimates and assumptions that affect: (a) the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements; and (b) the reported amounts of revenues and expenses and gains and losses during the reporting period Management has made significant estimates in preparing the financial statements, including, but not limited to, establishing the allowance for loan losses and reserve for guarantee losses, valuing financial instruments and other assets and liabilities, assessing impairments on investments, and assessing the realizability of net deferred tax assets Actual results could be different from these estimates

## Earnings Per Common Share

Because we have participating securities, we use the "two class" method of computing earnings per common share. Basic earnings per common share is computed as net income available to common stockholders divided by the weighted average common shares outstanding for the period The weighted average common shares outstanding for the period includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury pursuant to the Purchase Agreement. This warrant is included since it is unconditionally exercisable by the holder at a minimal cost See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for further information

Diluted earnings per common share is computed as net income attributable to common stockholders divided by the weighted average common shares outstanding during the period adjusted for the dilutive effect of common equivalent shares outstanding For periods with net income, the calculation includes the effect of the following common equivalent shares outstanding: (a) the weighted average shares related to stock options; and (b) the weighted average of restricted shares and restricted stock units. During periods in which a net loss has been incurred, potential common equivalent shares outstanding are not included in the calculation because it would have an antidilutive effect See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Earnings Per Common Share" in our 2011 Annual Report for further discussion of our significant accounting policies regarding our calculation of earnings per common share

## Recently Adopted Accounting Guidance

### *Fair Value Measurement*

On January 1, 2012, we adopted an amendment to the accounting guidance pertaining to fair value measurement and disclosure. This amendment provided: (a) clarification about the application of existing fair value measurement and disclosure requirements; and (b) changes to the guidance for measuring fair value and disclosing information about fair value measurements The adoption of this amendment did not have a material impact on our consolidated financial statements

### *Reconsideration of Effective Control for Repurchase Agreements*

On January 1, 2012, we adopted an amendment to the guidance for transfers and servicing with regard to repurchase agreements and other agreements that both entitle and obligate a transferor to repurchase or redeem financial assets before their maturity This amendment removed the criterion related to collateral maintenance from the transferor's assessment of effective control It focuses the assessment of effective control on the transferor's rights and obligations with respect to the transferred financial assets and not whether the transferor has the practical ability to perform in accordance with those rights or obligations The adoption of this amendment did not have a material impact on our consolidated financial statements

## NOTE 2: CONSERVATORSHIP AND RELATED MATTERS

### Business Objectives

We continue to operate under the conservatorship that commenced on September 6, 2008, conducting our business under the direction of FHFA, as our Conservator. The conservatorship and related matters have had a wide ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations. Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets The Conservator also succeeded to the title to all books, records, and assets of Freddie Mac held by any other ega custodian or third party. During the

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and management to conduct, day to day operations so that the company can continue to operate in the ordinary course of business  The directors serve on behalf of, and exercise authority as directed by, the Conservator

We are also subject to certain constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement  Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent  In addition, we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

While in conservatorship, we can, and have continued to, enter into and enforce contracts with third parties. The Conservator continues to direct the efforts of the Board of Directors and management to address and determine the strategic direction for the company  While the Conservator has delegated certain authority to management to conduct day to day operations, many management decisions are subject to review and approval by FHFA and Treasury. In addition, management frequently receives directions from FHFA on various matters involving day to day operations

Our business objectives and strategies have, in some cases, been altered since we were placed into conservatorship, and may continue to change  These changes to our business objectives and strategies may not contribute to our profitability  See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" in our 2011 Annual Report for further discussion.

On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac and Fannie Mae  The plan sets forth objectives and steps FHFA is taking or will take to meet FHFA's obligations as Conservator  FHFA states that the steps envisioned in the plan are consistent with each of the housing finance reform frameworks set forth in the report delivered by the Administration to Congress in February 2011, as well as with the leading congressional proposals introduced to date  FHFA indicates that the plan leaves open all options for Congress and the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future

FHFA's plan provides lawmakers and the public with an outline of how FHFA, as Conservator, intends to guide Freddie Mac and Fannie Mae over the next few years, and identifies three strategic goals:

- **Build.**  Build a new infrastructure for the secondary mortgage market;

- **Contract.**  Gradually contract Freddie Mac and Fannie Mae's dominant presence in the marketplace while simplifying and shrinking their operations; and

- **Maintain.**  Maintain foreclosure prevention activities and credit availability for new and refinanced mo tgages

On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that established objectives, performance targets, and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan  We are aligning our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard

Given the important role the Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions and our public mission, we may be required to take additional actions that could have a negative impact on our business, operating results, or financial condition. Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves our public mission and other non financial objectives, but may not contribute to our profitability  Some of these changes increase our expenses, while others require us to forego revenue opportunities in the near term  In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the Purchase Agreement, have adversely impacted and may continue to adversely impact our financial results, including our segment results  For example, our efforts to help struggling homeowners and the mortgage market, in line with our public mission, may help to mitigate our credit losses, but in some cases may increase our expenses or require us to forgo revenue opportunities in the near term  There is significant uncertainty as to the ultimate impact that our efforts to aid the housing and mortgage markets, including our efforts in connection with the MHA Program, will have on our future capital or liquidity needs  We are allocating significant internal resources to the implementation of the various initiatives under the MHA Program and to the servicing alignment initiative as directed by FHFA on April 28, 2011, which has increased, and will continue to increase, our expenses

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist  The Acting Director of FHFA stated on September 19, 2011 that "it ought to

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

be clear to everyone at this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship " The Acting Director of FHFA stated on November 15, 2011 that "the long term outlook is that neither [Freddie Mac nor Fannie Mae] will continue to exist, at least in its current form, in the future " We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near term. Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near term  We have no ability to predict the outcome of these deliberations

On February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long term role in a housing finance system in which the private sector is the dominant provider of mortgage credit  The report recommends winding down Freddie Mac and Fannie Mae, and states that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations  The report states the Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements  These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations, and financial condition.

The temporary high cost area limits expired on September 30, 2011  We are working with FHFA to identify ways to prudently accelerate the rate of contraction of our mortgage related investments portfolio  In addition, as discussed below, we recently raised our guarantee fees at the direction of FHFA  We cannot predict the extent to which the other recommendations in the report will be implemented or when any actions to implement them may be taken

On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 0 basis points above the average guarantee fees charged in 2011 on single family mortgage backed securities  Under the law, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies. Effective April 1, 2012, at the direction of FHFA, the guarantee fee on all single family residential mortgages sold to Freddie Mac and Fannie Mae was increased by 10 basis points.

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages  The revisions to HARP will be available to borrowers with loans that were sold to Freddie Mac and Fannie Mae on or before May 31, 2009 and who have current LTV ratios above 80%

**Impact of the Purchase Agreement and FHFA Regulation and Other Restrictions on the Mortgage Related Investments Portfolio**

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage related investments portfolio is subject to a cap that decreases by 0% each year until the portfolio reaches $250 billion  As a result, the UPB of our mortgage related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 3 , 20 2  The UPB of our mortgage related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation, was $618 3 billion at March 31, 2012. The annual 10% reduction in the size of our mortgage related investments portfolio is calculated based on the maximum allowable size of the mortgage-re ated investments portfolio, rather than the actual UPB of the mortgage related investments portfolio, as of December 3 of the preceding year  The limitation is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs  FHFA has stated that we will

108

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

not be a substantial buyer or seller of mortgages for our mortgage related investments portfolio  We are also subject to limits on the amount of assets we can sell from our mortgage related investments portfolio in any calendar month  without review and approval by FHFA and, if FHFA determines, Treasury.

**Government Support for our Business**

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business  Our ability to  access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a  receiver by FHFA under statutory mandatory receivership provisions.

Significant recent developments with respect to the support we  received from the government during the three months ended  March 31, 2012 include the following:

• On March 30, 2012, we received $146 million in funding  from Treasury under the Purchase Agreement, which increased the  agg egate liquidation preference of the senior preferred stock  to $72.3 billion as of March 31, 2012; and

• On March 30, 2012, we paid dividends of $1.8 billion  in cash on the senior preferred stock to Treasury at the  direction of the Conservator

To address our net worth deficit of $18 million at March 31, 2012, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $19 million, and will request that we receive these funds  by June 30, 2012. Our draw request represents our net worth deficit at quarter end rounded up to the nearest $1 million  Following funding of the draw request related  to our net worth deficit at March 31, 2012, our annual cash  dividend obligation to Treasury on the senior preferred stock  will be $7.23 billion, which exceeds our annual historical earnings in all but one period

Through March 2012, we paid $18.3 billion in cash dividends  in the aggregate on the senior preferred stock  Continued cash  payment of senior preferred dividends will have an adverse  impact on our future financial condition and net worth. In  addition, cash payment of quarterly commitment fees payable to Treasury will negatively impact our future net worth over the  long term  Treasury waived the fee for all quarters of 2011 and the first and second quarters of 2012. The amount of the fee has  not yet been established and could be substantial. As a result of additional draws and other factors: (a) the liquidation  preference of, and the dividends we owe on, the senior preferred  stock would increase and, therefore, we may need additional  draws from Treasury in order to pay our dividend obligations;  and (b) there is significant uncertainty as to our long term financial sustainability

See "NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS" and "NOTE 12: FREDDIE MAC  STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report for more information on the terms of the conservatorship  and the Purchase Agreement

**NOTE 3: VARIABLE INTEREST ENTITIES**

We use securitization trusts in our securities issuance process,  and are required to evaluate the trusts for consolidation on an  ongoing basis  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Consolidation and Equity Method  of Accounting" in our 2011 Annual Report for further information regarding the consolidation of certain VIEs

Based on our evaluation of whether we hold a controlling  financial interest in these VIEs, we determined that we are the  primary beneficiary of trusts that issue our single family PCs and certain Other Guarantee Transactions. Therefore, we  consolidate on our balance sheet the assets and liabilities of these trusts. In addition to our PC trusts, we are involved with  numerous other entities that meet the definition of a VIE, as discussed below

**VIEs for which We are the Primary Beneficiary**

*Single-family PC Trusts*

Our single family PC trusts issue pass through securities that  represent undivided beneficial interests in pools of mortgages  held by these trusts  For our fixed rate PCs, we guarantee the  timely payment of interest and principal  For our ARM PCs, we  guarantee the timely payment of the weighted average coupon  interest rate for the underlying mortgage loans and the full and  final payment of principal; we do not guarantee the timely payment of principal on ARM PCs  In exchange for providing this  guarantee, we may receive a management and guarantee fee and  up front delivery fees  We issue most of our single family PCs in transactions in which our customers exchange mortgage loans  for PCs  We refer to these transactions as guarantor swaps.

Source    D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                                                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

PCs are designed so that we bear the credit risk inherent in the loans underlying the PCs through our guarantee of principal and interest payments on the PCs  The PC holders bear the interest rate or prepayment risk on the mortgage loans and the risk that we will not perform on our obligation as guarantor  For purposes of our consolidation assessments, our evaluation of power and economic exposure with regard to PC trusts focuses on credit risk because the credit performance of the underlying mortgage loans was identified as the activity that most significantly impacts the economic performance of these entities  We have the power to impact the activities related to this risk in our role as guarantor and master servicer

Specifically, in our role as master servicer, we establish requirements for how mortgage loans are serviced and what steps are to be taken to avoid credit losses (*e.g.*, modification, foreclosure). Additionally, in our capacity as guarantor, we have the ability to remove defaulted mortgage loans out of the PC trust to help manage credit losses  See  "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS" for further information regarding our removal of mortgage loans out of PC trusts  These powers allow us to direct  the activities of the VIE (*i.e.*, the PC trust) that most significantly impact its economic performance  In addition, we  determined that our guarantee to each PC trust to provide principal and interest payments obligates us to absorb losses that could potentially be significant to the PC trusts  Accordingly, we concluded that we are the primary beneficiary of our single family PC trusts.

At both March 31, 2012 and December 31, 2011, we were  the primary beneficiary of, and therefore consolidated,  single family PC trusts with assets totaling $1.6 trillion, as  measured using the UPB of issued PCs. The assets of each PC  trust can be used only to settle obligations of that trust. In connection with our PC trusts, we have credit protection in the  form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancement  We also have  credit protection for certain of our PC trusts that issue PCs  backed by loans or certificates of federal agencies (such as FHA, VA, and USDA). See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES Credit Protection and Other Forms  of Credit Enhancement" for additional information regarding  third party credit enhancements related to our PC trusts.

### Other Guarantee Transactions

Other Guarantee Transactions are mortgage related securities  that we issue to third parties in exchange for non Freddie Mac  mortgage-related securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES       Securitization  Activities through Issuances of Freddie Mac Mortgage Related Securities" in our 2011 Annual Report for information on the nature of Other Guarantee Transactions  The degree to which our involvement with securitization trusts that issue Other  Guarantee Transactions provides us with power to direct the  activities that most significantly impact the economic  performance of these VIEs (*e.g.*, the ability to direct the servicing of the underlying assets of these entities) and obligation to absorb losses that could potentially  be significant to the VIEs (*e.g.*, the existence of third party credit enhancements) varies by transaction. For all Other Guarantee Transactions, our variable interest in these  VIEs represents some form of credit guarantee, whether covering all the issued beneficial interests or only the most senior  ones  The nature of our credit guarantee typically determines  whether we have power over the activities that most  significantly impact the economic performance of the VIE

For those Other Guarantee Transactions where our credit  guarantee is in a first loss position to absorb credit losses on  the underlying assets of these entities as of the reporting date, we would also have the ability to direct servicing of the  underlying assets, which is the power to direct the activities that most significantly impact economic performance of these VIEs. As a result, we would be the primary beneficiary, and we would consolidate the VIE  For those Other Guarantee  Transactions in which our credit guarantee is not in a first  loss position to absorb credit losses on the underlying assets of these entities as of the reporting date (*i.e.*, our credit guarantee is in a secondary loss position), we would not have the ability to direct servicing of the underlying assets,  so we would not be the primary beneficiary, and we would not  consolidate the VIE

Our consolidation determination took into consideration the  specific facts and circumstances of our involvement with each of  these entities  As a result, we have concluded that we are the  primary beneficiary of certain Other Guarantee Transactions with  underlying assets totaling $12.2 billion and $12.9 billion at March 31, 2012 and December 31,  2011, respectively. For those Other Guarantee Transactions that we do consolidate, the investors in these securities have  recourse only to the assets of those VIEs

110

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Consolidated VIEs

The table below represents the carrying amounts and  classification of the assets and liabilities of consolidated  VIEs on our consolidated balance sheets

**Table 3.1     Assets and Liabilities of Consolidated VIEs**

| Consolidated Balance Sheets Line Item | March 31, 2012 | December 31, 2011 |
|---|---:|---:|
| | | (in millions) |
| Cas  a d cas  eq  va e  s | $           1 | $           2 |
| Res  c ed cas  a d cas  eq  va e  s | 27,332 | 27,675 |
| Fede a  f  ds so d a d sec    es p  c ased   de ag ee  e  s o  rese | 3,000 | |
| Mo  gage loans held-fo - nves men  by consol da ed   us  s | 1,555,067 | 1,564,131 |
| Acc ued  n e es  ece vab e | 6,079 | 6,242 |
| Rea  es a e ow  ed,  e | 67 | 60 |
| O he  asse s | 6,227 | 6,083 |
| To al asse s of consol da ed VIEs | $ 1,597,773 | $   1,604,193 |
| Acc ued  n e es  payab e | $     5,832 | $     5,943 |
| Deb  secu   es of conso  da ed   us  s  s ed by    d pa  es | 1,481,622 | 1,471,437 |
| O he   ab    es | 2 | 3 |
| To al l ab l   es of consol da ed VIEs | $ 1,487,456 | $   1,477,383 |

### VIEs for which We are not the Primary Beneficiary

The table below represents the carrying amounts and  classification of the assets and liabilities recorded on our  consolidated balance sheets related to our variable interests in non consolidated VIEs, as well as our maximum exposure to loss  as a result of our involvement with these VIEs  Our involvement with VIEs for which we are not the primary beneficiary generally  takes one of two forms: (a) purchasing an investment in these entities; or (b) providing a guarantee to these  entities  Our maximum exposure to loss for those VIEs in which  we have purchased an investment is calculated as the maximum  potential charge that we would recognize in earnings if that  investment were to become worthless  This amount does not include other than temporary impairments or other write downs  that we previously recognized through earnings  Our maximum exposure to loss for those VIEs for which we have provided a  guarantee represents the contractual amounts that could be lost  under the guarantees if counterparties or borrowers defaulted,  without consideration of possible recoveries under credit  enhancement arrangements  We do not believe the maximum exposure to loss disclosed in the table below is representative of the  actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related  collateral liquidation, including possible recoveries under  credit enhancement arrangements

Source    D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    **TREASURY-3647**                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 3.2    Variable Interests in VIEs for which We are not the Primary Beneficiary**

| | Asset-Backed Investment Trusts(1) | Mortgage-Related Security Trusts | | Unsecuritized Multifamily Loans(3) | Other(1)(4) |
|---|---|---|---|---|---|
| | | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | | |
| **March 31, 2012** | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 45 | $ | $ | $ | $ |
| Restricted cash and cash equivalents | | 51 | | 32 | 183 |
| *Investments in securities* | | | | | |
| Available-for-sale, at fair value | | 76,163 | 118,694 | | |
| Trading, at fair value | 695 | 14,504 | 13,986 | | |
| *Mortgage loans* | | | | | |
| Held-for-investment, unsecuritized | | | | 70,874 | |
| Held-for-sale | | | | 11,337 | |
| Accrued interest receivable | | 440 | 409 | 349 | 6 |
| Derivative assets, net | | | | | 1 |
| Other assets | | 455 | | 467 | 418 |
| *Liabilities* | | | | | |
| Derivative liabilities, net | | (5) | | | (41) |
| Other liabilities | | (729) | (1) | (36) | (661) |
| **Maximum Exposure to Loss** | $ 740 | $ 39,143 | $ 146,731 | $ 83,059 | $ 11,142 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 26,002 | $ 44,843 | $ 853,285 | $ 136,229 | $22,467 |

| | Asset-Backed Investment Trusts(1) | Mortgage-Related Security Trusts | | Unsecuritized Multifamily Loans(3) | Other(1)(4) |
|---|---|---|---|---|---|
| | | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | | |
| **December 31, 2011** | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 447 | $ | $ | $ | $ |
| Restricted cash and cash equivalents | | 53 | | 33 | 167 |
| *Investments in securities* | | | | | |
| Available-for-sale, at fair value | | 81,092 | 121,743 | | |
| Trading, at fair value | 302 | 16,047 | 15,473 | | |
| *Mortgage loans* | | | | | |
| Held-for-investment, unsecuritized | | | | 72,295 | |
| Held-for-sale | | | | 9,710 | |
| Accrued interest receivable | | 471 | 420 | 353 | 6 |
| Derivative assets, net | | | | | 1 |
| Other assets | | 432 | 1 | 375 | 434 |
| *Liabilities* | | | | | |
| Derivative liabilities, net | | (1) | | | (42) |
| Other liabilities | | (585) | | (39) | (675) |
| **Maximum Exposure to Loss** | $ 749 | $ 36,438 | $ 153,620 | $ 82,766 | $ 11,198 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 16,748 | $ 41,740 | $ 921,219 | $ 134,145 | $25,616 |

(1) For our involvement with non-consolidated asset-backed investments, or of Freddie Mac security issuance or the VIEs where we do not provide a guarantee, our maximum exposure to loss is computed as the carrying amount of the security's classified as held for sale and for amortized cost of the security's classified as available-for-sale for our investments and related assets recorded on our consolidated balance sheets, including any unrealized amounts recorded in AOCI for securities classified as available-for-sale

(2) Freddie Mac securities include our variable interests in single-family issued as REMICs and Other Structured Securities, multifamily PCs, multifamily Other Structured Securities, and Other Guarantee Transactions that we do not consolidate. For our variable interests in non-consolidated Freddie Mac Securities trusts for which we have provided a guarantee, our maximum exposure to loss is based on the UPB of the underlying mortgage loans or securities that we have guaranteed, which we expect will not exceed our guarantee since our interests in single-family REMICs and Other Structured Securities are also consolidated and do not give rise to any additional exposure to credit loss as we already consolidate the underlying collateral

(3) For unsecuritized multifamily loans, our maximum exposure to loss is based on the UPB of these loans, adjusted for loan loss reserve basis adjustments, any associated allowance for loan losses, accrued interest receivable, and fair value adjustments on held-for-sale loans

(4) For our non-consolidated VIEs where we have provided a guarantee, our maximum exposure to loss is the contractual amount of the guarantee or the maximum exposure for which we could be required to provide. In some cases, we have considered the amount of possible recoveries under credit enhancement arrangements

(5) Represents the remaining UPB of assets held by non-consolidated VIEs using the most current information available, where our continuing involvement is significant. We do not include assets of our non-consolidated issued as single-family REMICs and Other Structured Securities trusts as we already consolidate the underlying collateral of these issued on our consolidated balance sheets

### Asset-Backed Investment Trusts

We invest in a variety of short term non mortgage related, asset backed investment trusts. These short term investments represent interests in trusts consisting of a pool of receivables or other financial assets, typically auto and equipment loans. These trusts act as vehicles to allow originators to securitize assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest rate risk of the underlying pool. The originators of the financial assets or the underwriters of the securities

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                  TREASURY-3648                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

offering create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our asset backed investments.

At March 31, 2012 and December 31, 2011, we had investments in 19 and 11 asset backed investment trusts in which we had a variable interest but were not considered the primary beneficiary, respectively. Our investments in these asset backed investment trusts as of March 31, 2012 were made in 2011 and 2012. At both March 31, 2012 and December 31, 2011, we were not the primary beneficiary of any such trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. As such, our investments in these asset backed investment trusts are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report. Our investments in these trusts totaled $0.7 billion at both March 31, 2012 and December 31, 2011, and are included as cash and cash equivalents, available for sale securities, or trading securities on our consolidated balance sheets. At both March 31, 2012 and December 31, 2011, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment.

### Mortgage-Related Security Trusts

#### Freddie Mac Securities

Freddie Mac securities related to our variable interests in non consolidated VIEs primarily consist of our REMICs and Other Structured Securities and Other Guarantee Transactions. REMICs and Other Structured Securities are created by using PCs or previously issued REMICs and Other Structured Securities as collateral. Our involvement with the resecuritization trusts that issue these securities does not provide us with rights to receive benefits or obligations to absorb losses nor does it provide any power that would enable us to direct the most significant activities of these VIEs because the ultimate underlying assets are PCs for which we have already provided a guarantee (*i.e.*, all significant rights, obligations and powers are associated with the underlying PC trusts). As a result, we have concluded that we are not the primary beneficiary of these resecuritization trusts.

Other Guarantee Transactions are created by using non Freddie Mac mortgage related securities as collateral. At both March 31, 2012 and December 31, 2011, our involvement with certain Other Guarantee Transactions does not provide us with the power to direct the activities that most significantly impact the economic performance of these VIEs. As a result, we hold a variable interest in, but are not the primary beneficiary of, certain Other Guarantee Transactions.

For non consolidated REMICs and Other Structured Securities and Other Guarantee Transactions, our investments are primarily included in either available for sale securities or trading securities on our consolidated balance sheets. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES     Securitization Activities through Issuances of Freddie Mac Mortgage Related Securities" in our 20    Annual Report for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

#### Non Freddie Mac Securities

We invest in a variety of mortgage related securities issued by third parties, including non Freddie Mac agency securities, CMBS, other private label securities backed by various mortgage related assets, and obligations of states and political subdivisions. These investments typically represent interests in trusts that consist of a pool of mortgage related assets and act as vehicles to allow originators to securitize those assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest rate risk of the underlying pool. The originators of the financial assets or the underwriters of the securities offering create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our non Freddie Mac securities.

Our investments in these non Freddie Mac securities at March 31, 2012 were made between 1994 and 2012. We are not generally the primary beneficiary of non Freddie Mac securities trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. We were not the primary beneficiary of any significant non Freddie Mac securities trusts as of March 31, 2012 or December 31, 2011. Our investments in non consolidated non Freddie Mac mortgage related securities are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report. At both March 31, 2012 and December 31, 2011, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

Source    D RA  HOM    OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3650                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

### Unsecuritized Multifamily Loans

We purchase loans made to various multifamily real estate entities. We primarily purchase such loans for securitization, and to a lesser extent, investment purposes  These real estate entities are primarily single asset entities (typically partnerships or limited liability companies) established to acquire, construct, rehabilitate, or refinance residential properties, and subsequently to operate the properties as residential rental real estate  The loans we acquire are usually are, at origination, equal to 80% or less of the value of the related underlying property  The remaining 20% of value is typically funded through equity contributions by the partners or members of the borrower entity  In certain cases, the 20% not funded through the loan we acquire also includes subordinate loans or mezzanine financing from third party lenders

We held more than 7,000 unsecuritized multifamily loans at both March 31, 2012 and December 31, 2011. The UPB of our investments in these loans was $82.5 billion and $82.3 billion as of March 31, 2012 and December 31, 2011, respectively, and was included in unsecuritized held for investment mortgage loans, at amortized cost, and held for sale mortgage loans at fair value on our consolidated balance sheets  We are not generally the primary beneficiary of the multifamily real estate borrowing entities because the loans we acquire are passive in nature and do not provide us with the power to direct the activities of these entities that most significantly impact their economic performance  However, when a multifamily loan becomes delinquent, we may become the primary beneficiary of the borrowing entity depending upon the structure of this entity and the rights granted to us under the governing legal documents  At both March 31, 2012 and December 31, 2011, the amount of unsecuritized multifamily loans for which we could be considered the primary beneficiary of the underlying borrowing entity was not material  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES   Mortgage Loans" in our 2011 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for more information.

### Other

Our involvement with other VIEs includes our investments in LIHTC partnerships, certain other mortgage related guarantees, and certain short term default and other guarantee commitments that we account for as derivatives:

- *Investments in LIHTC Partnerships:* We previously invested as a limited partner in various LIHTC partnerships that invest in lower tier or project partnerships that are single asset entities  Our investments in these LIHTC partnerships are funded through non recourse non interest bearing notes payable  We wrote down the carrying value of our investments to zero as of December 31, 2009, as we will not be able to realize any value from these investments

- *Certain other mortgage related guarantees:* We have other guarantee commitments outstanding on multifamily housing revenue bonds that were issued by third parties. As part of certain other mortgage related guarantees, we also provide commitments to advance funds, commonly referred to as "liquidity guarantees," which require us to advance funds to enable third parties to purchase variable rate multifamily housing revenue bonds, or certificates backed by such bonds, that cannot be remarketed within a specified number of days after they are tendered by their holders

- *Certain short term default and other guarantee commitments accounted for as derivatives*: Our involvement in these VIEs includes our guarantee of the performance of interest rate swap contracts in certain circumstances and credit derivatives we issued to guarantee the payments on multifamily loans or securities

At both March 31, 2012 and December 31, 2011, we were the primary beneficiary of one real estate entity that invests in multifamily property, related to a credit enhanced multifamily housing revenue bond that was not deemed to be material  We were not the primary beneficiary of the remainder of other VIEs because our involvement in these VIEs is passive in nature and does not provide us with the power to direct the activities of the VIEs that most significantly impact their economic performance  See Table 3 2 for the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Also see "NOTE 9: FINANCIAL GUARANTEES" for additional information about our involvement with the VIEs related to mortgage related guarantees and short term default and other guarantee commitments discussed above

### NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES

We own both single family mortgage loans, which are secured by one to four family residential properties, and multifamily mortgage loans, which are secured by properties with five or more residential rental units  Our single family loans are predominately first lien, fixed rate mortgages secured by the borrower's primary residence  For a discussion of

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

our significant accounting policies regarding our mortgage loans and loan loss reserves, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report.

The table below summarizes the types of loans on our consolidated balance sheets as of March 31, 2012 and December 31, 2011

**Table 4.1    Mortgage Loans**

| | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Unsecuritized | Held by Consolidated Trusts | Total | Unsecuritized | Held by Consolidated Trusts | Total |
| | | | (in millions) | | | |
| Single-family (1) | | | | | | |
| Fixed-rate | | | | | | |
| Amortizing | $ 147,841 | $ 1,409,553 | $1,557,394 | $ 153,177 | $1,418,751 | $ 1,571,928 |
| Interest-only | 3,077 | 13,575 | 16,652 | 3,184 | 14,758 | 17,942 |
| Total fixed-rate | 150,918 | 1,423,128 | 1,574,046 | 156,361 | 1,433,509 | 1,589,870 |
| Adjustable-rate | | | | | | |
| Amortizing | 3,292 | 69,406 | 72,698 | 3,428 | 68,362 | 71,790 |
| Interest-only | 9,734 | 40,916 | 50,650 | 10,376 | 43,655 | 54,031 |
| Total adjustable-rate | 13,026 | 110,322 | 123,348 | 13,804 | 112,017 | 125,821 |
| Other Guarantee Transactions backed by non-Freddie Mac securities | | 12,117 | 12,117 | | 12,776 | 12,776 |
| FHA/VA and other governmental | 1,552 | 3,119 | 4,671 | 1,494 | 3,254 | 4,748 |
| Total single-family | 165,496 | 1,548,686 | 1,714,182 | 171,659 | 1,561,556 | 1,733,215 |
| Multifamily (1) | | | | | | |
| Fixed-rate | 69,749 | | 69,749 | 69,647 | | 69,647 |
| Adjustable-rate | 12,737 | | 12,737 | 12,661 | | 12,661 |
| Other governmental | 3 | | 3 | 3 | | 3 |
| Total multifamily | 82,489 | | 82,489 | 82,311 | | 82,311 |
| Total UPB of mortgage loans | 247,985 | 1,548,686 | 1,796,671 | 253,970 | 1,561,556 | 1,815,526 |
| Deferred fees, unamortized premiums, discounts and other cost basis adjustments | (5,984) | 13,520 | 7,536 | (6,125) | 10,926 | 4,801 |
| Lower of cost or fair value adjustments on loans held-for-sale (2) | 206 | | 206 | 195 | | 195 |
| Allowance for loan losses on mortgage loans held-for-investment | (30,925) | (7,139) | (38,064) | (30,912) | (8,351) | (39,263) |
| Total mortgage loans, net | $ 211,282 | $ 1,555,067 | $1,766,349 | $ 217,128 | $1,564,131 | $1,781,259 |
| Mortgage loans, net | | | | | | |
| Held-for-investment | $ 199,945 | $ 1,555,067 | $ 1,755,012 | $ 207,418 | $1,564,131 | $1,771,549 |
| Held-for-sale | 11,337 | | 11,337 | 9,710 | | 9,710 |
| Total mortgage loans, net | $ 211,282 | $ 1,555,067 | $1,766,349 | $ 217,128 | $1,564,131 | $1,781,259 |

(1) Based on UPB and excluding our mortgage loans traded, but not yet settled.
(2) Consists of fair value adjustments associated with mortgage loans for which we have made a fair value election.

During the three months ended March 31, 2012 and 2011, we purchased $102.8 billion and $95.7 billion, respectively, in UPB of single family mortgage loans and $0.3 billion and $0.7 billion, respectively, in UPB of multifamily loans that were classified as held for investment at purchase. Our sales of multifamily mortgage loans occur primarily through the issuance of multifamily Other Guarantee Transactions. See "NOTE 9: FINANCIAL GUARANTEES" for more information. We did not have any reclassifications of mortgage loans into held for sale during the three months ended March 31, 2012. We did not sell any held for investment loans during the three months ended March 31, 2012.

**Credit Quality of Mortgage Loans**

We evaluate the credit quality of single family loans using different criteria than the criteria we use to evaluate multifamily loans. The current LTV ratio is one key factor we consider when estimating our loan loss reserves for single family loans. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of both March 31, 2012 and December 31, 2011, approximately 15% of loans in our single family credit guarantee portfolio had second lien financing by third parties at the time of origination of the first mortgage, and we estimate that these loans comprised 17% of our seriously delinquent loans at both dates, based on UPB. However,

Source   DRA HOM   OAN MORTGAG CORP, 10 Q, May 03, 2012                    TREASURY-3652

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

borrowers are free to obtain second lien financing after origination, and we are not entitled to receive notification when a borrower does so Therefore, it is likely that additional borrowers have post origination second lien mortgages For further information about concentrations of risk associated with our single family and multifamily mortgage loans, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

The table below presents information on the estimated current LTV ratios of single family loans on our consolidated balance sheets, all of which are held for investment Our current LTV ratio estimates are based on available data through the end of each respective period presented

**Table 4.2    Recorded Investment of Held For Investment Mortgage Loans, by LTV Ratio**

| | As of March 31, 2012 | | | | As of December 31, 2011 | | | |
| | Estimated Current LTV Ratio(1) | | | | Estimated Current LTV Ratio(1) | | | |
| | < 80 | >80 to 100 | > 100(2) | Total | < 80 | >80 to 100 | > 100(2) | Total |
| | | | | (in millions) | | | | |
| S ng e-fam y oans | | | | | | | | |
| 20 a d 30-yea o mo e, amor z ng f xed- a e(3 | $636,383 | $372,610 | $245,626 | $1,254,619 | $ 641,698 | $383,320 | $247,468 | $1,272,486 |
| 15-yea amor z ng f xed- a e(3 | 246,130 | 18,425 | 3,241 | 267,796 | 238,287 | 18,280 | 2,966 | 259,533 |
| Adj s ab e- a e( | 45,405 | 13,723 | 8,844 | 67,972 | 43,728 | 13,826 | 9,180 | 66,734 |
| A t-A, n e es -on y, and op on ARM( | 28,353 | 27,011 | 75,962 | 131,326 | 30,589 | 29,251 | 79,418 | 139,258 |
| o a s ng e-fam y oans | $ 956,271 | $431,769 | $333,673 | 1,721,713 | $ 954,302 | $444,677 | $ 339,032 | 1,738,011 |
| Mul fam ly loans | | | | 71,363 | | | | 72,801 |
| To al eco ded nves men of held-fo - nves men oans | | | | $1,793,076 | | | | $ 1,810,812 |

(1) The cu en LTV a os a e managemen es ma es, wh ch a e upda ed on a on y bas s Cu en ma ke va ue s a e es a ed y adj s g e va e of e p ope y a o g na on based on changes n he ma ke value of homes n he same geog aph cal a ea s nce ha me The va ue of a p ope y a o g na on s based on e as es p ce fo pu chase mo gages and h d-pa y app a sal fo ef nance mo gages Changes n ma ke value a e de ved f om ou n e nal ndex wh ch measu es p ce changes fo epea sales and ef nanc ng ac v y on he same p ope y E edd e Mac and Fann e Mae s ngle-fam ly mo gage acqu s ons, nclud ng fo eclosu e sa es Es ates of he cu en LTV a o nc ude he c ed -enhanced po on of he oan and exc ude any seconda y f nanc ng by h d pa es The ex s ence of a second en educes he bo owe 's equ y n e p ope y a d, e efo e, ca c ease e sk of defa

(2) The se ous del nquency a e fo he o al of s ngle-fam ly mo gage loans w h es ma ed cu en LTV a os n excess of 100% was 12 6% a d 12 8% as of Ma c 31, 2012 and Decembe 31, 2011, espec ve y

(3) The ma o y of ou loan mod f ca ons esul n new e ms ha nc ude f xed n e es a es afe mod f ca on Howeve, ou HAMP loan mod f ca ons esul n an n a n e es a e ha s seq e y adj s s g ad a y afe f ve yea s o a new as h s f xed fo he ema n ng l fe of he loan We have class f ed hese loans as f xed- a e fo p esen a on even o g key ave a a e adj s e p ov so, ecause ef e a es a e de e m ned a he me of he mod f ca on a he han a a s seq e t date

(4) Includes balloon/ ese mo gage loans and excludes op on ARMs

(5) We d sco ed p c ases of Al -A oans on Ma ch 1, 2009 (o a e, as cus o e s con ac s pe m ed), and n e es -on y oans effec ve Sep embe 1, 2010, and have no pu chased op on ARM oans s nce 2007 Mod f ed oans w h n he Al -A ca ego y e a n as such, even hough he bo owe ay have p ov ded full documen a on of asse s and ncome o omple e he mod f ca on on Mod f ed loans w h n he op on ARM ca ego y ema n as such even hough he mod f ed oan no longe p ov des fo op onal paymen p ov s ons

For information about the payment status of single family and multifamily mortgage loans, including the amount of such loans we deem impaired, see "NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS." For a discussion of certain indicators of credit quality for the multifamily loans on our consolidated balance sheets, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS Multifamily Mortgage Po tfolio "

**Allowance for Loan Losses and Reserve for Guarantee Losses, or Loan Loss Reserve**

We maintain an allowance for loan losses on mortgage loans that we classify as held for investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage related securities backed by multifamily loans, certain single family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk.

Source   D RA HOM OAN MORTGAG CORP, 10 Q, May 03, 2012                TREASURY-3653                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 4.3    Detail of Loan Loss Reserves**

| | Three Months Ended March 31, | | | | | | | |
| | 2012 | | | | 2011 | | | |
| | Allowance for Loan Losses | | | | Allowance for Loan Losses | | | |
| | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses(1) | Total | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses(1) | Total |
| | | | | (in millions) | | | | |
| *Single-family:* | | | | | | | | |
| Beginning balance | $ 30,406 | $ 8,351 | $ 159 | $38,916 | $ 27,317 | $ 11,644 | $ 137 | $ 39,098 |
| Provision for credit losses | 269 | 1,533 | 42 | 1,844 | 407 | 1,631 | 11 | 2,049 |
| Charge-offs(2) | (3,425) | (249) | (3) | (3,677) | (3,304) | (242) | (1) | (3,547) |
| Recoveries(2) | 499 | 16 | | 515 | 664 | 20 | | 684 |
| Transfers, net(3) | 2,687 | (2,512) | (2) | 173 | 3,814 | (3,536) | (4) | 274 |
| Ending balance | $ 30,436 | $ 7,139 | $ 196 | $37,771 | $ 28,898 | $ 9,517 | $ 143 | $38,558 |
| *Multifamily* | | | | | | | | |
| Beginning balance | $ 506 | $ | $ 39 | $ 545 | $ 730 | $ | $ 98 | $ 828 |
| Provision (benefit) for credit losses | (16) | | (3) | (19) | (45) | | (15) | (60) |
| Charge-offs(2) | (1) | | | (1) | (12) | | | (12) |
| Transfers, net(3) | | | | | | | (9) | (9) |
| Ending balance | $ 489 | $ | $ 36 | $ 525 | $ 673 | $ | $ 74 | $ 747 |
| *Total* | | | | | | | | |
| Beginning balance | $ 30,912 | $ 8,351 | $ 198 | $ 39,461 | $ 28,047 | $ 11,644 | $ 235 | $ 39,926 |
| Provision for credit losses | 253 | 1,533 | 39 | 1,825 | 362 | 1,631 | (4) | 1,989 |
| Charge-offs(2) | (3,426) | (249) | (3) | (3,678) | (3,316) | (242) | (1) | (3,559) |
| Recoveries(2) | 499 | 16 | | 515 | 664 | 20 | | 684 |
| Transfers, net(3) | 2,687 | (2,512) | (2) | 173 | 3,814 | (3,536) | (13) | 265 |
| Ending balance | $ 30,925 | $ 7,139 | $ 232 | $38,296 | $ 29,571 | $ 9,517 | $ 217 | $ 39,305 |
| Total loan loss reserves as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | | | | 2.03% | | | | 2.02% |

(1) Loans associated with our reserve for guarantee losses are those that underlie our non-consolidated securitization trusts and other guarantee commitments and are evaluated for impairment on a collective basis. Our reserve for guarantee losses is included in the table in our consolidated balance sheets.

(2) Charge-offs represent the amount of a loan that has been discharged to remove the loan from our consolidated balance sheet principally due to the foreclosure transfer to shortsales. Charge-offs exclude $101 million and $106 million for the three months ended March 31, 2012 and 2011, respectively, related to certain loans previously purchased out of financed guarantees and recorded as losses on loans purchased when we have expenses on our consolidated statements of comprehensive income. We record charge-offs and recoveries on our consolidated statement of comprehensive income when we record (a) a charge-off or a loss (such as a foreclosure transfer to foreclosure or real estate owned) occurs on a loan or when there remains a consolidated trust. Recoveries of charge-offs primarily result from foreclosure alternatives and REO acquisitions on loans where (a) a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements or (b) we received a reimbursement of our losses from a seller/servicer associated with a repurchase request on a loan that has experienced a foreclosure transfer or a foreclosure alternative.

(3) For the three months ended March 31, 2012 and 2011, consists of (a) approximately $2.5 billion and $3.5 billion, respectively, of reclassified single-family reserves related to our removal of loans previously held by consolidated trusts (b) approximately $171 million and $296 million, respectively, attributable to our reclassification of past due net loans on modified mortgage loans (c) $- million and $48 million, respectively, related to agreements with Selle/Servicers where the transfer relates to recoveries received under these agreements to compensate us for losses and related losses and (d) $1 million and $25 million, respectively, of other unsecuritized.

The table below presents our allowance for loan losses and our recorded investment in mortgage loans, held for investment, by impairment evaluation methodology.

**Table 4.4    Net Investment in Mortgage Loans**

| | March 31, 2012 | | | December 31, 2011 | | |
| | Single-family | Multifamily | Total | Single-family | Multifamily | Total |
| | | | (in millions) | | | |
| *Recorded investment* | | | | | | |
| Collectively evaluated | $ 1,659,317 | $ 68,753 | $1,728,070 | $1,677,974 | $ 70,131 | $1,748,105 |
| Individually evaluated | 62,396 | 2,610 | 65,006 | 60,037 | 2,670 | 62,707 |
| Total recorded investment | 1,721,713 | 71,363 | 1,793,076 | 1,738,011 | 72,801 | 1,810,812 |
| *Ending balance of the allowance for loan losses* | | | | | | |
| Collectively evaluated | (21,724) | (223) | (21,947) | (23,657) | (260) | (23,917) |
| Individually evaluated | (15,851) | (266) | (16,117) | (15,100) | (246) | (15,346) |
| Total ending balance of the allowance | (37,575) | (489) | (38,064) | (38,757) | (506) | (39,263) |
| Net investment in mortgage loans | $1,684,138 | $ 70,874 | $1,755,012 | $1,699,254 | $ 72,295 | $1,771,549 |

A significant number of unsecuritized single family mortgage loans on our consolidated balance sheets are individually evaluated for impairment and substantially all single family mortgage loans held by our consolidated trusts.

117

*Freddie Mac*

Source   DRA HOM   OAN MORTGAG CORP, 10 Q, May 03, 2012

TREASURY-3654

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

are collectively evaluated for impairment  The ending balance of  the allowance for loan losses associated with our  held for investment unsecuritized mortgage loans represented  approximately  3 4% and  3 0% of the recorded investment in such  loans at March 31, 2012 and December 31, 2011, respectively  The ending balance of the allowance for loan  losses associated with mortgage loans held by our consolidated trusts represented approximately 0 5% of the recorded investment  in such loans as of both March 31, 2012 and  December 31, 2011

**Credit Protection and Other Forms of Credit Enhancement**

In connection with many of our mortgage loans  held for investment and other mortgage related guarantees, we  have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms  of credit enhancements

The table below presents the UPB of loans on our consolidated  balance sheets or underlying our financial guarantees with  credit protection and the maximum amounts of potential loss  recovery by type of credit protection

**Table 4.5    Recourse and Other Forms of Credit Protection**[1]

| | UPB at | | Maximum Coverage[2] at | |
|---|---|---|---|---|
| | March 31, 2012 | December 31, 2011 | March 31, 2012 | December 31, 2011 |
| | (in millions) | | | |
| S ng e-fam  y | | | | |
| P  ma y mo  gage  nsu ance | $    191,829 | $    198,007 | $    47,380 | $    48,741 |
| Lende   ecou se and  ndemn f ca  ons | 8,434 | 8,798 | 8,146 | 8,453 |
| oo   nsu ance[3] | 22,692 | 26,754 | 1,793 | 1,855 |
| HFA  ndemn f ca on[4] | 8,142 | 8,637 | 3,323 | 3,323 |
| Subo d na  on[5] | 3,196 | 3,281 | 614 | 647 |
| O he   c ed  enhancemen s | 135 | 133 | 86 | 99 |
| o a | $    234,428 | $    245,610 | $    61,342 | $    63,118 |
| Mul  fam ly | | | | |
| HFA  ndemn f ca on[4] | $    1,235 | $    1,331 | $    699 | $    699 |
| Subo d na  on[5] | 26,670 | 23,636 | 3,948 | 3,359 |
| O he   c ed  enhancemen s | 8,286 | 8,334 | 2,598 | 2,554 |
| o a | $    36,191 | $    33,301 | $    7,245 | $    6,612 |

(1) Inc udes  he c ed  p o ec on assoc a ed w h unsecu  zed mo gage  oans,  oans he d by ou  conso da ed  us s as we  as ou  non-conso da ed mo  gage gua an ees  a d exc  des FHA/VA  oa s  ha he  gove nmen a  loans  Excep  fo  subo d na  on cove age,  hese amoun s exc ude c ed  p o ec on assoc a ed w h $15 9 b  on and $16 6 b  on  n UPB of s ngle-fam ly loans unde ly ng O he  Gua an ee T ansac  ons as of Ma ch 31, 2012 and Dece  be  31, 2011,  espec ve y, fo  wh ch he  nfo ma  on was no  ava lable

(2) Excep  fo  subo d na  on, h s  ep esen s  he  ema n ng amoun  of  oss  ecove y ha  s ava  ab e sub ec  o  e ms of coun e pa y ag eemen s

(3) Max mum cove age amoun s  p esen ed have been  m ed o  he  ema n ng UPB a  pe od end  P o pe od amoun s have been  ev sed  o confo m o cu en pe od  p ese  a o   Exc des app ox ma ely $11 1 b ll on and $13 5 b ll on  n UPB a  Ma c  31, 2012 a d Dece  be  31, 2011,  espec ve y, whe e  he  ela ed loans a e also cove ed by p  ma y mo  gage  n su a ce

(4) Rep esen s  he amoun  of po en a  e mbu semen  of  osses on sec     es we ave g a a  eed  a  a e backed by s a e a  oca  HFA  o ds,  de  w c  T eas y  bea s  n a  osses on  hese sec     es  p o 35% of  e o g a  UPB ss ed   de   e HFA  n  a ve on a comb ned p og am-w de bas s  T easu y w ll also bea   osses of unpa d  n e es s

(5) Rep esen s F edd e Mac  ssued mo  gage- e a ed secu     es wh s  bo d na  on p o ec on, exc d ng  ose backed by HFA bonds  Excludes mo  gage- ela ed secu     es whe e subo d na  on cove age was exhaus ed o  max mum cove age amoun s we e l m ed  o  he  ema n ng UPB a  ha  da e  P o pe od amoun s have been  ev sed o confo m o cu en pe od p esen a on

Primary mortgage insurance is the most prevalent type of credit  enhancement protecting our single family credit guarantee  portfolio, and is typically provided on a loan level basis  Pool  insurance contracts generally provide insurance on a group, or  pool, of mortgage loans up to a stated aggregate loss limit  We did not buy pool insurance during the three months ended  March 31, 2012  In recent periods, we also reached the maximum limit of recovery on certain pool insurance contracts  For information about counterparty risk associated with mortgage  insurers, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS       Mortgage Insurers."

We also have credit protection for certain of the mortgage loans  on our consolidated balance sheets that are covered by insurance  or partial guarantees issued by federal agencies (such as FHA,  VA, and USDA). The total UPB of these loans was $4.7 billion as of both March 31, 2012 and December 31, 2011

### NOTE 5: INDIVIDUALLY IMPAIRED AND NON PERFORMING LOANS

**Individually Impaired Loans**

Individually impaired single family loans include performing and  non performing TDRs, as well as loans acquired under our  financial guarantees with deteriorated credit quality  Individually impaired multifamily loans include TDRs, loans  three monthly payments or more past due, and loans that are impaired based on management judgment  For a discussion of our  significant accounting policies regarding impaired and non performing loans, which are applied

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3655

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

consistently for multifamily loans and single family loan classes, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report

Total loan loss reserves consist of a specific valuation allowance related to individually impaired mortgage loans, and a general reserve for other probable incurred losses  Our recorded investment in individually impaired mortgage loans and the related specific valuation allowance are summarized in the table below by product class (for single family loans)

119

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes any risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 5.1    Individually Impaired Loans

| | Balance at March 31, 2012 | | | | or the Three Months nded March 31, 2012 | |
| --- | --- | --- | --- | --- | --- | --- |
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | nterest Income Recognized |
| | | | | (in millions) | | |
| S ngle fam y | | | | | | |
| *With no specific allowance recorded(1):* | | | | | | |
| 20 and 30-year or more, amortizing f xed rate(2) | $ 6,7.5 | $ 3,057 | $ — | $ 3,057 | $ 3,123 | $ 79 |
| 15-year amort z ng f xed rate(2) | 6 | 22 | — | 22 | 22 | 1 |
| Adjustab e rate(3) | 12 | 6 | — | 6 | 5 | — |
| A t-A, nterest on y, and opt on ARM(4) | 1,873 | 836 | — | 836 | 856 | 16 |
| Tota w th no a owance recorded | 8,686 | 3,921 | — | 3,921 | ,006 | 96 |
| *With specific allowance recorded (* | | | | | | |
| 20 and 30-year or more, amortizing f xed rate(2) | 6,8 9 | 5,695 | (11,917 | 33,778 | 5,021 | 311 |
| 15-year amort z ng f xed rate(2) | 369 | 351 | ( 1 | 310 | 331 | 2 |
| Adjustab e rate(3) | 290 | 278 | (58 | 220 | 257 | 2 |
| A t-A, nterest on y, and opt on ARM(4) | 12,.8 | 12,151 | (3,835 | 8,316 | 11,913 | 69 |
| Tota w th spec f c a owance recorded | 9 99 | 58,75 | (15,851 | 2,62 | 57,522 | 386 |
| *Combined single-family:* | | | | | | |
| 20 and 30-year or more, amortizing f xed rate(2) | 53,59 | 8,752 | (11,917 | 36,835 | 8,1 | 390 |
| 15-year amort z ng f xed rate(2) | 25 | 373 | ( 1 | 332 | 353 | 5 |
| Adjustab e rate(3) | 302 | 28 | (58 | 226 | 262 | 2 |
| A t-A, nterest on y, and opt on ARM(4) | 1,.360 | 12,987 | (3,835 | 9,152 | 12,769 | 8.5 |
| ota s ngle am ly(6) | $ 68,681 | $ 62,396 | $ (15,851 | $ 6,5.5 | $ 61,528 | $ 82 |
| Mu t fam y — | | | | | | |
| *With no specific allowance recorded(7)* | $ 839 | $ 835 | $ — | $ 835 | $ 838 | $ 11 |
| *With specific allowance recorded* | 1,791 | 1,775 | (266 | 1,509 | 1,776 | 23 |
| ota mu t fam y | $ 2,630 | $ 2,610 | $ (266 | $ 2,3 | $ 2,61 | $ 3 |
| Tota s ng e-fam y and mu t fam y | $ 71,311 | $ 65,006 | $ (16,117 | $ 8,889 | $ 6 ,2 | 516 |

| | Balance at December 31, 2011 | | | | or the Three Months nded March 31, 2011 | |
| --- | --- | --- | --- | --- | --- | --- |
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | nterest Income Recognized |
| | | | | (in millions) | | |
| S ngle fam y | | | | | | |
| *With no specific allowance recorded(1):* | | | | | | |
| 20 and 30-year or more, amortizing f xed rate(2) | $ 7,073 | $ 3,200 | $ — | $ 3,200 | $ 3,585 | $ 92 |
| 15-year amort z ng f xed rate(2) | 57 | 23 | — | 23 | 5 | 2 |
| Adjustab e rate(3) | 13 | 6 | — | 6 | 8 | — |
| A t-A, nterest on y, and opt on ARM(4) | 1,987 | 8 81 | — | 8 81 | 1,037 | 21 |
| Tota w th no a owance recorded | 9,130 | ,110 | — | ,110 | ,675 | 115 |
| *With specific allowance recorded (* | | | | | | |
| 20 and 30-year or more, amortizing f xed rate(2) | ,672 | 3,533 | (11,253 | 32,280 | 27,638 | 176 |
| 15-year amort z ng f xed rate(2) | 367 | 3 7 | ( 3 | 30 | 178 | 3 |
| Adjustab e rate(3) | 280 | 268 | ( 9 | 209 | 122 | 1 |
| A t-A, nterest on y, and opt on ARM(4) | 12,103 | 11,779 | (3,7 5 | 8,03 | 7, 06 | 33 |
| Tota w th spec f c a owance recorded | 57,.22 | 55,927 | (15,100 | 0,827 | 35,3 | 213 |
| *Combined single-family:* | | | | | | |
| 20 and 30-year or more, amortizing f xed rate(2) | 51,7.5 | 6,733 | (11,253 | 35,.80 | 31,223 | 268 |
| 15-year amort z ng f xed rate(2) | 2 | 370 | ( 3 | 327 | 223 | 5 |
| Adjustab e rate(3) | 293 | 27 | ( 9 | 215 | 130 | 1 |
| A t-A, nterest on y, and opt on ARM(4) | 1,.090 | 12,660 | (3,7 5 | 8,915 | 8,_3 | 5 |
| ota s ngle am ly(6) | $ 66,552 | $ 60,037 | $ (15,100 | $ .937 | $ 0,019 | $ 328 |
| Mu t fam y — | | | | | | |
| *With no specific allowance recorded(7)* | $ 1,0 9 | $ 1,0. | $ — | $ 1,0. | $ 773 | $ 10 |
| *With specific allowance recorded* | 1,6 | 1,626 | (2 6 | 1,380 | 1,972 | 23 |
| ota mu t fam y | $ 2,693 | $ 2,670 | $ (2 6 | $ 2,2 | $ 2,7 5 | $ 3 |
| Tota s ng e-fam y and mu t fam y | $ 69,2.5 | $ 62,707 | $ (15,3 6 | $ 7,361 | $ 2,76 | $ 362 |

(1) Ind v dually mpa ed loans w th no spec f c e a ed valua on allowance p ma ly ep esen mo gage loans pu chased ou of PC pools and accoun ed fo n acco dance
w th he accoun ng gu dance fo oans and deb secu es acqu ed w h dee o a ed c ed qua y ha have no expe enced fu he de e o a on

(2) See e d o e (3) of "Tab e 4 2 Reco ded Inves men of He d-fo -Inves men Mo gage Loans, by LTV Ra o"

(3) Includes balloon/ ese mo gage loans and excludes op on ARMs

(4) See e d o e (5) of "Tab e 4 2 Reco ded Inves men of He d-fo -Inves men Mo gage Loans, by LTV Ra o"

(5) Cons s s p ma ly of mo gage loans class f ed as TDRs

(6) As of Ma ch 31, 2012 and Dece be 31, 2011 nc udes $60 0 b on and $57 4 b on, espec ve y, of UPB assoc a ed w h oans fo wh ch we have eco ded a
spec f c a owa ce, a d $8 7 b o a d $9 1 b o , espec ve y, of UPB assoc a ed w h oans ha have no spec f c allowance eco ded See endno e (1) fo
add onal nfo ma on

(7) Ind v dually mpa ed mul fam ly loans w h no spec f c e a ed valua on allowance p ma ly ep esen hose loans fo wh ch he eco a e a ue s suff c en y n excess
of he loan ba ance o esu n ecove y of he en e eco ded nves men f he p ope y we e fo ec osed upon o o he w se sub ec o d spos on

120

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Interest income foregone on individually impaired loans was approximately $530 million and $365 million for the three months ended March 31, 2012 and 2011 respectively.

**Mortgage Loan Performance**

We do not accrue interest on loans three months or more past due

The table below presents the recorded investment of our single family and multifamily mortgage loans, held for investment, by payment status.

**Table 5.2    Payment Status of Mortgage Loans**[1]

| | March 31, 2012 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 1,181,260 | $ 20,035 | $ 7,452 | $ 45,872 | $ 1,254,619 | $ 45,760 |
| 15-year amortizing fixed-rate[2] | 264,937 | 1,221 | 311 | 1,327 | 267,796 | 1,321 |
| Adjustable-rate[3] | 65,445 | 580 | 215 | 1,732 | 67,972 | 1,728 |
| Alt-A, interest-only, and option ARMs[4] | 104,682 | 3,742 | 1,846 | 21,056 | 131,326 | 21,027 |
| Total single-family | 1,616,324 | 25,578 | 9,824 | 69,987 | 1,721,713 | 69,836 |
| Total multifamily | 71,206 | 27 | 26 | 104 | 71,363 | 1,853 |
| Total single-family and multifamily | $1,687,530 | $ 25,605 | $ 9,850 | $ 70,091 | $ 1,793,076 | $ 71,689 |

| | December 31, 2011 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 1,191,809 | $24,964 | $ 9,006 | $ 46,707 | $1,272,486 | $ 46,600 |
| 15-year amortizing fixed-rate[2] | 256,306 | 1,499 | 361 | 1,367 | 259,533 | 1,361 |
| Adjustable-rate[3] | 63,929 | 724 | 239 | 1,842 | 66,734 | 1,838 |
| Alt-A, interest-only, and option ARMs[4] | 109,967 | 4,617 | 2,172 | 22,502 | 139,258 | 22,473 |
| Total single-family | 1,622,011 | 31,804 | 11,778 | 72,418 | 1,738,011 | 72,272 |
| Total multifamily | 72,715 | 2 | 15 | 69 | 72,801 | 1,882 |
| Total single-family and multifamily | $1,694,726 | $ 31,806 | $11,793 | $ 72,487 | $ 1,810,812 | $ 74,154 |

(1) Based on recorded investment in the loan Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as past due as long as the borrower is current under the modified federal’s Terms pay in same use of a loan may be affected by temporary modified differences, or lags, in the reporting of his information on our books by our servicers

(2) See endnote (3) of “Table 4 2      Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio ”

(3) Includes balloon/reset mortgage loans and excludes option ARMs

(4) See endnote (5) of “Table 4 2      Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio ”

We have the option under our PC agreements to remove mortgage loans from the loan pools that underlie our PCs under certain circumstances to resolve an existing or impending delinquency or default Our practice generally has been to remove loans from PC trusts when the loans have been delinquent for 120 days or more. As of March 31, 2012, there were $2.4 billion in UPB of loans underlying our PCs that were 20 days or more delinquent, and that met our criteria for removing the loan from the consolidated trust Generally, we remove these delinquent loans from the PC trust, and thereby extinguish the related PC debt, at the next scheduled PC payment date, unless the loans proceed to foreclosure transfer, complete a foreclosure alternative or are paid in full by the borrower before such date

When we remove mortgage loans from consolidated trusts, we reclassify the loans from mortgage loans held for investment by consolidated trusts to unsecuritized mortgage loans held for investment and record an extinguishment of the corresponding portion of the debt securities of the consolidated trusts. We removed $9.2 billion and $14.6 billion in UPB of loans from PC trusts (or purchased delinquent loans associated with other guarantee commitments) during the three months ended March 31, 2012 and 2011, respectively.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                          Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3658

Table of Contents

The table below summarizes the delinquency rates of mortgage loans within our single family credit guarantee and multifamily mortgage portfolios

**Table 5.3    Delinquency Rates⁽¹⁾**

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| *Single-family:* | | |
| Non-credit-enhanced portfolio | | |
| Serious delinquency rate | 2 75% | 2 80% |
| Total number of serious delinquency loans | 267,820 | 273,184 |
| Credit-enhanced portfolio | | |
| Serious delinquency rate | 7 54% | 7 56% |
| Total number of serious delinquency loans | 113,166 | 120,622 |
| Total portfolio, excluding Other Guarantee Transactions | | |
| Serious delinquency rate | 3 39% | 3 46% |
| Total number of serious delinquency loans | 380,986 | 393,806 |
| Other Guarantee Transactions ⁽²⁾ | | |
| Serious delinquency rate | 10 67% | 10 54% |
| Total number of serious delinquency loans | 19,801 | 20,328 |
| Total single-family | | |
| Serious delinquency rate | 3 51% | 3 58% |
| Total number of serious delinquency loans | 400,787 | 414,134 |
| *Multifamily* ⁽³⁾ | | |
| Non-credit-enhanced portfolio | | |
| Delinquency rate | 0 16% | 0 11% |
| UPB of delinquent loans (in millions) | $ 139 | $ 93 |
| Credit-enhanced portfolio | | |
| Delinquency rate | 0 39% | 0 52% |
| UPB of delinquent loans (in millions) | $ 137 | $ 166 |
| Total Multifamily | | |
| Delinquency rate | 0 23% | 0 22% |
| UPB of delinquent loans (in millions) | $ 276 | $ 259 |

(1) Single-family mortgage loans whose contractual terms have been modified under agreement when the borrower is no longer considered as seriously delinquent if the borrower is less than three months delinquent and does not bear the owers... REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different basis and do vary across...

(2) Other Guarantee Transactions generally have underlying mortgage loans with higher risk characteristics, but some of the Other Guarantee Transactions may provide the enhanced protection from losses and Other Guarantee Transactions whose loans... excess... over collateral or on and other features...

(3) Multifamily delinquency performance is based on UPB of mortgage loans that are two months past due or those in the process of foreclosure and includes multifamily Other Guarantee Transactions whose loans are... has been modified under an agreement when the borrower is as long as he borrower is less than two months past due under the modified contractual terms.

We continue to implement a number of initiatives to modify and restructure loans, including the MHA Program. As part of accomplishing certain of these initiatives, we pay various incentives to servicers and borrowers We bear the full costs associated with these loan workout and foreclosure alternatives on mortgages that we own or guarantee and do not receive a reimbursement for any component from Treasury.

**Troubled Debt Restructurings**

On July 1, 2011, we adopted an amendment to the accounting guidance for receivables, which clarifies the guidance regarding a creditor's evaluation of when a restructuring is considered a TDR While our adoption of this amendment did not have an impact on how we account for TDRs, it did have a significant impact on the population of loans that we account for as TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Recently Adopted Accounting Guidance" in our 2011 Annual Report for further information on our implementation of this guidance

***Single-Family TDRs***

We require our single family servicers to contact borrowers who are in default and to identify a loan workout in accordance with our requirements We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses We require our single family servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure We receive information related to loan workouts, such as modifications and loans in a modification trial period, and other alternatives to foreclosure from our servicers at the loan level on at least a monthly basis. For loans in a modification trial period under HAMP, we do not receive the terms of the expected completed modification until the modification is completed For these loans, we only receive notification that they are in a modification trial period under HAMP

In the case of borrowers considered for modifications, our servicers obtain information on income, assets, and other borrower obligations to determine modified loan terms Under HAMP, the goal of a single family loan modification is to

Source   D RA HOM  OAN MORTGAG CORP, 10 Q, May 03, 2012                    TREASURY-3659                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

reduce the borrower's monthly mortgage payments to a  specified percentage of the borrower's gross monthly  income, which may be achieved through a combination of methods,  including: (a) interest rate reductions; (b) term  extensions; and (c) principal forbearance  Principal forbearance is when a portion of the principal is  non interest bearing, but this does not represent principal  forgiveness  Although HAMP contemplates that some servicers will  also make use of principal forgiveness to achieve reduced  payments for borrowers, we have only used forbearance of principal and have not used principal forgiveness in modifying  our loans. During the three months ended March 31, 2012, approximately 65% of completed modifications that were  classified as TDRs involved interest rate reductions and term  extensions, and approximately 23% involved principal forbearance  in addition to interest rate reductions and term extensions  During the three months ended March 31, 2012, the average term extension was 93 months and the average interest rate  reduction was 3 0% for completed modifications classified as TDRs.

### Multifamily TDRs

The assessment as to whether a multifamily loan restructuring is  considered a TDR contemplates the unique facts and circumstances  of each loan. This assessment considers qualitative factors such  as whether the borrower's modified interest rate is  consistent with that of a borrower having a similar credit  profile at the time of modification  In certain cases, for  maturing loans we may provide short term loan extensions of up to one year with no changes to the effective borrowing rate  In other cases we may make more significant modifications of terms for borrowers experiencing financial difficulty, such as  reducing the interest rate or extending the maturity for longer  than one year  In cases where we do modify the contractual terms  of the loan, the changes in terms may be similar to those of  single family loans, such as an extension of the term, reduction of contractual rate, principal forbearance, or some combination  of these features

### TDR Activity and Performance

The table below provides additional information about both our  single family and multifamily TDR activity during the three  months ended March 31, 2012, based on the original category of the loan before the loan was classified as a TDR  Our  presentation of TDR activity includes all loans that were newly classified as a TDR during the respective period  Prior to  classification as a TDR, these loans were previously evaluated for impairment, including our estimation for loan losses, on a  collective basis  Loans classified as a TDR in one period may be subject to further action (such as a modification or  remodification) in a subsequent period. In such cases, the  subsequent activity would not be reflected in the table below since the loan would already have been classified as a TDR

### Table 5.4    TDR Activity, by Segment

| | Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | # o  Loans | Post TDR Recorded Investment | # o  Loans | Post TDR Recorded Investment |
| | | (in millions, except for number of loans) | | |
| *Single-family* | | | | |
| 20 a d 30-yea  o  mo e, amo   z ng f xed- a e | 15,072 | $ 2,643 | 18,900 | $ 3,925 |
| 15-yea  amo   z ng f xed- a e | 962 | 87 | 856 | 98 |
| Adj  s ab e- a e(1 | 451 | 85 | 497 | 107 |
| A t-A,  n e es -on y, and op  on ARM | 3,725 | 961 | 6,727 | 1,844 |
| o a  S ng e-fam  y | 20,210 | 3,776 | 26,980 | 5,974 |
| *Multifamily* | 4 | 22 | 2 | 3 |
| o a | 20,214 | $ 3,798 | 26,982 | $ 5,977 |

(1) Includes balloon  ese  mo gage loans

The measurement of impairment for TDRs is based on the excess of  our recorded investment in the loans over the present value of  the loans' expected future cash flows  Generally, restructurings that are TDRs have a higher allowance for loan  losses than restructurings that are not considered TDRs because TDRs involve a concession being granted to the borrower  Our process for determining the appropriate allowance for loan losses for both single family and multifamily loans considers  the impact that our loss mitigation activities, such as loan  restructurings, have on probabilities of default  For single  family loans evaluated individually and collectively for  impairment that have been modified, the probability of default is impacted by the incidence of redefault that we have  experienced on similar loans that have completed a modification   For multifamily loans, the incidence of redefault on loans that  have been modified does not directly impact the allowance for  loan losses as our multifamily loans are generally evaluated  individually for impairment which is based on the fair value of  the underlying collateral and contemplates the unique facts and circumstances of the loan. The process

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012          Powered by Morningstar ® Document Research℠

TREASURY-3660

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

for determining the appropriate allowance for loan losses for multifamily loans evaluated collectively for impairment considers the incidence of redefault on loans that have completed a modification

The table below presents the volume of payment defaults of our TDR modifications based on the original category of the loan before restructuring Modified loans within the Alt A category continue to remain in that category, even though the borrower may have provided full documentation of assets and income before completing the modification Modified loans within the option ARM category continue to remain in that category even though the modified loan no longer provides for optional payment provisions Substantially all of our completed single family loan modifications classified as a TDR during the three months ended March 31, 2012 resulted in a modified loan with a fixed interest rate Approximately $42 billion in UPB of our completed loan modifications at March 31, 2012 had provisions for reduced interest rates that remain fixed for the first five years of the modification and then increase at a rate of one percent per year (or such lesser amount as may be needed) until the interest rate has been adjusted to a market rate (determined at the time of the modification) The table below reflects only performance of completed modifications and excludes loans subject to other loss mitigation activity that were classified as TDRs.

**Table 5.5    Payment Defaults of Completed TDR Modifications, by Segment[1]**

| | Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | # o Loans | Post TDR Recorded Investment[2] | # o Loans | Post TDR Recorded Investment[2] |
| --- | --- | --- | --- | --- |
| | (in millions, except number of loans modified) | | | |
| *Single-family* | | | | |
| 20 a d 30-yea o mo e, amo z ng f xed- a e | 4,888 | $ 919 | 5,609 | $ 1,074 |
| 15-yea amo z ng f xed- a e | 232 | 24 | 194 | 21 |
| Adj s ab e- a e | 98 | 22 | 123 | 26 |
| A t-A, n e es -on y, and op on ARM | 1,048 | 278 | 1,574 | 421 |
| o a s ng e- am y | 6,266 | $ 1,243 | 7,500 | $ 1,542 |
| *Multifamily* | 1 | $ 2 | | $ |

(1) Rep ese s TDR oa s a expe e ced a paye defa d g he pe od and had comple ed a mod f ca on even du ng he yea p eced ng he paymen defau
A pay en defau occu s when a bo owe e he (a) became wo o mo e mon hs de que o ( ) co p e ed a oss eve , s c as a s o sale o fo eclosu e We on y nc ude paye en defau s fo a s ng e oan once du g each qua e ype od howeve , a s ng e loan w ll be effec ed mo e han once f he bo owe expe enced a o e pay e defau a s seque q a e
(2) Rep esen s he eco ded nves en a he end of he pe od n wh ch he oan was mod f ed and does no ep esen he eco ded nves en as of Ma ch 31, 2012

During the three months ended March 31, 2012, there were 783 loans with other loss mitigation activities (*i.e.*, repayment plan, forbearance agreement, or trial period modifications) initially classified as TDRs, with a post TDR recorded investment of $121 million that returned to a current payment status, and then subsequently became two months delinquent In addition, during the three months ended March 31, 2012, there were 1,598 loans with other loss mitigation activities initially classified as TDRs, with a post TDR recorded investment of $262 million that subsequently experienced a loss event, such as a short sale or a foreclosure transfer

### NOTE 6: REAL ESTATE OWNED

We obtain REO properties: (a) when we are the highest bidder at foreclosure sales of properties that collateralize non performing single family and multifamily mortgage loans owned by us; or (b) when a delinquent borrower chooses to transfer the mortgaged property to us in lieu of going through the foreclosure process See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for a discussion of our significant accounting policies for REO.

The table below provides a summary of the change in the carrying value of our combined single family and multifamily REO balances For the periods presented in the table below, the weighted average holding period for our disposed properties was less than one year

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                         Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 6.1    REO**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in millions) | |
| Beginning balance, REO, gross | $ 6,244 | $ 7,908 |
| Additions | 2,135 | 2,453 |
| Dispositions | (2,444) | (3,212) |
| Ending balance, REO, gross | 5,935 | 7,149 |
| Beginning balance, valuation allowance | (564) | (840) |
| Change in valuation allowance | 83 | 67 |
| Ending balance, valuation allowance | (481) | (773) |
| Ending balance, REO, net | $ 5,454 | $ 6,376 |

The REO balance, net at March 31, 2012 and December 31, 2011 associated with single family properties was $5.3 billion and $5.5 billion, respectively, and the balance associated with multifamily properties was $121 million and $133 million, respectively. The North Central region represented approximately 32% and 26% of our single family REO additions during the three months ended March 31, 2012 and 2011, respectively, based on the number of properties, and the Southeast region represented approximately 30% and 19% of our single family REO additions during these periods. Our single family REO inventory consisted of 59,307 properties and 60,535 properties at March 31, 2012 and December 31, 2011, respectively. The pace of our REO acquisitions slowed beginning in the fourth quarter of 2010 due to delays in the foreclosure process. These delays in foreclosures continued in the first quarter of 2012, particularly in states that require a judicial foreclosure process. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Seller/Servicers" for information about regional concentration of our portfolio as well as further details about delays in the single family foreclosure process.

Our REO operations expenses include REO property expenses, net losses incurred on disposition of REO properties, adjustments to the holding period allowance associated with REO properties to record them at the lower of their carrying amount or fair value less the estimated costs to sell, and recoveries from insurance and other credit enhancements. An allowance for estimated declines in the REO fair value during the period properties are held reduces the carrying value of REO property. Excluding holding period valuation adjustments, we recognized gains of $80 million and losses of $126 million on REO dispositions during the three months ended March 31, 2012 and 2011, respectively. We increased our valuation allowance for properties in our REO inventory by $2 million and $151 million during the three months ended March 31, 2012 and 2011, respectively.

REO property acquisitions that result from extinguishment of our mortgage loans held on our consolidated balance sheets are treated as non cash transfers. The amount of non cash acquisitions of REO properties during the three months ended March 31, 2012 and 2011 was $1.9 billion and $2.3 billion, respectively.

Source   DRA HOM  OAN MORTGAG CORP, 10 Q, May 03, 2012                    TREASURY-3662             Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 7: INVESTMENTS IN SECURITIES

The table below summarizes amortized cost, estimated fair  values, and corresponding gross unrealized gains and gross  unrealized losses for available for sale securities by major security type. At March 31, 2012 and December 31, 20  , all available  for sale securities are mortgage related securities

### Table 7.1    Available For Sale Securities

| March 31, 2012 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| | | | (in millions) | |
| Ava lable-fo -sale secu    es | | | | |
| F edd e Mac | $ 70,422 | $ 5,790 | $      (49) | $ 76,163 |
| Subp  me | 39,750 | 61 | (12,666) | 27,145 |
| CMBS | 51,976 | 3,477 | (700) | 54,753 |
| Op  on ARM | 8,714 | 13 | (2,909) | 5,818 |
| Al -A a  d o he | 13,243 | 104 | (2,253) | 11,094 |
| Fann e Mae | 17,648 | 1,252 | (3) | 18,897 |
| Obl ga  ons of s a es and pol  cal subd v s ons | 7,459 | 132 | (26) | 7,565 |
| Ma  fac  ed o s  g | 795 | 7 | (54) | 748 |
| G nn e Mae | 210 | 29 | | 239 |
| To al ava lable-fo -sale secu    es | $ 210,217 | $10,865 | $(18,660) | $202,422 |

| December 31, 2011 | | | | |
|---|---|---|---|---|
| Ava lable-fo -sale secu    es | | | | |
| F edd e Mac | $ 74,711 | $ 6,429 | $      (48) | $ 81,092 |
| Subp  me | 41,347 | 60 | (13,408) | 27,999 |
| CMBS | 53,637 | 2,574 | (548) | 55,663 |
| Op  on ARM | 9,019 | 15 | (3,169) | 5,865 |
| Al -A a  d o he | 13,659 | 32 | (2,812) | 10,879 |
| Fann e Mae | 19,023 | 1,303 | (4) | 20,322 |
| Obl ga  ons of s a es and pol  cal subd v s ons | 7,782 | 108 | (66) | 7,824 |
| Ma  fac  ed o s  g | 820 | 6 | (60) | 766 |
| G nn e Mae | 219 | 30 | | 249 |
| To al ava lable-fo -sale secu    es | $220,217 | $ 10,557 | $ (20,115) | $ 210,659 |

126                    *Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Available-For-Sale Securities in a Gross Unrealized Loss Position**

The table below shows the fair value of available for sale securities in a gross unrealized loss position, and whether they have been in that position less than 12 months, or 2 months or greater, including the non credit related portion of other than temporary impairments which have been recognized in AOCI

**Table 7.2    Available For Sale Securities in a Gross Unrealized Loss Position**

| March 31, 2012 | Fair Value | Other Than Temporary impairment | Temporary impairment(2) | Total | Fair Value | Other Than Temporary impairment | Temporary impairment(2) | Total | Fair Value | Other Than Temporary impairment | Temporary impairment(2) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Less than 12 Months** | **Gross Unrealized Losses** | | | **12 Months or Greater** | **Gross Unrealized Losses** | | | **Total** | **Gross Unrealized Losses** | | |
| | | | | | | (in millions) | | | | | | |
| Available for sale securities | | | | | | | | | | | | |
| Fred e Mac | $ 039 | $ — | $ (2 | $ (2 | $ 946 | $ — | $ (47 | $ (47 | $ 2 98 | $ — | $ (49 | $ (49 |
| Subprime | 36 | (4 | — | (4 | 26 86 | (10 239 | (2 23 | (12 662 | 26 90 | (10 243 | (2 23 | (2 666 |
| CMBS | 1 088 | (2 | ( 3 | (78 | 3 03 | ( 47 | (47 | (622 | 4 49 | ( 72 | ( 28 | (700 |
| Opt on ARM | 98 | (7 | — | (7 | 69 | (2 813 | (89 | (2 902 | 793 | (2 820 | (89 | (2 909 |
| Alt A and other | 27 | (27 | — | (27 | 9 230 | ( 742 | (484 | (2 226 | 9 7 7 | ( 769 | (484 | (2 2 3 |
| annie Mae | 623 | — | (2 | (2 | 0 | — | ( | ( | 633 | — | (3 | (3 |
| Obligations o states and political subdivisions | 67 | — | (4 | (4 | 722 | — | (22 | (22 | 397 | — | (26 | (26 |
| Manufactured housing | — | (4 | — | (4 | 3 3 | (4 | — | (9 | 464 | (4 | — | ( 4 |
| Total available or sale securities in a gross unrealized loss position | $ 4 97 | $ — | $ (67 | $ (6 | $ 8 22 | $ (14 982 | $ (3 0 | $ (18 32 | $ 2 21 | $ ( 049 | $ (3 6 | $ ( 8 660 |

| December 31, 2011 | Fair Value | Other Than Temporary impairment | Temporary impairment(2) | Total | Fair Value | Other Than Temporary impairment | Temporary impairment(2) | Total | Fair Value | Other Than Temporary impairment | Temporary impairment(2) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Less than 12 Months** | **Gross Unrealized Losses** | | | **12 Months or Greater** | **Gross Unrealized Losses** | | | **Total** | **Gross Unrealized Losses** | | |
| | | | | | | (in millions) | | | | | | |
| Available for sale securities | | | | | | | | | | | | |
| Fred e Mac | $ 2 96 | $ — | $ (4 | $ (4 | $ 1 88 | $ — | $ (44 | $ (44 | $ 4 080 | $ — | $ (48 | $ (48 |
| Subprime | 8 | ( | — | ( | 27 7 2 | (10 78 | (2 622 | ( 3 407 | 27 7 0 | (10 786 | (2 622 | (13 408 |
| CMBS | 997 | (20 | (4 | — | 3 73 | — | (478 | (487 | 4 70 | (29 | ( 9 | ( 8 |
| Opt on ARM | 9 | (13 | — | (13 | 7 3 | (3 067 | (478 | (31 6 | 838 | (3 080 | (89 | ( 3 69 |
| Alt A and other | 97 | ( 4 | (4 | ( 8 | 9 070 | (2 088 | (606 | (2 694 | 0 267 | (2 202 | (6 0 | (2 812 |
| annie Mae | 44 | — | (2 | (2 | 4 | — | (2 | ( | 1 1 8 | — | (4 | (4 |
| Obligations o states and political subdivisions | 292 | — | (6 | (6 | 2 1 7 | — | (60 | (60 | 2 449 | — | (66 | (66 |
| Manufactured housing | 97 | ( | — | ( | 3 | — | (44 | — | 2 | — | (49 | (60 |
| Total available or sale securities in a gross unrealized loss position | $ 6 26 | $ (1 3 | $ (7 | $ (2 0 | $ 0 28 | $ (1 993 | $ (3 912 | $ ( 9 90 | $ 6 6 | $ ( 6 46 | $ (3 969 | $ (20 11 |

(1) Rep esen s he g oss un ea zed osses fo secu es fo wh ch we have p ev ously ecogn zed o he -han- empo a y mpa men s n ea n gs
(2) Rep esen s he g oss un ea zed osses fo secu es fo wh ch we have no p ev ously ecogn zed o he -han- empo a y mpa men s n ea n gs

At March 31, 2012, total gross unrealized losses on available for sale securities were $18 7 billion The gross unrealized losses relate to 1,453 individual lots representing 1,387 separate securities, including securities with non credit related other than temporary impairments recognized in AOCI We purchase multiple lots of individual securities at different times and at different costs We determine gross unrealized gains and gross unrealized losses by specifically evaluating investment positions at the lot level; therefore, some of the lots we hold for a single security may be in an unrealized gain position while other lots for that security may be in an unrealized loss position, depending upon the amortized cost of the specific lot

**Impairment Recognition on Investments in Securities**

We recognize impairment losses on available for sale securities within our consolidated statements of comprehensive income as net impairment of available for sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other than temporary

We conduct quarterly reviews to evaluate each available for sale security that has an unrealized loss for other than temporary impairment An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis We recognize other than temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recognize only the credit component of other than temporary impairment in earnings and the amounts attributable to all other factors are recognized in AOCI The credit component represents the amount by which the present value of expected future cash flows to be collected from the security is less than the amortized cost basis of the security. The present value of expected future cash flows represents our estimate of future contractual cash flows that

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3664

Powered by Morningstar® Document Research℠

Table of Contents

we expect to collect, discounted at the effective interest rate implicit in the security at the date of acquisition or the effective interest rate determined based on significantly improved cash flows subsequent to initial impairment.

Our net impairment of available for sale securities recognized in earnings on our consolidated statements of comprehensive income for the three months ended March 31, 2012 and 2011, includes amounts related to certain securities where we have previously recognized other than temporary impairments through AOCI, but upon the recognition of additional credit losses, these amounts were reclassified out of non credit losses in AOCI and charged to earnings In certain instances, we recognized credit losses in excess of unrealized losses in AOCI

The determination of whether unrealized losses on available for sale securities are other than temporary requires significant management judgments and assumptions and consideration of numerous factors We perform an evaluation on a security by security basis considering all available information The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment Important factors include, but are not limited to:

- whether we intend to sell the security and it is not more likely than not that we will be required to sell the security before sufficient time elapses to recover all unrealized losses;

- loan level default modeling for single family residential mortgages that considers individual loan characteristics, including current LTV ratio, FICO score, and delinquency status, requires assumptions about future home prices and interest rates, and employs internal default models and prepayment assumptions. The modeling for CMBS employs third party models that require assumptions about the economic conditions in the areas surrounding each individual property; and

- security loss modeling combining the modeled performance of the underlying collateral relative to its current and projected credit enhancements to determine the expected cash flows for each evaluated security

For the majority of our available for sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other than temporary and is recorded within our consolidated statements of comprehensive income as net impairment of available for sale securities recognized in earnings

See "Table 7 2    Available For Sale Securities in a Gross Unrealized Loss Position" for the length of time our available for sale securities have been in an unrealized loss position Also see "Table 7 3    Significant Modeled Attributes for Certain Available For Sale Non Agency Mortgage-Re ated Securities" for the modeled default rates and severities that were used to determine whether our senior interests in certain non agency mortgage related securities would experience a cash shortfall.

### Freddie Mac and Fannie Mae Securities

We record the purchase of mortgage related securities issued by Fannie Mae as investments in securities in accordance with the accounting guidance for investments in debt and equity securities In contrast, our purchase of mortgage related securities that we issued (*e.g.*, PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions) is recorded as either investments in securities or extinguishment of debt securities of consolidated trusts depending on the nature of the mortgage related security that we purchase See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES    Securitization Activities through Issuances of Freddie Mac Mortgage Related Securities" in our 2011 Annual Report for additional information

We hold these investments in securities that are in an unrealized loss position at least to recovery and typically to maturity. As the principal and interest on these securities are guaranteed and we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses, we consider these unrealized losses to be temporary

### Non Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans

We believe the unrealized losses on the non agency mortgage related securities we hold are a result of poor underlying collateral performance, limited liquidity, and large risk premiums. We consider securities to be other than temporarily impaired when future credit losses are deemed likely.

Our review of the securities backed by subprime, option ARM, and Alt A and other loans includes loan level default modeling and analyses of the individual securities based on underlying collateral performance, including the collectability of amounts from bond insurers. In the case of bond insurers, we also consider factors such as the availability of capital,

TREASURY-3665

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

generation of new business, pending regulatory action, credit ratings, security prices, and credit default swap levels traded on the insurers. We consider loan level information including estimated current LTV ratios, FICO scores, and other loan level characteristics  We also consider the differences between the loan level characteristics of the performing and non performing  loan populations  For additional information regarding bond insurers, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS      Bond Insurers."

The table below presents the modeled default rates and  severities, without regard to subordination, that are used to  determine whether our senior interests in certain available for sale non agency mortgage related securities will  experience a cash shortfall  Our proprietary default model incorporates assumptions about future home prices, as defaults  and severities are modeled at the loan level and then  aggregated  The model uses projections of future home prices at the state level  Assumptions about voluntary prepayment rates  are also an input to the model and are discussed below

**Table 7.3     Significant Modeled Attributes for Certain Available For Sale Non Agency Mortgage Related Securities**

| | March 31, 2012 | | | | |
| | Subprime First Lien(2) | Option ARM | Alt-A(1) | | |
| | | | Fixed Rate | Variable Rate | Hybrid Rate |
| Issuance Date | | | (dollars in millions) | | |
| **2004 and prior** | | | | | |
| UPB | $   1,191 | $    114 | $   830 | $   499 | $ 2,155 |
| Weighted average collateral default rates(3 | 35% | 37% | 9% | 49% | 29% |
| Weighted average collateral severities( | 55% | 50% | 43% | 48% | 38% |
| Weighted average voluntary prepayment rates( | 5% | 7% | 17% | 7% | 8% |
| Average credit enhancement(6 | 43% | 13% | 14% | 18% | 15% |
| **2005** | | | | | |
| UPB | $   5,959 | $  2,795 | $ 1,169 | $   816 | $ 3,870 |
| Weighted average collateral default rates(3 | 57% | 54% | 25% | 59% | 43% |
| Weighted average collateral severities( | 66% | 58% | 51% | 54% | 46% |
| Weighted average voluntary prepayment rates( | 4% | 6% | 12% | 6% | 7% |
| Average credit enhancement(6 | 52% | 11% | 2% | 25% | 5% |
| **2006** | | | | | |
| UPB | $ 19,393 | $  6,432 | $   529 | $ 1,082 | $ 1,152 |
| Weighted average collateral default rates(3 | 67% | 67% | 38% | 66% | 56% |
| Weighted average collateral severities( | 71% | 64% | 57% | 62% | 53% |
| Weighted average voluntary prepayment rates( | 5% | 5% | 12% | 7% | 6% |
| Average credit enhancement(6 | 14% | 1% | 6% | (2)% | % |
| **2007** | | | | | |
| UPB | $ 20,935 | $  4,167 | $   156 | $ 1,319 | $   308 |
| Weighted average collateral default rates(3 | 65% | 57% | 53% | 63% | 65% |
| Weighted average collateral severities( | 72% | 62% | 65% | 62% | 62% |
| Weighted average voluntary prepayment rates( | 5% | 6% | 10% | 8% | 6% |
| Average credit enhancement(6 | 16% | 10% | 10% | (8)% | % |
| **Total** | | | | | |
| UPB | $ 47,478 | $13,508 | $2,684 | $ 3,716 | $7,485 |
| Weighted average collateral default rates(3 | 64% | 61% | 24% | 61% | 42% |
| Weighted average collateral severities( | 71% | 62% | 53% | 59% | 47% |
| Weighted average voluntary prepayment rates( | 5% | 6% | 14% | 7% | 7% |
| Average credit enhancement(6 | 20% | 6% | 6% | 7% | 7% |

(1) Excludes non-agency mortgage- related securities backed by other loans, which change primarily composed of securities backed by home equity lines of credit
(2) Excludes non-agency mortgage- related securities backed exclusively by subprime second liens  Certain securities identified as subprime first liens may be backed in part by subprime second lien loans, as the underlying loans of these securities were represented to include a small percentage of subprime second lien loans
(3) The expected cumulative default rate expressed as a percentage of current collateral at the UPB
(4) The expected average loss given default calculated as the ratio of cumulative loss over cumulative default for each security
(5) The security's voluntary prepayment rate as a percentage of the month ly voluntary prepayment rate weighted by the security's outstanding UPB
(6) Reflects the ratio of the current enhancing payment amount of the security expressed as a way to absorb losses  that occurs before any losses are allocated to securities that we own  Percentage generally calculated based on (a) the current UPB of securities that are subordinate to us, plus (b) any UPB of securities that are more senior, divided by (c) the total UPB of all of the securities that are issued by the trust (excluding non bond balances)  Only includes credit enhancement provided by subordinated securities and excludes credit enhancement provided by bond insurance, over collateralization and other forms of credit enhancement  Negative values are shown when collateral losses have yet to be applied to the tranches exceed the remaining credit enhancement, if any

In evaluating the non agency mortgage related securities backed by subprime, option ARM, and Alt A and other loans for other than temporary impairment, we noted that the percentage of securities that were AAA rated and the percentage that were investment grade declined significantly since acquisition  While these ratings have declined, the  ratings themselves are not determinative that a loss is more or  less likely. While we consider credit ratings in our analysis, we believe that our detailed security by security analyses provide a more consistent view of the ultimate collectability of contractual amounts due to us

Source    D RA  HOM    OAN MORTGAG  CORP, 10 Q, May 03, 2012                                      TREASURY-3666                                      Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our analysis is subject to change as new information regarding delinquencies, severities, loss timing, prepayments, and other factors becomes available  While it is reasonably possible that, under certain conditions, collateral losses on our remaining available for sale securities for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of March 31, 2012.

### Commercial Mortgage-Backed Securities

CMBS are exposed to stresses in the commercial real estate market  We use external models to identify securities that may have an increased risk of failing to make their contractual payments. We then perform an analysis of the underlying collateral on a security by security basis to determine whether we will receive all of the contractual payments due to us. While it is reasonably possible that, under certain conditions, collateral losses on our CMBS for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of March 31, 2012  We do not intend to sell the remaining CMBS and it is not more likely than not that we will be required to sell such securities before recovery of the unrealized losses

### Obligations of States and Political Subdivisions

These investments consist of housing revenue bonds  We believe the unrealized losses on obligations of states and political subdivisions are primarily a result of movements in interest rates and liquidity and risk premiums. We have determined that the impairment of these securities is temporary based on our conclusion that we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses  We believe that any credit risk related to these securities is minimal because of the issuer guarantees provided on these securities

### Bond Insurance

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our non agency mortgage-re ated securities. Circumstances in which it is likely a principal and interest shortfall will occur and there is substantial uncertainty surrounding a bond insurer's ability to pay all future claims can give rise to recognition of other than temporary impairment recognized in earnings  See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS     Bond Insurers" for additional information.

### Other Than Temporary Impairments on Available for Sale Securities

The table below summarizes our net impairments of available for sale securities recognized in earnings by security type

**Table 7.4    Net Impairment of Available For Sale Securities Recognized in Earnings**

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings For the Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2012 | | 2011 | |
| | (in millions) | | | |
| Ava lable-fo -sale secu es | | | | |
| Subp me | $ | (441) | $ | (734) |
| Op on ARM | | (48) | | (281) |
| Al -A a d o he | | (57) | | (40) |
| CMBS | | (16) | | (135) |
| Ma fac ed o s g | | (2) | | (3) |
| To al o he - han- empo a y mpa men s on ava lab e-fo -sale secu es | $ | (564) | $ | (1,193) |

The table below presents the changes in the unrealized credit related other than temporary impairment component of the amortized cost related to available for sale securities: (a) that we have written down for other than temporary impairment; and (b) for which the credit component of the loss is recognized in earnings  The credit related other than temporary impairment component of the amortized cost represents the difference between the present value of expected future cash flows, including the estimated proceeds from bond insurance, and the amortized cost basis of the security prior to considering credit losses  The beginning balance represents the other than temporary impairment credit loss component related to available for sale securities for which other than temporary impairment occurred prior to January 1, 2012, but will not be realized until the securities are sold, written off, or mature  Net impairment of available for sale securities recognized in earnings is presented as additions in two components based upon whether the current period is: (a) the first

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                      Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

time the debt security was credit impaired; or (b) not the  first time the debt security was credit impaired  The credit  loss component is reduced if we sell, intend to sell or believe we will be required to sell previously credit impaired available for sale securities  Additionally, the credit loss component is reduced by the amortization resulting from  significant increases in cash flows expected to be collected  that are recognized over the remaining life of the security

## Table 7.5    Other Than Temporary Impairments Related to Credit Losses on  Available For Sale Securities

|  | Three Months  nded March 31, 2012 |
| --- | --- |
|  | (in millions) |
| C ed  -ela ed o he - han- empo a y  mpa  men s on ava lable-fo -sale secu   es  ecogn zed  n ea n ngs |  |
| Beg nn ng balance   ema n ng c ed   losses o be  eal zed on ava lable-fo -sale secu  es held a   he beg nn ng of  he pe  od whe e o he - han-empo a y  mpa  men s we e  ecogn zed  n ea n ngs | $      15,988 |
| Add  ons |  |
| Amoun s e a ed  o c ed   osses fo  wh ch an o he - han- empo a y  mpa  men  was no  p ev ously  ecogn zed | 13 |
| Amoun s e a ed  o c ed   osses fo  wh ch an o he - han- empo a y  mpa  men  was p ev ously  ecogn zed | 551 |
| Red c o s |  |
| A  oun s e a ed o secu   es wh ch we e so d, w   en off o  ma u ed | (272) |
| Amoun s p ev ously  ecogn zed  n o he  comp ehens ve  ncome ha  we e  ecogn zed  n ea n ngs because we  n end o se   he secu  y o   s  mo e  ke y han no  ha we w   be  equ ed o sell he secu   y befo e  ecove y of  s amo  zed cos bas s | (14) |
| Amoun s  ela ed o amo   za on  esul ng f om s gn f can   nc eases n cash f ows expec ed o be co ec ed ha a e  ecogn zed ove   he  ema n ng   fe of  he secu   y | (52) |
| End ng balance    ema n ng c ed   losses o be  eal zed on ava lable-fo -sale secu  es held a  pe  od end whe e o he - han- empo a y  mpa  men s   we e  ecogn zed  n ea n ngs | $      16,214 |

## Realized Gains and Losses on Sales of Available For Sale Securities

The table below illustrates the gross realized gains and gross  realized losses received from the sale of available for sale  securities

## Table 7.6    Gross Realized Gains and Gross Realized Losses on Sales of  Available For Sale Securities

|  | Three Months  nded March 31, | |
| --- | --- | --- |
|  | 2012 | 2011 |
|  | (in millions) | |
| **Gross rea  zed ga ns** |  |  |
| Mo  gage- ela ed secu    es |  |  |
| F edd e Mac | $ | $      77 |
| Fann e Mae | 12 |  |
| CMBS | 76 |  |
| Obl ga  ons of s a es and pol   cal subd v s ons | 1 | 1 |
| To al mo  gage- ela ed secu    es g oss  eal zed ga ns | 89 | 78 |
| Non-mo  gage- ela ed secu   es |  |  |
| Asse -backed secu    es |  | 2 |
| To al non-mo  gage- ela ed secu   es g oss  eal zed ga ns |  | 2 |
| G oss  eal zed ga ns | 89 | 80 |
| **Gross realized losses** |  |  |
| G oss  eal zed losses |  |  |
| Ne   eal zed ga ns (losses) | $   89 | $   80 |

## Maturities of Available For Sale Securities

The table below summarizes the remaining contractual maturities  of available for sale securities

## Table 7.7    Maturities of Available For Sale Securities[1]

| March 31, 2012 | Amortized Cost | Fair Value |
| --- | --- | --- |
|  | (in millions) | |
| Ava lable-fo -sale secu   es |  |  |
| Due w h n 1 yea  o   ess | $      37 | $      37 |
| D e af e 1   o  g 5 yea s | 2,174 | 2,286 |
| D e af e 5   o  g 10 yea s | 3,746 | 3,961 |
| Due af e 10 yea s | 204,260 | 196,138 |
| To al ava lable-fo -sale secu    es | $ 210,217 | $202,422 |

(1) Ma u   y  nfo ma on p ov ded s based on con  ac ua  ma u   es, wh ch may no   ep esen  expec ed   fe as ob  ga  ons unde  y ng  hese secu    es   ay be p epa d a   any     e w hou  pena  y

131

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### AOCI Related to Available For Sale Securities

The table below presents the changes in AOCI related to available for sale securities  The net unrealized holding gains  represent the net fair value adjustments recorded on available for sale securities throughout the periods presented,  after the effects of our federal statutory tax rate of 35%. The net reclassification adjustment for net realized losses  represents the amount of those fair value adjustments, after the  effects of our federal statutory tax rate of 35%, that have been  recognized in earnings due to a sale of an available for sale  security or the recognition of an impairment loss.

**Table 7.8     AOCI Related to Available  For Sale Securities**

| | Three Months  nded March 31, | |
| | 2012 | 2011 |
| | (in millions) | |
| Beg nn ng balance | $(6,213) | $(9,678) |
| Ne  unreal zed hold ng  ga ns[1] | 838 | 1,216 |
| Ne   eclass f ca on ad us men  fo ne  eal zed  losses[2,3] | 309 | 725 |
| End ng balance | $(5,066) | $(7,737) |

(1) Ne  of  ax expense of $451 m ll on and $655 m ll on fo    e    ee o   s e ded Ma c  31, 2012 a d 2011,  espec vely
(2) Ne  of  ax benef  of $166 m ll on and $390 m ll on fo    e    ee o   s e ded Ma c  31, 2012 a d 2011,  espec vely
(3) Inc udes  he  eve sa of p ev ous y  eco ded un ea zed  osses  ha have been  ecogn zed on ou  conso  da ed s a emen s of comp ehens ve  ncome as  mpa  men  osses
    on ava  ab e-fo -sa e secu  es of $367 m  on and $775 m   on, ne of  axes, fo    e    ee o   s e ded Ma c  31, 2012 a d 2011,  espec vely

### Trading Securities

The table below summarizes the estimated fair values by major  security type for trading securities

**Table 7.9     Trading Securities**

| | March 31, 2012 | December 31, 2011 |
| | (in millions) | |
| Mo  gage- ela ed secu     es | | |
| F  edd e Mac | $      14,504 | $      16,047 |
| Fann e Mae | 13,692 | 15,165 |
| G nn e Mae | 151 | 156 |
| O  he | 153 | 164 |
| To al mo  gage- ela ed secu    es | 28,500 | 31,532 |
| Non-mo  gage- ela ed secu    es | | |
| Asse -backed secu    es | 695 | 302 |
| T easu y b  s | 3,000 | 100 |
| T eas  y  o es | 23,164 | 24,712 |
| FDIC-gua an eed co po a e med um- e m no es | 2,960 | 2,184 |
| To al non-mo  gage- ela ed secu    es | 29,819 | 27,298 |
| To al fa   value of  ad ng secu    es | $      58,319 | $      58,830 |

Trading securities mainly include Treasury securities, agency  fixed rate and variable rate pass through mortgage related  securities, and agency REMICs, including inverse floating rate,  interest only and principal only securities  With the exception of principal only securities, our agency securities, classified as trading, were at a net premium (i.e., have higher net fair value than UPB) as of March 31, 2012.

For the three months ended March 31, 2012 and 2011,  we recorded net unrealized losses on trading securities held at  those dates of $0.4 billion and $0.2 billion,  respectively

Total trading securities include $1.7 billion and $1.9 billion, respectively, of hybrid financial assets as  defined by the derivative and hedging accounting guidance regarding certain hybrid financial instruments as of March 31, 2012 and December 31, 2011. Gains (losses)  on trading securities on our consolidated statements of  comprehensive income include losses of $51 million and  $41 million, respectively, related to these hybrid financial securities for the three months ended March 31,  2012 and 2011.

### Collateral Pledged

#### *Collateral Pledged to Freddie Mac*

Our counterparties are required to pledge collateral for  securities purchased under agreements to resell transactions,  and most derivative instruments are subject to collateral  posting thresholds generally related to a counterparty's  credit rating  We consider the types of securities being pledged to us as collateral when determining how much we lend related to  securities purchased under agreements to resell transactions Additionally, we subsequently and regularly review the

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3669

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

market values of these securities compared to amounts loaned in an effort to minimize our exposure to losses  We had cash and cash equivalents pledged to us related to derivative instruments of $2.3 billion and $3.2 billion at March 31, 2012 and December 31, 2011, respectively. Although it is our practice not to repledge assets held as collateral, a portion of the collateral may be repledged based on master agreements related to our derivative instruments  At March 31, 2012 and December 31, 2011, we did not have collateral in the form of securities pledged to and held by us under these master agreements  Also at March 31, 2012 and December 31, 2011, we did not have securities pledged to us for securities purchased under agreements to resell transactions  that we had the right to repledge  From time to time we may  obtain pledges of collateral from certain seller/servicers as additional security for their obligations to us, including their  obligations to repurchase mortgages sold to us in breach of representations and warranties. This collateral may take the  form of cash, cash equivalents, or agency securities.

In addition, we hold cash and cash equivalents as collateral in connection with certain of our multifamily guarantees and mortgage loans as credit enhancements. The cash and cash equivalents held as collateral related to these transactions at March 31, 2012 and December 31, 2011 was $258 million and $246 million, respectively.

### *Collateral Pledged by Freddie Mac*

We are required to pledge collateral for margin requirements with third party custodians in connection with secured financings and derivative transactions with some counterparties  The level of collateral pledged related to our derivative instruments is determined after giving consideration to our credit rating. As of March 31, 2012, we had one secured, uncommitted intraday line of credit with a third party in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs, in connection with our use of the Fedwire system  In certain circumstances, the line of credit agreement gives the secured party the right to repledge the securities underlying our financing to other third parties, including the Federal Reserve Bank  We pledge collateral to meet our collateral requirements under the line of credit agreement upon demand by the counterparty

The table below summarizes all securities pledged as collateral by us, including assets that the secured party may repledge and those that may not be repledged

### Table 7.10    Collateral in the Form of Securities Pledged

|  | March 31, 2012 | December 31, 2011 |
|---|---|---|
|  | (in millions) | |
| Sec   es pledged w   e ab  y fo  e sec  ed pa y o  epledge | | |
| Deb  sec   es of co  so  da ed  s s  ed by   d pa  es(1 | $  10,373 | $  10,293 |
| Ava lable-fo  -sale secu   es | 187 | 204 |
| Sec   es pledged w  o  e ab  y fo  e sec  y o  epledge | | |
| Deb  sec   es of co  so  da ed  s s  ed by   d pa  es(1 | 90 | 8 8 |
| To al secu   es pledged | $  10,650 | $  10,585 |

(1) Rep esen s PCs he d by us n o  Inves  en s seg en   o gage  nves men s po  fo io and pledged as colla e al wh ch a e  eco ded as a  educ on on deb  secu    es of consol da ed   s s   ed by   d pa es o o  co  so da ed ba a ces hee s

### *Securities Pledged with the Ability of the Secured Party to Repledge*

At March 31, 2012, we pledged securities with the ability of the secured party to repledge of $10 6 billion, of which  $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

At December 3 , 20   , we pledged securities with the ability of the secured party to repledge of $10 5 billion, of which $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

The remaining $42 million and $25 million of collateral posted with the ability of the secured party to repledge at March 31, 2012 and December 31, 2011, respectively, was posted in connection with our margin account related to futures transactions

### *Securities Pledged without the Ability of the Secured Party to Repledge*

At March 31, 2012 and December 31, 2011, we pledged securities, without the ability of the secured party to repledge, of $90 million and $88 million, respectively, at a clearinghouse in connection with the trading and settlement of securities

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3670

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Collateral in the Form of Cash Pledged*

At March 31, 2012, we pledged $11.7 billion of collateral in the form of cash and cash equivalents, of which $11.5 billion related to our derivative agreements as we had $11.5 billion of such derivatives in a net loss position  At December 3 , 20  , we pledged $12.7 billion of collateral in the form of cash and cash  equivalents, of which $12.6 billion related to our  derivative agreements as we had $12.7 billion of such derivatives in a net loss position  The remaining $192 million and $133 million was posted at  clearinghouses in connection with our securities transactions at March 31, 2012 and December 31, 2011, respectively.

### NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS

Debt securities that we issue are classified on our consolidated  balance sheets as either debt securities of consolidated trusts  held by third parties or other debt  We issue other debt to fund our operations

Under the Purchase Agreement, without the prior written consent  of Treasury, we may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding  20% of the amount of mortgage assets we are allowed to own on December  3  of the immediately preceding calendar year  Because of this debt limit, we may be restricted in the amount of debt we are  allowed to issue to fund our operations  Under the Purchase Agreement, the amount of our "indebtedness" is  determined without giving effect to the January  , 20  0  change in the accounting guidance related to transfers of  financial assets and consolidation of VIEs. Therefore,  "indebtedness" does not include debt securities of consolidated trusts held by third parties  We also cannot become liable for any subordinated indebtedness without the prior  consent of Treasury.

Our debt cap under the Purchase Agreement is $874 8 billion  in 2012 and will decline to $787.3 billion on January 1, 2013. As of March 31, 2012, we estimate that the par value of our aggregate indebtedness totaled  $629.3 billion, which was approximately $245.5 billion below the applicable debt cap  Our aggregate indebtedness is  calculated as the par value of other debt

In the tables below, the categories of short term debt (due  within one year) and long term debt (due after one year) are  based on the original contractual maturity of the debt instruments classified as other debt.

The table below summarizes the interest expense and the balances  of total debt, net per our consolidated balance sheets

### Table 8.1    Total Debt, Net

| | Interest expense for the Three Months Ended March 31, | | Balance, Net[1] | |
| | 2012 | 2011 | March 31, 2012 | December 31, 2011 |
| | (in millions) | | (in millions) | |
| Other debt | | | | |
| Short-term debt | $ 40 | $ 115 | $ 134,825 | $ 161,399 |
| Long-term debt | | | | |
| Senior debt | 2,769 | 3,438 | 483,432 | 498,779 |
| Subordinated debt | 7 | 12 | 372 | 368 |
| Total long-term debt | 2,776 | 3,450 | 483,804 | 499,147 |
| Total other debt | 2,816 | 3,565 | 618,629 | 660,546 |
| Debt securities of consolidated trusts held by  third parties | 15,253 | 17,403 | 1,481,622 | 1,471,437 |
| Total debt, net | $ 18,069 | $ 20,968 | $ 2,100,251 | $ 2,131,983 |

(1) Represents par value, net of associated discounts, premiums, and hedge-related basis adjustments, which  $0 and $0 2 b llion , respectively, of other long-term debt are  represented at fair value  debt securities of a fair value option on recorded a  March 31, 2012 and December 31, 2011

During the three months ended March 31, 2012 and 2011, we  recognized fair value gains (losses) of $(17) million and  $(81) million, respectively, on our foreign currency denominated debt, of which $(19) million and  $(117) million, respectively, are gains (losses) related to our net foreign currency translation

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Other Debt**

The table below summarizes the balances and effective interest rates for other debt  We had no balances in federal funds purchased and securities sold under agreements to repurchase at  either March 31, 2012 or December 31, 2011

**Table 8.2    Other Debt**

| | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Par Value | Balance, Net(1) | Weighted Average ffective Rate(2) | Par Value | Balance, Net(1) | Weighted Average ffective Rate(2) |
| | | | (dollars in millions) | | | |
| O he  sho  - e m deb | | | | | | |
| Refe ence B  s® sec   es a d d sco    o es | $134,865 | $  134,825 | 0 12% | $ 161,193 | $  161,149 | 0 11% |
| Med um- e m no es | | | | 250 | 250 | 0 24 |
| To al o he  sho  - e m deb | 134,865 | 134,825 | 0 12 | 161,443 | 161,399 | 0 11 |
| O he  long - e m deb | | | | | | |
| O  g nal ma u   es on o  befo e Decembe  31, | | | | | | |
| 2012 | 88,192 | 88,185 | 1 73% | 127,798 | 127,776 | 1 79% |
| 2013 | 126,809 | 126,659 | 1 57 | 142,943 | 142,759 | 1 46 |
| 2014 | 93,956 | 93,780 | 1 76 | 87,453 | 87,267 | 1 91 |
| 2015 | 44,395 | 44,356 | 2 28 | 33,897 | 33,870 | 2 89 |
| 2016 | 44,546 | 44,502 | 3 09 | 45,526 | 45,473 | 3 21 |
| The eaf e | 96,557 | 86,322 | 3 64 | 75,254 | 62,002 | 4 58 |
| To a o he  ong - e m de  (3 | 494,455 | 483,804 | 2 21 | 512,871 | 499,147 | 2 27 |
| To al o he  deb | $ 629,320 | $  618,629 | | $ 674,314 | $  660,546 | |

(1) Rep esen s pa  va ue, ne  of assoc a ed d scoun s o p e  u  s and hedge- e a ed bas s adjus   en s

(2) Rep esen s he we gh ed ave age effec ve a  e ha   ema ns co s a  ove    e feof e  es    e , w c  c  des  e amo   za on of d scoun s o p em ums, ss  a ce costs, a d hedge- e a ed bas s ad us   en s

(3) Ba ance, ne  fo  o he   long - e m deb  nc udes ca  ab e deb  of $112 3 b   on and $121 4 b   on a  Ma ch 31, 2012 and Decembe  31, 2011,  espec  ve y

**Debt Securities of Consolidated Trusts Held by Third Parties**

Debt securities of consolidated trusts held by third parties  represents our liability to third parties that hold beneficial  interests in our consolidated securitization trusts (*i.e.*,  single family PC trusts and certain Other  Guarantee Transactions).

The table below summarizes the debt securities of consolidated  trusts held by third parties based on underlying mortgage  product type.

**Table 8.3    Debt Securities of Consolidated Trusts Held by Third Parties(1)**

| | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Contractual Maturity(2) | UPB | Balance, Net(3) | Weighted Average Coupon(2) | Contractual Maturity(2) | UPB | Balance, Net(3) | Weighted Average Coupon(2) |
| | | (dollars in millions) | | | | | | |
| S ng e-fam  y | | | | | | | | |
| 30-yea  o  mo e, f xed- a e | 2012 - 2048 | $1,027,889 | $1,042,879 | 4 83% | 2012 - 2048 | $ 1,034,680 | $1,047,556 | 4 92% |
| 20-yea  f xed- a e | 2012 - 2032 | 71,142 | 72,637 | 4 40 | 2012 - 2032 | 67,323 | 68,502 | 4 53 |
| 15-yea  f xed- a e | 2012 - 2027 | 253,146 | 257,850 | 3 94 | 2012 - 2027 | 242,077 | 246,023 | 4 09 |
| Adj s ab e- a e | 2012 - 2047 | 62,430 | 63,397 | 3 10 | 2012 - 2047 | 60,544 | 61,395 | 3 18 |
| In e es -only( | 2026 - 2041 | 42,803 | 42,874 | 4 79 | 2026 - 2041 | 45,807 | 45,884 | 4 91 |
| FHA/VA | 2012 - 2041 | 1,955 | 1,985 | 5 66 | 2012 - 2041 | 2,045 | 2,077 | 5 67 |
| To al deb  secu   es of consol da ed  t sts  ed  y t d pa es( | | $1,459,365 | $1,481,622 | | | $1,452,476 | $1,471,437 | |

(1) Deb  sec    es of conso  da ed    d  pa es a e p epayab e w  hou  pena  y

(2) Based o   e co  ac  a    a  y a d  es   e of deb  sec    es of o  co so da ed    s ed by    d  pa es

(3) Rep ese  s pa  va ue, ne  of d scoun  s, p e   s, a d o e  bas s adjus   en s

(4) Includes  n e es -only secu    es and  n e es -only mo  gage  oans ha  a ow he bo  owe s o pay on y  n e es  fo  a f xed pe od of   me befo e  he loan begn  o  amor  ze

(5) The effec  ve  a e fo  deb  secu    es of conso da ed   us   ed  y    d pa es was 4 04% a d 4 22% as of Ma c  31,  2012 and Decembe  31, 2011,  espec  ve y

**Lines of Credit**

At both March 31, 2012 and December 31, 2011, we had  one secured, uncommitted intraday line of credit with a third  party totaling $10 billion  We use this line of credit regularly to provide us with additional liquidity to fund our  intraday payment activities through the Fedwire system in connection with the Federal Reserve's payments system risk

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3672

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

policy, which restricts or eliminates daylight overdrafts by the GSEs. No amounts were drawn on this line of credit at March 31, 2012 or December 3 , 20    We expect to continue to use the current facility to satisfy our intraday financing needs; however, as the line is uncommitted, we may not be able to draw on it if and when needed

**Subordinated Debt Interest and Principal Payments**

The terms of certain of our subordinated debt securities provide for us to defer payments of interest in the event we fail to maintain specified capital levels However, in a September 23, 2008 statement concerning the conservatorship, the Director of FHFA stated that we would continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels

### NOTE 9: FINANCIAL GUARANTEES

When we securitize single family mortgages that we purchase, we issue mortgage related securities that can be sold to investors or held by us. During the three months ended March 31, 2012 and 2011, we issued and guaranteed $108.3 billion and $93.9 billion, respectively, in UPB of Freddie Mac mortgage related securities backed by single family mortgage loans (excluding those backed by HFA bonds)

Beginning January , 20 0, we no longer recognize a financial guarantee for such arrangements as we instead recognize both the mortgage loans and the debt securities of these securitization trusts on our consolidated balance sheets The table below presents our maximum potential exposure, our recognized liability, and the maximum remaining term of our financial guarantees that are not consolidated on our balance sheets

**Table 9.1    Financial Guarantees**

| | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Maximum Exposure(1) | Recognized Liability | Maximum Remaining Term | Maximum Exposure(1) | Recognized Liability | Maximum Remaining Term |
| | | | (dollars in millions, unless otherwise noted) | | | |
| Non-consol da ed F edd e Mac secu   es(2 | $38,572 | $ 321 | 41 | $35,879 | $ 300 | 42 |
| O he  gua an ee comm  men s(3 | 22,354 | 493 | 37 | 21,064 | 487 | 37 |
| De  va ve ns umen s | 19,998 | 931 | 33 | 37,737 | 2,977 | 34 |
| Se v c ng- ela ed p em um gua an ees | 160 | | 5 | 151 | | 5 |

(1) Max   u   exposu e ep esen s he con ac ua a  oun s ha  cou d be  unde  he non-conso da ed gua an ees f coun e pa  es o bo  owe s defau ed, w  ou  cons de a  on of poss ble  ecove es unde c ed  enhance en a  ange  en s, such as  ecou se p ov s ons, h d-pa y  nsu ance con ac s, o f co  a e a  he d o  pledged  The max mum exposu e d sclosed above s no  ep esen a ve of  eac a  oss we a e key o  nc  , based on ou  h s o  ca  oss expe  ence and a f  e  cons de a  on of p oceeds f om  ela ed colla e a l qu da on  The max mum exposu e fo  ou  qu d y gua an ees s no   u ua y exc us ve of ou  defau  gua an ees on  e sa  e secu    es   e efo e, hese amoun s a e nc uded w  h n he max mum exposu e of non-conso da ed F edd e Mac secu   es and o he  gua an ee  comm  men s

(2) As of Ma c  31, 2012 a d Dece  be  31, 2011,  e UPB of non-conso da ed F edd e Mac secu    es assoc a ed w  h s ng e-fam y mo gage oans was $10 4 b  on a d $10 7 b ll on, espec vely  The ema n ng balances ela e o mul  fam ly mo gage oans

(3) As of Ma c  31, 2012 a d Dece  be  31, 2011,  e UPB of o he  gua an ee comm  men s assoc a ed w  h s ng le-fam ly  mo gage loans was $12 5 b ll on and  $11 1 b   on, espec vely  The ema n ng balances ela e o mul  fam ly mo gage oans

**Non-Consolidated Freddie Mac Securities**

We issue three types of mortgage related securities: (a) PCs; (b) REMICs and Other Structured Securities; and (c) Other Guarantee Transactions We guarantee the payment of principal and interest on these securities, which are backed by pools of mortgage loans, irrespective of the cash flows received from the borrowers Commencing January 1, 2010, only our guarantees issued to non consolidated securitization trusts are accounted for in accordance with the accounting guidance for guarantees (*i.e.*, a guarantee asset and guarantee obligation are recognized)

Our single family securities issued in resecuritizations of our PCs and other previously issued REMICs and Other Structured Securities are not consolidated as they do not give rise to any additional exposure to credit loss as we already consolidate the underlying collateral The securities issued in these resecuritizations consist of single class and multiclass securities backed by PCs, REMICs, interest only strips, and principal only strips Since these resecuritizations do not increase our credit risk, no guarantee asset or guarantee obligation is recognized for these transactions and they are excluded from the table above

We recognize a guarantee asset, guarantee obligation and a reserve for guarantee losses, as necessary, for securities issued by non consolidated securitization trusts and other guarantee commitments for which we are exposed to incremental credit risk Our guarantee obligation represents the recognized liability, net of cumulative amortization, associated with our guarantee of multifamily PCs and certain Other Guarantee Transactions issued to non consolidated securitization trusts. In addition to our guarantee obligation, we recognize a reserve for guarantee losses, which is included within other liabilities on our consolidated balance sheets, which totaled $0.2 billion at both March 31, 2012 and

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                    TREASURY-3673                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

December 31, 2011  For many of the loans underlying our  non consolidated guarantees, there are credit protections from  third parties, including subordination, covering a portion of our  exposure. See "NOTE 4: MORTGAGE LOANS AND LOAN  LOSS RESERVES" for information about credit protections on loans we guarantee  See "NOTE 1: SUMMARY OF  SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for further information about our accounting for financial  guarantees

During the three months ended March 31, 2012 and 2011, we  issued approximately $3.1 billion and $2.9 billion,  respectively, in UPB of non consolidated Freddie Mac securities  primarily backed by multifamily mortgage loans, for which a  guarantee asset and guarantee obligation were recognized

In connection with transfers of financial assets to  non consolidated securitization trusts that are accounted for as  sales and for which we have incremental credit risk, we recognize our guarantee obligation in accordance with the  accounting guidance for guarantees  Additionally, we may retain an interest in the transferred financial assets ( *e.g.*, a beneficial interest issued by the securitization trust)

### Other Guarantee Commitments

We provide long term standby commitments to certain of our  customers, which obligate us to purchase seriously delinquent  loans that are covered by those agreements  During the three  months ended March 31, 2012 and 2011, we issued and  guaranteed $2.3 billion and $1.8 billion, respectively, in UPB of long term standby commitments  These other guarantee commitments totaled $  0 3 billion and $8.6 billion of UPB at March 31, 2012 and  December 31, 2011, respectively  We also had other guarantee commitments on multifamily housing revenue bonds that  were issued by HFAs of $9.6 billion in UPB at March 31, 2012  and December 31, 2011. In addition, as of March 31, 2012, and December 31, 2011,  respectively, we had issued guarantees under the TCLFP on  securities backed by HFA bonds with UPB of $2.5 billion, and $2.9 billion, respectively.

### Derivative Instruments

Derivative instruments include written options, written  swaptions, interest rate swap guarantees, and short term default  guarantee commitments accounted for as credit derivatives  See  "NOTE 10: DERIVATIVES" for further discussion of these  derivative guarantees

We guarantee the performance of interest rate swap contracts in two circumstances  First, we guarantee that a borrower will  perform under an interest rate swap contract linked to a  borrower's ARM  And second, in connection with our issuance  of certain REMICs and Other Structured Securities, which are  backed by tax exempt bonds, we guarantee that the sponsor of the  transaction will perform under the interest rate swap contract linked to the senior variable rate certificates that we issued

We also have issued REMICs and Other Structured Securities with  stated final maturities that are shorter than the stated  maturity of the underlying mortgage loans  If the underlying  mortgage loans to these securities have not been purchased by a  third party or fully matured as of the stated final maturity date of such securities, we will sponsor an auction of the  underlying assets  To the extent that purchase or auction proceeds are insufficient to cover unpaid principal amounts due  to investors in such REMICs and Other Structured Securities, we  are obligated to fund such principal. Our maximum exposure on  these guarantees represents the outstanding UPB of the REMICs  and Other Structured Securities subject to stated final  maturities

### Servicing Related Premium Guarantees

We provide guarantees to reimburse servicers for premiums paid  to acquire servicing in situations where the original seller is  unable to perform under its separate servicing agreement  The  liability associated with these agreements was not material at  March 31, 2012 and December 31, 2011

### Other Indemnifications

In connection with certain business transactions, we may provide  indemnification to counterparties for claims arising out of  breaches of certain obligations ( *e.g.*, those arising from representations and  warranties) in contracts entered into in the  normal course of business. Our assessment is that the risk of any material loss from such a claim for indemnification is  remote and there are no significant probable and estimable losses associated with these contracts  In addition, we provided  indemnification for litigation defense costs to certain former  officers who are subject to ongoing litigation  See "NOTE 17: LEGAL CONTINGENCIES" for further  information on ongoing litigation  The recognized liabilities on our consolidated balance sheets related to  indemnifications were  not significant at March 31, 2012 and December 31, 2011.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3674                          Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

As part of the guarantee arrangements pertaining to multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees" These guarantees require us to advance funds to enable others to repurchase any tendered tax exempt and related taxable bonds that are unable to be remarketed Any such advances are treated as loans and are secured by a pledge to us of the repurchased securities until the securities are remarketed We hold cash and cash equivalents on our consolidated balance sheets for the amount of these commitments No advances under these liquidity guarantees were outstanding at March 31, 2012 and December 31, 2011

## NOTE 10: DERIVATIVES

### Use of Derivatives

We use derivatives primarily to:

- hedge forecasted issuances of debt;

- synthetically create callable and non callable funding;

- regularly adjust or rebalance our funding mix in response to changes in the interest rate characteristics of our mortgage related assets; and

- hedge foreign currency exposure

#### Hedge Forecasted Debt Issuances

When we commit to purchase mortgage investments, such commitments are typically for a future settlement ranging from two weeks to three months after the date of the commitment To facilitate larger and more predictable debt issuances that contribute to lower funding costs, we use interest rate derivatives to economically hedge the interest rate risk exposure from the time we commit to purchase a mortgage to the time the related debt is issued

#### Create Synthetic Funding

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures For example, the combination of a series of short term debt issuances over a defined period and a pay fixed interest rate swap with the same maturity as the last debt issuance is the substantive economic equivalent of a long term fixed rate debt instrument of comparable maturity. Similarly, the combination of non callable debt and a call swaption, or option to enter into a receive fixed interest rate swap, with the same maturity as the non callable debt, is the substantive economic equivalent of callable debt These derivatives strategies increase our funding flexibility and allow us to better match asset and liability cash flows, often reducing overall funding costs.

#### Adjust Funding Mix

We generally use interest rate swaps to mitigate contractual funding mismatches between our assets and liabilities We also use swaptions and other option based derivatives to adjust the contractual terms of our debt funding in response to changes in the expected lives of our investments in mortgage related assets. As market conditions dictate, we take rebalancing actions to keep our interest rate risk exposure within management set limits In a declining interest rate environment, we typically enter into receive fixed interest rate swaps or purchase Treasury based derivatives to shorten the duration of our funding to offset the declining duration of our mortgage assets In a rising interest rate environment, we typically enter into pay fixed interest rate swaps or sell Treasury based derivatives in order to lengthen the duration of our funding to offset the increasing duration of our mortgage assets

#### Foreign Currency Exposure

We use foreign currency swaps to eliminate virtually all of our exposure to fluctuations in exchange rates related to our foreign currency denominated debt by entering into swap transactions that effectively convert foreign currency denominated obligations into U S dollar denominated obligations Foreign currency swaps are defined as swaps in which net settlement is based on one leg calculated in a fore gn-currency and the other leg calculated in U.S. dollars.

### Types of Derivatives

We principally use the following types of derivatives:

- LIBOR and Euribor based interest rate swaps;

- LIBOR and Treasury based options (including swaptions);

- LIBOR and Treasury based exchange traded futures; and

*Freddie Mac*

TREASURY-3675

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- Foreign currency swaps

In addition to swaps, futures, and purchased options, our derivative positions include the following:

### Written Options and Swaptions

Written call and put swaptions are sold to counterparties allowing them the option to enter into receive and pay fixed interest rate swaps, respectively. Written call and put options on mortgage related securities give the counterparty the right to execute a contract under specified terms, which generally occurs when we are in a liability position. We use these written options and swaptions to manage convexity risk over a wide range of interest rates. Written options lower our overall hedging costs, allow us to hedge the same economic risk we assume when selling guaranteed final maturity REMICs with a more liquid instrument, and allow us to rebalance the options in our callable debt and REMICs portfolios. We may, from time to time, write other derivative contracts such as interest rate futures.

### Commitments

We routinely enter into commitments that include our: (a) commitments to purchase and sell investments in securities; (b) commitments to purchase mortgage loans; and (c) commitments to purchase and extinguish or issue debt securities of our consolidated trusts. Most of these commitments are considered derivatives and therefore are subject to the accounting guidance for derivatives and hedging.

### Swap Guarantee Derivatives

In connection with some of the guarantee arrangements pertaining to multifamily housing revenue bonds and multifamily pass through certificates, we may also guarantee the sponsor's or the borrower's obligations as a counterparty on any related interest rate swaps used to mitigate interest rate risk, which are accounted for as swap guarantee derivatives.

### Credit Derivatives

We entered into credit risk sharing agreements for certain credit enhanced multifamily housing revenue bonds held by third parties in exchange for a monthly fee. In addition, we have purchased mortgage loans containing debt cancellation contracts, which provide for mortgage debt or payment cancellation for borrowers who experience unanticipated losses of income dependent on a covered event. The rights and obligations under these agreements have been assigned to the servicers. However, in the event the servicer does not perform as required by contract, under our guarantee, we would be obligated to make the required contractual payments.

For a discussion of our significant accounting policies related to derivatives, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Derivatives" in our 2011 Annual Report.

139

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Derivative Assets and Liabilities at Fair Value**

The table below presents the location and fair value of derivatives reported in our consolidated balance sheets

**Table 10.1    Derivative Assets and Liabilities at Fair Value**

| | At March 31, 2012 | | | At December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Notional or Contractual Amount | Derivatives at Fair Value Assets(1) | Liabilities(1) | Notional or Contractual Amount | Derivatives at Fair Value Assets(1) | Liabilities(1) |
| | | | (in millions) | | | |
| Total derivative portfolio | | | | | | |
| *Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging(2)* | | | | | | |
| Interest-rate swaps | | | | | | |
| Receive-fixed | $248,453 | $ 10,391 | $ (519) | $ 211,808 | $ 12,998 | $ (108) |
| Pay-fixed | 296,573 | 444 | (28,226) | 289,335 | 19 | (34,507) |
| Basis (floating to floating) | 2,400 | 4 | (2) | 2,750 | 5 | (7) |
| Total interest-rate swaps | 547,426 | 10,839 | (28,747) | 503,893 | 13,022 | (34,622) |
| Option-based | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 52,500 | 7,766 | | 76,275 | 12,975 | |
| Written | 12,025 | | (886) | 27,525 | | (2,932) |
| Put Swaptions | | | | | | |
| Purchased | 49,450 | 527 | | 70,375 | 638 | |
| Written | 250 | | (5) | 500 | | (2) |
| Other option-based derivatives(3) | 34,365 | 2,029 | | 38,549 | 2,256 | (2) |
| Total option-based | 148,590 | 10,322 | (891) | 213,224 | 15,869 | (2,936) |
| Futures | 44,281 | | (66) | 41,281 | 5 | |
| Foreign-currency swaps | 1,179 | 84 | | 1,722 | 106 | (9) |
| Commitments | 22,298 | 22 | (59) | 14,318 | 38 | (94) |
| Credit derivatives | 9,338 | 1 | (5) | 10,190 | 1 | (5) |
| Swap guarantee derivatives | 3,631 | | (36) | 3,621 | | (37) |
| Total derivatives not designated as hedging instruments | 776,743 | 21,268 | (29,804) | 788,249 | 29,041 | (37,703) |
| Netting adjustments(4) | | (21,086) | 29,508 | | (28,923) | 37,268 |
| Total derivative portfolio, net | $776,743 | $ 182 | $ (296) | $788,249 | $ 118 | $ (435) |

(1) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net

(2) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies

(3) Primarily includes purchased interest-rate caps and floors

(4) Represents counterparty netting, cash collateral netting, and/or trade/settle receivable or payable, and net derivative interest receivable or payable The net cash collateral posted at derivative trade/settle receivable we had at March 31, 2012 and December 31, 2011 was $2.3 billion and $3.2 billion, respectively Cash collateral we posted to counterparties to derivative contracts that has been offset and net trade/settle receivable we had $9.4 billion and $1... billion, respectively at December 31, 2011 The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.1) billion on both March 31, 2012 and December 31, 2011, which was many trade/settle receivables - interest-rate swaps we averaged received or

The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable and net trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement  Derivatives in a net asset position are reported as derivative assets, net. Similarly, derivatives in a net liability position are reported as derivative liabilities, net  Cash collateral we obtained from counterparties to derivative contracts that has been offset against derivative assets at March 31, 2012 and December 31, 2011 was $2.3 billion and $3.2 billion, respectively  Cash collateral we posted to counterparties to derivative contracts that has been offset against derivative liabilities at March 31, 2012 and December 31, 2011 was $11.5 billion and $12.6 billion, respectively  We are subject to collateral posting thresholds based on the credit rating of our long term senior unsecured debt securities from S&P or Moody's  The lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative transactions

The aggregate fair value of all derivative instruments with credit risk related contingent features that were in a liability position on March 31, 2012, was $11.5 billion for which we posted collateral of $11.5 billion in the normal course of business  Since we were fully collateralized as of March 31, 2012, we would not have to post additional collateral on that day if credit risk related contingent features underlying these agreements were triggered

At March 31, 2012 and December 31, 2011, there were no amounts of cash collateral that were not offset against derivative assets, net or derivative liabilities, net, as applicable. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information related to our derivative counterparties

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                TREASURY-3677                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Gains and Losses on Derivatives

The table below presents the gains and losses on derivatives reported in our consolidated statements of comprehensive income

**Table 10.2    Gains and Losses on Derivatives**

| Derivatives in Cash Flow Hedging Relationships(1)(2) | Amount of Gain or (Loss) Reclassified from AOCI into Earnings (Effective Portion) | |
|---|---|---|
| | Three Months Ended March 31, | |
| | 2012 | 2011 |
| | (in millions) | |
| Closed cash flow hedges(3) | $        (165) | $        (197) |

| Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging(5) | Derivative Gains (Losses)(4) | |
|---|---|---|
| | Three Months Ended March 31, | |
| | 2012 | 2011 |
| | (in millions) | |
| Interest-rate swaps | | |
| Receive-fixed | | |
| Foreign-currency denominated | $        (5) | $        (37) |
| US dollar denominated | (2,583) | (2,204) |
| Total receive-fixed swaps | (2,588) | (2,241) |
| Pay-fixed | 3,792 | 3,963 |
| Basis (floating to floating) | 4 | 1 |
| Total interest-rate swaps | 1,208 | 1,723 |
| Option-based | | |
| Call swaptions | | |
| Purchased | (1,194) | (684) |
| Written | 370 | 38 |
| Put swaptions | | |
| Purchased | (34) | (122) |
| Written | 2 | 7 |
| Other option-based derivatives(6) | (221) | (46) |
| Total option-based | (1,077) | (807) |
| Futures | (65) | (41) |
| Foreign-currency swaps(7) | 9 | 109 |
| Commitments | (57) | (164) |
| Credit derivatives | — | 1 |
| Swap guarantee derivatives | 2 | 1 |
| Subtotal | 20 | 822 |
| Accrual of periodic settlements (8) | | |
| Receive-fixed interest-rate swaps(9) | 779 | 1,246 |
| Pay-fixed interest-rate swaps | (1,858) | (2,504) |
| Foreign-currency swaps | 3 | 4 |
| Other | — | 5 |
| Total accrual of periodic settlements | (1,076) | (1,249) |
| Total | $        (1,056) | $        (427) |

(1) Derivatives that have met specific criteria may be accounted for as cash flow hedges. Net deferred gains and losses on closed cash flow hedges (i.e., where the derivative is no longer held) that remained in accumulated other comprehensive income / loss when the hedge accounting relationship is discontinued are amortized into earnings when the forecasted transactions affect earnings or are deemed probable of no occurring.

(2) No amounts of gains or (losses) were recognized in AOCI on derivatives (effective portion) and no net income (ineffective portion and amount excluded from effectiveness testing).

(3) Amounts reported in AOCI linked to interest payments on long-term debt are recorded in net interest expense and amounts not linked to interest payments on long-term debt are recorded in other expense in our consolidated statements of comprehensive income.

(4) Gains (losses) are reported as derivative gains (losses) in our consolidated statements of comprehensive income.

(5) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.

(6) Primarily includes purchased interest-rate caps and floors.

(7) Foreign-currency swaps are defined as swaps in which one leg is settlement based on one leg calculated in a foreign-currency and the other leg calculated in US dollars.

(8) For derivatives not in qualifying hedge accounting relationships, the accrual of periodic cash settlements is recorded in derivative gains (losses) in our consolidated statements of comprehensive income.

(9) Includes accrued interest on zero-coupon swaps.

### Hedge Designation of Derivatives

At March 31, 2012 and December 31, 2011, we did not have any derivatives in hedge accounting relationships; however, there are deferred net losses recorded in AOCI related to closed cash flow hedges. As shown in "Table 10.3

*Freddie Mac*

Source    FREDDIE MAC, LOAN MORTGAGE CORP, 10 Q, May 03, 2012

TREASURY-3678

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from this use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

AOCI Related to Cash Flow Hedge Relationships," the total AOCI related to derivatives designated as cash flow hedges was a loss of $1.6 billion and $2.1 billion at March 31, 2012 and 2011, respectively, composed of deferred net losses on closed cash flow hedges Closed cash flow hedges involve derivatives that have been terminated or are no longer designated as cash flow hedges Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI relating to losses on closed cash flow hedges

The previous deferred amount related to closed cash flow hedges remains in our AOCI balance and will be recognized into earnings over the expected time period for which the forecasted transactions impact earnings. Over the next 12 months, we estimate that approximately $393 million, net of taxes, of the $1.6 billion of cash flow hedge losses in AOCI at March 31, 2012 will be reclassified into earnings. The maximum remaining length of time over which we have hedged the exposure related to the variability in future cash flows on forecasted transactions, primarily forecasted debt issuances, is 22 years However, over 70% and 90% of AOCI relating to closed cash flow hedges at March 31, 2012 will be reclassified to earnings over the next five and ten years, respectively

The table below presents the changes in AOCI related to derivatives designated as cash flow hedges Net reclassifications of losses to earnings represents the AOCI amount that was recognized in earnings as the originally hedged forecasted transactions affected earnings, unless it was deemed probable that the forecasted transaction would not occur If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the hedge related to the forecasted transaction would be reclassified into earnings immediately

**Table 10.3    AOCI Related to Cash Flow Hedge Relationships**

| | Three Months ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in millions) | |
| Beginning balance[1] | $(1,730) | $(2,239) |
| Net reclassifications of losses to earnings[2] | 111 | 132 |
| Ending balance[1] | $(1,619) | $(2,107) |

(1) Represents net deferred gains and losses on closed (i.e., terminated) hedges gna ed) cash flow hedges
(2) Net of tax benefit of $54 million and $65 million for the three months ended March 31, 2012 and 2011, respectively

## NOTE 11: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)

**Senior Preferred Stock**

We received $146 million in March 2012 pursuant to draw requests that FHFA submitted to Treasury on our behalf to address the deficits in our net worth as of December 31, 2011. In addition, we had a deficit in net worth of $18 million as of March 31, 2012. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Government Support for our Business" for additional information regarding the draw request that FHFA, as Conservator, will submit on our behalf to Treasury to address our deficit in net worth The aggregate liquidation preference on the senior preferred stock owned by Treasury was $72.3 billion and $72.2 billion as of March 31, 2012 and December 31, 2011, respectively See "NOTE 14: REGULATORY CAPITAL" for additional information

**Stock Based Compensation**

We did not repurchase or issue any of our common shares or non cumulative preferred stock during the three months ended March 31, 2012, except for issuances of treasury stock as reported on our consolidated statements of equity (deficit) relating to stock based compensation granted prior to conservatorship Common stock delivered under these stock based compensation plans consists of treasury stock or shares acquired in market transactions on behalf of the participants. During the three months ended March 31, 2012, restrictions lapsed on 460,846 restricted stock units, all of which were granted prior to conservatorship. For a discussion regarding our stock based compensation plans, see "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report

For purposes of the earnings per share calculation, all stock based compensation plan options outstanding at March 31, 2012 and 2011 were out of the money and excluded from the computation of dilutive potential common shares for the three months ended March 31, 2012 and 2011, respectively The weighted average common shares outstanding for the period includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury pursuant to the Purchase Agreement.

TREASURY-3679

Source   D RA HOM   OAN MORTGAG CORP, 10 Q, May 03, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Dividends Declared During 2012**

No common dividends were declared during the three months ended March 31, 2012. In March 2012, we paid dividends of $1.8 billion in cash on the senior preferred stock at the direction of our Conservator We did not declare or pay dividends on any other series of Freddie Mac preferred stock outstanding during the three months ended March 31, 2012.

## NOTE 12: INCOME TAXES

**Income Tax Benefit**

For the three months ended March 31, 2012 and 2011, we reported an income tax benefit of $ 4 million and $74 million, respectively, resulting in effective tax rates of (2 5)% and (12 3)%, respectively For the three months ended March 31, 2012, the tax benefit recorded is related to the amortization of net deferred losses on pre 2008 closed cash flow hedges offset by an expense for alternative minimum tax We continue to be in a tax loss carryforward position Our effective tax rate was different from the statutory rate of 35% primarily due to changes in the valuation allowance recorded against a portion of our net deferred tax assets

**Deferred Tax Assets, Net**

Our valuation allowance decreased by $33 million during the first quarter of 2012 to $35.6 billion primarily due to a decrease in temporary differences After consideration of the valuation allowance, we had a net deferred tax asset of $2.9 billion, primarily representing the tax effect of unrealized losses on our available for sale securities

*IRS Examinations and Unrecognized Tax Benefits*

We believe appropriate reserves have been provided for settlement on reasonable terms related to questions of timing and potential penalties raised by the IRS during examinations of the 1998 to 2007 tax years regarding our tax accounting method for certain hedging transactions However, changes could occur in the balance of unrecognized tax benefits that could have a material impact on income tax expense in the period the issue is resolved if the outcome reached is not in our favor and the assessment is in excess of the amount currently reserved Considering the Tax Court trial date of November 13, 2012, the fact that no settlement discussions have occurred for an extended period of time, and the information currently available, we do not believe it is reasonably possible that this issue will be resolved within the next 12 months

The IRS is currently auditing our income tax returns for tax years 2008 and 2009 We believe appropriate reserves have been provided for all income tax uncertainties However, it is reasonably possible that the 2008 to 2009 audit cycle will be completed during the next 12 months, which could result in a decrease in the balance of unrecognized tax benefits by as much as $373 million.

For additional information, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 13: INCOME TAXES" in our 2011 Annual Report.

## NOTE 13: SEGMENT REPORTING

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for additional information about the conservatorship

We present Segment Earnings by: (a) reclassifying certain investment related activities and credit guarantee related activities between various line items on our GAAP consolidated statements of comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments These reclassifications and allocations are described in "NOTE 14: SEGMENT REPORTING" in our 2011 Annual Report

We do not consider our assets by segment when evaluating segment performance or allocating resources We conduct our operations solely in the U S and its territories Therefore, we do not generate any revenue from geographic locations outside of the U.S. and its territories.

**Segments**

Our operations consist of three reportable segments, which are based on the type of business activities each performs Investments, Single family Guarantee, and Multifamily. The chart below provides a summary of our three

43

*Freddie Mac*

Source   D RA HOM   OAN MORTGAG CORP, 10 Q, May 03, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

reportable segments and the All Other category  As reflected in the chart, certain activities that are not part of a reportable  segment are included in the All Other category  The All Other category consists of material corporate level expenses that are:  (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our  reportable segments  By recording these types of activities  to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies  that are executed within the reportable segments and provide greater comparability across time periods

| Segment | Description | Activities/Items |
|---|---|---|
| Investments | The Investments segment  reflects results from our  investment , funding and hedging activities In our  Investments segment , we invest principally in mortgage-related securities and single-family performing mortgage loans, which are funded by our debt issuances and hedged so we derive value from it  In  our Investments segment , we also provide funding and hedging management services to our Single-family and Multifamily segments  The Investments segment reflects changes in the fair value of the Multifamily segment assets  as a result associated with changes in interest rates Segment Earnings for this segment consists primarily of the returns on these investments, less the related funding, hedging, and administrative expenses | • Investments in mortgage- related securities and single-family performing mortgage loans<br><br>• Investments in asset-backed securities<br><br>• Agency and non-agency securities/securities, excluding CMBS and multifamily housing revenue bonds<br><br>• Derivatives<br><br>• Asset/liability management returns<br><br>• Guarantee buy-ups/buy-downs, net of executation gains/losses<br><br>• Cash and liquidity management<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated administrative expenses and taxes |
| Single-Family Guarantee | The Single-family Guarantee segment  reflects results from our single-family credit guarantee activities In our Single-family Guarantee segment , we purchase single-family mortgage loans originated by our seller servicers in the primary mortgage market In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities We guarantee the payment of principal and interest on the mortgage-related security in exchange for management and guarantee fees Segment Earnings for this segment consists primarily of management and guarantee fee revenues, including amortization of upfront fees, less credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net floating of our benefits or expenses | • Management and guarantee fees on PCs, cdg hose earned by us, and single-family mortgage loans in the mortgage investments portfolio<br><br>• Up-front credit delivery fees<br><br>• Adjustments for security performance<br><br>• Credit losses on all single-family assets<br><br>• Expected net losses recognized on the single-family credit guarantee portfolio<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated debt costs, administrative expenses and taxes |
| Multifamily | The Multifamily segment  reflects results from our investment  (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities  Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, most purchases of single-family mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008  The only CMBS that we have purchased since 2008  have been senior, mezzanine, and interest-only tranches related to one of our securitization transactions, and except in cases where our best single-family mortgage loans for aggregation and then securitization We guarantee the senior tranches of these securitizations in the Guarantee Transactions  Our Multifamily segment also assesses its REMIC securities  Our Multifamily segment also invests in the guarantee commitments on multifamily HFA bonds and does give revenue bonds Segment Earnings for this segment consists primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less credit-related expenses, administrative expenses, and allocated funding costs  In addition, the Multifamily segment  reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated only with make facilities for the  changes expenses, such as liquidity and credit | • Multifamily mortgage loans held-for-sale and associated securitization activities<br><br>• Investments in CMBS, family housing revenue bonds, and multifamily mortgage loans held-for-investment<br><br>• Allocated debt costs, administrative expenses and taxes<br><br>• Other guarantee commitments on multifamily HFA bonds and associated guarantee obligations<br><br>• LIHTC and valuation allowance<br><br>• Deferred tax asset valuation allowance |
| All Other | The All Other category consists of material corporate-level expenses that are (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments | • Tax services, as applicable<br><br>• Legal services, as applicable<br><br>• The deferred tax asset valuation allowance |

Source   FREDDIE MAC HOME LOAN MORTGAGE CORP, 10 Q, May 03, 2012                                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

| | | assoc a ed w  h p ev ously  ecogn zed  ncome  ax |
| | | c ed  s ca   ed fo wa d |

44                                                              *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Segment Earnings

The financial performance of our Single family Guarantee segment and Multifamily segment are measured based on each segment's contribution to GAAP net income (loss) Our Investments segment is measured on its contribution to GAAP comprehensive income (loss), which consists of the sum of its contribution to: (a) GAAP net income (loss); and (b) GAAP total other comprehensive income (loss), net of taxes

The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) Likewise, the sum of comprehensive income (loss) for each segment and the All Other category equals GAAP comprehensive income (loss) However, the accounting principles we apply to present certain financial statement line items in Segment Earnings for our reportable segments, in particular Segment Earnings net interest income and management and guarantee income, differ significantly from those applied in preparing the comparable line items in our consolidated financial statements prepared in accordance with GAAP Accordingly, the results of such line items differ significantly from, and should not be used as a substitute for, the comparable line items as determined in accordance with GAAP For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "Table 13.2    Segment Earnings and Reconciliation to GAAP Results "

### Segment Adjustments

In presenting Segment Earnings net interest income and management and guarantee income, we make adjustments to better reflect how management measures and assesses the performance of each segment and the company as a whole These adjustments relate to amounts that, effective January 1, 2010, are no longer reflected in net income (loss) as determined in accordance with GAAP as a result of the adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs These adjustments are reversed through the segment adjustments line item within Segment Earnings, so that Segment Earnings (loss) for each segment equals GAAP net income (loss) for each segment  Segment adjustments consist of the following:

• We adjust our Segment Earnings net interest income for the Investments segment to include the amortization of cash premiums and discounts and buy up and buy down fees on the consolidated Freddie Mac mortgage related securities we purchase as investments As of March 31, 2012, the unamortized balance of such premiums and discounts and buy up and buy down fees was $1.3 billion. These adjustments are necessary to reflect the economic yield realized on investments in consolidated Freddie Mac mortgage related securities purchased at a premium or discount or with buy up or buy down fees

• We adjust our Segment Earnings management and guarantee income for the Single family Guarantee segment to include the amortization of delivery fees recorded in periods prior to the January 1, 2010 adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs As of March 31, 2012, the unamortized balance of such fees was $2 0 billion We consider such fees to be part of the effective rate of the guarantee fee on guaranteed mortgage loans This adjustment is necessary in order to better reflect the realization of revenue associated with guarantee contracts over the life of the underlying loans

The table below presents Segment Earnings by segment

**Table 13.1    Summary of Segment Earnings and Comprehensive Income (Loss)**

| | Three Months ended March 31, | |
| --- | ---: | ---: |
| | 2012 | 2011 |
| | (in millions) | |
| Seg en Ea n ngs ( oss), ne of axes | | |
| Inves men s | $ 1,628 | $ 2,137 |
| S ngle-fam ly Gua an ee | (1,675) | (1,820) |
| Mu  fam y | 624 | 359 |
| To a Segmen Ea n ngs, ne of axes | 577 | 676 |
| Ne  ncome | $  577 | $  676 |
| Comp ehens ve ncome (loss) of segmen s | | |
| Inves men s | $ 1,963 | $ 3,263 |
| S ngle-fam ly Gua an ee | (1,698) | (1,824) |
| Mu  fam y | 1,524 | 1,301 |
| Comp ehens ve ncome of segmen s | 1,789 | 2,740 |
| Comp ehens ve ncome | $ 1,789 | $ 2,740 |

Source   D RA HOM   OAN MORTGAG CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3683

Table of Contents

The table below presents detailed reconciliations between our GAAP financial statements and Segment Earnings by financial statement line item for our reportable segments and All Other

**Table 13.2    Segment Earnings and Reconciliation to GAAP Results**

|  | | | | | Three Months Ended March 3 , 20 2 | | | | |
|  | | | | | | Reconciliation to Consolidated Statements of Comprehensive Income | | | Total per Consolidated Statements of Comprehensive Income |
|  | Investments | Single family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes | Reclassifications[1] | Segment Adjustments[2] | Total Reconciling Items | |
|  | | | | | (in millions) | | | | |
| Net nterest ncome | $ 1,763 | $ (32 | $ 318 | $ — | $ 2,0 9 | $ 2 296 | $ 155 | $ 2, 51 | $ ,500 |
| (Prov s on) bene t or cred t losses | — | (2,18 | 19 | — | (2,165 | 3 0 | — | 3 0 | (1,825 |
| Non nterest ncome ( oss) | | | | | | | | | |
| Management and guarantee ncome[3] | — | 1,011 | 33 | — | 1,0 | (803 | ( 96 | (999 | 5 |
| Net mpa rment of ava ab e for sa e secur t es recogn zed n earn ngs | (496 | — | (16 | — | (512 | (52 | — | (52 | (56 |
| Der vat ve ga ns (losses) | 200 | — | (1 | — | 99 | (1,255 | — | (1,255 | (1,056 |
| Ga ns (losses) on trad ng secur t es | (398 | — | 21 | — | (377 | — | — | — | (377 |
| Ga ns ( osses) on sa e of mortgage oans | (1 | — | 5 | — | 0 | — | — | — | 0 |
| Gains ( osses) on mortgage oans recorded at fair va ue | (38 | — | 177 | — | 139 | — | — | — | 139 |
| Other non nterest ncome (loss) | 513 | 181 | 89 | — | 783 | (526 | — | (526 | 257 |
| Non nterest expense | | | | | | | | | |
| Adm n strat ve expenses | (92 | (193 | (52 | — | (337 | — | — | — | (337 |
| REO operat ons ncome (expense) | — | (172 | 1 | — | (171 | — | — | — | (171 |
| Other non nterest expense | — | (73 | (15 | — | (88 | — | — | — | (88 |
| Segment adjustments[2] | 155 | — | — | — | ( 1 | — | 1 | 1 | — |
| Income tax (expense) bene t | 35 | (17 | ( | — | 1 | — | — | — | 1 |
| Net ncome (loss) | 1,628 | (1,675 | 62 | — | 577 | — | — | — | 577 |
| Tota other comprehens ve ncome, net of taxes | 335 | (23 | 900 | — | 1,212 | — | — | — | 1,212 |
| Comprehens ve ncome ( oss) | $ 1 963 | $ (1,698 | $ 1,52 | $ — | $ 1,789 | $ — | $ — | $ — | $ 1,789 |

|  | | | | | Three Months Ended March 3 , 20 | | | | |
|  | | | | | | Reconciliation to Consolidated Statements of Comprehensive Income | | | Total per Consolidated Statements of Comprehensive Income |
|  | Investments | Single family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes | Reclassifications[1] | Segment Adjustments[2] | Total Reconciling Items | |
|  | | | | | (in millions) | | | | |
| Net nterest ncome | $ 1,653 | $ 100 | $ 279 | $ — | $ 2,032 | $ 2,305 | $ 203 | $ 2,508 | $ ,5 0 |
| (Prov s on) bene t or cred t losses | — | (2,28 | 60 | — | (2,22 | 235 | — | 235 | (1,989 |
| Non nterest ncome | | | | | | | | | |
| Management and guarantee ncome[3] | — | 870 | 28 | — | 898 | (675 | (185 | (860 | 38 |
| Net mpa rment of ava ab e for sa e secur t es recogn zed n earn ngs | (1,029 | — | (135 | — | (1,16 | (29 | — | (29 | (1,193 |
| Der vat ve ga ns (losses) | 1,103 | — | 2 | — | 1,105 | (1,532 | — | (1,532 | ( 27 |
| Ga ns (losses) on trad ng secur t es | (23 | — | 3 | — | (200 | — | — | — | (200 |
| Ga ns ( osses) on sa e of mortgage oans | 12 | — | 8 3 | — | 9 | — | — | — | 9 |
| Gains ( osses) on mortgage oans recorded at fair va ue | (83 | — | 50 | — | (33 | — | — | — | (33 |
| Other non nterest ncome (loss) | 5 1 | 211 | 20 | — | 772 | (30 | — | (30 | 68 |
| Non nterest expense | | | | | | | | | |
| Adm n strat ve expenses | (9 | (215 | (51 | — | (361 | — | — | — | (361 |
| R O operat ons expense | — | (257 | — | — | (257 | — | — | — | (257 |
| Other non nterest expense | — | (66 | (13 | — | (79 | — | — | — | (79 |
| Segment adjustments[2] | 203 | (185 | — | — | 18 | — | (18 | (18 | — |
| Income tax bene t | 66 | 6 | 2 | — | 7 | — | — | — | 7 |
| Net ncome (loss) | 2,137 | (1,820 | 359 | — | 676 | — | — | — | 676 |
| Tota other comprehens ve ncome, net of taxes | 1,126 | ( | 9 2 | — | 2,06 | — | — | — | 2,06 |
| Comprehens ve ncome ( oss) | $ 3 263 | $ (1,82 | $ 1,301 | $ — | $ 2,7 0 | $ — | $ — | $ — | $ 2,7 0 |

(1) See "NOTE 14 SEGMENT REPORTING    Seg e Ea n ngs    *Investment Activity-Related Reclassifications*" a d "    *Credit Guarantee Activity-Related Reclassifications*"    o    2011 Annual Repo    fo nfo ma on ega d ng hese eclass f ca ons

(2) See "Segmen Ea n ngs    *Segment Adjustments*" fo add ona nfo ma on ega d ng hese adj s e s

(3) Managemen and gua an ee ncome o al pe conso da ed s a emen s of comp ehens ve ncome s ncluded n o he ncome on ou GAAP conso da ed s a emen s of comp ehens ve ncome

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3684

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents comprehensive income (loss) by segment

**Table 13.3     Comprehensive Income (Loss) of Segments**

| | | Three Months Ended March 31, 2012 | | | | |
| | | Other Comprehensive Income (Loss), Net of Taxes | | | | |
| | Net Income (Loss) | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss), Net of Taxes | Comprehensive Income (Loss) |
| | | | (in millions) | | | |
| Comprehensive income (loss) of segments | | | | | | |
| Investments | $ 1,628 | $ 242 | $ 111 | $ (18) | $ 335 | $ 1,963 |
| Single-family Guarantee | (1,675) | | | (23) | (23) | (1,698) |
| Multifamily | 624 | 905 | | (5) | 900 | 1,524 |
| Total per consolidated statements of comprehensive income | $ 577 | $ 1,147 | $ 111 | $ (46) | $ 1,212 | $ 1,789 |

| | | Three Months Ended March 31, 2011 | | | | |
| | | Other Comprehensive Income (Loss), Net of Taxes | | | | |
| | Net Income (Loss) | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss), Net of Taxes | Comprehensive Income (Loss) |
| | | | (in millions) | | | |
| Comprehensive income (loss) of segments | | | | | | |
| Investments | $ 2,137 | $ 999 | $ 131 | $ (4) | $ 1,126 | $ 3,263 |
| Single-family Guarantee | (1,820) | | | (4) | (4) | (1,824) |
| Multifamily | 359 | 942 | 1 | (1) | 942 | 1,301 |
| Total per consolidated statements of comprehensive income | $ 676 | $ 1,941 | $ 132 | $ (9) | $ 2,064 | $ 2,740 |

## NOTE 14: REGULATORY CAPITAL

On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship in light of the Purchase Agreement  FHFA continues to closely monitor our capital levels, but the existing statutory and FHFA directed regulatory capital requirements are not binding during conservatorship  We continue to provide our submission to FHFA on minimum capital, however we no longer provide our submission of risk based capital to FHFA

Our regulatory minimum capital is a leverage based measure that  is generally calculated based on GAAP and reflects a 2 50% capital requirement for on balance sheet assets and 0 45% capital requirement for off balance sheet obligations  Based  upon our adoption of amendments to the accounting guidance for  transfers of financial assets and consolidation of VIEs, we  determined that, under the new consolidation guidance, we are the primary beneficiary of trusts that issue our single family  PCs and certain Other Guarantee Transactions and, therefore, effective January 1, 2010, we consolidated on our balance  sheet the assets and liabilities of these trusts. Pursuant to regulatory guidance from FHFA, our minimum capital requirement  was not automatically affected by adoption of these amendments  Specifically, upon adoption of these amendments, FHFA directed us, for purposes of minimum capital, to continue reporting  single family PCs and certain Other Guarantee Transactions held by third parties using a 0 45% capital requirement  FHFA reserves the authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities  On  March 3, 2011, FHFA issued a final rule setting forth procedures and standards in the event FHFA were to make such a temporary increase in minimum capital levels  The table below  summarizes our minimum capital requirements and deficits and net  worth

### Table 14.1     Net Worth and Minimum Capital

| | March 31, 2012 | December 31, 2011 |
| | (in millions) | |
| GAAP  net worth[1] | $ (18) | $ (146) |
| Core capital (deficit)[2][3] | $ (65,552) | $ (64,322) |
| Less Minimum capital requirement[2] | 23,518 | 24,405 |
| Minimum capital  surplus (deficit)[2] | $ (89,070) | $ (88,727) |

(1) Net worth (deficit)  represents the difference between our assets and  liabilities under GAAP
(2) Core capital and minimum capital figures for March 31, 2012 are estimates  as FHFA's evaluation of our resources for our regulatory capital
(3) Core capital excludes certain components of GAAP total equity (deficit) (i.e., AOCI,  and our portion of the deferred portion of the senior preferred  preferred stock) as these items do not meet  the statutory definition of core capital

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3685

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Following our entry into conservatorship, we have focused our risk and capital management, consistent with the objectives of conservatorship, on, among other things, maintaining a positive balance of GAAP equity in order to reduce the likelihood that we will need to make additional draws on the Purchase Agreement with Treasury. The Purchase Agreement provides that, if FHFA determines as of quarter end that our liabilities have exceeded our assets under GAAP, Treasury will contribute funds to us in an amount equal to the difference between such liabilities and assets.

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has advised us that, if, during that 60 day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination. If funding has been requested under the Purchase Agreement to address a deficit in our net worth, and Treasury is unable to provide us with such funding within the 60 day period specified by FHFA, FHFA would be required to place us into receivership if our assets remain less than our obligations during that 60 day period.

To address our net worth deficit of $18 million at March 31, 2012, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $19 million, and will request that we receive these funds by June 30, 2012. Our draw request represents our net worth deficit at quarter end rounded up to the nearest $1 million. Upon funding of this draw request, our aggregate funding received from Treasury under the Purchase Agreement will be $7 3 billion. This aggregate funding amount does not include the initial $1 0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. As a result of the additional $19 million draw request, the aggregate liquidation preference on the senior preferred stock owned by Treasury will be $72.3 billion at June 30, 2012. We paid a quarterly dividend of $1.8 billion on the senior preferred stock in cash in March 2012 at the direction of the Conservator. Following funding of the draw request related to our net worth deficit at March 31, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock will be $7.23 billion, which exceeds our annual historical earnings in all but one period.

## NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS

### Single family Credit Guarantee Portfolio

Our business activity is to participate in and support the residential mortgage market in the United States, which we pursue by both issuing guaranteed mortgage securities and investing in mortgage loans and mortgage related securities.

The table below summarizes the concentration by year of origination and geographical area of the approximately $ 7 trillion UPB of our single family credit guarantee portfolio at both March 31, 2012 and December 31, 2011. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" and "NOTE 7: INVESTMENTS IN SECURITIES" for more information about credit risk associated with loans and mortgage related securities that we hold.

148                                                                                                    *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 15.1     Concentration of Credit Risk     Single Family Credit Guarantee Portfolio**

| | March 31, 2012 | | December 31, 2011 | | Percent of Credit Losses(1) Three Months Ended | |
| | Percentage of Portfolio(2) | Serious Delinquency Rate | Percentage of Portfolio(2) | Serious Delinquency Rate | March 31, 2012 | March 31, 2011 |
|---|---|---|---|---|---|---|
| Yea of O g na on | | | | | | |
| 2012 | 4% | % | N/A | N/A | % | N/A |
| 2011 | 16 | 0 1 | 14% | 0 1% | <1 | % |
| 2010 | 18 | 0 3 | 19 | 0 3 | 1 | |
| 2009 | 16 | 0 6 | 18 | 0 5 | 2 | 1 |
| 2008 | 6 | 5 9 | 7 | 5 7 | 9 | 8 |
| 2007 | 9 | 11 7 | 10 | 11 6 | 37 | 36 |
| 2006 | 7 | 10 9 | 7 | 10 8 | 25 | 29 |
| 2005 | 8 | 6 7 | 8 | 6 5 | 17 | 18 |
| 2004 and p o | 16 | 2 9 | 17 | 2 8 | 9 | 8 |
| o a | 100% | 3 5% | 100% | 3 6% | 100% | 100% |
| Reg on(3 | | | | | | |
| Wes | 28% | 3 5% | 28% | 3 6% | 45% | 56% |
| No heas | 25 | 3 5 | 25 | 3 4 | 8 | 7 |
| No h Cen a | 18 | 2 8 | 18 | 2 9 | 19 | 15 |
| So t east | 17 | 5 4 | 17 | 5 5 | 24 | 18 |
| So t west | 12 | 1 8 | 12 | 1 8 | 4 | 4 |
| o a | 100% | 3 5% | 100% | 3 6% | 100% | 100% |
| State( | | | | | | |
| Ca fo n a | 16% | 3 2% | 16% | 3 4% | 24% | 31% |
| F o da | 6 | 10 8 | 6 | 10 9 | 16 | 12 |
| no s | 5 | 4 5 | 5 | 4 7 | 8 | 4 |
| Georg a | 3 | 3 2 | 3 | 3 3 | 4 | 4 |
| M ch gan | 3 | 2 1 | 3 | 2 3 | 4 | 5 |
| A zona | 2 | 4 1 | 2 | 4 3 | 8 | 13 |
| Nevada | 1 | 9 1 | 1 | 9 8 | 7 | 5 |
| All o he | 64 | 2 8 | 64 | 2 8 | 29 | 26 |
| o a | 100% | 3 5% | 100% | 3 6% | 100% | 100% |

(1) C ed losses cons s of he agg ega e amoun of cha ge-offs, ne of ecove es, and REO ope a ons expense n each of he espec ve pe ods and exclude fo egone
    n e es on non-pe fo m ng loans and o he ma ke -based losses ecogn zed on ou consol da ed s a emen s of comp ehens ve ncome

(2) Based on he UPB of ou s ng e-fam y c ed gua an ee po fol o, wh ch ncludes unsecu zed s ngle-fam ly mo gage oans he d by us on ou conso da ed ba ance
    s ee s a d ose unde ly ng F edd e Mac mo gage- ela ed secu es, o cove ed by ou o he gua an ee comm men s

(3) Reg o des g a o   West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); No t east (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA,
    WV); No t Ce t a (IL, IN, IA, MI, MN, ND, OH, SD, WI); So t east (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); So t west (AR, CO, KS, LA,
    MO, NE, NM, OK, TX, WY)

(4) S a e p esen ed a e on hose w h he h ghes pe cen age of c ed osses d  g  e e o s e ased on ou c ed osses a Ma ch 31, 2012 O op seve s a es based o  e g es
    pe cen age of UPB as of Ma ch 31, 2012 a e Ca fo n a (16%), F o da (6%), I   o s (5%), New Yo k (5%), Texas (4%), New Je sey (4%), a d V g n a (4%),
    wh ch collec vely comp sed 44% of ou s ngle-fam ly c ed gua an ee po fol o as of Ma ch 31, 2012

## Credit Performance of Certain Higher Risk Single Family Loan Categories

Participants in the mortgage market often characterize single family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Many mortgage market participants classify single family loans with credit characteristics that range between their prime and subprime categories as Alt A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both However, there is no universally accepted definition of subprime or Alt A Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mo tgage (including Alt A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in either our re ef refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt A, such refinance loan may no longer be categorized or reported as Alt A in the table below because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt A loan As a result, our reported Alt A balances may be lower than would otherwise be the case had such refinancing not occurred

Although we do not categorize single family mortgage loans we purchase or guarantee as prime or subprime, we recognize that there are a number of mortgage loan types with certain characteristics that indicate a higher degree of credit risk For example, a borrower's credit score is a useful measure for assessing the credit quality of the borrower

149

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3687

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores

Presented below is a summary of the serious delinquency rates of certain higher risk categories of single family loans in our single family credit guarantee portfolio  The table includes a presentation of each higher risk category in isolation  A single loan may fall within more than one category (for example, an interest only loan may also have an original LTV ratio greater than 90%). Loans with a combination of these attributes will have an even higher risk of delinquency than those with isolated characteristics.

**Table 15.2     Certain Higher Risk Categories in the Single Family Credit Guarantee Portfolio[1]**

| | Percentage of Portfolio[1] | | Serious Delinquency Rate | |
|---|---|---|---|---|
| | March 31, 2012 | December 31, 2011 | March 31, 2012 | December 31, 2011 |
| In e es -only | 4% | 4% | 17 2% | 17 6% |
| Op on ARM | <1 | <1 | 19 6 | 20 5 |
| Al -A[2] | 5 | 5 | 11 8 | 11 9 |
| O g nal LTV a o g ea e han 90%[3] | 10 | 10 | 6 3 | 6 7 |
| Lowe FICO sco es a o g na on (less han 620) | 3 | 3 | 12 6 | 12 9 |

(1) Based o  UPB
(2) Al -A oans may no  nc ude hose oans ha  we e p ev ous y c ass f ed as  Al -A a d  ha  have been  ef nanced as  e  he  a  el ef  ef nance mo  gage  o  n ano he
    ef nance mo  gage  n  a ve
(3) Based o  o  f  s  e  expos e o  e p ope  y  I c  des  e  c ed -enhanced po  on of he  oan and exc udes any seconda y f nanc ng by  h  d pa  es  The
    ex s ence of a second l en ed ces  e bo owe 's eq  y  e p ope  y a d, he efo e, nc eases he  sk of defau

The percentage of borrowers in our single family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 20% at both March 31, 2012 and December 31, 2011. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan  The serious delinquency rate for single family loans with estimated current LTV ratios greater than 100% was 12.6% and 12.8% as of March 31, 2012 and December 31, 2011, respectively. Loans originated in the years 2005 through 2008 have been more affected by declines in home prices since 2006 than loans originated in other years  Loans originated in 2005 through 2008 comprised approximately 30% and 36% of our single family credit guarantee portfolio, based on UPB at March 31, 2012 and  2011, respectively; however, these loans accounted for approximately 88% and 91% of our credit losses during the three months ended March 31, 2012 and 2011, respectively

We categorize our investments in non agency mortgage related securities as subprime, option ARM, or Alt A if the securities were identified as such based on information provided to us when we entered into these transactions  We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt A securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on these categories and other concentrations in our investments in securities

**Multifamily Mortgage Portfolio**

The table below summarizes the concentration of multifamily mortgages in our multifamily mortgage portfolio by certain attributes. Information presented for multifamily mortgage loans includes certain categories based on loan or borrower characteristics present at origination  The table includes a presentation of each category in isolation  A single loan may fall within more than one category (for example, a non credit enhanced loan may also have an original LTV ratio greater than 80%)

150

<em>Freddie Mac</em>

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                    Powered by Morningstar ® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 15.3      Concentration of Credit Risk      Multifamily Mortgage  Portfolio**

| | March 31, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
| | UPB | Delinquency Rate(1) | UPB | Delinquency Rate(1) |
| | | (in billions) | | |
| **State(2** | | | | |
| Ca fo n a | $ 20 5 | 0 15% | $ 20 2 | 0 02% |
| Texas | 14 6 | 0 36 | 14 0 | 0 46 |
| New Yo k | 10 1 | 0 10 | 9 6 | |
| F o da | 7 4 | 0 05 | 7 1 | 0 05 |
| V rg n a | 6 4 | | 6 3 | |
| Georg a | 5 9 | 1 40 | 5 6 | 1 99 |
| A o he s aes | 54 3 | 0 17 | 53 3 | 0 14 |
| o a | $119 2 | 0 23% | $116 1 | 0 22% |
| **Reg on(3** | | | | |
| No heas | $ 33 9 | 0 10% | $ 33 1 | 0 01% |
| Wes | 30 4 | 0 19 | 29 9 | 0 07 |
| So t west | 23 3 | 0 38 | 22 4 | 0 44 |
| So t east | 21 4 | 0 43 | 20 7 | 0 65 |
| No h Cen a | 10 2 | 0 01 | 10 0 | 0 01 |
| o a | $119 2 | 0 23% | $116 1 | 0 22% |
| **Ca ego y(** | | | | |
| O g nal LTV a o g ea e han 80% | $ 6 4 | 2 23% | $ 6 4 | 2 34% |
| O g nal DSCR below 1 10 | 2 8 | 2 23 | 2 8 | 2 58 |
| Non-c ed enhanced loans | 84 5 | 0 16 | 84 5 | 0 11 |

(1) Based on he UPB of mul fam ly mo gages wo mon hly paymen s o mo e del nquen o n fo eclosu e
(2) Rep esen s he s x s a es w h he h ghes geog aph c co ce a o by UPB a Ma c 31, 2012
(3) See endno e (4) o "Tab e 15 1    Concen a on of C ed R sk    S ngle-fam ly C ed  Gua an ee Po fo o" fo a desc p on of hese eg ons
(4) These ca ego es a e no mu ua y exc us ve and a oan n one ca ego y may also be ncluded w h n ano he ca ego y

One indicator of risk for mortgage loans in our multifamily  mortgage portfolio is the amount of a borrower's equity  in the underlying property  A borrower's equity in a property decreases as the LTV ratio increases  Higher LTV ratios negatively affect a borrower's ability to refinance or sell a property for an amount at or above the balance of the  outstanding mortgage  The DSCR is another indicator of future  credit performance. The DSCR estimates a multifamily  borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non mortgage expenses from income  The higher the DSCR, the more  likely a multifamily borrower will be able to continue servicing its mortgage obligation

Our multifamily mortgage portfolio includes certain loans for  which we have credit enhancement  Credit enhancement can  significantly reduce our exposure to a potential credit loss  As of March 31, 2012, approximately one half of the  multifamily loans that were two monthly payments or more past due, based on UPB, had credit enhancements that we currently  believe will mitigate our expected losses on those loans  See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for additional information about credit enhancements on  multifamily loans.

We estimate that the percentage of loans in our multifamily  mortgage portfolio with a current LTV ratio of greater than   00% was approximately 4% and 5% at March 31, 2012 and  December 31, 2011, respectively, and our estimate of the  current average DSCR for these loans was 0.99 and 1.1, respectively  We estimate that the percentage of loans in our  multifamily mortgage portfolio with a current DSCR less than 1.0 was 4% and 5% at March 31, 2012 and December 31, 2011,  respectively, and the average current LTV ratio of these loans was 107% at both dates. Our estimates of current DSCRs are based  on the latest available income information for these properties  and our assessments of market conditions  Our estimates of the  current LTV ratios for multifamily loans are based on values we receive from a third party service provider as well as our internal  estimates of property value, for which we may use  changes in tax assessments, market vacancy rates, rent growth and comparable property sales in local areas as well as  third party appraisals for a portion of the portfolio  We periodically perform our own valuations or obtain third party appraisals in cases where a significant deterioration in a  borrower's financial condition has occurred, the borrower has applied for refinancing, or in certain other circumstances  where we deem it appropriate to reassess the property value  Although we use the most recently available results of our  multifamily borrowers to estimate a property's value, there  may be a significant lag in reporting, which could be six months or more, as they complete their results in the normal course of  business. Our internal estimates of property valuation are derived using techniques that include income capitalization,  discounted cash flows, sales comparables, or replacement costs.

151

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Non-Agency Mortgage Related Security Issuers**

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non agency mo tgage-re ated securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. Many of the parties from which we seek recovery under these efforts are also our seller/servicers. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" in our 2011 Annual Report for further information.

**Seller/Servicers**

We acquire a significant portion of our single family mortgage purchase volume from several large seller/servicers with whom we have entered into mortgage purchase volume commitments that provide for the lenders to deliver us up to a certain volume of mortgages during a specified period of time  Our top  0 single family seller/servicers provided approximately 79% of our single family purchase volume during the three months ended March 31, 2012. Wells Fargo Bank, N.A. and U.S. Bank, N.A., accounted for 28%, and 13%, respectively, of our s ng e-family mortgage purchase volume and were the only single family seller/servicers that comprised  0% or more of our purchase volume during the three months ended March 31, 2012  We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated without replacement from other lenders

We are exposed to institutional credit risk arising from the potential insolvency or non performance by our seller/servicers of their obligations to repurchase mortgages or (at our option) indemnify us in the event of: (a) breaches of the representations and warranties they made when they sold the mortgages to us; or (b) failure to comply with our servicing requirements  Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts. As of March 31, 2012 and December 31, 2011, the UPB of loans subject to our repurchase requests issued to our single family seller/servicers was approximately $3 2 billion and  $2.7 billion, and approximately 38% and 39% of these requests, respectively, were outstanding for more than four months since issuance of our initial repurchase request as measured by the UPB of the loans subject to the requests (these figures included repurchase requests for which appeals were pending). As of March 31, 2012, two of our largest seller/servicers had aggregate repurchase requests outstanding, based on UPB, of $1.7 billion, and approximately 47% of these requests were outstanding for four months or more since issuance of the initial request  During the three months ended  March 31, 2012 and 2011, we recovered amounts that covered losses with respect to $0.8 billion and $1.2 billion, respectively, of UPB on loans subject to our repurchase requests

The ultimate amounts of recovery payments we receive from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations  Our estimate of probable incurred losses for exposure to seller/servicers for their repurchase obligations is considered in our allowance for loan losses as of March 31, 2012 and December 31, 2011. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2011 Annual Report for further information  We believe we have appropriately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at March 31, 2012 and December 31, 2011; however, our actual losses may exceed our estimates

We are also exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses  For example, our seller/servicers have an active role in our loss mitigation efforts, including under the servicing alignment initiative and the MHA Program, and therefore, we have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans

A significant portion of our single family mortgage loans are serviced by several large seller/servicers  Our top three single family loan servicers, Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A. serviced approximately 26%, 12%, and 11%, respectively, of our single family mortgage loans, as of March 31, 2012 and together serviced approximately 49% of our single family mortgage loans  Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

As of March 31, 2012 our top three multifamily servicers, Berkadia Commercial Mortgage LLC, CBRE Capital Markets, Inc., and Wells Fargo Bank, N.A., each serviced more than 10% of our multifamily mortgage portfolio and together serviced approximately 40% of our multifamily mortgage portfolio

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3690                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Mortgage Insurers**

We have institutional credit risk relating to the potential insolvency of, or non performance by, mortgage insurers that insure single family mortgages we purchase or guarantee As of March 31, 2012, these insurers provided coverage, with maximum loss limits of $49.2 billion, for $225.6 billion of UPB, in connection with our single family credit guarantee portfolio Our top five mortgage insurer counterparties, Mortgage Guaranty Insurance Corporation , Radian Guaranty Inc , Genworth Mortgage Insurance Corporation, United Guaranty Residential Insurance Co , and PMI Mortgage Insurance Co each accounted for more than 0% and collectively represented approximately 85% of our overall mortgage insurance coverage at March 31, 2012 All our mortgage insurance counterparties are rated BBB or below as of April 23, 2012, based on the lower of the S&P or Moody's rating scales and stated in terms of the S&P equivalent.

We received proceeds of $0.5 billion and $0.6 billion during the three months ended March 31, 2012 and 2011, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single family loans We had outstanding receivables from mortgage insurers of $1.8 billion as of both March 31, 2012 and December 31, 2011. The balance of our outstanding accounts receivable from mortgage insurers, net of associated reserves, was approximately $1.0 billion as of both March 31, 2012 and December 31, 2011.

**Bond Insurers**

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering some of the non agency mortgage related securities we hold Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. At March 31, 2012, we had coverage, including secondary policies, on non agency mortgage related securities totaling $9.5 billion of UPB. At March 31, 2012, our top five bond insurers, Ambac Assurance Corporation (or Ambac), Financial Guaranty Insurance Company (or FGIC), MBIA Insurance Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp., each accounted for more than 0% of our overall bond insurance coverage and collectively represented approximately 99% of our total coverage

We evaluate the expected recovery from primary bond insurance policies as part of our impairment analysis for our investments in securities. FGIC and Ambac are currently not paying any claims. In addition, if a bond insurer fails to meet its obligations on our investments in securities, then the fair values of our securities may further decline, which could have a material adverse effect on our results and financial condition We recognized other than temporary impairment losses during 20 2 and 20 related to investments in mortgage related securities covered by bond insurance as a result of our uncertainty over whether or not certain insurers would be able to pay our future claims on expected credit losses on the securities See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on our evaluation of impairment on securities covered by bond insurance.

**Cash and Other Investments Counterparties**

We are exposed to institutional credit risk arising from the potential insolvency or non performance of counterparties of non-mortgage-re ated investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily major financial institutions and the Federal Reserve Bank As of March 31, 2012 and December 31, 2011, including amounts related to our consolidated VIEs, there were $60.7 billion and $68.5 billion, respectively, of cash and other non mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. As of March 31, 2012, these included:

- $4.9 billion of cash equivalents invested in 7 counterparties that had short term credit ratings of A or above on the S&P or equivalent scale;

- $24 3 billion of securities purchased under agreements to resell with 7 counterparties that had short term S&P ratings of A or above; and

- $30 3 billion of cash deposited with the Federal Reserve Bank (as a non interest bearing deposit)

**Derivative Portfolio**

*Derivative Counterparties*

Our use of exchange traded derivatives and OTC derivatives exposes us to institutional credit risk The requirement that we post initial and maintenance margin with our clearing firm in connection with exchange traded derivatives such as futures contracts exposes us to institutional credit risk in the event that our clearing firm or the exchange's clearinghouse

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                         TREASURY-3691                         Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

fail to meet their obligations  However, the use of exchange traded derivatives lessens our institutional credit risk exposure to individual counterparties, because a central counterparty is substituted for individual counterparties and changes in the value of open exchange traded contracts are settled daily via payments through the financial clearinghouse established by each exchange  OTC derivatives, however, expose us to institutional credit risk to individual counterparties because transactions are executed and settled between us and each counterparty, exposing us to potential losses if a counterparty fails to meet its contractual obligations

Our use of OTC interest rate swaps, option based derivatives, and foreign currency swaps is subject to rigorous internal credit and legal reviews  All of our OTC derivatives counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis  We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

### Master Netting and Collateral Agreements

We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest rate swaps, option based derivatives, and foreign currency swaps  Master netting agreements provide for the netting of amounts receivable and payable from an individual counterparty, which reduces our exposure to a single counterparty in the event of default. On a daily basis, the market value of each counterparty's derivatives outstanding is calculated to determine the amount of our net credit exposure, which is equal to derivatives in a net gain position by counterparty after giving consideration to collateral posted  Our collateral agreements require most counterparties to post collateral for the amount of our net exposure to them above the applicable threshold  Bilateral collateral agreements are in place for all of our active OTC derivative counterparties  Collateral posting thresholds are tied to a counterparty's credit rating  Derivative exposures and collateral amounts are monitored on a daily basis using both internal pricing models and dealer price quotes  Collateral is typically transferred within one business day based on the values of the related derivatives  This time lag in posting collateral can affect our net uncollateralized exposure to derivative counterparties

Collateral posted by a derivative counterparty is typically in the form of cash, although U.S. Treasury securities, Freddie Mac mortgage related securities, or our debt securities may also be posted  In the event a counterparty defaults on its obligations under the derivatives agreement and the default is not remedied in the manner prescribed in the agreement, we have the right under the agreement to direct the custodian bank to transfer the collateral to us or, in the case of non cash collateral, to sell the collateral and transfer the proceeds to us.

Our uncollateralized exposure to counterparties for OTC interest rate swaps, option based derivatives, foreign currency swaps, and purchased interest rate caps, after applying netting agreements and collateral, was $157 million and $71 million at March 31, 2012 and December 3 , 2011, respectively  In the event that all of our counterparties for these derivatives were to have defaulted simultaneously on March 31, 2012, our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately $157 million. Four counterparties each accounted for greater than 0% and collectively accounted for 83% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at March 31, 2012.  These counterparties were BNP Paribas, Deutsche Bank, A.G., Royal Bank of Scotland, and UBS AG, all of which were rated "A" or above by S&P as of April 23, 2012.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives, was $22 million and $38 million at March 31, 2012 and December 31, 2011, respectively  These commitments are uncollateralized  Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments  However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis to ensure that they continue to meet our internal risk management standards.

### NOTE 16: FAIR VALUE DISCLOSURES

### Fair Value Hierarchy

The accounting guidance for fair value measurements and disclosures establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value  Assets and liabilities are classified in their entirety within the fair value hierarchy based on the lowest level input that is significant to the fair value measurement

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3692                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

During the first quarter of 2012, we adopted an amendment to the guidance pertaining to fair value measurements and disclosure  The amendment changed the definition of the principal market to the perspective of the overall market for the particular asset or liability being valued, with less emphasis on the perspective of the reporting entity  As a result of adopting this guidance, we made a change to our principal market assessment for certain single family mortgage loans, primarily for loans that have not been modified and are delinquent four months or more or are in foreclosure  For these loans, we changed our principal market assessment to the whole loan market  The resulting impact was a decrease of $13 8 billion to our fair value of net assets on our fair value balance sheets

During the fourth quarter of 2011, our fair value results as presented in our consolidated fair value balance sheets were affected by a change in estimate which increased the implied capital costs included in our valuation of single family mortgage loans due to a change in the estimation of a risk premium assumption embedded in our modeled valuation of such loans. This change in estimate led to a $14.2 billion decrease in our fair value measurement of mortgage loans as of December 31, 2011

155

*Freddie Mac*

Source   D RA  HOM  OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below sets forth by level within the fair value hierarchy assets and liabilities measured and reported at fair value on a recurring basis in our consolidated balance sheets at March 31, 2012 and December 31, 2011.

**Table 16.1    Assets and Liabilities Measured at Fair Value on a Recurring Basis**

| | Fair Value at March 31, 2012 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) (in millions) | Netting Adjustment(1) | Total |
| **Assets:** | | | | | |
| Investments in securities | | | | | |
| Available-for-sale, at fair value | | | | | |
| Mortgage-related securities | | | | | |
| Freddie Mac | $ | $ 74,265 | $ 1,898 | $ | $ 76,163 |
| Subprime | | | 27,145 | | 27,145 |
| CMBS | | 51,610 | 3,143 | | 54,753 |
| Option ARM | | | 5,818 | | 5,818 |
| Alt-A and other | | 10 | 11,084 | | 11,094 |
| Fannie Mae | | 18,729 | 168 | | 18,897 |
| Obligations of states and political subdivisions | | | 7,565 | | 7,565 |
| Manufactured housing | | | 748 | | 748 |
| Ginnie Mae | | 228 | 11 | | 239 |
| Total available-for-sale securities, at fair value | | 144,842 | 57,580 | | 202,422 |
| Trading, at fair value | | | | | |
| Mortgage-related securities | | | | | |
| Freddie Mac | | 12,779 | 1,725 | | 14,504 |
| Fannie Mae | | 13,214 | 478 | | 13,692 |
| Ginnie Mae | | 131 | 20 | | 151 |
| Other | | 140 | 13 | | 153 |
| Total mortgage-related securities | | 26,264 | 2,236 | | 28,500 |
| Non-mortgage-related securities | | | | | |
| Asset-backed securities | | 695 | | | 695 |
| Treasury bills | 3,000 | | | | 3,000 |
| Treasury notes | 23,164 | | | | 23,164 |
| FDIC-guaranteed corporate medium-term notes | | 2,960 | | | 2,960 |
| Total non-mortgage-related securities | 26,164 | 3,655 | | | 29,819 |
| Total trading securities, at fair value | 26,164 | 29,919 | 2,236 | | 58,319 |
| Total investments in securities | 26,164 | 174,761 | 59,816 | | 260,741 |
| Mortgage loans | | | | | |
| Held-for-sale, at fair value | | | 11,337 | | 11,337 |
| Derivative assets, net | | | | | |
| Interest-rate swaps | 2 | 10,816 | 21 | | 10,839 |
| Option-based derivatives | | 10,322 | | | 10,322 |
| Other | | 106 | 1 | | 107 |
| Subtotal, before netting adjustments | 2 | 21,244 | 22 | | 21,268 |
| Netting adjustments(1) | | | | (21,086) | (21,086) |
| Total derivative assets, net | 2 | 21,244 | 22 | (21,086) | 182 |
| Other assets | | | | | |
| Guarantee asset, at fair value | | | 798 | | 798 |
| All other, at fair value | | | 143 | | 143 |
| Total other assets | | | 941 | | 941 |
| Total assets carried at fair value on a recurring basis | $ 26,166 | $ 196,005 | $ 72,116 | $ (21,086) | $273,201 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ | $ | $ 2,221 | $ | $ 2,221 |
| Derivative liabilities, net | | | | | |
| Interest-rate swaps | 2 | 28,739 | 6 | | 28,747 |
| Option-based derivatives | | 890 | 1 | | 891 |
| Other | 66 | 55 | 45 | | 166 |
| Subtotal, before netting adjustments | 68 | 29,684 | 52 | | 29,804 |
| Netting adjustments(1) | | | | (29,508) | (29,508) |
| Total derivative liabilities, net | 68 | 29,684 | 52 | (29,508) | 296 |
| Other liabilities | | | | | |
| All other, at fair value | | | 4 | | 4 |
| Total liabilities carried at fair value on a recurring basis | $ 68 | $ 29,684 | $ 2,277 | $ (29,508) | $ 2,521 |

*Freddie Mac*

Source    DRA HOM    OAN MORTGAG CORP, 10 Q, May 03, 2012    TREASURY-3694    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Fair Value at December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment(1) | Total |
| | | | (in millions) | | |
| **Asse s:** | | | | | |
| Inves en s n secu es | | | | | |
| Ava lable-fo -sale, a fa value | | | | | |
| Mo gage- ela ed secu es | | | | | |
| F edd e Mac | $ | $ 79,044 | $ 2,048 | $ | $ 81,092 |
| Subp me | | | 27,999 | | 27,999 |
| CMBS | | 51,907 | 3,756 | | 55,663 |
| Op on ARM | | | 5,865 | | 5,865 |
| Al -A a d o he | | 11 | 10,868 | | 10,879 |
| Fann e Mae | | 20,150 | 172 | | 20,322 |
| Obl ga ons of s a es and pol cal subd v s ons | | | 7,824 | | 7,824 |
| Ma fac ed ho s g | | | 766 | | 766 |
| G nn e Mae | | 237 | 12 | | 249 |
| To al ava lable-fo -sale secu es, a fa value | | 151,349 | 59,310 | | 210,659 |
| T ad g, a fa va e | | | | | |
| Mo gage- ela ed secu es | | | | | |
| F edd e Mac | | 14,181 | 1,866 | | 16,047 |
| Fann e Mae | | 14,627 | 538 | | 15,165 |
| G nn e Mae | | 134 | 22 | | 156 |
| O he | | 74 | 90 | | 164 |
| To al mo gage- ela ed secu es | | 29,016 | 2,516 | | 31,532 |
| Non-mo gage- ela ed secu es | | | | | |
| Asse -backed secu es | | 302 | | | 302 |
| T easu y b s | 100 | | | | 100 |
| T eas y o es | 24,712 | | | | 24,712 |
| FDIC-gua an eed co po a e med um- e m no es | | 2,184 | | | 2,184 |
| To al non-mo gage- ela ed secu es | 24,812 | 2,486 | | | 27,298 |
| To a ad ng secu es, a fa va ue | 24,812 | 31,502 | 2,516 | | 58,830 |
| To al nves men s n secu es | 24,812 | 182,851 | 61,826 | | 269,489 |
| Mo gage loans | | | | | |
| He d-fo -sa e, a fa va ue | | | 9,710 | | 9,710 |
| De va ve asse s, e | | | | | |
| In e es - a e swaps | | 12,976 | 46 | | 13,022 |
| Op on-based de va ves | 1 | 15,868 | | | 15,869 |
| O he | 5 | 110 | 35 | | 150 |
| S b o a befo e e g adj s es | 6 | 28,954 | 81 | | 29,041 |
| Ne ng adj s e s(1 | | | | (28,923) | (28,923) |
| To a de va ve asse s, ne | 6 | 28,954 | 81 | (28,923) | 118 |
| O e asse s | | | | | |
| G a an ee asse s, a fa va e | | | 752 | | 752 |
| A o e , a fa va e | | | 151 | | 151 |
| To a o he asse s | | | 903 | | 903 |
| To a asse s ca ed a fa va ue on a ecu ng bas s | $ 24,818 | $ 211,805 | $ 72,520 | $ (28,923) | $ 280,220 |
| **Liabili ies:** | | | | | |
| Deb secu es eco ded a fa va ue | $ | $ 3,015 | $ | $ | $ 3,015 |
| De va ve l ab l es, ne | | | | | |
| In e es - a e swaps | | 34,601 | 21 | | 34,622 |
| Op on-based de va ves | 1 | 2,934 | 1 | | 2,936 |
| O he | | 103 | 42 | | 145 |
| S b o a befo e e g adj s es | 1 | 37,638 | 64 | | 37,703 |
| Ne ng adj s e s(1 | | | | (37,268) | (37,268) |
| To al de va ve l ab l es, ne | 1 | 37,638 | 64 | (37,268) | 435 |
| To al l ab l es ca ed a fa value on a ecu ng bas s | $ 1 | $ 40,653 | $ 64 | $ (37,268) | $ 3,450 |

(1) Rep ese s co pa y e g, cas co a e a e g, e ade/se e ece vab e o payab e and ne de va ve e es ece vable o payable The ne cash colla e al posted a d e ade/se e ece vab e we e $9 2 b on and $299 o , espec ve y, a Ma c 31, 2012 T e e cash co a e a pos ed and ne ade/se e ece vable we e $9 4 b on and $1 on, espec ve y, a Decembe 31, 2011 The ne n e es ece vab e (payab e) of de va ve asse s and de va ve l ab l es was app ox ma ely $(1 1) b on a bo h Ma ch 31, 2012 and Decembe 31, 2011, wh ch was ma n y e a ed o n e es a e swaps a we a ve e ed o

## Recurring Fair Value Changes

For the three months ended March 31, 2012, our transfers between Level and Level 2 assets or liabilities were less than $1 million.

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3695

Table of Contents

Our Level 3 items mainly consist of non agency mortgage related securities  See "Assets and Liabilities  Measured at Fair Value in Our Consolidated Balance Sheets"  for additional information about the valuation methods and  assumptions used in our fair value measurements.

During the three months ended March 31, 2012, the fair  value of our Level 3 assets decreased primarily due to:  (a) principal repayments from the underlying collateral of non agency mortgage related securities; and (b) the net  transfer out of Level 3 assets of $0 3 billion, resulting from a change in valuation method for certain  mortgage related securities due to improved liquidity and  availability of price quotes from dealers and third party pricing services  These decreases are partially offset by an  increased volume of our multifamily held for sale mortgage loans  that we expect to securitize in future periods

During the three months ended March 31, 2012, the fair  value of our Level 3 liabilities increased primarily due to  the transfer of $3 0 billion of foreign currency denominated and certain other debt securities recorded at fair  value from Level 2 to Level 3 given the lack of market  depth as evidenced by low transaction volumes in these  securities

During the three months ended March 31, 2011, the fair  value of our Level 3 assets decreased by $2 0 billion,  mainly attributable to: (a) principal repayments from the  underlying collateral of non agency mortgage related securities;  and (b) net securitizations of multifamily held for sale loans  In addition, we had a net transfer into Level 3  assets of $0.1 billion during the first quarter of 2011, resulting from a change in valuation method due to a lack of relevant price quotes from dealers and third party pricing  services

The table below provides a reconciliation of the beginning and  ending balances for assets and liabilities measured at fair  value using significant unobservable inputs (Level 3)

158

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 16.2    Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs**

| | Balance, January 1, 2012 | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1) | Total | Purchases | Issues | Sales | Settlements, net(5) | Transfers into Level 3(6) | Transfers out of Level 3(6) | Balance, March 31, 2012 | Unrealized gains (losses) still held(7) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in millions) | | | | | |
| **Assets** | | | | | | | | | | | | |
| Investments in securities | | | | | | | | | | | | |
| Available-for-sale, at fair value | | | | | | | | | | | | |
| Mortgage-related securities | | | | | | | | | | | | |
| Freddie Mac | $ 2,048 | $ | $ (2) | $ (2) | $ | $ | $ | (28) | $ | (120) | $ 1,898 | $ |
| Subprime | 27,999 | (441) | 743 | 302 | | | | (1,156) | | | 27,145 | (441) |
| CMBS | 3,756 | 76 | (337) | (261) | | | (330) | (22) | | | 3,143 | |
| Option ARM | 5,865 | (48) | 258 | 210 | | | | (257) | | | 5,818 | (48) |
| Alt-A and other | 10,868 | (57) | 631 | 574 | | | | (358) | | | 11,084 | (57) |
| Fannie Mae | 172 | | 1 | 1 | | | | (5) | | | 168 | |
| Obligations of states and political subdivisions | 7,824 | 1 | 63 | 64 | | | (7) | (316) | | | 7,565 | |
| Manufactured housing | 766 | (2) | 7 | 5 | | | | (23) | | | 748 | (2) |
| Ginnie Mae | 12 | | | | | | | (1) | | | 11 | |
| Total available-for-sale mortgage-related securities | 59,310 | (471) | 1,364 | 893 | | | (337) | (2,166) | | (120) | 57,580 | (548) |
| Trading, at fair value | | | | | | | | | | | | |
| Mortgage-related securities | | | | | | | | | | | | |
| Freddie Mac | 1,866 | 6 | | 6 | | 51 | (63) | (51) | 35 | (119) | 1,725 | 5 |
| Fannie Mae | 538 | 3 | | 3 | (4) | | 4 | (8) | | (55) | 478 | 3 |
| Ginnie Mae | 22 | | | | | | | (2) | | | 20 | |
| Other | 90 | | | | | | | (2) | | (75) | 13 | |
| Total trading mortgage-related securities | 2,516 | 9 | | 9 | (4) | 51 | (59) | (63) | 35 | (249) | 2,236 | 8 |
| Mortgage loans | | | | | | | | | | | | |
| Held-for-sale, at fair value | 9,710 | 179 | | 179 | 5,367 | | | (3,903) | (16) | | 11,337 | 104 |
| Other assets | | | | | | | | | | | | |
| Guarantee asset(8) | 752 | 1 | | 1 | | 62 | | (17) | | | 798 | 1 |
| All other | 151 | (8) | | (8) | | | | | (17) | | 143 | (8) |
| Total other assets | 903 | (7) | | (7) | | 62 | | (17) | | | 941 | (7) |
| **Liabilities** | | | | | | | | | | | | |
| Debt securities recorded at fair value | | 18 | | 18 | | | | (812) | 3,015 | | 2,221 | (28) |
| Net derivatives(9) | (17) | 18 | | 18 | | | | (4) | | 33 | 30 | (12) |
| Other liabilities | | | | | | | | | | | | |
| Accrued, at fair value | | 4 | | 4 | | | | | | | 4 | (4) |

*Freddie Mac*

TREASURY-3697

Source    D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Balance, January 1, 2011 | Realized and unrealized gains (losses) | | | Purchases | Issues | Sales | Settlements, net(5) | Net transfers in and/or out of Level 3(6) | Balance, March 31, 2011 | Unrealized gains (losses) still held(7) |
| | | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1) | Total | | | | | | | |
| | | | (in millions) | | | | | | | | |
| **Investments in securities** | | | | | | | | | | | |
| Available-for-sale, at fair value | | | | | | | | | | | |
| Mortgage-related securities | | | | | | | | | | | |
| Freddie Mac | $ 2,037 | $ | $ | | $ | $ | $ | $ | (40) | (101) | $ 1,896 | $ |
| Subprime | 33,861 | (734) | 1,569 | 835 | | | | (1,352) | | 33,344 | (734) |
| CMBS | 3,115 | | (23) | (23) | | | | 1 | | 3,093 | |
| Option ARM | 6,889 | (281) | 692 | 411 | | | | (311) | | 6,989 | (281) |
| Alt-A and other | 13,155 | (40) | 238 | 198 | | | | (429) | | 12,924 | (40) |
| Fannie Mae | 212 | | 1 | 1 | | | | (13) | (5) | 195 | |
| Obligations of states and political subdivisions | 9,377 | 1 | (1) | | | | (37) | (465) | | 8,875 | |
| Manufactured housing | 897 | (3) | 12 | 9 | | | | (28) | | 878 | (3) |
| Ginnie Mae | 16 | | | | | | | (1) | | 15 | |
| Total available-for-sale mortgage-related securities | 69,559 | (1,057) | 2,488 | 1,431 | | | (37) | (2,638) | (106) | 68,209 | (1,058) |
| Trading, at fair value | | | | | | | | | | | |
| Mortgage-related securities | | | | | | | | | | | |
| Freddie Mac | 2,299 | 62 | | 62 | 230 | | (31) | (49) | 186 | 2,697 | 62 |
| Fannie Mae | 854 | 11 | | 11 | | | | (6) | 12 | 871 | 11 |
| Ginnie Mae | 27 | | | | | | | (1) | | 26 | |
| Other | 20 | | | | | | | (1) | | 19 | |
| Total trading mortgage-related securities | 3,200 | 73 | | 73 | 230 | | (31) | (57) | 198 | 3,613 | 73 |
| **Mortgage loans** | | | | | | | | | | | |
| Held-for-sale, at fair value | 6,413 | 62 | | 62 | 2,164 | | (3,322) | (13) | | 5,304 | (25) |
| Net derivatives(9) | (691) | (127) | | (127) | | 13 | | 74 | | (757) | (120) |
| **Other assets** | | | | | | | | | | | |
| Guarantee assets(8) | 541 | (1) | | (1) | | 68 | | (11) | | 597 | (1) |
| All other | 235 | (5) | | (5) | | | | (11) | | 230 | (5) |
| Total other assets | 776 | (6) | | (6) | | 68 | | (11) | | 827 | (6) |

(1) Changes in fair value for available-for-sale investment securities are recorded in AOCI, while gains and losses from sales are recorded in other gains (losses) on investment securities on our consolidated statements of comprehensive income. For mortgage-related securities classified as trading, the realized and unrealized gains (losses) are recorded in other gains (losses) on investment securities on our consolidated statements of comprehensive income.

(2) Changes in fair value of derivatives are recorded in derivative gains (losses) on our consolidated statements of comprehensive income for those not designated as accounting hedges.

(3) Changes in fair value of the guarantee asset are recorded in other income on our consolidated statements of comprehensive income.

(4) For held-for-sale mortgage loans for which fair value option is elected, gains (losses) on fair value changes and sale of mortgage loans are recorded in other income on our consolidated statements of comprehensive income.

(5) For non-agency mortgage-related securities, primarily represents principal repayments.

(6) Transfers in and/or out of Level 3 during the period are disclosed as if the transfer occurred at the beginning of the period.

(7) Represents the amount of total gains or losses for the period, included in earnings, and the change in unrealized gains (losses) related to assets and liabilities classified as Level 3 as were held at March 31, 2012 and 2011, respectively. Included in these amounts are credit-related other-than-temporary impairments recorded on available-for-sale securities.

(8) We estimate that all amounts recorded for unrealized gains and losses on our guarantee asset relate to those amounts still in position on. The amounts reflected as included in earnings represent the period of fair value changes of our guarantee asset.

(9) Net derivatives include derivative assets and derivative liabilities representing over-the-counter pay net settling, cash collateral netting, trade/settle receivable or payable and net derivative netting receivable or payable.

160

*Freddie Mac*

Source: D RA HOM OAN MORTGAG CORP, 10 Q, May 03, 2012    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Non-recurring Fair Value Changes**

Certain assets are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances. We consider the fair value measurement related to these assets to be non recurring  These assets include impaired held for investment multifamily mortgage loans and REO, net  These fair value measurements usually result from the write down  of individual assets to current fair value amounts due to impairments  See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets    *Mortgage Loans, Held for Investment*" and " *REO, Net*" for additional details

The table below presents assets measured and reported at fair  value on a non recurring basis in our consolidated balance  sheets by level within the fair value hierarchy at March 31, 2012 and December 31, 2011, respectively.

**Table 16.3      Assets Measured at Fair Value on a Non Recurring Basis**

| | Fair Value at March 31, 2012 | | | | | Fair Value at December 31, 2011 | | | | |
| | Quoted Prices in Active Markets for dentical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant nobservable Inputs ( evel 3) | Total | | Quoted Prices in Active Markets for dentical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant nobservable Inputs ( evel 3) | Total | |
| | | | | (in millions) | | | | | | |
| **Assets measured at fair value on a non-recurr ng bas s:** | | | | | | | | | | |
| Mo gage loans (1 | | | | | | | | | | |
| Held-fo - nves men | $ | $ | $    1,469 | $ 1,469 | | $ | $ | $    1,380 | $ 1,380 | |
| REO,  e (2 | | | 2,303 | 2,303 | | | | 3,146 | 3,146 | |
| To a  asse s  easu ed a  fa  va ue on a non- ecu ng bas s | $ | $ | $    3,772 | $3,772 | | $ | $ | $    4,526 | $4,526 | |

| | Total Gains (Losses) Three Months  nded March 31,(3) | |
| | 2012 | 2011 |
| | (in millions) | |
| **Assets measured at fa r value on a non-recurr ng bas s:** | | |
| Mo gage loans (1 | | |
| Held-fo - nves men | $ (26) | $    11 |
| REO,  e (2 | (15) | (135) |
| To al ga ns (losses) | $ (41) | $ (124) |

(1) Rep esen s ca  y ng va ue and  e a ed w e-downs of oans fo  w c  adj s e s a e based o  e fa va ea o  s T ese oans nc ude mpa ed mu  fam y
      mo gage loans  ha  a e class f ed as held-fo - nves men  and have a ela ed valua on a owance
(2) Rep esen s he fa  va ue and  e a ed osses of fo ec osed p ope  es  a  we e  eas ed a fa  va es bseq e  o  e n  a cass f ca on as REO, ne  The
      ca  y ng amoun  of REO,  e was w e  dow  of a  va e of $2 3  b  o  , ess e s ma ed cos s o sell of $159 m ll on (o app ox ma ely $2 1 b  on) a  Ma c  31,
      2012  The ca  y ng amoun  of REO,  e was w e  dow  of a  va e of $3 1 b  o  , less e s ma ed cos s o sell of $221 m ll on (o  app ox ma ely $2 9 b ll on) a
      Decembe  31, 2011
(3) Rep esen s he  o a  ne  ga ns ( osses) eco ded on  ems measu ed a  fa  va ue on a non- ecu  ng bas s as of Ma ch 31, 2012 and 2011,  espec ve y

**Fair Value Election**

We elected the fair value option for certain types of securities, multifamily held for sale mortgage loans,  foreign currency denominated debt, and certain other debt

***Certain Available-for-Sale Securities with Fair Value Option Elected***

We elected the fair value option for certain available for sale mortgage related securities to better reflect the natural offset  these securities provide to fair value changes recorded  historically on our guarantee asset at the time of our election  In addition, upon adoption of the accounting guidance for the fair value option, we elected this option for available for sale  securities within the scope of the accounting guidance for investments in beneficial interests in securitized financial  assets to better reflect any valuation changes that would occur  subsequent to impairment write downs previously recorded on  these instruments  By electing the fair value option for these  instruments, we reflect valuation changes through our consolidated statements of comprehensive income in the period  they occur, including any increases in value.

For mortgage related securities and investments in securities  that were selected for the fair value option and subsequently  classified as trading securities, the change in fair value is recorded in other gains (losses) on investment securities  recognized in earnings in our consolidated statements of comprehensive income. See "NOTE 7: INVESTMENTS IN  SECURITIES" for additional information regarding the net unrealized gains (losses) on trading securities, which include  gains (losses) for other items that are not selected for the  fair value option  Related interest

161

*Freddie Mac*

Source  D RA  HOM  OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3699

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

income continues to be reported as interest income in our consolidated statements of comprehensive income  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Investments in Securities" in our 2011 Annual Report for additional information about the measurement and recognition of interest income on investments in securities

### Debt Securities with Fair Value Option Elected

We elected the fair value option for foreign currency denominated debt and certain other debt securities  In the case of foreign currency denominated debt, we have entered into derivative transactions that effectively convert these instruments to U S  dollar denominated floating rate instruments  The fair value changes on these derivatives were recorded in derivative gains (losses) in our consolidated statements of comprehensive income  We elected the fair value option on these debt instruments to better reflect the economic offset that naturally results from the debt due to changes in interest rates  We also elected the fair value option for certain other debt securities containing potential embedded derivatives that required bifurcation

The changes in fair value of debt securities with the fair value option elected were $(17) million and $(81) million for the three months ended March 31, 2012 and 2011, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of comprehensive income  The changes in fair value related to fluctuations in exchange rates and interest rates were $(4) million and $(72) million for the three months ended March 31, 2012 and 2011, respectively. The remaining changes in the fair value of $(13) million and $(9) million were attributable to changes in credit risk  for the three months ended March 31, 2012 and 2011, respectively

The change in fair value attributable to changes in credit risk was primarily determined by comparing the total change in fair value of the debt to the total change in fair value of the interest rate and foreign currency derivatives used to hedge the debt  Any difference in the fair value change of the debt compared to the fair value change in the derivatives is attributed to credit risk.

The difference between the aggregate fair value and aggregate UPB for long term debt securities with fair value option elected was $42 million and $43 million at March 31, 2012 and December 3 , 20   , respectively  Related interest expense continues to be reported as interest expense in our consolidated statements of comprehensive income  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Debt Securities Issued" in our 2011 Annual Report for additional information about the measurement and recognition of interest expense on debt securities issued

### Multifamily Held For Sale Mortgage Loans with Fair Value Option Elected

We elected the fair value option for multifamily mortgage loans that were purchased for securitization. Through this channel, we acquire loans that we intend to securitize and sell to CMBS investors  While this is consistent with our overall strategy to expand our multifamily business, it differs from our previous buy and hold strategy with respect to multifamily loans held for investment  Therefore, these multifamily mortgage loans were classified as held for sale mortgage loans in our consolidated balance sheets  to reflect our intent to sell in the future

We recorded $179 million and $62 million from the change in fair value in gains (losses) on mortgage loans recorded at fair value in other income in our consolidated statements of comprehensive income for the three months ended March 31, 2012 and 2011, respectively. The changes in fair value of these loans were primarily attributable to changes in interest rates and other items such as liquidity. The changes in fair value attributable to instrument specific credit risk were not material given that these loans were generally originated within the past 12 months and have not seen a change in their credit characteristics

The difference between the aggregate fair value and the aggregate UPB for multifamily held for sale loans with the fair value option elected was $206 million and $195 million at March 31, 2012 and December 31, 2011, respectively. Related interest income continues to be reported as interest income in our consolidated statements of comprehensive income  See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES      Mortgage Loans" in our 2011 Annual Report for additional information about the measurement and recognition of interest income on our mortgage loans

### Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets

We categorize assets and liabilities that we measure and report at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation processes used to derive the fair value and our judgment regarding the observability of the related inputs

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3700                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Investments in Securities

#### Agency Securities

Fixed rate agency securities are valued based on dealer published quotes for a base TBA security, adjusted to reflect the measurement date as opposed to a forward settlement date ("carry") and pay ups for specified collateral. The base TBA price varies based on agency, term, coupon, and settlement month. The carry adjustment converts forward settlement date prices to spot or same day settlement date prices such that the fair value is estimated as of the measurement date, and not as of the forward settlement date. The carry adjustment uses our internal prepayment and interest rate models. A pay up is added to the base TBA price for characteristics that are observed to be trading at a premium versus TBAs; this currently includes seasoning and low loan balance attributes. Haircuts are applied to a small subset of positions that are less liquid and are observed to trade at a discount relative to TBAs; this includes securities that are not eligible for delivery into TBA trades.

Adjustable rate agency securities are valued based on the median of prices from multiple pricing services. The key valuation drivers used by the pricing services include the interest rate cap structure, term, agency, remaining term, and months to next coupon reset, coupled with prevailing market conditions, namely interest rates.

Because fixed rate and adjustable rate agency securities are generally liquid and contain observable pricing in the market, they generally are classified as Level 2.

Multiclass structures are valued using a variety of methods, depending on the product type. The predominant valuation methodology uses the median prices from multiple pricing services. This method is used for structures for which there is typically significant, relevant market activity. Some of the key valuation drivers used by the pricing services are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. Other tranche types that are more challenging to price are valued using the median prices from multiple dealers. These include structured interest only, structured principal only, inverse floating rate, and inverse interest only structures. Some of the key valuation drivers used by the dealers are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. There is also a subset of positions for which prices are published on a daily basis; these include trust interest only and trust principal only strips. These are fairly liquid tranches and are quoted on a regular settlement date basis. In order to align the regular settlement date price with the balance sheet date, the OAS is calculated based on the published prices. Then the tranche is valued using that OAS applied to the balance sheet date.

Multiclass agency securities are classified as Level 2 or 3 depending on the significance of the inputs that are not observable.

In addition, there is a subset of tranches for which there is a lack of relevant market activity. These are priced using either a proxy relationship, where the position is matched to the closest dealer priced tranche, and then valued by calculating an OAS using our proprietary prepayment and interest rate models, or the position will be valued via a hedge ratio pricing method. The subset of agency residential mortgage related securities classified as Level 3 is valued using unobservable inputs, including those valued using either OAS or hedge ratio prices.

For the subset of our positions that uses an OAS approach, we determine the fair values for these securities by using the estimated OAS as an input to the valuation calculation in conjunction with interest rate and prepayment models to calculate the NPV of the projected cash flows. These positions typically have smaller balances and are more difficult for dealers to value. The OAS based prices are predominantly associated with interest only and principal only securities. Dealers publish regular settlement date prices for many of these securities, which provide the necessary starting point to create an OAS based valuation as of the valuation date. These securities are sensitive to changes in prepayment expectations, interest rates, and changes in housing policy that could affect the level and timing of cash flows. In aggregate, as the cash flow streams are shortened (lengthened), the fair value of principal only securities would increase (decrease) while interest only securities would decrease (increase).

For a subset of agency residential mortgage backed securities, a hedge ratio pricing method is utilized as current information about cash flows is not readily available. The hedge ratio pricing method calculates a current period price from the prior period valuation and the associated risk metrics. Specifically, the securities' risk metrics, such as key rate durations, convexity, and volatility duration, are coupled with the market changes associated with each such metric to estimate the price change corresponding to that metric. The sum of the individual adjustments is added to the prior period valuation to produce the final valuation. If necessary, our judgment is applied to estimate the impact of differences in prepayment uncertainty or other unique cash flow characteristics related to that particular security. These valuations are sensitive to the market changes, specifically interest rate, spread, and volatility changes. As interest rates and/or volatility increase (decrease), the fair values of these securities will typically decrease (increase).

163                                                              *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Commercial Mortgage Backed Securities*

CMBS are valued primarily based on the median prices from  multiple pricing services  Some of the key valuation drivers  used by the pricing services include the collateral type, collateral performance, capital structure, issuer, credit  enhancement, coupon, weighted average life, and interest rates, coupled with the observed spread levels on trades of similar  securities  Many of these securities have significant prepayment lockout periods or penalty periods that limit the window of  potential prepayment to a relatively narrow band  These  securities are primarily classified as Level 2

There is a subset of CMBS comprised of military housing revenue  bonds that is valued using a hedge ratio pricing method, and  classified as Level 3 in the fair value hierarchy  These valuations are sensitive to market changes, specifically changes  in interest rates and OAS. As interest rates increase (decrease)  and/or OAS widens (tightens), fair values will typically decrease  (increase)

*Subprime, Option ARM, and Alt A and Other (Mortgage Related)*

These private label investments are valued using either the  median of multiple dealer prices or the median prices from  multiple pricing services  Some of the key valuation drivers  used by the dealers and pricing services include the product  type, vintage, collateral performance, capital structure, credit enhancements, and coupon, coupled with interest rates  and  spreads observed on trades of similar securities, where possible  The market for non agency mortgage related securities  backed by subprime, option ARM, and Alt A and other loans is illiquid, resulting in wide price ranges as well as wide credit  spreads. These securities are primarily classified as Level 3

The techniques used by these pricing services and dealers to  develop the prices generally are either: (a) a comparison  to transactions involving instruments with similar collateral  and risk profiles; or (b) a discounted cash flow model. For  a large majority of the securities we value using dealers and pricing services, we obtain multiple external prices, which are  non binding both to us and our counterparties. When multiple prices are received, we use the median of the prices  The models  and related assumptions used by the dealers and pricing services  are owned and managed by them  However, we have an understanding  of their processes used to develop the prices provided to us  based on our ongoing due diligence  We have discussions with our dealers and pricing service vendors at least annually and often  more frequently to maintain a current understanding of the  processes and inputs they use to develop prices  We make no adjustments to the individual prices we receive from third party pricing services or dealers for non agency mortgage related  securities beyond calculating median prices and discarding  certain prices that are determined not to be valid based on our  validation processes  See "Valuation Process and Controls Over Fair Value Measurement" for additional information regarding our validation processes

The non agency mortgage related security markets continued to be  illiquid during the first quarter of 2012  We continue to utilize the prices on such securities provided to us by various  pricing services and dealers and believe that the procedures  executed by the pricing services and dealers, combined with our internal verification and analytical processes, help ensure that  the prices used to develop our financial statements are in accordance with the accounting guidance for fair value  measurement and disclosure

The fair value measurements of these assets are sensitive to  changes in assumptions regarding probability of default, loss  severity in the event of default, forecasts of home prices, or  significant activity or developments in the non agency  securities market. Significant changes in any of those inputs in isolation may result in significantly higher or lower fair value  measurements  Generally, a change in the assumption used for forecasts of home price changes is accompanied by directionally  similar changes in the assumptions used for probability of  default and loss severity  Positive (negative) reaction to portfolio sales could trigger changes in investor sentiment  leading to higher (lower) fair values

The table below presents the fair value of subprime, option ARM,  and Alt A and other investments we held by origination year

**Table 16.4    Fair Value of Subprime, Option ARM, and Alt A and Other Investments by Origination Year**

| Year of Origination | Fair Value at | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (in millions) | |
| 2004 and p  o | $     4,294 | $     4,287 |
| 2005 | 10,320 | 10,411 |
| 2006 | 15,899 | 16,155 |
| 2007 | 13,544 | 13,890 |
| 2008 and beyond | | |
| o a | $   44,057 | $   44,743 |

164

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Obligations of States and Political Subdivisions*

These primarily represent housing revenue bonds, which are valued by taking the median prices from multiple pricing services Some of the key valuation drivers used by the pricing services include the structure of the bond, including call terms, cross collateralization features, and tax exempt features, coupled with municipal bond rates, credit ratings, and spread levels These securities are unique, resulting in low trading volumes and are classified as Level 3 in the fair value hierarchy

The investor base for most issues of municipal securities is fairly narrow, and within this investor base, there is only a subset that invests in housing revenue bonds, as these securities require an additional level of mortgage security expertise Consequently, the market for these securities is fairly illiquid. These valuations are sensitive to trends in the broader municipal securities market, which includes credit risk. As market concerns associated with credit risk increase (decrease), the fair value of housing revenue bonds will generally decrease (increase) In addition, they also are subject to the same interest rate risk, prepayment risk, and house price levels as other non agency mortgage related securities As interest rates increase (decrease) or projected home price forecasts decrease (increase), the fair value of housing revenue bonds will generally decrease (increase)

*Manufactured Housing*

Securities backed by loans on manufactured housing properties are dealer priced and we arrive at the fair value by taking the median of multiple dealer prices Some of the key valuation drivers include the overall market direction, the collateral's performance, and vintage These securities are classified as Level 3 in the fair value hierarchy because key inputs are unobservable in the market due to low levels of liquidity.

The fair values of our manufactured housing securities rely on unobservable inputs as there is no new production, and outstanding securities are very thinly traded In some instances, a security may be comprised of so few loans, that the concentration risk will further limit the number of potential investors These private label investments are valued using the median of multiple dealer prices Due to the seasoned nature of these securities, their valuations tend to track overall market sentiment. The primary valuation driver for manufactured housing is market demand at a particular point in time. An increase (decrease) in selling activity will typically result in a decrease (increase) in fair values A secondary driver of the overall fair value measurement is the macroeconomic drivers of the economy As the broader economy improves (deteriorates), the fair values will tend to increase (decrease)

*Asset Backed Securities (Non Mortgage Related)*

These private label non mortgage related securities are valued based on prices from pricing services Some of the key valuation drivers include the discount margin, subordination level, and prepayment speed, coupled with interest rates They are classified as Level 2 because of their liquidity and tight pricing ranges

*Treasury Bills and Treasury Notes*

Treasury bills and Treasury notes are classified as Level 1 in the fair value hierarchy since they are actively traded and price quotes are widely available at the measurement date for the exact security we are valuing

*FDIC Guaranteed Corporate Medium Term Notes*

Since these securities carry the FDIC guarantee, they are considered to have no credit risk. They are valued based on yield analysis. They are classified as Level 2 because of their high liquidity and tight pricing ranges.

**Mortgage Loans, Held for Sale**

Mortgage loans, held for sale consist of multifamily mortgage loans with the fair value option elected Thus, all held for sale mortgage loans are measured at fair value on a recurring basis.

The fair value of multifamily mortgage loans is generally based on market prices obtained from a third party pricing service provider for similar actively traded mortgages, adjusted for differences in loan characteristics and contractual terms. The pricing service aggregates observable price points from two markets: agency and non agency. The agency market consists of purchases made by the GSEs of loans underwritten by our counterparties in accordance with our guidelines while the non agency market generally consists of secondary market trades between banks and other financial institutions of loans that were originated and initially held in portfolio by these institutions. The pricing service blends the observable price data obtained from these two distinct markets into a final composite price based on the expected probability that a given loan will trade in one of these two markets This estimated probability is largely a function of the loan's credit quality, as determined by its current LTV ratio and DSCR. The result of this blending technique is that lower

Source   D RA HOM   OAN MORTGAG CORP, 10 Q, May 03, 2012

TREASURY-3703

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

credit quality loans receive a lower percentage of agency price  weighting and higher credit quality loans receive a higher  percentage of agency price weighting

Given the relative illiquidity in the marketplace for  multifamily mortgage loans and differences in contractual terms,  these loans are classified as Level 3 in the fair value  hierarchy.

These values are sensitive to changes in benchmark interest  rates, market pricing spreads to benchmark interest rates for  credit and liquidity risk factors, estimated prepayment speeds  subsequent to the expiration of yield maintenance periods, and  portfolio credit quality as represented by each loan's current estimated DSCR and LTV ratios. Significant increases in  interest rates and credit and liquidity spreads and/or deterioration in portfolio credit quality (*e.g.*,  increases in LTV ratios and/or decreases in DSCR) may result in significantly lower  fair value measurement

### Mortgage Loans, Held for Investment

Mortgage loans, held for investment measured at fair value on a  non recurring basis represent impaired multifamily mortgage  loans, which are not measured at fair value on an ongoing basis  but have been written down to fair value due to impairment  The  valuation technique we use to measure the fair value of impaired  multifamily mortgage loans, held for investment is based on the  value of the underlying property and may include assessment of third  party appraisals, environmental, and engineering reports  that we  compare with relevant market performance to arrive at a fair value  Our valuation technique incorporates one or more of the following  methods: income capitalization, discounted cash  flow, sales comparables, and replacement cost  We consider the  physical condition of the property, rent levels, and other market  drivers, including input from sales brokers and the  property manager  We classify impaired multifamily mortgage loans,  held for investment as Level 3 in the fair value hierarchy as  their valuation includes significant unobservable  inputs.

### Derivative Assets, Net

Derivative assets largely consist of interest rate swaps,  option based derivatives, futures, and forward purchase and sale  commitments that we account for as derivatives. The carrying  value of our derivatives on our consolidated balance sheets is  equal to their fair value, including net derivative interest receivable or payable and is  net of cash collateral held or posted, where allowable by a  master netting agreement  Derivatives in a net unrealized gain  position are reported as derivative assets, net. Similarly,  derivatives in a net unrealized loss position are reported as  derivative liabilities, net

#### *Interest Rate Swaps and Option Based Derivatives*

The fair values of interest rate swaps are determined by using  the appropriate yield curves to discount the expected cash flows  of both the fixed and variable rate components of the swap  contracts  In doing so, we first observe publicly available  market spot interest rates, such as money market rates, Eurodollar futures contracts and LIBOR swap  rates. The spot  curves are translated to forward curves using internal models  From the forward curves, the periodic cash flows are calculated  on the pay and receive side of the swap and discounted back at  the relevant forward rates to arrive at the fair value of the  swap. Since the fair values of the swaps are determined by using  observable inputs from active markets, these are generally classified as Level 2 under  the fair value hierarchy

Option based derivatives include call and put swaptions and  other option based derivatives, the majority of which are  European options  The fair values of the European call and put  swaptions are calculated by using market observable interest  rates and dealer supplied interest rate volatility grids as inputs to our option pricing models.  Within each grid, prices  are determined based on the option  term of the underlying swap and the strike rate of the swap  Derivatives with embedded  American options are valued using  dealer provided pricing grids  The grids contain prices  corresponding to specified option terms  of the underlying swaps and the strike rate of the swaps.   Interpolation is used to calculate prices for positions for which  specific grid points are not provided  Derivatives with  embedded Bermudan options are valued based on prices provided  directly by counterparties. Swaptions are classified as  Level 2 under the fair value hierarchy  Other option based  derivatives include exchange traded options that are valued by  exchange published daily closing prices  Therefore,  exchange traded options are classified as Level   under the fair value hierarchy  Other option based derivatives  also  include purchased interest rate cap and floor contracts that are  valued by using observable market interest rates and cap and  floor rate volatility grids obtained from dealers, and  cancellable interest rate swaps that are valued by using dealer  prices. Cap and floor contracts are classified as Level 2  and cancellable interest rate swaps with fair values using  significant unobservable inputs are classified as Level 3  under the fair value hierarchy

Cancelable swaps, which are interest rate swaps where one  counterparty has the option to terminate on one or more payment  dates, comprise the largest component of the Level 3  derivatives population  These positions are priced using  counterparty prices. The cancelable swap valuation is largely  driven by changes in interest rates and volatility  As we are

*Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

in a net receive fixed position with respect to cancelable swaps, we are effectively short a call option. As a result, an increase (decrease) in interest rates will result in a decrease (increase) to the fair value measurement. An increase (decrease) in volatility will generally result in a decrease (increase) to the fair value measurement. These impacts are highly dependent on the specific terms of each deal and the degree to which the holder of the option is in the money or out of the money, as a decrease in interest rates will increase the likelihood that the counterparty will exercise the call option. In addition, changes in our creditworthiness could impact the valuation, with a deterioration (improvement) in credit decreasing (increasing) the fair value measurement.

The table below shows the fair value, prior to counterparty and cash collateral netting adjustments, for our interest rate swaps and option based derivatives and the maturity profile of our derivative positions. It also provides the weighted average fixed rates of our pay fixed and receive fixed swaps. As of March 31, 2012 and December 31, 2011, our option based derivatives had a remaining weighted average life of 5.4 years and 5.0 years, respectively.

**Table 16.5    Fair Values and Maturities for Interest-Rate Swaps and Option Based Derivatives**

| | | | March 31, 2012 | | | |
| | | | | Fair Value(1) | | |
| | Notional or Contractual Amount | Total Fair Value(2) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| Interest-rate swaps | | | | | | |
| Receive-fixed | | | | | | |
| Swaps | $ 236,803 | $ 9,080 | $ 59 | $ 519 | $ 3,538 | $ 4,964 |
| Weighted-average fixed rate(3) | | | 1.52% | 0.92% | 2.24% | 3.10% |
| Forward-starting swaps(4) | 11,650 | 792 | | | | 792 |
| Weighted-average fixed rate(3) | | | | | | 3.83% |
| Basis (floating to floating) | 2,400 | 2 | (1) | | 3 | |
| Pay-fixed | | | | | | |
| Swaps | 280,869 | (26,292) | (38) | (2,647) | (5,112) | (18,495) |
| Weighted-average fixed rate(3) | | | 0.95% | 3.11% | 2.83% | 3.68% |
| Forward-starting swaps(4) | 15,704 | (1,490) | | | | (1,490) |
| Weighted-average fixed rate(3) | | | | | | 3.80% |
| Total interest-rate swaps | $ 547,426 | $(17,908) | $ 20 | $(2,128) | $ (1,571) | $(14,229) |
| Option-based derivatives | | | | | | |
| Call swaptions | $ 64,525 | $ 6,880 | $1,617 | $2,825 | $ 398 | $ 2,040 |
| Put swaptions | 49,700 | 522 | 1 | 35 | 134 | 352 |
| Other option-based derivatives(5) | 34,365 | 2,029 | | | | 2,029 |
| Total option-based | 148,590 | 9,431 | $1,618 | $2,860 | $ 532 | $ 4,421 |

| | | | December 31, 2011 | | | |
| | | | | Fair Value(1) | | |
| | Notional or Contractual Amount | Total Fair Value(2) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| Interest-rate swaps | | | | | | |
| Receive-fixed | | | | | | |
| Swaps | $ 195,716 | $ 10,651 | $ 22 | $ 390 | $ 2,054 | $ 8,185 |
| Weighted-average fixed rate(3) | | | 1.17% | 1.03% | 2.26% | 3.35% |
| Forward-starting swaps(4) | 16,092 | 2,239 | | | | 2,239 |
| Weighted-average fixed rate(3) | | | | | | 3.96% |
| Basis (floating to floating) | 2,750 | (2) | | (6) | 4 | |
| Pay-fixed | | | | | | |
| Swaps | 276,564 | (31,565) | (62) | (1,319) | (6,108) | (24,076) |
| Weighted-average fixed rate(3) | | | 1.59% | 2.20% | 3.13% | 3.84% |
| Forward-starting swaps(4) | 12,771 | (2,923) | | | | (2,923) |
| Weighted-average fixed rate(3) | | | | | | 5.16% |
| Total interest-rate swaps | $ 503,893 | $ (21,600) | $ (40) | $ (935) | $ (4,050) | $(16,575) |
| Option-based derivatives | | | | | | |
| Call swaptions | $ 103,800 | $ 10,043 | $5,230 | $ 1,339 | $ 558 | $ 2,916 |
| Put swaptions | 70,875 | 636 | 22 | 49 | 166 | 399 |
| Other option-based derivatives(5) | 38,549 | 2,254 | | | | 2,254 |
| Total option-based | 213,224 | $ 12,933 | $5,252 | $ 1,388 | $ 724 | $ 5,569 |

(1) Fair value is categorized based on the period from March 31, 2012 and December 31, 2011, respectively, until the contractual maturity of the derivative.
(2) Represents fair value for each product type, prior to counterparty netting, cash collateral netting, net trade/settlement receivable or payable, and net derivative interest receivable or payable adjustments.
(3) Represents the notional weighted-average rate for the fixed leg of the swaps.
(4) Represents interest-rate swap agreements that have a scheduled to begin on future dates ranging from less than one year to three years as of March 31, 2012.
(5) Primarily includes purchased interest-rate caps and floors.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Other Derivatives*

Other derivatives mainly consist of exchange traded futures, foreign currency swaps, certain forward purchase and sale commitments, and credit derivatives  The fair value of exchange traded futures is based on end of day observed closing prices obtained from third party pricing services; therefore, they are classified as Level 1 under the fair value hierarchy. The fair value of foreign currency swaps is determined by using the appropriate yield curves to calculate and discount the expected cash flows for the swap contracts; therefore, they are classified as Level 2 under the fair value hierarchy since the fair values are determined through models that use observable inputs from active markets.

Certain purchase and sale commitments are also considered to be derivatives and are classified as Level 2 or Level 3 under the fair value hierarchy, depending on the fair value hierarchy classification of the purchased or sold item, whether a security or loan. Such valuation techniques are further discussed in the *"Investments in Securities"* section above and "Valuation Methods and Assumptions for Assets and Liabilities Not Measured at Fair Value in Our Consolidated Balance Sheets, but for Which the Fair Value is Disclosed    *Mortgage Loans*."

Credit derivatives mainly include short term default guarantee commitments, which we value using a discounted cash flow approach and market adjusted credit spreads. We classify fair value measurements related to credit derivatives as Level 3 under the fair value hierarchy because there are limited market benchmarks and significant unobservable inputs.

*Consideration of Credit Risk in Our Valuation of Derivatives*

The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation  Additionally, the fair value of derivative liabilities considers the impact of our institutional credit risk. Based on this evaluation, and because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, our fair value of derivatives is not adjusted for credit risk. Substantially all of our credit risk arises from counterparties with investment grade credit ratings of A or above. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for a discussion of our counterparty credit risk.

**Other Assets, Guarantee Asset and All Other Assets**

Our guarantee asset is valued either through obtaining dealer quotes on similar securities or through an expected cash flow approach. Because of the broad range of liquidity discounts applied by dealers to these similar securities and because the expected cash flow valuation approach uses significant unobservable inputs, we classified the guarantee asset as Level 3  Our guarantee asset is comprised mostly of guarantees on multifamily Freddie Mac securities. This asset is valued using a discounted cash flow approach that is sensitive to changes in benchmark interest rates and our current OAS to benchmark rates for the inception of new guarantees, which are in turn driven by changes in our view of credit risk and liquidity and changes in the credit profile of the guarantee portfolio  Significant increases in benchmark interest rates and credit and liquidity OAS and/or deterioration in portfolio credit quality may result in significantly lower fair value measurement

All other assets at fair value consist of mortgage servicing rights, and are valued based on a valuation performed by a third party vendor that specializes in valuing and brokering sales of mortgage servicing rights  These values are sensitive to changes in unobservable inputs, including: benchmark interest rates, cost of servicing performing and non performing loans, estimated prepayment speeds and default rates, and expected ancillary income  Significant increases or decreases in any of these inputs may result in significantly different fair value measurements

**REO, Net**

REO is initially measured at its fair value less costs to sell, and is subsequently measured at the lower of cost or fair value less costs to sell  The fair value of REO is determined using an internal model that considers state and collateral level data to produce an estimate of fair value based on REO dispositions in the most recent three months  We use the actual disposition prices on REO and the current loan UPB at the state eve to estimate the current fair value of REO  Certain adjustments, such as state specific adjustments, are made to the estimated fair value, as applicable  Due to the use of unobservable inputs, REO is classified as Level 3 under the fair value hierarchy.

TREASURY-3706

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Debt Securities Recorded at Fair Value

We elected the fair value option for foreign currency denominated debt instruments and certain other debt securities  See "Fair Value Election   *Debt Securities with Fair Value Option Elected"* for additional information  We determine the fair value of these instruments by obtaining multiple quotes from dealers  Given the weakness in the market as evidenced by low transaction volumes in these securities, these fair values are classified as Level 3 in the fair value hierarchy at March 31, 2012.

Our foreign currency denominated debt instruments are priced using counterparty dealer prices  The fair value measurement is dependent on forward interest rates and spot exchange rates for the foreign currency  As we are the debt issuer, an increase (decrease) in interest rates will result in a decrease (increase) in the fair value measurement, while the strengthening (weakening) of the foreign currency versus the U.S. dollar will increase (decrease) the fair value measurement

Certain other debt securities represent our debt whose maturity can be lengthened at the option of the issuer  These products are callable in nature with an embedded option  In this case, the valuation behaves similarly to that of a callable bond  As we are the debt issuer, an increase (decrease) in interest rates will result in a decrease (increase) in the fair value measurement  An increase (decrease) in volatility will generally result in a decrease (increase) to fair value  These impacts are highly dependent on the specific terms of each deal and the degree to which the bond could be called back, as a decrease in interest rates will increase the likelihood that we will exercise our call option  In addition, changes in our creditworthiness could impact the valuation, with a deterioration (improvement) in credit reducing (increasing) the fair value measurement

### Derivative Liabilities, Net

See discussion under *"Derivative Assets, Net"* above

### Quantitative Information about Level 3 Fair Value Measurements for Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets

The table below provides valuation techniques, the range, and the weighted average of significant unobservable inputs for assets and liabilities measured at fair value on a recurring and non recurring basis using unobservable inputs (Level 3) as of March 31, 2012

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3707

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 16.6     Quantitative Information about Level 3 Fair Value Measurements**

| | Total Fair Value | Level 3 Fair Value | Predominant Valuation Technique(s) | Type | Range | Weighted Average |
|---|---|---|---|---|---|---|
| | (dollars in millions) | | | | March 31, 2012 | |
| **Recurring fair value measurements** | | | | | | |
| *Assets* | | | | | | |
| Investments in securities | | | | | | |
| Available-for-sale, at fair value | | | | | | |
| Mortgage-related securities | | | | | | |
| Agency securities | | | | | | |
| Freddie Mac | $ 76,163 | $ 1,898 | Edge ratio | Effective duration(2 | 1 7 - 1 7 years | 1 7 years |
| Fannie Mae | 18,897 | 168 | Median of external sources | External pricing sources | $102 8 - $10  8 | $103 6 |
| | | | Single external source | External pricing source | $115 5 - $115 5 | $115 5 |
| Ginnie Mae | 239 | 11 | Discounted cash flows | | | |
| Subprime, option ARM, and Alt-A | | | | | | |
| Subprime | 27,1 5 | 27,1 5 | Median of external sources | External pricing sources | $51 3 - $61 8 | $56 8 |
| Option ARM | 5,818 | 5,818 | Median of external sources | External pricing sources | $38 9 - $ 7 5 | $ 3 3 |
| Alt-A and other | 11,09 | 11,09 | Median of external sources | External pricing sources | $62 5 - $72 0 | $67 9 |
| CMBS | | | Single external source | External pricing source | $88 0 - $88 0 | $88 0 |
| | 5 ,753 | 3,1 3 | Edge ratio | Effective duration(2 | 9 5 - 15 3 years | 13 6 years |
| Obligations of states and political subdivisions | 7,565 | 7,565 | Median of external sources | External pricing sources | $101 0 - $102 0 | $101 5 |
| Manufactured housing | 7  8 | 7  8 | Median of external sources | External pricing sources | $76 7 - $83 6 | $80 1 |
| Total available-for-sale mortgage-related securities | 202, 22 | 57,580 | | | | |
| Trading, at fair value | | | | | | |
| Mortgage-related securities | | | | | | |
| Agency securities | | | | | | |
| Freddie Mac | 1 ,50 | 1,725 | Discounted cash flows | OAS | (3,105) - 11,117 bps | 677 bps |
| Fannie Mae | 13,692 | 78 | Discounted cash flows | OAS | (105)  10,065 bps | 859 bps |
| Ginnie Mae | 151 | 20 | Discounted cash flows | | | |
| Other | | | Median of external sources | | | |
| | 153 | 13 | Discounted cash flows | | | |
| Total trading mortgage-related securities | 28,500 | 2,236 | | | | |
| Total investments in securities | $ 230,922 | 59,816 | | | | |
| Mortgage loans | | | | | | |
| Held-for-sale, at fair value | | | Discounted cash flows | DSCR | 1 25 - 5 9 | 1 79 |
| | $ 11,337 | $ 11,337 | | Current LTV | 12% - 80% | 70% |
| Other assets | | | | | | |
| Guarantee asset, at fair value | 798 | 798 | Discounted cash flows | OAS | 0 - 3  6 bps | 55 bps |
| All other, at fair value | | 798 | Discounted cash flows | Prepayment rate(3 | 8 85% -  0  5% | 20 06% |
| | | | | Servicing income per loan | 0 19% - 0   9% | 0 25% |
| | | | | Cost to service per loan | $7  $35 | $131 |
| Total other assets | $  9 1 | $  9 1 | | | | |
| *Liabilities* | | | | | | |
| Debt securities recorded at fair value | $ 2,221 | $ 2,221 | Median of external sources | External pricing sources | $103 2 - $103 9 | $103 6 |
| | | | Single external source | External pricing source | $100 0 - $100 0 | $100 0 |
| Net derivatives | 11 | 30 | Discounted cash flows | | | |
| | | | Counterparty marks | | | |
| All other, at fair value | | | Discounted cash flows | | | |
| **Non-recurring fair value measurements** | | | | | | |
| Mortgage loans | | | | | | |
| Held for investment | $ 1 69 | $ 1 69 | Income capitalization | Capitalization rates(4 | 5%  10% | 7 1% |
| REO, net | | | Market comparable data( | Historical average sale proceeds by state per property(6 | $31,253 - $272,302 | $102,712 |
| | 2,303 | 2,303 | | | | |

(1) Certain unobservable input types, ranges, and weighted averages data are not disclosed in this table if they are associated with each asset class (a) as a Level 3 fair value measurement has no corresponding determinate or (b) where we have disclosed the aggregate impact on valuation on techniques where the weighted unobservable inputs for these are significant for portion of the asset class
(2) Effective duration is used as a proxy to represent the aggregate impact of key asset duration
(3) Represents the effective borrower prepayment modeled for each issue based upon the principal balance weighted expected life, derived from our prepayment model
(4) The capitalization rate "Range" and "Weighted Average" represent those ranges that have a value using the Income Capitalization approach, which is the predominant valuation technique used for these population on Certain loans in this population are also valued using goose methods, and the capitalization for those is not represented the "Range" or "Weighted Average" above
(5) Represents net amounts that have used discounted property sales proceeds by sale based on an asset in have a goose measure the net value of REO and the subsequent write-down to a net recoverable fair value for REO properties
(6) Represents the average of the collections of REO sales proceeds by state

## Valuation Processes and Controls Over Fair Value Measurement

Groups within our Finance division, independent of our trading and investing function, execute, and validate the valuation processes. Our Enterprise Valuation Risk group, or EVR, provides independent risk governance over all valuation processes with the goal of verifying that reasonable fair values are used for financial reporting and risk management. EVR creates, maintains, and updates corporate wide valuation control policies related to our valuation

Source  FREDDIE MAC  LOAN MORTGAGE CORP, 10 Q, May 03, 2012          TREASURY-3708
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

processes, including providing notice to the business areas when updates are made and consulting with the business areas on policy implementation

We employ control processes to validate the techniques and models we use to determine fair value including review and approval of new transaction types, valuation judgments, methods, models, process controls, and results. These processes are designed to help ensure that fair value measurements are appropriate, consistently applied, and reliable.

- Our control processes include performing monthly independent verification of fair value measurements by comparing the methodology driven price to other market source data (to the extent available), and using independent analytics to determine if assigned fair values are reasonable This review covers all categories of products with increased attention given to higher risk/impact valuations.

- Our validation processes are intended to help ensure that the individual prices we receive from third parties are consistent with our observations of the marketplace and prices that are provided to us by other dealers or pricing services Where applicable, prices are back tested by comparing the settlement prices to our fair value measurements

- Analytical procedures include automated checks of prices for reasonableness based on variations from prices in previous periods, comparisons of prices to internally calculated expected prices based on market moves, analysis of changes to pricing ranges, and relative value and yield comparisons based on specific characteristics of securities and our proprietary models

Our valuation processes and related fair value hierarchy assessments require us to make judgments regarding the liquidity of the marketplace These judgments are based on the volume of securities traded in the marketplace, the width of bid/ask spreads, and the dispersion of prices on similar securities

Thresholds are set for each product class by EVR to identify exceptions that require further analysis To the extent that we determine that a price is outside of established parameters, we will further examine the price, including follow up discussions with the specific pricing service or dealer and/or supplemental analytics and review, and ultimately will not use that price if we are unable to validate the price These processes are executed prior to the completion of the financial statements

Additionally, the Valuation & Finance Model Committee, or Valuation Committee, which includes senior representation from business areas and our Enterprise Risk Management and Finance divisions, provides senior management's governance over valuation methodologies and controls, and reviews exceptions and resolution from the review and validation processes

Where models are employed to assist in the measurement of fair value, all changes made to those models during the periods presented are put through the corporate model change governance process and material changes are reviewed by the Valuation Committee Inputs used by those models maximize the use of market based inputs, are regularly updated for changes in the underlying data, assumptions, valuation inputs, or market conditions, and are subject to the valuation controls noted above

We also consider credit risk in the valuation of our assets and liabilities, with the credit risk of the counterparty considered in asset valuations and our own credit risk considered in liability valuations.

## Consolidated Fair Value Balance Sheets

The supplemental consolidated fair value balance sheets in the table below present our estimates of the fair value of our financial assets and liabilities at March 31, 2012 and December 31, 2011. The valuations of financial instruments on our consolidated fair value balance sheets are in accordance with the accounting guidance for fair value measurements and disclosures and the accounting guidance for financial instruments. The consolidated fair value balance sheets do not purport to present our net realizable, liquidation, or market value as a whole Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3709

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 16.7     Consolidated Fair Value Balance Sheets**

| | March 31, 2012 | | | | | | December 31, 2011 | |
| | | Fair Value | | | | | | |
| | Carrying Amount(1) | Level 1 | Level 2 | Level 3 | Netting Adjustments | Total | Carrying Amount(1) | Fair Value |
| | | | | | (in billions) | | | |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Cash and cash equivalents | $  8 6 | $ 5 5 | $  3 1 | $ | $ | $  8 6 | $  28 4 | $  28 4 |
| Restricted cash and cash equivalents | 27 8 | | 27 8 | | | 27 8 | 28 1 | 28 1 |
| Federal funds sold and securities purchased under agreements to resell | 24 3 | | 24 3 | | | 24 3 | 12 0 | 12 0 |
| *Investments in securities* | | | | | | | | |
| Available-for-sale, at fair value | 202 4 | | 144 8 | 57 6 | | 202 4 | 210 7 | 210 7 |
| Trading, at fair value | 58 3 | 26 2 | 29 9 | 2 2 | | 58 3 | 58 8 | 58 8 |
| *Total investments in securities* | 260 7 | 26 2 | 174 7 | 59 8 | | 260 7 | 269 5 | 269 5 |
| *Mortgage loans* | | | | | | | | |
| Mortgage loans held by consolidated trusts | 1,555 1 | | 993 4 | 591 3 | | 1,584 7 | 1,564 2 | 1,598 2 |
| Unsecuritized mortgage loans | 211 2 | | 29 7 | 160 0 | | 189 7 | 217 1 | 205 9 |
| *Total mortgage loans* | 1,766 3 | | 1,023 1 | 751 3 | | 1,774 4 | 1,781 3 | 1,804 1 |
| Derivative assets, net | 0 2 | | 21 3 | | (21 1) | 0 2 | 0 1 | 0 1 |
| Other assets | 27 0 | 0 1 | 1 1 | 25 8 | | 27 0 | 27 8 | 28 5 |
| Total assets | $2,114 9 | $31 8 | $1,275 4 | $836 9 | $  (21 1) | $ 2,123 0 | $2,147 2 | $ 2,170 7 |
| **Liabilities** | | | | | | | | |
| *Debt, net:* | | | | | | | | |
| Debt securities of consolidated trusts held by third parties | $1,481 6 | $ | $1,556 5 | $  2 8 | $ | $ 1,559 3 | $1,471 4 | $1,552 5 |
| Other debt | 618 6 | | 615 8 | 21 1 | | 636 9 | 660 6 | 681 2 |
| *Total debt, net* | 2,100 2 | | 2,172 3 | 23 9 | | 2,196 2 | 2,132 0 | 2,233 7 |
| Derivative liabilities, net | 0 3 | 0 1 | 29 7 | | (29 5) | 0 3 | 0 4 | 0 4 |
| Other liabilities | 14 4 | | 8 4 | 7 3 | | 15 7 | 14 9 | 15 0 |
| Total liabilities | 2,114 9 | 0 1 | 2,210 4 | 31 2 | (29 5) | 2,212 2 | 2,147 3 | 2,249 1 |
| **Net assets** | | | | | | | | |
| Senior preferred stockholders | 72 3 | | | 72 3 | | 72 3 | 72 2 | 72 2 |
| Preferred stockholders | 14 1 | | 0 6 | | | 0 6 | 14 1 | 0 6 |
| Common stockholders | (86 4) | | (162 1) | | | (162 1) | (86 4) | (151 2) |
| Total net assets | | | 0 6 | (89 8) | | (89 2) | (0 1) | (78 4) |
| Total liabilities and net assets | $2,114 9 | $ 0 1 | $2,211 0 | $(58 6) | $  (29 5) | $ 2,123 0 | $2,147 2 | $ 2,170 7 |

(1) Equals the amount reported in our GAAP consolidated balance sheets.

## Limitations

Our consolidated fair value balance sheets do not capture all elements of value that are implicit in our operations as a going concern because our consolidated fair value balance sheets only capture the values of the current investment and securitization portfolios as of the dates presented  For example, our consolidated fair value balance sheets do not capture the value of new investment and securitization business that would likely replace prepayments as they occur, nor do they include any estimation of intangible or goodwill values  Thus, the fair value of net assets presented on our consolidated fair value balance sheets does not represent an estimate of our net realizable, liquidation, or market value as a whole

The fair value of certain financial instruments is based on our assumed current principal exit market as of the dates presented  As new markets evolve, our assumed principal exit market may change  The use of different assumptions and methodologies to determine the fair values of certain financial instruments, including the use of different principal exit markets, could have a material impact on the fair value of net assets presented on our consolidated fair value balance sheets

We report certain assets and liabilities that are not financial instruments (such as property and equipment and REO), as well as certain financial instruments that are not covered by the disclosure requirements in the accounting guidance for financial instruments, such as pension liabilities, at their carrying amounts in accordance with GAAP on our consolidated fair value balance sheets  We believe these items do not have a significant impact on our overall fair value results  Other non financial assets and liabilities on our GAAP consolidated balance sheets represent deferrals of costs and revenues that are amortized in accordance with GAAP, such as deferred debt issuance costs and deferred fees  Cash receipts and payments related to these items are generally recognized in the fair value of net assets when received or paid, with no basis reflected on our fair value balance sheets

Source   D RA  HOM  OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3710

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Valuation Methods and Assumptions for Assets and Liabilities Not Measured at Fair Value in Our Consolidated Balance Sheets, but for Which the Fair Value is Disclosed**

The following are valuation assumptions and methods for items not subject to the fair value hierarchy either because they are not measured at fair value other than on the fair value balance sheet or are only measured at fair value at inception

### *Cash and Cash Equivalents (including Restricted Cash and Cash Equivalents)*

Cash and cash equivalents largely consist of highly liquid investment securities with an original maturity of three months or less used for cash management purposes, as well as cash held at financial institutions and cash collateral posted by our derivative counterparties  Given that these assets are short term in nature with limited market value volatility, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value  Cash is classified as Level 1 except for restricted cash, which is classified as Level 2 primarily due to the restrictions on the cash. Cash equivalents that are highly liquid investments for which we can obtain unadjusted quoted prices are also classified as Level 1. Cash equivalents are primarily classified as Level 2 because we use observable inputs other than quoted prices to determine the fair value measurement

### *Federal Funds Sold and Securities Purchased Under Agreements to Resell*

Federal funds sold and securities purchased under agreements to resell principally consist of short term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities and federal funds sold  Given that these assets are short term in nature, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value. Federal funds sold and securities purchased under agreements to resell are classified as Level 2 because these are liquid, but there are no direct quotes available for our exact positions

### *Mortgage Loans*

Single family mortgage loans are classified as held for investment and recorded at amortized cost  Certain multifamily mortgage loans are recorded at fair value due to the election of the fair value option, or they are held for investment and recorded at fair value upon impairment, which is based upon the fair value of the collateral as multifamily loans are collateral dependent

#### Single Family Loans

In determining the fair value of single family mortgage loans, valuation outcomes can vary widely based on management judgments and decisions used in determining: (a) the principal market; (b) modeling assumptions, including default, severity, home prices, and risk premium; and (c) inputs used to determine variables including risk premiums, credit costs, security pricing, and implied management and guarantee fees  Our principal markets include the GSE securitization market and the whole loan market  To determine the principal market, we considered the market with the greatest volume and level of activity within the market, and our ability to access that market  In the absence of a market with active trading, we determined the market that would maximize the amount we would receive upon sale

#### GSE Securitization Market as Principal Market

For single family mortgage loans where we determined the principal market is the GSE securitization market, we estimate fair value based on the estimate of the price we would receive if we were to securitize these loans  This principal market assumption applies to both loans held by consolidated trusts and unsecuritized loans.

Our estimate of fair value is based on: (a) comparisons to actively traded mortgage related securities with similar characteristics; (b) the excess coupon (implied management and guarantee fee); and (c) the credit obligation related to performing our guarantee

The security price is derived from benchmark security pricing for similar actively traded mortgage related securities, and is adjusted for yield, credit, and liquidity differences. This security pricing process is consistent with our approach for valuing similar securities retained in our investment portfolio or issued to third parties. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets  *Investments in Securities*."

We derive the implied management and guarantee fees in excess of the coupon on the mortgage related securities by estimating the present value of the additional cash flows from these elements  Our approach for estimating the fair value of the implied management and guarantee fees uses third party market data as practicable  The valuation approach for the majority of implied management and guarantee fees relates to fixed rate loan products with coupons at or near current market rates and involves obtaining dealer quotes on hypothetical securities constructed with collateral characteristics

173

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

from our single family credit guarantee portfolio  The remaining  portion of the implied management and guarantee fees relates to  underlying loan products for which comparable market prices are  not readily available  These relate specifically to ARM products, highly seasoned loans, and fixed rate loans with coupons that are not consistent with current market rates  For this portion of the single family credit guarantee portfolio, the implied management and guarantee fees are valued using an  expected cash flow approach, leveraging the market information  received on the more liquid portion of the population and  including only those cash flows expected to result from our  contractual right to receive management and guarantee fees

The estimate of fair value is also net of the related credit and  other costs (such as general and administrative expense) and  benefits (such as credit enhancements) inherent in our guarantee  obligation  We use delivery and guarantee fees charged by us as a  market benchmark for all guaranteed loans that would qualify  for purchase under current underwriting standards (used for the  majority of the guaranteed loans, but accounts for a small share  of the overall fair value of the guarantee obligation)  For loans  that do not qualify for purchase based on current underwriting standards, we use our internal credit models, which  incorporate factors such as loan characteristics, loan  performance status information, expected losses, and risk  premiums without further adjustment (used for less than a  majority of the guaranteed loans, but accounts for the largest share of the overall fair value of the guarantee  obligation)

For loans that have been refinanced under HARP, we value our  guarantee obligation using the delivery and guarantee fees  currently charged by us under that initiative. If, subsequent to  delivery, the refinanced loan no longer qualifies for purchase  based on current underwriting standards (such as becoming past  due or being modified as a part of a troubled debt  restructuring), the fair value of the guarantee obligation is then measured using our internal credit models as described  above, or third party market pricing as described below.

The total compensation that we receive for the delivery of a  HARP loan reflects the pricing that we are willing to offer  because HARP is a part of a broader government program intended  to provide assistance to homeowners and prevent foreclosures   When HARP ends, the beneficial pricing afforded to HARP loans will no longer be reflected in our delivery and guarantee fee  pricing structure  If these benefits were not reflected in the pricing for these loans, the fair value of our mortgage loans  would have decreased by $8.5 billion as of March 31, 2012. The total fair value of the loans in our portfolio that  reflects the pricing afforded to HARP loans as of March 31, 2012 as presented in our consolidated fair value balance sheets is $117.9 billion.

*Whole Loan Market as Principal Market*

For single family mortgage loans where we determined the  principal market is the whole loan market, we estimate fair  value based on our estimate of prices we would receive if we  were to sell these loans in the whole loan market  Prices for  these loans are obtained from multiple dealers who reference market activity, where available, for deeply  delinquent and modified loans and use internal models and their  judgment to determine default rates, severity rates, home prices, and risk  premiums.

*Level in the Fair Value Hierarchy*

Single family mortgage loans are classified as Level 2 or  Level 3 depending on whether the inputs are observable  Single  family mortgage loans that would qualify for purchase  under current underwriting standards are assigned to  Level 2 as the key inputs used for the valuation of these loans such as TBA pricing, our externally  published credit pricing grids for delivery and guarantee fees,  and third party excess interest only prices, are observable while modeled  components comprise a small percentage of total value  (*e.g.*, general and administrative expense, credit enhancement)  Other single family mortgage loans are classified  in Level 3 if our credit cost is based on our internal  credit model or if loans are valued using prices obtained from  dealers  The internal model and the dealer prices are based on  assumptions, which include significant unobservable inputs.

<u>Multifamily Loans</u>

For a discussion of the techniques used to determine the fair  value of held for sale, and both impaired and non impaired held  for investment multifamily loans, see "Assets and Liabilities Measured at Fair  Value in Our Consolidated Balance Sheets    *Mortgage Loans, Held for Investment*" and " *Mortgage Loans, Held for Sale,*" respectively

**Other Assets**

Most of our other assets are not financial instruments required  to be valued at fair value under the accounting guidance for  disclosures about the fair value of financial instruments, such as  property and equipment  For most of these non financial  instruments in other assets, we use the carrying amounts from our GAAP consolidated balance sheets as the

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3712

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

reported values on our consolidated fair value balance sheets, without any adjustment. These assets represent an insignificant portion of our GAAP consolidated balance sheets

We adjust the GAAP basis deferred taxes reflected on our consolidated fair value balance sheets to include estimated income taxes on the difference between our consolidated fair value balance sheets net assets attributable to common stockholders, including deferred taxes from our GAAP consolidated balance sheets, and our GAAP consolidated balance sheets equity attributable to common stockholders To the extent the adjusted deferred taxes are a net asset, this amount is included in other assets In addition, if our net deferred tax assets on our consolidated fair value balance sheets, calculated as described above, exceed our net deferred tax assets on our GAAP consolidated balance sheets that have been reduced by a valuation allowance, our net deferred tax assets on our consolidated fair value balance sheets are limited to the amount of our net deferred tax assets on our GAAP consolidated balance sheets If the adjusted deferred taxes are a net liability, this amount is included in other liabilities

Accrued interest receivable is one of the components included within other assets on our consolidated fair value balance sheets On our GAAP consolidated balance sheets, we reverse accrued but uncollected interest income when a loan is placed on non accrual status. There is no such reversal performed for the fair value of accrued interest receivable disclosed on our consolidated fair value balance sheets Rather, we include in our fair value disclosure the amount we deem to be collectible As a result, there is a difference between the accrued interest receivable GAAP basis carrying amount and its fair value disclosed on our consolidated fair value balance sheets

Other assets are classified primarily as Level 2 or Level 3 depending on whether unobservable inputs are significant to the fair value measurement

### Total Debt, Net

Total debt, net represents debt securities of consolidated trusts held by third parties and other debt that we issued to finance our assets. On our consolidated GAAP balance sheets, total debt, net, excluding debt securities for which the fair value option has been elected, is reported at amortized cost, which is net of deferred items, including premiums, discounts, and hedging related basis adjustments

For fair value balance sheet purposes, we use the dealer published quotes for a base TBA security, adjusted for the carry and pay up price adjustments, to determine the fair value of the debt securities of consolidated trusts held by third parties. The valuation techniques we use are similar to the approach we use to value our investments in agency securities for GAAP purposes See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets *Investments in Securities Agency Securities*" for additional information regarding the valuation techniques we use

Other debt includes both non callable and callable debt, as well as short term zero coupon discount notes The fair value of the short term zero coupon discount notes is based on a discounted cash flow model with market inputs. The valuation of other debt securities represents the proceeds that we would receive from the issuance of debt and is generally based on market prices obtained from broker/dealers or reliable third party pricing service providers We elected the fair value option for foreign currency denominated debt and certain other debt securities and reported them at fair value on our GAAP consolidated balance sheets See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets *Debt Securities Recorded at Fair Value*" for additional information

The majority of our debt is classified in Level 2, as these are liquid securities and multiple pricing sources are generally available (through pricing and verification), historically with a tight price range including verification sources A smaller population of debt, including debt where the fair value option is elected, is classified as Level 3 because these are illiquid securities with significant unobservable inputs and wide pricing ranges

### Other Liabilities

Other liabilities consist of accrued interest payable on debt securities, the guarantee obligation for our other guarantee commitments and guarantees issued to non consolidated entities, the reserve for guarantee losses on non consolidated trusts, servicer advanced interest payable and certain other servicer liabilities, accounts payable and accrued expenses, payables related to securities, and other miscellaneous liabilities We believe the carrying amount of these liabilities is a reasonable approximation of their fair value, except for the guarantee obligation for our other guarantee commitments and guarantees issued to non consolidated entities The technique for estimating the fair value of our

*Freddie Mac*

Source D RA HOM OAN MORTGAG CORP, 10 Q, May 03, 2012

TREASURY-3713

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

guarantee obligation related to the credit component of the loan's fair value is described in the "Mortgage Loans    Single Family Loans" section

As discussed in "Other Assets," other liabilities may include a deferred tax liability adjusted for fair value balance sheet purposes

Other liabilities are classified primarily as Level 2 or Level 3 depending on whether unobservable inputs are significant to the fair value measurement

### Net Assets Attributable to Senior Preferred Stockholders

Our senior preferred stock held by Treasury in connection with the Purchase Agreement is recorded at the stated liquidation preference for purposes of the consolidated fair value balance sheets, which is the same as the carrying value in our GAAP consolidated balance sheets, and does not reflect fair value  As the senior preferred stock is restricted as to its redemption, we consider the liquidation preference to be the most appropriate measure for purposes of the consolidated fair value balance sheets. Our senior preferred stock is classified as Level 3 because observable inputs are not available as this stock is not traded.

### Net Assets Attributable to Preferred Stockholders

To determine the preferred stock fair value, we use a market based approach incorporating quoted dealer prices  Net Assets Attributable to Preferred Stockholders is classified as Level 2 because we receive multiple dealer quotes within a relatively narrow range, indicating an active market.

### Net Assets Attributable to Common Stockholders

Net assets attributable to common stockholders is equal to the difference between the fair value of total assets and total liabilities reported on our consolidated fair value balance sheets, less the value of net assets attributable to senior preferred stockholders and the fair value attributable to preferred stockholders  Our net assets attributable to common stockholders is classified as Level 3 because observable inputs are not available

## NOTE 17: LEGAL CONTINGENCIES

We are involved as a party in a variety of legal and regulatory proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment related litigation and other legal proceedings incidental to our business  We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures  From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and/or service mortgages for, us  In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories  In addition, we are sometimes sued in connection with the origination or servicing of mortgages  These suits typically involve claims alleging wrongful actions of seller/servicers  Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions with respect to mortgages sold to or serviced for Freddie Mac

Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction  In accordance with the accounting guidance for contingencies, we reserve for litigation claims and assessments asserted or threatened against us when a loss is probable and the amount of the loss can be reasonably estimated

During the three months ended March 31, 2012, we paid approximately $2 million for the advancement of legal fees and expenses of current and former officers and directors pursuant to our indemnification obligations to them  These fees and expenses related to some of the matters described below and to certain shareholder derivative lawsuits that were dismissed in April and May 2011. This figure does not include certain administrative support costs and certain costs related to document production and storage

### Putative Securities Class Action Lawsuits

*Ohio Public Employees Retirement System ("OPERS") vs. Freddie Mac, Syron, et al.* This putative securities class action lawsuit was filed against Freddie Mac and certain former officers on January 18, 2008 in the U.S. District Court for the Northern District of Ohio purportedly on behalf of a class of purchasers of Freddie Mac stock from August 1, 2006 through November 20, 2007. The plaintiff alleges that the defendants violated federal securities laws by making false and misleading statements concerning our business, risk management and the procedures we put into place to protect the company from problems in the mortgage industry. On April 10, 2008, the Court appointed OPERS as lead plaintiff and approved its choice of counsel. On September 2, 2008, defendants filed motions to dismiss plaintiff's amended complaint

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-3714

Table of Contents

On November 7, 2008, the plaintiff filed a second amended complaint, which removed certain allegations against Richard Syron, Anthony Piszel, and Eugene McQuade, thereby leaving insider trading allegations against only Patricia Cook  The second amended complaint also extends the damages period, but not the class period. The plaintiff seeks unspecified damages and interest, and reasonable costs and expenses, including attorney and expert fees  On November 19, 2008, the Court granted FHFA's motion to intervene in its capacity as Conservator  On April 6, 2009, defendants filed motions to dismiss the second amended complaint. On January 23, 2012, the Court denied defendants' motions to dismiss and set a briefing schedule for plaintiff's motion for leave to amend its complaint. On February 13, 2012, plaintiff filed motion for leave to amend, which sought leave to file a third amended complaint and add allegations based on a non prosecution agreement entered into between Freddie Mac and the SEC on December 15, 2011. On March 27, 2012, the Court granted the plaintiff's motion for leave to amend, and plaintiff filed its third amended complaint on March 28, 2012.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential impact on our business, financial condition, or results of operations  In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre trial litigation; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss

*Kuriakose vs. Freddie Mac, Syron, Piszel and Cook.* Another putative class action lawsuit was filed against Freddie Mac and certain former officers on August 15, 2008 in the U.S. District Court for the Southern District of New York for alleged violations of federal securities laws purportedly on behalf of a class of purchasers of Freddie Mac stock from November 21, 2007 through August 5, 2008. The plaintiffs claim that defendants made false and misleading statements about Freddie Mac's business that artificially inflated the price of Freddie Mac's common stock, and seek unspecified damages, costs, and attorneys' fees. On February 6, 2009, the Court granted FHFA's motion to intervene in its capacity as Conservator. On May 19, 2009, plaintiffs filed an amended consolidated complaint, purportedly on behalf of a class of purchasers of Freddie Mac stock from November 20, 2007 through September 7, 2008  Freddie Mac filed a motion to dismiss the complaint on February 24, 2010. On March 30, 2011, the Court granted without prejudice Freddie Mac's motion to dismiss all claims, and allowed the plaintiffs the option to file a new complaint, which they did on July 15, 2011. The defendants have filed motions to dismiss the second amended consolidated complaint  On February 17, 2012, plaintiff served a motion seeking leave to file a third amended consolidated complaint based on the non prosecution agreement entered into between Freddie Mac and the SEC on December 15, 2011.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential impact on our business, financial condition, or results of operations  In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre trial litigation; the fact that the Court has not yet ruled upon the defendants' motions to dismiss the second amended complaint or plaintiffs' motion seeking leave to file a third amended complaint; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the a eged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss

### Energy Lien Litigation

On July 14, 2010, the State of California filed a lawsuit against Freddie Mac, Fannie Mae, FHFA, and others in the U.S. District Court for the Northern District of California, alleging that Freddie Mac and Fannie Mae committed unfair business practices in violation of California law by asserting that property liens arising from government sponsored energy initiatives such as California's Property Assessed Clean Energy, or PACE, program cannot take priority over a mortgage to be sold to Freddie Mac or Fannie Mae  The lawsuit contends that the PACE programs create liens superior to such mortgages and that, by affirming Freddie Mac and Fannie Mae's positions, FHFA has violated the National Environmental Policy Act, or NEPA, and the Administrative Procedure Act, or APA  The complaint seeks declaratory and injunctive relief, costs and such other relief as the court deems proper

Similar complaints have been filed by other parties  On July 26, 2010, the County of Sonoma filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging similar violations of California law, NEPA, and the APA  In a filing dated September 23, 2010, the County of Placer moved to intervene in the Sonoma County lawsuit as a party plaintiff seeking to assert similar claims, which motion was granted on November 1, 2010. On October 1, 2010, the City of Palm Desert filed a similar complaint against Fannie Mae,

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Freddie Mac, and FHFA in the Northern District of California  On October 8, 2010, Leon County and the Leon County Energy  Improvement District filed a similar complaint against Fannie Mae, Freddie Mac, FHFA, and others in the Northern District of Florida. On October 12, 2010, FHFA filed a motion before the Judicial Panel on Multi District Litigation seeking an order  transferring these cases as well as a related case filed only against FHFA, for coordination or consolidation of pretrial proceedings. This motion was denied on February 8, 2011. On October 14, 2010, the defendants filed a motion to dismiss the lawsuits pending in the Northern District of California.  Also on October 14, 2010, the County of Sonoma filed a motion for preliminary injunction seeking to enjoin the  defendants from giving any force or effect in Sonoma County to certain directives by FHFA regarding energy retrofit loan programs and other related relief  On October 26, 2010, the  Town of Babylon filed a similar complaint against Fannie Mae,  Freddie Mac, and FHFA, as well as the Office of the Comptroller of the Currency, in the U.S. District Court for the Eastern District of New York.

The defendants filed motions to dismiss these lawsuits. The  courts have entered stipulated orders dismissing the individual  officers of Freddie Mac and Fannie Mae from the cases  On  December 17, 2010, the judge handling the cases in the Northern District of California requested a position statement  from the United States, which was filed on February 8,  2011. On June 13, 2011, the complaint filed by the Town of Babylon was dismissed. On August 11, 2011, the Town of Babylon filed a notice of appeal to the U S  Court of Appeals for the Second Circuit. On August 26, 2011, the California federal court granted in part defendants' motion  to dismiss, leaving only plaintiffs' APA and NEPA claims against FHFA  The California federal district court cases were thereafter consolidated and the plaintiffs in those cases filed a joint motion for summary judgment on January 23, 2012.  FHFA cross moved for summary judgment on February 27, 2012.

Sonoma County's motion for preliminary injunction was granted in part, requiring FHFA to provide a notice and comment period with regard to its directives  FHFA filed an appeal of the injunction on September 15, 2011, and the District Court granted FHFA a  0 day stay of the injunction to allow FHFA to request a further stay from the U.S. Court of Appeals for the Ninth Circuit, which  occurred on October 11, 2011. By order dated December 20, 2011, the Ninth Circuit denied the request for  a stay with respect to the notice and comment period   Accordingly, on January 26, 2012, FHFA issued an advance notice of proposed rulemaking and notice of intent to prepare an  environmental impact statement. On April 26, 2012, the Ninth Circuit issued an order stating that "the stay of the  preliminary injunction remains in effect" and that it "will take no action on [the California plaintiffs'] appeal until after a decision on the summary judgment motions is  issued."

On October 17, 2011 the City of Palm Desert voluntarily  dismissed any remaining claims it might have had against Freddie  Mac. The complaint filed by Leon County was dismissed by the  Court on September 30, 2011  Leon County filed a notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit on November 28, 2011.

At present, it is not possible for us to predict the probable  outcome of these lawsuits or any potential impact on our business, financial condition or results of operations  In  addition, we are unable to reasonably estimate the possible loss  or range of possible loss in the event of an adverse judgment in the foregoing matters due to the following factors, among  others: the inherent uncertainty of pre trial litigation; and the fact that the appeals filed by the Town of Babylon and Leon County are still pending

### Government Investigations and Inquiries

On December 16, 2011, the SEC announced that it had charged  three former executives of Freddie Mac with securities laws  violations These executives are former Chairman of the Board  and Chief Executive Officer Richard F  Syron, former Executive Vice President and Chief Business Officer Patricia L. Cook,  and  former Executive Vice President for the single family guarantee  business Donald J. Bisenius.

### Related Third Party Litigation and Indemnification Requests

On December 15, 2008, a plaintiff filed a putative class  action lawsuit in the U.S. District Court for the Southern  District of New York against certain former Freddie Mac officers and others styled *Jacoby vs. Syron, Cook, Piszel, Banc of America Securities LLC, JP Morgan Chase & Co., and FTN Financial Markets*. The complaint, as amended  on December 17, 2008, contends that the defendants made  material false and misleading statements in connection with  Freddie Mac's September 2007 offering of non cumulative,  non convertible, perpetual fixed rate preferred stock, and that  such statements "grossly overstated Freddie Mac's capitalization" and "failed to disclose Freddie  Mac's exposure to mortgage related losses, poor underwriting standards and risk management procedures." The  complaint further alleges that Syron, Cook, and Piszel made additional false statements following the offering  Freddie Mac  is not named as a defendant in this lawsuit, but the  underwriters previously gave notice to Freddie Mac of their  intention to seek full indemnity and

178

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3716

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel  The case is currently dormant and we believe plaintiff may have abandoned it.

By letter dated October  7, 2008, Freddie Mac received  formal notification of a putative class action securities  lawsuit, *Mark vs. Goldman, Sachs & Co., J.P. Morgan Chase & Co., and Citigroup Global Markets Inc.,* filed on September 23, 2008, in the  U.S. District Court for the Southern District of New York, regarding the company's November 29, 2007 public offering of $6 billion of 8 375% Fixed to Floating Rate Non Cumulative Perpetual Preferred Stock

On January 29, 2009, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern  District of New York styled *Kreysar vs. Syron, et al.* On April 30, 2009, the Court consolidated the Mark case with the Kreysar case, and the plaintiffs filed a consolidated class action complaint on July 2, 2009. The consolidated  complaint alleged that three former Freddie Mac officers, certain underwriters and Freddie Mac's auditor violated federal securities laws by making material false and misleading  statements in connection with the company's November 29, 2007 public offering of $6 billion of 8 375% Fixed to Floating Rate Non Cumulative Perpetual Preferred Stock. The complaint further alleged that certain defendants and  others made additional false statements following the offering  The complaint named as defendants Syron, Piszel, Cook, Goldman, Sachs & Co., JPMorgan Securities Inc., Banc of America Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Morgan  Stanley & Co. Incorporated, UBS Securities LLC and PricewaterhouseCoopers LLP

After the Court dismissed, without prejudice, the plaintiffs' consolidated complaint, amended consolidated complaint, and second consolidated complaint, the plaintiffs filed a third amended consolidated complaint against  PricewaterhouseCoopers LLP, Syron and Piszel, omitting Cook and the underwriter defendants, on November 14, 2010. On  January 11, 2011, the Court granted the remaining defendants' motion to dismiss the complaint with respect to  PricewaterhouseCoopers LLP, but denied the motion with respect to Syron and Piszel. On April 4, 2011, Piszel filed a motion for partial judgment on the pleadings  The Court granted  that motion on April 28, 2011. The plaintiffs moved for class certification on June 30, 2011, but withdrew this motion on July 5, 2011. The plaintiffs again moved for class certification on August 30, 2011, which motion was denied on March 27, 2012. Plaintiffs moved for  reconsideration of this denial on April 11, 2012.

Freddie Mac is not named as a defendant in the consolidated  lawsuit, but the underwriters previously gave notice to Freddie  Mac of their intention to seek full indemnity and contribution  under the underwriting agreement in this case, including  reimbursement of fees and disbursements of their legal counsel  At present, it is not possible for us to predict the probable  outcome of the lawsuit or any potential impact on our business, financial condition or results of operations  In addition, we  are unable to reasonably estimate the possible loss or range of  possible loss in the event of an adverse judgment in the  foregoing matter due to the inherent uncertainty of pre trial  litigation and the fact that plaintiffs may appeal the denial of class certification  Absent the certification of a specified class, the identification of a class period, and the  identification of the alleged statement or statements that  survive dispositive motions, we cannot reasonably estimate any  possible loss or range of possible loss

On July 6, 2011, plaintiffs filed a lawsuit in the U.S. District Court for Massachusetts styled *Liberty Mutual Insurance Company, Peerless Insurance Company, Employers Insurance Company of Wausau, Safeco Corporation and Liberty Life  Assurance Company of Boston vs. Goldman, Sachs & Co.* The complaint alleges that Goldman, Sachs & Co  made materially misleading statements and omissions in connection with Freddie Mac's November 29, 2007 public  offering of $6 billion of 8 375% Fixed to Floating Rate  Non Cumulative Perpetual Preferred Stock  Freddie Mac is not  named as a defendant in this lawsuit.

In an amended complaint dated February 17, 2012, Western and Southern Life Insurance Company and others asserted claims  against GS Mortgage Securities Corp , Goldman Sachs Mortgage  Company and Goldman Sachs & Co. in the Court of Common  Pleas, Hamilton County, Ohio. The amended complaint asserts,  among other things, that "Goldman Sachs" is liable to  plaintiffs under the Ohio Securities Act for alleged misstatements and omissions in connection with $6 billion  of preferred stock issued by Freddie Mac on December 4, 2007  Freddie Mac is not named as a defendant in this lawsuit.

## Lehman Bankruptcy

On September 15, 2008, Lehman filed a chapter 11  bankruptcy petition in the Bankruptcy Court for the Southern  District of New York. Thereafter, many of Lehman's U.S. subsidiaries and affiliates also filed bankruptcy  petitions (collectively, the "Lehman Entities")  Freddie Mac had numerous relationships with the Lehman Entities  which give rise to several claims. On September 22, 2009,  Freddie Mac filed proofs of claim in the Lehman bankruptcies  aggregat ng

179

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                              Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

approximately $2.1 billion. On April 14, 2010, Lehman filed its chapter 11 plan of liquidation and disclosure statement, providing for the liquidation of the bankruptcy estate's assets over the next three years  The plan and disclosure statement were subsequently modified several times  Hearings to consider confirmation of the plan were conducted on  December 6, 2011 and, on that date, the plan was confirmed by the court. The plan sets aside $1.2 billion to be available for payment in full of our priority claim relating to  losses incurred on short term lending transactions with certain Lehman Entities if it is ultimately allowed as a priority claim,  but leaves open for subsequent litigation whether our claim of priority status is proper. In the event that this claim is not  ultimately accorded priority status, it will be treated as a  senior unsecured claim under the plan, pursuant to which Freddie Mac would be entitled to receive an estimated distribution of  approximately 2 % (or approximately $250 million) over the next three years  The plan also provides that general unsecured  claims, such as our claim relating to repurchase obligations of $868 million, will be entitled to a distribution of  approximately 19.9% of the allowed amount, if any. The plan does not adjudge or allow our unsecured repurchase obligations claim,  but permits claims allowance proceedings to continue  Finally, the plan entitles Freddie Mac to a distribution of approximately 39% (or about $6 4 million) payable over the next three  years on our allowed claim exceeding $16 million relating to losses on derivative transactions

**Taylor, Bean & Whitaker Bankruptcy**

On August 24, 2009, TBW, which had been one of our single family seller/servicers, filed for bankruptcy in the  Bankruptcy Court for the Middle District of Florida. In 2011, with the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of  the unsecured trade creditors of TBW. See "NOTE 18: LEGAL CONTINGENCIES" in our 2011 Annual Report for information on the settlement

We understand that Ocala Funding, LLC, or Ocala, which is a  wholly owned subsidiary of TBW, or its creditors, may file an action to recover certain funds paid to us prior to the TBW  bankruptcy  However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to  recover assets  Based on court filings and other information, we  understand that Ocala or its creditors may attempt to assert fraudulent transfer and other possible claims totaling  approximately $840 million against us related to funds that  were a eged y transferred from Ocala to Freddie Mac custodial  accounts  We also understood that Ocala might attempt to make claims against us asserting ownership of a large number of loans  that we purchased from TBW. The order approving the settlement provides that nothing in the settlement shall be construed to limit, waive or release Ocala's claims against Freddie Mac,  except for TBW's claims and claims arising from the allocation of the loans discussed above to Freddie Mac

On or about May 14, 2010, certain underwriters at Lloyds,  London and London Market Insurance Companies brought an  adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage  bankers bonds providing fidelity and errors and omissions  insurance coverage  Several excess insurers on the bonds  thereafter filed similar claims in that action  Freddie Mac has  filed a proof of loss under the bonds, but we are unable at this  time to estimate our potential recovery, if any, thereunder  Discovery is proceeding

**IRS Litigation**

We received Statutory Notices from the IRS assessing $3 0 billion of additional income taxes and penalties for  the 1998 to 2007 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices for the 1998 to 2005 tax years. We paid the tax assessed in the Statutory Notice received for the years 2006  to 2007 of $36 million and will seek a refund through the  administrative process, which could include filing suit in  Federal District Court  A Tax Court trial date has been scheduled for November 13, 2012  We believe appropriate reserves have been provided for settlement on reasonable terms   For information on this matter, see "NOTE 12: INCOME  TAXES."

**Lawsuits Involving Real Estate Transfer Taxes and Recordation Taxes**

On June 20, 2011, Oakland County (Michigan) and the Oakland  County Treasurer filed a lawsuit against Freddie Mac and Fannie Mae in the U.S. District Court for the Eastern District of  Michigan alleging that the enterprises failed to pay real estate  transfer taxes on transfers of real property in Oakland County  where the enterprises were the grantors  FHFA later intervened as Conservator for Freddie Mac and Fannie Mae  On November 10, 2011, Genesee County (Michigan) and the  Genesee County Treasurer filed a class action lawsuit in  the same court on behalf of itself and the other 82 Michigan Counties raising similar claims against FHFA (as Conservator),  Freddie Mac, and Fannie Mae  The Court later certified the class, with two Michigan counties opting out. The Michigan  Department of Attorney General and the Michigan Department of Treasury intervened in both actions against the defendants. In both actions, FHFA, Freddie Mac and Fannie Mae asserted that  they were not liable for the transfer taxes based on statutory  tax exemptions applicable to each  On March 23, 2012, the Court granted summary judgment against FHFA (as Conservator), Freddie Mac, and

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3718

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused by and limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Fannie Mae in both actions, determining that the statutory exemptions did not exempt them from Michigan's state and county transfer tax. On April 24, 2012, the plaintiffs in the Oakland County case sought leave to file a second amended complaint to cover purportedly taxable transactions where the enterprises received property as grantees through a Michigan Sheriff's deed or a deed in lieu of foreclosure  Also on April 24, 2012, FHFA (as Conservator), Freddie Mac, and Fannie Mae requested that the Court certify its March 23, 2012 orders granting plaintiffs summary judgment for an interlocutory appeal to the U S  Court of Appeals for the Sixth Circuit and stay the actions pending resolution of any resulting appeal. On April 26, 2012, the plaintiffs in the Genesee County case sought leave to file an amended complaint to cover purportedly taxable transactions where the enterprises received property as grantees through a Michigan Sheriff's deed or a deed in lieu of foreclosure  The Court has not yet ruled on the defendants' motion for certification of an interlocutory appeal and motion for a stay, the Oakland plaintiffs' motion to file a second amended complaint or the Genesee plaintiffs' motion to file an amended complaint, nor has it addressed the amount of damages the plaintiffs contend are owed in either case

On or about June 22, 2011, Curtis Hertel (individually and as Register of Deeds of Ingham County, Michigan) filed suit in Michigan state court against Freddie Mac, Fannie Mae and others alleging, among other things, that the defendants failed to pay real estate transfer taxes on transfers of real property in Ingham County where the enterprises were the grantors and grantees  FHFA later intervened as Conservator for Freddie Mac and Fannie Mae, and the Michigan Department of Attorney General and the Michigan Department of Treasury intervened against the enterprises  The defendants removed the case to the U.S. District Court for the Western District of Michigan and then filed motions to dismiss and/or for summary judgment. The Court dismissed plaintiff Hertel from the case concluding that Hertel was not a proper plaintiff, but the Court has not yet ruled on the enterprises' and FHFA's motion to dismiss and/or for summary judgment as to the claims asserted by the Michigan Department of Attorney General and the Michigan Department of Treasury.

The plaintiffs in the Oakland County, Genesee County, and Ingham County cases are all seeking a declaration that the enterprises' statutory exemptions do not cover recording taxes such as the Michigan transfer taxes, damages against the enterprises for unpaid state transfer taxes, as well as penalties, interest, pre judgment interest, costs and attorneys' fees

On May 10, 2010, Andrew Ludel and Robert Hager (on behalf of the District of Columbia and District of Columbia Recorder of Deeds) filed a lawsuit against Freddie Mac, Fannie Mae, and Wells Fargo Home Mortgage, Inc  in the D C  Superior Court alleging that the enterprises violated the D C  False Claims Act by failing to pay D.C. recordation taxes. Plaintiffs voluntarily dismissed the complaint on November 10, 20 0, refiled the complaint on January 24, 2011, and filed a second amended complaint on March 8, 2011. The case was removed to the U.S. District Court for the District of Columbia on November 23, 2011  FHFA later intervened as Conservator for Freddie Mac and Fannie Mae  The enterprises and FHFA filed a motion to dismiss the complaint based on their respective statutory tax exemptions and the plaintiffs failure to adequately allege a false claims act violation  The Court has not yet ruled on the motion  The plaintiffs are seeking, among other things, treble damages on all recordation taxes not paid for a ten year period, plus penalties, interest, liquated penalties, pre judgment interest, costs and attorneys' fees

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition or results of operation  In addition, we are unable to reasonably estimate the possible loss or range of possible loss with respect to these lawsuits due to the following factors, among others: (a) none of the plaintiffs have demanded a stated amount of damages they believe are due; (b) with respect to the Oakland County and Genesee County lawsuits, the scope of permissible claims has not yet been determined and discovery regarding the amount of damages is still in the early stages; and (c) with respect to the Ingham County and Ludel lawsuits, discovery regarding the amount of damages has not yet begun

181

*Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### NOTE 18: SIGNIFICANT COMPONENTS OF OTHER ASSETS AND OTHER LIABILITIES ON OUR CONSOLIDATED BALANCE SHEETS

The table below presents the significant components of other assets and other liabilities on our consolidated balance sheets

**Table 18.1    Significant Components of Other Assets and Other Liabilities on Our Consolidated Balance Sheets**

| | March 31, 2012 | | December 31, 2011 |
| --- | ---: | --- | ---: |
| | (in millions) | | |
| Other assets | | | |
| Guarantee asset | $   798 | $ | 752 |
| Accounts and other receivables | 8,616 | | 8,350 |
| All other | 1,347 | | 1,411 |
| Total other assets | $ 10,761 | $ | 10,513 |
| Other liabilities | | | |
| Guarantee obligation | $   814 | $ | 787 |
| Service liabilities | 3,571 | | 3,600 |
| Accounts payable and accrued expenses | 942 | | 845 |
| All other | 959 | | 814 |
| Total other liabilities | $ 6,286 | $ | 6,046 |

182                                                                     *Freddie Mac*

Source   FDRAL HOME LOAN MORTGAGE CORP, 10 Q, May 03, 2012                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## PART II OTHER INFORMATION

### ITEM 1. LEGAL PROCEEDINGS

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business  See "NOTE 17: LEGAL CONTINGENCIES" for more information regarding our involvement as a party to various legal proceedings

### ITEM 1A. RISK FACTORS

This Form  0 Q should be read together with the "RISK FACTORS" section in our 2011 Annual report, which describes various risks and uncertainties to which we are or may become subject  These risks and uncertainties could, directly or indirectly, adversely affect our business, financial condition, results of operations, cash flows, strategies, and/or prospects.

### ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

**Recent Sales of Unregistered Securities**

The securities we issue are "exempted securities" under the Securities Act of 1933, as amended. As a result, we do not file registration statements with the SEC with respect to offerings of our securities

Following our entry into conservatorship, we suspended the operation of, and ceased making grants under, equity compensation plans. Previously, we had provided equity compensation under those plans to employees and members of our Board of Directors  Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations, or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms

No stock options were exercised during the three months ended  March 31, 2012. However, restrictions lapsed on 460,846 restricted stock units.

See "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report for more information

**Dividend Restrictions**

Our payment of dividends on Freddie Mac common stock or any series of Freddie Mac preferred stock (other than senior preferred stock) is subject to certain restrictions as described in "MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES    Dividends and Dividend Restrictions" in our 2011 Annual Report.

**Information about Certain Securities Issuances by Freddie Mac**

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off balance sheet arrangement. The disclosure must be made in a current report on Form 8 K under Item 2 03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC

Freddie Mac's securities offerings are exempted from SEC registration requirements  As a result, we are not required to and do not file registration statements or prospectuses with the SEC with respect to our securities offerings  To comply with the disclosure requirements of Form 8 K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars (or supplements thereto) that we post on our web site or in a current report on Form 8 K, in accordance with a "no action" letter we received from the SEC staff. In cases where the information is disclosed in an offering circular posted on our web site, the document will be posted on our web site within the same time period that a prospectus for a non exempt securities offering would be required to be filed with the SEC.

The web site address for disclosure about our debt securities, other than debt securities of consolidated trusts, is  www freddiemac com/debt  From this address, investors can access the offering circular and related supplements for debt securities offerings under Freddie Mac's global debt facility, including pricing supplements for individual issuances of debt securities

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3721

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Disclosure about the mortgage related securities we issue, some of which are off balance sheet obligations, can be found at www.freddiemac.com/mbs. From this address, investors can access information and documents about our mortgage related securities, including offering circulars and related offering circular supplements.

Source   D RA   HOM   OAN MORTGAG   CORP, 10 Q, May 03, 2012

TREASURY-3722

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### ITEM 6. EXHIBITS

The exhibits are listed in the Exhibit Index at the end of this Form 10 Q

185                                                                 *Freddie Mac*

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized

Federal Home Loan Mortgage Corporation

By: /s/ Charles E. Haldeman, Jr.
      Charles E. Haldeman, Jr.
      Chief Executive Officer

Date: May 3, 2012

By: /s/ Ross J. Kari
      Ross J. Kari
      Executive Vice President     Chief Financial Officer
      (Principal Financial Officer)

Date: May 3, 2012

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3724

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# GLOSSARY

This Glossary includes acronyms and defined terms that are used throughout this Form 10 Q

**Administration**   Executive branch of the U.S. Government.

**Agency securities**   Generally refers to mortgage related securities issued by the GSEs or government agencies

**Alt A loan**   Although there is no universally accepted definition of Alt A, many mortgage market participants classify single family loans with credit characteristics that range between their prime and subprime categories as Alt A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both In determining our Alt A exposure on loans underlying our single family credit guarantee portfolio, we classified mortgage loans as Alt A if the lender that delivers them to us classified the loans as Alt A, or if the loans had reduced documentation requirements, as well as a combination of certain credit characteristics and expected performance characteristics at acquisition which, when compared to full documentation loans in our portfolio, indicate that the loan should be classified as Alt A In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt A, such refinance loan may no longer be categorized or reported as an Alt A mortgage in this Form 0 Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the servicer as an Alt A loan As a result, our reported Alt A balances may be lower than would otherwise be the case had such refinancing not occurred For non agency mortgage related securities that are backed by Alt A loans, we categorize our investments in non agency mortgage related securities as Alt A if the securities were identified as such based on information provided to us when we entered into these transactions

**AOCI**   Accumulated other comprehensive income (loss), net of taxes

**ARM**   Adjustable rate mortgage   A mortgage loan with an interest rate that adjusts periodically over the life of the mortgage loan based on changes in a benchmark index.

**Board**   Board of Directors

**Bond insurers**   Companies that provide credit insurance principally covering securitized assets in both the primary issuance and secondary markets.

**BPS**   Basis points   One one hundredth of 1%. This term is commonly used to quote the yields of debt instruments or movements in interest rates

**Cash and other investments portfolio**   Our cash and other investments portfolio is comprised of our cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and investments in non mo tgage related securities

**Charter**   The Federal Home Loan Mortgage Corporation Act, as amended, 12 U.S.C. § 1451 et seq.

**CMBS**   Commercial mortgage backed security   A security backed by mortgages on commercial property (often including multifamily rental properties) rather than one to four family residential real estate Although the mortgage pools underlying CMBS can include mortgages financing multifamily properties and commercial properties, such as office buildings and hotels, the classes of CMBS that we hold receive distributions of scheduled cash flows only from multifamily properties Military housing revenue bonds are included as CMBS within investments related disclosures We have not identified CMBS as either subprime or Alt A securities

**Comprehensive income (loss)**   Consists of net income (loss) plus total other comprehensive income (loss)

**Conforming loan/Conforming jumbo loan/Conforming loan limit**   A conventional single family mortgage loan with an original principal balance that is equal to or less than the applicable conforming loan limit, which is a dollar amount cap on the size of the original principal balance of single family mortgage loans we are permitted by law to purchase or securitize The conforming loan limit is determined annually based on changes in FHFA's housing price index Any decreases in the housing price index are accumulated and used to offset any future increases in the housing price index so that conforming loan limits do not decrease from year to year Since 2006, the base conforming loan limit for a one family residence has been set at $417,000, and higher limits have been established in certain "high cost" areas (currently, up to $625,500 for a one family residence). Higher limits also apply to two to four family residences, and for mortgages secured by properties in Alaska, Guam, Hawaii and the U.S. Virgin Islands.

187                                                                                              *Freddie Mac*

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                              Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Actual loan limits are set by FHFA for each county (or equivalent), and the loan limit for specific high cost areas may be lower than the maximum amounts  We refer to loans that we have purchased with UPB exceeding the base conforming loan limit (*i.e.*, $417,000) as conforming jumbo loans

Beginning in 2008, pursuant to a series of laws, our loan limits in certain high cost areas were increased temporarily above the limits that otherwise would have been applicable (up to $729,750 for a one family residence)  The latest of these increases  expired on September 30, 20

**Conservator**     The Federal Housing Finance Agency, acting in its capacity as conservator of Freddie Mac

**Convexity**     A measure of how much a financial instrument's duration changes as interest rates change

**Core spread income**     Refers to a fair value estimate of the net current period accrual of income from the  spread between mortgage related investments and debt, calculated on an option adjusted basis.

**Credit enhancement**     Any number of different financial arrangements that are designed to reduce credit risk  by partially or fully compensating an investor in the event of certain financial losses  Examples of credit enhancements  include mortgage insurance, overcollateralization, indemnification agreements, and government guarantees

**Credit losses**     Consists of charge offs and REO operations income (expense)

**Credit related expenses**     Consists of our provision for credit losses and REO operations income (expense)

**Deed in lieu of foreclosure**     An alternative to foreclosure in which the borrower voluntarily conveys title to  the property to the lender and the lender accepts such title (sometimes together with an additional payment by the borrower)  in full satisfaction of the mortgage indebtedness

**Delinquency**     A failure to make timely payments of principal or interest on a mortgage loan  For single family  mortgage loans, we generally report delinquency rate information  for loans that are seriously delinquent. For multifamily loans,  we report delinquency rate information based on the UPB of loans that are two monthly payments or more past due or in the process  of foreclosure

**Derivative**     A financial instrument whose value depends upon the characteristics and value of an underlying  financial asset or index, such as a security or commodity price,  interest or currency rates, or other financial indices

**Dodd Frank Act**     Dodd Frank Wall Street Reform and Consumer Protection Act

**DSCR**     Debt Service Coverage Ratio     An indicator of future credit performance for multifamily loans   The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured  property's cash flow, after deducting non mortgage expenses from income  The higher the DSCR, the more likely a multifamily  borrower will be able to continue servicing its mortgage  obligation

**Duration**     Duration is a measure of a financial  instrument's price sensitivity to changes in interest rates

**Duration gap**     One of our primary interest rate risk measures  Duration gap is a measure of the difference  between the estimated durations of our interest rate sensitive assets and liabilities  We present the duration gap of our financial instruments in units expressed as months. A duration gap of zero implies that the change in value of our interest  rate sensitive assets from an instantaneous change in interest  rates would be expected to be accompanied by an equal and  offsetting change in the value of our debt and derivatives, thus  leaving the net fair value of equity unchanged.

**Effective rent**     The average rent actually paid by the tenant over the term of a lease

**Euribor**     Euro Interbank Offered Rate

**Exchange Act**     Securities and Exchange Act of 1934, as amended

**Fannie Mae**     Federal National Mortgage Association

**FASB**     Financial Accounting Standards Board

**FDIC**     Federal Deposit Insurance Corporation

**Federal Reserve**     Board of Governors of the Federal Reserve System

**FHA**     Federal Housing Administration

TREASURY-3726

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**FHFA**     Federal Housing Finance Agency     FHFA is an independent agency of the U S  government established by the Reform Act with responsibility for regulating Freddie Mac, Fannie Mae, and the  FHLBs.

**FHLB**     Federal Home Loan Bank

**FICO score**     A credit scoring system developed by Fair, Isaac and Co. FICO scores are the most commonly used  credit scores today  FICO scores are ranked on a scale of approximately 300 to 850 points with a higher value indicating a  lower likelihood of credit default

**Fixed  rate mortgage**     Refers to a mortgage originated at a specific rate of interest that remains constant  over the life of the loan

**Foreclosure alternative**     A workout option pursued when a home retention action is not successful or not  possible  A foreclosure alternative is either a short sale or deed in lieu of foreclosure

**Foreclosure transfer**     Refers to our completion of a transaction provided for by the foreclosure laws of the  applicable state, in which a delinquent borrower's ownership interest in a mortgaged property is terminated and  title to the property is transferred to us or to a third party  State foreclosure laws commonly refer to such transactions as  foreclosure sales, sheriff's sales, or trustee's sales, among other terms  When we, as mortgage holder, acquire a property in this manner, we pay for it by extinguishing some or  all of the mortgage debt

**Freddie Mac mortgage related securities**     Securities we issue and guarantee, including PCs, REMICs and  Other Structured Securities, and Other Guarantee Transactions.

**GAAP**     Generally accepted accounting principles

**Ginnie Mae**     Government National Mortgage Association

**GSE Act**     The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the  Reform Act

**GSEs**     Government sponsored enterprises     Refers to certain legal entities created by the U.S. government, including Freddie Mac, Fannie Mae, and the FHLBs.

**Guarantee fee**     The fee that we receive for guaranteeing the payment of principal and interest to mortgage  security investors.

**HAFA**     Home Affordable Foreclosures Alternative program     In 2009, the Treasury Department introduced  the HAFA program to provide an option for HAMP eligible homeowners who are unable to keep their homes  The HAFA program took effect on April 5, 2010 and we implemented it effective August 1, 2010

**HAMP**     Home Affordable Modification Program     Refers to the effort under the MHA Program whereby the U S  government, Freddie Mac and Fannie Mae commit funds to help eligible homeowners avoid foreclosure and  keep their homes through mortgage modifications

**HARP**     Home Affordable Refinance Program     Refers to the effort under the MHA Program that seeks to help eligible borrowers (whose monthly payments are current) with existing loans that are guaranteed by us or  Fannie Mae to refinance into loans with more affordable monthly payments and/or fixed rate terms  Through December 20    , under HARP, eligible borrowers who had mortgages sold to Freddie Mac or Fannie Mae on or before May 31, 2009 with current LTV ratios above 80% (and up to   25%) were allowed to refinance their mortgages  without obtaining new mortgage insurance in excess of what is  already in place  Beginning December 2011, HARP was expanded to a  ow e  g b e  borrowers who have mortgages with current LTV ratios above 125% to refinance under the program  The relief  refinance initiative, under which we also allow borrowers with LTV ratios of 80% and below to participate, is our implementation of HARP for our loans

**HFA**     State or local Housing Finance Agency

**HUD**     U.S. Department of Housing and Urban  Development     Prior to the enactment of the Reform  Act, HUD had general regulatory authority over Freddie Mac, including authority over our affordable housing goals and new  programs  Under the Reform Act, FHFA now has general regulatory authority over us, though HUD still has authority over Freddie  Mac with respect to fair lending

**Implied volatility**     A measurement of how the value of a financial instrument changes due to changes in the  market's expectation of potential changes in future interest rates  A decrease in implied volatility generally  increases the estimated

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3727

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

fair value of our mortgage assets and decreases the estimated fair value of our callable debt and options based derivatives, while an increase in implied volatility generally has the opposite effect

**Interest only loan**    A mortgage loan that allows the borrower to pay only interest (either fixed rate or adjustable rate) for a fixed period of time before principal amortization payments are required to begin After the end of the interest only period, the borrower can choose to refinance the loan, pay the principal balance in total, or begin paying the monthly scheduled principal due on the loan

**IRS**    Internal Revenue Service

**LIBOR**    London Interbank Offered Rate

**LIHTC partnerships**    Low income housing tax credit partnerships    Prior to 2008, we invested as a limited partner in LIHTC partnerships, which are formed for the purpose of providing funding for affordable multifamily rental properties. These LIHTC partnerships invest directly in limited partnerships that own and operate multifamily rental properties that generate federal income tax credits and deductible operating losses

**Liquidation preference**    Generally refers to an amount that holders of preferred securities are entitled to receive out of available assets, upon liquidation of a company. The initial liquidation preference of our senior preferred stock was $ 0 billion The aggregate liquidation preference of our senior preferred stock includes the initial liquidation preference plus amounts funded by Treasury under the Purchase Agreement In addition, dividends and periodic commitment fees not paid in cash are added to the liquidation preference of the senior preferred stock We may make payments to reduce the liquidation preference of the senior preferred stock only in limited circumstances.

**LTV ratio**    Loan to value ratio    The ratio of the unpaid principal amount of a mortgage loan to the value of the property that serves as collateral for the loan, expressed as a percentage Loans with high LTV ratios generally tend to have a higher risk of default and, if a default occurs, a greater risk that the amount of the gross loss will be high compared to loans with lower LTV ratios We report LTV ratios based solely on the amount of the loan purchased or guaranteed by us, generally excluding any second lien mortgages (unless we own or guarantee the second lien)

**MD&A**    Management's Discussion and Analysis of Financial Condition and Results of Operations

**MHA Program**    Making Home Affordable Program    Formerly known as the Housing Affordability and Stability Plan, the MHA Program was announced by the Obama Administration in February 2009 The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. The MHA Program includes HARP and HAMP

**Mortgage assets**    Refers to both mortgage loans and the mortgage related securities we hold in our mortgage related investments portfolio

**Mortgage related investments portfolio**    Our investment portfolio, which consists principally of mortgage related securities and single family and multifamily mortgage loans The size of our mortgage related investments portfolio under the Purchase Agreement is determined without giving effect to the January 1, 2010 change in accounting guidance related to transfers of financial assets and consolidation of VIEs Accordingly, for purposes of the portfolio limit, when PCs and certain Other Guarantee Transactions are purchased into the mortgage related investments portfolio, this is considered the acquisition of assets rather than the reduction of debt

**Mortgage to debt OAS**    The net OAS between the mortgage and agency debt sectors This is an important factor in determining the expected level of net interest yield on a new mortgage asset Higher mortgage to debt OAS means that a newly purchased mortgage asset is expected to provide a greater return relative to the cost of the debt issued to fund the purchase of the asset and, therefore, a higher net interest yield Mo tgage to debt OAS tends to be higher when there is weak demand for mortgage assets and lower when there is strong demand for mortgage assets

**Multifamily mortgage**    A mortgage loan secured by a property with five or more residential rental units

**Multifamily mortgage portfolio**    Consists of multifamily mortgage loans held by us on our consolidated balance sheets as well as those underlying non consolidated Freddie Mac mortgage related securities, and other guarantee commitments, but excluding those underlying our guarantees of HFA bonds under the HFA Initiative

**Net worth (deficit)**    The amount by which our total assets exceed (or are less than) our total liabilities as reflected on our consolidated balance sheets prepared in conformity with GAAP

Source    D RA  HOM    OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3728

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**NIBP**    New Issue Bond Program is a component of the Housing Finance Agency Initiative in which we and Fannie Mae issued partially guaranteed pass through securities to Treasury that are backed by bonds issued by various state and local HFAs. The program provides financing for HFAs to issue new housing bonds. Treasury is obligated to absorb any losses under the program up to a certain level before we are exposed to any losses.

**NPV**    Net present value

**OAS**    Option adjusted spread    An estimate of the incremental yield spread between a particular financial instrument (*e.g.*, a security, loan or derivative contract) and a benchmark yield curve (*e.g.*, LIBOR or agency or U.S. Treasury securities). This includes consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options.

**OFHEO**    Office of Federal Housing Enterprise Oversight  The predecessor to FHFA

**Option ARM loan**    Mortgage loans that permit a variety of repayment options, including minimum, interest only, fully amortizing 30-year and fully amortizing 15 year payments  The minimum payment alternative for option ARM loans allows the borrower to make monthly payments that may be less than the interest accrued for the period  The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance  For our non agency mortgage related securities that are backed by option ARM loans, we categorize securities as option ARM if the securities were identified as such based on information provided to us when we entered into these transactions  We have not identified option ARM securities as either subprime or Alt A securities

**OTC**    Over the counter

**Other guarantee commitments**    Mortgage related assets held by third parties for which we provide our guarantee without our securitization of the related assets

**Other Guarantee Transactions**    Transactions in which third parties transfer non Freddie Mac mortgage related securities to trusts specifically created for the purpose of issuing mortgage related securities, or certificates, in the Other Guarantee Transactions.

**PCs**    Participation Certificates    Securities that we issue as part of a securitization transaction  Typically we purchase mortgage loans from parties who sell mortgage loans, place a pool of loans into a PC trust and issue PCs from that trust. The PCs are generally transferred to the seller of the mortgage loans in consideration of the loans or are sold to third party investors if we purchased the mortgage loans for cash

**PMVS**    Portfolio Market Value Sensitivity    One of our primary interest rate risk measures  PMVS measures are estimates of the amount of average potential pre tax loss in the market value of our net assets due to parallel (PMVS L) and non parallel (PMVS YC) changes in LIBOR

**Primary mortgage market**    The market where lenders originate mortgage loans and lend funds to borrowers  We do not lend money directly to homeowners, and do not participate in this market.

**Purchase Agreement / Senior Preferred Stock Purchase Agreement**    An agreement the Conservator, acting on our behalf, entered into with Treasury on September 7, 2008, which was subsequently amended and restated on September 26, 2008 and further amended on May 6, 2009 and December 24, 2009.

**Recorded Investment**    The dollar amount of a loan recorded on our consolidated balance sheets, excluding any valuation allowance, such as the allowance for loan losses, but which does reflect direct write downs of the investment  For mortgage loans, direct write downs consist of valuation allowances associated with recording our initial investment in loans acquired with evidence of credit deterioration at the time of purchase  Recorded investment excludes accrued interest income

**Reform Act**    The Federal Housing Finance Regulatory Reform Act of 2008, which, among other things, amended the GSE Act by establishing a single regulator, FHFA, for Freddie Mac, Fannie Mae, and the FHLBs.

**Relief refinance mortgage**    A single family mortgage loan delivered to us for purchase or guarantee that meets the criteria of the Freddie Mac Relief Refinance Mortgagesm initiative  Part of this initiative is our implementation of HARP for our loans, and relief refinance options are also available for certain non HARP loans  Although HARP is targeted at borrowers with current LTV ratios above 80%, our initiative also allows borrowers with LTV ratios of 80% and below to participate

Source    D RA  HOM    OAN MORTGAG  CORP, 10 Q, May 03, 2012                    TREASURY-3729                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**REMIC**    Real Estate Mortgage Investment Conduit    A type of multiclass mortgage related security that divides the cash flows (principal and interest) of the underlying mortgage related assets into two or more classes that meet the investment criteria and portfolio needs of different investors.

**REMICs and Other Structured Securities** (or in the case of Multifamily securities, **Other Structured Securities**)    Single and multiclass securities issued by Freddie Mac that represent beneficial interests in pools of PCs and certain other types of mortgage related assets    REMICs and Other Structured Securities that are single class securities pass through the cash flows (principal and interest) on the underlying mortgage related assets    REMICs and Other Structured Securities that are multiclass securities divide the cash flows of the underlying mortgage related assets into two or more classes designed to meet the investment criteria and portfolio needs of different investors    Our principal multiclass securities qualify for tax treatment as REMICs

**REO**    Real estate owned    Real estate which we have acquired through foreclosure or through a deed in lieu of foreclosure

**S&P**    Standard & Poor's

**SEC**    Securities and Exchange Commission

**Secondary mortgage market**    A market consisting of institutions engaged in buying and selling mortgages in the form of whole loans (*i.e.*, mortgages that have not been securitized) and mortgage related securities    We participate in the secondary mortgage market by purchasing mortgage loans and mortgage related securities for investment and by issuing guaranteed mortgage related securities, principally PCs

**Senior preferred stock**    The shares of Variable Liquidation Preference Senior Preferred Stock issued to Treasury under the Purchase Agreement

**Seriously delinquent**    Single family mortgage loans that are three monthly payments or more past due or in the process of foreclosure as reported to us by our servicers

**Short sale**    Typically an alternative to foreclosure consisting of a sale of a mortgaged property in which the homeowner sells the home at market value and the lender accepts proceeds (sometimes together with an additional payment or promissory note from the borrower) that are less than the outstanding mortgage indebtedness in full satisfaction of the loan

**Single family credit guarantee portfolio**    Consists of unsecuritized single family loans, single family loans held by consolidated trusts, and single family loans underlying non consolidated Other Guarantee Transactions and covered by other guarantee commitments    Excludes our REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates and our guarantees under the HFA Initiative

**Single family mortgage**    A mortgage loan secured by a property containing four or fewer residential dwelling units

**Spread**    The difference between the yields of two debt securities, or the difference between the yield of a debt security and a benchmark yield, such as LIBOR.

**Strips**    Mortgage pass through securities created by separating the principal and interest payments on a pool of mortgage loans    A principal only strip entitles the security holder to principal cash flows, but no interest cash flows, from the underlying mortgages    An interest only strip entitles the security holder to interest cash flows, but no principal cash flows, from the underlying mortgages.

**Subprime**    Participants in the mortgage market may characterize single family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime    Subprime generally refers to the credit risk classification of a loan. There is no universally accepted definition of subprime    The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include, among other factors, a combination of high LTV ratios, low credit scores or originations using lower underwriting standards, such as limited or no documentation of a borrower's income    While we have not historically characterized the loans in our single family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk    Notwithstanding our historical characterizations of the single family credit guarantee portfolio, certain security collateral underlying our Other Guarantee Transactions have been identified as subprime based on information provided to Freddie Mac when the transactions were entered into    We also categorize our investments in non agency mo tgage-re ated

TREASURY-3730

Source    D RA  HOM    OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

securities as subprime if they were identified as such based on  information provided to us when we entered into these  transactions.

**Swaption**    An option contract to enter into an interest rate swap  In exchange for an option premium, a buyer  obtains the right but not the obligation to enter into a  specified swap agreement with the issuer on a specified future  date

**TBA**    To be announced

**TCLFP**    Temporary Credit and Liquidity Facility Program is a component of the Housing Finance Agency Initiative  in which we and Fannie Mae issued credit guarantees to holders of variable  rate demand obligations issued by various state and  local HFAs  Treasury is obligated to absorb any losses under the  program up to a certain level before we are exposed to any  losses  The program is scheduled to expire on December 3 , 2012; however, Treasury has given participants the option to extend the program facility to December 3 , 20  5

**TDR**    Troubled debt restructuring    A type of loan modification in which the changes to the  contractual terms result in concessions to borrowers that are experiencing financial difficulties

**Total other comprehensive income (loss)**    Consists of the after tax changes in: (a) the unrealized  gains and losses on available  for sale securities; (b) the effective portion of derivatives accounted for as cash flow  hedge relationships; and (c) defined benefit plans

**Total mortgage portfolio**    Includes mortgage loans and mortgage related securities held on our consolidated  balance sheets as well as the balances of our non consolidated  issued and guaranteed single class and multiclass securities,  and other mortgage related financial guarantees issued to third parties

**Treasury**    U.S. Department of the Treasury

**UPB**    Unpaid principal balance

**USDA**    U S  Department of Agriculture

**VA**    U.S. Department of Veteran Affairs

**VIE**    Variable Interest Entity    A VIE is an entity: (a) that has a total equity investment at  risk that is not sufficient to finance its activities without additional subordinated financial support provided by another  party; or (b) where the group of equity holders does not  have: (i) the ability to make significant decisions about  the entity's activities; (ii) the obligation to absorb  the entity's expected losses; or (iii) the right to receive the entity's expected residual returns

**Warrant**    Refers to the warrant we issued to  Treasury on September 8, 2008 pursuant to the Purchase  Agreement  The warrant provides Treasury the ability to purchase shares of our common stock equal to 79.9% of the total number of  shares of Freddie Mac common stock outstanding on a fully  diluted basis on the date of exercise

**Workout, or loan workout**    A workout is either: (a) a home retention action, which is either a loan  modification, repayment plan, or forbearance agreement; or (b) a foreclosure alternative, which is either a short sale  or a deed in lieu of foreclosure

**XBRL**    eXtensible Business Reporting Language

**Yield curve**    A graphical display of the relationship between yields and maturity dates for bonds of the  same credit quality  The slope of the yield curve is an important factor in determining the level of net interest yield  on a new mortgage asset, both initially and over time  For  example, if a mortgage asset is purchased when the yield curve  is inverted, with short term rates higher than long term rates,  our net interest yield on the asset will tend to be lower initially and then increase over time  Likewise, if a mortgage  asset is purchased when the yield curve is steep, with short term rates lower than long term rates, our net interest  yield on the asset will tend to be higher initially and then  decrease over time

*Freddie Mac*

Source    D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                          Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 0.1 | PC Master Trust Agreement dated January 4, 2012 (incorporated by reference to Exhibit 0 52 to the Registrant's Annual Report on Form 0 K for the fiscal year ended December 31, 2011, as filed on March 9, 2012) |
| 0.2 | Federal Home Loan Mortgage Corporation Global Debt Facility Agreement, dated March 9, 2012 |
| 12.1 | Statement re: computation of ratio of earnings to fixed charges and computation of ratio of earnings to combined fixed charges and preferred stock dividends |
| 3 .1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 3a 4(a) |
| 3 .2 | Certification of Executive Vice President Chief Financial Officer pursuant to Securities Exchange Act Rule 3a 4(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Executive Vice President Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101.INS | XBRL Instance Document[1] |
| 101.SCH | XBRL Taxonomy Extension Schema[1] |
| 101.CAL | XBRL Taxonomy Extension Calculation[1] |
| 101.LAB | XBRL Taxonomy Extension Labels[1] |
| 101 PRE | XBRL Taxonomy Extension Presentation[1] |
| 101 DEF | XBRL Taxonomy Extension Definition[1] |

(1) The f nanc a nfo ma on con a ned n hese XBRL documen s s unaud ed The nfo a on n hese exh b s sha no be dee ed "f ed" fo pu poses of Sec on 18 of e Sec es Exc a ge Ac of 1934, o o e w se s bjec o e ab es of Sec on 18, no sha hey be deemed nco po a ed by efe ence n o any d sclosu e documen ela ng to F edd e Mac, except to t e exte t, f a y, exp ess y set fo h by spec f c efe ence n such f ng

E

*Freddie Mac*

Source D RA HOM OAN MORTGAG CORP, 10 Q, May 03, 2012

TREASURY-3732

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 10.2**

## FEDERAL HOME LOAN MORTGAGE CORPORATION

### GLOBAL DEBT FACILITY AGREEMENT

**AGREEMENT**, dated as of March 9, 2012, among the Federal Home Loan Mortgage Corporation (**"Freddie Mac"**) and Holders of Debt Securities (each as hereinafter defined).

Whereas:

(a) Freddie Mac is a corporation duly organized and existing under and by virtue of the laws of the United States (Title III of the Emergency Home Finance Act of 1970, as amended (the **"Freddie Mac Act"**)) and has full corporate power and authority to enter into this Agreement and to undertake the obligations undertaken by it herein;

(b) Pursuant to Section 306(a) of the Freddie Mac Act, Freddie Mac is authorized, upon such terms and conditions as it may prescribe, to borrow, to pay interest or other return, and to issue notes, bonds or other obligations or securities; and

(c) To provide funds to permit Freddie Mac to engage in activities consistent with its statutory purposes, Freddie Mac has established a Global Debt Facility (the **"Facility"**) and authorized the issuance, from time to time, pursuant to this Agreement, of unsecured general obligations of Freddie Mac or, if so provided in the applicable Supplemental Agreement (as hereinafter defined), secured obligations of Freddie Mac (**"Debt Securities"**).

**NOW, THEREFORE**, in consideration of the premises and mutual covenants herein contained, it is hereby agreed that the following terms and conditions of this Agreement (including, as to each issue of the Debt Securities, the applicable Supplemental Agreement) shall govern the Debt Securities and the rights and obligations of Freddie Mac and Holders with respect to the Debt Securities.

## ARTICLE I

### Definitions

Whenever used in this Agreement, the following words and phrases shall have the following meanings, unless the context otherwise requires.

*Additional Debt Securities:*  Debt Securities issued by Freddie Mac with the same terms (other than Issue Date, interest commencement date and issue price) and conditions as Debt Securities for which settlement has previously occurred so as to form a single series of Debt Securities as specified in the applicable Supplemental Agreement.

*Agreement:*  This Global Debt Facility Agreement dated as of March 9, 2012, as it may be amended or supplemented from time to time, and successors thereto pursuant to which Freddie Mac issues the Debt Securities.

*Amortizing Debt Securities:*  Debt Securities on which Freddie Mac makes periodic payments of principal during the terms of such Debt Securities as described in the related Supplemental Agreement.

*Beneficial Owner:*  The entity or individual that beneficially owns a Debt Security.

*Bonds:*  Callable or non callable Debt Securities with maturities of more than ten years.

*Book Entry Rules:*  The Department of Housing and Urban Development regulations (24 C.F.R. Part 81, Subpart H) applicable to the Fed Book Entry Debt Securities and such procedures as to which Freddie Mac and the FRBNY may agree.

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Business Day:* (i) With respect to Fed Book Entry Debt Securities, any day other than (a) a Saturday, (b) a Sunday, (c) a day on which the FRBNY is closed, (d) as to any Holder of a Fed Book Entry Debt Security, a day on which the Federal Reserve Bank that maintains the Holder's account is closed, or (e) a day on which Freddie Mac's offices are closed; and (ii) with respect to Registered Debt Securities, any day other than (a) a Saturday, (b) a Sunday, (c) a day on which banking institutions are closed in (1) the City of New York or (2) if the Specified Payment Currency is other than U.S. dollars or euros, the Principal Financial Center of the country of such Specified Payment Currency, (d) if the Specified Payment Currency is euros, a day on which the TARGET2 system is not open for settlements, or a day on which payments in euros cannot be settled in the international interbank market as determined by the Global Agent, (e) for any required payment, a day on which banking institutions are closed in the place of payment, or (f) a day on which Freddie Mac's offices are closed.

*Calculation Agent:* Freddie Mac or a bank or broker dealer designated by Freddie Mac in the applicable Supplemental Agreement as the entity responsible for determining the interest rate on a Variable Rate Debt Security.

*Calculation Date:* In each year, each of those days in the calendar year that are specified in the applicable Supplemental Agreement as being the scheduled Interest Payment Dates regardless, for this purpose, of whether any such date is in fact an Interest Payment Date and, for the avoidance of doubt, a "Calculation Date" may occur prior to the Issue Date or after the last Principal Payment Date.

*Callable Reference Notes:* U.S. dollar denominated, callable Reference Securities with maturities of more than one year.

*Cap:* A maximum interest rate at which interest may accrue on a Variable Rate Debt Security during any Interest Reset Period.

*Citibank — London:* Citibank, N.A., London office, the Global Agent for Registered Debt Securities.

*Citigroup — Frankfurt:* Citigroup Global Markets Deutschland AG & Co. KGaA, the Registrar for Registered Debt Securities.

*Clearstream, Luxembourg:* Clearstream Banking, société anonyme, which holds securities for its participants and facilitates the clearance and settlement of securities transactions between its participants through electronic book entry changes in accounts of its participants.

*CMS Determination Date:* The second New York Banking Day preceding the applicable Reset Date.

*CMS Rate:* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(N).

*CMT Determination Date:* The second New York Banking Day preceding the applicable Reset Date.

*CMT Rate:* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(M).

*Code:* The Internal Revenue Code of 1986, as amended.

*Common Depositary:* The common depositary for Euroclear, Clearstream, Luxembourg and/or any other applicable clearing system, which will hold Other Registered Debt Securities on behalf of Euroclear, Clearstream, Luxembourg and/or any such other applicable clearing system.

*Currency Exchange Bank:* The currency exchange bank specified in the applicable Supplemental Agreement that will convert any amounts paid by Freddie Mac in a Specified Payment Currency on DTC Registered Debt Securities to U.S. Holders into U.S. dollars.

TREASURY-3734

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*CUSIP Number:*  A unique nine character designation assigned to each Debt Security by the CUSIP Service Bureau and used to identify each issuance of Debt Securities on the records of the Federal Reserve Banks or DTC, as applicable.

*Day Rate:*  The arithmetic mean for each day in a Seven Day Period as determined by the Calculation Agent in accordance with Section 2.07(i)(P)(2).

*Dealers:*  Firms that engage in the business of dealing or trading in debt securities as agents, brokers or principals.

*Debt Securities:*  Unsecured subordinated or unsubordinated notes, bonds and other debt securities issued from time to time by Freddie Mac under the Facility, or if so provided in the applicable Supplemental Agreement, secured obligation issued from time to time by Freddie Mac under the Facility.

*Deleverage Factor:*  A Multiplier of less than one by which an applicable Index is multiplied.

*Depository:*  DTC or any successor.

*Deposits:*  Deposits commencing on the applicable Reset Date.

*Designated EURIBOR Reuters Page:*  The display on Reuters Page EURIBOR01, or any successor page or such other page (or any successor page) on that service or any successor service specified in the applicable Supplemental Agreement for the purpose of displaying rates for Deposits in euros.

*Designated EUR LIBOR Reuters Page:*  The display on Reuters Page LIBOR01 or any successor page or such other page (or any successor page) on that service or any successor service specified in the applicable Supplemental Agreement for the purpose of displaying rates for Deposits in euros.

*Designated Reuters Page:*  The display on Reuters Page LIBOR01 (or where the Index Currency is Australian dollars, Swiss francs or Yen, Page LIBOR02) or any successor page or such other page (or any successor page) on that service or any successor service specified in the applicable Supplemental Agreement for the purpose of displaying British Bankers' Association interest settlement rates for Deposits in the Index Currency.

*Determination Date:*  The date as of which the rate of interest applicable to an Interest Reset Period is determined.

*Determination Period:*  The period from, and including, one Calculation Date to, but excluding, the next Calculation Date.

*DTC*  The Depository Trust Company, a limited purpose trust company, which holds securities for DTC participants and facilitates the clearance and settlement of transactions between DTC participants through electronic book entry changes in accounts of DTC participants.

*DTC Registered Debt Securities:*  Registered Debt Securities registered in the name of a nominee of DTC, which will clear and settle through the system operated by DTC.

EC: The European Community.

*EMU:*  European Economic and Monetary Union; the convergence of key features of the economies of certain participating European countries, including the adoption of a common monetary unit called the euro.

*EMU Event:*  As defined in Section 7.01(b).

*EURIBOR*  The rate determined by the Calculation Agent in accordance with Section 2.07(i)(J).

3

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EURIBOR Determination Date:*  The second TARGET2 Business Day preceding the applicable Reset Date, unless EURIBOR is determined in accordance with Section 2.07(i)(J)(3), in which case it means the applicable Reset Date.

*EUR LIBOR*   The rate determined by the Calculation Agent in accordance with Section 2.07(i)(I).

*EUR LIBOR Determination Date:*  The second TARGET2 Business Day preceding the applicable Reset Date.

*Euroclear:*  Euroclear System, a depositary that holds securities for its participants and clears and settles transactions between its participants through simultaneous electronic book entry delivery against payment.

*Euro Representative Amount:*  A principal amount of not less than the equivalent of U.S. $1,000,000 in euros that, in the Calculation Agent's sole judgment, is representative for a single transaction in the relevant market at the relevant time.

*Euro Zone:*  The region consisting of member states of the European Union that adopt the single currency in accordance with the Treaty.

*Event of Default:*  As defined in Section 7.01(a).

*Extendible Variable Rate Securities:*  Variable Rate Debt Securities, the maturity of which may be extended at a Benefical Owner's option effective as of certain specified dates, subject to a final maturity date, and that bear interest at variable rates subject to different Spreads for different specified periods.

*Facility:*  The Global Debt Facility described in the Offering Circular dated March 9, 2012 under which Freddie Mac issues the Debt Securities.

*Fed Book Entry Debt Securities:*  U.S. dollar denominated Debt Securities issued and maintained in book entry form on the Fed Book Entry System.

*Fed Book Entry System:*  The book entry system of the Federal Reserve Banks which provides book entry holding and settlement for U.S. dollar denominated securities issued by the U.S. Government, certain of its agencies, instrumentalities, government sponsored enterprises and international organizations of which the United States is a member.

*Federal Funds Rate (Daily):*  The rate determined by the Calculation Agent in accordance with Section 2.07(i)(O).

*Federal Funds Rate (Daily) Determination Date:*  The applicable Reset Date; provided, however, that if the Reset Date is not a Business Day, then the Federal Funds Rate (Daily) Determination Date means the Business Day immediately following the applicable Reset Date.

*Federal Funds Rate (Weekly Average):*  The rate determined by the Calculation Agent in accordance with Section 2.07(i)(P).

*Federal Reserve:*  The Board of Governors of the Federal Reserve System.

*Federal Reserve Bank:*  Each U.S. Federal Reserve Bank that maintains Debt Securities in book entry form.

*Federal Reserve Banks:*  Collectively, the Federal Reserve Banks.

*Fiscal Agency Agreement:*  The Uniform Fiscal Agency Agreement between Freddie Mac and the FRBNY.

*Fiscal Agent:*  The FRBNY is fiscal agent for Fed Book Entry Debt Securities.

4

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Fixed Principal Repayment Amount:*  An amount equal to 100% of the principal amount of a Debt Security, payable on the applicable Maturity Date or earlier date of redemption or repayment or a specified amount above or below such principal amount, as provided in the applicable Supplemental Agreement.

*Fixed Rate Debt Securities:*  Debt Securities that bear interest at a single fixed rate.

*Fixed/Variable Rate Debt Securities:*  Debt Securities that bear interest at a single fixed rate during one or more specified periods and at a variable rate determined by reference to one or more Indices, or otherwise, during one or more other periods. As to any such fixed rate period, the provisions of this Agreement relating to Fixed Rate Debt Securities shall apply, and, as to any such variable rate period, the provisions of this Agreement relating to Variable Rate Debt Securities shall apply.

*Floor:*  A minimum interest rate at which interest may accrue on a Debt Security during any Interest Reset Period.

*Freddie Mac:*  Federal Home Loan Mortgage Corporation, a stockholder owned company chartered by Congress pursuant to the Freddie Mac Act.

*Freddie Mac Act:*  Title III of the Emergency Home Finance Act of 1970, as amended, 12 U.S.C. § 1451-1459.

*FRBNY:*  The Federal Reserve Bank of New York.

*Global Agency Agreement:*  The agreement between Freddie Mac, the Global Agent and the Registrar.

*Global Agent:*  The entity selected by Freddie Mac to act as its fiscal, transfer and paying agent for Registered Debt Securities.

*H.15(519):*  The weekly statistical release entitled "Statistical Release H.15(519), Selected Interest Rates" as published by the Federal Reserve, or any successor publication of the Federal Reserve available on its website at http://www.federalreserve.gov/releases/h15/or any successor site.

*H.15 Daily Update:*  The daily update of H.15(519), available on the website of the Federal Reserve at http://www.federalreserve.gov/releases/h15/update/default.htm, or any successor site or publication.

*Holder:*  In the case of Fed Book Entry Debt Securities, the entity whose name appears on the book entry records of a Federal Reserve Bank as Holder; in the case of Registered Debt Securities in global registered form, the depository, or its nominee, in whose name the Registered Debt Securities are registered on behalf of a related clearing system; and, in the case of Registered Debt Securities in definitive registered form, the person or entity in whose name such Debt Securities are registered in the Register.

*Holding Institutions:*  Entities eligible to maintain book entry accounts with a Federal Reserve Bank.

*Index:*  LIBOR, EUR LIBOR, EURIBOR, Prime Rate, Treasury Rate, CMT Rate, CMS Rate, Federal Funds Rate (Daily), or Federal Funds (Weekly Average) or other specified interest rate, exchange rate or other index, as the case may be.

*Index Currency:*  The currency or currency unit specified in the applicable Supplemental Agreement with respect to which an Index will be calculated for a Variable Rate Debt Security; provided, however, that if euros are substituted for such currency or currency unit, the Index Currency will be euros and, with respect to LIBOR, the determination provisions for EUR-LIBOR will apply to such Debt

5

TREASURY-3737

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Securities upon such substitution. If no such currency or currency unit is specified in the applicable Supplemental Agreement, the Index Currency will be U.S. dollars.

*Index Maturity:*  The period with respect to which an Index will be calculated for a Variable Rate Debt Security that is specified in the applicable Supplemental Agreement.

*Interest Component:*  Each future interest payment, or portion thereof, due on or prior to the Maturity Date, or if the Debt Security is subject to redemption or repayment prior to the Maturity Date, the first date on which such Debt Security is subject to redemption or repayment.

*Interest Payment Date:*  The date or dates on which interest on Debt Securities will be payable in arrears.

*Interest Payment Period:*  Unless otherwise provided in the applicable Supplemental Agreement, the period beginning on (and including) the Issue Date or the most recent Interest Payment Date, as the case may be, and ending on (but excluding) the earlier of the next Interest Payment Date or the Principal Payment Date.

*Interest Reset Period:*  The period beginning on the applicable Reset Date and ending on the calendar day preceding the next Reset Date.

*Issue Date:*  The date on which Freddie Mac wires an issue of Debt Securities to Holders or other date specified in the applicable Supplemental Agreement.

*Leverage Factor:*  A Multiplier of greater than one by which an applicable Index is multiplied.

*LIBOR*   The rate determined by the Calculation Agent in accordance with Section 2.07(i)(H).

*LIBOR Determination Date:*  The second London Banking Day preceding the applicable Reset Date unless the Index Currency is Sterling, in which case it means the applicable Reset Date.

*London Banking Day:*  Any day on which commercial banks are open for business (including dealings in foreign exchange and deposits in the Index Currency) in London.

*Maturity Date:*  The date, one day or longer from the Issue Date, on which a Debt Security will mature unless extended, redeemed or repaid prior thereto.

*Mortgage Linked Amortizing Debt Securities:*  Amortizing Debt Securities on which Freddie Mac makes periodic payments of principal based on the rate of payments on referenced mortgage or mortgage related assets, as described in the related Supplemental Agreement.

*Multiplier:*  A constant or variable number (which may be greater than or less than one) to be multiplied by the relevant Index for a Variable Rate Debt Security.

*Non U.S. Currency*: Specified Currency other than U.S. dollars.

*Notes:*  Callable or non callable Debt Securities with maturities of more than one day.

*New York Banking Day:*  Any day other than (a) a Saturday, (b) a Sunday, (c) a day on which banking institutions in the City of New York are required or permitted by law or executive order to close, or (d) a day on which the FRBNY is closed.

*Offering Circular:*  The Freddie Mac Global Debt Facility Offering Circular dated March 9, 2012 (including any related Offering Circular Supplement) and successors thereto.

*OID Determination Date:*  The last day of the last accrual period ending prior to the date of the meeting of Holders (or, for consents not at a meeting, prior to a date established by Freddie Mac). The

TREASURY-3738

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

accrual period will be the same as the accrual period used by Freddie Mac to determine its deduction for accrued original issue discount under section 163 (e) of the Code.

*Other Registered Debt Securities:*  Registered Debt Securities that are not DTC Registered Debt Securities, that are deposited with a Common Depositary and that will clear and settle through the systems operated by Euroclear, Clearstream, Luxembourg and/or any such other applicable clearing system other than DTC.

*Pricing Supplement:*  A supplement to the Offering Circular that describes the specific terms, of, and provides pricing information and other information for, an issue of Debt Securities or which otherwise amends, modifies or supplements the terms of the Offering Circular.

*Prime Rate:*  The rate determined by the Calculation Agent in accordance with Section 2.07(i)(K).

*Prime Rate Determination Date:*  The New York Banking Day preceding the applicable Reset Date.

*Principal Component:*  The principal payment plus any interest payments that are either due after the date specified in, or are specified as ineligible for stripping in, the applicable Supplemental Agreement.

*Principal Financial Center:*  The capital city of the country of the Specified Payment Currency, or solely with respect to the calculation of LIBOR, the Index Currency, as the case may be, as specified in the applicable Supplemental Agreement except that with respect to U.S. dollars, Sterling, Yen, the euro and Swiss francs, the Principal Financial Center shall be the City of New York, London, Tokyo, Brussels and Zurich, respectively.

*Principal Payment Date:*  The Maturity Date, or the earlier date of redemption or repayment, if any (whether such redemption or repayment is in whole or in part).

*Range Accrual Debt Securities:*  Variable Rate Debt Securities on which no interest may accrue during periods when the applicable Index is outside a specified range as described in the related Supplemental Agreement.

*Record Date:*  As to Registered Debt Securities, the fifteenth calendar day preceding an Interest Payment Date. Interest on a Registered Debt Security will be paid to the Holder of such Registered Debt Security as of the close of business on the Record Date.

*Reference Bonds:*  U.S. dollar denominated, non callable Reference Securities with maturities of more than ten years.

*Reference Notes:*  U.S. dollar denominated, non callable Reference Securities with maturities of more than one year.

*Reference Securities:*  Scheduled U.S. dollar denominated issues of Debt Securities in large principal amounts, which may be either Callable Reference Notes, Reference Bonds or Reference Notes.

*Register:*  A register of the Holders of Registered Debt Securities maintained by the Registrar.

*Registered Debt Securities:*  Debt Securities issued and maintained in global registered or definitive registered form on the books and records of the Registrar.

*Registrar:*  The entity selected by Freddie Mac to maintain the Register.

*Representative Amount:*  A principal amount of not less than U.S. $1,000,000 (or, if the Index Currency is other than U.S. dollars, a principal amount not less than the equivalent in the Index Currency)

7

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3739

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

that, in the Calculation Agent's sole judgment, is representative for a single transaction in the relevant market at the relevant time.

*Reset Date:*  The date on which a new rate of interest on a Debt Security becomes effective.

*Reuters:*  Reuters Group PLC or any successor service.

*Reuters USAUCTION10 Page:*  The display designated as "USAUCTION10" (or any successor page) provided by Reuters.

*Reuters USAUCTION11 Page:*  The display designated as "USAUCTION11" (or any successor page) provided by Reuters.

*Reuters US PRIME1 Page:*  The display designated as page "USPRIME1" (or any successor page) provided by Reuters

*Seven Day Period:*  As defined in Section 2.07(i)(P)(1).

*Specified Currency:*  The currency or currency unit in which a Debt Security may be denominated and in which payments of principal of and interest on a Debt Security may be made.

*Specified Interest Currency:*  The Specified Currency provided for the payment of interest on Debt Securities.

*Specified Payment Currency:*  The term to which the Specified Interest Currency and Specified Principal Currency are referred collectively.

*Specified Principal Currency:*  The Specified Currency provided for the payment of principal on Debt Securities.

*Spread:*  A constant or variable percentage or number to be added to or subtracted from the relevant Index for a Variable Rate Debt Security.

*Step Debt Securities:*  Debt Securities that bear interest at different fixed rates during different specified periods.

*Sterling:*  British pounds sterling.

*Supplemental Agreement:*  An agreement which, as to the related issuance of Debt Securities, supplements the other provisions of this Agreement and identifies and establishes the particular offering of Debt Securities issued in respect thereof. A Supplemental Agreement may be documented by a supplement to this Agreement, a Pricing Supplement, a confirmation or a terms sheet. A Supplemental Agreement may, as to any particular issuance of Debt Securities, modify, amend or supplement the provisions of this Agreement in any respect whatsoever. A Supplemental Agreement shall be effective and binding as of its publication, whether or not executed by Freddie Mac.

*TARGET2:*  The Trans European Automated Real Time Gross Settlement Express Transfer payment system which utilizes a single shared platform and which was launched on November 19, 2007.

*TARGET2 Business Day:*  A day on which the TARGET2 system or its successor is operating.

*Targeted Registered Debt Securities:*  Debt Securities "targeted to foreign markets" under Treasury Department regulations and offered or sold solely to persons outside the United States or its territories or possessions.

*Treaty:*  The treaty establishing the EC, as amended by the treaty on European Union.

*Treasury Auction:*  The most recent auction of Treasury Bills prior to a given Reset Date.

8

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Treasury Bills:* Direct obligations of the United States.

*Treasury Department:* United States Department of the Treasury.

*Treasury Rate:* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(L).

*Treasury Rate Determination Date:* The day of the week in which the Reset Date falls on which Treasury Bills would normally be auctioned or, if no auction is held for a particular week, the first Business Day of that week. Treasury Bills are normally sold at auction on Monday of each week, unless that day is a legal holiday, in which case the auction is normally held on the following Tuesday, except that the auction may be held on the preceding Friday; provided, however, that if an auction is held on the Friday of the week preceding the Reset Date, the Treasury Rate Determination Date will be that preceding Friday; and provided, further, that if the Treasury Rate Determination Date would otherwise fall on the Reset Date, that Reset Date will be postponed to the next succeeding Business Day.

*Variable Principal Repayment Amount:* The principal amount determined by reference to one or more Indices or otherwise, payable on the applicable Maturity Date or date of redemption or repayment of a Debt Security, as specified in the applicable Supplemental Agreement.

*Variable Rate Debt Securities:* Debt Securities that bear interest at a variable rate, and reset periodically, determined by reference to one or more Indices or otherwise. The formula for a variable rate may include a Spread.

*Yen:* Japanese yen.

*Zero Coupon Debt Securities:* Debt Securities that do not bear interest and are issued at a discount to their principal amount.


## ARTICLE II

### Authorization; Certain Terms

#### Section 2.01. Authorization.

Debt Securities shall be issued by Freddie Mac in accordance with the authority vested in Freddie Mac by Section 306(a) of the Freddie Mac Act. The indebtedness represented by the Debt Securities shall be unsecured general obligations of Freddie Mac, or, if so provided in the applicable Supplemental Agreement, secured obligations of Freddie Mac. Debt Securities shall be offered from time to time by Freddie Mac in an unlimited amount and shall be known by the designation given them, and have the Maturity Dates stated, in the applicable Supplemental Agreement. Freddie Mac, in its discretion and at any time, may offer Additional Debt Securities having the same terms and conditions as Debt Securities previously offered. The Debt Securities may be issued as Reference Securities, which includes Callable Reference Notes, Reference Notes and Reference Bonds, or may be issued as any other Debt Securities, denominated in U.S. dollars or other currencies, with maturities of one day or longer and may be in the form of Notes or Bonds or otherwise. Issuances may consist of new issues of Debt Securities or reopenings of an existing issue of Debt Securities.

#### Section 2.02. Other Debt Securities Issued Hereunder.

Freddie Mac may from time to time create and issue Debt Securities hereunder which contain terms and conditions not specified in this Agreement. Such Debt Securities shall be governed by the applicable Supplemental Agreement and, to the extent that the terms of this Agreement are not inconsistent with Freddie Mac's intent in creating and issuing such Debt Securities, by the terms of this Agreement. Such

9

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Debt Securities shall be secured or unsecured obligations of Freddie Mac. If the Debt Securities are secured obligations of Freddie Mac, the provisions of Article V hereof shall apply to such Debt Securities.

### Section 2.03. Specified Currencies and Specified Payment Currencies.

(a) Each Debt Security shall be denominated and payable in such Specified Currency as determined by Freddie Mac. Fed Book Entry Debt Securities will be denominated and payable in U.S. dollars only.

(b) Except under the circumstances provided in Section 2.03(c)(i) and (ii) and Article VI hereof, Freddie Mac shall make payments of any interest on Debt Securities in the Specified Interest Currency and shall make payments of the principal of Debt Securities in the Specified Principal Currency. The Specified Currency for the payment of interest and principal with respect to any Debt Security shall be set forth in the applicable Supplemental Agreement.

(c) European Economic and Monetary Union and Unavailability

(i) *European Economic and Monetary Union*. The Treaty contemplated that EMU would occur in three stages. On January 1, 1999 the third and final stage of the EMU commenced with the irrevocable fixing of the exchange rates of the currencies of the initial 11 participating member states for interbank transfers in a single currency, the **"euro"**. Complete replacement of member currencies was completed in 2002. As of the date of this Agreement, the participating member states in the EMU are Austria, Belgium, Cyprus, Estonia, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, Malta, The Netherlands, Portugal, Slovakia, Slovenia and Spain.

(ii) *Unavailability*. Except as set forth below, if the principal of, premium, if any, or interest on, any Debt Security is payable in a Specified Currency other than U.S. dollars and such Specified Currency is not available to Freddie Mac for making required payments due to the imposition of exchange controls, its replacement or disuse or other circumstances beyond the control of Freddie Mac, then Freddie Mac shall be entitled to satisfy its obligations to Holders of the Debt Securities by making such payments in U.S. dollars on the basis of the noon U.S. dollar buying rate in New York City for cable transfers for such Specified Currency published by the FRBNY on the date of such payment, or, if such currency exchange rate is not available on such date, as of the most recent prior practicable date. Notwithstanding the provisions of the preceding sentence, if euros have replaced such Specified Currency as described under Section 2.03(c)(i) above, Freddie Mac may, at its option (or shall, if so required by applicable law) without the consent of the Holders of such Debt Securities effect the payment of principal of, premium, if any, or interest on, any Debt Security denominated in such Specified Currency in euros in lieu of such Specified Currency, in conformity with legally applicable measures taken pursuant to, or by virtue of the Treaty or other applicable legal or regulatory requirements.

### Section 2.04. Minimum Denominations.

The Debt Securities shall be issued and maintained in the minimum denominations of U.S. $1,000 and additional increments of U.S. $1,000 for U.S. dollar denominated Debt Securities, unless otherwise provided in the applicable Supplemental Agreement and as may be allowed or required from time to time by the relevant regulatory authority or any laws or regulations applicable to the relevant Specified Currency. In the case of Zero Coupon Debt Securities, denominations will be expressed in terms of the principal amount payable on the Maturity Date.

### Section 2.05. Maturity.

(a) Each Debt Security shall mature on its Maturity Date, as provided in the applicable Supplemental Agreement, unless redeemed at the option of Freddie Mac or repaid at the option of the Holder

TREASURY-3742

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                                                 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

prior thereto in accordance with the provisions described under Section 2.06. Debt Securities may be issued with minimum or maximum maturities or variable maturities allowed or required from time to time by the relevant regulatory or stock exchange authority or clearing systems or any laws or regulations applicable to the Specified Currency.

(b) If so provided in the applicable Supplemental Agreement, certain Debt Securities may have provision permitting their Beneficial Owner to elect to extend the initial Maturity Date specified in such Supplemental Agreement, or any later date to which the maturity of such Debt Securities has been extended, on specified dates. However, the maturity of such Debt Securities may not be extended beyond the final Maturity Date specified in the Supplemental Agreement.

(b) The principal amount payable on the Maturity Date of a Debt Security shall be a Fixed Principal Repayment Amount or a Variable Principal Repayment Amount, in each case as provided in the applicable Supplemental Agreement.

**Section 2.06. Optional Redemption and Optional Repayment.**

(a) The Supplemental Agreement for any particular issue of Debt Securities shall provide whether such Debt Securities may be redeemed at Freddie Mac's option or repayable at the Holder's option, in whole or in part, prior to their Maturity Date. If so provided in the applicable Supplemental Agreement, an issue of Debt Securities shall be subject to redemption at the option of Freddie Mac, or repayable at the option of the Holders, in whole or in part, on one or more specified dates, at any time on or after a specified date, or during one or more specified periods of time. The redemption or repayment price for such Debt Securities (or such part of such Debt Securities as is redeemed or repaid) shall be an amount provided in, or determined in a manner provided in, the applicable Supplemental Agreement, together with accrued and unpaid interest to the date fixed for redemption or repayment.

(b) Unless otherwise provided in the applicable Supplemental Agreement, notice of optional redemption shall be given to Holders of the related Debt Securities not less than 5 Business Days nor more than 60 calendar days prior to the date of redemption in the manner provided in Section 8.07.

(c) In the case of a partial redemption of an issue of Fed Book Entry Debt Securities by Freddie Mac, such Fed Book Entry Debt Securities shall be redeemed pro rata. In the case of a partial redemption of an issue of Registered Debt Securities by Freddie Mac, one or more of such Registered Debt Securities shall be reduced by the Global Agent in the amount of such redemption, subject to the principal amount of such Registered Debt Securities after redemption remaining in an authorized denomination. The effect of any partial redemption of an issue of Registered Debt Securities on the Beneficial Owners of such Registered Debt Securities will depend on the procedures of the applicable clearing system and, if such Beneficial Owner is not a participant therein, on the procedures of the participant through which such Beneficial Owner owns its interest.

(d) If so provided in the applicable Supplemental Agreement, certain Debt Securities shall be repayable, in whole or in part, by Freddie Mac at the option of the relevant Holders thereof or otherwise, on one or more specified dates, at any time on or after a specified date, or during one or more specified periods of time, upon terms and procedures provided in the applicable Supplemental Agreement. Unless otherwise provided in the applicable Supplemental Agreement, in the case of a Registered Debt Security, to exercise such option, the Holder shall deposit with the Global Agent (i) such Registered Debt Security; and (ii) a duly completed notice of optional repayment in the form obtainable from the Global Agent, in each case not more than the number of days nor less than the number of days specified in the applicable Supplemental Agreement prior to the date fixed for repayment. Unless otherwise specified in the applicable Supplemental Agreement, no such Registered Debt Security (or notice of repayment) so deposited may be withdrawn without the prior consent of Freddie Mac or the Global Agent. Unless

11

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

otherwise provided in the applicable Supplemental Agreement, in the case of a Fed Book Entry Debt Security, if the Beneficial Owner wishes to exercise such option, then the Beneficial Owner shall give notice thereof to Freddie Mac through the relevant Holding Institution as provided in the applicable Supplemental Agreement.

(e) The principal amount payable upon redemption or repayment of a Debt Security shall be a Fixed Principal Repayment Amount or a Variable Principal Repayment Amount, in each case as provided in the applicable Supplemental Agreement.

**Section 2.07. Payment Terms of the Debt Securities.**

(a) Debt Securities shall bear interest at one or more fixed rates or variable rates or may not bear interest. If so provided in the applicable Supplemental Agreement, Debt Securities may be separated by a Holder into one or more Interest Components and Principal Components. The Offering Circular or the applicable Supplemental Agreement for such Debt Securities shall specify the procedure for stripping such Debt Securities into such Interest and Principal Components.

(b) The applicable Supplemental Agreement shall specify the frequency with which interest, if any, is payable on the related Debt Securities. Interest on Debt Securities shall be payable in arrears on the Interest Payment Dates specified in the applicable Supplemental Agreement and on each Principal Payment Date.

(c) Each issue of interest bearing Debt Securities shall bear interest during each Interest Payment Period. No interest on the principal of any Debt Security will accrue on or after the Principal Payment Date on which such principal is repaid.

(d) The determination by the Calculation Agent of the interest rate on, or any Index in relation to, a Variable Rate Debt Security and the determination of any payment on any Debt Security (or any interim calculation in the determination of any such interest rate, index or payment) shall, absent manifest error, be final and binding on all parties. If a principal or interest payment error occurs, Freddie Mac may correct it by adjusting payments to be made on later Interest Payment Dates or Principal Payment Dates (as appropriate) or in any other manner Freddie Mac considers appropriate. If the source of an Index changes in format, but the Calculation Agent determines that the Index source continues to disclose the information necessary to determine the related interest rate substantially as required, the Calculation Agent will amend the procedure for obtaining information from that source to reflect the changed format. All Index values used to determine principal or interest payments are subject to correction within 30 days from the applicable payment. The source of a corrected value must be the same source from which the original value was obtained. A correction might result in an adjustment on a later date to the amount paid to the Holder.

(e) Payments on Debt Securities shall be rounded, in the case of U.S. dollars, to the nearest cent or, in the case of a Specified Payment Currency other than U.S. dollars, to the nearest smallest transferable unit (with one half cent or unit being rounded upwards).

(f) In the event that any jurisdiction imposes any withholding or other tax on any payment made by Freddie Mac (or our agent or any other person potentially required to withhold) with respect to a Debt Security, Freddie Mac (or our agent or such other person) will deduct the amount required to be withheld from such payment, and Freddie Mac (or our agent or such other person) will not be required to pay additional interest or other amounts, or redeem or repay the Debt Securities prior to the applicable Maturity Date, as a result.

12

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(g) *Fixed Rate Debt Securities*

Fixed Rate Debt Securities shall bear interest at a single fixed interest rate. The applicable Supplemental Agreement shall specify the fixed interest rate per annum on a Fixed Rate Debt Security. Unless otherwise specified in the applicable Supplemental Agreement, interest on a Fixed Rate Debt Security shall be computed on the basis of a 360 day year consisting of twelve 30 day months.

(h) *Step Debt Securities*

Step Debt Securities shall bear interest from their Issue Date to a specified date at their initial fixed interest rate and from that date to their Maturity Date at one or more different fixed interest rates that shall be prescribed as of the Issue Date. A Step Debt Security will have one or more step periods. The applicable Supplemental Agreement shall specify the fixed interest rate per annum payable on Step Debt Securities for each related period from issuance to maturity. Unless otherwise specified in the applicable Supplemental Agreement, interest on a Step Debt Security shall be computed on the basis of a 360 day year consisting of twelve 30 day months.

(i) *Variable Rate Debt Securities*

(A) Variable Rate Debt Securities shall bear interest at a variable rate determined on the basis of a direct or an inverse relationship to one or more specified Indices or otherwise, (x) plus or minus a Spread, if any, or (y) multiplied by one or more Leverage or Deleverage Factors, if any, as specified in the applicable Supplemental Agreement. Variable Rate Debt Securities also may bear interest in any other manner described in the applicable Supplemental Agreement.

(B) Variable Rate Debt Securities may have a Cap and/or a Floor.

(C) The applicable Supplemental Agreement shall specify the accrual method (i.e., the day count convention) for calculating interest or any relevant accrual factor on the related Variable Rate Debt Securities. The accrual method may incorporate one or more of the following defined terms:

"**Actual/360**" shall mean that interest or any other relevant accrual factor shall be calculated on the basis of the actual number of days elapsed in a year of 360 days.

"**Actual/365 (fixed)**" shall mean that interest or any other relevant accrual factor shall be calculated on the basis of the actual number of days elapsed in a year of 365 days, regardless of whether accrual or payment occurs during a calendar leap year.

"**Actual/Actual**" shall mean, unless otherwise indicated in the applicable Supplemental Agreement, that interest or any other relevant accrual factor shall be calculated on the basis of (x) the actual number of days elapsed in the Interest Payment Period divided by 365, or (y) if any portion of the Interest Payment Period falls in a calendar leap year, (A) the actual number of days in that portion divided by 366 plus (B) the actual number of days in the remaining portion divided by 365. If so indicated in the applicable Supplemental Agreement, "Actual/Actual" shall mean interest or any other relevant accrual factor shall be calculated in accordance with the definition of "Actual/Actual" adopted by the International Securities Market Association ("**Actual/Actual (ISMA)**"), which means a calculation on the basis of the following:

(1) where the number of days in the relevant Interest Payment Period is equal to or shorter than the Determination Period during which such Interest Payment Period ends, the number of days in such Interest Payment Period divided by the product of (A) the number of days in such Determination Period and (B) the number of Interest Payment Dates that would occur in one calendar year; or

13

TREASURY-3745

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(2) where the Interest Payment Period is longer than the Determination Period during which the Interest Payment Period ends, the sum of (A) the number of days in such Interest Payment Period falling in the Determination Period in which the Interest Payment Period begins divided by the product of (X) the number of days in such Determination Period and (Y) the number of Interest Payment Dates that would occur in one calendar year; and (B) the number of days in such Interest Payment Period falling in the next Determination Period divided by the product of (X) the number of days in such Determination Period and (Y) the number of Interest Payment Dates that would occur in one calendar year.

(D) The applicable Supplemental Agreement shall specify the frequency with which the rate of interest on the related Variable Rate Debt Securities shall reset. The applicable Supplemental Agreement also shall specify the Reset Date. If the interest rate will reset within an Interest Payment Period, then the interest rate in effect on the sixth Business Day preceding an Interest Payment Date will be the interest rate for the remainder of that Interest Payment Period and the first day of each Interest Payment Period also will be a Reset Date. Variable Rate Debt Securities may bear interest prior to the initial Reset Date at an initial interest rate, if any, specified in the applicable Supplemental Agreement. If so, then the first day of the first Interest Payment Period will not be a Reset Date. The rate of interest applicable to each Interest Reset Period shall be determined as provided below or in the applicable Supplemental Agreement.

Except for a Variable Rate Debt Security as to which the rate of interest thereon is determined by reference to LIBOR, EUR-LIBOR, EURIBOR, Prime Rate, Treasury Rate, CMT Rate, CMS Rate, Federal Funds Rate (Daily), or Federal Funds Rate (Weekly Average) or as otherwise set forth in the applicable Supplemental Agreement, the Determination Date for a Variable Rate Debt Security means the second Business Day preceding the Reset Date applicable to an Interest Reset Period.

(E) If the rate of interest on a Variable Rate Debt Security is subject to adjustment within an Interest Payment Period, accrued interest shall be calculated by multiplying the principal amount of such Variable Rate Debt Security by an accrued interest factor. Unless otherwise specified in the applicable Supplemental Agreement, this accrued interest factor shall be computed by adding the interest factor calculated for each Interest Reset Period in such Interest Payment Period and rounding the sum to nine decimal places. The interest factor for each such Interest Reset Period shall be computed by (1) multiplying the number of days in the Interest Reset Period by the interest rate (expressed as a decimal) applicable to such Interest Reset Period; and (2) dividing the product by the number of days in the year referred to in the accrual method specified in the applicable Supplemental Agreement.

(F) If and so long as an issue of Variable Rate Debt Securities is admitted for trading on the Euro MTF Market and listed on the Official List of the Luxembourg Stock Exchange and such stock exchange so requires, the Calculation Agent shall cause the interest rate for the applicable Interest Reset Period and the amount of interest on the minimum denomination in respect of such issue that would accrue through the last day of such Interest Reset Period, as well as the last day of such Interest Reset Period, to be provided to such stock exchange as soon as practicable, but in no event later than the applicable Reset Date.

(G) For each issue of Variable Rate Debt Securities, the Calculation Agent shall also cause the interest rate for the applicable Interest Reset Period and the amount of interest accrued on the minimum denomination specified for such issue to be made available to Holders as soon as practicable after its determination but in no event later than two Business Days thereafter. Such interest amounts so made available may subsequently be amended (or appropriate alternative

14

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

arrangements made by way of adjustment) without notice in the event of an extension or shortening of the Interest Reset Period.

(H) If the applicable Supplemental Agreement specifies LIBOR as the applicable Index for determining the rate of interest for the related Variable Rate Debt Security, the following provisions shall apply (unless otherwise specified in the applicable Supplemental Agreement):

"**LIBOR**" shall mean, with respect to any Reset Date (in the following order of priority):

(1) the rate (expressed as a percentage per annum) Deposits in the Index Currency having the Index Maturity that appears on the Designated Reuters Page at 11:00 a.m. (London time) on such LIBOR Determination Date;

(2) if such rate does not so appear pursuant to clause (1) above, the Calculation Agent shall request the principal London offices of four leading banks in the London interbank market selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to prime banks in the London interbank market for Deposits in the Index Currency having the Index Maturity at 11:00 a.m. (London time) on such LIBOR Determination Date and in a Representative Amount. If at least two quotations are provided, LIBOR shall be the arithmetic mean (if necessary rounded upwards) of such quotations;

(3) if fewer than two such quotations are provided as requested in clause (2) above, the Calculation Agent shall request four major banks in the applicable Principal Financial Center selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to leading European banks for a loan in the Index Currency for a period of time corresponding to the Index Maturity, commencing on such Reset Date, at approximately 11:00 a.m. in the Principal Financial Center on such LIBOR Determination Date and in a Representative Amount. If at least two such quotations are provided, LIBOR shall be the arithmetic mean (if necessary rounded upwards) of such quotations; and

(4) if fewer than two such quotations are provided as requested in clause (3) above, LIBOR shall be LIBOR determined with respect to the Reset Date immediately preceding such Reset Date or, in the case of the first Reset Date, shall be the rate for Deposits in the Index Currency having the Index Maturity at 11:00 a.m. (London time) on the most recent London Banking Day preceding the related LIBOR Determination Date for which such rate shall have been displayed on the Designated Reuters Page with respect to Deposits commencing on the second London Banking Day following such date (or, if the Index Currency is Sterling, commencing on such date).

(I) If the applicable Supplemental Agreement specifies EUR LIBOR as the applicable Index for determining the rate of interest for the related Variable Rate Debt Security, the following provisions shall apply (unless otherwise specified in the applicable Supplemental Agreement):

"**EUR-LIBOR**" shall mean, with respect to any Reset Date (in the following order of priority):

(1) the rate (expressed as a percentage per annum) for Deposits in euros having the Index Maturity that appears on the Designated EUR LIBOR Reuters Page at 11:00 a.m. (London time) on the related EUR LIBOR Determination Date;

(2) if such rate does not so appear pursuant to clause (1) above, the Calculation Agent shall request the principal London offices of four leading banks in the London interbank market selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not

15

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to prime banks in the London interbank market for Deposits in euros having the Index Maturity at 11:00 a.m. (London time) on such EUR LIBOR Determination Date and in a Euro Representative Amount. If at least two quotations are provided, EUR LIBOR shall be the arithmetic mean (if necessary rounded upwards) of such quotations;

(3) if fewer than two such quotations are provided as requested in clause (2) above, the Calculation Agent shall request four major banks in London selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to leading European banks for a loan in euros for a period of time corresponding to the Index Maturity, commencing on such Reset Date, at approximately 11:00 a.m. (London time) on such EUR LIBOR Determination Date and in a Euro Representative Amount. If at least two such quotations are provided, EUR LIBOR shall be the arithmetic mean (if necessary rounded upwards) of such quotations; and

(4) if fewer than two such quotations are provided as requested in clause (3) above, EUR LIBOR shall be EUR LIBOR determined with respect to the Reset Date immediately preceding such Reset Date or, in the case of the first Reset Date, the rate for Deposits in euros having the Index Maturity at 11:00 a.m. (London time) on the most recent TARGET Business Day preceding the EUR LIBOR Determination Date for which such rate was displayed on the Designated EUR LIBOR Reuters Page for deposits starting on the second TARGET Business Day following such date.

(J) If the applicable Supplemental Agreement specifies EURIBOR as the applicable Index for determining the rate of interest for the related Variable Rate Debt Security, the following provisions shall apply (unless otherwise specified in the applicable Supplemental Statement):

"**EURIBOR**" shall mean, with respect to a Reset Date (in the following order of priority):

(1) the rate (expressed as a percentage per annum) for Deposits in euros having the Index Maturity that appears on the Designated EURIBOR Reuters Page at 11:00 a.m., Brussels time, on the relevant EURIBOR Determination Date;

(2) if such rate does not so appear pursuant to clause (1) above, then the Calculation Agent will request the principal offices of four major banks in the Euro Zone selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to prime banks in the Euro Zone interbank market for Deposits in euros having the Index Maturity at 11:00 a.m. Brussels time on such EURIBOR Determination Date and in a Euro Representative Amount. If at least two quotations are provided, EURIBOR for that date will be the arithmetic mean (if necessary, rounded upwards) of the quotations;

(3) if fewer than two such quotations are provided as requested in clause (2) above, EURIBOR for that date will be the arithmetic mean (if necessary, rounded upwards) of the rates quoted by major banks in the Euro Zone, selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent), at approximately 11:00 a.m., Brussels time, on the EURIBOR Determination Date for loans in euros to leading European banks for a period of time corresponding to the Index Maturity and in a Euro Representative Amount. If at least two quotations are provided, EURIBOR for that date will be the arithmetic mean (if necessary, rounded upwards) of the quotations; and

16

---

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(4) if fewer than two quotations are provided as requested in clause (3) above, EURIBOR will be EURIBOR as determined for the immediately preceding Reset Date or, in the case of the first Reset Date, the interest rate payable for the new Interest Reset Period will be the initial interest rate.

(K) If the applicable Supplemental Agreement specifies the Prime Rate as the applicable Index for determining the rate of interest for the related Variable Rate Debt Securities, the following provisions shall apply:

The **"Prime Rate"** means, with respect to any Reset Date (in the following order of priority):

(1) the rate for the Prime Rate Determination Date, as published in H.15(519) Daily Update opposite the caption "Bank prime loan";

(2) if the rate is not published by 5:00 p.m., New York City time, on the Reset Date pursuant to clause (1), the rate for the Prime Rate Determination Date as published in H.15(519) opposite the caption "Bank prime loan";

(3) if the rate is not published in either H.15(519) or the H.15 Daily Update by 5:00 p.m., New York City time, on the Reset Date, then the Prime Rate will be the arithmetic mean, determined by the Calculation Agent, of the rates (after eliminating certain rates, as described below in this clause (3)) that appear, at 11:00 a.m., New York City time, on the Prime Rate Determination Date, on Reuters USPRIME1 Page as the U.S. dollar prime rate or base lending rate of each bank appearing on that page; provided, that at least three rates appear. In determining the arithmetic mean:

(i) if 20 or more rates appear, the highest five rates (or in the event of equality, five of the highest) and the lowest five rates (or in the event of equality, five of the lowest) will be eliminated,

(ii) if fewer than 20 but 10 or more rates appear, the highest two rates (or in the event of equality, two of the highest) and the lowest two rates (or in the event of equality, two of the lowest) will be eliminated, or

(iii) if fewer than 10 but five or more rates appear, the highest rate (or in the event of equality, one of the highest) and the lowest rate (or in the event of equality, one of the lowest) will be eliminated;

(4) if fewer than three rates so appear on Reuters USPRIME1 Page pursuant to clause (3) above, then the Calculation Agent will request five major banks in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide a quotation of such banks' U.S. dollar prime rates or base lending rates on the basis of the actual number of days in the year divided by 360 as of the close of business on the Prime Rate Determination Date. If at least three quotations are provided, then the Prime Rate will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or in the event of equality, one of the highest) and the lowest quotation (or in the event of equality, one of the lowest));

(5) if fewer than three quotations are so provided pursuant to clause (4) above, the Calculation Agent will request five banks or trust companies organized and doing business under the laws of the United States or any state, each having total equity capital of at least U.S. $500,000,000 and being subject to supervision or examination by federal or state authority, selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as

17

TREASURY-3749

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012                                                                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Calculation Agent), to provide a quotation of such banks' or trust companies' U.S. dollar prime rates or base lending rates on the basis of the actual number of days in the year divided by 360 as of the close of business on the Prime Rate Determination Date. In making such selection of five banks or trust companies, the Calculation Agent will include each bank, if any, that provided a quotation as requested in clause (4) above and exclude each bank that failed to provide a quotation as requested in clause (4). If at least three quotations are provided, then the Prime Rate will be the arithmetic mean determined by the Calculation Agent of the quotations obtained; and

(6) if fewer than three quotations are so provided pursuant to clause (5) above, then the Prime Rate will be the Prime Rate determined for the immediately preceding Reset Date. If the applicable Reset Date is the first Reset Date, then the Prime Rate will be the rate calculated pursuant to clause (1) or (2) for the most recent New York Banking Day preceding the Reset Date for which such rate was published in H.15(519) or H.15 Daily Update.

(L) If the applicable Supplemental Agreement specifies the Treasury Rate as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"Treasury Rate"** means, with respect to any Reset Date (in the following order of priority):

(1) the rate for the Treasury Determination Date of Treasury Bills having the Index Maturity, as published in H.15 Daily Update under the caption "U.S. government securities/Treasury bills/(secondary market)";

(2) if the rate described in clause (1) above does not appear in H.15 Daily Update by 5:00 p.m., New York City time, on the Reset Date, then the rate for the Treasury Rate Determination Date of Treasury Bills having the Index Maturity, as published in the H.15 (519), or other recognized electronic source used for the purpose of displaying that rate under the caption "U.S. government securities/Treasury bills(secondary market)";

(3) if the rate described in clause (2) above is not so published by 3.00 p.m., New York City time, on the Reset Date, then the rate from Treasury Auction of Treasury Bills having the Index Maturity, as that rate appears under the caption "INVEST RATE" on the display on Reuters USAUCTION10 Page or Reuters USAUCTION11 Page;

(4) if the rate described in clause (3) above is not published by 5:00 p.m., New York City time, on the Reset Date, then the auction average rate for Treasury Bills having the Index Maturity obtained from the applicable Treasury Auction as announced by the Treasury Department in the form of a press release under the heading "Investment Rate" by 5:00 p.m. on such Reset Date;

(5) if the rate describe in clause (4) above is not so announced by the Treasury Department by 5:00 p.m., New York City time, on the Reset Date, then auction average rate obtained from the Treasury Auction of the applicable Treasury Bills, as otherwise announced by the Treasury Department by 5:00 p.m., New York City time, on the Reset Date as determined by the Calculation Agent;

(6) if such rate described in clause (5) is not so announced by the Treasury Department by 5:00 p.m., New York City time, on the Reset Date, the Calculation Agent will request five leading primary United States government securities dealers in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide a quotation of such dealers' secondary market bid

18

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

yields, as of 3:00 p.m. on the Reset Date, for Treasury Bills with a remaining maturity closest to the Index Maturity (or, in the event that the remaining maturities are equally close, the longer remaining maturity). If at least three quotations are provided, then the Treasury Rate will be the arithmetic mean determined by the Calculation Agent of the quotations obtained; and

(7) if fewer than three quotations are so provided pursuant to clause (6) above, then the Treasury Rate for the immediately preceding Reset Date. If the applicable Reset Date is the first Reset Date, then the auction average rate for Treasury Bills having the Index Maturity from the most recent auction of Treasury Bills prior to the Reset Date for which such rate was announced by the Treasury Department in the form of a press release under the heading "Investment Rate."

The rate (including the auction average rate) for Treasury Bills and the secondary market bid yield for Treasury Bills will be obtained and expressed as a bond equivalent on the basis of a year of 365 or 366 days, as applicable (or, if not so expressed, will be converted by the Calculation Agent to such a bond equivalent yield).

(M) If the applicable Supplemental Agreement specifies the CMT Rate as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"CMT Rate"** means, with respect to any Reset Date (in the following order of priority):

(1) for any CMT Determination Date, the daily rate for the Index Maturity that appears on page "FRBCMT" on Reuters (or any other page that replaces the FRBCMT page on that service or any successor service) under the heading "...Treasury Constant Maturities. Federal Reserve Board Release H.15...Mondays Approximately 3:45 p.m.";

(2) if the applicable rate described in clause (1) is not displayed on Reuters page FRBCMT at 3:45 p.m., New York City time, on the CMT Determination Date, then the CMT Rate will be the Treasury constant maturity rate for the Index Maturity applicable for the CMT Determination Date as published in H.15 (519);

(3) if the CMT Rate is not determined pursuant to clause (1) and the applicable rate described in clause (2) does not appear in H.15 (519) at 3:45 p.m., New York City time, on the CMT Determination Date, then the CMT Rate will be the Treasury constant maturity rate, or other U.S. Treasury rate, applicable to an Index Maturity with reference to the CMT Determination Date, that:

(i) is published by the Federal Reserve or the Treasury Department; and

(ii) Freddie Mac has determined to be comparable to the applicable rate formerly displayed on Reuters page 7051 and published in H.15 (519);

(4) if the CMT Rate is not determined pursuant to clause (1) or (2) and the rate described in clause (3) above does not appear at 3:45 p.m., New York City time, on the CMT Determination Date, then the CMT Rate will be the yield to maturity of the arithmetic mean of the secondary market offered rates for U.S. Treasury securities with an original maturity of approximately the Index Maturity and a remaining term to maturity of no more than one year shorter than the Index Maturity, and in a Representative Amount, as of approximately 3:45 p.m., New York City time, on the CMT Determination Date, as quoted by three primary U.S. government securities dealers in New York City that Freddie Mac selects. In selecting these offered rates, Freddie Mac will request quotations from five primary dealers and will disregard the highest quotation or, if there is equality, one of the highest and the lowest quotation or, if there is equality, one of the lowest. If two U.S. Treasury securities with an original maturity longer than

19

Source   D RA   HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

the Index Maturity have remaining terms to maturity that are equally close to the Index Maturity, Freddie Mac will obtain quotations for the U.S. Treasury security with the shorter remaining term to maturity;

(5) if the CMT Rate is not determined pursuant to clause (1), (2) or (3) and fewer than five but more than two primary dealers are quoting offered rates as described in clause (4), then the CMT Rate for the CMT Determination Date will be based on the arithmetic mean of the offered rates so obtained, and neither the highest nor the lowest of those quotations will be disregarded;

(6) if the CMT Rate is not determined pursuant to clause (1), (2), (3) or (4) and two or fewer primary dealers are quoting offered rates as described in clause (5), then the CMT Rate will be the yield to maturity of the arithmetic mean of the secondary market offered rates for U.S. Treasury securities having an original maturity longer than the Index Maturity and a remaining term to maturity closest to the Index Maturity, and in a Representative Amount, as of approximately 3:45 p.m., New York City time, on the CMT Determination Date, as quoted by three primary U.S. government securities dealers in New York City that Freddie Mac selects. In selecting these offered rates, Freddie Mac will request quotations from five primary dealers and will disregard the highest quotation, or, if there is equality, one of the highest and the lowest quotation or, if there is equality, one of the lowest;

(7) if the CMT Rate is not determined pursuant to clauses (1) through (6) above and fewer than five but more than two primary dealers are quoting offered rates as described in clause (6), then the CMT Rate for the CMT Determination date will be based on the arithmetic mean of the offered rates so obtained, and neither the highest nor the lowest of those quotations will be disregarded; and

(8) if the Calculation Agent obtains fewer than three quotations of the kind described in clause (6), the CMT Rate in effect for the new Interest Reset Period will be the CMT Rate in effect for the prior Interest Rate Period, or if the applicable Reset Date is the first Reset Date, the rate of interest payable for the new Interest Reset Period will be the initial interest rate.

(N) If the applicable Supplemental Agreement specifies the CMS Rate as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"CMS Rate"** means, with respect to any Reset Date:

(1) the most recent rate for U.S. dollar swap transactions for the applicable Index Currency and applicable Index Maturity, as specified in the applicable Supplemental Agreement for the Debt Securities, expressed as a percentage, which appears on the Reuters page "ISDAFIX1" (or such other page that may replace that page on that service or a successor service) at 11:00 a.m., New York City time, on the applicable CMS Determination Date;

(2) if the most recent CMS Rate as described in clause (1) above was first available prior to ten calendar days before the applicable CMS Determination Date, then the CMS Rate will be determined by the Calculation Agent on the basis of the mid market semi annual swap rate quotations provided by the five leading swaps dealers in the New York City interbank market (which may include Dealers and their affiliates), and for this purpose, "mid market semi annual swap rate" means the arithmetic mean of the bid and offered rate quotations for the semi annual fixed leg, calculated on a 30/360 day count basis, of a fixed for floating United States dollars denominated interest rate swap transaction with the applicable Index Currency and Index Maturity, as specified in the applicable Supplemental Agreement for the Debt Securities, commencing on the Reset Date for the relevant Interest Period, and for a relevant representative amount in the relevant market at the relevant time, with an acknowledged dealer

20

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

of good credit in the swap market, where the floating leg, calculated on an Actual/360 day count basis, is equivalent to USD-LIBOR-BBA (as defined in the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc.) with a designated maturity of three months. The Calculation Agent will request the principal New York City office of each of the five leading swaps dealers selected by the Calculation Agent to provide a quotation of its rate. If at least five quotations are provided, the rate for that CMS Determination Date will be the arithmetic mean of the quotations, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest);

(3) if two, three or four (and not five) of such swaps dealers are quoting as described in clause (2) above, then the CMS Rate will be based on the arithmetic mean of the bid prices obtained and neither the highest nor lowest of such quotations will be eliminated; and

(4) if fewer than two rate quotations are provided, then the CMS Rate for the Reset Date will be the CMS Rate in effect on the preceding Reset Date, or if the applicable Reset Date is the first Reset Date, the rate of interest payable for the new Interest Reset Period will be the initial interest rate.

(O) If the applicable Supplemental Agreement specifies the Federal Funds Rate (Daily) as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"Federal Funds Rate (Daily)"** means, with respect to any Reset Date:

(1) the rate for the Business Day preceding the Federal Funds Rate (Daily) Determination Date for U.S. dollar federal funds, as published in the latest H.15 Daily Update opposite the caption "Federal funds (effective)";

(2) if the rate specified in clause (1) is not published by 5:00 p.m., New York City Time, on the Federal Funds Rate (Daily) Determination Date, the Federal Funds Rate (Daily) will be the rate for that Fed Funds Rate (Daily) Determination Date as published in the H.15 Daily Update, or other recognized electronic source used for the purpose of displaying the applicable rate, opposite the caption "Federal funds (effective)";

(3) if the rate specified in clause (2) is not published by 5:00 p.m., New York City time, on the Federal Funds Rate Determination Date, then the Calculation Agent will request five leading brokers (which may include the related Dealers or their affiliates) of federal funds transactions in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) each to provide a quotation of the broker's effective rate for transactions in overnight federal funds arranged by the broker settling on the Business Day preceding the Federal Funds Rate (Daily) Determination Date. If at least two quotations are provided, then the Federal Funds Rate (Daily) will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest));

(4) if fewer than two quotations are so provided pursuant to clause (3) above, then the Calculation Agent will request five leading brokers (which may include the related Dealers or their affiliates) of federal funds transactions in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) each to provide a quotation of the broker's rates for the last transaction in overnight federal funds arranged by the broker as of 11:00 a.m., New York City time, on the

21

TREASURY-3753

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Business Day preceding the Federal Funds Rate (Daily) Determination Date. If at least two quotations are provided, then the Federal Funds Rate (Daily) will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest)); and

(5) if fewer than two quotations are so provided pursuant to clause (4) above, then the Federal Funds Rate (Daily) as of such Federal Funds Rate (Daily) Determination Date will be the Federal Funds Rate (Daily) determined for the immediately preceding Reset Date. If the applicable Reset Date is the first Reset Date, then the rate of interest payable for the new Interest Rate Period will be the initial interest rate.

(P) If the applicable Supplemental Agreement specifies the Federal Funds Rate (Weekly Average) as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"Federal Funds Rate (Weekly Average)"** means, with respect to any Reset Date:

(1) the most recent rate published in the latest H.15(519) available by 5:00 p.m., New York City time, on the Reset Date, opposite the caption "Federal funds (effective)" and under the caption "Week Ending" for the Friday immediately preceding the Reset Date. (As described in the footnotes to the H.15(519), the rate shown for the week ending on a Friday preceding a Reset Date actually will be the rate for the week ending on (and including) the Wednesday preceding the Reset Date (the **"Seven-Day Period"**));

(2) if a rate is not so published pursuant to clause (1) above, then the Federal Funds Rate (Weekly Average) will be the arithmetic mean determined by the Calculation Agent of the rate, determined in the manner described in subclauses (y) and (z) below (as applicable), for each day in the Seven Day Period (each a **"Day Rate"**); provided, that the Calculation Agent determines a Day Rate for each day in the Seven Day Period;

(y) The Day Rate for a Business Day will be the rate that is published, by 5:00 p.m., New York City time, on the Reset Date, in the H.15 Daily Update or other recognized electronic source used for the purpose of displaying the applicable rate, opposite the caption "Federal funds (effective)" for that Business Day. If a rate for that Business Day does not appear on H.15 Daily Update by 5:00 p.m., New York City time, on the Reset Date, the Calculation Agent will request five leading brokers (which may include the related Dealers or their affiliates) of federal funds transactions in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) each to provide a quotation of the broker's rate for the last transaction in overnight federal funds arranged by the broker as of 11:00 a.m. on that Business Day. If at least two quotations are provided, then the Day Rate will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest)); and

(z) The Day Rate for a day other than a Business Day will be the rate for the preceding Business Day, whether or not the Business Day falls within the relevant Seven Day Period, determined in accordance with the provisions of subclause (y) above; and

(3) if the Day Rate for each day in the Seven Day Period is not so determined pursuant to either clause (1) or (2) above, then the Federal Funds Rate (Weekly Average) as of such Reset

22

TREASURY-3754

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Date will be the Federal Funds Rate (Weekly Average) determined for the immediately preceding Reset Date. If the applicable Reset Date is the first Reset Date, then the rate of interest payable for the new Interest Reset Period will be the initial interest rate.

### (j) Fixed/Variable Rate Debt Securities

Fixed/Variable Rate Debt Securities shall bear interest at a single fixed rate for one or more specified periods and at a rate determined by reference to one or more Indices, or otherwise, for one or more other specified periods. Fixed/Variable Rate Debt Securities also may bear interest at a rate that Freddie Mac may elect to convert from a fixed rate to a variable rate or from a variable rate to a fixed rate, if so provided in the applicable Supplemental Agreement.

If Freddie Mac may convert the interest rate on a Fixed/Variable Rate Debt Security from a fixed rate to a variable rate, or from a variable rate to a fixed rate, accrued interest for each Interest Payment Period may be calculated using an accrued interest factor in the manner described in Section 2.07(i)(E).

### (k) Zero Coupon Debt Securities

Zero Coupon Debt Securities shall not bear interest.

### (l) Amortizing Debt Securities

Amortizing Debt Securities are those on which Freddie Mac makes periodic payments of principal during the terms of such Debt Securities as described in the related Supplemental Agreement. Amortizing Debt Securities may bear interest at fixed or variable rates.

### (m) Debt Securities with Variable Principal Repayment Amounts

Variable Principal Repayment Amount Debt Securities are those on which the amount of principal payable is determined with reference to an Index specified in the related Supplemental Agreement.

### (n) Mortgage Linked Amortizing Debt Securities

Mortgage Linked Amortizing Debt Securities are Amortizing Debt Securities on which Freddie Mac makes periodic payments of principal based on the rate of payments on referenced mortgage or mortgage related assets, as described in the related Supplemental Agreement. Mortgage Linked Amortizing Debt Securities may bear interest at fixed or variable rates.

### (o) Range Accrual Debt Securities

Range Accrual Debt Securities are Variable Rate Debt Securities on which no interest may accrue during periods when the applicable Index is outside a specified range as described in the related Supplemental Agreement.

### (p) Extendible Variable Rate Debt Securities

Extendible Variable Rate Debt Securities' are Variable Rate Debt Securities, the maturity of which may be extended at a Beneficial Owner's option effective as of specified dates, subject to a final maturity date, and that bear interest at variable rates subject to different Spreads for different specified periods, as described in the related Supplemental Agreement.

**Section 2.08. Business Day Convention.**

Unless otherwise specified in the applicable Supplemental Agreement, in any case in which an Interest Payment Date or Principal Payment Date is not a Business Day, payment of any interest on or the principal of the Debt Securities shall not be made on such date but shall be made on the next Business Day with the same force and effect as if made on such Interest Payment Date or Principal Payment Date, as the

23

TREASURY-3755

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

case may be. Unless otherwise provided in the applicable Supplemental Agreement, no interest on such payment shall accrue for the period from and after such Interest Payment Date or Principal Payment Date, as the case may be, to the actual date of such payment.

### Section 2.09. Targeted Registered Issues.

Any Debt Securities that are Targeted Registered Debt Securities shall be considered to be "targeted to foreign markets" as provided under Treasury Department regulations.

### Section 2.10. Reopened Issues and Repurchases.

Freddie Mac reserves the right, in its discretion and at any time, to offer additional Debt Securities which have the same terms (other than Issue Date, interest commencement date and issue price) and conditions as Debt Securities for which settlement has previously occurred or been scheduled so as to form a single series of Debt Securities as specified in the applicable Supplemental Agreement.

Freddie Mac reserves the right, in its discretion and at any time, to purchase Debt Securities or otherwise acquire (either for cash or in exchange for securities) some or all of an issue of Debt Securities at any price or prices in the open market or otherwise. Such Debt Securities may be held, resold or canceled by Freddie Mac.

## ARTICLE III

### Form; Clearance and Settlement Procedures

### Section 3.01. Form of Fed Book-Entry Debt Securities.

(a) *General*

Fed Book Entry Debt Securities shall be issued and maintained only on the Fed Book Entry System. Fed Book Entry Debt Securities shall not be exchangeable for definitive Debt Securities. The Book Entry Rules are applicable to Fed Book Entry Debt Securities.

(b) *Title*

Fed Book Entry Debt Securities shall be held of record only by Holding Institutions. Such entities whose names appear on the book entry records of a Federal Reserve Bank as the entities to whose accounts Fed Book Entry Debt Securities have been deposited shall be the Holders of such Fed Book Entry Debt Securities. The rights of the Beneficial Owner of a Fed Book Entry Debt Security with respect to Freddie Mac and the Federal Reserve Banks may be exercised only through the Holder of the Fed Book Entry Debt Security. Freddie Mac and the Federal Reserve Banks shall have no direct obligation to a Beneficial Owner of a Fed Book Entry Debt Security that is not also the Holder of the Fed Book Entry Debt Security. The Federal Reserve Banks shall act only upon the instructions of the Holder in recording transfers of a Debt Security maintained on the Fed Book Entry System. Freddie Mac and the Federal Reserve Banks may treat the Holders as the absolute owners of Fed Book Entry Debt Securities for the purpose of making payments in respect thereof and for all other purposes, whether or not such Fed Book Entry Debt Securities shall be overdue and notwithstanding any notice to the contrary.

The Holders and each other financial intermediary holding such Fed Book Entry Debt Securities directly or indirectly on behalf of the Beneficial Owners shall have the responsibility of remitting payments for the accounts of their customers. All payments on Fed Book Entry Debt Securities shall be subject to any applicable law or regulation.

24

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(c) *Fiscal Agent*

The FRBNY shall be the Fiscal Agent for Fed Book Entry Debt Securities.

In acting under the Fiscal Agency Agreement, the FRBNY shall act solely as Fiscal Agent of Freddie Mac and does not assume any obligation or relationship of agency or trust for or with any Holder of a Fed Book Entry Debt Security.

**Section 3.02. Form of Registered Debt Securities.**

(a) *General*

As specified in the applicable Supplemental Agreement, Registered Debt Securities shall be deposited with (i) a custodian for, and registered in the name of a nominee of, DTC, or (ii) a Common Depositary, and registered in the name of such Common Depositary or a nominee of such Common Depositary.

(b) *Title*

The person in whose name a Registered Debt Security is registered in the Register shall be the Holder of such Registered Debt Security. Beneficial interests in a Registered Debt Security shall be represented, and transfers thereof shall be effected, only through book entry accounts of financial institutions acting on behalf of the Beneficial Owners of such Registered Debt Security, as a direct or indirect participant in the applicable clearing system for such Registered Debt Security.

Freddie Mac, the Global Agent and the Registrar may treat the Holders as the absolute owners of Registered Debt Securities for the purpose of making payments and for all other purposes, whether or not such Registered Debt Securities shall be overdue and notwithstanding any notice to the contrary. Owners of beneficial interests in a Registered Debt Security shall not be considered by Freddie Mac, the Global Agent or the Registrar as the owner or Holder of such Registered Debt Security and, except as provided in Section 4.02(a), shall not be entitled to have Debt Securities registered in their names and shall not receive or be entitled to receive definitive Debt Securities. Any Beneficial Owner shall rely on the procedures of the applicable clearing system and, if such Beneficial Owner is not a participant therein, on the procedures of the participant through which such Beneficial Owner holds its interest, to exercise any rights of a Holder of such Registered Debt Securities.

Payments by DTC participants to Beneficial Owners of DTC Registered Debt Securities held through DTC participants shall be the responsibility of such participants. Payments with respect to Other Registered Debt Securities held through Euroclear, Clearstream, Luxembourg or any other applicable clearing system shall be credited to Euroclear participants, Clearstream, Luxembourg participants or participants of any other applicable clearing system in accordance with the relevant system's rules and procedures.

(c) *Global Agent*

In acting under the Global Agency Agreement, the Global Agent acts solely as a fiscal agent of Freddie Mac and does not assume any obligation or relationship of agency or trust for or with any Holder of a Registered Debt Security, except that any moneys held by the Global Agent for payment on a Registered Debt Security shall be held in trust for the Holder as provided in the Global Agency Agreement.

(d) *Registrar*

In acting under the Global Agency Agreement, the Registrar does not assume any obligation or relationship of agency or trust for, or with, any Holder of a Registered Debt Security.

25

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 3.03. Clearance and Settlement Procedures.**

(a) *General*

Unless otherwise provided in the applicable Supplemental Agreement:

(i) Most Debt Securities denominated and payable in U.S. dollars and distributed within the United States shall clear and settle through the Fed Book Entry System.

(ii) Most Debt Securities denominated and payable in U.S. dollars and distributed simultaneously within and outside of the United States, including all Reference Securities, shall clear and settle, within the United States, through the Fed Book Entry System and, outside of the United States, through the systems operated by Euroclear, Clearstream, Luxembourg and/or any other designated clearing system.

(iii) Debt Securities denominated or payable in a Specified Currency other than U.S. dollars (and Debt Securities denominated and payable in U.S. dollars that are not cleared and settled in accordance with clauses (i) and (ii) above) and distributed solely within the United States shall clear and settle through the system operated by DTC.

(iv) Debt Securities denominated or payable in a Specified Currency other than U.S. dollars (and Debt Securities denominated and payable in U.S. dollars that are not cleared and settled in accordance with clauses (i) and (ii) above) and distributed simultaneously within and outside of the United States shall clear and settle through the systems operated by DTC, Euroclear, Clearstream, Luxembourg and/or any other designated clearing system.

(v) Debt Securities, irrespective of the Specified Currency in which such Debt Securities are denominated or payable, distributed solely outside of the United States shall clear and settle through the systems operated by Euroclear, Clearstream, Luxembourg and/or any other designated clearing system or, in certain cases, DTC.

(b) *Primary Distribution*

(i) *General.* On initial issue, Debt Securities shall be credited through one or more of the systems specified below or any other system specified in the applicable Supplemental Agreement.

(ii) *Federal Reserve Banks.* Fed Book Entry Debt Securities shall be issued and settled through the Fed Book Entry System in same day funds and shall be held by designated Holding Institutions. After initial issue, all Fed Book Entry Debt Securities shall continue to be held by such Holding Institutions in the Fed Book Entry System unless arrangements are made for the transfer thereof to another Holding Institution. Fed Book Entry Debt Securities shall not be exchangeable for definitive Debt Securities.

(iii) *DTC.* DTC participants acting on behalf of investors holding DTC Registered Debt Securities through DTC shall follow the delivery practices applicable to securities eligible for DTC's Same Day Funds Settlement System. DTC Registered Debt Securities shall be credited to DTC participants' securities accounts following confirmation of receipt of payment to Freddie Mac on the relevant Issue Date.

(iv) *Euroclear and Clearstream, Luxembourg.* Investors holding Other Registered Debt Securities through Euroclear, Clearstream, Luxembourg or such other clearing system shall follow the settlement procedures applicable to conventional Eurobonds in registered form. Such Other Registered Debt Securities shall be credited to Euroclear, Clearstream, Luxembourg or such other clearing system participants' securities accounts either on the relevant Issue Date or on the

26

TREASURY-3758

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

settlement day following the relevant Issue Date against payment in same day funds (for value on the relevant Issue Date).

(c) *Secondary Market Transfers*

(i) *Fed Book Entry Debt Securities.*  Transfers of Fed Book Entry Debt Securities shall take place only in book entry form on the Fed Book Entry System. Such transfers shall occur between Holding Institutions in accordance with the rules of the Fed Book Entry System.

(ii) *Registered Debt Securities.*  Transfers of beneficial interests in Registered Debt Securities within the various systems that may be clearing and settling interests therein shall be made in accordance with the usual rules and operating procedures of the relevant system applicable to the Specified Currency in which such Registered Debt Securities are denominated or payable and the nature of the transfer.

(iii) Freddie Mac shall not bear responsibility for the performance by any system or the performance of the system's respective direct or indirect participants or accountholders of the respective obligations of such participants or account holders under the rules and procedures governing such system's operations.

## ARTICLE IV

### Payments, Exchange for Definitive Debt Securities

**Section 4.01. Payments.**

(a) *Payments on Fed Book Entry Debt Securities*

Payments of principal of and any interest on Fed Book Entry Debt Securities shall be made in U.S. dollars (except as otherwise provided in the applicable Supplemental Agreement) on the applicable payment dates to Holders thereof as of the end of the Business Day preceding each such payment date. Payments on Fed Book Entry Debt Securities shall be made by credit of the payment amount to the Holders' accounts at the relevant Federal Reserve Bank. All payments to or upon the order of a Holder shall be valid and effective to discharge the liability of Freddie Mac and the Fiscal Agent in respect of the related Fed Book Entry Debt Securities.

(b) *Payments on Registered Debt Securities*

(i) Payments in respect of Registered Debt Securities shall be made in immediately available funds to DTC, Euroclear, Clearstream, Luxembourg or any other applicable clearing system, or their respective nominees, as the case may be, as the Holders thereof. Except as provided in Section 2.03(c) and Article VII hereof, such payments shall be made in the Specified Payment Currency. All payments to or upon the order of the Holder of a Registered Debt Security shall be valid and effective to discharge the liability of Freddie Mac in respect of such Registered Debt Security. Ownership positions within each system shall be determined in accordance with the normal conventions observed by such system. Freddie Mac, the Global Agent and the Registrar shall not have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Registered Debt Security or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

(ii) Interest on a Registered Debt Security shall be paid on the applicable Interest Payment Date. Such interest payment shall be made to the Holder of such Registered Debt Security as of the close of business on the related Record Date. The first payment of interest on any Registered Debt Security originally issued between a Record Date and the related Interest Payment Date shall be

27

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

made on the Interest Payment Date following the next Record Date to the Holder on such next Record Date. The principal of each Registered Debt Security, together with accrued and unpaid interest thereon, shall be paid to the Holder thereof against presentation and surrender of such Registered Debt Security.

(iii) All payments on Registered Debt Securities are subject to any applicable law or regulation. If a payment outside the United States is illegal or effectively precluded by exchange controls or other similar restrictions, payments in respect of the related Registered Debt Securities shall be made at the office of any paying agent in the United States.

### Section 4.02. Exchange for Definitive Debt Securities.

In the event that Freddie Mac issues definitive Debt Securities in exchange for Registered Debt Securities issued in global form, such definitive Debt Securities shall have terms identical to the Registered Debt Securities for which they were exchanged except as described below.

(a) *Issuance of Definitive Debt Securities*

Unless otherwise provided in the applicable Supplemental Agreement, beneficial interests in Registered Debt Securities issued in global form shall be subject to exchange for definitive Debt Securities only if such exchange is permitted by applicable law and (i) in the case of a DTC Registered Debt Security, DTC notifies Freddie Mac that it is no longer willing or able to discharge properly its responsibilities as depositary with respect to such DTC Registered Debt Security, or ceases to be a "clearing agency" registered under the Securities Exchange Act of 1934 (if so required), or is at any time no longer eligible to act as such, and in each case Freddie Mac is unable to locate a successor within 90 calendar days of receiving notice of such ineligibility on the part of DTC; (ii) in the case of any Other Registered Debt Security, if all of the systems through which it is cleared or settled are closed for business for a continuous period of 14 calendar days (other than by reason of holidays, statutory or otherwise) or are permanently closed for business or have announced an intention permanently to cease business and in any such situations Freddie Mac is unable to locate a single successor within 90 calendar days of such closure; (iii) a Holder has instituted a judicial proceeding in a court to enforce its rights under such Registered Debt Security and such Holder has been advised by counsel that in connection with such proceeding it is necessary for such Holder to obtain possession of definitive Debt Securities; (iv) Freddie Mac (at its discretion), upon the request of a Holder and at such Holder's expense, elects to issue definitive Debt Securities; or (v) Freddie Mac (at its discretion) elects to issue definitive Debt Securities. In such circumstances, Freddie Mac shall cause sufficient definitive Debt Securities to be executed and delivered as soon as practicable (and in any event within 45 calendar days of Freddie Mac's receiving notice of the occurrence of such circumstances) to the Global Agent or its agent for completion, authentication and delivery to the relevant registered holders of such definitive Debt Securities. A person having an interest in a DTC Registered Debt Security or Other Registered Debt Security issued in global form shall provide Freddie Mac or the Global Agent with a written order containing instructions and such other information as Freddie Mac or the Global Agent may require to complete, execute and deliver such definitive Debt Securities in authorized denominations.

(b) *Title*

The person in whose name a definitive Debt Security is registered in the Register shall be the **"Holder"** of such definitive Debt Security. Freddie Mac, the Global Agent and the Registrar may treat the Holders as the absolute owners of definitive Debt Securities for the purpose of making payments and for all other purposes, whether or not such definitive Debt Securities shall be overdue and notwithstanding any notice to the contrary.

28

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(c) *Payments*

Interest on a definitive Debt Security shall be paid on the applicable Interest Payment Date. Such interest payments shall be made by check mailed to the Holder thereof at the close of business on the Record Date preceding such Interest Payment Date at such Holder's address appearing in the Register. The principal of each definitive Debt Security, together with accrued and unpaid interest thereon, shall be due on the Principal Payment Date (subject to the right of the Holder thereof on the related Record Date to receive interest due on an Interest Payment Date that is on or prior to such Principal Payment Date) and shall be paid against presentation and surrender of such definitive Debt Security at the offices of the Global Agent or other paying agent. Payments on the Principal Payment Date shall be made by check provided at the appropriate office of the Global Agent or other paying agent or mailed by the Global Agent to the Holder of such definitive Debt Security. U.S. dollar checks shall be drawn on a bank in the United States. Checks in a Specified Payment Currency other than U.S. dollars shall be drawn on a bank office located outside the United States.

Notwithstanding the provisions described in the preceding paragraph relating to payments by check, the Holder of an aggregate principal amount of at least $10,000,000 of an issue of Debt Securities of which definitive Debt Securities form a part (or, in the case of a definitive Debt Security denominated in a Specified Currency other than U.S. dollars, the Specified Currency equivalent of at least $10,000,000) may elect to receive payments thereon by wire transfer of immediately available funds in the Specified Payment Currency to an account in such Specified Payment Currency with a bank designated by such Holder that is acceptable to Freddie Mac; provided, that such bank has appropriate facilities therefor and accepts such transfer and such transfer is permitted by any applicable law or regulation and will not subject Freddie Mac to any liability, requirement or unacceptable charge. In order for such Holder to receive such payments, the relevant paying agent (including the Global Agent) must receive at its office from such Holder (i) in the case of payments on an Interest Payment Date, a written request therefor not later than the close of business on the related Record Date; or (ii) in the case of payments on the Principal Payment Date, a written request therefor not later than the close of business on the date 15 days prior to such Principal Payment Date and the related definitive Debt Security not later than two Business Days prior to such Principal Payment Date. Such written request must be delivered to the relevant paying agent (including the Global Agent) by mail, by hand delivery or by tested or authenticated telex. Any such request shall remain in effect until the relevant paying agent receives written notice to the contrary.

All payments on definitive Debt Securities shall be subject to any applicable law or regulation. If a payment outside the United States is illegal or effectively precluded by exchange controls or similar restrictions, payments in respect of the related definitive Debt Securities may be made at the office of any paying agent in the United States.

(d) *Partial Redemption*

Definitive Debt Securities subject to redemption in part by Freddie Mac shall be selected by the Global Agent by lot or in such other manner as the Global Agent deems fair and appropriate, subject to the requirement that the principal amount of each outstanding definitive Debt Security after such redemption is in an authorized denomination.

(e) *Transfer and Exchange*

Definitive Debt Securities shall be presented for registration of transfer or exchange (with the form of transfer included thereon properly endorsed, or accompanied by a written instrument of transfer, with such evidence of due authorization and guaranty of signature as may be required by the Registrar, duly executed) at the office of the Registrar or any other transfer agent upon payment of any taxes and other governmental charges and other amounts, but without payment of any service charge to the Registrar or

29

TREASURY-3761

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

such transfer agent for such transfer or exchange. A transfer or exchange shall not be effective unless, and until, recorded in the Register.

A transfer or exchange of a definitive Debt Security shall be effected upon satisfying the Registrar with regard to the documents and identity of the person making the request and subject to such reasonable regulations as Freddie Mac may from time to time agree with the Registrar. Such documents may include forms prescribed by U.S. tax authorities to establish the applicability of, or the exemption from, withholding or other taxes regarding the transferee Holder. Definitive Debt Securities may be transferred or exchanged in whole or in part only in the authorized denominations of the DTC Registered Debt Securities or Other Registered Debt Securities issued in global form for which they were exchanged. In the case of a transfer of a definitive Debt Security in part, a new definitive Debt Security in respect of the balance not transferred shall be issued to the transferor. In addition, replacement of mutilated, destroyed, stolen or lost definitive Debt Securities also is subject to the conditions discussed above with respect to transfers and exchanges generally. Each new definitive Debt Security to be issued upon transfer of such a definitive Debt Security, as well as the definitive Debt Security issued in respect of the balance not transferred, shall be mailed to such address as may be specified in the form or instrument of transfer at the risk of the Holder entitled thereto in accordance with the customary procedures of the Registrar.

## ARTICLE V

### Secured Debt Securities

If so provided in the applicable Supplemental Agreement, the indebtedness represented by certain Debt Securities shall be secured obligations of Freddie Mac. In such event, the description of the security interest and the terms of the grant of the security interest shall be set forth in the applicable Supplemental Agreement.

## ARTICLE VI

### Currency Conversions

**Section 6.01. Currency Conversions for DTC Registered Debt Securities.**

(a) In the case of DTC Registered Debt Securities whose Specified Payment Currency is other than U.S. dollars, the Currency Exchange Bank specified in the applicable Supplemental Agreement, for Holders of such DTC Registered Debt Securities, shall convert any amounts paid by Freddie Mac in such Specified Payment Currency into U.S. dollars, unless such Holders elect to receive payments in such Specified Payment Currency as hereinafter described. Freddie Mac shall have no responsibility for the conversion of the Specified Payment Currency for such DTC Registered Debt Securities into U.S. dollars.

(b) The U.S. dollar amount to be received by a Holder of a DTC Registered Debt Security in respect of which payments are to be converted from the Specified Payment Currency into U.S. dollars shall be determined by the Currency Exchange Bank in the morning of the day that would be considered the date for "spot" settlement of the Specified Payment Currency on the applicable payment date in accordance with market convention (generally two New York business days prior to such payment date) at the market rate determined by the Currency Exchange Bank to accomplish the conversion on such payment date of the aggregate amount of the Specified Payment Currency payable in respect of DTC Registered Debt Securities scheduled to receive payments converted into U.S. dollars. All currency exchange costs shall be borne by the Holders of such DTC Registered Debt Securities (and, accordingly, by the related Beneficial Owners) by deductions from such payments. In the event all or any portion of a Specified

30

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Payment Currency is not convertible into U.S. dollars,  Holders of such DTC Registered Debt Securities shall receive  payment in the Specified Payment Currency.

(c) A Holder of a DTC Registered Debt Security to be paid  in a Specified Payment Currency other than U.S. dollars  shall have the option to receive payments of the principal of  and any interest on such DTC Registered Debt Security in the  Specified Payment Currency by notifying DTC no later than the  third New York business day after the related Record Date, in the case of payments on an Interest Payment Date, or the date  12 days prior to the Principal Payment Date, in the case of  payments on the Principal Payment Date.

## ARTICLE VII

### Events of Default and Remedies

**Section 7.01. Events of Default.**

(a) An "**Event of Default**" with respect to a specific issue of Debt Securities shall consist of  (i) any failure by Freddie Mac to pay to Holders of such  Debt Securities any required payment that continues unremedied  for 30 days; (ii) any failure by Freddie Mac to perform in any material respect any other covenant or agreement  in this Agreement, which failure continues unremedied for 60 days after the giving of notice of such failure to  Freddie Mac by the Holders of not less than 25% of the  outstanding principal amount (or notional principal amount) of  such Debt Securities; (iii) a court having jurisdiction in  the premises shall enter a decree or order for relief in respect  of Freddie Mac in an involuntary case under any applicable  bankruptcy, insolvency or other similar law now or hereafter in  effect, or appoint a receiver, liquidator, assignee, custodian,  or sequestrator (or other similar official) of Freddie Mac or for all or substantially all of its property, or order the  winding up or liquidation of its affairs, and such decree or order shall remain unstayed and in effect for a period of 60  consecutive days; or (iv) Freddie Mac shall commence a voluntary case under any applicable bankruptcy, insolvency or  other similar law now or hereafter in effect, or shall consent  to the entry of an order for relief in an involuntary case under  any such law, or shall consent to the appointment of or taking  possession by a receiver, liquidator, assignee, trustee, custodian, or sequestrator (or other similar official) of  Freddie Mac or any substantial part of its property, or shall make any  general assignment for the benefit of creditors, or  shall fail generally to pay its debts as they become due.

The appointment of a conservator (or other similar official) by  a regulator having jurisdiction over Freddie Mac, whether or not Freddie Mac consents to such appointment, will not constitute an  Event of Default. Any payment made in U.S. dollars or in euros as provided under Section 2.03(c)(ii) shall not constitute an Event of Default.

(b) Any event associated with EMU (an "**EMU Event**") shall not give rise to an Event of Default. An  EMU Event may include, without limitation, each (and any  combination) of (i) the fixing of exchange rates between  the currency of a member state of the European Union and euros  or between the currencies of member states of the European  Union; (ii) the introduction of euros as lawful currency in  a member state of the European Union; or (iii) the  disappearance or replacement of a relevant rate option or other price  source for the national currency of any member state of  the European Union, or the failure of the agreed sponsor (or a successor sponsor) to publish or display a  relevant rate, index,  price, page or screen.

**Section 7.02. Rights Upon Event of Default.**

(a) As long as an Event of Default under this Agreement remains  unremedied, Holders of not less than 50% of the outstanding principal amount (or notional principal amount) of  an issue of Debt Securities to which such Event of Default  relates may, by written notice to Freddie Mac, declare such

31

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Debt Securities due and payable and accelerate the maturity of such Debt Securities. Upon such acceleration, the principal amount of such Debt Securities and the interest accrued thereon shall be due and payable.

(b) No Holder has any right under this Agreement to institute any action or proceeding at law or in equity or in bankruptcy or otherwise, or for the appointment of a receiver or trustee, or for any other remedy, unless (i) such Holder previously has given to Freddie Mac written notice of an Event of Default and of the continuance thereof; (ii) the Holders of not less than 50% of the outstanding principal amount (or notional principal amount) of an issue of Debt Securities to which such Event of Default relates have given written notice to Freddie Mac of such Event of Default; and (iii) such Event of Default continues uncured for a period of 60 days following such notice. No Holder of an issue of Debt Securities has any right in any manner whatsoever by virtue of or by availing itself of any provision of this Agreement to affect, disturb or prejudice the rights of any other such Holder, or to obtain or seek to obtain preference or priority over any other such Holder or to enforce any right under this Agreement, except in the manner provided in this Agreement and for the ratable and common benefit of all such Holders.

(c) Prior to or after the institution of any action or proceeding relating to an issue of Debt Securities, the Holders of not less than 50% of the outstanding principal amount (or notional principal amount) of such Debt Securities may waive an Event of Default, whether or not it has resulted in a declaration of an acceleration of the maturity of such Debt Securities, and may rescind and annul any previously declared acceleration.

(d) Whenever in this Agreement it is provided that the Holders of a specified percentage in outstanding principal amount (or notional principal amount) of an issue of Debt Securities may take any action (including the making of any demand or request, or the giving of any authorization, notice, consent or waiver), the fact that at the time of taking any such action the Holders of such specified percentage have joined therein may be evidenced by a writing, or any number of writings of similar tenor, executed by Holders in person, or by an agent or proxy appointed in writing.

## ARTICLE VIII

### Miscellaneous Provisions

**Section 8.01. Limitations on Liability of Freddie Mac and Others.**

Neither Freddie Mac nor any of its directors, officers, employees or agents shall be under any liability to the Holders or Beneficial Owners for any action taken, or not taken, by them in good faith under this Agreement or for errors in judgment. This provision will not protect Freddie Mac or any other related person against any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence or by reason of reckless disregard of obligations and duties under this Agreement. Freddie Mac and such related persons shall have no liability of whatever nature for special, indirect or consequential damages, lost profits or business, or any other liability or claim (other than for direct damages), even if reasonably foreseeable or Freddie Mac has been advised of the possibility of such loss, damage, liability or claim.

In performing its responsibilities under this Agreement, Freddie Mac may employ agents or independent contractors. Except upon an Event of Default (as defined herein), Freddie Mac shall not be subject to the control of Holders in any manner in the discharge of its responsibilities pursuant to this Agreement.

Freddie Mac shall not be under any obligation to appear in, prosecute or defend any legal action that is not incidental to its responsibilities under this Agreement and which in its opinion may involve it in any

32

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

expense or liability. However, Freddie Mac may in its discretion undertake any such legal action which it may deem necessary or desirable in the interests of the Holders. In such event, the legal expenses and costs of such action shall be expenses and costs of Freddie Mac.

### Section 8.02. Binding Effect of this Agreement.

(a) By receiving and accepting a Debt Security, each Holder, financial intermediary and Beneficial Owner of such Debt Security unconditionally agrees, without any signature or further manifestation of assent, to be bound by the terms and conditions of this Agreement, as supplemented, modified or amended pursuant to its terms.

(b) This Agreement shall be binding upon and inure to the benefit of any successor to Freddie Mac.

### Section 8.03. Replacement.

Any Registered Debt Security in definitive form that becomes mutilated, destroyed, stolen or lost shall be replaced by Freddie Mac at the expense of the Holder upon delivery to the Global Agent of evidence of the destruction, theft or loss thereof, and an indemnity satisfactory to Freddie Mac and the Global Agent. Upon the issuance of any substituted Registered Debt Security, Freddie Mac or the Global Agent may require the payment by the Holder of a sum sufficient to cover any taxes and expenses connected therewith.

### Section 8.04. Conditions to Payment, Transfer or Exchange.

Freddie Mac, its agent or any other person potentially required to withhold with respect to payments on a Debt Security shall have the right to require a Holder of a Debt Security, as a condition to payment of principal of or interest on such Debt Security, or as a condition to transfer or exchange of such Debt Security, to present at such place as Freddie Mac, its agent or such other person shall designate a certificate in such form as Freddie Mac, its agent or such other person may from time to time prescribe, to enable Freddie Mac, its agent or such other person to determine its duties and liabilities with respect to (i) any taxes, assessments or governmental charges which Freddie Mac, any Federal Reserve Bank, the Global Agent or such other person, as the case may be, may be required to deduct or withhold from payments in respect of such Debt Security under any present or future law of the United States or jurisdiction therein or any regulation or interpretation of any taxing authority thereof; and (ii) any reporting or other requirements under such laws, regulations or interpretations. Freddie Mac, its agent or such other person shall be entitled to determine its duties and liabilities with respect to such deduction, withholding, reporting or other requirements on the basis of information contained in such certificate or, if no certificate shall be presented, on the basis of any presumption created by any such law, regulation or interpretation, and shall be entitled to act in accordance with such determination.

### Section 8.05. Amendment.

(a) Freddie Mac may modify, amend or supplement this Agreement and the terms of an issue of Debt Securities, without the consent of the Holders or Beneficial Owners, (i) to cure any ambiguity, or to correct or supplement any defective provision or to make any other provision with respect to matters or questions arising under this Agreement or the terms of any Debt Security that are not inconsistent with any other provision of this Agreement or the Debt Security; (ii) to add to the covenants of Freddie Mac for the benefit of the Holders or surrender any right or power conferred upon Freddie Mac; (iii) to evidence the succession of another entity to Freddie Mac and its assumption of the covenants of Freddie Mac; (iv) to conform the terms of an issue of Debt Securities or cure any ambiguity or discrepancy resulting from any changes in the Book Entry Rules or any regulation or document that are applicable to book entry securities of Freddie Mac; (v) to increase the amount of an issue of Debt Securities as contemplated

33

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

TREASURY-3765

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

under Section 2.07; or (vi) in any other manner that Freddie Mac may determine and that will not adversely affect in any material respect the interests of Holders or Beneficial Owners at the time of such modification, amendment or supplement.

(b) In addition, either (i) with the written consent of the Holders of at least 50% of the aggregate then outstanding principal amount or notional principal amount of an issue of Debt Securities affected thereby, excluding any such Debt Securities owned by Freddie Mac; or (ii) by the adoption of a resolution at a meeting of Holders at which a quorum is present, by the Holders of at least 50% of the aggregate then outstanding principal amount or notional principal amount of an issue of Debt Securities represented at such meeting, excluding any such Debt Securities owned by Freddie Mac, Freddie Mac may from time to time and at any time modify, amend or supplement the terms of an issue of Debt Securities for the purpose of adding any provisions to or changing in any manner or eliminating any provisions of such Debt Securities or modifying in any manner the rights of the Holders; provided, however, that no such modification, amendment or supplement may, without the written consent or affirmative vote of each Holder of a Debt Security; (A) change the Maturity Date or any Interest Payment Date of such Debt Security; (B) materially modify the redemption or repayment provisions, if any, relating to the redemption or repayment price of, or any redemption or repayment date or period for, such Debt Security; (C) reduce the principal amount of, delay the principal payment of, or materially modify the rate of interest or the calculation of the rate of interest on, such Debt Security; (D) in the case of Registered Debt Securities only, change the Specified Payment Currency of such Registered Debt Security; or (E) reduce the percentage of Holders whose consent or affirmative vote is necessary to modify, amend or supplement the terms of the relevant issue of Debt Securities. A quorum at any meeting of Holders called to adopt a resolution shall be Holders entitled to vote a majority of the then aggregate outstanding principal amount or notional principal amount of an issue of such Debt Securities called to such meeting and, at any reconvened meeting adjourned for lack of a quorum, 25% of the then aggregate outstanding principal amount or notional principal amount of such issue of Debt Securities, in both cases excluding any such Debt Securities owned by Freddie Mac. It shall not be necessary for the Holders to approve the particular form of any proposed amendment, but it shall be sufficient if such consent or resolution approves the substance of such change. If any modification, amendment or supplement of the terms of an issue of Debt Securities that have been separated into Interest and Principal Components requires the consent of Holders, only the Holders of the Principal Components will be entitled to give or withhold that consent. Holders of Interest Components will have no right to give or withhold such consent.

(c) The "principal amount," for purposes of the preceding paragraph, for a Debt Security that is a Zero Coupon Debt Security or for a Debt Security issued at an "issue price" of 80% or less of its principal amount will be equal to (i) the issue price of such Debt Security; plus (ii) the original issue discount that has accrued from the Issue Date of such Debt Security to the OID Determination Date; minus (iii) any amount considered as part of the "stated redemption price at maturity" of such Debt Security that has been paid from the Issue Date of such Debt Security to the OID Determination Date.

The "principal amount," for purposes of the second preceding paragraph, of a Debt Security whose Specified Principal Currency is other than U.S. dollars will be the U.S. dollar equivalent, determined on the Issue Date, of the principal amount (or, in the case of the Debt Securities referred to in the preceding paragraph, the amount determined in accordance with the provisions described in such preceding paragraph) of such Debt Security. The "principal amount" of a Debt Security with principal determined by reference to an Index will be described in the applicable Supplemental Agreement.

(d) Freddie Mac may establish a record date for the determination of Holders entitled to vote at any meeting of Holders of Debt Securities, to grant any consent in respect of Debt Securities and to notice with respect to any such meeting or consent.

TREASURY-3766

Source   D RA  HOM   OAN MORTGAG  CORP, 10 Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.