

**KPMG LLP**
2001 M Street, NW
Washington, DC 20036

**Independent Auditors' Report**

Inspector General
U.S. Department of the Treasury:

We have audited the accompanying consolidated balance sheets of the U.S. Department of the Treasury (Department) as of September 30, 2008 and 2007, and the related consolidated statements of net cost, and changes in net position, combined statements of budgetary resources, and the statements of custodial activity (hereinafter referred to as "consolidated financial statements") for the years then ended. The objective of our audits was to express an opinion on the fair presentation of these consolidated financial statements. These consolidated financial statements are incorporated in the accompanying *U.S. Department of the Treasury Fiscal Year 2008 Performance and Accountability Report* (PAR).

We did not audit the amounts included in the consolidated financial statements related to the Internal Revenue Service (IRS), a component entity of the Department. The financial statements of the IRS were audited by another auditor whose report thereon has been provided to us. Our opinion, insofar as it relates to the amounts included for the IRS, is based solely on the report of the other auditor.

In connection with our fiscal year 2008 audit, we, and the other auditor, also considered the Department's internal control over financial reporting and tested the Department's compliance with certain provisions of applicable laws, regulations, contracts, and grant agreements that could have a direct and material effect on these consolidated financial statements. Our conclusions on internal control over financial reporting and compliance and other matters, insofar as it relates to the IRS, are based solely on the report of the other auditor.

**Summary**

As stated in our opinion on the consolidated financial statements, based on our audits and the report of the other auditor, we concluded that the Department's consolidated financial statements as of and for the years ended September 30, 2008 and 2007, are presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles.

As discussed in Notes 24, 25, and 26, the Department is a participant in significant legislation and transactions whose purpose is to assist in stabilizing the financial markets.

Our, and the other auditor's consideration of internal control over financial reporting resulted in the following conditions being identified as significant deficiencies:

- Financial Systems and Reporting at the IRS (Repeat Condition)
- Financial Management Practices at the Departmental Level (Repeat Condition)
- Controls Over Foreign Currency Transactions

We consider the significant deficiency related to Financial Systems and Reporting at the IRS noted above, to be a material weakness.

KPMG LLP, a U.S. limited liability partnership, is the U.S. member firm of KPMG International, a Swiss cooperative.



U.S. Department of the Treasury
November 17, 2008
Page 2 of 12

The results of our tests, and the tests performed by the other auditor, of compliance with certain provisions of laws, regulations, contracts, and grant agreements disclosed an instance of noncompliance with *Internal Revenue Code (IRC)* Section 6325, that is required to be reported under *Government Auditing Standards*, issued by the Comptroller General of the United States, and Office of Management and Budget (OMB) Bulletin No. 07-04, *Audit Requirements for Federal Financial Statements*. In addition, the Department's financial management systems did not substantially comply with the *Federal Financial Management Improvement Act of 1996* (FFMIA) requirements related to compliance with Federal financial management system requirements (FFMSR), applicable Federal accounting standards, and the U.S. Government Standard General Ledger (SGL) at the transaction level.

We also reported a matter related to compliance with the *Anti-deficiency Act* at the Financial Crimes Enforcement Network (FinCEN). This potential violation is currently under review by the Government Accountability Office (GAO).

The following sections discuss our opinion on the Department's consolidated financial statements; our, and the other auditor's, consideration of the Department's internal controls over financial reporting; our, and the other auditor's, tests of the Department's compliance with certain provisions of applicable laws, regulations, contracts, and grant agreements; and management's and our responsibilities.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of the Department of the Treasury as of September 30, 2008 and 2007, and the related consolidated statements of net cost, changes in net position, the combined statements of budgetary resources, and the statements of custodial activity, for the years then ended.

We did not audit the amounts included in the consolidated financial statements related to the IRS, a component entity of the Department, which reflect total assets of $35.6 billion and $31.3 billion, net costs of operations of $12.2 billion and $11.7 billion, and custodial revenues of $2.8 trillion and $2.7 trillion, as of and for the years ended September 30, 2008 and 2007, respectively. The financial statements of the IRS, as of and for the years ended September 30, 2008 and 2007, were audited by another auditor whose report dated November 5, 2008, has been provided to us, and our opinion, insofar as it relates to the amounts included for the IRS, is based solely on the report of the other auditor.

In our opinion, based on our audits, and the report of the other auditor, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Department of the Treasury as of September 30, 2008 and 2007, and its net costs, changes in net position, budgetary resources, and custodial activity for the years then ended, in conformity with U.S. generally accepted accounting principles.

As discussed in Notes 24, 25, and 26, the Department is a participant in significant legislation and transactions whose purpose is to assist in stabilizing the financial markets.

The information in the PAR in Part I – *Management's Discussion and Analysis*, and the Required Supplemental Information section of Part III – *Annual Financial Report*, is not a required part of the consolidated financial statements, but is supplementary information required by U.S. generally accepted accounting principles. We, and the other auditor, have applied certain limited procedures, which consisted



U.S. Department of the Treasury
November 17, 2008
Page 3 of 12

principally of inquiries of management regarding the methods of measurement and presentation of this information. However, we did not audit this information and, accordingly, we express no opinion on it.

Our audits, and the audits of the other auditor, were conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The information in the Message from the Secretary, in the PAR in Part II – *Annual Performance Report*; and in Part IV – *Other Accompanying Information*, are presented for purposes of additional analysis and are not required as part of the consolidated financial statements. This information has not been subjected to auditing procedures and, accordingly, we express no opinion on it.

**Internal Control Over Financial Reporting**

Our, and the other auditor's, consideration of the internal control over financial reporting is described in the Responsibilities section of this report.  Our consideration of internal control over financial reporting was for a limited purpose and would not necessarily disclose all deficiencies in the internal control over financial reporting that might be significant deficiencies or material weaknesses.  This report also includes our consideration of the results of the other auditor's testing of internal control over financial reporting that is reported on separately by the other auditor.  The other auditor's consideration of internal control over financial reporting was for the purpose of providing an opinion on the effectiveness of IRS's internal controls.  This report, insofar as it relates to the results of the other auditor, is based solely on the report of the other auditor.

A control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis. A significant deficiency is a control deficiency, or combination of control deficiencies, that adversely affects the Department's ability to initiate, authorize, record, process, or report financial data reliably in accordance with U.S. generally accepted accounting principles such that there is more than a remote likelihood that a misstatement of the Department's consolidated financial statements that is more than inconsequential will not be prevented or detected by the Department's internal control. A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the financial statements will not be prevented or detected by the Department's internal control.

In our fiscal year 2008 audit, we, and the other auditor, consider the deficiencies, summarized below, to be significant deficiencies in internal control over financial reporting.  The significant deficiency related to Financial Systems and Reporting at the IRS noted below is considered to be a material weakness.  Because of the IRS material weakness in internal controls discussed below, the other auditor's opinion on internal control stated that the IRS did not maintain effective internal control over financial reporting (including safeguarding of assets), or compliance with laws and regulations, and thus did not provide reasonable assurance that losses, misstatements, and noncompliance with laws material in relation to the financial statements would be prevented or detected on a timely basis.



U.S. Department of the Treasury
November 17, 2008
Page 4 of 12

**MATERIAL WEAKNESS**

**Financial Systems and Reporting at the IRS (Repeat Condition)**

IRS continued to make progress in addressing weaknesses in internal control identified in previous years. However, significant deficiencies related to financial reporting, unpaid tax assessments, and information security controls continued to exist in fiscal year 2008.

These weaknesses adversely affect IRS's ability to fulfill its responsibilities as the nation's tax collector because it is unable to routinely obtain comprehensive, timely, accurate, and useful, information for day-to-day decision making. As a result, IRS personnel will continue to be challenged to sustain the level of effort needed to produce reliable financial statements timely until the IRS successfully addresses underlying systems and internal control weaknesses.

The material weaknesses in internal control over financial reporting identified by the auditors of IRS's financial statements, all of which are repeat conditions, and collectively considered a material weakness for the Department as a whole, are summarized as follows:

- Weaknesses in controls over the financial reporting process, resulting in IRS not (1) being able to prepare its balance sheet without extensive compensating procedures, and (2) having current and reliable ongoing cost information to support management decision making and to prepare cost-based performance measures;

- Weaknesses in controls over unpaid tax assessments, resulting in IRS's inability to properly manage unpaid tax assessments and leading to increased taxpayer burden; and

- Weaknesses in information security controls, resulting in increased risk of unauthorized individuals accessing, altering, or abusing proprietary IRS programs and electronic data and taxpayer information.

The material weaknesses in internal control noted above may adversely affect decisions by IRS's management that is based, in whole or in part, on information that is inaccurate because of these deficiencies.

Additional details related to the material weaknesses identified above have been provided to IRS management by the auditors of the IRS's financial statements in their report dated November 5, 2008.

**Recommendations**

Recommendations to address the material weaknesses discussed above have been provided to IRS management by the auditors of the IRS's financial statements. We recommend that the Assistant Secretary for Management and Chief Financial Officer (ASM/CFO) provide effective oversight to ensure that corrective actions are taken by the IRS to fully address this material weakness.



U.S. Department of the Treasury
November 17, 2008
Page 5 of 12

**SIGNIFICANT DEFICIENCIES**

**Financial Management Practices at the Departmental Level (Repeat Condition)**

Due to expanded accounting and reporting requirements and responsibilities of the Department, improvements continue to be needed in current financial management and reporting practices.

The Office of Accounting and Internal Control (AIC) within the Office of the Deputy Chief Financial Officer (ODCFO), is responsible for establishing and maintaining financial policies that guide consolidated financial reporting throughout the Department, and implementing internal controls to ensure the overall integrity of financial data reported at the consolidated level.   AIC prepares consolidated financial statements including footnote and supplementary data, from trial balances and other financial data submitted by the components. AIC uses this information to compile the Department's consolidated financial statements.   AIC is dependent on the Treasury components for complete, accurate, and timely submission of monthly financial data.   Certain quality control procedures are conducted by AIC to ensure that component financial and other data is accurate and complete for inclusion in the consolidated financial statements.   However, several control deficiencies were noted, as described below, that indicated a weak control environment, resulting in financial management and reporting weaknesses. These deficiencies in internal control over financial reporting are collectively considered a significant deficiency for the Department as a whole.

- We continue to note that AIC, in addition to other Departmental Offices such as the Office of Financial Management (OFM), and the Office of Performance Budgeting and Strategic Planning (OPBSP), have financial management infrastructures that are inadequately staffed for the financial reporting responsibilities of such a large and complex Executive Branch agency.  Several key personnel having significant institutional knowledge of the Department's accounting and reporting processes within these offices are at or near retirement eligibility status.  In the event of retirement or sudden prolonged absence of one or more of the key accounting individuals, Treasury would face a significant loss of operational and institutional knowledge absent a comprehensive, formalized succession plan, resulting in significant financial management deficiencies.  In fiscal year 2008, we noted that AIC successfully replaced one key official that retired in the current year, and supplemented its existing staff with two additional staff members on detail from other Treasury components.  Although this temporarily helped with AIC's short-term needs, AIC, OFM, and OPBSP's long-term human capital need of personnel who have the requisite financial accounting background, knowledge, and expertise, to assist in the financial management and reporting of such a large and complex executive branch agency remains to be addressed.

- AIC's supervisory and monitoring control procedures were not consistently performed and documented over certain financial data and other information transmitted by Treasury components.  During our review of interim and final consolidated financial statements, we noted errors and discrepancies that were only corrected after they were identified during audit test work.  In other instances, we noted inadequate and/or untimely follow-up of accounting and/or reporting issues.

- AIC has not yet formalized written policies and procedures for the required accounting and reporting of various non-routine, complex, and unique transactions, such as the reporting of the U.S. Mint's Seigniorage amount, accrued interest and discount on debt, transfers to the General Fund and Other, in the Department's consolidated financial statements.

Case 1:13-mc-01288-RCL   Document 7-3   Filed 12/17/13   Page 6 of 170



U.S. Department of the Treasury
November 17, 2008
Page 6 of 12

- AIC procedures for monitoring compliance with existing, as well as new laws and regulations that apply to the Department need improvement. Specifically, we noted that there is no formal communication between Treasury's Office of General Counsel (OGC) and AIC on matters related to new legislation, the assessment of compliance requirements, if any, and subsequent actions to be taken by the Department. Currently, interpretation of new laws and regulations, and resulting compliance needs, are left up to the discretion and interpretation of Department personnel. Without a formal communication process, there is significant risk of noncompliance with laws and regulations by the Department and its components.

- Our reviews of Department-wide testing and reporting on internal control over financial reporting, in accordance with OMB Circular No. A-123, *Management's Responsibility for Internal Control* (A-123), continue to identify similar implementation issues as in prior years. Although the Department established an effective implementation plan (Plan) to assess, document, test, and report on internal control over financial reporting, certain Treasury components did not fully execute the Plan. Specifically, some components did not have, or provide verifiable and documented results to support their conclusion as to whether internal control over financial reporting was properly designed and operating effectively for certain areas in accordance with the Department's guidelines. In addition, the AIC, which is responsible for the Department-wide monitoring of A-123 compliance, did not effectively review the work performed by components to assess whether the methodology and implementation requirements had been followed.

- As a result of the *Housing and Economic Recovery Act* legislation of 2008, the Department was involved in various financial transactions unique to the Department. These transactions were processed in a shortened time-frame causing various control deficiencies related to documentation of policies and procedures and financial reporting. The Department overcame significant time and personnel resource constraints to appropriately execute, manage, and report the results of these unprecedented events and transactions all of which occurred during the last month of the fiscal year. One transaction type involved the purchase of GSE Mortgage Backed Securities (MBS) in the amount of $3.3 billion. The Department concluded that the purchase of GSE MBS should be accounted under the Federal Credit Reform Act of 1990, as amended (FCRA). FCRA has significant documentation requirements. Since the MBS program was implemented in a shortened time-frame, the Department did not properly document policies and procedures, and controls relating to the MBS accounting and reporting. The primary cause of this lack of documentation was that Treasury did not have the resources, including personnel to prepare the required documentation supporting the accounting, re-estimate valuation, and financial reporting of the MBS purchases under FCRA.

The *Federal Managers' Financial Integrity Act of 1982* (FMFIA) requires that agencies establish internal controls according to standards prescribed by the Comptroller General and specified in the Government Accountability Office's (GAO) *Standards for Internal Control in the Federal Government (Standards)*. The GAO defines "internal control" as an integral component of an organization's management that provides reasonable assurance that the following objectives are achieved: effectiveness and efficiency of operations, reliability of financial reporting, and compliance with applicable laws and regulations. The GAO *Standards* identify the control environment as one of the five key elements of control, which emphasizes the importance of control consciousness in management's operating philosophy and



U.S. Department of the Treasury
November 17, 2008
Page 7 of 12

commitment to internal control. These standards cover controls such as human capital practices, supervisory reviews, and segregation of duties, policies, procedures, and monitoring.

A-123 requires agencies to (1) develop and implement management controls; (2) assess the adequacy of management controls; (3) identify needed improvements; (4) take corresponding corrective actions; and (5) report annually on management controls in support of FMFIA.  The issues we identified occurred mainly because certain key AIC and OFM financial personnel have excessive workloads, and there is insufficient time for these key financial personnel to devote to supervisory reviews and other financial management activities.  This resulted in increased reliance being placed on the annual audit process to identify errors and omissions in the consolidated financial statements, as well as the Department's implementation of A-123.

**Recommendations**

We recommend that the ASM/CFO, Deputy CFO, and Deputy Assistant Secretary for Human Resources and Chief Human Capital Officer, with input from the Directors of AIC, OFM and OPBSP, as appropriate:

1. Complete a human capital needs assessment, with particular focus on the management skills needed to perform the daily operations of these offices.  Once the human capital needs are assessed, hire staff, or consider transferring suitable staff from other offices within Treasury to meet these immediate needs.

2. Establish new policies or improve existing policies and procedures to ensure that:

    i. Quality control reviews are performed on the consolidated financial statements by responsible officials to ensure that all errors and inconsistencies are corrected in a timely manner; and

    ii. Adequate reviews are conducted by senior AIC officials on all documentation prepared to support consolidated financial statement amounts to ensure that the documents and information provided are accurate and complete, and such review is documented.

3. Ensure that documentation exists to support all new and/or unique accounting and reporting requirements as well as non-routine or complex accounting and reporting matters. For example, any new financial statement footnote disclosures that are developed should include a policy memo, financial statement footnote disclosure format as well as evidence of review by responsible officials within AIC of both the policy and the format to be followed.

4. Ensure that communication is initiated on a periodic basis (at least quarterly) with OGC, to obtain information and documentation on any new laws and regulations that apply at the Department/component level, including documentation of OGC's assessment of compliance requirements especially those having financial impact.

5. Monitor the A-123 work being conducted by components to ensure that the Department's A-123 guidance is fully implemented, and if not, document the rationale or mitgating factors that were considered for not following the Department's requirements.



U.S. Department of the Treasury
November 17, 2008
Page 8 of 12

6.  Document policy and procedures related to FCRA transactions, periodically examine performance of the credit programs to re-estimate cash flow projections and assumptions, and have affected personnel continue to consult with other Federal agencies that have substantial credit reform accounting experience.

**Controls Over Foreign Currency Transactions**

Improvements are needed related to internal control over foreign currency investment transactions at the Exchange Stabilization Fund (ESF). ESF's foreign currency operations are managed on ESF's behalf by a designated fiscal agent. The fiscal agent is responsible for the monthly accounting and reporting to the ESF of foreign currency activities. The fiscal agent also provides data that supports various ESF financial statement disclosures such as for fair values. The ESF relies entirely on the financial information reported by the fiscal agent and incorporates the financial data reported monthly into its general ledger and financial statements. Although ESF's financial data are subject to detailed review and validation by the fiscal agent, ESF does not have sufficient internal independent checks and balances in place to ensure the accuracy and completeness of the transactions and balances reported to them by the fiscal agent. Comprehensive internal processes, procedures, and controls over foreign currency transactions are essential to ensure that these transactions and balances are complete and accurate, and appropriately reported.

Additional details related to the significant deficiency identified above will be provided to ESF management by the auditors of the ESF's financial statements.

**Recommendations**

Recommendations to address the significant deficiency discussed above will be provided to ESF management by the auditors of the ESF's financial statements. We recommend that the ASM/CFO provide effective oversight to ensure that corrective actions are taken by the ESF to fully address this significant deficiency.

**Compliance and Other Matter**

The results of certain of our tests, and the tests performed by the other auditor, of compliance as described in the Responsibilities section of this report, exclusive of those referred to in FFMIA, disclosed the following instance of noncompliance or other matters that is required to be reported herein under *Government Auditing Standards* or OMB Bulletin No. 07-04.

- *Noncompliance with IRC Section 6325* - The IRC grants IRS the power to file a lien against the property of any taxpayer who neglects or refuses to pay all assessed Federal taxes. Under IRC Section 6325, the IRS is required to release a Federal tax lien within 30 days after the date the tax liability is satisfied, or has become legally unenforceable, or the Secretary of the Treasury has accepted a bond for the assessed tax. Instances were noted during the fiscal year 2008 audit where the IRS did not timely release the applicable Federal tax lien within 30 days of the tax liability being either paid off or abated as required by the IRC (Repeat Condition).



U.S. Department of the Treasury
November 17, 2008
Page 9 of 12

The results of our other tests, and the tests performed by the other auditor, of compliance as described in the Responsibilities section of this report, exclusive of those referred to in FFMIA, disclosed no instances of noncompliance or other matters that are required to be reported herein under *Government Auditing Standards* or OMB Bulletin No. 07-04.

The results of our tests of FFMIA, and the tests performed by the other auditor, disclosed instances where the Department's financial management systems did not substantially comply with FFMIA Section 803(a) requirements (Repeat Condition) related to compliance with (1) federal financial management system requirements (FFMSR), (2) applicable Federal accounting standards, and (3) the United States Government Standard General Ledger (SGL) at the transaction level, as described below.

Instances of noncompliance with FFMSR are summarized below:

- IRS's financial management systems do not provide timely and reliable information for financial reporting and preparation of financial statements. IRS had to rely on extensive compensating procedures to generate reliable financial statements.

- Deficiencies were identified in information security controls at the IRS, resulting in increased risk of unauthorized individuals accessing, altering, or abusing proprietary IRS programs and electronic data and taxpayer information.

Instances of noncompliance with Federal accounting standards are summarized below:

- Material weaknesses at the IRS related to controls over financial reporting and unpaid tax assessments.

- IRS's financial management system cannot produce reliable, current information on the costs of its activities available to support decision making on a routine basis, consistent with the requirements of Statement of Federal Financial Accounting Standards No. 4, *Managerial Cost Accounting Standards*.

An instance of noncompliance with the SGL at the transaction level is summarized below:

- IRS's core general ledger system for tax-related activities does not comply with the SGL at the transaction level and also does not post transactions in conformance with SGL posting models.

The Secretary of the Treasury also stated in his Letter of Assurance, included in Part I – *Management's Discussion and Analysis*, of the accompanying PAR that the Department cannot provide assurance that its financial management systems are in substantial compliance with FFMIA. The Department's remedial actions and related time frames are presented in Appendix D of the PAR.

FFMIA requires that if the head of an agency determines that its financial management systems do not substantially comply with FFMIA, a remediation plan must be developed, in consultation with OMB that describes the resources, remedies, and intermediate target dates for achieving substantial compliance. FFMIA also requires OMB concurrence with any plan not expected to bring the agency's system into substantial compliance within three years after a determination of noncompliance is made.



U.S. Department of the Treasury
November 17, 2008
Page 10 of 12

IRS has established a remediation plan to address the conditions affecting its systems' inability to comply substantially with the requirements of FFMIA. This plan outlines the actions to be taken to resolve these issues, but these actions are long term in nature and are tied to IRS's system modernization efforts.

**Recommendation**

We recommend that the ASM/CFO provide effective oversight to ensure that (1) IRS implements appropriate controls so that Federal tax liens are released in accordance with Section 6325 of the IRC; and (2) IRS implements its plan of action to solve financial management problems so as to enable resolving the identified instances of financial management systems noncompliance with the requirements of FFMIA. Detailed recommendations to address the noncompliance findings discussed above have been provided to IRS management by the auditors of the IRS's financial statements.

**Other Matter**

The Department's management informed us of an instance of a potential *Anti-deficiency Act* violation related to transactions and activities of FinCEN. Specifically, budgetary control weaknesses existing within FinCEN may have allowed a potential violation of the *Anti-deficiency Act*. This matter is currently under review by the GAO.

**Management's Response to Internal Control and Compliance Findings**

The Department's management has indicated in a separate letter immediately following this report that it concurs with the findings presented in this section of our report. Further, it has responded that it will take corrective action, as necessary, to ensure the matters presented are addressed by the respective component management within the Department. We did not audit the Department's response and, accordingly, we express no opinion on it.

\* \* \* \* \*

We noted certain additional matters involving internal control over financial reporting and its operation that we will report to the Department's management in a separate letter.

**Responsibilities**

**Management's Responsibilities.** Management is responsible for the consolidated financial statements; establishing and maintaining effective internal control; and complying with laws, regulations, contracts, and grant agreements applicable to the Department.

**Auditors' Responsibilities.** Our responsibility is to express an opinion on the fiscal year 2008 and 2007 consolidated financial statements of the Department based on our audits and the report of the other auditor. We, and the other auditor, conducted our audits in accordance with auditing standards generally accepted in the United States of America; the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States; and OMB Bulletin No. 07-04. Those standards and OMB Bulletin No. 07-04 require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit



U.S. Department of the Treasury
November 17, 2008
Page 11 of 12

procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Department's internal control over financial reporting. Accordingly, we express no such opinion.

An audit also includes:

• Examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements;

• Assessing the accounting principles used and significant estimates made by management; and

• Evaluating the overall consolidated financial statement presentation.

We believe that our audits, and the report of the other auditor, related to the amounts included for the IRS, provide a reasonable basis for our opinion.

In planning and performing our fiscal year 2008 audit, we considered the Department's internal control over financial reporting, exclusive of the internal control over financial reporting related to the IRS, by obtaining an understanding of the design effectiveness of the Department's internal control, determining whether internal controls had been placed in operation, assessing control risk, and performing tests of controls as a basis for designing our auditing procedures for the purpose of expressing our opinion on the consolidated financial statements. Internal control over financial reporting related to the IRS was considered by the other auditor whose report thereon dated November 5, 2008 has been provided to us. We, and the other auditor, did not test all internal controls relevant to operating objectives as broadly defined by the *Federal Managers' Financial Integrity Act of 1982*. The objective of our audit was not to express an opinion on the effectiveness of the Department's internal control over financial reporting. Accordingly, we do not express an opinion on the effectiveness of the Department's internal control over financial reporting.  The objective of the other auditor's audit was to express an opinion on the effectiveness of the IRS's internal control over financial reporting.  Accordingly, the other auditor provided an opinion on IRS's internal control over financial reporting.

As part of obtaining reasonable assurance about whether the Department's fiscal year 2008 consolidated financial statements are free of material misstatement, we, and the other auditor, performed tests of the Department's compliance with certain provisions of laws, regulations, contracts, and grant agreements, noncompliance with which could have a direct and material effect on the determination of the consolidated financial statement amounts, and certain provisions of other laws and regulations specified in OMB Bulletin No. 07-04, including the provisions referred to in Section 803(a) of FFMIA. We, and the other auditor, limited our tests of compliance to the provisions described in the preceding sentence, and we, and the other auditor, did not test compliance with all laws, regulations, contracts, and grant agreements applicable to the Department. However, providing an opinion on compliance with laws, regulations, contracts, and grant agreements was not an objective of our audit and, accordingly, we do not express such an opinion.

_____



U.S. Department of the Treasury
November 17, 2008
Page 12 of 12


This report is intended solely for the information and use of the Department's management, the Department's Office of Inspector General, OMB, the GAO, and the U.S. Congress and is not intended to be and should not be used by anyone other than these specified parties.



November 17, 2008



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

ASSISTANT SECRETARY

November 17, 2008

KPMG LLP
2001 M Street, N.W.
Washington, D.C. 20036

Ladies and Gentlemen:

On behalf of Secretary Paulson, I am responding to your draft audit report on the Department of the Treasury's fiscal year (FY) 2008 consolidated financial statements. All of our bureaus and program offices can be proud of the Department's success in issuing a timely and accurate Performance and Accountability Report for the seventh consecutive year of accelerated reporting. Further, they are to be congratulated for overcoming many obstacles to achieve another unqualified opinion on the Department's financial statements.

These successful results also are due in large part to the high level of professionalism, technical expertise, and partnership demonstrated by KPMG in conducting the audit. Treasury has appreciated your efforts during the audit process to provide timely, constructive advice on how to improve our financial reporting. Treasury is equally appreciative of the expertise and commitment level demonstrated by the other organizations involved in the audit process – the Office of Inspector General (OIG), the Government Accountability Office (GAO), and the firms that audited several of our bureaus.

The Department of the Treasury continued to make significant progress during FY 2008 to address financial and information management deficiencies. The Office of the Chief Information Officer made substantial improvements in Treasury's Information Security Program and achieved an audit outcome from the OIG of "significant progress in compliance" with the Federal Information Security Management Act (FISMA), for both Treasury unclassified and National Intelligence systems. As a result, the Department formally closed the longstanding FISMA compliance material weakness in September 2008. As reported by GAO, the Internal Revenue Service made significant progress in addressing its controls over the collection of tax revenues due to the federal government and over the issuance of tax refunds.

We acknowledge the Departmental level material weakness, the significant deficiencies, and the instances of noncompliance with laws and regulations described in your report. We agree with your recommendations. We will focus on necessary corrective actions to address each of these items.

We appreciate the continuing professional, cooperative relationship that exists with both KPMG and the Office of Inspector General.

Sincerely,

Peter B. McCarthy
Assistant Secretary for Management
and Chief Financial Officer



## CONSOLIDATED BALANCE SHEETS
### As of September 30, 2008 and 2007
*(In Millions)*

| ASSETS | | 2008 | | 2007 |
|---|---|---:|---|---:|
| **Intra-governmental Assets** | | | | |
| Fund Balance *(Note 2)* | $ | 275,368 | $ | 74,767 |
| Loans and Interest Receivable *(Note 3)* | | 264,854 | | 236,932 |
| Advances to the Black Lung Trust Fund *(Note 4 and Note 26)* | | 10,484 | | 10,058 |
| Due From the General Fund *(Note 4)* | | 10,100,763 | | 9,052,624 |
| Accounts Receivable and Related Interest *(Note 10)* | | 396 | | 466 |
| Other Intra-governmental Assets | | 13 | | 32 |
| **Total Intra-governmental Assets** | **$** | **10,651,878** | **$** | **9,374,879** |
| Cash, Foreign Currency, and Other Monetary Assets *(Note 5)* | | 387,270 | | 92,330 |
| Gold and Silver Reserves *(Note 6)* | | 11,062 | | 11,062 |
| Loans and Interest Receivable *(Note 3)* | | 172 | | 175 |
| Credit Program Receivables - Mortgage Backed Securities *(Note 3)* | | 3,385 | | 0 |
| Investments in Government Sponsored Enterprises *(Note 4, Note 7, and Note 13)* | | 7,032 | | 0 |
| Investments and Related Interest *(Note 7)* | | 10,576 | | 10,074 |
| Reserve Position in the International Monetary Fund *(Note 8)* | | 4,750 | | 4,464 |
| Investments in International Financial Institutions *(Note 9)* | | 5,546 | | 5,521 |
| Tax, Other, and Related Interest Receivables, Net *(Note 10)* | | 30,878 | | 27,559 |
| Inventory and Related Property, Net *(Note 11)* | | 698 | | 638 |
| Property, Plant, and Equipment, Net *(Note 12)* | | 2,077 | | 2,086 |
| Other Assets *(Note 3)* | | 1,714 | | 19 |
| **Total Assets** *(Note 13)* | **$** | **11,117,038** | **$** | **9,528,807** |
| Heritage Assets *(Note 12)* | | | | |
| | | | | |
| **LIABILITIES** | | | | |
| **Intra-governmental Liabilities** | | | | |
| Federal Debt and Interest Payable *(Note 4 and Note 14)* | $ | 4,262,414 | $ | 3,974,788 |
| Other Debt and Interest Payable *(Note 14)* | | 14,164 | | 14,164 |
| Due to the General Fund *(Note 4, Note 5, and Note 22)* | | 667,112 | | 328,973 |
| Other Intra-governmental Liabilities *(Note 17)* | | 345 | | 329 |
| **Total Intra-governmental Liabilities** | **$** | **4,944,035** | **$** | **4,318,254** |
| Federal Debt and Interest Payable *(Note 4 and Note 14)* | | 5,812,694 | | 5,054,250 |
| Certificates Issued to Federal Reserve Banks *(Note 5)* | | 2,200 | | 2,200 |
| Allocation of Special Drawing Rights *(Note 5)* | | 7,630 | | 7,627 |
| Gold Certificates Issued to Federal Reserve Banks *(Note 6)* | | 11,037 | | 11,037 |
| Refunds Payable *(Note 4 and Note 21)* | | 3,076 | | 1,684 |
| D.C. Pensions and Judiciary Retirement Actuarial Liability *(Note 15)* | | 8,803 | | 8,992 |
| Other Liabilities *(Note 17, Note 24 and Note 25)* | | 17,852 | | 3,664 |
| **Total Liabilities** | **$** | **10,807,327** | **$** | **9,407,708** |
| Commitments and Contingencies *(Note 16, Note 24 and Note 26)* | | | | |
| | | | | |
| **NET POSITION** | | | | |
| Unexpended Appropriations: Earmarked Funds *(Note 22)* | $ | 200 | $ | 200 |
| Other Funds | | 271,768 | | 72,117 |
| Subtotal | | 271,968 | | 72,317 |
| Cumulative Results of Operations: Earmarked Funds *(Note 22)* | | 37,586 | | 35,385 |
| Other Funds | | 157 | | 13,397 |
| Subtotal | | 37,743 | | 48,782 |
| **Total Net Position** *(Note 18)* | **$** | **309,711** | **$** | **121,099** |
| **Total Liabilities and Net Position** | **$** | **11,117,038** | **$** | **9,528,807** |

*The accompanying notes are an integral part of these financial statements.*

FINANCIAL REPORT



## CONSOLIDATED STATEMENTS OF NET COST
### For the Years Ended September 30, 2008 and 2007
*(In Millions)*

|  | 2008 | 2007 |
|---|---:|---:|
| **Cost of Treasury Operations:** *(Note 19)* | | |
| **Financial Program:** | | |
| Gross Cost | $ 14,569 | $ 13,980 |
| Less Earned Revenue | (2,282) | (2,245) |
| **Net Program Cost** | $ 12,287 | $ 11,735 |
| | | |
| **Economic Program:** | | |
| Gross Cost | $ 5,339 | $ 5,660 |
| Less Earned Revenue | (5,091) | (6,116) |
| **Net Program Cost** | $ 248 | $ (456) |
| | | |
| **Security Program:** | | |
| Gross Cost | $ 346 | $ 302 |
| Less Earned Revenue | (4) | (2) |
| **Net Program Cost** | $ 342 | $ 300 |
| | | |
| **Management Program:** | | |
| Gross Cost | $ 631 | $883 |
| Less Earned Revenue | (165) | (443) |
| **Net Program Cost** | $ 466 | $ 440 |
| | | |
| **Total Program Gross Costs:** | $ 20,885 | $ 20,825 |
| **Total Program Gross Earned Revenues** | (7,542) | (8,806) |
| **Total Net Cost of Treasury Operations** | $ 13,343 | $ 12,019 |
| | | |
| GSE Costs (Entity) *(Note 24)* | $ 13,800 | $ 0 |
| **Total Net Cost of Treasury Operations plus GSE** | $ 27,143 | $ 12,019 |
| | | |
| **Federal Costs:** *(Note 19)* | | |
| Federal Debt Interest | $ 453,347 | $ 432,153 |
| Less Interest Revenue from Loans | (12,439) | (11,714) |
| **Net Federal Debt Interest Costs** | $ 440,908 | $ 420,439 |
| | | |
| Other Federal Costs *(Note 19)* | $ 8,332 | $ 8,863 |
| Less GSE Revenue (non-Entity) *(Note 24)* | (7,032) | 0 |
| | | |
| **Net Federal Costs** | $ 442,208 | $ 429,302 |
| | | |
| **Net Cost of Treasury Operations, GSE Cost, Federal Debt Interest, Other Federal Costs, and GSE Revenue** | $ 469,351 | $ 441,321 |

*The accompanying notes are an integral part of these financial statements.*



## CONSOLIDATED STATEMENT OF CHANGES IN NET POSITION
For the Year Ended September 30, 2008
*(In Millions)*

| | Combined Earmarked Funds | Combined All Other Funds | Eliminations | Consolidated Total |
|---|---|---|---|---|
| **CUMULATIVE RESULTS OF OPERATIONS** | | | | |
| Beginning Balances | $ 35,385 | $ 13,397 | $ 0 | $ 48,782 |
| Budgetary Financing Sources: | | | | |
| Appropriations Used | 458 | 481,277 | 0 | 481,735 |
| Non-exchange Revenue | 134 | 144 | (24) | 254 |
| Donations and Forfeitures of Cash/Equivalent | 159 | 0 | 0 | 159 |
| Transfers In/Out Without Reimbursement | 0 | (10) | 0 | (10) |
| Other | 38 | (26) | 0 | 12 |
| Other Financing Sources (non-exchange) | | | | |
| Donation/Forfeiture of Property | 112 | 0 | 0 | 112 |
| Accrued Interest and Discount on Debt | 0 | (3,870) | 0 | (3,870) |
| Transfers In/Out Without Reimbursement | (52) | 31 | 0 | (21) |
| Imputed Financing Sources | 60 | 1,147 | (478) | 729 |
| Transfers to the General Fund and Other (Note 18) | (23) | (20,765) | 0 | (20,788) |
| **Total Financing Sources** | **886** | **457,928** | **(502)** | **458,312** |
| Net Cost of Operations | 1,315 | (471,168) | 502 | (469,351) |
| Net Change | 2,201 | (13,240) | 0 | (11,039) |
| **Cumulative Results of Operations** | **$ 37,586** | **$ 157** | **$ 0** | **$ 37,743** |
| | | | | |
| **UNEXPENDED APPROPRIATIONS** | | | | |
| Beginning Balances | $ 200 | $ 72,117 | $ 0 | $ 72,317 |
| Budgetary Financing Sources: | | | | |
| Appropriations Received *(Note 18)* | 458 | 681,015 | 0 | 681,473 |
| Appropriations Transferred In/Out | 0 | 24 | 0 | 24 |
| Other Adjustments | 0 | (111) | 0 | (111) |
| Appropriations Used | (458) | (481,277) | 0 | (481,735) |
| **Total Budgetary Financing Sources** | **0** | **199,651** | **0** | **199,651** |
| **Total Unexpended Appropriations** | **$ 200** | **$ 271,768** | **$ 0** | **$ 271,968** |
| **Net Position** | **$ 37,786** | **$ 271,925** | **$ 0** | **$ 309,711** |

*The accompanying notes are an integral part of these financial statements.*



## CONSOLIDATED STATEMENT OF CHANGES IN NET POSITION
### For the Year Ended September 30, 2007
*(In Millions)*

| | Combined Earmarked Funds | Combined All Other Funds | Eliminations | Consolidated Total |
|---|---|---|---|---|
| **CUMULATIVE RESULTS OF OPERATIONS** | | | | |
| Beginning Balances | $  31,614 | $  15,030 | $  0 | $  46,644 |
| Budgetary Financing Sources: | | | | |
|     Appropriations Used | 390 | 446,667 | 0 | 447,057 |
|     Non-exchange Revenue | 109 | 7 | (43) | 73 |
|     Donations and Forfeitures of Cash/Equivalent | 210 | 0 | 0 | 210 |
|     Transfers In/Out without Reimbursement | 0 | (8) | 0 | (8) |
|     Other | (1) | 0 | 0 | (1) |
| Other Financing Sources (non exchange) | | | | |
|     Donation/Forfeiture of Property | 73 | 0 | 0 | 73 |
|     Accrued Interest and Discount on Debt | 0 | 7,632 | 0 | 7,632 |
|     Transfers In/Out Without Reimbursement | (39) | 15 | 0 | (24) |
|     Imputed Financing Sources | 60 | 1,172 | (492) | 740 |
|     Transfers to the General Fund and Other *(Note 18)* | 205 | (12,498) | 0 | (12,293) |
| **Total Financing Sources** | **1,007** | **442,987** | **(535)** | **443,459** |
| Net Cost of Operations | 2,764 | (444,620) | 535 | (441,321) |
| Net Change | 3,771 | (1,633) | 0 | 2,138 |
| **Cumulative Results of Operations** | **35,385** | **13,397** | **0** | **48,782** |
| | | | | |
| **UNEXPENDED APPROPRIATIONS** | | | | |
| Beginning Balances | $  202 | $  68,068 | $  0 | $  68,270 |
| Budgetary Financing Sources: | | | | |
|     Appropriation Received *(Note 18)* | 390 | 450,832 | 0 | 451,222 |
|     Appropriations Transferred In/Out | 0 | 27 | 0 | 27 |
|     Other Adjustments | (2) | (143) | 0 | (145) |
|     Appropriations Used | (390) | (446,667) | 0 | (447,057) |
| **Total Budgetary Financing Sources** | **(2)** | **4,049** | **0** | **4,047** |
| **Total Unexpended Appropriations** | **$  200** | **$  72,117** | **$  0** | **$  72,317** |
| **Net Position** | **$  35,585** | **$  85,514** | **$  0** | **$  121,099** |

*The accompanying notes are an integral part of these financial statements.*



## COMBINED STATEMENT OF BUDGETARY RESOURCES

For the Year Ended September 30, 2008

(In Millions)

|  | Budgetary | Non-Budgetary Financing | Total |
|---|---|---|---|
| **Budgetary Resources** | | | |
| Unobligated balance, brought forward | $ 57,450 | $ 0 | $ 57,450 |
| Recoveries of prior year unpaid obligations | 413 | 0 | 413 |
| Budget authority: | | | |
| Appropriations *(Note 18)* | 679,563 | 0 | 679,563 |
| Borrowing authority | 4 | 34,304 | 34,308 |
| Spending Authority from Offsetting Collections | | | |
| Earned: Collected | 8,705 | 335 | 9,040 |
| Change in receivables from Federal sources | (32) | 0 | (32) |
| Change unfilled customer orders: | | | |
| Advance received | 19 | 0 | 19 |
| Without advance from Federal sources | (39) | 0 | (39) |
| Subtotal | 688,220 | 34,639 | 722,859 |
| Non-expenditure transfers, net | 844 | 0 | 844 |
| Temporarily not available pursuant to Public Law | (9) | 0 | (9) |
| Permanently not available | (4,626) | (4,767) | (9,393) |
| **Total Budgetary Resources** | **$ 742,292** | **$ 29,872** | **$ 772,164** |
| **Status of Budgetary Resources** | | | |
| Obligations incurred *(Note 20)*: Direct | $ 477,384 | $ 5,415 | $ 482,799 |
| Reimbursable | 4,735 | 0 | 4,735 |
| Subtotal | 482,119 | 5,415 | 487,534 |
| Unobligated Balance: Apportioned | 214,114 | 24,122 | 238,236 |
| Exempt from apportionment | 34,999 | 0 | 34,999 |
| Subtotal | 249,113 | 24,122 | 273,235 |
| Unobligated balance not available | 11,060 | 335 | 11,395 |
| **Total Status of Budgetary Resources** | **$ 742,292** | **$ 29,872** | **$ 772,164** |
| **Change in Obligated Balance** | | | |
| Obligated balance, net: | | | |
| Unpaid obligations brought forward, Oct. 1 | $ 57,811 | $ 0 | $ 57,811 |
| Uncollected customer payments from Federal sources brought forward | (418) | 0 | (418) |
| **Total unpaid obligated balance, net** | **57,393** | **0** | **57,393** |
| Obligations incurred, net | 482,119 | 5,415 | 487,534 |
| Gross outlays | (482,199) | (5,409) | (487,608) |
| Recoveries of prior year unpaid obligations, actual | (413) | 0 | (413) |
| Change uncollected customer payments Federal source | 71 | 0 | 71 |
| Obligated balance, net, end of period: | | | |
| Unpaid obligations | 57,318 | 6 | 57,324 |
| Uncollected customer payments Federal sources | (347) | 0 | (347) |
| **Total unpaid obligated balance, net, end of period** | **56,971** | **6** | **56,977** |
| **Net Outlays** | | | |
| Gross outlays | 482,199 | 5,409 | 487,608 |
| Offsetting collections | (8,194) | (335) | (8,529) |
| Distributed offsetting receipts | (16,211) | 0 | (16,211) |
| **Net Outlays** | **$ 457,794** | **$ 5,074** | **$ 462,868** |

*The accompanying notes are an integral part of these financial statements.*



## COMBINED STATEMENT OF BUDGETARY RESOURCES
For the Year Ended September 30, 2007

(In Millions)

|  | Budgetary | Non-Budgetary Financing | Total |
|---|---|---|---|
| **Budgetary Resources** | | | |
| Unobligated balance, brought forward | $ 57,540 | $ 0 | $ 57,540 |
| Recoveries of prior year unpaid obligations | 474 | 0 | 474 |
| Budget authority: | | | |
| Appropriations *(Note 18)* | 465,200 | 0 | 465,200 |
| Borrowing authority | 11 | 0 | 11 |
| Spending Authority from Offsetting Collections | | | |
| Earned: Collected | 9,937 | 0 | 9,937 |
| Change in receivables from Federal sources | (66) | 0 | (66) |
| Change unfilled customer orders: | | | |
| Advance received | 17 | 0 | 17 |
| Without advance from Federal sources | (125) | 0 | (125) |
| Subtotal | 474,974 | 0 | 474,974 |
| Non-expenditure transfers, net | 25 | 0 | 25 |
| Temporarily not available pursuant to Public Law | 90 | 0 | 90 |
| Permanently not available | (10,123) | 0 | (10,123) |
| **Total Budgetary Resources** | **$ 522,980** | **$ 0** | **$ 522,980** |
| **Status of Budgetary Resources** | | | |
| Obligations incurred *(Note 20)*: Direct | $ 460,999 | $ 0 | $ 460,999 |
| Reimbursable | 4,531 | 0 | 4,531 |
| Subtotal | 465,530 | 0 | 465,530 |
| Unobligated Balance: Apportioned | 13,525 | 0 | 13,525 |
| Exempt from apportionment | 32,930 | 0 | 32,930 |
| Subtotal | 46,455 | 0 | 46,455 |
| Unobligated balance not available | 10,995 | 0 | 10,995 |
| **Total Status of Budgetary Resources** | **$ 522,980** | **$ 0** | **$ 522,980** |
| **Change in Obligated Balance** | | | |
| Obligated balance, net: | | | |
| Unpaid obligations brought forward, Oct. 1 | $ 53,057 | $ 0 | $ 53,057 |
| Uncollected customer payments from Federal sources brought forward | (609) | 0 | (609) |
| **Total unpaid obligated balance, net** | **52,448** | **0** | **52,448** |
| Obligations incurred, net | 465,530 | 0 | 465,530 |
| Gross outlays | (460,302) | 0 | (460,302) |
| Recoveries of prior year unpaid obligations, actual | (474) | 0 | (474) |
| Change uncollected customer payments Federal source | 191 | 0 | 191 |
| Obligated balance, net, end of period: | | | |
| Unpaid obligations | 57,811 | 0 | 57,811 |
| Uncollected customer payments Federal sources | (418) | 0 | (418) |
| **Total unpaid obligated balance, net, end of period** | **57,393** | **0** | **57,393** |
| **Net Outlays** | | | |
| Gross outlays | 460,302 | 0 | 460,302 |
| Offsetting collections | (8,192) | 0 | (8,192) |
| Distributed offsetting receipts | (16,040) | 0 | (16,040) |
| **Net Outlays** | **$ 436,070** | **$ 0** | **$ 436,070** |

*The accompanying notes are an integral part of these financial statements.*



### STATEMENTS OF CUSTODIAL ACTIVITY
For the Years Ended September 30, 2008 and 2007
*(In Millions)*

| | 2008 | 2007 |
|---|---|---|
| **Sources of Custodial Revenue** *(Note 21)*: | | |
| **Revenue Received** | | |
| Individual Income and FICA Taxes | $  2,294,326 | $  2,201,464 |
| Corporate Income Taxes | 354,063 | 395,320 |
| Estate and Gift Taxes | 29,824 | 26,978 |
| Excise Taxes | 66,293 | 67,766 |
| Railroad Retirement Taxes | 4,939 | 4,718 |
| Unemployment Taxes | 7,331 | 7,416 |
| Deposit of Earnings, Federal Reserve System | 33,598 | 32,043 |
| Fines, Penalties, Interest and Other Revenue | 2,233 | 3,084 |
| **Total Revenue Received** | $  2,792,607 | $  2,738,789 |
| | | |
| Less Refunds | (426,074) | (292,684) |
| **Net Revenue Received** | $  2,366,533 | $  2,446,105 |
| | | |
| Accrual Adjustment | 3,132 | 5,588 |
| **Total Custodial Revenue** | $  2,369,665 | $  2,451,693 |
| | | |
| **Disposition of Custodial Revenue:** | | |
| Amounts Provided to Fund Non-Federal Entities | 407 | 486 |
| Amounts Provided to Fund the Federal Government *(Note 21)* | 2,366,126 | 2,445,619 |
| Accrual Adjustment | 3,132 | 5,588 |
| **Total Disposition of Custodial Revenue** | $  2,369,665 | $  2,451,693 |
| **Net Custodial Revenue** | $  0 | $  0 |

*The accompanying notes are an integral part of these financial statements.*

# NOTES TO THE FINANCIAL STATEMENTS

## TABLE OF CONTENTS

*Note #*

1. Summary of Significant Accounting Policies ........................................... 148
2. Fund Balance .......................................................................... 158
3. Loans, Interest Receivable and Credit Program Receivables - Mortgage Backed Securities ............................................................ 160
4. Due from the General Fund and Due to the General Fund........................... 164
5. Cash, Foreign Currency, and Other Monetary Assets ................................ 165
6. Gold and Silver Reserves, and Gold Certificates Issued to Federal Reserve Banks ........ 168
7. Investments and Related Interest....................................................... 169
8. Reserve Position in the International Monetary Fund ................................. 170
9. Investments in International Financial Institutions ................................... 172
10. Accounts Receivable and Related Interest ........................................... 173
11. Inventory and Related Property, Net ................................................. 174
12. Property, Plant, and Equipment, Net ................................................ 175
13. Non-Entity Assets..................................................................... 176
14. Federal Debt and Interest Payable.................................................... 177
15. D.C. Pensions and Judiciary Retirement Actuarial Liability ....................... 180
16. Commitments and Contingencies .................................................... 182
17. Liabilities ............................................................................. 185
18. Net Position ........................................................................... 187
19. Consolidated Statement of Net Cost and Net Costs of Treasury Sub-organizations ........ 188
20. Additional Information Related to the Combined Statements of Budgetary Resources ...... 194
21. Collection and Disposition of Custodial Revenue.................................... 197
22. Earmarked Funds ..................................................................... 199
23. Reconciliation of Net Cost of Operations to Budget ................................ 204
24. Special Programs with Government Sponsored Enterprises (GSE) .................. 205
25. Temporary Guarantee Program for Money Market Funds ........................... 208
26. Subsequent Events .................................................................... 209
    *Required Supplemental Information (Unaudited)*................................... 211

# 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

## A. Reporting Entity

The accompanying financial statements include the operations of the U.S. Department of the Treasury (Treasury Department), one of 24 CFO Act agencies of the Executive Branch of the United States Government, and certain custodial activities managed on behalf of the entire U.S. Government. The following paragraphs describe the activities of the reporting entity.

The Treasury Department was created by Act (1 Stat.65) on September 2, 1789. Many subsequent acts affected the development of the Treasury Department, delegating new duties to its charge and establishing the numerous bureaus and divisions that now comprise the Treasury Department. As a major policy advisor to the President, the Secretary has primary responsibility for formulating and managing the domestic and international tax and financial policies of the U.S. Government.

Further, the Secretary is responsible for recommending and implementing United States domestic and international economic and fiscal policy; governing the fiscal operations of the government; maintaining foreign assets control; managing the federal debt; collecting income and excise taxes; representing the United States on international monetary, trade, and investment issues; overseeing Departmental overseas operations; and directing the manufacturing of coins, currency, and other products for customer agencies and the public.

In September 2008, the Treasury Department began a number of emergency economic measures relating to the economy which involved various financing programs. Key initiatives effective for fiscal year 2008 involved programs concerning two Government Sponsored Enterprises (GSE), provision of a credit facility for GSEs and Federal Home Loan Banks, purchase of Mortgage Backed Securities, and setup of a Money Market Insurance Program (Notes 24 and 25).

The Treasury Department includes the Departmental Offices (DO) and nine operating bureaus. For financial reporting purposes, DO is comprised of: International Assistance Programs (IAP), Office of Inspector General (OIG), Treasury Forfeiture Fund (TFF), Exchange Stabilization Fund (ESF), Community Development Financial Institutions Fund (CDFI), Office of D.C. Pensions (DCP), Treasury Inspector General for Tax Administration (TIGTA), Federal Financing Bank (FFB), and the DO policy offices. In addition, the Air Transportation Stabilization Board (ATSB) was also part of the DO reporting entity for the year ended September 30, 2007. The ATSB was set up to administer the temporary emergency program to assist air carriers that were in need of funds as a result of the terrorist attacks on the United States that occurred on September 11, 2001. The ATSB program was terminated at September 30, 2007. To close out its remaining budgetary resources during fiscal year 2008, ATSB returned $3.5 million of unexpended appropriations to the General Fund of the United States. In fiscal year 2008 the management of the Treasury Franchise Fund was transferred from the Departmental Offices (DO) to the Bureau of the Public Debt (BPD).

The nine operating bureaus are: Office of the Comptroller of the Currency (OCC); Bureau of Engraving and Printing (BEP); Financial Crimes Enforcement Network (FinCEN); Financial Management Service (FMS); Internal Revenue Service (IRS); U.S. Mint (Mint); Bureau of the Public Debt (BPD); Office of Thrift Supervision (OTS); and the Alcohol and Tobacco Tax and Trade Bureau (TTB).

The Treasury Department's financial statements reflect the reporting of its own entity activities, which include appropriations it receives to conduct its operations and revenue generated from those operations. They also reflect the

reporting of certain non-entity (custodial) functions it performs on behalf of the U.S. Government and others. Non-entity activities include collecting of federal revenue, servicing the federal debt, disbursing certain federal funds, and maintaining certain assets and liabilities for the U.S. Government, as well as for others. The Treasury Department's reporting entity does not include the "General Fund" of the U.S. Government, which maintains receipt, disbursement, and appropriation accounts for all federal agencies.

Transactions and balances among the Treasury Department's entities have been eliminated from the Consolidated Balance Sheets, the Consolidated Statements of Net Cost, and the Consolidated Statements of Changes in Net Position.

## B. Basis of Accounting and Presentation

The financial statements have been prepared from the accounting records of the Treasury Department in conformity with accounting principles generally accepted in the United States for federal entities, and the Office of Management and Budget (OMB) Circular A-136, *Financial Reporting Requirements,* as amended. Accounting principles generally accepted for federal entities are the standards prescribed by the Federal Accounting Standards Advisory Board (FASAB). FASAB is recognized by the American Institute of Certified Public Accountants as the official accounting standards-setting body of the U.S. Government.

These financial statements are provided to meet the requirements of the Government Management Reform Act of 1994. They consist of the Consolidated Balance Sheets, the Consolidated Statements of Net Cost, and the Consolidated Statements of Changes in Net Position, the Combined Statements of Budgetary Resources, and the Statements of Custodial Activity. The statements and the related notes are prepared in a comparative form to present both fiscal year 2008 and fiscal year 2007 information.

While these financial statements have been prepared from the books and records of the Treasury Department in accordance with the formats prescribed by OMB, these financial statements are in addition to the financial reports used to monitor and control budgetary resources which are prepared from the same books and records.

Throughout these financial statements, intra-governmental assets, liabilities, earned revenues, and costs have been classified according to the entity for these transactions. Intra-governmental assets and liabilities are those from or to other federal entities. Intra-governmental earned revenues are collections or accruals of revenue from other federal entities, and intra-governmental costs are payments or accruals of expenditure to other federal entities.

The financial statements should be read with the realization that they are for a component of a sovereign entity, that liabilities not covered by budgetary resources cannot be liquidated without the enactment of an appropriation, and that the payment of all liabilities other than for contracts can be abrogated by the sovereign entity.

## C. Tax and Other Non-Entity Receivables

Tax receivables are not accrued until related tax returns are filed or assessments are made. Prepayments of taxes are netted against liabilities. Accruals are made to reflect penalties and interest on tax receivables through the balance sheet date. Tax receivables consist of unpaid assessments (taxes and associated penalties and interest) due from taxpayers for which the Treasury Department can support the existence of a receivable through taxpayer agreement, such as filing a tax return without sufficient payment, or a court ruling in favor of the Treasury Department. Tax receivables are shown on the balance sheet net of an allowance for doubtful accounts and abatements. The allowance for doubtful accounts reflects an estimate of the portion deemed to be uncollectible based on historical experience of similar taxes receivable.

## D. Inventory and Related Property

Inventories and related property include inventory, operating materials and supplies, and forfeited property. The Treasury Department values inventories at either standard cost or lower of cost or latest acquisition cost except for finished goods inventories, which are valued at weighted average unit cost. All operating materials and supplies are recorded as an expense when consumed in operations.

Forfeited property is recorded at estimated fair market value at the time of seizure as deferred revenue, and may be adjusted to reflect the current fair market value at the end of the fiscal year. Property forfeited in satisfaction of a taxpayer's assessed liability is recorded when title to the property passes to the U.S. Government and a corresponding credit is made to the related taxes receivable. Direct and indirect holding costs are not capitalized for individual forfeited assets.

Mortgages and claims on forfeited assets are recognized as a valuation allowance and a reduction of deferred revenue from forfeited assets when the asset is forfeited. The allowance includes mortgages and claims on forfeited property held for sale and a minimal amount of claims on forfeited property previously sold. Revenue from the forfeiture of property is deferred until the property is sold or transferred to a state, local or federal agency. Revenue is not recognized if the forfeited property is ultimately destroyed or cannot be legally sold.

## E. Loans and Interest Receivable – Entity and Non-Entity

Intra-governmental entity Loans and Interest Receivable from other federal agencies represent loans and interest receivable held by the Treasury Department. No subsidy costs were recorded for loans purchased from federal agencies or for guaranteed loans made to non-federal borrowers, because these are guaranteed (interest and principal) by those agencies.

Intra-governmental non-entity Loans and Interest Receivable from other federal agencies represent loans issued by the Treasury Department to federal agencies on behalf of the U.S. Government. The Treasury Department acts as an intermediary issuing these loans, because the agencies receiving these loans will lend these funds to others to carry out various programs of the Federal Government. Because of the Treasury Department's intermediary role in issuing these loans, the Treasury Department does not record an allowance or subsidy costs related to these loans. Instead, loan loss allowances and subsidy costs are recognized by the ultimate lender, the federal agency that issued the loans.

## F. Advances to the Black Lung Trust Fund

Advances have been provided to the Department of Labor's Black Lung Trust Fund from the General Fund of the U.S. Government. The Bureau of the Public Debt accounts for the advances on behalf of the General Fund of the U.S. Government. Advances to the Black Lung Trust Fund are being accounted for pursuant to the Benefits Revenue Act which states: "In the event that fund resources are not adequate to meet fund obligations, then, advances of interest and principal are paid to the General Fund of the U.S. Government when the Secretary of the Treasury determines that funds are available in the trust fund for such purposes." The advance to the Black Lung Trust Fund is repayable with interest at a rate determined by the Secretary of the Treasury to be equal to the current average market yield on outstanding marketable obligations of the United States with remaining periods to maturity comparable to the anticipated period during which the advance will be outstanding. Advances made prior to 1982 carried rates of interest equal to the average rate borne by all marketable interest-bearing obligations of the United States then forming a part of the public debt.

These advances were retired on October 7, 2008, under the refinancing agreement authorized by the enactment of the Energy Improvement and Extension Act of 2008 on October 3, 2008. The Act gave authority to the Black Lung Disability Trust Fund to issue obligations to the Secretary of the Treasury and gave authority to the Secretary of the Treasury to purchase the obligations. The repayable advances were retired with the proceeds from these obligations as a one time appropriation to the Trust Fund (Note 26).

## G. Property, Plant, and Equipment

Property, plant, and equipment (PP&E) is composed of capital assets used in providing goods or services. It also includes assets acquired through capital leases, which are initially recorded at the amount recognized as a liability for the capital lease at its inception. PP&E is stated at full cost, including costs related to acquisition, delivery, and installation, less accumulated depreciation. Major alterations and renovations including leasehold and land improvements are capitalized, while maintenance and repair costs are charged to expenses as incurred.

Internal use software encompasses software design, development, and testing of projects adding significant new functionality and long-term benefits. Costs for developing internal use software are accumulated in work in development until a project is placed into service, and testing and final acceptance are successfully completed. Once completed, the costs are transferred to depreciable property.

Costs for construction projects are recorded as construction-in-progress until completed, and are valued at actual (direct) cost, plus applied overhead and other indirect costs.

The Treasury Department leases land and buildings from the General Services Administration (GSA) to conduct most of its operations. GSA charges a standard level users fee which approximates commercial rental rates for similar properties. Therefore, GSA-owned properties are not included in the Department's PP&E.

The Treasury Department's bureaus are diverse both in size and in operating environment. Accordingly, the Department's capitalization policy provides minimum capitalization thresholds which range from $25,000 to $50,000. The Treasury Department also uses a capitalization threshold range for bulk purchases: $250,000 to $500,000 for non-manufacturing bureaus and $25,000 to $50,000 for manufacturing bureaus. Bureaus determine the individual items that comprise bulk purchases. In addition, Treasury bureaus may expense bulk purchases if they conclude that total period costs would not be materially distorted and the cost of capitalization is not economically feasible.

Depreciation is expensed on a straight-line basis over the estimated useful life of the asset with the exception of leasehold improvements, which are depreciated over the useful life of the lease or the useful life of the improvement, whichever is shorter. Service life ranges are high due to the Treasury Department's diversity of PP&E. Construction in progress and internal use software in development are not depreciated.

The Treasury Department owns the Treasury building — a multi-use heritage asset. Multi-use heritage assets are assets of historical significance for which the predominant use is general government operations. All acquisition, reconstruction, and betterment costs for the Treasury Department building are capitalized as general PP&E and depreciated over their service life.

## H. Federal Debt

Debt and associated interest are reported on the accrual basis of accounting. Interest costs are recorded as expenses when incurred, instead of when paid. Certain Treasury securities are issued at a discount or premium. These discounts and premiums are amortized over the term of the security using an interest method for all long term securities and the straight line method for short term securities. The Department of the Treasury also issues Treasury Inflation-Protected Securities (TIPS). The principal for TIPS is adjusted daily over the life of the security based on the Consumer Price Index for all Urban Consumers.

## I. Pension Costs, Other Retirement Benefits, and Other Post Employment Benefits

The Treasury Department recognizes the full costs of its employees' pension benefits. However, the liabilities associated with these costs are recognized by the Office of Personnel Management (OPM) rather than the Treasury Department.

Most employees of the Treasury Department hired prior to January 1, 1984, participate in the Civil Service Retirement System (CSRS), to which the Treasury Department contributes 8.51 percent of salaries for regular CSRS employees.

On January 1, 1987, the Federal Employees' Retirement System (FERS) went into effect pursuant to Public Law 99-335. Employees hired after December 31, 1983, are automatically covered by FERS and Social Security. A primary feature of FERS is that it offers a savings plan to which the Treasury Department automatically contributes one percent of base pay and matches any employee contributions up to an additional four percent of base pay. For most employees hired after December 31, 1983, the Treasury Department also contributes the employer's matching share for Social Security. For the FERS basic benefit the Treasury Department contributes 11.2 percent for regular FERS employees.

Similar to federal retirement plans, OPM, rather than the Treasury Department, reports the liability for future payments to retired employees who participate in the Federal Employees Health Benefits Program (FEHBP) and Federal Employees Group Life Insurance (FEGLI) Program. The Treasury Department reports the full cost of providing other retirement benefits (ORB). The Treasury Department also recognizes an expense and liability for other post employment benefits (OPEB), which includes all types of benefits provided to former or inactive (but not retired) employees, their beneficiaries, and covered dependents. Additionally, the Treasury bureaus, OCC and OTS, separately sponsor certain benefit plans for their employees. OCC sponsors a defined life insurance benefit plan for current and retired employees. Additionally, OTS provides certain health and life benefits for all retired employees that meet eligibility requirements.

## J. Special Drawing Rights (SDR) Certificates Issued to Federal Reserve Banks

The Exchange Stabilization Fund (ESF) was established for use by the Secretary of the Treasury to account for the purchase or sale of foreign currencies, to hold U.S. foreign exchange and Special Drawing Rights (SDR) assets, and to provide financing to foreign governments. SDR transactions of the ESF require the explicit authorization of the Secretary of the Treasury. The Special Drawing Rights Act of 1968 authorized the Secretary of the Treasury to issue certificates, not to exceed the value of SDR holdings, to the Federal Reserve Banks in return for interest free dollar amounts equal to the face value of certificates issued. The certificates may be issued to finance the acquisition of SDR from other countries or to provide resources for financing other ESF operations. Certificates issued are to be redeemed by the Treasury Department at such times and in such amounts as the Secretary of the Treasury may deter-

mine. Certificates issued to Federal Reserve Banks are stated at their face value. It is not practical to estimate the fair value of Certificates Issued to Federal Reserve Banks since these certificates contain no specific terms of repayment.

## K. Federal Employee Benefits Payable - FECA Actuarial Liability

The Federal Employees' Compensation Act (FECA) provides income and medical cost protection to covered Federal civilian employees injured on the job, and employees who have incurred a work-related injury or occupational disease. These future workers' compensation estimates were generated from an application of actuarial procedures developed to estimate the liability for FECA benefits. The actuarial liability estimates for FECA benefits include the expected liability for death, disability, medical, and miscellaneous costs for approved compensation cases.

## L. Revenue and Financing Sources

Treasury Department activities are financed either through exchange revenue it receives from others or through non-exchange revenue and financing sources (such as appropriations provided by the Congress and penalties, fines, and certain user fees collected). User fees primarily include Internal Revenue Service reimbursable costs to process installment agreements and accompanying photocopy and reproduction charges. Exchange revenues are recognized when earned; *i.e.*, goods have been delivered or services have been rendered. Non-exchange revenues are recognized when received by the respective Treasury Department collecting bureau. Appropriations used are recognized as financing sources when related expenses are incurred or assets are purchased. Revenue from reimbursable agreements is recognized when the services are provided. The Treasury Department also incurs certain costs that are paid in total or in part by other federal entities, such as pension costs. These subsidized costs are recognized on the Consolidated Statement of Net Cost, and the imputed financing for these costs is recognized on the Consolidated Statement of Changes in Net Position. As a result, there is no effect on net position. Other non-exchange financing sources such as donations and transfers of assets without reimbursements also are recognized for the period in which they occurred on the Consolidated Statement of Changes in Net Position.

The Treasury Department recognizes revenue it receives from disposition of forfeited property as non-exchange revenue on the Consolidated Statement of Changes in Net Position. The costs related to the forfeiture fund program are reported on the Consolidated Statement of Net Cost.

## M. Custodial Revenues and Collections

Non-entity revenue reported on the Treasury Department's Statement of Custodial Activity includes cash collected by the Treasury Department, primarily taxes. It does not include revenue collected by other federal agencies, such as user fees and other receipts, which are remitted for general operating purposes of the U.S. Government or are earmarked for certain trust funds. The Statements of Custodial Activity is presented on the "modified accrual basis." Revenues are recognized as cash is collected. The "accrual adjustment" is the net increase or decrease, during the reporting period, in net revenue related-assets and liabilities, mainly taxes receivable. The Balance Sheets include an estimated amount for taxes receivable and payable to the General Fund of the U.S. Government at September 30, 2008 and September 30, 2007.

## N. Tax Assessments and Abatements

Under Internal Revenue Code Section 6201, the Treasury Department is authorized and required to make inquiries, determinations, and assessments of all taxes which have not been duly paid (including interest, additions to the tax, and assessable penalties) under the law. Unpaid assessments result from taxpayers filing returns without sufficient

payment, as well as from tax compliance programs, such as examination, under-reporter, substitute for return, and combined annual wage reporting. The Treasury Department also has authority to abate the paid or unpaid portion of an assessed tax, interest, and penalty. Abatements occur for a number of reasons and are a normal part of the tax administration process. Abatements may result in claims for refunds or a reduction of the unpaid assessed amount.

## O. Permanent and Indefinite Appropriations

Permanent and indefinite appropriations are used to disburse tax refunds, income tax credits, and child tax credits. These appropriations are not subject to budgetary ceilings established by Congress. Therefore, refunds payable at year end are not subject to funding restrictions. Refund payment funding is recognized as appropriations are used. Permanent indefinite authority for refund activity is not stated as a specific amount and is available for an indefinite period of time. Although funded through appropriations, refund activity, in most instances, is reported as a custodial activity of the Treasury Department, since refunds are, in substance, a custodial revenue-related activity resulting from taxpayer overpayments of their tax liabilities.

The Treasury Department also receives two permanent and indefinite appropriations related to debt activity. One is used to pay interest on the public debt securities; the other is used to redeem securities that have matured, been called, or are eligible for early redemption. These accounts are not annual appropriations; and do not have refunds. Debt activity appropriations are related to the Treasury Department's liability and would be reported on the Treasury Department's Balance Sheet. Permanent indefinite authority for debt activity is available for an indefinite period of time.

Additionally, the Treasury Department receives other permanent and indefinite appropriations to make certain payments on behalf of the U.S. Government. These appropriations are provided to make payments to the Federal Reserve for services provided. They also include appropriations provided to make other disbursements on behalf of the U.S. Government, including payments made to various parties as the result of certain claims and judgments rendered against the United States.

## P. Income Taxes

As an agency of the Federal Government, the Treasury Department is exempt from all income taxes imposed by any governing body, whether it is a federal, state, commonwealth, local, or foreign government.

## Q. Use of Estimates

The Treasury Department has made certain estimates and assumptions relating to the reporting of assets, liabilities, revenues, expenses, and the disclosure of contingent liabilities to prepare these financial statements. Actual results could differ from these estimates. Major items subject to estimates include loan receivables (including Mortgage Backed Securities); investments in non-federal securities (including Freddie Mac and Fannie Mae); taxes receivables; depreciation; money market insurance liability; liability for liquidity commitment (Freddie Mac and Fannie Mae); imputed costs; actuarial liabilities; cost and earned revenue allocations; contingent legal liabilities; and credit reform subsidy costs (Notes 3 and 24).

The Treasury recognizes the sensitivity of credit reform modeling to slight changes in some model assumptions and uses continual review of model factors, statistical modeling, and annual re-estimates to reflect the most accurate cost of the credit programs to the U.S. Government. Two of the emergency economic programs that Treasury implemented in the latter part of September 2008, the purchase program for Mortgage Backed Securities (MBS) and the Government

Sponsored Enterprise credit line facility , both operate under the provisions of credit reform and the use of estimates as dictated by the Federal Credit Reform Act (Notes 3 and 24). Further, the assumptions underlying the estimated future liquidity payments to the GSE's are subject to a high level of market volatility, such that actual future payments may differ significantly from current estimates due to changing circumstances. The Troubled Asset Relief Program described further in subsequent event Note 26 will also require the use of sophisticated estimates.

The Treasury used the following methodologies for valuation of the investment in GSE:

**Common Stock Warrants:** The Black-Scholes Option Model (1973) was used to affirm that the value of the warrants is insensitive to the usual option input variables, including time to expiration and stock volatility, and that the value per warrant share is nominally less than the trading price at September 30, 2008.

**Senior Preferred Stock:** These shares were valued based on an interpolation of market prices during the five trading days prior to the announcement of the Keepwell Agreement for (i) Fannie Mae and Freddie Mac subordinated debt, as adjusted for the tax advantages of stock dividends compared with taxable interest, and (ii) Fannie Mae and Freddie Mac preferred stock.

## R. Credit Risk

Credit risk is the potential, no matter how remote, for financial loss from a failure of a borrower or a counter party to perform in accordance with underlying contractual obligations. The Treasury Department takes on possible credit risk when it makes direct loans or credits to foreign entities or becomes exposed to institutions which engage in financial transactions with foreign countries. Given the history of the Treasury Department with respect to such exposure and the financial policies in place in the U. S. Government and other institutions in which the United States participates, the Treasury Department expectations of credit losses is nominal.

The Treasury Department also takes on credit risk related to committed but undisbursed direct loans, its liquidity commitment to Government Sponsored Enterprises, its mortgage-backed securities portfolio, its insurance of non-FDIC insured money market funds, and its Terrorism Risk Insurance Program. Except for the Terrorism Risk Insurance Program, these activities focus on the underlying problems in the credit markets, and the ongoing turbulence in those markets exposes the Department to potential costs and losses. The extent of the risk assumed by the Treasury Department is described in more detail in the notes to the financial statements, and where applicable factored into credit reform models.

## S. Earmarked Funds

Treasury has accounted for revenues and other financing sources for earmarked funds separately from other funds. This method was adopted in accordance with the provisions of the Federal Accounting Standards Advisory Board's Statement of Federal Financial Accounting Standards (SFFAS) No. 27, *Identifying and Reporting Earmarked Funds*, which became effective October 1, 2007. This standard amended SFFAS No. 7, *Revenue and Other Financing Sources*, by:

- Elaborating the special accountability needs associated with dedicated collections;
- Separating dedicated collections into two categories – earmarked funds and fiduciary activity; and
- Defining, and providing accounting and reporting guidance for earmarked funds.

Earmarked funds are financed by specifically identified revenues, often supplemented by other financing sources, which remain available over time. These specifically identified revenues and other financing sources are required by statute to be used for designated activities or purposes. SSFAS No. 27 defines the following three criteria for deter-

mining an earmarked fund: (1) A statute committing the Federal Government to use specifically identified revenues and other financing sources not used in the current period for future use to finance the designated activities, benefits, or purposes; (2) Explicit authority for the earmarked fund to retain revenues and other financing sources not used in the current period for future use to finance the designated activities, benefits, or purposes; and (3) A requirement to account for and report on the receipt, use, and retention of the revenues and other financing sources that distinguished the earmarked fund from the Federal Government's general revenues.

## T.  Allocation Transfers

The Treasury Department is a party to allocation transfers with other federal agencies as both a transferring (parent) entity and/or a receiving (child) entity. Allocation transfers are legal delegations by one department of its authority to obligate budget authority and outlay funds to another department. A separate fund account (allocation account) is created in the U.S. Treasury as a subset of the parent fund account for tracking and reporting purposes. All allocation transfers of balances are credited to this account, and subsequent obligations and outlays incurred by the child entity are charged to this allocation account as they execute the delegated activity on behalf of the parent. Beginning in fiscal year 2007, parent federal agencies report both the proprietary and budgetary activity and the child agency does not report any financial activity related to budget authority allocated from the parent federal agency to the child federal agency. The Treasury Department had no significant allocation transfers to report in fiscal years 2008 and 2007.

The Treasury Department allocates funds, as the parent, to the Department of Energy. OMB allows certain exceptions to allocation reporting for certain funds. Accordingly, the Treasury Department has reported certain funds for which the Treasury Department is the child in the allocation transfer, but in compliance with OMB Circular No. A-136 (see II.4.2 question 5 for three exceptions), will report all activities relative to these allocation transfers in the Treasury Department's financial statements. The Treasury Department receives allocation transfers, as the child, from the Agency for International Development.

## U.  Credit Reform Accounting

The authoritative guidance for the credit reform portion of these statements are contained primarily in SFFAS No. 2, *Accounting for Direct Loans and Loan Guarantees,* as amended by SFFAS No. 18, *Amendments to Accounting Standards for Direct Loans and Loan Guarantees,* SFFAS No. 19, *Technical Amendments to Accounting Standards for Direct Loans and Loan Guarantees.* This guidance was promulgated as a result of the Federal Credit Reform Act (FCRA) of 1990.

The FCRA requires that the ultimate costs of a credit program be calculated, and the budgetary resources obtained, before the direct loan obligations are incurred. The cost of loan guarantee programs is the net present value of the estimated future cash flows from payments (for claims, interest rate subsidies). The primary purpose of the FCRA, which became effective on October 1, 1991, is to more accurately measure the cost of federal credit programs and to place the cost of such credit programs on a basis equivalent with other federal spending.

SFFAS No. 2, which generally mirrors the requirements of the FCRA, established guidance for estimating the cost of direct and guaranteed loan programs, as well as for recording direct loans and liability for loan guarantees for financial reporting purposes. SFFAS No. 2 states that the actual and expected costs of federal credit programs should be fully recognized in both budgetary and financial reporting. To accomplish this, agencies first predict or estimate the future performance of direct and guaranteed loans when preparing their annual budgets. The data used for these budgetary estimates are re-estimated after the fiscal year-end to reflect changes in actual loan performance and actual interest

rates in effect when the loans were issued. The re-estimate data are then used to report the cost of the loans disbursed under the direct or guaranteed loan program as a "Program Cost" in the agencies' Statement of Net Cost.

The FCRA establishes budgetary and financing control for each credit program through the use of the program, financing and negative subsidy receipt accounts for direct loans obligated after September 30, 1991. The FCRA establishes the use of the program, financing, and general fund receipt for direct loans obligated after September 30, 1991 (Credit Reform). These accounts are classified as either budgetary or non-budgetary in the Combined Statements of Budgetary Resources. The budgetary accounts include the program accounts and receipt accounts. The non-budgetary accounts consist of the credit reform financing accounts.

The program account is a budget account that receives and obligates appropriations to cover the subsidy cost of a direct loan or guarantee and disburses the subsidy cost to the financing account. The program account also receives appropriations for administrative expenses. The financing account is a non-budgetary account that records all of the cash flows resulting from Credit Reform direct loans or loan guarantees. It disburses loans, collects repayments and fees, makes claim payments, holds balances, borrows from U.S. Treasury Bureau of the Public Debt, earns or pays interest, and receives the subsidy cost payment from the program account.

The general fund receipt account is a budget account used for the receipt of amounts paid from the financing account when there is a negative subsidy from the original estimate or a downward re-estimate. In most cases, the receipt account is a general fund receipt account and amounts are not earmarked for the credit program. They are available for appropriations only in the sense that all general fund receipts are available for appropriations. Any assets in this account are non-entity assets and are offset by intragovernmental liabilities. At the beginning of the following fiscal year, the fund balance in the general fund receipt account is transferred to the U.S. Government General Fund.

## V. Investments

Treasury records investments in non-federal financial securities at acquisition cost at the date of purchases in accordance with OMB A-136. Disclosure of market values are made as of year end and any permanent impairment is recorded.

NOTE 1.
SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

## 2. FUND BALANCE

Fund Balance with Treasury is the aggregate amount of the Treasury Department's accounts with the U.S. Government's central accounts from which the Treasury Department is authorized to make expenditures and pay liabilities. It is an asset because it represents the Treasury Department's claim to the U.S. Government's resources. Fund balance with Treasury is not equivalent to unexpended appropriations, because it also includes non-appropriated revolving and enterprise funds, suspense accounts, and custodial funds such as deposit funds, special funds, and trust funds.

*Fund Balances:* As of September 30, 2008 and September 30, 2007, fund balances consisted of the following (in millions):

|  | 2008 | 2007 |
|---|---|---|
| Appropriated Funds (see Note 24) | $ 272,561 | $ 72,897 |
| Revolving Funds | 1,837 | 912 |
| Trust Funds | 2 | 8 |
| Clearing Funds | 26 | 10 |
| Deposit Funds | 587 | 542 |
| Special Funds | 299 | 395 |
| Other Funds (Receipts and Suspense Funds) | 56 | 3 |
| **Total Fund Balances** | **$ 275,368** | **$ 74,767** |

As of September 30, 2008 and September 30, 2007, the status of fund balances consisted of the following (in millions):

| Status of Fund Balance with Treasury | 2008 | 2007 |
|---|---|---|
| Unobligated Balance – Available (see Note 24) | $ 242,939 | $ 17,843 |
| Unobligated Balance – Unavailable | 11,395 | 10,995 |
| Obligated Balance not yet Disbursed | 56,868 | 57,310 |
| **Subtotal** | **$ 311,202** | **$ 86,148** |
| Adjustment for Non-Budgetary Funds | 669 | 556 |
| Adjustment for Borrowing Authority | (29,810) | (5,716) |
| Adjustment for Intra-Treasury Investments | (5,530) | (5,280) |
| Adjustment for Imprest Funds | (4) | (4) |
| Adjustment for Other Budgetary Resources Not in Fund | | |
| Balance – Cash and Other Assets | (4,838) | (4,616) |
| Authority Unavailable for Obligation | 3,679 | 3,679 |
| **Total Status of Fund Balance** | **$ 275,368** | **$ 74,767** |

For ESF, the above balances only include unobligated balances related to the ESF insurance program that began in fiscal year 2008. Otherwise, ESF does not have Fund Balance with Treasury. Accordingly, while other ESF balances are included on the Statement of Budgetary Resources (SBR), they are not a component of Fund Balance with Treasury. The ESF balances displayed on the SBR include components of cash, foreign currency, and other monetary assets (Note 5).

FINANCIAL REPORT

As of September 30, 2008 and September 30, 2007, the Treasury Department did not have any budgetary authority in Fund Balance with Treasury that was specifically withheld from apportionment by OMB. The balances in non-entity funds, such as deposit funds, are being held in a fiduciary capacity by the Treasury Department for the public or for another federal entity, such as the General Fund of the U.S. Government. Such funds have an offsetting liability equal to fund balance. See Note 8 regarding restrictions related to the line of credit held on the U.S. Quota in the International Monetary Fund.



NOTE 2.
FUND BALANCE

## 3. LOANS, INTEREST RECEIVABLE AND CREDIT PROGRAM RECEIVABLES - MORTGAGE BACKED SECURITIES

### Loans and Interest Receivable:

As of September 30, 2008 and September 30, 2007, intra-governmental loans (issued by the FFB) and interest receivable consisted of the following (in millions):

#### Entity Intra-governmental:

| | Loans Receivable | Interest Receivable | 2008 Total | Loans Receivable | Interest Receivable | 2007 Total |
|---|---|---|---|---|---|---|
| Executive Office of the President | $ 680 | $ 8 | $ 688 | $ 836 | $ 9 | $ 845 |
| Department of Agriculture | 26,326 | 50 | 26,376 | 25,604 | 300 | 25,904 |
| United States Postal Service | 7,200 | 1 | 7,201 | 4,200 | 3 | 4,203 |
| General Services Administration | 2,098 | 37 | 2,135 | 2,151 | 38 | 2,189 |
| Department of Housing and Urban Development | 691 | 84 | 775 | 791 | 96 | 887 |
| Department of Education | 338 | 3 | 341 | 315 | 4 | 319 |
| Department of Defense | 17 | 0 | 17 | 70 | 1 | 71 |
| National Credit Union Administration | 1,109 | 0 | 1,109 | 0 | 0 | 0 |
| Other Agencies | 18 | 0 | 18 | 25 | 1 | 26 |
| **Subtotal-Entity** | **$ 38,477** | **$ 183** | **$ 38,660** | **$ 33,992** | **$ 452** | **$ 34,444** |

The FFB issues the above loans to federal agencies for their own use or to private sector borrowers, whose loans are guaranteed by the federal agencies. When a federal agency has to honor its guarantee because a private sector borrower defaults, the federal agency that guaranteed the loan must obtain an appropriation or use other resources to repay the FFB. Loan principal and interest are backed by the full faith and credit of the U.S. Government, except for loans to the U.S. Postal Service. The FFB has not incurred and does not expect to incur any credit-related losses on its loans and accordingly, has not recorded an allowance for uncollectable intra-governmental loans.

#### Non-Entity Intra-governmental:

| | Loans Receivable | Interest Receivable | 2008 Total | Loans Receivable | Interest Receivable | 2007 Total |
|---|---|---|---|---|---|---|
| Department of Agriculture | $ 51,192 | $ 9 | $ 51,201 | $ 49,133 | $ 64 | $ 49,197 |
| Department of the Interior | 323 | 393 | 716 | 345 | 513 | 858 |
| Federal Communications Commission | 113 | 0 | 113 | 106 | 0 | 106 |
| Department of Veterans Affairs | 1,575 | 0 | 1,575 | 1,047 | 27 | 1,074 |
| Railroad Retirement Board | 3,096 | 69 | 3,165 | 2,945 | 73 | 3,018 |
| Small Business Administration | 9,463 | 0 | 9,463 | 11,366 | 0 | 11,366 |
| Department of Housing and Urban Development | 4,832 | 0 | 4,832 | 4,573 | 0 | 4,573 |
| Department of Energy | 2,186 | 20 | 2,206 | 2,241 | (8) | 2,233 |
| Department of Education | 128,331 | 0 | 128,331 | 103,973 | 0 | 103,973 |
| Export Import Bank of the U. S. | 2,929 | 0 | 2,929 | 4,364 | 0 | 4,364 |
| Department of Homeland Security | 17,360 | 359 | 17,719 | 17,787 | 367 | 18,154 |
| Other Agencies | 3,944 | 0 | 3,944 | 3,545 | 27 | 3,572 |
| **Subtotal Non-Entity** | **$ 225,344** | **$ 850** | **$ 226,194** | **$ 201,425** | **$ 1,063** | **$ 202,488** |
| **Total Intra-governmental Loans and Interest Receivable Entity and Non-Entity** | | | **$ 264,854** | | | **$ 236,932** |

BPD accounts for and reports on the principal borrowings from and repayments to the General Fund of the United States for approximately 80 funds managed by other federal agencies, as well as the related interest due to the General Fund. These agencies are statutorily authorized to borrow from the General Fund, through BPD, to make loans for a broad range of purposes, such as education, housing, farming, and small business support.

## Entity and Non-Entity Non-Federal:

As of September 30, 2008 and September 30, 2007, loans and interest receivable from non-federal entities consisted of the following (in millions):

|  | Entity | Non-entity | 2008 Total | Entity | Non-entity | 2007 Total |
|---|---|---|---|---|---|---|
| Direct Loans | $ 62 | $ 128 | $ 190 | $ 63 | $ 131 | $ 194 |
| Interest Receivable | 0 | 2 | 2 | 1 | 2 | 3 |
| Less: Allowance and Subsidy Cost | (20) | 0 | (20) | (22) | 0 | (22) |
| Total Non-Federal Loans and Related Interest Receivable | $ 42 | $ 130 | $ 172 | $ 42 | $ 133 | $ 175 |

Other amounts include certain loans and credits issued by the United States to various foreign governments. The agreements with each debtor government vary as to dates, interest rates, method of payment, and billing procedures. All such loans and credits represent legally valid and outstanding obligations of foreign governments, and the U.S. Government has not waived or renounced its rights with respect to any of them. The loans are due and payable in U.S. denominations.

# Credit Program Receivables

In fiscal year 2008, the Treasury Department began a program to support the availability of mortgage financing for millions of Americans and to mitigate pressures on mortgage rates. Under this program, Treasury purchases GSE MBS in the open market (note 24). This program is accounted for under credit reform accounting.

## MBS Purchase Program:

Congress granted Treasury authority to purchase mortgage-backed securities (MBS) issued by Government Sponsored Enterprises (GSEs) in the Housing and Economic Recovery Act of 2008. The authority expires on December 31, 2009. To promote stability in the mortgage market, Treasury's makes MBS purchases in the open market. GSE MBS are credit-guaranteed by the GSEs and Treasury plans to hold its portfolio of MBS to maturity unless, based on mortgage market conditions, sales are necessary. This program was implemented to help improve the availability of mortgage credit to American homebuyers and mitigate pressures on mortgage rates. By purchasing these securities, Treasury seeks to broaden access to mortgage funding for current and prospective homeowners as well as to promote market stability. The scale of the program will be based on developments in the capital markets and housing markets.

The MBS program is accounted for under the provisions of the Federal Credit Reform Act, section 13201 of the Omnibus Budget Reconciliation Act of 1990, P.L. No. 101-508, dated November 5, 1990. Treasury develops subsidy estimates, re-estimates, and rates based on anticipated cash flows from the purchases of MBS. Factors that impact these cash flows and the subsidy rate include the interest coupons on the securities, the discount or premium paid at the time of purchase, the speed of mortgage prepayments, and the probability of GSE failure. A positive subsidy reflects the cost to the Government of the program and a negative subsidy reflects earnings on the program. The

fiscal year 2008 GSE MBS subsidy rate was negative, indicating Treasury expects to earn a return on its investments in these securities.

As of September 30, 2008, the Treasury agent responsible for MBS purchases was in receipt of $1,689 million that was recorded as an advance which accounts for the increase, in other assets, in fiscal year 2008 to $1,714 million. This amount was to purchase MBS, however, the purchases were not made until after September 30, 2008.

## GSE Credit Facility program:

Congress granted Treasury authority to make credit available to GSE in the Housing and Economic Recovery Act of 2008. The GSE credit facility program (GSECF) will offer liquidity if needed until December 31, 2009. This will ensure credit availability to the GSEs and provide secured funding on an as needed basis under terms and conditions established by the Treasury Secretary to protect taxpayers. Fannie Mae, Freddie Mac, and the Federal Home Loan Banks are eligible to borrow under this program if needed. Funding will be provided directly by Treasury in exchange for eligible collateral from the GSEs which will be limited to guaranteed mortgage-backed securities issued by Freddie Mac and Fannie Mae as well as advances made by the Federal Home Loan Banks. All such assets pledged against loans will be accepted with appropriate collateral margins as determined by Treasury. Loan requests will require approval from Treasury and verification that adequate collateral has been pledged.

The GSECF program is accounted for under the provisions of the Federal Credit Reform Act, section 13201 of the Omnibus Budget Reconciliation Act of 1990, P.L. No. 101-508, dated November 5, 1990. Treasury develops subsidy estimates, re-estimates, and rates based on anticipated cash flows from the credit facility. Factors that impact these cash flows and the subsidy rate include the interest rate on loans and the probability of GSE failure. A positive subsidy reflects the cost to the Government of the program and a negative subsidy reflects earnings on the program. The GSECF was not utilized in fiscal year 2008 and no loans were made.

### Direct MBS Purchase Program and GSE Credit Facility Obligated *(in millions)*:

| Programs | Loan Receivable, Gross | Interest Receivable | Foreclosed Property | Allowance for Subsidy Cost (Present Value) | Value of Assets Related to Direct Loan |
|---|---|---|---|---|---|
| MBS | $ 3,311 | $ 0 | $ 0 | $ 74 | $ 3,385 |
| Credit Facility | 0 | 0 | 0 | 0 | 0 |
| **Total Obligated** | **$ 3,311** | **$ 0** | **$ 0** | **$ 74** | **$ 3,385** |

### Total amount of MBS purchases and GSE Credit Facility Disbursed *(in millions)*:

| Programs | Current Year |
|---|---|
| MBS | $ 3,311 |
| Credit Facility | 0 |
| **Total Obligated** | **$ 3,311** |

## Subsidy Expense Fiscal Year 2008 *(in millions)*:

| Programs | Interest Differential | | Defaults | | Fees and Other Collections | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| MBS | $ | (62) | $ | 8 | $ | 0 | $ | 0 | $ | (54) |
| Credit Facility | | 0 | | 0 | | 0 | | 0 | | 0 |
| **Total Subsidy Expense** | $ | **(62)** | $ | **8** | $ | **0** | $ | **0** | $ | **(54)** |

## Total MBS Purchases and GSE Credit Facility Subsidy Expense *(in millions)*:

| Programs | Fiscal Year 2008 | |
|---|---|---|
| MBS | $ | (54) |
| Credit Facility | | 0 |
| **Total** | $ | **(54)** |

## Subsidy Rates for MBS Purchases and GSE Credit Facility, Budget subsidy rates for programs in the current year cohorts *(in dollars)*:

| Programs | Interest Differential | | Defaults | | Fees and Other Collections | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| MBS, Cohort 2008 | $ | (1.86) | $ | 0.24 | $ | 0 | $ | 0 | $ | (1.62) |
| Credit Facility | | 0 | | 0 | | 0 | | 0 | | 0 |
| **Total Subsidy rates** | $ | **(1.86)** | $ | **0.24** | $ | **0** | $ | **0** | $ | **(1.62)** |

## Schedule for Reconciling Subsidy Cost Allowance Balances *(in millions)*:

| | | 2008 |
|---|---|---|
| **Beginning Balances, Changes, and Ending Balance** | | |
| Beginning Balance of the subsidy cost allowance | $ | 0 |
| Add: subsidy expense for disbursements: | | |
| (a) Interest rate differential cost | | (62) |
| (b) Default Costs (net of recoveries) | | 8 |
| (c) Fees and other collections | | 0 |
| (d) Other subsidy costs | | 0 |
| Total of the above subsidy expense components | | (54) |
| Adjustments: | | |
| (a) Loan Modifications | | 0 |
| (b) Fees received | | 0 |
| (c) Foreclosed property acquired | | 0 |
| (d) Loans written off | | 0 |
| (e) Subsidy allowance amortized | | (20) |
| Ending Balance subsidy cost allowance before re-estimates | | (74) |
| Add or subtract subsidy re-estimates by component: | | |
| (a) Interest rate re-estimate | | 0 |
| (b) Technical default re-estimate | | 0 |
| Total of the above re-estimate components | | 0 |
| **Ending balance of the subsidy cost allowance** | $ | **(74)** |

FHFA 0198

## 4. DUE FROM THE GENERAL FUND AND DUE TO THE GENERAL FUND

The Treasury Department is responsible for managing various assets and liabilities on behalf of the U.S. Government as a whole. Due from the General Fund represents amounts required to fund liabilities managed by Treasury on behalf of the U.S. Government. Liabilities managed by the Treasury Department are comprised primarily of the federal debt. Due to the General Fund represents assets held for the General Fund of the U.S. Government.

As of September 30, 2008 and September 30, 2007, Due from and Due to the General Fund, included the following non-entity assets and liabilities (in millions):

| Liabilities Requiring Funding from the General Fund: | | 2008 | | 2007 |
|---|---|---|---|---|
| Federal Debt and Interest Payable | $ | 5,812,694 | $ | 5,054,250 |
| Federal Debt and Interest Payable - Intra-governmental | | 4,262,414 | | 3,974,788 |
| Refunds Payable | | 3,076 | | 1,684 |
| Adjustment for Eliminated Liabilities | | 22,579 | | 21,902 |
| **Total Due from the General Fund** | $ | **10,100,763** | $ | **9,052,624** |
| | | | | |
| **Assets to be Distributed to the General Fund:** | | | | |
| Fund Balance | $ | 215 | $ | 222 |
| Advances to the Black Lung Trust Fund | | 10,484 | | 10,058 |
| Cash Held by the Treasury (Note 5) | | 364,594 | | 70,347 |
| Foreign Currency | | 31 | | 91 |
| Custodial Gold and Silver held by the U.S. Mint without certificates | | 25 | | 25 |
| Loans and Interest Receivable - Intra-governmental | | 226,194 | | 202,488 |
| Loans and Interest Receivable | | 130 | | 133 |
| Investments in GSEs (Note 24) | | 7,032 | | 0 |
| Accounts Receivable - Intra-governmental | | 372 | | 368 |
| Tax and Other Non-Entity Receivables | | 30,489 | | 27,395 |
| Miscellaneous Assets | | 12 | | 9 |
| Adjustment for Eliminated Assets | | 27,534 | | 17,837 |
| **Total Due to the General Fund** | $ | **667,112** | $ | **328,973** |

The Adjustment for Eliminated Intra-Treasury liabilities mainly represents investments in U.S. Government securities held by Treasury reporting entities that were eliminated against Federal Debt and Interest Payable. The Adjustment for Eliminated Intra-Treasury assets mainly represents loans and interest payable owed by reporting entities that are consolidated with Treasury, which were eliminated against Loans and Interest Receivable held by the Bureau of the Public Debt.

On the Balance Sheet, Treasury reported $30,878 million in Tax, Other, and Related Interest Receivables as of September 30, 2008 ($27,559 million as of September 30, 2007). However, only $30,489 million is reported as Due to the General Fund of the U.S. Government ($27,395 million as of September 30, 2007). The difference is attributable to the exclusion of amounts which will be paid to others outside the U.S. Government, and miscellaneous entity receivables (Note 10).

## 5. CASH, FOREIGN CURRENCY, AND OTHER MONETARY ASSETS

Cash, foreign currency, and other monetary assets held as of September 30, 2008 and September 30, 2007 were as follows (in millions):

| Entity: | 2008 | 2007 |
|---|---|---|
| Cash | $ 19 | $ 32 |
| Foreign Currency | 12,758 | 12,081 |
| Other Monetary Assets: | | |
| Special Drawing Rights | 9,464 | 9,363 |
| Other | 88 | 153 |
| **Subtotal - Entity** | **$ 22,329** | **$ 21,629** |
| | | |
| Non-Entity: | | |
| Operating Cash of the U.S. Government (see Note 24) | $ 364,273 | $ 69,701 |
| Foreign Currency | 31 | 91 |
| Miscellaneous Cash held by all Treasury sub-components | 637 | 909 |
| **Subtotal - Non-Entity** | **$ 364,941** | **$ 70,701** |
| **Total Cash, Foreign Currency, and Other Monetary Assets** | **$ 387,270** | **$ 92,330** |

Non-entity Operating Cash and Other Cash of the U.S. Government held by Treasury disclosed above consisted of the following (in millions):

| | 2008 | 2007 |
|---|---|---|
| Operating Cash of the U.S. Government | $ 39,209 | $ 69,797 |
| Operating Cash - Federal Reserve Account (see Note 24) | 332,480 | 5,539 |
| **Subtotal** | **$ 371,689** | **$ 75,336** |
| Outstanding Checks | (7,416) | (5,635) |
| **Total Operating Cash of the U.S. Government** | **364,273** | **69,701** |
| Other Cash | 386 | 700 |
| **Subtotal** | **364,659** | **70,401** |
| Amounts Due to the Public | (65) | (54) |
| **Total Cash Due to the General Fund (See Note 4)** | **$ 364,594** | **$ 70,347** |

### Entity

Entity cash, foreign currency, and other monetary assets primarily include Foreign Currency Denominated Assets (FCDA), Special Drawing Rights (SDR), and forfeited cash. SDR and FCDA are valued as of September 30, 2008 and September 30, 2007, using current exchange rates plus accrued interest, at September 30, 2008 and 2007. "Other" includes U.S. dollars restricted for use by the International Monetary Fund (IMF), which are maintained in two accounts at the Federal Reserve Bank of New York.

The foreign currency holdings are normally invested in interest bearing securities issued by or held through foreign governments or monetary authorities. FCDA with original maturities of three months or less, were valued at $9.3 billion as of September 30, 2008 ($7.6 billion as of September 30, 2007). Other FCDA with maturities greater than three months are also held. As of September 30, 2008, FCDA with maturities greater than three months were valued at $3.5 billion ($4.5 billion as of September 30, 2007).

The SDR are international reserve assets created by the IMF. It was created as a supplement to existing reserve assets and on several occasions SDR have been allocated by the IMF to members participating in the IMF's SDR department. The SDR value as reserve assets derive, essentially, from the commitments of participants to hold and accept SDR and to honor various obligations connected with their proper functioning as a reserve asset.

The Special Drawing Rights Act of 1968 authorizes the Secretary of the Treasury to issue certificates, not to exceed the value of SDR holdings, to the Federal Reserve Bank in return for interest free dollar amounts equal to the face value of certificates issued. The certificates may be issued for the purpose of financing the acquisition of SDR from other countries or to provide resources for the financing of the Treasury Department's ESF activities. Certificates issued are to be redeemed by the Treasury Department at such times and in such amounts as the Secretary of the Treasury may determine. As of September 30, 2008, the value of the certificates issued to Federal Reserve Banks amounted to $2.2 billion ($2.2 billion as of September 30, 2007).

On a daily basis, the IMF calculates the value of the SDR using the market value, in terms of the U.S. dollar, from the amounts of each of four freely usable weighted currencies, as defined by the IMF. These currencies are the U.S. dollar, the European euro, the Japanese yen, and the British pound sterling. Treasury's SDR holdings (assets resulting from various SDR related activities including remuneration received on interest earned on the U.S. reserve position – see Note 8) and allocations from the IMF (liabilities of the U.S. coming due only in the event of a liquidation of, or U.S. withdrawal from the SDR department of the IMF, or cancellation of SDR) are revalued monthly based on the SDR valuation rate calculated by the IMF.

Pursuant to the IMF Articles of Agreement, SDR allocated to or otherwise acquired by the United States are permanent resources unless:

    a. canceled by the Board of Governors based on an 85 percent majority decision of the total voting power of the Executive Board of the IMF

    b. the SDR Department of the IMF is liquidated

    c. the IMF is liquidated or

    d. the United States chooses to withdraw from the IMF or terminate its participation in the SDR Department.

Except for the payment of interest and charges on SDR allocations to the United States, the payment of the Treasury Department's commitment related to SDR allocations is conditional on events listed above, in which the United States has a substantial or controlling voice. Allocations of SDR were made on January 1, 1970, 1971, 1972, 1979, 1980, and 1981. Since 1981, the IMF has made no further allocations of SDR. As of September 30, 2008, the amount of SDR holdings of the United States was the equivalent of $ 9.4 billion and the amount of SDR allocations to the United States was the equivalent of $ 7.6 billion. As of September 30, 2007, the amount of SDR holdings of the United States was the equivalent of $ 9.3 billion and the amount of SDR allocations to the United States was the equivalent of $7.6 billion.

During fiscal year 2008, the Treasury Department received remuneration on the U.S. reserve position in the IMF, at the prevailing rates, in the amount of $59 million equivalent of SDR ($107 million equivalent of SDR during fiscal year 2007), and paid the General Fund of the Federal Government $0.01 million ($0.5 million in fiscal year 2007) in interest on these funds until they were transferred to the General Fund.

## Non-Entity

Non-entity cash, foreign currency, and other monetary assets include the Operating Cash of the U.S. Government, managed by the Treasury Department. Also included is foreign currency maintained by various U.S. and military disbursing offices. It also includes seized monetary instruments, undistributed cash, and offers in compromises which are maintained as the result of the Treasury Department's tax collecting responsibilities.

The Operating Cash of the U.S. Government represents balances from tax collections, other revenues, federal debt receipts, and other various receipts net of checks outstanding, which are held in the Federal Reserve Banks, foreign and domestic financial institutions, and in U.S. Treasury tax and loan accounts at commercial banks.

On September 18, 2008, the BPD began issuing specific cash management bills to fund the Supplementary Financing Program (SFP). The SFP is a temporary program that was announced by the Treasury Department and the Federal Reserve on September 17, 2008. The purpose of the program is to provide emergency cash for the Federal Reserve initiatives aimed at addressing the ongoing crisis in financial markets. As of September 30, 2008, there were a total of eight cash management bills outstanding that totaled $300 billion (Notes 14, 24, and 25).

Operating Cash of the U.S. Government is either insured (for balances up to $100,000), as of September 30, 2008, by the Federal Deposit Insurance Corporation (FDIC) or collateralized by securities pledged by the depository institutions and held by the Federal Reserve Banks, or through securities held under reverse repurchase agreements.

## 6. GOLD AND SILVER RESERVES, AND GOLD CERTIFICATES ISSUED TO FEDERAL RESERVE BANKS

The Treasury Department is responsible for safeguarding most of the U.S. Government's gold and silver reserves in accordance with 31 USC 5117. The consolidated Balance Sheets also reflect the value of the gold being held in the Federal Reserve Bank of New York (FRBNY).

Gold reserves being held by the Treasury Department are offset by a liability for gold certificates issued by the Secretary of the Treasury to the Federal Reserve as provided in 31 USC 5117. Since 1934, Gold Certificates have been issued in non-definitive or book-entry form to the Federal Reserve. The Treasury Department's liability incurred by issuing the Gold Certificates is limited to the gold being held by the Treasury Department at the legal standard value established by law. Upon issuance of Gold Certificates to the Federal Reserve, the proceeds from the certificates are deposited into the operating cash of the U.S. Government. All of the Treasury Department's certificates issued are payable to the Federal Reserve.

The deep storage gold and silver reserves are reported at the values stated in 31 U. S. C. § 5116 and § 5117 (statutory rates) which are $42.2222 per fine troy ounce (FTO) of gold and no less than $1.292929292 per FTO of silver. Accordingly, the silver is valued at $1.292929292 per FTO. The gold and silver reserves are in the custody of the U.S. Mint and FRBNY. The U.S. Mint holds gold and silver reserves without certificates (Note 4). As of September 30, 2008 and September 30, 2007, the gold and silver reserves consisted of the following (in millions):

| | FTOs | Statutory Rate | 9/30/08 Statutory Value | Market Rate | 9/30/08 Market Value |
|---|---|---|---|---|---|
| Gold | 248,046,116 | $ 42.2222 | $ 10,473 | $ 884.50 | $ 219,397 |
| Gold Held by Federal Reserve | 13,452,784 | 42.2222 | 568 | 884.50 | 11,899 |
| **Subtotal - Gold** | **261,498,900** | | **$ 11,041** | | **$ 231,296** |
| Silver | 16,000,000 | $ 1.292929292 | $ 21 | $ 12.96 | $ 207 |
| **Total Gold and Silver Reserves** | | | **$ 11,062** | | **$ 231,503** |

| | FTOs | Statutory Rate | 9/30/07 Statutory Value | Market Rate | 9/30/07 Market Value |
|---|---|---|---|---|---|
| Gold | 248,046,116 | $ 42.2222 | $ 10,473 | $ 743.00 | $ 184,298 |
| Gold Held by Federal Reserve | 13,452,784 | 42.2222 | 568 | 743.00 | 9,996 |
| **Subtotal - Gold** | **261,498,900** | | **$ 11,041** | | **$ 194,294** |
| Silver | 16,000,000 | $ 1.292929292 | $ 21 | $ 13.65 | $ 218 |
| **Total Gold and Silver Reserves** | | | **$ 11,062** | | **$ 194,512** |

# 7. INVESTMENTS AND RELATED INTEREST

Investments in U.S. Government securities held by Treasury Department entities have been eliminated against the federal debt liability for financial reporting purposes (Note 4). The ESF holds most of the Treasury Department's other investments. Securities that the Treasury Department has both the positive intent and ability to hold to maturity are classified as investment securities held to maturity and are carried at historical cost, adjusted for amortization of premiums and accretion of discounts. Foreign investment holdings are normally invested in interest bearing securities issued or held through foreign governments or monetary authorities (Note 5).

As of September 30, 2008 and September 30, 2007, entity investments in foreign investment holdings consisted of the following (in millions):

| Type of Investment | Cost/ Acquisition Value | Unamortized (Premium)/ Discount | Net Investment | Interest Receivable | 9/30/08 Investment Balance | 9/30/08 Market Value |
|---|---|---|---|---|---|---|
| Euro Bonds & Notes | $ 4,477 | $ 29 | $ 4,506 | $ 115 | $ 4,621 | $ 4,641 |
| Japanese Government Bonds | 5,908 | 3 | 5,911 | 11 | 5,922 | 5,935 |
| Other Investments | 39 | (6) | 33 | 0 | 33 | 33 |
| Total Non-Federal | $ 10,424 | $ 26 | $ 10,450 | $ 126 | $ 10,576 | $ 10,609 |

| Type of Investment | Cost/ Acquisition Value | Unamortized (Premium)/ Discount | Net Investment | Interest Receivable | 9/30/07 Investment Balance | 9/30/07 Market Value |
|---|---|---|---|---|---|---|
| Euro Bonds & Notes | $ 4,338 | $ 52 | $ 4,390 | $ 113 | $ 4,503 | $ 4,462 |
| Japanese Government Bonds | 5,520 | 9 | 5,529 | 8 | 5,537 | 5,538 |
| Other Investments | 40 | (6) | 34 | 0 | 34 | 34 |
| Total Non-Federal | $ 9,898 | $ 55 | $ 9,953 | $ 121 | $ 10,074 | $ 10,034 |

On September 7, 2008 the Treasury Department entered into senior preferred stock purchase agreements with each GSE. In exchange for entering into these agreements, Treasury Department initially received from each GSE: (1) 1,000,000 shares of non-voting variable liquidation preference senior preferred stock with a liquidation preference value of $1,000 per share and (2) warrants for the purchase at a nominal cost of 79.9 percent of common stock on a fully-diluted basis. The warrants expire on September 7, 2028 (Note 24). The GSE preferred stock and warrants for common stock were valued (Notes 1Q and 24) as of the initial date at cost of $7,032 million and also valued at September 30, 2008 at $12,374 million. As of September 30, 2008, GSE investments consisted of the following (in millions):

| GSE Investment | Cost/ Appraisal Value | Unamortized (Premium) Discount | Net Investment | Interest Receivable | 9/30/08 Investment Balance | 9/30/08 Appraisal Value |
|---|---|---|---|---|---|---|
| Fannie Mae Sr. Preferred Stock | $ 840 | $ 0 | $ 840 | $ 0 | $ 840 | $ 741 |
| Freddie Mac Sr. Preferred Stock | 824 | 0 | 824 | 0 | 824 | 727 |
| Fannie Mae Warrants Common Stock | 3,104 | 0 | 3,104 | 0 | 3,104 | 6,507 |
| Freddie Mac Warrants Common Stock | 2,264 | 0 | 2,264 | 0 | 2,264 | 4,399 |
| Total GSE Investment | $ 7,032 | $ 0 | $ 7,032 | $ 0 | $ 7,032 | $ 12,374 |

## 8. RESERVE POSITION IN THE INTERNATIONAL MONETARY FUND

The United States participates in the IMF through a quota subscription. Quota subscriptions are paid partly through the transfer of reserve assets, such as foreign currencies or SDR, which are international reserve currency assets created by the IMF, and partly by making domestic currency available as needed through a non-interest-bearing letter of credit. This letter of credit, issued by the Treasury Department and maintained by the FRBNY, represents the bulk of the IMF's holdings of dollars. Approximately one quarter of one percent of the U.S. quota is maintained in cash balances in an IMF account at FRBNY.

While resources for transactions between the IMF and the United States are appropriated, they do not result in net budgetary outlays. This is because U.S./IMF quota transactions constitute an exchange of monetary assets in which the United States receives an equal offsetting claim on the IMF in the form of an increase in the U.S. reserve position in the IMF, which is interest-bearing and can be drawn at any time for balance of payments needs. When the IMF draws dollars from the letter of credit to finance its operations and expenses, the drawing does not represent a net budget outlay on the part of the United States because there is a commensurate increase in the U.S. reserve position. When the IMF repays dollars to the United States, no net budget receipt results because the U.S. reserve position declines concurrently in an equal amount.

As of September 30, 2008 and 2007, the U.S. quota in the IMF was 37.1 billion SDR, valued at approximately $57.8 billion. The quota consisted of the following (in millions):

|  | 2008 | 2007 |
|---|---|---|
| Letter of Credit [1] | $ 53,012 | $ 53,212 |
| U.S. Dollars Held in Cash by the IMF [1] | 88 | 152 |
| Reserve Position [2] | 4,750 | 4,464 |
| **U.S. Quota in the IMF** | **$ 57,850** | **$ 57,828** |

[1] *This amount is included in entity appropriated funds under Note 2, Fund Balance with Treasury, and unexpended appropriations – Obligations/ Undelivered orders.*

[2] *This amount is included in the Cumulative Results of Operations.*

The U.S. reserve position is denominated in SDR, as is the U.S. quota. Consequently, fluctuations in the value of the dollar with respect to the SDR results in valuation changes in dollar terms for the U.S. reserve position in the IMF as well as the IMF letter of credit. The Treasury Department periodically adjusts these balances to maintain the SDR value of the U.S. quota and records the change as a deferred gain or loss in its cumulative results of operations. These adjustments, known as maintenance of value adjustments, are settled annually after the close of the IMF financial year on April 30. Such adjustments do not involve a flow of funds. At April 30, 2008, the annual settlement with the IMF resulting from the depreciation of the dollar against the SDR since April 30, 2007, called for an upward adjustment of the U.S. quota by $3.4 billion and a corresponding decrease to Unexpended Appropriations on the Statement of Changes in Net Position (At April 30, 2007, the depreciation of the dollar against the SDR since April 30, 2006, called for an upward adjustment of the U.S. quota by $1.793 billion and a corresponding decrease to Unexpended Appropriations.) The dollar balances shown above for the U.S. quota include accrued valuation adjustments. At September 30, 2008, the

Treasury Department recorded a net deferred valuation loss in the amount of $15.5 million for deferred maintenance of value adjustments needed at year end ($258.2 million valuation gain at September 30, 2007).

The United States earns "remuneration" (interest) on its reserve position in the IMF except for the portion of the reserve position originally paid in gold. Remuneration is paid quarterly and is calculated on the basis of the SDR interest rate. The SDR interest rate is a market-based interest rate determined on the basis of a weighted average of interest rates on short-term instruments in the markets of the currencies included in the SDR valuation basket. Payment of a portion of this remuneration is deferred as part of a mechanism for creditors and debtors to share the financial consequences of overdue obligations to the IMF, such as unpaid overdue interest, and to similarly share the burden of establishing any contingency accounts deemed necessary to reflect the possibility of non-repayment of relevant principal amounts. As overdue interest is paid, previously deferred remuneration corresponding to the creditors' share of the burden of earlier nonpayment is included in the next payment of remuneration. The deferred remuneration corresponding to the creditors' share of establishing the contingency accounts is usually paid when there are no longer any relevant overdue obligations or when the IMF Executive Board determines to pay the remuneration. There was no deduction in the remuneration paid by the IMF as a result of burden-sharing during fiscal years 2008 or 2007. For fiscal years 2008 and 2007, the Treasury Department received $59 million and $107 million as remuneration (Note 5).

In addition to quota subscriptions, the IMF maintains borrowing arrangements to supplement its resources in times of crisis when IMF liquidity is low. The United States currently participates in two such arrangements – the General Arrangements to Borrow (GAB) and the New Arrangements to Borrow (NAB). There were no U.S. loans outstanding under these arrangements in fiscal year 2008 and fiscal year 2007. The dollar equivalent of SDR $6.7 billion has been appropriated to finance U.S. participation in the GAB and NAB; as of September 30, 2008 and September 30, 2007, this amounted to $10.5 billion and $10.4 billion, respectively, in standing appropriations available for lending through the GAB or NAB as needed. As is the case for the U.S. quota in the IMF, budgetary treatment of U.S. participation in the GAB and NAB does not result in net budgetary outlays, since transactions under the GAB or NAB result in concurrent adjustments to the U.S. reserve position in the IMF.

Case: 1:13-mc-01288-RCL   Document 7-3   Filed 12/17/13   Page 46 of 170

## 9. INVESTMENTS IN INTERNATIONAL FINANCIAL INSTITUTIONS

The Treasury Department participates in Multilateral Development Banks (MDBs) to support poverty reduction, private sector development, and transition to market economies and sustainable economic growth and development, thereby advancing the United States' economic, political, and commercial interests abroad. The MDB consist of the World Bank Group (International Bank for Reconciliation and Development, International Finance Corporation, and Multilateral Investment Guarantee Agency), and five regional development banks (the African, Asian, European, Inter-American, and North American institutions), as enumerated in the table below. These investments are non-marketable equity investments valued at cost.

As of September 30, 2008 and September 30, 2007, investments in international financial institutions consisted of the following (in millions):

|  | 2008 | 2007 |
|---|---|---|
| African Development Bank | $ 172 | $ 172 |
| Asian Development Bank | 458 | 458 |
| European Bank for Reconstruction and Development | 633 | 624 |
| Inter-American Development Bank | 1,482 | 1,480 |
| International Bank for Reconstruction and Development | 1,985 | 1,985 |
| International Finance Corporation | 569 | 569 |
| Multilateral Investment Guarantee Agency | 45 | 45 |
| North American Development Bank | 202 | 188 |
| **Total** | **$ 5,546** | **$ 5,521** |

Refer to Note 16 for a description of the contingent liability related to these institutions.

# 10. ACCOUNTS RECEIVABLE AND RELATED INTEREST

## A.  Tax, Other, and Related Interest Receivables, Net

Tax, other, and related interest receivables include receivables from tax assessments, excise taxes, fees, penalties, and interest assessed and accrued that were not paid or abated, reduced by an estimate for uncollectible amounts. In addition to amounts attributed to taxes, interest income due on monies deposited in Federal Reserve Banks is also included in this line item.

As of September 30, 2008 and September 30, 2007, Tax, Other, and Related Interest Receivables, and Net, consisted of the following (in millions):

| Non-Entity: | 2008 | 2007 |
|---|---|---|
| IRS Federal Tax Receivable, Gross | $   112,067 | $   98,016 |
| Less: Allowance on Taxes Receivable | (83,046) | (72,007) |
| Receivable, Deposit of Earnings, Federal Reserve | 1,465 | 1,291 |
| Other Receivables and Interest | 28 | 105 |
| Less: Allowance on Other and Related Interest Receivable | (19) | (6) |
| **Total Tax, and Other Non-Entity Receivables, Net** | **$   30,495** | **$   27,399** |
| **Entity:** | | |
| Miscellaneous Entity Receivables and Related Interest | 383 | 160 |
| **Total Tax, Other and Related Interest Receivables, Net** | **$   30,878** | **$   27,559** |

IRS federal taxes receivable constitute the largest portion of the receivables. IRS federal taxes receivable consists of tax assessments, penalties, and interest which were not paid or abated, and which were agreed to by either the taxpayer and IRS, or the courts. An allowance for doubtful accounts is established for the difference between the gross receivables and the portion deemed collectible. The portion of tax receivables estimated to be collectible and the allowance for doubtful accounts are based on projections of collectability from a statistical sample of taxes receivable. The Treasury Department does not establish an allowance for the receivable on deposits of Federal Reserve earnings.

## B.  Intra-governmental Accounts and Related Interest Receivable

Intra-governmental accounts receivable and interest mainly represents non-entity payments made by the Treasury Department under the Contract Disputes Act ($368 million of the $396 million and $364 million of the $466 million displayed on the balance sheet for 2008 and 2007, respectively). Other federal agencies are required to reimburse the Treasury Department for payments made on their behalf, related to the Contract Disputes Act and the No Fear Act. These amounts are a receivable on the Treasury Department's books, of the Financial Management Service, and a payable on the other federal agencies' books until reimbursement is made. The remaining amount displayed as intra-governmental accounts receivable and interest is related to miscellaneous intra-governmental transactions.

## 11. INVENTORY AND RELATED PROPERTY, NET

Inventory and related property includes inventory, operating materials and supplies, and forfeited property held by Treasury. The Treasury Department's operating materials and supplies are maintained for the production of bureau products. The Treasury Department maintains inventory accounts or balances (e.g., metals, paper, etc.) for use in manufacturing currency and coins. The cost of these items is included in inventory costs, and is recorded as cost of goods sold upon delivery to customers. Inventory for check processing activities is also maintained. As of September 30, 2008 and September 30, 2007, inventory and related property consisted of the following (in millions):

|  | 2008 | 2007 |
|---|---|---|
| Operating materials and supplies held for use | $ 16 | $ 15 |
| Operating materials and supplies held in reserve for future use | 24 | 23 |
| Forfeited property | 100 | 85 |
| Inventory – raw materials | 355 | 288 |
| Inventory – work in process | 86 | 117 |
| Inventory – finished goods | 135 | 121 |
| Allowance for inventories and related property | (18) | (11) |
| **Total Inventories and Related Property, Net** | **$ 698** | **$ 638** |

## 12. PROPERTY, PLANT, AND EQUIPMENT, NET

As of September 30, 2008 and September 30, 2007, property, plant, and equipment consisted of the following (in millions):

| | Depreciation Method | Service Life | Cost | Accumulated Depreciation | 2008 Net Book Value |
|---|---|---|---|---|---|
| Buildings, structures, and facilities | S/L | 3 - 50 years | $  669 | $  (297) | $372 |
| Furniture, fixtures, and equipment | S/L | 2 - 20 years | 3,376 | (2,608) | 768 |
| Construction in progress | N/A | N/A | 35 | 0 | 35 |
| Land and land improvements | N/A | N/A | 12 | 0 | 12 |
| Internal use software | S/L | 2 -10 years | 1,151 | (664) | 487 |
| Internal use software in development | N/A | N/A | 205 | 0 | 205 |
| Assets under capital lease | S/L | 2 - 25 years | 30 | (20) | 10 |
| Leasehold improvements | S/L | 2 - 25 years | 580 | (392) | 188 |
| **Total** | | | $  6,058 | $  (3,981) | $  2,077 |

| | Depreciation Method | Service Life | Cost | Accumulated Depreciation | 2007 Net Book Value |
|---|---|---|---|---|---|
| Buildings, structures, and facilities | S/L | 3 - 50 years | $  658 | $  (276) | $  382 |
| Furniture, fixtures, and equipment | S/L | 2 - 20 years | 3,271 | (2,503) | 768 |
| Construction in progress | N/A | N/A | 27 | 0 | 27 |
| Land and land improvements | N/A | N/A | 12 | 0 | 12 |
| Internal use software | S/L | 2-10 years | 1,116 | (564) | 552 |
| Internal use software in development | N/A | N/A | 148 | 0 | 148 |
| Assets under capital lease | S/L | 2 - 25 years | 25 | (12) | 13 |
| Leasehold improvements | S/L | 2 - 25 years | 526 | (342) | 184 |
| **Total** | | | $  5,783 | $  (3,697) | $  2,086 |

The service life ranges vary significantly due to the diverse nature of PP&E held by the Treasury Department.

### Heritage Assets

The Treasury Department Complex (Main Treasury Building and Annex) was declared a national historical landmark in 1972. The Treasury Department Complex is treated as a multi-use heritage asset and is expected to be preserved indefinitely.

## 13. NON-ENTITY ASSETS

As of September 30, 2008 and September 30, 2007, non-entity assets consisted of the following (in millions):

| Intra-governmental Assets: | 2008 | | 2007 | |
|---|---|---|---|---|
| Fund Balance (Note 2) | $ | 889 | $ | 874 |
| Loans and Interest Receivable (Note 3) | | 226,194 | | 202,488 |
| Accounts Receivable and Related Interest (Note 10) | | 372 | | 367 |
| Advances to the Black Lung Trust Fund (Note 4) | | 10,484 | | 10,058 |
| Due from the General Fund (Note 4) | | 10,100,763 | | 9,052,624 |
| **Total Non-Entity Intra-governmental Assets** | **$** | **10,338,702** | **$** | **9,266,411** |
| | | | | |
| Cash, Foreign Currency, and Other Monetary Assets (Note 5) | | 364,941 | | 70,701 |
| Gold and Silver Reserves (Note 6) | | 11,062 | | 11,062 |
| Loans and Interest Receivable (Note 3) | | 130 | | 133 |
| Investments in Government Sponsored Enterprises (Note 7) | | 7,032 | | 0 |
| Tax, Other, and Related Interest Receivable, Net (Note 10) | | 30,495 | | 27,399 |
| Miscellaneous Assets | | 12 | | 9 |
| **Total Non-Entity Assets** | **$** | **10,752,374** | **$** | **9,375,715** |

Non-entity assets are those that are held by the Treasury Department but are not available for use by the Treasury Department. For example, Non-entity fund balance with Treasury represents unused balances of appropriations received by various Treasury Department entities to conduct custodial operations such as the payment of interest on the federal debt and refunds of taxes and fees. Non-entity loans and interest receivable represents loans managed by the Treasury Department on behalf of the U.S. Government. These loans are provided to federal agencies, and the Treasury Department is responsible for collecting these loans and transferring the proceeds to the General Fund of the U.S. Government. Non-entity cash, foreign currency, and other monetary assets include the operating cash of the U.S. Government, managed by the Treasury Department. It also includes foreign currency maintained by various U.S. and military disbursing offices, as well as seized monetary instruments.

On September 18, 2008, the Bureau of Public Debt began issuing specific cash management bills to fund the Supplementary Financing Program (SFP). The SFP is a temporary program that was announced by the Treasury Department and the Federal Reserve on September 17, 2008. The purpose of the program is to provide emergency cash for the Federal Reserve initiatives aimed at addressing the ongoing crisis in financial markets. The balance listed above of $364,941 million for 2008 is an increase over $70,701 million in 2007 as a result of the program. As of September 30, 2008, there were a total of eight cash management bills outstanding that totaled $300 billion (Notes 5, 14, 24, and 25).

## 14. FEDERAL DEBT AND INTEREST PAYABLE

The Treasury Department is responsible for administering the federal debt on behalf of the U.S. Government. The federal debt includes borrowings from the public as well as borrowings from federal agencies. The federal debt managed by the Treasury Department does not include debt issued by other governmental agencies such as the Tennessee Valley Authority or the Department of Housing and Urban Development.

The federal debt as of September 30, 2008 and September 30, 2007 was as follows (in millions):

| | 2008 | 2007 |
|---|---|---|
| **Intra-governmental** | | |
| Beginning Balance | $ 3,922,548 | $ 3,628,701 |
| New Borrowings/Repayments | 257,022 | 293,847 |
| **Subtotal at Par Value** | **4,179,570** | **3,922,548** |
| Premium/(Discount) | 32,489 | 3,672 |
| Interest Payable Covered by Budgetary Resources | 50,355 | 48,568 |
| **Total** | **$  4,262,414** | **$  3,974,788** |

| | 2008 | 2007 |
|---|---|---|
| **Owed to the Public** | | |
| Beginning Balance | $ 5,049,305 | $ 4,843,121 |
| New Borrowings/Repayments | 759,386 | 206,184 |
| **Subtotal at Par Value** | **5,808,691** | **5,049,305** |
| Premium/(Discount) | (36,124) | (39,441) |
| Interest Payable Covered by Budgetary Resources | 40,127 | 44,386 |
| **Total** | **$  5,812,694** | **$  5,054,250** |

Debt held by the public approximates the U.S. Government's competition with other sectors in the credit markets. In contrast, debt held by federal entities, primarily trust funds, represents the cumulative annual surpluses of these funds (*i.e.*, excess of receipts over disbursements plus accrued interest) that have been used to finance general government operations.

### Federal Debt held by Other Federal Agencies

Certain federal agencies are allowed to invest excess funds in debt securities issued by the Treasury Department on behalf of the U.S. Government. The terms and the conditions of debt securities issued are designed to meet the cash needs of the U.S. Government. The vast majority is non-marketable securities issued at par value, but some are issued at market prices whose prices and interest rates reflect market terms. The average interest rate for debt held by the federal entities in fiscal year 2008 was 4.83 percent (5.1 percent in fiscal year 2007).

The federal debt also includes intra-governmental marketable debt securities that certain agencies are permitted to buy and sell on the open market. The debt, at par value (not including interest receivable), owed to federal agencies as of September 30, 2008 and September 30, 2007 was as follows (in millions):

| | 2008 | 2007 |
|---|---|---|
| Social Security Administration | $ 2,367,138 | $ 2,182,091 |
| Office of Personnel Management | 797,107 | 762,013 |
| Department of Defense Agencies | 335,672 | 288,456 |
| Department of Health and Human Services | 380,540 | 361,294 |
| All Other Federal Entities - Consolidated | 299,113 | 328,694 |
| **Total Federal Debt Held by Federal Entities** | **$ 4,179,570** | **$ 3,922,548** |

The above balances do not include premium/discount and interest payable.

## Federal Debt Held by the Public

As of September 30, 2008 and September 30, 2007, Federal Debt held by the Public consisted of the following:

| (at par value, in millions) | Term | Average Interest Rates | 2008 |
|---|---|---|---|
| **Marketable:** | | | |
| Treasury Bills | 1 Year or Less | 1.6% | $ 1,484,332 |
| Treasury Notes | 2 - 10 Years | 4.1% | 2,623,364 |
| Treasury Bonds | Over 10 Years | 7.1% | 578,504 |
| Treasury Inflation Protected Security (TIPS) | 5 Years or More | 2.0% | 523,951 |
| **Total Marketable** | | | **$ 5,210,151** |
| Non-Marketable | On Demand to Over 10 Years | 4.1% | 598,540 |
| **Total Federal Debt (Public)** | | | **$ 5,808,691** |

| (at par value, in millions) | Term | Average Interest Rates | 2007 |
|---|---|---|---|
| **Marketable:** | | | |
| Treasury Bills | 1 Year or Less | 4.6% | $ 954,607 |
| Treasury Notes | 2 - 10 Yearss | 4.4% | 2,456,100 |
| Treasury Bonds | Over 10 Years | 7.4% | 560,922 |
| Treasury Inflation Protected Security (TIPS) | 5 Years or More | 2.3% | 456,776 |
| **Total Marketable** | | | **4,428,405** |
| Non-Marketable | On Demand to Over 10 Years | 4.9% | 620,900 |
| **Total Federal Debt (Public)** | | | **$ 5,049,305** |

The above balances do not include premium/discount and interest payable.

The Treasury Department issues marketable bills at a discount and pays the par amount of the security upon maturity. The average interest rate on Treasury bills represents the original issue effective yield on securities outstanding as of September 30, 2008 and 2007, respectively. Treasury bills are issued with a term of one year or less.

The Treasury Department issues marketable notes and bonds as long-term securities that pay semi-annual interest based on the securities' stated interest rates. These securities are issued at either par value or at an amount that reflects a discount or a premium. The average interest rate on marketable notes and bonds represents the stated interest rate adjusted by any discount or premium on securities outstanding as of September 30, 2008 and 2007. Treasury notes are issued with a term of 2 to 10 years and Treasury bonds are issued with a term of more than 10 years. The Treasury Department also issues inflation–indexed securities (TIPS) that have interest and redemption payments, which are tied to the Consumer Price Index, a widely used measurement of inflation. TIPS are issued with a term of five years or more. At maturity, TIPS are redeemed at the inflation-adjusted principal amount, or the original par value, whichever is greater. TIPS pay a semi-annual fixed rate of interest applied to the inflation-adjusted principal.

Over the course of fiscal year 2008, changes in economic conditions, financial markets, and fiscal policy as well as a reduction in nonmarketable debt issuance have caused an increase in Treasury's marketable borrowing needs. Financial market strains have impacted the real economy, and the nation has experienced lower economic growth, lower receipts, and increased outlays. Treasury has responded to the increase in marketable borrowing requirements by increasing issuance sizes of regular bills, the frequency, terms, and issuance sizes of cash management bills, and the issuance sizes of nominal coupon security offerings.

Federal Debt Held by the Public includes federal debt held outside of the U. S. Government by individuals, corporations, Federal Reserve Banks (FRB), state and local governments, and foreign governments and central banks. As of September 30, 2008, the FRB owned $221 billion, net of $256 billion in securities lent to dealers, for total holdings of $477 billion. As of September 30, 2007, the FRB owned $775 billion, net of $5 billion in securities lent to dealers, for total holdings of $780 billion. These securities are held in the FRB System Open Market Account (SOMA) for the purpose of conducting monetary policy.

## Other Debt and Interest Payable

Borrowings outstanding are with the Civil Service Trust Fund, which is administered by the Office of Personnel Management. The interest rates on these borrowings range from 4.62 percent to 5.62 percent, and the maturity dates range from June 30, 2009 to June 30, 2019. Borrowings began in 2005.

## 15. D.C. PENSIONS AND JUDICIARY RETIREMENT ACTUARIAL LIABILITY

Pursuant to Title XI of the Balanced Budget Act of 1997, as amended (the Act), on October 1, 1997, Treasury became responsible for certain District of Columbia retirement plans. The Act was intended to relieve the District of Columbia government of the burden of unfunded pension liabilities transferred to the District by the U.S. Government in 1979. To fulfill its responsibility, Treasury manages two funds — the D.C. Teachers, Police Officers, and Firefighters Federal Pension Fund (the D.C. Federal Pension Fund), and the District of Columbia Judicial Retirement and Survivors Annuity Fund (the Judicial Retirement Fund). The Treasury Department is required to make annual amortized payments from the General Fund of the U.S. Government to the D.C. Federal Pension Fund and the Judicial Retirement Fund. The actuarial cost method used to determine costs for the retirement plans is the Aggregate Entry Age Normal Actuarial Cost Method. The actuarial liability is based upon long-term assumptions selected by the Treasury Department. The pension benefit costs incurred by the plans are included on the Consolidated Statements of Net Cost.

### D.C. Federal Pension Fund

The purpose of the D.C. Federal Pension Fund is to make federal benefit payments and pay necessary administrative expenses for the District of Columbia Police Officers', Firefighters', and Teachers' Retirement Plans for benefits earned based upon service on or before June 30, 1997. The amount paid into the D.C. Federal Pension Fund from the General Fund of the U.S. Government was $340.2 million for fiscal year 2008 ($345.4 million during fiscal year 2007). As of September 30, 2008, the unobligated budgetary resources of the D.C. Federal Pension Fund were approximately $3,564 million, and the pension actuarial liability was $8,641 million, resulting in an unfunded liability of $5,077 million. (As of September 30, 2007, the unobligated budgetary resources of the D.C. Federal Pension Fund were approximately $3,565 million, and the pension actuarial liability was $8,842 million, resulting in an unfunded liability of $5,277 million.) In fiscal year 2008, the assumption for the annual rate of investment return in fiscal year 2009 is 4.7percent for the D.C. Federal Pension Fund with a gradual increase to 6.0percent by fiscal year 2014; and the assumption for the future annual rate of inflation and future cost-of-living adjustments is 3.5percent. In fiscal year 2007, the assumption for the annual rate of investment return for the D.C. Federal Pension Fund in fiscal year 2008 was 4.7percent with a gradual increase to 6percent by fiscal year 2013; and the assumption for the future annual rate of inflation and future cost-of-living adjustments is 3.5percent. In fiscal year 2008, the assumption for the future annual rate of salary increases is 6.5percent for police officers and firefighters (also 6.5percent during fiscal year 2007), and 5.5percent for teachers (also 5.5percent during fiscal year 2007).

### Judicial Retirement Fund

The purpose of the Judicial Retirement Fund is to make federal benefit payments and pay necessary administrative expenses for the Judges' Retirement Plans for all benefits earned. The amount paid into the Judicial Retirement Fund from the General Fund of the U.S. Government will be $6.98 million for fiscal year 2008 ($7.4 million during fiscal year 2007). As of September 30, 2008, the unobligated budgetary resources of the Judicial Retirement Fund were approximately $118.5 million, and the pension actuarial liability was $161.6 million, resulting in an unfunded liability of $43.1 million. (as of September 30, 2007, the unobligated budgetary resources of the Judicial Retirement Fund were approximately $114.3 million, and the pension actuarial liability was $150.1 million, resulting in an unfunded liability of $35.8 million.) In fiscal year 2008, the assumption for the annual rate of investment return for the Judicial Retirement Fund in fiscal year 2009 is 5.2percent for the Judicial Retirement Fund with a gradual increase

to 6.0percent by fiscal year 2015; and the assumption for the future annual rate of inflation and future cost-of-living adjustments is 3.5percent.  In fiscal year 2007, the assumption for the future annual rate of investment return for the Judicial Retirement Fund was 6percent; and the assumption for the future annual rate of inflation and future cost-of-living adjustments was 3.5percent.  In fiscal year 2008, the assumption for the future annual rate of salary increases is 3.5percent for judges. This assumption is unchanged from fiscal year 2007.



NOTE 15.
D.C. PENSIONS AND JUDICIARY RETIREMENT ACTUARIAL LIABILITY

## 16. COMMITMENTS AND CONTINGENCIES

### Legal Contingencies

The Department is a party in various administrative proceedings, legal actions, and claims including equal opportunity matters which may ultimately result in settlements or decisions adverse to the Federal Government. These contingent liabilities arise in the normal course of operations and their ultimate disposition is unknown. Treasury has one contingent liability in fiscal year 2008 related to the legal action taken on the case, American Council of the Blind and Others, where losses are determined to be probable and amounts can be estimated. The Department has disclosed contingent liabilities where the conditions for liability recognition have not been met and the likelihood of unfavorable outcome is more than remote. The Department does not accrue for possible losses related to cases where the potential loss cannot be estimated or the likelihood of an unfavorable outcome is less than probable.

In some cases, a portion of any loss that may occur may be paid by the Treasury's Judgment Fund which is separate from the operating resources of the Department. For those cases related to awards under federal anti-discrimination and whistleblower protection acts, Treasury must reimburse the Judgment Fund from future appropriations.

In the opinion of the Department's management and legal counsel, based on information currently available, the expected outcome of legal actions, individually or in the aggregate, will not have a materially adverse effect on the Department's financial statements, except for the legal actions described below.

### Pending Legal Actions

- *The American Council of the Blind and Others:* Plaintiffs have filed suit against the Department under Section 504 of the Rehabilitation Act seeking the redesign of U.S. currency. In 2006, a judge ruled that the current U.S. currency design violates this Act and this ruling was appealed. In 2008, the United States Court of Appeals for the District of Columbia Circuit affirmed this ruling. No monetary damages were awarded by the Court. However, the Department is required to provide meaningful access to United States currency for blind and other visually impaired persons. This may require changes to U.S. currency (excluding the one-dollar note.) The Court ordered such changes shall be completed, in connection with each denomination of currency, not later than the date when a redesign is next approved by the Secretary of the Treasury. Because the cost of these changes will be incorporated into future currency redesign costs, no redesign costs have been accrued in the accompanying financial statements as of September 30, 2008 and 2007.

  The judge in the above mentioned case also has ordered that the parties confer and attempt to negotiate attorney fees and costs to be awarded the plaintiffs. A preliminary attorney fee and cost estimate of $800,000 is included in other accrued liabilities. However, updated information has changed this figure to a range of $900,000 to $1,200,000.

- *Amidax Trading Group v. S.W.I.F.T.:* Allegations have been made that S.W.I.F.T. unlawfully disclosed information to the U.S. Government. We have no opinion as to the likelihood of an unfavorable outcome or an estimate of potential loss at this time.

- *Cobell et al. v. Kempthorne et al. (formerly Cobell v. Norton):* Native Americans allege that the Department of Interior and the Treasury Department have breached trust obligations with respect to the management of the plaintiffs' individual Indian monies. On August 7, 2008, a Federal District Court issued

an opinion awarding $455 million to the plaintiffs. The opinion is not a final order, and both parties have petitioned for the right to appeal. The Department of the Interior is also a defendant in this case and will be reporting this case in their financial statements.

- *Tribal Trust Fund Cases:* Numerous cases have been filed in which Native American Tribes seek a declaration that the U.S. has not provided the tribes with a full and complete accounting of their trust funds, and seek an order requiring the government to provide such an accounting. In addition, there are a number of other related cases for damages which do not name the Treasury Department as a defendant. It is not possible at this time to determine the likelihood of an unfavorable outcome or an estimate of the amount or range of any potential loss. The Department of the Interior is also a defendant in these cases.

- *Other Legal Actions:* The Department is also involved in employment related legal actions (*e.g.*, Discrimination, Equal Employment Opportunity Commission, Merit System Protection Board, etc.) which were reported to have a "reasonably possible" chance of being decided in the plaintiff's favor.  However, an estimate of potential loss cannot be determined at this time.  It is not expected that these cases will have a material effect on Treasury's financial position or results.

There are also other legal actions pending where the ultimate resolution of the legal actions, for which the possibility of loss could not be determined, may materially affect Treasury's financial position or results. As of September 30, 2008, three legal claims amounting to approximately $156.5 million existed for which the possibility of loss could not be determined.

## Other Contingencies

*Multilateral Development Banks (MDB):* The Treasury Department has subscribed to capital for certain MDB, portions of which are callable under certain limited circumstances to meet the obligations of the respective MDB. There has never been, nor is there anticipated, a call on the Treasury Department subscriptions. As of September 30, 2008 and September 30, 2007, U.S. callable capital in MDB was as follows (in millions):

|  | 2008 | 2007 |
|---|---|---|
| African Development Bank | $ 1,634 | $ 1,602 |
| Asian Development Bank | 5,911 | 5,911 |
| European Bank for Reconstruction and Development | 1,805 | 1,805 |
| Inter-American Development Bank | 28,687 | 28,687 |
| International Bank for Reconstruction and Development | 22,641 | 22,641 |
| Multilateral Investment Guarantee Agency | 301 | 301 |
| North American Development Bank | 1,275 | 1,275 |
| **Total** | $ 62,254 | $ 62,222 |

*Terrorism Risk Insurance Program:* The Terrorism Risk Insurance Act (TRIA or the Act) was signed into law on November 26, 2002. This law was enacted to address market disruptions resulting from terrorist attacks on September 11, 2001. The Act helps to ensure available and affordable commercial property and casualty insurance for terrorism risk, and simultaneously allows private markets to stabilize. The Terrorism Risk Insurance Program is activated upon the certification of an "act of terrorism" by the Secretary of the Treasury in concurrence with the Secretary of State and the Attorney General. If a certified act of terrorism occurs, insurers may be eligible to receive

reimbursement from the Federal Government for insured losses above a designated deductible amount. Insured losses above this amount will be shared between insurance companies and the Federal Government. The Act also gives Treasury authority to recoup federal payments made under the Program through policyholder surcharges under certain circumstances and contains provisions designed to manage litigation arising from or relating to a certified act of terrorism.

The original TRIA program was to expire on December 31, 2005, but the Program was extended through December 31, 2007, by the Terrorism Risk Insurance Extension Act of 2005 (Extension Act). This law included the following significant changes: it reduced the Federal role in terrorism risk insurance markets by increasing insurer deductibles and excluding certain types of previously covered insurance. The Extension Act also reduced the Federal Government's share of insured losses and added a "Program Trigger" provision which precludes federal payments unless insured losses from a certified act of terrorism exceeds $100 million.

On December 26, 2007, the President signed into law the Terrorism Risk Insurance Program Reauthorization Act of 2007 (Reauthorization Act) extending the Program through December 31, 2014. The Reauthorization Act, among other Program changes, revised the definition of "Act of Terrorism" to remove the certification requirement that the act be committed by an individual acting on behalf of a foreign person or foreign interest; revised the provisions of the Act with regard to the cap on annual liability for insured losses of $100 billion; and established deadlines by which recoupment of federal payments made under the Program would have to be accomplished.

# 17. LIABILITIES

## Liabilities Not Covered by Budgetary and Other Resources

As of September 30, 2008 and September 30, 2007, liabilities not covered by budgetary and other resources consisted of the following (in millions):

|  | 2008 | 2007 |
|---|---|---|
| **Intra-governmental Liabilities Not Covered by Budgetary and Other Resources:** | | |
| Federal Debt Principal, Premium/Discount (Note 14) | $ 4,212,059 | $ 3,926,220 |
| Other Intra-governmental Liabilities | 105 | 105 |
| **Total Intra-governmental Liabilities Not Covered by Budgetary and Other Resources** | $ 4,212,164 | $ 3,926,325 |
| | | |
| Federal Debt Principal, Premium/Discount (Note 14) | 5,772,567 | 5,009,864 |
| D.C. Pensions Liability (Note 15) | 5,120 | 5,313 |
| Other Liabilities | 1,085 | 1,037 |
| **Total Liabilities Not Covered by Budgetary and Other Resources** | $ 9,990,936 | $ 8,942,539 |

## Other Liabilities

Total "Other Liabilities" displayed on the Balance Sheets consists of both liabilities that are covered and not covered by budgetary resources.

The amounts displayed of $17,852 million and $3,664 million, respectively, at September 30, 2008 and September 30, 2007, consisted of the following (in millions):

|  | 2008 | | |
|---|---|---|---|
|  | Current | Non-Current | Total |
| **Intra-governmental** | | | |
| Unfunded Federal Workers Compensation Program Liability (FECA) | $ 45 | $ 57 | $ 102 |
| Accounts Payable | 76 | 0 | 76 |
| Other Accrued Liabilities | 165 | 2 | 167 |
| **Total Intra-governmental** | $ 286 | $ 59 | $ 345 |
| | | | |
| **With the Public** | | | |
| GSE Quarter Ended 9/30/08 Keepwell Payable (Note 24) | $ 13,800 | $ 0 | $ 13,800 |
| Actuarial Federal Workers Compensation Program Liability (FECA) | 0 | 594 | 594 |
| Liability for Deposit Funds (Held by the Federal Government for Others) and Suspense Accounts | 526 | 0 | 526 |
| Accrued Funded Payroll and Benefits | 424 | 0 | 424 |
| Capital Lease Liabilities | 4 | 1 | 5 |
| Accounts Payable and Other Accrued Liabilities | 2,460 | 43 | 2,503 |
| **Total with the Public** | $ 17,214 | $ 638 | $ 17,852 |

|  | 2007 | | |
|---|---|---|---|
|  | Current | Non-Current | Total |
| **Intra-governmental** | | | |
| Unfunded Federal Workers Compensation Program Liability (FECA) | $    44 | $    58 | $   102 |
| Accounts Payable | 46 | 21 | 67 |
| Other Accrued Liabilities | 158 | 2 | 160 |
| **Total Intra-governmental** | **$   248** | **$    81** | **$   329** |
|  | | | |
| **With the Public** | | | |
| Actuarial Federal Workers Compensation Program Liability (FECA) | $     0 | $   573 | $   573 |
| Liability for Deposit Funds (Held by the Federal Government for Others) and Suspense Accounts | 573 | 0 | 573 |
| Accrued Funded Payroll and Benefits | 402 | 0 | 402 |
| Capital Lease Liabilities | 2 | 5 | 7 |
| Accounts Payable and Other Accrued Liabilities | 2,045 | 64 | 2,109 |
| **Total with the Public** | **$ 3,022** | **$   642** | **$ 3,664** |

## 18. NET POSITION

Unexpended Appropriations represents the amount of spending authorized as of year-end that is unliquidated or unobligated and has not lapsed, been rescinded, or withdrawn. No-year appropriations remain available for obligation until expended. Annual appropriations remain available for upward or downward adjustment of obligations until expired.

Cumulative Results of Operations represents the net results of operations since inception, and includes cumulative amounts related to investments in capitalized assets and donations and transfers of assets in and out without reimbursement. Also included as a reduction in Cumulative Results of Operations are accruals for which the related expenses require funding from future appropriations and assessments. These future funding requirements include, among others (a) accumulated annual leave earned but not taken, (b) accrued workers compensation, and (c) expenses for contingent liabilities.

The amount reported as "appropriations received" are appropriated from Treasury General Fund of the U.S. Government receipts, such as income taxes, that are not earmarked by law for a specific purpose. This amount will not necessarily agree with the "appropriation received" amount reported on the Statement of Budgetary Resources (SBR) because of differences between proprietary and budgetary accounting concepts and reporting requirements. For example, certain dedicated and earmarked receipts are recorded as "appropriations received" on the SBR, but are recognized as exchange or non-exchange revenue (*i.e.*, typically in special and non-revolving trust funds) and reported on the Statement of Changes in Net Position in accordance with Statement of Federal Financial Accounting Standards (SFFAS No. 7).

### Transfers to the General Fund and Other

The amount reported as "Transfers to the General Fund and Other" on the Consolidated Statements of Changes in Net Position under "Other Financing Sources" mainly represents the distribution of interest revenue to the General Fund of the U.S. Government of $13.5 billion and $12.4 billion, for the year ended September 30, 2008 and year ended September 30, 2007, respectively and $7.032 billion for the value of the GSE stock transactions for the year ended September 30, 2008. The interest revenue is accrued on inter-agency loans held by the Treasury Department on behalf of the U.S. Government. A corresponding balance is reported on the Consolidated Statement of Net Cost under "Federal Costs: Less Interest Revenue from Loans." The amount reported on the Consolidated Statement of Net Cost is reduced by eliminations with Treasury Department bureaus.

The Treasury Department also includes seigniorage in "Transfers to the General Fund and Other." Seigniorage is the face value of newly minted circulating coins less the cost of production. The United States Mint is required to distribute the seigniorage that it recognizes to the General Fund of the U.S. Government. The distribution is also included in "Transfers to the General Fund and Other." In any given year, the amount recognized as seigniorage may differ for the amount distributed to the General Fund by an insignificant amount due to timing differences.

Seigniorage in the amounts of $728.6 million and $1,032 million was recognized, respectively, for the year ended September 30, 2008 and year ended September 30, 2007. Distributions to the General Fund, including seigniorage, and numismatic profit amounted to $750 million and $825 million, respectively, for the years ended September 30, 2008 and September 30, 2007.

## 19. CONSOLIDATED STATEMENT OF NET COST AND NET COSTS OF TREASURY SUB-ORGANIZATIONS

The Treasury Department's Consolidated Statement of Net Cost displays information on a consolidated basis. The complexity of the Treasury Department's organizational structure and operations requires that supporting schedules for Net Cost be included in the notes to the financial statements. These supporting schedules provide consolidating information, which fully displays the costs of each sub-organization (Departmental Offices and each operating bureau).

The classification of sub-organizations has been determined in accordance with SFFAS No. 4, *Managerial Cost Accounting Concepts and Standards for the Federal Government* which states that the predominant factor is the reporting entity's organization structure and existing responsibility components, such as bureaus, administrations, offices, and divisions within a department.

Each sub-organization is responsible for accumulating costs. The assignment of the costs to Treasury-wide programs is the result of using the following cost assignment methods: (1) direct costs, (2) cause and effect, and (3) cost allocation.

Intra-Departmental costs/revenues resulting from the provision of goods and/or services on a reimbursable basis among Departmental sub-organizations are reported as costs by providing sub-organizations. Accordingly, such costs/revenues are eliminated in the consolidation process.

To the extent practical or reasonable to do so, earned revenue is deducted from the gross costs of the programs to determine their net cost. There are no precise guidelines to determine the degree to which earned revenue can reasonably be attributed to programs. The attribution of earned revenues requires the exercise of managerial judgment.

In fiscal year 2008, the management of the Treasury Franchise Fund (BPF) was transferred from the Departmental Offices (DO) to the Bureau of the Public Debt (BPD). Accordingly, BPF is included with BPD for fiscal year 2008 reporting. For comparative purposes, this resulted in an increase in amounts reported under the Management Program for BPD in fiscal year 2008 and a decrease in the amounts reported for DO.

In fiscal year 2008, BPD began consolidating BPF. It should be noted that the 2008 Consolidated Statement of Net Cost by Treasury Sub-organization DO includes BPF, in fiscal year 2007 statement it is included in BPD. This change has an immaterial effect on the statement.

In fiscal year 2008, the Treasury Department began incurring costs in association with the intervention programs with GSEs. The amount reflected in the Statement of Net Cost for 2008 is $13,800 million. This is the expense portion of the quarter ended September 30, 2008 Keepwell payment to ensure liquidity of Freddie Mac. There was no payment anticipated or accrued for Fannie Mae.

The Treasury Department's Consolidated Statement of Net Cost also presents interest expense on the Federal Debt and other federal costs incurred as a result of assets and liabilities managed on behalf of the U.S. Government. These costs are not reflected as program costs related to the Treasury Department's strategic plan missions. Such costs are eliminated in the consolidation process to the extent that they involve transactions with Treasury Department sub-organizations.

TREASURY ANNUAL FINANCIAL REPORT

OMB Circular No. A-136, *Financial Reporting Requirements,* requires that the presentation of the Statements of Net Cost align directly with the goals and outcomes identified in the Strategic Plan. Accordingly, the Treasury Department has presented the gross costs and earned revenues by the applicable mission goals in the Treasury Department's fiscal years 2007–2012 Strategic Plan.

Other federal costs for the years ended September 30, 2008 and September 30, 2007 consisted of the following (in millions):

|  | 2008 | 2007 |
|---|---|---|
| Credit Reform Interest on Uninvested Funds (Intra-governmental) | $ 5,043 | $ 4,632 |
| Resolution Funding Corporation | 1,393 | 1,987 |
| Judgment Claims and Contract Disputes | 786 | 1,222 |
| Corporation for Public Broadcasting | 448 | 464 |
| Legal Services Corporation | 347 | 350 |
| All Other Payments | 315 | 208 |
| **Total** | **$ 8,332** | **$ 8,863** |

FHFA 0224

NOTE 19.
CONSOLIDATED STATEMENT OF NET COST AND NET COSTS OF TREASURY SUB-ORGANIZATIONS

## 19. Consolidated Statement of Net Cost and Net Costs of Treasury Sub-organizations (In Millions):

| Fiscal Year Ended September 30, 2008 / Program Costs: | Bureau of Engraving and Printing | Bureau of the Public Debt | Departmental Offices | Financial Crimes Enforcement Network | Financial Management Service | Internal Revenue Service | U.S. Mint |
|---|---|---|---|---|---|---|---|
| **FINANCIAL PROGRAM:** | | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 71 | $ 1,392 | $ 0 | $ 202 | $ 4,107 | $ 0 |
| Less: Earned Revenue | 0 | (15) | (2,009) | 0 | (159) | (72) | 0 |
| Intra-governmental Net Costs | 0 | 56 | (617) | 0 | 43 | 4,035 | 0 |
| Gross Costs with the public | 0 | 256 | 373 | 0 | 1,120 | 8,441 | 0 |
| Less: Earned Revenue | 0 | (10) | (1) | 0 | 0 | (287) | 0 |
| Net Costs with the public | 0 | 246 | 372 | 0 | 1,120 | 8,154 | 0 |
| **Net Cost: Financial Program** | **0** | **302** | **(245)** | **0** | **1,163** | **12,189** | **0** |
| **ECONOMIC PROGRAM:** | | | | | | | |
| Intra-governmental Gross Costs | 81 | 0 | 462 | 0 | 0 | 0 | 78 |
| Less: Earned Revenue | (8) | 0 | (811) | 0 | 0 | 0 | (10) |
| Intra-governmental Net Costs | 73 | 0 | (349) | 0 | 0 | 0 | 68 |
| Gross Costs with the public | 449 | 0 | 1,740 | 0 | 0 | 0 | 1,958 |
| Less: Earned Revenue | (509) | 0 | (1,529) | 0 | 0 | 0 | (2,063) |
| Net Costs with the public | (60) | 0 | 211 | 0 | 0 | 0 | (105) |
| **Net Cost: Economic Program** | **13** | **0** | **(138)** | **0** | **0** | **0** | **(37)** |
| **SECURITY PROGRAM:** | | | | | | | |
| Intra-governmental Gross Costs | 0 | 0 | 139 | 58 | 0 | 0 | 0 |
| Less: Earned Revenue | 0 | 0 | (18) | (2) | 0 | 0 | 0 |
| Intra-governmental Net Costs | 0 | 0 | 121 | 56 | 0 | 0 | 0 |
| Gross Costs with the public | 0 | 0 | 171 | 52 | 0 | 0 | 0 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | 0 | 0 | 171 | 52 | 0 | 0 | 0 |
| **Net Cost: Security Program** | **0** | **0** | **292** | **108** | **0** | **0** | **0** |
| **MANAGEMENT PROGRAM:** | | | | | | | |
| Intra-governmental Gross Costs | 0 | 51 | 143 | 0 | 0 | 0 | 0 |
| Less: Earned Revenue | 0 | (237) | (224) | 0 | 0 | 0 | 0 |
| Intra-governmental Net Costs | 0 | (186) | (81) | 0 | 0 | 0 | 0 |
| Gross Costs with the public | 0 | 207 | 300 | 0 | 0 | 0 | 0 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | 0 | 207 | 300 | 0 | 0 | 0 | 0 |
| **Net Cost: Management Program** | **0** | **21** | **219** | **0** | **0** | **0** | **0** |
| **Net Cost of Treasury Operations** | **$ 13** | **$ 323** | **$ 128** | **$ 108** | **$ 1,163** | **$ 12,189** | **$ (37)** |

| Fiscal Year Ended September 30, 2008<br><br>Program Costs: | Office of the Comptroller of the Currency | Office of Thrift Supervision | Alcohol, Tobacco Tax and Trade Bureau | Combined Total | Eliminations and Adjustments | 9/30/2008 Consolidated |
|---|---|---|---|---|---|---|
| **FINANCIAL PROGRAM:** | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 0 | $ 13 | $ 5,785 | $ (1,442) | $ 4,343 |
| Less: Earned Revenue | 0 | 0 | 0 | (2,255) | 272 | (1,983) |
| Intra-governmental Net Costs | 0 | 0 | 13 | 3,530 | (1,170) | 2,360 |
| | | | | | | |
| Gross Costs with the public | 0 | 0 | 36 | 10,226 | 0 | 10,226 |
| Less: Earned Revenue | 0 | 0 | (1) | (299) | 0 | (299) |
| Net Costs with the public | 0 | 0 | 35 | 9,927 | 0 | 9,927 |
| **Net Cost: Financial Program** | **0** | **0** | **48** | **13,457** | **(1,170)** | **12,287** |
| **ECONOMIC PROGRAM:** | | | | | | |
| Intra-governmental Gross Costs | 96 | 34 | 13 | 764 | (409) | 355 |
| Less: Earned Revenue | (27) | (14) | 0 | (870) | 845 | (25) |
| Intra-governmental Net Costs | 69 | 20 | 13 | (106) | 436 | 330 |
| | | | | | | |
| Gross Costs with the public | 584 | 217 | 36 | 4,984 | 0 | 4,984 |
| Less: Earned Revenue | (710) | (254) | (1) | (5,066) | 0 | (5,066) |
| Net Costs with the public | (126) | (37) | 35 | (82) | 0 | (82) |
| **Net Cost: Economic Program** | **(57)** | **(17)** | **48** | **(188)** | **436** | **248** |
| **SECURITY PROGRAM:** | | | | | | |
| Intra-governmental Gross Costs | 0 | 0 | 0 | 197 | (74) | 123 |
| Less: Earned Revenue | 0 | 0 | 0 | (20) | 16 | (4) |
| Intra-governmental Net Costs | 0 | 0 | 0 | 177 | (58) | 119 |
| | | | | | | |
| Gross Costs with the public | 0 | 0 | 0 | 223 | 0 | 223 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | 0 | 0 | 0 | 223 | 0 | 223 |
| **Net Cost: Security Program** | **0** | **0** | **0** | **400** | **(58)** | **342** |
| **MANAGEMENT PROGRAM:** | | | | | | |
| Intra-governmental Gross Costs | 0 | 0 | 0 | 194 | (70) | 124 |
| Less: Earned Revenue | 0 | 0 | 0 | (461) | 296 | (165) |
| Intra-governmental Net Costs | 0 | 0 | 0 | (267) | 226 | (41) |
| | | | | | | |
| Gross Costs with the public | 0 | 0 | 0 | 507 | 0 | 507 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | 0 | 0 | 0 | 507 | 0 | 507 |
| **Net Cost: Management Program** | **0** | **0** | **0** | **240** | **226** | **466** |
| **Net Cost of Treasury Operations** | **$ (57)** | **$ (17)** | **$ 96** | **$ 13,909** | **$ (566)** | **$ 13,343** |

FHFA 0226

## 19. Consolidated Statement of Net Cost and Net Costs of Treasury Sub-organizations (In Millions):

Fiscal Year Ended
September 30, 2007

Program Costs:

| | Bureau of Engraving and Printing | Bureau of the Public Debt | Departmental Offices | Financial Crimes Enforcement Network | Financial Management Service | Internal Revenue Service | U.S. Mint |
|---|---|---|---|---|---|---|---|
| **FINANCIAL PROGRAM:** | | | | | | | |
| Intra-governmental Gross Costs | $ 0 | $ 76 | $ 1,395 | $ 0 | $ 171 | $ 3,967 | $ 0 |
| Less: Earned Revenue | 0 | (14) | (2,097) | 0 | (144) | (45) | 0 |
| Intra-governmental Net Costs | 0 | 62 | (702) | 0 | 27 | 3,922 | 0 |
| | | | | | | | |
| Gross Costs with the public | 0 | 259 | 474 | 0 | 981 | 8,049 | 0 |
| Less: Earned Revenue | 0 | (3) | 0 | 0 | 0 | (231) | 0 |
| Net Costs with the public | 0 | 256 | 474 | 0 | 981 | 7,818 | 0 |
| **Net Cost: Financial Program** | **0** | **318** | **(228)** | **0** | **1,008** | **11,740** | **0** |
| **ECONOMIC PROGRAM:** | | | | | | | |
| Intra-governmental Gross Costs | 81 | 0 | 69 | 0 | 0 | 0 | 69 |
| Less: Earned Revenue | (5) | 0 | (850) | 0 | 0 | 0 | (9) |
| Intra-governmental Net Costs | 76 | 0 | (781) | 0 | 0 | 0 | 60 |
| | | | | | | | |
| Gross Costs with the public | 466 | 0 | 2,593 | 0 | 0 | 0 | 1,520 |
| Less: Earned Revenue | (573) | 0 | (3,033) | 0 | 0 | 0 | (1,595) |
| Net Costs with the public | (107) | 0 | (440) | 0 | 0 | 0 | (75) |
| **Net Cost: Economic Program** | **(31)** | **0** | **(1,221)** | **0** | **0** | **0** | **(15)** |
| **SECURITY PROGRAM:** | | | | | | | |
| Intra-governmental Gross Costs | 0 | 0 | 135 | 51 | 0 | 0 | 0 |
| Less: Earned Revenue | 0 | 0 | (13) | (1) | 0 | 0 | 0 |
| Intra-governmental Net Costs | 0 | 0 | 122 | 50 | 0 | 0 | 0 |
| | | | | | | | |
| Gross Costs with the public | 0 | 0 | 126 | 57 | 0 | 0 | 0 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | 0 | 0 | 126 | 57 | 0 | 0 | 0 |
| **Net Cost: Security Program** | **0** | **0** | **248** | **107** | **0** | **0** | **0** |
| **MANAGEMENT PROGRAM:** | | | | | | | |
| Intra-governmental Gross Costs | 0 | 0 | 167 | 0 | 0 | 0 | 0 |
| Less: Earned Revenue | 0 | 0 | (720) | 0 | 0 | 0 | 0 |
| Intra-governmental Net Costs | 0 | 0 | (553) | 0 | 0 | 0 | 0 |
| | | | | | | | |
| Gross Costs with the public | 0 | 0 | 770 | 0 | 0 | 0 | 0 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | 0 | 0 | 770 | 0 | 0 | 0 | 0 |
| **Net Cost: Management Program** | **0** | **0** | **217** | **0** | **0** | **0** | **0** |
| **Net Cost of Treasury Operations** | **$ (31)** | **$ 318** | **$ (984)** | **$ 107** | **$ 1,008** | **$ 11,740** | **$ (15)** |

| Fiscal Year Ended September 30, 2007<br><br>Program Costs: | Office of the Comptroller of the Currency | Office of Thrift Supervision | Alcohol, Tobacco Tax and Trade Bureau | Combined Total | Eliminations and Adjustments | 9/30/2007 Consolidated |
|---|---|---|---|---|---|---|
| **FINANCIAL PROGRAM:** | | | | | | |
| Intra-governmental Gross Costs | $      0 | $      0 | $     14 | $   5,623 | $  (1,441) | $   4,182 |
| Less: Earned Revenue | 0 | 0 | 0 | (2,300) | 291 | (2,009) |
| Intra-governmental Net Costs | 0 | 0 | 14 | 3,323 | (1,150) | 2,173 |
| Gross Costs with the public | 0 | 0 | 35 | 9,798 | 0 | 9,798 |
| Less: Earned Revenue | 0 | 0 | (2) | (236) | 0 | (236) |
| Net Costs with the public | 0 | 0 | 33 | 9,562 | 0 | 9,562 |
| **Net Cost: Financial Program** | **0** | **0** | **47** | **12,885** | **(1,150)** | **11,735** |
| **ECONOMIC PROGRAM:** | | | | | | |
| Intra-governmental Gross Costs | 89 | 30 | 13 | 351 | (48) | 303 |
| Less: Earned Revenue | (27) | (16) | 0 | (907) | 889 | (18) |
| Intra-governmental Net Costs | 62 | 14 | 13 | (556) | 841 | 285 |
| Gross Costs with the public | 548 | 195 | 35 | 5,357 | 0 | 5,357 |
| Less: Earned Revenue | (669) | (227) | (1) | (6,098) | 0 | (6,098) |
| Net Costs with the public | (121) | (32) | 34 | (741) | 0 | (741) |
| **Net Cost: Economic Program** | **(59)** | **(18)** | **47** | **(1,297)** | **841** | **(456)** |
| **SECURITY PROGRAM:** | | | | | | |
| Intra-governmental Gross Costs | 0 | 0 | 0 | 186 | (67) | 119 |
| Less: Earned Revenue | 0 | 0 | 0 | (14) | 12 | (2) |
| Intra-governmental Net Costs | 0 | 0 | 0 | 172 | (55) | 117 |
| Gross Costs with the public | 0 | 0 | 0 | 183 | 0 | 183 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | 0 | 0 | 0 | 183 | 0 | 183 |
| **Net Cost: Security Program** | **0** | **0** | **0** | **355** | **(55)** | **300** |
| **MANAGEMENT PROGRAM:** | | | | | | |
| Intra-governmental Gross Costs | 0 | 0 | 0 | 167 | (54) | 113 |
| Less: Earned Revenue | 0 | 0 | 0 | (720) | 277 | (443) |
| Intra-governmental Net Costs | 0 | 0 | 0 | (553) | 223 | (330) |
| Gross Costs with the public | 0 | 0 | 0 | 770 | 0 | 770 |
| Less: Earned Revenue | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Costs with the public | 0 | 0 | 0 | 770 | 0 | 770 |
| **Net Cost: Management Program** | **0** | **0** | **0** | **217** | **223** | **440** |
| **Net Cost of Treasury Operations** | **$    (59)** | **$    (18)** | **$     94** | **$  12,160** | **$    (141)** | **$  12,019** |

FHFA 0228

## 20. ADDITIONAL INFORMATION RELATED TO THE COMBINED STATEMENTS OF BUDGETARY RESOURCES

Federal agencies are required to disclose additional information related to the Combined Statements of Budgetary Resources (per OMB Circular A-136, *Financial Reporting Requirements as amended*). In accordance with SFFAS No. 7, the Department must report the value of goods and services ordered and obligated which have not been received. This amount includes any orders for which advance payment has been made but for which delivery or performance has not yet occurred. The information for the fiscal years ended September 30, 2008 and September 30, 2007 was as follows (in millions):

|  | 2008 | 2007 |
|---|---|---|
| Undelivered orders at the end of the period | $ 57,513 | $ 56,304 |
| Available borrowing and contract authority at the end of the period | $ 5,716 | $ 5,716 |

### Apportionment Categories of Obligations Incurred: Direct vs. Reimbursable Obligations

|  | 2008 | 2007 |
|---|---|---|
| **Obligations Incurred** |  |  |
| Direct - Category A | $ 7,050 | $ 6,525 |
| Direct - Category B | 20,623 | 14,197 |
| Direct - Exempt from Apportionment | 455,126 | 440,277 |
| **Total Direct** | $ 482,799 | $ 460,999 |
| Reimbursable - Category A | 2 | 0 |
| Reimbursable - Category B | 3,287 | 3,344 |
| Reimbursable - Exempt from Apportionment | 1,446 | 1,187 |
| Total Reimbursable | $ 4,735 | $ 4,531 |
| **Total Direct and Reimbursable** | $ 487,534 | $ 465,530 |

### Reconciliation of the President's Budget

The *Budget of the United States* (also known as the President's Budget), with actual numbers for fiscal year 2008, was not published at the time that these financial statements were issued. The President's Budget is expected to be published in 2009. It will be available from the United States Government Printing Office. The following chart displays the differences between the Combined Statement of Budgetary Resources (SBR) in the fiscal year 2007 Performance and Accountability Report and the actual fiscal year 2007 balances included in the fiscal year 2009 President's Budget (PB).

## Reconciliation of Fiscal Year 2007 Combined Statement of Budgetary Resources to the Fiscal Year 2009 President's Budget (in Millions)

| | Budgetary Resources | Outlays (net of offsetting collections) | Offsetting Receipts | Net Outlays | Obligations Incurred |
|---|---|---|---|---|---|
| **Statement of Budgetary Resources Amounts** | $ 522,980 | $ 452,110 | $ (16,040) | $ 436,070 | $ 465,530 |
| | | | | | |
| **Included in the Treasury Chapter of the President's Budget (PB) but not in the Statement of Budgetary Resources (SBR):** | | | | | |
| IRS non-entity tax credit payments (1) | 57,830 | 57,830 | (13) | 57,817 | 57,830 |
| Tax and Trade Bureau (TTB) non-entity collections for Puerto Rico | 462 | 462 | 0 | 462 | 0 |
| Non-Treasury offsetting receipts included in Treasury chapter of PB | 0 | 0 | (53) | (53) | 0 |
| Treasury offsetting receipts considered to be "General Fund" transactions for reporting purposes (2) | 0 | 0 | (53) | (53) | 0 |
| Continued dumping subsidy – CBP | 388 | 381 | 0 | 381 | 381 |
| Other | 2 | 1 | (1) | 0 | 1 |
| **Subtotal** | $ 58,682 | $ 58,674 | $ (120) | $ 58,554 | $ 58,212 |
| | | | | | |
| **Included in the SBR but not in the Treasury chapter of the PB:** | | | | | |
| Treasury resources shown in non-Treasury chapters of the PB, included in SBR (3) | (34,543) | (3,489) | 0 | (3,489) | (8,315) |
| Offsetting collections net of collections shown in PB | (7,224) | 0 | (741) | (741) | 0 |
| Treasury offsetting receipts shown in other chapters of PB, part of which is in SBR | 0 | 0 | 198 | 198 | 0 |
| Unobligated balance carried forward, recoveries of prior year funds and expired accounts | (1,339) | 0 | 0 | 0 | (35) |
| Exchange Stabilization Fund resources not shown in PB (4) | (28,919) | 0 | 0 | 0 | (307) |
| Treasury Financing Accounts (CDFI and ATSB) | (110) | (18) | 24 | 6 | (106) |
| IRS user fees and 50% Transfer Accounts and Capital Transfers to General Fund not included in PB | (108) | 0 | 0 | 0 | 0 |
| Other | (2) | (3) | 6 | 3 | (3) |
| **Subtotal** | $ (72,245) | $ (3,510) | $ (513) | $ (4,023) | $ (8,766) |
| **Trust Fund – Comptroller of the Currency (OCC) (5)** | 0 | 103 | 0 | 103 | 0 |
| **President's Budget Amounts\*** | $ 509,417 | $ 507,377 | $ (16,673) | $ 490,704 | $ 514,976 |

1. These are primarily Earned Income Tax Credit and Child Tax Credit payments that are reported with refunds as custodial activities in Treasury's financial statements and thus are not reported as budgetary resources.

2. These are receipt accounts that Treasury manages on behalf of other agencies and considers to be "General Fund" receipts rather than receipts of the Treasury reporting entity.

3. The largest of these resources relate to Treasury's International Assistance Programs.

4. Exchange Stabilization Fund (ESF) is a self-sustaining component that finances its operations with the buying and selling of foreign currencies to regulate the fluctuations of the dollar. Because of the nature of the activities of the component, it does not receive appropriations, and therefore is excluded from the PB.

5. Negative outlay for OCC included in both Analytical Perspectives and the Appendix.

\* Per President's Budget for fiscal year 2009 – Budgetary Resources and Outlays are from the Analytical Perspective. Offsetting Receipts and Obligations Incurred are from the Appendix.

FHFA_0230

Case 1:13-mc-01288-RCL   Document 7-3   Filed 12/17/13   Page 70 of 170

## Legal Arrangements Affecting Use of Unobligated Balances

The use of unobligated balances is restricted based on annual legislation requirements or enabling authorities. Funds are presumed to be available for only one fiscal year unless otherwise noted in the annual appropriation language. Unobligated balances in unexpired fund symbols are available in the next fiscal year for new obligations unless some restrictions had been placed on those funds by law. In those situations, the restricted funding will be temporarily unavailable until such time as the reasons for the restriction have been satisfied or legislation has been enacted to remove the restriction.

Amounts in expired fund symbols are not available for new obligations, but may be used to adjust obligations and make disbursements that were recorded before the budgetary authority expired or to meet a bona fide need that arose in the fiscal year for which the appropriation was made.

## 21. COLLECTION AND DISPOSITION OF CUSTODIAL REVENUE

The Treasury Department collects the majority of federal revenue from income and excise taxes. Collection activity, by revenue type and tax year, was as follows for the fiscal years ended September 30, 2008 and September 30, 2007 (in millions):

| | Tax Year | | | | 2008 Collections |
|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | Pre-2006 | |
| Individual Income and FICA Taxes | $ 1,455,017 | $ 799,244 | $ 23,498 | $ 16,567 | $ 2,294,326 |
| Corporate Income Taxes | 222,000 | 113,949 | 2,010 | 16,104 | 354,063 |
| Estate and Gift Taxes | 23 | 19,248 | 1,266 | 9,287 | 29,824 |
| Excise Taxes | 48,106 | 17,909 | 119 | 159 | 66,293 |
| Railroad Retirement Taxes | 3,769 | 1,164 | 1 | 5 | 4,939 |
| Unemployment Taxes | 5,146 | 2,026 | 42 | 117 | 7,331 |
| Federal Reserve Earnings | 25,879 | 7,719 | 0 | 0 | 33,598 |
| Fines, Penalties, Interest, and Other Revenue | 1,936 | 297 | 0 | 0 | 2,233 |
| **Subtotal** | **$ 1,761,876** | **$ 961,556** | **$ 26,936** | **$ 42,239** | **$ 2,792,607** |
| Less Amounts Collected for Non-federal Entities | | | | | (407) |
| **Total** | | | | | **$ 2,792,200** |

| | Tax Year | | | | 2007 Collections |
|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | Pre-2005 | |
| Individual Income and FICA Taxes | $ 1,408,591 | $ 750,587 | $ 23,861 | $ 18,425 | $ 2,201,464 |
| Corporate Income Taxes | 253,376 | 116,342 | 2,938 | 22,664 | 395,320 |
| Estate and Gift Taxes | 45 | 16,162 | 1,571 | 9,200 | 26,978 |
| Excise Taxes | 49,660 | 17,807 | 90 | 209 | 67,766 |
| Railroad Retirement Taxes | 3,576 | 1,127 | 1 | 14 | 4,718 |
| Unemployment Taxes | 5,198 | 2,041 | 51 | 126 | 7,416 |
| Federal Reserve Earnings | 26,255 | 5,788 | 0 | 0 | 32,043 |
| Fines, Penalties, Interest, and Other Revenue | 2,661 | 423 | 0 | 0 | 3,084 |
| **Subtotal** | **$ 1,749,362** | **$ 910,277** | **$ 28,512** | **$ 50,638** | **$ 2,738,789** |
| Less Amounts Collected for Non-federal Entities | | | | | (486) |
| **Total** | | | | | **$ 2,738,303** |

Amounts reported for Corporate Income Taxes collected in fiscal year 2008 include corporate taxes of $10 billion for tax year 2009 (similarly, amounts reported for Corporate Income Taxes collected in fiscal year 2007 include corporate taxes of $10 billion for tax year 2008). Individual Income and FICA Taxes includes $79 billion in payroll taxes collected from other federal agencies ($72 billion in fiscal year 2007).

## Amounts Provided to Fund the Federal Government

For the fiscal years ended September 30, 2008 and September 30, 2007, collections of custodial revenue transferred to other entities were as follows (in millions):

|  | 2008 | 2007 |
|---|---|---|
| Department of the Interior | $ 312 | $ 288 |
| General Fund | 2,365,814 | 2,445,331 |
| **Total** | **$ 2,366,126** | **$ 2,445,619** |

## Federal Tax Refunds Paid

Refund activity, broken out by revenue type and by tax year, was as follows for the fiscal years ended September 30, 2008 and September 30, 2007 (in millions):

| | Tax Year | | | | 2008 |
|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | Pre-2006 | Refunds |
| Individual Income and FICA Taxes | $ 935 | $ 342,216 | $ 19,217 | $ 6,980 | $ 369,348 |
| Corporate Income Taxes | 2,206 | 19,610 | 10,446 | 22,078 | 54,340 |
| Estate and Gift Taxes | 0 | 343 | 428 | 251 | 1,022 |
| Excise Taxes | 439 | 497 | 107 | 208 | 1,251 |
| Railroad Retirement Taxes | 0 | 1 | 1 | (9) | (7) |
| Unemployment Taxes | 1 | 65 | 14 | 39 | 119 |
| Fines, Penalties, Interest, and Other Revenue | 1 | 0 | 0 | 0 | 1 |
| **Total** | **$ 3,582** | **$ 362,732** | **$ 30,213** | **$ 29,547** | **$ 426,074** |

| | Tax Year | | | | 2007 |
|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | Pre-2005 | Refunds |
| Individual Income and FICA Taxes | $ 1,823 | $ 235,151 | $ 17,839 | $ 6,242 | $ 261,055 |
| Corporate Income Taxes | 1,241 | 8,122 | 4,278 | 14,509 | 28,150 |
| Estate and Gift Taxes | 0 | 256 | 490 | 223 | 969 |
| Excise Taxes | 416 | 570 | 253 | 1,131 | 2,370 |
| Railroad Retirement Taxes | 0 | 5 | 1 | 7 | 13 |
| Unemployment Taxes | 0 | 75 | 16 | 36 | 127 |
| **Total** | **$ 3,480** | **$ 244,179** | **$ 22,877** | **$ 22,148** | **$ 292,684** |

## Federal Tax Refunds Payable

As of September 30, 2008 and September 30, 2007, refunds payable to taxpayers consisted of the following (in millions):

|  | 2008 | 2007 |
|---|---|---|
| Alcohol, Tobacco Tax and Trade Bureau | $ 12 | $ 9 |
| Internal Revenue Service | $ 3,064 | $ 1,675 |
| **Total** | **$ 3,076** | **$ 1,684** |

## 22. EARMARKED FUNDS

Earmarked funds are financed by specifically identified revenues, often supplemented by other financing sources, which remain available over time. These specifically identified revenues and other financing sources are required by statute to be used for designated activities or purposes. SFFAS No. 27, *Identifying and Reporting Earmarked Funds,* issued by the FASAB defines the following three criteria for determining an earmarked fund: 1) A statute committing the Federal Government to use specifically identified revenues and other financing sources only for designated activities, benefits or purposes; 2) Explicit authority for the earmarked fund to retain revenues and other financing sources not used in the current period for future use to finance the designated activities, benefits, or purposes; and 3) A requirement to account for and report on the receipt, use, and retention of the revenues and other financing sources that distinguishes the earmarked fund from the government's general revenues.

The majority of Treasury's earmarked fund activities are attributed to the ESF and the pension and retirement funds managed by the Office of DCP. In addition, several Treasury bureaus operate with "public enterprise revolving funds" and receive no appropriations from the Congress. These bureaus are BEP, U.S. Mint, OCC, and OTS. Other miscellaneous earmarked funds are managed by BPD, DO, FMS, and TFF.

The following is a list of earmarked funds and a brief description of the purpose, accounting, and uses of these funds.

**Exchange Stabilization Fund (ESF)**

| | | |
|---|---|---|
| ESF | 20X4444 | Exchange Stabilization Fund |

**D.C. Pensions**

| | | |
|---|---|---|
| DCP | 20X1713 | Federal payment – D.C. Judicial Retirement |
| DCP | 20X1714 | Federal payment – D.C. Federal Pension Fund |
| DCP | 20X5511 | D.C. Federal Pension Fund |
| DCP | 20X8212 | D.C. Judicial Retirement and Survivor's Annuity Fund |

**Public Enterprise Revolving Funds**

| | | |
|---|---|---|
| BEP | 20X4502 | Bureau of Engraving and Printing Public Enterprise Fund |
| MNT | 20X4159 | Public Enterprise Revolving Fund |
| OCC | 20X8413 | Assessment Funds |
| OTS | 20X4108 | Public Enterprise Revolving Fund |
| IRS | 20X4413 | Federal Tax Lien Revolving Fund |

**Other Earmarked Funds**

| | | |
|---|---|---|
| BPD | 2061738 | Payments to the Terrestrial Wildlife Habitat Restoration |
| BPD | 2071738 | Payments to the Terrestrial Wildlife Habitat Restoration |
| BPD | 2081738 | Payments to the Terrestrial Wildlife Habitat Restoration |
| BPD | 20X5080 | Gifts to Reduce Public Debt |
| BPD | 20X5080.001 | Receipt of Gifts to Reduce Public Debt |
| BPD | 20X8207 | Lower Brule Sioux Tribe Terrestrial Wildlife Habitat Restoration Trust Fund |
| BPD | 20X8209 | Cheyenne River Sioux Terrestrial Wildlife Habitat Restoration Trust Fund |
| DO | 20X5407 | Sallie Mae Assessments |
| DO | 20X5816 | Confiscated and Vested Iraqi Property and Assets |

| | | |
|---|---|---|
| DO | 20X8790 | Gifts and Bequests Trust Fund |
| FMS | 205445 | Debt Collection |
| FMS | 20X5081 | Presidential Election Campaign |
| FMS | 20X8902 | Esther Cattell Schmitt Gift Fund |
| FMS | 202/35445 | Debt Collection Special Fund |
| FMS | 203/45445 | Debt Collection Special Fund |
| FMS | 204/55445 | Debt Collection Special Fund |
| FMS | 205/65445 | Debt Collection Special Fund |
| FMS | 206/75445 | Debt Collection Special Fund |
| FMS | 207/85445 | Debt Collection Special Fund |
| FMS | 208/95445 | Debt Collection Special Fund |
| IRS | 20X5510 | Private Collection Agent Program |
| TFF | 20X5697 | Treasury Forfeiture Fund |

The ESF uses funds to purchase foreign currencies, to hold U.S. foreign exchange and SDR assets, and to provide financing to foreign governments. ESF accounts and reports its holdings to FMS on the SF224, "Statement of Transactions," as well as to the Congress and Treasury's policy office. The Gold Reserve Act of 1934, Bretton Woods Agreement Act of 1945, P.L. 95-147 and P.L. 94-564 established and authorized the use of the Fund. SDR in the IMF, Investments in U.S. Securities (BPD), and Investments in Foreign Currency Denominated assets are the sources of revenues or other financing sources. ESF's earnings and realized gains on foreign currency denominated assets represent inflows of resources to the government, and the revenues earned are the result of intra-governmental inflows.

D.C. Pension Funds provide annuity payments for retired D.C. teachers, police officers, judges, and firefighters. The sources of revenues are through annual appropriations, employees' contributions, and interest earnings from investments. All proceeds are earmarked. Note 15 provides detailed information on various funds managed by the Office of DCP.

Treasury's four non-appropriated bureaus, BEP, Mint, OCC, and OTS, operate "public enterprise funds" that account for the revenue and expenses related to the production and sale of numismatic products and circulating bureaus coinage (Mint), the currency printing activities (BEP), and support of oversight functions of banking (OCC) and thrift operations (OTS). 31 USC 142 established the revolving fund for BEP to account for revenue and expenses related to the currency printing activities. Public Law 104-52 (31 USC §5136) established the Public Enterprise Fund for the Mint to account for all revenue and expenses related to the production and sale of numismatic products and circulating coinage. Revenues and other financing sources at the Mint are mainly from the sale of numismatic and bullion coins, and the sale of circulating coins to the Federal Reserve Banks system. 12 USC 481 established the Assessment Funds for OCC, and 103 Stat. 278 established the Public Enterprise Revolving Fund for OTS. Revenue and financing sources are from the bank examination and assessments for the oversight of the national banks, savings associations, and savings and loan holding companies. These earmarked funds do not directly contribute to the inflows of resources to the government; however, revenues in excess of costs are returned to the General Fund of the U.S. Government. There are minimal transactions with other government agencies.

There are other earmarked funds at several Treasury Department bureaus, such as donations to the Presidential Election Campaign Fund, funds related to the debt collection program, gifts to reduce the public debt, and other enforcement related activities. Public laws, statutory laws, U.S. Code, and the Debt Collection Improvement Act

established and authorized the use of these funds. Sources of revenues and other financing sources include contributions, cash and property forfeited in enforcement activities, public donations, and debt collection.

## Intra-governmental Investments in Treasury Securities

The Federal Government does not set aside assets to pay future benefits or other expenditures associated with earmarked funds. Treasury bureaus and other federal agencies invest some of the earmarked funds that they collect from the public. The funds are invested in securities issued by Treasury's Bureau of the Public Debt (BPD). The cash collected by BPD is deposited in the General Fund of the U.S. Government, which uses the cash for general government purposes.

The investments provide the Treasury Department bureaus and other federal agencies with authority to draw upon the General Fund of the U.S. Government to make future benefit payments or other expenditures. When Treasury Department bureaus or other federal agencies require redemption of these securities to make expenditures, the government finances those expenditures out of accumulated cash balances, by raising taxes or other receipts, by borrowing from the public or repaying less debt, or by curtailing other expenditures. This is the same way that the government finances all other expenditures.

The securities are an asset to the Treasury Department bureaus and other federal agencies and a liability of the BPD. The General Fund of the U.S. Government is liable to BPD. Because Treasury Department bureaus and other federal agencies are parts of the U.S. Government, these assets and liabilities offset each other from the standpoint of the government as a whole. For this reason, they do not represent an asset or a liability in the U.S. Government-wide financial statements.

The balances related to the investments made by Treasury Department bureaus are not displayed on Treasury's consolidated financial statements because the bureaus are subcomponents of the Treasury Department. However, the General Fund of the U.S. Government remains liable to BPD for the invested balances and BPD remains liable to the investing Treasury Department bureaus (Note 4).

Summary Information for Earmarked Funds as of and for the Year ended September 30, 2008 (In Millions):

| | Exchange Stabilization Fund | D.C. Pensions | Public Enterprise Revolving Funds | Other Earmarked Funds | Combined Earmarked Funds | Eliminations* | 09/30/2008 Totals |
|---|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | | |
| ASSETS: | | | | | | | |
| Fund Balance | $ 33 | $ 0 | $ 459 | $ 228 | $ 720 | $ 0 | $ 720 |
| Investments/Related Interest – Intra-governmental | 16,847 | 3,859 | 1,251 | 592 | 22,549 | 22,549 | 0 |
| Cash, Foreign Currency/Other Monetary Assets | 22,221 | 0 | 0 | 16 | 22,237 | 0 | 22,237 |
| Investments and Related Interest | 10,543 | 0 | 0 | 0 | 10,543 | 0 | 10,543 |
| Other Assets | 298 | 16 | 1,292 | 133 | 1,739 | 9 | 1,730 |
| **Total Assets** | **$ 49,942** | **$ 3,875** | **$ 3,002** | **$ 969** | **$ 57,788** | **$ 22,558** | **$ 35,230** |
| | | | | | | | |
| LIABILITIES: | | | | | | | |
| Intra-governmental Liabilities | $ 0 | $ 0 | $ 37 | $ 150 | $ 187 | $ 29 | $ 158 |
| Certificates Issued to Federal Reserve | 2,200 | 0 | 0 | 0 | 2,200 | 0 | 2,200 |
| Allocation of Special Drawing Rights | 7,630 | 0 | 0 | 0 | 7,630 | 0 | 7,630 |
| Other Liabilities | 330 | 8,856 | 617 | 182 | 9,985 | 0 | 9,985 |
| **Total Liabilities** | **$ 10,160** | **$ 8,856** | **$ 654** | **$ 332** | **$ 20,002** | **$ 29** | **$ 19,973** |
| | | | | | | | |
| NET POSITION: | | | | | | | |
| Unexpended Appropriations | $ 200 | $ 0 | $ 0 | $ 0 | $ 200 | $ 0 | $ 200 |
| Cumulative Results of Operations | 39,582 | (4,981) | 2,348 | 637 | 37,586 | 0 | 37,586 |
| **Total Liabilities and Net Position** | **$ 49,942** | **$ 3,875** | **$ 3,002** | **$ 969** | **$ 57,788** | **$ 29** | **$ 57,759** |
| | | | | | | | |
| **Statement of Net Cost** | | | | | | | |
| Gross Cost | $ 250 | $ 339 | $ 3,496 | $ 337 | $ 4,422 | $ 62 | $ 4,360 |
| Less Earned Revenue | (1,986) | (152) | (3,593) | (6) | (5,737) | (650) | (5,087) |
| **Total Net Cost of Operations** | **$ (1,736)** | **$ 187** | **$ (97)** | **$ 331** | **$ (1,315)** | **$ (588)** | **$ (727)** |
| | | | | | | | |
| **Cumulative Results of Operations** | | | | | | | |
| Beginning Balance | $ 37,846 | $ (5,141) | $ 2,206 | $ 474 | $ 35,385 | $ 0 | $ 35,385 |
| | | | | | | | |
| Budgetary Financing Sources | 0 | 347 | 0 | 442 | 789 | 23 | 766 |
| Other Financing Sources | 0 | 0 | 45 | 52 | 97 | (31) | 128 |
| Total Financing Sources | 0 | 347 | 45 | 494 | 886 | (8) | 894 |
| Net Cost of Operations | 1,736 | (187) | 97 | (331) | 1,315 | 588 | 727 |
| Net Change | 1,736 | 160 | 142 | 163 | 2,201 | 580 | 1621 |
| **Total Cumulative Results of Operations** | **$ 39,582** | **$ (4,981)** | **$ 2,348** | **$ 637** | **$ 37,586** | **$ 580** | **$ 37,006** |

*The eliminations reported above include both inter and intra eliminations for the Earmarked Funds. The total eliminations amount will not agree with the eliminations reported in the Statement of Changes in Net Position, which include eliminations for Other Funds.

NOTE 22.
EARMARKED FUNDS

FHFA 0237

## Summary Information for Earmarked Funds as of and for the Year ended September 30, 2007 (In Millions):

| | Exchange Stabilization Fund | D.C. Pensions | Public Enterprise Revolving Funds | Other Earmarked Funds | Combined Earmarked Funds | Eliminations* | 09/30/2007 Totals |
|---|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | | |
| ASSETS: | | | | | | | |
| Fund Balance | $ 0 | $ 0 | $ 439 | $ 265 | $ 704 | $ | $ 704 |
| Investments/Related Interest – Intra-governmental | 16,439 | 3,856 | 1,124 | 482 | 21,901 | 21,901 | 0 |
| Cash, Foreign Currency/Other Monetary Assets | 21,445 | 0 | 0 | 28 | 21,473 | | 21,473 |
| Investments and Related Interest | 10,040 | 0 | 0 | 0 | 10,040 | | 10,040 |
| Other Assets | 0 | 45 | 1,259 | 90 | 1,394 | 10 | 1,384 |
| **Total Assets** | **$ 47,924** | **$ 3,901** | **$ 2,822** | **$ 865** | **$ 55,512** | **$ 21,911** | **$ 33,601** |
| | | | | | | | |
| LIABILITIES: | | | | | | | |
| Intra-governmental Liabilities | $ 0 | $ 0 | $ 24 | $ 198 | $ 222 | $ 13 | $ 209 |
| Certificates Issued to Federal Reserve | 2,200 | 0 | 0 | 0 | 2,200 | | 2,200 |
| Allocation of Special Drawing Rights | 7,627 | 0 | 0 | 0 | 7,627 | | 7,627 |
| Other Liabilities | 51 | 9,042 | 592 | 193 | 9,878 | | 9,878 |
| **Total Liabilities** | **$ 9,878** | **$ 9,042** | **$ 616** | **$ 391** | **$ 19,927** | **$ 13** | **$ 19,914** |
| | | | | | | | |
| NET POSITION: | | | | | | | |
| Unexpended Appropriations | $ 200 | $ 0 | $ 0 | $ 0 | $ 200 | | $ 200 |
| Cumulative Results of Operations | 37,846 | (5,141) | 2,206 | 474 | 35,385 | | 35,385 |
| **Total Liabilities and Net Position** | **$ 47,924** | **$ 3,901** | **$ 2,822** | **$ 865** | **$ 55,512** | **$ 13** | **$ 55,499** |
| | | | | | | | |
| **Statement of Net Cost** | | | | | | | |
| Gross Cost | $ 703 | $ 446 | $ 2,997 | $ 234 | $ 4,380 | $ 56 | $ 4,324 |
| Less Earned Revenue | (3,864) | (160) | (3,120) | 0 | (7,144) | (1,036) | (6,108) |
| **Total Net Cost of Operations** | **$ (3,161)** | **$ 286** | **$ (123)** | **$ $234** | **$ (2,764)** | **$ (980)** | **$ (1,784)** |
| | | | | | | | |
| **Cumulative Results of Operations** | | | | | | | |
| Beginning Balance | $ 34,685 | $ (5,209) | $ 1,816 | $ 322 | $ 31,614 | $ 0 | $ 31,614 |
| | | | | | | | |
| Budgetary Financing Sources | $ 0 | $ 354 | $ 0 | $ 354 | $ 708 | $ 40 | $ 668 |
| Other Financing Sources | 0 | 0 | 267 | 32 | 299 | (16) | 315 |
| Total Financing Sources | 0 | 354 | 267 | 386 | 1,007 | 24 | 983 |
| Net Cost of Operations | 3,161 | (286) | 123 | (234) | 2,764 | 980 | 1,784 |
| Net Change | 3,161 | 68 | 390 | 152 | 3,771 | 1,004 | 2,767 |
| **Total Cumulative Results of Operations** | **$ 37,846** | **$ (5,141)** | **$ 2,206** | **$ 474** | **$ 35,385** | **$ 1,004** | **$ 34,381** |

\* The eliminations reported above include both inter and intra eliminations for the Earmarked Funds. The total eliminations amount will not agree with the eliminations reported in the Statement of Changes in Net Position, which include eliminations for Other Funds.

# 23. RECONCILIATION OF NET COST OF OPERATIONS TO BUDGET

The Reconciliation of Net Cost of Operations to Budget explains the difference between the budgetary net obliga-
tions and the proprietary net cost of operations. For fiscal years 2008 and 2007, OMB did not prescribe a format for
this reconciliation in OMB Circular A-136, *Financial Reporting Requirements,* as amended, so that preparers might
develop a more robust presentation tailored to their agency. As of September 30, 2008 and September 30, 2007, the
Reconciliation of Net Cost of Operations to Budget consisted of the following (in millions):

|  | 2008 | 2007 |
|---|---|---|
| **RESOURCES USED TO FINANCE ACTIVITIES:** | | |
| **Budgetary Resources Obligated:** | | |
| Obligations Incurred | $ 487,534 | $ 465,530 |
| Less: Spending Authority from Offsetting Collections and Recoveries | (9,401) | (10,237) |
| Obligations Net of Offsetting Collections and Recoveries | 478,133 | 455,293 |
| Less: Offsetting Receipts | (16,211) | (16,040) |
| **Net Obligations** | $ 461,922 | $ 439,253 |
| **Other Resources:** | | |
| Donations and Forfeiture of Property | 112 | 73 |
| Financing Sources for Accrued and Discount on the Debt | (3,870) | 7,632 |
| Transfers In/Out Without Reimbursement | (21) | (24) |
| Imputed Financing from Cost Absorbed by Others | 729 | 740 |
| Transfers to the General Fund and Other (Note 18) | (20,788) | (12,293) |
| Net Other Resources Used to Finance Activities | (23,838) | (3,872) |
| GSE Transactions | 13,800 | 0 |
| **Total Resources Used to Finance Activities** | $ 451,884 | $ 435,381 |
| | | |
| **RESOURCES USED TO FINANCE ITEMS NOT PART OF THE NET COST OF OPERATIONS:** | | |
| Change in Budgetary Resources Obligated for Goods, Services, and Benefits Ordered but not yet Provided | $ 1,229 | $ 4,788 |
| Credit Program Collections that Increase Liabilities for Loans Guarantees or Allowances for Subsidy | (5) | (94) |
| Adjustment to Accrued Interest and Discount on the Debt | (6,731) | 4,385 |
| Other (primarily non-exchange portion of offsetting receipts) | (10,745) | (14,089) |
| Total Resources Used to Finance Items Not Part of the Net Cost of Operations | (16,252) | (5,010) |
| **Total Resources Used to Finance the Net Cost of Operations** | $ 468,136 | $ 440,391 |
| | | |
| Total Components of Net Cost of Operations that will Require or Generate Resources in Future Periods | 14 | (18) |
| | | |
| Total Components of Net Cost of Operations that will not Require or Generate Resources | 1,201 | 948 |
| **Total Components of Net Cost of Operations That Will Not Require or Generate Resources in the Current Period** | 1,215 | 930 |
| **Net Cost of Operations** | $ 469,351 | $ 441,321 |

## 24. SPECIAL PROGRAMS WITH GOVERNMENT SPONSORED ENTERPRISES (GSE)

### Steps Taken to Maintain Financial Stability of GSE

The Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) are stockholder-owned GSE. Congress established these GSE to increase the supply of mortgage loans and to reduce the accompanying costs. A key Fannie Mae and Freddie Mac responsibility is to package purchased mortgages into securities. These securities are subsequently sold to investors. Proceeds from Fannie Mae and Freddie Mac sales are used to buy additional mortgages and keep money flowing through the mortgage markets. Fannie Mae and Freddie Mac direct, guaranteed debt, and mortgage backed securities (MBS) outstanding totaled approximately $5 trillion dollars at September 30, 2008.

Increasingly difficult conditions in the housing market challenged the soundness and profitability of MBS, thereby undermining the entire housing market. This led Congress to pass the Housing and Economic Recovery Act of 2008 in July 2008 (HERA). This Act created the new Federal Housing Finance Agency (FHFA), with enhanced regulatory authority over the GSE, and provided the Secretary of the Treasury with certain authorities intended to ensure the financial stability of the GSE, if necessary.

Due to deteriorating conditions in the housing mortgage markets and the resulting negative financial impact on the GSE, they were placed under FHFA conservatorship on September 7, 2008. This action was taken to preserve GSE assets, ensure a sound and solvent financial condition, and mitigate systemic risks that contributed to market instability. The FHFA director will terminate the conservatorship once sound and solvent conditions are established.

Pursuant to the authorities provided to the Secretary under the HERA, the Treasury Department, also on September 7, 2008, took three additional steps discussed below to help ensure the liquidity of the GSE while they are working to resolve their financial difficulties.

### Senior Preferred Stock Purchase Agreements

The first step was entering into senior preferred stock purchase agreements with each GSE on September 7, 2008. In exchange for entering into these agreements, Treasury Department initially received from each GSE: (1) 1,000,000 shares of non-voting variable liquidation preference senior preferred stock with a liquidation preference value of $1,000 per share and (2) a non-transferrable warrant for the purchase at a nominal cost of 79.9 percent of common stock on a fully-diluted basis. The warrants expire on September 7, 2028. The senior preferred stock accrues dividends at 10 percent per year, payable quarterly. This rate shall increase to 12 percent if, in any quarter, the dividends are not paid in cash, until all accrued dividends have been paid. In addition, beginning on March 31, 2010, the GSE will pay the Treasury Department a periodic commitment fee on a quarterly basis. This commitment fee will compensate the Treasury Department for the explicit support provided by the preferred stock agreements. This fee will be initially set by December 31, 2009, based on mutual agreement between the Treasury Department and each GSE, in consultation with the Chairman of the Federal Reserve Board. The fee shall be established for five-year periods, and may be waived by the Treasury Department for one year at a time if warranted by adverse mortgage market conditions. It may be paid in cash or may be added to the liquidation preference.

The senior preferred stock and warrants received in fiscal year 2008 are accounted for as non-entity investments in the Treasury Department's Fiscal Year 2008 Performance and Accountability Report. Their combined estimated value at September 08, 2008, is $7,032 million and at September 30, 2008, is $12,374 million. As these investments are accounted for at their fair value at the date of receipt, no increase in fair value is recorded. Other Federal Revenue of $7,032 was recognized from the acquisition of preferred stock and warrants. Treasury recorded the investment using the appraisal value $7,032 million at the date of purchase September 8, 2008, and then subsequently used the valuation $12,371 million at the reporting date to determine that no permanent impairment had occurred. Therefore, the recorded amount remained at the historical appraised value.

These agreements, which have no expiration date, provide that the Treasury Department will increase its investment in the senior preferred stock if at the end of any quarter the FHFA determines that the liabilities of either GSE exceed its assets. The maximum amount available to each GSE under this agreement is $100 billion. The Department determined that the net present value of this potential liability cannot be measured with sufficient reliability for fiscal year 2008. Accordingly, the estimated future liability, which would take into account increases in preferred stock liquidity value, associated dividends, and future commitment fees, is not recorded in the financial statements. The Department will attempt to make this determination on at least an annual basis going forward.

The actual recorded liability arising from the reported excess of GSE liabilities over assets as of September 30, 2008, is $ 13.8 billion. This amount is also recorded as an expense for fiscal year 2008. As funds for these payments are appropriated directly to the Department, these payments are treated as entity expenses and reflected as such on the Statement of Net Cost and Cumulative Results of Operations. The payment of this liability in fiscal year 2009 will result in an increase to the nonentity investment in GSE preferred stock, with a corresponding increase in Due to the General Fund, as the Department holds the investment on behalf of the General Fund. The carrying value of the investment will be evaluated on at least an annual basis.

The full amount of the $100 billion for each GSE, totaling $200 billion, was appropriated in fiscal year 2008, and accounts for the increase in appropriated funds and the increase in Unobligated Balance Available as seen in Note 2.

## GSE Credit Facility

The second step was the establishment of the Government Sponsored Enterprise Credit Facility (GSECF) to ensure credit availability to the GSE and the Federal Home Loan Banks. This lending facility will provide secured funding on an as needed basis under terms and conditions established by the Secretary to protect taxpayers. Fannie Mae, Freddie Mac, and the Federal Home Loan Banks are eligible to borrow under this program. The GSECF provides liquidity, if needed, until December 31, 2009.

Funding will be provided directly by Treasury from its account held at the Federal Reserve Bank of New York (FRBNY) in exchange for eligible collateral from the GSE which will be limited to guaranteed mortgage backed securities issued by the GSE as well as advances made by the Federal Home Loan Banks. Loan requests will require approval from Treasury and verification by the FRBNY that adequate collateral has been pledged. Loans made through the GSECF are subject to the federal debt limit. Loans will be for short-term durations and are in general expected to be for less than one month but no shorter than one week. Loans will not be made with a maturity date beyond December 31, 2009. The rate on a loan request ordinarily will be based on the daily London Interbank Borrowing Rate (LIBOR) for a similar term loan plus 50 basis points. The rate is set at the discretion of the Secretary with the objective of protecting the taxpayer, and is subject to change.

There is no stated limitation on loans provided through the GSECF. However, loans are limited to the amounts of available collateral.

There were no loans made through the GSECF in fiscal year 2008.

## GSE Mortgage-Backed Securities Purchase Program

The third step was the initiation of a temporary program to further support the availability of mortgage financing for millions of Americans and to mitigate pressures on mortgage rates. Under this program, Treasury purchases GSE MBS in the open market. By purchasing these credit-guaranteed securities, Treasury seeks to broaden access to mortgage funding for current and prospective homeowners and to promote stability in the mortgage market.

The size and timing of the MBS purchases is subject to the discretion of the Secretary. The scale of the program will be based on developments in the capital and housing markets. Initial purchases of $3.3 billion were made during September 2008. Additional purchases will be made as deemed appropriate through the expiration of this authority on December 31, 2009.

As these securities are backed by individual mortgages, they are accounted for under the Credit Reform Act of 1990.

FHFA 0242

Case 1:13-mc-01288-RCL    Document 7-3    Filed 12/17/13    Page 82 of 170

## 25. TEMPORARY GUARANTEE PROGRAM FOR MONEY MARKET FUNDS

The Treasury Department has established a Temporary Guarantee Program (Program) for Money Market Funds. Under this Program the Treasury Department will guarantee to investors that they will receive the stable share price (SSP) for shares held in participating money market funds as of the close of business on September 19, 2008. President George W. Bush approved the use of existing authorities by Secretary Henry M. Paulson, Jr. to make available, as necessary, the assets of the Exchange Stabilization Fund (ESF) to support the Program. If a participating fund's market-based net asset value (NAV) falls below 99.5 percent of the SSP and is not cured, a Guarantee Event will be deemed to occur. If outlays become necessary, they would be paid out initially from the ESF, and then under the provisions of Section 131 of the Emergency Economic Stabilization Act of 2008, such outlays would be reimbursed from funds available under the Troubled Assets Relief Program (Note 26). Treasury is not currently aware of any Guarantee Events which have occurred at funds that have been accepted into the Program.

Eligible funds must be regulated under Rule 2a-7 of the Investment Company Act of 1940, must maintain a SSP, must have had a market-based NAV of at least 99.5 percent of the SSP as of September 19, 2008, and must be publicly offered and registered with the Securities and Exchange Commission. The Program will be in effect until December 18, 2008, with an option to extend until September 18, 2009, at the discretion of the Secretary of the Treasury.

To participate in the Program, eligible money market funds must submit an application and pay a premium of one basis point if the fund's NAV is greater than or equal to 99.75 percent of the SSP, or 1.5 basis points of the SSP if the fund's NAV is less than 99.75 percent of the SSP but greater than or equal to 99.50 percent of the SSP. If the Program is extended beyond December 18, new premium charges will apply and funds will have the option to renew their coverage.

As of September 30, 2008, the Department collected $39.7 million in program participation premiums. As of October 10, 2008, the Department collected an additional $298.1 million in premiums. These premiums represent the payments for the first three months of coverage which began September 19, 2008. All premium payments were invested into U.S. Government securities. Treasury received applications representing at least $3 trillion of assets under management before the application deadline. As Treasury is currently reviewing the applications and determining eligibility for inclusion in the Program, the final assets under management that will be covered by the Program has not been determined. In addition, program participation payments from funds that are not accepted into the Program will be returned. Of the total $337.8 million collected, $45.0 million was recognized as earned revenue, while $292.8 million remained as unearned revenue at September 30, 2008. The revenue is included in Economic Program earned revenue on the Statement of Net Cost. The unearned revenue is included in other liabilities on the Balance Sheet.

The Department of the Treasury's exposure under the Program, when a guarantee event occurs, is the difference between the SSP and the NAV at liquidation of the money market fund. The Department believes the risk of loss under the program is negligible, and no future liability is recorded at September 30, 2008.

# 26. SUBSEQUENT EVENTS

## A. Emergency Economic Stabilization Act of 2008

The Emergency Economic Stabilization Act of 2008 (EESA) was signed into law on October 3, 2008. This law establishes a Troubled Asset Relief Program (TARP) to be administered by the Department of the Treasury. The TARP is intended to promote market stability and protect the U.S. economy by authorizing Treasury to purchase and guarantee troubled mortgage-related assets and other financial assets. EESA also provides for the purchase of any other financial instruments that the Secretary determines, after consultation with the Federal Reserve Board Chairman, is necessary in order to promote financial market stability.

The Secretary's authority to purchase financial assets was limited initially to $250 billion in outstanding assets, and increased to $350 billion upon certification by the President to the Congress on October 14, 2008. The authority can be increased to the maximum of $700 billion upon submission of a written report from the President to the Congress detailing the Secretary's plan to exercise additional authority, providing Congress does not enact a law to remove the President's authority.

The $700 billion limit shall be reduced by the difference between outstanding guaranteed obligations under the insurance program authorized by EESA, if any, and the balance in the Troubled Assets Insurance Financing Fund (TAIFF) established by EESA to guarantee timely payments on mortgage-related assets. The Secretary can guarantee timely payment of up to 100percent of the principal and interest on these insured assets. Institutions seeking this guarantee are required to pay risk-based premiums into the fund. The premiums will be in amounts determined by the Secretary, as necessary, to meet anticipated claims and eliminate any budgetary cost.

The EESA legislation terminates on December 31, 2009. However, the Secretary can extend this authority to October 3, 2010 upon submission of a written certification to Congress. EESA increases the statutory public debt limit by $700 billion, from $10.615 trillion to $11.315 trillion.

Upon passage of EESA, Treasury established the Office of Financial Stability to administer the TARP. No EESA transactions occurred during fiscal year 2008. Through November 14, 2008, $148 billion in financial assets were purchased through TARP.

## B. Energy Improvement and Extension Act of 2008

P.L. 110-343, *Division B – Energy Improvement and Extension Act of 2008*, was enacted on October 3, 2008.

Section 113 of the Act allowed for the restructuring of the Advance to the Black Lung Trust Fund (the Fund) by the repayment of the market value of outstanding repayable advances with the proceeds of obligations issued by the Fund to the General Fund of the U.S. Government and a one time appropriation.

Effective October 7, 2008, the Black Lung Disability Trust Fund repaid the General Fund of the U.S. Government the market value of the outstanding repayable plus accrued interest by transferring (1) obligations whose denominations, rate, and maturity were prescribed by the Secretary of the Treasury and (2) the one time appropriation amount, which was the difference between the proceeds received from issuance of the obligations described above and the market value of the outstanding advances payable.

## C. American International Group (AIG)

To help AIG work out its financial difficulties, the Federal Reserve Bank of New York agreed to lend up to $85 billion to AIG pursuant to the authority in Section 13(3) of the Federal Reserve Act. The Department is not a party to the AIG credit facility with the Fed, and has no liabilities, commitments or guarantees pursuant to the Fed's arrangements with AIG or any other financial relationship with AIG.

Under the terms of the agreement with AIG and the Federal Reserve, an approximately 79.9 percent equity interest in AIG (in the form of Convertible Participating Serial Preferred Stock convertible into approximately 79.9 percent of the issued and outstanding shares of common stock) was to be issued to a trust to be established by AIG. The U.S. Treasury will be named as the beneficiary of that trust, so that when the stock is ultimately liquidated the proceeds will be deposited into the General Fund of the U.S. Government. The Treasury Department will be the recipient of any dividends and any proceeds from the liquidation of the stock on behalf of the General Fund. The accounting and reporting for any activities related to the government's interest in the stock held by the trust will be done by the Treasury Department.

Subsequent to September 30, 2008, the credit facility to assist AIG was restructured significantly. The credit facility was modified to be incorporated into the TARP described above. To provide additional financial assistance to AIG, the Department agreed in November 2008 to directly purchase $40 billion in senior AIG preferred stock through the TARP. The Treasury Department will also receive common stock warrants for 2 percent of the outstanding AIG common stock, with the above-described convertible preferred stock interest to be owned by the trust reduced to 77.9 percent.

## REQUIRED SUPPLEMENTAL INFORMATION (UNAUDITED)

### Introduction

This section provides the Required Supplemental Information as prescribed by Office of Management and Budget (OMB) Circular A-136, *Financial Reporting Requirements*.

### Other Claims for Refunds

The Treasury Department has estimated that $22 billion may be payable as other claims for tax refunds. This estimate represents amounts (principal and interest) that may be paid for claims pending judicial review by the federal courts or internally. The total estimated payout (including principal and interest) for claims pending judicial review by the federal courts is $5.0 billion and by appeals is $17 billion.

### Federal Taxes Receivable, Net

In accordance with SFFAS No. 7, some unpaid tax assessments do not meet the criteria for financial statement recognition as discussed in Note 1 to the financial statements. Although compliance assessments and write-offs are not considered receivables under federal accounting standards, they represent legally enforceable claims of the Federal Government. There is, however, a significant difference in the collection potential between compliance assessments and receivables.

The components of the total unpaid assessments at September 30, 2008, were as follows (in billions):

| | | |
|---|---:|---:|
| Total Unpaid Assessments | $ | 278 |
| Less: Compliance Assessments | | (67) |
| Write Offs | | (99) |
| **Gross Federal Taxes Receivable** | **$** | **112** |
| Less: Allowance for Doubtful Accounts | | (83) |
| **Federal Taxes Receivables, Net** | **$** | **29** |

To eliminate double counting, the compliance assessments reported above exclude trust fund recovery penalties, totaling $4 billion, assessed against officers and directors of businesses who were involved in the non-remittance of federal taxes withheld from their employees. The related unpaid assessments of those businesses are reported as taxes receivable or write-offs, but the Treasury Department may also recover portions of those businesses' unpaid assessments from any and all individual officers and directors against whom a trust fund recovery penalty is assessed.

### Internal Revenue Service (IRS)

The unpaid assessments balance represents assessments resulting from taxpayers filing returns without sufficient payment, as well as from the IRS's enforcement programs such as examination, under-reporter, substitute for return, and combined annual wage reporting. A significant portion of this balance is not considered a receivable. Also, a substantial portion of the amounts considered receivables is largely uncollectible.

Under federal accounting standards, unpaid assessments require taxpayer or court agreement to be considered federal taxes receivable. Assessments not agreed to by taxpayers or the courts are considered compliance assessments and are not considered federal taxes receivable. Due to the lack of agreement, these compliance assessments are less likely to have future collection potential than those unpaid assessments that are considered federal taxes receivable.

Assessments with little or no future collection potential are called write-offs. Write-offs principally consist of amounts owed by deceased, bankrupt, or defunct taxpayers, including many failed financial institutions liquidated by the FDIC and the former Resolution Trust Corporation (RTC). As noted above, write-offs have little or no future collection potential, but statutory provisions require that these assessments be maintained until the statute for collection expires.

## Deferred Maintenance

In fiscal year 2008, the Treasury Department had no material amounts of deferred maintenance costs to report on vehicles, buildings, and structures owned by the Department of the Treasury.

Deferred maintenance applies to owned PP&E. Deferred maintenance is maintenance that was not performed when it should have been, or was scheduled to be, and is put off or delayed for a future period. Maintenance is defined as the act of keeping capitalized assets in an "acceptable condition" to serve their required mission. It includes preventive maintenance, normal repairs, replacement of parts and structural components, and other activities needed to preserve the asset so that it continues to provide acceptable services and achieves its expected useful life. Maintenance excludes activities aimed at expanding the capacity or significantly upgrading the assets to a different form than it was originally intended (*i.e.*, activities related to capitalized improvements, modernization, and/or restoration).

Logistic personnel use condition assessment surveys and/or the total life-cycle cost methods to determine deferred maintenance and acceptable operating condition of an asset. Periodic condition assessments, physical inspections, and review of manufacturing and engineering specifications, work orders, and building and other structure logistics reports can be used under these methodologies.

## Money Market Insurance Program– Risk Assumed Disclosure

The Treasury Department is not recording a contingent liability for any risk assumed, because the Department of the Treasury's exposure under the Program is the difference between a stable share price and the net asset value at liquidation of the money market fund. For all of the reasons outlined in Note 25, and based on current information and the Federal programs in place, and as this is a temporary program dealing with issues of first impression, we believe the risk of loss to the Treasury Department is negligible.

## Liquidity Commitment to Government Sponsored Enterprises (GSEs)

The liquidity commitment to the GSEs described in the senior preferred stock purchase agreements section of Note 24 is essentially an insurance program in that the Treasury Department received a commitment fee in return for a guarantee of GSE liquidity should their liabilities exceed their assets at the end of any future quarter.

The total program liability as of September 30, 2008 should include the amount of quarterly liquidity draws requested but not yet paid, accruals for amounts of liquidity draws not known until after the end of the quarter, and an estimated contingent liability for the discounted present value of future liquidity draws up to the $200 billion combined liability limit. The discounted present value would take into account estimated offsetting increases in the liquidity preference of the preferred stock, increases in dividends on the increased liquidity preference, and annual commitment fees. However, due to the current uncertainties and turbulence in the financial markets, for fiscal year 2008 the estimated contingent liability amount does not have "sufficient reliability" to be recorded as a liability. The only liability that is recorded for fiscal year 2008 is the $13.8 billion draw request received from the Federal Housing Finance Agency on behalf of Freddie Mac in November 2008 for the quarter ended September 30, 2008.  As noted above, the total gross risk under this commitment was $200 billion; after the November draw request, the remaining commitment is $186.2 billion.



Fiscal Year 2008 Statement of Budgetary Resources Disaggregated by Sub-organization Accounts (in Millions):

| | Engraving and Printing | Bureau Public Debt | Departmental Offices | Fin. Crimes Enforcement Network | Financial Management Service | Internal Revenue Service |
|---|---|---|---|---|---|---|
| **Budgetary Resources** | | | | | | |
| Unobligated balance brought forward | $ 112 | $ 131 | $ 55,288 | $ 11 | $ 259 | $ 662 |
| Recoveries prior year unpaid obligations | 0 | 125 | 133 | 2 | 15 | 105 |
| Budget Authority: | | | | | | |
| Appropriations | 0 | 452,780 | 203,289 | 86 | 12,018 | 11,296 |
| Borrowing authority | 0 | 0 | 4 | 0 | 0 | 0 |
| Spending authority offsetting collections: | | | | | | |
| Earned: Collected | 509 | 334 | 4,405 | 2 | 239 | 144 |
| Change in receivable federal | 8 | (73) | 2 | 1 | 2 | 28 |
| Change in unfilled customer order: | | | | | | |
| Advance received | 5 | 0 | (4) | 0 | 0 | 0 |
| Without advance from federal sources | 0 | (37) | 6 | 2 | (8) | (3) |
| Subtotal | 522 | 453,004 | 207,702 | 91 | 12,251 | 11,465 |
| Non-expenditure transfers, net | 0 | (2) | 846 | 0 | (18) | 18 |
| Temporarily not available | 0 | (5) | (4) | 0 | 0 | 0 |
| Permanently not available | 0 | (1,303) | (1,027) | (1) | (2,210) | (68) |
| **Total Budgetary Resources** | $ 634 | $ 451,950 | $ 262,938 | $ 103 | $ 10,297 | $ 12,182 |
| **Status of Budgetary Resources** | | | | | | |
| Obligations incurred | | | | | | |
| Direct | $ 0 | $ 451,458 | $ 4,544 | $ 80 | $ 9,847 | $ 11,360 |
| Reimbursable | 538 | 317 | 511 | 4 | 211 | 140 |
| Subtotal | 538 | 451,775 | 5,055 | 84 | 10,058 | 11,500 |
| Unobligated Balance | | | | | | |
| Apportioned | 96 | 144 | 213,380 | 15 | 212 | 217 |
| Exempt from apportionment | 0 | 23 | 33,932 | 0 | 18 | 0 |
| Subtotal | 96 | 167 | 247,312 | 15 | 230 | 217 |
| Unobligated balance not available | 0 | 8 | 10,571 | 4 | 9 | 465 |
| **Total Status of Budgetary Resources** | $ 634 | $ 451,950 | $ 262,938 | $ 103 | $ 10,297 | $ 12,182 |
| **Relationship Obligations to Outlays** | | | | | | |
| Obligated balance, net | | | | | | |
| Unpaid obligations brought forward | $ 102 | $ 297 | $ 55,202 | $ 16 | $ 332 | $ 1,440 |
| Uncollected customer payments Federal sources brought forward | (39) | (299) | (9) | 0 | (39) | (22) |
| Total unpaid obligated balance, net | 63 | (2) | 55,193 | 16 | 293 | 1,418 |
| Obligations incurred, net | 538 | 451,775 | 5,055 | 84 | 10,058 | 11,500 |
| Gross Outlays | (536) | (451,788) | (5,335) | (85) | (10,046) | (11,399) |
| Recoveries prior year unpaid obligations | 0 | (125) | (133) | (2) | (15) | (105) |
| Change uncollected customer payments | (8) | 110 | (8) | (3) | 6 | (25) |
| Obligated balance net, end of period | | | | | | |
| Unpaid obligations | 103 | 159 | 54,789 | 13 | 329 | 1,436 |
| Uncollected customer payments federal | (46) | (189) | (17) | (3) | (33) | (47) |
| Total unpaid obligated balance, net | 57 | (30) | 54,772 | 10 | 296 | 1,389 |
| **Net Outlays** | | | | | | |
| Gross outlays | 536 | 451,788 | 5,335 | 85 | 10,046 | 11,399 |
| Offsetting collections | (514) | (334) | (3,871) | (2) | (239) | (144) |
| Distributed offsetting receipts | 0 | (14,789) | (236) | 0 | (986) | (200) |
| **Net Outlays** | $ 22 | $ 436,665 | $ 1,228 | $ 83 | $ 8,821 | $ 11,055 |

| | U.S. Mint | Office of the Comptroller of the Currency | Office of Thrift Supervision | Alcohol Tobacco Tax & Trade Bureau | Budgetary Total | 9/30/2008 Non-Budgetary Financing |
|---|---|---|---|---|---|---|
| **Budgetary Resources** | | | | | | |
| Unobligated balance brought forward | $ 53 | $ 668 | $ 263 | $ 3 | $ 57,450 | $ 0 |
| Recoveries prior year unpaid obligations | 27 | 0 | 3 | 3 | 413 | 0 |
| Budget Authority: | | | | | | |
| Appropriations | 0 | 0 | 0 | 94 | 679,563 | 0 |
| Borrowing authority | 0 | 0 | 0 | 0 | 4 | 34,304 |
| Spending authority offsetting collections: | | | | | | |
| Earned: Collected | 2,066 | 740 | 263 | 3 | 8,705 | 335 |
| Change in receivable federal | 0 | 0 | 0 | 0 | (32) | 0 |
| Change in unfilled customer order: | | | | | | |
| Advance received | 9 | 0 | 9 | 0 | 19 | 0 |
| Without advance from federal sources | 1 | 0 | 0 | 0 | (39) | 0 |
| Subtotal | 2,076 | 740 | 272 | 97 | 688,220 | 34,639 |
| Non-expenditure transfers, net | 0 | 0 | 0 | 0 | 844 | 0 |
| Temporarily not available | 0 | 0 | 0 | 0 | (9) | 0 |
| Permanently not available | (15) | 0 | 0 | (2) | (4,626) | (4,767) |
| **Total Budgetary Resources** | **$ 2,141** | **$ 1,408** | **$ 538** | **$ 101** | **$ 742,292** | **$ 29,872** |
| **Status of Budgetary Resources** | | | | | | |
| Obligations incurred | | | | | | |
| Direct | $ 0 | $ 0 | $ 0 | $ 95 | $ 477,384 | $ 5,415 |
| Reimbursable | 2,091 | 674 | 246 | 3 | 4,735 | 0 |
| Subtotal | 2,091 | 674 | 246 | 98 | 482,119 | 5,415 |
| Unobligated Balance | | | | | | |
| Apportioned | 50 | 0 | 0 | 0 | 214,114 | 24,122 |
| Exempt from apportionment | 0 | 734 | 292 | 0 | 34,999 | 0 |
| Subtotal | 50 | 734 | 292 | 0 | 249,113 | 24,122 |
| Unobligated balance not available | 0 | 0 | 0 | 3 | 11,060 | 335 |
| **Total Status of Budgetary Resources** | **$ 2,141** | **$ 1,408** | **$ 538** | **$ 101** | **$ 742,292** | **$ 29,872** |
| **Relationship Obligations to Outlays** | | | | | | |
| Obligated balance, net | | | | | | |
| Unpaid obligations brought forward | $ 209 | $ 152 | $ 42 | $ 19 | $ 57,811 | $ 0 |
| Uncollected customer payments Federal sources brought forward | (6) | (4) | 0 | 0 | (418) | 0 |
| Total unpaid obligated balance, net | 203 | 148 | 42 | 19 | 57,393 | 0 |
| Obligations incurred, net | 2,091 | 674 | 246 | 98 | 482,119 | 5,415 |
| Gross Outlays | (2,013) | (660) | (241) | (96) | (482,199) | (5,409) |
| Recoveries prior year unpaid obligations | (27) | 0 | (3) | (3) | (413) | 0 |
| Change uncollected customer payments | (1) | 0 | 0 | 0 | 71 | 0 |
| Obligated balance net, end of period | | | | | | |
| Unpaid obligations | 260 | 166 | 44 | 19 | 57,318 | 6 |
| Uncollected customer payments federal | (7) | (4) | 0 | (1) | (347) | 0 |
| Total unpaid obligated balance, net | 253 | 162 | 44 | 18 | 56,971 | 6 |
| **Net Outlays** | | | | | | |
| Gross outlays | 2,013 | 660 | 241 | 96 | 482,199 | 5,409 |
| Offsetting collections | (2,075) | (740) | (272) | (3) | (8,194) | (335) |
| Distributed offsetting receipts | 0 | 0 | 0 | 0 | (16,211) | 0 |
| **Net Outlays** | **$ (62)** | **$ (80)** | **$ (31)** | **$ 93** | **$ 457,794** | **$ 5,074** |

*This page left intentionally blank*

# Tab 10



| Mortgage Market Note | **U.S. Treasury Support for Fannie Mae and Freddie Mac** |
|---|---|
| | December 5, 2008 |

# MORTGAGE MARKET NOTE 08-4

## I. Introduction

The Housing and Economic Recovery Act of 2008 (HERA) authorized the Secretary of the Treasury to support Fannie Mae, Freddie Mac, or the Federal Home Loan Banks (FHLBs) by purchasing obligations and other securities from those government-sponsored enterprises (collectively, the housing GSEs).  HERA gave the Secretary broad authority to determine the conditions and amounts of such purchases.

On September 7, 2008, Treasury Secretary Paulson exercised that authority by initiating individual agreements with Fannie Mae and Freddie Mac (the Enterprises) to purchase senior preferred stock.  In addition, the Treasury Secretary established two special facilities to purchase obligations of the housing GSEs:  one to purchase GSE-guaranteed mortgage-backed securities (the GSE MBS Purchase Facility) and the other to purchase GSE debt (the GSE Credit Facility).  Secretary Paulson has stated those three actions "have essentially guaranteed Fannie Mae and Freddie Mac securities."[1]  That guarantee is intended to improve investor confidence in the ability of each housing GSE to continue to provide liquidity to mortgage markets and to meet its obligations.  Investor confidence is essential to liquid and well-functioning mortgage markets, which in turn benefit homeowners and qualified mortgage borrowers by lowering borrowing costs and supporting home prices.

On November 25, 2008, the Federal Reserve announced it would purchase $100 billion of debt issued by the housing GSEs and $500 billion of MBS guaranteed by Fannie Mae, Freddie Mac, and Ginnie Mae.  Those purchases should further bolster investor confidence in Fannie Mae and Freddie Mac securities.

---

[1] See http://treasury.gov/press/releases/hp1301.htm

FHFA 0252

This Mortgage Market Note answers three basic questions about the Senior Preferred Stock Purchase Agreements, the GSE Credit Facility, and GSE MBS Purchase Facility:

- What do they do?
- How do they work? and
- When do they expire?

## II. Senior Preferred Stock Purchase Agreements

### *What they do*

The Senior Preferred Stock Purchase Agreements (SPSPAs) are the cornerstone of the financial support that the U.S. Treasury is providing to Fannie Mae and Freddie Mac.  The SPSPAs effectively provide a very long-term federal guarantee to existing and future debtholders.  Each SPSPA commits the Treasury to purchase up to $100 billion in senior preferred shares.  That commitment protects the credit interests of all holders of the Enterprises' senior and subordinated debt and MBS.  To put the $100 billion per Enterprise commitment in perspective, that amount is over three times Fannie Mae's statutory minimum capital requirement as of June 30, 2008, and nearly three-and-a-half times Freddie Mac's statutory minimum capital requirement as of that date.

Put another way, from the perspective of Enterprise debt and MBS holders, the Treasury commitment is equivalent to each Enterprise having raised $100 billion in new capital, thereby increasing its capital buffer by an amount that is more than three times greater than its minimum requirement.  That additional capital supports all past and future debt and MBS issues with no set expiration date.

### *How they work*

The SPSPAs effectively guarantee senior and subordinated debt and Enterprise-guaranteed MBS by ensuring the solvency of each Enterprise.  If an Enterprise's liabilities exceed its assets under generally accepted accounting principles, the Treasury must provide sufficient cash capital to eliminate that deficit in exchange for senior preferred stock.  The SPSPAs legally bind the U.S. government, through the Department of the Treasury, to provide the necessary capital under the stated conditions.   The Federal Housing Finance Agency is



responsible for determining whether the Treasury's obligation has been triggered.

In return for the support provided through the SPSPAs, Fannie Mae and Freddie Mac provided certain compensation to the Treasury and accepted various restrictions.  The compensation to the Treasury included the issuance by each Enterprise of $1 billion in senior preferred stock and warrants for the purchase of common stock representing 79.9 percent of its outstanding common stock.  The senior preferred stock pays an annual dividend of 10 percent in cash or 12 percent in additional senior preferred stock.  In addition, beginning March 31, 2010, the Treasury is entitled to receive from each Enterprise a commitment fee as compensation for the explicit support provided by the SPSPA.

The SPSPAs also restrict each Enterprise from issuing debt in excess of 110 percent of its debt outstanding as of June 30, 2008.  Further, each Enterprise's retained mortgage portfolio may not exceed $850 billion as of December 31, 2009, and must decline by 10 percent per year until it reaches $250 billion, which would occur no later than 2021.  As of September 30, 2008, Fannie Mae's consolidated balance sheet included retained mortgage assets of $745 billion and Freddie Mac's included retained mortgage assets of $695 billion.

## When they expire

The Treasury's commitment to provide capital to an Enterprise pursuant to their SPSPA has no set expiration date.  That commitment terminates only when one of the following events occurs:

- The Treasury has provided the full commitment of $100 billion in the form of senior preferred stock purchases.
- The Enterprise liquidates its assets.  In the event of such a liquidation, the Treasury will fund any capital deficiency up to its commitment under the SPSPA.  After that final funding, the funding commitment in the SPSPA would terminate.
- The Enterprise has repaid, defeased, or made other provision for all its mortgage guarantee obligations and debts.

The Justice Department has issued an opinion[2] that each SPSPA creates a binding obligation on the United States to provide the financial backstop set forth therein, without time limit, for the duration of the SPSPA and the liabilities protected by the SPSPA.  Thus, the Treasury's

---

[2] See http://www.usdoj.gov/olc/2008/treasury-gse-ltr-opinion.pdf.

FHFA 0254



commitment to provide capital to Fannie Mae and Freddie Mac is enforceable in federal court by the action of holders of debt issued or MBS guaranteed before or during the term of the commitment.  The effective guarantee of Fannie Mae and Freddie Mac debt and MBS will continue as long as those instruments are outstanding.

## III. GSE Credit Facility

### What it does

The GSE Credit Facility ensures that all three of the housing GSEs will have access to financing from the U.S. Treasury.  Through this facility, the Treasury will provide secured funding on an as-needed basis.  The facility ensures that a lack of access to funding in the open market will not prevent a housing GSE from conducting its business, including making timely payment of interest and principal on senior or subordinated debt obligations.  The facility has not yet been used, but remains available until December 31, 2009.

### How it works

The Treasury will provide funding directly to a housing GSE from its general fund held at the Federal Reserve Bank of New York (FRBNY) in exchange for eligible collateral from the GSE.  Eligible collateral is limited to MBS guaranteed by Freddie Mac and Fannie Mae and advances made by the Federal Home Loan Banks.  The FRBNY will act as the Treasury's fiscal agent to advance funds to the GSEs and to administer collateral arrangements.  Loan requests must be approved by the Treasury and the adequacy of collateral verified by the FRBNY.

Since the primary goal of this facility is to bridge relatively short periods when funding is unavailable to a GSE in the open market, loans are expected to be for less than one month but no shorter than one week, although specific maturities will be determined based on individual loan requests.  If necessary, a maturing loan may be replaced with a new loan under the same borrowing procedures as the initial loan.

Loan amounts will be based on available collateral as determined by the FRBNY, and loan rates will be set at the Treasury's discretion.  The Treasury has announced that it expects the loan rate will be half a percentage point above the London Interbank Offered Rate (LIBOR) for



a similar maturity dollar-denominated loan.  Since the facility was put in place on September 7th through the end of October 2008, the one-week LIBOR rate ranged from 1.64 to 4.76 percent and the one-month LIBOR rate ranged from 2.49 to 4.59 percent.  During that period, Fannie Mae issued short-term debt with maturities ranging from 91 to 182 days at yields ranging from 1.59 to 3.54 percent and Freddie Mac issued short-term debt with maturities ranging from 27 to 91 days at yields ranging from 1.09 to 2.89 percent.

### *When it expires*

The facility will offer liquidity if needed until December 31, 2009.  Loans will not be made that mature beyond that date.

## IV. GSE Mortgage-Backed Securities Purchase Facility

### *What it does*

The GSE MBS Purchase Facility provides a mechanism through which the Treasury can make unlimited purchases in the open market of MBS guaranteed by Fannie Mae and Freddie Mac.  Such purchases help improve the liquidity and stability of the secondary market for U.S. residential mortgages, which, in turn, improves the availability of mortgage credit to homebuyers, mitigates upward pressures on mortgage rates, and supports home prices.

### *How it works*

The Treasury has designated two independent asset managers to undertake the purchase and management of a portfolio of Enterprise MBS as the Treasury's financial agents.  Each portfolio is being managed with clear investment guidelines and investment objectives. The primary objectives of the portfolio include promoting market stability, ensuring mortgage availability, and protecting the taxpayer.

By providing a new source of direct investment in Enterprise MBS, the facility should reduce upward pressure on mortgage rates associated with investor uncertainty and loss of market liquidity.  The unlimited nature of the Treasury commitment and the Treasury's ability to hold assets to maturity should give the Treasury the ability to stabilize these markets and ensure the continued flow of funds to mortgage borrowers.



For example, if investors demand unusually large risk-adjusted spreads between the yields on Enterprise MBS and LIBOR or simply stop buying these securities in sufficient quantity to maintain the flow of funds to mortgage originators, Treasury may use this facility to purchase sufficient Enterprise MBS to reduce or eliminate the negative consequences.  Such actions would support the domestic economy by facilitating real estate sales and home refinancings that support consumption expenditures.

The Treasury purchased $5.1 billion in Enterprise MBS in September 2008 and $21.5 billion in October.  Program purchases are included in the *Final Monthly Treasury Statement of Receipts and Outlays of the United States Government*.

*When it expires*

The Treasury authority to make new purchases through the facility expires on December 31, 2009.  However, the Treasury may continue to hold a portfolio of Enterprise MBS purchased through the facility beyond that date.

FHFA 0257



# Tab 11

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2008
Commission File No.: 0-50231

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*
**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

Registrant's telephone number, including area code:
**(202) 752-7000**
Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, without par value | New York Stock Exchange<br>Chicago Stock Exchange |
| 8.25% Non-Cumulative Preferred Stock, Series T, stated value $25 per share | New York Stock Exchange |
| 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1, stated value $50 per share | New York Stock Exchange |
| Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S, stated value $25 per share | New York Stock Exchange |
| 7.625% Non-Cumulative Preferred Stock, Series R, stated value $25 per share | New York Stock Exchange |
| 6.75% Non-Cumulative Preferred Stock, Series Q, stated value $25 per share | New York Stock Exchange |
| Variable Rate Non-Cumulative Preferred Stock, Series P, stated value $25 per share | New York Stock Exchange |
| 5.50% Non-Cumulative Preferred Stock, Series N, stated value $50 per share | New York Stock Exchange |
| 4.75% Non-Cumulative Preferred Stock, Series M, stated value $50 per share | New York Stock Exchange |
| 5.125% Non-Cumulative Preferred Stock, Series L, stated value $50 per share | New York Stock Exchange |
| 5.375% Non-Cumulative Preferred Stock, Series I, stated value $50 per share | New York Stock Exchange |
| 5.81% Non-Cumulative Preferred Stock, Series H, stated value $50 per share | New York Stock Exchange |
| Variable Rate Non-Cumulative Preferred Stock, Series G, stated value $50 per share | New York Stock Exchange |
| Variable Rate Non-Cumulative Preferred Stock, Series F, stated value $50 per share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:
**Variable Rate Non-Cumulative Preferred Stock, Series O, stated value $50 per share**
*(Title of class)*
**5.375% Non-Cumulative Convertible Series 2004-1 Preferred Stock, stated value $100,000 per share**
*(Title of class)*
**5.10% Non-Cumulative Preferred Stock, Series E, stated value $50 per share**
*(Title of class)*
**5.25% Non-Cumulative Preferred Stock, Series D, stated value $50 per share**
*(Title of class)*

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑          Accelerated filer ☐          Non-accelerated filer ☐          Smaller reporting company ☐
                                            (Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☑

The aggregate market value of the common stock held by non-affiliates of the registrant computed by reference to the price at which the common stock was last sold on June 30, 2008 (the last business day of the registrant's most recently completed second fiscal quarter) was approximately $20,932 million.

As of January 31, 2009, there were 1,091,230,272 shares of common stock of the registrant outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**

None.

## TABLE OF CONTENTS

PART I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Item 1.     Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

            Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

            Market Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

            Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            Business Segments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            Conservatorship, Treasury Agreements, Our Charter And Regulation Of Our Activities . . . . . 20

            Our Customers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

            Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

            Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

            Where You Can Find Additional Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

            Forward-Looking Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Item 1A.    Risk Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

            Risks Relating to Our Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

            Risks Relating to Our Industry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Item 1B.    Unresolved Staff Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Item 2.     Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Item 3.     Legal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Item 4.     Submission of Matters to a Vote of Security Holders . . . . . . . . . . . . . . . . . . . . . . . . . . 75

PART II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Item 5.     Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases
            of Equity Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Item 6.     Selected Financial Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Item 7.     Management's Discussion and Analysis of Financial Condition and Results of Operations . . . 83

            Critical Accounting Policies And Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

            Consolidated Results Of Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

            Business Segment Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

            Consolidated Balance Sheet Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

            Supplemental Non-GAAP Information—Fair Value Balance Sheets . . . . . . . . . . . . . . . . . 140

            Liquidity And Capital Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

            Off-Balance Sheet Arrangements And Variable Interest Entities . . . . . . . . . . . . . . . . . . . 163

            Risk Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

            Impact Of Future Adoption Of New Accounting Pronouncements . . . . . . . . . . . . . . . . . . 209

            Glossary Of Terms Used In This Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

Item 7A.    Quantitative and Qualitative Disclosures about Market Risk . . . . . . . . . . . . . . . . . . . . . 215

Item 8.     Financial Statements and Supplementary Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

Item 9.     Changes in and Disagreements with Accountants on Accounting and Financial Disclosure . . . 215

Item 9A.    Controls and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

Item 9B.    Other Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

i

PART III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Item 10.   Directors, Executive Officers and Corporate Governance . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

       Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

       Corporate Governance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

       Executive Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

Item 11.   Executive Compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

       Compensation Discussion And Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

       Report Of The Compensation Committee Of The Board Of Directors . . . . . . . . . . . . . . . . . 238

       Compensation Tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder
       Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

Item 13.   Certain Relationships and Related Transactions, and Director Independence . . . . . . . . . . . . 259

Item 14.   Principal Accountant Fees and Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

PART IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

Item 15.   Exhibits and Financial Statement Schedules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

INDEX TO EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-1

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-1

FHFA 0260

## MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| — | Selected Financial Data | 80 |
| 1 | Credit Statistics, Single-Family Guaranty Book of Business | 9 |
| 2 | Level 3 Recurring Financial Assets at Fair Value | 85 |
| 3 | Condensed Consolidated Results of Operations and Selected Market Data | 96 |
| 4 | Analysis of Net Interest Income and Yield | 97 |
| 5 | Rate/Volume Analysis of Net Interest Income | 98 |
| 6 | Analysis of Guaranty Fee Income and Average Effective Guaranty Fee Rate | 100 |
| 7 | Investment Gains (Losses), Net | 103 |
| 8 | Fair Value Gains (Losses), Net | 104 |
| 9 | Derivatives Fair Value Gains (Losses), Net | 105 |
| 10 | Credit-Related Expenses | 109 |
| 11 | Allowance for Loan Losses and Reserve for Guaranty Losses | 110 |
| 12 | Statistics on Delinquent Loans Purchased from MBS Trusts Subject to SOP 03-3 | 112 |
| 13 | Activity of Delinquent Loans Acquired from MBS Trusts Subject to SOP 03-3 | 113 |
| 14 | Credit Loss Performance Metrics | 114 |
| 15 | Single-Family Credit Loss Sensitivity | 115 |
| 16 | Single-Family Business Results | 117 |
| 17 | HCD Business Results | 119 |
| 18 | Capital Markets Group Business Results | 120 |
| 19 | Mortgage Portfolio Activity | 123 |
| 20 | Mortgage Portfolio Composition | 124 |
| 21 | Amortized Cost, Fair Value, Maturity and Average Yield of Investments in Available-for-Sale Securities | 126 |
| 22 | Trading and Available-for-Sale Investment Securities | 127 |
| 23 | Investments in Private-Label Mortgage-Related Securities and Mortgage Revenue Bonds | 128 |
| 24 | Delinquency Status of Loans Underlying Alt-A and Subprime Private-Label Securities | 130 |
| 25 | Other-than-temporary Impairment Losses on Alt-A and Subprime Private-Label Securities | 130 |
| 26 | Investments in Alt-A Private-Label Mortgage-Related Securities, Excluding Wraps | 132 |
| 27 | Investments in Subprime Private-Label Mortgage-Related Securities, Excluding Wraps | 134 |
| 28 | Alt-A and Subprime Private-Label Wraps | 136 |
| 29 | Notional and Fair Value of Derivatives | 138 |
| 30 | Changes in Risk Management Derivative Assets (Liabilities) at Fair Value, Net | 139 |
| 31 | Comparative Measures—GAAP Consolidated Balance Sheets and Non-GAAP Fair Value Balance Sheets | 140 |
| 32 | Supplemental Non-GAAP Consolidated Fair Value Balance Sheets | 143 |
| 33 | Change in Fair Value of Net Assets (Net of Tax Effect) | 145 |
| 34 | Debt Activity | 149 |

| Table | Description | Page |
|---|---|---|
| 35 | Outstanding Short-Term Borrowings and Long-Term Debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 152 |
| 36 | Outstanding Short-Term Borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 153 |
| 37 | Maturity Profile of Outstanding Short-Term Debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 154 |
| 38 | Maturity Profile of Outstanding Long-Term Debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 154 |
| 39 | Contractual Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 155 |
| 40 | Cash and Other Investments Portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 157 |
| 41 | Fannie Mae Credit Ratings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 159 |
| 42 | Regulatory Capital Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 160 |
| 43 | On- and Off-Balance Sheet MBS and Other Guaranty Arrangements . . . . . . . . . . . . . . . . . . . | 164 |
| 44 | LIHTC Partnership Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 166 |
| 45 | Composition of Mortgage Credit Book of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 170 |
| 46 | Risk Characteristics of Conventional Single-Family Business Volume and Mortgage Credit Book of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 175 |
| 47 | Serious Delinquency Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 181 |
| 48 | Nonperforming Single-Family and Multifamily Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 183 |
| 49 | Statistics on Conventional Single-Family Problem Loan Workouts . . . . . . . . . . . . . . . . . . . . . | 185 |
| 50 | Re-performance Rates of Modified Conventional Single-Family Loans . . . . . . . . . . . . . . . . . . | 186 |
| 51 | Single-Family and Multifamily Foreclosed Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 187 |
| 52 | Mortgage Insurance Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 192 |
| 53 | Credit Loss Exposure of Risk Management Derivative Instruments . . . . . . . . . . . . . . . . . . . . | 197 |
| 54 | Activity and Maturity Data for Risk Management Derivatives . . . . . . . . . . . . . . . . . . . . . . . . | 203 |
| 55 | Fair Value Sensitivity of Net Portfolio to Changes in Level and Scope of Yield Curve . . . . . . . | 206 |
| 56 | Duration Gap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 207 |
| 57 | Interest Rate Sensitivity of Financial Instruments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 208 |

FHFA 0262

## PART I

*We have been under conservatorship since September 6, 2008. As conservator, the Federal Housing Finance Agency ("FHFA") succeeded to all rights, titles, powers and privileges of the company, and of any shareholder, officer or director of the company with respect to the company and its assets. We describe the conservatorship and its impact on our business under "Item 1—Business—Conservatorship, Treasury Agreements, Our Charter and Regulation of Our Activities" below.*

*Because of the complexity of our business and the industry in which we operate, we have included in this annual report on Form 10-K a glossary under "Part II—Item 7—Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A")—Glossary of Terms Used in This Report."*

## Item 1.   Business

### OVERVIEW

Fannie Mae is a government-sponsored enterprise ("GSE") that was chartered by Congress in 1938 to support liquidity and stability in the secondary mortgage market, where existing mortgage loans are purchased and sold. We securitize mortgage loans originated by lenders in the primary mortgage market into mortgage-backed securities that we refer to as Fannie Mae MBS, which can then be bought and sold in the secondary mortgage market. We describe the securitization process under "Business Segments—Single-Family Credit Guaranty Business—Mortgage Securitizations" below. We also participate in the secondary mortgage market by purchasing mortgage loans (often referred to as "whole loans") and mortgage-related securities, including our own Fannie Mae MBS, for our mortgage portfolio. We also make other investments that increase the supply of affordable housing. Under our charter, we may not lend money directly to consumers in the primary mortgage market.

We are subject to government oversight and regulation. Our regulators include FHFA, the Department of Housing and Urban Development ("HUD"), the Securities and Exchange Commission ("SEC"), and the Department of the Treasury ("Treasury"). We reference the Office of Federal Housing Enterprise Oversight ("OFHEO"), FHFA's predecessor, in this report with respect to actions taken by our safety and soundness regulator prior to the creation of FHFA on July 30, 2008.

Although we are a corporation chartered by the U.S. Congress, and although our conservator is a U.S. government agency and Treasury owns our senior preferred stock and a warrant to purchase our common stock, the U.S. government does not guarantee, directly or indirectly, our securities or other obligations. Our common stock is listed on the New York Stock Exchange ("NYSE") and traded under the symbol "FNM." We describe the impact of our failure to satisfy one of the NYSE's standards for continued listing of our common stock under "Conservatorship, Treasury Agreements, Our Charter and Regulation of Our Activities—New York Stock Exchange Listing" below. Our debt securities are actively traded in the over-the-counter market.

### MARKET OVERVIEW

Mortgage and housing market conditions worsened progressively and dramatically through 2008 and credit concerns and the liquidity crisis affected the general capital markets. The housing market downturn that began in the second half of 2006 and progressed through 2007 significantly worsened in 2008. During 2008, the nation experienced significant declines in new and existing home sales, housing starts and mortgage originations. Overall housing demand decreased over the past year due to an economic recession that began in December 2007 and a significant reduction in the availability of credit. Continued high housing supply due to the slowdown in demand, low availability of credit, and increase in mortgage foreclosures put downward pressure on home prices. Home prices declined approximately 9% in 2008, as measured from the fourth quarter of 2007 to the fourth quarter of 2008 based on our home price index, which is the greatest decline since our home price index's inception in 1975. As a result of declining home values, many home values fell below the amount of the mortgage owed on the home, leaving many borrowers unable to sell their homes or refinance their mortgage loans. These challenging market and economic conditions caused a significant

1

increase in mortgage delinquencies, defaults and foreclosures during 2008. Moreover, high housing supply and increased job losses have started to put pressure on the rental housing market.

Our business operates within the U.S. residential mortgage market, and therefore, we consider the amount of U.S. residential mortgage debt outstanding to be the best measure of the size of our overall market. As of September 30, 2008, the latest date for which information was available, the amount of U.S. residential mortgage debt outstanding was estimated by the Federal Reserve to be approximately $12.1 trillion (including $11.2 trillion of single-family mortgages). Our mortgage credit book of business, which includes mortgage assets we hold in our investment portfolio, our Fannie Mae MBS held by third parties and credit enhancements that we provide on mortgage assets, was $3.1 trillion as of September 30, 2008, or approximately 26% of total U.S. residential mortgage debt outstanding.

With weak housing activity and national home price declines, growth in total U.S. residential mortgage debt outstanding slowed to an estimated annual rate of 0.5% in the first nine months of 2008 (the most recent available data), compared with 7.7% over the first nine months of 2007, and 12.7% over the first nine months of 2006. We expect residential mortgage debt outstanding to shrink by approximately 0.2% in 2009. See "Item 1A—Risk Factors" for a description of the risks associated with the housing market downturn and continued home price declines.

The continuing downturn in the housing and mortgage markets has been affected by, and has had an effect on, challenging conditions that exist across the global financial markets. This adverse market environment intensified in the second half of 2008 and was characterized by increased illiquidity in the credit markets, wider credit spreads, lower business and consumer confidence, and concerns about corporate earnings and the solvency of many financial institutions. Conditions in the financial services industry were particularly difficult. In the second half of 2008, we and Freddie Mac were placed into conservatorship, Lehman Brothers Holdings Inc. ("Lehman Brothers") filed for bankruptcy, and a number of major U.S. financial institutions consolidated or received financial assistance from the U.S. government. During 2008, the FDIC was appointed receiver for 25 U.S. banks. Real gross domestic product, or GDP, growth slowed to 1.3% in 2008 with a decline of 3.8% in the fourth quarter. The unemployment rate increased from 4.9% at the end of 2007 to 7.2% at the end of 2008.

Since the second half of 2008, the U.S. government took a number of actions intended to strengthen market stability, improve the strength of financial institutions, and enhance market liquidity. These actions included the following:

- On July 30, 2008, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA") which, among other things, authorized the Secretary of the Treasury to purchase GSE debt, equity and other securities.

- On September 7, 2008, the Treasury Secretary announced a program to purchase GSE mortgage-backed securities in the open market pursuant to its authority under HERA. Treasury began purchasing Fannie Mae MBS under this program in September 2008. This authority expires on December 31, 2009.

- On September 19, 2008, the Federal Reserve Board announced enhancements to its existing liquidity facilities, including plans to purchase from primary dealers short-term debt obligations issued by us, Freddie Mac and the 12 Federal Home Loan Banks ("FHLBs").

- On October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008, or Stabilization Act, which authorized the Secretary of the Treasury to establish a Troubled Assets Relief Program, or TARP, to purchase up to $700 billion in troubled assets (including mortgage loans and mortgage-backed securities) from financial institutions. As of February 13, 2009, Treasury had committed a total of $305.8 billion under TARP, including $276.0 billion in capital investments in U.S. financial institutions.

- On October 7, 2008, the Federal Reserve Board announced the creation of a commercial paper funding facility that would fund purchases of commercial paper of three-month maturity from eligible issuers in an effort to provide additional liquidity to the short-term debt markets.

- On October 14, 2008, the Federal Deposit Insurance Corporation ("FDIC") announced a temporary liquidity guarantee program pursuant to which it would guarantee, until June 30, 2012, the senior debt issued on or before June 30, 2009 by all FDIC-insured institutions and their holding companies, as well as deposits in non-interest-bearing accounts held in FDIC-insured institutions.

- On November 25, 2008, the Federal Reserve announced a new program to purchase up to $100 billion in direct obligations of us, Freddie Mac, and the FHLBs, along with up to $500 billion in mortgage-backed securities guaranteed by us, Freddie Mac and the Government National Mortgage Association ("Ginnie Mae"). The Federal Reserve began purchasing our debt and MBS under this program in January 2009.

- On February 17, 2009, President Barack Obama signed into law the American Recovery and Reinvestment Act of 2009 ("2009 Stimulus Act"), a $787 billion economic stimulus package aimed at lifting the economy out of recession.

- On February 18, 2009, the Obama Administration announced the Homeowner Affordability and Stability Plan ("HASP") as part of the administration's strategy to get the economy back on track. The Administration announced that key components of the plan are (1) providing access to low-cost refinancing for responsible homeowners suffering from falling home prices, (2) creating a $75 billion homeowner stability initiative to reach up to three to four million at-risk homeowners and (3) supporting low mortgage rates by strengthening confidence in Fannie Mae and Freddie Mac.

## EXECUTIVE SUMMARY

*We have been in conservatorship, with FHFA acting as our conservator, since September 6, 2008. As conservator, FHFA succeeded to all rights, titles, powers and privileges of the company, and of any shareholder, officer or director of the company with respect to the company and its assets. Following FHFA placing us into conservatorship, a variety of factors that affect our business, results of operations, financial condition, liquidity, net worth, corporate structure, management, business strategies and objectives, and controls and procedures changed materially. We discuss the rights and powers of the conservator and the provisions of our agreements with Treasury in more detail below under "Conservatorship, Treasury Agreements, Our Charter and Regulation of Our Activities."*

***Our "Executive Summary" presents the most significant factors on which management and the conservator are focused in operating and evaluating our business and financial position and prospects, including recent significant changes in our business operations and strategies. More specifically, we discuss:***

- ***our business objectives and strategy, including the decision to make providing liquidity, stability and affordability in the mortgage market the highest priority and, in particular, our focused efforts on foreclosure prevention and helping homeowners;***

- ***our 2008 results of operations, including our $58.7 billion loss for 2008 and our net worth deficit of approximately $15.2 billion at year-end, resulting in a request from our conservator to Treasury for an investment of this amount under the senior preferred stock purchase agreement;***

- ***the recently announced Homeowner Affordability and Stability Plan, our role in that plan, and its anticipated impact on us;***

- ***the continuing deterioration of the performance of our mortgage credit book of business and the potential additional pressure placed on that performance by our foreclosure prevention efforts;***

- ***the funding challenges we experienced in 2008, the impact of debt market events on our debt maturity profile and the resulting increase in our refinancing risk; and***

- ***the likelihood that, in the future, we will need Treasury to make additional investments in the company under the senior preferred stock purchase agreement.***

***For an explanation of terms we use in this executive summary without definition, please see our glossary of terms included in "Part II—Item 7—MD&A—Glossary of Terms Used in This Report."***

**Management of Our Business**

*Business Objectives and Strategy*

FHFA, in its role as conservator, has overall management authority over our business but has delegated specified oversight authorities to our Board of Directors. The conservator also has delegated authority to our management to conduct our day-to-day operations. The Board of Directors and management are in consultation with the conservator in establishing the strategic direction for the company, and the conservator has approved the company's current business objectives and strategy.

We face a variety of different, and potentially conflicting, objectives, including:

- providing liquidity, stability and affordability in the mortgage market;

- immediately providing additional assistance to this market and to the struggling housing market;

- limiting the amount of the investment Treasury must make under the senior preferred stock purchase agreement in order to eliminate a net worth deficit;

- returning to long-term profitability; and

- protecting the interests of the taxpayers.

These objectives create conflicts in strategic and day-to-day decision-making that could lead to less than optimal outcomes for one or more, or possibly all, of these objectives. For example, limiting the amount of funds Treasury must invest in us pursuant to the senior preferred stock purchase agreement in order to eliminate a net worth deficit could require us to constrain some of our business activities, including activities that provide liquidity, stability and affordability to the mortgage market. Conversely, to the extent we increase our efforts, or undertake new activities, to assist the mortgage market, our financial results are likely to suffer, and we may be less effective in limiting Treasury's future investments in us under the senior preferred stock purchase agreement. We regularly consult with and receive direction from our conservator on how to balance these objectives.

Currently, we are primarily focusing on:

- providing liquidity, stability and affordability in the mortgage market; and

- immediately providing additional assistance to this market and to the struggling housing market.

More specifically, in pursuit of these objectives, we have concentrated our efforts on keeping people in their homes and preventing foreclosures. In addition, we have remained active in the secondary mortgage market through our guaranty business. The essence of this strategy is to build liquidity and affordability in the mortgage market, while efficiently creating and implementing successful foreclosure prevention approaches. Currently, one of the principal ways in which we are focusing on these objectives is through our participation in HASP, which we describe in more detail below. Focusing on these objectives is likely to contribute to further deterioration in both our results of operations and our net worth, which in turn would both increase the amount that Treasury will be required to invest in us under the senior preferred stock purchase agreement and inhibit our ability to return to long-term profitability. We therefore consult regularly with our conservator on how to balance these objectives against potentially competing considerations, such as limiting the amount of Treasury's investment in us and returning to long-term profitability.

*Homeowner Affordability and Stability Plan*

On February 18, 2009, the Obama Administration announced the Homeowner Affordability and Stability Plan. HASP includes several different elements that impact and involve us:

- *Loan Modification Program.*   Under HASP, we will offer to financially struggling homeowners loan modifications that reduce their monthly principal and interest payments on their mortgages. This program will be conducted in accordance with HASP requirements for borrower eligibility. The program seeks to provide a uniform, consistent regime that servicers would use in modifying loans to prevent foreclosures.

4

Under the program, servicers that service loans held in Fannie Mae MBS trusts or in our portfolio will be incented to reduce at-risk borrowers' monthly mortgage payments to as little as 31% of monthly income, which may be achieved through a variety of methods, including interest rate reductions, principal forbearance and term extensions. Although HASP contemplates that some servicers will also make use of principal reduction to achieve reduced payments for borrowers, we do not currently anticipate that principal reduction will be used in modifying our loans. We will bear the full cost of these modifications and will not receive a reimbursement from Treasury. Servicers will be paid incentive fees both when they originally modify a loan, and over time, if the modified loan remains current. Borrowers whose loans are modified through this program will also accrue monthly incentive payments that will be applied to reduce their principal as they successfully make timely payments over a period of five years. Fannie Mae, rather than Treasury, will bear the costs of these servicer and borrower incentive fees. As the details of this program continue to develop, there may be additional incentive fees and other costs that we will bear.

- *Program Administrator.*   We will play a role in administering HASP on behalf of Treasury. This will include implementing the guidelines and policies within which the loan modification program will operate, both for our own servicers and for servicers of non-agency loans that participate in the program. We will also maintain records and track the performance of modified loans, both for our own loans, as well as for loans of non-agency issuers that will participate in this program. Lastly, we will calculate and remit the subsidies and incentive payments to non-agency borrowers, servicers and investors who participate in the program. Treasury will reimburse us for the expenses we incur in connection with providing these services.

- *Streamlined Refinancing Initiative.*   Under HASP, we will help borrowers who have mortgages with current loan-to-value ratios up to 105% to refinance their mortgages without obtaining new mortgage insurance in excess of what was already in place. We have worked with our conservator and regulator, FHFA, to provide us the flexibility to implement this element of HASP. Through the initiative, we will offer this refinancing option only for qualifying mortgage loans we hold in our portfolio or that we guarantee. We will continue to hold the portion of the credit risk not covered by mortgage insurance for refinanced loans under this initiative. By March 4, 2009 we expect to release guidelines describing the details of this initiative and we expect to implement this initiative in the second quarter of 2009 which will bring efficiencies to the refinance process for lenders and borrowers.

Treasury has announced that it expects to issue guidelines for the national loan modification program, including our loan modification program described above, by March 4, 2009. Given that the nature of both the loan modification and streamlined refinance programs is unprecedented and the details of these programs are still under development at this time, it is difficult for us to predict the full extent of our activities under the programs and how those will impact us, the response rates we will experience, or the costs that we will incur. However, to the extent that our servicers and borrowers participate in these programs in large numbers, it is likely that the costs we incur associated with modifications of loans held in our portfolio or in Fannie Mae MBS trusts as well as the borrower and servicer incentive fees associated with them, will be substantial, and these programs would therefore likely have a material adverse effect on our business, results of operations, financial condition and net worth.

We expect that our efforts under HASP will replace the previously announced Streamlined Modification Program.

*Other Programs to Provide Stability and Affordability Through Our Homeowner Assistance and Foreclosure Prevention Initiatives*

In addition to our expected efforts under HASP, and in light of our objectives and strategy, during 2008 and 2009 (and prior to the announcement of HASP), we adopted or expanded a variety of initiatives designed to provide assistance to homeowners and prevent foreclosures, including the initiatives listed in the following table.

| Initiative | Description | Objective |
|---|---|---|
| Suspension of Foreclosures (*effective 11/26/08—1/31/09, 2/17/09—3/6/09*) and Suspension of Evictions (*effective 11/26/08—3/6/09*) | Suspension of foreclosure sales and of evictions of occupants  (renters or owners) of single-family homes we own | To aid borrowers facing foreclosure (or tenants of properties subject to foreclosure). During the suspension period, we engaged in a concentrated effort to implement foreclosure prevention measures. We have now extended these periods through March 6, 2009 to allow us to implement the recently announced HASP |
| New and Amended Single-Family Trust Documents (*announced 12/8/08*) | Trust documents govern how and when a loan can be purchased out of an MBS trust. New and revised trust documents provide greater flexibility to help borrowers with loans securitized into our MBS trusts by extending permitted forbearance and repayment plan periods for loans in most trusts and permitting earlier removal of delinquent loans from trusts created on or after January 1, 2009 | To provide servicers with added flexibility in designing workouts, and to help delinquent borrowers stay in homes |
| HomeSaver Advance (*announced 6/16/08*) | Provides an unsecured loan to qualified borrowers to cure the payment defaults on a first mortgage loan. Originally available only to borrowers who had missed three or more payments; now available for any qualified borrower regardless of number of payments missed | To help delinquent borrowers bring mortgages current (without requiring the purchase of a loan out of an MBS trust).  Removing the requirement for three missed payments permits servicers to assist qualified borrowers earlier in the process |
| National REO Rental Program (*announced 1/13/09*) | Permits existing, qualified renters to lease the property at market rate while the property is marketed for sale or provides financial assistance for the tenant's transition to new housing should they choose to vacate the property | To provide continued housing opportunity for qualified renters in Fannie Mae-owned foreclosed properties to stay in their homes, while the property is marketed, and to promote neighborhood stabilization |
| "Second Look" Program (*initiated 10/08*) | Review of seriously delinquent loans by our personnel to confirm that the borrower has been contacted and that workout options have been offered before a foreclosure sale is completed | To confirm that all workout options are explored for seriously delinquent borrowers and limit foreclosures |
| Reminder to servicers of availability of pre-foreclosure sales and deeds-in-lieu of foreclosure as a foreclosure alternative (*preexisting*) | Permits the sale (pre-foreclosure or "short" sale) or transfer (deed-in-lieu) of the home without completing a foreclosure sale | To permit earlier sales of the home in order to avoid potential adverse impact of further declines in home value and terminate further mortgage costs |

The principal purposes of these initiatives are: to help stabilize the mortgage market; to limit foreclosures and keep people in their homes; and to help stabilize communities.

The actions we are taking and the initiatives we have introduced to assist homeowners and limit foreclosures are significantly different from our historical approach to delinquencies, defaults and problem loans. In addition,

6

many of these efforts are relatively new and are being applied more broadly and in ways that we have not previously applied them. As a result, it will take time for us to assess and provide statistical information both on the relative success of these efforts and their effect on our results of operations and financial condition. Our early experience indicates that a number of our programs may not be achieving results either as rapidly as we had expected or in the ways that we had expected, and we are working with our conservator to reassess these programs in order to both help us best fulfill our objective of helping homeowners and the mortgage market, and to determine their effectiveness and priority with respect to the recently announced HASP. As we assess these programs, we may expand, eliminate or modify these programs in the future. We have included data relating to our borrower loss mitigation activities for 2008 and prior periods in "Part II—Item 7—Risk Management— Credit Risk Management—Mortgage Credit Risk Management."

Because approximately 92% of our guaranty book of business is made up of single-family conventional mortgage loans that we own or that are in guaranteed Fannie Mae MBS and because the number of seriously delinquent loans is significantly higher for our single-family mortgage credit guaranty book, we have focused our credit loss reduction and foreclosure prevention efforts primarily on these single-family conventional loans. The recently announced HASP is consistent with that focus. We have developed a variety of options for providing assistance, rather than relying on a "one size fits all" approach, in recognition that no single solution will resolve the varied problems facing homeowners who currently need assistance or who may need assistance in the future. As we implement these new initiatives, however, we face a variety of challenges that have limited the early success of our initiatives.

One challenge we face is the current unpredictability of consumer behavior. As a result, in introducing new programs, we have little historical data that we can use either as a basis for predicting consumer impact, response and acceptance rates, or to identify consumer behavior that is not consistent with historical patterns. To address this challenge, we monitor and assess on a regular basis both our workout initiatives and our understanding of borrowers' needs in the current market environment so that we will be in a position to offer solutions designed to have the highest possible success rate.

A second challenge we face is the stress that the current market environment has placed on servicer resources. Because we implement all of our homeowner assistance programs through servicers and depend on them to implement our initiatives effectively, limitations on servicer capacity and capabilities can significantly limit both the success of our initiatives and the amount of flexibility that can be offered within and among various initiatives. We therefore are focusing our efforts on accommodating servicers' resource constraints by creating and offering streamlined solutions for borrowers that are relatively easy both to explain and to implement. We also have increased the number of our own personnel that we place onsite in the offices of our largest servicers in order to enhance the servicers' capacity in the face of their increasingly heavy workload.

Third, we are experiencing challenges in creating initiatives that will permit homeowners who face debt pressure from a variety of sources in addition to mortgage loan payments to manage all of their debt payments successfully. Other types of consumer debt and obligations arise from a variety of sources, including second mortgages, credit card debt, loans to purchase an automobile, property insurance, and real estate taxes. Because we generally only have the ability to affect a homeowner's obligations relating to his or her first lien mortgage loan, we expect that, in many cases, we may not be able to offer sufficient assistance to permit the homeowner to continue to meet all existing obligations.

Finally, we believe that, during the current crisis, one of the key elements for successfully assisting homeowners and preventing foreclosures is to reach troubled and potentially troubled borrowers earlier in the delinquency process. We are working to develop effective ways to achieve this earlier intervention, which we believe is necessary to accelerate positive change in the current mortgage market.

Before the modification of a loan that is held in an MBS trust becomes effective, we generally purchase the loan from the trust. When we do, we are required by generally accepted accounting principles ("GAAP") to record the loan on our consolidated balance sheet at its current market value, rather than the loan amount, and recognize a loss for any difference between the loan amount and the market value of the loan. As we work aggressively to assist homeowners and implement the loan modification provisions of HASP, we expect that the number of loans we modify will increase substantially during 2009 and beyond. Some portion of the loans

7

that we permanently modify will not thereafter perform successfully but instead will again default, resulting in a foreclosure or requiring further modification at a later time.

For a discussion of various factors that may adversely affect the success of our homeowner assistance and foreclosure prevention programs, as well as our financial condition and results of operations, refer to "Item 1A—Risk Factors."

### Providing Mortgage Market Liquidity

In addition to our borrower support efforts, our work to support lenders and provide mortgage market liquidity includes the following:

- *Ongoing provision of liquidity to the mortgage markets.*   During the fourth quarter of 2008, we purchased or guaranteed an estimated $113.3 billion in new business, measured by unpaid principal balance, consisting primarily of single-family mortgages and provided financing for approximately 468,000 conventional single-family loans. Our purchase of approximately $35.0 billion of new and existing multifamily loans during 2008 helped to finance approximately 577,000 multifamily units.

- *Cancellation of planned delivery fee increase.*   In October 2008, we canceled a planned 25 basis point increase in our adverse market delivery charge on mortgage loans.

- *Partnership with Federal Home Loan Bank of Chicago.*   On October 7, 2008, we announced that we had entered into an agreement with the Federal Home Loan Bank of Chicago under which we have committed to purchase 15-year and 30-year fixed-rate mortgage loans that the Bank has acquired from its member institutions through its Mortgage Partnership Finance® (MPF®) program, which helps make affordable mortgages available to working families across the country. This arrangement is designed to allow us to expand our efforts to a broader market and provide additional liquidity to the mortgage market while prudently managing risk.

- *Reduced fees for our real estate mortgage investment conduits ("REMICs").*   In September 2008, we reduced the fees for our REMICs by 15%.

- *Relaxing restrictions on institutions holding principal and interest payments on our behalf in response to an FDIC rule change.*   In October 2008, the FDIC announced a rule change that lowered our risk of loss if a party holding principal and interest payments on our behalf in custodial depository accounts failed. In response to this rule change, we curtailed or reversed actions we had been taking for several months prior to October to reduce our risk. These prior actions included reducing the amount of our funds permitted to be held with mortgage servicers, requiring more frequent remittances of funds and moving funds held with our largest counterparties from custodial accounts to trust accounts.

### Summary of Our Financial Results for 2008

We recorded a net loss of $58.7 billion and a diluted loss per share of $24.04 for 2008. Our results for 2008 were driven primarily by escalating credit-related expenses, consisting primarily of additions to our combined loss reserves; significant fair value losses; investment losses from other-than-temporary impairment; and a non-cash charge of $21.4 billion in the third quarter of 2008 to establish a partial deferred tax asset valuation allowance. These results reflect the substantial challenges in the housing, mortgage and capital markets during 2008 and particularly during the second half of 2008, as well as the deepening economic recession and extremely challenging financial environment, both of which significantly intensified during the fourth quarter of 2008.

For the fourth quarter of 2008, we recorded a net loss of $25.2 billion and a diluted loss per share of $4.47, compared with a net loss of $29.0 billion and a diluted loss per share of $13.00 for the third quarter of 2008. The $3.8 billion decrease in our net loss for the fourth quarter of 2008 compared with the third quarter of 2008 was driven principally by our establishment during the third quarter of a deferred tax asset valuation allowance of $21.4 billion, more than offsetting the increase in fair value losses in our Capital Markets group to $12.3 billion during the fourth quarter of 2008, compared with $3.9 billion during the third quarter of 2008.

8

Our mortgage credit book of business increased to $3.1 trillion as of December 31, 2008 from $2.9 trillion as of December 31, 2007, as we have continued to perform our chartered mission of helping provide liquidity to the mortgage markets. Our estimated market share of new single-family mortgage-related securities issuances was 41.7% for the fourth quarter of 2008, compared with 42.2% for the third quarter of 2008 and an average estimated market share of 45.4% for the year. Our estimated market share of new single-family mortgage-related securities issuances decreased during the second half of 2008 from the levels we achieved during the first half of 2008 primarily due to changes in our pricing and eligibility standards, which reduced our acquisition of higher risk loans, as well as changes in the eligibility standards of the mortgage insurance companies, which further reduced our acquisition of loans with high loan-to-value ratios and other high-risk features. In addition, the estimated market share of new single-family mortgage-related securities issuances that were guaranteed by Ginnie Mae (which primarily guarantees securities backed by FHA insured loans) increased significantly during 2008. The cumulative effect of these changes contributed to a reduction in our mortgage acquisitions during the second half of 2008, compared with the first half of the year.

We provide more detailed discussions of key factors affecting changes in our results of operations and financial condition in "Part II—Item 7—MD&A—Consolidated Results of Operations," "Part II—Item 7—MD&A—Business Segment Results," "Part II—Item 7—MD&A—Consolidated Balance Sheet Analysis," "Part II—Item 7—MD&A—Supplemental Non-GAAP Information—Fair Value Balance Sheets," and "Part II—Item 7—MD&A—Risk Management—Credit Risk Management—Mortgage Credit Risk Management—Mortgage Credit Book of Business."

### Credit Overview

We expect economic conditions and falling home prices to continue to negatively affect our credit performance in 2009, which will cause our credit losses to increase. Further, if economic conditions continue to decline, more borrowers will be unable to make their monthly mortgage payments, resulting in increased delinquencies and defaults, sharper declines in home prices and higher credit losses.

The credit statistics presented in Table 1 illustrate the deterioration in the credit performance of mortgage loans in our single-family guaranty book of business in 2007, and on a quarterly basis in 2008.

**Table 1:   Credit Statistics, Single-Family Guaranty Book of Business[1]**

| | 2008 | | | | | 2007 |
|---|---|---|---|---|---|---|
| | Q4 | Q3 | Q2 | Q1 | Total | Total |
| | | | (Dollars in millions) | | | |
| As of the end of each period: | | | | | | |
| Serious delinquency rate[2] . . . . . . . . . . . . . . . . . | 2.42% | 1.72% | 1.36% | 1.15% | 2.42% | 0.98% |
| On-balance sheet nonperforming loans[3] . . . . . . . . | $20,484 | $14,148 | $11,275 | $10,947 | $20,484 | $10,067 |
| Off-balance sheet nonperforming loans[4] . . . . . . . . | $98,428 | $49,318 | $34,765 | $23,983 | $98,428 | $17,041 |
| Foreclosed property inventory (number of properties)[5][6] . . . . . . . . . . . . . . . . . . . . . . . . . . | 63,538 | 67,519 | 54,173 | 43,167 | 63,538 | 33,729 |
| During the period: | | | | | | |
| Loan modifications (number of properties)[7] . . . . . . | 6,276 | 5,262 | 10,190 | 11,521 | 33,249 | 26,421 |
| HomeSaver Advance problem loan workouts (number of properties)[8] . . . . . . . . . . . . . . . . . . | 25,783 | 27,267 | 16,742 | 1,151 | 70,943 | — |
| Foreclosed property acquisitions (number of properties)[6] . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,998 | 29,583 | 23,963 | 20,108 | 94,652 | 49,121 |
| Single-family credit-related expenses[9] . . . . . . . . . . | $11,917 | $ 9,215 | $ 5,339 | $ 3,254 | $29,725 | $ 5,003 |
| Single-family credit losses[10] . . . . . . . . . . . . . . . . | $ 2,197 | $ 2,164 | $ 1,249 | $   857 | $ 6,467 | $ 1,331 |

[1]  The single-family guaranty book of business consists of single-family mortgage loans held in our mortgage portfolio, single-family Fannie Mae MBS held in our mortgage portfolio, single-family Fannie Mae MBS held by third parties,

and other credit enhancements that we provide on single-family mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guarantee.

[2] Calculated based on number of loans. We include all of the conventional single-family loans that we own and that back Fannie Mae MBS in the calculation of the single-family delinquency rate.

[3] Represents the total amount of nonaccrual loans, troubled debt restructurings, and first-lien loans associated with unsecured HomeSaver Advance loans inclusive of troubled debt restructurings and HomeSaver Advance first-lien loans on accrual status. A troubled debt restructuring is a modification to the contractual terms of a loan that results in a concession to a borrower experiencing financial difficulty.

[4] Represents unpaid principal balance of nonperforming loans in our outstanding and unconsolidated Fannie Mae MBS held by third parties, including first-lien loans associated with unsecured HomeSaver Advance loans that are not seriously delinquent.

[5] Reflects the number of single-family foreclosed properties we held in inventory as of the end of each period.

[6] Includes deeds in lieu of foreclosure.

[7] Modifications include troubled debt restructurings and other modifications to the contractual terms of the loan that do not result in concessions to the borrower. A troubled debt restructuring involves some economic concession to the borrower, and is the only form of modification in which we do not expect to collect the full original contractual principal and interest amount due under the loan, although other resolutions and modifications may result in our receiving the full amount due, or certain installments due, under the loan over a period of time that is longer than the period of time originally provided for under the loans.

[8] Represents number of first-lien loans associated with unsecured HomeSaver Advance loans.

[9] Consists of the provision for credit losses and foreclosed property expense.

[10] Consists of (a) charge-offs, net of recoveries and (b) foreclosed property expense for the reporting period. Interest forgone on single-family nonperforming loans in our mortgage portfolio is not reflected in our credit losses total. In addition, other-than-temporary impairment losses resulting from deterioration in the credit quality of our mortgage-related securities and accretion of interest income on single-family loans subject to SOP 03-3 are excluded from credit losses.

Through December 31, 2008, our Alt-A loans, as well as certain other higher risk loans, loans on properties in particular states, and loans originated in 2006 and 2007, contributed disproportionately to our worsening credit statistics. At this time, however, we are observing higher delinquency rates across our broader guaranty book of business as well.

### Net Worth and Fair Value Deficit

#### *Net Worth and Fair Value Deficit Amounts*

Under our senior preferred stock purchase agreement with Treasury, Treasury generally has committed to provide us funds of up to $100 billion, on a quarterly basis, in the amount, if any, by which our total liabilities exceed our total assets, as reflected on our consolidated balance sheet, prepared in accordance with GAAP, for the applicable fiscal quarter. On February 18, 2009, in connection with the announcement of HASP, Treasury announced that it is amending the senior preferred stock purchase agreement with us to (1) increase its funding commitment from $100 billion to $200 billion, and (2) increase the size of our mortgage portfolio allowed under the agreement by $50 billion to $900 billion, with a corresponding increase in the allowable debt outstanding. In connection with announcing Treasury's planned amendments to the senior preferred stock purchase agreement, Secretary Geithner stated that "Fannie Mae and Freddie Mac are critical to the functioning of the housing finance system in this country and play a key role in making mortgage rates affordable and maintaining the stability and liquidity of our mortgage market" and that "[t]he increased funding will provide forward-looking confidence in the mortgage market and enable Fannie Mae and Freddie Mac to carry out ambitious efforts to ensure mortgage affordability for responsible homeowners." Because an amended agreement has not been executed as of the date of this report, the following discussion of the senior preferred stock purchase agreement, as well as references to that agreement throughout this report, refer to the terms of the existing agreement, without reflecting these changes. We describe the terms of the senior preferred stock purchase agreement in more detail in "Conservatorship, Treasury Agreements, Our Charter and Regulation of Our Activities—Treasury Agreements."

As a result of our net loss for the year ended December 31, 2008, our net worth (defined as the amount by which our total assets exceed our total liabilities, as reflected on our consolidated balance sheet prepared in accordance with GAAP), had a deficit of $15.2 billion as of December 31, 2008, a decrease of $59.3 billion from our net worth of $44.1 billion as of December 31, 2007. As of December 31, 2008, our fair value deficit (which represents a negative fair value of our net assets), as reflected in our consolidated non-GAAP fair value balance sheet, was $105.2 billion, a decrease of $142.5 billion from the fair value of our net assets as of December 31, 2007. The amount that Treasury will invest in us under the senior preferred stock purchase agreement is determined based on our GAAP balance sheet, rather than our non-GAAP fair value balance sheet. There are significant differences between our GAAP balance sheet and our non-GAAP fair value balance sheet, which we describe in greater detail in "Part II—Item 7—MD&A—Supplemental Non-GAAP Information—Fair Value Balance Sheets."

If current trends in the housing and financial markets continue or worsen, we expect that we also will have a net worth deficit in future periods, and therefore will be required to obtain additional funding from Treasury pursuant to the senior preferred stock purchase agreement.

### *Request for Treasury Investment*

Under the Regulatory Reform Act, FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are, and during the preceding 60 days have been, less than our obligations. FHFA has notified us that the measurement period for such a determination begins no earlier than the date of the SEC filing deadline for our quarterly and annual financial statements and continues for a period of 60 days after that date. FHFA also has advised us that, if we receive an investment from Treasury during that 60-day period in order to eliminate our net worth deficit of the prior period end in accordance with the senior preferred stock purchase agreement, the Director of FHFA will not make a mandatory receivership determination. The Director of FHFA submitted a request on February 25, 2009 to Treasury for $15.2 billion on our behalf under the terms of the senior preferred stock purchase agreement in order to eliminate our net worth deficit as of December 31, 2008. FHFA requested that Treasury provide the funds on or prior to March 31, 2009.

### *Significance of Net Worth Deficit, Fair Value Deficit and Combined Loss Reserves*

Our net worth deficit, which is derived from our consolidated GAAP balance sheet, includes the combined loss reserves of $24.8 billion that we recorded in our consolidated balance sheet as of December 31, 2008. Our non-GAAP fair value balance sheet presents all of our assets and liabilities at fair value as of the balance sheet date, based on assumptions and management judgment, as described in more detail in "Part II—Item 7—MD&A—Supplemental Non-GAAP Information—Fair Value Balance Sheets" and "Part II—Item 7—MD&A—Critical Accounting Policies and Estimates." "Fair value" represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. This is also sometimes referred to as the "exit price." In determining fair value, we use a variety of valuation techniques and processes, which are described in more detail in "Part II—Item 7—MD&A—Critical Accounting Policies and Estimates—Fair Value of Financial Instruments." In general, fair value incorporates the market's current view of the future, and that view is reflected in the current price of the asset or liability. However, future market conditions may be different from what the market has currently estimated and priced into these fair value measures.

Neither our combined loss reserves, as reflected on our consolidated GAAP balance sheet, nor our estimate of the fair value of our guaranty obligations, which we disclose in our consolidated non-GAAP fair value balance sheet, reflects our estimate of the future credit losses inherent in our existing guaranty book of business. Rather, our combined loss reserves reflect only probable losses that we believe we have already incurred as of the balance sheet date, while the fair value of our guaranty obligation is based not only on future expected credit losses over the life of the loans underlying our guarantees as of December 31, 2008, but also on the estimated profit that a market participant would require to assume that guaranty obligation. Because of the severe deterioration in the mortgage and credit markets, there is significant uncertainty regarding the full extent of future

credit losses in the mortgage industry as a whole, as well as to any participant in the industry. Therefore, we are not currently providing guidance or other estimates of the credit losses that we will experience in the future.

**Liquidity**

We fund our purchases of mortgage loans primarily from the proceeds from sales of our debt securities. In September 2008, Treasury made available to us two additional sources of funding: the Treasury credit facility and the senior preferred stock purchase agreement, as described below in "Conservatorship, Treasury Agreements, Our Charter and Regulation of Our Activities—Treasury Agreements."

During the second half of 2008, we began to experience significant deterioration in our access to the unsecured debt markets, particularly for long-term and callable debt, and in the yields on our debt as compared with relevant market benchmarks. These conditions, which became especially pronounced in October and November 2008, have had, and are continuing to have, adverse effects on our business and results of operations. Several factors contributed to the reduced demand for our debt securities, including continued severe market disruptions, market concerns about our capital position and the future of our business (including its future profitability, future structure, regulatory actions and agency status) and the extent of U.S. government support for our business.

On November 25, 2008, the Federal Reserve announced that it would purchase up to $100 billion in direct obligations of us, Freddie Mac and the FHLBs, and up to $500 billion in MBS guaranteed by us, Freddie Mac and Ginnie Mae. Since that time, the Federal Reserve has been supporting the liquidity of our debt as an active and significant purchaser of our long-term debt in the secondary market, and we have experienced noticeable improvement in spreads and in our access to the debt markets in January and February 2009. However, this recent improvement may not continue or may reverse. In addition, while distribution of recent issuances to international investors has been consistent with our distribution trends prior to mid-2007, we continue to experience reduced demand from international investors, particularly foreign central banks, compared with the historically high levels of demand we experienced from these investors between mid-2007 and mid-2008.

Because consistent demand for both our debt securities with maturities greater than one year and our callable debt was low between July and November 2008, we were forced to rely increasingly on short-term debt to fund our purchases of mortgage loans, which are by nature long-term assets. As a result, we will be required to refinance, or "roll over," our debt on a more frequent basis, exposing us to an increased risk, particularly when market conditions are volatile, that demand will be insufficient to permit us to refinance our debt securities as necessary and to risks associated with refinancing under adverse credit market conditions. Further, we expect that our "roll over," or refinancing, risk is likely to increase substantially as we approach year-end 2009 and the expiration of the Treasury credit facility. See "Part II—Item 7—MD&A—Liquidity and Capital Management—Liquidity Management—Debt Funding—Debt Funding Activity" for more information on our debt funding activities and risks posed by our current market challenges, and "Item 1A—Risk Factors" for a discussion of the risks to our business posed by our reliance on the issuance of debt to fund our operations.

The Treasury credit facility and the senior preferred stock purchase agreement may provide additional sources of funding in the event that we cannot adequately access the unsecured debt markets. On February 25, 2009, the Director of FHFA submitted a request to Treasury on our behalf for $15.2 billion in funding under the terms of the senior preferred stock purchase agreement in order to eliminate our net worth deficit as of December 31, 2008. There are limitations on our ability to use either of these sources of funding, however, and we describe these limitations in "Part II—Item 7—MD&A—Liquidity and Capital Management—Liquidity Management—Liquidity Contingency Plan."

In addition, although our liquidity contingency plan anticipates that we would use specified alternative sources of liquidity to the extent that we are unable to access the unsecured debt markets, we have uncertainty regarding our ability to execute on our liquidity contingency plan in the current market environment. See "Part II—Item 7—MD&A—Liquidity and Capital Management—Liquidity Management—Liquidity Contingency Plan" for a description of our liquidity contingency plan and the current uncertainties regarding that plan.

12

**Outlook**

During the fourth quarter of 2008, our outlook for 2009 worsened.

*Overall Market Conditions:*   We expect that the current crisis in the U.S. and global financial markets will continue, which will continue to adversely affect our financial results throughout 2009. We expect the unemployment rate to continue to increase as the economic recession continues. We expect to continue to experience home price declines and rising default and severity rates, all of which may worsen as unemployment rates continue to increase and if the U.S. continues to experience a broad-based recession. We expect mortgage debt outstanding to shrink by approximately 0.2% in 2009. We continue to expect the level of foreclosures and single-family delinquency rates to increase further in 2009.

*Home Price Declines:*   Following a decline of approximately 9% in 2008, we expect that home prices will decline another 7% to 12% on a national basis in 2009. We now expect that we will experience a peak-to-trough home price decline of 20% to 30%, rather than the 15% to 19% decline we predicted last year. These estimates contain significant inherent uncertainty in the current market environment, due to historically unprecedented levels of uncertainty regarding a variety of critical assumptions we make when formulating these estimates, including: the effect of actions the federal government may take with respect to national economic recovery; the impact of those actions on home prices, unemployment, and the general economic environment; and the rate of unemployment and/or wage decline. Because of these uncertainties, the actual home price decline we experience may differ significantly from these estimates. We also expect significant regional variation in home price decline percentages, with steeper declines in certain areas such as Florida, California, Nevada and Arizona.

Our estimate of a 7% to 12% home price decline for 2009 compares with a home price decline of approximately 12% to 18% using the S&P/Case-Schiller index method, and our 20% to 30% peak-to-trough home price decline estimate compares with an approximately 33% to 46% peak-to-trough decline using the S&P/Case-Schiller index method. Our estimates differ from the S&P/Case-Schiller index in two principal ways: (1) our estimates weight expectations for each individual property by number of properties, whereas the S&P/Case-Schiller index weights expectations of home price declines based on property value, such that declines in home prices on higher priced homes will have a greater effect on the overall result; and (2) our estimates do not include sales of foreclosed homes because we believe that differing maintenance practices and the forced nature of the sales make them less representative of market values, whereas the S&P/Case-Schiller index includes foreclosed property sales. The S&P/Case-Schiller comparison numbers shown above are calculated using our models and assumptions, but modified to use these two factors (weighting of expectations based on property value and the inclusion of foreclosed property sales). In addition to these differences, our estimates are based on our own internally available data combined with publicly available data, and are therefore based on data collected nationwide, whereas the S&P/Case-Schiller index is based only on publicly available data, which may be limited in certain geographies. Our comparative calculations to the S&P/Case-Schiller index provided above are not modified to account for this data pool difference.

*Credit Losses and Loss Reserves:*   We continue to expect our credit loss ratio (which excludes SOP 03-3 fair value losses and HomeSaver Advance fair value losses) in 2009 will exceed our credit loss ratio in 2008. We also expect a significant increase in our SOP 03-3 fair value losses as we increase the number of loans we repurchase from MBS trusts in order to modify them. In addition, we expect significant continued increases in our combined loss reserves through 2009.

*Liquidity:*   Although our access to the debt markets has improved noticeably since late November 2008, we expect continued pressure on our access to the debt markets throughout 2009 at economically attractive rates. Further, we expect the pressure will become increasingly great as we approach the expiration of the Treasury credit facility at the end of 2009. Pressure on our ability to access the debt markets at attractive rates, particularly our ability to issue long-term debt at attractive rates, increases our borrowing costs as well as our "roll over" risk, limits our ability to grow and to manage our market and liquidity risk effectively, and increases the likelihood that we may need to borrow under the Treasury credit facility.

13

*Uncertainty Regarding our Future Status and Profitability:*  We expect that we will experience adverse financial effects because of our strategy of concentrating our efforts on keeping people in their homes and preventing foreclosures, including our efforts under HASP, while remaining active in the secondary mortgage market. In addition, future activities that our regulators, other U.S. government agencies or Congress may request or require us to take to support the mortgage market and help borrowers may contribute to further deterioration in our results of operations and financial condition. In a statement issued on September 7, 2008, the then-Secretary of the Treasury stated that there is a consensus that we and Freddie Mac pose a systemic risk and that we could not continue in our then-current form.

## BUSINESS SEGMENTS

We are organized in three complementary business segments: Single-Family Credit Guaranty, Housing and Community Development, and Capital Markets. The table below displays net revenues, net income (loss) and total assets for each of our business segments for the years ended December 31, 2008, 2007 and 2006.

**Business Segment Summary Financial Information**

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2008** | **2007** | **2006** |
| | **(Dollars in millions)** | | |
| Net revenues:[1] | | | |
| Single-Family Credit Guaranty .................................. | $ 9,434 | $ 7,062 | $ 6,079 |
| Housing and Community Development .......................... | 476 | 425 | 510 |
| Capital Markets ........................................... | 7,526 | 3,718 | 5,432 |
| Total ................................................. | $ 17,436 | $11,205 | $12,021 |
| Net income (loss): | | | |
| Single-Family Credit Guaranty ................................ | $(27,101) | $   (858) | $ 2,044 |
| Housing and Community Development .......................... | (2,189) | 157 | 338 |
| Capital Markets ........................................... | (29,417) | (1,349) | 1,677 |
| Total ................................................. | $(58,707) | $ (2,050) | $ 4,059 |

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2008** | **2007** | **2006** |
| | **(Dollars in millions)** | | |
| Total assets: | | | |
| Single-Family Credit Guaranty ....................... | $ 24,115 | $ 23,356 | $ 15,777 |
| Housing and Community Development ................ | 10,994 | 15,094 | 14,100 |
| Capital Markets .................................. | 877,295 | 840,939 | 814,059 |
| Total ........................................... | $912,404 | $879,389 | $843,936 |

[1]  Includes net interest income, guaranty fee income, trust management income, and fee and other income.

For information on the results of operations of our business segments, see "Part II—Item 7—MD&A—Business Segment Results."

### Single-Family Credit Guaranty Business

Our Single-Family Credit Guaranty, or Single-Family, business works with our lender customers to securitize single-family mortgage loans into Fannie Mae MBS and to facilitate the purchase of single-family mortgage loans for our mortgage portfolio. Single-family mortgage loans relate to properties with four or fewer residential units. Revenues in the segment are derived primarily from guaranty fees received as compensation for assuming the credit risk on the mortgage loans underlying single-family Fannie Mae MBS and on the single-family mortgage loans held in our portfolio.

The aggregate amount of single-family guaranty fees we receive in any period depends on the amount of Fannie Mae MBS outstanding during that period and the applicable guaranty fee rates. The amount of Fannie Mae MBS outstanding at any time is primarily determined by the rate at which we issue new Fannie Mae MBS and by the repayment rate for the loans underlying our outstanding Fannie Mae MBS. Other factors affecting the amount of Fannie Mae MBS outstanding are the extent to which we purchase loans from our MBS trusts because of borrower defaults (with the amount of these purchases affected by rates of borrower defaults on the loans and the extent of loan modification programs in which we engage) and the extent to which servicers repurchase loans from us at our request because there was a breach in the representations and warranties provided upon delivery of the loans.

### Mortgage Securitizations

Our most common type of securitization transaction is referred to as a "lender swap transaction." Mortgage lenders that operate in the primary mortgage market generally deliver pools of mortgage loans to us in exchange for Fannie Mae MBS backed by these loans. After receiving the loans in a lender swap transaction, we place them in a trust that is established for the sole purpose of holding the loans separate and apart from our assets. We serve as trustee for the trust. We deliver to the lender (or its designee) Fannie Mae MBS that are backed by the pool of mortgage loans in the trust and that represent an undivided beneficial ownership interest in each of the loans. We guarantee to each MBS trust that we will supplement amounts received by the MBS trust as required to permit timely payment of principal and interest on the related Fannie Mae MBS. We retain a portion of the interest payment as the fee for providing our guaranty. Then, on behalf of the trust, we make monthly distributions to the Fannie Mae MBS certificateholders from the principal and interest payments and other collections on the underlying mortgage loans. For more information on our MBS trusts, see "Part II—Item 7—MD&A—Off-Balance Sheet Arrangements and Variable Interest Entities."

We issue both single-class and multi-class Fannie Mae MBS. Single-class Fannie Mae MBS refers to Fannie Mae MBS where the investors receive principal and interest payments in proportion to their percentage ownership of the MBS issuance. Multi-class Fannie Mae MBS refers to Fannie Mae MBS, including REMICs, where the cash flows on the underlying mortgage assets are divided, creating several classes of securities, each of which represents a beneficial ownership interest in a separate portion of cash flows. Terms to maturity of some multi-class Fannie Mae MBS, particularly REMIC classes, may match or be shorter than the maturity of the underlying mortgage loans and/or mortgage-related securities. As a result, each of the classes in a multi-class Fannie Mae MBS may have a different coupon rate, average life, repayment sensitivity or final maturity. We also issue structured Fannie Mae MBS, which are multi-class Fannie Mae MBS or single-class Fannie Mae MBS that are resecuritizations of other single-class Fannie Mae MBS.

### MBS Trusts

Each of our single-family MBS trusts operates in accordance with a trust agreement or an indenture. In most instances, a single-family MBS trust is also governed by an issue supplement documenting the formation of that MBS trust and the issuance of the Fannie Mae MBS by that trust. In December 2008, we established a new single-family master trust agreement that governs our single-family MBS trusts formed on or after January 1, 2009 and amended and restated our previous 2007 master trust agreement in order to provide greater flexibility to help borrowers with loans securitized in our MBS trusts. The trust agreements or the trust indenture, together with the issue supplement and any amendments, are the "trust documents" that govern an individual MBS trust.

In accordance with the terms of our single-family MBS trust documents, we have the option or, in some instances, the obligation, to purchase specified mortgage loans from an MBS trust. Our acquisition cost for these loans is the unpaid principal balance of the loan plus accrued interest. We generally purchase from the MBS trust any loan that we intend to modify prior to the time that the modification becomes effective. After we purchase the loan, we generally work with the borrower to modify the loan. Because we have established and are implementing a variety of strategies designed to permit modification of both whole loans that we own and loans in our MBS trusts, we expect that the number of loans we purchase from our MBS trusts will increase significantly. In the current market environment, an increase in the loans we purchase from our MBS

15

trusts also will increase our losses because we are required by GAAP to record these loans on our balance sheet at their market value, rather than at the loan amount, and recognize a loss for the difference between the loan amount and the market value of the loan.

In deciding whether and when to purchase a loan from an MBS trust, we consider a variety of factors, including our legal ability or obligation to purchase loans under the terms of the trust documents; our mission and public policy; our loss mitigation strategies and the exposure to credit losses we face under our guaranty; our cost of funds; relevant market yields; the administrative costs associated with purchasing and holding the loan; counterparty exposure to lenders that have agreed to cover losses associated with delinquent loans; general market conditions; our statutory obligations under our Charter Act; and other legal obligations such as those established by consumer finance laws. The weight we give to these factors may change in the future depending on market circumstances and other factors. Refer to "Part II—Item 7—MD&A—Critical Accounting Policies and Estimates—Fair Value of Financial Instruments—Fair Value of Loans Purchased with Evidence of Credit Deterioration" and "Part II—Item 7—MD&A—Consolidated Results of Operations—Credit-Related Expenses—Provision Attributable to SOP 03-3 and HomeSaver Advance Fair Value Losses" for a description of our accounting for delinquent loans purchased from MBS trusts and the effect of these purchases on our 2008 financial results.

### *Mortgage Acquisitions*

We acquire single-family mortgage loans for securitization or for our investment portfolio through either our flow or bulk transaction channels. In our flow business, we enter into agreements that generally set agreed-upon guaranty fee prices for a lender's future delivery of individual loans to us over a specified time period. Our bulk business generally consists of transactions in which a defined set of loans are to be delivered to us in bulk, and we have the opportunity to review the loans for eligibility and pricing prior to delivery in accordance with the terms of the applicable contracts. Guaranty fees and other contract terms for our bulk mortgage acquisitions are typically negotiated on an individual transaction basis.

### *Mortgage Servicing*

The servicing of the mortgage loans that are held in our mortgage portfolio or that back our Fannie Mae MBS is performed by mortgage servicers on our behalf. Typically, lenders who sell single-family mortgage loans to us service these loans for us. We require lenders to obtain our approval before selling servicing rights and obligations to other servicers.

Our mortgage servicers typically collect and deliver principal and interest payments, administer escrow accounts, monitor and report delinquencies, perform default prevention activities, evaluate transfers of ownership interests, respond to requests for partial releases of security, and handle proceeds from casualty and condemnation losses. Our mortgage servicers are the primary point of contact for borrowers and perform a key role in the effective implementation of our homeownership assistance initiatives, negotiation of workouts of troubled loans, and loss mitigation activities. If necessary, mortgage servicers inspect and preserve properties and process foreclosures and bankruptcies. Because we delegate the servicing of our mortgage loans to mortgage servicers and do not have our own servicing function, our ability to actively manage troubled loans that we own or guarantee may be limited. For more information on our homeownership assistance initiatives and a discussion of the risks associated with them, refer to "Item 1A—Risk Factors" and "Part II—Item 7—MD&A—Risk Management—Credit Risk Management—Mortgage Credit Risk Management—Problem Loan Management and Foreclosure Prevention."

We compensate servicers primarily by permitting them to retain a specified portion of each interest payment on a serviced mortgage loan as a servicing fee. Servicers also generally retain prepayment premiums, assumption fees, late payment charges and other similar charges, to the extent they are collected from borrowers, as additional servicing compensation. We also compensate servicers for negotiating workouts on problem loans.

16

Refer to "Item 1A—Risk Factors" and "Part II—Item 7—MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" for a discussion of the risks associated with a default by a mortgage servicer and how we seek to manage those risks.

## Housing and Community Development Business

Our Housing and Community Development, or HCD, business works with our lender customers to securitize multifamily mortgage loans into Fannie Mae MBS and to facilitate the purchase of multifamily mortgage loans for our mortgage portfolio. Multifamily mortgage loans relate to properties with five or more residential units, which may be apartment communities, cooperative properties or manufactured housing communities. Our HCD business also makes federal low-income housing tax credit ("LIHTC") partnership, debt and equity investments to increase the supply of affordable housing. Revenues in the segment are derived from a variety of sources, including the (1) guaranty fees received as compensation for assuming the credit risk on the mortgage loans underlying multifamily Fannie Mae MBS and on the multifamily mortgage loans held in our portfolio, (2) transaction fees associated with the multifamily business and (3) bond credit enhancement fees. HCD's investments in rental housing projects eligible for LIHTC and other investments generate both tax credits and net operating losses that may reduce our federal income tax liability. Other investments in rental and for-sale housing generate revenue and losses from operations and the eventual sale of the assets. As described in "Part II—Item 7—MD&A—Critical Accounting Policies and Estimates—Deferred Tax Assets," we concluded that it is more likely than not that we would not generate sufficient taxable income in the foreseeable future to realize all of our deferred tax assets. As a result, we are not currently making new LIHTC investments other than pursuant to commitments existing prior to 2008.

### *Mortgage Securitizations*

Our HCD business generally creates multifamily Fannie Mae MBS in the same manner as our Single-Family business creates single-family Fannie Mae MBS. See "Single-Family Credit Guaranty Business—Mortgage Securitizations" for a description of a typical lender swap securitization transaction.

### *MBS Trusts*

Each of our multifamily MBS trusts operates in accordance with a trust agreement or an indenture. In most instances, a multifamily MBS trust is also governed by an issue supplement documenting the formation of that MBS trust and the issuance of the Fannie Mae MBS by that trust. In January 2009, we established a new multifamily master trust agreement that governs our multifamily MBS trusts formed on or after February 1, 2009 and amended and restated our previous 2007 master trust agreement to (i) establish specific criteria for the segregation and maintenance by our loan servicers of collateral reserve accounts, (ii) provide greater flexibility in dealing with defaulted loans held in a MBS trust, and (iii) make changes to our multifamily MBS trusts to conform with our single-family MBS trusts.

In accordance with the terms of our multifamily MBS trust documents, we have the option or, in some instances, the obligation, to purchase specified mortgage loans from an MBS trust. Our acquisition cost for these loans is the unpaid principal balance of the loan plus accrued interest. We generally purchase from the MBS trust any loan that we intend to modify prior to the time that the modification becomes effective. We typically exercise our option to purchase a loan from a multifamily MBS trust if the loan is delinquent, in whole or in part, as to four or more consecutive monthly payments. After we purchase the loan, we generally work with the borrower to modify the loan.

### *Mortgage Acquisitions*

Our HCD business acquires multifamily mortgage loans for securitization or for our investment portfolio through either our flow or bulk transaction channels, in substantially the same manner as described under "Single-Family Credit Guaranty Business—Mortgage Acquisitions."

FHFA 0279

*Mortgage Servicing*

As with the servicing of single-family mortgages, described under "Single-Family Credit Guaranty Business—Mortgage Servicing," multifamily mortgage servicing is typically performed by the lenders who sell the mortgages to us. In contrast to our single-family mortgage servicers, however, many of those lenders have agreed, as part of the multifamily delegated underwriting and servicing relationship we have with these lenders, to accept loss sharing under certain defined circumstances with respect to mortgages that they have sold to us and are servicing. Thus, multifamily loss sharing obligations are an integral part of our selling and servicing relationships with multifamily lenders. Consequently, transfers of multifamily servicing rights are infrequent and are carefully monitored by us to enforce our right to approve all servicing transfers. As a seller-servicer, the lender is also responsible for evaluating the financial condition of property owners, administering various types of agreements (including agreements regarding replacement reserves, completion or repair, and operations and maintenance), as well as conducting routine property inspections.

*Affordable Housing Investments*

Our HCD business helps to expand the supply of affordable housing by investing in rental and for-sale housing projects. Most of these are LIHTC investments. Our HCD business also makes equity investments in rental and for-sale housing, and participates in specialized debt financing. These investments are consistent with our focus on serving communities and improving access to affordable housing. As described in "Part II—Item 7—MD&A—Critical Accounting Policies and Estimates—Deferred Tax Assets," we concluded that it is more likely than not that we would not generate sufficient taxable income in the foreseeable future to realize all of our deferred tax assets. As a result, we are currently recognizing only a small amount of tax benefits associated with tax credits and net operating losses in our financial statements. As a result of our tax position, we did not make any new LIHTC investments in 2008 other than pursuant to commitments existing prior to 2008. As we are limited in our use of the tax benefits related to our LIHTC investments, we will consider selling LIHTC investments, as we did in 2007 and 2008, if we conclude that the economic return from selling these investments is greater than the benefits we would receive from continuing to hold these investments. In addition, we have limited our new equity and specialized debt investments in 2008 as a result of unfavorable real estate market conditions.

For additional information regarding our investments in LIHTC partnerships and their impact on our financial results, refer to "Part II—Item 7—MD&A—Consolidated Results of Operations—Losses from Partnership Investments" and "Part II—Item 7—MD&A—Off-Balance Sheet Arrangements and Variable Interest Entities."

## Capital Markets Group

Our Capital Markets group manages our investment activity in mortgage loans, mortgage-related securities and other investments, our debt financing activity, and our liquidity and capital positions. We fund our investments primarily through proceeds we receive from our issuance of debt securities in the domestic and international capital markets.

Our Capital Markets group generates most of its revenue from the difference, or spread, between the interest we earn on our mortgage assets and the interest we pay on the debt we issue to fund these assets. We refer to this spread as our net interest yield. Changes in the fair value of the derivative instruments and trading securities we hold impact the net income or loss reported by the Capital Markets group business segment. The net income or loss reported by the Capital Markets group is also affected by the impairment of available-for-sale securities.

*Mortgage Investments*

Our mortgage investments include both mortgage-related securities and mortgage loans. We purchase primarily conventional (that is, loans that are not federally insured or guaranteed) single-family fixed-rate or adjustable-rate, first lien mortgage loans, or mortgage-related securities backed by these types of loans. In addition, we purchase loans insured by the Federal Housing Administration ("FHA"), loans guaranteed by the Department of Veterans Affairs ("VA"), or loans guaranteed by the Rural Development Housing and Community Facilities

Program of the Department of Agriculture, manufactured housing loans, reverse mortgage loans, multifamily mortgage loans, subordinate lien mortgage loans (for example, loans secured by second liens) and other mortgage-related securities. Most of these loans are prepayable at the option of the borrower. Our investments in mortgage-related securities include structured mortgage-related securities such as REMICs. For information on our mortgage investments, including the composition of our mortgage investment portfolio by product type, refer to "Part II—Item 7—MD&A—Consolidated Balance Sheet Analysis."

### Investment Activities

Our Capital Markets group seeks to increase the liquidity of the mortgage market by maintaining a presence as an active investor in mortgage assets and, in particular, supports the liquidity and value of Fannie Mae MBS in a variety of market conditions.

The Capital Markets group's purchases and sales of mortgage assets in any given period generally are determined by the rates of return that we expect to earn on the equity capital underlying our investments. When we expect to earn returns greater than our other uses of capital, we generally will be an active purchaser of mortgage loans and mortgage-related securities. When we believe that few opportunities exist to deploy capital in mortgage investments, we generally will be a less active purchaser, and may be a net seller, of mortgage loans and mortgage-related securities.

Our investment activities during 2008 have been affected by turmoil in the capital markets. They were also affected by our applicable capital requirements and other regulatory constraints, as described below under "Conservatorship, Treasury Agreements, Our Charter and Regulation of Our Activities—Regulation and Oversight of Our Activities." Since September 2008, our investment activities have been affected by both the conservatorship and the limit on our debt under our agreement with Treasury. Our investment activities will also be affected by the limit on our portfolio as of December 31, 2009 under the senior preferred stock purchase agreement with Treasury, described below under "Conservatorship, Treasury Agreements, Our Charter and Regulation of Our Activities—Treasury Agreements—Covenants Under Treasury Agreements," which includes a requirement that we reduce our mortgage portfolio by 10% per year beginning in 2010.

### Debt Financing Activities

Our Capital Markets group funds its investments primarily through the issuance of debt securities in the domestic and international capital markets. In 2008, our debt financing activities were affected by weakness in the capital markets, regulatory constraints and other factors, including government activities in the financial services sector, as described in "Part II—Item 7—MD&A—Liquidity and Capital Management—Liquidity Management."

### Securitization Activities

Our Capital Markets group engages in two principal types of securitization activities:

- creating and issuing Fannie Mae MBS from our mortgage portfolio assets, either for sale into the secondary market or to retain in our portfolio; and

- issuing structured Fannie Mae MBS for customers in exchange for a transaction fee.

Our Capital Markets group creates Fannie Mae MBS using mortgage loans and mortgage-related securities that we hold in our investment portfolio, referred to as "portfolio securitizations." We currently securitize a majority of the single-family mortgage loans we purchase. Our Capital Markets group may sell these Fannie Mae MBS into the secondary market or may retain the Fannie Mae MBS in our investment portfolio. In addition, the Capital Markets group issues structured Fannie Mae MBS, which are generally created through swap transactions, typically with our lender customers or securities dealer customers. In these transactions, the customer "swaps" a mortgage asset it owns for a structured Fannie Mae MBS we issue. Our Capital Markets group earns transaction fees for issuing structured Fannie Mae MBS for third parties.

19

*Customer Services*

Our Capital Markets group provides our lender customers and their affiliates with services that include: offering to purchase a wide variety of mortgage assets, including non-standard mortgage loan products; segregating customer portfolios to obtain optimal pricing for their mortgage loans; and assisting customers with the hedging of their mortgage business. These activities provide a significant flow of assets for our mortgage portfolio, help to create a broader market for our customers and enhance liquidity in the secondary mortgage market.

## CONSERVATORSHIP, TREASURY AGREEMENTS, OUR CHARTER AND REGULATION OF OUR ACTIVITIES

### Conservatorship

On September 6, 2008, at the request of the Secretary of the Treasury, the Chairman of the Federal Reserve Board and the Director of FHFA, our Board of Directors adopted a resolution consenting to putting the company into conservatorship. After obtaining this consent, the Director of FHFA appointed FHFA as our conservator in accordance with the Federal Housing Finance Regulatory Reform Act ("Regulatory Reform Act") and the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (the "1992 Act"). The conservatorship is a statutory process designed to preserve and conserve our assets and property, and put the company in a sound and solvent condition. The powers of the conservator under the Regulatory Reform Act are summarized below.

The conservatorship has no specified termination date. There can be no assurance as to when or how the conservatorship will be terminated, whether we will continue to exist following conservatorship, or what changes to our business structure will be made during or following the conservatorship. In a statement issued on September 7, 2008, the then Secretary of the Treasury stated that there is a consensus that we and Freddie Mac pose a systemic risk and that we could not continue in our then current form. For more information on the risks to our business relating to the conservatorship and uncertainties regarding the future of our business, see "Item 1A—Risk Factors."

The table below presents a summary comparison of various features of our business immediately before we were placed into conservatorship and as of February 26, 2009.

| Topic | Before Conservatorship | As of February 26, 2009 |
|---|---|---|
| Authority of Board of Directors, management and shareholders | • Board of Directors with right to determine the general policies governing the operations of the corporation and exercise all power and authority of the company, except as vested in shareholders or as the Board chooses to delegate to management<br>• Directors with duties to shareholders<br>• Board of Directors delegated significant authority to management<br>• Shareholders with specified voting rights | • FHFA, as conservator, succeeded to all of the power and authority of the Board of Directors, management and the shareholders<br>• The conservator has delegated authority to a newly constituted Board of Directors. The Board is required to consult with and obtain the consent of the conservator before taking action in specified areas. The conservator may modify or rescind this delegation at any time<br>• Directors do not have any duties to any person or entity except to the conservator.<br>• The conservator has delegated authority to management to conduct day-to-day operations so that the company can continue to operate in the ordinary course of business. The conservator retains overall management authority, including the authority to withdraw its delegations to management at any time<br>• Shareholders have no voting rights |
| Structure of Board of Directors | • 13 directors: 12 independent plus President and Chief Executive Officer; independent, non-executive Chairman of the Board<br>• Seven standing Board committees, including Audit Committee of which four of the five independent members were "audit committee financial experts" | • 10 directors: 9 independent plus President and Chief Executive Officer; independent, non-executive Chairman of the Board. Up to three additional Board members may be added by the Board subject to approval of the conservator<br>• Four standing Board committees, including Audit Committee of which three of the four independent members are "audit committee financial experts" |
| Capital | • Statutory and regulatory capital requirements<br>• Capital classifications as to adequacy of capital issued by FHFA on quarterly basis | • Capital requirements not binding<br>• Quarterly capital classifications by FHFA suspended |
| Net Worth[1] | • Receivership mandatory under Regulatory Reform Act if FHFA makes a written determination that we have net worth deficit for 60 days | • Conservator has directed management to focus, to the extent it does not conflict with our mission, on maintaining positive net worth<br>• Receivership mandatory if FHFA makes a written determination that we have net worth deficit for 60 days[2] |
| Management Strategy | • Maximize shareholder value over the long-term<br>• Fulfill our mission of providing liquidity, stability and affordability to the mortgage market | • Directed to provide liquidity, stability and affordability in the mortgage market and immediately provide additional assistance to this market and the struggling housing market, and to the extent not in conflict with our mission, to maintain positive net worth<br>• No longer managed with a strategy to maximize common shareholder returns<br>• Focus on foreclosure prevention |

21

(1)   Our "net worth" refers to the amount by which our total assets exceed our total liabilities, as reflected on our consolidated balance sheet. "Net worth" is substantially the same as "stockholders' equity;" however, "net worth" also includes the minority interests that third parties own in our consolidated subsidiaries (which was $157 million as of December 31, 2008), which is excluded from stockholders' equity.

(2)   If FHFA makes a written determination that we have a net worth deficit, then, if requested by FHFA (or by our Chief Financial Officer if we are not under conservatorship), Treasury is required to provide funds to us pursuant to the senior preferred stock purchase agreement. Treasury's funding commitment under that agreement is expected to enable us to maintain a positive net worth as long as Treasury has not yet invested the full amount provided for in that agreement. The Director of FHFA submitted a request on February 25, 2009 to Treasury for funds to eliminate our net worth deficit as of December 31, 2008. See "Treasury Agreements—Senior Preferred Stock Purchase Agreement and Related Issuance of Senior Preferred Stock and Common Stock Warrant" below.

### General Powers of the Conservator Under the Regulatory Reform Act

Upon its appointment, the conservator immediately succeeded to all rights, titles, powers and privileges of Fannie Mae, and of any shareholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and succeeded to the title to the books, records and assets of any other legal custodian of Fannie Mae. The conservator has the power to take over our assets and operate our business with all the powers of our shareholders, directors and officers, and to conduct all business of the company.

The conservator may take any actions it determines are necessary and appropriate to carry on our business and preserve and conserve our assets and property. The conservator's powers include the ability to transfer or sell any of our assets or liabilities (subject to limitations and post-transfer notice provisions for transfers of qualified financial contracts (as defined below under "Special Powers of the Conservator Under the Regulatory Reform Act—Security Interests Protected; Exercise of Rights Under Qualified Financial Contracts")) without any approval, assignment of rights or consent of any party. The Regulatory Reform Act, however, provides that mortgage loans and mortgage-related assets that have been transferred to a Fannie Mae MBS trust must be held for the beneficial owners of the Fannie Mae MBS and cannot be used to satisfy our general creditors.

In connection with any sale or disposition of our assets, the conservator must conduct its operations to maximize the net present value return from the sale or disposition, to minimize the amount of any loss realized, and to ensure adequate competition and fair and consistent treatment of offerors. In addition, the conservator is required to maintain a full accounting of the conservatorship and make its reports available upon request to shareholders and members of the public.

We remain liable for all of our obligations relating to our outstanding debt securities and Fannie Mae MBS. In a Fact Sheet dated September 7, 2008, FHFA indicated that our obligations will be paid in the normal course of business during the conservatorship.

### Special Powers of the Conservator Under the Regulatory Reform Act

#### Disaffirmance and Repudiation of Contracts

The conservator may disaffirm or repudiate contracts (subject to certain limitations for qualified financial contracts) that we entered into prior to its appointment as conservator if it determines, in its sole discretion, that performance of the contract is burdensome and that disaffirmance or repudiation of the contract promotes the orderly administration of our affairs. The Regulatory Reform Act requires FHFA to exercise its right to disaffirm or repudiate most contracts within a reasonable period of time after its appointment as conservator. As of February 26, 2009, the conservator had not determined whether or not a reasonable period of time had passed for purposes of the applicable provisions of the Regulatory Reform Act and, therefore, the conservator may still possess this right. As of February 26, 2009, the conservator has advised us that it has not disaffirmed or repudiated any contracts we entered into prior to its appointment as conservator.

We can, and have continued to, enter into and enforce contracts with third parties. The conservator has advised us that it has no intention of repudiating any guaranty obligation relating to Fannie Mae MBS because it views repudiation as incompatible with the goals of the conservatorship.

22

In general, the liability of the conservator for the disaffirmance or repudiation of any contract is limited to actual direct compensatory damages determined as of September 6, 2008, which is the date we were placed into conservatorship. The liability of the conservator for the disaffirmance or repudiation of a qualified financial contract is limited to actual direct compensatory damages (which include normal and reasonable costs of cover or other reasonable measures of damages utilized in the industries for such contract and agreement claims) determined as of the date of the disaffirmance or repudiation. If the conservator disaffirms or repudiates any lease to or from us, or any contract for the sale of real property, the Regulatory Reform Act specifies the liability of the conservator.

### Security Interests Protected; Exercise of Rights Under Qualified Financial Contracts

Notwithstanding the conservator's powers described above, the conservator must recognize legally enforceable or perfected security interests, except where such an interest is taken in contemplation of our insolvency or with the intent to hinder, delay or defraud us or our creditors. In addition, the Regulatory Reform Act provides that no person will be stayed or prohibited from exercising specified rights in connection with qualified financial contracts, including termination or acceleration (other than solely by reason of, or incidental to, the appointment of the conservator), rights of offset, and rights under any security agreement or arrangement or other credit enhancement relating to such contract. The term "qualified financial contract" means any securities contract, commodity contract, forward contract, repurchase agreement, swap agreement and any similar agreement that FHFA determines by regulation, resolution or order to be a qualified financial contract.

### Avoidance of Fraudulent Transfers

The conservator may avoid, or refuse to recognize, a transfer of any property interest of Fannie Mae or of any of our debtors, and also may avoid any obligation incurred by Fannie Mae or by any debtor of Fannie Mae, if the transfer or obligation was made (1) within five years of September 6, 2008, and (2) with the intent to hinder, delay, or defraud Fannie Mae, FHFA, the conservator or, in the case of a transfer in connection with a qualified financial contract, our creditors. To the extent a transfer is avoided, the conservator may recover, for our benefit, the property or, by court order, the value of that property from the initial or subsequent transferee, unless the transfer was made for value and in good faith. These rights are superior to any rights of a trust or any other party, other than a federal agency, under the U.S. bankruptcy code.

### Modification of Statutes of Limitations

Under the Regulatory Reform Act, notwithstanding any provision of any contract, the statute of limitations with regard to any action brought by the conservator is (1) for claims relating to a contract, the longer of six years or the applicable period under state law, and (2) for tort claims, the longer of three years or the applicable period under state law, in each case, from the later of September 6, 2008 or the date on which the cause of action accrues. In addition, notwithstanding the state law statute of limitation for tort claims, the conservator may bring an action for any tort claim that arises from fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting in substantial loss to us, if the state's statute of limitations expired not more than five years before September 6, 2008.

### Treatment of Breach of Contract Claims

Any final and unappealable judgment for monetary damages against the conservator for breach of an agreement executed or approved in writing by the conservator will be paid as an administrative expense of the conservator.

### Attachment of Assets and Other Injunctive Relief

The conservator may seek to attach assets or obtain other injunctive relief without being required to show that any injury, loss or damage is irreparable and immediate.

*Subpoena Power*

The Regulatory Reform Act provides the conservator with subpoena power for purposes of carrying out any power, authority or duty with respect to Fannie Mae.

### Management of the Company Under Conservatorship

Upon our entry into conservatorship on September 6, 2008, FHFA, as conservator, succeeded to the powers of our officers and directors. Accordingly, at that time, the Board of Directors had neither the power nor the duty to manage, direct or oversee our business and affairs. Thereafter, the conservator authorized the officers of Fannie Mae to continue to function in their applicable designated duties and delegated authorities, subject to the direction and control of the conservator. On September 7, 2008, the conservator appointed Herbert M. Allison, Jr. as our President and Chief Executive Officer, effective immediately. On September 16, 2008, FHFA appointed Philip A. Laskawy as the new non-executive Chairman of our Board of Directors. On November 24, 2008, FHFA reconstituted our Board of Directors and directed us regarding the function and authorities of the Board of Directors. FHFA's delegation of authority to the Board became effective on December 19, 2008 when nine Board members, in addition to the non-executive Chairman, were appointed by FHFA. The conservator retains the authority to withdraw its delegations to the Board and to management at any time.

Our directors serve on behalf of the conservator and exercise their authority as directed by and with the approval, where required, of the conservator. Our directors do not have any duties to any person or entity except to the conservator. Accordingly, our directors are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator.

The delegation of authority to the Board will remain in effect until modified or rescinded by the conservator. In addition, the conservator directed the Board to consult with and obtain the approval of the conservator before taking action in specified areas, as described in "Part III—Item 10—Directors, Executive Officers and Corporate Governance—Corporate Governance—Conservatorship and Delegation of Authority to Board of Directors."

### Effect of Conservatorship on Shareholders

The conservatorship has had the following adverse effects on our common and preferred shareholders:

- the rights of the shareholders are suspended during the conservatorship. Accordingly, our common shareholders do not have the ability to elect directors or to vote on other matters during the conservatorship unless the conservator delegates this authority to them;

- the conservator has eliminated common and preferred stock dividends (other than dividends on the senior preferred stock issued to Treasury) during the conservatorship; and

- according to a statement made by the then Treasury Secretary on September 7, 2008, because we are in conservatorship, we "will no longer be managed with a strategy to maximize common shareholder returns."

**Treasury Agreements**

The Regulatory Reform Act granted Treasury temporary authority (through December 31, 2009) to purchase any obligations and other securities issued by Fannie Mae on such terms and conditions and in such amounts as Treasury may determine, upon mutual agreement between Treasury and Fannie Mae. As of February 26, 2009, Treasury had used this authority as described below. By their terms, the senior preferred stock purchase agreement, senior preferred stock and warrant will continue to exist even if we are released from the conservatorship. For a description of the risks to our business relating to the Treasury agreements, refer to "Item 1A—Risk Factors."

***Senior Preferred Stock Purchase Agreement and Related Issuance of Senior Preferred Stock and Common Stock Warrant***

*Senior Preferred Stock Purchase Agreement*

On September 7, 2008, we, through FHFA, in its capacity as conservator, and Treasury entered into a senior preferred stock purchase agreement, which was subsequently amended and restated on September 26, 2008. We refer to this agreement as the "senior preferred stock purchase agreement." Pursuant to the agreement, we agreed to issue to Treasury (1) one million shares of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2, which we refer to as the "senior preferred stock," with an initial liquidation preference equal to $1,000 per share (for an aggregate liquidation preference of $1.0 billion), and (2) a warrant to purchase, for a nominal price, shares of common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis at the time the warrant is exercised, which we refer to as the "warrant." The terms of the senior preferred stock and warrant are summarized in separate sections below. We did not receive any cash proceeds from Treasury at the time the senior preferred stock or the warrant was issued.

The senior preferred stock and warrant were issued to Treasury as an initial commitment fee in consideration of the commitment from Treasury to provide up to $100.0 billion in funds to us under the terms and conditions set forth in the senior preferred stock purchase agreement. The senior preferred stock purchase agreement provides that, on a quarterly basis, we generally may draw funds up to the amount, if any, by which our total liabilities exceed our total assets, as reflected on our consolidated balance sheet, prepared in accordance with GAAP, for the applicable fiscal quarter (referred to as the "deficiency amount"), provided that the aggregate amount funded under the agreement may not exceed $100.0 billion.

On February 18, 2009, Treasury announced that it is amending the senior preferred stock purchase agreement to increase its commitment from $100.0 billion to $200.0 billion and revise some of the covenants under the senior preferred stock purchase agreement. Because an amended agreement has not been executed as of the date of this report, the description of the senior preferred stock purchase agreement in this section is of the terms of the existing agreement.

The senior preferred stock purchase agreement provides that the deficiency amount will be calculated differently if we become subject to receivership or other liquidation process. The deficiency amount may be increased above the otherwise applicable amount upon our mutual written agreement with Treasury. In addition, if the Director of FHFA determines that the Director will be mandated by law to appoint a receiver for us unless our capital is increased by receiving funds under the commitment in an amount up to the deficiency amount (subject to the maximum amount that may be funded under the agreement), then FHFA, in its capacity as our conservator, may request that Treasury provide funds to us in such amount. The senior preferred stock purchase agreement also provides that, if we have a deficiency amount as of the date of completion of the liquidation of our assets, FHFA (or our Chief Financial Officer if we are not under conservatorship), may request funds from Treasury in an amount up to the deficiency amount (subject to the maximum amount that may be funded under the agreement).

At December 31, 2008, our total liabilities exceeded our total assets, as reflected on our consolidated balance sheet, by $15.2 billion. The Director of FHFA submitted a request on February 25, 2009 for funds from Treasury on our behalf under the terms of the senior preferred stock purchase agreement to eliminate our net worth deficit as of December 31, 2008. FHFA requested that Treasury provide the funds on or prior to March 31, 2009. The amounts we draw under the senior preferred stock purchase agreement will be added to the liquidation preference of the senior preferred stock, and no additional shares of senior preferred stock will be issued under the senior preferred stock purchase agreement.

In addition to the issuance of the senior preferred stock and warrant, beginning on March 31, 2010, we are required to pay a quarterly commitment fee to Treasury. This quarterly commitment fee will accrue from January 1, 2010. The fee, in an amount to be mutually agreed upon by us and Treasury and to be determined with reference to the market value of Treasury's funding commitment as then in effect, will be determined on or before December 31, 2009, and will be reset every five years. Treasury may waive the quarterly commitment fee for up to one year at a time, in its sole discretion, based on adverse conditions in the

U.S. mortgage market. We may elect to pay the quarterly commitment fee in cash or add the amount of the fee to the liquidation preference of the senior preferred stock.

The senior preferred stock purchase agreement provides that the Treasury's funding commitment will terminate under any of the following circumstances: (1) the completion of our liquidation and fulfillment of Treasury's obligations under its funding commitment at that time, (2) the payment in full of, or reasonable provision for, all of our liabilities (whether or not contingent, including mortgage guaranty obligations), or (3) the funding by Treasury of the maximum amount that may be funded under the agreement. In addition, Treasury may terminate its funding commitment and declare the senior preferred stock purchase agreement null and void if a court vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of the conservator or otherwise curtails the conservator's powers. Treasury may not terminate its funding commitment under the agreement solely by reason of our being in conservatorship, receivership or other insolvency proceeding, or due to our financial condition or any adverse change in our financial condition.

The senior preferred stock purchase agreement provides that most provisions of the agreement may be waived or amended by mutual written agreement of the parties; however, no waiver or amendment of the agreement is permitted that would decrease Treasury's aggregate funding commitment or add conditions to Treasury's funding commitment if the waiver or amendment would adversely affect in any material respect the holders of our debt securities or guaranteed Fannie Mae MBS.

In the event of our default on payments with respect to our debt securities or guaranteed Fannie Mae MBS, if Treasury fails to perform its obligations under its funding commitment and if we and/or the conservator are not diligently pursuing remedies in respect of that failure, the holders of our debt securities or Fannie Mae MBS may file a claim in the United States Court of Federal Claims for relief requiring Treasury to fund to us the lesser of (1) the amount necessary to cure the payment defaults on our debt and Fannie Mae MBS and (2) the lesser of (a) the deficiency amount and (b) the maximum amount that may be funded under the agreement less the aggregate amount of funding previously provided under the commitment. Any payment that Treasury makes under those circumstances will be treated for all purposes as a draw under the senior preferred stock purchase agreement that will increase the liquidation preference of the senior preferred stock.

The senior preferred stock purchase agreement includes several covenants that significantly restrict our business activities, which are described below under "Covenants Under Treasury Agreements—Senior Preferred Stock Purchase Agreement Covenants."

*Issuance of Senior Preferred Stock*

Pursuant to the senior preferred stock purchase agreement, we issued one million shares of senior preferred stock to Treasury on September 8, 2008. The senior preferred stock was issued to Treasury in partial consideration of Treasury's commitment to provide up to $100.0 billion in funds to us under the terms set forth in the senior preferred stock purchase agreement.

Shares of the senior preferred stock have no par value, and had a stated value and initial liquidation preference equal to $1,000 per share for an aggregate liquidation preference of $1.0 billion. The liquidation preference of the senior preferred stock is subject to adjustment. Dividends that are not paid in cash for any dividend period will accrue and be added to the liquidation preference of the senior preferred stock. In addition, any amounts Treasury pays to us pursuant to its funding commitment under the senior preferred stock purchase agreement and any quarterly commitment fees that are not paid in cash to Treasury or waived by Treasury will be added to the liquidation preference of the senior preferred stock. Accordingly, the amount of the aggregate liquidation preference of the senior preferred stock will increase to $16.2 billion as a result of our expected draw, and will further increase by the amount of each additional draw on Treasury's funding commitment.

Treasury, as holder of the senior preferred stock, is entitled to receive, when, as and if declared by our Board of Directors, out of legally available funds, cumulative quarterly cash dividends at the annual rate of 10% per year on the then-current liquidation preference of the senior preferred stock. As conservator and under our charter, FHFA also has authority to declare and approve dividends on the senior preferred stock. The initial dividend of approximately $31 million was declared by the conservator and paid in cash on December 31, 2008 for the period from but not including September 8, 2008 through and including December 31, 2008. As a result of the expected draw, our annualized aggregate dividend payment to Treasury, at the 10% dividend rate, will increase to $1.6 billion. If at any time we fail to pay cash dividends in a timely manner, then immediately following such failure and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year.

The senior preferred stock ranks ahead of our common stock and all other outstanding series of our preferred stock, as well as any capital stock we issue in the future, as to both dividends and rights upon liquidation. The senior preferred stock provides that we may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the senior preferred stock unless (1) full cumulative dividends on the outstanding senior preferred stock (including any unpaid dividends added to the liquidation preference) have been declared and paid in cash, and (2) all amounts required to be paid with the net proceeds of any issuance of capital stock for cash (as described in the following paragraph) have been paid in cash. Shares of the senior preferred stock are not convertible. Shares of the senior preferred stock have no general or special voting rights, other than those set forth in the certificate of designation for the senior preferred stock or otherwise required by law. The consent of holders of at least two-thirds of all outstanding shares of senior preferred stock is generally required to amend the terms of the senior preferred stock or to create any class or series of stock that ranks prior to or on parity with the senior preferred stock.

We are not permitted to redeem the senior preferred stock prior to the termination of Treasury's funding commitment set forth in the senior preferred stock purchase agreement. Moreover, we are not permitted to pay down the liquidation preference of the outstanding shares of senior preferred stock except to the extent of (1) accrued and unpaid dividends previously added to the liquidation preference and not previously paid down; and (2) quarterly commitment fees previously added to the liquidation preference and not previously paid down. In addition, if we issue any shares of capital stock for cash while the senior preferred stock is outstanding, the net proceeds of the issuance must be used to pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of senior preferred stock may not be paid down below $1,000 per share prior to the termination of Treasury's funding commitment. Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in whole or in part. If, after termination of Treasury's funding commitment, we pay down the liquidation preference of each outstanding share of senior preferred stock in full, the shares will be deemed to have been redeemed as of the payment date.

*Issuance of Common Stock Warrant*

Pursuant to the senior preferred stock purchase agreement, on September 7, 2008, we, through FHFA, in its capacity as conservator, issued a warrant to purchase common stock to Treasury. The warrant was issued to Treasury in partial consideration of Treasury's commitment to provide up to $100.0 billion in funds to us under the terms set forth in the senior preferred stock purchase agreement.

The warrant gives Treasury the right to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise. The warrant may be exercised in whole or in part at any time on or before September 7, 2028, by delivery to us of: (a) a notice of exercise; (b) payment of the exercise price of $0.00001 per share; and (c) the warrant. If the market price of one share of our common stock is greater than the exercise price, then, instead of paying the exercise price, Treasury may elect to receive shares equal to the value of the warrant (or portion thereof being canceled) pursuant to the formula specified in the warrant. Upon exercise of the warrant, Treasury may assign the right to receive the shares of common stock issuable upon exercise to any other person. The warrant

contains several covenants, which are described under "Covenants Under Treasury Agreements—Warrant Covenants."

As of February 26, 2009, Treasury has not exercised the warrant in whole or in part.

### Treasury Credit Facility

On September 19, 2008, we entered into a lending agreement with Treasury under which we may request loans until December 31, 2009, which we refer to as the "Treasury credit facility." Loans under the Treasury credit facility require approval from Treasury at the time of request. Treasury is not obligated under the credit facility to make, increase, renew or extend any loan to us. The credit facility does not specify a maximum amount that may be borrowed under the credit facility, but any loans made to us by Treasury pursuant to the credit facility must be collateralized by Fannie Mae MBS or Freddie Mac mortgage-backed securities. Refer to "Part II—Item 7—MD&A—Liquidity and Capital Management—Liquidity Management—Liquidity Contingency Plan—Treasury Credit Facility" for a discussion of the collateral that we could pledge under the Treasury credit facility. Further, unless amended or waived by Treasury, the amount we may borrow under the credit facility is limited by the restriction under the senior preferred stock purchase agreement on incurring debt in excess of 110% of our aggregate indebtedness as of June 30, 2008. Our calculation of our aggregate indebtedness as of June 30, 2008, which has not been confirmed by Treasury, set this debt limit at $892.0 billion. As of January 31, 2009, we estimate that our aggregate indebtedness totaled $885.0 billion, significantly limiting our ability to issue additional debt.

The credit facility does not specify the maturities or interest rate of loans that may be made by Treasury under the credit facility. In a Fact Sheet regarding the credit facility published by Treasury on September 7, 2008, Treasury indicated that loans made pursuant to the credit facility will be for short-term durations and would in general be expected to be for less than one month but no shorter than one week. The Fact Sheet further indicated that the interest rate on loans made pursuant to the credit facility ordinarily will be based on the daily London Inter-bank Offer Rate, or LIBOR, for a similar term of the loan plus 50 basis points. Given that the interest rate we are likely to be charged under the credit facility will be significantly higher than the rates we have historically achieved through the sale of unsecured debt, use of the facility, particularly in significant amounts, would likely have a material adverse impact on our financial results.

As of February 26, 2009, we have not requested any loans or borrowed any amounts under the Treasury credit facility. For a description of the covenants contained in the credit facility, refer to "Covenants Under Treasury Agreements—Treasury Credit Facility Covenants" below.

### Covenants Under Treasury Agreements

The senior preferred stock purchase agreement, warrant and Treasury credit facility contain covenants that significantly restrict our business activities. These covenants, which are summarized below, include a prohibition on our issuance of additional equity securities (except in limited instances), a prohibition on the payment of dividends or other distributions on our equity securities (other than the senior preferred stock or warrant), a prohibition on our issuance of subordinated debt and a limitation on the total amount of debt securities we may issue. As a result, we can no longer obtain additional equity financing (other than pursuant to the senior preferred stock purchase agreement) and we are limited in the amount and type of debt financing we may obtain.

#### Senior Preferred Stock Purchase Agreement Covenants

The senior preferred stock purchase agreement provides that, until the senior preferred stock is repaid or redeemed in full, we may not, without the prior written consent of Treasury:

- Declare or pay any dividend (preferred or otherwise) or make any other distribution with respect to any Fannie Mae equity securities (other than with respect to the senior preferred stock or warrant);

- Redeem, purchase, retire or otherwise acquire any Fannie Mae equity securities (other than the senior preferred stock or warrant);

FHFA 0290

- Sell or issue any Fannie Mae equity securities (other than the senior preferred stock, the warrant and the common stock issuable upon exercise of the warrant and other than as required by the terms of any binding agreement in effect on the date of the senior preferred stock purchase agreement);

- Terminate the conservatorship (other than in connection with a receivership);

- Sell, transfer, lease or otherwise dispose of any assets, other than dispositions for fair market value: (a) to a limited life regulated entity (in the context of a receivership); (b) of assets and properties in the ordinary course of business, consistent with past practice; (c) in connection with our liquidation by a receiver; (d) of cash or cash equivalents for cash or cash equivalents; or (e) to the extent necessary to comply with the covenant described below relating to the reduction of our mortgage assets beginning in 2010;

- Incur indebtedness that would result in our aggregate indebtedness exceeding 110% of our aggregate indebtedness as of June 30, 2008;

- Issue any subordinated debt;

- Enter into a corporate reorganization, recapitalization, merger, acquisition or similar event; or

- Engage in transactions with affiliates unless the transaction is (a) pursuant to the senior preferred stock purchase agreement, the senior preferred stock or the warrant, (b) upon arm's-length terms or (c) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence on the date of the senior preferred stock purchase agreement.

The senior preferred stock purchase agreement also provides that we may not own mortgage assets in excess of (a) $850.0 billion on December 31, 2009, or (b) on December 31 of each year thereafter, 90% of the aggregate amount of our mortgage assets as of December 31 of the immediately preceding calendar year, provided that we are not required to own less than $250.0 billion in mortgage assets. The covenant in the agreement prohibiting us from issuing debt in excess of 110% of our aggregate indebtedness as of June 30, 2008 likely will prohibit us from increasing the size of our mortgage portfolio to $850.0 billion, unless Treasury elects to amend or waive this limitation.

On February 18, 2009, Treasury announced that it is amending the senior preferred stock purchase agreement to increase the size of the mortgage portfolio allowed under the agreement by $50.0 billion to $900.0 billion, with a corresponding increase in the allowable debt outstanding. Because an amended agreement has not been executed as of the date of this report, this description of the covenants in the senior preferred stock purchase agreement is of the terms of the existing agreement, without these changes.

In addition, the senior preferred stock purchase agreement provides that we may not enter into any new compensation arrangements or increase amounts or benefits payable under existing compensation arrangements of any named executive officer (as defined by SEC rules) without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury.

We are required under the senior preferred stock purchase agreement to provide annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K to Treasury in accordance with the time periods specified in the SEC's rules. In addition, our designated representative (which, during the conservatorship, is the conservator) is required to provide quarterly certifications to Treasury certifying compliance with the covenants contained in the senior preferred stock purchase agreement and the accuracy of the representations made pursuant to the agreement. We also are obligated to provide prompt notice to Treasury of the occurrence of specified events, such as the filing of a lawsuit that would reasonably be expected to have a material adverse effect.

As of February 26, 2009, we believe we were in compliance with the material covenants under the senior preferred stock purchase agreement.

*Warrant Covenants*

The warrant we issued to Treasury includes, among others, the following covenants:

- Our SEC filings under the Exchange Act will comply in all material respects as to form with the Exchange Act and the rules and regulations thereunder;

- We may not permit any of our significant subsidiaries to issue capital stock or equity securities, or securities convertible into or exchangeable for such securities, or any stock appreciation rights or other profit participation rights;

- We may not take any action that will result in an increase in the par value of our common stock;

- We may not take any action to avoid the observance or performance of the terms of the warrant and we must take all actions necessary or appropriate to protect Treasury's rights against impairment or dilution; and

- We must provide Treasury with prior notice of specified actions relating to our common stock, including setting a record date for a dividend payment, granting subscription or purchase rights, authorizing a recapitalization, reclassification, merger or similar transaction, commencing a liquidation of the company or any other action that would trigger an adjustment in the exercise price or number or amount of shares subject to the warrant.

The warrant remains outstanding through September 7, 2028. As of February 26, 2009, we believe we were in compliance with the material covenants under the warrant.

*Treasury Credit Facility Covenants*

The Treasury credit facility includes covenants requiring us, among other things:

- to maintain Treasury's security interest in the collateral, including the priority of the security interest, and take actions to defend against adverse claims;

- not to sell or otherwise dispose of, pledge or mortgage the collateral (other than Treasury's security interest);

- not to act in any way to impair, or to fail to act in a way to prevent the impairment of, Treasury's rights or interests in the collateral;

- promptly to notify Treasury of any failure or impending failure to meet our regulatory capital requirements;

- to provide for periodic audits of collateral held under borrower-in-custody arrangements, and to comply with certain notice and certification requirements;

- promptly to notify Treasury of the occurrence or impending occurrence of an event of default under the terms of the lending agreement; and

- to notify Treasury of any change in applicable law or regulations, or in our charter or bylaws, or certain other events, that may materially affect our ability to perform our obligations under the lending agreement.

The Treasury credit facility expires on December 31, 2009. As of February 26, 2009, we believe we were in compliance with the material covenants under the Treasury credit facility.

### Effect of Treasury Agreements on Shareholders

The agreements with Treasury have materially limited the rights of our common and preferred shareholders (other than Treasury as holder of the senior preferred stock). The senior preferred stock purchase agreement

and the senior preferred stock and warrant issued to Treasury pursuant to the agreement have had the following adverse effects on our common and preferred shareholders:

- the senior preferred stock ranks senior to the common stock and all other series of preferred stock as to both dividends and distributions upon dissolution, liquidation or winding up of the company;

- the senior preferred stock purchase agreement prohibits the payment of dividends on common or preferred stock (other than the senior preferred stock) without the prior written consent of Treasury; and

- the warrant provides Treasury with the right to purchase shares of our common stock equal to up to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise for a nominal price, thereby substantially diluting the ownership in Fannie Mae of our common shareholders at the time of exercise. Until Treasury exercises its rights under the warrant or its right to exercise the warrant expires on September 7, 2028 without having been exercised, the holders of our common stock continue to have the risk that, as a group, they will own no more than 20.1% of the total voting power of the company. Under our charter, bylaws and applicable law, 20.1% is insufficient to control the outcome of any vote that is presented to the common shareholders. Accordingly, existing common shareholders have no assurance that, as a group, they will be able to control the election of our directors or the outcome of any other vote after the conservatorship ends.

As described above and in "Item 1A—Risk Factors," the Treasury agreements also impact our business in ways that indirectly affect our common and preferred shareholders.

**New York Stock Exchange Listing**

As of February 26, 2009, our common stock continues to trade on the NYSE. We received a notice from the NYSE on November 12, 2008 that we had failed to satisfy one of the NYSE's standards for continued listing of our common stock because the average closing price of our common stock during the 30 consecutive trading days ended November 12, 2008 had been less than $1.00 per share.

On November 26, 2008, we advised the NYSE of our intent to cure this deficiency by May 11, 2009. At that time, we also advised the NYSE that, if necessary to cure the deficiency by that date, and subject to the approval of Treasury, we might undertake a reverse stock split, in which we would combine some specified number of shares of our common stock into a single share of our common stock. We are working internally and with the conservator to determine the specific action or actions that we will take.

If our share price and our average share price for the 30 consecutive trading days preceding May 11, 2009 is not at or above $1.00 as of May 11, 2009, the NYSE rules provide that the NYSE will initiate suspension and delisting procedures for our common stock. At that time, we expect that the NYSE also would delist all classes of our preferred stock. For a description of the risks to our business if the NYSE were to delist our common and preferred stock, refer to "Item 1A—Risk Factors."

**Charter Act**

We are a shareholder-owned corporation, originally established in 1938, organized and existing under the Federal National Mortgage Association Charter Act, as amended, which we refer to as the Charter Act or our charter. The Charter Act sets forth the activities that we are permitted to conduct, authorizes us to issue debt and equity securities, and describes our general corporate powers. The Charter Act states that our purpose is to:

- provide stability in the secondary market for residential mortgages;

- respond appropriately to the private capital market;

- provide ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and

31

- promote access to mortgage credit throughout the nation (including central cities, rural areas and underserved areas) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing.

In addition to the alignment of our overall strategy with these purposes, all of our business activities must be permissible under the Charter Act. Our charter authorizes us to, among other things, purchase, service, sell, lend on the security of, and otherwise deal in certain mortgage loans; issue debt obligations and mortgage-related securities; and "do all things as are necessary or incidental to the proper management of [our] affairs and the proper conduct of [our] business."

### Loan Standards

Mortgage loans we purchase or securitize must meet the following standards required by the Charter Act.

- *Principal Balance Limitations.*   Our charter permits us to purchase and securitize conventional mortgage loans secured by either a single-family or multifamily property. Single-family conventional mortgage loans are generally subject to maximum original principal balance limits. The principal balance limits are often referred to as "conforming loan limits" and are established each year based on the national average price of a one-family residence. The conforming loan limit for a one-family residence was $417,000 for 2008.

  The Economic Stimulus Act of 2008 temporarily increased our conforming loan limits in high-cost areas for loans originated between July 1, 2007 and December 31, 2008, which we refer to as jumbo-conforming loans. For a one-family residence, the loan limit increased to 125% of the area's median house price, up to a maximum of $729,750. Higher original principal balance limits apply to mortgage loans secured by two- to four-family residences and also to loans in Alaska, Hawaii, Guam and the Virgin Islands. In July 2008, HERA was signed into law. This legislation provided permanent authority for the GSEs to use higher loan limits in high-cost areas effective January 1, 2009. These limits will be set annually by FHFA.

  In November 2008, FHFA announced that the conforming loan limit for a one-unit property would remain $417,000 for 2009 for most areas in the United States, but specified higher limits in certain cities and counties. Loan limits for two-, three-, and four-unit properties in 2009 also remain at 2008 levels. Following the provisions of HERA, FHFA has set loan limits for high-cost areas in 2009. These limits are set equal to 115% of local median house prices and cannot exceed 150% of the standard limit, which is $625,500 for one-unit homes in the contiguous United States. The 2009 maximum conforming limits remain higher in Alaska, Hawaii, Guam, and the U.S. Virgin Islands. No statutory limits apply to the maximum original principal balance of multifamily mortgage loans that we purchase or securitize. In addition, the Charter Act imposes no maximum original principal balance limits on loans we purchase or securitize that are insured by the FHA or guaranteed by the VA, home improvement loans, and loans secured by manufactured housing.

  On February 17, 2009, President Obama signed into law the American Recovery and Reinvestment Act of 2009, which included a provision that returns the conforming loan limits for loans originated in 2009 to those limits established in the Economic Stimulus Act of 2008 (except in a limited number of areas where the limits established by HERA were greater).

- *Loan-to-Value and Credit Enhancement Requirements.*   The Charter Act generally requires credit enhancement on any conventional single-family mortgage loan that we purchase or securitize if it has a loan-to-value ratio over 80% at the time of purchase. We also do not purchase or securitize second lien single-family mortgage loans when the combined loan-to-value ratio exceeds 80%, unless the second lien mortgage loan has credit enhancement in accordance with the requirements of the Charter Act. The credit enhancement required by our charter may take the form of one or more of the following: (i) insurance or a guaranty by a qualified insurer; (ii) a seller's agreement to repurchase or replace any mortgage loan in default (for such period and under such circumstances as we may require); or (iii) retention by the seller of at least a 10% participation interest in the mortgage loans. We do not adjust the loan-to-value ratio of loans bearing credit enhancement to reflect that credit enhancement. On February 19, 2009, in conjunction with the announcement of HASP, FHFA determined that, until June 10, 2010, we may

refinance borrowers with mortgages that we hold or guarantee into new mortgages, without the need for these borrowers to obtain additional credit enhancement (such as private mortgage insurance) on their refinanced loans in excess of what was already in place. The credit enhancement requirement under the Charter Act may hinder our ability to refinance mortgage loans that we do not already own or guarantee where mortgage insurance or other credit enhancement is not available. Regardless of loan-to-value ratio, the Charter Act does not require us to obtain credit enhancement to purchase or securitize loans insured by the FHA or guaranteed by the VA, home improvement loans or loans secured by manufactured housing.

### Other Charter Act Provisions

The Charter Act has the following additional provisions.

- *Issuances of Our Securities.*   The Charter Act authorizes us, upon approval of the Secretary of the Treasury, to issue debt obligations and mortgage-related securities. Neither the U.S. government nor any of its agencies guarantees, directly or indirectly, our debt or mortgage-related securities. At the discretion of the Secretary of Treasury, Treasury may purchase our obligations up to a maximum of $2.25 billion outstanding at any one time. In addition, the Charter Act, as amended by the Regulatory Reform Act, provides Treasury with expanded temporary authority to purchase our obligations and securities in unlimited amounts (up to the national debt limit) until December 31, 2009. We describe Treasury's investment in our securities pursuant to this authority above under "Treasury Agreements."

- *Exemptions for Our Securities.*   Securities we issue are exempted securities under laws administered by the SEC, except that as a result of the Regulatory Reform Act, our equity securities are not treated as exempted securities for purposes of Sections 12, 13, 14 or 16 of the Securities Exchange Act of 1934, or the Exchange Act. Consequently, we are required to file periodic and current reports with the SEC, including annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K. However, we are not required to file registration statements with the SEC with respect to offerings of our securities pursuant to this exemption.

- *Exemption from Specified Taxes.*   Pursuant to the Charter Act, we are exempt from taxation by states, counties, municipalities or local taxing authorities, except for taxation by those authorities on our real property. However, we are not exempt from the payment of federal corporate income taxes.

- *Other Limitations and Requirements.*   Under the Charter Act, we may not originate mortgage loans or advance funds to a mortgage seller on an interim basis, using mortgage loans as collateral, pending the sale of the mortgages in the secondary market. In addition, we may only purchase or securitize mortgages on properties located in the United States, including the District of Columbia, the Commonwealth of Puerto Rico, and the territories and possessions of the United States.

### Regulation and Oversight of Our Activities

As a federally chartered corporation, we are subject to Congressional legislation and oversight. As a company under conservatorship, our primary regulator has management authority over us in its role as our conservator. The Regulatory Reform Act established FHFA as an independent agency with general supervisory and regulatory authority over Fannie Mae, Freddie Mac and the 12 FHLBs. FHFA assumed the duties of our former regulators, OFHEO and HUD, with respect to safety and soundness and mission oversight of Fannie Mae and Freddie Mac. HUD remains our regulator with respect to fair lending matters. We reference OFHEO in this report with respect to actions taken by our safety and soundness regulator prior to the creation of FHFA on July 30, 2008. As applicable, we reference HUD in this section with respect to actions taken by our mission regulator prior to the creation of FHFA on July 30, 2008. Our regulators also include the SEC and Treasury.

**Regulatory Reform Act**

The Regulatory Reform Act was signed into law on July 30, 2008, and became effective immediately. This legislation provided FHFA with safety and soundness authority that is stronger than the authority that was available to OFHEO, and that is comparable to and in some respects broader than that of the federal banking agencies. The legislation gave FHFA the authority, even if we had not been placed into conservatorship, to raise capital levels above statutory minimum levels, regulate the size and content of our portfolio, and approve new mortgage products. The legislation also gave FHFA the authority to place the GSEs into conservatorship or receivership under conditions set forth in the statute. We expect that FHFA will continue to implement the various provisions of the legislation over the next several months. In general, we remain subject to regulations, orders and determinations that existed prior to the enactment of the Regulatory Reform Act until new ones are issued or made. Below are some key provisions of the Regulatory Reform Act.

<u>Safety and Soundness Provisions</u>

*Conservatorship and Receivership.*   The legislation gave FHFA enhanced authority to place us into conservatorship, based on certain specified grounds. Pursuant to this authority, FHFA placed us into conservatorship on September 6, 2008. The legislation also gave FHFA new authority to place us into receivership at the discretion of the Director of FHFA, based on certain specified grounds, at any time, including directly from conservatorship. Further, FHFA must place us into receivership if it determines that our liabilities have exceeded our assets for 60 days, or we have not been paying our debts as they become due for 60 days.

*Capital.*   FHFA has broad authority to establish risk-based capital standards to ensure that we operate in a safe and sound manner and maintain sufficient capital and reserves. FHFA also has broad authority to increase the level of our required minimum capital and to establish capital or reserve requirements for specific products and activities, so as to ensure that we operate in a safe and sound manner. On October 9, 2008, FHFA announced that our capital requirements will not be binding during the conservatorship. We describe our capital requirements below under "Capital Adequacy Requirements." Pursuant to its new authority under the Regulatory Reform Act, FHFA has announced that it will be revising our minimum capital and risk-based capital requirements.

*Portfolio.*   FHFA is required to establish standards governing our portfolio holdings, to ensure that they are backed by sufficient capital and consistent with our mission and safe and sound operations. FHFA is also required to monitor our portfolio and, in some circumstances, may require us to dispose of or acquire assets. On January 30, 2009, FHFA published an interim final rule adopting, as the standard for our portfolio holdings, the portfolio cap established by the senior preferred stock purchase agreement described under "Treasury Agreements—Covenants under Treasury Agreements," as it may be amended from time to time. The interim final rule is effective for as long as we remain subject to the terms and obligations of the senior preferred stock purchase agreement.

*Prompt Corrective Action.*   FHFA has prompt corrective action authority, including the discretionary authority to change our capital classification under certain circumstances and to restrict our growth and activities if we are not adequately capitalized.

*Enforcement Powers.*   FHFA has enforcement powers, including cease-and-desist authority, authority to impose civil monetary penalties, and authority to suspend or remove directors and management.

<u>Mission Provisions</u>

*Products and Activities.*   We are required, with some exceptions, to obtain the approval of FHFA before we initially offer a product. The process for obtaining FHFA's approval includes a 30-day public notice and comment period relating to the product. A product may be approved only if it is authorized by our charter, in the public interest, and consistent with the safety and soundness of the enterprise and the mortgage finance system. We must provide written notice to FHFA before commencing any new activity.

*Affordable Housing Allocations.*   The legislation requires us to make annual allocations to fund government affordable housing programs, based on the dollar amount of our total new business purchases, at the rate of 4.2 basis points per dollar. FHFA must issue regulations prohibiting us from redirecting the cost of our allocations, through increased charges or fees, or decreased premiums, or in any other manner, to the originators of mortgages that we purchase or securitize. The legislation requires FHFA to temporarily suspend our allocation upon finding that it is contributing or would contribute to our financial instability; is causing or would cause us to be classified as undercapitalized; or is preventing or would prevent us from successfully completing a capital restoration plan. On November 13, 2008, we received notice from FHFA that it was suspending our allocation until further notice.

*Affordable Housing Goals and Duty to Serve.*   The legislation restructured our affordable housing goals. We discuss our affordable housing goals below under "Housing Goals and Subgoals."

### Temporary Provisions

*Enhanced Authority of U.S. Treasury to Purchase GSE Securities.*   The Secretary of the Treasury has long had authority to purchase up to $2.25 billion of our obligations. The legislation provides the Secretary of the Treasury with additional temporary authority to purchase our obligations and other securities in unlimited amounts (up to the national debt limit) and on terms that the Secretary may determine, subject to our agreement. This expanded authority expires on December 31, 2009. We describe Treasury's investment in our securities pursuant to this authority above under "Treasury Agreements."

*Consultation with the Federal Reserve Board Chairman.*   Until December 31, 2009, FHFA must consult with the Chairman of the Federal Reserve Board on risks posed by the GSEs to the financial system before taking certain regulatory actions such as issuance of regulations regarding capital or portfolio, or appointment of a conservator or receiver.

### Other Provisions

*Conforming Loan Limits.*   The legislation permanently increased our conforming loan limit in high cost areas, to the lower of 115% of the median home price for comparable properties in the area, or 150% of the otherwise applicable loan limit (currently $625,500). This provision became effective on January 1, 2009. The 2009 Stimulus Act further increased our loan limits in high cost areas for loans originated in 2009 as described under "Charter Act—Loan Standards—Principal Balance Limitations."

*Executive Compensation.*   The legislation directs FHFA to prohibit us from providing unreasonable or non-comparable compensation to our executive officers. FHFA may at any time review the reasonableness and comparability of an executive officer's compensation and may require us to withhold any payment to the officer during such review. In addition, under the Regulatory Reform Act, FHFA, as our regulator, has the power to approve, disapprove or modify executive compensation until December 31, 2009. However, during the conservatorship, FHFA, as conservator, has succeeded to all the powers of the Board and management. FHFA has delegated to the Board the authority to approve compensation for most officers and employees, and has retained approval rights for compensation for certain senior officers.

Under the Regulatory Reform Act, FHFA is also authorized to prohibit or limit certain golden parachute and indemnification payments to directors, officers, and certain other parties. In September 2008, the Director of FHFA notified us that severance and certain other payments contemplated in the employment contract of Daniel H. Mudd, our former President and Chief Executive Officer, are golden parachute payments within the meaning of the Regulatory Reform Act and should not be paid, effective immediately. In January 2009, FHFA issued final regulations relating to golden parachute payments, under which FHFA may limit golden parachute payments as defined, and that set forth factors to be considered by the Director of FHFA in acting upon his authority to limit these payments.

*Board of Directors.*   The legislation provides that our Board shall consist of 13 persons elected by the shareholders, or such other number as the Director of FHFA determines appropriate. Our Board shall at all times have as members at least one person from the homebuilding, mortgage lending, and real estate

industries, and at least one person from an organization representing consumer or community interests or one person who has demonstrated a career commitment to the provision of housing for low-income households. Upon our entry into conservatorship, FHFA succeeded to all the rights and powers of our Board of Directors. FHFA reconstituted our Board on November 24, 2008 and appointed a Board of Directors with specific delegated authorities that became effective on December 19, 2008, as described above "Conservatorship— Management of the Company Under Conservatorship."

*Exam Authority and Expenses.*   FHFA, in its role as our regulator, has agency examination authority, and we are required to submit to FHFA annual and quarterly reports on our financial condition and results of operations. FHFA is authorized to levy annual assessments on us, Freddie Mac and the FHLBs, to the extent authorized by Congress, to cover FHFA's reasonable expenses.

### Housing Goals and Subgoals

Since 1993, we have been subject to housing goals, which have been set as a percentage of the total number of dwelling units underlying our total mortgage purchases, and have been intended to expand housing opportunities (1) for low- and moderate-income families, (2) in HUD-defined underserved areas, including central cities and rural areas, and (3) for low-income families in low-income areas and for very low-income families, which is referred to as "special affordable housing." In addition, in 2004, HUD established three home purchase subgoals that have been expressed as percentages of the total number of mortgages we purchase that finance the purchase of single-family, owner-occupied properties located in metropolitan areas. Since 1995, we have also been required to meet a subgoal for multifamily special affordable housing that is expressed as a dollar amount. The Regulatory Reform Act changed the structure of the housing goals beginning in 2010, and gave FHFA the authority to set and enforce the housing goals.

We report our progress toward achieving our housing goals to FHFA on a quarterly basis, and we are required to submit a report to FHFA and Congress on our performance in meeting our housing goals on an annual basis.

The following table compares our performance against the housing goals and subgoals for 2008, 2007 and 2006. The 2006 and 2007 performance results are final results that were validated by HUD and FHFA, respectively. The 2008 performance results are preliminary results that we have not finalized and that also have not yet been validated by FHFA.

### Housing Goals and Subgoals Performance

|  | 2008 | | 2007 | | 2006 | |
|---|---|---|---|---|---|---|
|  | Result[1] | Goal | Result[1] | Goal | Result[1] | Goal |
| Housing goals:[2] |  |  |  |  |  |  |
| Low- and moderate-income housing . . . . . . . . . . . . . . . . . | 53.6% | 56.0% | 55.5% | 55.0% | 56.9% | 53.0% |
| Underserved areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 39.4 | 39.0 | 43.4 | 38.0 | 43.6 | 38.0 |
| Special affordable housing . . . . . . . . . . . . . . . . . . . . . . . . | 26.0 | 27.0 | 26.8 | 25.0 | 27.8 | 23.0 |
| Housing subgoals: |  |  |  |  |  |  |
| Home purchase subgoals:[3] |  |  |  |  |  |  |
| Low- and moderate-income housing . . . . . . . . . . . . . . . | 38.9% | 47.0% | 42.1% | 47.0% | 46.9% | 46.0% |
| Underserved areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30.4 | 34.0 | 33.4 | 33.0 | 34.5 | 33.0 |
| Special affordable housing . . . . . . . . . . . . . . . . . . . . . . | 13.6 | 18.0 | 15.5 | 18.0 | 18.0 | 17.0 |
| Multifamily special affordable housing subgoal ($ in billions)[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $13.42 | $5.49 | $19.84 | $5.49 | $13.31 | $5.49 |

[1]   Results presented for 2008 are preliminary and reflect our best estimates as of the date of this report. These results may differ from the results we report in our Annual Housing Activities Report for 2008. Some results differ from the results we reported in our Annual Housing Activities Reports for 2007 and 2006.

[2]   Goals are expressed as a percentage of the total number of dwelling units financed by eligible mortgage loan purchases during the period.

(3)  Home purchase subgoals measure our performance by the number of loans (not dwelling units) providing purchase
money for owner-occupied single-family housing in metropolitan areas.

(4)  The multifamily subgoal is measured by loan amount and expressed as a dollar amount.

As shown by the table above, we met all of our housing goals and subgoals in 2006. In 2007, we met each of our three housing goals and two of the four subgoals. However, we did not meet our "low- and moderate-income housing" and "special affordable housing" home purchase subgoals in 2007. In April 2008, HUD notified us of its determination that achievement of these subgoals was not feasible, primarily due to reduced housing affordability and turmoil in the mortgage market, which reduced the share of the conventional conforming primary home purchase market that would qualify for these subgoals. As a result, we were not required to submit a housing plan.

Declining market conditions and the increased goal levels in 2008 made meeting our housing goals and subgoals even more challenging than in 2007 or in previous years. Based on preliminary calculations, we believe we did not meet the low- and moderate-income and special affordable housing goals, or any of the home purchase subgoals. We are in close contact with FHFA regarding our performance. The housing goals are subject to enforcement by the Director of FHFA. If FHFA finds that the goals were feasible, we may become subject to a housing plan that could require us to take additional steps that could have an adverse effect on our profitability. The housing plan must describe the actions we will take to meet the goal in the next calendar year and be approved by FHFA. The potential penalties for failure to comply with housing plan requirements are a cease-and-desist order and civil money penalties.

The Regulatory Reform Act restructured our affordable housing goals and created a new duty for us and Freddie Mac to serve three underserved markets—manufactured housing, affordable housing preservation, and rural housing. With respect to these markets, we are required to "provide leadership to the market in developing loan products and flexible underwriting guidelines to facilitate a secondary market for mortgages for very low-, low-, and moderate-income families." Both the restructured goals and the new duty to serve take effect in 2010. The Regulatory Reform Act provides that the housing goals established for 2008 will remain in effect for 2009, except that by April 2009, FHFA must review the 2009 goals to determine their feasibility given the market conditions current at such time and, after seeking public comment for up to 30 days, FHFA may make appropriate adjustments to the 2009 goals consistent with such market conditions.

See "Item 1A—Risk Factors" for a description of how changes we have made to our business strategies in order to meet our housing goals and subgoals have increased our credit losses and may reduce our profitability.

### OFHEO Consent Order

During 2008, we were subject to a consent order that we entered into with OFHEO in May 2006. Concurrently with OFHEO's release of its final report of a special examination of our accounting policies and practices, internal controls, financial reporting, corporate governance, and other matters, we agreed to OFHEO's issuance of a consent order that resolved open matters relating to their investigation of us. Under the consent order, we neither admitted nor denied any wrongdoing. Effective March 1, 2008, OFHEO removed the limitation on the size of our portfolio under the consent order. In March 2008, OFHEO announced that we were in full compliance with the consent order, and OFHEO lifted the consent order effective May 6, 2008. Before we were placed into conservatorship in September 2008, we remained subject to the requirement that we maintain a capital surplus over our statutory minimum capital requirement. The capital surplus requirement was reduced from 30% to 20% in March 2008, and reduced further to 15% upon the completion of our capital raise in May 2008. On October 9, 2008, FHFA announced that our existing capital requirements will not be binding during the conservatorship.

### Capital Adequacy Requirements

The 1992 Act establishes capital adequacy requirements. The statutory capital framework incorporates two different quantitative assessments of capital—a minimum capital requirement and a risk-based capital

requirement. The minimum capital requirement is ratio-based, while the risk-based capital requirement is based on simulated stress test performance. The 1992 Act requires us to maintain sufficient capital to meet both of these requirements in order to be classified as "adequately capitalized."

Under the Regulatory Reform Act, FHFA has the authority to make a discretionary downgrade of our capital adequacy classification should certain safety and soundness conditions arise that could impact future capital adequacy. On October 9, 2008, FHFA announced that it was exercising its discretionary authority to classify us as "undercapitalized" as of June 30, 2008. Although we met the statutory capital requirements to be classified as "adequately capitalized" as of June 30, 2008, FHFA made its decision based on the factors described in "Liquidity and Capital Management—Capital Management—Regulatory Capital." However, at the same time, FHFA announced that our existing statutory and FHFA-directed regulatory capital requirements will not be binding during the conservatorship. FHFA has directed us, during the time we are under conservatorship, to focus on managing to a positive net worth, provided that it is not inconsistent with our mission objectives. Pursuant to its authority under the Regulatory Reform Act, FHFA has announced that it will be revising our minimum capital and risk-based capital requirements.

Under the Regulatory Reform Act, a capital classification of "undercapitalized" requires us to submit a capital restoration plan and imposes certain restrictions on our asset growth and ability to make capital distributions. FHFA may also take various discretionary actions with respect to us if we are classified as undercapitalized, including requiring us to acquire new capital. FHFA has advised us that, because we are under conservatorship, we will not be subject to these corrective action requirements.

*Statutory Minimum Capital Requirement.*   The existing ratio-based minimum capital standard ties our capital requirements to the size of our book of business. For purposes of the statutory minimum capital requirement, we are in compliance if our core capital equals or exceeds our statutory minimum capital requirement. Core capital is defined by statute as the sum of the stated value of outstanding common stock (common stock less treasury stock), the stated value of outstanding non-cumulative perpetual preferred stock, paid-in capital and retained earnings, as determined in accordance with GAAP. Our statutory minimum capital requirement is generally equal to the sum of:

- 2.50% of on-balance sheet assets;

- 0.45% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and

- up to 0.45% of other off-balance sheet obligations, which may be adjusted by the Director of FHFA under certain circumstances.

For information on the amounts of our core capital and our statutory minimum capital requirement as of December 31, 2008 and 2007, see "Part II—Item 7—MD&A—Liquidity and Capital Management—Capital Management—Regulatory Capital."

*Statutory Risk-Based Capital Requirement.*   The existing risk-based capital requirement ties our capital requirements to the risk in our book of business, as measured by a stress test model. The stress test simulates our financial performance over a ten-year period of severe economic conditions characterized by both extreme interest rate movements and high mortgage default rates. Simulation results indicate the amount of capital required to survive this prolonged period of economic stress without new business or active risk management action. In addition to this model-based amount, the risk-based capital requirement includes a 30% surcharge to cover unspecified management and operations risks.

Our total capital base is used to meet our risk-based capital requirement. Total capital is defined by statute as the sum of our core capital plus the total allowance for loan losses and reserve for guaranty losses in connection with Fannie Mae MBS, less the specific loss allowance (that is, the allowance required on individually-impaired loans). Each quarter, our regulator runs a detailed profile of our book of business through the stress test simulation model. The model generates cash flows and financial statements to evaluate our risk and measure our capital adequacy during the ten-year stress horizon. FHFA has stated that it does not intend to report our risk-based capital level during the conservatorship.

*Statutory Critical Capital Requirement.*   Our critical capital requirement is the amount of core capital below which we would be classified as critically undercapitalized and generally would be required to be placed in conservatorship. Our critical capital requirement is generally equal to the sum of:

- 1.25% of on-balance sheet assets;

- 0.25% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and

- up to 0.25% of other off-balance sheet obligations, which may be adjusted by the Director of FHFA under certain circumstances.

FHFA has stated that it does not intend to report our critical capital level during the conservatorship.

## OUR CUSTOMERS

Our principal customers are lenders that operate within the primary mortgage market where mortgage loans are originated and funds are loaned to borrowers. Our customers include mortgage banking companies, savings and loan associations, savings banks, commercial banks, credit unions, community banks, insurance companies, and state and local housing finance agencies. Lenders originating mortgages in the primary mortgage market often sell them in the secondary mortgage market in the form of whole loans or in the form of mortgage-related securities.

During 2008, approximately 1,000 lenders delivered mortgage loans to us, either for securitization or for purchase. We purchase a significant portion of our single-family mortgage loans from several large mortgage lenders. During 2008, our top five lender customers, in the aggregate, accounted for approximately 66% of our single-family business volume, compared with 56% in 2007. Three lender customers each accounted for 10% or more of our single-family business volume for 2008: Bank of America Corporation, Citigroup and Wells Fargo & Company, including each of their respective affiliates.

Our top lender customer is Bank of America Corporation, which acquired Countrywide Financial Corporation on July 1, 2008. Our single-family business volume from the two companies has decreased compared to 2007. Bank of America Corporation and its affiliates, following the acquisition of Countrywide Financial Corporation, accounted for approximately 19% of our single-family business volume in the second half of 2008. For 2007, Countrywide Financial Corporation and its affiliates accounted for approximately 28% of our single-family business volume and Bank of America Corporation accounted for approximately 4% of our single-family business volume.

Due to increasing consolidation within the mortgage industry, as well as a number of mortgage lenders having gone out of business since late 2006, we, as well as our competitors, seek business from a decreasing number of large mortgage lenders. As we become more reliant on a smaller number of lender customers, our negotiating leverage with these customers decreases, which could diminish our ability to price our products and services optimally. In addition, many of our lender customers are experiencing financial and liquidity problems that may affect the volume of business they are able to generate. We discuss these and other risks that this customer concentration poses to our business in "Item 1A—Risk Factors."

## COMPETITION

Historically, our competitors have included Freddie Mac, Ginnie Mae (which primarily guarantees securities backed by FHA-insured loans), the FHLBs, FHA, financial institutions, securities dealers, insurance companies, pension funds, investment funds and other investors. During 2008, almost all of our competitors, other than Freddie Mae, Ginnie Mae and the FHLBs, have ceased their activities in the residential mortgage finance business.

We compete to purchase mortgage assets in the secondary market both for our investment portfolio and for securitization into Fannie Mae MBS. Competition for the acquisition of mortgage assets is affected by many factors, including the supply of residential mortgage loans offered for sale in the secondary market by loan

39

originators and other market participants, the current demand for mortgage assets from mortgage investors, and the credit risk and prices associated with available mortgage investments.

We also compete for the issuance of mortgage-related securities to investors. Before the current market downturn, there was a significant increase in the issuance of mortgage-related securities by non-agency issuers, which caused a decrease in our share of the market for new issuances of single-family mortgage-related securities from 2003 to 2006. Non-agency issuers, also referred to as private-label issuers, are those issuers of mortgage-related securities other than agency issuers Fannie Mae, Freddie Mac and Ginnie Mae. The mortgage and credit market disruption led many investors to curtail their purchases of private-label mortgage-related securities in favor of mortgage-related securities backed by GSE guarantees or government guarantees (through Ginnie Mae). During 2008, we also experienced increased competition from Ginnie Mae (which primarily guarantees mortgage-related securities backed by FHA-insured loans), as issuance of single-family mortgage-related securities was predominately isolated to securities guaranteed by Fannie Mae, Freddie Mac and Ginnie Mae. As a result of these changes in investor demand, our estimated market share of new single-family mortgage-related securities issuance increased from approximately 24.6% for the fourth quarter of 2006 to approximately 48.5% for the fourth quarter of 2007, but then decreased to approximately 41.7% for the fourth quarter of 2008. In comparison, Ginnie Mae's market share of new single-family mortgage-related securities issuance was approximately 3.6%, 9.0% and 37.8% for the fourth quarter of 2006, 2007 and 2008, respectively. Our estimates of market share are based on publicly available data and exclude previously securitized mortgages.

We also compete for low-cost debt funding with institutions that hold mortgage portfolios, including Freddie Mac and the FHLBs. In recent months, the Federal Reserve has been supporting the liquidity of our debt as an active and significant purchaser of our long-term debt in the secondary market. See "Part II—Item 7—MD&A—Liquidity and Capital Management—Liquidity Management—Debt Funding" for a discussion of our debt funding.

## EMPLOYEES

As of December 31, 2008, we employed approximately 5,800 personnel, including full-time and part-time employees, term employees and employees on leave.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We file reports, proxy statements and other information with the SEC. We make available free of charge through our Web site our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and all other SEC reports and amendments to those reports as soon as reasonably practicable after we electronically file the material with, or furnish it to, the SEC. Our Web site address is www.fanniemae.com. Materials that we file with the SEC are also available from the SEC's Web site, www.sec.gov. In addition, these materials may be inspected, without charge, and copies may be obtained at prescribed rates, at the SEC's Public Reference Room at 100 F Street, NE, Room 1580, Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. You may also request copies of any filing from us, at no cost, by calling the Fannie Mae Fixed-Income Securities Helpline at (800) 237-8627 or (202) 752-7115 or by writing to Fannie Mae, Attention: Fixed-Income Securities, 3900 Wisconsin Avenue, NW, Area 2H-3S, Washington, DC 20016.

We are providing our Web site addresses and the Web site address of the SEC solely for your information. Information appearing on our Web site or on the SEC's Web site is not incorporated into this annual report on Form 10-K.

## FORWARD-LOOKING STATEMENTS

This report includes statements that constitute forward-looking statements within the meaning of Section 21E of the Exchange Act. In addition, our senior management may from time to time make forward-looking statements orally to analysts, investors, the news media and others. Forward-looking statements often include words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," "forecast," "project," "would," "should," "could," "may," or similar words.

Among the forward-looking statements in this report are statements relating to:

- Our expectation that the current crisis in the U.S. and global financial markets will continue, which will continue to adversely affect our financial results throughout 2009;

- Our expectation that the unemployment rate will continue to increase;

- Our expectation of the continued deterioration of the U.S. housing market, continued home price declines and rising delinquency, default and severity rates;

- Our expectation that mortgage debt outstanding will shrink by approximately 0.2% in 2009;

- Our expectation that the level of foreclosures and single-family delinquency rates will continue to increase in 2009;

- Our expectation that home prices will decline 7% to 12% on a national basis in 2009, and that there will be a peak-to-trough decline in home prices of 20% to 30%;

- Our expectation that there will be significant regional variation in national home price decline percentages, with steeper declines in certain areas such as Florida, California, Nevada and Arizona;

- Our expectation that economic conditions and falling home prices will continue to negatively affect our credit performance in 2009, which will cause our credit losses to increase;

- Our expectation that our credit loss ratio in 2009 will exceed our credit loss ratio in 2008;

- Our expectation of a significant increase in our SOP 03-3 fair value losses as we increase the number of loans we repurchase from MBS trusts in order to modify them;

- Our expectation of significant continued increases in our combined loss reserves through 2009;

- Our expectation of continued pressure on our access to the debt markets throughout 2009 at economically attractive rates, which we believe will become increasingly great as we approach the expiration of the Treasury credit facility at the end of 2009;

- Our expectation that the "roll over," or refinancing, risk on our unsecured debt is likely to increase substantially as we approach year-end 2009 and the expiration of the Treasury credit facility;

- Our expectation that we will continue to experience adverse financial effects because of our strategy of concentrating our efforts on keeping people in their homes and preventing foreclosures, including our efforts under HASP, while remaining active in the secondary mortgage market;

- Our expectation that future activities that our regulators, other U.S. government agencies or Congress may request or require us to take to support the mortgage market and help borrowers may contribute to further deterioration in our results of operations and financial condition;

- Our expectation that the Federal Reserve will continue to purchase our long-term debt and MBS in the secondary market;

- Our expectations with respect to our role in HASP, the elements of the HASP programs, the timing of our implementation of HASP programs, and the impact of these programs on our business, results of operations, financial condition and net worth;

- Our expectation that we also will have a net worth deficit in future periods, and therefore will be required to obtain additional funding from Treasury pursuant to the senior preferred stock purchase agreement;

- Our intention to use the funds we receive from Treasury under the senior preferred stock purchase agreement to repay our debt obligations;

- Our belief that we will not be required to make a minimum contribution to our qualified pension plan in 2009;

- Our belief that measures we have taken in 2008 and 2009 will significantly improve the credit profile of our single-family acquisitions;

- Our belief that our problem loan management strategies may help in reducing our long-term credit losses;

- Our expectation that our acquisitions of Alt-A mortgage loans will continue to be minimal in future periods;

- Our expectation that we will substantially increase our loan workout activity in 2009 relative to 2008;

- Our plan to continue to increase staffing levels in divisions of the company that focus on our foreclosure prevention efforts;

- Our belief that the early re-performance statistics related to loans modified during 2008 are likely to change, perhaps materially;

- Our belief that our liquidity contingency plan is unlikely to be sufficient to provide us with alternative sources of liquidity for 90 days;

- Our belief that the requirement under the senior preferred stock purchase agreement that we reduce our mortgage portfolio by 10% per year beginning in 2010 may have an adverse impact on our future net interest income;

- Our expectation that we will have the necessary technology and operational capabilities in place to support the securitization of a portion of our whole loans during the second quarter of 2009;

- Our expectation that Treasury's funding commitment under the senior preferred stock purchase agreement will enable us to maintain a positive net worth as long as Treasury has not yet invested the full amount provided for in that agreement;

- Our expectation that the loans we are now acquiring will generally have a lower credit risk, notwithstanding economic conditions, relative to the loans we acquired in 2006, 2007 and early 2008;

- Our belief that the market crisis will continue to adversely affect the liquidity and financial condition of our institutional counterparties and our lender counterparties;

- Our belief that recent government actions to provide liquidity and other support to specified financial market participants may help to improve the financial condition and liquidity position of a number of our institutional counterparties;

- Our belief that announced mergers of a number of our institutional counterparties, if completed, will improve the financial condition of these institutional counterparties and help to reduce our counterparty risk;

- Our belief that we are likely to incur further losses on our investments in Alt-A and subprime private-label mortgage-related securities, including on those that are currently rated AAA;

FHFA 0304

- Our intention to continue to sell non-mortgage-related securities in our cash and other investments portfolio from time to time as market conditions permit;

- Our intention to hold the majority of our mortgage assets to maturity to realize the contractual cash flows;

- Our intention to complete the remediation of the weakness in our internal control over financial reporting relating to our other-than-temporary-impairment assessment process for private-label mortgage-related securities by September 30, 2009;

- Our belief that it is likely we will not remediate the material weakness in our disclosure controls and procedures while we are under conservatorship; and

- Our belief that our deferred tax assets related to unrealized losses recorded in AOCI on our available-for-sale securities are recoverable.

Forward-looking statements reflect our management's expectations or predictions of future conditions, events or results based on various assumptions and management's estimates of trends and economic factors in the markets in which we are active, as well as our business plans. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. Our actual results and financial condition may differ, possibly materially, from the anticipated results and financial condition indicated in these forward-looking statements. There are a number of factors that could cause actual conditions, events or results to differ materially from those described in the forward-looking statements contained in this report, including, but not limited to our ability to maintain a positive net worth; adverse effects from activities we undertake to support the mortgage market and help borrowers; the investment by Treasury and its effect on our business; future amendments and guidance by the Financial Accounting Standards Board ("FASB"); changes in the structure and regulation of the financial services industry, including government efforts to bring about an economic recovery; our ability to access the debt capital markets; the conservatorship and its effect on our business (including our business strategies and practices); further disruptions in the housing, credit and stock markets; the level and volatility of interest rates and credit spreads; the adequacy of credit reserves; pending government investigations and litigation; changes in management; the accuracy of subjective estimates used in critical accounting policies; and those factors described in this report, including those factors described in "Item 1A—Risk Factors" of this report.

Readers are cautioned to place forward-looking statements in this report or that we make from time to time into proper context by carefully considering the factors discussed in "Item 1A—Risk Factors." These forward-looking statements are representative only as of the date they are made, and we undertake no obligation to update any forward-looking statement as a result of new information, future events or otherwise, except as required under the federal securities laws.

**Item 1A.   Risk Factors**

This section identifies specific risks that should be considered carefully in evaluating our business. The risks described in "Risks Relating to Our Business" are specific to us and our business, while those described in "Risks Relating to Our Industry" relate to the industry in which we operate. Refer to "Part II—Item 7—MD&A—Risk Management" for a more detailed description of the primary risks to our business and how we seek to manage those risks.

Any of these factors could materially adversely affect our business, financial condition, results of operations, liquidity and net worth, and could cause our actual results to differ materially from our historical results or the results contemplated by the forward-looking statements contained in this report. However, these are not the only risks facing us. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial condition, results of operations, liquidity and net worth.

## RISKS RELATING TO OUR BUSINESS

*We may not be able to achieve or maintain a positive net worth, which would result in requests for additional investment by Treasury.*

Under the Regulatory Reform Act, FHFA must place us into receivership if the Director of FHFA makes a written determination that we have a net worth deficit (which means that our assets are less than our obligations) for a period of 60 days. Our ability to maintain a positive net worth has been adversely affected by market conditions and volatility. At December 31, 2008, our total liabilities exceeded our total assets by $15.2 billion, as reflected on our consolidated balance sheet. As a result, we will have to draw on Treasury's commitment under the senior preferred stock purchase agreement. We expect the market conditions that contributed to our net loss for each quarter of 2008 to continue and possibly worsen in 2009, and therefore to continue to adversely affect our net worth resulting in additional draws on Treasury's commitment. Factors that could adversely affect our net worth for future periods include factors that we can affect as well as factors that we have no control over, such as: additional net losses; continued declines in home prices; increases in our credit and interest rate risk profiles; adverse changes in interest rates or implied volatility; adverse changes in option-adjusted spreads; impairments of private-label mortgage-related securities; counterparty downgrades; downgrades of private-label mortgage-related securities; changes in GAAP; and actions taken by FHFA, Treasury or Congress relating to our business, the mortgage industry or the financial services industry. In addition, actions we take to help homeowners, such as increasing our purchases of loans out of MBS trusts and modifying loans are likely to adversely affect our net worth in future periods.

*We are subject to mortgage credit risk. We expect increases in borrower delinquencies and defaults on mortgage loans that we own or that back our guaranteed Fannie Mae MBS to continue to materially and adversely affect our business, results of operations, financial condition, liquidity and net worth.*

We are exposed to mortgage credit risk relating to both the mortgage loans that we hold in our investment portfolio and the mortgage loans that back our guaranteed Fannie Mae MBS because borrowers may fail to make required payments of principal and interest on their mortgage loans, exposing us to the risk of credit losses and credit-related expenses.

Conditions in the housing and financial markets worsened dramatically during 2008 and have continued to worsen during the first quarter of 2009, contributing to a deterioration in the credit performance of our book of business, including higher serious delinquency rates, default rates and average loan loss severities on the mortgage loans we hold or that back our guaranteed Fannie Mae MBS, as well as a substantial increase in our inventory of foreclosed properties. Increases in delinquencies, default rates and severities cause us to experience higher credit-related expenses. In addition, deteriorating economic conditions have negatively affected the credit performance of our book of business. These worsening credit performance trends have been most notable in certain of our higher risk loan categories, states and vintages, although the recession has also begun to affect the credit performance of our broader book of business. We present detailed information about the risk characteristics of our conventional single-family mortgage credit book of business in "Part II— Item 7—MD&A—Risk Management—Credit Risk Management—Mortgage Credit Risk Management" and we present detailed information on our credit-related expenses, credit losses and results of operations for 2008 in "Part II—Item 7—MD&A—Consolidated Results of Operations."

We expect that these adverse credit performance trends will continue and may accelerate, particularly if we continue to experience national and regional declines in home prices, a recessionary economic environment and rising unemployment in the United States.

*The credit losses we experience in future periods as a result of the housing and economic crisis are likely to be larger, perhaps substantially larger, than our current combined loss reserves and will adversely affect our business, results of operations, financial condition, liquidity and net worth.*

Our combined loss reserves, as reflected on our consolidated balance sheet, do not reflect our estimate of the future credit losses inherent in our existing guaranty book of business. Rather, pursuant to GAAP, they reflect only the probable losses that we believe we have already incurred as of the balance sheet date. Accordingly,

although we believe that our credit losses will increase in the future due to the worsening housing and economic crisis, higher unemployment and other negative trends, we are not permitted under GAAP to reflect these future trends in our loss reserve calculations. Because of the housing and economic crisis, there is significant uncertainty regarding the full extent of our future credit losses. The credit losses we experience in future periods will adversely affect our business, results of operations, financial condition, liquidity and net worth.

***We are in conservatorship and the impact of the conservatorship on the management of our business may materially and adversely affect our business, financial condition, results of operations, liquidity and net worth.***

When FHFA was appointed as our conservator, it immediately succeeded to: (1) all of our rights, titles, powers and privileges, and that of any shareholder, officer or director of Fannie Mae with respect to us and our assets; and (2) title to the books, records and assets of any other legal custodian of Fannie Mae. As a result, we are currently under the control of our conservator. The conservatorship has no specified termination date; we do not know when or how it will be terminated. In addition, our directors do not have any duties to any person or entity except to the conservator. Accordingly, our directors are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator.

The then Secretary of the Treasury and the Director of FHFA stated that the conservatorship was implemented "to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and mitigate the systemic risk that has contributed directly to the instability in the current market." We do not know whether the objectives will change, what actions FHFA and Treasury may take or cause us to take in pursuit of their objectives, and whether the actions taken will achieve those objectives. Under the Regulatory Reform Act, as conservator, FHFA may take "such action as may be necessary to put the regulated entity in a sound and solvent condition." We have no control over FHFA's actions, or the actions it may direct us to take.

FHFA is also conservator of Freddie Mac, our primary competitor. We do not know the impact on our business of FHFA's serving as conservator of Freddie Mac. In addition, under the Regulatory Reform Act, FHFA may take any action authorized by the statute which FHFA determines is in its best interests or our best interests, in its sole discretion.

Under the Regulatory Reform Act, FHFA can direct us to enter into contracts or enter into contracts on our behalf. Further, FHFA, as conservator, generally has the power to transfer or sell any of our assets or liabilities and may do so without the approval, assignment or consent of any party. We describe the powers of the conservator in "Item 1—Business—Conservatorship, Treasury Agreements, Our Charter and Regulation of Our Activities—Conservatorship," the terms of the senior preferred stock purchase agreement in "Item 1—Business—Conservatorship, Treasury Agreements, Our Charter and Regulation of Our Activities—Treasury Agreements—Senior Preferred Stock Purchase Agreement and Related Issuance of Senior Preferred Stock and Common Stock Warrant" and the covenants contained in the senior preferred stock purchase agreement in "Item 1—Business—Conservatorship, Treasury Agreements, Our Charter and Regulation of Our Activities— Treasury Agreements—Covenants Under Treasury Agreements—Senior Preferred Stock Purchase Agreement Covenants." Our lack of overall control over our business may adversely affect our business, financial condition, results of operations, liquidity and net worth.

***Our multiple roles in the recently announced Homeowner Affordability and Stability Plan is likely to increase our costs and place burdens on our resources.***

On February 18, 2009, the Obama Administration announced HASP. Under HASP, we will work with our servicers to offer at-risk borrowers loan modifications that reduce their monthly principal and interest payments on their mortgages, and we will act as the program administrator. In addition, under HASP, we will launch a streamlined refinancing initiative that will allow borrowers who have mortgages with current loan-to-value ratios up to 105% to refinance their loans to a lower rate without obtaining new mortgage insurance in excess of what was already in place. Given that the nature of both the loan modification and streamlined refinance programs is unprecedented and the details of these programs are still under development at this time, it is difficult for us to predict the full extent of our activities under the programs and how those activities will

impact us, the response rates we will experience, or the costs that we will incur. However, to the extent that borrowers and our servicers participate in these programs in large numbers, it is likely that the costs we incur associated with the modifications of loans in our guaranty book of business, as well as the borrower and servicer incentive fees associated with them, will be substantial, and these programs would therefore likely have a material adverse effect on our business, results of operations, financial condition and net worth. In addition, our role as program administrator for the modification program is expected to be substantial, requiring significant levels of internal resources and management attention, which may therefore be shifted away from current corporate initiatives. This shift could have a material adverse effect on our business, results of operations, financial condition and net worth.

***Our efforts to pursue our mission and meet our mission-related goals may adversely affect our business, results of operations, financial condition, liquidity and net worth.***

Prior to the conservatorship, our business was managed with a strategy to maximize shareholder returns. However, our conservator has directed us to focus primarily on fulfilling our mission of providing liquidity, stability and affordability to the mortgage market and to provide assistance to struggling homeowners. In support of this focus on our mission, we may take, or be directed by the conservator to take, a variety of actions that could adversely affect our economic returns, possibly significantly, such as: increasing our purchase of loans that pose a higher credit risk; reducing our guaranty fees; refraining from foreclosing on seriously delinquent loans; increasing our purchases of loans out of MBS trusts in order to modify them; and modifying loans to extend the maturity, lower the interest rate or reduce the amount of principal owed by the borrower. For example, since November 2008 we suspended foreclosure sales and the eviction of occupants from our foreclosed properties in an effort to provide assistance to struggling homeowners. These activities may adversely affect our economic returns, in both the short term and long term. These activities also create risks to our business and are likely to have an adverse effect on our business, results of operations, financial condition, liquidity and net worth.

In addition to FHFA, other government agencies or Congress may also ask us to undertake significant efforts in pursuit of our mission. For example, on February 18, 2009, the Obama Administration announced HASP. Under HASP, we will work with our servicers to offer at-risk borrowers loan modifications that reduce their monthly principal and interest payments on their mortgages, and we will act as the program administrator. In addition, under HASP, we will launch a streamlined refinancing initiative that will allow borrowers who have mortgage loans with current loan-to-value ratios up to 105% to refinance their loans to a lower rate without obtaining new mortgage insurance in excess of what was already in place. To the extent that borrowers and our servicers participate in these programs in large numbers, it is likely that the costs we incur associated with the modifications of loans in our guaranty book of business, as well as the borrower and servicer incentive fees associated with them, will be substantial, and these programs would therefore likely have a material adverse effect on our business, results of operations, financial condition and net worth. We do not know what additional actions FHFA, other agencies of the U.S. government, or Congress may direct us to take in the future.

In addition, our efforts to fulfill our housing goals and subgoals have contributed to our losses because these efforts often resulted in our purchase of higher risk loans, on which we typically incur proportionately more credit losses than on other types of loans. Accordingly, these efforts have contributed to our higher credit losses and may lead to further increases in our credit losses.

***The conservatorship has no specified termination date, and the future structure of our business following termination of the conservatorship is uncertain.***

We do not know when or how the conservatorship will be terminated or what changes to our business structure will be made during or following the termination of the conservatorship. We do not know whether we will exist in the same or a similar form or continue to conduct our business as we did before the conservatorship, or whether the conservatorship will end in receivership. We can give no assurance that we will remain a shareholder-owned company. At the time we were placed into conservatorship, the then

46

Secretary of the Treasury indicated that there is a consensus that we and Freddie Mac pose a systemic risk and that we cannot continue in our current form.

Under the Regulatory Reform Act, the appointment of FHFA as the receiver of Fannie Mae would immediately terminate the conservatorship. The consequences of our being placed into receivership are described in the following risk factor. If we are not placed into receivership and the conservatorship is terminated, our business will remain subject to the restrictions of the senior preferred stock purchase agreement, unless it is amended by mutual agreement of us and Treasury. The restrictions on our business under the senior preferred stock purchase agreement are described in "Item 1—Business—Conservatorship, Treasury Agreements, Our Charter and Regulation of Our Activities—Treasury Agreements—Covenants Under Treasury Agreements—Senior Preferred Stock Purchase Agreement Covenants."

***Our regulator is authorized or required to place us into receivership under specified conditions, which would result in the liquidation of our assets and could have a material adverse effect on holders of our common stock, preferred stock, debt securities and Fannie Mae MBS.***

Under the Regulatory Reform Act, FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations or if we have not been paying our debts, in either case, for a period of 60 days. Because of our net worth deficit as of December 31, 2008, and continuing trends in the housing and financial markets, we will need funding from Treasury in order to avoid a trigger of mandatory receivership. In addition, we could be put in receivership at the discretion of the Director of FHFA at any time for other reasons, including conditions that FHFA has already asserted existed at the time the Director of FHFA placed us into conservatorship. These include: a substantial dissipation of assets or earnings due to unsafe or unsound practices; the existence of an unsafe or unsound condition to transact business; an inability to meet our obligations in the ordinary course of business; a weakening of our condition due to unsafe or unsound practices or conditions; critical undercapitalization; the likelihood of losses that will deplete substantially all of our capital; or by consent. A receivership would terminate the conservatorship. In addition to the powers FHFA has as conservator, the appointment of FHFA as our receiver would terminate all rights and claims that our shareholders and creditors may have against our assets or under our charter arising as a result of their status as shareholders or creditors, except for their right to payment, resolution or other satisfaction of their claims as permitted under the Regulatory Reform Act. Unlike a conservatorship, the purpose of which is to conserve our assets and return us to a sound and solvent condition, the purpose of a receivership is to liquidate our assets and resolve claims against us.

In the event of a liquidation of our assets, only after paying the secured and unsecured claims against the company (including repaying all outstanding debt obligations), the administrative expenses of the receiver and the liquidation preference of the senior preferred stock, would any liquidation proceeds be available to repay the liquidation preference on any other series of preferred stock. Finally, only after the liquidation preference on all series of preferred stock is repaid would any liquidation proceeds be available for distribution to the holders of our common stock. There can be no assurance that there would be sufficient proceeds to repay the liquidation preference of any series of our preferred stock or to make any distribution to the holders of our common stock. To the extent we are placed in receivership and do not or cannot fulfill our guaranty to the holders of our Fannie Mae MBS, they could become unsecured creditors of ours with respect to claims made under our guaranty.

***The investment by Treasury significantly restricts our business activities and requires that we pay substantial dividends and fees, which could adversely affect our business, financial condition, results of operations, liquidity and net worth. By its terms, Treasury's investment in our business is indefinite and may be permanent.***

Under our senior preferred stock purchase agreement with Treasury, Treasury generally has committed to provide us funds, on a quarterly basis, of up to $100 billion, in the amount, if any, by which our total liabilities exceed our total assets, as reflected on our consolidated balance sheet, prepared in accordance with GAAP, for the applicable fiscal quarter. On February 18, 2009, Treasury announced that it is amending the senior preferred stock purchase agreement to (1) increase its funding commitment from $100 billion to

$200 billion and (2) increase the size of the mortgage portfolio allowed under the agreement by $50 billion to $900 billion, with a corresponding increase in the allowable debt outstanding. Because an amended agreement has not been executed as of the date of this report, the following discussion of the senior preferred stock purchase agreement refers to the terms of that existing agreement, without these changes.

*Cost of Treasury Investment.*   Beginning in 2010, we are obligated to pay a quarterly commitment fee to Treasury in exchange for its continued funding commitment under the senior preferred stock purchase agreement. This fee has not yet been established and could be substantial. We are also required to pay dividends on the senior preferred stock at a rate of 10% per year (or 12% in specified circumstances) based on the liquidation preference of the stock. As a result of our expected draw on Treasury's funding commitment, our annualized aggregate dividend payment to Treasury, at the 10% dividend rate, will increase to $1.6 billion. The amount of the aggregate liquidation preference will increase to $16.2 billion as a result of our expected draw. The aggregate liquidation preference of the senior preferred stock will increase further by the amount of each additional draw on Treasury's funding commitment. The liquidation preference may also increase by the amount of each unpaid dividend if we fail to pay any required dividend and by the amount of each unpaid quarterly commitment fee if we fail to pay any required commitment fee. Because dividends on the senior preferred stock are paid based on the then-current liquidation preference of the stock, any further increases in the liquidation preference will increase the amount of the dividends payable, and the increase may be substantial. If the dividends payable are substantial, it could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. Moreover, increases in the liquidation preference of the senior preferred stock will make it more difficult for us to achieve self-sustaining profitability in the future.

*Restrictions Relating to Covenants.*   The senior preferred stock purchase agreement we entered into with Treasury includes a number of covenants that significantly restrict our business activities. We cannot, without the prior written consent of Treasury: pay dividends; sell, issue, purchase or redeem Fannie Mae equity securities; sell, transfer, lease or otherwise dispose of assets other than for fair market value in specified situations; engage in transactions with affiliates other than on arm's-length terms or in the ordinary course of business; issue subordinated debt; or incur indebtedness that would result in our aggregate indebtedness exceeding 110% of our aggregate indebtedness as of June 30, 2008. We provide a detailed description of these covenants in "Item 1—Business—Conservatorship, Treasury Agreements, Our Charter and Regulation of Our Activities—Treasury Agreements—Covenants Under Treasury Agreements—Senior Preferred Stock Purchase Agreement Covenants." The restrictions imposed by these covenants could adversely affect our business, financial condition, results of operations, liquidity and net worth.

*Mortgage Portfolio Cap.*   Pursuant to the senior preferred stock purchase agreement, we are not permitted to increase the size of our mortgage portfolio to more than $850.0 billion through the end of 2009, and beginning in 2010 we are required to reduce the size of our mortgage portfolio by 10% per year (based on the size of the portfolio on December 31 of the prior year) until it reaches $250.0 billion. This mortgage portfolio cap may force us to sell mortgage assets at unattractive prices and may prevent us from purchasing mortgage assets at attractive prices. Moreover, the interest income we generate from the mortgage assets we hold in our portfolio is a primary source of our revenue, which we expect will be reduced as the size of our portfolio is reduced. As a result, this mortgage portfolio cap could have a material adverse effect on our business, financial condition, results of operations, liquidity and net worth.

*Indefinite Nature of Treasury Investment.*   We have issued to Treasury one million shares of senior preferred stock and a warrant to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise. The senior preferred stock will remain outstanding until Treasury's funding commitment is terminated and the liquidation preference on the senior preferred stock is fully repaid. Treasury's funding commitment will terminate under any of the following circumstances: (1) the completion of our liquidation and fulfillment of Treasury's obligations under its funding commitment at that time, (2) the payment in full of, or the reasonable provision for, all of our liabilities (whether or not contingent, including mortgage guaranty obligations), or (3) the funding by Treasury of $100.0 billion under the commitment. The warrant will remain exercisable through September 7, 2028. Accordingly, even if the conservatorship is terminated, the U.S. government will have an equity ownership stake in our company so long as the senior preferred stock is outstanding, the warrant is exercisable or the

U.S. government holds shares of our common stock issued upon exercise of the warrant. These terms of Treasury's investment effectively eliminate our ability to raise equity capital from private sources. Moreover, our draw under Treasury's funding commitment, and the required dividend payment thereon could permanently impair our ability to build independent sources of capital and will make it more difficult for us to achieve self-sustaining profitability in the future.

***Treasury's funding commitment may not be sufficient to keep us in a solvent condition.***

Under the senior preferred stock purchase agreement, Treasury has made a commitment to provide up to $100 billion in funding as needed to help us maintain a positive net worth, and on February 18, 2009, Treasury announced that it is amending the agreement to increase its commitment from $100 billion to $200 billion. The amended agreement has not been executed as of the date of this report. On February 25, 2009, the Director of FHFA submitted a request for $15.2 billion under the funding commitment due to our net worth deficit as of December 31, 2008. The amount of Treasury's funding commitment will continue to be reduced by any amounts we receive under the commitment for future periods, as well as by any dividends or quarterly commitment fee that we do not pay in cash. If we continue to experience substantial losses in future periods or to the extent that we experience a liquidity crisis that prevents us from accessing the unsecured debt markets, this commitment may not be sufficient to keep us in solvent condition or from being placed into receivership. The announced amendment to increase the commitment of $200 billion reduces, but does not eliminate, this risk.

***We may not be able to rely on the Treasury credit facility in the event of a liquidity crisis.***

Treasury is not obligated by the terms of the Treasury credit facility to make any loans to us. In addition, we must provide collateral securing any loan that Treasury makes to us under the Treasury credit facility in the form of Fannie Mae MBS or Freddie Mac mortgage-backed securities. Treasury may reduce the value assigned to the collateral by whatever amount Treasury determines, and may request additional collateral. In addition, Treasury may require that we immediately repay, on demand, any one or more of the loans outstanding under the Treasury credit facility, regardless of the originally scheduled maturity date of the loan. Loans also become immediately due and payable upon the occurrence of specified events of default, which includes our receivership. Upon the occurrence of any event of default, Treasury may pursue specified remedies, including sale of the collateral we provided. If Treasury requires us to repay immediately loans made to us pursuant to the Treasury credit facility, there can be no assurance that we will be able to make those payments or borrow sufficient funds from alternative sources to make those payments. In addition, the forced sale of our collateral could adversely affect our business, financial condition, results of operations, liquidity and net worth.

***The conservatorship and investment by Treasury have had, and will continue to have, a material adverse effect on our common and preferred shareholders.***

*No voting rights during conservatorship.*   The rights and powers of our shareholders are suspended during the conservatorship. The conservatorship has no specified termination date. During the conservatorship, our common shareholders do not have the ability to elect directors or to vote on other matters unless the conservator delegates this authority to them.

*Dividends to common and preferred shareholders, other than Treasury, have been eliminated.*   The conservator has eliminated common and preferred stock dividends (other than dividends on the senior preferred stock) during the conservatorship. In addition, under the terms of the senior preferred stock purchase agreement, dividends may not be paid to common or preferred shareholders (other than the senior preferred stock) without the consent of Treasury, regardless of whether we are in conservatorship.

*Liquidation preference of senior preferred stock will increase, potentially substantially.*   The senior preferred stock ranks prior to our common stock and all other series of our preferred stock, as well as any capital stock we issue in the future, as to both dividends and distributions upon liquidation. Accordingly, if we are liquidated, the senior preferred stock is entitled to its then-current liquidation preference, plus any accrued but unpaid dividends, before any distribution is made to the holders of our common stock or other preferred stock. As of February 26, 2009, the liquidation preference on the senior preferred stock was $1.0 billion; however, it

49

will increase to $16.2 billion as a result of our expected draw on Treasury's funding commitment. The liquidation preference could increase substantially as we draw on Treasury's funding commitment, if we do not pay dividends owed on the senior preferred stock or if we do not pay the quarterly commitment fee under the senior preferred stock purchase agreement. If we are liquidated, there may not be sufficient funds remaining after payment of amounts to our creditors and to Treasury as holder of the senior preferred stock to make any distribution to holders of our common stock and other preferred stock.

*Warrant may substantially dilute investment of current shareholders.*   If Treasury exercises its warrant to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis, the ownership interest in the company of our then existing common shareholders will be substantially diluted. It is possible that private shareholders will not own more than 20.1% of our total common equity for the duration of our existence.

*Market price and liquidity of our common and preferred stock has substantially declined and may not recover.* After our entry into conservatorship, the market price for our common stock declined substantially (from approximately $7 per share immediately before the conservatorship to less than $1 per share after the conservatorship) and the investments of our common and preferred shareholders have lost substantial value. Our common and preferred stock may never recover their value and could be delisted from the NYSE as described below under *"Noncompliance with NYSE rules could result in the delisting of our common and preferred stock from the NYSE."* In addition, we do not know if or when we will pay dividends on those shares in the future.

*No longer managed for the benefit of shareholders.*   According to a statement made by the then Secretary of the Treasury on September 7, 2008, because we are in conservatorship, we "will no longer be managed with a strategy to maximize shareholder returns."

We do not know when or how the conservatorship will be terminated, and if or when the rights and powers of our shareholders, including the voting powers of our common shareholders, will be restored. Moreover, even if the conservatorship is terminated, by their terms, we remain subject to the senior preferred stock purchase agreement, senior preferred stock and warrant, which can only be cancelled or modified by mutual consent of Treasury and the conservator. For a description of additional restrictions on and risks to our shareholders, see "Item 1—Business—Conservatorship, Treasury Agreements, Our Charter and Regulation of Our Activities— Conservatorship—Effect of Conservatorship on Shareholders" and "Item 1—Business—Conservatorship, Treasury Agreements, Our Charter and Regulation of Our Activities—Treasury Agreements—Effect of Treasury Agreements on Shareholders."

**During the second half of 2008, our ability to access the debt capital markets, particularly the long-term or callable debt markets, was limited. Similar limitations in future periods could have a material adverse effect on our ability to fund our operations and on our costs, liquidity, business, results of operations, financial condition and net worth.**

Our ability to operate our business, meet our obligations and generate net interest income depends primarily on our ability to issue substantial amounts of debt frequently, with a variety of maturities and call features and at attractive rates. In July 2008, market concerns about our capital position, the future of our business (including future profitability, future structure, regulatory actions and agency status) and the extent of U.S. government support for our business began to severely negatively affect our access to the unsecured debt markets, particularly for long-term or callable debt, and increase the yields on our debt as compared to relevant market benchmarks. In October and November 2008, we experienced further deterioration in our access to the long-term debt market and a significant increase in the yields on our debt as compared to relevant market benchmarks. In addition, in recent months we have relied on the Federal Reserve as an active and significant purchaser of our long-term debt in the secondary market. There can be no assurance that the recent improvement in our access to funding will continue. We describe our access to the debt markets in "Part II—Item 7—MD&A—Liquidity and Capital Management—Liquidity Management—Debt Funding."

If our ability to access the debt capital markets is limited in future periods, we would likely need to meet our funding needs by issuing short-term debt, increasingly exposing us to the risk of increasing interest rates, adverse credit market conditions and insufficient demand for our debt to meet our refinancing needs. This

FHFA 0312

would increase the likelihood that we would need to rely on our liquidity contingency plan, obtain funds under the Treasury credit facility, or possibly be unable to repay our debt obligations as they become due. In the current market environment, we have significant uncertainty regarding our ability to carry out our liquidity contingency plans.

A primary source of our revenue is the net interest income we earn from the difference, or spread, between the return that we receive on our mortgage assets and our borrowing costs. The issuance of short-term and long-term debt securities in the domestic and international capital markets is our primary source of funding for our purchases of assets for our mortgage portfolio and for repaying or refinancing our existing debt. Our ability to obtain funds through the issuance of debt, and the cost at which we are able to obtain these funds, depends on many factors, including:

- the public's perception of the risks to and financial prospects of our business, industry or the markets in general;
- our corporate and regulatory structure, including our status as a GSE under conservatorship;
- the commitment of Treasury to provide funding to us;
- legislative or regulatory actions relating to our business, including any actions that would affect our GSE status or add additional requirements that would restrict or reduce our ability to issue debt;
- other actions by the U.S. Government, such as the FDIC's guarantee of corporate debt instruments and the Federal Reserve's program to purchase GSE debt and MBS;
- our credit ratings, including rating agency actions relating to our credit ratings;
- our financial results and changes in our financial condition;
- significant events relating to our business or industry;
- the preferences of debt investors;
- the breadth of our investor base;
- prevailing conditions in the capital markets;
- foreign exchange rates;
- interest rate fluctuations;
- the rate of inflation;
- competition from other debt issuers;
- general economic conditions in the U.S. and abroad; and
- broader trade and political considerations among the U.S. and other countries.

Foreign investors hold a significant portion of our debt securities and are an important source of funding for our business. The willingness of foreign investors to purchase and hold our debt securities may be influenced by many factors, including changes in the world economy, changes in foreign-currency exchange rates, regulatory and political factors, as well as the availability of and preferences for other investments. Foreign investors are also significant purchasers of mortgage-related securities, and changes in the strength and stability of foreign demand for mortgage-related securities could affect the overall market for those securities and the returns available to us on our portfolio investments. If foreign investors divest a significant portion of their holdings, our funding costs may increase. We have experienced reduced demand from international investors, particularly foreign central banks, compared with the historically high levels of demand we experienced from these investors between mid-2007 and mid-2008. The willingness of foreign investors to

51

purchase or hold our debt securities, as well as our mortgage-related securities, and any changes to such willingness, may materially affect our liquidity, earnings, financial condition and net worth.

In addition, our increased reliance on short-term debt, combined with limitations on the availability of a sufficient volume of reasonably priced derivative instruments to hedge that short-term debt position, may have an adverse impact on our duration and interest rate risk management positions. See "Part II—Item 7—MD&A—Risk Management—Interest Rate Risk Management and Other Market Risks" for more information regarding our interest rate risk management activities. Due to current financial market conditions and concerns about our business, we expect this trend toward dependence on short-term debt and increased roll over risk to continue. See "Part II—Item 7—Liquidity and Capital Management—Liquidity Management—Debt Funding—Outstanding Debt" for information on the maturity profile of our debt. To the extent the market for our debt securities has improved due to the Treasury credit facility being made available to us, we believe that the actual and perceived risk that we will be unable to refinance our debt as it becomes due remains and is likely to increase substantially as we progress toward December 31, 2009, which is the date on which the Treasury credit facility terminates.

Pursuant to our senior preferred stock purchase agreement with Treasury, we may not incur indebtedness that would result in our aggregate indebtedness exceeding 110% of our aggregate indebtedness as of June 30, 2008 and we may not incur any subordinated indebtedness. Our calculation of our aggregate indebtedness as of June 30, 2008, which has not been confirmed by Treasury, set this debt limit at $892.0 billion. We calculate aggregate indebtedness as the unpaid principal balance of our debt outstanding, or in the case of zero coupon bonds, at maturity and exclude basis adjustments and debt from consolidations. As of January 31, 2009, we estimate that our aggregate indebtedness totaled $885.0 billion, significantly limiting our ability to issue additional debt.

If we are unable to issue both short- and long-term debt securities at attractive rates and in amounts sufficient to operate our business and meet our obligations, it would have a continuing material adverse effect on our liquidity, earnings, financial condition and net worth.

***Our liquidity contingency plan may not provide sufficient liquidity to operate our business and meet our obligations in the event that we cannot access the debt capital markets.***

We maintain a liquidity policy, which includes a liquidity contingency plan that is intended to allow us to meet all of our cash obligations for 90 days without relying upon the issuance of unsecured debt. This plan is described in "Part II—Item 7—MD&A—Liquidity and Capital Management—Liquidity Management—Liquidity Contingency Plan." In adverse market conditions, such as the ones we are currently experiencing, our ability to meet that 90-day plan is likely to be significantly impaired and our ability to repay maturing indebtedness and fund our operations could be significantly impaired. Within the 90-day time frame contemplated by our liquidity contingency plan, we depend on continuous access to secured financing in the repurchase and securities lending markets to continue our operations. That access could be impaired by numerous factors that are specific to Fannie Mae, such as the conservatorship, our historical lack of reliance on repurchase arrangements, and operational risks, and factors that are not specific to Fannie Mae, such as the rapidly declining market values for assets and the severe disruption of the financial markets that has been ongoing. Our ability to sell mortgage assets and other assets may also be impaired, or be subject to a greater reduction in value if other market participants are seeking to sell similar assets at the same time.

***Future amendments and guidance from the FASB are expected to impact our accounting treatment, which could materially adversely affect our business, results of operations, financial condition, liquidity and net worth.***

On September 15, 2008, the FASB issued an exposure draft of a proposed statement of financial accounting standards, *Amendments to FASB Interpretation No. 46(R),* and an exposure draft of a proposed statement of financial accounting standards, *Accounting for Transfer of Financial Assets-an amendment of FASB Statement No. 140.* The proposed amendments to SFAS 140 would eliminate the concept of qualified special purpose entities ("QSPEs"). Additionally, the amendments to FIN 46R would replace the current consolidation model

with a different model. Refer to "Part II—Item 7—MD&A—Off-Balance Sheet Arrangements and Variable Interest Entities" for a description of our MBS trusts as QSPEs. The FASB's proposed amendments are not final and may be revised before final rules are issued. The proposed amendments would be effective for new transfers of financial assets and to all variable interest entities on or after January 1, 2010.

If the QSPE concept is eliminated from SFAS 140, all of our securitization structures that are currently QSPEs will have to be evaluated under FIN 46R for consolidation. Currently, we evaluate the MBS trusts used in our securitizations to determine whether they are QSPEs. If they are QSPEs, we do not consolidate them if we do not have the unilateral ability to dissolve them. FASB's proposal would potentially require consolidation of the loans and debt of our MBS trusts onto our balance sheet.

As of December 31, 2008, we had issued over $2.5 trillion of Fannie Mae MBS. Although we cannot at this time predict the content of the final amendments, we may be required to consolidate the assets and liabilities of some or all of these MBS trusts. If we are required to consolidate the assets and liabilities of some or all of these MBS trusts, these assets and liabilities would initially be reported at fair value under the FASB's currently proposed rules. If the fair value of those assets is substantially less than the fair value of the corresponding liabilities (which would be the case under current market conditions), our net worth would be severely impacted and Treasury's funding commitment may not be sufficient to prevent our mandatory receivership. However, at the FASB's January 28, 2009 meeting, a tentative decision was reached that the incremental assets and liabilities to be consolidated upon adoption should be recognized at their carrying values, and the FASB indicated that fair value would only be permitted if determining the carrying value is not practicable. As a result of this tentative decision, we could also experience a reduction in our net worth.

In addition, under our existing regulatory capital standards, which are currently suspended while we are in conservatorship, the amount of capital that we are required to hold for obligations reported on our balance sheet is significantly higher than the amount of capital that we are required to hold for the guarantees that we provide to the MBS trusts. Accordingly, if we are required to consolidate the assets and liabilities of our MBS trusts, we would be required to increase capital to satisfy regulatory capital requirements unless legislation is passed or FHFA adopts new capital standards that alter this requirement. If we do not have enough capital to meet these higher regulatory capital requirements, we could incur penalties and also could be subject to further restrictions on our activities and operations, or to investigation and enforcement actions by the FHFA. Under the Regulatory Reform Act, the FHFA may place us into receivership if it classifies us as critically undercapitalized. Moreover, changes to the accounting treatment for securitizations may impact the market for securitizations, which could weaken demand for, and reduce the liquidity of, our Fannie Mae MBS.

Finally, implementation of these proposed changes would fundamentally alter our financial reporting model, requiring significant operational and systems changes. Depending on the implementation date ultimately required by FASB, it may be difficult or impossible for us to make all such changes in a controlled manner by the effective date. Failure to make such changes by the effective date could have a material adverse impact on us, including our ability to prepare timely financial reports. In addition, making such changes in a compressed time frame would divert resources from other ongoing corporate initiatives, which could have a material adverse impact on us. We cannot predict what the final amendments to SFAS 140 and FIN 46R will be, nor can we predict whether we will be required to consolidate all, some or none of the assets and liabilities of our MBS trusts, or the effect of a consolidation of those assets and liabilities on our securitization activities, results of operations or net worth. Further, we cannot predict the impact that these or other amendments or guidance of the FASB that may be adopted in the future may have on our accounting policies and methods, which are fundamental to how we report our financial condition and results of operations.

***A decrease in our credit ratings would have an adverse effect on our ability to issue debt on reasonable terms, which could reduce our earnings and materially adversely affect our ability to conduct our normal business operations and our liquidity, financial condition and results of operations.***

Our borrowing costs and our access to the debt capital markets depend in large part on the high credit ratings on our senior unsecured debt. Our ratings are subject to revision or withdrawal at any time by the rating agencies. Factors such as the amount of our net losses, deterioration in our financial condition, actions by

governmental entities or others, and sustained declines in our long-term profitability could adversely affect our credit ratings. The reduction in our credit ratings could increase our borrowing costs, limit our access to the capital markets and trigger additional collateral requirements under our derivatives contracts and other borrowing arrangements. It may also reduce our earnings and materially adversely affect our liquidity, our ability to conduct our normal business operations, our financial condition and results of operations. Our credit ratings and ratings outlook are included in "Part II—Item 7—MD&A—Liquidity and Capital Management—Liquidity Management—Credit Ratings."

***We have experienced significant management changes and we may lose a significant number of valuable employees, which could have a material adverse effect on our ability to do business and our results of operations.***

Since late August 2008, several of our senior executive officers have left the company or their positions, including our former President and Chief Executive Officer, Executive Vice President and Chief Financial Officer, General Counsel, Chief Business Officer, Chief Risk Officer and Chief Technology Officer. FHFA appointed our new President and Chief Executive Officer at the commencement of the conservatorship, and we hired a new Chief Financial Officer on November 24, 2008. There have also been several internal management changes to fill key positions and the company continues to recruit members of its senior management team. It may take time for the new management team to be hired or retained and to become sufficiently familiar with our business and each other to effectively develop and implement our business strategies. This turnover in key management positions could harm our financial performance and results of operations. Management attention may be diverted from regular business concerns by reorganizations and the need to operate under this new framework.

In addition, the success of our business strategy depends on the continuing service of our employees. The conservatorship and the actions taken by Treasury and the conservator to date, or that may be taken by them or other government agencies in the future, may have an adverse effect on the retention and recruitment of employees and others in management. For example, pursuant to the senior preferred stock purchase agreement, we may not enter into any new compensation arrangements or increase amounts or benefits payable under existing compensation arrangements of any named executive officer (as defined by SEC rules) without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury. Limitations on executive compensation may adversely affect our ability to recruit and retain well-qualified employees. If we lose a significant number of employees and are not able to quickly recruit and train new employees, it could negatively affect customer relationships and goodwill, and could have a material adverse effect on our ability to do business and our results of operations.

***We are subject to pending government investigations and civil litigation. If it is determined that we engaged in wrongdoing, or if any material litigation is decided against us, we could be required to pay substantial judgments, settlements or other penalties.***

We are subject to investigations by the Department of Justice and the SEC, and are a party to a number of lawsuits. We are unable at this time to estimate our potential liability in these matters, but may be required to pay substantial judgments, settlements or other penalties and incur significant expenses in connection with these investigations and lawsuits, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. In addition, responding to requests for information in these investigations and lawsuits may divert significant internal resources away from managing our business. More information regarding these investigations and lawsuits is included in "Item 3—Legal Proceedings" and "Notes to Consolidated Financial Statements—Note 21, Commitments and Contingencies."

***The material weaknesses in our internal control over financial reporting could result in errors in our reported results or disclosures that are not complete or accurate, which could have a material adverse effect on our business and operations.***

As described in "Part II—Item 9A—Controls and Procedures," management has determined that, as of the date of this filing, we have ineffective disclosure controls and procedures and two material weaknesses in our internal control over financial reporting. These weaknesses could result in errors in our reported results or

disclosures that are not complete or accurate, which could have a material adverse effect on our business and operations.

One of these material weaknesses relates specifically to the impact of the conservatorship on our disclosure controls and procedures. Because we are under the control of FHFA, some of the information that we may need to meet our disclosure obligations may be solely within the knowledge of FHFA. As our conservator, FHFA has the power to take actions without our knowledge that could be material to our shareholders and other stakeholders, and could significantly affect our financial performance or our continued existence as an ongoing business. Because FHFA currently functions as both our regulator and our conservator, there are inherent structural limitations on our ability to design, implement, test or operate effective disclosure controls and procedures relating to information within FHFA's knowledge. As a result, we have not been able to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our financial statements. Given the structural nature of this material weakness, it is likely that we will not remediate this weakness while we are under conservatorship.

***Noncompliance with NYSE rules could result in the delisting of our common and preferred stock from the NYSE.***

We received notice from the NYSE on November 12, 2008 that we failed to satisfy one of the NYSE's standards for continued listing of our common stock because the average closing price of our common stock during the 30 consecutive trading days ended November 12, 2008 had been less than $1.00 per share. Under applicable NYSE rules, we now have until May 11, 2009, subject to supervision by the NYSE, to bring our share price as of May 11, 2009 and our average share price for the 30 consecutive trading days preceding May 11, 2009, above $1.00. If we fail to do so, the NYSE rules provide that the NYSE will initiate suspension and delisting procedures. We have advised the NYSE that we intend to cure this deficiency by May 11, 2009, and that, subject to the approval of Treasury, we might undertake a reverse stock split. However, a reverse stock split, or other action, may not be sufficient to cure this deficiency.

If the NYSE were to delist our common and preferred stock, it likely would result in a significant decline in the trading volume and liquidity of our common stock and of the classes of our preferred stock listed on the NYSE. We also expect that the suspension and delisting of our common stock would lead to decreases in analyst coverage and market-making activity relating to our common stock, as well as reduced information about trading prices and volume. As a result, it could become significantly more difficult for our shareholders to sell their shares at prices comparable to those in effect prior to delisting or at all.

***We may experience further losses and write-downs relating to our investment securities, which could materially adversely affect our business, results of operations, financial condition, liquidity and net worth.***

We experienced a significant increase in losses and write-downs relating to our investment securities in 2008, as well as credit rating downgrades relating to these securities. A substantial portion of these losses and write-downs related to our investments in private-label mortgage-related securities backed by Alt-A and subprime mortgage loans and CMBS. Due to the continued deterioration in home prices and continued increases in mortgage loan delinquencies, defaults and credit losses in the subprime and Alt-A sectors, we expect to incur further losses on our investments in private-label mortgage-related securities, including on those that continue to be AAA-rated. See "Part II—Item 7—MD&A—Consolidated Balance Sheet Analysis—Trading and Available-for-Sale Investment Securities—Investments in Private-Label Mortgage-Related Securities" for detailed information on our investments in private-label securities backed by Alt-A and subprime loans.

We also incurred significant losses during the second half of 2008 relating to the non-mortgage investment securities in our cash and other investments portfolio, primarily as a result of a substantial decline in the market value of these assets due to the financial market crisis. The fair value of the investment securities we hold may be further adversely affected by continued deterioration in the housing and financial markets, additional ratings downgrades or other events. Further losses and write-downs relating to our investment

securities could materially adversely affect our business, results of operations, financial condition, liquidity and net worth.

Market illiquidity also has increased the amount of management judgment required to value certain of our securities. If we were to sell any of these securities, the price we ultimately realize will depend on the demand and liquidity in the market at that time and may be materially lower than the value at which we carry these securities on our balance sheet. Any of these factors could require us to take further write-downs in the value of our investment portfolio and incur material impairment of assets, which would have an adverse effect on our business, results of operations, financial condition, liquidity and net worth.

***Our business with many of our institutional counterparties is critical and heavily concentrated. If one or more of our institutional counterparties defaults on its obligations to us or becomes insolvent, we could experience substantial losses and it could materially adversely affect our business, results of operations, financial condition, liquidity and net worth.***

We face the risk that one or more of our institutional counterparties may fail to fulfill their contractual obligations to us. That risk has escalated significantly as a result of the current financial market crisis. Our primary exposures to institutional counterparty risk are with: mortgage servicers that service the loans we hold in our mortgage portfolio or that back our Fannie Mae MBS; third-party providers of credit enhancement on the mortgage assets that we hold in our mortgage portfolio or that back our Fannie Mae MBS, including mortgage insurers, lenders with risk sharing arrangements, and financial guarantors; issuers of securities held in our cash and other investments portfolio; and derivatives counterparties.

The challenging mortgage and credit market conditions have adversely affected, and will likely continue to adversely affect, the liquidity and financial condition of our institutional counterparties. One or more of these institutions may default in its obligations to us for a number of reasons, such as changes in financial condition that affect their credit ratings, a reduction in liquidity, operational failures or insolvency. The financial difficulties that a number of our institutional counterparties are currently experiencing may negatively affect the ability of these counterparties to meet their obligations to us and the amount or quality of the products or services they provide to us. A default by a counterparty with significant obligations to us could result in significant financial losses to us and could materially adversely affect our ability to conduct our operations, which would adversely affect our business, results of operations, financial condition, liquidity and net worth. For example, we incurred significant losses during the third quarter of 2008 in connection with Lehman Brothers' entry into bankruptcy. For a description of these losses, refer to "Part II—Item 7—MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management."

In addition, we routinely execute a high volume of transactions with counterparties in the financial services industry. Many of these transactions expose us to credit risk relating to the possibility of a default by our counterparties. In addition, to the extent these transactions are secured, our credit risk may be exacerbated to the extent that the collateral held by us cannot be realized upon or is liquidated at prices not sufficient to recover the full amount of the loan or derivative exposure due to it. We have exposure to these financial institutions in the form of unsecured debt instruments, derivative transactions and equity investments. As a result, we could incur losses relating to defaults under these instruments or relating to impairments to the carrying value of our assets represented by these instruments. These losses could materially and adversely affect our business, results of operations, financial condition, liquidity and net worth.

Moreover, many of our counterparties provide several types of services to us. Many of our lender customers or their affiliates also act as mortgage servicers, custodial depository institutions and document custodians for us. Accordingly, if one of these counterparties were to become insolvent or otherwise default on its obligations to us, it could harm our business and financial results in a variety of ways. Refer to "Part II—Item 7—MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" for a detailed description of the business concentration and risk posed by each type of counterparty.

***We depend on our mortgage insurer counterparties to provide services that are critical to our business. If one or more of these counterparties defaults on its obligations to us or becomes insolvent, it could materially adversely affect our business, results of operations, financial condition, liquidity and net worth.***

Increases in mortgage insurance claims due to higher credit losses in recent periods have adversely affected the financial results and condition of many mortgage insurers. The insurer financial strength ratings of almost all of our major mortgage insurer counterparties have been downgraded to reflect their weakened financial condition. This condition creates an increased risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies.

If the financial condition of one or more of these mortgage insurer counterparties deteriorates further, it could result in an increase in our loss reserves and the fair value of our guaranty obligations if we determine it is probable that we would not collect all of our claims from the affected mortgage insurer, which could adversely affect our business, results of operations, financial condition, liquidity and net worth. In addition, if a mortgage insurer implements a run-off plan in which the insurer no longer enters into new business or is placed into receivership by its regulator, the quality and speed of their claims processing could deteriorate. Following Triad Guaranty Insurance Corporation's announced run-off of its business, we suspended Triad as a qualified provider of mortgage insurance. As a result, we experienced an additional increase in our concentration risk with our remaining mortgage insurer counterparties.

If other mortgage insurer counterparties stopped entering into new business with us or became insolvent, or if we were no longer willing to conduct business with one or more of our existing mortgage insurer counterparties, it is likely we would further increase our concentration risk with the remaining mortgage insurers in the industry.

As the volume of loan defaults has increased, the volume of mortgage insurer investigations for fraud and misrepresentation has also increased. In turn, the volume of cases where the mortgage insurer has rescinded coverage for servicer violation of policy terms has increased. In these cases, we generally require that the servicer repurchase the loan or indemnify us against loss resulting from the rescission of coverage, but as the volume of these repurchases and indemnifications increase, so does the risk that affected servicers will not be able to meet these obligations.

We are generally required pursuant to our charter to obtain credit enhancement on conventional single-family mortgage loans that we purchase or securitize with loan-to-value ratios over 80% at the time of purchase. Accordingly, if we are no longer able or willing to conduct business with some of our primary mortgage insurer counterparties, or these counterparties restrict their eligibility requirements for high loan-to-value ratio loans, and we do not find suitable alternative methods of obtaining credit enhancement for these loans, we may be restricted in our ability to purchase loans with loan-to-value ratios over 80% at the time of purchase. For example, where mortgage insurance or other credit enhancement is not available, we may be hindered in our ability to refinance borrowers whose loans we do not own or guarantee into more affordable loans. In addition, in the current environment, many mortgage insurers have stopped insuring new mortgages with loan-to-value ratios over 95%. The unavailability of suitable credit enhancement could negatively impact our ability to pursue new business opportunities relating to high loan-to-value ratio loans and therefore harm our competitive position and our earnings, and our ability to meet our housing goals.

***The success of our efforts to keep people in homes, as well as the re-performance rate of loans we modify, may be limited by our reliance on third parties to service our mortgage loans.***

We enter into servicing agreements with mortgage servicers, pursuant to which we delegate the servicing of our mortgage loans. These mortgage servicers, or their agents and contractors, typically are the primary point of contact for borrowers, and we rely on these mortgage servicers to identify and contact troubled borrowers as early as possible, to assess the situation and offer appropriate options for resolving the problem and to successfully implement a solution for the borrower. The demands placed on experienced mortgage loan servicers to service defaulted loans have increased significantly across the industry, straining servicer capacity. The recently announced HASP will also impact servicer resources. To the extent that mortgage servicers are hampered by limited resources or other factors, they may be unable to conduct their servicing activities in a

57

manner that fully accomplishes our objectives within the timeframe we desire. As a practical matter, however, our ability to augment our servicers' efforts is limited; we do not have any significant internal ability to assist servicers and, at this time, we have been unable to identify additional external servicing capacity. For these reasons, our ability to actively manage the troubled loans that we own or guarantee, and to implement our homeownership assistance and foreclosure prevention efforts quickly and effectively may be limited by our reliance on our mortgage servicers.

***We have several key lender customers, and the loss of business volume from any one of these customers could adversely affect our business and result in a decrease in our market share and earnings.***

Our ability to generate revenue from the purchase and securitization of mortgage loans depends on our ability to acquire a steady flow of mortgage loans from the originators of those loans. We acquire a significant portion of our mortgage loans from several large mortgage lenders. During 2008, our top five lender customers accounted for approximately 66% of our single-family business volume, and three of our customers each accounted for greater than 10% of our single-family business volume. Accordingly, maintaining our current business relationships and business volumes with our top lender customers is critical to our business.

We enter into mortgage purchase volume commitments with many of our lender customers that are negotiated annually to provide for a minimum level of mortgage volume that these customers will deliver to us. In July 2008, Bank of America Corporation completed its acquisition of Countrywide Financial Corporation. As a result, Bank of America Corporation and its affiliates accounted for approximately 19% of our single-family business volume in the second half of 2008.

The mortgage industry has been consolidating and a decreasing number of large lenders originate most single-family mortgages. The loss of business from any one of our major lender customers could adversely affect our market share, our revenues and the liquidity of Fannie Mae MBS, which in turn could have an adverse effect on their market value. In addition, as we become more reliant on a smaller number of lender customers, our negotiating leverage with these customers decreases, which could diminish our ability to price our products optimally.

In addition, many of our lender customers are experiencing, or may experience in the future, financial and liquidity problems that may affect the volume of business they are able to generate. If any of our key lender customers significantly reduces the volume or quality of mortgage loans that the lender delivers to us or that we are willing to buy from them, we could lose significant business volume that we might be unable to replace, which could adversely affect our business and result in a decrease in our market share and revenues. In addition, a significant reduction in the volume of mortgage loans that we securitize could reduce the liquidity of Fannie Mae MBS, which in turn could have an adverse effect on their market value.

***We rely on internal models to manage risk and to make business decisions. Our business could be adversely affected if those models fail to produce reliable results.***

We make significant use of business and financial models to measure and monitor our risk exposures and to manage our business. For example, we use models to measure and monitor our exposures to interest rate, credit and other market risks, and to forecast credit losses. The information provided by these models is used in making business decisions relating to strategies, initiatives, transactions, pricing and products.

Models are inherently imperfect predictors of actual results because they are based on historical data available to us and our assumptions about factors such as future loan demand, prepayment speeds, default rates, severity rates, home price trends and other factors that may overstate or understate future experience. Our models could produce unreliable results for a number of reasons, including invalid or incorrect assumptions underlying the models, the need for manual adjustments in response to rapid changes in economic conditions, incorrect coding of the models, incorrect data being used by the models or inappropriate application of a model to products or events outside of the model's intended use. In particular, models are less dependable when the economic environment is outside of historical experience, as has been the case in recent months.

The dramatic changes in the housing, credit and capital markets have required frequent adjustments to our models and the application of greater management judgment in the interpretation and adjustment of the results produced by our models. This application of greater management judgment reflects the need to take into account updated information while continuing to maintain controlled processes for model updates, including model development, testing, independent validation, and implementation. As a result of the time and resources, including technical and staffing resources, that are required to perform these processes effectively, it may not be possible to replace existing models quickly enough to ensure that they will always properly account for the impacts of recent information and actions.

If our models fail to produce reliable results on an ongoing basis, we may not make appropriate risk management or business decisions, including decisions affecting loan purchases, management of credit losses and risk, guaranty fee pricing, asset and liability management and the management of our net worth, and any of those decisions could adversely affect our earnings, liquidity, net worth and financial condition. Furthermore, any strategies we employ to attempt to manage the risks associated with our use of models may not be effective.

***In many cases, our accounting policies and methods, which are fundamental to how we report our financial condition and results of operations, require management to make judgments and estimates about matters that are inherently uncertain. Management also may rely on the use of models in making estimates about these matters.***

Our accounting policies and methods are fundamental to how we record and report our financial condition and results of operations. Our management must exercise judgment in applying many of these accounting policies and methods so that these policies and methods comply with GAAP and reflect management's judgment of the most appropriate manner to report our financial condition and results of operations. In some cases, management must select the appropriate accounting policy or method from two or more alternatives, any of which might be reasonable under the circumstances but might affect the amounts of assets, liabilities, revenues and expenses that we report. See "Notes to Consolidated Financial Statements—Note 2, Summary of Significant Accounting Policies" for a description of our significant accounting policies.

We have identified four accounting policies as critical to the presentation of our financial condition and results of operations. These accounting policies are described in "Part II—Item 7—MD&A—Critical Accounting Policies and Estimates." We believe these policies are critical because they require management to make particularly subjective or complex judgments about matters that are inherently uncertain and because of the likelihood that materially different amounts would be reported under different conditions or using different assumptions. Due to the complexity of these critical accounting policies, our accounting methods relating to these policies involve substantial use of models. Models are inherently imperfect predictors of actual results because they are based on assumptions, including assumptions about future events. Our models may not include assumptions that reflect very positive or very negative market conditions and, accordingly, our actual results could differ significantly from those generated by our models. As a result, the estimates that we use to prepare our financial statements, as well as our estimates of our future results of operations, may be inaccurate, potentially significantly.

***We may be required to establish an additional valuation allowance against our deferred tax assets, which could materially adversely affect our results of operations, financial condition and net worth.***

As of December 31, 2008, we had approximately $3.9 billion in net deferred tax assets on our consolidated balance sheet related to unrealized losses recorded through accumulated other comprehensive income (loss) ("AOCI") on our available-for-sale securities as of December 31, 2008. Deferred tax assets refer to assets on our consolidated balance sheet that are attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and to tax credits. The realization of our deferred tax assets is dependent upon the generation of sufficient future taxable income.

As described in "Part II—Item 7—MD&A—Critical Accounting Policies and Estimates—Deferred Tax Assets," during the third quarter of 2008, we concluded it was more likely than not that we would not

generate sufficient taxable income in the foreseeable future to realize all of our deferred tax assets, so we established a partial deferred tax valuation allowance. We currently believe that our remaining deferred tax assets are recoverable because we have the intent and ability to hold these securities until recovery of the carrying value.

We will continue to monitor all available evidence related to our ability to utilize our remaining deferred tax assets. If in a future period we determine that we no longer have the intent or the ability to hold our available-for-sale securities until recovery of the carrying value, we would record an additional valuation allowance against these deferred tax assets, which could have a material adverse effect on our results of operations, financial condition and net worth.

***Changes in option-adjusted spreads or interest rates, or our inability to manage interest rate risk successfully, could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.***

We fund our operations primarily through the issuance of debt and invest our funds primarily in mortgage-related assets that permit the mortgage borrowers to prepay the mortgages at any time. These business activities expose us to market risk, which is the risk of loss from adverse changes in market conditions. Our most significant market risks are interest rate risk and option-adjusted spread risk. We describe these risks in more detail in "Part II—Item 7—MD&A—Risk Management—Interest Rate Risk Management and Other Market Risks." Changes in interest rates affect both the value of our mortgage assets and prepayment rates on our mortgage loans.

Changes in interest rates could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. Our ability to manage interest rate risk depends on our ability to issue debt instruments with a range of maturities and other features, including call features, at attractive rates and to engage in derivative transactions. We must exercise judgment in selecting the amount, type and mix of debt and derivative instruments that will most effectively manage our interest rate risk. In the second half of 2008, and particularly in October and November 2008, our ability to issue callable debt deteriorated, and we therefore have been required to increase our use of derivatives to manage interest rate risk. The amount, type and mix of financial instruments that are available to us may not offset possible future changes in the spread between our borrowing costs and the interest we earn on our mortgage assets.

As described in "Part II—Item 7—MD&A—Risk Management—Interest Rate Risk Management and Other Market Risks," the volatility and disruption in the credit markets during the past year, which reached unprecedented levels during the second half of 2008, have created a number of challenges for us in managing our market-related risks. As a result of our extremely limited ability to issue callable debt or long-term debt in October and November 2008, we relied primarily on a combination of short-term debt, interest rate swaps and swaptions to fund mortgage purchases and to manage our interest rate risk. Although there has been improvement in our ability to issue debt since 2008 year end, there can be no assurance that this improvement will continue. The extreme levels of market volatility have resulted in a higher level of volatility in the interest rate risk profile of our net portfolio and led us to take more frequent rebalancing actions.

***Our business is subject to laws and regulations that restrict our activities and operations, which may adversely affect our business, results of operations, financial condition, liquidity and net worth.***

As a federally chartered corporation, we are subject to the limitations imposed by the Charter Act, extensive regulation, supervision and examination by FHFA, and regulation by other federal agencies, including Treasury, HUD and the SEC. As a company under conservatorship, our primary regulator has management authority over us in its role as our conservator. We are also subject to many laws and regulations that affect our business, including those regarding taxation and privacy. In addition, the policy, approach or regulatory philosophy of these agencies can materially affect our business.

FHFA, other government agencies, or Congress may ask us to undertake significant efforts in pursuit of our mission. For example, on February 18, 2009, the Obama Administration announced HASP. As described above, our efforts under HASP will be substantial. To the extent that Fannie Mae servicers and borrowers

FHFA 0322

participate in these programs in large numbers, it is likely that the costs we incur associated with the modifications of loans in our guaranty book of business, as well as the borrower and servicer incentive fees associated with them, will be substantial, and these programs would therefore likely have a material adverse effect on our business, results of operations, financial condition and net worth. We do not know what other actions other agencies of the U.S. government, as well as Congress may direct us to take in the future.

Additionally, the Charter Act defines our permissible business activities. For example, we may not purchase single-family loans in excess of the conforming loan limits. In addition, under the Charter Act, our business is limited to the U.S. housing finance sector. As a result of these limitations on our ability to diversify our operations, our financial condition and earnings depend almost entirely on conditions in a single sector of the U.S. economy, specifically, the U.S. housing market. Our substantial reliance on conditions in the U.S. housing market may adversely affect the investment returns we are able to generate.

The current housing goals and subgoals for our business require that a specified portion of our mortgage purchases during each calendar year relate to the purchase or securitization of mortgage loans that finance housing for low- and moderate-income households, housing in underserved areas and qualified housing under the definition of special affordable housing. Many of these goals and subgoals increased in 2008 over 2007 levels. These increases in goal levels and recent housing and mortgage market conditions, particularly the significant changes in the housing market that began in the third quarter of 2007, have made it increasingly challenging and expensive to meet our housing goals and subgoals. Based on preliminary calculations, we believe we did not meet several of our housing goals or any of the home purchase subgoals for 2008. If our efforts to meet the housing goals and special affordable housing subgoals prove to be insufficient and FHFA finds that the goals were feasible, we may become subject to a housing plan that could require us to take additional steps that could have an adverse effect on our profitability. The potential penalties for failure to comply with housing plan requirements are a cease-and-desist order and civil money penalties. The Regulatory Reform Act set the goals for 2009 at 2008 levels, but directed FHFA to determine whether these levels are feasible for 2009. We will not know what the final goal levels will be until FHFA announces them.

***Our business faces significant operational risks and an operational failure could materially adversely affect our business, results of operations, financial condition, liquidity and net worth.***

Shortcomings or failures in our internal processes, people or systems could have a material adverse effect on our risk management, liquidity, financial condition and results of operations; disrupt our business; and result in legislative or regulatory intervention, damage to our reputation and liability to customers. For example, our business is dependent on our ability to manage and process, on a daily basis, a large number of transactions across numerous and diverse markets. These transactions are subject to various legal and regulatory standards. We rely on the ability of our employees and our internal financial, accounting, cash management, data processing and other operating systems, as well as technological systems operated by third parties, to process these transactions and to manage our business. The steps we have taken and are taking to enhance our technology and operational controls and organizational structure may not be effective to manage these risks and may create additional operational risk as we execute these enhancements.

Due to events relating to the conservatorship, including changes in management, employees and business practices, our operational risk may increase and could result in business interruptions and financial losses. In addition, due to events that are wholly or partially beyond our control, these employees or third parties could engage in improper or unauthorized actions, or these systems could fail to operate properly, which could lead to financial losses, business disruptions, legal and regulatory sanctions, and reputational damage.

On February 18, 2009, the Obama Administration announced HASP. We will act as the program administrator for the loan modification program under HASP. Our role is expected to be substantial, requiring significant levels of internal resources and management attention, which may therefore be shifted away from current corporate initiatives. This shift could have a material adverse effect on our business, results of operations, financial condition and net worth.

61

***Mortgage fraud could result in significant financial losses and harm to our reputation.***

Because we use a process of delegated underwriting in which lenders make specific representations and warranties about the characteristics of the single-family mortgage loans we purchase and securitize, we do not independently verify most borrower information that is provided to us. This exposes us to the risk that one or more of the parties involved in a transaction (the borrower, seller, broker, appraiser, title agent, lender or servicer) will engage in fraud by misrepresenting facts about a mortgage loan. We have experienced financial losses resulting from mortgage fraud. In the future, we may experience significant financial losses and reputational damage as a result of mortgage fraud.

## RISKS RELATING TO OUR INDUSTRY

***A continuing, or broader, decline in U.S. home prices or activity in the U.S. housing market would negatively impact our business, results of operations, financial condition, liquidity and net worth.***

We expect the continued deterioration of the U.S. housing market and national decline in home prices in 2009 to result in increased delinquencies and defaults on the mortgage assets we own and that back our guaranteed Fannie Mae MBS. Further, the features of a significant portion of mortgage loans made in recent years, including loans with adjustable interest rates that may reset to higher payments either once or throughout their term, and loans that were made based on limited or no credit or income documentation, also increase the likelihood of future increases in delinquencies or defaults on mortgage loans. An increase in delinquencies or defaults will result in a higher level of credit losses and credit-related expenses, which in turn will reduce our earnings and adversely affect our net worth and financial condition.

Our business volume is affected by the rate of growth in total U.S. residential mortgage debt outstanding and the size of the U.S. residential mortgage market. The rate of growth in total U.S. residential mortgage debt outstanding has declined substantially in response to the reduced activity in the housing market and declines in home prices, and we expect mortgage debt outstanding to decrease by 0.2% in 2009. A decline in the rate of growth in mortgage debt outstanding reduces the unpaid principal balance of mortgage loans available for us to purchase or securitize, which in turn could reduce our net interest income and guaranty fee income. Even if we are able to increase our share of the secondary mortgage market, it may not be sufficient to make up for the decline in the rate of growth in mortgage originations, which could adversely affect our results of operations and financial condition.

***Changes in general market and economic conditions in the United States and abroad have materially adversely affected, and may continue to materially adversely affect, our business, results of operations, financial condition, liquidity and net worth.***

Our earnings and financial condition may continue to be materially adversely affected by unfavorable market and economic conditions in the United States and abroad. These conditions include the disruption of the international credit markets, weakness in the U.S. financial markets and national economy and local economies in the United States and economies of other countries with investors that hold our debt, short-term and long-term interest rates, the value of the U.S. dollar compared with the value of foreign currencies, the rate of inflation, fluctuations in both the debt and equity capital markets, high unemployment rates and the lack of economic recovery from the credit crisis. These conditions are beyond our control and may change suddenly and dramatically.

Changes in market and economic conditions could continue to adversely affect us in many ways, including the following:

- the economic recession and rising unemployment in the United States, either as a whole or in specific regions of the country, has decreased homeowner demand for mortgage loans and increased the number of homeowners who become delinquent or default on their mortgage loans. The increase in delinquencies and defaults has resulted in a higher level of credit losses and credit-related expenses and reduced our earnings. In addition, the credit crisis has reduced the amount of mortgage loans being originated.

Decreased homeowner demand for mortgage loans and reduced mortgage originations could reduce our guaranty fee income, net interest income and the fair value of our mortgage assets;

- the credit crisis has increased the risk that our counterparties will default on their obligations to us or become insolvent, resulting in a reduction in our earnings and thereby adversely affecting our net worth and financial condition;

- the credit crisis has reduced international demand for debt securities issued by U.S. financial institutions; and

- fluctuations in the global debt and equity capital markets, including sudden changes in short-term or long-term interest rates, could decrease the fair value of our mortgage assets, derivatives positions and other investments, negatively affect our ability to issue debt at reasonable rates, and reduce our net interest income.

***Our business is subject to economic, legislative and regulatory uncertainty as a result of the current disruption in the housing and mortgage markets.***

The mortgage credit markets continue to experience difficult conditions and volatility. The disruption has adversely affected the U.S. economy in general and the housing and mortgage markets in particular and likely will continue to do so. These deteriorating conditions in the mortgage market resulted in a decrease in availability of corporate credit and liquidity within the mortgage industry and have caused disruptions to normal operations of major mortgage originators, including some of our largest customers. These conditions resulted in less liquidity, greater volatility, widening of credit spreads and a lack of price transparency. We operate in these markets and are subject to potential adverse effects on our results of operations and financial condition due to our activities involving securities, mortgages, derivatives and mortgage commitments with our customers.

In addition, a variety of legislative, regulatory and other proposals have been introduced or adopted in an effort to address the disruption, which could adversely affect our business, results of operations, financial condition, liquidity and net worth. For example, on February 18, 2009, the Obama Administration announced HASP. Our efforts under HASP will be substantial, and are likely to have a material adverse effect on our business, results of operations, financial condition and net worth. In addition, President Obama supported congressional efforts to allow bankruptcy judges to reduce or "cram down" the difference between what a borrower owes on a mortgage and the home's current value. The Committee on the Judiciary of the U.S. House of Representatives approved such legislation on January 27, 2009. If this proposal becomes law, it could substantially increase our credit losses and investment losses. Further, these and other actions that may be taken by the U.S. government to address the disruption may not effectively bring about the intended economic recovery.

***Defaults by large financial institutions and insurance companies under agreements or instruments with other financial institutions and insurance companies could materially and adversely affect the general market and our business, results of operations, financial condition, liquidity and net worth.***

The financial soundness of many large financial institutions, including insurance companies, is interrelated with the credit, trading or other relationships among and between these financial institutions. As a result, concerns about, or a default or threatened default by, one financial institution could lead to significant market-wide liquidity problems, losses or defaults by other financial institutions. During the second half of 2008, investor confidence in financial institutions fell dramatically. In September and October 2008, we and Freddie Mac were placed into conservatorship, Lehman Brothers declared bankruptcy, and other major U.S. financial institutions were acquired or required assistance from the U.S. government. If the financial condition of large financial institutions continues to deteriorate or additional institutions fail, investor confidence will continue to fall, which may adversely impact investor confidence in us (including in our debt and MBS issuances). We may be particularly impacted by concerns related to Freddie Mac. There can be no assurance that the actions being taken by the U.S. government to improve the financial markets will improve the liquidity in the credit markets or result in lower credit spreads, and the current illiquidity and wide credit spreads may worsen.

Continued turbulence in the U.S. and international markets and economy may adversely affect our liquidity and financial condition and the willingness of certain counterparties and customers to do business with us or each other. If these or similar conditions continue or worsen, financial intermediaries, such as clearing agencies, clearing houses, banks, securities firms and exchanges, with which we interact on a daily basis, may be adversely affected, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.

***The financial services industry is undergoing significant structural changes, and is subject to significant and changing regulation. We do not know how these changes will affect our business.***

The financial services industry is undergoing significant structural changes. In 2008, all of the major independent investment banks were either acquired, declared bankruptcy, or changed their status to bank holding companies. In September 2008, we and Freddie Mac were placed into conservatorship, which effectively placed us under the control of the U.S. government. In light of current conditions in the U.S. financial markets and economy, regulators and legislatures have increased their focus on the regulation of the financial services industry. A number of proposals for legislation regulating the financial services industry are being introduced in Congress and in state legislatures and the number may increase.

We are unable to predict whether any of these proposals will be implemented or in what form, or whether any additional or similar changes to statutes or regulations, including the interpretation or implementation thereof, will occur in the future. Actions by regulators of the financial services industry, including actions related to limits on executive compensation, impact the retention and recruitment of management. In addition, the actions of Treasury, the FDIC, the Federal Reserve and international central banking authorities directly impact financial institutions' cost of funds for lending, capital raising and investment activities, which could increase our borrowing costs or make borrowing more difficult for us. Changes in monetary policy are beyond our control and difficult to anticipate.

The financial market crisis has also resulted in several mergers or announced mergers of a number of our most significant institutional counterparties. The increasing consolidation of the financial services industry will increase our concentration risk to counterparties in this industry, and we will become more reliant on a smaller number of institutional counterparties, which both increases our risk exposure to any individual counterparty and decreases our negotiating leverage with these counterparties.

The structural changes in the financial services industry and any legislative or regulatory changes could affect us in substantial and unforeseeable ways and could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. In particular, these changes could affect our ability to issue debt and may reduce our customer base.

***The occurrence of a major natural or other disaster in the United States could increase our delinquency rates and credit losses or disrupt our business operations and lead to financial losses.***

The occurrence of a major natural disaster, terrorist attack or health epidemic in the United States could increase our delinquency rates and credit losses in the affected region or regions, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.

The contingency plans and facilities that we have in place may be insufficient to prevent a disruption in the infrastructure that supports our business and the communities in which we are located from having an adverse effect on our ability to conduct business. Substantially all of our senior management and investment personnel work out of our offices in the Washington, DC metropolitan area. If a disruption occurs and our senior management or other employees are unable to occupy our offices, communicate with other personnel or travel to other locations, our ability to interact with each other and with our customers may suffer, and we may not be successful in implementing contingency plans that depend on communication or travel.

**Item 1B.   Unresolved Staff Comments**

None.

**Item 2.   Properties**

We own our principal office, which is located at 3900 Wisconsin Avenue, NW, Washington, DC, as well as additional Washington, DC facilities at 3939 Wisconsin Avenue, NW and 4250 Connecticut Avenue, NW. We also own two office facilities in Herndon, Virginia, as well as two additional facilities located in Reston, Virginia, and Urbana, Maryland. These owned facilities contain a total of approximately 1,459,000 square feet of space. We lease the land underlying the 4250 Connecticut Avenue building pursuant to a ground lease that automatically renews on July 1, 2029 for an additional 49 years unless we elect to terminate the lease by providing notice to the landlord of our decision to terminate at least one year prior to the automatic renewal date. In addition, we lease approximately 429,000 square feet of office space, including a conference center, at 4000 Wisconsin Avenue, NW, which is adjacent to our principal office. The present lease term for the office space at 4000 Wisconsin Avenue expires in April 2013 and we have one additional 5-year renewal option remaining under the original lease. The lease term for the conference center at 4000 Wisconsin Avenue expires in April 2018. We also lease an additional approximately 392,000 square feet of office space at four locations in Washington, DC, Virginia and Maryland. We maintain approximately 508,000 square feet of office space in leased premises in Pasadena, California; Atlanta, Georgia; Chicago, Illinois; Philadelphia, Pennsylvania; and two facilities in Dallas, Texas.

**Item 3.   Legal Proceedings**

This item describes our material legal proceedings. In addition to the matters specifically described in this item, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that do not have a material impact on our business. Litigation claims and proceedings of all types are subject to many factors that generally cannot be predicted accurately.

We record reserves for claims and lawsuits when they are probable and reasonably estimable. We presently cannot determine the ultimate resolution of the matters described below. For matters where the likelihood or extent of a loss is not probable or cannot be reasonably estimated, we have not recognized in our consolidated financial statements the potential liability that may result from these matters. If one or more of these matters is determined against us, it could have a material adverse effect on our earnings, liquidity and financial condition.

**Securities Class Action Lawsuits**

*In re Fannie Mae Securities Litigation*

Beginning on September 23, 2004, 13 separate complaints were filed by holders of certain of our securities against us, as well as certain of our former officers, in three federal district courts. All of the cases were consolidated and/or transferred to the U.S. District Court for the District of Columbia. The court entered an order naming the Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio as lead plaintiffs. The lead plaintiffs filed a consolidated complaint on March 4, 2005 against us and certain of our former officers, which complaint was subsequently amended on April 17, 2006 and on August 14, 2006. The lead plaintiffs' second amended complaint added KPMG LLP and Goldman, Sachs & Co. as additional defendants. The lead plaintiffs allege that the defendants made materially false and misleading statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder, largely with respect to accounting statements that were inconsistent with the GAAP requirements relating to hedge accounting and the amortization of premiums and discounts. The lead plaintiffs contend that the alleged fraud resulted in artificially inflated prices for our common stock and seek unspecified compensatory damages, attorneys' fees, and other fees and costs.

On January 7, 2008, the court issued an order that certified the action as a class action, and appointed the lead plaintiffs as class representatives and their counsel as lead counsel. The court defined the class as all purchasers of Fannie Mae common stock and call options and all sellers of publicly traded Fannie Mae put options during the period from April 17, 2001 through December 22, 2004.

On April 16, 2007, KPMG LLP, our former outside auditor and a co-defendant in the shareholder class action suit, filed cross-claims against us in this action for breach of contract, fraudulent misrepresentation, fraudulent inducement, negligent misrepresentation and contribution. KPMG amended these cross-claims on February 25, 2008. KPMG is seeking unspecified compensatory, consequential, restitutionary, rescissory and punitive damages, including purported damages related to legal costs, exposure to legal liability, costs and expenses of responding to investigations related to our accounting, lost fees, attorneys' fees, costs and expenses.

We believe we have valid defenses to the claims in these lawsuits and intend to defend against these lawsuits vigorously.

On October 17, 2008, FHFA, as conservator for Fannie Mae, intervened in the consolidated shareholder class action (as well as in the consolidated ERISA litigation and the shareholder derivative lawsuits pending in the U.S. District Court for the District of Columbia) and filed a motion to stay those cases. On October 20, 2008, the Court issued an order staying the cases until January 6, 2009. Upon expiration of the stay, discovery in those cases resumed.

**Securities Class Action Lawsuits Pursuant to the Securities Act of 1933**

Beginning on August 7, 2008, a series of shareholder lawsuits were filed under the Securities Act against underwriters of issuances of certain Fannie Mae common and preferred stock. Two of these lawsuits were also filed against us and one of those two was also filed against certain former Fannie Mae officers and directors. While the factual allegations in these cases vary to some degree, these plaintiffs generally allege that defendants misled investors by understating the company's need for capital, causing putative class members to purchase shares at artificially inflated prices. Their complaints allege similar violations of Section 12(a)(2) of the Securities Act, and seek rescission, damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. On November 12, 2008, we filed a motion with the Judicial Panel on Multidistrict Litigation to transfer and coordinate each of these actions with the other recently filed section 10(b), section 12(a)(2) and ERISA actions. The Panel granted our motion on February 11, 2009, and all of these cases are now pending before in the U.S. District Court for the Southern District of New York for coordinated or consolidated pretrial proceedings. On February 13, 2009, the district court entered an order appointing Tennessee Consolidated Retirement System as lead plaintiff on behalf of purchasers of preferred stock, and appointing the Massachusetts Pension Reserves Investment Management Board and the Boston Retirement Board as lead plaintiffs on behalf of common stockholders. Each individual case is described more fully below. We believe we have valid defenses to the claims in these lawsuits and intend to defend against these lawsuits vigorously.

*Krausz v. Fannie Mae, et al.*

On September 11, 2008, Malka Krausz filed a complaint in New York Supreme Court against Fannie Mae, former officers Daniel H. Mudd and Stephen M. Swad, and underwriters Lehman Brothers, Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Goldman Sachs & Co. and J.P. Morgan Securities, Inc. The complaint was filed on behalf of purchasers of Fannie Mae's Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S (referred to as the "Series S Preferred Stock") pursuant to an offering that closed on December 11, 2007. The complaint alleges that defendants misled investors by understating our need for capital, causing putative class members to purchase shares at artificially inflated prices. The complaint contends further that the defendants violated Sections 12(a)(2) and 15 of the Securities Act. The complaint also asserts claims for common law fraud and negligent misrepresentation. The plaintiff seeks rescission of the purchases, damages, costs, including attorneys', accountants' and experts' fees, and other unspecified relief. On October 6, 2008, this case was removed to the U.S. District Court for the Southern District of New York, where it is currently pending. On October 14, 2008, we, along with certain of the other defendants, filed a motion to dismiss this case. That motion is fully briefed and remains pending.

*Kramer v. Fannie Mae, et al.*

On September 26, 2008, Daniel Kramer filed a securities class action complaint in the Superior Court of New Jersey, Law Division, Bergen County, against Fannie Mae, Merrill Lynch, Pierce, Fenner & Smith Inc., Citigroup Global Markets Inc., Morgan Stanley & Co. Inc., UBS Securities LLC, Wachovia Capital Markets LLC, Moody's Investors Services, Inc., The McGraw-Hill Companies, Inc., Standard & Poor's Ratings Services and Fitch Ratings, Inc. The complaint was filed on behalf of purchasers of Fannie Mae's Series S Preferred Stock and/or Fannie Mae's 8.25% Non-cumulative Preferred Stock, Series T (referred to as the "Series T Preferred Stock") issued pursuant to an offering that closed on May 13, 2008. The complaint alleges that the defendants violated Section 12(a)(2) of the Securities Act. The plaintiff seeks rescission of the purchases, damages, costs, including attorneys', accountants' and experts' fees, and other unspecified relief. On October 27, 2008, this lawsuit was removed to the U.S. District Court for the District of New Jersey. Plaintiff filed a motion to remand back to state court on November 17, 2008, which is now fully briefed and remains pending. FHFA, as conservator for Fannie Mae, filed a motion to intervene and for a stay on November 21, 2008, which has been fully briefed and remains pending. On February 11, 2009, the Judicial Panel on Multidistrict Litigation transferred this case to the U.S. District Court for the Southern District of New York.

**Securities Class Action Lawsuits Pursuant to the Securities Exchange Act of 1934**

On September 8, 2008, the first of several shareholder lawsuits was filed under the Exchange Act against certain current and former Fannie Mae officers and directors, underwriters of issuances of certain Fannie Mae common and preferred stock, and, in one case, Fannie Mae. While the factual allegations in these cases vary to some degree, the plaintiffs generally allege that defendants misled investors by understating the company's need for capital, causing putative class members to purchase shares at artificially inflated prices. The plaintiffs generally allege similar violations of Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Exchange Act, and seek damages, interest, costs, attorneys' and experts' fees, and injunctive and other unspecified equitable relief. On November 12, 2008, we filed a motion with the Judicial Panel on Multidistrict Litigation to transfer and coordinate each of these actions with all of the other recently filed section 10(b), section 12(a)(2) and ERISA suits. The Panel granted our motion on February 11, 2009, and all of these cases are now pending in the U.S. District Court for the Southern District of New York for coordinated or consolidated pretrial proceedings. On February 13, 2009, the district court entered an order appointing the Tennessee Consolidated Retirement System as lead plaintiff on behalf of purchasers of our preferred stock, and appointing the Massachusetts Pension Reserves Investment Management Board and the Boston Retirement Board as lead plaintiffs on behalf of our common stockholders. Each individual case is described more fully below. We believe we have valid defenses to the claims in these lawsuits and intend to defend against these lawsuits vigorously.

*Genovese v. Ashley, et al.*

On September 8, 2008, John A. Genovese filed a securities class action complaint in the U.S. District Court for the Southern District of New York against former officers and directors Stephen B. Ashley, Robert J. Levin, Daniel H. Mudd and Stephen Swad. Fannie Mae was not named as a defendant. The complaint was filed on behalf of all persons who purchased or otherwise acquired the publicly traded securities of Fannie Mae between November 16, 2007 and September 5, 2008. The complaint alleges that the defendants violated Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Exchange Act. The plaintiff seeks damages, interest, costs, attorneys' fees, and injunctive and other unspecified equitable relief.

*Gordon v. Ashley, et al.*

On September 11, 2008, Hilda Gordon filed a securities class action complaint in the U.S. District Court for the Southern District of Florida against certain current and former officers and directors. Fannie Mae was not named as a defendant. The complaint was filed on behalf of all persons who purchased or otherwise acquired the publicly traded securities of Fannie Mae between November 16, 2007 and September 11, 2008. In addition to alleging that the defendants violated Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of