asset quality issues (e.g. risky non-traditional loan products, poor underwriting, commercial real estate); liquidity issues (e.g. reliance on volatile brokered deposits to fund aggressive growth); and management issues (e.g. management systems not commensurate with level of risk, non-responsive to regulator concerns). With respect to supervision, OIG reported that OCC or OTS usually identified the problems early on but did not forcefully act to address them. Both regulators have been responsive to OIG's recommendations for improving supervision processes.

## TIGTA AUDITS

TIGTA conducts audits and investigations to ensure fair administration of the nation's tax system and accountability for the more than $2 trillion in tax revenue collected each year. The audits identify high-risk issues and deficiencies related to the administration of programs and operations, ensuring taxpayers are appropriately served and their rights adequately protected. In fiscal year 2009, TIGTA issued 142 audit reports focusing on the areas of improved tax compliance (including the international arena), security maintenance, systems modernization and operations. The audit reports isolated $14.7 billion in potential financial benefits, the majority stemming from a possible $8.9 billion savings over five years from the disallowance of the Additional Child Tax Credit to filers without a valid social security number.

TIGTA conducted a special audit on a major Recovery Act activity for IRS associated with the First-Time Homebuyer Tax Credit. TIGTA found that although the IRS developed controls to identify many questionable claims for the First-Time Homebuyer Tax Credit, some key documentation requirements to substantiate the purchase of a house were inadequate. As a result, 19,351 Tax Year 2008 income tax returns included erroneous or fraudulent claims for the credit, totaling over $139 million for homes that had not yet been purchased. In addition, taxpayers who appeared not to be first-time homebuyers claimed the credit on their

returns. The IRS has implemented filters to identify these taxpayers and ensure the credits are properly applied. In addition, IRS identified 48,580 taxpayers who may not have been aware of the changes to the credit and did not claim the full amount. IRS is planning an outreach campaign to inform those taxpayers of the additional credit, if they do not otherwise amend their returns.

## EFFECTIVE MANAGEMENT OF TREASURY'S INFORMATION TECHNOLOGY

The Department relies on information technology (IT) infrastructure to manage more than $8 trillion dollars in debt, collect more than $2 trillion in revenue, and conduct more than $58 billion in daily cash transactions. In fiscal year 2009, the Department defined strategic IT management priorities to strengthen cyber security, reduce infrastructure operations costs, increase bureau collaboration and productivity, and improve Treasury IT workforce proficiency. As part of operations management, the Department uses OMB's IT Dashboard to gauge the effectiveness of its IT systems. Each month, Treasury's Chief Information Officer evaluates the Department's 59 major investments on cost and schedule performance metrics. As of October 1, 2009, Treasury had 58 out of 59 investments (98.3 percent) reported as Green or Yellow for Cost Variance and 1 investment (1.7 percent Red) reported as Red. As of October 1, 2008, 37 out of 62 investments (59.7 percent) reported Green for Cost Variance and the remainder (40.3 percent) reported red. As of October 1, 2009, Treasury had 59 out of 59 investments (100.0 percent) reported as Green or Yellow for Schedule Variance and no investments reported as Red. As of October 1, 2008, 50 out of 62 investments (80.6 percent) reported Green for Schedule Variance and the remainder (19.4 percent) reported red. Additionally, the information security management challenge was closed in fiscal year 2009.

## EXPANDED HUMAN CAPITAL INITIATIVES

The Office of the Deputy Assistant Secretary for Human Resources/Chief Human Capital Officer (DASHR/CHCO) endeavors to broaden and diversify Treasury's talent pool; develop and retain an effective workforce; effectively manage and utilize human capital; and develop human capital practitioners as strategic business partners. In fiscal year 2009, DASHR/CHCO was directly involved in ramping up emergency programs to support economic stabilization efforts, improving applicant outreach and supporting new hires through the Hamilton Fellows Program and other initiatives, and expanding the diversity of Treasury's workforce. A major challenge in future years will be managing the retirement of a significant percentage of Treasury's employees as baby boomers leave the workforce. Improving retention of new hires and providing executive leadership development for current employees is essential to ensuring Treasury has a strong and professional talent pool.

# Department of the Treasury Key Performance Measures for 2009

The following table contains ten key performance metrics providing a representative overview of the Department's performance for 2009. Discussion of the factors contributing to each measure's performance results, and plans to improve the measure's results in future years, follows the table.

**ANNUAL FINANCIAL REPORT FOR FISCAL YEAR 2009**

**Treasury Department Key Performance Measure Table**

| Performance Measure Official Title | Bureau | 2005 Target | 2005 Actual | 2006 Target | 2006 Actual | 2007 Target | 2007 Actual | 2008 Target | 2008 Actual | 2009 Target | 2009 Actual | Percent Target Achieved 2009 | 2009 Actual vs. Target | Target Trend | Actual Trend |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Percentage collected electronically of total dollar amount of Federal government receipts (%) | FMS | 82 | 79 | 83 | 79 | 80 | 79 | 79 | 80 | 80 | 83 | 104% | Exceeded | ▶ | ▲ |
| Customer Service Representative (CSR) Level of Service (%) | IRS | 82.0 | 82.6 | 82.0 | 82.0 | 82.0 | 82.1 | 82.0 | 52.8 | 70.0 | 70.0 | 100% | Met | ▼ | ▼ |
| Percent of Business Returns Processed Electronically (%) | IRS | 17 | 17.8 | 18.6 | 16.6 | 19.5 | 19.1 | 20.8 | 19.4 | 21.6 | 22.8 | 106% | Exceeded | ▲ | ▲ |
| Percent of Individual Returns Processed Electronically (%) | IRS | 51 | 51.1 | 55 | 54.1 | 57 | 57.1 | 61.8 | 57.6 | 64 | 65.9 | 103% | Exceeded | ▲ | ▲ |
| Number of full-time equivalent jobs created or maintained in underserved communities by businesses financed by CDFI program awardees | CDFI | 26,995 | 23,656 | 29,158 | 22,329 | 34,009 | 35,022 | 28,676 | 29,539 | 30,000 | 70,260 | 234% | Exceeded | ▶ | ▲ |
| Rehabilitated national banks as a percentage of problem national banks one year ago (CAMELS 3, 4 or 5) (%) | OCC | 40 | 44 | 40 | 46 | 40 | 52 | 40 | 47 | 40 | 29 | 73% | Unmet | ▶ | ▼ |
| Clean audit opinion on TARP financial statements | DO | | | | | | | | | Baseline | Met | 100% | Met | B | B |
| Percentage of SIGTARP and GAO oversight recommendations responded to on time | DO | | | | | | | | | Baseline | 100 | 100% | Met | B | B |
| Average days to close a FOIA case | DO | | | | | | | | | Baseline | 67 | 100% | Met | B | B |
| Impact of TFI programs and activities | DO | | | | | | | | | Baseline | 7.81 | 100% | Met | B | B |

| Legend | Symbol |
|---|---|
| Favorable upward trend | ▲ |
| Favorable downward trend | ▼ |
| Unfavorable upward trend | ▲ |
| Unfavorable downward trend | ▼ |
| No change in trend, no effect | ▶ |
| No change in trend, favorable effect | ▶ |
| No change in trend, unfavorable effect | ▶ |
| Baseline | B |

In fiscal year 2009, FMS' total dollar collections decreased from $3.2 trillion to $2.9 trillion as a result of both businesses and individuals being impacted by the economic downturn. However, paper tax receipts collected through a lockbox network and paper federal tax deposits decreased by more than 28 percent compared with 2008, while electronic tax collections only decreased by 11 percent. This caused FMS' metric "Percentage collected electronically of total dollar amount of Federal government receipts" to exceed its performance target by four percent, and show a four percent improvement over 2008.FMS regularly reaches out to the banking community to promote electronic collection, and is implementing marketing programs to encourage migration of paper-based collections to electronic collection systems and Pay.gov. Two initiatives to promote this migration would eliminate paper coupons for employment taxes, transferring them completely to electronic collection systems by 2011, and require certain classes of non-tax collections be paid electronically. Both proposals would help to significantly increase the percentage of electronic collections going forward.

The IRS metric "Customer Service Representative (CSR) Level of Service" met its performance target in fiscal year 2009 and improved on the prior fiscal year's result by 33 percent. Demand for IRS customer service was unusually high in 2009, due largely to inquiries related to the Recovery Act, Rebate Recovery Credit and interest in electronic filing. Given the sunset for Recovery Act provisions and the Recovery Rebate Credit, the IRS does not anticipate a significant increase in the CSR Level of Service for fiscal year 2010.

IRS electronic filing metrics "Percent of Business Returns Processed Electronically" and "Percent of Individual Returns Processed Electronically" exceeded their performance targets by six percent and three percent, respectively, and each improved significantly over their fiscal year 2008 results by 18 percent and 14 percent, respectively. Their favorable results can be attributed to changes in filing patterns, economic and demographic trends, legislative requirements, and IRS administrative processes. IRS expects the percentage of both business and individual returns filed electronically to increase in fiscal year 2010 based on recent experience, historical growth trends, increased marketing, and expanded programs aimed at boosting electronic filing. IRS will continue to pursue additional legislative mandates to increase electronic filing for businesses taxpayers, such as a provision for 2011 requiring taxpayers filing more than ten individual returns during a calendar year file electronically.

CDFI's metric "Number of full-time equivalent jobs created or maintained in underserved communities by businesses financed by CDFI program awardees" in fiscal year 2009 exceeded its performance target by 134 percent and improved over the prior fiscal year's actual result by 138 percent. The primary reason for this increase was the additional $90 million in Recovery Act funds added to the $57 million received under the regular budget. Targeted performance without the additional Recovery Act funding was 30,000 full-time jobs created or maintained; with Recovery Act funding, 70,000 full-time jobs were created. In addition, the amount of money CDFIs were able to attract from private investment reached nearly $1.3 billion, more than double the 2008 target of $635 million, due to commitments made before the full onset of the financial crisis. Based on the increased funding and private sector matching, in 2009 CDFIs were able to invest in projects that created or maintained 70,260 jobs, more than double the target of 30,000 jobs. With an anticipated drop in Recovery Act funding and private sector matching in 2009, it is unlikely that these results will be repeated in 2010.

During fiscal year 2009, OCC's metric "Rehabilitated national banks as a percentage of problem national banks one year ago (CAMELS 3, 4 or 5)" only achieved 73 percent of its performance target, dropping by 38 percent compared with fiscal year 2008. During fiscal year 2009, national banks continued to operate in a highly challenging and volatile environment. Deterioration in the housing and commercial real estate markets and the decline in general economic conditions directly impacted national banks' financial condition and performance. OCC is identifying banks most vulnerable to current economic conditions, and is allocating bank supervision resources to areas and institutions of highest risk. For problem banks, OCC is working to develop specific plans to correct deficiencies in a timely manner and return the bank to a safe and sound condition. For all national banks, OCC is continuing to focus on quick response to deteriorating bank credit quality and on ensuring banks maintain adequate liquidity, loan loss reserves, and capital buffers.

In fiscal year 2009, DO's Office of Financial Stability, responsible for managing TARP, established new performance measures. These measures included the following:

- Clean audit opinion on TARP financial statements: For 2009, OFS received a clean audit opinion on TARP financial statements, a significant accomplishment given OFS's very challenging first year of operations after standing up the organization.

- Percentage of SIGTARP and GAO oversight recommendations responded to on time: In fiscal year 2009, OFS responded to 100 percent of these oversight bodies' recommendations on time. Going forward, OFS will continue working to ensure that all recommendations from the oversight bodies are responded to efficiently and effectively.

- Average days to close a FOIA case (after received by OFS): During fiscal year 2009, OFS went to great lengths to reduce the time required to respond to FOIA requests, and by the end of the fiscal year, averaged 67 days to close a FOIA case, a response time faster than the overall Treasury average. Going forward, OFS will continue working to further reduce the time taken to respond to all incoming FOIA requests.

TFI began applying its composite performance metric "Impact of TFI programs and activities" during fiscal year 2009. This metric consists of four overall focus areas, with additional detailed focus area components. These components align to performance goals established by TFI. In fiscal year 2009 this metric achieved a 7.81 rating out of 10 possible points. The external review process for this measure still needs to be developed, but the implementation of this measure is a large step in the effort to measure performance for a policy office that also has operational responsibilities.

# Summary of Management and Performance Challenges and High Risk Areas

Annually, the Treasury Office of Inspector General (OIG) and the Treasury Inspector General for Tax Administration (TIGTA) identify the most significant management and performance challenges facing the Department. The Government Accountability Office (GAO) identifies High Risk areas biennially. These challenges do not necessarily indicate deficiencies in performance; rather, some represent inherent risks that must be monitored continuously. Treasury made much progress on these issues in fiscal year 2009, and will continue to focus on resolving them during fiscal year 2010.

Summaries of the IG-identified management challenges and GAO-identified high risks are below, along with Treasury's progress and status ratings for each management challenge. For details, please refer to Appendix C for this year's OIG and TIGTA memoranda identifying major management and performance challenges, and the Secretary's responses.

## TREASURY-WIDE MANAGEMENT CHALLENGES – AS IDENTIFIED BY OIG

| MANAGEMENT CHALLENGE | IMPORTANCE | PROGRESS* | STATUS* |
|---|---|---|---|
| Treasury's New Authorities Related to Distressed Financial Markets | Protection of the taxpayer from unnecessary risk associated with the implementation of the program | Reasonable | Meets Expectations |
| Regulation of National Banks and Thrifts | Prevent or better mitigate unsafe and unsound practices and protect the financial health of the banking industry | Reasonable | Meets Expectations |
| Management of Recovery Act Programs | Ensure the programs achieve their intended purposes, provide for accountability and transparency, and are free from fraud and abuse | New | New |
| Management of Capital Investments | Effective use of taxpayer funds for large capital investments | Significant | Meets Expectations |
| Anti-Money Laundering and Terrorist Financing/ Bank Secrecy Act Reporting | U.S. and international financial systems that are safe | Reasonable | Meets Expectations |
| Information Security | Ensure compliance to federal standards for protection of systems and information | Closed | Closed |
| Corporate Management | Overall agency performance/improved value for the taxpayer | Closed | Closed |

* Determined by management

## IRS MANAGEMENT CHALLENGES – AS IDENTIFIED BY TIGTA

| MANAGEMENT CHALLENGE | IMPORTANCE | PROGRESS* | STATUS* |
|---|---|---|---|
| Modernization | Improved taxpayer service and efficiency of operations | Reasonable | Meets Expectations |
| Security | Appropriate protection of financial, personal, and other information | Reasonable | Meets Expectations |
| Tax Compliance Initiatives | Improved compliance and fairness in the application of the tax laws | Reasonable | Meets Expectations |
| Implementing Tax Law Changes | Responsiveness to new tax provisions, including the Recovery Act, and adjusting to expiring ones | Reasonable | Meets Expectations |
| Providing Quality Taxpayer Service Operations | Improved taxpayer service | Reasonable | Meets Expectations |
| Human Capital | Enables the IRS to achieve its mission | Significant | Meets Expectations |
| Erroneous and Improper Payments and Credits | Effective use of taxpayer funds | Reasonable | Adequate |
| Globalization | Increased outreach efforts to foreign governments on cross border transactions | New | New |
| Taxpayer Protection and Rights | Fairness in the application of the tax laws | Reasonable | Meets Expectations |
| Leveraging Data to Improve Program Effectiveness and Reduce Costs | Resources that are focused on producing the best value for stakeholders | Significant | Exceeds Expectations |

* Determined by management

**LEGEND**

| Progress Rating | Description |
|---|---|
| New | A new management challenge in fiscal year 2009 |
| None | No progress was made on the management challenge |
| Marginal | Minimal progress was made on the management challenge compared to the prior year |
| Reasonable | Progress was made in addressing the management challenge, improving from the prior year |
| Significant | A large amount of progress was made compared to the prior year assessment |

**LEGEND**

| Status Rating | Description |
|---|---|
| New | A new management challenge in fiscal year 2009 |
| Inadequate | Regardless of progress made in fiscal year, the status of the management challenge remains incomplete and falls significantly short of expectations |
| Adequate | The current status of the management challenge is acceptable but falls slightly short of expectations set for the fiscal year |
| Meets Expectations | The current status of the management challenge meets expectations set for the fiscal year |
| Exceeds Expectations | The current status of the management challenge exceeds expectations set for the fiscal year |
| Closed | Actions taken resulted in the elimination of the management challenge |

## HIGH RISK AREAS – AS IDENTIFIED BY GAO

### ENFORCEMENT OF THE TAX LAWS

**Problem:** The IRS needs to improve its enforcement of tax laws, not only to catch tax cheats, but also to promote broader compliance by giving taxpayers confidence that others are paying their fair share.

**Goal:** Improve research on noncompliance, increase the use of third party information reporting, focus on improving standards among tax return preparers, and increase emphasis on international noncompliance.

**Challenges and Actions Taken/Planned:**

***Reduce the opportunity for evasion***

- Offshore Private Banking Initiative – The largest bank in Switzerland agreed to provide the names of 4,450 of their U.S. account holders and to pay a $780 million fine, including $380 million to the IRS. Another bank entered into a deferred prosecution agreement to forfeit $340 million, the largest seizure in IRS history, in connection with violations of the International Emergency Economic Powers Act. Over 7,500 people submitted "voluntary disclosure" applications under the partial amnesty program that ended October 15, 2009.
- Offshore Merchant Account Initiative – A summons was issued to a large processor of merchant accounts to identify U.S. businesses that deposit unreported business receipts from debit and credit card sales in accounts in banks domiciled in secrecy jurisdictions.

***Target specific areas of noncompliance and improve voluntary compliance with extensive research***

- The IRS maintained its focus on high-net worth individuals, flow through entities, and large corporations (assets > $10 million). The IRS conducted over 145,000 high-net worth audits, an increase of 11.2 percent. Audits of large corporations increased by 3.6 percent and the number of flow through audits remained over 31,000.
- In fiscal year 2010, IRS will continue to expand its efforts to address international tax evasion, to expand the focus on corporate and high net-worth returns, to integrate significant new information reporting authorities into compliance programs, and to implement higher standards within the practitioner community to ensure that the proper amount of tax is paid.

### IRS BUSINESS SYSTEMS MODERNIZATION

**Problem:** The Business Systems Modernization (BSM) program is developing and delivering a number of modernized systems to replace the aging business and tax processing systems currently in use. This effort is highly complex and scheduled to be carried out over a numbers of years, ultimately creating a more efficient and effective IRS. Though the IRS experienced delays and cost overruns in the early years of the effort, improved practices and oversight are now contributing to better delivery of outcomes.

**Goal:** Meet all BSM project milestones within a cost and schedule variance of 10 percent of the initial estimate.

**Challenges and Actions Taken/Planned:**

***Fully implement all projects and programs for the BSM program***

- In fiscal year 2009, the IRS revised its Customer Account Data Engine (CADE) strategy. BSM will continue the revised CADE strategy to implement the new taxpayer account database by the end of 2011 for the 2012 filing season. The new database will result in the migration

of all 140 million individual taxpayers to a modernized, relational database that will support daily processing and result in faster refunds for all individual refund filers. Daily updating of all individual taxpayer accounts by 2012 also will improve taxpayer service and accuracy, reduce interest paid on late refunds, improve data security, and create new tools to combat fraud and improve enforcement activities. Completion of the taxpayer account database is the pre-requisite for other major initiatives, including significant expansion of online services and transactions and the next generation of enforcement technologies.

## MODERNIZING THE OUTDATED U.S. REGULATORY SYSTEM (NEWLY IDENTIFIED IN 2009)

**Problem:** The current financial system is a fragmented, complex arrangement of federal and state regulators that arose over the past 150 years, often in response to past crises.

**Goal:** Establish regulatory reform goals and a measurement plan.

**Challenges and Actions Taken/Planned:**

***Promote robust supervision and regulation of financial firms***

- A new Financial Services Oversight Council of financial regulators to identify emerging systemic risks and improve interagency cooperation.
- New authority for the Federal Reserve to supervise all firms that could pose a threat to financial stability, even those that do not own banks.
- Stronger capital and other prudential standards for all financial firms, and even higher standards for large, interconnected firms.
- A new National Bank Supervisor to supervise all federally chartered banks.
- Elimination of the federal thrift charter and other loopholes that allowed some depository institutions to avoid bank holding company regulation by the Federal Reserve.
- The registration of advisers of hedge funds and other private pools of capital with the Securities and Exchange Commission.

***Establish comprehensive supervision of financial markets***

- Enhanced regulation of securitization markets, including new requirements for market transparency, stronger regulation of credit rating agencies, and a requirement that issuers and originators retain a financial interest in securitized loans.
- Comprehensive regulation of all over-the-counter derivatives.
- A new regime to resolve nonbank financial institutions whose failure could have serious systemic effects.
- Revisions to the Federal Reserve's emergency lending authority to improve accountability.
- New authority for the Federal Reserve to oversee payment, clearing, and settlement systems.

***Protect comprehensive supervision of financial markets***

- A new Consumer Financial Protection Agency to protect consumers across the financial sector from unfair, deceptive, and abusive practices.
- Stronger regulations to improve the transparency, fairness, and appropriateness of consumer and investor products and services.
- A level playing field and higher standards for providers of consumer financial products and services, whether or not they are part of a bank.

***Provide the government with the tools it needs to manage financial crises***

- A new regime to resolve nonbank financial institutions whose failure could have serious systemic effects.
- Revisions to the Federal Reserve's emergency lending authority to improve accountability.

***Raise international regulatory standards and improve international cooperation***

- International reforms to support our efforts at home, including strengthening the capital framework; improving oversight of global financial markets; coordinating supervision of internationally active firms; and enhancing crisis management tools.

# Analysis of Financial Statements

| CONDENSED BALANCE SHEET: (in Millions) | 2009 | 2008 |
|---|---|---|
| Due From the General Fund | $ 11,992,719 | $ 10,100,763 |
| Other Intra-governmental Assets | 923,457 | 551,115 |
| Cash, Foreign Currency, and Other Monetary Assets | 341,308 | 387,270 |
| Gold and Silver Reserve | 11,062 | 11,062 |
| Investments and Related Interest | 13,565 | 10,576 |
| Tax, Other Related Interest Receivables, Net | 30,408 | 30,878 |
| Asset Guarantee | 1,765 | 0 |
| Investments-Credit Reform | 203,141 | 0 |
| Investments in Government Sponsored Enterprises | 64,679 | 7,032 |
| Credit Program Receivables, Direct Loans | 219,170 | 3,385 |
| Beneficial Interest in Trust | 23,472 | 0 |
| Other Assets | 21,855 | 14,957 |
| Total Assets | $ 13,846,601 | $ 11,117,038 |
| Federal Debt and Interest Payable | $ 11,962,385 | $ 10,075,108 |
| Other Intra-governmental Liabilities | 1,275,613 | 681,621 |
| Other Liabilities | 180,547 | 50,598 |
| Total Liabilities | 13,418,545 | 10,807,327 |
| Unexpended Appropriations | 455,144 | 271,968 |
| Cumulative Results of Operations | (27,088) | 37,743 |
| Total Net Position | $ 428,056 | $ 309,711 |
| Total Liabilities and Net Position | $ 13,846,601 | $ $11,117,038 |

| CONDENSED STATEMENT OF NET COST: (in Millions) | 2009 | 2008 |
|---|---|---|
| Net Financial Program Cost | $ 13,055 | $ 12,287 |
| Net Economic Program (Revenue)/Cost | 195,705 | 14,048 |
| Net Security Program Cost | 322 | 342 |
| Net Management Program Cost | 509 | 466 |
| Total Net Cost of Treasury Operations | 209,591 | 27,143 |
| Net Federal Costs (primarily interest on the Federal Debt) | $ 313,341 | $ 442,208 |

| CONDENSED STATEMENT OF CUSTODIAL ACTIVITY: (in Millions) | 2009 | 2008 |
|---|---|---|
| Individual and FICA Taxes | $ 2,036,557 | $ 2,294,326 |
| Corporate Income Taxes | 225,482 | 354,063 |
| Other Revenues | 139,648 | 144,218 |
| Total Revenue Received | 2,401,687 | 2,792,607 |
| Less Refunds | (437,972) | (426,074) |
| **Net Revenue Received** | 1,963,715 | 2,366,533 |
| Beneficial Interest in Trust | 23,472 | – |
| Accrual Adjustment | (1,097) | 3,132 |
| **Total Custodial Revenue** | 1,986,090 | 2,369,665 |
| Amounts Provided to Fund the Federal Government | 1,963,228 | 2,366,126 |
| Other Agencies | 487 | 407 |
| Beneficial Interest in Trust | 23,472 | – |
| Accrual Adjustment | (1,097) | 3,132 |
| Total Disposition of Custodial Revenue | 1,986,090 | 2,369,665 |
| Net Custodial Revenue Activity | $ 0 | $ 0 |

| **CONDENSED STATEMENT OF CHANGES IN NET POSITION:** (in Millions) | 2009 | 2008 |
|---|---|---|
| Beginning Balance | $ 37,743 | $ 48,782 |
| Budgetary Financing Sources | 668,894 | 482,150 |
| Other Financing Sources (Uses) | (210,793) | (23,838) |
| Total Financing Sources | 458,101 | 458,312 |
| Net Cost of Operations | (522,932) | (469,351) |
| Net Change | (64,831) | (11,039) |
| **Cumulative Results of Operations** | **(27,088)** | **37,743** |
| Beginning Balance | $ 271,968 | $ 72,317 |
| Appropriations Received | 855,762 | 681,473 |
| Appropriations Used | (668,153) | (481,735) |
| Other | (4,433) | (87) |
| Total Budgetary Financing Sources | 183,176 | 199,651 |
| **Total Unexpended Appropriations** | **455,144** | **271,968** |
| **Net Position - Year End** | **$ 428,056** | **$ 309,711** |

| **CONDENSED STATEMENT OF BUDGETARY RESOURCES:** (in Millions) | 2009 | 2008 |
|---|---|---|
| Unobligated Balances, Brought Forward | $ 284,630 | $ 57,450 |
| Recoveries of Prior Year Obligations | 8,096 | 413 |
| Budget Authority | 1,814,086 | 722,859 |
| Other Budget Authority | (271,778) | (8,558) |
| Total Budgetary Resources | $ 1,835,034 | $ 772,164 |
| Obligations Incurred | 1,387,195 | 487,534 |
| Unobligated Balance | 413,998 | 273,235 |
| Unobligated Balance, Not Available | 33,841 | 11,395 |
| Total Status of Budgetary Resources | $ 1,835,034 | $ 772,164 |
| Total Unpaid Obligated Balances, Net | $ 56,977 | $ 57,393 |
| Obligations Incurred, Net | $ 1,387,195 | $ 487,534 |
| Gross Outlays | $ (1,248,916) | $ (487,608) |
| Recoveries of Prior Year Unpaid Obligations, Actual | $ (8,096) | $ (413) |
| Changes in Uncollected Customer Payments Federal | $ (28,748) | $ 71 |
| Total Unpaid Obligated Balance, Net, End of Year | $ 158,412 | $ 56,977 |
| Net Outlays | $ 922,165 | $ 462,868 |

## SUMMARY OF AUDITOR'S REPORT ON THE TREASURY DEPARTMENT'S FINANCIAL STATEMENTS

The Department received an unqualified audit opinion on its fiscal year 2009 financial statements. As summarized in the table below, the auditor reported two material weaknesses. The auditor also reported significant deficiencies related to financial reporting at the Office of Financial Stability and information system controls at the Financial Management Service. The auditor also reported an instance of noncompliance with laws and regulations related to Section 6325 of the Internal Revenue Code and that the Department's financial management systems did not substantially comply with the requirements of the *Federal Financial Management Improvement Act of 1996*.

### SUMMARY OF FINANCIAL STATEMENT AUDIT

| AUDIT OPINION | UNQUALIFIED | | | | |
|---|---|---|---|---|---|
| Restatement | No | | | | |
| Material Weaknesses | Beginning Balance | New | Resolved | Consolidated | Ending Balance |
| Financial Systems and Reporting at the IRS<br>Financial Management Practices at the Departmental Level (new) | 1 | 1 | 0 | 0 | 2 |

### LIMITATIONS ON THE PRINCIPAL FINANCIAL STATEMENTS

The principal financial statements have been prepared to report the financial position and results of operations of the Department of the Treasury, pursuant to the requirements of 31 U.S.C. 3515 (b). While the statements have been prepared from the books and records of the Department of the Treasury, in accordance with generally accepted accounting principles (GAAP) for federal entities and the formats prescribed by OMB, the statements are in addition to the financial reports used to monitor and control budgetary resources which are prepared from the same books and records.

The financial statements should be read with the realization that they are for a component of a sovereign entity, that liabilities not covered by budgetary resources cannot be liquidated without the enactment of an appropriation, and that the payment of all liabilities other than for contracts can be abrogated by the sovereign entity.

### MAJOR HIGHLIGHTS

The following provides the highlights of Treasury's financial position and results of operations for fiscal year 2009.

## MAJOR HIGHLIGHTS

The following provides the major highlights of Treasury's financial position and results of operations for fiscal year 2009.

**Assets.** Total assets increased from $11.1 trillion at September 30, 2008 to $13.8 trillion at September 30, 2009. The primary reason for the increase is the rise in the federal debt, which causes a corresponding rise in the "Due from the General Fund of the U.S. Government" account ($12.0 trillion). This account represents future funds required from the General Fund of the U.S. Government to pay borrowings from the public and other federal agencies.

The majority of loans and interest receivable ($410.6 billion) included in "Intra-governmental" assets are the loans issued by the Bureau of the Public Debt to other federal agencies for their own use or to private sector borrowers, whose loans are guaranteed by the federal agencies.

**Total Assets**

11%
Other Assets
3%
Intra-governmental Loans and Interest Receivable
86%
Due from the General Fund

**Liabilities.** Intra-governmental liabilities totaled $5.7 trillion, and include $4.4 trillion of principal and interest payable to various federal agencies, such as the Social Security Trust Fund. These borrowings do not include debt issued separately by other governmental agencies, such as the Tennessee Valley Authority or the Department of Housing and Urban Development.

Liabilities also include federal debt held by the public, including interest, of $7.6 trillion; this debt was mainly issued as Treasury Notes. The increase in total liabilities in fiscal year 2009 over fiscal year 2008 ($2.6 trillion and 24.2 percent), is the result of increases in borrowings from various federal agencies ($140.7 billion), and federal debt held by the public, including interest, ($1.75 trillion). Debt held by the public increased primarily because of the need to finance budget deficits.

**Total Liabilities**

11%
Other Liabilities
56%
Federal Debt and Interest Payable (held by the public)
33%
Federal Debt and Interest Payable (held by other federal agencies)

DEPARTMENT OF THE TREASURY • AGENCY FINANCIAL REPORT • FISCAL YEAR 2009

**Net Cost of Treasury Operations.** The Consolidated Statement of Net Cost presents the Department's gross and net cost for its four strategic missions: financial program, economic program, security program, and management program. The majority of the Net Cost of Treasury Operations is in the economic program which includes Troubled Asset Relief Program (TARP) activity and investments in the Government Sponsored Enterprises (GSEs). Financial program costs include costs associated with Treasury's role as the primary fiscal agent for the Federal Government in managing the nation's finances by collecting revenue, making federal payments, managing federal borrowing, performing central accounting functions, and producing coins and currency sufficient to meet the demand.

Net Cost of Treasury Operations (in millions)
Dollars (in millions)
$250,000
$200,000
$150,000
$100,000
$50,000
$0
$13,055
$195,705
$322
$509
FINANCIAL
ECONOMIC
SECURITY
MANAGEMENT
PROGRAM COSTS

Net Cost of Treasury Operations (in billions)
Dollars (in billions)
$300
$200
$100
$0
$13.80
$14.00
$12.00
$27.10
$209.59
FY05
FY06
FY07
FY08
FY09

**Net Federal Debt Interest Costs.** The decrease of $77.7 billion in net interest paid on the federal debt is due to the decrease in the average interest rate for debt held by federal entities and federal debt held by the public.

Net Federal Debt Interest Cost (in billions)
Dollars (in billions)
$500
$400
$300
$200
$100
$0
$342.4
$390.9
$420.4
$440.9
$363.2
FY05
FY06
FY07
FY08
FY09

**Custodial Revenue.** Total net revenue collected by Treasury on behalf of the Federal Government includes various taxes, primarily income taxes, user fees, fines and penalties, and other revenue. Over 94.2 percent of the revenues are from income and social security taxes.

Total Revenue
9%
Corporate
Income Taxes
6%
Other Revenue
85%
Individual Income
and FICA Taxes

Net Revenue Received (in trillions)
Dollars (in trillions)
$3.00
$2.50
$2.00
$1.50
$1.00
$0.50
$0.00
$2.04
$2.28
$2.45
$2.37
$1.99
FY05
FY06
FY07
FY08
FY09

56 ANALYSIS OF FINANCIAL STATEMENTS

FHFA 0907

# Improper Payments Information Act and Recovery Auditing Act

## IMPROPER PAYMENTS INFORMATION ACT

### BACKGROUND

*The Improper Payments Information Act of 2002* (IPIA) requires agencies to review their programs and activities annually to identify those susceptible to significant improper payments. According to Office of Management and Budget (OMB) Circular A-123, *Management's Responsibility for Internal Control*, Appendix C, *Requirements for Effective Measurement and Remediation of Improper Payments* (A-123, Appendix C), "significant" means that an estimated error rate and a dollar amount exceed the threshold of 2.5 percent and $10 million of total program funding. A-123, Appendix C also requires the agency to implement a corrective action plan that includes improper payment reduction targets.

However, some federal programs are so complex that developing an annual error rate is not feasible. The government-wide Chief Financial Officers Council developed an alternative for such programs to assist them in meeting the IPIA requirements. Agencies may establish an annual estimate for a high-risk component of a complex program (e.g., a specific program population) with OMB approval. Agencies must also perform trend analyses to update the program's baseline error rate in the interim years between detailed program studies. When development of a statistically valid error rate is possible, the reduction targets are revised and become the basis for future trend analyses.

### TREASURY'S RISK ASSESSMENT METHODOLOGY AND RESULTS FOR FISCAL YEAR 2009

Each year, Treasury develops a comprehensive inventory of all funding sources and conducts a risk assessment for improper payments on all of its programs and activities. The risk assessment performed on all of Treasury's programs and activities in fiscal year 2009 resulted in low and medium risk susceptibility for improper payments except for the Internal Revenue Service's (IRS) Earned Income Tax Credit (EITC) program. The high-risk status of this program is well-documented and has been deemed a complex program for the purposes of the IPIA.

### EARNED INCOME TAX CREDIT

The EITC is a refundable tax credit that offsets income tax owed by low-income taxpayers and, if the credit exceeds the amount of taxes due, provides a lump-sum payment in the form of a refund to those who qualify. The fiscal year 2009 estimate is that a maximum of 28 percent ($13.3 billion) and a minimum of 23 percent ($11.2 billion) of the EITC total program payments are overclaims.

The IRS has a robust base enforcement program for the EITC which consists of examinations (audits), math error notices, and document matching. In fiscal year 2009 the IRS expanded its approach to decrease improper payments.

## RECOVERY AUDITING ACT

### BACKGROUND

In accordance with the *Recovery Auditing Act of 2002*, OMB Circular A-123, Appendix C, requires agencies issuing $500 million or more in contracts to establish and maintain recovery auditing activities and report on the results of those recovery efforts annually. Recovery auditing activities include the use of (1) contract audits, in which an examination of contracts pursuant to the audit and records clause incorporated in the contract is performed, (2) contingency contracts for recovery services in which the contractor is paid a percentage of the recoveries, and (3) internal review and analysis in which payment controls are employed to ensure that contract payments are accurate.

For Recovery Auditing Act compliance, Treasury requires each bureau and office to review their post-payment controls and report on recovery auditing activities, contracts issued, improper payments identified, and recoveries achieved. Bureaus and offices may use recovery auditing firms to perform many of the steps in their recovery program and identify candidates for recovery action.

### RESULTS FOR FISCAL YEAR 2009

During fiscal year 2009, $5.3 billion in contracts (defined as issued and obligated contracts, modifications, task orders, and delivery orders) were issued. Improper payments in the amount of $1.5 million were identified from recovery auditing efforts and $1.4 million has been recovered, including prior year recoveries, with $117,630 outstanding as accounts receivable on September 30, 2009.

Note: Additional detail on Treasury's IPIA and Recovery Auditing Act Programs can be found in Appendix B.

# Management Assurances

## THE SECRETARY'S LETTER OF ASSURANCE

The Department of the Treasury's management is responsible for establishing and maintaining effective internal control and financial management systems that meet the objectives of the Federal Managers' Financial Integrity Act (FMFIA). Treasury has evaluated its management controls, internal controls over financial reporting, and compliance with federal financial systems standards. As part of the evaluation process, we considered results of extensive testing and assessment across the Department and independent audits.

Treasury provides assurance that the objectives of the Federal Managers' Financial Integrity Act over operations have been achieved, except for the material weaknesses noted below. In accordance with OMB Circular A-123, Appendix A, we provide qualified assurance on internal control over financial reporting based on the results of the assessment for the period ending June 30, 2009. Treasury is not in substantial compliance with the Federal Financial Management Improvement Act due to the material weakness involving revenue accounting systems.

As of September 30, 2009, Treasury has five material weaknesses as follows (with resolution time frames indicated):

**Operations:**

Internal Revenue Service
- Improved Modernization Management Controls Processes (fiscal year 2011)
- Computer Security (fiscal year 2012)

Financial Management Service
- Systems, Controls, and Procedures to Prepare the Government-wide Financial Statements (fiscal year 2012)

**Financial Reporting:**

Internal Revenue Service
- Financial Accounting of Revenue-Custodial (fiscal year 2010)

Treasury Departmental Offices
- Financial Management Practices (fiscal year 2010)

The external auditors identified one new material weakness in 2009. Treasury is taking action to address this issue in fiscal year 2010. Overall, Treasury continues to make progress in reducing management and control weaknesses and in meeting federal financial systems requirements.



Timothy F. Geithner
December 15, 2009

# Material Weaknesses, Audit Follow-up, and Financial Systems

## SUMMARY OF MANAGEMENT ASSURANCES

**SUMMARY OF MATERIAL WEAKNESSES**

| Material Weaknesses | Beginning Balance | New | Resolved | Consolidated | Reassessed | Ending Balance |
|---|---|---|---|---|---|---|
| IRS - Financial Accounting of Revenue - Custodial | 1 | 0 | 0 | 0 | 0 | 1 |
| IRS - Improve Modernization Management Controls and Processes | 1 | 0 | 0 | 0 | 0 | 1 |
| IRS - Computer Security | 1 | 0 | 0 | 0 | 0 | 1 |
| FMS - Systems, Controls, and Procedures to Prepare the Government-wide Financial Statements | 1 | 0 | 0 | 0 | 0 | 1 |
| DO - Financial Management Practices | 0 | 1 | 0 | 0 | 0 | 1 |
| Total Material Weaknesses | 4 | 1 | 0 | 0 | 0 | 5 |

As of September 30, 2009, Treasury has five material weaknesses under Section 2 of the *Federal Managers' Financial Improvement Act* as shown in the tables below.

**EFFECTIVENESS OF INTERNAL CONTROL OVER FINANCIAL REPORTING (FMFIA § 2)**

| Statement of Assurance | Qualified | | | | | |
|---|---|---|---|---|---|---|
| Material Weaknesses | Beginning Balance | New | Resolved | Consolidated | Reassessed | Ending Balance |
| IRS - Financial Accounting for Revenue - Custodial | 1 | 0 | 0 | 0 | 0 | 1 |
| DO - Financial Management Practices | 0 | 1 | 0 | 0 | 0 | 1 |
| Total Material Weaknesses | 1 | 1 | 0 | 0 | 0 | 2 |

**EFFECTIVENESS OF INTERNAL CONTROL OVER OPERATIONS (FMFIA § 2)**

| Statement of Assurance | Qualified | | | | | |
|---|---|---|---|---|---|---|
| Material Weaknesses | Beginning Balance | New | Resolved | Consolidated | Reassessed | Ending Balance |
| IRS - Improve Modernization Management Controls and Processes | 1 | 0 | 0 | 0 | 0 | 1 |
| IRS - Computer Security | 1 | 0 | 0 | 0 | 0 | 1 |
| FMS - Systems, Controls, and Procedures to Prepare the Government-wide Financial Statements | 1 | 0 | 0 | 0 | 0 | 1 |
| Total Material Weaknesses | 3 | 0 | 0 | 0 | 0 | 3 |

**CONFORMANCE WITH FINANCIAL MANAGEMENT SYSTEM REQUIREMENTS (FMFIA § 4)**

| Statement of Assurance | Systems conform to financial management system requirements | | | | | |
|---|---|---|---|---|---|---|
| Non-Conformances | Beginning Balance | New | Resolved | Consolidated | Reassessed | Ending Balance |
| Total Non-conformances | 0 | 0 | 0 | 0 | 0 | 0 |

| COMPLIANCE WITH FEDERAL FINANCIAL MANAGEMENT IMPROVEMENT ACT (FFMIA) | | |
|---|---|---|
| | Agency | Auditor |
| Overall Substantial Compliance | No | No |
| 1. System Requirements | No | |
| 2. Accounting Standards | No | |
| 3. USSGL at Transaction Level | No | |

## FEDERAL MANAGERS' FINANCIAL INTEGRITY ACT (FMFIA)

The management control objectives under FMFIA are to reasonably ensure that:

- programs achieve their intended results
- resources are used consistent with overall mission
- programs and resources are free from waste, fraud, and mismanagement
- laws and regulations are followed
- controls are sufficient to minimize any improper or erroneous payments
- performance information is reliable
- system security is in substantial compliance with all relevant requirements
- continuity of operations planning in critical areas is sufficient to reduce risk to reasonable levels
- financial management systems are in compliance with federal financial systems standards

Deficiencies that seriously affect an agency's ability to meet these objectives are deemed "material weaknesses." Treasury can provide assurance that the objectives of the FMFIA have been achieved, except for the material weaknesses noted in the Secretary's Letter of Assurance, which include one new weakness identified by the external auditors in November 2009. Although the last open material weakness is targeted to be closed in fiscal year 2012, Treasury is focusing on making sufficient progress to downgrade the weakness sooner.

Each year material weaknesses, both the resolution of existing ones and the prevention of new ones, receive special attention from management. In fiscal year 2009, Treasury continued to make resolution of material weaknesses a performance requirement for every executive, manager, and supervisor.

## OFFICE OF MANAGEMENT AND BUDGET CIRCULAR A-123, APPENDIX A

The Department continues to strengthen and improve the execution of the Treasury mission through the application of sound internal controls over financial reporting. In response to Office of Management and Budget (OMB) Circular A-123, *Management's Responsibility for Internal Control*, Appendix A, Internal Control over Financial Reporting, Treasury developed and implemented an extensive annual testing and assessment methodology that identified and documented internal controls over financial reporting at the transaction level integrated with the Government Accountability Office's Standards for Internal Control. The testing and assessment were completed across all material Treasury bureaus and offices by June 30, 2009. Treasury provides qualified assurance that internal controls over financial reporting are effective as of June 30, 2009, due in large part to the computer security and financial accounting of revenue - custodial weaknesses at the Internal Revenue Service.

## *FEDERAL FINANCIAL MANAGEMENT IMPROVEMENT ACT* (FFMIA)

FFMIA mandates that agencies "… implement and maintain financial management systems that comply substantially with federal financial management systems requirements, applicable federal accounting standards, and the United States Government Standard General Ledger at the transaction level." FFMIA also requires that remediation plans be developed for any entity that is unable to report substantial compliance with these requirements.

As of September 30, 2009, the Treasury Department's financial management systems were not in substantial compliance with FFMIA due to deficiencies with the IRS's financial management systems. The IRS has a remediation plan in place to correct the deficiencies. For each FFMIA recommendation, the remediation plan identifies specific remedies, target dates, responsible officials, and resource estimates required for completion. This plan is reviewed and updated quarterly. (Refer to Appendix D for detailed information.)

## AUDIT FOLLOW-UP

During fiscal year 2009, Treasury continued its efforts to improve both the general administration of management and internal control issues throughout the Department and the timeliness of the resolution of all findings and recommendations identified by the Office of the Inspector General (OIG), the Treasury Inspector General for Tax Administration (TIGTA), the Special Inspector General for the Troubled Asset Relief Program (SIGTARP), the Government Accountability Office, and external auditors.

Treasury management at every level will maintain the momentum on accomplishing Planned Corrective Actions (PCAs) to resolve and implement sound solutions for all audit recommendations. Although Treasury has made great progress, considerably more work remains. Specifically, Treasury must provide timely and accurate performance to address PCA schedules and implementation and integrate the effects of those actions more fully into management decision-making processes. Treasury needs to identify more precisely what it costs to accomplish its varied missions and develop ways to improve overall performance. This will entail building upon the progress made in expanding the communication and coordination among offices variously involved in strategic planning, budget formulation, budget execution, performance management, and financial management.

## FINANCIAL MANAGEMENT SYSTEMS FRAMEWORK

The Department's overall financial management systems framework consists of a Treasury-wide financial data warehouse, supported by a financial reporting tool and separate bureau financial systems. Currently, 14 bureaus are serviced by the Bureau of the Public Debt's Administrative Resource Center (BPD ARC) for core financial system processing. Bureaus submit their monthly financial data to the data warehouse within three business days of the month-end. The Department then produces monthly financial statements and reports for management analysis. This framework satisfies both the bureaus' diverse financial operational and reporting needs, as well as the Department's internal and external reporting requirements. The financial data warehouse is part of the overarching Treasury-wide Financial Analysis and Reporting System (FARS), which also includes applications for the bureaus to report the status of their performance measures and the status of their planned audit corrective actions. In addition to the existing FARS applications, the Department is reviewing options for implementing a new fleet management application. The fleet application would maintain a consolidated inventory of Treasury vehicles to enhance management control and reporting. Treasury is evaluating existing government owned and operated systems to support this functionality.

Treasury's FARS applications operate at a contractor operated hosting facility. In accordance with the guidance contained in the American Institute of Certified Public Accountants' Statement of Auditing Standards (SAS) No. 70, *Service Organizations,* the service provider's independent auditors examined the controls for the dedicated hosting service. In the opinion of the auditors, the description of the controls presents fairly, in all material respects, the relevant aspects of the provider's controls that had been placed in operation as of September 30, 2009. Also, the controls described are suitably designed to provide reasonable assurance that the specified control objectives would be achieved if the described controls were complied with satisfactorily and customer organizations applied the controls contemplated in the design of the provider's controls.

The Department continues to eliminate redundant and outdated financial management systems with the goal of consolidating financial management activities to improve productivity. As of September 30, 2009, the number of financial management systems decreased to 55, down from 60 at the end of fiscal year 2008. Many of these systems support bureau-specific program functions, while others support internal bureau financial management. These systems are either maintained and operated by the individual bureaus, or provided on a cross-serviced basis by BPD ARC.

BPD ARC has been designated by OMB as a Financial Management Line of Business Shared Service Provider (SSP). A SSP provides financial management systems and services for other federal organizations. BPD ARC currently services 29 federal entities for core financial systems, including 14 Treasury bureaus and reporting entities. Using a SSP enables the bureaus to streamline their financial management activities and achieve more efficient and cost effective business performance by reducing maintenance and operational costs. Treasury will continue to evaluate opportunities to consolidate financial management systems and better utilize existing federal resources. The Department will work with the remaining bureaus to develop plans to migrate to Treasury's SSP for core financial systems in accordance with the Financial Management Line of Business requirements.

As part of the Department's E-Government initiative, BPD ARC also provides systems and service support to 14 Treasury bureaus in the processing of their human resources and travel activities. BPD ARC's human resource management system supports the bureaus' specific human resources needs and provides consolidated systems and resources. BPD ARC's consolidated travel system and activity processing has reduced redundant systems and merged travel processes.

The Department's FARS applications have also been used to support other federal agencies. Since the initial start of the Department of Homeland Security (DHS), Treasury serviced DHS in the preparation of its consolidated financial statements. Beginning with fiscal year 2009, DHS implemented the FARS financial applications in its own systems environment and is now generating its financial statements and reports. As a result of this arrangement, DHS was able to take advantage of existing government systems and did not have to develop new systems to support its financial reporting requirements.

DEPARTMENT OF THE TREASURY • AGENCY FINANCIAL REPORT • FISCAL YEAR 2009

*This page left intentionally blank*

64 MATERIAL WEAKNESSES, AUDIT FOLLOW-UP, AND FINANCIAL SYSTEMS
FHFA 0915



# Part 2
# Annual Financial Report

FHFA 0917

# Message from the Assistant Secretary for Management and Chief Financial Officer



December 15, 2009

Secretary Geithner's message describes the extraordinary actions the Department of the Treasury has taken to help stabilize the nation's financial systems and provide the foundation for a sustainable economic recovery. Following the enactment of the Housing and Economic Recovery Act in July 2008 and the Emergency Economic Stabilization Act in early fiscal year 2009, Treasury took bold and assertive action to restore confidence in the financial system and ease the housing crisis.

Building upon this effort, with the enactment of the American Recovery and Reinvestment Act (Recovery Act) just weeks after the new Administration took office, Treasury quickly implemented additional new programs to stimulate the economy. Treasury's Recovery Act programs include:

- tax benefits to more than 110 million families, or 95 percent of working families;
- providing numerous tax incentives for businesses and households;
- supporting local and state government development;
- creating new methods of low cost borrowing; and
- investing in renewable energy, low income housing, and health care.

These programs have positively impacted the lives of millions of Americans. Treasury has taken a risk-based approach and is focused on balancing the requirements of speed, quality, and accountability to ensure that Recovery Act funds are distributed quickly and accurately.

The magnitude and complexity of these new economic stabilization programs coupled with the large volume and dollar amounts of these programs made the preparation and audit of the fiscal year 2009 financial statements a difficult undertaking. Despite these challenges, the Department received an unqualified audit opinion on both our new Office of Financial Stability/Troubled Asset Relief Program and again on our Treasury-wide fiscal year 2009 financial statements. The Department has five material weaknesses, including one new area of concern, regarding financial management practices at the departmental level. This new area of weakness is directly related to Treasury's expanded roles and programs. We are taking corrective action to address this area in 2010. We also made substantial progress on the four existing material weaknesses open as of September 30, 2008. Those weaknesses involve complex solutions that will require several years of sustained efforts to resolve. The Department is

also continuing to devote special attention to programs included in the Government Accountability Office's High Risk List and management and performance challenges identified by the Department's Inspectors General. These challenges do not necessarily indicate deficiencies in performance – rather, they represent inherent risks based on the nature of Treasury's programs and will be monitored continuously.

While Treasury has already executed extraordinary measures to stabilize our economy, we will continue to take bold and assertive action to restore America's confidence in the financial system, ease the housing crisis, and put our country back on a path of sustainable economic and job growth.

Dan Tangherlini
Assistant Secretary for Management
and Chief Financial Officer



OFFICE OF
INSPECTOR GENERAL

DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

December 16, 2009

**INFORMATION MEMORANDUM FOR SECRETARY GEITHNER**

**FROM:** Eric M. Thorson
Inspector General

**SUBJECT:** Audit of the Department of the Treasury's Financial Statements for Fiscal Years 2009 and 2008

## INTRODUCTION

I am pleased to transmit KPMG LLP's report on the Department of the Treasury's (the Department) financial statements as of and for the fiscal years (FY) ending September 30, 2009 and 2008.

The Department of the Treasury Office of Inspector General is responsible for ensuring that the financial statement audit of the Department of the Treasury is conducted in accordance with the Chief Financial Officers' Act of 1990, as amended by the Government Management Reform Act of 1994.

The Department was granted a reporting extension from the Director of the Office of Management and Budget to complete its Agency Financial Report (AFR) by December 15, 2009. This extension was provided due to the unprecedented challenges that the Department faced in FY 2009 with the establishment of the Office of Financial Stability. However, since the AFR was not completed timely, this report could not be issued until December 16, 2009.

## RESULTS OF INDEPENDENT AUDIT

Under a contract monitored by my office, KPMG LLP, an independent certified public accounting firm, performed an audit of the Department's FY 2009 and 2008 financial statements. Among other things, the contract required that the audit be performed in accordance with generally accepted government auditing standards issued by the Comptroller General of the United States; Office of Management and Budget Bulletin No. 07-04, *Audit Requirements for Federal Financial Statements*, as amended; and the GAO/PCIE Financial Audit Manual.

In its audit of the Department, KPMG LLP

- found that the financial statements were fairly presented, in all material respects, in conformity with U.S. generally accepted accounting principles;

- reported that weaknesses related to 1) financial management practices at the Departmental level, and 2) financial systems and reporting at the Internal Revenue Service represent material weaknesses for the Department as a whole;

- reported that weaknesses related to 1) financial accounting and reporting at the Office of Financial Stability, and 2) information system controls at the Financial Management Service represent significant deficiencies for the Department as a whole;

- reported an instance of noncompliance with laws and regulations related to the Internal Revenue Code Section 6325; and

- reported that the Department's financial management systems did not substantially comply with the requirements of the Federal Financial Management Improvement Act of 1996

## EVALUATION OF AUDITORS' PERFORMANCE

To ensure the quality of the audit work performed, we reviewed KPMG LLP's approach and planning of the audit, evaluated the qualifications and independence of the auditors, monitored the progress of the audit at key points, reviewed and accepted KPMG LLP's audit report, and performed other procedures that we deemed necessary. Additionally, we provide oversight of the audits of financial statements and certain accounts and activities conducted at 13 component entities of the Department. Our review, as differentiated from an audit performed in accordance with generally accepted government auditing standards, was not intended to enable us to express, and we do not express, an opinion on the financial statements or conclusions about the effectiveness of internal control or on whether the Department's financial management systems substantially complied with the Federal Financial Management Improvement Act of 1996 or conclusions on compliance with laws and regulations. KPMG LLP is responsible for the attached auditors' report dated December 15, 2009, and the conclusions expressed in that report. However, our review disclosed no instances where KPMG LLP did not comply, in all material respects, with generally accepted government auditing standards.

I appreciate the courtesies and cooperation extended to KPMG LLP and my staff during the audit. Should you or your staff have questions, you may contact me at (202) 622-1090 or Marla A. Freedman, Assistant Inspector General for Audit, at (202) 927-5400.

Attachment

cc: Daniel Tangherlini
Assistant Secretary for Management
and Chief Financial Officer



**KPMG LLP**
2001 M Street, NW
Washington, DC 20036

**Independent Auditors' Report**

Inspector General
U.S. Department of the Treasury:

We have audited the accompanying consolidated balance sheets of the U.S. Department of the Treasury (Treasury Department) as of September 30, 2009 and 2008, and the related consolidated statements of net cost, and changes in net position, combined statements of budgetary resources, and the statements of custodial activity (hereinafter referred to as "consolidated financial statements") for the years then ended. The objective of our audits was to express an opinion on the fair presentation of these consolidated financial statements. These consolidated financial statements are incorporated in the accompanying *U.S. Department of the Treasury Fiscal Year 2009 Agency Financial Report (AFR).*

We did not audit the amounts included in the consolidated financial statements related to the Internal Revenue Service (IRS) and the Office of Financial Stability (OFS), component entities of the Treasury Department. The financial statements of the IRS and the OFS were audited by another auditor whose reports thereon have been provided to us. Our opinions, insofar as they relate to the amounts included for the IRS and the OFS, are based solely on the reports of the other auditor.

In connection with our fiscal year 2009 audit, we, and the other auditor, also considered the Treasury Department's internal control over financial reporting and tested the Treasury Department's compliance with certain provisions of applicable laws, regulations, contracts, and grant agreements that could have a direct and material effect on these consolidated financial statements. Our conclusions on internal control over financial reporting and compliance and other matters, insofar as they relate to the IRS and the OFS, are based solely on the reports of the other auditor.

**Summary**

As stated in our opinion on the consolidated financial statements, based on our audits and the reports of the other auditor, we concluded that the Treasury Department's consolidated financial statements as of and for the years ended September 30, 2009 and 2008, are presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles.

As discussed in Note 29, the Treasury Department is a participant in significant legislation and transactions whose purpose is to assist in stabilizing the financial markets.

Notes 1A, 8, 9, and 12, respectively, discuss the following matters:

- Treasury Department's consolidated financial statements do not include the assets, liabilities, or results of operations of commercial entities in which the Treasury Department has a significant equity interest as the Treasury Department has determined that none of these entities meet the criteria of a federal entity and are therefore not included in the Treasury Department's consolidated financial statements.
- The valuation of certain Treasury Department's investments, loans, and asset guarantees is based on estimates. These estimates are inherently subject to substantial uncertainty arising from the likelihood of future changes in general economic, regulatory, and market conditions. As such, there will be differences between the net estimated value of these investments, loans, and asset guarantees at



September 30, 2009, and the amounts that the Treasury Department will ultimately realize from these assets. Such differences may be material and will also affect the ultimate cost of the programs to the Treasury Department.

Our, and the other auditor's, consideration of internal control over financial reporting identified significant deficiencies in the following areas:

- Financial Management Practices at the Departmental Level (Repeat Condition)
- Financial Systems and Reporting at the IRS (Repeat Condition)
- Financial Accounting and Reporting at the Office of Financial Stability (OFS)
- Information System Controls at the Financial Management Service (FMS)

We consider the significant deficiencies related to Financial Management Practices at the Departmental Level, and Financial Systems and Reporting at the IRS noted above to be material weaknesses.

The results of our tests, and the tests performed by the other auditor, of compliance with certain provisions of laws, regulations, contracts, and grant agreements disclosed an instance of noncompliance with *Internal Revenue Code* (IRC) Section 6325, that is required to be reported under *Government Auditing Standards*, issued by the Comptroller General of the United States, and Office of Management and Budget (OMB) Bulletin No. 07-04, *Audit Requirements for Federal Financial Statements*, as amended. In addition, the Treasury Department's financial management systems did not substantially comply with the *Federal Financial Management Improvement Act of 1996* (FFMIA) requirements related to compliance with Federal financial management system requirements (FFMSR), applicable Federal accounting standards, and the U.S. Government Standard General Ledger (SGL) at the transaction level.

The following sections discuss our opinion on the Treasury Department's consolidated financial statements; our, and the other auditor's, consideration of the Treasury Department's internal controls over financial reporting; our, and the other auditor's tests of the Treasury Department's compliance with certain provisions of applicable laws, regulations, contracts, and grant agreements; and management's and our responsibilities.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of the Department of the Treasury as of September 30, 2009 and 2008, and the related consolidated statements of net cost, changes in net position, the combined statements of budgetary resources, and the statements of custodial activity, for the years then ended.

We did not audit the amounts included in the consolidated financial statements related to the IRS, a component entity of the Treasury Department, which reflect total assets of $36.8 billion and $35.6 billion, net costs of operations of $12.5 billion and $12.2 billion, budgetary resources of $12.8 billion and $12.2 billion, and custodial revenues of $2.3 trillion and $2.7 trillion, before applicable eliminating entries, as of and for the years ended September 30, 2009 and 2008, respectively. The financial statements of the IRS as of and for the years ended September 30, 2009 and 2008, were audited by another auditor whose report dated November 5, 2009, has been provided to us, and our opinion, insofar as it relates to the amounts included for the IRS, is based solely on the report of the other auditor.



We did not audit the amounts included in the consolidated financial statements related to the OFS, a component entity of the Treasury Department, which reflect total assets of $337.4 billion, net costs of operations of $41.6 billion and budgetary resources of $699.4 billion, before applicable eliminating entries, as of and for the year ended September 30, 2009. The financial statements of the OFS as of and for the year ended September 30, 2009, were audited by another auditor whose report dated December 4, 2009, has been provided to us, and our opinion, insofar as it relates to the amounts included for the OFS, is based solely on the report of the other auditor.

In our opinion, based on our audits, and the reports of the other auditor, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Department of the Treasury as of September 30, 2009 and 2008, and its net costs, changes in net position, budgetary resources, and custodial activity for the years then ended, in conformity with U.S. generally accepted accounting principles.

As discussed in Note 29, the Treasury Department is a participant in significant legislation and transactions whose purpose is to assist in stabilizing the financial markets.

Notes 1A, 8, 9, and 12, respectively, discuss the following matters:

- Treasury Department's consolidated financial statements do not include the assets, liabilities, or results of operations of commercial entities in which the Treasury Department has a significant equity interest as the Treasury Department has determined that none of these entities meet the criteria of a federal entity and are therefore not included in the Treasury Department's consolidated financial statements.
- The valuation of certain Treasury Department's investments, loans, and asset guarantees is based on estimates. These estimates are inherently subject to substantial uncertainty arising from the likelihood of future changes in general economic, regulatory, and market conditions. As such, there will be differences between the net estimated value of these investments, loans, and asset guarantees at September 30, 2009, and the amounts that the Treasury Department will ultimately realize from these assets. Such differences may be material and will also affect the ultimate cost of the programs to the Treasury Department.

The information in the *AFR* in Part 1: *Management's Discussion and Analysis (MD&A)*, and the Required Supplemental Information in Part 2: *Annual Financial Report*, is not a required part of the consolidated financial statements, but is supplementary information required by U.S. generally accepted accounting principles. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of this information. However, we did not audit this information and, accordingly, we express no opinion on it.

Our audits, and the audits of the other auditor, were conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The information in the *Message from the Secretary of the Treasury*, the *Message from the Assistant Secretary for Management and Chief Financial Officer* in Part 2, and *Other Accompanying Information* in Part 3 is presented for purposes of additional analysis and is not required as part of the consolidated financial statements. This information has not been subjected to auditing procedures and, accordingly, we express no opinion on it.

**Internal Control Over Financial Reporting**

Our, and the other auditor's, consideration of the internal control over financial reporting was for a limited purpose described in the Responsibilities section of this report, and was not designed to identify all deficiencies in the internal control over financial reporting that might be deficiencies, significant deficiencies, or material weaknesses. This report also includes our consideration of the results of the other auditor's testing of internal control over financial reporting that is reported on separately by the other auditor. The other auditor performed an examination of internal control over financial reporting for the purpose of providing an opinion on the effectiveness of IRS's and OFS's internal controls. This report, insofar as it relates to the results of the other auditor, is based solely on the reports of the other auditor.

A deficiency in internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct misstatements on a timely basis. A significant deficiency is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance. A material weakness is a deficiency, or combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the Treasury Department's financial statements will not be prevented or detected and corrected on a timely basis.

In our fiscal year 2009 audit, we, and the other auditor, identified the significant deficiencies in internal control over financial reporting, discussed below. The significant deficiencies related to Financial Management Practices at the Departmental Level and Financial Systems and Reporting at the IRS are considered to be material weaknesses. Because of the IRS material weakness in internal controls discussed below, the other auditor's opinion on IRS' internal control stated that the IRS did not maintain effective internal control over financial reporting as of September 30, 2009.

**Material Weaknesses**

### Financial Management Practices at the Departmental Level (Repeat Condition)

We identified the following two significant deficiencies that we collectively consider to be a material weakness at the Departmental level. Both are repeat conditions related to Department-wide control environment weaknesses.

***Department-wide Entity Level Controls Affecting Financial Reporting***

The Office of Accounting and Internal Control (AIC) within the Office of the Deputy Chief Financial Officer (ODCFO), and the Office of Performance Budgeting and Strategic Planning (OPBSP) are responsible for establishing and maintaining financial policies that guide financial reporting throughout the Treasury Department, and ensure the overall integrity of financial data reported at the consolidated level. The Treasury Department's financial management offices are understaffed and have not grown proportionally in relation to the Treasury Department's rapid growth in new programs and operations in fiscal year 2009. Specifically, the Department lacked sufficient personnel in key accounting and managerial functions, who had the experience and core technical competencies to ensure that the Department's financial statements were prepared accurately, and in compliance with generally accepted accounting principles on a consistent basis.



For example, we noted the following:

- Two senior key accounting positions with responsibility for supervisory review and management of the Department's consolidation process were vacant from April 2009 through July 2009 creating a gap in continuity and technical knowledge. Specifically, one key senior staff accounting position and one key supervisory accounting position went unfilled for a period of one month and four months, respectively.
- A key position within OPBSP that has significant responsibilities for review and oversight of departmental budget activities was vacant for two months;
- Staffing shortages continue to exist within AIC and the Treasury Department's Office of Financial Management (OFM). These offices have significant program management and accounting responsibilities; and
- A comprehensive, formalized succession plan has not been prepared for key personnel in AIC and other OFM officials who have significant institutional knowledge of the Treasury Department's accounting and reporting processes that are at or near retirement eligibility status and bear excessive workloads.

These conditions occurred during a period when the Treasury Department was undergoing significant program changes as well as addressing unique accounting and reporting issues related to new programs. We identified several material financial reporting errors resulting from a lack of experienced and qualified senior staff to support the Departmental financial accounting and reporting consolidation effort. The lack of adequate experienced senior accounting staff within AIC and OFM, including the lack of capable support staff with sufficient knowledge and experience led to significant delays in preparing supporting accounting documentation and information as well as communication of issues when addressing critical accounting matters.

In previous years, we reported a significant deficiency in this area, and although steps have been taken towards filling key open positions, the Treasury Department has not addressed long-term human capital needs in the area of financial management. The risk of material misstatement in the consolidated financial statements increases without sufficient personnel who have the requisite financial accounting background, knowledge, and expertise to perform these functions at the Department level.

***Financial Accounting and Reporting***

The Departmental level accounting and financial reporting infrastructure, including policies, procedures, processes and internal controls, need improvement. We identified the following weaknesses that had a pervasive impact on the effectiveness of internal controls over the Treasury Department's consolidated financial reporting.

- Supervisory and monitoring control procedures were not consistently performed over certain financial data and other information transmitted by Treasury Department components. Monitoring control procedures to examine and resolve differences between subsidiary records and the general ledger, misclassified assets, and various over and understatements of proprietary and budgetary account balances were not performed timely.



- Written policies and procedures to account for and report various non-routine, complex, and unique transactions, such as accounting and reporting of General Fund transactions, U.S. Mint's Seigniorage, accrued interest and discount on debt, transfers to the General Fund, and non-entity transactions were either not documented or required further improvement.

- AIC has not developed adequate written procedures for the consolidation process nor procedures for performing certain key financial statements analyses such as that for proprietary and budgetary relationships, and cumulative results of operations.

- As a result of the Housing and Economic Recovery Act of 2008, the Treasury Department is involved in various unique financial transactions that are to be accounted for under the Federal Credit Reform Act of 1990, as amended (FCRA). FCRA has significant documentation requirements and the Treasury Department did not have documentation in place for a majority of the year.

- AIC procedures for monitoring compliance with existing, as well as new laws and regulations that apply to the Treasury Department need improvement. Specifically, we noted a lack of communication during the year between the Treasury Department's Office of General Counsel (OGC) and AIC on matters related to new legislation, the assessment of compliance requirements, if any, and subsequent actions to be taken by the Treasury Department. We noted an instance where legislation impacting the Treasury Department's financial reporting had not been identified or communicated to AIC and the legislation, the Supplemental Appropriation Act of 2009 (PL 111-32 Section 14), was also not identified in OGC's listing of laws and regulations provided at year-end.

- Our review of Department-wide testing and reporting on internal control over financial reporting, in accordance with OMB Circular No. A-123, *Management's Responsibility for Internal Control* (A-123), identified implementation issues similar to the prior year. The Treasury Department established an implementation plan (Plan) to assess, document, test, and report on internal control over financial reporting. However, this Plan was not updated timely for new events and transactions. Specifically, procedures and controls identified in the Plan for testing various transactions, information technology, and assessing compliance with laws and regulations need further improvement. In addition, implementation of A-123 requirements including the preparation of supporting documentation for work conducted at Treasury components should be improved.

These conditions resulted in material financial statement account balance variances that remained unexplained, and account balances without adequate supporting documentation. In addition, material adjustments were recorded without proper analysis and documentation. We also noted several instances where the reviews conducted were not effective, allowing errors to remain undetected until discovered during audit procedures.

The *Federal Managers' Financial Integrity Act of 1982* (FMFIA) requires that agencies establish internal controls according to standards prescribed by the Comptroller General and specified in the Government Accountability Office's (GAO) *Standards for Internal Control in the Federal Government (Standards).* The GAO defines "internal control" as an integral component of an organization's management that provides reasonable assurance that the following objectives are achieved: effectiveness and efficiency of operations, reliability of financial reporting, and compliance with applicable laws and regulations. The GAO *Standards* identify the control environment as one of the five key elements of control, which



emphasizes the importance of control conscientiousness in management's operating philosophy and commitment to internal control. These standards cover controls such as human capital practices, supervisory reviews, and segregation of duties, policies, procedures, and monitoring.

A-123 states that monitoring the effectiveness of internal control should occur in the normal course of business. In addition, periodic reviews, reconciliations or comparisons of data should be included as part of the regular assigned duties of personnel. Periodic assessments should be integrated as part of management's continuous monitoring of internal control, which should be ingrained in the agency's operations. An effective, continuous monitoring program can level the resources needed to maintain effective internal controls throughout the year.

**Recommendations**

We recommend that the Assistant Secretary for Management and Chief Financial Officer (ASM/CFO):

***Department-wide Entity Level Controls Affecting Financial Reporting***

1. Conduct a review of the current status of staffing, skill competencies, contract support, and training, within the AIC, OPBSP, and OFM to identify gaps between existing skills sets and those needed to fully perform the daily operations of AIC, OPBSP, and OFM as well as to establish or refine policy and procedures, where necessary.

   The review should be conducted either internally or by an independent specialist, and should identify the additional managerial skill sets needed, such as financial accounting background, knowledge, and expertise required to strengthen the financial accounting and reporting infrastructure, and, once strengthened, to effectively manage the processes necessary to be conducted throughout the year.

2. Once the review is completed (per recommendation 1 above), hire staff, or consider transferring suitable staff from other offices within the Treasury Department to meet these needs. In addition, provide training and guidance to staff as necessary to enhance the quality and timeliness of work products in light of the increased responsibilities discussed above.

***Financial Accounting and Reporting***

3. Conduct a detailed review of the existing processes to analyze and review the consolidated financial reporting process.

4. Establish new policies or improve existing policies and procedures to ensure that:

   a. Quality control reviews are performed on the consolidated financial reporting process as well as on the consolidated financial statements by responsible officials to ensure that all errors and inconsistencies are identified and corrected in a timely manner;

   b. Effective reviews are conducted by senior AIC officials on documentation prepared to support consolidated financial statement amounts to ensure that the supporting documents and information are accurate and complete, and such review is documented; and

   c. Key consolidation accounting and reporting activities are captured in a manner that is easily followed by staff not familiar with the consolidation process.



5. Require that documentation is developed to support all new and/or unique accounting and reporting requirements as well as non-routine or complex accounting and reporting matters, and periodically updated (at least annually). For example, any new financial statement footnote disclosures that are developed should include a policy memo, financial statement footnote disclosure format, as well as evidence of review by responsible officials within AIC of both the policy and the format to be followed.

6. Require periodic monitoring by senior management of the implementation of policy and procedures. For example, policies and procedures related to FCRA transactions should require periodic examination of the performance of the credit programs to re-estimate cash flow projections and assumptions.

7. Require that communication is initiated on a periodic basis with OGC, to obtain information and documentation of any laws and regulations that apply at the Treasury Department/component level, including documentation of OGC's assessment of compliance requirements especially those having a financial impact. Such communication should be documented and referred to by management in monitoring the population of laws and regulations that are material to the financial statements.

8. Update the Treasury Department's A-123 Plan annually to incorporate new events and transactions, and require components to fully comply with the requirements of the Plan. Further, implement a more robust monitoring process of the A-123 work being conducted by components to ensure that the Treasury Department's A-123 guidance is fully implemented and complied with, and supports components' assurance statements on internal control.

## Financial Systems and Reporting at the IRS (Repeat Condition)

The IRS continued to make strides in addressing its internal control deficiencies. However, internal control and financial management system deficiencies continued to make it necessary for IRS to use resource-intensive compensating processes to prepare its financial statements.

The challenges the IRS faces as a result of these remaining deficiencies adversely affect IRS's ability to (1) produce reliable financial statements without significant compensating procedures, and (2) obtain current, complete, and accurate information needed to make well-informed decisions. As the IRS continues to progress towards increasingly automated financial management processes, the continued material weakness in internal control over information security that jeopardizes the reliability of the financial information that IRS processes, could have serious implications in determining whether IRS's financial statements are fairly stated. This weakness also continues to increase the risk that sensitive taxpayer information may be compromised.

The material weaknesses in internal control over financial reporting identified by the auditors of the IRS's financial statements, which are repeat conditions and collectively considered a material weakness for the Treasury Department as a whole, are summarized as follows:

- Weaknesses in internal control over unpaid tax assessments resulted in the IRS's inability to effectively manage unpaid tax assessments on an ongoing basis and in errors in taxpayer accounts leading to increased taxpayer burden. Specifically, systems limitations and weaknesses in processing controls



resulted in the following issues: (1) IRS's reported balances for taxes receivable and other unpaid assessments were not supported by its core general ledger system for tax administration-related transactions, (2) IRS lacked a subsidiary ledger for unpaid tax assessments that would allow it to produce reliable, useful, and timely information with which to manage and report externally, and (3) IRS experienced errors and delays in recording taxpayer information, payments, and other activities.

- New and previously identified weaknesses in internal control over information security continue to place IRS systems at risk. Specifically, controls over information systems are not effectively established and maintained. Further, during the fiscal year 2009 audit, additional significant weaknesses in internal control over information security, along with previously identified weaknesses, continued to jeopardize the confidentiality, availability, and integrity of information processed by IRS's key systems, increasing the risk of material misstatement for financial reporting.

The material weaknesses in internal control noted above may adversely affect decisions by IRS's management that are based, in whole or in part, on information that is inaccurate because of these deficiencies.

Additional details related to the material weakness identified above have been provided to IRS management by the auditors of the IRS's financial statements in their report dated November 5, 2009.

**Recommendations**

Recommendations to address prior year issues that encompass the material weakness discussed above have previously been provided to IRS management by the auditors of the IRS's financial statements. New recommendations to address issues identified in the fiscal year 2009 IRS financial statement audit that comprise the material weakness discussed above will be provided to IRS management by the auditors of IRS's financial statements in separate reports. We recommend that the ASM/CFO provide effective oversight to ensure that corrective actions are taken by the IRS to fully address this material weakness.

**SIGNIFICANT DEFICIENCIES**

## Financial Accounting and Reporting at the OFS

The OFS has made progress in building a financial reporting structure, including developing an internal control system over Troubled Assets Recovery Program (TARP) activities and transactions and addressing key accounting and financial reporting issues necessary to enable it to prepare financial statements. However, OFS's financial reporting structure continued to evolve throughout the year as new TARP programs were implemented, which posed a challenge to OFS's ability to establish a comprehensive system of internal control while simultaneously reacting to market events and implementing TARP initiatives. This challenge contributed to the significant deficiencies in OFS's internal control that the other auditor identified. These OFS deficiencies collectively constitute a significant deficiency for the Treasury Department as a whole and are summarized as follows.

- Control deficiencies were identified related to accounting and financial reporting processes. OFS did not effectively implement its review and approval process for preparing its financial statements and related disclosures for TARP. The other auditor identified incorrect amounts and inaccurate,



inconsistent, and incomplete disclosures in OFS's draft financial statements, footnotes, and MD&A for TARP that are significant, but not material, and that were not detected by OFS. OFS had not finalized its procedures related to its processes for accounting for certain program transactions, preparing its financial statements, and its oversight and monitoring of financial-related services provided to OFS by asset managers and certain financial agents. OFS did not have proper segregation of duties over a significant accounting database it uses in valuing its assets in that the same individual was responsible for performing both the data entry and the reconciliation of the data output.

- OFS did not effectively implement its verification procedures for certain assumptions and related data that were input into the economic and financial credit subsidy models used for the valuation of OFS's loans, equity investments, and asset guarantees. Specifically, the other auditor identified data input errors to the estimation models, such as incorrect dividend rates and maturity dates that were not detected by OFS's verification procedures.

Additional details related to the significant deficiency identified above have been provided to OFS management by the auditors of the OFS's financial statements in their report dated December 4, 2009.

**Recommendations**

We recommend that the ASM/CFO provide effective oversight to ensure that corrective actions are taken by the OFS to fully address this significant deficiency.

## Information System Controls at the FMS

Information controls and security programs managed by the FMS need improvement. Current year tests conducted over IT general controls revealed that the necessary policies and procedures to detect and correct control and functionality weaknesses have not been consistently documented, implemented, or enforced. Specifically, issues were identified in the areas of (1) security management; (2) access; (3) change configuration; (4) segregation of duties; and (5) contingency planning. Individually or collectively, the conditions identified could compromise FMS's ability to ensure security over sensitive financial data and reliability of key systems.

The above weaknesses collectively serve to weaken the IT general control environment at FMS.

**Recommendations**

The detailed findings and related recommendations have been provided to FMS management in a separate report. We recommend that the ASM/CFO provide effective oversight and the resources necessary to ensure that information security requirements over financial systems are implemented at FMS.

**Compliance**

The results of certain of our tests, and the tests performed by the other auditor, of compliance as described in the Responsibilities section of this report, exclusive of those referred to in FFMIA, disclosed the following instance of noncompliance that is required to be reported herein under *Government Auditing Standards* or OMB Bulletin No. 07-04.



- ***Noncompliance with IRC Section 6325*** **-** The IRC grants the IRS the power to file a lien against the property of any taxpayer who neglects or refuses to pay all assessed Federal taxes. Under IRC Section 6325, the IRS is required to release a Federal tax lien within 30 days after the date the tax liability is satisfied, or has become legally unenforceable, or the Secretary of the Treasury has accepted a bond for the assessed tax. Despite actions the IRS has taken to date to improve its lien release process, instances continued to be identified where the IRS did not timely release the applicable Federal tax lien within 30 days of the tax liability being either paid off or abated as required by the IRC (Repeat Condition).

The results of our other tests, and the tests performed by the other auditor, of compliance as described in the Responsibilities section of this report, exclusive of those referred to in FFMIA, disclosed no instances of noncompliance or other matters that are required to be reported herein under *Government Auditing Standards* or OMB Bulletin No. 07-04.

The results of our tests of FFMIA, and the tests performed by the other auditor, disclosed instances where the Department's financial management systems did not substantially comply with FFMIA Section 803(a) requirements (Repeat Condition) related to compliance with (1) FFMSR, (2) applicable Federal accounting standards, and (3) the SGL at the transaction level, as described below.

Instances of noncompliance with FFMSR are summarized below:

- IRS's core general ledger system does not conform to the requirements of FFMSR, contained in OMB Circular A-127, *Financial Management Systems*.

- Material weaknesses in IRS's internal control over information security continue to threaten (1) integrity of the financial statements and the accuracy and availability of financial information needed to support day-to-day decision making, and (2) confidentiality of proprietary information.

An instance of noncompliance with Federal accounting standards is summarized below:

- IRS's automated systems for tax related transactions did not support the net taxes receivable amount on IRS's balance sheet and other required supplemental information related to uncollected taxes - compliance assessments and tax write-offs - in accordance with Statement of Federal Financial Accounting Standards No. 7, *Accounting for Revenue and Other Financing Sources and Concepts for Reconciling Budgetary and Financial Accounting*.

An instance of noncompliance with the SGL at the transaction level is summarized below:

- IRS's core general ledger system for tax-related activities does not comply with the SGL at the transaction level and also does not post transactions in conformance with SGL posting models.

The Secretary of the Treasury also stated in his Letter of Assurance, included in Part 1: *Management's Discussion and Analysis*, of the accompanying *AFR* that the Treasury Department cannot provide assurance that its financial management systems are in substantial compliance with FFMIA. The IRS has established a remediation plan to address the conditions that lead to its systems' substantial noncompliance with the requirements of FFMIA. This plan outlines the actions to be taken to resolve these issues, many of which are long-term in nature and are tied to IRS's system modernization efforts. The Treasury



Department's remedial actions and related timeframes are presented in Appendix D: *Material Weaknesses, Audit Follow-up, Financial Systems, and Recovery Act Risk Management* of the *AFR*.

**Recommendation**

We recommend that the ASM/CFO provide effective oversight to ensure that (1) IRS implements appropriate controls so that Federal tax liens are released in accordance with Section 6325 of the IRC; and (2) IRS implements its plan of action to solve financial management problems so as to enable resolving the identified instances of financial management systems' noncompliance with the requirements of FFMIA. Detailed recommendations to address the noncompliance findings discussed above have been provided to IRS management by the auditors of the IRS's financial statements.

**Management's Response to Internal Control and Compliance Findings**

The Department's management has indicated, in a separate letter immediately following this report, that it concurs with the findings presented in this section of our report. Further, it has responded that it will take corrective action, as necessary, to ensure the matters presented are addressed by the respective component management within the Treasury Department. We did not audit the Treasury Department's response and, accordingly, we express no opinion on it.

* * * * *

We noted certain additional matters involving internal control over financial reporting and its operation that we will report to the Treasury Department's management in a separate letter.

**Responsibilities**

**Management's Responsibilities.** Management is responsible for the consolidated financial statements; establishing and maintaining effective internal control; and complying with laws, regulations, contracts, and grant agreements applicable to the Treasury Department.

**Auditors' Responsibilities.** Our responsibility is to express an opinion on the fiscal year 2009 and 2008 consolidated financial statements of the Treasury Department based on our audits and the reports of the other auditor. We, and the other auditor, conducted our audits in accordance with the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Also, we conducted our audit in accordance with auditing standards generally accepted in the United States of America and OMB Bulletin No. 07-04. Those standards and OMB Bulletin No. 07-04 require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Treasury Department's internal control over financial reporting. Accordingly, we express no such opinion.



An audit also includes:

- Examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements;
- Assessing the accounting principles used and significant estimates made by management; and
- Evaluating the overall consolidated financial statement presentation.

We believe that our audits, and the reports of the other auditor, related to the amounts included for the IRS and OFS, provide a reasonable basis for our opinion.

In planning and performing our fiscal year 2009 audit, we considered the Treasury Department's internal control over financial reporting, exclusive of the internal control over financial reporting related to the IRS and OFS, by obtaining an understanding of the design effectiveness of the Treasury Department's internal control, determining whether internal controls had been placed in operation, assessing control risk, and performing tests of controls as a basis for designing our auditing procedures for the purpose of expressing our opinion on the consolidated financial statements. Internal control over financial reporting related to the IRS and the OFS was considered by the other auditor whose reports thereon dated November 5, 2009, and December 4, 2009 respectively, have been provided to us. We, and the other auditor, did not test all internal controls relevant to operating objectives as broadly defined by the *Federal Managers' Financial Integrity Act of 1982*. The objective of our audit was not to express an opinion on the effectiveness of the Treasury Department's internal control over financial reporting. Accordingly, we do not express an opinion on the effectiveness of the Treasury Department's internal control over financial reporting. The objective of the other auditor's audits was to express an opinion on the effectiveness of the IRS's and the OFS's internal control over financial reporting. Because of the IRS material weakness in internal controls discussed above, the other auditor's opinion on the IRS' internal control stated that the IRS did not maintain effective internal control over financial reporting as of September 30, 2009.

As part of obtaining reasonable assurance about whether the Treasury Department's fiscal year 2009 consolidated financial statements are free of material misstatement, we, and the other auditor, performed tests of the Treasury Department's compliance with certain provisions of laws, regulations, contracts, and grant agreements, noncompliance with which could have a direct and material effect on the determination of the consolidated financial statement amounts, and certain provisions of other laws and regulations specified in OMB Bulletin No. 07-04, including the provisions referred to in Section 803(a) of FFMIA. We, and the other auditor, limited our tests of compliance to the provisions described in the preceding sentence, and we, and the other auditor, did not test compliance with all laws, regulations, contracts, and grant agreements applicable to the Treasury Department. However, providing an opinion on compliance with laws, regulations, contracts, and grant agreements was not an objective of our audits and, accordingly, we, and the other auditor, do not express such an opinion.

---



DEPARTMENT OF THE TREASURY • AGENCY FINANCIAL REPORT • FISCAL YEAR 2009

U.S. Department of the Treasury
December 15, 2009
Page 14 of 14

This report is intended solely for the information and use of the Treasury Department's management, the Treasury Department's Office of Inspector General, OMB, the GAO, and the U.S. Congress and is not intended to be and should not be used by anyone other than these specified parties.

KPMG LLP

December 15, 2009

84 AUDITORS' REPORT ON THE DEPARTMENT'S FINANCIAL STATEMENTS

FHFA 0935



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

ASSISTANT SECRETARY

December 15, 2009

KPMG LLP
2001 M Street, N.W.
Washington, D.C. 20036

Ladies and Gentlemen:

On behalf of Secretary Geithner, I am responding to your draft audit report on the Department of the Treasury's fiscal year 2009 consolidated financial statements. Our bureaus and program offices all can be proud of the Department's success in achieving an unqualified opinion on the Department's financial statements for the tenth consecutive year. We are particularly proud of the unqualified opinion from the Government Accountability Office (GAO) on the Office of Financial Stability's financial statements – a remarkable achievement considering the magnitude and complexity of the new economic stabilization programs.

These successful results also are due in large part to the high level of professionalism, technical expertise, and partnership demonstrated by KPMG in conducting the audit. Treasury appreciates your efforts during the audit process to provide timely, constructive advice on how to improve our financial reporting. Treasury is equally appreciative of the expertise and commitment demonstrated by the other organizations involved in the audit process – the Office of Inspector General, GAO, and the firms that audited several of our bureaus.

In 2009, KPMG identified a new material weakness at the departmental level, Financial Management Practices. We agree with your related recommendations, and have already started taking corrective action to resolve the issues and close this material weakness in 2010. Treasury continued to make significant progress during fiscal year 2009 to address previously identified financial and information management deficiencies. As reported by GAO, the Internal Revenue Service made significant strides in addressing its internal control deficiencies in financial reporting and tax revenue collection and refund issuance.

We acknowledge the material weaknesses, significant deficiencies, and instances of noncompliance with laws and regulations described in your report. We agree with your recommendations, and will focus on necessary corrective actions to address each of the issues quickly and aggressively.

Dan Tangherlini
Assistant Secretary for Management
and Chief Financial Officer

**CONSOLIDATED BALANCE SHEETS**
**AS OF SEPTEMBER 30, 2009 AND 2008**
**(IN MILLIONS)**

| ASSETS | 2009 | 2008 |
|---|---|---|
| Intra-governmental Assets | | |
| Fund Balance (Note 2) | $ 504,582 | $ 275,368 |
| Loans and Interest Receivable (Note 3) | 410,591 | 264,854 |
| Advances to the Black Lung Trust Fund (Notes 1 & 4) | 0 | 10,484 |
| Advances to the Unemployment Trust Fund (Notes 1 & 4) | 7,981 | 0 |
| Due From the General Fund (Note 4) | 11,992,719 | 10,100,763 |
| Accounts Receivable and Related Interest (Note 5) | 298 | 396 |
| Other Intra-governmental Assets | 5 | 13 |
| Total Intra-governmental Assets | $ 12,916,176 | $ 10,651,878 |
| Cash, Foreign Currency, and Other Monetary Assets (Note 6) | 341,308 | 387,270 |
| Gold and Silver Reserves (Note 7) | 11,062 | 11,062 |
| Asset Guarantee (Note 8) | 1,765 | 0 |
| Investments – Credit Reform (Note 8) | 203,141 | 0 |
| Investments in Government Sponsored Enterprises (Note 9) | 64,679 | 7,032 |
| Investments in International Financial Institutions (Note 10) | 5,575 | 5,546 |
| Other Investments and Related Interest (Note 11) | 13,565 | 10,576 |
| Credit Program Receivables, Direct Loans, Net (Note 12) | 219,170 | 3,385 |
| Loans and Interest Receivable (Note 13) | 168 | 172 |
| Reserve Position in the International Monetary Fund (Note 14) | 13,469 | 4,750 |
| Tax, Other, and Related Interest Receivables, Net (Note 15) | 30,408 | 30,878 |
| Beneficial Interest in Trust (Note 29) | 23,472 | 0 |
| Inventory and Related Property, Net (Note 16) | 598 | 698 |
| Property, Plant, and Equipment, Net (Note 17) | 2,036 | 2,077 |
| Other Assets | 9 | 1,714 |
| Total Assets | $ 13,846,601 | $ 11,117,038 |
| Heritage Assets (Note 17) | | |

*The accompanying notes are an integral part of these financial statements.*

FHFA 0937

**CONSOLIDATED BALANCE SHEETS**
**AS OF SEPTEMBER 30, 2009 AND 2008**
**(IN MILLIONS)**

| LIABILITIES | 2009 | 2008 |
|---|---|---|
| Intra-governmental Liabilities | | |
| Federal Debt and Interest Payable (Notes 4 and 19) | $ 4,403,080 | $ 4,262,414 |
| Other Debt and Interest Payable (Note 20) | 12,060 | 14,164 |
| Due to the General Fund (Notes 4, 6, and 27) | 1,263,128 | 667,112 |
| Other Intra-governmental Liabilities (Note 22) | 425 | 345 |
| **Total Intra-governmental Liabilities** | **$ 5,678,693** | **$ 4,944,035** |
| | | |
| Federal Debt and Interest Payable (Notes 4 and 19) | 7,559,305 | 5,812,694 |
| Certificates Issued to the Federal Reserve (Note 6) | 5,200 | 2,200 |
| Allocation of Special Drawing Rights (Note 6) | 55,953 | 7,630 |
| Gold Certificates Issued to the Federal Reserve Banks (Note 7) | 11,037 | 11,037 |
| Refunds Payable (Notes 4 and 26) | 4,040 | 3,076 |
| D.C. Pensions and Judiciary Retirement Actuarial Liability (Note 21) | 9,049 | 8,803 |
| Liabilities to GSEs (Note 9) | 91,937 | 13,800 |
| Other Liabilities (Note 22) | 3,331 | 4,052 |
| **Total Liabilities** | **$ 13,418,545** | **$ 10,807,327** |
| Commitments and Contingencies (Note 31) | | |
| | | |
| NET POSITION | | |
| Unexpended Appropriations: | | |
| Earmarked Funds (Note 27) | $ 200 | $ 200 |
| Other Funds | 454,944 | 271,768 |
| Subtotal | 455,144 | 271,968 |
| Cumulative Results of Operations: | | |
| Earmarked Funds (Note 27) | 41,653 | 37,586 |
| Other Funds | (68,741) | 157 |
| Subtotal | (27,088) | 37,743 |
| **Total Net Position (Note 23)** | **$ 428,056** | **$ 309,711** |
| **Total Liabilities and Net Position** | **$ 13,846,601** | **$ 11,117,038** |

*The accompanying notes are an integral part of these financial statements.*

## CONSOLIDATED STATEMENTS OF NET COST
## FOR THE YEARS ENDED SEPTEMBER 30, 2009 AND 2008
## (IN MILLIONS)

| Cost of Treasury Operations: (Note 24) | 2009 | 2008 |
|---|---|---|
| Financial Program: | | |
| Gross Cost | $ 15,313 | $ 14,569 |
| Less Earned Revenue | (2,258) | (2,282) |
| **Net Program Cost** | **$ 13,055** | **$ 12,287** |
| Economic Program: | | |
| Gross Cost | $ 210,490 | $ 19,139 |
| Less Earned Revenue | (14,785) | (5,091) |
| **Net Program Cost** | **$ 195,705** | **$ 14,048** |
| Security Program: | | |
| Gross Cost | $ 325 | $ 346 |
| Less Earned Revenue | (3) | (4) |
| **Net Program Cost** | **$ 322** | **$ 342** |
| Management Program: | | |
| Gross Cost | $ 569 | $ 631 |
| Less Earned Revenue | (60) | (165) |
| **Net Program Cost** | **$ 509** | **$ 466** |
| **Total Program Gross Costs** | **$ 226,697** | **$ 34,685** |
| **Total Program Gross Earned Revenues** | **(17,106)** | **(7,542)** |
| **Total Net Cost of Treasury Operations** | **$ 209,591** | **$ 27,143** |
| **Federal Costs: (Note 24)** | | |
| Federal Debt Interest | $ 380,519 | $ 453,347 |
| Less Interest Revenue from Loans | (17,326) | (12,439) |
| **Net Federal Debt Interest Costs** | **$ 363,193** | **$ 440,908** |
| **Net GSE Non-Entity Revenue** (Note 9) | **(61,983)** | **(7,032)** |
| Other Federal Costs (Note 24) | $ 12,131 | $ 8,332 |
| **Total Net Federal Costs** | **$ 313,341** | **$ 442,208** |
| **Net Cost of Treasury Operations, Federal Debt Interest, Other Federal Costs, and Net GSE Non-Entity Revenue** | **$ 522,932** | **$ 469,351** |

*The accompanying notes are an integral part of these financial statements.*

**CONSOLIDATED STATEMENT OF CHANGES IN NET POSITION
FOR THE YEAR ENDED SEPTEMBER 30, 2009
(IN MILLIONS)**

| CUMULATIVE RESULTS OF OPERATIONS | Combined Earmarked Funds | Combined All Other Funds | Elimination | Consolidated Total |
|---|---|---|---|---|
| Beginning Balances | $ 37,586 | $ 157 | $ 0 | $ 37,743 |
| Budgetary Financing Sources: | | | | |
| Appropriations Used | 408 | 667,745 | 0 | 668,153 |
| Non-exchange Revenue | 263 | 234 | (4) | 493 |
| Donations and Forfeitures of Cash/Equivalent | 257 | 0 | 0 | 257 |
| Transfers In/Out Without Reimbursement | (16) | (7) | 2 | (21) |
| Other | 10 | 2 | 0 | 12 |
| Other Financing Sources (non-exchange) | | | | |
| Donation/Forfeiture of Property | 127 | 0 | 0 | 127 |
| Accrued Interest and Discount on Debt | 0 | 6,027 | 0 | 6,027 |
| Transfers In/Out Without Reimbursement | (63) | 29 | (2) | (36) |
| Imputed Financing Sources | 61 | 1,206 | (474) | 793 |
| Transfers to the General Fund and Other (Note 23) | (31) | (217,673) | 0 | (217,704) |
| **Total Financing Sources** | **1,016** | **457,563** | **(478)** | **458,101** |
| Net Cost of Operations | 3,051 | (526,461) | 478 | (522,932) |
| Net Change | 4,067 | (68,898) | 0 | (64,831) |
| **Cumulative Results of Operations** | **$ 41,653** | **$ (68,741)** | **$ 0** | **$ (27,088)** |
| UNEXPENDED APPROPRIATIONS | | | | |
| Beginning Balances | $ 200 | $ 271,768 | $ 0 | $ 271,968 |
| Budgetary Financing Sources: | | | | |
| Appropriations Received (Note 23) | 408 | 855,354 | 0 | 855,762 |
| Appropriations Transferred In/Out | 0 | 11 | 0 | 11 |
| Other Adjustments | 0 | (4,444) | 0 | (4,444) |
| Appropriations Used | (408) | (667,745) | 0 | (668,153) |
| **Total Budgetary Financing Sources** | **0** | **183,176** | **0** | **183,176** |
| **Total Unexpended Appropriations** | **$ 200** | **$ 454,944** | **$ 0** | **$ 455,144** |
| **Net Position** | **$ 41,853** | **$ 386,203** | **$ 0** | **$ 428,056** |

*The accompanying notes are an integral part of these financial statements.*

**CONSOLIDATED STATEMENT OF CHANGES IN NET POSITION**
**FOR THE YEAR ENDED SEPTEMBER 30, 2008**
**(IN MILLIONS)**

| CUMULATIVE RESULTS OF OPERATIONS | Combined Earmarked Funds | Combined All Other Funds | Elimination | Consolidated Total |
|---|---|---|---|---|
| Beginning Balances | $ 35,385 | $ 13,397 | $ 0 | $ 48,782 |
| Budgetary Financing Sources: | | | | |
| Appropriations Used | 458 | 481,277 | 0 | 481,735 |
| Non-exchange Revenue | 134 | 144 | (24) | 254 |
| Donations and Forfeitures of Cash/Equivalent | 159 | 0 | 0 | 159 |
| Transfers In/Out without Reimbursement | 0 | (10) | 0 | (10) |
| Other | 38 | (26) | 0 | 12 |
| Other Financing Sources (non exchange) | | | | |
| Donation/Forfeiture of Property | 112 | 0 | 0 | 112 |
| Accrued Interest and Discount on Debt | 0 | (3,870) | 0 | (3,870) |
| Transfers In/Out Without Reimbursement | (52) | 31 | 0 | (21) |
| Imputed Financing Sources | 60 | 1,147 | (478) | 729 |
| Transfers to the General Fund and Other (Note 23) | (23) | (20,765) | 0 | (20,788) |
| **Total Financing Sources** | **886** | **457,928** | **(502)** | **458,312** |
| Net Cost of Operations | 1,315 | (471,168) | 502 | (469,351) |
| Net Change | 2,201 | (13,240) | 0 | (11,039) |
| **Cumulative Results of Operations** | **$ 37,586** | **$ 157** | **$ 0** | **$ 37,743** |
| UNEXPENDED APPROPRIATIONS | | | | |
| Beginning Balances | $ 200 | $ 72,117 | $ 0 | $ 72,317 |
| Budgetary Financing Sources: | | | | |
| Appropriations Received (Note 23) | 458 | 681,015 | 0 | 681,473 |
| Appropriations Transferred In/Out | 0 | 24 | 0 | 24 |
| Other Adjustments | 0 | (111) | 0 | (111) |
| Appropriations Used | (458) | (481,277) | 0 | (481,735) |
| **Total Budgetary Financing Sources** | **0** | **199,651** | **0** | **199,651** |
| **Total Unexpended Appropriations** | **$ 200** | **$ 271,768** | **$ 0** | **$ 271,968** |
| **Net Position** | **$ 37,786** | **$ 271,925** | **$ 0** | **$ 309,711** |

The accompanying notes are an integral part of these financial statements.

**COMBINED STATEMENT OF BUDGETARY RESOURCES**
**FOR THE YEAR ENDED SEPTEMBER 30, 2009**
**(IN MILLIONS)**

| | Budgetary | Non-Budgetary Financing | Total |
|---|---|---|---|
| Budgetary Resources | | | |
| Unobligated balance, brought forward | $ 260,173 | $ 24,457 | $ 284,630 |
| Recoveries of prior year unpaid obligations | 8,097 | (1) | 8,096 |
| Budget authority: | | | |
| Appropriations (Note 23) | 952,185 | 0 | 952,185 |
| Borrowing authority | 493 | 548,242 | 548,735 |
| Spending Authority from Offsetting Collections | | | |
| Earned: Collected | 11,681 | 272,768 | 284,449 |
| Change in receivables from Federal sources | (44) | 0 | (44) |
| Change in unfilled customer orders: | | | |
| Advance received | (31) | 0 | (31) |
| Without advance from Federal sources | (134) | 28,926 | 28,792 |
| Subtotal | 964,150 | 849,936 | 1,814,086 |
| Non-expenditure transfers, net | (43) | 0 | (43) |
| Temporarily not available pursuant to Public Law | 2 | 0 | 2 |
| Permanently not available | (92,001) | (179,736) | (271,737) |
| Total Budgetary Resources | $ 1,140,378 | $ 694,656 | $ 1,835,034 |
| | | | |
| Status of Budgetary Resources | | | |
| Obligations incurred (Note 25): Direct | $ 729,697 | $ 652,829 | $ 1,382,526 |
| Reimbursable | 4,669 | 0 | 4,669 |
| Subtotal | 734,366 | 652,829 | 1,387,195 |
| | | | |
| Unobligated Balance: Apportioned | 349,889 | 19,612 | 369,501 |
| Exempt from apportionment | 44,497 | 0 | 44,497 |
| Subtotal | 394,386 | 19,612 | 413,998 |
| Unobligated balance not available | 11,626 | 22,215 | 33,841 |
| Total Status of Budgetary Resources | $ 1,140,378 | $ 694,656 | $ 1,835,034 |
| | | | |
| Change in Obligated Balance | | | |
| Obligated balance, net: (Note 1 AC) | | | |
| Unpaid obligations brought forward, Oct. 1 | $ 57,314 | 10 | $ 57,324 |
| Uncollected customer payments from Federal sources brought forward | (346) | (1) | (347) |
| Total unpaid obligated balance, net | 56,968 | 9 | 56,977 |
| Obligations incurred, net | 734,366 | 652,829 | 1,387,195 |
| Gross outlays | (675,286) | (573,630) | (1,248,916) |
| Recoveries of prior year unpaid obligations, actual | (8,097) | 1 | (8,096) |
| Change In uncollected customer payments Federal source | 178 | (28,926) | (28,748) |
| Obligated balance, net, end of period: | | | |
| Unpaid obligations | 108,297 | 79,209 | 187,506 |
| Uncollected customer payments Federal sources | (168) | (28,926) | (29,094) |
| Total unpaid obligated balance, net, end of period | 108,129 | 50,283 | 158,412 |
| Net Outlays | | | |
| Gross outlays | 675,286 | 573,630 | 1,248,916 |
| Offsetting collections | (9,369) | (272,768) | (282,137) |
| Distributed offsetting receipts | (40,114) | (4,500) | (44,614) |
| Net Outlays | $ 625,803 | $ 296,362 | $ 922,165 |

*The accompanying notes are an integral part of these financial statements.*

**COMBINED STATEMENT OF BUDGETARY RESOURCES**
**FOR THE YEAR ENDED SEPTEMBER 30, 2008**
**(IN MILLIONS)**

| | Budgetary | Non-Budgetary Financing | Total |
|---|---|---|---|
| **Budgetary Resources** | | | |
| Unobligated balance, brought forward | $ 57,450 | $ 0 | $ 57,450 |
| Recoveries of prior year unpaid obligations | 413 | 0 | 413 |
| Budget authority: | | | |
| Appropriations (Note 23) | 679,563 | 0 | 679,563 |
| Borrowing authority | 4 | 34,304 | 34,308 |
| Spending Authority from Offsetting Collections | | | |
| Earned: Collected | 8,705 | 335 | 9,040 |
| Change in receivables from Federal sources | (32) | 0 | (32) |
| Change in unfilled customer orders: Advance received | 19 | 0 | 19 |
| Without advance from Federal sources | (39) | 0 | (39) |
| Subtotal | 688,220 | 34,639 | 722,859 |
| Non-expenditure transfers, net | 844 | 0 | 844 |
| Temporarily not available pursuant to Public Law | (9) | 0 | (9) |
| Permanently not available | (4,626) | (4,767) | (9,393) |
| **Total Budgetary Resources** | **$ 742,292** | **$ 29,872** | **$ 772,164** |
| **Status of Budgetary Resources** | | | |
| Obligations incurred (Note 25): Direct | $ 477,384 | $ 5,415 | $ 482,799 |
| Reimbursable | 4,735 | 0 | 4,735 |
| Subtotal | 482,119 | 5,415 | 487,534 |
| Unobligated Balance: Apportioned | 214,114 | 24,122 | 238,236 |
| Exempt from apportionment | 34,999 | 0 | 34,999 |
| Subtotal | 249,113 | 24,122 | 273,235 |
| Unobligated balance not available | 11,060 | 335 | 11,395 |
| **Total Status of Budgetary Resources** | **$ 742,292** | **$ 29,872** | **$ 772,164** |
| **Change in Obligated Balance** | | | |
| Obligated balance, net: | | | |
| Unpaid obligations brought forward, Oct. 1 | $ 57,811 | $ 0 | $ 57,811 |
| Uncollected customer payments from Federal sources brought forward | (418) | 0 | (418) |
| **Total unpaid obligated balance, net** | **57,393** | **0** | **57,393** |
| Obligations incurred, net | 482,119 | 5,415 | 487,534 |
| Gross outlays | (482,199) | (5,409) | (487,608) |
| Recoveries of prior year unpaid obligations, actual | (413) | 0 | (413) |
| Change In uncollected customer payments Federal source | 71 | 0 | 71 |
| Obligated balance, net, end of period: | | | |
| Unpaid obligations | 57,318 | 6 | 57,324 |
| Uncollected customer payments Federal sources | (347) | 0 | (347) |
| **Total unpaid obligated balance, net, end of period** | **56,971** | **6** | **56,977** |
| **Net Outlays** | | | |
| Gross outlays | 482,199 | 5,409 | 487,608 |
| Offsetting collections | (8,194) | (335) | (8,529) |
| Distributed offsetting receipts | (16,211) | 0 | (16,211) |
| **Net Outlays** | **$ 457,794** | **$ 5,074** | **$ 462,868** |

*The accompanying notes are an integral part of these financial statements.*

**STATEMENTS OF CUSTODIAL ACTIVITY**
**FOR THE YEARS ENDED SEPTEMBER 30, 2009 AND 2008**
**(IN MILLIONS)**

| | 2009 | 2008 |
|---|---|---|
| Sources of Custodial Revenue (Note 26): | | |
| Revenue Received | | |
| Individual Income and FICA Taxes | $ 2,036,557 | $ 2,294,326 |
| Corporate Income Taxes | 225,482 | 354,063 |
| Estate and Gift Taxes | 24,677 | 29,824 |
| Excise Taxes | 67,248 | 66,293 |
| Railroad Retirement Taxes | 4,711 | 4,939 |
| Unemployment Taxes | 6,765 | 7,331 |
| Deposit of Earnings, Federal Reserve System | 34,318 | 33,598 |
| Fines, Penalties, Interest and Other Revenue | 1,929 | 2,233 |
| Total Cash Revenue Received | $ 2,401,687 | $ 2,792,607 |
| Less Refunds | (437,972) | (426,074) |
| Net Cash Revenue Received | $ 1,963,715 | $ 2,366,533 |
| Non-Cash Custodial Transactions | | |
| Beneficial Interest in Trust (Note 29) | 23,472 | 0 |
| Accrual Adjustment | (1,097) | 3,132 |
| Total Custodial Revenue | $ 1,986,090 | $ 2,369,665 |
| Disposition of Custodial Revenue: | | |
| Amounts Provided to Fund Non-Federal Entities | 487 | 407 |
| Amounts Provided to Fund the Federal Government (Notes 26 and 29) | 1,963,228 | 2,366,126 |
| Total Disposition of Cash Revenue | $ 1,963,715 | $ 2,366,533 |
| Non-cash Revenue – Beneficial Interest in Trust | 23,472 | 0 |
| Accrual Adjustment | (1,097) | 3,132 |
| Total Disposition of Custodial Revenue | 1,986,090 | 2,369,665 |
| Net Custodial Revenue | $ 0 | $ 0 |

*The accompanying notes are an integral part of these financial statements.*

# Notes to the Financial Statements

## TABLE OF CONTENTS

1. Summary of Significant Accounting Policies . . . 95
2. Fund Balance . . . 111
3. Loans and Interest Receivable – Intra-governmental . . . 114
4. Due from the General Fund and Due to the General Fund . . . 116
5. Accounts Receivable and Related Interest – Intra-governmental . . . 118
6. Cash, Foreign Currency, and Other Monetary Assets . . . 119
7. Gold and Silver Reserves, and Gold Certificates Issued to the Federal Reserve Banks . . . 122
8. Investments – Credit Reform and Asset Guarantee . . . 123
9. Investments in Government Sponsored Enterprises . . . 135
10. Investments in International Financial Institutions . . . 138
11. Other Investments and Related Interest . . . 139
12. Credit Program Receivables, Direct Loans, Net . . . 140
13. Loans and Interest Receivable . . . 154
14. Reserve Position in the International Monetary Fund . . . 155
15. Tax, Other, and Related Interest Receivables, Net . . . 157
16. Inventory and Related Property, Net . . . 158
17. Property, Plant, and Equipment, Net . . . 159
18. Non-Entity Assets . . . 160
19. Federal Debt and Interest Payable . . . 161
20. Other Debt and Interest Payable . . . 164
21. D.C. Pensions and Judiciary Retirement Actuarial Liability . . . 165
22. Liabilities . . . 167
23. Net Position . . . 169
24. Consolidated Statement of Net Cost and Net Costs of Treasury Sub-organizations . . . 171
25. Additional Information Related to the Combined Statements of Budgetary Resources . . . 178
26. Collection and Disposition of Custodial Revenue . . . 182
27. Earmarked Funds . . . 184
28. Reconciliation of Net Cost of Operations to Budget . . . 189
29. Financial Stability and Stimulus Activities . . . 190
30. Schedule of Fiduciary Activity . . . 197
31. Commitments and Contingencies . . . 199
32. Imputed Financing Costs . . . 203
33. Subsequent Events . . . 204

Required Supplemental Information (Unaudited) . . . 206

# 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

## A. REPORTING ENTITY

The accompanying financial statements include the operations of the U.S. Department of the Treasury (Treasury Department), one of 24 CFO Act agencies of the Executive Branch of the United States Government, and certain custodial activities managed on behalf of the entire U.S. Government. The following paragraphs describe the activities of the reporting entity.

The Treasury Department was created by Act (1 Stat.65) on September 2, 1789. Many subsequent acts affected the development of the Treasury Department, delegating new duties to its charge and establishing the numerous bureaus and divisions that now comprise the Treasury Department. As a major policy advisor to the President, the Secretary has primary responsibility for formulating and managing the domestic and international tax and financial policies of the U.S. Government.

Further, the Secretary is responsible for recommending and implementing United States domestic and international economic and fiscal policy; governing the fiscal operations of the government; maintaining foreign assets control; managing the federal debt; collecting income and excise taxes; representing the United States on international monetary, trade, and investment issues; overseeing Departmental overseas operations; and directing the manufacturing of coins, currency, and other products for customer agencies and the public.

The *Emergency Economic Stabilization Act of 2008* (EESA) was signed into law on October 3, 2008. EESA authorized the establishment of the Troubled Asset Relief Program (TARP) to be administered by the Treasury Department. EESA established two new offices within the Treasury Department: the Office of Financial Stability to administer the TARP, and a new Special Inspector General for TARP (SIGTARP). Under EESA, the Special Inspector General has the responsibility, among other things, to conduct, supervise, and coordinate audits and investigations of the purchase, management, and sale of assets under TARP.

The Treasury Department includes the Departmental Offices (DO) and nine operating bureaus. For financial reporting purposes, DO is composed of: International Assistance Programs (IAP), Office of Inspector General (OIG), the Special Office of Inspector General for the Troubled Asset Relief Program (SIGTARP), Treasury Forfeiture Fund (TFF), Exchange Stabilization Fund (ESF), Community Development Financial Institutions Fund (CDFI), Office of D.C. Pensions (DCP), Treasury Inspector General for Tax Administration (TIGTA), Federal Financing Bank (FFB), Office of Financial Stability (OFS), and the DO policy offices, which include the Government Sponsored Enterprise and Mortgage Backed Securities programs.

The nine operating bureaus are: Office of the Comptroller of the Currency (OCC); Bureau of Engraving and Printing (BEP); Financial Crimes Enforcement Network (FinCEN); Financial Management Service (FMS); Internal Revenue Service (IRS); U.S. Mint (Mint); Bureau of the Public Debt (BPD); Office of Thrift Supervision (OTS); and the Alcohol and Tobacco Tax and Trade Bureau (TTB).

The Treasury Department's financial statements reflect the reporting of its own entity activities, which include appropriations it receives to conduct its operations and revenue generated from those operations. They also reflect the reporting of certain non-entity (custodial) functions it performs on behalf of the U.S. Government and others. Non-entity activities include collecting federal revenue, servicing the federal debt, disbursing certain federal funds, and maintaining certain assets and liabilities for the U.S. Government, as well as for other federal entities.

The Treasury Department's reporting entity does not include the "General Fund" of the U.S. Government, which maintains receipt, disbursement, and appropriation accounts for all federal agencies.

Transactions and balances among the Treasury Department's entities have been eliminated from the Consolidated Balance Sheets, the Consolidated Statements of Net Cost, and the Consolidated Statements of Changes in Net Position.

Following GAAP for federal entities, the Treasury Department has not consolidated into its financial statements the assets, liabilities, or results of operations of any financial organization or commercial entity in which it holds either a direct, indirect, or beneficial majority equity investment. Even though some of the equity investments are significant, these entities meet the criteria of "bailed out" entities under paragraph 50 of the Statement of Federal Financial Accounting Standards (SFFAS) No. 2, which directs that such "bailout" investments should not be consolidated into the financial reports of the Federal Government, either in part or as a whole.

## B. BASIS OF ACCOUNTING AND PRESENTATION

The financial statements have been prepared from the accounting records of the Treasury Department in conformity with accounting principles generally accepted in the United States for federal entities, and the Office of Management and Budget (OMB) Circular No. A-136, *Financial Reporting Requirements*, as amended. Accounting principles generally accepted for federal entities are the standards prescribed by the Federal Accounting Standards Advisory Board (FASAB). FASAB is recognized by the American Institute of Certified Public Accountants as the official accounting standards-setting body of the U.S. Government. As such, the FASAB is responsible for identifying the Generally Accepted Accounting Principles (GAAP) hierarchy for Federal reporting entities.

In July 2009, the FASAB issued SFFAS No. 34, *The Hierarchy of Generally Accepted Accounting Principles for Federal Entities, Including the Application of Standards Issued by the Financial Accounting Standards Board*. SFFAS No. 34 incorporates the hierarchy of the sources of accounting principles and the framework for selecting the principles used in the preparation of general purpose financial reports of Federal reporting entities that are presented in conformity with federal GAAP.

These financial statements are provided to meet the requirements of the *Government Management Reform Act of 1994*. They consist of the Consolidated Balance Sheets, the Consolidated Statements of Net Cost, the Consolidated Statements of Changes in Net Position, the Combined Statements of Budgetary Resources, and the Statements of Custodial Activity. The statements and the related notes are prepared in a comparative form to present both fiscal year 2009 and fiscal year 2008 information.

While these financial statements have been prepared from the books and records of the Treasury Department in accordance with the formats prescribed by OMB, these financial statements are in addition to the financial reports used to monitor and control budgetary resources which are prepared from the same books and records.

Intra-governmental assets and liabilities are those from or to other federal entities. Intra-governmental earned revenues are collections or accruals of revenue from other federal entities, and intra-governmental costs are payments or accruals of expenditures to other federal entities.

The financial statements should be read with the realization that they are for a component of a sovereign entity, that liabilities not covered by budgetary resources cannot be liquidated without the enactment of an appropriation, and that the payment of all liabilities other than for contracts can be abrogated by the sovereign entity.

Liabilities represent the probable and measurable future outflow or other sacrifice of resources as a result of past transactions or events. Since Treasury Department is a component of the United States Government, a sovereign entity, Treasury's liabilities cannot be liquidated without legislation that provides resources or an appropriation. Liabilities covered by budgetary resources are those liabilities for which Congress has appropriated funds or funding is otherwise available to pay amounts due. Liabilities not covered by budgetary or other resources represent amounts owed in excess of available, congressionally appropriated funds or other amounts, and there is no certainty that the appropriations will be enacted. The United States government, acting in its sovereign capacity, can abrogate liabilities of Treasury arising from other than contracts.

## C. INVESTMENTS

### Investments – Credit Reform

Troubled Asset Relief Program (TARP) equity investments, including investments in preferred and common stock and warrants of public companies are accounted for pursuant to the provisions of the *Federal Credit Reform Act* (FCRA) and the associated FASAB accounting standard SFFAS No. 2, *Accounting for Direct Loans and Loan Guarantees*, as amended. As consideration for investments made, Treasury received common stock warrants, preferred shares (referred to as warrant preferred shares) or additional notes. Treasury concluded that GAAP accounting for such investments using SFFAS No. 2 was appropriate analogous accounting guidance based on the similarity between the equity investments made by Treasury and direct loans. Consequently, TARP equity investments, including investments in preferred and common stock and warrants of public companies are accounted for by Treasury using credit reform accounting in accordance with SFFAS No. 2, as amended, and reported in accordance with FCRA in these financial statements. Treasury calculates and accounts for equity investments using a market risk adjusted discount rate. In addition, the inclusion of market risk required by EESA in the valuation calculation results in accounting for these investments at estimated fair value, which is consistent with the accounting for other equity investments held by Treasury (i.e., Investments in GSEs).

Treasury recognizes dividend revenue associated with equity investments when declared by the entity in which Treasury has invested and when received in relation to any repurchases and restructuring. Treasury reflects changes in the present value of the projected cost value of direct loans, equity investments, and asset guarantees in the subsidy cost on the Statement of Net Cost annually, as required by FCRA. The estimated values associated with these additional instruments are disclosed in Note 8.

### Investments in Government Sponsored Enterprises

The senior preferred stock liquidity preference (preferred stock) and associated common stock warrant (warrant(s)) in GSEs are presented at their fair value as permitted by OMB Circular No. A-136. This Circular includes language that generally requires agencies to value non-federal investments at acquisition cost, and also permits the use of other measurement basis, such as fair value, in certain situations. OMB issued guidance to the Department of the Treasury on October 7, 2009, noting that while OMB Circular No. A-136 focuses primarily on federal securities, which are normally accounted for at amortized cost, it is reasonable to interpret OMB Circular No. A-136 to permit non-federal investments, on an instrument by instrument election, to be reported on a basis other than cost. OMB's guidance allows the use of fair value accounting for non-federal securities beginning with reporting for fiscal year 2009. OMB Circular No. A-136 also directs agencies with non-federal securities to consult FASB's Statement of Financial Accounting Standards No. 115, *Accounting for Certain Investments in Debt and Equity Securities*, for additional guidance. The Investments in GSEs disclosed as of

September 30, 2008, were recorded at acquisition cost at the date of purchase with disclosure of fair values as of fiscal year end 2008.

Treasury performs annual valuations, as of September 30th, of the preferred stock and warrants. Any changes in valuation, including impairment, is recorded and disclosed in accordance with SFFAS No. 7, *Accounting for Revenue and Other Financing Sources*. Since the valuation is an annual process, the changes in valuation of the preferred stock and warrants are deemed usual and recurring. Accordingly, changes in valuation are recorded as an exchange transaction that is either an expense or revenue. Since the costs of preferred stock and warrants are exchange transactions, any change in valuation is also recorded as an exchange transaction.

In addition, the preferred stock, warrants, and related dividends, and changes in valuation are accounted for as non-entity transactions. Furthermore, any related revenue, gains, or losses to the preferred stock or warrants are reported as non-entity exchange revenue. Dividends are accrued when declared; therefore, no accrual is made for future dividends.

Increases in the non-entity preferred stock liquidity preference occur when quarterly payments to the GSEs are made pursuant to the preferred stock purchase agreements (i.e., when a GSE's liabilities exceed its assets at the end of any quarter). These quarterly payments (liquidity commitments) are made from funds appropriated directly to the Treasury Department. Therefore, quarterly liquidity payments are recorded as costs in the Treasury Department's entity accounts and appear as costs on the Statement of Net Cost economic program section.

### Investments in International Financial Institutions

The Treasury Department invests in Multilateral Development Banks (MDB) to support poverty reduction, private sector development, and transition to market economies and sustainable economic growth and development, thereby advancing the United States' economic, political, and commercial interests abroad. These investments are non-marketable equity investments valued at cost.

### Other Investments and Related Interest

The ESF holds most of the Treasury Department's other investments. Securities that the Treasury Department has both the intent and ability to hold to maturity are classified as investment securities held to maturity and are carried at historical cost, adjusted for amortization of premiums and accretion of discounts, in accordance with OMB Circular No. A-136. The GSE securities held by ESF are in this category. "Other Foreign Currency Denominated Assets" are considered "available for sale" securities and recorded at fair value as permitted by OMB Circular No. A-136 beginning in fiscal year 2009. (Prior to fiscal year 2009, A-136 required reporting at cost.) These holdings are normally invested in interest bearing securities issued or held through foreign governments or monetary authorities.

## D.  TAX AND OTHER NON-ENTITY RECEIVABLES

Federal taxes receivable, net and the corresponding liability, due to Treasury are not accrued until related tax returns are filed or assessments are made by the IRS and agreed to by either the taxpayer or the court. Additionally, the prepayments are netted against liabilities. Accruals are made to reflect penalties and interest on taxes receivable through the balance sheet date.

Taxes receivable consist of unpaid assessments (taxes and associated penalties and interest) due from taxpayers. The existence of a receivable is supported by a taxpayer agreement, such as filing of a tax return without sufficient

payment, or a court ruling in favor of the IRS. The allowance reflects an estimate of the portion of total taxes receivable deemed to be uncollectible.

Compliance assessments are unpaid assessments which neither the taxpayer nor a court has affirmed the taxpayer owes to the Federal Government. Examples include assessments resulting from an IRS audit or examination in which the taxpayer does not agree with the results. Write-offs consist of unpaid assessments for which the IRS does not expect further collections due to factors such as taxpayers' bankruptcy, insolvency, or death. Compliance assessments and write-offs are not reported on the balance sheet. Statutory provisions require the accounts to be maintained until the statute for collection expires.

## E.   INVENTORY AND RELATED PROPERTY

Inventory and related property include inventory, operating materials and supplies, and forfeited property. The Treasury Department values inventories at either standard cost, or lower of cost or latest acquisition cost, except for finished goods inventories, which are valued at weighted-average unit cost. All operating materials and supplies are recorded as an expense when consumed in operations.

Forfeited property is recorded at estimated fair market value as deferred revenue, and may be adjusted to reflect the current fair market value at the end of the fiscal year. Property forfeited in satisfaction of a taxpayer's assessed liability is recorded when title to the property passes to the U.S. Government and a corresponding credit is made to the related taxes receivable. Direct and indirect holding costs are not capitalized for individual forfeited assets.

Mortgages and claims on forfeited assets are recognized as a valuation allowance and a reduction of deferred revenue from forfeited assets when the asset is forfeited. The allowance includes mortgages and claims on forfeited property held for sale and a minimal amount of claims on forfeited property previously sold. Revenue from the forfeiture of property is deferred until the property is sold or transferred to a state, local, or federal agency. Revenue is not recognized if the forfeited property is ultimately destroyed or cannot be legally sold.

## F.   LOANS AND INTEREST RECEIVABLE, INTRAGOVERNMENTAL – ENTITY AND NON-ENTITY

Intra-governmental entity Loans and Interest Receivable from other federal agencies represent loans and interest receivable held by the Treasury Department. No credit reform subsidy costs were recorded for loans purchased from federal agencies or for guaranteed loans made to non-federal borrowers, because of outstanding balances guaranteed (interest and principal) by those agencies.

Intra-governmental non-entity Loans and Interest Receivable from other federal agencies represent loans issued by the Treasury Department to federal agencies on behalf of the U.S. Government. The Treasury Department acts as an intermediary issuing these loans, because the agencies receiving these loans will lend these funds to others to carry out various programs of the Federal Government. Because of the Treasury Department's intermediary role in issuing these loans, the Treasury Department does not record an allowance related to these intra-governmental loans. Instead, loan loss allowances and subsidy costs are recognized by the ultimate lender, the federal agency that issued the loans to the public.

## G.  ADVANCES TO THE BLACK LUNG TRUST FUND

Advances were provided to the Department of Labor's Black Lung Disability Trust Fund from the General Fund of the U.S. Government. BPD accounted for the advances on behalf of the General Fund of the U.S. Government. Advances to the Black Lung Disability Trust Fund were accounted for pursuant to the *Benefits Revenue Act* which states: "In the event that fund resources are not adequate to meet fund obligations, then, advances of interest and principal are paid to the General Fund of the U.S. Government when the Secretary of the Treasury determines that funds are available in the trust fund for such purposes." The advances to the Black Lung Trust Fund were repayable with interest at a rate determined by the Secretary of the Treasury to be equal to the current average market yield on outstanding marketable obligations of the United States with remaining periods to maturity comparable to the anticipated period during which the advance will be outstanding. Advances made prior to 1982 carried rates of interest equal to the average rate borne by all marketable interest-bearing obligations of the United States then forming a part of the public debt.

The *Benefits Revenue Act* authorized restructuring of the Trust Fund debt by the repayment of the market value of outstanding repayable advances with the proceeds of Authorized Trust Fund borrowing and a one-time appropriation of $6,498 million. As a result of the refinancing, the General Fund of the U.S. Government recognized a gain of $2,496 million for the difference between the market value of the outstanding advances plus accrued interest of $12,994 million and the carrying value of the outstanding advances plus accrued interest of $10,498 million.

## H.  ADVANCES TO THE UNEMPLOYMENT TRUST FUND

Advances have been issued to the Department of Labor's Unemployment Trust Fund from the General Fund of the U.S. Government to states for unemployment benefits. The Bureau of the Public Debt accounts for the advances on behalf of the General Fund. As outlined in 42 USC § 1323, these repayable advances bear an interest rate of 3.375 percent, and were computed as the average interest rate, as of the end of the calendar month preceding the issuance date of the advance, for all interest bearing obligations of the United States then forming the public debt, to the nearest lower one-eighth of one percent. Interest on the repayable advances is due on September 30th of each year. Advances will be repaid by transfers from the Unemployment Trust Fund to the General Fund when the Secretary of the Treasury, in consultation with the Secretary of Labor, has determined that the balance in the Unemployment Trust Fund is adequate to allow repayment.

## I.  RECEIVABLE ON DEPOSIT OF EARNINGS, FEDERAL RESERVE SYSTEM

Reserve Banks are required by the Board of Governors of the Federal Reserve System to transfer to the U.S. Treasury excess earnings, after providing for the cost of operations, payment of dividends, and reservation of an amount necessary to equate surplus with capital paid in. In the event of losses, or a substantial increase in capital, a Reserve Bank will suspend its payments to the U.S. Treasury until such losses or increases in capital are recovered through subsequent earnings. Weekly payments to the U.S. Treasury may vary significantly. The Receivable on Deposit of Earnings, Federal Reserve System, represents the earnings due Treasury as of September 30, but not collected by the U.S. Treasury until after the end of the month.

## J. PROPERTY, PLANT, AND EQUIPMENT

### General

Property, plant, and equipment (PP&E) is composed of capital assets used in providing goods or services. It also includes assets acquired through capital leases, which are initially recorded at the amount recognized as a liability for the capital lease at its inception. PP&E is stated at full cost, including costs related to acquisition, delivery, and installation, less accumulated depreciation. Major alterations and renovations including leasehold and land improvements are capitalized, while maintenance and repair costs are charged to expenses as incurred.

Internal use software encompasses software design, development, and testing of projects adding significant new functionality and long-term benefits. Costs for developing internal use software are accumulated in work in development until a project is placed into service, and testing and final acceptance are successfully completed. Once completed, the costs are transferred to depreciable property.

Costs for construction projects are recorded as construction-in-progress until completed, and are valued at actual (direct) cost, plus applied overhead and other indirect costs.

The Treasury Department leases land and buildings from the General Services Administration (GSA) to conduct most of its operations. GSA charges a standard level users fee which approximates commercial rental rates for similar properties. Therefore, GSA-owned properties are not included in the Department's PP&E.

The Treasury Department's bureaus are diverse both in size and in operating environment. Accordingly, the Department's capitalization policy provides minimum capitalization thresholds which range from $25,000 to $50,000. The Treasury Department also uses a capitalization threshold range for bulk purchases: $250,000 to $500,000 for non manufacturing bureaus and $25,000 to $50,000 for manufacturing bureaus. Bureaus determine the individual items that comprise bulk purchases. In addition, Treasury bureaus may expense bulk purchases if they conclude that total period costs would not be materially distorted and the cost of capitalization is not economically feasible.

Depreciation is expensed on a straight-line basis over the estimated useful life of the asset with the exception of leasehold improvements, which are depreciated over the useful life of the lease or the useful life of the improvement, whichever is shorter. Service life ranges are high due to the Treasury Department's diversity of PP&E. Construction in progress and internal use software in development are not depreciated.

### Heritage Assets

The Treasury Department owns the Treasury building -- a multi-use heritage asset. The building housing the United States Mint in Denver, Colorado, is also considered a multi-use heritage asset. Multi-use heritage assets are assets of historical significance for which the predominant use is general government operations. All acquisition, reconstruction, and betterment costs for the Treasury Department building are capitalized as general PP&E and depreciated over their service life.

## K. NON-ENTITY GOVERNMENT-WIDE CASH

Non-entity government-wide cash is held in depositary institutions and Federal Reserve accounts. Agencies can deposit funds that are submitted to them directly into either a Federal Reserve Treasury General Account (TGA) or a local TGA depositary. The balances in these TGA accounts are transferred to the FRBNY's TGA at the end of each day.

Operating Cash of the U.S. Government represents balances from tax collections, customs duties, other revenue, federal debt receipts, and other various receipts net of cash outflows for budget outlays and other payments held in the Federal Reserve Banks, foreign and domestic financial institutions, and in U. S. Treasury Tax and loan accounts. Outstanding checks are netted against operating cash until they are cleared by the Federal Reserve System.

The Treasury General Account (TGA) is maintained at the Federal Reserve Bank of New York (FRBNY) and functions as the government's checking account for deposits and disbursements of public funds. The Treasury Tax and Loan (TT&L) program includes about 9,000 depositories that accept tax payments and remit them the day after receipt to FRBNY's TGA. Certain TT&L depositaries also hold Non-entity Government-wide Cash in interest bearing accounts. Cash in the TGA and the TT&L program is restricted for Government-wide operations.

U. S. Treasury Tax and Loan Accounts include funds invested through the Term Investment Option program and the Repo program. Under the Term Investment Option program Treasury auctions funds for a set term, usually in the range of one day to three weeks. Under the Repo program, Treasury invests funds through overnight reverse repurchase agreements. However, under both programs, Treasury reserves the right to call the funds prior to maturity under special circumstances.

The Supplementary Financing Program (SFP) Account is maintained at FRBNY. SFP is a temporary program announced by Treasury and the Federal Reserve on September 14, 2008, to provide emergency cash for Federal Reserve initiatives aimed at addressing the ongoing crisis in financial markets. The program consists of a series of Treasury bills, apart from Treasury's current borrowing program.

To promote stability in the mortgage market, a Federal Reserve account was established at JP Morgan Chase. Treasury uses this account to purchase Government Sponsored Enterprise (GSE) mortgage-backed securities in the open market.

Other cash is mostly comprised of Automated Clearinghouse transfers and other deferred items.

## L. FEDERAL DEBT

Debt and associated interest are reported on the accrual basis of accounting. Interest costs are recorded as expenses when incurred, instead of when paid. Certain Treasury securities are issued at a discount or premium. These discounts and premiums are amortized over the term of the security using an interest method for all long term securities and the straight line method for short term securities. The Treasury Department also issues Treasury Inflation-Protected Securities (TIPS). The principal for TIPS is adjusted daily over the life of the security based on the Consumer Price Index for all Urban Consumers.

## M.  LOAN COMMITMENTS

The FFB recognizes loan commitments when the FFB and the other parties fully execute the promissory notes and reduces loan commitments when the FFB issues loans or when the commitments expire. Most obligations of the FFB give a borrower the contractual right to a loan or loans immediately or at some point in the future. The FFB limits the time available for a loan under an obligation, where applicable.

## N.  PENSION COSTS, OTHER RETIREMENT BENEFITS, AND OTHER POST EMPLOYMENT BENEFITS

The Treasury Department recognizes the full costs of its employees' pension benefits. However, the liabilities associated with these costs are recognized by the Office of Personnel Management (OPM) rather than the Treasury Department.

Most employees of the Treasury Department hired prior to January 1, 1984, participate in the Civil Service Retirement System (CSRS), to which the Treasury Department contributes 8.51percent of salaries for regular CSRS employees.

On January 1, 1987, the Federal Employees Retirement System (FERS) went into effect pursuant to Public Law 99-335. Employees hired after December 31, 1983, are automatically covered by FERS and Social Security. A primary feature of FERS is that it offers a savings plan to which the Treasury Department automatically contributes 1 percent of base pay and matches any employee contributions up to an additional 4 percent of base pay. For most employees hired after December 31, 1983, the Treasury Department also contributes the employer's matching share for Social Security. For the FERS basic benefit, the Treasury Department contributes 11.2 percent for regular FERS employees.

Similar to federal retirement plans, OPM, rather than the Treasury Department, reports the liability for future payments to retired employees who participate in the Federal Employees Health Benefits Program (FEHBP) and Federal Employees' Group Life Insurance (FEGLI) Program. The Treasury Department reports the full cost of providing other retirement benefits (ORB). The Treasury Department also recognizes an expense and liability for other post employment benefits (OPEB), which includes all types of benefits provided to former or inactive (but not retired) employees, their beneficiaries, and covered dependents. Additionally, the Treasury Department bureaus, OCC and OTS, separately sponsor certain benefit plans for their employees. OCC sponsors a defined life insurance benefit plan for current and retired employees. Additionally, OTS provides certain health and life benefits for all retired employees who meet eligibility requirements

## O.  SPECIAL DRAWING RIGHTS (SDR)

The ESF was established for use by the Secretary of the Treasury to account for the purchase or sale of foreign currencies, to hold U.S. foreign exchange and Special Drawing Rights (SDR) holdings, and to provide financing to foreign governments. SDR transactions of the ESF require the explicit authorization of the Secretary of the Treasury.

The International Monetary Fund (IMF) has authority to cancel, in part or in whole, SDRs created under previous allocations. Decisions of the IMF to cancel an SDR are adopted by the IMF's Board of Governors on a basis of proposal by the IMF Managing Director, with concurrence by the IMF Executive Board. The same majority

requirements as those for allocations apply to the Executive Board's concurrence and to the Board of Governor's decision on an SDR cancellation proposal.

### Allocations and Holdings

Allocations of SDR are recorded as liabilities. These liabilities represent the amount that is payable in the event of liquidation of, or U.S. withdrawal from the SDR department of the IMF, or cancellation of the SDR.

SDR holdings represent transactions resulting from ESF SDR activities. These activities are primarily the result of IMF allocations. Other transactions reported in this account are recorded as incurred. They include SDR acquisitions and sales, interest received on SDR holdings, interest charges on SDR allocations, and valuation adjustments. The U.S. Government receives remuneration in SDRs from the IMF. This is based on claims on the IMF, represented by the U.S. Reserve Position. The allocations and holdings are revalued monthly based on the SDR valuation rate calculated by the IMF.

### Certificates

The *SDR Act of 1968* authorized the Secretary of the Treasury to issue certificates, not to exceed the value of SDR holdings, to the Federal Reserve Banks in return for interest-free dollar amounts equal to the face value of certificates issued. The certificates may be issued to finance the acquisition of SDR from other countries or to provide resources for financing other ESF operations. Certificates issued are to be redeemed by the Treasury Department at such times and in such amounts as the Secretary may determine. Certificates issued to Federal Reserve Banks are stated at their face value. It is not practical to estimate the fair value of certificates issued to Federal Reserve Banks, since these certificates contain no specific terms of repayment.

## P. FEDERAL EMPLOYEE BENEFITS PAYABLE—FECA ACTUARIAL LIABILITY

The *Federal Employees' Compensation Act* (FECA) provides income and medical cost protection to covered federal civilian employees injured on the job, and employees who have incurred a work-related injury or occupational disease. These future workers' compensation estimates were generated from an application of actuarial procedures developed to estimate the liability for FECA benefits. The actuarial liability estimates for FECA benefits include the expected liability for death, disability, medical, and miscellaneous costs for approved compensation cases.

## Q. ANNUAL, SICK, AND OTHER LEAVE

Annual and compensatory leave earned by Treasury employees, but not yet used, is reported as an accrued liability. The accrued balance is adjusted annually to current pay rates. Any portions of the accrued leave, for which funding is not available, are recorded as an unfunded liability. Sick and other leave are expensed as taken.

## R. REVENUE AND FINANCING SOURCES

Treasury Department activities are financed either through exchange revenue it receives from others or through non-exchange revenue and financing sources (such as appropriations provided by the Congress and penalties, fines, and certain user fees collected). User fees primarily include IRS reimbursable costs to process installment agreements and accompanying photocopy and reproduction charges. Exchange revenues are recognized when earned; i.e., goods have been delivered or services have been rendered. Non-exchange revenues are recognized when received by the respective Treasury Department collecting bureau. Appropriations used are recognized as

financing sources when related expenses are incurred or assets are purchased. Revenue from reimbursable agreements is recognized when the services are provided. The Treasury Department also incurs certain costs that are paid in total or in part by other federal entities, such as pension costs. These subsidized costs are recognized on the Consolidated Statement of Net Cost, and the imputed financing for these costs is recognized on the Consolidated Statement of Changes in Net Position. As a result, there is no effect on net position. Other non-exchange financing sources such as donations and transfers of assets without reimbursements also are recognized for the period in which they occurred on the Consolidated Statement of Changes in Net Position.

The Treasury Department recognizes revenue it receives from disposition of forfeited property as non-exchange revenue on the Consolidated Statement of Changes in Net Position. The costs related to the Forfeiture Fund program are reported on the Consolidated Statement of Net Cost.

## S.  CUSTODIAL REVENUES AND COLLECTIONS

Non-entity revenue reported on the Treasury Department's Statement of Custodial Activity includes cash collected by the Treasury Department, primarily taxes. It does not include revenue collected by other federal agencies, such as user fees and other receipts, which are remitted for general operating purposes of the U.S. Government or are earmarked for certain trust funds. The Statement of Custodial Activity is presented on the "modified accrual basis." Revenues are recognized as cash is collected. The "accrual adjustment" is the net increase or decrease, during the reporting period, in net revenue related-assets and liabilities, mainly taxes receivable. The Balance Sheets include an estimated amount for taxes receivable and payable to the General Fund of the U.S. Government at September 30, 2009 and September 30, 2008.

## T.  TAX ASSESSMENTS, ABATEMENTS, AND REFUNDS PAYABLE

Under Internal Revenue Code Section 6201, the Treasury Department is authorized and required to make inquiries, determinations, and assessments of all taxes which have not been duly paid (including interest, additions to the tax, and assessable penalties) under the law. Unpaid assessments result from taxpayers filing returns without sufficient payment, as well as from tax compliance programs such as examination, under-reporter, substitute for return, and combined annual wage reporting. The Treasury Department also has authority to abate the paid or unpaid portion of assessed tax, interest, and penalty. Abatements occur for a number of reasons and are a normal part of the tax administration process. Abatements may result in claims for refunds or a reduction of the unpaid assessed amount.

Refunds payable arise in the normal course of tax administration when it is determined that taxpayers have paid more than the actual taxes they owe. Amounts the Treasury Department has concluded to be valid refunds owed to taxpayers are recorded as a liability (Refunds Payable on the Balance Sheet), with a corresponding receivable from the General Fund. This receivable is included on the Balance Sheet in the line entitled "Due from the General Fund."

## U.  PERMANENT AND INDEFINITE APPROPRIATIONS

Permanent and indefinite appropriations are used to disburse tax refunds, income tax credits, and child tax credits. These appropriations are not subject to budgetary ceilings established by Congress. Therefore, refunds payable at year end are not subject to funding restrictions. Refund payment funding is recognized as appropriations are used. Permanent indefinite authority for refund activity is not stated as a specific amount and is available for an

indefinite period of time. Although funded through appropriations, refund activity, in most instances, is reported as a custodial activity of the Treasury Department, since refunds are, in substance, a custodial revenue-related activity resulting from taxpayer overpayments of their tax liabilities.

The Treasury Department also receives two permanent and indefinite appropriations related to debt activity. One is used to pay interest on the public debt securities; the other is used to redeem securities that have matured, been called, or are eligible for early redemption. These accounts are not annual appropriations and do not have refunds. Debt activity appropriations are related to the Treasury Department's liability and are reported on the Treasury Department's Balance Sheet. Permanent indefinite authority for debt activity is available for an indefinite period of time.

Treasury receives permanent indefinite appropriations annually to fund increases in the projected subsidy costs of credit programs as determined by the reestimation process required by the FCRA.

Additionally, the Treasury Department receives other permanent and indefinite appropriations to make certain payments on behalf of the U.S. Government. These appropriations are provided to make payments to the Federal Reserve Banks for services provided. They also include appropriations provided to make other disbursements on behalf of the U.S. Government, including payments made to various parties as the result of certain claims and judgments rendered against the United States.

## V. INCOME TAXES

As an agency of the Federal Government, the Treasury Department is exempt from all income taxes imposed by any governing body, whether it is a federal, state, commonwealth, local, or foreign government.

## W. USE OF ESTIMATES

The Treasury Department has made certain estimates and assumptions relating to the reporting of assets, liabilities, revenues, expenses, and the disclosure of contingent liabilities to prepare these financial statements. Actual results could differ from these estimates. Significant transactions subject to estimates include loan receivables (including Mortgage Backed Securities (MBS) and TARP); investments in non-federal securities (including Government Sponsored Enterprises (GSEs) foreign and domestic public entities) and related impairment, if any; tax receivables; loan guarantees; depreciation; liability for liquidity commitment (GSEs); imputed costs; actuarial liabilities; cost and earned revenue allocations; contingent legal liabilities; and credit reform subsidy costs.

The Treasury recognizes the sensitivity of credit reform modeling to slight changes in some model assumptions and uses regular review of model factors, statistical modeling, and annual reestimates to reflect the most accurate cost of the credit programs to the U.S. Government. Two of the emergency economic programs that Treasury implemented in the latter part of September 2008, the purchase program for MBS and the GSE credit line facility, both operate under the provisions of credit reform and the use of estimates as dictated by the *Federal Credit Reform Act* (Note 12). Additionally, all TARP credit activity, including investments in common and preferred stock and warrants of public companies and loans and loan guarantees or guaranty-like insurance activities, are also subject to credit reform subsidy cost estimates and valuation of direct loans, equity investments and asset guarantees. (Notes 8 and 12)

The forecasted future cash flows used to determine these amounts as of September 30, 2009, are sensitive to slight changes in model assumptions, such as general economic conditions, specific stock price volatility of the entities in which the Treasury Department has an equity interest, estimates of expected default, and prepayment rates. Forecasts of future financial results have inherent uncertainty and the TARP Direct Loans and Equity Investments, Net, and Asset Guarantee Program line items as of September 30, 2009, are reflective of relative illiquid, troubled assets whose values are particularly sensitive to future economic conditions and other assumptions. Additional discussion related to sensitivity analysis can be found in the Management's Discussion and Analysis section of the Agency Financial Report.

The GSE preferred stock agreements provide that the Treasury Department will increase its investment in the GSE's senior preferred stock if at the end of any quarter the Federal Housing Finance Agency (FHFA), acting as the conservator, determines that the liabilities of either GSE, individually, exceed its respective assets. Based on U.S. GAAP, these contingent liquidity commitments predicated on the future occurrence of any shareholders' deficits of the GSEs at the end of any reporting quarter, are potential liabilities of Treasury. Valuation analyses were performed to attempt to provide a "sufficiently reliable" estimate of the outstanding commitment in order for Treasury to record the remaining liability in accordance with SFFAS 5. The valuation incorporated various forcasts, projections and cash flow analysis to develop an estimate of potential liability. Note 9 discusses the results of the valuation and the liability recorded as of September 30, 2009.

## X.  CREDIT RISK

Credit risk is the potential, no matter how remote, for financial loss from a failure of a borrower or a counterparty to perform in accordance with underlying contractual obligations. The Treasury Department takes on possible credit risk when it makes direct loans or credits to foreign entities or becomes exposed to institutions which engage in financial transactions with foreign countries (Note 11). Given the history of the Treasury Department with respect to such exposure and the financial policies in place in the U. S. Government and other institutions in which the United States participates, the Treasury Department expectations of credit losses is nominal.

The Treasury Department also takes on credit risk related to committed but undisbursed direct loans, its liquidity commitment to GSE, its MBS portfolio, investments, loans, and asset guarantees of the TARP, its insurance of non-FDIC insured money market funds, and its Terrorism Risk Insurance Program. Except for the Terrorism Risk Insurance Program, these activities focus on the underlying problems in the credit markets, and the ongoing instability in those markets exposes the Department to potential unknown costs and losses. The extent of the risk assumed by the Treasury Department is described in more detail in the notes to the financial statements, and where applicable is factored into credit reform models and reflected in fair value measurements (Notes 8, 9 & 12).

In addition, for EESA programs, the statute requires that market risk be considered in the subsidy cost of the asset, through an adjustment to the discount rate. Within the TARP programs, Treasury has invested in many assets that would traditionally be held by private investors and their valuation would inherently include market risk. Thus, for all TARP direct loan, guarantee, and equity purchase programs, Treasury calculates a Market Risk Adjusted Discount Rate (MRADR). Therefore, the Treasury cost estimates for the TARP programs are adjusted for unexpected loss and the estimated risk of expected cash flows. Under SFFAS No. 2, including market risk in the cash flow estimates is consistent with the type of assets and liabilities being valued. The inclusion of the MRADR is the mechanism for providing the fair market value of the assets.

## Y. EARMARKED FUNDS

Treasury has accounted for revenues and other financing sources for earmarked funds separately from other funds. Earmarked funds are financed by specifically identified revenues, often supplemented by other financing sources, which remain available over time. These specifically identified revenues and other financing sources are required by statute to be used for designated activities or purposes. SFFAS No. 27, *Identifying and Reporting Earmarked Funds*, defines the following three criteria for determining an earmarked fund: (1) A statute committing the Federal Government to use specifically identified revenues and other financing sources not used in the current period for future use to finance the designated activities, benefits, or purposes; (2) Explicit authority for the earmarked fund to retain revenues and other financing sources not used in the current period for future use to finance the designated activities, benefits, or purposes; and (3) A requirement to account for and report on the receipt, use, and retention of the revenues and other financing sources that distinguished the earmarked fund from the Federal Government's general revenues.

## Z. ALLOCATION TRANSFERS

The Treasury Department is a party to allocation transfers with other federal agencies as both a transferring (parent) entity and/or a receiving (child) entity. Allocation transfers are legal delegations by one department of its authority to obligate budget authority and outlay funds to another department. A separate fund account (allocation account) is created in the U.S. Treasury as a subset of the parent fund account for tracking and reporting purposes. All allocation transfers of balances are credited to this account, and subsequent obligations and outlays incurred by the child entity are charged to this allocation account as they execute the delegated activity on behalf of the parent. Beginning in fiscal year 2007, parent federal agencies report both the proprietary and budgetary activity and the child agency does not report any financial activity related to budget authority allocated from the parent federal agency to the child federal agency.

The Treasury Department allocates funds, as the parent, to the Department of Energy. OMB allows certain exceptions to allocation reporting for certain funds. Accordingly, the Treasury Department has reported certain funds for which the Treasury Department is the child in the allocation transfer, but in compliance with OMB guidance (A-136 III.4.2 section 5 for three exceptions), will report all activities relative to these allocation transfers in the Treasury Department's financial statements. Also, the Treasury Department receives allocation transfers, as the child, from the Agency for International Development and Department of Transportation. The Treasury Department had no significant allocation transfers to report in fiscal years 2009 and 2008.

## AA. CREDIT REFORM ACCOUNTING

The authoritative guidance for the credit reform portion of these statements is contained primarily in SFFAS No. 2, *Accounting for Direct Loans and Loan Guarantees*, as amended by SFFAS No. 18, *Amendments to Accounting Standards for Direct Loans and Loan Guarantees*, and SFFAS No. 19, *Technical Amendments to Accounting Standards for Direct Loans and Loan Guarantees*. This guidance was promulgated as a result of the *Federal Credit Reform Act of 1990* (FCRA).

The FCRA requires that the ultimate costs of a credit program be calculated, and the budgetary resources obtained, before the direct loan obligations are incurred. The cost of loan guarantee programs is the net present value of the estimated future cash flows from payments (for claims and interest rate subsidies). The primary pur-

pose of the FCRA, which became effective on October 1, 1991, is to more accurately measure the cost of federal credit programs and to place the cost of such credit programs on a basis equivalent with other federal spending.

SFFAS No. 2, which generally mirrors the requirements of the FCRA, established guidance for estimating the cost of direct and guaranteed loan programs, as well as for recording direct loans and liabilities for loan guarantees for financial reporting purposes. SFFAS No. 2 states that the actual and expected costs of federal credit programs should be fully recognized in both budgetary and financial reporting. To accomplish this, agencies first predict or estimate the future performance of direct and guaranteed loans when preparing their annual budgets. The data used for these budgetary estimates are reestimated after the fiscal year-end to reflect changes in actual loan performance and actual interest rates in effect when the loans were issued. The data used for these estimates were reestimated at the fiscal year-end to reflect adjustments for market risk, asset performance, and other key variables and economic factors. The reestimate data are then used to report the cost of the loans disbursed under the direct or guaranteed loan program as a "Program Cost" in the agencies' Statement of Net Cost.

The FCRA establishes budgetary and financing control for each credit program through the use of the program, financing and negative subsidy receipt accounts for direct loans obligated after September 30, 1991. The FCRA establishes the use of the program, financing, and general fund receipt for direct loans obligated after September 30, 1991. These accounts are classified as either budgetary or non-budgetary in the Combined Statements of Budgetary Resources. The budgetary accounts include the program accounts and receipt accounts. The non-budgetary accounts consist of the credit reform financing accounts.

The program account is a budget account that receives and obligates appropriations to cover the subsidy cost of a direct loan or guarantee and disburses the subsidy cost to the financing account. The program account also receives appropriations for administrative expenses. The financing account is a non-budgetary account that records all of the cash flows resulting from Credit Reform direct loans or loan guarantees. It disburses loans, collects repayments and fees, makes claim payments, holds balances, borrows from BPD, earns or pays interest, and receives the subsidy cost payment from the program account.

The General Fund receipt account is a budget account used for the receipt of amounts paid from the financing account when there is a negative subsidy or negative modification from the original estimate or a downward reestimate. They are available for appropriations only in the sense that all General Fund receipts are available for appropriations. Any assets in this account are non-entity assets and are offset by intragovernmental liabilities. At the end of the fiscal year, the fund balance transferred to the U.S. Treasury through the General Fund receipt account is no longer included in Treasury's fund balance reporting.

The Department of Treasury accounts for TARP direct loans, equity investments and Asset Guarantees, MBS purchased as a part of GSEs assistance program, and the GSE Credit Facility program, in accordance with the FCRA and the provisions under the FASAB accounting standard SFFAS No. 2, as amended. Treasury determined it was acceptable to include an estimate of market risk in the calculation of subsidy cost under SFFAS No. 2.

## AB. FIDUCIARY ACTIVITIES

Treasury has adopted SFFAS No. 31, *Accounting for Fiduciary Activities*, which is effective for years beginning after September 30, 2008. SFFAS No. 31, prescribes that fiduciary type activities and related transactions will no longer be reported in proprietary financial statements. Fiduciary activities are the collection or receipt, and the management, protection, accounting, investment, and disposition by the Federal Government of cash or other

assets in which non-Federal individuals or entities have an ownership interest that the Federal Government must uphold. Fiduciary cash and other assets are not assets of the Federal Government. While these activities are no longer reported in the proprietary financial statements, they are required to be reported on schedules in the notes to financial statements (Note 30).

## AC. RECLASSIFICATIONS

Certain fiscal year 2008 balances on the Statements of Budgetary Resources (SBR) and Net Cost (SNC) have been reclassified to conform to the fiscal year 2009 presentations. In fiscal year 2009, certain SBR budgetary and non-budgetary amounts were disaggregated whereas in fiscal year 2008 they were reported in the aggregate. The change was made to appropriately disclose the significant TARP and GSEs non-budgetary credit reform activity that occurred in fiscal year 2009. In addition, the Investments in GSEs accrued year-end liquidity payment disclosed as of September 30, 2008 were reported in the Statement of Net Cost (SNC) separate from the four Treasury strategic goals. In fiscal year 2009, Treasury concluded that the cost of this program helps accomplish the Treasury strategic goal of ensuring that the U.S. economy performs at its full economic potential. Thus, as of September 30, 2009 the cost of investments in GSEs and the related year-end accrual are included in the Economic Program section of the SNC. The GSE transaction reclassification in the SNC also caused a similar reclassification for the GSE transaction in Note 28, Reconciliation of Net Cost of Operations to Budget, as well.

## AD. RELATED PARTIES

The primary "related parties" with whom the Treasury Department conducts business are other federal agencies, mainly through the normal lending activities of the BPD and the Federal Financing Bank. These activities are disclosed in these financial statements. The Treasury Department utilizes the services of the Federal Reserve to execute a variety of transactions on behalf of the BPD and the Exchange Stabilization Fund. The Federal Reserve is serving as the Treasury Department's fiscal agent in executing these transactions and receives fees for its services. The Treasury Department also consults with the Federal Reserve on matters affecting the economy, such as the structuring of bailout financing for American International Group and other companies affected by the current economic situation. However, these actions do not involve transactions between the Treasury Department and the Federal Reserve.

Finally, the Secretary of the Treasury serves on the Federal Housing Finance Administration (FHFA) Oversight Board, and consults with the Director of FHFA in matters involving Fannie Mae and Freddie Mac. This provides the Treasury Department a voice in the FHFA's actions as the conservator for Fannie Mae and Freddie Mac, and thus some influence over major decisions involving Fannie Mae and Freddie Mac. The Treasury Department has no transactions with FHFA; transactions and balances arising from transactions with Fannie Mae and Freddie Mac are accounted for and disclosed in these financial statements.

## 2. FUND BALANCE

Fund Balance with Treasury is the aggregate amount of the Treasury Department's accounts with the U.S. Government's central accounts from which the Treasury Department is authorized to make expenditures and pay liabilities. It is an asset because it represents the Treasury Department's claim to the U.S. Government's resources. Fund balance with Treasury is not equivalent to unexpended appropriations, because it also includes non-appropriated revolving and enterprise funds, suspense accounts, and custodial funds such as deposit funds, special funds, and trust funds.

Appropriated funds consist of amounts appropriated annually by Congress to fund the operations of the Department. Appropriated funds include clearing funds, which represent reconciling differences with Treasury balances.

Revolving funds are used for continuing cycles of business-like activity, in which the fund charges for the sale of products or services and uses the proceeds to finance its spending, usually without requirement for annual appropriations. A public enterprise revolving fund is an account that is authorized by law to be credited with offsetting collections from the public and those monies are used to finance operations. The Working Capital Fund is a fee-for-service fund established to support operations of Department Components. Also included are the financing funds for credit reform. The GSA and TARP programs were the main drivers for the increase in appropriated and revolving funds.

Trust funds include both receipt accounts and expenditure accounts that are designated by law as a trust fund. Trust fund receipts are used for specific purposes.

Deposit funds represent amounts received as an advance that are not accompanied by an order and include non-entity collections that do not belong to the Federal Government. See Note 30, Schedule of Fiduciary Activity for Non-Entity collections.

Special funds include funds designated for specific purposes including the disbursement of non-entity monies received in connection with the Presidential Election Campaign.

***Fund Balances:*** As of September 30, 2009 and September 30, 2008, fund balances consisted of the following (in millions):

| | 2009 | 2008 |
|---|---|---|
| Appropriated Funds | $ 455,983 | $ 272,561 |
| Revolving Funds | 47,897 | 1,837 |
| Trust Funds | 5 | 2 |
| Clearing Funds | 93 | 26 |
| Deposit Funds | 146 | 587 |
| Special Funds | 455 | 299 |
| Other Funds (Receipts and Suspense Funds) | 3 | 56 |
| **Total Fund Balances** | **$ 504,582** | **$ 275,368** |

## Status of Fund Balance with Treasury

Portions of the Unobligated Balance Unavailable include amounts appropriated in prior fiscal years that are not available to fund new obligations. However, it can be used for upward and downward adjustments for existing obligations in future years. The Obligated Balance Not Yet Disbursed represents amounts designated for payment of goods and services ordered but not received or goods and services received but for which payment has not yet been made.

Since the following line items do not post to budgetary status accounts, the following adjustments are required to reconcile the budgetary status to non-budgetary Fund Balance with Treasury as reported in the accompanying Balance Sheets:

- Adjustments for Non-Budgetary Funds are receipt, clearing, and deposit funds that represent amounts on deposit with Treasury that have no budget status.
- Borrowing authority is in budgetary status but not in Fund Balance with Treasury.
- Budgetary resources have investments included; however, the money has been moved from the Fund Balance with Treasury asset account to Investments.
- Imprest funds represent monies moved from Fund Balance with Treasury to Cash and Other Monetary Assets with no change in the budgetary status.
- Adjustments for IMF– monies moved from Fund Balance with Treasury to Other Monetary Assets related to IMF accounts that are with the Federal Reserve Bank of New York. They also include the IMF Reserve Position based on SDRs.
- Adjustment for Unavailable for Obligations reduced the budgetary resources; however, did not impact the Fund Balance with Treasury.

As of September 30, 2009 and September 30, 2008, the status of fund balances consisted of the following (in millions):

| | 2009 | 2008 |
|---|---|---|
| Unobligated Balance – Available | $ 382,047 | $ 242,939 |
| Unobligated Balance – Unavailable | 33,841 | 11,395 |
| Obligated Balance not yet Disbursed | 158,324 | 56,868 |
| **Subtotal** | **$ 574,212** | **$ 311,202** |
| Adjustment for Non-Budgetary Funds | 241 | 669 |
| Adjustment for Borrowing Authority | (51,510) | (29,810) |
| Adjustment for Intra-Treasury Investments | (8,554) | (5,530) |
| Adjustment for Imprest Funds | (4) | (4) |
| Adjustment for IMF | (13,513) | (4,838) |
| Adjustments for Temporary Reduction | 30 | 0 |
| Authority Unavailable for Obligation | 3,680 | 3,679 |
| **Total Status of Fund Balance** | **$ 504,582** | **$ 275,368** |

For ESF, the above balances only include unobligated balances related to the ESF insurance program that began in fiscal year 2008, and expired on September 18, 2009. Otherwise, ESF does not have Fund Balance with Treasury. Accordingly, while other ESF balances are included on the Statement of Budgetary Resources (SBR), they are

not a component of Fund Balance with Treasury. The ESF balances displayed on the SBR include components of cash, foreign currency, and other monetary assets (Note 6).

As of September 30, 2009 and September 30, 2008, the Treasury Department did not have any budgetary authority in Fund Balance with Treasury that was specifically withheld from apportionment by OMB. The balances in non-entity funds, such as certain deposit funds (e.g., seized cash), are being held by the Treasury Department for the public or for another federal entity, such as the General Fund of the U.S. Government. Such funds have an offsetting liability equal to fund balance. See Note 14 regarding restrictions related to the line of credit held on the U.S. Quota in the International Monetary Fund.

## 3. LOANS AND INTEREST RECEIVABLE - INTRA-GOVERNMENTAL

As of September 30, 2009 and September 30, 2008, intra-governmental loans (issued by the Federal Financing Bank) and interest receivable consisted of the following (in millions):

***Entity Intra-governmental:***

| | Loans Receivable | Interest Receivable | 2009 Total | Loans Receivable | Interest Receivable | 2008 Total |
|---|---|---|---|---|---|---|
| Department of Agriculture | $ 28,438 | $ 52 | $ 28,490 | $ 26,326 | $ 50 | $ 26,376 |
| National Credit Union Administration | 18,384 | 22 | 18,406 | 1,109 | 0 | 1,109 |
| United States Postal Service | 10,200 | 37 | 10,237 | 7,200 | 1 | 7,201 |
| General Services Administration | 2,037 | 36 | 2,073 | 2,098 | 37 | 2,135 |
| Department of Energy | 908 | 0 | 908 | 0 | 0 | 0 |
| Department of Housing and Urban Development | 587 | 71 | 658 | 691 | 84 | 775 |
| Executive Office of the President | 546 | 6 | 552 | 680 | 8 | 688 |
| Department of Education | 453 | 2 | 455 | 338 | 3 | 341 |
| Department of Defense | 0 | 0 | 0 | 17 | 0 | 17 |
| Other Agencies | 12 | 0 | 12 | 18 | 0 | 18 |
| Subtotal-Entity | $ 61,565 | $ 226 | $ 61,791 | $ 38,477 | $ 183 | $ 38,660 |

The FFB issues the above loans to federal agencies for their own use or to private sector borrowers, whose loans are guaranteed by the federal agencies. When a federal agency has to honor its guarantee because a private sector borrower defaults, the federal agency that guaranteed the loan must obtain an appropriation or use other resources to repay the FFB. Loan principal and interest are backed by the full faith and credit of the U.S. Government, except for loans to the U.S. Postal Service. The FFB has not incurred and does not expect to incur any credit-related losses on its loans and accordingly, has not recorded an allowance for uncollectible intra-governmental loans.

***Non-Entity Intra-governmental:***

| | Loans Receivable | Interest Receivable | 2009 Total | Loans Receivable | Interest Receivable | 2008 Total |
|---|---|---|---|---|---|---|
| Department of Education | $ 234,918 | $ 12 | $ 234,930 | $ 128,331 | $ 0 | $ 128,331 |
| Department of Agriculture | 55,627 | 2 | 55,629 | 51,192 | 9 | 51,201 |
| Department of Homeland Security | 19,004 | 0 | 19,004 | 17,360 | 359 | 17,719 |
| Small Business Administration | 10,873 | 0 | 10,873 | 9,463 | 0 | 9,463 |
| Department of Labor | 6,371 | 0 | 6,371 | 0 | 0 | 0 |
| Other Agencies | 5,961 | 1 | 5,962 | 3,944 | 0 | 3,944 |
| Department of Housing and Urban Development | 4,425 | 0 | 4,425 | 4,832 | 0 | 4,832 |
| Export Import Bank of the U. S. | 3,805 | 0 | 3,805 | 2,929 | 0 | 2,929 |
| Railroad Retirement Board | 3,359 | 58 | 3,417 | 3,096 | 69 | 3,165 |
| Department of Energy | 2,131 | 18 | 2,149 | 2,186 | 20 | 2,206 |
| Department of Veterans Affairs | 1,545 | 0 | 1,545 | 1,575 | 0 | 1,575 |
| Department of the Interior | 316 | 328 | 644 | 323 | 393 | 716 |
| Federal Communications Commission | 46 | 0 | 46 | 113 | 0 | 113 |
| Subtotal Non-Entity | $ 348,381 | $ 419 | $ 348,800 | $ 225,344 | $ 850 | $ 226,194 |
| Total Intra-governmental Loans and Interest Receivable Entity and Non-Entity | | | $ 410,591 | | | $ 264,854 |

BPD accounts for and reports on the principal borrowings from and repayments to the General Fund of the United States for approximately 80 funds managed by other federal agencies, as well as the related interest due to the General Fund. These agencies are statutorily authorized to borrow from the General Fund, through BPD, to make loans for a broad range of purposes, such as education, housing, farming, and small business support.

## 4. DUE FROM THE GENERAL FUND AND DUE TO THE GENERAL FUND

The Treasury Department is responsible for managing various assets and liabilities on behalf of the U.S. Government as a whole. Due from the General Fund represents amounts required to fund liabilities managed by Treasury Department on behalf of the U.S. Government. Liabilities managed by the Treasury Department are comprised primarily of the federal debt. Due to the General Fund represents assets held for the General Fund of the U.S. Government.

As of September 30, 2009 and September 30, 2008, Due from and Due to the General Fund, included the following non-entity assets and liabilities (in millions):

| Liabilities Requiring Funding from the General Fund: | 2009 | 2008 |
|---|---|---|
| Federal Debt and Interest Payable | $ 7,559,305 | $ 5,812,694 |
| Federal Debt and Interest Payable - Intra-governmental | 4,403,080 | 4,262,414 |
| Refunds Payable | 4,040 | 3,076 |
| Adjustment for Eliminated Liabilities | 26,294 | 22,579 |
| **Total Due from the General Fund** | **$ 11,992,719** | **$ 10,100,763** |

| Assets to be Distributed to the General Fund: | 2009 | 2008 |
|---|---|---|
| Fund Balance | $202 | $215 |
| Advances to the Black Lung Trust Fund | 0 | 10,484 |
| Advances to the Unemployment Trust Fund | 7,981 | 0 |
| Cash Held by the Treasury Department | 269,311 | 364,594 |
| Foreign Currency | 26 | 31 |
| Custodial Gold and Silver held by the U.S. Mint without certificates | 25 | 25 |
| Loans and Interest Receivable - Intra-governmental | 348,800 | 226,194 |
| Loans and Interest Receivable | 127 | 130 |
| Investments in GSEs | 64,679 | 7,032 |
| Credit Reform Downward Subsidy Reestimate | 118,139 | 0 |
| Accounts Receivable - Intra-governmental | 285 | 372 |
| Tax and Other Non-Entity Receivables | 30,353 | 30,489 |
| Beneficial Interest in Trust | 23,472 | 0 |
| Miscellaneous Assets | 3 | 12 |
| Adjustment for Eliminated Assets | 399,725 | 27,534 |
| **Total Due to the General Fund** | **$ 1,263,128** | **$ 667,112** |

The Adjustment for Eliminated Intra-Treasury liabilities mainly represents investments in U.S. Government securities held by Treasury reporting entities that were eliminated against Federal Debt and Interest Payable. The Adjustment for Eliminated Intra-Treasury assets mainly represents loans and interest payable owed by Treasury reporting entities, which were eliminated against Loans and Interest Receivable held by the BPD.

The non-entity Credit Reform Downward Subsidy Reestimates represents amounts for the downward subsidy reestimates for the Treasury's discretionary GSE MBS Credit Program Receivables ($8,392 million) and TARP Direct Loan, Equity Investments and Asset Guarantees ($109,747 million). Downward subsidy reestimates indicates that too much subsidy will be or has been paid to the credit reform financing account. Because these

credit programs are discretionary, the downward reestimates are not available to Treasury and they are returned to the U.S. Government General Fund Receipt Account (GFRA) in the fiscal year following the accrual of the reestimates. Generally, during the year, these GFRAs contain prior year reestimates. At year-end, the prior year funds are "swept" by the General Fund. Since fiscal year 09 is the first year Treasury has reported reestimates there were no prior year balances in the GFRAs. Also at year-end, the Treasury accrues the current year's reestimates, including downward reestimates as applicable. For the downward reestimates, in the loan financing funds, the Treasury records an inter-governmental accrual adjustment that records a transfer out to the non-entity fund, a reduction of subsidy allowance or loan guarantee liability, and an account payable to the GFRA non-entity fund. In the loan program funds, the Treasury records a reduction of loan subsidy expense and the associated impact on the net cost. The non-entity GFRAs contain a corresponding inter-governmental account receivable in anticipation of the receipt of the downward reestimates in the following year and a Downward Reestimate Liability for Non-Entity Asset due to the general fund. For consolidated financial statement presentation, Treasury is required to eliminate the financing fund's inter-governmental payable due to the GFRA and the GFRA's inter-governmental receivable due from the financing funds; since both are included in Treasury reporting entity. The Downward Reestimate Liability for Non-Entity Asset Due to the General Fund is reflected on the Balance Sheet's intra-governmental liability Due to the General Fund line.

On the Balance Sheet, the Treasury Department reported $30,408 million in Tax, Other, and Related Interest Receivables as of September 30, 2009 ($30,878 million as of September 30, 2008). However, only $30,353 million is reported as Due to the General Fund of the U.S. Government ($30,489 million as of September 30, 2008). The difference is attributable to the exclusion of amounts which will be paid to others outside the U.S. Government, and miscellaneous entity receivables (see Notes 5 and 15).

## 5. ACCOUNTS RECEIVABLE AND RELATED INTEREST—INTRA-GOVERNMENTAL

Intra-governmental accounts receivable and interest mainly represents non-entity payments made by the Treasury Department under the *Contract Disputes Act* ($285 million of the $298 million and $368 million of the $396 million displayed on the balance sheet for 2009 and 2008, respectively). Other federal agencies are required to reimburse the Treasury Department for payments made on their behalf, related to the *Contract Disputes Act* and the No Fear Act. These amounts are a receivable on the Treasury Department's books, specifically the Financial Management Service, and a payable on the other federal agencies' books until reimbursement is made. The remaining amount displayed as intra-governmental accounts receivable and interest is related to miscellaneous intra-governmental transactions.

## 6. CASH, FOREIGN CURRENCY, AND OTHER MONETARY ASSETS

Cash, foreign currency, and other monetary assets held as of September 30, 2009 and September 30, 2008 were as follows (in millions):

| | 2009 | 2008 |
|---|---|---|
| Entity: | | |
| Cash | $ 23 | $ 19 |
| Foreign Currency and Foreign Currency Denominated Assets | 13,701 | 12,758 |
| Other Monetary Assets: | | |
| Special Drawing Rights | 57,961 | 9,464 |
| Other | 44 | 88 |
| **Subtotal - Entity** | **$ 71,729** | **$ 22,329** |
| Non-Entity: | | |
| Operating Cash of the U.S. Government | $ 269,052 | $ 364,273 |
| Foreign Currency | 26 | 31 |
| Miscellaneous Cash held by all Treasury sub-components | 501 | 637 |
| **Subtotal - Non-Entity** | **$ 269,579** | **$ 364,941** |
| **Total Cash, Foreign Currency, and Other Monetary Assets** | **$ 341,308** | **$ 387,270** |

Non-entity Operating Cash and Other Cash of the U.S. Government held by the Treasury Department disclosed above consisted of the following (in millions):

| | 2009 | 2008 |
|---|---|---|
| Operating Cash of the U.S. Government | $ 2,063 | $ 39,209 |
| Operating Cash - Federal Reserve Bank Account | 273,269 | 332,480 |
| **Subtotal** | **$ 275,332** | **$ 371,689** |
| Outstanding Checks | (6,280) | (7,416) |
| **Total Operating Cash of the U.S. Government** | **$ 269,052** | **$ 364,273** |
| Other Cash | 366 | 386 |
| **Subtotal** | **$ 269,418** | **$ 364,659** |
| Amounts Due to the Public | (107) | (65) |
| **Total Cash Due to the General Fund (See Note 4)** | **$ 269,311** | **$ 364,594** |

### Entity

Entity cash, foreign currency, and other monetary assets primarily include Foreign Currency Denominated Assets (FCDA), Special Drawing Rights (SDR), and forfeited cash. SDR and FCDA are valued as of September 30, 2009 and September 30, 2008, using current exchange rates plus accrued interest. "Other" includes U.S. dollars restricted for use by the International Monetary Fund (IMF), which are maintained in two accounts at the FRBNY.

The foreign currency holdings are normally invested in interest bearing securities issued by or held through foreign governments or monetary authorities. FCDA with original maturities of three months or less, were valued at $8.7 billion as of September 30, 2009 ($9.3 billion as of September 30, 2008). Other FCDAs having terms of less than or equal to a year but greater than three months are classified as available for sale. As of September 30, 2009,

FCDA with maturities greater than three months were valued at $2.4 billion ($3.5 billion as of September 30, 2008).

The SDR are international reserve assets created by the IMF. They were created as a supplement to existing reserve assets and on several occasions SDR have been allocated by the IMF to members participating in the IMF's SDR department. The SDR derives their value as reserve assets, essentially, from the commitments of participants to hold and accept SDR and to honor various obligations connected with their proper functioning as a reserve asset.

The *Special Drawing Rights Act of 1968* authorizes the Secretary of the Treasury Department to issue certificates, not to exceed the value of SDR holdings, to the Federal Reserve Banks in return for interest free dollar amounts equal to the face value of certificates issued. The certificates may be issued for the purpose of financing the acquisition of SDR from other countries or to provide resources for financing exchange stabilization activities. Certificates issued are to be redeemed by the Treasury Department at such times and in such amounts as the Secretary of the Treasury Department may determine. As of September 30, 2009, the value of the certificates issued to Federal Reserve Banks amounted to $5.2 billion ($2.2 billion as of September 30, 2008).

On a daily basis, the IMF calculates the value of the SDR using the market value, in terms of the U.S. dollar, from the amounts of each of four freely usable weighted currencies, as defined by the IMF. These currencies are the U.S. dollar, the European euro, the Japanese yen, and the British pound sterling. Treasury Department's SDR holdings (assets resulting from various SDR related activities including remuneration received on interest earned on the U.S. reserve position – see Note 14) and allocations from the IMF (liabilities of the U.S. coming due only in the event of a liquidation of, or U.S. withdrawal from the SDR department of the IMF, or cancellation of SDR) are revalued monthly based on the SDR valuation rate calculated by the IMF.

Pursuant to the IMF Articles of Agreement, SDR allocated to or otherwise acquired by the United States are permanent resources unless:

a. cancelled by the Board of Governors based on an 85 percent majority decision of the total voting power of the Executive Board of the IMF
b. the SDR Department of the IMF is liquidated
c. the IMF is liquidated or
d. the United States chooses to withdraw from the IMF or terminate its participation in the SDR Department.

Except for the payment of interest and charges on SDR allocations to the United States, the payment of the Treasury Department's commitment related to SDR allocations is conditional on events listed above, in which the United States has a substantial or controlling voice. Allocations of SDR were made in 1970, 1971, 1972, 1979, 1980, and 1981, and 2009. On August 28, 2009, the ESF received 27.5 billion SDRs (equivalent of $43 billion in U.S.) as the U.S. share of a general allocation from the IMF. On September 9, 2009, the ESF received 2.9 billion SDRs (equivalent of $4.5 billion in U.S.) as the U.S. share of a special allocation from the IMF. As of September 30, 2009, the amount of SDR holdings and related accruals of the United States was the equivalent of $ 57.9 billion, and the amount of SDR allocations to the United States was the equivalent of $ 55.9 billion. As of September 30, 2008, the amount of SDR holdings and related accruals of the United States was the equivalent of $ 9.4 billion and the amount of SDR allocations to the United States was the equivalent of $7.6 billion.

In fiscal year 2009, Treasury entered into a voluntary arrangement with the IMF for the purpose of providing additional hard currency liquidity to certain countries. The voluntary arrangement allows Treasury to purchase up to

approximately 16 billion SDRs. As of September 30, 2009 and September 30, 2008, the value of SDR allocations was the equivalent of $55.9 and $7.6 billion, respectively.

During fiscal year 2009, the Treasury Department received remuneration on the U.S. reserve position in the IMF, at the prevailing rates, in the amount of $39.6 million equivalent of SDR ($59 million equivalent of SDR during fiscal year 2008), and paid the General Fund of the Federal Government $0.0038 million ($0.01 million in fiscal year 2008) in interest on these funds until they were transferred to the General Fund.

Securities Purchased Under Agreement to Resell are issued in book entry form and denominated in Euro, and issued or guaranteed in full by Belgium, France, Germany, Italy, the Netherlands and Spain. Maturities of the Securities will not exceed 10.5 years. The duration of individual repo transactions will not exceed 90 days. These agreements are generally treated as collateralized financial transactions and are carried at amounts at which the securities were acquired. ESF has $2.6 billion securities which are pledged on behalf of their fiscal agent, Federal Reserve Bank of New York (FRBNY). The fair value of such securities is monitored throughout the contract term to insure that asset values remain sufficient to protect against counterparty default.

## Non-Entity

Non-entity cash, foreign currency, and other monetary assets include the Operating Cash of the U.S. Government, managed by the Treasury Department. Also included is foreign currency maintained by various U.S. and military disbursing offices. It also includes seized monetary instruments, undistributed cash, and offers in compromises which are maintained as the result of the Treasury Department's tax collecting responsibilities.

The Operating Cash of the U.S. Government represents balances from tax collections, other revenues, federal debt receipts, and other various receipts net of checks outstanding, which are held in the Federal Reserve Banks, foreign and domestic financial institutions, and in U.S. Treasury tax and loan accounts at commercial banks. Operating Cash of the U.S. Government is either insured (for balances up to $250,000), as of September 30, 2009, by the FDIC or collateralized by securities pledged by the depository institutions and held by the Federal Reserve Banks, or through securities held under reverse repurchase agreements.

The Supplementary Financing Program (SFP) is a temporary program announced on September 17, 2008, by Treasury and the Federal Reserve, to provide emergency cash for Federal Reserve initiatives aimed at addressing the ongoing crisis in financial markets. At the height of this program's activity, during the week of November 6, 2008, there were a total of 15 cash management bills outstanding that totaled $560 billion. As of September 30, 2009, there were a total of five SEP cash management bills outstanding that totaled $165 billion. The decrease is a result of outstanding SFP bills that have matured and have not been reinvested in the program. On September 16, 2009, Treasury announced its intention to reduce the balance to $15 billion in the short run to preserve flexibility in the conduct of debt management policy.

## 7. GOLD AND SILVER RESERVES, AND GOLD CERTIFICATES ISSUED TO THE FEDERAL RESERVE BANKS

The Treasury Department is responsible for safeguarding most of the U.S. Government's gold and silver reserves in accordance with 31 USC 5117. The Consolidated Balance Sheets also reflect the value of the gold being held in the FRBNY.

Gold reserves being held by the Treasury Department are offset by a liability for gold certificates issued by the Secretary of the Treasury Department to the Federal Reserve Banks as provided in 31 USC 5117. Since 1934, Gold Certificates have been issued in non-definitive or book-entry form to the Federal Reserve Banks. The Treasury Department's liability incurred by issuing the Gold Certificates is limited to the gold being held by the Treasury Department at the legal standard value established by law. Upon issuance of Gold Certificates to the Federal Reserve Banks, the proceeds from the certificates are deposited into the operating cash of the U.S. Government. All of the Treasury Department's certificates issued are payable to the Federal Reserve Banks.

The deep storage gold and silver reserves are reported at the values stated in 31 U. S. C. §§ 5116 – 5117 (statutory rates) which are $42.2222 per fine troy ounce (FTO) of gold and no less than $1.292929292 per FTO of silver. Accordingly, the silver is valued at $1.292929292 per FTO. The gold and silver reserves are in the custody of the U.S. Mint and FRBNY. The U.S. Mint holds gold and silver reserves without certificates (See Note 4). As of September 30, 2009 and September 30, 2008, the gold and silver reserves consisted of the following (in millions):

| | FTOs | Statutory Rate | 9/30/09 Statutory Value | Market Rate | 9/30/09 Market Value |
|---|---|---|---|---|---|
| Gold | 248,046,116 | $ 42.2222 | $ 10,473 | $ 995.75 | $ 246,992 |
| Gold Held by Federal Reserve Banks | 13,452,784 | $42.2222 | 568 | $ 995.75 | 13,396 |
| Subtotal - Gold | 261,498,900 | | $ 11,041 | | $ 260,388 |
| Silver | 16,000,000 | $ 1.292929292 | 21 | $ 16.45 | 263 |
| **Total Gold and Silver Reserves** | | | **$ 11,062** | | **$ 260,651** |

| | FTOs | Statutory Rate | 9/30/08 Statutory Value | Market Rate | 9/30/08 Market Value |
|---|---|---|---|---|---|
| Gold | 248,046,116 | $ 42.2222 | $ 10,473 | $ 884.50 | $ 219,397 |
| Gold Held by Federal Reserve Banks | 13,452,784 | 42.2222 | 568 | $ 884.50 | 11,899 |
| Subtotal - Gold | 261,498,900 | | $ 11,041 | | $ 231,296 |
| Silver | 16,000,000 | 1.292929292 | 21 | $ 12.96 | 207 |
| **Total Gold and Silver Reserves** | | | **$ 11,062** | | **$ 231,503** |

## 8. INVESTMENTS – CREDIT REFORM AND ASSET GUARANTEE

The F*ederal Credit Reform Act of 1990* (FCRA) and associated FASAB accounting standard SFFAS No. 2, as amended, governs direct loans and asset guarantees made after fiscal year 1991. FCRA loans are valued at the present value of expected future cash flows, discounted at the interest rate of marketable Treasury securities. The subsidy allowance account represents the difference between the outstanding loan receivables balance and the net present value of the estimated cash flows of the loans over their remaining term. The subsidy allowance is subtracted from the outstanding loans receivable balance to obtain the net loans receivable balance.

Under the provisions of the EESA, Treasury implemented the TARP which resulted in the development of several equity investment programs and transactions including: the Capital Purchase Program; the American International Group, Inc. Investment Program (formerly known as Systemically Significant Failing Institution Program); the Targeted Investment Program; the Automotive Industry Investment Program; the Public-Private Investment Program; and the Asset Guarantee Program.

Treasury applies the provisions of SFFAS No. 2 to account for equity investments (including asset guarantees). This standard requires measurement of the asset or liability at the present value of the estimated future cash-flows. The cash flow estimates for each equity investment transaction reflect the actual structure of the instruments. Analytical cash flow models generate estimated cash flows to and from Treasury over the estimated term of the facility. Further, each cash-flow model reflects the specific terms and conditions of the program, technical assumptions regarding the underlying assets, risk of default or other losses, and other factors as appropriate. The models also incorporate an adjustment for market risk to reflect the additional return required by the market to compensate for variability around the expected losses reflected in the cash flows (the "unexpected loss"). The basic methods for these models as well as a description of each equity investment program are outlined below.

### Equity Investments

Preferred stock cash flows are projected using an analytical model developed to incorporate the risk of losses associated with adverse events, such as failure of the institution or increases in market interest rates. The model estimates how cash flows vary depending on 1) current interest rates, which may affect the decision whether to repay the preferred stock; and 2) the strength of a financial institution's assets. Inputs to the model include institution specific accounting data obtained from regulatory filings; an institution's stock price volatility, historical bank failure information as well as market prices of comparable securities trading in the market. Treasury estimates the values and projects the cash flows of warrants using an option-pricing approach based on the current stock price and its volatility. Investments in common stock which are exchange traded is valued at the market price. The result of using market prices, either quoted prices for the identical asset or quoted prices for comparable assets, is that the equity investments are recorded at estimated fair value.

### Asset Guarantees

The value of the asset guarantee reflect the net present value of estimated default-claim payments by the Government, net of income from recoveries on defaults, fees, or other income. Guarantee fees to date have been paid in the form of preferred stock subsequently converted to trust preferred stocks and a warrant to purchase common stock of the financial institution, whose value is modeled using the same methodology for other equity purchase programs, discussed above. Default-claim payments are based on estimated losses on the guaranteed

assets. Key inputs into these estimates are forecasted gross domestic product, unemployment rates and home price depreciation, in a base scenario and a stress scenario.

### Subsidy Cost

The recorded subsidy cost of a direct loan, equity investment or asset guarantee is based on a set of estimated future cash flows. Government actions that change these estimated future cash flows change subsidy costs and are recorded as a modification. The cost of a modification is recognized as a modification expense, included in subsidy cost, when the direct loan, equity investment, or asset guarantee is modified. During fiscal year 2009, modifications occurred within the Capital Purchase Program, Consumer and Business Lending Initiative, the AIG Investment Program, and the Automotive Industry Financing Program. See detailed discussion related to each program and related modifications below. Total net modification costs for the period ended September 30, 2009 approximated $412.1 million.

## CAPITAL PURCHASE PROGRAM (CPP)

In October 2008, Treasury began implementation of the TARP with the Capital Purchase Program (CPP), designed to stabilize the financial system by assisting in building the capital base of certain viable U.S. financial institutions to increase the capacity of those institutions to lend to businesses and consumers and support the economy. Under this program, Treasury purchases senior perpetual preferred stock from qualifying U.S. controlled banks, savings associations, and certain bank and savings and loan holding companies (Qualified Financial Institution or QFI). The senior preferred stock has a stated dividend rate of 5.0 percent through year five, increasing to 9.0 percent in subsequent years. The dividends are cumulative for bank holding companies and subsidiaries of bank holding companies and non-cumulative for others and payable when and if declared by the institution's board of directors. Under the original terms of the senior preferred stock, the QFI may not redeem the shares within the first three years of the date of the investment, unless it has received the proceeds of one or more Qualified Equity Offerings (QEOs)[1] which results in aggregate gross proceeds to the QFI of not less than 25.0 percent of the issue price of the senior preferred shares. QFIs that are Sub-chapter S Corporations issued subordinated debt in order to maintain compliance with the Internal Revenue Code. The maturity of the subordinated debentures is 30 years and interest rates are 7.7 percent for the first 5 years and 13.8 percent for the remaining years.

In February 2009 and May 2009, the United States Congress passed the *American Recovery and Reinvestment Act of 2009* and the *Helping Families Save Their Homes Act of 2009*, respectively. These acts contained amendments to the EESA (EESA Amendments) which require the Secretary to allow QFIs to repay at any time, subject to regulatory approval, regardless of whether the 25.0 percent or greater QEO was accomplished. The ability of a QFI to repay the Treasury investment prior to year 3 or a 25.0 percent QEO was not considered in the original subsidy cost estimate. Therefore, a modification cost of $77.7 million was recorded as a result of these amendments.

In addition to the senior preferred shares, Treasury received warrants as required by section 113(d) of EESA from public QFIs to purchase a number of shares of common stock. The warrants have an aggregate market price equal to 15.0 percent of the total senior preferred share investment. The exercise price and market value used to determine the number of shares of common stock subject to the warrant was calculated based on the average of closing prices of the common stock on the 20 trading days ending on the last day prior to the date the QFIs application

1 A Qualified Equity Offering is defined as the sale by the QFI after the date of the senior preferred stock investment of Tier 1 perpetual preferred stock or common stock for cash.

was preliminarily approved for participation in the program. The warrants include customary anti-dilution provisions. In the event that a public QFI completes, prior to December 31, 2009, one or more QEOs with aggregate gross proceeds of not less than 100.0 percent (100.0 percent QEO) of the senior perpetual preferred stock investment, the number of shares subject to the warrants will be reduced by 50.0 percent. As of September 30, 2009, 19 QFIs reduced the number of shares available under the warrants as a result of this provision. The warrants have a 10 year term. The Treasury may exercise one half of the warrants prior to the earlier of a 100.0 percent QEO, or December 31, 2009. Subsequent to December 31, 2009, Treasury may exercise any warrants held in whole or in part. Treasury considers the impact of potential future QEOs in the valuation process.

The Treasury received warrants from non-public QFIs for the purchase of additional senior preferred stock (or subordinated debentures, if appropriate) with a stated dividend rate of 9.0 percent (13.8 percent interest rate for subordinate debentures) and a liquidation value equal to 5.0% of the total senior preferred share (additional subordinate debenture) investment. These warrants were immediately exercised and resulted in Treasury holding additional senior preferred stock (subordinated debentures) (collectively referred to as “warrant preferred stock”) of non-public QFIs. The Treasury did not receive warrants from banks considered Community Development Financial Institutions (CDFIs). As of September 30, 2009, Treasury has invested in 20 institutions considered CDFIs. The EESA Amendments previously discussed also allows the Secretary to liquidate warrants associated with repurchased senior preferred stock at the market price. In addition, a QFI, upon the repurchase of its senior preferred stock, also has the contractual right to repurchase the common stock warrants at the market price.

In June 2009, Treasury entered into an exchange agreement with Citigroup. Under the terms of the agreement, Treasury exchanged $25,000 million of its investment in senior preferred stock for a new series (Series M) of mandatorily convertible preferred stock. The initial conversion price was $3.25 per share. In July 2009, Treasury received the Series M shares, which were subsequently converted in September 2009 to approximately 7,700 million common shares of Citigroup. This exchange transaction was not considered in the original subsidy cost estimate for CPP. As a result, Treasury recorded a modification cost of approximately $1,866 million for the fiscal year ended 2009. The Treasury also has investments in Citigroup through the Targeted Investment Program (TIP) and Asset Guarantee Program (AGP).

During the period ending September 30, 2009, Treasury has invested approximately $204,619 million in 685 institutions, including small, community, regional, and national banks, as well as CDFIs, in 48 states, the District of Columbia, and Puerto Rico. Approximately $70,718 million of Treasury investments have been repurchased or redeemed bringing the total gross investment balance as of September 30, 2009 to approximately $133,901 million. In addition, during the period ending September 30, 2009, Treasury received under CPP approximately $6,800 million in dividends on senior preferred and warrant preferred stock and approximately $2,900 million in proceeds from the repurchase of warrants and warrant preferred shares. Thirty-eight QFIs have not declared and paid one or more dividends to Treasury under CPP as of September 30, 2009.

Further details on the outstanding senior preferred stock investments and subordinated debentures under CPP and the net investment amount including estimated cash flows associated with the sale or exercise of the warrants, as of September 30, 2009, are presented in the table at the end of this section.

## AMERICAN INTERNATIONAL GROUP, INC. (AIG)

Treasury provides assistance to certain systemically significant financial institutions on a case-by-case basis in order to provide stability to institutions that are critical to a functioning financial system and are at substantial risk of failure as well as to prevent broader disruption to financial markets.

In November 2008, Treasury invested $40,000 million in AIG's Cummulative Series D perpetual cumulative preferred stock with a dividend rate of 10.0 percent compounded quarterly. On April 17, 2009, AIG and Treasury restructured their November 2008 agreement. Under the restructuring, Treasury exchanged $40,000 million of cumulative Series D preferred stock for $41,603 million of non-cumulative 10.0 percent Series E preferred stock. The amount of Series E preferred stock is equal to the original $40,000 million, plus approximately $733.0 million in undeclared dividends as of the February 1, 2009 scheduled quarterly dividend payment date, $15.0 million in dividends compounded on the undeclared dividends, and an additional $855.0 million in dividends from February 1, 2009, but not paid as of April 17, 2009. AIG's restructured agreement kept the quarterly dividend payment dates of May 1, August 1, November 1, and February 1, as established by the original November 2008 agreement. The original subsidy cost estimate did not consider this restructuring which resulted in a modification cost of $127.2 million.

In addition to the exchange, Treasury agreed to make available an additional $29,800 million capital facility to allow AIG to draw additional funds if needed to assist in AIG's restructuring. Treasury investment consists of Series F non-cumulative perpetual preferred stock with an initial liquidation amount of $0.0. This liquidation amount increases with any drawdown by AIG on the facility. The dividend rate applicable to these stock is 10.0 percent and is payable quarterly, if declared, on the outstanding liquidation amount. As of September 30, 2009, approximately $3,200 million has been funded by Treasury to AIG under this additional capital facility. Consistent with SFFAS No. 2, the unused portion of the AIG capital facility is not recognized as an asset as of September 30, 2009.

As of September 30, 2009, AIG has not made any dividend payments on any of the perpetual preferred stock. Subsequently, AIG failed to make a dividend payment on November 2, 2009. Per the terms of the preferred stock, if AIG misses 4 dividend payments, Treasury may appoint to the AIG board of directors the greater of two members or 20.0 percent of the total number of directors of the Company.

## TARGETED INVESTMENT PROGRAM (TIP)

The Targeted Investment Program (TIP) was designed to prevent a loss of confidence in financial institutions that could result in significant market disruptions, threatening the financial strength of similarly situated financial institutions, impairing broader financial markets, and undermining the overall economy. Treasury considers institutions as candidates for the TIP on a case-by-case basis, based on a number of factors described in the program guidelines. These factors include the threats posed by destabilization of the institution, the risks caused by a loss of confidence in the institution, and the institution's importance to the nation's economy.

Treasury completed the first transaction under the TIP in December 2008, when it invested $20,000 million in Citigroup cumulative perpetual preferred stock and received a warrant for the purchase of Citigroup common stock. Under the agreement with Citigroup, Treasury receives an 8.0 percent annual dividend, payable quarterly, if and when declared by Citigroups' Board of Directors. As part of this agreement, Citigroup must implement rigorous compensation standards and other restrictions on corporate expenditures. In June 2009, Treasury and

Citigroup agreed to an exchange of the cumulative perpetual preferred stock issued under the TIP for a new series of trust preferred securities. Citigroup issued subordinated debentures to a trust established by Citigroup, and the trust issued trust preferred securities to Treasury. Interest and principal payments on the subordinated debentures are passed-through to the trust preferred security holders. The trust preferred securities pay a quarterly distribution at an annual rate of 8.0 percent to Treasury. The subordinated debentures contains an interest deferral provision allowing Citigroup to defer payment of interest for up to 5 years. Treasury will not receive distributions from the trust preferred securities during a deferral period. Deferred interest is required to be paid upon termination of the deferral period. The subordinated debentures will mature in 2039. As a result, the trust is scheduled to pay out the proceeds to the holders of the trust preferred securities. In addition, the subordinate debentures can be prepaid by Citigroup at any time prior to maturity, subject to consultation with the Federal Reserve, as long as the U.S. Government holds the trust preferred securities. The terms of the new securities are substantially the same as the preferred share originally received by Treasury and therefore the exchange transaction did not result in a modification. Treasury has investments in Citigroup through the CPP and the Asset Guarantee Program (AGP).

In January 2009, Treasury completed its second transaction under the TIP, investing $20,000 million in Bank of America. Under the agreement with Bank of America, Treasury purchased $20,000 million of cumulative perpetual preferred stock and received a warrant for the purchase of Bank of America common stock. The preferred stock purchased from Bank of America contains a stated annual dividend rate of 8.0 percent, payable quarterly, if declared. Bank of America's agreement under the TIP stipulates that the institution must implement rigorous executive compensation standards and other restrictions on corporate expenditures. Treasury also has investments in Bank of America through the CPP. (See Note 33.)

During the period ending September 30, 2009, Treasury received approximately $1,900 million in dividends under the TIP.

## AUTOMOTIVE INDUSTRY FINANCING PROGRAMS (AIFP)

The objective of the Automotive Industry Financing Program was to prevent a significant disruption of the American automotive industry, which could have a negative effect on the economy of the United States. The discussion below details the various investments made by the Treasury in the automotive industry.[2]

### GMAC Preferred Stock

In December 2008, the Treasury purchased preferred membership interest for $5,000 million which were converted to senior preferred stock with an 8.0 percent annual distribution right (dividends) from GMAC. Under the agreement, GMAC issued warrants to Treasury to purchase, for a nominal price, additional preferred equity in an amount equal to 5.0 percent of the preferred equity purchased. These warrants were exercised at closing of the investment transaction. The additional preferred stock provided for a 9.0 percent annual distribution right. The purpose of this investment was to enable GMAC to restore liquidity to its finance businesses and restore stability to the domestic automobile industry in the United States. As of September 30, 2009, Treasury has received $265.2 million in dividends associated with these preferred and warrant preferred stock.

2 Included in the TARP Direct Loans net, are equity interests acquired during the restructuring of GM and Chrysler. These equity amounts are included with the original loans portfolio in Note 12.

### GMAC Mandatorily Convertible Preferred Stock

In May 2009, the Treasury published a non-binding term sheet to invest $13,140 million to support GMAC, subject to definitive documentation and GMAC's capital needs. The Treasury has invested $7,500 million (of the $13,140 million) in 9.0 percent Mandatorily Convertible Preferred Stock in GMAC to support its ability to originate new loans to Chrysler dealers and consumers, and help address GMAC's capital needs. The preferred stock have a liquidation amount of $50 per share and are convertible, in whole or in part, at any time, at the option of GMAC, subject to the approval of the Federal Reserve. Furthermore, GMAC shall not convert any of the stock to the extent such conversion would result in the Treasury owning in excess of 49 percent of GMAC's common equity except (1) with the prior written consent of the Treasury, (2) pursuant to GMAC's Capital Plan, or (3) pursuant to an order of the Federal Reserve compelling such a conversion. The determination of the percentage of common equity owned by the Treasury would take into account the common stock currently owned by the Treasury as a result of the conversion of the GMAC Rights Offering, previously discussed. Absent a previous conversion, the preferred stock will automatically convert after 7 years. The conversion rate is .00432 units of common stock per unit of convertible preferred stock. The remaining $5,600 million (per the non-binding term sheet) is subject to FRB's review of GMAC's capital plan assessment of whether additional capital is needed. As of September 30, 2009, the remaining $5,600 million has not been funded. The Treasury has received approximately $165.4 million in dividends associated with these preferred and warrant preferred stock.

## PUBLIC-PRIVATE INVESTMENT PARTNERSHIP (PPIP) EQUITY

The Public-Private Investment Program is part of Treasury's efforts to help restart the markets and provide liquidity for legacy assets. Under this program Treasury will make equity and debt investments in investment vehicles (referred to as Public Private Investment Funds or "PPIFs") established by private investment managers. The equity investment will be used to match private capital and will equal not more than 50.0 percent of the total equity invested. The debt investment will be, at the option of the investment manager, equal to 50.0 percent or 100.0 percent of the total equity (including private equity). The PPIFs are only allowed to purchase commercial mortgage-backed securities and non-agency residential mortgage-backed securities issued prior to January 1, 2009 that were originally rated AAA or an equivalent rating by two or more nationally recognized statistical rating organizations without external credit enhancement and that are secured directly by the actual mortgage loans, leases or other assets and not other securities. The PPIFs are also permitted to invest in certain temporary securities, including bank deposits, U.S. Treasury Securities, and certain money market mutual funds. At least 90 percent of the assets underlying any eligible asset must be situated in the United States. On September 30, 2009, Treasury signed definitive agreements with two investment managers, committing to potentially disburse up to $6,700 million. As of September 30, 2009, no private fund managers had made any investments and Treasury had not disbursed any funds.

## ASSET GUARANTEE PROGRAM (AGP)

The AGP provides guarantees for assets held by systemically significant financial institutions that face a risk of losing market confidence due in large part to a portfolio of distressed or illiquid assets. The AGP is applied with extreme discretion in order to improve market confidence in the systemically significant institution and in financial markets broadly.

Section 102 of the EESA established the AGP to guarantee troubled assets originated or issued prior to March 14, 2008, including mortgage-backed securities, and established the Troubled Assets Insurance Financing Fund

(TAIFF). In accordance with Section 102(c) and (d) of the EESA, premiums from financial institutions, are collected and all fees are recorded by Treasury in the TAIFF. In addition, Section 102(c)(3) of the EESA requires that the original premiums assessed are "set" at a minimum level necessary to create reserves sufficient to meet anticipated claims. In the event there are insufficient funds within the TAIFF for the payment of claims, amounts are borrowed from the U.S. Treasury until sufficient funds are received into the TAIFF. In the event that the estimate of claims exceeds the estimated future cash inflows, an upward reestimate would be recorded and amounts would be transferred to the TAIFF as a subsidy expense.

Treasury completed its first transaction under the AGP in January 2009, when it finalized the terms of a guarantee agreement with Citigroup. Under the agreement, Treasury, the Federal Reserve Bank (FRB), the Federal Deposit Insurance Corporation (FDIC), and the Federal Reserve Bank of New York (FRBNY) provided protection against the possibility of large losses on an asset pool of approximately $301,000 million of loans and securities backed by residential and commercial real estate and other such assets, which remain on Citigroup's balance sheet. The following loss-sharing terms apply to the transaction: Citigroup absorbs the first $39,500 million in losses, and losses over the $39,500 million are shared by the U. S. government (90.0 percent) and Citigroup (10.0 percent) (the "second loss"). For the second loss, Treasury absorbs up to $5,000 million, then the FDIC absorbs up to $10,000 million, and lastly the FRBNY funds any U.S. government losses above Treasury and the FDIC commitments through a non-recourse loan. The guarantee is in place for ten years for residential assets and five years for non-residential assets.

As a premium for the guarantee, Citigroup issued $7,034 million of cumulative perpetual preferred stock with an 8.0 percent stated dividend rate and a warrant for the purchase of common stock; $4,034 million was issued to Treasury and approximately $3,000 million was issued to the FDIC. Treasury received the warrant. As part of the agreement, Citigroup submitted an executive compensation plan to Treasury and the FDIC for approval and must comply with certain common stock dividend restrictions. Treasury has received approximately $174.8 million in dividends on the preferred stock received as compensation for this arrangement. These dividends have been deposited into the TAIFF. The preferred stock originally issued to Treasury and the FDIC were exchanged for the trust preferred securities discussed above under the TIP. Treasury has also invested in Citigroup through the CPP and the TIP.

The net present value of the estimated cash inflows from the preferred stock and warrant received by Treasury from Citigroup as a premium is greater than the estimated net present value of future claim payments, resulting in an asset of approximately $1,765 million, after reestimates, as of September 30, 2009.

In January 2009, Treasury, FDIC, FRBNY (together the USG Parties), and Bank of America signed a Summary of Terms (Term Sheet) pursuant to which the USG Parties agreed to guarantee or lend against a pool of up to $118,000 million of financial instruments consisting of securities backed by residential and commercial real estate loans and corporate debt and related derivatives. In May 2009, prior to completing definitive documentation, Bank of America notified the USG Parties of its desire to terminate negotiations with respect to the guarantee contemplated in the Term Sheet. All parties agreed that Bank of America received value for entering into the Term Sheet with the USG Parties and that the USG Parties should be compensated for out-of-pocket expenses and a fee equal to the amount Bank of America would have paid for the guarantee from the date of the signing of the Term Sheet through the termination date. Under the terms of the settlement, the U.S. Treasury received $276.0 million for its role in the guarantee agreement through Treasury, the FRBNY received $57.0 million, and the FDIC received $92.0 million. All Treasury funds received for the settlement were deposited in the TAIFF

and subsequently paid to the U.S. Treasury General Fund. The $276 million received by Treasury pursuant to the settlement is reflected in the Statement of Net Cost as a reduction of subsidy cost.

The tables below provide an analysis of the TARP equity investments including allowance for subsidy costs, modifications, reestimates, and administrative costs. The TARP programs were created in fiscal year 2009 and thus there are no fiscal year 2008 comparative balances to disclose.

## Troubled Asset Relief Programs - Equity Investments, Net (in millions)

| Programs | Equity Investments, Gross | Interest Receivable | Foreclosed Property | Allowance for Subsidy Cost and Loan Guarantee Liability —Present Value | 2009 Value of Assets Related to Equity Investments |
|---|---|---|---|---|---|
| CPP | $ 133,901 | $ 0 | $ 0 | $ 7,770 | $ 141,671 |
| AIG | 43,206 | 0 | 0 | (30,054) | 13,152 |
| TIP | 40,000 | 0 | 0 | 341 | 40,341 |
| AIFP | 12,500 | 0 | 0 | (4,523) | 7,977 |
| **Total** | **$ 229,607** | **$ 0** | **$ 0** | **$ (26,466)** | **$ 203,141** |

***Total Amount of Disbursements, Equity Investments (in millions):***

| Programs | 2009 |
|---|---|
| CPP | $ 204,618 |
| AIG | 43,206 |
| TIP | 40,000 |
| AIFP | 12,500 |
| **Total** | **$ 300,324** |

### *Subsidy Expense, Equity Investments (in millions):*

| Programs | Interest Differential | Defaults | Fees and Other Collections | Other | 2009 Total |
|---|---|---|---|---|---|
| CPP | $ 12,279 | $ 52,655 | $ $0 | $ (9,414) | $ 55,520 |
| AIG | (17,280) | 46,906 | 0 | 1,799 | 31,425 |
| TIP | 3,724 | 19,352 | 0 | (3,536) | 19,540 |
| AIFP | 5,319 | 3,694 | 0 | (2,196) | 6,817 |
| **Total** | **$ $4,042** | **$ 122,607** | **$ 0** | **$ (13,347)** | **$ 113,302** |

### *Modifications and Reestimates, Equity Investments (in millions):*

| Programs | Total Modifications | Interest Rate Reestimates | Technical Reestimates | Total Reestimates |
|---|---|---|---|---|
| CPP | $ 1,866 | $ 0 | $ (72,419) | $ (72,419) |
| AIG | 127 | 0 | (1,125) | (1,125) |
| TIP | 0 | 0 | (21,467) | (21,467) |
| AIFP | 0 | 0 | (2,710) | (2,710) |
| **Total** | **$ 1,993** | **$ 0** | **$ (97,721)** | **$ (97,721)** |

### *Total Subsidy Expense, Equity Investments, (in millions):*

| Programs | 2009 |
|---|---|
| CPP | $ (15,033) |
| AIG | 30,427 |
| TIP | (1,927) |
| AIFP | 4,107 |
| **Total** | **$ 17,574** |

### *Subsidy Rates by Program and Component, Equity Investments*:*

| Programs | Interest Differential | Defaults | Fees and Other Collections | Other | 2009 Total |
|---|---|---|---|---|---|
| CPP | 5.97% | 25.60% | 0.00% | -4.58% | 26.99% |
| AIG | -45.52% | 123.56% | 0.00% | 4.74% | 82.78% |
| TIP | 9.31% | 48.38% | 0.00% | -8.84% | 48.85% |
| AIFP | 42.55% | 29.55% | 0.00% | -17.57% | 54.53% |

(*) The rates reflected in the "Subsidy Rate" table above are weighted rates for the program. To compensate for the weighting of the various risk category subsidy rates, the "by component" dollar amounts reflected were computed as a ratio of the component rate to the total weighted subsidy rate multiplied by the subsidy expense for the program.

### *Schedule for Reconciling Subsidy Cost Allowance Balances (in millions):*

| Fiscal Year 2009 | CPP | AIG | TIP | AIFP | Totals |
|---|---|---|---|---|---|
| Beginning Balance of the subsidy cost allowance | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Add: subsidy expense for disbursements | | | | | |
| (a) Interest rate differential cost | 12,279 | (17,280) | 3,724 | 5,319 | 4,042 |
| (b) Default costs (net of recoveries) | 52,655 | 46,906 | 19,352 | 3,694 | 122,607 |
| (c) Fees and other collections | 0 | 0 | 0 | 0 | 0 |
| (d) Other subsidy costs | (9,414) | 1,799 | (3,536) | (2,196) | (13,347) |
| Total of the above subsidy expense components | $ 55,520 | $ 31,425 | $ 19,540 | $ 6,817 | $ 113,302 |
| Adjustments: | | | | | |
| (a) Loan modifications | 1,866 | 127 | 0 | 0 | 1,993 |
| (b) Fees received | 9,691 | 0 | 1,862 | 431 | 11,984 |
| (c) Foreclosed property acquired | 0 | 0 | 0 | 0 | 0 |
| (d) Loans written off | 0 | 0 | 0 | 0 | 0 |
| (e) Subsidy allowance amortized | (2,428) | (373) | (276) | (15) | (3,092) |
| (f) Other | 0 | 0 | 0 | 0 | 0 |
| | 0 | | | | |
| Ending Balance subsidy cost allowance before reestimates | $ 64,649 | $ 31,179 | $ 21,126 | $ 7,233 | $ 124,187 |
| Add or subtract subsidy reestimates by component: | | | | | |
| (a) Interest rate reestimate | 0 | 0 | 0 | 0 | 0 |
| (b) Technical default reestimate | (72,419) | (1,125) | (21,467) | (2,710) | (97,721) |
| Total of the above reestimate components | (72,419) | (1,125) | (21,467) | (2,710) | (97,721) |
| **Ending Balance of the subsidy cost allowance** | **$ (7,770)** | **$ 30,054** | **$ (341)** | **$ 4,523** | **$ 26,466** |

### *Administrative Expense of TARP programs (in millions):*

| Programs | 2009 |
|---|---|
| Troubled Asset Relief Programs | $ 167 |
| Total | $ 167 |

## Troubled Asset Relief Programs – Asset Guarantee Program (AGP)

As of September 30, 2009, Asset Guarantees consisted of the following (in millions):

### *Asset Guarantees Outstanding (in millions):*

| Programs | Outstanding Principal of Guaranteed Assets | 2009 Amount of Outstanding Principal Guaranteed |
|---|---|---|
| AGP | $301,000 | $5,000 |

### *Asset for Asset Guarantee (in millions):*

| Programs | 2009 Asset for Asset Guarantee Present Value |
|---|---|
| AGP | *$1,765 |

(*)The net present value of the preferred stock received by Treasury from the TAIFF as a premium ($4,034 million) is greater than the liability ($2,269), resulting in a net asset of $1,765 million included as a line item on the face of the balance sheet, after reestimates, as of September 30, 2009.

### *Subsidy Expense, Guarantee (in millions):*

| Programs | Interest Differential | Defaults | Fees and Other Collections | Other | 2009 Total |
|---|---|---|---|---|---|
| AGP | $ 0 | $ 2,181 | $ (2,662) | $ (270) | $ (751) |

### *Modifications and Reestimates (in millions):*

| Programs | Total Modifications | Interest Rate Reestimates | Technical Reestimates | 2009 Total Reestimates |
|---|---|---|---|---|
| AGP | $ 0 | $ 0 | $ (1,174) | $ (1,174) |

### *Total Guarantee Subsidy Expense (in millions):*

| Programs | 2009 |
|---|---|
| AGP | $(1,925) |

### *Subsidy Rates for Guarantee by Program and Component:*

| Programs | Interest Differential | Defaults | Fees and Other Collections | Other | 2009 Total |
|---|---|---|---|---|---|
| AGP | 0.00% | 43.62% | -53.23% | -5.37% | -14.98% |

*Schedule for Reconciling Asset Guatrantee Program Balances (in millions)*

| BEGINNING BALANCES, CHANGES, AND ENDING BALANCE | 2009 |
|---|---|
| Beginning Balance of the Asset Guarantee liability | $ 0 |
| Add: subsidy expense for disbursements | |
| (a) Interest rate supplement costs | 0 |
| (b) Default costs (net of recoveries) | 2,181 |
| (c )Fees and other collections | (2,662) |
| (d) Other subsidy costs | (270) |
| Total of the above subsidy expense components | (751) |
| Adjustments: | |
| (a) Loan guarantee modifications | 0 |
| (b) Fees received | 175 |
| (c ) Interest supplements paid | (15) |
| (d ) Foreclosed property acquired | 0 |
| (e) Claim payments to lenders | 0 |
| (f) Interest accumulation on the liability balance | 0 |
| (g) Other | 0 |
| Ending Balance of loan guarantee liability before reestimates | (591) |
| Add or subtract subsidy reestimates by component: | |
| (a) Interest rate reestimate | 0 |
| (b) Technical default reestimate | (1,174) |
| Total of the above reestimate components | (1,174) |
| Ending Balance of Asset for Asset Guarantee | $ (1,765) |

## 9. INVESTMENTS IN GOVERNMENT SPONSORED ENTERPRISES

The *Housing and Economic Recovery Act* (HERA), P.L. 110–289, dated July 30, 2008, authorized Treasury to enter into several different types of financing arrangements with Government Sponsored Enterprises (GSEs) to:

- provide stability to the financial markets;
- prevent disruptions in the availability of mortgage finance; and
- protect the taxpayer

As authorized by HERA, the Secretary of the Treasury entered into a Senior Preferred Stock Purchase Agreements (SPSPA) with Fannie Mae and Freddie Mac on September 7, 2008 and began providing substantial financial support to the enterprises; thereby minimizing potential systemic financial risks associated with the deteriorating financial condition of Fannie Mae and Freddie Mac. Per SFFAC No. 2, *Entity and Display*, these entities meet the criteria of "bailed out" entities under paragraph 50. Accordingly, Treasury has not consolidated them into the financial statements, but include "disclosure of the relationship(s) with the bailed out entities and any actual or potential material costs or liabilities" in the consolidated financial statements.

Under the SPSPA, Treasury initially received from each GSE: (1) 1,000,000 shares of non-voting variable liquidation preference senior preferred stock with a liquidation preference value of $1,000 per share and (2) a non-transferrable warrant for the purchase, at a nominal cost, of 79.9 percent of common stock on a fully-diluted basis. The warrants expire on September 7, 2028. The senior preferred stock accrues dividends at 10 percent per year, payable quarterly. This rate will increase to 12 percent if, in any quarter, the dividends are not paid in cash, until all accrued dividends have been paid. As of September 30, 2009, dividends of $4,336 million have been received. In addition, beginning on March 31, 2010, the GSEs will pay Treasury a periodic commitment fee on a quarterly basis. This fee will be initially set by December 31, 2009, based on mutual agreement between Treasury and each GSE, in consultation with the Chairman of the Federal Reserve Board. The fee will be established for five-year periods, and may be waived by Treasury for one year at a time if warranted by adverse mortgage market conditions. It may be paid in cash or may be added to the liquidation preference.

These agreements, which have no expiration date, provide that Treasury will increase its investment in the senior preferred stock if at the end of any quarter the Federal Housing Finance Agency (FHFA) determines that the liabilities of either GSE exceed its assets. The maximum amount available to each GSE under this agreement is $200,000 million. Actual payments to the GSEs to date are $95,600 million, of which $15,000 million has been accrued as a liability for the quarter ended September 30, 2009 ($13,800 million at September 30, 2008). As of September 30, 2009, $140,100 million and $149,300 million remain available to Fannie Mae and Freddie Mac, respectively, after quarterly payments made or accrued.

The Treasury Department determined the estimated amount of the remaining liability to the GSEs under the SPSPA as of September 30, 2009. The valuation analysis resulted in estimates ranging from the "best case" scenario of $76,937 million to an "extreme case" scenario of $206,700 million. The results also noted that no value within the range is a better estimate than any other amount. However, future payments under the SPSPA are deemed to be probable. SFFAS 5 provides that when a probable contingent liability is a range of amounts and no amount within the range is a better estimate than any other amount, the estimated liability should be based on the minimum value in the range. Accordingly, $76,937 million is recorded as a contingent liability as of September 30, 2009.

As described below, the SPSPA payments are treated as entity expenses and liabilities, while the increases in liquidity preference of the GSE preferred stock resulting from actual liquidity payments are non-entity transactions. Accordingly, the contingent liability recorded is the gross estimated amount, without considering the increase in preferred stock liquidity preference, future dividend payments, or future commitment fees.

As funds for these payments are appropriated directly to the Treasury Department, these payments are treated as entity expenses and reflected as such on the Statement of Net Cost (SNC) and Cumulative Results of Operations. In fiscal year 2008, these costs were reported on the SNC, as a below the line entity cost, separate from the four Treasury strategic goals. In fiscal year 2009, Treasury concluded that the cost of this program helps accomplish the Treasury strategic goal of ensuring that the U.S. economy performs at its full economic potential. Thus, as of September 30, 2009, the entity cost of these Investments in GSEs are included in the Economic Program section of the SNC. These payments also results in an increase to the non-entity investment in GSE preferred stock, with a corresponding increase in Due to the General Fund, as the Treasury Department holds the investment on behalf of the U.S. Government General Fund. Such investments are subject to impairment testing as noted below.

The Investments in GSEs disclosed as of September 30, 2008 were recorded at acquisition cost at the date of purchase with disclosure of market values as of fiscal year end 2008. OMB issued guidance to Treasury on October 7, 2009 allowing the use of fair value accounting for non-federal securities beginning with reporting for fiscal year 2009. As a result, the GSE investments are reported at fair value at September 30, 2009. The preferred stock and warrants for common stock were valued as of September 30, 2009. In accordance with SFFAS 7, the annual valuation is classified as usual and recurring and thus recorded as an expense or revenue to the financial statements. In addition, since Treasury holds the investment on behalf of the U.S. Government General Fund, any valuation impairment is recorded as a non-entity cost/revenue and reported on the SNC below the line. As of September 30, 2009 and September 30, 2008, GSE investments consisted of the following (in millions):

| GSE Investment | Value at Begin of Year | Current Year Investments | Net Investments | Valuation Gain/(Loss) | 9/30/09 Fair Value at Reporting Date |
|---|---|---|---|---|---|
| Fannie Mae Sr. Preferred Stock | $ 840 | $ 44,900 | $ 45,740 | $ (20,658) | $ 25,082 |
| Freddie Mac Sr. Preferred Stock | 824 | 50,700 | 51,524 | (23,273) | 28,251 |
| Fannie Mae Warrants Common Stock | 3,104 | 0 | 3,104 | 3,603 | 6,707 |
| Freddie Mac Warrants Common Stock | 2,264 | 0 | 2,264 | 2,375 | 4,639 |
| **Total GSE Investment** | **$ 7,032** | **$ 95,600** | **$ 102,632** | **$ (37,953)** | **$ 64,679** |

| GSE Investment | Cost at Purchase Date | 9/30/08 Investment Balance | Valuation Gain/(Loss) | 9/30/08 Fair Value at Reporting Date |
|---|---|---|---|---|
| Fannie Mae Sr. Preferred Stock | $ 840 | $ 840 | $ (99) | $ 741 |
| Freddie Mac Sr. Preferred Stock | 824 | 824 | (97) | 727 |
| Fannie Mae Warrants Common Stock | 3,104 | 3,104 | 3,403 | 6,507 |
| Freddie Mac Warrants Common Stock | 2,264 | 2,264 | 2,135 | 4,399 |
| **Total GSE Investment** | **$ 7,032** | **$ 7,032** | **$ 5,342** | **$ 12,374** |

PART 2 • ANNUAL FINANCIAL REPORT

### *Summary of GSE Non-Entity Costs*

| | 2009 | 2008 |
|---|---|---|
| General Fund Revenue from Increase in Liquidity Preference of GSE Preferred Stock | $ (95,600) | $ – |
| Net Valuation Loss on GSE Warrants/Pfd Stock | 37,953 | – |
| GSE Pfd Stock Dividends | (4,336) | – |
| Pfd Stock Commitment Fee | – | $ (7,032) |
| | **$ (61,983)** | **$ (7,032)** |

NOTE 9. INVESTMENTS IN GOVERNMENT SPONSORED ENTERPRISES (GSES)

137

FHFA 0988

## 10. INVESTMENTS IN INTERNATIONAL FINANCIAL INSTITUTIONS

The Treasury Department participates in Multilateral Development Banks (MDB) to support poverty reduction, private sector development, and transition to market economies and sustainable economic growth and development, thereby advancing the United States' economic, political, and commercial interests abroad. The MDB consist of the World Bank Group (International Bank for Reconstruction and Development, International Finance Corporation, and Multilateral Investment Guarantee Agency), and five regional development banks (the African, Asian, European, Inter-American, and North American institutions), as enumerated in the table below. These investments are non-marketable equity investments valued at cost.

As of September 30, 2009 and September 30, 2008, investments in international financial institutions consisted of the following (in millions):

| | 2009 | 2008 |
|---|---|---|
| African Development Bank | $ 175 | $ 172 |
| Asian Development Bank | 458 | 458 |
| European Bank for Reconstruction and Development | 636 | 633 |
| Inter-American Development Bank | 1,482 | 1,482 |
| International Bank for Reconstruction and Development | 1,985 | 1,985 |
| International Finance Corporation | 569 | 569 |
| Multilateral Investment Guarantee Agency | 45 | 45 |
| North American Development Bank | 225 | 202 |
| **Total** | **$ 5,575** | **$ 5,546** |

Refer to Note 31 for a description of the additional commitments related to these institutions.

## 11. OTHER INVESTMENTS AND RELATED INTEREST

Investments in U.S. Government securities held by Treasury Department entities have been eliminated against the federal debt liability for financial reporting purposes (See Note 4). The ESF holds most of the Treasury Department's Other Investments, including Foreign Investments. Foreign investment holdings are normally invested in interest bearing securities issued or held through foreign governments or monetary authorities (see Note 6). During fiscal year 2009, ESF transferred other FCDA and Investment Securities to the available-for-sale classification, and reported at fair value. The Other Investments represent securities that the Treasury Department has both the positive intent and ability to hold to maturity and are carried at historical cost, adjusted for amortization of premiums and accretion of discounts.

As of September 30, 2009 and September 30, 2008, entity investments in foreign investment holdings and other investments consisted of the following (in millions):

| Type of Investment | Cost/ Acquisition Value | Unamortized (Premium)/ Discount | Interest Receivable | 9/30/09 Investment Balance | Unrealized Gain/ (Loss) | 9/30/09 Fair Value |
|---|---|---|---|---|---|---|
| Foreign Investments: | | | | | | |
| Euro Bonds & Notes | $ 4,827 | $ 52 | $ 116 | $ 4,995 | $ 184 | $ 5,179 |
| Japanese Government Bonds | 7,192 | 9 | 12 | 7,213 | 43 | 7,256 |
| Other Investments | 1,137 | (7) | 0 | 1,130 | 0 | 1,130 |
| Total Non-Federal | $ 13,156 | $ 54 | $ 128 | $ 13,338 | $ 227 | $ 13,565 |

| Type of Investment | Cost/ Acquisition Value | Unamortized (Premium)/ Discount | Net Investment | Interest Receivable | 9/30/08 Investment Balance | Unrealized Gain/ (Loss) | 9/30/08 Market Value |
|---|---|---|---|---|---|---|---|
| Foreign Investments: | | | | | | | |
| Euro Bonds & Notes | $ 4,477 | $ 29 | $ 4,506 | $ 115 | $ 4,621 | $ 20 | $ 4,641 |
| Japanese Government Bonds | 5,908 | 3 | 5,911 | 11 | 5,922 | 13 | 5,935 |
| Other Investments | 39 | (6) | 33 | 0 | 33 | 0 | 33 |
| Total Non-Federal | $ 10,424 | $ 26 | $ 10,450 | $ 126 | $ 10,576 | $ 33 | $ 10,609 |

## 12. CREDIT PROGRAM RECEIVABLES, DIRECT LOANS

The table below summarizes, by program, Treasury's credit program assets net of subsidy allowance. As of September 30, 2009 and September 30, 2008, Credit Program Receivables and Direct Loans consisted of the following (in millions):

|  | 2009 | 2008 |
|---|---|---|
| GSE MBS Purchase Program Receivables | $ 184,419 | $ 3,385 |
| Troubled Asset Relief Program Direct Loans | 34,751 | 0 |
| **Total Credit Program Receivables and Direct Loans** | **$ 219,170** | **$ 3,385** |

## CREDIT PROGRAM RECEIVABLES, GSE MBS PURCHASE PROGRAM AND GSE CREDIT FACILITY:

The *Housing and Economic Recovery Act* (HERA), P.L. 110–289, dated July 30, 2008, authorized Treasury to enter into several different types of financing arrangements with Government Sponsored Enterprises (GSEs) to provide stability to the financial markets; prevent disruptions in the availability of mortgage finance; and protect the taxpayer. Two of these arrangements include the GSE Mortgage-Backed Securities (MBS) Purchase Program and GSE Credit Facility (GSECF).

The GSE Mortgage-Backed Securities Purchase Program is a program to further support the availability of mortgage financing for millions of Americans and to mitigate pressures on mortgage rates. Under this program, Treasury, via Asset Managers, purchases GSE MBS in the open market. By purchasing these credit-guaranteed securities, Treasury seeks to broaden access to mortgage funding for current and prospective homeowners and to promote stability in the mortgage market. The Asset Managers are also authorized to enter into other trade/sell transactions such as Pair Offs, Turns, Assignments, and Dollar Rolls to further support the market under the HERA provisions/mandate. While the size and timing of the MBS purchases is subject to the discretion of the Secretary, the authority granted by Congress to purchase MBS expires on December 31, 2009. The scale of the program has been based on developments in the capital and housing market but will moderate once the program expires.

Treasury purchases mortgage-backed pass-through securities through the Government Sponsored Enterprise Mortgage-Backed Securities (GSE MBS) Purchase Program. Consistent with the Federal Credit Reform Act, these securities are treated as direct loans, and the value of Treasury's position and the associated credit subsidy requirements are determined based on the net present value of the securities' forecasted future cash flows. Treasury estimates nominal future cash flows using a financial model that incorporates each security's payment characteristics together with assumptions about the future prepayment, default, and loss severity performance of underlying loan collateral and the GSEs' ability to uphold their guarantee. Nominal cash flow forecasts are discounted at interest rates of Treasury securities with comparable maturities using the Office of Management and Budget's Credit Subsidy Calculator. Cash flows are estimated under the assumption that all securities will be held to maturity.

Security-level data used as the basis for cash flow model forecasts are obtained directly from Treasury's program custodian. Assumptions about security and program performance are drawn from widely available market sources as well as information published by the GSEs. Key inputs to the cash flow forecast include:

- Security characteristics such as unpaid principal balance, pass-through coupon rate, weighted-average loan age, and weighted-average maturity

- Forecast prepayment rates and default rates

The GSE Credit Facility was established to ensure credit availability to the GSEs and the Federal Home Loan Banks. This lending facility will provide secured funding on an as needed basis under terms and conditions established by the Secretary to protect taxpayers. Fannie Mae, Freddie Mac, and the Federal Home Loan Banks are eligible to borrow under this program. The GSECF provides liquidity, if needed, until December 31, 2009. There were no loans made through the GSECF in fiscal year 2009 or 2008, and therefore the GSECF program is not disclosed in tables below.

Treasury's GSE Mortgage Backed Security (MBS) Purchase Program portfolio consists of mortgage pass-through securities issued by Freddie Mac and Fannie Mae. At the end of fiscal year 2009, Treasury held $173.3 billion in outstanding MBS principal and estimated the net present value of future cash flows on these holdings to be $184.4 billion. The difference between the outstanding MBS principal balance and the value of the MBS to Treasury is the negative subsidy allowance- Treasury expects the portfolio to generate the spread income between coupon rates on the MBS and Treasury's discount rate which exceeds its estimate of potential credit losses on the securities.

The tables below provide an analysis of the GSE MBS Credit Program Receivables including allowance for subsidy costs, modifications, reestimates, and administrative costs. As of September 30, 2009 and September 30, 2008, the Direct Mortgage-Backed Securities (MBS) Purchases Outstanding consisted of the following (in millions):

| | | | | | 2009 |
|---|---|---|---|---|---|
| Programs | Credit Program Receivable, Gross | Interest Receivable | Foreclosed Property | Allowance for Subsidy Cost (Present Value) | Value of Assets Related to Credit Program Receivable |
| MBS | $ 173,326 | $ 0 | $ 0 | $ 11,093 | $ 184,419 |

| | | | | | 2008 |
|---|---|---|---|---|---|
| Programs | Credit Program Receivable, Gross | Interest Receivable | Foreclosed Property | Allowance for Subsidy Cost (Present Value) | Value of Assets Related to Credit Program Receivable |
| MBS | $ 3,311 | $ 0 | $ 0 | $ 74 | $ 3,385 |

### *Total amount of MBS Purchase Program, Disbursed (in millions):**

| Programs | 2009 | 2008 |
|---|---|---|
| MBS | $ 192,263 | $ 3,311 |

(*) Total fiscal year 2009 disbursements for MBS purchases was $192,263 million. These disbursements include fiscal year 2009 settled MBS purchases of $190,651 million and $1,612 million of fiscal year 2008 pre funded settled purchases. Negative subsidy for the fiscal year 2009 purchases has been calculated based on the negative subsidy rate of 2.36%. In 2008, $5,000 million was initially prefunded for the MBS purchase program. During fiscal year 2008 , $3,300 million of MBS purchases were made and negative subsidy was calculated on the settled amounts only. The negative subsidy amount calculated on 2008 purchase was based on a negative subsidy factor of 1.62%. In fiscal year 2009, the remaining $1,612 million of the initial $5,000 million prefunding were settled. The associated negative subsidy of $26 million related to these settled purchases was not reported on the fiscal year 2008 financial statements and has been captured in the 2009 negative subsidy reestimate.

### *Subsidy Expense (in millions):*

| Programs | *Interest Differential | *Defaults | Fees and Other Collections | Other | 2009 Total |
|---|---|---|---|---|---|
| MBS | $ (4,977) | $ 477 | $ 0 | $ 0 | $ (4,500) |

| Programs | Interest Differential | Defaults | Fees and Other Collections | Other | 2008 Total |
|---|---|---|---|---|---|
| MBS | $ (62) | $ 8 | $ 0 | $ 0 | $ (54) |

*The change in defaults and interest differential between fiscal year 2009 and fiscal year 2008 is driven by the an increase in the mortgage rate default assumptions and fluctuation in pricing/interest rate curves, respectively, between years.

### *Modifications and Reestimates (in millions):*

| Programs | Total Modifications | Interest Rate Reestimates | Technical Reestimates | 2009 Total Reestimates |
|---|---|---|---|---|
| MBS | $ 0 | $ 0 | $ (8,392) | $ (8,392) |

| Programs | Total Modifications | Interest Rate Reestimates | Technical Reestimates | 2008 Total Reestimates |
|---|---|---|---|---|
| MBS | $ 0 | $ 0 | $ 0 | $ 0 |

### *Total MBS Purchases Subsidy Expense (in millions):*

| Programs | 2009 | 2008 |
|---|---|---|
| MBS | $ (12,892) | $ (54) |

### *Subsidy Rates for MBS Purchases:*

| Programs | Interest Differential | Defaults | Fees and Other Collections | Other | 2009 Total |
|---|---|---|---|---|---|
| MBS, Cohort 2009 | -2.61% | 0.25% | 0.00% | 0.00% | -2.36% |

| Programs | Interest Differential | Defaults | Fees and Other Collections | Other | 2008 Total |
|---|---|---|---|---|---|
| MBS, Cohort 2008 | -1.86% | 0.24% | 0.00% | 0.00% | -1.62% |

***Schedule for Reconciling Subsidy Cost Allowance Balances (in millions):***

| | 2009 | 2008 |
|---|---|---|
| Beginning Balance of the subsidy cost allowance | $ (74) | $ 0 |
| Add: subsidy expense for disbursements | | |
| (a) Interest rate differential cost | (4,977) | (62) |
| (b) Default costs (net of recoveries) | 477 | 8 |
| (c )Fees and other collections | 0 | 0 |
| (d) Other subsidy costs | 0 | 0 |
| Total of the above subsidy expense components | (4,500) | (54) |
| Adjustments: | | |
| (a) Loan modifications | 0 | 0 |
| (b) Fees received | 0 | 0 |
| (c ) Foreclosed property acquired | 0 | 0 |
| (d) Loans written off | 0 | 0 |
| (e) Subsidy allowance amortized | 1,873 | (20) |
| Ending Balance subsidy cost allowance before reestimates | $ (2,701) | (74) |
| Add or subtract subsidy reestimates by component: | | |
| (a) Interest rate reestimate | 0 | 0 |
| (b) Technical default reestimate | (8,392) | 0 |
| Total of the above reestimate components | (8,392) | 0 |
| Ending Balance of the subsidy cost allowance | $ (11,093) | $ (74) |

***Administrative Expense of GSE Program Receivables – MBS (in millions):***

| Programs | 2009 | 2008 |
|---|---|---|
| GSE Related Credit Program Receivables-MBS | $ 12 | $ 0 |

## TROUBLED ASSET RELIEF PROGRAM DIRECT LOANS

FCRA and associated FASAB accounting standard SFFAS No. 2, as amended, governs direct loans made after fiscal year 1991. FCRA loans are valued at the present value of expected future cash flows, discounted at the interest rate of marketable Treasury securities. The subsidy allowance account represents the difference between the outstanding loan receivables balance and the net present value of the estimated cash flows of the loans over their remaining term. The subsidy allowance is subtracted from the outstanding loans receivable balance to obtain the net loans receivable balance.

Under the provisions of the EESA, Treasury implemented the TARP which resulted in the development of several direct loan programs and transactions including: the Automotive Industry Financing Program; the Consumer and Business Lending Initiative; and the Public-Private Investment Partnership.

Treasury applies the provisions of SFFAS No. 2 to account for direct loans. This standard requires measurement of the asset or liability at the present value of the estimated future cash flows. The cash flow estimates for each direct loan transaction reflect the actual structure of the instruments. Analytical cash flow models generate estimated cash flows to and from the Government over the life of a facility. Further, each cash-flow model reflects the specific terms and conditions of the program, technical assumptions regarding the underlying assets, risk of default or

other losses, and other factors as appropriate. The models also incorporate an adjustment for market risk to reflect the additional return required by the market to compensate for variability around the expected losses reflected in the cash flows (the "unexpected loss"). The basic methods for these models are outlined below.

### Direct Loans

The estimated future cash flows for direct loans are derived using analytical models that estimate the cash flows to and from Treasury over the life of the loan. These cash flows include the scheduled principal, interest, and other payments to Treasury, including estimated proceeds from equity interest obtained or additional notes. These models also include estimates of default and recoveries, incorporating the value of any collateral provided by the contract. The probability and timing of default and losses related to a default are estimated by using applicable historical data when available, or publicly available proxy data, including credit rating agency historical performance data.

In the case of the Term Asset-Backed Securities Loan Facility (TALF), Treasury uses an analytical model to project cash flows to and from Treasury-based on the estimated loan collateral performance, the estimated mix of collateral funded through the TALF, and the terms of the contracts.

The models include an adjustment for market risk which is intended to capture the risk of unexpected losses, but are not intended to represent fair value, i.e. the proceeds that would be expected to be received if the loans were sold to a market participant.

## AUTOMOTIVE INDUSTRY FINANCING PROGRAMS (AIFP)

The objective of the Automotive Industry Financing Program was to prevent a significant disruption of the American automotive industry, which would pose a systemic risk to financial market stability and have a negative effect on the economy of the United States. The discussion below details the various loans made by the Treasury to the automotive industry.[3]

### General Motors (GM or old GM) General Purpose Loan including Working Capital Advances

The Treasury provided GM with a total of $13,400 million in a three-year direct loan bearing interest at 3 Month LIBOR (subject to a 2.0 percent floor), plus 3.0 percent and secured by various types of collateral. Approximately $4,000 million of this loan was funded in December 2008, an additional $5,400 million in January 2009, and an additional $4,000 million in February 2009. In April 2009, the Treasury and GM amended this loan agreement to increase the maximum loan amount from $13,400 million to $15,400 million, and on May 20, 2009 to increase the maximum loan amount from $15,400 million to $19,400 million (these amendments are referred to as the Working Capital Advances) to provide GM with adequate working capital to assist in the restructuring effort. The additional amounts were funded upon amendment, bringing the total funded under this loan to $19,400 million. The agreement required GM to develop and implement a restructuring plan to achieve long-term financial viability and required compliance with certain enhanced executive compensation and expense control requirements.

3 Included in the TARP Direct Loans net, are equity interests acquired during the restructuring of GM and Chrysler. These equity amounts are included with the original loans portfolio in this note.

Furthermore, the Treasury received warrants for shares of GM common stock and an additional senior unsecured note in the principal amount of $748.6 million. The purpose of this loan was to enhance the ability of GM and its subsidiaries to pursue timely and aggressive production of energy-efficient advanced technology vehicles; preserve and promote the jobs of American workers employed directly by GM and its subsidiaries; safeguard the ability of GM and its subsidiaries to provide retirement and health care benefits for retirees and their dependents; and stimulate manufacturing and sales of automobiles produced by GM. On June 1, 2009, GM filed for Chapter 11 bankruptcy. All rights under this loan were transferred to a newly created entity (GM NewCo) and subsequently extinguished in connection with a successful credit bid for the assets of old GM. In addition, Treasury received $134.4 million in interest while the loan was outstanding. See further discussion below under GM Debtor-In-Possession.

### Chrysler Holding LLC General Purpose

The Treasury provided a three-year, $4,000 million loan to Chrysler in January 2009, bearing interest at 3 Month LIBOR (subject to a 2.0 percent floor) plus 3.0 percent. The loan was secured by various collateral including parts inventory, real estate, and certain equity interests held by Chrysler. This agreement required Chrysler to submit a restructuring plan to achieve long-term viability and required compliance with certain enhanced executive compensation and expense-control requirements. Furthermore, the Treasury received a senior unsecured note from Chrysler in the principal amount of approximately $266.8 million, containing the same terms as the General Purpose loan. The purpose of this loan was to: enhance the ability of Chrysler and its subsidiaries to pursue timely and aggressive production of energy-efficient advanced technology vehicles; preserve and promote the jobs of American workers employed directly by Chrysler and its subsidiaries; safeguard the ability of Chrysler and its subsidiaries to provide retirement and health care benefits for retirees and their dependents; and stimulate manufacturing and sales of automobiles produced by Chrysler.

On April 30, 2009, Chrysler filed for Chapter 11 bankruptcy. Upon entering bankruptcy, a portion of Chrysler was sold to a newly created entity (New Chrysler). Under the terms of the bankruptcy agreement, $500.0 million of this loan was assumed by New Chrysler (see discussion under Chrysler Exit for discussion of note terms). The balance remains outstanding and is in default.  Any recovery of the remainder of this loan will depend on: (a) Chrysler Holding's obligation to pay the greater of $1,375 million or 40.0 percent of the equity value of Chrysler Financial to Treasury should Chrysler Holding receive certain distributions from Chrysler Financial and (b) proceeds received from the sale of assets remaining in the bankrupt company. In addition, Treasury received $52.1 million in interest payments on this note.

### Chrysler Financial

In January 2009, the Treasury loaned $1,500 million to Chrysler LB Receivables Trust (Chrysler Trust), a special purpose entity created by Chrysler Financial, to finance the extension of new consumer auto loans. The five-year loan bore interest at 1 Month LIBOR plus 1.0 percent for the first year, 1.5 percent for the remaining term and was secured by a senior secured interest in a pool of newly originated consumer automotive loans, and Chrysler served as a guarantor for certain covenants of Chrysler Financial. Under the agreement, Chrysler Financial was required to comply with the executive compensation and corporate governance requirements of Section 111(b) of the EESA, as well as enhanced restrictions on executive compensation including the need to reduce by 40.0 percent its bonus pool for Senior Executive Officers and Senior Employees. In lieu of warrants, the Treasury

received additional notes in an amount equal to five percent of the maximum loan amount. The additional notes would vest 20.0 percent on the closing date and 20.0 percent on each anniversary of the closing date and had other terms similar to the loan. The purpose of this loan was to assist Chrysler Financial in providing retail financing to purchasers of automobiles, light duty trucks and recreational vehicles; to stimulate manufacturing and sales of automobiles produced by Chrysler's affiliates; preserve and promote the jobs of American workers employed directly by Chrysler's affiliates and in related industries; and safeguard the ability of Chrysler to provide retirement and health care benefits for their retirees and their dependents. On July 14, 2009, the loan and additional note of $15.0 million were paid in full. In addition, Treasury received $7.4 million in interest payments while this loan was outstanding.

### Auto Supplier Support Program

In April 2009, the Treasury committed $5,000 million in financing for the Auto Supplier Support Program, as follows: $3,500 million for GM suppliers and $1,500 million for Chrysler suppliers. These commitments were subsequently reduced to $2,500 million for GM and $1,000 million for Chrysler per the loan agreement. Under the program, suppliers are able to sell their receivable to a special purpose vehicle, created by the respective automaker, at a discount. The purchases of the receivables are funded by equity investments made by the automaker, cash payments made by the automaker on previously purchased receivables or from draws on the Treasury funding commitment. The duration of the program is 12 months, extendable at the option of the Treasury. Interest is charged on advances under the facility at a rate of 3 Month LIBOR (subject to a 2.0 percent floor) plus 3.5 percent. In addition, the Treasury received a contingent payment note comprised of an exit fee equal to 4.0 percent of the adjusted commitment amount and 50.0% of the residual equity in the special purpose vehicle after the program's end date. This program provides suppliers with access to government backed protection ensuring that money owed to them for the products they ship will be paid regardless of what happens to the recipient car company. This provided suppliers with needed funding to operate their businesses and help unlock credit more broadly in the supplier industry. Purchases of receivables and collection of amounts due from GM and Chrysler is performed by a third party service provider. Suppliers must maintain qualifying commercial terms with the automakers to participate in the program. The Treasury has provided approximately $413.1 million, collectively, of funding to this program. The bankruptcy of Chrysler and GM did not impact this program, as both companies were allowed to continue paying suppliers while in bankruptcy. As of September 30, 2009, Treasury had received $5.9 million in interest under the Auto Supplier Support Program.

### Auto Warranty Program

In April 2009 and May 2009, the Treasury loaned approximately $280.0 million to Chrysler and $360.6 million to GM, respectively, to capitalize certain SPVs created by Chrysler and GM to finance participation in the Warranty Commitment Program (warranty program). The Treasury also received additional notes as consideration for its loans in an amount equal to 6.67 percent of the funded amounts. The warranty program covered all warranties on new vehicles purchased from Chrysler and GM during the period in which Chrysler and GM were restructuring. The program was run by a third party program administrator with the backing of financial resources allocated by the Treasury, Chrysler and GM. Chrysler and GM contributed 15.0 percent of the projected cost for warranty service on each covered vehicle, with the Treasury providing additional funds to cover 110.0 percent of the projected cost. The SPVs holding the funds operated separately from Chrysler and GM and would transfer the necessary funds to a third-party to handle all warranty claims even if Chrysler and GM entered into

bankruptcy or went out of business. Both Chrysler and GM have completed the Section 363[4] sales in June 2009 and July 2009, respectively. Upon completion of the sale, the Treasury received principal amounts due from both GM and Chrysler and terminated the warranty program. Interest in the amount of $3.1 million was received by Treasury from Chrysler. No interest was received in connection with the GM repayment. The GM additional note was assigned to the New GM as part of the bankruptcy proceedings and extinguished as part of the credit bid for the assets of old GM. The Chrysler additional note is still outstanding.

### Chrysler Debtor-In-Possession

In May 2009, the Treasury and the Canadian government jointly agreed to make a loan in the total amount of $4,100 million ($3,000 million by the Treasury and $1,100 million by Canada) to Chrysler LLC in its capacity as debtor-in-possession (DIP) in its bankruptcy case. In May 2009, the Treasury increased its loan commitment in the DIP credit agreement to $3,800 million, and the Canadian government increased its commitment to $1,200 million, bringing the maximum loan amount to $5,000 million. The loan interest rate was the 3 Month Eurodollar rate plus 3.0 percent. The stated maturity was September 2009, with earlier maturity depending on the bankruptcy proceedings. Of the $3,800 million committed by the Treasury, approximately $1,900 million was funded during the bankruptcy. This DIP loan provided the necessary liquidity to sustain Chrysler during the bankruptcy period. Upon the Section 363 sale of the Chrysler assets, the funding commitment was reduced to amounts previously drawn. As such, no additional amounts were drawn from this facility. Recovery of the DIP loan is subject to the bankruptcy process associated with the Chrysler assets remaining after the sale to New Chrysler.

### Chrysler Exit

In May 2009, the Treasury committed to make a loan to in New CarCo Acquisition LLC (New Chrysler or Chrysler Group LLC), the company that purchased the assets of Chrysler. The final terms of the credit agreement resulted in a loan to New Chrysler for $7,140 million. This amount consists of $6,640 million of new funding and $500.0 million of assumed debt[5] from the Treasury January 2, 2009 credit agreement with Chrysler Holding LLC. The loan was secured by a first priority lien on the assets of Chrysler Group LLC. Funding of the loan was available in two installments or tranches (B and C), each with varying availability and terms. The following describes the terms of Tranches B and C.

The maximum funding under Tranche B was $2,000 million and was funded on the closing date of the agreement. Interest on Tranche B is 3 Month Eurodollar plus 5.0 percent margin (in certain situations, defined in the agreement, a rate other than the 3 Month Eurodollar rate will be applied. This rate, referred to as the Alternative Base Rate, will be the greater of the Prime Rate, the Federal Funds Effective rate plus 0.5 percent or the 3 Month Eurodollar rate plus 1.0 percent. If this Alternative Base Rate is applied, the margin will be 4.0 percent versus the 5.0 percent if the 3 Month Eurodollar Rate). Tranche B is due and payable on December 10, 2011, provided that the Chrysler Group LLC may elect to extend the maturity of up to $400.0 million of Tranche B to the Tranche C maturity date. If so elected, the applicable margin will increase to 6.5 percent for Eurodollar and 5.5 percent for ABR loans, respectively.

The maximum funding under Tranche C is $4,640 million, of which $2,580 million was funded on the closing date. Interest on Tranche B is 3 Month Eurodollar plus 7.91 percent margin (in certain situations, defined in the agreement, a rate other than the 3 Month Eurodollar rate will be applied. This rate, referred to as the Alternative

4 Section 363 refers to Section 363 of the Federal Bankruptcy Code, which allows companies in bankruptcy to sell assets in reorganization.
5 The assumed debt contains the same terms as the Tranche C loan with respect to mandatory prepayment, interest and maturity.

Base Rate, will be the greater of the Prime Rate, the Federal Funds Effective rate plus 0.5 percent or the 3 Month Eurodollar rate plus 1.0 percent. If this Alternative Base Rate is applied, the margin will be 6.91 percent versus the 7.91 percent if the 3 Month Eurodollar Rate is used). On June 10, 2016, the Tranche C loan shall be prepaid to the extent funded amount is greater than 50.0 percent of the closing date commitment amount, taking into consideration amounts previously prepaid as a voluntary prepayment. The remaining balance of the Tranche C loan is due and payable on June 10, 2017.

Interest on both the Tranche B and Tranche C will be payable in-kind through December 2009 and will be added to the principal balance of the respective Tranche. In addition, additional in-kind interest will accrue in the amount of $17.0 million per quarter. Such amount will be added to the Tranche C loan balance subject to interest at the appropriate rate.

The Treasury also obtained other consideration, including a 9.85 percent equity interest in Chrysler Group LLC (included in Notes) and additional notes[6] with principal balances of $288.0 million and $100.0[7] million. As of September 30, 2009, the Treasury has funded approximately $4,600 million under this facility.

### GM Debtor-In-Possession

On June 1, 2009, GM filed for Chapter 11 bankruptcy. As part of the filing the Treasury and the Canadian government agreed to lend up to $33,300 million under the terms of the DIP credit agreement; the Treasury's commitment amount was $30,100 million. The Treasury funded the $30,100 million of which approximately $986 million remains outstanding. In July 2009, the DIP credit agreement was amended to reflect the fact that the amounts there under (other than $986 million that remained with GM for wind-down in bankruptcy and $7,100 million that was assumed by GM NewCo) were extinguished in connection with a successful credit bid for the assets of old GM.

The Treasury has assigned its rights in this loan as well as the General Purpose and Working Capital loans and previously received common stock warrants to a newly created entity (GM NewCo or General Motors Company). The purpose of this GM NewCo is to obtain sufficient assets of GM out of bankruptcy to satisfy the original disbursed to GM and discussed above, which it accomplished through a successful credit bid for the assets in a sale pursuant to Section 363 of the Bankruptcy Code. Upon closing of the Section 363 sale, the General Motors Company has assumed $7,100 million of the DIP loan, simultaneously paying $400 million (return of warranty program funds), resulting in a balance of $6,700 million. The loan has a term of 6 years and bears interest at 3 Month Eurodollar (subject to a 2.0 percent floor) plus 5.0 percent and has a first lien security interest in the assets of General Motors Company. The Treasury also received $2,100 million in 9.0 percent cumulative perpetual preferred shares and 60.8 percent of the common equity interest in General Motors Company. The assets received by the Treasury as a result of the assignment and Section 363 sale are considered recoveries of the original loans for subsidy cost estimation purposes. As of September 30, 2009, Treasury had received $34.1 million in dividends on GM preferred stock.

6 The additional note bears the same interest rate and maturity as the Tranche C loan.
7 Interest begins to accrue on this note after certain events, defined in the credit agreement, have taken place.

### GMAC Limited Liability Company (LLC) Rights Offering

In December 2008, the Treasury agreed, in principal, to lend up to $1,000 million to GM for participation in a rights offering by GMAC in support of GMAC's reorganization as a bank holding company. The loan was secured by the GMAC common interest acquired in the rights offering. The loan agreement specified that at any time, at the option of the lender (Treasury), the unpaid principal and accrued interest was exchangeable for the membership interest purchased, by GM, during the rights offering. The note was funded for $884.0 million. In May 2009, the Treasury exercised its exchange option under the loan and received 190,921 membership interests, representing approximately 35.36 percent of the voting interest, in GMAC in full satisfaction of the loan. In addition, Treasury received $9.1 million in interest while the loan was outstanding. The conversion to GMAC shares was not considered in the original subsidy cost. As a result a modification was recorded reducing the estimated subsidy cost by approximately $1,600 million.

## THE CONSUMER AND BUSINESS LENDING INITIATIVE (CBLI)

### Term Asset-Backed Securities Loan Facility

The Term Asset-Backed Securities Loan Facility (TALF) was created by the Federal Reserve Board (FRB) to provide low cost funding to investors in certain classes of Asset Backed Securities (ABS). Treasury agreed to participate in the program by providing liquidity and credit protection to the FRB.

Under the TALF, the FRBNY, as implementer of the TALF program, originated loans on a non-recourse basis to holders of certain AAA rated ABS secured by recently originated consumer and commercial loans and commercial mortgage backed securities (New Issue CMBS). In addition to securities secured by recently originated loans, CMBS issued prior to January 2009 and originally AAA rated (Legacy CMBS) are eligible collateral. TALF loans have a term of 3 or 5 years and are secured solely by eligible collateral. Haircuts (a percentage reduction used for collateral valuation) are determined based on the riskiness of each type of eligible collateral and the maturity of the eligible collateral pledged to the FRBNY. The "haircuts" provide additional protection to Treasury by exposing the TALF borrowers to risk of loss. Interest rates charged on the TALF loans depend on the weighted average maturity of the pledged collateral, the collateral type and whether the collateral pays a fixed or variable coupon.

As part of the program, the FRBNY has entered into a put agreement with the TALF, LLC, a special purpose vehicle created by the FRBNY. In the event of a TALF borrower default, the FRBNY will seize the collateral and sell it to the TALF, LLC under this agreement. The TALF, LLC receives a monthly fee equal to the difference between the TALF loan rate and the FRBNY's fee (spread) as compensation for entering into the put agreement. The accumulation of this fee will be used to fund purchases. In the event there are insufficient funds to purchase the collateral, the Treasury has committed to invest up to $20,000 million in non-recourse subordinate notes issued by the TALF, LLC. The subordinate notes bear interest at 1 Month LIBOR plus 3.0 percent and mature 10 years from the closing date, subject to extension. The Treasury disbursed $100.0 million upon creation of the TALF, LLC and the remainder can be drawn to purchase collateral in the event the spread is not sufficient to cover purchases. Any amounts needed in excess of the Treasury commitment and the fee would be provided through a loan from the FRBNY. Upon wind-down of TALF, LLC (collateral defaults, reaches final maturity or is sold), the cash balance will be disbursed according to the following payment priority:

1. FRBNY principal balance

2. Treasury principal balance

3. FRBNY interest

4. Treasury interest
5. Remaining cash balance – 90.0 percent to Treasury, 10.0 percent to FRBNY

Subsequent to the initial cost estimates prepared for the TALF, certain changes were made to the terms of the program, including increasing the term to 5 years and the addition of different types of acceptable collateral. These program changes resulted in a modification, increasing the original cost estimate by $8.0 million.

The TALF, LLC is owned and controlled by the FRBNY. The credit agreement entered into between the Treasury and the TALF, LLC provides the Treasury with certain rights consistent with a creditor but would not constitute control. As such TALF, LLC is not a federal entity and the assets, liabilities, revenue and cost of TALF, LLC are not included in the Treasury financial statements. The discussion below provides information on 1) the amount of TALF loans issued by the FRBNY, by collateral class, and 2) the assets, liabilities, income and expense of the TALF, LLC.

The FRBNY has originated $50,900 million in TALF loans[8], of which about $42,700 million is outstanding as of September 30, 2009. The average "haircut" was approximately 9.9 percent of the originated balance. As of September 30, 2009, all TALF loans performed as agreed. The table below shows the outstanding balance of the TALF loans as of September 30, 2009, by collateral type:

| Collateral Type | Loan Amount (in millions) | % of Total |
|---|---|---|
| Auto | $ 7,430 | 17.3% |
| Credit Cards | 21,610 | 50.6 % |
| Equipment | 890 | 2.1 % |
| Floorplan | 1,010 | 2.4 % |
| Premium Finance | 990 | 2.3 % |
| Servicing Advances | 580 | 1.4 % |
| Small Business | 460 | 1.1 % |
| Student Loans | 5,630 | 13.1 % |
| New Issue CMBS | 0 | 0.0 % |
| Legacy CMBS | 4,130 | 9.7 % |
| **Total** | **$ 42,730** | **100%** |

As of September 30, 2009, the TALF, LLC has assets of approximately $198.9 million consisting primarily of investments in U.S. Treasury and Agency securities[9]. Total liabilities of the TALF, LLC are $101.8 million consisting of Treasury subordinated note plus accrued interest. During the period ended September 30, 2009, TALF, LLC collected $99.1 million in fees and investment income and incurred $2.3 million in expenses, $1.8 million of which is accrued interest on Treasury subordinated note. As of September 30, 2009 there were no TALF borrower defaults and consequently no purchases of collateral by TALF, LLC.

The tables below provide an analysis of the TARP direct loans including allowance for subsidy costs, modifications, and reestimates. The description of the TARP direct loan programs are described above. The TARP programs were created in fiscal year 2009 and thus there are no fiscal year 2008 comparitive balances to disclose.

8 These represent loans originated by the FRBNY and not Treasury. The intention of this disclosure is to show the activity in the program and the types of collateral that could eventually be purchased by the TALF, LLC with funding provided by Treasury.
9 Agency securities refer to securities issued by either Ginnie Mae, Fannie Mae, Freddie Mac, or the Federal Home Loan Banks.

### *Troubled Asset Relief Programs - Direct Loans Receivables, Net (in millions):*

| Programs | Direct Loans Receivable, Gross | Interest Receivable | Foreclosed Property | Allowance for Subsidy Cost (Present Value) | 2009 Value of Assets Related to Direct Loans |
|---|---|---|---|---|---|
| AIFP | $ 61,262 | $ 0 | $ 0 | $ (26,955) | $ 34,307 |
| CBLI | 100 | 0 | 0 | 344 | 444 |
| Total | $ 61,362 | $ 0 | $ 0 | $ (26,611) | $ 34,751 |

### *Total Amount of Disbursements, Direct Loans (in millions):*

| Programs | 2009 |
|---|---|
| AIFP | $63,402 |
| CBLI | 100 |
| Total | $63,502 |

### *Subsidy Expense, Direct Loans (in millions):*

| Programs | Interest Differential | Defaults | Fees and Other Collections | Other | 2009 Total |
|---|---|---|---|---|---|
| AIFP | $ (33) | $ 38,787 | $ 0 | $ (184) | $ 38,570 |
| CBLI | 6 | 0 | 0 | (110) | (104) |
| Total | $ (27) | $ 38,787 | $ 0 | $ (294) | $ 38,466 |

### *Modifications and Reestimates, Direct Loans (in millions):*

| Programs | Total Modifications | Interest Rate Reestimates | Technical Reestimates | 2009 Total Reestimates |
|---|---|---|---|---|
| AIFP | $ (1,589) | $ 0 | $ (10,610) | $ (10,610) |
| CBLI | 8 | 0 | (243) | (243) |
| Total | $ (1,581) | $ 0 | $ (10,853) | $ (10,853) |

### *Total Subsidy Expense, Direct Loans (in millions):*

| Programs | 2009 |
|---|---|
| AIFP | 26,371 |
| CBLI | (339) |
| Total | $ 26,032 |

### *Subsidy Rates by Program and Component, Direct Loans:*

| Programs | Interest Differential | Defaults | Fees and Other Collections | Other | 2009 Total |
|---|---|---|---|---|---|
| AIFP | -0.05% | 59.07% | 0.00% | -0.28% | 58.74% |
| CBLI | 5.87% | 0.00% | 0.00% | -110.10% | -104.23% |

### *Schedule for Reconciling Subsidy Cost Allowance Balances (in millions):*

**DIRECT LOANS**

| | AIFP | CBLI | 2009 Totals |
|---|---|---|---|
| Beginning Balance of the subsidy cost allowance | $ 0 | $ 0 | $ 0 |
| Add: subsidy expense for disbursements | | | |
| (a) Interest rate differential cost | (33) | 6 | (27) |
| (b) Default costs (net of recoveries) | 38,787 | 0 | 38,787 |
| (c) Fees and other collections | 0 | 0 | 0 |
| (d) Other subsidy costs | (184) | (110) | (294) |
| Total of the above subsidy expense components | $ 38,570 | $ (104) | $ 38,466 |
| Adjustments: | | | |
| (a) Loan modifications | (1,589) | 8 | (1,581) |
| (b) Fees received | 261 | 0 | 261 |
| (c) Foreclosed property acquired | 0 | 0 | 0 |
| (d) Loans written off | 0 | 0 | 0 |
| (e) Subsidy allowance amortized | 323 | (5) | 318 |
| (f) Other | 0 | 0 | 0 |
| Ending Balance subsidy cost allowance before reestimates | $ 37,565 | $ (101) | $ 37,464 |
| Add or subtract subsidy reestimates by component: | | | |
| (a) Interest rate reestimate | 0 | 0 | 0 |
| (b) Technical default reestimate | (10,610) | (243) | (10,853) |
| Total of the above reestimate components | (10,610) | (243) | (10,853) |
| **Ending Balance of the subsidy cost allowance** | **$ 26,955** | **$ (344)** | **$ 26,611** |

## HOME AFFORDABLE MODIFICATION PROGRAM (HAMP)

The Home Affordable Modification Program (HAMP) is designed to assist eligible homeowners who are experiencing financial hardships to remain in their homes by providing reductions in their monthly mortgage payments for up to five years. The HAMP provides for one-time, monthly, and annual incentives to servicers, borrowers, and investors who participate in the program. On an ongoing basis, beyond such incentive, the Treasury shares equally in the cost of the reductions with the mortgage investors.  Lastly, investors are paid a Home Price Decline Protection payment to partially offset losses from home price declines.

For the HAMP, Fannie Mae provides direct programmatic support as a third party agent on behalf of Treasury, Freddie Mac provides compliance oversight as a third party agent on behalf of Treasury, and the servicers work directly with the borrowers to modify and service the borrowers' loans.

As of September 30, 2009, the Treasury had entered into agreements with 63 servicers to provide up to approximately $27,100 million in payments and incentives to borrowers, servicers, and investors. It should be noted that all HAMP payments are made to servicers either for themselves or for the benefit of borrowers and investors. Furthermore, all payments are contingent on borrowers remaining current on their mortgage payments. As of September 30, 2009, approximately $0.95 million in incentive payments had been paid to three servicers in incentive payments for 743 borrowers who had completed official loan modifications. Servicers have until December 31, 2012, to enter into mortgage modifications with borrowers.

The HAMP is not subject to the FCRA per ESSA. The liability for payments to servicers and investors, and principal balance reduction payments for the account of borrowers under the HAMP are accounted for in accordance with SFFAS No. 5, *Accounting for Liabilities of the Federal Government*. Under SFFAS No. 5, the liability is recognized in the period in which the exchange occurs. The exchange of consideration between the parties and the Treasury occurs on a month to month basis. Executed contract and program documentation identifies servicing requirements by the servicer, certain incentives for investors to participate in the modifications and/or not assert any rights to object or dissent to the modification and the nature and timing of the actions the borrower must agree to and take, in order for the Treasury to be liable for payment. A key requirement of program continuance is the servicer's ongoing responsibility under the servicing agreement to closely monitor and perform loss mitigation when required to assist the borrowers to remain current on their payments. As of September 30, 2009, the Treasury had accrued approximately $1.4 million of first lien incentive for modifications under the HAMP program, and reported in other liabilities in the financial statements.

## 13. LOANS AND INTEREST RECEIVABLE

### Entity and Non-Entity Non-Federal:

As of September 30, 2009 and September 30, 2008, loans and interest receivable from non-federal entities consisted of the following, excluding TARP Loans (in millions):

| | Entity | Non-entity | 2009 Total | Entity | Non-entity | 2008 Total |
|---|---|---|---|---|---|---|
| Direct Loans | $ 61 | $ 125 | $ 186 | $ 62 | $ 128 | $ 190 |
| Interest Receivable | 0 | 2 | 2 | 0 | 2 | 2 |
| Less: Allowance and Subsidy Cost | (20) | 0 | (20) | (20) | 0 | (20) |
| **Total Non-Federal Loans and Related Interest Receivable** | **$ 41** | **$ 127** | **$ 168** | **$ 42** | **$ 130** | **$ 172** |

Loans and Interest Receivable amounts include certain loans and credits issued by the United States to various foreign governments and other entities. The agreements with each debtor government vary as to dates, interest rates, method of payment, and billing procedures. All such loans and credits represent legally valid and outstanding obligations of foreign governments, other entities, and the U.S. Government has not waived or renounced its rights with respect to any of them. The loans are due and payable in U.S. denominations.