## Table 5. Fannie Mae Mortgage Assets Detail

| End of Period | ($ in Millions) | | | | |
|---|---|---|---|---|---|
| | Whole Loans[1,2] ($) | Fannie Mae Securities[1,3] ($) | Other Mortgage-Related Securities[1,3,4] ($) | Unamortized Premiums, Discounts, Deferred Adjustments, and Fair-Value Adjustments on Securities and Loans[5] ($) | Total Mortgage Assets ($) |
| 4Q09 | 416,543 | 220,245 | 132,464 | (23,981) | 745,271 |
| 3Q09 | 424,538 | 215,571 | 152,818 | (17,505) | 775,422 |
| 2Q09 | 426,710 | 234,632 | 134,914 | (23,239) | 773,017 |
| 1Q09 | 436,369 | 223,024 | 130,148 | (24,327) | 765,214 |
| Annual Data | | | | | |
| 2009 | 416,543 | 220,245 | 132,464 | (23,981) | 745,271 |
| 2008 | 429,493 | 228,950 | 133,753 | (24,207) | 767,989 |
| 2007 | 403,577 | 180,163 | 144,163 | (4,283) | 723,620 |
| 2006 | 383,045 | 199,644 | 146,243 | (2,498) | 726,434 |
| 2005 | 366,680 | 234,451 | 136,758 | (1,086) | 736,803 |
| 2004 | 400,157 | 344,404 | 172,648 | 7,985 | 925,194 |
| 2003 | 397,633 | 405,922 | 105,313 | 10,721 | 919,589 |
| 2002 | 323,244 | 380,383 | 96,152 | 20,848 | 820,627 |
| 2001 | 167,405 | 431,776 | 109,270 | (2,104) | 706,347 |
| 2000 | 152,634 | 351,066 | 106,551 | (2,520) | 607,731 |
| 1999 | 149,231 | 281,714 | 93,122 | (964) | 523,103 |
| 1998 | 155,779 | 197,375 | 61,361 | 919 | 415,434 |
| 1997 | 160,102 | 130,444 | 26,132 | (86) | 316,592 |
| 1996 | 167,891 | 102,607 | 16,554 | (525) | 286,528 |
| 1995 | 171,481 | 69,729 | 12,301 | (643) | 252,868 |
| 1994 | 170,909 | 43,998 | 7,150 | (1,242) | 220,815 |
| 1993 | 163,149 | 24,219 | 3,493 | (692) | 190,169 |
| 1992 | 134,597 | 20,535 | 2,987 | (1,859) | 156,260 |
| 1991 | 109,251 | 16,700 | 3,032 | (2,304) | 126,679 |
| 1990 | 101,797 | 11,758 | 3,073 | (2,562) | 114,066 |
| 1989 | 95,729 | 11,720 | 3,272 | (2,740) | 107,981 |
| 1988 | 92,220 | 8,153 | 2,640 | (2,914) | 100,099 |
| 1987 | 89,618 | 4,226 | 2,902 | (3,081) | 93,665 |
| 1986 | 94,167 | 1,606 | 2,060 | (3,710) | 94,123 |
| 1985 | 97,421 | 435 | 793 | (4,040) | 94,609 |
| 1984 | 87,205 | 477 | 427 | (3,974) | 84,135 |
| 1983 | 77,983 | Not Available | 273 | (3,009) | 75,247 |
| 1982 | 71,777 | Before 1984 | 37 | (2,458) | 69,356 |
| 1981 | 61,411 | | 1 | (1,783) | 59,629 |
| 1980 | 57,326 | | 1 | (1,738) | 55,589 |
| 1979 | 51,096 | | 1 | (1,320) | 49,777 |
| 1978 | 43,315 | | Not Available | (1,212) | 42,103 |
| 1977 | 34,377 | | Before 1979 | (1,125) | 33,252 |
| 1976 | 32,937 | | | (1,162) | 31,775 |
| 1975 | 31,916 | | | (1,096) | 30,820 |
| 1974 | 29,708 | | | (1,042) | 28,666 |
| 1973 | 24,459 | | | (870) | 23,589 |
| 1972 | 20,326 | | | (674) | 19,652 |
| 1971 | 18,515 | | | (629) | 17,886 |

Source: Fannie Mae

1   Unpaid principal balance.

2   Beginning with 2002, includes mortgage-related securities consolidated as loans as of period end. For 1999, 2000, and 2001, includes certain loans held for investment that were classified as nonmortgage investments.

3   Beginning with 2002, excludes mortgage-related securities consolidated as loans as of period end.

4   Includes mortgage revenue bonds.

5   Includes unamortized premiums, discounts, deferred adjustments, and fair-value adjustments on securities and loans. Beginning in 2002, amounts include fair-value adjustments and impairments on mortgage-related securities and securities commitments classified as trading and available-for-sale. Excludes the allowance for loan losses on loans held for investment.

**Table 5a. Fannie Mae Mortgage Assets Detail – Whole Loans**

| End of Period | Whole Loans ($ in Millions)[1] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Single-Family | | | | | Multifamily | | | Total Whole Loans ($) |
| | Conventional | | | | Total FHA/VA/RD[3] ($) | Conventional ($) | FHA/RD ($) | Total ($) | |
| | Fixed-Rate[2] ($) | Adjustable-Rate ($) | Seconds ($) | Total ($) | | | | | |
| **4Q09** | 208,915 | 34,602 | 213 | 243,730 | 52,399 | 119,829 | 585 | 120,414 | 416,543 |
| **3Q09** | 214,635 | 35,777 | 207 | 250,619 | 52,133 | 121,170 | 616 | 121,786 | 424,538 |
| **2Q09** | 216,744 | 37,796 | 203 | 254,743 | 51,173 | 120,150 | 644 | 120,794 | 426,710 |
| **1Q09** | 226,652 | 42,167 | 209 | 269,028 | 48,167 | 118,501 | 673 | 119,174 | 436,369 |
| | Annual Data | | | | | | | | |
| **2009** | 208,915 | 34,602 | 213 | 243,730 | 52,399 | 119,829 | 585 | 120,414 | 416,543 |
| **2008** | 223,881 | 44,157 | 215 | 268,253 | 43,799 | 116,742 | 699 | 117,441 | 429,493 |
| **2007** | 240,090 | 43,278 | 261 | 283,629 | 28,202 | 90,931 | 815 | 91,746 | 403,577 |
| **2006** | 255,490 | 46,820 | 287 | 302,597 | 20,106 | 59,374 | 968 | 60,342 | 383,045 |
| **2005** | 261,214 | 38,331 | 220 | 299,765 | 15,036 | 50,731 | 1,148 | 51,879 | 366,680 |
| **2004** | 307,048 | 38,350 | 177 | 345,575 | 10,112 | 43,396 | 1,074 | 44,470 | 400,157 |
| **2003** | 335,812 | 19,155 | 233 | 355,200 | 7,284 | 33,945 | 1,204 | 35,149 | 397,633 |
| **2002** | 282,899 | 12,142 | 416 | 295,457 | 6,404 | 19,485 | 1,898 | 21,383 | 323,244 |
| **2001** | 140,454 | 10,427 | 917 | 151,798 | 5,069 | 8,987 | 1,551 | 10,538 | 167,405 |
| **2000** | 125,786 | 13,244 | 480 | 139,510 | 4,763 | 6,547 | 1,814 | 8,361 | 152,634 |
| **1999** | 130,614 | 6,058 | 176 | 136,848 | 4,472 | 5,564 | 2,347 | 7,911 | 149,231 |
| **1998** | 135,351 | 7,633 | 206 | 143,190 | 4,404 | 5,590 | 2,595 | 8,185 | 155,779 |
| **1997** | 134,543 | 10,389 | 268 | 145,200 | 4,631 | 7,388 | 2,883 | 10,271 | 160,102 |
| **1996** | 137,507 | 12,415 | 323 | 150,245 | 4,739 | 9,756 | 3,151 | 12,907 | 167,891 |
| **1995** | 137,032 | 14,756 | 423 | 152,211 | 4,780 | 11,175 | 3,315 | 14,490 | 171,481 |
| **1994** | 133,882 | 16,475 | 537 | 150,894 | 4,965 | 11,681 | 3,369 | 15,050 | 170,909 |
| **1993** | 123,308 | 19,175 | 772 | 143,255 | 5,305 | 11,143 | 3,446 | 14,589 | 163,149 |
| **1992** | 91,500 | 22,637 | 1,355 | 115,492 | 6,097 | 9,407 | 3,601 | 13,008 | 134,597 |
| **1991** | 69,130 | 19,763 | 2,046 | 90,939 | 6,962 | 7,641 | 3,709 | 11,350 | 109,251 |
| **1990** | 61,873 | 19,558 | 1,851 | 83,282 | 8,524 | 6,142 | 3,849 | 9,991 | 101,797 |
| **1989** | 55,638 | 20,751 | 1,614 | 78,003 | 9,450 | 3,926 | 4,350 | 8,276 | 95,729 |
| **1988** | 53,090 | 20,004 | 1,561 | 74,655 | 10,480 | 2,699 | 4,386 | 7,085 | 92,220 |
| **1987** | 55,913 | 13,702 | 1,421 | 71,036 | 11,652 | 2,448 | 4,482 | 6,930 | 89,618 |
| **1986** | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | 94,167 |
| **1985** | Before 1987 | Before 1987 | Before 1987 | Before 1987 | Before 1987 | Before 1987 | Before 1987 | Before 1987 | 97,421 |
| **1984** | | | | | | | | | 87,205 |
| **1983** | | | | | | | | | 77,983 |
| **1982** | | | | | | | | | 71,777 |
| **1981** | | | | | | | | | 61,411 |
| **1980** | | | | | | | | | 57,326 |
| **1979** | | | | | | | | | 51,096 |
| **1978** | | | | | | | | | 43,315 |
| **1977** | | | | | | | | | 34,377 |
| **1976** | | | | | | | | | 32,937 |
| **1975** | | | | | | | | | 31,916 |
| **1974** | | | | | | | | | 29,708 |
| **1973** | | | | | | | | | 24,459 |
| **1972** | | | | | | | | | 20,326 |
| **1971** | | | | | | | | | 18,515 |

Source: Fannie Mae

[1]  Unpaid principal balance. Beginning with 2002, includes mortgage-related securities consolidated as loans as of period end. For 1999, 2000, and 2001, includes certain loans held for investment that were classified as nonmortgage investments.

[2]  Includes balloon and energy loans.

[3]  Includes loans guaranteed by USDA Rural Development programs.

FHFA 1341

DATA TABLES

## Table 5b. Fannie Mae Mortgage Assets Detail – Part 1, Mortgage-Related Securities

| End of Period | Mortgage-Related Securities ($ in Millions)[1] | | | | | | | | | | | | | |
| | Fannie Mae Securities ($) | | | | Others' Securities | | | | | | | | | |
| | Single-Family | | | | Freddie Mac | | | | Ginnie Mae | | | | Total Private-Label ($) | Total Others' Securities ($)[2] |
| | | | | | Single-Family | | | | Single-Family | | | | | |
| | Fixed-Rate ($) | Adjustable-Rate ($) | Multi-family ($) | Total Fannie Mae ($) | Fixed-Rate ($) | Adjustable-Rate ($) | Multi-family ($) | Total Freddie Mac ($) | Fixed-Rate ($) | Adjustable-Rate ($) | Multi-family ($) | Total Ginnie Mae ($) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4Q09 | 203,577 | 16,272 | 396 | 220,245 | 29,783 | 11,607 | 0 | 41,390 | 1,119 | 137 | 21 | 1,277 | 75,344 | 118,011 |
| 3Q09 | 197,812 | 17,361 | 398 | 215,571 | 46,799 | 12,359 | 0 | 59,158 | 1,280 | 141 | 21 | 1,442 | 77,471 | 138,071 |
| 2Q09 | 215,546 | 18,684 | 402 | 234,632 | 25,817 | 13,302 | 0 | 39,119 | 1,235 | 145 | 21 | 1,401 | 79,375 | 119,895 |
| 1Q09 | 202,964 | 19,651 | 409 | 223,024 | 17,757 | 14,208 | 0 | 31,965 | 1,306 | 149 | 21 | 1,476 | 81,422 | 114,863 |
| **Annual Data** | | | | | | | | | | | | | | |
| 2009 | 203,577 | 16,272 | 396 | 220,245 | 29,783 | 11,607 | 0 | 41,390 | 1,119 | 137 | 21 | 1,277 | 75,344 | 118,011 |
| 2008 | 207,867 | 20,637 | 446 | 228,950 | 18,420 | 14,963 | 0 | 33,383 | 1,343 | 153 | 21 | 1,517 | 83,406 | 118,306 |
| 2007 | 158,863 | 20,741 | 559 | 180,163 | 16,954 | 14,425 | 0 | 31,379 | 1,575 | 34 | 50 | 1,659 | 94,810 | 127,848 |
| 2006 | 194,702 | 4,342 | 600 | 199,644 | 17,304 | 12,773 | 0 | 30,077 | 1,905 | 0 | 56 | 1,961 | 97,281 | 129,319 |
| 2005 | 230,546 | 3,030 | 875 | 234,451 | 18,850 | 9,861 | 0 | 28,711 | 2,273 | 0 | 57 | 2,330 | 86,915 | 117,956 |
| 2004 | 339,138 | 3,869 | 1,397 | 344,404 | 29,328 | 8,235 | 0 | 37,563 | 4,131 | 1 | 68 | 4,200 | 108,809 | 150,572 |
| 2003 | 400,863 | 3,149 | 1,910 | 405,922 | 30,356 | 558 | 0 | 30,914 | 6,993 | 0 | 68 | 7,061 | 46,979 | 84,954 |
| 2002 | 373,958 | 3,827 | 2,598 | 380,383 | 32,617 | 207 | 0 | 32,824 | 15,436 | 0 | 85 | 15,521 | 28,157 | 76,502 |
| 2001 | 417,796 | 5,648 | 8,332 | 431,776 | 42,516 | 287 | 26 | 42,829 | 18,779 | 1 | 109 | 18,889 | 29,175 | 90,893 |
| 2000 | Not Available | Not Available | Not Available | 351,066 | Not Available | Not Available | Not Available | 33,290 | Not Available | Not Available | Not Available | 23,768 | 34,266 | 91,324 |
| 1999 | Before 2001 | Before 2001 | Before 2001 | 281,714 | Before 2001 | Before 2001 | Before 2001 | 25,577 | Before 2001 | Before 2001 | Before 2001 | 23,701 | 31,673 | 80,951 |
| 1998 | | | | 197,375 | | | | 23,453 | | | | 8,638 | 19,585 | 51,676 |
| 1997 | | | | 130,444 | | | | 5,262 | | | | 7,696 | 5,554 | 18,512 |
| 1996 | | | | 102,607 | | | | 3,623 | | | | 4,780 | 1,486 | 9,889 |
| 1995 | | | | 69,729 | | | | 3,233 | | | | 2,978 | 747 | 6,958 |
| 1994 | | | | 43,998 | | | | 564 | | | | 3,182 | 1 | 3,747 |
| 1993 | | | | 24,219 | | | | Not Available | | | | 972 | 2 | 974 |
| 1992 | | | | 20,535 | | | | Before 1994 | | | | 168 | 3 | 171 |
| 1991 | | | | 16,700 | | | | | | | | 180 | 93 | 273 |
| 1990 | | | | 11,758 | | | | | | | | 191 | 352 | 543 |
| 1989 | | | | 11,720 | | | | | | | | 202 | 831 | 1,033 |
| 1988 | | | | 8,153 | | | | | | | | 26 | 810 | 836 |
| 1987 | | | | 4,226 | | | | | | | | Not Available | 1,036 | 1,036 |
| 1986 | | | | 1,606 | | | | | | | | Before 1988 | 1,591 | 1,591 |
| 1985 | | | | 435 | | | | | | | | | Not Available | Not Available |
| 1984 | | | | 477 | | | | | | | | | Before 1986 | Before 1986 |

Source: Fannie Mae

[1] Unpaid principal balance. Beginning with 2002, excludes mortgage-related securities consolidated as loans as of period end.

[2] Excludes mortgage revenue bonds.

**Table 5b. Fannie Mae Mortgage Assets Detail – Part 2, Mortgage-Related Securities, Private-Label Detail**

| End of Period | Mortgage-Related Securities ($ in Millions)[1] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Private-Label | | | | | | | |
| | | Single-Family | | | | | | | |
| | Manufactured Housing ($) | Subprime | | Alt-A | | Other | | Multifamily ($) | Total Private-Label ($) |
| | | Fixed-Rate ($) | Adjustable-Rate ($) | Fixed-Rate ($) | Adjustable-Rate ($) | Fixed-Rate ($) | Adjustable-Rate ($) | | |
| 4Q09 | 2,485 | 391 | 20,136 | 7,515 | 16,990 | 255 | 1,849 | 25,723 | 75,344 |
| 3Q09 | 2,563 | 404 | 21,337 | 7,724 | 17,531 | 262 | 1,888 | 25,762 | 77,471 |
| 2Q09 | 2,647 | 415 | 22,188 | 7,967 | 18,163 | 271 | 1,932 | 25,792 | 79,375 |
| 1Q09 | 2,745 | 428 | 23,110 | 8,239 | 18,833 | 279 | 1,972 | 25,816 | 81,422 |
| Annual Data | | | | | | | | | |
| 2009 | 2,485 | 391 | 20,136 | 7,515 | 16,990 | 255 | 1,849 | 25,723 | 75,344 |
| 2008 | 2,840 | 438 | 24,113 | 8,444 | 19,414 | 286 | 2,021 | 25,850 | 83,406 |
| 2007 | 3,316 | 503 | 31,537 | 9,221 | 23,254 | 319 | 1,187 | 25,473 | 94,810 |
| 2006 | 3,902 | 268 | 46,608 | 10,722 | 24,402 | 376 | 1,282 | 9,721 | 97,281 |
| 2005 | 4,622 | 431 | 46,679 | 11,848 | 21,203 | 634 | 1,455 | 43 | 86,915 |
| 2004 | 5,461 | 889 | 73,768 | 11,387 | 14,223 | 2,535 | 487 | 59 | 108,809 |
| 2003 | 6,522 | 1,437 | 27,738 | 8,429 | 383 | 1,944 | 428 | 98 | 46,979 |
| 2002 | 9,583 | 2,870 | 6,534 | 3,905 | 20 | 3,773 | 1,325 | 147 | 28,157 |
| 2001 | 10,708 | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | 299 | 29,175 |
| 2000 | Not Available | Before 2002 | Before 2002 | Before 2002 | Before 2002 | Before 2002 | Before 2002 | Not Available | 34,266 |
| 1999 | Before 2001 | | | | | | | Before 2001 | 31,673 |
| 1998 | | | | | | | | | 19,585 |
| 1997 | | | | | | | | | 5,554 |
| 1996 | | | | | | | | | 1,486 |
| 1995 | | | | | | | | | 747 |
| 1994 | | | | | | | | | 1 |
| 1993 | | | | | | | | | 2 |
| 1992 | | | | | | | | | 3 |
| 1991 | | | | | | | | | 93 |
| 1990 | | | | | | | | | 352 |
| 1989 | | | | | | | | | 831 |
| 1988 | | | | | | | | | 810 |
| 1987 | | | | | | | | | 1,036 |
| 1986 | | | | | | | | | 1,591 |

Source: Fannie Mae

[1]  Unpaid principal balance.

## Table 5b. Fannie Mae Mortgage Assets Detail – Part 3, Mortgage-Related Securities

| End of Period | Mortgage-Related Securities ($ in Millions) | | ($ in Millions) | |
|---|---|---|---|---|
| | Mortgage Revenue Bonds[1] ($) | Total Mortgage-Related Securities[1] ($) | Unamortized Premiums, Discounts, Deferred Adjustments, & Fair-Value Adjustments on Securities and Loans[2] ($) | Total Mortgage Assets ($) |
| **4Q09** | 14,453 | 352,709 | (23,981) | 745,271 |
| **3Q09** | 14,747 | 368,389 | (17,505) | 775,422 |
| **2Q09** | 15,019 | 369,546 | (23,239) | 773,017 |
| **1Q09** | 15,285 | 353,172 | (24,327) | 765,214 |
| **Annual Data** | | | | |
| **2009** | 14,453 | 352,709 | (23,981) | 745,271 |
| **2008** | 15,447 | 362,703 | (24,207) | 767,989 |
| **2007** | 16,315 | 324,326 | (4,283) | 723,620 |
| **2006** | 16,924 | 345,887 | (2,498) | 726,434 |
| **2005** | 18,802 | 371,209 | (1,086) | 736,803 |
| **2004** | 22,076 | 517,052 | 7,985 | 925,194 |
| **2003** | 20,359 | 511,235 | 10,721 | 919,589 |
| **2002** | 19,650 | 476,535 | 20,848 | 820,627 |
| **2001** | 18,377 | 541,046 | (2,104) | 706,347 |
| **2000** | 15,227 | 457,617 | (2,520) | 607,731 |
| **1999** | 12,171 | 374,836 | (964) | 523,103 |
| **1998** | 9,685 | 258,736 | 919 | 415,434 |
| **1997** | 7,620 | 156,576 | (86) | 316,592 |
| **1996** | 6,665 | 119,161 | (525) | 286,527 |
| **1995** | 5,343 | 82,030 | (643) | 252,868 |
| **1994** | 3,403 | 51,148 | (1,242) | 220,815 |
| **1993** | 2,519 | 27,712 | (692) | 190,169 |
| **1992** | 2,816 | 23,522 | (1,859) | 156,260 |
| **1991** | 2,759 | 19,732 | (2,304) | 126,679 |
| **1990** | 2,530 | 14,831 | (2,562) | 114,066 |
| **1989** | 2,239 | 14,992 | (2,740) | 107,981 |
| **1988** | 1,804 | 10,793 | (2,914) | 100,099 |
| **1987** | 1,866 | 7,128 | (3,081) | 93,665 |
| **1986** | 469 | Not Available Before 1987 | (3,710) | 94,123 |
| **1985** | Not Available Before 1986 | | (4,040) | 95,250 |
| **1984** | | | (3,974) | 84,695 |
| **1983** | | | (3,009) | 75,782 |
| **1982** | | | (2,458) | 69,842 |
| **1981** | | | (1,783) | 59,949 |
| **1980** | | | (1,738) | 55,878 |
| **1979** | | | (1,320) | 49,777 |
| **1978** | | | (1,212) | 42,103 |
| **1977** | | | (1,125) | 33,252 |
| **1976** | | | (1,162) | 31,775 |
| **1975** | | | (1,096) | 30,821 |
| **1974** | | | (1,042) | 28,665 |
| **1973** | | | (870) | 23,579 |
| **1972** | | | (674) | 19,650 |
| **1971** | | | (629) | 17,886 |

Source: Fannie Mae

[1] Unpaid principal balance.

[2] Includes unamortized premiums, discounts, deferred adjustments, and fair-value adjustments on securities and loans. Beginning in 2002, amounts include fair-value adjustments and impairments on mortgage-related securities and securities commitments classified as trading and available-for-sale. Excludes the allowance for loan losses on loans held for investment.

## Table 6. Fannie Mae Financial Derivatives

| End of Period | Financial Derivatives - Notional Amount Outstanding ($ in Millions) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Interest Rate Swaps[1] ($) | Interest Rate Caps, Floors, and Corridors ($) | Foreign Currency Contracts ($) | OTC Futures, Options, and Forward Rate Agreements ($) | Mandatory Mortgage Purchase & Sell Commitments ($) | Other ($) | Total ($) |
| 4Q09 | 661,990 | 7,000 | 1,537 | 174,680 | 121,947 | 0 | 967,154 |
| 3Q09 | 787,825 | 7,000 | 1,498 | 175,530 | 118,051 | 0 | 1,089,904 |
| 2Q09 | 1,245,196 | 3,000 | 1,431 | 171,030 | 174,183 | 0 | 1,594,840 |
| 1Q09 | 1,191,236 | 500 | 1,222 | 174,780 | 127,906 | 0 | 1,495,644 |
| Annual Data | | | | | | | |
| 2009 | 661,990 | 7,000 | 1,537 | 174,680 | 121,947 | 0 | 967,154 |
| 2008 | 1,023,384 | 500 | 1,652 | 173,060 | 71,236 | 0 | 1,269,832 |
| 2007 | 671,274 | 2,250 | 2,559 | 210,381 | 55,366 | 0 | 941,830 |
| 2006 | 516,571 | 14,000 | 4,551 | 210,271 | 39,928 | 0 | 785,321 |
| 2005 | 317,470 | 33,000 | 5,645 | 288,000 | 39,194 | 0 | 683,309 |
| 2004 | 256,216 | 104,150 | 11,453 | 318,275 | 40,600 | 0 | 730,694 |
| 2003 | 598,288 | 130,350 | 5,195 | 305,175 | 43,560 | 0 | 1,082,568 |
| 2002 | 253,211 | 122,419 | 3,932 | 275,625 | Not Available Before 2003 | 0 | 655,187 |
| 2001 | 299,953 | 75,893 | 8,493 | 148,800 | | 0 | 533,139 |
| 2000 | 227,651 | 33,663 | 9,511 | 53,915 | | 0 | 324,740 |
| 1999 | 192,032 | 28,950 | 11,507 | 41,081 | | 1,400 | 274,970 |
| 1998 | 142,846 | 14,500 | 12,995 | 13,481 | | 3,735 | 187,557 |
| 1997 | 149,673 | 100 | 9,968 | 0 | | 1,660 | 161,401 |
| 1996 | 158,140 | 300 | 2,429 | 0 | | 350 | 161,219 |
| 1995 | 125,679 | 300 | 1,224 | 29 | | 975 | 128,207 |
| 1994 | 87,470 | 360 | 1,023 | 0 | | 1,465 | 90,317 |
| 1993 | 49,458 | 360 | 1,023 | 0 | | 1,425 | 52,265 |
| 1992 | 24,130 | 0 | 1,177 | 0 | | 1,350 | 26,658 |
| 1991 | 9,100 | 0 | Not Available Before 1992 | 50 | | 1,050 | 10,200 |
| 1990 | 4,800 | 0 | | 25 | | 1,700 | 6,525 |

Source: Fannie Mae

[1] Beginning in 2002, includes MBS options, swap credit enhancements, and forward-starting debt.

# Table 7. Fannie Mae Nonmortgage Investments

| End of Period | Nonmortgage Investments ($ in Millions)[1] | | | | | |
| | Federal Funds and Eurodollars ($) | Asset-Backed Securities ($) | Repurchase Agreements[2] ($) | Commercial Paper and Corporate Debt[3] ($) | Other[4] ($) | Total ($) |
|---|---|---|---|---|---|---|
| 4Q09 | 44,900 | 8,515 | 4,000 | 364 | 3 | 57,782 |
| 3Q09 | 21,810 | 9,263 | 12,999 | 521 | 3 | 44,596 |
| 2Q09 | 14,310 | 9,808 | 11,500 | 935 | 5,003 | 41,556 |
| 1Q09 | 32,910 | 10,270 | 15,000 | 3,725 | 2,003 | 63,908 |
| Annual Data | | | | | | |
| 2009 | 44,900 | 8,515 | 4,000 | 364 | 3 | 57,782 |
| 2008 | 45,910 | 10,598 | 8,000 | 6,037 | 1,005 | 71,550 |
| 2007 | 43,510 | 15,511 | 5,250 | 13,515 | 9,089 | 86,875 |
| 2006 | 9,410 | 18,914 | 0 | 27,604 | 1,055 | 56,983 |
| 2005 | 8,900 | 19,190 | 0 | 16,979 | 947 | 46,016 |
| 2004 | 3,860 | 25,644 | 70 | 16,435 | 1,829 | 47,839 |
| 2003 | 12,575 | 26,862 | 111 | 17,700 | 2,270 | 59,518 |
| 2002 | 150 | 22,312 | 181 | 14,659 | 2,074 | 39,376 |
| 2001 | 16,089 | 20,937 | 808 | 23,805 | 4,343 | 65,982 |
| 2000 | 7,539 | 17,512 | 87 | 8,893 | 18,316 | 52,347 |
| 1999 | 4,837 | 19,207 | 122 | 1,723 | 11,410 | 37,299 |
| 1998 | 7,926 | 20,993 | 7,556 | 5,155 | 16,885 | 58,515 |
| 1997 | 19,212 | 16,639 | 6,715 | 11,745 | 10,285 | 64,596 |
| 1996 | 21,734 | 14,635 | 4,667 | 6,191 | 9,379 | 56,606 |
| 1995 | 19,775 | 9,905 | 10,175 | 8,629 | 8,789 | 57,273 |
| 1994 | 17,593 | 3,796 | 9,006 | 7,719 | 8,221 | 46,335 |
| 1993 | 4,496 | 3,557 | 4,684 | 0 | 8,659 | 21,396 |
| 1992 | 6,587 | 4,124 | 3,189 | 0 | 5,674 | 19,574 |
| 1991 | 2,954 | 2,416 | 2,195 | 0 | 2,271 | 9,836 |
| 1990 | 5,329 | 1,780 | 951 | 0 | 1,808 | 9,868 |
| 1989 | 5,158 | 1,107 | 0 | 0 | 2,073 | 8,338 |
| 1988 | 4,125 | 481 | 0 | 0 | 683 | 5,289 |
| 1987 | 2,559 | 25 | 0 | 0 | 884 | 3,468 |
| 1986 | 1,530 | 0 | 0 | 0 | 245 | 1,775 |
| 1985 | 1,391 | 0 | 0 | 0 | 75 | 1,466 |
| 1984 | 1,575 | 0 | 0 | 0 | 265 | 1,840 |
| 1983 | 9 | 0 | 0 | 0 | 227 | 236 |
| 1982 | 1,799 | 0 | 0 | 0 | 631 | 2,430 |
| 1981 | Not Available | Not Available | Not Available | Not Available | Not Available | 1,047 |
| 1980 | Before 1982 | Before 1982 | Before 1982 | Before 1982 | Before 1982 | 1,556 |
| 1979 | | | | | | 843 |
| 1978 | | | | | | 834 |
| 1977 | | | | | | 318 |
| 1976 | | | | | | 245 |
| 1975 | | | | | | 239 |
| 1974 | | | | | | 466 |
| 1973 | | | | | | 227 |
| 1972 | | | | | | 268 |
| 1971 | | | | | | 349 |

Source: Fannie Mae

[1] Data reflect unpaid principal balance net of unamortized purchase premium, discounts and cost basis adjustments, fair-value adjustments, and impairments on available-for-sale and trading securities. Prior to 1982, the majority of nonmortgage investments consisted of U.S. government and agency securities.

[2] Since 2005, advances to lenders are not included in the data. Amounts for periods prior to 2005 may include or consist of advances to lenders. Includes tri-party repurchase agreements.

[3] Includes commercial paper, floating-rate notes, taxable auction notes, corporate bonds and auction-rate preferred stock. Starting with 2006, medium-term notes previously reported in "Other" are included in commercial paper.

[4] Includes Yankee and domestic certificates of deposit (CDs).

# Table 8. Fannie Mae Mortgage Asset Quality

| End of Period | Mortgage Asset Quality | | | | |
|---|---|---|---|---|---|
| | Single-Family Delinquency Rate[1] (%) | Multifamily Delinquency Rate[2] (%) | Credit Losses as a Proportion of the Guarantee Book of Business[3,4] (%) | REO as a Proportion of the Guarantee Book of Business[4] (%) | Credit-Enhanced Outstanding as a Proportion of the Guarantee Book of Business[5] (%) |
| 4Q09 | 5.38 | 0.63 | 0.53 | 0.30 | 21.2 |
| 3Q09 | 4.72 | 0.62 | 0.48 | 0.25 | 22.0 |
| 2Q09 | 3.94 | 0.51 | 0.44 | 0.22 | 22.7 |
| 1Q09 | 3.15 | 0.34 | 0.33 | 0.22 | 23.3 |
| Annual Data | | | | | |
| 2009 | 5.38 | 0.63 | 0.45 | 0.30 | 21.2 |
| 2008 | 2.42 | 0.30 | 0.23 | 0.23 | 23.7 |
| 2007 | 0.98 | 0.08 | 0.05 | 0.13 | 23.9 |
| 2006 | 0.65 | 0.08 | 0.02 | 0.09 | 22.3 |
| 2005 | 0.79 | 0.32 | 0.01 | 0.08 | 21.8 |
| 2004 | 0.63 | 0.11 | 0.01 | 0.07 | 20.5 |
| 2003 | 0.60 | 0.29 | 0.01 | 0.06 | 22.6 |
| 2002 | 0.57 | 0.08 | 0.01 | 0.05 | 26.8 |
| 2001 | 0.55 | 0.27 | 0.01 | 0.04 | 34.2 |
| 2000 | 0.45 | 0.07 | 0.01 | 0.05 | 40.4 |
| 1999 | 0.47 | 0.11 | 0.01 | 0.06 | 20.9 |
| 1998 | 0.56 | 0.23 | 0.03 | 0.08 | 17.5 |
| 1997 | 0.62 | 0.37 | 0.04 | 0.10 | 12.8 |
| 1996 | 0.58 | 0.68 | 0.05 | 0.11 | 10.5 |
| 1995 | 0.56 | 0.81 | 0.05 | 0.08 | 10.6 |
| 1994 | 0.47 | 1.21 | 0.06 | 0.10 | 10.2 |
| 1993 | 0.48 | 2.34 | 0.04 | 0.10 | 10.6 |
| 1992 | 0.53 | 2.65 | 0.04 | 0.09 | 15.6 |
| 1991 | 0.64 | 3.62 | 0.04 | 0.07 | 22.0 |
| 1990 | 0.58 | 1.70 | 0.06 | 0.09 | 25.9 |
| 1989 | 0.69 | 3.20 | 0.07 | 0.14 | Not Available Before 1990 |
| 1988 | 0.88 | 6.60 | 0.11 | 0.15 | |
| 1987 | 1.12 | Not Available Before 1988 | 0.11 | 0.18 | |
| 1986 | 1.38 | | 0.12 | 0.22 | |
| 1985 | 1.48 | | 0.13 | 0.32 | |
| 1984 | 1.65 | | 0.09 | 0.33 | |
| 1983 | 1.49 | | 0.05 | 0.35 | |
| 1982 | 1.41 | | 0.01 | 0.20 | |
| 1981 | 0.96 | | 0.01 | 0.13 | |
| 1980 | 0.90 | | 0.01 | 0.09 | |
| 1979 | 0.56 | | 0.02 | 0.11 | |
| 1978 | 0.55 | | 0.02 | 0.18 | |
| 1977 | 0.46 | | 0.02 | 0.26 | |
| 1976 | 1.58 | | 0.03 | 0.27 | |
| 1975 | 0.56 | | 0.03 | 0.51 | |
| 1974 | 0.51 | | 0.02 | 0.52 | |
| 1973 | Not Available Before 1974 | | 0.00 | 0.61 | |
| 1972 | | | 0.02 | 0.98 | |
| 1971 | | | 0.01 | 0.59 | |

Source: Fannie Mae

[1] Single-family loans are seriously delinquent when the borrower has missed three or more consecutive monthly payments and the loan has not been brought current. Rate is calculated using the number of conventional single-family loans owned and backing Fannie Mae MBS. Includes loans referred to foreclosure proceedings but not yet foreclosed. Prior to 1988, all data included all seriously delinquent loans for which Fannie Mae had primary risk of loss. Beginning with 1998, data included all seriously delinquent conventional loans owned and backing Fannie Mae MBS with and without primary mortgage insurance and/or credit enhancement. Data prior to 1992 include loans and securities in relief or bankruptcy, even if the loans were less than 90 days delinquent, calculated based on number of loans.

[2] Prior to 1998, data include multifamily loans for which Fannie Mae had primary risk of loss. Beginning in 1998, data included all multifamily loans and securities 60 days or more past due. For 1998-2001, rate is calculated using the mortgage credit book of business as the denominator. Beginning in 2002, rate is calculated using unpaid principal balance of delinquent multifamily loans owned by Fannie Mae or underlying Fannie Mae guaranteed securities as the denominator.

[3] Credit losses are charge-offs, net of recoveries and foreclosed property expense (income). Average balances used to calculate ratios subsequent to 1994. Quarterly data are annualized. Beginning in 2005, credit losses exclude the impact of fair-value losses of credit impaired loans acquired from MBS trusts. Beginning in 2008, credit losses also exclude the impact of HomeSaver Advance fair-value losses.

[4] Guarantee book of business refers to the sum of the unpaid principal balance of (1) mortgage loans held as investments; (2) Fannie Mae MBS held as investments; (3) Fannie Mae MBS held by third parties; and (4) credit enhancements that Fannie Mae provides on mortgage assets. It excludes non-Fannie Mae mortgage-related securities held as investments that Fannie Mae does not guarantee. Prior to 2005, the ratio was based on the mortgage credit book of business, which includes non-Fannie Mae mortgage-related securities held as investments that are not guaranteed.

[5] Beginning in 2000, credit-enhanced outstanding is expanded to include primary mortgage insurance. Amounts for periods prior to 2000 reflect proportion of the mortgage assets portfolio with additional recourse from a third party to accept some or all of the expected losses on defaulted mortgages.

FHFA 1347

## Table 9. Fannie Mae Capital

| End of Period | Capital ($ in Millions)[1] | | | | | | | | | |
| | Minimum Capital Requirement | | | Risk-Based Capital Requirement | | | Market Capitalization[7] ($) | Core Capital/Total Assets (%) | Core Capital/Total MBS Outstanding Plus Total Assets (%) | Common Share Dividend Payout Rate[8] (%) |
| | Core Capital ($) | Minimum Capital Requirement[2] ($) | Minimum Capital Surplus (Deficit)[3] ($) | Total Capital[4] ($) | Risk-Based Capital Requirement[5] ($) | Risk-Based Capital Surplus (Deficit)[6] ($) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 4Q09 | (74,540) | 33,057 | (107,597) | N/A | N/A | N/A | 1,314 | (8.58) | (2.26) | N/A |
| 3Q09 | (58,226) | 33,504 | (91,730) | N/A | N/A | N/A | 1,687 | (6.54) | (1.76) | N/A |
| 2Q09 | (38,480) | 33,878 | (72,358) | N/A | N/A | N/A | 645 | (4.22) | (1.17) | N/A |
| 1Q09 | (31,848) | 33,912 | (65,760) | N/A | N/A | N/A | 773 | (3.46) | (0.98) | N/A |
| **Annual Data** | | | | | | | | | | |
| 2009 | (74,540) | 33,057 | (107,597) | N/A | N/A | N/A | 1,314 | (8.58) | (2.26) | N/A |
| 2008 | (8,641) | 33,552 | (42,193) | N/A | N/A | N/A | 825 | (0.95) | (0.27) | N/M |
| 2007 | 45,373 | 31,927 | 13,446 | 48,658 | 24,700 | 23,958 | 38,946 | 5.14 | 1.51 | N/M |
| 2006 | 41,950 | 29,359 | 12,591 | 42,703 | 26,870 | 15,833 | 57,735 | 4.97 | 1.60 | 32.4 |
| 2005 | 39,433 | 28,233 | 11,200 | 40,091 | 12,636 | 27,455 | 47,373 | 4.73 | 1.62 | 17.2 |
| 2004 | 34,514 | 32,121 | 2,393 | 35,196 | 10,039 | 25,157 | 69,010 | 3.38 | 1.42 | 42.1 |
| 2003 | 26,953 | 31,816 | (4,863) | 27,487 | 27,221 | 266 | 72,838 | 2.64 | 1.16 | 20.8 |
| 2002 | 20,431 | 27,688 | (7,257) | 20,831 | 17,434 | 3,397 | 63,612 | 2.26 | 1.05 | 34.5 |
| 2001 | 25,182 | 24,182 | 1,000 | 25,976 | Not Applicable Before 2002 | Not Applicable Before 2002 | 79,281 | 3.15 | 1.51 | 23.0 |
| 2000 | 20,827 | 20,293 | 533 | 21,634 | | | 86,643 | 3.08 | 1.51 | 26.0 |
| 1999 | 17,876 | 17,770 | 106 | 18,677 | | | 63,651 | 3.11 | 1.43 | 28.8 |
| 1998 | 15,465 | 15,334 | 131 | 16,257 | | | 75,881 | 3.19 | 1.38 | 29.5 |
| 1997 | 13,793 | 12,703 | 1,090 | 14,575 | | | 59,167 | 3.52 | 1.42 | 29.4 |
| 1996 | 12,773 | 11,466 | 1,307 | 13,520 | | | 39,932 | 3.64 | 1.42 | 30.4 |
| 1995 | 10,959 | 10,451 | 508 | 11,703 | | | 33,812 | 3.46 | 1.32 | 34.6 |
| 1994 | 9,541 | 9,415 | 126 | 10,368 | | | 19,882 | 3.50 | 1.26 | 30.8 |
| 1993 | 8,052 | 7,064 | 988 | 8,893 | | | 21,387 | 3.71 | 1.17 | 26.8 |
| 1992 | Not Applicable | Not Applicable | Not Applicable | Not Applicable | | | 20,874 | Not Applicable | Not Applicable | 23.2 |
| 1991 | Before 1993 | Before 1993 | Before 1993 | Before 1993 | | | 18,836 | Before 1993 | Before 1993 | 21.3 |
| 1990 | | | | | | | 8,490 | | | 14.7 |
| 1989 | | | | | | | 8,092 | | | 12.8 |
| 1988 | | | | | | | 3,992 | | | 11.2 |
| 1987 | | | | | | | 2,401 | | | 11.7 |
| 1986 | | | | | | | 3,006 | | | 8.0 |
| 1985 | | | | | | | 1,904 | | | 30.1 |
| 1984 | | | | | | | 1,012 | | | N/A |
| 1983 | | | | | | | 1,514 | | | 13.9 |
| 1982 | | | | | | | 1,603 | | | N/A |
| 1981 | | | | | | | 502 | | | N/A |
| 1980 | | | | | | | 702 | | | 464.2 |
| 1979 | | | | | | | Not Available | | | 45.7 |
| 1978 | | | | | | | Before 1980 | | | 30.3 |
| 1977 | | | | | | | | | | 31.8 |
| 1976 | | | | | | | | | | 33.6 |
| 1975 | | | | | | | | | | 31.8 |
| 1974 | | | | | | | | | | 29.6 |
| 1973 | | | | | | | | | | 18.1 |
| 1972 | | | | | | | | | | 15.2 |
| 1971 | | | | | | | | | | 18.7 |

Sources: Fannie Mae and FHFA

N/A = not applicable          N/M = not meaningful

[1] On October 9, 2008, FHFA suspended capital classifications of Fannie Mae. As of the fourth quarter of 2008, neither the existing statutory nor the FHFA-directed regulatory capital requirements are binding and will not be binding during conservatorship.

[2] Beginning in the third quarter of 2005, Fannie Mae was required to maintain an additional 30 percent capital in excess of the statutory minimum capital requirement. That requirement was reduced to 20 percent as of the first quarter of 2008 and to 15 percent as of the second quarter of 2008. The minimum capital requirement and minimum capital surplus numbers stated in this table do not reflect the additional capital requirements.

[3] Minimum capital surplus is the difference between core capital and minimum capital requirement.

[4] Total capital is core capital plus the total allowance for loan losses and guarantee liability for MBS, less any specific loss allowances.

[5] Risk-based capital requirement is the amount of total capital that an Enterprise must hold to absorb projected losses flowing from future adverse interest rate and credit risk conditions and is specified by the Federal Housing Enterprises Financial Safety and Soundness Act of 1992. For 2004 through 2006, the requirements were calculated based on originally reported, not restated or revised, financial results.

[6] The difference between total capital and the risk-based capital requirement. For 2004 through 2006, the difference reflects restated total capital and the risk-based capital requirement rather than total capital originally reported by Fannie Mae and used by FHFA to make capital classifications. FHFA is not reporting on risk-based capital levels during conservatorship.

[7] Stock price at the end of the period multiplied by the number of outstanding common shares.

[8] Common dividends declared during the period divided by net income available for common stockholders for the period.

## Table 10. Freddie Mac Mortgage Purchases

| Period | Business Activity ($ in Millions) | | | |
| | Purchases[1] | | | |
| | Single-Family ($) | Multifamily ($) | Total Mortgages[2] ($) | Mortgage-Related Securities[3] ($) |
|---|---|---|---|---|
| 4Q09 | 90,676 | 4,658 | 95,334 | 16,745 |
| 3Q09 | 120,770 | 3,628 | 124,398 | 44,191 |
| 2Q09 | 150,488 | 4,447 | 154,935 | 63,127 |
| 1Q09 | 112,614 | 3,824 | 116,438 | 115,588 |
| Annual Data | | | | |
| 2009 | 474,548 | 16,557 | 491,105 | 239,651 |
| 2008 | 357,585 | 23,972 | 381,557 | 297,614 |
| 2007 | 466,066 | 21,645 | 487,711 | 231,039 |
| 2006 | 351,270 | 13,031 | 364,301 | 241,205 |
| 2005 | 381,673 | 11,172 | 392,845 | 325,575 |
| 2004 | 354,812 | 12,712 | 367,524 | 223,299 |
| 2003 | 701,483 | 15,292 | 716,775 | 385,078 |
| 2002 | 533,194 | 10,654 | 543,848 | 299,674 |
| 2001 | 384,124 | 9,510 | 393,634 | 248,466 |
| 2000 | 168,013 | 6,030 | 174,043 | 91,896 |
| 1999 | 232,612 | 7,181 | 239,793 | 101,898 |
| 1998 | 263,490 | 3,910 | 267,400 | 128,446 |
| 1997 | 115,160 | 2,241 | 117,401 | 35,385 |
| 1996 | 122,850 | 2,229 | 125,079 | 36,824 |
| 1995 | 89,971 | 1,565 | 91,536 | 39,292 |
| 1994 | 122,563 | 847 | 123,410 | 19,817 |
| 1993 | 229,051 | 191 | 229,242 | Not Available |
| 1992 | 191,099 | 27 | 191,126 | Before 1994 |
| 1991 | 99,729 | 236 | 99,965 | |
| 1990 | 74,180 | 1,338 | 75,518 | |
| 1989 | 76,765 | 1,824 | 78,589 | |
| 1988 | 42,884 | 1,191 | 44,075 | |
| 1987 | 74,824 | 2,016 | 76,840 | |
| 1986 | 99,936 | 3,538 | 103,474 | |
| 1985 | 42,110 | 1,902 | 44,012 | |
| 1984 | Not Available | Not Available | 21,885 | |
| 1983 | Before 1985 | Before 1985 | 22,952 | |
| 1982 | | | 23,671 | |
| 1981 | | | 3,744 | |
| 1980 | | | 3,690 | |
| 1979 | | | 5,716 | |
| 1978 | | | 6,524 | |
| 1977 | | | 4,124 | |
| 1976 | | | 1,129 | |
| 1975 | | | 1,716 | |
| 1974 | | | 2,185 | |
| 1973 | | | 1,334 | |
| 1972 | | | 1,265 | |
| 1971 | | | 778 | |

Source: Freddie Mac

[1] Based on unpaid principal balances and excludes mortgage loans and mortgage-related securities traded but not yet settled.

[2] Consists of loans purchased from lenders. Excludes purchases of non-Freddie Mac MBS as well as Freddie Mac MBS repurchased and held for investment.

[3] Not included in total mortgages. For 2002 through the current period, amounts include non-Freddie Mac mortgage-related securities as well as Freddie Mac MBS repurchased and held for investment. For years prior to 2002, amounts exclude structured securities backed by Ginnie Mae MBS. Activity does not include dollar roll transactions.

## Table 10a. Freddie Mac Mortgage Purchases Detail by Type of Loan

| | Purchases ($ in Millions)[1] | | | | | | | | | | | |
| | Single-Family Mortgages | | | | | | | | Multifamily Mortgages | | | |
| Period | Conventional | | | | FHA/VA | | | Total Single-Family Mortgages ($) | Conventional ($) | FHA/RD ($) | Total Multifamily Mortgages ($) | Total Mortgage Purchases ($) |
| | Fixed-Rate[2] ($) | Adjustable-Rate[3] ($) | Seconds ($) | Total ($) | Fixed-Rate ($) | Adjustable-Rate ($) | Total ($) | | | | | |
| **4Q09** | 88,315 | 2,015 | 0 | 90,330 | 346 | 0 | 346 | 90,676 | 4,658 | 0 | 4,658 | 95,334 |
| **3Q09** | 119,475 | 956 | 0 | 120,431 | 339 | 0 | 339 | 120,770 | 3,628 | 0 | 3,628 | 124,398 |
| **2Q09** | 149,740 | 271 | 0 | 150,011 | 477 | 0 | 477 | 150,488 | 4,447 | 0 | 4,447 | 154,935 |
| **1Q09** | 112,023 | 373 | 0 | 112,396 | 218 | 0 | 218 | 112,614 | 3,824 | 0 | 3,824 | 116,438 |
| Annual Data | | | | | | | | | | | | |
| **2009** | 469,553 | 3,615 | 0 | 473,168 | 1,380 | 0 | 1,380 | 474,548 | 16,557 | 0 | 16,557 | 491,105 |
| **2008** | 327,006 | 30,014 | 0 | 357,020 | 565 | 0 | 565 | 357,585 | 23,972 | 0 | 23,972 | 381,557 |
| **2007** | 387,760 | 78,149 | 0 | 465,909 | 157 | 0 | 157 | 466,066 | 21,645 | 0 | 21,645 | 487,711 |
| **2006** | 272,875 | 77,449 | 0 | 350,324 | 946 | 0 | 946 | 351,270 | 13,031 | 0 | 13,031 | 364,301 |
| **2005** | 313,842 | 67,831 | 0 | 381,673 | 0 | 0 | 0 | 381,673 | 11,172 | 0 | 11,172 | 392,845 |
| **2004** | 293,830 | 60,663 | 0 | 354,493 | 319 | 0 | 319 | 354,812 | 12,712 | 0 | 12,712 | 367,524 |
| **2003** | 617,796 | 82,270 | 0 | 700,066 | 1,417 | 0 | 1,417 | 701,483 | 15,292 | 0 | 15,292 | 716,775 |
| **2002** | 468,901 | 63,448 | 0 | 532,349 | 845 | 0 | 845 | 533,194 | 10,654 | 0 | 10,654 | 543,848 |
| **2001** | 353,056 | 30,780 | 0 | 383,836 | 288 | 0 | 288 | 384,124 | 9,507 | 3 | 9,510 | 393,634 |
| **2000** | 145,744 | 21,201 | 0 | 166,945 | 1,068 | 0 | 1,068 | 168,013 | 6,030 | 0 | 6,030 | 174,043 |
| **1999** | 224,040 | 7,443 | 0 | 231,483 | 1,129 | 0 | 1,129 | 232,612 | 7,181 | 0 | 7,181 | 239,793 |
| **1998** | 256,008 | 7,384 | 0 | 263,392 | 98 | 0 | 98 | 263,490 | 3,910 | 0 | 3,910 | 267,400 |
| **1997** | 106,174 | 8,950 | 0 | 115,124 | 36 | 0 | 36 | 115,160 | 2,241 | 0 | 2,241 | 117,401 |
| **1996** | 116,316 | 6,475 | 0 | 122,791 | 59 | 0 | 59 | 122,850 | 2,229 | 0 | 2,229 | 125,079 |
| **1995** | 75,867 | 14,099 | 0 | 89,966 | 5 | 0 | 5 | 89,971 | 1,565 | 0 | 1,565 | 91,536 |
| **1994** | 105,902 | 16,646 | 0 | 122,548 | 15 | 0 | 15 | 122,563 | 847 | 0 | 847 | 123,410 |
| **1993** | 208,322 | 20,708 | 1 | 229,031 | 20 | 0 | 20 | 229,051 | 191 | 0 | 191 | 229,242 |
| **1992** | 175,515 | 15,512 | 7 | 191,034 | 65 | 0 | 65 | 191,099 | 27 | 0 | 27 | 191,126 |
| **1991** | 91,586 | 7,793 | 206 | 99,585 | 144 | 0 | 144 | 99,729 | 236 | 0 | 236 | 99,965 |
| **1990** | 56,806 | 16,286 | 686 | 73,778 | 402 | 0 | 402 | 74,180 | 1,338 | 0 | 1,338 | 75,518 |
| **1989** | 57,100 | 17,835 | 1,206 | 76,141 | 624 | 0 | 624 | 76,765 | 1,824 | 0 | 1,824 | 78,589 |
| **1988** | 34,737 | 7,253 | 59 | 42,049 | 835 | 0 | 835 | 42,884 | 1,191 | 0 | 1,191 | 44,075 |
| **1987** | 69,148 | 4,779 | 69 | 73,996 | 828 | 0 | 828 | 74,824 | 2,016 | 0 | 2,016 | 76,840 |
| **1986** | 96,105 | 2,262 | 90 | 98,457 | 1,479 | 0 | 1,479 | 99,936 | 3,538 | 0 | 3,538 | 103,474 |
| **1985** | 40,226 | 605 | 34 | 40,865 | 1,245 | 0 | 1,245 | 42,110 | 1,902 | 0 | 1,902 | 44,012 |

Source: Freddie Mac

[1] Based on unpaid principal balances and excludes mortgage loans traded but not yet settled.

[2] For 2002 through the current period, includes loans guaranteed by USDA Rural Development programs.

[3] For 2001 through the current period, includes balloons/reset mortgages.

## Table 10b. Freddie Mac Purchases of Mortgage-Related Securities – Part 1

| Period | Purchases ($ in Millions)[1] | | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Freddie Mac Securities | | | | Others' Securities | | | | | | | | | | |
| | Single-Family | | Multi-family ($) | Total Freddie Mac ($) | Fannie Mae | | | | Ginnie Mae | | | | Total Private-Label ($) | Mortgage Revenue Bonds ($) | Total Mortgage-Related Securities[2] ($) |
| | | | | | Single-Family | | Multi-family ($) | Total Fannie Mae ($) | Single-Family | | Multi-family ($) | Total Ginnie Mae ($) | | | |
| | Fixed-Rate ($) | Adjustable-Rate ($) | | | Fixed-Rate ($) | Adjustable-Rate ($) | | | Fixed-Rate ($) | Adjustable-Rate ($) | | | | | |
| **4Q09** | 7,839 | 45 | 0 | 7,884 | 3,502 | 28 | 0 | 3,530 | 0 | 0 | 0 | 0 | 5,330 | 1 | 16,745 |
| **3Q09** | 38,873 | 4,852 | 0 | 43,725 | 269 | 106 | 0 | 375 | 0 | 0 | 0 | 0 | 7 | 84 | 44,191 |
| **2Q09** | 46,331 | 268 | 0 | 46,599 | 9,418 | 1,378 | 0 | 10,796 | 0 | 0 | 0 | 0 | 5,713 | 19 | 63,127 |
| **1Q09** | 83,931 | 249 | 0 | 84,180 | 30,109 | 1,185 | 0 | 31,294 | 0 | 0 | 27 | 27 | 11 | 76 | 115,588 |
| **Annual Data** | | | | | | | | | | | | | | | |
| **2009** | 176,974 | 5,414 | 0 | 182,388 | 43,298 | 2,697 | 0 | 45,995 | 0 | 0 | 27 | 27 | 11,061 | 180 | 239,651 |
| **2008** | 192,701 | 26,344 | 111 | 219,156 | 49,534 | 18,519 | 0 | 68,053 | 0 | 0 | 8 | 8 | 10,316 | 81 | 297,614 |
| **2007** | 111,976 | 26,800 | 2,283 | 141,059 | 2,170 | 9,863 | 0 | 12,033 | 0 | 0 | 0 | 0 | 76,134 | 1,813 | 231,039 |
| **2006** | 76,378 | 27,146 | 0 | 103,524 | 4,259 | 8,014 | 0 | 12,273 | 0 | 0 | 0 | 0 | 122,230 | 3,178 | 241,205 |
| **2005** | 106,682 | 29,805 | 0 | 136,487 | 2,854 | 3,368 | 0 | 6,222 | 64 | 0 | 0 | 64 | 179,962 | 2,840 | 325,575 |
| **2004** | 72,147 | 23,942 | 146 | 96,235 | 756 | 3,282 | 0 | 4,038 | 0 | 0 | 0 | 0 | 121,082 | 1,944 | 223,299 |
| **2003** | Not Available | Not Available | Not Available | 266,989 | Not Available | Not Available | Not Available | 47,806 | Not Available | Not Available | Not Available | 166 | 69,154 | 963 | 385,078 |
| **2002** | Before 2004 | Before 2004 | Before 2004 | 192,817 | Before 2004 | Before 2004 | Before 2004 | 45,798 | Before 2004 | Before 2004 | Before 2004 | 820 | 59,376 | 863 | 299,674 |
| **2001** | | | | 157,339 | | | | 64,508 | | | | 1,444 | 24,468 | 707 | 248,466 |
| **2000** | | | | 58,516 | | | | 18,249 | | | | 3,339 | 10,304 | 1,488 | 91,896 |
| **1999** | | | | 69,219 | | | | 12,392 | | | | 3,422 | 15,263 | 1,602 | 101,898 |
| **1998** | | | | 107,508 | | | | 3,126 | | | | 319 | 15,711 | 1,782 | 128,446 |
| **1997** | | | | 31,296 | | | | 897 | | | | 326 | 1,494 | 1,372 | 35,385 |
| **1996** | | | | 33,338 | | | | Not Available | | | | Not Available | Not Available | Not Available | 36,824 |
| **1995** | | | | 32,534 | | | | Before 1997 | | | | Before 1997 | Before 1997 | Before 1997 | 39,292 |
| **1994** | | | | 19,817 | | | | | | | | | | | 19,817 |

Source: Freddie Mac

[1] Based on unpaid principal balances and excludes mortgage-related securities traded but not yet settled.

[2] For years prior to 2002, amounts exclude structured securities backed by Ginnie Mae MBS.

## Table 10b. Freddie Mac Purchases of Mortgage-Related Securities – Part 2, Private-Label Detail

| | | Purchases ($ in Millions)[1] | | | | | | | |
| | | Private-Label | | | | | | | |
| | | Single-Family | | | | | | | |
| | | Subprime | | Alt-A[2] | | Other[3] | | | |
| Period | Manufactured Housing ($) | Fixed-Rate ($) | Adjustable-Rate ($) | Fixed-Rate ($) | Adjustable-Rate ($) | Fixed-Rate ($) | Adjustable-Rate ($) | Multifamily ($) | Total Private-Label ($) |
|---|---|---|---|---|---|---|---|---|---|
| 4Q09 | 0 | 0 | 0 | 0 | 0 | 3,930 | 0 | 1,400 | 5,330 |
| 3Q09 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 7 |
| 2Q09 | 0 | 0 | 0 | 0 | 0 | 4,728 | 0 | 985 | 5,713 |
| 1Q09 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 11 |
| **Annual Data** | | | | | | | | | |
| 2009 | 0 | 0 | 0 | 0 | 0 | 8,676 | 0 | 2,385 | 11,061 |
| 2008 | 0 | 60 | 46 | 0 | 618 | 8,175 | 0 | 1,417 | 10,316 |
| 2007 | 127 | 843 | 42,824 | 702 | 9,306 | 48 | 0 | 22,284 | 76,134 |
| 2006 | 0 | 116 | 74,645 | 718 | 29,828 | 48 | 0 | 16,875 | 122,230 |
| 2005 | 0 | Not Available Before 2006 | Not Available Before 2006 | Not Available Before 2006 | Not Available Before 2006 | 2,191 | 162,931 | 14,840 | 179,962 |
| 2004 | 0 | | | | | 1,379 | 108,825 | 10,878 | 121,082 |
| 2003 | 0 | | | | | Not Available Before 2004 | Not Available Before 2004 | Not Available Before 2004 | 69,154 |
| 2002 | 318 | | | | | | | | 59,376 |
| 2001 | 0 | | | | | | | | 24,468 |
| 2000 | 15 | | | | | | | | 10,304 |
| 1999 | 3,293 | | | | | | | | 15,263 |
| 1998 | 1,630 | | | | | | | | 15,711 |
| 1997 | 36 | | | | | | | | 1,494 |

Source: Freddie Mac

1   Based on unpaid principal balances and excludes mortgage-related securities traded but not yet settled.

2   Includes Alt-A and option ARM private-label mortgage-related security purchases.

3   Includes non-Freddie Mac mortgage-related securities purchased for structured securities as well as nonagency securities purchased and held for investment.

## Table 11. Freddie Mac MBS Issuances

| Period | Business Activity ($ in Millions) | | | |
|---|---|---|---|---|
| | MBS Issuances[1] | | | |
| | Single-Family MBS[2] ($) | Multifamily MBS ($) | Total MBS[2] ($) | Multiclass MBS[3] ($) |
| **4Q09** | 91,908 | 1,539 | 93,447 | 21,423 |
| **3Q09** | 122,144 | 107 | 122,251 | 27,889 |
| **2Q09** | 154,810 | 1,128 | 155,938 | 29,033 |
| **1Q09** | 103,599 | 177 | 103,776 | 7,857 |
| **Annual Data** | | | | |
| **2009** | 472,461 | 2,951 | 475,412 | 86,202 |
| **2008** | 352,776 | 5,085 | 357,861 | 64,305 |
| **2007** | 467,342 | 3,634 | 470,976 | 133,321 |
| **2006** | 358,184 | 1,839 | 360,023 | 169,396 |
| **2005** | 396,213 | 1,654 | 397,867 | 208,450 |
| **2004** | 360,933 | 4,175 | 365,108 | 215,506 |
| **2003** | 705,450 | 8,337 | 713,787 | 298,118 |
| **2002** | 543,716 | 3,596 | 547,312 | 331,672 |
| **2001** | 387,234 | 2,357 | 389,591 | 192,437 |
| **2000** | 165,115 | 1,786 | 166,901 | 48,202 |
| **1999** | 230,986 | 2,045 | 233,031 | 119,565 |
| **1998** | 249,627 | 937 | 250,564 | 135,162 |
| **1997** | 113,758 | 500 | 114,258 | 84,366 |
| **1996** | 118,932 | 770 | 119,702 | 34,145 |
| **1995** | 85,522 | 355 | 85,877 | 15,372 |
| **1994** | 116,901 | 209 | 117,110 | 73,131 |
| **1993** | 208,724 | 0 | 208,724 | 143,336 |
| **1992** | 179,202 | 5 | 179,207 | 131,284 |
| **1991** | 92,479 | 0 | 92,479 | 72,032 |
| **1990** | 71,998 | 1,817 | 73,815 | 40,479 |
| **1989** | 72,931 | 587 | 73,518 | 39,754 |
| **1988** | 39,490 | 287 | 39,777 | 12,985 |
| **1987** | 72,866 | 2,152 | 75,018 | 0 |
| **1986** | 96,798 | 3,400 | 100,198 | 2,233 |
| **1985** | 37,583 | 1,245 | 38,828 | 2,625 |
| **1984** | Not Available Before 1985 | Not Available Before 1985 | 18,684 | 1,805 |
| **1983** | | | 19,691 | 1,685 |
| **1982** | | | 24,169 | Not Issued Before 1983 |
| **1981** | | | 3,526 | |
| **1980** | | | 2,526 | |
| **1979** | | | 4,546 | |
| **1978** | | | 6,412 | |
| **1977** | | | 4,657 | |
| **1976** | | | 1,360 | |
| **1975** | | | 950 | |
| **1974** | | | 46 | |
| **1973** | | | 323 | |
| **1972** | | | 494 | |
| **1971** | | | 65 | |

Source: Freddie Mac

[1] Based on unpaid principal balances and excludes mortgage loans and mortgage-related securities traded but not yet settled. Includes issuance of other credit guarantees for mortgages not in the form of a security.

[2] Includes MBS and structured securities backed by non-Freddie Mac mortgage-related securities. For 2002 through the current period, includes structured securities backed by Ginnie Mae MBS. For years prior to 2002, excludes structured securities backed by Ginnie Mae MBS.

[3] Includes activity related to multiclass structured securities, primarily REMICs, as well as principal-only strips and other structured securities but excludes resecuritizations of MBS into single-class securities. Amounts are not included in total MBS issuances.

## Table 12. Freddie Mac Earnings

| Period | Earnings ($ in Millions) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Net Interest Income ($) | Guarantee Fee Income ($) | Average Guarantee Fee (basis points) | Administrative Expenses ($) | Credit-Related Expenses[1] ($) | Net Income (Loss) ($) | Return on Equity[2] (%) |
| **4Q09** | 4,497 | 743 | 16.2 | 463 | 7,065 | (6,472) | N/M |
| **3Q09** | 4,462 | 800 | 17.6 | 433 | 7,877 | (5,408) | N/M |
| **2Q09** | 4,255 | 710 | 15.8 | 383 | 5,674 | 302 | N/M |
| **1Q09** | 3,859 | 780 | 17.4 | 372 | 9,221 | (9,975) | N/M |
| **Annual Data** | | | | | | | |
| **2009** | 17,073 | 3,033 | 16.7 | 1,651 | 29,837 | (21,553) | N/M |
| **2008** | 6,796 | 3,370 | 18.9 | 1,505 | 17,529 | (50,119) | N/M |
| **2007** | 3,099 | 2,635 | 16.6 | 1,674 | 3,060 | (3,094) | (21.0) |
| **2006** | 3,412 | 2,393 | 17.1 | 1,641 | 356 | 2,327 | 9.8 |
| **2005** | 4,627 | 2,076 | 16.6 | 1,535 | 347 | 2,113 | 8.1 |
| **2004** | 9,137 | 1,382 | 17.5 | 1,550 | 140 | 2,937 | 9.4 |
| **2003** | 9,498 | 1,653 | 23.3 | 1,181 | 2 | 4,816 | 17.7 |
| **2002** | 9,525 | 1,527 | 22.2 | 1,406 | 126 | 10,090 | 47.2 |
| **2001** | 7,448 | 1,381 | 23.8 | 1,024 | 39 | 3,158 | 20.2 |
| **2000** | 3,758 | 1,243 | 23.7 | 825 | 75 | 3,666 | 39.0 |
| **1999** | 2,926 | 1,019 | 19.8 | 655 | 159 | 2,223 | 25.5 |
| **1998** | 2,215 | 1,019 | 21.4 | 578 | 342 | 1,700 | 22.6 |
| **1997** | 1,847 | 1,082 | 22.9 | 495 | 529 | 1,395 | 23.1 |
| **1996** | 1,705 | 1,086 | 23.4 | 440 | 608 | 1,243 | 22.6 |
| **1995** | 1,396 | 1,087 | 23.8 | 395 | 541 | 1,091 | 22.1 |
| **1994** | 1,112 | 1,108 | 24.4 | 379 | 425 | 983 | 23.3 |
| **1993** | 772 | 1,009 | 23.8 | 361 | 524 | 786 | 22.3 |
| **1992** | 695 | 936 | 24.7 | 329 | 457 | 622 | 21.2 |
| **1991** | 683 | 792 | 23.7 | 287 | 419 | 555 | 23.6 |
| **1990** | 619 | 654 | 22.4 | 243 | 474 | 414 | 20.4 |
| **1989** | 517 | 572 | 23.4 | 217 | 278 | 437 | 25.0 |
| **1988** | 492 | 465 | 21.5 | 194 | 219 | 381 | 27.5 |
| **1987** | 319 | 472 | 24.2 | 150 | 175 | 301 | 28.2 |
| **1986** | 299 | 301 | 22.4 | 110 | 120 | 247 | 28.5 |
| **1985** | 312 | 188 | 22.1 | 81 | 79 | 208 | 30.0 |
| **1984** | 213 | 158 | 24.7 | 71 | 54 | 144 | 52.0 |
| **1983** | 125 | 132 | 26.2 | 53 | 46 | 86 | 44.5 |
| **1982** | 30 | 77 | 24.5 | 37 | 26 | 60 | 21.9 |
| **1981** | 34 | 36 | 19.5 | 30 | 16 | 31 | 13.1 |
| **1980** | 54 | 23 | 14.3 | 26 | 23 | 34 | 14.7 |
| **1979** | 55 | 18 | 13.2 | 19 | 20 | 36 | 16.2 |
| **1978** | 37 | 14 | 14.9 | 14 | 13 | 25 | 13.4 |
| **1977** | 31 | 9 | 18.9 | 12 | 8 | 21 | 12.4 |
| **1976** | 18 | 3 | 13.6 | 10 | (1) | 14 | 9.5 |
| **1975** | 31 | 3 | 24.8 | 10 | 11 | 16 | 11.6 |
| **1974** | 42 | 2 | 25.5 | 8 | 33 | 5 | 4.0 |
| **1973** | 31 | 2 | 32.4 | 7 | 15 | 12 | 9.9 |
| **1972** | 10 | 1 | 39.4 | 5 | 4 | 4 | 3.5 |
| **1971** | 10 | 1 | Not Available Before 1972 | Not Available Before 1972 | Not Available Before 1972 | 6 | 5.5 |

Source: Freddie Mac

N/M = not meaningful

1   For 2002 through the current period, defined as provision for credit losses and real estate owned operations income/expense. For 2000 and 2001, includes only the provision for credit losses.

2   Ratio computed as annualized net income (loss) available to common stockholders divided by the simple average of beginning and ending common stockholders' equity, net of senior preferred stock and preferred stock (both at redemption value).

## Table 13. Freddie Mac Balance Sheet

| End of Period | Balance Sheet ($ in Millions) | | | | | | | Mortgage-Backed Securities Outstanding ($ in Millions)[1] | |
| | Total Assets ($) | Total Mortgage Assets[2] ($) | Nonmortgage Investments ($) | Debt Outstanding ($) | Stockholders' Equity ($) | Core Capital[3] ($) | Fair Value of Net Assets ($) | Total MBS Outstanding ($) | Multiclass MBS Outstanding[4] ($) |
|---|---|---|---|---|---|---|---|---|---|
| 4Q09 | 841,784 | 716,974 | 26,271 | 780,604 | 4,278 | (23,774) | (62,500) | 1,495,267 | 444,823 |
| 3Q09 | 866,644 | 743,872 | 28,076 | 803,781 | 9,325 | (15,034) | (67,700) | 1,458,531 | 449,589 |
| 2Q09 | 892,310 | 775,954 | 26,683 | 836,978 | 7,546 | (8,748) | (70,500) | 1,410,646 | 458,777 |
| 1Q09 | 946,954 | 811,512 | 45,659 | 909,511 | (6,288) | (23,401) | (80,900) | 1,379,399 | 478,275 |
| Annual Data | | | | | | | | | |
| 2009 | 841,784 | 716,974 | 26,271 | 780,604 | 4,278 | (23,774) | (62,500) | 1,495,267 | 444,823 |
| 2008 | 850,963 | 748,747 | 18,944 | 843,021 | (30,731) | (13,174) | (95,600) | 1,402,714 | 517,475 |
| 2007 | 794,368 | 710,042 | 41,663 | 738,557 | 26,724 | 37,867 | 12,600 | 1,381,863 | 526,604 |
| 2006 | 804,910 | 700,002 | 68,614 | 744,341 | 26,914 | 35,365 | 31,800 | 1,122,761 | 491,696 |
| 2005 | 798,609 | 709,503 | 57,324 | 740,024 | 25,691 | 35,043 | 30,900 | 974,200 | 437,668 |
| 2004 | 795,284 | 664,582 | 62,027 | 731,697 | 31,416 | 34,106 | 30,900 | 852,270 | 390,516 |
| 2003 | 803,449 | 660,531 | 53,124 | 739,613 | 31,487 | 32,416 | 27,300 | 752,164 | 347,833 |
| 2002 | 752,249 | 589,899 | 91,871 | 665,696 | 31,330 | 28,990 | 22,900 | 729,809 | 392,545 |
| 2001 | 641,100 | 503,769 | 89,849 | 578,368 | 19,624 | 20,181 | 18,300 | 653,084 | 299,652 |
| 2000 | 459,297 | 385,451 | 43,521 | 426,899 | 14,837 | 14,380 | Not Available | 576,101 | 309,185 |
| 1999 | 386,684 | 322,914 | 34,152 | 360,711 | 11,525 | 12,692 | Before 2001 | 537,883 | 316,168 |
| 1998 | 321,421 | 255,670 | 42,160 | 287,396 | 10,835 | 10,715 | | 478,351 | 260,504 |
| 1997 | 194,597 | 164,543 | 16,430 | 172,842 | 7,521 | 7,376 | | 475,985 | 233,829 |
| 1996 | 173,866 | 137,826 | 22,248 | 156,981 | 6,731 | 6,743 | | 473,065 | 237,939 |
| 1995 | 137,181 | 107,706 | 12,711 | 119,961 | 5,863 | 5,829 | | 459,045 | 246,336 |
| 1994 | 106,199 | 73,171 | 17,808 | 93,279 | 5,162 | 5,169 | | 460,656 | 264,152 |
| 1993 | 83,880 | 55,938 | 18,225 | 49,993 | 4,437 | 4,437 | | 439,029 | 265,178 |
| 1992 | 59,502 | 33,629 | 12,542 | 29,631 | 3,570 | Not Applicable | | 407,514 | 218,747 |
| 1991 | 46,860 | 26,667 | 9,956 | 30,262 | 2,566 | Before 1993 | | 359,163 | 146,978 |
| 1990 | 40,579 | 21,520 | 12,124 | 30,941 | 2,136 | | | 316,359 | 88,124 |
| 1989 | 35,462 | 21,448 | 11,050 | 26,147 | 1,916 | | | 272,870 | 52,865 |
| 1988 | 34,352 | 16,918 | 14,607 | 26,882 | 1,584 | | | 226,406 | 15,621 |
| 1987 | 25,674 | 12,354 | 10,467 | 19,547 | 1,182 | | | 212,635 | 3,652 |
| 1986 | 23,229 | 13,093 | Not Available | 15,375 | 953 | | | 169,186 | 5,333 |
| 1985 | 16,587 | 13,547 | Before 1987 | 12,747 | 779 | | | 99,909 | 5,047 |
| 1984 | 13,778 | 10,018 | | 10,999 | 606 | | | 70,026 | 3,214 |
| 1983 | 8,995 | 7,485 | | 7,273 | 421 | | | 57,720 | 1,669 |
| 1982 | 5,999 | 4,679 | | 4,991 | 296 | | | 42,952 | Not Issued |
| 1981 | 6,326 | 5,178 | | 5,680 | 250 | | | 19,897 | Before 1983 |
| 1980 | 5,478 | 5,006 | | 4,886 | 221 | | | 16,962 | |
| 1979 | 4,648 | 4,003 | | 4,131 | 238 | | | 15,316 | |
| 1978 | 3,697 | 3,038 | | 3,216 | 202 | | | 12,017 | |
| 1977 | 3,501 | 3,204 | | 3,110 | 177 | | | 6,765 | |
| 1976 | 4,832 | 4,175 | | 4,523 | 156 | | | 2,765 | |
| 1975 | 5,899 | 4,878 | | 5,609 | 142 | | | 1,643 | |
| 1974 | 4,901 | 4,469 | | 4,684 | 126 | | | 780 | |
| 1973 | 2,873 | 2,521 | | 2,696 | 121 | | | 791 | |
| 1972 | 1,772 | 1,726 | | 1,639 | 110 | | | 444 | |
| 1971 | 1,038 | 935 | | 915 | 107 | | | 64 | |

Source: Freddie Mac

[1] Based on unpaid principal balances held by third parties and excludes mortgage loans and mortgage-related securities traded but not yet settled.

[2] Excludes allowance for loan losses.

[3] The sum of (a) the stated value of outstanding common stock, (b) the stated value of outstanding noncumulative perpetual preferred stock, (c) paid-in capital, and (d) retained earnings (accumulated deficit) less Treasury stock and senior preferred stock.

[4] Amounts are included in total MBS outstanding column.

## Table 13a. Freddie Mac Total MBS Outstanding Detail[1]

| End of Period | Single-Family Mortgages ($ in Millions) | | | | | Multifamily Mortgages ($ in Millions) | | | ($ in Millions) |
| | Conventional | | | | Total FHA/VA[4] | Conventional ($) | FHA/RD ($) | Multifamily Mortgages ($) | Total MBS Outstanding[5] ($) |
| | Fixed-Rate[2] ($) | Adjustable-Rate[3] ($) | Seconds[4] ($) | Total ($) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 4Q09 | 1,364,796 | 111,550 | 3 | 1,476,349 | 3,544 | 15,374 | 0 | 15,374 | 1,495,267 |
| 3Q09 | 1,323,135 | 117,303 | 3 | 1,440,441 | 3,699 | 14,391 | 0 | 14,391 | 1,458,531 |
| 2Q09 | 1,267,065 | 125,324 | 3 | 1,392,392 | 3,768 | 14,486 | 0 | 14,486 | 1,410,646 |
| 1Q09 | 1,227,143 | 134,807 | 3 | 1,361,953 | 3,844 | 13,602 | 0 | 13,602 | 1,379,399 |
| Annual Data | | | | | | | | | |
| 2009 | 1,364,796 | 111,550 | 3 | 1,476,349 | 3,544 | 15,374 | 0 | 15,374 | 1,495,267 |
| 2008 | 1,242,648 | 142,495 | 4 | 1,385,147 | 3,970 | 13,597 | 0 | 13,597 | 1,402,714 |
| 2007 | 1,206,495 | 161,963 | 7 | 1,368,465 | 4,499 | 8,899 | 0 | 8,899 | 1,381,863 |
| 2006 | 967,580 | 141,740 | 12 | 1,109,332 | 5,396 | 8,033 | 0 | 8,033 | 1,122,761 |
| 2005 | 836,023 | 117,757 | 19 | 953,799 | 6,289 | 14,112 | 0 | 14,112 | 974,200 |
| 2004 | 736,332 | 91,474 | 70 | 827,876 | 9,254 | 15,140 | 0 | 15,140 | 852,270 |
| 2003 | 649,699 | 74,409 | 140 | 724,248 | 12,157 | 15,759 | 0 | 15,759 | 752,164 |
| 2002 | 647,603 | 61,110 | 5 | 708,718 | 12,361 | 8,730 | 0 | 8,730 | 729,809 |
| 2001 | 609,290 | 22,525 | 10 | 631,825 | 14,127 | 7,132 | 0 | 7,132 | 653,084 |
| 2000 | 533,331 | 36,266 | 18 | 569,615 | 778 | 5,708 | 0 | 5,708 | 576,101 |
| 1999 | 499,671 | 33,094 | 29 | 532,794 | 627 | 4,462 | 0 | 4,462 | 537,883 |
| 1998 | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | Not Available | 478,351 |
| 1997 | Before 1999 | Before 1999 | Before 1999 | Before 1999 | Before 1999 | Before 1999 | Before 1999 | Before 1999 | 475,985 |
| 1996 | | | | | | | | | 473,065 |
| 1995 | | | | | | | | | 459,045 |
| 1994 | | | | | | | | | 460,656 |
| 1993 | | | | | | | | | 439,029 |
| 1992 | | | | | | | | | 407,514 |
| 1991 | | | | | | | | | 359,163 |
| 1990 | | | | | | | | | 316,359 |
| 1989 | | | | | | | | | 272,870 |
| 1988 | | | | | | | | | 226,406 |
| 1987 | | | | | | | | | 212,635 |
| 1986 | | | | | | | | | 169,186 |
| 1985 | | | | | | | | | 99,909 |
| 1984 | | | | | | | | | 70,026 |
| 1983 | | | | | | | | | 57,720 |
| 1982 | | | | | | | | | 42,952 |
| 1981 | | | | | | | | | 19,897 |
| 1980 | | | | | | | | | 16,962 |
| 1979 | | | | | | | | | 15,316 |
| 1978 | | | | | | | | | 12,017 |
| 1977 | | | | | | | | | 6,765 |
| 1976 | | | | | | | | | 2,765 |
| 1975 | | | | | | | | | 1,643 |
| 1974 | | | | | | | | | 780 |
| 1973 | | | | | | | | | 791 |
| 1972 | | | | | | | | | 444 |
| 1971 | | | | | | | | | 64 |

Source: Freddie Mac

1 Based on unpaid principal balances of mortgage guarantees held by third parties. Excludes MBS held for investment by Freddie Mac.

2 Includes USDA Rural Development programs and other federally guaranteed loans.

3 For 2001 through the current period, includes MBS with underlying mortgages classified as balloons/reset loans.

4 For 2002 through the current period, includes resecuritizations of non-Freddie Mac securities.

5 Based on unpaid principal balances and excludes mortgage loans and mortgage-related securities traded but not yet settled. For 2002 through the current period, amounts include structured securities backed by non-Freddie Mac securities (including Ginnie Mae MBS) and credit guarantees of mortgage loans and mortgage-backed securities held by third parties.

# Table 14. Freddie Mac Mortgage Assets Detail

| End of Period | ($ in Millions) | | | | |
|---|---|---|---|---|---|
| | Whole Loans[1] ($) | Freddie Mac Securities[1] ($) | Other Mortgage-Related Securities[1] ($) | Unamortized Premiums, Discounts, Deferred Fees, Plus Unrealized Gains/Losses on Available-for-Sale Securities[2] ($) | Total Mortgage Assets[3] ($) |
| 4Q09 | 138,816 | 374,615 | 241,841 | (38,298) | 716,974 |
| 3Q09 | 131,879 | 403,490 | 248,802 | (40,299) | 743,872 |
| 2Q09 | 130,275 | 440,478 | 259,084 | (53,883) | 775,954 |
| 1Q09 | 126,946 | 455,421 | 284,737 | (55,592) | 811,512 |
| Annual Data | | | | | |
| 2009 | 138,816 | 374,615 | 241,841 | (38,298) | 716,974 |
| 2008 | 111,476 | 424,524 | 268,762 | (56,015) | 748,747 |
| 2007 | 82,158 | 356,970 | 281,685 | (10,771) | 710,042 |
| 2006 | 65,847 | 354,262 | 283,850 | (3,957) | 700,002 |
| 2005 | 61,481 | 361,324 | 287,541 | (843) | 709,503 |
| 2004 | 61,360 | 356,698 | 235,203 | 11,321 | 664,582 |
| 2003 | 60,270 | 393,135 | 192,362 | 14,764 | 660,531 |
| 2002 | 63,886 | 341,287 | 162,099 | 22,627 | 589,899 |
| 2001 | 62,792 | 308,427 | 126,420 | 6,130 | 503,769 |
| 2000 | 59,240 | 246,209 | 80,244 | (242) | 385,451 |
| 1999 | 56,676 | 211,198 | 56,569 | (1,529) | 322,914 |
| 1998 | 57,084 | 168,108 | 29,817 | 661 | 255,670 |
| 1997 | 48,454 | 103,400 | Not Available Before 1998 | 122 | 164,543 |
| 1996 | 46,504 | 81,195 | | 71 | 137,826 |
| 1995 | 43,753 | 56,006 | | 282 | 107,706 |
| 1994 | Not Available Before 1995 | 30,670 | | Not Available Before 1995 | 73,171 |
| 1993 | | 15,877 | | | 55,938 |
| 1992 | | 6,394 | | | 33,629 |
| 1991 | | Not Available Before 1992 | | | 26,667 |
| 1990 | | | | | 21,520 |
| 1989 | | | | | 21,448 |
| 1988 | | | | | 16,918 |
| 1987 | | | | | 12,354 |
| 1986 | | | | | 13,093 |
| 1985 | | | | | 13,547 |
| 1984 | | | | | 10,018 |
| 1983 | | | | | 7,485 |
| 1982 | | | | | 4,679 |
| 1981 | | | | | 5,178 |
| 1980 | | | | | 5,006 |
| 1979 | | | | | 4,003 |
| 1978 | | | | | 3,038 |
| 1977 | | | | | 3,204 |
| 1976 | | | | | 4,175 |
| 1975 | | | | | 4,878 |
| 1974 | | | | | 4,469 |
| 1973 | | | | | 2,521 |
| 1972 | | | | | 1,726 |
| 1971 | | | | | 935 |

Source: Freddie Mac

1   Based on unpaid principal balances and excludes mortgage loans and mortgage-related securities traded but not yet settled.

2   Includes premiums, discounts, deferred fees, impairments of unpaid principal balances, and other basis adjustments on mortgage loans and mortgage-related securities, plus unrealized gains or losses on available-for-sale mortgage-related securities. Amounts prior to 2006 include MBS residuals at fair value.

3   Excludes allowance for loan losses.

## Table 14a. Freddie Mac Mortgage Assets Detail – Whole Loans

| End of Period | Whole Loans ($ in Millions)[1] | | | | | | | | |
| | Single-Family | | | | | Multifamily | | | Total Whole Loans ($) |
| | Conventional | | | | Total FHA/VA ($) | Conventional ($) | FHA/RD ($) | Total ($) | |
| | Fixed-Rate[2] ($) | Adjustable-Rate ($) | Seconds ($) | Total ($) | | | | | |
| 4Q09 | 50,980 | 2,310 | 0 | 53,290 | 1,588 | 83,935 | 3 | 83,938 | 138,816 |
| 3Q09 | 47,703 | 1,669 | 0 | 49,372 | 1,277 | 81,227 | 3 | 81,230 | 131,879 |
| 2Q09 | 49,175 | 1,727 | 0 | 50,902 | 1,066 | 78,304 | 3 | 78,307 | 130,275 |
| 1Q09 | 48,217 | 2,308 | 0 | 50,525 | 688 | 75,730 | 3 | 75,733 | 126,946 |
| Annual Data | | | | | | | | | |
| 2009 | 50,980 | 2,310 | 0 | 53,290 | 1,588 | 83,935 | 3 | 83,938 | 138,816 |
| 2008 | 36,071 | 2,136 | 0 | 38,207 | 548 | 72,718 | 3 | 72,721 | 111,476 |
| 2007 | 21,578 | 2,700 | 0 | 24,278 | 311 | 57,566 | 3 | 57,569 | 82,158 |
| 2006 | 19,211 | 1,233 | 0 | 20,444 | 196 | 45,204 | 3 | 45,207 | 65,847 |
| 2005 | 19,238 | 903 | 0 | 20,141 | 255 | 41,082 | 3 | 41,085 | 61,481 |
| 2004 | 22,055 | 990 | 0 | 23,045 | 344 | 37,968 | 3 | 37,971 | 61,360 |
| 2003 | 25,889 | 871 | 1 | 26,761 | 513 | 32,993 | 3 | 32,996 | 60,270 |
| 2002 | 33,821 | 1,321 | 3 | 35,145 | 705 | 28,033 | 3 | 28,036 | 63,886 |
| 2001 | 38,267 | 1,073 | 5 | 39,345 | 964 | 22,480 | 3 | 22,483 | 62,792 |
| 2000 | 39,537 | 2,125 | 9 | 41,671 | 1,200 | 16,369 | Not Available Before 2001 | 16,369 | 59,240 |
| 1999 | 43,210 | 1,020 | 14 | 44,244 | 77 | 12,355 | | 12,355 | 56,676 |
| 1998 | 47,754 | 1,220 | 23 | 48,997 | 109 | 7,978 | | 7,978 | 57,084 |
| 1997 | 40,967 | 1,478 | 36 | 42,481 | 148 | 5,825 | | 5,825 | 48,454 |
| 1996 | Not Available Before 1997 | Not Available Before 1997 | Not Available Before 1997 | Not Available Before 1997 | Not Available Before 1997 | 4,746 | | 4,746 | 46,504 |
| 1995 | | | | | | 3,852 | | 3,852 | 43,753 |

Source: Freddie Mac

[1]  Based on unpaid principal balances and excludes mortgage loans traded but not yet settled.

[2]  For 2001 through the current period, includes loans guaranteed by USDA Rural Development programs.

**Table 14b.  Freddie Mac Mortgage Assets Detail – Part 1, Mortgage-Related Securities**

| End of Period | Mortgage-Related Securities ($ in Millions)[1] | | | | | | | | | | | | | |
| | Freddie Mac Securities[2] ($) | | | | Others' Securities | | | | | | | | | |
| | Single-Family | | Multi-family ($) | Total Freddie Mac ($) | Fannie Mae | | | | Ginnie Mae | | | | Total Private-Label ($) | Total Others' Securities ($) |
| | | | | | Single-Family | | Multi-family ($) | Total Fannie Mae ($) | Single-Family | | Multi-family ($) | Total Ginnie Mae ($) | | |
| | Fixed-Rate ($) | Adjustable-Rate ($) | | | Fixed-Rate ($) | Adjustable-Rate ($) | | | Fixed-Rate ($) | Adjustable-Rate ($) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4Q09 | 294,958 | 77,708 | 1,949 | 374,615 | 36,549 | 28,585 | 528 | 65,662 | 341 | 133 | 35 | 509 | 163,816 | 229,987 |
| 3Q09 | 319,275 | 82,260 | 1,955 | 403,490 | 36,296 | 30,693 | 531 | 67,520 | 357 | 138 | 35 | 530 | 168,542 | 236,592 |
| 2Q09 | 350,733 | 87,777 | 1,968 | 440,478 | 38,670 | 33,132 | 539 | 72,341 | 370 | 143 | 35 | 548 | 173,707 | 246,596 |
| 1Q09 | 364,163 | 89,270 | 1,988 | 455,421 | 57,545 | 33,956 | 559 | 92,060 | 385 | 148 | 45 | 578 | 179,360 | 271,998 |
| **Annual Data** | | | | | | | | | | | | | | |
| 2009 | 294,958 | 77,708 | 1,949 | 374,615 | 36,549 | 28,585 | 528 | 65,662 | 341 | 133 | 35 | 509 | 163,816 | 229,987 |
| 2008 | 328,965 | 93,498 | 2,061 | 424,524 | 35,142 | 34,460 | 674 | 70,276 | 398 | 152 | 26 | 576 | 185,041 | 255,893 |
| 2007 | 269,896 | 84,415 | 2,659 | 356,970 | 23,140 | 23,043 | 922 | 47,105 | 468 | 181 | 82 | 731 | 218,914 | 266,750 |
| 2006 | 282,052 | 71,828 | 382 | 354,262 | 25,779 | 17,441 | 1,214 | 44,434 | 707 | 231 | 13 | 951 | 224,631 | 270,016 |
| 2005 | 299,167 | 61,766 | 391 | 361,324 | 28,818 | 13,180 | 1,335 | 43,333 | 1,045 | 218 | 30 | 1,293 | 231,594 | 276,220 |
| 2004 | 304,555 | 51,737 | 406 | 356,698 | 41,828 | 14,504 | 1,672 | 58,004 | 1,599 | 81 | 31 | 1,711 | 166,411 | 226,126 |
| 2003 | Not Available | Not Available | Not Available | 393,135 | Not Available | Not Available | Not Available | 74,529 | Not Available | Not Available | Not Available | 2,760 | 107,301 | 184,590 |
| 2002 | Before 2004 | Before 2004 | Before 2004 | 341,287 | Before 2004 | Before 2004 | Before 2004 | 78,829 | Before 2004 | Before 2004 | Before 2004 | 4,878 | 70,752 | 154,459 |
| 2001 | | | | 308,427 | | | | 71,128 | | | | 5,699 | 42,336 | 119,163 |
| 2000 | | | | 246,209 | | | | 28,303 | | | | 8,991 | 35,997 | 73,291 |
| 1999 | | | | 211,198 | | | | 13,245 | | | | 6,615 | 31,019 | 50,879 |
| 1998 | | | | 168,108 | | | | 3,749 | | | | 4,458 | 16,970 | 25,177 |
| 1997 | | | | 103,400 | | | | Not Available | | | | 6,393 | Not Available | Not Available |
| 1996 | | | | 81,195 | | | | Before 1998 | | | | 7,434 | Before 1998 | Before 1998 |
| 1995 | | | | 56,006 | | | | | | | | Not Available | | |
| 1994 | | | | 30,670 | | | | | | | | Before 1996 | | |
| 1993 | | | | 15,877 | | | | | | | | | | |
| 1992 | | | | 6,394 | | | | | | | | | | |

Source: Freddie Mac

1   Based on unpaid principal balances.

2   For 2001 through the current period, includes structured securities backed by Ginnie Mae MBS, which were previously classified as non-Freddie Mac mortgage-related securities.

FHFA 1359

## Table 14b. Freddie Mac Mortgage Assets Detail – Part 2, Mortgage-Related Securities, Private-Label Detail

| End of Period | Mortgage-Related Securities ($ in Millions)[1] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Private-Label | | | | | | | | |
| | Single-Family | | | | | | | Multifamily ($) | Total Private-Label ($) |
| | Manufactured Housing ($) | Subprime | | Alt-A[2] | | Other[3] | | | |
| | | Fixed-Rate ($) | Adjustable-Rate ($) | Fixed-Rate ($) | Adjustable-Rate ($) | Fixed-Rate ($) | Adjustable-Rate ($) | | |
| **4Q09** | 1,201 | 395 | 61,179 | 2,845 | 18,594 | 0 | 17,687 | 61,915 | 163,816 |
| **3Q09** | 1,232 | 407 | 63,989 | 2,941 | 19,311 | 0 | 18,213 | 62,449 | 168,542 |
| **2Q09** | 1,266 | 417 | 67,158 | 3,049 | 20,118 | 0 | 18,746 | 62,953 | 173,707 |
| **1Q09** | 1,296 | 428 | 70,568 | 3,164 | 21,000 | 0 | 19,220 | 63,684 | 179,360 |
| **Annual Data** | | | | | | | | | |
| **2009** | 1,201 | 395 | 61,179 | 2,845 | 18,594 | 0 | 17,687 | 61,915 | 163,816 |
| **2008** | 1,326 | 438 | 74,413 | 3,266 | 21,801 | 0 | 19,606 | 64,191 | 185,041 |
| **2007** | 1,472 | 498 | 100,827 | 3,720 | 26,343 | 0 | 21,250 | 64,804 | 218,914 |
| **2006** | 1,510 | 408 | 121,691 | 3,626 | 31,743 | 0 | 20,893 | 44,760 | 224,631 |
| **2005** | 1,680 | Not Available Before 2006 | Not Available Before 2006 | Not Available Before 2006 | Not Available Before 2006 | 4,749 | 181,678 | 43,487 | 231,594 |
| **2004** | 1,816 | | | | | 8,243 | 115,168 | 41,184 | 166,411 |
| **2003** | 2,085 | | | | | Not Available Before 2004 | Not Available Before 2004 | Not Available Before 2004 | 107,301 |
| **2002** | 2,394 | | | | | | | | 70,752 |
| **2001** | 2,462 | | | | | | | | 42,336 |
| **2000** | 2,896 | | | | | | | | 35,997 |
| **1999** | 4,693 | | | | | | | | 31,019 |
| **1998** | 1,711 | | | | | | | | 16,970 |

Source: Freddie Mac

1   Based on unpaid principal balances.

2   Includes nonagency mortgage-related securities backed by home equity lines of credit.

3   Consists of nonagency mortgage-related securities backed by option ARM loans. Prior to 2006, includes securities principally backed by subprime and Alt-A mortgage loans.

## Table 14b. Freddie Mac Mortgage Assets Detail – Part 3, Mortgage-Related Securities

| End of Period | Mortgage-Related Securities ($ in Millions) | | ($ in Millions) | |
| --- | --- | --- | --- | --- |
| | Mortgage Revenue Bonds[1] ($) | Total Mortgage-Related Securities[1] ($) | Unamortized Premiums, Discounts, Deferred Fees, Plus Unrealized Gains/Losses on Available-for-Sale Securities[2] ($) | Total Mortgage Assets[3] ($) |
| 4Q09 | 11,854 | 616,456 | (38,298) | 716,974 |
| 3Q09 | 12,210 | 652,292 | (40,299) | 743,872 |
| 2Q09 | 12,488 | 699,562 | (53,883) | 775,954 |
| 1Q09 | 12,739 | 740,158 | (55,592) | 811,512 |
| Annual Data | | | | |
| 2009 | 11,854 | 616,456 | (38,298) | 716,974 |
| 2008 | 12,869 | 693,286 | (56,015) | 748,747 |
| 2007 | 14,935 | 638,655 | (10,771) | 710,042 |
| 2006 | 13,834 | 638,112 | (3,957) | 700,002 |
| 2005 | 11,321 | 648,865 | (843) | 709,503 |
| 2004 | 9,077 | 591,901 | 11,321 | 664,582 |
| 2003 | 7,772 | 585,497 | 14,764 | 660,531 |
| 2002 | 7,640 | 503,386 | 22,627 | 589,899 |
| 2001 | 7,257 | 434,847 | 6,130 | 503,769 |
| 2000 | 6,953 | 326,453 | (242) | 385,451 |
| 1999 | 5,690 | 267,767 | (1,529) | 322,914 |
| 1998 | 4,640 | 197,925 | 661 | 255,670 |
| 1997 | 3,031 | Not Available Before 1998 | 122 | 164,543 |
| 1996 | 1,787 | | 71 | 137,826 |
| 1995 | Not Available Before 1996 | | 282 | 107,706 |
| 1994 | | | Not Available Before 1995 | 73,171 |
| 1993 | | | | 55,938 |
| 1992 | | | | 33,629 |
| 1991 | | | | 26,667 |
| 1990 | | | | 21,520 |
| 1989 | | | | 21,448 |
| 1988 | | | | 16,918 |
| 1987 | | | | 12,354 |
| 1986 | | | | 13,093 |
| 1985 | | | | 13,547 |
| 1984 | | | | 10,018 |
| 1983 | | | | 7,485 |
| 1982 | | | | 4,679 |
| 1981 | | | | 5,178 |
| 1980 | | | | 5,006 |
| 1979 | | | | 4,003 |
| 1978 | | | | 3,038 |
| 1977 | | | | 3,204 |
| 1976 | | | | 4,175 |
| 1975 | | | | 4,878 |
| 1974 | | | | 4,469 |
| 1973 | | | | 2,521 |
| 1972 | | | | 1,726 |
| 1971 | | | | 935 |

Source: Freddie Mac

[1] Based on unpaid principal balances.

[2] Includes premiums, discounts, deferred fees, impairments of unpaid principal balances, and other basis adjustments on mortgage loans and mortgage-related securities, plus unrealized gains or losses on mortgage-related securities. Amounts prior to 2006 include MBS residuals.

[3] Excludes allowance for loan losses.

FHFA 1361

## Table 15. Freddie Mac Financial Derivatives

| End of Period | Financial Derivatives – Notional Amount Outstanding ($ in Millions) | | | | | | | | | |
| | Interest Rate Swaps ($) | Interest Rate Caps, Floors, and Corridors ($) | Foreign Currency Contracts ($) | OTC Futures, Options, and Forward Rate Agreements ($) | Treasury-Based Contracts[1] ($) | Exchange-Traded Futures, Options and Other Derivatives ($) | Credit Derivatives[2] ($) | Commitments[3] ($) | Other[4] ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| 4Q09 | 705,707 | 35,945 | 5,669 | 366,443 | 540 | 80,409 | 14,198 | 13,872 | 3,521 | 1,226,304 |
| 3Q09 | 786,849 | 36,035 | 5,775 | 420,581 | 1,210 | 80,409 | 14,146 | 34,571 | 3,488 | 1,383,064 |
| 2Q09 | 768,250 | 36,129 | 7,186 | 493,646 | 2,112 | 29,939 | 19,648 | 70,306 | 3,441 | 1,430,657 |
| 1Q09 | 761,044 | 36,223 | 12,345 | 331,482 | 34,596 | 73,594 | 17,359 | 98,780 | 3,392 | 1,368,815 |
| Annual Data | | | | | | | | | | |
| 2009 | 705,707 | 35,945 | 5,669 | 366,443 | 540 | 80,409 | 14,198 | 13,872 | 3,521 | 1,226,304 |
| 2008 | 766,158 | 36,314 | 12,924 | 251,426 | 28,403 | 106,610 | 13,631 | 108,273 | 3,281 | 1,327,020 |
| 2007 | 711,829 | 0 | 20,118 | 313,033 | 0 | 196,270 | 7,667 | 72,662 | 1,302 | 1,322,881 |
| 2006 | 440,879 | 0 | 29,234 | 252,022 | 2,000 | 20,400 | 2,605 | 10,012 | 957 | 758,109 |
| 2005 | 341,008 | 45 | 37,850 | 193,502 | 0 | 86,252 | 2,414 | 21,961 | 738 | 683,770 |
| 2004 | 178,739 | 9,897 | 56,850 | 224,204 | 2,001 | 127,109 | 10,926 | 32,952 | 114,100 | 756,778 |
| 2003 | 287,592 | 11,308 | 46,512 | 349,650 | 8,549 | 122,619 | 15,542 | 89,520 | 152,579 | 1,083,871 |
| 2002 | 290,096 | 11,663 | 43,687 | 277,869 | 17,900 | 210,646 | 17,301 | 191,563 | 117,219 | 1,177,944 |
| 2001 | 442,771 | 12,178 | 23,995 | 187,486 | 13,276 | 358,500 | 10,984 | 121,588 | 0 | 1,170,778 |
| 2000 | 277,888 | 12,819 | 10,208 | 113,064 | 2,200 | 22,517 | N/A | N/A | 35,839 | 474,535 |
| 1999 | 126,580 | 19,936 | 1,097 | 172,750 | 8,894 | 94,987 | Not Applicable | Not Applicable | 0 | 424,244 |
| 1998 | 57,555 | 21,845 | 1,464 | 63,000 | 11,542 | 157,832 | Before 2000 | Before 2000 | 0 | 313,238 |
| 1997 | 54,172 | 21,995 | 1,152 | 6,000 | 12,228 | 0 | | | 0 | 95,547 |
| 1996 | 46,646 | 14,095 | 544 | 0 | 651 | 0 | | | 0 | 61,936 |
| 1995 | 45,384 | 13,055 | 0 | 0 | 24 | 0 | | | 0 | 58,463 |
| 1994 | 21,834 | 9,003 | 0 | 0 | 0 | 0 | | | 0 | 30,837 |
| 1993 | 17,888 | 1,500 | 0 | 0 | 0 | 0 | | | 0 | 19,388 |

Source: Freddie Mac

N/A = not available

[1]  Amounts for 2002 through the current period include exchange-traded.

[2]  Amounts included in "Other" in 2000, not applicable in prior periods.

[3]  Commitments to purchase and sell mortgage loans and mortgage-related securities. Periods prior to 2004 include commitments to purchase and sell various debt securities.

[4]  Includes prepayment management agreement and swap guarantee derivatives.

## Table 16. Freddie Mac Nonmortgage Investments

| End of Period | Nonmortgage Investments ($ in Millions) | | | | | |
|---|---|---|---|---|---|---|
| | Federal Funds and Eurodollars ($) | Asset-Backed Securities ($) | Repurchase Agreements ($) | Commercial Paper and Corporate Debt ($) | Other[1] ($) | Total ($) |
| **4Q09** | 0 | 4,045 | 7,000 | 439 | 14,787 | 26,271 |
| **3Q09** | 550 | 5,882 | 9,000 | 250 | 12,394 | 28,076 |
| **2Q09** | 0 | 6,788 | 8,500 | 0 | 11,395 | 26,683 |
| **1Q09** | 0 | 7,614 | 34,050 | 0 | 3,995 | 45,659 |
| **Annual Data** | | | | | | |
| **2009** | 0 | 4,045 | 7,000 | 439 | 14,787 | 26,271 |
| **2008** | 0 | 8,794 | 10,150 | 0 | 0 | 18,944 |
| **2007** | 162 | 16,588 | 6,400 | 18,513 | 0 | 41,663 |
| **2006** | 19,778 | 32,122 | 3,250 | 11,191 | 2,273 | 68,614 |
| **2005** | 9,909 | 30,578 | 5,250 | 5,764 | 5,823 | 57,324 |
| **2004** | 18,647 | 21,733 | 13,550 | 0 | 8,097 | 62,027 |
| **2003** | 7,567 | 16,648 | 13,015 | 5,852 | 10,042 | 53,124 |
| **2002** | 6,129 | 34,790 | 16,914 | 13,050 | 20,988 | 91,871 |
| **2001** | 15,868 | 26,297 | 17,632 | 21,712 | 8,340 | 89,849 |
| **2000** | 2,267 | 19,063 | 7,488 | 7,302 | 7,401 | 43,521 |
| **1999** | 10,545 | 10,305 | 4,961 | 3,916 | 4,425 | 34,152 |
| **1998** | 20,524 | 7,124 | 1,756 | 7,795 | 4,961 | 42,160 |
| **1997** | 2,750 | 2,200 | 6,982 | 3,203 | 1,295 | 16,430 |
| **1996** | 9,968 | 2,086 | 6,440 | 1,058 | 2,696 | 22,248 |
| **1995** | 110 | 499 | 9,217 | 1,201 | 1,684 | 12,711 |
| **1994** | 7,260 | 0 | 5,913 | 1,234 | 3,401 | 17,808 |
| **1993** | 9,267 | 0 | 4,198 | 1,438 | 3,322 | 18,225 |
| **1992** | 5,632 | 0 | 4,060 | 53 | 2,797 | 12,542 |
| **1991** | 2,949 | 0 | 4,437 | 0 | 2,570 | 9,956 |
| **1990** | 1,112 | 0 | 9,063 | 0 | 1,949 | 12,124 |
| **1989** | 3,527 | 0 | 5,765 | 0 | 1,758 | 11,050 |
| **1988** | 4,469 | 0 | 9,107 | 0 | 1,031 | 14,607 |
| **1987** | 3,177 | 0 | 5,859 | 0 | 1,431 | 10,467 |

Source: Freddie Mac

[1] For 2009, amounts include Treasury Bills. For 2004 through 2008, amounts include obligations of states and municipalities classified as available-for-sale securities. For 2003 and prior periods, includes nonmortgage related securities classified as trading, debt securities issued by the U.S. Treasury and other U.S. government agencies, obligations of states and municipalities, and preferred stock.

## Table 17. Freddie Mac Mortgage Asset Quality

| End of Period | Mortgage Asset Quality | | | | |
|---|---|---|---|---|---|
| | Single-Family Delinquency Rate[1] (%) | Multifamily Delinquency Rate[2] (%) | Credit Losses/Average Total Mortgage Portfolio[3] (%) | REO/Total Mortgage Portfolio[4] (%) | Credit Enhanced[5]/ Total Mortgage Portfolio[4] (%) |
| **4Q09** | 3.87 | 0.15 | 0.51 | 0.23 | 16.0 |
| **3Q09** | 3.33 | 0.11 | 0.44 | 0.21 | 16.0 |
| **2Q09** | 2.78 | 0.11 | 0.40 | 0.17 | 17.0 |
| **1Q09** | 2.29 | 0.09 | 0.28 | 0.15 | 17.0 |
| **Annual Data** | | | | | |
| **2009** | 3.87 | 0.15 | 0.41 | 0.23 | 16.0 |
| **2008** | 1.72 | 0.01 | 0.20 | 0.17 | 18.0 |
| **2007** | 0.65 | 0.02 | 0.03 | 0.08 | 17.0 |
| **2006** | 0.42 | 0.06 | 0.01 | 0.04 | 16.0 |
| **2005** | 0.53 | 0.00 | 0.01 | 0.04 | 17.0 |
| **2004** | 0.73 | 0.06 | 0.01 | 0.05 | 19.0 |
| **2003** | 0.86 | 0.05 | 0.01 | 0.06 | 21.0 |
| **2002** | 0.77 | 0.13 | 0.01 | 0.05 | 27.4 |
| **2001** | 0.62 | 0.15 | 0.01 | 0.04 | 34.7 |
| **2000** | 0.49 | 0.04 | 0.01 | 0.04 | 31.8 |
| **1999** | 0.39 | 0.14 | 0.02 | 0.05 | 29.9 |
| **1998** | 0.50 | 0.37 | 0.04 | 0.08 | 27.3 |
| **1997** | 0.55 | 0.96 | 0.08 | 0.11 | 15.9 |
| **1996** | 0.58 | 1.96 | 0.10 | 0.13 | 10.0 |
| **1995** | 0.60 | 2.88 | 0.11 | 0.14 | 9.7 |
| **1994** | 0.55 | 3.79 | 0.08 | 0.18 | 7.2 |
| **1993** | 0.61 | 5.92 | 0.11 | 0.16 | 5.3 |
| **1992** | 0.64 | 6.81 | 0.09 | 0.12 | Not Available Before 1993 |
| **1991** | 0.61 | 5.42 | 0.08 | 0.14 | |
| **1990** | 0.45 | 2.63 | 0.08 | 0.12 | |
| **1989** | 0.38 | 2.53 | 0.08 | 0.09 | |
| **1988** | 0.36 | 2.24 | 0.07 | 0.09 | |
| **1987** | 0.36 | 1.49 | 0.07 | 0.08 | |
| **1986** | 0.42 | 1.07 | Not Available Before 1987 | 0.07 | |
| **1985** | 0.42 | 0.63 | | 0.10 | |
| **1984** | 0.46 | 0.42 | | 0.15 | |
| **1983** | 0.47 | 0.58 | | 0.15 | |
| **1982** | 0.54 | 1.04 | | 0.12 | |
| **1981** | 0.61 | Not Available Before 1982 | | 0.07 | |
| **1980** | 0.44 | | | 0.04 | |
| **1979** | 0.31 | | | 0.02 | |
| **1978** | 0.21 | | | 0.02 | |
| **1977** | Not Available Before 1978 | | | 0.03 | |
| **1976** | | | | 0.04 | |
| **1975** | | | | 0.03 | |
| **1974** | | | | 0.02 | |

Source: Freddie Mac

[1] Based on the number of mortgages 90 days or more delinquent or in foreclosure and excludes modified loans if the borrower is less than 90 days past due under the modified terms. Rates for years 2000 through 2004 are based on the single-family loans held as investments and total MBS and structured securities issued, excluding that portion of structured securities backed by Ginnie Mae MBS. Rates for years 2005 through the current period are based on single-family loans held as investments and total MBS and structured securities issued, excluding structured transactions and that portion of issued structured securities backed by Ginnie Mae MBS. The single-family delinquency rate, including structured transactions, was 3.98 percent in 2009 and 1.83 percent in 2008.

[2] Prior to 2008, these rates were based on net carrying value of mortgages 60 days or more delinquent or in foreclosure. Beginning in 2008, these rates are based on the net carrying value of loans 90 days or more delinquent or in foreclosure.

[3] Credit losses equal REO operations expense (income) plus net charge-offs and exclude other market-based valuation losses. Calculated as credit losses divided by the average balance of mortgage loans held for investment and mortgage loans underlying Freddie Mac MBS and structured securities, excluding that portion of structured securities backed by Ginnie Mae MBS.

[4] Based on the total mortgage portfolio excluding non-Freddie Mac mortgage-related securities and that portion of issued structured securities backed by Ginnie Mae MBS.

[5] Credit enhanced includes loans for which the lender or a third party has retained a portion of the primary default risk by pledging collateral or agreeing to accept losses on loans that default. In many cases, the lender's or third party's risk is limited to a specific level of losses at the time the credit enhancement becomes effective.

## Table 18. Freddie Mac Capital

| End of Period | Capital ($ in Millions)[1] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Minimum Capital Requirement | | | Risk-Based Capital Requirement | | | | | | |
| | Core Capital ($) | Minimum Capital Requirement[2] ($) | Regulatory Capital Surplus (Deficit)[2] ($) | Total Capital[3] ($) | Risk-Based Capital Requirement[4] ($) | Risk-Based Capital Surplus (Deficit)[5] ($) | Market Capitalization[6] ($) | Core Capital/ Total Assets (%) | Core Capital/ Total MBS Outstanding plus Total Assets (%) | Common Share Dividend Payout Rate[7] (%) |
| 4Q09 | (23,774) | 28,352 | (52,126) | N/A | N/A | N/A | 953 | (2.82) | (1.02) | N/A |
| 3Q09 | (15,034) | 28,800 | (43,834) | N/A | N/A | N/A | 1,167 | (1.73) | (0.65) | N/A |
| 2Q09 | (8,748) | 29,234 | (37,982) | N/A | N/A | N/A | 402 | (0.98) | (0.38) | N/A |
| 1Q09 | (23,401) | 30,477 | (53,878) | N/A | N/A | N/A | 493 | (2.47) | (1.01) | N/A |
| Annual Data | | | | | | | | | | |
| 2009 | (23,774) | 28,352 | (52,126) | N/A | N/A | N/A | 953 | (2.82) | (1.02) | N/A |
| 2008 | (13,174) | 28,200 | (41,374) | N/A | N/A | N/A | 473 | (1.55) | (0.58) | N/M |
| 2007 | 37,867 | 26,473 | 11,394 | 40,929 | 14,102 | 26,827 | 22,018 | 4.77 | 1.74 | N/M |
| 2006 | 35,365 | 25,607 | 9,758 | 36,742 | 15,320 | 21,422 | 44,896 | 4.39 | 1.83 | 63.9 |
| 2005 | 35,043 | 24,791 | 10,252 | 36,781 | 11,282 | 25,499 | 45,269 | 4.35 | 1.97 | 56.4 |
| 2004 | 34,106 | 23,715 | 10,391 | 34,691 | 11,108 | 23,583 | 50,898 | 4.29 | 2.07 | 30.7 |
| 2003 | 32,416 | 23,362 | 9,054 | 33,436 | 5,426 | 28,010 | 40,158 | 4.03 | 2.08 | 15.6 |
| 2002 | 28,990 | 22,339 | 6,651 | 24,222 | 4,743 | 19,479 | 40,590 | 3.85 | 1.96 | 6.2 |
| 2001 | 20,181 | 19,014 | 1,167 | Not Applicable | Not Applicable | Not Applicable | 45,473 | 3.15 | 1.56 | 18.9 |
| 2000 | 14,380 | 14,178 | 202 | Before 2002 | Before 2002 | Before 2002 | 47,702 | 3.13 | 1.39 | 20.0 |
| 1999 | 12,692 | 12,287 | 405 | | | | 32,713 | 3.28 | 1.37 | 20.1 |
| 1998 | 10,715 | 10,333 | 382 | | | | 44,797 | 3.33 | 1.34 | 20.7 |
| 1997 | 7,376 | 7,082 | 294 | | | | 28,461 | 3.79 | 1.10 | 21.1 |
| 1996 | 6,743 | 6,517 | 226 | | | | 19,161 | 3.88 | 1.04 | 21.3 |
| 1995 | 5,829 | 5,584 | 245 | | | | 14,932 | 4.25 | 0.98 | 21.1 |
| 1994 | 5,169 | 4,884 | 285 | | | | 9,132 | 4.87 | 0.91 | 20.5 |
| 1993 | 4,437 | 3,782 | 655 | | | | 9,005 | 5.29 | 0.85 | 21.6 |
| 1992 | Not Applicable | Not Applicable | Not Applicable | | | | 8,721 | Not Applicable | Not Applicable | 23.1 |
| 1991 | Before 1993 | Before 1993 | Before 1993 | | | | 8,247 | Before 1993 | Before 1993 | 21.6 |
| 1990 | | | | | | | 2,925 | | | 23.2 |
| 1989 | | | | | | | 4,024 | | | 24.3 |

Sources: Freddie Mac and FHFA

N/A = not applicable

N/M = not meaningful

1  On October 9, 2008, FHFA suspended capital classifications of Freddie Mac. As of the fourth quarter, neither the existing statutory nor the FHFA-directed regulatory capital requirements are binding and will not be binding during conservatorship.

2  Beginning in the fourth quarter of 2003, FHFA directed Freddie Mac to maintain an additional 30 percent capital in excess of the statutory minimum capital requirement. On March 19, 2008, FHFA announced a reduction in the mandatory target capital surplus from 30 percent to 20 percent above the statutory minimum capital requirements. The minimum capital requirement and minimum capital surplus numbers stated in this table do not reflect the inclusion of the additional capital requirement. Minimum capital surplus is the difference between core capital and the minimum capital requirement.

3  Total capital includes core capital and general reserves for mortgage and foreclosure losses.

4  The risk-based capital requirement is the amount of total capital an Enterprise must hold to absorb projected losses flowing from future adverse interest rate and credit risk conditions and is specified by the Federal Housing Enterprises Financial Safety and Soundness Act of 1992. FHFA is not reporting on risk-based capital levels during conservatorship.

5  The difference between total capital and risk-based capital requirement. FHFA is not requiring risk-based capital during conservatorship.

6  Stock price at the end of the period multiplied by the number of outstanding common shares.

7  Common dividends paid as a percentage of net income available to common stockholders.

## Table 19. Federal Home Loan Banks Combined Statement of Income

| End of Period | ($ in Millions) | | | | |
|---|---|---|---|---|---|
| | Net Interest Income ($) | Operating Expenses ($) | Affordable Housing Program Assessment ($) | REFCORP Assessment[1] ($) | Net Income ($) |
| 4Q09 | 1,346 | 226 | 62 | 138 | 552 |
| 3Q09 | 1,357 | 203 | 19 | 38 | (165) |
| 2Q09 | 1,487 | 196 | 120 | 272 | 1,123 |
| 1Q09 | 1,242 | 188 | 57 | 124 | 345 |
| Annual Data | | | | | |
| 2009 | 5,432 | 813 | 258 | 572 | 1,855 |
| 2008 | 5,243 | 732 | 188 | 412 | 1,206 |
| 2007 | 4,516 | 714 | 318 | 703 | 2,827 |
| 2006 | 4,293 | 671 | 295 | 647 | 2,612 |
| 2005 | 4,207 | 657 | 282 | 625 | 2,525 |
| 2004 | 4,171 | 547 | 225 | 505 | 1,994 |
| 2003 | 3,877 | 450 | 218 | 490 | 1,885 |
| 2002 | 3,722 | 393 | 168 | 375 | 1,507 |
| 2001 | 3,446 | 364 | 220 | 490 | 1,970 |
| 2000 | 3,313 | 333 | 246 | 553 | 2,211 |
| 1999 | 2,534 | 282 | 199 | Not Applicable | 2,128 |
| 1998 | 2,116 | 258 | 169 | Before 2000 | 1,778 |
| 1997 | 1,772 | 229 | 137 | | 1,492 |
| 1996 | 1,584 | 219 | 119 | | 1,330 |
| 1995 | 1,401 | 213 | 104 | | 1,300 |
| 1994 | 1,230 | 207 | 100 | | 1,023 |
| 1993 | 954 | 197 | 75 | | 884 |
| 1992 | 736 | 207 | 50 | | 850 |
| 1991 | 1,051 | 264 | 50 | | 1,159 |
| 1990 | 1,510 | 279 | 60 | | 1,468 |

Source: Federal Home Loan Bank System Office of Finance

[1] Prior to 2000, the Federal Home Loan Banks charged a $300 million annual capital distribution to the Resolution Funding Corporation (REFCORP) directly to retained earnings.

## Table 20. Federal Home Loan Banks Combined Balance Sheet

| End of Period | ($ in Millions) | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Total Assets ($) | Advances to Members Outstanding ($) | Mortgage Loans Held ($) | Mortgage-Related Securities ($) | Consolidated Obligations ($) | Capital Stock ($) | Retained Earnings ($) | Regulatory Capital[1] | Regulatory Capital/Total Assets |
| 4Q09 | 1,015,583 | 631,159 | 71,437 | 152,028 | 934,876 | 44,982 | 6,033 | 59,153 | 5.82 |
| 3Q09 | 1,061,766 | 677,880 | 74,177 | 151,929 | 979,914 | 48,111 | 5,643 | 59,384 | 5.59 |
| 2Q09 | 1,147,896 | 738,812 | 77,755 | 152,844 | 1,060,668 | 48,966 | 6,009 | 60,608 | 5.28 |
| 1Q09 | 1,232,195 | 817,407 | 85,032 | 157,536 | 1,142,062 | 47,246 | 5,037 | 59,654 | 4.84 |
| Annual Data | | | | | | | | | |
| 2009 | 1,015,583 | 631,159 | 71,437 | 152,028 | 934,876 | 44,982 | 6,033 | 59,153 | 5.82 |
| 2008 | 1,349,053 | 928,638 | 87,361 | 169,170 | 1,258,267 | 49,551 | 2,936 | 58,625 | 4.35 |
| 2007 | 1,271,800 | 875,061 | 91,610 | 143,513 | 1,178,916 | 50,253 | 3,689 | 55,050 | 4.33 |
| 2006 | 1,016,469 | 640,681 | 97,974 | 130,228 | 934,214 | 42,001 | 3,143 | 46,247 | 4.55 |
| 2005 | 997,389 | 619,860 | 105,240 | 122,328 | 915,901 | 42,043 | 2,600 | 46,102 | 4.62 |
| 2004 | 924,751 | 581,216 | 113,922 | 124,417 | 845,738 | 40,092 | 1,744 | 42,990 | 4.65 |
| 2003 | 822,418 | 514,037 | 113,438 | 97,867 | 740,721 | 37,703 | 1,098 | 38,801 | 4.72 |
| 2002 | 763,052 | 489,338 | 60,455 | 96,386 | 673,383 | 35,186 | 716 | 35,904 | 4.71 |
| 2001 | 696,254 | 472,540 | 27,641 | 86,730 | 621,003 | 33,288 | 749 | 34,039 | 4.89 |
| 2000 | 653,687 | 437,861 | 16,149 | 77,385 | 591,606 | 30,537 | 728 | 31,266 | 4.78 |
| 1999 | 583,212 | 395,747 | 2,026 | 62,531 | 525,419 | 28,361 | 654 | 29,019 | 4.98 |
| 1998 | 434,002 | 288,189 | 966 | 52,232 | 376,715 | 22,287 | 465 | 22,756 | 5.24 |
| 1997 | 348,575 | 202,265 | 37 | 47,072 | 304,493 | 18,833 | 341 | 19,180 | 5.50 |
| 1996 | 292,035 | 161,372 | 0 | 42,960 | 251,316 | 16,540 | 336 | 16,883 | 5.78 |
| 1995 | 272,661 | 132,264 | 0 | 38,029 | 231,417 | 14,850 | 366 | 15,213 | 5.58 |
| 1994 | 239,076 | 125,893 | 0 | 29,967 | 200,196 | 13,095 | 271 | 13,373 | 5.59 |
| 1993 | 178,897 | 103,131 | 0 | 22,217 | 138,741 | 11,450 | 317 | 11,766 | 6.58 |
| 1992 | 162,134 | 79,884 | 0 | 20,123 | 114,652 | 10,102 | 429 | 10,531 | 6.50 |
| 1991 | 154,556 | 79,065 | 0 | Not Available | 108,149 | 10,200 | 495 | Not Available | Not Available |
| 1990 | 165,742 | 117,103 | 0 | Before 1992 | 118,437 | 11,104 | 521 | Before 1992 | Before 1992 |

Source: Federal Home Loan Bank System Office of Finance

[1] The sum of regulatory capital amounts reported in call reports filed by each Federal Home Loan Bank plus the combining adjustment for Federal Home Loan Bank System retained earnings reported by the Office of Finance.

## Table 21. Federal Home Loan Banks Net Income

| End of Period | ($ in Millions) | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Atlanta | Boston | Chicago | Cincinnati | Dallas | Des Moines | Indianapolis | New York | Pittsburgh | San Francisco | Seattle | Topeka | Combining Adjustment | System Total |
| 4Q09 | 82 | 6 | 21 | 49 | 39 | 41 | 24 | 96 | (5) | 174 | (18) | 46 | (3) | 552 |
| 3Q09 | 11 | (105) | (150) | 61 | 18 | 35 | 21 | 140 | (40) | (85) | (93) | 25 | (3) | (165) |
| 2Q09 | 192 | (5) | 103 | 75 | 26 | 76 | 53 | 187 | 31 | 303 | (35) | 105 | 12 | 1,123 |
| 1Q09 | (2) | (83) | (39) | 83 | 65 | (6) | 22 | 148 | (23) | 123 | (16) | 61 | 12 | 345 |
| **Annual Data** | | | | | | | | | | | | | | |
| 2009 | 283 | (187) | (65) | 268 | 148 | 146 | 120 | 571 | (37) | 515 | (162) | 237 | 18 | 1,855 |
| 2008 | 254 | (116) | (119) | 236 | 79 | 127 | 184 | 259 | 19 | 461 | (199) | 28 | (7) | 1,206 |
| 2007 | 445 | 198 | 111 | 269 | 130 | 101 | 122 | 323 | 237 | 652 | 71 | 150 | 18 | 2,827 |
| 2006 | 414 | 196 | 188 | 253 | 122 | 89 | 118 | 285 | 216 | 542 | 26 | 136 | 27 | 2,612 |
| 2005 | 344 | 135 | 244 | 220 | 242 | 228 | 153 | 230 | 192 | 369 | 2 | 136 | 30 | 2,525 |
| 2004 | 294 | 90 | 365 | 227 | 65 | 100 | 131 | 161 | 119 | 293 | 83 | 93 | (27) | 1,994 |
| 2003 | 207 | 92 | 437 | 171 | 113 | 135 | 134 | 46 | 69 | 323 | 144 | 88 | (74) | 1,885 |
| 2002 | 267 | 76 | 205 | 178 | (50) | 46 | 81 | 234 | (27) | 292 | 147 | 58 | 0 | 1,507 |
| 2001 | 162 | 113 | 164 | 189 | 114 | 74 | 104 | 285 | 85 | 425 | 178 | 77 | 0 | 1,970 |
| 2000 | 298 | 146 | 129 | 193 | 129 | 124 | 127 | 277 | 173 | 377 | 139 | 99 | 0 | 2,211 |
| 1999 | 282 | 137 | 131 | 173 | 109 | 132 | 125 | 244 | 184 | 332 | 165 | 90 | 24 | 2,128 |
| 1998 | 221 | 116 | 111 | 176 | 99 | 116 | 111 | 186 | 143 | 294 | 154 | 81 | (30) | 1,778 |
| 1997 | 192 | 103 | 99 | 135 | 87 | 110 | 98 | 144 | 110 | 249 | 129 | 65 | (29) | 1,492 |
| 1996 | 165 | 96 | 92 | 116 | 95 | 111 | 80 | 131 | 97 | 219 | 118 | 58 | (48) | 1,330 |
| 1995 | 159 | 92 | 73 | 91 | 91 | 103 | 74 | 136 | 82 | 200 | 87 | 50 | 63 | 1,300 |
| 1994 | 120 | 69 | 57 | 68 | 78 | 76 | 71 | 126 | 58 | 196 | 75 | 45 | (16) | 1,024 |
| 1993 | 114 | 57 | 49 | 33 | 39 | 50 | 53 | 117 | 62 | 163 | 122 | 35 | (12) | 884 |
| 1992 | 124 | 52 | 51 | 41 | 26 | 47 | 59 | 141 | 58 | 131 | 93 | 33 | (5) | 850 |
| 1991 | 158 | 88 | 58 | 51 | 38 | 46 | 64 | 156 | 57 | 316 | 58 | 64 | 7 | 1,159 |

Source: Federal Home Loan Bank System Office of Finance

## Table 22. Federal Home Loan Banks Advances Outstanding

| End of Period | Atlanta | Boston | Chicago | Cincinnati | Dallas | Des Moines | Indianapolis | New York | Pittsburgh | San Francisco | Seattle | Topeka | System Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **($ in Millions)** | | | | | | | | | | | | | |
| **4Q09** | 114,580 | 37,591 | 24,148 | 35,818 | 47,263 | 35,720 | 22,443 | 94,349 | 41,177 | 133,559 | 22,257 | 22,254 | 631,159 |
| **3Q09** | 125,823 | 37,936 | 25,457 | 38,082 | 50,035 | 36,303 | 24,432 | 95,945 | 41,364 | 154,962 | 24,908 | 22,633 | 677,880 |
| **2Q09** | 134,503 | 41,854 | 27,192 | 44,865 | 53,470 | 37,165 | 25,987 | 100,458 | 45,799 | 174,732 | 28,257 | 24,530 | 738,812 |
| **1Q09** | 148,090 | 49,433 | 31,197 | 47,112 | 56,402 | 37,783 | 27,899 | 104,464 | 52,260 | 203,904 | 31,848 | 27,015 | 817,407 |
| **Annual Data** | | | | | | | | | | | | | |
| **2009** | 114,580 | 37,591 | 24,148 | 35,818 | 47,263 | 35,720 | 22,443 | 94,349 | 41,177 | 133,559 | 22,257 | 22,254 | 631,159 |
| **2008** | 165,856 | 56,926 | 38,140 | 53,916 | 60,920 | 41,897 | 31,249 | 109,153 | 62,153 | 235,664 | 36,944 | 35,820 | 928,638 |
| **2007** | 142,867 | 55,680 | 30,221 | 53,310 | 46,298 | 40,412 | 26,770 | 82,090 | 68,798 | 251,034 | 45,524 | 32,057 | 875,061 |
| **2006** | 101,476 | 37,342 | 26,179 | 41,956 | 41,168 | 21,855 | 22,282 | 59,013 | 49,335 | 183,669 | 27,961 | 28,445 | 640,681 |
| **2005** | 101,265 | 38,068 | 24,921 | 40,262 | 46,457 | 22,283 | 25,814 | 61,902 | 47,493 | 162,873 | 21,435 | 27,087 | 619,860 |
| **2004** | 95,867 | 30,209 | 24,192 | 41,301 | 47,112 | 27,175 | 25,231 | 68,508 | 38,980 | 140,254 | 14,897 | 27,490 | 581,216 |
| **2003** | 88,149 | 26,074 | 26,443 | 43,129 | 40,595 | 23,272 | 28,925 | 63,923 | 34,662 | 92,330 | 19,653 | 26,882 | 514,037 |
| **2002** | 82,244 | 26,931 | 24,945 | 40,063 | 36,869 | 23,971 | 28,944 | 68,926 | 29,251 | 81,237 | 20,036 | 25,921 | 489,338 |
| **2001** | 71,818 | 24,361 | 21,902 | 35,223 | 32,490 | 20,745 | 26,399 | 60,962 | 29,311 | 102,255 | 24,252 | 22,822 | 472,540 |
| **2000** | 58,249 | 21,594 | 18,462 | 31,935 | 30,195 | 21,158 | 24,073 | 52,396 | 25,946 | 110,031 | 26,240 | 17,582 | 437,861 |
| **1999** | 45,216 | 22,488 | 17,167 | 28,134 | 27,034 | 22,949 | 19,433 | 44,409 | 36,527 | 90,514 | 26,284 | 15,592 | 395,747 |
| **1998** | 33,561 | 15,419 | 14,899 | 17,873 | 22,191 | 18,673 | 14,388 | 31,517 | 26,050 | 63,990 | 21,151 | 8,477 | 288,189 |
| **1997** | 23,128 | 12,052 | 10,369 | 14,722 | 13,043 | 10,559 | 11,435 | 19,601 | 16,979 | 49,310 | 15,223 | 5,844 | 202,265 |
| **1996** | 16,774 | 9,655 | 10,252 | 10,882 | 10,085 | 10,306 | 9,570 | 16,486 | 12,369 | 39,222 | 10,850 | 4,921 | 161,372 |
| **1995** | 13,920 | 8,124 | 8,282 | 8,287 | 9,505 | 11,226 | 7,926 | 15,454 | 9,657 | 25,664 | 9,035 | 5,185 | 132,264 |
| **1994** | 14,526 | 8,504 | 6,675 | 7,140 | 8,039 | 9,819 | 7,754 | 14,509 | 8,475 | 25,343 | 8,899 | 6,212 | 125,893 |
| **1993** | 11,340 | 7,208 | 4,380 | 4,274 | 10,470 | 6,362 | 6,078 | 12,162 | 6,713 | 23,847 | 5,889 | 4,407 | 103,131 |
| **1992** | 9,301 | 5,038 | 2,873 | 2,415 | 7,322 | 3,314 | 5,657 | 8,780 | 3,547 | 23,110 | 5,025 | 3,502 | 79,884 |
| **1991** | 8,861 | 5,297 | 1,773 | 2,285 | 4,634 | 2,380 | 5,426 | 11,804 | 2,770 | 24,178 | 5,647 | 4,011 | 79,065 |

Source: Federal Home Loan Bank System Office of Finance

FHFA 1369

## Table 23. Federal Home Loan Banks Regulatory Capital[1]

| End of Period | Atlanta | Boston | Chicago | Cincinnati | Dallas | Des Moines | Indianapolis | New York | Pittsburgh | San Francisco | Seattle | Topeka | Combining Adjustment[2] | System Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | ($ in Millions) | | | | | | | | | |
| 4Q09 | 9,185 | 3,876 | 3,502 | 4,151 | 2,897 | 2,953 | 2,830 | 5,874 | 4,415 | 14,657 | 2,848 | 1,980 | (15) | 59,153 |
| 3Q09 | 9,085 | 3,856 | 3,486 | 4,152 | 2,935 | 3,428 | 2,811 | 5,936 | 4,416 | 14,467 | 2,865 | 1,959 | (12) | 59,384 |
| 2Q09 | 9,028 | 3,948 | 3,638 | 4,506 | 3,208 | 3,373 | 2,793 | 6,098 | 4,450 | 14,589 | 2,957 | 2,029 | (9) | 60,608 |
| 1Q09 | 8,702 | 3,941 | 3,499 | 4,462 | 3,233 | 3,250 | 2,721 | 6,042 | 4,410 | 14,252 | 2,987 | 2,176 | (21) | 59,654 |
| Annual Data | | | | | | | | | | | | | | |
| 2009 | 9,185 | 3,876 | 3,502 | 4,151 | 2,897 | 2,953 | 2,830 | 5,874 | 4,415 | 14,657 | 2,848 | 1,980 | (15) | 59,153 |
| 2008 | 8,942 | 3,658 | 3,327 | 4,399 | 3,530 | 3,174 | 2,701 | 6,112 | 4,157 | 13,539 | 2,687 | 2,432 | (33) | 58,625 |
| 2007 | 8,080 | 3,421 | 3,342 | 3,877 | 2,688 | 3,125 | 2,368 | 5,025 | 4,295 | 13,859 | 2,660 | 2,336 | (26) | 55,050 |
| 2006 | 6,394 | 2,542 | 3,208 | 4,050 | 2,598 | 2,315 | 2,111 | 4,025 | 3,655 | 10,865 | 2,303 | 2,225 | (44) | 46,247 |
| 2005 | 6,225 | 2,675 | 4,507 | 4,130 | 2,796 | 2,346 | 2,349 | 3,900 | 3,289 | 9,698 | 2,268 | 1,990 | (71) | 46,102 |
| 2004 | 5,681 | 2,240 | 4,793 | 4,002 | 2,846 | 2,453 | 2,132 | 4,005 | 2,791 | 7,959 | 2,166 | 2,023 | (101) | 42,990 |
| 2003 | 5,030 | 2,490 | 4,542 | 3,737 | 2,666 | 2,226 | 1,961 | 3,765 | 2,344 | 5,858 | 2,456 | 1,800 | (74) | 38,801 |
| 2002 | 4,577 | 2,323 | 3,296 | 3,613 | 2,421 | 1,889 | 1,935 | 4,296 | 1,824 | 5,687 | 2,382 | 1,661 | 0 | 35,904 |
| 2001 | 4,165 | 2,032 | 2,507 | 3,240 | 2,212 | 1,574 | 1,753 | 3,910 | 1,970 | 6,814 | 2,426 | 1,436 | 0 | 34,039 |
| 2000 | 3,649 | 1,905 | 1,701 | 2,841 | 2,166 | 1,773 | 1,581 | 3,747 | 2,175 | 6,292 | 2,168 | 1,267 | 0 | 31,266 |
| 1999 | 3,433 | 1,868 | 1,505 | 2,407 | 1,862 | 2,264 | 1,446 | 3,093 | 2,416 | 5,438 | 2,098 | 1,190 | 0 | 29,019 |
| 1998 | 2,427 | 1,530 | 1,299 | 1,952 | 1,570 | 1,526 | 1,179 | 2,326 | 1,827 | 4,435 | 1,813 | 894 | (24) | 22,756 |
| 1997 | 2,077 | 1,344 | 1,159 | 1,694 | 1,338 | 1,320 | 1,090 | 1,881 | 1,440 | 3,545 | 1,495 | 791 | 6 | 19,180 |
| 1996 | 1,846 | 1,239 | 1,091 | 1,377 | 1,150 | 1,245 | 903 | 1,616 | 1,230 | 3,150 | 1,334 | 666 | 35 | 16,883 |
| 1995 | 1,615 | 1,201 | 941 | 1,128 | 1,168 | 1,217 | 799 | 1,531 | 1,030 | 2,719 | 1,148 | 632 | 83 | 15,213 |
| 1994 | 1,488 | 1,091 | 749 | 961 | 944 | 905 | 676 | 1,281 | 924 | 2,627 | 1,094 | 612 | 20 | 13,373 |
| 1993 | 1,423 | 927 | 648 | 692 | 914 | 652 | 584 | 1,251 | 740 | 2,440 | 934 | 526 | 36 | 11,766 |
| 1992 | 1,333 | 843 | 564 | 563 | 661 | 515 | 548 | 1,181 | 566 | 2,453 | 782 | 474 | 48 | 10,531 |
| 1991 | 1,367 | 807 | 525 | 517 | 645 | 450 | 515 | 1,234 | 492 | 2,924 | 652 | 514 | 53 | 10,695 |

Source: Federal Home Loan Bank System Office of Finance

[1] For the Federal Home Loan Bank of Chicago and for all other FHLBanks before 2005, amounts for regulatory capital are from call reports filed by each Federal Home Loan Bank. Except for the Federal Home Loan Bank of Chicago, amounts in 2005, 2006, 2007, 2008, and the first three quarters of 2009 are as reported by the Office of Finance.

[2] Combining adjustment for Federal Home Loan Bank System retained earnings reported by the Office of Finance.

## Table 24. Loan Limits

| Period | Single-Family Conforming Loan Limits[1] | | | |
|---|---|---|---|---|
| | One Unit | Two Units | Three Units | Four Units |
| 2010[2] | 417,000-729,750 | 533,850-934,200 | 645,300-1,129,250 | 801,950-1,403,400 |
| 2009[3] | 417,000-729,750 | 533,850-934,200 | 645,300-1,129,250 | 801,950-1,403,400 |
| 2008[4] | 417,000-729,750 | 533,850-934,200 | 645,300-1,129,250 | 801,950-1,403,400 |
| 2007 | 417,000 | 533,850 | 645,300 | 801,950 |
| 2006 | 417,000 | 533,850 | 645,300 | 801,950 |
| 2005 | 359,650 | 460,400 | 556,500 | 691,600 |
| 2004 | 333,700 | 427,150 | 516,300 | 641,650 |
| 2003 | 322,700 | 413,100 | 499,300 | 620,500 |
| 2002 | 300,700 | 384,900 | 465,200 | 578,150 |
| 2001 | 275,000 | 351,950 | 425,400 | 528,700 |
| 2000 | 252,700 | 323,400 | 390,900 | 485,800 |
| 1999 | 240,000 | 307,100 | 371,200 | 461,350 |
| 1998 | 227,150 | 290,650 | 351,300 | 436,600 |
| 1997 | 214,600 | 274,550 | 331,850 | 412,450 |
| 1996 | 207,000 | 264,750 | 320,050 | 397,800 |
| 1995 | 203,150 | 259,850 | 314,100 | 390,400 |
| 1994 | 203,150 | 259,850 | 314,100 | 390,400 |
| 1993 | 203,150 | 259,850 | 314,100 | 390,400 |
| 1992 | 202,300 | 258,800 | 312,800 | 388,800 |
| 1991 | 191,250 | 244,650 | 295,650 | 367,500 |
| 5/1/1990 – 12/31/1990 | 187,450 | 239,750 | 289,750 | 360,150 |
| 1989 – 4/30/1990 | 187,600 | 239,950 | 290,000 | 360,450 |
| 1988 | 168,700 | 215,800 | 260,800 | 324,150 |
| 1987 | 153,100 | 195,850 | 236,650 | 294,150 |
| 1986 | 133,250 | 170,450 | 205,950 | 256,000 |
| 1985 | 115,300 | 147,500 | 178,200 | 221,500 |
| 1984 | 114,000 | 145,800 | 176,100 | 218,900 |
| 1983 | 108,300 | 138,500 | 167,200 | 207,900 |
| 1982 | 107,000 | 136,800 | 165,100 | 205,300 |
| 1981 | 98,500 | 126,000 | 152,000 | 189,000 |
| 1980 | 93,750 | 120,000 | 145,000 | 170,000 |
| 10/27/1977 – 1979 | 75,000 | 75,000 | 75,000 | 75,000 |
| 1975 – 10/26/1977 | 55,000 | 55,000 | 55,000 | 55,000 |

Sources: Department of Housing and Urban Development (HUD), FHFA, Freddie Mac

[1] Conforming loan limits are 50 percent higher in Alaska, Hawaii, Guam, and the U.S. Virgin Islands.

[2] Maximum loan limits for mortgages originated in 2010 were set by Public Law 111-88 at the higher of the limits established by the Economic Stimulus Act of 2008 and those determined under a formula prescribed by the Housing and Economic Recovery Act of 2008. For all areas, the resulting 2010 limits were the same as those in effect for 2009.

[3] Loan limits for mortgages originated in 2009 were initially set under provisions of the Housing and Economic Recovery Act of 2008, which allowed for high-cost area limits of up to $625,500. In February 2009, however, the American Recovery and Reinvestment Act of 2009 restored the $729,750 maximum loan limit for mortgages originated in 2009.

[4] The Economic Stimulus Act of 2008 allowed Fannie Mae and Freddie Mac to raise the conforming loan limits in certain high-cost areas to a maximum of $729,750 for one-unit homes in the continental United States. Higher limits applied to two-, three-, and four-unit homes. Alaska, Hawaii, Guam, and the Virgin Islands have higher maximum limits. The limits applied to loans originated between July 1, 2007 and December 31, 2008.

| Period | FHA Single-Family Insurable Limits | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | One Unit | | Two Units | | Three Units | | Four Units | |
| | Low-Cost Area Max | High-Cost Area Max | Low-Cost Area Max | High-Cost Area Max | Low-Cost Area Max | High-Cost Area Max | Low-Cost Area Max | High-Cost Area Max |
| 2010[1] | 271,050 | 729,750 | 347,000 | 934,200 | 419,400 | 1,129,250 | 521,250 | 1,403,400 |
| 2009[2] | 271,050 | 729,750 | 347,000 | 934,200 | 419,400 | 1,129,250 | 521,250 | 1,403,400 |
| 2008[3] | 271,050 | 729,750 | 347,000 | 934,200 | 419,400 | 1,129,250 | 521,250 | 1,403,400 |
| 2007 | 200,160 | 362,790 | 256,248 | 464,449 | 309,744 | 561,411 | 384,936 | 697,696 |
| 2006 | 200,160 | 362,790 | 256,248 | 464,449 | 309,744 | 561,411 | 384,936 | 697,696 |
| 2005 | 172,632 | 312,895 | 220,992 | 400,548 | 267,120 | 484,155 | 331,968 | 601,692 |
| 2004 | 160,176 | 290,319 | 205,032 | 371,621 | 247,824 | 449,181 | 307,992 | 558,236 |
| 2003 | 154,896 | 280,749 | 198,288 | 359,397 | 239,664 | 434,391 | 297,840 | 539,835 |
| 2002 | 144,336 | 261,609 | 184,752 | 334,863 | 223,296 | 404,724 | 277,512 | 502,990 |
| 2001 | 132,000 | 239,250 | 168,936 | 306,196 | 204,192 | 370,098 | 253,776 | 459,969 |
| 2000 | 121,296 | 219,849 | 155,232 | 281,358 | 187,632 | 340,083 | 233,184 | 422,646 |
| 1999 | 115,200 | 208,800 | 147,408 | 267,177 | 178,176 | 322,944 | 221,448 | 401,375 |
| 1998 | 109,032 | 197,621 | 139,512 | 252,866 | 168,624 | 305,631 | 209,568 | 379,842 |
| 1997 | 81,546 | 170,362 | 104,310 | 205,875 | 126,103 | 248,888 | 156,731 | 309,338 |

Source: Federal Housing Administration

[1] Maximum loan limits for mortgages originated in 2010 were set by Public Law 111-88 at the higher of the limits established by the Economic Stimulus Act of 2008 and those determined under a formula prescribed by the Housing and Economic Recovery Act of 2008. For all areas, the resulting 2010 limits were the same as those in effect for 2009.

[2] Loan limits for mortgages originated in 2009 were initially set under provisions of the Housing and Economic Recovery Act of 2008, which allowed for high-cost area limits of up to $625,500. In February 2009, however, the American Recovery and Reinvestment Act of 2009 restored the $729,750 maximum loan limit for mortgages originated in 2009.

[3] The Economic Stimulus Act of 2008 allowed the Federal Housing Administration (FHA) to increase the single-family insurable limits to a maximum of $729,750 for one-unit homes in the continental United States. Higher limits applied to two-, three-, and four-unit homes. Alaska, Hawaii, Guam, and the Virgin Islands have higher maximum limits. The limits applied to loans originated between July 1, 2007, and December 31, 2008.

FHFA 1371

## Table 25. Mortgage Interest Rates

| Period | Average Commitment Rates on Loans | | Effective Rates on Closed Loans | |
|---|---|---|---|---|
| | Conventional | | Conventional | |
| | 30-Year Fixed Rate ($) | One-Year Adjustable Rate ($) | Fixed Rate ($) | Adjustable Rate ($) |
| 4Q09 | 4.9 | 4.4 | 5.1 | N/A |
| 3Q09 | 5.2 | 4.7 | 5.3 | N/A |
| 2Q09 | 5.0 | 4.8 | 5.0 | N/A |
| 1Q09 | 5.1 | 4.9 | 5.1 | N/A |
| Annual Data | | | | |
| 2009 | 5.0 | 4.7 | 5.2 | N/A |
| 2008 | 6.0 | 5.2 | 6.2 | 5.8 |
| 2007 | 6.3 | 5.6 | 6.5 | 6.3 |
| 2006 | 6.4 | 5.5 | 6.7 | 6.4 |
| 2005 | 5.9 | 4.5 | 6.1 | 5.5 |
| 2004 | 5.8 | 3.9 | 6.0 | 5.2 |
| 2003 | 5.8 | 3.8 | 5.9 | 5.0 |
| 2002 | 6.5 | 4.6 | 6.7 | 5.7 |
| 2001 | 7.0 | 5.8 | 7.1 | 6.4 |
| 2000 | 8.1 | 7.0 | 8.3 | 7.1 |
| 1999 | 7.4 | 6.0 | 7.4 | 6.5 |
| 1998 | 6.9 | 5.6 | 7.2 | 6.5 |
| 1997 | 7.6 | 5.6 | 7.9 | 6.9 |
| 1996 | 7.8 | 5.7 | 8.0 | 7.1 |
| 1995 | 7.9 | 6.1 | 8.2 | 7.1 |
| 1994 | 8.4 | 5.4 | 8.2 | 6.4 |
| 1993 | 7.3 | 4.6 | 7.5 | 5.7 |
| 1992 | 8.4 | 5.6 | 8.5 | 6.6 |
| 1991 | 9.2 | 7.1 | 9.7 | 8.3 |
| 1990 | 10.1 | 8.4 | 10.4 | 9.2 |
| 1989 | 10.3 | 8.8 | 10.5 | 9.4 |
| 1988 | 10.3 | 7.9 | 10.4 | 8.5 |
| 1987 | 10.2 | 7.8 | 9.9 | 8.5 |
| 1986 | 10.2 | 8.4 | 10.5 | 9.4 |
| 1985 | 12.4 | 10.0 | 12.4 | 10.9 |
| 1984 | 13.9 | 11.5 | 13.2 | 12.0 |
| 1983 | 13.2 | Not Available Before 1984 | 13.0 | 12.3 |
| 1982 | 16.0 | | Not Available Before 1983 | Not Available Before 1983 |
| 1981 | 16.6 | | | |
| 1980 | 13.7 | | | |
| 1979 | 11.2 | | | |
| 1978 | 9.6 | | | |
| 1977 | 8.8 | | | |
| 1976 | 8.9 | | | |
| 1975 | 9.0 | | | |
| 1974 | 9.2 | | | |
| 1973 | 8.0 | | | |
| 1972 | 7.4 | | | |

Sources: Freddie Mac for average commitment rates; FHFA for effective rates

N/A = not available

**Table 26. Housing Market Activity**[1]

| Period | Housing Starts (units in thousands) | | | Home Sales (units in thousands) | |
|---|---|---|---|---|---|
| | One- to Four-Unit Housing Starts | Multifamily Housing Starts | Total Housing Starts | Sales of New One- to Four-Unit Homes | Sales of Existing One- to Four-Unit Homes |
| 4Q09[2] | N/A | 68 | 565 | 372 | 5,970 |
| 3Q09[2] | N/A | 79 | 586 | 406 | 5,280 |
| 2Q09[2] | N/A | 104 | 537 | 372 | 4,780 |
| 1Q09[2] | N/A | 149 | 530 | 338 | 4,610 |
| Annual Data | | | | | |
| 2009 | 457 | 97 | 554 | 375 | 5,156 |
| 2008 | 640 | 266 | 906 | 485 | 4,913 |
| 2007 | 1,078 | 277 | 1,355 | 776 | 5,652 |
| 2006 | 1,508 | 293 | 1,801 | 1,051 | 6,478 |
| 2005 | 1,757 | 311 | 2,068 | 1,283 | 7,076 |
| 2004 | 1,653 | 303 | 1,956 | 1,203 | 6,778 |
| 2003 | 1,533 | 315 | 1,848 | 1,086 | 6,175 |
| 2002 | 1,397 | 308 | 1,705 | 973 | 5,632 |
| 2001 | 1,310 | 293 | 1,603 | 908 | 5,335 |
| 2000 | 1,270 | 299 | 1,569 | 877 | 5,174 |
| 1999 | 1,334 | 307 | 1,641 | 880 | 5,183 |
| 1998 | 1,314 | 303 | 1,617 | 886 | 4,966 |
| 1997 | 1,178 | 296 | 1,474 | 804 | 4,371 |
| 1996 | 1,206 | 271 | 1,477 | 757 | 4,167 |
| 1995 | 1,110 | 244 | 1,354 | 667 | 3,852 |
| 1994 | 1,234 | 224 | 1,457 | 670 | 3,886 |
| 1993 | 1,155 | 133 | 1,288 | 666 | 3,739 |
| 1992 | 1,061 | 139 | 1,200 | 610 | 3,432 |
| 1991 | 876 | 138 | 1,014 | 509 | 3,145 |
| 1990 | 932 | 260 | 1,193 | 534 | 3,186 |
| 1989 | 1,059 | 318 | 1,376 | 650 | 3,290 |
| 1988 | 1,140 | 348 | 1,488 | 676 | 3,594 |
| 1987 | 1,212 | 409 | 1,621 | 671 | 3,526 |
| 1986 | 1,263 | 542 | 1,805 | 750 | 3,565 |
| 1985 | 1,166 | 576 | 1,742 | 688 | 3,214 |
| 1984 | 1,206 | 544 | 1,750 | 639 | 2,868 |
| 1983 | 1,181 | 522 | 1,703 | 623 | 2,719 |
| 1982 | 743 | 320 | 1,062 | 412 | 1,990 |
| 1981 | 797 | 288 | 1,084 | 436 | 2,419 |
| 1980 | 962 | 331 | 1,292 | 545 | 2,973 |
| 1979 | 1,316 | 429 | 1,745 | 709 | 3,827 |
| 1978 | 1,558 | 462 | 2,020 | 817 | 3,986 |
| 1977 | 1,573 | 414 | 1,987 | 819 | 3,650 |
| 1976 | 1,248 | 289 | 1,538 | 646 | 3,064 |
| 1975 | 956 | 204 | 1,160 | 549 | 2,476 |
| 1974 | 956 | 382 | 1,338 | 519 | 2,272 |
| 1973 | 1,250 | 795 | 2,045 | 634 | 2,334 |
| 1972 | 1,450 | 906 | 2,357 | 718 | 2,252 |
| 1971 | 1,272 | 781 | 2,052 | 656 | 2,018 |

Sources: U.S. Census Bureau for housing starts and sales of new one- to four-unit properties; National Association of Realtors for sales of existing one- to four-unit properties

N/A = not available

[1]  Components may not add to totals due to rounding.

[2]  Seasonally adjusted annual rates.

## Table 27. Weighted Repeat Sales House Price Index (Annual Data)[1]

| Period | USA | New England | Mid-Atlantic | South Atlantic | East North Central | West North Central | East South Central | West South Central | Mountain | Pacific |
|---|---|---|---|---|---|---|---|---|---|---|
| 4Q09 | (1.50) | (0.78) | (1.48) | (2.79) | (1.74) | (0.03) | (0.04) | 1.00 | (7.44) | (0.68) |
| 3Q09 | (3.77) | (2.71) | (3.16) | (4.83) | (2.57) | (1.34) | (1.38) | (0.29) | (8.96) | (7.88) |
| 2Q09 | (5.90) | (3.17) | (3.76) | (7.74) | (3.79) | (2.18) | (2.61) | (0.32) | (10.48) | (14.81) |
| 1Q09 | (7.06) | (3.48) | (4.00) | (8.80) | (4.03) | (2.76) | (3.00) | (0.40) | (10.73) | (19.87) |
| **Annual Data** | | | | | | | | | | |
| 2009 | (1.50) | (0.78) | (1.48) | (2.79) | (1.74) | (0.03) | (0.04) | 1.00 | (7.44) | (0.68) |
| 2008 | (8.30) | (5.80) | (3.93) | (11.25) | (5.73) | (3.67) | (3.30) | (0.78) | (9.39) | (21.96) |
| 2007 | (1.25) | (2.07) | 0.76 | (1.78) | (2.96) | (0.44) | 1.97 | 3.13 | (0.85) | (5.59) |
| 2006 | 3.51 | (1.60) | 3.03 | 3.78 | (0.05) | 1.92 | 6.05 | 6.30 | 8.18 | 5.09 |
| 2005 | 9.26 | 6.37 | 10.14 | 13.15 | 3.62 | 4.37 | 7.26 | 7.00 | 14.66 | 15.24 |
| 2004 | 9.27 | 10.26 | 12.32 | 12.44 | 4.51 | 5.79 | 4.99 | 4.44 | 11.38 | 15.96 |
| 2003 | 7.57 | 10.43 | 11.15 | 8.69 | 4.65 | 5.53 | 4.23 | 3.21 | 6.76 | 13.08 |
| 2002 | 7.63 | 13.66 | 12.10 | 8.14 | 4.69 | 6.39 | 3.30 | 3.60 | 5.14 | 12.76 |
| 2001 | 6.79 | 12.20 | 9.71 | 7.61 | 4.80 | 6.86 | 3.41 | 3.76 | 4.99 | 9.13 |
| 2000 | 6.92 | 12.92 | 8.50 | 6.33 | 5.14 | 7.26 | 2.85 | 5.79 | 5.80 | 10.03 |
| 1999 | 6.04 | 10.64 | 7.01 | 5.46 | 5.22 | 5.90 | 3.98 | 5.67 | 5.73 | 7.05 |
| 1998 | 5.58 | 8.33 | 4.56 | 4.72 | 5.01 | 6.52 | 4.64 | 5.62 | 4.76 | 7.62 |
| 1997 | 3.42 | 4.72 | 2.16 | 3.49 | 3.55 | 3.62 | 2.84 | 3.01 | 3.03 | 4.44 |
| 1996 | 3.05 | 2.71 | 0.97 | 2.90 | 4.69 | 4.03 | 3.89 | 2.36 | 3.93 | 2.20 |
| 1995 | 2.70 | 0.40 | (0.15) | 2.60 | 5.20 | 4.34 | 4.66 | 3.02 | 4.78 | (0.23) |
| 1994 | 2.92 | 0.81 | (0.43) | 3.06 | 4.51 | 4.29 | 5.08 | 2.81 | 8.71 | 0.10 |
| 1993 | 2.80 | (1.61) | 0.27 | 1.86 | 4.45 | 6.30 | 4.66 | 4.50 | 9.85 | (1.63) |
| 1992 | 2.65 | (0.75) | 1.55 | 1.98 | 4.88 | 3.82 | 4.16 | 3.79 | 6.56 | (1.18) |
| 1991 | 2.93 | (2.24) | 1.46 | 3.06 | 4.54 | 3.75 | 4.15 | 3.72 | 4.73 | 1.32 |
| 1990 | 0.57 | (7.70) | (2.92) | 0.08 | 3.75 | 0.56 | 0.59 | 0.37 | 1.86 | 2.85 |
| 1989 | 5.91 | 0.63 | 2.33 | 5.09 | 6.11 | 3.05 | 3.00 | 2.66 | 2.74 | 19.61 |
| 1988 | 5.88 | 3.57 | 6.14 | 6.94 | 6.64 | 2.42 | 2.71 | (1.99) | 0.33 | 17.57 |
| 1987 | 5.86 | 13.56 | 16.22 | 6.98 | 8.18 | 2.64 | 4.16 | (8.64) | (2.64) | 9.54 |
| 1986 | 7.44 | 21.03 | 18.29 | 6.16 | 7.33 | 4.11 | 5.47 | (0.42) | 3.06 | 7.25 |
| 1985 | 6.01 | 25.10 | 14.17 | 5.37 | 4.83 | 4.43 | 5.15 | (1.57) | 2.18 | 4.86 |
| 1984 | 5.12 | 18.10 | 13.60 | 4.16 | 2.71 | 4.20 | 3.70 | (0.15) | 2.23 | 5.15 |
| 1983 | 4.10 | 15.62 | 9.89 | 3.23 | 4.81 | 4.44 | 3.91 | 0.53 | (2.64) | 0.96 |
| 1982 | 1.68 | 3.79 | 3.91 | 4.19 | (5.21) | (0.74) | 3.68 | 5.80 | 6.39 | 0.78 |
| 1981 | 4.71 | 5.73 | 0.83 | 6.43 | 2.31 | 0.89 | 0.94 | 12.21 | 7.31 | 6.03 |
| 1980 | 6.65 | 5.07 | 9.76 | 8.25 | 1.52 | 4.24 | 3.94 | 8.39 | 6.81 | 11.24 |
| 1979 | 12.46 | 10.70 | 17.83 | 12.19 | 8.92 | 8.99 | 8.98 | 13.35 | 14.76 | 16.21 |
| 1978 | 13.78 | 16.73 | 7.86 | 11.69 | 14.97 | 13.39 | 12.02 | 17.43 | 17.28 | 15.55 |
| 1977 | 14.22 | 8.67 | 10.63 | 8.14 | 13.32 | 17.37 | 12.42 | 14.08 | 18.16 | 25.86 |
| 1976 | 7.66 | 3.54 | (0.97) | 5.62 | 8.29 | 5.53 | 4.45 | 8.87 | 10.45 | 19.89 |

[1]  Percentage changes based on FHFA's purchase-only index for 1992 through 2009 and all-transactions index for prior years. Annual data are measured based on fourth quarter to fourth quarter percentage change. Quarterly data for 2009 reflect changes over the previous four quarters.

Regional Divisions

New England: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont

Mid-Atlantic: New Jersey, New York, Pennsylvania

South Atlantic: Washington, D.C., Delaware, Florida, Georgia, Maryland, North Carolina, South Carolina, Virginia, West Virginia

East North Central: Illinois, Indiana, Michigan, Ohio, Wisconsin

West North Central: Iowa, Kansas, Minnesota, Missouri, Nebraska, North Dakota, South Dakota

East South Central: Alabama, Kentucky, Mississippi, Tennessee

West South Central: Arkansas, Louisiana, Oklahoma, Texas

Mountain: Arizona, Colorado, Idaho, Montana, Nevada, New Mexico, Utah, Wyoming

Pacific: Alaska, California, Hawaii, Oregon, Washington

FHFA 1375

# Federal Housing Finance Agency

## KEY MANAGEMENT OFFICIALS

**Edward J. DeMarco,** *Acting Director*

**Stephen Cross**
*Acting Chief Operating Officer and Senior Deputy Director of the Division of Federal Home Loan Bank Regulation*

**Christopher Dickerson**
*Deputy Director of the Division of Enterprise Regulation*

**Edward Kelley**
*Associate Director, Internal Audit*

**Peter Brereton**
*Associate Director, External Relations*

**Anthony G. Cornyn**
*Senior Associate Director, Monitoring & Analysis*

**Christopher T. Curtis**
*Senior Deputy General Counsel*

**Wanda DeLeo**
*Senior Associate Director and Chief Accountant*

**John Kerr**
*Senior Associate Director, Examinations*

**Mark Kinsey**
*Chief Financial Officer*

**Patrick Lawler**
*Chief Economist*

**David A. Lee**
*Chief Administrative Officer*

**Janet Murphy**
*Chief Human Capital Officer*

**Nelson Hernandez**
*Senior Associate Director, Housing Mission and Goals*

**Alfred Pollard**
*General Counsel*

**Jeff Spohn**
*Senior Associate Director, Conservatorship Operations*

**Karen Walter**
*Senior Associate Director, Supervisory Policy*

**Kevin Winkler**
*Chief Information Officer*

## FHFA OVERSIGHT BOARD

**Edward J. DeMarco**
*Chairman*

**Timothy F. Geithner**
*Secretary of the Treasury*

**Shaun Donovan**
*Secretary of Housing and Urban Development*

**Mary L. Schapiro**
*Chairman, Securities and Exchange Commission*



**FEDERAL HOUSING
FINANCE AGENCY**

**1700 G Street, NW
Washington, D.C. 20552**

**202-414-3800**

**www.fhfa.gov**

# Tab 22

# FEDERAL HOUSING FINANCE AGENCY



## NEWS RELEASE

For Immediate Release
October 21, 2010

**Contact:**   Corinne Russell      (202) 414-6921
Stefanie Johnson   (202) 414-6376

## FHFA Releases Projections Showing Range of Potential Draws for Fannie Mae and Freddie Mac

**Washington, DC –** The Federal Housing Finance Agency (FHFA) today released projections of the financial performance of Fannie Mae and Freddie Mac (the Enterprises) including potential draws under the Preferred Stock Purchase Agreements (PSPAs) with the U.S. Department of the Treasury.   To date, the Enterprises have drawn $148 billion from the Treasury Department under the terms of the PSPAs.  Under the three scenarios used in the projections, cumulative Enterprise draws range from $221 billion to $363 billion through 2013.

FHFA worked with the Enterprises to develop consistent, forward-looking projections across three possible house price paths.  The approach taken in developing these projections is based roughly on the approach taken by the federal banking agencies last year in the Supervisory Capital Assessment Program, which produced potential, not expected outcomes.

"These projections are intended to give policymakers and the public useful snapshots of potential outcomes for the taxpayer support of Fannie Mae and Freddie Mac," said FHFA Acting Director Edward J. DeMarco. "These are not predictions; the results reflect the potential effects of a limited set of hypothetical changes in house prices, a key variable driving credit losses for the Enterprises."

The projected credit losses in each scenario primarily reflect possible further losses on the Enterprises' pre-conservatorship mortgage business.  As time passes, Enterprise dividend payments on Treasury preferred stock make up larger portions of the draws.  Under the scenarios used in the projections, if dividend payments on preferred stock were excluded, cumulative Enterprise draws range from $142 billion to $259 billion.

"Much like the recently published Conservator's Report, FHFA is releasing these projections to enhance public understanding of Fannie Mae's and Freddie Mac's financial performance," DeMarco said.

FHFA will periodically update and refine these projections and will report the updates as part of its Conservator's Report.

(Attachment follows)

###

*The Federal Housing Finance Agency regulates Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks. These government-sponsored enterprises provide more than $5.9 trillion in funding for the U.S. mortgage markets and financial institutions.*



Federal Housing Finance Agency

Projections of the Enterprises' Financial Performance

October 2010

FHFA 1379

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2010

## Contents

Purpose............................................................. 3

Approach............................................................ 3

Projection Scenarios................................................ 4

House Price Assumptions............................................. 5

Results............................................................. 7

Appendix ........................................................... 11

FHFA 1380

Federal Housing Finance Agency

## Purpose

- The purpose of this report is to provide the public with information on possible future Treasury draws by Fannie Mae and Freddie Mac (the "Enterprises") under specified scenarios, using consistent assumptions for both Enterprises. FHFA will periodically update and refine these projections and will report such updates as part of its Conservator's Report.

- To date, the Enterprises have drawn $148 billion from the U.S. Treasury under the terms of the Senior Preferred Stock Purchase Agreements (PSPAs), as amended, between the Treasury and each of the Enterprises.

- To provide a sense of the Enterprises' possible future draws under the PSPAs, FHFA worked with the Enterprises to develop consistent forward-looking financial projections. The results do not define the full range of possible outcomes. This effort should be interpreted as a sensitivity analysis of future draws to possible house price paths.

## Approach

- The approach taken in developing these projections is based roughly on the approach taken by the federal banking agencies last year in the Supervisory Capital Assessment Program (SCAP).[1] FHFA provided the Enterprises with key assumptions for each scenario. The Enterprises used their respective internal models to project their financial results based on the assumptions provided by FHFA.

- *As with SCAP, the results here are not expected outcomes. They are modeled projections in response to "what if" exercises based on assumptions about Enterprise operations, financial market conditions, and house prices.*

- While this effort achieves a degree of comparability between the Enterprises, it does not allow for actions that the Enterprises might undertake in response to the economic conditions specified in the scenarios. Those Enterprise-specific business changes could lead to different results across the scenarios than are presented in these projections.

---

[1] The Supervisory Capital Assessment Program stress tests were conducted by the Federal Reserve System, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of the Currency to assess the capital adequacy of U.S. domestic bank holding companies with assets above $100 billion.

FHFA 1381

## Projection Scenarios

Key factors that influence the Enterprises' financial results are listed in Figure 1. FHFA requested that the Enterprises project financial results for three scenarios. Because changes in house prices have had the largest impact on the Enterprises' financial results, we chose to change only this factor across the three scenarios.

## Figure 1: Scenario Assumptions

| Factor | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| House prices* | Moody's "Stronger Near-term Recovery" house price path | Moody's "Current Baseline" house price paths | Moody's "Deeper Second Recession" house price paths |
| Interest rates | Future interest rates are implied by the forward curve for swaps as of June 30, 2010 | *Same as Scenario 1* | *Same as Scenario 1* |
| Securities prices | ABS and CMBS prices fall by 5 points at the beginning of the period | *Same as Scenario 1* | *Same as Scenario 1* |
| Agency MBS spreads | Agency MBS spreads to swaps remain unchanged | *Same as Scenario 1* | *Same as Scenario 1* |
| Credit Guarantee growth | Zero growth in credit guarantees through year end 2013 | *Same as Scenario 1* | *Same as Scenario 1* |
| Retained Portfolio growth | Additions to retained portfolios are limited to nonperforming loans bought out of pools backing Fannie Mae's MBS and Freddie Mac's PCs | *Same as Scenario 1* | *Same as Scenario 1* |

*Moody's scenarios as of September 2010

4

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2010

## House Price Assumptions

House price changes have been the major driver of credit losses at the Enterprises. A wide range of possible future paths exist for house prices at the national and local levels. Given the high level of uncertainty about overall economic conditions in general and the U.S. housing markets in particular, FHFA directed the Enterprises to project financial results for Moody's current baseline and two additional house price paths. Moody's considers "Deeper Second Recession" to be a downside alternative to the Current Baseline and "Stronger Near-term Recovery" to be an upside alternative to the Current Baseline.

### Figure 2: House Price Assumptions

Moody's house price paths (Case Shiller National Index; September 2010)



**Moody's House Price Paths**
Moody's descriptions are in quotes.

Current Baseline (*FHFA Scenario 2*)
"Small remaining home price declines" contribute to a 34% peak-to-trough decline. From the trough in 3Q11 to the end of the forecast period house prices increase by 8%.

Stronger Near-term Recovery (*FHFA Scenario 1*)
"Increased access to credit supports the above-baseline growth. As a result, the recent increases in house prices are sustained, although additional increases are minimal in 2010 and 2011." The peak-to-trough decline is 31%. From the trough in 1Q09 to the end of the forecast period house prices increase by 5%.

Deeper Second Recession (*FHFA Scenario 3*)
"As a result of restricted access to credit and continuing high unemployment, the moderate rebound in housing construction that occurred over the first half of 2009 not only pauses but reverses course." The peak-to-trough decline is 45%. From the trough in 1Q12 to the end of the forecast period house prices increase by 11%.

5

FHFA 1383

## House Price Assumptions (continued)

### Selection of House Price Assumptions

Figure 2 shows national-level paths for the Case-Shiller house price index associated with the selected Moody's house price paths. Scenario 2 uses house price paths associated with Moody's "Current Baseline (September 2010)." That house price path is derived from Moody's assumptions regarding monetary and fiscal policy, U.S. dollar, and energy prices. Scenario 1 and Scenario 3 use house price paths associated with better and worse economic performance relative to Moody's "Current Baseline (September 2010)."

Moody's describes the house price paths associated with "Stronger Near-term Recovery," as being consistent with "a 10% probability that the economy will perform better than in this scenario, broadly speaking, and a 90% probability that it will perform worse." Conversely, Moody's describes the house price paths associated with "Deeper Second Recession" as being consistent with "a 90% probability that the economy will perform better, broadly speaking, and a 10% probability that it will perform worse." As with the SCAP exercise, FHFA chose the "Deeper Second Recession" house price path to ensure a stringent test that would provide information tied to a continued severe weakening in housing.

### Use of Moody's Localized Forecasts

FHFA chose to base the scenarios on Moody's house price paths because Moody's is a widely used benchmark. Moody's provides a full set of quarterly, forward-looking house price paths for each of the 384 Metropolitan Statistical Areas (MSAs) and Divisions for which FHFA publishes a historical house price index. FHFA does not forecast house prices. Such localized forecasts enable the Enterprises to project credit losses on a more comparable basis as opposed to a simple national projection of peak-to-trough change in house prices, which would require each Enterprise to translate that house price path into its own local house price index.

Defining a house price path at just the national level for the Enterprises would limit the usefulness of the results because house prices often behave quite differently in different local markets. The mix of local market price projections associated with a given national average price projection can have a substantial impact on the aggregate loss projection for an Enterprise. Similarly, defining the path with only a peak-to-trough measure is problematic because the timing of the trough and the rate of recovery beyond the trough can also greatly affect expected losses.

Federal Housing Finance Agency

## Results

The projected combined cumulative Treasury draw for both Enterprises through December 31, 2013 reach $221 billion under Scenario 1, $238 billion under Scenario 2, and $363 billion under Scenario 3. The cumulative projected draw through 2013 for Fannie Mae under each scenario is approximately double the projected draw for Freddie Mac in part because Fannie Mae's mortgage book of business is forty-five percent larger than Freddie Mac's.

**Figure 3: Cumulative Treasury Draws\*** *($ in billions)*



Includes any projected net deficit at the end of 2013

FHFA 1385

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2010

## Results (continued)

Credit-related expenses, particularly the provision for credit losses, are the primary driver of projected Treasury draws across all three scenarios. Fannie Mae's credit-related expenses increase by $85 billion from Scenario 1 to Scenario 3, and for Freddie Mac that increase amounts to $28 billion. Thus $113 billion of the projected $142 billion difference in Treasury draws across those scenarios is directly related to credit-related expense projections.

### Figure 4: Cumulative Financial Results (2009-2013) ($ in billions)

| | Fannie Mae | | | Freddie Mac | | |
|---|---|---|---|---|---|---|
| | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 1 | Scenario 2 | Scenario 3 |
| Revenues | $86 | $86 | $81 | $77 | $77 | $73 |
| Provision for credit losses | (140) | (148) | (219) | (56) | (61) | (83) |
| Other credit-related expenses | (30) | (31) | (37) | (21) | (21) | (22) |
| Total Credit-related Expenses/Losses | (170) | (179) | (255) | (77) | (82) | (105) |
| Other expenses[1] | (26) | (27) | (27) | (20) | (20) | (20) |
| Net Income (Loss) | ($110) | ($119) | ($202) | ($21) | ($26) | ($52) |
| **Capital Erosion** | | | | | | |
| Net Income | (110) | (119) | (202) | (21) | (26) | (52) |
| Dividends | (49) | (51) | (65) | (31) | (33) | (39) |
| Other[2] | 24 | 24 | 25 | 25 | 27 | 30 |
| Total Capital Erosion | (135) | (147) | (242) | (27) | (31) | (61) |
| Beginning Net Worth (12/31/2008) | (15) | (15) | (15) | (31) | (31) | (31) |
| Capital Deficit (2009-2013) | (150) | (162) | (257) | (57) | (62) | (92) |
| Senior Preferred Treasury Draw (2009-2013) | $150 | $162 | $257 | $57 | $62 | $92 |
| Cumulative Senior Preferred Treasury Draw[3] | $150 | $162 | $257 | $71 | $76 | $106 |
| Cumulative Draw excluding Dividends[3] | $102 | $111 | $192 | $40 | $43 | $67 |

[1] Consists of mark-to-market gains/losses, administrative expenses, tax expense/benefit and other expenses.

[2] Consists of change in accumulated other comprehensive income, plus FAS 115-2 and consolidation accounting adjustments, less positive net worth as of 12/31/13, if any.

[3] Freddie Mac's cumulative draw includes $13.8 billion of Treasury draw received in 2008.

Numbers may not foot due to rounding.

8

FHFA 1386

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2010

## Results (continued)

From 2007 through the second quarter of 2010 the Enterprises' provisions for credit losses have been driven primarily by increases to loan loss reserves. However, charge-offs increase during the latter years of the projection period as non-performing loans are ultimately resolved.

**Figure 5: Single-Family Cumulative Credit Losses (2009-2013)** *($ in billions)*



Credit losses are defined as charge-offs and foreclosed property expenses.

9

FHFA 1387

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2010

## Results (continued)

The Enterprises have already received $148 billion from the U.S. Treasury to maintain positive net worth.  For the selected scenarios an additional $73 to $215 billion would be required to further support the Enterprises over the projection period.  Of those amounts $67 billion to $91 billion represent dividend payments to Treasury on its holdings of senior preferred stock in the Enterprises.  Per the terms of the Senior Preferred Stock Purchase Agreements with the U.S. Treasury, senior preferred stock accrues dividends at 10 percent per year.

**Figure 6: Additional Treasury Draws and Dividends (Jul 2010 through Dec 2013)** *($ in billions)*

Projected Additional Draw and Dividends through 2013

|  | Current Draw as of 6/30/10 | | Scenario 1 | | Scenario 2 | | Scenario 3 | |
|---|---|---|---|---|---|---|---|---|
|  | Total Draw | Total Dividends | Additional Draw | Additional Dividends | Additional Draw | Additional Dividends | Additional Draw | Additional Dividends |
| Fannie Mae | $85 | $6 | $65 | $43 | $77 | $45 | $172 | $59 |
| Freddie Mac | 63 | 7 | 8 | 24 | 13 | 26 | 43 | 32 |
| Total | $148 | $13 | $73 | $67 | $90 | $71 | $215 | $91 |

10

FHFA 1388

**Appendix**

Financial Projections Procedures

FHFA directed the Enterprises to project revenue, mark-to-market gains and losses, credit-related expenses, administrative expenses, earnings, capital, and, ultimately, cumulative senior preferred Treasury draws under the three scenarios using their own respective models. Both Enterprises routinely prepare financial forecasts using their respective management assumptions. Modeling assumptions were changed at both Enterprises to conform to the assumptions listed in Figure 1.

FHFA directed that the projection period cover the remainder of 2010 and the next three years, similar to projection periods used by the Enterprises for routine management forecasts. Furthermore for the selected house price paths, by the end of the projection period the bulk of credit losses are recognized.

The Enterprises' models use projections of interest rates to calculate future net interest margins, gains and losses on the retained portfolio and derivatives used for hedging, and prepayment speeds on held or guaranteed mortgages, which influence both credit losses and guarantee fee revenue.

To project revenue, the Enterprises projected the size of the retained portfolios and credit guarantee books using assumptions provided by FHFA on business volume growth. Additions to retained portfolios were limited to nonperforming loans bought out of pools backing Fannie Mae's MBS and Freddie Mac's PCs. The balance of outstanding credit guarantees at each Enterprise remained unchanged over the forecast period.

Net interest income (which includes most of the Enterprises' guarantee fee income) is driven primarily by the size of the retained portfolio and net interest margin (the difference between yield on assets and funding costs). For this exercise, funding costs were influenced by the forward curve for swaps, and asset yields were influenced by the forward curve for swaps and the assumptions about the level of Agency MBS spreads to swaps.

Guarantee fee income is driven by the size of the credit guarantee book and guarantee fee pricing. To project the size of the credit guarantee books the Enterprises used assumptions provided on new business volume and interest rates which influence prepayment speeds on guaranteed mortgages. FHFA did not provide explicit assumptions about

11

guarantee fee pricing.  However, FHFA reviewed the pricing assumptions of each Enterprise for the forecast period for consistency. For both Enterprises, guarantee fee pricing remained relatively unchanged over the forecast period.

Projections of mark-to-market losses reflect changes in the value of securities held in the retained portfolio and changes in the value of derivatives used for hedging.  The Enterprises' models use assumptions about future interest rates, securities prices, and spreads to project the future values of securities held in the retained portfolio and resulting gains and losses.  Future values of derivatives used to hedge interest rate risk are based on the projections of future interest rates.

To project credit-related expenses, each Enterprise uses a multistep process.  First, a statistical loan transition model projects the unpaid principal balance (UPB) of loans expected to default over the projection period.  House price projections are used to determine the mark-to-market loan-to-value ratios of the guaranteed mortgages, which in turn influence the probabilities of default, and projections of loss given default.  Next, a second model projects the severity of losses associated with defaulted loans resolved through various processes.  The projections of distressed UPB are combined with the projections of loss severities to arrive at credit losses for each quarter.  Next, each Enterprise projected loan loss reserves based on projections of credit losses, to determine its future provisions for credit losses.  Finally, projections of credit-related expenses incorporate projections of future provisions for credit losses, foreclosed property expenses, and expenses incurred after foreclosure on the property.

The Enterprises used their own respective management assumptions to forecast administrative expenses.

FHFA reviews models and methodologies for internal consistency and comprehensiveness as part of the continuing supervision of the Enterprises.  However, as with other regulator-driven financial projections that rely on internal models of banks, the internal models of one Enterprise will produce different answers than those of the other given the same set of assumptions and other inputs.

This modeling exercise is not the same as, nor did it follow all the same control procedures as the process followed for formal financial reporting.  For instance, the projections did not incorporate management judgment as to how the specific assumptions employed might produce other changes in model assumptions.  Nonetheless, FHFA believes that the results of this exercise provide a reasonable indication of plausible future Treasury draws under the specified scenarios, using comparable key assumptions for each Enterprise.

FHFA 1390

# Tab 23



THE **DEPARTMENT**
OF THE **TREASURY**

NOVEMBER 15, 2010

**PERFORMANCE** AND
**ACCOUNTABILITY**
**REPORT**

FISCAL YEAR 2010

FHFA 1391

and will become fixed at the end of the three years. At the conclusion of the three year period, the remaining commitment will then be fully available to be drawn per the terms of the agreements. As of September 30, 2010, Treasury's gross investment in Fannie Mae and Freddie Mac were $85.9 billion and $63.9 billion, respectively. The losses the GSEs continue to report are largely the result of delinquencies and defaults on loans that were originated and guaranteed in 2006, 2007, and 2008. Less than one percent of losses have come from loans originated in 2009 or 2010.

The U.S. Government's investment in and support of the GSEs through the SPSPAs was structured in such a way that ensures that virtually all profits in the company revert to the Government in the form of dividends on the preferred shares in Fannie Mae and Freddie Mac. To get a true picture of the Government's exposure in the companies, it is critical to factor in those dividends and net them against the draws that the GSEs make from Treasury. For instance, while for Fiscal Year 2010 the GSEs' draws exceeded dividends by $40.5 billion, in the quarter ending September 30, 2010 the Government received more in dividend payments than the companies drew from the Treasury SPSPAs.

The GSEs are projected to have positive net operating income after 2012. However, over time their net income will be inadequate to cover the senior preferred dividend payments due to Treasury based on the balance of preferred stock outstanding and the accretion of the balance due to incremental draws over time to fund further dividends. The projections take into account that the GSEs will be gradually winding down their retained mortgage portfolios to the $250 billion cap specified in the SPSPAs and do not assume any changes to operating assumptions on the single family guarantee business.

The chart below depicts the expected gross and net draws under the existing SPSPAs, without considering the likely future fair value adjustments to the senior preferred stock liquidation preference. The net draws reflect the net payout by Treasury for each GSE to maintain positive net worth at the end of each period. As shown below, beyond 2013 the GSEs' draws under the SPSPAs are only required to cover dividend payments above the amount of anticipated positive net income. No dividend receipts are projected beyond the years when the commitment caps are reached, which is 2022 and 2031 for Fannie Mae and Freddie Mac, respectively.

| GSEs Actual and Projected Draw Payments and Dividend Receipts (in millions): | | | | |
|---|---|---|---|---|
| | Fiscal Year Ending September 30 | Draw Payments | Dividend Receipts | Net Draws (Dividends) |
| Beginning Balance | 2009 | $ 95,600 | $ (4,336) | $ 91,264 |
| Actual | 2010 | 52,600 | (12,142) | 40,458 |
| Projected[1] | 2011-2013 | 87,600 | (61,772) | 25,828 |
| Projected[2] | 2014-2017 | 51,400 | (102,781) | (51,381) |
| Projected[2] | 2018-2022 | 113,000 | (151,795) | (38,795) |
| Projected[3] | 2023-2031 | 107,900 | (139,334) | (31,434) |
| Net Cumulative Draws | | $ 508,100 | $ (472,160) | $ 35,940 |

1 / No cap
2 / Fannie Mae and Freddie Mac with cap
3 / Freddie Mac only with cap

The $508 billion in total gross draw payments, of which $360 billion is recorded as an accrued contingent liability as of September 30, 2010, has a counterpart increase in the projected senior preferred stock liquidation preference and this asset value would then be subject to any expected fair value adjustments. Ultimately, the cost to the Government is expected to be the valuation losses on the senior preferred stock and common stock warrants, partly offset by dividend revenues received from the GSEs, which will be received until the point in time in which the funding commitment caps are reached. Freddie Mac would reach its adjusted cap of $224 billion in 2031. While Fannie Mae is projected to begin generating positive net income in 2013, because of its greater level of credit losses (and draws) than Freddie Mac, it would reach its cap of $284 billion in 2022. As shown, the projections would imply that a total of $472 billion of dividends are received, resulting in a total net draw of $36 billion.

## GSE MBS Purchase Program

The GSE MBS Purchase Program helped support the availability of mortgage credit by temporarily providing additional capital to the mortgage market. By purchasing these securities, Treasury sought to broaden access to mortgage funding for current and prospective homeowners, as well as promote market stability. In total, since inception of the program in September 2008, the Treasury Department purchased MBS worth approximately $225.5 billion, $29.9 billion of which were purchased in fiscal year 2010. In total, Treasury has received back $61.1 billion in principal and $13.9 billion in interest from MBS holdings; of those amounts, $38.9 billion in principal and $8.9 billion in interest were received in fiscal year 2010. As of September 30, 2010, the valuation of MBS

PART I: MANAGEMENT'S DISCUSSION AND ANALYSIS

held under HERA programs was $172.2 billion. The GSE MBS Purchase Program expired on December 31, 2009.

## Housing Finance Agencies Initiative

State and local HFAs are agencies or authorities created by state law charged with helping individuals and families of low or moderate income obtain affordable housing. HFAs provide mortgage financing for new homebuyers, refinancing and modification opportunities to existing homeowners at risk, loans for rehabilitation of single-family homes, and support for the development and rehabilitation of multifamily properties. In the course of the financial crisis, HFAs experienced challenges obtaining funding in private markets, limiting their ability to provide support for economically-distressed communities. The HFA Initiative provided funding to more than 90 HFAs to enable them to continue supporting housing markets. In fiscal year 2010, Treasury under the HFA New Issue Bond Purchase Program (NIBP) purchased $15.3 billion of GSE-issued securities backed by HFAs' mortgage revenue bonds.  Under the HFA Temporary Credit and Liquidity Program, Treasury purchased participation interests from the GSEs in liquidity facilities supporting $8.2 billion of existing HFA variable rate demand obligations (VRDOs) single family and certain multi-family mortgage loans.  Since inception of the program, Treasury's obligation has been reduced to $7.6 billion. Treasury's actions are authorized by HERA authority, which expired on December 31, 2009.

## Helping those hit hardest

In February 2010, the Obama Administration announced the Housing Finance Agency Innovation Fund for the Hardest Hit Housing Markets (HFA Hardest Hit Fund, or HHF), allowing HFAs in the nation's hardest hit housing markets with high unemployment to design innovative, locally-targeted foreclosure prevention programs.  States included those with average home price declines greater than 20 percent since the housing market downturn, accounting for the majority of "underwater" mortgages in the country; those with  concentrated areas of economic distress due to unemployment; or those with an unemployment rate at or above the national average for the past year.

A total of $7.6 billion is being made available to 18 states and the District of Columbia.  These states include Alabama, Arizona, California, Florida, Georgia, Illinois, Indiana, Kentucky, Michigan, Mississippi, Nevada, New Jersey, North Carolina, Ohio, Oregon, Rhode Island, South Carolina, and

Tennessee.  As of September 30, 2010, $56.1 million has been disbursed to states participating in HHF, largely for administrative and startup expenses. Further information on the funded programs is available at *http://www.FinancialStability.gov/roadtostability/hardesthitfund.html.*

## Comprehensive reform of the U.S. housing finance system

The Dodd-Frank Act includes fundamental reform of mortgage market rules, including ability-to-pay requirements and risk retention standards for mortgages, and Treasury and HUD are preparing to offer recommendations for further reform of t                                In April 2010, Treasury and the Department of Housing and Urban Development (HUD) posted seven questions for public comment and received over 300 responses from a broad cross-section of stakeholders. In August, Treasury and HUD hosted a Conference on the Future of Housing Finance, including experts from academia, consumer and community organizations, industry groups, market participants, Congressional staff, and other stakeholders. In September, the Secretary and Elizabeth Warren, Assistant to the President, held a forum on simplifying mortgage disclosure forms. To provide for long-term stability in housing markets, the Obama Administration has committed to deliver a proposal for comprehensive reform of the U.S. housing finance system to Congress in January 2011.

## Supporting America's Small Businesses

Treasury and the Small Business Administration (SBA) led efforts to pass the *Small Business Jobs Act of 2010*. Enacted on September 27, 2010, the Act will strengthen the capacity of small businesses to create jobs and support economic recovery by:

- Creating a Small Business Lending Fund (SBLF) to provide $30 billion in capital to small banks

- Establishing a State Small Business Credit Initiative (SSBCI) to provide $1.5-2 billion to spur $20 billion of private sector lending through innovative state programs

- Extending and expanding key SBA loan programs

- Instituting small business tax cuts, including zero capital gains for key small business investments

# 9.   INVESTMENTS IN GOVERNMENT SPONSORED ENTERPRISES (GSEs)

The Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) are stockholder-owned GSEs. Congress established these GSEs to support the supply of mortgage loans. A key function is to package purchased mortgages into securities. These securities are subsequently sold to investors.

Increasingly difficult conditions in the housing market challenged the soundness and profitability of GSEs, thereby undermining the entire housing market. This led Congress to pass the Housing and Economic Recovery Act of 2008 on July 30, 2008 (HERA). This Act created the new Federal Housing Finance Agency (FHFA), with enhanced regulatory authority over the GSEs, and provided the Secretary of the Treasury with certain authorities intended to ensure the financial stability of the GSEs, if necessary. On September 7, 2008, FHFA placed the GSEs under conservatorship and the Department entered into a Senior Preferred Stock Purchase Agreement (SPSPA) with each GSE. These actions were taken to preserve the GSEs' assets, ensure a sound and solvent financial condition, and mitigate systemic risks that contributed to current market instability.

The actions taken by the Department thus far are temporary, as defined by section 1117 of HERA, and are intended to provide financial stability until Fannie Mae and Freddie Mac can return to normal operations or until t
address how they should be structured going forward. As of September 30, 2010, there are no plans to bring these organizations into the government; rather, the purpose of these financial arrangements is to maintain the solvency of the GSEs so they can continue to fulfill their vital roles in the home mortgage market while the Administration and Congress deliberate what, if any, structural changes should be made. The FHFA director may terminate the conservatorship if safe and solvent conditions can be established. Per SFFAS No. 2, *Entity and Display*, these entities meet the criteria of "bailed out" entities under paragraph 50. Accordingly, the Department has not consolidated them into the financial statements, but includes "disclosure of the relationship(s) with the bailed out entities and any actual or potential material costs or liabilities" in the consolidated financial statements. Draws under the SPSPAs are designed to ensure that the GSEs maintain positive net worth as a result of any net losses from operations and also meet taxpayer dividend requirements under the SPSPAs. While this construction is somewhat circular in the event that dividends exceed net income and draws are made to fund dividends, the SPSPAs were structured to ensure any investments made on behalf of the taxpayers were fully and fairly accounted for.

Under the SPSPAs, the Department initially received from each GSE: (1) 1,000,000 shares of non-voting variable liquidation preference senior preferred stock with a liquidation preference value of $1,000 per share and (2) a non-transferrable warrant for the purchase, at a nominal cost, of 79.9 percent of common stock on a fully-diluted basis. The warrants expire on September 7, 2028. The senior preferred stock accrues dividends at 10 percent per year, payable quarterly. This rate will increase to 12 percent if, in any quarter, the dividends are not paid in cash, until all accrued dividends have been paid. Dividends of $12,142 million and $4,336 million were received for the fiscal years ended September 30, 2010 and September 30, 2009. In addition, beginning on March 31, 2011, the GSEs are scheduled to begin paying the Department a periodic commitment fee on a quarterly basis unless the payment is waived. This fee is to be initially set by December 31, 2010, based on mutual agreement between the Department and each GSE, in consultation with the Chairman of the Federal Reserve Board. The fee is to be established for five-year periods, and may be waived by the Department for one year at a time, if warranted by adverse mortgage market conditions. It may be paid in cash or may be added to the liquidation preference.

The initial agreements, which had no expiration date, provided that the Department would disburse funds to the GSEs, if at the end of any quarter the FHFA determines that the liabilities of either GSE exceed its assets. The maximum amount available to each GSE under this agreement was originally $100,000 million and in May 2009 was raised to $200,000 million. In December 2009, the Department amended the SPSPAs to replace the $200,000 million per GSE funding commitment cap with a formulaic cap that will allow continued draws for three years at amounts that will automatically adjust upwards quarterly by the cumulative amount of any losses realized by either GSE and downward by the cumulative amount of any gains, but not below $200,000 million, and will become fixed at the end of the three years. At the conclusion of the three year period, the remaining commitment will then be fully available

PART 3: ANNUAL FINANCIAL REPORT

to be drawn per the terms of the agreements (referred to hereafter as the "Adjusted Caps"). Draws against the funding commitment of the SPSPAs do not result in the issuance of additional shares of senior preferred stock; instead, the liquidation preference of the initial 1,000,000 shares is increased by the amount of the draw.

Actual payments to the GSEs for fiscal years ended September 30, 2010 and September 30, 2009 were $52,600 million and $95,600 million, respectively. Additionally, $359,900 million has been accrued as a contingent liability as of September 30, 2010 ($91,937 million as of September 30, 2009). The amount accrued is the total estimated contingent liability under the SPSPAs. This accrued contingent liability is based on the projected draws under the SPSPAs. It is undiscounted and does not take into account any of the offsetting dividends which may be received as a result of those draws.

### Accounting Treatment

**Entity Transactions –** The estimated contingent liability to the GSEs accrued pursuant to the SPSPAs will be funded through the Department's direct appropriations. Therefore, they are reflected at their gross amount as "entity" costs on the Department's Statements of Net Cost and Cumulative Results of Operations, without considering the increase in Senior Preferred Stock liquidity preference/fair value adjustments, future dividend receipts from the GSEs, or any future commitment fees.

**Non-Entity Transactions –** As actual payments are made to the GSEs, they result in increases to the U.S. Government's liquidation preference in the GSEs' preferred stock, and thus represent General Fund exchange revenue reported on the Department's Statement of Net Cost as "GSE Non-Entity Revenue." The associated valuation losses and dividends are likewise General Fund costs and revenues.

Over time, the Department's entity expense for the accrued contingent liability under the SPSPAs will be offset in part by the General Fund's exchange revenues recognized when actual draw payments are made to the GSEs.

### Investments in GSEs

As of September 30, 2010 and September 30, 2009, the Department's investments in the GSEs consisted of the following (in millions):

| GSEs Investment | Gross Investment as of 9/30/10 | Cumulative Valuation Gain/(Loss) | 9/30/10 Fair Value |
|---|---|---|---|
| Fannie Mae Senior Preferred Stock | $ 85,941 | $ (29,450) | $ 56,491 |
| Freddie Mac Senior Preferred Stock | 63,924 | (12,759) | 51,165 |
| Fannie Mae Warrants Common Stock | 3,104 | (2,097) | 1,007 |
| Freddie Mac Warrants Common Stock | 2,264 | (1,711) | 553 |
| **Total GSEs Investment** | **$ 155,233** | **$ (46,017)** | **$ 109,216** |

| GSEs Investment | Gross Investment as of 9/30/09 | Cumulative Valuation Gain/(Loss) | 9/30/09 Fair Value |
|---|---|---|---|
| Fannie Mae Senior Preferred Stock | $ 45,740 | $ (20,658) | $ 25,082 |
| Freddie Mac Senior Preferred Stock | 51,524 | (23,273) | 28,251 |
| Fannie Mae Warrants Common Stock | 3,104 | 3,603 | 6,707 |
| Freddie Mac Warrants Common Stock | 2,264 | 2,375 | 4,639 |
| **Total GSEs Investment** | **$ 102,632** | **$ (37,953)** | **$ 64,679** |

*Senior Preferred Stock and Warrants for Common Stock*

In performing the calculations for the valuations of the senior preferred stock and warrants for common stock, the Department relied on the GSEs'                                                    l statements, monthly summaries, quarterly credit supplements, independent research regarding high yield bond and preferred stock trading, independent research regarding the GSEs' common stock trading, and other information pertinent to the valuations.

A complicating issue for the valuation of the senior preferred stock is the interaction between liquidity payments and the ongoing liquidation preference of the stock and the amount of dividends associated with that liquidation preference. The projections assume that a hypothetical buyer would acquire the dividend stream related to the existing balance of the liquidation preference on the transaction date, as well as the commitment fee payment that if agreed upon by the Department and FHFA could begin on March 31, 2011. This stream of dividend payments was then discounted to address certain issues unique to the senior preferred stock.

The valuation of the warrants are impacted by the nominal exercise price and the large number of potential exercise shares, the market trading of the common stock that underlies the warrants, the principal market, and the market participants. Other discounting factors are the holding period risk related directly to the amount of time that it will take to sell the exercise shares without depressing the market and the other activity under the SPSPA.

*Contingent Liability*

As part of the valuation exercise, the Department prepared a series of long-range projections through 2031 to determine what the implied amount of the contingent liability to the GSEs under the SPSPAs would be and as a result has estimated the contingent liability to be $359,900 million as of September 30, 2010 as a result of their projected equity deficits stemming from near term losses and contractual dividend requirements. The valuation analysis resulted in total SPSPA estimates ranging from a "baseline" scenario of $508,100 million to an "extreme case" scenario of $610,000 million, as of September 30, 2010 ($91,937 million to $206,700 as of September 30, 2009 of which $76,937 million was recorded as contingent). As future payments under the SPSPA are deemed to be probable, the baseline scenario was used to record the contingent liability as of September 30, 2010. SFFAS 5 provides that when a probable contingent liability is a range of amounts and no amount within the range is a better estimate than any other amount, the estimated contingent liability should be based on the minimum value in the range, as was done for FY 2009. The recorded contingent liability is the total estimated payments for the life of the agreements under the Adjusted Caps, minus actual payments made through the end of the fiscal year. Such accruals are adjusted as new information develops or circumstances change.

In performing the calculations for the valuation and contingent liability estimates, the Department relied on the GSEs' public filings and press releases concerning its audited and unaudited financial statements, monthly summaries, quarterly credit supplements, September 2010 Forecast for the years 2010 through 2013 (as released by FHFA on October 21, 2010), and interviews with the GSEs' management. The GSE managers were not able to provide the Department with a forecast of needed draws under the SPSPAs after December 31, 2013; however, they did provide the Department with general guidance as to the key assumptions that were used for subsequent periods. The forecasts after 2013 generally assume similar operating assumptions on the guarantee business and assume a gradual wind-down of the retained portfolios (and corresponding net interest income) through 2022, as directed under the provisions of the SPSPAs for the GSEs to reduce the investment portfolios by 10 percent per annum.

As of September 30, 2010 the summarized aggregated financial condition of the GSEs was as follows:

| | (in millions) Combined |
|---|---:|
| **As of September 30, 2010** | |
| Combined total assets | $ 5,518,352 |
| *of which are:* | |
| *- investment securities* | 474,437 |
| *- mortgage loans* | 4,782,405 |
| | |
| Combined total liabilities | $ 5,520,857 |
| *of which is:* | |
| *- long term debt* | 5,248,221 |
| | |
| Combined net deficit | $ (2,505) |
| | |
| **For the nine months ended September 30, 2010** | |
| Combined net interest income | $ 24,312 |
| Combined provision for loan losses | (35,082) |
| Net interest income (loss) after provision for loan losses | $ (10,770) |
| | |
| *Financial Guarantees not consolidated on GSE balance sheets September 30, 2010* | $ 116,091 |
| | |
| *Regulatory Capital - minimum capital surplus (deficit) as of September 30, 2010* | $ (198,999) |

The above information was taken directly from the quarterly reports filed with the Securities and Exchange Commission (SEC), which are publicly available on the SEC's website (www.SEC.gov) and also the GSE investor relations websites.

The Department also relied upon economic and demographic data from The 2010 Annual Report of the Board of Trustees of the Federal Old-age and Survivors Insurance and Federal Disability Insurance Trust Funds, the Standard and Poor's (S&P)/Case-Shiller June 2010 Housing Price Index, and the Federal Housing Finance Agency's House Price Index. The following paragraph summarizes information obtained from these sources.

In the near term, the price of U.S single-family homes is the predominant variable affecting the value of the SPSPAs in determining delinquencies, default rates, and severity rates. The prices of U.S. homes depend on numerous factors, including tax incentives, interest rates, vacant homes, new construction, and unemployment rates. Although housing prices have risen recently, they are still significantly down from the peak experienced in prior years.

Both GSEs reported very low early delinquencies on additions to their credit books in 2009 and the first half of 2010. This favorable early delinquency experience is an improvement compared with the loans originated in 2005 through 2008. However, both GSEs expect to make additional draws under the SPSPA in future periods despite improving levels of net income as the required dividend payments required under the SPSPAs exceed the net income of the GSEs and incremental draws under the SPSPAs are needed to meet dividend payment requirements. The GSEs expect their net worth will also be impacted negatively by dividend payments on the SPSPAs.

Under the existing SPSPAs, as amended, the Department's projections show that each GSE will fully utilize the amount of funding available under the Adjusted Cap. This is in addition to any draws during calendar years 2010 through 2012, as this period is not subject to the cap. Adverse changes in home prices would have a material and adverse impact on the SPSPAs.

PART 3: ANNUAL FINANCIAL REPORT

*GSEs Non-Entity Revenue*

As of September 30, 2010 and September 30, 2009, GSEs Non-Entity Revenue consisted of the following (in millions):

| Summary of GSEs Non-Entity Revenue | 2010 | 2009 |
|---|---|---|
| General Fund Revenue from Increase in Liquidity Preference of GSEs Preferred Stock | $ (52,600) | $ (95,600) |
| Current Valuation Loss on GSEs Warrants/Preferred Stock | 8,064 | 37,953 |
| GSEs Preferred Stock Dividends | (12,142) | (4,336) |
| Total GSEs Non-Entity Revenue | $ (56,678) | $ (61,983) |

*Changing Regulatory Environment*

On July 9, 2010, FHFA published, in the Federal Register, a proposed rule to clarify certain terms of conservatorship and receivership operations for the GSEs. The key issues addressed in the proposed rule are the status and priority of claims and the relationships among various classes of creditors and equity-holders under conservatorships or receiverships.

On July 21, 2010, the President signed the Dodd-Frank Wall Street Reform and Consumer Protection Act, or the Dodd-Frank Act, into law. The Dodd-Frank Act will significantly change the regulation of the financial services industry, including the creation of new standards related to regulatory oversight of financial institutions deemed systemically important; an orderly liquidation mechanism for these institutions; and oversight of derivatives, capital requirements, asset-backed securitization, mortgage underwriting, and consumer financial protection. The Dodd-Frank Act may result in the GSEs being subjected to new and additional regulatory oversight and standards, which would lead to increased restrictions on their day-to-day business and operations. Also, it contains a provision requiring the Secretary of the Treasury to conduct a study and develop recommendations regarding the options for ending the conservatorship. The Secretary's report and recommendations are required to be submitted to Congress by January 31, 2011.

# Tab 24



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

UNDER SECRETARY

December 29, 2010

The Honorable Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street NW
Washington, DC  20552-0003

Dear Acting Director DeMarco:

As you know, the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (collectively, the Enterprises), provides, in section 3.2 of each Agreement, that each Enterprise shall pay to Treasury quarterly a "Periodic Commitment Fee" (PCF) beginning on March 31, 2011.  The amount of the PCF is intended to fully compensate Treasury for the support provided by the ongoing funding commitment under the Agreement with each Enterprise following December 31, 2010.  The amount of the PCF is to be set no later than December 31, 2010, but Treasury may waive the PCF for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

By this letter, please be advised that Treasury waives, for the first quarter of Calendar Year (CY) 2011, the PCF payable by each Enterprise. Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.  As currently structured, the Enterprises' required dividend payments to Treasury through the end of CY 2011 are forecast to be larger than the earnings that the Enterprises are forecast to produce.  Therefore, any net income from the Enterprises through the end of CY 2011 is forecast to be returned to taxpayers already.   Accordingly, Treasury believes that the imposition of the PCF at this time would not provide additional net proceeds for the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set.  Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Jeffrey A. Goldstein

# Tab 25



## SPECIAL COMMENT

# The GSE Debate and the U.S. Mortgage Market

Table of Contents:

| | |
|---|---|
| SUMMARY | 1 |
| INTRODUCTION | 1 |
| THE UNIQUE FEATURES OF THE U.S. MORTGAGE MARKET | 4 |
| THE CREDIT CRISIS: A TRANSFORMATIVE EVENT FOR U.S. HOUSING FINANCE | 5 |
| CREDITORS LIKELY TO BE PROTECTED, BUT UNCERTAINLY REMAINS | 6 |
| THE OBJECTIVES AND THE ALTERNATIVES FOR REFORM | 7 |
| THE ROLE OF OTHER CAPITAL PROVIDERS FOLLOWING GSE REFORM | 10 |
| APPENDIX: THE HYBRID ALTERNATIVES – SOME OUTSTANDING QUESTIONS | 13 |

Analyst Contacts:

NEW YORK                    1.212.553.1653

**GSEs**
Brian L. Harris            1.212.553.4705
Senior Vice President
Brian.Harris@moodys.com

**Mortgage Insurers**
Ranjini Venkatesan         1.212.553.7841
Assistant Vice President
Ranjini.Venkatesan@moodys.com

**RMBS**
Navneet Agarwal            1.212.553.3674
Senior Vice President
Navneet.Agarwal@moodys.com

## Summary

This special comment considers the U.S. housing finance market in the wake of the financial crisis, the effect of the crisis on U.S. government-sponsored enterprises (GSEs) Fannie Mae and Freddie Mac, alternative reform scenarios for those companies, and the potential impact of reform on the ratings of their debt obligations. The salient points include:

»   The Aaa ratings on the GSEs' debt obligations are based on the assumption of support by the U.S. government, and we currently see this support continuing beyond our rating horizon of the next 12 to 18 months.

»   Major reforms are unlikely to be adopted until after the next presidential election and are unlikely to be implemented until well after adoption, though the bond market could "force the issue" sooner, as the government's currently unlimited support for the GSEs is replaced by a fixed sum on January 1, 2013.

»   Reforms are likely to include provisions that retain government support for the GSE debt issued prior to their implementation, which would be consistent with the maintenance of Aaa ratings on that stock of debt.

»   Our stable rating outlook for, or even the ratings on, existing debt could change if political support were to mobilize around a recapitalization plan for the GSEs that included an expectation that, going forward, those companies would service their existing debt from their own resources, that is, without the government's assistance.

## Introduction

The credit crisis and the resulting dramatic decline in U.S. house prices significantly weakened the financial condition of GSEs Fannie Mae and Freddie Mac, causing the government to take over those companies, and ultimately forcing a review of the government's role in the housing finance market.

GSE reform is a daunting challenge, since Fannie Mae and Freddie Mac own or guarantee almost $5.4 trillion of mortgage loans or securities, which accounts for about half of the U.S. housing finance market. In considering GSE reform, the U.S. government appears to have two, conflicting, main objectives: 1) to ensure consistent availability of affordable mortgage credit, and 2) to limit its role in the housing finance market and thereby reduce the risk of future taxpayer bailouts.

Compounding the challenge are divergent views on what the government's role in the housing finance should be. To date, the government has provided strong support for Fannie Mae and Freddie Mac because of those companies' important role in housing finance.[1]

We believe that major reforms are unlikely to be adopted until after the November 2012 presidential election and that implementation may not be immediate, with changes likely phased in over time. But while a political solution may not be quick in coming, the credit market will at some point expect clarity on the role of Fannie Mae and Freddie Mac by demanding a greater risk premium on their obligations, thus increasing their borrowing costs and raising the cost of mortgage credit.

The credit market's views of GSE reform may become increasingly important as January 1, 2013 approaches. At that date the terms of government assistance provided to the GSEs during the financial crisis change. A lack of progress on reform could therefore affect the companies' debt costs, or even their access to the long-term debt markets, as 1) investors become increasingly concerned about the timing of reform, 2) the government's capital support is limited to $274 billion, and 3) the GSEs continue to need capital injections to cover credit losses and/or to pay dividends on their senior preferred stock.

The Aaa ratings on Fannie Mae's and Freddie Mac's senior unsecured debt are based on our view that bondholders benefit from the effective credit substitution of the United States sovereign, which is supporting those companies and which is rated Aaa. Absent government support, the GSEs' current level of capitalization and overall financial profile would be inconsistent with Aaa ratings. The stable rating outlook reflects the strong support provided to the GSEs to date by the government, primarily through contingent capital, and our corresponding expectation that additional contingent capital will be available for the foreseeable future.

Although GSE reform could take many directions, we believe the likely path will include government support for the senior debt[2] issued by the companies prior to the implementation of reform through final maturity, and see the continuance of the effective substitution of the U.S. sovereign rating for these obligations. Nevertheless, there are alternative reform outcomes that would be less creditor friendly, as well as many variables that could change the path of reform, making the ultimate outcome highly uncertain. While we recognize this overall uncertainty, we also believe that any change in the GSEs' current set-up is unlikely to occur over our rating outlook horizon of the next 12 to 18 months, thus we have maintained a stable rating outlook to date.

An outlook change, to negative from stable, could occur, however, if progress on reform occurs more quickly than we expect, with political consensus building around a plausible reform scenario that diminishes the GSEs' importance. Under these circumstances, the rating outlook would change to negative unless the proposed reform included explicit support, such as a guarantee, of Fannie Mae's and Freddie Mac's existing debt. In the same way, the companies' debt ratings would be downgraded if we believed the proposed reform would be enacted into law, unless it included explicit support. For example, a plan to shrink Fannie Mae and Freddie Mac, coupled with a plan to recapitalize the companies *without* explicit, ongoing government support for "legacy" bondholders would be inconsistent with Aaa ratings. In this case, the debt ratings of the recapitalized GSEs would depend on the companies' capital position and financial profile, though they could still be investment grade. If

---

[1]   The U.S. Treasury has provided an unlimited capital backstop to Fannie Mae and Freddie Mac through December 31, 2012. After January 1, 2013, however, that capital support will be capped at approximately $274 billion in aggregate.

[2]   Fannie Mae's and Freddie Mac's senior unsecured and subordinated debt are rated Aaa and Aa2, respectively. In addition, both companies have preferred stock ratings of Ca. Throughout this document, when we refer to "ratings," we are referencing the senior unsecured ratings.

reform excluded both recapitalization and explicit support, bondholders would face losses and downgrades would be severe. Alternatively, if it included explicit ongoing government support, the ratings could remain at the same level as that of the U.S. sovereign.

In regards to the structure of GSE reform, we believe that some sort of hybrid structure is most likely. While this could retain some of the features of the current model, it is more likely to be differentiated by a greater number of "GSE-like entities" with a new form of ownership, and a government guarantee on mortgage-backed securities (MBS).

In the following sections we look at the distinguishing features of the U.S. housing market, how that market and the GSEs in particular were impacted by the financial crisis, and how reform of the GSEs might affect their creditors. We then review three broad alternatives for reform: privatization, permanent nationalization, and a hybrid between the two. We describe each alternative, its likely impact on bondholders, the government objectives that are maximized and constrained in each case, and the likelihood of adoption. Finally, we look at how other sources of capital (banks, mortgage insurers, and the securitization market) might be affected by the reform of the GSEs, as well as the potential for a more robust covered bond market in the United States.

## The unique features of the U.S. mortgage market

The United States has one of the most generous residential mortgage financing systems in the world. Borrowers benefit from indirect subsidies through the tax code,[3] and mortgage credit is available to low- and moderate-income individuals through GSEs such as Fannie Mae and Freddie Mac and federal agencies such as Ginnie Mae.

Some have suggested that looking at other countries' mortgage markets may be instructive in identifying alternatives for the U.S. market. However, over the decades the U.S. mortgage market has developed features that clearly distinguish it from those elsewhere. The most important of these features is the use of the 30-year, fixed-rate pre-payable (without penalty) mortgage, which dominates the U.S. market.

FIGURE 1

### Originations of fixed-rate mortgages in the United States





Source: Federal Housing Finance Agency

As seen in figure 1, above, originations of fixed-rate mortgages represented on average 75% (with a range between 60% and 96%) of annual mortgage originations in the United States each year from 1990 through 2009. During that same period, fixed-rate mortgages represented 60% of originations in 1990, the low and 96% of originations in 2009, the high.

The long-term, fixed-rate mortgage market in the United States developed over several decades on the back of strong support from the federal government. In fact, long-term fixed-rate mortgages were first offered by the Home Owner's Loan Corporation (HOLC), a predecessor of Fannie Mae, during the 1930s. The government first ensured the availability of mortgage credit through the HOLC during the Great Depression by refinancing delinquent borrowers into long-term fixed-rate mortgages (20-year mortgages). Successors of the HOLC such as Fannie Mae and Freddie Mac were created to ensure that credit continued to be available to low- and moderate-income borrowers.

Borrowers benefited from the government's support of the mortgage market, since it both made credit available and enabled them to prepay their fixed-rate long-term mortgage debt without penalty. The GSEs supported credit availability by operating every day in every state. Their role as ready buyers of mortgage loans and securities helped stabilize the mortgage market during periods of stress and

---

[3]   Interest on mortgages up to $1 million for married taxpayers and local property taxes qualify as deductions for tax purposes. Additionally, the first $500,000 of capital gains on qualified housing may be exempt from income taxes.

FHFA 1404

contributed to the view that mortgage lending was a "safe" or low-risk asset class. During periods of declining interest rates, borrowers benefited from the ability to prepay without penalty and re-finance into a new mortgage at a lower interest rate. The ability to prepay a residential mortgage shifts the interest-rate risk from the borrower to the bank, mortgage investor, or GSE because the investor must re-invest the proceeds at a lower yield. Banks also benefited from the government's support of the mortgage market. The creation of a stable market allowed them to grow their mortgage business with minimal risk and generate fee business through mortgage originations and servicing.

We believe that the importance of the 30-year fixed-rate mortgage[4] will not diminish with the reform of Fannie Mae and Freddie Mac and this is a critical expectation because, in our opinion, some level of government support will remain necessary to ensure that the product remains broadly available. We believe the 30-year fixed-rate mortgage will remain important because of its popularity, as Figure 1 above indicates, and because of the political difficulty of reducing availability of such a popular product. We believe the product's popularity is based on its economic benefits for borrowers, that is, it provides for stable (fixed payment), affordable (30-year amortizing term) mortgage payments.

## The credit crisis: a transformative event for U.S. housing finance

The GSEs' financial model failed after a rapid and unprecedented decline in house prices, which significantly increased those companies' credit losses and ultimately depleted their capital. What characterized the GSEs' financial model was the companies' private ownership, public policy objectives, and implicit support from the government. Their private ownership and public policy objectives caused conflicts in the allocation of their returns, while the implicit government support fueled returns by enabling the companies to issue cheap financing that could be passed on to borrowers in the form of low mortgage rates and to provide attractive returns for investors. In September 2008, Fannie Mae and Freddie Mac were put into conservatorship following several quarters of significant losses and in the face of mounting credit quality issues, and by the third quarter of 2010 the government had injected $150 billion into the two companies (see figure 2 below).

FIGURE 2
Fannie Mae's and Freddie Mac's Cumulative and Quarterly Capital Draws



Source: Fannie Mae and Freddie Mac SEC reports

---

[4]  By 30-year fixed-rate mortgage we mean the product used in the United States that is pre-payable by the borrower without penalty. Many other countries have long-term fixed-rate mortgages (up to 30 years or more), including Canada, the United Kingdom, and Australia, but few have long-term mortgage products that are pre-payable without penalty and whose interest rates do not re-set on a periodic basis over the term of the mortgage. For example, for a typical Canadian mortgage with a 35-year amortization period, the interest rate would be fixed for five years, but would only be pre-payable upon payment of an interest rate penalty.

In hindsight, it is clear that the risks the GSEs were exposed to were improperly priced. It is also clear that if the GSE model is to be preserved, the companies would require far more capital and the risk premia on their debt would likely be much higher. This would, in turn, necessitate either significantly higher mortgage rates, in contradiction of the government's first policy objective of providing affordable house financing, or require much more financial backing from the government, defeating the second, fiscal objective of maximizing private-sector participation in the $5 trillion GSE mortgage market in order to reduce the risk of taxpayer bailouts.

Currently, the GSEs are operating on the basis of a government-financed lifeline that is repayable to the U.S. Treasury. According to the FHFA,[5] Fannie Mae will have drawn between $147 billion and $232 billion of senior preferred stock from the Treasury by the end of 2012, while Freddie Mac will have drawn between $71 billion and $104 billion by that time. This means that Fannie Mae will owe the U.S. government between $14.7 billion and $23.2 billion annual preferred dividends, even though the company has never earned more than $8.1 billion. For its part, Freddie Mac would have to pay an annual preferred dividend of between $7.1 billion and $10.4 billion to the Treasury, though its annual earnings have exceeded $7.1 billion only once, in 2002 ($10.1 billion). Clearly, the failure of the GSEs' financial model, including their inability to service their preferred dividends over the longer term, mean that reform must occur at some point.

Action by the legislative and executive branches of the U.S. government will ultimately be required to achieve GSE reform. The "political process" of getting agreement between all sections of government will not be easy, however. We are therefore of the opinion that, in practice, the catalyst for GSE reform will be the debt markets rather than the government. This is because the currently unlimited financial lifeline extended by the government will expire on December 31, 2012. From January 1, 2013, Fannie Mae and Freddie Mac will have access to $125 billion and $149 billion of preferred capital, respectively.[6] And at that point, the companies will still be dependent on capital draws from the U.S. Treasury to pay preferred dividends, as they are unlikely to be generating sufficient earnings to meet their obligations, even though their credit losses may by then be largely realized.

The credit markets, then, may force a compromise on GSE reform because of the obstacles that stand in the way of a political solution. We believe the formal reform process will take several years and is unlikely to begin before 2013, that is, until after the next presidential election. All parties appear to want strong reform; however, agreeing on the terms will be difficult and the history of GSE legislation is littered with long, drawn-out negotiations. For creditors, this raises two important questions: 1) Will the GSEs' creditworthiness be affected during the transition from their current form to another? 2) **What is the likelihood that the GSEs will lose their Aaa[7] rating status in their present form?**

## Creditors likely to be protected, but uncertainly remains

The GSEs' Aaa ratings have been based on the Aaa rating of the U.S. sovereign, and take into account the government's support of the companies. Absent that support, the GSEs' current level of capitalization and overall financial profile would be inconsistent with Aaa ratings. The stable rating

---

[5]   See "FHFA Releases Projections Showing Range of Potential Draws for Fannie Mae and Freddie Mac," October 21, 2010.

[6]   As of the amended Senior Preferred Stock Purchase Agreement, dated December 24, 2009, Fannie Mae and Freddie Mac can request an unlimited amount of senior preferred capital on a quarterly basis from the U.S. Treasury to ensure that they maintain their positive net worth through 2012. After the fourth quarter of 2012, each company will have access to $200 billion of preferred capital, less any amount used through December 31, 2009. Fannie Mae will have access to $125 billion and Freddie Mac to $149 billion on January 1, 2013.

[7]   Support from the U.S. government lifted Fannie Mae's and Freddie Mac's stand-alone ratings to Aaa. When we reference Fannie Mae's and Freddie Mac's ability to achieve Aaa ratings in this document, we are assuming there is no change in the rating of the U.S. sovereign.

outlook reflects the government's strong support for the GSEs to date, primarily through the issuance of contingent capital, as well as our expectation that contingent capital will remain available for the foreseeable future.

Although there are many directions GSE reform could take, we believe the likely path will result in the U.S. government supporting the senior obligations issued by the GSEs prior to the implementation of reform through their final maturities, as well as the continuance of the effective credit substitution of the U.S. sovereign rating for these instruments. As noted, however, there are alternative reform outcomes that would be less creditor friendly, as well as many variables that could change the path of GSE reform, making the ultimate outcome highly uncertain. While recognizing this overall uncertainty, we nonetheless also believe that any change in the GSEs' current set-up is unlikely to occur over our ratings outlook horizon of the next 12 to 18 months, and so we have to date maintained our stable rating outlook.

An outlook change, to negative from stable, could occur, however, if progress on reform occurs more quickly than we expect, with political consensus building around a reform scenario that diminishes the GSEs' importance. Under these circumstances, the rating outlooks on the companies would change to negative unless the scenario included the promise of explicit support, such as a guarantee, of Fannie Mae's and Freddie Mac's debt. Likewise, the companies' debt ratings would be downgraded if we believed the proposed reform would be enacted into law. For example, a plan to shrink Fannie Mae and Freddie Mac – perhaps by consistently reducing the conforming loan limit over several years – coupled with a plan to recapitalize the companies *without* explicit, ongoing government support for legacy bondholders would be inconsistent with Aaa ratings. Under this scenario, the debt ratings of the recapitalized GSEs would depend on the companies' capital position and financial profile, though they could still be investment grade. If reform excluded both recapitalization and explicit support, bondholders would face losses and downgrades would be severe. Alternatively, if it included explicit ongoing government support, the ratings could remain at the same level as that of the U.S. sovereign.

## The objectives and the alternatives for reform

The U.S. government's two main objectives in terms of GSE reform are to 1) ensure consistent access to mortgage credit across mortgage products, geographies, and the housing market cycle, and 2) reduce governmental involvement in the mortgage market by transitioning to one in which private equity capital is consistently available, thereby reducing the likelihood of taxpayer-funded bailouts. However, these are conflicting objectives. Specifically, achieving the second objective would work against the first, resulting in higher costs and less mortgage credit availability for borrowers. Gaining consensus on reform therefore will involve agreeing on a balance between these goals.

At the core of the GSE model was the simple proposition that cheap financing raised by the GSEs would be passed along to borrowers in the form of low mortgage interest rates. Our expectation and the market's perception was that the U.S. government would support Fannie Mae and Freddie Mac. This enabled objective 1 above, at the expense of objective 2.

We believe it is most likely that, post-reform, the legacy debt of the GSEs will remain fully protected, and perhaps even federally guaranteed, because government officials have been fairly vocal in recent years in telling investors that they should not be concerned that the federal guarantee is only implicit. That said, it is conceivable that the GSEs' legacy debt will not be formally guaranteed, and will instead be backed by high-quality assets that provide investors with a high level of protection, though not necessarily to the Aaa level of credit quality.

As noted, the risks to bondholders will change depending on the type of reform eventually enacted. In the present circumstances we believe there are three broad alternatives: privatization, nationalization, and a hybrid between the two. Below is a brief description of each model and its likely impact on current bondholders, as well as our assessment of its ability to meet the government's objectives and the likelihood of adoption.

## Privatization

By privatization we mean that the U.S. government would remove all its support from the housing finance market. Fannie Mae and Freddie Mac could be wound down, or their assets sold. In any case, the importance of the GSEs would decline, exposing legacy bondholders to possible losses in the absence of an explicit guarantee from the government. Should consensus build around this option, we would likely change the outlook on the GSEs' debt to negative while we determine the likelihood of the government providing explicit support, such as a guarantee to legacy bondholders or through recapitalizing the GSEs. Without such support, the legacy debt is highly unlikely to be rated Aaa. The ultimate rating, which could still be investment grade, would depend on the financial profile and capitalization supporting the companies' legacy debt, including any remaining contingent capital from the Treasury. The legacy debt ratings could be significantly downgraded if both explicit support and recapitalization were not part of the privatization plan. Alternatively, a plan that included ongoing explicit support could result in the ratings remaining aligned with that of the U.S. sovereign.

We believe the likelihood of privatization is low because it would result in a trade-off. Contrary to the government's first objective, the cost of mortgage credit would rise and access to it would decline, but in line with the second, the risk of taxpayer-funded bailouts would be substantially reduced. Mortgage rates would go up because banks and the securitization market – the obvious alternative sources of mortgage credit – would expect higher returns for increasing their exposure to long-term, fixed-rate mortgages. In addition, privatization could reduce the availability of 30-year fixed-rate mortgages, as the private sector could refuse to provide credit at a price that is acceptable to borrowers. At the same time, access would likely be uneven across geographies, and less available during periods of stress.

## Permanent nationalization

By permanent nationalization we mean that the U.S. government would absorb the operations of Fannie Mae and Freddie Mac, possibly through a federal agency such as Ginnie Mae. It would also explicitly guarantee the principal and interest of any securities of the government entity. Similar to privatization, nationalization would marginalize the GSEs. Therefore, our actions would be driven by the level of any explicit support and/or the financial profile of the entity in which the legacy debt resides. We believe that permanent nationalization is unlikely because although mortgage credit would remain both affordable and widely available, in line with the government's first policy objective, it would result in taxpayers providing 100% of the support for the housing market, which would defeat the second objective of reducing the risk of bailouts. It is also worth noting that nationalizing Fannie Mae and Freddie Mac on a permanent basis would involve a massive expansion of government (i.e., absorbing a $5 trillion market), which neither politicians nor voters want.

## Hybrid

By "hybrid" we mean something between privatization and nationalization. Below we describe two possible models.

**Option 1:** This model would be similar to the current one, with the existing GSEs being transformed into one or two "GSE-like entities" that aggregate mortgage credit and interest-rate exposure, either through owning the underlying mortgage loans or guaranteeing the principal and interest of securities

owned by other investors. These GSE-like entities would have their own franchise, which would be funded by their own capital and debt financing. Alternative ownership structures have been put forward but remain vague, but cooperative, utility, and not-for-profit structures have been discussed. These entities' business activities likely would be quite restricted and their investment portfolios limited.

It is uncertain what would happen to the legacy debt of the GSEs under this scenario. It could be removed from those entities and put into a "bad bank." On the other hand, Fannie Mae and Freddie Mac could be recapitalized and continue operating, in which case legacy debt may not be distinguished from new debt, that is, the debt issued post reform. In any case, we would evaluate the financial profile and the levels of capitalization and explicit government support associated with the entity or entities that hold the legacy debt in order to determine our rating on that debt, conducting our analysis in a similar way to that described under the privatization and nationalization options above. Under this first option the government could provide a guarantee, but it would be on the MBS issued by the new entity or entities, whose bondholders therefore would be exposed to losses. The new GSE-like entities likely would remain systemically important, and as a result we can envision their debt ratings remaining at Aaa.

> **The ratings under each option**
>
> Under the first model, the one or two entities' credit profiles would likely incorporate an assumption of government support; the entities therefore might attain Aaa ratings. Under the second model, the entities' credit profiles would not likely incorporate an assumption of support, so the entities would not likely attain Aaa ratings.

Although this option would be relatively easy to implement because it likely would entail the least amount of change, it would also be difficult to "sell" from a political perspective because of its similarity to the current GSE model. If GSE reform were to drag out past 2013, however, it would remain a possibility. Under this option the GSE-like entities would still aggregate large amounts of credit risk through their mortgage guarantee portfolios, which would likely make standardizing easier and translate into lower mortgage rates for consumers (but also lower yields for investors). In this respect, it would largely meet the government's first policy objective of ensuring consistent availability of affordable mortgage credit. On the other hand, the one or two entities' systemic importance would be about the same as the GSEs' is today, so taxpayer bailouts would continue to be a risk, contrary to the second objective.

**Option 2:** This would involve the creation of many private GSE-like entities, in which case Fannie Mae's and Freddie Mac's assets could be sold to the highest bidder or slowly wound down, or the companies could be transformed into GSE-like entities. These entities would securitize loans into MBS ultimately guaranteed by the U.S. government. The underlying mortgage loans, however, would not be guaranteed by the government. The government's guarantee on the MBS would become effective only after an entity's resources had been depleted.[8] The entities would pay a fee to the government for the guarantee on the MBS, which would effectively act as catastrophic insurance. The entities would have minimal balance sheets, consisting primarily of mortgage loans accumulated for securitization and possibly a small securities portfolio for liquidity purposes. The types of mortgages they could underwrite would be restricted by the government or its regulators. Again, alternative ownership structures have been discussed but remain vague, with cooperative, utility, and not-for-profit structures among them.

---

[8]   Simply put, the basic business model would be for the GSE-like entities to provide a guarantee on the mortgage securities. The entities would also service the securities, receiving cash payments from mortgage servicers and passing those cash flows through to MBS investors. The entities would have to make good on mortgage payments that are in default using their own funds. The government guarantee would kick in only after those resources were fully depleted.

We would expect legacy debt to be removed under this option. As for option 1, under this scenario we would evaluate the financial profile and levels of capitalization and explicit government support associated with the entity or entities that hold the legacy debt in order to determine the ratings on that debt. The primary difference between this option and option 1, from a bondholder's point of view, lies in the systemic importance of the entities. The existence of multiple private GSE-like entities under this second model diminishes the systemic importance of each one, so the debt issued by an entity likely would not be rated Aaa. This option could also include a government guarantee, but again it would be on the securities issued by the entity, so bondholders would be exposed to losses.

This second hybrid option appears to be the more likely. It would be more feasible politically, as it would meet both of the government's objectives to some extent. In terms of the first objective, the government would take a more explicit role in supporting home ownership through its guarantee of MBS (which would also make MBS more attractive to investors). It is unlikely, however, that the entities would be able to issue debt at interest rates similar to those of Fannie Mae and Freddie Mac, and the higher debt costs would presumably be passed along to borrowers, resulting in modestly higher mortgage rates.[9] In terms of the second objective, the ownership and guarantee structure would spread risk of loss across all capital providers, which would reduce potential systemic risk and therefore the possibility of taxpayer bailouts. The extent of the reduction would depend on the number of GSE-like entities, however, and because the mortgage business has always been one of scale, the market may not be able to economically support more than just a few of these entities.

> See Appendix for a more in-depth look at some of the outstanding issues related to instituting a hybrid model.

## The role of other capital providers following GSE reform

The U.S. mortgage market evolved over decades, with the GSEs at its center. The GSEs' presence revived some sectors (e.g., mortgage insurers), enabled others (e.g., structured finance), and prevented others from taking hold (e.g., covered bonds). Now, the GSEs must be reformed if the government is to reduce its direct support of the housing market. However, reforms in and of themselves can render certain capital providers more or less attractive, in the same way that the creation of GSEs and the requirement that mortgage loans have a loan-to-value ratio of more than 80% spawned the mortgage insurance industry. Here we look at how banks, mortgage insurers, and residential structured finance might be affected by GSE reform and provide our views on the likely impact of reform on each. We also look at various issues surrounding the potential emergence of a more robust covered bond market in the United States.

### Banks

U.S. banks are highly concentrated in the residential mortgage business. The top three banks originate more than 56% of U.S. residential mortgages and service almost 50% of these. In addition, the banks own approximately $1.2 trillion of agency MBS. Banks, therefore, could replace almost 25% of the GSEs' mortgage funding by replacing run-off of MBS with mortgage loans. Increasing that amount would require substantial additional capital, however, as well as increase the banks' already high concentration in residential mortgages.

---

[9]   We assume the increase in mortgage rates would be only modest because the entities' need for debt capital would be much lower if guaranteeing mortgage credit were their primary business.

### Mortgage insurers

Mortgage insurers believe they have provided a consistent source of private capital during the credit crisis, and that the industry's business model has been validated by substantial loss absorption that would otherwise have been assumed by taxpayers and investors. Furthermore, recent capital raises and a new entrant to the market demonstrate continued investor appetite. Mortgage insurers continue to benefit from a government-granted franchise, with the GSE charter requirement for credit enhancement of high loan-to-value mortgages thus far unchanged, and Fannie Mae and Freddie Mac remain the dominant sources of liquidity for the housing market.

What happens to the GSEs will have a meaningful and direct impact on future demand for mortgage insurance. GSE reform that eliminates the requirement for credit enhancement of high loan-to-value mortgages would negatively affect an industry that has already been weakened by significant losses, though other business opportunities may arise. For mortgage insurers, both the structure and timing of GSE reform are critical. A long transition, for example, would allow these insurers to continue to write profitable business and build capital while seeking out new business opportunities.

### Structured finance – Residential mortgage-backed securities

Investor demand for residential mortgage-backed securities (RMBS) has been very limited over the past several years, and is unlikely to significantly increase until housing prices stabilize. Apart from a stabilization of house prices, several factors are necessary before demand for RMBS can increase, including: 1) greater transparency on the risks associated with RMBS, 2) clear mechanisms for enforcing representations and warranties, 3) improved creditworthiness of the entities making the representations and warranties, and 4) greater clarity on the implications of financial reform laws generally and GSE reform specifically. We believe that RMBS have a role in the U.S. mortgage finance; however, defining how large that role will be is difficult without further clarity on GSE reform.

### Covered bonds

We expect that there will be legislation that promotes U.S. covered bonds. The challenges faced by traditional U.S. mortgage finance markets in the wake of the credit crisis highlighted the need to develop complementary financing techniques, and a robust covered bond market would provide banks with an additional source of financing for mortgage originations. However, legislation that clearly defines how covered bonds will be treated in the event of a bank default will be necessary for the market to develop to its optimal size. Additionally, there is a limit to the size of a covered bond market in the United States due to competition from Federal Home Loan Banks (FHLBanks).

Covered bonds[10] have existed in Europe for hundreds of years. Their distinguishing feature is that they are "dual recourse" securities; that is, bondholders have recourse first to the issuing bank and then, in the event of default, to a pool of high-quality collateral. In Europe, most covered bond markets are supported by robust national laws that grant licenses and set requirements. In the United States, where a covered bond market has not yet taken hold (Washington Mutual and Bank of America issued the only U.S.-based covered bonds on October 10, 2006 and April 24, 2007, respectively), there is currently no legislation devoted specifically to these bonds.

---

[10]   For more information on covered bonds, including the legislative proposals, see "FDIC Concedes Market Value Cap to Gain Repudiation Rights over US Bank-Sponsored Covered Bonds" (September 20, 2010), "New US Covered Bond Bill Is Positive but Falls Short on Addressing Market Value Risk" (August 2, 2010), and "Moody's Credit Rating Perspective on US Covered Bonds: Frequently Asked Questions" (October 2, 2008).

Currently, the primary limitation on covered bonds in the United States is uncertainty surrounding the manner in which the Federal Deposit Insurance Corporation (FDIC) might treat collateral if a sponsoring bank were to go into receivership. The FDIC, as receiver or conservator of a failed bank sponsor, would have the right to repudiate the legal agreement that gave rise to a covered bond program. If a bank sponsoring a covered bond program were to become insolvent, the FDIC, as receiver or conservator, could:

> **The FHLBanks vs. covered bonds**
>
> A significant difference between the U.S. and the European housing markets is the existence of the FHLBanks in the United States. The FHLBanks, which form a cooperative, provide funding to member banks through collateralized lending agreements. Mortgage loans or securities are the most common form of collateral for FHLBank advances. As GSEs, FHLBanks issue debt at very tight spreads to U.S. Treasury securities and, as a cooperative, FHLBanks pass on much of the savings to members in the form of attractive funding costs. It is unlikely that covered bonds would have a price advantage over FHLBank advances given these low funding costs. Advances are also very flexible and can be structured in any tenor (i.e., overnight to 30 years). Additionally, derivatives can be embedded in advances so that they are callable, while covered bonds do not have this level of flexibility.

1. Continue to pay the covered bonds in accordance with the legal agreement while looking to transfer the covered bond program to a solvent bank,

2. Keep the pledged collateral by repudiating the contract underpinning the covered bonds and paying "actual direct compensatory damages" to bondholders, limited to the market value of the pledged collateral, or

3. Require the trustee of the covered bond transaction to liquidate the pledged collateral to pay off the bondholders, and return excess proceeds, if any, to the FDIC.

To restate, then, clear rules on the rights of covered bondholders in the event of a sponsor bank's receivership or conservatorship are necessary for the development of a robust covered bond market in the United States.

## Appendix: The hybrid alternatives – Some outstanding questions

Following is a more in-depth, though still incomplete, analysis of some of the outstanding questions related to instituting a hybrid model, between privatization and nationalization.

### Ownership structure and governance

**Options 1 and 2:** The most significant problem in terms of governance relates to the inherent conflict between the companies' shareholder ownership and their public policy mission. This conflict was never more on display than in 2008, when it became apparent that Fannie Mae and Freddie Mac needed to raise large amounts of capital. The size of these capital raises were certainly impacted by the dilutive effect on existing shareholders.

Changing the companies' ownership structure to a cooperative one (similar to FHLBanks or farm credit banks) with optional membership, or a utility or not-for-profit one would largely resolve this issue. If their ownership structure were changed, the GSEs' investment portfolios would need to be substantially reduced and their business activities curtailed.

A cooperative structure would present both benefits and challenges. Cooperatives can be structured so that they are self-capitalizing. For example, members of the FHLBanks must own a certain amount of stock, plus additional "activity" stock based on their level of borrowing. On the other hand, financial institutions may not be interested in the services of cooperatives.

### Standardization – Effect on MBS and TBA Markets[11]

**Option 2:** The GSEs' success was partly due to their issuing large quantities (more than $5 trillion) of standardized MBS. The standardized securities, coupled with Fannie Mae's and Freddie Mac's guarantees and the implied government support for the companies, essentially removed credit risk and led to GSE securities being viewed as "rate securities" (i.e., their value changed in line with interest-rate changes only). Creating multiple GSE-like entities would make standardization difficult, as each entity would have different underwriting standards even if the government were to create underwriting guidelines. Differences in underwriting, product focus, and geographic concentration would result in price differences for the securities, which in turn would affect the mortgage rate each entity could offer.

### Housing goals

**Option 2:** Fannie Mae and Freddie Mac supported low-income housing through defined goals set by the Department of Housing and Urban Development. Establishing housing goals for Fannie Mae and Freddie Mac was an easy way to support low-income housing for the U.S. government because it did not include any cash cost. However, we do not believe this sort of arrangement is viable going forward. For example, some have criticized the government's ever-increasing housing goals, which resulted in the GSEs purchasing ever-greater amounts of riskier loans, which contributed to their large losses during the financial crisis. Others have said that the pressure to provide an attractive return to shareholders, which resulted in minimal capital bases, was to blame. In any case, the perceived need to provide attractive returns to shareholders raised questions as to whether the GSEs were fulfilling their public mission.

---

[11]   A term used to describe a forward mortgage-backed securities trade. Pass-through securities issued by Freddie Mac, Fannie Mae, and Ginnie Mae trade in the TBA market. The term "TBA" is derived from the fact that the actual mortgage-backed security that will be delivered to fulfill a TBA trade is not designated at the time the trade is made. The securities are "to be announced" 48 hours prior to the established trade settlement date. Mortgage originators and servicers use the TBA market to hedge their mortgage risk.

FHFA 1413

Some proposals would replace housing goals with a "tax" on the profits of the new GSE-like entities to create a fund to support low-income housing.[12] Assuming that the tax rate would be stable, under this approach the funds available to support such housing would be pre-defined and finite. Supporters of low-income housing may not be fully convinced that this is beneficial, given the popularity of increasing housing goals. It should also be noted that during periods when earnings are low or non-existent, there would be far less money to support low-income housing goals – arguably at a time when demand for such capital would be greater. The funds available for these programs would therefore be subject to cyclicality.

---

[12]   This is similar to the way in which the FHLBanks support low-income housing. FHLBanks earmark 20% of net income for community re-investment projects.

Report Number: 130726

| Author | Senior Production Associate |
|---|---|
| Brian L. Harris | Wing Chan |

© 2011 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ARE MOODY'S INVESTORS SERVICE, INC.'S ("MIS") CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MIS DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS DO NOT CONSTITUTE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS ARE NOT RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. CREDIT RATINGS DO NOT COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MIS ISSUES ITS CREDIT RATINGS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Any publication into Australia of this document is by MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657, which holds Australian Financial Services License no. 336969. This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001.

Notwithstanding the foregoing, credit ratings assigned on and after October 1, 2010 by Moody's Japan K.K. ("MJKK") are MJKK's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities. In such a case, "MIS" in the foregoing statements shall be deemed to be replaced with "MJKK".

MJKK is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO.

This credit rating is an opinion as to the creditworthiness or a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be dangerous for retail investors to make any investment decision based on this credit rating. If in doubt you should contact your financial or other professional adviser.



**Moody's**
**INVESTORS SERVICE**

# Tab 26





FISCAL YEAR 2012

# APPENDIX

BUDGET OF THE U.S. GOVERNMENT

OFFICE OF MANAGEMENT AND BUDGET

BUDGET.GOV

FHFA 1416

# GOVERNMENT-SPONSORED ENTERPRISES

This chapter contains descriptions of the data on the Government-sponsored enterprises listed below. These enterprises were established and chartered by the Federal Government for public policy purposes. They are not included in the Federal Budget because they are private companies, and their securities are not backed by the full faith and credit of the Federal Government. However, because of their public purpose, detailed statements of financial condition are presented, to the extent such information is available, on a basis that is as consistent as practicable with the basis for the budget data of Government agencies.

—The Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation provide assistance to the secondary market for residential mortgages.

—The Federal Home Loan Banks assist thrift institutions, banks, insurance companies, and credit unions in providing financing for housing and community development.

—Institutions of the Farm Credit System, which include the Agricultural Credit Bank and Farm Credit Banks, provide financial assistance to agriculture. They are regulated by the Farm Credit Administration.

—The Federal Agricultural Mortgage Corporation, under the regulation of the Farm Credit Administration, provides a secondary market for agricultural real estate, rural housing loans, and certain rural utility loans, as well as for farm and business loans guaranteed by the U.S. Department of Agriculture.

## FEDERAL NATIONAL MORTGAGE ASSOCIATION

The Federal National Mortgage Association (Fannie Mae) is a Government-sponsored enterprise (GSE) in the housing finance market. As a housing GSE, Fannie Mae is a federally chartered, privately owned company with a public mission to provide stability and to increase the liquidity of the residential mortgage market and to help increase the availability of mortgage credit to low- and moderate-income families and in underserved areas. Fannie Mae engages primarily in two forms of business: guaranteeing residential mortgage securities and investing in portfolios of residential mortgages.

Fannie Mae was established in 1938 to assist private markets in providing a steady supply of funds for housing. Fannie Mae was originally a subsidiary of the Reconstruction Finance Corporation and was permitted to purchase only loans insured by the Federal Housing Administration (FHA). In 1954, Fannie Mae was restructured as a mixed ownership (part government, part private) corporation. Legislation directed the sale of the Government's remaining interest in Fannie Mae in 1968 and completed the transformation to private shareholder ownership in 1970.

Stress in the mortgage markets has eliminated Fannie Mae's stockholder equity, and required ongoing assistance from Treasury under authority provided by the Congress in the Housing and Economic Recovery Act (HERA) of 2008. HERA strengthened housing GSE regulation by creating the Federal Housing Finance Agency (FHFA), a new independent regulator, and provided temporary authority for the U.S. Department of the Treasury to purchase obligations of the housing GSEs. In September 2008, FHFA put Fannie Mae under Federal conservatorship and the U.S. Department of the Treasury entered into a Senior Preferred Stock Purchase Agreement (PSPA) with Fannie Mae to make investments of up to $100 billion in senior preferred stock as required to maintain positive equity. In May 2009, Treasury increased the funding commitments for the PSPA to $200 billion and in December 2009, Treasury modified the funding commitments in the PSPA to the greater of $200 billion or $200 billion plus cumulative net worth deficits experienced during 2010–2012, less any surplus remaining as of December 31, 2012. As of December 31, 2010, Fannie Mae had received $87.6 billion under the PSPA and made $10.2 billion in dividend payments to Treasury. The Budget continues to reflect the GSEs as non-budgetary entities, though their status will continue to be reviewed. All of the current federal assistance being provided to Fannie Mae, including the PSPA, is shown on-budget. For additional discussion and analyses of Fannie Mae, please see the *Analytical Perspectives* and *Summary Tables* volumes of the Budget documents.

### PORTFOLIO PROGRAMS

**Status of Direct Loans** (in millions of dollars)

| Identification code 99–2500–0–3–371 | 2010 actual | CR | 2012 est. |
|---|---|---|---|
| Position with respect to appropriations act limitation on obligations: | | | |
| 1131 Direct loan obligations | 362,160 | | |
| 1150 Total direct loan obligations | 362,160 | | |
| Cumulative balance of direct loans outstanding: | | | |
| 1210 Outstanding, start of year | 792,675 | 802,851 | 729,000 |
| 1231 Disbursements: Direct loan disbursements | 362,160 | | |
| 1251 Repayments: Repayments and prepayments | –351,984 | –73,851 | –72,900 |
| 1290 Outstanding, end of year | 802,851 | 729,000 | 656,100 |

**Balance Sheet** (in millions of dollars)

| Identification code 99–2500–0–3–371 | 2009 actual | 2010 actual |
|---|---|---|
| ASSETS: | | |
| Federal assets: Investments in US securities: | | |
| 1102 Treasury securities, par | | 38,775 |
| 1201 Non-Federal assets: Investments in other securities, net | 44,643 | 26,644 |
| Net value of assets related to direct loans receivable and acquired defaulted guaranteed loans receivable: | | |
| 1601 Senior/page Loans and Mortgage Related Securities | 766,431 | 477,433 |
| 1601 Mortgage Loans and Mortgage Related Securities - Consolidated Trusts | | 2,559,629 |
| 1604 Direct loans and interest receivable, net | 766,431 | 3,037,062 |
| 1606 Acquired Property, net | 7,735 | 17,590 |
| 1699 Value of assets related to direct loans | 774,166 | 3,054,652 |
| Other Federal assets: | | |
| 1801 Cash and other monetary assets | 54,566 | 106,781 |
| 1901 Other assets | 16,900 | 2,770 |
| 1999 Total assets | 890,275 | 3,229,622 |
| LIABILITIES: | | |
| Non-Federal liabilities: | | |
| 2202 Interest payable | 5,032 | 14,212 |
| 2203 Debt | 802,990 | 812,047 |
| 2203 Debt – Consolidated Trusts | | 2,391,415 |
| 2204 Estimated liability for loan guarantees | 70,074 | 1,023 |
| 2207 Other | 27,139 | 13,372 |
| 2999 Total liabilities | 905,235 | 3,232,069 |
| NET POSITION: | | |
| 3300 Senior Preferred Stock | 45,900 | 86,100 |
| 3300 Private Equity | –60,965 | –88,627 |
| 3300 Noncontrolling Interest | 105 | 80 |
| 3999 Total net position | –14,960 | –2,447 |
| 4999 Total liabilities and net position[1] | 890,275 | 3,229,622 |

[1] Gross amounts for assets and liabilities adjusted on January 1, 2010 based on new FASB accounting standards requiring consolidation of most securitization trusts for Fannie Mae MBS.

FHFA 1417

MORTGAGE-BACKED SECURITIES

**Status of Direct Loans** (in millions of dollars)

| Identification code 99–2501–0–3–371 | 2010 actual | CR | 2012 est. |
|---|---|---|---|
| Cumulative balance of direct loans outstanding: | | | |
| 1210   Outstanding, start of year ............................................... | 2,795,734 | 2,642,820 | 2,642,820 |
| 1231   Disbursements: Direct loan disbursements ............................. | 539,473 | .................... | .................... |
| 1251   Repayments: Repayments and prepayments ............................ | –692,387 | .................... | .................... |
| 1290   Outstanding, end of year ............................................... | 2,642,820 | 2,642,820 | 2,642,820 |

Prior to January 1, 2010 the mortgages in the pools of loans supporting the mortgage-backed securities guaranteed by Fannie Mae were considered to be owned by the holders of these securities according to the accounting standards for private corporations. Consequently, on the books of Fannie Mae, these mortgages were not considered assets and the securities outstanding were not considered liabilities. New accounting standards implemented on January 1, 2010 require consolidation of many, but not all, of these securities in Fannie Mae's financial statements. For the purposes of this document they are presented as direct loans for mortgage-backed securities. "Disbursements" and "Repayments" are budgetary terms. These items are reported by Fannie Mae as "Issuances" and "Liquidations" respectively.

# FEDERAL HOME LOAN MORTGAGE CORPORATION

PORTFOLIO PROGRAMS

**Status of Direct Loans** (in millions of dollars)

| Identification code 99–4420–0–3–371 | 2010 actual | CR | 2012 est. |
|---|---|---|---|
| Position with respect to appropriations act limitation on obligations: | | | |
| 1131   Direct loan obligations ............................................... | 139,917 | .................... | .................... |
| 1150   Total direct loan obligations ...................................... | 139,917 | .................... | .................... |
| Cumulative balance of direct loans outstanding: | | | |
| 1210   Outstanding, start of year ........................................... | 784,171 | 710,248 | 710,248 |
| 1231   Disbursements: Direct loan disbursements ......................... | 139,917 | .................... | .................... |
| 1251   Repayments: Repayments and prepayments ........................ | –213,840 | .................... | –54,148 |
| 1290   Outstanding, end of year ........................................... | 710,248 | 710,248 | 656,100 |

The Federal Home Loan Mortgage Corporation (Freddie Mac) is a Government-sponsored enterprise (GSE) in the housing finance market. As a housing GSE, Freddie Mac is a federally chartered, shareholder-owned, private company with a public mission to provide stability and increase the liquidity of the residential mortgage market, and to help increase the availability of mortgage credit to low- and moderate-income families and in underserved areas. Freddie Mac engages primarily in two forms of business: guaranteeing residential mortgage securities and investing in portfolios of residential mortgages.

Freddie Mac was established in 1970 under the Emergency Home Finance Act. The Congress chartered Freddie Mac to provide mortgage lenders with an organized national secondary market enabling them to manage their conventional mortgage portfolio more effectively and gain indirect access to a ready source of additional funds to meet new demands for mortgages. Freddie Mac serves as a conduit facilitating the flow of investment dollars from the capital markets to mortgage lenders, and ultimately, to homebuyers.

Stress in the mortgage markets has eliminated Freddie Mac's stockholder equity, and required ongoing assistance from Treasury under authority provided by Congress in the Housing and Economic Recovery Act (HERA) of 2008. HERA strengthened housing GSE regulation by creating the Federal Housing Finance Agency (FHFA), a new independent regulator, and provided temporary authority for the U.S. Department of the Treasury to purchase obligations of the housing GSEs. In September 2008, FHFA put Freddie Mac under Federal conservatorship and the U.S. Department of the Treasury entered into a Senior Preferred Stock Purchase Agreement (PSPA) with Freddie Mac to make investments of up to $100 billion in senior preferred stock as required to maintain positive equity. In May 2009, Treasury increased the funding commitments for the PSPA to $200 billion and in December 2009, Treasury modified the funding commitments in the PSPA to the greater of $200 billion or $200 billion plus cumulative net worth deficits experienced during 2010–2012, less any surplus remaining as of December 31, 2012. As of December 31, 2010, Freddie Mac had received $63.2 billion under the PSPA and made $10 billion in dividend payments to Treasury. The Budget continues to reflect the GSEs as non-budgetary entities, though their status will continue to be reviewed. All of the current federal assistance being provided to Freddie Mac, including the PSPA, is shown on-budget. For additional discussion and analyses of Freddie Mac, please see the *Analytical Perspectives* and *Summary Tables* volumes of the Budget documents.

**Balance Sheet** (in millions of dollars)

| Identification code 99–4420–0–3–371 | 2009 actual | 2010 actual |
|---|---|---|
| ASSETS: | | |
| Federal assets: Investments in US securities: | | |
| 1102   Treasury securities, par ............................................... | 12,394 | 29,548 |
| 1201   Non-Federal assets: Investments in other securities, net ........... | 15,682 | 46,391 |
| Net value of assets related to direct loans receivable and acquired defaulted guaranteed loans receivable: | | |
| 1601   Mortgage Loans and Mortgage Related Securities .................. | 742,898 | 461,637 |
| 1601   Mortgage Loans and Mortgage Related Securities – Consolidated Trusts ..................................................................... | .................... | 1,681,736 |
| 1604   Direct loans and interest receivable, net ............................ | 742,898 | 2,143,373 |
| 1606   Acquired property, net ............................................... | 4,234 | 7,511 |
| 1699   Value of assets related to direct loans ................................ | 747,132 | 2,150,884 |
| Other Federal assets: | | |
| 1801   Cash and other monetary assets ................................... | 66,826 | 55,773 |
| 1901   Other assets ............................................................ | 24,567 | 6,134 |
| 1999   Total assets ............................................................ | 866,601 | 2,288,730 |
| LIABILITIES: | | |
| Non-Federal liabilities: | | |
| 2202   Interest payable ...................................................... | 4,341 | 10,097 |
| 2203   Debt ..................................................................... | 803,781 | 727,391 |
| 2203   Debt – Consolidated Trusts ........................................ | .................... | 1,542,503 |
| 2204   Liabilities for loan guarantees ..................................... | 40,819 | 791 |
| 2207   Other .................................................................... | 7,254 | 8,006 |
| 2999   Total liabilities ....................................................... | 856,195 | 2,288,788 |
| NET POSITION: | | |
| 3300   Senior Preferred Stock ............................................... | 51,700 | 64,100 |
| 3300   Private Equity .......................................................... | –41,389 | –64,158 |
| 3300   Noncontrolling Interest .............................................. | 95 | .................... |
| 3999   Total net position ..................................................... | 10,406 | –58 |
| 4999   Total liabilities and net position [1] ................................ | 866,601 | 2,288,730 |

[1] Gross amounts for assets and liabilities adjusted on January 1, 2010 based on new FASB accounting standards requiring consolidation of most securitization trusts for Freddie Mac MBS.

MORTGAGE-BACKED SECURITIES

**Status of Direct Loans** (in millions of dollars)

| Identification code 99–4440–0–3–371 | 2010 actual | CR | 2012 est. |
|---|---|---|---|
| Position with respect to appropriations act limitation on obligations: | | | |
| 1131   Direct loan obligations ............................................... | 361,640 | .................... | .................... |
| 1150   Total direct loan obligations ...................................... | 361,640 | .................... | .................... |
| Cumulative balance of direct loans outstanding: | | | |
| 1210   Outstanding, start of year ........................................... | 1,862,021 | 1,763,696 | 1,763,696 |
| 1231   Disbursements: Direct loan disbursements ......................... | 361,640 | .................... | .................... |

# Tab 27

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# Form 10-K

## ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2010**
**Commission File No.: 0-50231**

# Federal National Mortgage Association
*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(202) 752-7000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **None** | |

**Securities registered pursuant to Section 12(g) of the Act:**
**Common Stock, without par value**
*(Title of class)*
**8.25% Non-Cumulative Preferred Stock, Series T, stated value $25 per share**
*(Title of class)*
**8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1, stated value $50 per share**
*(Title of class)*
**Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S, stated value $25 per share**
*(Title of class)*
**7.625% Non-Cumulative Preferred Stock, Series R, stated value $25 per share**
*(Title of class)*
**6.75% Non-Cumulative Preferred Stock, Series Q, stated value $25 per share**
*(Title of class)*
**Variable Rate Non-Cumulative Preferred Stock, Series P, stated value $25 per share**
*(Title of class)*
**Variable Rate Non-Cumulative Preferred Stock, Series O, stated value $50 per share**
*(Title of class)*
**5.375% Non-Cumulative Convertible Series 2004-1 Preferred Stock, stated value $100,000 per share**
*(Title of class)*
**5.50% Non-Cumulative Preferred Stock, Series N, stated value $50 per share**
*(Title of class)*
**4.75% Non-Cumulative Preferred Stock, Series M, stated value $50 per share**
*(Title of class)*
**5.125% Non-Cumulative Preferred Stock, Series L, stated value $50 per share**
*(Title of class)*
**5.375% Non-Cumulative Preferred Stock, Series I, stated value $50 per share**
*(Title of class)*
**5.81% Non-Cumulative Preferred Stock, Series H, stated value $50 per share**
*(Title of class)*
**Variable Rate Non-Cumulative Preferred Stock, Series G, stated value $50 per share**
*(Title of class)*
**Variable Rate Non-Cumulative Preferred Stock, Series F, stated value $50 per share**
*(Title of class)*
**5.10% Non-Cumulative Preferred Stock, Series E, stated value $50 per share**
*(Title of class)*
**5.25% Non-Cumulative Preferred Stock, Series D, stated value $50 per share**
*(Title of class)*

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☐          Non-accelerated filer ☑          Smaller Reporting company ☐
*(Do not check if a smaller reporting company)*

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☑

The aggregate market value of the common stock held by non-affiliates of the registrant computed by reference to the last reported sale price of the common stock quoted on the New York Stock Exchange on June 30, 2010 (the last business day of the registrant's most recently completed second fiscal quarter) was approximately $383 million.

As of January 31, 2011, there were 1,119,639,748 shares of common stock of the registrant outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**   None

# TABLE OF CONTENTS

PART I ............................................................................. 1
Item 1.     Business ............................................................. 1
            Overview .......................................................... 1
            Residential Mortgage Market ....................................... 2
            Executive Summary ................................................. 5
            Mortgage Securitizations .......................................... 21
            Business Segments ................................................. 23
            Conservatorship and Treasury Agreements ........................... 32
            Legislation and GSE Reform ........................................ 37
            Our Charter and Regulation of Our Activities ...................... 39
            Making Home Affordable Program .................................... 47
            Our Customers ..................................................... 48
            Competition ....................................................... 48
            Employees ......................................................... 49
            Where You Can Find Additional Information .......................... 49
            Forward-Looking Statements ........................................ 50
Item 1A.    Risk Factors ........................................................ 53
Item 1B.    Unresolved Staff Comments ......................................... 68
Item 2.     Properties .......................................................... 68
Item 3.     Legal Proceedings ................................................. 69
Item 4.     [Removed and Reserved] ............................................ 70

PART II. ........................................................................ 70
Item 5.     Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases
            of Equity Securities .............................................. 70
Item 6.     Selected Financial Data ........................................... 73
Item 7.     Management's Discussion and Analysis of Financial Condition and Results of Operations ... 76
            Critical Accounting Policies and Estimates ........................ 76
            Consolidated Results of Operations ................................ 82
            Business Segment Results .......................................... 104
            Consolidated Balance Sheet Analysis ............................... 121
            Supplemental Non-GAAP Information — Fair Value Balance Sheets ...... 126
            Liquidity and Capital Management .................................. 131
            Off-Balance Sheet Arrangements .................................... 145
            Risk Management ................................................... 146
            Glossary of Terms Used in This Report ............................. 190
Item 7A.    Quantitative and Qualitative Disclosures about Market Risk ........ 192
Item 8.     Financial Statements and Supplementary Data ....................... 192
Item 9.     Changes in and Disagreements with Accountants on Accounting and Financial Disclosure ... 192
Item 9A.    Controls and Procedures ........................................... 193
Item 9B.    Other Information ................................................. 199

i

**PART III** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

Item 10.    Directors, Executive Officers and Corporate Governance . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

              Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

              Corporate Governance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

              Executive Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

Item 11.    Executive Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

              Compensation Discussion and Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

              Compensation Committee Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

              Compensation Risk Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

              Compensation Tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

Item 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder
              Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

Item 13.    Certain Relationships and Related Transactions, and Director Independence . . . . . . . . . . . . . 235

              Policies and Procedures Relating to Transactions with Related Persons . . . . . . . . . . . . . . . . . 235

              Transactions with Related Persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

              Director Independence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

Item 14.    Principal Accounting Fees and Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

**PART IV** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

Item 15.    Exhibits, Financial Statement Schedules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

INDEX TO EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-1

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-1

FHFA 1421

# MD&A TABLE REFERENCE

| Table | Description | Page |
|-------|-------------|------|
| — | Selected Financial Data | 73 |
| 1 | Expected Lifetime Profitability of Single-Family Loans Acquired in 1991 through 2010 | 10 |
| 2 | Single-Family Serious Delinquency Rates by Year of Acquisition | 12 |
| 3 | Credit Profile of Single-Family Conventional Loans Acquired | 13 |
| 4 | Credit Statistics, Single-Family Guaranty Book of Business | 17 |
| 5 | Level 3 Recurring Financial Assets at Fair Value | 77 |
| 6 | Summary of Consolidated Results of Operations | 83 |
| 7 | Analysis of Net Interest Income and Yield | 85 |
| 8 | Rate/Volume Analysis of Changes in Net Interest Income | 86 |
| 9 | Fair Value Losses, Net | 89 |
| 10 | Credit-Related Expenses | 92 |
| 11 | Total Loss Reserves | 93 |
| 12 | Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves) | 94 |
| 13 | Nonperforming Single-Family and Multifamily Loans | 98 |
| 14 | Credit Loss Performance Metrics | 100 |
| 15 | Credit Loss Concentration Analysis | 101 |
| 16 | Single-Family Credit Loss Sensitivity | 102 |
| 17 | Impairments and Fair Value Losses on Loans in HAMP | 104 |
| 18 | Business Segment Summary | 107 |
| 19 | Business Segment Results | 108 |
| 20 | Single-Family Business Results | 109 |
| 21 | Multifamily Business Results | 113 |
| 22 | Capital Markets Group Results | 116 |
| 23 | Capital Markets Group's Mortgage Portfolio Activity | 119 |
| 24 | Capital Markets Group's Mortgage Portfolio Composition | 120 |
| 25 | Summary of Consolidated Balance Sheets | 122 |
| 26 | Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities | 123 |
| 27 | Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps) | 124 |
| 28 | Changes in Risk Management Derivative Assets (Liabilities) at Fair Value, Net | 126 |
| 29 | Comparative Measures—GAAP Change in Stockholders' Deficit and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect) | 127 |
| 30 | Supplemental Non-GAAP Consolidated Fair Value Balance Sheets | 130 |
| 31 | Activity in Debt of Fannie Mae | 133 |
| 32 | Outstanding Short-Term Borrowings and Long-Term Debt | 136 |
| 33 | Outstanding Short-Term Borrowings | 137 |
| 34 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year | 139 |

FHFA 1422

| Table | Description | Page |
|---|---|---|
| 35 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year . . . . . . . . | 139 |
| 36 | Contractual Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 140 |
| 37 | Cash and Other Investments Portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 141 |
| 38 | Fannie Mae Credit Ratings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 143 |
| 39 | Composition of Mortgage Credit Book of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 150 |
| 40 | Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 155 |
| 41 | Delinquency Status of Single-Family Conventional Loans . . . . . . . . . . . . . . . . . . . . . . . . . | 160 |
| 42 | Serious Delinquency Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 161 |
| 43 | Single-Family Conventional Serious Delinquency Rate Concentration Analysis . . . . . . . . . . . . | 162 |
| 44 | Statistics on Single-Family Loan Workouts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 164 |
| 45 | Loan Modification Profile . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 165 |
| 46 | Single-Family Foreclosed Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 166 |
| 47 | Single-Family Acquired Property Concentration Analysis . . . . . . . . . . . . . . . . . . . . . . . . . | 167 |
| 48 | Multifamily Serious Delinquency Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 169 |
| 49 | Multifamily Concentration Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 169 |
| 50 | Multifamily Foreclosed Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 170 |
| 51 | Mortgage Insurance Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 174 |
| 52 | Activity and Maturity Data for Risk Management Derivatives . . . . . . . . . . . . . . . . . . . . . . | 185 |
| 53 | Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 187 |
| 54 | Derivative Impact on Interest Rate Risk (50 Basis Points) . . . . . . . . . . . . . . . . . . . . . . . . | 187 |
| 55 | Interest Rate Sensitivity of Financial Instruments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 188 |

FHFA 1423

## PART I

*We have been under conservatorship, with the Federal Housing Finance Agency ("FHFA") acting as conservator, since September 6, 2008. As conservator, FHFA succeeded to all rights, titles, powers and privileges of the company, and of any shareholder, officer or director of the company with respect to the company and its assets. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. We describe the rights and powers of the conservator, key provisions of our agreements with the U.S. Department of the Treasury ("Treasury"), and their impact on shareholders in "Conservatorship and Treasury Agreements."*

*This report contains forward-looking statements, which are statements about matters that are not historical facts. Forward-looking statements often include words like "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," "would," "should," "could," "may," or similar words. Actual results could differ materially from those projected in the forward-looking statements as a result of a number of factors including those discussed in "Risk Factors" and elsewhere in this report. Please review "Forward-Looking Statements" for more information on the forward-looking statements in this report.*

*We provide a glossary of terms in "Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A")—Glossary of Terms Used in This Report."*

### Item 1.   Business

### OVERVIEW

Fannie Mae is a government-sponsored enterprise that was chartered by Congress in 1938 to support liquidity, stability and affordability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold. Our charter does not permit us to originate loans and lend money directly to consumers in the primary mortgage market. Our most significant activities include providing market liquidity by securitizing mortgage loans originated by lenders in the primary mortgage market into Fannie Mae mortgage-backed securities, which we refer to as Fannie Mae MBS, and purchasing mortgage loans and mortgage-related securities in the secondary market for our mortgage portfolio. We acquire funds to purchase mortgage-related assets for our mortgage portfolio by issuing a variety of debt securities in the domestic and international capital markets. We also make other investments that increase the supply of affordable housing. During 2010, we concentrated much of our efforts on minimizing our credit losses by using home retention solutions and foreclosure alternatives to address delinquent mortgages, starting with solutions, such as modifications, that permit people to stay in their homes. When there is no lower-cost alternative, our goal is to move to foreclosure expeditiously. We describe our business activities below.

As a federally chartered corporation, we are subject to extensive regulation, supervision and examination by FHFA, and regulation by other federal agencies, including Treasury, the Department of Housing and Urban Development ("HUD"), and the Securities and Exchange Commission ("SEC").

Although we are a corporation chartered by the U.S. Congress, our conservator is a U.S. government agency, Treasury owns our senior preferred stock and a warrant to purchase 79.9% of our common stock, and Treasury has made a commitment under a senior preferred stock purchase agreement to provide us with funds under specified conditions to maintain a positive net worth, the U.S. government does not guarantee our securities or other obligations. Our common stock was delisted from the New York Stock Exchange and the Chicago Stock Exchange on July 8, 2010 and since then has been traded in the over-the-counter market and quoted on the OTC Bulletin Board under the symbol "FNMA." Our debt securities are actively traded in the over-the-counter market.

The conservatorship we have been under since September 2008, with FHFA acting as conservator, has no specified termination date. There can be no assurance as to when or how the conservatorship will be terminated, whether we will continue to exist following conservatorship, or what changes to our business structure will be made during or following the conservatorship.

1

Since our entry into conservatorship, we have entered into agreements with Treasury that include covenants that significantly restrict our business activities and provide for substantial U.S. government financial support. We provide additional information on the conservatorship, the provisions of our agreements with the Treasury, and its impact on our business below under "Conservatorship and Treasury Agreements" and "Risk Factors."

## RESIDENTIAL MORTGAGE MARKET

### The U.S. Residential Mortgage Market

We conduct business in the U.S. residential mortgage market and the global securities market. In response to the financial crisis and severe economic recession that began in December 2007, the U.S. government took a number of extraordinary measures designed to provide fiscal stimulus, improve liquidity and protect and support the housing and financial markets. Examples of these measures include: (1) the Federal Reserve's temporary programs to purchase up to $1.25 trillion of GSE mortgage-backed securities and approximately $175 billion of GSE debt by March 31, 2010, which were intended to provide support to mortgage lending and the housing market and to improve overall conditions in private credit markets; (2) the Administration's Making Home Affordable Program, which was intended to stabilize the housing market by providing assistance to homeowners and preventing foreclosures; and (3) the first-time and move-up homebuyer tax credits, enacted to help increase home sales and stabilize home prices. The homebuyer tax credits were available for qualifying home purchases by buyers who entered into binding contracts by April 30, 2010.

Total U.S. residential mortgage debt outstanding, which includes $10.6 trillion of single-family mortgage debt outstanding, was estimated to be approximately $11.5 trillion as of September 30, 2010, the latest date for which information was available, according to the Federal Reserve. After increasing every quarter since record keeping began in 1952 until the second quarter of 2008, single-family mortgage debt outstanding has been steadily declining since then. We owned or guaranteed mortgage assets representing approximately 27.4% of total U.S. residential mortgage debt outstanding as of September 30, 2010.

We operate our business solely in the United States and its territories, and accordingly, we generate no revenue from and have no assets in geographic locations other than the United States and its territories.

### Housing and Mortgage Market and Economic Conditions

During the fourth quarter of 2010, the United States economic recovery continued. The U.S. gross domestic product, or GDP, rose by 3.2% on an annualized basis during the quarter after adjusting for inflation, according to the Bureau of Economic Analysis advance estimate. The overall economy gained an estimated 128,000 jobs in the fourth quarter, with the private sector continuing its recent trend of moderate employment growth throughout the quarter and into January 2011. The unemployment rate was 9.0% in January 2011, compared with 9.6% in September 2010, based on data from the U.S. Bureau of Labor Statistics.

Housing activity rebounded modestly in the fourth quarter of 2010 after experiencing a pullback in the third quarter. For all of 2010, home sales declined for the fourth time in the past five years, despite low mortgage rates, reduced home prices and the first-time and move-up homebuyer tax credits that increased existing home sales earlier in the year. Weak demand for homes, a weak labor market, strengthened lending standards in the industry and elevated vacancy and foreclosure rates are the main obstacles to the housing recovery. Total existing home sales fell by 4.8% in 2010 from 2009, according to data available through January 2011. Faced with fierce competition from distressed sales, new home sales fared significantly worse, dropping by 14.2% in 2010, according to data available through January 2011, and accounting for just 5.5% of total home sales in the fourth quarter of 2010, down from a peak of more than 19% at the beginning of 2005. After four consecutive years of double-digit declines to an annual record low, total housing starts rose a modest 5.9% in 2010.

FHFA 1425

The table below presents several key indicators related to the total U.S. residential mortgage market.

**Housing and Mortgage Market Indicators[1]**

| | 2010 | 2009 | 2008 | % Change 2010 | 2009 |
|---|---|---|---|---|---|
| Home sales (units in thousands) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,229 | 5,530 | 5,398 | (5.4)% | 2.4% |
| New home sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 321 | 374 | 485 | (14.2) | (22.9) |
| Existing home sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,908 | 5,156 | 4,913 | (4.8) | 4.9 |
| Home price depreciation based on Fannie Mae Home Price Index ("HPI")[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (3.1)% | (3.7)% | (10.3)% | — | — |
| Annual average fixed-rate mortgage interest rate[3]. . . . . . . . . . . . . . . | 4.7% | 5.0% | 6.0% | — | — |
| Single-family mortgage originations (in billions) . . . . . . . . . . . . . . . . . | $ 1,530 | $ 1,917 | $ 1,580 | (20.2) | 21.3 |
| Type of single-family mortgage origination: | | | | | |
| Refinance share . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 65% | 69% | 52% | — | — |
| Adjustable-rate mortgage share . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5% | 4% | 7% | — | — |
| Total U.S. residential mortgage debt outstanding (in billions)[4] . . . . . . . | $11,459 | $11,712 | $11,915 | (2.2) | (1.7) |

[1]   The sources of the housing and mortgage market data in this table are the Federal Reserve Board, the Bureau of the Census, HUD, the National Association of Realtors, the Mortgage Bankers Association and FHFA. Homes sales data are based on information available through January 2011. Single-family mortgage originations, as well as refinance shares, are based on February 2011 estimates from Fannie Mae's Economics & Mortgage Market Analysis Group. The adjustable-rate mortgage share is based on mortgage applications data reported by the Mortgage Bankers Association. Certain previously reported data may have been changed to reflect revised historical data from any or all of these organizations.

[2]   Calculated internally using property data information on loans purchased by Fannie Mae, Freddie Mac and other third-party home sales data. Fannie Mae's HPI is a weighted repeat transactions index, meaning that it measures average price changes in repeat sales on the same properties. Fannie Mae's HPI excludes prices on properties sold in foreclosure. The reported home price depreciation reflects the percentage change in Fannie Mae's HPI from the fourth quarter of the prior year to the fourth quarter of the reported year.

[3]   Based on the annual average 30-year fixed-rate mortgage interest rate reported by Freddie Mac.

[4]   Information for 2010 is through September 30, 2010 and has been obtained from the Federal Reserve's September 2010 mortgage debt outstanding release.

Home prices, which rose in the second quarter of 2010 when the home buyer tax credits were available, have fallen since the tax credits' expiration. We estimate that home prices on a national basis declined by approximately 3.1% in both the second half of 2010 and in 2010 overall. We estimate that home prices have declined by 20.5% from their peak in the third quarter of 2006. Our home price estimates are based on preliminary data and are subject to change as additional data become available.

As a result of the increase in existing home sales in the fourth quarter of 2010 and the pause in foreclosures triggered by the discovery of deficiencies in servicers' foreclosure processes, the supply of unsold single-family homes dropped during the quarter. According to the National Association of Realtors' December 2010 Existing Home Sales Report, there was an 8.1 month average supply of existing unsold homes as of December 31, 2010, compared with a 10.6 month average supply as of September 30, 2010 and a 7.2 month average supply as of December 31, 2009. Although the supply of unsold homes dropped in the fourth quarter, the inventory of unsold homes remains above long-term average levels. The national average inventory/sales ratio masks significant regional variation as some regions, such as Florida, struggle with large inventory overhang while others, such as California, are experiencing nearly depleted inventories in some market segments.

An additional factor weighing on the market is the elevated level of vacant properties, as reported by the Census Bureau. While the inventory of vacant homes for sale and for rent appears to be stabilizing, according to the Bureau of the Census Housing Vacancy Survey, vacancy rates remain significantly above their normal levels and will continue to weigh down the market. The serious delinquency rate has trended down since

3

peaking in the fourth quarter of 2009 but has remained historically high, with an estimated four million loans seriously delinquent (90 days or more past due or in the foreclosure process), based on the Mortgage Bankers Association National Delinquency Survey. The shadow supply from these mortgages will also negatively affect the market. According to the minutes of the December Federal Reserve Open Market Committee, members expressed concern that the elevated supply of homes available for sale and the overhang of foreclosed homes will contribute to further drops in home prices, reducing household wealth and thus restraining growth in consumer spending. We provide information about Fannie Mae's serious delinquency rate, which also decreased during 2010, in "Executive Summary—Credit Performance."

We estimate that total single-family mortgage originations decreased by 20.2% in 2010 to $1.5 trillion, with a purchase share of 35% and a refinance share of 65%. For 2011, we expect an increase in mortgage rates will likely reduce the share of refinance loans to approximately 35% and total single-family originations are expected to decline to about $1.0 trillion.

Since the second quarter of 2008, single-family mortgage debt outstanding has been steadily declining due to several factors including rising foreclosures, declining house prices, increased cash sales, reduced household formation, and reduced home equity extraction. We anticipate another approximately 2% decline in single-family mortgage debt outstanding in 2011. Total U.S. residential mortgage debt outstanding fell on an annualized basis by approximately 2.4% in both the second and third quarters of 2010.

Despite signs of stabilization and improvement, one out of seven borrowers was delinquent or in foreclosure during the fourth quarter of 2010, according to the Mortgage Bankers Association National Delinquency Survey. The housing market remains under pressure due to the high level of unemployment, which was a primary driver of the significant number of mortgage delinquencies and defaults in 2010. At the start of the recession in December 2007, the unemployment rate was 5.0%, based on data from the U.S. Bureau of Labor Statistics. The unemployment rate peaked at a 26-year high of 10.1% in October 2009, and remained as high as 9.0% in January 2011. We expect the unemployment rate to decline modestly throughout 2011.

The most comprehensive measure of the unemployment rate, which includes those working part-time who would rather work full-time (part-time workers for economic reasons) and those not looking for work but who want to work and are available for work (discouraged workers), was 16.7% in December 2010, close to the record high of 17.4% in October 2009.

The decline in house prices both nationally and regionally has left many homeowners with "negative equity" in their homes, which means the principal balances on their mortgages exceed the current market value of their homes. This provides an incentive for borrowers to walk away from their mortgage obligations and for the loans to become delinquent and proceed to foreclosure. According to First American CoreLogic, Inc. approximately 11 million, or 23%, of all residential properties with mortgages were in negative equity in the third quarter of 2010. This potential supply also weighs on the supply/demand balance putting downward pressure on both house prices and rents. See "Risk Factors" for a description of risks to our business associated with the weak economy and housing market.

The multifamily sector improved during 2010 despite slow job growth. Multifamily fundamentals strengthened, driven primarily by increases in non-farm payrolls and tenants renting rather than purchasing homes due to uncertainty surrounding home values. Vacancy rates, which had climbed to record levels in 2009, have improved, and asking rents increased on a national basis. Preliminary third-party data suggest that the rate of apartment vacancies held steady in the fourth quarter of 2010. Rents appear to have risen during most of 2010, with overall rent growth up by an estimated 3%.

Vacancy rates and rents are important to loan performance because multifamily loans are generally repaid from the cash flows generated by the underlying property. Improvements in these fundamentals helped to stabilize property values during 2010 in a number of metropolitan areas.

Prolonged periods of high vacancies and negative or flat rent growth will adversely affect multifamily properties' net operating incomes and related cash flows, which can strain the ability of borrowers to make loan payments and thereby potentially increase delinquency rates and credit expenses.

4

While national multifamily market fundamentals improved during 2010, certain local markets and properties continue to exhibit weak fundamentals. As a result, we expect that our multifamily nonperforming assets will increase in certain areas and we may continue to experience an increase in delinquencies and credit losses despite generally improving market fundamentals. We expect the multifamily sector to continue to improve modestly in 2011, even though unemployment levels remain elevated.

## EXECUTIVE SUMMARY

*Please read this Executive Summary together with our Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") and our consolidated financial statements as of December 31, 2010 and related notes. This discussion contains forward-looking statements that are based upon management's current expectations and are subject to significant uncertainties and changes in circumstances. Please review "Forward-Looking Statements" for more information on the forward-looking statements in this report and "Risk Factors" for a discussion of factors that could cause our actual results to differ, perhaps materially, from our forward-looking statements. Please also see "MD&A—Glossary of Terms Used in This Report."*

### Our Mission

Our public mission is to support liquidity and stability in the secondary mortgage market and increase the supply of affordable housing. In connection with our public mission, FHFA, as our conservator, and the Obama Administration have given us an important role in addressing housing and mortgage market conditions. As we discuss below and elsewhere in "Business," we are concentrating our efforts on supporting liquidity, stability and affordability in the secondary mortgage market and minimizing our credit losses from delinquent loans.

### Our Business Objectives and Strategy

Our Board of Directors and management consult with our conservator in establishing our strategic direction, taking into consideration our role in addressing housing and mortgage market conditions. FHFA has approved our business objectives. We face a variety of different, and potentially conflicting, objectives including:

- minimizing our credit losses from delinquent mortgages;

- providing liquidity, stability and affordability in the mortgage market;

- providing assistance to the mortgage market and to the struggling housing market;

- limiting the amount of the investment Treasury must make under our senior preferred stock purchase agreement;

- returning to long-term profitability; and

- protecting the interests of the taxpayers.

We therefore regularly consult with and receive direction from our conservator on how to balance these objectives. Our pursuit of our mission creates conflicts in strategic and day-to-day decision-making that could hamper achievement of some or all of these objectives.

We currently are concentrating our efforts on minimizing our credit losses. We use home retention solutions and foreclosure alternatives to address delinquent mortgages, starting with solutions, such as modifications, that permit people to stay in their homes. When there is no lower-cost alternative, our goal is to move to foreclosure expeditiously. We also seek to minimize credit losses by actively managing our real estate owned ("REO") inventory and by pursuing contractual remedies where third parties such as lenders or providers of credit enhancement are obligated to compensate us for losses.

Along with our efforts to minimize credit losses, we continue our significant role of providing support for liquidity and affordability in the mortgage market through our guaranty and capital markets businesses. In

2010, we continued our work to strengthen our book of business, acquiring loans with a strong overall credit profile. We discuss the performance of single-family loans we acquired in 2009 and 2010 later in this executive summary.

We will continue to need funds from Treasury as a result of ongoing adverse conditions in the housing and mortgage markets, the deteriorated credit performance of loans in our mortgage credit book of business that we acquired prior to 2009, the costs associated with our efforts pursuant to our mission, and the dividends we are required to pay Treasury on the senior preferred stock. As a result of these factors, we do not expect to earn profits in excess of our annual dividend obligation to Treasury for the indefinite future. Further, there is significant uncertainty regarding the future of our company, as the Administration, Congress and our regulators consider options for the future state of Fannie Mae, Freddie Mac and the U.S. government's role in residential mortgage finance.

On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. We discuss the report's recommendations for a new long-term structure for the housing finance system in more detail in "Legislation and GSE Reform—GSE Reform."

In the final quarter of 2010 we initiated a comprehensive review of our business processes, infrastructure and organizational structure to assess the company's readiness to operate effectively in the secondary mortgage market of the future. We expect to implement the plan in phases with goals of providing value to our customers, simplifying and standardizing our operating model, and reducing our costs.

To provide context for analyzing our consolidated financial statements and understanding our MD&A, we discuss the following topics in this executive summary:

- Our 2010 financial performance;

- Actions we take to provide liquidity to the mortgage market;

- Our expectations regarding profitability, the book of business we have acquired since the beginning of 2009 and credit losses;

- Our strategies and actions to reduce credit losses;

- Our 2009 and 2010 credit performance;

- The servicer foreclosure process deficiencies discovered in 2010 and the related foreclosure pause;

- Our liquidity position; and

- Our outlook.

**Summary of Our Financial Performance for 2010**

Our financial results for 2010 reflect the continued weakness in the housing and mortgage markets, which remain under pressure from high levels of unemployment and underemployment, and the impact of the adoption of new accounting standards and the consolidation of the majority of our MBS trusts.

Effective January 1, 2010, we prospectively adopted new accounting standards on the transfers of financial assets and the consolidation of variable interest entities. We refer to these accounting standards together as the "new accounting standards." In this report, we also refer to January 1, 2010 as the "transition date."

Our adoption of the new accounting standards had a major impact on the presentation of our consolidated financial statements. The new standards require that we consolidate the substantial majority of Fannie Mae MBS trusts we guarantee and recognize the underlying assets (typically mortgage loans) and debt (typically

6

bonds issued by the trusts in the form of Fannie Mae MBS certificates) of these trusts as assets and liabilities in our consolidated balance sheets.

Although the new accounting standards did not change the economic risk to our business, we recorded a decrease of $3.3 billion in our total deficit as of January 1, 2010 to reflect the cumulative effect of adopting these new standards. We provide a detailed discussion of the impact of the new accounting standards on our accounting and financial statements in "Note 2, Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities." Upon adopting the new accounting standards, we changed the presentation of segment financial information that is currently evaluated by management, as we discuss in "Business Segment Results — Changes to Segment Reporting."

We recognized a net loss of $14.0 billion for 2010, a net loss attributable to common stockholders of $21.7 billion, which includes $7.7 billion in dividends on senior preferred stock paid to Treasury, and a diluted loss per share of $3.81. In comparison, we recognized a net loss of $72.0 billion, a net loss attributable to common stockholders of $74.4 billion, including $2.5 billion in dividends on senior preferred stock, and a diluted loss per share of $13.11 in 2009.

The $58.0 billion decrease in our net loss for 2010 compared with 2009 was due primarily to:

- a $46.9 billion decrease in credit-related expenses, which consist of the provision for loan losses, the provision for guaranty losses (collectively referred to as the "provision for credit losses") plus foreclosed property expense, due to the factors described below;

- a $9.1 billion decrease in net other-than-temporary impairments due to slower deterioration of the estimated credit component of the fair value losses of Alt-A and subprime securities. In addition, net-other-than temporary impairment decreased in 2010 compared with 2009 because, effective beginning in the second quarter of 2009, we recognize only the credit portion of other-than-temporary impairment in our consolidated statements of operations due to the adoption of a new other-than-temporary impairment accounting standard;

- a $6.7 billion decrease in losses from partnership investments resulting primarily from the recognition, in the fourth quarter of 2009, of $5.0 billion in other-than-temporary impairment losses on our federal low-income housing tax credit ("LIHTC") investments; and

- a $2.3 billion decrease in net fair value losses primarily due to lower fair value losses on risk management derivatives.

Our credit-related expenses were $26.6 billion for 2010 compared with $73.5 billion for 2009. Our provision for credit losses was substantially lower in 2010, primarily because there was neither a significant increase in the number of seriously delinquent loans, nor a sharp decline in home prices. Therefore, we did not need to substantially increase our total loss reserves in 2010. Another contributing factor was the insignificant amount of fair value losses on acquired credit-impaired loans recognized in 2010, because only purchases of credit-deteriorated loans from unconsolidated MBS trusts or as a result of other credit guarantees generate fair value losses upon acquisition, due to our adoption of the new accounting standards. Additionally, on December 31, 2010, we entered into an agreement with Bank of America, N.A., and its affiliates, to address outstanding repurchase requests for residential mortgage loans. Bank of America agreed, among other things, to a cash payment of $1.3 billion, $930 million of which was recognized as a recovery of charge-offs, resulting in a reduction to our provision for loan losses and allowance for loan losses, and $266 million as a reduction to foreclosed property expense. For additional information on the terms of this agreement, see "Risk Management — Credit Risk Management — Institutional Counterparty Credit Risk Management."

We had a net worth deficit of $2.5 billion as of December 31, 2010 and $2.4 billion as of September 30, 2010, compared with $15.3 billion as of December 31, 2009. Our net worth as of December 31, 2010 was negatively impacted by the recognition of our net loss of $14.0 billion and the senior preferred stock dividends of $7.7 billion. These reductions in our net worth were offset by our receipt of $27.7 billion in funds from Treasury under our senior preferred stock purchase agreement with Treasury, a $3.3 billion cumulative effect from the adoption of new accounting standards as of January 1, 2010, and a $3.1 billion reduction in

FHFA 1430

unrealized losses in our holdings of available-for-sale securities. Our net worth, which is the basis for determining the amount that Treasury has committed to provide us under the senior preferred stock purchase agreement, equals the "Total deficit" reported in our consolidated balance sheets. In February 2011, the Acting Director of FHFA submitted a request to Treasury on our behalf for $2.6 billion to eliminate our net worth deficit as of December 31, 2010. When Treasury provides the requested funds, the aggregate liquidation preference on the senior preferred stock will be $91.2 billion, which will require an annualized dividend payment of $9.1 billion. This amount exceeds our reported annual net income for each of the last nine years, in most cases by a significant margin. Through December 31, 2010, we have paid an aggregate of $10.2 billion to Treasury in dividends on the senior preferred stock.

Our total loss reserves, which reflect our estimate of the probable losses we have incurred in our guaranty book of business, increased to $66.3 billion as of December 31, 2010 from $64.7 billion as of September 30, 2010, $61.4 billion as of January 1, 2010 and $64.9 billion as of December 31, 2009. Our total loss reserve coverage to total nonperforming loans was 30.85% as of December 31, 2010, compared with 30.34% as of September 30, 2010 and 29.98% as of December 31, 2009.

We recognized net income of $73 million for the fourth quarter of 2010, driven primarily by net interest income of $4.6 billion and fair value gains of $366 million, which were partially offset by credit-related expenses of $4.3 billion and administrative expenses of $592 million. Our fourth quarter results were favorably impacted by the cash payment received from Bank of America, because it reduced our credit-related expenses for the period. The net loss attributable to common stockholders, which includes $2.2 billion in dividends on senior preferred stock, was $2.1 billion and our diluted loss per share was $0.37. In comparison, we recognized a net loss of $1.3 billion, a net loss attributable to common stockholders of $3.5 billion and a diluted loss per share of $0.61 for the third quarter of 2010. We recognized a net loss of $15.2 billion, a net loss attributable to common stockholders of $16.3 billion and a diluted loss per share of $2.87 for the fourth quarter of 2009.

**Providing Mortgage Market Liquidity**

We support liquidity and stability in the secondary mortgage market, serving as a stable source of funds for purchases of homes and multifamily rental housing and for refinancing existing mortgages. We provide this financing through the activities of our three complementary businesses: our Single-Family business ("Single-Family"), our Multifamily Mortgage Business ("Multifamily," formerly "Housing and Community Development," or "HCD") and our Capital Markets group. Our Single-Family and Multifamily businesses work with our lender customers to purchase and securitize mortgage loans customers deliver to us into Fannie Mae MBS. Our Capital Markets group manages our investment activity in mortgage-related assets, funding investments primarily through proceeds we receive from the issuance of debt securities in the domestic and international capital markets. The Capital Markets group works with lender customers to provide funds to the mortgage market through short-term financing and other activities, making short-term use of our balance sheet. These financing activities include whole loan conduit transactions, early funding transactions, Real Estate Mortgage Investment Conduit ("REMIC") and other structured securitization activities, and dollar rolls, which we describe in more detail in "Business Segments — Capital Markets Group."

In 2010, we purchased or guaranteed approximately $856 billion in loans, measured by unpaid principal balance, which includes approximately $217 billion in delinquent loans we purchased from our single-family MBS trusts. Our purchases and guarantees financed approximately 2,712,000 single-family conventional loans, excluding delinquent loans purchased from our MBS trusts, and approximately 306,000 units in multifamily properties.

Our mortgage credit book of business — which consists of the mortgage loans and mortgage-related securities we hold in our investment portfolio, Fannie Mae MBS held by third parties and other credit enhancements that we provide on mortgage assets — totaled $3.1 trillion as of September 30, 2010, which represented approximately 27.4% of U.S. residential mortgage debt outstanding on September 30, 2010, the latest date for which the Federal Reserve has estimated U.S. residential mortgage debt outstanding. We remained the largest single issuer of mortgage-related securities in the secondary market, with an estimated market share of new

single-family mortgage-related securities of 49.0% during the fourth quarter of 2010 and 44.0% for the full year. In comparison, our estimated market share of new single-family mortgage-related securities issuances was 44.5% in the third quarter of 2010 and 38.9% in the fourth quarter of 2009. If the Federal Housing Administration ("FHA") continues to be the lower-cost option for some consumers, and in some cases the only option, for loans with higher loan-to-value ("LTV") ratios, our market share could be adversely impacted if the market shifts away from refinance activity, which is likely to occur when interest rates rise. In the multifamily market, we remain a constant source of liquidity, guaranteeing an estimated 20.1% of multifamily mortgage debt outstanding as of September 30, 2010, the latest date for which the Federal Reserve has estimated mortgage debt outstanding for multifamily residences.

### Our Expectations Regarding Profitability, the Single-Family Loans We Acquired Beginning in 2009, and Credit Losses

In this section we discuss our expectations regarding the profitability, performance and credit profile of the single-family loans we have purchased or guaranteed since the beginning of 2009, shortly after entering into conservatorship in late 2008, and our expected single-family credit losses. We refer to loans that we have purchased or guaranteed as loans that we have "acquired."

- Since the beginning of 2009, we have acquired single-family loans that have a strong overall credit profile and are performing well. We expect these loans will be profitable, by which we mean they will generate more fee income than credit losses and administrative costs, as we discuss in "Expected Profitability of Our Single-Family Acquisitions" below. For further information, see "Table 2: Single-Family Serious Delinquency Rates by Year of Acquisition" and "Table 3: Credit Profile of Single-Family Conventional Loans Acquired."

- The vast majority of our realized credit losses in 2009 and 2010 on single-family loans are attributable to single-family loans that we purchased or guaranteed from 2005 through 2008. While these loans will give rise to additional credit losses that we have not yet realized, we estimate that we have reserved for the substantial majority of the remaining losses.

### Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations

In this discussion, we present a number of estimates and expectations regarding the profitability of single-family loans we have acquired, our single-family credit losses, and our draws from and dividends to be paid to Treasury. These estimates and expectations are forward-looking statements based on our current assumptions regarding numerous factors, including future home prices and the future performance of our loans. Our future estimates of these amounts, as well as the actual amounts, may differ materially from our current estimates and expectations as a result of home price changes, changes in interest rates, unemployment, direct and indirect consequences resulting from failures by servicers to follow proper procedures in the administration of foreclosure cases, government policy, changes in generally accepted accounting principles ("GAAP"), credit availability, social behaviors, other macro-economic variables, the volume of loans we modify, the effectiveness of our loss mitigation strategies, management of our REO inventory and pursuit of contractual remedies, changes in the fair value of our assets and liabilities, impairments of our assets, or many other factors, including those discussed in "Risk Factors" and "MD&A — Forward-Looking Statements." For example, if the economy were to enter a deep recession during this time period, we would expect actual outcomes to differ substantially from our current expectations.

### Expected Profitability of Our Single-Family Acquisitions

While it is too early to know how loans we have acquired since January 1, 2009 will ultimately perform, given their strong credit risk profile, low levels of payment delinquencies shortly after their acquisition, and low serious delinquency rate, we expect that, over their lifecycle, these loans will be profitable. Table 1 provides information about whether we expect loans we acquired in 1991 through 2010 to be profitable, and the percentage of our single-family guaranty book of business represented by these loans as of December 31, 2010. The expectations reflected in Table 1 are based on the credit risk profile of the loans we have acquired,

which we discuss in more detail in "Table 3: Credit Profile of Single-Family Conventional Loans Acquired" and in "Table 40: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business." These expectations are also based on numerous other assumptions, including our expectations regarding home price declines set forth below in "Outlook." As shown in Table 1, we expect loans we have acquired in 2009 and 2010 to be profitable. If future macroeconomic conditions turn out to be significantly more adverse than our expectations, these loans could become unprofitable. For example, we believe that these loans would become unprofitable if home prices declined more than 20% from their December 2010 levels over the next five years based on our home price index, which would be an approximately 36% decline from their peak in the third quarter of 2006.

**Table 1:   Expected Lifetime Profitability of Single-Family Loans Acquired in 1991 through 2010**



As Table 1 shows, the key years in which we acquired loans that we expect will be unprofitable are 2005 through 2008, and the vast majority of our realized credit losses in 2009 and 2010 to date are attributable to these loans. Loans we acquired in 2004 were originated under more conservative acquisition policies than loans we acquired from 2005 through 2008; however, we expect them to perform close to break-even because these loans were made as home prices were rapidly increasing and therefore suffered from the subsequent decline in home prices.

Loans we have acquired since the beginning of 2009 comprised over 40% of our single-family guaranty book of business as of December 31, 2010. Our 2005 to 2008 acquisitions are becoming a smaller percentage of our guaranty book of business, having decreased from 50% of our guaranty book of business as of December 31, 2009 to 39% as of December 31, 2010.

10

*Performance of Our Single-Family Acquisitions*

In our experience, an early predictor of the ultimate performance of loans is the rate at which the loans become seriously delinquent within a short period of time after acquisition. Loans we acquired in 2009 have experienced historically low levels of delinquencies shortly after their acquisition. Table 2 shows, for single-family loans we acquired in each year from 2001 to 2009, the percentage that were seriously delinquent (three or more months past due or in the foreclosure process) as of the end of the fourth quarter following the acquisition year. Loans we acquired in 2010 are not included in this table because a substantial portion of them were originated so recently that they could not yet have become seriously delinquent. As Table 2 shows, the percentage of our 2009 acquisitions that were seriously delinquent as of the end of the fourth quarter following their acquisition year was more than nine times lower than the average comparable serious delinquency rate for loans acquired in 2005 through 2008. Table 2 also shows serious delinquency rates for each year's acquisitions as of December 31, 2010. Except for the most recent acquisition years, whose serious delinquency rates are likely lower than they will be after the loans have aged, Table 2 shows that the serious delinquency rate as of December 31, 2010 generally tracks the trend of the serious delinquency rate as of the end of the fourth quarter following the year of acquisition. Below the table we provide information about the economic environment in which the loans were acquired, specifically home price appreciation and unemployment levels.

FHFA 1434

**Table 2:   Single-Family Serious Delinquency Rates by Year of Acquisition**



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|
| Home Price Appreciation[1] | 6.3 % | 7.5 % | 7.6 % | 10.7 % | 11.5 % | 2.7 % | (4.1) % | (10.3) % | (3.7) % | (3.1) % |
| Unemployment rate[2] | 4.7 % | 5.8 % | 6.0 % | 5.5 % | 5.1 % | 4.6 % | 4.6 % | 5.8 % | 9.3 % | 9.6 % |

---

\*   For 2009, the serious delinquency rate as of December 31, 2010 is the same as the serious delinquency rate as of the end of the fourth quarter following the acquisition year.

[1]   Based on Fannie Mae's HPI, which measures average price changes based on repeat sales on the same properties. For 2010, the data show an initial estimate based on purchase transactions in Fannie-Freddie acquisition and public deed data available through the end of January 2011. Previously reported data has been revised to reflect additional available historical data. Including subsequently available data may lead to materially different results.

[2]   Based on the average national unemployment rates for each month reported in the labor force statistics current population survey (CPS), Bureau of Labor Statistics.

### Credit Profile of Our Single-Family Acquisitions

Single-family loans we purchased or guaranteed from 2005 through 2008 were acquired during a period when home prices were rising rapidly, peaked, and then started to decline sharply, and underwriting and eligibility standards were more relaxed than they are now. These loans were characterized, on average and as discussed below, by higher LTV ratios and lower FICO credit scores than loans we have acquired since January 1, 2009. In addition, many of these loans were Alt-A loans or had other higher-risk loan attributes such as interest-only payment features. As a result of the sharp declines in home prices, 29% of the loans that we acquired from

12

2005 through 2008 had mark-to-market LTV ratios that were greater than 100% as of December 31, 2010, which means the principal balance of the borrower's primary mortgage exceeded the current market value of the borrower's home. This percentage is higher when second lien loans secured by the same properties that secure our loans are included. The sharp decline in home prices, the severe economic recession that began in December 2007 and continued through June 2009, and continuing high unemployment and underemployment have significantly and adversely impacted the performance of loans we acquired from 2005 through 2008. We are taking a number of actions to reduce our credit losses. We discuss these actions and our strategy below in "Our Strategies and Actions to Reduce Credit Losses on Loans in our Single-Family Guaranty Book of Business" and in "MD&A — Risk Management — Credit Risk Management — Single-Family Mortgage Credit Risk Management."

In 2009, we began to see the effect of actions we took, beginning in 2008, to significantly strengthen our underwriting and eligibility standards and change our pricing to promote sustainable homeownership and stability in the housing market. As a result of these changes and other market conditions, we reduced our acquisitions of loans with higher-risk loan attributes. The loans we have purchased or guaranteed since January 1, 2009 have had a better credit risk profile overall than loans we acquired in 2005 through 2008, and their early performance has been strong. Our experience has been that loans with stronger credit risk profiles perform better than loans without stronger credit risk profiles. For example, one measure of a loan's credit risk profile that we believe is a strong predictor of performance is LTV ratio, which indicates the amount of equity a borrower has in the underlying property. As Table 3 demonstrates, the loans we have acquired since January 1, 2009 have a strong credit risk profile, with lower original LTV ratios, higher FICO credit scores, and a product mix with a greater percentage of fully amortizing fixed-rate mortgage loans than loans we acquired from 2005 through 2008.

**Table 3:   Credit Profile of Single-Family Conventional Loans Acquired[1]**

| | Acquisitions from 2009 through 2010 | Acquisitions from 2005 through 2008 |
|---|---|---|
| Weighted average loan-to-value ratio at origination . . . . . . . . . . . . . . . . . | 68% | 73% |
| Weighted average FICO credit score at origination . . . . . . . . . . . . . . . . . | 762 | 722 |
| Fully amortizing, fixed-rate loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 95% | 86% |
| Alt-A loans[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 14% |
| Interest-only . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 12% |
| Original loan-to-value ratio > 90 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5% | 11% |
| FICO credit score < 620 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | * | 5% |

\*    Represent less than 0.5% of the total acquisitions.

[1]   Loans that meet more than one category are included in each applicable category.

[2]   Newly originated Alt-A loans acquired in 2009 and 2010 consist of the refinance of existing Alt-A loans.

Improvements in the credit risk profile of our 2009 and 2010 acquisitions over acquisitions in prior years reflect changes that we made to our pricing and eligibility standards, as well as changes that mortgage insurers made to their eligibility standards. In addition, FHA's role as the lower-cost option for some consumers for loans with higher LTV ratios has also reduced our acquisitions of these types of loans. The credit risk profile of our 2009 and 2010 acquisitions has been influenced further by a significant percentage of refinanced loans, which generally perform well as they demonstrate a borrower's desire to maintain homeownership. In 2010 our acquisitions of refinanced loans included a significant number of loans under the Refi Plus™ initiative, which involves refinancing existing, performing Fannie Mae loans with current LTV ratios up to 125%, and possibly lower FICO credit scores, into loans that reduce the borrowers' monthly payments or are otherwise more sustainable. A substantial portion of the refinances with higher LTV ratios were done as part of the Home Affordable Refinance Program ("HARP"), which is for loans on primary residences with current LTV ratios in excess of 80% and up to 125%. Due to the volume of HARP loans, the LTV ratios at origination for our 2010 acquisitions are higher than for our 2009 acquisitions. However, the overall credit profile of our 2010 acquisitions remained significantly stronger than the credit profile of our 2005 through 2008 acquisitions.

13

Whether the loans we acquire in the future exhibit an overall credit profile similar to our acquisitions since January 1, 2009 will depend on a number of factors, including our future eligibility standards and those of mortgage insurers, the percentage of loan originations representing refinancings, our future objectives, and market and competitive conditions.

Beginning in 2008, we made changes to our pricing and eligibility standards and underwriting that were intended to more accurately reflect the risk in the housing market and to significantly reduce our acquisitions of loans with higher-risk attributes. These changes included the following:

- Established a minimum FICO credit score and reduced maximum debt-to-income ratio for most loans;

- Limited or eliminated certain loan products with higher-risk characteristics, including discontinuing the acquisition of newly originated Alt-A loans, except for those that represent the refinancing of an existing Alt-A Fannie Mae loan (we may also continue to selectively acquire seasoned Alt-A loans that meet acceptable eligibility and underwriting criteria; however, we expect our acquisitions of Alt-A mortgage loans to continue to be minimal in future periods);

- Updated our comprehensive risk assessment model in Desktop Underwriter®, our proprietary automated underwriting system, and implemented a comprehensive risk assessment worksheet to assist lenders in the manual underwriting of loans;

- Increased our guaranty fee pricing to better align risk and pricing;

- Updated our policies regarding appraisals of properties backing loans; and

- Established a national down payment policy requiring borrowers to have a minimum down payment (or minimum equity, for refinances) of 3%, in most cases.

If we had applied our current pricing and eligibility standards and underwriting to loans we acquired in 2005 through 2008, our losses on loans acquired in those years would have been lower, although we would still have experienced losses due to the rise and subsequent sharp decline in home prices and increased unemployment.

### Expectations Regarding Credit Losses

The single-family credit losses we realized in 2009 and 2010, combined with the amounts we have reserved for single-family credit losses as of December 31, 2010, total approximately $110 billion. The vast majority of these losses are attributable to single-family loans we purchased or guaranteed from 2005 through 2008.

While loans we acquired in 2005 through 2008 will give rise to additional credit losses that we have not yet realized, we estimate that we have reserved for the substantial majority of the remaining losses. While we believe our results of operations have already reflected a substantial majority of the credit losses we have yet to realize on these loans, we expect that defaults on these loans and the resulting charge-offs will occur over a period of years. In addition, given the large current and anticipated supply of single-family homes in the market, we anticipate that it will take years before our REO inventory approaches pre-2008 levels.

We show how we calculate our realized credit losses in "Table 14: Credit Loss Performance Metrics." Our reserves for credit losses consist of (1) our allowance for loan losses, (2) our allowance for accrued interest receivable, (3) our allowance for preforeclosure property taxes and insurance receivables, and (4) our reserve for guaranty losses (collectively, our "total loss reserves"), plus the portion of fair value losses on loans purchased out of MBS trusts reflected in our consolidated balance sheets that we estimate represents accelerated credit losses we expect to realize. For more information on our reserves for credit losses, please see "Table 11: Total Loss Reserves."

The fair value losses that we consider part of our reserves are not included in our "total loss reserves." The majority of the fair value losses were recorded prior to our adoption of the new accounting standards in 2010. Upon our acquisition of credit-impaired loans out of unconsolidated MBS trusts, we recorded fair value loss charge-offs against our reserve for guaranty losses to the extent that the acquisition cost of these loans exceeded their estimated fair value. We expect to realize a portion of these fair value losses as credit losses in

the future (for loans that eventually involve charge-offs or foreclosure), yet these fair value losses have already reduced the mortgage loan balances reflected in our consolidated balance sheets and have effectively been recognized in our consolidated statements of operations through our provision for guaranty losses. We consider these fair value losses as an "effective reserve," apart from our total loss reserves, to the extent that we expect to realize them as credit losses in the future.

As a result of the substantial reserving for and realizing of our credit losses to date, we have drawn a significant amount of funds from Treasury through December 31, 2010. As our draws from Treasury for credit losses abate, we expect our draws instead to be driven increasingly by dividend payments to Treasury.

**Our Strategies and Actions to Reduce Credit Losses on Loans in our Single-Family Guaranty Book of Business**

To reduce the credit losses we ultimately incur on our single-family guaranty book of business, we are focusing our efforts on the following strategies:

- Reducing defaults to avoid losses that otherwise would occur;

- Efficiently managing timelines for home retention solutions, foreclosure alternatives, and foreclosures;

- Pursuing foreclosure alternatives to reduce the severity of the losses we incur;

- Managing our REO inventory to reduce costs and maximize sales proceeds; and

- Pursuing contractual remedies from lenders and providers of credit enhancement, including mortgage insurers.

We refer to actions taken by our servicers with borrowers to resolve the problem of existing or potential delinquent loan payments as "workouts," which include our home retention solutions and foreclosure alternatives discussed below. As "Table 4: Credit Statistics, Single-Family Guaranty Book of Business" illustrates, our single-family serious delinquency rate decreased to 4.48% as of December 31, 2010 from 5.38% as of December 31, 2009. This decrease is primarily the result of workouts and foreclosed property acquisitions completed during the year and reflects our work with servicers to reduce delays in determining and executing the appropriate approach for a given loan. During 2010, we completed approximately 772,000 workouts and foreclosed property acquisitions. The decrease is also attributable to our acquisition of loans with stronger credit profiles in 2010. Serious delinquency rates declined in 2010 and, as of September 30, 2010, we experienced the first year-over-year decline in our serious delinquency rate since 2007. This year-over-year decline continued as of December 31, 2010. We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, and the extent to which borrowers with modified loans again become delinquent in their payments.

*Reducing Defaults.*   We are working to reduce defaults through improved servicing, refinancing initiatives and solutions that help borrowers retain their homes, such as modifications.

- *Improved Servicing*.   Our mortgage servicers are the primary point of contact for borrowers and perform a vital role in our efforts to reduce defaults and pursue foreclosure alternatives. We seek to improve the servicing of our delinquent loans through a variety of means, including increasing our resources for managing the oversight of servicers, increasing our communications with servicers, and holding servicers accountable for following our requirements. We are also working with some of our servicers to test and implement high-touch protocols for servicing our higher risk loans, including lowering the ratio of loans per servicer employee, prescribing borrower outreach strategies to be used at earlier stages of delinquency, and providing distressed borrowers a single point of contact to resolve issues.

- *Refinancing Initiatives*.   Through our Refi Plus™ initiative, which provides expanded refinance opportunities for eligible Fannie Mae borrowers, we acquired or guaranteed approximately 659,000 loans in 2010 that helped borrowers obtain more affordable monthly payments now and in the future or a more stable mortgage product (for example, by moving from an adjustable-rate mortgage to a fixed-rate mortgage). These refinancing activities may help prevent future delinquencies and defaults. Loans

15

FHFA 1438

refinanced through the Refi Plus initiative in 2010 reduced our borrowers' monthly mortgage payments by an average of $149.

- *Home Retention Solutions*.   Our home retention solutions are intended to help borrowers stay in their homes and include loan modifications, repayment plans and forbearances. We provide information on our home retention solutions completed during 2010 in Table 4. Please also see "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management—Management of Problem Loans and Loan Workout Metrics" for a discussion of our home retention strategies.

*Managing Timelines.*   We believe that repayment plans, short-term forbearances and loan modifications can be most effective in preventing defaults when completed at an early stage of delinquency. Similarly, we believe that our foreclosure alternatives are more likely to be successful in reducing our loss severity if they are executed expeditiously. Accordingly, it is important for servicers to work with delinquent borrowers early in the delinquency to determine whether home retention solutions or foreclosure alternatives will be viable and, where no workout is viable, to reduce delays in proceeding to foreclosure.

*Pursuing Foreclosure Alternatives.*   If we are unable to provide a viable home retention solution for a problem loan, we seek to offer foreclosure alternatives and complete them in a timely manner. These foreclosure alternatives are primarily preforeclosure sales, which are sometimes referred to as "short sales," as well as deeds-in-lieu of foreclosure. These alternatives are intended to reduce the severity of our loss resulting from a borrower's default while permitting the borrower to avoid going through a foreclosure. We provide information about the volume of foreclosure alternatives we completed during 2010 in Table 4.

*Managing Our REO Inventory.*   Since January 2009, we have strengthened our REO sales capabilities by significantly increasing the number of resources in this area, and we are working to manage our REO inventory to reduce costs and maximize sales proceeds. As Table 4 shows, in 2010 we increased our dispositions of foreclosed single-family properties by 51% as compared with 2009, while our acquisition of properties increased by 80%. Given the large number of seriously delinquent loans in our single-family guaranty book of business and the large current and anticipated supply of single-family homes in the market, we expect it will take years before our REO inventory approaches pre-2008 levels.

*Pursuing Contractual Remedies.*   We conduct reviews of delinquent loans and, when we discover loans that do not meet our underwriting and eligibility requirements, we make demands for lenders to repurchase these loans or compensate us for losses sustained on the loans. We also make demands for lenders to repurchase or compensate us for loans for which the mortgage insurer rescinds coverage. We increased the volume of our repurchase requests in 2010 as compared with 2009, and we expect the number of repurchase requests we make in 2011 to remain high. During 2010, lenders repurchased from us or reimbursed us for losses on approximately $8.8 billion in loans, measured by unpaid principal balance, pursuant to their contractual obligations. In addition, as of December 31, 2010, we had outstanding requests for lenders to repurchase from us or reimburse us for losses on $5.0 billion in loans, of which 30% had been outstanding for more than 120 days.

These dollar amounts represent the unpaid principal balance of the loans underlying the repurchase requests, not the actual amounts we have received or requested from the lenders. When lenders pay us for these requests, they pay us either to repurchase the loans or else to make us whole for our losses in cases where we have acquired and disposed of the property underlying the loans. Make-whole payments are typically for less than the unpaid principal balance because we have already recovered some of the balance through the sale of the REO. As a result, our actual cash receipts relating to these outstanding repurchase requests are significantly lower than the unpaid principal balance of the loans.

We entered into an agreement on December 31, 2010, with Bank of America, N.A., BAC Home Loans Servicing LP, and Countrywide Home Loans, Inc., each of which is an affiliate of Bank of America Corporation. The agreement addresses outstanding repurchase requests on loans with an unpaid principal balance of approximately $3.9 billion delivered to Fannie Mae by affiliates of Countrywide Financial Corporation (collectively, "Countrywide"), with which Bank of America Corporation merged in 2008. For

16

more information regarding this agreement, please see "MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management."

We are also pursuing contractual remedies from providers of credit enhancement on our loans, including mortgage insurers. We received proceeds under our mortgage insurance policies for single-family loans of $1.9 billion for the fourth quarter of 2010. Please see "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" for a discussion of our repurchase and reimbursement requests and outstanding receivables from mortgage insurers, as well as the risk that one or more of these counterparties fails to fulfill its obligations to us.

While the actions we have taken to stabilize the housing market and minimize our credit losses have been undertaken with the goal of reducing our future credit losses below what they otherwise would have been, it is difficult to predict how effective these actions ultimately will be in reducing our credit losses and, in the future, it may be difficult to measure the impact our actions ultimately have on our credit losses.

### Credit Performance

Table 4 presents information for each quarter of 2010 and for 2009 about the credit performance of mortgage loans in our single-family guaranty book of business and our loan workouts. The workout information in Table 4 does not reflect repayment plans and forbearances that have been initiated but not completed, nor does it reflect trial modifications that have not become permanent.

**Table 4:   Credit Statistics, Single-Family Guaranty Book of Business[1]**

|  | 2010 | | | | | 2009 |
|---|---|---|---|---|---|---|
|  | Full Year | Q4 | Q3 | Q2 | Q1 | Full Year |
|  | | | (Dollars in millions) | | | |
| **As of the end of each period:** | | | | | | |
| Serious delinquency rate[2] . . . . . . . . . . . | 4.48% | 4.48% | 4.56% | 4.99% | 5.47% | 5.38% |
| Nonperforming loans[3] . . . . . . . . . . . . . | $ 212,858 | $212,858 | $212,305 | $217,216 | $222,892 | $ 215,505 |
| Foreclosed property inventory: | | | | | | |
| Number of properties . . . . . . . . . . . . . | 162,489 | 162,489 | 166,787 | 129,310 | 109,989 | 86,155 |
| Carrying value . . . . . . . . . . . . . . . . . . . | $ 14,955 | $ 14,955 | $ 16,394 | $ 13,043 | $ 11,423 | $ 8,466 |
| Combined loss reserves[4] . . . . . . . . . . . . | $ 60,163 | $ 60,163 | $ 58,451 | $ 59,087 | $ 58,900 | $ 62,312 |
| Total loss reserves[5] . . . . . . . . . . . . . . . . | $ 64,469 | $ 64,469 | $ 63,105 | $ 64,877 | $ 66,479 | $ 62,848 |
| **During the period:** | | | | | | |
| Foreclosed property (number of properties): | | | | | | |
| Acquisitions[6] . . . . . . . . . . . . . . . . . . . . | 262,078 | 45,962 | 85,349 | 68,838 | 61,929 | 145,617 |
| Dispositions. . . . . . . . . . . . . . . . . . . . . . | (185,744) | (50,260) | (47,872) | (49,517) | (38,095) | (123,000) |
| Credit-related expenses[7] . . . . . . . . . . . . | $ 26,420 | $ 4,064 | $ 5,559 | $ 4,871 | $ 11,926 | $ 71,320 |
| Credit losses[8] . . . . . . . . . . . . . . . . . . . . | $ 23,133 | $ 3,111 | $ 8,037 | $ 6,923 | $ 5,062 | $ 13,362 |
| Loan workout activity (number of loans): | | | | | | |
| Home retention loan workouts[9] . . . . . . . . | 440,276 | 89,691 | 113,367 | 132,192 | 105,026 | 160,722 |
| Preforeclosure sales and deeds-in-lieu of foreclosure . . . . . . . . . . . . . . . . . . . . . | 75,391 | 15,632 | 20,918 | 21,515 | 17,326 | 39,617 |
| Total loan workouts . . . . . . . . . . . . . . . . | 515,667 | 105,323 | 134,285 | 153,707 | 122,352 | 200,339 |
| Loan workouts as a percentage of our delinquent loans in our guaranty book of business[10] . . . . . . . . . . . . . . . . . . . . | 37.30% | 30.47% | 37.86% | 41.18% | 31.59% | 12.24% |

[1] Our single-family guaranty book of business consists of (a) single-family mortgage loans held in our mortgage portfolio, (b) single-family mortgage loans underlying Fannie Mae MBS, and (c) other credit enhancements that we provide on single-family mortgage assets, such as long-term standby commitments. It excludes non-Fannie Mae mortgage-related securities held in our mortgage portfolio for which we do not provide a guaranty.

FHFA 1440

(2) Calculated based on the number of single-family conventional loans that are three or more months past due and loans that have been referred to foreclosure but not yet foreclosed upon, divided by the number of loans in our single-family conventional guaranty book of business. We include all of the single-family conventional loans that we own and those that back Fannie Mae MBS in the calculation of the single-family serious delinquency rate.

(3) Represents the total amount of nonperforming loans, including troubled debt restructurings and HomeSaver Advance first-lien loans, which are unsecured personal loans in the amount of past due payments used to bring mortgage loans current, that are on accrual status. A troubled debt restructuring is a restructuring of a mortgage loan in which a concession is granted to a borrower experiencing financial difficulty. We generally classify loans as nonperforming when the payment of principal or interest on the loan is two months or more past due.

(4) Consists of the allowance for loan losses for loans recognized in our consolidated balance sheets and the reserve for guaranty losses related to both single-family loans backing Fannie Mae MBS that we do not consolidate in our consolidated balance sheets and single-family loans that we have guaranteed under long-term standby commitments. Prior period amounts have been restated to conform to the current period presentation. The amounts shown as of March 31, 2010, June 30, 2010, September 30, 2010 and December 31, 2010 reflect a decrease from the amount shown as of December 31, 2009 as a result of the adoption of the new accounting standards. For additional information on the change in our loss reserves see "Consolidated Results of Operations—Credit-Related Expenses—Provision for Credit Losses."

(5) Consists of (a) the combined loss reserves, (b) allowance for accrued interest receivable, and (c) allowance for preforeclosure property taxes and insurance receivables.

(6) Includes acquisitions through deeds-in-lieu of foreclosure.

(7) Consists of the provision for loan losses, the provision (benefit) for guaranty losses and foreclosed property expense.

(8) Consists of (a) charge-offs, net of recoveries and (b) foreclosed property expense; adjusted to exclude the impact of fair value losses resulting from credit-impaired loans acquired from MBS trusts and HomeSaver Advance loans.

(9) Consists of (a) modifications, which do not include trial modifications or repayment plans or forbearances that have been initiated but not completed; (b) repayment plans and forbearances completed and (c) HomeSaver Advance first-lien loans. See "Table 44: Statistics on Single-Family Loan Workouts" in "Risk Management—Credit Risk Management" for additional information on our various types of loan workouts.

(10) Calculated based on annualized problem loan workouts during the period as a percentage of delinquent loans in our single-family guaranty book of business as of the end of the period.

We provide additional information on our credit-related expenses in "Consolidated Results of Operations—Credit-Related Expenses" and on the credit performance of mortgage loans in our single-family book of business and our loan workouts in "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management."

**Servicer Foreclosure Process Deficiencies and Foreclosure Pause**

In the fall of 2010, a number of our single-family mortgage servicers temporarily halted foreclosures in some or all states after discovering deficiencies in their processes and the processes of their lawyers and other service providers relating to the execution of affidavits in connection with the foreclosure process. Deficiencies include improperly notarized affidavits and affidavits signed without appropriate knowledge and review of the documents. These foreclosure process deficiencies have generated significant concern and are currently being investigated by various government agencies and by the attorneys general of all fifty states. This has resulted in new foreclosure laws and court rules in several states that we anticipate will increase costs and may lengthen the time to foreclose.

We have directed our servicers and certain of the law firms that handle foreclosure processes for our mortgage servicers to review their policies and procedures relating to the execution of affidavits, verifications and other legal documents in connection with the foreclosure process. We are also addressing concerns that have been raised regarding the practices of some law firms that handle the foreclosure process for our mortgage servicers in Florida. In the case of one firm under investigation by the Florida attorney general's office, we terminated the firm's handling of Fannie Mae matters and moved all Fannie Mae matters pending with the firm to other firms. We have also served a termination notice on a second Florida law firm handling foreclosure related matters for us. We have expanded the list of law firms that our servicers may use to process foreclosures in Florida.

FHFA 1441

The Acting Director of FHFA issued statements on October 1 and October 13, 2010 regarding servicers' foreclosure processing issues. We are currently coordinating with FHFA regarding appropriate corrective actions consistent with the four-point policy framework issued by FHFA on October 13, 2010. Under this framework, servicers are required to: (1) review their processes and verify that all documents are in compliance with legal requirements; (2) remediate problems identified through this review in an appropriate, timely and sustainable manner; (3) report suspected fraudulent activity; and (4) without delay, proceed to foreclose on mortgage loans that have no problems relating to process, on which the borrower has stopped payment, and for which home retention solutions and foreclosure alternatives have been unsuccessful.

Due to the servicer affidavit issues, we temporarily suspended certain eviction proceedings and the closing of some REO sales. On November 24, 2010, we authorized the scheduling and closing of REO sale transactions to resume. Effective January 18, 2011, we issued instructions to counsel to proceed with scheduling and completing the eviction actions previously placed on hold.

Although the foreclosure pause has negatively affected our serious delinquency rates, credit-related expenses and foreclosure timelines, we cannot yet predict the full extent of its impact. The foreclosure pause also could negatively affect housing market conditions and delay the recovery of the housing market. Some servicers have lifted the foreclosure pause in certain jurisdictions, while continuing the pause in others. At this time, we cannot predict how long the pause on foreclosures will last, how many of our loans will be affected by it or its ultimate impact on our business or the housing market. See "Risk Factors" for further information about the potential impact of the servicer foreclosure process deficiencies and the foreclosure pause on our business, results of operations, financial condition and liquidity position.

## Liquidity

In response to the strong demand that we experienced for our debt securities during 2010, we issued a variety of non-callable and callable debt securities in a wide range of maturities to achieve cost-efficient funding and to extend our debt maturity profile. In particular, we issued a significant amount of long-term debt during this period, which we then used to repay maturing debt and prepay more expensive callable long-term debt.

We believe that our ready access to long-term debt funding during 2009 and 2010 has been primarily due to the actions taken by the federal government to support us and the financial markets. Accordingly, we believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially and adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition, results of operations and ability to continue as a going concern. Demand for our debt securities could decline in the future, as the Administration, Congress and our regulators debate our future. Despite the conclusion of the Federal Reserve's program to purchase agency debt and MBS during the first quarter of 2010, as of the date of this filing, demand for our long-term debt securities continues to be strong. See "MD&A—Liquidity and Capital Management—Liquidity Management" for more information on our debt funding activities and "Risk Factors" for a discussion of the risks to our business posed by our reliance on the issuance of debt securities to fund our operations.

## Outlook

*Overall Market Conditions.*   We expect weakness in the housing and mortgage markets to continue in 2011. The high level of delinquent mortgage loans will result in the foreclosure of troubled loans, which is likely to add to the excess housing inventory. Home sales are unlikely to rise before the unemployment rate improves. In addition, the servicer foreclosure process deficiencies described above create uncertainty for potential home buyers, because foreclosed homes account for a substantial part of the existing home market. Thus, widespread concerns about foreclosure process deficiencies could suppress home sales in the near term and interfere with the housing recovery.

We expect that single-family default and severity rates, as well as the level of single-family foreclosures, will remain high in 2011. Despite the initial signs of multifamily sector improvement, we expect multifamily

FHFA 1442

charge-offs to remain commensurate with 2010 levels throughout 2011. All of these conditions as well as our single-family serious delinquency rate may worsen if the unemployment rate increases on either a national or regional basis. We expect our overall business volume in 2011 will be lower than in 2010 as a result of our expectations that, in 2011 (1) residential mortgage debt outstanding will continue to decline, (2) total originations will decline, and (3) the portion of originations represented by refinancings will decline. Approximately 78% of our single-family business in 2010 consisted of refinancings.

*Home Price Declines.*   We expect that home prices on a national basis will decline slightly, with greater declines in some geographic areas than others, before stabilizing later in 2011, and that the peak-to-trough home price decline on a national basis will range between 21% and 26%. These estimates are based on our home price index, which is calculated differently from the S&P/Case-Shiller U.S. National Home Price Index and therefore results in different percentages for comparable declines. These estimates also contain significant inherent uncertainty in the current market environment regarding a variety of critical assumptions we make when formulating these estimates, including the effect of actions the federal government has taken and may take with respect to the national economic recovery; the management of the Federal Reserve's MBS holdings; and the impact of those actions on home prices, unemployment and the general economic and interest rate environment. Because of these uncertainties, the actual home price decline we experience may differ significantly from these estimates. We also expect significant regional variation in home price declines and stabilization.

Our 21% to 26% peak-to-trough home price decline estimate corresponds to an approximate 32% to 40% peak-to-trough decline using the S&P/Case-Shiller index method. Our estimates differ from the S&P/Case-Shiller index in two principal ways: (1) our estimates weight expectations by number of properties, whereas we believe the S&P/Case-Shiller index weights expectations based on property value, causing home price declines on higher priced homes to have a greater effect on the overall result; and (2) our estimates attempt to exclude sales of foreclosed homes because we believe that differing maintenance practices and the forced nature of the sales make foreclosed home prices less representative of market values, whereas we believe the S&P/Case-Shiller index includes foreclosed homes sales. The S&P/Case-Shiller comparison numbers are calculated using our models and assumptions, but modified to account for weighting based on property value and the impact of foreclosed property sales. In addition to these differences, our estimates are based on our own internally available data combined with publicly available data, and are therefore based on data collected nationwide, whereas the S&P/Case-Shiller index is based on publicly available data, which may be limited in certain geographic areas of the country. Our comparative calculations to the S&P/Case-Shiller index provided above are not modified to account for this data pool difference. We are working on enhancing our home price estimates to identify and exclude a greater portion of foreclosed home sales. When we begin reporting these enhanced home price estimates, we expect that some period to period comparisons of home prices may differ from those determined using our current estimates.

*Credit-Related Expenses and Credit Losses.*   We expect that our credit-related expenses will remain high in 2011 and that our credit losses will increase in 2011 as compared to 2010. We describe our credit loss outlook above under "Our Expectations Regarding Profitability, the Single-Family Loans We Acquired Beginning in 2009, and Credit Losses."

*Uncertainty Regarding our Long-Term Financial Sustainability and Future Status.*   There is significant uncertainty in the current market environment, and any changes in the trends in macroeconomic factors that we currently anticipate, such as home prices and unemployment, may cause our future credit-related expenses and credit losses to vary significantly from our current expectations. Although Treasury's funds under the senior preferred stock purchase agreement permit us to remain solvent and avoid receivership, the resulting dividend payments are substantial. Given our expectations regarding future losses, which we describe above under "Our Expectations Regarding Profitability, the Single-Family Loans We Acquired Beginning in 2009, and Credit Losses," we do not expect to earn profits in excess of our annual dividend obligation to Treasury for the indefinite future. As a result of these factors, there is significant uncertainty as to our long-term financial sustainability.

FHFA 1443

In addition, there is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. We expect this uncertainty to continue. In December 2009, while announcing amendments to the senior preferred stock purchase agreement and to Treasury's preferred stock purchase agreement with Freddie Mac, Treasury noted that the amendments "should leave no uncertainty about the Treasury's commitment to support [Fannie Mae and Freddie Mac] as they continue to play a vital role in the housing market during this current crisis." Treasury and HUD's February 11, 2011 report to Congress on reforming America's housing finance market provides that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding long-term reform of the GSEs. Please see "Legislation and GSE Reform" for a discussion of recent legislative reform of the financial services industry, and proposals for GSE reform, that could affect our business and "Risk Factors" for a discussion of the risks to our business relating to the uncertain future of our company.

## MORTGAGE SECURITIZATIONS

We support market liquidity by securitizing mortgage loans, which means we place loans in a trust and Fannie Mae MBS backed by the mortgage loans are then issued. We guarantee to the MBS trust that we will supplement amounts received by the MBS trust as required to permit timely payment of principal and interest on the trust certificates. In return for this guaranty, we receive guaranty fees.

Below we discuss (1) two broad categories of securitization transactions: lender swaps and portfolio securitizations; (2) features of our MBS trusts; (3) circumstances under which we purchase loans from MBS trusts; and (4) single-class and multi-class Fannie Mae MBS.

### Lender Swaps and Portfolio Securitizations

We currently securitize a majority of the single-family and multifamily mortgage loans we acquire. Our securitization transactions primarily fall within two broad categories: lender swap transactions and portfolio securitizations.

Our most common type of securitization transaction is our "lender swap transaction." Mortgage lenders that operate in the primary mortgage market generally deliver pools of mortgage loans to us in exchange for Fannie Mae MBS backed by these mortgage loans. A pool of mortgage loans is a group of mortgage loans with similar characteristics. After receiving the mortgage loans in a lender swap transaction, we place them in a trust that is established for the sole purpose of holding the mortgage loans separate and apart from our assets. We deliver to the lender (or its designee) Fannie Mae MBS that are backed by the pool of mortgage loans in the trust and that represent an undivided beneficial ownership interest in each of the mortgage loans. We guarantee to each MBS trust that we will supplement amounts received by the MBS trust as required to permit timely payment of principal and interest on the related Fannie Mae MBS. We retain a portion of the interest payment as the fee for providing our guaranty. Then, on behalf of the trust, we make monthly distributions to the Fannie Mae MBS certificateholders from the principal and interest payments and other collections on the underlying mortgage loans. The structured securitization transactions we describe below in "Business Segments—Capital Markets—Securitization Activities" involve a process that is very similar to the process involved in our lender swap securitizations.

In contrast to our lender swap securitizations, in which lenders deliver pools of mortgage loans to us that we immediately place in a trust for securitization, our "portfolio securitization transactions" involve creating and issuing Fannie Mae MBS using mortgage loans and mortgage-related securities that we hold in our mortgage portfolio.

FHFA 1444

### Features of Our MBS Trusts

We serve as trustee for our MBS trusts, each of which is established for the sole purpose of holding mortgage loans separate and apart from our assets. Our MBS trusts hold either single-family or multifamily mortgage loans or mortgage-related securities. Each trust operates in accordance with a trust agreement or a trust indenture. Each MBS trust is also governed by an issue supplement documenting the formation of that MBS trust, the identification of its related assets and the issuance of the related Fannie Mae MBS. The trust agreement or the trust indenture, together with the issue supplement and any amendments, are considered the "trust documents" that govern an individual MBS trust.

In 2010 we established a new multifamily master trust agreement that governs our multifamily MBS trusts formed on or after October 1, 2010. The new master trust agreement provides greater flexibility in certain servicing activities related to multifamily mortgage loans held in an MBS trust formed on or after that date.

### Purchases of Loans from our MBS Trusts

Under the terms of our MBS trust documents, we have the option or, in some instances, the obligation, to purchase mortgage loans that meet specific criteria from an MBS trust. In particular, we have the option to purchase a loan from an MBS trust if the loan is delinquent as to four or more consecutive monthly payments. Our acquisition cost for these loans is the unpaid principal balance of the loan plus accrued interest.

In deciding whether and when to purchase a loan from a single-family MBS trust, we consider a variety of factors, including: our legal ability or obligation to purchase loans under the terms of the trust documents; our mission and public policy; our loss mitigation strategies and the exposure to credit losses we face under our guaranty; our cost of funds; the impact on our results of operations; relevant market yields; the accounting impact; the administrative costs associated with purchasing and holding the loans; counterparty exposure to lenders that have agreed to cover losses associated with delinquent loans; general market conditions; our statutory obligations under our Charter Act; and other legal obligations such as those established by consumer finance laws. The weight we give to these factors changes depending on market circumstances and other factors.

With the adoption of new accounting standards on January 1, 2010, we no longer recognize the acquisition of loans from the MBS trusts that we have consolidated as a purchase with an associated fair value loss for the difference between the fair value of the acquired loan and its acquisition cost, as these loans are already reflected on our consolidated balance sheet. Currently, the cost of purchasing most delinquent loans from Fannie Mae MBS trusts and holding them in our portfolio is less than the cost of advancing delinquent payments to security holders. In light of these factors, in the first half of 2010 we significantly increased these purchases, purchasing the substantial majority of our previously outstanding delinquent loan population in our single-family MBS trusts. As a result, during 2010 we reduced the total unpaid principal balance of loans in single-family MBS trusts that were delinquent for four or more consecutive months to approximately $8 billion as of December 31, 2010 from approximately $127 billion as of December 31, 2009. We expect to continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other constraints, including the limit on mortgage assets that we may own pursuant to the senior preferred stock purchase agreement. We continue to review the economics of purchasing loans that are four or more months delinquent in the future and may reevaluate our delinquent loan purchase practices and alter them if circumstances warrant.

For our multifamily MBS trusts, we typically exercise our option to purchase a loan from the trust if the loan is delinquent, in whole or in part, as to four or more consecutive monthly payments.

### Single-Class and Multi-Class Fannie Mae MBS

Fannie Mae MBS trusts may be single-class or multi-class. Single-class MBS are MBS in which the investors receive principal and interest payments in proportion to their percentage ownership of the MBS issuance. Multi-class MBS are MBS, including REMICs, in which the cash flows on the underlying mortgage assets are divided, creating several classes of securities, each of which represents an undivided beneficial ownership

22

interest in the assets of the related MBS trust and entitles the related holder to a specific portion of cash flows. Terms to maturity of some multi-class Fannie Mae MBS, particularly REMIC classes, may match or be shorter than the maturity of the underlying mortgage loans and/or mortgage-related securities. After these classes expire, cash flows received on the underlying mortgage assets are allocated to the remaining classes in accordance with the terms of the securities' structures. As a result, each of the classes in a multi-class MBS may have a different coupon rate, average life, repayment sensitivity or final maturity. Structured Fannie Mae MBS are either multi-class MBS or single-class MBS that are typically resecuritizations of other single-class Fannie Mae MBS. In a resecuritization, pools of MBS are collected and securitized.

## BUSINESS SEGMENTS

We have three business segments for management reporting purposes: Single-Family Credit Guaranty, Multifamily, and Capital Markets. We refer to our business groups that run these segments as our "Single-Family business," our "Multifamily business" and our "Capital Markets group." These groups engage in complementary business activities in pursuing our mission of providing liquidity, stability and affordability to the U.S. housing market. These activities are summarized in the table below and described in more detail following this table. We also summarize in the table below the key sources of revenue for each of our segments and the primary expenses.

| Business Segment | Primary Business Activities | Primary Revenues | Primary Expenses |
|---|---|---|---|
| Single-Family Credit Guaranty, or Single-Family | • *Mortgage securitizations:* Works with our lender customers to securitize single-family mortgage loans delivered to us by lenders into Fannie Mae MBS, which we refer to as "lender swap" transactions<br><br>• *Mortgage acquisitions:* Works with our Capital Markets group to facilitate the purchase of single-family mortgage loans for our mortgage portfolio<br><br>• *Credit risk management:* Prices and manages the credit risk on loans in our single-family guaranty book of business<br><br>• *Credit loss management:* Works to prevent foreclosures and reduce costs of defaulted loans through foreclosure alternatives, through management of REO we acquire upon foreclosure or through a deed-in-lieu of foreclosure, and through lender repurchases | • *Guaranty fees:* Compensation for assuming and managing the credit risk on our single-family guaranty book of business<br><br>• *Fee and other income:* Compensation received for providing lender services | • *Credit-related expenses.* Consists of provision for single-family loan losses, provision for single-family guaranty losses and foreclosed property expense on loans underlying our single-family guaranty book of business<br><br>• *Administrative expenses:* Consists of salaries and benefits, occupancy costs, professional services, and other expenses associated with the Single-Family business operations |

| Business Segment | Primary Business Activities | Primary Revenues | Primary Expenses |
|---|---|---|---|
| Multifamily | • *Mortgage securitizations:* Works with our lender customers to securitize multifamily mortgage loans delivered to us by lenders into Fannie Mae MBS in lender swap transactions<br><br>• *Mortgage acquisitions:* Works with our Capital Markets group to facilitate the purchase of multifamily mortgage loans for our mortgage portfolio<br><br>• *Affordable housing investments*:  Provides funding for investments in affordable multifamily rental housing projects<br><br>• *Credit risk management:* Prices and manages the credit risk on loans in our multifamily guaranty book of business<br><br>• *Credit loss management:* Works to prevent foreclosures and reduce costs of defaulted loans through foreclosure alternatives, through management of REO we acquire upon foreclosure or through a deed-in-lieu of foreclosure, and through lender repurchases | • *Guaranty fees:* Compensation for assuming and managing the credit risk on our multifamily guaranty book of business<br><br>• *Fee and other income*: Compensation received for engaging in multifamily transactions and bond credit enhancements | • *Credit-related expenses:* Consists of provision for multifamily loan losses, provision for multifamily guaranty losses and foreclosed property expense on loans underlying our multifamily guaranty book of business<br><br>• *Net operating losses:* Generated by our affordable housing investments, net of any tax benefits generated by these investments that we are able to utilize<br><br>• *Administrative expenses:* Consists of salaries and benefits, occupancy costs, professional services, and other expenses associated with our Multifamily business operations |

24

FHFA 1447

| Business Segment | Primary Business Activities | Primary Revenues | Primary Expenses |
|---|---|---|---|
| Capital Markets | • *Mortgage and other investments:* Purchases mortgage assets and makes investments in other non-mortgage interest-earning assets<br><br>• *Mortgage securitizations:* Purchases loans from a large group of lenders, securitizes them, and may sell the securities to dealers and investors<br><br>• *Structured mortgage securitizations and other customer services:* Issues structured Fannie Mae MBS for customers in exchange for a transaction fee and provides other fee-related services to our lender customers<br><br>• *Interest rate risk management:* Manages the interest rate risk on our portfolio by issuing a variety of debt securities in a wide range of maturities and by using derivatives | • *Net interest income:* Generated from the difference between the interest income earned on our interest-earning assets and the interest expense associated with the debt funding those assets<br><br>• *Fee and other income:* Compensation received for providing structured transactions and other lender services | • *Fair value gains and losses:* Primarily consists of fair value gains and losses on derivatives and trading securities<br><br>• *Investment gains and losses:* Primarily consists of gains and losses on the sale or securitization of mortgage assets<br><br>• *Other-than-temporary impairment:* Consists of impairment recognized on our investments<br><br>• *Administrative expenses:* Consists of salaries and benefits, occupancy costs, professional services, and other expenses associated with our Capital Markets business operations |

### Revenues from our Business Segments

The following table shows the percentage of our total net revenues accounted for by our business segments for each of the last three years. Our prospective adoption of the new accounting standards had a significant impact on our financial statements. Also, effective in 2010 we changed the presentation of segment financial information that is currently evaluated by management. As a result of the new accounting standards and changes to our segment presentation, our 2010 segment results are not comparable to prior years' segment results. We have not restated prior years' results, nor have we presented 2010 results under the old presentation, because we determined that it was impracticable to do so. For more information about changes in our segment reporting and the financial results and performance of each of our segments, please see "MD&A—Business Segment Results" and "Note 15, Segment Reporting."

### Business Segment Revenues[1]

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2010[2] | 2009 | 2008 |
| Single-Family Credit Guaranty | 12% | 39% | 54% |
| Multifamily[3] | 5 | 3 | 3 |
| Capital Markets | 77 | 58 | 43 |

[1] Amounts presented represent the percentage of our total net revenues accounted for by each of our business segments.

[2] Segment results for 2010 are not comparable with prior years' results. In addition, under our current segment reporting structure, the sum of net revenues for our three business segments does not equal our consolidated total net revenues because we separate the activity related to our consolidated trusts from the results generated by our three segments.

[3] These amounts do not include the net interest income we earn on our multifamily investments in our mortgage portfolio, which is reflected in the revenues of our Capital Markets segment.

FHFA 1448

Under the terms of our intracompany guaranty arrangement, Capital Markets receives reimbursements primarily from Single-Family for the contractual interest due on mortgage loans held in our portfolio when interest income on the loans is no longer recognized in accordance with our nonaccrual accounting policy. As a result, the substantial increase in the number of nonaccrual loans purchased from our consolidated MBS trusts in 2010 significantly increased Capital Markets' net revenue in 2010, while reducing the net revenues of Single-Family.

**Single-Family Business**

Our Single-Family business works with our lender customers to provide funds to the mortgage market by securitizing single-family mortgage loans into Fannie Mae MBS. Our Single-Family business also works with our Capital Markets group to facilitate the purchase of single-family mortgage loans for our mortgage portfolio. Our Single-Family business has primary responsibility for pricing and managing the credit risk on our single-family guaranty book of business, which consists of single-family mortgage loans underlying Fannie Mae MBS and single-family loans held in our mortgage portfolio.

A single-family loan is secured by a property with four or fewer residential units. Our Single-Family business and Capital Markets group securitize and purchase primarily conventional (not federally insured or guaranteed) single-family fixed-rate or adjustable-rate, first lien mortgage loans, or mortgage-related securities backed by these types of loans. We also securitize or purchase loans insured by FHA, loans guaranteed by the Department of Veterans Affairs ("VA"), and loans guaranteed by the Rural Development Housing and Community Facilities Program of the Department of Agriculture, manufactured housing loans, reverse mortgage loans, multifamily mortgage loans, subordinate lien mortgage loans (for example, loans secured by second liens) and other mortgage-related securities.

Revenues for our Single-Family business are derived primarily from guaranty fees received as compensation for assuming the credit risk on the mortgage loans underlying single-family Fannie Mae MBS. We also allocate guaranty fee revenues to the Single-Family business for assuming and managing the credit risk on the single-family mortgage loans held in our portfolio. The aggregate amount of single-family guaranty fees we receive or that are allocated to our Single-Family business in any period depends on the amount of single-family Fannie Mae MBS outstanding and loans held in our mortgage portfolio during the period and the applicable guaranty fee rates. The amount of Fannie Mae MBS outstanding at any time is primarily determined by the rate at which we issue new Fannie Mae MBS and by the repayment rate for the loans underlying our outstanding Fannie Mae MBS. Other factors affecting the amount of Fannie Mae MBS outstanding are the extent to which (1) we purchase loans from our MBS trusts because of borrower defaults (with the amount of these purchases affected by the rate of borrower defaults on the loans and the extent of loan modification programs in which we engage) and (2) sellers and servicers repurchase loans from us upon our demand based on a breach in the selling representations and warranties provided upon delivery of the loans.

We describe the credit risk management process employed by our Single-Family business, including its key strategies in managing credit risk and key metrics used in measuring and evaluating our single-family credit risk in "MD&A—Risk Management—Credit Risk Management."

*Single-Family Mortgage Securitizations and Acquisitions*

Our Single-Family business securitizes single-family mortgage loans and issues single-class Fannie Mae MBS, which are described above in "Mortgage Securitizations—Single-Class and Multi-Class Fannie Mae MBS," for our lender customers. Unlike our Capital Markets group, which securitizes loans from our portfolio, our Single-Family business securitizes loans solely in lender swap transactions, in which lenders deliver pools of mortgage loans to us, which are placed immediately in a trust, in exchange for Fannie Mae MBS backed by these loans. We describe lender swap transactions, and how they differ from portfolio securitizations, in "Mortgage Securitizations—Lender Swaps and Portfolio Securitizations."

Loans from our lender customers are delivered to us through either our "flow" or "bulk" transaction channels. In our flow business, we enter into agreements that generally set agreed-upon guaranty fee prices for a

26

lender's future delivery of individual loans to us over a specified time period. Our bulk business generally consists of transactions in which a set of loans is delivered to us in bulk, typically with guaranty fees and other contract terms negotiated individually for each transaction.

### Single-Family Mortgage Servicing

#### Servicing

Generally, the servicing of the mortgage loans held in our mortgage portfolio or that back our Fannie Mae MBS is performed by mortgage servicers on our behalf. Typically, lenders who sell single-family mortgage loans to us service these loans for us. For loans we own or guarantee, the lender or servicer must obtain our approval before selling servicing rights to another servicer.

Our mortgage servicers typically collect and deliver principal and interest payments, administer escrow accounts, monitor and report delinquencies, perform default prevention activities, evaluate transfers of ownership interests, respond to requests for partial releases of security, and handle proceeds from casualty and condemnation losses. Our mortgage servicers are the primary point of contact for borrowers and perform a key role in the effective implementation of our homeownership assistance initiatives, negotiation of workouts of troubled loans, and loss mitigation activities. If necessary, mortgage servicers inspect and preserve properties and process foreclosures and bankruptcies. Because we generally delegate the servicing of our mortgage loans to mortgage servicers and do not have our own servicing function, our ability to actively manage troubled loans that we own or guarantee may be limited. For more information on the risks of our reliance on servicers, refer to "Risk Factors" and "MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management."

We compensate servicers primarily by permitting them to retain a specified portion of each interest payment on a serviced mortgage loan as a servicing fee. Servicers also generally retain prepayment premiums, assumption fees, late payment charges and other similar charges, to the extent they are collected from borrowers, as additional servicing compensation. We also compensate servicers for negotiating workouts on problem loans.

In January 2011, FHFA announced that it directed Fannie Mae and Freddie Mac to work on a joint initiative, in coordination with FHFA and HUD, to consider alternatives for future mortgage servicing structures and servicing compensation for their single-family mortgage loans. Alternatives that may be considered include a fee for service compensation structure for nonperforming loans, as well as the possibility of reducing or eliminating the minimum mortgage servicing fee for performing loans, or other structures. In its announcement, FHFA stated that any implementation of a new servicing compensation structure would not be expected to occur before summer 2012.

#### REO Management and Lender Repurchase Evaluations

In the event a loan defaults and we acquire a home through foreclosure or a deed-in-lieu of foreclosure, we focus on selling the home through a national network of real estate agents. Our primary objectives are both to minimize the severity of loss to Fannie Mae by maximizing sales prices and also to stabilize neighborhoods—to prevent empty homes from depressing home values. We also continue to seek non-traditional ways to sell properties, including by selling homes to cities, municipalities and other public entities, and by selling properties in bulk or through public auctions.

We also conduct post-purchase quality control file reviews to ensure that loans sold to and serviced for us meet our guidelines. If we discover violations through reviews, we issue repurchase demands to the seller and seek to collect on our repurchase claims.

### Multifamily Business

A core part of Fannie Mae's mission is to support the U.S. multifamily housing market to help serve the nation's rental housing needs, focusing on low- to middle-income households and communities. Multifamily mortgage loans relate to properties with five or more residential units, which may be apartment communities,

27

cooperative properties or manufactured housing communities. During 2010, we changed the name of our multifamily business division from Housing and Community Development to Multifamily Mortgage Business. The new name better reflects the division's realignment to focus on our core multifamily activities and the discontinuation of some of our non-mortgage secured debt and equity investment activities as instructed by FHFA.

Our Multifamily business works with our lender customers to provide funds to the mortgage market by securitizing multifamily mortgage loans into Fannie Mae MBS. Through our Multifamily business, we provide liquidity and support to the U.S. multifamily housing market principally by purchasing or securitizing loans that finance multifamily rental housing properties. We also provide some limited debt financing for other acquisition, development, construction and rehabilitation activity related to projects that complement this business. Our Multifamily business also works with our Capital Markets group to facilitate the purchase and securitization of multifamily mortgage loans and securities for Fannie Mae's portfolio, as well as to facilitate portfolio securitization and resecuritization activities. Our multifamily guaranty book of business consists of multifamily mortgage loans underlying Fannie Mae MBS and multifamily loans and securities held in our mortgage portfolio. Our Multifamily business has primary responsibility for pricing the credit risk on our multifamily guaranty book of business and for managing the credit risk on multifamily loans and Fannie Mae MBS backed by multifamily loans that are held in our mortgage portfolio.

Revenues for our Multifamily business are derived from a variety of sources, including: (1) guaranty fees received as compensation for assuming the credit risk on the mortgage loans underlying multifamily Fannie Mae MBS and on the multifamily mortgage loans held in our portfolio and on other mortgage-related securities; (2) transaction fees associated with the multifamily business and (3) other bond credit enhancement related fees.

We describe the credit risk management process employed by our Multifamily business, along with our Multifamily Enterprise Risk Management group, including its key strategies in managing credit risk and key metrics used in measuring and evaluating our multifamily credit risk, in "MD&A—Risk Management—Credit Risk Management—Multifamily Mortgage Credit Risk Management."

### Key Characteristics of the Multifamily Mortgage Market and Multifamily Transactions

The multifamily mortgage market and our transactions in that market have a number of key characteristics that affect our multifamily activities and distinguish them from our activities in the single-family residential mortgage market.

- *Funding sources:*   Unlike the single-family residential mortgage market in which the GSEs' predominance makes us a driver of market standards and rates, the multifamily market is made up of a wide variety of lending sources, including commercial banks, life insurance companies, investment banks, small community banks, FHA, state and local housing finance agencies and the GSEs.

- *Number of lenders; lender relationships:*   In 2010, we executed multifamily transactions with 32 lenders. Of these, 24 lenders delivered loans to us under our Delegated Underwriting and Servicing, or DUS®, product line. In determining whether to do business with a multifamily lender, we consider the lender's financial strength, multifamily underwriting and servicing experience, portfolio performance and willingness and ability to share in the risk of loss associated with the multifamily loans they originate.

- *Loan size:*   On average, loans in our multifamily guaranty book of business are several million dollars in size. A significant number of our multifamily loans are under $5 million, and some of our multifamily loans are greater than $25 million.

- *Collateral:*   Multifamily loans are collateralized by properties that generate cash flows, such as garden and high-rise apartment complexes, seniors housing communities, cooperatives, dedicated student housing and manufactured housing communities. These rental properties are operated as businesses.

- *Borrower profile:*   Most multifamily borrowers are for-profit corporations, limited liability companies, partnerships, real estate investment trusts and individuals who invest in real estate for cash flow and

FHFA 1451

equity returns in exchange for their original investment in the asset. Multifamily loans are generally non-recourse to the borrower. When considering a multifamily borrower, creditworthiness is evaluated through a combination of quantitative and qualitative data including liquid assets, net worth, number of units owned, experience in a market and/or property type, multifamily portfolio performance, access to additional liquidity, debt maturities, asset/property management platform, senior management experience, reputation and lender exposure.

- *Borrower and lender investment:*   Borrowers are required to contribute cash equity into multifamily properties on which they borrow, while lenders generally share in any losses realized from the loans that we purchase.

- *Underwriting process:*   Some multifamily loans require a detailed underwriting process due to the size of the loan or the complexity of the collateral or transaction.

- *Term and lifecycle:*   In contrast to the standard 30-year single-family residential loan, multifamily loans typically have terms of 5, 7 or 10 years, with balloon payments due at maturity.

- *Prepayment terms:*   Multifamily Fannie Mae loans and MBS trade in a market in which investors expect commercial investment terms, particularly limitations on prepayments of loans and the imposition of prepayment premiums.

### *Multifamily Mortgage Securitizations and Acquisitions*

Our Multifamily business generally creates multifamily Fannie Mae MBS and acquires multifamily mortgage assets in the same manner as our Single-Family business, as described above in "Single-Family Business— Mortgage Securitizations and Acquisitions."

### Delegated Underwriting and Servicing (DUS)

In an effort to promote product standardization in the multifamily marketplace, in 1988 Fannie Mae initiated the DUS product line for acquiring individual multifamily loans.

DUS is a unique business model in the commercial mortgage industry. The standard industry practice for a multifamily loan requires the purchaser or guarantor to underwrite or re-underwrite each loan prior to deciding whether to purchase or guaranty the loan. Under our model, DUS lenders are pre-approved and delegated the authority to underwrite and service loans on behalf of Fannie Mae. In exchange for this authority, DUS lenders are required to share with us the risk of loss over the life of the loan, generally retaining one-third of the underlying credit risk on each loan sold to Fannie Mae. Since DUS lenders share in the credit risk, the servicing fee to the lenders includes compensation for credit risk. Delegation permits lenders to respond to customers more rapidly, as the lender generally has the authority to approve a loan within prescribed parameters, which provides an important competitive advantage.

We believe our DUS model aligns the interests of the borrower, lender and Fannie Mae. Our current 25-member DUS lender network, which is comprised of large financial institutions and independent mortgage lenders, continues to be our principal source of multifamily loan deliveries.

Fannie Mae MBS secured by DUS loans are typically backed by a single mortgage loan, which is often a fixed-rate loan. We believe this structure increases the liquidity of the securities in the market. Structuring MBS to be backed by a single multifamily loan also facilitates securitizations by our smaller lenders.

### *Multifamily Mortgage Servicing*

As with the servicing of single-family mortgages, multifamily mortgage servicing is typically performed by the lenders who sell the mortgages to us. Many of our multifamily mortgage servicers have agreed, as part of the DUS relationship, to accept loss sharing, which we believe increases the alignment of interests between us and our multifamily loan servicers. Because of our loss-sharing arrangements with our multifamily lenders, transfers of multifamily servicing rights are infrequent, and we carefully monitor all our servicing relationships and enforce our right to approve all servicing transfers. As a seller-servicer, the lender is responsible for

29

evaluating the financial condition of properties and property owners, administering various types of agreements (including agreements regarding replacement reserves, completion or repair, and operations and maintenance), as well as conducting routine property inspections.

### The Multifamily Markets in which We Operate

In the multifamily mortgage market, we aim to address the rental housing needs of a wide range of the population, from those at the lower end of the income range up through middle-income households. Our mission requires us to serve the market steadily, rather than moving in and out depending on market conditions. Through the secondary mortgage market, we support rental housing for the workforce, for senior citizens and students, and for families with the greatest economic need. Our Multifamily business is organized and operated as an integrated commercial real estate finance business, with dedicated teams that address the spectrum of multifamily housing finance needs, including the teams described below.

- To meet the growing need for affordable financing, we have a team that focuses on the purchase and guarantee of multifamily loans under $3 million ($5 million in high income areas), which finance affordable housing. We purchase these loans from DUS lenders as well as small community banks and nonprofits or similar entities. Over the years, we have been an active purchaser of these loans from both DUS and non-DUS lenders and, as of December 31, 2010, they represented 70% of our multifamily guaranty book of business by loan count and 18% based on unpaid principal balance.

- To serve low- and very low-income households, we also have a team that focuses exclusively on relationships with lenders financing privately-owned multifamily properties that receive public subsidies in exchange for maintaining long-term affordable rents. We enable borrowers to leverage housing programs and subsidies provided by local, state and federal agencies. These public subsidy programs are largely targeted to providing housing to families earning less than 60% of area median income (as defined by HUD) and are structured to ensure that the low and very low-income households who benefit from the subsidies pay no more than 30% of their gross monthly income for rent and utilities. As of December 31, 2010, this type of financing represented approximately 14% of our multifamily guaranty book of business, based on unpaid principal balance, including $16.5 billion in bond credit enhancements.

## Capital Markets

Our Capital Markets group manages our investment activity in mortgage-related assets and other interest-earning non-mortgage investments. We fund our investments primarily through proceeds we receive from the issuance of debt securities in the domestic and international capital markets. Our Capital Markets group has primary responsibility for managing the interest rate risk associated with our investments in mortgage assets.

The business model for our Capital Markets group has evolved in recent years. Our business activity is now focused on making short-term use of our balance sheet rather than long-term investments. As a result, our Capital Markets group works with lender customers to provide funds to the mortgage market through short-term financing and investing activities. Activities we are undertaking to provide liquidity to the mortgage market include the following:

- *Whole Loan Conduit.*   Whole loan conduit activities involve our purchase of both single-family and multifamily loans principally for the purpose of securitizing them. We purchase loans from a large group of lenders and then securitize them as Fannie Mae MBS, which may then be sold to dealers and investors.

- *Early Funding.*   Lenders who deliver whole loans or pools of whole loans to us in exchange for MBS typically must wait between 30 and 45 days from the closing and settlement of the loans or pools and the issuance of the MBS. This delay may limit lenders' ability to originate new loans. Under our early lender funding programs, we purchase whole loans or pools of loans on an accelerated basis, allowing lenders to receive quicker payment for the whole loans and pools, which replenishes their funds and allows them to originate more mortgage loans.

FHFA 1453

- *REMICs and Other Structured Securitizations.*   We issue structured Fannie Mae MBS (including REMICs), typically for our lender customers or securities dealer customers, in exchange for a transaction fee.

- *Dollar Roll Transactions.*   We engaged in dollar roll activity in 2010, but the transaction volume was lower than in 2009 and 2008 due to lower market demand for short-term financing. A dollar roll transaction is a commitment to purchase a mortgage-related security with a concurrent agreement to re-sell a substantially similar security at a later date or vice versa.

In 2010, our Capital Markets group substantially increased the amount of loans purchased out of our single-family MBS trusts because, as a result of the adoption of the new accounting standards, the cost of purchasing most delinquent loans from Fannie Mae MBS trusts and holding them in our portfolio is less than the cost of advancing delinquent payments to security holders.

### Securitization Activities

Our Capital Markets group is engaged in issuing both single-class and multi-class Fannie Mae MBS through both portfolio securitizations and structured securitizations involving third party assets.

- *Portfolio securitizations.*   Our Capital Markets group creates single-class and multi-class Fannie Mae MBS from mortgage-related assets held in our mortgage portfolio. Our Capital Markets group may sell these Fannie Mae MBS into the secondary market or may retain the Fannie Mae MBS in our investment portfolio.

- *Structured securitizations:*   Our Capital Markets group creates single-class and multi-class structured Fannie Mae MBS, typically for our lender customers or securities dealer customers, in exchange for a transaction fee. In these transactions, the customer "swaps" a mortgage-related asset that it owns (typically a mortgage security) in exchange for a structured Fannie Mae MBS we issue. Our Capital Markets group earns transaction fees for creating structured Fannie Mae MBS for third parties. The process for issuing Fannie Mae MBS in a structured securitization is similar to the process involved in our lender swap securitizations. For more information about that process and how it differs from portfolio securitizations, please see "Mortgage Securitizations—Lender Swaps and Portfolio Securitizations."

For a description of single-class Fannie Mae MBS, please see "Mortgage Securitizations—Single-Class and Multi-Class Fannie Mae MBS."

### Other Customer Services

Our Capital Markets group provides our lender customers and their affiliates with services that include offering to purchase a wide variety of mortgage assets, including non-standard mortgage loan products; segregating customer portfolios to obtain optimal pricing for their mortgage loans; and assisting customers with hedging their mortgage business. These activities provide a significant flow of assets for our mortgage portfolio, help to create a broader market for our customers and enhance liquidity in the secondary mortgage market.

### Mortgage Asset Portfolio

Although our Capital Markets group's business activities are focused on short-term financing and investing, revenue from our Capital Markets group is derived primarily from the difference, or spread, between the interest we earn on our mortgage and non-mortgage investments and the interest we incur on the debt we issue to fund these assets. Our Capital Markets revenues are primarily derived from our mortgage asset portfolio. Over time, we expect these revenues to decrease as the maximum allowable size of our mortgage asset portfolio decreases by 10% annually under our senior preferred stock purchase agreement with Treasury. See "Conservatorship and Treasury Agreements—Treasury Agreements—Covenants under Treasury Agreements" for more information on the decreasing limits on the amount of mortgage assets we are permitted to hold.

We describe the interest rate risk management process employed by our Capital Markets group, including its key strategies in managing interest rate risk and key metrics used in measuring and evaluating our interest rate risk in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk."

### Investment and Financing Activities

Our Capital Markets group seeks to increase the liquidity of the mortgage market by maintaining a presence as an active investor in mortgage loans and mortgage-related securities and, in particular, supports the liquidity and value of Fannie Mae MBS in a variety of market conditions.

Our Capital Markets group funds its investments primarily through the issuance of a variety of debt securities in a wide range of maturities in the domestic and international capital markets. The most active investors in our debt securities include commercial bank portfolios and trust departments, investment fund managers, insurance companies, pension funds, state and local governments, and central banks. The approved dealers for underwriting various types of Fannie Mae debt securities may differ by funding program. See "MD&A— Liquidity and Capital Management—Liquidity Management" for information on the composition of our outstanding debt and a discussion of our liquidity.

Our Capital Markets group's investment and financing activities are affected by market conditions and the target rates of return that we expect to earn on the equity capital underlying our investments. When we estimate that we can earn returns in excess of our targets, we generally will be an active purchaser of mortgage loans and mortgage-related securities. When potential returns are below our investment targets, we generally will be a less active purchaser, and may be a net seller, of mortgage assets. Our investment activities also are subject to contractual limitations, the provisions of the senior preferred stock agreement with Treasury, capital requirements (although our regulator has announced that these are not binding on us during conservatorship) and other regulatory constraints, to the extent described below under "Conservatorship and Treasury Agreements" and "Our Charter and Regulation of Our Activities."

## CONSERVATORSHIP AND TREASURY AGREEMENTS

### Conservatorship

On September 6, 2008, the Director of FHFA appointed FHFA as our conservator, pursuant to its authority under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Federal Housing Finance Regulatory Reform Act of 2008, or 2008 Reform Act (together, the "GSE Act"). The conservatorship is a statutory process designed to preserve and conserve our assets and property, and put the company in a sound and solvent condition.

The conservatorship has no specified termination date and there continues to be uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. For more information on the risks to our business relating to the conservatorship and uncertainties regarding the future of our company and business, as well as the adverse effects of the conservatorship on the rights of holders of our common stock, please see "Risk Factors."

### Management of the Company during Conservatorship

Upon its appointment, the conservator immediately succeeded to (1) all rights, titles, powers and privileges of Fannie Mae, and of any shareholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and (2) title to the books, records and assets of any other legal custodian of Fannie Mae. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. The conservator retains the authority to withdraw its delegations at any time.

FHFA 1455

Our directors serve on behalf of the conservator and exercise their authority as directed by and with the approval, where required, of the conservator. Our directors do not have any duties to any person or entity except to the conservator. Accordingly, our directors are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator. In addition, the conservator directed the Board to consult with and obtain the approval of the conservator before taking action in specified areas, as described in "Directors, Executive Officers and Corporate Governance—Corporate Governance—Conservatorship and Delegation of Authority to Board of Directors."

Because we are in conservatorship, our common shareholders currently do not have the ability to elect directors or to vote on other matters. The conservator eliminated common and preferred stock dividends (other than dividends on the senior preferred stock issued to Treasury) during the conservatorship, and we are no longer managed with a strategy to maximize shareholder returns. In a letter to Congress dated February 2, 2010, the Acting Director of FHFA stated that minimizing our credit losses is our central goal and that we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship. The Acting Director also stated that FHFA does not expect that we will be a substantial buyer or seller of mortgages for our retained portfolio, except for purchases of delinquent mortgages out of our guaranteed MBS pools. For additional information about our business strategy, please see "Executive Summary—Our Business Objectives and Strategy."

### Powers of the Conservator under the GSE Act

FHFA has broad powers when acting as our conservator. As conservator, FHFA can direct us to enter into contracts or enter into contracts on our behalf. Further, FHFA may transfer or sell any of our assets or liabilities (subject to limitations and post-transfer notice provisions for transfers of certain types of financial contracts), without any approval, assignment of rights or consent of any party. The GSE Act provides, however, that mortgage loans and mortgage-related assets that have been transferred to a Fannie Mae MBS trust must be held by the conservator for the beneficial owners of the Fannie Mae MBS and cannot be used to satisfy the general creditors of the company. As of February 24, 2011, FHFA has not exercised its power to transfer or sell our assets or liabilities.

In addition, FHFA has the power to disaffirm or repudiate most contracts that we entered into prior to its appointment as conservator, provided that it exercises this power within a "reasonable period" following such appointment. FHFA's proposed rule on conservatorship and receivership operations, published on July 9, 2010, defines a "reasonable period" as a period of 18 months following the appointment of a conservator or receiver. This proposed rule has not been finalized. As of February 24, 2011, FHFA has not disaffirmed or repudiated any contracts we entered into prior to its appointment as conservator.

Neither the conservatorship nor the terms of our agreements with Treasury changes our obligation to make required payments on our debt securities or perform under our mortgage guaranty obligations.

Under the GSE Act, FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations (that is, we have a net worth deficit) or if we have not been paying our debts, in either case, for a period of 60 days. In addition, the Director of FHFA may place us in receivership at his discretion at any time for other reasons, including conditions that FHFA has already asserted existed at the time the Director of FHFA placed us into conservatorship. Placement into receivership would have a material adverse effect on holders of our common stock, preferred stock, debt securities and Fannie Mae MBS. Should we be placed into receivership, different assumptions would be required to determine the carrying value of our assets, which could lead to substantially different financial results. For more information on the risks to our business relating to conservatorship and uncertainties regarding the future of our business, see "Risk Factors."

### Treasury Agreements

On September 7, 2008, we, through FHFA, in its capacity as conservator, and Treasury entered into a senior preferred stock purchase agreement, which was subsequently amended on September 26, 2008, May 6, 2009

FHFA 1456

and December 24, 2009. Unless the context indicates otherwise, references in this report to the senior preferred stock purchase agreement refer to the agreement as amended through December 24, 2009. The terms of the senior preferred stock purchase agreement, senior preferred stock and the warrant discussed below will continue to apply to us even if we are released from the conservatorship. Please see "Risk Factors" for a description of the risks to our business relating to the Treasury agreements, as well as the adverse effects of the senior preferred stock and the warrant on the rights of holders of our common stock and other series of preferred stock.

### Senior Preferred Stock Purchase Agreement and Related Issuance of Senior Preferred Stock and Common Stock Warrant

#### Senior Preferred Stock Purchase Agreement

Under the senior preferred stock purchase agreement, we issued to Treasury (a) one million shares of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2, which we refer to as the "senior preferred stock," and (b) a warrant to purchase, for a nominal price, shares of common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis at the time the warrant is exercised, which we refer to as the "warrant."

The senior preferred stock and warrant were issued to Treasury as an initial commitment fee in consideration of the commitment from Treasury to provide funds to us under the terms and conditions set forth in the senior preferred stock purchase agreement. The senior preferred stock purchase agreement provides that, on a quarterly basis, we generally may draw funds up to the amount, if any, by which our total liabilities exceed our total assets, as reflected on our consolidated balance sheet, prepared in accordance with GAAP, for the applicable fiscal quarter (referred to as the "deficiency amount").

On December 24, 2009, the maximum amount of Treasury's funding commitment to us under the senior preferred stock purchase agreement was increased pursuant to an amendment to the agreement. The amendment provides that the maximum amount under the senior preferred stock purchase agreement will increase as necessary to accommodate any net worth deficits for calendar quarters in 2010 through 2012. For any net worth deficits after December 31, 2012, Treasury's remaining funding commitment will be $124.8 billion, ($200 billion less the $75.2 billion cumulatively drawn through March 31, 2010), less the smaller of either (a) our positive net worth as of December 31, 2012 or (b) our cumulative draws from Treasury for the calendar quarters in 2010 through 2012.

In announcing the December 24, 2009 amendments to the senior preferred stock purchase agreement and to Treasury's preferred stock purchase agreement with Freddie Mac, Treasury noted that the amendments "should leave no uncertainty about the Treasury's commitment to support [Fannie Mae and Freddie Mac] as they continue to play a vital role in the housing market during this current crisis." The senior preferred stock purchase agreement provides that the deficiency amount will be calculated differently if we become subject to receivership or other liquidation process. We discuss our net worth deficits and FHFA's requests on our behalf for funds from Treasury in "Executive Summary—Summary of our Financial Performance for 2010."

Under the senior preferred stock purchase agreement, beginning on March 31, 2011, we were scheduled to begin paying a quarterly commitment fee to Treasury. On December 29, 2010, Treasury notified FHFA that Treasury was waiving the commitment fee for the first quarter of 2011 due to adverse conditions in the U.S. mortgage market and because it believed that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury further noted that it would reevaluate matters in the next calendar quarter to determine whether to set the quarterly commitment fee under the senior preferred stock purchase agreement.

The senior preferred stock purchase agreement provides that the Treasury's funding commitment will terminate under any of the following circumstances: (1) the completion of our liquidation and fulfillment of Treasury's obligations under its funding commitment at that time, (2) the payment in full of, or reasonable provision for, all of our liabilities (whether or not contingent, including mortgage guaranty obligations), or (3) the funding by Treasury of the maximum amount that may be funded under the agreement. In addition,

Treasury may terminate its funding commitment and declare the senior preferred stock purchase agreement null and void if a court vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of the conservator or otherwise curtails the conservator's powers. Treasury may not terminate its funding commitment under the agreement solely by reason of our being in conservatorship, receivership or other insolvency proceeding, or due to our financial condition or any adverse change in our financial condition.

The senior preferred stock purchase agreement provides that most provisions of the agreement may be waived or amended by mutual written agreement of the parties; however, no waiver or amendment of the agreement is permitted that would decrease Treasury's aggregate funding commitment or add conditions to Treasury's funding commitment if the waiver or amendment would adversely affect in any material respect the holders of our debt securities or guaranteed Fannie Mae MBS.

In the event of our default on payments with respect to our debt securities or guaranteed Fannie Mae MBS, if Treasury fails to perform its obligations under its funding commitment and if we and/or the conservator are not diligently pursuing remedies in respect of that failure, the holders of our debt securities or Fannie Mae MBS may file a claim in the United States Court of Federal Claims for relief requiring Treasury to fund to us the lesser of (1) the amount necessary to cure the payment defaults on our debt and Fannie Mae MBS and (2) the lesser of (a) the deficiency amount and (b) the maximum amount that may be funded under the agreement less the aggregate amount of funding previously provided under the commitment. Any payment that Treasury makes under those circumstances will be treated for all purposes as a draw under the senior preferred stock purchase agreement that will increase the liquidation preference of the senior preferred stock.

### Senior Preferred Stock

Pursuant to the senior preferred stock purchase agreement, we issued one million shares of senior preferred stock to Treasury on September 8, 2008 with an aggregate initial liquidation preference of $1.0 billion. The stock's liquidation preference is subject to adjustment. Dividends that are not paid in cash for any dividend period will accrue and be added to the liquidation preference. In addition, any amounts Treasury pays to us pursuant to its funding commitment under the senior preferred stock purchase agreement and any quarterly commitment fees that are either not paid in cash to Treasury or not waived by Treasury will be added to the liquidation preference. Accordingly, the aggregate liquidation preference of the senior preferred stock was $88.6 billion as of December 31, 2010 and will increase to $91.2 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2010.

Treasury, as holder of the senior preferred stock, is entitled to receive, when, as and if declared by our Board of Directors, out of legally available funds, cumulative quarterly cash dividends at the annual rate of 10% per year on the then-current liquidation preference of the senior preferred stock. If at any time we fail to pay cash dividends in a timely manner, then immediately following such failure and for all dividend periods thereafter until the dividend period following the date on which we have paid in cash full cumulative dividends (including any unpaid dividends added to the liquidation preference), the dividend rate will be 12% per year.

The senior preferred stock ranks ahead of our common stock and all other outstanding series of our preferred stock, as well as any capital stock we issue in the future, as to both dividends and rights upon liquidation. The senior preferred stock provides that we may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the senior preferred stock unless (1) full cumulative dividends on the outstanding senior preferred stock (including any unpaid dividends added to the liquidation preference) have been declared and paid in cash, and (2) all amounts required to be paid with the net proceeds of any issuance of capital stock for cash (as described in the following paragraph) have been paid in cash. Shares of the senior preferred stock are not convertible. Shares of the senior preferred stock have no general or special voting rights, other than those set forth in the certificate of designation for the senior preferred stock or otherwise required by law. The consent of holders of at least two-thirds of all outstanding shares of senior preferred stock is generally required to amend the terms of the senior preferred stock or to create any class or series of stock that ranks prior to or on parity with the senior preferred stock.

FHFA 1458

We are not permitted to redeem the senior preferred stock prior to the termination of Treasury's funding commitment under the senior preferred stock purchase agreement. Moreover, we are not permitted to pay down the liquidation preference of the outstanding shares of senior preferred stock except to the extent of (1) accrued and unpaid dividends previously added to the liquidation preference and not previously paid down; and (2) quarterly commitment fees previously added to the liquidation preference and not previously paid down. In addition, if we issue any shares of capital stock for cash while the senior preferred stock is outstanding, the net proceeds of the issuance must be used to pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of senior preferred stock may not be paid down below $1,000 per share prior to the termination of Treasury's funding commitment. Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in whole or in part.

<u>Common Stock Warrant</u>

Pursuant to the senior preferred stock purchase agreement, on September 7, 2008, we, through FHFA, in its capacity as conservator, issued a warrant to purchase common stock to Treasury. The warrant gives Treasury the right to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise, for an exercise price of $0.00001 per share. The warrant may be exercised in whole or in part at any time on or before September 7, 2028.

**Covenants under Treasury Agreements**

The senior preferred stock purchase agreement and warrant contain covenants that significantly restrict our business activities and require the prior written consent of Treasury before we can take certain actions. These covenants prohibit us from:

- paying dividends or other distributions on or repurchasing our equity securities (other than the senior preferred stock or warrant);

- issuing additional equity securities (except in limited instances);

- selling, transferring, leasing or otherwise disposing of any assets, other than dispositions for fair market value, except in limited circumstances including if the transaction is in the ordinary course of business and consistent with past practice;

- issuing subordinated debt; and

- entering into any new compensation arrangements or increasing amounts or benefits payable under existing compensation arrangements for any of our executive officers (as defined by SEC rules) without the consent of the Director of FHFA, in consultation with the Secretary of the Treasury.

In November 2009, Treasury withheld its consent under these covenants to our proposed transfer of LIHTC investments. Please see "MD&A—Consolidated Results of Operations—Losses from Partnership Investments" for information on the resulting other-than-temporary impairment losses we recognized during the fourth quarter of 2009.

We also are subject to limits, which are described below, on the amount of mortgage assets that we may own and the total amount of our indebtedness. As a result, we can no longer obtain additional equity financing (other than pursuant to the senior preferred stock purchase agreement) and we are limited in the amount and type of debt financing we may obtain.

- *Mortgage Asset Limit.*   We are restricted in the amount of mortgage assets that we may own. The maximum allowable amount was reduced by $90 billion to $810 billion on December 31, 2010. On each December 31 thereafter, we are required to reduce our mortgage assets to 90% of the maximum allowable amount that we were permitted to own as of December 31 of the immediately preceding calendar year, until the amount of our mortgage assets reaches $250 billion. Accordingly, the maximum allowable amount of mortgage assets we may own on December 31, 2011 is $729 billion. The definition of mortgage asset is based on the unpaid principal balance of such assets and does not reflect market

36

valuation adjustments, allowance for loan losses, impairments, unamortized premiums and discounts and the impact of consolidation of variable interest entities. Under this definition, our mortgage assets on December 31, 2010 were $788.8 billion. We disclose the amount of our mortgage assets on a monthly basis under the caption "Gross Mortgage Portfolio" in our Monthly Summaries, which are available on our Web site and announced in a press release.

- *Debt Limit.* We are subject to a limit on the amount of our indebtedness. Our debt limit in 2010 was $1,080 billion and in 2011 is $972 billion. For every year thereafter, our debt cap will equal 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. The definition of indebtedness is based on the par value of each applicable loan for purposes of our debt cap. Under this definition, our indebtedness as of December 31, 2010 was $793.9 billion. We disclose the amount of our indebtedness on a monthly basis under the caption "Total Debt Outstanding" in our Monthly Summaries, which are available on our Web site and announced in a press release.

Under the terms of the senior preferred stock purchase agreement, "mortgage assets" and "indebtedness" are calculated without giving effect to changes made after May 2009 to the accounting rules governing the transfer and servicing of financial assets and the extinguishment of liabilities or similar accounting standards. Accordingly, our adoption in 2010 of new accounting policies regarding consolidation and transfers of financial assets did not affect these calculations.

## LEGISLATION AND GSE REFORM

### Financial Regulatory Reform Legislation: The Dodd-Frank Act

On July 21, 2010, President Obama signed into law financial regulatory reform legislation known as the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"). The Dodd-Frank Act will significantly change the regulation of the financial services industry, including by its creation of new standards related to regulatory oversight of systemically important financial companies, derivatives transactions, asset-backed securitization, mortgage underwriting and consumer financial protection. The Dodd-Frank Act will directly affect our business because new and additional regulatory oversight and standards will apply to us. We may also be affected by provisions of the Dodd-Frank Act and implementing regulations that impact the activities of our customers and counterparties in the financial services industry. Extensive regulatory guidance is needed to implement and clarify many of the provisions of the Dodd-Frank Act and regulators have not completed the required administrative processes. It is therefore difficult to assess fully the impact of this legislation on our business and industry at this time. We discuss the potential risks to our business resulting from the Dodd-Frank Act in "Risk Factors." Below we summarize some key provisions of the legislation.

The Dodd-Frank Act established the Financial Stability Oversight Council (the "FSOC"), chaired by the Secretary of the Treasury, to ensure that all financial companies whose failure could pose a threat to the financial stability of the United States—not just banks—will be subject to strong oversight. The FSOC has held meetings and issued a proposed rule describing the criteria that will inform the FSOC's designation of systemically important nonbank financial companies. Under the proposed rule, the FSOC will make such a designation if it determines that material financial distress at the nonbank financial company, or the nature, scope, size, scale, concentration, interconnectedness, or mix of the activities of the company, could pose a threat to the financial stability of the United States. FSOC action on the final designation criteria and process is expected later this year. If we are so designated, we may be subject to stricter prudential standards to be established by the Federal Reserve, including standards related to risk-based capital, leverage limits, liquidity, credit concentrations, resolution plans, reporting credit exposures and other risk management measures. The Federal Reserve may also impose other standards related to contingent capital, enhanced public disclosure, short-term debt limits and other requirements as appropriate.

The Dodd-Frank Act requires certain institutions meeting the definition of "swap dealer" or "major swap participant" to register with the Commodity Futures Trading Commission (the "CFTC"). The CFTC and SEC have issued a joint proposed rule regarding certain definitions in the Dodd-Frank Act, including the definition of "major swap participant." If we are determined to be a major swap participant, minimum capital and

FHFA 1460

margin requirements would apply to our swap transactions, including transactions that are not subject to clearing. Even if we are not deemed to be a major swap participant, the Dodd-Frank Act includes provisions that may require us to submit new swap transactions for clearing to a derivatives clearing organization.

The Dodd-Frank Act requires creditors to determine that borrowers have a "reasonable ability to repay" mortgage loans prior to making such loans. The act provides a presumption of compliance for mortgage loans that meet certain terms and characteristics (so-called "qualified mortgages"); however, the presumption is rebuttable by a borrower bringing a claim. If a creditor fails to comply, a borrower may be able to offset amounts owed as part of a foreclosure or recoup monetary damages. The new Bureau of Consumer Financial Protection, created by the Dodd-Frank Act, is responsible for prescribing the criteria that define a qualified mortgage.

The Dodd-Frank Act requires financial regulators to jointly prescribe regulations requiring securitizers and/or originators to maintain a portion of the credit risk in assets transferred, sold or conveyed through the issuance of asset-backed securities, with certain exceptions. This risk retention requirement does not appear to apply to us and, in any event, we already retain the credit risk on mortgages we own or guarantee. How this requirement will affect our customers and counterparties on loans sold to and guaranteed by us will depend on how the regulations are implemented.

In accordance with the Dodd-Frank Act's requirements, the SEC recently adopted a rule requiring securitizers to disclose certain information regarding fulfilled and unfulfilled repurchase requests, to allow investors to identify asset originators with clear underwriting deficiencies. As adopted, the rule will require us to file quarterly reports on our repurchase activity, with our initial report to cover a three-year period and be filed in February 2012. We anticipate that providing the required disclosure will involve a significant operational burden.

### GSE Reform

The Dodd-Frank Act does not contain substantive GSE reform provisions, but does state that it is the sense of Congress that efforts to regulate the terms and practices related to residential mortgage credit would be incomplete without enactment of meaningful structural reforms of Fannie Mae and Freddie Mac. The Dodd-Frank Act also required the Treasury Secretary to submit a report to Congress with recommendations for ending the conservatorships of Fannie Mae and Freddie Mac.

On February 11, 2011, Treasury and HUD released their report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions.

The report identifies a number of policy steps that could be used to wind down Freddie Mac and Fannie Mae, reduce the government's role in housing finance and help bring private capital back to the mortgage market. These steps include (1) increasing guaranty fees, (2) gradually increasing the level of required down payment so that any mortgages insured by Freddie Mac or Fannie Mae eventually have at least a 10% down payment, (3) reducing conforming loan limits to those established in the 2008 Reform Act, (4) encouraging Freddie Mac and Fannie Mae to pursue additional credit loss protection and (5) reducing Freddie Mac and Fannie Mae's portfolios, consistent with Treasury's senior preferred stock purchase agreements with the companies.

In addition, the report outlines three potential options for a new long-term structure for the housing finance system following the wind-down of Fannie Mae and Freddie Mac. The first option would privatize housing finance almost entirely. The second option would add a government guaranty mechanism that could scale up during times of crisis. The third option would involve the government offering catastrophic reinsurance behind private mortgage guarantors. Each of these options assumes the continued presence of programs operated by FHA, the Department of Agriculture and the VA to assist targeted groups of borrowers. The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system. The report emphasizes the importance of proceeding with a careful

FHFA 1461

transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period.

A copy of the report can be found on the Housing Finance Reform section of Treasury's Web site, www.Treasury.gov. We are providing Treasury's Web site address solely for your information, and information appearing on Treasury's Web site is not incorporated into this annual report on Form 10-K.

During 2010, Congress held hearings on the future status of Fannie Mae and Freddie Mac, the Congressional Budget Office released a study examining various alternatives for the future of the secondary mortgage market, and members of Congress offered legislative proposals relating to the future status of the GSEs. We expect hearings on GSE reform to continue in 2011 and additional proposals to be discussed, including proposals that would result in a substantial change to our business structure or that involve Fannie Mae's liquidation or dissolution. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs.

On January 27, 2011, the Financial Crisis Inquiry Commission released its Final Report on the Causes of the Financial and Economic Crisis in the United States, which consists of a majority report and two dissenting views. The report addresses, among other things, the roles that the GSEs played in the financial crisis, and may be considered by policymakers as they assess legislative proposals related to the future status of the GSEs. We cannot predict how the report may impact such deliberations.

In sum, there continues to be uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. Please see "Risk Factors" for a discussion of the risks to our business relating to the uncertain future of our company.

**Energy Loan Tax Assessment Legislation**

A number of states have enacted or are considering legislation allowing localities to create energy loan assessment programs for the purpose of financing energy efficient home improvements. These programs are typically named Property Assessed Clean Energy, or PACE, programs. While the specific terms may vary, these laws generally grant lenders of energy efficient loans the equivalent of a tax lien, giving them priority over all other liens on the property, including previously recorded first lien mortgage loans.

On July 6, 2010, FHFA announced that it had determined that certain of these programs present significant safety and soundness concerns that must be addressed by the GSEs. FHFA directed Fannie Mae and Freddie Mac to waive the uniform mortgage document prohibitions against senior liens for any homeowner who obtained a PACE or PACE-like loan with a first priority lien before July 6, 2010 and to undertake actions to protect the safe and sound operation of the companies as it relates to loans originated under PACE programs.

On August 31, 2010, we released a new directive to our seller-servicers in which we reinforced our long-standing requirement that mortgages sold to us must be and remain in the first-lien position, while also providing guidance on our requirements for refinancing loans that were originated with PACE obligations before July 6, 2010.

During 2010, legislation was introduced in Congress that would require us to adopt standards to support PACE programs. We and FHFA are also subject to a number of lawsuits relating to PACE programs. We cannot predict the outcome of the litigation, or the prospects for enactment, timing or content of federal or state legislative proposals relating to PACE or PACE-like programs.

## OUR CHARTER AND REGULATION OF OUR ACTIVITIES

**Charter Act**

We are a shareholder-owned corporation, originally established in 1938, organized and existing under the Federal National Mortgage Association Charter Act, as amended, which we refer to as the Charter Act or our

charter. The Charter Act sets forth the activities that we are permitted to conduct, authorizes us to issue debt and equity securities, and describes our general corporate powers. The Charter Act states that our purposes are to:

- provide stability in the secondary market for residential mortgages;

- respond appropriately to the private capital market;

- provide ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and

- promote access to mortgage credit throughout the nation (including central cities, rural areas and underserved areas) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing.

It is from these sections of the Charter Act that we derive our mission of providing liquidity, increasing stability and promoting affordability in the residential mortgage market. In addition to the alignment of our overall strategy with these purposes, all of our business activities must be permissible under the Charter Act. Our charter authorizes us to: purchase, service, sell, lend on the security of, and otherwise deal in certain mortgage loans; issue debt obligations and mortgage-related securities; and "do all things as are necessary or incidental to the proper management of [our] affairs and the proper conduct of [our] business."

### Loan Standards

Mortgage loans we purchase or securitize must meet the following standards required by the Charter Act.

- *Principal Balance Limitations.* Our charter permits us to purchase and securitize mortgage loans secured by either a single-family or multifamily property. Single-family conventional mortgage loans are subject to maximum original principal balance limits, known as "conforming loan limits." The conforming loan limits are established each year based on the average prices of one-family residences.

  In 2010, the national conforming loan limit for mortgages that finance one-family residences was $417,000, with higher limits for mortgages secured by two- to four-family residences and in four statutorily-designated states and territories (Alaska, Hawaii, Guam and the U.S. Virgin Islands). Higher loan limits also apply in high-cost areas (counties or county-equivalent areas) that are designated by FHFA annually. Our charter sets permanent loan limits for high-cost areas up to 150% of the national loan limit ($625,500 for a one-family residence; higher for two- to four-family residences and in the four statutorily-designated states and territories). Since early 2008, however, a series of legislative acts have increased our loan limits for loans originated during a designated time period in high-cost areas, to up to 175% of the national loan limit ($729,750 for a one-family residence; higher for two- to four-family residences and in the four statutorily-designated states and territories). These loan limits are currently in effect for mortgages originated through September 30, 2011.

  No statutory limits apply to the maximum original principal balance of multifamily mortgage loans that we purchase or securitize. In addition, the Charter Act imposes no maximum original principal balance limits on loans we purchase or securitize that are insured by FHA or guaranteed by the VA.

- *Loan-to-Value and Credit Enhancement Requirements.* The Charter Act generally requires credit enhancement on any conventional single-family mortgage loan that we purchase or securitize if it has a loan-to-value ratio over 80% at the time of purchase. We also do not purchase or securitize second lien single-family mortgage loans when the combined loan-to-value ratio exceeds 80%, unless the second lien mortgage loan has credit enhancement in accordance with the requirements of the Charter Act. The credit enhancement required by our charter may take the form of one or more of the following: (1) insurance or a guaranty by a qualified insurer of the over-80% portion of the unpaid principal balance of the mortgage; (2) a seller's agreement to repurchase or replace the mortgage in the event of default (for such period and

FHFA 1463

under such circumstances as we may require); or (3) retention by the seller of at least a 10% participation interest in the mortgage. Regardless of loan-to-value ratio, the Charter Act does not require us to obtain credit enhancement to purchase or securitize loans insured by FHA or guaranteed by the VA.

### *Authority of U.S. Treasury to Purchase GSE Securities*

Pursuant to our charter, at the discretion of the Secretary of the Treasury, Treasury may purchase our obligations up to a maximum of $2.25 billion outstanding at any one time. While the 2008 Reform Act gave Treasury expanded temporary authority to purchase our obligations and other securities in unlimited amounts (up to the national debt limit), this authority expired on December 31, 2009. We describe Treasury's investment in our senior preferred stock and a common stock warrant pursuant to this expanded temporary authority under "Conservatorship and Treasury Agreements—Treasury Agreements."

### *Other Charter Act Provisions*

The Charter Act has the following additional provisions.

- *Issuances of Our Securities.*   We are authorized, upon the approval of the Secretary of the Treasury, to issue debt obligations and mortgage-related securities. Neither the U.S. government nor any of its agencies guarantees, directly or indirectly, our debt or mortgage-related securities.

- *Exemptions for Our Securities.*   The Charter Act generally provides that our securities are exempt under the federal securities laws administered by the SEC. As a result, we are not required to file registration statements with the SEC under the Securities Act of 1933 with respect to offerings of any of our securities. Our non-equity securities are also exempt securities under the Securities Exchange Act of 1934 (the "Exchange Act"). However, our equity securities are not treated as exempted securities for purposes of Sections 12, 13, 14 or 16 of the Exchange Act. Consequently, we are required to file periodic and current reports with the SEC, including annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K.

- *Exemption from Specified Taxes.*   We are exempt from taxation by states, territories, counties, municipalities and local taxing authorities, except for taxation by those authorities on our real property. We are not exempt from the payment of federal corporate income taxes.

- *Other Limitations and Requirements.*   We may not originate mortgage loans or advance funds to a mortgage seller on an interim basis, using mortgage loans as collateral, pending the sale of the mortgages in the secondary market. In addition, we may only purchase or securitize mortgages on properties located in the United States and its territories.

### Regulation and Oversight of Our Activities

As a federally chartered corporation, we are subject to government regulation and oversight. FHFA is an independent agency of the federal government with general supervisory and regulatory authority over Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks. FHFA was established in July 2008, assuming the duties of our former safety and soundness regulator, the Office of Federal Housing Enterprise Oversight ("OFHEO"), and our former mission regulator, HUD. HUD remains our regulator with respect to fair lending matters. Our regulators also include the SEC and Treasury.

The GSE Act provides FHFA with safety and soundness authority that is comparable to and in some respects broader than that of the federal banking agencies. Even if we were not in conservatorship, the GSE Act gives FHFA the authority to raise capital levels above statutory minimum levels, regulate the size and content of our portfolio and approve new mortgage products, among other things.

FHFA is responsible for implementing the various provisions of the GSE Act. In general, we remain subject to existing regulations, orders and determinations until new ones are issued or made.

*Capital.*   The GSE Act provides FHFA with broad authority to increase the level of our required minimum capital and to establish capital or reserve requirements for specific products and activities. FHFA also has

FHFA 1464

broad authority to establish risk-based capital requirements, to ensure that we operate in a safe and sound manner and maintain sufficient capital and reserves. During the conservatorship, FHFA has suspended our capital classifications. We continue to submit capital reports to FHFA during the conservatorship, and FHFA continues to monitor our capital levels. We describe our capital requirements below under "Capital Adequacy Requirements."

*Portfolio.*   The GSE Act requires FHFA to establish standards governing our portfolio holdings, to ensure that they are backed by sufficient capital and consistent with our mission and safe and sound operations. FHFA is also required to monitor our portfolio and, in some circumstances, may require us to dispose of or acquire assets. On December 28, 2010, FHFA published a final rule adopting, as the standard for our portfolio holdings, the portfolio limits specified in the senior preferred stock purchase agreement described under "Treasury Agreements—Covenants under Treasury Agreements," as it may be amended from time to time. The rule is effective for as long as we remain subject to the terms and obligations of the senior preferred stock purchase agreement.

*New Products.*   The GSE Act requires us to obtain FHFA's approval before initially offering any product, subject to certain exceptions. The GSE Act also requires us to provide FHFA with written notice before commencing any new activity. On July 2, 2009, FHFA published an interim final rule implementing these provisions of the GSE Act. Subsequently, the Acting Director of FHFA concluded that permitting us to offer new products at this time is inconsistent with the goals of the conservatorship. He therefore instructed us not to submit requests for approval of new products under the interim final rule. We cannot predict when or if FHFA will permit us to submit new product requests under the rule.

*Receivership.*   Under the GSE Act, FHFA must place us into receivership if it determines that our assets are less than our obligations for 60 days, or we have not been paying our debts as they become due for 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and liabilities would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days thereafter. FHFA has advised us that if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the senior preferred stock purchase agreement, the Director of FHFA will not make a mandatory receivership determination.

In addition, we could be put into receivership at the discretion of the Director of FHFA at any time for other reasons, including conditions that FHFA has already asserted existed at the time the then-Director of FHFA placed us into conservatorship. The statutory grounds for discretionary appointment of a receiver include: a substantial dissipation of assets or earnings due to unsafe or unsound practices; the existence of an unsafe or unsound condition to transact business; an inability to meet our obligations in the ordinary course of business; a weakening of our condition due to unsafe or unsound practices or conditions; critical undercapitalization; the likelihood of losses that will deplete substantially all of our capital; or by consent.

On July 9, 2010, FHFA published a proposed rule to establish a framework for conservatorship and receivership operations for the GSEs. The proposed rule would, among other things, clarify that: (1) all claims arising from an equity interest in a regulated entity in receivership would be given the same treatment as the interests of shareholders; and (2) claims by shareholders would receive the lowest priority in a receivership, behind administrative expenses of the receiver, general liabilities of the regulated entity and liabilities subordinated to those of general creditors. The proposed rule would also provide that payment of certain securities litigation claims would be held in abeyance during conservatorship, except as otherwise ordered by FHFA. The proposed rule is part of FHFA's implementation of the powers provided by the 2008 Reform Act, and does not seek to anticipate or predict future conservatorships or receiverships. In announcing the publication of this proposed rule for comment, the Acting Director of FHFA said it had "no impact" on current conservatorship operations. This rule has not been finalized.

*Prudential Management and Operational Standards.*   The GSE Act requires FHFA to establish prudential standards for a broad range of our operations. These standards must address internal controls, independence and adequacy of internal audit systems, management of interest rate risk exposure, management of market risk, adequacy and maintenance of liquidity and reserves, management of asset and investment portfolio

FHFA 1465

growth, investments and asset acquisitions, overall risk management processes, management of credit and counterparty risk and recordkeeping. FHFA may also establish any additional operational and management standards the Director of FHFA deems appropriate.

*Affordable Housing Goals and Duty to Serve.*   We discuss our affordable housing goals and our duty to serve underserved markets below under "Housing Goals and Duty to Serve Underserved Markets."

*Affordable Housing Allocations.*   The GSE Act requires us to set aside in each fiscal year an amount equal to 4.2 basis points for each dollar of the unpaid principal balance of our total new business acquisitions, and to allocate such amount to certain government funds. The GSE Act also allows FHFA to suspend allocations on a temporary basis. In November 2008, FHFA advised us that it was suspending our allocations until further notice.

*Executive Compensation.*   The GSE Act directs FHFA to prohibit us from providing unreasonable or non-comparable compensation to our executive officers. FHFA may at any time review the reasonableness and comparability of an executive officer's compensation and may require us to withhold any payment to the officer during such review. FHFA is also authorized to prohibit or limit certain golden parachute and indemnification payments to directors, officers and certain other parties. FHFA has issued rules relating to golden parachute payments, setting forth factors to be considered by the Director of FHFA in acting upon his authority to limit such payments.

*Fair Lending.*   The GSE Act requires the Secretary of HUD to assure that the GSEs meet their fair lending obligations. Among other things, HUD is required to periodically review and comment on the underwriting and appraisal guidelines of each company to ensure consistency with the Fair Housing Act. HUD is currently conducting such a review.

### Capital Adequacy Requirements

The GSE Act establishes capital adequacy requirements. The statutory capital framework incorporates two different quantitative assessments of capital—a minimum capital requirement and a risk-based capital requirement. The minimum capital requirement is ratio-based, while the risk-based capital requirement is based on simulated stress test performance. The GSE Act requires us to maintain sufficient capital to meet both of these requirements in order to be classified as "adequately capitalized." However, during the conservatorship, FHFA has suspended capital classification of us and announced that our existing statutory and FHFA-directed regulatory capital requirements will not be binding. FHFA has advised us that, because we are under conservatorship, we will not be subject to corrective action requirements that would ordinarily result from our receiving a capital classification of "undercapitalized."

*Minimum Capital Requirement.*   Under the GSE Act, we must maintain an amount of core capital that equals or exceeds our minimum capital requirement. The GSE Act defines core capital as the sum of the stated value of outstanding common stock (common stock less treasury stock), the stated value of outstanding non-cumulative perpetual preferred stock, paid-in capital, and retained earnings, as determined in accordance with GAAP. Our minimum capital requirement is generally equal to the sum of 2.50% of on-balance sheet assets and 0.45% of off-balance sheet obligations.

Effective January 1, 2010, we adopted new accounting standards that resulted in our recording on our consolidated balance sheet substantially all of the loans backing our Fannie Mae MBS. However, FHFA has directed us, for purposes of minimum capital, to continue reporting loans backing Fannie Mae MBS held by third parties based on 0.45% of the unpaid principal balance. FHFA retains authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities.

*Risk-Based Capital Requirement.*   The GSE Act requires FHFA to establish risk-based capital requirements for Fannie Mae and Freddie Mac, to ensure that we operate in a safe and sound manner. Existing risk-based capital regulation ties our capital requirements to the risk in our book of business, as measured by a stress test model. The stress test simulates our financial performance over a ten-year period of severe economic conditions characterized by both extreme interest rate movements and high mortgage default rates. FHFA has stated that it does not intend to publish our risk-based capital level during the conservatorship and has

43

discontinued stress test simulations under the existing rule. We continue to submit detailed profiles of our books of business to FHFA to support FHFA's monitoring of our business activity and their research into future risk-based capital rules.

*Critical Capital Requirement.*   The GSE Act also establishes a critical capital requirement, which is the amount of core capital below which we would be classified as "critically undercapitalized." Under the GSE Act, such classification is a discretionary ground for appointing a conservator or receiver. Our critical capital requirement is generally equal to the sum of 1.25% of on-balance sheet assets and 0.25% of off-balance sheet obligations. FHFA has directed us, for purposes of critical capital, to continue reporting loans backing Fannie Mae MBS held by third parties based on 0.25% of the unpaid principal balance, notwithstanding our consolidation of substantially all of the loans backing these securities. FHFA has stated that it does not intend to publish our critical capital level during the conservatorship.

*Bank Capital Requirements.*   In the wake of the financial crisis and as a result of the Dodd-Frank Act and of actions by international bank regulators, the capital regime for the banking industry is undergoing major changes. The Basel Committee on Banking Supervision finalized a set of revisions (known as Basel III) to the international capital requirements in December 2010. Basel III generally narrows the definition of capital that can be used to meet risk-based standards and raises the amount of capital that must be held. U.S. bank regulators are expected to issue detailed implementing regulations for U.S. banks in the coming months.

Although the GSEs are not currently subject to bank capital requirements, any revised framework for GSE capital standards may be based on bank requirements, particularly if the GSEs are deemed to be systemically important financial companies subject to Federal Reserve oversight.

### Housing Goals and Duty to Serve Underserved Markets

Since 1993, we have been subject to housing goals. For 2010, the structure of our housing goals changed as a result of the 2008 Reform Act. The 2008 Reform Act also created a new duty for us to serve three underserved markets, which we discuss below.

### Housing Goals

FHFA published a final rule establishing our 2010 and 2011 housing goals on September 14, 2010. FHFA's final rule and subsequent notices dated October 29, 2010 and January 28, 2011 established the following single-family home purchase and refinance housing goal benchmarks for 2010 and 2011. A home purchase mortgage may be counted toward more than one home purchase benchmark.

- *Low-Income Families Home Purchase Benchmark:*   At least 27% of our acquisitions of single-family owner-occupied mortgage loans financing home purchases must be affordable to low-income families (defined as families with income no higher than 80% of area median income).

- *Very Low-Income Families Home Purchase Benchmark:*   At least 8% of our acquisitions of single-family owner-occupied mortgage loans financing home purchases must be affordable to very low-income families (defined as families with income no higher than 50% of area median income).

- *Low-Income Areas Home Purchase Benchmarks:*   At least 24% of our acquisitions of single-family owner-occupied mortgage loans financing home purchases must be for families in low-income census tracts, for moderate-income families (defined as families with income no higher than 100% of area median income) in designated disaster areas or for moderate-income families in minority census tracts. In addition, at least 13% of our acquisitions of single-family owner-occupied purchase money mortgage loans must be for families in low-income census tracts or for moderate-income families in minority census tracts.

- *Low-Income Families Refinancing Benchmark:*   At least 21% of our acquisitions of single-family owner-occupied refinance mortgage loans must be affordable to low-income families, which may include qualifying permanent modifications of mortgages under HAMP completed during the year.

If we do not meet these benchmarks, we may still meet our goals. The final rule specifies that our single-family housing goals performance will be measured against these benchmarks and against goals-qualifying

FHFA 1467

originations in the primary mortgage market. We will be in compliance with the housing goals if we meet either the benchmarks or market share measures.

The final rule also established a new multifamily goal and subgoal. For each of 2010 and 2011, our multifamily mortgage acquisitions must finance at least 177,750 units affordable to low-income families, and at least 42,750 units affordable to very low-income families. There is no market-based alternative measurement for the multifamily goals.

FHFA's final rule made significant changes to prior housing goals regulations regarding the types of products that count towards the housing goals. Private-label mortgage-related securities, second liens and single-family government loans do not count towards the housing goals. In addition, only permanent modifications of mortgages under HAMP completed during the year will count towards the housing goals; trial modifications will not be counted. Moreover, these modifications will count only towards the single-family low-income families refinance goal, not any of the home purchase goals.

The final rule notes that "FHFA does not intend for [Fannie Mae] to undertake uneconomic or high-risk activities in support of the [housing] goals. However, the fact that [Fannie Mae is] in conservatorship should not be a justification for withdrawing support from these market segments." If our efforts to meet our goals prove to be insufficient, FHFA will determine whether the goals were feasible. If FHFA finds that our goals were feasible, we may become subject to a housing plan that could require us to take additional steps that could have an adverse effect on our results of operations and financial condition. The housing plan must describe the actions we would take to meet the goal in the next calendar year and be approved by FHFA. The potential penalties for failure to comply with housing plan requirements include a cease-and-desist order and civil money penalties. See "Risk Factors" for a description of how we may be unable to meet our housing goals and how actions we may take to meet these goals and other regulatory requirements could adversely affect our business, results of operations and financial condition.

The following table presents our performance against our 2010 single-family housing benchmarks and multifamily housing goals. These performance results have not yet been validated by FHFA.

### 2010 Housing Goals Performance

| | Result[1] | Benchmark[2] |
|---|---|---|
| **Single-family housing goals:[3]** | | |
| Low-income families home purchases | 25.1% | 27.0% |
| Very low-income families home purchases | 7.2 | 8.0 |
| Low-income areas home purchases | 24.0 | 24.0 |
| Low-income and high-minority areas home purchases | 12.4 | 13.0 |
| Low-income families refinancing | 20.9 | 21.0 |

| | Result[1] | Goal |
|---|---|---|
| **Multifamily housing goals:** | | |
| Affordable to families with incomes no higher than 80% of area median income | 212,768 units | 177,750 units |
| Affordable to families with incomes no higher than 50% of area median income | 53,184 units | 42,750 units |

[1] Our 2010 results have not been validated by FHFA, and after validation they may differ from the results reported above.

[2] Even if our results do not meet the benchmarks, we may still meet our goals. The final rule specifies that our single-family housing goals performance will be measured not only against these benchmarks, but also against the share of goals-qualifying originations in the primary mortgage market. We will be in compliance with the housing goals if we meet either the benchmarks or market share measures. The amount of goals-qualifying originations in the market during 2010 will not be available until the release of data reported by primary market originators under the Home Mortgage Disclosure Act in the fall of 2011.

[3] Our single-family results and benchmarks are expressed as a percentage of the total number of eligible mortgages acquired during the period.

FHFA 1468

We believe we met our single-family low-income areas home purchase benchmark for 2010, as well as our 2010 multifamily goals. To determine whether we met our other 2010 single-family goals, we and FHFA will have to compare our performance with that of the market after the release of data reported by primary market originators under the Home Mortgage Disclosure Act in the fall of 2011, because we believe we did not meet the benchmarks for these goals. As noted in FHFA's final rule establishing our 2010 housing goals, FHFA has indicated that we should not undertake uneconomic or high-risk activities in support of our housing goals.

We will file our assessment of our performance with FHFA in mid-March. FHFA will then determine our final performance numbers and whether we met our goals.

_Duty to Serve_

The 2008 Reform Act created the duty to serve underserved markets in order for us and Freddie Mac to "provide leadership to the market in developing loan products and flexible underwriting guidelines to facilitate a secondary market for very low-, low-, and moderate-income families" with respect to three underserved markets: manufactured housing, affordable housing preservation, and rural areas.

The duty to serve is a new oversight responsibility for FHFA. The Director of FHFA is required to establish by regulation a method for evaluating and rating the performance by us and Freddie Mac of the duty to serve underserved markets. On June 7, 2010, FHFA published its proposed rule to implement this new duty, although the final rule has not been issued.

Under the proposed rule, we would be required to submit an underserved markets plan at least 90 days before the plan's effective date of January 1st of a particular year establishing benchmarks and objectives against which FHFA would evaluate and rate our performance. The plan term is two years. We will likely need to submit a plan as soon as practicable after the publication of the final rule that will be effective for the first plan period.

The 2008 Reform Act requires FHFA to separately evaluate the following four assessment factors:

- The loan product assessment factor requires evaluation of our "development of loan products, more flexible underwriting guidelines, and other innovative approaches to providing financing to each" underserved market.

- The outreach assessment factor requires evaluation of "the extent of outreach to qualified loan sellers and other market participants." We are expected to engage market participants and pursue relationships with qualified sellers that serve each underserved market.

- The loan purchase assessment factor requires FHFA to consider the volume of loans acquired in each underserved market relative to the market opportunities available to us. The 2008 Reform Act prohibits the establishment of specific quantitative targets by FHFA. However, in its evaluation FHFA could consider the volume of loans acquired in past years.

- The investment and grants assessment factor requires evaluation of the amount of investment and grants in projects that assist in meeting the needs of underserved markets.

Under the proposed rule, FHFA would give the loan purchase and outreach assessment factors significant weight. Because we are in conservatorship, the investment and grants assessment factor would receive little or no weight. In addition, FHFA would consider the loan product assessment factor, even though we are currently prohibited from entering into new lines of business and developing new products. The proposed rule states that acquisitions and activities pursuant to the duty to serve should be profitable, even if less profitable than other activities.

FHFA would evaluate our performance on each assessment factor annually, and assign a rating of "satisfactory" or "unsatisfactory" to each factor in each underserved market. The evaluation would be based on whether we have substantially met our benchmarks and objectives as outlined in our underserved markets plan. FHFA would also consider the impact of overall market conditions and other factors outside our control that could impact our ability to meet our benchmarks and objectives. Based on the assessment factor findings,

46

FHFA would assign a rating of "in compliance" or "noncompliance" with the duty to serve each underserved market.

With some exceptions, the counting rules and other requirements would be similar to those established for the housing goals. For the loan purchase assessment factor, FHFA proposes to measure performance in terms of units rather than mortgages or unpaid principal balance. All single-family loans we acquire must meet the standards in the Interagency Statement on Subprime Mortgage Lending and the Interagency Guidance on Nontraditional Mortgage Product Risks. We are expected to review the operations of loan sellers to ensure compliance with these standards.

If we fail to comply with, or there is a substantial probability that we will not comply with, our duty to serve a particular underserved market in a given year, FHFA would determine whether the benchmarks and objectives in our underserved markets plan are or were feasible. If we fail to meet our duty to serve, and FHFA determines that the benchmarks and objectives in our underserved markets plan are or were feasible, then, in the Director's discretion, we may be required to submit a housing plan. Under the proposed rule, the housing plan must describe the activities that we will take to comply with the duty to serve a particular underserved market for the next calendar year, or improvements and changes in operations that we will make during the remainder of the current year.

Under the proposed rule, we would be required to provide quarterly and annual reports on our performance and progress towards meeting our duty to serve.

See "Risk Factors" for a description of how changes we may make in our business strategies in order to meet our housing goals and duty to serve requirement may increase our credit losses and adversely affect our results of operations.

## MAKING HOME AFFORDABLE PROGRAM

The Obama Administration's Making Home Affordable Program, which was introduced in February 2009, is intended to provide assistance to homeowners and prevent foreclosures. Working with our conservator, we have devoted significant effort and resources to help distressed homeowners through initiatives that support the Making Home Affordable Program. Below we describe key aspects of the Making Home Affordable Program and our role in the program. For additional information about our activities under the program, please see "Business—Making Home Affordable Program" in our Annual Report on Form 10-K for the year ended December 31, 2009. For information about the program's financial impact on us, please see "MD&A— Consolidated Results of Operations—Financial Impact of the Making Home Affordable Program on Fannie Mae."

The Making Home Affordable Program is comprised primarily of a Home Affordable Refinance Program ("HARP"), under which we acquire or guarantee loans that are refinancings of mortgage loans we own or guarantee, and Freddie Mac does the same, and a Home Affordable Modification Program ("HAMP"), which provides for the modification of mortgage loans owned or guaranteed by us or Freddie Mac, as well as other mortgage loans. These two programs were designed to expand the number of borrowers who can refinance or modify their mortgages to achieve a monthly payment that is more affordable now and into the future or to obtain a more stable loan product, such as a fixed-rate mortgage loan in lieu of an adjustable-rate mortgage loan. We participate in the Making Home Affordable Program, and our sellers and servicers offer HARP and HAMP to Fannie Mae borrowers. We also serve as Treasury's program administrator for HAMP and other initiatives under the Making Home Affordable Program.

### Our Role as Program Administrator

Treasury has engaged us to serve as program administrator for HAMP and other initiatives under the Making Home Affordable Program. Our principal activities as program administrator include the following:

- Implementing the guidelines and policies of the Treasury program;

- Preparing the requisite forms, tools and training to facilitate efficient loan modifications by servicers;

47

- Creating, making available and managing the process for servicers to report modification activity and program performance;

- Calculating incentive compensation consistent with program guidelines;

- Acting as record-keeper for executed loan modifications and program administration;

- Coordinating with Treasury and other parties toward achievement of the program's goals, including assisting with development and implementation of updates to the program and initiatives expanding the program's reach; and

- Performing other tasks as directed by Treasury from time to time.

In our capacity as program administrator for the program, we support over 100 servicers that have signed up to participate with respect to non-agency loans under the program. To help servicers implement the program, we have provided information and resources through a Web site dedicated to servicers under the program. We have also communicated information about the program to servicers and helped servicers implement and integrate the program with new systems and processes. As program administrator, we have taken the following steps to help servicers implement the program:

- dedicated Fannie Mae personnel to work closely with participating servicers;

- established a servicer support call center;

- conducted ongoing conference calls with the leadership of participating servicers;

- provided training through live Web seminars and recorded tutorials; and

- made checklists and job aids available on the program Web site.

## OUR CUSTOMERS

Our principal customers are lenders that operate within the primary mortgage market where mortgage loans are originated and funds are loaned to borrowers. Our customers include mortgage banking companies, savings and loan associations, savings banks, commercial banks, credit unions, community banks, insurance companies, and state and local housing finance agencies. Lenders originating mortgages in the primary mortgage market often sell them in the secondary mortgage market in the form of whole loans or in the form of mortgage-related securities.

During 2010, approximately 1,100 lenders delivered single-family mortgage loans to us, either for securitization or for purchase. We acquire a significant portion of our single-family mortgage loans from several large mortgage lenders. During both 2010 and 2009, our top five lender customers, in the aggregate, accounted for approximately 62% of our single-family business volume. Three lender customers, Wells Fargo & Company, Bank of America Corporation, and JPMorgan Chase & Co., including their respective affiliates, in the aggregate accounted for more than 52% of our single-family business volume for 2010.

Due to ongoing consolidation within the mortgage industry, as well as the number of mortgage lenders that have gone out of business since late 2006, we, as well as our competitors, seek business from a decreasing number of large mortgage lenders. To the extent we become more reliant on a smaller number of lender customers, our negotiating leverage with these customers decreases, which could diminish our ability to price our products and services optimally. In addition, many of our lender customers are experiencing financial and liquidity problems that may affect the volume of business they are able to generate. We discuss these and other risks that this customer concentration poses to our business in "Risk Factors."

## COMPETITION

Historically, our competitors have included Freddie Mac, FHA, Ginnie Mae (which primarily guarantees securities backed by FHA-insured loans), the 12 Federal Home Loan Banks ("FHLBs"), financial institutions,

FHFA 1471

securities dealers, insurance companies, pension funds, investment funds and other investors. During 2008, almost all of our competitors, other than Freddie Mac, FHA, Ginnie Mae and the FHLBs, ceased their activities in the residential mortgage finance business, and we remained the largest single issuer of mortgage-related securities in the secondary market in 2010.

We compete to acquire mortgage assets in the secondary market both for securitization into Fannie Mae MBS and, to a significantly lesser extent, for our investment portfolio. We also compete for the issuance of mortgage-related securities to investors. Competition in these areas is affected by many factors, including the amount of residential mortgage loans offered for sale in the secondary market by loan originators and other market participants, the nature of the residential mortgage loans offered for sale (for example, whether the loans represent refinancings), the current demand for mortgage assets from mortgage investors, the interest rate risk investors are willing to assume and the yields they will require as a result, and the credit risk and prices associated with available mortgage investments.

Competition to acquire mortgage assets is significantly affected by pricing and eligibility standards. Changes in our pricing and eligibility standards and in the eligibility standards of the mortgage insurance companies in 2008 and 2009 have reduced our acquisition of loans with higher LTV ratios and other high-risk features. In addition, FHA has become the lower-cost option, or in some cases the only option, for loans with higher LTV ratios.

During 2010, our primary competitors for the issuance of mortgage-related securities were Ginnie Mae and Freddie Mac. Prior to the severe market downturn, there was a significant increase in the issuance of mortgage-related securities by non-agency issuers, which caused a decrease in our share of the market for new issuances of single-family mortgage-related securities from 2003 to 2006. Non-agency issuers, also referred to as private-label issuers, are those issuers of mortgage-related securities other than agency issuers Fannie Mae, Freddie Mac and Ginnie Mae. The subsequent mortgage and credit market disruption led to a significant decline in the issuance of private-label mortgage-related securities. Accordingly, our market share significantly increased during 2008 and has remained high since then. Our estimated market share of new single-family mortgage-related securities issuances was 44.0% in 2010, compared with 46.3% in 2009, 45.4% in 2008, and 33.9% in 2007. Our estimated market share of 46.3% in 2009 includes $94.6 billion of whole loans held for investment in our mortgage portfolio that were securitized into Fannie Mae MBS in the second quarter, but retained in our mortgage portfolio and consolidated on our consolidated balance sheets. Excluding these Fannie Mae MBS from the estimate of our market share, our estimated 2009 market share of new single-family mortgage-related securities issuances was 43.2%.

We also compete for low-cost debt funding with institutions that hold mortgage portfolios, including Freddie Mac and the FHLBs.

Although we do not know the structure that long-term GSE reform will ultimately take, we expect that, if our company continues, we will face more competition in the future. Please see "Business—Legislation and GSE Reform" for a discussion of proposals for GSE reform, as well as recent legislative reform of the financial services industry that could affect our business.

## EMPLOYEES

As of January 31, 2011, we employed approximately 7,300 personnel, including full-time and part-time employees, term employees and employees on leave.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We make available free of charge through our Web site our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and all other SEC reports and amendments to those reports as soon as reasonably practicable after we electronically file the material with, or furnish it to, the SEC. Our Web site address is www.fanniemae.com. Materials that we file with the SEC are also available from the SEC's Web site, www.sec.gov. You may also request copies of any filing from us, at no cost, by calling the Fannie Mae

Fixed-Income Securities Helpline at (800) 237-8627 or (202) 752-7115 or by writing to Fannie Mae, Attention: Fixed-Income Securities, 3900 Wisconsin Avenue, NW, Area 2H-3S, Washington, DC 20016.

We are providing our Web site addresses and the Web site address of the SEC solely for your information. Information appearing on our Web site or on the SEC's Web site is not incorporated into this annual report on Form 10-K.

## FORWARD-LOOKING STATEMENTS

This report includes statements that constitute forward-looking statements within the meaning of Section 21E of the Exchange Act. In addition, our senior management may from time to time make forward-looking statements orally to analysts, investors, the news media and others. Forward-looking statements often include words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," "forecast," "project," "would," "should," "could," "may," "prospects," or similar words.

Among the forward-looking statements in this report are statements relating to:

- Our expectation that mortgage interest rates will increase in 2011, which will likely reduce the share of refinance loans;

- The size of the declines nationwide in total single-family originations and mortgage debt outstanding that we expect in 2011;

- Our expectation that the unemployment rate will decline modestly throughout 2011;

- Our expectations that our multifamily nonperforming assets will increase in certain geographic areas and that we may continue to experience an increase in delinquencies and credit losses despite improving market fundamentals;

- Our expectation that the multifamily sector will continue to improve modestly in 2011, even though unemployment levels remain elevated;

- Our expectation that we will not earn profits in excess of our annual dividend obligation to Treasury for the indefinite future;

- Our expectation that, if FHA continues to be the lower-cost option for some consumers, and in some cases the only option, for loans with higher LTV ratios, our market share could be adversely impacted if the market shifts away from refinance activity;

- Our expectation that the single-family loans we have acquired since 2009 will be profitable;

- Our estimate that, while single-family loans that we acquired from 2005 through 2008 will give rise to additional credit losses that we have not yet realized, we have reserved for the substantial majority of the remaining losses;

- Our expectation that our draws from Treasury for credit losses will abate and our draws will increasingly be driven by dividend payments;

- Our belief that loans we have acquired since 2009 would become unprofitable if home prices declined by more than 20% from their December 2010 levels over the next five years based on our home price index;

- Our expectations regarding whether loans we acquired in specific years prior to 2009 will be profitable or unprofitable;

- Our expectation that defaults on loans we acquired from 2005 through 2008 and the resulting charge-offs will occur over a period of years;

- Our expectation that it will take years before our REO inventory approaches pre-2008 levels;

- Our expectation that the number of our repurchase requests to seller/servicers will remain high in 2011;

- Our expectation that we will realize as credit losses an estimated two-thirds of the fair value losses on loans purchased out of MBS trusts that are reflected in our consolidated balance sheets, and recover the remaining third through our consolidated statements of operations;

- Our belief that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding;

- Our expectation that weakness in the housing and mortgage markets will continue in 2011;

- Our expectation that home sales are unlikely to increase until the unemployment rate improves;

- Our expectation that single-family default and severity rates and the level of single-family foreclosures will remain high in 2011;

- Our expectation that multifamily charge-offs will remain commensurate with 2010 levels throughout 2011;

- Our expectation that our overall business volume in 2011 will be lower than in 2010;

- Our expectation that home prices on a national basis will decline slightly, with greater declines in some geographic areas than others, before stabilizing later in 2011, and that the peak-to-trough home price decline on a national basis will range between 21% and 26%;

- Our expectation that our credit-related expenses will remain high in 2011 and that our credit losses will increase in 2011 as compared to 2010;

- Our expectation that we will continue to purchase loans from MBS trusts as they become delinquent for four or more consecutive monthly payments subject to market conditions, servicer capacity, and other constraints, including the limit on mortgage assets that we may own pursuant to the senior preferred stock purchase agreement;

- Our expectation that revenues from our mortgage asset portfolio will decrease over time;

- Whether during conservatorship we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship;

- Our not being a substantial buyer or seller of mortgages for our retained portfolio, except for purchases of delinquent mortgages out of our guaranteed MBS pools;

- Our expectations that FHFA will request additional funds from Treasury on our behalf to ensure we maintain a positive net worth and avoid mandatory receivership, that Treasury will provide such funds, and that the dividends on Treasury's investments in us will therefore increase;

- Our expectation that the Dodd-Frank Act will significantly change the regulation of the financial services industry, directly affect our business, and may involve a significant operational burden;

- Our expectation that some or all of the conditions that negatively affected our ability to meet our 2010 single-family housing goals are likely to continue in 2011;

- Our expectation that the pause in foreclosures as a result of servicer foreclosure process deficiencies will likely result in higher serious delinquency rates, longer foreclosure timelines and higher foreclosed property expenses;

- Our expectation that we may continue to experience substantial changes in management, employees and our business structure and practices;

- Our intention to maximize the value of nonperforming loans over time, utilizing loan modification, foreclosure, repurchases and other preferable loss mitigation actions;

- Our estimation of the amount that we could realize over the fair value of our nonperforming loans reported in our non-GAAP consolidated fair value balance sheet;

FHFA 1474

- Our expectation that the current market premium portion of our current estimate of fair value will not impact future Treasury draws, which is based on our intention not to have another party assume the credit risk inherent in our book of business;

- Our expectation that our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirements of the senior preferred stock purchase agreement;

- Our expectation that, due to the large size of our portfolio of mortgage-related securities, current market conditions and the significant amount of distressed assets in our mortgage portfolio, it is unlikely that there would be sufficient market demand for large amounts of these securities over a prolonged period of time, particularly during a liquidity crisis;

- Our expectation that our acquisitions of Alt-A mortgage loans will continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A will decrease over time;

- Our belief that we have limited exposure to losses on home equity conversion mortgages, a type of reverse mortgage insured by the federal government;

- Our expectation that serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions and the extent to which borrowers with modified loans again become delinquent in their payments;

- Our expectation that we will increase our use of foreclosure alternatives;

- Our belief that the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and home prices;

- Our belief that one or more of our financial guarantor counterparties may not be able to fully meet their obligations to us in the future;

- Our assumption that the guaranty fee income generated from future business activity will largely replace guaranty fee income lost due to mortgage prepayments; and

- Our anticipated 2011 contributions to our benefit plans.

Forward-looking statements reflect our management's expectations or predictions of future conditions, events or results based on various assumptions and management's estimates of trends and economic factors in the markets in which we are active, as well as our business plans. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. Our actual results and financial condition may differ, possibly materially, from the anticipated results and financial condition indicated in these forward-looking statements. There are a number of factors that could cause actual conditions, events or results to differ materially from those described in the forward-looking statements contained in this report, including, but not limited to, the following: the uncertainty of our future; legislative and regulatory changes affecting us; challenges we face in retaining and hiring qualified employees; the deteriorated credit performance of many loans in our guaranty book of business; the conservatorship and its effect on our business; the investment by Treasury and its effect on our business; adverse effects from activities we undertake to support the mortgage market and help borrowers; limitations on our ability to access the debt capital markets; further disruptions in the housing and credit markets; defaults by one or more institutional counterparties; our reliance on mortgage servicers; deficiencies in servicer and law firm foreclosure processes and the consequences of those deficiencies; guidance by the Financial Accounting Standards Board ("FASB"); operational control weaknesses; our reliance on models; the level and volatility of interest rates and credit spreads; changes in the structure and regulation of the financial services industry; and those factors described in this report, including those factors described in "Risk Factors."

Readers are cautioned to place forward-looking statements in this report or that we make from time to time into proper context by carefully considering the factors discussed in "Risk Factors." These forward-looking statements are representative only as of the date they are made, and we undertake no obligation to update any forward-looking statement as a result of new information, future events or otherwise, except as required under the federal securities laws.

52

**Item 1A.    Risk Factors**

This section identifies specific risks that should be considered carefully in evaluating our business. The risks described in "Risks Relating to Our Business" are specific to us and our business, while those described in "Risks Relating to Our Industry" relate to the industry in which we operate. Refer to "MD&A—Risk Management" for a more detailed description of the primary risks to our business and how we seek to manage those risks.

In addition to the risks we discuss below, we face risks and uncertainties not currently known to us or that we currently deem to be immaterial. The risks we face could materially adversely affect our business, results of operations, financial condition, liquidity and net worth and could cause our actual results to differ materially from our past results or the results contemplated by the forward-looking statements contained in this report.

## RISKS RELATING TO OUR BUSINESS

### *The future of our company is uncertain.*

There is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated.

On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period.

During 2010, Congress held hearings on the future status of Fannie Mae and Freddie Mac, the Congressional Budget Office released a study examining various alternatives for the future of the secondary mortgage market, and legislative proposals were introduced that would substantially change our business structure and the operation of our business. We expect hearings on GSE reform to continue in 2011 and additional proposals to be discussed, including proposals that would result in a substantial change to our business structure or that involve Fannie Mae's liquidation or dissolution. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future status of the GSEs. See "Business—Legislation and GSE Reform" for more information about the Treasury report and Congressional proposals regarding reform of the GSEs.

### *We expect FHFA to request additional funds from Treasury on our behalf to ensure we maintain a positive net worth and avoid mandatory receivership. The dividends we must pay or that accrue on Treasury's investments are substantial and are expected to increase, and we likely will not be able to fund them through net income.*

FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations (which we refer to as a net worth deficit) or if we have not been paying our debts, in either case, for a period of 60 days after the filing deadline for our Form 10-K or Form-Q with the SEC. We have had a net worth deficit as of the end of each of the last nine fiscal quarters, including as of December 31, 2010. Treasury provided us with funds under the senior preferred stock purchase agreement to cure the net worth deficits in prior periods before the end of the 60-day period, and we expect Treasury to do the same with respect to the December 31, 2010 deficit. When Treasury provides the additional $2.6 billion FHFA has requested on our behalf, the aggregate liquidation preference on the senior preferred stock will be $91.2 billion, and will require an annualized dividend of $9.1 billion. The prospective $9.1 billion annual dividend obligation exceeds our reported annual net income for each of the last nine years, in most cases by a significant margin. Our ability to maintain a positive net worth has been and continues to be adversely affected by market conditions. To the extent we have a negative net worth as of the end of future fiscal

FHFA 1476

quarters, we expect that FHFA will request on our behalf additional funds from Treasury under the senior preferred stock purchase agreement. Further funds from Treasury under the senior preferred stock purchase agreement will increase the liquidation preference of and the dividends we owe on the senior preferred stock and, therefore, we will need additional funds from Treasury in order to meet our dividend obligation to Treasury.

In addition, beginning in 2011, the senior preferred stock purchase agreement requires that we pay a quarterly commitment fee to Treasury. Although Treasury has waived this fee for the first quarter of 2011 due to adverse conditions in the mortgage market and its belief that imposing the commitment fee would not generate increased compensation for taxpayers, Treasury indicated that it would reevaluate whether to set the fee next quarter. The aggregate liquidation preference and dividend obligations relating to the preferred stock also will increase by the amount of any required dividend on the senior preferred stock that we fail to pay in cash and by the amount of any required quarterly commitment fee on the senior preferred stock that we fail to pay. The substantial dividend obligations and potentially substantial quarterly commitment fees on the senior preferred stock, coupled with our effective inability to pay down draws under the senior preferred stock purchase agreement, will continue to strain our financial resources and have an adverse impact on our results of operations, financial condition, liquidity and net worth, both in the short and long term.

***Our regulator is authorized or required to place us into receivership under specified conditions, which would result in the liquidation of our assets. Amounts recovered from the liquidation may be insufficient to cover our obligations or aggregate liquidation preference on our preferred stock, or provide any proceeds to common shareholders.***

Because of the weak economy, conditions in the housing market and our dividend obligation to Treasury, we will continue to need funding from Treasury to avoid a trigger of mandatory receivership under the GSE Act. In addition, we could be put into receivership at the discretion of the Director of FHFA at any time for other reasons, including conditions that FHFA has already asserted existed at the time the former Director of FHFA placed us into conservatorship.

A receivership would terminate the conservatorship. In addition to the powers FHFA has as our conservator, the appointment of FHFA as our receiver would terminate all rights and claims that our shareholders and creditors may have against our assets or under our charter arising from their status as shareholders or creditors, except for their right to payment, resolution or other satisfaction of their claims as permitted under the GSE Act. Unlike a conservatorship, the purpose of which is to conserve our assets and return us to a sound and solvent condition, the purpose of a receivership is to liquidate our assets and resolve claims against us.

In the event of a liquidation of our assets, only after payment of the secured and unsecured claims against the company (including repaying all outstanding debt obligations), the administrative expenses of the receiver and the liquidation preference of the senior preferred stock, would any liquidation proceeds be available to repay the liquidation preference on any other series of preferred stock. Finally, only after the liquidation preference on all series of preferred stock is repaid would any liquidation proceeds be available for distribution to the holders of our common stock. It is unlikely that there would be sufficient proceeds to repay the liquidation preference of any series of our preferred stock or to make any distribution to the holders of our common stock. To the extent we are placed into receivership and do not or cannot fulfill our guaranty to the holders of our Fannie Mae MBS, the MBS holders could become unsecured creditors of ours with respect to claims made under our guaranty.

***Our business and results of operations may be materially adversely affected if we are unable to retain and hire qualified employees.***

Our business processes are highly dependent on the talents and efforts of our employees. The uncertainty of our future and the public policy debate surrounding GSE reform, as well as limitations on employee compensation, our inability to offer equity compensation and our conservatorship, have adversely affected and may in the future adversely affect our ability to retain and recruit well-qualified employees. We face competition from within the financial services industry and from businesses outside of the financial services industry for qualified employees. An improving economy is likely to put additional pressures on turnover, as

FHFA 1477

attractive opportunities become available to our employees. If we lose a significant number of employees and are not able to quickly recruit and train new employees, it could negatively affect customer relationships and goodwill, and could have a material adverse effect on our ability to do business and our results of operations. In addition, management turnover may impair our ability to manage our business effectively. Since August 2008, we have had significant departures by various members of senior management, including two Chief Executive Officers and two Chief Financial Officers. Further turnover in key management positions and challenges in integrating new management could harm our ability to manage our business effectively and ultimately adversely affect our financial performance.

***Since 2008, we have experienced substantial deterioration in the credit performance of mortgage loans that we own or that back our guaranteed Fannie Mae MBS, which we expect to continue and result in additional credit-related expenses.***

We are exposed to mortgage credit risk relating to the mortgage loans that we hold in our investment portfolio and the mortgage loans that back our guaranteed Fannie Mae MBS. When borrowers fail to make required payments of principal and interest on their mortgage loans, we are exposed to the risk of credit losses and credit-related expenses.

While serious delinquency rates improved in recent months, conditions in the housing market contributed to a deterioration in the credit performance of our book of business, negatively impacting serious delinquency rates, default rates and average loan loss severity on the mortgage loans we hold or that back our guaranteed Fannie Mae MBS, as well as increasing our inventory of foreclosed properties. Increases in delinquencies, default rates and loss severity cause us to experience higher credit-related expenses. The credit performance of our book of business has also been negatively affected by the extent and duration of the decline in home prices and high unemployment. These credit performance trends have been notable in certain of our higher risk loan categories, states and vintages. Home price declines, adverse market conditions and continuing high levels of unemployment also have affected the credit performance of our broader book of business. Further, home price declines have resulted in a large number of borrowers with "negative equity" in their properties (that is, they owe more on their mortgage loans than their houses are worth), which increases the likelihood that either these borrowers will strategically default on their mortgage loans even if they have the ability to continue to pay the loans or that their homes will be sold in a "short sale" for significantly less than the unpaid amount of the loans. We present detailed information about the risk characteristics of our conventional single-family guaranty book of business in "MD&A—Risk Management—Credit Risk Management—Mortgage Credit Risk Management," and we present detailed information on our 2010 credit-related expenses, credit losses and results of operations in "MD&A—Consolidated Results of Operations."

Adverse credit performance trends may resume, particularly if we experience further national and regional declines in home prices, weak economic conditions and high unemployment.

***We expect further losses and write-downs relating to our investment securities.***

We experienced significant fair value losses and other-than-temporary impairment write-downs relating to our investment securities in 2008 and recorded significant other-than-temporary impairment write-downs of some of our available-for-sale securities in 2009. A substantial portion of these fair value losses and write-downs related to our investments in private-label mortgage-related securities backed by Alt-A and subprime mortgage loans and, in the case of fair value losses, our investments in commercial mortgage-backed securities ("CMBS") due to the decline in home prices and the weak economy. We expect to experience additional other-than-temporary impairment write-downs of our investments in private-label mortgage-related securities, including those that continue to be AAA-rated. See "MD&A—Consolidated Balance Sheet Analysis— Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities" for detailed information on our investments in private-label mortgage-related securities backed by Alt-A and subprime mortgage loans.

If the market for securities we hold in our investment portfolio is not liquid, we must use a greater amount of management judgment to value these securities. Later valuations and any price we ultimately would realize if

we were to sell these securities could be materially lower than the estimated fair value at which we carry them on our balance sheet.

Any of the above factors could require us to record additional write-downs in the value of our investment portfolio, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.

***Our business activities are significantly affected by the conservatorship and the senior preferred stock purchase agreement.***

We are currently under the control of our conservator, FHFA, and we do not know when or how the conservatorship will be terminated. As conservator, FHFA can direct us to enter into contracts or enter into contracts on our behalf, and generally has the power to transfer or sell any of our assets or liabilities. In addition, our directors do not have any duties to any person or entity except to the conservator. Accordingly, our directors are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS in making or approving a decision unless specifically directed to do so by the conservator.

The conservator has determined that while we are in conservatorship, we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship. In view of the conservatorship and the reasons stated for its establishment, it is likely that our business model and strategic objectives will continue to change, possibly significantly, including in pursuit of our public mission and other non-financial objectives. Among other things, we could experience significant changes in the size, growth and characteristics of our guarantor and investment activities, and we could further change our operational objectives, including our pricing strategy in our core mortgage guaranty business. Accordingly, our strategic and operational focus going forward may not be consistent with the investment objectives of our investors. In addition, we may be directed to engage in activities that are operationally difficult, costly to implement or unprofitable.

The senior preferred stock purchase agreement with Treasury includes a number of covenants that significantly restrict our business activities. We cannot, without the prior written consent of Treasury: pay dividends (except on the senior preferred stock); sell, issue, purchase or redeem Fannie Mae equity securities; sell, transfer, lease or otherwise dispose of assets in specified situations; engage in transactions with affiliates other than on arm's-length terms or in the ordinary course of business; issue subordinated debt; or incur indebtedness that would result in our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are allowed to own. In deciding whether to consent to any request for approval it receives from us under the agreement, Treasury has the right to withhold its consent for any reason and is not required by the agreement to consider any particular factors, including whether or not management believes that the transaction would benefit the company. Pursuant to the senior preferred stock purchase agreement, the maximum allowable amount of mortgage assets we may own on December 31, 2010 is $810 billion. (Our mortgage assets were approximately $788.8 billion as of that date.) On December 31, 2011, and each December 31 thereafter, our mortgage assets may not exceed 90% of the maximum allowable amount that we were permitted to own as of December 31 of the immediately preceding calendar year. The maximum allowable amount is reduced annually until it reaches $250 billion. This limit on the amount of mortgage assets we are permitted to hold could constrain the amount of delinquent loans we purchase from single-family MBS trusts, which could increase our costs.

We discuss the powers of the conservator, the terms of the senior preferred stock purchase agreement, and their impact on us and shareholders in "Business—Conservatorship and Treasury Agreements." These factors may adversely affect our business, results of operations, financial condition, liquidity and net worth.

***The conservatorship and investment by Treasury have had, and will continue to have, a material adverse effect on our common and preferred shareholders.***

We do not know when or how the conservatorship will be terminated. Moreover, even if the conservatorship is terminated, we remain subject to the terms of the senior preferred stock purchase agreement, senior preferred stock and warrant, which can only be cancelled or modified by mutual consent of Treasury and the

FHFA 1479

conservator. The conservatorship and investment by Treasury have had, and will continue to have, material adverse effects on our common and preferred shareholders, including the following:

*No voting rights during conservatorship.*   The rights and powers of our shareholders are suspended during the conservatorship. The conservatorship has no specified termination date. During the conservatorship, our common shareholders do not have the ability to elect directors or to vote on other matters unless the conservator delegates this authority to them.

*Dividends to common and preferred shareholders, other than to Treasury, have been eliminated.*   Under the terms of the senior preferred stock purchase agreement, dividends may not be paid to common or preferred shareholders (other than on the senior preferred stock) without the consent of Treasury, regardless of whether we are in conservatorship.

*Liquidation preference of senior preferred stock will increase, likely substantially.*   The senior preferred stock ranks prior to our common stock and all other series of our preferred stock, as well as any capital stock we issue in the future, as to both dividends and distributions upon liquidation. Accordingly, if we are liquidated, the senior preferred stock is entitled to its then-current liquidation preference, plus any accrued but unpaid dividends, before any distribution is made to the holders of our common stock or other preferred stock. As of December 31, 2010, the liquidation preference on the senior preferred stock was $88.6 billion; however, it will increase to $91.2 billion when Treasury provides the additional $2.6 billion FHFA has already requested on our behalf. The liquidation preference could increase substantially as we draw on Treasury's funding commitment, if we do not pay dividends owed on the senior preferred stock or if we do not pay the quarterly commitment fee under the senior preferred stock purchase agreement. If we are liquidated, it is unlikely that there would be sufficient funds remaining after payment of amounts to our creditors and to Treasury as holder of the senior preferred stock to make any distribution to holders of our common stock and other preferred stock.

*Exercise of the Treasury warrant would substantially dilute investment of current shareholders.*   If Treasury exercises its warrant to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis, the ownership interest in the company of our then existing common shareholders will be substantially diluted, and we would thereafter have a controlling shareholder.

*No longer managed for the benefit of shareholders.*   Because we are in conservatorship, we are no longer managed with a strategy to maximize shareholder returns.

For additional description of the restrictions on us and the risks to our shareholders, see "Business—Conservatorship and Treasury Agreements."

**Efforts we are required or asked to undertake by FHFA, other government agencies or Congress in pursuit of providing liquidity, stability and affordability to the mortgage market and providing assistance to struggling homeowners, or in pursuit of other goals, may adversely affect our business, results of operations, financial condition, liquidity and net worth.**

Prior to the conservatorship, our business was managed with a strategy to maximize shareholder returns, while fulfilling our mission. Our conservator has directed us to focus primarily on minimizing our credit losses from delinquent mortgages and providing assistance to struggling homeowners to help them remain in their homes. As a result, we may continue to take a variety of actions designed to address this focus that could adversely affect our economic returns, possibly significantly, such as: reducing our guaranty fees and modifying loans to extend the maturity, lower the interest rate or defer or forgive principal owed by the borrower. These activities may have short- and long-term adverse effects on our business, results of operations, financial condition, liquidity and net worth. Other agencies of the U.S. government or Congress also may ask us to undertake significant efforts to support the housing and mortgage markets, as well as struggling homeowners. For example, under the Administration's Making Home Affordable Program, we are offering HAMP. We have incurred substantial costs in connection with the program, as we discuss in "MD&A—Consolidated Results of Operations—Financial Impact of the Making Home Affordable Program on Fannie Mae."

FHFA 1480

***We may be unable to meet our housing goals and duty to serve requirements, and actions we take to meet those requirements may adversely affect our business, results of operations, financial condition, liquidity and net worth.***

To meet our housing goals obligations, a portion of the mortgage loans we acquire must be for low- and very-low income families, families in low-income census tracts and moderate-income families in minority census tracts or designated disaster areas. In addition, when a final duty-to-serve rule is issued, we will have a duty to serve three underserved markets: manufactured housing, affordable housing preservation and rural areas. We may take actions to meet these obligations that could increase our credit losses and credit-related expenses. If we fail to meet our housing goals in a given year and FHFA finds that they were feasible, or if we fail to comply with our duty to serve requirements, we may become subject to a housing plan that could require us to take additional steps that could have an adverse effect on our financial condition. The housing plan must describe the actions we would take to meet the goals and/or duty to serve in the next calendar year and be approved by FHFA. With respect to our housing goals, the potential penalties for failure to comply with housing plan requirements are a cease-and-desist order and civil money penalties.

Mortgage market conditions during 2010 negatively affected our ability to meet our goals. These conditions included a reduction in single-family borrowing by low-income purchasers following the expiration of the home buyer tax credits, an increase in the share of mortgages made to moderate-income borrowers due to low interest rates, continuing high unemployment, strengthened underwriting and eligibility standards, increased standards of private mortgage insurers and the increased role of FHA in acquiring goals-qualifying mortgage loans. Some or all of these conditions are likely to continue in 2011. We cannot predict the impact that market conditions during 2011 will have on our ability to meet our 2011 housing goals and duty to serve requirements.

For more information about our housing goals and duty to serve requirements, as well as our 2010 housing goals performance, please see "Business—Our Charter and Regulation of Our Activities—Housing Goals and Duty to Serve Underserved Markets."

***Limitations on our ability to access the debt capital markets could have a material adverse effect on our ability to fund our operations and generate net interest income.***

Our ability to fund our business depends primarily on our ongoing access to the debt capital markets. Our level of net interest income depends on how much lower our cost of funds is compared to what we earn on our mortgage assets. Market concerns about matters such as the extent of government support for our business and the future of our business (including future profitability, future structure, regulatory actions and GSE status) could cause a severe negative effect on our access to the unsecured debt markets, particularly for long-term debt. We believe that our ability in 2010 to issue debt of varying maturities at attractive pricing resulted from federal government support of us and the financial markets, including the Federal Reserve's purchases of our debt and MBS. As a result, we believe that our status as a GSE and continued federal government support of our business is essential to maintaining our access to debt funding. Changes or perceived changes in the government's support of us or the markets could have a material adverse effect on our ability to fund our operations. On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. Please see "MD&A—Liquidity and Capital Management—Liquidity Management—Debt Funding—Fannie Mae Debt Funding Activity" for a more complete discussion of actions taken by the federal government to support us and the financial markets. However, there can be no assurance that the government will continue to support us or that our current level of access to debt funding will continue.

In addition, future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, as well as our liquidity position. If we are unable to issue both short- and long-term debt securities at attractive rates and in amounts sufficient to operate our business and meet our

obligations, it likely would interfere with the operation of our business and have a material adverse effect on our liquidity, results of operations, financial condition and net worth.

***Our liquidity contingency plans may be difficult or impossible to execute during a liquidity crisis.***

We believe that our liquidity contingency plans may be difficult or impossible to execute during a liquidity crisis. As a result if we cannot access the unsecured debt markets, our ability to repay maturing indebtedness and fund our operations could be significantly impaired. If adverse market conditions resulted in our being unable to access the unsecured debt markets, our alternative sources of liquidity consist of our cash and other investments portfolio and the unencumbered mortgage assets in our mortgage portfolio.

We believe that the amount of mortgage-related assets that we could successfully borrow against or sell in the event of a liquidity crisis or significant market disruption is substantially lower than the amount of mortgage-related assets we hold. Due to the large size of our portfolio of mortgage assets, current market conditions and the significant amount of distressed assets in our mortgage portfolio, it is unlikely that there would be sufficient market demand for large amounts of these assets over a prolonged period of time, particularly during a liquidity crisis, which could limit our ability to borrow against or sell these assets.

To the extent that we would be able to obtain funding by pledging or selling mortgage-related securities as collateral, we anticipate that a discount would be applied that would reduce the value assigned to those securities. Depending on market conditions at the time, this discount would result in proceeds significantly lower than the current market value of these securities and would thereby reduce the amount of financing we would obtain. In addition, our primary source of collateral is Fannie Mae MBS that we own. In the event of a liquidity crisis in which the future of our company is uncertain, counterparties may be unwilling to accept Fannie Mae MBS as collateral. As a result, we may not be able to sell or borrow against these securities in sufficient amounts to meet our liquidity needs.

***A decrease in the credit ratings on our senior unsecured debt would likely have an adverse effect on our ability to issue debt on reasonable terms and trigger additional collateral requirements.***

Our borrowing costs and our access to the debt capital markets depend in large part on the high credit ratings on our senior unsecured debt. Credit ratings on our debt are subject to revision or withdrawal at any time by the rating agencies. Actions by governmental entities impacting the support we receive from Treasury could adversely affect the credit ratings on our senior unsecured debt. The reduction in our credit ratings would likely increase our borrowing costs, limit our access to the capital markets and trigger additional collateral requirements under our derivatives contracts and other borrowing arrangements. It may also reduce our earnings and materially adversely affect our liquidity, our ability to conduct our normal business operations, our financial condition and results of operations. Our credit ratings and ratings outlook are included in "MD&A—Liquidity and Capital Management—Liquidity Management—Credit Ratings."

***Deterioration in the credit quality of, or defaults by, one or more of our institutional counterparties could result in financial losses, business disruption and decreased ability to manage risk.***

We face the risk that one or more of our institutional counterparties may fail to fulfill their contractual obligations to us. Unfavorable market conditions since 2008 have adversely affected the liquidity and financial condition of our institutional counterparties. Our primary exposures to institutional counterparty risk are with mortgage seller/servicers that service the loans we hold in our mortgage portfolio or that back our Fannie Mae MBS; seller/servicers that are obligated to repurchase loans from us or reimburse us for losses in certain circumstances; third-party providers of credit enhancement on the mortgage assets that we hold in our mortgage portfolio or that back our Fannie Mae MBS, including mortgage insurers, lenders with risk sharing arrangements and financial guarantors; issuers of securities held in our cash and other investments portfolio; and derivatives counterparties.

We may have multiple exposures to one counterparty as many of our counterparties provide several types of services to us. For example, our lender customers or their affiliates also act as derivatives counterparties, mortgage servicers, custodial depository institutions or document custodians. Accordingly, if one of these

59

counterparties were to become insolvent or otherwise default on its obligations to us, it could harm our business and financial results in a variety of ways.

An institutional counterparty may default in its obligations to us for a number of reasons, such as changes in financial condition that affect its credit rating, a reduction in liquidity, operational failures or insolvency. A number of our institutional counterparties are currently experiencing financial difficulties that may negatively affect the ability of these counterparties to meet their obligations to us and the amount or quality of the products or services they provide to us. Counterparty defaults or limitations on their ability to do business with us could result in significant financial losses or hamper our ability to do business, which would adversely affect our business, results of operations, financial condition, liquidity and net worth.

We routinely execute a high volume of transactions with counterparties in the financial services industry. Many of the transactions we engage in with these counterparties expose us to credit risk relating to the possibility of a default by our counterparties. In addition, to the extent these transactions are secured, our credit risk may be exacerbated to the extent that the collateral we hold cannot be realized or can be liquidated only at prices too low to recover the full amount of the loan or derivative exposure. We have exposure to these financial institutions in the form of unsecured debt instruments and derivatives transactions. As a result, we could incur losses relating to defaults under these instruments or relating to impairments to the carrying value of our assets represented by these instruments. These losses could materially and adversely affect our business, results of operations, financial condition, liquidity and net worth.

We depend on our ability to enter into derivatives transactions in order to manage the duration and prepayment risk of our mortgage portfolio. If we lose access to our derivatives counterparties, it could adversely affect our ability to manage these risks, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.

***Deterioration in the credit quality of, or defaults by, one or more of our mortgage insurer counterparties could result in nonpayment of claims under mortgage insurance policies, business disruptions and increased concentration risk.***

We rely heavily on mortgage insurers to provide insurance against borrower defaults on conventional single-family mortgage loans with LTV ratios over 80% at the time of acquisition. The current weakened financial condition of our mortgage insurer counterparties creates a significant risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. Since January 1, 2009, the insurer financial strength ratings of all of our major mortgage insurer counterparties have been downgraded to reflect their weakened financial condition, in some cases more than once. One of our mortgage insurer counterparties ceased issuing commitments for new mortgage insurance in 2008, and, under an order received from its regulator, is now paying all valid claims 60% in cash and 40% by the creation of a deferred payment obligation, which may be paid in the future.

A number of our mortgage insurers publicly disclosed that they have exceeded or might exceed the state-imposed risk-to-capital limits under which they operate and they might not have access to sufficient capital to continue to write new business in accordance with state regulatory requirements. In addition, a number of our mortgage insurers have received waivers from their regulators regarding state-imposed risk-to-capital limits. However, these waivers are temporary. Some mortgage insurers have been exploring corporate restructurings, intended to provide relief from risk-to-capital limits in certain states. A restructuring plan that would involve contributing capital to a subsidiary would result in less liquidity available to its parent company to pay claims on its existing book of business and an increased risk that its parent company will not pay its claims in full in the future.

If mortgage insurers are not able to raise capital and exceed their risk-to-capital limits, they will likely be forced into run-off or receivership unless they can secure a waiver from their state regulator. This would increase the risk that they will fail to pay our claims under insurance policies, and could also cause the quality and speed of their claims processing to deteriorate. If our assessment of one or more of our mortgage insurer counterparty's ability to fulfill its obligations to us worsens and our internal credit rating for the insurer is

FHFA 1483

further downgraded, it could result in a significant increase in our loss reserves and a significant increase in the fair value of our guaranty obligations.

Many mortgage insurers stopped insuring new mortgages with higher loan-to-value ratios or with lower borrower credit scores or on select property types, which has contributed to the reduction in our business volumes for high loan-to-value ratio loans. As our charter generally requires us to obtain credit enhancement on conventional single-family mortgage loans with loan-to-value ratios over 80% at the time of purchase, an inability to find suitable credit enhancement may inhibit our ability to pursue new business opportunities, meet our housing goals and otherwise support the housing and mortgage markets. For example, where mortgage insurance or other credit enhancement is not available, we may be hindered in our ability to refinance loans into more affordable loans. In addition, access to fewer mortgage insurer counterparties will increase our concentration risk with the remaining mortgage insurers in the industry.

***The loss of business volume from any one of our key lender customers could adversely affect our business and result in a decrease in our revenues.***

Our ability to generate revenue from the purchase and securitization of mortgage loans depends on our ability to acquire a steady flow of mortgage loans from the originators of those loans. We acquire most of our mortgage loans through mortgage purchase volume commitments that are negotiated annually or semiannually with lender customers and that establish a minimum level of mortgage volume that these customers will deliver to us. We acquire a significant portion of our mortgage loans from several large mortgage lenders. During 2010, our top five lender customers, in the aggregate, accounted for approximately 62% of our single-family business volume, with three of our customers accounting for greater than 52% of our single-family business volume. Accordingly, maintaining our current business relationships and business volumes with our top lender customers is critical to our business.

The mortgage industry has been consolidating and a decreasing number of large lenders originate most single-family mortgages. The loss of business from any one of our major lender customers could adversely affect our revenues and the liquidity of Fannie Mae MBS, which in turn could have an adverse effect on their market value. In addition, as we become more reliant on a smaller number of lender customers, our negotiating leverage with these customers decreases, which could diminish our ability to price our products optimally.

In addition, many of our lender customers are experiencing, or may experience in the future, financial and liquidity problems that may affect the volume of business they are able to generate. Many of our lender customers also strengthened their lending criteria, which reduced their loan volume. If any of our key lender customers significantly reduces the volume or quality of mortgage loans that the lender delivers to us or that we are willing to buy from them, we could lose significant business volume that we might be unable to replace, which could adversely affect our business and result in a decrease in our revenues. Our demands that our lender customers repurchase or compensate us for losses on loans that do not meet our underwriting and eligibility standards may strain our relationships with our lender customers and may also result in our customers reducing the volume of loans they provide us. A significant reduction in the volume of mortgage loans that we securitize could reduce the liquidity of Fannie Mae MBS, which in turn could have an adverse effect on their market value.

***Our reliance on third parties to service our mortgage loans may impede our efforts to keep people in their homes, as well as the re-performance rate of loans we modify.***

Mortgage servicers, or their agents and contractors, typically are the primary point of contact for borrowers as we delegate servicing responsibilities to them. We rely on these mortgage servicers to identify and contact troubled borrowers as early as possible, to assess the situation and offer appropriate options for resolving the problem and to successfully implement a solution. The demands placed on experienced mortgage loan servicers to service delinquent loans have increased significantly across the industry, straining servicer capacity. The Making Home Affordable Program is also impacting servicer resources. To the extent that mortgage servicers are hampered by limited resources or other factors, they may not be successful in conducting their servicing activities in a manner that fully accomplishes our objectives within the timeframe we desire. Further, our servicers have advised us that they have not been able to reach many of the borrowers

who may need help with their mortgage loans even when repeated efforts have been made to contact the borrower.

For these reasons, our ability to actively manage the troubled loans that we own or guarantee, and to implement our homeownership assistance and foreclosure prevention efforts quickly and effectively, may be limited by our reliance on our mortgage servicers. Our inability to effectively manage these loans and implement these efforts could have a material adverse effect on our business, results of operations and financial condition.

***Deficiencies in servicer and law firm foreclosure processes and the resulting foreclosure pause may cause higher credit losses and credit-related expenses.***

A number of our single-family mortgage servicers temporarily halted foreclosures in the fall of 2010 in some or all states after discovering deficiencies in their processes and the processes of their lawyers and other service providers relating to the execution of affidavits in connection with the foreclosure process. This foreclosure pause could expand to additional servicers and states, and possibly to all or substantially all of our loans in the foreclosure process. Some servicers have lifted the foreclosure pause in some jurisdictions, while continuing the pause in others.

Although we cannot predict the ultimate impact of this foreclosure pause on our business at this time, we expect the pause will likely result in higher serious delinquency rates, longer foreclosure timelines and higher foreclosed property expenses. This foreclosure pause could also negatively affect the value of our REO inventory and the severity of our losses on foreclosed properties. In addition, this foreclosure pause could negatively affect housing market conditions and delay the recovery of the housing market. As a result, we expect this foreclosure pause will likely result in higher credit losses and credit-related expenses. This foreclosure pause may also negatively affect the value of the private-label securities we hold and result in additional impairments on these securities.

The foreclosure process deficiencies have generated significant concern and are currently being investigated by various government agencies and the attorneys general of all fifty states. These foreclosure process deficiencies could lead to expensive or time-consuming new regulation, such as new rules applicable to the foreclosure process recently issued by courts in some states. In addition, the failure of our servicers or a law firm to apply prudent and effective process controls and to comply with legal and other requirements in the foreclosure process poses operational, reputational and legal risks for us. As a result, depending on the duration and extent of the foreclosure pause and the foreclosure process deficiencies, these matters could have a material adverse effect on our business.

***Challenges to the MERS® System could pose counterparty, operational, reputational and legal risks for us.***

MERSCORP, Inc. is a privately held company that maintains an electronic registry (the "MERS System") that tracks servicing rights and ownership of loans in the United States. Mortgage Electronic Registration Systems, Inc. ("MERS"), a wholly owned subsidiary of MERSCORP, Inc., can serve as a nominee for the owner of a mortgage loan and, in that role, become the mortgagee of record for the loan in local land records. Fannie Mae seller/servicers may choose to use MERS as a nominee; however, we have prohibited servicers from initiating foreclosures on Fannie Mae loans in MERS's name. Approximately half of the loans we own or guarantee are registered in MERS's name and the related servicing rights are tracked in the MERS System. The MERS System is widely used by participants in the mortgage finance industry. Along with a number of other organizations in the mortgage finance industry, we are a shareholder of MERSCORP, Inc.

Several legal challenges have been made disputing MERS's legal standing to initiate foreclosures and/or act as nominee in local land records. These challenges have focused public attention on MERS and on how loans are recorded in local land records. As a result, these challenges could negatively affect MERS's ability to serve as the mortgagee of record in some jurisdictions. In addition, where MERS is the mortgagee of record, it must execute assignments of mortgages, affidavits and other legal documents in connection with foreclosure proceedings. As a result, investigations by governmental authorities and others into the servicer foreclosure process deficiencies discussed above may impact MERS. Failures by MERS to apply prudent and effective process controls and to comply with legal and other requirements could pose counterparty, operational,

reputational and legal risks for us. If investigations or new regulation or legislation restricts servicers' use of MERS, our counterparties may be required to record all mortgage transfers in land records, incurring additional costs and time in the recordation process. At this time, we cannot predict the ultimate outcome of these legal challenges to MERS or the impact on our business, results of operations and financial condition.

***Changes in accounting standards can be difficult to predict and can materially impact how we record and report our financial results.***

Our accounting policies and methods are fundamental to how we record and report our financial condition and results of operations. From time to time, FASB changes the financial accounting and reporting standards that govern the preparation of our financial statements. In addition, those who set or interpret accounting standards may amend or even reverse their previous interpretations or positions on how these standards should be applied. These changes can be difficult to predict and expensive to implement, can divert management's attention from other matters, and can materially impact how we record and report our financial condition and results of operations.

***Material weaknesses in our internal control over financial reporting could result in errors in our reported results or disclosures that are not complete or accurate.***

Management has determined that, as of the date of this filing, we have ineffective disclosure controls and procedures and a material weakness in our internal control over financial reporting. In addition, our independent registered public accounting firm, Deloitte & Touche LLP, has expressed an adverse opinion on our internal control over financial reporting because of the material weakness. Our ineffective disclosure controls and procedures and material weakness could result in errors in our reported results or disclosures that are not complete or accurate, which could have a material adverse effect on our business and operations.

Our material weakness relates specifically to the impact of the conservatorship on our disclosure controls and procedures. Because we are under the control of FHFA, some of the information that we may need to meet our disclosure obligations may be solely within the knowledge of FHFA. As our conservator, FHFA has the power to take actions without our knowledge that could be material to our shareholders and other stakeholders, and could significantly affect our financial performance or our continued existence as an ongoing business. Because FHFA currently functions as both our regulator and our conservator, there are inherent structural limitations on our ability to design, implement, test or operate effective disclosure controls and procedures relating to information within FHFA's knowledge. As a result, we have not been able to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our financial statements. Given the structural nature of this material weakness, it is likely that we will not remediate this weakness while we are under conservatorship. See "Controls and Procedures" for further discussion of management's conclusions on our disclosure controls and procedures and internal control over financial reporting.

***Operational control weaknesses could materially adversely affect our business, cause financial losses and harm our reputation.***

Shortcomings or failures in our internal processes, people or systems could have a material adverse effect on our risk management, liquidity, financial statement reliability, financial condition and results of operations; disrupt our business; and result in legislative or regulatory intervention, liability to customers and financial losses or damage to our reputation, including as a result of our inadvertent dissemination of confidential or inaccurate information. For example, our business is dependent on our ability to manage and process, on a daily basis, an extremely large number of transactions across numerous and diverse markets and in an environment in which we must make frequent changes to our core processes in response to changing external conditions. These transactions are subject to various legal and regulatory standards.

We rely upon business processes that are highly dependent on people, legacy technology and the use of numerous complex systems and models to manage our business and produce books and records upon which our financial statements are prepared. This reliance increases the risk that we may be exposed to financial,

reputational or other losses as a result of inadequately designed internal processes or systems, or failed execution of our systems. Our operational risk management efforts are aimed at reducing this risk.

We continue to implement our operational risk management framework, which consists of a set of integrated processes, tools and strategies designed to support the identification, assessment, mitigation and control, and reporting and monitoring of operational risk. We also have made a number of changes in our structure, business focus and operations during the past two years, as well as changes to our risk management processes, to keep pace with changing external conditions. These changes, in turn, have necessitated modifications to or development of new business models, processes, systems, policies, standards and controls. While we believe that the steps we have taken and are taking to enhance our technology and operational controls and organizational structure will help identify, assess, mitigate, control and monitor operational risk, our implementation of our operational risk management framework may not be effective to manage these risks and may create additional operational risk as we execute these enhancements.

In addition, we have experienced, and expect we may continue to experience, substantial changes in management, employees and our business structure and practices since the conservatorship began. These changes could increase our operational risk and result in business interruptions and financial losses. In addition, due to events that are wholly or partially beyond our control, employees or third parties could engage in improper or unauthorized actions, or our systems could fail to operate properly, which could lead to financial losses, business disruptions, legal and regulatory sanctions and reputational damage.

***In many cases, our accounting policies and methods, which are fundamental to how we report our financial condition and results of operations, require management to make judgments and estimates about matters that are inherently uncertain. Management also relies on models in making these estimates.***

Our accounting policies and methods are fundamental to how we record and report our financial condition and results of operations. Our management must exercise judgment in applying many of these accounting policies and methods so that these policies and methods comply with GAAP and reflect management's judgment of the most appropriate manner to report our financial condition and results of operations. In some cases, management must select the appropriate accounting policy or method from two or more alternatives, any of which might be reasonable under the circumstances but might affect the amounts of assets, liabilities, revenues and expenses that we report. See "Note 1, Summary of Significant Accounting Policies" for a description of our significant accounting policies.

We have identified three accounting policies as critical to the presentation of our financial condition and results of operations. These accounting policies are described in "MD&A—Critical Accounting Policies and Estimates." We believe these policies are critical because they require management to make particularly subjective or complex judgments about matters that are inherently uncertain and because of the likelihood that materially different amounts would be reported under different conditions or using different assumptions. Due to the complexity of these critical accounting policies, our accounting methods relating to these policies involve substantial use of models. Models are inherently imperfect predictors of actual results because they are based on assumptions, including assumptions about future events. Our models may not include assumptions that reflect very positive or very negative market conditions and, accordingly, our actual results could differ significantly from those generated by our models. As a result of the above factors, the estimates that we use to prepare our financial statements, as well as our estimates of our future results of operations, may be inaccurate, potentially significantly.

***Failure of our models to produce reliable results may adversely affect our ability to manage risk and make effective business decisions.***

We make significant use of business and financial models to measure and monitor our risk exposures and to manage our business. For example, we use models to measure and monitor our exposures to interest rate, credit and market risks, and to forecast credit losses. The information provided by these models is used in making business decisions relating to strategies, initiatives, transactions, pricing and products.

Models are inherently imperfect predictors of actual results because they are based on historical data available to us and our assumptions about factors such as future loan demand, borrower behavior, creditworthiness,

home price trends and other factors that may overstate or understate future experience. Models can produce unreliable results for a number of reasons, including invalid or incorrect assumptions, incorrect computer coding, flaws in data or data use, inappropriate application of a model to products or events outside the model's intended use and, fundamentally, the inherent limitations of relying on historical data to predict future results, especially in the face of unprecedented events. Adjustments to models or model results are sometimes required to align the results with management's best judgment.

We continually receive new economic and mortgage market data, such as housing starts and sales and home price changes. Our critical accounting estimates, such as our loss reserves and other-than-temporary impairments, are subject to change, sometimes significantly, due to the nature and magnitude of changes in market conditions. However, there is generally a lag between the availability of this market information and the preparation of our financial statements. When market conditions change quickly and in unforeseen ways, there is an increased risk that the assumptions and inputs reflected in our models are not representative of the most recent market conditions.

In addition, we may take actions that require us to rely on management judgment and adjustments to our models if circumstances preclude effective execution of our standard control processes required for a formal model update. These control processes include model research, testing, independent validation and implementation. In a rapidly changing environment, it may not be possible to update existing models quickly enough to ensure they properly account for the most recently available data and events. Model adjustments are a means of mitigating circumstances where models cannot be updated quickly enough, but the resulting model output is only as reliable as the underlying management judgment.

If our models fail to produce reliable results on an ongoing basis, we may not make appropriate risk management decisions, including decisions affecting loan purchases, management of credit losses, guaranty fee pricing, asset and liability management and the management of our net worth. Any of these decisions could adversely affect our businesses, results of operations, liquidity, net worth and financial condition. Furthermore, strategies we employ to manage the risks associated with our use of models may not be effective or fully reliable.

***Changes in interest rates or our loss of the ability to manage interest rate risk successfully, could adversely affect our net interest income and increase interest rate risk.***

We fund our operations primarily through the issuance of debt and invest our funds primarily in mortgage-related assets that permit mortgage borrowers to prepay their mortgages at any time. These business activities expose us to market risk, which is the risk of adverse changes in the fair value of financial instruments resulting from changes in market conditions. Our most significant market risks are interest rate risk and prepayment risk. We describe these risks in more detail in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management." Changes in interest rates affect both the value of our mortgage assets and prepayment rates on our mortgage loans.

Changes in interest rates could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. Our ability to manage interest rate risk depends on our ability to issue debt instruments with a range of maturities and other features, including call provisions, at attractive rates and to engage in derivatives transactions. We must exercise judgment in selecting the amount, type and mix of debt and derivatives instruments that will most effectively manage our interest rate risk. The amount, type and mix of financial instruments that are available to us may not offset possible future changes in the spread between our borrowing costs and the interest we earn on our mortgage assets.

***Our business is subject to laws and regulations that restrict our activities and operations, which may prohibit us from undertaking activities that management believes would benefit our business and limit our ability to diversify our business.***

As a federally chartered corporation, we are subject to the limitations imposed by the Charter Act, extensive regulation, supervision and examination by FHFA and regulation by other federal agencies, including Treasury, HUD and the SEC. As a company under conservatorship, our primary regulator has management authority

FHFA 1488

over us in its role as our conservator. We are also subject to other laws and regulations that affect our business, including those regarding taxation and privacy.

The Charter Act defines our permissible business activities. For example, we may not originate mortgage loans or purchase single-family loans in excess of the conforming loan limits, and our business is limited to the U.S. housing finance sector. In addition, our conservator has determined that, while in conservatorship, we will not be permitted to engage in new products and will be limited to continuing our existing business activities and taking actions necessary to advance the goals of the conservatorship. As a result of these limitations on our ability to diversify our operations, our financial condition and earnings depend almost entirely on conditions in a single sector of the U.S. economy, specifically, the U.S. housing market. The weak and unstable condition of the U.S. housing market over the past approximately three to four years has therefore had a significant adverse effect on our results of operations, financial condition and net worth, which is likely to continue.

***We could be required to pay substantial judgments, settlements or other penalties as a result of pending government investigations and civil litigation.***

We are subject to investigations by the Department of Justice and the SEC, and are a party to a number of lawsuits. We are unable at this time to estimate our potential liability in these matters, but may be required to pay substantial judgments, settlements or other penalties and incur significant expenses in connection with these investigations and lawsuits, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. In addition, responding to requests for information in these investigations and lawsuits may divert significant internal resources away from managing our business. More information regarding these investigations and lawsuits is included in "Legal Proceedings" and "Note 20, Commitments and Contingencies."

***Our common and preferred stock have been delisted from the NYSE and the Chicago Stock Exchange, which could adversely affect the market price and liquidity of our delisted securities.***

Our common stock and previously-listed series of our preferred stock were delisted from the New York Stock Exchange and the Chicago Stock Exchange on July 8, 2010 and are now traded exclusively in the over-the-counter market. The market price of our common stock has declined significantly since June 16, 2010, the date we announced our intention to delist these securities, and may decline further.

There can be no assurance that an active trading market in our equity securities will continue to exist. Our quoted securities are likely to experience price and volume fluctuations which may be more significant than when our securities were listed on a national securities exchange, which could adversely affect the market price of these securities. We cannot predict the actions of market makers, investors or other market participants, and can offer no assurances that the market for our securities will be stable.

***Mortgage fraud could result in significant financial losses and harm to our reputation.***

We use a process of delegated underwriting in which lenders make specific representations and warranties about the characteristics of the single-family mortgage loans we purchase and securitize. As a result, we do not independently verify most borrower information that is provided to us. This exposes us to the risk that one or more of the parties involved in a transaction (the borrower, seller, broker, appraiser, title agent, lender or servicer) will engage in fraud by misrepresenting facts about a mortgage loan. We have experienced financial losses resulting from mortgage fraud, including institutional fraud perpetrated by counterparties. In the future, we may experience additional financial losses or reputational damage as a result of mortgage fraud.

## RISKS RELATING TO OUR INDUSTRY

***A further decline in U.S. home prices or activity in the U.S. housing market would likely cause higher credit losses and credit-related expenses, and lower business volumes.***

We expect weakness in the real estate financial markets to continue in 2011. The deterioration in the credit condition of outstanding mortgages will result in the foreclosure of some troubled loans, which is likely to add

FHFA 1489

to excess inventory of unsold homes. We also expect heightened default and severity rates to continue during this period, and home prices, particularly in some geographic areas, may decline further. Any resulting increase in delinquencies or defaults, or in severity, will likely result in a higher level of credit losses and credit-related expenses, which in turn will reduce our earnings and adversely affect our net worth and financial condition.

Our business volume is affected by the rate of growth in total U.S. residential mortgage debt outstanding and the size of the U.S. residential mortgage market. The rate of growth in total U.S. residential mortgage debt outstanding has declined substantially in response to the reduced activity in the housing market and declines in home prices, and we expect single-family mortgage debt outstanding to decrease by approximately 2% in 2011. A decline in the rate of growth in mortgage debt outstanding reduces the unpaid principal balance of mortgage loans available for us to purchase or securitize, which in turn could reduce our net interest income and guaranty fee income. Even if we are able to increase our share of the secondary mortgage market, it may not be sufficient to make up for the decline in the rate of growth in mortgage originations, which could adversely affect our results of operations and financial condition.

***The Dodd-Frank Act and regulatory changes in the financial services industry may negatively impact our business.***

The Dodd-Frank Act will significantly change the regulation of the financial services industry, including by the creation of new standards related to regulatory oversight of systemically important financial companies, derivatives transactions, asset-backed securitization, mortgage underwriting and consumer financial protection. This legislation will directly and indirectly affect many aspects of our business and could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. The Dodd-Frank Act and related future regulatory changes could require us to change certain business practices, cause us to incur significant additional costs, limit the products we offer, require us to increase our regulatory capital or otherwise adversely affect our business. Additionally, implementation of this legislation will result in increased supervision and more comprehensive regulation of our customers and counterparties in the financial services industry, which may have a significant impact on the business practices of our customers and counterparties, as well as on our counterparty credit risk.

Examples of aspects of the Dodd-Frank Act and related future regulatory changes that, if applicable, may significantly affect us include mandatory clearing of certain derivatives transactions, which could impose significant additional costs on us; minimum standards for residential mortgage loans, which could subject us to increased legal risk for loans we purchase or guarantee; and the development of credit risk retention regulations applicable to residential mortgage loan securitizations, which could impact the types and volume of loans sold to us. We could also be designated as a systemically important nonbank financial company subject to supervision and regulation by the Federal Reserve. If this were to occur, the Federal Reserve would have the authority to examine us and could impose stricter prudential standards on us, including risk-based capital requirements, leverage limits, liquidity requirements, credit concentration limits, resolution plan and credit exposure reporting requirements, overall risk management requirements, contingent capital requirements, enhanced public disclosures and short-term debt limits. Regulators have been seeking public comment regarding the criteria for designating nonbank financial companies for heightened supervision.

Because federal agencies have not completed the extensive rulemaking processes needed to implement and clarify many of the provisions of the Dodd-Frank Act, it is difficult to assess fully the impact of this legislation on our business and industry at this time, nor can we predict what similar changes to statutes or regulations will occur in the future.

Recent revisions by the Basel Committee on Banking Supervision to international capital requirements, referred to as Basel III, may also have a significant impact on us or on the business practices of our customers and counterparties. Depending on how they are implemented by regulators, the Basel III rules could be the basis for a revised framework for GSE capital standards that could increase our capital requirements. The Basel III rules could also affect investor demand for our debt and MBS securities, and could limit some lenders' ability to count their rights to service mortgage loans toward meeting their regulatory capital

FHFA 1490

requirements, which may reduce the economic value of mortgage servicing rights. As a result, a number of our customers and counterparties may change their business practices.

In addition, the actions of Treasury, the CFTC, the SEC, the Federal Deposit Insurance Corporation, the Federal Reserve and international central banking authorities directly or indirectly impact financial institutions' cost of funds for lending, capital raising and investment activities, which could increase our borrowing costs or make borrowing more difficult for us. Changes in monetary policy are beyond our control and difficult to anticipate.

Legislative and regulatory changes could affect us in substantial and unforeseeable ways and could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. In particular, these changes could affect our ability to issue debt and may reduce our customer base.

***Structural changes in the financial services industry may negatively impact our business.***

The financial market crisis has resulted in mergers of some of our most significant institutional counterparties. Consolidation of the financial services industry has increased and may continue to increase our concentration risk to counterparties in this industry, and we are and may become more reliant on a smaller number of institutional counterparties. This both increases our risk exposure to any individual counterparty and decreases our negotiating leverage with these counterparties. The structural changes in the financial services industry could affect us in substantial and unforeseeable ways and could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.

***The occurrence of a major natural or other disaster in the United States could negatively impact our credit losses and credit-related expenses or disrupt our business operations in the affected geographic area.***

We conduct our business in the residential mortgage market and own or guarantee the performance of mortgage loans throughout the United States. The occurrence of a major natural or environmental disaster, terrorist attack, pandemic, or similar event (a "major disruptive event") in a regional geographic area of the United States could negatively impact our credit losses and credit-related expenses in the affected area.

The occurrence of a major disruptive event could negatively impact a geographic area in a number of different ways, depending on the nature of the event. A major disruptive event that either damaged or destroyed residential real estate underlying mortgage loans in our book of business or negatively impacted the ability of homeowners to continue to make principal and interest payments on mortgage loans in our book of business could increase our delinquency rates, default rates and average loan loss severity of our book of business in the affected region or regions, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. While we attempt to create a geographically diverse mortgage credit book of business, there can be no assurance that a major disruptive event, depending on its magnitude, scope and nature, will not generate significant credit losses and credit-related expenses.

Additionally, the contingency plans and facilities that we have in place may be insufficient to prevent an adverse effect on our ability to conduct business, which could lead to financial losses. Substantially all of our senior management and investment personnel work out of our offices in the Washington, DC metropolitan area. If a disruption occurs and our senior management or other employees are unable to occupy our offices, communicate with other personnel or travel to other locations, our ability to interact with each other and with our customers may suffer, and we may not be successful in implementing contingency plans that depend on communication or travel.

## Item 1B.   Unresolved Staff Comments

None.

## Item 2.   Properties

We own our principal office, which is located at 3900 Wisconsin Avenue, NW, Washington, DC, as well as additional Washington, DC facilities at 3939 Wisconsin Avenue, NW and 4250 Connecticut Avenue, NW. We also own two office facilities in Herndon, Virginia, as well as two additional facilities located in Reston,

Virginia; and Urbana, Maryland. These owned facilities contain a total of approximately 1,459,000 square feet of space. We lease the land underlying the 4250 Connecticut Avenue building pursuant to a ground lease that automatically renews on July 1, 2029 for an additional 49 years unless we elect to terminate the lease by providing notice to the landlord of our decision to terminate at least one year prior to the automatic renewal date. In addition, we lease approximately 429,000 square feet of office space, including a conference center, at 4000 Wisconsin Avenue, NW, which is adjacent to our principal office. The present lease term for the office space at 4000 Wisconsin Avenue expires in April 2013 and we have one additional 5-year renewal option remaining under the original lease. The lease term for the conference center at 4000 Wisconsin Avenue expires in April 2018. We also lease an additional approximately 317,000 square feet of office space at three other locations in Washington, DC and Virginia. We maintain approximately 723,000 square feet of office space in leased premises in Pasadena, California; Irvine, California; Atlanta, Georgia; Chicago, Illinois; Philadelphia, Pennsylvania; and three facilities in Dallas, Texas.

### Item 3.   Legal Proceedings

This item describes our material legal proceedings. We describe additional material legal proceedings in "Note 20, Commitments and Contingencies" in the section titled "Litigation and Regulatory Matters," which is incorporated herein by reference. In addition to the matters specifically described or incorporated by reference in this item, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that do not have a material impact on our business. Litigation claims and proceedings of all types are subject to many factors that generally cannot be predicted accurately.

We record reserves for legal claims when losses associated with the claims become probable and the amounts can reasonably be estimated. The actual costs of resolving legal claims may be substantially higher or lower than the amounts reserved for those claims. For matters where the likelihood or extent of a loss is not probable or cannot be reasonably estimated, we have not recognized in our consolidated financial statements the potential liability that may result from these matters. We presently cannot determine the ultimate resolution of the matters described or incorporated by reference below. We have recorded a reserve for legal claims related to those matters for which we were able to determine a loss was both probable and reasonably estimable. If certain of these matters are determined against us, it could have a material adverse effect on our results of operations, liquidity and financial condition, including our net worth.

### *Shareholder Derivative Litigation*

Four shareholder derivative cases, filed at various times between June 2007 and June 2008, naming certain of our current and former directors and officers as defendants, and Fannie Mae as a nominal defendant, are currently pending in the U.S. District Court for the District of Columbia: *Kellmer v. Raines, et al.* (filed June 29, 2007); *Middleton v. Raines, et al.* (filed July 6, 2007); *Arthur v. Mudd, et al.* (filed November 26, 2007); and *Agnes v. Raines, et al.* (filed June 25, 2008). Three of the cases (*Kellmer*, *Middleton*, and *Agnes*) rely on factual allegations that Fannie Mae's accounting statements were inconsistent with the GAAP requirements relating to hedge accounting and the amortization of premiums and discounts. Two of the cases (*Arthur* and *Agnes*) rely on factual allegations that defendants wrongfully failed to disclose our exposure to the subprime mortgage crisis and that the Board improperly authorized the company to buy back $100 million in shares while the stock price was artificially inflated. Plaintiffs seek, on behalf of Fannie Mae, various forms of monetary and non-monetary relief, including unspecified money damages (including restitution, legal fees and expenses, disgorgement and punitive damages); corporate governance changes; an accounting; and attaching, impounding or imposing a constructive trust on the individual defendants' assets. Pursuant to a June 25, 2009 order, FHFA, as our conservator, substituted itself for shareholder plaintiffs in all of these actions. On July 27, 2010, the U.S. District Court for the District of Columbia dismissed *Kellmer* and *Middleton* with prejudice and *Arthur* and *Agnes* without prejudice. FHFA filed motions to reconsider the decisions dismissing *Kellmer and Middleton* with prejudice, and those motions were denied on October 22, 2010. FHFA appealed that denial on November 22, 2010. Plaintiffs Kellmer and Agnes also appealed the substitution and the dismissal orders. On January 20, 2011, the Court of Appeals for the District of Columbia issued an order in the *Kellmer* appeal granting FHFA's motions for the voluntary dismissal of defendants Kenneth M. Duberstein, Frederic Malek

and Patrick Swygert. On that same day, in the *Middleton* appeal, the Court of Appeals for the District of Columbia issued an order granting FHFA's motions for the voluntary dismissal of defendants Stephen Ashley, Kenneth Duberstein, Thomas Gerrity, Ann Korologos, Frederic Malek, Donald Marron, Anne Mulcahy, Joe Pickett, Leslie Rahl, Patrick Swygert, and John Wulff.

### Inquiry by the Financial Crisis Inquiry Commission

Over the course of 2010, we received numerous requests for documents and information from the Financial Crisis Inquiry Commission (the "FCIC") in connection with its statutory mandate to examine the causes of the financial crisis. The FCIC released its final report on January 27, 2011. The report is described in "Business— Legislation and GSE Reform—GSE Reform."

### Item 4.   [Removed and Reserved]

## PART II

### Item 5.   Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

Our common stock is traded in the over-the-counter market and quoted on the OTC Bulletin Board under the ticker symbol "FNMA." The transfer agent and registrar for our common stock is Computershare, P.O. Box 43078, Providence, Rhode Island 02940.

### Common Stock Data

The following table shows, for the periods indicated, the high and low prices per share of our common stock as reported in the Bloomberg Financial Markets service. For periods prior to our stock's delisting from the NYSE on July 8, 2010, these are high and low sales prices reported in the consolidated transaction reporting system. For periods on or after July 8, 2010, these prices represent high and low trade prices. No dividends were declared on shares of our common stock during the periods indicated.

| Quarter | High | Low |
|---|---|---|
| **2009** | | |
| First Quarter | $1.43 | $0.35 |
| Second Quarter | 1.05 | 0.51 |
| Third Quarter | 2.13 | 0.51 |
| Fourth Quarter | 1.55 | 0.88 |
| **2010** | | |
| First Quarter | $1.23 | $0.91 |
| Second Quarter | 1.36 | 0.34 |
| Third Quarter | 0.42 | 0.19 |
| Fourth Quarter | 0.47 | 0.27 |

### Dividends

Our payment of dividends is subject to the following restrictions:

*Restrictions Relating to Conservatorship.*   Our conservator announced on September 7, 2008 that we would not pay any dividends on the common stock or on any series of preferred stock, other than the senior preferred stock.

*Restrictions Under Senior Preferred Stock Purchase Agreement.*   The senior preferred stock purchase agreement prohibits us from declaring or paying any dividends on Fannie Mae equity securities without the prior written consent of Treasury.

*Statutory Restrictions.*   Under the GSE Act, FHFA has authority to prohibit capital distributions, including payment of dividends, if we fail to meet our capital requirements. If FHFA classifies us as significantly

undercapitalized, approval of the Director of FHFA is required for any dividend payment. Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized, except the Director of FHFA may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition.

*Restrictions Relating to Subordinated Debt.*   During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock.

*Restrictions Relating to Preferred Stock.*   Payment of dividends on our common stock is also subject to the prior payment of dividends on our preferred stock and our senior preferred stock. Payment of dividends on all outstanding preferred stock, other than the senior preferred stock, is also subject to the prior payment of dividends on the senior preferred stock.

See "MD&A—Liquidity and Capital Management" for information on dividends declared and paid to Treasury on the senior preferred stock.

## Holders

As of January 31, 2011, we had approximately 18,000 registered holders of record of our common stock, including holders of our restricted stock. In addition, as of January 31, 2011, Treasury held a warrant giving it the right to purchase shares of our common stock equal to 79.9% of the total number of shares of our common stock outstanding on a fully diluted basis on the date of exercise.

## Recent Sales of Unregistered Securities

Under the terms of our senior preferred stock purchase agreement with Treasury, we are prohibited from selling or issuing our equity interests, other than as required by (and pursuant to) the terms of a binding agreement in effect on September 7, 2008, without the prior written consent of Treasury.

We previously provided stock compensation to employees and members of the Board of Directors under the Fannie Mae Stock Compensation Plan of 1993 and the Fannie Mae Stock Compensation Plan of 2003 (the "Stock Compensation Plans"). Information about sales and issuances of our unregistered securities during the first three quarters of 2010, some of which were made pursuant to these Stock Compensation Plans, was provided in our quarterly reports on Form 10-Q for the quarters ended March 31, 2010, June 30, 2010 and September 30, 2010 filed with the SEC on May 10, 2010, August 5, 2010 and November 5, 2010, respectively.

During the quarter ended December 31, 2010, 520,589 shares of common stock were issued upon conversion of 337,871 shares of 8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1, at the option of the holders pursuant to the terms of the preferred stock. All series of preferred stock, other than the senior preferred stock, were issued prior to September 7, 2008.

The securities we issue are "exempted securities" under laws administered by the SEC to the same extent as securities that are obligations of, or are guaranteed as to principal and interest by, the United States, except that, under the GSE Act, our equity securities are not treated as exempted securities for purposes of Section 12, 13, 14 or 16 of the Exchange Act. As a result, our securities offerings are exempt from SEC registration requirements and we do not file registration statements or prospectuses with the SEC under the Securities Act with respect to our securities offerings.

## Information about Certain Securities Issuances by Fannie Mae

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03

FHFA 1494

or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Because the securities we issue are exempted securities, we do not file registration statements or prospectuses with the SEC with respect to our securities offerings. To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars or prospectuses (or supplements thereto) that we post on our Web site or in a current report on Form 8-K that we file with the SEC, in accordance with a "no-action" letter we received from the SEC staff in 2004. In cases where the information is disclosed in a prospectus or offering circular posted on our Web site, the document will be posted on our Web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The Web site address for disclosure about our debt securities is www.fanniemae.com/debtsearch. From this address, investors can access the offering circular and related supplements for debt securities offerings under Fannie Mae's universal debt facility, including pricing supplements for individual issuances of debt securities.

Disclosure about our obligations pursuant to some of the MBS we issue, some of which may be off-balance sheet obligations, can be found at www.fanniemae.com/mbsdisclosure. From this address, investors can access information and documents about our MBS, including prospectuses and related prospectus supplements.

We are providing our Web site address solely for your information. Information appearing on our Web site is not incorporated into this annual report on Form 10-K.

### Purchases of Equity Securities by the Issuer

The following table shows shares of our common stock we repurchased during the fourth quarter of 2010.

| | Total Number of Shares Purchased[1] | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Program[2] | Maximum Number of Shares that May Yet be Purchased Under the Program[2] |
|---|---|---|---|---|
| | | | (Shares in thousands) | |
| **2010** | | | | |
| October 1-31 . . . . . . . . . . . . . . . . . . . . . . . . | 1 | $0.37 | — | — |
| November 1-30 . . . . . . . . . . . . . . . . . . . . . . | 1 | 0.38 | — | — |
| December 1-31 . . . . . . . . . . . . . . . . . . . . . . . | 1 | 0.32 | — | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | | | |

[1] Consists of shares of common stock reacquired from employees to pay an aggregate of approximately $930 in withholding taxes due upon the vesting of previously issued restricted stock. Does not include 337,871 shares of 8.75% Non-Cumulative Mandatory Convertible Series 2008-1 Preferred Stock received from holders upon conversion of those shares into 520,589 shares of common stock.

[2] On January 21, 2003, we publicly announced that the Board of Directors had approved an open market share repurchase program under which we could purchase in open market transactions the sum of (a) up to 5% of the shares of common stock outstanding as of December 31, 2002 (49.4 million shares) and (b) additional shares to offset stock issued or expected to be issued under our employee benefit plans. Since August 2004, no shares have been repurchased pursuant to this program. The Board of Directors terminated this share repurchase program on October 14, 2010.

FHFA 1495

## Item 6.   Selected Financial Data

The selected consolidated financial data presented below is summarized from our results of operations for the five-year period ended December 31, 2010, as well as selected consolidated balance sheet data as of the end of each year within this five-year period. Certain prior period amounts have been reclassified to conform to the current period presentation. This data should be reviewed in conjunction with the audited consolidated financial statements and related notes and with the MD&A included in this annual report on Form 10-K.

| | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2010[1] | 2009 | 2008 | 2007 | 2006 |
| | (Dollars and shares in millions, except per share amounts) | | | | |
| **Statement of operations data:**[2] | | | | | |
| Net interest income | $ 16,409 | $ 14,510 | $ 8,782 | $ 4,581 | $ 6,752 |
| Guaranty fee income | 202 | 7,211 | 7,621 | 5,071 | 4,250 |
| Net other-than-temporary impairments | (722) | (9,861) | (6,974) | (814) | (853) |
| Investment gains (losses), net | 346 | 1,458 | (246) | (53) | 162 |
| Fair value losses, net[3] | (511) | (2,811) | (20,129) | (4,668) | (1,744) |
| Administrative expenses | (2,597) | (2,207) | (1,979) | (2,669) | (3,076) |
| Credit-related expenses[4] | (26,614) | (73,536) | (29,809) | (5,012) | (783) |
| Other income (expenses), net[5] | 240 | (6,287) | (743) | (923) | (84) |
| (Provision) benefit for federal income taxes | 82 | 985 | (13,749) | 3,091 | (166) |
| Net (loss) income attributable to Fannie Mae | (14,014) | (71,969) | (58,707) | (2,050) | 4,059 |
| Preferred stock dividends and issuance costs at redemption | (7,704) | (2,474) | (1,069) | (513) | (511) |
| Net (loss) income attributable to common stockholders | (21,718) | (74,443) | (59,776) | (2,563) | 3,548 |
| **Per common share data:** | | | | | |
| Earnings (loss) per share: | | | | | |
| Basic | $ (3.81) | $ (13.11) | $ (24.04) | $ (2.63) | $ 3.65 |
| Diluted | (3.81) | (13.11) | (24.04) | (2.63) | 3.65 |
| Weighted-average common shares outstanding:[6] | | | | | |
| Basic | 5,694 | 5,680 | 2,487 | 973 | 971 |
| Diluted | 5,694 | 5,680 | 2,487 | 973 | 972 |
| Cash dividends declared per share | $  — | $  — | $ 0.75 | $ 1.90 | $ 1.18 |
| **New business acquisition data:** | | | | | |
| Fannie Mae MBS issues acquired by third parties[7] | $497,975 | $496,067 | $434,711 | $563,648 | $417,471 |
| Mortgage portfolio purchases[8] | 357,573 | 327,578 | 196,645 | 182,471 | 185,507 |
| New business acquisitions | $855,548 | $823,645 | $631,356 | $746,119 | $602,978 |

73

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | 2010[1] | 2009 | 2008 | 2007 | 2006 |
| | (Dollars in millions) | | | | |
| **Balance sheet data:**[2] | | | | | |
| Investments in securities: | | | | | |
|   Fannie Mae MBS . . . . . . . . . . . . . . . . . . . . . . . . | $ 30,226 | $ 229,169 | $ 234,250 | $ 179,401 | $ 196,678 |
|   Other agency MBS . . . . . . . . . . . . . . . . . . . . . . . | 19,951 | 43,905 | 35,440 | 32,957 | 31,484 |
|   Mortgage revenue bonds . . . . . . . . . . . . . . . . . . | 11,650 | 13,446 | 13,183 | 16,213 | 17,221 |
|   Other mortgage-related securities . . . . . . . . . . . . . . | 56,668 | 54,265 | 56,781 | 90,827 | 97,156 |
|   Non-mortgage-related securities . . . . . . . . . . . . . . . | 32,753 | 8,882 | 17,640 | 38,115 | 47,573 |
| Mortgage loans:[9] | | | | | |
|   Loans held for sale . . . . . . . . . . . . . . . . . . . . . . | 915 | 18,462 | 13,270 | 7,008 | 4,868 |
|   Loans held for investment, net of allowance . . . . . . . . . | 2,922,805 | 376,099 | 412,142 | 396,516 | 378,687 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,221,972 | 869,141 | 912,404 | 879,389 | 841,469 |
| Short-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . | 157,243 | 200,437 | 330,991 | 234,160 | 165,810 |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,039,757 | 574,117 | 539,402 | 562,139 | 601,236 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,224,489 | 884,422 | 927,561 | 835,271 | 799,827 |
| Senior preferred stock . . . . . . . . . . . . . . . . . . . . . . . | 88,600 | 60,900 | 1,000 | — | — |
| Preferred stock . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,204 | 20,348 | 21,222 | 16,913 | 9,108 |
| Total Fannie Mae stockholders' equity (deficit) . . . . . . . . . | (2,599) | (15,372) | (15,314) | 44,011 | 41,506 |
| Net worth surplus (deficit)[10] . . . . . . . . . . . . . . . . . . . . | $ (2,517) | $ (15,281) | $ (15,157) | $ 44,118 | $ 41,642 |
| **Book of business data:** | | | | | |
| Total mortgage assets[11] . . . . . . . . . . . . . . . . . . . . . . | $3,099,250 | $ 769,252 | $ 792,196 | $ 727,903 | $ 728,932 |
| Unconsolidated Fannie Mae MBS, held by third parties[12] . . | 21,323 | 2,432,789 | 2,289,459 | 2,118,909 | 1,777,550 |
| Other guarantees[13] . . . . . . . . . . . . . . . . . . . . . . . . . . | 35,619 | 27,624 | 27,809 | 41,588 | 19,747 |
|   Mortgage credit book of business . . . . . . . . . . . . . . . | $3,156,192 | $3,229,665 | $3,109,464 | $2,888,400 | $2,526,229 |
|   Guaranty book of business[14] . . . . . . . . . . . . . . . . . . | $3,054,488 | $3,097,201 | $2,975,710 | $2,744,237 | $2,379,986 |
| **Credit quality:** | | | | | |
| Nonperforming loans[15] . . . . . . . . . . . . . . . . . . . . . . . | $ 214,752 | $ 216,455 | $ 119,232 | $ 27,156 | $ 13,846 |
| Total loss reserves . . . . . . . . . . . . . . . . . . . . . . . . . . | 66,251 | 64,891 | 24,753 | 3,391 | 859 |
| Total loss reserves as a percentage of total guaranty book of business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.17% | 2.10% | 0.83% | 0.12% | 0.04% |
| Total loss reserves as a percentage of total nonperforming loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30.85 | 29.98 | 20.76 | 12.49 | 6.20 |

| | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2010[1] | 2009 | 2008 | 2007 | 2006 |
| **Performance ratios:** | | | | | |
| Net interest yield[16] . . . . . . . . . . . . . . . . . . . | 0.51% | 1.65% | 1.03% | 0.57% | 0.85% |
| Average effective guaranty fee rate (in basis points)[17] . . . . . . . . . . . . . . . . . . . . . . . . . . . | N/A | 27.6 bp | 31.0 bp | 23.7 bp | 22.2 bp |
| Credit loss ratio (in basis points)[18] . . . . . . . . | 77.4 bp | 44.6 bp | 22.7 bp | 5.3 bp | 2.2 bp |
| Return on assets[19]* . . . . . . . . . . . . . . . . . . . . | (0.67)% | (8.27)% | (6.77)% | (0.30)% | 0.42% |

[1] As discussed in "Business—Executive Summary," prospectively adopting the new accounting standards had a significant impact on the presentation and comparability of our consolidated financial statements due to the consolidation of the substantial majority of our single-class securitization trusts and the elimination of previously recorded deferred revenue from our guaranty arrangements. While some line items in our consolidated statements of operations and balance sheet were not impacted, others were impacted significantly, which reduces the comparability of our results for 2010 with the results for prior years. See "Note 2, Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities" for a further discussion of the impact of the new accounting standards on our consolidated financial statements.

[2] Certain prior period amounts have been reclassified to conform to the current period presentation.

74

[3] Consists of the following: (a) derivatives fair value gains (losses), net; (b) trading securities gains (losses), net; (c) hedged mortgage assets gains (losses), net; (d) debt foreign exchange gains (losses), net; (e) debt fair value gains (losses), net; and (f) mortgage loans fair value losses, net.

[4] Consists of provision for loan losses, provision for guaranty losses and foreclosed property expense.

[5] Consists of the following: (a) debt extinguishment gains (losses), net; (b) losses from partnership investments; (c) losses on certain guaranty contracts; and (d) fee and other income.

[6] Includes the weighted-average shares of common stock that would be issuable upon the full exercise of the warrant issued to Treasury from the date of conservatorship through the end of the period for 2008 and for the full year for 2009 and 2010. Because the warrant's exercise price of $0.00001 per share is considered non-substantive (compared to the market price of our common stock), the warrant was evaluated based on its substance over form. It was determined to have characteristics of non-voting common stock, and thus included in the computation of basic earnings (loss) per share.

[7] Reflects unpaid principal balance of Fannie Mae MBS issued and guaranteed by us during the reporting period less: (a) securitizations of mortgage loans held in our mortgage portfolio during the reporting period and (b) Fannie Mae MBS purchased for our mortgage portfolio during the reporting period.

[8] Reflects unpaid principal balance of mortgage loans and mortgage-related securities we purchased for our mortgage portfolio during the reporting period. Includes acquisition of mortgage-related securities accounted for as the extinguishment of debt because the entity underlying the mortgage-related securities has been consolidated in our consolidated balance sheet. For 2010, includes unpaid principal balance of approximately $217 billion of delinquent loans purchased from our single-family MBS trusts. Under our MBS trust documents, we have the option to purchase from MBS trusts loans that are delinquent as to four or more consecutive monthly payments.

[9] Mortgage loans consist solely of domestic residential real-estate mortgages.

[10] Total assets less total liabilities.

[11] Reflects unpaid principal balance of mortgage loans and mortgage-related securities reported in our consolidated balance sheets. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount. As a result of our adoption of the new accounting standards as of January 1, 2010, we reflect a substantial majority of our Fannie Mae MBS as mortgage assets and the balance as unconsolidated Fannie Mae MBS.

[12] Reflects unpaid principal balance of unconsolidated Fannie Mae MBS, held by third-party investors. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

[13] Primarily includes long-term standby commitments we have issued and single-family and multifamily credit enhancements we have provided and that are not otherwise reflected in the table.

[14] Reflects mortgage credit book of business less non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

[15] Consists of on-balance sheet nonperforming loans held in our mortgage assets and off-balance sheet nonperforming loans in unconsolidated Fannie Mae MBS trusts held by third parties. Includes all nonaccrual loans, as well as troubled debt restructurings ("TDRs") and HomeSaver Advance first-lien loans on accrual status. We generally classify single-family and multifamily loans as nonperforming when the payment of principal or interest on the loan is equal to or greater than two and three months past due, respectively. A troubled debt restructuring is a restructuring of a mortgage loan in which a concession is granted to a borrower experiencing financial difficulty. Prior to 2008, the nonperforming loans that we reported consisted of on-balance sheet nonperforming loans held in our mortgage portfolio and did not include off-balance sheet nonperforming loans in Fannie Mae MBS held by third parties.

[16] Calculated based on net interest income for the reporting period divided by the average balance of total interest-earning assets during the period, expressed as a percentage.

[17] Calculated based on guaranty fee income for the reporting period divided by average outstanding Fannie Mae MBS and other guarantees during the period, expressed in basis points.

[18] Consists of (a) charge-offs, net of recoveries and (b) foreclosed property expense for the reporting period (adjusted to exclude the impact of fair value losses resulting from credit-impaired loans acquired from MBS trusts and HomeSaver Advance loans) divided by the average guaranty book of business during the period, expressed in basis points.

[19] Calculated based on net income (loss) available to common stockholders for the reporting period divided by average total assets during the period, expressed as a percentage.

**Note:**

* Average balances for purposes of ratio calculations are based on balances at the beginning of the year and at the end of each respective quarter for 2010, 2009, 2008 and 2007. Average balances for purposes of ratio calculations for 2006 are based on beginning and end of year balances. Beginning of the year balance for 2010 is as of January 1, 2010, post transition adjustment. See "Note 2, Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities" for a further discussion of the impacts of the new accounting standards on our consolidated financial statements.

FHFA 1498

**Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations**

*You should read this Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in conjunction with our consolidated financial statements as of December 31, 2010 and related notes, and with "Business—Executive Summary."*

*This report contains forward-looking statements that are based upon management's current expectations and are subject to significant uncertainties and changes in circumstances. Please review "Business—Forward-Looking Statements" for more information on the forward-looking statements in this report and "Risk Factors" for a discussion of factors that could cause our actual results to differ, perhaps materially, from our forward-looking statements. Please also see "MD&A—Glossary of Terms Used in This Report."*

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in accordance with GAAP requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the consolidated financial statements. Understanding our accounting policies and the extent to which we use management judgment and estimates in applying these policies is integral to understanding our financial statements. We describe our most significant accounting policies in "Note 1, Summary of Significant Accounting Policies."

We evaluate our critical accounting estimates and judgments required by our policies on an ongoing basis and update them as necessary based on changing conditions. Management has discussed any significant changes in judgments and assumptions in applying our critical accounting policies with the Audit Committee of our Board of Directors. See "Risk Factors" for a discussion of the risk associated with the use of models. We have identified three of our accounting policies as critical because they involve significant judgments and assumptions about highly complex and inherently uncertain matters, and the use of reasonably different estimates and assumptions could have a material impact on our reported results of operations or financial condition. These critical accounting policies and estimates are as follows:

- Fair Value Measurement

- Total Loss Reserves

- Other-Than-Temporary Impairment of Investment Securities

Effective January 1, 2010, we adopted the new accounting standards on the transfers of financial assets and the consolidation of variable interest entities. Refer to "Note 1, Summary of Significant Accounting Policies" and "Note 2, Adoption of the New Accounting Standards on the Transfers of Financial Assets and Consolidation of Variable Interest Entities" for additional information.

In this section, we discuss significant changes in the judgments and assumptions we made during 2010 in applying our critical accounting policies, significant changes to critical estimates and the impact of the new accounting standards on our total loss reserves.

### Fair Value Measurement

The use of fair value to measure our assets and liabilities is fundamental to our financial statements and is a critical accounting estimate because we account for and record a portion of our assets and liabilities at fair value. In determining fair value, we use various valuation techniques. We describe the valuation techniques and inputs used to determine the fair value of our assets and liabilities and disclose their carrying value and fair value in "Note 19, Fair Value."

The fair value accounting rules provide a three-level fair value hierarchy for classifying financial instruments. This hierarchy is based on whether the inputs to the valuation techniques used to measure fair value are observable or unobservable. Each asset or liability is assigned to a level based on the lowest level of any input that is significant to the fair value measurement. The three levels of the fair value hierarchy are described below:

Level 1:  Quoted prices (unadjusted) in active markets for identical assets or liabilities.

FHFA 1499

Level 2: Observable market-based inputs, other than quoted prices in active markets for identical assets or liabilities.

Level 3: Unobservable inputs.

The majority of the financial instruments that we report at fair value in our consolidated financial statements fall within the Level 2 category and are valued primarily utilizing inputs and assumptions that are observable in the marketplace, that can be derived from observable market data or that can be corroborated by recent trading activity of similar instruments with similar characteristics. For example, we generally request non-binding prices from at least four independent pricing services to estimate the fair value of our trading and available-for-sale securities at an individual security level. We use the average of these prices to determine the fair value.

In the absence of such information or if we are not able to corroborate these prices by other available, relevant market information, we estimate their fair values based on single source quotations from brokers or dealers or by using internal calculations or discounted cash flow techniques that incorporate inputs, such as prepayment rates, discount rates and delinquency, default and cumulative loss expectations, that are implied by market prices for similar securities and collateral structure types. Because this valuation technique relies on significant unobservable inputs, the fair value estimation is classified as Level 3. The process for determining fair value using unobservable inputs is generally more subjective and involves a high degree of management judgment and assumptions. These assumptions may have a significant effect on our estimates of fair value, and the use of different assumptions as well as changes in market conditions could have a material effect on our results of operations or financial condition.

### *Fair Value Hierarchy—Level 3 Assets and Liabilities*

The assets and liabilities that we have classified as Level 3 consist primarily of financial instruments for which there is limited market activity and therefore little or no price transparency. As a result, the valuation techniques that we use to estimate the fair value of Level 3 instruments involve significant unobservable inputs, which generally are more subjective and involve a high degree of management judgment and assumptions. Our Level 3 assets and liabilities consist of certain mortgage- and asset-backed securities and residual interests, certain mortgage loans, acquired property, partnership investments, our guaranty assets and buy-ups, our master servicing assets, certain long-term debt arrangements and certain highly structured, complex derivative instruments.

Table 5 presents a comparison, by balance sheet category, of the amount of financial assets carried in our consolidated balance sheets at fair value on a recurring basis ( "recurring asset") that were classified as Level 3 as of December 31, 2010 and 2009. The availability of observable market inputs to measure fair value varies based on changes in market conditions, such as liquidity. As a result, we expect the amount of financial instruments carried at fair value on a recurring basis and classified as Level 3 to vary each period.

**Table 5:   Level 3 Recurring Financial Assets at Fair Value**

| Balance Sheet Category | As of December 31, | |
|---|---|---|
| | **2010** | **2009** |
| | (Dollars in millions) | |
| Trading securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 4,576 | $ 8,861 |
| Available-for-sale securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31,934 | 36,154 |
| Mortgage loans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,207 | — |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 247 | 2,727 |
| Level 3 recurring assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 38,964 | $ 47,742 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,221,972 | $869,141 |
| Total recurring assets measured at fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 161,696 | $353,718 |
| Level 3 recurring assets as a percentage of total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1% | 5% |
| Level 3 recurring assets as a percentage of total recurring assets measured at fair value . . . . . . . | 24% | 13% |
| Total recurring assets measured at fair value as a percentage of total assets . . . . . . . . . . . . . . . | 5% | 41% |

FHFA 1500

The decrease in assets classified as Level 3 during 2010 includes a $2.6 billion decrease due to derecognition of guaranty assets and buy-ups at the transition date as well as net transfers of approximately $6.0 billion in assets to Level 2 from Level 3. The assets transferred from Level 3 consist primarily of Fannie Mae guaranteed mortgage-related securities and private-label mortgage-related securities.

Assets measured at fair value on a nonrecurring basis and classified as Level 3, which are not presented in the table above, primarily include held-for-sale loans, held-for-investment loans, acquired property and partnership investments. The fair value of Level 3 nonrecurring assets totaled $63.0 billion during the year ended December 31, 2010, and $21.2 billion during the year ended December 31, 2009.

Financial liabilities measured at fair value on a recurring basis and classified as Level 3 consisted of long-term debt with a fair value of $1.0 billion as of December 31, 2010 and $601 million as of December 31, 2009, and derivatives liabilities with a fair value of $143 million as of December 31, 2010 and $27 million as of December 31, 2009.

### Fair Value Control Processes

We have control processes that are designed to ensure that our fair value measurements are appropriate and reliable, that they are based on observable inputs wherever possible and that our valuation approaches are consistently applied and the assumptions used are reasonable. Our control processes consist of a framework that provides for a segregation of duties and oversight of our fair value methodologies and valuations and validation procedures.

Our Valuation Oversight Committee, which includes senior representation from our three business segments, our Enterprise Risk Office and our Finance Division, is responsible for reviewing the valuation methodologies used in our fair value measurements and any significant valuation adjustments, judgments, controls and results. Actual valuations are performed by personnel independent of our business units. Our Price Verification Group, which is an independent control group separate from the group responsible for obtaining prices, is responsible for performing monthly independent price verification. The Price Verification Group also performs independent reviews of the assumptions used in determining the fair value of products we hold that have material estimation risk because observable market-based inputs do not exist.

Our validation procedures are intended to ensure that the individual prices we receive are consistent with our observations of the marketplace and prices that are provided to us by pricing services or dealers. We verify selected prices using a variety of methods, including comparing the prices to secondary pricing services, corroborating the prices by reference to other independent market data, such as non-binding broker or dealer quotations, relevant benchmark indices, and prices of similar instruments. We review prices for reasonableness based on variations from prices provided in previous periods, comparing prices to internally calculated expected prices and conducting relative value comparisons based on specific characteristics of securities. In addition, we compare our derivatives valuations to counterparty valuations as part of the collateral exchange process. We have formal discussions with the pricing services as part of our due diligence process in order to maintain a current understanding of the models and related assumptions and inputs that these vendors use in developing prices. The prices provided to us by independent pricing services reflect the existence of credit enhancements, including monoline insurance coverage, and the current lack of liquidity in the marketplace. If we determine that a price provided to us is outside established parameters, we will further examine the price, including having follow-up discussions with the pricing service or dealer. If we conclude that a price is not valid, we will adjust the price for various factors, such as liquidity, bid-ask spreads and credit considerations. These adjustments are generally based on available market evidence. In the absence of such evidence, management's best estimate is used. All of these processes are executed before we use the prices in preparing our financial statements.

We continually refine our valuation methodologies as markets and products develop and the pricing for certain products becomes more or less transparent. While we believe our valuation methods are appropriate and consistent with those of other market participants, using different methodologies or assumptions to determine fair value could result in a materially different estimate of the fair value of some of our financial instruments.

The dislocation of historical pricing relationships between certain financial instruments persisted during 2010 due to the housing and financial market crisis. These conditions, which have resulted in greater market volatility, wider credit spreads and a lack of price transparency, made the measurement of fair value more difficult and complex for some financial instruments, particularly for financial instruments for which there is no active market, such as our guaranty contracts and loans purchased with evidence of credit deterioration.

### Other-Than-Temporary Impairment of Investment Securities

We evaluate available-for-sale securities in an unrealized loss position as of the end of each quarter for other-than-temporary impairment. A debt security is evaluated for other-than-temporary impairment if its fair value is less than its amortized cost basis. We recognize other-than-temporary impairment in earnings if one of the following conditions exists: (1) our intent is to sell the security; (2) it is more likely than not that we will be required to sell the security before the impairment is recovered; or (3) we do not expect to recover our amortized cost basis. If, by contrast, we do not intend to sell the security and will not be required to sell prior to recovery of the amortized cost basis, we recognize only the credit component of other-than-temporary impairment in earnings. We record the noncredit component in other comprehensive income. The credit component is the difference between the security's amortized cost basis and the present value of its expected future cash flows, while the noncredit component is the remaining difference between the security's fair value and the present value of expected future cash flows. If, subsequent to recognizing other-than-temporary impairment, our estimates of future cash flows improve, we recognize the change in estimate prospectively over the remaining life of securities as a component of interest income.

Our evaluation requires significant management judgment and consideration of various factors to determine if we will receive the amortized cost basis of our investment securities. We evaluate a debt security for other-than-temporary impairment using an econometric model that estimates the present value of cash flows given multiple factors. These factors include: the severity and duration of the impairment; recent events specific to the issuer and/or industry to which the issuer belongs; the payment structure of the security; external credit ratings and the failure of the issuer to make scheduled interest or principal payments. We rely on expected future cash flow projections to determine if we will recover the amortized cost basis of our available-for-sale securities. To reduce costs associated with maintaining our internal model and decrease the operational risk, in the fourth quarter of 2010, we ceased to use our internally developed model and began using a third-party model to project cash flow estimates on our private-label securities. This model change resulted in more favorable cash flow estimates that, based on estimates as of December 31, 2010, increased the amount that we will recognize prospectively as interest income over the remaining life of the securities by $2.5 billion.

We provide more detailed information on our accounting for other-than-temporary impairment in "Note 1, Summary of Significant Accounting Policies" and "Note 6, Investments in Securities." Also refer to "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities" for a discussion of other-than-temporary impairment recognized on our investments in Alt-A and subprime private-label securities. See "Risk Factors" for a discussion of the risks associated with possible future write-downs of our investment securities.

### Total Loss Reserves

Our total loss reserves consist of the following components:

- Allowance for loan losses;
- Allowance for accrued interest receivable;
- Reserve for guaranty losses; and
- Allowance for preforeclosure property tax and insurance receivable.

These components can be further divided into single-family portions, which collectively make up our single-family loss reserves, and multifamily portions, which collectively make up our multifamily loss reserves.

We maintain an allowance for loan losses and an allowance for accrued interest receivable for loans classified as held for investment, including both loans we hold in our portfolio and loans held in consolidated Fannie

Mae MBS trusts. We maintain a reserve for guaranty losses for loans held in unconsolidated Fannie Mae MBS trusts we guarantee and loans we have guaranteed under long-term standby commitments and other credit enhancements we have provided. We also maintain an allowance for preforeclosure property tax and insurance receivable on delinquent loans that is included in "Other assets" in our consolidated balance sheets. These amounts, which we collectively refer to as our total loss reserves, represent probable losses related to loans in our guaranty book of business as of the balance sheet date.

The allowance for loan losses, allowance for accrued interest receivable and allowance for preforeclosure property tax and insurance receivable are valuation allowances that reflect an estimate of incurred credit losses related to our recorded investment in loans held for investment. The reserve for guaranty losses is a liability account in our consolidated balance sheets that reflects an estimate of incurred credit losses related to our guaranty to each unconsolidated Fannie Mae MBS trust that we will supplement amounts received by the Fannie Mae MBS trust as required to permit timely payments of principal and interest on the related Fannie Mae MBS. As a result, the guaranty reserve considers not only the principal and interest due on the loan at the current balance sheet date, but also an estimate of any additional interest payments due to the trust from the current balance sheet date until the point of loan acquisition or foreclosure. Our loss reserves consist of a specific loss reserve for individually impaired loans and a collective loss reserve for all other loans.

We have an established process, using analytical tools, benchmarks and management judgment, to determine our loss reserves. Although our loss reserve process benefits from extensive historical loan performance data, this process is subject to risks and uncertainties, including a reliance on historical loss information that may not be representative of current conditions. We continually monitor delinquency and default trends and make changes in our historically developed assumptions and estimates as necessary to better reflect present conditions, including current trends in borrower risk and/or general economic trends, changes in risk management practices, and changes in public policy and the regulatory environment. We also consider the recoveries that we expect to receive on mortgage insurance and other loan-specific credit enhancements entered into contemporaneously with and in contemplation of a guaranty or loan purchase transaction, as such recoveries reduce the severity of the loss associated with defaulted loans. Due to the stress in the housing and credit markets, and the speed and extent of deterioration in these markets, our process for determining our loss reserves has become significantly more complex and involves a greater degree of management judgment than prior to this period of housing and mortgage market stress.

### Single-Family Loss Reserves

We establish a specific single-family loss reserve for individually impaired loans, which includes loans we restructure in troubled debt restructurings, certain nonperforming loans in MBS trusts and acquired credit-impaired loans that have been further impaired subsequent to acquisition. The single-family loss reserve for individually impaired loans has grown as a proportion of the total single-family loss reserves in recent periods due to increases in the population of restructured loans. We typically measure impairment based on the difference between our recorded investment in the loan and the present value of the estimated cash flows we expect to receive, which we calculate using the effective interest rate of the original loan or the effective interest rate at acquisition for an acquired credit-impaired loan. However, when foreclosure is probable on an individually impaired loan, we measure impairment based on the difference between our recorded investment in the loan and the fair value of the underlying property, adjusted for the estimated discounted costs to sell the property and estimated insurance or other proceeds we expect to receive. We then allocate a portion of the reserve to interest accrued on the loans as of the balance sheet date.

We establish a collective single-family loss reserve for all other single-family loans in our single-family guaranty book of business using a model that estimates the probability of default of loans to derive an overall loss reserve estimate given multiple factors such as: origination year, mark-to-market LTV ratio, delinquency status and loan product type. We believe that the loss severity estimates we use in determining our loss reserves reflect current available information on actual events and conditions as of each balance sheet date, including current home prices. Our loss severity estimates do not incorporate assumptions about future changes in home prices. We do, however, use a look back period to develop our loss severity estimates for all loan categories. We then allocate a portion of the reserve to interest accrued on the loans as of the balance sheet date.

FHFA 1503