---

(1)  Consists of shares of common stock reacquired from employees to pay an aggregate of $167,443 in withholding taxes due upon the vesting of previously issued restricted stock. Does not include 100 shares of 8.75% Non-Cumulative Mandatory Convertible Series 2008-1 Preferred Stock received from holders upon conversion of those shares into 154 shares of common stock.

(2)  We no longer have any publicly announced share repurchase programs under which we could purchase our common stock.

**Dividend Restrictions**

Our payment of dividends is subject to the following restrictions:

*Restrictions Relating to Conservatorship.*   Our conservator announced on September 7, 2008 that we would not pay any dividends on the common stock or on any series of preferred stock, other than the senior preferred stock.

*Restrictions under Senior Preferred Stock Purchase Agreement.*   The senior preferred stock purchase agreement prohibits us from declaring or paying any dividends on Fannie Mae equity securities without the prior written consent of Treasury.

*Statutory Restrictions.*   Under the GSE Act, FHFA has authority to prohibit capital distributions, including payment of dividends, if we fail to meet our capital requirements. If FHFA classifies us as significantly undercapitalized, approval of the Director of FHFA is required for any dividend payment. Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized, except the Director of FHFA may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition.

*Restrictions Relating to Qualifying Subordinated Debt.*   During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock.

*Restrictions Relating to Preferred Stock.*   Payment of dividends on our common stock is also subject to the prior payment of dividends on our preferred stock and our senior preferred stock. Payment of dividends on all outstanding preferred stock, other than the senior preferred stock, is also subject to the prior payment of dividends on the senior preferred stock.

**Item 3.   Defaults Upon Senior Securities**

None.

**Item 4.   [Removed and reserved]**

**Item 5.   Other Information**

None.

**Item 6.   Exhibits**

An index to exhibits has been filed as part of this report beginning on page E-1 and is incorporated herein by reference.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Federal National Mortgage Association

By: /s/   Michael J. Williams

Michael J. Williams
President and Chief Executive Officer

Date: May 6, 2011

By: /s/   David C. Hisey

David C. Hisey
Executive Vice President and
Deputy Chief Financial Officer

Date: May 6, 2011

154

## INDEX TO EXHIBITS

| <u>Item</u> | <u>Description</u> |
|---|---|
| 3.1 | Fannie Mae Charter Act (12 U.S.C. § 1716 et seq.) as amended through July 30, 2008 (Incorporated by reference to Exhibit 3.1 to Fannie Mae's Annual Report on Form 10-K, filed February 24, 2011.) |
| 3.2 | Fannie Mae Bylaws, as amended through January 30, 2009 (Incorporated by reference to Exhibit 3.2 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.) |
| 4.1 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series D (Incorporated by reference to Exhibit 4.1 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.2 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series E (Incorporated by reference to Exhibit 4.2 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.3 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series F (Incorporated by reference to Exhibit 4.3 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.4 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series G (Incorporated by reference to Exhibit 4.4 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.5 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series H (Incorporated by reference to Exhibit 4.5 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.6 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series I (Incorporated by reference to Exhibit 4.6 to Fannie Mae's registration statement on Form 10, filed March 31, 2003.) |
| 4.7 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series L (Incorporated by reference to Exhibit 4.7 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.) |
| 4.8 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series M (Incorporated by reference to Exhibit 4.8 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.) |
| 4.9 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series N (Incorporated by reference to Exhibit 4.9 to Fannie Mae's Quarterly Report on Form 10-Q, filed August 8, 2008.) |
| 4.10 | Certificate of Designation of Terms of Fannie Mae Non-Cumulative Convertible Preferred Stock, Series 2004-1 (Incorporated by reference to Exhibit 4.10 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.) |
| 4.11 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series O (Incorporated by reference to Exhibit 4.11 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2009, filed February 26, 2010.) |
| 4.12 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series P (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed September 28, 2007.) |
| 4.13 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series Q (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed October 5, 2007.) |
| 4.14 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series R (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed November 21, 2007.) |
| 4.15 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series S (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed December 11, 2007.) |
| 4.16 | Certificate of Designation of Terms of Fannie Mae Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1 (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed May 14, 2008.) |
| 4.17 | Certificate of Designation of Terms of Fannie Mae Preferred Stock, Series T (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed May 19, 2008.) |

E-1

| Item | Description |
|------|-------------|
| 4.18 | Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2 (Incorporated by reference to Exhibit 4.2 to Fannie Mae's Current Report on Form 8-K, filed September 11, 2008.) |
| 4.19 | Warrant to Purchase Common Stock, dated September 7, 2008 (Incorporated by reference to Exhibit 4.3 to Fannie Mae's Current Report on Form 8-K, filed September 11, 2008.) |
| 4.20 | Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of September 26, 2008, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed October 2, 2008.) |
| 4.21 | Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of May 6, 2009, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.21 to Fannie Mae's Quarterly Report on Form 10-Q, filed May 8, 2009.) |
| 4.22 | Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated as of December 24, 2009, between the United States Department of the Treasury and Federal National Mortgage Association, acting through the Federal Housing Finance Agency as its duly appointed conservator (Incorporated by reference to Exhibit 4.1 to Fannie Mae's Current Report on Form 8-K, filed December 30, 2009.) |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Deputy Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Deputy Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101. INS | XBRL Instance Document* |
| 101. SCH | XBRL Taxonomy Extension Schema* |
| 101. CAL | XBRL Taxonomy Extension Calculation* |
| 101. LAB | XBRL Taxonomy Extension Labels* |
| 101. PRE | XBRL Taxonomy Extension Presentation* |
| 101. DEF | XBRL Taxonomy Extension Definition* |

* The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Fannie Mae, except to the extent, if any, expressly set forth by specific reference in such filing.

E-2

Exhibit 31.1

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Michael J. Williams, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2011 of Fannie Mae (formally, the Federal National Mortgage Association);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   Michael J. Williams

Michael J. Williams
President and Chief Executive Officer

Date: May 6, 2011

Exhibit 31.2

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, David C. Hisey, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2011 of Fannie Mae (formally, the Federal National Mortgage Association);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/   David C. Hisey

David C. Hisey
Executive Vice President and
Deputy Chief Financial Officer

Date: May 6, 2011

**Exhibit 32.1**

**CERTIFICATION**

In connection with the Quarterly Report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association) for the quarter ended March 31, 2011, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael J. Williams, President and Chief Executive Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350 that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.

/s/   Michael J. Williams
_____

Michael J. Williams
President and Chief Executive Officer

Dated: May 6, 2011

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.

**Exhibit 32.2**

## CERTIFICATION

In connection with the Quarterly Report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association) for the quarter ended March 31, 2011, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, David C. Hisey, Executive Vice President and Deputy Chief Financial Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.


/s/   David C. Hisey

David C. Hisey
Executive Vice President and
Deputy Chief Financial Officer

Dated: May 6, 2011

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.



**FR006**

# Tab 32



# Congressional Budget Office

## Testimony

**Statement of
Deborah Lucas
Assistant Director for Financial Analysis**

# The Budgetary Cost of Fannie Mae and Freddie Mac and Options for the Future Federal Role in the Secondary Mortgage Market

**before the
Committee on the Budget
U.S. House of Representatives**

**June 2, 2011**

*This document is embargoed until it is delivered at 10:00 a.m. (EDT) on Thursday, June 2, 2011. The contents may not be published, transmitted, or otherwise communicated by any print, broadcast, or electronic media before that time.*

CONGRESSIONAL BUDGET OFFICE
SECOND AND D STREETS, S.W.
WASHINGTON, D.C. 20515

Chairman Ryan, Congressman Van Hollen, and Members of the Committee, thank you for inviting me to testify about the budgetary cost of Fannie Mae and Freddie Mac and options for the future federal role in the secondary mortgage market.

Historically, support for the mortgage market has been part of a broader federal policy aimed at encouraging home ownership and, to a lesser extent, at making housing more affordable for low- and moderate-income families. The activities of Fannie Mae, Freddie Mac, and the Federal Housing Administration (FHA) have been an important aspect of that policy. In 2010, Fannie Mae and Freddie Mac owned or guaranteed roughly half of all outstanding mortgages in the United States, and they financed 63 percent of the new mortgages originated that year. Including the 23 percent of home loans insured by federal agencies such as FHA, about 86 percent of new mortgages made in 2010 carried a federal guarantee. However, the largest federal subsidies for home ownership have generally come from favorable tax treatment for housing.[1]

My testimony today focuses on the Congressional Budget Office's (CBO's) estimates of the budgetary cost of the government's takeover and continuing operation of Fannie Mae and Freddie Mac. I will also discuss how the budgetary treatment of those two enterprises differs from that of FHA and other federal mortgage programs and the potential problems those inconsistencies cause, and I will summarize alternative options for the future role of the federal government in the secondary mortgage market.

## Summary

The Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) are government-sponsored enterprises (GSEs) that were chartered by the Congress to provide a stable source of funding for residential mortgages across the country. They carry out that mission in the secondary, or resale, mortgage market. They purchase home loans from originators and package those loans into mortgage-backed securities (MBSs); those securities then can be sold to investors, along with a guarantee against losses from defaults on the underlying mortgages, or held as portfolio investments financed by issuing debt of the GSEs themselves, so-called "agency debt."

Until recently, the obligations of Fannie Mae and Freddie Mac had no official backing from the federal government, nor were any costs associated with them reflected in the federal budget. However, because of the GSEs' size, federal charter, and major role in the mortgage market, most observers believed that the government would not allow Fannie Mae and Freddie Mac to default on their obligations. That implicit federal guarantee, which lowered their borrowing costs and increased the price that investors paid for their guarantees, represented a federal subsidy to the GSEs.

---

1. See Congressional Budget Office, *An Overview of Federal Support for Housing,* Issue Brief (November 2009).

Starting in 2007, as housing prices dropped nationwide and foreclosures increased, the two GSEs suffered large losses on various investments in their portfolios. Concerns arose about the size of potential losses on their outstanding guarantees (which totaled $3.8 trillion in September 2008) impairing their ability to issue low-cost debt to fund their purchases of mortgages, and doubts surfaced about whether they had enough capital to cover potential losses. The implicit federal guarantee was made more explicit in 2008 with the enactment of the Housing and Economic Recovery Act (Public Law 110-289), which allowed the Federal Housing Finance Agency to place Fannie Mae and Freddie Mac into conservatorship in September 2008. Under the authority provided by that law, the Treasury entered into agreements with Fannie Mae and Freddie Mac to provide sufficient capital to keep their net worth from falling below zero. In return, the government received senior preferred stock and warrants that made the Treasury the effective owner of the GSEs. Between November 2008 and the end of March 2011, the government provided about $154 billion in capital to Fannie Mae and Freddie Mac and received more than $24 billion in dividends on its preferred stock, resulting in net payments to the GSEs of $130 billion. CBO expects additional net cash payments from the government over the next several years.

### CBO's Budgetary Treatment of Fannie Mae and Freddie Mac

In CBO's judgment, the federal conservatorship of Fannie Mae and Freddie Mac and their resulting ownership and control by the Treasury make the two entities effectively part of the government and imply that their operations should be reflected in the federal budget. Hence, in its baseline budget projections, CBO accounts for the cost of the GSEs' operations as though they are being conducted by a federal agency. The costs included in CBO's baseline are estimates of the federal subsidies associated with the GSEs' mortgage guarantees over the life of the mortgages.

Unlike CBO, the Administration's Office of Management and Budget (OMB) treats Fannie Mae and Freddie Mac as nongovernmental entities for budgetary purposes. In the budget, instead of recording forward-looking subsidy costs for their new obligations, OMB records only cash transfers between the Treasury and the two GSEs, such as for stock purchases made to shore up their capital and the dividends they pay to the Treasury. That approach can postpone for many years the recognition of the costs of new obligations. Subsidized mortgage guarantees may even show gains for the government in the short term because fees are collected up front but losses are realized over time as defaults occur.

After consulting with the House and Senate Committees on the Budget, CBO concluded that using a fair-value approach to estimate subsidy costs for Fannie Mae and Freddie Mac would give the Congress the most accurate and comprehensive information about the budgetary costs of supporting the GSEs. Those fair-value estimates represent the up-front payment that a private entity in an orderly transaction would

require to assume the federal responsibility for the GSEs' obligations.[2] The fair-value approach produces estimates of the value of assets and liabilities that either correspond to or approximate market prices.

Another alternative would be to account for the GSEs according to the method spelled out in the Federal Credit Reform Act of 1990 (FCRA). Most federal programs that provide loans or loan guarantees are accounted for using that method. The main difference between FCRA estimates and fair-value estimates is the discount rate used to calculate the present value of the future costs of guarantees and acquisitions: Under FCRA, projected cash flows are discounted using interest rates on Treasury securities, whereas fair-value estimates use rates that incorporate a risk premium. By including a market-based risk premium, fair-value estimates provide a more comprehensive measure of cost, which recognizes that the financial risk that the government assumes when issuing guarantees is more costly to taxpayers than FCRA estimates suggest. The FCRA and fair-value approaches paint very different pictures of the cost of continuing to operate Fannie Mae and Freddie Mac over the next decade under current law. Whereas on a fair-value basis, new obligations generate a budgetary *cost*, under FCRA, the continuing operations would result in budgetary *savings*.[3]

### CBO's Estimates of the Cost of the GSEs' Activities

In August 2009, CBO estimated that the cost of all of the GSEs' mortgage commitments made before fiscal year 2009 plus new commitments made in 2009 would total $291 billion on a fair- value basis. Since then, CBO has not produced a new estimate of the subsidy cost associated with the GSEs' past commitments. However, the GSEs' financial reports suggest that losses have increased somewhat since that time because of the continued deterioration of conditions in the housing market.

For each new set of baseline budget projections, CBO estimates the subsidy cost for the GSEs' new business over the current year and next 10 years on a fair-value basis. The average rate for that subsidy of the GSEs' new business has fallen since the peak of the financial crisis, and it is expected to decline further in coming years as the housing market recovers. The subsidy rate (the subsidy cost per dollar of mortgage principal guaranteed) will remain positive, however, as long as Fannie Mae and Freddie Mac provide capital and guarantees to the mortgage market at prices below what private financial institutions offer. On the basis of the March 2011 baseline projections used for CBO's analysis of the President's budget, the agency estimates that the new guarantees the GSEs will make over the 2012–2021 period will cost the government $42 billion.

---

2. An orderly transaction is one that occurs under competitive market conditions between willing participants and does not involve forced liquidation or a distressed sale.

3. Congressional Budget Office, letter to the Honorable Barney Frank about the budgetary impact of Fannie Mae and Freddie Mac (September 16, 2010).

FHFA 2363

**Options for the Federal Role in the Secondary Mortgage Market**

Policymakers are contemplating a wide range of proposals for the federal role in the secondary mortgage market in general, for the future of Fannie Mae and Freddie Mac in particular, and for the transition to a new model. The broad options include:

- Moving to a hybrid public/private approach that would involve explicit federal guarantees of some privately issued MBSs;

- Establishing a fully federal agency that would purchase and guarantee qualifying mortgages; or

- Promoting a fully private secondary mortgage market with no federal guarantees.

Any new approach would need to confront major design issues—if the approach included federal guarantees, how to structure and price them; whether to support affordable housing and, if so, by what means; and how to structure and regulate the secondary market. In a recent study, CBO analyzed those alternatives and the trade-offs among them.[4] To evaluate the options, CBO looked at a number of criteria, including whether a given alternative would ensure a stable supply of financing for mortgages, how affordable-housing goals would be met, how well taxpayers would be protected from risk, whether federal guarantees would be priced fairly, and to what extent an approach would provide incentives to control risk taking. A summary of the study's findings is included at the end of this testimony.

**Comparability of Cost Estimates Across Federal Housing Programs**

The policy choices made about the future federal role in the secondary mortgage market will have budgetary implications that could differ considerably depending on the budgetary treatment used. In CBO's judgment, continuing to use a fair-value approach to estimate subsidy costs for Fannie Mae and Freddie Mac would provide the most accurate and comprehensive measure of the cost to taxpayers of any eventual transition to a new model for the federal role in the secondary mortgage market. However, doing so would maintain the practice of accounting for similar federal credit programs and financial transactions in different ways. Currently, fair-value accounting is used to estimate the budgetary cost of activities of the Troubled Asset Relief Program (TARP), as well as for CBO's baseline projections of the cost of operating Fannie Mae and Freddie Mac, but the FCRA approach is used to estimate the cost of federal mortgage guarantee programs operated by the Department of Veterans Affairs (VA) and FHA. At the same time, the Federal Reserve System's remittances to the Treasury (based on the Federal Reserve's net income) are recorded in the budget on a cash basis. As a result, the budgetary effects of recent purchases of mortgage-backed securities by federal entities have been accounted for on a FCRA basis for

---

4. Congressional Budget Office, *Fannie Mae, Freddie Mac, and the Federal Role in the Secondary Mortgage Market* (December 2010).

FHFA 2364

transactions by the Treasury, on a fair-value basis for transactions by the GSEs, and on a cash basis for transactions by the Federal Reserve.

The practice of using different accounting methods for similar federal obligations can cause confusion, make it difficult to accurately compare costs between programs, and create an incentive to rely more on programs or activities that have relatively low budgetary costs even if their full costs to taxpayers are higher. Providing an illustration, CBO recently compared the estimated cost of FHA's single-family mortgage insurance program on a FCRA versus a fair-value basis.[5] The two approaches yield very different estimates. Under the FCRA methodology, the FHA program would produce budgetary *savings* of $4.4 billion in fiscal year 2012. On a fair-value basis, in contrast, the program would have a *cost* of $3.5 billion in 2012. The inconsistent treatment of the GSEs and FHA also implies that a mortgage that generates a budgetary cost when it is guaranteed by Fannie Mae or Freddie Mac could show budgetary savings if FHA provided the coverage instead.

## Fannie Mae, Freddie Mac, and the Secondary Mortgage Market

Four decades ago, Congressional charters set up Fannie Mae and Freddie Mac as government-sponsored enterprises—privately owned financial institutions established by the government to fulfill a public mission. The two GSEs were created to provide a stable source of funding for residential mortgages across the country, including loans on housing for low- and moderate-income families. The GSEs purchase mortgages that meet certain standards from banks and other originators, pool those loans into MBSs that they guarantee against losses from defaults, and sell the securities to investors—a process referred to as securitization. In addition, they buy mortgages and MBSs (both each other's and those issued by private companies) to hold in their portfolios. They fund those portfolio holdings by issuing debt obligations, known as agency securities, which are sold to investors.

Until recently, the GSEs' debt securities and MBSs were not officially backed by the federal government. Nevertheless, most investors believed that the government would not allow Fannie Mae and Freddie Mac to default on their obligations. That perception of an implicit federal guarantee stemmed from the very prominent role the two entities played in the housing market and in the broader financial markets. It also stemmed from the specific benefits that the two entities received because of their status as GSEs, such as not having to register their securities with the Securities and Exchange Commission, being exempt from state and local corporate income taxes, and having a line of credit with the Treasury.

---

5. Congressional Budget Office, "Accounting for FHA's Single-Family Mortgage Insurance Program on a Fair-Value Basis," attachment to a letter to the Honorable Paul Ryan (May 18, 2011).

Because of their implicit federal guarantee, Fannie Mae and Freddie Mac could borrow to fund their portfolio holdings at lower interest rates than those paid by fully private financial institutions that posed otherwise comparable risks. In addition, investors valued the GSEs' guarantees of MBSs more highly than those issued by fully private guarantors. Some of those benefits from federal support flowed to mortgage borrowers in the form of greater availability of credit and somewhat lower interest rates. The GSEs' other stakeholders (shareholders, managers, and employees) also reaped some of the gains. The advantages of implicit federal support allowed Fannie Mae and Freddie Mac to grow rapidly and dominate the secondary market for the types of mortgages they were permitted to buy (known as conforming mortgages). In turn, the perception that the GSEs had become "too big to fail" reinforced the idea that they were federally protected.

Fannie Mae and Freddie Mac were profitable in most years until recently, when the United States experienced its most severe financial crisis since the Great Depression of the 1930s. Starting in 2007, as housing prices dropped nationwide and foreclosures increased, the two GSEs suffered large losses on various investments in their portfolios, such as subprime mortgages (loans made to borrowers with poorer-than-average credit) and "private-label" MBSs (securities issued and insured by private companies without government backing). The GSEs also faced heightened uncertainty about the magnitude of the ultimate decline in housing prices and increase in unemployment and thus about the size of losses on their outstanding guarantees (which totaled $3.8 trillion in September 2008). Those factors impaired the GSEs' ability to issue low-cost debt to fund their purchases of mortgages, and doubts arose about whether they had enough capital to cover potential losses.

The enactment of the Housing and Economic Recovery Act of 2008 established the Federal Housing Finance Agency and gave it the authority to place Fannie Mae and Freddie Mac in conservatorship—a step it took in September 2008. Under the authority provided by that law, the Treasury entered into agreements with Fannie Mae and Freddie Mac to provide up to $200 billion (by purchasing their stock) in order to maintain their solvency. The amount was increased in February 2009 to a maximum of $400 billion and again in December 2009, when the Treasury made the commitment unlimited for 2010 through 2012. Beginning in 2013, the Treasury will continue to maintain the GSEs' solvency using the remaining balances of the $400 billion (net of amounts of capital provided before 2010), which have no time limit. Those actions gave the government control over the two institutions and effectively made the government's backing of their debt securities and MBS guarantees explicit.

Under the agreements authorized by the Housing and Economic Recovery Act, the Treasury committed to provide sufficient capital to keep Fannie Mae's and Freddie Mac's net worth at zero through 2012 (as measured according to generally accepted accounting principles). In return, the government received senior preferred stock in the GSEs and warrants that give it the option to buy nearly 80 percent of the entities' common stock at a price close to zero. The Treasury's agreements with the GSEs also

call for their portfolio holdings of mortgages to gradually shrink over time to reduce risks to the overall financial system and losses to taxpayers.

As of March 31, 2011, the government had provided about $154 billion to Fannie Mae and Freddie Mac and received over $24 billion in dividends on their preferred stock holdings, resulting in net payments to the GSEs of $130 billion. CBO expects that the GSEs will need additional net cash payments in fiscal year 2011 and in 2012 as well. After that, CBO estimates, the GSEs will pay more to the Treasury in dividends than they will receive from purchases of preferred stock.[6]

As a result of the government's aid and the explicit federal guarantee, Fannie Mae and Freddie Mac have been able to continue channeling funds to the mortgage market, even as private financial institutions faltered. Consequently, in 2010, the two GSEs owned or guaranteed roughly half of all outstanding mortgages in the United States (including a significant share of subprime mortgages), and they financed 63 percent of new mortgages originated that year. Including the 23 percent of home loans insured by federal agencies such as FHA, about 86 percent of new mortgages made in 2010 carried a federal guarantee.

## CBO's Budgetary Treatment of Fannie Mae and Freddie Mac

The federal government now controls Fannie Mae and Freddie Mac and is operating them to fulfill the public purpose of supporting the housing and mortgage markets. Moreover, both entities are relying on their federal backing to maintain their low-cost access to financial markets. Although they are not legally government agencies, and their employees are not civil servants, CBO believes that the two entities are effectively part of the government and that it is appropriate and useful to policymakers to include their financial transactions alongside all other federal activities in the budget. Hence, in its baseline budget projections, CBO accounts for the cost of the entities' operations as though the operations are being carried out by a federal agency.

Specifically, CBO treats the mortgages guaranteed each year by the two GSEs as new guarantee obligations of the federal government. For those guarantees, CBO's projections of budget outlays equal the estimated federal subsidies inherent in the commitments at the time they are made. In contrast, the Administration's Office of Management and Budget continues to treat Fannie Mae and Freddie Mac as non-governmental entities for budgetary purposes, and thus outside the budget. It records as outlays the amount of the net cash payments provided by the Treasury to the GSEs. (By CBO's accounting, those payments from the Treasury are effectively intragovernmental payments, which do not affect net federal outlays.)

---

6. The total projected cash payments are lower than the fair value estimates of cost discussed elsewhere in this testimony primarily because cash estimates do not include the cost of market risk and are not discounted.

Neither CBO nor OMB incorporates debt securities or mortgage-backed securities issued by Fannie Mae and Freddie Mac in estimates of federal debt held by the public. Such a determination depends on how narrowly or broadly—and for what purpose—one interprets the concept of federal debt. Nevertheless, recent events clearly indicate a strengthening of the federal government's commitment to the obligations of Fannie Mae and Freddie Mac.

### Possible Approaches to Estimating the Budgetary Impact of the GSEs' Activities

Two approaches are available that, in principle, could be used to estimate the budgetary impact of the credit activities of Fannie Mae and Freddie Mac, considering them as part of the federal government: the method specified by the Federal Credit Reform Act of 1990 and the fair-value (or risk-adjusted) method. Those approaches differ significantly in the information they provide to policymakers and in their implications for the budgetary costs of the GSEs and of any new policies that would affect the GSEs' operations or structure. In CBO's judgment, using a fair-value basis to estimate the subsidy cost for Fannie Mae and Freddie Mac has two advantages: It provides the Congress with the most complete information about the cost of supporting those entities under conservatorship, and it aligns the budgetary costs with the economic costs of any eventual transition to a new federal role in the secondary mortgage market.

**FCRA Subsidy Estimates.** Most federal credit programs are accounted for on a FCRA basis, which, like a fair-value approach, provides an accrual measure of the so-called subsidy cost of new federal direct loans or loan guarantees made each year. Under FCRA, the subsidy calculation measures the lifetime cost of loans or guarantees as of the year of disbursement and counts that cost as a federal outlay in that year; that cost is calculated by projecting all federal cash flows associated with a cohort of loans or guarantees and discounting those cash flows to the year of disbursement using interest rates on Treasury securities of comparable maturity.

A stated purpose of FCRA accounting is to make the budgetary cost of credit programs equivalent to that of other federal spending. FCRA estimates do not fully achieve that goal, however. Most federal spending takes place at prices that cover the costs to private entities of producing the goods and services that the government buys. But with FCRA estimates, the costs of federal loans and loan guarantees are recorded in the budget at prices that do not fully reflect such costs, for two reasons:

- By using Treasury rates for discounting, FCRA accounting implicitly treats market risk—a type of risk that is reflected in market prices because investors require compensation to bear it—as having no cost to the government. (FCRA procedures do, however, incorporate the expected cost of defaults on federal loans or loan guarantees.)

- Subsidy rates computed under FCRA exclude the administrative costs of federal credit programs—even costs that are essential for preserving the value of the government's claim to future repayments, such as costs for servicing and collecting on

FHFA 2368

loans. Such administrative costs are accounted for separately in the budget on a cash basis each year as they are incurred.

Because the cost of market risk is omitted and essential administrative costs are treated separately, the estimated budgetary cost of a federal loan or loan guarantee is systematically lower than that of an economically equivalent grant or benefit payment. That bias may lead policymakers to favor credit programs over other forms of aid that have a similar economic cost. Moreover, federal loans and loan guarantees tend to appear less costly than comparable activities undertaken in the private sector, even if the government is not intrinsically more efficient at providing them.

For those reasons, estimates prepared using FCRA procedures provide a less-than-comprehensive measure of the cost to taxpayers of federal credit commitments. In particular, discounting expected cash flows at Treasury rates—and thus ignoring market risk—yields an estimate of the cost of a loan guarantee that is lower than what competitive financial institutions would charge for such protection.

**Fair-Value Subsidy Estimates.** After consulting with the House and Senate Committees on the Budget, CBO concluded that using a fair-value basis to estimate subsidy costs for Fannie Mae and Freddie Mac under conservatorship would provide the Congress with the most useful information about the budgetary cost of supporting those entities. A fair-value approach produces a more comprehensive measure of cost than credit reform accounting because it recognizes that when the government assumes financial risk, there is a cost to taxpayers of bearing risk beyond the expected losses from defaults. Specifically, fair-value estimates represent the up-front payments that a private entity in an orderly market would need to be paid to voluntarily take on the commitments of Fannie Mae and Freddie Mac without any federal backing.[7]

The fair-value approach produces estimates of the value of assets and liabilities that either correspond to or approximate market prices. The fair value of an asset is defined as the price that would be received if the asset was sold in an orderly transaction (one that occurs under competitive market conditions between willing participants and does not involve forced liquidation or a distressed sale). The fair value of a liability, such as a GSE loan guarantee, is the price that would have to be paid to induce a private financial institution to assume the liability.

A common argument against using fair-value estimates is that market risk does not involve costs for the federal government because the government can borrow at Treasury rates. However, when the government finances a risky loan or loan guarantee by selling a safe Treasury security, it is effectively shifting risk to members of the public. If such a loan is paid off as expected, the interest and principal payments cover the government's obligation to the holder of the Treasury security, but if the borrower

---

7. For a more detailed description of how CBO accounts for Fannie Mae and Freddie Mac and estimates federal subsidies, see Congressional Budget Office, *CBO's Budgetary Treatment of Fannie Mae and Freddie Mac*, Background Paper (January 2010).

defaults, the security must be paid for through higher taxes or lower government spending in the future.

In CBO's view, a fair-value treatment provides more timely and relevant information to policymakers about the costs of the GSEs' activities than does the cash treatment currently used by the Administration. For instance, if legislation were to require Fannie Mae and Freddie Mac to increase subsidies on guarantees to first-time home buyers, the program would show an immediate cost under CBO's budgetary treatment. But under a cash treatment that tracked inflows and outflows from the Treasury, there would be no immediate cost (or possibly a net gain from fees collected), because losses would not materialize for some months or years. For the same reason, the cost of different proposals to modify the terms on mortgages guaranteed by the GSEs cannot be compared meaningfully on a cash basis.

Both the FCRA approach and the fair-value approach use an accrual basis of accounting, and both rely on the same projections of future cash flows. The main difference between FCRA estimates and fair-value estimates is the discount rate used to calculate the present value of future costs of guarantees and acquisitions: Projected cash flows under FCRA are discounted at Treasury rates, whereas fair-value estimates incorporate a risk premium. Thus, FCRA estimates omit the cost of market risk, and fair-value estimates include it.

The market risk associated with any new mortgage guarantees made by the GSEs generates a cost to taxpayers. The guarantees that CBO projects will be made over the 2011–2020 period appear to be considerably safer than were the guarantees made during the peak of the housing boom or during the recession. However, foreclosure rates on houses remain high, and there is continuing uncertainty about whether house prices will fall further than they have already. CBO expects the economy to continue to recover gradually over the next few years, but the speed and strength of the recovery are uncertain. High loss rates are unlikely on the GSEs' new guarantees, but should they recur, that is likely to happen when the overall economy is weak and the cost of those losses is high; thus, mortgage guarantees continue to expose taxpayers to market risk.

### CBO's Estimates of the Cost of the GSEs' Activities

To infer the risk-adjusted discount rates used to estimate the fair value of Fannie Mae's and Freddie Mac's guarantees, CBO relied in part on information from the GSEs' disclosures and also considered prices in private markets, such as those for private-label mortgage securities and for jumbo mortgages (that is, mortgages of amounts higher than conforming mortgages). In CBO's view, Fannie Mae's and Freddie Mac's disclosures understate the fair value of the guarantees that the GSEs provide because the disclosures treat the portion of costs covered by the federal guarantee as having no cost to the GSEs. To uncover the value of the federal guarantees, CBO looked to the difference in prices that investors are willing to pay for private mortgage securities versus those backed by the GSEs, and the agency made adjustments to account for

differences in products, the characteristics of borrowers, market structure, and other factors. A further complication is that the GSEs receive no appropriated funds, and all administrative costs of their loan guarantees are covered by a portion of the fees they charge for those guarantees. Therefore, to calculate the credit subsidy for the GSEs, CBO excludes the portion of the guarantee fee that is required to cover those administrative costs. As a result, only part of the guarantee fee charged by the GSEs is available to offset the risk of default on guaranteed mortgages.

On a fair-value basis, CBO estimated in August 2009 that the cost of all of the GSEs' mortgage commitments made before fiscal year 2009 plus new commitments made in 2009 would total $291 billion. That figure closely corresponded with the GSEs' own estimates of their fair-value net worth of a deficit of $258 billion in June 2009. Since then, CBO has not produced a new estimate of the subsidy cost associated with the enterprises' past commitments—the value of which changes over time as repayments and defaults occur and as market conditions change. However, the assets and liabilities reported on the GSEs' fair-value balance sheets provide an indication of how the costs arising from past commitments have changed since then. As of March 31, 2011, the GSEs reported a fair-value deficit of approximately $187 billion. Adding to that the $130 billion in net payments already received from the Treasury implies a fair-value cost to the government of about $317 billion in obligations incurred through March 2011. The increase in that total compared with CBO's 2009 estimate reflects continued deterioration in the condition of the housing market that is increasing default rates on distressed mortgages and depressing the amounts that can be recovered following defaults; there are also differences between CBO's estimating assumptions and those of the GSEs.

For each new set of baseline budget projections, CBO estimates the subsidy cost for the GSEs' new business over the current year and next 10 years on a fair-value basis. In its most recent baseline projections from March 2011, CBO estimated that the subsidy costs of the GSEs' new business would total about $42 billion over the 2012–2021 period, an average of about $4 billion a year (see Table 1). The average subsidy rate on the GSEs' new business has fallen since the peak of the financial crisis, and it is expected to decline further in coming years as the housing market recovers. The subsidy cost will remain positive, however, as long as Fannie Mae and Freddie Mac provide capital and guarantees to the mortgage market at prices below what private financial institutions offer. The GSEs are able to do that primarily because of their federal backing, which ultimately transfers risk from them to taxpayers.

## The Budgetary Cost of a Transition to a New Federal Role in the Secondary Mortgage Market

As the operations of Fannie Mae and Freddie Mac make a transition from federal conservatorship to some new federal role in the secondary mortgage market, the budgetary costs or savings—and whether the budgetary figures provide a timely and comprehensive accounting of the financial implications of the policy changes for the government—will depend critically on the budgetary treatment used.

**Table 1.**

## CBO's March 2011 Baseline Budget Projections of Subsidy Costs for Fannie Mae and Freddie Mac

(Billions of dollars)

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total 2012-2016 | Total 2012-2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fair-Value Subsidy Costs | 7.6 | 5.3 | 3.1 | 3.0 | 3.1 | 3.4 | 3.8 | 4.0 | 4.2 | 4.3 | 22.1 | 41.6 |

Source:   Congressional Budget Office.

Note:   Numbers do not add up to totals because of rounding.

FCRA and fair-value accounting offer very different pictures of the cost of continuing a federal program that provides government backing for a large share of new and refinanced mortgages: Under FCRA, each mortgage guaranteed would appear to make money for the government and therefore reduce the budget deficit; on a fair-value basis, each mortgage guaranteed would entail a small cost to the government. On the basis of its August 2010 baseline projections, CBO estimated that on a FCRA basis, the GSEs would generate $44 billion in budgetary savings during the 2011–2020 period, whereas on a fair-value basis, the GSEs would generate a budgetary cost of $53 billion over the same period (see Table 2).[8]

The sales or purchases of mortgages or MBSs by the GSEs that could take place in a transition period would also appear to have very different effects under the alternative budgetary treatments. On a cash basis, sales of mortgages or securities appear to make money and purchases of mortgages or securities to cost money, even if the transactions involve exchanges of equal market value (claims on mortgage income in exchange for cash with equal value). FCRA accounting also records sales and purchases of mortgages and securities in a way that creates distortions. Investments in MBSs typically yield a return that is greater than the rates earned on Treasury securities; as a result, discounting the expected cash flows from investments in MBSs at Treasury rates, as under FCRA, will result in a reported net gain from purchasing fairly priced securities. For example, the Treasury's purchases of MBSs in 2010 produced budgetary savings because they were accounted for on a FCRA basis. Conversely, selling fairly priced securities under FCRA entails a budgetary cost. However, on a fair-value basis, any purchases or sales of mortgages and MBSs by the GSEs at competitive market prices result in no estimated gains or losses.

The choice between fair-value and FCRA accounting treatments may also affect decisions about the forms of assistance offered to low-income home buyers. For example, low-income home buyers could receive assistance of equivalent economic value

8. See Congressional Budget Office, letter to the Honorable Barney Frank about the budgetary impact of Fannie Mae and Freddie Mac (September 16, 2010).

**Table 2.**

# Projections of Mandatory Outlays for Fannie Mae and Freddie Mac Under Alternative Budgetary Treatments

(By fiscal year, in billions of dollars)

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2011– 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FCRA | -6 | -5 | -5 | -5 | -4 | -4 | -4 | -4 | -4 | -4 | -44 |
| Fair Value | 14 | 9 | 5 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 53 |

Source:   Congressional Budget Office based on August 2010 baseline budget projections.

Notes: Numbers do not add up to totals because of rounding.

FCRA = Federal Credit Reform Act.

through grants that cover their down payments or through loan guarantees that subsidize their borrowing costs. FCRA accounting would make the loan program appear to be less costly than a grant for down payment assistance that has an equivalent fair value but that might be more effective at overcoming barriers to home ownership.

**Comparability of Budget Estimates Across Federal Housing Programs**

Currently, similar federal programs and financial transactions are being accounted for in different ways. That practice creates several problems: It can cause confusion, hamper an accurate comparison of costs between programs, and create the incentive to rely more on programs with relatively low budgetary costs even if they have higher true costs to taxpayers. For example, although CBO's method of estimating the cost of operating Fannie Mae and Freddie Mac parallels the budgetary treatment for the activities of the TARP, that methodology is inconsistent with the FCRA methodology used for other federal mortgage guarantee programs, such as the ones run by the VA and FHA. Those differing approaches create an incentive to shift activities to programs that receive the most favorable budgetary treatment. For example, because costs recorded on a FCRA basis are generally below fair value, if legislation caused mortgage borrowers who would otherwise obtain a guarantee from Fannie Mae or Freddie Mac to instead use an FHA program to guarantee an identical mortgage, the legislation could appear to produce budgetary savings, even though the government's exposure to losses from defaults would be identical.

A comparison of the estimated cost of FHA's single-family mortgage insurance program on a FCRA versus a fair-value basis illustrates the magnitude of the differences.[9] Under the FCRA methodology, the program would produce budgetary savings of $4.4 billion in fiscal year 2012, CBO estimates. That result stems from an estimated subsidy rate of -1.9 percent applied to an estimated loan volume of $233 billion. (The

---

9.  Congressional Budget Office, "Accounting for FHA's Single-Family Mortgage Insurance Program on a Fair-Value Basis," attachment to a letter to the Honorable Paul Ryan (May 18, 2011).

negative subsidy rate means that the present value of expected payments to the government for the loans guaranteed in 2012 exceeds the present value of expected payments from the government for those loans by an amount equal to 1.9 percent of the loan volume.) On a fair-value basis, in contrast, the program would have a cost of $3.5 billion in 2012, CBO estimates—reflecting an estimated positive subsidy rate of 1.5 percent applied to the same projected loan volume.

## Options for the Federal Role in the Secondary Mortgage Market

The cost to taxpayers of assisting Fannie Mae and Freddie Mac and continuing their operations under conservatorship—and the structural weaknesses that contributed to their financial problems—have prompted consideration of various alternatives for the federal role in the secondary mortgage market in the future. Alternative proposals involve different choices about whether the Federal government should continue to guarantee payment on certain types of mortgages or MBSs and, if so, what the scope, structure, and pricing of those guarantees should be.[10] The proposals also involve choices about support for affordable housing and the competitive structure and regulation of the secondary market. In a recent study, CBO examined the trade-offs involved in making those key design choices and evaluated the strengths and weaknesses of three broad approaches for the future of the secondary mortgage market (see Table 3):[11]

- A hybrid public/private model in which the government would help to ensure a steady supply of mortgage financing by providing explicit guarantees on privately issued mortgages or MBSs that met certain qualifications;

- A fully public model in which a wholly federal entity would guarantee qualifying mortgages or MBSs; or

- A fully private model in which there would be no special federal backing for the secondary mortgage market.

CBO's analysis, which is summarized in this testimony, focused primarily on the long-term strengths and weaknesses of the alternative approaches, not on the transition from the status quo to a new model. Transitional issues—such as what to do with the existing portfolios and obligations of Fannie Mae and Freddie Mac—are important in their own right, but they are largely separate from the questions about the long-term

---

10. For a discussion of the options under consideration by the Administration, see Department of the Treasury and Department of Housing and Urban Development, *Reforming America's Housing Finance Market*: *A Report to Congress* (February 2010).

11. Congressional Budget Office, *Fannie Mae, Freddie Mac, and the Federal Role in the Secondary Mortgage Market* (December 2010).

FHFA 2374

**Table 3.**

# Key Features of Alternatives for the Secondary Mortgage Market

| | Hybrid Public/ Private Model | Fully Federal Agency | Fully Private Market |
|---|---|---|---|
| Existing operating assets of Fannie Mae and Freddie Mac | Handed over to specialized issuers of federally backed MBSs (could be nonprofit, cooperative, or private firms), sold to private-label issuers, or liquidated | Used for operations of agency, sold to private-label issuers, or liquidated | Sold to private-label issuers or liquidated |
| Licenses to issue federally guaranteed MBSs | Under "public-utility model," only a few; under "competitive market-maker model," available to any firm meeting specified criteria | None; operations undertaken by agency | None |
| Federal guarantees for loans or MBSs | Explicit, possibly covering only catastrophic risks | Explicit | None (Phased out) |
| Private capital's role in secondary market | Absorbs most or all losses, except in cases of unusually large shocks | None on federally guaranteed securities; absorbs all losses on private-label securities | Absorbs all losses |
| Allowable activities for federally guaranteed securitizers | Under "public-utility model," restricted to issuing MBSs and holding very limited portfolios; under "competitive market-maker model," restricted only enough to limit spillover of risk to government | Issuing guarantees and possibly holding portfolios of mortgages and MBSs | Not applicable |
| Support for affordable housing | Could occur through terms on federal guarantees, fees on issuers of federally backed MBSs, or government agencies | Could occur through agency | No special role; could occur through government agencies |
| Role of issuers of private-label MBSs | Serve borrowers whose mortgages do not qualify for federal guarantees | Serve borrowers whose mortgages do not qualify for federal guarantees | Dominant players in secondary market, along with other private financial institutions |

Source:   Congressional Budget Office.

Note:   MBSs = mortgage-backed securities.

FHFA 2375

future of the secondary mortgage market that are discussed here. In particular, alternative ways of resolving the transitional issues probably would not substantially affect the relative long-term merits of different models for the secondary market, and the different models do not appear to require any particular resolution of the transitional issues—choices about each could be combined in various ways. If changes were made in the next few years, care would need to be taken not to disrupt the housing and mortgage markets further. Those markets remain fragile: The sharp decline in housing prices since mid-2006 has left many homeowners owing more on their mortgages than their homes are worth, foreclosure rates are still high, and obtaining a mortgage continues to be difficult for many households.

## Possible Rationales for a Federal Role in the Secondary Market

In assessing future options for Fannie Mae and Freddie Mac, a fundamental issue is what role, if any, the federal government should play in the secondary mortgage market. Historically, support for that market has been part of a broader federal housing policy aimed at encouraging home ownership and, to a lesser extent, at making housing more affordable for low- and moderate-income families. The activities of Fannie Mae and Freddie Mac have been an important aspect of that policy (although the largest federal subsidies for home ownership have generally come from favorable tax treatment for housing).

In particular, the government has tried to ensure a steady supply of financing for residential mortgages through policies that increase the liquidity of mortgages and MBSs. In a liquid market, investors can quickly buy or sell large quantities of an asset without affecting its price. The government can enhance the liquidity of the secondary mortgage market by providing credit guarantees, which make MBSs safer and thus easier for investors to value, and by standing ready to buy and sell MBSs. Such government support has the greatest impact on the availability and price of mortgage funding during disruptions in the financial markets. At such times, interruptions in the supply of mortgage credit can spill over to the market for new-home construction and weaken the broader economy. Such interruptions can also impede the mobility of labor by making it more difficult for people to buy and sell homes when they want to move.

Under normal market conditions, supporting liquidity in the secondary mortgage market through federal credit guarantees tends to lower interest rates only slightly for most mortgage borrowers. When mortgages are unsubsidized, the cost of providing a credit guarantee is offset by the fees charged to investors, and those guarantee fees are passed on to borrowers. Nevertheless, borrowers may benefit because investors are willing to pay somewhat higher prices (or, equivalently, accept lower interest rates) for MBSs that are more liquid. In a competitive marketplace, that advantage tends to reduce the rates paid by borrowers relative to what rates would be in the absence of federal guarantees. (To the extent that Fannie Mae and Freddie Mac are able to dominate the market for MBSs, the value of greater liquidity may accrue largely to them rather than to borrowers.)

FHFA 2376

The benefits of the government's actions to increase liquidity in the secondary market by providing credit guarantees and purchasing mortgages must be weighed against the costs. Those actions expose taxpayers to the risk of potentially large losses when the cost of honoring guarantees exceeds the value of guarantee fees collected—or when mortgages held by the government lose value because of changes in interest rates or prepayment rates (that is, the extent to which borrowers pay mortgages off early). Federal guarantees also reduce the incentive for mortgage originators to avoid making risky loans in the first place.

Besides encouraging a stable supply of financing, another objective of federal involvement in the secondary mortgage market is to increase the availability of credit and subsidize its costs for people with low or moderate income. Broadening access to home ownership could be beneficial because owning a home may give people a greater stake in their community and thus make communities more stable. Moreover, certain types of housing assistance may be provided more effectively through support for the secondary market than through grants or tax preferences. For example, some borrowers may have the financial means to own a home but have trouble obtaining private credit—a problem known as "credit rationing." That problem can occur when it is difficult for lenders to assess the creditworthiness of certain borrowers, such as those with short credit histories. Lenders cannot address that greater risk by charging higher interest rates, because such terms tend to attract borrowers who are more likely to default. However, the government may decide that the value to society from subsidizing certain loans is greater than the cost of doing so.

Currently, several federal agencies—including FHA, VA, and the Government National Mortgage Association (Ginnie Mae)—provide assistance to low- and moderate-income borrowers through the secondary market, as (to a more limited extent) do Fannie Mae and Freddie Mac. FHA and VA increase the flow of credit to such borrowers by explicitly insuring mortgages against losses from default, and Ginnie Mae guarantees the payment of interest and principal on MBSs backed by pools of those mortgages. Fannie Mae and Freddie Mac are required to provide support for affordable housing by meeting certain goals set by regulators. Those goals specify the percentage of the GSEs' mortgage guarantees and purchases that must involve loans used to finance rental housing for, or home purchases by, people with low or moderate income.

## Weaknesses of the Precrisis Model

Despite the potential beneficial effects of federal involvement in the secondary mortgage market, the rules and market structure under which Fannie Mae and Freddie Mac operated before conservatorship—referred to here as the precrisis model—had numerous weaknesses, including the following:

- Adverse effects from the implicit federal guarantee of the two GSEs (such as a concentration of market power, risks to the stability of the larger financial system,

incentives for excessive risk taking, and a lack of transparency about costs and risks for the government);

■ Limited effects on affordable housing;

■ Lax regulation; and

■ Tensions in trying to balance competing public and private goals.

The implicit federal guarantee concentrated market power in Fannie Mae and Freddie Mac by giving them lower funding costs than potential competitors in the secondary market. As a consequence, the GSEs grew to dominate the segments of the market in which they were allowed to operate. Because of their size and interconnectedness with other financial institutions, they posed substantial systemic risk—the risk that their failure could impose very high costs on the financial system and the economy. The GSEs' market power also allowed them to use their profits partly to benefit their other stakeholders rather than exclusively to benefit mortgage borrowers.

The implicit guarantee created an incentive for the GSEs to take excessive risks: Stakeholders would benefit when gambles paid off, but taxpayers would absorb the losses when they did not. (Financial institutions that lack the benefit of a federal guarantee have less incentive to take risks because doing so can increase their financing costs, although some still act imprudently at times.) One way that Fannie Mae and Freddie Mac increased risk was by expanding the volume of mortgages and MBSs held in their portfolios, which exposed them to the risk of losses from changes in interest or prepayment rates. Over the past decade, the two GSEs also increased their exposure to default losses by investing in lower-quality mortgages, such as subprime and Alt-A loans.[12]

Because the federal guarantee was implicit rather than explicit, the costs and risks to taxpayers did not appear in the federal budget. That lack of transparency made it more difficult for policymakers to assess and control the GSEs' costs and risks. Lack of transparency also made it difficult for policymakers to evaluate whether the GSEs were effectively and efficiently meeting their affordable-housing goals; several studies have questioned the effectiveness of the GSEs' affordable-housing activities.

Weak regulation was a further shortcoming of the precrisis model. For instance, until 2008, the GSEs' regulators lacked the power to increase capital requirements for Fannie Mae and Freddie Mac or to place them in receivership—powers that regulators have long had over banks.

---

12. Subprime and Alt-A mortgages are offered to some borrowers who do not meet the qualifications for a prime mortgage (one extended to the least risky borrowers) because of such risk factors as a low credit rating, insufficient documentation of income, or the ability to make only a small down payment.

FHFA 2378

Finally, as private companies with a public mission and implicit public backing, Fannie Mae and Freddie Mac faced an intrinsic tension in balancing the objectives of maximizing profits for their shareholders, maintaining safety and soundness to minimize potential costs to taxpayers, and supporting affordable housing. For example, efforts to help low-income households tend to involve targeting loans toward borrowers who generally pose more risk than borrowers of traditional conforming mortgages do, thereby putting taxpayers at greater risk of loss. The affordable-housing goals and the pursuit of profit may have encouraged Fannie Mae and Freddie Mac to purchase subprime MBSs that were expected to generate high returns but that involved excessive risk for borrowers and taxpayers alike.

### Alternative Approaches for the Federal Government's Role in the Secondary Mortgage Market

The weaknesses inherent in the precrisis model may argue against returning to that model after the GSEs' conservatorship ends. A broad array of alternatives are possible for the federal government's future role in the secondary mortgage market. Any new approach would need to confront major design issues, such as whether to have federal guarantees and, if so, how to structure and price them; whether to support affordable housing and, if so, by what means; and how to structure and regulate the secondary market.

In examining the three broad approaches listed earlier, CBO looked at a number of criteria, including whether a given alternative would ensure a stable supply of financing for mortgages, how affordable-housing goals would be met, how well taxpayers would be protected from risk, whether federal guarantees would be priced fairly, and to what extent an approach would provide incentives to control risk taking. (For a synopsis of the trade-offs between the alternative approaches, see Table 4).

**Managing the Transition to a New Approach.** Moving from the current operations of Fannie Mae and Freddie Mac under conservatorship to any new model would involve several transitional issues, including how to manage the GSEs' existing portfolios and guarantee obligations and what to do with their operating assets. The government faces two basic choices: either retain the GSEs' portfolios and the responsibility for their outstanding guarantees and allow both to run out as mortgages are paid off, or pay a private entity to assume the guarantee obligations and sell off the portfolios. Whatever model for the secondary market is ultimately adopted, the expected losses on the GSEs' existing business will largely be borne by taxpayers, because private investors would not assume those obligations without compensation. The GSEs' operating assets are valuable; they could be auctioned off to investors (with the proceeds helping to offset some of the losses to taxpayers) or kept for use by a federal agency.

Handling those transitional issues efficiently and without disruption to the secondary mortgage market—especially given current conditions in housing and mortgage markets—is both important and difficult. However, in CBO's judgment, those issues have

FHFA 2379

**Table 4.**

## Key Factors for Assessing Alternatives for the Secondary Mortgage Market

|  | Hybrid Public/ Private Model | Fully Federal Agency | Fully Private Market |
|---|---|---|---|
| Supply of financing for mortgages | Under normal market conditions, the supply of funding for federally backed mortgages would be fairly stable. During periods of market stress, financing could become less available, especially under versions with narrower federal guarantees and more reliance on private capital. | The supply of funding for federally backed mortgages would be fairly stable—both in normal times and during periods of market stress—because uncertainty about the strength of the federal guarantee would be minimized. | The market would be more susceptible to fluctuations in the supply of funding. During periods of acute market stress, funding could become extremely scarce without federal intervention. |
| Support for affordable housing | Mortgages that satisfied affordable-housing goals could be subsidized through lower federal guarantee fees, with the subsidy cost shown in the budget. Or responsibility could be transferred to a fully federal agency, such as the Federal Housing Administration. | Subsidies could be delivered by the agency and would be shown in the federal budget. | Responsibility would be transferred to a fully federal agency, such as the Federal Housing Administration, or subsidies would be discontinued. |
| Taxpayers' exposure to risk | Intermediaries in the secondary market would bear all credit losses until their capital was exhausted, limiting the credit risk that taxpayers faced.

If only a few specialized firms participated in the market, they might receive government support if their solvency was threatened. | Taxpayers would bear the entire credit risk on guaranteed mortgages.

Private-label issuers seen as critical to the functioning of the mortgage market might receive government support during periods of acute market stress. | Taxpayers' exposure to credit risk would be very small under normal market conditions. Taxpayers could be exposed to greater risk through federal deposit insurance if banks bore more credit risk.

Firms seen as critical to the functioning of the mortgage market might receive government support during periods of acute market stress. |

**Continued**

**Table 4.** **Continued**

## Key Factors for Assessing Alternatives for the Secondary Mortgage Market

| | Hybrid Public/ Private Model | Fully Federal Agency | Fully Private Market |
|---|---|---|---|
| Pricing of federal guarantees | The government could have trouble fully pricing catastrophic risk or setting risk-sensitive prices, which would probably shift some cost to taxpayers. | The government probably has weaker incentives than private guarantors do to charge fees that would fully compensate for the risks associated with guarantees, suggesting that taxpayers would probably bear a cost. | No explicit federal guarantees; however, any implicit federal guarantees that arose would be free to the private issuers of MBSs and hence would entail a cost to taxpayers. |
| Incentives to control risk taking | The presence of federal guarantees would create an incentive for excessive risk taking. Limiting government guarantees and charging risk-based prices for them would reduce that incentive. In addition, private intermediaries would have an incentive to set risk-based prices and monitor risk taking. | Having the government absorb all credit losses would create a strong incentive for excessive risk taking by originators. The government could counter that incentive by setting risk-based prices for guarantees and by restricting eligibility for guarantees to safer mortgages. Incentives to limit risk taking would probably be weaker than if private capital was in the position to absorb some losses. | Financial intermediaries would have a relatively strong incentive to manage risk, but the incentive would be weakened if their obligations were seen as implicitly guaranteed by the government. |

**Continued**

FHFA 2381

**Table 4.** **Continued**

## Key Factors for Assessing Alternatives for the Secondary Mortgage Market

| Other considerations | Depending on the model implemented, government control over the secondary mortgage market could be greater or less than under the precrisis model.<br><br>Tensions between public and private purposes might remain, particularly under models with a small number of highly regulated intermediaries.<br><br>Subsidies could tilt the allocation of capital in the economy too far toward housing and away from other uses. | The government would control a large segment of the capital market.<br><br>The market would probably be less dynamic, and there would be less incentive for product innovation.<br><br>Tensions between public and private purposes would be minimized.<br><br>Subsidies could tilt the allocation of capital in the economy too far toward housing and away from other uses. | The government would regulate the secondary mortgage market but otherwise not intervene.<br><br>The market would not rely on the viability of any one firm or business model.<br><br>Tensions between public and private purposes would be minimized. |

Source:  Congressional Budget Office.

little impact on the relative merits of various approaches for the long-term organization of the secondary market.

**Major Design Issues.** Many different models for the secondary mortgage market involve common design issues, such as how to structure and price any federal credit guarantees, whether and how to support affordable housing, and how to structure and regulate the secondary market.

*Structuring Federal Guarantees.* The design of federal guarantees is an important issue for both a hybrid public/private approach and a fully federal approach. A key choice involves which mortgages would be considered eligible for federal guarantees. Mortgage products that qualify for federal backing tend to be popular, and hence such backing can be used to encourage best practices by lenders. Including a wide range of products in the definition of qualifying mortgages—and setting high dollar limits for those loans—would provide benefits to more borrowers and could increase the stability of the secondary market. At the same time, a large-scale guarantee program would expose the government to greater risk, reduce the incentives for prudent risk taking, and tend to crowd out private participation in the market.

The government could charge guarantee fees that partly or fully offset the total expense of its guarantee program, including administrative costs, expected losses, and

FHFA 2382

the cost of risk. (If fees and other collections were insufficient to cover those costs, the government would have to subsidize the program.) Basing guarantee fees on the riskiness of a mortgage would weaken the incentive for excessive risk taking and reduce the extent to which safer borrowers cross-subsidized riskier ones.

Some proposals envision providing federal guarantees but limiting the government's exposure to losses by sharing risk with the private sector. Under such proposals, private capital—along with homeowners' down payments and any capital provided by private mortgage insurance—would be the first line of defense against losses from defaults. Transferring risk to the private sector would not only lower the government's exposure directly but also give private entities greater incentives to control risk and thereby reduce the government's exposure further.

One risk-sharing option that could limit federal losses would be for the government to sell catastrophic risk protection on qualifying MBSs. With catastrophic guarantees, payouts to investors might be triggered, for instance, only when nationwide default rates exceeded some threshold. Smaller losses would be absorbed by private capital or insured by private mortgage insurance. Relying heavily on the private sector for credit protection would have drawbacks, however. Investors would probably perceive securities with very limited federal backing as being riskier and less uniform than those currently issued by Fannie Mae and Freddie Mac, which would make them less liquid. The availability of private capital and private mortgage insurance is also susceptible to disruptions in the financial markets.

*Supporting Affordable Housing.* The main design issue related to affordable housing is whether to transfer the GSEs' responsibilities in this area to fully federal entities (such as FHA) that are funded with broad-based taxes or to pursue affordable-housing goals through taxes or mandates on private institutions operating in the secondary mortgage market. Supporting affordable housing generally involves providing subsidies, which are most easily controlled and monitored when administered by a federal agency. Some observers, however, question whether a federal agency could provide support as effectively or flexibly as private entities; in their view, it would be better to have such support remain the responsibility of private financial institutions.

In the precrisis model, the GSEs' affordable-housing activities were effectively funded through the financial advantage generated by the government's implicit guarantee. Under alternative approaches with an explicit federal guarantee, the fees charged to investors would probably either just cover or not entirely cover the government's cost for the guarantee program and so would not generate a surplus that could be used to support affordable housing. Thus, the alternatives to fund affordable-housing activities would be either to use general revenues or to use special taxes or mandates on financial institutions. Broad-based taxes tend to be less distorting and hence preferable in terms of economic efficiency, although special assessments on financial institutions might be justified as compensation for benefits that those institutions receive from the government.

FHFA 2383

*Structuring and Regulating the Secondary Market.* Key issues related to the structure of the market include what role private-label securitizers would play, how much they would be regulated, and whether any of the GSEs' advantages would be extended to other market participants or abolished. For a hybrid public/private approach, another critical design issue is how the market would be structured—specifically, the number and types of intermediaries that would exist and the activities that they would be permitted to engage in. Proposals range from licensing a small number of highly regulated private entities to package and sell federally guaranteed MBSs—the "public-utility model"—to allowing any private financial institution that met certain regulatory criteria to package and sell federally guaranteed MBSs—the "competitive market-maker model").

An argument in favor of the public-utility model is that it could create a more level playing field for mortgage originators than a less regulated approach would; the public utilities would be required to serve all originators, thereby facilitating broad access to the secondary market. In addition, having a small number of intermediaries could increase the liquidity of the secondary market by ensuring that investors viewed different federally backed MBSs as interchangeable. If the intermediaries were structured as nonprofit entities, they might also have less incentive to take risk than for-profit firms do.

If the public utilities' business was limited to creating federally backed MBSs, however, they would be more exposed to mortgage credit risk than would financial institutions with a more diverse set of investments. Concentrating risk exposure would replicate one of the major weaknesses of Fannie Mae and Freddie Mac and make the new public utilities more susceptible to shocks in the housing market than more-diversified institutions would be. In addition, having only a few large intermediaries that were essential to the functioning of the secondary market could recreate the "too big to fail" problem, even if federal guarantees were limited by law. And nonprofits might have weaker incentives than private-sector institutions do to control costs and risks and to innovate. Another concern with the public-utility model is "regulatory capture"—that over time, regulators might become more responsive to the goals of the regulated entities than to the interests of the general public.

The competitive market-maker model also has strengths and weaknesses. On the one hand, spreading mortgage credit risk more widely among more-diversified institutions would reduce risks to the overall financial system and the economy, compared with circumstances under both the precrisis model and the public-utility model. Having a greater number of institutions issue federally backed MBSs would also encourage innovation and foster competition—which could help ensure that the benefits of federal support went to mortgage borrowers rather than to stakeholders of the financial intermediaries.

On the other hand, even with a federal guarantee, MBSs issued by different institutions might not be viewed as completely interchangeable. In that case, the liquidity of MBSs would be reduced, and borrowing costs would increase. It is also possible that smaller mortgage originators might have trouble gaining access to the secondary mar-

ket if large private institutions were unwilling to buy loans from them, although competition among market makers would make that outcome unlikely. Another concern with allowing broad participation by diversified firms is that the government could be exposed to greater risk because losses from the firms' other lines of business could spill over to their activities in the secondary mortgage market.

**A Hybrid Public/Private Model.** Many proposals for the future of the secondary market involve providing federal guarantees of certain mortgages or MBSs that would qualify for government backing. That approach would preserve many features of how the secondary market for conforming mortgages operated before Fannie Mae and Freddie Mac were placed in conservatorship. However, a hybrid approach would depart from the precrisis model in three main ways: A potentially different set of private intermediaries would be established to securitize federally backed mortgages, the federal guarantees on those mortgages would be explicit rather than implicit, and their subsidy cost would be recorded in the federal budget.

As the preceding discussions about structuring federal guarantees and regulating the secondary mortgage market illustrate, a hybrid approach could be implemented in ways that involved broader or narrower federal guarantees and more or less regulation of participants in the market.

Under a hybrid approach, private capital and possibly private mortgage insurance would absorb losses from defaults before the federal guarantee would be called upon. Fannie Mae and Freddie Mac could be privatized and allowed to compete in the secondary market; they could be used to form a nonprofit organization that would issue federal guarantees; or they could be liquidated. The government could provide additional housing assistance to low- and moderate-income families by subsidizing guarantee fees for qualifying borrowers or by funding programs of FHA or other federal agencies that target those groups.

Compared with the approach of establishing a fully federal agency, a hybrid public/private approach would lessen concerns about putting a large portion of the capital market under government control. It would also limit costs and risks to taxpayers by having intermediaries in the secondary market bear all credit losses until their capital was exhausted. In addition, putting private capital at risk would provide incentives for prudent underwriting and pricing of risk. Compared with a fully private secondary market, a hybrid approach would probably improve the liquidity of the market, especially during times of financial stress. Moreover, providing an explicit federal guarantee would avoid the problems of a lack of transparency and control that an implicit guarantee involves.

Relying on explicit government guarantees of qualifying mortgages would also have some disadvantages, the importance of which would depend partly on the design chosen. If competition remained muted, with only a few specialized firms participating in the secondary market, limiting risk to the overall financial system and avoiding regulatory capture could be difficult. Moreover, federal guarantees would reduce creditors'

incentive to monitor risk. Experience with other federal insurance and credit programs suggests that the government would have trouble setting risk-sensitive prices and would most likely end up imposing some cost and risk on taxpayers. In addition, a hybrid approach might not eliminate the frictions that arise between private and public missions.

**A Fully Federal Agency.** An alternative would be to create a government-run program that provided explicit federal guarantees promising timely payment of interest and principal on qualifying mortgages or MBSs. (Such a program could share many features with the current activities of FHA and Ginnie Mae.) The net cost of the federal program would appear in the budget and could be covered wholly or partly by charging guarantee fees. Policymakers could use the design of the fees to determine the size of subsidies to low-income borrowers or providers of low-income rental housing. Under that fully federal approach, some of the current operations of Fannie Mae and Freddie Mac could become part of a new or existing federal agency.

A federally run program could have some advantages over alternatives that relied on the private sector. For example, such a program would be more likely to ensure a fairly steady flow of funds to the secondary mortgage market—both in normal times and during periods of financial stress—by minimizing uncertainty about the strength of the federal guarantee. Compared with the precrisis model, this approach would increase transparency by replacing an implicit guarantee with an explicit one. Moreover, most of the federal subsidies would probably flow to mortgage borrowers rather than to private financial institutions.

At the same time, however, a new federal program would permanently increase government control of a large segment of the capital market. Depending on the size of the subsidies, that greater federal presence could tilt the allocation of capital in the economy further toward housing and away from other activities. In addition, a federally operated secondary market would probably be less dynamic and result in fewer innovations than a market in which competing private institutions played a larger role.

Furthermore, taxpayers, rather than private financial institutions, would bear much of the credit risk on guaranteed mortgages. That shift in risk bearing might give mortgage originators and other financial intermediaries less incentive to control risk—a situation (known as moral hazard) that commonly arises with guarantees and insurance. Depending on the specific budgetary treatment of the program, the government could have weaker incentives than private parties do to charge guarantee fees that fully compensated for the risks associated with the guarantees. Currently, the budgetary treatment of most federal credit guarantees follows the guidelines of FCRA, which do not include a charge for market risk in estimates of federal subsidies. As a result, such estimates tend to understate a guarantee's economic cost to taxpayers.

**A Fully Private Secondary Mortgage Market.** Another approach would be to move to a fully private secondary mortgage market and either wind down the operations of

Fannie Mae and Freddie Mac or sell the federal stake in their assets to private inves-
tors. Responsibility for carrying out the GSEs' affordable-housing mission, to the
extent it was continued, could be transferred to a government housing agency, such as
FHA. Private firms would then form the secondary market—just as they did for
private-label MBSs before the financial crisis and as they continue to do for securities
backed by other types of assets (such as automobile, student, commercial real estate,
and credit card loans). In times of severe distress, the government could still step in to
promote liquidity. For instance, it could make FHA guarantees available to more bor-
rowers, or it could buy MBSs (as the Treasury and the Federal Reserve did during the
financial crisis). Expanding the activities of federal agencies, however, generally
requires Congressional action.

Privatization might provide the strongest incentive for prudent behavior on the part
of financial intermediaries by removing the moral hazard that federal guarantees cre-
ate. (The enormous losses that have occurred in recent years on private-label subprime
mortgages, however, offer a painful reminder that private markets are not immune to
aggressive risk taking.) By increasing competition in the secondary market, the priva-
tization approach would reduce the market's reliance on the viability of any one firm.
Private markets may also be best positioned to allocate the credit risk and interest rate
risk of mortgages efficiently, and they would probably be more innovative than a sec-
ondary market dominated by a fully federal agency. Further, privatization would elim-
inate the tension between public and private purposes inherent in the traditional GSE
model.

Full privatization could have several drawbacks, however, including the risk that it
might not prove credible. If the private firms operating in the secondary market were
seen as critical to the functioning of the mortgage market, investors might again treat
them as implicitly guaranteed by the government, weakening market discipline,
reducing transparency, and creating moral hazard. In addition, without some predict-
able federal response, the liquidity of the private secondary market might dry up dur-
ing periods of acute financial stress. Moreover, privatization might not significantly
reduce taxpayers' overall exposure to risk if it shifted credit risk on mortgages to banks
that were covered by federal deposit insurance and if that additional risk was not rec-
ognized in regulators' actions and in the fees charged for deposit insurance.

**Other Mortgage-Financing Approaches.** As an alternative to mortgage-backed securi-
ties, the federal government could offer support for other funding mechanisms for
home loans. One possibility would be to encourage greater reliance on covered
bonds—bonds collateralized by residential mortgages—which many large European
banks use to fund the mortgages they hold. With covered bonds, banks bear most of
the risks of mortgage lending: When a mortgage is paid off or goes into default, the
issuer is contractually obligated to replace the collateral with a new mortgage. That
allocation of risk has both advantages and disadvantages compared with MBSs,
which spread risk more widely among financial institutions, investors, and the gov-
ernment. Other developed countries with high rates of home ownership rely less on
government-backed MBSs to fund mortgages than the United States does. Some
observers have pointed to Europe's housing finance systems as potential models for

this country; those systems have supported rates of home ownership comparable with that in the United States while relying less on MBSs. Although covered bonds are common in Europe, there is considerable variation in how mortgages are funded and what types of mortgages are available. Nevertheless, all developed countries with high rates of home ownership depend on some degree of government support to maintain the flow of credit to the mortgage market during periods of financial stress.

# Tab 33



## ISSUER COMMENT

Analyst Contacts:

NEW YORK                          1.212.553.1653

Thuy Nguyen, CPA                  1.212.553.4860
*Analyst*
Thuy.Nguyen@moodys.com

Brian Harris, CPA                 1.212.553.4705
*Senior Vice President*
Brian.Harris@moodys.com

# CBO Estimate of GSE Loss Is Credit Positive

Extracted from "Moody's Weekly Credit Outlook", dated June 13, 2011

On 2 June, the Congressional Budget Office (CBO) said the real cost of guaranteeing Fannie Mae (Aaa stable)[1] and Freddie Mac (Aaa stable) was $317 billion. This amount falls inside the Federal Housing Finance Agency's (FHFA) previous loss estimate of $221-$363 billion. The CBO estimate is credit positive for investors in GSE debt as the CBO and the FHFA believe that Fannie Mae and Freddie Mac have enough contingent capital through their senior preferred stock purchase agreement (SPSPA) to cover capital deficiencies. Additionally, the reduced uncertainty about the GSEs' capital needs will benefit the companies in the form of continued stable financing costs.

The CBO's loss estimate includes GSEs' total capital draws to date under the SPSPA and the fair value of guaranteeing the mortgage loans that the GSEs have purchased and securitized. The fair-value estimates the amount a private entity in an orderly market would need to be paid to voluntarily take on the GSEs' commitments without any federal backing. The CBO estimates the fair value of the guarantee at $187 billion.

The FHFA's estimate of GSE losses in September 2010 was the first time since Fannie Mae and Freddie Mac went into conservatorship that their potential capital hole was dimensioned. FHFA's estimate of $221-$363 billion was based on three economic environments: a base-case scenario, a stronger near-term recovery, and a deeper second recession in which peak-to-trough house prices declined by 34%, 31%, and 45%, respectively.

The CBO's loss estimate suggests Fannie Mae and Freddie Mac may have enough contingent capital under the SPSPA to meet their obligations, even after their ability to draw in unlimited amounts expires at the end of 2012. In December 2009, the US Treasury amended the SPSPA for the third time since September 2008. Under the revised agreement, each company can draw up to $200 billion plus any quarterly deficit in 2010, 2011, and 2012, less any surplus as of 31 December 2012. To date, Fannie Mae has $125 billion available ($200 billion less $75 billion used through 2009), and Freddie Mac has $149 billion ($200 billion less $51 billion used through 2009). These amounts will not decline until after 2012.

### What is Moody's Weekly Credit Outlook?

Moody's Weekly Credit Outlook provides our research clients with timely opinions on breaking credit market developments and trends. Published every Monday morning, the newsletter will help you start your week informed of Moody's latest opinions from across the organization.

---

[1]  Ratings for Fannie Mae and Freddie Mac are of senior unsecured debt.

Despite Fannie Mae and Freddie Mac's ability to cover losses according to CBO's and FHFA's estimates, the companies will still be unable to service their senior preferred dividends. This will further pressure the government to more permanently address GSE reform. According to the FHFA, Fannie Mae will have to service at least $150 billion in senior preferred stock by 2013, which equates to a $15 billion annualized dividend. But the company has never earned more than $8 billion, which was its net income in 2003. According to the FHFA, Freddie annual senior preferred dividend will be greater than $7 billion. Freddie Mac's annual net income never exceeded $4.8 billion other than in 2002, when it was $10.1 billion.

FHFA 2390

Report Number: 133742

Authors
Thuy Nguyen, CFA
Brian Harris, CFA

Senior Production Associate
Wing Chan

© 2011 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ARE MOODY'S INVESTORS SERVICE, INC.'S ("MIS") CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MIS DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS DO NOT CONSTITUTE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS ARE NOT RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. CREDIT RATINGS DO NOT COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MIS ISSUES ITS CREDIT RATINGS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Any publication into Australia of this document is by MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657, which holds Australian Financial Services License no. 336969. This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001.

Notwithstanding the foregoing, credit ratings assigned on and after October 1, 2010 by Moody's Japan K.K. ("MJKK") are MJKK's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities. In such a case, "MIS" in the foregoing statements shall be deemed to be replaced with "MJKK".

MJKK is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO.

This credit rating is an opinion as to the creditworthiness or a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be dangerous for retail investors to make any investment decision based on this credit rating. If in doubt you should contact your financial or other professional adviser.



Moody's
INVESTORS SERVICE

FHFA 2391

# Tab 34



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

June 30, 2011

The Honorable Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street NW
Washington, DC 20552-0003

Dear Acting Director DeMarco:

As you know, in my letter to you dated March 31, 2011, I communicated to you our waiver, for the second quarter of Calendar Year (CY) 2011, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the third quarter of CY 2011, the PCF payable by each Enterprise. Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set. Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Jeffrey A. Goldstein

# Tab 35



**Edward J. DeMarco**
**Acting Director**
**Federal Housing Finance Agency**

**American Mortgage Conference**
**Raleigh, North Carolina**
**September 19, 2011**

**The Conservatorships of Fannie Mae and Freddie Mac:**
**Current and Future Operations**

**Introduction**

Thank you for inviting me to speak here today. We just passed the third anniversary of placing Fannie Mae and Freddie Mac – or what I will refer to as the Enterprises – into conservatorship. Today I would like to review the basic guiding principles of how the conservatorships have been operated over the last three years, the challenges faced by the Federal Housing Finance Agency (FHFA) in carrying out its conservatorship responsibilities, and in light of those challenges, where we are headed with the conservatorships in the future.

**The Backdrop and Framework of Conservatorship**

The events taking place in the months leading into September 2008 are generally familiar by now. As market conditions deteriorated significantly, concerns about the Enterprises' credit loss exposure and capital positions became more urgent, and it became clear that neither company was able to raise additional capital. The key concern at the time was that the private secondary mortgage market had vanished and the Enterprises' significant position in capital markets meant that their disappearance from the market could have posed a systemic threat to financial markets and the broader economy.

On September 7, 2008, FHFA announced that it had placed both Enterprises into conservatorship and the Treasury Department announced it was supporting the ongoing operations of the two companies in conservatorship with a commitment of ongoing capital injections, as needed, to ensure the companies' continued solvency. Continued

1

solvency was an announced policy goal in order to avoid triggering mandatory receivership and it gave comfort to the companies' debt holders and mortgage-backed securities holders that the government was providing adequate financial support to those securities. Some market discipline was realized because none of the classes of equity securities were protected and senior executives, starting with the two CEOs and the two boards of directors, were replaced.

As conservator and regulator, FHFA has three principal mandates set forth in law that direct and motivate FHFA's activities and decisions involving the Enterprises.

First, FHFA has a statutory responsibility as conservator of the Enterprises to "take such action as may be: necessary to put the regulated entity in a sound and solvent condition; and appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." As FHFA has noted on numerous occasions, with taxpayers providing the capital supporting the Enterprises' operations, this "preserve and conserve" mandate directs us to minimize losses on behalf of taxpayers.

Second, even though the Enterprises are in conservatorship, without further statutory changes they have the same mission as they did prior to being placed into conservatorship, which is broadly to support the secondary mortgage market. FHFA has a statutory responsibility to ensure the Enterprises "operate in a safe and sound manner" and that "the operations and activities of each regulated entity foster liquid, efficient, competitive, and resilient national housing finance markets." We typically refer to this requirement as "supporting a stable and liquid mortgage market."

Third, under the Emergency Economic Stabilization Act of 2008, FHFA has a statutory responsibility to "implement a plan that seeks to maximize assistance for homeowners and use its authority to encourage the servicers of the underlying mortgages, and considering net present value to the taxpayer to take advantage of … available programs to minimize foreclosures."

These three mandates form the basis for how FHFA views its responsibilities as conservator of the Enterprises. In view of the critical and substantial resource requirements of conserving assets and restoring financial health, combined with a recognition that the Enterprises operate today only with the support of taxpayers, FHFA has focused the Enterprises on their existing core business, including minimizing credit losses. This means that FHFA is not permitting the Enterprises to offer new products or enter new lines of business. Their operations are focused on their core business activities and loss mitigation. This type of limitation on new business activities is consistent with the standard regulatory approach for addressing companies that are financially troubled. And it is even more pertinent for the Enterprises given their uncertain future and reliance on taxpayer funds.

**A Brief History of Priorities in the Housing Crisis**

Before providing a preview of the next phase in the conservatorships of Fannie Mae and Freddie Mac, let me recap some of the highlights of the story thus far. These highlights reflect the key challenges we have faced since September 2008. While some have been resolved, others remain a dominant part of the ongoing narrative. From that backdrop, I'll try to provide a peek at what may lie ahead.

The initial phase was one of ensuring the companies opened for business on the day after being placed into conservatorship, and that the country's secondary mortgage market continued to function. In particular, policymakers wanted to ensure that the mortgage market did not seize up as a result of conservatorship and that the Enterprises continued to provide mortgage originators with a functioning, liquid secondary market outlet for new loan production. The failure of Lehman Brothers the following weekend and the resulting market turmoil is well known and need not be repeated here.

Once ongoing daily operations at the companies were assured, and market trading of their debt and mortgage-backed securities (MBS) continued to function, the next phase saw attention turn to the looming foreclosure crisis. The first wave of foreclosures was led by defaults in non-traditional mortgages, principally subprime and Alt-A loans, and the bursting of the housing bubble in certain key states such as Florida and California.

At the end of the Bush Administration and in the early days of the Obama Administration, attention focused on loan modifications as a way of stabilizing troubled borrowers' monthly payments and aiding them in avoiding foreclosure. These efforts resulted in the Home Affordable Modification Program, or HAMP. For much of 2009, the key priority was developing and then implementing HAMP; in late 2009 and into 2010, the challenge became making HAMP more operationally effective and converting borrowers from trial modifications to permanent modifications.

Both Fannie Mae and Freddie Mac implemented HAMP as the first option for troubled borrowers. The Enterprises also refined their own proprietary loan modification programs to address borrowers who are not eligible for HAMP. Separately, the Enterprises also act as agents for Treasury in implementing HAMP for non-Enterprise mortgages.

After months of effort on developing and implementing loan modifications, the HAMP program began to expand into other areas – unemployment forbearance, short sales, second liens, and ultimately principal forgiveness. But the next wave was about to hit – problems, real and perceived, in foreclosure processing suddenly dominated the headlines. The newest priority was fixing mortgage servicing, especially as it concerned responding to delinquent borrowers and processing foreclosures for borrowers unable or unwilling to avoid foreclosure through one of the several methods developed through HAMP and its derivate activities and programs.

The servicing alignment initiative is a key contribution that FHFA and the Enterprises made in response to these issues. While still in the implementation stage, I am pleased

FHFA 2395

that months of effort have finally led to a sensible set of mortgage servicing standards for working with delinquent borrowers that are designed to correct some of the deficiencies of past approaches and reflect what we have learned from this crisis.

Current priorities are focused on issues at the two ends of the foreclosure process – at one end, we are enhancing efforts to keep current borrowers from going delinquent in the first place and at the other end, we are now focusing on the challenges of disposing of the real estate owned that is left after a foreclosure.

First, let me talk about the Home Affordable Refinance Program or HARP.

Introduced in 2009, HARP provides more borrowers with an opportunity to refinance into a lower interest rate and/or more stable mortgage product, in an effort to avoid future mortgage defaults and thereby reduce credit losses for Fannie Mae and Freddie Mac (and hence taxpayers). The program covers only mortgages owned or guaranteed by Fannie Mae or Freddie Mac and originated before June 2009. To be eligible, borrowers must be current on their payments and have a current loan-to-value ratio (LTV) between 80 and 125 percent.

An essential element of this program is allowing borrowers to carry forward into the new loan any existing private mortgage insurance from the prior mortgage or, if no mortgage insurance existed, not requiring any for the refinanced mortgage.

HARP is not a mass refinancing program; it was designed to address a particular segment of borrowers with loans guaranteed by the Enterprises. The Enterprises control certain features of HARP, but they do not make loans to borrowers nor set the rates that borrowers pay. Primary mortgage market originators determine the note rate offered to borrowers, and the ultimate benefit to borrowers will also be affected by the pricing and underwriting decisions of originators.

As of June 30, more than 838,000 borrowers had refinanced through the HARP program – a meaningful number but fewer than expected or eligible for the program. In the meantime, continued declines in house prices and recent declines in mortgage interest rates to historic low levels suggest that more households could benefit from this program and, importantly, such refinances could reduce the Enterprises' credit risk.

FHFA is carefully reviewing the mechanics of the HARP program to identify possible enhancements that would reduce barriers for borrowers already otherwise eligible to refinance using HARP. If there are frictions associated with the origination of HARP loans that can be eased while still achieving the program's intent of assisting borrowers and reducing credit risk for the Enterprises, we will seek to do so. Loan level price adjustments, representations and warranties, valuation requirements, and portability of mortgage insurance coverage are among the matters being considered.

Most creditworthy borrowers outside of the HARP program parameters and with positive equity should be able to refinance their mortgage through normal market mechanisms.

FHFA 2396

Indeed, since HARP's inception the Enterprises have completed more than 1 million streamlined refinances outside of HARP and nearly 7 million standard "rate and term" refinances.

FHFA is also considering the barriers to refinancing mortgages that would otherwise be HARP-eligible but for having a current LTV above 125 percent, HARP's current ceiling. There are several challenging issues to work through here and the outcome of this review is uncertain.  Still, FHFA is carefully analyzing this group of Enterprise loans for inclusion in HARP.  As we do so, our objective is to achieve the original and central purpose of HARP – provide borrowers in high-LTV loans who have a history of making on-time mortgage payments with an opportunity to refinance, resulting in reduced credit risk to the Enterprises and added stability to housing.

The second area I would like to briefly discuss is the disposition of Real Estate Owned or REO.  In August, FHFA, Treasury, and HUD issued a Request for Information (RFI) on ways to dispose of REO properties.  While the Enterprises have considered various approaches to disposing of REO over time, the RFI represents an opportunity to consider new approaches, including possible approaches that include both the Enterprises and the Federal Housing Administration (FHA).  By taking this collaborative approach, the three agencies seek ways to improve returns to taxpayers and bring greater stability to local housing markets.  We have received nearly 4,000 submissions in response to the RFI. We are encouraged by the strong response and interest in this effort.  Obviously it will take a little time to review so many responses but we are already hard at work doing so.

To be clear, this effort is not intended to develop a single, national program for REO disposition.  Rather, we are most interested in proposals tailored to the needs and economic conditions of local communities.  I am also encouraged by the apparent collaboration among for-profit and not-for-profit organizations in submitting proposals.

**A Look Ahead**

As I noted at the outset, we just passed the three-year anniversary of placing the Enterprises into conservatorship.  In 2008, the actions taken by FHFA and the Treasury Department were characterized as a "time out" to allow policymakers to devise a new structure for our Nation's housing finance system.  We all knew that reforming the housing finance system was going to be difficult, but I think the general expectation was that more progress would have been made by now.

It ought to be clear to everyone at this point, given the Enterprises' losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that the Enterprises will not be able to earn their way back to a condition that allows them to emerge from conservatorship.  In any event, the model on which they were built is broken beyond repair.  Conservatorship allows the Enterprises to continue serving their public purpose while lawmakers determine the ultimate resolution of the conservatorships and the future legal structure for housing finance.

Yet, after three years, there still is no clear direction as to what legal and institutional structures will replace the Enterprises and their central position in the housing finance market.  This puts FHFA in a difficult position as it provides direction to the Enterprises' ongoing activities and future business strategies.

FHFA has directed the Enterprises to work on initiatives that focus on key conservatorship issues such as improving their internal operations, mitigating credit losses, and ensuring continued liquidity in the market.  We have also been considering long-term improvements to the functioning of the housing finance system, improvements that should bring dividends down the road, irrespective of the ultimate outcome of housing finance reform. To-date, we have announced four such initiatives.

We announced the first initiative in May 2010 when FHFA directed the Enterprises to develop uniform standards for data reporting on mortgage loans and appraisals. This Uniform Mortgage Data Program is designed to improve the consistency, quality, and uniformity of data that are collected at the front end of the mortgage process. By identifying potential defects at the front end of the mortgage process, the Enterprises will improve the quality of mortgage purchases, which should reduce repurchase risk for originators. This initiative will be phased in over the rest of this year and next.

The second initiative started at the beginning of this year, when FHFA announced the Joint Servicing Compensation Initiative. FHFA directed Fannie Mae and Freddie Mac, in coordination with FHFA and HUD, to consider alternatives for future mortgage servicing compensation for their single-family mortgage loans. The goals of the joint initiative are to improve service for borrowers, reduce financial risk to servicers, and provide flexibility for guarantors to better manage non-performing loans, while promoting continued liquidity in the To Be Announced mortgage securities market. Part of the goal in undertaking this initiative is to consider changes to the compensation structure that would improve competition and liquidity in the market for mortgage servicing.

The third initiative we announced in late April. This one, our servicing alignment initiative, produced a single, consistent set of protocols for servicing Enterprise mortgages from the moment they first become delinquent. This initiative responds to concerns about how delinquent mortgages have been getting serviced and it will simplify the procedures for mortgages servicers by giving them just one set of procedures to follow whether the mortgage is owned by Fannie Mae or Freddie Mac.  I am hopeful that these procedures gain even broader acceptance in the marketplace, beyond just servicing Enterprise loans.

Lastly, we are considering ways to enhance loan-level disclosures on Enterprise MBS, both at the time of origination and throughout a security's life. I believe that improving Enterprise MBS disclosures over time will help establish consistency and quality of such data. Moreover, it will contribute to an environment in which private capital has the information needed to efficiently measure and price mortgage credit risk, thereby facilitating the shifting of this risk away from the government and back into the private sector.

These four initiatives constitute meaningful steps to improving housing finance and preparing for the future.  Still, without direction on the future of the Enterprises, as the length of the conservatorships extend, real risks exist beyond the normal business risks associated with guaranteeing new mortgages.  Previously, I have characterized these risks as the problem of how to preserve and conserve the Enterprises' intangible assets – their business platforms, operations, and processes, and their human capital – while operating in conservatorship with the general policy position of the Administration and many in Congress that market reliance on the Enterprises for mortgage finance should be greatly reduced or eliminated over time.

One way to mitigate this risk is for the Enterprises' market presence to shrink, not only the size of their retained portfolio, which we are doing, but also the size of their credit guarantee book.

Another statutory goal of conservatorship is to move the Enterprises toward a sound and stable financial condition.  It is important to further consider what that means.  Prior to enactment of the Housing and Economic Recovery Act of 2008 (HERA), the Enterprises operated under a regulatory capital regime in which the regulator had limited capacity to set standards.  This provided a regulatory capital advantage to the Enterprises over other regulated financial institutions and private market participants.  It also meant the Enterprises entered the housing crisis with far less capital than needed.  HERA gave FHFA the authority to establish a regulatory capital regime that addressed many of these problems, but with the Enterprises being placed into conservatorship barely a month after HERA's enactment, that regime was never put into place.

While the Enterprises are operating in conservatorship with capital provided by Treasury, capital requirements do not apply.  However, the requirement to move the Enterprises to a sound and stable financial condition suggests that further consideration should be given to pricing and to other forms of risk sharing that build off of private sector disciplines and that move Enterprise operations to better reflect what might be expected of them as private companies not in conservatorship.

Let me begin with pricing.

### *Guarantee-Fee Pricing*

Since being placed into conservatorship, as discussed in FHFA's annual reports to Congress on guarantee fee pricing, the Enterprises have steadily increased guarantee fees and lessened the degree of cross subsidization in credit pricing.

However, even with these improvements, the Enterprises' current pricing for credit guarantees is less than one would likely observe in a purely private, competitive market.  Given the high degree of uncertainty in real estate and financial markets today, it appears reasonable to assume that fully private firms operating with their own capital at risk would be more likely to give greater weight to more negative scenarios  or model

uncertainty than the Enterprises do operating under the umbrella of conservatorship and government capital. In addition, private firms would likely target a higher rate of return than the Enterprises, and the market would demand higher levels of capital.

Therefore, a logical next step in conservatorship is to continue down the path already started of gradually increasing guarantee fee pricing to better reflect that which would be anticipated in a private, competitive market. Two immediate words of caution are required. First, there is substantial effort long underway to bring stability to housing and housing finance, so such increases should not undermine those efforts. Second, we can model and make educated guesses about the price a purely competitive, private market would charge for a given set of mortgage credit characteristics presented by any given borrower, but we can't know this with certainty. For these reasons, it is my view that a series of periodic, gradual price increases makes more sense than one or two larger price adjustments.

So, in providing a peek ahead, I would anticipate the Enterprises will continue the gradual process of increasing guarantee fees. This will not happen immediately but should be expected in 2012, with some prior announcement as is typically done by each company. As I will now discuss, this is a bit more complicated than simply an across-the-board uniform price increase. In particular, we also will be considering a number of other changes to guarantee fee pricing that are consistent with private sector pricing discipline while mindful of the unique circumstances associated with conservatorship.

- Cross Subsidization – Through greater risk-based guarantee fee pricing, the Enterprises have reduced the degree of cross subsidization in current pricing. Nonetheless, cross subsidization still exists across product type (*e.g.*, 15 versus 30-year mortgages) and product characteristics (*e.g.*, down payment and other credit characteristics). Some of this cross subsidization was related to the government sponsored enterprise mission and business model that provided additional focus to certain targeted populations and geographic areas. However, being fully mindful of fair lending concerns, the past degree of Enterprise cross subsidization would not be present in a private sector model that did not operate benefits provided by the government.

- Geographic Pricing Differentials – The Enterprises have long operated by essentially providing credit guarantee pricing that did not take into account differences in risk across the country. While this had benefits of broadly leading to a general mortgage price across the country, it also meant the Enterprises would be absorbing but not pricing for added credit risk associated with specific local market conditions and policies. In particular, even if we put aside local economic conditions, various state and local laws can greatly impact the Enterprises' costs. For example, given the vast differences in foreclosure laws across the states, foreclosure timelines and processes vary considerably. Private sector participants in the mortgage credit risk market would likely take these factors into consideration.

FHFA 2400

- Pricing Across Lenders – The Enterprises have long charged different guarantee fees to lenders based on volume and risk characteristics.  While some of these guarantee fee differentials may be warranted by risk characteristics, some of the differential is related to competition among the Enterprises to gain market share.  While volume discounts and certain other pricing concessions might be appropriate in the private market that type of competition does not fit well with the Enterprises operating in conservatorship.

### *Risk Sharing*

Another way to meet the dual goals of reducing the Enterprises' long-term risk exposure and placing them in a more stable and sound financial condition in line with private market disciplines is to consider methods of sharing risk.  FHFA will be considering a number of alternatives, such as expanded use of mortgage insurance and securities structures that allow for private sector risk sharing.

A traditional way that the Enterprises shared risk with the private sector was through the use of private mortgage insurance.  The law has long required that the Enterprises obtain some form of credit enhancement on mortgages with loan-to-value ratios greater than 80 percent.  Most often the Enterprises meet this requirement through private mortgage insurance, and the Enterprises often require deeper mortgage insurance coverage than strictly required by law.  Consideration could be given to requiring greater mortgage insurance coverage, but doing so would need to be weighed against the financial condition of individual mortgage insurers.

Another way to allow for greater private sector risk sharing is to develop security structures that allow for a portion of the credit risk currently undertaken by the Enterprises to be sold off.  There are numerous securities structures that could be considered in this space, and we will be evaluating some of those in the coming months.

Considering these types of risk sharing alternatives has an added benefit of providing feedback into the Enterprises' guarantee fee pricing decisions.  If the market price to absorb a portion of the Enterprises' risk exposure is greater than the charged guarantee fee, that would be a signal of how much prices would have to rise to attract private capital and move the Enterprises' guarantee fee pricing more in line with private markets.

### Conclusion

Through the establishment of the conservatorships and financial support from Treasury, the goals were to provide stability to financial markets and continue to have the Enterprises support a struggling mortgage market.  It was understood at the time that conservatorship was not going to be a long-term solution.  It also validated the policy argument made by some over the past decades that the government sponsored enterprise (GSE) model – where private companies are provided benefits and tasked with performing a public mission – had fundamental flaws.  But given the severity of the

financial problems in the fall of 2008, the speed with which those problems developed, and the difficulty with reforming the GSE model in the short-term, conservatorship was viewed as a "time out" to provide stability in the mortgage market while policymakers developed a new structure for housing finance.

I think we all realized in 2008 that developing a new structure for housing finance was not going to be an easy task.  But without a new structure, FHFA is left to manage the conservatorships within the current Enterprise statutory structure and FHFA's statutory mandates.

Thank you.

# Tab 36

SEPTEMBER 26, 2011



## SECTOR COMMENT

# Plan To Raise Fannie Mae and Freddie Mac Guarantee Fees Raises Question of Support

Extracted from "Moody's Weekly Credit Outlook", dated September 26, 2011

**Analyst Contacts:**

NEW YORK                    1.212.553.1653

Brian Harris, CPA           1.212.553.4705
*Senior Vice President*
brian.harris@moodys.com

In a speech on 19 September at the American Mortgage Conference, Edward DeMarco, acting director of the Federal Housing Finance Agency (FHFA), the regulator of Fannie Mae and Freddie Mac (the government-sponsored enterprises, or GSEs), supported a series of periodic, gradual increases in GSE guarantee fees[1] with the goal of shrinking the GSEs' presence. This is consistent with the US government's goal as stated in a February 2011 Treasury report.[2] Actions that lessen the relevance of Fannie Mae and Freddie Mac are credit negative for GSE bondholders because the government is embarking on a process to reduce reliance on GSEs without clearly articulating, among other things, if bondholders will be protected beyond the current capital support.

In February 2011, the Treasury report stated the administration's intention to wind down Fannie Mae and Freddie Mac. One method mentioned was to gradually increase guarantee fees so as to enable private capital to more effectively compete with the GSEs. Less clear was the timing of the wind-down, whether bondholders might receive further protections, and the future role of the US government in the housing market.

Only the inadequacy of the GSEs capital base is clear, a point with which the FHFA seems to agree, based on Mr. DeMarco's comments at the conference: "It ought to be clear to everyone at this point, given the enterprises' losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that the enterprises will not be able to earn their way back to a condition that allows them to emerge from conservatorship."

Our Aaa ratings on Fannie Mae's and Freddie Mac's senior unsecured debt are entirely based on US government support, without which the GSEs' capitalization level and overall financial profile would not support. As shown in Exhibit 1, preferred shares outstanding and dividends will continue to increase even if Fannie Mae and Freddie Mac can break even after provisioning for credit losses. In effect, Fannie Mae and Freddie Mac will be borrowing money from the US Treasury in order to pay the US Treasury its 10% dividend on the senior preferred stock.

**What is Moody's Weekly Credit Outlook?**

Moody's Weekly Credit Outlook provides our research clients with timely opinions on breaking credit market developments and trends. Published every Monday morning, the newsletter will help you start your week informed of Moody's latest opinions from across the organization.

---

1   A 10-basis-point increase in guarantee fees was also included in President Obama's economic plan.
2   Reforming America's Housing Finance Market: A Report to Congress, February 2011.

EXHIBIT 1
**GSE Preferred Stock Outstanding and Dividend**



*Source: Fannie Mae and Freddie Mac financial statements, Moody's*

Furthermore, dividends on the US Treasury's senior preferred stock will eliminate Fannie Mae's contingent capital by 2019 and Freddie Mac's by 2022 (see Exhibit 2). This assumes that the GSEs are able to fully offset credit losses, which we believe is unlikely.

EXHIBIT 2
**Fannie Mae's and Freddie Mac's Contingent Capital**



*Source: Fannie Mae and Freddie Mac financial statements, Moody's*

Our view of US government support for Fannie Mae and Freddie Mac is predicated on the importance of the two institutions to mortgage finance and the importance of mortgage finance to the US economy. The government's actions to preserve Fannie Mae and Freddie Mac, as well as statements by senior government officials lead us to believe that the likely path of GSE reform will include further support for current creditors, if necessary.

However, if GSE reform proves too contentious to arrive at a consensus, or if it excludes explicit support and results in less relevant GSEs with insufficient contingent capital, it would be credit negative and prompt a review of their Aaa ratings. In this case, the GSEs' debt ratings would depend on the companies' capital position and financial profile, and would likely be multiple notches below the current Aaa ratings.

Report Number: 136281

Author
Brian Harris

Production Specialist
Wing Chan

© 2011 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ARE MOODY'S INVESTORS SERVICE, INC.'S ("MIS") CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MIS DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS DO NOT CONSTITUTE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS ARE NOT RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. CREDIT RATINGS DO NOT COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MIS ISSUES ITS CREDIT RATINGS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Any publication into Australia of this document is by MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657, which holds Australian Financial Services License no. 336969. This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001.

Notwithstanding the foregoing, credit ratings assigned on and after October 1, 2010 by Moody's Japan K.K. ("MJKK") are MJKK's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities. In such a case, "MIS" in the foregoing statements shall be deemed to be replaced with "MJKK".

MJKK is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO.

This credit rating is an opinion as to the creditworthiness or a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be dangerous for retail investors to make any investment decision based on this credit rating. If in doubt you should contact your financial or other professional adviser.



FHFA 2405

# Tab 37



THE DEPUTY SECRETARY OF THE TREASURY
WASHINGTON

September 30, 2011

The Honorable Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street NW
Washington, DC  20552-0003

Dear Acting Director DeMarco:

As you know, in the letter to you dated June 30, 2011, Treasury communicated to you its waiver, for the third quarter of Calendar Year (CY) 2011, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the fourth quarter of CY 2011, the PCF payable by each Enterprise.  Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set.  Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Neal S. Wolin

# Tab 38

# FEDERAL HOUSING FINANCE AGENCY



## NEWS RELEASE

| | | |
|---|---|---|
| For Immediate Release | **Contact:** Corinne Russell | (202) 414-6921 |
| October 27, 2011 | Stefanie Johnson | (202) 414-6376 |

## FHFA Updates Projections of Potential Draws for Fannie Mae and Freddie Mac

**Washington, DC –**The Federal Housing Finance Agency (FHFA) today released updated projections of the financial performance of Fannie Mae and Freddie Mac, including potential draws under the Senior Preferred Stock Purchase Agreements with the U.S. Department of the Treasury.  FHFA first released financial projections in October 2010, and these updated projections show similar results for two out of three scenarios, and a decrease in cumulative Treasury draws in one scenario.  Through the FHFA Conservator's Report, FHFA tracks actual performance versus projections on a quarterly basis.

(Attachment follows)

*###*

*The Federal Housing Finance Agency regulates Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks. These government-sponsored enterprises provide more than $5.7 trillion in funding for the U.S. mortgage markets and financial institutions.*



# Federal Housing Finance Agency

## Projections of the Enterprises' Financial Performance

## October 2011

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

## Contents

Summary…………………...………...………….…………………………  3

Results …………………….…………….………………………………...  4

Comparison of Oct 2011 Projections to Oct 2010 Projections...…………..  8

Projection Scenarios ……………………………………………………...  11

House Price Assumptions ………………………………………………….  12

Appendix………………………………………………………............  14

FHFA 2409

## Summary

- This report provides updated information on possible future Treasury draws by Fannie Mae and Freddie Mac (the "Enterprises") under specified scenarios, using consistent assumptions for both Enterprises.  FHFA published initial projections of the Enterprises' financial performance in October 2010.  The report on the initial projections can be found in FHFA's Projections of the Enterprises' Financial Performance, October 2010.  The projections have been updated to reflect the current outlook for house prices, interest rates, and recent trends in borrower behavior.  The projection period has been extended an additional year.

- To date, the Enterprises have drawn $169 billion from Treasury under the terms of the Senior Preferred Stock Purchase Agreements (PSPAs), as amended, between the Treasury and each of the Enterprises.  FHFA worked with the Enterprises to develop forward-looking financial projections across three possible house price paths.  **Under the three scenarios used in the projections, cumulative Treasury draws (including dividends) at the end of 2014 range from $220 billion to $311 billion.  In the initial projections released in October 2010, cumulative Treasury draws (including dividends) at the end of 2013 ranged from $221 billion to $363 billion.**

- The difference in the range of ending cumulative Treasury draws between the October 2010 projections and the October 2011 projections can be attributed primarily to the fact that actual results for the first year of the projection period in the October 2010 projections were substantially better than projected.  (See page 8 for further details.)

- The projections reported here are not expected outcomes.  They are modeled projections in response to "what if" exercises based on assumptions about Enterprise operations, loan performance, macroeconomic and financial market conditions, and house prices.  The projections do not define the full range of possible outcomes.  Actual outcomes may be very different.  This effort should be interpreted as a sensitivity analysis of future draws to possible house price paths.

- FHFA provided the Enterprises with key assumptions for each scenario. The Enterprises used their respective internal models to project their financial results based on the assumptions provided by FHFA.  While this effort achieves a degree of comparability between the Enterprises, it does not allow for actions that the Enterprises might undertake in response to the economic conditions specified in the scenarios.  Those Enterprise-specific business changes could lead to different results across the scenarios than are presented in these projections.

Federal Housing Finance Agency

Projections of the<br>Enterprises' Financial Performance<br>October 2011

## Results

The assumptions used in each of the three scenarios are described on page 11.  The projected combined cumulative Treasury draws for both Enterprises through December 31, 2014 reach $220 billion under Scenario 1, $226 billion under Scenario 2, and $311 billion under Scenario 3. Fannie Mae's cumulative draws are higher than Freddie Mac's in part because Fannie Mae's mortgage book of business is approximately fifty percent larger than Freddie Mac's.  In addition, Fannie Mae's serious delinquency rates are higher than Freddie Mac's.

**Figure 1: Cumulative Treasury Draws\*** *($ in billions)*



Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

## Results (continued)

The Enterprises are required to pay a 10 percent dividend on the amount of funds drawn by the Enterprises under the Senior Preferred Stock Purchase Agreements (PSPAs) with Treasury.  The PSPAs do not allow for dividends to reduce prior draws.  However, for illustrative purposes, if dividend payments were subtracted from the projected cumulative draws, the net amounts would reach $121 billion under Scenario 1, $124 billion under Scenario 2, and $193 billion under Scenario 3.  Most dividends to date have been paid from funds acquired with additional draws.  The projections show a portion of future dividends being paid out of comprehensive income.

**Figure 2: Cumulative Treasury Draws less dividends paid** *($ in billions)*





**Cumulative Treasury Draw through 2014**

| | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| Related to operating losses and other* | $105 | $110 | $161 |
| Related to senior preferred dividends | 40 | 40 | 58 |
| Cumulative Treasury Draw | $145 | $150 | $219 |
| | | | |
| Senior preferred dividends (not financed through Treasury Draws) | $20 | $22 | $18 |
| Total senior preferred dividends | $60 | $62 | $76 |

**Cumulative Treasury Draw through 2014**

| | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| Related to operating losses and other* | $58 | $59 | $66 |
| Related to senior preferred dividends | 17 | 17 | 26 |
| Cumulative Treasury Draw | $75 | $76 | $92 |
| | | | |
| Senior preferred dividends (not financed through Treasury Draws) | $22 | $22 | $17 |
| Total senior preferred dividends | $39 | $39 | $43 |

*Operating losses and other refers to net losses reported on the income statement, changes in unrealized losses reported on the balance sheet, and the impact of other accounting changes for consolidation and security impairments.
In accordance with Senior Preferred Stock Purchase Agreements (PSPAs), the Enterprises are not permitted to paydown the Treasury draw amounts, even if the Enterprises generate positive net income or total comprehensive income.
Numbers may not foot due to rounding.

FHFA 2412

Federal Housing Finance Agency

Projections of the<br>Enterprises' Financial Performance<br>October 2011

## Results (continued)

Credit-related expenses, particularly the provision for credit losses, continue to drive projected Treasury draws across all three scenarios.  Fannie Mae's credit-related expenses increase by $57 billion from Scenario 1 to Scenario 3, and for Freddie Mac that increase amounts to $23 billion.  Thus $80 billion of the projected $92 billion difference in Treasury draws across those scenarios is directly related to credit-related expense projections.

**Figure 3: Cumulative Financial Results (2009-2014)** *($ in billions)*

| | Fannie Mae | | | Freddie Mac | | |
|---|---|---|---|---|---|---|
| | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 1 | Scenario 2 | Scenario 3 |
| Revenues | $112 | $112 | $110 | $104 | $104 | $103 |
| Provision for credit losses | (135) | (139) | (189) | (64) | (66) | (86) |
| Other credit-related expenses[1] | (35) | (35) | (38) | (26) | (26) | (27) |
|    Total Credit-related Expenses/Losses | (170) | (174) | (227) | (90) | (92) | (113) |
| Other expenses[2] | (33) | (33) | (33) | (26) | (26) | (26) |
|    Net Income (Loss) | ($91) | ($94) | ($150) | ($12) | ($14) | ($36) |
| **Capital Change** | | | | | | |
| Net Income | (91) | (94) | (150) | (12) | (14) | (36) |
| Dividends | (60) | (62) | (76) | (39) | (39) | (43) |
| Other[3] | 21 | 21 | 21 | 21 | 22 | 31 |
|    Total Capital Change | (130) | (135) | (204) | (30) | (31) | (48) |
|    Beginning Net Worth (12/31/2008) | (15) | (15) | (15) | (31) | (31) | (31) |
|      Capital Deficit (2009-2014) | (145) | (150) | (219) | (61) | (62) | (79) |
|      Senior Preferred Treasury Draw (2009-2014) | 145 | 150 | 219 | 61 | 62 | 79 |
|    **Cumulative Senior Preferred Treasury Draw[4]** | $145 | $150 | $219 | $75 | $76 | $92 |
|    **Cumulative Draw less Dividends[4]** | $85 | $88 | $144 | $36 | $36 | $49 |

[1] Consists of foreclosed property expenses, SOP 03-3 losses, net, and other than temporary impairments.

[2] Consists of mark-to-market gains/losses, administrative expenses, tax expense/benefit and other expenses.

[3] Consists of change in accumulated other comprehensive income, and other accounting changes for consolidation and security impairments, less positive net worth as of 12/31/14, if any.

[4] Freddie Mac's cumulative draw includes $13.8 billion of Treasury draw received in 2008.

Projected financial results assume that the Senior Preferred Stock Purchase Agreement (PSPA) commitment fee has been waived at both Enterprises.

Numbers may not foot due to rounding.

FHFA 2413

Federal Housing Finance Agency

Projections of the<br>Enterprises' Financial Performance<br>October 2011

## Results (continued)

The Enterprises have received $169 billion from Treasury to maintain positive net worth.  For the selected scenarios an additional $51 to $142 billion would be required to support the Enterprises over the projection period.  In Scenarios 1 and 2, dividend payments to Treasury exceed  additional Treasury draws.  Per the terms of the Senior Preferred Stock Purchase Agreements with Treasury, senior preferred stock accrues dividends at 10 percent per year.

**Figure 4: Additional Treasury Draws and Dividends (Jul 2011 through Dec 2014)** *($ in billions)*

| | Current Draw as of 06/30/11 | | Scenario 1 | | Scenario 2 | | Scenario 3 | |
|---|---|---|---|---|---|---|---|---|
| | Total Draw | Total Dividends | Additional Draw | Additional Dividends | Additional Draw | Additional Dividends | Additional Draw | Additional Dividends |
| Fannie Mae | $104 | $15 | $41 | $45 | $46 | $47 | $115 | $61 |
| Freddie Mac | 65 | 13 | 10 | 26 | 11 | 26 | 27 | 30 |
| Total | $169 | $28 | $51 | $71 | $57 | $73 | $142 | $91 |

FHFA 2414

## Comparison of October 2011 Projections to October 2010 Projections

The projection period for the current projections and the previous projections runs three and a half years.  The current projection period runs through the end of 2014.  The prior projection period runs through the end of 2013.

- In the October 2011 projections, the ending combined cumulative Treasury draw is $1 billion lower for scenario 1 and $51 billion lower for scenario 3 than the ending cumulative Treasury draw in the October 2010 projections.  The difference can be attributed to three primary factors:

  o Actual results for the first year of the projection period were substantially better than projected. The actual combined Treasury draw was $19 billion lower for scenario 1 and $73 billion lower for scenario 3 than the projections (See Figure 5). This factor is partially offset by the next two factors.

  o Projected Treasury draws for the remainder of the initial projection period were $14 billion higher for scenario 1 and $16 billion higher for scenario 3 in the October 2011 projections; and

  o The projection period has been extended through 2014, adding $3 billion in Treasury draws for scenario 1 and $6 billion in Treasury draws for scenario 3.

- Drivers of the differences in the projected pattern of financial results include the following factors:

  o Recent observed trends show that borrowers with high MTM LTV loans and modified loans are performing better than previously projected.

  o The number of serious delinquent loans has declined as transition rates to later stages of delinquency are lower than previously projected.

  o Foreclosure delays pushed some defaults into later years of the projection period and beyond.

  o Recent observed trends indicate higher REO sales prices than previously projected.

  o Net interest income is higher in the current projection results due to lower interest rates, resulting in decreased funding costs and slightly higher average portfolio balances, driven by slower portfolio liquidations than previously projected.

  o The house price path in scenario 3 used in the current projections is better through the second quarter of 2012 and worse thereafter, compared to the corresponding house price path used in the October 2010 projections.

8

Comparison of October 2011 Projections to October 2010 Projections (continued)

**Figure 5: Comparison of Oct 2011 Projections to Oct 2010 Projections** *($ in billions)*

| | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| **October 2010 Projections** | | | |
| Beginning Cumulative Draw 6/30/10 | 148 | 148 | 148 |
| Projected Treasury draw - Year 1 (Second half of 2010 and first half of 2011) | 39 | 50 | 93 |
| Projected Treasury draw - Years 2-3$^1$/$_2$ (Second half of 2011; 2012 and 2013) | 34 | 40 | 121 |
| **Ending Cumulative Draw 2013** | **221** | **238** | **363** |
| | | | |
| **October 2011 Projections** | | | |
| Beginning Cumulative Draw 6/30/10 | 148 | 148 | 148 |
| Actual Treasury draw - Year 1 (Second half of 2010 and first half of 2011) | 21 | 21 | 21 |
| Beginning Cumulative Draw 6/30/11 | 169 | 169 | 169 |
| Projected Treasury draw - Years 2-3$^1$/$_2$ (Second half of 2011; 2012 and 2013) | 48 | 56 | 137 |
| Projected Treasury draw - Year 3$^1$/$_2$-4$^1$/$_2$ (2014) | 3 | 1 | 6 |
| **Ending Cumulative Draw 2014** | **220** | **226** | **311** |
| | | | |
| **Difference in ending Cumulative Draw** | | | |
| Actual versus Projection - Year 1 (Second half of 2010 and first half of 2011) | (19) | (29) | (73) |
| Difference in Projections - Years 2-3$^1$/$_2$ (Second half of 2011; 2012 and 2013) | 14 | 16 | 16 |
| Additional year of Projection (2014) | 3 | 1 | 6 |
| **Total difference in ending cumulative draw** | **(1)** | **(12)** | **(51)** |

Numbers may not foot due to rounding

9

Federal Housing Finance Agency

## Comparison of October 2011 Projections to October 2010 Projections (continued)

Actual and forecasted house price paths for Scenarios 1 and 2 used in the October 2011 projections are worse compared to the corresponding house price paths used in the October 2010 projections. The house price path in Scenario 3 used in the October 2011 projections is better through the second quarter of 2012 and worse thereafter, compared to the corresponding house price path used in the October 2010 projections.

**Figure 6: Comparison of Current and Previous House Price Paths**



Moody's house price paths (Case Shiller National Index; July 2011 vs. September 2010)

FHFA 2417

## Projection Scenarios

Key factors that influence the Enterprises' financial results are listed in Figure 7. FHFA requested that the Enterprises project financial results for three scenarios.  Because changes in house prices have had the largest impact on the Enterprises' financial results, we chose to change only this factor across the three scenarios.

**Figure 7: Scenario Assumptions**

| Factor | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| House prices* | Moody's "Stronger Near-term Rebound" house price paths | Moody's "Current Baseline" house price paths | Moody's "Deeper Second Recession" house price paths |
| Interest rates | Future interest rates are implied by the forward curves as of June 30, 2011. | *Same as Scenario 1* | *Same as Scenario 1* |
| Securities prices | ABS and CMBS prices fall by 5 points at the beginning of the period | *Same as Scenario 1* | *Same as Scenario 1* |
| Agency MBS spreads | Agency MBS spreads to swaps remain unchanged. | *Same as Scenario 1* | *Same as Scenario 1* |
| Credit Guarantee growth | Zero growth in credit guarantees through year end 2014. | *Same as Scenario 1* | *Same as Scenario 1* |
| Retained Portfolio growth | Additions to retained portfolios are limited to nonperforming loans bought out of pools backing Fannie Mae's MBS and Freddie Mac's PCs. | *Same as Scenario 1* | *Same as Scenario 1* |

*Moody's house price paths as of July 2011

11

## House Price Assumptions

House price changes have been the major driver of credit losses at the Enterprises.  A wide range of possible future paths exist for house prices at the national and local levels.  Given the high level of uncertainty about overall economic conditions in general and the U.S. housing markets in particular, FHFA directed the Enterprises to project financial results for Moody's current baseline and two additional house price paths.  Moody's considers "Deeper Second Recession" to be a downside alternative to the Current Baseline and "Stronger Near-term Rebound" to be an upside alternative to the Current Baseline.

**Figure 8: Moody's House Price Paths** *(Case-Shiller National Index; July 2011)*



### Descriptions

**Stronger Near-term Rebound** *(FHFA Scenario 1)*
An expansion of credit supports above-baseline growth. As a result, house prices start to increase after 2Q11, although additional increases are minimal in 2011 and 2012. The peak-to-trough decline is 33% based on the Case-Shiller National Index. From the trough in 2Q11 to the end of the forecast period house prices increase by 12%. Total new housing permits reach an annual pace above 1 million units by the first quarter of 2012.

**Current Baseline** *(FHFA Scenario 2)*
Remaining home price declines contribute to a 35% peak-to-trough decline based on the Case-Shiller National Index. From the trough in 1Q12 to the end of the forecast period, house prices increase by 15%. Total new housing permits reach an annual pace above 1 million units by the second quarter of 2012.

**Deeper Second Recession** *(FHFA Scenario 3)*
As a result of continuing high unemployment, the moderate rebound in housing construction that occurred over the first half of 2009 and then stalled reverses course. Housing starts resume their decline, bottoming out in mid-2012, more than 80% below their peak in 2005. The peak-to-trough decline is 46% based on the Case-Shiller National Index.  From the trough in 4Q12 to the end of the forecast period house prices increase by 23%.

FHFA 2419

## House Price Assumptions (continued)

**Selection of House Price Assumptions**

Figure 8 shows national-level paths for the Case-Shiller house price index associated with the selected Moody's house price paths.  Scenario 2 uses house price paths associated with Moody's "Current Baseline (July 2011)."  That house price path is derived from Moody's assumptions regarding monetary and fiscal policy, U.S. dollar, and energy prices.  Scenario 1 and Scenario 3 use house price paths associated with better and worse economic performance relative to Moody's "Current Baseline (July 2011)."

Moody's describes the house price paths associated with "Stronger Near-term Rebound", as being consistent with "a 10% probability that the economy will perform better than in this scenario, broadly speaking, and a 90% probability that it will perform worse."  Conversely, Moody's describes the house price paths associated with "Deeper Second Recession" as being consistent with "a 90% probability that the economy will perform better, broadly speaking, and a 10% probability that it will perform worse."  FHFA chose the "Deeper Second Recession" house price path to ensure a stringent test that would provide information tied to a continued severe weakening in housing.

**Use of Moody's Localized Forecasts**

FHFA chose to base the scenarios on Moody's house price paths because Moody's is a widely used benchmark.  Moody's provides a full set of quarterly, forward-looking house price paths for each of the 384 Metropolitan Statistical Areas (MSAs) and Divisions for which FHFA publishes a historical house price index.  FHFA does not forecast house prices. Such localized forecasts enable the Enterprises to project credit losses on a more comparable basis as opposed to a simple national projection of peak-to-trough change in house prices, which would require each Enterprise to translate that house price path into its own local house price index.

Defining a house price path at just the national level for the Enterprises would limit the usefulness of the results because house prices often behave quite differently in different local markets.  The mix of local market price projections associated with a given national average price projection can have a substantial impact on the aggregate loss projection for an Enterprise.  Similarly, defining the path with only a peak-to-trough measure is problematic because the timing of the trough and the rate of recovery beyond the trough can also greatly affect expected losses.

## Appendix

Financial Projections Procedures

FHFA directed the Enterprises to project revenue, mark-to-market gains and losses, credit-related expenses, administrative expenses, earnings, capital, and, ultimately, cumulative senior preferred Treasury draws under the three scenarios using their own respective models.  Both Enterprises routinely prepare financial forecasts using their respective management assumptions.  Modeling assumptions were changed at both Enterprises to conform to the assumptions listed in Figure 7.

FHFA directed that the projection period cover the remainder of 2011 and the next three years, similar to projection periods used by the Enterprises for routine management forecasts.  Furthermore for the selected house price paths, by the end of the projection period the bulk of credit losses are recognized.

The Enterprises' models use projections of interest rates to calculate future net interest margins, gains and losses on the retained portfolio and derivatives used for hedging, and prepayment speeds on held or guaranteed mortgages, which influence both credit losses and guarantee fee revenue.

To project revenue, the Enterprises projected the size of the retained portfolios and credit guarantee books using assumptions provided by FHFA on business volume growth.  Additions to retained portfolios were limited to nonperforming loans bought out of pools backing Fannie Mae's MBS and Freddie Mac's PCs. The balance of outstanding credit guarantees at each Enterprise remained unchanged over the forecast period.

Net interest income (which includes most of the Enterprises' guarantee fee income) is driven primarily by the size of the retained portfolio and net interest margin (the difference between yield on assets and funding costs).  For this exercise, funding costs were influenced by the forward curve for swaps, and asset yields were influenced by the forward curve for swaps and the assumptions about the level of Agency MBS spreads to swaps.

Guarantee fee income is driven by the size of the credit guarantee book and guarantee fee pricing.  To project the size of the credit guarantee books the Enterprises used assumptions provided by FHFA on new business volume and interest rates, which influence prepayment speeds on guaranteed mortgages.  FHFA did not provide explicit assumptions about guarantee fee pricing.  However, FHFA reviewed the pricing assumptions of each Enterprise for

14

the projection period for consistency. For both Enterprises, guarantee fee pricing remained relatively unchanged over the projection period.

Projections of mark-to-market losses reflect changes in the value of securities held in the retained portfolio and changes in the value of derivatives used for hedging.  The Enterprises' models use assumptions about future interest rates, securities prices, and spreads to project gains and losses on securities held in the retained portfolio and on derivatives used to hedge interest rate risk.

To project credit-related expenses, each Enterprise uses a multistep process.  First, a statistical loan transition model projects the unpaid principal balance (UPB) of loans expected to default over the projection period.  House price projections are used to determine the mark-to-market loan-to-value ratios of the guaranteed mortgages, which in turn influence the probabilities of default, and projections of loss given default.  Next, a second model projects the severity of losses associated with defaulted loans resolved through various processes.  The projections of distressed UPB are combined with the projections of loss severities to arrive at credit losses for each quarter.  Next, each Enterprise projected loan loss reserves based on projections of credit losses, to determine its future provisions for credit losses.  Finally, projections of credit-related expenses incorporate projections of future provisions for credit losses, foreclosed property expenses, and expenses incurred after foreclosure on the property.

The Enterprises used their own respective management assumptions to project administrative expenses.

FHFA reviews models and methodologies for internal consistency and comprehensiveness as part of the continuing supervision of the Enterprises.  However, as with other regulator-driven financial projections that rely on internal models of banks, the internal models of one Enterprise will produce different answers than those of the other given the same set of assumptions and other inputs.

This modeling exercise is not the same as, nor did it follow all the same control procedures as the process followed for formal financial reporting.  For instance, the projections did not incorporate management judgment as to how the specific assumptions employed might produce other changes in model assumptions.  Nonetheless, FHFA believes that the results of this exercise provide a reasonable indication of plausible future Treasury draws under the specified scenarios, using comparable key assumptions for each Enterprise.

# Tab 39

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended September 30, 2011**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from                    to**

**Commission File Number: 001-34139**

# Federal Home Loan Mortgage Corporation

*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| | |
|---|---|
| **Federally chartered corporation** | **52-0904874** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **8200 Jones Branch Drive, McLean, Virginia** | **22102-3110** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(703) 903-2000**

*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant:   (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.   ☒ Yes    ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   ☒ Yes    ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                           Accelerated filer ☒

Non-accelerated filer (Do not check if a smaller reporting company) ☐          Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   ☐ Yes    ☒ No

As of October 21, 2011, there were 649,722,580 shares of the registrant's common stock outstanding.

# TABLE OF CONTENTS

Page

**PART I — FINANCIAL INFORMATION**

Item 1.    Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    103

Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations . . . . . . . . . . .    1

           Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

           Selected Financial Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

           Consolidated Results of Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

           Consolidated Balance Sheets Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33

           Risk Management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    49

           Liquidity and Capital Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    83

           Fair Value Measurements and Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    89

           Off-Balance Sheet Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    91

           Critical Accounting Policies and Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    92

           Forward-Looking Statements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    92

           Risk Management and Disclosure Commitments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    94

           Legislative and Regulatory Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    95

Item 3.    Quantitative and Qualitative Disclosures About Market Risk. . . . . . . . . . . . . . . . . . . . . . . . . . . .    99

Item 4.    Controls and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    100

**PART II — OTHER INFORMATION**

Item 1.    Legal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    192

Item 1A.   Risk Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    192

Item 2.    Unregistered Sales of Equity Securities and Use of Proceeds  . . . . . . . . . . . . . . . . . . . . . . . . . . .    195

Item 6.    Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    195

**SIGNATURES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    196

**GLOSSARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    197

**EXHIBIT INDEX** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    E-1

*Freddie Mac*

## MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| — | Selected Financial Data | 13 |
| 1 | Total Single-Family Loan Workout Volumes | 2 |
| 2 | Single-Family Credit Guarantee Portfolio Data by Year of Origination | 5 |
| 3 | Credit Statistics, Single-Family Credit Guarantee Portfolio | 6 |
| 4 | Mortgage-Related Investments Portfolio | 11 |
| 5 | Summary Consolidated Statements of Income and Comprehensive Income | 14 |
| 6 | Net Interest Income/Yield and Average Balance Analysis | 15 |
| 7 | Derivative Gains (Losses) | 19 |
| 8 | Other Income | 20 |
| 9 | Non-Interest Expense | 21 |
| 10 | REO Operations Expense, REO Inventory, and REO Dispositions | 21 |
| 11 | Composition of Segment Mortgage Portfolios and Credit Risk Portfolios | 24 |
| 12 | Segment Earnings and Key Metrics — Investments | 25 |
| 13 | Segment Earnings and Key Metrics — Single-Family Guarantee | 27 |
| 14 | Segment Earnings Composition — Single-Family Guarantee Segment | 29 |
| 15 | Segment Earnings and Key Metrics — Multifamily | 31 |
| 16 | Investments in Securities | 34 |
| 17 | Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets | 35 |
| 18 | Total Mortgage-Related Securities Purchase Activity | 36 |
| 19 | Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics | 37 |
| 20 | Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans | 38 |
| 21 | Net Impairment on Available-For-Sale Mortgage-Related Securities Recognized in Earnings | 39 |
| 22 | Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS | 41 |
| 23 | Mortgage Loan Purchase and Other Guarantee Commitment Activity | 43 |
| 24 | Derivative Fair Values and Maturities | 44 |
| 25 | Changes in Derivative Fair Values | 45 |
| 26 | Freddie Mac Mortgage-Related Securities | 47 |
| 27 | Issuances and Extinguishments of Debt Securities of Consolidated Trusts | 48 |
| 28 | Changes in Total Equity (Deficit) | 48 |
| 29 | Mortgage Insurance by Counterparty | 54 |
| 30 | Bond Insurance by Counterparty | 55 |
| 31 | Derivative Counterparty Credit Exposure | 57 |
| 32 | Characteristics of the Single-Family Credit Guarantee Portfolio | 60 |
| 33 | Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio | 63 |
| 34 | Single-Family Home Affordable Modification Program Volume | 65 |
| 35 | Single-Family Refinance Loan Volume | 66 |
| 36 | Single-Family Loan Workouts, Serious Delinquency, and Foreclosure Volumes | 68 |
| 37 | Reperformance Rates of Modified Single-Family Loans | 69 |
| 38 | Single-Family Serious Delinquency Rates | 71 |
| 39 | Credit Concentrations in the Single-Family Credit Guarantee Portfolio | 71 |
| 40 | Single-Family Credit Guarantee Portfolio by Attribute Combinations | 73 |
| 41 | Single-Family Credit Guarantee Portfolio by Year of Loan Origination | 75 |
| 42 | Multifamily Mortgage Portfolio — by Attribute | 76 |
| 43 | Non-Performing Assets | 78 |
| 44 | REO Activity by Region | 79 |
| 45 | Credit Loss Performance | 81 |
| 46 | Single-Family Credit Loss Sensitivity | 82 |
| 47 | Other Debt Security Issuances by Product, at Par Value | 86 |
| 48 | Other Debt Security Repurchases, Calls, and Exchanges | 86 |
| 49 | Freddie Mac Credit Ratings | 87 |
| 50 | Summary of Assets and Liabilities at Fair Value on a Recurring Basis | 89 |
| 51 | Summary of Change in the Fair Value of Net Assets | 91 |
| 52 | PMVS Results | 100 |
| 53 | Derivative Impact on PMVS-L (50 bps) | 100 |

*Freddie Mac*

## FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Freddie Mac Consolidated Statements of Income and Comprehensive Income | 104 |
| Freddie Mac Consolidated Balance Sheets | 105 |
| Freddie Mac Consolidated Statements of Equity (Deficit) | 106 |
| Freddie Mac Consolidated Statements of Cash Flows | 107 |
| Note 1: Summary of Significant Accounting Policies | 108 |
| Note 2: Conservatorship and Related Matters | 110 |
| Note 3: Variable Interest Entities | 113 |
| Note 4: Mortgage Loans and Loan Loss Reserves | 119 |
| Note 5: Individually Impaired and Non-Performing Loans | 123 |
| Note 6: Real Estate Owned | 130 |
| Note 7: Investments in Securities | 132 |
| Note 8: Debt Securities and Subordinated Borrowings | 140 |
| Note 9: Financial Guarantees | 142 |
| Note 10: Retained Interests in Mortgage-Related Securitizations | 144 |
| Note 11: Derivatives | 145 |
| Note 12: Freddie Mac Stockholders' Equity (Deficit) | 150 |
| Note 13: Income Taxes | 151 |
| Note 14: Employee Benefits | 152 |
| Note 15: Segment Reporting | 152 |
| Note 16: Regulatory Capital | 159 |
| Note 17: Concentration of Credit and Other Risks | 160 |
| Note 18: Fair Value Disclosures | 167 |
| Note 19: Legal Contingencies | 185 |
| Note 20: Earnings (Loss) Per Share | 190 |
| Note 21: Selected Financial Statement Line Items | 191 |

# PART I — FINANCIAL INFORMATION

*We continue to operate under the conservatorship that commenced on September 6, 2008, under the direction of FHFA as our Conservator. The Conservator succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any shareholder, officer or director thereof, with respect to the company and its assets. The Conservator has delegated certain authority to our Board of Directors to oversee, and management to conduct, day-to-day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator. See "BUSINESS — Conservatorship and Related Matters" in our Annual Report on Form 10-K for the year ended December 31, 2010, or 2010 Annual Report, for information on the terms of the conservatorship, the powers of the Conservator, and related matters, including the terms of our Purchase Agreement with Treasury.*

*This Quarterly Report on Form 10-Q includes forward-looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward-looking statements are made as of the date of this Form 10-Q and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Form 10-Q. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in: (a) "MD&A — FORWARD-LOOKING STATEMENTS," and "RISK FACTORS" in this Form 10-Q and in the comparably captioned sections of our 2010 Annual Report and our Quarterly Reports on Form 10-Q for the first and second quarters of 2011; and (b) the "BUSINESS" section of our 2010 Annual Report.*

*Throughout this Form 10-Q, we use certain acronyms and terms which are defined in the Glossary.*

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this MD&A in conjunction with our consolidated financial statements and related notes for the three and nine months ended September 30, 2011 included in "FINANCIAL STATEMENTS," and our 2010 Annual Report.*

## EXECUTIVE SUMMARY

### Overview

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments. During the worst housing and financial crisis since the Great Depression, we are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures. We believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure.

### *Summary of Financial Results*

Our financial performance in the third quarter of 2011 was impacted by the ongoing weakness in the economy, including in the mortgage market, and by a significant reduction in long-term interest rates and changes in OAS levels during the quarter. Our total comprehensive income (loss) was $(4.4) billion and $1.4 billion for the third quarters of 2011 and 2010, respectively, consisting of: (a) $(4.4) billion and $(2.5) billion of net income (loss), respectively; and (b) $46 million and $3.9 billion of total other comprehensive income, respectively.

Our total equity (deficit) was $(6.0) billion at September 30, 2011 and includes our total comprehensive income (loss) of $(4.4) billion for the third quarter of 2011 and our dividend payment of $1.6 billion on our senior preferred stock on September 30, 2011. To address our deficit in net worth, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement for $6.0 billion. Following receipt of the draw, the aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $72.2 billion.

### Our Primary Business Objectives

Under conservatorship, we are focused on: (a) meeting the needs of the U.S. residential mortgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in the MHA Program initiatives, including HAMP and HARP, and through our non-HAMP workout and refinancing initiatives; (c) minimizing our credit losses; (d) maintaining the credit quality of the loans we purchase and guarantee; and (e) strengthening our infrastructure and improving overall efficiency. Our business objectives

reflect, in part, direction we have received from the Conservator. We also have a variety of different, and potentially competing, objectives based on our charter, public statements from Treasury and FHFA officials, and other guidance and directives from our Conservator. For more information, see "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business*" in our 2010 Annual Report.

### Providing Mortgage Liquidity and Conforming Loan Availability

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- Our support enables borrowers to have access to a variety of conforming mortgage products, including the prepayable 30-year fixed-rate mortgage, which historically has represented the foundation of the mortgage market.

- Our support provides lenders with a constant source of liquidity. We estimate that we, Fannie Mae, and Ginnie Mae collectively guaranteed more than 90% of the single-family conforming mortgages originated during the third quarter of 2011.

- Our consistent market presence provides assurance to our customers that there will be a buyer for their conforming loans that meet our credit standards. We believe this provides our customers with confidence to continue lending in difficult environments.

- We are an important counter-cyclical influence as we stay in the market even when other sources of capital have pulled out, as evidenced by the events of the last three years.

During the three and nine months ended September 30, 2011, we guaranteed $68.2 billion and $226.1 billion in UPB of single-family conforming mortgage loans, respectively, representing more than 312,000 and 1,022,000 borrowers, respectively, who purchased homes or refinanced their mortgages.

Borrowers typically pay a lower interest rate on loans acquired or guaranteed by Freddie Mac, Fannie Mae, or Ginnie Mae. Mortgage originators are generally able to offer homebuyers and homeowners lower mortgage rates on conforming loan products, including ours, in part because of the value investors place on GSE-guaranteed mortgage-related securities. Prior to 2007, mortgage markets were less volatile, home values were stable or rising, and there were many sources of mortgage funds. We estimate that prior to 2007 the average effective interest rates on conforming, fixed-rate single-family mortgage loans were about 30 basis points lower than on non-conforming loans. Since 2007, we estimate that , at times, interest rates on conforming, fixed-rate loans, excluding conforming jumbo loans, have been lower than those on non-conforming loans by as much as 184 basis points. In September 2011, we estimate that borrowers were paying an average of 53 basis points less on these conforming loans than on non-conforming loans. These estimates are based on data provided by HSH Associates, a third-party provider of mortgage market data.

### Reducing Foreclosures and Keeping Families in Homes

We are focused on reducing the number of foreclosures and helping to keep families in their homes. In addition to our participation in HAMP, we introduced several new initiatives during the last few years to help eligible borrowers keep their homes or avoid foreclosure, including our relief refinance mortgage initiative (which is our implementation of HARP). Since the beginning of 2011, we have helped more than 164,000 borrowers either stay in their homes or sell their properties and avoid foreclosure through HAMP and our various other workout initiatives. Table 1 presents our recent single-family loan workout activities.

### Table 1 — Total Single-Family Loan Workout Volumes[1]

| | For the Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 09/30/2011 | 06/30/2011 | 03/31/2011 | 12/31/2010 | 09/30/2010 |
| | (number of loans) | | | | |
| Loan modifications | 23,919 | 31,049 | 35,158 | 37,203 | 39,284 |
| Repayment plans | 8,333 | 7,981 | 9,099 | 7,964 | 7,030 |
| Forbearance agreements[2] | 4,262 | 3,709 | 7,678 | 5,945 | 6,976 |
| Short sales and deed-in-lieu transactions | 11,744 | 11,038 | 10,706 | 12,097 | 10,472 |
| Total single-family loan workouts | 48,258 | 53,777 | 62,641 | 63,209 | 63,762 |

(1) Based on actions completed with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment, and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent, or effective, such as loans in the trial period under HAMP. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period.
(2) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.

We continue to execute a high volume of loan workouts. Highlights of these efforts include the following:

- We completed 48,258 single-family loan workouts during the third quarter of 2011, including 23,919 loan modifications and 11,744 short sales and deed-in-lieu transactions.

- Based on information provided by the MHA Program administrator, our servicers had completed 143,739 loan modifications under HAMP from the introduction of the initiative in 2009 through September 30, 2011 and, as of September 30, 2011, 13,785 loans were in HAMP trial periods (this figure only includes borrowers who made at least their first payment under the trial period).

We continue to directly assist troubled borrowers through targeted outreach and other efforts. In addition, on April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie Mae. This servicing alignment initiative will result in consistent processes for both HAMP and non-HAMP loan modifications. We implemented most aspects of this initiative effective October 1, 2011. As part of this initiative, we introduced a new non-HAMP standard loan modification process in the fourth quarter of 2011 that requires borrowers to complete a three month trial period and permits forbearance (but not forgiveness) of principal. This new standard modification will replace our existing non-HAMP modification initiative. We believe that the servicing alignment initiative, which will establish a uniform framework and requirements for servicing non-performing loans owned or guaranteed by us and Fannie Mae, will ultimately change the way servicers communicate and work with troubled borrowers, bring greater consistency and accountability to the servicing industry, and help more distressed homeowners avoid foreclosure. For information on changes to mortgage servicing and foreclosure practices that could adversely affect our business, see "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices."

On October 24, 2011 FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers who can benefit from refinancing their home mortgage. The Acting Director of FHFA stated that the goal of pursuing these changes is to create refinancing opportunities for more borrowers whose mortgage is owned or guaranteed by the GSEs while reducing risk for the GSEs and bringing a measure of stability to housing markets. The revisions to HARP enable us to expand the assistance we provide to homeowners by making their mortgage payments more affordable through one or more of the following ways: (a) a reduction in payment; (b) a reduction in rate; (c) movement to a more stable mortgage product type (*i.e.*, from an adjustable-rate mortgage to a fixed-rate mortgage); or (d) a reduction in amortization term.

For more information about HAMP, other loan workout programs, our HARP and relief refinance mortgage initiative, and other initiatives to help eligible borrowers keep their homes or avoid foreclosure, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — MHA Program" and "— Single-Family Loan Workouts*."

### *Minimizing Credit Losses*

We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure.

To help minimize the credit losses related to our guarantee activities, we are focused on:

- pursuing a variety of loan workouts, including foreclosure alternatives, in an effort to reduce the severity of losses we experience over time;

- managing foreclosure timelines to the extent possible, given the increasingly lengthy foreclosure process in many states;

- managing our inventory of foreclosed properties to reduce costs and maximize proceeds; and

- pursuing contractual remedies against originators, lenders, servicers, and insurers, as appropriate.

We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans that have been originated under specified underwriting standards. If we subsequently discover that contractual standards were not followed, we can exercise certain contractual remedies to mitigate our credit losses. These contractual remedies include requiring the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan. The amount we expect to collect on the outstanding requests is significantly less than the UPB amount primarily because many of these requests will likely be satisfied by the seller/servicers reimbursement to us for realized credit losses. These requests also may be rescinded in the course of the contractual appeals process. As of

September 30, 2011, the UPB of loans subject to repurchase requests issued to our single-family seller/servicers was approximately $2.7 billion, and approximately 40% of these requests were outstanding for more than four months since issuance of our initial repurchase request.

Our credit loss exposure is also partially mitigated by mortgage insurance, which is a form of credit enhancement. Primary mortgage insurance is required to be purchased, typically at the borrower's expense, for certain mortgages with higher LTV ratios. As of September 30, 2011, we had mortgage insurance coverage on loans that represent approximately 13% of the UPB of our single-family credit guarantee portfolio. We received payments under primary and other mortgage insurance of $0.7 billion and $2.0 billion in the three and nine months ended September 30, 2011, respectively, which helped to mitigate our credit losses. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Table 4.5 — Recourse and Other Forms of Credit Protection" for more detail. The financial condition of certain of our mortgage insurers continued to deteriorate in the third quarter of 2011. In August 2011, we suspended Republic Mortgage Insurance Company, or RMIC, and PMI Mortgage Insurance Co., or PMI, and their respective affiliates as approved mortgage insurers for our loans. PMI has been put under state supervision, and PMI's state regulator has petitioned for judicial action to place PMI into receivership. Triad Guaranty Insurance Corp., or Triad, has been operating under regulatory supervision since 2009. In addition to Triad, RMIC, and PMI, we believe that certain mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as they emerge. Our loan loss reserves reflect our estimates of expected insurance recoveries. As of September 30, 2011, only six insurance companies remained as eligible insurers for Freddie Mac loans, which makes it likely that, in the future, our mortgage insurance exposure will be concentrated among a smaller number of counterparties.

See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for further information on our agreements with our seller/servicers and our exposure to mortgage insurers.

### Maintaining the Credit Quality of New Loan Purchases and Guarantees

We continue to focus on maintaining credit policies, including our underwriting guidelines, that allow us to purchase and guarantee loans made to qualified borrowers that we believe will provide management and guarantee fee income, over the long-term, that exceeds our expected credit-related and administrative expenses on such loans.

As of September 30, 2011 and December 31, 2010, approximately 50% and 39%, respectively, of our single-family credit guarantee portfolio consisted of mortgage loans originated after 2008. Loans in our single-family credit guarantee portfolio originated after 2008 have experienced lower serious delinquency trends in the early years of their terms than loans originated in 2005 through 2008.

The credit quality of the single-family loans we acquired in the nine months ended September 30, 2011 (excluding relief refinance mortgages, which represented approximately 26% of our single family purchase volume during the nine months ended September 30, 2011) is significantly better than that of loans we acquired from 2005 through 2008, as measured by early delinquency rate trends, original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. The improvement in credit quality of loans we have purchased since 2008 is primarily the result of the combination of: (a) changes in our credit policies, including changes in our underwriting guidelines; (b) fewer purchases of loans with higher risk characteristics; and (c) changes in mortgage insurers' and lenders' underwriting practices.

Approximately 91% of our single-family purchase volume in the nine months ended September 30, 2011 consisted of fixed-rate amortizing mortgages. Approximately 67% and 75% of our single-family purchase volumes in the three and nine months ended September 30, 2011, respectively, were refinance mortgages, including approximately 22% and 26%, respectively, that were relief refinance mortgages, based on UPB. Relief refinance mortgages with LTV ratios above 80% may not perform as well as refinance mortgages with LTV ratios of 80% and below over time due, in part, to the continued high LTV ratios of these loans. Approximately 11% and 13% of our single-family purchase volume in the three and nine months ended September 30, 2011, respectively, was relief refinance mortgages with LTV ratios above 80%. Relief refinance mortgages comprised approximately 10% and 7% of the UPB in our total single-family credit guarantee portfolio at September 30, 2011 and December 31, 2010, respectively.

Table 2 presents the composition, loan characteristics, and serious delinquency rates of loans in our single-family credit guarantee portfolio, by year of origination at September 30, 2011.

**Table 2 — Single-Family Credit Guarantee Portfolio Data by Year of Origination[1]**

| | At September 30, 2011 | | | | | |
|---|---|---|---|---|---|---|
| Year of Origination | % of Portfolio | Average Credit Score[2] | Original LTV Ratio | Current LTV Ratio[3] | Current LTV Ratio >100% [3][4] | Serious Delinquency Rate[5] |
| 2011 | 10% | 752 | 71% | 70% | 5% | 0.03% |
| 2010 | 20 | 755 | 70 | 70 | 5 | 0.17 |
| 2009 | 20 | 754 | 68 | 72 | 5 | 0.41 |
| 2008 | 7 | 726 | 74 | 91 | 33 | 5.20 |
| 2007 | 10 | 706 | 77 | 112 | 59 | 11.21 |
| 2006 | 7 | 710 | 75 | 111 | 54 | 10.54 |
| 2005 | 8 | 717 | 73 | 95 | 37 | 6.20 |
| 2004 and prior | 18 | 720 | 71 | 60 | 9 | 2.63 |
| Total | 100% | 735 | 72 | 79 | 19 | 3.51 |

(1) Based on the loans remaining in the portfolio, which totaled $1,784 billion at September 30, 2011, rather than all loans originally guaranteed by us and originated in the respective year.
(2) Based on FICO credit score of the borrower as of the date of loan origination and may not be indicative of the borrowers' credit worthiness at September 30, 2011. Excludes $10 billion in UPB of loans where the FICO scores at origination were not available at September 30, 2011.
(3) We estimate current market values by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination.
(4) Calculated as a percentage of the aggregate UPB of loans with LTV ratios greater than 100% in relation to the total UPB of loans in the category.
(5) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk* — Delinquencies" for further information about our reported serious delinquency rates.

Mortgages originated after 2008 represent an increasingly large proportion of our single-family credit guarantee portfolio, as the amount of older vintages in the portfolio, which have a higher composition of loans with higher-risk characteristics, continues to decline due to liquidations, which include prepayments, refinancing activity, foreclosure transfers, and foreclosure alternatives. We currently expect that, over time, the replacement of older vintages should positively impact the serious delinquency rates and credit-related expenses of our single-family credit guarantee portfolio. However, the rate at which this replacement occurs slowed beginning in 2010, due to a decline in the volume of home purchase mortgage originations, an increase in the proportion of relief refinance mortgage activity, and delays in the foreclosure process. See "Table 14 — Segment Earnings Composition — Single-Family Guarantee Segment" for an analysis of the contribution to Segment Earnings (loss) by loan origination year.

### Strengthening Our Infrastructure and Improving Overall Efficiency

In conjunction with our Conservator, we are working to both enhance the quality of our infrastructure and improve our efficiency in order to preserve the taxpayers' investment. As such, we are focusing our resources primarily on key projects. Many of these projects will likely take several years to fully implement and focus on making significant improvements to our systems infrastructure in order to: (a) respond to mandatory initiatives from FHFA or other regulatory bodies; (b) replace legacy hardware or software systems at the end of their lives and strengthen our disaster recovery capabilities; and (c) improve our data collection and administration as well as our ability to assist in the servicing of loans. As a result of these efforts, we expect to have an infrastructure in place that is more efficient, flexible and well-controlled, which will assist us in our continued efforts to serve the mortgage market and reduce administrative expenses and other costs.

We continue to actively manage our general and administrative expenses, while also continuing to focus on retaining key talent. Our general and administrative expenses declined for the three and nine months ended September 30, 2011 compared to the three and nine months ended September 30, 2010.

### Single-Family Credit Guarantee Portfolio

In discussing our credit performance, we often use the terms "credit losses" and "credit-related expenses." These terms are significantly different. Our "credit losses" consist of charge-offs and REO operations income (expense), net of recoveries, while our "credit-related expenses" consist of our provision for credit losses and REO operations income (expense).

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $70.5 billion, and have recorded an additional $4.4 billion in losses on loans purchased from PC trusts, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been

incurred and, thus have not been provisioned for, we believe that, as of September 30, 2011, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations.

The UPB of our single-family credit guarantee portfolio declined approximately 2%, on an annualized basis, during the nine months ended September 30, 2011. This reflects that the amount of single-family loan liquidations has exceeded new loan purchase and guarantee activity in 2011, which we believe is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market. Table 3 provides certain credit statistics for our single-family credit guarantee portfolio.

**Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio**

| | As of | | | | |
|---|---|---|---|---|---|
| | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 | 9/30/2010 |
| Payment status — | | | | | |
| One month past due | 1.94% | 1.92% | 1.75% | 2.07% | 2.11% |
| Two months past due | 0.70% | 0.67% | 0.65% | 0.78% | 0.80% |
| Seriously delinquent[1] | 3.51% | 3.50% | 3.63% | 3.84% | 3.80% |
| Non-performing loans (in millions)[2] | $119,081 | $114,819 | $115,083 | $115,478 | $112,746 |
| Single-family loan loss reserve (in millions)[3] | $ 39,088 | $ 38,390 | $ 38,558 | $ 39,098 | $ 37,665 |
| REO inventory (in properties) | 59,596 | 60,599 | 65,159 | 72,079 | 74,897 |
| REO assets, net carrying value (in millions) | $ 5,539 | $ 5,834 | $ 5,834 | $ 6,261 | $ 7,420 |

| | For the Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 | 9/30/2010 |
| | (in units, unless noted) | | | | |
| Seriously delinquent loan additions[1] | 93,850 | 87,813 | 97,646 | 113,235 | 115,359 |
| Loan modifications[4] | 23,919 | 31,049 | 35,158 | 37,203 | 39,284 |
| Foreclosure starts ratio[5] | 0.56% | 0.55% | 0.54% | 0.73% | 0.75% |
| REO acquisitions | 24,378 | 24,788 | 24,707 | 23,771 | 39,053 |
| REO disposition severity ratio:[6] | | | | | |
| California | 45.5% | 44.9% | 44.5% | 43.9% | 41.9% |
| Arizona | 48.7% | 51.3% | 50.8% | 49.5% | 46.6% |
| Florida | 53.3% | 52.7% | 54.8% | 53.0% | 54.9% |
| Nevada | 53.2% | 55.4% | 53.1% | 53.1% | 51.6% |
| Michigan | 48.1% | 48.5% | 48.3% | 49.7% | 49.2% |
| Total U.S. | 41.9% | 41.7% | 43.0% | 41.3% | 41.5% |
| Single-family credit losses (in millions) | $ 3,440 | $ 3,106 | $ 3,226 | $ 3,086 | $ 4,216 |

(1) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Delinquencies*" for further information about our reported serious delinquency rates.
(2) Consists of the UPB of loans in our single-family credit guarantee portfolio that have undergone a TDR or that are seriously delinquent. As of September 30, 2011 and December 31, 2010, approximately $42.2 billion and $26.6 billion in UPB of TDR loans, respectively, were no longer seriously delinquent.
(3) Consists of the combination of: (a) our allowance for loan losses on mortgage loans held for investment; and (b) our reserve for guarantee losses associated with non-consolidated single-family mortgage securitization trusts and other guarantee commitments.
(4) Represents the number of completed modifications under agreement with the borrower during the quarter. Excludes forbearance agreements, repayment plans, and loans in the trial period under HAMP.
(5) Represents the ratio of the number of loans that entered the foreclosure process during the respective quarter divided by the number of loans in the single-family credit guarantee portfolio at the end of the quarter. Excludes Other Guarantee Transactions and mortgages covered under other guarantee commitments.
(6) Calculated as the amount of our losses recorded on disposition of REO properties during the respective quarterly period, excluding those subject to repurchase requests made to our seller/servicers, divided by the aggregate UPB of the related loans. The amount of losses recognized on disposition of the properties is equal to the amount by which the UPB of the loans exceeds the amount of sales proceeds from disposition of the properties. Excludes sales commissions and other expenses, such as property maintenance and costs, as well as applicable recoveries from credit enhancements, such as mortgage insurance.

The quarterly number of seriously delinquent loan additions declined steadily from the fourth quarter of 2009 through the second quarter of 2011; however, we experienced a small increase in the quarterly number of seriously delinquent loan additions during the third quarter of 2011. Several factors, including delays in foreclosure due to concerns about the foreclosure process, have resulted in loans remaining in serious delinquency for longer periods than prior to 2008, particularly in states that require a judicial foreclosure process. As of September 30, 2011 and December 31, 2010, the percentage of seriously delinquent loans that have been delinquent for more than six months was 70% and 66%, respectively. The UPB of our non-performing loans increased during the nine months ended September 30, 2011, primarily due to an increase in single-family loans classified as TDRs. The credit losses and loan loss reserve associated with our single-family credit guarantee portfolio remained elevated for this period, due in part to:

• Losses associated with the continued high volume of foreclosures and foreclosure alternatives. These actions relate to the continued efforts of our servicers to resolve our large inventory of seriously delinquent loans. Due to the length of time necessary for servicers either to complete the foreclosure process or pursue foreclosure alternatives

on seriously delinquent loans in our portfolio, we expect our credit losses will continue to remain high even if the volume of new serious delinquencies declines.

- Continued negative impact of certain loan groups within the single-family credit guarantee portfolio, such as those underwritten with certain lower documentation standards and interest-only loans, as well as other 2005 through 2008 vintage loans. These groups continue to be large contributors to our credit losses.

- Cumulative declines in national home prices during the last five years, based on our own index, which resulted in approximately 19% of our single-family credit guarantee portfolio, based on UPB, consisting of loans with estimated current LTV ratios in excess of 100% (underwater loans) as of September 30, 2011.

- Deterioration in the financial condition of certain of our mortgage insurers, which reduced our estimates of expected recoveries from these counterparties.

Our REO inventory (measured in number of properties) declined in each of the last four quarters due to an increase in the volume of REO dispositions and slowdowns in REO acquisition volume as foreclosure timelines have been lengthening. Dispositions of REO increased 16% for the nine months ended September 30, 2011 compared to the nine months ended September 30, 2010, based on the number of properties sold. We also have continued to experience high REO disposition severity ratios on sales of our REO inventory in the nine months ended September 30, 2011. We believe our single-family REO acquisition volume and single-family credit losses beginning in the fourth quarter of 2010 have been less than they otherwise would have been due to delays in the single-family foreclosure process. See "Mortgage Market and Economic Conditions — *Delays in the Foreclosure Process for Single-Family Mortgages*" for further information.

### Conservatorship and Government Support for our Business

We have been operating under conservatorship, with FHFA acting as our conservator, since September 6, 2008. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition, and results of operations.

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

While the conservatorship has benefited us, we are subject to certain constraints on our business activities imposed by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement and by FHFA, as our Conservator.

To address our net worth deficit of $6.0 billion at September 30, 2011, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $6.0 billion. FHFA will request that we receive these funds by December 31, 2011. Upon funding of the draw request: (a) our aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $72.2 billion; and (b) the corresponding annual cash dividend owed to Treasury will increase to $7.2 billion.

We pay cash dividends to Treasury at an annual rate of 10%. Through September 30, 2011, we paid aggregate cash dividends to Treasury of $14.9 billion, an amount equal to 23% of our aggregate draws received under the Purchase Agreement. As of September 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock exceeded our annual historical earnings in all but one period. As a result, we expect to make additional draws in future periods, even if our operating performance generates net income or comprehensive income.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The $200 billion cap on Treasury's funding commitment will increase as necessary to eliminate any net worth deficits we may have during 2010, 2011, and 2012. We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

On August 5, 2011, S&P lowered the long-term credit rating of the U.S. government to "AA+" from "AAA" and assigned a negative outlook to the rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating. While this could adversely affect our liquidity and the supply and cost of debt financing available to us in the future, we have not yet experienced such adverse effects. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Other Debt Securities — Credit Ratings*."

Neither the U.S. government nor any other agency or instrumentality of the U.S. government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities or other obligations.

For information on conservatorship, the Purchase Agreement, and the impact of credit ratings, see "BUSINESS — Conservatorship and Related Matters" in our 2010 Annual Report and "RISK FACTORS — *A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business. Our business could also be adversely affected if there is a downgrade in the credit ratings of the U.S. government or a payment default by the U.S. government*" and "*— If Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth, FHFA could be required to place us into receivership*" in our Quarterly Report on Form 10-Q for the second quarter of 2011.

## Consolidated Financial Results

Net loss was $4.4 billion and $2.5 billion for the three months ended September 30, 2011 and 2010, respectively. Key highlights of our financial results include:

- Net interest income for the three months ended September 30, 2011 increased to $4.6 billion from $4.3 billion for the three months ended September 30, 2010, mainly due to lower funding costs, partially offset by a decline in the average balances of mortgage-related securities.

- Provision for credit losses for the three months ended September 30, 2011 decreased to $3.6 billion, compared to $3.7 billion for the three months ended September 30, 2010. The slight decline in provision for credit losses for the three months ended September 30, 2011 reflects a decline in the volume of early (*i.e.*, one or two months past due) and seriously delinquent loans, which was substantially offset by higher loss severity, primarily due to lower expectations from mortgage insurance recoveries due to the deterioration in the financial condition of certain of these counterparties, compared to the three months ended September 30, 2010. The provision for credit losses in the three months ended September 30, 2010 also reflected a higher volume of completed loan modifications that were classified as TDRs.

- Non-interest income (loss) was $(4.8) billion for the three months ended September 30, 2011, compared to $(2.6) billion for the three months ended September 30, 2010 largely due to derivative losses in both periods. However, there was a significant decline in net impairments of available-for-sale securities recognized in earnings during the three months ended September 30, 2011 compared to the three months ended September 30, 2010.

- Non-interest expense was $(687) million and $(828) million in the three months ended September 30, 2011 and 2010, respectively, and reflects reduced REO operations expense in the three months ended September 30, 2011, compared to the three months ended September 30, 2010.

- Total comprehensive income (loss) was $(4.4) billion for the three months ended September 30, 2011 compared to $1.4 billion for the three months ended September 30, 2010. Total comprehensive income (loss) for the three months ended September 30, 2011 primarily reflects the $(4.4) billion net loss.

## Mortgage Market and Economic Conditions

### Overview

The housing market continued to experience challenges during the third quarter of 2011 due primarily to continued weakness in the employment market and a significant inventory of seriously delinquent loans and REO properties in the market. The U.S. real gross domestic product rose by 2.5% on an annualized basis during the third quarter of 2011, compared to 1.3% during the second quarter of 2011, according to the Bureau of Economic Analysis estimates. The national unemployment rate was 9.1% in September 2011, compared to 9.2% in June 2011 and 8.8% in March 2011, based on data from the U.S. Bureau of Labor Statistics.

### Single-Family Housing Market

We believe the overall number of potential home buyers in the market combined with the volume of homes offered for sale will determine the direction of home prices. Within the industry, existing home sales are important for assessing the rate at which the mortgage market might absorb the inventory of listed, but unsold, homes in the U.S. (including listed REO properties). Additionally, we believe new home sales can be an indicator of certain economic trends, such as the potential for growth in gross domestic product and total U.S. mortgage debt outstanding. Sales of existing homes in the third quarter of 2011 averaged 4.88 million (at a seasonally adjusted annual rate), unchanged from the second quarter of 2011. New home sales in the third quarter of 2011 averaged 302,000 homes (at a seasonally adjusted annual rate) decreasing approximately 2.3% from an average seasonally adjusted annual rate of approximately 309,000 homes in the second quarter of 2011.

We estimate that home prices (on a non-seasonally adjusted basis) decreased approximately 1.0% nationwide during the nine months ended September 30, 2011, which includes a 0.7% decrease in the third quarter of 2011. Seasonal factors typically result in stronger house-price appreciation during the second and third quarters. These estimates are based on our own index of mortgage loans in our single-family credit guarantee portfolio. Other indexes of home prices may have different results, as they are determined using different pools of mortgage loans and calculated under different conventions than our own.

*Multifamily Housing Market*

Multifamily market fundamentals continued to improve on a national level during the third quarter of 2011. This improvement continues a trend of favorable movements in key indicators such as vacancy rates and effective rents. Vacancy rates and effective rents are important to loan performance because multifamily loans are generally repaid from the cash flows generated by the underlying property and these factors significantly influence those cash flows. These improving fundamentals, perceived optimism about demand for multifamily housing, and lower capitalization rates have helped improve property values in most markets. However, the broader economy continues to be challenged by persistently high unemployment, which has delayed a more comprehensive recovery of the multifamily housing market.

*Delays in the Foreclosure Process for Single-Family Mortgages*

In the fall of 2010, several large single-family seller/servicers announced issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits. As a result, a number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in the latter part of 2010 in certain states in which they do business, and we temporarily suspended certain REO sales in November 2010. During the first quarter of 2011, we fully resumed marketing and sales of REO properties. While the larger servicers generally resumed foreclosure proceedings in the first quarter of 2011, we continued to experience significant delays in the foreclosure process for single-family mortgages in the nine months ended September 30, 2011, as compared to before these issues arose, particularly in states that require a judicial foreclosure process. More recently, regulatory developments impacting mortgage servicing and foreclosure practices have also contributed to these delays. We believe that these delays have caused the volume of our single-family REO acquisitions in the nine months ended September 30, 2011 to be less than it otherwise would have been. We expect these delays in the foreclosure process to continue into 2012. We generally refer to these issues as the concerns about the foreclosure process. For information on recent regulatory developments affecting foreclosures, see "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices."

**Mortgage Market and Business Outlook**

Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties. For example, a number of factors could cause the actual performance of the housing and mortgage markets and the U.S. economy during the remainder of 2011 to be significantly worse than we expect, including adverse changes in consumer confidence, national or international economic conditions and changes in the federal government's fiscal policies. See "FORWARD-LOOKING STATEMENTS" for additional information.

*Overview*

We continue to expect key macroeconomic drivers of the economy — such as income growth, employment, and inflation — will affect the performance of the housing and mortgage markets into 2012. As a result of the weak payroll employment growth during the third quarter of 2011 and the continued high unemployment rate, near-term demand for housing will likely remain weak. Further, consumer confidence measures, while up from recession lows, remain below long-term averages and suggest that households will likely be more cautious in home buying. We also expect rates on fixed-rate single-family mortgages to remain historically low into 2012, which may extend the recent high level of refinancing activity (relative to new purchase lending activity). Lastly, many large financial institutions experienced delays in the foreclosure process for single-family loans in late 2010 and throughout 2011. To the extent a large volume of loans completes the foreclosure process in a short period of time, the resulting REO inventory could have a negative impact on the housing market.

Our expectation for home prices, based on our own index, is that national average home prices will continue to remain weak and will likely decline over the near term before a long-term recovery in housing begins, due to, among

other factors: (a) our expectation for a sustained volume of distressed sales, which include short sales and sales by financial institutions of their REO properties; and (b) the likelihood that unemployment rates will remain high.

### Single-Family

We expect our provision for credit losses and charge-offs will likely remain elevated into 2012. This is in part due to the substantial number of underwater mortgage loans in our single-family credit guarantee portfolio, as well as the substantial inventory of seriously delinquent loans. For the near term, we also expect:

- REO disposition severity ratios to remain relatively high, as market conditions, such as home prices and the rate of home sales, continue to remain weak;
- non-performing assets, which include loans deemed TDRs, to continue to remain high;
- the volume of loan workouts to remain high; and
- continued high volume of loans in the foreclosure process as well as prolonged foreclosure timelines.

### Multifamily

The most recent market data available continues to reflect improving national apartment fundamentals, including decreasing vacancy rates and increasing effective rents. However, some geographic areas in which we have investments in multifamily loans, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We own or guarantee loans in these states that we believe are at risk of default. We expect our multifamily delinquency rate to remain relatively stable in the remainder of 2011.

Recent market data shows a significant increase in multifamily loan activity, compared to prior year periods, and reflects that the multifamily sector has experienced greater stability in market fundamentals and investor demand than other real estate sectors. Our purchase and guarantee of multifamily loans increased approximately 46%, to $12.4 billion for the nine months ended September 30, 2011, compared to $8.5 billion during the same period in 2010. We expect our purchase and guarantee activity to continue to increase, but at a more moderate pace in the remainder of 2011.

### Changes to the Home Affordable Refinance Program

On October 24, 2011 FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers who can benefit from refinancing their home mortgage. The Acting Director of FHFA stated that the goal of pursuing these changes is to create refinancing opportunities for more borrowers whose mortgage is owned or guaranteed by the GSEs while reducing risk for the GSEs and bringing a measure of stability to housing markets. The revisions to HARP enable us to expand the assistance we provide to homeowners by making their mortgage payments more affordable through one or more of the following ways: (a) a reduction in payment; (b) a reduction in rate; (c) movement to a more stable mortgage product type (i.e., from an adjustable-rate mortgage to a fixed-rate mortgage); or (d) a reduction in amortization term.

The revisions to HARP will continue to be available to borrowers with loans that were sold to the GSEs on or before May 31, 2009 and who have current LTV ratios above 80%. The October 24, 2011 announcement stated that the GSEs will issue guidance with operational details about the HARP changes to mortgage lenders and servicers by November 15, 2011. We are working collectively with FHFA and Fannie Mae on several operational details of the program. We are also waiting to receive details from FHFA regarding the fees that we may charge associated with the refinancing program. Since industry participation in HARP is not mandatory, we anticipate that implementation schedules will vary as individual lenders, mortgage insurers and other market participants modify their processes. At this time we do not know how many eligible borrowers are likely to refinance under the program.

The recently announced revisions to HARP will help to reduce our exposure to credit risk to the extent that HARP refinances strengthen the borrowers' capacity to repay their mortgages and, in some cases, reduce the terms of their mortgages. These revisions to HARP could also reduce our credit losses to the extent that the revised program contributes to bringing stability to the housing market. However, with our release of certain representations and warranties to lenders, credit losses associated with loans identified with defects will not be recaptured through loan buybacks. We could also experience declines in the fair values of certain agency mortgage-related security investments classified as available-for-sale or trading resulting from changes in expectations of mortgage prepayments and lower net interest yields over time on other mortgage-related investments. As a result, we cannot currently estimate these impacts until more details about the program and the level of borrower participation can be reasonably assured. See "RISK FACTORS — *The MHA Program and other efforts to reduce foreclosures, modify loan terms and refinance mortgages, including HARP, may fail to mitigate our credit losses and may adversely affect our results of operations or financial condition*" for additional information.

*Long-Term Financial Sustainability*

There is significant uncertainty as to our long-term financial sustainability. The Acting Director of FHFA stated on September 19, 2011 that "it ought to be clear to everyone at this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship."

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will regularly generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived in the future. Treasury waived the fee for all quarters of 2011, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the quarterly commitment fee has not yet been established and could be substantial.

There continues to be significant uncertainty in the current mortgage market environment, and continued high levels of unemployment, weakness in home prices, adverse changes in interest rates, mortgage security prices, spreads and other factors could lead to additional draws. For discussion of other factors that could result in additional draws, see "LIQUIDITY AND CAPITAL RESOURCES — Capital Resources."

There is also significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Obama Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations. As discussed below in "Legislative and Regulatory Developments," on February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market.

### Limits on Mortgage-Related Investments Portfolio

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $810 billion as of December 31, 2010 and may not exceed $729 billion as of December 31, 2011. FHFA has stated that we will not be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio, except for purchases of delinquent mortgages out of PC trusts. FHFA has also indicated that the portfolio reduction targets under the Purchase Agreement and FHFA regulation should be viewed as minimum reductions and has encouraged us to reduce the mortgage-related investments portfolio at a faster rate than required, consistent with FHFA guidance, safety and soundness and the goal of conserving and preserving assets.

Table 4 presents the UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation.

### Table 4 — Mortgage-Related Investments Portfolio[1]

|  | September 30, 2011 | December 31, 2010 |
|---|---|---|
|  | (in millions) | |
| Investments segment — Mortgage investments portfolio | $473,630 | $481,677 |
| Single-family Guarantee segment — Single-family unsecuritized mortgage loans[2] | 63,237 | 69,766 |
| Multifamily segment — Mortgage investments portfolio | 142,266 | 145,431 |
| Total mortgage-related investments portfolio | $679,133 | $696,874 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Represents unsecuritized nonaccrual single-family loans managed by the Single-family Guarantee segment.

The UPB of our mortgage-related investments portfolio declined from December 31, 2010 to September 30, 2011, primarily due to liquidations, partially offset by the purchase of $34.8 billion of seriously delinquent loans from PC trusts.

Our mortgage-related investments portfolio includes assets that are less liquid than agency securities, including unsecuritized performing single-family mortgage loans, multifamily mortgage loans, CMBS, and housing revenue bonds. Our less liquid assets collectively represented approximately 30% of the UPB of the portfolio at September 30, 2011. Our mortgage-related investments portfolio also includes illiquid assets, including unsecuritized seriously delinquent and modified single-family mortgage loans which we purchased from PC trusts, and our investments in non-agency mortgage-

related securities backed by subprime, option ARM, and Alt-A and other loans. Our illiquid assets collectively represented approximately 28% of the UPB of the portfolio at September 30, 2011. The liquidity of our assets, as described above, is based on our own internal expectations given current market conditions. Challenging market conditions are expected to continue and may rapidly and adversely affect the liquidity of our assets at any given time.

We disclose our mortgage assets on the basis used to determine the cap under the caption "Mortgage-Related Investments Portfolio — Ending Balance" in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC.

We are providing our web site addresses here and elsewhere in this Form 10-Q solely for your information. Information appearing on our web site is not incorporated into this Form 10-Q.

### Legislative and Regulatory Developments

A number of bills have been introduced in Congress that would bring about changes in Freddie Mac and Fannie Mae's business model. In addition, on February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, and states that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

On August 10, 2011, FHFA, in consultation with Treasury and HUD, announced a request for information seeking input on new options for sales and rentals of single-family REO properties held by Freddie Mac, Fannie Mae and FHA. According to the announcement, the objective of the request for information is to help address current and future REO inventory. The request for information solicited alternatives for maximizing value to taxpayers and increasing private investment in the housing market, including approaches that support rental and affordable housing needs.

On September 19, 2011, the Acting Director of FHFA stated that he would anticipate Freddie Mac and Fannie Mae will continue the gradual process of increasing guarantee fees. He stated that this will not happen immediately but should be expected in 2012. In addition, the Acting Director indicated that FHFA will be considering other alternatives to reduce our long-term risk exposure. President Obama's Plan for Economic Growth and Deficit Reduction, announced on September 19, 2011, contained a proposal to increase the guarantee fees charged by Freddie Mac and Fannie Mae by 10 basis points.

On September 27, 2011, FHFA announced that it is seeking public comment on two alternative mortgage servicing compensation structures detailed in a discussion paper. One proposal would establish a reserve account within the current servicing compensation structure. The other proposal would create a new fee for service compensation structure (*i.e.* a flat per-loan fee). We cannot predict what changes to the current structure will emerge from this process, or the extent to which our business may be impacted by them.

On October 19, 2011, FHFA announced that it has directed Freddie Mac and Fannie Mae to transition away from current foreclosure attorney network programs and move to a system where mortgage servicers select qualified law firms that meet certain minimum, uniform criteria. The changes will be implemented after a transition period in which input will be taken from servicers, regulators, lawyers, and other market participants. We cannot predict the scope of these changes, or the extent to which our business will be impacted by them.

See "LEGISLATIVE AND REGULATORY MATTERS" for information on the Obama Administration's February 2011 report, recent developments in GSE reform legislation, recently initiated rulemakings under the Dodd-Frank Act, and other regulatory developments, including revisions to HARP announced on October 24, 2011.

## SELECTED FINANCIAL DATA[1]

The selected financial data presented below should be reviewed in conjunction with MD&A and our consolidated financial statements and related notes for the three and nine months ended September 30, 2011.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (dollars in millions, except share-related amounts) | | | |
| **Statements of Income and Comprehensive Income Data** | | | | |
| Net interest income | $ 4,613 | $ 4,279 | $ 13,714 | $ 12,540 |
| Provision for credit losses | (3,606) | (3,727) | (8,124) | (14,152) |
| Non-interest income (loss) | (4,798) | (2,646) | (9,907) | (11,127) |
| Non-interest expense | (687) | (828) | (1,930) | (1,974) |
| Net loss attributable to Freddie Mac | (4,422) | (2,511) | (5,885) | (13,912) |
| Total comprehensive income (loss) attributable to Freddie Mac | (4,376) | 1,436 | (2,736) | (874) |
| Net loss attributable to common stockholders | (6,040) | (4,069) | (10,725) | (18,058) |
| Loss per common share: | | | | |
| Basic | (1.86) | (1.25) | (3.30) | (5.56) |
| Diluted | (1.86) | (1.25) | (3.30) | (5.56) |
| Cash dividends per common share | — | — | — | — |
| Weighted average common shares outstanding (in thousands):[2] | | | | |
| Basic | 3,244,496 | 3,248,794 | 3,245,473 | 3,249,753 |
| Diluted | 3,244,496 | 3,248,794 | 3,245,473 | 3,249,753 |

| | September 30, 2011 | December 31, 2010 |
|---|---|---|
| | (dollars in millions) | |
| **Balance Sheets Data** | | |
| Mortgage loans held-for-investment, at amortized cost by consolidated trusts (net of allowances for loan losses) | $1,611,580 | $1,646,172 |
| Total assets | 2,172,336 | 2,261,780 |
| Debt securities of consolidated trusts held by third parties | 1,488,036 | 1,528,648 |
| Other debt | 674,421 | 713,940 |
| All other liabilities | 15,870 | 19,593 |
| Total stockholders' equity (deficit) | (5,991) | (401) |
| **Portfolio Balances**[3] | | |
| Mortgage-related investments portfolio | $ 679,133 | $ 696,874 |
| Total Freddie Mac mortgage-related securities[4] | 1,667,842 | 1,712,918 |
| Total mortgage portfolio[5] | 2,114,169 | 2,164,859 |
| Non-performing assets[6] | 127,903 | 125,405 |

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| **Ratios**[7] | | | | |
| Return on average assets[8][11] | (0.8)% | (0.4)% | (0.4)% | (0.8)% |
| Non-performing assets ratio[9] | 6.6 | 6.2 | 6.6 | 6.2 |
| Equity to assets ratio[10][11] | (0.2) | — | (0.1) | (0.2) |

(1) See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report and this Form 10-Q for information regarding our accounting policies and the impact of new accounting policies on our consolidated financial statements.

(2) Includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included in basic loss per share, because it is unconditionally exercisable by the holder at a cost of $0.00001 per share.

(3) Represents the UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(4) See "Table 26 — Freddie Mac Mortgage-Related Securities" for the composition of this line item.

(5) See "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios" for the composition of our total mortgage portfolio.

(6) See "Table 43 — Non-Performing Assets" for a description of our non-performing assets.

(7) The return on common equity ratio is not presented because the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit), net of preferred stock (at redemption value), is less than zero for all periods presented. The dividend payout ratio on common stock is not presented because we are reporting a net loss attributable to common stockholders for all periods presented.

(8) Ratio computed as annualized net income (loss) attributable to Freddie Mac divided by the simple average of the beginning and ending balances of total assets.

(9) Ratio computed as non-performing assets divided by the ending UPB of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities.

(10) Ratio computed as the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit) divided by the simple average of the beginning and ending balances of total assets.

(11) To calculate the simple averages for the nine months ended September 30, 2010, the beginning balances of total assets, and total Freddie Mac stockholders' equity are based on the January 1, 2010 balances included in "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES — Table 2.1 — Impact of the Change in Accounting for Transfers of Financial Assets and Consolidation of Variable Interest Entities on Our Consolidated Balance Sheet" in our 2010 Annual Report, so that both the beginning and ending balances reflect changes in accounting principles.

## CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported results of operations.

### Table 5 — Summary Consolidated Statements of Income and Comprehensive Income

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2011 | 2010 | 2011 | 2010 |
|  | (in millions) | | | |
| Net interest income | $ 4,613 | $ 4,279 | $13,714 | $ 12,540 |
| Provision for credit losses | (3,606) | (3,727) | (8,124) | (14,152) |
| Net interest income (loss) after provision for credit losses | 1,007 | 552 | 5,590 | (1,612) |
| Non-interest income (loss): |  |  |  |  |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (310) | (66) | (212) | (160) |
| Gains (losses) on retirement of other debt | 19 | (50) | 34 | (229) |
| Gains (losses) on debt recorded at fair value | 133 | (366) | 15 | 525 |
| Derivative gains (losses) | (4,752) | (1,130) | (8,986) | (9,653) |
| Impairment of available-for-sale securities: |  |  |  |  |
| Total other-than-temporary impairment of available-for-sale securities | (459) | (523) | (1,743) | (1,054) |
| Portion of other-than-temporary impairment recognized in AOCI | 298 | (577) | 37 | (984) |
| Net impairment of available-for-sale securities recognized in earnings | (161) | (1,100) | (1,706) | (2,038) |
| Other gains (losses) on investment securities recognized in earnings | (541) | (503) | (452) | (1,176) |
| Other income | 814 | 569 | 1,400 | 1,604 |
| Total non-interest income (loss) | (4,798) | (2,646) | (9,907) | (11,127) |
| Non-interest expense: |  |  |  |  |
| Administrative expenses | (381) | (388) | (1,126) | (1,197) |
| REO operations expense | (221) | (337) | (505) | (456) |
| Other expenses | (85) | (103) | (299) | (321) |
| Total non-interest expense | (687) | (828) | (1,930) | (1,974) |
| Loss before income tax benefit | (4,478) | (2,922) | (6,247) | (14,713) |
| Income tax benefit | 56 | 411 | 362 | 800 |
| Net loss | (4,422) | (2,511) | (5,885) | (13,913) |
| Other comprehensive income, net of taxes and reclassification adjustments: |  |  |  |  |
| Changes in unrealized gains (losses) related to available-for-sale securities | (80) | 3,781 | 2,764 | 12,524 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 124 | 164 | 391 | 520 |
| Changes in defined benefit plans | 2 | 2 | (6) | (6) |
| Total other comprehensive income, net of taxes and reclassification adjustments | 46 | 3,947 | 3,149 | 13,038 |
| Comprehensive income (loss) | (4,376) | 1,436 | (2,736) | (875) |
| Less: Comprehensive loss attributable to noncontrolling interest | — | — | — | 1 |
| Total comprehensive income (loss) attributable to Freddie Mac | $(4,376) | $ 1,436 | $(2,736) | $ (874) |

**Net Interest Income**

Table 6 presents an analysis of net interest income, including average balances and related yields earned on assets and incurred on liabilities.

**Table 6 — Net Interest Income/Yield and Average Balance Analysis**

| | | Three Months Ended September 30, | | | | |
|---|---|---|---|---|---|---|
| | **2011** | | | **2010** | | |
| | **Average Balance**[(1)(2)] | **Interest Income (Expense)**[(1)] | **Average Rate** | **Average Balance**[(1)(2)] | **Interest Income (Expense)**[(1)] | **Average Rate** |
| | | | (dollars in millions) | | | |
| Interest-earning assets: | | | | | | |
| Cash and cash equivalents | $ 51,225 | $ 4 | 0.03% | $ 43,171 | $ 24 | 0.21% |
| Federal funds sold and securities purchased under agreements to resell | 16,434 | 4 | 0.08 | 51,439 | 24 | 0.19 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities[(3)] | 443,135 | 5,050 | 4.56 | 500,500 | 6,058 | 4.84 |
| Extinguishment of PCs held by Freddie Mac | (166,356) | (1,918) | (4.61) | (195,890) | (2,543) | (5.19) |
| Total mortgage-related securities, net | 276,779 | 3,132 | 4.53 | 304,610 | 3,515 | 4.62 |
| Non-mortgage-related securities[(3)] | 18,175 | 18 | 0.40 | 28,631 | 42 | 0.59 |
| Mortgage loans held by consolidated trusts[(4)] | 1,626,583 | 19,140 | 4.71 | 1,706,329 | 21,473 | 5.03 |
| Unsecuritized mortgage loans[(4)] | 243,162 | 2,282 | 3.75 | 221,442 | 2,305 | 4.16 |
| Total interest-earning assets | $2,232,358 | $ 24,580 | 4.41 | $2,355,622 | $ 27,383 | 4.65 |
| Interest-bearing liabilities: | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $1,641,905 | $(18,633) | (4.54) | $1,723,095 | $(21,264) | (4.94) |
| Extinguishment of PCs held by Freddie Mac | (166,356) | 1,918 | 4.61 | (195,890) | 2,543 | 5.19 |
| Total debt securities of consolidated trusts held by third parties | 1,475,549 | (16,715) | (4.53) | 1,527,205 | (18,721) | (4.90) |
| Other debt: | | | | | | |
| Short-term debt | 188,004 | (70) | (0.14) | 207,673 | (143) | (0.27) |
| Long-term debt[(5)] | 495,188 | (3,002) | (2.42) | 542,842 | (4,002) | (2.94) |
| Total other debt | 683,192 | (3,072) | (1.79) | 750,515 | (4,145) | (2.20) |
| Total interest-bearing liabilities | 2,158,741 | (19,787) | (3.67) | 2,277,720 | (22,866) | (4.01) |
| Income (expense) related to derivatives[(6)] | — | (180) | (0.03) | — | (238) | (0.04) |
| Impact of net non-interest-bearing funding | 73,617 | — | 0.12 | 77,902 | — | 0.13 |
| Total funding of interest-earning assets | $2,232,358 | $(19,967) | (3.58) | $2,355,622 | $(23,104) | (3.92) |
| Net interest income/yield | | $ 4,613 | 0.83 | | $ 4,279 | 0.73 |

| | Nine Months Ended September 30, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2011** | | | **2010** | | |
| | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate | Average Balance[1][2] | Interest Income (Expense)[1] | Average Rate |
| | (dollars in millions) | | | | | |
| **Interest-earning assets:** | | | | | | |
| Cash and cash equivalents | $ 40,817 | $ 30 | 0.10% | $ 52,008 | $ 59 | 0.15% |
| Federal funds sold and securities purchased under agreements to resell | 32,174 | 30 | 0.12 | 46,774 | 56 | 0.16 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities[3] | 450,227 | 15,581 | 4.61 | 544,797 | 19,769 | 4.84 |
| Extinguishment of PCs held by Freddie Mac | (166,734) | (5,947) | (4.76) | (224,397) | (8,897) | (5.29) |
| Total mortgage-related securities, net | 283,493 | 9,634 | 4.53 | 320,400 | 10,872 | 4.52 |
| Non-mortgage-related securities[3] | 24,520 | 74 | 0.40 | 27,130 | 158 | 0.78 |
| Mortgage loans held by consolidated trusts[4] | 1,640,276 | 58,986 | 4.79 | 1,741,092 | 66,319 | 5.08 |
| Unsecuritized mortgage loans[4] | 242,063 | 6,890 | 3.80 | 198,047 | 6,445 | 4.34 |
| Total interest-earning assets | $2,263,343 | $ 75,644 | 4.46 | $2,385,451 | $ 83,909 | 4.69 |
| **Interest-bearing liabilities:** | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $1,654,554 | $(57,326) | (4.62) | $1,754,713 | $(66,309) | (5.04) |
| Extinguishment of PCs held by Freddie Mac | (166,734) | 5,947 | 4.76 | (224,397) | 8,897 | 5.29 |
| Total debt securities of consolidated trusts held by third parties | 1,487,820 | (51,379) | (4.60) | 1,530,316 | (57,412) | (5.00) |
| Other debt: | | | | | | |
| Short-term debt | 192,326 | (280) | (0.19) | 225,745 | (421) | (0.25) |
| Long-term debt[5] | 504,603 | (9,690) | (2.56) | 553,701 | (12,791) | (3.08) |
| Total other debt | 696,929 | (9,970) | (1.91) | 779,446 | (13,212) | (2.26) |
| Total interest-bearing liabilities | 2,184,749 | (61,349) | (3.74) | 2,309,762 | (70,624) | (4.08) |
| Income (expense) related to derivatives[6] | — | (581) | (0.04) | — | (745) | (0.04) |
| Impact of net non-interest-bearing funding | 78,594 | — | 0.13 | 75,689 | — | 0.13 |
| Total funding of interest-earning assets | $2,263,343 | $(61,930) | (3.65) | $2,385,451 | $(71,369) | (3.99) |
| Net interest income/yield | | $ 13,714 | 0.81 | | $ 12,540 | 0.70 |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) We calculate average balances based on amortized cost.
(3) Interest income (expense) includes accretion of the portion of impairment charges recognized in earnings where we expect a significant improvement in cash flows.
(4) Non-performing loans, where interest income is generally recognized when collected, are included in average balances.
(5) Includes current portion of long-term debt.
(6) Represents changes in fair value of derivatives in cash flow hedge relationships that were previously deferred in AOCI and have been reclassified to earnings as the associated hedged forecasted issuance of debt affects earnings.

Net interest income increased $334 million and $1.2 billion during the three and nine months ended September 30, 2011, respectively, compared to the three and nine months ended September 30, 2010. Net interest yield increased 10 basis points and 11 basis points during the three and nine months ended September 30, 2011, respectively, compared to the three and nine months ended September 30, 2010. The primary driver underlying the increases was lower funding costs from the replacement of debt at lower rates and favorable rate resets on floating-rate debt. In addition, the increases in net interest income and net interest yield for the nine months ended September 30, 2011 compared to the nine months ended September 30, 2010 were partially driven by the impact of a change in practice announced in February 2010 to purchase substantially all 120 day delinquent loans from PC trusts, as the average funding rate of the other debt used to purchase such loans from PC trusts is significantly less than the average funding rate of the debt securities of consolidated trusts held by third parties. These factors were partially offset by the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations and limited purchase activity.

We do not recognize interest income on non-performing loans that have been placed on nonaccrual status, except when cash payments are received. We refer to this interest income that we do not recognize as foregone interest income, and it includes interest income not recognized due to interest rate concessions granted on certain modified loans. Foregone interest income and reversals of previously recognized interest income, net of cash received, related to non-performing loans was $1.0 billion and $2.9 billion during the three and nine months ended September 30, 2011, respectively, compared to $1.1 billion and $3.6 billion during the three and nine months ended September 30, 2010, respectively, primarily due to the decreased volume of non-performing loans on nonaccrual status.

During the three and nine months ended September 30, 2011, spreads on our debt and our access to the debt markets remained favorable relative to historical levels. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

**Provision for Credit Losses**

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $70.5 billion, and have recorded an additional $4.4 billion in losses on loans purchased from our PCs, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred, and thus have not been provisioned for, we believe that, as of September 30, 2011, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for certain quarterly credit statistics for our single-family credit guarantee portfolio.

Our provision for credit losses was $3.6 billion for the third quarter of 2011 compared to $3.7 billion for the third quarter of 2010, and was $8.1 billion in the nine months ended September 30, 2011 compared to $14.2 billion in the nine months ended September 30, 2010. The provision for credit losses in the third quarter of 2011 reflects a decline in the volume of early and seriously delinquent loans, while the provision for credit losses in the nine months ended September 30, 2011 reflects declines in the rate at which delinquent loans transition into serious delinquency. The provision for credit losses in the three and nine months ended September 30, 2011 also reflects higher loss severity, primarily due to lower expectations for mortgage insurance recoveries, which is due to deterioration in the financial condition of certain of these counterparties during the 2011 periods. The provision for credit losses in the three and nine months ended September 30, 2010 also reflected a higher volume of completed loan modifications that were classified as TDRs. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for further information on our mortgage insurance counterparties.

During the nine months ended September 30, 2011, our charge-offs, net of recoveries for single-family loans, exceeded the amount of our provision for credit losses. Our charge-offs in the nine months ended September 30, 2011 remained elevated, but reflect suppression of activity due to delays in the foreclosure process and because market conditions, such as home prices and the rate of home sales, continue to remain weak. We believe the level of our charge-offs will continue to remain high in the remainder of 2011 and may increase in 2012. As of September 30, 2011 and December 31, 2010, the UPB of our single-family non-performing loans was $119.1 billion and $115.5 billion, respectively. These amounts include $42.2 billion and $26.6 billion, respectively, of single-family TDRs that are reperforming (*i.e.*, less than three months past due). See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, and our non-performing assets.

We continued to experience a high volume of completed loan modifications involving concessions to borrowers during the nine months ended September 30, 2011, but the volume of such modifications was less than the volume during the nine months ended September 30, 2010. See "Table 37 — Reperformance Rates of Modified Single-Family Loans" for information on the performance of our modified loans.

We adopted new accounting guidance related to the classification of loans as TDRs in the third quarter of 2011, which significantly increases the population of loans we account for and disclose as TDRs. The impact of this change in guidance on our results for the third quarter of 2011 was not significant. We expect that the number of loans that newly qualify as TDRs in the remainder of 2011 will remain high, primarily because we anticipate that the majority of our modifications, both completed and those still in trial periods will be considered TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for additional information on our TDR loans, including our implementation of changes to the accounting guidance for recognition of TDR loans.

While the total number of seriously delinquent loans declined approximately 10.5% during the nine months ended September 30, 2011, in part due to a significant volume of loan modifications, our serious delinquency rate remains high compared to historical levels due to the continued weakness in home prices, persistently high unemployment, extended foreclosure timelines and foreclosure suspensions in many states, and continued challenges faced by servicers processing large volumes of problem loans. Upon completion of a modification, a delinquent single-family loan is given a current payment status.

Our seller/servicers have an active role in our loan workout activities, including under the MHA Program, and a decline in their performance could result in a failure to realize the anticipated benefits of our loss mitigation plans. We believe that the servicing alignment initiative, which will establish a uniform framework and requirements for servicing non-performing loans owned or guaranteed by us and Fannie Mae, will ultimately change the way servicers communicate

and work with troubled borrowers, bring greater consistency and accountability to the servicing industry, and help more distressed homeowners avoid foreclosure.

Our provision (benefit) for credit losses associated with our multifamily mortgage portfolio was $(37) million and $19 million for the third quarters of 2011 and 2010, respectively, and was $(110) million in the nine months ended September 30, 2011 compared to $167 million in the nine months ended September 30, 2010. Our loan loss reserves associated with our multifamily mortgage portfolio were $656 million and $828 million as of September 30, 2011 and December 31, 2010, respectively. The decline in loan loss reserves for multifamily loans was driven primarily by positive market trends in vacancy rates and effective rents reflected over the past several consecutive quarters, as well as stabilizing or improved property values. However, some states in which we have investments in multifamily mortgage loans, including Nevada, Arizona, and Georgia, continue to exhibit weaker than average apartment fundamentals.

**Non-Interest Income (Loss)**

*Gains (Losses) on Extinguishment of Debt Securities of Consolidated Trusts*

When we purchase PCs that have been issued by consolidated PC trusts, we extinguish a pro rata portion of the outstanding debt securities of the related consolidated trusts. We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to extinguish the debt security differs from its carrying value. For the three months ended September 30, 2011 and 2010, we extinguished debt securities of consolidated trusts with a UPB of $22.8 billion and $10.7 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount), and our gains (losses) on extinguishment of these debt securities of consolidated trusts were $(310) million and $(66) million, respectively. The losses during the third quarter of 2011 were primarily due to the repurchase of our debt securities at larger net premiums driven by a decrease in interest rates during the period. For the nine months ended September 30, 2011 and 2010, we extinguished debt securities of consolidated trusts with a UPB of $69.8 billion and $13.2 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount), and our gains (losses) on extinguishment of these debt securities of consolidated trusts were $(212) million and $(160) million, respectively. The losses for the nine months ended September 30, 2011 were due to the repurchases of our debt securities at a net premium during the second and third quarters of 2011 driven by a decrease in interest rates during those periods. See "Table 18 — Total Mortgage-Related Securities Purchase Activity" for additional information regarding purchases of mortgage-related securities, including those issued by consolidated PC trusts.

*Gains (Losses) on Retirement of Other Debt*

Gains (losses) on retirement of other debt were $19 million and $(50) million during the three months ended September 30, 2011 and 2010, respectively, and $34 million and $(229) million during the nine months ended September 30, 2011 and 2010, respectively. We recognized gains on debt retirements for the third quarter and first nine months of 2011, compared to losses for the third quarter and first nine months of 2010, because we purchased debt with higher associated discounts in 2010 relative to the comparable periods in 2011.

*Gains (Losses) on Debt Recorded at Fair Value*

Gains (losses) on debt recorded at fair value primarily relate to changes in the fair value of our foreign-currency denominated debt. For the three and nine months ended September 30, 2011, we recognized gains on debt recorded at fair value of $133 million and $15 million, respectively, primarily due to the U.S. dollar strengthening relative to the Euro. For the three and nine months ended September 30, 2010, we recognized gains (losses) on debt recorded at fair value of $(366) million and $525 million, respectively, primarily due to the U.S. dollar strengthening relative to the Euro during the first six months of 2010, followed by the U.S. dollar weakening relative to the Euro during the third quarter of 2010. We mitigate changes in the fair value of our foreign-currency denominated debt by using foreign currency swaps and foreign-currency denominated interest-rate swaps.

*Derivative Gains (Losses)*

Table 7 presents derivative gains (losses) reported in our consolidated statements of income and comprehensive income. See "NOTE 11: DERIVATIVES — Table 11.2 — Gains and Losses on Derivatives" for information about gains and losses related to specific categories of derivatives. Changes in fair value and interest accruals on derivatives not in hedge accounting relationships are recorded as derivative gains (losses) in our consolidated statements of income and comprehensive income. At September 30, 2011 and December 31, 2010, we did not have any derivatives in hedge accounting relationships; however, there are amounts recorded in AOCI related to discontinued cash flow hedges. Amounts recorded in AOCI associated with these closed cash flow hedges are reclassified to earnings when the forecasted

transactions affect earnings. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the forecasted transaction is reclassified into earnings immediately.

While derivatives are an important aspect of our strategy to manage interest-rate risk, they generally increase the volatility of reported net income (loss), because, while fair value changes in derivatives affect net income, fair value changes in several of the types of assets and liabilities being hedged do not affect net income.

**Table 7 — Derivatives Gains (Losses)**

| | Derivative Gains (Losses) | | | |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Interest-rate swaps | $(8,278) | $(3,963) | $(10,304) | $(14,235) |
| Option-based derivatives[1] | 5,887 | 3,303 | 6,682 | 8,585 |
| Other derivatives[2] | (1,092) | 475 | (1,494) | (498) |
| Accrual of periodic settlements[3] | (1,269) | (945) | (3,870) | (3,505) |
| Total | $(4,752) | $(1,130) | $ (8,986) | $ (9,653) |

(1) Primarily includes purchased call and put swaptions and purchased interest-rate caps and floors.
(2) Includes futures, foreign-currency swaps, commitments, swap guarantee derivatives, and credit derivatives. Foreign-currency swaps are defined as swaps in which net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars. Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.
(3) Includes imputed interest on zero-coupon swaps.

Gains (losses) on derivatives not accounted for in hedge accounting relationships are principally driven by changes in: (a) interest rates and implied volatility; and (b) the mix and volume of derivatives in our derivatives portfolio.

During the three and nine months ended September 30, 2011, we recognized losses on derivatives of $4.8 billion and $9.0 billion, respectively, primarily due to declines in interest rates in the second and third quarters. Specifically, during the three months and nine months ended September 30, 2011, we recognized fair value losses on our pay-fixed swap positions of $19.1 billion and $22.4 billion, respectively, partially offset by fair value gains on our receive-fixed swaps of $10.8 billion and $12.1 billion, respectively. We also recognized fair value gains of $5.9 billion and $6.7 billion during the three and nine months ended September 30, 2011, respectively, on our option-based derivatives, resulting from gains on our purchased call swaptions as interest rates decreased during the second and third quarters of 2011. Additionally, we recognized losses related to the accrual of periodic settlements during the three and nine months ended September 30, 2011 due to our net pay-fixed swap position in the current interest rate environment.

During the three and nine months ended September 30, 2010, the yield curve flattened, with declining interest rates, resulting in a loss on derivatives of $1.1 billion and $9.7 billion, respectively. Specifically, for the three and nine months ended September 30, 2010, the decrease in interest rates resulted in fair value losses on our pay-fixed swaps of $11.5 billion and $34.9 billion, respectively, partially offset by fair value gains on our receive-fixed swaps of $7.5 billion and $20.6 billion, respectively. We recognized fair value gains for the three and nine months ended September 30, 2010 of $3.3 billion and $8.6 billion, respectively, on our option-based derivatives, resulting from gains on our purchased call swaptions primarily due to the declines in interest rates during these periods.

### *Investment Securities-Related Activities*

#### *Impairments of Available-For-Sale Securities*

We recorded net impairments of available-for-sale securities recognized in earnings, which were related to non-agency mortgage-related securities, of $161 million and $1.7 billion during the three and nine months ended September 30, 2011, respectively, compared to $1.1 billion and $2.0 billion during the three and nine months ended September — 30, 2010, respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" and "NOTE 7: INVESTMENTS IN SECURITIES" for information regarding the accounting principles for investments in debt and equity securities and the other-than-temporary impairments recorded during the three and nine months ended September 30, 2011 and 2010.

#### *Other Gains (Losses) on Investment Securities Recognized in Earnings*

Other gains (losses) on investment securities recognized in earnings primarily consists of gains (losses) on trading securities. We recognized $(547) million and $(473) million related to gains (losses) on trading securities during the three

and nine months ended September 30, 2011, respectively, compared to $(561) million and $(1.3) billion related to gains (losses) on trading securities during the three and nine months ended September 30, 2010, respectively.

The losses on trading securities for all periods presented were primarily due to the movement of securities with unrealized gains towards maturity, partially offset by fair value gains due to a decline in interest rates.

During the three and nine months ended September 30, 2011 the decreased losses on trading securities as compared to the three and nine months ended September 30, 2010 were primarily due to a tightening of OAS levels on agency securities and a decline in interest rates.

*Other Income*

Table 8 summarizes the significant components of other income.

**Table 8 — Other Income**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Other income: | | | | |
| Guarantee-related income | $ 40 | $ 58 | $ 175 | $ 177 |
| Gains on sale of mortgage loans | 46 | 28 | 302 | 244 |
| Gains on mortgage loans recorded at fair value | 216 | 128 | 319 | 154 |
| Recoveries on loans impaired upon purchase | 119 | 247 | 376 | 643 |
| All other | 393 | 108 | 228 | 386 |
| Total other income | $814 | $569 | $1,400 | $1,604 |

Other income increased to $814 million in the three months ended September 30, 2011, compared to $569 million in the three months ended September 30, 2010, primarily due to the recognition of a gain from the settlement of our claim in the bankruptcy of TBW, one of our former seller/servicers, and an adjustment to the amount recorded in the prior period to correct an accounting error.

Other income declined during the nine months ended September 30, 2011, compared to the same period in 2010, primarily due to lower recoveries on loans impaired upon purchase during the 2011 period and a decline in all other income. All other income declined to $228 million during the nine months ended September 30, 2011, compared to $386 million during the nine months ended September 30, 2010, primarily due to the correction in 2011 of certain prior period accounting errors not material to our financial statements. During the nine months ended September 30, 2011, other income includes the correction of prior period accounting errors associated with the accrual of interest income for certain impaired mortgage-related securities during 2010 and 2009. This correction reduced other income in 2011 by approximately $293 million in the second quarter of 2011, and increased other income by $122 million in the third quarter of 2011 for a net decrease of approximately $171 million in the nine months ended September 30, 2011. Partially offsetting the decline in other income was an increase in gains on mortgage loans recorded at fair value during the nine months ended September 30, 2011, which was primarily due to declines in interest rates combined with higher balances of loans recorded at fair value during the 2011 period.

During the third quarters of 2011 and 2010, recoveries on loans impaired upon purchase were $119 million and $247 million, respectively, and were $376 million in the nine months ended September 30, 2011, compared to $643 million in the nine months ended September 30, 2010. The declines in the 2011 periods were due to a lower volume of foreclosure transfers associated with loans impaired upon purchase. These recoveries principally relate to impaired loans purchased prior to January 1, 2010, due to a change in accounting guidance effective on that date. Consequently, our recoveries on loans impaired upon purchase will generally continue to decline over time.

**Non-Interest Expense**

Table 9 summarizes the components of non-interest expense.

**Table 9 — Non-Interest Expense**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | | (in millions) | | |
| Administrative expenses:[1] | | | | |
| Salaries and employee benefits | $212 | $224 | $ 638 | $ 688 |
| Professional services | 73 | 72 | 193 | 220 |
| Occupancy expense | 14 | 16 | 44 | 47 |
| Other administrative expense | 82 | 76 | 251 | 242 |
| Total administrative expenses | 381 | 388 | 1,126 | 1,197 |
| REO operations expense | 221 | 337 | 505 | 456 |
| Other expenses | 85 | 103 | 299 | 321 |
| Total non-interest expense | $687 | $828 | $1,930 | $1,974 |

(1) Commencing in the first quarter of 2011, we reclassified certain expenses from other expenses to professional services expense. Prior period amounts have been reclassified to conform to the current presentation.

*Administrative Expenses*

Administrative expenses decreased for the three and nine months ended September 30, 2011, compared to the three and nine months ended September 30, 2010, due in part to our ongoing focus on cost reduction measures, particularly with regard to salaries and employee benefits. We expect our administrative expenses will decline for the full year of 2011 when compared to 2010.

*REO Operations Expense*

The table below presents the components of our REO operations expense, and REO inventory and disposition information.

**Table 10 — REO Operations Expense, REO Inventory, and REO Dispositions**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | | (dollars in millions) | | |
| REO operations expense: | | | | |
| Single-family: | | | | |
| REO property expenses[1] | $ 298 | $ 336 | $ 906 | $ 820 |
| Disposition (gains) losses, net[2][3] | 29 | 33 | 211 | 7 |
| Change in holding period allowance, dispositions | (87) | (40) | (371) | (167) |
| Change in holding period allowance, inventory[4] | 127 | 250 | 283 | 367 |
| Recoveries[5] | (141) | (242) | (511) | (575) |
| Total single-family REO operations expense | 226 | 337 | 518 | 452 |
| Multifamily REO operations expense (income) | (5) | — | (13) | 4 |
| Total REO operations expense | $ 221 | $ 337 | $ 505 | $ 456 |
| REO inventory (in properties), at September 30: | | | | |
| Single-family | 59,596 | 74,897 | 59,596 | 74,897 |
| Multifamily | 20 | 13 | 20 | 13 |
| Total | 59,616 | 74,910 | 59,616 | 74,910 |
| REO property dispositions (in properties) | 25,387 | 26,336 | 86,370 | 74,621 |

(1) Consists of costs incurred to acquire, maintain or protect a property after it is acquired in a foreclosure transfer, such as legal fees, insurance, taxes, and cleaning and other maintenance charges.
(2) Represents the difference between the disposition proceeds, net of selling expenses, and the fair value of the property on the date of the foreclosure transfer.
(3) Commencing in the first quarter of 2011, we reclassified expenses related to the disposition of REO underlying Other Guarantee Transactions from REO property expense to disposition (gains) losses, net. Prior periods have been revised to conform to the current presentation.
(4) Represents the (increase) decrease in the estimated fair value of properties that were in inventory during the period.
(5) Includes recoveries from primary mortgage insurance, pool insurance and seller/servicer repurchases.

REO operations expense was $221 million for the third quarter of 2011, as compared to $337 million during the third quarter of 2010, and was $505 million in the nine months ended September 30, 2011 compared to $456 million for the nine months ended September 30, 2010. The decline in REO operations expense in the third quarter of 2011, compared to the third quarter of 2010, was primarily due to the impact of a less significant decline in home prices resulting in lower write-downs of single-family REO inventory, partially offset by lower recoveries on sold properties during the third

quarter of 2011. Although REO operations expense was relatively unchanged for the nine months ended September 30, 2011, compared to the nine months ended September 30, 2010, the 2011 period reflects higher single-family property expenses and lower recoveries on sold properties partially offset by lower write-downs of single-family REO inventory, compared to the 2010 period. We expect REO property expenses to continue to remain high in the remainder of 2011 and into 2012 due to expected continued high levels of single-family REO acquisitions and inventory.

In recent periods, the volume of our single-family REO acquisitions has been less than it otherwise would have been due to delays caused by concerns about the foreclosure process, including deficiencies in foreclosure documentation practices, particularly in states that require a judicial foreclosure process. The acquisition slowdown, coupled with high disposition levels, led to an approximate 17% reduction in REO property inventory from December 31, 2010 to September 30, 2011. We expect these delays in the foreclosure process will likely continue into 2012. For more information on how concerns about foreclosure documentation practices could adversely affect our REO operations expense, see "RISK FACTORS — Operational Risks — *We have incurred and could continue to incur expenses and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process*" in our 2010 Annual Report. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

**Other Expenses**

Other expenses consist primarily of HAMP servicer incentive fees, costs related to terminations and transfers of mortgage servicing, and other miscellaneous expenses. Other expenses were lower in the three and nine months ended September 30, 2011 compared to the three and nine months ended September 30, 2010, primarily due to lower expenses associated with transfers and terminations of mortgage servicing, partially offset by higher servicer incentive fees associated with HAMP during the 2011 periods.

**Income Tax Benefit**

For the three months ended September 30, 2011 and 2010, we reported an income tax benefit of $56 million and $411 million, respectively. For the nine months ended September 30, 2011 and 2010, we reported an income tax benefit of $362 million and $800 million, respectively. See "NOTE 13: INCOME TAXES" for additional information.

**Total Comprehensive Income (Loss)**

Our total comprehensive income (loss) was $(4.4) billion and $1.4 billion for the three months ended September 30, 2011 and 2010, respectively, consisting of: (a) $(4.4) billion and $(2.5) billion of net income (loss), respectively; and (b) $46 million and $3.9 billion of total other comprehensive income, respectively.

Our total comprehensive income (loss) was $(2.7) billion and $(0.9) billion for the nine months ended September 30, 2011 and 2010, respectively, consisting of: (a) $(5.9) billion and $(13.9) billion of net income (loss), respectively; and (b) $3.1 billion and $13.0 billion of total other comprehensive income, respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Total Equity (Deficit)" for additional information regarding total other comprehensive income (loss).

**Segment Earnings**

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. Certain activities that are not part of a reportable segment are included in the All Other category.

The Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans funded by other debt issuances and hedged using derivatives. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. The Investments segment also reflects the impact of changes in fair value of CMBS and multifamily held-for-sale loans associated with changes in interest rates.

The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related securities in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less the credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses.

The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, our purchases of such loans have declined significantly since 2010 and our purchases of such CMBS have declined significantly since 2008. Currently, our primary strategy is to purchase multifamily mortgage loans for purposes of aggregation and then securitization. We guarantee the senior tranches of these securitizations. The Multifamily segment does not issue REMIC securities but does issue Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less allocated funding costs, the credit-related expenses, and administrative expenses. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated only with factors other than changes in interest rates, such as liquidity and credit.

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. The financial performance of our segments is measured based on each segment's contribution to GAAP net income (loss). In addition, our Investments segment is measured on its contribution to GAAP total comprehensive income (loss). The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods. The All Other category also includes the deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward.

In presenting Segment Earnings, we make significant reclassifications to certain financial statement line items in order to reflect a measure of net interest income on investments, and a measure of management and guarantee income on guarantees, that is in line with how we manage our business. We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of income and comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments.

As a result of these reclassifications and allocations, Segment Earnings for our reportable segments differs significantly from, and should not be used as a substitute for, net income (loss) as determined in accordance with GAAP. Our definition of Segment Earnings may differ from similar measures used by other companies. However, we believe that Segment Earnings provides us with meaningful metrics to assess the financial performance of each segment and our company as a whole.

See "NOTE 17: SEGMENT REPORTING" in our 2010 Annual Report for further information regarding our segments, including the descriptions and activities of the segments and the reclassifications and allocations used to present Segment Earnings.

Table 11 provides information about our various segment mortgage portfolios at September 30, 2011 and December 31, 2010. For a discussion of each segment's portfolios, see "*Segment Earnings — Results*."

### Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios[1]

| | September 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| **Segment mortgage portfolios:** | | |
| *Investments — Mortgage investments portfolio:* | | |
| Single-family unsecuritized mortgage loans[2] | $ 98,115 | $ 79,097 |
| Freddie Mac mortgage-related securities | 251,242 | 263,152 |
| Non-agency mortgage-related securities | 88,857 | 99,639 |
| Non-Freddie Mac agency mortgage-related securities | 35,416 | 39,789 |
| Total Investments — Mortgage investments portfolio | 473,630 | 481,677 |
| *Single-family Guarantee — Managed loan portfolio:*[3] | | |
| Single-family unsecuritized mortgage loans[4] | 63,237 | 69,766 |
| Single-family Freddie Mac mortgage-related securities held by us | 251,242 | 261,508 |
| Single-family Freddie Mac mortgage-related securities held by third parties | 1,394,200 | 1,437,399 |
| Single-family other guarantee commitments[5] | 11,437 | 8,632 |
| Total Single-family Guarantee — Managed loan portfolio | 1,720,116 | 1,777,305 |
| *Multifamily — Guarantee portfolio:*[3] | | |
| Multifamily Freddie Mac mortgage related securities held by us | 2,813 | 2,095 |
| Multifamily Freddie Mac mortgage related securities held by third parties | 19,587 | 11,916 |
| Multifamily other guarantee commitments[5] | 9,812 | 10,038 |
| Total Multifamily — Guarantee portfolio | 32,212 | 24,049 |
| *Multifamily — Mortgage investments portfolio*[3] | | |
| Multifamily investment securities portfolio | 60,675 | 59,548 |
| Multifamily loan portfolio | 81,591 | 85,883 |
| Total Multifamily — Mortgage investments portfolio | 142,266 | 145,431 |
| Total Multifamily portfolio | 174,478 | 169,480 |
| Less : Freddie Mac single-family and certain multifamily securities[6] | (254,055) | (263,603) |
| **Total mortgage portfolio** | $2,114,169 | $2,164,859 |
| **Credit risk portfolios:**[7] | | |
| *Single-family credit guarantee portfolio:* | | |
| Single-family mortgage loans, on-balance sheet | $1,771,717 | $1,799,256 |
| Non-consolidated Freddie Mac mortgage-related securities | 10,884 | 11,268 |
| Other guarantee commitments | 11,437 | 8,632 |
| Less: HFA-related guarantees[8] | (8,885) | (9,322) |
| Less: Freddie Mac mortgage-related securities backed by Ginnie Mae certificates[8] | (817) | (857) |
| Total single-family credit guarantee portfolio | $1,784,336 | $1,808,977 |
| *Multifamily mortgage portfolio:* | | |
| Multifamily mortgage loans, on-balance sheet | $ 81,591 | $ 85,883 |
| Non-consolidated Freddie Mac mortgage-related securities | 22,400 | 14,011 |
| Other guarantee commitments | 9,812 | 10,038 |
| Less: HFA-related guarantees[8] | (1,449) | (1,551) |
| Total multifamily mortgage portfolio | $ 112,354 | $ 108,381 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Excludes unsecuritized non-accrual single-family loans managed by the Single-family Guarantee segment. However, the Single-family Guarantee segment continues to earn management and guarantee fees associated with unsecuritized single-family loans in the Investments segment.
(3) The balances of the mortgage-related securities in these portfolios are based on the UPB of the security, whereas the balances of our single-family credit guarantee and multifamily mortgage portfolios presented in this report are based on the UPB of the mortgage loans underlying the related security. The differences in the loan and security balances result from the timing of remittances to security holders, which is typically 45 or 75 days after the mortgage payment cycle of fixed-rate and ARM PCs, respectively.
(4) Represents unsecuritized non-accrual single-family loans managed by the Single-family Guarantee segment.
(5) Represents the UPB of mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.
(6) Freddie Mac single-family mortgage-related securities held by us are included in both our Investments segment's mortgage investments portfolio and our Single-family Guarantee segment's managed loan portfolio, and Freddie Mac multifamily mortgage-related securities held by us are included in both the multifamily investment securities portfolio and the multifamily guarantee portfolio. Therefore, these amounts are deducted in order to reconcile to our total mortgage portfolio.
(7) Represents the UPB of loans for which we present characteristics, delinquency data, and certain other statistics in this report. See "GLOSSARY" for further description.
(8) We exclude HFA-related guarantees and our resecuritizations of Ginnie Mae certificates from our credit risk portfolios and most related statistics because these guarantees do not expose us to meaningful amounts of credit risk due to the credit enhancement provided on these by the U.S. government.

**Segment Earnings — Results**

*Investments*

Table 12 presents the Segment Earnings of our Investments segment.

**Table 12 — Segment Earnings and Key Metrics — Investments**[1]

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (dollars in millions) | | | |
| Segment Earnings: | | | | |
| Net interest income | $ 1,905 | $ 1,667 | $ 5,384 | $ 4,487 |
| Non-interest income (loss): | | | | |
| Net impairment of available-for-sale securities | (116) | (934) | (1,284) | (1,637) |
| Derivative gains (losses) | (3,144) | 192 | (4,197) | (4,703) |
| Other non-interest income (loss) | 178 | (768) | 657 | (496) |
| Total non-interest income (loss) | (3,082) | (1,510) | (4,824) | (6,836) |
| Non-interest expense: | | | | |
| Administrative expenses | (97) | (110) | (293) | (343) |
| Other non-interest expense | (1) | (1) | (2) | (14) |
| Total non-interest expense | (98) | (111) | (295) | (357) |
| Segment adjustments[2] | 137 | 272 | 466 | 1,076 |
| Segment Earnings (loss) before income tax benefit (expense) | (1,138) | 318 | 731 | (1,630) |
| Income tax benefit (expense) | 59 | (34) | 337 | 192 |
| Segment Earnings (loss), net of taxes, including noncontrolling interest | (1,079) | 284 | 1,068 | (1,438) |
| Less: Net (income) loss — noncontrolling interest | — | — | — | (2) |
| Segment Earnings (loss), net of taxes | (1,079) | 284 | 1,068 | (1,440) |
| Total other comprehensive income, net of taxes | 1,347 | 3,317 | 3,106 | 10,051 |
| Total comprehensive income | $ 268 | $ 3,601 | $ 4,174 | $ 8,611 |
| Key metrics — Investments: | | | | |
| *Portfolio balances:* | | | | |
| Average balances of interest-earning assets:[3][4][5] | | | | |
| Mortgage-related securities[6] | $387,428 | $439,073 | $393,301 | $482,660 |
| Non-mortgage-related investments[7] | 85,819 | 123,241 | 97,505 | 125,912 |
| Unsecuritized single-family loans | 97,059 | 64,517 | 91,638 | 53,753 |
| Total average balances of interest-earning assets | $570,306 | $626,831 | $582,444 | $662,325 |
| *Return:* | | | | |
| Net interest yield — Segment Earnings basis (annualized) | 1.34% | 1.06% | 1.23% | 0.90% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15: SEGMENT REPORTING — Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."
(2) For a description of our segment adjustments, see "NOTE 15: SEGMENT REPORTING — Segment Earnings."
(3) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(4) Excludes non-performing single-family mortgage loans.
(5) We calculate average balances based on amortized cost.
(6) Includes our investments in single-family PCs and certain Other Guarantee Transactions, which have been consolidated under GAAP on our consolidated balance sheet since January 1, 2010.
(7) Includes the average balances of interest-earning cash and cash equivalents, non-mortgage-related securities, and federal funds sold and securities purchased under agreements to resell.

Our total comprehensive income for our Investments segment was $268 million and $4.2 billion for the three and nine months ended September 30, 2011, respectively, consisting of: (a) $(1.1) billion and $1.1 billion of Segment Earnings (loss), respectively; and (b) $1.3 billion and $3.1 billion of total other comprehensive income, respectively.

Our total comprehensive income for our Investments segment was $3.6 billion and $8.6 billion for the three and nine months ended September 30, 2010, respectively, consisting of: (a) $284 million and $(1.4) billion of Segment Earnings (loss), respectively; and (b) $3.3 billion and $10.1 billion of total other comprehensive income, respectively.

During the three and nine months ended September 30, 2011, the UPB of the Investments segment mortgage investments portfolio decreased at an annualized rate of 3.0% and 2.2%, respectively. We held $286.7 billion of agency securities and $88.9 billion of non-agency mortgage-related securities as of September 30, 2011 compared to $302.9 billion of agency securities and $99.6 billion of non-agency mortgage-related securities as of December 31, 2010. The decline in UPB of agency securities is due mainly to liquidations, including prepayments and selected sales. The decline in UPB of non-agency mortgage-related securities is due mainly to the receipt of monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral, representing a partial return of our investments in these securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for additional information regarding our mortgage-related securities.

Segment Earnings net interest income increased $238 million and $897 million, and Segment Earnings net interest yield increased 28 basis points and 33 basis points during the three and nine months ended September 30, 2011, respectively, compared to the three and nine months ended September 30, 2010. The primary driver was lower funding costs, primarily due to the replacement of debt at lower rates and favorable rate resets on floating-rate debt. These lower funding costs were partially offset by the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations.

Segment Earnings non-interest income (loss) was $(3.1) billion for the three months ended September 30, 2011 compared to $(1.5) billion for the three months ended September 30, 2010. This increase in non-interest loss was primarily attributable to increased derivative losses, partially offset by decreased impairments of available-for-sale securities. Segment Earnings non-interest income (loss) was $(4.8) billion for the nine months ended September 30, 2011 compared to $(6.8) billion for the nine months ended September 30, 2010. This decrease in non-interest loss was mainly due to decreased derivative losses, primarily due to a smaller decline in interest rates, and decreased losses on trading securities, primarily due to a smaller decline in interest rates coupled with tightening OAS levels on agency securities, during the nine months ended September 30, 2011, compared to the nine months ended September 30, 2010.

We recorded derivative gains (losses) for this segment of $(3.1) billion and $(4.2) billion during the three and nine months ended September 30, 2011, respectively, compared to $192 million and $(4.7) billion during the three and nine months ended September 30, 2010. While derivatives are an important aspect of our strategy to manage interest-rate risk, they generally increase the volatility of reported Segment Earnings, because while fair value changes in derivatives affect Segment Earnings, fair value changes in several of the types of assets and liabilities being hedged do not affect Segment Earnings. During the three and nine months ended September 30, 2011 and the three and nine months ended September 30, 2010, swap interest rates decreased, resulting in fair value losses on our pay-fixed swaps that were partially offset by fair value gains on our receive-fixed swaps and purchased call swaptions. See "Non-Interest Income (Loss) — Derivative Gains (Losses)" for additional information on our derivatives.

Impairments recorded in our Investments segment decreased by $818 million and $353 million during the three and nine months ended September 30, 2011, compared to the three and nine months ended September 30, 2010. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities" for additional information on our impairments.

Our Investments segment's total other comprehensive income was $1.3 billion and $3.1 billion for the three and nine months ended September 30, 2011, respectively. Net unrealized losses in AOCI on our available-for-sale securities decreased by $1.2 billion and $2.7 billion during the three and nine months ended September 30, 2011, respectively, primarily attributable to the impact of declining interest rates, resulting in fair value gains on our agency and CMBS securities, and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities, partially offset by the impact of widening of OAS levels on our non-agency mortgage-related securities. The impact of widening of OAS levels on our CMBS securities is reflected in the Multifamily segment.

Our Investments segment's total other comprehensive income was $3.3 billion and $10.1 billion during the three and nine months ended September 30, 2010, respectively. Net unrealized losses in AOCI on our available-for-sale securities decreased by $3.2 billion and $9.5 billion during the three and nine months ended September 30, 2010, respectively, primarily attributable to the impact of declining interest rates, resulting in fair value gains on our agency, CMBS, and non-agency mortgage-related securities. In addition, the impact of widening OAS levels during these periods was offset by fair value gains related to the movement of securities with unrealized losses towards maturity and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities.

The objectives set forth for us under our charter and conservatorship, restrictions set forth in the Purchase Agreement and restrictions imposed by FHFA have negatively impacted, and will continue to negatively impact, our Investments segment results. For example, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. This will likely cause a corresponding reduction in our net interest income from these assets and therefore negatively affect our Investments segment results. FHFA also stated that we will not be a substantial buyer of mortgages for our mortgage-related investments portfolio, except for purchases of seriously delinquent mortgages out of PC trusts. FHFA has also indicated that the portfolio reduction targets under the Purchase Agreement and FHFA regulation should be viewed as minimum reductions and has encouraged us to reduce the mortgage-related investments portfolio at a faster rate than required, consistent with FHFA guidance, safety and soundness and the goal of conserving and preserving assets. We are also subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury.

For information on the impact of the requirement to reduce the mortgage-related investments portfolio limit by 10% annually, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Impact of the Purchase Agreement and FHFA Regulation on the Mortgage-Related Investments Portfolio."

*Single-Family Guarantee*

Table 13 presents the Segment Earnings of our Single-family Guarantee segment.

### Table 13 — Segment Earnings and Key Metrics — Single-Family Guarantee[1]

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (dollars in millions) | | | |
| **Segment Earnings:** | | | | |
| Net interest income (expense) | $ (98) | $ (4) | $ (28) | $ 106 |
| Provision for credit losses | (4,008) | (3,980) | (9,178) | (15,315) |
| Non-interest income: | | | | |
| Management and guarantee income | 913 | 922 | 2,631 | 2,635 |
| Other non-interest income | 331 | 307 | 750 | 785 |
| Total non-interest income | 1,244 | 1,229 | 3,381 | 3,420 |
| Non-interest expense: | | | | |
| Administrative expenses | (227) | (224) | (670) | (695) |
| REO operations (expense) income | (226) | (337) | (518) | (452) |
| Other non-interest expense | (69) | (85) | (241) | (254) |
| Total non-interest expense | (522) | (646) | (1,429) | (1,401) |
| Segment adjustments[2] | (161) | (245) | (489) | (666) |
| Segment Earnings (loss) before income tax (expense) benefit | (3,545) | (3,646) | (7,743) | (13,856) |
| Income tax (expense) benefit | — | 508 | (8) | 617 |
| Segment Earnings (loss), net of taxes | (3,545) | (3,138) | (7,751) | (13,239) |
| Total other comprehensive income (loss), net of taxes | — | 1 | (3) | (2) |
| Total comprehensive income (loss) | $(3,545) | $(3,137) | $(7,754) | $(13,241) |
| **Key metrics — Single-family Guarantee:** | | | | |
| *Balances and Growth (in billions, except rate):* | | | | |
| Average balance of single-family credit guarantee portfolio | $ 1,800 | $ 1,858 | $ 1,811 | $ 1,873 |
| Issuance — Single-family credit guarantees[3] | $ 68 | $ 91 | $ 226 | $ 261 |
| Fixed-rate products — Percentage of purchases[4] | 88.6% | 95.0% | 91.4% | 95.6% |
| Liquidation rate — Single-family credit guarantees (annualized)[5] | 19.9% | 26.2% | 21.6% | 26.9% |
| *Management and Guarantee Fee Rate (in bps, annualized):* | | | | |
| Contractual management and guarantee fees | 13.8 | 13.5 | 13.7 | 13.4 |
| Amortization of delivery fees | 6.5 | 6.4 | 5.7 | 5.4 |
| Segment Earnings management and guarantee income | 20.3 | 19.9 | 19.4 | 18.8 |
| *Credit:* | | | | |
| Serious delinquency rate, at end of period | 3.51% | 3.80% | 3.51% | 3.80% |
| REO inventory, at end of period (number of properties) | 59,596 | 74,897 | 59,596 | 74,897 |
| Single-family credit losses, in bps (annualized)[6] | 76.3 | 91.0 | 71.9 | 78.4 |
| *Market:* | | | | |
| Single-family mortgage debt outstanding (total U.S. market, in billions)[7] | $ 9,920 | $10,094 | $ 9,920 | $ 10,094 |
| 30-year fixed mortgage rate[8] | 4.0% | 4.3% | 4.0% | 4.3% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15: SEGMENT REPORTING — Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."
(2) For a description of our segment adjustments, see "NOTE 15: SEGMENT REPORTING — Segment Earnings."
(3) Based on UPB.
(4) Excludes Other Guarantee Transactions.
(5) Represents principal repayments relating to loans underlying Freddie Mac mortgage-related securities and other guarantee commitments. Also includes our purchases of seriously delinquent and modified mortgage loans and balloon/reset mortgage loans out of PC pools.
(6) Calculated as the amount of single-family credit losses divided by the sum of the average carrying value of our single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees. Credit losses are equal to charge-offs, plus REO operations income (expense).
(7) Source: Federal Reserve Flow of Funds Accounts of the United States of America dated September 16, 2011. The outstanding amount for September 30, 2011 reflects the balance as of June 30, 2011, which is the latest available information.
(8) Based on Freddie Mac's Primary Mortgage Market Survey rate for the last week in the period, which represents the national average mortgage commitment rate to a qualified borrower exclusive of any fees and points required by the lender. This commitment rate applies only to financing on conforming mortgages with LTV ratios of 80%.

*Financial Results*

For the three and nine months ended September 30, 2011, Segment Earnings (loss) for our Single-family Guarantee segment was $(3.5) billion and $(7.8) billion, respectively, compared to $(3.1) billion and $(13.2) billion for the three and nine months ended September 30, 2010, respectively. Segment Earnings (loss) for our Single-family Guarantee segment worsened for the three months ended September 30, 2011 compared to the three months ended September 30, 2010

primarily due to a decrease in recognized income tax benefit. Segment Earnings (loss) for our Single-family Guarantee segment improved for the nine months ended September 30, 2011 compared to the nine months ended September 30, 2010 primarily due to a decline in provision for credit losses.

During the three and nine months ended September 30, 2011, our provision for credit losses for the Single-family Guarantee segment was $4.0 billion and $9.2 billion, respectively, compared to $4.0 billion and $15.3 billion during the three and nine months ended September 30, 2010, respectively. The Segment Earnings provision for credit losses in the third quarter of 2011 reflects a decline in the volume of early and seriously delinquent loans, while the provision for credit losses in the nine months ended September 30, 2011 reflects declines in the rate at which delinquent loans transition into serious delinquency. The Segment Earnings provision for credit losses in the three and nine months ended September 30, 2011 also reflects higher loss severity, primarily due to lower expectations for mortgage insurance recoveries, which is due to deterioration in the financial condition of certain of these counterparties during the 2011 periods. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for further information on our mortgage insurance counterparties. The Segment Earnings provision for credit losses in the three and nine months ended September 30, 2010 also reflected a higher volume of completed loan modifications that were classified as TDRs.

We adopted new accounting guidance on the classification of loans as TDRs in the third quarter of 2011, which significantly increases the population of loans we account for and disclose as TDRs. The impact of this change in guidance on our results for the third quarter of 2011 was not significant. We expect that the number of loans that newly qualify as TDRs in the remainder of 2011 will remain high, primarily because we anticipate that the majority of our modifications, both completed and those still in trial periods will be considered TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for additional information on our TDR loans, including our implementation of changes to the accounting guidance for recognition of TDR loans.

Segment Earnings management and guarantee income decreased slightly in the three and nine months ended September 30, 2011, as compared to the three and nine months ended September 30, 2010, primarily due to lower average balances of the single-family credit guarantee portfolio during the 2011 periods.

On September 19, 2011, the Acting Director of FHFA stated that he would anticipate Freddie Mac and Fannie Mae will continue the gradual process of increasing guarantee fees. He stated that this will not happen immediately but should be expected in 2012. President Obama's Plan for Economic Growth and Deficit Reduction, announced on September 19, 2011, contained a proposal to increase the guarantee fees charged by Freddie Mac and Fannie Mae by 10 basis points.

Table 14 provides summary information about the composition of Segment Earnings (loss) for this segment in the three and nine months ended September 30, 2011.

**Table 14 — Segment Earnings Composition — Single-Family Guarantee Segment**

| | Three Months Ended September 30, 2011 | | | | |
|---|---|---|---|---|---|
| | Segment Earnings Management and Guarantee Income[1] | | Credit Expenses[2] | | Net Amount[4] |
| | Amount | Average Rate[3] | Amount | Average Rate[3] | |
| | (dollars in millions, rates in bps) | | | | |
| Year of origination:[5] | | | | | |
| 2011 | $ 111 | 22.2 | $ (25) | 5.7 | $ 86 |
| 2010 | 186 | 22.0 | (85) | 9.8 | 101 |
| 2009 | 176 | 20.5 | (97) | 11.0 | 79 |
| 2008 | 89 | 22.4 | (466) | 141.3 | (377) |
| 2007 | 87 | 18.2 | (1,426) | 320.1 | (1,339) |
| 2006 | 57 | 18.4 | (991) | 296.7 | (934) |
| 2005 | 66 | 18.3 | (631) | 165.6 | (565) |
| 2004 and prior | 141 | 18.9 | (513) | 61.9 | (372) |
| Total | $ 913 | 20.3 | $(4,234) | 94.0 | $(3,321) |
| Administrative expenses | | | | | (227) |
| Net interest income (expense) | | | | | (98) |
| Other non-interest income and expenses, net | | | | | 101 |
| Segment Earnings (loss), net of taxes | | | | | $(3,545) |

| | Nine Months Ended September 30, 2011 | | | | |
|---|---|---|---|---|---|
| | Segment Earnings Management and Guarantee Income[1] | | Credit Expenses[2] | | Net Amount[4] |
| | Amount | Average Rate[3] | Amount | Average Rate[3] | |
| | (dollars in millions, rates in bps) | | | | |
| Year of origination:[5] | | | | | |
| 2011 | $ 202 | 19.9 | $ (40) | 5.0 | $ 162 |
| 2010 | 555 | 21.2 | (199) | 7.4 | 356 |
| 2009 | 498 | 18.7 | (211) | 7.7 | 287 |
| 2008 | 292 | 23.1 | (879) | 83.7 | (587) |
| 2007 | 283 | 18.6 | (3,320) | 236.8 | (3,037) |
| 2006 | 172 | 17.4 | (2,483) | 237.4 | (2,311) |
| 2005 | 194 | 17.1 | (1,525) | 127.3 | (1,331) |
| 2004 and prior | 435 | 18.3 | (1,039) | 39.5 | (604) |
| Total | $2,631 | 19.4 | $(9,696) | 71.4 | $(7,065) |
| Administrative expenses | | | | | (670) |
| Net interest income (expense) | | | | | (28) |
| Other non-interest income and expenses, net | | | | | 12 |
| Segment Earnings (loss), net of taxes | | | | | $(7,751) |

(1) Includes amortization of delivery fees of $293 and $769 million for the three and nine months ended September 30, 2011, respectively.
(2) Consists of the aggregate of the Segment Earnings provision for credit losses and Segment Earnings REO operations expense. Historical rates of average credit expenses may not be representative of future results.
(3) Calculated as the annualized amount of Segment Earnings management and guarantee income or credit expenses, respectively, divided by the sum of the average carrying values of the single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees.
(4) Calculated as Segment Earnings management and guarantee income less credit expenses.
(5) Segment Earnings management and guarantee income is presented by year of guarantee origination, whereas credit expenses are presented based on year of loan origination.

During the nine months ended September 30, 2011, the guarantee-related revenue from mortgage guarantees we issued after 2008 exceeded the credit-related and administrative expenses associated with these guarantees. We currently believe our management and guarantee fee rates for guarantee issuances after 2008, when coupled with the higher credit quality of the mortgages within our new guarantee issuances, will provide management and guarantee fee income, over the long term, that exceeds our expected credit-related and administrative expenses associated with the underlying loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to incur expenses on these loans beyond our current expectations. Our management and guarantee fee rates associated with guarantee issuances in 2005 through 2008 have not been adequate to provide income to cover the credit and administrative expenses associated with such loans, primarily due to the high rate of defaults on the loans originated in those years coupled with a high volume of refinancing since 2008. High levels of refinancing and delinquency since 2008 have significantly reduced the balance of performing loans from those years that remain in our portfolio and consequently

reduced management and guarantee income associated with loans originated in 2005 through 2008 (we do not recognize Segment Earnings management and guarantee income on non-accrual mortgage loans). We also believe that the management and guarantee fees associated with originations after 2008 will not be sufficient to offset the future expenses associated with our 2005 to 2008 guarantee issuances for the foreseeable future. Consequently, we expect to continue reporting net losses for the Single-family Guarantee segment for the remainder of 2011 and into 2012.

*Key Metrics*

The UPB of the Single-family Guarantee managed loan portfolio declined to $1.7 trillion at September 30, 2011 from $1.8 trillion at December 31, 2010. This reflects that the amount of single-family loan liquidations has exceeded new loan purchase and guarantee activity in 2011, which we believe is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market. Additionally, our loan purchase and guarantee activity in the nine months ended September 30, 2011 was at the lowest level we have experienced in the last several years. During the three and nine months ended September 30, 2011 our annualized liquidation rate on our securitized single-family credit guarantees was approximately 20% and 22%, respectively.

Refinance volumes continued to be high due to continued low interest rates, and, based on UPB, represented 67% and 75% of our single-family mortgage purchase volume during the three and nine months ended September 30, 2011, respectively, compared to 76% and 75% of our single-family mortgage purchase volume during the three and nine months ended September 30, 2010, respectively. Relief refinance mortgages comprised approximately 40% and 35% of our total refinance volume during the nine months ended September 30, 2011 and 2010, respectively, based on number of loans.

The serious delinquency rate on our single-family credit guarantee portfolio declined to 3.51% as of September 30, 2011 from 3.84% as of December 31, 2010 due to a high volume of loan modifications and foreclosure transfers, as well as a slowdown in new serious delinquencies. The quarterly number of seriously delinquent loan additions declined steadily from the fourth quarter of 2009 through the second quarter of 2011; however, we experienced a small increase in the quarterly number of seriously delinquent loan additions during the third quarter of 2011. Our serious delinquency rate remains high compared to historical levels, reflecting continued stress in the housing and labor markets.

As of September 30, 2011 and December 31, 2010, approximately 50% and 39%, respectively, of our single-family credit guarantee portfolio is comprised of mortgage loans originated after 2008. Excluding relief refinance mortgages, these new vintages reflect a combination of changes in underwriting practices and improved borrower and loan characteristics, and represent an increasingly large proportion of our single-family credit guarantee portfolio. The proportion of the portfolio represented by 2005 through 2008 vintages, which have a higher composition of loans with higher-risk characteristics, continues to decline principally due to liquidations resulting from prepayments, foreclosure events, and foreclosure alternatives. We currently expect that, over time, the replacement of older vintages should positively impact the serious delinquency rates and credit-related expenses of our single-family credit guarantee portfolio. However, the rate at which this replacement occurs slowed beginning in 2010, due to a decline in the volume of home purchase mortgage originations, an increase in the proportion of relief refinance mortgage activity, and delays in the foreclosure process. Relief refinance mortgages with LTV ratios above 80% represented approximately 13% and 12% of our single-family mortgage purchase volume during the nine months ended September 30, 2011 and 2010, respectively, based on UPB. Relief refinance mortgages with LTV ratios above 80% may not perform as well as refinance mortgages with LTV ratios of 80% or less over time due, in part, to the continued high LTV ratios of these loans.

Single-family credit losses as a percentage of the average balance of the single-family credit guarantee portfolio and HFA-related guarantees was 76.3 basis points in the third quarter of 2011, compared to 91.0 basis points for the third quarter of 2010, and was 71.9 basis points for the nine months ended September 30, 2011, compared to 78.4 basis points for the nine months ended September 30, 2010. Charge-offs, net of recoveries, associated with the single-family loans declined to $3.2 billion in the third quarter of 2011, from $3.9 billion for the third quarter of 2010. Charge-offs, net of recoveries, were $9.3 billion and $10.5 billion in the nine months ended September 30, 2011 and 2010, respectively. Our net charge-offs in the three and nine months ended September 30, 2011 remained elevated, but reflect suppression of activity due to delays in the foreclosure process. We believe that the level of our charge-offs will continue to remain high in the remainder of 2011 and may increase in 2012 due to the large number of single-family non-performing loans that will likely be resolved as our servicers work through their foreclosure-related issues and because market conditions, such as home prices and the rate of home sales, continue to remain weak. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, and our non-performing assets.

*Freddie Mac*

*Multifamily*

Table 15 presents the Segment Earnings of our Multifamily segment.

**Table 15 — Segment Earnings and Key Metrics — Multifamily[1]**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (dollars in millions) | | | |
| Segment Earnings: | | | | |
| Net interest income | $ 314 | $ 290 | $ 897 | $ 806 |
| (Provision) benefit for credit losses | 37 | (19) | 110 | (167) |
| Non-interest income (loss): | | | | |
| Management and guarantee income | 32 | 25 | 90 | 74 |
| Net impairment of available-for-sale securities | (27) | (5) | (344) | (77) |
| Derivative gains (losses) | (1) | 1 | 3 | 5 |
| Other non-interest income (loss) | (83) | 185 | 215 | 348 |
| Total non-interest income (loss) | (79) | 206 | (36) | 350 |
| Non-interest expense: | | | | |
| Administrative expenses | (57) | (54) | (163) | (159) |
| REO operations income (expense) | 5 | — | 13 | (4) |
| Other non-interest expense | (15) | (17) | (56) | (53) |
| Total non-interest expense | (67) | (71) | (206) | (216) |
| Segment Earnings before income tax benefit | 205 | 406 | 765 | 773 |
| Income tax benefit (expense) | — | (25) | (1) | (24) |
| Segment Earnings, net of taxes, including noncontrolling interest | 205 | 381 | 764 | 749 |
| Less: Net (income) loss — noncontrolling interest | — | — | — | 3 |
| Segment Earnings, net of taxes | 205 | 381 | 764 | 752 |
| Total other comprehensive income (loss), net of taxes | (1,301) | 629 | 46 | 2,989 |
| Total comprehensive income (loss) | $(1,096) | $ 1,010 | $ 810 | $ 3,741 |
| Key metrics — Multifamily: | | | | |
| *Balances and Growth:* | | | | |
| Average balance of Multifamily loan portfolio | $82,128 | $83,232 | $83,875 | $82,932 |
| Average balance of Multifamily guarantee portfolio | $31,283 | $22,428 | $28,566 | $21,206 |
| Average balance of Multifamily investment securities portfolio | $60,868 | $60,988 | $61,873 | $61,835 |
| Liquidation rate — Multifamily loan portfolio (annualized) | 12.4% | 5.7% | 9.2% | 4.3% |
| Growth rate (annualized)[2] | 5.8% | 5.4% | 4.7% | 6.3% |
| *Yield and Rate:* | | | | |
| Net interest yield — Segment Earnings basis (annualized) | 0.87% | 0.80% | 0.82% | 0.74% |
| Average Management and guarantee fee rate, in bps (annualized)[3] | 41.5 | 50.0 | 43.5 | 50.7 |
| *Credit:* | | | | |
| Delinquency rate: | | | | |
| Credit-enhanced loans, at period end | 0.77% | 0.86% | 0.77% | 0.86% |
| Non-credit-enhanced loans, at period end | 0.18% | 0.18% | 0.18% | 0.18% |
| Total Delinquency rate, at period end | 0.33% | 0.31% | 0.33% | 0.31% |
| Allowance for loan losses and reserve for guarantee losses, at period end | $ 656 | $ 931 | $ 656 | $ 931 |
| Allowance for loan losses and reserve for guarantee losses, in bps | 57.6 | 87.8 | 57.6 | 87.8 |
| Credit losses, in bps (annualized)[4] | 4.0 | 9.0 | 5.3 | 9.2 |

(1) For reconciliations of Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15: SEGMENT REPORTING — Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."
(2) Based on the aggregate UPB of the Multifamily loan and guarantee portfolios.
(3) Represents Multifamily Segment Earnings — management and guarantee income, excluding prepayment and certain other fees, divided by the sum of the average balance of the multifamily guarantee portfolio and the average balance of guarantees associated with the HFA initiative, excluding certain bonds under the NIBP.
(4) Calculated as the amount of multifamily credit losses divided by the sum of the average carrying value of our multifamily loan portfolio and the average balance of the multifamily guarantee portfolio, including multifamily HFA initiative guarantees. Credit losses are equal to charge-offs, plus REO operations income (expense).

Our purchase and guarantee of multifamily loans increased by approximately 46%, to $12.4 billion for the nine months ended September 30, 2011, compared to $8.5 billion during the same period in 2010. We completed Other Guarantee Transactions securitizing $10.1 billion and $5.2 billion in UPB of multifamily loans in the nine months ended September 30, 2011 and 2010, respectively. The UPB of the total multifamily portfolio increased to $174.5 billion at September 30, 2011 from $169.5 billion at December 31, 2010, primarily due to increased issuance of Other Guarantee Transactions, partially offset by maturities and other repayments of multifamily held-for-investment mortgage loans.

During the third quarter of 2011, Multifamily Segment Earnings were negatively impacted by the widening of OAS levels on multifamily investments, which we believe was primarily due to increased global economic uncertainty. Although widening of OAS levels was largely offset by a decline in interest rates during the quarter, the financial impact associated with the decline in interest rates is included in Segment Earnings of the Investments segment, while the non-interest rate component of the change in fair value is recognized in the Multifamily segment.

Segment Earnings for our Multifamily segment decreased to $205 million for the third quarter of 2011 from $381 million for the third quarter of 2010 primarily due to lower other non-interest income, partially offset by recognition of benefit for credit losses and higher net interest income in the third quarter of 2011. Segment Earnings for our Multifamily segment slightly increased to $764 million for the nine months ended September 30, 2011, compared to $752 million for the nine months ended September 30, 2010, primarily due to improvement of provision (benefit) for credit losses, which was substantially offset by higher security impairments on CMBS in the 2011 period. We currently expect to generate positive Segment Earnings in the Multifamily segment in the remainder of 2011 and 2012.

Our total comprehensive income (loss) for our Multifamily segment was $(1.1) billion and $0.8 billion for the three and nine months ended September 30, 2011, respectively, consisting of: (a) Segment Earnings of $0.2 billion and $0.8 billion, respectively; and (b) $(1.3) billion and $46 million, respectively, of total other comprehensive income (loss), which was mainly attributable to widening OAS levels on available-for-sale CMBS. Our total comprehensive income for our Multifamily segment was $1.0 billion and $3.7 billion for the three and nine months ended September 30, 2010, respectively, consisting of: (a) Segment Earnings of $0.4 billion and $0.7 billion, respectively; and (b) $0.6 billion and $3.0 billion, respectively, of total other comprehensive income, primarily resulting from improved fair values resulting from tightening of OAS levels on available-for-sale CMBS.

Segment Earnings net interest income increased to $314 million in the third quarter of 2011 from $290 million in the third quarter of 2010, and was $897 million and $806 million in the nine months ended September 30, 2011 and 2010, respectively. These increases were primarily attributable to higher interest income relative to allocated funding costs in the 2011 periods.

Within Segment Earnings non-interest income (loss), we recognized higher security impairments on CMBS that were partially offset by higher gains on sale of mortgage loans during the nine months ended September 30, 2011, compared to the nine months ended September 30, 2010. CMBS impairments during the nine months ended September 30, 2011 and 2010 totaled $344 million and $77 million, respectively, representing an increase of $267 million. We recognized $302 million in gains on sales of $10.1 billion in UPB of multifamily loans during the nine months ended September 30, 2011, compared to $244 million of gains on sales of $5.4 billion in UPB of multifamily loans during the nine months ended September 30, 2010. Gains on sales of multifamily loans in the multifamily segment are presented net of changes in fair value due to changes in interest rates.

The most recent market data available continues to reflect improving national apartment fundamentals, including decreasing vacancy rates and increasing effective rents. However, the broader economy continues to be challenged by persistently high unemployment, which has delayed a more comprehensive recovery of the multifamily housing market. Some geographic areas in which we have investments in multifamily loans, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We expect our multifamily delinquency rate to remain relatively stable in the remainder of 2011. For further information on delinquencies, including geographical and other concentrations, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS."

Our Multifamily segment recognized a provision (benefit) for credit losses of $(37) million and $(110) million for the three and nine months ended September 30, 2011 compared to a provision for credit losses of $19 million and $167 million, for the three and nine months ended September 30, 2010, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $656 million and $828 million as of September 30, 2011 and December 31, 2010, respectively. The decline in our loan loss reserves in the nine months ended September 30, 2011 was driven by positive trends in vacancy rates and effective rents, as well as stabilizing or improved property values. For loans where we identified deteriorating collateral performance characteristics, such as estimated current LTV ratio and DSCRs, we evaluate each individual loan, using estimates of the property's current value, to determine if a specific loan loss reserve is needed. Although we use the most recently available results of our multifamily borrowers to estimate a property's current value, there may be a significant lag in reporting, which could be six months or more, as they prepare their results in the normal course of business.

The credit quality of the multifamily mortgage portfolio remains strong, as evidenced by low delinquency rates and credit losses, and we believe reflects prudent underwriting practices. The delinquency rate for loans in the multifamily mortgage portfolio was 0.33% and 0.26% as of September 30, 2011 and December 31, 2010, respectively. As of September 30, 2011, more than half of the multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two or more monthly payments past due had credit enhancements that we currently believe will mitigate our expected losses on those loans. The multifamily delinquency rate of credit-enhanced loans as of September 30, 2011 and December 31, 2010, was 0.77% and 0.85%, respectively, while the delinquency rate for non-credit-enhanced loans

was 0.18% and 0.12%, respectively. See "RISK MANAGEMENT -Credit Risk -*Mortgage Credit Risk - Multifamily Mortgage Credit Risk*" for further information about our reported multifamily delinquency rates, including factors that can positively impact such rates.

Multifamily credit losses as a percentage of the combined average balance of our multifamily loan and guarantee portfolios declined from 9.0 basis points in the third quarter of 2010 to 4.0 basis points in the third quarter of 2011. Charge-offs, net of recoveries, associated with multifamily loans decreased to $16 million in the third quarter of 2011, compared to $23 million in the third quarter of 2010, and decreased to $57 million in the nine months ended September 30, 2011, compared to $68 million in the nine months ended September 30, 2010, due to a decline in loss severities in the 2011 periods.

## CONSOLIDATED BALANCE SHEETS ANALYSIS

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also, see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported financial position.

**Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell**

Cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and other liquid assets discussed in "Investments in Securities — *Non-Mortgage-Related Securities*," are important to our cash flow and asset and liability management, and our ability to provide liquidity and stability to the mortgage market. We use these assets to help manage recurring cash flows and meet our other cash management needs. We consider federal funds sold to be overnight unsecured trades executed with commercial banks that are members of the Federal Reserve System. Securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities.

The short-term assets on our consolidated balance sheets also include those related to our consolidated VIEs, which are comprised primarily of restricted cash and cash equivalents at September 30, 2011. These short-term assets decreased by $11.7 billion from December 31, 2010 to September 30, 2011, primarily due to a relative decline in the level of refinancing activity.

Excluding amounts related to our consolidated VIEs, we held $18.2 billion and $37.0 billion of cash and cash equivalents, $0 billion and $1.4 billion of federal funds sold, and $10.6 billion and $15.8 billion of securities purchased under agreements to resell at September 30, 2011 and December 31, 2010, respectively. The aggregate decrease in these assets was primarily driven by a decline in funding needs for debt redemptions. In addition, excluding amounts related to our consolidated VIEs, we held on average $37.7 billion and $33.2 billion of cash and cash equivalents and $12.9 billion and $21.0 billion of federal funds sold and securities purchased under agreements to resell during the three and nine months ended September 30, 2011, respectively.

In the beginning of the third quarter of 2011, we made a temporary change in the composition of our portfolio of liquid assets to more cash and overnight investments given the market's concerns about the potential for a downgrade in the credit ratings of the U.S. government and the potential that the U.S. would exhaust its borrowing authority under the statutory debt limit. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

**Investments in Securities**

Table 16 provides detail regarding our investments in securities as of September 30, 2011 and December 31, 2010. Table 16 does not include our holdings of single-family PCs and certain Other Guarantee Transactions. For information on our holdings of such securities, see "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

**Table 16 — Investments in Securities**

| | Fair Value | |
|---|---|---|
| | September 30, 2011 | December 31, 2010 |
| | (in millions) | |
| Investments in securities: | | |
| Available-for-sale: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | $ 84,021 | $ 85,689 |
| Subprime | 28,888 | 33,861 |
| CMBS | 56,265 | 58,087 |
| Option ARM | 6,168 | 6,889 |
| Alt-A and other | 11,443 | 13,168 |
| Fannie Mae | 20,580 | 24,370 |
| Obligations of states and political subdivisions | 8,132 | 9,377 |
| Manufactured housing | 816 | 897 |
| Ginnie Mae | 271 | 296 |
| Total available-for-sale mortgage-related securities | 216,584 | 232,634 |
| Total investments in available-for-sale securities | 216,584 | 232,634 |
| Trading: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | 16,588 | 13,437 |
| Fannie Mae | 17,603 | 18,726 |
| Ginnie Mae | 161 | 172 |
| Other | 78 | 31 |
| Total trading mortgage-related securities | 34,430 | 32,366 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 276 | 44 |
| Treasury bills | 1,000 | 17,289 |
| Treasury notes | 17,159 | 10,122 |
| FDIC-guaranteed corporate medium-term notes | 2,433 | 441 |
| Total trading non-mortgage-related securities | 20,868 | 27,896 |
| Total investments in trading securities | 55,298 | 60,262 |
| Total investments in securities | $271,882 | $292,896 |

(1) For information on the types of instruments that are included, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report.

### Non-Mortgage-Related Securities

Our investments in non-mortgage-related securities provide an additional source of liquidity for us. We held investments in non-mortgage-related securities classified as trading of $20.9 billion and $27.9 billion as of September 30, 2011 and December 31, 2010, respectively. While balances may fluctuate from period to period, we continue to meet required liquidity and contingency levels.

### Mortgage-Related Securities

We are primarily a buy-and-hold investor in mortgage-related securities, which consist of securities issued by Fannie Mae, Ginnie Mae, and other financial institutions. We also invest in our own mortgage-related securities. However, the single-family PCs and certain Other Guarantee Transactions we purchase as investments are not accounted for as investments in securities because we recognize the underlying mortgage loans on our consolidated balance sheets through consolidation of the related trusts.

Table 17 provides the UPB of our investments in mortgage-related securities classified as available-for-sale or trading on our consolidated balance sheets. Table 17 does not include our holdings of our own single-family PCs and certain Other Guarantee Transactions. For further information on our holdings of such securities, see "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

**Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets**

| | September 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Fixed Rate | Variable Rate[1] | Total | Fixed Rate | Variable Rate[1] | Total |
| | (in millions) | | | | | |
| Freddie Mac mortgage-related securities:[2] | | | | | | |
| Single-family | $ 76,432 | $ 9,086 | $ 85,518 | $ 79,955 | $ 8,118 | $ 88,073 |
| Multifamily | 1,009 | 1,804 | 2,813 | 339 | 1,756 | 2,095 |
| Total Freddie Mac mortgage-related securities | 77,441 | 10,890 | 88,331 | 80,294 | 9,874 | 90,168 |
| Non-Freddie Mac mortgage-related securities: | | | | | | |
| Agency securities:[3] | | | | | | |
| Fannie Mae: | | | | | | |
| Single-family | 19,380 | 15,666 | 35,046 | 21,238 | 18,139 | 39,377 |
| Multifamily | 62 | 77 | 139 | 228 | 88 | 316 |
| Ginnie Mae: | | | | | | |
| Single-family | 264 | 106 | 370 | 296 | 117 | 413 |
| Multifamily | 27 | — | 27 | 27 | — | 27 |
| Total agency securities | 19,733 | 15,849 | 35,582 | 21,789 | 18,344 | 40,133 |
| Non-agency mortgage-related securities: | | | | | | |
| Single-family:[4] | | | | | | |
| Subprime | 341 | 49,857 | 50,198 | 363 | 53,855 | 54,218 |
| Option ARM | — | 14,351 | 14,351 | — | 15,646 | 15,646 |
| Alt-A and other | 2,190 | 15,065 | 17,255 | 2,405 | 16,438 | 18,843 |
| CMBS | 20,228 | 35,379 | 55,607 | 21,401 | 37,327 | 58,728 |
| Obligations of states and political subdivisions[5] | 8,131 | 23 | 8,154 | 9,851 | 26 | 9,877 |
| Manufactured housing | 854 | 134 | 988 | 930 | 150 | 1,080 |
| Total non-agency mortgage-related securities[6] | 31,744 | 114,809 | 146,553 | 34,950 | 123,442 | 158,392 |
| Total UPB of mortgage-related securities | $128,918 | $141,548 | 270,466 | $137,033 | $151,660 | 288,693 |
| Premiums, discounts, deferred fees, impairments of UPB and other basis adjustments | | | (11,908) | | | (11,839) |
| Net unrealized (losses) on mortgage-related securities, pre-tax | | | (7,544) | | | (11,854) |
| Total carrying value of mortgage-related securities | | | $251,014 | | | $265,000 |

(1) Variable-rate mortgage-related securities include those with a contractual coupon rate that, prior to contractual maturity, is either scheduled to change or is subject to change based on changes in the composition of the underlying collateral.

(2) When we purchase REMICs and Other Structured Securities and certain Other Guarantee Transactions that we have issued, we account for these securities as investments in debt securities as we are investing in the debt securities of a non-consolidated entity. We do not consolidate our resecuritization trusts since we are not deemed to be the primary beneficiary of such trusts. We are subject to the credit risk associated with the mortgage loans underlying our Freddie Mac mortgage-related securities. Mortgage loans underlying our issued single-family PCs and certain Other Guarantee Transactions are recognized on our consolidated balance sheets as held-for-investment mortgage loans, at amortized cost. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report for further information.

(3) Agency securities are generally not separately rated by nationally recognized statistical rating organizations, but have historically been viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities AAA-rated or equivalent.

(4) For information about how these securities are rated, see "Table 22 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS."

(5) Consists of housing revenue bonds. Approximately 38% and 50% of these securities held at September 30, 2011 and December 31, 2010, respectively, were AAA-rated as of those dates, based on the lowest rating available.

(6) Credit ratings for most non-agency mortgage-related securities are designated by no fewer than two nationally recognized statistical rating organizations. Approximately 21% and 23% of total non-agency mortgage-related securities held at September 30, 2011 and December 31, 2010, respectively, were AAA-rated as of those dates, based on the UPB and the lowest rating available.

The total UPB of our investments in mortgage-related securities on our consolidated balance sheets decreased from $288.7 billion at December 31, 2010 to $270.5 billion at September 30, 2011 primarily as a result of liquidations exceeding our purchase activity during the nine months ended September 30, 2011.

Table 18 summarizes our mortgage-related securities purchase activity for the three and nine months ended September 30, 2011 and 2010. The purchase activity includes single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated. Purchases of single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated are recorded as an extinguishment of debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

**Table 18 — Total Mortgage-Related Securities Purchase Activity[1]**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Non-Freddie Mac mortgage-related securities purchased for resecuritization: | | | | |
| Ginnie Mae Certificates | $ 1 | $ 40 | $ 73 | $ 53 |
| Non-agency mortgage-related securities purchased for Other Guarantee Transactions[2] | 2,088 | 969 | 8,600 | 8,653 |
| Total non-Freddie Mac mortgage-related securities purchased for resecuritization | 2,089 | 1,009 | 8,673 | 8,706 |
| Non-Freddie Mac mortgage-related securities purchased as investments in securities: | | | | |
| Agency securities: | | | | |
| *Fannie Mae:* | | | | |
| Fixed-rate | 1,550 | — | 4,750 | — |
| Variable-rate | 927 | 209 | 1,155 | 373 |
| *Total agency securities* | 2,477 | 209 | 5,905 | 373 |
| Non-agency mortgage-related securities: | | | | |
| *CMBS:* | | | | |
| Fixed-rate | — | — | 14 | — |
| Variable-rate | 6 | 40 | 52 | 40 |
| *Total non-agency mortgage-related securities* | 6 | 40 | 66 | 40 |
| *Total non-Freddie Mac mortgage-related securities purchased as investments in securities* | 2,483 | 249 | 5,971 | 413 |
| Total non-Freddie Mac mortgage-related securities purchased | $ 4,572 | $ 1,258 | $14,644 | $ 9,119 |
| Freddie Mac mortgage-related securities purchased: | | | | |
| *Single-family:* | | | | |
| Fixed-rate | $23,607 | $17,344 | $84,590 | $23,389 |
| Variable-rate | 587 | 79 | 3,591 | 282 |
| *Multifamily:* | | | | |
| Fixed-rate | 125 | 31 | 176 | 216 |
| Variable-rate | 52 | — | 117 | 41 |
| *Total Freddie Mac mortgage-related securities purchased* | $24,371 | $17,454 | $88,474 | $23,928 |

(1) Based on UPB. Excludes mortgage-related securities traded but not yet settled.
(2) Purchases for the nine months ended September 30, 2010 include HFA bonds we acquired and resecuritized under the NIBP. See "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS" in our 2010 Annual Report for further information on this component of the HFA Initiative.

During the three and nine months ended September 30, 2011, we engaged in mortgage-related security transactions in which we entered into an agreement to purchase and subsequently resell (or sell and subsequently repurchase) agency securities. We engaged in these transactions primarily to support the market and pricing of our PC securities. When these transactions involve our consolidated PC trusts, the purchase and sale represents an extinguishment and issuance of debt securities, respectively, and impacts our net interest income and recognition of gain or loss on the extinguishment of debt on our consolidated statements of income and comprehensive income. These transactions can cause short-term fluctuations in the balance of our mortgage-related investments portfolio. The increase in our purchases of agency securities in the three and nine months ended September 30, 2011, reflected in Table 18 is attributed primarily to these transactions.

*Unrealized Losses on Available-For-Sale Mortgage-Related Securities*

At September 30, 2011, our gross unrealized losses, pre-tax, on available-for-sale mortgage-related securities were $20.8 billion, compared to $23.1 billion at December 31, 2010. The improvement in unrealized losses was primarily due to the impact of a decline in interest rates, resulting in fair value gains on our agency and CMBS securities, partially offset by the impact of widening OAS levels on our CMBS and other non-agency mortgage-related securities. Additionally, net unrealized losses recorded in AOCI decreased due to the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities. We believe the unrealized losses related to these securities at September 30, 2011 were mainly attributable to poor underlying collateral performance, limited liquidity and large risk premiums in the market for residential non-agency mortgage-related securities. All available-for-sale securities in an unrealized loss position are evaluated to determine if the impairment is other-than-temporary. See "Total Equity (Deficit)" and "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding unrealized losses on our available-for-sale securities.

*Higher-Risk Components of Our Investments in Mortgage-Related Securities*

As discussed below, we have exposure to subprime, option ARM, interest-only, and Alt-A and other loans as part of our investments in mortgage-related securities as follows:

- *Single-family non-agency mortgage-related securities:* We hold non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans.

- *Single-family Freddie Mac mortgage-related securities:* We hold certain Other Guarantee Transactions as part of our investments in securities. There are subprime and option ARM loans underlying some of these Other Guarantee Transactions. For more information on single-family loans with certain higher-risk characteristics underlying our issued securities, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*."

*Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, and Alt-A Loans*

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. Since the first quarter of 2008, we have not purchased any non-agency mortgage-related securities backed by subprime, option ARM, or Alt-A loans. Tables 19 and 20 present information about our holdings of these securities.

**Table 19 — Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics[1]**

| | As of | | | | |
|---|---|---|---|---|---|
| | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 | 9/30/2010 |
| | (dollars in millions) | | | | |
| UPB: | | | | | |
| Subprime first lien[2] | $49,794 | $51,070 | $52,403 | $53,756 | $55,250 |
| Option ARM | 14,351 | 14,778 | 15,232 | 15,646 | 16,104 |
| Alt-A[3] | 14,643 | 15,059 | 15,487 | 15,917 | 16,406 |
| Gross unrealized losses, pre-tax:[4] | | | | | |
| Subprime first lien[2] | $14,132 | $13,764 | $12,481 | $14,026 | $16,446 |
| Option ARM | 3,216 | 3,099 | 3,170 | 3,853 | 4,815 |
| Alt-A[3] | 2,468 | 2,171 | 1,941 | 2,096 | 2,542 |
| Present value of expected future credit losses:[5] | | | | | |
| Subprime first lien[2] | $ 5,414 | $ 6,487 | $ 6,612 | $ 5,937 | $ 4,364 |
| Option ARM | 4,434 | 4,767 | 4,993 | 4,850 | 4,208 |
| Alt-A[3] | 2,204 | 2,310 | 2,401 | 2,469 | 2,101 |
| Collateral delinquency rate:[6] | | | | | |
| Subprime first lien[2] | 42% | 42% | 44% | 45% | 45% |
| Option ARM | 44 | 44 | 44 | 44 | 44 |
| Alt-A[3] | 25 | 26 | 26 | 27 | 26 |
| Average credit enhancement:[7] | | | | | |
| Subprime first lien[2] | 22% | 23% | 24% | 25% | 25% |
| Option ARM | 8 | 10 | 11 | 12 | 12 |
| Alt-A[3] | 7 | 8 | 8 | 9 | 9 |
| Cumulative collateral loss:[8] | | | | | |
| Subprime first lien[2] | 21% | 20% | 19% | 18% | 17% |
| Option ARM | 16 | 15 | 14 | 13 | 11 |
| Alt-A[3] | 8 | 7 | 7 | 6 | 6 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities.
(2) Excludes non-agency mortgage-related securities backed by subprime second liens. We held $404 million of UPB of these securities at September 30, 2011.
(3) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.
(4) Represents the aggregate of the amount by which amortized cost, after other-than-temporary impairments, exceeds fair value measured at the individual lot level.
(5) Represents our estimate of future contractual cash flows that we do not expect to collect, discounted at the effective interest rate implicit in the security at the date of acquisition. This discount rate is only utilized to analyze the cumulative credit deterioration for securities since acquisition and may be lower than the discount rate used to measure ongoing other-than-temporary impairment to be recognized in earnings for securities that have experienced a significant improvement in expected cash flows since the last recognition of other-than-temporary impairment recognized in earnings.
(6) Determined based on the number of loans that are two monthly payments or more past due that underlie the securities using information obtained from a third-party data provider.
(7) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by bond insurance, overcollateralization and other forms of credit enhancement.
(8) Based on the actual losses incurred on the collateral underlying these securities. Actual losses incurred on the securities that we hold are significantly less than the losses on the underlying collateral as presented in this table, as non-agency mortgage-related securities backed by subprime first lien, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements.

FHFA 2463

**Table 20 — Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans**[1]

| | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 | 9/30/2010 |
| | | | (in millions) | | |
| Net impairment of available-for-sale securities recognized in earnings: | | | | | |
| Subprime — first and second liens | $ 31 | $ 70 | $ 734 | $1,207 | $ 213 |
| Option ARM | 19 | 65 | 281 | 668 | 577 |
| Alt-A and other | 80 | 32 | 40 | 372 | 296 |
| Principal repayments and cash shortfalls:[2] | | | | | |
| Subprime — first and second liens: | | | | | |
| Principal repayments | $1,287 | $1,341 | $1,361 | $1,512 | $1,685 |
| Principal cash shortfalls | 6 | 10 | 14 | 6 | 8 |
| Option ARM: | | | | | |
| Principal repayments | $ 318 | $ 331 | $ 315 | $ 347 | $ 377 |
| Principal cash shortfalls | 109 | 123 | 100 | 111 | 122 |
| Alt-A and other: | | | | | |
| Principal repayments | $ 425 | $ 464 | $ 452 | $ 537 | $ 582 |
| Principal cash shortfalls | 81 | 84 | 81 | 62 | 56 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities.
(2) In addition to the contractual interest payments, we receive monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral of these securities representing a partial return of our investment in these securities.

As discussed below, we recognized impairment in earnings on our holdings of such securities during the three and nine months ended September 30, 2011 and 2010. See "Table 21 — Net Impairment on Available-For-Sale Mortgage-Related Securities Recognized in Earnings" for more information.

For purposes of our cumulative credit deterioration analysis, our estimate of the present value of expected future credit losses on our portfolio of non-agency mortgage-related securities decreased to $12.9 billion at September 30, 2011 from $14.4 billion at June 30, 2011. All of these amounts have been reflected in our net impairment of available-for-sale securities recognized in earnings in this period or prior periods. The decline in the present value of expected future credit losses was primarily due to the impact of a decline in interest rates resulting in a benefit from expected structural credit enhancements on the securities.

Since the beginning of 2007, we have incurred actual principal cash shortfalls of $1.3 billion on impaired non-agency mortgage-related securities, of which $202 million and $630 million related to the three and nine months ended September 30, 2011. Many of the trusts that issued non-agency mortgage-related securities we hold were structured so that realized collateral losses in excess of structural credit enhancements are not passed on to investors until the investment matures. We currently estimate that the future expected principal and interest shortfalls on non-agency mortgage-related securities we hold will be significantly less than the fair value declines experienced on these securities.

The investments in non-agency mortgage-related securities we hold backed by subprime first lien, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements. Bond insurance is an additional credit enhancement covering some of the non-agency mortgage-related securities. These credit enhancements are the primary reason we expect our actual losses, through principal or interest shortfalls, to be less than the underlying collateral losses in aggregate. It is difficult to estimate the point at which structural credit enhancements will be exhausted and we will incur actual losses. During the three and nine months ended September 30, 2011, we continued to experience the erosion of structural credit enhancements on many securities backed by subprime first lien, option ARM, and Alt-A loans due to poor performance of the underlying collateral. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers*."

*Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*

Table 21 provides information about the mortgage-related securities for which we recognized other-than-temporary impairments for the three months ended September 30, 2011 and 2010.

**Table 21 — Net Impairment on Available-For-Sale Mortgage-Related Securities Recognized in Earnings**

| | Three Months Ended September 30, | | | |
| | 2011 | | 2010 | |
| | UPB | Net Impairment of Available-For-Sale Securities Recognized in Earnings | UPB | Net Impairment of Available-For-Sale Securities Recognized in Earnings |
| --- | --- | --- | --- | --- |
| | | (in millions) | | |
| Subprime: | | | | |
| 2006 & 2007 first lien | $1,431 | $ 29 | $12,847 | $ 204 |
| Other years — first and second liens[1] | 77 | 2 | 496 | 9 |
| Total subprime — first and second liens | 1,508 | 31 | 13,343 | 213 |
| Option ARM: | | | | |
| 2006 & 2007 | 1,446 | 15 | 10,721 | 526 |
| Other years | 555 | 4 | 1,509 | 51 |
| Total option ARM | 2,001 | 19 | 12,230 | 577 |
| Alt-A: | | | | |
| 2006 & 2007 | 1,311 | 29 | 4,971 | 227 |
| Other years | 1,212 | 10 | 2,607 | 59 |
| Total Alt-A | 2,523 | 39 | 7,578 | 286 |
| Other loans | 1,202 | 41 | 841 | 10 |
| Total subprime, option ARM, Alt-A and other loans | 7,234 | 130 | 33,992 | 1,086 |
| CMBS | 788 | 27 | 312 | 6 |
| Manufactured housing | 245 | 4 | 460 | 8 |
| Total available-for-sale mortgage-related securities | $8,267 | $161 | $34,764 | $1,100 |

(1) Includes all second liens.

We recorded net impairment of available-for-sale mortgage-related securities recognized in earnings of $161 million and $1.7 billion during the three and nine months ended September 30, 2011, respectively, compared to $1.1 billion and $2.0 billion during the three and nine months ended September 30, 2010, as our estimate of the present value of expected future credit losses on certain individual securities increased during the periods. These impairments include $130 million and $1.4 billion of impairments related to securities backed by subprime, option ARM, and Alt-A and other loans during the three and nine months ended September 30, 2011, respectively, compared to $1.1 billion and $1.9 billion during the three and nine months ended September 30, 2010. In addition, during the three and nine months ended September 30, 2011, these impairments include recognition of the fair value declines related to certain investments in CMBS of $27 million and $181 million, respectively, as an impairment charge in earnings, as we have the intent to sell these securities. For more information, see "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-For-Sale Securities."

While it is reasonably possible that collateral losses on our available-for-sale mortgage-related securities where we have not recorded an impairment charge in earnings could exceed our credit enhancement levels, we do not believe that those conditions were likely at September 30, 2011. Based on our conclusion that we do not intend to sell our remaining available-for-sale mortgage-related securities in an unrealized loss position and it is not more likely than not that we will be required to sell these securities before a sufficient time to recover all unrealized losses and our consideration of other available information, we have concluded that the reduction in fair value of these securities was temporary at September 30, 2011 and have recorded these fair value losses in AOCI.

The credit performance of loans underlying our holdings of non-agency mortgage-related securities has declined since 2007. This decline has been particularly severe for subprime, option ARM, and Alt-A and other loans. Economic factors negatively impacting the performance of our investments in non-agency mortgage-related securities include high unemployment, a large inventory of seriously delinquent mortgage loans and unsold homes, tight credit conditions, and weak consumer confidence during the three and nine months ended September 30, 2011 and 2010. In addition, subprime, option ARM, and Alt-A and other loans backing the securities we hold have significantly greater concentrations in the states that are undergoing the greatest economic stress, such as California and Florida. Loans in these states undergoing economic stress are more likely to become seriously delinquent and the credit losses associated with such loans are likely to be higher than in other states.

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our investments in non-agency mortgage-related securities. We have determined that there is substantial uncertainty surrounding certain bond insurers' ability to pay our future claims on expected credit losses related to our non-agency mortgage-related security investments. This uncertainty contributed to the impairments recognized in earnings during the three and nine months ended September 30, 2011 and 2010. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers*" and "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

Our assessments concerning other-than-temporary impairment require significant judgment and the use of models, and are subject to potentially significant change. In addition, changes in the performance of the individual securities and in mortgage market conditions may also affect our impairment assessments. Depending on the structure of the individual mortgage-related security and our estimate of collateral losses relative to the amount of credit support available for the tranches we own, a change in collateral loss estimates can have a disproportionate impact on the loss estimate for the security. Additionally, servicer performance, loan modification programs and backlogs, bankruptcy reform and other forms of government intervention in the housing market can significantly affect the performance of these securities, including the timing of loss recognition of the underlying loans and thus the timing of losses we recognize on our securities. Foreclosure processing suspensions can also affect our losses. For example, while defaulted loans remain in the trusts prior to completion of the foreclosure process, the subordinate classes of securities issued by the securitization trusts may continue to receive interest payments, rather than absorbing default losses. This may reduce the amount of funds available for the tranches we own. Given the extent of the housing and economic downturn, it is difficult to estimate the future performance of mortgage loans and mortgage-related securities with high assurance, and actual results could differ materially from our expectations. Furthermore, various market participants could arrive at materially different conclusions regarding estimates of future cash shortfalls. For more information on how delays in the foreclosure process, including delays related to concerns about deficiencies in foreclosure documentation practices, could adversely affect the values of, and the losses on, the non-agency mortgage-related securities we hold, see "RISK FACTORS — Operational Risks — *We have incurred and will continue to incur expenses and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process*" in our 2010 Annual Report.

For information regarding our efforts to mitigate losses on our investments in non-agency mortgage-related securities, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*."

*Ratings of Non-Agency Mortgage-Related Securities*

Table 22 shows the ratings of non-agency mortgage-related securities backed by subprime, option ARM, Alt-A and other loans, and CMBS held at September 30, 2011 based on their ratings as of September 30, 2011, as well as those held at December 31, 2010 based on their ratings as of December 31, 2010 using the lowest rating available for each security.

**Table 22 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS**

| Credit Ratings as of September 30, 2011 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Bond Insurance Coverage[1] |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| Subprime loans: | | | | | |
| AAA-rated | $ 1,099 | 2% | $ 1,099 | $ (127) | $ 23 |
| Other investment grade | 2,773 | 6 | 2,773 | (429) | 387 |
| Below investment grade[2] | 46,326 | 92 | 39,103 | (13,583) | 1,680 |
| Total | $ 50,198 | 100% | $ 42,975 | $(14,139) | $2,090 |
| Option ARM loans: | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 89 | 1 | 89 | (10) | 89 |
| Below investment grade[2] | 14,262 | 99 | 9,277 | (3,206) | 42 |
| Total | $ 14,351 | 100% | $ 9,366 | $ (3,216) | $ 131 |
| Alt-A and other loans: | | | | | |
| AAA-rated | $ 366 | 2% | $ 364 | $ (19) | $ 6 |
| Other investment grade | 2,303 | 13 | 2,327 | (357) | 323 |
| Below investment grade[2] | 14,586 | 85 | 11,386 | (2,299) | 2,204 |
| Total | $ 17,255 | 100% | $ 14,077 | $ (2,675) | $2,533 |
| CMBS: | | | | | |
| AAA-rated | $ 25,995 | 47% | $ 26,041 | $ — | $ 42 |
| Other investment grade | 26,202 | 47 | 26,168 | (388) | 1,651 |
| Below investment grade[2] | 3,410 | 6 | 2,918 | (147) | 1,699 |
| Total | $ 55,607 | 100% | $ 55,127 | $ (535) | $3,392 |
| Total subprime, option ARM, Alt-A and other loans, and CMBS: | | | | | |
| AAA-rated | $ 27,460 | 20% | $ 27,504 | $ (146) | $ 71 |
| Other investment grade | 31,367 | 23 | 31,357 | (1,184) | 2,450 |
| Below investment grade[2] | 78,584 | 57 | 62,684 | (19,235) | 5,625 |
| Total | $137,411 | 100% | $121,545 | $(20,565) | $8,146 |
| Total investments in mortgage-related securities | $270,466 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 51% | | | | |
| **Credit Ratings as of December 31, 2010** | | | | | |
| Subprime loans: | | | | | |
| AAA-rated | $ 2,085 | 4% | $ 2,085 | $ (199) | $ 31 |
| Other investment grade | 3,407 | 6 | 3,408 | (436) | 449 |
| Below investment grade[2] | 48,726 | 90 | 42,423 | (13,421) | 1,789 |
| Total | $ 54,218 | 100% | $ 47,916 | $(14,056) | $2,269 |
| Option ARM loans: | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 139 | 1 | 140 | (18) | 129 |
| Below investment grade[2] | 15,507 | 99 | 10,586 | (3,835) | 50 |
| Total | $ 15,646 | 100% | $ 10,726 | $ (3,853) | $ 179 |
| Alt-A and other loans: | | | | | |
| AAA-rated | $ 1,293 | 7% | $ 1,301 | $ (87) | $ 7 |
| Other investment grade | 2,761 | 15 | 2,765 | (362) | 368 |
| Below investment grade[2] | 14,789 | 78 | 11,498 | (2,002) | 2,443 |
| Total | $ 18,843 | 100% | $ 15,564 | $ (2,451) | $2,818 |
| CMBS: | | | | | |
| AAA-rated | $ 28,007 | 48% | $ 28,071 | $ (52) | $ 42 |
| Other investment grade | 26,777 | 45 | 26,740 | (676) | 1,655 |
| Below investment grade[2] | 3,944 | 7 | 3,653 | (1,191) | 1,704 |
| Total | $ 58,728 | 100% | $ 58,464 | $ (1,919) | $3,401 |
| Total subprime, option ARM, Alt-A and other loans, and CMBS: | | | | | |
| AAA-rated | $ 31,385 | 21% | $ 31,457 | $ (338) | $ 80 |
| Other investment grade | 33,084 | 23 | 33,053 | (1,492) | 2,601 |
| Below investment grade[2] | 82,966 | 56 | 68,160 | (20,449) | 5,986 |
| Total | $147,435 | 100% | $132,670 | $(22,279) | $8,667 |
| Total investments in mortgage-related securities | $288,693 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 51% | | | | |

(1) Represents the amount of UPB covered by bond insurance. This amount does not represent the maximum amount of losses we could recover, as the bond insurance also covers interest.
(2) Includes securities with S&P credit ratings below BBB– and certain securities that are no longer rated.

**Mortgage Loans**

The UPB of mortgage loans on our consolidated balance sheet declined to $1,853 billion as of September 30, 2011 from $1,885 billion as of December 31, 2010. This reflects that the amount of single-family loan liquidations has exceeded new loan purchase and guarantee activity in 2011, which we believe is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market. Our single-family loan purchase and guarantee activity in the nine months ended September 30, 2011 was at the lowest level we have experienced in the last several years. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further detail about the mortgage loans on our consolidated balance sheets.

The UPB of unsecuritized single-family mortgage loans increased by $12.5 billion, to $161.4 billion at September 30, 2011 from $148.9 billion at December 31, 2010, primarily due to our continued purchases of seriously delinquent and modified loans from the mortgage pools underlying our PCs. Based on the amount of the recorded investment of these loans, approximately $73.1 billion, or 4.1%, of the single-family mortgage loans on our consolidated balance sheet as of September 30, 2011 were seriously delinquent, as compared to $84.2 billion, or 4.7%, as of December 31, 2010. This decline was primarily due to modifications, foreclosure transfers, and short sale activity. The majority of these seriously delinquent loans are unsecuritized, and were purchased by us from our PC trusts. As guarantor, we have the right to purchase mortgages that back our PCs from the underlying loan pools under certain circumstances. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information on our purchases of single-family loans from PC trusts.

The UPB of unsecuritized multifamily mortgage loans was $81.6 billion at September 30, 2011 and $85.9 billion at December 31, 2010. Our multifamily loan activity in the three and nine months ended September 30, 2011 primarily consisted of purchases of loans intended for securitization and subsequently sold through Other Guarantee Transactions. We expect to continue to purchase and subsequently securitize multifamily loans, which supports liquidity for the multifamily market and affordability for multifamily rental housing, as our primary multifamily business strategy.

Table 23 summarizes our purchase and guarantee activity in mortgage loans. This activity consists of: (a) mortgage loans underlying consolidated single-family PCs issued in the period (regardless of whether such securities are held by us or third parties); (b) single-family and multifamily mortgage loans purchased, but not securitized, in the period; and (c) mortgage loans underlying our mortgage-related financial guarantees issued in the period, which are not consolidated on our balance sheets.

**Table 23 — Mortgage Loan Purchase and Other Guarantee Commitment Activity[1]**

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| | 2011 | | 2010 | | 2011 | | 2010 | |
| | UPB Amount | % of Total | UPB Amount | % of Total | UPB Amount | % of Total | UPB Amount | % of Total |
| | | | | (dollars in millions) | | | | |
|---|---|---|---|---|---|---|---|---|
| Mortgage loan purchases and guarantee issuances: | | | | | | | | |
| Single-family: | | | | | | | | |
| 30-year or more amortizing fixed-rate . . | $42,743 | 56% | $62,573 | 65% | $145,986 | 60% | $181,848 | 68% |
| 20-year amortizing fixed-rate . . . . . . . | 3,880 | 5 | 6,316 | 6 | 13,910 | 6 | 13,545 | 5 |
| 15-year amortizing fixed-rate . . . . . . . | 16,385 | 22 | 18,990 | 20 | 51,496 | 21 | 48,841 | 18 |
| Adjustable-rate[2] . . . . . . . . . . . . . . . | 8,150 | 11 | 4,544 | 5 | 20,016 | 8 | 10,327 | 4 |
| Interest-only[3] . . . . . . . . . . . . . . . . . | — | — | 89 | < 1 | — | — | 909 | 1 |
| FHA/VA and other governmental . . . . . | 121 | <1 | 177 | < 1 | 325 | <1 | 3,309 | 1 |
| *Total single-family*[4] . . . . . . . . . . . | 71,279 | 94 | 92,689 | 96 | 231,733 | 95 | 258,779 | 97 |
| Multifamily . . . . . . . . . . . . . . . . . . . . . | 4,888 | 6 | 3,435 | 4 | 12,449 | 5 | 8,502 | 3 |
| *Total mortgage loan purchases and other guarantee commitment activity*[5] . . . . . . . | $76,167 | 100% | $96,124 | 100% | $244,182 | 100% | $267,281 | 100% |
| Percentage of mortgage purchases and other guarantee commitment activity with credit enhancements[6] . . . . . . . . . . . . . . . . . . | 10% | | 8% | | 8% | | 10% | |

(1) Based on UPB. Excludes mortgage loans traded but not yet settled. Excludes seriously delinquent loans and balloon/reset mortgages purchased out of PC trusts. Includes other guarantee commitments associated with mortgage loans. See endnote (5) for further information.

(2) Includes amortizing ARMs with 1-, 3-, 5-, 7- and 10-year initial fixed-rate periods. We did not purchase any option ARM loans during the nine months ended September 30, 2011 or 2010.

(3) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed-rate and variable-rate interest-only loans.

(4) Includes $20.1 billion and $16.7 billion of mortgage loans in excess of $417,000, which we refer to as conforming jumbo mortgages, for the nine months ended September 30, 2011 and 2010, respectively.

(5) Includes issuances of other guarantee commitments on single-family loans of $3.9 billion and $3.1 billion and issuances of other guarantee commitments on multifamily loans of $0.5 billion and $1.2 billion during the nine months ended September 30, 2011 and 2010, respectively, which include our unsecuritized guarantees of HFA bonds under the TCLFP in 2010.

(6) See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for further details on credit enhancement of mortgage loans in our multifamily mortgage and single-family credit guarantee portfolios.

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" and "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Table 17.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio" for information about mortgage loans in our single-family credit guarantee portfolio that we believe have higher-risk characteristics.

### Derivative Assets and Liabilities, Net

The composition of our derivative portfolio changes from period to period as a result of derivative purchases, terminations, or assignments prior to contractual maturity, and expiration of the derivatives at their contractual maturity. We also classify net derivative interest receivable or payable, trade/settle receivable or payable, and cash collateral held or posted on our consolidated balance sheets in derivative assets, net and derivative liabilities, net. See "NOTE 11: DERIVATIVES" for additional information regarding our derivatives.

Table 24 shows the fair value for each derivative type, the weighted average fixed rate of our pay-fixed and receive-fixed swaps, and the maturity profile of our derivative positions as of September 30, 2011. A positive fair value in Table 24 for each derivative type is the estimated amount, prior to netting by counterparty, that we would be entitled to receive if the derivatives of that type were terminated. A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if the derivatives of that type were terminated.

**Table 24 — Derivative Fair Values and Maturities**

| | | | September 30, 2011 | | | |
|---|---|---|---|---|---|---|
| | | | Fair Value[1] | | | |
| | Notional or Contractual Amount[2] | Total Fair Value[3] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $200,465 | $ 10,986 | $    24 | $   537 | $ 1,999 | $  8,426 |
| Weighted average fixed rate[4] | | | 0.90% | 1.07% | 2.24% | 3.26% |
| Forward-starting swaps[5] | 20,203 | 2,039 | — | — | — | 2,039 |
| Weighted average fixed rate[4] | | | — | 0.60% | 0.84% | 3.53% |
| Total receive-fixed | 220,668 | 13,025 | 24 | 537 | 1,999 | 10,465 |
| Basis (floating to floating) | 2,725 | (3) | — | (5) | 2 | — |
| Pay-fixed: | | | | | | |
| Swaps | 279,437 | (33,716) | (93) | (1,221) | (6,686) | (25,716) |
| Weighted average fixed rate[4] | | | 2.00% | 2.07% | 3.32% | 3.99% |
| Forward-starting swaps[5] | 14,246 | (3,204) | — | — | — | (3,204) |
| Weighted average fixed rate[4] | | | — | — | — | 5.29% |
| Total pay-fixed | 293,683 | (36,920) | (93) | (1,221) | (6,686) | (28,920) |
| Total interest-rate swaps | 517,076 | (23,898) | (69) | (689) | (4,685) | (18,455) |
| Option-based: | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 89,875 | 14,387 | 6,621 | 4,183 | 832 | 2,751 |
| Written | 26,525 | (2,763) | (188) | (2,340) | (235) | — |
| Put swaptions | | | | | | |
| Purchased | 68,175 | 725 | 16 | 90 | 203 | 416 |
| Written | — | — | — | — | — | — |
| Other option-based derivatives[6] | 50,958 | 2,116 | (7) | — | — | 2,123 |
| Total option-based | 235,533 | 14,465 | 6,442 | 1,933 | 800 | 5,290 |
| Futures | 72,262 | — | — | — | — | — |
| Foreign-currency swaps | 1,779 | 154 | 54 | 100 | — | — |
| Commitments[7] | 39,429 | (107) | (107) | — | — | — |
| Swap guarantee derivatives | 3,722 | (36) | — | (1) | (1) | (34) |
| Subtotal | 869,801 | (9,422) | $6,320 | $ 1,343 | $(3,886) | $(13,199) |
| Credit derivatives | 10,988 | (5) | | | | |
| Subtotal | 880,789 | (9,427) | | | | |
| Derivative interest receivable (payable), net | | (1,341) | | | | |
| Trade/settle receivable (payable), net | | 6 | | | | |
| Derivative cash collateral (held) posted, net | | 10,728 | | | | |
| Total | $880,789 | $    (34) | | | | |

(1) Fair value is categorized based on the period from September 30, 2011 until the contractual maturity of the derivative.
(2) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.
(3) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net, and includes derivative interest receivable or (payable), net, trade/settle receivable or (payable), net and derivative cash collateral (held) or posted, net.
(4) Represents the notional weighted average rate for the fixed leg of the swaps.
(5) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to fifteen years.
(6) Primarily includes purchased interest-rate caps and floors.
(7) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

At September 30, 2011, the net fair value of our total derivative portfolio was $(34) million, as compared to $(1.1) billion at December 31, 2010. During the nine months ended September 30, 2011, the fair value of our total derivative portfolio increased primarily due to additional cash collateral we posted to our counterparties during this period, partially offset by the impact of declines in interest rates. See "NOTE 11: DERIVATIVES" for the notional or contractual amounts and related fair values of our total derivative portfolio by product type at September 30, 2011 and December 31, 2010, as well as derivative collateral posted and held.

Table 25 summarizes the changes in derivative fair values.

**Table 25 — Changes in Derivative Fair Values**

|  | Nine Months Ended September 30,[1] | |
|---|---|---|
|  | **2011** | **2010** |
|  | (in millions) | |
| Beginning balance, at January 1 — Net asset (liability) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(6,560) | $ (2,267) |
| Net change in: | | |
| Commitments[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (87) | (16) |
| Credit derivatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (12) | (5) |
| Swap guarantee derivatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | (3) |
| Other derivatives:[3] | | |
| Changes in fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (3,778) | (6,217) |
| Fair value of new contracts entered into during the period[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 604 | (1) |
| Contracts realized or otherwise settled during the period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 406 | (1,845) |
| Ending balance, at September 30 — Net asset (liability) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(9,427) | $(10,354) |

(1) Refer to "Table 24 — Derivative Fair Values and Maturities" for a reconciliation of net fair value to the amounts presented on our consolidated balance sheets as of September 30, 2011. At September 30, 2010, fair value in this table excludes derivative interest receivable or (payable), net of $(1.1) billion, trade/settle receivable or (payable), net of $3 million, and derivative cash collateral posted, net of $10.5 billion.

(2) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(3) Includes fair value changes for interest-rate swaps, option-based derivatives, futures, and foreign-currency swaps.

(4) Consists primarily of cash premiums paid or received on options.

See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for a description of gains (losses) on our derivative positions.

## REO, Net

As a result of borrower default on mortgage loans that we own, or for which we have issued our financial guarantee, we acquire properties which are recorded as REO assets on our consolidated balance sheets. The balance of our REO, net, declined to $5.6 billion at September 30, 2011 from $7.1 billion at December 31, 2010. In recent periods, the volume of our single-family REO acquisitions has been less than it otherwise would have been due to delays caused by concerns about the foreclosure process. These delays in foreclosures continued in the nine months ended September 30 2011, particularly in states that require a judicial foreclosure process. We expect these delays in the foreclosure process will likely continue into 2012. However, we expect our REO inventory to remain at elevated levels, as we have a large inventory of significantly delinquent loans in our single-family credit guarantee portfolio, many of which will likely complete the foreclosure process and transition to REO during the next few quarters as our servicers work through their foreclosure-related issues. To the extent a large volume of loans completes the foreclosure process in a short period of time, the resulting REO inventory could have a negative impact on the housing market. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

## Deferred Tax Assets, Net

In connection with our entry into conservatorship, we determined that it was more likely than not that a portion of our net deferred tax assets would not be realized due to our inability to generate sufficient taxable income and, therefore, we recorded a valuation allowance. After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, and related difficulty in forecasting future profit levels, we reached a similar conclusion in all subsequent quarters, including in the third quarter of 2011. Our valuation allowance increased by $2.4 billion during the nine months ended September 30, 2011 to $35.8 billion, primarily attributable to an increase in temporary differences during the period. As of September 30, 2011, after consideration of the valuation allowance, we had a net deferred tax asset of $3.9 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities. We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered.

### IRS Examinations

Prior to 2011, the IRS completed its examinations of tax years 1998 to 2007. We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices. The principal matter of controversy involves questions of timing and potential penalties regarding our tax accounting method for certain hedging transactions. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. On July 6, 2011, the U.S. Tax Court

*Freddie Mac*

issued a Notice Setting Case for Trial and a Standing Pretrial Order. The trial date set forth in the Notice was December 12, 2011, and is now proposed for continuance to November 5, 2012. We believe appropriate reserves have been provided for settlement on reasonable terms. For additional information, see "NOTE 13: INCOME TAXES."

**Other Assets**

Other assets consist of the guarantee asset related to non-consolidated trusts and other guarantee commitments, accounts and other receivables, and other miscellaneous assets. Other assets decreased to $10.6 billion as of September 30, 2011 from $10.9 billion as of December 31, 2010 primarily because of a decrease in other receivables. See "NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

**Total Debt, Net**

PCs and Other Guarantee Transactions issued by our consolidated trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets. Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated trusts. The debt securities of our consolidated trusts may be prepaid without penalty at any time.

Other debt consists of unsecured short-term and long-term debt securities we issue to third parties to fund our business activities. It is classified as either short-term or long-term based on the contractual maturity of the debt instrument. See "LIQUIDITY AND CAPITAL RESOURCES" for a discussion of our management activities related to other debt.

Table 26 presents the UPB for Freddie Mac issued mortgage-related securities by the underlying mortgage product type based on the UPB of the securities.

**Table 26 — Freddie Mac Mortgage-Related Securities[1][2]**

| | September 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total |
| | (in millions) | | | | | |
| Single-family: | | | | | | |
| 30-year or more amortizing fixed-rate . . . . . . | $1,166,874 | $ — | $1,166,874 | $1,213,448 | $ — | $1,213,448 |
| 20-year amortizing fixed-rate . . . . . . . . . . . | 67,817 | — | 67,817 | 65,210 | — | 65,210 |
| 15-year amortizing fixed-rate . . . . . . . . . . . | 252,011 | — | 252,011 | 248,702 | — | 248,702 |
| Adjustable-rate[3] . . . . . . . . . . . . . . . . . . . . | 67,921 | — | 67,921 | 61,269 | — | 61,269 |
| Interest-only[4] . . . . . . . . . . . . . . . . . . . . . | 63,011 | — | 63,011 | 79,835 | — | 79,835 |
| FHA/VA and other governmental . . . . . . . . . | 3,394 | — | 3,394 | 3,369 | — | 3,369 |
| *Total single-family* . . . . . . . . . . . . . . . . . | 1,621,028 | — | 1,621,028 | 1,671,833 | — | 1,671,833 |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . . . | — | 4,582 | 4,582 | — | 4,603 | 4,603 |
| *Total single-family and multifamily* . . . . . . | 1,621,028 | 4,582 | 1,625,610 | 1,671,833 | 4,603 | 1,676,436 |
| Other Guarantee Transactions: | | | | | | |
| HFA bonds:[5] | | | | | | |
| Single-family . . . . . . . . . . . . . . . . . . . . | — | 6,135 | 6,135 | — | 6,168 | 6,168 |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . | — | 1,084 | 1,084 | — | 1,173 | 1,173 |
| Total HFA bonds . . . . . . . . . . . . . . . . . . | — | 7,219 | 7,219 | — | 7,341 | 7,341 |
| Other: | | | | | | |
| Single-family[6] . . . . . . . . . . . . . . . . . . . | 13,530 | 3,932 | 17,462 | 15,806 | 4,243 | 20,049 |
| Multifamily . . . . . . . . . . . . . . . . . . . . . . | — | 16,734 | 16,734 | — | 8,235 | 8,235 |
| Total Other Guarantee Transactions . . . . . . | 13,530 | 20,666 | 34,196 | 15,806 | 12,478 | 28,284 |
| REMICs and Other Structured Securities backed by Ginnie Mae Certificates[7] . . . . . . . . . . | — | 817 | 817 | — | 857 | 857 |
| Total Freddie Mac Mortgage-Related Securities . . . . . . . . . . . . . . . . . . . . . . . . . | $1,634,558 | $33,284 | $1,667,842 | $1,687,639 | $25,279 | $1,712,918 |
| Less: Repurchased Freddie Mac Mortgage-Related Securities[8] . . . . . . . . . . . . . . . . . | (163,583) | | | (170,638) | | |
| Total UPB of debt securities of consolidated trusts held by third parties . . . . . . . . . . . . | $1,470,975 | | | $1,517,001 | | |

(1) Based on UPB of the securities and excludes mortgage-related debt traded, but not yet settled.
(2) Excludes other guarantee commitments for mortgage assets held by third parties that require us to purchase loans from lenders when these loans meet certain delinquency criteria.
(3) Includes $1.2 billion and $1.3 billion in UPB of option ARM mortgage loans as of September 30, 2011 and December 31, 2010, respectively. See endnote (6) for additional information on option ARM loans that back our Other Guarantee Transactions.
(4) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed- and variable-rate interest-only loans.
(5) Consists of bonds we acquired and resecuritized under the NIBP.
(6) Backed by non-agency mortgage-related securities that include prime, FHA/VA and subprime mortgage loans and also include $7.6 billion and $8.4 billion in UPB of securities backed by option ARM mortgage loans at September 30, 2011 and December 31, 2010, respectively.
(7) Backed by FHA/VA loans.
(8) Represents the UPB of repurchased Freddie Mac mortgage-related securities that are consolidated on our balance sheets and includes certain remittance amounts associated with our security trust administration that are payable to third-party mortgage-related security holders. Our holdings of non-consolidated Freddie Mac mortgage-related securities are presented in "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets."

Excluding Other Guarantee Transactions, the percentage of amortizing fixed-rate single-family loans underlying our consolidated trust debt securities, based on UPB, was approximately 92% at both September 30, 2011 and December 31, 2010. The majority of newly issued Freddie Mac single-family mortgage-related securities during the nine months ended September 30, 2011 were backed by refinance mortgages. During the nine months ended September 30, 2011, the UPB of Freddie Mac mortgage-related securities issued by consolidated trusts declined approximately 4.2%, on an annualized basis, as the volume of our new issuances has been less than the volume of liquidations of these securities. The UPB of multifamily Other Guarantee Transactions, excluding HFA-related securities, increased to $16.7 billion as of September 30, 2011 from $8.2 billion as of December 31, 2010, due to increased multifamily loan securitization activity.

Table 27 presents issuances and extinguishments of debt securities of our consolidated trusts held by third parties during the three and nine months ended September 30, 2011 and 2010.

### Table 27 — Issuances and Extinguishments of Debt Securities of Consolidated Trusts[1]

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Beginning balance of debt securities of consolidated trusts held by third parties . . . . . | $1,484,416 | $1,536,949 | $1,517,001 | $1,564,093 |
| Issuances to third parties of debt securities of consolidated trusts: | | | | |
| Issuances based on underlying mortgage product type: | | | | |
| 30-year or more amortizing fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 37,821 | 61,099 | 136,129 | 183,126 |
| 20-year amortizing fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,600 | 6,882 | 12,990 | 13,761 |
| 15-year amortizing fixed-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17,252 | 18,944 | 52,766 | 46,321 |
| Adjustable-rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8,179 | 4,333 | 20,041 | 9,938 |
| Interest-only . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 88 | 152 | 845 |
| FHA/VA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | 160 | 1,075 |
| Debt securities of consolidated trusts retained by us at issuance . . . . . . . . . . . . . | (100) | (5,225) | (6,758) | (8,016) |
| Net issuances of debt securities of consolidated trusts . . . . . . . . . . . . . . . . . | 66,752 | 86,121 | 215,480 | 247,050 |
| Reissuances of debt securities of consolidated trusts previously held by us[2] . . . . . . | 16,765 | 20,323 | 53,318 | 36,683 |
| Total issuances to third parties of debt securities of consolidated trusts . . . . . . . | 83,517 | 106,444 | 268,798 | 283,733 |
| Extinguishments, net[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (96,958) | (110,328) | (314,824) | (314,761) |
| Ending balance of debt securities of consolidated trusts held by third parties . . . . . . . | $1,470,975 | $1,533,065 | $1,470,975 | $1,533,065 |

(1) Based on UPB.

(2) Represents our sales of PCs and certain Other Guarantee Transactions previously held by us.

(3) Represents: (a) UPB of our purchases from third parties of PCs and Other Guarantee Transactions issued by our consolidated trusts; (b) principal repayments related to PCs and Other Guarantee Transactions issued by our consolidated trusts; and (c) certain remittance amounts associated with our trust security administration that are payable to third-party mortgage-related security holders as of September 30, 2011 and 2010.

### Other Liabilities

Other liabilities consist of the guarantee obligation, the reserve for guarantee losses on non-consolidated trusts and other mortgage-related financial guarantees, servicer liabilities, accounts payable and accrued expenses, and other miscellaneous liabilities. Other liabilities decreased to $6.9 billion as of September 30, 2011 from $8.1 billion as of December 31, 2010 primarily because of a decrease in servicer advanced interest liabilities due to a decrease in seriously delinquent loans and a decrease in accounts payable and accrued expenses during the nine months ended September 30, 2011. See "NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

### Total Equity (Deficit)

Table 28 presents the changes in total equity (deficit) and certain capital-related disclosures.

### Table 28 — Changes in Total Equity (Deficit)

| | Three Months Ended | | | | | Nine Months Ended |
|---|---|---|---|---|---|---|
| | 9/30/2011 | 6/30/2011 | 3/31/2011 | 12/31/2010 | 9/30/2010 | 9/30/2011 |
| | (in millions) | | | | | |
| Beginning balance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(1,478) | $ 1,237 | $ (401) | $ (58) | $(1,738) | $ (401) |
| Net income (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (4,422) | (2,139) | 676 | (113) | (2,511) | (5,885) |
| Other comprehensive income (loss), net of taxes: | | | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (80) | 903 | 1,941 | 1,097 | 3,781 | 2,764 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 124 | 135 | 132 | 153 | 164 | 391 |
| Changes in defined benefit plans . . . . . . . . . . . . . . . . . . . . . | 2 | 1 | (9) | 19 | 2 | (6) |
| Total comprehensive income (loss) . . . . . . . . . . . . . . . . . . . . . | (4,376) | (1,100) | 2,740 | 1,156 | 1,436 | (2,736) |
| Capital draw funded by Treasury . . . . . . . . . . . . . . . . . . . . . . | 1,479 | — | 500 | 100 | 1,800 | 1,979 |
| Senior preferred stock dividends declared . . . . . . . . . . . . . . . . . | (1,618) | (1,617) | (1,605) | (1,603) | (1,561) | (4,840) |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 2 | 3 | 4 | 5 | 7 |
| Total equity (deficit)/Net worth . . . . . . . . . . . . . . . . . . . . . . . | $(5,991) | $(1,478) | $ 1,237 | $ (401) | $ (58) | $(5,991) |
| Aggregate draws under the Purchase Agreement[1] . . . . . . . . . . . | $65,179 | $63,700 | $63,700 | $63,200 | $63,100 | $65,179 |
| Aggregate senior preferred stock dividends paid to Treasury in cash . . | $14,866 | $13,248 | $11,631 | $10,026 | $ 8,423 | $14,866 |
| Percentage of dividends paid to Treasury in cash to aggregate draws . . | 23% | 21% | 18% | 16% | 13% | 23% |

(1) Does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received.

Net unrealized losses in AOCI on our available-for-sale securities increased by $80 million during the three months ended September 30, 2011, primarily due to the impact of widening OAS levels on our non-agency mortgage-related

securities, partially offset by the impact of a decline in interest rates on our agency securities and CMBS. Net unrealized losses in AOCI on our available-for-sale securities decreased by $2.8 billion during the nine months ended September 30, 2011, primarily due to the impact of a decline in interest rates, resulting in fair value gains on our agency and CMBS securities, partially offset by the impact of widening OAS levels on our CMBS and other non-agency mortgage-related securities. Additionally, net unrealized losses recorded in AOCI decreased due to the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities. Net unrealized losses in AOCI on our closed cash flow hedge relationships decreased by $124 million and $391 million during the three and nine months ended September 30, 2011, respectively, primarily attributable to the reclassification of losses into earnings related to our closed cash flow hedges as the originally forecasted transactions affected earnings.

## RISK MANAGEMENT

Our investment and credit guarantee activities expose us to three broad categories of risk: (a) credit risk; (b) interest-rate risk and other market risk; and (c) operational risk. See "RISK FACTORS" in our 2010 Annual Report, our Quarterly Reports on Form 10-Q for the first and second quarters of 2011, and in this Form 10-Q for additional information regarding these and other risks.

### Credit Risk

We are subject primarily to two types of credit risk: institutional credit risk and mortgage credit risk. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee. We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment.

#### *Institutional Credit Risk*

In recent periods, challenging market conditions have adversely affected the liquidity and financial condition of our counterparties. The concentration of our exposure to our counterparties increased in recent periods due to industry consolidation and counterparty failures.

Our exposure to single-family mortgage seller/servicers remained high during the nine months ended September 30, 2011 with respect to their repurchase obligations arising from breaches of representations and warranties made to us for loans they underwrote and sold to us. We rely on our single-family seller/servicers to perform loan workout activities as well as foreclosures on loans that they service for us. Our credit losses could increase to the extent that our seller/servicers do not fully perform these obligations in a prudent and timely manner.

The financial condition of certain of our mortgage insurers continued to deteriorate during the third quarter of 2011. In addition, our exposure to derivatives counterparties remains highly concentrated as compared to historical levels.

We continue to face challenges in reducing our risk concentrations with counterparties. Efforts we take to reduce exposure to financially weakened counterparties could further increase our exposure to other individual counterparties. The failure of any of our significant counterparties to meet their obligations to us could have a material adverse effect on our results of operations, financial condition, and our ability to conduct future business.

#### *Non-Agency Mortgage-Related Security Issuers*

Our investments in securities expose us to institutional credit risk to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform their obligations. Our investments in non-Freddie Mac mortgage-related securities include both agency and non-agency securities. However, agency securities have historically presented minimal institutional credit risk due to the guarantee provided by those institutions.

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non-agency mortgage-related securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. The effectiveness of our efforts is highly uncertain and any potential recoveries may take significant time to realize.

As previously disclosed, we joined an investor group that delivered a notice of non-performance in 2010 to The Bank of New York Mellon, as Trustee, and Countrywide Home Loans Servicing LP (now known as BAC Home Loans Servicing, LP), related to the possibility that certain mortgage pools backing certain mortgage-related securities issued by

Countrywide Financial Corporation and related entities include mortgages that may have been ineligible for inclusion in the pools due to breaches of representations or warranties.

On June 29, 2011, Bank of America Corporation announced that it, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and Countrywide Home Loans, Inc. entered into a settlement agreement with The Bank of New York Mellon, as trustee, to resolve all outstanding and potential claims related to alleged breaches of representations and warranties (including repurchase claims), substantially all historical loan servicing claims and certain other historical claims with respect to 530 Countrywide first-lien and second-lien residential mortgage-related securitization trusts. Bank of America indicated that the settlement is subject to final court approval and certain other conditions, including the receipt of a private letter ruling from the IRS. There can be no assurance that final court approval of the settlement will be obtained or that all conditions will be satisfied. Bank of America noted that, given the number of investors and the complexity of the settlement, it is not possible to predict the timing or ultimate outcome of the court approval process, which could take a substantial period of time. We have investments in certain of these Countrywide securitization trusts and would expect to benefit from this settlement, if final court approval is obtained.

In connection with the settlement, Bank of America Corporation entered into an agreement with the investor group. Under this agreement, the investor group agreed, among other things, to use reasonable best efforts and to cooperate in good faith to effectuate the settlement, including to obtain final court approval. Freddie Mac was not a party to this agreement, but agreed to retract any previously delivered notices of non-performance upon final court approval of the settlement.

The Bank of New York Mellon, as trustee, filed the settlement in state court in New York and planned to seek approval at a hearing, which approval would bind all investors in the related trusts. The court directed that any objections to the settlement be filed no later than August 30, 2011. On August 30, 2011, FHFA announced that, in its capacity as conservator, it had filed an appearance and conditional objection regarding the settlement, in order to obtain any additional pertinent information developed in the matter. In the announcement, FHFA, as conservator, stated that it is aware of no basis upon which it would raise a substantive objection to the settlement at this time, but that it believes it prudent not only to receive additional information as it continues its due diligence of the settlement, but also to reserve its capability to voice a substantive objection in the unlikely event that necessity should arise.

On August 26, 2011, the case was removed to Federal court. The trustee filed a motion to remand the case back to state court. On October 19, 2011, the Federal court denied the trustee's motion to remand. The trustee has the right to appeal this decision; there is no assurance that the trustee would be successful on any such appeal.

On September 2, 2011, FHFA announced that it, as conservator for Freddie Mac and Fannie Mae, has filed lawsuits against 17 financial institutions and related defendants alleging violations of federal securities laws and common law in the sale of residential non-agency mortgage-related securities to Freddie Mac and Fannie Mae. FHFA, as conservator, filed a similar lawsuit against UBS Americas, Inc. and related defendants on July 27, 2011. FHFA seeks to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non-agency mortgage-related securities issued by these financial institutions.

See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for additional information on credit risk associated with our investments in mortgage-related securities, including higher-risk components and impairment charges we recognized in the three and nine months ended September 30, 2011 related to these investments. For information about institutional credit risk associated with our investments in non-mortgage-related securities, see "NOTE 7: INVESTMENTS IN SECURITIES — Table 7.9 — Trading Securities" as well as "Cash and Other Investments Counterparties" below.

_Single-family Mortgage Seller/Servicers_

We acquire a significant portion of our single-family mortgage purchase volume from several large lenders, or seller/servicers. Our top 10 single-family seller/servicers provided approximately 84% of our single-family purchase volume during the nine months ended September 30, 2011. Wells Fargo Bank, N.A., JPMorgan Chase Bank, N.A. and Bank of America, N.A. accounted for 27%, 14%, and 10%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume for the nine months ended September 30, 2011.

We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans that have been originated under specified underwriting standards. If we subsequently discover that contractual standards were not followed, we can exercise certain contractual remedies to mitigate our credit losses. These contractual remedies

include the ability to require the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our mortgage seller/servicers, including non-performance of their repurchase obligations arising from breaches of the representations and warranties made to us for loans they underwrote and sold to us or failure to honor their recourse and indemnification obligations to us. Pursuant to their repurchase obligations, our seller/servicers are obligated to repurchase mortgages sold to us when there has been a breach of the representations and warranties made to us with respect to the mortgages. In lieu of repurchase, we may choose to allow a seller/servicer to indemnify us against losses realized on such mortgages or otherwise compensate us for the risk of continuing to hold the mortgages. In some cases, the ultimate amounts of recovery payments we have received from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations. If a seller/servicer does not satisfy its repurchase or indemnification obligations with respect to a loan, we will be subject to the full range of credit risks posed by the loan if the loan fails to perform, including the risk that a mortgage insurer may deny or rescind coverage on the loan (if the loan is insured) and the risk that we will incur credit losses on the loan through the workout or foreclosure process.

Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal. Some of our seller/servicers have failed to fully perform their repurchase obligations due to lack of financial capacity, while others, including many of our larger seller/servicers, have not fully performed their repurchase obligations in a timely manner. The UPB of loans subject to repurchase requests issued to our single-family seller/servicers declined to approximately $2.7 billion as of September 30, 2011 from $3.8 billion as of December 31, 2010, primarily because resolved requests of $8.4 billion exceeded our issuance of $7.3 billion of new requests for the nine months ended September 30, 2011. As measured by UPB, approximately 40% and 34% of the repurchase requests outstanding at September 30, 2011 and December 31, 2010, respectively, were outstanding for four months or more since issuance of the initial request. The amount we expect to collect on the outstanding requests is significantly less than the UPB of the loans subject to repurchase requests primarily because many of these requests will likely be satisfied by reimbursement of our realized credit losses by seller/servicers. These requests may be rescinded in the course of the contractual appeal process. Based on our historical loss experience and the fact that many of these loans are covered by credit enhancements, we expect the actual credit losses experienced by us should we fail to collect on these repurchase requests to also be less than the UPB of the loans. As of September 30, 2011, a significant portion of the repurchase requests outstanding more than four months relates to requests made because the mortgage insurer rescinded the mortgage insurance on the loan or denied the mortgage insurance claim. Our actual credit losses could increase should the mortgage insurance coverage not be reinstated and we fail to collect on these repurchase requests.

During the nine months ended September 30, 2011, we recovered amounts that covered losses with respect to $3.5 billion of UPB of loans subject to our repurchase requests. At September 30, 2011 and December 31, 2010, four of our largest single-family seller/servicers collectively had approximately 43% and 32%, respectively, of their repurchase obligations outstanding for more than four months since issuance of our initial repurchase request, as measured by the UPB of loans associated with our repurchase requests. During 2010, we entered into agreements with certain of our seller/servicers to release specified loans from certain repurchase obligations in exchange for one-time cash payments. In a memorandum to the FHFA Office of Inspector General dated September 19, 2011, FHFA stated that earlier this year it had "suspended certain future repurchase agreements [with seller/servicers concerning their repurchase obligations] pending the outcome" of a review by Freddie Mac of its loan sampling methodology. We are in discussions with FHFA concerning our review of our sampling methodology. We cannot predict when this process will be completed or whether or when FHFA will terminate or revise its suspension.

In order to resolve outstanding repurchase requests on a more timely basis with our single-family seller/servicers in the future, we have begun to require certain of our larger seller/servicers to commit to plans for completing repurchases, with financial consequences or with stated remedies for non-compliance, as part of the annual renewals of our contracts with them. We continue to review loans and pursue our rights to issue repurchase requests to our counterparties, as appropriate.

As part of our expansion of HARP, we have agreed to waive certain future potential representation and warranties claims, which could be significant. For more information, see "LEGISLATIVE AND REGULATORY MATTERS — *Changes to the Home Affordable Refinance Program*."

Our estimate of recoveries from seller/servicer repurchase obligations is considered in our allowance for loan losses as of September 30, 2011 and December 31, 2010; however, our actual recoveries may be different than our estimates.

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for further information.

On August 24, 2009, Taylor, Bean & Whitaker Mortgage Corp., or TBW, filed for bankruptcy. Prior to that date, we had terminated TBW's status as a seller/servicer of our loans. We had exposure to TBW with respect to its loan repurchase obligations. We also had exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac. Colonial Bank was placed into receivership by the FDIC in August 2009.

On or about June 14, 2010, we filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, approximately $1.15 billion related to current and projected repurchase obligations and approximately $440 million related to funds deposited with Colonial Bank, or with the FDIC as its receiver, which were attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represented miscellaneous costs and expenses incurred in connection with the termination of TBW's status as a seller/servicer of our loans.

With the approval of FHFA, as Conservator, we entered into a proposed settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement, which is discussed below, was filed with the Bankruptcy Court for the Middle District of Florida on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011, which became effective on August 10, 2011.

Under the terms of the settlement, we have been granted an unsecured claim in the TBW bankruptcy estate in the amount of $1.022 billion, largely representing our claims to past and future loan repurchase exposures. We estimate that this claim may result in a distribution to us of approximately $40-45 million, which is based on the plan of liquidation and disclosure statement filed with the court by TBW, indicating that general unsecured creditors are likely to receive a distribution of 3.3 to 4.4 cents on the dollar. The settlement provides that $6.3 million of this amount is to be paid to certain creditors of TBW. In addition, pursuant to the settlement, we have received net proceeds of $156 million through September 30, 2011 relating to various funds on deposit, net of amounts we were required to assign or pay to other parties. The settlement also allows for our sale of TBW-related mortgage servicing rights and provides a formula for determining the amount of the proceeds, if any, to be allocated to third parties that have asserted interests in those rights. During the third quarter of 2011, we recognized a $0.2 billion gain, primarily representing the difference between the amounts that we assigned, or paid, to TBW and their creditors and the liability previously recorded on our consolidated balance sheet.

At the time of settlement, we estimated our uncompensated loss exposure to TBW to be approximately $0.7 billion. This estimated exposure largely relates to outstanding repurchase claims that have already been adjusted in our financial statements through our provision for loan losses. Our ultimate losses could exceed our recorded estimate. Potential changes in our estimate of uncompensated loss exposure or the potential for additional claims as discussed below could cause us to record additional losses in the future.

We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors, may file an action to recover certain funds paid to us prior to the TBW bankruptcy. However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to recover assets. Based on court filings and other information, we understand that Ocala or its creditors may attempt to assert fraudulent transfer and other possible claims totaling approximately $840 million against us related to funds that were allegedly transferred from Ocala to Freddie Mac custodial accounts. We also understood that Ocala might attempt to make claims against us asserting ownership of a large number of loans that we purchased from TBW. The order approving the settlement provides that nothing in the settlement shall be construed to limit, waive or release Ocala's claims against Freddie Mac, except for TBW's claims and claims arising from the allocation of the loans discussed above to Freddie Mac.

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds insuring against loss resulting from dishonest acts by TBW's officers, directors, and employees. Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder. Discovery is proceeding.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top five single-family loan servicers, Wells Fargo Bank N.A., Bank of America N.A., JPMorgan Chase Bank, N.A., Citimortgage, Inc., and U.S. Bank, N.A., together serviced approximately 67% of our single-family mortgage loans as of September 30,

2011. Wells Fargo Bank N.A., Bank of America N.A., and JPMorgan Chase Bank, N.A. serviced approximately 26%, 13%, and 13%, respectively, of our single-family mortgage loans, as of September 30, 2011. Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

During the second half of 2010, a number of our single-family servicers, including several of our largest, announced that they were evaluating the potential extent of issues relating to the possible improper execution of documents associated with foreclosures of loans they service, including those they service for us. Some of these companies temporarily suspended foreclosure proceedings in certain states in which they do business. While these servicers generally resumed foreclosure proceedings in the first quarter of 2011, the rate at which they are effecting foreclosures has been slower than prior to the suspensions. See "RISK FACTORS — Operational Risks — *We have incurred and will continue to incur expenses and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process*" in our 2010 Annual Report.

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loan workout efforts, including under the MHA Program and the recent servicing alignment initiative, and therefore, we also have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans. During the nine months ended September 30, 2011, there have been several regulatory developments that have affected and will continue to significantly impact our single-family mortgage servicers. For more information on regulatory and other developments in mortgage servicing, and how these developments may impact our business, see "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices."

While we have legal remedies against seller/servicers who fail to comply with our contractual servicing requirements, we are exposed to institutional credit risk in the event of their insolvency or if, for other causes, seller/servicers fail to perform their obligations to repurchase affected mortgages, indemnify us for losses resulting from any breach, or pay damages for any breach. In the event a seller/servicer does not fulfill its repurchase or other responsibilities, we may seek partial recovery of amounts owed by the seller/servicer by transferring the applicable mortgage servicing rights of the seller/servicer to a different servicer. However, this option may be difficult to accomplish with respect to our largest seller/servicers due to the operational and capacity challenges of transferring a large servicing portfolio.

*Multifamily Mortgage Seller/Servicers*

As of September 30, 2011, our top four multifamily servicers, Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., CBRE Capital Markets, Inc., and Deutsche Bank Berkshire Mortgage, each serviced more than 10% of our multifamily mortgage portfolio and together serviced approximately 51% of our multifamily mortgage portfolio. For the nine months ended September 30, 2011, our top three multifamily sellers, CBRE Capital Markets, Inc., Berkadia Commercial Mortgage LLC, and NorthMarq Capital, LLC accounted for 21%, 11%, and 11%, respectively, of our multifamily purchase volume. Our top 10 multifamily lenders represented an aggregate of approximately 85% of our multifamily purchase volume for the nine months ended September 30, 2011.

In our multifamily business, we are exposed to the risk that multifamily seller/servicers could come under financial pressure, which could potentially cause degradation in the quality of servicing they provide to us or, in certain cases, reduce the likelihood that we could recover losses through recourse agreements or other credit enhancements, where applicable. This risk primarily relates to multifamily loans that we hold on our consolidated balance sheets where we retain all of the related credit risk. We monitor the status of all our multifamily seller/servicers in accordance with our counterparty credit risk management framework.

*Mortgage Insurers*

We have institutional credit risk relating to the potential insolvency of or non-performance by mortgage insurers that insure single-family mortgages we purchase or guarantee. As a guarantor, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. If any of our mortgage insurers that provide credit enhancement fail to fulfill their obligation, we could experience increased credit losses.

Table 29 summarizes our exposure to mortgage insurers as of September 30, 2011. In the event that a mortgage insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses resulting from such failure. As of September 30, 2011, most of the coverage outstanding from mortgage insurance shown in Table 29 is attributed to primary policies rather than pool insurance policies.

**Table 29 — Mortgage Insurance by Counterparty**

| | | | As of September 30, 2011 | | |
| | | | Primary Insurance[2] | Pool Insurance[2] | Coverage Outstanding[3] |
| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | | (in billions) | |
|---|---|---|---|---|---|
| Mortgage Guaranty Insurance Corporation (MGIC) . . . . . | B+ | Negative | $ 50.1 | $29.8 | $13.1 |
| Radian Guaranty Inc . . . . . . . . . . . . . . . . . . . . . . . . | B+ | Negative | 37.1 | 11.9 | 10.6 |
| Genworth Mortgage Insurance Corporation. . . . . . . . . . | BB− | Negative | 31.7 | 0.9 | 8.1 |
| United Guaranty Residential Insurance Co. . . . . . . . . . | BBB | Stable | 28.9 | 0.3 | 7.1 |
| PMI Mortgage Insurance Co. (PMI) . . . . . . . . . . . . . | R | N/A | 25.7 | 1.4 | 6.5 |
| Republic Mortgage Insurance Company (RMIC) . . . . . . | CC | Negative | 21.1 | 2.1 | 5.3 |
| Triad Guaranty Insurance Corp[4] . . . . . . . . . . . . . . . | Not Rated | N/A | 8.9 | 0.9 | 2.2 |
| CMG Mortgage Insurance Co. . . . . . . . . . . . . . . . . . | BBB | Negative | 2.9 | 0.1 | 0.7 |
| Essent Guaranty, Inc. . . . . . . . . . . . . . . . . . . . . . . . | Not Rated | N/A | 0.5 | — | 0.1 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | $206.9 | $47.4 | $53.7 |

(1)  Except for RMIC, latest rating available as of October 21, 2011. RMIC's credit rating and credit rating outlook reflect an S&P action on October 28, 2011. Represents the lower of S&P and Moody's credit ratings and outlooks. In this table, the rating and outlook of the legal entity is stated in terms of the S&P equivalent.

(2)  Represents the amount of UPB at the end of the period for our single-family credit guarantee portfolio covered by the respective insurance type.

(3)  Represents the remaining aggregate contractual limit for reimbursement of losses under policies of both primary and pool insurance. These amounts are based on our gross coverage without regard to netting of coverage that may exist to the extent an affected mortgage is covered under both types of insurance.

(4)  Beginning on June 1, 2009, Triad began paying valid claims 60% in cash and 40% in deferred payment obligations under order of its state regulator.

We received proceeds of $2.0 billion and $1.2 billion during the nine months ended September 30, 2011 and 2010, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers, net of associated reserves, of $1.1 billion and $1.5 billion as of September 30, 2011 and December 31, 2010, respectively.

The UPB of single-family loans covered by pool insurance declined approximately 16% during the nine months ended September 30, 2011, primarily due to prepayments and other liquidation events. We did not purchase pool insurance on single-family loans during the nine months ended September 30, 2011. In recent periods, we also reached the maximum limit of recovery on certain of these policies.

Based on information we received from MGIC, we understand that MGIC may challenge our future claims under certain of their pool insurance policies. We believe that our pool insurance policies with MGIC provide us with the right to obtain recoveries for losses up to the aggregate limit indicated in Table 29. However, MGIC's interpretation of these policies would result in claims coverage approximately $0.6 billion lower than the coverage outstanding amount set forth in Table 29. We expect this difference to increase but not to exceed approximately $0.7 billion.

The financial condition of certain of our mortgage insurers continued to deteriorate during the third quarter of 2011. In August 2011, we suspended PMI and its affiliates and RMIC and its affiliates as approved mortgage insurers, making loans insured by either company ineligible for sale to Freddie Mac. During the third quarter of 2011, RMIC announced that its waiver of state regulatory capital requirements expired, and it ceased writing new business. PMI, which had exceeded its risk to capital requirements, also ceased writing new business during the third quarter of 2011. PMI has been put under state supervision, and PMI's state regulator has petitioned for judicial action to place PMI into receivership. PMI has announced that, effective October 24, 2011, it instituted a partial claim payment plan, under which claim payments will be made at 50%, with the remaining amount deferred as a policyholder claim. Given the difficulties in the mortgage insurance industry, we believe it is likely that other companies may also exceed their regulatory capital limit in the future. In the future, our mortgage insurance exposure will likely be concentrated among a smaller number of counterparties.

As part of the estimate of our loan loss reserves, we evaluate the near term recovery from insurance policies for mortgage loans that we hold on our consolidated balance sheet as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments. Triad is continuing to pay claims 60% in cash and 40% in deferred payment obligations under orders of its state regulator. To date, the state regulator has not allowed Triad to begin paying its deferred payment obligations, and it is uncertain when or if Triad will be permitted to do so. If Triad does not pay its deferred payment obligations, we would lose a significant portion of the coverage provided by Triad shown in Table 29 above. In addition to Triad, RMIC, and PMI, we believe that certain mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as they emerge.

At least one of our largest servicers entered into arrangements with two of our mortgage insurance counterparties for settlement of future rescission activity for certain mortgage loans. Under such agreements, servicers pay and/or indemnify

mortgage insurers in exchange for the mortgage insurers agreeing not to issue mortgage insurance rescissions and /or denials of coverage related to origination defects on Freddie Mac-owned mortgages. For loans covered by these agreements, we may be at risk of additional loss to the extent we do not independently uncover loan defects and require lender repurchase for loans that otherwise would have resulted in mortgage insurance rescission. Additionally, this type of activity could result in negative financial impacts on our mortgage insurers' ability to pay in some economic scenarios. In April 2011, we issued an industry letter to our servicers reminding them that they may not enter into these types of agreements without our consent. It is unclear how widespread this type of agreement between our servicers and mortgage insurers has become or how many loans it may impact. For more information, see "RISK FACTORS — *We could incur increased credit losses if our seller/servicers enter into arrangements with mortgage insurers for settlement of future rescission activity and such agreements could potentially reduce the ability of mortgage insurers to pay claims to us*."

### Bond Insurers

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering certain of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. Bond insurance exposes us to the risk that the bond insurer will be unable to satisfy claims.

Table 30 presents our coverage amounts of bond insurance, including secondary coverage, for the non-agency mortgage-related securities we hold. In the event a bond insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses related to such a failure.

### Table 30 — Bond Insurance by Counterparty

| | | | September 30, 2011 | |
| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | Coverage Outstanding[2] | Percent of Total[2] |
|---|---|---|---|---|
| | | | (dollars in billions) | |
| Ambac Assurance Corporation (Ambac)[3] | Not rated | N/A | $4.4 | 44% |
| Financial Guaranty Insurance Company (FGIC)[3] | Not rated | N/A | 1.8 | 18 |
| MBIA Insurance Corp. | B− | Negative | 1.3 | 13 |
| Assured Guaranty Municipal Corp. | AA− | Negative | 1.1 | 12 |
| National Public Finance Guarantee Corp. | BBB | Developing | 1.2 | 12 |
| Syncora Guarantee Inc.[3] | Not rated | N/A | 0.1 | 1 |
| Total | | | $9.9 | 100% |

(1) Latest ratings available as of October 21, 2011. Represents the lower of S&P and Moody's credit ratings. In this table, the rating and outlook of the legal entity is stated in terms of the S&P equivalent.
(2) Represents the remaining contractual limit for reimbursement of losses, including lost interest and other expenses, on non-agency mortgage-related securities.
(3) Ambac, FGIC, and Syncora Guarantee Inc. are currently operating under regulatory supervision.

We monitor the financial strength of our bond insurers in accordance with our risk management policies. Some of our larger bond insurers are in runoff mode where no new business is being issued. We expect to receive substantially less than full payment of our claims from FGIC and Ambac due to adverse developments concerning these companies, both of which are currently not paying any of their claims. We believe that we will likely receive substantially less than full payment of our claims from some of our other bond insurers, because we believe they also lack sufficient ability to fully meet all of their expected lifetime claims-paying obligations to us as such claims emerge. In the event one or more of these bond insurers were to become subject to a regulatory order or insolvency proceeding, our ability to recover certain unrealized losses on our mortgage-related securities would be further negatively impacted, which may result in further impairment losses to be recognized on our investments in securities. We considered our expectations regarding our bond insurers' ability to meet their obligations, including those of Ambac and FGIC, in making our impairment determinations at September 30, 2011 and December 31, 2010. See "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-For-Sale Securities" for additional information regarding impairment losses on securities covered by bond insurers.

### Cash and Other Investments Counterparties

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. As of September 30, 2011 and December 31, 2010, there were $54.5 billion and $91.6 billion, respectively, of cash and other

non- mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. See "NOTE 17: CONCENTRATIONS OF CREDIT AND OTHER RISKS" for further information.

*Derivative Counterparties*

We are exposed to institutional credit risk arising from the possibility that a derivative counterparty will not be able to meet its contractual obligations. We are also an active user of exchange-traded derivatives, such as Treasury and Eurodollar futures. Exchange-traded derivatives do not measurably increase our institutional credit risk to derivative counterparties because changes in the value of open exchange-traded contracts are settled daily through a financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk because transactions are executed and settled directly between us and the counterparty. When our net position with an OTC counterparty subject to a master netting agreement has a market value above zero at a given date (*i.e.*, it is an asset reported as derivative assets, net on our consolidated balance sheets), then the counterparty could potentially be obligated to deliver cash, securities, or a combination of both having that market value necessary to satisfy its net obligation to us under the derivatives (subject to a threshold).

The Dodd-Frank Act will require central clearing and trading on exchanges or comparable trading facilities of many types of derivatives. Pursuant to the Dodd-Frank Act, the U.S. Commodity Futures Trading Commission, or CFTC, is in the process of determining the types of derivatives that must be subject to this requirement. See "LEGISLATIVE AND REGULATORY MATTERS — Dodd-Frank Act" for more information. We continue to work with the Chicago Mercantile Exchange and others to implement a central clearing platform for interest rate derivatives. We will be exposed to institutional credit risk with respect to the Chicago Mercantile Exchange or other comparable exchanges or trading facilities in the future, to the extent we use them to clear and trade derivatives, and to the members of such clearing organizations that execute and submit our transactions for clearing.

We seek to manage our exposure to institutional credit risk related to our OTC derivative counterparties using several tools, including:

- review of external rating analyses;
- strict standards for approving new derivative counterparties;
- ongoing monitoring and internal analysis of our positions with, and credit rating of, each counterparty;
- managing diversification mix among counterparties;
- master netting agreements and collateral agreements; and
- stress-testing to evaluate potential exposure under possible adverse market scenarios.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

All of our OTC derivative counterparties are major financial institutions and are experienced participants in the OTC derivatives market. A large number of OTC derivative counterparties had credit ratings of A+ or below as of October 21, 2011. For counterparties with credit ratings of A+ or below, we require them to post collateral if our net exposure to them on derivative contracts exceeds $1 million. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

The relative concentration of our derivative exposure among our primary derivative counterparties remains high. This concentration has increased significantly since 2008 due to industry consolidation and the failure of certain counterparties, and could further increase. Table 31 summarizes our exposure to our derivative counterparties, which represents the net positive fair value of derivative contracts, related accrued interest and collateral held by us from our counterparties, after netting by counterparty as applicable (*i.e.*, net amounts due to us under derivative contracts which are recorded as derivative assets). In addition, we have derivative liabilities where we post collateral to counterparties. Pursuant to certain derivative agreements, the amount of collateral that we are required to post to derivative counterparties is based on the credit rating of our long-term senior unsecured debt securities from S&P or Moody's. The lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative transactions. As a result of S&P's downgrade of Freddie Mac's credit rating of long-term senior unsecured debt from AAA to AA+ on August 8, 2011, we posted additional collateral to certain derivative counterparties in accordance with the terms of the derivative agreements. At September 30, 2011, our collateral posted exceeded our collateral held. See "CONSOLIDATED BALANCE SHEETS

ANALYSIS — Derivative Assets and Liabilities, Net" and "Table 24 — Derivative Fair Values and Maturities" for a reconciliation of fair value to the amounts presented on our consolidated balance sheets as of September 30, 2011, which includes both cash collateral held and posted by us, net.

### Table 31 — Derivative Counterparty Credit Exposure

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | **As of September 30, 2011** | | | |
| **Rating**[1] | **Number of Counterparties**[2] | **Notional or Contractual Amount**[3] | **Total Exposure at Fair Value**[4] | **Exposure, Net of Collateral**[5] | **Weighted Average Contractual Maturity (in years)** | **Collateral Posting Threshold**[6] |
| | | | (dollars in millions) | | | |
| AA | 2 | $ 46,947 | $ — | $ 9 | 5.5 | $10 million or less |
| AA- | 5 | 216,362 | 2,384 | 117 | 6.1 | $10 million or less |
| A+ | 7 | 295,892 | 20 | 10 | 6.1 | $1 million or less |
| A | 4 | 172,030 | 15 | 81 | 5.5 | $1 million or less |
| Subtotal[7] | 18 | 731,231 | 2,419 | 217 | 5.9 | |
| Other derivatives[8] | | 106,407 | — | — | | |
| Commitments[9] | | 39,429 | 65 | 65 | | |
| Swap guarantee derivatives | | 3,722 | — | — | | |
| Total derivatives[10] | | $ 880,789 | $2,484 | $282 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | **As of December 31, 2010** | | | |
| **Rating**[1] | **Number of Counterparties**[2] | **Notional or Contractual Amount**[3] | **Total Exposure at Fair Value**[4] | **Exposure, Net of Collateral**[5] | **Weighted Average Contractual Maturity (in years)** | **Collateral Posting Threshold**[6] |
| | | | (dollars in millions) | | | |
| AA | 3 | $ 53,975 | $ — | $ — | 6.8 | $10 million or less |
| AA- | 4 | 270,694 | 1,668 | 29 | 6.4 | $10 million or less |
| A+ | 7 | 441,004 | 460 | 1 | 6.2 | $1 million or less |
| A | 3 | 177,277 | 16 | 2 | 5.2 | $1 million or less |
| Subtotal[7] | 17 | 942,950 | 2,144 | 32 | 6.1 | |
| Other derivatives[8] | | 244,640 | — | — | | |
| Commitments[9] | | 14,292 | 103 | 103 | | |
| Swap guarantee derivatives | | 3,614 | — | — | | |
| Total derivatives[10] | | $1,205,496 | $2,247 | $135 | | |

(1) We use the lower of S&P and Moody's ratings to manage collateral requirements. In this table, the rating of the legal entity is stated in terms of the S&P equivalent.
(2) Based on legal entities. Affiliated legal entities are reported separately.
(3) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged.
(4) For each counterparty, this amount includes derivatives with a net positive fair value (recorded as derivative assets, net), including the related accrued interest receivable/payable (net) and trade/settle fees.
(5) Calculated as Total Exposure at Fair Value less cash collateral held as determined at the counterparty level. Includes amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level.
(6) Counterparties are required to post collateral when their exposure exceeds agreed-upon collateral posting thresholds. These thresholds are typically based on the counterparty's credit rating and are individually negotiated.
(7) Consists of OTC derivative agreements for interest-rate swaps, option-based derivatives (excluding certain written options), foreign-currency swaps, and purchased interest-rate caps.
(8) Consists primarily of exchange-traded contracts, certain written options, and certain credit derivatives. Written options do not present counterparty credit exposure, because we receive a one-time up-front premium in exchange for giving the holder the right to execute a contract under specified terms, which generally puts us in a liability position.
(9) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.
(10) The difference between the exposure, net of collateral column above and derivative assets, net on our consolidated balance sheets primarily represents exchange-traded contracts which are settled daily through a clearinghouse, and thus, do not present counterparty credit exposure.

Over time, our exposure to individual counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps varies depending on changes in fair values, which are affected by changes in period-end interest rates, the implied volatility of interest rates, foreign-currency exchange rates, and the amount of derivatives held. If all of our counterparties for these derivatives defaulted simultaneously on September 30, 2011, the combined amount of our uncollateralized and overcollateralized exposure to these counterparties, or our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately $217 million. Our similar exposure as of December 31, 2010 was $32 million. Four counterparties each accounted for greater than 10% and collectively accounted for 90% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at September 30, 2011. These counterparties were Barclays Bank PLC, Goldman Sachs Bank USA, JP Morgan Chase Bank, N.A., and Bank of America N.A., all of which were rated "A" or above by S&P as of October 21, 2011.

Approximately 95% of our counterparty credit exposure for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps was collateralized at September 30, 2011 (excluding amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level). The remaining exposure was primarily due to exposure amounts below the applicable counterparty collateral posting threshold, as well as market movements during the time period between when a derivative was marked to fair value and the date we received the related collateral. In some instances, these market movements result in us having provided collateral that has fair value in excess of our obligation, which represents our overcollateralization exposure. Collateral is typically transferred within one business day based on the values of the related derivatives.

In the event a derivative counterparty defaults, our economic loss may be higher than the uncollateralized exposure of our derivatives if we are not able to replace the defaulted derivatives in a timely and cost-effective fashion. We could also incur economic loss if the collateral held by us cannot be liquidated at prices that are sufficient to recover the amount of such exposure. We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps will increase under certain adverse market conditions by performing daily market stress tests. These tests, which involve significant management judgment, evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties on OTC derivatives contracts assuming certain changes in the level and implied volatility of interest rates and certain changes in foreign currency exchange rates over a brief time period. Our actual exposure could vary significantly from amounts forecasted by these tests.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives for accounting purposes, was $65 million and $103 million at September 30, 2011 and December 31, 2010, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis in an effort to ensure that they continue to meet our internal risk-management standards.

### Mortgage Credit Risk

We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment. Mortgage credit risk is primarily influenced by the credit profile of the borrower on the mortgage, the features of the mortgage itself, the type of property securing the mortgage, and general economic conditions. All mortgages that we purchase or guarantee have an inherent risk of default.

#### Single-Family Mortgage Credit Risk

Through our delegated underwriting process, single-family mortgage loans and the borrowers' ability to repay the loans are evaluated using several critical risk characteristics, including but not limited to the borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the original LTV ratio, the type of mortgage product and the occupancy type of the loan. Despite the improvements in underwriting standards and borrower and loan credit characteristics since 2008, our single-family quality control sampling and review continues to find loans with underwriting deficiencies. We meet with our larger seller/servicers that have higher than average rates of loans with deficiencies from our sampling to help ensure they make changes appropriate to their underwriting process. See "BUSINESS — Our Business" and "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Underwriting Requirements and Quality Control Standards*" in our 2010 Annual Report for information about our charter requirements for single-family loans purchases, delegated underwriting, and our quality control monitoring.

Conditions in the mortgage market continued to remain challenging during the nine months ended September 30, 2011. Most single-family mortgage loans, especially those originated from 2005 through 2008, have been affected by the compounding pressures on household wealth caused by significant declines in home values that began in 2006 and the ongoing weak employment environment. Our serious delinquency rates remained high in the nine months ended September 30, 2011 compared to historical levels, primarily due to economic factors which adversely affected borrowers. Also contributing to high serious delinquency rates were: (a) delays related to servicer processing capacity constraints and, in states that require a judicial foreclosure process, court backlogs; (b) delays associated with the modification process; and (c) delays caused by concerns about the foreclosure process and other delays imposed by third parties. These delays lengthen the period of time in which loans remain in seriously delinquent status, as the delays extend the time it takes for seriously delinquent loans to be modified, foreclosed upon or otherwise resolved and thus transition out of seriously

delinquent status. The UPB of our single-family non-performing loans remained at high levels during the nine months ended September 30, 2011.

*Characteristics of the Single-Family Credit Guarantee Portfolio*

The average UPB of loans in our single-family credit guarantee portfolio was approximately $151,000 and $150,000 at September 30, 2011 and December 31, 2010, respectively. Our single-family mortgage purchases and other guarantee commitment activity in the third quarter of 2011 decreased by 23% to $71.3 billion, as compared to $92.7 billion in the third quarter of 2010. Approximately 88% of the single-family mortgages we purchased in the third quarter of 2011 were fixed-rate amortizing mortgages, based on UPB. Approximately 67% and 75% of the single-family mortgages we purchased in the three and nine months ended September 30, 2011 were refinance mortgages, including approximately 22% and 26%, respectively, that were relief refinance mortgages, based on UPB.

An important safeguard against credit losses on mortgage loans in our single-family credit guarantee portfolio is provided by the borrowers' equity in the underlying properties. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and, based upon historical information, is more likely to default than other borrowers due to limits in the ability to sell or refinance. The percentage of borrowers in our single-family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 19% and 18% as of September 30, 2011 and December 31, 2010, respectively. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 12.7% and 14.9% as of September 30, 2011 and December 31, 2010, respectively. Due to declines in home prices since 2006, we estimate that, as of September 30, 2011, approximately 46% of the loans originated in 2005 through 2008 that remained in our single-family credit guarantee portfolio as of that date had current LTV ratios greater than 100%. In recent periods, loans with current LTV ratios greater than 100% contributed disproportionately to our credit losses. In addition, as of September 30, 2011 and December 31, 2010, for the loans in our single-family credit guarantee portfolio with greater than 80% estimated current LTV ratios, the borrowers had a weighted average credit score at origination of 724 and 721, respectively.

A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of September 30, 2011 and December 31, 2010, approximately 15% and 14% of loans in our single-family credit guarantee portfolio had second lien financing at the time of origination of the first mortgage, and we estimate that these loans comprised 18% and 19%, respectively, of our seriously delinquent loans, based on UPB. However, borrowers are free to obtain second lien financing after origination and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

Table 32 provides additional characteristics of single-family mortgage loans purchased during the three and nine months ended September 30, 2011 and 2010, and of our single-family credit guarantee portfolio at September 30, 2011 and December 31, 2010.

**Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio[1]**

| Original LTV Ratio Range[3][4] | Purchases During the Three Months Ended September 30, | | Purchases During the Nine Months Ended September 30, | | Portfolio[2] at | |
|---|---|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 | September 30, 2011 | December 31, 2010 |
| 60% and below | 27% | 29% | 30% | 30% | 23% | 23% |
| Above 60% to 70% | 15 | 17 | 17 | 16 | 16 | 16 |
| Above 70% to 80% | 47 | 46 | 44 | 46 | 43 | 43 |
| Above 80% to 90% | 6 | 5 | 5 | 5 | 9 | 9 |
| Above 90% to 100% | 5 | 3 | 4 | 3 | 8 | 8 |
| Above 100% | <1 | <1 | <1 | <1 | 1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average original LTV ratio | 69% | 68% | 68% | 68% | 72% | 71% |
| **Estimated Current LTV Ratio Range[5]** | | | | | | |
| 60% and below | | | | | 26% | 27% |
| Above 60% to 70% | | | | | 12 | 12 |
| Above 70% to 80% | | | | | 18 | 17 |
| Above 80% to 90% | | | | | 15 | 16 |
| Above 90% to 100% | | | | | 10 | 10 |
| Above 100% to 110% | | | | | 6 | 6 |
| Above 110% to 120% | | | | | 4 | 4 |
| Above 120% | | | | | 9 | 8 |
| Total | | | | | 100% | 100% |
| Weighted average estimated current LTV ratio: | | | | | | |
| Relief refinance mortgages[6] | | | | | 78% | 78% |
| All other mortgages | | | | | 80% | 78% |
| Total mortgages | | | | | 79% | 78% |
| **Credit Score[3][7]** | | | | | | |
| 740 and above | 73% | 74% | 73% | 71% | 54% | 53% |
| 700 to 739 | 18 | 17 | 18 | 18 | 21 | 21 |
| 660 to 699 | 7 | 7 | 7 | 8 | 15 | 15 |
| 620 to 659 | 2 | 2 | 2 | 2 | 7 | 7 |
| Less than 620 | <1 | <1 | <1 | 1 | 3 | 3 |
| Not available | <1 | <1 | <1 | <1 | <1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average credit score: | | | | | | |
| Relief refinance mortgages[6] | 740 | 749 | 742 | 744 | 743 | 745 |
| All other mortgages | 757 | 759 | 757 | 755 | 734 | 732 |
| Total mortgages | 753 | 756 | 753 | 752 | 735 | 733 |
| **Loan Purpose** | | | | | | |
| Purchase | 33% | 24% | 25% | 25% | 30% | 31% |
| Cash-out refinance | 16 | 19 | 18 | 21 | 28 | 29 |
| Other refinance[8] | 51 | 57 | 57 | 54 | 42 | 40 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Property Type** | | | | | | |
| Detached/townhome[9] | 94% | 94% | 94% | 94% | 92% | 92% |
| Condo/Co-op | 6 | 6 | 6 | 6 | 8 | 8 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | | | |
| Primary residence | 91% | 92% | 91% | 92% | 91% | 91% |
| Second/vacation home | 4 | 4 | 4 | 4 | 5 | 5 |
| Investment | 5 | 4 | 5 | 4 | 4 | 4 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

---

(1) Purchases and ending balances are based on the UPB of the single-family credit guarantee portfolio. Other Guarantee Transactions with ending balances of $2 billion at both September 30, 2011 and December 31, 2010, are excluded from portfolio balance data since these securities are backed by non-Freddie Mac issued securities for which the loan characteristics data was not available.

(2) Includes loans acquired under our relief refinance initiative, which began in 2009.

(3) Purchases columns exclude mortgage loans acquired under our relief refinance initiative. See "Table 35 — Single-Family Refinance Loan Volume" for further information on the LTV ratios of these loans.

(4) Original LTV ratios are calculated as the amount of the mortgage we guarantee including the credit-enhanced portion, divided by the lesser of the appraised value of the property at the time of mortgage origination or the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien mortgage reduces the borrower's equity in the home and, therefore, can increase the risk of default.

(5) Current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination. Estimated current LTV ratio range is not applicable to purchase activity, and excludes any secondary financing by third parties.

(6) Relief refinance mortgages comprised approximately 10% and 7% of our single-family credit guarantee portfolio by UPB as of September 30, 2011 and December 31, 2010, respectively.

(7) Credit score data is based on FICO scores. Although we obtain updated credit information on certain borrowers after the origination of a mortgage, such as those borrowers seeking a modification, the scores presented in this table represent only the credit score of the borrower at the time of loan origination.

(8) Other refinance transactions include: relief refinance mortgages with "no cash-out" to the borrower; and (b) refinance mortgages for which the delivery data provided was not sufficient for us to determine whether the mortgage was a cash-out or a no cash-out refinance transaction.

(9) Includes manufactured housing and homes within planned unit development communities. The UPB of manufactured housing mortgage loans purchased in the nine months ended September 30, 2011 and 2010 was $282 million and $277 million, respectively.

*Attribute Combinations*

Certain combinations of loan characteristics often can indicate a higher degree of credit risk. For example, single-family mortgages with both high LTV ratios and borrowers who have lower credit scores typically experience higher rates of serious delinquency and default. We estimate that there were $11.4 billion and $11.8 billion at September 30, 2011 and December 31, 2010, respectively, of loans in our single-family credit guarantee portfolio with both original LTV ratios greater than 90% and FICO scores less than 620 at the time of loan origination. Certain mortgage product types, including interest-only or option ARM loans, that have additional higher risk characteristics, such as lower credit scores or higher LTV ratios, will also have a higher risk of default than those same products without these characteristics. The presence of a second lien mortgage can also increase the risk that a borrower will default.

*Single-Family Mortgage Product Types*

The primary mortgage products in our single-family credit guarantee portfolio are first lien, fixed-rate mortgage loans. The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts to a new rate that is fixed for the remaining life of the loan. We classified these loans as fixed-rate products for presentation within this Form 10-Q and elsewhere in our reporting even though they have a one-time rate adjustment provision, because the change in rate is determined at the time of modification rather than at a future date.

The following paragraphs provide information on the interest-only, option ARM and conforming jumbo loans in our single-family credit guarantee portfolio. Interest-only and option ARM loans have experienced significantly higher serious delinquency rates than fixed-rate amortizing mortgage products.

Interest-Only Loans

Interest-only loans have an initial period during which the borrower pays only interest, and at a specified date the monthly payment changes to begin reflecting repayment of principal until maturity. Interest-only loans represented approximately 4% and 5% of the UPB of our single-family credit guarantee portfolio at September 30, 2011 and December 31, 2010, respectively. We purchased a limited number of interest-only loans after 2008 and fully discontinued purchasing such loans on September 1, 2010.

Option ARM Loans

Most option ARM loans have initial periods during which the borrower has various options as to the amount of each monthly payment, until a specified date, when the terms are recast. At both September 30, 2011 and December 31, 2010, option ARM loans represented less than 1% of the UPB of our single-family credit guarantee portfolio. Included in this exposure was $7.6 billion and $8.4 billion of option ARM securities underlying certain of our Other Guarantee Transactions at September 30, 2011 and December 31, 2010, respectively. While we have not categorized these option ARM securities as either subprime or Alt-A securities for presentation within this Form 10-Q and elsewhere in our reporting, they could exhibit similar credit performance to collateral identified as subprime or Alt-A. We have not purchased option ARM loans in our single-family credit guarantee portfolio since 2007. For information on our exposure to option ARM loans through our holdings of non-agency mortgage-related securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Conforming Jumbo Loans

We purchased $20.1 billion and $16.7 billion of conforming jumbo loans during the nine months ended September 30, 2011 and 2010, respectively. The UPB of conforming jumbo loans in our single-family credit guarantee portfolio as of September 30, 2011 and December 31, 2010 was $48.4 billion and $37.8 billion, respectively. The average size of these loans was approximately $545,000 and $548,000 at September 30, 2011 and December 31, 2010, respectively. Our purchases of conforming jumbo loans should decline beginning in the fourth quarter of 2011 since the temporary increase in limits on the size of loans we may purchase expired on September 30, 2011. See "LEGISLATIVE AND REGULATORY MATTERS" for further information on the conforming loan limits.

*Other Categories of Single-Family Mortgage Loans*

While we classified certain loans as subprime or Alt-A for purposes of the discussion below and elsewhere in this Form 10-Q, there is no universally accepted definition of subprime or Alt-A, and our classification of such loans may differ from those used by other companies. For example, some financial institutions may use FICO credit scores to delineate certain residential mortgages as subprime. In addition, we do not rely primarily on these loan classifications to evaluate the credit risk exposure relating to such loans in our single-family credit guarantee portfolio.

Subprime Loans

Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see "*Higher Risk Loans in the Single-Family Credit Guarantee Portfolio*" and "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for further information).

We estimate that approximately $2.3 billion and $2.5 billion of security collateral underlying our Other Guarantee Transactions at September 30, 2011 and December 31, 2010, respectively, were identified as subprime based on information provided to us when we entered into these transactions.

We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions. At September 30, 2011 and December 31, 2010, we held $50.2 billion and $54.2 billion, respectively, in UPB of non-agency mortgage-related securities backed by subprime loans. These securities were structured to provide credit enhancements, and 8% and 10% of these securities were investment grade at September 30, 2011 and December 31, 2010, respectively. The credit performance of loans underlying these securities deteriorated significantly beginning in 2008. For more information on our exposure to subprime mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Alt-A Loans

Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. The UPB of Alt-A loans in our single-family credit guarantee portfolio declined to $99.1 billion as of September 30, 2011 from $115.5 billion as of December 31, 2010. The UPB of our Alt-A loans declined in the nine months ended September 30, 2011 primarily due to refinancing into other mortgage products, foreclosure transfers, and other liquidation events. As of September 30, 2011, for Alt-A loans in our single-family credit guarantee portfolio, the average FICO credit score at origination was 718. Although Alt-A mortgage loans comprised approximately 6% of our single-family credit guarantee portfolio as of September 30, 2011, these loans represented approximately 28% and 29% of our credit losses during the three and nine months ended September 30, 2011, respectively. During the first quarter of 2011, we identified approximately $0.6 billion in UPB of single-family loans underlying certain Other Guarantee Transactions that had been previously reported in both the Alt-A and subprime categories. Commencing March 31, 2011, we no longer report these loans as Alt-A (but continue to report them as subprime) and we revised the prior periods to conform to the current period presentation.

We did not purchase any new single-family Alt-A mortgage loans in our single-family credit guarantee portfolio during the nine months ended September 30, 2011. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. However, in the event we purchase a refinance mortgage in one of these programs and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. From the time the product became available in 2009 to September 30, 2011, we purchased approximately $14.4 billion of relief refinance mortgages that were previously categorized as Alt-A loans in our portfolio, including $4.1 billion during the nine months ended September 30, 2011.

We also hold investments in non-agency mortgage-related securities backed by single-family Alt-A loans. At September 30, 2011 and December 31, 2010, we held investments of $17.3 billion and $18.8 billion, respectively, of non-agency mortgage-related securities backed by Alt-A and other mortgage loans and 15% and 22%, respectively, of these securities were categorized as investment grade. The credit performance of loans underlying these securities deteriorated significantly since the beginning of 2008 and continued to deteriorate during the nine months ended September 30, 2011. We categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such

based on information provided to us when we entered into these transactions. For more information on our exposure to Alt-A mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Higher-Risk Loans in the Single-Family Credit Guarantee Portfolio

Table 33 presents information about certain categories of single-family mortgage loans within our single-family credit guarantee portfolio that we believe have certain higher-risk characteristics. These loans include categories based on product type and borrower characteristics present at origination. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Mortgage loans with higher LTV ratios have a higher risk of default, especially during housing and economic downturns, such as the one the U.S. has experienced since 2007.

**Table 33 — Certain Higher-Risk[1] Categories in the Single-Family Credit Guarantee Portfolio**

| | As of September 30, 2011 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | (dollars in billions) | | | |
| Loans with one or more specified characteristics | $350.3 | 105% | 6.9% | 9.3% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 99.1 | 106 | 8.1 | 11.8 |
| Interest-only[6] | 76.6 | 119 | 0.2 | 17.7 |
| Option ARM[7] | 8.6 | 119 | 3.8 | 21.2 |
| Original LTV ratio greater than 90%, non-relief refinance mortgages[8] | 110.7 | 108 | 7.8 | 8.3 |
| Original LTV ratio greater than 90%, relief refinance mortgages[8] | 55.1 | 103 | 0.1 | 1.0 |
| Lower original FICO scores (less than 620)[8] | 57.1 | 93 | 12.9 | 12.7 |

| | As of December 31, 2010 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | (dollars in billions) | | | |
| Loans with one or more specified characteristics | $368.8 | 100% | 5.5% | 10.3% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 115.5 | 99 | 5.7 | 12.2 |
| Interest-only[6] | 95.4 | 112 | 0.5 | 18.4 |
| Option ARM[7] | 9.4 | 115 | 3.1 | 21.2 |
| Original LTV ratio greater than 90%, non-relief refinance mortgages[8] | 117.8 | 105 | 6.3 | 9.1 |
| Original LTV ratio greater than 90%, relief refinance mortgages[8] | 36.5 | 101 | 0.1 | 0.7 |
| Lower original FICO scores (less than 620)[8] | 61.2 | 89 | 10.4 | 13.9 |

(1) Categories are not additive and a single loan may be included in multiple categories if more than one characteristic is associated with the loan. Loans with a combination of these characteristics will have an even higher risk of default than those with an individual characteristic.
(2) See endnote (5) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of current LTV ratios.
(3) Represents the percentage of loans based on loan count in our single-family credit guarantee portfolio that have been modified under agreement with the borrower, including those with no changes in the interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan. Excludes loans underlying certain Other Guarantee Transactions for which data was not available.
(4) See "Delinquencies" for further information about our reported serious delinquency rates.
(5) Loans within the Alt-A category continue to remain in that category following modification, even though the borrower may have provided full documentation of assets and income to complete the modification.
(6) The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post-modification), primarily due to delays in processing.
(7) Loans within the option ARM category continue to remain in that category following modification, even though the modified loan no longer provides for optional payment provisions.
(8) See endnotes (4) and (7) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios and our use of FICO scores, respectively.

Loans with one or more of the above characteristics comprised approximately 20% of our single-family credit guarantee portfolio as of both September 30, 2011 and December 31, 2010. The total UPB of loans in our single-family credit guarantee portfolio with one or more of these characteristics declined approximately 5%, to $350.3 billion as of September 30, 2011 from $368.8 billion as of December 31, 2010. This decline was principally due to liquidations resulting from prepayments, refinancing activity, and liquidations resulting from foreclosure events and foreclosure alternatives, but was partially offset by increases in loans with original LTV ratios greater than 90% due to our relief refinance mortgage activity in the nine months ended September 30, 2011. The serious delinquency rates associated with these loans declined to 9.3% as of September 30, 2011 from 10.3% as of December 31, 2010.

*Credit Enhancements*

Our charter requires that single-family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests. However, as discussed below, under HARP we allow eligible

borrowers who have mortgages with high current LTV ratios to refinance their mortgages without obtaining new mortgage insurance in excess of what was already in place. Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements.

At September 30, 2011 and December 31, 2010, our credit-enhanced mortgages represented 14% and 15%, respectively, of our single-family credit guarantee portfolio, excluding those backing Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative. Freddie Mac securities backed by Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative are excluded because we consider the incremental credit risk to which we are exposed to be insignificant. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities*" for credit enhancement and other information about our investments in non-Freddie Mac mortgage-related securities.

We had recoveries associated with charged-off single-family loans of $2.1 billion and $2.4 billion during the nine months ended September 30, 2011 and 2010, respectively, under our primary and pool mortgage insurance policies and other credit enhancements. During the nine months ended September 30, 2011, the credit enhancement coverage for new purchases was lower than in periods before 2009, primarily as a result of high refinance activity. Refinance loans (other than relief refinance mortgages) typically have lower LTV ratios, and are more likely to have a LTV ratio below 80% and not require credit protection as specified in our charter. In addition, we have been purchasing significant amounts of relief refinance mortgages. These mortgages allow for the refinance of existing loans guaranteed by us under terms such that we may not have mortgage insurance for some or all of the UPB of the mortgage in excess of 80% of the value of the property for certain of these loans.

See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protection and other forms of credit enhancements covering loans in our single-family credit guarantee portfolio as of September 30, 2011 and December 31, 2010.

*Other Credit Risk Management Activities*

To compensate us for higher levels of risk in some mortgage products, we may charge upfront delivery fees above a base management and guarantee fee, which are calculated based on credit risk factors such as the mortgage product type, loan purpose, LTV ratio and other loan or borrower characteristics. We announced delivery fee increases in the fourth quarter of 2010 that became effective March 1, 2011 (or later, as outstanding contracts permit) for loans with higher LTV ratios. These increased fees do not apply to relief refinance mortgages with settlement dates on or after July 1, 2011. In July 2011, FHFA informed us that it expects us, going forward, to have in our agreements with single-family sellers the ability to change base guarantee fees upon 90 days notice to sellers, if directed to do so by FHFA. FHFA and the Obama Administration recently announced the potential for guarantee fee increases in the future. See "LEGISLATIVE AND REGULATORY MATTERS."

*MHA Program*

The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. Participation in the MHA Program is an integral part of our mission of providing stability to the housing market. Through our participation in this program, we help borrowers maintain home ownership. Some of the key initiatives of this program include:

Home Affordable Modification Program

HAMP commits U.S. government, Freddie Mac and Fannie Mae funds to help eligible homeowners avoid foreclosures and keep their homes through mortgage modifications, where possible. Under this program, we offer loan modifications to financially struggling homeowners with mortgages on their primary residences that reduce the monthly principal and interest payments on their mortgages. HAMP applies both to delinquent borrowers and to current borrowers at risk of imminent default. See "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risks — Portfolio Management Activities — MHA Program*" in our 2010 Annual Report for further information on HAMP.

Table 34 presents the number of single-family loans that completed modification or were in trial periods under HAMP as of September 30, 2011 and December 31, 2010.

**Table 34 — Single-Family Home Affordable Modification Program Volume[1]**

| | As of September 30, 2011 | | As of December 31, 2010 | |
| | Amount[2] | Number of Loans | Amount[2] | Number of Loans |
|---|---|---|---|---|
| | (dollars in millions) | | | |
| Completed HAMP modifications[3] | $31,706 | 143,739 | $23,635 | 107,073 |
| Loans in the HAMP trial period | $ 2,981 | 13,785 | $ 4,905 | 22,352 |

(1) Based on information reported by our servicers to the MHA Program administrator.
(2) For loans in the HAMP trial period, this reflects the loan balance prior to modification. For completed HAMP modifications, the amount represents the balance of loans after modification under HAMP.
(3) Completed HAMP modifications are those where the borrower has made the last trial period payment, has provided the required documentation to the servicer and the modification has become effective. Amounts presented represent completed HAMP modifications with effective dates since our implementation of HAMP in 2009 through September 30, 2011 and December 31, 2010, respectively.

As of September 30, 2011, the borrower's monthly payment was reduced on average by an estimated $563, which amounts to an average of $6,756 per year, and a total of $971 million in annual reductions for all of our completed HAMP modifications (these amounts are calculated by multiplying the number of completed modifications by the average reduction in monthly payment, and have not been adjusted to reflect the actual performance of the loans following modification). Except in limited instances, each borrower's reduced payment will remain in effect for a minimum of five years, and borrowers whose payments were adjusted below current market levels will have their payment gradually increased after the fifth year to a rate consistent with the market rate at the time of modification. We bear the cost associated with the borrowers' payment reductions. Although mortgage investors under the MHA Program are entitled to certain subsidies from Treasury for reducing the borrowers' monthly payments from 38% to 31% of the borrower's income, we do not receive such subsidies on modified mortgages owned or guaranteed by us.

The number of our loans in the HAMP trial period declined to 13,785 as of September 30, 2011 from 22,352 as of December 31, 2010. A large number of borrowers entered into trial period plans when the program was initially introduced in 2009, and significantly fewer new borrowers entered into HAMP trial period plans after 2009. Consequently, we expect fewer borrowers will complete a HAMP modification during 2011 than 2010, since a large number of the delinquent borrowers that were eligible for the program have already completed the trial period or attempted to do so, but failed. When a borrower's HAMP trial period is cancelled, the loan is considered for our other workout activities. HAMP currently will expire on December 31, 2012 and only applies to loans originated on or before January 1, 2009 provided the trial period begins by December 31, 2012. For more information on our HAMP modifications, including redefault rates on these loans, see "*Single-Family Loan Workouts.*"

Home Affordable Refinance Program

HARP gives eligible homeowners, with loans owned or guaranteed by us or Fannie Mae, an opportunity to refinance into loans with more affordable monthly payments and/or fixed-rate terms. Under HARP, we allow eligible borrowers who have mortgages with current LTV ratios up to 125% to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place.

The relief refinance initiative is our implementation of HARP. HARP is targeted at borrowers with current LTV ratios above 80%; however, our program also allows borrowers with LTV ratios of 80% and below to participate. HARP loans may not perform as well as other refinance mortgages over time due, in part, to the continued high LTV ratios of these loans. Through our relief refinance initiative, we offer this refinancing option only for qualifying mortgage loans that we hold or guarantee. We continue to bear the credit risk for refinanced loans under this program, to the extent that such risk is not covered by existing mortgage insurance or other existing credit enhancements.

The implementation of the relief refinance mortgage initiative resulted in a higher volume of purchases and increased delivery fees from the new loans than we would expect in the absence of the program. However, we believe the net effect of the refinance activity on our financial results has not been significant.

Table 35 below presents the composition of our purchases of refinanced single-family loans during the nine months ended September 30, 2011 and 2010.

### Table 35 — Single-Family Refinance Loan Volume[1]

| | Nine Months Ended September 30, 2011 | | | Nine Months Ended September 30, 2010 | | |
| | Amount | Number of Loans | Percent | Amount | Number of Loans | Percent |
|---|---|---|---|---|---|---|
| | (dollars in millions) | | | | | |
| Relief refinance mortgages: | | | | | | |
| Above 105% LTV ratio | $  6,597 | 29,069 | 3.5% | $  2,487 | 10,333 | 1.1% |
| Above 80% to 105% LTV ratio | 24,630 | 115,488 | 13.8 | 29,234 | 126,876 | 13.6 |
| 80% and below LTV ratio | 30,024 | 188,402 | 22.6 | 34,305 | 191,289 | 20.5 |
| Total relief refinance mortgages | $ 61,251 | 332,959 | 39.9% | $ 66,026 | 328,498 | 35.2% |
| Total refinance loan volume[2] | $172,839 | 834,888 | 100% | $193,097 | 934,472 | 100% |

(1) Consists of all single-family refinance mortgage loans that we either purchased or guaranteed during the period, excluding those associated with other guarantee commitments and Other Guarantee Transactions.
(2) Consists of relief refinance mortgages and other refinance mortgages.

Relief refinance mortgages comprised approximately 40% and 35%, based on the number of loans, of our total refinance volume during the nine months ended September 30, 2011 and 2010, respectively. Relief refinance mortgages with LTV ratios above 80% represented approximately 13% and 12% of our total single-family credit guarantee portfolio purchases, based on UPB, during the nine months ended September 30, 2011 and 2010, respectively. Relief refinance mortgages comprised approximately 10% and 7% of the UPB in our total single-family credit guarantee portfolio at September 30, 2011 and December 31, 2010, respectively.

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers who can benefit from refinancing their home mortgage. For more information, see "LEGISLATIVE AND REGULATORY MATTERS — *Changes to the Home Affordable Refinance Program.*"

<u>Home Affordable Foreclosure Alternatives Program</u>

HAFA is designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales, if such borrowers did not qualify for or participate in a HAMP trial period, failed to complete their HAMP trial period, or defaulted on their HAMP modification. HAFA also provides a process for borrowers to convey title to their homes through a deed in lieu of foreclosure. HAFA took effect in April 2010 and ends on December 31, 2012. We began our implementation of this program in August 2010. We completed a small number of HAFA transactions on our single-family mortgage loans during the nine months ended September 30, 2011.

<u>Hardest Hit Fund</u>

In 2010, the federal government created the Hardest Hit Fund, which provides funding for state HFAs to create programs to assist homeowners in those states that have been hit hardest by the housing crisis and economic downturn. To the extent our borrowers participate in the HFA unemployment assistance programs and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency. Based on information provided to us by our seller/servicers, we believe participation in these programs by our borrowers has been limited through September 30, 2011.

*Impact of the MHA Program on Freddie Mac*

As previously discussed, HAMP is intended to provide borrowers the opportunity to obtain more affordable monthly payments and to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our credit losses by reducing or eliminating a portion of the costs related to foreclosed properties. We believe our overall loss mitigation programs, including efforts outside of the MHA Program, could reduce our ultimate credit losses over the long term. However, we cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives.

The costs we incur related to loan modifications and other activities under HAMP have been, and will likely continue to be, significant for the following reasons:

- Except for certain Other Guarantee Transactions and loans underlying our other guarantee commitments, we bear the full cost of the monthly payment reductions related to modifications of loans we own or guarantee and all

servicer and borrower incentives, and we will not receive a reimbursement of these costs from Treasury. We paid $52 million and $127 million of servicer incentives during the three and nine months ended September 30, 2011, respectively, as compared to $33 million and $113 million of such incentives during the three and nine months ended September 30, 2010, respectively. As of September 30, 2011, we accrued $62 million for both initial and recurring servicer incentives not yet due. We paid $33 million and $71 million of borrower incentives during the three and nine months ended September 30, 2011, respectively, as compared to $14 million and $20 million of these incentives during the three and nine months ended September 30, 2010, respectively. As of September 30, 2011, we accrued $44 million for borrower incentives not yet due. We also have the potential to incur additional servicer incentives and borrower incentives as long as the borrower remains current on a loan modified under HAMP.

- Under HAMP, we typically provide concessions to borrowers, which generally include interest rate reductions and often also provide for forbearance (but not forgiveness) of principal. To the extent borrowers continue to participate in HAMP, we will continue to experience high volumes of TDRs.

- Some borrowers will fail to complete the HAMP trial period and others will default on their HAMP modified loans. For those borrowers who redefault or who do not complete the trial period and do not qualify for another loan workout, HAMP will have delayed the resolution of the loans through the foreclosure process. If home prices decline while these events take place, such delay in the foreclosure process may increase the losses we recognize on these loans, to the extent the prices we ultimately receive for the foreclosed properties are less than the prices we could have received had we foreclosed upon the properties earlier.

- Non-GSE mortgages modified under HAMP include mortgages backing our investments in non-agency mortgage-related securities. Such modifications reduce the monthly payments due from affected borrowers, and thus reduce the payments we receive on these securities (to the extent the payment reductions have not been absorbed by subordinated investors or by other credit enhancement).

We began the implementation of a new non-HAMP standard loan modification during the fourth quarter of 2011. For more information, see "Single-Family Loan Workouts."

*Single-Family Loan Workouts*

Loan workout activities are a key component of our loss mitigation strategy for managing and resolving troubled assets and lowering credit losses. Our single-family loss mitigation strategy emphasizes early intervention by servicers in delinquent mortgages and provides alternatives to foreclosure. Other single-family loss mitigation activities include providing our single-family servicers with default management tools designed to help them manage non-performing loans more effectively and to assist borrowers in retaining home ownership where possible, or facilitate foreclosure alternatives when continued homeownership is not an option. Loan workouts are intended to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the additional credit losses that likely would be incurred in a REO sale. See "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Loss Mitigation and Workout Activities*" in our 2010 Annual Report for a general description of our loan workouts.

We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure. During the nine months ended September 30, 2011, we helped more than 164,000 borrowers either stay in their homes or sell their properties and avoid foreclosures through our various workout programs, including HAMP, and we completed approximately 92,000 foreclosures.

Table 36 presents volumes of single-family loan workouts, serious delinquency, and foreclosures for the three and nine months ended September 30, 2011 and 2010.

**Table 36 — Single-Family Loan Workouts, Serious Delinquency, and Foreclosure Volumes[1]**

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| | 2011 | | 2010 | | 2011 | | 2010 | |
| | Number of Loans | Loan Balances | Number of Loans | Loan Balances | Number of Loans | Loan Balances | Number of Loans | Loan Balances |
|---|---|---|---|---|---|---|---|---|
| | | | | (dollars in millions) | | | | |
| **Home retention actions:** | | | | | | | | |
| Loan modifications[2] | | | | | | | | |
| with no change in terms[3] | 1,140 | $ 206 | 999 | $ 173 | 3,463 | $ 615 | 2,948 | $ 493 |
| with term extension | 3,765 | 711 | 5,017 | 872 | 13,573 | 2,507 | 14,472 | 2,469 |
| with reduction of contractual interest rate | 6,642 | 1,453 | 11,753 | 2,622 | 24,727 | 5,530 | 39,928 | 8,867 |
| with rate reduction and term extension | 7,814 | 1,713 | 15,199 | 3,293 | 32,478 | 7,207 | 50,909 | 11,139 |
| with rate reduction, term extension and principal forbearance | 4,558 | 1,214 | 6,316 | 1,648 | 15,885 | 4,239 | 24,817 | 6,485 |
| Total loan modifications[4] | 23,919 | 5,297 | 39,284 | 8,608 | 90,126 | 20,098 | 133,074 | 29,453 |
| Repayment plans[5] | 8,333 | 1,194 | 7,030 | 1,015 | 25,413 | 3,637 | 23,246 | 3,372 |
| Forbearance agreements[6] | 4,262 | 859 | 6,976 | 1,415 | 15,649 | 3,088 | 28,649 | 5,966 |
| Total home retention actions: | 36,514 | 7,350 | 53,290 | 11,038 | 131,188 | 26,823 | 184,969 | 38,791 |
| **Foreclosure alternatives:** | | | | | | | | |
| Short sale | 11,580 | 2,662 | 10,373 | 2,441 | 33,095 | 7,665 | 26,780 | 6,290 |
| Deed-in-lieu transactions | 164 | 28 | 99 | 17 | 393 | 68 | 298 | 48 |
| Total foreclosure alternatives | 11,744 | 2,690 | 10,472 | 2,458 | 33,488 | 7,733 | 27,078 | 6,338 |
| Total single-family loan workouts | 48,258 | $10,040 | 63,762 | $13,496 | 164,676 | $34,556 | 212,047 | $45,129 |
| Seriously delinquent loan additions | 93,850 | | 115,359 | | 279,309 | | 389,475 | |
| Single-family foreclosures[7] | 30,786 | | 43,604 | | 92,012 | | 113,623 | |
| Seriously delinquent loans, at period end | 413,859 | | 464,367 | | 413,859 | | 464,367 | |

(1) Based on completed actions with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent, or effective, such as loans in the trial period under HAMP. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period (see endnote 6).

(2) Substantially all of the completed loan modifications during the three months ended September 30, 2011 were classified as TDRs. As a result of new accounting guidance on the classification of loans as TDRs, which became effective in the third quarter of 2011, the population of loans we account for as TDRs significantly increased due to the inclusion of loans that were not previously considered TDRs, including those loans that were subject to workout activities that occurred during the first half of 2011. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information.

(3) Under this modification type, past due amounts are added to the principal balance and reamortized based on the original contractual loan terms.

(4) Includes completed loan modifications under HAMP; however, the number of such completions differs from that reported by the MHA Program administrator in part due to differences in the timing of recognizing the completions by us and the administrator.

(5) Represents the number of borrowers as reported by our seller/servicers that have completed the full term of a repayment plan for past due amounts. Excludes the number of borrowers that are actively repaying past due amounts under a repayment plan, which totaled 20,733 and 22,662 borrowers as of September 30, 2011 and 2010, respectively.

(6) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.

(7) Represents the number of our single-family loans that complete foreclosure transfers, including third-party sales at foreclosure auction in which ownership of the property is transferred directly to a third-party rather than to us.

We experienced declines in home retention actions, particularly loan modifications, and increases in short sales during the three and nine months ended September 30, 2011, compared to the three and nine months ended September 30, 2010, respectively. Loan modifications may include the additions of past due amounts to principal, interest rate reductions, term extensions and principal forbearance. Although HAMP contemplates that some servicers will also make use of principal reduction to achieve reduced payments for borrowers, we only used principal forbearance in the nine months ended September 30, 2011 and 2010, and did not use principal reduction in modifying our loans. We bear the costs of these activities, including the cost of any monthly payment reductions.

The UPB of loans in our single-family credit guarantee portfolio for which we have completed a loan modification increased to $66 billion as of September 30, 2011 from $52 billion as of December 31, 2010. The number of modified loans in our single-family credit guarantee portfolio has been increasing and such loans comprised approximately 2.8% and 2.1% of our single-family credit guarantee portfolio as of September 30, 2011 and December 31, 2010, respectively. The estimated current LTV ratio for all modified loans in our single-family credit guarantee portfolio was 123% and the serious delinquency rate on these loans was 17% as of September 30, 2011. Table 37 presents the reperformance rate of modified single-family loans in each of the last eight quarterly periods.

**Table 37 — Reperformance Rates<sup>(1)</sup> of Modified Single-Family Loans**

| HAMP loan modifications: | Quarter of Loan Modification Completion[2] | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 |
| Time since modification- | | | | | | | | |
| 3 to 5 months . . . . . . . . . . . . . . . . . . . . | 96% | 95% | 94% | 93% | 94% | 95% | 94% | 96% |
| 6 to 8 months . . . . . . . . . . . . . . . . . . . . | | 93 | 92 | 92 | 91 | 93 | 93 | 93 |
| 9 to 11 months . . . . . . . . . . . . . . . . . . . . | | | 89 | 90 | 89 | 90 | 90 | 92 |
| 12 to 14 months . . . . . . . . . . . . . . . . . . . . | | | | 87 | 87 | 88 | 88 | 91 |
| 15 to 17 months . . . . . . . . . . . . . . . . . . . . | | | | | 85 | 86 | 86 | 89 |
| 18 to 20 months . . . . . . . . . . . . . . . . . . . . | | | | | | 84 | 85 | 87 |
| 21 to 23 months . . . . . . . . . . . . . . . . . . . . | | | | | | | 82 | 85 |
| 24 to 26 months . . . . . . . . . . . . . . . . . . . . | | | | | | | | 83 |

| Non-HAMP loan modifications: | Quarter of Loan Modification Completion[2] | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 |
| Time since modification- | | | | | | | | |
| 3 to 5 months . . . . . . . . . . . . . . . . . . . . | 92% | 93% | 94% | 93% | 93% | 94% | 90% | 88% |
| 6 to 8 months . . . . . . . . . . . . . . . . . . . . | | 86 | 89 | 90 | 86 | 87 | 82 | 78 |
| 9 to 11 months . . . . . . . . . . . . . . . . . . . . | | | 83 | 85 | 82 | 80 | 75 | 71 |
| 12 to 14 months . . . . . . . . . . . . . . . . . . . . | | | | 81 | 78 | 77 | 69 | 66 |
| 15 to 17 months . . . . . . . . . . . . . . . . . . . . | | | | | 74 | 74 | 66 | 61 |
| 18 to 20 months . . . . . . . . . . . . . . . . . . . . | | | | | | 70 | 64 | 59 |
| 21 to 23 months . . . . . . . . . . . . . . . . . . . . | | | | | | | 61 | 57 |
| 24 to 26 months . . . . . . . . . . . . . . . . . . . . | | | | | | | | 54 |

| Total (HAMP and Non-HAMP): | Quarter of Loan Modification Completion[2] | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 |
| Time since modification- | | | | | | | | |
| 3 to 5 months . . . . . . . . . . . . . . . . . . . . | 95% | 95% | 94% | 93% | 94% | 95% | 92% | 89% |
| 6 to 8 months . . . . . . . . . . . . . . . . . . . . | | 90 | 90 | 91 | 90 | 92 | 88 | 79 |
| 9 to 11 months . . . . . . . . . . . . . . . . . . . . | | | 86 | 88 | 87 | 88 | 84 | 72 |
| 12 to 14 months . . . . . . . . . . . . . . . . . . . . | | | | 84 | 85 | 86 | 80 | 67 |
| 15 to 17 months . . . . . . . . . . . . . . . . . . . . | | | | | 82 | 84 | 78 | 62 |
| 18 to 20 months . . . . . . . . . . . . . . . . . . . . | | | | | | 81 | 76 | 61 |
| 21 to 23 months . . . . . . . . . . . . . . . . . . . . | | | | | | | 73 | 59 |
| 24 to 26 months . . . . . . . . . . . . . . . . . . . . | | | | | | | | 56 |

(1) Represents the percentage of loans that are current or less than three monthly payments past due as well as those paid-in-full or repurchased. Excludes loans in the trial period under HAMP.

(2) Loan modifications are recognized as completed in the quarterly period in which the servicer has reported the modification as effective and the agreement has been accepted by us, which in certain cases may be delayed by a backlog in servicer processing of modifications. In the second quarter of 2011, we revised the calculation of reperformance rates to better account for re-modified loans, or those where a borrower has received a second modification. The revised calculation reflects the status of each modification separately. In the case of a remodified loan where the borrower is performing, the previous modification would be presented as being in default in the applicable period.

The redefault rate is the percentage of our modified loans that became seriously delinquent, transitioned to REO, or completed a loss-producing foreclosure alternative, and is the inverse of the reperformance rate. As of September 30, 2011, the redefault rate for all of our single-family loan modifications (including those under HAMP) completed during the first half of 2011, and full years 2010, 2009, and 2008 was 8%, 17%, 49%, and 66%, respectively. Many of the borrowers that received modifications in 2008 and 2009 were negatively affected by worsening economic conditions, including high unemployment rates during the last several years. As of September 30, 2011, the redefault rate for loans modified under HAMP in the first half of 2011, and full years 2010 and 2009 was approximately 6%, 14% and 17%, respectively. These redefault rates may not be representative of the future performance of modified loans, including those modified under HAMP. We believe the redefault rate for loans modified in 2011, 2010, 2009, and 2008, including those modified under HAMP, is likely to increase, particularly since the housing and economic environments remain challenging.

In February 2011, FHFA directed Freddie Mac and Fannie Mae to develop consistent requirements, policies and processes for the servicing of non-performing loans. This directive was designed to create greater consistency in servicing practices and to build on the best practices of each of the GSEs. In April 2011, pursuant to this directive, FHFA announced a new set of aligned standards (known as the servicing alignment initiative) for servicing non-performing loans owned or guaranteed by Freddie Mac and Fannie Mae that are designed to help servicers do a better job of communicating and working with troubled borrowers and to bring greater accountability to the servicing industry. We announced our detailed requirements for this initiative on June 30, 2011, with implementation beginning for loans that were delinquent as of October 1, 2011. These standards provide for earlier and more frequent communication with delinquent borrowers, consistent requirements for collecting documents from borrowers, consistent timelines for

responding to borrowers, and consistent timelines for processing foreclosures. These standards are expected to result in greater alignment of servicer processes for both HAMP and most non-HAMP workouts.

Under these new servicing standards, we will pay incentives to servicers that exceed certain performance standards with respect to servicing delinquent loans. We will also assess compensatory fees from servicers if they do not achieve a minimum performance benchmark with respect to servicing delinquent loans. These incentives may result in our payment of increased fees to our seller/servicers, but these fees may be at least partially mitigated by the compensatory fees paid to us by our servicers that do not perform as required.

As part of the servicing alignment initiative, we began implementation of a new non-HAMP standard loan modification initiative. This new standard modification will replace our existing non-HAMP modification initiative beginning January 1, 2012. The new standard modification requires a three month trial period. Servicers may begin offering standard modification trial period plans with effective dates on or after October 1, 2011. We expect to experience a temporary decline in completed modification volume in the fourth quarter of 2011 and first quarter of 2012, below what otherwise would be expected, as many borrowers will be in the process of completing the trial period under the new standard modification initiative. This new standard modification program is expected to result in a higher volume of modifications where we partially forbear (but do not forgive) principal until the borrower sells the home or refinances or pays off the mortgage. The standard modification provides an extension of the loan's term to 480 months. In addition, the new modification initiative provides for a standard modified interest rate of 5% (the program may be changed in the future to reflect market interest rates). Our previous non-HAMP modification initiative allowed for reduction of contractual interest rates to as low as 2% and did not permit principal forbearance. This new initiative will also provide for a different fee schedule for non-HAMP modifications that will provide greater incentives to our servicers to modify loans on a more timely basis, which may cause the costs associated with our modification activities to increase in the future.

*Delinquencies*

We report single-family serious delinquency rate information based on the number of loans that are three monthly payments or more past due or in the process of foreclosure, as reported by our servicers. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the borrower is current under the modified terms. Single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower. To the extent our borrowers participate in the HFA unemployment assistance initiatives and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency.

Our single-family delinquency rates include all single-family loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by either Ginnie Mae Certificates or HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancements provided on them by the U.S. government.

Some of our loss mitigation activities create fluctuations in our delinquency statistics. For example, single-family loans that we report as seriously delinquent before they enter the HAMP trial period continue to be reported as seriously delinquent for purposes of our delinquency reporting until the modifications become effective and the loans are removed from delinquent status by our servicers. However, under our previous non-HAMP modifications, the borrower would return to a current payment status sooner, because these modifications do not have trial periods. Consequently, the volume, timing, and type of loan modifications impact our reported serious delinquency rate. As discussed above in "Single-Family Loan Workouts," the new non-HAMP standard loan modification initiative includes a trial period comparable to that of our HAMP modification initiative. In addition, there may be temporary timing differences, or lags, in the reporting of payment status and modification completion due to differing practices of our servicers that can affect our delinquency reporting.

Temporary actions to suspend foreclosure transfers of occupied homes, increases in foreclosure process timeframes, process requirements of HAMP, general constraints on servicer capacity, and court backlogs (in states that require a judicial foreclosure process) caused loans to remain in seriously delinquent status for longer periods than prior to 2008, before such actions and delays arose. This has caused our single-family serious delinquency rates to be higher in recent periods than they otherwise would have been. Delays in foreclosure relating to the concerns about the foreclosure process also had a similar effect on our single-family serious delinquency rates. As of September 30, 2011 and December 31, 2010, the percentage of seriously delinquent loans that have been delinquent for more than six months was 70% and 66%, respectively.

Table 38 presents serious delinquency rates for our single-family credit guarantee portfolio.

**Table 38 — Single-Family Serious Delinquency Rates**

| | As of September 30, 2011 | | As of December 31, 2010 | |
|---|---|---|---|---|
| | Percentage of Portfolio | Serious Delinquency Rate | Percentage of Portfolio | Serious Delinquency Rate |
| Single-family: | | | | |
| Non-credit-enhanced................................................. | 86% | 2.77% | 85% | 3.01% |
| Credit-enhanced....................................................... | 14 | 7.70 | 15 | 8.27 |
| Total single-family credit guarantee portfolio[1] ............................. | 100% | 3.51 | 100% | 3.84 |

(1) As of September 30, 2011 and December 31, 2010, approximately 68% and 61%, respectively, of the single-family loans reported as seriously delinquent were in the process of foreclosure.

Serious delinquency rates of our single-family credit guarantee portfolio declined slightly to 3.51% as of September 30, 2011 from 3.84% as of December 31, 2010. Serious delinquency rates for interest-only and option ARM products, which together represented approximately 5% of our total single-family credit guarantee portfolio at September 30, 2011, were 17.7% and 21.2%, respectively, at September 30, 2011, compared with 18.4% and 21.2%, respectively, at December 31, 2010. Serious delinquency rates of single-family 30-year, fixed rate amortizing loans, which is a more traditional mortgage product, were approximately 3.7% and 4.0% at September 30, 2011, and December 31, 2010, respectively. The slight improvement in our single-family serious delinquency rate at September 30, 2011, compared to December 31, 2010, reflects a high volume of loan modifications and foreclosure transfers, as well as a slowdown in new serious delinquencies. See "Table 37 — Reperformance Rates of Modified Single-Family Loans" for information on the performance of modified loans.

In certain states, our single-family serious delinquency rates have remained persistently high. As of September 30, 2011, single-family loans in Arizona, California, Florida, and Nevada comprised 25% of our single-family credit guarantee portfolio, and the serious delinquency rate of loans in these states was 6.2%. During the nine months ended September 30, 2011, we also continued to experience high serious delinquency rates on single-family loans originated between 2005 and 2008. We purchased significant amounts of loans with higher-risk characteristics in those years. In addition, those borrowers are more susceptible to the declines in home prices since 2006 than those homeowners that have built up equity in their homes over time.

Table 39 presents credit concentrations for certain loan groups in our single-family credit guarantee portfolio.

**Table 39 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio**

| | As of September 30, 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio[1] | Percentage Modified[2] | Serious Delinquency Rate |
| | | (in billions) | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada ................. | $ 40 | $ 413 | $ 453 | 93% | 4.3% | 6.2% |
| All other states ....................................... | 59 | 1,272 | 1,331 | 75 | 2.4 | 2.8 |
| Year of origination: | | | | | | |
| 2011 ................................................. | — | 171 | 171 | 70 | — | <0.1 |
| 2010 ................................................. | — | 347 | 347 | 70 | <0.1 | 0.2 |
| 2009 ................................................. | <1 | 348 | 348 | 72 | 0.1 | 0.4 |
| 2008 ................................................. | 8 | 123 | 131 | 91 | 3.9 | 5.2 |
| 2007 ................................................. | 30 | 146 | 176 | 112 | 9.3 | 11.2 |
| 2006 ................................................. | 27 | 104 | 131 | 111 | 8.5 | 10.5 |
| 2005 ................................................. | 18 | 133 | 151 | 95 | 4.6 | 6.2 |
| 2004 and prior...................................... | 16 | 313 | 329 | 60 | 2.3 | 2.6 |

*Freddie Mac*

FHFA 2497

| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio[1] | Percentage Modified[2] | Serious Delinquency Rate |
|---|---|---|---|---|---|---|
| | | (in billions) | | | | |
| **Geographical distribution:** | | | | | | |
| Arizona, California, Florida, and Nevada . . . . . . . . . . . . . . . . . | $ 50 | $ 415 | $ 465 | 88% | 2.8% | 7.2% |
| All other states . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 74 | 1,298 | 1,372 | 72 | 1.6 | 2.9 |
| **Year of origination:** | | | | | | |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 209 | 209 | 71 | — | <0.1 |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | <1 | 427 | 427 | 68 | <0.1 | 0.2 |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 | 169 | 180 | 83 | 1.7 | 4.3 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38 | 186 | 224 | 100 | 5.1 | 11.0 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33 | 136 | 169 | 100 | 4.8 | 9.8 |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 | 171 | 193 | 87 | 2.7 | 5.7 |
| 2004 and prior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 | 415 | 435 | 57 | 1.5 | 2.3 |

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | (in millions) | |
| **Credit Losses** | | | | |
| **Geographical distribution:** | | | | |
| Arizona, California, Florida, and Nevada . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,995 | $2,551 | $5,946 | $6,743 |
| All other states . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,445 | 1,665 | 3,826 | 4,231 |
| **Year of origination:** | | | | |
| 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | <1 | — | <1 | — |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 | — | 37 | — |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 59 | 23 | 126 | 37 |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 268 | 303 | 752 | 692 |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,219 | 1,427 | 3,534 | 3,704 |
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 923 | 1,275 | 2,753 | 3,328 |
| 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 624 | 782 | 1,728 | 2,201 |
| 2004 and prior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 324 | 406 | 842 | 1,012 |

(1) See endnote (5) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of estimated current LTV ratios.

(2) Represents the percentage of loans, based on loan count in our single-family credit guarantee portfolio, that have been modified under agreement with the borrower, including those with no changes in interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan.

Table 40 presents statistics for combinations of certain characteristics of the mortgages in our single-family credit guarantee portfolio as of September 30, 2011 and December 31, 2010.

**Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations**

September 30, 2011

| | Current LTV Ratio ≤ 80[1] | | Current LTV Ratio of > 80 to 100[1] | | Current LTV > 100[1] | | Current LTV Ratio All Loans[1] | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 0.9% | 7.9% | 0.8% | 13.1% | 1.0% | 23.5% | 2.7% | 15.8% | 13.8% |
| 15- year amortizing fixed-rate | 0.2 | 4.3 | <0.1 | 10.5 | <0.1 | 17.2 | 0.2 | 2.0 | 4.8 |
| ARMs/adjustable rate[4] | 0.1 | 11.2 | <0.1 | 17.5 | <0.1 | 25.0 | 0.1 | 9.2 | 15.7 |
| Interest-only[5] | <0.1 | 16.6 | <0.1 | 23.2 | 0.1 | 35.7 | 0.1 | 0.5 | 30.9 |
| Other[6] | <0.1 | 3.6 | <0.1 | 8.0 | 0.1 | 12.7 | 0.1 | 4.0 | 5.4 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.3 | 1.2 | 23.9 | 3.2 | 12.9 | 12.7 |
| FICO scores of 620 to 659: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 2.1 | 5.0 | 1.5 | 8.6 | 2.0 | 18.0 | 5.6 | 10.8 | 9.7 |
| 15- year amortizing fixed-rate | 0.6 | 2.5 | <0.1 | 6.5 | <0.1 | 14.4 | 0.6 | 1.0 | 2.9 |
| ARMs/adjustable rate[4] | 0.1 | 5.5 | 0.1 | 11.9 | 0.1 | 23.9 | 0.3 | 1.5 | 12.7 |
| Interest-only[5] | <0.1 | 10.9 | 0.1 | 19.1 | 0.3 | 32.3 | 0.4 | 0.4 | 27.5 |
| Other[6] | <0.1 | 2.7 | <0.1 | 4.2 | <0.1 | 5.0 | <0.1 | 1.3 | 4.1 |
| Total FICO scores of 620 to 659 | 2.8 | 4.3 | 1.7 | 8.9 | 2.4 | 19.2 | 6.9 | 8.5 | 9.2 |
| FICO scores of >=660: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 35.8 | 0.9 | 19.8 | 2.4 | 12.1 | 9.0 | 67.7 | 2.5 | 2.6 |
| 15- year amortizing fixed-rate | 12.8 | 0.4 | 0.9 | 1.2 | 0.1 | 6.0 | 13.8 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 2.3 | 1.2 | 0.8 | 4.6 | 0.8 | 15.1 | 3.9 | 0.3 | 4.7 |
| Interest-only[5] | 0.5 | 3.7 | 0.8 | 9.7 | 2.5 | 21.0 | 3.8 | 0.2 | 16.2 |
| Other[6] | <0.1 | 1.6 | <0.1 | 1.7 | 0.1 | 1.8 | 0.1 | 0.4 | 1.7 |
| Total FICO scores >= 660 | 51.4 | 0.8 | 22.3 | 2.6 | 15.6 | 10.7 | 89.3 | 1.8 | 2.5 |
| FICO scores not available | 0.3 | 4.4 | 0.1 | 11.3 | 0.2 | 21.6 | 0.6 | 5.2 | 8.5 |
| All FICO scores: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 38.9 | 1.5 | 22.1 | 3.4 | 15.2 | 11.3 | 76.2 | 3.8 | 3.7 |
| 15- year amortizing fixed-rate | 13.5 | 0.6 | 0.9 | 1.7 | 0.2 | 7.2 | 14.6 | 0.2 | 0.7 |
| ARMs/adjustable rate[4] | 2.6 | 1.9 | 0.9 | 5.9 | 1.0 | 16.6 | 4.5 | 0.8 | 5.7 |
| Interest-only[5] | 0.6 | 4.4 | 0.9 | 11.0 | 2.8 | 22.5 | 4.3 | 0.2 | 17.7 |
| Other[6] | 0.1 | 8.2 | 0.1 | 8.1 | 0.2 | 7.5 | 0.4 | 6.5 | 8.0 |
| Total Single-family Credit Guarantee Portfolio[7] | 55.7% | 1.2% | 24.9% | 3.6% | 19.4% | 12.7% | 100.0% | 2.8% | 3.5% |
| **By Region[8]** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| North Central | 0.2% | 6.2% | 0.2% | 11.8% | 0.2% | 20.2% | 0.6% | 12.9% | 11.9% |
| Northeast | 0.4 | 9.1 | 0.2 | 18.4 | 0.3 | 28.1 | 0.9 | 13.6 | 14.2 |
| Southeast | 0.2 | 7.8 | 0.2 | 13.9 | 0.3 | 28.9 | 0.7 | 13.3 | 15.6 |
| Southwest | 0.2 | 5.1 | 0.1 | 10.6 | 0.1 | 19.3 | 0.4 | 9.1 | 7.8 |
| West | 0.2 | 4.6 | 0.1 | 9.7 | 0.3 | 20.0 | 0.6 | 15.5 | 12.2 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.3 | 1.2 | 23.9 | 3.2 | 12.9 | 12.7 |
| FICO scores of 620 to 659: | | | | | | | | | |
| North Central | 0.4 | 3.9 | 0.4 | 8.0 | 0.5 | 14.9 | 1.3 | 8.3 | 8.2 |
| Northeast | 0.9 | 5.5 | 0.5 | 13.0 | 0.4 | 22.4 | 1.8 | 8.5 | 9.8 |
| Southeast | 0.6 | 5.1 | 0.2 | 9.2 | 0.6 | 23.8 | 1.4 | 8.6 | 12.0 |
| Southwest | 0.5 | 3.0 | 0.3 | 6.7 | 0.1 | 13.0 | 0.9 | 5.6 | 4.9 |
| West | 0.4 | 3.0 | 0.3 | 6.7 | 0.8 | 17.9 | 1.5 | 11.4 | 10.1 |
| Total FICO scores of 620 to 659 | 2.8 | 4.3 | 1.7 | 8.9 | 2.4 | 19.2 | 6.9 | 8.5 | 9.2 |
| FICO scores >=660: | | | | | | | | | |
| North Central | 8.7 | 0.7 | 4.6 | 2.3 | 2.7 | 7.4 | 16.0 | 1.5 | 2.0 |
| Northeast | 15.4 | 1.0 | 5.3 | 4.1 | 1.8 | 12.1 | 22.5 | 1.5 | 2.2 |
| Southeast | 7.2 | 1.1 | 3.9 | 2.8 | 3.8 | 14.0 | 14.9 | 1.9 | 4.1 |
| Southwest | 7.3 | 0.6 | 2.8 | 1.9 | 0.4 | 6.0 | 10.5 | 0.9 | 1.1 |
| West | 12.8 | 0.5 | 5.7 | 1.7 | 6.9 | 10.2 | 25.4 | 2.8 | 3.0 |
| Total FICO scores >= 660 | 51.4 | 0.8 | 22.3 | 2.6 | 15.6 | 10.7 | 89.3 | 1.8 | 2.5 |
| Total FICO scores not available | 0.3 | 4.4 | 0.1 | 11.3 | 0.2 | 21.6 | 0.6 | 5.2 | 8.5 |
| All FICO scores: | | | | | | | | | |
| North Central | 9.4 | 1.0 | 5.2 | 3.2 | 3.4 | 9.5 | 18.0 | 2.5 | 2.9 |
| Northeast | 16.8 | 1.6 | 6.1 | 5.6 | 2.4 | 15.2 | 25.3 | 2.5 | 3.2 |
| Southeast | 7.9 | 1.8 | 4.4 | 3.9 | 4.8 | 16.5 | 17.1 | 3.2 | 5.4 |
| Southwest | 8.1 | 1.0 | 3.2 | 3.0 | 0.6 | 9.1 | 11.9 | 1.8 | 1.8 |
| West | 13.5 | 0.7 | 6.0 | 2.2 | 8.2 | 11.4 | 27.7 | 3.6 | 3.7 |
| Total Single-family Credit Guarantee Portfolio[7] | 55.7% | 1.2% | 24.9% | 3.6% | 19.4% | 12.7% | 100.0% | 2.8% | 3.5% |

73

*Freddie Mac*

| | As of December 31, 2010 | | | | | | | | |
| | Current LTV Ratio ≤ 80%[1] | | Current LTV Ratio of > 80 to 100%[1] | | Current LTV > 100%[1] | | Current LTV Ratio All Loans[1] | | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
|---|---|---|---|---|---|---|---|---|---|
| **By Product Type** | | | | | | | | | |
| **FICO scores < 620:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 1.1% | 8.6% | 0.8% | 15.1% | 0.9% | 27.5% | 2.8% | 12.9% | 15.1% |
| 15- year amortizing fixed-rate | 0.2 | 4.6 | <0.1 | 11.8 | <0.1 | 22.2 | 0.2 | 1.8 | 5.1 |
| ARMs/adjustable rate[4] | 0.1 | 12.2 | <0.1 | 18.4 | 0.1 | 28.6 | 0.1 | 7.6 | 16.9 |
| Interest only[5] | <0.1 | 17.6 | 0.1 | 25.3 | 0.1 | 39.9 | 0.2 | 0.9 | 33.3 |
| Other[6] | <0.1 | 3.7 | <0.1 | 8.5 | 0.1 | 13.2 | 0.1 | 3.1 | 5.6 |
| Total FICO scores < 620 | 1.4 | 7.6 | 0.9 | 15.3 | 1.1 | 27.9 | 3.4 | 10.4 | 13.9 |
| **FICO scores of 620 to 659:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 2.4 | 5.2 | 1.7 | 9.8 | 1.8 | 20.5 | 5.9 | 8.3 | 10.3 |
| 15- year amortizing fixed-rate | 0.6 | 2.6 | <0.1 | 7.3 | <0.1 | 16.6 | 0.6 | 0.9 | 3.0 |
| ARMs/adjustable rate[4] | 0.1 | 6.0 | 0.1 | 13.5 | 0.1 | 25.9 | 0.3 | 1.5 | 13.6 |
| Interest only[5] | <0.1 | 10.9 | 0.2 | 20.6 | 0.3 | 35.6 | 0.5 | 0.9 | 29.2 |
| Other[6] | <0.1 | 2.6 | <0.1 | 5.4 | <0.1 | 5.3 | <0.1 | 1.0 | 4.3 |
| Total FICO scores of 620 to 659 | 3.1 | 4.5 | 2.0 | 10.3 | 2.2 | 22.0 | 7.3 | 6.5 | 9.9 |
| **FICO scores of >=660:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 36.5 | 1.0 | 20.0 | 2.8 | 10.4 | 10.4 | 66.9 | 1.9 | 2.8 |
| 15- year amortizing fixed-rate | 12.5 | 0.4 | 0.9 | 1.4 | 0.1 | 7.3 | 13.5 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 1.9 | 1.6 | 0.8 | 5.4 | 0.8 | 17.0 | 3.5 | 0.4 | 5.6 |
| Interest only[5] | 0.7 | 3.7 | 1.2 | 10.3 | 2.8 | 23.1 | 4.7 | 0.4 | 16.7 |
| Other[6] | <0.1 | 2.1 | <0.1 | 2.0 | 0.1 | 1.3 | 0.1 | 0.4 | 1.7 |
| Total FICO scores >= 660 | 51.6 | 0.8 | 22.9 | 3.1 | 14.2 | 12.6 | 88.7 | 1.3 | 2.7 |
| FICO scores not available | 0.4 | 4.6 | 0.1 | 11.9 | 0.1 | 23.7 | 0.6 | 4.1 | 8.8 |
| **All FICO scores:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 40.2 | 1.6 | 22.6 | 3.9 | 13.2 | 13.1 | 76.0 | 2.9 | 4.0 |
| 15- year amortizing fixed-rate | 13.3 | 0.6 | 0.9 | 2.0 | 0.2 | 8.8 | 14.4 | 0.2 | 0.8 |
| ARMs/adjustable rate[4] | 2.1 | 2.4 | 1.0 | 7.0 | 0.9 | 18.7 | 4.0 | 0.8 | 6.7 |
| Interest only[5] | 0.7 | 4.5 | 1.3 | 11.7 | 3.2 | 24.9 | 5.2 | 0.5 | 18.4 |
| Other[6] | 0.2 | 9.3 | 0.1 | 8.6 | 0.1 | 7.3 | 0.4 | 5.2 | 8.6 |
| Total Single-family Credit Guarantee Portfolio[7] | 56.5% | 1.4% | 25.9% | 4.3% | 17.6% | 14.9% | 100.0% | 2.1% | 3.8% |
| **By Region[8]** | | | | | | | | | |
| **FICO scores < 620:** | | | | | | | | | |
| North Central | 0.2% | 7.1% | 0.2% | 13.7% | 0.2% | 22.5% | 0.6% | 10.9% | 13.0% |
| Northeast | 0.5 | 9.4 | 0.3 | 19.9 | 0.2 | 30.5 | 1.0 | 10.7 | 14.5 |
| Southeast | 0.2 | 8.4 | 0.2 | 15.5 | 0.3 | 31.9 | 0.7 | 10.7 | 16.4 |
| Southwest | 0.3 | 5.9 | 0.1 | 12.7 | 0.1 | 24.1 | 0.5 | 7.6 | 9.2 |
| West | 0.2 | 5.6 | 0.1 | 13.5 | 0.3 | 28.0 | 0.6 | 12.3 | 15.8 |
| Total FICO scores < 620 | 1.4 | 7.6 | 0.9 | 15.3 | 1.1 | 27.9 | 3.4 | 10.4 | 13.9 |
| **FICO scores of 620 to 659:** | | | | | | | | | |
| North Central | 0.6 | 4.3 | 0.4 | 9.6 | 0.4 | 16.6 | 1.4 | 6.6 | 8.9 |
| Northeast | 0.9 | 5.4 | 0.6 | 13.7 | 0.3 | 23.2 | 1.8 | 6.4 | 9.4 |
| Southeast | 0.5 | 5.3 | 0.4 | 10.0 | 0.6 | 25.5 | 1.5 | 6.6 | 12.1 |
| Southwest | 0.6 | 3.4 | 0.3 | 8.1 | 0.1 | 15.3 | 1.0 | 4.5 | 5.6 |
| West | 0.5 | 3.5 | 0.3 | 9.6 | 0.8 | 23.7 | 1.6 | 8.5 | 12.7 |
| Total FICO scores of 620 to 659 | 3.1 | 4.5 | 2.0 | 10.3 | 2.2 | 22.0 | 7.3 | 6.5 | 9.9 |
| **FICO scores of >= 660:** | | | | | | | | | |
| North Central | 8.9 | 0.7 | 4.9 | 2.8 | 2.3 | 7.9 | 16.1 | 1.2 | 2.1 |
| Northeast | 15.0 | 1.0 | 5.6 | 4.4 | 1.5 | 12.0 | 22.1 | 1.1 | 2.4 |
| Southeast | 7.4 | 1.2 | 4.1 | 3.0 | 3.6 | 15.1 | 15.1 | 1.4 | 4.1 |
| Southwest | 7.3 | 0.7 | 2.9 | 2.3 | 0.3 | 6.8 | 10.5 | 0.7 | 1.2 |
| West | 13.0 | 0.6 | 5.4 | 2.7 | 6.5 | 13.8 | 24.9 | 2.1 | 3.9 |
| Total FICO scores >= 660 | 51.6 | 0.8 | 22.9 | 3.1 | 14.2 | 12.6 | 88.7 | 1.3 | 2.7 |
| FICO scores not available | 0.4 | 4.6 | 0.1 | 11.9 | 0.1 | 23.7 | 0.6 | 4.1 | 8.8 |
| **All FICO scores:** | | | | | | | | | |
| North Central | 9.6 | 1.2 | 5.6 | 3.9 | 3.0 | 10.5 | 18.2 | 2.0 | 3.1 |
| Northeast | 16.6 | 1.6 | 6.4 | 6.0 | 2.0 | 15.4 | 25.0 | 1.9 | 3.2 |
| Southeast | 8.2 | 1.9 | 4.7 | 4.3 | 4.5 | 17.8 | 17.4 | 2.4 | 5.6 |
| Southwest | 8.2 | 1.2 | 3.4 | 3.6 | 0.5 | 10.9 | 12.1 | 1.5 | 2.1 |
| West | 13.9 | 0.9 | 5.8 | 3.4 | 7.6 | 15.5 | 27.3 | 2.7 | 4.7 |
| Total Single-family Credit Guarantee Portfolio[7] | 56.5% | 1.4% | 25.9% | 4.3% | 17.6% | 14.9% | 100.0% | 2.1% | 3.8% |

(1) The current LTV ratios are our estimates. See endnote (5) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information.

(2) Based on UPB of the single-family credit guarantee portfolio.

(3) See endnote (2) to "Table 39 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio."

(4) Includes balloon/resets and option ARM mortgage loans.

(5) Includes both fixed-rate and adjustable rate loans. The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post-modification), primarily due to delays in processing.

(6) Consist of FHA/VA and other government guaranteed mortgages.

(7) The total of all FICO scores categories may not sum due to the inclusion of loans where FICO scores are not available in the respective totals for all loans. See endnote (7) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information about our use of FICO scores.

(8) Presentation with the following regional designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); and Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

74

FHFA 2500

Table 41 presents delinquency and default rate information for loans in our single-family credit guarantee portfolio based on year of origination.

**Table 41  Single-Family Credit Guarantee Portfolio by Year of Loan Origination**

| | As of September 30, 2011 | | | As of December 31, 2010 | | |
|---|---|---|---|---|---|---|
| Year of Loan Origination | Percentage of Portfolio | Serious Delinquency Rate | Foreclosure and Short Sale Rate[1] | Percentage of Portfolio | Serious Delinquency Rate | Foreclosure and Short Sale Rate[1] |
| 2011 | 10% | 0.03% | <0.01% | —% | —% | —% |
| 2010 | 20 | 0.17 | 0.03 | 18 | 0.05 | — |
| 2009 | 20 | 0.41 | 0.13 | 21 | 0.26 | 0.04 |
| 2008 | 7 | 5.20 | 1.97 | 9 | 4.89 | 1.26 |
| 2007 | 10 | 11.21 | 6.84 | 11 | 11.63 | 4.92 |
| 2006 | 7 | 10.54 | 6.47 | 9 | 10.46 | 5.00 |
| 2005 | 8 | 6.20 | 3.79 | 10 | 6.04 | 2.95 |
| 2004 and prior[2] | 18 | 2.63 | 1.00 | 22 | 2.46 | 0.88 |
| Total | 100% | 3.51% | | 100% | 3.84% | |

(1) Calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries during the period from origination to September 30, 2011 and December 31, 2010, respectively, divided by the number of loans in our single-family credit guarantee portfolio originated in that year.
(2) The foreclosure and short sale rate for "2004 and prior" represents the rate associated with loans originated from 2000 to 2004.

At September 30, 2011, approximately 32% of our single-family credit guarantee portfolio consisted of mortgage loans originated from 2005 through 2008. Loans originated during these years have experienced higher serious delinquency rates in the earlier years of their terms as compared to our historical experience. We attribute this serious delinquency performance to a number of factors, including: (a) the expansion of credit terms under which loans were underwritten during these years; (b) an increase in the origination and our purchase of interest-only and Alt-A mortgage products in these years; and (c) an environment of decreasing home sales and broadly declining home prices in the period following the loans' origination. Interest-only and Alt-A products have higher inherent credit risk than traditional fixed-rate mortgage products.

The UPB of loans originated after 2008 comprised 50% of our portfolio as of September 30, 2011. Approximately 91% of the loans we purchased in our single-family credit guarantee portfolio during the nine months ended September 30, 2011 were amortizing fixed-rate mortgage products.

*Multifamily Mortgage Credit Risk*

Portfolio diversification, particularly by product and geographical area, is an important aspect of our strategy to manage mortgage credit risk for multifamily loans. We monitor a variety of mortgage loan characteristics that may affect the default experience on our multifamily mortgage portfolio, such as the LTV ratio, DSCR, geographic location and loan duration. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for more information about the loans in our multifamily mortgage portfolio. We also monitor the performance and risk concentrations of our multifamily loans and the underlying properties throughout the life of the loan.

Table 42 provides certain attributes of our multifamily mortgage portfolio at September 30, 2011 and December 31, 2010.

**Table 42 — Multifamily Mortgage Portfolio — by Attribute**

| | UPB[1] at | | Delinquency Rate[2] at | |
|---|---|---|---|---|
| | September 30, 2011 | December 31, 2010 | September 30, 2011 | December 31, 2010 |
| | (dollars in billions) | | | |
| **Original LTV Ratio[3]** | | | | |
| Below 75% | $ 75.9 | $ 72.0 | 0.18% | 0.08% |
| 75% to 80% | 30.1 | 29.8 | 0.21 | 0.24 |
| Above 80% | 6.4 | 6.6 | 2.65 | 2.30 |
| Total | $112.4 | $108.4 | 0.33% | 0.26% |
| Weighted average LTV ratio at origination | 70% | 70% | | |
| **Maturity Dates** | | | | |
| 2011 | $ 0.4 | $ 2.3 | 5.83% | 0.97% |
| 2012 | 3.4 | 4.1 | — | 0.82 |
| 2013 | 5.9 | 6.8 | 1.05 | — |
| 2014 | 8.0 | 8.5 | 0.03 | 0.02 |
| 2015 | 11.5 | 12.0 | 0.16 | 0.09 |
| Beyond 2015 | 83.2 | 74.7 | 0.32 | 0.29 |
| Total | $112.4 | $108.4 | 0.33% | 0.26% |
| **Year of Acquisition or Guarantee[4]** | | | | |
| 2004 and prior | $ 13.4 | $ 15.9 | 0.37% | 0.31% |
| 2005 | 7.6 | 7.9 | 0.08 | — |
| 2006 | 11.0 | 11.6 | 0.35 | 0.25 |
| 2007 | 20.1 | 20.8 | 1.01 | 0.97 |
| 2008 | 21.5 | 23.0 | 0.35 | 0.03 |
| 2009 | 14.4 | 15.2 | — | — |
| 2010 | 12.7 | 14.0 | — | — |
| 2011 | 11.7 | N/A | — | N/A |
| Total | $112.4 | $108.4 | 0.33% | 0.26% |
| **Current Loan Size Distribution** | | | | |
| Above $25 million | $ 40.6 | $ 39.6 | 0.22% | 0.07% |
| Above $5 million to $25 million | 62.4 | 59.4 | 0.39 | 0.38 |
| $5 million and below | 9.4 | 9.4 | 0.48 | 0.37 |
| Total | $112.4 | $108.4 | 0.33% | 0.26% |
| **Legal Structure** | | | | |
| Unsecuritized loans | $ 81.7 | $ 85.9 | 0.17% | 0.11% |
| Non-consolidated Freddie Mac mortgage-related securities | 21.3 | 12.8 | 1.00 | 1.30 |
| Other guarantee commitments | 9.4 | 9.7 | 0.19 | 0.23 |
| Total | $112.4 | $108.4 | 0.33% | 0.26% |
| **Credit Enhancement** | | | | |
| Credit-enhanced | $ 28.9 | $ 20.9 | 0.77% | 0.85% |
| Non-credit-enhanced | 83.5 | 87.5 | 0.18 | 0.12 |
| Total | $112.4 | $108.4 | 0.33% | 0.26% |

(1) Beginning in the second quarter of 2011, we exclude non-consolidated mortgage-related securities for which we do not provide our guarantee. The prior period has been revised to conform to the current period presentation.
(2) See "Delinquencies" below for more information about our multifamily delinquency rates.
(3) Original LTV ratios are calculated as the UPB of the mortgage, divided by the lesser of the appraised value of the property at the time of mortgage origination or, except for refinance loans, the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.
(4) Based on either: (a) the year of acquisition, for loans recorded on our consolidated balance sheets; or (b) the year that we issued our guarantee, for the remaining loans in our multifamily mortgage portfolio.

Our multifamily mortgage portfolio consists of product types that are categorized based on loan terms. Multifamily loans may be interest-only or amortizing, fixed or variable rate, or may switch between fixed and variable rate over time. However, our multifamily loans generally have balloon maturities ranging from five to ten years. Amortizing loans reduce our credit exposure over time because the UPB declines with each mortgage payment. As of September 30, 2011 and

December 31, 2010, approximately 84% and 85%, respectively, of the multifamily loans on our consolidated balance sheets had fixed interest rates while the remaining loans had variable interest rates.

Because most multifamily loans require a significant lump sum payment of unpaid principal at maturity, the inability to refinance or pay off the loan at maturity is a serious concern for lenders. Although property values increased in recent quarters, in some instances they are still well below the highs of a few years ago and are lower than when the loans were originally underwritten, particularly in areas where economic conditions remain weak. As a result, if property values do not continue to improve, borrowers may experience significant difficulty refinancing as their loans approach maturity, which could increase borrower defaults or increase modification volumes. As of September 30, 2011, approximately 91% of UPB in our multifamily mortgage portfolio matures in 2014 and beyond.

In certain cases, we may provide short-term loan extensions of up to 12 months for certain borrowers. Modifications and extensions of loans are performed in an effort to minimize our losses. During the nine months ended September 30, 2011, we extended and modified unsecuritized multifamily loans totaling $315 million in UPB, compared with $390 million during the nine months ended September 30, 2010. Multifamily unsecuritized loan modifications during the nine months ended September 30, 2011 included: (a) $84 million in UPB for short-term loan extensions; and (b) $231 million in UPB for loan modifications. Where we have granted a concession to borrowers experiencing financial difficulties, we account for these loans as TDRs. When we execute a modification classified as a TDR, the loan is then classified as nonperforming for the life of the loan regardless of its delinquency status. At September 30, 2011, we had $1.0 billion of multifamily loan UPB classified as TDRs on our consolidated balance sheets.

*Delinquencies*

Our multifamily delinquency rates include all multifamily loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancement provided by the U.S. government. We report multifamily delinquency rates based on UPB of mortgage loans that are two monthly payments or more past due or in the process of foreclosure, as reported by our servicers. Our delinquency rates for multifamily loans are positively impacted to the extent we have been successful in working with troubled borrowers to modify their loans prior to becoming delinquent or by providing temporary relief through loan modifications, including short-term extensions. Some geographic areas in which we have investments in multifamily loans, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We own or guarantee loans in these states that are non-performing, or we believe are at risk of default. For further information regarding concentrations in our multifamily mortgage portfolio, including regional geographic composition, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS."

Our multifamily mortgage portfolio delinquency rate increased to 0.33% at September 30, 2011 from 0.26% at December 31, 2010. Our delinquency rate for credit-enhanced loans was 0.77% and 0.85% at September 30, 2011 and December 31, 2010, respectively, and for non-credit-enhanced loans was 0.18% and 0.12% at September 30, 2011 and December 31, 2010, respectively. As of September 30, 2011, more than one-half of our multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two monthly payments or more past due had credit enhancements that we currently believe will mitigate our expected losses on those loans. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections and other forms of credit enhancements covering loans in our multifamily mortgage portfolio as of September 30, 2011 and December 31, 2010.

<u>*Non-Performing Assets*</u>

Non-performing assets consist of single-family and multifamily loans that have undergone a TDR, single-family seriously delinquent loans, multifamily loans that are three or more payments past due or in the process of foreclosure, and REO assets, net. Non-performing assets also include multifamily loans that are deemed impaired based on management judgment. We place non-performing loans on non-accrual status when we believe the collectability of interest and principal on a loan is not reasonably assured, unless the loan is well secured and in the process of collection. When a loan is placed on non-accrual status, any interest income accrued but uncollected is reversed. Thereafter, interest income is recognized only upon receipt of cash payments. We did not accrue interest on any loans three monthly payments or more past due or if the loan is in the process of foreclosure during the three and nine months ended September 30, 2011.

We classify TDRs as those loans where we have granted a concession to a borrower that is experiencing financial difficulties. TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further information about our TDRs.

Table 43 provides detail on non-performing loans and REO assets on our consolidated balance sheets and non-performing loans underlying our financial guarantees.

## Table 43 — Non-Performing Assets[1]

| | As of | | |
|---|---|---|---|
| | September 30, 2011 | December 31, 2010 | September 30, 2010 |
| | (dollars in millions) | | |
| Non-Performing mortgage loans — on balance sheet: | | | |
| Single-family TDRs: | | | |
| Reperforming (*i.e.*; less than three monthly payments past due) | $ 42,156 | $ 26,612 | $ 22,526 |
| Seriously delinquent | 10,509 | 3,144 | 2,239 |
| Multifamily TDRs[2] | 1,045 | 911 | 343 |
| Total TDRs | 53,710 | 30,667 | 25,108 |
| Other single-family non-performing loans[3] | 65,179 | 84,272 | 86,443 |
| Other multifamily non-performing loans[4] | 1,853 | 1,750 | 1,580 |
| Total non-performing mortgage loans — on balance sheet | 120,742 | 116,689 | 113,131 |
| Non-performing mortgage loans — off-balance sheet: | | | |
| Single-family loans | 1,237 | 1,450 | 1,538 |
| Multifamily loans | 294 | 198 | 177 |
| Total non-performing mortgage loans — off-balance sheet | 1,531 | 1,648 | 1,715 |
| Real estate owned, net | 5,630 | 7,068 | 7,511 |
| Total non-performing assets | $127,903 | $125,405 | $122,357 |
| Loan loss reserves as a percentage of our non-performing mortgage loans | 32.5% | 33.7% | 33.6% |
| Total non-performing assets as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | 6.6% | 6.4% | 6.2% |

(1) Mortgage loan amounts are based on UPB and REO, net is based on carrying values.
(2) As of September 30, 2011, approximately $1.0 billion in UPB of these loans were current.
(3) Represents loans recognized by us on our consolidated balance sheets, including loans purchased from PC trusts due to the borrower's serious delinquency.
(4) Of this amount, $1.7 billion, $1.6 billion, and $1.3 billion of UPB were current at September 30, 2011, December 31, 2010, and September 30, 2010, respectively.

The amount of non-performing assets increased to $127.9 billion as of September 30, 2011, from $125.4 billion at December 31, 2010, primarily due to an increase in single-family loans classified as TDRs. However, during the nine months ended September 30, 2011, there was a decline in the rate at which loans transitioned into serious delinquency. Our serious delinquency rate has remained high compared to historical levels due to the impact of continued weakness in home prices and persistently high unemployment, extended foreclosure timelines and foreclosure suspensions in many states, and challenges faced by servicers in processing large volumes of problem loans. The UPB of loans categorized as TDRs increased to $53.7 billion at September 30, 2011 from $30.7 billion at December 31, 2010, largely due to a continued high volume of loan modifications during the nine months ended September 30, 2011 in which we decreased the contractual interest rate, deferred the balance on which contractual interest is computed, or made a combination of both of these changes. TDRs during the third quarter of 2011 include HAMP and non-HAMP loan modifications as well as trial period modifications and certain other loss mitigation actions. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES," and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for information about our implementation of new accounting guidance on classification of loans as TDRs in the third quarter of 2011. In recent periods, our non-HAMP modifications comprised a greater portion of our completed loan modification volume and the volume of HAMP modifications declined. We expect this trend to continue in 2012. We expect our non-performing assets, including loans deemed to be TDRs, to remain at elevated levels into 2012.

Table 44 provides detail by region for REO activity. Our REO activity relates almost entirely to single-family residential properties. Consequently, our regional REO acquisition trends generally follow a pattern that is similar to, but lags, that of regional serious delinquency trends of our single-family credit guarantee portfolio. See "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for information about regional serious delinquency rates.

**Table 44 — REO Activity by Region**[1]

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | | (number of properties) | | |
| **REO Inventory** | | | | |
| Beginning property inventory | 60,618 | 62,190 | 72,093 | 45,052 |
| Adjustment to beginning balance[2] | — | — | — | 1,340 |
| Properties acquired by region: | | | | |
| Northeast | 1,705 | 3,673 | 5,111 | 9,403 |
| Southeast | 6,475 | 11,301 | 16,340 | 28,929 |
| North Central | 6,527 | 8,759 | 19,307 | 24,077 |
| Southwest | 3,274 | 4,442 | 9,775 | 11,133 |
| West | 6,404 | 10,881 | 23,360 | 29,597 |
| Total properties acquired | 24,385 | 39,056 | 73,893 | 103,139 |
| Properties disposed of by region: | | | | |
| Northeast | (1,914) | (2,263) | (7,002) | (6,405) |
| Southeast | (5,921) | (7,450) | (22,675) | (19,586) |
| North Central | (5,870) | (5,783) | (19,963) | (16,618) |
| Southwest | (3,116) | (2,688) | (10,135) | (7,832) |
| West | (8,566) | (8,152) | (26,595) | (24,180) |
| Total properties disposed of | (25,387) | (26,336) | (86,370) | (74,621) |
| Ending property inventory | 59,616 | 74,910 | 59,616 | 74,910 |

(1) See endnote (8) to "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for a description of these regions.
(2) Represents REO assets associated with previously non-consolidated mortgage trusts recognized upon adoption of the amendment to the accounting guidance for consolidation of VIEs on January 1, 2010.

Our REO property inventory declined 17% from December 31, 2010 to September 30, 2011, primarily due to a decline in the volume of single-family foreclosures caused by delays in the foreclosure process, including delays related to concerns about the foreclosure process, combined with continued strong levels of REO disposition activity during the period. The average length of time for foreclosure of a Freddie Mac loan significantly increased in recent years due to temporary suspensions, delays, and other factors. The nationwide average for completion of a foreclosure (as measured from the date of the last scheduled payment made by the borrower) on our single-family delinquent loans, excluding those underlying our Other Guarantee Transactions, was 516 days and 472 days for foreclosures completed during the three months ended September 30, 2011 and 2010, respectively.

We expect the pace of our REO acquisitions will continue to be affected by delays in the foreclosure process into 2012. However, we expect the volume of our REO acquisitions will likely remain elevated, in part due to the resumption earlier in the year of foreclosure activity by servicers following the suspensions over concerns about documentation practices. We have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio, many of which will likely complete the foreclosure process and transition to REO during the next few quarters as our servicers work through their foreclosure-related issues. This inventory of seriously delinquent loans arose due to various factors and events that have lengthened the problem loan resolution process and delayed the transition of such loans to a workout or foreclosure transfer (and then, to REO). These factors and events include the effect of HAMP, suspensions of foreclosure transfers, and the increasingly lengthy foreclosure process in many states.

Our single-family REO acquisitions during the nine months ended September 30, 2011 were most significant in the states of California, Michigan, Arizona, Georgia, and Florida, which collectively represented 44% of total REO acquisitions based on the number of properties. The states with the most properties in our REO inventory are Michigan and California. At September 30, 2011, our REO inventory in Michigan and California comprised 12% and 11%, respectively, of total REO property inventory, based on the number of properties.

We are limited in our REO disposition efforts by the capacity of the market to absorb large numbers of foreclosed properties. An increasing portion of our REO acquisitions are: (a) located in jurisdictions that require a period of time after foreclosure during which the borrower may reclaim the property; or (b) occupied and we have either retained the tenant under an existing lease or begun the process of eviction. During the period when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property. This generally extends our holding period for up to three additional months. As of September 30, 2011 and December 31, 2010, approximately 31% and 28%, respectively, of our REO property inventory was not marketable due to the above conditions. Our temporary suspension of certain REO sales during the fourth quarter of 2010 (for up to three months) due to concerns about deficiencies in foreclosure documentation practices also caused the holding period to increase. Primarily for these reasons, the average holding period of our REO property increased in recent periods, though it varies significantly in different states. Excluding any post-foreclosure period during which borrowers may reclaim a foreclosed property, the average

holding period associated with our REO dispositions during the nine months ended September 30, 2011 and 2010 was 201 days and 151 days, respectively. As of September 30, 2011 and December 31, 2010, the percentage of our single-family REO property inventory that had been held for sale longer than one year was 8.2% and 3.4%, respectively. We continue to actively market these properties through our established initiatives. All of these factors have resulted in an increase in the aging of our inventory.

The composition of interest-only and Alt-A loans in our single-family credit guarantee portfolio, based on UPB, was approximately 4% and 6%, respectively, at September 30, 2011 and was 8% on a combined basis. The percentage of our REO acquisitions in the nine months ended September 30, 2011 that had been secured by either of these loan types represented approximately 31% of our total REO acquisitions, based on loan amount prior to acquisition.

On August 10, 2011, FHFA, in consultation with Treasury and HUD, announced a request for information seeking input on new options for sales and rentals of single-family REO properties held by Freddie Mac, Fannie Mae and FHA. According to the announcement, the objective of the request for information is to help address current and future REO inventory. The request for information solicited alternatives for maximizing value to taxpayers and increasing private investment in the housing market, including approaches that support rental and affordable housing needs. It is too early to determine the impact this initiative may have on the levels of our REO property inventory, the process for disposing of REO property or our REO operations expense.

### Credit Loss Performance

Many loans that are seriously delinquent, or in foreclosure, result in credit losses. Table 45 provides detail on our credit loss performance associated with mortgage loans and REO assets on our consolidated balance sheets and underlying our non-consolidated mortgage-related financial guarantees.

**Table 45 — Credit Loss Performance**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (dollars in millions) | | | |
| **REO** | | | | |
| REO balances, net: | | | | |
| Single-family | $5,539 | $ 7,420 | $ 5,539 | $ 7,420 |
| Multifamily | 91 | 91 | 91 | 91 |
| Total | $5,630 | $ 7,511 | $ 5,630 | $ 7,511 |
| REO operations (income) expense: | | | | |
| Single-family | $ 226 | $ 337 | $ 518 | $ 452 |
| Multifamily | (5) | — | (13) | 4 |
| Total | $ 221 | $ 337 | $ 505 | $ 456 |
| **Charge-offs** | | | | |
| Single-family: | | | | |
| Charge-offs, gross[1] (including $3.7 billion, $4.8 billion, $11.0 billion, and $12.6 billion relating to loan loss reserves, respectively) | $3,823 | $ 4,936 | $11,347 | $12,967 |
| Recoveries[2] | (609) | (1,057) | (2,093) | (2,445) |
| Single-family, net | $3,214 | $ 3,879 | $ 9,254 | $10,522 |
| Multifamily: | | | | |
| Charge-offs, gross[1] (including $8 million, $23 million, $49 million, and $68 million relating to loan loss reserves, respectively) | $ 16 | $ 23 | $ 57 | $ 68 |
| Recoveries[2] | — | — | — | — |
| Multifamily, net | $ 16 | $ 23 | $ 57 | $ 68 |
| Total Charge-offs: | | | | |
| Charge-offs, gross[1] (including $3.7 billion, $4.8 billion, $11.1 billion, and $12.6 billion relating to loan loss reserves, respectively) | $3,839 | $ 4,959 | $11,404 | $13,035 |
| Recoveries[2] | (609) | (1,057) | (2,093) | (2,445) |
| Total Charge-offs, net | $3,230 | $ 3,902 | $ 9,311 | $10,590 |
| **Credit losses**[3] | | | | |
| Single-family | $3,440 | $ 4,216 | $ 9,772 | $10,974 |
| Multifamily | 11 | 23 | 44 | 72 |
| Total | $3,451 | $ 4,239 | $ 9,816 | $11,046 |
| Total (in bps)[4] | 72.1 | 86.5 | 68.0 | 74.8 |

(1) Represent the carrying amount of a loan that has been discharged in order to remove the loan from our consolidated balance sheets at the time of resolution, regardless of when the impact of the credit loss was recorded on our consolidated statements of income and comprehensive income through the provision for credit losses or losses on loans purchased. Charge-offs primarily result from foreclosure transfers and short sales and are generally calculated as the recorded investment of a loan at the date it is discharged less the estimated value in final disposition or actual net sales in a short sale.

(2) Recoveries of charge-offs primarily result from foreclosure transfers and short sales on loans where a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements.

(3) Excludes foregone interest on non-performing loans, which reduces our net interest income but is not reflected in our total credit losses. In addition, excludes other market-based credit losses: (a) incurred on our investments in mortgage loans and mortgage-related securities; and (b) recognized in our consolidated statements of income and comprehensive income.

(4) Calculated as credit losses divided by the average carrying value of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates.

Our credit loss performance metric generally measures losses at the conclusion of the loan and related collateral resolution process. There is a significant lag in time from the implementation of problem loan workout activities until the final resolution of seriously delinquent mortgage loans and REO assets. Our credit loss performance is based on our charge-offs and REO expenses. We primarily record charge-offs at the time we take ownership of a property through foreclosure and at the time of settlement of foreclosure alternative transactions. Single-family charge-offs, gross, for the three and nine months ended September 30, 2011 were $3.8 billion and $11.3 billion, respectively, compared to $4.9 billion and $13.0 billion for the three and nine months ended September 30, 2010, respectively. Our net charge-offs in the three and nine months ended September 30, 2011 remained elevated, but reflect suppression of activity due to delays in the foreclosure process. We expect our charge-offs and credit losses to remain high in the remainder of 2011 and may increase in 2012, due to the large number of single-family non-performing loans that will likely be resolved as our servicers work through their foreclosure-related issues and because market conditions, such as home prices and the rate of home sales, continue to remain weak.

Our credit losses during the three months ended September 30, 2011 continued to be disproportionately high in those states that experienced significant declines in property values since 2006, such as California, Florida, Nevada, and Arizona, which collectively comprised approximately 58% and 61% of our total credit losses in the three and nine months ended September 30, 2011, respectively. California accounted for 16% of loans in our single-family credit guarantee

*Freddie Mac*

portfolio as of September 30, 2011. In addition, although Alt-A loans comprised approximately 6% of our single-family credit guarantee portfolio at both September 30, 2011 and December 31, 2010, respectively, these loans accounted for approximately 28% and 29% of our credit losses for the three and nine months ended September 30, 2011, respectively. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for information on REO disposition severity ratios, and see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about our credit losses.

*Credit Risk Sensitivity*

Under a 2005 agreement with FHFA, then OFHEO, we are required to disclose the estimated increase in the NPV of future expected credit losses for our single-family credit guarantee portfolio over a ten year period as the result of an immediate 5% decline in home prices nationwide, followed by a stabilization period and return to the base case. This sensitivity analysis is hypothetical and may not be indicative of our actual results. We do not use this analysis for determination of our reported results under GAAP. As shown in Table 46, our credit loss sensitivity declined in the third quarter of 2011, primarily due to the effects of a decline in mortgage interest rates, which affected recent and future expectations of refinancing activity.

**Table 46 — Single-Family Credit Loss Sensitivity**

| | Before Receipt of Credit Enhancements[1] | | After Receipt of Credit Enhancements[2] | |
|---|---|---|---|---|
| | NPV[3] | NPV Ratio[4] | NPV[3] | NPV Ratio[4] |
| | (dollars in millions) | | | |
| At: | | | | |
| September 30, 2011 | $ 8,824 | 49.5 bps | $8,229 | 46.1 bps |
| June 30, 2011 | $10,203 | 56.5 bps | $9,417 | 52.2 bps |
| March 31, 2011 | $ 9,832 | 54.2 bps | $8,999 | 49.6 bps |
| December 31, 2010 | $ 9,926 | 54.9 bps | $9,053 | 50.0 bps |
| September 30, 2010 | $ 9,099 | 49.5 bps | $8,187 | 44.6 bps |

(1) Assumes that none of the credit enhancements currently covering our mortgage loans has any mitigating impact on our credit losses.
(2) Assumes we collect amounts due from credit enhancement providers after giving effect to certain assumptions about counterparty default rates.
(3) Based on the single-family credit guarantee portfolio, excluding REMICs and Other Structured Securities backed by Ginnie Mae Certificates.
(4) Calculated as the ratio of NPV of increase in credit losses to the single-family credit guarantee portfolio, defined in note (3) above.

**Interest Rate and Other Market Risks**

For a discussion of our interest rate and other market risks, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

**Operational Risks**

We may face increased operational risk due to the requirement that we and Fannie Mae align certain single-family mortgage servicing practices for non-performing loans. On April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie Mae. Implementing this servicing alignment initiative has become a top priority for the company, but may pose significant short-term operational challenges in data management and place additional strain on existing systems, processes, and key resources, particularly if the requirements were to change or new requirements were to be imposed on servicers whether through government directives or servicer settlements with the state attorneys general. See "Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Single-Family Loan Workouts*" for more information. There also have been a number of other regulatory developments in recent periods impacting single-family mortgage servicing and foreclosure practices. The servicing model for single-family mortgages may face further significant changes in the future. As a result, we may be required to make additional significant changes to our practices, which could further increase our operational risk. See "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices" for more information.

Our business decision-making, risk management, and financial reporting are highly dependent on our use of models. In recent periods, external market factors have increasingly contributed to a growing risk associated with the use of these models. For example, certain economic events or the implementation of government policies could create increased model uncertainty as models may not fully capture these events, which makes it more difficult to assess model performance and requires a higher degree of management judgment. We have taken certain actions to mitigate this risk to the extent possible, including additional efforts in the area of model oversight and governance pertaining to clarifying roles, aligning model resources, and providing more transparency to management over model issues and changes.

Our risks related to employee retention are high. We have experienced elevated levels of voluntary turnover, and expect this trend to continue as the public debate regarding the future role of the GSEs continues. This has led to

*Freddie Mac*

concerns about staffing inadequacies and management depth. A number of senior officers left the company in 2011, including our Chief Operating Officer, our Executive Vice President — Single-Family Credit Guarantee, our Executive Vice President — Investments and Capital Markets and Treasurer, our Executive Vice President — Multifamily, our Senior Vice President — Operations & Technology, our Executive Vice President — General Counsel & Corporate Secretary, and our Executive Vice President — Chief Credit Officer. In addition, our Senior Vice President — Interim General Counsel & Corporate Secretary will be leaving the company in November 2011. Because we have maintained succession plans for our senior management positions, we were able to fill some of these senior management positions quickly, or eliminated them through reorganizations. However, we may not be able to continue to do so in the future. Disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in any of our operations, affect our execution capabilities, cause delays in the implementation of critical technology and other projects, and erode our business, modeling, internal audit, risk management, information security, financial reporting, and compliance expertise and capabilities.

On October 26, 2011, FHFA announced that our Chief Executive Officer has expressed his desire to step down in the coming year, and that the Board and FHFA will be developing a succession plan.

We made two significant internal reorganizations during the second quarter of 2011, as we combined our Single-Family Credit Guarantee, Single-Family Portfolio Management, and Operations & Technology divisions into a new Single-Family Business and Information Technology division, and we merged our Credit Management division into our Enterprise Risk Management division. During the third quarter of 2011, we further reorganized our Single-Family Business and Information Technology division. In the near term, this change could increase our operational risk as employees become accustomed to new roles and responsibilities. Over time, we expect to realize expense efficiencies and improve our effectiveness and overall risk profile as a result of these changes.

Freddie Mac management has determined that current business recovery capabilities may not be effective in the event of a catastrophic regional business event and could result in a significant business disruption and inability to process transactions through normal business processes. While management has developed a remediation plan that will address the current capability gaps, any measures we take to mitigate this risk may not be sufficient to respond to the full range of catastrophic events that may occur. The remediation plan is designed to improve Freddie Mac's ability to recover normal business operations during a regional business disruption, such as a terrorist event, natural disaster, loss of infrastructure services, denial of access, and/or a pandemic. For more information, see "RISK FACTORS — *A failure in our operational systems or infrastructure, or those of third parties, could impair our liquidity, disrupt our business, damage our reputation and cause losses*" in our 2010 Annual Report.

Management, including the company's Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were not effective as of September 30, 2011, at a reasonable level of assurance, because our disclosure controls and procedures did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. We have not been able to update our disclosure controls and procedures to provide reasonable assurance that information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure. For additional information, see "CONTROLS AND PROCEDURES."

**LIQUIDITY AND CAPITAL RESOURCES**

## Liquidity

Our business activities require that we maintain adequate liquidity to fund our operations, which may include the need to make payments of principal and interest on our debt securities, including securities issued by our consolidated trusts; make payments upon the maturity, redemption or repurchase of our debt securities; make net payments on derivative instruments; pay dividends on our senior preferred stock; purchase mortgage-related securities and other investments; and purchase mortgage loans, including modified or seriously delinquent loans from PC trusts. For more information on our liquidity needs and liquidity management, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES" in our 2010 Annual Report.

We fund our cash requirements primarily by issuing short-term and long-term debt. Other sources of cash include:

• receipts of principal and interest payments on securities or mortgage loans we hold;

• other cash flows from operating activities, including the management and guarantee fees we receive in connection with our guarantee activities;

- borrowings against mortgage-related securities and other investment securities we hold; and

- sales of securities we hold.

We have also received substantial amounts of cash from Treasury pursuant to draws under the Purchase Agreement, which are made to address deficits in our net worth. We received $1.5 billion in cash from Treasury during the third quarter of 2011 due to our negative net worth at June 30, 2011.

We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

As a result of the potential that the U.S. would exhaust its borrowing authority under the statutory debt limit and market concerns regarding the potential for a downgrade in the credit rating of the U.S. government, in the beginning of the third quarter of 2011 we made a temporary change in the composition of our portfolio of liquid assets to more cash and overnight investments. On August 5, 2011, S&P lowered the long-term credit rating of the U.S. government to "AA+" from "AAA" and assigned a negative outlook to the rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating. While this could adversely affect our liquidity, and the supply and cost of debt financing available to us in the future, we have not yet experienced such adverse effects. For more information, see "*Other Debt Securities — Credit Ratings*" and "RISK FACTORS — *A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business. Our business could also be adversely affected if there is a downgrade in the credit ratings of the U.S. government or a payment default by the U.S. government*" in our Quarterly Report on Form 10-Q for the second quarter of 2011.

### *Liquidity Management*

Maintaining sufficient liquidity is of primary importance and we continually strive to enhance our liquidity management practices and policies. Under these practices and policies, we maintain an amount of cash and cash equivalent reserves in the form of liquid, high quality short-term investments that is intended to enable us to meet ongoing cash obligations for an extended period, in the event we do not have access to the short- or long-term unsecured debt markets. We also actively manage the concentration of debt maturities and closely monitor our monthly maturity profile. In the second quarter of 2011, we revised our liquidity management practices and policies such that they no longer require us to maintain a back-up core portfolio of liquid non-mortgage-related securities with a market value of $10 billion. This requirement was no longer deemed to be necessary due to improvements in our ability to forecast cash flows. Our remaining liquidity management policies include the requirement to maintain funds sufficient to cover our maximum cash liquidity needs for at least the following 35 calendar days. For a discussion of our liquidity management practices and policies, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Liquidity Management*" in our 2010 Annual Report.

Throughout the third quarter of 2011, we complied with all requirements under our liquidity management policies. Furthermore, the majority of the funds used to cover our short-term cash liquidity needs is invested in short-term assets with a rating of A-1/P-1 or AAA or is issued by a counterparty with that rating. In the event of a downgrade of a position or counterparty, as applicable, below minimum rating requirements, our credit governance policies require us to exit from the position within a specified period.

We also continue to manage our debt issuances to remain in compliance with the aggregate indebtedness limits set forth in the Purchase Agreement.

To facilitate cash management, we forecast cash outflows. These forecasts help us to manage our liabilities with respect to asset purchases and runoff, when financial markets are not in crisis. For further information on our management of interest-rate risk associated with asset and liability management, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

Notwithstanding these practices and policies, our ability to maintain sufficient liquidity, including by pledging mortgage-related and other securities as collateral to other financial institutions, could cease or change rapidly and the cost of the available funding could increase significantly due to changes in market confidence and other factors. For more information, see "RISK FACTORS — Competitive and Market Risks — *Our business may be adversely affected by limited availability of financing and increased funding costs*" in our 2010 Annual Report.

### Actions of Treasury and FHFA

Since our entry into conservatorship, Treasury and FHFA have taken a number of actions that affect our cash requirements and ability to fund those requirements. The conservatorship, and the resulting support we received from Treasury, has enabled us to access debt funding on terms sufficient for our needs.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The Purchase Agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009). In the event we have a capital surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year-end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year-end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws.

While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 2012. The costs of our debt funding could also increase due to the downgrades discussed above or in the event of any future downgrades in our credit ratings or the credit ratings of the U.S. government. Upon funding of the draw request that FHFA will submit to eliminate our net worth deficit at September 30, 2011, our aggregate funding received from Treasury under the Purchase Agreement will increase to $71.2 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. Commencing in the second quarter of 2011, our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. In addition, we are required to pay a quarterly commitment fee to Treasury under the Purchase Agreement, as discussed below.

For more information on these actions, see "BUSINESS — Conservatorship and Related Matters" and "— Regulation and Supervision" in our 2010 Annual Report.

### Dividend Obligation on the Senior Preferred Stock

Following funding of the draw request related to our net worth deficit at September 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $6.6 billion to $7.2 billion, which exceeds our annual historical earnings in all but one period. The senior preferred stock accrues quarterly cumulative dividends at a rate of 10% per year or 12% per year in any quarter in which dividends are not paid in cash until all accrued dividends have been paid in cash. We paid a quarterly dividend of $1.6 billion in cash on the senior preferred stock on September 30, 2011 at the direction of our Conservator. Through September 30, 2011, we paid aggregate cash dividends to Treasury of $14.9 billion, an amount equal to 23% of our aggregate draws received under the Purchase Agreement. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth and will increasingly drive future draws. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived in the future. Treasury has waived the fee for all quarters of 2011, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the fee has not yet been established and could be substantial.

The payment of dividends on our senior preferred stock in cash reduces our net worth. For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all.

As discussed in "Capital Resources," we expect to make additional draws under the Purchase Agreement in future periods. Further draws will increase the liquidation preference of and the dividends we owe on the senior preferred stock.

*Freddie Mac*

*Other Debt Securities*

Spreads on our debt and our access to the debt markets remained favorable relative to historical levels during the three and nine months ended September 30, 2011, due largely to support from the U.S. government. As a result, we were able to replace certain higher cost debt with lower cost debt. Our short-term debt was 27% of outstanding other debt at September 30, 2011 as compared to 28% at both December 31, 2010 and June 30, 2011.

Because of the debt limit under the Purchase Agreement, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Our debt cap under the Purchase Agreement is $972 billion in 2011 and will decline to $874.8 billion in 2012. As of September 30, 2011, we estimate that the par value of our aggregate indebtedness totaled $689.9 billion, which was approximately $282.1 billion below the applicable debt cap. As of December 31, 2010, we estimate that the par value of our aggregate indebtedness totaled $728.2 billion, which was approximately $351.8 billion below the then applicable limit of $1.08 trillion. Our aggregate indebtedness is calculated as the par value of other debt. We disclose the amount of our indebtedness on this basis monthly under the caption "Other Debt Activities — Total Debt Outstanding" in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC.

*Other Debt Issuance Activities*

Table 47 summarizes the par value of other debt securities we issued, based on settlement dates, during the three and nine months ended September 30, 2011 and 2010.

### Table 47 — Other Debt Security Issuances by Product, at Par Value[1]

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (in millions) | | | |
| Other short-term debt: | | | | |
| Reference Bills® securities and discount notes | $115,723 | $124,526 | $323,769 | $381,460 |
| Medium-term notes — callable | — | 1,500 | — | 1,500 |
| Medium-term notes — non-callable[2] | — | — | 450 | 1,065 |
| Total other short-term debt | 115,723 | 126,026 | 324,219 | 384,025 |
| Other long-term debt: | | | | |
| Medium-term notes — callable | 52,965 | 52,687 | 124,012 | 179,383 |
| Medium-term notes — non-callable | 18,408 | 12,825 | 66,065 | 64,025 |
| U.S. dollar Reference Notes® securities — non-callable | 15,000 | 9,000 | 33,000 | 26,500 |
| Total other long-term debt | 86,373 | 74,512 | 223,077 | 269,908 |
| Total other debt issued | $202,096 | $200,538 | $547,296 | $653,933 |

(1) Excludes federal funds purchased and securities sold under agreements to repurchase and lines of credit. Also excludes debt securities of consolidated trusts held by third parties.

(2) Includes $0.5 billion and $1.1 billion of medium-term notes — non-callable issued for the nine months ended September 30, 2011 and 2010, respectively, which were accounted for as debt exchanges. No such debt exchanges were included in the three month periods.

*Other Debt Retirement Activities*

We repurchase, call, or exchange our outstanding medium- and long-term debt securities from time to time to help support the liquidity and predictability of the market for our other debt securities and to manage our mix of liabilities funding our assets.

Table 48 provides the par value, based on settlement dates, of other debt securities we repurchased, called, and exchanged during the three and nine months ended September 30, 2011 and 2010.

### Table 48 — Other Debt Security Repurchases, Calls, and Exchanges[1]

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (in millions) | | | |
| Repurchases of outstanding €Reference Notes® securities | $ 259 | $ — | $ 259 | $ 262 |
| Repurchases of outstanding medium-term notes | 3,915 | — | 7,683 | 4,054 |
| Calls of callable medium-term notes | 59,080 | 78,384 | 144,612 | 217,118 |
| Exchanges of medium-term notes | — | — | 450 | 1,065 |

(1) Excludes debt securities of consolidated trusts held by third parties.

*Freddie Mac*

*Credit Ratings*

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, is highly dependent upon our credit ratings. Table 49 indicates our credit ratings as of October 21, 2011.

**Table 49 — Freddie Mac Credit Ratings**

| | Nationally Recognized Statistical Rating Organization | | |
| --- | --- | --- | --- |
| | S&P | Moody's | Fitch |
| Senior long-term debt[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | AA+/Negative | Aaa/Negative | AAA |
| Short-term debt[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A-1+ | P-1 | F1+ |
| Subordinated debt[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A/Negative | Aa2/Negative | AA- |
| Preferred stock[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | C | Ca | C/RR6 |

(1) Consists of medium-term notes, U.S. dollar Reference Notes® securities and €Reference Notes® securities.
(2) Consists of Reference Bills® securities and discount notes.
(3) Consists of Freddie SUBS® securities.
(4) Does not include senior preferred stock issued to Treasury.

On August 2, 2011, President Obama signed the Budget and Control Act of 2011 which raised the U.S. government's statutory debt limit. The raising of the statutory debt limit and details outlined in the legislation to reduce the deficit resulted in the following rating actions on our debt ratings and the ratings of the U.S. government.

- On August 2, 2011, Moody's confirmed our senior long-term debt and subordinated debt ratings and assigned a negative outlook to the ratings. This action accompanied Moody's confirmation of the U.S. government's long-term credit rating and assignment of a negative outlook to the rating.

- On August 5, 2011, S&P lowered the long-term credit rating of the United States to "AA+" from "AAA" and affirmed the short-term rating of "A-1+." S&P also assigned a negative outlook to the U.S. government's long-term credit rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating.

- On August 16, 2011, Fitch affirmed our senior long-term debt rating, as well as our short-term debt, subordinated debt, and preferred stock debt ratings, with a stable outlook. This action followed Fitch's affirmation of the U.S. government's long-term credit rating with a stable outlook. Fitch noted that, by the end of 2011, it will review its fiscal projections in light of the outcome of the deliberations of the Joint Select Committee (formed as a result of the Budget and Control Act of 2011) due on November 23, 2011, as well as its near and medium-term economic outlook for the U.S. Fitch indicated that an upward revision to its medium to long-term projections for public debt as a result of weaker than expected economic recovery or the failure of the Joint Select Committee to reach an agreement on at least $1.2 trillion of deficit-reduction measures would likely result in a negative rating action. The rating action would most likely be a revision of the rating outlook to negative.

For information about factors that could lead to future ratings actions and the potential impact of a downgrade in our credit ratings, see "RISK FACTORS — *A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business. Our business could also be adversely affected if there is a downgrade in the credit ratings of the U.S. government or a payment default by the U.S. government*" in our Quarterly Report on Form 10-Q for the second quarter of 2011.

A security rating is not a recommendation to buy, sell or hold securities. It may be subject to revision or withdrawal at any time by the assigning rating organization. Each rating should be evaluated independently of any other rating.

### Cash and Cash Equivalents, Federal Funds Sold, Securities Purchased Under Agreements to Resell, and Non-Mortgage-Related Securities

Excluding amounts related to our consolidated VIEs, we held $49.6 billion in the aggregate of cash and cash equivalents, securities purchased under agreements to resell, and non-mortgage-related securities at September 30, 2011. These investments are important to our cash flow and asset and liability management and our ability to provide liquidity and stability to the mortgage market. At September 30, 2011, our non-mortgage-related securities primarily consisted of FDIC-guaranteed corporate medium-term notes, Treasury notes, and Treasury bills that we could sell to provide us with an additional source of liquidity to fund our business operations. For additional information on these assets, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell" and "— Investments in Securities — *Non-Mortgage-Related Securities.*"

*Mortgage Loans and Mortgage-Related Securities*

We invest principally in mortgage loans and mortgage-related securities, certain categories of which are largely unencumbered and highly liquid. Our primary source of liquidity among these mortgage assets is our holdings of agency securities. In addition, our unsecuritized performing single-family mortgage loans are also a potential source of liquidity. Our holdings of CMBS are less liquid than agency securities. Our holdings of non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans are not liquid due to market conditions and the continued poor credit quality of the underlying assets. Our holdings of unsecuritized seriously delinquent and modified single-family mortgage loans are also illiquid.

We are subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. See "CONSOLIDATED RESULTS OF OPERATIONS — Segment Earnings — *Segment Earnings — Results — Investments*" for more information.

## Cash Flows

Our cash and cash equivalents decreased $18.8 billion to $18.2 billion during the nine months ended September 30, 2011 and decreased $36.8 billion to $27.9 billion during the nine months ended September 30, 2010. Cash flows provided by operating activities during the nine months ended September 30, 2011 and 2010 were $9.4 billion and $10.4 billion, respectively, primarily driven by net interest income. Cash flows provided by investing activities during the nine months ended September 30, 2011 and 2010 were $263.6 billion and $244.5 billion, respectively, primarily resulting from net proceeds received as a result of repayments of single-family held-for-investment mortgage loans. Cash flows used for financing activities during the nine months ended September 30, 2011 and 2010 were $291.8 billion and $291.6 billion, respectively, largely attributable to funds used to repay debt securities of consolidated trusts held by third parties.

## Capital Resources

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA. To address our net worth deficit of $6.0 billion at September 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $6.0 billion, and will request that we receive these funds by December 31, 2011. See "BUSINESS — Regulation and Supervision — *Federal Housing Finance Agency — Receivership*" in our 2010 Annual Report for additional information on mandatory receivership. See also "RISK FACTORS — *If Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth, FHFA could be required to place us into receivership*" in our Quarterly Report on Form 10-Q for the second quarter of 2011.

We expect to make further draws under the Purchase Agreement in future periods. Given the substantial senior preferred stock dividend obligation to Treasury, which will increase with additional draws, senior preferred stock dividend payments will increasingly drive our future draw requests under the Purchase Agreement with Treasury.

The size and timing of our future draws will be determined by our dividend obligation on the senior preferred stock and a variety of other factors that could adversely affect our net worth. These other factors include how long and to what extent the housing market, including home prices, remains weak, which could increase credit expenses and cause additional other-than-temporary impairments of the non-agency mortgage-related securities we hold; foreclosure prevention efforts and foreclosure processing delays, which could increase our expenses; adverse changes in interest rates, the yield curve, implied volatility or mortgage-to-debt OAS, which could increase realized and unrealized mark-to-fair-value losses recorded in earnings or AOCI; required reductions in the size of our mortgage-related investments portfolio and other limitations on our investment activities that reduce the earnings capacity of our investment activities; quarterly commitment fees payable to Treasury; adverse changes to our funding costs and limited availability of financing; establishment of additional valuation allowances for our remaining net deferred tax asset; changes in accounting practices or guidance; the effect of the MHA Program and other government initiatives; limitations on our ability to develop new products; the introduction of additional public mission-related initiatives that may adversely impact our financial results; or changes in business practices resulting from legislative and regulatory developments.

For more information on the Purchase Agreement, its effect on our business and capital management activities, and the potential impact of making additional draws, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Dividend Obligation on the Senior Preferred Stock*," "BUSINESS — Executive Summary — *Long-Term Financial Sustainability and Future Status*" and "RISK FACTORS" in our 2010 Annual Report.

## FAIR VALUE MEASUREMENTS AND ANALYSIS

**Fair Value Measurements**

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. For additional information regarding the fair value hierarchy and measurements and validation processes, see "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS" in our 2010 Annual Report.

We categorize assets and liabilities measured and reported at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation process used to derive their fair values and our judgments regarding the observability of the related inputs. Those judgments are based on our knowledge and observations of the markets relevant to the individual assets and liabilities and may vary due to changes in market conditions. In making our judgments, we review ranges of third-party prices and transaction volumes, and hold discussions with dealers and pricing service vendors to understand and assess the extent of market benchmarks available and the judgments or modeling required in their processes. Based on these factors, we determine whether the inputs are observable and whether the principal markets are active or inactive.

Our Level 3 fair value measurements (*i.e.*, valued using significant inputs that are unobservable) primarily consist of non-agency mortgage-related securities. The market for non-agency mortgage-related securities continued to be illiquid during the third quarter of 2011, with low transaction volumes, wide credit spreads, and limited transparency. We value the non-agency mortgage-related securities we hold based primarily on prices received from pricing services and dealers. The techniques used by these pricing services and dealers to develop the prices generally are either: (a) a comparison to transactions involving instruments with similar collateral and risk profiles; or (b) industry standard modeling, such as a discounted cash flow model. For a large majority of the non-agency mortgage-related securities we value using dealers and pricing services, we obtain multiple independent prices, which are non-binding both to us and our counterparties. When multiple prices are received, we use the median of the prices. The models and related assumptions used by the dealers and pricing services are owned and managed by them. However, we have an understanding of the processes they use to develop the prices provided to us based on our ongoing due diligence. We periodically have discussions with our dealers and pricing service vendors to maintain a current understanding of the processes and inputs they use to develop prices. We make no adjustments to the individual prices we receive from third-party pricing services or dealers for non-agency mortgage-related securities beyond calculating median prices and discarding certain prices that are determined not to be valid based on our validation processes.

Table 50 below summarizes our assets and liabilities measured at fair value on a recurring basis at September 30, 2011 and December 31, 2010.

**Table 50 — Summary of Assets and Liabilities at Fair Value on a Recurring Basis**

| | September 30, 2011 | | December 31, 2010 | |
| --- | --- | --- | --- | --- |
| | Total GAAP Recurring Fair Value | Percentage in Level 3 | Total GAAP Recurring Fair Value | Percentage in Level 3 |
| | (dollars in millions) | | | |
| **Assets:** | | | | |
| Investments in securities: | | | | |
| Available-for-sale, at fair value .................................. | $216,584 | 28% | $232,634 | 30% |
| Trading, at fair value ........................................ | 55,298 | 5 | 60,262 | 5 |
| Mortgage loans: | | | | |
| Held-for-sale, at fair value .................................... | 6,275 | 100 | 6,413 | 100 |
| Derivative assets, net[1] ...................................... | 295 | — | 143 | — |
| Other assets: | | | | |
| Guarantee assets, at fair value ................................. | 674 | 100 | 541 | 100 |
| Total assets carried at fair value on a recurring basis[1]................ | $279,126 | 23 | $299,993 | 25 |
| **Liabilities:** | | | | |
| Debt securities recorded at fair value ............................. | $  3,291 | —% | $  4,443 | —% |
| Derivative liabilities, net[1] ................................... | 329 | — | 1,209 | 3 |
| Total liabilities carried at fair value on a recurring basis[1] ............... | $  3,620 | — | $  5,652 | 2 |

(1) Percentages by level are based on gross fair value of derivative assets and derivative liabilities before counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

*Changes in Level 3 Recurring Fair Value Measurements*

At September 30, 2011 and December 31, 2010, we measured and recorded at fair value on a recurring basis, assets of $71.2 billion and $79.8 billion, respectively, or approximately 23% and 25% of total assets carried at fair value on a recurring basis, using significant unobservable inputs (Level 3), before the impact of counterparty and cash collateral netting. Our Level 3 assets at September 30, 2011 primarily consist of non-agency mortgage-related securities. At September 30, 2011 and December 31, 2010, we also measured and recorded at fair value on a recurring basis, Level 3 derivative liabilities of $0.1 billion and $0.8 billion, or less than 1% and 2%, respectively, of total liabilities carried at fair value on a recurring basis, before the impact of counterparty and cash collateral netting.

During the three and nine months ended September 30, 2011, the fair value of our Level 3 assets decreased due to: (a) monthly remittances of principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) the widening of OAS levels on these securities. During the three and nine months ended September 30, 2011, we had a net transfer into Level 3 assets of $98 million and $94 million, respectively, resulting from a change in valuation method for certain mortgage-related securities due to a lack of relevant price quotes from dealers and third-party pricing services.

See "NOTE 18: FAIR VALUE DISCLOSURES — Table 18.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs" for the Level 3 reconciliation. For discussion of types and characteristics of mortgage loans underlying our mortgage-related securities, see "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets" and "RISK MANAGEMENT — Credit Risk."

*Consideration of Credit Risk in Our Valuation*

We consider credit risk in the valuation of our assets and liabilities through consideration of credit risk of the counterparty in asset valuations and through consideration of our own institutional credit risk in liability valuations on our GAAP consolidated balance sheets.

We consider credit risk in our valuation of investments in securities based on fair value measurements that are largely the result of price quotes received from multiple dealers or pricing services. Some of the key valuation drivers of such fair value measurements can include the collateral type, collateral performance, credit quality of the issuer, tranche type, weighted average life, vintage, coupon, and interest rates. We also make adjustments for items such as credit enhancements or other types of subordination and liquidity, where applicable. In cases where internally developed models are used, we maximize the use of market-based inputs or calibrate such inputs to market data.

We also consider credit risk when we evaluate the valuation of our derivative positions. The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. For derivatives that are in an asset position, we hold collateral against those positions in accordance with agreed upon thresholds. The amount of collateral held depends on the credit rating of the counterparty and is based on our credit risk policies. Similarly, for derivatives that are in a liability position, we post collateral to counterparties in accordance with agreed upon thresholds. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties*" for a discussion of our counterparty credit risk.

See "NOTE 18: FAIR VALUE DISCLOSURES — Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information regarding the valuation of our assets and liabilities.

**Consolidated Fair Value Balance Sheets Analysis**

Our consolidated fair value balance sheets present our estimates of the fair value of our financial assets and liabilities. See "NOTE 18: FAIR VALUE DISCLOSURES — Table 18.6 — Consolidated Fair Value Balance Sheets" for our fair value balance sheets. In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" in this Form 10-Q and our 2010 Annual Report, and "RISK FACTORS" and "RISK MANAGEMENT — Operational Risks" in our 2010 Annual Report for information concerning the risks associated with these models.

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report and "NOTE 18: FAIR VALUE DISCLOSURES" in this Form 10-Q for more information on fair values.

**Discussion of Fair Value Results**

Table 51 summarizes the change in the fair value of net assets for the nine months ended September 30, 2011 and 2010.

**Table 51 — Summary of Change in the Fair Value of Net Assets**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (in billions) | |
| Beginning balance | $(58.6) | $(62.5) |
| Changes in fair value of net assets, before capital transactions | (7.0) | (2.3) |
| Capital transactions: | | |
| Dividends and share issuances, net[1] | (2.9) | 8.3 |
| Ending balance | $(68.5) | $(56.5) |

(1) Includes the funds received from Treasury of $2.0 billion and $12.4 billion for the nine months ended September 30, 2011 and 2010, respectively, under the Purchase Agreement, which increased the liquidation preference of our senior preferred stock.

During the nine months ended September 30, 2011, the fair value of net assets, before capital transactions, decreased by $7.0 billion, compared to a $2.3 billion decrease during the nine months ended September 30, 2010. The decrease in the fair value of net assets, before capital transactions, during the nine months ended September 30, 2011, was primarily due to a decrease in the fair value of our single-family loans due to a decline in seasonally adjusted home prices and a continued weak credit environment, as well as unrealized losses from the widening of OAS levels on our non-agency mortgage-related securities and CMBS securities. The decrease in fair value was partially offset by a tightening of OAS levels on our agency securities and high estimated core spread income.

During the nine months ended September 30, 2010, the decrease in the fair value of net assets, before capital transactions, was primarily due to an increase in the risk premium related to our single-family loans in the continued weak credit environment. The decrease in fair value was partially offset by high estimated core spread income and an increase in the fair value of our investments in mortgage-related securities driven by the tightening of CMBS OAS levels.

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other market factors being equal. However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset. The reverse is true when the OAS on a given asset tightens — current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. However, as market conditions change, our estimate of expected fair value gains and losses from OAS may also change, and the actual core spread income recognized in future periods could be significantly different from current estimates.

### OFF-BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction. These off-balance sheet arrangements may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets.

**Securitization Activities and Other Guarantee Commitments**

We have off-balance sheet arrangements related to our securitization activities involving guaranteed mortgages and mortgage-related securities. Our off-balance sheet arrangements related to these securitization activities primarily consisted of: (a) Freddie Mac mortgage-related securities backed by multifamily loans; and (b) certain single-family Other Guarantee Transactions. We also have off-balance sheet arrangements related to other guarantee commitments, including long-term standby commitments and liquidity guarantees.

We guarantee the payment of principal and interest on Freddie Mac mortgage-related securities we issue and on mortgage loans covered by our other guarantee commitments. Therefore, our maximum potential off-balance sheet exposure to credit losses relating to these securitization activities and the other guarantee commitments is primarily represented by the UPB of the underlying loans and securities, which was $54.5 billion and $43.9 billion at September 30, 2011 and December 31, 2010, respectively. Our off-balance sheet arrangements related to securitization activity have been significantly reduced from historical levels due to accounting guidance for transfers of financial assets and the consolidation of VIEs, which we adopted on January 1, 2010. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report and "NOTE 9: FINANCIAL GUARANTEES" in this Form 10-Q for more information on our off-balance sheet securitization activities and other guarantee commitments.

Our exposure to losses on the transactions described above would be partially mitigated by the recovery we would receive through exercising our rights to the collateral backing the underlying loans and the available credit enhancements, which may include recourse and primary insurance with third parties. In addition, we provide for incurred losses each period on these guarantees within our provision for credit losses.

**Other Agreements**

We own an interest in numerous entities that are considered to be VIEs for which we are not the primary beneficiary and which we do not consolidate in accordance with the accounting guidance for the consolidation of VIEs. These VIEs relate primarily to our investment activity in mortgage-related assets and non-mortgage assets, and include LIHTC partnerships, certain Other Guarantee Transactions, and certain asset-backed investment trusts. Our consolidated balance sheets reflect only our investment in the VIEs, rather than the full amount of the VIEs' assets and liabilities. See "NOTE 3: VARIABLE INTEREST ENTITIES" for additional information related to our variable interests in these VIEs.

As part of our credit guarantee business, we routinely enter into forward purchase and sale commitments for mortgage loans and mortgage-related securities. Some of these commitments are accounted for as derivatives. Their fair values are reported as either derivative assets, net or derivative liabilities, net on our consolidated balance sheets. We also have purchase commitments primarily related to our mortgage purchase flow business, which we principally fulfill by issuing PCs in swap transactions, and, to a lesser extent, commitments to purchase or guarantee multifamily mortgage loans that are not accounted for as derivatives and are not recorded on our consolidated balance sheets. These non-derivative commitments totaled $262.7 billion, and $220.7 billion in notional value at September 30, 2011 and December 31, 2010, respectively.

In connection with the execution of the Purchase Agreement, we, through FHFA, in its capacity as Conservator, issued a warrant to Treasury to purchase 79.9% of our common stock outstanding on a fully diluted basis on the date of exercise. See "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report for further information.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts within our consolidated financial statements. Certain of our accounting policies, as well as estimates we make, are critical, as they are both important to the presentation of our financial condition and results of operations and require management to make difficult, complex, or subjective judgments and estimates, often regarding matters that are inherently uncertain. Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements.

Our critical accounting policies and estimates relate to: (a) allowances for loan losses and reserve for guarantee losses; (b) fair value measurements; (c) impairment recognition on investments in securities; and (d) realizability of net deferred tax assets. For additional information about our critical accounting policies and estimates and other significant accounting policies, including recently issued accounting pronouncements, see "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES" in our 2010 Annual Report and "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in this Form 10-Q.

## FORWARD-LOOKING STATEMENTS

We regularly communicate information concerning our business activities to investors, the news media, securities analysts and others as part of our normal operations. Some of these communications, including this Form 10-Q, contain "forward-looking statements," including statements pertaining to the conservatorship, our current expectations and objectives for our efforts under the MHA Program and other programs to assist the U.S. residential mortgage market, the servicing alignment initiative, future business plans, liquidity, capital management, economic and market conditions and trends, market share, the effect of legislative and regulatory developments, implementation of new accounting guidance, credit losses, internal control remediation efforts, and results of operations and financial condition on a GAAP, Segment Earnings, and fair value basis. Forward-looking statements are often accompanied by, and identified with, terms such as "objective," "expect," "trend," "forecast," "anticipate," "believe," "intend," "could," "future," "may," "will," and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties, including those described in the

"RISK FACTORS" sections of this Form 10-Q, our 2010 Annual Report, and our Quarterly Reports on Form 10-Q for the first and second quarters of 2011, and:

- the actions FHFA, Treasury, the Federal Reserve, the Obama Administration, Congress, and our management may take;

- the impact of the restrictions and other terms of the conservatorship, the Purchase Agreement, the senior preferred stock, and the warrant on our business, including our ability to pay: (a) the dividend on the senior preferred stock; and (b) any quarterly commitment fee that we are required to pay to Treasury under the Purchase Agreement;

- our ability to maintain adequate liquidity to fund our operations, including following any changes in the support provided to us by Treasury or FHFA, a change in the credit ratings of our debt securities or a change in the credit rating of the U.S. government;

- changes in our charter or applicable legislative or regulatory requirements, including any restructuring or reorganization in the form of our company, whether we will remain a stockholder-owned company or continue to exist and whether we will be wound down or placed under receivership, regulations under the GSE Act, the Reform Act, or the Dodd-Frank Act, regulatory or legislative actions taken to implement the Obama Administration's plan to reform the housing finance system, changes to affordable housing goals regulation, reinstatement of regulatory capital requirements, or the exercise or assertion of additional regulatory or administrative authority;

- changes in the regulation of the mortgage and financial services industries, including changes caused by the Dodd-Frank Act, or any other legislative, regulatory, or judicial action at the federal or state level;

- enforcement actions against mortgage servicers and other mortgage industry participants by federal or state authorities;

- the scope of the recently expanded HARP program and our various other initiatives designed to help in the housing recovery (including the extent to which borrowers participate in the MHA Program and new non-HAMP standard loan modification initiative), and the impact of such programs on our credit losses, expenses, and the size and composition of our mortgage-related investments portfolio;

- the impact of any deficiencies in foreclosure documentation practices and related delays in the foreclosure process;

- the ability of our financial, accounting, data processing, and other operating systems or infrastructure, and those of our vendors to process the complexity and volume of our transactions;

- changes in accounting or tax guidance or in our accounting policies or estimates, and our ability to effectively implement any such changes in guidance, policies, or estimates;

- changes in general regional, national, or international economic, business, or market conditions and competitive pressures, including changes in employment rates and interest rates, and changes in the federal government's fiscal and monetary policy;

- changes in the U.S. residential mortgage market, including changes in the rate of growth in total outstanding U.S. residential mortgage debt, the size of the U.S. residential mortgage market, and home prices;

- our ability to effectively implement our business strategies, including our efforts to improve the supply and liquidity of, and demand for, our products, and restrictions on our ability to offer new products or engage in new activities;

- our ability to recruit and retain executive officers and other key employees;

- our ability to effectively identify and manage credit, interest-rate, operational, and other risks in our business, including changes to the credit environment and the levels and volatilities of interest rates, as well as the shape and slope of the yield curves;

- the effects of internal control deficiencies and our ability to effectively identify, assess, evaluate, manage, mitigate, or remediate control deficiencies and risks, including material weaknesses and significant deficiencies, in our internal control over financial reporting and disclosure controls and procedures;

- incomplete or inaccurate information provided by customers and counterparties;

- consolidation among, or adverse changes in the financial condition of, our customers and counterparties;

- the failure of our customers and counterparties to fulfill their obligations to us, including the failure of seller/servicers to meet their obligations to repurchase loans sold to us in breach of their representations and warranties;

- changes in our judgments, assumptions, forecasts, or estimates regarding the volume of our business and spreads we expect to earn;

- the availability of options, interest-rate and currency swaps, and other derivative financial instruments of the types and quantities, on acceptable terms, and with acceptable counterparties needed for investment funding and risk management purposes;

- changes in pricing, valuation or other methodologies, models, assumptions, judgments, estimates and/or other measurement techniques, or their respective reliability;

- changes in mortgage-to-debt OAS;

- the potential impact on the market for our securities resulting from any sales by the Federal Reserve or Treasury of Freddie Mac debt and mortgage-related securities they have purchased;

- adverse judgments or settlements in connection with legal proceedings, governmental investigations, and IRS examinations;

- volatility of reported results due to changes in the fair value of certain instruments or assets;

- the development of different types of mortgage servicing structures and servicing compensation;

- preferences of originators in selling into the secondary mortgage market;

- changes to our underwriting or servicing requirements (including servicing alignment efforts under the servicing alignment initiative), our practices with respect to the disposition of REO properties, or investment standards for mortgage-related products;

- investor preferences for mortgage loans and mortgage-related and debt securities compared to other investments;

- borrower preferences for fixed-rate mortgages or adjustable-rate mortgages;

- the occurrence of a major natural or other disaster in geographic areas in which our offices or portions of our total mortgage portfolio are concentrated;

- other factors and assumptions described in this Form 10-Q, in our 2010 Annual Report, and our Quarterly Reports on Form 10-Q for the first and second quarters of 2011;

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their impacts; and

- market reactions to the foregoing.

Forward-looking statements speak only as of the date they are made, and we undertake no obligation to update any forward-looking statements we make to reflect events or circumstances occurring after the date of this Form 10-Q.

## RISK MANAGEMENT AND DISCLOSURE COMMITMENTS

In October 2000, we announced our adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with FHFA, then OFHEO, that updated these commitments and set forth a process for implementing them. A copy of the letters between us and OFHEO dated September 1, 2005 constituting the written agreement has been filed as an exhibit to our Registration Statement on Form 10, filed with the SEC on July 18, 2008, and is available on the Investor Relations page of our web site at www.freddiemac.com/investors/sec_filings/index.html.

In November 2008, FHFA suspended our periodic issuance of subordinated debt disclosure commitment during the term of conservatorship and thereafter until directed otherwise. In March 2009, FHFA suspended the remaining disclosure commitments under the September 1, 2005 agreement until further notice, except that: (a) FHFA will continue to monitor our adherence to the substance of the liquidity management and contingency planning commitment through normal supervision activities; and (b) we will continue to provide interest-rate risk and credit risk disclosures in our periodic public reports. For the nine months ended September 30, 2011, our duration gap averaged zero months, PMVS-L averaged $390 million and PMVS-YC averaged $22 million. Our 2011 monthly average duration gap, PMVS results and related disclosures are provided in our Monthly Volume Summary reports, which are available on our web site, www.freddiemac.com/investors/volsum and in current reports on Form 8-K we file with the SEC. For disclosures concerning credit risk sensitivity, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Credit Risk Sensitivity.*"

## LEGISLATIVE AND REGULATORY MATTERS

**Obama Administration Report on Reforming the U.S. Housing Finance Market**

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, stating that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Obama Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Obama Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements. These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations and financial condition.

On September 19, 2011, the Acting Director of FHFA stated that he would anticipate Freddie Mac and Fannie Mae will continue the gradual process of increasing guarantee fees. He stated this will not happen immediately but should be expected in 2012. President Obama's Plan for Economic Growth and Deficit Reduction, announced on September 19, 2011, contained a proposal to increase the guarantee fees charged by Freddie Mac and Fannie Mae by ten basis points. We cannot currently predict the extent to which our business will be impacted by the potential increase in guarantee fees. In addition, as discussed below in "Conforming Loan Limits," the temporary high-cost area loan limits expired on September 30, 2011.

We cannot predict the extent to which the other recommendations will be implemented or when any actions to implement them may be taken. However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term.

**Changes to the Home Affordable Refinance Program**

On October 24, 2011 FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers who can benefit from refinancing their home mortgage. The Acting Director of FHFA stated that the goal of pursuing these changes is to create refinancing opportunities for more borrowers whose mortgage is owned or guaranteed by the GSEs while reducing risk for the GSEs and bringing a measure of stability to housing markets. The revisions to HARP enable us to expand the assistance we provide to homeowners by making their mortgage payments more affordable through one or more of the following ways: (a) a reduction in payment; (b) a reduction in rate; (c) movement to a more stable mortgage product type (*i.e.*, from an adjustable-rate mortgage to a fixed-rate mortgage); or (d) a reduction in amortization term.

The revisions to HARP will continue to be available to borrowers with loans that were sold to the GSEs on or before May 31, 2009 and who have current LTV ratios above 80%. The program enhancements include:

- eliminating certain risk-based fees for borrowers who refinance into shorter-term mortgages and lowering fees for other borrowers;

- removing the current 125% LTV ceiling for fixed-rate mortgages backed by the GSEs;

- waiving certain representations and warranties that lenders commit to in making loans owned or guaranteed by the GSEs;

- eliminating the need for a new property appraisal where there is a reliable automated valuation model estimate provided by the GSEs; and

- extending the end date for HARP until December 31, 2013.

The October 24, 2011 announcement stated that the GSEs will issue guidance with operational details about the HARP changes to mortgage lenders and servicers by November 15, 2011. We are working collectively with FHFA and Fannie Mae on several operational details of the program. We are also waiting to receive details from FHFA regarding the fees that we may charge associated with the refinancing program. Since industry participation in HARP is not mandatory, we anticipate that implementation schedules will vary as individual lenders, mortgage insurers and other market participants modify their processes. At this time we do not know how many eligible borrowers are likely to refinance under the program.

The recently announced revisions to HARP will help to reduce our exposure to credit risk to the extent that HARP refinances strengthen the borrowers' capacity to repay their mortgages and, in some cases, reduce the terms of their mortgages. These revisions to HARP could also reduce our credit losses to the extent that the revised program contributes to bringing stability to the housing market. However, with our release of certain representations and warranties to lenders, credit losses associated with loans identified with defects will not be recaptured through loan buybacks. We could also experience declines in the fair values of certain agency mortgage-related security investments classified as available-for-sale or trading resulting from changes in expectations of mortgage prepayments and lower net interest yields over time on other mortgage-related investments. As a result, we cannot currently estimate these impacts until more details about the program and the level of borrower participation can be reasonably assured. See "RISK FACTORS — *The MHA Program and other efforts to reduce foreclosures, modify loan terms and refinance mortgages, including HARP, may fail to mitigate our credit losses and may adversely affect our results of operations or financial condition*" for additional information.

### Legislation Related to Reforming Freddie Mac and Fannie Mae

Our future structure and role will be determined by the Obama Administration and Congress, and there are likely to be significant changes beyond the near-term. Since July 2011, there have not been any significant developments with respect to legislation related to reforming Freddie Mac and Fannie Mae.

A number of bills were introduced in the Senate and House in 2011 concerning the future state of Freddie Mac and Fannie Mae. Several of these bills take a comprehensive approach that would wind down Freddie Mac and Fannie Mae (or completely restructure the companies), while other bills would revise the companies' operations in a limited manner. While there have not been any significant developments with respect to these bills since July 2011, Congress continues to hold hearings related to the long-term future of housing finance including the role of Freddie Mac and Fannie Mae. For more information on these bills, see "MD&A — LEGISLATIVE AND REGULATORY DEVELOPMENTS — Legislation Related to Reforming Freddie Mac and Fannie Mae" in our Form 10-Q for the second quarter of 2011.

On October 27, 2011, the Chairman of the House Financial Services Subcommittee on Capital Markets and Government Sponsored Enterprises announced a proposal that would reform the secondary mortgage market by facilitating continued standardization and uniformity of mortgage securitization, ensuring legal certainty, and providing additional transparency and disclosure. The proposal is intended to promote private investment in the U.S. mortgage market without a government guarantee. We expect the Chairman will introduce legislation to implement the proposal.

We expect additional legislation relating to Freddie Mac and Fannie Mae to be introduced and considered by Congress; however, we cannot predict whether or when any such legislation will be enacted.

Some of the bills introduced in 2011, if enacted, would materially affect the role of the company, our business model and our structure, and could have an adverse effect on our financial results and operations as well as our ability to retain and recruit management and other valuable employees. Under several of the bills, our charter could be revoked and/or we would be wound down or placed into receivership. Such legislation could impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent an explicit guarantee of our existing and ongoing liabilities by the U.S. government. A number of the other bills introduced in 2011 would adversely affect our ability to conduct business under our current business model, including by subjecting us to new requirements that could increase costs, reduce revenues and limit or prohibit current business activities.

### Dodd-Frank Act

The Dodd-Frank Act, which was signed into law on July 21, 2010, significantly changed the regulation of the financial services industry, including by creating new standards related to regulatory oversight of systemically important financial companies, derivatives, capital requirements, asset-backed securitization, mortgage underwriting, and consumer financial protection. The Dodd-Frank Act has and will directly affect the business and operations of Freddie Mac by subjecting us to new and additional regulatory oversight and standards, including with respect to our activities and products. We may also be affected by provisions of the Dodd-Frank Act and implementing regulations that affect the

activities of banks, savings institutions, insurance companies, securities dealers, and other regulated entities that are our customers and counterparties.

At this time, it is difficult to assess fully the impact of the Dodd-Frank Act on Freddie Mac and the financial services industry. Implementation of the Dodd-Frank Act is being accomplished through numerous rulemakings, many of which are still in process. The final effects of the legislation will not be known with certainty until these rulemakings are complete. The Dodd-Frank Act also mandates the preparation of studies on a wide range of issues, which could lead to additional legislation or regulatory changes.

Developments since the end of the second quarter of 2011 with respect to rulemakings that may have a significant impact on Freddie Mac include the following:

- Designation of systemically important nonbank financial companies — The Financial Stability Oversight Council, or FSOC, released a proposed rule and guidance that describe the processes and procedures that the FSOC intends to follow in making a determination that a nonbank financial company is systemically important. Pursuant to the Dodd-Frank Act, the FSOC may designate a nonbank financial company to be subject to the supervision of the Federal Reserve Board and subject to additional prudential standards if the FSOC determines that material financial distress at the nonbank financial company, or the nature, scope, size, scale, concentration, interconnectedness, or mix of the activities of the company, could pose a threat to the financial stability of the United States. If Freddie Mac is designated as a systemically important nonbank financial company under the standards ultimately adopted by the FSOC, we could be subject to additional oversight and prudential standards.

- Resolution Plans — The Federal Reserve Board and the FDIC have approved a final rule to implement a requirement under the Dodd-Frank Act that requires large bank holding companies and systemically important nonbank financial companies to submit annual resolution plans to the Federal Reserve and the FDIC. Resolution plans must describe the company's strategy for rapid and orderly resolution in bankruptcy during times of financial distress, and must include a strategic analysis of the plan's components, a description of the range of specific actions the company proposes to take during resolution, and a description of the company's organizational structure, material entities, interconnections and interdependencies, and management information systems. If we are designated as a systemically important nonbank financial company under the standards ultimately adopted by the FSOC, we will be required to submit annual resolution plans pursuant to the requirements of this rule.

- Derivatives Rulemakings — The Chairman of the Commodity Futures Trading Commission announced on September 8, 2011 that numerous proposed derivatives rules likely will not be finalized until the first quarter of 2012, including rules relating to capital and margin requirements, client clearing documentation and risk management, and swap execution facilities. When finalized, these rules may have a significant impact on our derivatives trading activities.

We continue to review and assess the impact of rulemakings and other activities under the Dodd-Frank Act. For more information, see "RISK FACTORS — Legal and Regulatory Risks — *The Dodd-Frank Act and related regulation may adversely affect our business activities and financial results*" in our 2010 Annual Report.

### SEC Regulation on Disclosure for Asset-Backed Securities

On January 20, 2011, the SEC adopted Rule 15Ga-1, which requires issuers of asset-backed securities to disclose specified information concerning fulfilled and unfulfilled repurchase requests relating to the assets backing such securities, including certain historical information. This disclosure will first be required to be reported by February 14, 2012 (containing information covering the three year period ended December 31, 2011), with subsequent filings due each quarter thereafter.

We currently believe compliance with the disclosure requirements of this new rule will likely present significant operational challenges for us. Since Rule 15Ga-1 was adopted by the SEC in January 2011, we have been assessing its requirements to determine how we will comply with the Rule and complete Form ABS-15G, which is the report securitizers are required to file. In many cases, our existing systems may not collect the data required to be disclosed under the Rule in the form required by Form ABS-15G. We have devoted substantial resources to examining our systems and operations, and developing internal requirements and software in order to file with the SEC by February 14, 2012.

### Conforming Loan Limits

On September 30, 2011, the temporary high-cost area loan limits established by Congress for certain high-cost areas were permitted to expire. Accordingly, the permanent high-cost area loan limits set out in the Reform Act apply with respect to loans originated on or after October 1, 2011 in high-cost areas. Congress has been considering legislation that

would re-establish higher temporary loan limits for higher-cost areas, however, we cannot predict whether or when such legislation will be enacted.

**Developments Concerning Single-Family Servicing Practices**

There have been a number of regulatory developments in recent periods impacting single-family mortgage servicing and foreclosure practices, including those discussed below. These developments caused delays in the foreclosure process for single-family mortgages, which caused the volume of our single-family REO acquisitions to be less than it otherwise would have been. It is possible that these developments will result in significant changes to mortgage servicing and foreclosure practices that could adversely affect our business. New compliance requirements placed on servicers as a result of these developments could expose Freddie Mac to financial risk as a result of further extensions of foreclosure timelines if home prices remain weak or decline. We may need to make additional significant changes to our practices, which could increase our operational risk. It is difficult to predict other impacts on our business of these changes, though such changes could adversely affect our credit losses and costs of servicing, and make it more difficult for us to transfer mortgage servicing rights to a successor servicer should we need to do so. The regulatory developments and changes include the following:

• On April 13, 2011, the OCC, the Federal Reserve, the FDIC, and the Office of Thrift Supervision entered into consent orders with 14 large servicers regarding their foreclosure and loss mitigation practices. These institutions service the majority of the single-family mortgages we own or guarantee. The consent orders require the servicers to submit comprehensive action plans relating to, among other items, use of foreclosure documentation, staffing of foreclosure and loss mitigation activities, oversight of third parties, use of the Mortgage Electronic Registration System, or the MERS System, and communications with borrowers. We will not be able to assess the impact of these actions on our business until the servicers' comprehensive action plans are publicly available.

• On April 28, 2011, FHFA announced a new set of aligned standards for servicing delinquent mortgages owned or guaranteed by Freddie Mac and Fannie Mae. We implemented most aspects of this initiative effective October 1, 2011. We have also implemented a new standard modification initiative that will replace our existing non-HAMP modification program beginning January 1, 2012. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts*." FHFA has also directed us and Fannie Mae to work on a joint initiative to consider alternatives for future mortgage servicing structures and servicing compensation. The development of further alternatives could impact our ability to conduct current initiatives. On September 27, 2011, FHFA announced that it is seeking public comment on two alternative mortgage servicing compensation structures detailed in a discussion paper. One proposal would establish a reserve account within the current servicing compensation structure. The other proposal would create a new fee for service compensation structure (*i.e.*, a flat per-loan fee).

• On June 30, 2011, the OCC issued Supervisory Guidance regarding the OCC's expectations for the oversight and management of mortgage foreclosure activities by national banks. The Supervisory Guidance contains several elements from the consent orders with the 14 major servicers that will now be applied to all national banks. In the Supervisory Guidance, the OCC directed all national banks to conduct a self-assessment of foreclosure management practices by September 30, 2011. Additionally, the Guidance sets forth foreclosure management standards that mirror the broad categories of the servicing guidelines contained in the consent orders. During Congressional testimony on July 7, 2011, an OCC official indicated that there is an active interagency effort under way to develop comprehensive, nationally applicable mortgage servicing standards, and that this effort involves federal bank regulatory agencies, HUD and FHFA.

• A group consisting of state attorneys general and state bank and mortgage regulators is in discussions with a number of large seller/servicers concerning a global settlement of certain issues related to mortgage servicing practices. It has been reported that this settlement could include changes to mortgage servicing practices.

• On July 21, 2011, new MERS membership rules with respect to the foreclosure of mortgages registered on the MERS System were adopted. Subject to certain limited exceptions, these rules require the assignment of a mortgage out of MERS' name prior to the initiation of foreclosure or certain other legal proceedings. This may further extend Freddie Mac's foreclosure timelines.

• Several localities have adopted ordinances that would expand the responsibilities and liability for registering and maintaining vacant properties to servicers and assignees. These laws could significantly expand mortgage costs and liabilities in those areas.

For more information on operational risks related to these developments in mortgage servicing, see "RISK MANAGEMENT — Operational Risks."

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

**Interest-Rate Risk and Other Market Risks**

Our investments in mortgage loans and mortgage-related securities expose us to interest-rate risk and other market risks arising primarily from the uncertainty as to when borrowers will pay the outstanding principal balance of mortgage loans and mortgage-related securities, known as prepayment risk, and the resulting potential mismatch in the timing of our receipt of cash flows related to our assets versus the timing of payment of cash flows related to our liabilities used to fund those assets. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" in our 2010 Annual Report for more information on our exposure to interest-rate and other market risks, including our use of derivatives as part of our efforts to manage certain of these risks.

### PMVS and Duration Gap

Our primary interest-rate risk measures are PMVS and duration gap.

PMVS is an estimate of the change in the market value of our net assets and liabilities from an instantaneous 50 basis point shock to interest rates, assuming no rebalancing actions are undertaken and assuming the mortgage-to-LIBOR basis does not change. We do not actively manage overall basis risk, also referred to as mortgage-to-debt OAS risk or spread risk, arising from funding mortgage-related assets with our debt securities. Recently our agency-to-swap basis risk exposure has increased due to the increased use of floating rate debt. Agency-to-swap basis risk impacts the debt component of our mortgage-to-debt OAS risk. PMVS is measured in two ways, one measuring the estimated sensitivity of our portfolio market value to parallel movements in interest rates (PMVS-Level or PMVS-L) and the other to nonparallel movements (PMVS-YC).

The 50 basis point shift and 25 basis point change in slope of the LIBOR yield curve used for our PMVS measures reflect reasonably possible near-term changes that we believe provide a meaningful measure of our interest-rate risk sensitivity. Our PMVS measures assume instantaneous shocks. Therefore, these PMVS measures do not consider the effects on fair value of any rebalancing actions that we would typically expect to take to reduce our risk exposure.

Duration gap measures the difference in price sensitivity to interest rate changes between our assets and liabilities, and is expressed in months relative to the market value of assets. For example, assets with a six-month duration and liabilities with a five-month duration would result in a positive duration gap of one month. A duration gap of zero implies that the duration of our assets approximates the duration of our liabilities. Multiplying duration gap (expressed as a percentage of a year) by the fair value of our assets will provide an indication of the change in the fair value of our equity resulting from a 1% change in interest rates.

### Limitations of Market Risk Measures

Our PMVS and duration gap estimates are determined using models that involve our best judgment of interest-rate and prepayment assumptions. Accordingly, while we believe that PMVS and duration gap are useful risk management tools, they should be understood as estimates rather than as precise measurements. While PMVS and duration gap estimate our exposure to changes in interest rates, they do not capture the potential impact of certain other market risks, such as changes in volatility, basis, and foreign-currency risk.

There are inherent limitations in any methodology used to estimate exposure to changes in market interest rates. Our sensitivity analyses for PMVS and duration gap contemplate only certain movements in interest rates and are performed at a particular point in time based on the estimated fair value of our existing portfolio. These sensitivity analyses do not consider other factors that may have a significant effect on our financial instruments, most notably business activities and strategic actions that management may take in the future to manage interest-rate risk. As such, these analyses are not intended to provide precise forecasts of the effect a change in market interest rates would have on the estimated fair value of our net assets.

In addition, it is more difficult to measure and manage the interest rate risk related to mortgage assets as risk for prepayment model error remains high due to uncertainty regarding default rates, unemployment, loan modification, and the volatility and impact of home price movements on mortgage durations. Mis-estimation of prepayments could result in hedging-related losses.

*Duration Gap and PMVS Results*

Table 52 provides duration gap, estimated point-in-time and minimum and maximum PMVS-L and PMVS-YC results, and an average of the daily values and standard deviation for the three and nine months ended September 30, 2011 and 2010. Table 52 also provides PMVS-L estimates assuming an immediate 100 basis point shift in the LIBOR yield curve. We do not hedge the entire prepayment risk exposure embedded in our mortgage assets. The interest rate sensitivity of a mortgage portfolio varies across a wide range of interest rates. Therefore, the difference between PMVS at 50 basis points and 100 basis points is non-linear. As shown in Table 52, the PMVS-L results based on both 50 basis point and 100 basis point shifts in the LIBOR curve as of September 30, 2011 were significantly lower than corresponding amounts as of December 31, 2010 due to a low mortgage interest rate environment that resulted in a lower convexity on our mortgage portfolio.

**Table 52 — PMVS Results**

|  | PMVS-YC | PMVS-L | |
|---|---|---|---|
|  | 25 bps | 50 bps | 100 bps |
|  |  | (in millions) | |
| Assuming shifts of the LIBOR yield curve: |  |  |  |
| September 30, 2011 | $13 | $ 29 | $ 49 |
| December 31, 2010 | $35 | $588 | $1,884 |

| | Three Months Ended September 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | | | 2010 | | |
| | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
| | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Average | (0.1) | $21 | $304 | 0.1 | $26 | $ 91 |
| Minimum | (0.8) | $— | $ — | (0.2) | $ 1 | $ — |
| Maximum | 0.5 | $77 | $514 | 0.6 | $83 | $321 |
| Standard deviation | 0.3 | $18 | $136 | 0.2 | $18 | $ 86 |

| | Nine Months Ended September 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | | | 2010 | | |
| | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
| | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Average | (0.1) | $22 | $390 | 0.0 | $22 | $325 |
| Minimum | (1.0) | $— | $ — | (0.7) | $— | $ — |
| Maximum | 0.6 | $77 | $721 | 0.7 | $83 | $668 |
| Standard deviation | 0.3 | $15 | $121 | 0.3 | $17 | $190 |

Derivatives have historically enabled us to keep our interest-rate risk exposure at consistently low levels in a wide range of interest-rate environments. Table 53 shows that the PMVS-L risk levels for the periods presented would generally have been higher if we had not used derivatives to manage our interest-rate risk exposure.

**Table 53 — Derivative Impact on PMVS-L (50 bps)**

|  | Before Derivatives | After Derivatives | Effect of Derivatives |
|---|---|---|---|
|  |  | (in millions) | |
| At: |  |  |  |
| September 30, 2011 | $1,612 | $ 29 | $(1,583) |
| December 31, 2010 | $3,614 | $588 | $(3,026) |

The disclosure in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC, reflects the average of the daily PMVS-L, PMVS-YC and duration gap estimates for a given reporting period (a month, quarter or year).

## ITEM 4. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC rules and forms and that such information is accumulated and communicated to senior management, as appropriate, to allow timely decisions regarding required disclosure. In designing our disclosure controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and we must apply judgment in implementing possible controls and procedures.

*Freddie Mac*

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of September 30, 2011. As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of September 30, 2011, at a reasonable level of assurance, because our disclosure controls and procedures did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. We have not been able to update our disclosure controls and procedures to provide reasonable assurance that information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure. Based on discussions with FHFA and the structural nature of this continued weakness, it is likely that we will not remediate this weakness in our disclosure controls and procedures while we are under conservatorship. As noted below, we also consider this situation to be a continuing material weakness in our internal control over financial reporting.

### Changes in Internal Control Over Financial Reporting During the Quarter Ended September 30, 2011

We evaluated the changes in our internal control over financial reporting that occurred during the quarter ended September 30, 2011 and concluded that the following matters have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

A number of senior officers have left the company since June 30, 2011, including Michael C. May, Executive Vice President — Multifamily, Joseph A. Rossi, Senior Vice President — Operations & Technology, Robert E. Bostrom, Executive Vice President — General Counsel & Corporate Secretary, and Raymond G. Romano, Executive Vice President — Chief Credit Officer. In addition, John R. Dye, Senior Vice President — Interim General Counsel & Corporate Secretary will be leaving the company in November 2011. Because we have maintained succession plans for our senior management positions, we were able to fill some of these senior management positions quickly, or eliminated them through reorganizations. However, we may not be able to continue to do so in the future. Disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in any of our operations, affect our execution capabilities, cause delays in the implementation of critical technology and other projects, and erode our business, modeling, internal audit, risk management, financial reporting, and compliance expertise and capabilities.

On October 26, 2011, FHFA announced that Charles E. Haldeman Jr., Chief Executive Officer, has expressed his desire to step down in the coming year, and that the Board and FHFA will be developing a succession plan.

FHFA also announced on October 26, 2011, that two Board members, John Koskinen (Chairman) and Robert Glauber (Chairman, Governance and Nominating Committee), have reached the company's mandatory retirement age and will be stepping down from the Board at the end of the current term in February 2012. In order to promote a smooth transition, FHFA announced that Christopher Lynch, currently Chairman of the Audit Committee, will assume the chairmanship of the Board effective at the December 2011 Board meeting. A third Board member, Laurence E. Hirsch, notified the company on October 18, 2011 that he will not seek re-election to the Board when his term expires.

During the third quarter of 2011, we further reorganized our Single-Family Business and Information Technology division. In the near term, this change could increase our operational risk as employees become accustomed to new roles and responsibilities. Over time, we expect this change will improve our effectiveness and overall risk profile.

### Mitigating Actions Related to the Material Weakness in Internal Control Over Financial Reporting

We have not remediated the material weakness in internal control over financial reporting related to our disclosure controls and procedures as of September 30, 2011. Given the structural nature of this continued weakness, we believe it is likely that we will not remediate this material weakness while we are under conservatorship. However, both we and FHFA have continued to engage in activities and employ procedures and practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws. These include the following:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the Conservator.

- We provide drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also provide drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, review our SEC filings prior to filing, including this quarterly report on Form 10-Q, and engage in discussions regarding issues associated with the information contained in those filings.

Prior to filing this quarterly report on Form 10-Q, FHFA provided us with a written acknowledgement that it had reviewed the quarterly report on Form 10-Q, was not aware of any material misstatements or omissions in the quarterly report on Form 10-Q, and had no objection to our filing the quarterly report on Form 10-Q.

- The Acting Director of FHFA is in frequent communication with our Chief Executive Officer, typically meeting (in person or by phone) on a weekly basis.

- FHFA representatives hold frequent meetings, typically weekly, with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, capital markets management, external communications and legal matters.

- Senior officials within FHFA's accounting group meet frequently, typically weekly, with our senior financial executives regarding our accounting policies, practices and procedures.

In view of our mitigating actions related to the material weakness, we believe that our interim consolidated financial statements for the quarter ended September 30, 2011 have been prepared in conformity with GAAP.

**ITEM 1. FINANCIAL STATEMENTS**

FHFA 2529

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME**
**(UNAUDITED)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions, except share-related amounts) | | | |
| Interest income | | | | |
| Mortgage loans: | | | | |
| Held by consolidated trusts | $ 19,140 | $ 21,473 | $ 58,986 | $ 66,319 |
| Unsecuritized | 2,282 | 2,305 | 6,890 | 6,445 |
| Total mortgage loans | 21,422 | 23,778 | 65,876 | 72,764 |
| Investments in securities | 3,150 | 3,557 | 9,708 | 11,030 |
| Other | 8 | 48 | 60 | 115 |
| Total interest income | 24,580 | 27,383 | 75,644 | 83,909 |
| Interest expense | | | | |
| Debt securities of consolidated trusts | (16,715) | (18,721) | (51,379) | (57,412) |
| Other debt | (3,072) | (4,145) | (9,970) | (13,212) |
| Total interest expense | (19,787) | (22,866) | (61,349) | (70,624) |
| Expense related to derivatives | (180) | (238) | (581) | (745) |
| Net interest income | 4,613 | 4,279 | 13,714 | 12,540 |
| Provision for credit losses | (3,606) | (3,727) | (8,124) | (14,152) |
| Net interest income (loss) after provision for credit losses | 1,007 | 552 | 5,590 | (1,612) |
| Non-interest income (loss) | | | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (310) | (66) | (212) | (160) |
| Gains (losses) on retirement of other debt | 19 | (50) | 34 | (229) |
| Gains (losses) on debt recorded at fair value | 133 | (366) | 15 | 525 |
| Derivative gains (losses) | (4,752) | (1,130) | (8,986) | (9,653) |
| Impairment of available-for-sale securities: | | | | |
| Total other-than-temporary impairment of available-for-sale securities | (459) | (523) | (1,743) | (1,054) |
| Portion of other-than-temporary impairment recognized in AOCI | 298 | (577) | 37 | (984) |
| Net impairment of available-for-sale securities recognized in earnings | (161) | (1,100) | (1,706) | (2,038) |
| Other gains (losses) on investment securities recognized in earnings | (541) | (503) | (452) | (1,176) |
| Other income | 814 | 569 | 1,400 | 1,604 |
| Non-interest income (loss) | (4,798) | (2,646) | (9,907) | (11,127) |
| Non-interest expense | | | | |
| Salaries and employee benefits | (212) | (224) | (638) | (688) |
| Professional services | (73) | (72) | (193) | (220) |
| Occupancy expense | (14) | (16) | (44) | (47) |
| Other administrative expenses | (82) | (76) | (251) | (242) |
| Total administrative expenses | (381) | (388) | (1,126) | (1,197) |
| Real estate owned operations expense | (221) | (337) | (505) | (456) |
| Other expenses | (85) | (103) | (299) | (321) |
| Non-interest expense | (687) | (828) | (1,930) | (1,974) |
| Loss before income tax benefit | (4,478) | (2,922) | (6,247) | (14,713) |
| Income tax benefit | 56 | 411 | 362 | 800 |
| Net loss | (4,422) | (2,511) | (5,885) | (13,913) |
| Other comprehensive income, net of taxes and reclassification adjustments: | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | (80) | 3,781 | 2,764 | 12,524 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 124 | 164 | 391 | 520 |
| Changes in defined benefit plans | 2 | 2 | (6) | (6) |
| Total other comprehensive income, net of taxes and reclassification adjustments | 46 | 3,947 | 3,149 | 13,038 |
| Comprehensive income (loss) | (4,376) | 1,436 | (2,736) | (875) |
| Less: Comprehensive loss attributable to noncontrolling interest | — | — | — | 1 |
| Total comprehensive income (loss) attributable to Freddie Mac | $ (4,376) | $ 1,436 | $ (2,736) | $ (874) |
| Net loss | $ (4,422) | $ (2,511) | $ (5,885) | $ (13,913) |
| Less: Net loss attributable to noncontrolling interest | — | — | — | 1 |
| Net loss attributable to Freddie Mac | (4,422) | (2,511) | (5,885) | (13,912) |
| Preferred stock dividends | (1,618) | (1,558) | (4,840) | (4,146) |
| Net loss attributable to common stockholders | $ (6,040) | $ (4,069) | $ (10,725) | $ (18,058) |
| Loss per common share: | | | | |
| Basic | $ (1.86) | $ (1.25) | $ (3.30) | $ (5.56) |
| Diluted | $ (1.86) | $ (1.25) | $ (3.30) | $ (5.56) |
| Weighted average common shares outstanding (in thousands): | | | | |
| Basic | 3,244,496 | 3,248,794 | 3,245,473 | 3,249,753 |
| Diluted | 3,244,496 | 3,248,794 | 3,245,473 | 3,249,753 |

*The accompanying notes are an integral part of these consolidated financial statements.*

**FREDDIE MAC**
**CONSOLIDATED BALANCE SHEETS**
**(UNAUDITED)**

|  | September 30, 2011 | December 31, 2010 |
|---|---|---|
|  | (in millions, except share-related amounts) | |
| **Assets** | | |
| Cash and cash equivalents (includes $1 and $1, respectively, related to our consolidated VIEs) | $  18,174 | $  37,012 |
| Restricted cash and cash equivalents (includes $25,180 and $7,514, respectively, related to our consolidated VIEs) | 25,695 | 8,111 |
| Federal funds sold and securities purchased under agreements to resell (includes $- and $29,350, respectively, related to our consolidated VIEs) | 10,596 | 46,524 |
| *Investments in securities:* | | |
| Available-for-sale, at fair value (includes $224 and $817, respectively, pledged as collateral that may be repledged) | 216,584 | 232,634 |
| Trading, at fair value | 55,298 | 60,262 |
| *Total investments in securities* | 271,882 | 292,896 |
| *Mortgage loans:* | | |
| Held-for-investment, at amortized cost: | | |
| By consolidated trusts (net of allowances for loan losses of $8,696 and $11,644, respectively) | 1,611,580 | 1,646,172 |
| Unsecuritized (net of allowances for loan losses of $30,848 and $28,047, respectively) | 199,382 | 192,310 |
| Total held-for-investment mortgage loans, net | 1,810,962 | 1,838,482 |
| Held-for-sale, at lower-of-cost-or-fair-value (includes $6,275 and $6,413 at fair value, respectively) | 6,275 | 6,413 |
| *Total mortgage loans, net* | 1,817,237 | 1,844,895 |
| Accrued interest receivable (includes $6,535 and $6,895, respectively, related to our consolidated VIEs) | 8,327 | 8,713 |
| Derivative assets, net | 295 | 143 |
| Real estate owned, net (includes $64 and $118, respectively, related to our consolidated VIEs) | 5,630 | 7,068 |
| Deferred tax assets, net | 3,909 | 5,543 |
| Other assets (Note 21) (includes $6,158 and $6,001, respectively, related to our consolidated VIEs) | 10,591 | 10,875 |
| *Total assets* | $2,172,336 | $2,261,780 |
| **Liabilities and equity (deficit)** | | |
| *Liabilities* | | |
| Accrued interest payable (includes $6,120 and $6,502, respectively, related to our consolidated VIEs) | $   8,603 | $   10,286 |
| *Debt, net:* | | |
| Debt securities of consolidated trusts held by third parties | 1,488,036 | 1,528,648 |
| Other debt (includes $3,291 and $4,443 at fair value, respectively) | 674,421 | 713,940 |
| *Total debt, net* | 2,162,457 | 2,242,588 |
| Derivative liabilities, net | 329 | 1,209 |
| Other liabilities (Note 21) (includes $3,636 and $3,851, respectively, related to our consolidated VIEs) | 6,938 | 8,098 |
| *Total liabilities* | 2,178,327 | 2,262,181 |
| Commitments and contingencies (Notes 9, 11, and 19) | | |
| *Equity (deficit)* | | |
| Senior preferred stock, at redemption value | 66,179 | 64,200 |
| Preferred stock, at redemption value | 14,109 | 14,109 |
| Common stock, $0.00 par value, 4,000,000,000 shares authorized, 725,863,886 shares issued and 649,718,089 shares and 649,179,789 shares outstanding, respectively | — | — |
| Additional paid-in capital | 2 | 7 |
| Retained earnings (accumulated deficit) | (73,489) | (62,733) |
| *AOCI, net of taxes, related to:* | | |
| Available-for-sale securities (includes $10,646 and $10,740, respectively, related to net unrealized losses on securities for which other-than-temporary impairment has been recognized in earnings) | (6,914) | (9,678) |
| Cash flow hedge relationships | (1,848) | (2,239) |
| Defined benefit plans | (120) | (114) |
| *Total AOCI, net of taxes* | (8,882) | (12,031) |
| Treasury stock, at cost, 76,145,797 shares and 76,684,097 shares, respectively | (3,910) | (3,953) |
| *Total equity (deficit)* | (5,991) | (401) |
| *Total liabilities and equity (deficit)* | $2,172,336 | $2,261,780 |

*The accompanying notes are an integral part of these consolidated financial statements.*

FHFA 2531

## FREDDIE MAC
## CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT)
## (UNAUDITED)

| | Shares Outstanding | | | Freddie Mac Stockholders' Equity (Deficit) | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Senior Preferred Stock | Preferred Stock | Common Stock | Senior Preferred Stock, at Redemption Value | Preferred Stock, at Redemption Value | Common Stock, at Par Value | Additional Paid-In Capital | Retained Earnings (Accumulated Deficit) | AOCI, Net of Tax | Treasury Stock, at Cost | Noncontrolling Interest | Total Equity (Deficit) |
| | | | | | | | (in millions) | | | | | |
| **Balance as of December 31, 2009** | 1 | 464 | 649 | $51,700 | $14,109 | $— | $ 57 | $(33,921) | $(23,648) | $(4,019) | $ 94 | $ 4,372 |
| Cumulative effect of change in accounting principle | | | | | | | | (9,011) | (2,690) | | (2) | (11,703) |
| Balance as of January 1, 2010 | 1 | 464 | 649 | 51,700 | 14,109 | — | 57 | (42,932) | (26,338) | (4,019) | 92 | (7,331) |
| *Comprehensive income (loss):* | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (13,912) | — | — | (1) | (13,913) |
| Other comprehensive income (loss), net of taxes | — | — | — | — | — | — | — | — | 13,038 | — | — | 13,038 |
| *Comprehensive income (loss)* | | | | | | | | (13,912) | 13,038 | | (1) | (875) |
| Increase in liquidation preference | — | — | — | 12,400 | — | — | — | — | — | — | — | 12,400 |
| Stock-based compensation | — | — | — | — | — | — | 20 | — | — | — | — | 20 |
| Income tax benefit from stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | — | 1 |
| Common stock issuances | — | — | — | — | — | — | (66) | — | — | 65 | — | (1) |
| Noncontrolling interest purchase | — | — | — | — | — | — | (31) | — | — | — | (89) | (120) |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 23 | (23) | — | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (4,146) | — | — | — | (4,146) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (4) | — | — | — | (4) |
| Dividends and other | — | — | — | — | — | — | — | — | — | — | (2) | (2) |
| **Ending balance at September 30, 2010** | 1 | 464 | 649 | $64,100 | $14,109 | $— | $ 4 | $(61,017) | $(13,300) | $(3,954) | $ — | $ (58) |
| **Balance as of December 31, 2010** | 1 | 464 | 649 | $64,200 | $14,109 | $— | $ 7 | $(62,733) | $(12,031) | $(3,953) | $ — | $ (401) |
| *Comprehensive income (loss):* | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (5,885) | — | — | — | (5,885) |
| Other comprehensive income (loss), net of taxes | — | — | — | — | — | — | — | — | 3,149 | — | — | 3,149 |
| *Comprehensive income (loss)* | | | | | | | | (5,885) | 3,149 | | | (2,736) |
| Increase in liquidation preference | — | — | — | 1,979 | — | — | — | — | — | — | — | 1,979 |
| Stock-based compensation | — | — | — | — | — | — | 9 | — | — | — | — | 9 |
| Income tax benefit from stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | — | 1 |
| Common stock issuances | — | — | 1 | — | — | — | (43) | — | — | 43 | — | — |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 28 | (28) | — | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (4,840) | — | — | — | (4,840) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (3) | — | — | — | (3) |
| **Ending balance at September 30, 2011** | 1 | 464 | 650 | $66,179 | $14,109 | $— | $ 2 | $(73,489) | $ (8,882) | $(3,910) | $ — | $ (5,991) |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

# FREDDIE MAC
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### (UNAUDITED)

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2011 | 2010 |
| | (in millions) | |
| **Cash flows from operating activities** | | |
| Net loss | $ (5,885) | $ (13,913) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Derivative losses | 5,117 | 6,148 |
| Asset related amortization — premiums, discounts, and basis adjustments | 1,201 | (34) |
| Debt related amortization — premiums and discounts on certain debt securities and basis adjustments | (686) | 1,321 |
| Net discounts paid on retirements of other debt | (627) | (1,750) |
| Net premiums received from issuance of debt securities of consolidated trusts | 2,955 | 2,991 |
| Losses on extinguishment of debt securities of consolidated trusts and other debt | 178 | 389 |
| Provision for credit losses | 8,124 | 14,152 |
| Losses on investment activity | 1,537 | 2,816 |
| Gains on debt recorded at fair value | (15) | (525) |
| Deferred income tax benefit | (46) | (594) |
| Purchases of held-for-sale mortgage loans | (9,553) | (5,117) |
| Sales of mortgage loans acquired as held-for-sale | 10,283 | 5,637 |
| Repayments of mortgage loans acquired as held-for-sale | 29 | 15 |
| Change in: | | |
| Accrued interest receivable | 386 | 535 |
| Accrued interest payable | (1,461) | (1,958) |
| Income taxes payable | (315) | (15) |
| Other, net | (1,824) | 280 |
| *Net cash provided by operating activities* | 9,398 | 10,378 |
| **Cash flows from investing activities** | | |
| Purchases of trading securities | (36,143) | (46,126) |
| Proceeds from sales of trading securities | 28,742 | 9,259 |
| Proceeds from maturities of trading securities | 11,835 | 37,112 |
| Purchases of available-for-sale securities | (9,548) | (1,792) |
| Proceeds from sales of available-for-sale securities | 2,390 | 2,020 |
| Proceeds from maturities of available-for-sale securities | 25,742 | 33,917 |
| Purchases of held-for-investment mortgage loans | (27,515) | (43,407) |
| Repayments of mortgage loans acquired as held-for-investment | 245,323 | 272,141 |
| (Increase) decrease in restricted cash | (17,584) | 9,229 |
| Net proceeds from mortgage insurance and acquisitions and dispositions of real estate owned | 9,875 | 8,691 |
| Net decrease (increase) in federal funds sold and securities purchased under agreements to resell | 35,928 | (30,445) |
| Derivative premiums and terminations and swap collateral, net | (5,445) | (6,114) |
| Purchase of noncontrolling interest | — | (23) |
| *Net cash provided by investing activities* | 263,600 | 244,462 |
| **Cash flows from financing activities** | | |
| Proceeds from issuance of debt securities of consolidated trusts held by third parties | 67,248 | 70,014 |
| Repayments of debt securities of consolidated trusts held by third parties | (316,458) | (317,334) |
| Proceeds from issuance of other debt | 799,561 | 884,074 |
| Repayments of other debt | (839,290) | (936,416) |
| Increase in liquidation preference of senior preferred stock | 1,979 | 12,400 |
| Repurchase of REIT preferred stock | — | (100) |
| Payment of cash dividends on senior preferred stock | (4,840) | (4,146) |
| Excess tax benefits associated with stock-based awards | 1 | 1 |
| Payments of low-income housing tax credit partnerships notes payable | (37) | (96) |
| *Net cash used in financing activities* | (291,836) | (291,603) |
| Net decrease in cash and cash equivalents | (18,838) | (36,763) |
| Cash and cash equivalents at beginning of period | 37,012 | 64,683 |
| *Cash and cash equivalents at end of period* | $ 18,174 | $ 27,920 |
| **Supplemental cash flow information** | | |
| Cash paid (received) for: | | |
| Debt interest | $ 64,837 | $ 73,462 |
| Net derivative interest carry | 3,352 | 3,013 |
| Income taxes | (1) | (191) |
| Non-cash investing and financing activities: | | |
| Underlying mortgage loans related to guarantor swap transactions | 206,328 | 220,435 |
| Debt securities of consolidated trusts held by third parties established for guarantor swap transactions | 206,328 | 220,435 |
| Transfers from held-for-investment mortgage loans to held-for-sale mortgage loans | — | 196 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Freddie Mac was chartered by Congress in 1970 to stabilize the nation's residential mortgage market and expand opportunities for home ownership and affordable rental housing. Our statutory mission is to provide liquidity, stability and affordability to the U.S. housing market. We are a GSE regulated by FHFA, the SEC, HUD, and the Treasury. For more information on the roles of FHFA and the Treasury, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" in this Form 10-Q and "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS" in our Annual Report on our Form 10-K for the year ended December 31, 2010, or our 2010 Annual Report.

We are involved in the U.S. housing market by participating in the secondary mortgage market. We do not participate directly in the primary mortgage market. Our participation in the secondary mortgage market includes providing our credit guarantee for mortgages originated by mortgage lenders in the primary mortgage market and investing in mortgage loans and mortgage-related securities.

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Single-family Guarantee, Investments, and Multifamily. Our Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we acquire and securitize mortgage loans by issuing PCs to third-party investors and we also guarantee the payment of principal and interest on single-family mortgage loans and mortgage-related securities. We also resecuritize mortgage-related securities that are issued by us or Ginnie Mae as well as private (non-agency) entities. Our Investments segment reflects results from our investment, funding, and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family mortgage loans. These activities are funded by debt issuances. We manage the interest-rate risk associated with these investment and funding activities using derivatives. Our Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. In our Multifamily segment, we purchase multifamily mortgage loans primarily for securitization. We also guarantee the payment of principal and interest on multifamily mortgage-related securities and mortgages underlying multifamily housing revenue bonds. See "NOTE 15: SEGMENT REPORTING" for additional information.

Under conservatorship, we are focused on the following primary business objectives: (a) meeting the needs of the U.S. residential mortgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in the MHA Program initiatives, including HAMP and HARP and through our non-HAMP workout and refinancing initiatives; (c) minimizing our credit losses; (d) maintaining the credit quality of the loans we purchase and guarantee; and (e) strengthening our infrastructure and improving overall efficiency.

In addition to our primary business objectives discussed above, we have a variety of different, and potentially competing, objectives based on our charter, public statements from Treasury and FHFA officials, and other guidance from our Conservator. For information regarding these objectives, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Business Objectives."

Throughout our consolidated financial statements and related notes, we use certain acronyms and terms which are defined in the Glossary.

For additional information regarding our significant accounting policies, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

**Basis of Presentation**

The accompanying unaudited consolidated financial statements have been prepared in accordance with GAAP for interim financial information and include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated. These unaudited consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes in our 2010 Annual Report. We are operating under the basis that we will realize assets and satisfy liabilities in the normal course of business as a going concern and in accordance with the delegation of authority from FHFA to our Board of Directors and management. Certain financial information that is normally included in annual financial statements prepared in conformity with GAAP but is not required for interim reporting purposes has been condensed or omitted. Certain amounts in prior periods' consolidated financial statements have been reclassified to conform to the current presentation. In the opinion of management, all adjustments, which include only normal recurring adjustments, have been recorded for a fair statement of our unaudited consolidated financial statements.

We recorded the cumulative effect of certain miscellaneous errors related to previously reported periods as corrections in the three and nine months ended September 30, 2011. We concluded that these errors are not material individually or in the aggregate to our previously issued consolidated financial statements for any of the periods affected, or to our estimated earnings for the full year ending December 31, 2011 or to the trend of earnings. The cumulative effect, net of taxes, of the errors corrected during the three and nine months ended September 30, 2011 was $22 million and $2 million, respectively.

**Use of Estimates**

The preparation of financial statements requires us to make estimates and assumptions that affect: (a) the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements; and (b) the reported amounts of revenues and expenses and gains and losses during the reporting period. Management has made significant estimates in preparing the financial statements, including, but not limited to, establishing the allowance for loan losses and reserve for guarantee losses, valuing financial instruments and other assets and liabilities, assessing impairments on investments, and assessing the realizability of net deferred tax assets. Actual results could be different from these estimates.

**Recently Adopted Accounting Guidance**

*A Creditor's Determination of Whether a Restructuring is a Troubled Debt Restructuring*

On July 1, 2011, we adopted an amendment to the accounting guidance related to the classification of loans as TDRs, which clarifies when a restructuring such as a loan modification is considered a TDR. This amendment clarifies the guidance regarding a creditor's evaluation of whether a debtor is experiencing financial difficulty and whether a creditor has granted a concession to a debtor for purposes of determining if a restructuring constitutes a TDR.

Both single-family and multifamily loans that experience restructurings resulting in a concession being granted to a borrower experiencing financial difficulties are considered TDRs. The amendment provides guidance to determine whether a borrower is experiencing financial difficulties, which is largely consistent with the guidance for debtors. As we had previously analogized to the guidance for debtors, this change does not have a significant impact on our determination of whether a borrower is experiencing financial difficulties. Pursuant to this amendment, a concession is deemed to have been granted when, as a result of the restructuring, we do not expect to collect all amounts due, including interest accrued, at the original contractual interest rate. As appropriate, we also consider other qualitative factors in determining whether a concession is deemed to have been granted, including whether the borrower's modified interest rate is consistent with that of a non-troubled borrower. We do not consider restructurings that result in a delay in payment that is insignificant to be a concession. We generally consider a delay in payment amount or timing that is three months or less to be insignificant. The amendment also specifies that a concession shall not be determined by comparing the borrower's pre-restructuring effective interest rate to the post-restructuring effective interest rate. These changes result in a significant impact on our determination of whether a concession has been granted. Accordingly, a concession typically includes one or more of the following being granted to the borrower: (a) a trial period modification where the expected permanent modification will change our expectation of collecting all amounts due at the original contract rate; (b) a delay in payment that is more than insignificant; (c) a reduction in the contractual interest rate; (d) interest forbearance for a period of time that is not insignificant or forgiveness of accrued but uncollected interest amounts; and (e) a reduction in the principal amount of the loan.

The amendment was effective for interim and annual periods beginning on or after June 15, 2011 and applied as of July 1, 2011 to restructurings occurring on or after January 1, 2011. As of September 30, 2011, the total recorded investment in loans identified as TDRs during the third quarter of 2011 which relate to modifications or agreements entered into between January 1, 2011 and June 30, 2011 was $7.5 billion, and the allowance for credit losses related to those loans was $1.7 billion. We recognized additional provision for credit losses of $0.2 billion during the third quarter of 2011 due to the population of restructurings occurring in the first half of 2011 that are now considered TDRs.

Please refer to "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further disclosures regarding our loan restructurings accounted for and disclosed as TDRs and for discussion regarding how modifications and other loss mitigation activities are factored into our allowance for loan losses.

**Recently Issued Accounting Guidance, Not Yet Adopted Within These Consolidated Financial Statements**

*Fair Value Measurement*

In May 2011, the FASB issued amendments to the accounting guidance pertaining to fair value measurement and disclosure. These amendments provide both: (a) clarification about the FASB's intent about the application of existing fair value measurement and disclosure requirements; and (b) changes to some of the principles or requirements for measuring fair value or for disclosing information about fair value measurements. These amendments are effective for interim and annual periods beginning after December 15, 2011 and are to be applied prospectively, with early adoption not permitted by public companies. We do not expect that the adoption of these amendments will have a material impact on our consolidated financial statements.

*Reconsideration of Effective Control for Repurchase Agreements*

In April 2011, the FASB issued an amendment to the guidance for transfers and servicing with regard to repurchase agreements and other agreements that both entitle and obligate a transferor to repurchase or redeem financial assets before their maturity. This amendment removes the criterion related to collateral maintenance from the transferor's assessment of effective control. It focuses the assessment of effective control on the transferor's rights and obligations with respect to the transferred financial assets and not whether the transferor has the practical ability to perform in accordance with those rights or obligations. The amendment is effective for interim and annual periods beginning on or after December 15, 2011. We do not expect that the adoption of this amendment will have a material impact on our consolidated financial statements.

## NOTE 2: CONSERVATORSHIP AND RELATED MATTERS

**Business Objectives**

We continue to operate under the conservatorship that commenced on September 6, 2008, conducting our business under the direction of FHFA, as our Conservator. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations. Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets. The Conservator also succeeded to the title to all books, records, and assets of Freddie Mac held by any other legal custodian or third party. During the conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and management to conduct, day-to-day operations so that the company can continue to operate in the ordinary course of business. The directors serve on behalf of, and exercise authority as directed by, the Conservator.

We are also subject to certain constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent.

Our business objectives and strategies have in some cases been altered since we were placed into conservatorship, and may continue to change. These changes to our business objectives and strategies may not contribute to our profitability. Based on our charter, public statements from Treasury and FHFA officials and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives, including:

• providing liquidity, stability and affordability in the mortgage market;

• continuing to provide additional assistance to the struggling housing and mortgage markets;

• reducing the need to draw funds from Treasury pursuant to the Purchase Agreement;

• returning to long-term profitability; and

• protecting the interests of taxpayers.

In a letter to the Chairmen and Ranking Members of the Senate Banking and House Financial Services Committees dated February 2, 2010, the Acting Director of FHFA stated that the focus of the conservatorship is on conserving assets, minimizing corporate losses, ensuring Freddie Mac continues to serve its mission, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed. The Acting Director of FHFA stated that minimizing our credit losses is our central goal and that we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship. The Acting Director stated that permitting us to offer new products is inconsistent with the goals of the conservatorship.

These objectives create conflicts in strategic and day-to-day decision making that will likely lead to suboptimal outcomes for one or more, or possibly all, of these objectives. We regularly receive direction from our Conservator on how to pursue our objectives under conservatorship, including direction to focus our efforts on assisting homeowners in the housing and mortgage markets. The Conservator and Treasury have also not authorized us to engage in certain business activities and transactions, including the purchase or sale of certain assets, which we believe may have had a beneficial impact on our results of operations or financial condition, if executed. Our inability to execute such transactions may adversely affect our profitability, and thus contribute to our need to draw additional funds from Treasury. However, we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

Given the important role the Obama Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions and our public mission, we may be required to take additional actions that could have a negative impact on our business, operating results, or financial condition. The Acting Director of FHFA stated that FHFA does not expect we will be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio, except for purchases of seriously delinquent mortgages from PC trusts. We are also subject to limits on the amount of assets we can sell from our mortgage-related investments portfolio in any calendar month without review and approval by FHFA and, if FHFA determines, Treasury.

Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives, but may not contribute to our profitability. Some of these changes increase our expenses, while others require us to forego revenue or other opportunities. In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the Purchase Agreement, have adversely impacted and may continue to adversely impact our financial results, including our segment results. For example, our efforts to help struggling homeowners and the mortgage market, in line with our public mission, may help to mitigate our credit losses, but in some cases may increase our expenses or require us to forgo revenue opportunities in the near term. There is significant uncertainty as to the ultimate impact that our efforts to aid the housing and mortgage markets, including our efforts in connection with the MHA Program, will have on our future capital or liquidity needs. We are allocating significant internal resources to the implementation of the various initiatives under the MHA Program and to the servicing alignment initiative as directed by FHFA on April 28, 2011, which has increased, and will continue to increase, our expenses. We cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of loan defaults and foreclosures due to these initiatives.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following our conservatorship, including whether we will continue to exist. Our future structure and role will be determined by the Obama Administration and Congress. We have no ability to predict the outcome of these deliberations.

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, and states that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Obama Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Obama Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase

agreements. These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations, and financial condition.

On September 19, 2011, the Acting Director of FHFA stated that he would anticipate Freddie Mac and Fannie Mae will continue the gradual process of increasing guarantee fees. He stated this will not happen immediately but should be expected in 2012. President Obama's Plan for Economic Growth and Deficit Reduction, announced on September 19, 2011, contained a proposal to increase the guarantee fees charged by Freddie Mac and Fannie Mae by ten basis points. We cannot currently predict the extent to which our business will be impacted by the potential increase in guarantee fees. In addition, the temporary high-cost area loan limits expired on September 30, 2011.

We cannot predict the extent to which the other recommendations will be implemented or when any actions to implement them may be taken. However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term.

On October 24, 2011 FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers who can benefit from refinancing their home mortgage. The revisions to HARP will continue to be available to borrowers with loans that were sold to the GSEs on or before May 31, 2009 and who have current LTV ratios above 80%.

The October 24, 2011 announcement stated that the GSEs will issue guidance with operational details about the HARP changes to mortgage lenders and servicers by November 15, 2011. We are working collectively with FHFA and Fannie Mae on several operational details of the program. We are also waiting to receive details from FHFA regarding the fees that we may charge associated with the refinancing program. Since industry participation in HARP is not mandatory, we anticipate that implementation schedules will vary as individual lenders, mortgage insurers and other market participants modify their processes. At this time we do not know how many eligible borrowers are likely to refinance under the program.

The recently announced revisions to HARP will help to reduce our exposure to credit risk to the extent that HARP refinances strengthen the borrowers' capacity to repay their mortgages and, in some cases, reduce the terms of their mortgages. These revisions to HARP could also reduce our credit losses to the extent that the revised program contributes to bringing stability to the housing market. However, with our release of certain representations and warranties to lenders, credit losses associated with loans identified with defects will not be recaptured through loan buybacks. We could also experience declines in the fair values of certain agency mortgage-related security investments classified as available-for-sale or trading resulting from changes in expectations of mortgage prepayments and lower net interest yields over time on other mortgage-related investments. As a result, we cannot currently estimate these impacts until more details about the program and the level of borrower participation can be reasonably assured.

Management is continuing its efforts to identify and evaluate actions that could be taken to reduce the significant uncertainties surrounding our business, as well as the level of future draws under the Purchase Agreement; however, our ability to pursue such actions may be limited by market conditions and other factors. Our future draws are dictated by the terms of the Purchase Agreement. Any actions we take will likely require approval by FHFA and possibly Treasury before they are implemented. FHFA will regulate any actions we take related to the uncertainties surrounding our business. In addition, FHFA, Treasury, or Congress may have a different perspective from management and may direct us to focus our efforts on supporting the mortgage markets in ways that make it more difficult for us to implement any such actions.

### Impact of the Purchase Agreement and FHFA Regulation on the Mortgage-Related Investments Portfolio

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $810 billion as of December 31, 2010 and may not exceed $729 billion as of December 31, 2011. The UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation, was $679.1 billion at September 30, 2011. The annual 10% reduction in the size of our mortgage-related investments portfolio is calculated based on the maximum allowable size of the mortgage-related investments portfolio, rather than the actual UPB of the mortgage-related investments portfolio, as of December 31 of the preceding year. The limitation is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs.

**Government Support for our Business**

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

Significant recent developments with respect to the support we receive from the government include the following:

• On March 31, 2011, we received $500 million in funding from Treasury under the Purchase Agreement relating to our quarterly net worth deficit at December 31, 2010. No cash was received from Treasury under the Purchase Agreement during the second quarter of 2011 due to our positive net worth at March 31, 2011. On September 30, 2011, we received $1.5 billion in funding from Treasury under the Purchase Agreement relating to our quarterly net worth deficit at June 30, 2011, which increased our aggregate liquidation preference of the senior preferred stock to $66.2 billion as of September 30, 2011.

• On March 31, 2011, June 30, 2011 and September 30, 2011, we paid dividends of $1.6 billion in cash on the senior preferred stock to Treasury at the direction of the Conservator.

To address our net worth deficit of $6.0 billion at September 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $6.0 billion, and will request that we receive these funds by December 31, 2011. Commencing in the second quarter of 2011, our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. Following funding of the draw request related to our net worth deficit at September 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $6.6 billion to $7.2 billion, which exceeds our annual historical earnings in all but one period.

Through September 30, 2011, we paid $14.9 billion in cash dividends in the aggregate on the senior preferred stock. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth. In addition, cash payment of quarterly commitment fees payable to Treasury will negatively impact our future net worth over the long-term. Treasury waived the fee for all quarters of 2011. The amount of the fee has not yet been established and could be substantial. As a result of additional draws and other factors: (a) the liquidation preference of, and the dividends we owe on, the senior preferred stock would increase and, therefore, we may need additional draws from Treasury in order to pay our dividend obligations; and (b) there is significant uncertainty as to our long-term financial sustainability.

See "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS," "NOTE 9: DEBT SECURITIES AND SUBORDINATED BORROWINGS," and "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report for more information on the terms of the conservatorship and the Purchase Agreement.

## NOTE 3: VARIABLE INTEREST ENTITIES

We use securitization trusts in our securities issuance process, and are required to evaluate the trusts for consolidation. For VIEs, our policy is to consolidate all entities in which we hold a controlling financial interest and are therefore deemed to be the primary beneficiary. The accounting guidance related to the consolidation of VIEs states that an enterprise will be deemed to have a controlling financial interest in, and thus be the primary beneficiary of, a VIE if it has both: (a) the power to direct the activities of the VIE that most significantly impact the VIE's economic performance; and (b) the right to receive benefits from the VIE that could potentially be significant to the VIE or the obligation to absorb losses of the VIE that could potentially be significant to the VIE. We perform ongoing assessments of whether we are the primary beneficiary of a VIE. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Consolidation and Equity Method of Accounting" in our 2010 Annual Report for further information regarding the consolidation of certain VIEs.

Based on our evaluation, we determined that we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions. Therefore, we consolidate on our balance sheet the assets and liabilities of these trusts. In addition to our PC trusts, we are involved with numerous other entities that meet the definition of a VIE, as discussed below.

### VIEs for which We are the Primary Beneficiary

#### *Single-family PC Trusts*

Our single-family PC trusts issue pass-through securities that represent undivided beneficial interests in pools of mortgages held by these trusts. For our fixed-rate PCs, we guarantee the timely payment of interest and principal. For our ARM PCs, we guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage

loans and the full and final payment of principal; we do not guarantee the timely payment of principal on ARM PCs. In exchange for providing this guarantee, we may receive a management and guarantee fee and up-front delivery fees. We issue most of our single-family PCs in transactions in which our customers exchange mortgage loans for PCs. We refer to these transactions as guarantor swaps.

PCs are designed so that we bear the credit risk inherent in the loans underlying the PCs through our guarantee of principal and interest payments on the PCs. The PC holders bear the interest rate or prepayment risk on the mortgage loans and the risk that we will not perform on our obligation as guarantor. For purposes of our consolidation assessments, our evaluation of power and economic exposure with regard to PC trusts focuses on credit risk because the credit performance of the underlying mortgage loans was identified as the activity that most significantly impacts the economic performance of these entities. We have the power to impact the activities related to this risk in our role as guarantor and master servicer.

Specifically, in our role as master servicer, we establish requirements for how mortgage loans are serviced and what steps are to be taken to avoid credit losses (*e.g.*, modification, foreclosure). Additionally, in our capacity as guarantor, we have the ability to purchase defaulted mortgage loans out of the PC trust to help manage credit losses. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further information regarding our purchase of mortgage loans out of PC trusts. These powers allow us to direct the activities of the VIE (*i.e.*, the PC trust) that most significantly impact its economic performance. In addition, we determined that our guarantee to each PC trust to provide principal and interest payments obligates us to absorb losses that could potentially be significant to the PC trusts. Accordingly, we concluded that we are the primary beneficiary of our single-family PC trusts.

At September 30, 2011 and December 31, 2010, we were the primary beneficiary of, and therefore consolidated, single-family PC trusts with assets totaling $1.6 trillion and $1.7 trillion, respectively, as measured using the UPB of issued PCs. The assets of each PC trust can be used only to settle obligations of that trust. In connection with our PC trusts, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancement. We also have credit protection for certain of our PC trusts that issue PCs backed by loans or certificates of federal agencies (such as FHA, VA, and USDA). See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for additional information regarding third-party credit enhancements related to our PC trusts.

### Other Guarantee Transactions

Other Guarantee Transactions are mortgage-related securities that we issue to third parties in exchange for non-Freddie Mac mortgage-related securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for information on the nature of Other Guarantee Transactions. The degree to which our involvement with securitization trusts that issue Other Guarantee Transactions provides us with power to direct the activities that most significantly impact the economic performance of these VIEs (*e.g.*, the ability to mitigate credit losses on the underlying assets of these entities) and exposure to benefits or losses that could potentially be significant to the VIEs (*e.g.*, the existence of third party credit enhancements) varies by transaction. Our consolidation determination took into consideration the specific facts and circumstances of our involvement with each of these entities, including our ability to direct or influence the performance of the underlying assets and our exposure to potentially significant variability based upon the design of each entity and its governing contractual arrangements. As a result, we have concluded that we are the primary beneficiary of certain Other Guarantee Transactions with underlying assets totaling $13.5 billion and $15.8 billion at September 30, 2011 and December 31, 2010, respectively. For those Other Guarantee Transactions that we do consolidate, the investors in these securities have recourse only to the assets of those VIEs.

*Consolidated VIEs*

Table 3.1 represents the carrying amounts and classification of the assets and liabilities of consolidated VIEs on our consolidated balance sheets.

**Table 3.1 — Assets and Liabilities of Consolidated VIEs**

| Consolidated Balance Sheets Line Item | September 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| Cash and cash equivalents | $        1 | $        1 |
| Restricted cash and cash equivalents | 25,180 | 7,514 |
| Federal funds sold and securities purchased under agreements to resell | — | 29,350 |
| Mortgage loans held-for-investment by consolidated trusts | 1,611,580 | 1,646,172 |
| Accrued interest receivable | 6,535 | 6,895 |
| Real estate owned, net | 64 | 118 |
| Other assets | 6,158 | 6,001 |
| Total assets of consolidated VIEs | $1,649,518 | $1,696,051 |
| Accrued interest payable | $    6,120 | $    6,502 |
| Debt securities of consolidated trusts held by third parties | 1,488,036 | 1,528,648 |
| Other liabilities | 3,636 | 3,851 |
| Total liabilities of consolidated VIEs | $1,497,792 | $1,539,001 |

**VIEs for which We are not the Primary Beneficiary**

Table 3.2 represents the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Our involvement with VIEs for which we are not the primary beneficiary generally takes one of two forms: (a) purchasing an investment in these entities; or (b) providing a guarantee to these entities. Our maximum exposure to loss for those VIEs in which we have purchased an investment is calculated as the maximum potential charge that we would recognize in our consolidated statements of income and comprehensive income if that investment were to become worthless. This amount does not include other-than-temporary impairments or other write-downs that we previously recognized through earnings. Our maximum exposure to loss for those VIEs for which we have provided a guarantee represents the contractual amounts that could be lost under the guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements. We do not believe the maximum exposure to loss disclosed in the table below is representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation, including possible recoveries under credit enhancement arrangements.

**Table 3.2 — Variable Interests in VIEs for which We are not the Primary Beneficiary**

|  | September 30, 2011 | | | | |
|  | | Mortgage-Related Security Trusts | | | |
|  | Asset-Backed Investment Trusts[1] | Freddie Mac Securities[2] | Non-Freddie Mac Securities[1] | Unsecuritized Multifamily Loans[3] | Other[1][4] |
|  | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 1,957 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 55 | — | 26 | 157 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 84,021 | 124,431 | — | — |
| Trading, at fair value | 276 | 16,588 | 17,830 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 74,892 | — |
| Held-for-sale | — | — | — | 6,275 | — |
| Accrued interest receivable | — | 498 | 456 | 342 | 6 |
| Derivative assets, net | — | — | — | — | 1 |
| Other assets | — | 386 | — | 423 | 401 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (1) | — | — | (42) |
| Other liabilities | — | (525) | — | (31) | (679) |
| **Maximum Exposure to Loss** | $ 2,233 | $33,976 | $ 160,126 | $ 81,958 | $11,155 |
| **Total Assets of Non-Consolidated VIEs[5]** | $ 25,440 | $38,721 | $1,024,419 | $132,157 | $25,374 |

|  | December 31, 2010 | | | | |
|  | | Mortgage-Related Security Trusts | | | |
|  | Asset-Backed Investment Trusts[1] | Freddie Mac Securities[2] | Non-Freddie Mac Securities[1] | Unsecuritized Multifamily Loans[3] | Other[1][4] |
|  | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 9,909 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 52 | — | 34 | 464 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 85,689 | 137,568 | — | — |
| Trading, at fair value | 44 | 13,437 | 18,914 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 78,448 | — |
| Held-for-sale | — | — | — | 6,413 | — |
| Accrued interest receivable | — | 419 | 717 | 372 | 5 |
| Derivative assets, net | — | — | — | — | 2 |
| Other assets | — | 277 | 6 | 23 | 381 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (2) | — | — | (41) |
| Other liabilities | — | (408) | (3) | (36) | (1,034) |
| **Maximum Exposure to Loss** | $ 9,953 | $26,392 | $ 176,533 | $ 85,290 | $11,375 |
| **Total Assets of Non-Consolidated VIEs[5]** | $129,479 | $29,368 | $1,036,975 | $138,330 | $25,875 |

(1) For our involvement with non-consolidated asset-backed investment trusts, non-Freddie Mac security trusts and certain other VIEs where we do not provide a guarantee, our maximum exposure to loss is computed as the carrying amount if the security is classified as trading or the amortized cost if the security is classified as available-for-sale for our investments and related assets recorded on our consolidated balance sheets, including any unrealized amounts recorded in AOCI for securities classified as available-for-sale.

(2) Freddie Mac securities include our variable interests in single-family multiclass REMICs and Other Structured Securities, multifamily PCs, multifamily Other Structured Securities, and Other Guarantee Transactions that we do not consolidate. For our variable interests in non-consolidated Freddie Mac security trusts for which we have provided a guarantee, our maximum exposure to loss is the outstanding UPB of the underlying mortgage loans or securities that we have guaranteed, which is the maximum contractual amount under such guarantees. However, our investments in single-family REMICs and Other Structured Securities that are not consolidated do not give rise to any additional exposure to loss as we already consolidate the underlying collateral.

(3) For unsecuritized multifamily loans, our maximum exposure to loss is based on the UPB of these loans, as adjusted for loan level basis adjustments, any associated allowance for loan losses, accrued interest receivable, and fair value adjustments on held-for-sale loans.

(4) For other non-consolidated VIEs where we have provided a guarantee, our maximum exposure to loss is the contractual amount that could be lost under the guarantee if the counterparty or borrower defaulted, without consideration of possible recoveries under credit enhancement arrangements.

(5) Represents the remaining UPB of assets held by non-consolidated VIEs using the most current information available, where our continuing involvement is significant. We do not include the assets of our non-consolidated trusts related to single-family REMICs and Other Structured Securities in this amount as we already consolidate the underlying collateral of these trusts on our consolidated balance sheets.

*Asset-Backed Investment Trusts*

We invest in a variety of short-term non-mortgage-related, asset-backed investment trusts. These short-term investments represent interests in trusts consisting of a pool of receivables or other financial assets, typically credit card receivables, auto loans, or student loans. These trusts act as vehicles to allow originators to securitize assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss

from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the deal create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our asset-backed investments.

At September 30, 2011 and December 31, 2010, we had investments in 10 and 23 asset-backed investment trusts in which we had a variable interest but were not considered the primary beneficiary, respectively. Our investments in these asset-backed investment trusts as of September 30, 2011 were made in 2010 and 2011. At both September 30, 2011 and December 31, 2010, we were not the primary beneficiary of any such trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. As such, our investments in these asset-backed investment trusts are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report. Our investments in these trusts totaled $2.2 billion and $10.0 billion as of September 30, 2011 and December 31, 2010, respectively, and are included as cash and cash equivalents, available-for-sale securities or trading securities on our consolidated balance sheets. At both September 30, 2011 and December 31, 2010, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment.

### Mortgage-Related Security Trusts

*Freddie Mac Securities*

Freddie Mac securities related to our variable interests in non-consolidated VIEs primarily consist of our REMICs and Other Structured Securities and Other Guarantee Transactions. REMICs and Other Structured Securities are created by using PCs or previously issued REMICs and Other Structured Securities as collateral. Our involvement with the resecuritization trusts that issue these securities does not provide us with rights to receive benefits or obligations to absorb losses nor does it provide any power that would enable us to direct the most significant activities of these VIEs because the ultimate underlying assets are PCs for which we have already provided a guarantee (*i.e.*, all significant rights, obligations and powers are associated with the underlying PC trusts). As a result, we have concluded that we are not the primary beneficiary of these resecuritization trusts.

Other Guarantee Transactions are created by using non-Freddie Mac mortgage-related securities as collateral. At both September 30, 2011 and December 31, 2010, our involvement with certain Other Guarantee Transactions does not provide us with the power to direct the activities that most significantly impact the economic performance of these VIEs. As a result, we hold a variable interest in, but are not the primary beneficiary of, certain Other Guarantee Transactions.

For non-consolidated REMICs and Other Structured Securities and Other Guarantee Transactions, our investments are primarily included in either available-for-sale securities or trading securities on our consolidated balance sheets. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

*Non-Freddie Mac Securities*

We invest in a variety of mortgage-related securities issued by third-parties, including non-Freddie Mac agency securities, CMBS, other private-label securities backed by various mortgage-related assets, and obligations of states and political subdivisions. These investments typically represent interests in trusts that consist of a pool of mortgage-related assets and act as vehicles to allow originators to securitize those assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the deal create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our non-Freddie Mac securities.

Our investments in these non-Freddie Mac securities at September 30, 2011 were made between 1994 and 2011. We are not generally the primary beneficiary of non-Freddie Mac securities trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. We were not the primary beneficiary of any significant non-Freddie Mac securities trusts as of September 30, 2011 and December 31, 2010. Our investments in non-consolidated non-Freddie Mac mortgage-related securities are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report. At both September 30, 2011 and December 31, 2010, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment. Our

investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

**Unsecuritized Multifamily Loans**

We purchase loans made to various multifamily real estate entities. We primarily purchase such loans for securitization, and to a lesser extent, investment purposes. These real estate entities are primarily single-asset entities (typically partnerships or limited liability companies) established to acquire, construct, rehabilitate, or refinance residential properties, and subsequently to operate the properties as residential rental real estate. The loans we acquire usually make up 80% or less of the value of the related underlying property at origination. The remaining 20% of value is typically funded through equity contributions by the partners or members of the borrower entity. In certain cases, the 20% not funded through the loan we acquire also includes subordinate loans or mezzanine financing from third-party lenders.

We held more than 7,000 unsecuritized multifamily loans at both September 30, 2011 and December 31, 2010. The UPB of our investments in these loans was $81.6 billion and $85.9 billion as of September 30, 2011 and December 31, 2010, respectively, and was included in unsecuritized held-for-investment mortgage loans, at amortized cost, and held-for-sale mortgage loans at fair value on our consolidated balance sheets. We are not generally the primary beneficiary of the multifamily real estate borrowing entities because the loans we acquire are passive in nature and do not provide us with the power to direct the activities of these entities that most significantly impact their economic performance. However, when a multifamily loan becomes delinquent, we may become the primary beneficiary of the borrowing entity depending upon the structure of this entity and the rights granted to us under the governing legal documents. At September 30, 2011 and December 31, 2010, the amount of loans for which we could be considered the primary beneficiary of the underlying borrowing entity was not material. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2010 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for more information.

*Other*

Our involvement with other VIEs includes our investments in LIHTC partnerships, certain other mortgage-related guarantees, and certain short-term default and other guarantee commitments that we account for as derivatives:

- *Investments in LIHTC Partnerships:* We hold equity investments in various LIHTC partnerships that invest in lower-tier or project partnerships that are single asset entities. In February 2010, the Acting Director of FHFA, after consultation with Treasury, informed us that we may not sell or transfer our investments in LIHTC assets and that he sees no other disposition options. As a result, we wrote down the carrying value of our LIHTC investments to zero as of December 31, 2009, as we will not be able to realize any value from these investments either through reductions to our taxable income and related tax liabilities or through a sale to a third party.

- *Certain other mortgage-related guarantees:* We have other guarantee commitments outstanding on multifamily housing revenue bonds that were issued by third parties. As part of certain other mortgage-related guarantees, we also provide commitments to advance funds, commonly referred to as "liquidity guarantees," which require us to advance funds to enable third parties to purchase variable-rate multifamily housing revenue bonds, or certificates backed by such bonds, that cannot be remarketed within five business days after they are tendered by their holders.

- *Certain short-term default and other guarantee commitments accounted for as derivatives*: Our involvement in these VIEs includes our guarantee of the performance of interest-rate swap contracts in certain circumstances and credit derivatives we issued to guarantee the payments on multifamily loans or securities.

At September 30, 2011 and December 31, 2010, we were the primary beneficiary of one and three, respectively, credit-enhanced multifamily housing revenue bonds that were not deemed to be material. We were not the primary beneficiary of the remainder of other VIEs because our involvement in these VIEs is passive in nature and does not provide us with the power to direct the activities of the VIEs that most significantly impact their economic performance. See Table 3.2 for the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in these non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Also see "NOTE 9: FINANCIAL GUARANTEES" for additional information about our involvement with the VIEs related to mortgage-related guarantees and short-term default and other guarantee commitments discussed above.

## NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES

We own both single-family mortgage loans, which are secured by one to four family residential properties, and multifamily mortgage loans, which are secured by properties with five or more residential rental units. For a discussion of our significant accounting policies regarding our mortgage loans and loan loss reserves, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

Table 4.1 summarizes the types of loans on our consolidated balance sheets as of September 30, 2011 and December 31, 2010.

### Table 4.1 — Mortgage Loans

| | September 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Unsecuritized | Held by Consolidated Trusts | Total | Unsecuritized | Held by Consolidated Trusts | Total |
| | (in millions) | | | | | |
| Single-family:[1] | | | | | | |
| Fixed-rate | | | | | | |
| Amortizing | $142,089 | $1,464,388 | $1,606,477 | $126,561 | $1,493,206 | $1,619,767 |
| Interest-only | 3,313 | 15,841 | 19,154 | 4,161 | 19,616 | 23,777 |
| Total fixed-rate | 145,402 | 1,480,229 | 1,625,631 | 130,722 | 1,512,822 | 1,643,544 |
| Adjustable-rate | | | | | | |
| Amortizing | 3,535 | 66,807 | 70,342 | 3,625 | 59,851 | 63,476 |
| Interest-only | 11,006 | 46,533 | 57,539 | 13,018 | 58,792 | 71,810 |
| Total adjustable-rate | 14,541 | 113,340 | 127,881 | 16,643 | 118,643 | 135,286 |
| Other Guarantee Transactions backed by non-Freddie Mac securities | — | 13,415 | 13,415 | — | 15,580 | 15,580 |
| FHA/VA and other governmental | 1,409 | 3,381 | 4,790 | 1,498 | 3,348 | 4,846 |
| Total single-family | 161,352 | 1,610,365 | 1,771,717 | 148,863 | 1,650,393 | 1,799,256 |
| Multifamily:[1] | | | | | | |
| Fixed-rate | 68,288 | — | 68,288 | 72,679 | — | 72,679 |
| Adjustable-rate | 13,300 | — | 13,300 | 13,201 | — | 13,201 |
| Other governmental | 3 | — | 3 | 3 | — | 3 |
| Total multifamily | 81,591 | — | 81,591 | 85,883 | — | 85,883 |
| Total UPB of mortgage loans | 242,943 | 1,610,365 | 1,853,308 | 234,746 | 1,650,393 | 1,885,139 |
| Deferred fees, unamortized premiums, discounts and other cost basis adjustments | (6,611) | 9,911 | 3,300 | (7,665) | 7,423 | (242) |
| Lower of cost or fair value adjustments on loans held-for-sale[2] | 173 | — | 173 | (311) | — | (311) |
| Allowance for loan losses on mortgage loans held-for-investment | (30,848) | (8,696) | (39,544) | (28,047) | (11,644) | (39,691) |
| Total mortgage loans, net | $205,657 | $1,611,580 | $1,817,237 | $198,723 | $1,646,172 | $1,844,895 |
| Mortgage loans, net: | | | | | | |
| Held-for-investment | $199,382 | $1,611,580 | $1,810,962 | $192,310 | $1,646,172 | $1,838,482 |
| Held-for-sale | 6,275 | — | 6,275 | 6,413 | — | 6,413 |
| Total mortgage loans, net | $205,657 | $1,611,580 | $1,817,237 | $198,723 | $1,646,172 | $1,844,895 |

(1) Based on UPB and excluding mortgage loans traded, but not yet settled.
(2) Consists of fair value adjustments associated with mortgage loans for which we have made a fair value election.

We purchased UPB of $69.9 billion of single-family mortgage loans and $0.7 billion of multifamily loans that were classified as held-for-investment at purchase in the three months ended September 30, 2011. We purchased UPB of $227.9 billion of single-family mortgage loans and $2.3 billion of multifamily loans that were classified as held-for-investment at purchase in the nine months ended September 30, 2011. Our sales of multifamily mortgage loans occur primarily through the issuance of multifamily Other Guarantee Transactions. See "NOTE 9: FINANCIAL GUARANTEES" for more information. We did not sell a significant amount of held-for-investment loans during the three and nine months ended September 30, 2011. We did not have significant reclassifications of mortgage loans into held-for-sale in the three and nine months ended September 30, 2011.

### Credit Quality of Mortgage Loans

We evaluate the credit quality of single-family loans using different criteria than the criteria we use to evaluate multifamily loans. The current LTV ratio is one key factor we consider when estimating our loan loss reserves for single-family loans. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is

*Freddie Mac*

more likely to default than other borrowers. A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of September 30, 2011 and December 31, 2010, approximately 15% and 14%, respectively, of loans in our single-family credit guarantee portfolio had second lien financing at the time of origination of the first mortgage, and we estimate that these loans comprised 18% and 19%, respectively, of our seriously delinquent loans, based on UPB. However, borrowers are free to obtain second lien financing after origination, and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

Table 4.2 presents information on the estimated current LTV ratios of single-family loans on our consolidated balance sheets, all of which are held-for-investment. Our current LTV ratio estimates are based on available data through the end of each respective period.

### Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio

| | As of September 30, 2011 | | | | As of December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Estimated Current LTV Ratio[1] | | | | Estimated Current LTV Ratio[1] | | | |
| | <= 80 | > 80 – 100 | > 100[2] | Total | <= 80 | > 80 – 100 | > 100[2] | Total |
| | (in millions) | | | | | | | |
| Single-family loans: | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[3] . . . . . . | $676,849 | $383,667 | $246,662 | $1,307,178 | $ 704,882 | $393,853 | $216,388 | $1,315,123 |
| 15-year amortizing fixed-rate . . . . | 236,370 | 16,447 | 2,948 | 255,765 | 233,422 | 16,432 | 2,523 | 252,377 |
| Adjustable-rate[3][4] . . . . . . . . . . | 42,745 | 12,820 | 9,398 | 64,963 | 34,252 | 13,273 | 9,149 | 56,674 |
| Alt-A, interest-only, and option ARM[5] . . . . . . . . . . . . . . . . | 33,552 | 31,899 | 81,651 | 147,102 | 45,068 | 44,540 | 85,213 | 174,821 |
| Total single-family loans . . . . . . . . | $989,516 | $444,833 | $340,659 | 1,775,008 | $1,017,624 | $468,098 | $313,273 | 1,798,995 |
| Multifamily loans . . . . . . . . . . . . . | | | | 75,498 | | | | 79,178 |
| Total recorded investment of held-for-investment loans . . . . . . . . . . | | | | $1,850,506 | | | | $1,878,173 |

(1) The current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since that time. The value of a property at origination is based on the sales price for purchase mortgages and third-party appraisal for refinance mortgages. Changes in market value are derived from our internal index which measures price changes for repeat sales and refinancing activity on the same properties using Freddie Mac and Fannie Mae single-family mortgage acquisitions, including foreclosure sales. Estimates of the current LTV ratio include the credit-enhanced portion of the loan and exclude any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.

(2) The serious delinquency rate for the total of single-family mortgage loans with estimated current LTV ratios in excess of 100% was 12.7% and 14.9% as of September 30, 2011 and December 31, 2010, respectively.

(3) The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate for presentation even though they have a one-time rate adjustment provision, because the change in rate is determined at the time of the modification rather than at a future date.

(4) Includes balloon/reset mortgage loans and excludes option ARMs.

(5) We discontinued purchases of Alt-A loans on March 1, 2009 (or later, as customers' contracts permitted), and interest-only loans effective September 1, 2010, and have not purchased option ARM loans since 2007. Modified loans within the Alt-A category remain as such, even though the borrower may have provided full documentation of assets and income to complete the modification. Modified loans within the option ARM category remain as such even though the modified loan no longer provides for optional payment provisions.

For information about the payment status of single-family and multifamily mortgage loans, including the amount of such loans we deem impaired, see "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS." For a discussion of certain indicators of credit quality for the multifamily loans on our consolidated balance sheets, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Multifamily Mortgage Portfolio."

### Allowance for Loan Losses and Reserve for Guarantee Losses, or Loan Loss Reserve

We maintain an allowance for loan losses on mortgage loans that we classify as held-for-investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage-related securities backed by multifamily loans, certain single-family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk.

During the second quarter of 2010, we identified a backlog related to the processing of loan workouts reported to us by our servicers, principally loan modifications and short sales, which impacted our allowance for loan losses. For additional information, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Basis of Presentation — *Out-of-Period Accounting Adjustment*" in our 2010 Annual Report.

Table 4.3 summarizes loan loss reserve activity.

## Table 4.3 — Detail of Loan Loss Reserves

### Three Months Ended September 30,

| | 2011 | | | | 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | Total | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | Total |
| | Unsecuritized | Held By Consolidated Trusts | | | Unsecuritized | Held By Consolidated Trusts | | |
| | (in millions) | | | | | | | |
| **Single-family:** | | | | | | | | |
| Beginning balance | $ 29,283 | $ 8,948 | $159 | $ 38,390 | $22,787 | $ 14,476 | $ 121 | $ 37,384 |
| Provision for credit losses | 1,597 | 2,051 | (275) | (5) | 3,643 | 1,513 | 2,185 | 10 |
| Charge-offs[3] | (3,446) | (275) | (2) | (3,723) | (4,363) | (414) | (3) | (4,780) |
| Recoveries[3] | 549 | 60 | — | 609 | 912 | 145 | — | 1,057 |
| Transfers, net[4][5] | 2,259 | (2,088) | (2) | 169 | 3,469 | (3,164) | (9) | 296 |
| Ending balance | $ 30,242 | $ 8,696 | $150 | $ 39,088 | $24,318 | $ 13,228 | $ 119 | $ 37,665 |
| **Multifamily:** | | | | | | | | |
| Beginning balance | $ 636 | $ — | $ 69 | $ 705 | $ 879 | $ — | $ 56 | $ 935 |
| Provision (benefit) for credit losses | (22) | — | (15) | (37) | (1) | — | 20 | 19 |
| Charge-offs[3] | (8) | — | — | (8) | (23) | — | — | (23) |
| Transfers, net[5] | — | — | (4) | (4) | — | — | — | — |
| Ending balance | $ 606 | $ — | $ 50 | $ 656 | $ 855 | $ — | $ 76 | $ 931 |
| **Total:** | | | | | | | | |
| Beginning balance | $ 29,919 | $ 8,948 | $228 | $ 39,095 | $23,666 | $ 14,476 | $ 177 | $ 38,319 |
| Provision for credit losses | 1,575 | 2,051 | (20) | 3,606 | 1,512 | 2,185 | 30 | 3,727 |
| Charge-offs[3] | (3,454) | (275) | (2) | (3,731) | (4,386) | (414) | (3) | (4,803) |
| Recoveries[3] | 549 | 60 | — | 609 | 912 | 145 | — | 1,057 |
| Transfers, net[4][5] | 2,259 | (2,088) | (6) | 165 | 3,469 | (3,164) | (9) | 296 |
| Ending balance | $ 30,848 | $ 8,696 | $200 | $ 39,744 | $25,173 | $ 13,228 | $ 195 | $ 38,596 |

### Nine Months Ended September 30,

| | 2011 | | | | 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | Total | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | Total |
| | Unsecuritized | Held By Consolidated Trusts | | | Unsecuritized | Held By Consolidated Trusts | | |
| | (in millions) | | | | | | | |
| **Single-family:** | | | | | | | | |
| Beginning balance | $ 27,317 | $11,644 | $137 | $ 39,098 | $ 693 | $ — | $ 32,333 | $ 33,026 |
| Adjustments to beginning balance[2] | — | — | — | — | 32,006 | (32,192) | — | (186) |
| Provision for credit losses | 2,322 | 5,885 | 27 | 8,234 | 6,035 | 7,930 | 20 | 13,985 |
| Charge-offs[3] | (10,320) | (712) | (6) | (11,038) | (9,605) | (2,937) | (8) | (12,550) |
| Recoveries[3] | 1,986 | 107 | — | 2,093 | 1,878 | 567 | — | 2,445 |
| Transfers, net[4][5] | 8,937 | (8,228) | (8) | 701 | 25,317 | (24,338) | (34) | 945 |
| Ending balance | $ 30,242 | $ 8,696 | $150 | $ 39,088 | $24,318 | $ 13,228 | $ 119 | $ 37,665 |
| **Multifamily:** | | | | | | | | |
| Beginning balance | $ 730 | $ — | $ 98 | $ 828 | $ 748 | $ — | $ 83 | $ 831 |
| Provision (benefit) for credit losses | (75) | — | (35) | (110) | 175 | — | (8) | 167 |
| Charge-offs[3] | (49) | — | — | (49) | (68) | — | — | (68) |
| Transfers, net[5] | — | — | (13) | (13) | — | — | 1 | 1 |
| Ending balance | $ 606 | $ — | $ 50 | $ 656 | $ 855 | $ — | $ 76 | $ 931 |
| **Total:** | | | | | | | | |
| Beginning balance | $ 28,047 | $11,644 | $235 | $ 39,926 | $ 1,441 | $ — | $ 32,416 | $ 33,857 |
| Adjustments to beginning balance[2] | — | — | — | — | 32,006 | (32,192) | — | (186) |
| Provision for credit losses | 2,247 | 5,885 | (8) | 8,124 | 6,210 | 7,930 | 12 | 14,152 |
| Charge-offs[3] | (10,320) | (712) | (6) | (11,038) | (9,673) | (2,937) | (8) | (12,618) |
| Recoveries[3] | 1,986 | 107 | — | 2,093 | 1,878 | 567 | — | 2,445 |
| Transfers, net[4][5] | 8,937 | (8,228) | (21) | 688 | 25,317 | (24,338) | (33) | 946 |
| Ending balance | $ 30,848 | $ 8,696 | $200 | $ 39,744 | $25,173 | $ 13,228 | $ 195 | $ 38,596 |
| Total loan loss reserve as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | | | 2.06% | | | | 1.94% | |

(1)  All of these loans are collectively evaluated for impairments. Beginning January 1, 2010, our reserve for guarantee losses is included in other liabilities.

(2)  Adjustments relate to the adoption of the accounting guidance for transfers of financial assets and consolidation of VIEs. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information.

(3)  Charge-offs represent the carrying amount of a loan that has been discharged to remove the loan from our consolidated balance sheet principally due to either foreclosure transfers or short sales. Charge-offs exclude $108 million and $156 million for the three months ended September 30, 2011 and 2010, respectively, related to certain loans purchased under financial guarantees and recorded as losses on loans purchased within other expenses on our consolidated statements of income and comprehensive income. Charge-offs exclude $317 million and $417 million for the nine months ended September 30, 2011 and 2010, respectively, related to certain loans purchased under financial guarantees and recorded as losses on loans purchased within other expenses on our consolidated statements of income and comprehensive income. Recoveries of charge-offs primarily result from foreclosure transfers and short sales on loans where a share of default risk has been assumed by mortgage insurers, servicers or other third parties through credit enhancements.

(4)  In February 2010, we announced that we would purchase substantially all single-family mortgage loans that are 120 days or more delinquent from our PC trusts. We purchased $9.5 billion and $16.2 billion in UPB of loans from PC trusts during the three months ended September 30, 2011 and 2010, respectively. We purchased $34.8 billion and $113.0 billion in UPB of loans from PC trusts during the nine months ended September 30, 2011 and 2010, respectively. As a result of these purchases, related amounts of our loan loss reserves were transferred from the allowance for loan losses — held by consolidated trusts and the reserve for guarantee losses into the allowance for loan losses — unsecuritized. We record charge-offs and recoveries on loans held by consolidated trusts when a loss event (such as a short sale or foreclosure) occurs on a loan held in a consolidated trust prior to that loan reaching 120 days past due.

(5)  Consist primarily of: (a) approximately $2.1 billion and $3.1 billion during the three months ended September 30, 2011 and 2010, respectively, and $8.2 billion and $24.5 billion during the nine months ended September 30, 2011 and 2010, respectively, of reclassified single-family reserves related to our purchases during the periods of loans previously held by consolidated trusts (as discussed in endnote (4) above); (b) amounts related to agreements with seller/servicers where the transfer represents recoveries received under these agreements to compensate us for previously incurred and recognized losses; (c) the transfer of a proportional amount of the recognized reserves for guarantee losses associated with loans purchased from non-consolidated Freddie Mac mortgage-related securities and other guarantee commitments; and (d) net amounts attributable to recapitalization of past due interest on modified mortgage loans.

Table 4.4 presents our allowance for loan losses and our recorded investment in mortgage loans, held-for-investment, by impairment evaluation methodology.

**Table 4.4 — Net Investment in Mortgage Loans**

| | September 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Single-family | Multifamily | Total | Single-family | Multifamily | Total |
| | | | (in millions) | | | |
| *Recorded investment:* | | | | | | |
| Collectively evaluated . . . . . . . . . . . . . . . . . . . . . . | $1,717,932 | $72,622 | $1,790,554 | $1,762,490 | $76,541 | $1,839,031 |
| Individually evaluated . . . . . . . . . . . . . . . . . . . . . . | 57,076 | 2,876 | 59,952 | 36,505 | 2,637 | 39,142 |
| Total recorded investment . . . . . . . . . . . . . . . . . | 1,775,008 | 75,498 | 1,850,506 | 1,798,995 | 79,178 | 1,878,173 |
| *Ending balance of the allowance for loan losses:* | | | | | | |
| Collectively evaluated . . . . . . . . . . . . . . . . . . . . . . | (24,451) | (323) | (24,774) | (30,477) | (382) | (30,859) |
| Individually evaluated . . . . . . . . . . . . . . . . . . . . . . | (14,487) | (283) | (14,770) | (8,484) | (348) | (8,832) |
| Total ending balance of the allowance. . . . . . . . . . | (38,938) | (606) | (39,544) | (38,961) | (730) | (39,691) |
| Net investment in mortgage loans . . . . . . . . . . . . . . . . | $1,736,070 | $74,892 | $1,810,962 | $1,760,034 | $78,448 | $1,838,482 |

A significant number of unsecuritized single-family mortgage loans on our consolidated balance sheets are individually evaluated for impairment and substantially all single-family mortgage loans held by our consolidated trusts are collectively evaluated for impairment. The ending balance of the allowance for loan losses associated with our held-for-investment unsecuritized mortgage loans represented approximately 13.4% and 12.7% of the recorded investment in such loans at September 30, 2011 and December 31, 2010, respectively. The ending balance of the allowance for loan losses associated with mortgage loans held by our consolidated trusts represented approximately 0.5% and 0.7% of the recorded investment in such loans as of September 30, 2011 and December 31, 2010, respectively.

### Credit Protection and Other Forms of Credit Enhancement

In connection with many of our mortgage loans held-for-investment and other mortgage-related guarantees, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancements.

Table 4.5 presents the UPB of loans on our consolidated balance sheets or underlying our financial guarantees with credit protection and the maximum amounts of potential loss recovery by type of credit protection.

**Table 4.5 — Recourse and Other Forms of Credit Protection**[1]

| | UPB at | | Maximum Coverage[2] at | |
|---|---|---|---|---|
| | September 30, 2011 | December 31, 2010 | September 30, 2011 | December 31, 2010 |
| | | (in millions) | | |
| Single-family: | | | | |
| Primary mortgage insurance . . . . . . . . . . . . . . . . . . . . . . | $206,912 | $217,133 | $50,611 | $52,899 |
| Lender recourse and indemnifications . . . . . . . . . . . . . . . | 8,978 | 10,064 | 8,736 | 9,566 |
| Pool insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31,693 | 37,868 | 2,474 | 2,966 |
| HFA indemnification[3] . . . . . . . . . . . . . . . . . . . . . . . . . | 8,885 | 9,322 | 3,110 | 3,263 |
| Subordination[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,359 | 3,889 | 683 | 825 |
| Other credit enhancements . . . . . . . . . . . . . . . . . . . . . . | 132 | 223 | 107 | 118 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $259,959 | $278,499 | $65,721 | $69,637 |
| Multifamily: | | | | |
| HFA indemnification[3] . . . . . . . . . . . . . . . . . . . . . . . . . | $  1,449 | $  1,551 | $  507 | $  543 |
| Subordination[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20,766 | 12,252 | 2,860 | 1,414 |
| Other credit enhancements . . . . . . . . . . . . . . . . . . . . . . | 8,474 | 9,004 | 2,642 | 2,930 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 30,689 | $ 22,807 | $ 6,009 | $ 4,887 |

(1) Includes the credit protection associated with unsecuritized mortgage loans, loans held by our consolidated trusts as well as our non-consolidated mortgage guarantees and excludes FHA/VA and other governmental loans. Except for subordination coverage, these amounts exclude credit protection associated with $17.3 billion and $19.8 billion in UPB of single-family loans underlying Other Guarantee Transactions as of September 30, 2011 and December 31, 2010, respectively, for which the information was not available.

(2) Except for subordination, this represents the remaining amount of loss recovery that is available subject to terms of counterparty agreements.

(3) Represents the amount of potential reimbursement of losses on securities we have guaranteed that are backed by state and local HFA bonds, under which Treasury bears initial losses on these securities up to 35% of those issued under the HFA initiative on a combined basis. Treasury will also bear losses of unpaid interest.

(4) Represents Freddie Mac issued mortgage-related securities with subordination protection, excluding those backed by HFA bonds. Excludes mortgage-related securities where subordination coverage was exhausted or maximum coverage amounts were limited to the remaining UPB at that date. Prior period amounts have been revised to conform to current period presentation.

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. Pool insurance contracts generally provide insurance on a group, or pool, of mortgage loans up to a stated aggregate loss limit. We did not buy pool insurance during the nine

months ended September 30, 2011. In recent periods, we also reached the maximum limit of recovery on certain of these contracts.

We also have credit protection for certain of the mortgage loans on our consolidated balance sheets that are covered by insurance or partial guarantees issued by federal agencies (such as FHA, VA, and USDA). The total UPB of these loans was $4.8 billion as of both September 30, 2011 and December 31, 2010.

### NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS

#### Individually Impaired Loans

Individually impaired single-family loans include performing and non-performing TDRs, as well as loans acquired under our financial guarantees with deteriorated credit quality. Individually impaired multifamily loans include TDRs, loans three monthly payments or more past due, and loans that are impaired based on management judgment. For a discussion of our significant accounting policies regarding impaired and non-performing loans, which are applied consistently for multifamily loans and single-family loan classes, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

Total loan loss reserves consist of a specific valuation allowance related to individually impaired mortgage loans, and a general reserve for other probable incurred losses. Our recorded investment in individually impaired mortgage loans and the related specific valuation allowance are summarized in Table 5.1 by product class (for single-family loans).

#### Table 5.1 — Individually Impaired Loans

| | Balance at September 30, 2011 | | | | For the Three Months Ended September 30, 2011 | | For the Nine Months Ended September 30, 2011 | |
|---|---|---|---|---|---|---|---|---|
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized | Average Recorded Investment | Interest Income Recognized |
| | | | | (in millions) | | | | |
| Single-family — | | | | | | | | |
| *With no specific allowance recorded*[1]: | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 7,341 | $ 3,298 | $      — | $ 3,298 | $ 3,332 | $ 84 | $ 3,406 | $  256 |
| 15-year amortizing fixed-rate[2] | 102 | 43 | — | 43 | 44 | 2 | 45 | 5 |
| Adjustable rate[3] | 15 | 7 | — | 7 | 7 | — | 7 | — |
| Alt-A, interest-only, and option ARM[4] | 2,085 | 921 | — | 921 | 932 | 16 | 967 | 55 |
| Total with no specific allowance recorded | $ 9,543 | $ 4,269 | $      — | $ 4,269 | $ 4,315 | $102 | $ 4,425 | $  316 |
| *With specific allowance recorded:* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $42,066 | $40,939 | $(10,774) | $30,165 | $40,035 | $268 | $33,172 | $  596 |
| 15-year amortizing fixed-rate[2] | 396 | 370 | (40) | 330 | 337 | 4 | 208 | 8 |
| Adjustable rate[3] | 273 | 260 | (55) | 205 | 234 | 2 | 139 | 3 |
| Alt-A, interest-only, and option ARM[4] | 11,556 | 11,238 | (3,618) | 7,620 | 10,766 | 58 | 8,763 | 110 |
| Total with specific allowance recorded | $54,291 | $52,807 | $(14,487) | $38,320 | $51,372 | $332 | $42,282 | $  717 |
| *Combined single-family:* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $49,407 | $44,237 | $(10,774) | $33,463 | $43,367 | $351 | $36,578 | $  852 |
| 15-year amortizing fixed-rate[2] | 498 | 413 | (40) | 373 | 381 | 6 | 253 | 13 |
| Adjustable rate[3] | 288 | 267 | (55) | 212 | 241 | 2 | 146 | 3 |
| Alt-A, interest-only, and option ARM[4] | 13,641 | 12,159 | (3,618) | 8,541 | 11,698 | 75 | 9,730 | 165 |
| Total single-family | 63,834 | 57,076 | (14,487) | 42,589 | 55,687 | 434 | 46,707 | 1,033 |
| Total multifamily | 2,898 | 2,876 | (283) | 2,593 | 2,878 | 37 | 3,247 | 109 |
| Total single-family and multifamily | $66,732 | $59,952 | $(14,770) | $45,182 | $58,565 | $471 | $49,954 | $1,142 |

| | Balance at December 31, 2010 | | | |
| | UPB | Recorded Investment | Associated Allowance | Net Investment |
| --- | --- | --- | --- | --- |
| | | | (in millions) | |
| **Single-family —** | | | | |
| *With no specific allowance recorded*[1]: | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 8,462 | $ 3,721 | $    — | $ 3,721 |
| 15-year amortizing fixed-rate[2] | 119 | 50 | — | 50 |
| Adjustable rate[3] | 20 | 9 | — | 9 |
| Alt-A, interest-only, and option ARM[4] | 2,525 | 1,098 | — | 1,098 |
| Total with no specific allowance recorded | $11,126 | $ 4,878 | $    — | $ 4,878 |
| | | | | |
| *With specific allowance recorded:* | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $25,504 | $24,502 | $(6,283) | $18,219 |
| 15-year amortizing fixed-rate[2] | 229 | 198 | (17) | 181 |
| Adjustable rate[3] | 168 | 153 | (23) | 130 |
| Alt-A, interest-only, and option ARM[4] | 7,035 | 6,774 | (2,161) | 4,613 |
| Total with specific allowance recorded | $32,936 | $31,627 | $(8,484) | $23,143 |
| | | | | |
| *Combined single-family:* | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $33,966 | $28,223 | $(6,283) | $21,940 |
| 15-year amortizing fixed-rate[2] | 348 | 248 | (17) | 231 |
| Adjustable rate[3] | 188 | 162 | (23) | 139 |
| Alt-A, interest-only, and option ARM[4] | 9,560 | 7,872 | (2,161) | 5,711 |
| Total single-family | 44,062 | 36,505 | (8,484) | 28,021 |
| Total multifamily | 2,661 | 2,637 | (348) | 2,289 |
| Total single-family and multifamily | $46,723 | $39,142 | $(8,832) | $30,310 |

(1) Individually impaired loans with no specific related valuation allowance primarily represent mortgage loans purchased out of PC pools and accounted for in accordance with the accounting guidance for loans and debt securities acquired with deteriorated credit quality that have not experienced further deterioration.
(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."
(3) Includes balloon/reset mortgage loans and excludes option ARMs.
(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

The average recorded investment in individually impaired loans for the three and nine months ended September 30, 2010 was approximately $31.9 billion and $25.0 billion, respectively. We recognized interest income on individually impaired loans of $338 million and $860 million for the three and nine months ended September 30, 2010. Interest income foregone on individually impaired loans was approximately $441 million and $193 million for the three months ended September 30, 2011 and 2010, respectively. Interest income foregone on individually impaired loans was approximately $1.1 billion and $532 million for the nine months ended September 30, 2011 and 2010, respectively.

**Mortgage Loan Performance**

We do not accrue interest on loans three months or more past due or if the loan is in the process of foreclosure.

Table 5.2 presents the recorded investment of our single-family and multifamily mortgage loans, held-for-investment, by payment status.

**Table 5.2 — Payment Status of Mortgage Loans[1]**

| | | | | September 30, 2011 | | |
|---|---|---|---|---|---|---|
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] . . . . . . . . | $1,227,293 | $24,503 | $ 9,204 | $46,178 | $1,307,178 | $46,058 |
| 15-year amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . . . . | 252,486 | 1,487 | 381 | 1,411 | 255,765 | 1,405 |
| Adjustable-rate[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 62,061 | 725 | 277 | 1,900 | 64,963 | 1,896 |
| Alt-A, interest-only, and option ARM[4] . . . . . . . . . . . . . | 116,354 | 4,763 | 2,326 | 23,659 | 147,102 | 23,625 |
| Total single-family . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,658,194 | 31,478 | 12,188 | 73,148 | 1,775,008 | 72,984 |
| Total multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 75,353 | 2 | 17 | 126 | 75,498 | 1,916 |
| Total single-family and multifamily . . . . . . . . . . . . . . . . | $1,733,547 | $31,480 | $12,205 | $73,274 | $1,850,506 | $74,900 |

| | | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] . . . . . . . . | $1,226,874 | $26,442 | $10,203 | $51,604 | $1,315,123 | $51,507 |
| 15-year amortizing fixed-rate[2] . . . . . . . . . . . . . . . . . . . . | 248,572 | 1,727 | 450 | 1,628 | 252,377 | 1,622 |
| Adjustable-rate[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . | 53,205 | 826 | 335 | 2,308 | 56,674 | 2,303 |
| Alt-A, interest-only, and option ARM[4] . . . . . . . . . . . . . | 137,395 | 5,701 | 3,046 | 28,679 | 174,821 | 28,620 |
| Total single-family . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,666,046 | 34,696 | 14,034 | 84,219 | 1,798,995 | 84,052 |
| Total multifamily . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 79,044 | 41 | 7 | 86 | 79,178 | 1,751 |
| Total single-family and multifamily . . . . . . . . . . . . . . . . | $1,745,090 | $34,737 | $14,041 | $84,305 | $1,878,173 | $85,803 |

(1) Based on recorded investment in the loan. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as past due as long as the borrower is current under the modified terms. The payment status of a loan may be affected by temporary timing differences, or lags, in the reporting of this information to us by our servicers.
(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."
(3) Includes balloon/reset mortgage loans and excludes option ARMs.
(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

We have the option under our PC agreements to purchase mortgage loans from the loan pools that underlie our PCs under certain circumstances to resolve an existing or impending delinquency or default. Since the first quarter of 2010, our practice generally results in our purchase of loans from PC trusts when the loans have been delinquent for four months or more. As of September 30, 2011, there were $3.0 billion in UPB of loans underlying our PCs that were four monthly payments past due, and that met our purchase criteria. Generally, we purchase these delinquent loans, and thereby extinguish the related PC debt, at the next scheduled PC payment date, unless the loans proceed to foreclosure transfer, complete a foreclosure alternative or are paid in full by the borrower before such date.

When we purchase mortgage loans from consolidated trusts, we reclassify the loans from mortgage loans held-for-investment by consolidated trusts to unsecuritized mortgage loans held-for-investment and record an extinguishment of the corresponding portion of the debt securities of the consolidated trusts. We purchased $9.5 billion and $16.2 billion in UPB of loans from PC trusts during the three months ended September 30, 2011 and 2010, respectively. We purchased $34.8 billion and $113.0 billion in UPB of loans from PC trusts during the nine months ended September 30, 2011 and 2010, respectively.

Table 5.3 summarizes the delinquency rates of mortgage loans within our single-family credit guarantee and multifamily mortgage portfolios.

## Table 5.3 — Delinquency Rates[1]

| | September 30, 2011 | December 31, 2010 |
|---|---|---|
| Delinquencies: | | |
| *Single-family:* | | |
| Non-credit-enhanced portfolio: | | |
| Serious delinquency rate | 2.72% | 2.97% |
| Total number of seriously delinquent loans | 269,081 | 296,397 |
| Credit-enhanced portfolio: | | |
| Serious delinquency rate | 7.27% | 7.83% |
| Total number of seriously delinquent loans | 124,316 | 144,116 |
| Total portfolio, excluding Other Guarantee Transactions | | |
| Serious delinquency rate | 3.39% | 3.73% |
| Total number of seriously delinquent loans | 393,397 | 440,513 |
| Other Guarantee Transactions:[2] | | |
| Serious delinquency rate | 10.25% | 9.86% |
| Total number of seriously delinquent loans | 20,462 | 21,926 |
| Total single-family: | | |
| Serious delinquency rate | 3.51% | 3.84% |
| Total number of seriously delinquent loans | 413,859 | 462,439 |
| *Multifamily:*[3] | | |
| Non-credit-enhanced portfolio: | | |
| Delinquency rate | 0.18% | 0.12% |
| UPB of delinquent loans (in millions) | $ 152 | $ 106 |
| Credit-enhanced portfolio: | | |
| Delinquency rate | 0.77% | 0.85% |
| UPB of delinquent loans (in millions) | $ 225 | $ 182 |
| Total Multifamily: | | |
| Delinquency rate | 0.33% | 0.26% |
| UPB of delinquent loans (in millions) | $ 377 | $ 288 |

(1) Single-family mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as seriously delinquent if the borrower is less than three monthly payments past due under the modified terms. Serious delinquencies on single-family mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice.

(2) Other Guarantee Transactions generally have underlying mortgage loans with higher risk characteristics, but some Other Guarantee Transactions may provide inherent credit protections from losses due to underlying subordination, excess interest, overcollateralization and other features.

(3) Multifamily delinquency performance is based on UPB of mortgage loans that are two monthly payments or more past due or those in the process of foreclosure and includes multifamily Other Guarantee Transactions. Excludes mortgage loans whose contractual terms have been modified under an agreement with the borrower as long as the borrower is less than two monthly payments past due under the modified contractual terms.

We continue to implement a number of initiatives to modify and restructure loans, including the MHA Program. Our implementation of the MHA Program, for our loans, includes the following: (a) an initiative to allow mortgages currently owned or guaranteed by us to be refinanced without obtaining additional credit enhancement beyond that already in place for the loan (our relief refinance mortgage, which is our implementation of HARP); (b) an initiative to modify mortgages for both homeowners who are in default and those who are at risk of imminent default (HAMP); and (c) an initiative designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales or to complete a deed in lieu transaction (HAFA). As part of accomplishing certain of these initiatives, we pay various incentives to servicers and borrowers. We will bear the full costs associated with these loan workout and foreclosure alternatives on mortgages that we own or guarantee and will not receive a reimbursement for any component from Treasury. We cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives.

**Troubled Debt Restructurings**

On July 1, 2011, we adopted an amendment to the accounting guidance for receivables, which clarifies the guidance regarding a creditor's evaluation of when a restructuring is considered a TDR. While our adoption of this amendment did not have an impact on how we account for TDRs, it did have a significant impact on the population of loans that we account for as TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Adopted Accounting Guidance" for further information on our implementation of this guidance.

*Single-Family TDRs*

We rely on our single-family servicers to contact borrowers who are in default and to identify an alternative to foreclosure in accordance with our requirements. We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the

best opportunity for minimizing our credit losses. We require our single-family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure.

Repayment plans are agreements between the servicer and the borrower that give the borrower a defined period of time to reinstate the mortgage by paying regular payments plus an additional agreed upon amount in repayment of the past due amount. These agreements are considered TDRs if they result in a delay in payment that is considered to be more than insignificant.

Forbearance agreements are agreements between the servicer and the borrower where reduced payments or no payments are required during a defined period. These agreements are considered TDRs if they result in a delay in payment that is considered to be more than insignificant.

In the case of borrowers considered for modifications, our servicers obtain information on income, assets, and other borrower obligations to determine modified loan terms. Under HAMP, the goal of a single-family loan modification is to reduce the borrower's monthly mortgage payments to a specified percentage of the borrower's gross monthly income (31% for HAMP loans), which may be achieved through a combination of methods, including: (a) interest rate reductions; (b) term extensions; and (c) principal forbearance. Principal forbearance is when a portion of the principal is non-interest bearing, but this does not represent principal forgiveness. Although HAMP contemplates that some servicers will also make use of principal forgiveness to achieve reduced payments for borrowers, we have only used forbearance of principal and have not used principal forgiveness in modifying our loans.

HAMP requires that each borrower complete a trial period during which the borrower will make monthly payments based on the estimated amount of the modification payments. Trial periods are required for at least three months. After the final trial-period payment is received by our servicer, the borrower and servicer enter into the modification.

HAMP applies to loans originated on or before January 1, 2009, provided the trial period begins by December 31, 2012. With the adoption of the new accounting guidance for TDRs in the third quarter of 2011, we began to consider restructurings under HAMP as TDRs at the inception of the trial period if the expected modification will result in a change in our expectation to collect all amounts due at the original contract rate.

Our HAMP and non-HAMP modification initiatives are available for borrowers experiencing what is generally expected to be a longer-term financial hardship. Historically, for our non-HAMP modifications, our single-family servicers have generally taken an approach to modifying the loan's terms in the following order of priority until the borrower's monthly payment amount is reduced to a sustainable level given the borrower's individual circumstances: (a) extend the term of the loan; and (b) reduce the interest rate of the loan. As discussed below, this non-HAMP modification initiative will be replaced by the standard modification effective January 1, 2012.

In February 2011, FHFA directed Freddie Mac and Fannie Mae to develop consistent requirements, policies and processes for the servicing of non-performing loans. This directive was designed to create greater consistency in servicing practices and to build on the best practices of each of the GSEs. In April 2011, pursuant to this directive, FHFA announced a new set of aligned standards for servicing non-performing loans owned or guaranteed by Freddie Mac and Fannie Mae that are designed to help servicers do a better job of communicating and working with troubled borrowers and to bring greater accountability to the servicing industry. As part of the servicing alignment initiative, we began implementation of a new non-HAMP standard loan modification initiative. This new standard modification will replace our existing non-HAMP modification initiative beginning January 1, 2012. The new standard modification requires a three month trial period. Servicers may begin offering standard modification trial period plans with effective dates on or after October 1, 2011.

*Freddie Mac*

In Table 5.4, we provide information about our single-family loans that were initially classified as TDRs during the three and nine months ended September 30, 2011.

### Table 5.4 — Single-Family TDRs, by Type

| | Three Months Ended September 30, 2011 | | | Nine Month Ended September 30, 2011 | | |
|---|---|---|---|---|---|---|
| | Number of Loans | Pre-TDR Recorded Investment | Percentage of Recorded Investment | Number of Loans | Pre-TDR Recorded Investment | Percentage of Recorded Investment |
| Type of completed loan modification: | | | | | | |
| No change in terms[1][2] | 3,053 | $ 499 | 4% | 3,053 | $ 499 | 2% |
| Extension of term[2] | 11,834 | 1,922 | 15 | 11,834 | 1,922 | 8 |
| Reduction of contractual interest rate | 3,013 | 615 | 5 | 20,341 | 4,214 | 18 |
| Rate reduction and extension of term | 5,146 | 1,030 | 8 | 28,465 | 5,826 | 24 |
| Rate reduction, extension of term, and principal forbearance | 2,048 | 495 | 4 | 12,806 | 3,097 | 13 |
| Subtotal-loan modification activity[3] | 25,094 | 4,561 | 36 | 76,499 | 15,558 | 65 |
| Other activity: | | | | | | |
| Trial period modifications[4] | 17,891 | 3,752 | 29 | 17,891 | 3,752 | 16 |
| Forbearance agreement[2] | 16,129 | 3,099 | 24 | 16,129 | 3,099 | 13 |
| Repayment plan[2] | 8,497 | 1,348 | 11 | 8,497 | 1,348 | 6 |
| Subtotal-other activity | 42,517 | 8,199 | 64 | 42,517 | 8,199 | 35 |
| Total single-family TDRs | 67,611 | $12,760 | 100% | 119,016 | $23,757 | 100% |

(1) Under this modification type, past due amounts are added to the principal balance and reamortized based on the original contractual loan terms, and no other change is made to the terms of the loan.

(2) Represents only those agreements or plans that result in more than an insignificant delay, which is generally considered by us as more than three monthly payments under the original terms.

(3) Includes loans that were in the trial period at June 30, 2011 and completed modification in July 2011.

(4) Represents loans that entered the trial period for modification, regardless of whether borrower completed the trial period during the third quarter of 2011 or remained in the trial period as of September 30, 2011. Beginning in the third quarter of 2011, we began to classify loans as TDRs when they entered a trial period rather than at the time the trial period is completed.

Table 5.4 presents completed modification activity based on the following types of modification:

- No change in terms:   This involves the addition of past due amounts, including delinquent monthly principal and interest payments, to the remaining principal balance and allows for amortization of such past due amounts over the loan's remaining original contractual life with no other change in terms. These restructurings are considered TDRs if they result in a delay in payment that is considered to be more than insignificant.

- Extension of term:   This involves resetting the contractual life of the loan to a longer term, and the longer amortization period results in a reduced monthly payment compared to the pre-modified terms. These restructurings are considered TDRs if they result in a delay in payment that is considered to be more than insignificant.

- Reduction of contractual interest rate:   These modifications are considered TDRs as they result in a concession being granted to the borrower as we do not expect to collect all amounts due, including accrued interest at the original contractual interest rate.

- Principal forbearance:   This involves the separation of a portion of the principal balance and does not calculate this portion of the principal in determination of monthly payment of amortized principal and interest. No interest accrues on this portion of the principal and repayment is delayed until either the final payoff of the mortgage, the maturity date, or the transfer of the property. Accordingly, this reduces the monthly payment amount compared to the pre-modified terms. These restructurings are considered TDRs as they result in a concession being granted to the borrower as we do not expect to collect all amounts due, including accrued interest at the original contractual interest rate.

During the three and nine months ended September 30, 2011, the average term extension was 95 and 96 months and the average interest rate reduction was 2.6% and 2.7%, respectively, on completed modifications classified as TDRs.

*Multifamily TDRs*

We monitor a variety of mortgage loan characteristics for multifamily loans, such as the LTV ratio, DSCR, and geographic location, among others, that help us assess the financial performance of the property and the borrower's ability to repay the loan. In certain cases, we may provide short-term loan extensions of up to 12 months with no changes to the effective borrowing rate. In other cases we may make more significant modifications of terms for borrowers experiencing financial difficulty, such as reducing the interest rate or extending the maturity for longer than 12 months. In cases where

we do modify the contractual terms of the loan, the changes in terms may be similar to those of single-family loans, such as an extension of the term, reduction of contractual rate, principal forbearance, or some combination of these features.

The assessment as to whether a multifamily loan restructuring is considered a TDR contemplates the unique facts and circumstances of each loan. This assessment considers qualitative factors such as whether the borrower's modified interest rate is consistent with that of a non-troubled enterprise.

*TDR Activity and Performance*

Table 5.5 provides additional information about both our single-family and multifamily TDR activity during the three and nine months ended September 30, 2011, based on the original category of the loan before modification. Our presentation of TDR activity includes all loans that were newly classified as a TDR during the respective periods. Prior to classification as a TDR, these loans were previously evaluated for impairment, including our estimation for loan losses, on a collective basis. Loans classified as a TDR in one period may be subject to further action (such as a modification or remodification) in a subsequent period. In such cases, the subsequent activity would not be reflected in Table 5.5 since the loan would already have been classified as a TDR.

**Table 5.5 — TDR Activity, by Segment**

|  | Three Months Ended September 30, 2011 | | Nine Months Ended September 30, 2011 | |
|---|---|---|---|---|
|  | # of Loans | Post-TDR Recorded Investment | # of Loans | Post-TDR Recorded Investment |
|  | (in millions, except number of loans modified) | | | |
| *Single-family* |  |  |  |  |
| 20 and 30-year or more, amortizing fixed-rate | 48,595 | $ 8,869 | 84,790 | $16,374 |
| 15-year amortizing fixed-rate | 3,724 | 360 | 5,358 | 544 |
| Adjustable-rate[1] | 1,789 | 347 | 2,714 | 550 |
| Alt-A, interest-only, and option ARM | 13,503 | 3,554 | 26,154 | 7,040 |
| Total Single-family | 67,611 | 13,130 | 119,016 | 24,508 |
| *Multifamily* | 6 | 82 | 17 | 196 |
| Total | 67,617 | $13,212 | 119,033 | $24,704 |

(1) Includes balloon/reset mortgage loans.

The aggregate recorded investment of single-family TDRs during the three and nine months ended September 30, 2011 was higher post-modification (as shown in Table 5.5) than the aggregate recorded investment of the pre-modified loans (as shown in Table 5.4) since past due amounts are added to the principal balance at the time of restructuring.

The measurement of impairment for TDRs is based on the excess of our recorded investment in the loans over the present value of the loan's expected future cash flows. Generally, restructurings that are TDRs have a higher allowance for loan losses than restructurings that are not considered TDRs because TDRs involve a concession being granted to the borrower. Our process for determining the appropriate allowance for loan losses in both our segments considers the impact that our loss mitigation activities, such as loan restructurings, have on probabilities of default.

Table 5.6 presents the performance of our TDRs based on the original category of the loan before modification. Modified loans within the Alt-A category remain as such, even though the borrower may have provided full documentation of assets and income before completing the modification. Modified loans within the option ARM category remain as such even though the modified loan no longer provides for optional payment provisions. Substantially all of our completed single-family loan modifications classified as a TDR during the nine months ended September 30, 2011 resulted in the modified loan with a fixed interest rate or one that is fixed below market for five years and then gradually adjusts to a market rate (determined at the time of modification) and remains fixed at that new rate for the remaining term. Table 5.6 reflects only performance of completed modifications and excludes loans subject to other loss mitigation activity that were classified as TDRs.

**Table 5.6 — Payment Defaults of Completed TDR Modifications, by Segment**[1]

| | Three Months Ended September 30, 2011 | | Nine Months Ended September 30, 2011 | |
|---|---|---|---|---|
| | # of Loans | Post-TDR Recorded Investment[2] | # of Loans | Post-TDR Recorded Investment[2] |
| | (in millions, except number of loans modified) | | | |
| *Single-family* | | | | |
| 20 and 30-year or more, amortizing fixed-rate | 6,235 | $1,158 | 17,584 | $3,302 |
| 15-year amortizing fixed-rate | 233 | 24 | 643 | 67 |
| Adjustable-rate | 131 | 27 | 376 | 79 |
| Alt-A, interest-only, and option ARM | 1,508 | 399 | 4,543 | 1,204 |
| Total single-family | 8,107 | $1,608 | 23,146 | $4,652 |
| *Multifamily* | 7 | $   18 | 7 | $   18 |

(1) Represents TDR loans that experienced a payment default during the period and had completed a modification event in the twelve months prior to the payment default. A payment default occurs when a borrower either: (a) became two or more months delinquent; or (b) completed a loss event, such as a short sale or foreclosure. We only include payment defaults for a single loan once during each quarterly period; however, a single loan will be reflected more than once if the borrower experienced another payment default in a subsequent quarter.
(2) Represents the recorded investment at the end of the period in which the loan was modified and does not represent the recorded investment as of September 30, 2011.

During the three months ended September 30, 2011, there were 1,289 loans with other loss mitigation activities (*i.e.*, repayment plan, forbearance agreement, or trial period modifications) accounted for as TDRs, with a post-TDR recorded investment of $230 million, that returned to a current payment status, and then subsequently became two months delinquent. In addition, during the three months ended September 30, 2011, there were 1,508 loans with other loss mitigation activities accounted for as TDRs, with a post-TDR recorded investment of $257 million, that subsequently experienced a loss event, such as a short sale or a foreclosure transfer.

### NOTE 6: REAL ESTATE OWNED

We obtain REO properties when we are the highest bidder at foreclosure sales of properties that collateralize non-performing single-family and multifamily mortgage loans owned by us or when a delinquent borrower chooses to transfer the mortgaged property to us in lieu of going through the foreclosure process. Upon acquiring single-family properties, we establish a marketing plan to sell the property as soon as practicable by either listing it with a sales broker or by other means, such as arranging a real estate auction. However, certain jurisdictions require a period of time after foreclosure during which the borrower may reclaim the property. During the period when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property. This generally extends our holding period for up to three additional months. As of September 30, 2011 and December 31, 2010, approximately 31% and 28%, respectively, of our REO property inventory was not marketable due to the above conditions. Upon acquiring multifamily properties, we may operate them with third-party property-management firms for a period to stabilize value and then sell the properties through commercial real estate brokers. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report for a discussion of our significant accounting policies for REO.

Table 6.1 provides a summary of the change in the carrying value of our combined single-family and multifamily REO balances. For the periods presented in Table 6.1, the weighted average holding period for our disposed properties was less than one year.

**Table 6.1 — REO**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (in millions) | | | |
| Beginning balance — REO, gross . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 6,533 | $ 6,855 | $ 7,908 | $ 5,125 |
| Adjustments to beginning balance[(1)] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | 158 |
| Additions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,346 | 4,196 | 7,207 | 10,839 |
| Dispositions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (2,623) | (2,671) | (8,859) | (7,742) |
| Ending balance — REO, gross . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,256 | 8,380 | 6,256 | 8,380 |
| Beginning balance, valuation allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (601) | (557) | (840) | (433) |
| Adjustment to beginning balance[(1)] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (11) |
| Change in valuation allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (25) | (312) | 214 | (425) |
| Ending balance, valuation allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (626) | (869) | (626) | (869) |
| Ending balance — REO, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 5,630 | $ 7,511 | $ 5,630 | $ 7,511 |

(1) Adjustment to the beginning balance related to the adoption of new accounting guidance for transfers of financial assets and consolidation of VIEs. See "Note 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information.

The REO balance, net at September 30, 2011 and December 31, 2010 associated with single-family properties was $5.5 billion and $7.0 billion, respectively, and the balance associated with multifamily properties was $91 million and $107 million, respectively. The West region represented approximately 26% and 28% of our single-family REO additions during the three months ended September 30, 2011 and 2010, respectively, based on the number of properties, and the North Central region represented approximately 27% and 22% of our single-family REO additions during these periods. Our single-family REO inventory consisted of 59,596 properties and 72,079 properties at September 30, 2011 and December 31, 2010, respectively. The pace of our REO acquisitions slowed beginning in the fourth quarter of 2010 due to delays in the foreclosure process, including delays related to concerns about the foreclosure process. These delays in foreclosures continued in the nine months ended September 30, 2011, particularly in states that require a judicial foreclosure process. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Seller/Servicers" for information about regional concentration of our portfolio as well as further details about delays in the single-family foreclosure process.

Our REO operations expenses includes REO property expenses, net losses incurred on disposition of REO properties, adjustments to the holding period allowance associated with REO properties to record them at the lower of their carrying amount or fair value less the estimated costs to sell, and recoveries from insurance and other credit enhancements. An allowance for estimated declines in the REO fair value during the period properties are held reduces the carrying value of REO property. Excluding holding period valuation adjustments, we recognized a loss of $25 million and $33 million on REO dispositions during the three months ended September 30, 2011 and 2010, respectively, and recognized a loss of $199 million and a gain of $7 million on REO dispositions during the nine months ended September 30, 2011 and 2010, respectively. We increased our valuation allowance for properties in our REO inventory by $127 million and $250 million in the three months ended September 30, 2011 and 2010, respectively. We increased our valuation allowance for properties in our REO inventory by $283 million and $368 million in the nine months ended September 30, 2011 and 2010, respectively.

REO property acquisitions that result from extinguishment of our mortgage loans held on our consolidated balance sheets are treated as non-cash transfers. The amount of non-cash acquisitions of REO properties during the nine months ended September 30, 2011 and 2010 was $7.0 billion and $10.9 billion, respectively.

*Freddie Mac*

## NOTE 7: INVESTMENTS IN SECURITIES

Table 7.1 summarizes amortized cost, estimated fair values, and corresponding gross unrealized gains and gross unrealized losses for available-for-sale securities by major security type. At September 30, 2011 and December 31, 2010, all available-for-sale securities are mortgage-related securities.

### Table 7.1 — Available-For-Sale Securities

| September 30, 2011 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| | | | (in millions) | |
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 77,238 | $ 6,845 | $    (62) | $ 84,021 |
| Subprime | 42,975 | 52 | (14,139) | 28,888 |
| CMBS | 55,065 | 1,735 | (535) | 56,265 |
| Option ARM | 9,366 | 18 | (3,216) | 6,168 |
| Alt-A and other | 14,075 | 43 | (2,675) | 11,443 |
| Fannie Mae | 19,272 | 1,311 | (3) | 20,580 |
| Obligations of states and political subdivisions | 8,145 | 89 | (102) | 8,132 |
| Manufactured housing | 847 | 12 | (43) | 816 |
| Ginnie Mae | 239 | 32 | — | 271 |
| Total available-for-sale securities | $227,222 | $10,137 | $(20,775) | $216,584 |

| December 31, 2010 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 80,742 | $ 5,142 | $   (195) | $ 85,689 |
| Subprime | 47,916 | 1 | (14,056) | 33,861 |
| CMBS | 58,455 | 1,551 | (1,919) | 58,087 |
| Option ARM | 10,726 | 16 | (3,853) | 6,889 |
| Alt-A and other | 15,561 | 58 | (2,451) | 13,168 |
| Fannie Mae | 23,025 | 1,348 | (3) | 24,370 |
| Obligations of states and political subdivisions | 9,885 | 31 | (539) | 9,377 |
| Manufactured housing | 945 | 13 | (61) | 897 |
| Ginnie Mae | 268 | 28 | — | 296 |
| Total available-for-sale securities | $247,523 | $ 8,188 | $(23,077) | $232,634 |

## Available-For-Sale Securities in a Gross Unrealized Loss Position

Table 7.2 shows the fair value of available-for-sale securities in a gross unrealized loss position, and whether they have been in that position less than 12 months, or 12 months or greater, including the non-credit-related portion of other-than-temporary impairments which have been recognized in AOCI.

### Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position

| | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | |
| September 30, 2011 | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total |
| | | | | | | (in millions) | | | | | | |
| **Available-for-sale securities:** | | | | | | | | | | | | |
| Freddie Mac | $ 707 | $ — | $ (3) | $ (3) | $ 1,887 | $ — | $ (59) | $ (59) | $ 2,594 | $ — | $ (62) | $ (62) |
| Subprime | 8 | (1) | — | (1) | 28,729 | (11,301) | (2,837) | (14,138) | 28,737 | (11,302) | (2,837) | (14,139) |
| CMBS | 715 | (1) | (36) | (37) | 3,638 | — | (498) | (498) | 4,353 | (1) | (534) | (535) |
| Option ARM | 90 | (5) | — | (5) | 6,031 | (3,120) | (91) | (3,211) | 6,121 | (3,125) | (91) | (3,216) |
| Alt-A and other | 1,112 | (74) | (4) | (78) | 9,511 | (2,016) | (581) | (2,597) | 10,623 | (2,090) | (585) | (2,675) |
| Fannie Mae | 233 | | | | 13 | | (3) | (3) | 246 | | (3) | (3) |
| Obligations of states and political subdivisions | 944 | — | (16) | (16) | 2,376 | — | (86) | (86) | 3,320 | — | (102) | (102) |
| Manufactured housing | 40 | (2) | — | (2) | 365 | (31) | (10) | (41) | 405 | (33) | (10) | (43) |
| Total available-for-sale securities in a gross unrealized loss position | $3,849 | $(83) | $ (59) | $(142) | $52,550 | $(16,468) | $(4,165) | $(20,633) | $56,399 | $(16,551) | $(4,224) | $(20,775) |

| | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | | | Gross Unrealized Losses | | |
| December 31, 2010 | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total | Fair Value | Other-Than-Temporary Impairment[1] | Temporary Impairment[2] | Total |
| | | | | | | (in millions) | | | | | | |
| **Available-for-sale securities:** | | | | | | | | | | | | |
| Freddie Mac | $2,494 | $ — | $ (70) | $ (70) | $ 1,880 | $ — | $ (125) | $ (125) | $ 4,374 | $ — | $ (195) | $ (195) |
| Subprime | 6 | — | — | — | 33,839 | (10,041) | (4,015) | (14,056) | 33,845 | (10,041) | (4,015) | (14,056) |
| CMBS | 2,950 | — | (51) | (51) | 8,894 | (844) | (1,024) | (1,868) | 11,844 | (844) | (1,075) | (1,919) |
| Option ARM | 3 | (1) | — | (1) | 6,838 | (3,744) | (108) | (3,852) | 6,841 | (3,745) | (108) | (3,853) |
| Alt-A and other | 42 | — | (3) | (3) | 12,025 | (1,846) | (602) | (2,448) | 12,067 | (1,846) | (605) | (2,451) |
| Fannie Mae | 54 | — | — | — | 14 | — | (3) | (3) | 68 | — | (3) | (3) |
| Obligations of states and political subdivisions | 3,953 | — | (163) | (163) | 3,402 | — | (376) | (376) | 7,355 | — | (539) | (539) |
| Manufactured housing | 8 | (1) | — | (1) | 507 | (45) | (15) | (60) | 515 | (46) | (15) | (61) |
| Total available-for-sale securities in a gross unrealized loss position | $9,510 | $ (2) | $(287) | $(289) | $67,399 | $(16,520) | $(6,268) | $(22,788) | $76,909 | $(16,522) | $(6,555) | $(23,077) |

(1) Represents the gross unrealized losses for securities for which we have previously recognized other-than-temporary impairments in earnings.
(2) Represents the gross unrealized losses for securities for which we have not previously recognized other-than-temporary impairments in earnings.

At September 30, 2011, total gross unrealized losses on available-for-sale securities were $20.8 billion. The gross unrealized losses relate to 1,762 individual lots representing 1,699 separate securities, including securities with non-credit-related other-than-temporary impairments recognized in AOCI. We purchase multiple lots of individual securities at different times and at different costs. We determine gross unrealized gains and gross unrealized losses by specifically evaluating investment positions at the lot level; therefore, some of the lots we hold for a single security may be in an unrealized gain position while other lots for that security may be in an unrealized loss position, depending upon the amortized cost of the specific lot.

## Impairment Recognition on Investments in Securities

We recognize impairment losses on available-for-sale securities within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other-than-temporary.

We conduct quarterly reviews to evaluate each available-for-sale security that has an unrealized loss for other-than-temporary impairment. An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis. We recognize other-than-temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security. If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recognize only the credit component of other-than-temporary impairment in earnings and the amounts attributable to all other factors are recognized in AOCI. The credit component represents the amount by which the present value of expected future cash flows to be collected from the security is less than the amortized cost basis of the security. The present value of expected future cash flows represents our estimate of future contractual cash flows that

we expect to collect, discounted at the effective interest rate implicit in the security at the date of acquisition or the effective interest rate determined based on significantly improved cash flows subsequent to initial impairment.

Our net impairment of available-for-sale securities recognized in earnings on our consolidated statements of income and comprehensive income for the three and nine months ended September 30, 2011 and 2010, includes amounts related to certain securities where we have previously recognized other-than-temporary impairments through AOCI, but upon the recognition of additional credit losses, these amounts were reclassified out of non-credit losses in AOCI and charged to earnings. In certain instances, we recognized credit losses in excess of unrealized losses in AOCI.

The determination of whether unrealized losses on available-for-sale securities are other-than-temporary involves the evaluation of numerous factors. We perform an evaluation on a security-by-security basis considering all available information. The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment. Important factors include, but are not limited to:

- whether we intend to sell the security and it is not more likely than not that we will be required to sell the security before sufficient time elapses to recover all unrealized losses;

- loan level default modeling for single-family residential mortgages that considers individual loan characteristics, including current LTV ratio, FICO score, and delinquency status, requires assumptions about future home prices and interest rates, and employs internal default models and prepayment assumptions. The modeling for CMBS employs third-party models that require assumptions about the economic conditions in the areas surrounding each individual property; and

- security loss modeling combining the modeled performance of the underlying collateral relative to its current and projected credit enhancements to determine the expected cash flows for each evaluated security.

For the majority of our available-for-sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other-than-temporary and is recorded within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings.

See "Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position" for the length of time our available-for-sale securities have been in an unrealized loss position. Also see "Table 7.3 — Significant Modeled Attributes for Certain Non-Agency Mortgage-Related Securities" for the modeled default rates and severities that were used to determine whether our senior interests in certain non-agency mortgage-related securities would experience a cash shortfall.

### Freddie Mac and Fannie Mae Securities

We record the purchase of mortgage-related securities issued by Fannie Mae as investments in securities in accordance with the accounting guidance for investments in debt and equity securities. In contrast, our purchase of mortgage-related securities that we issued (*e.g.*, PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions) is recorded as either investments in securities or extinguishment of debt securities of consolidated trusts depending on the nature of the mortgage-related security that we purchase. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for additional information.

We hold these investments in securities that are in an unrealized loss position at least to recovery and typically to maturity. As the principal and interest on these securities are guaranteed and we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses, we consider these unrealized losses to be temporary.

### Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans

We believe the unrealized losses on the non-agency mortgage-related securities we hold are a result of poor underlying collateral performance, limited liquidity, and large risk premiums. We consider securities to be other-than-temporarily impaired when future credit losses are deemed likely.

Our review of the securities backed by subprime, option ARM, and Alt-A and other loans includes loan level default modeling and analyses of the individual securities based on underlying collateral performance, including the collectability of amounts that would be recovered from primary bond insurers. In the case of bond insurers, we also consider factors such as the availability of capital, generation of new business, pending regulatory action, credit ratings, security prices,

and credit default swap levels traded on the insurers. We consider loan level information including estimated current LTV ratios, FICO scores, and other loan level characteristics. We also consider the differences between the loan level characteristics of the performing and non-performing loan populations.

Table 7.3 presents the modeled default rates and severities, without regard to subordination, that are used to determine whether our senior interests in certain non-agency mortgage-related securities will experience a cash shortfall. Our proprietary default model requires assumptions about future home prices, as defaults and severities are modeled at the loan level and then aggregated. The model uses projections of future home prices at the state level. Assumptions of voluntary prepayment rates are also an input to the present value of expected cash flows and are discussed below.

### Table 7.3 — Significant Modeled Attributes for Certain Non-Agency Mortgage-Related Securities

| | | | Alt-A[1] | | |
| | Subprime first lien | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
| | | | September 30, 2011<br>(dollars in millions) | | |
|---|---|---|---|---|---|
| **Issuance Date** | | | | | |
| **2004 and prior:** | | | | | |
| UPB | $ 1,247 | $ 121 | $ 905 | $ 529 | $2,236 |
| Weighted average collateral defaults[2] | 34% | 34% | 8% | 42% | 23% |
| Weighted average collateral severities[3] | 56% | 55% | 47% | 51% | 40% |
| Weighted average voluntary prepayment rates[4] | 6% | 7% | 19% | 7% | 8% |
| Average credit enhancement[5] | 41% | 16% | 14% | 18% | 15% |
| **2005:** | | | | | |
| UPB | $ 6,615 | $ 2,945 | $1,240 | $ 865 | $4,025 |
| Weighted average collateral defaults[2] | 53% | 52% | 24% | 52% | 38% |
| Weighted average collateral severities[3] | 66% | 64% | 54% | 58% | 50% |
| Weighted average voluntary prepayment rates[4] | 4% | 6% | 15% | 7% | 8% |
| Average credit enhancement[5] | 52% | 14% | 4% | 27% | 6% |
| **2006:** | | | | | |
| UPB | $20,248 | $ 6,883 | $ 568 | $1,164 | $1,215 |
| Weighted average collateral defaults[2] | 63% | 63% | 38% | 60% | 50% |
| Weighted average collateral severities[3] | 71% | 70% | 62% | 67% | 58% |
| Weighted average voluntary prepayment rates[4] | 7% | 6% | 15% | 9% | 8% |
| Average credit enhancement[5] | 16% | 3% | 7% | (1)% | 1% |
| **2007:** | | | | | |
| UPB | $21,684 | $ 4,402 | $ 162 | $1,392 | $ 342 |
| Weighted average collateral defaults[2] | 60% | 62% | 60% | 60% | 60% |
| Weighted average collateral severities[3] | 72% | 71% | 67% | 67% | 67% |
| Weighted average voluntary prepayment rates[4] | 7% | 7% | 12% | 9% | 8% |
| Average credit enhancement[5] | 17% | 12% | 13% | (6)% | —% |
| **Total:** | | | | | |
| UPB | $49,794 | $14,351 | $2,875 | $3,950 | $7,818 |
| Weighted average collateral defaults[2] | 60% | 60% | 23% | 56% | 37% |
| Weighted average collateral severities[3] | 71% | 69% | 58% | 64% | 51% |
| Weighted average voluntary prepayment rates[4] | 6% | 6% | 16% | 8% | 8% |
| Average credit enhancement[5] | 22% | 8% | 8% | 6% | 6% |

(1) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.
(2) The expected cumulative default rate expressed as a percentage of the current collateral UPB.
(3) The expected average loss given default calculated as the ratio of cumulative loss over cumulative default rate for each security.
(4) The security's voluntary prepayment rate represents the average of the monthly voluntary prepayment rate weighted by the security's outstanding UPB.
(5) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by bond insurance, overcollateralization and other forms of credit enhancement. Negative values are shown when collateral losses that have yet to be applied to the tranches exceed the remaining credit enhancement, if any.

In evaluating the non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans for other-than-temporary impairment, we noted that the percentage of securities that were AAA-rated and the percentage that were investment grade declined significantly since acquisition. While these ratings have declined, the ratings themselves are not determinative that a loss is more or less likely. While we consider credit ratings in our analysis, we believe that our detailed security-by-security analyses provide a more consistent view of the ultimate collectability of contractual amounts due to us. As such, we have impaired securities with current ratings ranging from CCC to AAA and have determined that other securities within the same ratings were not other-than-temporarily impaired. However, we carefully consider individual ratings, especially those below investment grade, including changes since September 30, 2011.

Our analysis is subject to change as new information regarding delinquencies, severities, loss timing, prepayments, and other factors becomes available. While it is reasonably possible that, under certain conditions, collateral losses on our

*Freddie Mac*

remaining available-for-sale securities for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of September 30, 2011.

### Commercial Mortgage-Backed Securities

CMBS are exposed to stresses in the commercial real estate market. We use external models to identify securities that may have an increased risk of failing to make their contractual payments. We then perform an analysis of the underlying collateral on a security-by-security basis to determine whether we will receive all of the contractual payments due to us. During the three and nine months ended September 30, 2011, we recognized the unrealized fair value losses related to certain investments in CMBS of $27 million and $181 million, respectively, as an impairment charge in earnings because we have the intent to sell these securities. While it is reasonably possible that, under certain conditions, collateral losses on our CMBS for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of September 30, 2011. We do not intend to sell the remaining CMBS and it is not more likely than not that we will be required to sell such securities before recovery of the unrealized losses.

### Obligations of States and Political Subdivisions

These investments consist of housing revenue bonds. We believe the unrealized losses on obligations of states and political subdivisions are primarily a result of movements in interest rates and liquidity and risk premiums. We have determined that the impairment of these securities is temporary based on our conclusion that we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses. We believe that any credit risk related to these securities is minimal because of the issuer guarantees provided on these securities.

### Bond Insurance

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our non-agency mortgage-related securities. Circumstances in which it is likely a principal and interest shortfall will occur and there is substantial uncertainty surrounding a primary bond insurer's ability to pay all future claims can give rise to recognition of other-than-temporary impairment recognized in earnings. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

### Other-Than-Temporary Impairments on Available-for-Sale Securities

Table 7.4 summarizes our net impairments of available-for-sale securities recognized in earnings by security type.

### Table 7.4 — Net Impairment of Available-For-Sale Securities Recognized in Earnings

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings | | | |
|---|---|---|---|---|
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Available-for-sale securities: | | | | |
| Subprime | $ (31) | $ (213) | $ (835) | $ (562) |
| Option ARM | (19) | (577) | (365) | (727) |
| Alt-A and other | (80) | (296) | (152) | (648) |
| CMBS[1] | (27) | (6) | (345) | (78) |
| Manufactured housing | (4) | (8) | (9) | (23) |
| Total other-than-temporary impairments on available-for-sale securities | $(161) | $(1,100) | $(1,706) | $(2,038) |

(1) Includes $27 million and $181 million of other-than-temporary impairments recognized in earnings for the three and nine months ended September 30, 2011, respectively, as we have the intent to sell the related security before recovery of its amortized cost basis.

Table 7.5 presents the changes in the unrealized credit-related other-than-temporary impairment component of the amortized cost related to available-for-sale securities: (a) that we have written down for other-than-temporary impairment; and (b) for which the credit component of the loss is recognized in earnings. The credit-related other-than-temporary impairment component of the amortized cost represents the difference between the present value of expected future cash flows, including the estimated proceeds from bond insurance, and the amortized cost basis of the security prior to considering credit losses. The beginning balance represents the other-than-temporary impairment credit loss component related to available-for-sale securities for which other-than-temporary impairment occurred prior to January 1, 2011, but will not be realized until the securities are sold, written off, or mature. Net impairment of available-for-sale securities

recognized in earnings is presented as additions in two components based upon whether the current period is: (a) the first time the debt security was credit-impaired; or (b) not the first time the debt security was credit-impaired. The credit loss component is reduced if we sell, intend to sell or believe we will be required to sell previously credit-impaired available-for-sale securities. Additionally, the credit loss component is reduced by the amortization resulting from significant increases in cash flows expected to be collected that are recognized over the remaining life of the security.

### Table 7.5 — Other-Than-Temporary Impairments Related to Credit Losses on Available-For-Sale Securities[1]

| | Nine Months Ended September 30, 2011 |
|---|---|
| | (in millions) |
| Credit-related other-than-temporary impairments on available-for-sale securities recognized in earnings: | |
| Beginning balance — remaining credit losses to be realized on available-for-sale securities held at the beginning of the period where other-than-temporary impairments were recognized in earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $15,049 |
| Additions: | |
| Amounts related to credit losses for which an other-than-temporary impairment was not previously recognized . . . . . . . . | 49 |
| Amounts related to credit losses for which an other-than-temporary impairment was previously recognized . . . . . . . . . . . | 1,506 |
| Reductions: | |
| Amounts related to securities which were sold, written off or matured . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (756) |
| Amounts previously recognized in other comprehensive income that were recognized in earnings because we intend to sell the security or it is more likely than not that we will be required to sell the security before recovery of its amortized cost basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (161) |
| Amounts related to amortization resulting from significant increases in cash flows expected to be collected that are recognized over the remaining life of the security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (56) |
| Ending balance — remaining credit losses to be realized on available-for-sale securities held at period end where other-than-temporary impairments were recognized in earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $15,631 |

(1) Excludes other-than-temporary impairments on securities that we intend to sell or it is more likely than not that we will be required to sell before recovery of the unrealized losses.

### Realized Gains and Losses on Sales of Available-For-Sale Securities

Table 7.6 below illustrates the gross realized gains and gross realized losses received from the sale of available-for-sale securities.

### Table 7.6 — Gross Realized Gains and Gross Realized Losses on Sales of Available-For-Sale Securities

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | | (in millions) | | |
| **Gross realized gains** | | | | |
| Mortgage-related securities: | | | | |
| Freddie Mac . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $— | $— | $ 77 | $26 |
| Fannie Mae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 54 | 14 | 54 |
| Obligations of states and political subdivisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | 1 | 10 | 2 |
| Total mortgage-related securities gross realized gains . . . . . . . . . . . . . . . . . . . . . . . | 6 | 55 | 101 | 82 |
| Non-mortgage-related securities: | | | | |
| Asset-backed securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 3 | — | 3 |
| Total non-mortgage-related securities gross realized gains . . . . . . . . . . . . . . . . . . . | — | 3 | — | 3 |
| Gross realized gains . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | 58 | 101 | 85 |
| **Gross realized losses** | | | | |
| Mortgage related securities:[1] | | | | |
| CMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | (80) | — |
| Option ARM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | — | (6) |
| Total mortgage-related securities gross realized losses . . . . . . . . . . . . . . . . . . . . . | — | — | (80) | (6) |
| Gross realized losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | — | (80) | (6) |
| Net realized gains (losses) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 6 | $58 | $ 21 | $79 |

(1) These individual sales do not change our conclusion that we do not intend to sell the majority of our remaining mortgage-related securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses.

**Maturities of Available-For-Sale Securities**

Table 7.7 summarizes the remaining contractual maturities of available-for-sale securities.

**Table 7.7 — Maturities of Available-For-Sale Securities[(1)]**

| September 30, 2011 | Amortized Cost | Fair Value |
|---|---|---|
| | (in millions) | |
| Available-for-sale securities: | | |
| Due within 1 year or less | $ 39 | $ 39 |
| Due after 1 through 5 years | 1,243 | 1,298 |
| Due after 5 through 10 years | 5,755 | 6,048 |
| Due after 10 years | 220,185 | 209,199 |
| Total available-for-sale securities | $227,222 | $216,584 |

(1) Maturity information provided is based on contractual maturities, which may not represent expected life as obligations underlying these securities may be prepaid at any time without penalty.

**AOCI Related to Available-For-Sale Securities**

Table 7.8 presents the changes in AOCI related to available-for-sale securities. The net unrealized holding gains represent the net fair value adjustments recorded on available-for-sale securities throughout the periods presented, after the effects of our federal statutory tax rate of 35%. The net reclassification adjustment for net realized losses represents the amount of those fair value adjustments, after the effects of our federal statutory tax rate of 35%, that have been recognized in earnings due to a sale of an available-for-sale security or the recognition of an impairment loss.

**Table 7.8 — AOCI Related to Available-For-Sale Securities**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2011 | 2010 |
| | (in millions) | |
| Beginning balance | $(9,678) | $(20,616) |
| Adjustment to initially apply the adoption of amendments to accounting guidance for transfers of financial assets and the consolidation of VIEs[(1)] | — | (2,683) |
| Net unrealized holding gains[(2)] | 1,669 | 11,249 |
| Net reclassification adjustment for net realized losses[(3)(4)] | 1,095 | 1,275 |
| Ending balance | $(6,914) | $(10,775) |

(1) Net of tax benefit of $1.4 billion for the nine months ended September 30, 2010.
(2) Net of tax expense of $899 million and $6.1 billion for the nine months ended September 30, 2011 and 2010, respectively.
(3) Net of tax benefit of $589 million and $686 million for the nine months ended September 30, 2011 and 2010, respectively.
(4) Includes the reversal of previously recorded unrealized losses that have been recognized on our consolidated statements of income and comprehensive income as impairment losses on available-for-sale securities of $1.1 billion and $1.3 billion, net of taxes, for the nine months ended September 30, 2011 and 2010, respectively.

**Trading Securities**

Table 7.9 summarizes the estimated fair values by major security type for trading securities.

**Table 7.9 — Trading Securities**

| | September 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| Mortgage-related securities: | | |
| Freddie Mac | $16,588 | $13,437 |
| Fannie Mae | 17,603 | 18,726 |
| Ginnie Mae | 161 | 172 |
| Other | 78 | 31 |
| Total mortgage-related securities | 34,430 | 32,366 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 276 | 44 |
| Treasury bills | 1,000 | 17,289 |
| Treasury notes | 17,159 | 10,122 |
| FDIC-guaranteed corporate medium-term notes | 2,433 | 441 |
| Total non-mortgage-related securities | 20,868 | 27,896 |
| Total fair value of trading securities | $55,298 | $60,262 |

For the three months ended September 30, 2011 and 2010, we recorded net unrealized losses on trading securities held at September 30, 2011 and 2010 of $583 million and $544 million, respectively. For the nine months ended

September 30, 2011 and 2010, we recorded net unrealized losses on trading securities held at September 30, 2011 and 2010 of $547 million and $1.3 billion, respectively.

Total trading securities include $2.1 billion and $2.5 billion, respectively, of hybrid financial assets as defined by the derivative and hedging accounting guidance regarding certain hybrid financial instruments as of September 30, 2011 and December 31, 2010. Gains (losses) on trading securities on our consolidated statements of income and comprehensive income include $(13) million and $(42) million, respectively, related to these hybrid financial securities for the three and nine months ended September 30, 2011. Gains (losses) on trading securities include gains of $33 million and $34 million related to these trading securities for the three and nine months ended September 30, 2010, respectively.

## Collateral Pledged

### Collateral Pledged to Freddie Mac

Our counterparties are required to pledge collateral for securities purchased under agreements to resell transactions, and most derivative instruments are subject to collateral posting thresholds generally related to a counterparty's credit rating. We consider the types of securities being pledged to us as collateral when determining how much we lend related to securities purchased under agreements to resell transactions. Additionally, we subsequently and regularly review the market values of these securities compared to amounts loaned in an effort to ensure our exposure to losses is minimized. We had cash and cash equivalents pledged to us related to derivative instruments of $2.3 billion and $2.2 billion at September 30, 2011 and December 31, 2010, respectively. Although it is our practice not to repledge assets held as collateral, a portion of the collateral may be repledged based on master agreements related to our derivative instruments. At September 30, 2011 and December 31, 2010, we did not have collateral in the form of securities pledged to and held by us under these master agreements. Also at September 30, 2011 and December 31, 2010, we did not have securities pledged to us for securities purchased under agreements to resell transactions that we had the right to repledge. From time to time we may obtain pledges of collateral from certain seller/servicers as additional security for their obligations to us, including their obligations to repurchase mortgages sold to us in breach of representations and warranties. These pledges may take the form of cash, cash equivalents, or agency securities.

In addition, we hold cash and cash equivalents as collateral in connection with certain of our multifamily guarantees as credit enhancements. The cash and cash equivalents held as collateral related to these transactions at September 30, 2011 and December 31, 2010 was $232 million and $550 million, respectively.

### Collateral Pledged by Freddie Mac

We are required to pledge collateral for margin requirements with third-party custodians in connection with secured financings and derivative transactions with some counterparties. The level of collateral pledged related to our derivative instruments is determined after giving consideration to our credit rating. As a result of S&P's downgrade of our senior long-term debt credit rating from AAA to AA+ on August 8, 2011, we posted additional collateral to certain derivative counterparties in accordance with the terms of the derivative agreements. As of September 30, 2011, we had one secured, uncommitted intraday line of credit with a third party in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs, in connection with our use of the Fedwire system. In certain circumstances, the line of credit agreement gives the secured party the right to repledge the securities underlying our financing to other third parties, including the Federal Reserve Bank. We pledge collateral to meet our collateral requirements under the line of credit agreement upon demand by the counterparty.

Table 7.10 summarizes all securities pledged as collateral by us, including assets that the secured party may repledge and those that may not be repledged.

### Table 7.10 — Collateral in the Form of Securities Pledged

| | September 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| Securities pledged with the ability for the secured party to repledge: | | |
| Debt securities of consolidated trusts held by third parties[1] | $10,348 | $ 9,915 |
| Available-for-sale securities | 224 | 817 |
| Securities pledged without the ability for the secured party to repledge: | | |
| Debt securities of consolidated trusts held by third parties[1] | 354 | 5 |
| Total securities pledged | $10,926 | $10,737 |

(1) Represents PCs held by us in our Investments segment mortgage investments portfolio and pledged as collateral which are recorded as a reduction to debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

*Securities Pledged with the Ability of the Secured Party to Repledge*

At September 30, 2011, we pledged securities with the ability of the secured party to repledge of $10.6 billion, of which $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

At December 31, 2010, we pledged securities with the ability of the secured party to repledge of $10.7 billion, of which $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

There were no borrowings against the line of credit at September 30, 2011 or December 31, 2010. The remaining $0.1 billion and $0.2 billion of collateral posted with the ability of the secured party to repledge at September 30, 2011 and December 31, 2010, respectively, was posted in connection with our margin account related to futures transactions.

*Securities Pledged without the Ability of the Secured Party to Repledge*

At September 30, 2011 and December 31, 2010, we pledged securities without the ability of the secured party to repledge of $354 million and $5 million, respectively, at a clearinghouse in connection with the trading and settlement of securities.

*Collateral in the Form of Cash Pledged*

At September 30, 2011, we pledged $13.3 billion of collateral in the form of cash and cash equivalents, all but $277 million of which related to our derivative agreements as we had $13.0 billion of such derivatives in a net loss position. At December 31, 2010, we pledged $8.5 billion of collateral in the form of cash and cash equivalents, all but $40 million of which related to our derivative agreements as we had $9.3 billion of such derivatives in a net loss position. The remaining $277 million and $40 million was posted at clearinghouses in connection with our securities and other derivative transactions at September 30, 2011 and December 31, 2010, respectively.

## NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS

Debt securities that we issue are classified on our consolidated balance sheets as either debt securities of consolidated trusts held by third parties or other debt. We issue other debt to fund our operations.

Under the Purchase Agreement, without the prior written consent of Treasury, we may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. Because of this debt limit, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Under the Purchase Agreement, the amount of our "indebtedness" is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs. Therefore, "indebtedness" does not include debt securities of consolidated trusts held by third parties. We also cannot become liable for any subordinated indebtedness, without the prior consent of Treasury.

Our debt cap under the Purchase Agreement is $972 billion in 2011 and will decline to $874.8 billion in 2012. As of September 30, 2011, we estimate that the par value of our aggregate indebtedness totaled $689.9 billion, which was approximately $282.1 billion below the applicable debt cap. Our aggregate indebtedness is calculated as the par value of other debt.

In Tables 8.1 and 8.2, the categories of short-term debt (due within one year) and long-term debt (due after one year) are based on the original contractual maturity of the debt instruments classified as other debt.

Table 8.1 summarizes the interest expense and the balances of total debt, net per our consolidated balance sheets.

**Table 8.1 — Total Debt, Net**

| | Interest Expense for the | | | | Balance, Net[1] | |
|---|---|---|---|---|---|---|
| | Three Months Ended September 30, | | Nine Months Ended September 30, | | | |
| | 2011 | 2010 | 2011 | 2010 | September 30, 2011 | December 31, 2010 |
| | (in millions) | | | | (in millions) | |
| Other debt: | | | | | | |
| Short-term debt | $ 70 | $ 143 | $ 280 | $ 421 | $ 180,752 | $ 197,106 |
| Long-term debt: | | | | | | |
| Senior debt | 2,995 | 3,990 | 9,665 | 12,756 | 493,305 | 516,123 |
| Subordinated debt | 7 | 12 | 25 | 35 | 364 | 711 |
| Total long-term debt | 3,002 | 4,002 | 9,690 | 12,791 | 493,669 | 516,834 |
| Total other debt | 3,072 | 4,145 | 9,970 | 13,212 | 674,421 | 713,940 |
| Debt securities of consolidated trusts held by third parties | 16,715 | 18,721 | 51,379 | 57,412 | 1,488,036 | 1,528,648 |
| Total debt, net | $19,787 | $22,866 | $61,349 | $70,624 | $2,162,457 | $2,242,588 |

(1) Represents par value, net of associated discounts, premiums and hedge-related basis adjustments, with $0.4 billion and $0.9 billion, respectively, of other short-term debt, and $2.8 billion and $3.6 billion, respectively, of other long-term debt that represents the fair value of debt securities with the fair value option elected at September 30, 2011 and December 31, 2010.

For the three and nine months ended September 30, 2011, we recognized fair value gains (losses) of $134 million and $16 million, respectively, on our foreign-currency denominated debt, of which $146 million and $(17) million, respectively, are gains (losses) related to our net foreign-currency translation.

**Other Debt**

Table 8.2 summarizes the balances and effective interest rates for other debt. We had no balances in federal funds purchased and securities sold under agreements to repurchase at either September 30, 2011 or December 31, 2010.

**Table 8.2 — Other Debt**

| | September 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] |
| | (dollars in millions) | | | (dollars in millions) | | |
| Other short-term debt: | | | | | | |
| Reference Bills® securities and discount notes | $180,360 | $180,302 | 0.13% | $194,875 | $194,742 | 0.24% |
| Medium-term notes | 450 | 450 | 0.12 | 2,364 | 2,364 | 0.31 |
| Total other short-term debt | 180,810 | 180,752 | 0.13 | 197,239 | 197,106 | 0.25 |
| Other long-term debt: | | | | | | |
| Original maturities on or before December 31, | | | | | | |
| 2011 | 25,607 | 25,606 | 0.60% | 120,951 | 120,959 | 2.13% |
| 2012 | 127,417 | 127,386 | 1.80 | 138,474 | 138,418 | 1.79 |
| 2013 | 126,657 | 126,446 | 1.60 | 79,177 | 78,886 | 2.64 |
| 2014 | 75,261 | 75,090 | 2.18 | 36,328 | 36,142 | 3.46 |
| 2015 | 33,483 | 33,455 | 3.00 | 45,779 | 45,752 | 2.99 |
| Thereafter | 120,683 | 105,686 | 4.21 | 110,269 | 96,677 | 4.77 |
| Total other long-term debt[3] | 509,108 | 493,669 | 2.34 | 530,978 | 516,834 | 2.78 |
| Total other debt | $689,918 | $674,421 | | $728,217 | $713,940 | |

(1) Represents par value, net of associated discounts, premiums, and hedging-related adjustments.
(2) Represents the weighted average effective rate that remains constant over the life of the instrument, which includes the amortization of discounts or premiums, issuance costs, and hedging-related basis adjustments.
(3) Balance, net for other long-term debt includes callable debt of $116.8 billion and $142.6 billion at September 30, 2011 and December 31, 2010, respectively.

**Debt Securities of Consolidated Trusts Held by Third Parties**

Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated securitization trusts (i.e., single-family PC trusts and certain Other Guarantee Transactions).

Table 8.3 summarizes the debt securities of consolidated trusts held by third parties based on underlying mortgage product type.

**Table 8.3 — Debt Securities of Consolidated Trusts Held by Third Parties[1]**

| | September 30, 2011 | | | | December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Contractual Maturity[2] | UPB | Balance, Net | Weighted Average Coupon[2] | Contractual Maturity[2] | UPB | Balance, Net | Weighted Average Coupon[2] |
| | | (dollars in millions) | | | | (dollars in millions) | | |
| Single-family: | | | | | | | | |
| 30-year or more, fixed-rate | 2011 - 2048 | $1,056,643 | $1,068,244 | 4.97% | 2011 - 2048 | $1,110,943 | $1,118,994 | 5.03% |
| 20-year fixed-rate | 2012 - 2031 | 66,352 | 67,394 | 4.63 | 2012 - 2031 | 63,941 | 64,752 | 4.78 |
| 15-year fixed-rate | 2011 - 2026 | 237,725 | 241,247 | 4.21 | 2011 - 2026 | 227,269 | 229,510 | 4.41 |
| Adjustable-rate | 2011 - 2047 | 58,983 | 59,763 | 3.29 | 2011 - 2047 | 50,904 | 51,351 | 3.69 |
| Interest-only[3] | 2026 - 2041 | 49,140 | 49,222 | 5.03 | 2026 - 2040 | 61,773 | 61,830 | 5.30 |
| FHA/VA | 2012 - 2041 | 2,132 | 2,166 | 5.69 | 2011 - 2040 | 2,171 | 2,211 | 5.88 |
| Total debt securities of consolidated trusts held by third parties[4] | | $1,470,975 | $1,488,036 | | | $1,517,001 | $1,528,648 | |

(1) Debt securities of consolidated trusts held by third parties are prepayable without penalty.
(2) Based on the contractual maturity and interest rate of debt securities of our consolidated trusts held by third parties.
(3) Includes interest-only securities and interest-only mortgage loans that allow the borrowers to pay only interest for a fixed period of time before the loans begin to amortize.
(4) The effective rate for debt securities of consolidated trusts held by third parties was 4.44% and 4.57% as of September 30, 2011 and December 31, 2010, respectively.

### Lines of Credit

At both September 30, 2011 and December 31, 2010, we had one secured, uncommitted intraday line of credit with a third party totaling $10 billion. We use this line of credit regularly to provide us with additional liquidity to fund our intraday activities through the Fedwire system in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs. No amounts were drawn on this line of credit at September 30, 2011 or December 31, 2010. We expect to continue to use the current facility to satisfy our intraday financing needs; however, as the line is uncommitted, we may not be able to draw on it if and when needed.

### Subordinated Debt Interest and Principal Payments

In a September 23, 2008 statement concerning the conservatorship, the Director of FHFA stated that we would continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels. As a result, the terms of any of our subordinated debt that provide for us to defer payments of interest under certain circumstances, including our failure to maintain specified capital levels, are no longer applicable.

### NOTE 9: FINANCIAL GUARANTEES

We securitize substantially all of the single-family mortgage loans we purchase and issue securities backed by such mortgage loans, which we guarantee. During the nine months ended September 30, 2011 and 2010, we issued and guaranteed $222.3 billion and $255.1 billion, respectively, in UPB of Freddie Mac mortgage-related securities backed by single-family mortgage loans (excluding those backed by HFA bonds).

Beginning January 1, 2010, we no longer recognize a financial guarantee for such arrangements as we instead recognize both the mortgage loans and the debt securities of these securitization trusts on our consolidated balance sheets. Table 9.1 presents our maximum potential exposure, our recognized liability, and the maximum remaining term of our financial guarantees that are not consolidated on our balance sheets.

**Table 9.1 — Financial Guarantees**

| | September 30, 2011 | | | December 31, 2010 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Maximum Exposure[1] | Recognized Liability | Maximum Remaining Term | Maximum Exposure[1] | Recognized Liability | Maximum Remaining Term |
| | (dollars in millions, terms in years) | | | | | |
| Non-consolidated Freddie Mac securities[2] .............. | $33,284 | $ 276 | 42 | $25,279 | $202 | 41 |
| Other guarantee commitments[3] ...................... | 21,249 | 464 | 38 | 18,670 | 427 | 38 |
| Derivative instruments ............................ | 42,816 | 2,816 | 34 | 37,578 | 301 | 35 |
| Servicing-related premium guarantees ................. | 141 | — | 5 | 172 | — | 5 |

(1) Maximum exposure represents the contractual amounts that could be lost under the non-consolidated guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements, such as recourse provisions, third-party insurance contracts, or from collateral held or pledged. The maximum exposure disclosed above is not representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation. The maximum exposure for our liquidity guarantees is not mutually exclusive of our default guarantees; therefore, these amounts are included within the maximum exposure of non-consolidated Freddie Mac securities and other guarantee commitments.
(2) As of September 30, 2011 and December 31, 2010, the UPB of non-consolidated Freddie Mac securities associated with single-family mortgage loans was $10.9 billion and $11.3 billion, respectively. The remaining balances relate to multifamily mortgage loans.
(3) As of September 30, 2011 and December 31, 2010, the UPB of other guarantee commitments associated with single-family mortgage loans was $11.4 billion and $8.6 billion, respectively. The remaining balances relate to multifamily mortgage loans.

## Non-consolidated Freddie Mac Securities

We issue three types of mortgage-related securities: (a) PCs; (b) REMICs and Other Structured Securities; and (c) Other Guarantee Transactions. We guarantee the payment of principal and interest on these securities, which are backed by pools of mortgage loans, irrespective of the cash flows received from the borrowers. Commencing January 1, 2010, only our guarantees issued to non-consolidated securitization trusts are accounted for in accordance with the accounting guidance for guarantees (*i.e.*, a guarantee asset and guarantee obligation are recognized).

Our securities issued in resecuritizations of our PCs and other previously issued REMICs and Other Structured Securities are not consolidated as they do not give rise to any additional exposure to loss as we already consolidate the underlying collateral. The securities issued in these resecuritizations consist of single-class and multiclass securities backed by PCs, REMICs, interest-only strips, and principal-only strips. Since these resecuritizations do not increase our credit-related exposure, no guarantee asset or guarantee obligation is recognized for these transactions and they are excluded from the table above.

We recognize a guarantee asset, guarantee obligation and a reserve for guarantee losses, as necessary, for securities issued by non-consolidated securitization trusts and other guarantee commitments for which we are exposed to incremental credit risk. Our guarantee obligation represents the recognized liability, net of cumulative amortization, associated with our guarantee of PCs and certain Other Guarantee Transactions issued to non-consolidated securitization trusts. In addition to our guarantee obligation, we recognize a reserve for guarantee losses, which is included within other liabilities on our consolidated balance sheets, which totaled $0.2 billion at both September 30, 2011 and December 31, 2010, respectively. For many of the loans underlying our non-consolidated guarantees, there are credit protections from third parties, including subordination, covering a portion of our exposure. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections on loans we guarantee. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information about our accounting for financial guarantees.

During the three and nine months ended September 30, 2011 we issued approximately $2.1 billion and $8.8 billion, respectively, compared to $1.1 billion and $4.8 billion for the three and nine months ended September 30, 2010, respectively, in UPB of non-consolidated Freddie Mac securities primarily backed by multifamily mortgage loans, for which a guarantee asset and guarantee obligation were recognized. During the nine months ended September 30, 2010, we also issued $4.0 billion in UPB of non-consolidated Other Guarantee Transactions backed by HFA bonds as part of the NIBP, for which a guarantee asset and guarantee obligation were recognized.

In connection with transfers of financial assets to non-consolidated securitization trusts that are accounted for as sales and for which we have incremental credit risk, we recognize our guarantee obligation in accordance with the accounting guidance for guarantees. Additionally, we may retain an interest in the transferred financial assets (*e.g.*, a beneficial interest issued by the securitization trust). See "NOTE 10: RETAINED INTERESTS IN MORTGAGE-RELATED SECURITIZATIONS" for further information on these retained interests.

## Other Guarantee Commitments

We provide long-term standby commitments to certain of our customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements. During the three and nine months ended September 30, 2011, we

issued and guaranteed $1.4 billion and $3.9 billion, respectively, in UPB of long-term standby commitments. These other guarantee commitments totaled $8.7 billion and $5.5 billion of UPB at September 30, 2011 and December 31, 2010, respectively. We also had other guarantee commitments on multifamily housing revenue bonds that were issued by HFAs of $9.4 billion and $9.7 billion in UPB at September 30, 2011 and December 31, 2010, respectively. In addition, as of September 30, 2011 and December 31, 2010, respectively, we had issued guarantees under the TCLFP on securities backed by HFA bonds with UPB of $3.1 billion and $3.5 billion, respectively. In September 2011, Treasury announced that it intended to consent to a three year extension of the expiration date of the TCLFP.

### Derivative Instruments

Derivative instruments include written options, written swaptions, interest-rate swap guarantees, and short-term default guarantee commitments accounted for as credit derivatives. See "NOTE 11: DERIVATIVES" for further discussion of these derivative guarantees.

We guarantee the performance of interest-rate swap contracts in two circumstances. First, we guarantee that a borrower will perform under an interest-rate swap contract linked to a borrower's adjustable-rate mortgage. And second, in connection with our issuance of certain REMICs and Other Structured Securities, which are backed by tax-exempt bonds, we guarantee that the sponsor of the transaction will perform under the interest-rate swap contract linked to the senior variable-rate certificates that we issued.

We also have issued REMICs and Other Structured Securities with stated final maturities that are shorter than the stated maturity of the underlying mortgage loans. If the underlying mortgage loans to these securities have not been purchased by a third party or fully matured as of the stated final maturity date of such securities, we will sponsor an auction of the underlying assets. To the extent that purchase or auction proceeds are insufficient to cover unpaid principal amounts due to investors in such REMICs and Other Structured Securities, we are obligated to fund such principal. Our maximum exposure on these guarantees represents the outstanding UPB of the REMICs and Other Structured Securities subject to stated final maturities.

### Servicing-Related Premium Guarantees

We provide guarantees to reimburse servicers for premiums paid to acquire servicing in situations where the original seller is unable to perform under its separate servicing agreement. The liability associated with these agreements was not material at September 30, 2011 and December 31, 2010.

### Other Indemnifications

In connection with certain business transactions, we may provide indemnification to counterparties for claims arising out of breaches of certain obligations (*e.g.*, those arising from representations and warranties) in contracts entered into in the normal course of business. Our assessment is that the risk of any material loss from such a claim for indemnification is remote and there are no significant probable and estimable losses associated with these contracts. Therefore, we have not recorded any liabilities related to these indemnifications on our consolidated balance sheets at September 30, 2011 and December 31, 2010.

As part of the guarantee arrangements pertaining to multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees." These guarantees require us to advance funds to enable others to repurchase any tendered tax-exempt and related taxable bonds that are unable to be remarketed. Any such advances are treated as loans and are secured by a pledge to us of the repurchased securities until the securities are remarketed. We hold cash and cash equivalents on our consolidated balance sheets for the amount of these commitments. No advances under these liquidity guarantees were outstanding at September 30, 2011 and December 31, 2010.

### NOTE 10: RETAINED INTERESTS IN MORTGAGE-RELATED SECURITIZATIONS

Beginning January 1, 2010, in accordance with the amendment to the accounting guidance for consolidation of VIEs, we consolidated our single-family PC trusts and certain Other Guarantee Transactions. As a result, a large majority of our transfers of financial assets that historically qualified as sales (*e.g.*, the transfer of mortgage loans to our single-family PC trusts) are no longer treated as such because the financial assets are transferred to a consolidated entity. In addition, to the extent that we receive newly-issued PCs or Other Guarantee Transactions in connection with such a transfer, we extinguish a proportional amount of the debt securities of the consolidated trust. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information regarding the impacts of consolidation of our single-family PC trusts and certain Other Guarantee Transactions.

Certain of our transfers of financial assets to non-consolidated trusts and third parties may continue to qualify as sales. In connection with our transfers of financial assets that qualify as sales, we may retain certain interests in the transferred assets. Our retained interests are primarily beneficial interests issued by non-consolidated securitization trusts (*e.g.*, multifamily PCs and multiclass resecuritization securities). These interests are included in investments in securities on our consolidated balance sheets. In addition, our guarantee asset recognized in connection with non-consolidated securitization transactions also represents a retained interest. For more information about our retained interests in mortgage-related securitizations, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report. These transfers and our resulting retained interests are not significant to our consolidated financial statements in the nine months ended September 30, 2011 and 2010.

## NOTE 11: DERIVATIVES

### Use of Derivatives

We use derivatives primarily to:

- hedge forecasted issuances of debt;

- synthetically create callable and non-callable funding;

- regularly adjust or rebalance our funding mix in order to more closely match changes in the interest-rate characteristics of our mortgage assets; and

- hedge foreign-currency exposure.

### *Hedge Forecasted Debt Issuances*

When we commit to purchase mortgage investments, such commitments are typically for a future settlement ranging from two weeks to three months after the date of the commitment. To facilitate larger and more predictable debt issuances that contribute to lower funding costs, we use interest-rate derivatives to economically hedge the interest-rate risk exposure from the time we commit to purchase a mortgage to the time the related debt is issued.

### *Create Synthetic Funding*

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. For example, the combination of a series of short-term debt issuances over a defined period and a pay-fixed interest rate swap with the same maturity as the last debt issuance is the substantive economic equivalent of a long-term fixed-rate debt instrument of comparable maturity. Similarly, the combination of non-callable debt and a call swaption, or option to enter into a receive-fixed interest rate swap, with the same maturity as the non-callable debt, is the substantive economic equivalent of callable debt. These derivatives strategies increase our funding flexibility and allow us to better match asset and liability cash flows, often reducing overall funding costs.

### *Adjust Funding Mix*

We generally use interest-rate swaps to mitigate contractual funding mismatches between our assets and liabilities. We also use swaptions and other option-based derivatives to adjust the contractual terms of our debt funding in response to changes in the expected lives of our investments in mortgage-related assets. As market conditions dictate, we take rebalancing actions to keep our interest-rate risk exposure within management-set limits. In a declining interest-rate environment, we typically enter into receive-fixed interest rate swaps or purchase Treasury-based derivatives to shorten the duration of our funding to offset the declining duration of our mortgage assets. In a rising interest-rate environment, we typically enter into pay-fixed interest rate swaps or sell Treasury-based derivatives in order to lengthen the duration of our funding to offset the increasing duration of our mortgage assets.

### *Foreign-Currency Exposure*

We use foreign-currency swaps to eliminate virtually all of our exposure to fluctuations in exchange rates related to our foreign-currency denominated debt by entering into swap transactions that effectively convert foreign-currency denominated obligations into U.S. dollar-denominated obligations.

### Types of Derivatives

We principally use the following types of derivatives:

- LIBOR- and Euribor-based interest-rate swaps;

*Freddie Mac*

- LIBOR- and Treasury-based options (including swaptions);

- LIBOR- and Treasury-based exchange-traded futures; and

- Foreign-currency swaps.

In addition to swaps, futures and purchased options, our derivative positions include the following:

### Written Options and Swaptions

Written call and put swaptions are sold to counterparties allowing them the option to enter into receive- and pay-fixed interest rate swaps, respectively. Written call and put options on mortgage-related securities give the counterparty the right to execute a contract under specified terms, which generally occurs when we are in a liability position. We use these written options and swaptions to manage convexity risk over a wide range of interest rates. Written options lower our overall hedging costs, allow us to hedge the same economic risk we assume when selling guaranteed final maturity REMICs with a more liquid instrument, and allow us to rebalance the options in our callable debt and REMICs portfolios. We may, from time to time, write other derivative contracts such as caps, floors, interest-rate futures and options on buy-up and buy-down commitments.

### Commitments

We routinely enter into commitments that include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts. Most of these commitments are considered derivatives and therefore are subject to the accounting guidance for derivatives and hedging.

### Swap Guarantee Derivatives

In connection with some of the guarantee arrangements pertaining to multifamily housing revenue bonds and multifamily pass-through certificates, we may also guarantee the sponsor's or the borrower's obligations as a counterparty on any related interest-rate swaps used to mitigate interest-rate risk, which are accounted for as swap guarantee derivatives.

### Credit Derivatives

We entered into credit-risk sharing agreements for certain credit enhanced multifamily housing revenue bonds held by third parties in exchange for a monthly fee. In addition, we have purchased mortgage loans containing debt cancellation contracts, which provide for mortgage debt or payment cancellation for borrowers who experience unanticipated losses of income dependent on a covered event. The rights and obligations under these agreements have been assigned to the servicers. However, in the event the servicer does not perform as required by contract, under our guarantee, we would be obligated to make the required contractual payments.

For a discussion of our significant accounting policies related to derivatives, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Derivatives" in our 2010 Annual Report.

### Derivative Assets and Liabilities at Fair Value

Table 11.1 presents the location and fair value of derivatives reported in our consolidated balance sheets.

### Table 11.1 — Derivative Assets and Liabilities at Fair Value

| | At September 30, 2011 | | | At December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Notional or Contractual Amount | Derivatives at Fair Value | | Notional or Contractual Amount | Derivatives at Fair Value | |
| | | Assets[1] | Liabilities[1] | | Assets[1] | Liabilities[1] |
| | | | (in millions) | | | |
| **Total derivative portfolio** | | | | | | |
| *Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging*[2] | | | | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed | $220,668 | $ 13,099 | $ (74) | $ 324,590 | $ 6,952 | $ (3,267) |
| Pay-fixed | 293,683 | 27 | (36,947) | 394,294 | 3,012 | (24,210) |
| Basis (floating to floating) | 2,725 | 2 | (5) | 2,375 | 6 | (2) |
| Total interest-rate swaps | 517,076 | 13,128 | (37,026) | 721,259 | 9,970 | (27,479) |
| Option-based: | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 89,875 | 14,387 | — | 114,110 | 8,391 | — |
| Written | 26,525 | — | (2,763) | 11,775 | — | (244) |
| Put Swaptions | | | | | | |
| Purchased | 68,175 | 725 | — | 59,975 | 1,404 | — |
| Written | — | — | — | 6,000 | — | (8) |
| Other option-based derivatives[3] | 50,958 | 2,128 | (12) | 47,234 | 1,460 | (10) |
| Total option-based | 235,533 | 17,240 | (2,775) | 239,094 | 11,255 | (262) |
| Futures | 72,262 | 6 | (6) | 212,383 | 3 | (170) |
| Foreign-currency swaps | 1,779 | 154 | — | 2,021 | 172 | — |
| Commitments[4] | 39,429 | 65 | (172) | 14,292 | 103 | (123) |
| Credit derivatives | 10,988 | 1 | (6) | 12,833 | 12 | (5) |
| Swap guarantee derivatives | 3,722 | — | (36) | 3,614 | — | (36) |
| Total Derivatives not designated as hedging instruments | 880,789 | 30,594 | (40,021) | 1,205,496 | 21,515 | (28,075) |
| Netting adjustments[5] | | (30,299) | 39,692 | | (21,372) | 26,866 |
| Total derivative portfolio, net | $880,789 | $ 295 | $ (329) | $1,205,496 | $ 143 | $ (1,209) |

(1) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net.
(2) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.
(3) Primarily includes purchased interest-rate caps and floors.
(4) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.
(5) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $10.7 billion and $6 million, respectively, at September 30, 2011. The net cash collateral posted and net trade/settle receivable were $6.3 billion and $1 million, respectively, at December 31, 2010. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.3) billion and $(0.8) billion at September 30, 2011 and December 31, 2010, respectively, which was mainly related to interest-rate swaps that we have entered into.

The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable and net trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net asset position are reported as derivative assets, net. Similarly, derivatives in a net liability position are reported as derivative liabilities, net. Cash collateral we obtained from counterparties to derivative contracts that has been offset against derivative assets at September 30, 2011 and December 31, 2010 was $2.3 billion and $2.2 billion, respectively. Cash collateral we posted to counterparties to derivative contracts that has been offset against derivative liabilities at September 30, 2011 and December 31, 2010 was $13.0 billion and $8.5 billion, respectively. We are subject to collateral posting thresholds based on the credit rating of our long-term senior unsecured debt securities from S&P or Moody's. The lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative transactions. As a result of S&P's downgrade of Freddie Mac's credit rating of our long-term senior unsecured debt from AAA to AA+ on August 8, 2011, we posted additional collateral to certain derivative counterparties in accordance with the terms of the derivative agreements.

The aggregate fair value of all derivative instruments with credit-risk-related contingent features that were in a liability position on September 30, 2011, was $13.0 billion for which we posted collateral of $13.0 billion in the normal course of business. Since we were fully collateralized as of September 30, 2011, we would not have had to post additional collateral on that day if the credit-risk-related contingent features underlying these agreements were triggered.

At September 30, 2011 and December 31, 2010, there were no amounts of cash collateral that were not offset against derivative assets, net or derivative liabilities, net, as applicable. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information related to our derivative counterparties.

FHFA 2574

## Gains and Losses on Derivatives

Table 11.2 presents the gains and losses on derivatives reported in our consolidated statements of income and comprehensive income.

### Table 11.2 — Gains and Losses on Derivatives

| Derivatives in Cash Flow Hedging Relationships[1] | Amount of Gain or (Loss) Recognized in AOCI on Derivatives (Effective Portion) | | Amount of Gain or (Loss) Reclassified from AOCI into Earnings (Effective Portion) | | Amount of Gain or (Loss) Recognized in Other Income (Ineffective Portion and Amount Excluded from Effectiveness Testing) | |
|---|---|---|---|---|---|---|
| **Three Months Ended September 30,** | 2011 | 2010 | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | | | |
| Closed cash flow hedges[2] ............... | $— | $— | $ (185) | $ (245) | $— | $— |

| Derivatives in Cash Flow Hedging Relationships[1] | Amount of Gain or (Loss) Recognized in AOCI on Derivatives (Effective Portion) | | Amount of Gain or (Losses) Reclassified from AOCI into Earnings (Effective Portion) | | Amount of Gain or (Loss) Recognized in Other Income (Ineffective Portion and Amount Excluded from Effectiveness Testing) | |
|---|---|---|---|---|---|---|
| **Nine Months Ended September 30,** | 2011 | 2010 | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | | | |
| Closed cash flow hedges[2] ............... | $— | $— | $ (583) | $ (781) | $— | $— |

| Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging[4] | Derivative Gains (Losses)[3] | | | |
|---|---|---|---|---|
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Interest-rate swaps: | | | | |
| Receive-fixed | | | | |
| Foreign-currency denominated ......... | $ 3 | $ (31) | $ (37) | $ (96) |
| U.S. dollar denominated ............. | 10,811 | 7,571 | 12,168 | 20,670 |
| Total receive-fixed swaps ........... | 10,814 | 7,540 | 12,131 | 20,574 |
| Pay-fixed ........................ | (19,086) | (11,503) | (22,430) | (34,883) |
| Basis (floating to floating) ............. | (6) | — | (5) | 74 |
| Total interest-rate swaps............ | (8,278) | (3,963) | (10,304) | (14,235) |
| Option based: | | | | |
| Call swaptions | | | | |
| Purchased ...................... | 8,210 | 4,055 | 9,552 | 11,086 |
| Written ....................... | (1,959) | (525) | (2,117) | (802) |
| Put swaptions | | | | |
| Purchased ...................... | (1,025) | (243) | (1,502) | (2,030) |
| Written ....................... | 1 | 9 | 8 | 88 |
| Other option-based derivatives[5] ......... | 660 | 7 | 741 | 243 |
| Total option-based ............... | 5,887 | 3,303 | 6,682 | 8,585 |
| Futures ........................... | (33) | (128) | (173) | (140) |
| Foreign-currency swaps[6] ............... | (141) | 382 | 15 | (433) |
| Commitments[7] ..................... | (917) | 219 | (1,338) | 70 |
| Credit derivatives ..................... | (2) | 3 | (1) | 5 |
| Swap guarantee derivatives................ | 1 | (1) | 3 | — |
| Subtotal ...................... | (3,483) | (185) | (5,116) | (6,148) |
| Accrual of periodic settlements:[8] | | | | |
| Receive-fixed interest-rate swaps[9] ........ | 997 | 1,650 | 3,309 | 4,870 |
| Pay-fixed interest-rate swaps ........ | (2,276) | (2,610) | (7,208) | (8,400) |
| Foreign-currency swaps ............... | 7 | 3 | 17 | 15 |
| Other .......................... | 3 | 12 | 12 | 10 |
| Total accrual of periodic settlements ..... | (1,269) | (945) | (3,870) | (3,505) |
| Total........................ | $ (4,752) | $ (1,130) | $ (8,986) | $ (9,653) |

(1) Derivatives that meet specific criteria may be accounted for as cash flow hedges. Net deferred gains and losses on closed cash flow hedges (*i.e.*, where the derivative is either terminated or redesignated) are also included in AOCI until the related forecasted transaction affects earnings or is determined to be probable of not occurring.

(2) Amounts reported in AOCI related to changes in the fair value of commitments to purchase securities that were designated as cash flow hedges are recognized as basis adjustments to the related assets, which are amortized in earnings as interest income. Amounts linked to interest payments on long-term debt are recorded in other debt interest expense and amounts not linked to interest payments on long-term debt are recorded in expense related to derivatives.

(3) Gains (losses) are reported as derivative gains (losses) on our consolidated statements of income and comprehensive income.

(4) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.

(5) Primarily includes purchased interest-rate caps and floors.

(6) Foreign-currency swaps are defined as swaps in which the net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars.

(7) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(8) For derivatives not in qualifying hedge accounting relationships, the accrual of periodic cash settlements is recorded in derivative gains (losses) on our consolidated statements of income and comprehensive income.

(9) Includes imputed interest on zero-coupon swaps.

*Freddie Mac*

**Hedge Designation of Derivatives**

At September 30, 2011 and December 31, 2010, we did not have any derivatives in hedge accounting relationships; however, there are deferred net losses recorded in AOCI related to closed cash flow hedges. As shown in Table 11.3, the total AOCI related to derivatives designated as cash flow hedges was a loss of $1.8 billion and $2.4 billion at September 30, 2011 and 2010, respectively, composed of deferred net losses on closed cash flow hedges. Closed cash flow hedges involve derivatives that have been terminated or are no longer designated as cash flow hedges. Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI relating to losses on closed cash flow hedges.

The previous deferred amount related to closed cash flow hedges remains in our AOCI balance and will be recognized into earnings over the expected time period for which the forecasted transactions impact earnings. Over the next 12 months, we estimate that approximately $438 million, net of taxes, of the $1.8 billion of cash flow hedge losses in AOCI at September 30, 2011 will be reclassified into earnings. The maximum remaining length of time over which we have hedged the exposure related to the variability in future cash flows on forecasted transactions, primarily forecasted debt issuances, is 23 years. However, over 70% and 90% of AOCI relating to closed cash flow hedges at September 30, 2011, will be reclassified to earnings over the next five and ten years, respectively.

Table 11.3 presents the changes in AOCI related to derivatives designated as cash flow hedges. Net reclassifications of losses to earnings represents the AOCI amount that was recognized in earnings as the originally hedged forecasted transactions affected earnings, unless it was deemed probable that the forecasted transaction would not occur. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the hedge related to the forecasted transaction would be reclassified into earnings immediately.

**Table 11.3 — AOCI Related to Cash Flow Hedge Relationships**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2011 | 2010 |
| | (in millions) | |
| Beginning balance[1] | $(2,239) | $(2,905) |
| Cumulative effect of change in accounting principle[2] | — | (7) |
| Net reclassifications of losses to earnings[3] | 391 | 520 |
| Ending balance[1] | $(1,848) | $(2,392) |

(1) Represents net deferred gains and losses on closed (*i.e.*, terminated or redesignated) cash flow hedges.
(2) Represents adjustment to initially apply the accounting guidance for accounting for transfers of financial assets and consolidation of VIEs, as well as a change in the amortization method for certain related deferred items. Net of tax benefit of $4 million for the nine months ended September 30, 2010.
(3) Net of tax benefit of $192 million and $261 million for the nine months ended September 30, 2011 and 2010, respectively.

## NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)

**Senior Preferred Stock**

To address our net worth deficit of $6.0 billion at September 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $6.0 billion. We received $500 million in March 2011 and $1.5 billion in September 2011 pursuant to draw requests that FHFA submitted to Treasury on our behalf to address the deficit in our net worth as of December 31, 2010 and June 30, 2011, respectively. No cash was received from Treasury under the Purchase Agreement during the second quarter of 2011 due to our positive net worth at March 31, 2011. The aggregate liquidation preference on the senior preferred stock owned by Treasury was $66.2 billion and $64.2 billion as of September 30, 2011 and December 31, 2010, respectively. See "NOTE 16: REGULATORY CAPITAL" for additional information.

**Stock Repurchase and Issuance Programs**

We did not repurchase or issue any of our common shares or non-cumulative preferred stock during the nine months ended September 30, 2011, except for issuances of treasury stock as reported on our consolidated statements of equity (deficit) relating to stock-based compensation granted prior to conservatorship. Common stock delivered under these stock-based compensation plans consists of treasury stock. During the nine months ended September 30, 2011, restrictions lapsed on 840,402 restricted stock units, all of which were granted prior to conservatorship. For a discussion regarding our stock-based compensation plans, see "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report.

**Dividends Declared During 2011**

No common dividends were declared in 2011. On March 31, 2011, June 30, 2011, and September 30, 2011, we paid dividends of $1.6 billion in cash on the senior preferred stock at the direction of our Conservator for each period. We did not declare or pay dividends on any other series of Freddie Mac preferred stock outstanding during the nine months ended September 30, 2011.

## NOTE 13: INCOME TAXES

**Income Tax Benefit**

For the three months ended September 30, 2011 and 2010, we reported an income tax benefit of $56 million and $411 million, respectively, resulting in effective tax rates of 1.3% and 14.1%, respectively. For the nine months ended September 30, 2011 and 2010, we reported an income tax benefit of $362 million and $800 million, respectively, representing effective tax rates of 5.8% and 5.4%, respectively. For the three and nine months ended September 30, 2011 and 2010, our effective tax rate was different from the statutory rate of 35% primarily due to changes in the valuation allowance recorded against a portion of our net deferred tax assets.

**Deferred Tax Assets, Net**

We use the asset and liability method to account for income taxes in accordance with the accounting guidance for income taxes. Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates. Valuation allowances are recorded to reduce net deferred tax assets when it is more likely than not that a tax benefit will not be realized. The realization of our net deferred tax assets is dependent upon the generation of sufficient taxable income in available carryback years from current operations and unrecognized tax benefits, and upon our intent and ability to hold available-for-sale debt securities until the recovery of any temporary unrealized losses.

In connection with our entry into conservatorship, we determined that it was more likely than not that a portion of our net deferred tax assets would not be realized due to our inability to generate sufficient taxable income and, therefore, we recorded a valuation allowance. After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, and related difficulty in forecasting future profit levels, we reached a similar conclusion in subsequent quarters, including the third quarter of 2011. Our valuation allowance increased by $2.4 billion to $35.8 billion in the nine months ended September 30, 2011, primarily attributable to an increase in temporary differences during the period. As of September 30, 2011, after consideration of the valuation allowance, we had a net deferred tax asset of $3.9 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities. We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered.

As of September 30, 2011, we had net operating loss and LIHTC carryforwards that will expire over multiple years beginning in 2027 and ending in 2031 and alternative minimum tax credit carryforwards that will not expire.

**Unrecognized Tax Benefits**

At September 30, 2011, we had total unrecognized tax benefits, exclusive of interest, of $1.4 billion. This amount relates to tax positions for which ultimate deductibility is highly certain, but for which there is uncertainty as to the timing of such deductibility. If favorably resolved, $1.2 billion of unrecognized tax benefits would have a positive impact on the effective tax rate due to the reversal of the valuation allowance established against deferred tax assets created by the uncertain tax positions. This favorable impact would be offset by a $186 million tax expense related to the establishment of a valuation allowance against credits that have been carried forward. A valuation allowance has not currently been recorded against this amount because a portion of the unrecognized tax benefits was used as a source of taxable income in our realization assessment of our net deferred tax assets.

We continue to recognize interest and penalties, if any, in income tax expense. There has been no material change during the quarter in total accrued interest payable allocable to unrecognized tax benefits.

The period for assessment under the statute of limitations for federal income tax purposes is open on corporate income tax returns filed for tax years 1998 to 2010. Prior to 2011, the IRS completed its examinations of tax years 1998 to 2007. We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory

Notices. The principal matter of controversy involves questions of timing and potential penalties regarding our tax accounting method for certain hedging transactions. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. On July 6, 2011, the U.S. Tax Court issued a Notice Setting Case for Trial and a Standing Pretrial Order. The trial date set forth in the Notice was December 12, 2011. On September 7, 2011, a joint motion for continuance was filed with the U.S. Tax Court. The joint motion was granted, and, on October 11, 2011, the parties submitted a status report and proposed a revised trial date of November 5, 2012. In light of the revised trial date and the fact that no settlement discussions have occurred for an extended period of time, we do not believe it is reasonably possible that the hedge accounting method issue will be resolved within the next 12 months. We believe appropriate reserves have been provided for settlement on reasonable terms. However, changes could occur in the gross balance of unrecognized tax benefits that could have a material impact on income tax expense in the period the issue is resolved if the outcome reached is not in our favor and the assessment is in excess of the amount currently reserved. Based upon information currently available, we do not have the ability to reasonably estimate the amount that our unrecognized tax benefits could change within the next 12 months.

## NOTE 14: EMPLOYEE BENEFITS

**Defined Benefit Plans**

We maintain a tax-qualified, funded defined benefit pension plan, or Pension Plan, covering substantially all of our employees. We also maintain a nonqualified, unfunded defined benefit pension plan for our officers as part of our SERP (we refer to this plan and the Pension Plan as our Defined Benefit Pension Plans). We also maintain a defined benefit postretirement health care plan, or Retiree Health Plan, that generally provides postretirement health care benefits on a contributory basis to retired employees age 55 or older who meet certain minimum service and other eligibility requirements. Our Retiree Health Plan is currently unfunded and the benefits are paid from our general assets. This plan and our Defined Benefit Pension Plans are collectively referred to as the Defined Benefit Plans.

In June 2011, we amended our Defined Benefit Pension Plans. Under those amendments, eligibility for the pension benefit under our Defined Benefit Pension Plans will be limited to eligible employees hired on or before December 31, 2011. The amendments are effective January 1, 2012.

Table 14.1 presents the components of the net periodic benefit cost with respect to pension and postretirement health care benefits for the three and nine months ended September 30, 2011 and 2010. Net periodic benefit cost is included in salaries and employee benefits on our consolidated statements of income and comprehensive income.

**Table 14.1 — Net Periodic Benefit Cost Detail**

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| **Pension Benefits** | **2011** | **2010** | **2011** | **2010** |
|  | | (in millions) | | |
| Service cost | $ 9 | $ 8 | $ 26 | $ 24 |
| Interest cost on benefit obligation | 10 | 9 | 30 | 28 |
| Expected return on plan assets | (12) | (10) | (36) | (30) |
| Recognized net actuarial loss | 2 | 3 | 5 | 8 |
| Net periodic benefit cost | $ 9 | $ 10 | $ 25 | $ 30 |
| **Postretirement Health Care Benefits** | | | | |
| Service cost | $ 3 | $ 2 | $ 6 | $ 5 |
| Interest cost on benefit obligation | 2 | 3 | 7 | 7 |
| Recognized prior service credit | — | (1) | — | (1) |
| Net periodic benefit cost | $ 5 | $ 4 | $ 13 | $ 11 |

**Cash Flows Related to Defined Benefit Plans**

Our general practice is to contribute to our Pension Plan an amount equal to at least the minimum required contribution, if any, but no more than the maximum amount deductible for federal income tax purposes each year. A contribution to our Pension Plan is not required in calendar year 2011.

## NOTE 15: SEGMENT REPORTING

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for additional information about the conservatorship. The financial performance of our segments is measured

based on each segment's contribution to GAAP net income (loss). In addition, our Investments segment is measured on its contribution to GAAP total comprehensive income (loss).

We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of income and comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments. These reclassifications and allocations are described in "NOTE 17: SEGMENT REPORTING" in our 2010 Annual Report.

We do not consider our assets by segment when evaluating segment performance or allocating resources. We conduct our operations solely in the U.S. and its territories. Therefore, we do not generate any revenue from geographic locations outside of the U.S. and its territories.

**Segments**

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. The chart below provides a summary of our three reportable segments and the All Other category. As reflected in the chart, certain activities that are not part of a reportable segment are included in the All Other category. The All Other category consists of material corporate level expenses that are: (a) non-recurring in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods.

| Segment | Description | Activities/Items |
|---------|-------------|------------------|
| Investments | Segment Earnings for the Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans funded by other debt issuances and hedged using derivatives. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. The Investments segment also reflects the impact of changes in fair value of CMBS and multifamily held-for-sale loans associated with changes in interest rates. | • Investments in mortgage-related securities and single-family performing mortgage loans<br>• Investments in asset-backed securities<br>• All other traded instruments / securities, excluding CMBS and multifamily housing revenue bonds<br>• Debt issuances<br>• All asset / liability management returns<br>• Guarantee buy-ups / buy-downs, net of execution gains / losses<br>• Cash and liquidity management<br>• Deferred tax asset valuation allowance<br>• Allocated administrative expenses and taxes |
| Single-Family Guarantee | Segment Earnings for the Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related security in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less the credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses. | • Management and guarantee fees on PCs, including those retained by us, and single-family mortgage loans in the mortgage investments portfolio<br>• Up-front credit delivery fees<br>• Adjustments for security performance<br>• Credit losses on all single-family assets<br>• Expected net float income or expense on the single-family credit guarantee portfolio<br>• Deferred tax asset valuation allowance<br>• Allocated debt costs, administrative expenses and taxes |
| Multifamily | Segment Earnings for the Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, our purchases of such loans have declined significantly since 2010 and our purchases of such CMBS have declined significantly since 2008. Currently, our primary strategy is to purchase multifamily mortgage loans for purposes of aggregation and then securitization. We guarantee the senior tranches of these securitizations. The Multifamily segment does not issue REMIC securities but does issue Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less allocated funding costs, the credit-related expenses, and administrative expenses. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in the fair value of CMBS and held-for-sale loans associated only with factors other than changes in interest rates, such as liquidity and credit. | • Multifamily mortgage loans held-for-sale and associated securitization activities<br>• Investments in CMBS, multifamily housing revenue bonds, and multifamily mortgage loans held-for-investment<br>• Allocated debt costs, administrative expenses and taxes<br>• Other guarantee commitments on multifamily mortgage loans<br>• LIHTC and valuation allowance<br>• Deferred tax asset valuation allowance |
| All Other | The All Other category consists of corporate-level expenses that are material and infrequent in nature and based on management decisions outside the control of the reportable segments. | • LIHTC write-down<br>• Tax settlements, as applicable<br>• Legal settlements, as applicable<br>• The deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward. |

### Segment Earnings

The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac. However, the accounting principles we apply to present certain financial statement line items in Segment Earnings for our reportable segments, in particular Segment Earnings net interest income and management and guarantee income, differ significantly from those applied in preparing the comparable line items in our consolidated financial statements prepared in accordance with GAAP. Accordingly, the results of such line items differ significantly from, and should not be used as a substitute for, the comparable line items as determined in accordance with GAAP. For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."

In presenting Segment Earnings net interest income and management and guarantee income, we make adjustments to better reflect how management measures and assesses the performance of each segment and the company as a whole. These adjustments relate to amounts that, effective January 1, 2010, are no longer reflected in net income (loss) as determined in accordance with GAAP as a result of the adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. These adjustments are reversed through the segment adjustments line item within Segment Earnings, so that Segment Earnings (loss) for each segment equals GAAP net income (loss) attributable to Freddie Mac for each segment. Segment adjustments consist of the following:

- We adjust our Segment Earnings net interest income for the Investments segment to include the amortization of cash premiums and discounts and buy-up and buy-down fees on the consolidated Freddie Mac mortgage-related securities we purchase as investments. As of September 30, 2011, the unamortized balance of such premiums and discounts and buy-up and buy-down fees was $2.2 billion. These adjustments are necessary to reflect the economic yield realized on investments in consolidated Freddie Mac mortgage-related securities purchased at a premium or discount or with buy-up or buy-down fees.

- We adjust our Segment Earnings management and guarantee income for the Single-family Guarantee segment to include the amortization of delivery fees recorded in periods prior to the January 1, 2010 adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. As of September 30, 2011, the unamortized balance of such fees was $2.4 billion. We consider such fees to be part of the effective rate of the guarantee fee on guaranteed mortgage loans. This adjustment is necessary in order to better reflect the realization of revenue associated with guarantee contracts over the life of the underlying loans.

Table 15.1 presents Segment Earnings by segment.

### Table 15.1 — Summary of Segment Earnings and Total Comprehensive Income (Loss)[1]

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Segment Earnings (loss), net of taxes: | | | | |
| Investments | $(1,079) | $ 284 | $ 1,068 | $ (1,440) |
| Single-family Guarantee | (3,545) | (3,138) | (7,751) | (13,239) |
| Multifamily | 205 | 381 | 764 | 752 |
| All Other | (3) | (38) | 34 | 15 |
| Total Segment Earnings (loss), net of taxes | (4,422) | (2,511) | (5,885) | (13,912) |
| Net income (loss) attributable to Freddie Mac | $(4,422) | $(2,511) | $(5,885) | $(13,912) |
| Total comprehensive income (loss) of segments: | | | | |
| Investments | $ 268 | $ 3,601 | $ 4,174 | $ 8,611 |
| Single-family Guarantee | (3,545) | (3,137) | (7,754) | (13,241) |
| Multifamily | (1,096) | 1,010 | 810 | 3,741 |
| All Other | (3) | (38) | 34 | 15 |
| Total comprehensive income (loss) of segments | (4,376) | 1,436 | (2,736) | (874) |
| Total comprehensive income (loss) attributable to Freddie Mac | $(4,376) | $ 1,436 | $(2,736) | $ (874) |

(1) The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

Table 15.2 presents detailed financial information by financial statement line item for our reportable segments and All Other.

## Table 15.2 — Segment Earnings and Reconciliation to GAAP Results

### Three Months Ended September 30, 2011

(in millions)

| | Net Interest Income | (Provision) Benefit for Credit Losses | Management and Guarantee Income[1] | Non-Interest Income (Loss): Security Impairments | Non-Interest Income (Loss): Derivative Gains (Losses) | Non-Interest Income (Loss): Other Non-Interest Income (Loss) | Non-Interest Expense: Administrative Expenses | Non-Interest Expense: REO Operations Income (Expense) | Non-Interest Expense: Other Non-Interest Expense | Segment Adjustments[2] | Income Tax (Expense) Benefit | Net Income (Loss) | Less: Net (Income) Loss – Noncontrolling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Investments | $1,905 | $— | $— | $(116) | $(3,144) | $178 | $(97) | $— | $(1) | $137 | $59 | $(1,079) | $— | $(1,079) | $1,347 | $268 |
| Single-family Guarantee | (98) | (4,008) | 913 | (27) | — | 331 | (227) | (226) | (69) | (161) | — | (3,545) | — | (3,545) | — | (3,545) |
| Multifamily | 314 | 37 | 32 | — | (1) | (83) | (57) | 5 | (15) | — | (3) | 205 | — | 205 | (1,301) | (1,096) |
| All Other | — | — | — | — | — | — | — | — | — | — | — | (3) | — | (3) | — | (3) |
| Total Segment Earnings (loss), net of taxes | 2,121 | (3,971) | 945 | (143) | (3,145) | 426 | (381) | (221) | (85) | (24) | 56 | (4,422) | — | (4,422) | 46 | (4,376) |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications[2] | 2,355 | 365 | (741) | (18) | (1,607) | (354) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments[2] | 137 | — | (161) | — | — | — | — | — | — | 24 | — | — | — | — | — | — |
| Total reconciling items | 2,492 | 365 | (902) | (18) | (1,607) | (354) | — | — | — | 24 | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $4,613 | $(3,606) | $43 | $(161) | $(4,752) | $72 | $(381) | $(221) | $(85) | $— | $56 | $(4,422) | $— | $(4,422) | $46 | $(4,376) |

### Nine Months Ended September 30, 2011

(in millions)

| | Net Interest Income | (Provision) Benefit for Credit Losses | Management and Guarantee Income[1] | Non-Interest Income (Loss): Security Impairments | Non-Interest Income (Loss): Derivative Gains (Losses) | Non-Interest Income (Loss): Other Non-Interest Income (Loss) | Non-Interest Expense: Administrative Expenses | Non-Interest Expense: REO Operations Income (Expense) | Non-Interest Expense: Other Non-Interest Expense | Segment Adjustments[2] | Income Tax (Expense) Benefit | Net Income (Loss) | Less: Net (Income) Loss – Noncontrolling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Investments | $5,384 | $— | $— | $(1,284) | $(4,197) | $657 | $(293) | $— | $(2) | $466 | $337 | $1,068 | $— | $1,068 | $3,106 | $4,174 |
| Single-family Guarantee | (28) | (9,178) | 2,631 | (344) | 3 | 750 | (670) | (518) | (241) | (489) | (8) | (7,751) | — | (7,751) | (3) | (7,754) |
| Multifamily | 897 | 110 | 90 | — | — | 215 | (163) | 13 | (56) | — | (1) | 764 | — | 764 | 46 | 810 |
| All Other | — | — | — | — | — | — | — | — | — | — | 34 | 34 | — | 34 | — | 34 |
| Total Segment Earnings (loss), net of taxes | 6,253 | (9,068) | 2,721 | (1,628) | (4,194) | 1,622 | (1,126) | (505) | (299) | (23) | 362 | (5,885) | — | (5,885) | 3,149 | (2,736) |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications[2] | 6,995 | 944 | (2,110) | (78) | (4,792) | (959) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments[2] | 466 | — | (489) | — | — | — | — | — | — | 23 | — | — | — | — | — | — |
| Total reconciling items | 7,461 | 944 | (2,599) | (78) | (4,792) | (959) | — | — | — | 23 | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $13,714 | $(8,124) | $122 | $(1,706) | $(8,986) | $663 | $(1,126) | $(505) | $(299) | $— | $362 | $(5,885) | $— | $(5,885) | $3,149 | $(2,736) |

### Three Months Ended September 30, 2010

*(in millions)*

| | Net Interest Income | Provision for Credit Losses | Management and Guarantee Income[1] | Non-Interest Income (Loss) — Security Impairments | Non-Interest Income (Loss) — Derivative Gains (Losses) | Non-Interest Income (Loss) — Other Non-Interest Income (Loss) | Non-Interest Expense — REO Operations Expense | Non-Interest Expense — Administrative Expenses | Non-Interest Expense — Other Non-Interest Expense | Segment Adjustments[2] | Income Tax (Expense) Benefit | Net Income (Loss) | Less: Net (Income) Loss — Noncontrolling Interests | Net Income (Loss) — Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Investments | $1,667 | $ — | $ — | $(934) | $192 | $(768) | $ — | $(110) | $(1) | $272 | $(34) | $284 | $ — | $284 | $3,317 | $3,601 |
| Single-family Guarantee | (4) | (3,980) | 922 | — | — | 307 | (337) | (224) | (85) | (245) | 507 | (3,138) | — | (3,138) | 1 | (3,137) |
| Multifamily | 290 | (19) | 25 | (5) | 1 | 185 | — | (54) | (17) | — | (25) | 381 | — | 381 | 629 | 1,010 |
| All Other | — | — | — | — | — | — | — | — | — | — | (38) | (38) | — | (38) | — | (38) |
| Total Segment Earnings (loss), net of taxes | 1,953 | (3,999) | 947 | (939) | 193 | (276) | (337) | (388) | (103) | 27 | 411 | (2,511) | — | (2,511) | 3,947 | 1,436 |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications[2][3] | 2,054 | 272 | (667) | (161) | (1,323) | (175) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments[2] | 272 | — | (245) | — | — | — | — | — | — | (27) | — | — | — | — | — | — |
| Total reconciling items | 2,326 | 272 | (912) | (161) | (1,323) | (175) | — | — | — | (27) | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $4,279 | $(3,727) | $35 | $(1,100) | $(1,130) | $(451) | $(337) | $(388) | $(103) | $ — | $411 | $(2,511) | $ — | $(2,511) | $3,947 | $1,436 |

### Nine Months Ended September 30, 2010

*(in millions)*

| | Net Interest Income | Provision for Credit Losses | Management and Guarantee Income[1] | Non-Interest Income (Loss) — Security Impairments | Non-Interest Income (Loss) — Derivative Gains (Losses) | Non-Interest Income (Loss) — Other Non-Interest Income (Loss) | Non-Interest Expense — REO Operations Expense | Non-Interest Expense — Administrative Expenses | Non-Interest Expense — Other Non-Interest Expense | Segment Adjustments[2] | Income Tax (Expense) Benefit | Net Income (Loss) | Less: Net (Income) Loss — Noncontrolling Interests | Net Income (Loss) — Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Investments | $4,487 | $ — | $ — | $(1,637) | $(4,703) | $(496) | $ — | $(343) | $(14) | $1,076 | $192 | $(1,438) | $(2) | $(1,440) | $10,051 | $8,611 |
| Single-family Guarantee | 106 | (15,315) | 2,635 | — | — | 785 | (452) | (695) | (254) | (666) | 617 | (13,239) | — | (13,239) | (2) | (13,241) |
| Multifamily | 806 | (167) | 74 | (77) | 5 | 348 | (4) | (159) | (53) | — | (24) | 749 | 3 | 752 | 2,989 | 3,741 |
| All Other | — | — | — | — | — | — | — | — | — | — | 15 | 15 | — | 15 | — | 15 |
| Total Segment Earnings (loss), net of taxes | 5,399 | (15,482) | 2,709 | (1,714) | (4,698) | 637 | (456) | (1,197) | (321) | 410 | 800 | (13,913) | 1 | (13,912) | 13,038 | (874) |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications[2][3] | 6,065 | 1,330 | (1,936) | (334) | (4,955) | (180) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments[2] | 1,076 | — | (666) | — | — | — | — | — | — | (410) | — | — | — | — | — | — |
| Total reconciling items | 7,141 | 1,330 | (2,602) | (334) | (4,955) | (180) | — | — | — | (410) | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $12,540 | $(14,152) | $107 | $(2,048) | $(9,653) | $457 | $(456) | $(1,197) | $(321) | $ — | $800 | $(13,913) | $1 | $(13,912) | $13,038 | $(874) |

(1) Management and guarantee income total per consolidated statements of income and comprehensive income is included in other income on our GAAP consolidated statements of income and comprehensive income.

(2) See "Segment Earnings" for additional information regarding these adjustments.

(3) See "NOTE 17: SEGMENT REPORTING — Segment Earnings — Investment Activity-Related Reclassifications" and "— Credit Guarantee Activity-Related Reclassifications" in our 2010 Annual Report for information regarding these reclassifications.

Table 15.3 presents total comprehensive income (loss) by segment.

## Table 15.3 — Total Comprehensive Income (Loss) of Segments[1]

### Three Months Ended September 30, 2011

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ (1,079) | $ 1,221 | $124 | $ 2 | $ 1,347 | $ 268 |
| Single-family Guarantee | (3,545) | — | — | — | — | (3,545) |
| Multifamily | 205 | (1,301) | — | — | (1,301) | (1,096) |
| All Other | (3) | — | — | — | — | (3) |
| Total per consolidated statements of income and comprehensive income | $ (4,422) | $ (80) | $124 | $ 2 | $ 46 | $ (4,376) |

### Nine Months Ended September 30, 2011

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 1,068 | $ 2,718 | $390 | $(2) | $ 3,106 | $ 4,174 |
| Single-family Guarantee | (7,751) | — | — | (3) | (3) | (7,754) |
| Multifamily | 764 | 46 | 1 | (1) | 46 | 810 |
| All Other | 34 | — | — | — | — | 34 |
| Total per consolidated statements of income and comprehensive income | $ (5,885) | $ 2,764 | $391 | $(6) | $ 3,149 | $ (2,736) |

### Three Months Ended September 30, 2010

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 284 | $ 3,152 | $164 | $ 1 | $ 3,317 | $ 3,601 |
| Single-family Guarantee | (3,138) | — | — | 1 | 1 | (3,137) |
| Multifamily | 381 | 629 | — | — | 629 | 1,010 |
| All Other | (38) | — | — | — | — | (38) |
| Total per consolidated statements of income and comprehensive income | $ (2,511) | $ 3,781 | $164 | $ 2 | $ 3,947 | $ 1,436 |

### Nine Months Ended September 30, 2010

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ (1,440) | $ 9,533 | $520 | $(2) | $10,051 | $ 8,611 |
| Single-family Guarantee | (13,239) | — | — | (2) | (2) | (13,241) |
| Multifamily | 752 | 2,991 | — | (2) | 2,989 | 3,741 |
| All Other | 15 | — | — | — | — | 15 |
| Total per consolidated statements of income and comprehensive income | $(13,912) | $12,524 | $520 | $(6) | $13,038 | $ (874) |

(1) The sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

FHFA 2584

## NOTE 16: REGULATORY CAPITAL

On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship in light of the Purchase Agreement. FHFA continues to closely monitor our capital levels, but the existing statutory and FHFA-directed regulatory capital requirements are not binding during conservatorship. We continue to provide our submission to FHFA on minimum capital.

Our regulatory minimum capital is a leverage-based measure that is generally calculated based on GAAP and reflects a 2.50% capital requirement for on-balance sheet assets and 0.45% capital requirement for off-balance sheet obligations. Based upon our adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs, we determined that, under the new consolidation guidance, we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions and, therefore, effective January 1, 2010, we consolidated on our balance sheet the assets and liabilities of these trusts. Pursuant to regulatory guidance from FHFA, our minimum capital requirement was not automatically affected by adoption of these amendments. Specifically, upon adoption of these amendments, FHFA directed us, for purposes of minimum capital, to continue reporting single-family PCs and certain Other Guarantee Transactions held by third parties using a 0.45% capital requirement. FHFA reserves the authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities. On March 3, 2011, FHFA issued a final rule setting forth procedures and standards in the event FHFA were to make such a temporary increase in minimum capital levels. Table 16.1 summarizes our minimum capital requirements and deficits and net worth.

### Table 16.1 — Net Worth and Minimum Capital

|  | September 30, 2011 | December 31, 2010 |
|---|---|---|
|  | (in millions) | |
| GAAP net worth[1] | $ (5,991) | $    (401) |
| Core capital (deficit)[2][3] | $(63,288) | $(52,570) |
| Less: Minimum capital requirement[2] | 24,603 | 25,987 |
| Minimum capital surplus (deficit)[2] | $(87,891) | $(78,557) |

(1) Net worth (deficit) represents the difference between our assets and liabilities under GAAP.
(2) Core capital and minimum capital figures for September 30, 2011 are estimates. FHFA is the authoritative source for our regulatory capital.
(3) Core capital excludes certain components of GAAP total equity (deficit) (*i.e.*, AOCI, liquidation preference of the senior preferred stock) as these items do not meet the statutory definition of core capital.

Following our entry into conservatorship, we have focused our risk and capital management, consistent with the objectives of conservatorship, on, among other things, maintaining a positive balance of GAAP equity in order to reduce the likelihood that we will need to make additional draws on the Purchase Agreement with Treasury, while returning to long-term profitability. The Purchase Agreement provides that, if FHFA determines as of quarter end that our liabilities have exceeded our assets under GAAP, Treasury will contribute funds to us in an amount equal to the difference between such liabilities and assets.

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has advised us that, if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination. If funding has been requested under the Purchase Agreement to address a deficit in our net worth, and Treasury is unable to provide us with such funding within the 60-day period specified by FHFA, FHFA would be required to place us into receivership if our assets remain less than our obligations during that 60-day period.

To address our net worth deficit of $6.0 billion at September 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $6.0 billion, and will request that we receive these funds by December 31, 2011. Commencing in the second quarter of 2011, our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. Upon funding of this draw request, our aggregate funding received from Treasury under the Purchase Agreement will increase to $71.2 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. As a result of the additional $6.0 billion draw request, the aggregate liquidation preference on the senior preferred stock owned by Treasury will increase from $66.2 billion at September 30, 2011 to $72.2 billion. We paid a quarterly dividend of $1.6 billion, $1.6 billion, and $1.6 billion on the senior preferred stock in cash on March 31, 2011, June 30, 2011, and September 30, 2011, respectively, at the direction of the Conservator. Following funding of the draw request related to our net worth deficit at

September 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $6.6 billion to $7.2 billion, which exceeds our annual historical earnings in all but one period.

## NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS

### Single-family Credit Guarantee Portfolio

Our business activity is to participate in and support the residential mortgage market in the United States, which we pursue by both issuing guaranteed mortgage securities and investing in mortgage loans and mortgage-related securities.

Table 17.1 summarizes the concentration by year of origination and geographical area of the approximately $1.8 trillion UPB of our single-family credit guarantee portfolio at both September 30, 2011 and December 31, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" and "NOTE 7: INVESTMENTS IN SECURITIES" for more information about credit risk associated with loans and mortgage-related securities that we hold.

**Table 17.1 — Concentration of Credit Risk — Single-Family Credit Guarantee Portfolio**

| | September 30, 2011 | | December 31, 2010 | | Percent of Credit Losses[1] Nine Months Ended | |
| --- | --- | --- | --- | --- | --- | --- |
| | Percentage of Portfolio[2] | Serious Delinquency Rate[3] | Percentage of Portfolio[2] | Serious Delinquency Rate[3] | September 30, 2011 | September 30, 2010 |
| Year of Origination | | | | | | |
| 2011 | 10% | <0.1% | N/A | N/A | — | N/A |
| 2010 | 20 | 0.2 | 18% | 0.1% | <1% | — |
| 2009 | 20 | 0.4 | 21 | 0.3 | 1 | <1% |
| 2008 | 7 | 5.2 | 9 | 4.9 | 8 | 6 |
| 2007 | 10 | 11.2 | 11 | 11.6 | 36 | 34 |
| 2006 | 7 | 10.5 | 9 | 10.5 | 28 | 31 |
| 2005 | 8 | 6.2 | 10 | 6.0 | 18 | 20 |
| 2004 and prior | 18 | 2.6 | 22 | 2.5 | 9 | 9 |
| Total | 100% | 3.5% | 100% | 3.8% | 100% | 100% |
| Region[4] | | | | | | |
| West | 28% | 3.7% | 27% | 4.7% | 54% | 47% |
| Northeast | 25 | 3.2 | 25 | 3.2 | 7 | 9 |
| North Central | 18 | 2.9 | 18 | 3.1 | 15 | 16 |
| Southeast | 17 | 5.4 | 18 | 5.6 | 20 | 25 |
| Southwest | 12 | 1.8 | 12 | 2.1 | 4 | 3 |
| Total | 100% | 3.5% | 100% | 3.8% | 100% | 100% |
| State[5] | | | | | | |
| California | 16% | 3.5% | 16% | 4.9% | 30% | 26% |
| Florida | 6 | 10.7 | 6 | 10.5 | 12 | 19 |
| Illinois | 5 | 4.6 | 5 | 4.6 | 4 | 6 |
| Georgia | 3 | 3.4 | 3 | 4.1 | 4 | 3 |
| Michigan | 3 | 2.3 | 3 | 3.0 | 5 | 5 |
| Arizona | 2 | 4.3 | 3 | 6.1 | 12 | 11 |
| Nevada | 1 | 10.3 | 1 | 11.9 | 7 | 5 |
| All other | 64 | N/A | 63 | N/A | 26 | 25 |
| Total | 100% | 3.5% | 100% | 3.8% | 100% | 100% |

(1) Credit losses consist of the aggregate amount of charge-offs, net of recoveries, and REO operations expense in each of the respective periods and exclude foregone interest on non-performing loans and other market-based losses recognized on our consolidated statements of income and comprehensive income.

(2) Based on the UPB of our single-family credit guarantee portfolio, which includes unsecuritized single-family mortgage loans held by us on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities, or covered by our other guarantee commitments.

(3) Serious delinquencies on mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice.

(4) Region designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

(5) States presented based on those with the highest percentage of credit losses during the nine months ended September 30, 2011. Our top seven states based on the highest percentage of UPB as of September 30, 2011 are: California (16%), Florida (6%), Illinois (5%), New York (5%), Texas (5%), New Jersey (4%), and Virginia (4%), and comprised 45% of our single-family credit guarantee portfolio as of September 30, 2011.

### Credit Performance of Certain Higher Risk Single-Family Loan Categories

Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income

or asset documentation requirements compared to a full documentation mortgage loan, or both. However, there is no universally accepted definition of subprime or Alt-A. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as Alt-A in Table 17.2 because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred.

Although we do not categorize single-family mortgage loans we purchase or guarantee as prime or subprime, we recognize that there are a number of mortgage loan types with certain characteristics that indicate a higher degree of credit risk. For example, a borrower's credit score is a useful measure for assessing the credit quality of the borrower. Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores.

Presented below is a summary of the serious delinquency rates of certain higher-risk categories of single-family loans in our single-family credit guarantee portfolio. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Loans with a combination of these attributes will have an even higher risk of delinquency than those with isolated characteristics.

**Table 17.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio[1]**

| | Percentage of Portfolio[1] | | Serious Delinquency Rate | |
|---|---|---|---|---|
| | September 30, 2011 | December 31, 2010 | September 30, 2011 | December 31, 2010 |
| Interest-only | 4% | 5% | 17.7% | 18.4% |
| Option ARM | <1 | 1 | 21.2 | 21.2 |
| Alt-A[2] | 6 | 6 | 11.8 | 12.2 |
| Original LTV ratio greater than 90%[3] | 9 | 9 | 6.7 | 7.8 |
| Lower original FICO scores (less than 620) | 3 | 3 | 12.7 | 13.9 |

(1) Based on UPB.
(2) Alt-A loans may not include those loans that were previously classified as Alt-A and that have been refinanced as either a relief refinance mortgage or in another refinance mortgage initiative.
(3) Based on our first lien exposure on the property. Includes the credit-enhanced portion of the loan and excludes any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, increases the risk of default.

The percentage of borrowers in our single-family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 19% and 18% at September 30, 2011 and December 31, 2010, respectively. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is more likely to default than other borrowers. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 12.7% and 14.9% as of September 30, 2011 and December 31, 2010, respectively.

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on these categories and other concentrations in our investments in securities.

**Multifamily Mortgage Portfolio**

Table 17.3 summarizes the concentration of multifamily mortgages in our multifamily mortgage portfolio by certain attributes. Information presented for multifamily mortgage loans includes certain categories based on loan or borrower characteristics present at origination. The table includes a presentation of each category in isolation. A single loan may fall within more than one category (for example, a non-credit enhanced loan may also have an original LTV ratio greater than 80%).

**Table 17.3 — Concentration of Credit Risk — Multifamily Mortgage Portfolio**

| | September 30, 2011 | | December 31, 2010 | |
|---|---|---|---|---|
| | UPB[1] | Delinquency Rate[2] | UPB[1] | Delinquency Rate[2] |
| **State** | | | | |
| California | $ 19.6 | 0.02% | $ 19.3 | 0.06% |
| Texas | 13.7 | 0.67 | 12.7 | 0.52 |
| New York | 9.3 | — | 9.2 | — |
| Florida | 6.9 | 0.05 | 6.4 | 0.56 |
| Georgia | 5.7 | 2.06 | 5.5 | 0.98 |
| Maryland | 5.6 | 1.11 | 5.3 | — |
| All other states | 51.6 | 0.19 | 50.0 | 0.24 |
| Total | $112.4 | 0.33% | $108.4 | 0.26% |
| **Region[3]** | | | | |
| Northeast | $ 31.6 | 0.22% | $ 31.1 | —% |
| West | 29.1 | 0.05 | 28.3 | 0.07 |
| Southwest | 21.6 | 0.66 | 20.2 | 0.61 |
| Southeast | 20.3 | 0.68 | 19.2 | 0.59 |
| North Central | 9.8 | 0.13 | 9.6 | 0.30 |
| Total | $112.4 | 0.33% | $108.4 | 0.26% |
| **Category[4]** | | | | |
| Original LTV ratio greater than 80% | $ 6.4 | 2.65% | $ 6.6 | 2.30% |
| Original DSCR below 1.10 | 2.9 | 3.26 | 3.2 | 1.22 |
| Non-credit enhanced loans | 83.5 | 0.18 | 87.5 | 0.12 |

(1) Beginning in the second quarter of 2011, we exclude non-consolidated mortgage-related securities for which we do not provide our guarantee. The prior period has been revised to conform to the current period presentation.
(2) Based on the UPB of multifamily mortgages two monthly payments or more delinquent or in foreclosure.
(3) See endnote (4) to "Table 17.1 — Concentration of Credit Risk — Single-family Credit Guarantee Portfolio" for a description of these regions.
(4) These categories are not mutually exclusive and a loan in one category may also be included within another.

One indicator of risk for mortgage loans in our multifamily mortgage portfolio is the amount of a borrower's equity in the underlying property. A borrower's equity in a property decreases as the LTV ratio increases. Higher LTV ratios negatively affect a borrower's ability to refinance or sell a property for an amount at or above the balance of the outstanding mortgage. The DSCR is another indicator of future credit performance. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

Our multifamily mortgage portfolio includes certain loans for which we have credit enhancement. Credit enhancement significantly reduces our exposure to a potential credit loss. As of September 30, 2011, more than one-half of the multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two monthly payments or more past due had credit enhancements that we currently believe will mitigate our expected losses on those loans.

We estimate that the percentage of loans in our multifamily mortgage portfolio with a current LTV ratio of greater than 100% was approximately 6% and 8% at September 30, 2011 and December 31, 2010, respectively, and our estimate of the current average DSCR for these loans was 1.1 at both September 30, 2011 and December 31, 2010. We estimate that the percentage of loans in our multifamily mortgage portfolio with a current DSCR less than 1.0 was 5% and 7% at September 30, 2011 and December 31, 2010, respectively, and the average current LTV ratio of these loans was 107% and 108%, respectively. Our estimates of current DSCRs are based on the latest available income information for these properties and our assessments of market conditions. Our estimates of the current LTV ratios for multifamily loans are based on values we receive from a third-party service provider as well as our internal estimates of property value, for which we may use changes in tax assessments, market vacancy rates, rent growth and comparable property sales in local areas as well as third-party appraisals for a portion of the portfolio. We periodically perform our own valuations or obtain third-party appraisals in cases where a significant deterioration in a borrower's financial condition has occurred, the borrower has applied for refinancing, or in certain other circumstances where we deem it appropriate to reassess the property value. Although we use the most recently available results of our multifamily borrowers to estimate a property's value, there may be a significant lag in reporting, which could be six months or more, as they complete their results in the normal course of business. Our internal estimates of property valuation are derived using techniques that include income capitalization, discounted cash flows, sales comparables, or replacement costs.

*Freddie Mac*

**Seller/Servicers**

We acquire a significant portion of our single-family mortgage purchase volume from several large seller/servicers with whom we have entered into mortgage purchase volume commitments that provide for the lenders to deliver us up to a specified dollar amount of mortgages during a specified period of time. Our top 10 single-family seller/servicers provided approximately 84% of our single-family purchase volume during the nine months ended September 30, 2011. Wells Fargo Bank, N.A., JPMorgan Chase Bank, N.A., and Bank of America, N.A., accounted for 27%, 14%, and 10%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume during the nine months ended September 30, 2011. We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated without replacement from other lenders.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our seller/servicers of their obligations to repurchase mortgages or (at our option) indemnify us in the event of: (a) breaches of the representations and warranties they made when they sold the mortgages to us; or (b) failure to comply with our servicing requirements. Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts. As of September 30, 2011 and December 31, 2010, the UPB of loans subject to our repurchase requests issued to our single-family seller/servicers was approximately $2.7 billion and $3.8 billion, and approximately 40% and 34% of these requests, respectively, were outstanding for more than four months since issuance of our initial repurchase request as measured by the UPB of the loans subject to the requests. During the three and nine months ended September 30, 2011, respectively, we recovered amounts that covered losses with respect to $1.1 billion and $3.5 billion of UPB on loans subject to our repurchase requests.

On August 24, 2009, one of our single-family seller/servicers, Taylor, Bean & Whitaker Mortgage Corp., or TBW, filed for bankruptcy and announced its plan to wind down its operations. We had exposure to TBW with respect to its loan repurchase obligations. We also had exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac. Colonial Bank was placed into receivership by the FDIC in August 2009.

With the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement was filed with the bankruptcy court on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011, which became effective on August 10, 2011. We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors, may file an action to recover certain funds paid to us prior to the TBW bankruptcy. See "NOTE 19: LEGAL CONTINGENCIES" for additional information on the settlement, our claims arising from TBW's bankruptcy, and Ocala's potential claims.

As previously disclosed, we joined an investor group that delivered a notice of non-performance in 2010 to The Bank of New York Mellon, as Trustee, and Countrywide Home Loans Servicing LP (now known as BAC Home Loans Servicing, LP), related to the possibility that certain mortgage pools backing certain mortgage-related securities issued by Countrywide Financial Corporation and related entities include mortgages that may have been ineligible for inclusion in the pools due to breaches of representations or warranties.

On June 29, 2011, Bank of America Corporation announced that it, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and Countrywide Home Loans, Inc. entered into a settlement agreement with The Bank of New York Mellon, as trustee, to resolve all outstanding and potential claims related to alleged breaches of representations and warranties (including repurchase claims), substantially all historical loan servicing claims and certain other historical claims with respect to 530 Countrywide first-lien and second-lien residential mortgage-related securitization trusts. Bank of America indicated that the settlement is subject to final court approval and certain other conditions, including the receipt of a private letter ruling from the IRS. There can be no assurance that final court approval of the settlement will be obtained or that all conditions will be satisfied. Bank of America noted that, given the number of investors and the complexity of the settlement, it is not possible to predict the timing or ultimate outcome of the court approval process, which could take a substantial period of time. We have investments in certain of these Countrywide securitization trusts and would expect to benefit from this settlement, if final court approval is obtained.

In connection with the settlement, Bank of America Corporation entered into an agreement with the investor group. Under this agreement, the investor group agreed, among other things, to use reasonable best efforts and to cooperate in good faith to effectuate the settlement, including to obtain final court approval. Freddie Mac was not a party to this

agreement, but agreed to retract any previously delivered notices of non-performance upon final court approval of the settlement.

The Bank of New York Mellon, as trustee, filed the settlement in state court in New York and planned to seek approval at a hearing, which approval would bind all investors in the related trusts. The court directed that any objections to the settlement be filed no later than August 30, 2011. On August 30, 2011, FHFA announced that, in its capacity as conservator, it had filed an appearance and conditional objection regarding the settlement, in order to obtain any additional pertinent information developed in the matter. In the announcement, FHFA, as conservator, stated that it is aware of no basis upon which it would raise a substantive objection to the settlement at this time, but that it believes it prudent not only to receive additional information as it continues its due diligence of the settlement, but also to reserve its capability to voice a substantive objection in the unlikely event that necessity should arise.

On August 26, 2011, the case was removed to Federal court. The trustee filed a motion to remand the case back to state court. On October 19, 2011, the Federal court denied the trustee's motion to remand. The trustee has the right to appeal this decision; there is no assurance that the trustee would be successful on any such appeal.

On September 2, 2011, FHFA announced that it, as conservator for Freddie Mac and Fannie Mae, has filed lawsuits against 17 financial institutions and related defendants alleging violations of federal securities laws and common law in the sale of residential non-agency mortgage-related securities to Freddie Mac and Fannie Mae. FHFA, as conservator, filed a similar lawsuit against UBS Americas, Inc. and related defendants on July 27, 2011. FHFA seeks to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non-agency mortgage-related securities issued by these financial institutions.

The ultimate amounts of recovery payments we receive from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations. Our estimate of probable incurred losses for exposure to seller/servicers for their repurchase obligations is considered in our allowance for loan losses as of September 30, 2011 and December 31, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for further information. We believe we have appropriately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at September 30, 2011 and December 31, 2010; however, our actual losses may exceed our estimates.

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loss mitigation efforts, including under the MHA Program, and therefore, we have exposure to them to the extent a decline in their performance results in a failure to achieve the anticipated benefits of our loss mitigation plans.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top five single-family loan servicers, Wells Fargo Bank N.A., Bank of America N.A., JPMorgan Chase Bank, N.A., Citimortgage, Inc., and U.S. Bank, N.A., together serviced approximately 67% of our single-family mortgage loans as of September 30, 2011. Wells Fargo Bank N.A., Bank of America N.A., and JPMorgan Chase Bank, N.A. serviced approximately 26%, 13% and 13%, respectively, of our single-family mortgage loans, as of September 30, 2011. Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

During the second half of 2010, a number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in some or all states in which they do business. These seller/servicers announced these suspensions were necessary while they evaluated and addressed issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits. While these servicers generally resumed foreclosure proceedings in the first quarter of 2011, the rate at which they are effecting foreclosures has been slower than prior to the suspensions. See "NOTE 7: REAL ESTATE OWNED" in our 2010 Annual Report for additional information.

As of September 30, 2011 our top four multifamily servicers, Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., CBRE Capital Markets, Inc., and Deutsche Bank Berkshire Mortgage, each serviced more than 10% of our multifamily mortgage portfolio and together serviced approximately 51% of our multifamily mortgage portfolio.

In our multifamily business, we are exposed to the risk that multifamily seller/servicers could come under financial pressure, which could potentially cause degradation in the quality of servicing they provide to us or, in certain cases, reduce the likelihood that we could recover losses through recourse agreements or other credit enhancements, where applicable. This risk primarily relates to multifamily loans that we hold on our consolidated balance sheets where we

retain all of the related credit risk. We monitor the status of all our multifamily seller/servicers in accordance with our counterparty credit risk management framework.

**Mortgage Insurers**

We have institutional credit risk relating to the potential insolvency of or non-performance by mortgage insurers that insure single-family mortgages we purchase or guarantee. We evaluate the recovery from insurance policies for mortgage loans that we hold for investment as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments as part of the estimate of our loan loss reserves. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for additional information. As of September 30, 2011, these insurers provided coverage, with maximum loss limits of $53.7 billion, for $254.3 billion of UPB, in connection with our single-family credit guarantee portfolio. Our top six mortgage insurer counterparties, Mortgage Guaranty Insurance Corporation (or MGIC), Radian Guaranty Inc., Genworth Mortgage Insurance Corporation, United Guaranty Residential Insurance Co., PMI Mortgage Insurance Co. (or PMI), and Republic Mortgage Insurance Co. (or RMIC) each accounted for more than 10% and collectively represented approximately 94% of our overall mortgage insurance coverage at September 30, 2011. All our mortgage insurance counterparties are rated BBB or below as of October 21, 2011, based on the lower of the S&P or Moody's rating scales and stated in terms of the S&P equivalent.

We received proceeds of $2.0 billion and $1.2 billion during the nine months ended September 30, 2011 and 2010, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers of $2.0 billion and $2.3 billion as of September 30, 2011 and December 31, 2010, respectively. The balance of our outstanding accounts receivable from mortgage insurers, net of associated reserves, was approximately $1.1 billion and $1.5 billion as of September 30, 2011 and December 31, 2010, respectively.

In August 2011, we suspended RMIC and its affiliates, and PMI and its affiliates, as approved mortgage insurers for Freddie Mac loans, making loans insured by either company ineligible for sale to Freddie Mac. During the third quarter of 2011, RMIC announced that its waiver of state regulatory capital requirements expired, and it ceased writing new business. PMI, which had exceeded its risk to capital requirements, also ceased writing new business during the third quarter of 2011. PMI has been put under state supervision, and PMI's state regulator has petitioned for judicial action to place PMI into receivership. PMI has announced that, effective October 24, 2011, it instituted a partial claim payment plan, under which claim payments will be made at 50%, with the remaining amount deferred as a policyholder claim. In the future, our mortgage insurance exposure will likely be concentrated among a smaller number of mortgage insurer counterparties.

As part of the estimate of our loan loss reserves, we evaluate the near term recovery from insurance policies for mortgage loans that we hold on our consolidated balance sheet as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments. Triad Guaranty Insurance Corp., or Triad, is continuing to pay claims 60% in cash and 40% in deferred payment obligation under orders of its state regulator. To date, the state regulator has not allowed Triad to begin paying its deferred payment obligations, and it is uncertain when or if Triad will be permitted to do so.

**Bond Insurers**

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering some of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. At September 30, 2011, we had coverage, including secondary policies, on non-agency mortgage-related securities totaling $9.9 billion of UPB. At September 30, 2011, our top five bond insurers, Ambac Assurance Corporation (or Ambac), Financial Guaranty Insurance Company (or FGIC), MBIA Insurance Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp., each accounted for more than 10% of our overall bond insurance coverage and collectively represented approximately 99% of our total coverage.

We evaluate the recovery from primary bond insurance policies as part of our impairment analysis for our investments in securities. FGIC and Ambac are currently not paying any claims. If a bond insurer fails to meet its obligations on our investments in securities, then the fair values of our securities may further decline, which could have a material adverse effect on our results and financial condition. We recognized other-than-temporary impairment losses during 2010 and 2011 related to investments in mortgage-related securities covered by bond insurance as a result of our uncertainty over whether or not certain insurers will meet our future claims in the event of a loss on the securities. See

*Freddie Mac*

"NOTE 7: INVESTMENTS IN SECURITIES" for further information on our evaluation of impairment on securities covered by bond insurance.

**Cash and Other Investments Counterparties**

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. As of September 30, 2011 and December 31, 2010, there were $54.5 billion and $91.6 billion, respectively, of cash and other non- mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. As of September 30, 2011, these included:

- $4.2 billion of cash equivalents invested in 18 counterparties that had short-term credit ratings of A-1 or above on the S&P or equivalent scale;

- $3.1 billion of securities purchased under agreements to resell with two counterparties that had short-term S&P ratings of A-1 or above;

- $7.5 billion of securities purchased under agreements to resell with three counterparties that had short-term S&P ratings of A-2; and

- $39.0 billion of cash deposited with the Federal Reserve Bank.

**Derivative Portfolio**

*Derivative Counterparties*

Our use of derivatives exposes us to institutional credit risk, which arises from the possibility that the derivative counterparty will not be able to meet its contractual obligations. Exchange-traded derivatives, such as futures contracts, do not measurably increase our institutional credit risk because changes in the value of open exchange-traded contracts are settled daily through a financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk because transactions are executed and settled between us and our counterparty. Our use of OTC interest-rate swaps, option-based derivatives, and foreign-currency swaps is subject to rigorous internal credit and legal reviews. All of our OTC derivatives counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

*Master Netting and Collateral Agreements*

We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest-rate swaps, option-based derivatives, and foreign-currency swaps. Master netting agreements provide for the netting of amounts receivable and payable from an individual counterparty, which reduces our exposure to a single counterparty in the event of default. On a daily basis, the market value of each counterparty's derivatives outstanding is calculated to determine the amount of our net credit exposure, which is equal to derivatives in a net gain position by counterparty after giving consideration to collateral posted. Our collateral agreements require most counterparties to post collateral for the amount of our net exposure to them above the applicable threshold. Bilateral collateral agreements are in place for the majority of our counterparties. Collateral posting thresholds are tied to a counterparty's credit rating. Derivative exposures and collateral amounts are monitored on a daily basis using both internal pricing models and dealer price quotes. Collateral is typically transferred within one business day based on the values of the related derivatives. This time lag in posting collateral can affect our net uncollateralized exposure to derivative counterparties.

Collateral posted by a derivative counterparty is typically in the form of cash, although U.S. Treasury securities, Freddie Mac mortgage-related securities, or our debt securities may also be posted. In the event a counterparty defaults on its obligations under the derivatives agreement and the default is not remedied in the manner prescribed in the agreement, we have the right under the agreement to direct the custodian bank to transfer the collateral to us or, in the case of non-cash collateral, to sell the collateral and transfer the proceeds to us.

Our uncollateralized exposure to counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest-rate caps, after applying netting agreements and collateral, was $217 million and $32 million at September 30, 2011 and December 31, 2010, respectively. In the event that all of our counterparties for these derivatives were to have defaulted simultaneously on September 30, 2011, our maximum loss for accounting purposes would have been approximately $217 million. Four counterparties each accounted for greater than 10% and collectively accounted for 90% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at September 30, 2011. These counterparties were Barclays Bank PLC, Goldman Sachs Bank USA, JP Morgan Chase Bank, N.A., and Bank of America, N.A., all of which were rated "A" or above by S&P as of October 21, 2011.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives, was $65 million and $103 million at September 30, 2011 and December 31, 2010, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis to ensure that they continue to meet our internal risk-management standards.

## NOTE 18: FAIR VALUE DISCLOSURES

**Fair Value Hierarchy**

The accounting guidance for fair value measurements and disclosures establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. Assets and liabilities are classified in their entirety within the fair value hierarchy based on the lowest level input that is significant to the fair value measurement. Table 18.1 sets forth by level within the fair value hierarchy assets and liabilities measured and reported at fair value on a recurring basis in our consolidated balance sheets at September 30, 2011 and December 31, 2010.

**Table 18.1 — Assets and Liabilities Measured at Fair Value on a Recurring Basis**

| | Fair Value at September 30, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Total |
| | | | (in millions) | | |
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $ — | $ 81,986 | $ 2,035 | $ — | $ 84,021 |
| Subprime | — | — | 28,888 | — | 28,888 |
| CMBS | — | 52,788 | 3,477 | — | 56,265 |
| Option ARM | — | — | 6,168 | — | 6,168 |
| Alt-A and other | — | 11 | 11,432 | — | 11,443 |
| Fannie Mae | — | 20,158 | 422 | — | 20,580 |
| Obligations of states and political subdivisions | — | — | 8,132 | — | 8,132 |
| Manufactured housing | — | — | 816 | — | 816 |
| Ginnie Mae | — | 258 | 13 | — | 271 |
| Total available-for-sale securities, at fair value | — | 155,201 | 61,383 | — | 216,584 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 14,490 | 2,098 | — | 16,588 |
| Fannie Mae | — | 16,982 | 621 | — | 17,603 |
| Ginnie Mae | — | 137 | 24 | — | 161 |
| Other | — | 60 | 18 | — | 78 |
| Total mortgage-related securities | — | 31,669 | 2,761 | — | 34,430 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 276 | — | — | 276 |
| Treasury bills | 1,000 | — | — | — | 1,000 |
| Treasury notes | 17,159 | — | — | — | 17,159 |
| FDIC-guaranteed corporate medium-term notes | — | 2,433 | — | — | 2,433 |
| Total non-mortgage-related securities | 18,159 | 2,709 | — | — | 20,868 |
| Total trading securities, at fair value | 18,159 | 34,378 | 2,761 | — | 55,298 |
| Total investments in securities | 18,159 | 189,579 | 64,144 | — | 271,882 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 6,275 | — | 6,275 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 13,036 | 92 | — | 13,128 |
| Option-based derivatives | 4 | 17,236 | — | — | 17,240 |
| Other | 6 | 164 | 56 | — | 226 |
| Subtotal, before netting adjustments | 10 | 30,436 | 148 | — | 30,594 |
| Netting adjustments[1] | — | — | — | (30,299) | (30,299) |
| Total derivative assets, net | 10 | 30,436 | 148 | (30,299) | 295 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 674 | — | 674 |
| Total assets carried at fair value on a recurring basis | $18,169 | $220,015 | $71,241 | $(30,299) | $279,126 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ — | $ 3,291 | $ — | $ — | $ 3,291 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 37,005 | 21 | — | 37,026 |
| Option-based derivatives | 11 | 2,763 | 1 | — | 2,775 |
| Other | 6 | 162 | 52 | — | 220 |
| Subtotal, before netting adjustments | 17 | 39,930 | 74 | — | 40,021 |
| Netting adjustments[1] | — | — | — | (39,692) | (39,692) |
| Total derivative liabilities, net | 17 | 39,930 | 74 | (39,692) | 329 |
| Total liabilities carried at fair value on a recurring basis | $ 17 | $ 43,221 | $ 74 | $(39,692) | $ 3,620 |

*Freddie Mac*

| | Fair Value at December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Total |
| | | | (in millions) | | |
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $ — | $ 83,652 | $ 2,037 | $ — | $ 85,689 |
| Subprime | — | — | 33,861 | — | 33,861 |
| CMBS | — | 54,972 | 3,115 | — | 58,087 |
| Option ARM | — | — | 6,889 | — | 6,889 |
| Alt-A and other | — | 13 | 13,155 | — | 13,168 |
| Fannie Mae | — | 24,158 | 212 | — | 24,370 |
| Obligations of states and political subdivisions | — | — | 9,377 | — | 9,377 |
| Manufactured housing | — | — | 897 | — | 897 |
| Ginnie Mae | — | 280 | 16 | — | 296 |
| Total available-for-sale securities, at fair value | — | 163,075 | 69,559 | — | 232,634 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 11,138 | 2,299 | — | 13,437 |
| Fannie Mae | — | 17,872 | 854 | — | 18,726 |
| Ginnie Mae | — | 145 | 27 | — | 172 |
| Other | — | 11 | 20 | — | 31 |
| Total mortgage-related securities | — | 29,166 | 3,200 | — | 32,366 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 44 | — | — | 44 |
| Treasury bills | 17,289 | — | — | — | 17,289 |
| Treasury notes | 10,122 | — | — | — | 10,122 |
| FDIC-guaranteed corporate medium-term notes | — | 441 | — | — | 441 |
| Total non-mortgage-related securities | 27,411 | 485 | — | — | 27,896 |
| Total trading securities, at fair value | 27,411 | 29,651 | 3,200 | — | 60,262 |
| Total investments in securities | 27,411 | 192,726 | 72,759 | — | 292,896 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 6,413 | — | 6,413 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 9,921 | 49 | — | 9,970 |
| Option-based derivatives | — | 11,255 | — | — | 11,255 |
| Other | 3 | 266 | 21 | — | 290 |
| Subtotal, before netting adjustments | 3 | 21,442 | 70 | — | 21,515 |
| Netting adjustments[1] | — | — | — | (21,372) | (21,372) |
| Total derivative assets, net | 3 | 21,442 | 70 | (21,372) | 143 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 541 | — | 541 |
| Total assets carried at fair value on a recurring basis | $27,414 | $214,168 | $79,783 | $(21,372) | $299,993 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ — | $ 4,443 | $ — | $ — | $ 4,443 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 26,856 | 623 | — | 27,479 |
| Option-based derivatives | 8 | 252 | 2 | — | 262 |
| Other | 170 | 28 | 136 | — | 334 |
| Subtotal, before netting adjustments | 178 | 27,136 | 761 | — | 28,075 |
| Netting adjustments[1] | — | — | — | (26,866) | (26,866) |
| Total derivative liabilities, net | 178 | 27,136 | 761 | (26,866) | 1,209 |
| Total liabilities carried at fair value on a recurring basis | $ 178 | $ 31,579 | $ 761 | $(26,866) | $ 5,652 |

(1) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $10.7 billion and $6 million, respectively, at September 30, 2011. The net cash collateral posted and net trade/settle receivable were $6.3 billion and $1 million, respectively, at December 31, 2010. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.3) billion and $(0.8) billion at September 30, 2011 and December 31, 2010, respectively, which was mainly related to interest rate swaps that we have entered into.

**Recurring Fair Value Changes**

For the three and nine months ended September 30, 2011, we did not have any significant transfers between Level 1 and Level 2 assets or liabilities.

Our Level 3 items mainly consist of non-agency mortgage-related securities. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information about the valuation methods and assumptions used in our fair value measurements.

During the three and nine months ended September 30, 2011, the fair value of our Level 3 assets decreased due to: (a) monthly remittances of principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) the widening of OAS levels on these securities. During the three and nine months ended September 30, 2011, we had a net transfer into Level 3 assets of $98 million and $94 million, respectively, resulting from a change in valuation method for certain mortgage-related securities due to a lack of relevant price quotes from dealers and third-party pricing services.

During the third quarter of 2010, the fair value of our Level 3 assets increased due to: (a) a decline in market interest rates; and (b) fair value gains related to the movement of securities with unrealized losses towards maturity. For the nine months ended September 30, 2010, the fair value of our Level 3 assets decreased primarily due to the adoption of the amendments to the accounting standards for transfers of financial assets and consolidation of VIEs. These accounting changes resulted in the elimination of $28.8 billion in our Level 3 assets on January 1, 2010, including the elimination of certain mortgage-related securities issued by our consolidated trusts that are held by us and the guarantee asset for guarantees issued to our consolidated trusts. In addition, we transferred $0.3 billion of Level 3 assets to Level 2 during the nine months ended September 30, 2010, resulting from improved liquidity and availability of price quotes received from dealers and third-party pricing services.

Table 18.2 provides a reconciliation of the beginning and ending balances for assets and liabilities measured at fair value using significant unobservable inputs (Level 3).

*Freddie Mac*

**Table 18.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs**

Three Months Ended September 30, 2011

| | Balance, June 30, 2011 | Realized and unrealized gains (losses) | | | Purchases | Issuances | Sales | Settlements, net[5] | Net transfers in and/or out of Level 3[6] | Balance, September 30, 2011 | Unrealized gains (losses) still held[7] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Included in earnings[1][2][3][4] | Included in other comprehensive income[1] | Total | | (in millions) | | | | | |
| **Investments in securities:** | | | | | | | | | | | |
| *Available-for-sale, at fair value:* | | | | | | | | | | | |
| *Mortgage-related securities:* | | | | | | | | | | | |
| Freddie Mac | $ 1,983 | $ — | $ 28 | $ 28 | $ 101 | $ — | $ — | $ (14) | $ (63) | $ 2,035 | $ — |
| Subprime | 30,491 | (31) | (348) | (379) | — | — | — | (1,224) | — | 28,888 | (31) |
| CMBS | 3,207 | — | 273 | 273 | — | — | — | (3) | — | 3,477 | — |
| Option ARM | 6,591 | (19) | (128) | (147) | — | — | — | (276) | — | 6,168 | (19) |
| Alt-A and other | 12,197 | (80) | (294) | (374) | — | — | — | (391) | — | 11,432 | (80) |
| Fannie Mae | 187 | — | (2) | (2) | 246 | — | — | (9) | — | 422 | — |
| Obligations of states and political subdivisions | 8,560 | 9 | 253 | 262 | — | — | (413) | (277) | — | 8,132 | — |
| Manufactured housing | 844 | (4) | 5 | 1 | — | — | — | (29) | — | 816 | (4) |
| Ginnie Mae | 14 | — | — | — | — | — | — | (1) | — | 13 | — |
| Total available-for-sale mortgage-related securities | 64,074 | (125) | (213) | (338) | 347 | — | (413) | (2,224) | (63) | 61,383 | (134) |
| *Trading, at fair value:* | | | | | | | | | | | |
| *Mortgage-related securities:* | | | | | | | | | | | |
| Freddie Mac | 2,622 | (637) | — | (637) | 69 | — | — | (58) | 102 | 2,098 | (638) |
| Fannie Mae | 843 | (268) | — | (268) | — | — | — | (13) | 59 | 621 | (268) |
| Ginnie Mae | 26 | — | — | — | — | — | — | (2) | — | 24 | — |
| Other | 18 | (1) | — | (1) | — | 5 | (3) | (1) | — | 18 | (1) |
| Total trading mortgage-related securities | 3,509 | (906) | — | (906) | 69 | 5 | (3) | (74) | 161 | 2,761 | (907) |
| **Mortgage loans:** | | | | | | | | | | | |
| Held-for-sale, at fair value | 4,463 | 261 | — | 261 | 4,119 | — | (2,561) | (7) | — | 6,275 | 170 |
| Net derivatives[8] | (319) | 534 | — | 534 | — | (23) | — | (118) | — | 74 | 279 |
| **Other assets:** | | | | | | | | | | | |
| Guarantee asset[9] | 667 | (27) | — | (27) | — | 48 | — | (14) | — | 674 | (27) |

*Freddie Mac*

**Nine Months Ended September 30, 2011**

(in millions)

| | Balance, January 1, 2011 | Realized and unrealized gains (losses) | | | Purchases | Issuances | Sales | Settlements, net [5] | Net transfers in and/or out of Level 3 [6] | Balance, September 30, 2011 | Unrealized gains (losses) still held [7] |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Included in earnings [1][2][3][4] | Included in other comprehensive income [1] | Total | | | | | | | |
| **Investments in securities:** | | | | | | | | | | | |
| **Available-for-sale, at fair value:** | | | | | | | | | | | |
| **Mortgage-related securities:** | | | | | | | | | | | |
| Freddie Mac | $ 2,037 | $ — | $ 67 | $ 67 | $ 101 | $ — | $ — | $ (71) | $ (99) | $ 2,035 | $ — |
| Subprime | 33,861 | (835) | (33) | (868) | — | — | — | (4,105) | — | 28,888 | (835) |
| CMBS | 3,115 | — | 385 | 385 | — | — | — | (23) | — | 3,477 | (365) |
| Option ARM | 6,889 | (365) | 640 | 275 | — | — | — | (996) | — | 6,168 | (365) |
| Alt-A and other | 13,155 | (152) | (238) | (390) | 246 | — | — | (1,333) | (5) | 11,432 | (152) |
| Fannie Mae | 212 | | | — | | | | (31) | | 422 | |
| Obligations of states and political subdivisions | 9,377 | 13 | 495 | 508 | | | (608) | (1,145) | | 8,132 | — |
| Manufactured housing | 897 | (9) | 17 | 8 | | | | (89) | | 816 | (9) |
| Ginnie Mae | 16 | — | | — | | | | (3) | | 13 | — |
| Total available-for-sale mortgage-related securities | 69,559 | (1,348) | 1,333 | (15) | 347 | | (608) | (7,796) | (104) | 61,383 | (1,361) |
| **Trading, at fair value:** | | | | | | | | | | | |
| **Mortgage-related securities:** | | | | | | | | | | | |
| Freddie Mac | 2,299 | (629) | | (629) | 451 | | (55) | (155) | 187 | 2,098 | (630) |
| Fannie Mae | 854 | (270) | | (270) | 56 | | | (30) | 11 | 621 | (270) |
| Ginnie Mae | 27 | | | — | | 6 | (3) | (3) | | 24 | — |
| Other | 20 | (2) | | (2) | | | | (3) | | 18 | (2) |
| Total trading mortgage-related securities | 3,200 | (901) | | (901) | 507 | 6 | (58) | (191) | 198 | 2,761 | (902) |
| **Mortgage loans:** | | | | | | | | | | | |
| Held-for-sale, at fair value | 6,413 | 621 | | 621 | 9,553 | | (10,283) | (29) | 2 | 6,275 | 203 |
| Net derivatives [8] | (691) | 927 | | 927 | | (45) | | (119) | | 74 | 378 |
| **Other assets:** | | | | | | | | | | | |
| Guarantee asset [9] | 541 | (22) | | (22) | | 193 | | (38) | | 674 | (22) |

172

*Freddie Mac*

| | | Three Months Ended September 30, 2010 | | | | | | |
| | | Realized and unrealized gains (losses) | | | | | | |
| | Balance, June 30, 2010 | Included in earnings[1][2][3][4] | Included in other comprehensive income[3] | Total | Purchases, issuances, sales and settlements, net[5] | Net transfers in and/or out of Level 3[6] | Balance, September 30, 2010 | Unrealized gains (losses) still held[7] |
|---|---|---|---|---|---|---|---|---|
| | | | | | (in millions) | | | |
| **Investments in securities:** | | | | | | | | |
| **Available-for-sale, at fair value:** | | | | | | | | |
| **Mortgage-related securities:** | | | | | | | | |
| Freddie Mac | $ 2,099 | $ — | $ 55 | $ 55 | $ 32 | $(110) | $ 2,076 | $ — |
| Subprime | 34,554 | (213) | 1,316 | 1,103 | (1,583) | — | 34,074 | (213) |
| CMBS | 58,129 | (6) | 2,040 | 2,034 | (861) | — | 59,302 | (6) |
| Option ARM | 6,897 | (577) | 951 | 374 | (346) | — | 6,925 | (577) |
| Alt-A and other | 12,958 | (296) | 1,218 | 922 | (571) | — | 13,309 | (296) |
| Fannie Mae | 289 | — | 1 | 1 | (77) | — | 213 | — |
| Obligations of states and political subdivisions | 10,743 | 1 | 162 | 163 | (555) | — | 10,351 | — |
| Manufactured housing | 892 | (8) | 49 | 41 | (30) | — | 903 | (8) |
| Ginnie Mae | 3 | — | — | — | — | — | 3 | — |
| Total available-for-sale mortgage-related securities | 126,564 | (1,099) | 5,792 | 4,693 | (3,991) | (110) | 127,156 | (1,100) |
| **Trading, at fair value:** | | | | | | | | |
| **Mortgage-related securities:** | | | | | | | | |
| Freddie Mac | 3,041 | (319) | — | (319) | 177 | (54) | 2,845 | (327) |
| Fannie Mae | 918 | (166) | — | (166) | (12) | — | 740 | (166) |
| Ginnie Mae | 28 | 1 | — | 1 | (1) | — | 28 | 1 |
| Other | 23 | — | — | — | 34 | — | 57 | — |
| Total trading mortgage-related securities | 4,010 | (484) | — | (484) | 198 | (54) | 3,670 | (492) |
| **Mortgage loans:** | | | | | | | | |
| Held-for-sale, at fair value | 1,656 | 157 | — | 157 | 1,051 | — | 2,864 | 82 |
| Net derivatives[8] | 199 | 149 | — | 149 | (212) | — | 136 | 61 |
| **Other assets:** | | | | | | | | |
| Guarantee asset[9] | 485 | (1) | — | (1) | 22 | — | 506 | (1) |

173

*Freddie Mac*

| | | | | Nine Months Ended September 30, 2010 | | | | | |
| | | | | Realized and unrealized gains (losses) | | | | | |
| | Balance, December 31, 2009 | Cumulative effect of change in accounting principle[10] | Balance, January 1, 2010 | Included in earnings[1][2][3][4] | Included in other comprehensive income[1] | Total | Purchases, issuances, sales and settlements, net[5] | Net transfers in and/or out of Level 3[6] | Balance, September 30, 2010 | Unrealized gains (losses) still held[7] |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in millions) | | | | | |
| **Investments in securities:** | | | | | | | | | | |
| **Available-for-sale securities, at fair value:** | | | | | | | | | | |
| **Mortgage-related securities:** | | | | | | | | | | |
| Freddie Mac | $ 20,807 | $(18,775) | $ 2,032 | $ — | $ 72 | $ 72 | $ (28) | $ — | $ 2,076 | $ — |
| Subprime | 35,721 | — | 35,721 | (562) | 4,581 | 4,019 | (5,666) | — | 34,074 | (562) |
| CMBS | 54,019 | — | 54,019 | (78) | 7,701 | 7,623 | (2,340) | — | 59,302 | (78) |
| Option ARM | 7,236 | — | 7,236 | (734) | 1,648 | 914 | (1,225) | — | 6,925 | (727) |
| Alt-A and other | 13,391 | — | 13,391 | (648) | 2,381 | 1,733 | (1,815) | — | 13,309 | (648) |
| Fannie Mae | 338 | — | 338 | — | (1) | (1) | (124) | — | 213 | |
| Obligations of states and political subdivisions | 11,477 | — | 11,477 | 3 | 374 | 377 | (1,503) | — | 10,351 | |
| Manufactured housing | 911 | — | 911 | (23) | 104 | 81 | (89) | — | 903 | (23) |
| Ginnie Mae | 4 | — | 4 | — | — | — | (1) | — | 3 | |
| Total available-for-sale securities | 143,904 | (18,775) | 125,129 | (2,042) | 16,860 | 14,818 | (12,791) | — | 127,156 | (2,038) |
| **Trading, at fair value:** | | | | | | | | | | |
| **Mortgage-related securities:** | | | | | | | | | | |
| Freddie Mac | 2,805 | (5) | 2,800 | (947) | — | (947) | 1,275 | (283) | 2,845 | (970) |
| Fannie Mae | 1,343 | — | 1,343 | (564) | — | (564) | (37) | (2) | 740 | (564) |
| Ginnie Mae | 27 | — | 27 | 2 | — | 2 | (1) | — | 28 | 2 |
| Other | 28 | (1) | 27 | (2) | — | (2) | 32 | — | 57 | 2 |
| Total trading mortgage-related securities | 4,203 | (6) | 4,197 | (1,511) | — | (1,511) | 1,269 | (285) | 3,670 | (1,534) |
| **Mortgage loans:** | | | | | | | | | | |
| Held-for-sale, at fair value | 2,799 | — | 2,799 | 379 | — | 379 | (314) | — | 2,864 | 80 |
| Net derivatives[8] | (430) | — | (430) | 824 | — | 824 | (258) | — | 136 | 236 |
| **Other assets:** | | | | | | | | | | |
| Guarantee asset[9] | 10,444 | (10,024) | 420 | (8) | — | (8) | 94 | — | 506 | (8) |

(1) Changes in fair value for available-for-sale investments are recorded in AOCI, while gains and losses from sales are recorded in other gains (losses) on investments on our consolidated statements of income and comprehensive income. For mortgage-related securities classified as trading, the realized and unrealized gains (losses) are recorded in other gains (losses) on investments on our consolidated statements of income and comprehensive income.

(2) Changes in fair value of derivatives are recorded in derivative gains (losses) on our consolidated statements of income and comprehensive income for those not designated as accounting hedges.

(3) Changes in fair value of the guarantee asset are recorded in other income on our consolidated statements of income and comprehensive income.

(4) For held-for-sale mortgage loans with fair value option elected, gains (losses) on fair value changes and sale of mortgage loans are recorded in other income on our consolidated statements of income and comprehensive income.

(5) For non-agency mortgage-related securities, primarily represents principal repayments.

(6) Transfer in and/or out of Level 3 during the period is disclosed as if the transfer occurred at the beginning of the period.

(7) Represents the amount of total gains or losses for the period, included in earnings, attributable to the change in unrealized gains (losses) related to assets and liabilities classified as Level 3 that were still held at September 30, 2011 and 2010, respectively. Included in these amounts are credit-related other-than-temporary impairments recorded on available-for-sale securities.

(8) Net derivatives include derivative assets and derivative liabilities prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

(9) We estimate that all amounts recorded for unrealized gains and losses on our guarantee asset relate to those amounts still in position. The amounts reflected in earnings represent the periodic fair value changes of our guarantee asset.

(10) Represents adjustment to adopt the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs.

*Freddie Mac*

## Non-recurring Fair Value Changes

Certain assets are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances. We consider the fair value measurement related to these assets to be non-recurring. These assets include impaired held-for-investment multifamily mortgage loans and REO, net. These fair value measurements usually result from the write-down of individual assets to current fair value amounts due to impairments.

The fair value of impaired multifamily held-for-investment mortgage loans is generally based on the value of the underlying property. Given the relative illiquidity in the markets for these impaired loans, and differences in contractual terms of each loan, we classified these loans as Level 3 in the fair value hierarchy. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Mortgage Loans, Held-for-Investment*" for additional details.

REO is initially measured at its fair value less costs to sell. In subsequent periods, REO is reported at the lower of its carrying amount or fair value less costs to sell. Subsequent measurements of fair value less costs to sell are estimated values based on relevant current and historical factors, which are considered to be unobservable inputs. As a result, REO is classified as Level 3 under the fair value hierarchy. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *REO, Net*" for additional details.

Table 18.3 presents assets measured and reported at fair value on a non-recurring basis in our consolidated balance sheets by level within the fair value hierarchy at September 30, 2011 and December 31, 2010, respectively.

### Table 18.3 — Assets Measured at Fair Value on a Non-Recurring Basis

| | Fair Value at September 30, 2011 | | | | Fair Value at December 31, 2010 | | | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|---|---|---|---|
| | | | (in millions) | | | | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | | | | | |
| Mortgage loans:[1] | | | | | | | | |
| Held-for-investment . . . . . . | $— | $— | $1,448 | $1,448 | $— | $— | $1,560 | $1,560 |
| REO, net[2] . . . . . . . . . . . . | — | — | 4,622 | 4,622 | — | — | 5,606 | 5,606 |
| Total assets measured at fair value on a non-recurring basis . . . . . . . . . . . . . . . | $— | $— | $6,070 | $6,070 | $— | $— | $7,166 | $7,166 |

| | Total Gains (Losses)[3] | | | |
| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2011 | 2010 | 2011 | 2010 |
|---|---|---|---|---|
| | | (in millions) | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | |
| Mortgage loans:[1] | | | | |
| Held-for-investment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ (23) | $ (11) | $ (32) | $(134) |
| REO, net[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (115) | (243) | (162) | (276) |
| Total gains (losses) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $(138) | $(254) | $(194) | $(410) |

(1) Represents carrying value and related write-downs of loans for which adjustments are based on the fair value amounts. These loans include impaired multifamily mortgage loans that are classified as held-for-investment and have a related valuation allowance.

(2) Represents the fair value and related losses of foreclosed properties that were measured at fair value subsequent to their initial classification as REO, net. The carrying amount of REO, net was written down to fair value of $4.6 billion, less estimated costs to sell of $325 million (or approximately $4.3 billion) at September 30, 2011. The carrying amount of REO, net was written down to fair value of $5.6 billion, less estimated costs to sell of $406 million (or approximately $5.2 billion) at December 31, 2010.

(3) Represents the total net gains (losses) recorded on items measured at fair value on a non-recurring basis as of September 30, 2011 and 2010, respectively.

## Fair Value Election

We elected the fair value option for certain types of securities, multifamily held-for-sale mortgage loans, foreign-currency denominated debt, and certain other debt.

### Certain Available-for-Sale Securities with Fair Value Option Elected

We elected the fair value option for certain available-for-sale mortgage-related securities to better reflect the natural offset these securities provide to fair value changes recorded historically on our guarantee asset at the time of our election. In addition, upon adoption of the accounting guidance for the fair value option, we elected this option for available-for-sale securities within the scope of the accounting guidance for investments in beneficial interests in securitized financial assets to better reflect any valuation changes that would occur subsequent to impairment write-downs

previously recorded on these instruments. By electing the fair value option for these instruments, we reflect valuation changes through our consolidated statements of income and comprehensive income in the period they occur, including any increases in value.

For mortgage-related securities and investments in securities that were selected for the fair value option and subsequently classified as trading securities, the change in fair value is recorded in other gains (losses) on investment securities recognized in earnings in our consolidated statements of income and comprehensive income. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding the net unrealized gains (losses) on trading securities, which include gains (losses) for other items that are not selected for the fair value option. Related interest income continues to be reported as interest income in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report for additional information about the measurement and recognition of interest income on investments in securities.

### Debt Securities with Fair Value Option Elected

We elected the fair value option for foreign-currency denominated debt and certain other debt securities. In the case of foreign-currency denominated debt, we have entered into derivative transactions that effectively convert these instruments to U.S. dollar denominated floating rate instruments. The fair value changes on these derivatives were recorded in derivative gains (losses) in our consolidated statements of income and comprehensive income. We elected the fair value option on these debt instruments to better reflect the economic offset that naturally results from the debt due to changes in interest rates. We also elected the fair value option for certain other debt securities containing potential embedded derivatives that required bifurcation.

The changes in fair value of debt securities with the fair value option elected were $133 million and $15 million for the three and nine months ended September 30, 2011, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of income and comprehensive income. The changes in fair value related to fluctuations in exchange rates and interest rates were $137 million and $21 million for the three and nine months ended September 30, 2011, respectively. The remaining changes in the fair value of $(4) million and $(6) million were attributable to changes in credit risk for the three and nine months ended September 30, 2011, respectively.

The changes in fair value of debt securities with the fair value option elected were $(366) million and $525 million for the three and nine months ended September 30, 2010, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of income and comprehensive income. The changes in fair value related to fluctuations in exchange rates and interest rates were $(351) million and $526 million for the three and nine months ended September 30, 2010, respectively. The remaining changes in the fair value of $(15) million and $(1) million were attributable to changes in credit risk for the three and nine months ended September 30, 2010, respectively.

The change in fair value attributable to changes in credit risk was primarily determined by comparing the total change in fair value of the debt to the total change in fair value of the interest-rate and foreign-currency derivatives used to hedge the debt. Any difference in the fair value change of the debt compared to the fair value change in the derivatives is attributed to credit risk.

The difference between the aggregate fair value and aggregate UPB for long-term debt securities with fair value option elected was $62 million and $108 million at September 30, 2011 and December 31, 2010, respectively. Related interest expense continues to be reported as interest expense in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Debt Securities Issued" in our 2010 Annual Report for additional information about the measurement and recognition of interest expense on debt securities issued.

### Multifamily Held-For-Sale Mortgage Loans with Fair Value Option Elected

We elected the fair value option for multifamily mortgage loans that were purchased for securitization. Through this channel, we acquire loans that we intend to securitize and sell to CMBS investors. While this is consistent with our overall strategy to expand our multifamily business, it differs from our traditional buy-and-hold strategy with respect to multifamily loans held-for-investment. Therefore, these multifamily mortgage loans were classified as held-for-sale mortgage loans in our consolidated balance sheets to reflect our intent to sell in the future.

We recorded $261 million and $621 million from the change in fair value in gains (losses) on mortgage loans recorded at fair value in other income in our consolidated statements of income and comprehensive income for the three and nine months ended September 30, 2011, respectively. We recorded fair value changes of $157 million and

$379 million in other income in our consolidated statements of income and comprehensive income for the three and nine months ended September 30, 2010, respectively. The changes in fair value of these loans were primarily attributable to changes in interest rates and other non-credit related items such as liquidity. The changes in fair value attributable to credit risk were not material given that these loans were generally originated within the past six to twelve months and have not seen a change in their credit characteristics.

The difference between the aggregate fair value and the aggregate UPB for multifamily held-for-sale loans with the fair value option elected was $173 million and $(311) million at September 30, 2011 and December 31, 2010, respectively. Related interest income continues to be reported as interest income in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2010 Annual Report for additional information about the measurement and recognition of interest income on our mortgage loans.

### Valuation Methods and Assumptions Subject to Fair Value Hierarchy

We categorize assets and liabilities that we measure and report at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation process used to derive the fair value and our judgment regarding the observability of the related inputs.

#### *Investments in Securities*

##### <u>Agency Securities</u>

Fixed-rate agency securities are valued based on dealer-published quotes for a base TBA security, adjusted to reflect the measurement date as opposed to a forward settlement date ("carry") and pay-ups for specified collateral. The base TBA price varies based on agency, term, coupon, and settlement month. The carry adjustment converts forward settlement date prices to spot or same-day settlement date prices such that the fair value is estimated as of the measurement date, and not as of the forward settlement date. The carry adjustment uses our internal prepayment and interest rate models. A pay-up is added to the base TBA price for characteristics that are observed to be trading at a premium versus TBAs; this currently includes seasoning and low-loan balance attributes. Haircuts are applied to a small subset of positions that are less liquid and are observed to trade at a discount relative to TBAs; this includes securities that are not eligible for delivery into TBA trades.

Adjustable-rate agency securities are valued based on the median of prices from multiple pricing services. The key valuation drivers used by the pricing services include the interest rate cap structure, term, agency, remaining term, and months-to-next coupon reset, coupled with prevailing market conditions, namely interest rates.

Because fixed-rate and adjustable-rate agency securities are generally liquid and contain observable pricing in the market, they generally are classified as Level 2.

Multiclass structures are valued using a variety of methods, depending on the product type. The predominant valuation methodology uses the median prices from multiple pricing services. This method is used for structures for which there is typically significant, relevant market activity. Some of the key valuation drivers used by the pricing services are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. Other tranche types that are more challenging to price are valued using the median prices from multiple dealers. These include structured interest-only, structured principal-only, inverse floaters, and inverse interest-only structures. Some of the key valuation drivers used by the dealers are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. In addition, there is a subset of tranches for which there is a lack of relevant market activity that are priced using a proxy relationship where the position is matched to the closest dealer-priced tranche, then valued by calculating an OAS using our proprietary prepayment and interest rate models from the dealer-priced tranche. If necessary, our judgment is applied to estimate the impact of differences in prepayment uncertainty or other unique cash flow characteristics related to that particular security. We then determine the fair values for these securities by using the estimated OAS as an input to the valuation calculation in conjunction with interest-rate and prepayment models to calculate the NPV of the projected cash flows. These positions typically have smaller balances and are more difficult for dealers to value. There is also a subset of positions for which prices are published on a daily basis; these include trust interest-only and trust principal-only strips. These are fairly liquid tranches and are quoted on a regular settlement date basis. In order to align the regular settlement date price with the balance sheet date, the OAS is calculated based on the published prices. Then the tranche is valued using that OAS applied to the balance sheet date.

Multiclass agency securities are classified as Level 2 or 3 depending on the significance of the inputs that are not observable.

*Freddie Mac*

*Commercial Mortgage-Backed Securities*

CMBS are valued based on the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the collateral type, collateral performance, capital structure, issuer, credit enhancement, coupon, and weighted average life, coupled with the observed spread levels on trades of similar securities. The weighted average coupon of the collateral underlying our CMBS investments was 5.7% as of both September 30, 2011 and December 31, 2010. The weighted-average life of the collateral underlying our CMBS investments was 3.8 years and 4.3 years, respectively, as of September 30, 2011 and December 31, 2010. Many of these securities have significant prepayment lockout periods or penalty periods that limit the window of potential prepayment to a relatively narrow band. These securities are primarily classified as Level 2.

*Subprime, Option ARM, and Alt-A and Other (Mortgage-Related)*

These private-label investments are valued using either the median of multiple dealer prices or the median prices from multiple pricing services. Some of the key valuation drivers used by the dealers and pricing services include the product type, vintage, collateral performance, capital structure, credit enhancements, and coupon, coupled with interest rates and spreads observed on trades of similar securities, where possible. The market for non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans is highly illiquid, resulting in wide price ranges as well as wide credit spreads. These securities are primarily classified as Level 3.

Table 18.4 below presents the fair value of subprime, option ARM, and Alt-A and other investments we held by origination year.

**Table 18.4 — Fair Value of Subprime, Option ARM, and Alt-A and Other Investments by Origination Year**

| Year of Origination | Fair Value at | |
| --- | --- | --- |
| | September 30, 2011 | December 31, 2010 |
| | (in millions) | |
| 2004 and prior | $ 4,449 | $ 4,998 |
| 2005 | 10,973 | 13,126 |
| 2006 | 16,799 | 19,333 |
| 2007 | 14,278 | 16,461 |
| 2008 and beyond | — | — |
| Total | $46,499 | $53,918 |

*Obligations of States and Political Subdivisions*

These primarily represent housing revenue bonds, which are valued by taking the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the structure of the bond, call terms, cross-collateralization features, and tax-exempt features coupled with municipal bond rates, credit ratings, and spread levels. These securities are unique, resulting in low trading volumes and are classified as Level 3 in the fair value hierarchy.

*Manufactured Housing*

Securities backed by loans on manufactured housing properties are dealer-priced and we arrive at the fair value by taking the median of multiple dealer prices. Some of the key valuation drivers include the collateral's performance and vintage. These securities are classified as Level 3 in the fair value hierarchy because key inputs are unobservable in the market due to low levels of liquidity.

*Asset-Backed Securities (Non-Mortgage-Related)*

These private-label non-mortgage-related securities are valued based on prices from pricing services. Some of the key valuation drivers include the discount margin, subordination level, and prepayment speed, coupled with interest rates. They are classified as Level 2 because of their liquidity and tight pricing ranges.

*Treasury Bills and Treasury Notes*

Treasury bills and Treasury notes are classified as Level 1 in the fair value hierarchy since they are actively traded and price quotes are widely available at the measurement date for the exact security we are valuing.

*FDIC-Guaranteed Corporate Medium-Term Notes*

Since these securities carry the FDIC guarantee, they are considered to have no credit risk. They are valued based on yield analysis. They are classified as Level 2 because of their high liquidity and tight pricing ranges.

*Mortgage Loans, Held-for-Sale*

Mortgage loans, held-for-sale represent multifamily mortgage loans with the fair value option elected. Thus, all held-for-sale mortgage loans are measured at fair value on a recurring basis.

The fair value of multifamily mortgage loans is generally based on market prices obtained from a third-party pricing service provider for similar actively traded mortgages, adjusted for differences in loan characteristics and contractual terms. The pricing service aggregates observable price points from two markets: agency and non-agency. The agency market consists of purchases made by the GSEs of loans underwritten by our counterparties in accordance with our guidelines while the non-agency market generally consists of secondary market trades between banks and other financial institutions of loans that were originated and initially held in portfolio by these institutions. The pricing service blends the observable price data obtained from these two distinct markets into a final composite price based on the expected probability that a given loan will trade in one of these two markets. This estimated probability is largely a function of the loan's credit quality, as determined by its current LTV ratio and DSCR. The result of this blending technique is that lower credit quality loans receive a lower percentage of agency price weighting and higher credit quality loans receive a higher percentage of agency price weighting.

Given the relative illiquidity in the marketplace for multifamily mortgage loans and differences in contractual terms, these loans are classified as Level 3 in the fair value hierarchy.

*Mortgage Loans, Held-for-Investment*

Mortgage loans, held-for-investment measured at fair value on a non-recurring basis represent impaired multifamily mortgage loans, which are not measured at fair value on an ongoing basis but have been written down to fair value due to impairment. The valuation technique we use to measure the fair value of impaired multifamily mortgage loans, held-for-investment is based on the value of the underlying property and may include assessment of third-party appraisals, environmental, and engineering reports that we compare with relevant market performance to arrive at a fair value. Our valuation technique incorporates one or more of the following methods: income capitalization, discounted cash flow, sales comparables, and replacement cost. We consider the physical condition of the property, rent levels, and other market drivers, including input from sales brokers and the property manager. We classify impaired multifamily mortgage loans, held-for-investment as Level 3 in the fair value hierarchy as their valuation includes significant unobservable inputs.

*Derivative Assets, Net*

Derivative assets largely consist of interest-rate swaps, option-based derivatives, futures, and forward purchase and sale commitments that we account for as derivatives. The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable, trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net unrealized gain position are reported as derivative assets, net. Similarly, derivatives in a net unrealized loss position are reported as derivative liabilities, net.

<u>*Interest-Rate Swaps and Option-Based Derivatives*</u>

The fair values of interest-rate swaps are determined by using the appropriate yield curves to discount the expected cash flows of both the fixed and variable rate components of the swap contracts. In doing so, we first observe publicly available market spot interest rates, such as money market rates, Eurodollar futures contracts and LIBOR swap rates. The spot curves are translated to forward curves using internal models. From the forward curves, the periodic cash flows are calculated on the pay and receive side of the swap and discounted back at the relevant forward rates to arrive at the fair value of the swap. Since the fair values of the swaps are determined by using observable inputs from active markets, these are generally classified as Level 2 under the fair value hierarchy.

Option-based derivatives include call and put swaptions and other option-based derivatives, the majority of which are European options. The fair values of the European call and put swaptions are calculated by using market observable interest rates and dealer-supplied interest rate volatility grids as inputs to our option-pricing models. Within each grid, prices are determined based on the option term of the underlying swap and the strike rate of the swap. Derivatives with embedded American options are valued using dealer-provided pricing grids. The grids contain prices corresponding to specified option terms of the underlying swaps and the strike rate of the swaps. Interpolation is used to calculate prices for positions for which specific grid points are not provided. Derivatives with embedded Bermudan options are valued based on prices provided directly by counterparties. Swaptions are classified as Level 2 under the fair value hierarchy. Other option-based derivatives include exchange-traded options that are valued by exchange-published daily closing prices. Therefore, exchange-traded options are classified as Level 1 under the fair value hierarchy. Other option-based

derivatives also include purchased interest-rate cap and floor contracts that are valued by using observable market interest rates and cap and floor rate volatility grids obtained from dealers, and cancellable interest rate swaps that are valued by using dealer prices. Cap and floor contracts are classified as Level 2 and cancellable interest rate swaps with fair values using significant unobservable inputs are classified as Level 3 under the fair value hierarchy.

Table 18.5 below shows the fair value, prior to counterparty and cash collateral netting adjustments, for our interest-rate swaps and option-based derivatives and the maturity profile of our derivative positions. It also provides the weighted-average fixed rates of our pay-fixed and receive-fixed swaps. As of September 30, 2011 and December 31, 2010 our option-based derivatives had a remaining weighted-average life of 4.4 years and 4.5 years, respectively.

### Table 18.5 — Fair Values and Maturities for Interest-Rate Swaps and Option-Based Derivatives

| | | | September 30, 2011 | | | |
|---|---|---|---|---|---|---|
| | | | | Fair Value[1] | | |
| | Notional or Contractual Amount | Total Fair Value[2] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| **Interest-rate swaps:** | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $200,465 | $ 10,986 | $  24 | $  537 | $ 1,999 | $ 8,426 |
| Weighted average fixed rate[3] | | | 0.90% | 1.07% | 2.24% | 3.26% |
| Forward-starting swaps[4] | 20,203 | 2,039 | — | — | — | 2,039 |
| Weighted average fixed rate[3] | | | — | 0.60% | 0.84% | 3.53% |
| Basis (floating to floating) | 2,725 | (3) | — | (5) | 2 | — |
| Pay-fixed: | | | | | | |
| Swaps | 279,437 | (33,716) | (93) | (1,221) | (6,686) | (25,716) |
| Weighted-average fixed rate[3] | | | 2.00% | 2.07% | 3.32% | 3.99% |
| Forward-starting swaps[4] | 14,246 | (3,204) | — | — | — | (3,204) |
| Weighted-average fixed rate[3] | | | — | — | — | 5.29% |
| Total interest-rate swaps | $517,076 | $(23,898) | $  (69) | $  (689) | $(4,685) | $(18,455) |
| **Option-based derivatives:** | | | | | | |
| Call swaptions | $116,400 | $ 11,624 | $6,433 | $ 1,843 | $  597 | $ 2,751 |
| Put swaptions | 68,175 | 725 | 16 | 90 | 203 | 416 |
| Other option-based derivatives[5] | 50,958 | 2,116 | (7) | — | — | 2,123 |
| Total option-based | $235,533 | $ 14,465 | $6,442 | $ 1,933 | $  800 | $ 5,290 |

| | | | December 31, 2010 | | | |
|---|---|---|---|---|---|---|
| | | | | Fair Value[1] | | |
| | Notional or Contractual Amount | Total Fair Value[2] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| **Interest-rate swaps:** | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $302,178 | $ 3,314 | $ 137 | $ 534 | $ 1,269 | $ 1,374 |
| Weighted-average fixed rate[3] | | | 1.54% | 1.12% | 2.39% | 3.66% |
| Forward-starting swaps[4] | 22,412 | 371 | — | 123 | (9) | 257 |
| Weighted-average fixed rate[3] | | | — | 3.47% | 1.88% | 4.19% |
| Basis (floating to floating) | 2,375 | 4 | — | — | 4 | — |
| Pay-fixed: | | | | | | |
| Swaps | 338,035 | (17,189) | (273) | (1,275) | (3,297) | (12,344) |
| Weighted-average fixed rate[3] | | | 3.11% | 2.21% | 3.04% | 4.02% |
| Forward-starting swaps[4] | 56,259 | (4,009) | — | — | — | (4,009) |
| Weighted-average fixed rate[3] | | | — | — | — | 4.54% |
| Total interest-rate swaps | $721,259 | $(17,509) | $ (136) | $ (618) | $(2,033) | $(14,722) |
| **Option-based derivatives:** | | | | | | |
| Call swaptions | $125,885 | $ 8,147 | $2,754 | $ 2,661 | $ 1,246 | $ 1,486 |
| Put swaptions | 65,975 | 1,396 | 136 | 451 | 226 | 583 |
| Other option-based derivatives[5] | 47,234 | 1,450 | (8) | — | (1) | 1,459 |
| Total option-based | $239,094 | $ 10,993 | $2,882 | $ 3,112 | $ 1,471 | $ 3,528 |

(1) Fair value is categorized based on the period from September 30, 2011 and December 31, 2010, respectively, until the contractual maturity of the derivatives.

(2) Represents fair value for each product type, prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable adjustments.

(3) Represents the notional weighted average rate for the fixed leg of the swaps.

(4) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to fifteen years.

(5) Primarily includes purchased interest rate caps and floors.

*Other Derivatives*

Other derivatives mainly consist of exchange-traded futures, foreign-currency swaps, certain forward purchase and sale commitments, and credit derivatives. The fair value of exchange-traded futures is based on end-of-day closing prices obtained from third-party pricing services; therefore, they are classified as Level 1 under the fair value hierarchy. The fair value of foreign-currency swaps is determined by using the appropriate yield curves to calculate and discount the expected cash flows for the swap contracts; therefore, they are classified as Level 2 under the fair value hierarchy since the fair values are determined through models that use observable inputs from active markets.

Certain purchase and sale commitments are also considered to be derivatives and are classified as Level 2 or Level 3 under the fair value hierarchy, depending on the fair value hierarchy classification of the purchased or sold item, whether a security or loan. Such valuation techniques are further discussed in the *"Investments in Securities"* section above and "Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy — *Mortgage Loans*."

Credit derivatives primarily include purchased credit default swaps and certain short-term default guarantee commitments, which are valued using prices from the respective counterparty and verified using third-party dealer credit default spreads at the measurement date. We classify credit derivatives as Level 3 under the fair value hierarchy due to the inactive market and significant divergence among prices obtained from the dealers.

*Consideration of Credit Risk in Our Valuation of Derivatives*

The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. Additionally, the fair value of derivative liabilities considers the impact of our institutional credit risk. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for a discussion of our counterparty credit risk.

**Other Assets, Guarantee Asset**

Our guarantee asset is valued either through obtaining dealer quotes on similar securities or through an expected cash flow approach. Because of the broad range of liquidity discounts applied by dealers to these similar securities and because the expected cash flow valuation approach uses significant unobservable inputs, we classified the guarantee asset as Level 3.

**REO, Net**

REO is carried at the lower of its carrying amount or fair value less costs to sell. The fair value of REO is calculated using an internal model that considers state and collateral level data to produce an estimate of fair value based on REO dispositions in the most recent three months. We use the actual disposition prices on REO and the current loan UPB to estimate the current fair value of REO. Certain adjustments, such as state specific adjustments, are made to the estimated fair value, as applicable. Due to the use of unobservable inputs, REO is classified as Level 3 under the fair value hierarchy.

**Debt Securities Recorded at Fair Value**

We elected the fair value option for foreign-currency denominated debt instruments and certain other debt securities. See "Fair Value Election — *Debt Securities with Fair Value Option Elected*" for additional information. We determine the fair value of these instruments by obtaining multiple quotes from dealers. Since the prices provided by the dealers consider only observable data such as interest rates and exchange rates, these fair values are classified as Level 2 under the fair value hierarchy.

**Derivative Liabilities, Net**

See discussion under *"Derivative Assets, Net"* above.

**Consolidated Fair Value Balance Sheets**

The supplemental consolidated fair value balance sheets in Table 18.6 present our estimates of the fair value of our financial assets and liabilities at September 30, 2011 and December 31, 2010. The valuations of financial instruments on our consolidated fair value balance sheets are in accordance with the accounting guidance for fair value measurements and disclosures and the accounting guidance for financial instruments. The consolidated fair value balance sheets do not

purport to present our net realizable, liquidation, or market value as a whole. Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.

**Table 18.6 — Consolidated Fair Value Balance Sheets**

| | September 30, 2011 | | December 31, 2010 | |
| --- | --- | --- | --- | --- |
| | Carrying Amount[(1)] | Fair Value | Carrying Amount[(1)] | Fair Value |
| | | (in billions) | | |
| **Assets** | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 18.2 | $ 18.2 | $ 37.0 | $ 37.0 |
| Restricted cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25.7 | 25.7 | 8.1 | 8.1 |
| Federal funds sold and securities purchased under agreements to resell . . . . . . . . . . . . . . . | 10.6 | 10.6 | 46.5 | 46.5 |
| *Investments in securities:* | | | | |
| Available-for-sale, at fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 216.6 | 216.6 | 232.6 | 232.6 |
| Trading, at fair value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 55.3 | 55.3 | 60.3 | 60.3 |
| *Total investments in securities* | 271.9 | 271.9 | 292.9 | 292.9 |
| *Mortgage loans:* | | | | |
| Mortgage loans held by consolidated trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,611.6 | 1,661.4 | 1,646.2 | 1,667.5 |
| Unsecuritized mortgage loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 205.6 | 198.5 | 198.7 | 191.5 |
| *Total mortgage loans* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,817.2 | 1,859.9 | 1,844.9 | 1,859.0 |
| Derivative assets, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.3 | 0.3 | 0.1 | 0.1 |
| Other assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 28.4 | 28.9 | 32.3 | 37.2 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,172.3 | $2,215.5 | $2,261.8 | $2,280.8 |
| **Liabilities** | | | | |
| *Debt, net:* | | | | |
| Debt securities of consolidated trusts held by third parties . . . . . . . . . . . . . . . . . . . . . . | $1,488.0 | $1,572.4 | $1,528.7 | $1,589.5 |
| Other debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 674.5 | 695.9 | 713.9 | 729.7 |
| *Total debt, net* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,162.5 | 2,268.3 | 2,242.6 | 2,319.2 |
| Derivative liabilities, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.3 | 0.3 | 1.2 | 1.2 |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15.5 | 15.4 | 18.4 | 19.0 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,178.3 | 2,284.0 | 2,262.2 | 2,339.4 |
| **Net assets** | | | | |
| Senior preferred stockholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 66.2 | 66.2 | 64.2 | 64.2 |
| Preferred stockholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14.1 | 1.0 | 14.1 | 0.3 |
| Common stockholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (86.3) | (135.7) | (78.7) | (123.1) |
| Total net assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (6.0) | (68.5) | (0.4) | (58.6) |
| Total liabilities and net assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,172.3 | $2,215.5 | $2,261.8 | $2,280.8 |

(1) Equals the amount reported on our GAAP consolidated balance sheets.

**Limitations**

Our consolidated fair value balance sheets do not capture all elements of value that are implicit in our operations as a going concern because our consolidated fair value balance sheets only capture the values of the current investment and securitization portfolios as of the dates presented. For example, our consolidated fair value balance sheets do not capture the value of new investment and securitization business that would likely replace prepayments as they occur, nor do they include any estimation of intangible or goodwill values. Thus, the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets does not represent an estimate of our net realizable, liquidation or market value as a whole.

The fair value of certain financial instruments is based on our assumed current principal exit market as of the dates presented. As new markets are developed, our assumed principal exit market may change. The use of different assumptions and methodologies to determine the fair values of certain financial instruments, including the use of different principal exit markets, could have a material impact on the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets.

We report certain assets and liabilities that are not financial instruments (such as property and equipment and REO), as well as certain financial instruments that are not covered by the disclosure requirements in the accounting guidance for financial instruments, such as pension liabilities, at their carrying amounts in accordance with GAAP on our consolidated fair value balance sheets. We believe these items do not have a significant impact on our overall fair value results. Other non-financial assets and liabilities on our GAAP consolidated balance sheets represent deferrals of costs and revenues that are amortized in accordance with GAAP, such as deferred debt issuance costs and deferred fees. Cash receipts and payments related to these items are generally recognized in the fair value of net assets when received or paid, with no basis reflected on our fair value balance sheets.

**Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy**

The following are valuation assumptions and methods for items not subject to the fair value hierarchy either because they are not measured at fair value other than on the fair value balance sheet or are only measured at fair value at inception.

*Cash and Cash Equivalents*

Cash and cash equivalents largely consist of highly liquid investment securities with an original maturity of three months or less used for cash management purposes, as well as cash held at financial institutions and cash collateral posted by our derivative counterparties. Given that these assets are short-term in nature with limited market value volatility, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

*Federal Funds Sold and Securities Purchased Under Agreements to Resell*

Federal funds sold and securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities and federal funds sold. Given that these assets are short-term in nature, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

*Mortgage Loans*

Single-family mortgage loans are not subject to the fair value hierarchy since they are classified as held-for-investment and recorded at amortized cost. Certain multifamily mortgage loans are subject to the fair value hierarchy since these are either recorded at fair value with the fair value option elected or they are held for investment and recorded at fair value upon impairment, which is based upon the fair value of the collateral as multifamily loans are collateral-dependent.

<u>Single-Family Loans</u>

We determine the fair value of single-family mortgage loans as an estimate of the price we would receive if we were to securitize those loans, as we believe this represents the principal market for such loans. This includes both those held by consolidated trusts and unsecuritized loans and excludes single-family loans for which a contractual modification has been completed. Our estimate of fair value is based on comparisons to actively traded mortgage-related securities with similar characteristics. We adjust to reflect the excess coupon (implied management and guarantee fee) and credit obligation related to performing our guarantee.

To calculate the fair value, we begin with a security price derived from benchmark security pricing for similar actively traded mortgage-related securities, adjusted for yield, credit, and liquidity differences. This security pricing process is consistent with our approach for valuing similar securities retained in our investment portfolio or issued to third parties. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Investments in Securities*."

We estimate the present value of the additional cash flows on the mortgage loan coupon in excess of the coupon on the mortgage-related securities. Our approach for estimating the fair value of the implied management and guarantee fee at September 30, 2011 used third-party market data as practicable. The valuation approach for the majority of implied management and guarantee fee that relates to fixed-rate loan products with coupons at or near current market rates involves obtaining dealer quotes on hypothetical securities constructed with collateral from our single-family credit guarantee portfolio. The remaining implied management and guarantee fee relates to underlying loan products for which comparable market prices were not readily available. These amounts relate specifically to ARM products, highly seasoned loans, or fixed-rate loans with coupons that are not consistent with current market rates. This portion of the implied management and guarantee fee is valued using an expected cash flow approach, including only those cash flows expected to result from our contractual right to receive management and guarantee fees.

The implied management and guarantee fee for single-family mortgage loans is also net of the related credit and other costs (such as general and administrative expense) and benefits (such as credit enhancements) inherent in our guarantee obligation. We use delivery and guarantee fees charged by us as a market benchmark for all guaranteed loans that would qualify for purchase under current underwriting guidelines (used for the majority of the guaranteed loans, but accounts for a small share of the overall fair value of the guarantee obligation). For loans that do not qualify for purchase based on current underwriting guidelines, we use our internal credit models, which incorporate factors such as loan characteristics, loan performance status information, expected losses, and risk premiums without further adjustment (used for less than a majority of the guaranteed loans, but accounts for the largest share of the overall fair value of the guarantee obligation).

*Freddie Mac*

For single-family mortgage loans for which a contractual modification has been approved, we estimate fair value based on our estimate of prices we would receive if we were to sell these loans in the whole loan market, as this represents our current principal market for modified loans. These prices are obtained from multiple dealers who reference market activity, where available, for modified loans and use internal models and their judgment to determine default rates, severity rates, and risk premiums.

The fair value of single family mortgage loans is a fair value measurement with limited market benchmarks and significant unobservable inputs. In determining the fair value of single family mortgage loans, there is a wide range of variability and valuation outcomes based on management judgments used in determining a principal exit market, modeling assumptions and inputs used to determine variables including risk premiums, credit costs, security pricing and implied management and guarantee fees, and management decisions regarding those judgments and assumptions.

_Multifamily Loans_

For a discussion of the techniques used to determine the fair value of held-for-sale, and both impaired and non-impaired held-for-investment multifamily loans, see "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — _Mortgage Loans, Held-for-Investment_" and _"— Mortgage Loans, Held-for-Sale,"_ respectively.

**Other Assets**

Our other assets are not financial instruments required to be valued at fair value under the accounting guidance for disclosures about the fair value of financial instruments, such as property and equipment. For most of these non-financial instruments in other assets, we use the carrying amounts from our GAAP consolidated balance sheets as the reported values on our consolidated fair value balance sheets, without any adjustment. These assets represent an insignificant portion of our GAAP consolidated balance sheets. Certain non-financial assets in other assets on our GAAP consolidated balance sheets are assigned a zero value on our consolidated fair value balance sheets. This treatment is applied to deferred items such as deferred debt issuance costs.

We adjust the GAAP-basis deferred taxes reflected on our consolidated fair value balance sheets to include estimated income taxes on the difference between our consolidated fair value balance sheets net assets attributable to common stockholders, including deferred taxes from our GAAP consolidated balance sheets, and our GAAP consolidated balance sheets equity attributable to common stockholders. To the extent the adjusted deferred taxes are a net asset, this amount is included in other assets. In addition, if our net deferred tax assets on our consolidated fair value balance sheets, calculated as described above, exceed our net deferred tax assets on our GAAP consolidated balance sheets that have been reduced by a valuation allowance, our net deferred tax assets on our consolidated fair value balance sheets are limited to the amount of our net deferred tax assets on our GAAP consolidated balance sheets. If the adjusted deferred taxes are a net liability, this amount is included in other liabilities.

Accrued interest receivable is one of the components included within other assets on our consolidated fair value balance sheets. On our GAAP consolidated balance sheets, we reverse accrued but uncollected interest income when a loan is placed on non-accrual status. There is no such reversal performed for the fair value of accrued interest receivable disclosed on our consolidated fair value balance sheets. Rather, we include in our disclosure the amount we deem to be collectible. As a result, there is a difference between the accrued interest receivable GAAP-basis carrying amount and its fair value disclosed on our consolidated fair value balance sheets.

**Total Debt, Net**

Total debt, net represents debt securities of consolidated trusts held by third parties and other debt that we issued to finance our assets. On our consolidated GAAP balance sheets, total debt, net, excluding debt securities for which the fair value option has been elected, is reported at amortized cost, which is net of deferred items, including premiums, discounts, and hedging-related basis adjustments.

For fair value balance sheet purposes, we use the dealer-published quotes for a base TBA security, adjusted for the carry and pay-up price adjustments, to determine the fair value of the debt securities of consolidated trusts held by third parties. The valuation techniques we use are similar to the approach we use to value our investments in agency securities for GAAP purposes. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — _Investments in Securities — Agency Securities_" for additional information regarding the valuation techniques we use.

Other debt includes both non-callable and callable debt, as well as short-term zero-coupon discount notes. The fair value of the short-term zero-coupon discount notes is based on a discounted cash flow model with market inputs. The valuation of other debt securities represents the proceeds that we would receive from the issuance of debt and is generally based on market prices obtained from broker/dealers or reliable third-party pricing service providers. We elected the fair

value option for foreign-currency denominated debt and certain other debt securities and reported them at fair value on our GAAP consolidated balance sheets. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Debt Securities Recorded at Fair Value*" for additional information.

*Other Liabilities*

Other liabilities consist of accrued interest payable on debt securities, the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities, the reserve for guarantee losses on non-consolidated trusts, servicer advanced interest payable and certain other servicer liabilities, accounts payable and accrued expenses, payables related to securities, and other miscellaneous liabilities. We believe the carrying amount of these liabilities is a reasonable approximation of their fair value, except for the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities. The technique for estimating the fair value of our guarantee obligation related to the credit component of the loan's fair value is described in the "Mortgage Loans — Single-Family Loans" section.

Furthermore, certain deferred items reported as other liabilities on our GAAP consolidated balance sheets are assigned zero value on our consolidated fair value balance sheets, such as deferred fees. Also, as discussed in "Other Assets," other liabilities may include a deferred tax liability adjusted for fair value balance sheet purposes.

*Net Assets Attributable to Senior Preferred Stockholders*

Our senior preferred stock held by Treasury in connection with the Purchase Agreement is recorded at the stated liquidation preference for purposes of the consolidated fair value balance sheets. As the senior preferred stock is restricted as to its redemption, we consider the liquidation preference to be the most appropriate measure for purposes of the consolidated fair value balance sheets.

*Net Assets Attributable to Preferred Stockholders*

To determine the preferred stock fair value, we use a market-based approach incorporating quoted dealer prices.

*Net Assets Attributable to Common Stockholders*

Net assets attributable to common stockholders is equal to the difference between the fair value of total assets and the sum of total liabilities reported on our consolidated fair value balance sheets, less the value of net assets attributable to senior preferred stockholders and the fair value attributable to preferred stockholders.

## NOTE 19: LEGAL CONTINGENCIES

We are involved as a party to a variety of legal and regulatory proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment-related litigation and other legal proceedings incidental to our business. We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures. From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and/or service mortgages for, us. In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories. In addition, we are sometimes sued in connection with the origination or servicing of mortgages. These suits typically involve claims alleging wrongful actions of seller/servicers. Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions with respect to mortgages sold to Freddie Mac.

Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction. In accordance with the accounting guidance for contingencies, we reserve for litigation claims and assessments asserted or threatened against us when a loss is probable and the amount of the loss can be reasonably estimated.

### Putative Securities Class Action Lawsuits

*Ohio Public Employees Retirement System ("OPERS") vs. Freddie Mac, Syron, et al.*   This putative securities class action lawsuit was filed against Freddie Mac and certain former officers on January 18, 2008 in the U.S. District Court for the Northern District of Ohio purportedly on behalf of a class of purchasers of Freddie Mac stock from August 1, 2006 through November 20, 2007. The plaintiff alleges that the defendants violated federal securities laws by making false and misleading statements concerning our business, risk management and the procedures we put into place to protect the company from problems in the mortgage industry. On April 10, 2008, the Court appointed OPERS as lead plaintiff and approved its choice of counsel. On September 2, 2008, defendants filed a motion to dismiss plaintiff's amended complaint. On November 7, 2008, the plaintiff filed a second amended complaint, which removed certain allegations

against Richard Syron, Anthony Piszel, and Eugene McQuade, thereby leaving insider-trading allegations against only Patricia Cook. The second amended complaint also extends the damages period, but not the class period. The plaintiff seeks unspecified damages and interest, and reasonable costs and expenses, including attorney and expert fees. On November 19, 2008, the Court granted FHFA's motion to intervene in its capacity as Conservator. On April 6, 2009, defendants filed motions to dismiss the second amended complaint, which motions remain pending.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential impact on our business, financial condition, or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre-trial litigation; the fact that the Court has not yet ruled upon the defendants' motions to dismiss the second amended complaint; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

*Kuriakose vs. Freddie Mac, Syron, Piszel and Cook.* Another putative class action lawsuit was filed against Freddie Mac and certain former officers on August 15, 2008 in the U.S. District Court for the Southern District of New York for alleged violations of federal securities laws purportedly on behalf of a class of purchasers of Freddie Mac stock from November 21, 2007 through August 5, 2008. The plaintiffs claim that defendants made false and misleading statements about Freddie Mac's business that artificially inflated the price of Freddie Mac's common stock, and seek unspecified damages, costs, and attorneys' fees. On February 6, 2009, the Court granted FHFA's motion to intervene in its capacity as Conservator. On May 19, 2009, plaintiffs filed an amended consolidated complaint, purportedly on behalf of a class of purchasers of Freddie Mac stock from November 30, 2007 through September 7, 2008. Freddie Mac filed a motion to dismiss the complaint on February 24, 2010. On March 30, 2011, the Court granted without prejudice Freddie Mac's motion to dismiss all claims, and allowed the plaintiffs the option to file a new complaint, which they did on July 15, 2011. The defendants have filed motions to dismiss the second amended complaint.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential impact on our business, financial condition, or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre-trial litigation; the fact that the Court has not yet ruled upon the defendants' motions to dismiss the second amended complaint; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

**Energy Lien Litigation**

On July 14, 2010, the State of California filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging that Fannie Mae and Freddie Mac committed unfair business practices in violation of California law by asserting that property liens arising from government-sponsored energy initiatives such as California's Property Assessed Clean Energy, or PACE, program cannot take priority over a mortgage to be sold to Fannie Mae or Freddie Mac. The lawsuit contends that the PACE programs create liens superior to such mortgages and that, by affirming Fannie Mae and Freddie Mac's positions, FHFA has violated the National Environmental Policy Act, or NEPA, and the Administrative Procedure Act, or APA. The complaint seeks declaratory and injunctive relief, costs and such other relief as the court deems proper.

Similar complaints have been filed by other parties. On July 26, 2010, the County of Sonoma filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging similar violations of California law, NEPA, and the APA. In a filing dated September 23, 2010, the County of Placer moved to intervene in the Sonoma County lawsuit as a party plaintiff seeking to assert similar claims, which motion was granted on November 1, 2010. On October 1, 2010, the City of Palm Desert filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA in the Northern District of California. On October 8, 2010, Leon County and the Leon County Energy Improvement District filed a similar complaint against Fannie Mae, Freddie Mac, FHFA, and others in the Northern District of Florida. On October 12, 2010, FHFA filed a motion before the Judicial Panel on Multi-District Litigation seeking an order transferring these cases as well as a related case filed only against FHFA, for coordination or consolidation of pretrial proceedings. This motion was denied on February 8, 2011. On October 14, 2010, the defendants filed a motion to dismiss the lawsuits pending in the Northern District of California. Also on October 14, 2010, the County of Sonoma filed a motion for preliminary injunction seeking to enjoin the defendants from giving any force or

effect in Sonoma County to certain directives by FHFA regarding energy retrofit loan programs and other related relief. On October 26, 2010, the Town of Babylon filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA, as well as the Office of the Comptroller of the Currency, in the U.S. District Court for the Eastern District of New York.

The defendants have filed motions to dismiss these lawsuits. The courts have entered stipulated orders dismissing the individual officers of Freddie Mac and Fannie Mae from the cases. On December 17, 2010, the judge handling the cases in the Northern District of California requested a position statement from the United States, which was filed on February 8, 2011. On June 13, 2011, the complaint filed by the Town of Babylon was dismissed. On August 11, 2011, the Town of Babylon filed a notice of appeal to the U.S. Court of Appeals for the Second Circuit. On August 26, 2011, the California federal court granted in part defendants' motion to dismiss, leaving only plaintiffs' APA and NEPA claims against FHFA.

Sonoma County's motion for preliminary injunction was granted in part, requiring FHFA to provide a notice and comment period with regard to its directives. FHFA filed an appeal of the injunction on September 15, 2011, and the District Court granted FHFA a 10-day stay of the injunction to allow FHFA to request a further stay from the U.S. Court of Appeals for the Ninth Circuit, which occurred on October 11, 2011. While Freddie Mac believes that the intent of the Court's order in the California cases was to dismiss Freddie Mac from the case entirely, for the sake of clarity, the company has asked the City of Palm Desert to dismiss any such claims voluntarily as to Freddie Mac, and the City of Palm Desert has agreed to do so. The complaint filed by Leon County was dismissed by the Court on September 30, 2011. The time for appeal has yet to run.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matters due to the following factors, among others: the inherent uncertainty of pre-trial litigation; the fact that the Second Circuit has not ruled on the appeal filed by the Town of Babylon; and the fact that Leon County still has time to file an appeal.

### Government Investigations and Inquiries

On September 26, 2008, Freddie Mac received notice from the Staff of the Enforcement Division of the SEC that it is also conducting an inquiry to determine whether there has been any violation of federal securities laws, and directing the company to preserve documents. On October 21, 2008, the SEC issued to the company a request for documents. The SEC staff has also conducted interviews of company employees. Beginning January 23, 2009, the SEC issued subpoenas to Freddie Mac and certain of its employees pursuant to a formal order of investigation. Freddie Mac is cooperating fully in these matters.

Freddie Mac was informed by Donald J. Bisenius, former Executive Vice President — Single-Family Credit Guarantee, that on February 10, 2011, he received a "Wells Notice" from the SEC staff in connection with the investigation. The Wells Notice indicates that the staff is considering recommending that the SEC bring civil enforcement action against Mr. Bisenius for possible violations of the federal securities laws and related rules that are alleged to have occurred in 2007 and 2008.

Under the SEC's procedures, a recipient of a Wells Notice has an opportunity to respond in the form of a written submission that seeks to persuade the SEC staff that no action should be commenced. Mr. Bisenius has informed the company that he has made such a submission.

### Related Third Party Litigation and Indemnification Requests

On December 15, 2008, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York against certain former Freddie Mac officers and others styled *Jacoby v. Syron, Cook, Piszel, Banc of America Securities LLC, JP Morgan Chase & Co., and FTN Financial Markets.* The complaint, as amended on December 17, 2008, contends that the defendants made material false and misleading statements in connection with Freddie Mac's September 2007 offering of non-cumulative, non-convertible, perpetual fixed-rate preferred stock, and that such statements "grossly overstated Freddie Mac's capitalization" and "failed to disclose Freddie Mac's exposure to mortgage-related losses, poor underwriting standards and risk management procedures." The complaint further alleges that Syron, Cook, and Piszel made additional false statements following the offering. Freddie Mac is not named as a defendant in this lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel. The case is currently dormant and we believe plaintiff may have abandoned it.

By letter dated October 17, 2008, Freddie Mac received formal notification of a putative class action securities lawsuit, *Mark v. Goldman, Sachs & Co., J.P. Morgan Chase & Co., and Citigroup Global Markets Inc.*, filed on September 23, 2008, in the U.S. District Court for the Southern District of New York, regarding the company's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock.

On January 29, 2009, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York styled *Kreysar v. Syron, et al.* On April 30, 2009, the Court consolidated the Mark case with the Kreysar case, and the plaintiffs filed a consolidated class action complaint on July 2, 2009. The consolidated complaint alleged that three former Freddie Mac officers, certain underwriters and Freddie Mac's auditor violated federal securities laws by making material false and misleading statements in connection with the company's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock. The complaint further alleged that certain defendants and others made additional false statements following the offering. The complaint named as defendants Syron, Piszel, Cook, Goldman, Sachs & Co., JPMorgan Securities Inc., Banc of America Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Morgan Stanley & Co. Incorporated, UBS Securities LLC and PricewaterhouseCoopers LLP.

The defendants filed a motion to dismiss the consolidated class action complaint on September 30, 2009. On January 14, 2010, the Court granted the defendants' motion to dismiss the consolidated action with leave to file an amended complaint on or before March 15, 2010. On March 15, 2010, plaintiffs filed their amended consolidated complaint against these same defendants. The defendants moved to dismiss the amended consolidated complaint on April 28, 2010. On July 29, 2010, the Court granted the defendants' motion to dismiss, without prejudice, and allowed the plaintiffs leave to replead. On August 16, 2010, the plaintiffs filed their second amended consolidated complaint against these same defendants. The defendants moved to dismiss the second amended consolidated complaint on September 16, 2010. On October 22, 2010, the Court granted the defendants' motion to dismiss, without prejudice, again allowing the plaintiffs leave to replead. On November 14, 2010, the plaintiffs filed a third amended consolidated complaint against PricewaterhouseCoopers LLP, Syron and Piszel, omitting Cook and the underwriter defendants. On January 11, 2011, the Court granted the remaining defendants' motion to dismiss the complaint with respect to PricewaterhouseCoopers LLP, but denied the motion with respect to Syron and Piszel. On April 4, 2011, Piszel filed a motion for partial judgment on the pleadings. The Court granted that motion on April 28, 2011. The plaintiffs moved for class certification on June 30, 2011, but withdrew this motion on July 5, 2011. The plaintiffs again moved for class certification on August 30, 2011. No decision has been issued on the motion.

Freddie Mac is not named as a defendant in the consolidated lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the underwriting agreement in this case, including reimbursement of fees and disbursements of their legal counsel. At present, it is not possible for us to predict the probable outcome of the lawsuit or any potential impact on our business, financial condition or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the inherent uncertainty of pre-trial litigation and the fact that the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

On July 6, 2011, plaintiffs filed a lawsuit in the U.S. District Court for Massachusetts styled *Liberty Mutual Insurance Company, Peerless Insurance Company, Employers Insurance Company of Wausau, Safeco Corporation and Liberty Life Assurance Company of Boston v. Goldman, Sachs & Co.* The complaint alleges that Goldman, Sachs & Co. made materially misleading statements and omissions in connection with Freddie Mac's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock. Freddie Mac is not named as a defendant in this lawsuit.

**Lehman Bankruptcy**

On September 15, 2008, Lehman filed a chapter 11 bankruptcy petition in the Bankruptcy Court for the Southern District of New York. Thereafter, many of Lehman's U.S. subsidiaries and affiliates also filed bankruptcy petitions (collectively, the "Lehman Entities"). Freddie Mac had numerous relationships with the Lehman Entities which give rise to several claims. On September 22, 2009, Freddie Mac filed proofs of claim in the Lehman bankruptcies aggregating approximately $2.1 billion. On April 14, 2010, Lehman filed its chapter 11 plan and disclosure statement, providing for the liquidation of the bankruptcy estate's assets over the next three years. On January 25, 2011, Lehman filed its first amended plan and disclosure statement. Lehman filed its second amended joint plan and disclosure statement on June 29,

2011. On August 31, 2011, Lehman filed its third amended joint plan and disclosure statement. The disclosure statement was approved on September 1, 2011. Votes on and objections to the plan are due November 4, 2011. Hearings on confirmation of the plan are currently scheduled for December 6, 2011.

**Taylor, Bean & Whitaker Bankruptcy**

On August 24, 2009, TBW filed for bankruptcy in the Bankruptcy Court for the Middle District of Florida. Prior to that date, Freddie Mac had terminated TBW's status as a seller/servicer of loans. On or about June 14, 2010, Freddie Mac filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, about $1.15 billion related to current and projected repurchase obligations and about $440 million related to funds deposited with Colonial Bank, or with the FDIC as its receiver, which were attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represented miscellaneous costs and expenses incurred in connection with the termination of TBW's status as a seller/servicer.

With the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement, which is discussed below, was filed with the bankruptcy court on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011, which became effective on August 10, 2011.

Under the terms of the settlement, we have been granted an unsecured claim in the TBW bankruptcy estate in the amount of $1.022 billion, largely representing our claims to past and future loan repurchase exposures. We estimate that this claim may result in a distribution to us of approximately $40-45 million, which is based on the plan of liquidation and disclosure statement filed with the court by TBW indicating that general unsecured creditors are likely to receive a distribution of 3.3 to 4.4 cents on the dollar. The settlement provides that $6.3 million of this amount is to be paid to certain creditors of TBW. In addition, pursuant to the settlement, we have received net proceeds of $156 million through September 30, 2011 relating to various funds on deposit, net of amounts we were required to assign or pay to other parties. The settlement also allows for our sale of TBW-related mortgage servicing rights and provides a formula for determining the amount of the proceeds, if any, to be allocated to third parties that have asserted interests in those rights. During the third quarter of 2011, we recognized a $0.2 billion gain, primarily representing the difference between the amounts we assigned, or paid, to TBW and their creditors and the liability recorded on our consolidated balance sheet.

At the time of settlement, we estimated our uncompensated loss exposure to TBW to be approximately $0.7 billion. This estimated exposure largely relates to outstanding repurchase claims that have already been adjusted in our financial statements through our provision for loan losses. Our ultimate losses could exceed our recorded estimate. Potential changes in our estimate of uncompensated loss exposure or the potential for additional claims as discussed below could cause us to record additional losses in the future.

We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors, may file an action to recover certain funds paid to us prior to the TBW bankruptcy. However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to recover assets. Based on court filings and other information, we understand that Ocala or its creditors may attempt to assert fraudulent transfer and other possible claims totaling approximately $840 million against us related to funds that were allegedly transferred from Ocala to Freddie Mac custodial accounts. We also understood that Ocala might attempt to make claims against us asserting ownership of a large number of loans that we purchased from TBW. The order approving the settlement provides that nothing in the settlement shall be construed to limit, waive or release Ocala's claims against Freddie Mac, except for TBW's claims and claims arising from the allocation of the loans discussed above to Freddie Mac.

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds insuring against loss resulting from dishonest acts by TBW's officers, directors, and employees. Several excess insurers on the bonds thereafter filed similar claims in that action. Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder. Discovery is proceeding.

**IRS Litigation**

We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. On July 6, 2011, the U.S. Tax Court issued a Notice Setting Case for Trial and a Standing Pretrial Order. The trial date set forth in the Notice

was December 12, 2011. On September 7, 2011, a joint motion for continuance was filed with the U.S. Tax Court. The joint motion for continuance was granted, and, on October 11, 2011, the parties submitted a status report and proposed a revised trial date of November 5, 2012. In light of the revised trial date and the fact that no settlement discussions have occurred for an extended period of time, we do not believe it is reasonably possible that this issue will be resolved within the next 12 months. We believe appropriate reserves have been provided for settlement on reasonable terms. For information on this matter, see "NOTE 13: INCOME TAXES."

## NOTE 20: EARNINGS (LOSS) PER SHARE

We have participating securities related to options and restricted stock units with dividend equivalent rights that receive dividends as declared on an equal basis with common shares but are not obligated to participate in undistributed net losses. Consequently, in accordance with accounting guidance for earnings per share, we use the "two-class" method of computing earnings per share. Basic earnings per common share are computed by dividing net loss attributable to common stockholders by weighted average common shares outstanding — basic for the period. The weighted average common shares outstanding — basic during the three and nine months ended September 30, 2011 and 2010 include the weighted average number of shares during the periods that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement since the warrant is unconditionally exercisable by the holder at a minimal cost. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for further information.

Diluted loss per common share is computed as net loss attributable to common stockholders divided by weighted average common shares outstanding — diluted for the period, which considers the effect of dilutive common equivalent shares outstanding. For periods with net income, the effect of dilutive common equivalent shares outstanding includes: (a) the weighted average shares related to stock options; and (b) the weighted average of restricted shares and restricted stock units. Such items are included in the calculation of weighted average common shares outstanding — diluted during periods of net income, when the assumed conversion of the share equivalents has a dilutive effect. Such items are excluded from the weighted average common shares outstanding — basic. For a discussion of our significant accounting policies regarding our calculation of earnings per common share, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Earnings Per Common Share" in our 2010 Annual Report.

**Table 20.1 — Loss Per Common Share — Basic and Diluted**

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2011 | 2010 | 2011 | 2010 |
|  | (dollars in millions, except per share amounts) | | | |
| Net loss attributable to Freddie Mac | $ (4,422) | $ (2,511) | $ (5,885) | $ (13,912) |
| Preferred stock dividends[1] | (1,618) | (1,558) | (4,840) | (4,146) |
| Net loss attributable to common stockholders | $ (6,040) | $ (4,069) | $ (10,725) | $ (18,058) |
| Weighted average common shares outstanding — basic (in thousands)[2] | 3,244,496 | 3,248,794 | 3,245,473 | 3,249,753 |
| Dilutive potential common shares (in thousands) | — | — | — | — |
| Weighted average common shares outstanding — diluted (in thousands) | 3,244,496 | 3,248,794 | 3,245,473 | 3,249,753 |
| Antidilutive potential common shares excluded from the computation of dilutive potential common shares (in thousands) | 3,095 | 4,875 | 3,588 | 5,469 |
| Basic loss per common share | $ (1.86) | $ (1.25) | $ (3.30) | $ (5.56) |
| Diluted loss per common share | $ (1.86) | $ (1.25) | $ (3.30) | $ (5.56) |

(1) Consistent with the covenants of the Purchase Agreement, we paid dividends on our senior preferred stock, but did not declare dividends on any other series of preferred stock outstanding subsequent to entering conservatorship.

(2) Includes the weighted average number of shares during the periods that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included in shares outstanding — basic, since it is unconditionally exercisable by the holder at a minimal cost of $0.00001 per share.

## NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS

Table 21.1 below presents the major components of other assets and other liabilities on our consolidated balance sheets.

**Table 21.1 — Other Assets and Other Liabilities on Consolidated Balance Sheets**

|  | September 30, 2011 | December 31, 2010 |
|---|---|---|
|  | (in millions) | |
| Other assets: | | |
| Guarantee asset | $ 674 | $ 541 |
| Accounts and other receivables | 8,519 | 8,734 |
| All other | 1,398 | 1,600 |
| Total other assets | $10,591 | $10,875 |
| Other liabilities: | | |
| Guarantee obligation | $ 741 | $ 625 |
| Servicer liabilities | 3,771 | 4,456 |
| Accounts payable and accrued expenses | 1,039 | 1,760 |
| All other | 1,387 | 1,257 |
| Total other liabilities | $ 6,938 | $ 8,098 |

*Freddie Mac*

## PART II OTHER INFORMATION

## ITEM 1. LEGAL PROCEEDINGS

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business. See "NOTE 19: LEGAL CONTINGENCIES" for more information regarding our involvement as a party to various legal proceedings.

## ITEM 1A. RISK FACTORS

This Form 10-Q should be read together with the "RISK FACTORS" sections in our Quarterly Reports on Form 10-Q for the first and second quarters of 2011, and our 2010 Annual Report, which describe various risks and uncertainties to which we are or may become subject, and is supplemented by the discussion below. These risks and uncertainties could, directly or indirectly, adversely affect our business, financial condition, results of operations, cash flows, strategies and/or prospects.

*We could incur increased credit losses if our seller/servicers enter into arrangements with mortgage insurers for settlement of future rescission activity and such agreements could potentially reduce the ability of mortgage insurers to pay claims to us.*

Under our contracts with our seller/servicers, the rescission or denial of mortgage insurance on a loan is grounds for us to make a repurchase request to the seller/servicer. At least one of our largest servicers has entered into arrangements with two of our mortgage insurance counterparties under which the servicer pays and/or indemnifies the insurer in exchange for the mortgage insurer agreeing not to issue mortgage insurance rescissions or denials of coverage on Freddie Mac mortgages. When such an agreement is in place, we are unable to make repurchase requests based solely on a rescission of insurance or denial of coverage. Thus, there is a risk that we will experience higher credit losses if we do not independently identify other areas of noncompliance with our contractual requirements and require lenders to repurchase the loans we own. Additionally, there could be a negative financial impact on our mortgage insurers' ability to pay their other obligations to us if the payments they receive from the seller/servicers are insufficient to compensate them for the insurance claims paid that would have otherwise been denied. As guarantor of the insured loans, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligation to reimburse us for claims, and this could increase our credit losses.

*We may not be able to protect the security of our systems or the confidentiality of our information from cyber attack and other unauthorized access.*

Our operations rely on the secure receipt, processing, storage and transmission of confidential and other information in our computer systems and networks and with our business partners. Our computer systems, software and networks may be vulnerable to internal or external cyber attack, unauthorized access, computer viruses or other malicious code, computer denial of service attacks or other attempts to harm our systems or misuse our confidential information. Our employees may be vulnerable to social engineering efforts that cause a breach in our security that otherwise would not exist as a technical matter. If one or more of such events occur, this potentially could jeopardize or result in the unauthorized disclosure, misuse or corruption of confidential and other information, including nonpublic personal information and other sensitive business data processed, stored in, or transmitted through, our computer systems and networks, or otherwise cause interruptions or malfunctions in our operations or the operations of our customers or counterparties. This could result in significant losses or reputational damage, adversely affect our relationships with our customers and counterparties, and adversely affect our ability to purchase loans, issue securities or enter into and execute other business transactions. We could also face regulatory action. Internal or external attackers may seek to steal, corrupt or disclose confidential financial assets, intellectual property and other sensitive information. We may be required to expend significant additional resources to modify our protective measures or to investigate and remediate vulnerabilities or other exposures, and we may be subject to litigation and financial losses that are not fully insured. Because the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently and often are not recognized until launched against a target, and because some techniques involve social engineering attempts addressed to employees who may have insufficient knowledge to recognize them, we may be unable to anticipate these techniques or to implement adequate preventative measures. While we have invested significant resources in our information security program, there is a risk that it could prove to be inadequate to protect our computer systems, software, and networks.

***The MHA Program and other efforts to reduce foreclosures, modify loan terms and refinance mortgages, including HARP, may fail to mitigate our credit losses and may adversely affect our results of operations or financial condition.***

The MHA Program and other loss mitigation activities are a key component of our strategy for managing and resolving troubled assets and lowering credit losses. However, there can be no assurance that any of our loss mitigation strategies will be successful and that credit losses will not continue to escalate. To the extent that borrowers participate in HAMP in large numbers, it is likely that the costs we incur related to loan modifications and other activities under HAMP will be substantial because we will bear the full cost of the monthly payment reductions related to modifications of loans we own or guarantee, and all servicer and borrower incentive fees. We will not be reimbursed for these costs by Treasury.

FHFA has directed us to implement HAMP for troubled mortgages we own or guarantee. It is possible that Treasury could make changes to HAMP that, to the extent we were required to or elected to implement them, could make the program more costly to us, both in terms of credit expenses and the cost of implementing and operating the program. We could also be required or elect to make changes to our implementation of our other loss mitigation activities that could make these activities more costly to us. For example, we could be required to, or elect to, use principal reduction to achieve reduced payments for borrowers. This could further increase our losses, as we could bear the full costs of such reductions.

In June 2010, Treasury announced an initiative under which servicers will be required to consider an alternative modification approach that includes a possible reduction of principal for loans with LTV ratios over 115%. Mortgage investors will receive incentives based on the amount of reduced principal. In October 2010, Treasury provided guidance with respect to applying this alternative for borrowers who have already received permanent modifications or are in trial plans. Holders of mortgages and mortgage-related securities are not required to agree to a reduction of principal, but servicers must have a process for considering the approach. We do not currently have plans to apply these changes to mortgages that we own or guarantee. However, it is possible that FHFA might direct us to implement some or all of these changes. Our credit losses could increase to the extent we apply these changes.

A significant number of loans are in the trial period of HAMP. Although the ultimate completion rate remains uncertain, a large number of loans have failed to complete the trial period or qualify for any of our other loan modification and loss mitigation programs. It is possible that, in the future, additional loans will fail to complete the trial period or qualify for these other programs. For these loans, HAMP will have effectively delayed the foreclosure process and could increase our losses, to the extent the prices we ultimately receive for the foreclosed properties are less than the prices we could have received had we foreclosed upon the properties earlier, due to continued home price declines. These delays in foreclosure could also cause our REO operations expense to increase, perhaps substantially.

Our seller/servicers have a key role in the success of our loss mitigation activities. The continued increases in seriously delinquent loan volume, the ongoing weak conditions of the mortgage market during 2009 and 2010, and the number and variety of additions and changes to HAMP have placed a strain on the loss mitigation resources of many of our seller/servicers. This has also increased the operational complexity of the servicing function, as well as the risk that errors will occur. A decline in the performance of seller/servicers in mitigation efforts could result in missed opportunities for successful loan modifications, an increase in our credit losses and damage to our reputation.

Mortgage modifications on the scale of HAMP, particularly any new focus on principal reductions, have the potential to change borrower behavior and mortgage underwriting. This, coupled with the phenomenon of widespread underwater mortgages, could significantly affect borrower attitudes towards homeownership, the commitment of borrowers to making their mortgage payments, the way the market values residential mortgage assets, the way in which we conduct business and, ultimately, our financial results.

On October 24, 2011 FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers who can benefit from refinancing their home mortgage. The Acting Director of FHFA stated that the goal of pursuing these changes is to create refinancing opportunities for more borrowers whose mortgage is owned or guaranteed by the GSEs while reducing risk for the GSEs and bringing a measure of stability to housing markets. However, there can be no assurance that the revisions to HARP will be successful in achieving these objectives or that any benefits from the revised program will exceed our costs. Because we will be releasing lenders from certain representations and warranties, credit losses associated with loans identified with defects will not be recaptured through loan buybacks. In addition, changes in expectations of mortgage prepayments could result in declines in the fair value of our investments in certain agency mortgage-related securities and lower net interest yields over time on other mortgage-related investments. The ultimate impact of the HARP revisions on our financial results will be driven by the level of borrower participation and the volume of loans with high loan-to-value ratios that we acquire under the program.

Depending on the type of loss mitigation activities we pursue, those activities could result in accelerating or slowing prepayments on our PCs and REMICs and Other Structured Securities, either of which could negatively affect the pricing of such securities.

We are devoting significant internal resources to the implementation of the various initiatives under the MHA Program, which has, and will continue to, increase our expenses. The size and scope of our effort under the MHA Program may also limit our ability to pursue other business opportunities or corporate initiatives.

## ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

**Recent Sales of Unregistered Securities**

The securities we issue are "exempted securities" under the Securities Act of 1933, as amended. As a result, we do not file registration statements with the SEC with respect to offerings of our securities.

Following our entry into conservatorship, we suspended the operation of and ceased making grants under equity compensation plans. Previously, we had provided equity compensation under those plans to employees and members of our Board of Directors. Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms.

No stock options were exercised during the three months ended September 30, 2011. However, restrictions lapsed on 16,797 restricted stock units.

See "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report for more information.

**Dividend Restrictions**

Our payment of dividends on Freddie Mac common stock or any series of Freddie Mac preferred stock (other than senior preferred stock) is subject to certain restrictions as described in "MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES — Dividends and Dividend Restrictions" in our 2010 Annual Report.

**Information about Certain Securities Issuances by Freddie Mac**

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Freddie Mac's securities offerings are exempted from SEC registration requirements. As a result, we are not required to and do not file registration statements or prospectuses with the SEC with respect to our securities offerings. To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars (or supplements thereto) that we post on our web site or in a current report on Form 8-K, in accordance with a "no-action" letter we received from the SEC staff. In cases where the information is disclosed in an offering circular posted on our web site, the document will be posted on our web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The web site address for disclosure about our debt securities, other than debt securities of consolidated trusts, is www.freddiemac.com/debt. From this address, investors can access the offering circular and related supplements for debt securities offerings under Freddie Mac's global debt facility, including pricing supplements for individual issuances of debt securities.

Disclosure about the mortgage-related securities we issue, some of which are off-balance sheet obligations, can be found at www.freddiemac.com/mbs. From this address, investors can access information and documents about our mortgage-related securities, including offering circulars and related offering circular supplements.

## ITEM 6. EXHIBITS

The exhibits are listed in the Exhibit Index at the end of this Form 10-Q.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Federal Home Loan Mortgage Corporation

By: /s/  Charles E. Haldeman, Jr.

Charles E. Haldeman, Jr.
Chief Executive Officer

Date:  November 3, 2011

By: /s/  Ross J. Kari

Ross J. Kari
Executive Vice President — Chief Financial Officer
(Principal Financial Officer)

Date:  November 3, 2011

FHFA 2622

## GLOSSARY

**Agency securities** — Generally refers to mortgage-related securities issued by the GSEs or government agencies.

**Alt-A loan** — Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. In determining our Alt-A exposure on loans underlying our single-family credit guarantee portfolio, we classified mortgage loans as Alt-A if the lender that delivers them to us classified the loans as Alt-A, or if the loans had reduced documentation requirements, as well as a combination of certain credit characteristics and expected performance characteristics at acquisition which, when compared to full documentation loans in our portfolio, indicate that the loan should be classified as Alt-A. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. For non-agency mortgage-related securities that are backed by Alt-A loans, we categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions.

**AOCI** — Accumulated other comprehensive income (loss), net of taxes

**ARM** — Adjustable-rate mortgage — A mortgage loan with an interest rate that adjusts periodically over the life of the mortgage loan based on changes in a benchmark index.

**Bond insurers** — Companies that provide credit insurance principally covering securitized assets in both the primary issuance and secondary markets.

**BPS** — Basis points — One one-hundredth of 1%.   This term is commonly used to quote the yields of debt instruments or movements in interest rates.

**Cash and other investments portfolio** — Our cash and other investments portfolio is comprised of our cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and investments in non-mortgage-related securities.

**Charter** — The Federal Home Loan Mortgage Corporation Act, as amended, 12 U.S.C. § 1451 et seq.

**CMBS** — Commercial mortgage-backed security — A security backed by mortgages on commercial property (often including multifamily rental properties) rather than one-to-four family residential real estate. Although the mortgage pools underlying CMBS can include mortgages financing multifamily properties and commercial properties, such as office buildings and hotels, the classes of CMBS that we hold receive distributions of scheduled cash flows only from multifamily properties. Military housing revenue bonds are included as CMBS within investments-related disclosures. We have not identified CMBS as either subprime or Alt-A securities.

**Conforming loan/Conforming jumbo loan/Conforming loan limit** — A conventional single-family mortgage loan with an original principal balance that is equal to or less than the applicable conforming loan limit, which is a dollar amount cap on the size of the original principal balance of single-family mortgage loans we are permitted by law to purchase or securitize. The conforming loan limit is determined annually based on changes in FHFA's housing price index. Any decreases in the housing price index are accumulated and used to offset any future increases in the housing price index so that conforming loan limits do not decrease from year-to-year. Since 2006, the base conforming loan limit for a one-family residence has been set at $417,000 with higher limits in certain "high-cost" areas.

Beginning in 2008, the conforming loan limits were increased for mortgages originated in certain "high-cost" areas above the conforming loan limits. In addition, conforming loan limits for certain high-cost areas were increased temporarily (up to $729,250 for a one-family residence) for loans originated prior to October 1, 2011. Actual loan limits are set by FHFA for each county (or equivalent) and the loan limit for specific high-cost areas may be lower than the maximum amounts. We refer to loans that we have purchased with UPB exceeding $417,000 as conforming jumbo loans.

**Conservator** — The Federal Housing Finance Agency, acting in its capacity as conservator of Freddie Mac.

**Convexity** — A measure of how much a financial instrument's duration changes as interest rates change.

**Core spread income** — Refers to a fair value estimate of the net current period accrual of income from the spread between mortgage-related investments and debt, calculated on an option-adjusted basis.

**Credit enhancement** — Any number of different financial arrangements that are designed to reduce credit risk by partially or fully compensating an investor in the event of certain financial losses. Examples of credit enhancements include mortgage insurance, overcollateralization, indemnification agreements, and government guarantees.

**Credit losses** — Consists of charge-offs and REO operations income (expense), net of recoveries.

**Credit-related expenses** — Consists of our provision for credit losses and REO operations income (expense).

**Deed in lieu of foreclosure** — An alternative to foreclosure in which the borrower voluntarily conveys title to the property to the lender and the lender accepts such title (sometimes together with an additional payment by the borrower) in full satisfaction of the mortgage indebtedness.

**Delinquency** — A failure to make timely payments of principal or interest on a mortgage loan. For single-family mortgage loans, we generally report delinquency rate information for loans that are seriously delinquent. For multifamily loans, we report delinquency rate information based on the UPB of loans that are two monthly payments or more past due or in the process of foreclosure.

**Derivative** — A financial instrument whose value depends upon the characteristics and value of an underlying financial asset or index, such as a security or commodity price, interest or currency rates, or other financial indices.

**Dodd-Frank Act** — Dodd-Frank Wall Street Reform and Consumer Protection Act.

**DSCR** — Debt Service Coverage Ratio — An indicator of future credit performance for multifamily loans. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

**Duration** — The weighted average maturity of a financial instrument's cash flows. Duration is used as a measure of a financial instrument's price sensitivity to changes in interest rates.

**Duration gap** — One of our primary interest-rate risk measures. Duration gap is a measure of the difference between the estimated durations of our interest rate sensitive assets and liabilities. We present the duration gap of our financial instruments in units expressed as months. A duration gap of zero implies that the change in value of our interest rate sensitive assets from an instantaneous change in interest rates would be expected to be accompanied by an equal and offsetting change in the value of our debt and derivatives, thus leaving the net fair value of equity unchanged.

**Effective rent** — The average rent paid by the tenant over the term of a lease.

**Euribor** — Euro Interbank Offered Rate

**Exchange Act** — Securities and Exchange Act of 1934, as amended

**Fannie Mae** — Federal National Mortgage Association

**FDIC** — Federal Deposit Insurance Corporation

**Federal Reserve** — Board of Governors of the Federal Reserve System

**FHA** — Federal Housing Administration

**FHFA** — Federal Housing Finance Agency — FHFA is an independent agency of the U.S. government established by the Reform Act with responsibility for regulating Freddie Mac, Fannie Mae, and the FHLBs.

**FHLB** — Federal Home Loan Bank

**FICO score** — A credit scoring system developed by Fair, Isaac and Co. FICO scores are the most commonly used credit scores today. FICO scores are ranked on a scale of approximately 300 to 850 points with a higher value indicating a lower likelihood of credit default.

**Fixed-rate mortgage** — Refers to a mortgage originated at a specific rate of interest that remains constant over the life of the loan.

**Foreclosure alternative** — A workout option pursued when a home retention action is not successful or not possible. A foreclosure alternative is either a short sale or deed in lieu of foreclosure.

**Foreclosure transfer** — Refers to our completion of a transaction provided for by the foreclosure laws of the applicable state, in which a delinquent borrower's ownership interest in a mortgaged property is terminated and title to the property is transferred to us or to a third party. State foreclosure laws commonly refer to such transactions as foreclosure sales, sheriff's sales, or trustee's sales, among other terms. When we, as mortgage holder, acquire a property in this manner, we pay for it by extinguishing some or all of the mortgage debt.

**Freddie Mac mortgage-related securities** — Securities we issue and guarantee, including PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions.

**GAAP** — Generally accepted accounting principles

**Ginnie Mae** — Government National Mortgage Association

**GSE Act** — The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Reform Act.

**GSEs** — Government sponsored enterprises — Refers to certain legal entities created by the U.S. government, including Freddie Mac, Fannie Mae, and the FHLBs.

**Guarantee fee** — The fee that we receive for guaranteeing the payment of principal and interest to mortgage security investors.

**HAFA** — Home Affordable Foreclosures Alternative program — In 2009, the Treasury Department introduced the HAFA program to provide an option for HAMP-eligible homeowners who are unable to keep their homes. The HAFA program took effect on April 5, 2010 and we implemented it effective August 1, 2010.

**HAMP** — Home Affordable Modification Program — Refers to the effort under the MHA Program whereby the U.S. government, Freddie Mac and Fannie Mae commit funds to help eligible homeowners avoid foreclosure and keep their homes through mortgage modifications.

**HARP** — Home Affordable Refinance Program — Refers to the effort under the MHA Program that seeks to help eligible borrowers with loans guaranteed by us or Fannie Mae refinance into loans with more affordable monthly payments and/or fixed-rate terms. Under HARP, we allow eligible borrowers who have mortgages with current LTV ratios from 80% up to 125% to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place. The relief refinance initiative is our implementation of HARP for our loans, under which we also allow borrowers with LTV ratios of 80% and below to participate.

**HFA** — State or local Housing Finance Agency

**HUD** — U.S. Department of Housing and Urban Development — Prior to the enactment of the Reform Act, HUD had general regulatory authority over Freddie Mac, including authority over our affordable housing goals and new programs. Under the Reform Act, FHFA now has general regulatory authority over us, though HUD still has authority over Freddie Mac with respect to fair lending.

**Implied volatility** — A measurement of how the value of a financial instrument changes due to changes in the market's expectation of potential changes in future interest rates. A decrease in implied volatility generally increases the estimated fair value of our mortgage assets and decreases the estimated fair value of our callable debt and options-based derivatives, while an increase in implied volatility generally has the opposite effect.

**Interest-only loan** — A mortgage loan that allows the borrower to pay only interest (either fixed-rate or adjustable-rate) for a fixed period of time before principal amortization payments are required to begin. After the end of the interest-only period, the borrower can choose to refinance the loan, pay the principal balance in total, or begin paying the monthly scheduled principal due on the loan.

**IRS** — Internal Revenue Service

**LIBOR** — London Interbank Offered Rate

**LIHTC partnerships** — Low-income housing tax credit partnerships — Prior to 2008, we invested as a limited partner in LIHTC partnerships, which are formed for the purpose of providing funding for affordable multifamily rental properties. These LIHTC partnerships invest directly in limited partnerships that own and operate multifamily rental properties that generate federal income tax credits and deductible operating losses.

**Liquidation preference** — Generally refers to an amount that holders of preferred securities are entitled to receive out of available assets, upon liquidation of a company. The initial liquidation preference of our senior preferred stock was $1.0 billion. The aggregate liquidation preference of our senior preferred stock includes the initial liquidation preference plus amounts funded by Treasury under the Purchase Agreement. In addition, dividends and periodic commitment fees not paid in cash are added to the liquidation preference of the senior preferred stock. We may make payments to reduce the liquidation preference of the senior preferred stock only in limited circumstances.

**LTV ratio** — Loan-to-value ratio — The ratio of the unpaid principal amount of a mortgage loan to the value of the property that serves as collateral for the loan, expressed as a percentage. Loans with high LTV ratios generally tend to have a higher risk of default and, if a default occurs, a greater risk that the amount of the gross loss will be high compared to loans with lower LTV ratios. We report LTV ratios based solely on the amount of the loan purchased or guaranteed by us, generally excluding any second lien mortgages (unless we own or guarantee the second lien).

**MD&A** — Management's Discussion and Analysis of Financial Condition and Results of Operations

**MHA Program** — Making Home Affordable Program — Formerly known as the Housing Affordability and Stability Plan, the MHA Program was announced by the Obama Administration in February 2009. The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. The MHA Program includes HARP and HAMP.

**Mortgage assets** — Refers to both mortgage loans and the mortgage-related securities we hold in our mortgage-related investments portfolio.

**Mortgage-related investments portfolio** — Our investment portfolio, which consists principally of mortgage-related securities and single-family and multifamily mortgage loans. The size of our mortgage-related investments portfolio under the Purchase Agreement is determined without giving effect to the January 1, 2010 change in accounting guidance related to transfers of financial assets and consolidation of VIEs. Accordingly, for purposes of the portfolio limit, when PCs and certain Other Guarantee Transactions are purchased into the mortgage-related investments portfolio, this is considered the acquisition of assets rather than the reduction of debt.

**Mortgage-to-debt OAS** — The net OAS between the mortgage and agency debt sectors. This is an important factor in determining the expected level of net interest yield on a new mortgage asset. Higher mortgage-to-debt OAS means that a newly purchased mortgage asset is expected to provide a greater return relative to the cost of the debt issued to fund the purchase of the asset and, therefore, a higher net interest yield. Mortgage-to-debt OAS tends to be higher when there is weak demand for mortgage assets and lower when there is strong demand for mortgage assets.

**Multifamily mortgage** — A mortgage loan secured by a property with five or more residential rental units.

**Multifamily mortgage portfolio** — Consists of multifamily mortgage loans held by us on our consolidated balance sheets as well as those underlying non-consolidated Freddie Mac mortgage-related securities, and other guarantee commitments, but excluding those underlying our guarantees of HFA bonds under the HFA Initiative.

**Net worth (deficit)** — The amount by which our total assets exceed (or are less than) our total liabilities as reflected on our consolidated balance sheets prepared in conformity with GAAP.

**NIBP** — New Issue Bond Program

**NPV** — Net present value

**OAS** — Option-adjusted spread — An estimate of the incremental yield spread between a particular financial instrument (*e.g.*, a security, loan or derivative contract) and a benchmark yield curve (*e.g.*, LIBOR or agency or U.S. Treasury securities). This includes consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options.

**OCC** — Office of the Comptroller of the Currency

**OFHEO** — Office of Federal Housing Enterprise Oversight

**Option ARM loan** — Mortgage loans that permit a variety of repayment options, including minimum, interest-only, fully amortizing 30-year and fully amortizing 15-year payments. The minimum payment alternative for option ARM loans allows the borrower to make monthly payments that may be less than the interest accrued for the period. The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance. For our non-agency mortgage-related securities that are backed by option ARM loans, we categorize securities as option ARM if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM securities as either subprime or Alt-A securities.

**OTC** — Over-the-counter

**Other guarantee commitments** — Mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.

**Other Guarantee Transactions** — Transactions in which third parties transfer non-Freddie Mac mortgage-related securities to trusts specifically created for the purpose of issuing mortgage-related securities, or certificates, in the Other Guarantee Transactions.

**PCs** — Participation Certificates — Securities that we issue as part of a securitization transaction. Typically we purchase mortgage loans from parties who sell mortgage loans, place a pool of loans into a PC trust and issue PCs from that trust. The PCs are generally transferred to the seller of the mortgage loans in consideration of the loans or are sold to third party investors if we purchased the mortgage loans for cash.

**Pension Plan** — Employees' Pension Plan

**PMVS** — Portfolio Market Value Sensitivity — One of our primary interest-rate risk measures. PMVS measures are estimates of the amount of average potential pre-tax loss in the market value of our net assets due to parallel (PMVS-L) and non-parallel (PMVS-YC) changes in LIBOR.

**Primary mortgage market** — The market where lenders originate mortgage loans and lend funds to borrowers. We do not lend money directly to homeowners, and do not participate in this market.

**Purchase Agreement / Senior Preferred Stock Purchase Agreement** — An agreement the Conservator, acting on our behalf, entered into with Treasury on September 7, 2008, which was subsequently amended and restated on September 26, 2008 and further amended on May 6, 2009 and December 24, 2009.

**Recorded Investment** — The dollar amount of a loan recorded on our consolidated balance sheets, excluding any valuation allowance, such as the allowance for loan losses, but which does reflect direct write-downs of the investment. For mortgage loans, direct write-downs consist of valuation allowances associated with recording our initial investment in loans acquired with evidence of credit deterioration at the time of purchase.

**Reform Act** — The Federal Housing Finance Regulatory Reform Act of 2008, which, among other things, amended the GSE Act by establishing a single regulator, FHFA, for Freddie Mac, Fannie Mae, and the FHLBs.

**Relief refinance mortgage** — A single-family mortgage loan delivered to us for purchase or guarantee that meets the criteria of the Freddie Mac Relief Refinance MortgageSM initiative. This initiative is our implementation of HARP for our loans. Although HARP is targeted at borrowers with current LTV ratios above 80% (and up to a maximum of 125%), our initiative also allows borrowers with LTV ratios of 80% and below to participate.

**REMIC** — Real Estate Mortgage Investment Conduit — A type of multiclass mortgage-related security that divides the cash flows (principal and interest) of the underlying mortgage-related assets into two or more classes that meet the investment criteria and portfolio needs of different investors.

**REMICs and Other Structured Securities** (or in the case of Multifamily securities, **Other Structured Securities**) — Single- and multiclass securities issued by Freddie Mac that represent beneficial interests in pools of PCs and certain other types of mortgage-related assets. REMICs and Other Structured Securities that are single-class securities pass through the cash flows (principal and interest) on the underlying mortgage-related assets. REMICs and Other Structured Securities that are multiclass securities divide the cash flows of the underlying mortgage-related assets into two or more

*Freddie Mac*

classes designed to meet the investment criteria and portfolio needs of different investors. Our principal multiclass securities qualify for tax treatment as REMICs.

**REO** — Real estate owned — Real estate which we have acquired through foreclosure or through a deed in lieu of foreclosure.

**S&P** — Standard & Poor's

**SEC** — Securities and Exchange Commission

**Secondary mortgage market** — A market consisting of institutions engaged in buying and selling mortgages in the form of whole loans (*i.e.*, mortgages that have not been securitized) and mortgage-related securities. We participate in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities for investment and by issuing guaranteed mortgage-related securities, principally PCs.

**Senior preferred stock** — The shares of Variable Liquidation Preference Senior Preferred Stock issued to Treasury under the Purchase Agreement.

**Seriously delinquent** — Single-family mortgage loans that are three monthly payments or more past due or in the process of foreclosure as reported to us by our servicers.

**SERP** — Supplemental Executive Retirement Plan

**Short sale** — Typically an alternative to foreclosure consisting of a sale of a mortgaged property in which the homeowner sells the home at market value and the lender accepts proceeds (sometimes together with an additional payment or promissory note from the borrower) that are less than the outstanding mortgage indebtedness in full satisfaction of the loan.

**Single-family credit guarantee portfolio** — Consists of unsecuritized single-family loans, single-family loans held by consolidated trusts, and single-family loans underlying non-consolidated Other Guarantee Transactions and covered by other guarantee commitments. Excludes our REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates and our guarantees under the HFA Initiative.

**Single-family mortgage** — A mortgage loan secured by a property containing four or fewer residential dwelling units.

**Spread** — The difference between the yields of two debt securities, or the difference between the yield of a debt security and a benchmark yield, such as LIBOR.

**Strips** — Mortgage pass-through securities created by separating the principal and interest payments on a pool of mortgage loans. A principal-only strip entitles the security holder to principal cash flows, but no interest cash flows, from the underlying mortgages. An interest-only strip entitles the security holder to interest cash flows, but no principal cash flows, from the underlying mortgages.

**Subprime** — Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Subprime generally refers to the credit risk classification of a loan. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include, among other factors, a combination of high LTV ratios, low credit scores or originations using lower underwriting standards, such as limited or no documentation of a borrower's income. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk. Notwithstanding our historical characterizations of the single family credit guarantee portfolio, certain security collateral underlying our Other Guarantee Transactions have been identified as subprime based on information provided to Freddie Mac when the transactions were entered into. We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions.

**Swaption** — An option contract to enter into an interest-rate swap. In exchange for an option premium, a buyer obtains the right but not the obligation to enter into a specified swap agreement with the issuer on a specified future date.

**TBA** — To be announced

**TCLFP** — Temporary Credit and Liquidity Facility Program

**TDR** — Troubled debt restructuring — A type of loan modification in which the changes to the contractual terms result in concessions to borrowers that are experiencing financial difficulties.

**Total comprehensive income (loss)** — Consists of net income (loss) plus the after-tax changes in: (a) the unrealized gains and losses on available-for-sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans.

**Total other comprehensive income (loss)** — Consists of the after-tax changes in: (a) the unrealized gains and losses on available-for-sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans.

**Total mortgage portfolio** — Includes mortgage loans and mortgage-related securities held on our consolidated balance sheets as well as the balances of our non-consolidated issued and guaranteed single-class and multiclass securities, and other mortgage-related financial guarantees issued to third parties.

**Treasury** — U.S. Department of the Treasury

**UPB** — Unpaid principal balance

**USDA** — U.S. Department of Agriculture

**VA** — U.S. Department of Veteran Affairs

**VIE** — Variable Interest Entity — A VIE is an entity: (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by another party; or (b) where the group of equity holders does not have: (i) the ability to make significant decisions about the entity's activities; (ii) the obligation to absorb the entity's expected losses; or (iii) the right to receive the entity's expected residual returns.

**Warrant** — Refers to the warrant we issued to Treasury on September 8, 2008 pursuant to the Purchase Agreement. The warrant provides Treasury the ability to purchase shares of our common stock equal to 79.9% of the total number of shares of Freddie Mac common stock outstanding on a fully diluted basis on the date of exercise.

**Workout, or loan workout** — A workout is either: (a) a home retention action, which is either a loan modification, repayment plan, or forbearance agreement; or (b) a foreclosure alternative, which is either a short sale or a deed in lieu of foreclosure.

**XBRL** — eXtensible Business Reporting Language

**Yield curve** — A graphical display of the relationship between yields and maturity dates for bonds of the same credit quality. The slope of the yield curve is an important factor in determining the level of net interest yield on a new mortgage asset, both initially and over time. For example, if a mortgage asset is purchased when the yield curve is inverted, with short-term rates higher than long-term rates, our net interest yield on the asset will tend to be lower initially and then increase over time. Likewise, if a mortgage asset is purchased when the yield curve is steep, with short-term rates lower than long-term rates, our net interest yield on the asset will tend to be higher initially and then decrease over time.

**EXHIBIT INDEX**

| Exhibit No. | Description |
|---|---|
| 10.1 | PC Master Trust Agreement dated September 22, 2011 |
| 10.2 | First Amendment To The Federal Home Loan Mortgage Corporation Mandatory Executive Deferred Base Salary Plan (As Effective January 1, 2009) (incorporated by reference to Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2011, as filed on August 8, 2011) |
| 12.1 | Statement re: computation of ratio of earnings to fixed charges and computation of ratio of earnings to combined fixed charges and preferred stock dividends |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101.INS | XBRL Instance Document[1] |
| 101.SCH | XBRL Taxonomy Extension Schema[1] |
| 101.CAL | XBRL Taxonomy Extension Calculation[1] |
| 101.LAB | XBRL Taxonomy Extension Labels[1] |
| 101.PRE | XBRL Taxonomy Extension Presentation[1] |
| 101.DEF | XBRL Taxonomy Extension Definition[1] |

(1) The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Freddie Mac, except to the extent, if any, expressly set forth by specific reference in such filing.

FHFA 2630

Exhibit 12.1

## RATIO OF EARNINGS TO FIXED CHARGES AND
## RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

| | Nine Months Ended September 30, | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2011 | 2010 | 2010 | 2009 | 2008 | 2007 | 2006 |
| | | | (dollars in millions) | | | | |
| Net Income (loss) before income tax benefit (expense) and cumulative effect of changes in accounting principles... | $(6,247) | $(14,713) | $(14,882) | $(22,384) | $(44,564) | $(5,989) | $ 2,340 |
| Add: | | | | | | | |
| Low-income housing tax credit partnerships ......... | — | — | — | 4,155 | 453 | 469 | 407 |
| Total interest expense ...................... | 61,349 | 70,624 | 92,131 | 22,150 | 33,332 | 38,482 | 37,270 |
| Interest factor in rental expenses ................. | 3 | 4 | 5 | 7 | 8 | 7 | 6 |
| Earnings (loss), as adjusted ..................... | $55,105 | $ 55,915 | $ 77,254 | $ 3,928 | $(10,771) | $32,969 | $40,023 |
| Fixed charges: | | | | | | | |
| Total interest expense ...................... | $61,349 | $ 70,624 | $ 92,131 | $ 22,150 | $ 33,332 | $38,482 | $37,270 |
| Interest factor in rental expenses ................. | 3 | 4 | 5 | 7 | 8 | 7 | 6 |
| Capitalized interest ......................... | — | — | — | — | — | — | — |
| Total fixed charges............................ | $61,352 | $ 70,628 | $ 92,136 | $ 22,157 | $ 33,340 | $38,489 | $37,276 |
| Senior preferred stock and preferred stock dividends[1].. | 4,840 | 4,146 | 5,749 | 4,105 | 675 | 398 | 270 |
| Total fixed charges including preferred stock dividends ... | $66,192 | $ 74,774 | $ 97,885 | $ 26,262 | $ 34,015 | $38,887 | $37,546 |
| Ratio of earnings to fixed charges[2] ................ | — | — | — | — | — | — | 1.07 |
| Ratio of earnings to combined fixed charges and preferred stock dividends[3] ........................... | — | — | — | — | — | — | 1.07 |

(1) Senior preferred stock and preferred stock dividends represent pre-tax earnings required to cover any senior preferred stock and preferred stock dividend requirements computed using our effective tax rate, whenever there is an income tax provision, for the relevant periods.

(2) Ratio of earnings to fixed charges is computed by dividing earnings (loss), as adjusted by total fixed charges. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $6.2 billion, $14.7 billion, $14.9 billion, $18.2 billion, $44.1 billion and $5.5 billion for the nine months ended September 30, 2011 and 2010 and for the years ended December 31, 2010, 2009, 2008 and 2007, respectively.

(3) Ratio of earnings to combined fixed charges and preferred stock dividends is computed by dividing earnings (loss), as adjusted by total fixed charges including preferred stock dividends. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $11.1 billion, $18.9 billion, $20.6 billion, $22.3 billion, $44.8 billion and $5.9 billion for the nine months ended September 30, 2011 and 2010 and for the years ended December 31, 2010, 2009, 2008 and 2007, respectively.

**Exhibit 31.1**

# CERTIFICATION

## PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Charles E. Haldeman, Jr., certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended September 30, 2011 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  November 3, 2011

/s/  Charles E. Haldeman, Jr.
_____

Charles E. Haldeman, Jr.
Chief Executive Officer

**Exhibit 31.2**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Ross J. Kari, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended September 30, 2011 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  November 3, 2011

/s/  Ross J. Kari
_____

Ross J. Kari
Executive Vice President — Chief Financial Officer

**Exhibit 32.1**

## CERTIFICATION

### PURSUANT TO 18 U.S.C. SECTION 1350,

### AS ENACTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report on Form 10-Q for the quarter ended September 30, 2011 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Charles E. Haldeman, Jr., Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:  November 3, 2011

/s/  Charles E. Haldeman, Jr.
_____

Charles E. Haldeman, Jr.
Chief Executive Officer

**Exhibit 32.2**

## CERTIFICATION

**PURSUANT TO 18 U.S.C. SECTION 1350,**

**AS ENACTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q for the quarter ended September 30, 2011 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Ross J. Kari, Executive Vice President — Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 3, 2011

/s/ Ross J. Kari
                                         
Ross J. Kari
Executive Vice President — Chief Financial Officer



# Tab 40



**Statement of**

**Edward J. DeMarco**
**Acting Director**
**Federal Housing Finance Agency**

**Before the House Financial Services**
**Subcommittee on Oversight and Investigations**

**December 1, 2011**

**Embargoed until delivery – 2PM EST**

**Statement of**
**Edward J. DeMarco**
**Acting Director**
**Federal Housing Finance Agency**
**Before the House Financial Services**
**Subcommittee on Oversight and Investigations**

**December 1, 2011**

Chairman Neugebauer, Ranking Member Capuano, and members of the Subcommittee,
I am pleased to be invited here today to discuss the Federal Housing Finance Agency's (FHFA)
oversight of our regulated entities, Fannie Mae, and Freddie Mac, and the Federal Home Loan
Banks (FHLBanks).

The main focus of my testimony will be on key topics related to FHFA's role as the Enterprises'
conservator and regulator.  I will update you on the financial condition of the Enterprises in
conservatorship.  Then I will review FHFA's approach to preparing for increased private market
participation in housing finance and describe significant activities that FHFA has undertaken
during the past year to further our conservatorship goals.  Finally, I will report on the condition
of the Federal Home Loan Banks (FHLBanks).


## INTRODUCTION

I think it may be useful for me to begin with a brief overview of what it means for Fannie Mae
and Freddie Mac to be in conservatorship and what legal responsibilities FHFA operates under as
conservator.

The determination to place Fannie Mae and Freddie Mac, or the Enterprises as I will refer to
them, in conservatorship was made as the financial crisis of the autumn of 2008 was taking
shape.  At that time, the private mortgage securitization market had already vanished, house
prices were declining rapidly, and the Enterprises' eroding financial condition and inability to
access capital markets threatened a collapse of the country's housing finance system.  FHFA,
with financial support from and substantial consultation with the Treasury Department, placed
the Enterprises into conservatorship on September 6, 2008.

Conservatorship, along with financial support from Treasury, permitted the government to take
greater management control of the Enterprises and give investors in the Enterprises' debt and
mortgage-backed securities confidence that the Enterprises would have the financial capacity to
honor their financial obligations.  The alternative, receivership, was rejected at the time, in part
because such action would have placed greater limits on the timing and approach for the
Congress and the incoming Administration to analyze and respond to the problems confronted by
the Enterprises and the country's housing finance system.  At the time, Treasury Secretary
Paulson referred to conservatorship as a "time-out" to allow markets to continue to function

2

while policymakers considered and acted on a permanent resolution.  More than three years later, we are still waiting for that resolution.

As conservator, FHFA stands in the place of each company's shareholders, boards, and management, with the responsibility to "preserve and conserve the assets and property" of the companies.  The statute also charges the conservator with the responsibility to place the companies in "a sound and solvent condition."  At the time the conservatorships were established, FHFA was less than six weeks old as an agency, and had fewer than 400 employees. To accomplish these responsibilities, FHFA made the practical judgment that the most effective means to carry out these functions was to replace the boards and senior management, and then delegate to new boards and management day-to-day responsibility.   Since then, reconstituted boards of directors have worked with FHFA to define the operational goals in conservatorship and to support FHFA in its work to guide and oversee management in fulfilling these goals. Likewise, the new CEOs and executive officers have worked with FHFA to these same ends.

As conservator and regulator, FHFA has three principal mandates set forth in law that direct and motivate FHFA's activities and decisions involving the Enterprises.

First, as I have noted, FHFA has a statutory responsibility as conservator of the Enterprises to "take such action as may be: necessary to put the regulated entity in a sound and solvent condition; and appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." As FHFA has stated on numerous occasions, with taxpayers providing the capital supporting the Enterprises' operations, this "preserve and conserve" mandate directs us to minimize losses on behalf of taxpayers.

Second, even though the Enterprises are in conservatorship, without further statutory changes they have the same mission and obligations as they did prior to being placed into conservatorship.  FHFA has a statutory responsibility to ensure the Enterprises "operate in a safe and sound manner" and that "the operations and activities of each regulated entity foster liquid, efficient, competitive, and resilient national housing finance markets."  We typically refer to this requirement as "supporting a stable and liquid mortgage market."

Third, under the Emergency Economic Stabilization Act of 2008, FHFA has a statutory responsibility to "implement a plan that seeks to maximize assistance for homeowners and use its authority to encourage the servicers of the underlying mortgages, and considering net present value to the taxpayer to take advantage of … available programs to minimize foreclosures."

These three mandates form the basis for how FHFA views its responsibilities as conservator of the Enterprises.  In view of the critical and substantial resource requirements of conserving assets and restoring financial health, combined with a recognition that the Enterprises operate today only with the support of taxpayers, FHFA has focused the Enterprises on their existing core business, including minimizing credit losses.  This means that FHFA is not permitting the Enterprises to offer new products or enter new lines of business.  Their operations are focused on their core business activities and loss mitigation.  This type of limitation on new business activities is consistent with the standard regulatory approach for addressing companies that are

3

financially troubled.  And it is even more pertinent for the Enterprises given their uncertain future and reliance on taxpayer funds.

As a final introductory comment, the Enterprises' equity holders retain an economic claim on the companies but that claim is subordinate to taxpayer claims.  As a practical matter, taxpayers are not likely to be repaid in full, so Enterprise stock lower in priority is not likely to have any value.  Prior to conservatorship, much executive compensation, and indeed some staff compensation, was in the form of company stock, so the value of such compensation has essentially vanished.  Finally, the company leaders most responsible for the business decisions that led to the Enterprises ending up in conservatorship had either left the company before conservatorship, at the time of the conservatorship, or shortly thereafter.  The boards of directors were also replaced.

Thus, the leadership working at the Enterprises today is not the same as those chiefly responsible for the business decisions that led to conservatorship and that continue to drive the financial results.  Moreover, they are there to further the goals of conservatorship and ensure the country has a functioning secondary mortgage market while lawmakers deliberate the future structure for housing finance.  The boards, executives, and staff have been and are working with FHFA in its efforts to minimize taxpayer losses, provide stability and liquidity to the market, and maximize assistance to homeowners to avoid foreclosure.  They do so knowing that the long-term outlook is that neither Enterprise will continue to exist, at least in its current form, in the future.

## THIRD QUARTER 2011 FINANCIAL PERFORMANCE AND CONDITION OF THE ENTERPRISES

### Providing Liquidity to the Market
Since conservatorship, Fannie Mae and Freddie Mac have been the largest issuers of mortgage-related securities in the secondary market, guaranteeing roughly three-quarters of single-family mortgage-backed securities (MBS) issued.

### Capital
Combined Treasury support as a result of financial performance in the third quarter of 2011 was $13.8 billion. The Single-Family Credit Guarantee segment continued to drive losses as credit-related expenses remained high. Additionally, the Investments segment results turned negative in the third quarter of 2011, due primarily to a significant decrease in interest rates and a widening of credit spreads on non-agency securities.  This was partially offset by a two percent increase in net interest income.  In addition, $4.1 billion of the $13.8 billion draw is to pay interest to the Treasury on previous draws.

### Credit Quality of New Single-Family Book of Business

The quality of new business remained high in the third quarter of 2011. The percentage of new business volume with FICO scores below 620 remained below two percent and the average loan-to-value ratio (LTV) for new business was roughly 70 percent for both Enterprises, reflecting in part the high degree of refinance activity.

4

**Loss Mitigation Activity**

Since conservatorship, the Enterprises have completed two million foreclosure prevention transactions, of which one million have been permanent loan modifications and another 960,000 have been other forms of assistance that have allowed homeowners to retain homeownership. Significantly, loans modified since late 2009 continue to perform substantially better than loans modified before then.  Separately, another 270,000 transactions have resulted in households leaving their homes but without going through foreclosure.  Most of these actions have been short sales.

**Projections of Financial Performance**

To provide additional information on future Enterprise financial performance, beginning in October 2010, FHFA published financial projections of the Enterprises' financial performance across different house price scenarios.  Those initial projections were updated a few weeks ago, and the projected combined cumulative Treasury draws (which includes 10 percent dividend payments to Treasury) through the end of 2014 range between $220 and $311 billion.   In general, these financial projections show that under less stressful house price scenarios, the cumulative draws from Treasury would stabilize in the next year or so, with the Enterprises earning enough income to cover dividend payments to Treasury.


<u>**FHFA INITIATIVES**</u>

Recent Congressional efforts to begin serious discussion of a gradual transition to greater private capital participation in housing finance and greater distribution of risk to participants other than the government are important.  FHFA has already begun taking actions in support of these objectives.  Since conservatorship, underwriting standards have been strengthened and several price increases have been initiated to better align pricing with risk, and we will continue to gradually increase guarantee fee pricing to better reflect that which would be anticipated in a private, competitive market.  Also, we will soon be exploring more private sector risk-sharing opportunities.  Such steps are consistent with actions already taken in conservatorship and we are examining further options along these lines in support of a stable transition over time.

While debate over the future of the housing finance system progresses, FHFA has and will continue to focus on meeting the goals of the conservatorships through a series of initiatives aimed at retaining value in the business operations of Fannie Mae and Freddie Mac, maintaining their support for the housing market, and mitigating losses to taxpayers.

**Recovering Certain Losses**

Consistent with FHFA's mission to preserve and conserve the Enterprises' assets on behalf of taxpayers, this year we filed lawsuits against 18 financial institutions to recover certain losses suffered by Freddie Mac and Fannie Mae that we believe are the legal responsibility of others. We believe that the loans in these private-label mortgage backed securities (PLMBS) had different and more risky characteristics than the descriptions contained in the marketing and sales materials provided to the Enterprises for those securities.

**Real Estate-Owned Request for Information**

In August, FHFA, in conjunction with the Department of Housing and Urban Development (HUD) and the Treasury Department, issued a Request for Information (RFI) seeking input on new options for selling single-family real estate owned (REO) held by Freddie Mac, Fannie Mae, and FHA. We are looking for approaches to reduce the REO portfolios of the Enterprises in a cost-effective manner, as well as to reduce the losses on individual distressed properties. We are seeking alternatives that will maximize value to taxpayers and increase private investments in the housing market, including approaches that support rental and affordable housing needs. We are not trying to develop a single, national program for REO disposition. We are most interested in proposals tailored to the needs and economic conditions of local communities. Based on the input of RFI responders we understand the magnitude of the task at hand. FHFA is proceeding prudently, but with a sense of urgency, to lay the groundwork for the development of good initial pilot transactions.

**Uniform Mortgage Data Program**

In May 2010, FHFA directed the Enterprises to develop uniform standards for data reporting on mortgage loans and appraisals. This Uniform Mortgage Data Program is designed to improve the consistency, quality, and uniformity of data that are collected at the front end of the mortgage process. By identifying potential defects at the front end of the mortgage process, the Enterprises will improve the quality of mortgage purchases, which should reduce repurchase risk for originators. This initiative will be phased in over the rest of this year and next.

**Loan Level Disclosures**

Earlier this year, I announced that FHFA is considering ways to enhance loan-level disclosures on Enterprise MBS, both at the time of origination and throughout a security's life. I believe that improving Enterprise MBS disclosures over time will help establish consistency and quality of such data. Moreover, it will contribute to an environment in which private capital has the information needed to efficiently measure and price mortgage credit risk, thereby facilitating the shifting of this risk away from the government and back into the private sector.

**Servicing Alignment Initiative**

Our Servicing Alignment Initiative (SAI), which we announced last April, responded to concerns about how delinquent mortgages were being serviced. SAI meets the conservatorship objectives of minimizing losses and assisting homeowners with alternatives to foreclosure. FHFA instructed Freddie Mac and Fannie Mae to establish a single, consistent set of procedures for servicing Enterprise mortgages, from the time they first become delinquent. The updated framework, which went into effect on October 1, prioritizes early borrower outreach, streamlines documentation requirements, simplifies mortgage modification terms and requirements, and establishes a schedule of performance-based incentive payments and penalties aimed at ensuring that servicers review foreclosure alternatives in a timely manner. We are also working to align and improve Fannie Mae and Freddie Mac policies regarding unemployment forbearance to reflect the realities of the current job market.

6

**Foreclosure Attorney Networks**

In October, as an adjunct to SAI, FHFA directed Freddie Mac and Fannie Mae to change the way foreclosure attorneys are selected in an effort to produce uniform foreclosure processing standards to assist servicers, homeowners, and lenders.  Under current practice, in certain states each Enterprise designates law firms eligible under the Enterprise's criteria to undertake foreclosure work and mortgage servicers then select and work with these firms.  FHFA instructed Fannie Mae and Freddie Mac to transition away from current foreclosure attorney network programs and move to a system where mortgage servicers select qualified law firms that meet certain minimum, uniform criteria.  These efforts will lead to greater transparency and benefit delinquent borrowers who become subject to the foreclosure process. FHFA is now working with other regulators and industry stakeholders to create uniform qualifications and oversight of foreclosure attorneys.

I am hopeful that these new directives, which create uniform procedures for servicing delinquent loans and processing foreclosures, will gain acceptance beyond the Enterprises and become "best practices" throughout the industry.

**Servicing Compensation Initiative**

The last initiative I will discuss today, the Joint Servicing Compensation Initiative, made up of FHFA, Fannie Mae, Freddie Mac, and HUD, is one of the initiatives we have directed the Enterprises to undertake designed to broadly consider changes that will lead to improvements in the operations of the Enterprises and the overall mortgage market.  The goals of the Joint Initiative are to improve service for borrowers, reduce financial risk to servicers, and provide flexibility for guarantors to better manage non-performing loans, while promoting continued liquidity in the To Be Announced mortgage securities market.  In addition to those specific goals, the Joint Initiative seeks broader options for mortgage servicing compensation that lead to enhanced competition in mortgage servicing and origination, and that can be replicated across multiple future states of housing finance.

At the end of September, the Joint Initiative released a discussion document seeking comments on two alternative servicing compensation structures for servicing single-family mortgages.  One proposal would establish a reserve account within the current servicing compensation structure. The other proposal would create a new fee-for-service compensation structure that would replace today's fixed fee approach.  We requested that comments be submitted by late December, after which they will be considered and evaluated by the Joint Initiative.

**Home Affordable Refinance Program**

On October 24, 2011, we announced a series of changes to the Home Affordable Refinance Program (HARP).  These changes should make HARP refinances accessible to more households with mortgages owned or guaranteed by the Enterprises.  Changes to the program include: eliminating or reducing certain risk-based fees; removing the current 125 percent LTV ceiling; waiving certain representations and warranties; eliminating the need for certain property appraisals; improving the process for carrying over mortgage insurance coverage; and extending the end date for HARP to December 31, 2013.

7

Importantly, such refinances should also reduce the Enterprises' credit risk, and thus losses to taxpayers. HARP, even with the new enhancements, is not a mass refinancing program; it was designed to help a defined set of borrowers with Fannie Mae and Freddie Mac mortgages that are underwater or nearly underwater.

It is impossible to project accurately how many homeowners will benefit from the enhancements to HARP because of unknowable factors, such as future interest rate fluctuations and the desire of borrowers to enter into a refinance transaction. Since HARP was introduced in 2009, more than 900,000 homeowners have refinanced through the HARP program. We believe the announced changes may double the number of homeowners helped through HARP.
Since industry participation in HARP is not mandatory, implementation schedules will vary as individual lenders, mortgage insurers and other market participants modify their processes.

Separately, the Enterprises have refinanced approximately nine million mortgages since 2009.

## EXECUTIVE COMPENSATION

Now I will turn my attention briefly to the subject of executive compensation for Fannie Mae and Freddie Mac executives, a topic that has attracted much attention recently from the Congress, the press and the public. The House Financial Services Committee has already passed legislation that would put Enterprise executives' salaries in line with those at the Federal Financial Regulatory Agencies and put Enterprise employees on the Federal government's GS-pay scale. I testified before the Committee last year as to why I do not think that would be a good idea.

At the outset, let me state that the best way to address concerns with executive compensation is action by Congress to restructure the nation's housing finance system and dissolve the conservatorships. In the absence of that resolution, FHFA will continue to evaluate the appropriateness of executive compensation at the Enterprises given their ongoing activities.

As conservator, I need to ensure that the companies have people with the skills needed to manage the credit and interest rate risks of $5 trillion worth of mortgage assets and $1 trillion of annual new business that the American taxpayer is supporting. I have concluded that it would be irresponsible of me to risk this enormous contingent taxpayer liability with a rapid turnover of management and staff, replaced with people lacking the institutional, technical, operational, and risk management knowledge requisite to the running of corporations with thousands of employees and more than $2 trillion in financial obligations each. That conclusion is further buttressed by the realization that, from an Enterprise executive's or staff's point of view, continued employment at an Enterprise risks substantial job and career uncertainty. The public scrutiny and criticism is often harsh, and almost everyone expects the Enterprises to cease to exist, at least in their current form, in the future. At the same time, the taxpayer is backing Enterprise financial commitments that have 30-year lives, and we will need expert management of those guarantees for years to come. Given the amount of money at risk here, small mistakes can easily be amplified to losses far greater than the compensation paid to Enterprise executives.

8

In short, as Congress considers executive compensation at the Enterprises, the basic fact is that despite the large amounts of government support provided to the Enterprises they remain private companies with uncertain futures, not government agencies.  They employ thousands of people. We cannot maintain operational effectiveness while suddenly treating them as ongoing government agencies – something they are not.  Major changes to compensation, for executives or staff, cannot be done safely and soundly in a short period of time and attempting to do so would pose substantial risk to the mortgage market and a greater risk of loss to taxpayers.


## FEDERAL HOME LOAN BANK SUPERVISION

While much attention remains focused on the Enterprises, we continue to fulfill FHFA's statutory mandate to oversee the FHLBanks.

### Third Quarter 2011 Performance and Condition of the FHLBanks

Total assets of the FHLBanks declined by $31 billion in the third quarter of 2011 and by $100 billion during the first three quarters of the year.  From a peak in 2008 of $1.4 trillion, combined assets have nearly halved to $778 billion at September 30, 2011.  Advances (collateralized loans to members) are driving the decline, as balances have fallen from a 2008 high of $1.0 trillion to just $415 billion, or about the level of advances last seen in the first quarter of 2000.  More recently, advances declined $13 billion in the third quarter of 2011, and $63 billion year-to-date through September.  The decline, in part, reflects high levels of liquidity at member banks with a consequent decline in the demand for advances.  As of September 30, 2011, advances comprised 53 percent of assets, non-MBS investments were 19 percent, agency and federal MBS were 15 percent, mortgage loans were seven percent, and PLMBS were four percent. Though PLMBS assets are relatively small, their distribution among FHLBanks is uneven, leading to pockets of concentration at some FHLBanks.

The FHLBanks principally fund themselves by issuing consolidated obligations in the capital markets. Market access remains excellent, and spreads to comparable Treasury securities are narrow.  Total regulatory capital at September 30, 2011, was $55.4 billion or 6.5 percent of assets.

Net income is declining at the FHLBanks as fewer earning assets generate less net interest income, and as lower interest rates reduce the return on the FHLBanks' invested capital. Offsetting these factors is a decline in credit-related other-than-temporary impairment (OTTI) on PLMBS, though this remains a potentially volatile item, with the possibility to increase should collateral performance or the broader housing market deteriorate further.  On a year-to-date basis through September 30, 2011, all FHLBanks were profitable, though some did have quarterly net losses. Combined net income was $475 million for the third quarter of 2011 and $1.1 billion year-to-date. This is down from comparable periods in 2010, when net income was $680 million in the third quarter and $1.3 billion year-to-date through September 2010.  A significant factor in the lower quarterly net income was mark-to-market losses on derivatives.  These derivatives are part of a prudent risk-management strategy, and the losses should reverse as the derivatives

approach maturity. Credit OTTI charges were lower in 2011 relative to 2010—credit OTTI totaled $775 million in the first three quarters of 2011, down from $905 million for the same period in 2011.  To date, the FHLBanks have reported a total of $4.4 billion in credit-OTTI charges on PLMBS, which amounts to about five percent of the peak balance of this asset category.  PLMBS remain a supervisory concern.

**Resolution Funding Corporation**
In 2011, the FHLBanks satisfied their collective obligation to make payments related to the Resolution Funding Corporation, a funding mechanism used during the savings and loan crisis. Related to this accomplishment, the FHLBanks collectively entered into a Joint Capital Enhancement Agreement, which requires each FHLBank to allocate 20 percent of its net income to a restricted retained earnings account, from which it cannot pay dividends and which serves to enhance the joint-and-several liability features inherent in FHLBank consolidated obligations.

**Federal Home Loan Bank of Chicago**
On September 31, 2011, FHFA approved the capital plan of the FHLBank of Chicago, a requirement of the 2007 Consent Order with that FHLBank.  Implementation is expected on January 1, 2012.  Until then, the FHLBank of Chicago remains the only FHLBank still operating under a pre-Gramm Leach Bliley Act capital structure.

**Federal Home Loan Bank of Seattle**
The FHLBank of Seattle faces a declining advance franchise, a problematic PLMBS portfolio, and insufficient retained earnings.  Although the FHLBank has capital equal to 6.8 percent of assets, FHFA has exercised its discretion to classify the FHLBank as "undercapitalized."   The FHLBank of Seattle has operated under a Consent Order to resolve outstanding capital and supervisory matters since October 2010.

**Voluntary Mergers**
Earlier this week, FHFA published in the *Federal Register* a final rule outlining the regulatory process for FHLBanks to undertake voluntary mergers.  This rule fulfills a mandate in the Housing and Economic Recovery Act of 2008 to "promulgate regulations establishing the condition and procedures for the consideration and approval of any voluntary merger" authorized by the Act.


Mr. Chairman, thank you again for this opportunity.  I look forward to responding to the Subcommittee's questions.

# Tab 41



Federal Housing Finance Agency

Conservator's Report
on the Enterprises' Financial Performance

Third Quarter 2011

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Third Quarter 2011

## Contents

Executive Summary……………………………….…..……………….…… 3

1. Mortgage Markets and the Enterprises' Market Presence…….…………… 4

2. Credit Quality of New Single-Family Business…………………….………. 6

3. Capital…………..……………….…………….……………….........……………... 9

4. Single-Family Credit Guarantee Segment Results………..……………….. 11

5. Investments and Capital Markets Segment Results…………………….….. 14

6. Loss Mitigation Activity….…………...…………………………….…..…..…. 16

7. Comparison of Actual Results to Projections of the Enterprises' Financial
   Performance……………………….…………..…………….………... 17

The purpose of this report is to provide an overview of key aspects of the financial condition of Fannie Mae and Freddie Mac (the Enterprises) during conservatorship. The data in this report are derived primarily from the Enterprises' SEC filings and other publicly available sources. In some cases, FHFA adjusted the classification of certain data to provide comparability between the Enterprises. In other cases, the Enterprises' reporting methodologies changed over time. Therefore, the data in this report may not exactly match published figures.

FHFA 2648

## Executive Summary

### Mortgage Markets and the Enterprises' Market Presence

Mortgage originations in 2011 are on pace to be below 2010 levels as home purchase activity remains weak, despite low mortgage rates during 2011. More than half of all mortgage originations this year are due to refinance volume. The Enterprises continue to dominate the MBS issuance market accounting for 71 percent market share.

### Credit Quality of New Single-Family Business

The quality of new business remained high year-to-date 3Q11, as evidenced by average FICO credit scores greater than 750. Both Enterprises have experienced a slight uptick in new business with LTVs greater than 90 percent. This is due primarily to activity related to Enterprise refinance programs (including the Home Affordable Refinance Program) that support improving the housing market.

### Capital

Combined Treasury support as a result of poor financial performance in the third quarter of 2011 was $13.8 billion. The Single-Family Credit Guarantee segment continues to drive losses as credit-related expenses remain high. The Investments segment results were also weak in the third quarter of 2011, partly due to derivative losses arising from a significant decline in swap rates. The Single-Family Credit Guarantee segment and senior preferred dividends have been the main drivers of charges against capital since the end of 2007.

### Single-Family Credit Guarantee Segment Results

Credit-related expenses continue to drive Single-Family Credit Guarantee segment financial results for the Enterprises. Enterprise combined revenue for this segment of $7 billion year-to-date was not enough to offset the $32 billion in credit-related expenses. Credit-related expenses continue to be driven by the provision for credit losses due to factors such as home price deterioration and an aging delinquent loan population.

### Investments and Capital Markets Segment Results

The Investments and Capital Markets segment has been a positive contributor to capital year-to-date 2011. Funding costs remain low as a result of the interest rate environment contributing primarily to $16 billion in total revenue for this segment year-to-date. Revenue more than offset losses on derivatives and other expenses.

### Loss Mitigation Activity

Since conservatorship, the Enterprises have completed nearly 2 million foreclosure prevention actions. More than one million of these actions have been permanent loan modifications and another 676,500 have been other forms of assistance that have allowed homeowners to retain homeownership. Approximately 269,700 of the actions have been short sales and deeds-in-lieu, which resulted in households leaving their homes but without going through the foreclosure process.

### Projections of Financial Performance

The projected combined Treasury draws for the third quarter of 2011 ranged from $16 billion to $23 billion. This compares to an actual combined draw of approximately $13.8 billion. The primary driver of the difference between actual and projected performance was lower than projected credit-related expenses at Fannie Mae as a result of reduced provisioning for credit losses. A key driver of reduced provisioning for credit losses was lower delinquencies and higher expected prepayments due to the continued lower rate environment.

3

Federal Housing Finance Agency

# 1   Mortgage Markets and the Enterprises' Market Presence

## 1.1   Primary Mortgage Market Trends—Mortgage Originations

- Mortgage originations year-to-date of $925 billion are on pace to be below 2010 levels despite lower mortgage rates.  Refinance volume continues to account for the majority of mortgage originations.  Annualized home purchase activity in 2011 is at the lowest reported level since 2003.

**Figure 1.1 Mortgage Originations by Product Type** *($ in billions)*




Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Third Quarter 2011

1.2     Secondary Mortgage Market Trends—Mortgage-Backed Securities Issued

- The Enterprises' market share of mortgage-backed securities (MBS) issuances through 3Q11 rose slightly to 71 percent, while Ginnie Mae's market presence remained unchanged.  The Enterprises and Ginnie Mae continued to account for almost all issuances of mortgage-backed securities.

**Figure 1.2 Enterprises' Market Share – MBS Issuance Volume**



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | YTD 3Q11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Enterprises | 67% | 68% | 70% | 47% | 41% | 40% | 58% | 73% | 72% | 70% | 71% |
| Ginnie Mae | 13% | 9% | 8% | 7% | 4% | 4% | 5% | 22% | 25% | 26% | 26% |
| Total Agency | 80% | 77% | 78% | 54% | 45% | 44% | 63% | 95% | 97% | 96% | 97% |

Sources:
Inside Mortgage Finance, Inside MBS & ABS, Enterprises' Monthly Volume Summaries.
Issuance figures exclude MBS issued backed by assets previously held in the Enterprises' portfolios.

Federal Housing Finance Agency

## 2   Credit Quality of New Single-Family Business

### 2.1   Credit Characteristics of the Enterprises' New Single-Family Business

- The credit quality of new Single-Family business remained high year-to-date 3Q11.  Purchases of non-traditional and higher-risk mortgages were very low and the average FICO credit score was over 750 at both Enterprises.  The increase in the percentage of new business with LTVs greater than 90 percent primarily relates to the Enterprises' refinance programs, including the Home Affordable Refinance Program.

### Figure 2.1 Characteristics of Single-Family Mortgage Acquisitions

Percent of New Single-Family Business[1]
(Categories overlap and are not additive)

| | Fannie Mae | | | | | | Freddie Mac | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 | 2007 | 2008 | 2009 | 2010 | YTD 3Q11 | 2006 | 2007 | 2008 | 2009 | 2010 | YTD 3Q11 |
| Alt-A[2] | 22% | 17% | 3% | 0% | 1% | 1% | 18% | 22% | 7% | 0% | 0% | 0% |
| Interest-Only | 15% | 15% | 6% | 1% | 1% | 1% | 17% | 21% | 6% | 0% | 0% | 0% |
| Credit Score <620 | 6% | 6% | 3% | 0% | 0% | 1% | 5% | 6% | 3% | 1% | 1% | 1% |
| LTV >90 Percent | 10% | 16% | 10% | 4% | 7% | 10% | 6% | 11% | 9% | 4% | 9% | 12% |
| Average LTV | 73% | 75% | 72% | 67% | 68% | 70% | 73% | 74% | 71% | 67% | 69% | 71% |
| Average Credit Score | 716 | 716 | 738 | 761 | 762 | 760 | 720 | 718 | 734 | 756 | 755 | 753 |

Notes
[1] New business is defined as issuance of MBS/PC plus purchases of whole loans and does not include purchases of mortgage-related securities.
[2] Refer to sources for Alt-A definitions. Freddie Mac's 2010 figures include Alt-A purchases of $1.5 billion due to a long-term standby commitment termination and a subsequent PC issuance. There was no change to the Alt-A exposure on these mortgages as a result of these transactions. Fannie Mae newly originated Alt-A loans acquired in 2009 through 2011 consist of the refinancing of existing loans.

Sources:
Enterprises' Forms 10-K and 10-Q, credit supplements to SEC disclosures, and management reports.

Federal Housing Finance Agency

2.2     Performance of Non-Traditional and Higher-Risk Mortgages (mostly purchased pre-conservatorship)

- Enterprise single-family serious delinquency rates (SDQ) remain high, despite a downward trend since 4Q09.  The number of delinquent loans in 2011 remains elevated partly from a slowdown in SDQ outflows due to delays in foreclosure processing. Non-traditional and higher-risk mortgages, which account for a relatively small portion of the credit guarantee portfolios, continue to show substantially higher serious delinquency rates than traditional mortgages.

**Figure 2.2 Single-Family Serious Delinquency Rates**

| | Fannie Mae | | | | | Freddie Mac | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 4Q07 | 4Q08 | 4Q09 | 4Q10 | 3Q11 | 4Q07 | 4Q08 | 4Q09 | 4Q10 | 3Q11 |
| **Product Type**[1] | | | | | | | | | | |
| Alt-A | 2.2% | 7.0% | 15.6% | 13.9% | 12.7% | 1.9% | 5.6% | 12.3% | 12.2% | 11.8% |
| Interest-Only | 2.0% | 8.4% | 20.2% | 17.9% | 15.7% | 2.0% | 7.6% | 17.6% | 18.4% | 17.7% |
| **Credit Score** | | | | | | | | | | |
| <620 | 4.7% | 9.0% | 18.2% | 14.6% | 13.6% | 3.4% | 7.8% | 14.9% | 13.9% | 12.7% |
| **Loan-to-Value Ratio** | | | | | | | | | | |
| >90 Percent | 3.0% | 6.3% | 13.1% | 10.0% | 8.4% | 1.9% | 4.8% | 9.1% | 7.8% | 6.7% |
| **Risk-Layering** | | | | | | | | | | |
| Credit score <620 & LTV >90 Percent | 8.6% | 16.0% | 28.0% | 21.4% | 19.0% | 5.4% | 11.5% | 19.0% | 17.1% | 15.2% |
| **Total Single-Family** | 1.0% | 2.4% | 5.4% | 4.5% | 4.0% | 0.7% | 1.8% | 4.0% | 3.8% | 3.5% |

Notes
[1] Loans with multiple product features may be in more than one category. Refer to sources for Alt-A definition.

Sources:
Enterprises' Forms 10-K and 10-Q, credit supplements to SEC disclosures, and management reports.

Federal Housing Finance Agency

## 2.3    Performance of Post-Conservatorship Business

- While not necessarily indicative of the ultimate performance, the improved credit characteristics of the new post-conservatorship business is reflected in substantially lower cumulative default rates for the 2009 and 2010 vintages compared to the years leading up to conservatorship.

**Figure 2.3 Cumulative Default Rate by Origination Year**





**Notes**
[1] Defaults include loan liquidations other than through voluntary pay-off or repurchase by lenders and include loan foreclosures, preforeclosure sales, sales to third parties and deeds-in-lieu of foreclosure. Cumulative Default Rate is the total number of single-family conventional loans in the guarantee book of business originated in the identified year that have defaulted, divided by the total number of single-family conventional loans in Fannie Mae's guarantee book of business originated in the identified year.
[2] Rates are calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries, divided by the number of loans in Freddie Mac's single-family credit guarantee portfolio originated in the identified year.

Time Since Origination

**Fannie Mae[1]**

| Vintage | Yr1Q4 | Yr 2Q4 |
|---------|-------|--------|
| 2002 | 0.4 | 9.5 |
| 2003 | 0.4 | 7.1 |
| 2004 | 0.7 | 11.6 |
| 2005 | 0.7 | 14.0 |
| 2006 | 1.3 | 37.4 |
| 2007 | 3.0 | 78.9 |
| 2008 | 2.2 | 37.1 |
| 2009 | 0.1 | 4.2 |
| 2010 | 0.2 | N/A |

Time Since Origination

**Freddie Mac[2]**

| Vintage | Yr1Q4 | Yr2Q4 |
|---------|-------|--------|
| 2002 | 0.3 | 7.7 |
| 2003 | 0.2 | 3.7 |
| 2004 | 0.4 | 5.2 |
| 2005 | 0.2 | 6.3 |
| 2006 | 0.6 | 25.2 |
| 2007 | 2.3 | 63.4 |
| 2008 | 2.1 | 36.4 |
| 2009 | 0.1 | 4.0 |
| 2010 | 0.1 | N/A |

Source:
Enterprises' quarterly credit supplements.

## 3.  Capital

### 3.1    Capital Changes: January 1, 2008 – September 30, 2011

- At the end of 2007, the Enterprises had $71 billion of combined capital.  From the end of 2007 through the third quarter of 2011, the Enterprises' combined charges against capital have totaled $261 billion, requiring Treasury support of $183 billion through draws under the Preferred Stock Purchase Agreements. The Single-Family Credit Guarantee segment has been the largest contributor to charges against capital, accounting for $208 billion, or 80 percent, of capital reduction to-date.  Senior preferred dividends on Treasury draws accounted for $32 billion, or 12 percent, of capital reduction.

**Figure 3.1 Capital Changes: January 1, 2008 – September 30, 2011** *($ in billions)*

| | Fannie Mae | | Freddie Mac | | Combined | |
|---|---|---|---|---|---|---|
| Beginning Capital[1] | $44 | | $27 | | $71 | |
| Equity Issuance[2] | 7 | | 0 | | 7 | |
| Available Capital | $51 | | $27 | | $78 | |
| **Capital Change** | | | | | | |
| Single-Family Comprehensive Income[3] | ($137) | *84%* | ($71) | *73%* | ($208) | *80%* |
| Multifamily Comprehensive Income[3,4] | (6) | *3%* | 13 | *-13%* | 7 | *-3%* |
| Investments Comprehensive Income[3,4] | 6 | *-4%* | (10) | *10%* | (4) | *1%* |
| Consolidation Accounting Adjustment | 3 | *-2%* | (12) | *12%* | (8) | *3%* |
| Other | (13) | *8%* | (3) | *3%* | (16) | *6%* |
| Senior Preferred dividends | (17) | *11%* | (15) | *15%* | (32) | *12%* |
| Total Capital Change[5] | ($163) | *100%* | ($98) | *100%* | ($261) | *100%* |
| Capital deficit | ($112) | | ($71) | | ($183) | |
| Treasury Senior Preferred draw[6] | $111.6 | | $71.2 | | $182.7 | |

Notes

Totals may not sum due to rounding.

[1] Capital is defined as stockholders' equity.

[2] Fannie Mae's figure includes common and preferred stock issuance pre-conservatory.

[3] Segment comprehensive income (loss) represents net income (loss) plus total other comprehensive income (loss) by segment.

[4] Freddie Mac includes net interest income on investments in multifamily loans, net interest income on commercial mortgage-backed securities, and non-interest rate risk-related unrealized gains (losses) on commercial mortgage-backed securities in Multifamily Comprehensive Income (Loss), while Fannie Mae includes these items in Investments comprehensive income.  Investments comprehensive income  includes the impact of accounting changes for security impairments.

[5] Included in total capital change for both Enterprises are losses attributable to the writedown of low income housing tax credits (LIHTC) investments to zero in the fourth quarter of 2009.  The writedown of these LIHTC losses for Fannie Mae and Freddie Mac were $5 billion and $3 billion, respectively, and are included in Other. The establishment of a deferred tax asset valuation allowance, which reduced capital by $21 billion for Fannie Mae and $14 billion for Freddie Mac in 2008, is also contributing to the total capital change (valuation allowance has been allocated across segments).

[6] Total draws include amounts relating to the third quarter of 2011 to be received in the fourth quarter of 2011.

Sources:

Fannie Mae segment earnings per Fannie Mae SEC disclosures for the relevant time periods.

Freddie Mac's 2008 and 2009 comprehensive income (loss) by segment reflect revised methodology effective January 1, 2010.

The presentation on this page and other pages discussing segment results in this report reflect a change in reporting convention from prior reports.  The Single-Family Guarantee segment and Multifamily segment figures for 2009, 2010 and year-to-date 2011 have been revised to reflect net income (loss) plus total other comprehensive income (loss), instead of net income (loss) only. The Investments segment figures have been changed to reflect net income (loss) plus total other comprehensive income (loss) for the Investments segment only.  In reports prior to 1Q11, the Investments segment included net income (loss) plus other comprehensive income (loss) for all of the other segments.

Federal Housing Finance Agency

3.2     Capital Changes: Third Quarter 2011

- During the third quarter of 2011, losses from the Single-Family Credit Guarantee segment drove overall negative contributions to capital at the combined Enterprises.

**Figure 3.2 Capital Changes: June 30, 2011 – September 30, 2011** *($ in billions)*

| | Fannie Mae | Freddie Mac | Combined |
|---|---|---|---|
| Available Capital[1] | $0 | $0 | $0 |
| **Capital Change** | | | |
| Single-Family Comprehensive Income (Loss)[2] | ($4) | ($4) | ($7) |
| Multifamily Comprehensive Income (Loss)[2] | 0 | (1) | (1) |
| Investments Comprehensive Income (Loss)[2] | (1) | 0 | (1) |
| Other | (1) | (0) | (1) |
| Capital increase (decrease) pre-dividends | ($5) | ($4) | ($10) |
| Senior Preferred dividends | (2) | (2) | (4) |
| Total Capital Change | ($8) | ($6) | ($14) |
| Capital Deficit | ($8) | ($6) | ($14) |
| Treasury Senior Preferred draw[3] | $7.8 | $6.0 | $13.8 |

Sources:
Fannie Mae and Freddie Mac SEC disclosures for the quarter ended September 30, 2011.

Notes
  Totals may not sum due to rounding.
[1] Capital is defined as stockholders' equity. Available capital is defined as beginning capital plus Treasury draw related to prior quarter's deficit.
[2] Represents net income (loss) plus total other comprehensive income (loss) by segment. Freddie Mac includes net interest income on investments in multifamily loans, net interest income on commercial mortgage-backed securities, and non-interest rate risk-related unrealized gains (losses) on commercial mortgage-backed securities in Multifamily comprehensive income (loss), while Fannie Mae includes these items in Investments comprehensive income.
[3] Reflects requested Treasury draws related to current quarter deficit, to be received during the next quarter.  Enterprises' draw requests are rounded up to the nearest $1 million.

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Third Quarter 2011

## 4. Single-Family Credit Guarantee Segment Results

### 4.1 Single-Family Credit Guarantee Segment Results

- Losses from the Single-Family Credit Guarantee segment year-to-date 3Q11 have been primarily driven by credit-related expenses, notably the provision for credit losses.  Both Enterprises continue to be influenced by home price deterioration, newly delinquent loans, and an aging delinquent loan population.

### Figure 4.1 Single-Family Credit Guarantee Segment Results ($ in billions)

| | Fannie Mae | | | | | Freddie Mac | | | | | Combined 2008 - 3Q11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | YTD 3Q11 | Total | 2008 | 2009 | 2010 | YTD 3Q11 | Total | |
| Revenue[1] | $9 | $9 | $2 | $4 | $24 | $5 | $4 | $5 | $3 | $18 | $42 |
| Provision for credit losses[2] | (26) | (50) | (25) | (21) | (121) | (16) | (29) | (19) | (9) | (73) | (195) |
| Foreclosed Property Expenses | (2) | (1) | (2) | (1) | (5) | (1) | (0) | (1) | (1) | (3) | (8) |
| Credit-related expenses | (28) | (51) | (26) | (22) | (127) | (17) | (29) | (19) | (10) | (76) | (203) |
| SOP 03-3 Losses[3] | (2) | (20) | (0) | (0) | (23) | (2) | (5) | (0) | (0) | (6) | (29) |
| Other expenses[4] | (2) | (3) | (2) | (2) | (9) | (1) | (1) | (2) | (1) | (6) | (15) |
| Pre-tax income (loss) | (22) | (65) | (27) | (20) | (134) | (15) | (31) | (17) | (8) | (71) | (204) |
| (Provision) benefit for taxes | (5) | 1 | 0 | 0 | (3) | (5) | 4 | 1 | (0) | (1) | (4) |
| Net income (loss) | ($27) | ($64) | ($27) | ($19) | ($137) | ($20) | ($27) | ($16) | ($8) | ($71) | ($209) |
| Other Comprehensive Income | - | 0 | 0 | - | 0 | - | 0 | 0 | (0) | 0 | 0 |
| Total Comprehensive Income[5] | ($27) | ($64) | ($27) | ($19) | ($137) | ($20) | ($27) | ($16) | ($8) | ($71) | ($208) |

Notes
Totals may not sum due to rounding.
[1] Consists of guarantee fee income, trust management income, net interest income, and other income. Guarantee fee revenue of $5.6 billion for Fannie Mae year-to-date was offset by net interest expense of $2.0 billion primarily related to interest income not recognized for non-accrual loans.
[2] The provision for credit losses is the recognition of estimated incurred losses and increases the loan loss reserve. Fannie Mae's figures have been adjusted to exclude losses on credit-impaired loans acquired from MBS trusts.
[3] Losses on credit-impaired loans acquired from MBS/PC Trusts.
[4] Consists of investment gains (losses), fair value losses (Fannie Mae), administrative expenses, other expenses, and at Freddie Mac, segment adjustments.
[5] Represents segment earnings (loss) and, for periods after 2008, total comprehensive income (loss), net of taxes, for the Single-Family Credit Guarantee Segment.

Sources:
Fannie Mae segment earnings per Fannie Mae SEC disclosures for the relevant time periods.  Effective in the first quarter 2010, Fannie Mae changed the presentation of segment financial information; prior periods were not revised.   Freddie Mac segment comprehensive income (loss) for 2008 and 2009 reflect revised methodology effective January 1, 2010.  Enterprise segment comprehensive income (loss) for 2010 and 2011 is not comparable with prior periods due to the adoption of accounting standards for consolidations, effective January 1, 2010.

Federal Housing Finance Agency

## 4.2    Loan Loss Reserves

- Loan loss reserves remain high at both Enterprises driven by continued provisioning for credit losses.  Differences in the magnitude of loss reserves year-to-date 3Q11 stem from differences in the size and credit quality of the Enterprises' single-family guarantee portfolios.  Fannie Mae's single-family guarantee portfolio is larger than Freddie Mac's and has higher serious delinquency rates.

**Figure 4.2 Loan Loss Reserves** *($ in billions)*

| | Fannie Mae | | | | | Freddie Mac | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Single-Family Loss Reserve | 2008 | 2009 | 2010 | YTD 3Q11 | Total | 2008 | 2009 | 2010 | YTD 3Q11 | Total |
| Beginning balance[1] | $3 | $24 | $62 | $60 | | $3 | $15 | $33 | $39 | |
| Provision for credit losses[2,3] | 26 | 50 | 25 | 21 | 121 | 16 | 29 | 19 | 9 | 73 |
| Charge-offs, net[3] | (5) | (13) | (21) | (13) | (52) | (2) | (7) | (13) | (9) | (31) |
| Adoption of Accounting Standards | - | - | (11) | 0 | | - | - | (0) | 0 | |
| Other | 0 | 0 | 5 | 3 | | (1) | (4) | 0 | (0) | |
| Ending balance[1] | $24 | $62 | $60 | $71 | | $15 | $33 | $39 | $39 | |
| **Credit Losses - Single-Family** | | | | | | | | | | |
| Charge-offs[3] | $5 | $13 | $21 | $13 | $52 | $2 | $7 | $13 | $9 | $31 |
| Other[4] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Foreclosed Property Expense | 2 | 1 | 2 | 1 | 5 | 1 | 0 | 1 | 1 | 3 |
| Total[3] | $6 | $13 | $23 | $14 | $57 | $4 | $8 | $14 | $10 | $35 |

Sources:
SEC disclosures for the relevant time periods.

Notes
Totals may not sum due to rounding.
[1] Fannie Mae's loan loss reserve excludes amounts related to the allowance for accrued interest receivable and allowance for preforeclosure property taxes and insurance receivable.  Freddie Mac's loan loss reserve excludes amounts related to the allowance for accrued interest receivable and forgone interest on loans placed on non-accrual status.
[2] Freddie Mac's figures represent Segment Earnings provision for credit losses, which is generally higher than that recorded under GAAP, primarily due to recognized provision associated with forgone interest income on loans placed on non-accrual status, which is not recognized under GAAP.
[3] Fannie Mae's provision for credit losses have been adjusted to exclude losses on credit-impaired loans acquired from MBS trusts.  Additionally, the effect of losses from credit-impaired loans acquired from MBS trusts on charge-offs and foreclosed property expense has been reflected as an adjustment to total credit losses and charge-offs, net.
[4] Freddie Mac's figures include charge-offs related to certain loans purchased under financial guarantees.

Federal Housing Finance Agency

## 4.3    Credit Losses

- Non-traditional and higher-risk mortgages concentrated in the 2006 and 2007 vintages, and mortgages originated in California, Florida, Arizona and Nevada continue to account for a disproportionate share of credit losses (charge-offs and foreclosed property expenses).  However, the proportion of losses coming from non-traditional products continues to trend downward.

**Figure 4.3 Credit Losses** *(Percent of total credit losses)*

| | Fannie Mae | | | | | Freddie Mac | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % of UPB as of Dec 31, 2008[1] | 2008 | 2009 | 2010 | YTD 3Q11 | % of UPB as of Dec 31, 2008[1] | 2008 | 2009 | 2010 | YTD 3Q11 |
| **by State** | | | | | | | | | | |
| California | 16% | 25% | 24% | 23% | 29% | 14% | 30% | 32% | 26% | 30% |
| Florida | 7% | 11% | 16% | 18% | 9% | 7% | 10% | 15% | 19% | 12% |
| Arizona | 3% | 8% | 11% | 10% | 13% | 3% | 9% | 11% | 11% | 12% |
| Nevada | 1% | 5% | 7% | 6% | 9% | 1% | 4% | 6% | 6% | 7% |
| **by Product**[2] | | | | | | | | | | |
| Alt-A | 11% | 46% | 40% | 33% | 28% | 10% | 50% | 44% | 37% | 29% |
| Interest-Only | 8% | 34% | 33% | 29% | 27% | 9% | 50% | 47% | 37% | 30% |
| **by Vintage** | | | | | | | | | | |
| 2006 | 14% | 35% | 31% | 29% | 28% | 15% | 41% | 35% | 30% | 28% |
| 2007 | 20% | 28% | 36% | 36% | 31% | 19% | 25% | 36% | 34% | 36% |
| 2008 | 16% | 1% | 5% | 7% | 5% | 15% | 0% | 5% | 7% | 8% |
| 2009 | N/A | N/A | 0% | 0% | 2% | N/A | N/A | 0% | 0% | 1% |

Notes
[1] Represents each category's share of the respective Enterprise's single-family book of business, which is based on the unpaid principal balance of all single-family unsecuritized mortgages held by the Enterprises and those underlying Freddie Mac mortgage-related securities, or covered by the Enterprise's other guarantee commitments.
[2] Product categories overlap.

Sources:
Enterprises' Forms 10-K and 10-Q, credit supplements to SEC disclosures, and management reports.

13

## 5.  Investments and Capital Markets Segment Results

### 5.1    Investments and Capital Markets Segment Results

- Year-to-date 3Q11, the Investments and Capital Markets segment has been a positive contributor to capital driven by low funding costs as a result of the interest rate environment.  Both Enterprises experienced derivative losses in 3Q11 due to a significant decrease in swap rates.

### Figure 5.1 Investments and Capital Markets Segment Results *($ in billions)*

| | Fannie Mae | | | | | Freddie Mac | | | | | Combined 2008 - 3Q11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | YTD 3Q11 | Total | 2008 | 2009 | 2010 | YTD 3Q11 | Total | |
| Revenue[1] | $8 | $13 | $13 | $11 | $45 | $3 | $8 | $6 | $5 | $22 | $67 |
| Derivatives gains (losses) | (15) | (6) | (3) | (6) | (31) | (13) | 5 | (2) | (4) | (14) | (45) |
| Trading gains (losses) | (7) | 4 | 3 | (0) | (0) | 1 | 5 | (1) | (1) | 4 | 4 |
| Other gains (losses)[2] | 2 | 1 | 4 | 2 | 9 | 2 | (0) | 1 | 1 | 4 | 12 |
| Other-than-temporary impairments | (7) | (10) | (1) | (0) | (18) | (17) | (10) | (4) | (1) | (32) | (50) |
| Other expenses[3] | (1) | (1) | (0) | (0) | (2) | (2) | (1) | 1 | 0 | (1) | (3) |
| Pre-tax income (loss) | (21) | 1 | 16 | 6 | 3 | (26) | 7 | 1 | 1 | (17) | (14) |
| (Provision) benefit for taxes[4] | (9) | (0) | 0 | 0 | (9) | (2) | (1) | 0 | 0 | (2) | (11) |
| Net income (loss) | ($29) | $1 | $16 | $6 | ($6) | ($28) | $6 | $1 | $1 | ($19) | ($25) |
| | | | | | | | | | | | |
| Unrealized gains (losses) on AFS[5] | (6) | 11 | 4 | (0) | 9 | (20) | 11 | 10 | 3 | 4 | 13 |
| Accounting change for Impairments | 0 | 3 | 0 | 0 | 3 | 0 | 5 | 0 | 0 | 5 | 8 |
| Total Comprehensive Income | ($35) | $15 | $20 | $6 | $6 | ($48) | $23 | $11 | $4 | ($10) | ($4) |

Sources:
Fannie Mae segment earnings per Fannie Mae SEC disclosures for the relevant time periods.  Effective in the first quarter 2010, Fannie Mae changed the presentation of segment financial information; prior periods were not revised.  Freddie Mac segment comprehensive income for 2008 and 2009 reflect revised methodology effective January 1, 2010.  Enterprise segment comprehensive income for 2010 and 2011 is not comparable with prior periods due to the adoption of accounting standards for consolidations effective January 1, 2010.

Notes
Totals may not sum due to rounding.
[1] Consists of guarantee fee expense, trust management income, net interest income, and other income.
[2] Figures consist of debt extinguishment losses, debt foreign exchange gains (losses), debt fair-value losses, investment gains (losses), and hedged mortgage assets gains, net.
[3] Consists of administrative expenses, other expenses, and at Freddie Mac, segment adjustments.
[4] Includes extraordinary losses /noncontrolling interest.
[5] Amount for 2008 includes consolidated changes in unrealized gains (losses) on available for sale securities, net of taxes.  Effective April 2009, includes adjustments for other-than-temporary impairments, net of taxes, included in accumulated other comprehensive income due to a change in accounting standards for impairments.  At Freddie Mac, amount also includes the change in unrealized gains (losses), net of taxes, related to cash flow hedge relationships.

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Third Quarter 2011

## 5.2    Security Impairments

- Year-to-date 3Q11, annualized security impairments are below 2010 levels for both Enterprises.  Freddie Mac's non-agency portfolio is larger than Fannie Mae's, generally causing higher levels of security impairments.

**Figure 5.2 Security Impairments** *($ in billions)*

**Fannie Mae**

| Vintage[1] | 2008 | | | 2009 | | | 2010 | | | YTD 3Q11 | | | Total 2008-3Q11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | |
| Alt-A/Option ARM Alt-A | $3.0 | $1.8 | $4.8 | $1.7 | $2.3 | $4.0 | $0.2 | $0.1 | $0.3 | $0.2 | $0.1 | $0.3 | $9.4 |
| Subprime | 1.9 | - | 1.9 | 5.6 | 0.1 | 5.7 | 0.4 | 0.0 | 0.4 | 0.0 | 0.0 | 0.0 | 8.0 |
| Other | 0.0 | 0.2 | 0.2 | 0.0 | 0.2 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.5 |
| Total[2] | $4.9 | $2.0 | $7.0 | $7.3 | $2.6 | $9.9 | $0.6 | $0.2 | $0.7 | $0.2 | $0.2 | $0.4 | $17.9 |

**Freddie Mac**

| Vintage[1] | 2008 | | | 2009 | | | 2010 | | | YTD 3Q11 | | | Total 2008-3Q11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | 2006 & 2007 | Other vintages | Total | |
| Alt-A | $2.1 | $1.8 | $4.0 | $0.9 | $0.8 | $1.7 | $0.5 | $0.2 | $0.7 | $0.1 | $0.0 | $0.1 | $6.5 |
| Subprime | 3.4 | 0.2 | 3.6 | 6.4 | 0.1 | 6.5 | 1.7 | 0.0 | 1.8 | 0.8 | 0.0 | 0.8 | 12.7 |
| CMBS | - | - | - | 0.1 | 0.0 | 0.1 | 0.1 | 0.0 | 0.1 | 0.3 | 0.1 | 0.3 | 0.5 |
| Option ARM | 6.0 | 1.6 | 7.6 | 1.4 | 0.4 | 1.7 | 1.2 | 0.2 | 1.4 | 0.3 | 0.1 | 0.4 | 11.1 |
| Other | 1.1 | 0.4 | 1.4 | 0.8 | 0.1 | 0.9 | 0.3 | 0.1 | 0.3 | 0.0 | 0.0 | 0.1 | 2.7 |
| Total[2] | $12.6 | $4.0 | $16.6 | $9.6 | $1.5 | $11.0 | $3.8 | $0.5 | $4.3 | $1.5 | $0.2 | $1.7 | $33.6 |

Notes
Totals may not sum due to rounding.
[1] Vintage of private-label securities is based on security issue date.
[2] The adoption of an accounting standard for impairments in April 2009 required the Enterprises to begin recognizing only the credit portion of impairments in their statements of income and comprehensive income. This accounting standard did not require the Enterprises to revise previously recorded amounts in their statements of income and comprehensive income but did result in an equity increase of $5 billion which is not reflected in Figure 5.2.  For the full year of 2008 and a portion of 2009, amounts include both credit and non-credit-related security impairments.

<u>Sources:</u>
Fannie Mae and Freddie Mac management reports.

Federal Housing Finance Agency

## 6. Loss Mitigation Activity

- The Enterprises have traditionally worked with delinquent borrowers to mitigate credit losses in situations where the borrower demonstrates the willingness and ability to cure the delinquency.  Loss mitigation actions include home retention actions (loan modifications, repayment plans and forbearance plans), and home forfeiture actions (short sales and deeds-in-lieu).
- In 2010, loss mitigation activity increased substantially for all home retention actions with the greatest increase attributable to increases in loan modifications.  Loan modifications continued to be the dominant type of loss mitigation action completed year-to- date 3Q11.
- More information on the Enterprises' loss mitigation activities can be found in FHFA's Third Quarter 2011 Foreclosure Prevention & Refinance Report .

### Figure 6 Enterprises' Completed Foreclosure Prevention Actions

#### Completed Foreclosure Prevention Actions

| | Full Year 2008 | Full Year 2009 | Full Year 2010 | YTD Sep-11 | Conservatorship to Date[1] |
|---|---|---|---|---|---|
| **Home Retention Actions** | | | | | |
| Repayment Plans | 62,560 | 142,360 | 185,954 | 139,586 | 481,209 |
| Forbearance Plans | 5,692 | 25,227 | 63,024 | 27,320 | 117,687 |
| Charge-offs in Lieu | 799 | 2,247 | 3,118 | 1,751 | 7,389 |
| HomeSaver Advance *(Fannie)* | 70,967 | 39,199 | 5,191 | - | 70,178 |
| Loan Modifications | 68,307 | 163,647 | 575,022 | 250,997 | 1,013,443 |
| **Total** | **208,325** | **372,680** | **832,309** | **419,654** | **1,689,906** |
| | | | | | |
| **Nonforeclosure - Home Forfeiture Actions** | | | | | |
| Short Sales | 15,704 | 55,447 | 107,953 | 83,452 | 253,044 |
| Deeds-in-lieu | 1,511 | 2,971 | 6,043 | 7,121 | 16,675 |
| **Total** | **17,215** | **58,418** | **113,996** | **90,573** | **269,719** |
| | | | | | |
| **Total Foreclosure Prevention Actions** | **225,540** | **431,098** | **946,305** | **510,227** | **1,959,625** |

[1] Since the first full quarter in conservatorship (4Q08).

16

## 7.  Comparison of Actual Results to Projections of the Enterprises' Financial Performance

7.1    Comparison of Actual Results to Projections of the Enterprises' Financial Performance

- FHFA published updated projections of the Enterprises' financial performance in October 2011. The purpose and approach of these projections can be found in FHFA's Projections of the Enterprises' Financial Performance, October 2011.

- October 2011 projections are not expected outcomes, but rather modeled projections in response to "what if" exercises based on assumptions about Enterprise operations, financial market conditions, and house prices.

- The combined projected Treasury draws for the Enterprises for the third quarter of 2011 ranged from $16 billion to $23 billion. The actual combined Treasury draw for the third quarter of 2011 was $14 billion.

- The primary driver of the difference was lower than projected credit-related expenses at Fannie Mae, mostly as a result of lower provisioning for credit losses, mainly driven by lower delinquencies and higher expected prepayments due to the lower interest rate environment.

**Figure 7.1 Actual versus Projected Treasury Draws through 3Q11** *($ in billions)*

| | Cumulative Treasury Draw | Projected Draw through 3Q11 Scenario 1 | | Projected Draw through 3Q11 Scenario 2 | | Projected Draw through 3Q11 Scenario 3 | | Actual Draw through 3Q11 | |
|---|---|---|---|---|---|---|---|---|---|
| | As of 6/30/2011 | Additional Draw | Cumulative Draw as of 9/30/2011 | Additional Draw | Cumulative Draw as of 9/30/2011 | Additional Draw | Cumulative Draw as of 9/30/2011 | Additional Draw | Cumulative Draw as of 9/30/2011 |
| Fannie Mae | $104 | $10 | $113 | $10 | $114 | $17 | $120 | $8 | $112 |
| Freddie Mac * | 65 | 6 | 71 | 6 | 71 | 6 | 71 | 6 | 71 |
| Total | $169 | $16 | $184 | $16 | $185 | $23 | $191 | $14 | $183 |

\* - The production of the October 2011 projections was put in place well before the end of 3Q11.  An adjustment was made to Freddie Mac's projections for 3Q11 to reflect additional information regarding estimated actual results for 3Q11.

17

7.2   Impact of Actual Results on Future Projections of the Enterprises' Financial Performance

- Mortgage defaults pushed out to later periods could reduce projected losses if home prices improve or increase projected losses if home prices worsen.
- The Enterprises' future financial performance is heavily dependent on the performance of the U.S. housing market. Trends observed in the third quarter of 2011 should not be used to extrapolate future projections.

# Tab 42



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

ASSISTANT SECRETARY

December 21, 2011

Edward DeMarco
Acting Director
Federal Housing Finance Agency
1700 G Street, NW
Washington, DC 20552-0003

Dear Acting Director DeMarco:

As you know, in the letter to you dated September 30, 2011, Treasury communicated to you its waiver, for the fourth quarter of Calendar Year (CY) 2011, of the "Periodic Commitment Fee" (PCF) under the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and each of the Federal National Mortgage Association and the Federal Loan Mortgage Corporation (collectively, the Enterprises).

By this letter, please be advised that Treasury waives, for the first quarter of CY 2012, the PCF payable by each Enterprise. Treasury takes this step due to the continued fragility of the mortgage market and the belief that the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer.

Treasury will reevaluate the situation during the next calendar quarter to determine whether the PCF should then be set. Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers as compensation for their investment.

Sincerely,

Cyrus Amir-Mokri

# Tab 43

# Housing & Government Sponsored Enterprises

# FY 2013

# Congressional Justification

FHFA 2666

# Table of Contents

**Section 1 – Purpose** ................................................................................................ **3**

  1A – Mission Statement ............................................................................................ 3

  **1.1 Program Account Summary** ............................................................................. 3

  1B – Vision, Priorities and Context ......................................................................... 3

**Section 2 – Budget Adjustments and Appropriation Language** .......................... **9**

  2.2 Financing Account Summary .............................................................................. 9

  2.3 Summary of Mandatory Receipts – Preferred Stock Purchase Agreement .......... 9

  2B – Appropriations Language and Explanation of Changes .................................... 9

  2C – Legislative Proposals ...................................................................................... 9

**Section 3 – Budget and Performance Report and Plan** ..................................... **10**

  3A – Preferred Stock Purchase Agreements .......................................................... 10

  3.1.1 – Preferred Stock Purchase Agreement Budget and Performance Report and Plan ........ 10

  3B – GSE MBS Purchase Program ......................................................................... 11

  3.1.2 – GSE MBS Purchase Program Budget and Performance Report and Plan ................... 11

  3C – New Issue Bond Program .............................................................................. 12

  3.1.3 – New Issue Bond Program Budget and Performance Report and Plan ......................... 12

  3D – Temporary Credit and Liquidity Program ..................................................... 12

  3.1.4 – Temporary Credit and Liquidity Program Budget and Performance Report and Plan. 13

FHFA 2667

# Section 1 – Purpose

## 1A – Mission Statement

To provide stability to financial markets and promote mortgage affordability while at the same time protecting the taxpayer, Treasury has implemented four programs with respect to two Government Sponsored Enterprises (GSEs), Fannie Mae and Freddie Mac, as well as the Federal Home Loan Banks (FHLBs).  These programs include Preferred Stock Purchase Agreements (PSPAs) with Fannie Mae and Freddie Mac, and a Mortgage-Backed Securities (MBS) Purchase Program limited to such securities issued by Fannie Mae and Freddie Mac.  In addition to these programs, Treasury has purchased securities of Fannie Mae and Freddie Mac backed by new housing bonds issued by the Housing Finance Agencies (HFAs), through the New Issue Bond Program (NIBP).  Treasury also purchased participation interests in temporary credit and liquidity facilities which are obligations of Fannie Mae and Freddie Mac as part of the Temporary Credit and Liquidity Program (TCLP) to provide backstop liquidity and credit for state and local HFAs.  Together, the TCLP and the NIBP comprise the Housing Finance Agencies Initiative (HFA Initiative).

## 1.1 Program Account Summary

Dollars in millions

| Preferred Stock and Program Accounts | 2011 Actual | 2012 Estimate | 2013 Estimate | Increase (+) Decrease (-) |
|---|---|---|---|---|
| **Obligations:** | | | | |
| Preferred Stock Purchase Account | $21,766 | $39,745 | $12,700 | -$27,045 |
| GSE MBS Purchase Program Account | $7,917 | $151 | $11 | -$140 |
| **Budget Authority:** | | | | |
| Preferred Stock Purchase Account | $21,766 | $39,745 | $12,700 | -$27,045 |
| GSE MBS Purchase Program Account | $7,918 | $154 | $17,000 | -$137 |
| **Outlays:** | | | | |
| Preferred Stock Purchase Account | $21,766 | $39,745 | $12,700 | -$27,045 |
| GSE MBS Purchase Program Account | $7,922 | $155 | $11 | -$144 |

## 1B – Vision, Priorities and Context

### FY 2013 Priorities:

- To provide stability to financial markets.
- To prevent disruptions to the availability of mortgage credit for American homebuyers.
- To maintain investor confidence in the GSEs and in state and local HFAs.
- To restore the capacity of state and local HFAs to provide affordable housing resources to working families at the state and local level.
- To begin an orderly exit from programs where doing so does not negatively affect the above goals

FHFA 2668

**Preferred Stock Purchase Agreements (PSPAs)**

Section 1117 of the Housing and Economic Recovery Act of 2008 (Act) authorizes the Treasury to purchase any obligations and other securities issued by Fannie Mae, Freddie Mac, and any Federal Home Loan Bank on such terms and conditions as the Treasury may determine and in such amounts as the Treasury may determine.  On September 7, 2008, the Secretary of the Treasury made the determination that the Treasury's exercise of its purchase authority under the Act was necessary to provide stability to the financial markets, prevent disruptions in the availability of mortgage finance, and protect taxpayers.

The PSPAs were created to instill confidence in investors that Fannie Mae and Freddie Mac would remain viable entities critical to the functioning of the housing and mortgage markets. Investors have purchased securities issued or guaranteed by Fannie Mae and Freddie Mac in part because ambiguities in their Congressional charters created a perception of government backing. These ambiguities fostered enormous growth in the obligations issued or guaranteed by the two housing GSEs and the breadth of these holdings posed a systemic risk to global financial markets.

*Vision:* The function of the PSPAs is to enhance market stability by providing holders of Fannie Mae and Freddie Mac securities with additional confidence that the GSEs will remain viable entities. This leads to increased mortgage affordability.  This commitment also eliminates any mandatory triggering of receivership. To this end, the PSPAs are an effective means of averting systemic risk while at the same time protecting the taxpayer.

*Priorities***:** Market stability is central to the mission of the Treasury. In this regard, the following priorities have been identified for mission success:
- To provide stability to the GSE securities market.
- To maintain the viability of the GSEs.

**Program History:**  During FY 2008, the Department of the Treasury entered into agreements with Fannie Mae and Freddie Mac. The agreements are indefinite in duration and have a funding commitment limit of $100 billion each.  These agreements were amended to have a funding commitment limit of $200 billion each, and further amended in December 2009, to replace the fixed-dollar-amount funding commitment limit with a formulaic limit that will automatically adjust upward quarterly by the amount of any cumulative reduction in net worth until December 2012.  In exchange for entering into these agreements with these two GSEs, Treasury immediately received $1 billion of senior preferred stock in each GSE and warrants for the purchase of common stock of each GSE representing 79.9 percent of the common stock of each GSE on a fully-diluted basis at a nominal price. No taxpayer money was spent to receive the senior preferred stock.

**Program Outlook:**  Under the Preferred Stock Purchase Agreements (PSPA), Treasury has helped to ensure the viability of the GSEs by providing $146.4 billion of investment, net of dividends the GSEs paid to Treasury as of December 31, 2011.  Treasury estimates that it will make $39.7 billion in payments under its funding commitment in FY 2012 and $12.7 billion in FY 2013.

**GSE MBS Purchase Program**

The Housing and Economic Recovery Act of 2008 (HERA) gave Treasury the authority to purchase agency-guaranteed GSE MBS to prevent disruption in the availability of mortgage finance and to provide stability to financial markets.

*Vision:* Treasury's investment in GSE MBS, with the size and timing subject to the discretion of the Secretary of the Treasury, was an element of its comprehensive plan to address challenges in the housing market.  By purchasing GSE MBS, Treasury sought to broaden access to mortgage funding for current and prospective homeowners and to promote secondary market stability while protecting taxpayers.  The scale of the program was based on developments in the capital markets and housing markets.  Given the spreads between Treasury's cost of funds and GSE MBS' yield, and that purchases occurred during a period of low prices in the market, the program is likely to result in a positive return to the taxpayers.

*Priorities:*
- To prevent disruptions to the availability of mortgage credit.
- To mitigate pressures in mortgage markets.
- To provide stability and liquidity to financial markets.
- To protect taxpayers.

**Program History:** During September 2008, Treasury designated private sector firms as its financial agents to act as asset managers and custodians.  Treasury began to fund the GSE MBS Purchase program in September 2008; Treasury's agents made the first purchases in the third week of September 2008. Program activity was initially reported in the Monthly Treasury Statement and is now also published in a more detailed form in the Data and Charts Center on Treasury.gov.

**Program Outlook:**  Treasury purchased approximately $225 billion of MBS during the purchase phase of the program, which ran from September 2008 until the expiration of purchase authority on December 31, 2010.  As a result of scheduled principal repayments, the portfolio declined to $136 billion face value as of March 1, 2011.  On March 21, 2011, Treasury began the orderly disposition of the MBS portfolio at a rate of up to $10 billion face value per month, subject to market conditions. Selling MBS is consistent with the general pattern of Treasury's divestment from various financial stabilization programs when doing so can be accomplished without disrupting the markets or otherwise jeopardizing program goals.  The disposition is expected to be complete by April 2012, subject to market conditions.

**Housing Finance Agencies Initiative**

State and local Housing Finance Agencies (collectively, the "HFAs") are agencies or authorities created by state law that are charged with helping persons and families of low or moderate income attain affordable housing.  HFAs serve numerous functions to this end including providing mortgages, financing affordable rental housing, providing homeownership education, and allocating low income housing tax credits.

HFAs have historically played a central role in providing a safe, sustainable path to homeownership but have experienced a number of challenges in the course of the housing downturn, including a lack of liquidity support for existing variable rate bonds, losses on

mortgages and downgrades of re-insurance providers. Historically, HFAs have funded their activities by issuing tax-exempt mortgage revenue bonds (MRBs), and keeping the associated mortgage collateral produced on HFA balance sheets.  The bond performance of HFAs has generally been strong. However, due to the uncertainties and strain throughout the housing sector and the widening of spreads in the tax-exempt market, HFAs have experienced challenges in issuing new bonds to fund new mortgage lending.

To provide stability to the financial markets and promote mortgage affordability while at the same time protecting the taxpayer, Treasury has implemented two programs as part of the Housing Finance Agencies Initiative – the New Issue Bond Purchase Program (NIBP) and the Temporary Credit and Liquidity Program (TCLP).

On October 19, 2009, pursuant to its authorities under HERA, Treasury announced the Housing Finance Agencies Initiative, including the New Issue Bond Program and the Temporary Credit and Liquidity Program.

**New Issue Bond Program**
The New Issue Bond Program (NIBP) provides temporary financing for HFAs to issue new housing bonds.  Treasury purchased securities of Fannie Mae and Freddie Mac backed by HFA housing bonds, with the funding placed in escrow to be converted into new mortgages prior to the end of calendar year 2012. This temporarily allows the HFAs to issue new housing bonds, consistent with  what they would ordinarily have been able to issue with the allocations provided them by Congress but are unable to issue given the challenges in housing and related markets. The program is sized to support over one hundred thousand new mortgages to first time homebuyers, as well as refinancing opportunities to put at-risk, but responsible and performing, borrowers into more sustainable mortgages. The NIBP also supports development of tens of thousands of new rental housing units for working families.

*Vision:* The NIBP provides stability to financial markets and prevents disruptions in mortgage finance availability by providing a temporary supplemental market for newly issued HFA housing bonds.  The NIBP enables HFAs to keep their lending programs active while they adapt to changing market conditions.  The program supports the availability of mortgage credit and affordable rental properties for low and moderate income Americans.  Facilitating supply and demand in the housing markets helps to stabilize them, thereby reducing losses to the Housing GSEs.

*Priorities***:**
- To provide stability to the housing market.
- To maintain the viability of the GSEs and state and local Housing Finance Agencies.
- To promote availability and affordability of housing resources for low and moderate income Americans.
- To protect taxpayers

**Program History:**  During FY 2010, the Department of the Treasury entered into a Memorandum of Understanding with Fannie Mae, Freddie Mac and the Federal Housing Finance Agency (FHFA) outlining the obligations of each party with regard to the HFA Initiative

transactions. Under the terms of the NIBP, Treasury has purchased GSE securities backed by housing bonds issued by the state and local HFAs, with the funding placed in escrow pending the origination of new mortgages.  Use of escrowed proceeds to finance new mortgages originally had to be completed by December 31, 2010; however continued disruptions in the HFA market have led to two one-year extensions of this deadline.

**Program Outlook:**  Treasury purchased approximately $15.3 billion under its authority for this program in FY 2010.  Treasury's authority to enter additional purchase commitments under the program expired on December 31, 2009, however the funds remaining in escrow may continue to be used for the origination of new mortgages through December 31, 2012.

**Temporary Credit and Liquidity Program**

Fannie Mae and Freddie Mac administer a Temporary Credit and Liquidity Program (TCLP) for HFAs to help relieve current financial strains.  Treasury purchased a participation interest in the Temporary Credit and Liquidity Facilities (TCLFs) provided to HFAs under the program, thus providing a credit and liquidity backstop.  These temporary credit and liquidity facilities help the HFAs maintain their financial health and preserve the viability of the HFA infrastructure so that that HFAs can continue their Congressionally supported role in helping provide affordable mortgage credit to low and moderate income Americans, as well as continue their other important activities in communities.

*Vision:* The TCLP provides stability to financial markets and prevents disruptions in mortgage finance availability by helping HFAs relieve current financial strains.  The TCLP supports the HFAs through the downturn and gives them time to develop and implement more sustainable financing structures that preserve their critical role in extending mortgage credit to low- and moderate-income Americans.

*Priorities***:**
- To provide stability to the housing market.
- To maintain the viability of the GSEs and state and local Housing Finance Agencies.
- To promote availability and affordability of housing resources for low and moderate income Americans.
- To protect taxpayers

**Program History:** During FY 2010, the Department of the Treasury entered into a Memorandum of Understanding with Fannie Mae, Freddie Mac and the Federal Housing Finance Agency (FHFA) outlining the obligations of each party with regard to the HFA Initiative transactions. Under the terms of the TCLP, Treasury purchased participation interests in GSE liquidity facilities available to support outstanding housing bonds issued by state and local HFAs.  At the time of execution, $8.2 billion had been allocated to state and local HFAs through the TCLP to use the credit and liquidity facilities.

**Program Outlook:**  Treasury incurred approximately $8.2 billion in obligations in FY 2010 that will remain open into FY 2013.  However, to date there have been no draw requests or disbursements from the TCLP.  Due to continued strain on the market for HFA liquidity facilities, Treasury announced that it will extend TCLP for three years to the end of 2015 for any

HFAs that submit a satisfactory plan on how they will reduce their liquidity risk and transition to private market liquidity providers.  Prior to the expiration of the program, Treasury's obligation will continue to diminish over time as HFAs redeem the bonds supported by the program or otherwise reduce their need for Treasury's liquidity support.

## Section 2 – Budget Adjustments and Appropriation Language

### 2.2 Financing Account Summary
Dollars in millions

|  | 2011 Actual | 2012 Estimate | 2013 Estimate |
|---|---|---|---|
| **GSE MBS Direct Loans:** |  |  |  |
| Obligations | $5,192 | $9,123 | $232 |
| Collections | $108,802 | $72,190 | $746 |
| Financing Authority(net) | -$96,214 | -$70,463 | -$514 |
| Financing Disbursements(net) | -$103,610 | -$70,524 | -$514 |
| **State HFA NIPB & TCLP:** |  |  |  |
| Obligations | $597 | $894 | $583 |
| Collections | $2,202 | $1,780 | $3,107 |
| Financing Authority(net) | -$1,575 | -$900 | -$2,073 |
| Financing Disbursements(net) | -$1,605 | -$1,111 | $928 |

### 2.3 Summary of Mandatory Receipts – Preferred Stock Purchase Agreement
Dollars in millions

| Preferred Stock Purchase Account | 2011 Actual | 2012 Estimate | 2013 Estimate |
|---|---|---|---|
| **Mandatory Receipts:**<br>Senior Preferred Dividend Payments from Fannie/Freddie | $15,5886 | $18,790 | $21,690 |

### 2B – Appropriations Language and Explanation of Changes
The Housing Government Sponsored Enterprise Programs and the Housing Finance Agencies Initiative Programs do not receive any discretionary appropriation authority from the Congress. Therefore, no appropriations language is proposed.

### 2C – Legislative Proposals
There are no current proposals for amending the enacting legislation.

### 2D – Probability of Repayment
At the end of December, 2009, Treasury closed on all GSE MBS, NIBP and TCLP transactions. All three programs had a negative subsidy estimate at the time of purchase/obligation meaning anticipated net receipts for the government is in excess of outlays. Subsequent re-estimates have led to a positive subsidy estimate for the NIBP. Such changes in the NIBP estimate were a result of cash flows on actual bond issuances being timed in a manner different from the timing originally modeled, as well as the fact that the present value factors used to model Treasury's cost of capital changed. Future re-estimates pending the formulation of a disposition strategy may cause the NIBP subsidy to become negative again. The subsidy estimates for the TCLP and MBS Purchase program remain negative.

FHFA 2674

## <u>Section 3 – Budget and Performance Report and Plan</u>

### 3A – Preferred Stock Purchase Agreements
*(No funding)*:
The function of the PSPAs is to instill confidence in investors that Fannie Mae and Freddie Mac will remain viable entities critical to the functioning of the housing and mortgage markets. Treasury entered into a PSPA with each GSE to ensure that each enterprise maintains a positive net worth.

PSPAs enhance market stability by providing additional confidence to holders of Fannie Mae and Freddie Mac securities, which, in turn, leads to increased mortgage affordability. This commitment also eliminates any mandatory triggering of receivership. To this end, the PSPAs are an effective means of averting systemic risk while at the same time protecting the taxpayer. They are more efficient than a one-time equity injection, in that Treasury will use them only as needed and on terms that the Treasury deems appropriate.

In exchange for entering into these agreements with the GSEs, Treasury received $1 billion on senior preferred stock in each GSE and warrants for the purchase of common stock of each GSE representing 79.9 percent of the common stock of each GSE on a fully-diluted basis at a nominal price. The senior preferred stock accrues dividends at 10 percent per year. The rate will increase to 12 percent if, in any quarter, the dividends are not paid in cash, until all accrued dividends have been paid in cash.

Beginning March 31, 2011, the GSEs shall pay the Treasury on a quarterly basis a periodic commitment fee that will compensate the Treasury for the explicit support provided by the agreement. The Secretary of the Treasury and the Conservator shall determine the periodic commitment fee in consultation with the Chairman of the Federal Reserve. This fee may be paid in cash or may be added to the senior preferred stock.

### 3.1.1 – Preferred Stock Purchase Agreement Budget and Performance Report and Plan

*Description of Performance:*
PSPA program offices track metrics to assess Fannie Mae and Freddie Mac's health and contribution to mortgage market stability. To assess the contribution of Fannie Mae and Freddie Mac to mortgage availability, the Housing GSE program tracks the percentage of agency MBS issuance of total MBS issuance and the dollar volume of mortgage purchases by the GSEs. During FY 2009, the majority of MBS were originated by the GSEs, contributing substantially to the stabilization of housing markets. To assess program management and ensure the stability of the GSEs, the program tracks the condition of the GSEs in coordination with the FHFA and makes PSPA disbursements as necessary. Increasing stability in the housing market has resulted in declining disbursements to the GSEs in recent quarters. Under the Preferred Stock Purchase Agreements (PSPA), Treasury has helped to ensure the viability of the GSEs by providing $146.4 billion of investment as of December 31, 2011, net of dividends the GSEs paid to Treasury. Projected disbursements for FY 2012 and FY 2013 are $39.7 billion and $12.7 billion, respectively.

**3B – GSE MBS Purchase Program**
*(No funding):*
The function of the GSE MBS Purchase Program was to prevent disruption in the availability of mortgage finance and to provide stability to financial markets.

Treasury's investment in GSE MBS, with the size and timing subject to the discretion of the Secretary of the Treasury, was an element of its comprehensive plan to address challenges in the housing markets. By purchasing GSE MBS, Treasury sought to broaden access to mortgage funding for current and prospective homeowners and to promote secondary market liquidity and stability while protecting taxpayers. The scale of the program was based on developments in the capital markets and housing markets. Given the spreads between Treasury's cost of funds and GSE MBS' yield and that purchases occurred during a period of low prices in the market, the program is likely to result in a positive return to the taxpayer.

Treasury designated independent asset managers as financial agents to undertake the purchase, management, and sale of portfolio of GSE MBS on behalf of Treasury. The portfolios were purchased and managed with clear investment guidelines and investment objectives. The primary objectives were to promote market stability and ensure mortgage availability while protecting taxpayers.

The disposition of agency-guaranteed MBS is consistent with the general pattern of Treasury divestment of financial stabilization programs when doing so can be accomplished without disrupting the markets or otherwise jeopardizing program goals. The disposition was designed to allow Treasury to gradually exit its investment in a manner that maximizes value to the taxpayer without conflicting with the previous goals of market stability and mortgage availability.

Treasury's purchases of GSE MBS were deemed as outlays, and the debt incurred to fund the purchases is subject to the statutory debt limit. However, Treasury received income-producing assets in return for its invested funds.

Treasury's purchase authority for GSE MBS under HERA expired on December 31, 2009.

**3.1.2 – GSE MBS Purchase Program Budget and Performance Report and Plan**

*Description of Performance:*
The MBS Purchase Program utilized a broad range of qualitative and quantitative market indicators in daily operations to ensure funds supported mortgage availability and promoted secondary market stability and liquidity. In the disposition phase, similar qualitative and quantitative metrics are being used to ensure that the GSE MBS are sold in a way that maximizes taxpayer value without disrupting the availability of mortgage credit or impacting market liquidity. The program also utilized risk assessment techniques, including scenario analysis and cash flow forecasts.

The process of selling the portfolio and managing the remaining risk currently constitutes the bulk of program operations. The portfolio is currently on pace to be fully sold by April 2012 and

no additional purchases beyond December 31, 2009 are currently permitted under law. Therefore, no activity is expected in FY 2013.

### 3C – New Issue Bond Program
*(No funding):*
The function of the NIBP is to provide stability to financial markets and prevent disruptions in mortgage finance availability by providing a temporary supplemental market for newly issued HFA housing bonds.  By temporarily supplementing private demand for HFA production, the NIBP enables HFAs to keep their lending programs active while they adapt to changing market conditions.  The program supports the availability of mortgage credit and affordable rental properties for low and moderate income Americans.

***Program sized to meet demand.*** HFAs submitted detailed program participation requests to Treasury. In order to scale back the NIBP requests to an acceptable level that could be recommended for adoption, a methodology was developed and applied to arrive at final allocation recommendations under the program for state and local HFAs. The allocation methodology was based primarily on the 2008 HERA allocations to HFAs and historical HFA issuance.

***Support for both single-family and multi-family bonds****.* HFAs were able to request that a portion or all of their NIBP allocation be used to issue single or multi-family bonds. The amount of multi-family bond issuance is subject to a cap at the program level.

***Protecting Taxpayers.*** HFAs pay the GSEs and Treasury an amount intended to cover both the cost of financing the newly issued bonds as well as a fee designed to cover risk posed by the HFA. Generally speaking, the interest rate on the bond after release from escrow will be set to cover Treasury's cost of financing (set at a market-based index rate) plus the additional fee designed to offset the credit risk to the taxpayer.

### 3.1.3 – New Issue Bond Program Budget and Performance Report and Plan

*Description of Performance:*
Treasury continues to monitor the housing markets as well as other indicators which have an impact on the HFAs.  Through monitoring these indicators, as well as the performance of the HFAs, Treasury will assess the relative health of the HFAs in FY 2013.  No additional assistance beyond December 31, 2009 is currently permitted under law.

### 3D – Temporary Credit and Liquidity Program
*(No funding):*
The function of the TCLP is to help relieve current financial strains for HFAs. The TCLP provides HFAs with temporary credit and liquidity facilities to preserve the viability of the HFA infrastructure. This allows HFAs to continue their Congressionally supported role in helping provide affordable mortgage credit to low and moderate income Americans, and other important activities in communities.

FHFA 2677