*including Refi Plus and HARP loans; the future volume of the company's acquisitions of HARP loans, including loans with LTV ratios greater than 125 percent; the trend of stabilizing home prices; the impact of the company's actions on its future losses, delinquencies, costs and credit losses; and future volatility in the fair value of the company's trading securities and derivatives. These estimates, forecasts, expectations, and statements are forward looking statements based on the company's current assumptions regarding numerous factors, including future home prices and the future performance of its loans. Actual results, and future projections, could be materially different from what is set forth in the forward-looking statements as a result of home price changes, interest rate changes, unemployment rates, other macroeconomic variables, government policy, credit availability, social behaviors, including increases in the number of underwater borrowers who strategically default on their mortgage loan, the volume of loans it modifies, the nature, volume and effectiveness of its loss mitigation strategies and activities, management of its real estate owned inventory and pursuit of contractual remedies, changes in the fair value of its assets and liabilities, impairments of its assets, the adequacy of its loss reserves, future legislative or regulatory requirements that have a significant impact on the company's business such as a requirement that the company implement a principal forgiveness program, future updates to the company's models relating to loss reserves, including the assumptions used by these models; changes in generally accepted accounting principles, changes to the company' accounting policies, failures by its mortgage seller-servicers to fulfill their repurchase obligations to it, its ability to maintain a positive net worth, effects from activities the company takes to support the mortgage market and help homeowners, the conservatorship and its effect on the company's business, the investment by Treasury and its effect on the company's business, changes in the structure and regulation of the financial services industry, the company's ability to access the debt markets, disruptions in the housing, credit, and stock markets, government investigations and litigation, the performance of the company's servicers, conditions in the foreclosure environment, and many other factors, including those discussed in the "Risk Factors" section of and elsewhere in the company's quarterly report on Form 10-Q for the quarter ended June 30, 2012 and its annual report on Form 10-K for the year ended December 31, 2011, and elsewhere in this release.*

*Fannie Mae provides Web site addresses in its news releases solely for readers' information. Other content or information appearing on these Web sites is not part of this release.*

*Fannie Mae exists to expand affordable housing and bring global capital to local communities in order to serve the U.S. housing market. Fannie Mae has a federal charter and operates in America's secondary mortgage market to enhance the liquidity of the mortgage market by purchasing or guaranteeing mortgage loans originated by mortgage bankers and other lenders so that they may lend to home buyers. Our job is to help those who house America.*

# ANNEX I
# FANNIE MAE
**(In conservatorship)**
**Condensed Consolidated Balance Sheets — (Unaudited)**
**(Dollars in millions, except share amounts)**

|  | As of | |
| --- | --- | --- |
|  | June 30, 2012 | December 31, 2011 |
| **ASSETS** | | |
| Cash and cash equivalents | $ 24,728 | $ 17,539 |
| Restricted cash (includes $51,205 and $45,900, respectively, related to consolidated trusts) | 55,985 | 50,797 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 24,000 | 46,000 |
| Investments in securities: | | |
| Trading, at fair value | 50,935 | 74,198 |
| Available-for-sale, at fair value (includes $998 and $1,191, respectively, related to consolidated trusts) | 69,694 | 77,582 |
| Total investments in securities | 120,629 | 151,780 |
| Mortgage loans: | | |
| Loans held for sale, at lower of cost or fair value (includes $72 and $66, respectively, related to consolidated trusts) | 455 | 311 |
| Loans held for investment, at amortized cost: | | |
| Of Fannie Mae | 369,660 | 380,134 |
| Of consolidated trusts (includes $5,231 and $3,611 respectively, at fair value and loans pledged as collateral that may be sold or repledged of $1,126 and $798, respectively) | 2,616,502 | 2,590,332 |
| Total loans held for investment | 2,986,162 | 2,970,466 |
| Allowance for loan losses | (63,375) | (72,156) |
| Total loans held for investment, net of allowance | 2,922,787 | 2,898,310 |
| Total mortgage loans | 2,923,242 | 2,898,621 |
| Accrued interest receivable, net (includes $8,107 and $8,466, respectively, related to consolidated trusts) | 9,668 | 10,000 |
| Acquired property, net | 10,387 | 11,373 |
| Other assets (includes cash pledged as collateral of $1,535 and $1,109, respectively) | 26,981 | 25,374 |
| Total assets | $ 3,195,620 | $ 3,211,484 |
| **LIABILITIES AND EQUITY (DEFICIT)** | | |
| Liabilities: | | |
| Accrued interest payable (includes $9,018 and $9,302, respectively, related to consolidated trusts) | $ 11,858 | $ 12,648 |
| Federal funds purchased and securities sold under agreements to repurchase | 153 | — |
| Debt: | | |
| Of Fannie Mae (includes $831 and $838, respectively, at fair value) | 659,389 | 732,444 |
| Of consolidated trusts (includes $4,600 and $3,939, respectively, at fair value) | 2,504,499 | 2,457,428 |
| Other liabilities (includes $762 and $629, respectively, related to consolidated trusts) | 16,951 | 13,535 |
| Total liabilities | 3,192,850 | 3,216,055 |
| Commitments and contingencies | — | — |
| Fannie Mae stockholders' equity (deficit): | | |
| Senior preferred stock, 1,000,000 shares issued and outstanding | 117,149 | 112,578 |
| Preferred stock, 700,000,000 shares are authorized—555,374,922 shares issued and outstanding | 19,130 | 19,130 |
| Common stock, no par value, no maximum authorization—1,308,762,703 shares issued, 1,158,069,699 and 1,157,767,400 shares outstanding, respectively | 687 | 687 |
| Accumulated deficit | (126,300) | (128,381) |
| Accumulated other comprehensive loss | (545) | (1,235) |
| Treasury stock, at cost, 150,693,004 and 150,995,303 shares, respectively | (7,401) | (7,403) |
| Total Fannie Mae stockholders' equity (deficit) | 2,720 | (4,624) |
| Noncontrolling interest | 50 | 53 |
| Total equity (deficit) | 2,770 | (4,571) |
| Total liabilities and equity (deficit) | $ 3,195,620 | $ 3,211,484 |

See Notes to Condensed Consolidated Financial Statements

## FANNIE MAE
### (In conservatorship)
### Condensed Consolidated Statements of Operations and Comprehensive Income (Loss) — (Unaudited)
#### (Dollars and shares in millions, except per share amounts)

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| Interest income: | | | | |
| Trading securities | $   73 | $   264 | $   522 | $   548 |
| Available-for-sale securities | 1,035 | 1,152 | 1,762 | 2,365 |
| Mortgage loans (includes $28,424 and $31,613, respectively, for the three months ended and $57,425 and $63,478, respectively, for the six months ended related to consolidated trusts) | 32,023 | 35,333 | 64,593 | 70,923 |
| Other | 40 | 25 | 78 | 53 |
| Total interest income | 33,171 | 36,774 | 66,955 | 73,889 |
| Interest expense: | | | | |
| Short-term debt | 32 | 81 | 74 | 188 |
| Long-term debt (includes $24,714 and $27,919, respectively, for the three months ended and $50,074 and $55,771, respectively, for the six months ended related to consolidated trusts) | 27,711 | 31,721 | 56,256 | 63,769 |
| Total interest expense | 27,743 | 31,802 | 56,330 | 63,957 |
| Net interest income | 5,428 | 4,972 | 10,625 | 9,932 |
| Benefit (provision) for credit losses | 3,041 | (6,537) | 1,041 | (17,091) |
| Net interest income (loss) after benefit (provision) for credit losses | 8,469 | (1,565) | 11,666 | (7,159) |
| Investment gains, net | 131 | 171 | 247 | 246 |
| Other-than-temporary impairments | (196) | (28) | (276) | (85) |
| Noncredit portion of other-than-temporary impairments recognized in other comprehensive income | (403) | (28) | (387) | (15) |
| Net other-than-temporary impairments | (599) | (56) | (663) | (100) |
| Fair value losses, net | (2,449) | (1,634) | (2,166) | (1,345) |
| Debt extinguishment losses, net | (93) | (43) | (127) | (30) |
| Fee and other income | 395 | 265 | 770 | 502 |
| Non-interest loss | (2,615) | (1,297) | (1,939) | (727) |
| Administrative expenses: | | | | |
| Salaries and employee benefits | 292 | 310 | 598 | 630 |
| Professional services | 179 | 169 | 347 | 358 |
| Occupancy expenses | 48 | 43 | 91 | 85 |
| Other administrative expenses | 48 | 47 | 95 | 101 |
| Total administrative expenses | 567 | 569 | 1,131 | 1,174 |
| Foreclosed property (income) expense | (70) | (478) | 269 | 10 |
| Other expenses | 238 | 32 | 490 | 384 |
| Total expenses | 735 | 123 | 1,890 | 1,568 |
| Income (loss) before federal income taxes | 5,119 | (2,985) | 7,837 | (9,454) |
| Benefit for federal income taxes | — | (93) | — | (91) |
| Net income (loss) | 5,119 | (2,892) | 7,837 | (9,363) |
| Other comprehensive income (loss): | | | | |
| Changes in unrealized losses on available-for-sale securities, net of reclassification adjustments and taxes | 320 | (1) | 675 | 178 |
| Other | 8 | 3 | 15 | 5 |
| Total other comprehensive income | 328 | 2 | 690 | 183 |
| Total comprehensive income (loss) | 5,447 | (2,890) | 8,527 | (9,180) |
| Less: Comprehensive income attributable to the noncontrolling interest | (5) | (1) | (4) | (1) |
| Total comprehensive income (loss) attributable to Fannie Mae | $ 5,442 | $ (2,891) | $ 8,523 | $ (9,181) |
| Net income (loss) | $ 5,119 | $ (2,892) | $ 7,837 | $ (9,363) |
| Less: Net income attributable to the noncontrolling interest | (5) | (1) | (4) | (1) |
| Net income (loss) attributable to Fannie Mae | 5,114 | (2,893) | 7,833 | (9,364) |
| Preferred stock dividends | (2,929) | (2,282) | (5,746) | (4,498) |
| Net income (loss) attributable to common stockholders | $ 2,185 | $ (5,175) | $ 2,087 | $ (13,862) |
| Earnings (loss) per share | | | | |
| Basic | $   0.38 | $   (0.90) | $   0.36 | $   (2.43) |
| Diluted | 0.37 | (0.90) | 0.35 | (2.43) |
| Weighted-average common shares outstanding: | | | | |
| Basic | 5,762 | 5,730 | 5,762 | 5,714 |
| Diluted | 5,893 | 5,730 | 5,893 | 5,714 |

See Notes to Condensed Consolidated Financial Statements

# FANNIE MAE
**(In conservatorship)**
**Condensed Consolidated Statements of Cash Flows − (Unaudited)**
(Dollars in millions)

| | For the Six Months Ended June 30, | |
|---|---|---|
| | 2012 | 2011 |
| **Net cash provided by (used in) operating activities** | $ 24,135 | $ (2,095) |
| **Cash flows provided by investing activities:** | | |
| Purchases of trading securities held for investment | (1,095) | (545) |
| Proceeds from maturities and paydowns of trading securities held for investment | 1,763 | 1,051 |
| Proceeds from sales of trading securities held for investment | 693 | 516 |
| Purchases of available-for-sale securities | (25) | (44) |
| Proceeds from maturities and paydowns of available-for-sale securities | 5,972 | 6,933 |
| Proceeds from sales of available-for-sale securities | 696 | 1,850 |
| Purchases of loans held for investment | (81,192) | (26,000) |
| Proceeds from repayments of loans held for investment of Fannie Mae | 14,236 | 11,722 |
| Proceeds from repayments of loans held for investment of consolidated trusts | 355,110 | 226,210 |
| Net change in restricted cash | (5,188) | 26,099 |
| Advances to lenders | (56,489) | (27,990) |
| Proceeds from disposition of acquired property and preforeclosure sales | 20,570 | 24,142 |
| Net change in federal funds sold and securities purchased under agreements to resell or similar agreements | 22,000 | (7,749) |
| Other, net | (92) | (33) |
| Net cash provided by investing activities | 276,959 | 236,162 |
| **Cash flows used in financing activities:** | | |
| Proceeds from issuance of debt of Fannie Mae | 337,683 | 345,028 |
| Payments to redeem debt of Fannie Mae | (408,557) | (401,125) |
| Proceeds from issuance of debt of consolidated trusts | 160,523 | 117,760 |
| Payments to redeem debt of consolidated trusts | (382,520) | (305,465) |
| Payments of cash dividends on senior preferred stock to Treasury | (5,750) | (4,497) |
| Proceeds from senior preferred stock purchase agreement with Treasury | 4,571 | 11,100 |
| Net change in federal funds purchased and securities sold under agreements to repurchase | 153 | — |
| Other, net | (8) | 109 |
| Net cash used in financing activities | (293,905) | (237,090) |
| **Net increase (decrease) in cash and cash equivalents** | 7,189 | (3,023) |
| Cash and cash equivalents at beginning of period | 17,539 | 17,297 |
| Cash and cash equivalents at end of period | $ 24,728 | $ 14,274 |
| **Cash paid during the period for interest** | $ 60,926 | $ 65,710 |

See Notes to Condensed Consolidated Financial Statements

# Tab 61

## Will Obama's second term cause the stock market to decline?

If you have a $500,000 portfolio, you should download the latest report by Forbes columnist Ken Fisher's firm. It tells you where we think the stock market is headed and why. This must-read report includes our latest stock market forecast plus research and analysis you can use in your portfolio right now. Don't miss it!    Click Here to Download Your Report!

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com.

See a sample reprint in PDF format.
Order a reprint of this article now

Earnings

Fannie Mae Posts Profit as Home Prices Rise

By NICK TIMIRAOS

Updated Aug. 8, 2012 6:23 p.m. ET

Rising home prices powered Fannie Mae to a $5.1 billion second-quarter profit, its largest since the mortgage-finance company was taken over by the government in 2008.

### Now Reporting

Track the performances of 150 companies as they report and compare their results with analysts' estimates. Sort by date and industry.



More photos and interactive graphics

The gain, which followed a $2.7 billion profit in the first quarter and a $2.9 billion loss in 2011's second quarter, offered the clearest sign yet that Fannie and its smaller sibling, Freddie Mac, are stabilizing after requiring massive injections of taxpayer aid to stay afloat. This week, Freddie reported a $3 billion profit for the same period.

Altogether this year, Fannie has made a profit of $7.8 billion. That is more than the company's annual earnings for any year except 2003, since it was privatized more than 40 years ago. The profit stemmed largely from the company's decision to move $3 billion out of its loss reserves in anticipation of fewer losses going forward. "The most significant driver of the performance is home prices," said Susan McFarland, Fannie's chief financial officer in an interview. By comparison, during the year-ago quarter, Fannie added $6.5 billion to its loss reserves amid a soft housing market.

While prices typically weaken later in the year when buying activity cools down, the stronger-than-average seasonal gain in home prices "gives us some grounds for encouragement that some of that improvement is sustainable," she said.

Higher job losses could lead more borrowers to fall behind on their mortgage payments, and falling home prices would trigger higher losses when Fannie sells foreclosed properties. Both companies still have sizable backlogs of delinquent mortgages.

The improving earnings were driven by steps that Fannie and Freddie took in late 2008 to tighten their lending standards. Nearly three in five mortgage backed by the firms were originated after standards were stiffened in 2009.

Fannie's reserves dropped to $68 billion at the end of June, down from $77 billion at the beginning of the year. Fannie also said that it had discovered an accounting error from the end of last year that provided a $1.1 billion gain.

### Related Reading

Home Prices Climb as Supply Dwindles

The results hint at the tremendous earnings potential at Fannie and Freddie once home prices have stabilized and now that they have replaced the risky loan books with the newer credit portfolio.

But Fannie's future is clouded by the terms of its government bailout: Every quarter it has to pay the government a big dividend, which in the most recent period amounted to $2.9 billion.

Because of its $5.1 billion profit, Fannie was able to make that payment. But in other quarters in which the profit is below the dividend obligation, Fannie has to borrow from the government to pay it, which also increases future dividend payments.

"It's hard for me to envision that we would be able to make enough every single quarter to cover the dividend payment," said Ms. McFarland, even though she said it was possible the company could continue to post positive net income.

This hasn't been a problem in recent years because the Treasury Department in 2009 said it would provide unlimited help for three years. But beginning in January, the companies once again will have a fixed amount of money available from the Treasury: $125 billion for Fannie and $150 billion for Freddie.

Even if Fannie and Freddie keep running big profits, they would face the problem of paying down the principal amount that they owe the government. Their agreements governing their 2008 rescues provide no direct way to do that.

Case 1:13-mc-01288-RCL   Document 7-16   Filed 12/17/13   Page 7 of 50

The total cost to taxpayers from the bailout of both companies stands at nearly $142 billion.

Separately, the firm's regulator, the Federal Housing Finance Agency, said Wednesday it was considering action to prevent the use of eminent domain by municipalities that are considering mortgage seizures. Several California municipalities and the city of Chicago have set in motion efforts in recent weeks that could allow them to seize underwater mortgages with the goal of writing down the loans to avoid potential foreclosures.

Such programs "could undermine and have a chilling effect" on mortgage markets, the FHFA said in a bulletin. "Action may be necessary…to avoid a risk to safe and sound operations and to avoid taxpayer expense."

**Write to** Nick Timiraos at nick.timiraos@wsj.com

Copyright 2013 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law.
For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit
www.djreprints.com

# Tab 62



MOODY'S
INVESTORS SERVICE

ISSUER COMMENT

# Fannie Mae's and Freddie Mac's Return to Profitability Is Fleeting

From Credit Outlook

Analyst Contacts:

NEW YORK          +1.212.553.1653

Brian Harris      +1.212.553.4705
*Senior Vice President*
brian.harris@moodys.com

Last week, the Federal National Mortgage Association (Fannie Mae, Aaa negative) and Federal Home Loan Mortgage Corp. (Freddie Mac, Aaa negative) announced second-quarter net earnings of $5.1 billion and $3.0 billion, respectively, primarily on the reversal of loan loss reserves fueled by improving house prices.[1]

Improving housing values will reduce credit losses in their mortgage portfolios. However, once the benefit of reserve release runs its course, we believe the government sponsored enterprises' (GSEs) ultimate path remains unchanged: they will deplete their capital bases because the dividends they'll be paying on their preferred securities will be greater than their earnings[2]. As shown in Exhibit 1, the GSEs' earnings and losses have been driven by loan loss provisioning.

EXHIBIT 1
**Fannie Mae and Freddie Mac Net Income and Provision for Losses**



Source: Fannie Mae and Freddie Mac financial statements

---

[1]  Fannie Mae announced second-quarter results on Tuesday, and Freddie Mac announced results on Wednesday.
[2]  See Weekly Credit Outlook, Plan To Raise Fannie Mae and Freddie Mac Guarantee Fees Raises Question of Support, 26 September 2011

The substantial reduction in provisions for credit losses primarily reflects each company's lower loan loss severities, which are driven by positive house price appreciation. Second-quarter home prices[3] rose by 3.2% in Fannie Mae's portfolio and by 4.8% in Freddie Mac's. This led to declining severity of losses (as shown in Exhibit 2) and downward revisions to their credit loss reserves. If the housing market is turning for the better (a highly debated subject),[4] declining severity rates would be a virtuous trend for a few more quarters.

EXHIBIT 2
**Single-Family Initial Charge-Off Severity Rates**



*Source: Fannie Mae and Freddie Mac financial statements*

As a result of the improved home price outlook, both Fannie Mae and Freddie Mac drew down their single-family allowance for credit losses by $6.3 billion and $2.5 billion, respectively. At the end of the second quarter, Fannie Mae's allowance as a percent of its total single-family mortgage portfolio was 2.23% while Freddie Mac's was 1.94%.

Over the past ten years Fannie Mae's and Freddie Mac's allowance for loan losses as a percent of total single-family mortgage portfolio has averaged 1.01% and 0.89%, respectively. In trying to quantify the benefits to the GSEs of an improving housing market the GSEs may benefit from a temporary period of lower provisioning as their allowance declines to their ten year average. This suggests the benefit that will accrue to Fannie Mae is $34.7 billion and the benefit that will accrue to Freddie Mac is $19.2 billion.[5] In other words, an improving housing market reduces the GSEs future expected losses on their current mortgage guaranty portfolio.

However, bondholders will not benefit from any positive earnings in 2012. This is because the GSEs' agreement[6] with the US Treasury is structured such that beginning on 1 January 2013, the GSEs' access to US Treasury-provided capital will become limited to $125 billion minus any positive net worth for Fannie Mae and $150 billion minus any positive net worth for Freddie Mac. In effect, the US Treasury receives the benefits of any earnings in 2012 because they reduce the GSEs' ongoing capital claim.

---

3   Both Fannie Mae and Freddie Mac maintain indexes of changes in house prices on the single-family houses in their portfolio.
4   It remains an open question whether the housing market is turning for the better. Fannie Mae reported a slight decline in house prices in the first quarter of 2012, while Freddie Mac reported two consecutive quarters of house price appreciation, a first since 2007. The GSEs' foreclosure timelines remain extended which may be supporting house prices. It is also possible that the second quarter house price appreciation reflects seasonality. Both Fannie Mae and Freddie Mac have in the past reported positive house price appreciation only to report house price depreciation in following quarters.
5   This assumes their mortgage portfolio remains at the 30 June 2012 level.
6   The Senior Preferred Stock Purchase Agreement allows the GSEs to request an unlimited amount of capital from the US Treasury until year-end 2012. After year end, Fannie Mae and Freddie Mac will respectively have access to $125 billion and $150 billion of preferred capital less any positive net worth.

Report Number: 144710

| Author | Senior Production Associate |
|---|---|
| Brian Harris | Shubhra Bhatnagar |

© 2012 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILIT     IT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Any publication into Australia of this document is by MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657, which holds Australian Financial Services License no. 336969. This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001.

Notwithstanding the foregoing, credit ratings assigned on and after October 1, 2010 by Moody's Japan K.K. ("MJKK") are MJKK's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities. In such a case, "MIS" in the foregoing statements shall be deemed to be replaced with "MJKK". MJKK is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO.

This credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be dangerous for retail investors to make any investment decision based on this credit rating. If in doubt you should contact your financial or other professional adviser.



FHFA 4030

# Tab 63

## THIRD AMENDMENT TO AMENDED AND RESTATED
## SENIOR PREFERRED STOCK PURCHASE AGREEMENT

THIRD AMENDMENT dated as of August 17, 2012, to the AMENDED AND RESTATED SENIOR PREFERRED STOCK PURCHASE AGREEMENT dated as of September 26, 2008, between the UNITED STATES DEPARTMENT OF THE TREASURY ("Purchaser"), and FEDERAL NATIONAL MORTGAGE ASSOCIATION ("Seller"), acting through the Federal Housing Finance Agency (the "Agency") as its duly appointed conservator (the Agency in such capacity, "Conservator").

### Background

A.  Purchaser and Seller have heretofore entered into the Amended and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008 (the "Amended and Restated Agreement").

B.  In the Amended and Restated Agreement, Purchaser committed itself to provide to Seller, on the terms and conditions provided in the Amended and Restated Agreement, immediately available funds in an amount as determined from time to time as provided in the Amended and Restated Agreement, but in no event in an aggregate amount exceeding $100,000,000,000.

C.  In consideration for Purchaser's commitment, Seller agreed to sell, and did sell, to Purchaser 1,000,000 shares of senior preferred stock, in the form of the Variable Liquidation Preference Senior Preferred Stock of Seller attached as Exhibit A to the Amended and Restated Agreement, with an initial liquidation preference equal to $1,000 per share.

D.  The Amended and Restated Agreement provides that the aggregate liquidation preference of the outstanding shares of senior preferred stock shall be automatically increased by an amount equal to the amount of each draw under Purchaser's funding commitment, and the senior preferred stock sold by Seller to Purchaser provides that the senior preferred stock shall accrue dividends at the annual rate per share equal to 10 percent on the then-current liquidation preference.

E.  Purchaser and Seller have heretofore entered into the Amendment dated as of May 6, 2009, to the Amended and Restated Agreement (the "First Amendment").

F.  In the First Amendment, Purchaser increased to $200,000,000,000 the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated

Agreement, and amended the terms of the Amended and Restated Agreement in certain other respects.

G.   Purchaser and Seller have heretofore entered into the Second Amendment dated as of December 24, 2009, to the Amended and Restated Agreement (the "Second Amendment").

H.   In the Second Amendment, Purchaser modified the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated Agreement, as previously amended, by replacing the fixed maximum aggregate amount with the new formulaic maximum amount specified therein, and amended the terms of the Amended and Restated Agreement, as previously amended, in certain other respects.

I.   Purchaser and Seller are each authorized to enter into this Third Amendment to the Amended and Restated Agreement ("this Third Amendment") that (i) includes an agreement by Seller to modify the dividend rate provision of the senior preferred stock sold by Seller to Purchaser, and (ii) amends the terms of the Amended and Restated Agreement, as previously amended, in certain other respects.

THEREFORE, for and in consideration of the mutual agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Purchaser and Seller agree as follows:

## Terms and Conditions

1.   **Definitions.**

Capitalized terms used and not defined in this Third Amendment shall have the respective meanings given such terms in the Amended and Restated Agreement, as amended by the First Amendment and the Second Amendment (the Amended and Restated Agreement, as amended by the First Amendment and the Second Amendment, being the "Existing Agreement").

2.   **Amendment to Paragraph 2(a) of Senior Preferred Stock (Relating to Dividend Payment Dates and Dividend Periods).**

With respect to the Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2, dated September 7, 2008 (the "Senior Preferred Stock Certificate"), sold by Seller to Purchaser and purchased by Purchaser from Seller, Seller agrees either to amend the existing paragraph 2(a) of the Senior Preferred Stock Certificate, or to issue a replacement Senior Preferred Stock Certificate, in either case so that, by not later than September 30, 2012, paragraph 2(a) reads as follows:

- 2 -

(a)  For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, cumulative cash dividends at the annual rate per share equal to the then-current Dividend Rate on the then-current Liquidation Preference.  For each Dividend Period from January 1, 2013, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, cumulative cash dividends in an amount equal to the then-current Dividend Amount.  Dividends on the Senior Preferred Stock shall accrue from but not including the date of the initial issuance of the Senior Preferred Stock and will be payable in arrears when, as and if declared by the Board of Directors quarterly on March 31, June 30, September 30 and December 31 of each year (each, a "Dividend Payment Date"), commencing on December 31, 2008.  If a Dividend Payment Date is not a "Business Day," the related dividend will be paid not later than the next Business Day with the same force and effect as though paid on the Dividend Payment Date, without any increase to account for the period from such Dividend Payment Date through the date of actual payment.  "Business Day" means a day other than (i) a Saturday or Sunday, (ii) a day on which New York City banks are closed, or (iii) a day on which the offices of the Company are closed.

If declared, the initial dividend will be for the period from but not including the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2008.  Except for the initial Dividend Payment Date, the "Dividend Period" relating to a Dividend Payment Date will be the period from but not including the preceding Dividend Payment Date through and including the related Dividend Payment Date.  For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, the amount of dividends payable on the initial Dividend Payment Date or for any Dividend Period through and including December 31, 2012, that is not a full calendar quarter shall be computed on the basis of 30-day months, a 360-day year and the actual number of days elapsed in any period of less than one month.  For the avoidance of doubt, for each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, in the event that the Liquidation Preference changes in the middle of a Dividend Period, the amount of dividends payable on the Dividend Payment Date at the end of such Dividend Period shall take into account such change in Liquidation Preference and shall be computed at the Dividend Rate on each Liquidation Preference based on the portion of the Dividend Period that each Liquidation Preference was in effect.

3.      **Amendment to Paragraph 2(c) of Senior Preferred Stock (Relating to Dividend Rate and Dividend Amount).**

   With respect to the Senior Preferred Stock Certificate sold by Seller to Purchaser and purchased by Purchaser from Seller, Seller agrees either to amend the existing paragraph 2(c) of the Senior Preferred Stock Certificate, or to issue a replacement Senior Preferred Stock Certificate, in either case so that,  effective September 30, 2012, paragraph 2(c) reads as follows:

   (c)  For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, "Dividend Rate" means 10.0%; provided, however, that if at any time the Company shall have for any reason failed to pay dividends in cash in a timely manner as required by this Certificate, then immediately following such failure and for all Dividend Periods thereafter until the Dividend Period following the date on which the Company shall have paid in cash full cumulative dividends (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8) the "Dividend Rate" shall mean 12.0%.

   For each Dividend Period from January 1, 2013, through and including December 31, 2017, the "Dividend Amount" for a Dividend Period means the amount, if any, by which the Net Worth Amount at the end of the immediately preceding fiscal quarter, less the Applicable Capital Reserve Amount, exceeds zero.  For each Dividend Period from January 1, 2018, the "Dividend Amount" for a Dividend Period means the amount, if any, by which the Net Worth Amount at the end of the immediately preceding fiscal quarter exceeds zero.  In each case, "Net  Worth Amount" means (i) the total assets of the Company (such assets excluding the Commitment and any unfunded amounts thereof) as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP, less (ii) the total liabilities of the Company (such liabilities excluding any obligation in respect of any capital stock of the Company, including this Certificate), as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP.  "Applicable Capital Reserve Amount" means, as of any date of determination, for each Dividend Period from January 1, 2013, through and including December 31, 2013, $3,000,000,000; and for each Dividend Period occurring within each 12-month period thereafter, $3,000,000,000 reduced by an equal amount for each such 12-month period through and including December 31, 2017, so that for each Dividend Period from January 1, 2018, the Applicable Capital Reserve Amount shall be zero.  For the avoidance of doubt, if the calculation of the Dividend Amount for a Dividend Period does not exceed zero, then no Dividend Amount shall accrue or be payable for such Dividend Period.

4.   **Amendment to Section 3.2 (Relating to the Periodic Commitment Fee).**

Section 3.2 of the Existing Agreement is hereby amended to read as follows:

3.2. *Periodic Commitment Fee.* (a) Commencing March 31, 2011, Seller shall pay to Purchaser quarterly, on the last day of March, June, September and December of each calendar year (each a "Periodic Fee Date"), a periodic commitment fee (the "Periodic Commitment Fee"). The Periodic Commitment Fee shall accrue from January 1, 2011.

(b) The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2010. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2010 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

(c) At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock so that the aggregate liquidation preference of all such outstanding shares of Senior Preferred Stock is increased by an amount equal to the Periodic Commitment Fee. Seller shall deliver notice of such election not later than three (3) Business Days prior to each Periodic Fee Date. If the Periodic Commitment Fee is not paid in cash by 12:00 pm (New York time) on the applicable Periodic Fee Date (irrespective of Seller's election pursuant to this subsection), Seller shall be deemed to have elected to pay the Periodic Commitment Fee by adding the amount thereof to the liquidation preference of the Senior Preferred Stock, and the aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall thereupon be automatically increased, in the manner contemplated by the first sentence of this section, by an aggregate amount equal to the Periodic Commitment Fee then due.

(d) Notwithstanding anything to the contrary in paragraphs (a), (b), or (c) above, and in consideration of the modification made to the Senior Preferred Stock effective September 30, 2012, for each quarter commencing January 1, 2013, and continuing for as long as paragraph 2 of the Senior Preferred Stock remains in form and content substantially the same as the form and content of the Senior Preferred Stock in effect on September 30, 2012, no Periodic Commitment Fee shall be set, accrue, or be payable.

5.      **Amendment to Section 5.4 (Relating to Transfer of Assets).**

Section 5.4 of the Existing Agreement is hereby amended to read as follows:

5.4.  *Transfer of Assets.*  Seller shall not, and shall not permit any of its subsidiaries to, in each case without prior written consent of Purchaser, sell, transfer, lease or otherwise dispose of (in one transaction or a series of related transactions) all or any portion of its assets (including Equity Interests in other persons, including subsidiaries), whether now owned or hereafter acquired (any such sale, transfer, lease or disposition, a "Disposition"), other than Dispositions for fair market value:

(a) to a limited life regulated entity ("LLRE") pursuant to Section 1367(i) of the FHE Act;

(b) of assets and properties in the ordinary course of business, consistent with past practice;

(c) of assets and properties having fair market value individually or in aggregate less than $250,000,000 in one transaction or a series of related transactions;

(d) in connection with a liquidation of Seller by a receiver appointed pursuant to Section 1367(a) of the FHE Act;

(e) of cash or cash equivalents for cash or cash equivalents; or

(f) to the extent necessary to comply with the covenant set forth in Section 5.7 below.

6.      **Amendment to Section 5.7 (Relating to Owned Mortgage Assets).**

Section 5.7 of the Existing Agreement is hereby amended to read as follows:

5.7.  Mortgage Assets.  Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2012, $650 billion, or (ii) on December 31 of each year thereafter, 85.0% of the aggregate amount of Mortgage Assets that Seller was permitted to own as of December 31 of the immediately preceding calendar year; provided, that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets.

FHFA 4036

7. **Amendment to Section 5 (Adding New Section 5.11 Relating to "Annual Risk Management Plans").**

Section 5 of the Existing Agreement is hereby amended by inserting after section 5.10 the following:

5.11.  Annual Risk Management Plans.  Not later than December 15, 2012, and not later than December 15 of each year thereafter while Seller remains in conservatorship pursuant to Section 1367 of the FHE Act, Seller shall, under the direction of Conservator, deliver a risk management plan to Purchaser.  Each annual risk management plan shall set out Seller's strategy for reducing its enterprise-wide risk profile and shall describe, in reasonable detail, the actions Seller will take, to reduce both the financial and operational risk associated with each reportable business segment of Seller.  Plans delivered subsequent to December 15, 2012 shall also include an assessment of Seller's performance relative to the planned actions described in the prior year's plan. The submission of annual risk management plans under this section shall not in any way limit or affect the Agency in any of its capacities to carry out its statutory responsibilities, including but not limited to providing direction to and oversight of Seller."

8. **Existing Agreement to Continue, as Amended.**

Except as expressly modified by this Third Amendment, the Existing Agreement shall continue in full force and effect.

9. **Effective Date.**

This Third Amendment shall not become effective until it has been executed by both of Purchaser and Seller.  When this Third Amendment has been so executed, it shall become effective as of the date first above written.

FHFA 4037

FEDERAL NATIONAL MORTGAGE
ASSOCIATION, by

Federal Housing Finance Agency,
its Conservator


_Edward J. DeMarco_
Edward J. DeMarco
Acting Director


UNITED STATES DEPARTMENT
OF THE TREASURY


_Timothy F. Geithner_
Timothy F. Geithner
Secretary of the Treasury

- 8 -

# Tab 64

# THIRD AMENDMENT TO AMENDED AND RESTATED
# SENIOR PREFERRED STOCK PURCHASE AGREEMENT

THIRD AMENDMENT dated as of August 17, 2012, to the AMENDED AND
RESTATED SENIOR PREFERRED STOCK PURCHASE AGREEMENT dated as of
September 26, 2008, between the UNITED STATES DEPARTMENT OF THE TREASURY
("Purchaser"), and FEDERAL HOME LOAN MORTGAGE CORPORATION ("Seller"), acting
through the Federal Housing Finance Agency (the "Agency") as its duly appointed conservator
(the Agency in such capacity, "Conservator").

## Background

A.   Purchaser and Seller have heretofore entered into the Amended and Restated Senior
Preferred Stock Purchase Agreement dated as of September 26, 2008 (the "Amended and
Restated Agreement").

B.   In the Amended and Restated Agreement, Purchaser committed itself to provide to
Seller, on the terms and conditions provided in the Amended and Restated Agreement,
immediately available funds in an amount as determined from time to time as provided in the
Amended and Restated Agreement, but in no event in an aggregate amount exceeding
$100,000,000,000.

C.   In consideration for Purchaser's commitment, Seller agreed to sell, and did sell, to
Purchaser 1,000,000 shares of senior preferred stock, in the form of the Variable Liquidation
Preference Senior Preferred Stock of Seller attached as Exhibit A to the Amended and Restated
Agreement, with an initial liquidation preference equal to $1,000 per share.

D.   The Amended and Restated Agreement provides that the aggregate liquidation
preference of the outstanding shares of senior preferred stock shall be automatically increased by
an amount equal to the amount of each draw under Purchaser's funding commitment, and the
senior preferred stock sold by Seller to Purchaser provides that the senior preferred stock shall
accrue dividends at the annual rate per share equal to 10 percent on the then-current liquidation
preference.

E.   Purchaser and Seller have heretofore entered into the Amendment dated as of May 6,
2009, to the Amended and Restated Agreement (the "First Amendment").

F.   In the First Amendment, Purchaser increased to $200,000,000,000 the maximum
aggregate amount permitted to be provided to Seller under the Amended and Restated

Agreement, and amended the terms of the Amended and Restated Agreement in certain other respects.

G.   Purchaser and Seller have heretofore entered into the Second Amendment dated as of December 24, 2009, to the Amended and Restated Agreement (the "Second Amendment").

H.   In the Second Amendment, Purchaser modified the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated Agreement, as previously amended, by replacing the fixed maximum aggregate amount with the new formulaic maximum amount specified therein, and amended the terms of the Amended and Restated Agreement, as previously amended, in certain other respects.

I.   Purchaser and Seller are each authorized to enter into this Third Amendment to the Amended and Restated Agreement ("this Third Amendment") that (i) includes an agreement by Seller to modify the dividend rate provision of the senior preferred stock sold by Seller to Purchaser, and (ii) amends the terms of the Amended and Restated Agreement, as previously amended, in certain other respects.

THEREFORE, for and in consideration of the mutual agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Purchaser and Seller agree as follows:

## Terms and Conditions

1.   **Definitions.**

Capitalized terms used and not defined in this Third Amendment shall have the respective meanings given such terms in the Amended and Restated Agreement, as amended by the First Amendment and the Second Amendment (the Amended and Restated Agreement, as amended by the First Amendment and the Second Amendment, being the "Existing Agreement").

2.   **Amendment to Paragraph 2(a) of Senior Preferred Stock (Relating to Dividend Payment Dates and Dividend Periods).**

With respect to the Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Liquidation Preference Senior Preferred Stock (Par Value $1.00 Per Share) dated September 7, 2008 (the "Senior Preferred Stock Certificate"), sold by Seller to Purchaser and purchased by Purchaser from Seller, Seller agrees either to amend the existing paragraph 2(a) of the Senior Preferred Stock Certificate, or to issue a replacement Senior Preferred Stock Certificate, in either case so that, by not later than September 30, 2012, paragraph 2(a) reads as follows:

- 2 -

(a)  For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, cumulative cash dividends at the annual rate per share equal to the then-current Dividend Rate on the then-current Liquidation Preference.  For each Dividend Period from January 1, 2013, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, cumulative cash dividends in an amount equal to the then-current Dividend Amount.  Dividends on the Senior Preferred Stock shall accrue from but not including the date of the initial issuance of the Senior Preferred Stock and will be payable in arrears when, as and if declared by the Board of Directors quarterly on March 31, June 30, September 30 and December 31 of each year (each, a "Dividend Payment Date"), commencing on December 31, 2008.  If a Dividend Payment Date is not a "Business Day," the related dividend will be paid not later than the next Business Day with the same force and effect as though paid on the Dividend Payment Date, without any increase to account for the period from such Dividend Payment Date through the date of actual payment.  "Business Day" means a day other than (i) a Saturday or Sunday, (ii) a day on which New York City banks are closed, or (iii) a day on which the offices of the Company are closed.

If declared, the initial dividend will be for the period from but not including the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2008.  Except for the initial Dividend Payment Date, the "Dividend Period" relating to a Dividend Payment Date will be the period from but not including the preceding Dividend Payment Date through and including the related Dividend Payment Date.  For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, the amount of dividends payable on the initial Dividend Payment Date or for any Dividend Period through and including December 31, 2012, that is not a full calendar quarter shall be computed on the basis of 30-day months, a 360-day year and the actual number of days elapsed in any period of less than one month.  For the avoidance of doubt, for each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, in the event that the Liquidation Preference changes in the middle of a Dividend Period, the amount of dividends payable on the Dividend Payment Date at the end of such Dividend Period shall take into account such change in Liquidation Preference and shall be computed at the Dividend Rate on each Liquidation Preference based on the portion of the Dividend Period that each Liquidation Preference was in effect.

FHFA 4041

3.     **Amendment to Paragraph 2(c) of Senior Preferred Stock (Relating to Dividend Rate and Dividend Amount).**

With respect to the Senior Preferred Stock Certificate sold by Seller to Purchaser and purchased by Purchaser from Seller, Seller agrees either to amend the existing paragraph 2(c) of the Senior Preferred Stock Certificate, or to issue a replacement Senior Preferred Stock Certificate, in either case so that, effective September 30, 2012, paragraph 2(c) reads as follows:

(c)  For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, "Dividend Rate" means 10.0%; provided, however, that if at any time the Company shall have for any reason failed to pay dividends in cash in a timely manner as required by this Certificate, then immediately following such failure and for all Dividend Periods thereafter until the Dividend Period following the date on which the Company shall have paid in cash full cumulative dividends (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8) the "Dividend Rate" shall mean 12.0%.

For each Dividend Period from January 1, 2013, through and including December 31, 2017, the "Dividend Amount" for a Dividend Period means the amount, if any, by which the Net Worth Amount at the end of the immediately preceding fiscal quarter, less the Applicable Capital Reserve Amount, exceeds zero. For each Dividend Period from January 1, 2018, the "Dividend Amount" for a Dividend Period means the amount, if any, by which the Net Worth Amount at the end of the immediately preceding fiscal quarter exceeds zero. In each case, "Net Worth Amount" means (i) the total assets of the Company (such assets excluding the Commitment and any unfunded amounts thereof) as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP, less (ii) the total liabilities of the Company (such liabilities excluding any obligation in respect of any capital stock of the Company, including this Certificate), as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP. "Applicable Capital Reserve Amount" means, as of any date of determination, for each Dividend Period from January 1, 2013, through and including December 31, 2013, $3,000,000,000; and for each Dividend Period occurring within each 12-month period thereafter, $3,000,000,000 reduced by an equal amount for each such 12-month period through and including December 31, 2017, so that for each Dividend Period from January 1, 2018, the Applicable Capital Reserve Amount shall be zero. For the avoidance of doubt, if the calculation of the Dividend Amount for a Dividend Period does not exceed zero, then no Dividend Amount shall accrue or be payable for such Dividend Period.

FHFA 4042

4.    **Amendment to Section 3.2 (Relating to the Periodic Commitment Fee).**

Section 3.2 of the Existing Agreement is hereby amended to read as follows:

3.2. *Periodic Commitment Fee.* (a) Commencing March 31, 2011, Seller shall pay to Purchaser quarterly, on the last day of March, June, September and December of each calendar year (each a "Periodic Fee Date"), a periodic commitment fee (the "Periodic Commitment Fee"). The Periodic Commitment Fee shall accrue from January 1, 2011.

(b) The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2010. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2010 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

(c) At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock so that the aggregate liquidation preference of all such outstanding shares of Senior Preferred Stock is increased by an amount equal to the Periodic Commitment Fee. Seller shall deliver notice of such election not later than three (3) Business Days prior to each Periodic Fee Date. If the Periodic Commitment Fee is not paid in cash by 12:00 pm (New York time) on the applicable Periodic Fee Date (irrespective of Seller's election pursuant to this subsection), Seller shall be deemed to have elected to pay the Periodic Commitment Fee by adding the amount thereof to the liquidation preference of the Senior Preferred Stock, and the aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall thereupon be automatically increased, in the manner contemplated by the first sentence of this section, by an aggregate amount equal to the Periodic Commitment Fee then due.

(d) Notwithstanding anything to the contrary in paragraphs (a), (b), or (c) above, and in consideration of the modification made to the Senior Preferred Stock effective September 30, 2012, for each quarter commencing January 1, 2013, and continuing for as long as paragraph 2 of the Senior Preferred Stock remains in form and content substantially the same as the form and content of the Senior Preferred Stock in effect on September 30, 2012, no Periodic Commitment Fee shall be set, accrue, or be payable.

- 5 -

5.    **Amendment to Section 5.4 (Relating to Transfer of Assets).**

Section 5.4 of the Existing Agreement is hereby amended to read as follows:

5.4.  *Transfer of Assets.*   Seller shall not, and shall not permit any of its subsidiaries to, in each case without prior written consent of Purchaser, sell, transfer, lease or otherwise dispose of (in one transaction or a series of related transactions) all or any portion of its assets (including Equity Interests in other persons, including subsidiaries), whether now owned or hereafter acquired (any such sale, transfer, lease or disposition, a "Disposition"), other than Dispositions for fair market value:

(a) to a limited life regulated entity ("LLRE") pursuant to Section 1367(i) of the FHE Act;

(b) of assets and properties in the ordinary course of business, consistent with past practice;

(c) of assets and properties having fair market value individually or in aggregate less than $250,000,000 in one transaction or a series of related transactions;

(d) in connection with a liquidation of Seller by a receiver appointed pursuant to Section 1367(a) of the FHE Act;

(e) of cash or cash equivalents for cash or cash equivalents; or

(f) to the extent necessary to comply with the covenant set forth in Section 5.7 below.

6.    **Amendment to Section 5.7 (Relating to Owned Mortgage Assets).**

Section 5.7 of the Existing Agreement is hereby amended to read as follows:

5.7.  Mortgage Assets.  Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2012, $650 billion, or (ii) on December 31 of each year thereafter, 85.0% of the aggregate amount of Mortgage Assets that Seller was permitted to own as of December 31 of the immediately preceding calendar year; provided, that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets.

- 6 -

7.    **Amendment to Section 5 (Adding New Section 5.11 Relating to "Annual Risk Management Plans").**

Section 5 of the Existing Agreement is hereby amended by inserting after section 5.10 the following:

5.11.  Annual Risk Management Plans.  Not later than December 15, 2012, and not later than December 15 of each year thereafter while Seller remains in conservatorship pursuant to Section 1367 of the FHE Act, Seller shall, under the direction of Conservator, deliver a risk management plan to Purchaser.  Each annual risk management plan shall set out Seller's strategy for reducing its enterprise-wide risk profile and shall describe, in reasonable detail, the actions Seller will take, to reduce both the financial and operational risk associated with each reportable business segment of Seller.  Plans delivered subsequent to December 15, 2012 shall also include an assessment of Seller's performance relative to the planned actions described in the prior year's plan. The submission of annual risk management plans under this section shall not in any way limit or affect the Agency in any of its capacities to carry out its statutory responsibilities, including but not limited to providing direction to and oversight of Seller."

8.    **Existing Agreement to Continue, as Amended.**

Except as expressly modified by this Third Amendment, the Existing Agreement shall continue in full force and effect.

9.    **Effective Date.**

This Third Amendment shall not become effective until it has been executed by both of Purchaser and Seller.  When this Third Amendment has been so executed, it shall become effective as of the date first above written.

- 7 -

FEDERAL HOME LOAN MORTGAGE
CORPORATION, by

Federal Housing Finance Agency,
its Conservator


Edward J. DeMarco
Acting Director


UNITED STATES DEPARTMENT
OF THE TREASURY


Timothy F. Geithner
Secretary of the Treasury

- 8 -

# Tab 65

# FEDERAL HOUSING FINANCE AGENCY



## STATEMENT

| For Immediate Release | **Contact:** | Corinne Russell | (202) 649-3032 |
| August 17, 2012 | | Stefanie Johnson | (202) 649-3030 |

### Statement of FHFA Acting Director Edward J. DeMarco On Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements

"The steps taken today between the Federal Housing Finance Agency (FHFA), as conservator of Fannie Mae and Freddie Mac, and the U.S. Department of the Treasury to amend the Preferred Stock Purchase Agreements (PSPAs) are important for ensuring stability in the housing finance market.  These steps reaffirm our commitment to move  forward with the components of the Strategic Plan for the Conservatorships of Fannie Mae and Freddie Mac, which includes building for the future, gradually contracting their operations, and maintaining foreclosure prevention activities and credit availability.  Replacing the current fixed dividend in the PSPAs with a variable dividend based on net worth will help to ensure stability, fully capture financial benefits for taxpayers, and eliminate the need for Fannie Mae and Freddie Mac to continue to borrow from the Treasury Department to pay dividends.  As Fannie Mae and Freddie Mac shrink, the continued payment of a fixed dividend could have called into question the adequacy of the financial commitment contained in the PSPAs.   In addition, the faster reduction in the retained mortgage portfolio will further reduce risk exposure and simplify the operations of Fannie Mae and Freddie Mac.

"These changes provide certainty to Fannie Mae,  Freddie Mac and market participants as they continue to perform their critical mission of providing liquidity and stability to the country's housing market.  The steps today are also important as Congress and policymakers contemplate the future of Fannie Mae and Freddie Mac."

Link to FHFA Strategic Plan for the Conservatorships of Fannie Mae and Freddie Mac

### 

*The Federal Housing Finance Agency regulates Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks. These government-sponsored enterprises provide more than $5.7 trillion in funding for the U.S. mortgage markets and financial institutions.*

# Tab 66

| | |
|---|---|
| **From:** | Newell, Jamie [Jamie.Newell@fhfa.gov] |
| **Sent:** | Wednesday, October 10, 2012 12:17 PM |
| **To:** | David, Mark |
| **Subject:** | FW: Update: Treasury changes the PSPAs: Initial thoughts |

Another article
Jamie

**From:** Adama Kah [mailto:adama_kah@freddiemac.com]
**Sent:** Friday, August 17, 2012 11:50 AM
**To:** Burns, Meg; Kvartunas, Deirdre; Newell, Jamie
**Cc:** Sar, Prasant; Prendergast, Joseph; Giammarinaro, Matthew
**Subject:** Fw: Update: Treasury changes the PSPAs: Initial thoughts


Fyi, short blurb on Barclay's views on the PSPA modifications announced today.

Have a good weekend.

Regards,
-- Adama

----- Forwarded by Adama Kah/HQ/FHLMC on 08/17/2012 11:42 AM -----

| | | |
|---|---|---|
| **Barclays Research**<br><barclaysresearch@barclays.com> | To | adama_kah@freddiemac.com |
| | cc | |
| 08/17/2012 11:17 AM | Subject | Update: Treasury changes the PSPAs: Initial thoughts |

> Please respond to
> barclaysresearch@barclays.com



| | |
|---|---|
| INTEREST RATES RESEARCH \| U.S. INSTANT INSIGHTS | 17 August 2012 |

James Ma         +1 212 412 2563   james.ma@barclays.com
Rajiv Setia      +1 212 412 5507   rajiv.setia@barclays.com
Nicholas Strand  +1 212 412 2057   nicholas.strand@barclays.com

*This version replaces the one sent earlier today with updates to our views on ratings and other implications.*
**Treasury changes the PSPAs: Initial thoughts**
The Treasury has changed two aspects of the Preferred Stock Purchase Agreements (PSPAs) that govern the terms of the Treasury's capital support for Fannie Mae (FNM) and Freddie Mac (FRE):

■      All future net income generated by FNM/FRE will be swept directly to the Treasury;

the dividend is waived in any period in which a GSE makes a net loss. Previously, this was a flat 10% annual rate.

■      The retained portfolios' maximum size will now decrease 15% per year, an acceleration from the previous 10% per year.

This change is along the lines that we have been calling for since last year.[1] This modification of the coupon ensures that capital support will be maintained post-YE12 (of $125bn at FNM and $150bn at FRE), while allowing the Treasury and taxpayers to recover the maximum possible value from future GSE cash flows. It obviously is a blow to the hopes of investors in the junior preferred shares and those who have speculated the old GSE model would eventually be revived.

When we examined the GSEs' long-term cash flows last year, we concluded that the Treasury would likely make such a change this December.[2] However, the push forward in the timeline could have been prompted by worries over FNM/FRE ratings; for example, Moody's had suggested that GSE ratings could be changed independently of the US sovereign ratings if more clarity on capital support post-2012 were not provided.

Our baseline projections for GSE profitability have always assumed that legacy credit losses would be fully provisioned in 2012, allowing the GSEs to return to profitability even after the 10% dividend; we saw clear evidence of this in the Q2 results. However, the primary driver of profitability was net interest income from the portfolio; as this was slated to shrink 10% per annum, it could not be counted on as a sustainable source of revenues. As a result, we were more concerned about the viability of finite credit support 7-10y out, rather than in the near term. This view was likely shared by agency debt investors; for instance, 2-3y debt trades at less than 10bp vs. Treasuries, while intermediate maturities are valued at a spread closer to 35-40bp.

With the change in support, we see virtually no chance of the post-YE12 capital supports being exhausted over a multi-decade period. This is primarily because of the high quality of the post-conservatorship guarantee book, coupled with our view that provisioning for legacy credit losses is essentially complete (also in line with the Q2 results).

In our view, this puts to rest any worries about GSE credit risk even in intermediate/longer maturities. Thus, we expect the agency-Treasury spread curve to flatten sharply and can envision 10s trading at T+15-20bp. By accelerating the pace of portfolio shrinkage to 15%, this should also boost the positive supply technical for agency debt, further buoying valuations.

In terms of knock-on effects for other sectors:

■      With the pace of shrinkage accelerating to 15% per annum, the retained portfolios could be a marginal source of agency MBS "supply." However, the current pace of liquidations should be enough for FNM/FRE to comply with the new limits in 2012 without resorting to outright sales. Further out, depending on the level of rates, strategic dispositions may be needed. However, past experience suggests that FHFA will be flexible in ensuring that the portfolios are wound down in a non-disruptive way.

■      Also, the accelerated pace of portfolio runoff also reduces the GSEs' need to use pay-fixed swaps positions and/or buy options. Notional derivative positions have already been declining roughly 15% per year over the past four years, slightly ahead of the existing pace of portfolio shrinkage. This reinforces the secular move underway in which ownership of the mortgage universe is transitioning from hedgers to non-hedgers. Despite the presumably faster wind-down of the derivatives book, we do not see a large effect on intermediate swap spreads. However, our vol strategist expects the modest acceleration in the unwind of the GSEs' existing swaption books to be bearish for intermediate expiries on mid-tails (on a relative basis).

In our view, the GSEs are now, more than ever, dependent on the government. By removing virtually all concerns about standalone credit and appropriating all future profits, the government is signalling what most market participants already know: that FNM/FRE are essentially off-balance-sheet government entities. The question remains whether this

move will be enough to change perceptions of investors (typically overseas) that have previously differentiated between Treasury/GNMA and FNM/FRE securities.

We think that over time, the answer to this question is an unambiguous yes. Any signal that the Fed/OCC is considering reducing FNM/FRE risk weights as a result of this dividend change would increase investor appetite for agency debt/MBS; however, this would also further entrench FNM/FRE securitization, complicating any transition to another housing finance model. Ultimately, our MBS strategists expect this change to help weaken support for the GNMA/FNMA swaps over time.

---

[1] *US Agencies Outlook 2012: Achtung baby!* , 14 December 2011
[2] *GSE preferred shares: Hope is not a strategy*, 16 June 2011

For analyst certification(s) and important disclosures, please **click here**.

Edit my subscriptions profile | Unsubscribe me from this email

The Corporate and Investment Banking division of Barclays Bank PLC and its affiliates (collectively and each individually, "Barclays") uses your contact information to deliver information to you. Barclays reserves the right, as permitted by applicable law, to monitor electronic communications. Barclays uses cookies and other tracking technologies to collect information about recipients of electronic communications (such as internet protocol addresses). Barclays uses the information collected to monitor the effectiveness, and extent and frequency of usage of our products, and to further improve our products and our relationships with our clients. This e-mail is intended only for the person to whom it was originally sent, and may contain information that is confidential, proprietary, privileged or otherwise protected from disclosure. If you are not the intended recipient of this e-mail, please advise the sender by reply e-mail. Do not duplicate or redistribute it by any means. Please delete it and any attachments without retaining any copies. Unless specifically indicated, this e-mail is not an offer to buy or sell, or a solicitation to buy or sell any securities, investment products, or other financial product or service, an official confirmation of any transaction, or an official statement of Barclays. Any views or opinions presented are solely those of the author and do not necessarily represent those of Barclays. This e-mail is subject to terms available at the following link:http://www.barcap.com/emaildisclaimer. By messaging with Barclays you consent to the foregoing. Barclays Bank PLC, a company registered in England (number 1026167) with its registered office at 1 Churchill Place, London, E14 5HP. This email may relate to or be sent from other divisions or affiliates of Barclays.

# Tab 67



## ISSUER COMMENT

# US Treasury Amends Fannie Mae's and Freddie Mac's Capital Agreement, a Credit Positive

From Credit Outlook

Analyst Contacts:

NEW YORK                    +1.212.553.1653

Brian Harris                +1.212.553.4705
*Senior Vice President*
brian.harris@moodys.com

Last Friday, the US Treasury amended[1] its Senior Preferred Stock Purchase Agreement (the Capital Agreement) with the government-sponsored enterprises (GSEs) Fannie Mae (Aaa negative) and Freddie Mac (Aaa negative). The most significant provision of the amendment, which goes into effect on 1 January 2013, is the reduction of the dividends the GSEs will pay. This reduction is credit positive because it considerably diminishes the risk of the GSEs depleting the capital commitment that they have from the US Treasury.

The Treasury's capital commitment to the GSEs has been the source that provides positive net worth to the two GSEs since their conservatorship. Our Aaa ratings on the GSEs are based on effective credit substitution with the US government. We believe this amendment confirms the connection between the GSEs and the US government because the most tangible form of GSE support, the Capital Agreement, will remain in place and will continue to provide for a significant call on capital from the US government for the foreseeable future.

Prior to this amendment, the GSEs were to have a fixed capital commitment from the US Treasury, and we believed those dividend payments would have depleted the limited capital commitment over about the next 10 years. Therefore, the US government needed to take some action to avoid depleting the capital commitment.

The amendment reduces dividends from the GSEs to the US Treasury to any positive net worth above a pre-determined nominal capital reserve.[2] More importantly, limiting dividends to the amount of earnings each GSE generates and eliminating the burden of the former high dividends ensures that each company will have sufficient contingent capital under its Capital Agreement with the US Treasury, a credit positive.

Based on our analysis, Fannie Mae and Freddie Mac are likely to return to operating profitability in the next few years, increasing the certainty that they each will have a significant amount of contingent capital from the US government available to them. By our estimates, they are each likely to receive more than $100 billion of capital from the US Treasury, and given that only operating losses would reduce this amount, we expect this capital to remain in place for the foreseeable future.

### What is Moody's Credit Outlook?

Published every Monday and Thursday morning, Moody's Credit Outlook informs our research clients of the credit implications of current events.

---

[1]    This is the third amendment of the Senior Preferred Stock Purchase Agreement between the US Treasury and Fannie Mae and Freddie Mac. In each case, the amendment resulted in increased protections for bondholders.

[2]    The capital reserve for each company in 2013 will be $3.0 billion and will decline by $600 million per year. That is, each of the GSE's capital reserve will be $3.0 billion in 2013, $2.4 billion in 2014, $1.8 billion in 2015, $1.2 billion in 2016, $600 million in 2017, and $0 in 2018 and beyond.

Report Number: 144994

| | |
|---|---|
| Author | Production Associate |
| Brian Harris | David Dombrovskis |

© 2012 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Any publication into Australia of this document is by MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657, which holds Australian Financial Services License no. 336969. This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001.

Notwithstanding the foregoing, credit ratings assigned on and after October 1, 2010 by Moody's Japan K.K. ("MJKK") are MJKK's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities. In such a case, "MIS" in the foregoing statements shall be deemed to be replaced with "MJKK". MJKK is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO.

This credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be dangerous for retail investors to make any investment decision based on this credit rating. If in doubt you should contact your financial or other professional adviser.



FHFA 4052

# Tab 68



Federal Housing Finance Agency

Conservator's Report
on the Enterprises' Financial Performance

Second Quarter 2012

FHFA 4053

Federal Housing Finance Agency

Conservator's Report on the<br>Enterprises' Financial Performance<br>Second Quarter 2012

## Contents

Executive Summary………………………………………..………….……   3

1.  Mortgage Markets and the Enterprises' Market Presence…….…………   4

2.  Credit Quality of New Single-Family Business……………….…….……   6

3.  Capital…………..………………….………………….......……………..   9

4.  Single-Family Credit Guarantee Segment Results………..…………….   11

5.  Investments and Capital Markets Segment Results………………….…..   14

6.  Loss Mitigation Activity..…………..…………………………..…...…..   16

7.  Comparison of Actual Results to Projections of the Enterprises' Financial
    Performance……………………….………..…………….………...   17

The purpose of this report is to provide an overview of key aspects of the financial condition of Fannie Mae and Freddie Mac (the Enterprises) during conservatorship. The data in this report are derived primarily from the Enterprises' SEC filings and other publicly available sources.  In some cases, FHFA adjusted the classification of certain data to provide comparability between the Enterprises.  In other cases, the Enterprises' reporting methodologies changed over time. Therefore, the data in this report may not exactly match published figures.

FHFA 4054

Federal Housing Finance Agency

## Executive Summary

### Mortgage Markets and the Enterprises' Market Presence

Seventy-two percent of all mortgage originations in the first half of 2012 were due to refinance volume.  Refinances surged during the first half of 2012, in response to a sustained period of record low mortgage rates, enhancements to the Home Affordable Refinance Program (HARP), and lender reaction to the 10 basis point guarantee fee increase in April 2012.  As a result, combined Enterprise mortgage-backed securities (MBS) issuance share grew to 77 percent in the first half of 2012.

### Credit Quality of New Single-Family Business

The quality of new business remained high in the first half of 2012, as evidenced by average FICO credit scores around the 760 range.  Both Enterprises have experienced an increase in new business with loan-to-value (LTV) ratios greater than 90 percent, due to refinance programs that support improving the housing market, including HARP.

### Capital

For the first time since the start of the conservatorships in the third quarter of 2008, both Enterprises ended the second quarter of 2012 with positive net worth.  Also for the first time in conservatorship, the Single-Family Credit Guarantee segment generated income in the second quarter of 2012, as a result of substantially lower provisions for credit losses, particularly at Fannie Mae.  The Investments segment results continued to be positive in the second quarter of 2012 driven by low funding costs as a result of the low interest rate environment.

### Single-Family Credit Guarantee Segment Results

In the first half of 2012, Fannie Mae generated credit-related income and Freddie Mac incurred substantially lower credit-related expenses, primarily due to substantially lower provisions for credit losses.  Lower provisions for credit losses were driven by improvement in both national home prices and real estate owned (REO) disposition values, and the continued decrease in the seriously delinquent loan population.

### Investments and Capital Markets Segment Results

The Investments and Capital Markets segment was a positive contributor to capital in the first half of 2012, as both Enterprises continued to benefit from low funding costs as a result of the low interest rate environment.

### Loss Mitigation Activity

Since conservatorship, the Enterprises have completed approximately 2.4 million foreclosure prevention actions.  Half of these actions were permanent loan modifications.

### Projections of Financial Performance

The projected combined Treasury draws for the second half of 2011 and the first half of 2012 ranged from $35 billion to $91 billion.  This compares to an actual combined draw of $19 billion.  The primary driver of the difference between actual and projected performance was lower than projected provisions for credit losses.  Lower provisions for credit losses were mainly driven by improved portfolio quality reflected in lower delinquencies and lower LTV ratios, combined with higher REO disposition values.

FHFA 4055

Federal Housing Finance Agency

## 1   Mortgage Markets and the Enterprises' Market Presence

### 1.1   Primary Mortgage Market Trends—Mortgage Originations

- Seventy-two percent of all mortgage originations in the first half of 2012 were due to refinance volume.  Refinance volumes surged during the first half of 2012 in response to a sustained period of record low mortgage rates, enhancements to the Home Affordable Refinance Program (HARP), and increased volume ahead of the 10 basis point guarantee fee increase in April 2012.

**Figure 1.1 Mortgage Originations by Product Type** *($ in billions)*



Source:
Inside Mortgage Finance

Federal Housing Finance Agency

Conservator's Report on the<br>Enterprises' Financial Performance<br>Second Quarter 2012

### 1.2    Secondary Mortgage Market Trends—Mortgage-Backed Securities Issued

- The Enterprises' market share of mortgage-backed securities (MBS) issuances for the first half of 2012 rose to 77 percent, driven by increased MBS issuance volumes in the first quarter of 2012, as lenders delivered mortgage products ahead of the April 1, 2012 guarantee fee increase.  Ginnie Mae's market share fell to 23 percent.  The Enterprises and Ginnie Mae continued to account for essentially all issuances of mortgage-backed securities.

**Figure 1.2 Enterprises' Market Share – MBS Issuance Volume**



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Enterprises | 67% | 68% | 70% | 47% | 41% | 40% | 58% | 73% | 72% | 70% | 73% | 77% |
| Ginnie Mae | 13% | 9% | 8% | 7% | 4% | 4% | 5% | 22% | 25% | 26% | 25% | 23% |
| Total Agency | 80% | 77% | 78% | 54% | 45% | 44% | 63% | 95% | 97% | 96% | 98% | 100% |

<u>Sources:</u>
Inside Mortgage Finance, Inside MBS & ABS, Enterprises' Monthly Volume Summaries.
Issuance figures exclude MBS issued backed by assets previously held in the Enterprises' portfolios.

FHFA 4057

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Second Quarter 2012

## 2   Credit Quality of New Single-Family Business

### 2.1    Credit Characteristics of the Enterprises' New Single-Family Business

- The credit quality of new Single-Family business remained high in the first half of 2012; however, new business with LTV ratios greater than 90 percent increased due to refinance programs targeting deeply underwater borrowers.  The increase in the percentage of new business with LTV ratios greater than 90 percent primarily relates to the Enterprises' refinance programs, including HARP.  Purchases of non-traditional and higher-risk mortgages continue to be very low and the average FICO credit score remained around the 760 range at both Enterprises.

**Figure 2.1 Characteristics of Single-Family Mortgage Acquisitions**

(Categories overlap and are not additive)

| Percent of New Single-Family Business[1] | Fannie Mae | | | | | | | Freddie Mac | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 |
| Alt-A[2] | 22% | 17% | 3% | 0% | 1% | 1% | 1% | 18% | 22% | 7% | 0% | 0% | 0% | 0% |
| Interest-Only | 15% | 15% | 6% | 1% | 1% | 1% | 0% | 17% | 21% | 6% | 0% | 0% | 0% | 0% |
| Credit Score <620 | 6% | 6% | 3% | 0% | 0% | 0% | 1% | 5% | 6% | 3% | 1% | 1% | 1% | 1% |
| LTV >90 Percent | 10% | 16% | 10% | 4% | 7% | 9% | 15% | 6% | 11% | 9% | 4% | 9% | 11% | 19% |
| Average LTV | 73% | 75% | 72% | 67% | 68% | 69% | 73% | 73% | 74% | 71% | 67% | 69% | 70% | 76% |
| Average Credit Score | 716 | 716 | 738 | 761 | 762 | 762 | 762 | 720 | 718 | 734 | 756 | 755 | 755 | 756 |

Notes
[1] New business is defined as issuance of MBS/PC plus purchases of whole loans and does not include purchases of mortgage-related securities.
[2] Refer to sources for Alt-A definitions. Freddie Mac's 2010 figures include Alt-A purchases of $1.5 billion due to a long-term standby commitment termination and a subsequent PC issuance.  There was no change to the Alt-A exposure on these mortgages as a result of these transactions. Fannie Mae newly originated Alt-A loans acquired since 2009 consist of the refinancing of existing loans.

Sources:
Enterprises' Forms 10-K and 10-Q, credit supplements to SEC disclosures, and management reports.

6

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Second Quarter 2012

### 2.2    Performance of Non-Traditional and Higher-Risk Mortgages (mostly purchased pre-conservatorship)

- Single-family serious delinquency rates remained high for the Enterprises' single-family credit guarantee portfolios; however, serious delinquency rates continued to decline for all product categories in the second quarter of 2012, as delinquent loans were resolved through loss mitigation activities or foreclosure, and new loans with stronger credit profiles were acquired.  Non-traditional and higher-risk mortgages, which account for a relatively small portion of the credit guarantee portfolios, continue to show substantially higher serious delinquency rates than traditional mortgages.

**Figure 2.2 Single-Family Serious Delinquency Rates**

| | Fannie Mae | | | | | | Freddie Mac | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4Q07 | 4Q08 | 4Q09 | 4Q10 | 4Q11 | 2Q12 | 4Q07 | 4Q08 | 4Q09 | 4Q10 | 4Q11 | 2Q12 | |
| **Product Type**[1] | | | | | | | | | | | | | [1] Loans with multiple product features may be in more than one category.  Refer to sources for Alt-A definition. |
| Alt-A | 2.2% | 7.0% | 15.6% | 13.9% | 12.4% | 11.8% | 1.9% | 5.6% | 12.3% | 12.2% | 11.9% | 11.7% | |
| Interest-Only | 2.0% | 8.4% | 20.2% | 17.9% | 15.3% | 14.5% | 2.0% | 7.6% | 17.6% | 18.4% | 17.6% | 17.1% | |
| **Credit Score** | | | | | | | | | | | | | [2] Represents loan-to-value ratio at origination, which is generally based on original unpaid principal balance divided by the appraised value at the time of acquisition of the loan. |
| <620 | 4.7% | 9.0% | 18.2% | 14.6% | 13.5% | 12.2% | 3.4% | 7.8% | 14.9% | 13.9% | 12.9% | 12.5% | |
| **Loan-to-Value Ratio**[2] | | | | | | | | | | | | | |
| >90 Percent | 3.0% | 6.3% | 13.1% | 10.0% | 8.1% | 6.5% | 1.9% | 4.8% | 9.1% | 7.8% | 6.7% | 5.8% | |
| **Risk-Layering** | | | | | | | | | | | | | |
| Credit score <620 & LTV >90 Percent[2] | 8.6% | 16.0% | 28.0% | 21.4% | 18.7% | 15.8% | 5.4% | 11.5% | 19.0% | 17.1% | 15.4% | 13.9% | |
| **Total Single-Family** | 1.0% | 2.4% | 5.4% | 4.5% | 3.9% | 3.5% | 0.7% | 1.8% | 4.0% | 3.8% | 3.6% | 3.5% | |

<u>Sources:</u>
Enterprises' Forms 10-K and 10-Q, credit supplements to SEC disclosures, and management reports.

Serious Delinquency - All loans in the process of foreclosure plus loans that are three or more payments delinquent (including loans in the process of bankruptcy).

7

### 2.3    Performance of Post-Conservatorship Business

- While not necessarily indicative of the ultimate performance, the improved credit characteristics of the new post-conservatorship business is reflected in substantially lower cumulative default rates for the 2009 and newer vintages compared to the years leading up to conservatorship.

## Figure 2.3 Cumulative Default Rate by Origination Year



Notes
[1] Defaults include loan liquidations other than through voluntary pay-off or repurchase by lenders and include loan foreclosures, preforeclosure sales, sales to third parties and deeds-in-lieu of foreclosure. Cumulative Default Rate is the total number of single-family conventional loans in the guarantee book of business originated in the identified year that have defaulted, divided by the total number of single-family conventional loans in Fannie Mae's guarantee book of business originated in the identified year.
[2] Rates are calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries, divided by the number of loans in Freddie Mac's single-family credit guarantee portfolio originated in the identified year.

### Fannie Mae[1]

| Vintage | Yr1Q4 | Yr 2Q4 |
|---|---|---|
| 2002 | 0.4 | 9.5 |
| 2003 | 0.4 | 7.1 |
| 2004 | 0.7 | 11.6 |
| 2005 | 0.7 | 14.0 |
| 2006 | 1.3 | 37.4 |
| 2007 | 3.0 | 78.9 |
| 2008 | 2.2 | 37.1 |
| 2009 | 0.1 | 4.3 |
| 2010 | 0.2 | 5.6 |
| 2011 | 0.3 | NA |

### Freddie Mac[2]

| Vintage | Yr1Q4 | Yr2Q4 |
|---|---|---|
| 2002 | 0.3 | 7.7 |
| 2003 | 0.2 | 3.7 |
| 2004 | 0.4 | 5.2 |
| 2005 | 0.2 | 6.3 |
| 2006 | 0.6 | 25.2 |
| 2007 | 2.3 | 63.4 |
| 2008 | 2.1 | 36.4 |
| 2009 | 0.1 | 4.0 |
| 2010 | 0.1 | 5.4 |
| 2011 | 0.2 | NA |

Source:
Enterprises' quarterly credit supplements.

Federal Housing Finance Agency

## 3. Capital

### 3.1 Capital Changes: January 1, 2008 – June 30, 2012

- At the end of 2007, the Enterprises had $71 billion of combined capital.  From the end of 2007 through the second quarter of 2012, the Enterprises' combined charges against capital have totaled $262 billion, requiring Treasury support of approximately $187 billion through draws under the Senior Preferred Stock Purchase Agreements.  The Single-Family Credit Guarantee segment has been the largest contributor to charges against capital, accounting for $213 billion, or 81 percent, of capital reduction to date.  Senior preferred dividends on Treasury draws accounted for $46 billion, or 17 percent, of capital reduction.

**Figure 3.1 Capital Changes: January 1, 2008 – June 30, 2012** *($ in billions)*

| | Fannie Mae | | Freddie Mac | | Combined | |
|---|---|---|---|---|---|---|
| Beginning Capital[1] | $44 | | $27 | | $71 | |
| Equity Issuance[2] | 7 | | 0 | | 7 | |
| Available Capital | $51 | | $27 | | $78 | |
| **Capital Change** | | | | | | |
| Single-Family Comprehensive Income (Loss)[3] | ($138) | 84% | ($75) | 77% | ($213) | 81% |
| Multifamily Comprehensive Income (Loss)[3,4] | (5) | 3% | 16 | -16% | 11 | -4% |
| Investments Comprehensive Income (Loss)[3,4] | 16 | -9% | (3) | 3% | 13 | -5% |
| Consolidation Accounting Adjustment | 3 | -2% | (12) | 12% | (8) | 3% |
| Other | (15) | 9% | (3) | 3% | (18) | 7% |
| Senior Preferred dividends | (26) | 16% | (20) | 21% | (46) | 17% |
| Total Capital Change[5] | ($165) | 100% | ($97) | 100% | ($262) | 100% |
| Capital surplus (deficit) | ($113) | | ($70) | | ($184) | |
| Treasury Senior Preferred draw | $116.1 | | $71.3 | | $187.5 | |

Notes
Totals may not sum due to rounding.
[1] Capital is defined as stockholders' equity.
[2] Fannie Mae's figure includes common and preferred stock issuance pre-conservatorship.
[3] Segment comprehensive income (loss) represents net income (loss) plus total other comprehensive income (loss) by segment.
[4] Freddie Mac includes net interest income on investments in multifamily loans, net interest income on commercial mortgage-backed securities, and non-interest rate risk-related unrealized gains (losses) on commercial mortgage-backed securities in Multifamily Comprehensive Income (Loss), while Fannie Mae includes these items in Investments comprehensive income.  Investments comprehensive income includes the impact of accounting changes for security impairments.
[5] Included in total capital change for both Enterprises are losses attributable to the writedown of low income housing tax credits (LIHTC) investments to zero in the fourth quarter of 2009.  The writedown of these LIHTC losses for Fannie Mae and Freddie Mac were $5 billion and $3 billion, respectively, and are included in Other.  The establishment of a deferred tax asset valuation allowance, which reduced capital by $21 billion for Fannie Mae and $14 billion for Freddie Mac in 2008, is also contributing to the total capital change (valuation allowance has been allocated across segments).

Sources:
Fannie Mae segment earnings per Fannie Mae SEC disclosures for the relevant time periods.
Freddie Mac's 2008 and 2009 comprehensive income (loss) by segment reflect revised methodology effective January 1, 2010.

Federal Housing Finance Agency

### 3.2   Capital Changes: Second Quarter 2012

- During the second quarter of 2012, positive contributions to capital at both Enterprises, particularly from the Single-Family Credit Guarantee and Investments segments, more than offset senior preferred dividends paid to the Treasury.  Both Enterprises ended the quarter with positive net worth, and as a result, neither Enterprise required a draw from the Treasury.

**Figure 3.2 Capital Changes: March 31, 2012 – June 30, 2012** *($ in billions)*

| | Fannie Mae | Freddie Mac | Combined |
|---|---|---|---|
| Available Capital[1] | $0 | $0 | $0 |
| **Capital Change** | | | |
| Single-Family Comprehensive Income (Loss)[2] | $4 | $0 | $5 |
| Multifamily Comprehensive Income (Loss)[2] | 0 | 0 | 1 |
| Investments Comprehensive Income (Loss)[2] | 2 | 2 | 4 |
| Other | (1) | (0) | (1) |
|    Capital increase (decrease) pre-dividends | $5 | $3 | $8 |
| Senior Preferred dividends | (3) | (2) | (5) |
|    Total Capital Change | $3 | $1 | $4 |
| Capital Surplus (Deficit) | $3 | $1 | $4 |
| Treasury Senior Preferred draw[3] | - | - | - |

<u>Sources:</u>
Fannie Mae and Freddie Mac SEC disclosures for the quarter ended June 30, 2012.

<u>Notes</u>
Totals may not sum due to rounding.
[1] Capital is defined  as stockholders' equity.  Available capital is defined  as beginning  capital plus Treasury draw related to prior quarter's deficit.
[2] Represents  net income (loss) plus total other comprehensive  income (loss) by segment.  Freddie Mac includes net interest income on investments in multifamily loans, net interest income on commercial mortgage-backed  securities, and non-interest rate risk-related  unrealized gains (losses) on commercial mortgage-backed  securities in Multifamily comprehensive  income (loss), while Fannie  Mae includes these items in Investments comprehensive  income (loss).
[3] Reflects requested Treasury  draws related to current quarter deficit, to be received  during the next quarter. Enterprises' draw requests are rounded  up to the nearest $1 million.

10

Federal Housing Finance Agency

Conservator's Report on the
Enterprises' Financial Performance
Second Quarter 2012

## 4. Single-Family Credit Guarantee Segment Results

### 4.1 Single-Family Credit Guarantee Segment Results

- Both Enterprises reported a significant decrease in the provision for credit losses in the first half of 2012. Fannie Mae generated income from the Single-Family Credit Guarantee segment for the first half of 2012. Provisions for credit losses decreased at both Enterprises driven by improvements in national home prices and REO disposition values, and the continued decrease in the seriously delinquent loan population.

**Figure 4.1 Single-Family Credit Guarantee Segment Results** *($ in billions)*

| | Fannie Mae | | | | | | Freddie Mac | | | | | | Combined 2008 - 2Q12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 | Total | 2008 | 2009 | 2010 | 2011 | YTD 2Q12 | Total | |
| Revenue[1] | $9 | $9 | $2 | $6 | $4 | $30 | $5 | $4 | $5 | $5 | $2 | $22 | $51 |
| (Provision) benefit for credit losses[2] | (26) | (50) | (25) | (26) | 1 | (126) | (16) | (29) | (19) | (12) | (3) | (79) | (205) |
| Foreclosed Property Expenses | (2) | (1) | (2) | (1) | (0) | (5) | (1) | (0) | (1) | (1) | (0) | (3) | (8) |
| Credit-related expenses | (28) | (51) | (26) | (27) | 1 | (131) | (17) | (29) | (19) | (13) | (3) | (82) | (213) |
| SOP 03-3 Losses[3] | (2) | (20) | (0) | (0) | (0) | (23) | (2) | (5) | (0) | (0) | (0) | (6) | (29) |
| Other expenses[4] | (2) | (3) | (2) | (3) | (1) | (11) | (1) | (1) | (2) | (2) | (1) | (7) | (18) |
| Pre-tax income (loss) | (22) | (65) | (27) | (24) | 3 | (135) | (15) | (31) | (17) | (10) | (1) | (74) | (209) |
| (Provision) benefit for taxes | (5) | 1 | 0 | 0 | 0 | (3) | (5) | 4 | 1 | (0) | (0) | (1) | (4) |
| Net income (loss) | ($27) | ($64) | ($27) | ($24) | $3 | ($138) | ($20) | ($27) | ($16) | ($10) | ($1) | ($75) | ($214) |
| Other Comprehensive Income | - | 0 | 0 | - | - | 0 | - | 0 | 0 | 0 | (0) | 0 | 0 |
| Comprehensive Income (Loss)[5] | ($27) | ($64) | ($27) | ($24) | $3 | ($138) | ($20) | ($27) | ($16) | ($10) | ($1) | ($75) | ($213) |

Sources:
Fannie Mae segment earnings per Fannie Mae SEC disclosures for the relevant time periods. Effective in the first quarter 2010, Fannie Mae changed the presentation of segment financial information; prior periods were not revised. Freddie Mac segment comprehensive income (loss) for 2008 and 2009 reflect revised methodology effective January 1, 2010. Enterprise segment comprehensive income (loss) since 2010 is not comparable with prior periods due to the adoption of accounting standards for consolidations, effective January 1, 2010.

Notes
Totals may not sum due to rounding.
[1] Consists of guarantee fee income, trust management income, net interest income, and other income. Guarantee fee revenue of $3.9 billion for Fannie Mae year-to-date was offset by net interest expense of $0.6 billion primarily related to interest income not recognized for non-accrual loans.
[2] The provision for credit losses is the recognition of estimated incurred losses and increases the loan loss reserve. Fannie Mae's figures have been adjusted to exclude losses on credit-impaired loans acquired from MBS trusts.
[3] Losses on credit-impaired loans acquired from MBS/PC Trusts.
[4] Consists of investment gains (losses), fair value losses (Fannie Mae), administrative expenses, other expenses, and at Freddie Mac, segment adjustments.
[5] Represents segment earnings (loss) and, for periods after 2008, total comprehensive income (loss), net of taxes, for the Single-Family Credit Guarantee segment.