The SPSPAs, which have no expiration date, provide for the Department to disburse funds to the GSEs if, at the end of any quarter, the FHFA determines that the liabilities of either GSE exceed its assets.  The maximum amount available to each GSE under this agreement was originally $100.0 billion in fiscal year 2008, raised to $200.0 billion in fiscal year 2009, and replaced in fiscal year 2010 with a formulaic cap.  This formulaic cap allows for continued draws for a three-year period ending December 2012 at amounts that will automatically adjust upwards quarterly by the cumulative amount of any net deficits realized by either GSE and downward by the GSE's positive net worth, if any, as of December 31, 2012, but not below $200.0 billion, and will become fixed at the end of the three-year period.  At the conclusion of this period, the remaining commitment will then be fully available to be drawn per the terms of the agreements (referred to hereafter as the "Adjusted Caps").  Draws against the funding commitment of the SPSPAs do not result in the issuance of additional shares of senior preferred stock; instead, the liquidation preference of the initial 1,000,000 shares is increased by the amount of the draw.

Actual payments to the GSEs for fiscal years ended September 30, 2012 and 2011 were $18.5 billion and $20.8 billion, respectively.  Additionally, $9.0 billion and $316.2 billion were accrued as a contingent liability as of September 30, 2012 and 2011, respectively.  This accrued contingent liability is based on the projected future draws under the SPSPAs. It is undiscounted and does not take into account any of the offsetting dividends which may be received, as the dividends are owed directly to the General Fund.

### ACCOUNTING TREATMENT

*Entity Transactions* — The estimated contingent liability to the GSEs accrued pursuant to the SPSPAs is funded through the Department's direct appropriations.  Therefore, they are reflected at their gross amount as "entity" costs on the Department's Consolidated Statements of Net Cost and in the line item, "Cumulative Results of Operations" on the Department's Consolidated Balance Sheets, without considering the increase in senior preferred stock liquidation preference/fair value adjustments, future dividend receipts from the GSEs, or any PCFs.

*Non-Entity Transactions* — As actual payments are made to the GSEs, they result in increases to the U.S. Government's liquidation preference in the GSEs' senior preferred stock, and thus represent General Fund exchange revenue reported on the Department's Consolidated Statements of Net Cost as "GSEs Non-Entity Cost (Revenue)."  The associated valuation losses and dividends are General Fund-related costs and revenues that are likewise reported as "GSEs Non-Entity Cost (Revenue)."

### INVESTMENTS IN GSEs

As of September 30, 2012 and 2011, the Department's investments in the GSEs consisted of the following (in millions):

| GSEs Investments | Gross Investments As of 9/30/12 | | Cumulative Valuation Loss | | 9/30/12 Fair Value | |
|---|---|---|---|---|---|---|
| Fannie Mae Senior Preferred Stock | $ | 116,989 | $ | (51,331) | $ | 65,658 |
| Freddie Mac Senior Preferred Stock | | 72,160 | | (30,224) | | 41,936 |
| Fannie Mae Warrants Common Stock | | 3,104 | | (1,956) | | 1,148 |
| Freddie Mac Warrants Common Stock | | 2,264 | | (1,664) | | 600 |
| **Total GSEs Investments** | $ | **194,517** | $ | **(85,175)** | $ | **109,342** |

U.S. Department of the Treasury  |  **Fiscal Year 2012**

| GSEs Investments | | Gross Investments As of 9/30/11 | | Cumulative Valuation Loss | | 9/30/11 Fair Value |
|---|---|---|---|---|---|---|
| Fannie Mae Senior Preferred Stock | $ | 104,627 | $ | (26,718) | $ | 77,909 |
| Freddie Mac Senior Preferred Stock | | 66,004 | | (12,380) | | 53,624 |
| Fannie Mae Warrants Common Stock | | 3,104 | | (2,137) | | 967 |
| Freddie Mac Warrants Common Stock | | 2,264 | | (1,721) | | 543 |
| **Total GSEs Investments** | $ | 175,999 | $ | (42,956) | $ | 133,043 |

### SENIOR PREFERRED STOCK AND WARRANTS FOR COMMON STOCK

In determining the fair value of the senior preferred stock and warrants for common stock, the Department relied on the GSEs' public filings and press releases concerning its financial statements, projection forecasts, monthly summaries, quarterly credit supplements, independent research regarding high-yield bond and preferred stock trading, independent research regarding the GSEs' common stock trading, discussions with the GSE's management, and other information pertinent to the fair valuations.  Because of the nature of the instruments, which are not publicly traded and for which there is no comparable trading information available, the fair valuations rely on significant unobservable inputs that reflect assumptions about the expectations that market participants would use in pricing.

The fair value of the senior preferred stock considers the amount of forecasted dividend payments.  The fair valuations assume that a hypothetical buyer would acquire the discounted dividend stream as of the transaction date.  The significant decline in the fair value of the senior preferred stock at September 30, 2012 compared to 2011 is primarily due to a decrease in expected dividend payments and an increase in the discount rate used in the current year's valuation to reflect more of the variable nature of the future cash flows anticipated as a result of the amended SPSPAs compared to the prior fiscal year.

The fair value of the warrants are impacted by the nominal exercise price and the large number of potential exercise shares, the market trading of the common stock that underlies the warrants as of September 30, the principal market, and the market participants.  Other discounting factors are the holding period risk related directly to the amount of time that it will take to sell the exercised shares without depressing the market and the other activity under the SPSPA.

### CONTINGENT LIABILITIES TO GSES

As part of the fair valuation exercise, the Department prepared a series of long-range forecasts through 2025 to determine what the implied amount of the total contingent liability to the GSEs under the SPSPAs would be as of September 30.  Since future payments under the SPSPAs are deemed to be probable, the Department estimated a contingent liability of $9.0 billion as of September 30, 2012.  This estimate reflects the projected equity deficits of the GSEs stemming from credit losses and contractual dividend requirements until December 31, 2012.  The estimated contingent liability as of September 30, 2012 included several case scenarios which resulted in total SPSPA estimates ranging from $3.5 billion (based on an "optimistic" case scenario) to $22.4 billion (based on an "extreme" case scenario).  The $9.0 billion contingent liability reported as of September 30, 2012 reflects the Department's best estimate.  This compares to the $316.2 billion contingent liability reported as of September 30, 2011 which was based on a range of $309.6 billion to $376.1 billion.  At September 30, 2012, the maximum remaining potential commitment to the GSEs for the remaining life of the SPSPAs under the Adjusted Caps was estimated at $282.3 billion, which was based upon case scenario estimates ranging from $274.0 billion to $291.5 billion.  The recorded contingent liability of $316.2 billion at September 30, 2011 constituted the maximum commitment payable under the Adjusted Caps, minus actual payments made through the end of that fiscal year.  Such accruals are adjusted as new information develops or circumstances change.

FHFA 4074

Based on the annual valuation of the Department's estimated future contingent liability, the Department reduced its estimated liability by $288.7 billion and $22.9 billion at the end of fiscal years 2012 and 2011, respectively, via a reduction in expense. The significant reduction in this estimated liability at September 30, 2012 compared to 2011 is primarily due to a forecasted reduction in the amount of future draws needed by the GSEs which, in part, reflects lower quarterly dividend payments anticipated as a result of the amended provisions of the SPSPAs. The Department reported this expense reduction as a reduction to entity costs within the Economic Program section of the Department's Consolidated Statements of Net Cost.

In determining the contingent liability estimates, the Department relied on the GSEs' public filings and press releases concerning its audited and unaudited financial statements, monthly summaries, quarterly credit supplements, September 2012 forecast for the years 2012 through 2015 (as provided by FHFA), and discussions with the GSEs' forecasting team and FHFA. The forecasted draws under the SPSPAs after December 31, 2015 were based on general guidance provided by the GSE managers as to the key assumptions that were used for subsequent periods. Absent longer-term financial forecasts from the GSEs and FHFA, the forecasts after 2015 generally assume similar operating assumptions on the guarantee business and assume a gradual wind-down of the retained portfolios (and corresponding net interest income) through 2025, as directed under the amended SPSPAs for each GSE to reduce the maximum balance of its retained mortgage portfolio by 15.0 percent per annum beginning December 31, 2013 (a change from the 10.0 percent per annum prior to the amended SPSPAs). The maximum balance of the GSEs' retained mortgage portfolio is initially set at $650 billion as of December 31, 2012, and is required under the amended SPSPAs to be reduced to $250.0 billion by December 31, 2018. The Department also relied upon economic and demographic data from the 2012 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds and the FHFA's House Price Index.

As of September 30, 2012 and 2011, the summarized unaudited aggregated financial condition of the GSEs was as follows (in millions):

| | 2012 | | 2011 |
|---|---|---|---|
| Combined Assets | | | |
| Investment Securities | $ 338,974 | $ | 422,741 |
| Mortgage Loans | 4,641,231 | | 4,715,057 |
| Other | 262,548 | | 248,415 |
| Total Combined Assets | 5,242,753 | | 5,386,213 |
| Combined Liabilities | | | |
| Long-Term Debt | 4,963,297 | | 4,974,759 |
| Other | 272,137 | | 425,236 |
| Total Combined Liabilities | 5,235,434 | | 5,399,995 |
| Combined Net Equity (Deficit) | $ 7,319 | $ | (13,782) |
| **For the Nine Months Ended September 30** | | | |
| Combined Net Interest Income | $ 29,097 | $ | 28,832 |
| Combined Provisions for Loan Losses | (3,628) | | (28,672) |
| Combined Net Interest Income After Provision for Loan Losses | $ 25,469 | $ | 160 |
| Combined Regulatory Capital - Minimum Capital Deficit as of September 30 | $ (231,949) | $ | (231,531) |

*Excludes financial guarantees not consolidated on GSE balance sheets.*

The above information was taken directly from the quarterly reports filed with the SEC, which are publicly available on the SEC's website (www.SEC.gov) and also the GSE investor relations websites.

Both GSEs reported significantly lower early delinquencies on additions to their credit books on loans originated after 2008. This favorable early delinquency experience is an improvement compared with the loans originated in 2005

through 2008.  Incremental draws under the SPSPAs through December 31, 2012 are projected in order to meet the 10.0 percent per annum dividend payment requirement.  Under the amended SPSPAs, both GSEs may require additional draws should they report a net deficit in any quarter commencing with the quarter ending March 31, 2013.

Under the amended SPSPAs, the Department's forecasts indicate that each GSE will not fully utilize the amount of funding available under the Adjusted Cap.  The Department's forecasts of future liquidity payments may differ from actual experience.  Future actual liquidity payment levels will depend on numerous factors that are difficult to predict, including, but not limited to, changes in government policy with respect to the GSEs, the business cycle, inflation, home prices, unemployment rates, interest rates, changes in housing preferences, home financing alternatives, availability of debt financing, market rates of guarantee fees, outcomes of loan refinancings and modifications, new housing programs, and other applicable factors.

### GSEs Non-Entity Cost (Revenue)

For the fiscal years ended September 30, 2012 and 2011, GSEs Non-Entity Cost (Revenue) consisted of the following (in millions):

| Summary of GSEs Non-Entity Cost (Revenue) | | 2012 | | 2011 |
|---|---|---|---|---|
| General Fund Revenue from Increase in Liquidity Preference of GSEs Preferred Stock | $ | **(18,519)** | $ | (20,766) |
| Fair Value (Gain)/Loss on GSEs Warrants/Preferred Stock | | **42,220** | | (3,061) |
| GSEs Preferred Stock Dividends | | **(18,379)** | | (15,588) |
| **Total GSEs Non-Entity Cost (Revenue)** | $ | **5,322** | $ | (39,415) |

### Regulatory Environment

Pursuant to a provision within the Dodd Frank Act, the Secretary conducted a study and developed recommendations regarding the options for ending the conservatorship.  In February 2011, the President delivered to Congress a report from the Secretary that provided recommendations regarding the options for ending the conservatorship and plans to wind down the GSEs.  To date, Congress has not approved a plan to address the future of the GSEs, thus the GSEs continue to operate under the direction of their conservator, the FHFA, who's stated planned objectives are to build a revitalized infrastructure for the secondary mortgage market and a continued gradual contraction of the GSEs presence in the secondary mortgage market.

In December 2011, Congress passed the Temporary Payroll Tax Cut Continuation Act of 2011 (TPTCCA), which was funded by an increase of ten basis points in the GSEs' guarantee fees beginning April 1, 2012, and is effective through October 1, 2021.  The increased fees are to be remitted to the Department and not retained by the GSEs.  On September 28, 2012, the GSEs remitted to the Department an amount of $35 million as the first payment of these increased fees covering the period of April 1, 2012 through June 30, 2012.  This increase in guarantee fees did not affect the profitability of the GSEs during that time period.

# Tab 70

Case 1:13-mc-01288-RCL   Document 7-18   Filed 12/17/13   Page 6 of 31



## CREDIT FOCUS

# Fannie Mae and Freddie Mac:
# Government Support Underpins Aaa Ratings

## RATINGS

**Fannie Mae**

| | | |
|---|---|---|
| BFSR | E+ | Stable |
| Issuer rating | Aaa | Negative |
| Senior unsecured | Aaa | Negative |
| Subordinate | Aa2 | Negative |
| Pref. stock | Ca (hyb) | Stable |
| Pref. stock non-cumulative | Ca (hyb) | Stable |
| Other short term | Prime-1 | |

**Freddie Mac**

| | | |
|---|---|---|
| BFSR | E+ | Stable |
| Issuer rating | Aaa | Negative |
| Senior unsecured | Aaa | Negative |
| Subordinate | Aa2 | Negative |
| Pref. stock | Ca (hyb) | Stable |
| Pref. stock non-cumulative | Ca (hyb) | Stable |
| Other short term | Prime-1 | |

## KEY INDICATORS

**Fannie Mae**

| | YTD Sept. 30 2012 | Dec 31 2011 |
|---|---|---|
| ROAA | 0.40% | -0.52% |
| Serious delinquency rate | 3.41% | 3.91% |
| Net income (millions) | $9,650 | $(16,855) |
| Total assets (billions) | $3,226 | $3,211 |

*Source: Company reports*

**Freddie Mac**

| | YTD Sept. 30 2012 | Dec 31 2011 |
|---|---|---|
| ROAA | 0.42% | -0.24% |
| Serious delinquency rate | 3.37% | 3.58% |
| Net income (millions) | $6,525 | $(5,266) |
| Total assets (billions) | $2,017 | $2,147 |

*Source: Company reports*

Analyst Contacts:

NEW YORK                                +1.212.553.1653

Brian L. Harris                         +1.212.553.4705
*Senior Vice President*
brian.harris@moodys.com

>>contacts continued on the last page

## Summary

**Despite a lack of an explicit (formal) guarantee there is very strong government support underpinning the Aaa senior ratings of <u>Fannie Mae</u> and <u>Freddie Mac.</u>** We believe that the US government will stand behind obligations of the two largest government-sponsored enterprises (GSEs), leaving their bondholders as protected as creditors of the US government itself (effective credit substitution). Accordingly, the senior ratings are aligned with the Aaa <u>US government</u> rating. The negative outlook on the debt ratings of Fannie Mae and Freddie Mac are also aligned with the US government rating outlook.

**Our support assumptions reflect the critical importance of Fannie Mae and Freddie Mac to the US mortgage market.** Both GSEs combined owned or guaranteed 79% of the estimated $1.2 trillion of US residential mortgages originated during the first nine months of 2012. This share demonstrates their role in anchoring this very large market, particularly in periods of prolonged uncertainty. To fulfill their role, the GSEs depend on government support.

**The amended Senior Preferred Stock Agreement (Capital Agreement) allows the two GSEs to maintain operations.** In August 2012, the US Treasury amended its agreement with Fannie Mae and Freddie Mac, reducing the dividends the GSEs must pay on preferred stock held by the Treasury. The amendment eliminates the previously-high risk that the committed capital support for both GSEs could prove insufficient, and it also confirmed our support expectations.

**Reform debate adds uncertainty, but we believe existing creditors will remain supported.** Given the wide range of proposals and a general lack of progress on reforming the GSEs, their future size and structure is uncertain, but under any plausible scenario, government support for existing creditors will remain strong. A key barrier to an abrupt removal of support is the widely-shared political commitment to provide stability to the US mortgage market and promote access to mortgage credit. Furthermore, the cost of supporting the GSEs is relatively modest compared with the economic cost of a disorderly exit from the housing market by these companies. Even if the government was to reduce its support in the future, we would expect it to protect existing creditors (grandfathering). For example, earlier in 1996, Congress passed legislation splitting Sallie Mae into two entities: a GSE and a non-GSE. Sallie Mae, the GSE was to be wound down by September 2006. The legislation enacted included government oversight of the wind-down and ultimately all creditors were fully paid.

### Strong government support underpins the Aaa ratings of Fannie Mae and Freddie Mac

The two housing GSEs' Aaa senior unsecured ratings reflect our view that bondholders benefit from effective credit substitution with the US government. That is, senior creditors of Fannie Mae or Freddie Mac face similar risks as creditors of the US government. The Aa2 subordinated debt ratings of the two GSEs are also based on very high government support assumptions. We believe current bondholders will be protected from losses, irrespective of the outcome of housing GSE reform, including a possible winding-down of these entities.

Our support assumptions are based mainly on the following factors:

» The role of the GSEs in providing an anchor and backstop for the US mortgage market, given the painful economic impact of a disruption in this market.

» The importance of implicit government support for the US model of GSEs, under which privately-owned institutions contribute to public policy goals by accessing market funds at very low cost.

» The limited cost to the government of supporting Fannie Mae and Freddie Mac relative to the adverse effects of not doing so.

» The long demonstrated history of support (see Appendix 2) for GSEs including the $187[1] billion of capital provided to the companies through the 3rd quarter of 2012, as well as the $275 billion of additional capital that the US Treasury committed to provide the GSEs.

» Sallie Mae is the one example in which a GSE has been wound down (see page 9).  The resolution of Sallie Mae included legislation, oversight by the US government and protections for creditors. Ultimately all bondholders were paid in full and on time. Of course, the US government could choose to wind-down Fannie Mae and Freddie Mac without protecting bondholders.  However, the economic consequences of that would be much more significant than the consequences of not supporting Sallie Mae's bondholders.

#### Housing GSEs play important role for US mortgage market

U.S. Congress chartered Fannie Mae in 1938 and Freddie Mac in 1970 to provide stability and on-going assistance to the secondary market for residential mortgages, and to promote access to mortgage credit and home ownership. The two GSEs pursue their public policy mission by purchasing single- and multi-family residential mortgages from lenders in the primary mortgage market, as well as by guaranteeing the timely payment of principal and interest on mortgage-related securities.

Both GSEs combined owned or guaranteed 79% of the total $1.2 trillion of US residential mortgages issued during 2012 (Exhibit 1 below). The sheer size of the two GSEs also underpins their systemic importance, with Fannie Mae reporting total on-balance sheet assets of $3.2 trillion, while Freddie Mac reported $2.0 trillion.

---

[1]   The US Treasury has provided $116 billion of capital to Fannie Mae and $71 billion to Freddie Mac through the third quarter of 2012.  In addition, the US Treasury is committed to provide an additional $125 billion of capital to Fannie Mae and $149 billion of capital to Freddie Mac.  The US Treasury amounts will be reduced by any positive net worth as of year-end 2012.

FHFA 4078

EXHIBIT 1
**Fannie Mae and Freddie Mac Mortgage Origination Market Share**



Source: Company reports, Mortgage Bankers Association

The GSEs' current share of the total mortgage market is far above the 40%-50% range typical before the period of prolonged financial turmoil accelerated in 2008. The recent increase indicates that Fannie Mae and Freddie Mac perform an important role as anchors and backstop of the US mortgage market, particularly in times of elevated uncertainty.

As long as the housing GSEs' market share remains substantial, the US government has little choice but to support the housing GSEs and by extension current bondholders, as needed. Not doing so would almost certainly lead to market volatility and higher costs for US residential mortgages, which would likely have a profound negative impact on housing prices, and therefore household wealth and the broader economy.

## Failure to support Fannie Mae and Freddie Mac would adversely affect other GSEs

Even if the size and importance of Fannie Mae and Freddie Mac declines over time (a plausible, if difficult scenario, as discussed below), government support would still be very strong, in our view. The reason is that a failure to support Fannie Mae and Freddie Mac would adversely affect the ability to obtain low-cost funding of other GSEs, for example the Federal Home Loan Banks and Federal Farm Credit Banks.

In the US, institutions that are neither wholly government-owned nor explicitly-guaranteed, i.e. GSEs, contribute to public-policy objectives like supporting the housing, agriculture, and banking sectors. The viability of this model depends on the ability of these institutions to access low-cost market funds, which would be imperiled, were the government to not support even a smaller Fannie Mae and/or Freddie Mac, if needed.

## Fannie Mae's and Freddie Mac's support needs are manageable for government

The US government has not only strong willingness, but also the ability to support the housing GSEs. As of September 30, 2012, the US Treasury injected $116.1 billion of capital into Fannie Mae and $71.3 billion into Freddie Mac (with additional capital committed if needed, as discussed below). These amounts are substantial in absolute terms, but manageable in comparison to the approximate US government expenditures of $3.5 trillion in 2012. The cost of support is also far lower than the likely adverse economic effects of a failure to support, in our view.

FHFA 4079

We believe the cost of supporting the GSEs is unlikely to increase materially going forward, since we expect the housing GSEs will be profitable on a long-term, sustainable basis and thus not require additional capital (provided, US housing prices do not fall materially lower). They have also re-gained low-cost, stable access to market funds.

## Amended Capital Agreement protects GSE creditors

Consistent with our support expectations, the US government has provided substantial capital and other assistance to both Fannie Mae and Freddie Mac since 2008. In September 2008, their regulator, the Federal Housing Finance Authority (FHFA), placed both firms into conservatorship. At the time, both faced a depletion of their capital from outsized losses on their mortgage exposures, given the US housing market downturn and subprime crisis.

The US Treasury's commitment to prevent a negative net worth of the housing GSEs by covering their capital shortfall prevented their insolvency, thereby protecting creditors. The capital agreement was amended three times subsequently, each time to the benefit of bondholders[2].

The US Treasury also supported the GSEs by establishing a secured lending facility as a liquidity back-stop, shortly after placing Fannie Mae and Freddie Mac into conservatorship. The facility expired unused at year-end 2009. In addition, the GSEs are benefiting from the Federal Reserve's quantitative easing.  The Federal Reserve's purchasing of MBS is keeping mortgage rates low thereby allowing more homeowners to more easily meet their obligations or refinance.  The refinanced mortgages have lower monthly payments which strengthens the financial wherewithal of the borrowers and lowers the GSEs' credit losses.

These recent actions are consistent with our view that the government will stand behind the housing GSEs' obligations under any plausible scenario, despite there not being an explicit guarantee.

The substantial, ongoing support of Fannie Mae and Freddie Mac is not unprecedented. To the contrary, it is consistent with the US government's history of supporting GSEs, when needed (see Appendix 1 for detail), including regulatory forbearance for Fannie Mae in the 1980s, debt guarantees for Farm Credit Banks in the 1980s, as well as the orderly wind-down of the GSE arm of Sallie Mae in the late 1990s.

## GSEs' dividend obligations to US Treasury are limited to their profits

Each of the three amendments to the Capital Agreement (including the latest, agreed in August 2012) has increased protections for bondholders. We believe this amendment further formalizes the connection between the housing GSEs and the US government. The US government will receive all of the housing GSEs' earnings, w                              significant commitment to inject additional capital if needed.

Effective January 1, 2013, the US Treasury's amended Senior Preferred Stock Purchase Agreement (Capital Agreement) with Fannie Mae and Freddie Mac goes into effect. The most significant provision of the amendment is the reduction of dividends to be paid by the housing GSEs. The amendment reduces these dividends to any positive net worth above a pre-determined nominal capital

---

[2]  The US Treasury three times amended the Capital Agreements with Fannie Mae and Freddie Mac.  The first amendment in May 2009 increased the amount of capital available to $200 billion each from $100 billion each.  The second amendment in December 2009 enabled Fannie Mae and Freddie Mac to request an unlimited amount of capital though December 31, 2012.  After December 31, 2012, each company will have access to $200 billion of preferred capital, less any amount used through December 31, 2009 or $125 billion for Fannie Mae and $149 billion for Freddie Mac.

FHFA 4080

reserve[3]. By limiting dividends to the amount of earnings each housing GSE generates, the amendment reduces the risk of the housing GSEs depleting the capital commitment from the US Treasury at a time when that commitment becomes limited to about $275[4] billion for the combined entities.

Prior to this amendment, the housing GSE's dividend obligation to the US Treasury was a fixed 10%. As of September 30, 2012, Fannie Mae and Freddie Mac senior preferred stock outstanding was $117.1 billion and $72.3 billion, respectively, resulting in annual dividend payments of $11.7 billion for Fannie Mae and $7.2 billion for Freddie Mac.

### Amendment averts path to insolvency

Before the recent amendment we expected Fannie Mae to run out of contingent capital sometime around 2023 and Freddie Mac a couple of years later. We had projected that in 2023, Fannie Mae would have $233 billion of Senior Preferred Stock outstanding and be obligated to pay the US Treasury more than $23 billion of dividends annually, while Freddie Mac would have just over $140 billion of Senior Preferred Stock outstanding and owe the US Treasury just over $14 billion annually. Neither company has the earnings potential to service a dividend of this magnitude.

As a result, the companies would have had to borrow from the US Treasury in order to pay the dividend, further increasing the amount of preferred stock outstanding along with future dividend payments – creating a negative feedback cycle. Had this continued, all $275 billion of Senior Preferred Stock would have been drawn a few years later. Our projections of escalating dividend obligations prior to the amendment are shown in Exhibit 2 (Fannie Mae and Freddie Mac before amendment - green and blue bars).

Under the amended agreement, dividend payments will equal each company's net income, as shown in Exhibit 2 (Fannie Mae and Freddie Mac after Amendment – orange and gold bars). Therefore, the dividend will not deplete capital, averting the path to insolvency on which the housing GSEs were headed previously.

---

[3]   The capital reserve for each company in 2013 will be $3.0 billion and will decline by $600 million per annum.  That is, each of the GSE's capital reserve will be $3.0 billion, $2.4 billion, $1.8 billion, $1.2 billion, $600 million and $0 in 2013, 2014, 2015, 2016, 2017, and 2018, respectively.

[4]   As of January 1, 2013, Fannie Mae and Freddie Mac will have $125 billion and $150 billion, respectively of contingent capital available.

FHFA 4081

MOODY'S INVESTORS SERVICE

FINANCE COMPANIES

EXHIBIT 2
**Projected Earnings and Dividend Obligations of Fannie Mae and Freddie Mac ($ billions)**



*Source: Moody's estimates*

**Assuming sustained profitability, the reduced dividends could allow Fannie Mae and Freddie Mac to operate indefinitely**

We expect that both GSEs will be profitable on a long-term, sustainable basis going forward (provided US house prices do not fall materially further). This outlook, together with the amended Capital Agreement, means that that the likelihood of either Fannie Mae or Freddie Mac requiring additional capital is low. Each company also will have sufficient contingent capital available from the US Treasury, allowing them to maintain operations indefinitely.

Over the next several years, we expect Fannie Mae to charge-off about $90 billion and Freddie Mac to charge-off $61 billion to recognize losses embedded in their current single-family guarantee portfolios. This compares with an allowance for mortgage losses of $63 billion for Fannie Mae and $33 billion for Freddie Mac as of September 30, 2012. Over that same period of time, we expect Fannie Mae and Freddie Mac to earn $54 billion and $28 billion in pre-tax, income, respectively. Therefore, the housing GSEs' profitability will meet or exceed the shortfall between charge-offs and their allowance.

FHFA 4082

### GSE reform debate adds uncertainty, but existing creditors will be supported

The many, diverse proposals to reform Fannie Mae and Freddie Mac that are currently being debated add uncertainty to the outlook for their future size, systemic importance and structure. We will continue to monitor these proposals and assess their credit implications. While the timing and nature of reform remains unclear, we firmly believe that any reform, including a complete wind-down, will protect current creditors.

In our view, even in a wind-down scenario, new creditors will still benefit from very strong government support, at least up to a well-defined transition date. This expectation reflects the systemic relevance of these institutions, as described above, and is reflected in our Aaa senior ratings. Senior government officials have clearly stated that the US government will continue to support these institutions and ensure that the GSEs have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations.

We recognize the clear intent of many relevant parties, including Fannie Mae's and Freddie Mac's regulator, the FHFA, to reduce the size of the two housing GSEs. The goal is to decrease Fannie Mae's and Freddie Mac's importance to the US mortgage market, which would reduce the need for government support. Also, the cost of supporting smaller GSEs would likely be lower.

Ultimately, we believe it likely that Fannie Mae and Freddie Mac will become smaller; they may even be wound down in their current form. However, we believe any reform will take many years to implement. It will be gradual rather than abrupt, well-specified rather than undefined, and, importantly, existing creditors will be supported. The key drivers of for our expectations are:

» A broad political consensus supports the public policy mission of the housing GSEs, namely to support the stability of the US mortgage market and promote access to mortgage credit and home ownership

» There is no near-term institutional alternative to the GSEs to pursue the aforementioned goals

» There is no catalyst for near-term reform now that the amended capital agreement is in place

### Intent to reduce GSEs' size is clear, but progress will be slow

The FHFA states its intent to reduce these entities' size in its strategic plan, but also mentions the challenges to achieving this: *"Fannie Mae and Freddie Mac have purchased or guaranteed approximately three of every four mortgages originated in the country since entering into conservatorship in September 2008. The challenge for FHFA is to reduce the Enterprises' position in the marketplace in a safe and sound manner without comparable private-sector players. FHFA will take steps to establish a path for shifting mortgage credit risk from the Enterprises to the private sector and gradually reduce the Enterprises' proportion of the market[5]."*

Even if Fannie Mae and Freddie Mac completely ceased purchasing and guaranteeing new mortgages, it would take many years for their existing portfolios to decline. As of September 30, 2012, 63% and 60% of Fannie Mae's and Freddie Mac's guarantee portfolio was originated on or after 2009.  This leaves many years to maturity, given that most US mortgages have 30-year terms at origination. And while historically a US mortgage has prepaid at approximately 15% per year, it is likely that prepayment rates will be historically low in coming years given low current mortgage rates and the prospects for higher rates in the future.

---

[5]   Strategic Plan, Federal Housing Finance Agency, Fiscal Years 2013 – 2017, October 9, 2012

FHFA 4083

## There is no catalyst for change

Prior to the above-discussed capital amendment in August 2012, the prospect of capital depletion appeared to be a key catalyst for housing GSE reform. However, the amendment effectively eliminates that prospect, removing it as a possible catalyst of reform.

Furthermore, the cost of support will naturally decrease, if and as the housing GSEs become smaller, reducing the pressure for reform. We also expect the cost of future support to be lower as the risk profile of the companies continues to strengthen as FHFA is committed to maintaining strict underwriting standards. At the same time, increasing guarantee fees will elevate the earnings buffer available to absorb credit losses.

## Substantial barriers to reform exist

The primary barrier to any abrupt, radical housing GSE reform is the broad political consensus to support a functional market that provides mortgages at a reasonable cost to residential home borrowers. This goal conflicts with the goal to remove as much government support from the mortgage market as possible. Agreeing on how to manage these conflicting objectives is proving to be very contentious.

In addition, there are few institutional alternatives to the role currently played by the housing GSEs in the US mortgage market. Such alternatives include banks, covered bonds, and securitization. They all have drawbacks, and none can fully replace the role played today by the housing GSEs. The fragility of the current recovery of the mortgage market makes any transformative change even more difficult. Below, we briefly discuss each institutional alternative:

» **Banks**. Banks currently hold approximately $1.3 trillion[6] out of a total of $4.4 trillion[7] of agency mortgage-backed securities (MBS) in their investment portfolio, most of which are 30-year fixed rate. MBS are widely held by financial institutions because of the presumption of support from the US government. If banks were to directly fund the mortgages that are currently financed in Agency MBS, this would significantly increase their risk weighted assets and capital requirements. If they just replaced the current $1.4 trillion in Agency MBS that they have on their balance sheet, this would translate into $380 billion of risk-weighted assets and require over $30 billion of additional capital. If the banks were required to replace the entire $4.4 trillion in Agency MBS with on-balance sheet mortgages, this would require over $145 billion in incremental capital, which, unless the return on mortgages was significantly higher, would be prohibitively expensive.

» **Covered bonds**. A covered bond market is also an alternative to the housing GSEs. However, covered bonds are strictly a financing tool and do not change the interest rate or credit risk exposure of the financial institution holding the mortgages backing the covered bonds. This is in contrast to the reduction of credit risk for a financial institution that securitizes mortgages with the housing GSEs or the reduction of interest rate risk that then sells the GSE-guaranteed MBS.

» **Securitization**. The securitization market is an alternative to the housing GSEs. Securitizations transfer interest rate risk and, depending on the structure, securitizations transfer some amount of credit risk. However, current volumes are low as a result of unfavorable economics involved in securitizing mortgages rather than selling them into agency mortgage pools, and on-going legal

---

[6]   FDIC Statistics as of September 30, 2012.

[7]   Fannie Mae and Freddie Mac have $2.7 trillion and $1.6 trillion, respectively of MBS outstanding as of September 30, 2012.

FHFA 4084

and regulatory uncertainty around the mortgage market. At its peak, securitizations accounted for about half of the mortgage issuance in the US and, given the post-crisis disruption in this market, it is difficult to envision volumes reaching anywhere near that peak in the foreseeable future.

### Sallie Mae provides example of assisted wind-down

The aforementioned barriers make any far-reaching reform unlikely in the near term. But it is imaginable that the housing GSEs could be wound down in the long term. Even then, we believe that creditors will be supported. This expectation is consistent with the so-far only example of winding down a GSE, that of the Student Loan Marketing Association (Sallie Mae).

In 1996, the Student Loan Marketing Association Reorganization Act (the Privatization Act) was passed to privatize Sallie Mae. The company was split into a GSE part and a non-GSE part. The targeted completion of the wind-down was September 2006. The non-GSE part was allowed to operate without previous business restrictions. Subsequent to the Privatization Act, the GSE continued to purchase student loans funded with new unsecured debt maturing prior to September 2006.

With respect to debt maturing beyond September 2006, high-quality assets such as cash or U.S. government obligations were accumulated and placed in a trust to defease such debt. The wind down of the GSE was overseen by the US Secretary of the Treasury. All obligations were paid in full and on time.

FHFA 4085

## Appendix 1:

### Provisions of the Capital Agreement between the US Treasury and Fannie Mae and Freddie Mac

1. Reduces the senior preferred stock dividends from a fixed 10% to any positive net worth above a pre-determined nominal capital reserve. The capital reserve for each company in 2013 will be $3.0 billion and will decline by $600 million per annum.

2. Further reduces the housing GSEs retained mortgage portfolio to $650 billion as of December 31, 2012 from $656.1 billion. Requires the housing GSEs reduce their mortgage portfolio by 15% per year, up from 10%.

3. Suspends the periodic commitment fee, which was part of the original Capital Agreement but has been waived every quarter.

4. Eliminates the requirement that the housing GSEs obtain permission from the US Treasury for sales of assets less than $250 million.

5. Requires Fannie Mae and Freddie Mac to provide an annual risk management plan to the Treasury no later than December 15 of each year that the companies remain in conservatorship, beginning on December 15, 2012.  Management is required to set out the companies' strategy for reducing its risk profile.  Each plan must include an assessment of the companies' actual performance against the prior year plan.

## Appendix 2:

### US government support for housing GSEs through the financial crisis was not unprecedented

US government support of GSEs is not new.  There are examples of government support of GSEs during times of economic stress. During these times, Moody's maintained Aaa ratings on the companies due to US government support even though the stand-alone financial strength of the companies weakened.

» **Fannie Mae**. During the early 1980s, Fannie Mae incurred substantial losses.  Similar to other mortgage lenders such as Savings and Loan (S&L) institutions, the losses were partly caused by rising interest rates.  Similar to the S&Ls, Fannie Mae financed its long-term, fixed-rate mortgage portfolio with short-term debt.  The federal government provided certain financial benefits to Fannie Mae, such as regulatory forbearance and tax benefits to help it recover.

» **Farm Credit System**. During the 1980's, adverse economic conditions, volatile interest rates, and poor management practices led to severe financial difficulties in many Farm Credit System institutions.  As a result, Congress passed The Agricultural Credit Act of 1987 (the Act), which provided financial assistance to Farm Credit institutions. The Act established the Farm Credit System Financial Assistance Corporation with authority to sell $4 billion of 15-year bonds, guaranteed by the US Treasury. Ultimately, $1.261 billion of debt was issued. The last of the outstanding bonds was repaid in 2005.

FHFA 4086

» contacts continued from page 1

Analyst Contacts:

NEW YORK                    +1.212.553.1653

Warren Kornfeld            +1.212.553.1932
*Senior Vice President*
warren.kornfeld@moodys.com

Robert Young               +1.212.553.4122
*Managing Director - Financial Institutions*
robert.young@moodys.com

Report Number: 148144

**Author**
Brian L. Harris

**Production Associate**
Shubhra Bhatnagar

© 2012 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDIT   ISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Any publication into Australia of this document is by MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657, which holds Australian Financial Services License no. 336969. This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001.

Notwithstanding the foregoing, credit ratings assigned on and after October 1, 2010 by Moody's Japan K.K. ("MJKK") are MJKK's current opinions of the relative future credit risk of entities, credit commitments, or debt or debt-like securities. In such a case, "MIS" in the foregoing statements shall be deemed to be replaced with "MJKK". MJKK is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO.

This credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors. It would be dangerous for retail investors to make any investment decision based on this credit rating. If in doubt you should contact your financial or other professional adviser.



**Moody's**
**INVESTORS SERVICE**

FHFA 4087

# Tab 71

# Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE and Mortgage-Related Securities

The five tables that follow provide data on activities by the Department of the Treasury and the Federal Reserve System to support mortgage markets through purchases of securities issued by the housing government-sponsored enterprises (GSEs; Fannie Mae, Freddie Mac, and the Federal Home Loan Banks) and by Ginnie Mae, a federal agency that guarantees securities backed by mortgages insured or guaranteed by the Federal Housing Administration, the Department of Veterans Affairs, and other federal agencies.  Those activities include purchases by the Treasury of senior preferred stock and mortgage-backed securities guaranteed by Fannie Mae and Freddie Mac.  For more information on Treasury support for Fannie Mae and Freddie Mac, see Mortgage Market Note 10-1.  In addition, the Federal Reserve announced in November 2008 its intention to buy up to $500 billion of MBS guaranteed by Fannie Mae, Freddie Mac, and Ginnie Mae and up to $100 billion of debt securities issued by the housing GSEs.  Those purchases commenced in January 2009.  In March 2009, the Federal Reserve announced its intention to purchase up to an additional $750 billion of MBS guaranteed by Fannie Mae, Freddie Mac, and Ginnie Mae and up to an additional $100 billion of debt issued by the housing GSEs.

**Table 1: Quarterly Draws on Treasury Commitments to Fannie Mae and Freddie Mac per the Senior Preferred Purchase Agreements**
**Table 2:  Dividends on Enterprise Draws from Treasury**
**Table 3: Treasury Purchases of GSE MBS**
**Table 4: Federal Reserve Purchases of GSE and Ginnie Mae MBS**
**Table 5: Federal Reserve Purchases of GSE Debt**

**Table 1: Quarterly Draws on Treasury Commitments to Fannie Mae and Freddie Mac per the Senior Preferred Stock Purchase Agreements[1]** *($ billions)*

| | Freddie Mac | | | | Fannie Mae | | | |
|---|---|---|---|---|---|---|---|---|
| Quarter | Reported GAAP Net Worth | Requested Draw | Draw Date | Cumulative Enterprise Draws[2] | Reported GAAP Net Worth | Requested Draw | Draw Date | Cumulative Enterprise Draws[2] |
| 2008 Q3 | -$13.7 | $13.8 | 11/24/2008 | $13.8 | $9.4 | N/A | N/A | $0 |
| 2008 Q4 | -30.6 | 30.8 | 3/31/2009 | 44.6 | -15.2 | 15.2 | 3/31/2009 | 15.2 |
| 2009 Q1 | -6.0 | 6.1 | 6/30/2009 | 50.7 | -18.9 | 19.0 | 6/30/2009 | 34.2 |
| 2009 Q2 | 8.2 | 0 | N/A | 50.7 | -10.6 | 10.7 | 9/30/2009 | 44.9 |
| 2009 Q3 | 10.4 | 0 | N/A | 50.7 | -15.0 | 15.0 | 12/31/2009 | 59.9 |
| 2009 Q4 | 4.4 | 0 | N/A | 50.7 | -15.3 | 15.3 | 3/31/2010 | 75.2 |
| 2010 Q1 | -10.5 | 10.6 | 6/30/2010 | 61.3 | -8.4 | 8.4 | 6/30/2010 | 83.6 |
| 2010 Q2 | -1.7 | 1.8 | 9/30/2010 | 63.1 | -1.4 | 1.5 | 9/30/2010 | 85.1 |
| 2010 Q3 | -0.1 | 0.1 | 12/30/2010 | 63.2 | -2.4 | 2.5 | 12/30/2010 | 87.6 |
| 2010 Q4 | -0.4 | 0.5 | 3/31/2011 | 63.7 | -2.5 | 2.6 | 3/31/2011 | 90.2 |
| 2011 Q1 | 1.2 | 0 | N/A | 63.7 | -8.4 | 8.5 | 6/30/2011 | 98.7 |
| 2011 Q2 | -1.478 | 1.479 | 9/30/2011 | 65.179 | -5.087 | 5.087 | 9/30/2011 | 103.787 |
| 2011 Q3 | -5.991 | 5.992 | 12/30/2011 | 71.171 | -7.791 | 7.791 | 12/30/2011 | 111.578 |
| 2011 Q4 | -0.146 | 0.146 | 3/30/2012 | 71.317 | -4.571 | 4.571 | 3/30/2012 | 116.149 |
| 2012 Q1 | -0.019 | 0.019 | 6/29/2012 | 71.336 | 0.268 | 0.000 | N/A | 116.149 |
| 2012 Q2 | 1.086 | 0.000 | N/A | 71.336 | 2.770 | 0.000 | N/A | 116.149 |
| 2012 Q3 | 4.906 | 0.000 | N/A | 71.336 | 2.412 | 0.000 | N/A | 116.149 |
| 2012 Q4 | 8.826 | 0.000 | N/A | 71.336 | 7.224 | 0.000 | N/A | 116.149 |
| 2013 Q1 | 6.971 | 0.000 | N/A | 71.336 | 59.368 | 0.000 | N/A | 116.149 |
| 2013 Q2 | 7.357 | 0.000 | N/A | 71.336 | 13.243 | 0.000 | N/A | 116.149 |
| 2013 Q3 | 33.436 | 0.000 | N/A | 71.336 | 11.568 | 0.000 | N/A | 116.149 |
| **Remaining Treasury Support** | $140.474 | | | | $117.576 | | | |
| **Cumulative Draws by Both Enterprises** | $187.485 | | | | | | | |

Source: Freddie Mac and Fannie Mae                    **N/A = not applicable**

---

[1] Freddie Mac's draws have been based on reported GAAP stockholders' equity, while Fannie Mae's draw was based on GAAP net worth.  Both GAAP stockholders' equity and GAAP net worth are measures of the difference between an Enterprise's assets and liabilities.  Both measures include realized and unrealized losses as of the reporting date.  Losses ultimately realized in the future may differ from unrealized losses as of the reporting date.

The full text of the Senior Preferred Stock Purchase Agreements and the amendments to those agreements are available online here.  For an overview of those agreements, see MMN 10-1 "Treasury Support for Fannie Mae and Freddie Mac".  For Fannie Mae's quarterly financial results, click here.  For Fannie Mae's annual financial results, click here.  For Freddie Mac's quarterly financial results, click here.  For Freddie Mac's annual financial results, click here.

[2] Excludes $1 billion in liquidation preference on the senior preferred stock position obtained by Treasury from each Enterprise upon initiation of the Senior Preferred Stock Purchase Agreement. The initial $1 billion is not a draw on the Treasury's commitment under the agreement.

**Table 2: Dividends on Enterprise Draws from Treasury**[3] *($ billions)*

| Quarter | Freddie Mac | | | Fannie Mae | | |
|---|---|---|---|---|---|---|
| | Dividends Accrued | Date Paid | Cumulative Dividends Paid[4] | Dividends Accrued | Date Paid | Cumulative Dividends Paid[4] |
| 2008 Q3 | $0.006 | N/A | $0.000 | $0.006 | N/A | $0.000 |
| 2008 Q4 | 0.167 | 12/31/2008 | 0.173 | 0.025 | 12/31/2008 | 0.031 |
| 2009 Q1 | 0.370 | 3/31/2009 | 0.543 | 0.025 | 3/31/2009 | 0.056 |
| 2009 Q2 | 1.149 | 6/30/2009 | 1.691 | 0.409 | 6/30/2009 | 0.465 |
| 2009 Q3 | 1.294 | 9/30/2009 | 2.986 | 0.885 | 9/30/2009 | 1.351 |
| 2009 Q4 | 1.293 | 12/31/2009 | 4.278 | 1.150 | 12/31/2009 | 2.501 |
| 2010 Q1 | 1.293 | 3/31/2010 | 5.571 | 1.527 | 3/31/2010 | 4.028 |
| 2010 Q2 | 1.293 | 6/30/2010 | 6.863 | 1.909 | 6/30/2010 | 5.937 |
| 2010 Q3 | 1.560 | 9/30/2010 | 8.424 | 2.117 | 9/30/2010 | 8.055 |
| 2010 Q4 | 1.603 | 12/31/2010 | 10.027 | 2.153 | 12/31/2010 | 10.207 |
| 2011 Q1 | 1.605 | 3/31/2011 | 11.632 | 2.216 | 3/31/2011 | 12.424 |
| 2011 Q2 | 1.618 | 6/30/2011 | 13.249 | 2.281 | 6/30/2011 | 14.705 |
| 2011 Q3 | 1.618 | 9/30/2011 | 14.867 | 2.495 | 9/30/2011 | 17.199 |
| 2011 Q4 | 1.655 | 12/30/2011 | 16.522 | 2.621 | 12/30/2011 | 19.821 |
| 2012 Q1 | 1.808 | 3/30/2012 | 18.329 | 2.819 | 3/30/2012 | 22.639 |
| 2012 Q2 | 1.808 | 6/29/2012 | 20.137 | 2.931 | 6/29/2012 | 25.571 |
| 2012 Q3 | 1.808 | 9/28/2012 | 21.946 | 2.929 | 9/28/2012 | 28.499 |
| 2012 Q4 | 1.808 | 12/31/2012 | 23.754 | 2.929 | 12/31/2012 | 31.428 |
| 2013 Q1 | 5.826 | 3/29/2013 | 29.580 | 4.224 | 3/29/2013 | 35.652 |
| 2013 Q2 | 6.971 | 6/28/2013 | 36.552 | 59.368 | 6/28/2013 | 95.020 |
| 2013 Q3 | 4.357 | 9/30/2013 | 40.909 | 10.243 | 9/30/2013 | 105.263 |
| 2013 Q4 | 30.436 | TBD | 71.345 | 8.568 | TBD | 113.831 |
| Cumulative Dividends Paid by Both Enterprises[4] | **$185.176** | | | | | |

Source: Freddie Mac and Fannie Mae          **TBD = to be determined but not later than 12/31/2013**

---

[3] As set forth in the Third Amendment to the Amended and Restated Senior Preferred Stock Purchase Agreement, between January 1, 2013 and December 31, 2017, dividend amounts will be the Net Worth Amount at the end of the immediately preceding fiscal quarter minus the applicable capital reserve amount. The 2013 capital reserve amount of $3 billion will be reduced by $600 million each calendar year until it reaches zero on January 1, 2018.
[4] Dividends accrued may not add up to cumulative dividends due to rounding.

**Table 3: Treasury Purchases of Freddie Mac and Fannie Mae MBS[5]**
*($ billions, current face value as of purchase)*

| Period | Purchases of: | |
| --- | --- | --- |
| | **Freddie Mac MBS** | **Fannie Mae MBS** |
| September 2008 | $2.5 | $0.9 |
| October 2008 | 4.3 | 11.6 |
| November 2008 | 10.0 | 10.5 |
| December 2008 | 10.3 | 18.1 |
| January 2009 | 7.4 | 13.9 |
| February 2009 | 11.9 | 2.8 |
| March 2009 | 10.2 | 9.2 |
| April 2009 | 5.5 | 11.2 |
| May 2009 | 5.7 | 6.9 |
| June 2009 | 5.6 | 3.4 |
| July 2009 | 9.4 | 1.7 |
| August 2009 | 3.8 | 5.9 |
| September 2009 | 4.4 | 5.2 |
| October 2009 | 6.7 | 3.0 |
| November 2009 | 6.6 | 3.1 |
| December 2009 | 1.7 | 7.6 |
| **Total[6]** | 105.9 | 114.8 |
| **Total Purchases** | **$220.8** | |

Source: Department of the Treasury

---

[5] The Treasury's GSE MBS purchase program terminated on December 31, 2009.
[6] Columns may not add to totals due to rounding.

**Table 4: Federal Reserve GSE and Ginnie Mae MBS Purchase Program**
*($ billions, current face value as of purchase)*

| Period[8] | Net Transactions[7] | | |
|---|---|---|---|
| | Freddie Mac  MBS | Fannie Mae MBS | Ginnie Mae MBS |
| January 5-7, 2009 | $6.9 | $2.9 | $0.4 |
| January 8-14, 2009 | 15.8 | 5.6 | 2.0 |
| January 15-21, 2009 | 5.4 | 11.7 | 1.8 |
| January 22-28, 2009 | 5.3 | 7.2 | 4.3 |
| January 29-February 4, 2009 | 9.7 | 10.5 | 2.0 |
| February 5-11, 2009 | 14.7 | 7.2 | 1.4 |
| February 12-18, 2009 | 7.9 | 10.9 | 1.0 |
| February 19-25, 2009 | 8.4 | 15.6 | 1.0 |
| February 26-March 4, 2009 | 15.6 | 13.6 | 1.0 |
| March 5-11, 2009 | 9.7 | 16.8 | 0.6 |
| March 12-18, 2009 | 12.5 | 5.2 | 2.1 |
| March 19-25, 2009 | 13.5 | 18.5 | 1.3 |
| March 25-April 1, 2009 | 14.4 | 17.0 | 1.6 |
| April 2-8, 2009 | 7.4 | 22.2 | 0.9 |
| April 9-15, 2009 | 1.3 | 20.2 | 0.3 |
| April 16-22, 2009 | 5.6 | 19.8 | 0.8 |
| April 23-29, 2009 | 9.1 | 13.5 | 0.5 |
| April 30-May 6, 2009 | 5.0 | 17.2 | 3.3 |
| May 7-13, 2009 | 4.4 | 20.6 | 2.2 |
| May 14-20, 2009 | 7.5 | 13.1 | 4.1 |
| May 21-27, 2009 | 11.0 | 12.0 | 2.5 |
| May 29-June 3, 2009 | 5.0 | 18.8 | 2.1 |
| June 4-10, 2009 | 7.4 | 14.6 | 1.0 |
| June 11-17, 2009 | 5.5 | 11.3 | 3.5 |
| June 18-24, 2009 | 8.5 | 10.2 | 3.6 |
| June 25-July 1, 2009 | 7.2 | 13.1 | 2.8 |
| July 2-8, 2009 | 3.2 | 9.9 | 4.1 |
| July 9-15, 2009 | 6.9 | 11.3 | 4.1 |
| July 16-22, 2009 | 6.5 | 11.2 | 3.5 |
| July 23-29, 2009 | 5.4 | 14.5 | 0.3 |
| July 20-August 5, 2009 | 5.0 | 14.2 | 0.0 |
| **[Table continued on next page]** | | | |

---

[7] The Federal Reserve Bank of New York reported "transactions" through the period ending February 25, 2009 and "net purchases" thereafter.
[8] Federal Reserve transactions commenced on January 5, 2009, and are reported on a weekly basis for weeks beginning on a Thursday and therefore overlap months.

| Period[8] | Net Transactions[7] | | |
|---|---|---|---|
| | Freddie Mac  MBS | Fannie Mae MBS | Ginnie Mae MBS |
| August 6-12, 2009 | 2.3 | 17.7 | 0.5 |
| August 13-19, 2009 | 5.9 | 17.5 | 1.7 |
| August 20-26, 2009 | 7.3 | 15.8 | 2.4 |
| August 27-September 2, 2009 | 8.3 | 17.3 | 0.0 |
| September 3-9, 2009 | 3.6 | 12.4 | 2.9 |
| September 10-16, 2009 | 6.3 | 15.7 | 3.5 |
| September 17-23, 2009 | 6.0 | 15.9 | 1.1 |
| September 24-30, 2009 | 7.6 | 10.6 | 1.8 |
| October 1-7, 2009 | 8.0 | 8.1 | 4.0 |
| October 8-14, 2009 | 7.3 | 8.4 | 0.5 |
| October 15-21, 2009 | 6.7 | 8.4 | 3.0 |
| October 22-28, 2009 | 5.3 | 11.4 | 1.4 |
| October 29-November 4, 2009 | 3.3 | 12.6 | 0.2 |
| November 5-11, 2009 | 2.9 | 9.8 | 0.8 |
| November 12-18, 2009 | 5.9 | 3.8 | 6.4 |
| November 19-25, 2009 | 6.5 | 6.0 | 3.5 |
| November 26-December 2, 2009 | 5.7 | 7.7 | 2.6 |
| December 3-9, 2009 | 4.8 | 9.6 | 1.5 |
| December 10-16, 2009 | 7.6 | 7.2 | 1.2 |
| December 17-23, 2009 | 7.8 | 7.2 | 0.0 |
| December 24-30, 2009 | 3.3 | 6.0 | 0.0 |
| December 31, 2009-January 6, 2010 | 1.8 | 10.2 | 0.0 |
| January 7-13, 2010 | 9.7 | 3.5 | 0.9 |
| January 14-20, 2010 | 1.3 | 8.5 | 2.3 |
| January 21-27, 2010 | 5.1 | 4.2 | 2.7 |
| January 28-February 3, 2010 | 5.7 | 3.7 | 2.7 |
| February 4-10, 2010 | 4.0 | 4.5 | 2.6 |
| February 11-17, 2010 | 4.5 | 4.0 | 2.6 |
| February, 18-24, 2010 | 5.4 | 4.3 | 1.4 |
| February 25-March 3, 2010 | 3.6 | 6.3 | 0.1 |

**[Table continued on next page]**

**Table 4 (Continued): Federal Reserve GSE and Ginnie Mae MBS Purchase Program** *($ billions, current face value as of purchase)*

| Period[8] | Net Transactions[7] | | |
|---|---|---|---|
| | **Freddie Mac  MBS** | **Fannie Mae MBS** | **Ginnie Mae MBS** |
| March 4-10, 2010 | 4.4 | 5.6 | 0.0 |
| March 11-17, 2010 | 4.8 | 4.8 | 0.4 |
| March 18-24, 2010 | 3.6 | 4.1 | 0.3 |
| March 25-31, 2010 | 5.2 | 0.9 | 0.0 |
| **Total net transactions[9]** | **432.3** | **703.6** | **114.0** |
| **Total committed** | **$1,250** | | |
| **Unused commitment** | **$0 of $1,250** | | |

Source: Federal Reserve Bank of New York

---

[7] The Federal Reserve Bank of New York reported "transactions" through the period ending February 25, 2009 and "net purchases" thereafter.
[8] Federal Reserve transactions commenced on January 5, 2009, and are reported on a weekly basis for weeks beginning on a Thursday and therefore overlap months.
[9] Columns may not add to totals due to rounding.

**Table 5: Federal Reserve Purchases of GSE Debt** *($ billions, par amount)*

| Period | Purchases of: | | |
|---|---|---|---|
| | **Freddie Mac Debt** | **Fannie Mae Debt** | **FHLB Debt** |
| December 2008 | $6.1 | $5.8 | $3.1 |
| January 2009 | 4.8 | 4.0 | 2.5 |
| February 2009 | 4.2 | 2.4 | 2.8 |
| March 2009 | 5.8 | 7.1 | 4.0 |
| April 2009 | 2.9 | 6.6 | 5.0 |
| May 2009 | 5.2 | 6.4 | 2.2 |
| June 2009 | 6.7 | 6.1 | 3.0 |
| July 2009 | 3.8 | 4.8 | 1.9 |
| August 2009 | 4.6 | 5.2 | 1.5 |
| September 2009 | 5.7 | 4.3 | 2.6 |
| October 2009 | 7.6 | 5.4 | 2.7 |
| November 2009 | 2.4 | 4.0 | 1.7 |
| December 2009 | 1.9 | 1.5 | 1.4 |
| January 2010 | 2.3 | 1.7 | 0.9 |
| February 2010 | 1.6 | 1.1 | 1.6 |
| March 2010 | 1.4 | 0.9 | 0.7 |
| **Total**[10] | **67.1** | **67.4** | **37.7** |
| **Total committed** | **$172.1** | | |
| **Unused commitment** | **$2.9 of $175**[11] | | |

Source: Federal Reserve Bank of New York

---

[10] Columns may not add to totals due to rounding.
[11] On November 4, 2009, the Federal Reserve lowered its target level of purchases of GSE debt to $175 billion from $200 billion.

# Tab 72

**Non-Core Assets Forecast**
Actual 12/31/11 Balances; GSE estimates for 12/31/12; 12/31/13; 12/31/14 based on regularly provided RP forecasts

### Freddie

| Product | 12/31/11 | 6/30/2012 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 | |
|---|---|---|---|---|---|---|---|---|
| **UPB ($ in millions)** | | | | Forecast | | | | |
| Non-Agency PLS | 79,771 | 74,558 | 69,344 | 60,016 | 51,888 | 44,861 | 38,785 | |
| Non-Agency CMBS | 54,110 | 52,722 | 51,334 | 48,801 | 46,326 | 43,976 | 41,745 | $ |
| Non-Agency MRBS/Other | 8,853 | 8,540 | 8,328 | 8,010 | 7,695 | 7,392 | 7,101 | |
| Modified/Delinquent Loans | 47,362 | 46,334 | 45,306 | 42,390 | 35,112 | 28,947 | 23,865 | |
| REO (fmv) | 5,500 | 6,100 | 6,100 | 6,100 | 6,100 | 6,100 | 3,100 | |
| Reverse mortgage loans | - | - | - | - | - | - | - | |
| Reverse securities | - | - | - | - | - | - | - | |
| **Total Non-Core** | 195,496 | 188,254 | 180,412 | 165,517 | 147,120 | 131,276 | 117,596 | $ 27,390 |
| Distressed Modified SF | 71,044 | 69,502 | 67,960 | 63,885 | 52,668 | 43,421 | 35,797 | $ (17,713) |
| SF Performing Loans | 53,253 | 34,918 | 16,583 | 12,879 | 10,835 | 9,115 | 7,669 | |
| MF Loans | 82,311 | 83,012 | 83,713 | 82,930 | 75,613 | 68,942 | 62,659 | $ 570.63 |
| Agency MBS/CMO (18% run-off) | 256,709 | 233,605 | 210,501 | 177,611 | 141,541 | 116,064 | 95,172 | |
| **Total** | 658,813 | 609,291 | 559,168 | 497,822 | 427,778 | 368,817 | 319,093 | |

Right-hand annotations (Freddie):
- Amount of sales needed to get to 75% of December 31, 2012 non-core assets by January 1 2015 — $ (738) Monthly sales for 24 months
- Amount of sales needed to get to 50% of December 31, 2012 non-core assets by January 1 2015 — $ 570.63 Monthly sales for 48 months
- 41% assumes modified loans can be securitized after 4 years performance

Note: We did not ask for REO estimates from Freddie and the Credit Risk team did not have them.
Note: We did not have a break out for Distressed Modified vs Distressed non-modified from Freddie (so we used Fannie's 60% modified 40% non-modified)

### Fannie

| Product | 12/31/2011 | 6/30/2012 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 | |
|---|---|---|---|---|---|---|---|---|
| **UPB ($ in millions)** | | | | Forecast | | | | |
| Non-Agency PLS | 39,000 | 38,509 | 37,522 | 35,938 | 34,421 | 32,968 | 31,576 | |
| Non-Agency CMBS | 23,000 | 21,989 | 20,104 | 18,583 | 17,177 | 15,878 | 14,676 | |
| Non-Agency MRBS/Other | 10,700 | 10,520 | 10,284 | 9,845 | 9,425 | 9,022 | 8,637 | |
| Distressed - non-modified | 104,000 | 110,066 | 105,592 | 98,700 | 88,557 | 81,099 | 74,270 | |
| REO (fmv) | 19,000 | 19,600 | 23,000 | 25,000 | 21,200 | 17,625 | 14,653 | |
| Reverse Mortgage Loans | 41,400 | 40,844 | 39,586 | 38,657 | 37,750 | 33,865 | | |
| Reverse Securities | 10,500 | 10,506 | 10,403 | 10,123 | 9,851 | 9,985 | 9,327 | |
| **Total Non-Core** | 247,600 | 252,034 | 247,442 | 236,275 | 219,287 | 203,928 | 190,005 | $ 66,284 |
| Distressed - Modified SF | 153,000 | 148,048 | 143,688 | 138,000 | 132,652 | 127,457 | 122,464 | 33,706 |
| SF Performing Loans | 39,000 | 22,260 | 20,757 | 17,472 | 15,716 | 13,028 | 11,155 | |
| MF Loans | 78,000 | 72,893 | | | 20,537 | 18,840 | | $ 1,381 |
| Agency MBS/CMO (18% run-off) | 218,610 | 198,939 | 179,363 | 148,946 | 124,537 | 98,841 | 81,049 | |
| **Total** | 727,414 | 693,994 | 653,623 | 578,250 | 512,263 | 458,674 | 414,351 | |

Right-hand annotations (Fannie):
- Amount of sales needed to get to 75% of December 31, 2012 non-core assets by January 1 2015 — $ 1,404.41 Monthly sales for 24 months
- Amount of sales needed to get to 50% of December 31, 2012 non-core assets by January 1 2015 — $ 1,381 Monthly sales for 48 months
- 49% assumes modified loans can be securitized after 4 years performance

Note: Fannie provided estimates for 2012 and 2013 (we extrapolated for 2014, 2015 and 2016).
Note: FHFA Credit Team provided REO estimates for Fannie
Note: We did not have a break out for Distressed Modified vs Distressed non-modified from Fannie

Handwritten side calculation block:

| | 90% | 85% | 80% |
|---|---|---|---|
| | 656,000 | 656,000 | 656,000 |
| | 590,400 | 557,600 | 524,800 |
| | 531,360 | 473,960 | 419,840 |
| | 478,224 | 402,866 | 335,872 |
| | 430,402 | 342,436 | 288,698 |
| | 387,361 | 291,071 | 274,958 |
| | 348,625 | 247,410 | 247,410 |
| | 313,763 | 210,299 | 171,573 |
| | 282,386 | 178,754 | 110,059 |

Handwritten notes: "10%" , "15 → 08" , "(15) ⇒ Sell now core" , "2.x – 4x"

# Tab 73

**Retained Portfolio PSPA Compliance Forecast**

Actual 12/31/11 Balances; GSE estimates for 12/31/12; 12/31/13; 12/31/14 based on regularly provided RP Forecasts

### Freddie

|  |  | Forecast | | | | |
|---|---|---|---|---|---|---|
| Product / UPB ($ in millions) | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 |
| Non-Agency PLS | 79,771 | 69,344 | 60,016 | 51,888 | 44,861 | 38,785 |
| Non-Agency CMBS | 54,110 | 51,334 | 48,801 | 46,326 | 43,976 | 41,745 |
| Non-Agency MRBS/Other | 8,753 | 8,328 | 8,010 | 7,695 | 7,392 | 7,101 |
| Distressed Non-modified | 47,362 | 45,306 | 42,590 | 35,112 | 28,947 | 23,865 |
| Reverse mortgage loans | - | - | - | - | - | - |
| Reverse securities | - | - | - | - | - | - |
| Total Non-Core | 189,996 | 174,312 | 159,417 | 141,020 | 125,176 | 111,496 |
| Distressed Modified SF | 71,044 | 67,960 | 63,885 | 52,668 | 43,421 | 35,797 |
| SF Performing Loans | 53,253 | 16,583 | 12,879 | 10,835 | 9,115 | 7,669 |
| MF Loans | 82,311 | 83,713 | 82,930 | 75,613 | 68,559 | 62,859 |
| Agency MBS/CMO (18% run-off) | 256,709 | 210,501 | 172,611 | 141,541 | 116,064 | 95,182 |
| Total | 653,313 | 553,068 | 491,691 | 421,678 | 362,077 | 312,983 |
| PSPA Cap | 656,000 | 557,000 | 557,000 | 473,980 | 402,866 | 342,435 |

Note: We did not have a break out for Distressed Modified vs Distressed non-modified from Freddie (so we used Fannie's 60% modified 40% non-modified)

### Fannie

|  |  | Forecast | | | | |
|---|---|---|---|---|---|---|
| Product / UPB ($ in millions) | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 |
| Non-Agency PLS | 39,000 | 37,522 | 35,938 | 34,421 | 32,966 | 31,576 |
| Non-Agency CMBS | 23,000 | 20,104 | 18,583 | 17,177 | 15,878 | 14,676 |
| Non-Agency MRBS/Other | 10,700 | 10,284 | 9,945 | 9,425 | 9,022 | 8,637 |
| Distressed - non-modified | 104,000 | 105,592 | 96,700 | 88,557 | 81,090 | 74,270 |
| Reverse Mortgage Loans | 41,400 | 40,537 | 39,586 | 38,657 | 37,760 | 36,895 |
| Reverse Securities | 10,500 | 10,403 | 10,123 | 9,851 | 9,585 | 9,327 |
| Total Non-Core | 228,600 | 224,442 | 210,775 | 198,087 | 186,303 | 175,382 |
| Distressed - Modified SF | 153,000 | 143,688 | 138,060 | 132,652 | 127,457 | 122,464 |
| SF Performing Loans | 30,000 | 20,757 | 17,772 | 15,216 | 13,028 | 11,155 |
| MF Loans | 78,200 | 62,373 | 39,147 | 24,570 | 15,421 | 9,678 |
| Agency MBS/CMO (18% run-off) | 218,614 | 179,263 | 146,996 | 120,537 | 98,840 | 81,049 |
| Total | 708,414 | 630,523 | 552,750 | 491,063 | 444,048 | 399,698 |
| PSPA Cap | 656,000 | 656,000 | 557,600 | 557,600 | 402,866 | 342,435 |

Note: Fannie provided estimates for 2012 and 2013 (we extrapolated for 2014, 2015 and 2016)
Note: MF loans row includes some securitization goals as part of MRA remediation
Note: We did have a break out for Distressed non-modified from Fannie

Sales / Liquid Assets
$10B/GSE — Every two years
$30B/GSE — Over 6 years
$30B/GSE — Over 6 years

Assume 1% PSPA Cap Annual Non-Core Asset Sales (not subtracted RP Bi-Annual Non-Core Asset Sales)

| 2012 | 6360 |
| 2013 | 5578 |
| 2014 | 4740 |
| 2015 | 4029 |
| 2016 | 3424 |
| 2017 | 2911 |
| 2018 | 2374 |
| | 29713 |

Assume 2% PSPA Cap every two years or 2% of $656B 2012 PSPA cap (not subtracted RP Total row)

| 13120 | |
| 9479 | |
| 9479 | |
| 5849 | 0 |
| 0 | 29448 Total |

42% Securitize modified and add agencies divided by retained portfolio
30% Liquid agencies divided by retained portfolio

51% Securitize modified and add agencies divided by retained portfolio
20% Liquid agencies divided by retained portfolio

Assume sell $10B agency in 2014, 2015, 2016
Assume securitize and sell $10B distressed modified agency in 2014, 2015, 2016

**Retained Portfolio PSPA Compliance Forecast**
Actual 12/31/11 Balances; GSE estimates for 12/31/12, 12/31/13, 12/31/14 based on regularly provided RP forecasts

| Year | PSPA 10% | PSPA 15% | PSPA 20% |
|---|---|---|---|
| 2012 | 656,000 | 656,000 | 656,000 |
| 2013 | 590,400 | 557,600 | 524,800 |
| 2014 | 531,360 | 473,960 | 419,840 |
| 2015 | 478,224 | 402,866 | 335,872 |
| 2016 | 430,402 | 342,436 | 268,698 |
| 2017 | 387,361 | 291,071 | 214,958 |
| 2018 | 348,625 | 247,410 | 171,966 |
| 2019 | 313,763 | 210,299 | 137,573 |
| 2020 | 282,386 | 178,754 | 110,059 |

### Freddie

| Product / UPB ($ in millions) | 12/31/2011 | 6/30/2012 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 |
|---|---|---|---|---|---|---|---|
| Non-Agency PLS | 79,771 | 74,558 | 69,344 | 60,016 | 51,888 | 44,861 | 38,785 |
| Non-Agency CMBS | 54,110 | 52,722 | 51,334 | 48,801 | 46,326 | 43,976 | 41,745 |
| Non-Agency MRBs/Other | 8,753 | 8,540 | 8,328 | 8,010 | 7,695 | 7,392 | 7,101 |
| Distressed Non-modified | 47,362 | 46,334 | 45,306 | 42,590 | 35,112 | 28,947 | 23,865 |
| REO (fmv) | 5,500 | 6,100 | 6,100 | 6,100 | 6,100 | 6,100 | 6,100 |
| Reverse mortgage loans | - | - | - | - | - | - | - |
| Reverse securities | - | - | - | - | - | - | - |
| **Total Non-Core** | **195,496** | **188,254** | **180,412** | **165,517** | **147,120** | **131,276** | **117,596** |
| Distressed - Modified SF | 71,044 | 69,502 | 67,960 | 63,885 | 52,668 | 43,421 | 35,797 |
| SF Performing Loans | 53,253 | 34,918 | 16,583 | 12,879 | 10,835 | 9,115 | 7,669 |
| MF Loans | 82,311 | 83,012 | 83,713 | 82,930 | 75,613 | 68,942 | 62,859 |
| Agency MBS/CMO (18% run-off) | 256,709 | 233,605 | 210,501 | 172,611 | 141,541 | 116,064 | 95,172 |
| **Total** | **658,813** | **609,291** | **559,168** | **497,822** | **427,778** | **388,817** | **319,093** |

Note: We did not ask for REO estimates from Freddie and the Credit Risk team did not have them.
Note: We did not have a break out for Distressed Modified vs Distressed non-modified from Freddie (so we used Fannie's 60% modified 40% non-modified)

### Fannie

| Product / UPB ($ in millions) | 12/31/2011 | 6/30/2012 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 |
|---|---|---|---|---|---|---|---|
| Non-Agency PLS | 39,000 | 38,509 | 37,522 | 35,938 | 34,421 | 32,988 | 31,576 |
| Non-Agency CMBS | 23,000 | 21,989 | 20,104 | 18,583 | 17,177 | 15,878 | 14,676 |
| Non-Agency MRB/Other | 10,700 | 11,520 | 11,284 | 9,845 | 9,425 | 9,022 | 8,637 |
| Distressed - non-modified | 104,000 | 110,066 | 105,592 | 96,700 | 88,557 | 81,099 | 74,270 |
| REO (fmv) | 19,000 | 19,600 | 23,000 | 25,500 | 21,200 | 17,825 | 14,653 |
| Reverse Mortgage Loans | 41,400 | 40,844 | 40,537 | 39,586 | 38,657 | 37,750 | 36,865 |
| Reverse Securities | 10,500 | 10,506 | 10,403 | 10,123 | 9,851 | 9,585 | 9,327 |
| **Total Non-Core** | **247,600** | **253,034** | **247,442** | **236,275** | **219,287** | **203,928** | **190,005** |
| Distressed - Modified SF | 153,000 | 148,048 | 143,688 | 138,060 | 132,652 | 127,457 | 122,464 |
| SF Performing Loans | 30,000 | 22,280 | 20,757 | 17,772 | 15,216 | 13,028 | 11,155 |
| MF Loans | 78,200 | 72,693 | 62,373 | 39,147 | 24,570 | 15,421 | 9,678 |
| Agency MBS/CMO (18% run-off) | 218,614 | 198,939 | 146,996 | 179,263 | 120,537 | 80,840 | 81,049 |
| **Total** | **727,414** | **693,994** | **665,523** | **578,250** | **512,263** | **458,674** | **414,351** |

Note: Fannie provided estimates for 2012 and 2013 (we extrapolated for 2014, 2015 and 2016).
Note: FHFA Credit Team provided REO estimates for Fannie
Note: We did have a break out for Distressed Modified vs Distressed non-modified from Fannie

**Assume 25% PSPA Cap every two years**
13120   or 2% of $656B 2012 PSPA cap (not subtracted RP Total row)

| | |
|---|---|
| 0 | |
| 13120 | |
| 9479 | |
| 6849 | |
| 0 | |
| **29448 Total** | |

**Assume 1% PSPA Cap**
Annual Non-Core Asset Sales (not subtracted RP Total to Bi-Annual Non-Core Asset Sales (not subtracted RP Total row)

| | |
|---|---|
| 6560 | |
| 5576 | |
| 4740 | |
| 4029 | |
| 3424 | |
| 2911 | |
| 2474 | |
| 29713 | |

30%   Liquid agencies divided by retained portfolio
41%   Securitize modified and add agencies divided by retained portfolio
49%   Securitize modified and add agencies divided by retained portfolio
20%   Liquid agencies divided by retained portfolio

**Retained Portfolio PSPA Compliance Forecast**
Actual 12/31/11 Balances; GSE estimates for 12/31/12; 12/31/13; 12/31/14 based on regularly provided RP forecasts

### Freddie

|  |  | | | | Forecast | | |
| Product | 12/31/11 | 6/30/2012 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 |
|---|---|---|---|---|---|---|---|
| **UPB ($ in millions)** | | | | | | | |
| Non-Agency PLS | 79,771 | 74,558 | 69,344 | 60,016 | 51,888 | 44,861 | 38,785 |
| Non-Agency CMBS | 54,110 | 52,722 | 51,334 | 48,801 | 46,326 | 43,976 | 41,745 |
| Non-Agency MRBs/Other | 8,753 | 8,540 | 8,328 | 8,010 | 7,695 | 7,392 | 7,101 |
| Modified/Delinquent Loans | 47,392 | 46,334 | 45,306 | 42,590 | 35,112 | 28,947 | 23,866 |
| REO (fmv) | 5,500 | 6,100 | 6,100 | 6,100 | 6,100 | 6,100 | 6,100 |
| Reverse mortgage loans | | | | | | | |
| Reverse securities | | | | | | | |
| **Total Non-Core** | **195,496** | **188,264** | **180,412** | **165,517** | **147,120** | **131,276** | **117,596** |
| Distressed- Modified SF | 71,044 | 69,502 | 67,960 | 63,886 | 52,668 | 43,421 | 35,797 |
| SF Performing Loans | 53,233 | 34,918 | 16,433 | 12,873 | 11,835 | 9,115 | 7,669 |
| MF Loans | 82,311 | 83,012 | 83,713 | 82,930 | 76,633 | 68,942 | 62,059 |
| Agency MBS/CMO (18% run-off) | 256,709 | 233,605 | 210,501 | 172,611 | 116,064 | 115,064 | 35,172 |
| **Total** | **658,813** | **609,291** | **559,168** | **497,822** | **427,778** | **368,817** | **319,050** |

Note: We did not ask for REO estimates from Freddie and the Credit Risk team did not have them.
Note: We did not have a break out for Distressed Modified vs Distressed non-modified from Freddie (so we used Fannie's 60% modified 40% non-modified)

### Fannie

|  |  | | | | Forecast | | |
| Product | 12/31/11 | 6/30/2012 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 |
|---|---|---|---|---|---|---|---|
| **UPB ($ in millions)** | | | | | | | |
| Non-Agency PLS | 39,000 | 38,509 | 37,522 | 35,938 | 34,421 | 32,968 | 31,576 |
| Non-Agency CMBS | 23,000 | 21,889 | 20,104 | 18,583 | 17,177 | 15,878 | 14,676 |
| Non-Agency MRBs/Other | 10,700 | 10,520 | 10,284 | 9,845 | 9,425 | 9,022 | 8,637 |
| Distressed - non-modified | 119,000 | 110,066 | 105,592 | 96,700 | 88,557 | 81,099 | 74,270 |
| REO (fmv) | 19,000 | 19,600 | 23,000 | 25,500 | 21,200 | 17,625 | 14,653 |
| Reverse Mortgage Loans | 41,400 | 40,844 | 40,637 | 39,586 | 38,457 | 37,750 | 36,865 |
| Reverse Securities | 10,500 | 10,506 | 10,403 | 10,123 | 9,855 | 9,585 | 9,327 |
| **Total Non-Core** | **247,600** | **252,034** | **247,442** | **236,275** | **219,287** | **203,928** | **190,005** |
| Distressed - Mod'fied SF | 153,000 | 148,048 | 145,688 | 138,000 | 132,652 | 127,457 | 122,464 |
| SF Performing Loans | 30,000 | 22,280 | 20,757 | 17,772 | 15,216 | 13,028 | 11,155 |
| MF Loans | 78,200 | 72,693 | 62,373 | 39,147 | 24,570 | 15,421 | 9,678 |
| Agency MBS/CMO (18% run-off) | 218,614 | 198,939 | 178,263 | 146,996 | 120,537 | 98,840 | 81,049 |
| **Total** | **727,414** | **693,994** | **653,523** | **578,250** | **512,263** | **458,674** | **414,351** |

Note: Fannie provided estimates for 2012 and 2013 (we extrapolated for 2014, 2015, and 2016)
Note: FHFA Credit Team provided REO estimates for Fannie
Note: We did have a break out for Distressed/Modified vs Distressed non-modified from Fannie

| | PSPA 10% | PSPA 15% | PSPA 20% |
|---|---|---|---|
| 2012 | 656,000 | 656,000 | 656,000 |
| 2013 | 590,400 | 557,600 | 524,800 |
| 2014 | 531,360 | 473,960 | 419,840 |
| 2015 | 478,224 | 402,866 | 335,872 |
| 2016 | 430,402 | 342,436 | 268,698 |
| 2017 | 387,361 | 291,071 | 214,958 |
| 2018 | 348,625 | 247,410 | 171,966 |
| 2019 | 313,763 | 210,299 | 137,573 |
| 2020 | 282,386 | 178,754 | 110,059 |
| 2021 | 254,148 | | |

Assume 1% PSPA Cap
Non-Core Asset Sales (not yet subtracted from RP Total row)

30% | Liquid agencies divided by retained portfolio
41% Securitize modified and add agencies divided by retained portfolio
<9% Securitize modified and add agencies divided by retained portfolio
20% | Liquid agencies divided by retained portfolio

_[handwritten notes: 656; 72a; 24%; 41%; 35b; 14; and additional illegible handwriting]_