# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended June 30, 2011**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from          to**

**Commission File Number: 000-53330**

# Federal Home Loan Mortgage Corporation
*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| | |
|---|---|
| **Federally chartered corporation** | **52-0904874** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **8200 Jones Branch Drive, McLean, Virginia** | **22102-3110** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(703) 903-2000**
*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.  ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                                                                            Accelerated filer ☒

Non-accelerated filer (Do not check if a smaller reporting company) ☐                              Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  ☐ Yes ☒ No

As of July 22, 2011, there were 649,709,893 shares of the registrant's common stock outstanding.

TREASURY-1647

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **PART I — FINANCIAL INFORMATION** | | |
| Item 1. | Financial Statements | 101 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 1 |
|  | Executive Summary | 1 |
|  | Selected Financial Data | 12 |
|  | Consolidated Results of Operations | 13 |
|  | Consolidated Balance Sheets Analysis | 32 |
|  | Risk Management | 48 |
|  | Liquidity and Capital Resources | 81 |
|  | Fair Value Measurements and Analysis | 87 |
|  | Off-Balance Sheet Arrangements | 89 |
|  | Critical Accounting Policies and Estimates | 90 |
|  | Forward-Looking Statements | 90 |
|  | Risk Management and Disclosure Commitments | 92 |
|  | Legislative and Regulatory Matters | 93 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 97 |
| Item 4. | Controls and Procedures | 99 |
| **PART II — OTHER INFORMATION** | | |
| Item 1. | Legal Proceedings | 185 |
| Item 1A. | Risk Factors | 185 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 187 |
| Item 6. | Exhibits | 187 |
| **SIGNATURES** | | 188 |
| **GLOSSARY** | | 189 |
| **EXHIBIT INDEX** | | E-1 |

i                                                                 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| — | Selected Financial Data | 12 |
| 1 | Total Single-Family Loan Workout Volumes | 2 |
| 2 | Single-Family Credit Guarantee Portfolio Data by Year of Origination | 4 |
| 3 | Credit Statistics, Single-Family Credit Guarantee Portfolio | 6 |
| 4 | Mortgage-Related Investments Portfolio | 11 |
| 5 | Summary Consolidated Statements of Income and Comprehensive Income | 13 |
| 6 | Net Interest Income/Yield and Average Balance Analysis | 14 |
| 7 | Derivative Gains (Losses) | 17 |
| 8 | Other Income | 18 |
| 9 | Non-Interest Expense | 19 |
| 10 | REO Operations Expense (Income), REO Inventory, and REO Dispositions | 19 |
| 11 | Segment Mortgage Portfolio Composition | 22 |
| 12 | Segment Earnings and Key Metrics — Investments | 23 |
| 13 | Segment Earnings and Key Metrics — Single-Family Guarantee | 26 |
| 14 | Segment Earnings Composition — Single-Family Guarantee Segment | 28 |
| 15 | Segment Earnings and Key Metrics — Multifamily | 30 |
| 16 | Investments in Securities | 33 |
| 17 | Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets | 34 |
| 18 | Total Mortgage-Related Securities Purchase Activity | 35 |
| 19 | Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics | 36 |
| 20 | Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans | 37 |
| 21 | Net Impairment on Available-For-Sale Mortgage-Related Securities Recognized in Earnings | 38 |
| 22 | Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS | 40 |
| 23 | Mortgage Loan Purchase and Other Guarantee Commitment Activity | 41 |
| 24 | Derivative Fair Values and Maturities | 43 |
| 25 | Changes in Derivative Fair Values | 44 |
| 26 | Freddie Mac Mortgage-Related Securities | 46 |
| 27 | Issuances and Extinguishments of Debt Securities of Consolidated Trusts | 47 |
| 28 | Changes in Total Equity (Deficit) | 47 |
| 29 | Mortgage Insurance by Counterparty | 53 |
| 30 | Monoline Bond Insurance by Counterparty | 54 |
| 31 | Derivative Counterparty Credit Exposure | 56 |
| 32 | Characteristics of the Single-Family Credit Guarantee Portfolio | 59 |
| 33 | Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio | 62 |
| 34 | Single-Family Home Affordable Modification Program Volume | 64 |
| 35 | Single-Family Refinance Loan Volume | 65 |
| 36 | Single-Family Loan Workouts, Serious Delinquency, and Foreclosure Volumes | 67 |
| 37 | Reperformance Rates of Modified Single-Family Loans | 68 |
| 38 | Single-Family Serious Delinquency Rates | 69 |
| 39 | Credit Concentrations in the Single-Family Credit Guarantee Portfolio | 71 |
| 40 | Single-Family Credit Guarantee Portfolio by Attribute Combinations | 72 |
| 41 | Single-Family Credit Guarantee Portfolio by Year of Loan Origination | 74 |
| 42 | Multifamily Mortgage Portfolio — by Attribute | 75 |
| 43 | Non-Performing Assets | 77 |
| 44 | REO Activity by Region | 78 |
| 45 | Credit Loss Performance | 79 |
| 46 | Single-Family Credit Loss Sensitivity | 80 |
| 47 | Other Debt Security Issuances by Product, at Par Value | 84 |
| 48 | Other Debt Security Repurchases, Calls, and Exchanges | 84 |
| 49 | Freddie Mac Credit Ratings | 85 |
| 50 | Summary of Assets and Liabilities at Fair Value on a Recurring Basis | 87 |
| 51 | Summary of Change in the Fair Value of Net Assets | 89 |
| 52 | PMVS Results | 98 |
| 53 | Derivative Impact on PMVS-L (50 bps) | 98 |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Freddie Mac Consolidated Statements of Income and Comprehensive Income | 102 |
| Freddie Mac Consolidated Balance Sheets | 103 |
| Freddie Mac Consolidated Statements of Equity (Deficit) | 104 |
| Freddie Mac Consolidated Statements of Cash Flows | 105 |
| Note 1: Summary of Significant Accounting Policies | 106 |
| Note 2: Conservatorship and Related Matters | 107 |
| Note 3: Variable Interest Entities | 110 |
| Note 4: Mortgage Loans and Loan Loss Reserves | 116 |
| Note 5: Individually Impaired and Non-Performing Loans | 120 |
| Note 6: Real Estate Owned | 124 |
| Note 7: Investments in Securities | 125 |
| Note 8: Debt Securities and Subordinated Borrowings | 134 |
| Note 9: Financial Guarantees | 136 |
| Note 10: Retained Interests in Mortgage-Related Securitizations | 138 |
| Note 11: Derivatives | 138 |
| Note 12: Freddie Mac Stockholders' Equity (Deficit) | 142 |
| Note 13: Income Taxes | 143 |
| Note 14: Employee Benefits | 144 |
| Note 15: Segment Reporting | 145 |
| Note 16: Regulatory Capital | 151 |
| Note 17: Concentration of Credit and Other Risks | 152 |
| Note 18: Fair Value Disclosures | 159 |
| Note 19: Legal Contingencies | 177 |
| Note 20: Earnings (Loss) Per Share | 183 |
| Note 21: Selected Financial Statement Line Items | 184 |

iii                                                                 *Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# PART I — FINANCIAL INFORMATION

*We continue to operate under the conservatorship that commenced on September 6, 2008, under the direction of FHFA as our Conservator. The Conservator succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any shareholder, officer or director thereof, with respect to the company and its assets. The Conservator has delegated certain authority to our Board of Directors to oversee, and management to conduct, day-to-day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator. See "BUSINESS — Conservatorship and Related Matters" in our Annual Report on Form 10-K for the year ended December 31, 2010, or 2010 Annual Report, for information on the terms of the conservatorship, the powers of the Conservator, and related matters, including the terms of our Purchase Agreement with Treasury.*

*This Quarterly Report on Form 10-Q includes forward-looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward-looking statements are made as of the date of this Form 10-Q and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Form 10-Q. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in: (a) "MD&A — FORWARD-LOOKING STATEMENTS," and "RISK FACTORS" in this Form 10-Q and in the comparably captioned sections of our 2010 Annual Report and our Quarterly Report on Form 10-Q for the first quarter of 2011; and (b) the "BUSINESS" section of our 2010 Annual Report.*

*Throughout this Form 10-Q, we use certain acronyms and terms which are defined in the Glossary.*

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this MD&A in conjunction with our consolidated financial statements and related notes for the three and six months ended June 30, 2011 included in "FINANCIAL STATEMENTS," and our 2010 Annual Report.*

## EXECUTIVE SUMMARY

**Overview**

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments. During the worst housing and financial crisis since the Great Depression, we are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures. We believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure.

*Summary of Financial Results*

Our financial performance in the second quarter of 2011 was impacted by the ongoing weakness in the economy, including the mortgage market. Our total comprehensive income (loss) was $(1.1) billion and $(430) million for the second quarters of 2011 and 2010, respectively, consisting of: (a) $(2.1) billion and $(4.7) billion of net income (loss), respectively; and (b) $1.0 billion and $4.3 billion of total other comprehensive income, respectively.

Our total equity (deficit) was $(1.5) billion at June 30, 2011, resulting from several contributing factors including our dividend payment of $1.6 billion on our senior preferred stock on June 30, 2011 and our total comprehensive income (loss) of $(1.1) billion for the second quarter of 2011. To address our deficit in net worth, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement for $1.5 billion. Following receipt of the draw, the aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $66.2 billion.

**Our Primary Business Objectives**

Under conservatorship, we are focused on: (a) meeting the needs of the U.S. residential mortgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in the MHA Program initiatives, including HAMP and HARP, and through our non-HAMP workout initiatives; (c) minimizing our credit losses; (d) maintaining the credit quality of the loans we purchase and guarantee; and (e) strengthening our infrastructure and improving overall efficiency. Our business objectives reflect, in part, direction we have received from the Conservator. We also have a variety of different, and potentially competing,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1651

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

objectives based on our charter, public statements from Treasury and FHFA officials, and other guidance and directives from our Conservator. For more information, see "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business*" in our 2010 Annual Report.

### Providing Mortgage Liquidity and Conforming Loan Availability

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- Our support enables borrowers to have access to a variety of conforming mortgage products, including the prepayable 30-year fixed-rate mortgage which historically has represented the foundation of the mortgage market.

- Our support provides lenders with a constant source of liquidity. We estimate that we, Fannie Mae, and Ginnie Mae collectively guaranteed more than 90% of the single-family conforming mortgages originated during the second quarter of 2011.

- Our consistent market presence provides assurance to our customers that there will be a buyer for their conforming loans that meet our credit standards. We believe this provides our customers with confidence to continue lending in difficult environments.

- We are an important counter-cyclical influence as we stay in the market even when other sources of capital have pulled out, as evidenced by the events of the last three years.

During the three and six months ended June 30, 2011, we guaranteed $62.2 billion and $157.9 billion in UPB of single-family conforming mortgage loans, respectively, representing more than 275,000 and 709,000 borrowers, respectively, who purchased homes or refinanced their mortgages.

Borrowers typically pay a lower interest rate on loans acquired or guaranteed by Freddie Mac, Fannie Mae, or Ginnie Mae. Mortgage originators are generally able to offer homebuyers and homeowners lower mortgage rates on conforming loan products, including ours, in part because of the value investors place on GSE-guaranteed mortgage-related securities. Prior to 2007, mortgage markets were less volatile, home values were stable or rising, and there were many sources of mortgage funds. We estimate that prior to 2007 the average effective interest rates on conforming single-family mortgage loans were about 30 basis points lower than on non-conforming loans. Since 2007, we estimate that interest rates on conforming loans, excluding conforming jumbo loans, have been lower than those on non-conforming loans by as much as 184 basis points. In June 2011, we estimate that borrowers were paying an average of 48 basis points less on these conforming loans than on non-conforming loans. These estimates are based on data provided by HSH Associates, a third-party provider of mortgage market data.

### Reducing Foreclosures and Keeping Families in Homes

We are focused on reducing the number of foreclosures and helping to keep families in their homes. In addition to our participation in HAMP, we introduced several new initiatives during the last few years to help eligible borrowers keep their homes or avoid foreclosure, including our relief refinance mortgage initiative, which is our implementation of HARP. In the first half of 2011, we helped more than 116,000 borrowers either stay in their homes or sell their properties and avoid foreclosure through HAMP and our various other workout initiatives. Table 1 presents our recent single-family loan workout activities.

### Table 1 — Total Single-Family Loan Workout Volumes[1]

| | For the Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | 06/30/2011 | 03/31/2011 | 12/31/2010 | 09/30/2010 | 06/30/2010 |
| | | | (number of loans) | | |
| Loan modifications | 31,049 | 35,158 | 37,203 | 39,284 | 49,562 |
| Repayment plans | 7,981 | 9,099 | 7,964 | 7,030 | 7,455 |
| Forbearance agreements[2] | 3,709 | 7,678 | 5,945 | 6,976 | 12,815 |
| Short sales and deed-in-lieu transactions | 11,038 | 10,706 | 12,097 | 10,472 | 9,542 |
| Total single-family loan workouts | 53,777 | 62,641 | 63,209 | 63,762 | 79,374 |

(1) Based on actions completed with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment, and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent, or effective, such as loans in the trial period under HAMP. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period.

(2) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1652

Table of Contents

We continue to execute a high volume of loan workouts. Highlights of these efforts include the following:

- We completed 53,777 single-family loan workouts during the second quarter of 2011, including 31,049 loan modifications and 11,038 short sales and deed-in-lieu transactions.

- Based on information provided by the MHA Program administrator, our servicers had completed 134,282 loan modifications under HAMP from the introduction of the initiative in 2009 through June 30, 2011 and, as of June 30, 2011, 16,106 loans were in HAMP trial periods (this figure only includes borrowers who made at least their first payment under the trial period).

We continue to directly assist troubled borrowers through outreach and other efforts. In addition, on April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie Mae. This servicing alignment initiative will result in consistent processes for both HAMP and non-HAMP workout solutions, and will be implemented over the course of 2011 and into 2012. As part of this initiative, we will implement a new non-HAMP loan modification process that, similar to the HAMP process, will require borrowers to complete a three month trial period. We believe that the servicing alignment initiative, which will establish a uniform framework and requirements for servicing non-performing loans owned or guaranteed by us and Fannie Mae, will ultimately change the way servicers communicate and work with troubled borrowers, bring greater consistency and accountability to the servicing industry, and help more distressed homeowners avoid foreclosure. For information on changes to mortgage servicing and foreclosure practices that could adversely affect our business, see "LEGISLATIVE AND REGULATORY MATTERS —Developments Concerning Single-Family Servicing Practices."

For more information about HAMP, other loan workout programs, our relief refinance mortgage initiative, and other initiatives to help eligible borrowers keep their homes or avoid foreclosure, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — MHA Program*" and "*— Single-Family Loan Workouts.*"

*Minimizing Credit Losses*

We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure.

To help minimize the credit losses related to our guarantee activities, we are focused on:

- pursuing a variety of loan workouts, including foreclosure alternatives, in an effort to reduce the severity of losses we experience over time;

- managing foreclosure timelines to the extent possible, given the increasingly lengthy foreclosure process in many states;

- managing our inventory of foreclosed properties to reduce costs and maximize proceeds; and

- pursuing contractual remedies against originators, lenders, servicers, and insurers, as appropriate.

We have contractual arrangements with our seller/servicers under which they agree to provide us with mortgage loans that have been originated under specified underwriting standards. If we subsequently discover that contractual standards were not followed, we can exercise certain contractual remedies to mitigate our credit losses. These contractual remedies include requiring the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan. As of June 30, 2011, the UPB of loans subject to repurchase requests issued to our single-family seller/servicers was approximately $3.1 billion, and approximately 43% of these requests were outstanding for more than four months since issuance of our initial repurchase request. The amount we expect to collect on the outstanding requests is significantly less than the UPB amount primarily because many of these requests will likely be satisfied by reimbursement of our realized losses by seller/servicers, or may be rescinded in the course of the contractual appeals process. We continue to review loans and pursue our rights to issue repurchase requests to our counterparties, as appropriate. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Mortgage Seller/Servicers*" for further information on our agreements with our seller/servicers.

Our credit loss exposure is also partially mitigated by mortgage insurance, which is a form of credit enhancement. Primary mortgage insurance is required to be purchased, at the borrower's expense, for certain mortgages with higher LTV ratios. We received payments under primary and other mortgage insurance of $0.7 billion and $1.3 billion in the three and six months ended June 30, 2011, respectively, which helped to mitigate our credit losses. We believe that in addition to Triad Guaranty Insurance Corp., or Triad (as discussed below), certain of our other mortgage insurance counterparties

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

may lack sufficient ability to fully meet all of their expected lifetime claims paying obligations to us over the long term as such claims emerge. However, we evaluate the near term recovery from insurance policies for mortgage loans that we hold on our consolidated balance sheet as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments as part of the estimate of our loan loss reserves. Based upon currently available information, we believe that all of our mortgage insurance counterparties, except for Triad, have the capacity to pay all claims as they become due in the normal course for the near term.

### Maintaining the Credit Quality of New Loan Purchases and Guarantees

We continue to focus on maintaining credit policies, including our underwriting guidelines, that allow us to purchase and guarantee loans made to qualified borrowers that we believe will provide management and guarantee fee income, over the long-term, that exceeds our expected credit-related and administrative expenses on such loans.

As of June 30, 2011 and December 31, 2010, approximately 46% and 39%, respectively, of our single-family credit guarantee portfolio consisted of mortgage loans originated after 2008. Loans in our single-family credit guarantee portfolio originated after 2008 have experienced lower serious delinquency trends in the early years of their terms than loans originated in 2005 through 2008.

The credit quality of the single-family loans we acquired in the first half of 2011 (excluding relief refinance mortgages, which represented approximately 28% of our single family purchase volume during the first half of 2011) is significantly better than that of loans we acquired from 2005 through 2008, as measured by original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. The improvement in credit quality of loans we have purchased since 2008 is primarily the result of the combination of: (a) changes in our credit policies, including changes in our underwriting guidelines; (b) fewer purchases of loans with higher risk characteristics; and (c) changes in mortgage insurers' and lenders' underwriting practices.

Approximately 93% of our single-family purchase volume in the first half of 2011 consisted of fixed-rate amortizing mortgages. Approximately 70% and 79% of our single-family purchase volume in the three and six months ended June 30, 2011, respectively, was refinance mortgages, including approximately 26% and 28%, respectively, that were relief refinance mortgages, based on UPB. Relief refinance mortgages with LTV ratios above 80% may not perform as well as other refinance mortgages over time due, in part, to the continued high LTV ratios of these loans. Approximately 14% of our single-family purchase volume in the first half of 2011 was relief refinance mortgages with LTV ratios above 80%. Relief refinance mortgages comprised approximately 10% and 7% of the UPB in our total single-family credit guarantee portfolio at June 30, 2011 and December 31, 2010, respectively.

Table 2 presents the composition, loan characteristics, and serious delinquency rates of loans in our single-family credit guarantee portfolio, by year of origination at June 30, 2011.

### Table 2 — Single-Family Credit Guarantee Portfolio Data by Year of Origination[1]

|  | At June 30, 2011 | | | | | |
|---|---|---|---|---|---|---|
|  | % of Portfolio | Average Credit Score[2][3] | Original LTV Ratio[3] | Current LTV Ratio[3][4] | Current LTV Ratio >100% | Serious Delinquency Rate[3][5] |
| **Year of Origination** | | | | | | |
| 2011 | 6% | 751 | 71% | 70% | 5% | 0.01% |
| 2010 | 20 | 755 | 70 | 71 | 5 | 0.12 |
| 2009 | 20 | 755 | 68 | 72 | 5 | 0.34 |
| 2008 | 8 | 727 | 74 | 90 | 32 | 4.94 |
| 2007 | 10 | 706 | 77 | 110 | 58 | 11.04 |
| 2006 | 8 | 711 | 75 | 109 | 54 | 10.28 |
| 2005 | 9 | 717 | 73 | 95 | 36 | 6.01 |
| 2004 and prior | 19 | 721 | 71 | 60 | 9 | 2.49 |
| Total | 100% | 734 | 71 | 79 | 20 | 3.50 |

(1) Based on the single-family credit guarantee portfolio, which totaled $1,805 billion at June 30, 2011, and includes relief refinance mortgage loans.

(2) Based on FICO credit score of the borrower as of the date of loan origination and may not be indicative of the borrowers' creditworthiness at June 30, 2011. Excludes $11 billion in UPB of loans where the FICO scores at origination were not available at June 30, 2011.

(3) Calculated based on the loans remaining in the portfolio as of June 30, 2011, rather than all loans originally guaranteed by us and originated in the respective year.

(4) We estimate current market values by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination.

(5) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk* — Delinquencies" for further information about our reported serious delinquency rates.

Mortgages originated after 2008 represent an increasingly large proportion of our single-family credit guarantee portfolio, as the amount of older vintages in the portfolio, which have a higher composition of loans with higher-risk

*Freddie Mac*

TREASURY-1654

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

characteristics, continues to decline due to liquidations, which include payoffs, repayments, refinancing activity, and foreclosures. We currently expect that, over time, the replacement of older vintages should positively impact the serious delinquency rates and credit-related expenses of our single-family credit guarantee portfolio. However, the rate at which this replacement occurs has slowed in recent quarterly periods, due to a decline in the volume of home purchase mortgage originations and an increase in the proportion of relief refinance mortgage activity. See "Table 14 — Segment Earnings Composition — Single-Family Guarantee Segment" for an analysis of the contribution to Segment Earnings (loss) by loan origination year.

### Strengthening Our Infrastructure and Improving Overall Efficiency

We are working with our Conservator to both enhance the value of our infrastructure and improve our efficiency in order to preserve the taxpayers' investment. As such, we are investing considerable resources in an effort to improve our existing systems infrastructure. This effort will likely take several years to fully implement and focuses on making significant improvements to our systems infrastructure in order to: (a) comply with FHFA- and regulatory-mandated initiatives; (b) improve risk management; (c) enhance the service we provide to our customers; and (d) improve operational efficiency. At the end of this effort, we expect to have an infrastructure in place that is more efficient, flexible and well-controlled, which will assist us in our continued efforts to serve the mortgage market and reduce administrative expenses and other costs.

We continue to actively monitor our general and administrative expenses, while also continuing to focus on retaining key talent. Our general and administrative expenses declined in the first half of 2011 compared to the first half of 2010.

### Single-Family Credit Guarantee Portfolio

In discussing our credit performance, we often use the terms "credit losses" and "credit-related expenses." These terms are significantly different. Our "credit losses" consist of charge-offs, and REO operations income (expense), net of recoveries, and our "credit-related expenses" consist of our provision for credit losses and REO operations income (expense).

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $66.9 billion, and have recorded an additional $4.5 billion in losses on loans purchased from PC trusts, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred and, thus have not been provisioned for, we believe that, as of June 30, 2011, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations.

*Freddie Mac*

TREASURY-1655

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                                                                     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The UPB of our single-family credit guarantee portfolio declined slightly during the first half of 2011, since the amount of liquidations exceeded new loan purchase and guarantee activity. Table 3 provides certain credit statistics for our single-family credit guarantee portfolio.

**Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio**

| | As of | | | | |
|---|---|---|---|---|---|
| | 06/30/2011 | 03/31/2011 | 12/31/2010 | 09/30/2010 | 06/30/2010 |
| Payment status — | | | | | |
| One month past due | 1.92% | 1.75% | 2.07% | 2.11% | 2.02% |
| Two months past due | 0.67% | 0.65% | 0.78% | 0.80% | 0.77% |
| Seriously delinquent[1] | 3.50% | 3.63% | 3.84% | 3.80% | 3.96% |
| Non-performing loans (in millions)[2] | $114,819 | $115,083 | $115,478 | $112,746 | $111,758 |
| Single-family loan loss reserve (in millions)[3] | $ 38,390 | $ 38,558 | $ 39,098 | $ 37,665 | $ 37,384 |
| REO inventory (in properties) | 60,599 | 65,159 | 72,079 | 74,897 | 62,178 |
| REO assets, net carrying value (in millions) | $ 5,834 | $ 6,261 | $ 6,961 | $ 7,420 | $ 6,228 |

| | For the Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 06/30/2011 | 03/31/2011 | 12/31/2010 | 09/30/2010 | 06/30/2010 |
| | | | (in units, unless noted) | | |
| Seriously delinquent loan additions[1] | 87,813 | 97,646 | 113,235 | 115,359 | 123,175 |
| Loan modifications[4] | 31,049 | 35,158 | 37,203 | 39,284 | 49,562 |
| Foreclosure starts ratio[5] | 0.55% | 0.58% | 0.73% | 0.75% | 0.61% |
| REO acquisitions | 24,788 | 24,707 | 23,771 | 39,053 | 34,662 |
| REO disposition severity ratio:[6] | | | | | |
| California | 44.9% | 44.5% | 43.9% | 41.9% | 42.0% |
| Arizona | 51.3% | 50.8% | 49.5% | 46.6% | 44.3% |
| Florida | 52.7% | 54.8% | 53.0% | 54.9% | 53.8% |
| Nevada | 55.4% | 53.5% | 53.1% | 51.6% | 49.4% |
| Michigan | 48.5% | 48.3% | 49.7% | 49.2% | 47.2% |
| Total U.S. | 41.7% | 43.0% | 41.3% | 41.5% | 39.2% |
| Single-family credit losses (in millions) | $ 3,106 | $ 3,226 | $ 3,086 | $ 4,216 | $ 3,851 |

(1) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Delinquencies*" for further information about our reported serious delinquency rates.

(2) Consists of the UPB of loans in our single-family credit guarantee portfolio that have undergone a TDR or that are seriously delinquent. As of June 30, 2011 and December 31, 2010, approximately $36.2 billion and $26.6 billion in UPB of TDR loans, respectively, were no longer seriously delinquent.

(3) Consists of the combination of: (a) our allowance for loan losses on mortgage loans held for investment; and (b) our reserve for guarantee losses associated with non-consolidated single-family mortgage securitization trusts and other guarantee commitments.

(4) Represents the number of completed modifications under agreement with the borrower during the quarter. Excludes forbearance agreements, repayment plans, and loans in the trial period under HAMP.

(5) Represents the ratio of the number of loans that entered the foreclosure process during the respective quarter divided by the number of loans in the single-family credit guarantee portfolio at the end of the quarter. Excludes Other Guarantee Transactions and mortgages covered under other guarantee commitments.

(6) Calculated as the amount of our losses recorded on disposition of REO properties during the respective quarterly period, excluding those subject to repurchase requests made to our seller/servicers, divided by the aggregate UPB of the related loans. The amount of losses recognized on disposition of the properties is equal to the amount by which the UPB of the loans exceeds the amount of sales proceeds from disposition of the properties. Excludes sales commissions and other expenses, such as property maintenance and costs, as well as applicable recoveries from credit enhancements, such as mortgage insurance.

The number of seriously delinquent loan additions has continued to decline; however, our single-family credit guarantee portfolio continued to experience a high level of serious delinquencies and foreclosures in the first half of 2011 as compared to our historical experience. Several factors, including delays in foreclosure due to concerns about the foreclosure process, have resulted in loans remaining in serious delinquency for longer periods than prior to 2008, particularly in states that require a judicial foreclosure process. As of June 30, 2011 and December 31, 2010, the percentage of seriously delinquent loans that have been delinquent for more than six months was 72% and 66%, respectively. The UPB of our non-performing loans declined in the first half of 2011. However, the credit losses and loan loss reserve associated with our single-family credit guarantee portfolio remained elevated in the first half of 2011, due in part to:

• Losses associated with the continued high volume of foreclosures and foreclosure alternatives. These actions relate to our continued efforts to resolve our large inventory of seriously delinquent loans. Due to the length of time necessary for servicers either to complete the foreclosure process or pursue foreclosure alternatives on seriously delinquent loans in our portfolio, we expect our credit losses will continue to remain high even if the volume of new serious delinquencies continues to decline.

6

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- Continued negative impact of certain loan groups within the single-family credit guarantee portfolio, such as those underwritten with certain lower documentation standards and interest-only loans, as well as other 2005 through 2008 vintage loans. These groups continue to be large contributors to our credit losses.

- Cumulative declines in national home prices during the last five years, based on our own index, which resulted in continued high REO disposition severity ratios on our dispositions of REO inventory.

Our REO inventory (measured in number of properties) declined in each of the last three quarters due to an increase in the volume of REO dispositions and temporary slowdowns in REO acquisition volume. Dispositions of REO increased 26% in the first half of 2011 compared to the first half of 2010, based on the number of properties sold. We believe our single-family REO acquisition volume and single-family credit losses beginning in the fourth quarter of 2010 have been less than they otherwise would have been due to delays in the single-family foreclosure process. See "Mortgage Market and Economic Conditions — *Delays in the Foreclosure Process for Single-Family Mortgages*" for further information.

**Conservatorship and Government Support for our Business**

We have been operating under conservatorship, with FHFA acting as our conservator, since September 6, 2008. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition, and results of operations.

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

While the conservatorship has benefited us, we are subject to certain constraints on our business activities imposed by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement and by FHFA, as our Conservator.

To address our net worth deficit of $1.5 billion at June 30, 2011, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $1.5 billion. FHFA will request that we receive these funds by September 30, 2011. Upon funding of the draw request: (a) our aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $66.2 billion; and (b) the corresponding annual cash dividend owed to Treasury will increase to $6.6 billion.

We pay cash dividends to Treasury at an annual rate of 10%. Through June 30, 2011, we paid aggregate cash dividends to Treasury of $13.2 billion, an amount equal to 21% of our aggregate draws received under the Purchase Agreement. As of June 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock exceeded our annual historical earnings in all but one period. As a result, we expect to make additional draws in future periods, even if our operating performance generates net income or comprehensive income.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The $200 billion cap on Treasury's funding commitment will increase as necessary to eliminate any net worth deficits we may have during 2010, 2011, and 2012. We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

On August 5, 2011, S&P lowered the long-term credit rating of the U.S. government to "AA+" from "AAA" and assigned a negative outlook to the rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating. This could adversely affect our liquidity and the supply and cost of debt financing available to us. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Other Debt Securities — Credit Ratings.*"

Neither the U.S. government nor any other agency or instrumentality of the U.S. government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities or other obligations.

For information on conservatorship, the Purchase Agreement, and the impact of credit ratings, see "BUSINESS — Conservatorship and Related Matters" in our 2010 Annual Report and "RISK FACTORS — *A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business. Our business could also be adversely affected if there is a downgrade in the credit ratings of the U.S. government or a payment default by the U.S. government*" and "— *If Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth, FHFA could be required to place us into receivership.*"

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Consolidated Financial Results**

Net loss was $(2.1) billion and $(4.7) billion for the second quarters of 2011 and 2010, respectively. Key highlights of our financial results include:

- Net interest income for the second quarter of 2011 increased to $4.6 billion from $4.1 billion in the second quarter of 2010, mainly due to lower funding costs, partially offset by a decline in the average balances of mortgage-related securities.

- Provision for credit losses for the second quarter of 2011 decreased to $2.5 billion, compared to $5.0 billion for the second quarter of 2010. The provision for credit losses in the second quarter of 2011 primarily reflects a decline in the rate at which delinquent loans transition into serious delinquency. The provision for credit losses in the second quarter of 2010 reflected a higher volume of seriously delinquent loan additions and loan modifications that were classified as TDRs.

- Non-interest income (loss) was $(3.9) billion for the second quarter of 2011, compared to $(3.6) billion for the second quarter of 2010 largely due to derivative losses in both periods.

- Non-interest expense was $546 million and $479 million in the second quarters of 2011 and 2010, respectively, and reflects increased REO operations expense, partially offset by a decline in administrative expenses in the second quarter of 2011, compared to the second quarter of 2010.

- Total comprehensive income (loss) was $(1.1) billion for the second quarter of 2011 compared to $(430) million for the second quarter of 2010. Total comprehensive income (loss) for the second quarter of 2011 reflects the $(2.1) billion net loss, partially offset by the $1.0 billion total other comprehensive income, primarily resulting from improved fair values on available-for-sale securities.

**Mortgage Market and Economic Conditions**

*Overview*

The housing market experienced continued challenges during the second quarter of 2011 due primarily to continued weakness in the employment market and a large number of distressed property sales. The U.S. real gross domestic product rose by 1.3% on an annualized basis during the second quarter of 2011, compared to 0.4% during the first quarter of 2011, according to the Bureau of Economic Analysis estimates. The national unemployment rate rose to 9.2% in June 2011, compared to 8.8% in March 2011, based on data from the U.S. Bureau of Labor Statistics.

*Single-Family Housing Market*

We believe the overall number of potential home buyers in the market combined with the volume of homes offered for sale will determine the direction of home prices. Within the industry, existing home sales are important for assessing the rate at which the mortgage market might absorb the inventory of listed, but unsold, homes in the U.S. (including listed REO properties). Additionally, we believe new home sales can be an indicator of certain economic trends, such as the potential for growth in gross domestic product and total U.S. mortgage debt outstanding. Sales of existing homes in the second quarter of 2011 averaged 4.86 million (at a seasonally adjusted annual rate), a decline of 5% from an average seasonally adjusted annual rate of 5.14 million in the first quarter of 2011. New home sales in the second quarter of 2011 averaged 315,000 homes (at a seasonally adjusted annual rate) increasing approximately 5% from an average seasonally adjusted annual rate of approximately 300,000 homes in the first quarter of 2011.

We estimate that home prices (on a non-seasonally adjusted basis) decreased 0.2% nationwide during the first half of 2011, which includes a 2.1% increase in the second quarter of 2011. Seasonal factors typically result in stronger house-price appreciation during the second quarter. We estimate that seasonally adjusted home prices were approximately flat during the second quarter. These estimates are based on our own index of mortgage loans in our single-family credit guarantee portfolio. Other indexes of home prices may have different results, as they are determined using different pools of mortgage loans and calculated under different conventions than our own.

*Multifamily Housing Market*

Multifamily market fundamentals continued to improve on a national level during the second quarter of 2011. This improvement continues a trend of favorable movements in key indicators such as vacancy rates and effective rents. Vacancy rates and effective rents are important to loan performance because multifamily loans are generally repaid from the cash flows generated by the underlying property and these factors significantly influence those cash flows. These improving fundamentals and perceived optimism about demand for multifamily housing have helped improve property

8

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.
Powered by Morningstar® Document Research℠

Table of Contents

values in most markets. However, the broader economy continues to be challenged by persistently high unemployment, which has delayed a more complete economic recovery.

### Delays in the Foreclosure Process for Single-Family Mortgages

In the fall of 2010, several large single-family seller/servicers announced issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits. As a result, a number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in the latter part of 2010 in certain states in which they do business, and we temporarily suspended certain REO sales in November 2010. During the first quarter of 2011, we fully resumed marketing and sales of REO properties. While the larger servicers generally resumed foreclosure proceedings in the first quarter of 2011, we have continued to experience significant delays in the foreclosure process for single-family mortgages in the second quarter of 2011, as compared to before these issues arose, particularly in states that require a judicial foreclosure process. More recently, regulatory developments impacting mortgage servicing and foreclosure practices have contributed to these delays. These delays have caused the volume of our single-family REO acquisitions in the first half of 2011 to be less than it otherwise would have been. We expect these delays in the foreclosure process will likely continue at least through the remainder of 2011. We generally refer to these issues as the concerns about the foreclosure process. For information on recent regulatory developments affecting foreclosures, see "LEGISLATIVE AND REGULATORY MATTERS —Developments Concerning Single-Family Servicing Practices."

### Mortgage Market and Business Outlook

Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties. For example, a number of factors could cause the actual performance of the housing and mortgage markets and the U.S. economy during the remainder of 2011 to be significantly worse than we expect, including adverse changes in consumer confidence, national or international economic conditions and changes in the federal government's fiscal policies. See "FORWARD-LOOKING STATEMENTS" for additional information.

### Overview

We continue to expect key macroeconomic drivers of the economy — such as income growth, employment, and inflation — will affect the performance of the housing and mortgage markets in the remainder of 2011. The economy is expected to continue to generate new jobs and rising incomes, which will help in continuing the gradual recovery in housing activity. However, the weak payroll employment growth during the second quarter and accompanying rise in the unemployment rate weakens near-term demand for housing. Further, consumer confidence measures, while up from recession lows, remain below long-term averages and suggest that households will likely be more cautious in home buying. We also expect rates on fixed-rate single-family mortgages to be slightly higher in the second half of 2011, as stronger GDP growth and labor market improvements generate higher demand for credit and mitigate deflationary pressures. Lastly, many large financial institutions experienced temporary delays in the foreclosure process for single-family loans late in 2010 and early in 2011. To the extent a large inventory of loans completes the foreclosure process, such an increase in REO inventory could have a negative impact on the housing market.

Our expectation for home prices, based on our own index, is that national average home prices will continue to remain volatile and will likely decline over the near term before a long-term recovery in housing begins, due to, among other factors: (a) our expectation for a sustained volume of distressed sales, which include short sales and sales by financial institutions of their REO properties; and (b) the likelihood that unemployment rates will remain high.

### Single-Family

We expect our credit losses will likely remain elevated in the second half of 2011. This is in part due to the substantial number of mortgage loans in our single-family credit guarantee portfolio on which borrowers owe more than their home is currently worth, as well as the substantial inventory of seriously delinquent loans. For the near term, we also expect:

- REO disposition severity ratios to remain relatively high, as market conditions, such as home prices and the rate of home sales, continue to remain weak;

- non-performing assets, which include loans deemed TDRs, to continue to remain high;

9

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- the volume of loan workouts to remain high; and

- continued high volume of loans in the foreclosure process as well as prolonged foreclosure timelines, which may result in a continued high loan loss reserve balance in the near term and increases in charge-offs in future periods.

### Multifamily

The most recent data available continues to reflect improving national apartment fundamentals, including vacancy rates and effective rents. However, some geographic areas in which we have investments in multifamily loans, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We own or guarantee many nonperforming loans, and loans that we believe are at risk of default, in these states. Our delinquency rates have historically been a lagging indicator and, as a result, we expect to continue to experience delinquencies in the remainder of 2011, consistent with our experience in the first half of 2011.

In addition, as more market participants re-emerged in the multifamily market during the first half of 2011, increased competition from other institutional investors could negatively impact our future purchase volumes as well as the pricing and credit quality of newly originated loans for the remainder of 2011.

### Long-Term Financial Sustainability

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will regularly generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived in the future. Treasury waived the fee for the first three quarters of 2011, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the quarterly commitment fee has not yet been established and could be substantial. As a result of these factors, there is uncertainty as to our long-term financial sustainability.

There continues to be significant uncertainty in the current mortgage market environment, and continued high levels of unemployment, weakness in home prices, adverse changes in interest rates, mortgage security prices, spreads and other factors could lead to additional draws. For discussion of other factors that could result in additional draws, see "LIQUIDITY AND CAPITAL RESOURCES — Capital Resources."

There is also significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Obama Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations. As discussed below in "Legislative and Regulatory Developments," on February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market.

### Limits on Mortgage-Related Investments Portfolio

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $810 billion as of December 31, 2010 and may not exceed $729 billion as of December 31, 2011. FHFA has stated that we will not be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio, except for purchases of delinquent mortgages out of PC trusts. FHFA has also indicated that the portfolio reduction targets under the Purchase Agreement and FHFA regulation should be viewed as minimum reductions and has encouraged us to reduce the mortgage-related investments portfolio at a faster rate than required, consistent with FHFA guidance, safety and soundness and the goal of conserving and preserving assets.

Table 4 presents the UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation.

TREASURY-1660

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 4 — Mortgage-Related Investments Portfolio**[1]

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| Investments segment — Mortgage investments portfolio | $ 477,196 | $ 481,677 |
| Single-family Guarantee segment — Single-family unsecuritized mortgage loans[2] | 64,744 | 69,766 |
| Multifamily segment — Mortgage investments portfolio | 143,093 | 145,431 |
| Total mortgage-related investments portfolio | $ 685,033 | $ 696,874 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Represents unsecuritized non-performing single-family loans managed by the Single-family Guarantee segment.

The UPB of our mortgage-related investments portfolio declined from December 31, 2010 to June 30, 2011, primarily due to liquidations, partially offset by the purchase of $25.2 billion of seriously delinquent loans from PC trusts.

Our mortgage-related investments portfolio includes assets that are less liquid than agency securities, including unsecuritized performing single-family mortgage loans, multifamily mortgage loans, CMBS, and housing revenue bonds. Our less liquid assets collectively represented approximately 35% of the UPB of the portfolio at June 30, 2011. Our mortgage-related investments portfolio also includes illiquid assets, including unsecuritized seriously delinquent and modified single-family mortgage loans, which we purchased from PC trusts, and our investments in non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans. Our illiquid assets collectively represented approximately 22% of the UPB of the portfolio at June 30, 2011.

We disclose our mortgage assets on the basis used to determine the cap under the caption "Mortgage-Related Investments Portfolio — Ending Balance" in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC.

We are providing our web site addresses here and elsewhere in this Form 10-Q solely for your information. Information appearing on our web site is not incorporated into this Form 10-Q.

**Legislative and Regulatory Developments**

A number of bills have been introduced in Congress that would bring about changes in Freddie Mac and Fannie Mae's business model. In addition, on February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, and states that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

See "LEGISLATIVE AND REGULATORY MATTERS" for information on the Obama Administration's February 2011 report, recent developments in GSE reform legislation, recently initiated rulemakings under the Dodd-Frank Act, and other regulatory developments.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1661

Table of Contents

## SELECTED FINANCIAL DATA[1]

The selected financial data presented below should be reviewed in conjunction with MD&A and our consolidated financial statements and related notes for the three and six months ended June 30, 2011.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (dollars in millions, except share-related amounts) | | | |
| **Statements of Income and Comprehensive Income Data** | | | | |
| Net interest income | $ 4,561 | $ 4,136 | $ 9,101 | $ 8,261 |
| Provision for credit losses | (2,529) | (5,029) | (4,518) | (10,425) |
| Non-interest income (loss) | (3,857) | (3,627) | (5,109) | (8,481) |
| Non-interest expense | (546) | (479) | (1,243) | (1,146) |
| Net loss attributable to Freddie Mac | (2,139) | (4,713) | (1,463) | (11,401) |
| Total comprehensive income (loss) attributable to Freddie Mac | (1,100) | (430) | 1,640 | (2,310) |
| Net loss attributable to common stockholders | (3,756) | (6,009) | (4,685) | (13,989) |
| Loss per common share: | | | | |
| Basic | (1.16) | (1.85) | (1.44) | (4.30) |
| Diluted | (1.16) | (1.85) | (1.44) | (4.30) |
| Cash dividends per common share | — | — | — | — |
| Weighted average common shares outstanding (in thousands):[2] | | | | |
| Basic | 3,244,967 | 3,249,198 | 3,245,970 | 3,250,241 |
| Diluted | 3,244,967 | 3,249,198 | 3,245,970 | 3,250,241 |

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| | (dollars in millions) | |
| **Balance Sheets Data** | | |
| Mortgage loans held-for-investment, at amortized cost by consolidated trusts (net of allowances for loan losses) | $ 1,634,773 | $ 1,646,172 |
| Total assets | 2,195,795 | 2,261,780 |
| Debt securities of consolidated trusts held by third parties | 1,499,036 | 1,528,648 |
| Other debt | 681,087 | 713,940 |
| All other liabilities | 17,150 | 19,593 |
| Total stockholders' equity (deficit) | (1,478) | (401) |
| **Portfolio Balances[3]** | | |
| Mortgage-related investments portfolio | $ 685,033 | $ 696,874 |
| Total Freddie Mac Mortgage-Related Securities[4] | 1,681,985 | 1,712,918 |
| Total mortgage portfolio[5] | 2,128,659 | 2,164,859 |
| Non-performing assets[6] | 123,861 | 125,405 |

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| **Ratios[7]** | | | | |
| Return on average assets[8][11] | (0.4)% | (0.8)% | (0.1)% | (1.0)% |
| Non-performing assets ratio[9] | 6.4 | 6.0 | 6.4 | 6.0 |
| Equity to assets ratio[10][11] | 0.0 | (0.3) | 0.0 | (0.2) |

(1) See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report for information regarding our accounting policies.
(2) Includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included in basic loss per share, because it is unconditionally exercisable by the holder at a cost of $0.00001 per share.
(3) Represents the UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(4) See "Table 26 — Freddie Mac Mortgage-Related Securities" for the composition of this line item.
(5) See "Table 11 — Segment Mortgage Portfolio Composition" for the composition of our total mortgage portfolio.
(6) See "Table 43 — Non-Performing Assets" for a description of our non-performing assets.
(7) The return on common equity ratio is not presented because the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit), net of preferred stock (at redemption value), is less than zero for all periods presented. The dividend payout ratio on common stock is not presented because we are reporting a net loss attributable to common stockholders for all periods presented.
(8) Ratio computed as annualized net income (loss) attributable to Freddie Mac divided by the simple average of the beginning and ending balances of total assets.
(9) Ratio computed as non-performing assets divided by the ending UPB of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities.
(10) Ratio computed as the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit) divided by the simple average of the beginning and ending balances of total assets.
(11) To calculate the simple averages for the six months ended June 30, 2010, the beginning balances of total assets, and total Freddie Mac stockholders' equity are based on the January 1, 2010 balances included in "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES — Table 2.1 — Impact of the Change in Accounting for Transfers of Financial Assets and Consolidation of Variable Interest Entities on Our Consolidated Balance Sheet" in our 2010 Annual Report, so that both the beginning and ending balances reflect changes in accounting principles.

12 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported results of operations.

## Table 5 — Summary Consolidated Statements of Income and Comprehensive Income

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Net interest income | $ 4,561 | $ 4,136 | $ 9,101 | $ 8,261 |
| Provision for credit losses | (2,529) | (5,029) | (4,518) | (10,425) |
| Net interest income (loss) after provision for credit losses | 2,032 | (893) | 4,583 | (2,164) |
| Non-interest income (loss): | | | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (125) | 4 | 98 | (94) |
| Gains (losses) on retirement of other debt | 3 | (141) | 15 | (179) |
| Gains (losses) on debt recorded at fair value | (37) | 544 | (118) | 891 |
| Derivative gains (losses) | (3,807) | (3,838) | (4,234) | (8,523) |
| Impairment of available-for-sale securities: | | | | |
| Total other-than-temporary impairment of available-for-sale securities | (230) | (114) | (1,284) | (531) |
| Portion of other-than-temporary impairment recognized in AOCI | (122) | (314) | (261) | (407) |
| Net impairment of available-for-sale securities recognized in earnings | (352) | (428) | (1,545) | (938) |
| Other gains (losses) on investment securities recognized in earnings | 209 | (257) | 89 | (673) |
| Other income | 252 | 489 | 586 | 1,035 |
| Total non-interest income (loss) | (3,857) | (3,627) | (5,109) | (8,481) |
| Non-interest expense: | | | | |
| Administrative expenses | (384) | (404) | (745) | (809) |
| REO operations (expense) income | (27) | 40 | (284) | (119) |
| Other expenses | (135) | (115) | (214) | (218) |
| Total non-interest expense | (546) | (479) | (1,243) | (1,146) |
| Loss before income tax benefit | (2,371) | (4,999) | (1,769) | (11,791) |
| Income tax benefit | 232 | 286 | 306 | 389 |
| Net loss | (2,139) | (4,713) | (1,463) | (11,402) |
| Other comprehensive income, net of taxes and reclassification adjustments: | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 903 | 4,097 | 2,844 | 8,743 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 135 | 184 | 267 | 356 |
| Changes in defined benefit plans | 1 | 2 | (8) | (8) |
| Total other comprehensive income, net of taxes and reclassification adjustments | 1,039 | 4,283 | 3,103 | 9,091 |
| Comprehensive income (loss) | (1,100) | (430) | 1,640 | (2,311) |
| Less: Comprehensive loss attributable to noncontrolling interest | — | — | — | 1 |
| Total comprehensive income (loss) attributable to Freddie Mac | $ (1,100) | $ (430) | $ 1,640 | $ (2,310) |

## Net Interest Income

Table 6 presents an analysis of net interest income, including average balances and related yields earned on assets and incurred on liabilities.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 6 — Net Interest Income/Yield and Average Balance Analysis**

| | Three Months Ended June 30, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2011 | | | 2010 | | |
| | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate |
| | | | (dollars in millions) | | | |
| Interest-earning assets: | | | | | | |
| Cash and cash equivalents | $  33,660 | $    10 | 0.12% | $  45,879 | $    18 | 0.15% |
| Federal funds sold and securities purchased under agreements to resell | 32,227 | 8 | 0.09 | 37,238 | 16 | 0.18 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities(3) | 450,575 | 5,215 | 4.63 | 540,380 | 6,432 | 4.76 |
| Extinguishment of PCs held by Freddie Mac | (166,318) | (1,966) | (4.73) | (220,350) | (2,913) | (5.29) |
| Total mortgage-related securities, net | 284,257 | 3,249 | 4.57 | 320,030 | 3,519 | 4.40 |
| Non-mortgage-related securities(3) | 26,078 | 26 | 0.39 | 32,571 | 55 | 0.67 |
| Mortgage loans held by consolidated trusts(4) | 1,643,680 | 19,782 | 4.81 | 1,729,618 | 22,114 | 5.11 |
| Unsecuritized mortgage loans(4) | 242,471 | 2,274 | 3.75 | 212,919 | 2,179 | 4.09 |
| Total interest-earning assets | $ 2,262,373 | $ 25,349 | 4.48 | $2,378,255 | $ 27,901 | 4.69 |
| Interest-bearing liabilities: | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 1,656,150 | $ (19,222) | (4.64) | $ 1,739,519 | $ (21,961) | (5.05) |
| Extinguishment of PCs held by Freddie Mac | (166,318) | 1,966 | 4.73 | (220,350) | 2,913 | 5.29 |
| Total debt securities of consolidated trusts held by third parties | 1,489,832 | (17,261) | (4.63) | 1,519,169 | (19,048) | (5.02) |
| Other debt: | | | | | | |
| Short-term debt | 194,153 | (95) | (0.19) | 226,624 | (137) | (0.24) |
| Long-term debt(5) | 500,587 | (3,238) | (2.59) | 561,353 | (4,331) | (3.08) |
| Total other debt | 694,740 | (3,333) | (1.92) | 787,977 | (4,468) | (2.27) |
| Total interest-bearing liabilities | 2,184,572 | (20,594) | (3.77) | 2,307,146 | (23,516) | (4.08) |
| Income (expense) related to derivatives(6) | — | (194) | (0.03) | — | (249) | (0.04) |
| Impact of net non-interest-bearing funding | 77,801 | | 0.13 | 71,109 | | 0.13 |
| Total funding of interest-earning assets | $ 2,262,373 | $(20,788) | (3.67) | $2,378,255 | $(23,765) | (3.99) |
| Net interest income/yield | | $  4,561 | 0.81 | | $  4,136 | 0.70 |

| | Six Months Ended June 30, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2011 | | | 2010 | | |
| | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate |
| | | | (dollars in millions) | | | |
| Interest-earning assets: | | | | | | |
| Cash and cash equivalents | $  35,611 | $    26 | 0.14% | $  56,426 | $    35 | 0.12% |
| Federal funds sold and securities purchased under agreements to resell | 40,044 | 26 | 0.13 | 44,441 | 32 | 0.14 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities(3) | 453,773 | 10,531 | 4.64 | 566,946 | 13,711 | 4.84 |
| Extinguishment of PCs held by Freddie Mac | (166,923) | (4,029) | (4.83) | (238,651) | (6,354) | (5.32) |
| Total mortgage-related securities, net | 286,850 | 6,502 | 4.53 | 328,295 | 7,357 | 4.48 |
| Non-mortgage-related securities(3) | 27,694 | 56 | 0.40 | 26,380 | 116 | 0.88 |
| Mortgage loans held by consolidated trusts(4) | 1,647,123 | 39,846 | 4.84 | 1,758,473 | 44,846 | 5.10 |
| Unsecuritized mortgage loans(4) | 241,514 | 4,608 | 3.82 | 186,350 | 4,140 | 4.44 |
| Total interest-earning assets | $2,278,836 | $ 51,064 | 4.48 | $ 2,400,365 | $ 56,526 | 4.71 |
| Interest-bearing liabilities: | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 1,660,879 | $(38,693) | (4.66) | $ 1,770,522 | $ (45,045) | (5.09) |
| Extinguishment of PCs held by Freddie Mac | (166,923) | 4,029 | 4.83 | (238,651) | 6,354 | 5.32 |
| Total debt securities of consolidated trusts held by third parties | 1,493,956 | (34,664) | (4.64) | 1,531,871 | (38,691) | (5.05) |
| Other debt: | | | | | | |
| Short-term debt | 194,488 | (210) | (0.21) | 234,781 | (278) | (0.24) |
| Long-term debt(5) | 509,310 | (6,688) | (2.63) | 559,130 | (8,789) | (3.14) |
| Total other debt | 703,798 | (6,898) | (1.96) | 793,911 | (9,067) | (2.28) |
| Total interest-bearing liabilities | 2,197,754 | (41,562) | (3.78) | 2,325,782 | (47,758) | (4.11) |
| Income (expense) related to derivatives(6) | — | (401) | (0.04) | — | (507) | (0.04) |
| Impact of net non-interest-bearing funding | 81,082 | | 0.14 | 74,583 | | 0.13 |
| Total funding of interest-earning assets | $2,278,836 | $ (41,963) | (3.68) | $ 2,400,365 | $(48,265) | (4.02) |
| Net interest income/yield | | $  9,101 | 0.80 | | $  8,261 | 0.69 |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) We calculate average balances based on amortized cost.
(3) Interest income (expense) includes accretion of the portion of impairment charges recognized in earnings expected to be recovered.
(4) Non-performing loans, where interest income is generally recognized when collected, are included in average balances.
(5) Includes current portion of long-term debt.
(6) Represents changes in fair value of derivatives in cash flow hedge relationships that were previously deferred in AOCI and have been reclassified to earnings as the associated hedged forecasted issuance of debt affects earnings.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1664

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Net interest income increased $425 million and $840 million during the three and six months ended June 30, 2011, respectively, compared to the three and six months ended June 30, 2010. Net interest yield increased 11 basis points during both the three and six months ended June 30, 2011, compared to the three and six months ended June 30, 2010. The primary driver underlying the increases was lower funding costs from the replacement of debt at lower rates. In addition, the increases in net interest income and net interest yield for the six months ended June 30, 2011 compared to the six months ended June 30, 2010 were partially driven by the impact of a change in practice announced in February 2010 to purchase substantially all 120 day delinquent loans from PC trusts, as the average funding rate of the other debt used to purchase such loans from PC trusts is significantly less than the average funding rate of the debt securities of consolidated trusts held by third parties. These factors were partially offset by the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations and limited purchase activity.

Interest income that we did not recognize related to non-performing loans, which we refer to as foregone interest income, includes interest income not recognized due to interest rate concessions granted on certain modified loans. Foregone interest income and reversals of previously recognized interest income, net of cash received, related to non-performing loans was $1.0 billion and $2.0 billion during the three and six months ended June 30, 2011, respectively, compared to $1.3 billion and $2.4 billion during the three and six months ended June 30, 2010, respectively, primarily due to the decreased volume of non-performing loans on nonaccrual status.

During the three and six months ended June 30, 2011, spreads on our debt and our access to the debt markets remained favorable relative to historical levels. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

**Provision for Credit Losses**

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $66.9 billion, and have recorded an additional $4.5 billion in losses on loans purchased from our PCs, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred, and thus have not been provisioned for, we believe that, as of June 30, 2011, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for certain quarterly credit statistics for our single-family credit guarantee portfolio.

Our provision for credit losses was $2.5 billion for the second quarter of 2011 compared to $5.0 billion for the second quarter of 2010, and was $4.5 billion in the first half of 2011 compared to $10.4 billion in the first half of 2010. The decrease in the provision for credit losses in the second quarter and first half of 2011 primarily reflects a decline in the rate at which delinquent loans transition into serious delinquency. The provision for credit losses in the second quarter and first half of 2010 reflected a higher volume of seriously delinquent loan additions and loan modifications that were classified as TDRs.

During the three and six months ended June 30, 2011, our charge-offs for single-family loans exceeded the amount of our provision for credit losses. We believe the level of our charge-offs will continue to remain high in 2011 and may increase in 2012 due to the large number of single-family non-performing loans that will likely be resolved as our servicers work through their foreclosure-related issues. As of June 30, 2011 and December 31, 2010, the UPB of our single-family non-performing loans was $114.8 billion and $115.5 billion, respectively. These amounts include $36.2 billion and $26.6 billion, respectively, of single-family TDRs that are reperforming, or less than three months past due. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, and non-performing assets.

We continued to experience a high volume of loan modifications involving concessions to borrowers, which are considered TDRs, during the first half of 2011, but the volume of such modifications was less than the volume in the first half of 2010. Impairment analysis for TDRs requires giving recognition in the provision for credit losses to the excess of our recorded investment in the loan over the present value of the expected future cash flows. This generally results in a higher allowance for loan losses for loan modifications that are TDRs than for loan modifications that are not TDRs. We expect the percentage of modifications that qualify as TDRs in 2011 will remain high, primarily since the majority of our modifications are anticipated to include a significant reduction in the contractual interest rate, which represents a concession to the borrower. In addition, the FASB issued an amendment to the accounting guidance for receivables to clarify when a restructuring such as a loan modification is considered a TDR, which will become effective in the third

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                                 Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

quarter of 2011. As a result of this amendment, the population of loan modifications we account for and disclose as TDRs will likely increase.

The total number of seriously delinquent loans declined approximately 10% during the first half of 2011, but has remained high compared to historical levels due to the continued weakness in home prices, persistently high unemployment, extended foreclosure timelines and foreclosure suspensions in many states, and continued challenges faced by servicers processing large volumes of problem loans. Our seller/servicers have an active role in our loan workout activities, including under the MHA Program, and a decline in their performance could result in a failure to realize the anticipated benefits of our loss mitigation plans. In an effort to help mitigate such risk, we made significant investments in systems and personnel in the last months of 2010 to help our seller/servicers manage their loss mitigation efforts. In addition, we believe that the servicing alignment initiative, which will establish a uniform framework and requirements for servicing non-performing loans owned or guaranteed by us and Fannie Mae, will ultimately change the way servicers communicate and work with troubled borrowers, bring greater consistency and accountability to the servicing industry, and help more distressed homeowners avoid foreclosure.

Our provision (benefit) for credit losses associated with our multifamily mortgage portfolio was $(13) million and $119 million for the second quarters of 2011 and 2010, respectively, and was $(73) million in the first half of 2011 compared to $148 million in the first half of 2010. Our loan loss reserves associated with our multifamily mortgage portfolio were $705 million and $828 million as of June 30, 2011 and December 31, 2010, respectively. The decline in loan loss reserves for multifamily loans was driven primarily by positive market trends in vacancy rates and effective rents reflected over the past several consecutive quarters, as well as stabilizing or improved property values. However, some states in which we have substantial investments in multifamily mortgage loans, including Nevada, Arizona, and Georgia, continue to exhibit weaker than average fundamentals.

**Non-Interest Income (Loss)**

### Gains (Losses) on Extinguishment of Debt Securities of Consolidated Trusts

When we purchase PCs that have been issued by consolidated PC trusts, we extinguish a pro rata portion of the outstanding debt securities of the related consolidated trust. We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to extinguish the debt security differs from its carrying value. For the three months ended June 30, 2011 and 2010, we extinguished debt securities of consolidated trusts with a UPB of $22.2 billion and $0.4 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount), and our gains (losses) on extinguishment of these debt securities of consolidated trusts were $(125) million and $4 million, respectively. The losses during the second quarter of 2011 were primarily due to the repurchase of our debt securities at larger net premiums driven by the decrease in interest rates during the period. For the six months ended June 30, 2011 and 2010, we extinguished debt securities of consolidated trusts with a UPB of $47.0 billion and $2.5 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount), and our gains (losses) on extinguishment of these debt securities of consolidated trusts were $98 million and $(94) million, respectively. The decreased volume of the extinguishment of debt securities in the 2010 periods was due to a change in practice announced in February 2010 that we would purchase substantially all single-family mortgage loans that are 120 days or more delinquent from our PC trusts. As a result, the increased purchases of delinquent loans limited our capacity to repurchase debt securities into our mortgage-related investments portfolio due to limits on the portfolio under the Purchase Agreement and FHFA regulation. The gains for the six months ended June 30, 2011 were due to the repurchases of our debt securities at a net discount during the first quarter of 2011 driven by an increase in interest rates during the first quarter of 2011. See "Table 18 — Total Mortgage-Related Securities Purchase Activity" for additional information regarding purchases of mortgage-related securities, including those issued by consolidated PC trusts.

### Gains (Losses) on Retirement of Other Debt

Gains (losses) on retirement of other debt were $3 million and $(141) million during the three months ended June 30, 2011 and 2010, respectively. Gains (losses) on retirement of other debt were $15 million and $(179) million during the six months ended June 30, 2011 and 2010, respectively. We recognized gains on debt retirements for the second quarter and first half of 2011, compared to losses for the second quarter and first half of 2010, driven by a decrease in the related write-off of unamortized net discounts on the retired other debt during the second quarter and first half of 2011.

### Gains (Losses) on Debt Recorded at Fair Value

Gains (losses) on debt recorded at fair value primarily relates to changes in the fair value of our foreign-currency denominated debt. For the three and six months ended June 30, 2011, we recognized losses on debt recorded at fair value

TREASURY-1666

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                              Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

of $37 million and $118 million, respectively, primarily due to the U.S. dollar weakening relative to the Euro. For the three and six months ended June 30, 2010, we recognized gains on debt recorded at fair value of $544 million and $891 million, respectively, primarily due to the U.S. dollar strengthening relative to the Euro. We mitigate changes in the fair value of our foreign-currency denominated debt by using foreign currency swaps and foreign-currency denominated interest-rate swaps.

### Derivative Gains (Losses)

Table 7 presents derivative gains (losses) reported in our consolidated statements of income and comprehensive income. See "NOTE 11: DERIVATIVES — Table 11.2 — Gains and Losses on Derivatives" for information about gains and losses related to specific categories of derivatives. Changes in fair value and interest accruals on derivatives not in hedge accounting relationships are recorded as derivative gains (losses) in our consolidated statements of income and comprehensive income. At June 30, 2011 and December 31, 2010, we did not have any derivatives in hedge accounting relationships; however, there are amounts recorded in AOCI related to discontinued cash flow hedges. Amounts recorded in AOCI associated with these closed cash flow hedges are reclassified to earnings when the forecasted transactions affect earnings. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the forecasted transaction is reclassified into earnings immediately.

While derivatives are an important aspect of our management of interest-rate risk, they generally increase the volatility of reported net income (loss), because, while fair value changes in derivatives affect net income, fair value changes in several of the types of assets and liabilities being hedged do not affect net income.

### Table 7 — Derivative Gains (Losses)

| | Derivative Gains (Losses) | | | |
| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Interest-rate swaps | $(3,749) | $(7,938) | $(2,026) | $(10,272) |
| Option-based derivatives[1] | 1,602 | 5,864 | 795 | 5,282 |
| Other derivatives[2] | (308) | (553) | (402) | (973) |
| Accrual of periodic settlements[3] | (1,352) | (1,211) | (2,601) | (2,560) |
| Total | $(3,807) | $(3,838) | $(4,234) | $ (8,523) |

(1) Primarily includes purchased call and put swaptions and purchased interest rate caps and floors.
(2) Includes futures, foreign currency swaps, commitments, swap guarantee derivatives, and credit derivatives. Foreign-currency swaps are defined as swaps in which net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars. Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.
(3) Includes imputed interest on zero-coupon swaps.

Gains (losses) on derivatives not accounted for in hedge accounting relationships are principally driven by changes in: (a) swap and forward interest rates and implied volatility; and (b) the mix and volume of derivatives in our derivatives portfolio.

During the three and six months ended June 30, 2011, we recognized losses on derivatives of $3.8 billion and $4.2 billion, respectively, primarily due to declines in interest rates in the second quarter. Specifically, during the three and six months ended June 30, 2011, we recognized fair value losses on our pay-fixed swap positions of $7.3 billion and $3.3 billion, respectively, partially offset by fair value gains on our receive-fixed swaps of $3.6 billion and $1.3 billion, respectively. We also recognized fair value gains of $1.6 billion and $0.8 billion, respectively, on our option-based derivatives, resulting from gains on our purchased call swaptions as interest rates decreased during these periods. Additionally, we recognized losses related to the accrual of periodic settlements during the three and six months ended June 30, 2011 due to our net pay-fixed swap position in the current interest rate environment.

During the three and six months ended June 30, 2010, the yield curve flattened, with declining longer-term swap interest rates, resulting in a loss on derivatives of $3.8 billion and $8.5 billion, respectively. Also contributing to these losses was a decline in implied volatility on our options portfolio during the six months ended June 30, 2010. Specifically, for the three and six months ended June 30, 2010, the decrease in longer-term swap interest rates resulted in fair value losses on our pay-fixed swaps of $18.6 billion and $23.4 billion, respectively, partially offset by fair value gains on our receive-fixed swaps of $10.7 billion and $13.0 billion, respectively. We recognized fair value gains for the three and six months ended June 30, 2010 of $5.9 billion and $5.3 billion, respectively, on our option-based derivatives, resulting from gains on our purchased call swaptions primarily due to the declines in interest rates during these periods.

17

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

### Investment Securities-Related Activities

#### Impairments of Available-For-Sale Securities

We recorded net impairments of available-for-sale securities recognized in earnings, which was related to non-agency mortgage-related securities, of $352 million and $1.5 billion during the three and six months ended June 30, 2011, respectively, compared to $428 million and $938 million during the three and six months ended June 30, 2010, respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities* — *Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" and "NOTE 7: INVESTMENTS IN SECURITIES" for information regarding the accounting principles for investments in debt and equity securities and the other-than-temporary impairments recorded during the three and six months ended June 30, 2011 and 2010.

#### Other Gains (Losses) on Investment Securities Recognized in Earnings

Other gains (losses) on investment securities recognized in earnings primarily consists of gains (losses) on trading securities. We recognized $274 million and $74 million related to gains (losses) on trading securities during the three and six months ended June 30, 2011, respectively, compared to $(277) million and $(694) million related to gains (losses) on trading securities during the three and six months ended June 30, 2010, respectively.

During the three and six months ended June 30, 2011 the gains on trading securities were primarily due to a decline in interest rates coupled with a tightening of OAS levels on agency securities.

During the three and six months ended June 30, 2010, the losses on trading securities were primarily due to the movement of securities with unrealized gains towards maturity, partially offset by fair value gains due to a decline in interest rates.

### Other Income

Table 8 summarizes the significant components of other income.

#### Table 8 — Other Income

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Other income: | | | | |
| Guarantee-related income | $ 81 | $ 60 | $ 135 | $ 119 |
| Gains on sale of mortgage loans | 161 | 121 | 256 | 216 |
| Gains on mortgage loans recorded at fair value | 136 | 5 | 103 | 26 |
| Recoveries on loans impaired upon purchase | 132 | 227 | 257 | 396 |
| All other | (258) | 76 | (165) | 278 |
| Total other income | $ 252 | $ 489 | $ 586 | $1,035 |

Other income declined during the three and six months ended June 30, 2011, compared to the same periods in 2010, primarily due to certain prior period accounting errors not material to our financial statements recorded in the second quarter of 2011 partially offset by increased gains on mortgage loans recorded at fair value.

During the second quarter of 2011, our largest correction related to an error associated with the accrual of interest income for certain impaired mortgage-related securities during 2010 and 2009, which reduced other income in 2011 by approximately $293 million.

During the second quarters of 2011 and 2010, recoveries on loans impaired upon purchase were $132 million and $227 million, respectively, and were $257 million in the first half of 2011, compared to $396 million in the first half of 2010. The declines in the 2011 periods were due to a lower volume of foreclosure transfers associated with loans impaired upon purchase. We principally recognize recoveries on impaired loans purchased prior to January 1, 2010, due to a change in accounting guidance effective on that date. Consequently, our recoveries on loans impaired upon purchase will generally decline over time.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1668

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Non-Interest Expense**

Table 9 summarizes the components of non-interest expense.

**Table 9 — Non-Interest Expense**

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2011 | 2010 | 2011 | 2010 |
|  | (in millions) | | | |
| Administrative expenses[1]: |  |  |  |  |
| Salaries and employee benefits | $ 219 | $ 230 | $ 426 | $ 464 |
| Professional services | 64 | 67 | 120 | 148 |
| Occupancy expense | 15 | 15 | 30 | 31 |
| Other administrative expense | 86 | 92 | 169 | 166 |
| Total administrative expenses | 384 | 404 | 745 | 809 |
| REO operations expense (income) | 27 | (40) | 284 | 119 |
| Other expenses | 135 | 115 | 214 | 218 |
| Total non-interest expense | $ 546 | $ 479 | $1,243 | $1,146 |

(1) Commencing in the first quarter of 2011, we reclassified certain expenses from other expenses to professional services expense. Prior period amounts have been reclassified to conform to the current presentation.

*Administrative Expenses*

Administrative expenses decreased for the three and six months ended June 30, 2011, compared to the three and six months ended June 30, 2010, due in part to our ongoing focus on cost reduction measures, particularly with regard to salaries and employee benefits and professional services costs. We expect our administrative expenses will decline for the full year of 2011 when compared to 2010.

*REO Operations Expense (Income)*

The table below presents the components of our REO operations expense (income), and REO inventory and disposition information.

**Table 10 — REO Operations Expense (Income), REO Inventory, and REO Dispositions**

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2011 | 2010 | 2011 | 2010 |
|  | (dollars in millions) | | | |
| REO operations expense (income): |  |  |  |  |
| Single-family: |  |  |  |  |
| REO property expenses[1] | $ 300 | $ 252 | $ 608 | $ 484 |
| Disposition (gains) losses, net[2][3] | 56 | (39) | 182 | (26) |
| Change in holding period allowance, dispositions | (129) | (60) | (284) | (127) |
| Change in holding period allowance, inventory[4] | 5 | (20) | 156 | 117 |
| Recoveries[5] | (197) | (174) | (370) | (333) |
| Total single-family REO operations expense (income) | 35 | (41) | 292 | 115 |
| Multifamily REO operations expense (income) | (8) | 1 | (8) | 4 |
| Total REO operations expense (income) | $ 27 | $ (40) | $ 284 | $ 119 |
| REO inventory (in properties), at June 30: |  |  |  |  |
| Single-family | 60,599 | 62,178 | 60,599 | 62,178 |
| Multifamily | 19 | 12 | 19 | 12 |
| Total | 60,618 | 62,190 | 60,618 | 62,190 |
| REO property dispositions (in properties) | 29,355 | 26,316 | 60,983 | 48,285 |

(1) Consists of costs incurred to acquire, maintain or protect a property after it is acquired in a foreclosure transfer, such as legal fees, insurance, taxes, and cleaning and other maintenance charges.
(2) Represents the difference between the disposition proceeds, net of selling expenses, and the fair value of the property on the date of the foreclosure transfer.
(3) We have reclassified expenses related to the disposition of REO underlying Other Guarantee Transactions from REO property expense to disposition (gains) losses, net. Prior periods have been revised to conform to the current presentation.
(4) Represents the (increase) decrease in the estimated fair value of properties that were in inventory during the period.
(5) Includes recoveries from primary mortgage insurance, pool insurance and seller/servicer repurchases.

REO operations expense (income) was $27 million for the second quarter of 2011, as compared to $(40) million during the second quarter of 2010 and was $284 million in the first half of 2011 compared to $119 million for the first half of 2010. These increases were primarily due to higher single-family property expenses in the 2011 periods. We recorded net disposition losses during the 2011 periods as we completed a higher volume of property dispositions and

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                TREASURY-1669                                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

home prices remained weak. We recorded net disposition gains during the 2010 periods due to the relative stabilization in national home prices in the first half of 2010 that included slight improvements in many geographic areas. We expect REO property expenses to continue to remain high in the remainder of 2011 due to expected continued high levels of single-family REO acquisitions and inventory.

In recent periods, the volume of our single-family REO acquisitions has been less than it otherwise would have been due to delays caused by concerns about the foreclosure process, including deficiencies in foreclosure documentation practices, particularly in states that require a judicial foreclosure process. The acquisition slowdown, coupled with high disposition levels, led to an approximate 16% reduction in REO property inventory from December 31, 2010 to June 30, 2011. We expect these delays in the foreclosure process will likely continue at least through the remainder of 2011. For more information on how concerns about foreclosure documentation practices could adversely affect our REO operations expense (income), see "RISK FACTORS — Operational Risks — *We have incurred and will continue to incur expenses and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process*" in our 2010 Annual Report. See "RISK MANAGEMENT— Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

## Other Expenses

Other expenses consist primarily of HAMP servicer incentive fees, costs related to terminations and transfers of mortgage servicing, and other miscellaneous expenses. Other expenses were lower in the first half of 2011 compared to the first half of 2010, primarily due to lower losses on purchases of impaired loans, which were partially offset by increased expenses associated with transfers and terminations of mortgage servicing in the first half of 2011.

## Income Tax Benefit

For the three months ended June 30, 2011 and 2010, we reported an income tax benefit of $232 million and $286 million, respectively. For the six months ended June 30, 2011 and 2010 we reported an income tax benefit of $306 million and $389 million, respectively. See "NOTE 13: INCOME TAXES" for additional information.

## Total Comprehensive Income (Loss)

Our total comprehensive income (loss) was $(1.1) billion and $(430) million for the three months ended June 30, 2011 and 2010, respectively, consisting of: (a) a net income (loss) of $(2.1) billion and $(4.7) billion, respectively; and (b) $1.0 billion and $4.3 billion of total other comprehensive income (loss), respectively.

Our total comprehensive income (loss) was $1.6 billion and $(2.3) billion for the six months ended June 30, 2011 and 2010, respectively, consisting of: (a) a net income (loss) of $(1.5) billion and $(11.4) billion, respectively; and (b) $3.1 billion and $9.1 billion of total other comprehensive income (loss), respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Total Equity (Deficit)" for additional information regarding total other comprehensive income (loss).

## Segment Earnings

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. Certain activities that are not part of a reportable segment are included in the All Other category.

The Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans funded by other debt issuances and hedged using derivatives. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. The Investments segment also reflects the impact of changes in fair value of CMBS and multifamily held-for-sale loans associated with changes in interest rates.

The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related securities in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less the related credit costs (*i.e.*, provision for credit losses), administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses.

TREASURY-1670

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans that we purchased for investment, we have not purchased significant amounts of these loans for investment since 2010. Currently, our primary strategy is to purchase multifamily mortgage loans for purposes of aggregation and then securitization. We guarantee the senior tranches of these securitizations. Although we hold CMBS that we purchased for investment, we have not purchased significant amounts of non-agency CMBS for investment since 2008. The Multifamily segment does not issue REMIC securities but does issue Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less allocated funding costs, the related credit costs (*i.e.* provision (benefit) for credit losses), and administrative expenses. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated only with factors other than changes in interest rates, such as liquidity and credit.

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. The financial performance of our segments is measured based on each segment's contribution to GAAP net income (loss). In addition, our Investments segment is measured on its contribution to GAAP total comprehensive income (loss). The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods. The All Other category includes the deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward.

In presenting Segment Earnings, we make significant reclassifications to certain financial statement line items in order to reflect a measure of net interest income on investments, and a measure of management and guarantee income on guarantees, that is in line with how we manage our business. We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of income and comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments.

As a result of these reclassifications and allocations, Segment Earnings for our reportable segments differs significantly from, and should not be used as a substitute for, net income (loss) as determined in accordance with GAAP. Our definition of Segment Earnings may differ from similar measures used by other companies. However, we believe that Segment Earnings provides us with meaningful metrics to assess the financial performance of each segment and our company as a whole.

See "NOTE 17: SEGMENT REPORTING" in our 2010 Annual Report for further information regarding our segments, including the descriptions and activities of the segments and the reclassifications and allocations used to present Segment Earnings.

TREASURY-1671

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 11 provides information about our various segment mortgage portfolios at June 30, 2011 and December 31, 2010. For a discussion of each segment's portfolios, see *"Segment Earnings — Results."*

**Table 11 — Segment Mortgage Portfolio Composition**[1]

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| **Segment portfolios:** | | |
| *Investments — Mortgage investments portfolio:* | | |
| Single-family unsecuritized mortgage loans[2] | $ 93,404 | $ 79,097 |
| Freddie Mac mortgage-related securities | 256,190 | 263,152 |
| Non-agency mortgage-related securities | 91,735 | 99,639 |
| Non-Freddie Mac agency mortgage-related securities | 35,867 | 39,789 |
| Total Investments — Mortgage investments portfolio | 477,196 | 481,677 |
| *Single-family Guarantee — Managed loan portfolio:*[3] | | |
| Single-family unsecuritized mortgage loans[4] | 64,744 | 69,766 |
| Single-family Freddie Mac mortgage-related securities held by us | 256,190 | 261,508 |
| Single-family Freddie Mac mortgage-related securities held by third parties | 1,405,372 | 1,437,399 |
| Single-family other guarantee commitments[5] | 10,442 | 8,632 |
| Total Single-family Guarantee — Managed loan portfolio | 1,736,748 | 1,777,305 |
| *Multifamily — Guarantee portfolio:*[3] | | |
| Multifamily Freddie Mac mortgage-related securities held by us | 2,578 | 2,095 |
| Multifamily Freddie Mac mortgage-related securities held by third parties | 17,845 | 11,916 |
| Multifamily other guarantee commitments[5] | 9,967 | 10,038 |
| Total Multifamily — Guarantee portfolio | 30,390 | 24,049 |
| *Multifamily — Mortgage investments portfolio:*[3] | | |
| Multifamily investment securities portfolio | 61,291 | 59,548 |
| Multifamily loan portfolio | 81,802 | 85,883 |
| Total Multifamily — Mortgage investments portfolio | 143,093 | 145,431 |
| Total Multifamily portfolio | 173,483 | 169,480 |
| Less: Freddie Mac single-family and multifamily securities[6] | (258,768) | (263,603) |
| **Total mortgage portfolio** | $2,128,659 | $ 2,164,859 |
| **Credit risk portfolios:**[7] | | |
| *Single-family credit guarantee portfolio:* | | |
| Single-family mortgage loans, on-balance sheet | $ 1,793,769 | $ 1,799,256 |
| Non-consolidated Freddie Mac mortgage-related securities | 11,034 | 11,268 |
| Other guarantee commitments | 10,442 | 8,632 |
| Less: HFA-related guarantees[8] | (9,057) | (9,322) |
| Less: Freddie Mac mortgage-related securities backed by Ginnie Mae certificates[8] | (852) | (857) |
| Total single-family credit guarantee portfolio: | $ 1,805,336 | $ 1,808,977 |
| *Multifamily mortgage portfolio:* | | |
| Multifamily mortgage loans, on-balance sheet | $ 81,802 | $ 85,883 |
| Non-consolidated Freddie Mac mortgage-related securities | 20,422 | 14,011 |
| Other guarantee commitments | 9,967 | 10,038 |
| Less: HFA-related guarantees[8] | (1,468) | (1,551) |
| Total multifamily mortgage portfolio: | $ 110,723 | $ 108,381 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Excludes unsecuritized non-performing single-family loans managed by the Single-family Guarantee segment. However, the Single-family Guarantee segment continues to earn management and guarantee fees associated with unsecuritized single-family loans in the Investments segment.
(3) The balances of the mortgage-related securities in these portfolios are based on the UPB of the security, whereas the balances of our single-family credit guarantee and multifamily mortgage portfolios presented in this report are based on the UPB of the mortgage loans underlying the related security. The differences in the loan and security balances result from the timing of remittances to security holders, which is typically 45 or 75 days after the mortgage payment cycle of fixed-rate and ARM PCs, respectively.
(4) Represents unsecuritized non-performing single-family loans managed by the Single-family Guarantee segment.
(5) Represents the UPB of mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.
(6) Freddie Mac single-family mortgage-related securities held by us are included in both our Investments segment's mortgage investments portfolio and our Single-family Guarantee segment's managed loan portfolio, and Freddie Mac multifamily mortgage-related securities held by us are included in both the multifamily investment securities portfolio and the multifamily guarantee portfolio. Therefore, these amounts are deducted in order to reconcile to our total mortgage portfolio.
(7) Represents the UPB of loans for which we present characteristics, delinquency data, and other statistics in this report. See "GLOSSARY" for further description.
(8) We exclude HFA-related guarantees and our resecuritizations of Ginnie Mae certificates from our credit risk portfolios because these guarantees do not expose us to meaningful amounts of credit risk due to the credit enhancement provided on these by the U.S. government.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011        TREASURY-1672        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Segment Earnings — Results*

*Investments*

Table 12 presents the Segment Earnings of our Investments segment.

**Table 12 — Segment Earnings and Key Metrics — Investments[1]**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (dollars in millions) | | | |
| **Segment Earnings:** | | | | |
| Net interest income | $ 1,826 | $ 1,509 | $ 3,479 | $ 2,820 |
| Non-interest income (loss): | | | | |
| Net impairment of available-for-sale securities | (139) | (327) | (1,168) | (703) |
| Derivative gains (losses) | (2,156) | (2,193) | (1,053) | (4,895) |
| Other non-interest income (loss) | 243 | 294 | 479 | 272 |
| Total non-interest income (loss) | (2,052) | (2,226) | (1,742) | (5,326) |
| Non-interest expense: | | | | |
| Administrative expenses | (101) | (111) | (196) | (233) |
| Other non-interest expense | (1) | (6) | (1) | (13) |
| Total non-interest expense | (102) | (117) | (197) | (246) |
| Segment adjustments[2] | 126 | 294 | 329 | 804 |
| Segment Earnings (loss) before income tax benefit | (202) | (540) | 1,869 | (1,948) |
| Income tax benefit | 212 | 129 | 278 | 226 |
| Segment Earnings (loss), net of taxes, including noncontrolling interest | 10 | (411) | 2,147 | (1,722) |
| Less: Net (income) loss — noncontrolling interest | — | — | — | (2) |
| Segment Earnings (loss), net of taxes | 10 | (411) | 2,147 | (1,724) |
| Total other comprehensive income, net of taxes | 633 | 3,614 | 1,759 | 6,734 |
| Total comprehensive income | $ 643 | $ 3,203 | $ 3,906 | $ 5,010 |
| **Key metrics — Investments:** | | | | |
| *Portfolio balances:* | | | | |
| Average balances of interest-earning assets:[3][4][5] | | | | |
| Mortgage-related securities[6] | $ 393,361 | $478,043 | $396,238 | $504,454 |
| Non-mortgage-related investments[7] | 91,965 | 115,688 | 103,348 | 127,247 |
| Unsecuritized single-family loans | 92,339 | 53,183 | 88,927 | 48,371 |
| Total average balances of interest-earning assets | $577,665 | $646,914 | $588,513 | $680,072 |
| *Return:* | | | | |
| Net interest yield — Segment Earnings basis (annualized) | 1.26% | 0.93% | 1.18% | 0.83% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15: SEGMENT REPORTING — Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."

(2) For a description of our segment adjustments, see "NOTE 15: SEGMENT REPORTING — Segment Earnings."

(3) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(4) Includes non-performing single-family mortgage loans.

(5) We calculate average balances based on amortized cost.

(6) Includes our investments in single-family PCs and certain Other Guarantee Transactions, which have been consolidated under GAAP on our consolidated balance sheet since January 1, 2010.

(7) Includes the average balances of interest-earning cash and cash equivalents, non-mortgage-related securities, and federal funds sold and securities purchased under agreements to resell.

Our total comprehensive income for our Investments segment was $643 million and $3.9 billion for the three and six months ended June 30, 2011, respectively, consisting of: (a) Segment Earnings of $10 million and $2.1 billion, respectively; and (b) $633 million and $1.8 billion of total other comprehensive income, respectively.

Our total comprehensive income for our Investments segment was $3.2 billion and $5.0 billion for the three and six months ended June 30, 2010, respectively, consisting of: (a) Segment Earnings (loss) of $(411) million and $(1.7) billion, respectively; and (b) $3.6 billion and $6.7 billion of total other comprehensive income, respectively.

During the three and six months ended June 30, 2011, the UPB of the Investments segment mortgage investments portfolio decreased at an annualized rate of 0.2% and 1.9%, respectively, compared to a decrease at an annualized rate of 21.2% and 25.0% for the three and six months ended June 30, 2010, respectively. The larger decrease in our Investments segment mortgage investments portfolio during the three and six months ended June 30, 2010 was primarily due to a higher volume of purchases of delinquent and modified loans from the mortgage pools underlying both our PCs and other agency securities. We announced a change in practice in February 2010 to purchase substantially all 120 day delinquent loans from PC trusts. As a result, the increased purchases of delinquent loans limited our capacity to purchase investments into our mortgage-related investments portfolio due to limits on the portfolio under the Purchase Agreement and FHFA regulation. We report the loans that formerly collateralized our PCs in the Single-family Guarantee segment. The UPB of

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1673

Powered by Morningstar® Document Research℠

the Investments segment mortgage investments portfolio declined  to $477.2 billion at June 30, 2011 from $481.7 billion at December 31, 2010.

We held $292.1 billion of agency securities and $91.7 billion of non-agency mortgage-related securities as  of June 30, 2011 compared to $302.9 billion of agency securities and $99.6 billion of non-agency mortgage-related  securities as of December 31, 2010. The decline in UPB of agency securities is due mainly to liquidations, including  prepayments and selected sales. The decline in UPB of non-agency  mortgage-related securities is due mainly to the receipt of  monthly remittances of principal repayments from both the  recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral, representing  a partial return of our investments in these securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for additional information  regarding our mortgage-related securities.

Segment Earnings net interest income increased $317 million  and $659 million, and Segment Earnings net interest yield  increased 33 basis points and 35 basis points during  the three and six months ended June 30, 2011, respectively,  compared to the three and six months ended June 30, 2010. The primary driver was lower funding costs, primarily due to the  replacement of debt at lower rates. These lower funding costs were partially offset by the reduction in the average balance of  higher-yielding mortgage-related assets due to continued  liquidations.

Segment Earnings non-interest income (loss) was  $(2.1) billion for the three months ended June 30,  2011 compared to $(2.2) billion for the three months ended June 30, 2010. This decrease in non-interest loss was  primarily attributable to increased gains on trading securities  and decreased impairments of available-for-sale securities  during the three months ended June 30, 2011, compared to  the three months ended June 30, 2010. Segment Earnings non-interest income (loss) was $(1.7) billion for the six  months ended June 30, 2011 compared to $(5.3) billion for the six months ended June 30, 2010. This decrease in  non-interest loss was mainly due to decreased derivative losses  and increased gains on trading securities, partially offset by  increased impairments of available-for-sale securities during  the six months ended June 30, 2011, compared to the six months ended June 30, 2010.

Impairments recorded in our Investments segment decreased by  $188 million during the three months ended June 30,  2011, compared to the three months ended June 30, 2010, and increased by $465 million during the six months ended  June 30, 2011, compared to the six months ended June 30, 2010. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" for additional information on our impairments.

We recorded derivative gains (losses) for this segment of $(2.2) billion and $(1.1) billion during the three and  six months ended June 30, 2011, respectively, compared to $(2.2) billion and $(4.9) billion during the three and  six months ended June 30, 2010. While derivatives are an important aspect of our management of interest-rate risk, they  generally increase the volatility of reported Segment Earnings,  because while fair value changes in derivatives affect Segment  Earnings, fair value changes in several of the types of assets  and liabilities being hedged do not affect Segment Earnings. During the three and six months ended June 30, 2011 and  the three and six months ended June 30, 2010, longer-term swap interest rates decreased, resulting in fair value losses on our  pay-fixed swaps that were partially offset by fair value gains  on our receive-fixed swaps and purchased call swaptions. See  "Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for additional information on our derivatives.

Our Investments segment's total other comprehensive income  was $633 million and $1.8 billion for the three and  six months ended June 30, 2011, respectively, compared to $3.6 billion and $6.7 billion during the three and  six months ended June 30, 2010, respectively. Net unrealized losses in AOCI on our available-for-sale securities decreased by  $498 million and $1.5 billion during the three and  six months ended June 30, 2011, respectively, primarily attributable to fair value gains related to the movement of  non-agency mortgage-related securities with unrealized losses towards maturity, the impact of declining interest rates on our  agency securities, and the recognition in earnings of  other-than-temporary impairments on our non-agency  mortgage-related securities, partially offset by the impact of  widening of OAS levels on our non-agency mortgage-related securities. Net unrealized losses in AOCI on our available-for-sale securities decreased by $3.4 billion and  $6.4 billion during the three and six months ended June 30, 2010, respectively, primarily attributable to fair value gains  related to the movement of securities with unrealized losses towards maturity and a net decrease in  interest rates.

The objectives set forth for us under our charter and  conservatorship, restrictions set forth in the Purchase  Agreement and restrictions imposed by FHFA have negatively impacted, and will continue to negatively impact, our  Investments segment results. For example, our mortgage-related investments portfolio is subject to a cap that decreases by  10% each year until the portfolio reaches $250 billion. This  will likely cause a corresponding reduction in our net interest  income from these assets and therefore negatively affect our  Investments segment results. FHFA also stated that we will not be a

24

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

substantial buyer of mortgages for our mortgage-related investments portfolio, except for purchases of seriously delinquent mortgages out of PC trusts. FHFA has also indicated that the portfolio reduction targets under the Purchase Agreement and FHFA regulation should be viewed as minimum reductions and has encouraged us to reduce the mortgage-related investments portfolio at a faster rate than required, consistent with FHFA guidance, safety and soundness and the goal of conserving and preserving assets. We are also subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury.

For information on the impact of the requirement to reduce the mortgage-related investments portfolio limit by 10% annually, see "NOTE 2: CONSERVATORSHIP AND RELATEDMATTERS — Impact of the Purchase Agreement and FHFA Regulation on the Mortgage-Related Investments Portfolio."

25

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Single-Family Guarantee*

Table 13 presents the Segment Earnings of our Single-family Guarantee segment.

**Table 13 — Segment Earnings and Key Metrics — Single-Family Guarantee**[1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (dollars in millions) | | | |
| Segment Earnings: | | | | |
| Net interest income (expense) | $ (30) | $ 51 | $ 70 | $ 110 |
| Provision for credit losses | (2,886) | (5,294) | (5,170) | (11,335) |
| Non-interest income: | | | | |
| Management and guarantee income | 848 | 865 | 1,718 | 1,713 |
| Other non-interest income | 208 | 268 | 419 | 478 |
| Total non-interest income | 1,056 | 1,133 | 2,137 | 2,191 |
| Non-interest expense: | | | | |
| Administrative expenses | (228) | (242) | (443) | (471) |
| REO operations (expense) income | (35) | 41 | (292) | (115) |
| Other non-interest expense | (106) | (90) | (172) | (169) |
| Total non-interest expense | (369) | (291) | (907) | (755) |
| Segment adjustments[2] | (143) | (208) | (328) | (421) |
| Segment Earnings (loss) before income tax (expense) benefit | (2,372) | (4,609) | (4,198) | (10,210) |
| Income tax (expense) benefit | (14) | 104 | (8) | 109 |
| Segment Earnings (loss), net of taxes | (2,386) | (4,505) | (4,206) | (10,101) |
| Total other comprehensive income (loss), net of taxes | 1 | 1 | (3) | (3) |
| Total comprehensive income (loss) | $ (2,385) | $ (4,504) | $ (4,209) | $ (10,104) |
| Key metrics — Single-family Guarantee: | | | | |
| *Balances and Growth (in billions, except rate):* | | | | |
| Average balance of single-family credit guarantee portfolio | $ 1,816 | $ 1,877 | $ 1,817 | $ 1,880 |
| Issuance — Single-family credit guarantees[3] | $ 62 | $ 76 | $ 158 | $ 170 |
| Fixed-rate products — Percentage of purchases[4] | 90.3% | 94.2% | 92.6% | 96.0% |
| Liquidation rate — Single-family credit guarantees (annualized)[5] | 17.4% | 21.7% | 22.7% | 27.8% |
| *Management and Guarantee Fee Rate (in bps, annualized):* | | | | |
| Contractual management and guarantee fees | 13.7 | 13.5 | 13.6 | 13.4 |
| Amortization of delivery fees | 5.0 | 4.9 | 5.3 | 4.8 |
| Segment Earnings management and guarantee income | 18.7 | 18.4 | 18.9 | 18.2 |
| *Credit:* | | | | |
| Serious delinquency rate, at end of period | 3.50% | 3.96% | 3.50% | 3.96% |
| REO inventory, at end of period (number of properties) | 60,599 | 62,178 | 60,599 | 62,178 |
| Single-family credit losses, in bps (annualized)[6] | 68.4 | 82.4 | 69.7 | 72.2 |
| *Market:* | | | | |
| Single-family mortgage debt outstanding (total U.S. market, in billions)[7] | $ 9,970 | $ 10,150 | $ 9,970 | $ 10,150 |
| 30-year fixed mortgage rate[8] | 4.5% | 4.6% | 4.5% | 4.6% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15: SEGMENT REPORTING — Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."
(2) For a description of our segment adjustments, see "NOTE 15: SEGMENT REPORTING — Segment Earnings."
(3) Based on UPB.
(4) Excludes Other Guarantee Transactions.
(5) Includes our purchases of delinquent loans from PCs. On February 10, 2010, we announced that we would begin purchasing substantially all 120 days or more delinquent mortgages from our PC trusts. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information.
(6) Calculated as the amount of single-family credit losses divided by the sum of the average carrying value of our single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees.
(7) Source: Federal Reserve Flow of Funds Accounts of the United States of America dated June 9, 2011. The outstanding amount for June 30, 2011 reflects the balance as of March 31, 2011, which is the latest available information.
(8) Based on Freddie Mac's Primary Mortgage Market Survey rate for the last week in the period, which represents the national average mortgage commitment rate to a qualified borrower exclusive of any fees and points required by the lender. This commitment rate applies only to financing on conforming mortgages with LTV ratios of 80%.

*Financial Results*

For the three and six months ended June 30, 2011, Segment Earnings (loss) for our Single-family Guarantee segment was $(2.4) billion and $(4.2) billion, respectively, compared to $(4.5) billion and $(10.1) billion for the three and six months ended June 30, 2010, respectively. Segment Earnings (loss) for our Single-family segment improved for the three and six months ended June 30, 2011, as compared to the corresponding 2010 periods primarily due to a decline in provision for credit losses.

During the three and six months ended June 30, 2011, our provision for credit losses for the Single-family Guarantee segment was $2.9 billion and $5.2 billion, respectively, compared to $5.3 billion and $11.3 billion during the three and six

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1676

Table of Contents

months ended June 30, 2010, respectively. Segment Earnings provision for credit losses decreased in the three and six  months ended June 30, 2011, as compared to the corresponding periods in 2010, primarily due to a decline in the  rate at which delinquent loans transition into serious delinquency.

Segment Earnings management and guarantee income consists of  contractual amounts due to us related to our management and  guarantee fees as well as amortization of delivery fees. Segment  Earnings management and guarantee income increased slightly in  the six months ended June 30, 2011, as compared to the first half of 2010, primarily due to an increase in the  amortization of delivery fees. Increased amortization of delivery fees reflects the impact of higher delivery fees  associated with loans purchased after 2008 combined with  continued high prepayment rates on guaranteed mortgages in the  first half of 2011 as mortgage rates remained low and  refinancing activity remained high. This increase was partially offset by a decline in contractual management and guarantee  income due to lower average balances of the single-family credit  guarantee portfolio during the first half of 2011. Segment  Earnings management and guarantee income decreased approximately  2% in the three months ended June 30, 2011, as compared to  the second quarter of 2010, primarily due to lower average  balances of the single-family credit guarantee portfolio.

27

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 14 provides summary information about the composition of Segment Earnings (loss) for this segment in the three and six months ended June 30, 2011.

**Table 14 — Segment Earnings Composition — Single-Family Guarantee Segment**

| | Three Months Ended June 30, 2011 | | | | |
| | Segment Earnings Management and Guarantee Income(1) | | Credit Expenses(2) | | |
| | Amount | Average Rate(3) | Amount | Average Rate(3) | Net Amount(4) |
| | | | (dollars in millions, rates in bps) | | |
| Year of origination(5): | | | | | |
| 2011 | $    65 | 18.9 | $    (12) | 4.5 | $    53 |
| 2010 | 185 | 21.1 | (60) | 6.6 | 125 |
| 2009 | 152 | 17.0 | (64) | 6.9 | 88 |
| 2008 | 93 | 22.2 | (202) | 57.7 | (109) |
| 2007 | 95 | 18.7 | (1,010) | 216.5 | (915) |
| 2006 | 56 | 17.0 | (729) | 209.4 | (673) |
| 2005 | 62 | 16.4 | (491) | 122.7 | (429) |
| 2004 and prior | 140 | 17.6 | (353) | 40.2 | (213) |
| Total | $  848 | 18.7 | $(2,921) | 64.4 | $  (2,073) |
| Administrative expenses | | | | | (228) |
| Net interest income (expense) | | | | | (30) |
| Other non-interest income and expenses, net | | | | | (55) |
| Segment Earnings (loss), net of taxes | | | | | $  (2,386) |

| | Six Months Ended June 30, 2011 | | | | |
| | Segment Earnings Management and Guarantee Income(1) | | Credit Expenses(2) | | |
| | Amount | Average Rate(3) | Amount | Average Rate(3) | Net Amount(4) |
| | | | (dollars in millions, rates in bps) | | |
| Year of origination(5): | | | | | |
| 2011 | $    91 | 17.6 | $    (15) | 4.1 | $    76 |
| 2010 | 369 | 20.9 | (114) | 6.2 | 255 |
| 2009 | 322 | 17.8 | (114) | 6.1 | 208 |
| 2008 | 203 | 23.5 | (413) | 57.3 | (210) |
| 2007 | 196 | 18.8 | (1,894) | 198.0 | (1,698) |
| 2006 | 115 | 17.0 | (1,492) | 208.8 | (1,377) |
| 2005 | 128 | 16.5 | (894) | 109.4 | (766) |
| 2004 and prior | 294 | 18.0 | (526) | 29.2 | (232) |
| Total | $ 1,718 | 18.9 | $(5,462) | 60.2 | $  (3,744) |
| Administrative expenses | | | | | (443) |
| Net interest income | | | | | 70 |
| Other non-interest income and expenses, net | | | | | (89) |
| Segment Earnings (loss), net of taxes | | | | | $  (4,206) |

(1) Includes amortization of delivery fees of $224 and $476 million for the three and six months ended June 30, 2011, respectively.

(2) Consists of the aggregate of the Segment Earnings provision for credit losses and Segment Earnings REO operations expense. Historical rates of average credit expenses may not be representative of future results.

(3) Calculated as the annualized amount of Segment Earnings management and guarantee income or credit expenses, respectively divided by the sum of the average carrying values of the single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees.

(4) Calculated as Segment Earnings management and guarantee income less credit expenses.

(5) Segment Earnings management and guarantee income is presented by year of guarantee origination, whereas credit expenses are presented based on year of loan origination.

During the first half of 2011, the guarantee-related revenue from mortgage guarantees we issued after 2008 exceeded the credit-related and administrative expenses associated with these guarantees. We currently believe our management and guarantee fee rates for guarantee issuances after 2008, when coupled with the higher credit quality of the mortgages within our new guarantee issuances, will provide management and guarantee fee income, over the long term, that exceeds our expected credit-related and administrative expenses associated with the underlying loans. However, our management and guarantee fee rates associated with guarantee issuances in 2005 through 2008 have not been adequate to provide income to cover the credit and administrative expenses associated with such loans, primarily due to the high rate of defaults on the loans originated in those years coupled with a high volume of refinancing since 2008. High levels of refinancing since 2008 have significantly reduced the balance of performing loans from those years that remain in our portfolio and consequently reduced management and guarantee income associated with loans originated in those years. We also believe that the management and guarantee fees associated with originations after 2008 will not be sufficient to offset

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1678

the future expenses associated with our 2005 to 2008 guarantee issuances. Consequently, we expect to continue reporting net losses for the Single-family Guarantee segment at least through 2011.

*Key Metrics*

The UPB of the Single-family Guarantee managed loan portfolio declined to $1.7 trillion at June 30, 2011 from $1.8 trillion at December 31, 2010. The decline in UPB of the Single-family Guarantee managed loan portfolio during 2011 reflects that the amount of liquidations has exceeded new loan purchase and guarantee activity, which we believe is due in part, to declines in the amount of single-family mortgage debt outstanding in the market. During the three and six months ended June 30, 2011 our annualized liquidation rate on our securitized single-family credit guarantees was 17% and 23%, respectively.

Refinance volumes continued to be high due to continued low interest rates, and, based on UPB, represented 70% and 79% of our single-family mortgage purchase volume during the three and six months ended June 30, 2011, respectively, compared to 71% and 75% of our single-family mortgage purchase volume during the three and six months ended June 30, 2010, respectively. Relief refinance mortgages comprised approximately 40% and 34% of our total refinance volume during the six months ended June 30, 2011 and 2010, respectively, based on number of loans. Relief refinance mortgages with LTV ratios above 80% represented approximately 14% and 12% of our single-family mortgage purchase volume during the six months ended June 30, 2011 and 2010, respectively, based on UPB.

The serious delinquency rate on our single-family credit guarantee portfolio declined to 3.50% as of June 30, 2011 from 3.84% as of December 31, 2010 due to a high volume of loan modifications and foreclosure transfers, as well as a slowdown in new serious delinquencies. Although the volume of new serious delinquencies has continued to decline, our serious delinquency rate remains high compared to historical levels, reflecting continued stress in the housing and labor markets. As of June 30, 2011 and December 31, 2010, approximately 46% and 39%, respectively, of our single-family credit guarantee portfolio is comprised of mortgage loans originated after 2008. Excluding relief refinance mortgages, these new vintages reflect a combination of changes in underwriting practices and improved borrower and loan characteristics, and represent an increasingly large proportion of our single-family credit guarantee portfolio. The proportion of the portfolio represented by 2005 through 2008 vintages, which have a higher composition of loans with higher-risk characteristics, continues to decline principally due to liquidations resulting from repayments, payoffs, and refinancing activity as well as liquidations resulting from foreclosure events and foreclosure alternatives. We currently expect that, over time, the replacement of older vintages should positively impact the serious delinquency rates and credit-related expenses of our single-family credit guarantee portfolio. However, the rate at which this replacement occurs has slowed in recent quarterly periods, due to a decline in the volume of home purchase mortgage originations and an increase in the proportion of relief refinance mortgage activity. Relief refinance mortgages with LTV ratios above 80% may not perform as well as other refinance mortgages over time due, in part, to the continued high LTV ratios of these loans.

Single-family credit losses as a percentage of the average balance of the single-family credit guarantee portfolio and HFA-related guarantees was 68.4 basis points in the second quarter of 2011, compared to 82.4 basis points for the second quarter of 2010, and was 69.7 basis points for the first half of 2011, compared to 72.2 basis points for the first half of 2010. Charge-offs, net of recoveries, associated with the single-family loans declined to $3.1 billion in the second quarter of 2011, from $3.9 billion for the second quarter of 2010. Charge-offs, net of recoveries, were $6.0 billion and $6.6 billion in the first half of 2011 and 2010, respectively. Our net charge-offs in the three and six months ended June 30, 2011 remained elevated, but reflect suppression of activity due to delays in foreclosures caused by concerns about the foreclosure process. We believe that the level of our charge-offs will remain high in 2011 and may increase in 2012 due to the large number of single-family non-performing loans that will likely be resolved as our servicers work through their foreclosure-related issues. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, and our non-performing assets.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                   TREASURY-1679                              Powered by Morningstar ® Document Research ℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Multifamily*

Table 15 presents the Segment Earnings of our Multifamily segment.

**Table 15 — Segment Earnings and Key Metrics — Multifamily(1)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2011** | **2010** | **2011** | **2010** |
| | (dollars in millions) | | | |
| Segment Earnings: | | | | |
| Net interest income | $ 304 | $ 278 | $ 583 | $ 516 |
| (Provision) benefit for credit losses | 13 | (119) | 73 | (148) |
| Non-interest income (loss): | | | | |
| Management and guarantee income | 30 | 25 | 58 | 49 |
| Net impairment of available-for-sale securities | (182) | (17) | (317) | (72) |
| Derivative gains (losses) | 2 | (1) | 4 | 4 |
| Other non-interest income | 111 | 55 | 298 | 163 |
| Total non-interest income (loss) | (39) | 62 | 43 | 144 |
| Non-interest expense: | | | | |
| Administrative expenses | (55) | (51) | (106) | (105) |
| REO operations income (expense) | 8 | (1) | 8 | (4) |
| Other non-interest expense | (28) | (19) | (41) | (36) |
| Total non-interest expense | (75) | (71) | (139) | (145) |
| Segment Earnings before income tax benefit | 203 | 150 | 560 | 367 |
| Income tax benefit (expense) | (3) | — | (1) | 1 |
| Segment Earnings, net of taxes, including noncontrolling interest | 200 | 150 | 559 | 368 |
| Less: Net (income) loss — noncontrolling interest | — | — | — | 3 |
| Segment Earnings, net of taxes | 200 | 150 | 559 | 371 |
| Total other comprehensive income, net of taxes | 405 | 668 | 1,347 | 2,360 |
| Total comprehensive income | $ 605 | $ 818 | $ 1,906 | $ 2,731 |
| Key metrics — Multifamily: | | | | |
| *Balances and Growth:* | | | | |
| Average balance of Multifamily loan portfolio | $83,718 | $82,107 | $84,749 | $82,782 |
| Average balance of Multifamily guarantee portfolio | $ 29,014 | $21,723 | $ 27,163 | $ 20,594 |
| Average balance of Multifamily investment securities portfolio | $ 61,909 | $ 62,017 | $ 62,376 | $ 62,259 |
| Liquidation rate — Multifamily loan portfolio (annualized) | 10.1% | 4.8% | 7.9% | 3.6% |
| Growth rate (annualized) | 4.6% | 4.9% | 4.1% | 6.6% |
| *Yield and Rate:* | | | | |
| Net interest yield — Segment Earnings basis (annualized) | 0.83% | 0.77% | 0.79% | 0.71% |
| Average Management and guarantee fee rate, in bps (annualized)(2) | 43.0 | 49.6 | 44.7 | 51.1 |
| *Credit:* | | | | |
| Delinquency rate, at period end(3) | 0.31% | 0.22% | 0.31% | 0.22% |
| Allowance for loan losses and reserve for guarantee losses, at period end | $ 705 | $ 935 | $ 705 | $ 935 |
| Allowance for loan losses and reserve for guarantee losses, in bps | 62.8 | 89.4 | 62.8 | 89.4 |
| Credit losses, in bps (annualized)(4) | 7.6 | 10.3 | 5.9 | 9.2 |

(1) For reconciliations of Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 15: SEGMENT REPORTING — Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."

(2) Represents Multifamily Segment Earnings — management and guarantee income, excluding prepayment and certain other fees, divided by the sum of the average balance of the multifamily guarantee portfolio and the average balance of guarantees associated with the HFA initiative, excluding certain bonds under the NIBP.

(3) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Multifamily Mortgage Credit Risk*" for information on our reported multifamily delinquency rate.

(4) Calculated as the amount of multifamily credit losses divided by the sum of the average carrying value of our multifamily loan portfolio, and the average balance of the multifamily guarantee portfolio, including multifamily HFA initiative guarantees.

Our total comprehensive income for our Multifamily segment was $605 million and $1.9 billion for the three and six months ended June 30, 2011 respectively, consisting of: (a) Segment Earnings of $200 million and $559 million, respectively; and (b) $405 million and $1.3 billion, respectively, of total other comprehensive income, primarily resulting from improved fair values related to credit risk on available-for-sale CMBS.

Our total comprehensive income for our Multifamily segment was $818 million and $2.7 billion for the three and six months ended June 30, 2010, respectively, consisting of: (a) Segment Earnings of $150 million and $371 million, respectively; and (b) $668 million and $2.4 billion, respectively, of total other comprehensive income, primarily resulting from improved fair values related to credit risk on available-for-sale CMBS.

Segment Earnings for our Multifamily segment increased to $200 million for the second quarter of 2011 from $150 million for the second quarter of 2010 and increased to $559 million for the first half of 2011 from $371 million for the first half of 2010. These increases were primarily due to lower provision for credit losses and higher other non-interest income, partially offset by higher net impairments on available-for-sale securities in the three and six months ended

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1680                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

June 30, 2011, compared to the same periods in 2010. We currently expect to generate positive Segment Earnings in the Multifamily segment in the remainder of 2011.

Segment Earnings net interest income increased to $304 million in the second quarter of 2011 from $278 million in the second quarter of 2010, and was $583 million and $516 million in the first half of 2011 and 2010, respectively. These increases were primarily attributable to growth in the average balance of the multifamily loan portfolio and higher interest income relative to allocated funding costs in the first half of 2011.

Segment Earnings non-interest income (loss) was $(39) million and $62 million for the three months ended June 30, 2011 and 2010, respectively, and was $43 million and $144 million for the six months ended June 30, 2011 and 2010, respectively. Within Segment Earnings non-interest income, we experienced higher security impairments on CMBS that were offset primarily by fair value gains on mortgage loans during the first half of 2011, compared to the first half of 2010. CMBS impairments during the first half of 2011 and 2010 totaled $317 million and $72 million, respectively. During the second quarter of 2011, we sold two of the five impaired CMBS bonds, which had generated a majority of our Segment Earnings net impairments of available-for-sale securities recognized during the first half of 2011. We have the intent to sell the three other impaired CMBS bonds in the second half of 2011 subject to market conditions. We also recognized $240 million in gains on sales of $7.7 billion in UPB of multifamily loans during the first half of 2011, compared to $205 million of gains on sales of $4.2 billion in UPB of multifamily loans during the first half of 2010. Gains on sales of multifamily loans in the multifamily segment are presented net of changes in fair value due to changes in interest rates.

The most recent data available continues to reflect improving national apartment fundamentals, including vacancy rates and effective rents. However, the broader economy continues to be challenged by persistently high unemployment, which has delayed a more complete economic recovery. Some geographic areas in which we have investments in multifamily loans, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We own or guarantee many nonperforming loans, and loans that we believe are at risk of default, in these states. Our delinquency rates have historically been a lagging indicator and, as a result, we expect to continue to experience delinquencies in the remainder of 2011, consistent with our experience in the first half of 2011. For further information on delinquencies, including geographical and other concentrations, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS."

Our Multifamily segment recognized a provision (benefit) for credit losses of $(13) million and $(73) million for the three and six months ended June 30, 2011 compared to a provision for credit losses of $119 million and $148 million, for the three and six months ended June 30, 2010, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $705 million and $828 million as of June 30, 2011 and December 31, 2010, respectively. The decline in our loan loss reserves in the first half of 2011 was driven by positive trends in vacancy rates and effective rents, as well as stabilizing or improved property values. For loans where we identified deteriorating collateral performance characteristics, such as estimated current LTV ratio and DSCRs, we evaluate each individual loan, using estimates of property value, to determine if a specific loan loss reserve is needed. Although we use the most recently available results of our multifamily borrowers to estimate a property's value, there may be a significant lag in reporting, which could be six months or more, as they prepare their results in the normal course of business.

The delinquency rate for loans in the multifamily mortgage portfolio was 0.31% and 0.26% as of June 30, 2011 and December 31, 2010, respectively. As of June 30, 2011, more than one-half of the multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two or more monthly payments past due had credit enhancements that we currently believe will mitigate our expected losses on those loans. The multifamily delinquency rate of credit-enhanced loans as of June 30, 2011 and December 31, 2010, was 0.70% and 0.85%, respectively, while the delinquency rate for non-credit-enhanced loans was 0.19% and 0.12%, respectively. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Multifamily Mortgage Credit Risk*" for further information about our reported multifamily delinquency rates, including factors that can positively impact such rates.

Multifamily credit losses as a percentage of the combined average balance of our multifamily loan and guarantee portfolios declined from 10.3 basis points in the second quarter of 2010 to 7.6 basis points in the second quarter of 2011, driven by an improvement in REO operations income (expense) for the second quarter of 2011. Charge-offs, excluding recoveries, associated with multifamily loans increased to $29 million in the second quarter of 2011, compared to $27 million in the second quarter of 2010, due to an increase in the number of foreclosures in the 2011 period. Charge-offs, excluding recoveries, were $41 million and $45 million in the first half of 2011 and 2010, respectively. We currently expect that our charge-offs and credit losses in the full-year of 2011 will be consistent with the amount realized in 2010.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

The UPB of the total multifamily portfolio increased to $173.5 billion at June 30, 2011 from $169.5 billion at December 31, 2010, due primarily to increased guarantees of non-consolidated securities issued during the first half of 2011 as well as the transfer in the first quarter of 2011 of certain housing revenue bonds to the Multifamily Segment that were previously managed by the Investments segment. We issued $7.0 billion and $5.6 billion UPB of Freddie Mac mortgage-related securities and other guarantee commitments related to multifamily mortgage loans in the first half of 2011 and 2010, respectively. Increased competition in certain markets has exerted and may continue to exert downward pressure on pricing and credit for new activity in the remainder of 2011, and could negatively impact our future purchase volumes. Our primary multifamily business strategy in 2011 is to purchase loans and subsequently securitize them, which supports liquidity for the multifamily market and affordability for multifamily rental housing.

## CONSOLIDATED BALANCE SHEETS ANALYSIS

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also, see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported financial position.

### Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell

Cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and other liquid assets discussed in "Investments in Securities — *Non-Mortgage-Related Securities,*" are important to our cash flow and asset and liability management, and our ability to provide liquidity and stability to the mortgage market. We use these assets to help manage recurring cash flows and meet our other cash management needs. We consider federal funds sold to be overnight unsecured trades executed with commercial banks that are members of the Federal Reserve System. Securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities.

The short-term assets on our consolidated balance sheets also include those related to our consolidated VIEs, which are comprised primarily of restricted cash and cash equivalents and investments in securities purchased under agreements to resell. These short-term assets decreased by $21.1 billion from December 31, 2010 to June 30, 2011, primarily due to a relative decline in the level of refinancing activity.

Excluding amounts related to our consolidated VIEs, we held $17.5 billion and $37.0 billion of cash and cash equivalents, $7.3 billion and $1.4 billion of federal funds sold, and $12.4 billion and $15.8 billion of securities purchased under agreements to resell at June 30, 2011 and December 31, 2010, respectively. The aggregate decrease in these assets was primarily driven by a decline in funding needs for debt redemptions. In addition, excluding amounts related to our consolidated VIEs, we held on average $29.8 billion and $30.9 billion of cash and cash equivalents and $21.6 billion and $25.1 billion of federal funds sold and securities purchased under agreements to resell during the three and six months ended June 30, 2011.

Recently we changed the composition of our portfolio of liquid assets given the recent market concerns about the potential for a downgrade in the credit ratings of the U.S. government and the potential that the U.S. would exhaust its borrowing authority under the statutory debt limit. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

### Investments in Securities

Table 16 provides detail regarding our investments in securities as of June 30, 2011 and December 31, 2010. Table 16 does not include our holdings of single-family PCs and certain Other Guarantee Transactions. For information on our holdings of such securities, see "Table 11 — Segment Mortgage Portfolio Composition."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1682

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 16 — Investments in Securities**

| | Fair Value | |
|---|---|---|
| | June 30, 2011 | December 31, 2010 |
| | (in millions) | |
| Investments in securities: | | |
| Available-for-sale: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | $  85,221 | $  85,689 |
| Subprime | 30,491 | 33,861 |
| CMBS | 57,647 | 58,087 |
| Option ARM | 6,591 | 6,889 |
| Alt-A and other | 12,209 | 13,168 |
| Fannie Mae | 21,011 | 24,370 |
| Obligations of states and political subdivisions | 8,560 | 9,377 |
| Manufactured housing | 844 | 897 |
| Ginnie Mae | 275 | 296 |
| Total available-for-sale mortgage-related securities | 222,849 | 232,634 |
| Total investments in available-for-sale securities | 222,849 | 232,634 |
| Trading: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | 16,997 | 13,437 |
| Fannie Mae | 17,982 | 18,726 |
| Ginnie Mae | 165 | 172 |
| Other | 82 | 31 |
| Total trading mortgage-related securities | 35,226 | 32,366 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 164 | 44 |
| Treasury bills | 250 | 17,289 |
| Treasury notes | 17,497 | 10,122 |
| FDIC-guaranteed corporate medium-term notes | 1,627 | 441 |
| Total trading non-mortgage-related securities | 19,538 | 27,896 |
| Total investments in trading securities | 54,764 | 60,262 |
| Total investments in securities | $  277,613 | $  292,896 |

(1) For information on the types of instruments that are included,  see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report.

### Non-Mortgage-Related Securities

Our investments in non-mortgage-related securities provide an  additional source of liquidity for us. We held investments in non-mortgage-related securities classified as trading of $19.5 billion and $27.9 billion as of June 30, 2011 and December 31, 2010, respectively. While balances may fluctuate from period to period, we continue to meet  required liquidity and contingency levels.

### Mortgage-Related Securities

We are primarily a buy-and-hold investor in mortgage-related securities, which consist of  securities issued by Fannie Mae, Ginnie Mae, and other financial institutions. We also invest in our own mortgage-related securities. However, the single-family PCs and certain Other  Guarantee Transactions we purchase as investments are not  accounted for as investments in securities because we recognize  the underlying mortgage loans on our consolidated balance sheets  through consolidation of the related trusts.

Table 17 provides the UPB of our investments in mortgage-related securities classified as available-for-sale or  trading on our consolidated balance sheets. Table 17 does not include our holdings of single-family PCs and certain Other  Guarantee Transactions. For further information on our holdings of such securities, see "Table 11 — Segment Mortgage Portfolio Composition."

33

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1683                    Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets**

| | June 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Fixed Rate | Variable Rate(1) | Total | Fixed Rate | Variable Rate(1) | Total |
| | | | (in millions) | | | |
| Freddie Mac mortgage-related securities:(2) | | | | | | |
| Single-family | $ 79,194 | $ 9,014 | $ 88,208 | $ 79,955 | $ 8,118 | $ 88,073 |
| Multifamily | 780 | 1,798 | 2,578 | 339 | 1,756 | 2,095 |
| Total Freddie Mac mortgage-related securities | 79,974 | 10,812 | 90,786 | 80,294 | 9,874 | 90,168 |
| Non-Freddie Mac mortgage-related securities: | | | | | | |
| Agency securities:(3) | | | | | | |
| Fannie Mae: | | | | | | |
| Single-family | 19,838 | 15,645 | 35,483 | 21,238 | 18,139 | 39,377 |
| Multifamily | 70 | 77 | 147 | 228 | 88 | 316 |
| Ginnie Mae: | | | | | | |
| Single-family | 273 | 111 | 384 | 296 | 117 | 413 |
| Multifamily | 27 | — | 27 | 27 | — | 27 |
| Total agency securities | 20,208 | 15,833 | 36,041 | 21,789 | 18,344 | 40,133 |
| Non-agency mortgage-related securities: | | | | | | |
| Single-family:(4) | | | | | | |
| Subprime | 344 | 51,147 | 51,491 | 363 | 53,855 | 54,218 |
| Option ARM | — | 14,778 | 14,778 | — | 15,646 | 15,646 |
| Alt-A and other | 2,260 | 15,502 | 17,762 | 2,405 | 16,438 | 18,843 |
| CMBS | 20,574 | 35,817 | 56,391 | 21,401 | 37,327 | 58,728 |
| Obligations of states and political subdivisions(5) | 8,809 | 24 | 8,833 | 9,851 | 26 | 9,877 |
| Manufactured housing | 879 | 140 | 1,019 | 930 | 150 | 1,080 |
| Total non-agency mortgage-related securities(6) | 32,866 | 117,408 | 150,274 | 34,950 | 123,442 | 158,392 |
| Total UPB of mortgage-related securities | $133,048 | $144,053 | 277,101 | $137,033 | $ 151,660 | 288,693 |
| Premiums, discounts, deferred fees, impairments of UPB and other basis adjustments | | | (11,696) | | | (11,839) |
| Net unrealized (losses) on mortgage-related securities, pre-tax | | | (7,330) | | | (11,854) |
| Total carrying value of mortgage-related securities | | | $258,075 | | | $ 265,000 |

(1) Variable-rate mortgage-related securities include those with a contractual coupon rate that, prior to contractual maturity, is either scheduled to change or is subject to change based on changes in the composition of the underlying collateral.

(2) We are subject to the credit risk associated with the mortgage loans underlying our Freddie Mac mortgage-related securities. Mortgage loans underlying our issued single-family PCs and certain Other Guarantee Transactions are recognized on our consolidated balance sheets as held-for-investment mortgage loans, at amortized cost. We do not consolidate our resecuritization trusts since we are not deemed to be the primary beneficiary of such trusts. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report for further information.

(3) Agency securities are generally not separately rated by nationally recognized statistical rating organizations, but have historically been viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities AAA-rated or equivalent.

(4) For information about how these securities are rated, see "Table 22 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS."

(5) Consists of housing revenue bonds. Approximately 49% and 50% of these securities held at June 30, 2011 and December 31, 2010, respectively, were AAA-rated as of those dates, based on the lowest rating available.

(6) Credit ratings for most non-agency mortgage-related securities are designated by no fewer than two nationally recognized statistical rating organizations. Approximately 22% and 23% of total non-agency mortgage-related securities held at June 30, 2011 and December 31, 2010, respectively, were AAA-rated as of those dates, based on the UPB and the lowest rating available.

The total UPB of our investments in mortgage-related securities on our consolidated balance sheets decreased from $288.7 billion at December 31, 2010 to $277.1 billion at June 30, 2011 primarily as a result of liquidations exceeding our purchase activity during the six months ended June 30, 2011.

Table 18 summarizes our mortgage-related securities purchase activity for the three and six months ended June 30, 2011 and 2010. The purchase activity includes single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated. Purchases of single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated are recorded as an extinguishment of debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

TREASURY-1684

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table 18 — Total Mortgage-Related Securities Purchase Activity**[(1)]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Non-Freddie Mac mortgage-related securities purchased for resecuritization: | | | | |
| Ginnie Mae Certificates | $   56 | $   — | $   72 | $   13 |
| Non-agency mortgage-related securities purchased for Other Guarantee Transactions[(2)] | 3,633 | 2,063 | 6,512 | 7,684 |
| Total non-Freddie Mac mortgage-related securities purchased for resecuritization | 3,689 | 2,063 | 6,584 | 7,697 |
| Non-Freddie Mac mortgage-related securities purchased as investments in securities: | | | | |
| Agency securities: | | | | |
| *Fannie Mae:* | | | | |
| Fixed-rate | 2,181 | — | 3,200 | — |
| Variable-rate | 60 | 117 | 228 | 164 |
| *Total agency securities* | 2,241 | 117 | 3,428 | 164 |
| Non-agency mortgage-related securities: | | | | |
| *CMBS:* | | | | |
| Fixed-rate | 14 | — | 14 | — |
| Variable-rate | 46 | — | 46 | — |
| *Total non-agency mortgage-related securities* | 60 | — | 60 | — |
| *Total non-Freddie Mac mortgage-related securities purchased as investments in securities* | 2,301 | 117 | 3,488 | 164 |
| Total non-Freddie Mac mortgage-related securities purchased | $ 5,990 | $2,180 | $ 10,072 | $ 7,861 |
| Freddie Mac mortgage-related securities purchased: | | | | |
| *Single-family:* | | | | |
| Fixed-rate | $ 24,304 | $1,205 | $60,983 | $ 6,045 |
| Variable-rate | 462 | — | 3,004 | 203 |
| *Multifamily:* | | | | |
| Fixed-rate | 26 | 160 | 51 | 185 |
| Variable-rate | 65 | 10 | 65 | 41 |
| *Total Freddie Mac mortgage-related securities purchased* | $24,857 | $1,375 | $ 64,103 | $6,474 |

(1) Based on UPB. Excludes mortgage-related securities traded but not yet settled.
(2) Purchases for the six months ended June 30, 2010 include HFA bonds we acquired and resecuritized under the NIBP. See "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS" in our 2010 Annual Report for further information on this component of the HFA Initiative.

During the three and six months ended June 30, 2011, we engaged in mortgage-related security transactions in which we entered into an agreement to purchase and subsequently resell (or sell and subsequently repurchase) agency securities. We engaged in these transactions primarily to support the market and pricing of our PC securities. When these transactions involve our consolidated PC trusts, the purchase and sale represents an extinguishment and issuance of debt securities, respectively, and impacts our net interest income and recognition of gain or loss on the extinguishment of debt on our consolidated statements of income and comprehensive income. These transactions can cause short-term fluctuations in the balance of our mortgage-related investments portfolio. The increase in our purchases of agency securities in the first half of 2011 reflected in Table 18 above is attributed primarily to these transactions.

*Unrealized Losses on Available-For-Sale Mortgage-Related Securities*

At June 30, 2011, our gross unrealized losses, pre-tax, on available-for-sale mortgage-related securities were $20.5 billion, compared to $23.1 billion at December 31, 2010. The improvement in unrealized losses was primarily due to fair value gains on non-agency mortgage-related securities related to the movement of these securities with unrealized losses towards maturity and the impact of a decline in interest rates, partially offset by the impact of widening OAS levels on our non-agency mortgage-related securities. Additionally, net unrealized losses recorded in AOCI decreased due to the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities. We believe the unrealized losses related to these securities at June 30, 2011 were mainly attributable to poor underlying collateral performance, limited liquidity and large risk premiums in the market for residential non-agency mortgage-related securities. All available-for-sale securities in an unrealized loss position are evaluated to determine if the impairment is other-than-temporary. See "Total Equity (Deficit)" and "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding unrealized losses on our available-for-sale securities.

*Higher-Risk Components of Our Investments in Mortgage-Related Securities*

As discussed below, we have exposure to subprime, option ARM, interest-only, and Alt-A and other loans as part of our investments in mortgage-related securities as follows:

•  *Single-family non-agency mortgage-related securities:* We hold non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- *Single-family Freddie Mac mortgage-related securities:* We hold certain Other Guarantee Transactions as part of our investments in securities. There are subprime and option ARM loans underlying some of these Other Guarantee Transactions. For more information on single-family loans with certain higher-risk characteristics underlying our issued securities, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk.*"

*Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, and Alt-A Loans*

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. Since the first quarter of 2008, we have not purchased any non-agency mortgage-related securities backed by subprime, option ARM, or Alt-A loans. Tables 19 and 20 present information about our holdings of these securities.

**Table 19 — Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics[1]**

| | | | As of | | |
| --- | --- | --- | --- | --- | --- |
| | 06/30/2011 | 03/31/2011 | 12/31/2010 (dollars in millions) | 09/30/2010 | 06/30/2010 |
| UPB: | | | | | |
| Subprime first lien | $ 51,070 | $ 52,403 | $53,756 | $55,250 | $56,922 |
| Option ARM | 14,778 | 15,232 | 15,646 | 16,104 | 16,603 |
| Alt-A[2] | 15,059 | 15,487 | 15,917 | 16,406 | 16,909 |
| Gross unrealized losses, pre-tax:[3] | | | | | |
| Subprime first lien | $ 13,764 | $ 12,481 | $ 14,026 | $16,446 | $ 17,757 |
| Option ARM | 3,099 | 3,170 | 3,853 | 4,815 | 5,770 |
| Alt-A[2] | 2,171 | 1,941 | 2,096 | 2,542 | 3,335 |
| Present value of expected credit losses: | | | | | |
| Subprime first lien | $ 6,487 | $ 6,612 | $ 5,937 | $ 4,364 | $ 3,311 |
| Option ARM | 4,767 | 4,993 | 4,850 | 4,208 | 3,534 |
| Alt-A[2] | 2,310 | 2,401 | 2,469 | 2,101 | 1,653 |
| Collateral delinquency rate:[4] | | | | | |
| Subprime first lien | 42% | 44% | 45% | 45% | 46% |
| Option ARM | 44 | 44 | 44 | 44 | 45 |
| Alt-A[2] | 26 | 26 | 27 | 26 | 26 |
| Cumulative collateral loss:[5] | | | | | |
| Subprime first lien | 20% | 19% | 18% | 17% | 16% |
| Option ARM | 15 | 14 | 13 | 11 | 10 |
| Alt-A[2] | 7 | 7 | 6 | 6 | 5 |
| Average credit enhancement:[6] | | | | | |
| Subprime first lien | 23% | 24% | 25% | 25% | 26% |
| Option ARM | 10 | 11 | 12 | 12 | 13 |
| Alt-A[2] | 8 | 8 | 9 | 9 | 10 |

(1) See *"Ratings of Non-Agency Mortgage-Related Securities"* for additional information about these securities.

(2) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.

(3) Represents the aggregate of the amount by which amortized cost, after other-than-temporary impairments, exceeds fair value measured at the individual lot level.

(4) Determined based on the number of loans that are two monthly payments or more past due that underlie the securities using information obtained from a third-party data provider.

(5) Based on the actual losses incurred on the collateral underlying these securities. Actual losses incurred on the securities that we hold are significantly less than the losses on the underlying collateral as presented in this table, as non-agency mortgage-related securities backed by subprime first lien, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements.

(6) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by monoline bond insurance, overcollateralization and other forms of credit enhancement.

36                                                                                              *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 20 — Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans[1]**

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | 06/30/2011 | 03/31/2011 | 12/31/2010 | 09/30/2010 | 06/30/2010 |
| | | | (in millions) | | |
| Net impairment of available-for-sale securities recognized in earnings: | | | | | |
| Subprime — first and second liens | $    70 | $    734 | $ 1,207 | $    213 | $    17 |
| Option ARM | 65 | 281 | 668 | 577 | 48 |
| Alt-A and other | 32 | 40 | 372 | 296 | 333 |
| Principal repayments and cash shortfalls:[2] | | | | | |
| Subprime — first and second liens: | | | | | |
| Principal repayments | $ 1,341 | $ 1,361 | $ 1,512 | $1,685 | $2,001 |
| Principal cash shortfalls | 10 | 14 | 6 | 8 | 12 |
| Option ARM: | | | | | |
| Principal repayments | $    331 | $    315 | $    347 | $    377 | $    435 |
| Principal cash shortfalls | 123 | 100 | 111 | 122 | 80 |
| Alt-A and other: | | | | | |
| Principal repayments | $    464 | $    452 | $    537 | $    582 | $    653 |
| Principal cash shortfalls | 84 | 81 | 62 | 56 | 67 |

(1) See *"Ratings of Non-Agency Mortgage-Related Securities"* for additional information about these securities.
(2) In addition to the contractual interest payments, we receive monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral of these securities representing a partial return of our investment in these securities.

As discussed below, we recognized impairment in earnings on our holdings of such securities during the three and six months ended June 30, 2011 and 2010. See "Table 21 — Net Impairment on Available-For-Sale Mortgage-Related Securities Recognized in Earnings" for more information.

For purposes of our impairment analysis, our estimate of the present value of expected future credit losses on our portfolio of non-agency mortgage-related securities decreased to $14.4 billion at June 30, 2011 from $15.2 billion at March 31, 2011. All of this amount has been reflected in our net impairment of available-for-sale securities recognized in earnings in this period or prior periods. The decrease in our estimate of the present value of expected future credit losses resulted primarily from decreasing interest rates in the second quarter of 2011, offset by a decline in forecasted home prices on a seasonally adjusted basis.

Since the beginning of 2007, we have incurred actual principal cash shortfalls of $1.1 billion on impaired non-agency mortgage-related securities, of which $229 million and $428 million related to the three and six months ended June 30, 2011. Many of the trusts that issued non-agency mortgage-related securities we hold were structured so that realized collateral losses in excess of structural credit enhancements are not passed on to investors until the investment matures. We currently estimate that the future expected principal and interest shortfalls on non-agency mortgage-related securities we hold will be significantly less than the fair value declines experienced on these securities.

The investments in non-agency mortgage-related securities we hold backed by subprime first lien, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements. Bond insurance is an additional credit enhancement covering some of the non-agency mortgage-related securities. These credit enhancements are the primary reason we expect our actual losses, through principal or interest shortfalls, to be less than the underlying collateral losses in aggregate. It is difficult to estimate the point at which structural credit enhancements will be exhausted and we will incur actual losses. During the three and six months ended June 30, 2011, we continued to experience the erosion of structural credit enhancements on many securities backed by subprime first lien, option ARM, and Alt-A loans due to poor performance of the underlying collateral. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers.*"

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1687

Table of Contents

*Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*

Table 21 provides information about the mortgage-related securities for which we recognized other-than-temporary impairments for the three months ended June 30, 2011 and 2010.

**Table 21 — Net Impairment on Available-For-Sale Mortgage-Related Securities Recognized in Earnings**

| | Three Months Ended June 30, | | | |
| | 2011 | | 2010 | |
| | UPB | Net Impairment of Available-For-Sale Securities Recognized in Earnings | UPB | Net Impairment of Available-For-Sale Securities Recognized in Earnings |
|---|---|---|---|---|
| | | (in millions) | | |
| Subprime: | | | | |
| 2006 & 2007 first lien | $ 11,909 | $      67 | $  606 | $      15 |
| Other years — first and second liens(1) | 298 | 3 | 234 | 2 |
| Total subprime — first and second liens(1) | 12,207 | 70 | 840 | 17 |
| Option ARM: | | | | |
| 2006 & 2007 | 5,867 | 43 | 1,940 | 34 |
| Other years | 1,235 | 22 | 260 | 14 |
| Total option ARM | 7,102 | 65 | 2,200 | 48 |
| Alt-A: | | | | |
| 2006 & 2007 | 1,494 | 16 | 2,860 | 37 |
| Other years | 2,126 | 15 | 152 | 2 |
| Total Alt-A | 3,620 | 31 | 3,012 | 39 |
| Other loans | 80 | 1 | 2,419 | 294 |
| Total subprime, option ARM, Alt-A and other loans | 23,009 | 167 | 8,471 | 398 |
| CMBS | 918 | 183 | 900 | 17 |
| Manufactured housing | 205 | 2 | 424 | 13 |
| Total available-for-sale mortgage-related securities | $24,132 | $     352 | $9,795 | $     428 |

(1) Includes all second liens.

We recorded net impairment of available-for-sale mortgage-related securities recognized in earnings of $352 million and $1.5 billion during the three and six months ended June 30, 2011, respectively, compared to $428 million and $938 million during the three and six months ended June 30, 2010, as our estimate of the present value of expected future credit losses on certain individual securities increased during the periods. These impairments include $167 million and $1.2 billion of impairments related to securities backed by subprime, option ARM, and Alt-A and other loans during the three and six months ended June 30, 2011, respectively, compared to $398 million and $851 million during the three and six months ended June 30, 2010. In addition, during the three months ended June 30, 2011, these impairments include recognition of the unrealized fair value losses related to three investments in CMBS of $154 million as an impairment charge in earnings, as we have the intent to sell these securities. For more information, see "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-For-Sale Securities."

While it is reasonably possible that collateral losses on our available-for-sale mortgage-related securities where we have not recorded an impairment charge in earnings could exceed our credit enhancement levels, we do not believe that those conditions were likely at June 30, 2011. Based on our conclusion that we do not intend to sell our remaining available-for-sale mortgage-related securities in an unrealized loss position and it is not more likely than not that we will be required to sell these securities before a sufficient time to recover all unrealized losses and our consideration of other available information, we have concluded that the reduction in fair value of these securities was temporary at June 30, 2011 and have recorded these fair value losses in AOCI.

The credit performance of loans underlying our holdings of non-agency mortgage-related securities has declined since 2007. This decline has been particularly severe for subprime, option ARM, and Alt-A and other loans. Economic factors impacting the performance of our investments in non-agency mortgage-related securities include high unemployment, a large inventory of seriously delinquent mortgage loans and unsold homes, tight credit conditions, and weak consumer confidence, all of which have contributed to poor performance during the three and six months ended June 30, 2011 and 2010. In addition, subprime, option ARM, and Alt-A and other loans backing the securities we hold have significantly greater concentrations in the states that are undergoing the greatest economic stress, such as California and Florida. Loans in these states undergoing economic stress are more likely to become seriously delinquent and the credit losses associated with such loans are likely to be higher than in other states.

We rely on monoline bond insurance, including secondary coverage, to provide credit protection on some of our investments in non-agency mortgage-related securities. We have determined that there is substantial uncertainty

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

surrounding certain monoline bond insurers' ability to pay our future claims on expected credit losses related to our non-agency mortgage-related security investments. This uncertainty contributed to the impairments recognized in earnings during the three and six months ended June 30, 2011 and 2010. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

Our assessments concerning other-than-temporary impairment require significant judgment and the use of models, and are subject to potentially significant change due to changes in the performance of the individual securities and in mortgage market conditions. Depending on the structure of the individual mortgage-related security and our estimate of collateral losses relative to the amount of credit support available for the tranches we own, a change in collateral loss estimates can have a disproportionate impact on the loss estimate for the security. Additionally, servicer performance, loan modification programs and backlogs, bankruptcy reform and other forms of government intervention in the housing market can significantly affect the performance of these securities, including the timing of loss recognition of the underlying loans and thus the timing of losses we recognize on our securities. Foreclosure processing suspensions can also affect our losses. For example, while defaulted loans remain in the trusts prior to completion of the foreclosure process, the subordinate classes of securities issued by the securitization trusts may continue to receive interest payments, rather than absorbing default losses. This may reduce the amount of funds available for the tranches we own. Given the extent of the housing and economic downturn, it is difficult to estimate the future performance of mortgage loans and mortgage-related securities with high assurance, and actual results could differ materially from our expectations. Furthermore, various market participants could arrive at materially different conclusions regarding estimates of future cash shortfalls. For more information on how delays in the foreclosure process, including delays related to concerns about deficiencies in foreclosure documentation practices, could adversely affect the values of, and the losses on, the non-agency mortgage-related securities we hold, see "RISK FACTORS — Operational Risks — *We have incurred and will continue to incur expenses and we may otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process"* in our 2010 Annual Report.

*Ratings of Non-Agency Mortgage-Related Securities*

Table 22 shows the ratings of non-agency mortgage-related securities backed by subprime, option ARM, Alt-A and other loans, and CMBS held at June 30, 2011 based on their ratings as of June 30, 2011 as well as those held at December 31, 2010 based on their ratings as of December 31, 2010 using the lowest rating available for each security.

39

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 22 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS**

| Credit Ratings as of June 30, 2011 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Monoline Insurance Coverage(1) |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| **Subprime loans:** | | | | | |
| AAA-rated | $ 1,284 | 2% | $ 1,284 | $ (106) | $ 23 |
| Other investment grade | 2,934 | 6 | 2,934 | (395) | 394 |
| Below investment grade(2) | 47,273 | 92 | 40,013 | (13,271) | 1,727 |
| Total | $ 51,491 | 100% | $ 44,231 | $(13,772) | $ 2,144 |
| **Option ARM loans:** | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 100 | 1 | 100 | (12) | 100 |
| Below investment grade(2) | 14,678 | 99 | 9,561 | (3,087) | 45 |
| Total | $ 14,778 | 100% | $ 9,661 | $ (3,099) | $ 145 |
| **Alt-A and other loans:** | | | | | |
| AAA-rated | $ 482 | 3% | $ 483 | $ (25) | $ 7 |
| Other investment grade | 2,300 | 13 | 2,323 | (306) | 337 |
| Below investment grade(2) | 14,980 | 84 | 11,744 | (2,056) | 2,274 |
| Total | $ 17,762 | 100% | $ 14,550 | $ (2,387) | $ 2,618 |
| **CMBS:** | | | | | |
| AAA-rated | $ 26,407 | 47% | $ 26,455 | $ (29) | $ 42 |
| Other investment grade | 26,524 | 47 | 26,496 | (421) | 1,652 |
| Below investment grade(2) | 3,460 | 6 | 2,990 | (266) | 1,701 |
| Total | $ 56,391 | 100% | $ 55,941 | $ (716) | $ 3,395 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS:** | | | | | |
| AAA-rated | $ 28,173 | 20% | $ 28,222 | $ (160) | $ 72 |
| Other investment grade | 31,858 | 23 | 31,853 | (1,134) | 2,483 |
| Below investment grade(2) | 80,391 | 57 | 64,308 | (18,680) | 5,747 |
| Total | $ 140,422 | 100% | $124,383 | $(19,974) | $ 8,302 |
| Total investments in mortgage-related securities | $ 277,101 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 51% | | | | |

| Credit Ratings as of December 31, 2010 | | | | | |
|---|---|---|---|---|---|
| **Subprime loans:** | | | | | |
| AAA-rated | $ 2,085 | 4% | $ 2,085 | $ (199) | $ 31 |
| Other investment grade | 3,407 | 6 | 3,408 | (436) | 449 |
| Below investment grade(2) | 48,726 | 90 | 42,423 | (13,421) | 1,789 |
| Total | $ 54,218 | 100% | $ 47,916 | $(14,056) | $ 2,269 |
| **Option ARM loans:** | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 139 | 1 | 140 | (18) | 129 |
| Below investment grade(2) | 15,507 | 99 | 10,586 | (3,835) | 50 |
| Total | $ 15,646 | 100% | $ 10,726 | $ (3,853) | $ 179 |
| **Alt-A and other loans:** | | | | | |
| AAA-rated | $ 1,293 | 7% | $ 1,301 | $ (87) | $ 7 |
| Other investment grade | 2,761 | 15 | 2,765 | (362) | 368 |
| Below investment grade(2) | 14,789 | 78 | 11,498 | (2,002) | 2,443 |
| Total | $ 18,843 | 100% | $ 15,564 | $ (2,451) | $ 2,818 |
| **CMBS:** | | | | | |
| AAA-rated | $ 28,007 | 48% | $ 28,071 | $ (52) | $ 42 |
| Other investment grade | 26,777 | 45 | 26,740 | (676) | 1,655 |
| Below investment grade(2) | 3,944 | 7 | 3,653 | (1,191) | 1,704 |
| Total | $ 58,728 | 100% | $ 58,464 | $ (1,919) | $ 3,401 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS:** | | | | | |
| AAA-rated | $ 31,385 | 21% | $ 31,457 | $ (338) | $ 80 |
| Other investment grade | 33,084 | 23 | 33,053 | (1,492) | 2,601 |
| Below investment grade(2) | 82,966 | 56 | 68,160 | (20,449) | 5,986 |
| Total | $ 147,435 | 100% | $132,670 | $(22,279) | $ 8,667 |
| Total investments in mortgage-related securities | $288,693 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 51% | | | | |

(1) Represents the amount of UPB covered by monoline bond insurance coverage. This amount does not represent the maximum amount of losses we could recover, as the monoline insurance also covers interest.

(2) Includes securities with S&P credit ratings below BBB– and certain securities that are no longer rated.

40

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1691

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Mortgage Loans**

The UPB of mortgage loans on our consolidated balance sheet declined to $1,876 billion as of June 30, 2011 from $1,885 billion as of December 31, 2010. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further detail about the mortgage loans on our consolidated balance sheets.

The UPB of unsecuritized single-family mortgage loans increased by $9.2 billion, to $158.1 billion at June 30, 2011 from $148.9 billion at December 31, 2010, primarily due to our continued purchases of seriously delinquent and modified loans from the mortgage pools underlying our PCs. Based on the amount of the recorded investment of these loans, approximately $74.6 billion, or 4.2%, of the single-family mortgage loans on our consolidated balance sheet as of June 30, 2011 were seriously delinquent, as compared to $84.2 billion, or 4.7%, as of December 31, 2010. The majority of these seriously delinquent loans are unsecuritized, and were purchased by us from our PC trusts. As guarantor, we have the right to purchase mortgages that back our PCs from the underlying loan pools under certain circumstances. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information on our purchases of single-family loans from PC trusts.

The UPB of unsecuritized multifamily mortgage loans was $81.8 billion at June 30, 2011 and $85.9 billion at December 31, 2010. Our multifamily loan activity in the three and six months ended June 30, 2011 primarily consisted of purchases of loans intended for securitization and sales of loans through Other Guarantee Transactions. We expect to continue to purchase and subsequently securitize multifamily loans, which supports liquidity for the multifamily market and affordability for multifamily rental housing, as our primary multifamily business strategy.

Table 23 summarizes our purchase and guarantee activity in mortgage loans. This activity consists of: (a) mortgage loans underlying consolidated single-family PCs issued in the period (regardless of whether such securities are held by us or third parties); (b) single-family and multifamily mortgage loans purchased, but not securitized, in the period; and (c) mortgage loans underlying our mortgage-related financial guarantees issued in the period, which are not consolidated on our balance sheets.

**Table 23 — Mortgage Loan Purchase and Other Guarantee Commitment Activity[1]**

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| | 2011 | | 2010 | | 2011 | | 2010 | |
| | UPB Amount | % of Total | UPB Amount | % of Total | UPB Amount | % of Total | UPB Amount | % of Total |
| | | | | (dollars in millions) | | | | |
|---|---|---|---|---|---|---|---|---|
| Mortgage loan purchases and guarantee issuances: | | | | | | | | |
| Single-family: | | | | | | | | |
| 30-year or more amortizing fixed-rate | $40,345 | 60% | $ 53,661 | 67% | $103,243 | 61% | $119,275 | 70% |
| 20-year amortizing fixed-rate | 3,315 | 5 | 3,871 | 5 | 10,030 | 6 | 7,229 | 4 |
| 15-year amortizing fixed-rate | 13,001 | 19 | 14,737 | 18 | 35,111 | 21 | 29,851 | 18 |
| Adjustable-rate[2] | 6,125 | 9 | 3,925 | 5 | 11,866 | 7 | 5,783 | 3 |
| Interest-only[3] | — | — | 499 | 1 | — | — | 820 | <1 |
| FHA/VA and other governmental | 117 | <1 | 349 | <1 | 204 | <1 | 3,132 | 2 |
| *Total single-family[4]* | 62,903 | 93 | 77,042 | 96 | 160,454 | 95 | 166,090 | 97 |
| Multifamily | 4,512 | 7 | 2,954 | 4 | 7,561 | 5 | 5,067 | 3 |
| *Total mortgage loan purchases and other guarantee commitment activity[5]* | $67,415 | 100% | $79,996 | 100% | $168,015 | 100% | $171,157 | 100% |
| Percentage of mortgage purchases and other guarantee commitment activity with credit enhancements[6] | 9% | | 8% | | 8% | | 11% | |

(1) Based on UPB. Excludes mortgage loans traded but not yet settled. Excludes additions of seriously delinquent loans and balloon/reset mortgages purchased out of PC trusts. Includes other guarantee commitments associated with mortgage loans. See endnote (5) for further information.

(2) Includes amortizing ARMs with 1-, 3-, 5-, 7- and 10-year initial fixed-rate periods. We did not purchase any option ARM loans during the first half of 2011 or 2010.

(3) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed-rate and variable-rate interest-only loans.

(4) Includes $13.3 billion and $11.0 billion of mortgage loans in excess of $417,000, which we refer to as conforming jumbo mortgages, for the six months ended June 30, 2011 and 2010, respectively.

(5) Includes issuances of other guarantee commitments on single-family loans of $2.5 billion and $3.1 billion and issuances of other guarantee commitments on multifamily loans of $0.4 billion and $0.9 billion during the six months ended June 30, 2011 and 2010, respectively, which include our unsecuritized guarantees of HFA bonds under the TCLFP in 2010.

(6) See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for further details on credit enhancement of mortgage loans in our single-family credit guarantee portfolio.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1692                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" and "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Table 17.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio" for information about mortgage loans in our single-family credit guarantee portfolio that we believe have higher-risk characteristics.

**Derivative Assets and Liabilities, Net**

The composition of our derivative portfolio changes from period to period as a result of derivative purchases, terminations, or assignments prior to contractual maturity, and expiration of the derivatives at their contractual maturity. We also classify net derivative interest receivable or payable, trade/settle receivable or payable, and cash collateral held or posted on our consolidated balance sheets in derivative assets, net and derivative liabilities, net. See "NOTE 11: DERIVATIVES" for additional information regarding our derivatives.

Table 24 shows the fair value for each derivative type, the weighted average fixed rate of our pay-fixed and receive-fixed swaps, and the maturity profile of our derivative positions as of June 30, 2011. A positive fair value in Table 24 for each derivative type is the estimated amount, prior to netting by counterparty, that we would be entitled to receive if the derivatives of that type were terminated. A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if the derivatives of that type were terminated.

42                                                                                              *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Table 24 — Derivative Fair Values and Maturities

| | | | June 30, 2011 | | | |
|---|---|---|---|---|---|---|
| | | | | Fair Value(1) | | |
| | Notional or Contractual Amount(2) | Total Fair Value(3) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| **Interest-rate swaps:** | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 199,851 | $ 2,260 | $ 151 | $ 590 | $ 931 | $ 588 |
| Weighted average fixed rate(4) | | | 1.31% | 1.22% | 2.21% | 3.60% |
| Forward-starting swaps(5) | 15,907 | 440 | — | — | (1) | 441 |
| Weighted average fixed rate(4) | | | — | 0.59% | 1.09% | 4.51% |
| Total receive-fixed | 215,758 | 2,700 | 151 | 590 | 930 | 1,029 |
| Basis (floating to floating) | 3,275 | 4 | — | 1 | 3 | — |
| Pay-fixed: | | | | | | |
| Swaps | 302,831 | (18,263) | (136) | (1,261) | (4,880) | (11,986) |
| Weighted average fixed rate(4) | | | 2.90% | 1.68% | 3.28% | 4.07% |
| Forward-starting swaps(5) | 19,039 | (2,489) | — | — | — | (2,489) |
| Weighted average fixed rate(4) | | | | | | 5.37% |
| Total pay-fixed | 321,870 | (20,752) | (136) | (1,261) | (4,880) | (14,475) |
| Total interest-rate swaps | 540,903 | (18,048) | 15 | (670) | (3,947) | (13,446) |
| **Option-based:** | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 103,825 | 8,260 | 4,084 | 2,001 | 816 | 1,359 |
| Written | 23,025 | (780) | (18) | (694) | (68) | — |
| Put swaptions | | | | | | |
| Purchased | 73,475 | 1,714 | 117 | 427 | 484 | 686 |
| Written | 6,000 | — | — | — | — | — |
| Other option-based derivatives(6) | 41,861 | 1,514 | 5 | — | — | 1,509 |
| Total option-based | 248,186 | 10,708 | 4,188 | 1,734 | 1,232 | 3,554 |
| Futures | 105,169 | (46) | (46) | — | — | — |
| Foreign-currency swaps | 2,184 | 327 | 101 | 226 | — | — |
| Commitments(7) | 34,361 | 55 | 55 | — | — | — |
| Swap guarantee derivatives | 3,733 | (36) | — | (1) | (1) | (34) |
| Subtotal | 934,536 | (7,040) | $ 4,313 | $ 1,289 | $ (2,716) | $ (9,926) |
| Credit derivatives | 11,383 | (2) | | | | |
| Subtotal | 945,919 | (7,042) | | | | |
| Derivative interest receivable (payable), net | | (1,347) | | | | |
| Trade/settle receivable (payable), net | | 6 | | | | |
| Derivative collateral (held) posted, net | | 8,221 | | | | |
| Total | $ 945,919 | $ (162) | | | | |

(1) Fair value is categorized based on the period from June 30, 2011 until the contractual maturity of the derivative.

(2) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.

(3) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net, and includes derivative interest receivable or (payable), net, trade/settle receivable or (payable), net and derivative cash collateral (held) or posted, net.

(4) Represents the notional weighted average rate for the fixed leg of the swaps.

(5) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to fifteen years.

(6) Primarily includes purchased interest rate caps and floors.

(7) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

At June 30, 2011, the net fair value of our total derivative portfolio was $(0.2) billion, as compared to $(1.1) billion at December 31, 2010. During the six months ended June 30, 2011, the fair value of our total derivative portfolio increased primarily due to additional cash collateral we posted to our counterparties during this period, partially offset by declines in interest rates. See "NOTE 11: DERIVATIVES — Table 11.1 — Derivative Assets and Liabilities at Fair Value" for our notional or contractual amounts and related fair values of our total derivative portfolio by product type at June 30, 2011 and December 31, 2010.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
TREASURY-1694
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 25 summarizes the changes in derivative fair values.

## Table 25 — Changes in Derivative Fair Values

| | Six Months Ended June 30,(1) | |
| | 2011 | 2010 |
|---|---|---|
| | (in millions) | |
| Beginning balance, at January 1 — Net asset (liability) | $(6,560) | $(2,267) |
| Net change in: | | |
| Commitments(2) | 75 | (1) |
| Credit derivatives | (9) | (4) |
| Swap guarantee derivatives | — | (1) |
| Other derivatives:(3) | | |
| Changes in fair value | (1,213) | (5,816) |
| Fair value of new contracts entered into during the period(4) | 576 | (324) |
| Contracts realized or otherwise settled during the period | 89 | 99 |
| Ending balance, at June 30 — Net asset (liability) | $(7,042) | $(8,314) |

(1) Refer to "Table 24 — Derivative Fair Values and Maturities" for reconciliation of fair value to the amounts presented on our consolidated balance sheets as of June 30, 2011. At June 30, 2011, fair value in this table excludes derivative interest receivable or (payable), net of $(791) million, trade/settle receivable or (payable), net of $17 million, and derivative cash collateral posted, net of $8.4 billion.
(2) Our commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.
(3) Includes fair value changes for interest-rate swaps, option-based derivatives, futures, and foreign-currency swaps.
(4) Consists primarily of cash premiums paid or received on options.

See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for a description of gains (losses) on our derivative positions.

## REO, Net

As a result of borrower default on mortgage loans that we own, or for which we have issued our financial guarantee, we acquire properties which are recorded as REO assets on our consolidated balance sheets. The balance of our REO, net, declined to $5.9 billion at June 30, 2011 from $7.1 billion at December 31, 2010. In recent periods, the volume of our single-family REO acquisitions has been less than it otherwise would have been due to delays caused by concerns about the foreclosure process. These delays in foreclosures continued in the first half of 2011, particularly in states that require a judicial foreclosure process. We expect these delays in the foreclosure process will likely continue at least through the remainder of 2011. However, we expect our REO inventory to remain at elevated levels, as we have a large inventory of significantly delinquent loans in our single-family credit guarantee portfolio, many of which will likely complete the foreclosure process and transition to REO during the next few quarters as our servicers work through their foreclosure-related issues. To the extent a large inventory of loans completes the foreclosure process, such an increase in REO inventory could have a negative impact on the housing market. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

## Deferred Tax Assets, Net

In connection with our entry into conservatorship, we determined that it was more likely than not that a portion of our net deferred tax assets would not be realized due to our inability to generate sufficient taxable income and, therefore, we recorded a valuation allowance. After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, and related difficulty in forecasting future profit levels, we reached a similar conclusion in all subsequent quarters, including in the second quarter of 2011. Our valuation allowance increased by $658 million during the six months ended June 30, 2011 to $33.9 billion, primarily attributable to an increase in temporary differences during the period. As of June 30, 2011, after consideration of the valuation allowance, we had a net deferred tax asset of $3.9 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities. We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered.

## *IRS Examinations*

Prior to 2011, the IRS completed its examinations of tax years 1998 to 2007. We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices. The principal matter of controversy involves questions of timing and potential penalties regarding our tax accounting method for certain hedging transactions. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. On July 6, 2011, the U.S. Tax Court

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1695

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

issued a Notice Setting Case for Trial and a Standing Pretrial Order. The trial date set forth in the Notice is December 12, 2011. We currently believe adequate reserves have been provided for settlement on reasonable terms. For additional information, see "NOTE 13: INCOME TAXES."

**Other Assets**

Other assets consist of the guarantee asset related to non-consolidated trusts and other guarantee commitments, accounts and other receivables, and other miscellaneous assets. Other assets decreased to $8.4 billion as of June 30, 2011 from $10.9 billion as of December 31, 2010 primarily because of a decrease in servicer receivables resulting from lower loan liquidations on mortgage loans held by consolidated trusts. See "NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

**Total Debt, Net**

PCs and Other Guarantee Transactions issued by our consolidated trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets. Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated trusts. The debt securities of our consolidated trusts may be prepaid without penalty at any time.

Other debt consists of unsecured short-term and long-term debt securities we issue to third parties to fund our business activities. It is classified as either short-term or long-term based on the contractual maturity of the debt instrument. See "LIQUIDITY AND CAPITAL RESOURCES" for a discussion of our management activities related to other debt.

TREASURY-1696

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 26 presents the UPB for Freddie Mac issued mortgage-related securities by the underlying mortgage product type based on the UPB of the securities.

**Table 26 — Freddie Mac Mortgage-Related Securities[(1)(2)]**

| | June 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total |
| | | | (in millions) | | | |
| Single-family: | | | | | | |
| 30-year or more amortizing fixed-rate | $1,182,288 | $      — | $1,182,288 | $1,213,448 | $      — | $1,213,448 |
| 20-year amortizing fixed-rate | 67,525 | — | 67,525 | 65,210 | — | 65,210 |
| 15-year amortizing fixed-rate | 251,030 | — | 251,030 | 248,702 | — | 248,702 |
| Adjustable-rate[(3)] | 64,367 | — | 64,367 | 61,269 | — | 61,269 |
| Interest-only[(4)] | 67,593 | — | 67,593 | 79,835 | — | 79,835 |
| FHA/VA and other governmental | 3,486 | — | 3,486 | 3,369 | — | 3,369 |
| *Total single-family* | 1,636,289 | — | 1,636,289 | 1,671,833 | — | 1,671,833 |
| Multifamily | — | 4,611 | 4,611 | — | 4,603 | 4,603 |
| *Total single-family and multifamily* | 1,636,289 | 4,611 | 1,640,900 | 1,671,833 | 4,603 | 1,676,436 |
| Other Guarantee Transactions: | | | | | | |
| HFA bonds:[(5)] | | | | | | |
| Single-family | — | 6,144 | 6,144 | — | 6,168 | 6,168 |
| Multifamily | — | 1,093 | 1,093 | — | 1,173 | 1,173 |
| Total HFA bonds | — | 7,237 | 7,237 | — | 7,341 | 7,341 |
| Other: | | | | | | |
| Single-family[(6)] | 14,240 | 4,038 | 18,278 | 15,806 | 4,243 | 20,049 |
| Multifamily | — | 14,718 | 14,718 | — | 8,235 | 8,235 |
| Total Other Guarantee Transactions | 14,240 | 18,756 | 32,996 | 15,806 | 12,478 | 28,284 |
| REMICs and Other Structured Securities backed by Ginnie Mae Certificates[(7)] | — | 852 | 852 | — | 857 | 857 |
| Total Freddie Mac Mortgage-Related Securities | $ 1,650,529 | $    31,456 | $1,681,985 | $1,687,639 | $    25,279 | $1,712,918 |
| Less: Repurchased Freddie Mac Mortgage-Related Securities[(8)] | (166,113) | | | (170,638) | | |
| Total UPB of debt securities of consolidated trusts held by third parties | $ 1,484,416 | | | $ 1,517,001 | | |

(1) Based on UPB of the securities and excludes mortgage-related debt traded, but not yet settled.

(2) Excludes other guarantee commitments for mortgage assets held by third parties that require us to purchase loans from lenders when these loans meet certain delinquency criteria.

(3) Includes $1.2 billion and $1.3 billion in UPB of option ARM mortgage loans as of June 30, 2011 and December 31, 2010, respectively. See endnote (6) for additional information on option ARM loans that back our Other Guarantee Transactions.

(4) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed- and variable-rate interest-only loans.

(5) Consists of bonds we acquired and resecuritized under the NIBP.

(6) Backed by non-agency mortgage-related securities that include prime, FHA/VA and subprime mortgage loans and also include $7.9 billion and $8.4 billion in UPB of securities backed by option ARM mortgage loans at June 30, 2011 and December 31, 2010, respectively.

(7) Backed by FHA/VA loans.

(8) Represents the UPB of repurchased Freddie Mac mortgage-related securities that are consolidated on our balance sheets and includes certain remittance amounts associated with our security trust administration that are payable to third-party mortgage-related security holders. Our holdings of non-consolidated Freddie Mac mortgage-related securities are presented in "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets."

Excluding Other Guarantee Transactions, the percentage of amortizing fixed-rate single-family loans underlying our consolidated trust securities, based on UPB, was approximately 92% at both June 30, 2011 and December 31, 2010. Because mortgage interest rates remained relatively low in the first half of 2011, the majority of newly issued Freddie Mac single-family mortgage-related securities in 2011 were backed by refinance mortgages. During the first half of 2011, the UPB of Freddie Mac mortgage-related securities issued by consolidated trusts declined approximately 4.4%, on an annualized basis, as our new issuances have not been sufficient to replace the liquidations of these securities. The UPB of multifamily Other Guarantee Transactions, excluding HFA-related securities, increased to $14.7 billion as of June 30, 2011 from $8.2 billion as of December 31, 2010, due to increased multifamily loan securitization activity.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1697

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 27 presents issuances and extinguishments of debt securities of our consolidated trusts held by third parties during the three and six months ended June 30, 2011 and 2010.

**Table 27 — Issuances and Extinguishments of Debt Securities of Consolidated Trusts[1]**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Beginning balance of debt securities of consolidated trusts held by third parties | $1,497,849 | $1,543,062 | $1,517,001 | $1,564,093 |
| Issuances to third parties of debt securities of consolidated trusts: | | | | |
| Issuances based on underlying mortgage product type: | | | | |
| 30-year or more amortizing fixed-rate | 36,517 | 53,603 | 98,308 | 122,027 |
| 20-year amortizing fixed-rate | 3,147 | 4,006 | 9,390 | 6,879 |
| 15-year amortizing fixed-rate | 15,648 | 14,170 | 35,514 | 27,377 |
| Adjustable-rate | 6,216 | 3,835 | 11,862 | 5,605 |
| Interest-only | — | 473 | 152 | 757 |
| FHA/VA | — | 1 | 160 | 1,075 |
| Debt securities of consolidated trusts retained by us at issuance | (313) | (481) | (6,658) | (2,791) |
| Net issuances of debt securities of consolidated trusts | 61,215 | 75,607 | 148,728 | 160,929 |
| Reissuances of debt securities of consolidated trusts previously held by us[2] | 11,977 | 8,449 | 36,553 | 16,360 |
| Total issuances to third parties of debt securities of consolidated trusts | 73,192 | 84,056 | 185,281 | 177,289 |
| Extinguishments, net[3] | (86,625) | (90,169) | (217,866) | (204,433) |
| Ending balance of debt securities of consolidated trusts held by third parties | $1,484,416 | $1,536,949 | $1,484,416 | $1,536,949 |

(1) Based on UPB.
(2) Represents our sales of PCs and certain Other Guarantee Transactions previously held by us.
(3) Represents: (a) UPB of our purchases from third parties of PCs and Other Guarantee Transactions issued by our consolidated trusts; (b) principal repayments related to PCs and Other Guarantee Transactions issued by our consolidated trusts; and (c) certain remittance amounts associated with our trust security administration that are payable to third-party mortgage-related security holders as of June 30, 2011 and 2010.

**Other Liabilities**

Other liabilities consist of the guarantee obligation, the reserve for guarantee losses on non-consolidated trusts and other mortgage-related financial guarantees, servicer liabilities, accounts payable and accrued expenses, and other miscellaneous liabilities. Other liabilities decreased to $7.2 billion as of June 30, 2011 from $8.1 billion as of December 31, 2010 primarily because of a decrease in servicer liabilities and accounts payable and accrued expenses during the first half of 2011. See "NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS" for additional information.

**Total Equity (Deficit)**

Table 28 presents the changes in total equity (deficit) and certain capital-related disclosures.

**Table 28 — Changes in Total Equity (Deficit)**

| | Three Months Ended | | | | | Six Months Ended |
|---|---|---|---|---|---|---|
| | 06/30/11 | 03/31/11 | 12/31/10 | 09/30/10 | 06/30/10 | 06/30/11 |
| | (in millions) | | | | | |
| Beginning balance | $ 1,237 | $ (401) | $ (58) | $ (1,738) | $(10,525) | $ (401) |
| Net income (loss) | (2,139) | 676 | (113) | (2,511) | (4,713) | (1,463) |
| Other comprehensive income (loss), net of taxes: | | | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 903 | 1,941 | 1,097 | 3,781 | 4,097 | 2,844 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 135 | 132 | 153 | 164 | 184 | 267 |
| Changes in defined benefit plans | 1 | (9) | 19 | 2 | 2 | (8) |
| Total comprehensive income (loss) | (1,100) | 2,740 | 1,156 | 1,436 | (430) | 1,640 |
| Capital draw funded by Treasury | — | 500 | 100 | 1,800 | 10,600 | 500 |
| Senior preferred stock dividends declared | (1,617) | (1,605) | (1,603) | (1,561) | (1,293) | (3,222) |
| Other | 2 | 3 | 4 | 5 | (90) | 5 |
| Total equity (deficit) / Net worth | $ (1,478) | $ 1,237 | $ (401) | $ (58) | $ (1,738) | $ (1,478) |
| Aggregate draws under the Purchase Agreement[1] | $ 63,700 | $ 63,700 | $63,200 | $ 63,100 | $ 61,300 | $ 63,700 |
| Aggregate senior preferred stock dividends paid to Treasury in cash | $13,248 | $11,631 | $10,026 | $ 8,423 | $ 6,862 | $13,248 |
| Percentage of dividends paid to Treasury in cash to aggregate draws | 21% | 18% | 16% | 13% | 11% | 21% |

(1) Does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was required.

Net unrealized losses in AOCI on our available-for-sale securities decreased by $0.9 billion and $2.8 billion during the three and six months ended June 30, 2011, respectively, primarily due to fair value gains related to the movement of

47

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any errors, omissions or delays in this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

non-agency mortgage-related securities with unrealized losses towards maturity and the impact of a decline in interest rates, partially offset by the impact of widening OAS levels on our non-agency mortgage-related securities. Additionally, net unrealized losses recorded in AOCI decreased due to the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities. Net unrealized losses in AOCI on our closed cash flow hedge relationships decreased by $135 million and $267 million during the three and six months ended June 30, 2011, respectively, primarily attributable to the reclassification of losses into earnings related to our closed cash flow hedges as the originally forecasted transactions affected earnings.

## RISK MANAGEMENT

Our investment and credit guarantee activities expose us to three broad categories of risk: (a) credit risk; (b) interest-rate risk and other market risk; and (c) operational risk. See "RISK FACTORS" in our 2010 Annual Report, our Quarterly Report on Form 10-Q for the first quarter of 2011, and in this Form 10-Q for additional information regarding these and other risks.

### Credit Risk

We are subject primarily to two types of credit risk: institutional credit risk and mortgage credit risk. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee. We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment.

#### *Institutional Credit Risk*

In recent periods, challenging market conditions adversely affected the liquidity and financial condition of our counterparties. The concentration of our exposure to our counterparties has increased in recent periods due to industry consolidation and counterparty failures. In addition, previously highly-rated mortgage insurers have been downgraded in prior periods due to their weakened financial condition. As a result, we continue to face challenges in reducing our risk concentrations with counterparties. Efforts we take to reduce exposure to financially weakened counterparties could further increase our exposure to other individual counterparties. The failure of any of our primary counterparties to meet their obligations to us could have a material adverse effect on our results of operations, financial condition, and our ability to conduct future business.

Our exposure to mortgage seller/servicers remained high during the six months ended June 30, 2011 with respect to their repurchase obligations arising from breaches of representations and warranties made to us for loans they underwrote and sold to us. We rely on our seller/servicers to perform loan workout activities as well as foreclosures on loans that they service for us. Our credit losses could increase to the extent that our seller/servicers do not fully perform these obligations in a prudent and timely manner.

Our exposure to derivatives counterparties remains highly concentrated as compared to historical levels.

#### Non-Agency Mortgage-Related Security Issuers

Our investments in securities expose us to institutional credit risk to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform their obligations. Our investments in non-Freddie Mac mortgage-related securities include both agency and non-agency securities. However, agency securities have historically presented minimal institutional credit risk due to the guarantee provided by those institutions.

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non-agency mortgage-related securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. The effectiveness of our efforts is highly uncertain and any potential recoveries may take significant time to realize.

As previously disclosed, we joined an investor group that delivered a notice of non-performance in 2010 to The Bank of New York Mellon, as Trustee, and Countrywide Home Loans Servicing LP (now known as BAC Home Loans Servicing, LP), related to the possibility that certain mortgage pools backing certain mortgage-related securities issued by Countrywide Financial and related entities include mortgages that may have been ineligible for inclusion in the pools due to breaches of representations or warranties.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

On June 29, 2011, Bank of America Corporation announced that it, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and Countrywide Home Loans, Inc. entered into a settlement agreement with The Bank of New York Mellon, as trustee, to resolve all outstanding and potential claims related to alleged breaches of representations and warranties (including repurchase claims), substantially all historical loan servicing claims and certain other historical claims with respect to 530 Countrywide first-lien and second-lien residential mortgage-related securitization trusts. Bank of America indicated that the settlement is subject to final court approval and certain other conditions, including the receipt of a private letter ruling from the IRS. There can be no assurance that final court approval of the settlement will be obtained or that all conditions will be satisfied. Bank of America noted that, given the number of investors and the complexity of the settlement, it is not possible to predict whether and to what extent challenges will be made to the settlement or the timing or ultimate outcome of the court approval process, which could take a substantial period of time. We have investments in certain of these Countrywide securitization trusts and would expect to benefit from this settlement, if final court approval is obtained.

In connection with the settlement, Bank of America Corporation entered into an agreement with the investor group. Under this agreement, the investor group agreed, among other things, to use reasonable best efforts and to cooperate in good faith to effectuate the settlement, including to obtain final court approval. Freddie Mac was not a party to this agreement, but agreed to retract any previously delivered notices of non-performance upon final court approval of the settlement.

The court has directed that any objections to the settlement be filed no later than August 30, 2011. FHFA, after considering input from us and others, will determine whether or not to object to the proposed settlement.

On July 27, 2011, FHFA announced that it, as conservator of Freddie Mac and Fannie Mae, has filed a lawsuit in the federal district court for the Southern District of New York against UBS Americas, Inc., and related defendants alleging violations of federal securities laws in the sale of residential private-label mortgage-related securities to Freddie Mac and Fannie Mae. FHFA seeks to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in UBS securities.

See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for additional information on credit risk associated with our investments in mortgage-related securities, including higher-risk components and impairment charges we recognized in the three and six months ended June 30, 2011 related to these investments. For information about institutional credit risk associated with our investments in non-mortgage-related securities, see "NOTE 7: INVESTMENTS IN SECURITIES — Table 7.9 — Trading Securities" as well as "Cash and Other Investments Counterparties" below.

*Mortgage Seller/Servicers*

We acquire a significant portion of our single-family mortgage purchase volume from several large lenders, or seller/servicers. Our top 10 single-family seller/servicers provided approximately 85% of our single-family purchase volume during the six months ended June 30, 2011. Wells Fargo Bank, N.A., JPMorgan Chase Bank, N.A., Bank of America, N.A. and U.S. Bank, N.A. accounted for 29%, 14%, 11%, and 10% respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume for the six months ended June 30, 2011. For the six months ended June 30, 2011, our top two multifamily lenders, CBRE Capital Markets, Inc., and Berkadia Commercial Mortgage LLC accounted for 21% and 13%, respectively, of our multifamily purchase volume. Our top 10 multifamily lenders represented an aggregate of approximately 85% of our multifamily purchase volume for the six months ended June 30, 2011. In July 2011, FHFA informed us that it expects us, going forward, to have in our agreements with sellers the ability to change base guarantee fees upon 90 days notice to sellers, if directed to do so by FHFA.

We have contractual arrangements with our seller/servicers under which they agree to provide us with mortgage loans that have been originated under specified underwriting standards. If we subsequently discover that contractual standards were not followed, we can exercise certain contractual remedies to mitigate our credit losses. These contractual remedies include the ability to require the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan. In addition, we may enter into agreements with certain of our seller/servicers to release specified loans in their servicing portfolios from certain repurchase obligations in exchange for one-time cash payments or seek other remedies with our seller/servicers in the future.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our mortgage seller/servicers, including non-performance of their repurchase obligations arising from breaches of the representations and warranties made to us for loans they underwrote and sold to us or failure to honor their recourse and indemnification

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1700

Table of Contents

obligations to us. Pursuant to their repurchase obligations, our seller/servicers are obligated to repurchase mortgages sold to us when there has been a breach of the representations and warranties made to us with respect to the mortgages. In lieu of repurchase, we may choose to allow a seller/servicer to indemnify us against losses realized on such mortgages or otherwise compensate us for the risk of continuing to hold the mortgages. In some cases, the ultimate amounts of recovery payments we have received from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations. If a seller/servicer does not satisfy its repurchase or indemnification obligations with respect to a loan, we will be subject to the full range of credit risks posed by the loan if the loan fails to perform, including the risk that a mortgage insurer may deny or rescind coverage on the loan (if the loan is insured) and the risk that we will incur credit losses on the loan through the workout or foreclosure process.

Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal. Some of our seller/servicers have failed to fully perform their repurchase obligations due to lack of financial capacity, while others, including many of our larger seller/servicers, have not fully performed their repurchase obligations in a timely manner. The UPB of loans subject to repurchase requests issued to our single-family seller/servicers declined to approximately $3.1 billion as of June 30, 2011 from $3.8 billion as of December 31, 2010, primarily because resolved requests of $6.1 billion exceeded our issuance of $5.4 billion of new requests for the six months ended June 30, 2011. As measured by UPB, approximately 43% and 34% of the repurchase requests outstanding at June 30, 2011 and December 31, 2010, respectively, were outstanding for four months or more since issuance of the initial request. The amount we expect to collect on the outstanding requests is significantly less than the UPB amount because many of these requests are likely to be satisfied by reimbursement of our realized losses by seller/servicers, or rescinded in the course of the contractual appeal process. Based on our historical loss experience and the fact that many of these loans are covered by credit enhancement, we expect the actual credit losses experienced by us should we fail to collect on these repurchase requests to also be less than the UPB of the loans. As of June 30, 2011, a significant portion of the repurchase requests outstanding more than four months relates to requests made because the mortgage insurer rescinded the mortgage insurance on the loan or denied the mortgage insurance claim. Our actual credit losses could increase should the mortgage insurance coverage not be reinstated and we fail to collect on these repurchase requests.

During the six months ended June 30, 2011, we recovered amounts that covered losses with respect to $2.4 billion of UPB of loans subject to our repurchase requests. At June 30, 2011 and December 31, 2010, four of our largest single-family seller/servicers collectively had approximately 47% and 32%, respectively, of their repurchase obligations outstanding for more than four months since issuance of our initial repurchase request, as measured by the UPB of loans associated with our repurchase requests. During 2010, we entered into agreements with certain of our seller/servicers to release specified loans in their servicing portfolios from certain repurchase obligations in exchange for one-time cash payments.

In order to resolve outstanding repurchase requests on a more timely basis with our single-family seller/servicers in the future, we have begun to require certain of our larger seller/servicers to commit to plans for completing repurchases, with financial consequences or with stated remedies for non-compliance, as part of the annual renewals of our contracts with them. While these provisions are in place for certain of our seller/servicers, it is too early to tell if these provisions will help in resolving future repurchase requests in a more timely manner or the impact they may have on the size or timing of our credit losses. In addition, we will implement a new monitoring process for our seller/servicers in the third quarter of 2011, which is intended to allow us to better evaluate our servicers and remediate issues concerning performance. We continue to review loans and pursue our rights to issue repurchase requests to our counterparties, as appropriate.

Our estimate of probable incurred losses for exposures to seller/servicer repurchase obligations is considered in our allowance for loan losses as of June 30, 2011 and December 31, 2010; however, our actual losses may be different than our estimates. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for further information.

On August 24, 2009, Taylor, Bean & Whitaker Mortgage Corp., or TBW, filed for bankruptcy. Prior to that date, we had terminated TBW's status as a seller/servicer of our loans. We had exposure to TBW with respect to its loan repurchase obligations. We also had exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac. Colonial Bank was placed into receivership by the FDIC in August 2009.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.
Powered by Morningstar® Document Research℠

TREASURY-1701

Table of Contents

On or about June 14, 2010, we filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, approximately $1.15 billion related to current and projected repurchase obligations and approximately $440 million related to funds deposited with Colonial Bank, or with the FDIC as its receiver, which are attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represented miscellaneous costs and expenses incurred in connection with the termination of TBW's status as a seller/servicer of our loans.

With the approval of FHFA, as Conservator, we entered into a proposed settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement, which is discussed below, was filed with the Bankruptcy Court for the Middle District of Florida on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011.

Under the terms of the settlement, we have been granted an unsecured claim in the TBW bankruptcy estate in the amount of $1.022 billion, largely representing our claims to past and future loan repurchase exposures. We estimate that this claim may result in a distribution to us of approximately $40-45 million, which is based on the plan of liquidation and disclosure statement filed with the court by TBW, indicating that general unsecured creditors are likely to receive a distribution of 3.3 to 4.4 cents on the dollar. We are also entitled to approximately $203 million on deposit in certain TBW bank accounts relating to our mortgage loans, $150 million of which we received on June 21, 2011 from the FDIC as receiver of Colonial Bank. We are required to assign ownership rights of certain escrow accounts associated with the serviced loans to TBW and certain of its creditors. The settlement also allows for our sale of TBW-related mortgage servicing rights and provides a formula for determining the amount of the proceeds, if any, to be allocated to third parties that have asserted interests in those rights. We estimate that during the third quarter of 2011, we will recognize approximately a $0.2 billion gain, representing the difference between the amounts that we assign, or pay, to TBW and their creditors and the liability recorded on our consolidated balance sheet.

At June 30, 2011, we estimate our uncompensated loss exposure to TBW to be approximately $0.7 billion. This estimated exposure largely relates to outstanding repurchase claims that have already been adjusted in our financial statements to their net realizable value through our provision for loan losses. Our ultimate losses could exceed our recorded estimate. Potential changes in our estimate of uncompensated loss exposure or the potential for additional claims as discussed below could cause us to record additional losses in the future.

We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors may file an action to recover certain funds paid to us prior to the TBW bankruptcy. However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to recover assets. Based on court filings and other information, we understand that Ocala or its creditors may attempt to assert fraudulent transfer and other possible claims totaling approximately $840 million against us related to funds that were allegedly transferred from Ocala to Freddie Mac custodial accounts. We also understood that Ocala might attempt to make claims against us asserting ownership of a large number of loans that we purchased from TBW. The order approving the settlement provides that nothing in the settlement shall be construed to limit, waive or release Ocala's claims against Freddie Mac, except for TBW's claims and claims arising from the allocation of the loans discussed above to Freddie Mac.

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds insuring against loss resulting from dishonest acts by TBW's officers, directors, and employees. Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder. Discovery is proceeding.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top five single-family loan servicers, Wells Fargo Bank N.A., Bank of America N.A., JPMorgan Chase Bank, N.A., Citimortgage, Inc., and U.S. Bank, N.A., together serviced approximately 67% of our single-family mortgage loans as of June 30, 2011. Wells Fargo Bank N.A., Bank of America N.A., and JPMorgan Chase Bank, N.A. serviced approximately 26%, 14%, and 12%, respectively, of our single-family mortgage loans, as of June 30, 2011. Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

During the second half of 2010, a number of our single-family servicers, including several of our largest, announced that they were evaluating the potential extent of issues relating to the possible improper execution of documents associated with foreclosures of loans they service, including those they service for us. Some of these companies temporarily suspended foreclosure proceedings in certain states in which they do business. While these servicers generally

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

resumed foreclosure proceedings in the first quarter of 2011,  the rate at which they are effecting foreclosures has been  slower than prior to the suspensions. See "RISK FACTORS — Operational Risks — *We have incurred and will continue to incur expenses and we may  otherwise be adversely affected by deficiencies in foreclosure practices, as well as related delays in the foreclosure process"* in our 2010 Annual Report.

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual  requirements, resulting in increased credit losses. For example,  our seller/servicers have an active role in our loan workout  efforts, including under the MHA Program and the recent servicing alignment initiative, and therefore, we also have  exposure to them to the extent a decline in their performance  results in a failure to realize the anticipated benefits of our  loss mitigation plans. During the first half of 2011, there have  been several regulatory developments that have affected and will  continue to significantly impact our single-family mortgage  servicers. For more information on regulatory and other developments in mortgage servicing, and how these developments  may impact our business, see "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices."

While we have legal remedies against seller/servicers who fail  to comply with our contractual servicing requirements, we are  exposed to institutional credit risk in the event of their  insolvency or if, for other causes, seller/servicers fail to  perform their obligations to repurchase affected mortgages, indemnify us for losses resulting from any breach, or pay  damages for any breach. In the event a seller/servicer does not fulfill its repurchase or other responsibilities, we may seek  partial recovery of amounts owed by the seller/servicer by  transferring the applicable mortgage servicing rights of the  seller/servicer to a different servicer. However, this option may be difficult to accomplish with respect to our largest seller/servicers due to the operational and capacity challenges  of transferring a large servicing portfolio.

As of June 30, 2011, our top four multifamily servicers,  Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., CBRE Capital Markets, Inc., and Deutsche Bank Berkshire Mortgage, each serviced more than 10% of our  multifamily mortgage portfolio and together serviced approximately 51% of our multifamily mortgage portfolio.

In our multifamily business, we are exposed to the risk that  multifamily seller/servicers could come under financial  pressure, which could potentially cause degradation in the  quality of servicing they provide to us or, in certain cases,  reduce the likelihood that we could recover losses through recourse agreements or other credit enhancements, where  applicable. This risk primarily relates to multifamily loans  that we hold on our consolidated balance sheets where we retain all of the related credit risk. We monitor the status of all our  multifamily seller/servicers in accordance with our counterparty  credit risk management framework.

### *Mortgage Insurers*

We have institutional credit risk relating to the potential  insolvency of or non-performance by mortgage insurers that  insure single-family mortgages we purchase or guarantee. As a guarantor, we remain responsible for the payment of principal  and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. If any of our mortgage insurers that  provide credit enhancement fail to fulfill their obligation, we could experience increased credit losses.

Table 29 summarizes our exposure to mortgage insurers as of  June 30, 2011. In the event that a mortgage insurer fails  to perform, the coverage outstanding represents our maximum  exposure to credit losses resulting from such failure. As of June 30, 2011, most of the coverage outstanding from mortgage insurance shown in Table 29 is attributed to primary  policies rather than pool insurance policies.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 29 — Mortgage Insurance by Counterparty**

| | | | As of June 30, 2011 | | |
|---|---|---|---|---|---|
| Counterparty Name | Credit Rating(1) | Credit Rating Outlook(1) | Primary Insurance(2) | Pool Insurance(2) (in billions) | Coverage Outstanding(3) |
| Mortgage Guaranty Insurance Corporation (MGIC) | B+ | Negative | $ 50.9 | $ 31.0 | $ 13.4 |
| Radian Guaranty Inc. | B+ | Negative | 37.5 | 12.4 | 11.0 |
| Genworth Mortgage Insurance Corporation | BB− | Negative | 32.4 | 0.9 | 8.3 |
| United Guaranty Residential Insurance Co. | BBB | Stable | 28.5 | 0.3 | 7.0 |
| PMI Mortgage Insurance Co. (PMI) | CCC− | Negative | 26.3 | 2.3 | 6.6 |
| Republic Mortgage Insurance Company (RMIC) | B+ | Negative | 21.8 | 2.2 | 5.5 |
| Triad Guaranty Insurance Corp.(4) | Not rated | N/A | 9.4 | 1.0 | 2.3 |
| CMG Mortgage Insurance Co. | BBB | Negative | 2.9 | 0.1 | 0.7 |
| Total | | | $ 209.7 | $ 50.2 | $ 54.8 |

(1) Except for PMI and RMIC, latest rating available as of July 22, 2011. PMI's and RMIC's credit rating and credit rating outlook reflect a S&P action on August 4, 2011 and August 1, 2011, respectively. Represents the lower of S&P and Moody's credit ratings and outlooks. In this table, the rating and outlook of the legal entity is stated in terms of the S&P equivalent.

(2) Represents the amount of UPB at the end of the period for our single-family credit guarantee portfolio covered by the respective insurance type.

(3) Represents the remaining aggregate contractual limit for reimbursement of losses under policies of both primary and pool insurance. These amounts are based on our gross coverage without regard to netting of coverage that may exist to the extent an affected mortgage is covered under both types of insurance.

(4) Beginning on June 1, 2009, Triad began paying valid claims 60% in cash and 40% in deferred payment obligations.

We received proceeds of $1.3 billion and $0.7 billion during the six months ended June 30, 2011 and 2010, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers, net of associated reserves, of $1.4 billion and $1.5 billion as of June 30, 2011 and December 31, 2010, respectively.

The UPB of single-family loans covered by pool insurance declined approximately 11% during the six months ended June 30, 2011, primarily due to payoffs and other liquidation events. We did not purchase pool insurance on single-family loans during the six months ended June 30, 2011. In recent periods, we also reached the maximum limit of recovery on certain of these policies.

Based on information we received from MGIC, we understand that MGIC may challenge our future claims under certain of their pool insurance policies. We believe that our pool insurance policies with MGIC provide us with the right to obtain recoveries for losses up to the aggregate limit indicated in Table 29. However, MGIC's interpretation of these policies would result in claims coverage approximately $0.5 billion lower than the coverage outstanding amount set forth in Table 29. We expect this difference to increase but not to exceed approximately $0.7 billion.

Four of our mortgage insurers, including RMIC and PMI, have exceeded risk to capital ratios required by their state insurance regulators, and others may exceed regulatory limits in the future. Most, but not all, states have issued waivers to allow the companies to continue writing new business in their states, and Freddie Mac has, in certain circumstances, approved limited purpose affiliates to allow the companies to continue writing business in those states that have not issued waivers. Some of those state regulatory waivers are nearing their expiration dates.

On July 28, 2011, RMIC announced that its waiver of minimum state regulatory capital requirements will expire on August 31, 2011, and that it has not yet obtained necessary approvals to move production of new business to a separately capitalized subsidiary. RMIC stated that it is probable that its new business production will cease, at least temporarily, prior to August 31, 2011. RMIC also stated that, absent approval to underwrite new production through a separately capitalized subsidiary, it is most likely that RMIC's existing book of business would be placed into run off operating mode. We notified RMIC that they were suspended as an approved insurer for Freddie Mac loans effective August 1, 2011.

We evaluate the near term recovery from insurance policies for mortgage loans that we hold on our consolidated balance sheet as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments as part of the estimate of our loan loss reserves. Based upon currently available information, we believe that all of our mortgage insurance counterparties have the capacity to pay all claims as they become due in the normal course for the near term, except for claims obligations of Triad that were partially deferred beginning June 1, 2009, under order of Triad's state regulator. To date, Triad's regulator has not allowed Triad to begin paying its deferred payment obligations, and it is uncertain when or if Triad will be permitted to do so, which would result in the loss of a significant portion of the coverage provided by Triad and indicated in Table 29 above. In addition, we believe that certain of our other mortgage insurance counterparties may lack sufficient ability to fully meet all of their expected lifetime claims paying obligations to us over the long term as such claims emerge.

53

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1704          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We believe at least one of our largest servicers entered into arrangements with two of our mortgage insurance counterparties for settlement of future rescission activity for certain mortgage loans. Under such agreements, servicers pay and/or indemnify mortgage insurers in exchange for the mortgage insurers agreeing not to issue mortgage insurance rescissions and /or denials of coverage related to origination defects on Freddie Mac-owned mortgages. For loans covered by these agreements, we may be at risk of additional loss to the extent we do not independently uncover loan defects and require lender repurchase for loans that otherwise would have resulted in mortgage insurance rescission. Additionally, this type of activity could result in negative financial impacts on our mortgage insurers' ability to pay in some economic scenarios. In April 2011, we issued an industry letter to our servicers reminding them that they may not enter into these types of agreements without our consent. It is unclear how widespread this type of agreement between our servicers and mortgage insurers may become or how many loans it may impact.

*Bond Insurers*

Most of the non-agency mortgage-related securities we hold rely primarily on subordinated tranches to provide credit loss protection. Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering certain of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. Bond insurance exposes us to the risk that the bond insurer will be unable to satisfy claims.

Table 30 presents our coverage amounts of monoline bond insurance, including secondary coverage, for the non-agency mortgage-related securities we hold. In the event a monoline bond insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses related to such a failure.

**Table 30 — Monoline Bond Insurance by Counterparty**

| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | June 30, 2011 Coverage Outstanding[2] (dollars in billions) | Percent of Total[2] |
|---|---|---|---|---|
| Ambac Assurance Corporation (Ambac)[3] | Not rated | N/A | $ 4.4 | 43% |
| Financial Guaranty Insurance Company (FGIC)[3] | Not rated | N/A | 1.9 | 19 |
| MBIA Insurance Corp. | B | Negative | 1.4 | 14 |
| Assured Guaranty Municipal Corp. | AA+ | Stable | 1.2 | 12 |
| National Public Finance Guarantee Corp. | BBB | Developing | 1.1 | 11 |
| Syncora Guarantee Inc.[3] | Not rated | N/A | 0.1 | 1 |
| Total | | | $ 10.1 | 100% |

(1) Latest ratings available as of July 22, 2011. Represents the lower of S&P and Moody's credit ratings. In this table, the rating and outlook of the legal entity is stated in terms of the S&P equivalent.

(2) Represents the remaining contractual limit for reimbursement of losses, including lost interest and other expenses, on non-agency mortgage-related securities.

(3) Neither S&P nor Moody's provide credit ratings for Ambac, FGIC, or Syncora Guarantee Inc., since these companies operate under regulatory supervision at June 30, 2011.

We monitor the financial strength of our bond insurers in accordance with our risk management policies. We expect to receive substantially less than full payment of our claims from FGIC and Ambac due to adverse developments concerning these companies, both of which are currently not paying any of their claims. We believe that we will likely receive substantially less than full payment of our claims from some of our other bond insurers, because we believe they also lack sufficient ability to fully meet all of their expected lifetime claims-paying obligations to us as such claims emerge. In the event one or more of these bond insurers were to become subject to a regulatory order or insolvency proceeding, our ability to recover certain unrealized losses on our mortgage-related securities would be negatively impacted, which may result in further impairment losses to be recognized on our investments in securities. We considered our expectations regarding our bond insurers' ability to meet their obligations, including those of Ambac and FGIC, in making our impairment determinations at June 30, 2011 and December 31, 2010. See "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-For-Sale Securities" for additional information regarding impairment losses on securities covered by bond insurers.

*Cash and Other Investments Counterparties*

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. As of June 30, 2011 and December 31, 2010, there were $53.4 billion and $91.6 billion, respectively, of cash and other non-

54                                                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. As of June 30, 2011, these included:

- $14.4 billion of cash equivalents invested in 32 counterparties that had short-term credit ratings of A-1 or above on the S&P or equivalent scale;

- $6.0 billion of federal funds sold with four counterparties that had short-term S&P ratings of A-1 or above;

- $1.3 billion of federal funds sold with one counterparty that had a short-term S&P rating of A-2;

- $7.1 billion of securities purchased under agreements to resell with three counterparties that had short-term S&P ratings of A-1 or above;

- $19.2 billion of securities purchased under agreements to resell with eight counterparties that had short-term S&P ratings of A-2; and

- $4.9 billion of cash deposited with the Federal Reserve Bank.

*Derivative Counterparties*

We are exposed to institutional credit risk arising from the possibility that a derivative counterparty will not be able to meet its contractual obligations. We are an active user of exchange-traded products, such as Treasury and Eurodollar futures, to reduce our overall exposure to derivative counterparties. Exchange-traded derivatives do not measurably increase our institutional credit risk because changes in the value of open exchange-traded contracts are settled daily through a financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk because transactions are executed and settled directly between us and the counterparty. When our net position with an OTC counterparty subject to a master netting agreement has a market value above zero at a given date (*i.e.*, it is an asset reported as derivative assets, net on our consolidated balance sheets), then the counterparty could potentially be obligated to deliver cash, securities, or a combination of both having that market value necessary to satisfy its net obligation to us under the derivatives (subject to a threshold).

The Dodd-Frank Act will require that, in the future, many types of derivatives be centrally cleared and traded on exchanges or comparable trading facilities. Pursuant to the Dodd-Frank Act, the U.S. Commodity Futures Trading Commission, or CFTC, is in the process of determining the types of derivatives that must be subject to this requirement. See "LEGISLATIVE AND REGULATORY MATTERS — Dodd-Frank Act" for more information. In addition, we continue to work with the Chicago Mercantile Exchange and other parties to implement a central clearing platform for interest rate derivatives. We will be exposed to institutional credit risk with respect to the Chicago Mercantile Exchange or other comparable exchanges or trading facilities in the future, to the extent we use them to clear and trade derivatives, and to the members of such clearing organizations that execute and submit our transactions for clearing.

We seek to manage our exposure to institutional credit risk related to our OTC derivative counterparties using several tools, including:

- review of external rating analyses;

- strict standards for approving new derivative counterparties;

- ongoing monitoring and internal analysis of our positions with, and credit rating of, each counterparty;

- managing diversification mix among counterparties;

- master netting agreements and collateral agreements; and

- stress-testing to evaluate potential exposure under possible adverse market scenarios.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

All of our OTC derivative counterparties are major financial institutions and are experienced participants in the OTC derivatives market. A large number of OTC derivative counterparties have credit ratings below AA–. We require such counterparties to post collateral if our net exposure to them on derivative contracts exceeds $1 million. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

The relative concentration of our derivative exposure among our primary derivative counterparties remains high. This concentration has increased significantly since 2008 due to industry consolidation and the failure of certain counterparties, and could further increase. Table 31 summarizes our exposure to our derivative counterparties, which represents the net

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

positive fair value of derivative contracts, related accrued interest and collateral held by us from our counterparties, after netting by counterparty as applicable (*i.e.*, net amounts due to us under derivative contracts which are recorded as derivative assets). In addition, we have derivative liabilities where we post collateral to counterparties. At June 30, 2011, our collateral posted exceeded our collateral held. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Derivative Assets and Liabilities, Net" and "Table 24 — Derivative Fair Values and Maturities" for a reconciliation of fair value to the amounts presented on our consolidated balance sheets as of June 30, 2011, which includes both cash collateral held and posted by us, net.

## Table 31 — Derivative Counterparty Credit Exposure

| Rating[1] | | As of June 30, 2011 | | | | |
|---|---|---|---|---|---|---|
| | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
| | | | (dollars in millions) | | | |
| AA | 3 | $ 54,831 | $ — | $ — | 5.8 | $10 million or less |
| AA− | 4 | 227,820 | 1,634 | 60 | 6.0 | $10 million or less |
| A+ | 7 | 395,803 | 101 | 40 | 5.3 | $1 million or less |
| A | 3 | 98,758 | 15 | 13 | 6.0 | $1 million or less |
| Subtotal[7] | 17 | 777,212 | 1,750 | 113 | 5.6 | |
| Other derivatives[8] | | 130,613 | — | — | | |
| Commitments[9] | | 34,361 | 121 | 121 | | |
| Swap guarantee derivatives | | 3,733 | — | — | | |
| Total derivatives[10] | | $ 945,919 | $ 1,871 | $ 234 | | |

| Rating[1] | | As of December 31, 2010 | | | | |
|---|---|---|---|---|---|---|
| | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
| | | | (dollars in millions) | | | |
| AA | 3 | $ 53,975 | $ — | $ — | 6.8 | $10 million or less |
| AA− | 4 | 270,694 | 1,668 | 29 | 6.4 | $10 million or less |
| A+ | 7 | 441,004 | 460 | 1 | 6.2 | $1 million or less |
| A | 3 | 177,277 | 16 | 2 | 5.2 | $1 million or less |
| Subtotal[7] | 17 | 942,950 | 2,144 | 32 | 6.1 | |
| Other derivatives[8] | | 244,640 | — | — | | |
| Commitments[9] | | 14,292 | 103 | 103 | | |
| Swap guarantee derivatives | | 3,614 | — | — | | |
| Total derivatives[10] | | $1,205,496 | $ 2,247 | $ 135 | | |

(1) We use the lower of S&P and Moody's ratings to manage collateral requirements. In this table, the rating of the legal entity is stated in terms of the S&P equivalent.

(2) Based on legal entities. Affiliated legal entities are reported separately.

(3) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged.

(4) For each counterparty, this amount includes derivatives with a net positive fair value (recorded as derivative assets, net), including the related accrued interest receivable/payable (net) and trade/settle fees.

(5) Calculated as Total Exposure at Fair Value less cash collateral held as determined at the counterparty level. Includes amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level.

(6) Counterparties are required to post collateral when their exposure exceeds agreed-upon collateral posting thresholds. These thresholds are typically based on the counterparty's credit rating and are individually negotiated.

(7) Consists of OTC derivative agreements for interest-rate swaps, option-based derivatives (excluding certain written options), foreign-currency swaps, and purchased interest-rate caps.

(8) Consists primarily of exchange-traded contracts, certain written options, and certain credit derivatives. Written options do not present counterparty credit exposure, because we receive a one-time up-front premium in exchange for giving the holder the right to execute a contract under specified terms, which generally puts us in a liability position.

(9) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(10) The difference between the exposure, net of collateral column above and derivative assets, net on our consolidated balance sheets primarily represents exchange-traded contracts which are settled daily through a clearinghouse, and thus, do not present counterparty credit exposure.

Over time, our exposure to individual counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps varies depending on changes in fair values, which are affected by changes in period-end interest rates, the implied volatility of interest rates, foreign-currency exchange rates, and the amount of derivatives held. If all of our counterparties for these derivatives defaulted simultaneously on June 30, 2011, our uncollateralized exposure to these counterparties, or our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately $113 million. Our uncollateralized exposure as of December 31, 2010 was $32 million. Four counterparties each accounted for greater than 10% and collectively accounted for 94% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at June 30, 2011. These

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

counterparties were Barclays Bank PLC, Deutsche Bank, A.G., UBS A.G., and Goldman Sachs Bank USA, all of which were rated A or higher as of July 22, 2011.

As indicated in Table 31, approximately 94% of our counterparty credit exposure for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps was collateralized at June 30, 2011. The uncollateralized exposure was primarily due to exposure amounts below the applicable counterparty collateral posting threshold, as well as market movements during the time period between when a derivative was marked to fair value and the date we received the related collateral. Collateral is typically transferred within one business day based on the values of the related derivatives.

In the event a derivative counterparty defaults, our economic loss may be higher than the uncollateralized exposure of our derivatives if we are not able to replace the defaulted derivatives in a timely and cost-effective fashion. We could also incur economic loss if the collateral held by us cannot be liquidated at prices that are sufficient to recover the amount of such exposure. We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps will increase under certain adverse market conditions by performing daily market stress tests. These tests, which involve significant management judgment, evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties on OTC derivatives contracts assuming certain changes in the level and implied volatility of interest rates and certain changes in foreign currency exchange rates over a brief time period. Our actual exposure could vary significantly from amounts forecasted by these tests.

As indicated in Table 31, the total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives for accounting purposes, was $121 million and $103 million at June 30, 2011 and December 31, 2010, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis in an effort to ensure that they continue to meet our internal risk-management standards.

### Mortgage Credit Risk

We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment. Mortgage credit risk is primarily influenced by the credit profile of the borrower on the mortgage, the features of the mortgage itself, the type of property securing the mortgage and general economic conditions. All mortgages that we purchase or guarantee have an inherent risk of default.

#### Single-Family Mortgage Credit Risk

Through our delegated underwriting process, single-family mortgage loans and the borrowers' ability to repay the loans are evaluated using several critical risk characteristics, including but not limited to the borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the original LTV ratio, the type of mortgage product and the occupancy type of the loan. Despite the improvements in underwriting standards and borrower and loan credit characteristics in the past two years, our single-family quality control sampling and review continues to find loans with underwriting deficiencies. We meet with our seller/servicers that have higher than average rates of loans with deficiencies from our sampling to help ensure they make changes appropriate to their underwriting process. See "BUSINESS — Our Business" and "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Underwriting Requirements and Quality Control Standards*" in our 2010 Annual Report for information about our charter requirements for single-family loans purchases, delegated underwriting, and our quality control monitoring.

Conditions in the mortgage market continued to remain challenging during the six months ended June 30, 2011. All single-family mortgage loans, especially those originated between 2005 and 2008, have been affected by the compounding pressures on household wealth caused by significant declines in home values that began in 2006 and the ongoing weak employment environment. Our serious delinquency rates remained high in the first half of 2011 compared to historical levels, primarily due to economic factors which adversely affected borrowers. Also contributing to high serious delinquency rates were: (a) delays related to servicer processing capacity constraints; (b) delays associated with the modification process; and (c) delays caused by concerns about the foreclosure process and other delays imposed by third parties. These delays lengthen the period of time in which loans remain in seriously delinquent status, as the delays extend the time it takes for seriously delinquent loans to be modified, foreclosed upon or otherwise resolved and thus transition out of seriously delinquent status. While still at historically high levels, the UPB of our single-family non-

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1708

Table of Contents

performing loans declined during the six months ended June 30, 2011, and the number of loans that transitioned to serious delinquency also declined.

*Characteristics of the Single-Family Credit Guarantee Portfolio*

The average UPB of loans in our single-family credit guarantee portfolio was approximately $151,000 and $150,000 at June 30, 2011 and December 31, 2010, respectively. Our single-family mortgage purchases and other guarantee commitment activity in the second quarter of 2011 decreased by 18% to $62.9 billion, as compared to $77.0 billion in the second quarter of 2010. Approximately 90% of the single-family mortgages we purchased in the second quarter of 2011 were fixed-rate amortizing mortgages, based on UPB. Approximately 70% and 79% of the single-family mortgages we purchased in the three and six months ended June 30, 2011 were refinance mortgages, including approximately 26% and 28%, respectively, that were relief refinance mortgages, based on UPB.

An important safeguard against credit losses on mortgage loans in our single-family credit guarantee portfolio is provided by the borrowers' equity in the underlying properties. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and, based upon historical information, is more likely to default than other borrowers. The percentage of borrowers in our single-family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 20% and 18% as of June 30, 2011 and December 31, 2010, respectively. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 12.7% and 14.9% as of June 30, 2011 and December 31, 2010, respectively. Due to declines in home prices since 2006, we estimate that, as of June 30, 2011, approximately 46% of the loans originated in 2005 through 2008 that remained in our single-family credit guarantee portfolio as of that date had current LTV ratios greater than 100%. In addition, as of June 30, 2011 and December 31, 2010, for the loans in our single-family credit guarantee portfolio with greater than 80% estimated current LTV ratios, the borrowers had a weighted average credit score at origination of 724 and 721, respectively.

A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of June 30, 2011 and December 31, 2010, approximately 15% and 14% of loans in our single-family credit guarantee portfolio had second lien financing at the time of origination of the first mortgage, and we estimate that these loans comprised 18% and 19%, respectively, of our seriously delinquent loans, based on UPB. However, borrowers are free to obtain second lien financing after origination and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

Table 32 provides additional characteristics of single-family mortgage loans purchased during the three and six months ended June 30, 2011 and 2010, and of our single-family credit guarantee portfolio at June 30, 2011 and December 31, 2010.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1709

Table of Contents

**Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio**[1]

| | Purchases During the Three Months Ended June 30, | | Purchases During the Six Months Ended June 30, | | Portfolio[2] at | |
|---|---|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 | June 30, 2011 | December 31, 2010 |
| **Original LTV Ratio Range**[3][4] | | | | | | |
| 60% and below | 29% | 28% | 31% | 30% | 23% | 23% |
| Above 60% to 70% | 16 | 16 | 17 | 16 | 16 | 16 |
| Above 70% to 80% | 46 | 48 | 44 | 46 | 43 | 43 |
| Above 80% to 90% | 5 | 5 | 5 | 5 | 9 | 9 |
| Above 90% to 100% | 4 | 3 | 3 | 3 | 8 | 8 |
| Above 100% | <1 | <1 | <1 | <1 | 1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average original LTV ratio | 68% | 68% | 67% | 68% | 71% | 71% |
| **Estimated Current LTV Ratio Range**[5] | | | | | | |
| 60% and below | | | | | 25% | 27% |
| Above 60% to 70% | | | | | 12 | 12 |
| Above 70% to 80% | | | | | 17 | 17 |
| Above 80% to 90% | | | | | 16 | 16 |
| Above 90% to 100% | | | | | 10 | 10 |
| Above 100% to 110% | | | | | 7 | 6 |
| Above 110% to 120% | | | | | 4 | 4 |
| Above 120% | | | | | 9 | 8 |
| Total | | | | | 100% | 100% |
| Weighted average estimated current LTV ratio: | | | | | | |
| Relief refinance mortgages[6] | | | | | 79% | 78% |
| All other mortgages | | | | | 79% | 78% |
| Total mortgages | | | | | 79% | 78% |
| **Credit Score**[3][7] | | | | | | |
| 740 and above | 71% | 68% | 73% | 69% | 54% | 53% |
| 700 to 739 | 19 | 20 | 18 | 19 | 21 | 21 |
| 660 to 699 | 8 | 9 | 7 | 9 | 14 | 15 |
| 620 to 659 | 2 | 2 | 2 | 2 | 7 | 7 |
| Less than 620 | <1 | 1 | 1 | 1 | 3 | 3 |
| Not available | <1 | <1 | <1 | <1 | 1 | 1 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average credit score: | | | | | | |
| Relief refinance mortgages[6] | 738 | 741 | 742 | 742 | 744 | 745 |
| All other mortgages | 755 | 752 | 757 | 753 | 733 | 732 |
| Total mortgages | 751 | 749 | 753 | 750 | 734 | 733 |
| **Loan Purpose** | | | | | | |
| Purchase | 30% | 29% | 21% | 25% | 30% | 31% |
| Cash-out refinance | 19 | 23 | 19 | 23 | 28 | 29 |
| Other refinance[8] | 51 | 48 | 60 | 52 | 42 | 40 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Property Type** | | | | | | |
| Detached/townhome[9] | 93% | 93% | 94% | 93% | 92% | 92% |
| Condo/Co-op | 7 | 7 | 6 | 7 | 8 | 8 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | | | |
| Primary residence | 89% | 91% | 91% | 92% | 91% | 91% |
| Second/vacation home | 5 | 5 | 4 | 5 | 5 | 5 |
| Investment | 6 | 4 | 5 | 3 | 4 | 4 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

(1) Purchases and ending balances are based on the UPB of the single-family credit guarantee portfolio. Other Guarantee Transactions with ending balances of $2 billion at both June 30, 2011 and December 31, 2010, are excluded from portfolio balance data since these securities are backed by non- Freddie Mac issued securities for which the loan characteristics data was not available.

(2) Includes loans acquired under our relief refinance initiative, which began in 2009.

(3) Purchases columns exclude mortgage loans acquired under our relief refinance initiative. See "Table 35 — Single-Family Refinance Loan Volume" for further information on the LTV ratios of these loans.

(4) Original LTV ratios are calculated as the amount of the mortgage we guarantee including the credit-enhanced portion, divided by the lesser of the appraised value of the property at the time of mortgage origination or the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien mortgage reduces the borrower's equity in the home and, therefore, can increase the risk of default.

(5) Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination. Estimated current LTV ratio range is not applicable to purchase activity, and excludes any secondary financing by third parties.

(6) The ending balances of relief refinance mortgages comprised approximately 10% and 7% of our single-family credit guarantee portfolio as of June 30, 2011 and December 31, 2010, respectively.

(7) Credit score data is based on FICO scores. Although we obtain updated credit information on certain borrowers after the origination of a mortgage, such as those borrowers seeking a modification, the scores presented in this table represent only the credit score of the borrower at the time of loan origination.

(8) Other refinance transactions include: (a) refinance mortgages with "no cash-out" to the borrower; and (b) refinance mortgages for which the delivery data provided was not sufficient for us to determine whether the mortgage was a cash-out or a no cash-out refinance transaction.

(9) Includes manufactured housing and homes within planned unit development communities. The UPB of manufactured housing mortgage loans purchased in the six months ended June 30, 2011 and 2010 was $206 million and $179 million, respectively.

59

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1710

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Attribute Combinations*

Certain combinations of loan characteristics often can indicate a higher degree of credit risk. For example, single-family mortgages with both high LTV ratios and borrowers who have lower credit scores typically experience higher rates of serious delinquency and default. We estimate that there were $11.5 billion and $11.8 billion at June 30, 2011 and December 31, 2010, respectively, of loans in our single-family credit guarantee portfolio with both original LTV ratios greater than 90% and FICO scores less than 620 at the time of loan origination. Certain mortgage product types, including interest-only or option ARM loans, that have additional higher risk characteristics, such as lower credit scores or higher LTV ratios, will also have a higher risk of default than those same products without these characteristics. The presence of a second lien mortgage can also increase the risk that a borrower will default.

*Single-Family Mortgage Product Types*

The primary mortgage products in our single-family credit guarantee portfolio are first lien, fixed-rate mortgage loans. The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate products for presentation within this Form 10-Q and elsewhere in our reporting even though they have a one-time rate adjustment provision, because the change in rate is determined at the time of modification rather than at a future date.

The following paragraphs provide information on the interest-only, option ARM and conforming jumbo loans in our single-family credit guarantee portfolio. Interest-only and option ARM loans have experienced significantly higher serious delinquency rates than fixed-rate amortizing mortgage products.

Interest-Only Loans

Interest-only loans have an initial period during which the borrower pays only interest, and at a specified date the monthly payment changes to begin reflecting repayment of principal until maturity. At both June 30, 2011 and December 31, 2010, interest-only loans represented approximately 5% of the UPB of our single-family credit guarantee portfolio. We discontinued purchasing interest-only loans on September 1, 2010.

Option ARM Loans

Most option ARM loans have initial periods during which the borrower has various options as to the amount of each monthly payment, until a specified date, when the terms are recast. At both June 30, 2011 and December 31, 2010, option ARM loans represented less than 1% of the UPB of our single-family credit guarantee portfolio. Included in this exposure was $7.9 billion and $8.4 billion of option ARM securities underlying certain of our Other Guarantee Transactions at June 30, 2011 and December 31, 2010, respectively. While we have not categorized these option ARM securities as either subprime or Alt-A securities for presentation within this Form 10-Q and elsewhere in our reporting, they could exhibit similar credit performance to collateral identified as subprime or Alt-A. We have not purchased option ARM loans in our single-family credit guarantee portfolio since 2007. For information on our exposure to option ARM loans through our holdings of non-agency mortgage-related securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Conforming Jumbo Loans

We purchased $13.3 billion and $11.0 billion of conforming jumbo loans during the six months ended June 30, 2011 and 2010, respectively. The UPB of conforming jumbo loans in our single-family credit guarantee portfolio as of June 30, 2011 and December 31, 2010 was $46.7 billion and $37.8 billion, respectively. The average size of these loans was approximately $548,000 at both June 30, 2011 and December 31, 2010. Our purchases of conforming jumbo loans will likely decline beginning in the fourth quarter of 2011 if the temporary increase in limits on the size of loans we may purchase expires as scheduled on September 30, 2011. See "LEGISLATIVE AND REGULATORY MATTERS" for further information on the conforming loan limits.

*Other Categories of Single-Family Mortgage Loans*

While we classified certain loans as subprime or Alt-A for purposes of the discussion below and elsewhere in this Form 10-Q, there is no universally accepted definition of subprime or Alt-A, and our classification of such loans may differ from those used by other companies. For example, some financial institutions may use FICO credit scores to delineate certain residential mortgages as subprime. In addition, we do not rely primarily on these loan classifications to evaluate the credit risk exposure relating to such loans in our single-family credit guarantee portfolio.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Subprime Loans

Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see *"Higher Risk Loans in the Single-Family Credit Guarantee Portfolio"* and "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for further information).

We estimate that approximately $2.4 billion and $2.5 billion of security collateral underlying our Other Guarantee Transactions at June 30, 2011 and December 31, 2010, respectively, were identified as subprime based on information provided to us when we entered into these transactions.

We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions. At June 30, 2011 and December 31, 2010, we held $51.5 billion and $54.2 billion, respectively, in UPB of non-agency mortgage-related securities backed by subprime loans. These securities were structured to provide credit enhancements, and 8% and 10% of these securities were investment grade at June 30, 2011 and December 31, 2010, respectively. The credit performance of loans underlying these securities has deteriorated significantly since the beginning of 2008 and has continued to deteriorate during the six months ended June 30, 2011. For more information on our exposure to subprime mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Alt-A Loans

Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. The UPB of Alt-A loans in our single-family credit guarantee portfolio declined to $104.0 billion as of June 30, 2011 from $115.5 billion as of December 31, 2010. The UPB of our Alt-A loans declined in the first half of 2011 primarily due to refinancing into other mortgage products, foreclosure transfers, and other liquidation events. As of June 30, 2011, for Alt-A loans in our single-family credit guarantee portfolio, the average FICO credit score at origination was 719. Although Alt-A mortgage loans comprised approximately 6% of our single-family credit guarantee portfolio as of June 30, 2011, these loans represented approximately 29% and 30% of our credit losses during the three and six months ended June 30, 2011, respectively. During the first quarter of 2011, we identified approximately $0.6 billion in UPB of single-family loans underlying certain Other Guarantee Transactions that had been previously reported in both the Alt-A and subprime categories. Commencing March 31, 2011, we no longer report these loans as Alt-A (but continue to report them as subprime) and we revised the prior periods to conform to the current period presentation.

We did not purchase any new single-family Alt-A mortgage loans in our single-family credit guarantee portfolio during the six months ended June 30, 2011. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. However, in the event we purchase a refinance mortgage in one of these programs and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. From the time the product became available in 2009 to June 30, 2011, we purchased approximately $13.4 billion of relief refinance mortgages that were previously categorized as Alt-A loans in our portfolio, including $3.2 billion during the six months ended June 30, 2011.

We also hold investments in non-agency mortgage-related securities backed by single-family Alt-A loans. At June 30, 2011 and December 31, 2010, we held investments of $17.8 billion and $18.8 billion, respectively, of non-agency mortgage-related securities backed by Alt-A and other mortgage loans and 16% and 22%, respectively, of these securities were categorized as investment grade. The credit performance of loans underlying these securities has deteriorated significantly since the beginning of 2008 and has continued to deteriorate during the six months ended June 30, 2011. We categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such

61

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

based on information provided to us when we entered into these transactions. For more information on our exposure to Alt-A mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Higher-Risk Loans in the Single-Family Credit Guarantee Portfolio

Table 33 presents information about certain categories of single-family mortgage loans within our single-family credit guarantee portfolio that we believe have certain higher-risk characteristics. These loans include categories based on product type and borrower characteristics present at origination. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Mortgage loans with higher LTV ratios have a higher risk of default, especially during housing and economic downturns, such as the one the U.S. has experienced since 2007.

**Table 33 — Certain Higher-Risk[1] Categories in the Single-Family Credit Guarantee Portfolio**

| | As of June 30, 2011 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | | (dollars in billions) | | |
| Loans with one or more specified characteristics | $ 356.4 | 104% | 6.5% | 9.3% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 104.0 | 104 | 7.4 | 11.7 |
| Interest-only[6] | 82.1 | 117 | 0.4 | 17.7 |
| Option ARM[7] | 9.0 | 118 | 3.4 | 21.6 |
| Original LTV ratio greater than 90%, non-relief refinance mortgages[8] | 112.5 | 108 | 7.4 | 8.3 |
| Original LTV ratio greater than 90%, relief refinance mortgages[8] | 50.3 | 104 | 0.1 | 0.9 |
| Lower original FICO scores (less than 620)[8] | 58.5 | 92 | 12.2 | 12.5 |

| | As of December 31, 2010 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | | (dollars in billions) | | |
| Loans with one or more specified characteristics | $368.8 | 100% | 5.5% | 10.3% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 115.5 | 99 | 5.7 | 12.2 |
| Interest-only[6] | 95.4 | 112 | 0.5 | 18.4 |
| Option ARM[7] | 9.4 | 115 | 3.1 | 21.2 |
| Original LTV ratio greater than 90%, non-relief refinance mortgages[8] | 117.8 | 105 | 6.3 | 9.1 |
| Original LTV ratio greater than 90%, relief refinance mortgages[8] | 36.5 | 101 | 0.1 | 0.7 |
| Lower original FICO scores (less than 620)[8] | 61.2 | 89 | 10.4 | 13.9 |

(1) Categories are not additive and a single loan may be included in multiple categories if more than one characteristic is associated with the loan. Loans with a combination of these characteristics will have an even higher risk of default than those with an individual characteristic.

(2) Based on our first lien exposure on the property and excludes secondary financing by third parties, if applicable. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default. For refinance mortgages, the original LTV ratios are based on third-party appraisals used in loan origination, whereas new purchase mortgages are based on the lower of an appraisal or property sales price.

(3) Represents the percentage of loans based on loan count in our single-family credit guarantee portfolio that have been modified under agreement with the borrower, including those with no changes in the interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan. Excludes loans underlying certain Other Guarantee Transactions for which data was not available.

(4) See "Delinquencies" for further information about our reported serious delinquency rates.

(5) Loans within the Alt-A category continue to remain as such following modification, even though the borrower may have provided full documentation of assets and income to complete the modification.

(6) The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post modification), primarily due to delays in processing.

(7) Loans within the option ARM category continue to remain as such following modification, even though the modified loan no longer provides for optional payment provisions.

(8) See endnotes (4) and (7) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios and use of FICO scores, respectively.

Loans with one or more of the above attributes comprised approximately 20% of our single-family credit guarantee portfolio as of both June 30, 2011 and December 31, 2010. The total UPB of loans in our single-family credit guarantee portfolio with one or more of these characteristics declined approximately 3%, to $356.4 billion as of June 30, 2011 from $368.8 billion as of December 31, 2010. This decline was principally due to liquidations resulting from repayments, payoffs, and refinancing activity as well as liquidations resulting from foreclosure events and foreclosure alternatives, but was partially offset by increases in loans with original LTV ratios greater than 90% due to our relief refinance mortgage activity in the first half of 2011. The serious delinquency rates associated with these loans declined to 9.3% as of June 30, 2011 from 10.3% as of December 31, 2010.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1713                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Credit Enhancements*

Our charter requires that single-family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests. However, as discussed below, under HARP we allow eligible borrowers who have mortgages with high current LTV ratios to refinance their mortgages without obtaining new mortgage insurance in excess of what was already in place. Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements.

At June 30, 2011 and December 31, 2010, our credit-enhanced mortgages represented 14% and 15%, respectively, of our single-family credit guarantee portfolio, excluding those backing Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative. Freddie Mac securities backed by Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative are excluded because we consider the incremental credit risk to which we are exposed to be insignificant. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities*" for credit enhancement and other information about our investments in non-Freddie Mac mortgage-related securities.

We had recoveries associated with charged-off single-family loans of $1.5 billion and $1.4 billion during the six months ended June 30, 2011 and 2010, respectively, under our primary and pool mortgage insurance policies and other credit enhancements. During the six months ended June 30, 2011, the credit enhancement coverage for new purchases was lower than in periods before 2009, primarily as a result of the high refinance activity during the first half of 2011. Refinance loans (other than relief refinance mortgages) typically have lower LTV ratios, and are more likely to have a LTV ratio below 80% and not require credit protection as specified in our charter. In addition, we have been purchasing significant amounts of relief refinance mortgages. These mortgages allow for the refinance of existing loans guaranteed by us under terms such that we may not have mortgage insurance for some or all of the UPB of the mortgage in excess of 80% of the value of the property for certain of these loans.

See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protection and other forms of credit enhancements covering loans in our single-family credit guarantee portfolio as of June 30, 2011 and December 31, 2010.

*Other Credit Risk Management Activities*

To compensate us for higher levels of risk in some mortgage products, we may charge upfront delivery fees above a base management and guarantee fee, which are calculated based on credit risk factors such as the mortgage product type, loan purpose, LTV ratio and other loan or borrower characteristics. We announced delivery fee increases in the fourth quarter of 2010 that became effective March 1, 2011 (or later, as outstanding contracts permit) for loans with higher LTV ratios. These increased fees do not apply to relief refinance mortgages with settlement dates on or after July 1, 2011.

*MHA Program*

The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. Participation in the MHA Program is an integral part of our mission of providing stability to the housing market. Through our participation in this program, we help borrowers maintain home ownership. Some of the key initiatives of this program include:

Home Affordable Modification Program

HAMP commits U.S. government, Freddie Mac and Fannie Mae funds to help eligible homeowners avoid foreclosures and keep their homes through mortgage modifications, where possible. Under this program, we offer loan modifications to financially struggling homeowners with mortgages on their primary residences that reduce the monthly principal and interest payments on their mortgages. HAMP applies both to delinquent borrowers and to current borrowers at risk of imminent default. See "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risks — Portfolio Management Activities — MHA Program*" in our 2010 Annual Report for further information on HAMP.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1714

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 34 presents the number of single-family loans that completed modification or were in trial periods under HAMP as of June 30, 2011 and December 31, 2010.

**Table 34 — Single-Family Home Affordable Modification Program Volume**[1]

| | As of June 30, 2011 | | As of December 31, 2010 | |
|---|---|---|---|---|
| | Amount[2] | Number of Loans | Amount[2] | Number of Loans |
| | (dollars in millions) | | | |
| Completed HAMP modifications[3] | $29,662 | 134,282 | $23,635 | 107,073 |
| Loans in the HAMP trial period | $ 3,460 | 16,106 | $ 4,905 | 22,352 |

(1) Based on information reported by our servicers to the MHA Program administrator.

(2) For loans in the HAMP trial period, this reflects the loan balance prior to modification. For completed HAMP modifications, the amount represents the balance of loans after modification under HAMP.

(3) Completed HAMP modifications are those where the borrower has made the last trial period payment, has provided the required documentation to the servicer and the modification has become effective. Amounts presented represent completed HAMP modifications with effective dates since our implementation of HAMP in 2009 through June 30, 2011 and December 31, 2010, respectively.

As of June 30, 2011, the borrower's monthly payment was reduced on average by an estimated $563, which amounts to an average of $6,756 per year, and a total of $907 million in annual reductions for all of our completed HAMP modifications (these amounts are calculated by multiplying the number of completed modifications by the average reduction in monthly payment, and have not been adjusted to reflect the actual performance of the loans following modification). Except in limited instances, each borrower's reduced payment will remain in effect for a minimum of five years, and borrowers whose payments were adjusted below current market levels will have their payment gradually increased after the fifth year to a rate consistent with the market rate at the time of modification. We bear the cost associated with the borrowers' payment reductions. Although mortgage investors under the MHA Program are entitled to certain subsidies from Treasury for reducing the borrowers' monthly payments from 38% to 31% of the borrower's income, we do not receive such subsidies on modified mortgages owned or guaranteed by us.

The number of our loans in the HAMP trial period declined to 16,106 as of June 30, 2011 from 22,352 as of December 31, 2010. A large number of borrowers entered into trial period plans when the program was initially introduced in 2009, and significantly fewer new borrowers entered into HAMP trial period plans after 2009. Consequently, we expect fewer borrowers will complete a HAMP modification during 2011 than 2010, since a large number of the delinquent borrowers that were eligible for the program have already completed the trial period or attempted to do so, but failed. When a borrower's HAMP trial period is cancelled, the loan is considered for our other workout activities. For more information on our HAMP modifications, including redefault rates on these loans, see "*Single-Family Loan Workouts*."

Home Affordable Refinance Program

HARP gives eligible homeowners with loans owned or guaranteed by us or Fannie Mae an opportunity to refinance into loans with more affordable monthly payments and/or fixed-rate terms and is available until June 2012. Under HARP, we allow eligible borrowers who have mortgages with current LTV ratios up to 125% to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place.

The relief refinance initiative is our implementation of HARP. HARP is targeted at borrowers with current LTV ratios above 80%; however, our program also allows borrowers with LTV ratios of 80% and below to participate. HARP loans may not perform as well as other refinance mortgages over time due, in part, to the continued high LTV ratios of these loans. Through our relief refinance initiative, we offer this refinancing option only for qualifying mortgage loans that we hold or guarantee. We continue to bear the credit risk for refinanced loans under this program, to the extent that such risk is not covered by existing mortgage insurance or other existing credit enhancements.

The implementation of the relief refinance mortgage product has resulted in a higher volume of purchases and increased delivery fees from the new loans than we would expect in the absence of the program. However, we believe the net effect of the refinance activity on our financial results has not been significant.

64

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1715

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 35 below presents the composition of our purchases of refinanced single-family loans during the six months ended June 30, 2011 and 2010.

**Table 35 — Single-Family Refinance Loan Volume[1]**

| | Six Months Ended June 30, 2011 | | | Six Months Ended June 30, 2010 | | |
|---|---|---|---|---|---|---|
| | Amount | Number of Loans | Percent | Amount | Number of Loans | Percent |
| | (dollars in millions) | | | | | |
| Relief refinance mortgages: | | | | | | |
| Above 105% LTV ratio | $ 4,638 | 20,072 | 3.3% | $ 1,376 | 5,736 | 1.0% |
| Above 80% to 105% LTV ratio | 18,431 | 85,328 | 14.1 | 18,998 | 81,913 | 13.8 |
| 80% and below LTV ratio | 22,269 | 137,053 | 22.7 | 19,749 | 110,627 | 18.7 |
| Total relief refinance mortgages | $ 45,338 | 242,453 | 40.1% | $ 40,123 | 198,276 | 33.5% |
| Total refinance loan volume[2] | $125,399 | 604,493 | 100% | $122,377 | 591,936 | 100% |

(1) Consists of all single-family refinance mortgage loans that we either purchased or guaranteed during the period, excluding those associated with other guarantee commitments and Other Guarantee Transactions.

(2) Consists of relief refinance mortgages and other refinance mortgages.

Relief refinance mortgages comprised approximately 40% and 34%, based on the number of loans, of our total refinance volume during the six months ended June 30, 2011 and 2010, respectively. Relief refinance mortgages with LTV ratios above 80% represented approximately 14% and 12% of our total single-family credit guarantee portfolio purchases, based on UPB, during the six months ended June 30, 2011 and 2010, respectively. Relief refinance mortgages comprised approximately 10% and 7% of the UPB in our total single-family credit guarantee portfolio at June 30, 2011 and December 31, 2010, respectively.

Home Affordable Foreclosure Alternatives Program

HAFA is designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales, if such borrowers did not qualify for or participate in a trial period, failed to complete their HAMP trial period, or defaulted on their HAMP modification. HAFA also provides a process for borrowers to convey title to their homes through a deed in lieu of foreclosure. HAFA took effect in April 2010 and ends on December 31, 2012. We began our implementation of this program in August 2010. We completed a small number of HAFA transactions on our single-family mortgage loans during the first half of 2011.

Hardest Hit Fund

In 2010, the federal government created the Hardest Hit Fund, which provides funding for state HFAs to create programs to assist homeowners in those states that have been hit hardest by the housing crisis and economic downturn. To the extent our borrowers participate in the HFA unemployment assistance programs and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency. Based on information provided to us by our seller/servicers, we believe participation in these programs by our borrowers has been limited through June 30, 2011.

*Impact of the MHA Program on Freddie Mac*

As previously discussed, HAMP is intended to provide borrowers the opportunity to obtain more affordable monthly payments and to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our credit losses by reducing or eliminating a portion of the costs related to foreclosed properties. We believe our overall loss mitigation programs, including efforts outside of the MHA Program, could reduce our ultimate credit losses over the long term. However, we cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives.

The costs we incur related to loan modifications and other activities under HAMP have been, and will likely continue to be, significant for the following reasons:

• Except for certain Other Guarantee Transactions and loans underlying our other guarantee commitments, we bear the full cost of the monthly payment reductions related to modifications of loans we own or guarantee and all servicer and borrower incentive fees and we will not receive a reimbursement of these costs from Treasury. We paid $113 million of servicer and borrower incentive fees during the six months ended June 30, 2011, as compared to $85 million of such fees during the six months ended June 30, 2010. We also have the potential to incur additional servicer incentive fees and borrower incentive fees as long as the borrower remains current on a loan

65

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

modified under HAMP. As of June 30, 2011, we accrued $116 million for both initial fees and recurring incentive fees not yet due.

- Under HAMP, we typically provide concessions to borrowers, including interest rate reductions and forbearance of principal. To the extent borrowers successfully obtain HAMP modifications, we will continue to experience high volumes of TDRs, similar to our experience during 2010 and the six months ended June 30, 2011.

- Some borrowers will fail to complete the HAMP trial period and others will default on their HAMP modified loans. For those borrowers who redefault or who do not complete the trial period and do not qualify for another loan workout, HAMP will have delayed the resolution of the loans through the foreclosure process. If home prices decline while these events take place, such delay in the foreclosure process may increase the losses we recognize on these loans, to the extent the prices we ultimately receive for the foreclosed properties are less than the prices we could have received had we foreclosed upon the properties earlier.

- Non-GSE mortgages modified under HAMP include mortgages backing our investments in non-agency mortgage-related securities. Such modifications reduce the monthly payments due from affected borrowers, and thus reduce the payments we receive on these securities (to the extent the payment reductions have not been absorbed by subordinated investors or by other credit enhancement).

*Single-Family Loan Workouts*

Loan workout activities are a key component of our loss mitigation strategy for managing and resolving troubled assets and lowering credit losses. Our single-family loss mitigation strategy emphasizes early intervention in seriously delinquent mortgages and provides alternatives to foreclosure. Other single-family loss mitigation activities include providing our single-family servicers with default management tools designed to help them manage non-performing loans more effectively and to assist borrowers in retaining home ownership where possible, or facilitate foreclosure alternatives when continued homeownership is not an option. Loan workouts are intended to reduce the number of seriously delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the additional credit losses that likely would be incurred in a REO sale. See "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Loss Mitigation and Workout Activities*" in our 2010 Annual Report for a general description of our loan workouts.

We require our single-family seller/servicers to first evaluate problem loans for possible reinstatement, a repayment plan, or a forbearance agreement before considering a modification under HAMP. If a borrower is not eligible for a modification under HAMP, the borrower is considered for modification under our other loan modification programs. If the borrower is not eligible for any such programs, the loan is considered for other workout options. During the six months ended June 30, 2011, we helped more than 116,000 borrowers either stay in their homes or sell their properties and avoid foreclosures through our various workout programs, including HAMP, and we completed approximately 61,000 foreclosures.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 36 presents volumes of single-family workouts, serious delinquency, and foreclosures for the three and six months ended June 30, 2011 and 2010.

**Table 36 — Single-Family Loan Workouts, Serious Delinquency, and Foreclosure Volumes**[1]

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| | 2011 | | 2010 | | 2011 | | 2010 | |
| | Number of Loans | Loan Balances | Number of Loans | Loan Balances | Number of Loans | Loan Balances | Number of Loans | Loan Balances |
| | | | | (dollars in millions) | | | | |
|---|---|---|---|---|---|---|---|---|
| **Home retention actions:** | | | | | | | | |
| Loan modifications[2] | | | | | | | | |
| with no change in terms[3] | 1,058 | $ 190 | 1,212 | $ 205 | 2,323 | $ 409 | 1,949 | $ 321 |
| with extension of loan terms | 4,528 | 836 | 5,494 | 940 | 9,808 | 1,797 | 9,455 | 1,597 |
| with reduction of contractual interest rate | 8,720 | 1,942 | 14,261 | 3,202 | 18,085 | 4,076 | 28,175 | 6,244 |
| with rate reduction and term extension | 11,061 | 2,461 | 19,511 | 4,273 | 24,664 | 5,494 | 35,710 | 7,846 |
| with rate reduction, term extension and principal forbearance | 5,682 | 1,520 | 9,084 | 2,373 | 11,327 | 3,025 | 18,501 | 4,838 |
| Total loan modifications[4] | 31,049 | 6,949 | 49,562 | 10,993 | 66,207 | 14,801 | 93,790 | 20,846 |
| Repayment plans[5] | 7,981 | 1,157 | 7,455 | 1,090 | 17,080 | 2,443 | 16,216 | 2,358 |
| Forbearance agreements[6] | 3,709 | 703 | 12,815 | 2,695 | 11,387 | 2,229 | 21,673 | 4,551 |
| Total home retention actions: | 42,739 | 8,809 | 69,832 | 14,778 | 94,674 | 19,473 | 131,679 | 27,755 |
| Foreclosure alternatives: | | | | | | | | |
| Short sale | 10,894 | 2,515 | 9,450 | 2,240 | 21,515 | 5,003 | 16,407 | 3,849 |
| Deed-in-lieu transactions | 144 | 25 | 92 | 15 | 229 | 40 | 199 | 31 |
| Total foreclosure alternatives | 11,038 | 2,540 | 9,542 | 2,255 | 21,744 | 5,043 | 16,606 | 3,880 |
| Total single-family loan workouts | 53,777 | $11,349 | 79,374 | $ 17,033 | 116,418 | $24,516 | 148,285 | $31,635 |
| Delinquent loan additions | 87,813 | | 123,175 | | 185,459 | | 274,116 | |
| Single-family foreclosures[7] | 30,139 | | 37,718 | | 61,226 | | 70,019 | |
| Delinquent loans, at period end | 417,457 | | 492,500 | | 417,457 | | 492,500 | |

(1) Based on completed actions with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent, or effective, such as loans in the trial period under HAMP. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period (see endnote 6).

(2) Includes approximately 24,000 and 40,000 TDRs during the three months ended June 30, 2011 and 2010, respectively, and approximately 51,000 and 67,000 TDRs during the six months ended June 30, 2011 and 2010, respectively.

(3) Under this modification type, past due amounts are added to the principal balance and reamortized based on the original contractual loan terms.

(4) Includes completed loan modifications under HAMP; however, the number of such completions differs from that reported by the MHA Program administrator in part due to differences in the timing of recognizing the completions by us and the administrator.

(5) Represents the number of borrowers as reported by our seller/servicers that have completed the full term of a repayment plan for past due amounts. Excludes the number of borrowers that are actively repaying past due amounts under a repayment plan, which totaled 20,342 and 22,323 borrowers as of June 30, 2011 and 2010, respectively.

(6) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before a loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.

(7) Represents the number of our single-family loans that complete foreclosure transfers, including third-party sales at foreclosure auction in which ownership of the property is transferred directly to a third-party rather than to us.

We experienced declines in home retention actions, particularly loan modifications, and increases in short sales during the three and six months ended June 30, 2011, compared to the three and six months ended June 30, 2010, respectively. Loan modifications may include the additions of past due amounts to principal, interest rate reductions, term extensions and principal forbearance. Although HAMP contemplates that some servicers will also make use of principal reduction to achieve reduced payments for borrowers, we only used forbearance in the first half of 2011 and did not use principal reduction in modifying our loans. We bear the costs of these activities, including the cost of any monthly payment reductions.

The UPB of loans in our single-family credit guarantee portfolio for which we have completed a loan modification increased to $63 billion as of June 30, 2011 from $52 billion as of December 31, 2010. The number of modified loans in our single-family credit guarantee portfolio has been increasing and such loans comprised approximately 2.6% and 2.1% of our single-family credit guarantee portfolio as of June 30, 2011 and December 31, 2010, respectively. The estimated current LTV ratio for all modified loans in our single-family credit guarantee portfolio was 121% and the serious delinquency rate on these loans was 16% as of June 30, 2011. Table 37 presents the reperformance rate of modified single-family loans in each of the last eight quarterly periods.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1718          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 37 — Reperformance Rates[1] of Modified Single-Family Loans**

| HAMP loan modifications: | | Quarter of Loan Modification Completion[2] | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 | 2Q 2009 |
| Time since modification– | | | | | | | | |
| 3 to 5 months | 95% | 94% | 93% | 94% | 95% | 94% | 96% | — |
| 6 to 8 months | | 92 | 92 | 91 | 93 | 93 | 93 | — |
| 9 to 11 months | | | 90 | 89 | 90 | 90 | 92 | — |
| 12 to 14 months | | | | 87 | 88 | 88 | 91 | — |
| 15 to 17 months | | | | | 86 | 86 | 89 | — |
| 18 to 20 months | | | | | | 85 | 87 | — |
| 21 to 23 months | | | | | | | 85 | — |
| 24 to 26 months | | | | | | | | — |

| Non-HAMP loan modifications: | | Quarter of Loan Modification Completion[2] | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 | 2Q 2009 |
| Time since modification– | | | | | | | | |
| 3 to 5 months | 93% | 94% | 93% | 93% | 94% | 90% | 88% | 73% |
| 6 to 8 months | | 89 | 90 | 86 | 87 | 82 | 78 | 64 |
| 9 to 11 months | | | 85 | 82 | 80 | 75 | 71 | 58 |
| 12 to 14 months | | | | 78 | 77 | 69 | 66 | 55 |
| 15 to 17 months | | | | | 74 | 66 | 61 | 51 |
| 18 to 20 months | | | | | | 64 | 59 | 48 |
| 21 to 23 months | | | | | | | 57 | 47 |
| 24 to 26 months | | | | | | | | 46 |

| Total (HAMP and non-HAMP): | | Quarter of Loan Modification Completion[2] | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 | 4Q 2009 | 3Q 2009 | 2Q 2009 |
| Time since modification– | | | | | | | | |
| 3 to 5 months | 95% | 94% | 93% | 94% | 95% | 92% | 89% | 73% |
| 6 to 8 months | | 90 | 91 | 90 | 92 | 88 | 79 | 64 |
| 9 to 11 months | | | 88 | 87 | 88 | 84 | 72 | 58 |
| 12 to 14 months | | | | 85 | 86 | 80 | 67 | 55 |
| 15 to 17 months | | | | | 84 | 78 | 62 | 51 |
| 18 to 20 months | | | | | | 76 | 61 | 48 |
| 21 to 23 months | | | | | | | 59 | 47 |
| 24 to 26 months | | | | | | | | 46 |

(1) Represents the percentage of loans that are current or less than three monthly payments past due as well as those paid-in-full or repurchased. Excludes those loan modification activities for which the borrower has started the required process, but the modification has not been made permanent, or effective, such as loans in the trial period under HAMP.

(2) Loan modifications are recognized as completed in the quarterly period in which the servicer has reported the modification as effective and the agreement has been accepted by us, which in certain cases may be delayed by a backlog in servicer processing of modifications. In the second quarter of 2011, we revised the calculation of reperformance rates to better account for remodified loans, or those where a borrower has received a second modification. The revised calculation reflects the status of each modification separately. In the case of a remodified loan where the borrower is performing, the previous modification would be presented as being in default in the applicable period.

The redefault rate is the percentage of our modified loans that became seriously delinquent, transitioned to REO, or completed a loss-producing foreclosure alternative, and is the inverse of the reperformance rate. As of June 30, 2011, the redefault rate for all of our single-family loan modifications (including those under HAMP) completed during 2010, 2009, and 2008 was 14%, 46%, and 65%, respectively. Many of the borrowers that received modifications in 2008 and 2009 were negatively affected by worsening economic conditions, including high unemployment rates during the last several years. As of June 30, 2011, the redefault rate for loans modified under HAMP in 2010 and 2009 was approximately 12% and 15%, respectively. These redefault rates may not be representative of the future performance of modified loans, including those modified under HAMP. We believe the redefault rate for loans modified in 2010, 2009, and 2008, including those modified under HAMP, is likely to increase, particularly since the housing and economic environments remain challenging.

In February 2011, FHFA directed Freddie Mac and Fannie Mae to develop consistent requirements, policies and processes for the servicing of non-performing loans. This directive was designed to create greater consistency in servicing practices and to build on the best practices of each of the GSEs. In April 2011, pursuant to this directive, FHFA announced a new set of aligned standards for servicing non-performing loans owned or guaranteed by Freddie Mac and Fannie Mae that are designed to help servicers do a better job of communicating and working with troubled borrowers and to bring greater accountability to the servicing industry. These standards will provide for earlier and more frequent communication with borrowers, consistent requirements for collecting documents from borrowers, consistent timelines for responding to borrowers, a consistent approach to modifications, and consistent timelines for processing foreclosures. These standards will result in the alignment of our processes for both HAMP and non-HAMP workouts, and will be implemented over the course of 2011 and into 2012.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1719

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Under these new servicing standards, servicers will be subject to incentives and compensatory fee assessments with respect to servicer performance. These incentives will likely result in our payment of increased fees to our seller/servicers, but these fees will be at least partially mitigated by compensatory fees paid to us by our servicers that do not perform as required.

We anticipate implementing the new non-HAMP modification initiative beginning in the fourth quarter of 2011. This initiative will require a three month trial period for our new non-HAMP modifications. Consequently, we expect to experience a temporary decline in completed modification volume, as many borrowers will be in the process of completing the trial period of this non-HAMP modification initiative. This new modification program is expected to result in a higher volume of modifications where we partially forbear principal until the borrower sells the home or refinances or pays off the mortgage. In addition, the new modification initiative will allow for a change of contractual interest rates to a current market rate whereas, our previous initiative allowed for reduction of contractual interest rates to as low as 2%.

*Delinquencies*

We report single-family serious delinquency rate information based on the number of loans that are three monthly payments or more past due or in the process of foreclosure, as reported by our seller/servicers. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the borrower is current under the modified terms. Single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower. To the extent our borrowers participate in the HFA unemployment assistance initiatives and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency.

Our single-family delinquency rates include all single-family loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by either Ginnie Mae Certificates or HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancements provided on these securities by the U.S. government.

Some of our loss mitigation activities create fluctuations in our delinquency statistics. For example, single-family loans that we report as seriously delinquent before they enter the HAMP trial period continue to be reported as seriously delinquent for purposes of our delinquency reporting until the modifications become effective and the loans are removed from delinquent status by our servicers. However, under many of our non-HAMP modifications, the borrower would return to a current payment status sooner, because these modifications do not have trial periods. Consequently, the volume, timing, and type of loan modifications have impacted our reported serious delinquency rate. As discussed above in "Single-Family Loan Workouts," we anticipate implementing a new non-HAMP loan modification initiative that will include a trial period comparable to that of our HAMP modification initiative. In addition, there may be temporary timing differences, or lags, in the reporting of payment status and modification completion due to differing practices of our servicers that can affect our delinquency reporting.

Temporary actions to suspend foreclosure transfers of occupied homes, increases in foreclosure process timeframes, process requirements of HAMP, and general constraints on servicer capacity caused loans to remain in seriously delinquent status for longer periods than prior to 2008, before such actions and delays arose. This has caused our single-family serious delinquency rates to be higher in recent periods than they otherwise would have been. Delays in foreclosure relating to the concerns about the foreclosure process have also had a similar effect on our single-family serious delinquency rates. As of June 30, 2011 and December 31, 2010, the percentage of seriously delinquent loans that have been delinquent for more than six months was 72% and 66%, respectively.

Table 38 presents delinquency rates for our single-family credit guarantee portfolio.

**Table 38 — Single-Family Serious Delinquency Rates**

|  | As of June 30, 2011 | | As of December 31, 2010 | |
|---|---|---|---|---|
|  | Percentage of Portfolio | Serious Delinquency Rate | Percentage of Portfolio | Serious Delinquency Rate |
| Single-family: |  |  |  |  |
| Non-credit-enhanced | 86% | 2.75% | 85% | 3.01% |
| Credit-enhanced | 14 | 7.67 | 15 | 8.27 |
| Total single-family credit guarantee portfolio(1) | 100% | 3.50 | 100% | 3.84 |

(1) As of June 30, 2011 and December 31, 2010, approximately 67% and 61%, respectively, of the single-family loans reported as seriously delinquent were in the process of foreclosure.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1720

Table of Contents

Serious delinquency rates of our single-family credit guarantee portfolio declined slightly to 3.50% as of June 30, 2011 from 3.84% as of December 31, 2010. Serious delinquency rates for interest-only and option ARM products, which together represented approximately 5% of our total single-family credit guarantee portfolio at June 30, 2011, were 17.7% and 21.6%, respectively, at June 30, 2011, compared with 18.4% and 21.2%, respectively, at December 31, 2010. Serious delinquency rates of single-family 30-year, fixed rate amortizing loans, which is a more traditional mortgage product, were approximately 3.7% and 4.0% at June 30, 2011, and December 31, 2010, respectively. The slight improvement in the single-family serious delinquency rate during the second quarter of 2011 was primarily due to a continued high volume of loan modifications, significant volumes of foreclosure transfers, and a slowdown in new serious delinquencies. Although the volume of new serious delinquencies declined in each of the past several quarters, our serious delinquency rate remains high, reflecting continued stress in the housing and labor markets.

In certain states our single-family serious delinquency rates have remained persistently high. As of June 30, 2011, single-family loans in Arizona, California, Florida, and Nevada comprised 26% of our single-family credit guarantee portfolio, and the serious delinquency rate of loans in these states was 6.3%. During the six months ended June 30, 2011, we also continued to experience high serious delinquency rates on single-family loans originated between 2005 and 2008. We purchased significant amounts of loans with higher-risk characteristics in those years. In addition, those borrowers are more susceptible to the declines in home prices since 2006 than those homeowners that have built up equity in their homes over time.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 39 presents credit concentrations for certain loan groups in our single-family credit guarantee portfolio.

**Table 39 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio**

| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio(1) | Percentage Modified(2) | Serious Delinquency Rate |
|---|---|---|---|---|---|---|
| | | **As of June 30, 2011** | | | | |
| | | (in billions) | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 43 | $  416 | $  459 | 92% | 4.1% | 6.3% |
| All other states | 61 | 1,285 | 1,346 | 75 | 2.2 | 2.7 |
| Year of origination: | | | | | | |
| 2011 | — | 105 | 105 | 70 | — | <0.1 |
| 2010 | — | 361 | 361 | 71 | <0.1 | 0.1 |
| 2009 | <1 | 366 | 366 | 72 | 0.1 | 0.3 |
| 2008 | 9 | 131 | 140 | 90 | 3.4 | 4.9 |
| 2007 | 32 | 154 | 186 | 110 | 8.5 | 11.0 |
| 2006 | 28 | 111 | 139 | 109 | 7.7 | 10.3 |
| 2005 | 19 | 140 | 159 | 95 | 4.2 | 6.0 |
| 2004 and prior | 16 | 333 | 349 | 60 | 2.1 | 2.5 |

| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio(1) | Percentage Modified(2) | Serious Delinquency Rate |
|---|---|---|---|---|---|---|
| | | **As of June 30, 2010** | | | | |
| | | (in billions) | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 53 | $  421 | $  474 | 82% | 2.3% | 7.6% |
| All other states | 80 | 1,316 | 1,396 | 70 | 1.4 | 3.0 |
| Year of origination: | | | | | | |
| 2010 | — | 122 | 122 | 68 | — | <0.1 |
| 2009 | <1 | 452 | 452 | 66 | <0.1 | 0.1 |
| 2008 | 11 | 188 | 199 | 79 | 1.2 | 4.1 |
| 2007 | 41 | 200 | 241 | 95 | 4.1 | 11.0 |
| 2006 | 36 | 146 | 182 | 95 | 3.8 | 9.9 |
| 2005 | 24 | 183 | 207 | 83 | 2.1 | 5.7 |
| 2004 and prior | 21 | 446 | 467 | 54 | 1.2 | 2.3 |

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | (in millions) | |
| **Credit Losses** | | | | |
| Geographical distribution: | | | | |
| Arizona, California, Florida, and Nevada | $1,967 | $2,445 | $ 3,951 | $ 4,192 |
| All other states | 1,139 | 1,406 | 2,381 | 2,566 |
| Year of origination: | | | | |
| 2011 | — | — | — | — |
| 2010 | — | — | — | — |
| 2009 | 35 | 9 | 67 | 14 |
| 2008 | 233 | 232 | 484 | 389 |
| 2007 | 1,139 | 1,325 | 2,315 | 2,277 |
| 2006 | 899 | 1,189 | 1,830 | 2,053 |
| 2005 | 534 | 767 | 1,104 | 1,419 |
| 2004 and prior | 266 | 329 | 532 | 606 |

(1) See endnote (5) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of estimated current LTV ratios.
(2) Represents the percentage of loans, based on loan count in our single-family credit guarantee portfolio, that have been modified under agreement with the borrower, including those with no changes in interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1722

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 40 presents statistics for combinations of certain characteristics of the mortgages in our single-family credit guarantee portfolio as of June 30, 2011 and December 31, 2010.

## Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations

| | As of June 30, 2011 | | | | | | | | |
| | Current LTV Ratio[1] < 80 | | Current LTV Ratio[1] of 81-100 | | Current LTV Ratio[1] > 100 | | Current LTV Ratio[1] All Loans | | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[1] | Percentage Modified[3] | Serious Delinquency Rate |
|---|---|---|---|---|---|---|---|---|---|
| **By Product Type** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| 20 and 30-year or more amortizing fixed rate | 0.9% | 7.6% | 0.8% | 12.6% | 1.0% | 23.3% | 2.7% | 15.1% | 13.6% |
| 15-year amortizing fixed rate | 0.2 | 4.2 | <0.1 | 10.7 | <0.1 | 18.2 | 0.2 | 1.9 | 4.8 |
| ARMs/adjustable rate[4] | 0.1 | 11.2 | <0.1 | 16.9 | <0.1 | 25.3 | 0.1 | 8.9 | 15.7 |
| Interest-only[5] | <0.1 | 16.2 | <0.1 | 22.6 | 0.1 | 36.6 | 0.1 | 0.7 | 31.3 |
| Other[6] | <0.1 | 3.1 | <0.1 | 7.4 | 0.1 | 11.6 | 0.1 | 3.7 | 4.9 |
| Total FICO scores < 620 | 1.2 | 6.7 | 0.8 | 12.8 | 1.2 | 23.8 | 3.2 | 12.2 | 12.5 |
| FICO scores of 620 to 659 | | | | | | | | | |
| 20 and 30-year or more amortizing fixed rate | 2.0 | 4.8 | 1.6 | 8.3 | 2.0 | 17.6 | 5.6 | 10.1 | 9.5 |
| 15-year amortizing fixed rate | 0.6 | 2.5 | <0.1 | 6.4 | <0.1 | 14.2 | 0.6 | 1.0 | 2.8 |
| ARMs/adjustable rate[4] | 0.1 | 5.4 | 0.1 | 11.8 | 0.1 | 24.0 | 0.3 | 1.5 | 12.9 |
| Interest-only[5] | <0.1 | 10.1 | 0.1 | 18.7 | 0.3 | 32.6 | 0.4 | 0.7 | 27.5 |
| Other[6] | <0.1 | 2.0 | <0.1 | 4.8 | <0.1 | 4.9 | <0.1 | 1.2 | 3.9 |
| Total FICO scores of 620 to 659 | 2.7 | 4.1 | 1.8 | 8.7 | 2.4 | 18.9 | 6.9 | 8.0 | 9.1 |
| FICO scores ≥ 660 | | | | | | | | | |
| 20 and 30-year or more amortizing fixed rate | 34.6 | 0.9 | 20.8 | 2.2 | 12.3 | 8.9 | 67.7 | 2.4 | 2.6 |
| 15-year amortizing fixed rate | 12.6 | 0.4 | 1.0 | 1.1 | 0.2 | 6.6 | 13.8 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 2.0 | 1.3 | 0.9 | 4.6 | 0.8 | 15.4 | 3.7 | 0.4 | 5.1 |
| Interest-only[5] | 0.5 | 3.4 | 0.9 | 9.2 | 2.6 | 21.3 | 4.0 | 0.3 | 16.2 |
| Other[6] | <0.1 | 1.7 | <0.1 | 1.5 | 0.1 | 1.4 | 0.1 | 0.4 | 1.4 |
| Total FICO scores ≥ 660 | 49.7 | 0.7 | 23.6 | 2.5 | 16.0 | 10.7 | 89.3 | 1.7 | 2.5 |
| FICO scores not available | 0.3 | 4.2 | 0.2 | 11.1 | 0.1 | 20.2 | 0.6 | 4.9 | 8.5 |
| All FICO scores | | | | | | | | | |
| 20 and 30-year or more amortizing fixed rate | 37.8 | 1.4 | 23.2 | 3.2 | 15.3 | 11.1 | 76.3 | 3.6 | 3.7 |
| 15-year amortizing fixed rate | 13.3 | 0.6 | 1.1 | 1.6 | 0.2 | 7.2 | 14.6 | 0.2 | 0.7 |
| ARMs/adjustable rate[4] | 2.2 | 2.0 | 1.0 | 5.9 | 1.0 | 17.0 | 4.2 | 0.8 | 6.0 |
| Interest-only[5] | 0.5 | 4.2 | 1.0 | 10.5 | 3.0 | 22.9 | 4.5 | 0.4 | 17.7 |
| Other[6] | 0.1 | 7.7 | 0.1 | 8.5 | 0.2 | 6.5 | 0.4 | 6.1 | 7.5 |
| Total Single-family Credit Guarantee Portfolio[7] | 53.9% | 1.2% | 26.4% | 3.4% | 19.7% | 12.7% | 100.0% | 2.6% | 3.5% |
| **By Region**[8] | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| North Central | 0.2% | 6.0% | 0.2% | 11.4% | 0.2% | 19.4% | 0.6% | 12.4% | 11.7% |
| Northeast | 0.4 | 8.7 | 0.2 | 17.5 | 0.3 | 27.1 | 0.9 | 12.8 | 13.7 |
| Southeast | 0.2 | 7.4 | 0.2 | 13.2 | 0.3 | 28.7 | 0.7 | 12.6 | 15.2 |
| Southwest | 0.2 | 5.1 | 0.1 | 10.1 | 0.1 | 19.1 | 0.4 | 8.7 | 7.8 |
| West | 0.2 | 4.7 | 0.1 | 10.3 | 0.3 | 21.5 | 0.6 | 14.7 | 12.8 |
| Total FICO scores < 620 | 1.2 | 6.7 | 0.8 | 12.8 | 1.2 | 23.8 | 3.2 | 12.2 | 12.5 |
| FICO scores of 620 to 659 | | | | | | | | | |
| North Central | 0.4 | 3.7 | 0.4 | 7.9 | 0.5 | 14.3 | 1.3 | 7.8 | 8.1 |
| Northeast | 0.9 | 5.1 | 0.5 | 12.0 | 0.4 | 21.6 | 1.8 | 7.9 | 9.3 |
| Southeast | 0.5 | 4.9 | 0.3 | 9.0 | 0.6 | 23.5 | 1.4 | 8.1 | 11.7 |
| Southwest | 0.5 | 3.0 | 0.3 | 6.6 | 0.1 | 12.3 | 0.9 | 5.3 | 4.9 |
| West | 0.4 | 3.1 | 0.3 | 7.2 | 0.8 | 18.9 | 1.5 | 10.6 | 10.4 |
| Total FICO scores of 620 to 659 | 2.7 | 4.1 | 1.8 | 8.7 | 2.4 | 18.9 | 6.9 | 8.0 | 9.1 |
| FICO scores ≥ 660 | | | | | | | | | |
| North Central | 8.1 | 0.6 | 5.0 | 2.1 | 3.0 | 6.8 | 16.1 | 1.4 | 1.9 |
| Northeast | 14.7 | 0.9 | 5.8 | 3.7 | 1.9 | 11.6 | 22.4 | 1.4 | 2.1 |
| Southeast | 7.0 | 1.1 | 4.1 | 2.7 | 3.8 | 14.1 | 14.9 | 1.8 | 4.1 |
| Southwest | 7.1 | 0.6 | 3.0 | 1.8 | 0.4 | 5.7 | 10.5 | 0.8 | 1.1 |
| West | 12.8 | 0.5 | 5.7 | 1.9 | 6.9 | 10.9 | 25.4 | 2.6 | 3.2 |
| Total FICO scores ≥ 660 | 49.7 | 0.7 | 23.6 | 2.5 | 16.0 | 10.7 | 89.3 | 1.7 | 2.5 |
| FICO scores not available | 0.3 | 4.2 | 0.2 | 11.1 | 0.1 | 20.2 | 0.6 | 4.9 | 8.5 |
| All FICO scores | | | | | | | | | |
| North Central | 8.7 | 1.0 | 5.6 | 3.0 | 3.8 | 8.8 | 18.1 | 2.4 | 2.8 |
| Northeast | 16.1 | 1.5 | 6.5 | 5.0 | 2.5 | 14.5 | 25.1 | 2.4 | 3.1 |
| Southeast | 7.7 | 1.7 | 4.7 | 3.8 | 4.8 | 16.5 | 17.2 | 3.0 | 5.4 |
| Southwest | 7.9 | 1.0 | 3.5 | 2.8 | 0.6 | 8.6 | 12.0 | 1.7 | 1.8 |
| West | 13.5 | 0.7 | 6.1 | 2.4 | 8.0 | 12.2 | 27.6 | 3.4 | 3.8 |
| Total Single-family Credit Guarantee Portfolio[7] | 53.9% | 1.2% | 26.4% | 3.4% | 19.7% | 12.7% | 100.0% | 2.6% | 3.5% |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1723

Table of Contents

| | As of December 31, 2010 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current LTV Ratio[1] ≤ 80 | | Current LTV Ratio[1] of 81-100 | | Current LTV Ratio[1] > 100 | | Current LTV Ratio[1] All Loans | | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed rate | 1.1% | 8.6% | 0.8% | 15.1% | 0.9% | 27.5% | 2.8% | 12.9% | 15.1% |
| 15- year amortizing fixed rate | 0.2 | 4.6 | <0.1 | 11.8 | <0.1 | 22.2 | 0.2 | 1.8 | 5.1 |
| ARMs/adjustable rate[4] | 0.1 | 12.2 | <0.1 | 18.4 | <0.1 | 28.6 | 0.1 | 7.6 | 16.9 |
| Interest-only[5] | <0.1 | 17.6 | 0.1 | 25.3 | 0.1 | 39.9 | 0.2 | 0.9 | 33.3 |
| Other[6] | <0.1 | 3.7 | <0.1 | 8.5 | 0.1 | 13.2 | 0.1 | 3.1 | 5.6 |
| Total FICO scores < 620 | 1.4 | 7.6 | 0.9 | 15.3 | 1.1 | 27.9 | 3.4 | 10.4 | 13.9 |
| FICO scores of 620 to 659: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed rate | 2.4 | 5.2 | 1.7 | 9.8 | 1.8 | 20.5 | 5.9 | 8.3 | 10.3 |
| 15- year amortizing fixed rate | 0.6 | 2.6 | <0.1 | 7.3 | <0.1 | 18.4 | 0.6 | 0.9 | 3.0 |
| ARMs/adjustable rate[4] | 0.1 | 6.0 | 0.1 | 13.5 | 0.1 | 25.9 | 0.3 | 1.5 | 13.6 |
| Interest-only[5] | <0.1 | 10.9 | 0.2 | 20.6 | 0.3 | 35.6 | 0.5 | 0.9 | 29.2 |
| Other[6] | <0.1 | 2.6 | <0.1 | 5.4 | <0.1 | 5.3 | <0.1 | 1.0 | 4.3 |
| Total FICO scores of 620 to 659 | 3.1 | 4.5 | 2.0 | 10.3 | 2.2 | 22.0 | 7.3 | 6.5 | 9.9 |
| FICO scores ≥ 660: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed rate | 36.5 | 1.0 | 20.0 | 2.8 | 10.4 | 10.4 | 66.9 | 1.9 | 2.8 |
| 15- year amortizing fixed rate | 12.5 | 0.4 | 0.9 | 1.4 | 0.1 | 7.3 | 13.5 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 1.9 | 1.6 | 0.8 | 5.4 | 0.8 | 17.0 | 3.5 | 0.4 | 5.6 |
| Interest-only[5] | 0.7 | 3.7 | 1.2 | 10.3 | 2.8 | 23.1 | 4.7 | 0.4 | 16.7 |
| Other[6] | <0.1 | 2.1 | <0.1 | 2.0 | 0.1 | 1.3 | 0.1 | 0.4 | 1.7 |
| Total FICO scores ≥ 660 | 51.6 | 0.8 | 22.9 | 3.1 | 14.2 | 12.6 | 88.7 | 1.3 | 2.7 |
| FICO scores not available | 0.4 | 4.6 | 0.1 | 11.9 | 0.1 | 23.7 | 0.6 | 4.1 | 8.8 |
| All FICO scores: | | | | | | | | | |
| 20 and 30- year or more amortizing fixed rate | 40.2 | 1.6 | 22.6 | 3.9 | 13.2 | 13.1 | 76.0 | 2.9 | 4.0 |
| 15- year amortizing fixed rate | 13.3 | 0.6 | 0.9 | 2.0 | 0.2 | 8.8 | 14.4 | 0.2 | 0.8 |
| ARMs/adjustable rate[4] | 2.1 | 2.4 | 1.0 | 7.0 | 0.9 | 18.7 | 4.0 | 0.8 | 8.7 |
| Interest-only[5] | 0.7 | 4.5 | 1.3 | 11.7 | 3.2 | 24.9 | 5.2 | 0.5 | 18.4 |
| Other[6] | 0.2 | 9.3 | 0.1 | 8.6 | 0.1 | 7.3 | 0.4 | 5.2 | 8.6 |
| Total Single-family Credit Guarantee Portfolio[7] | 56.5% | 1.4% | 25.9% | 4.3% | 17.6% | 14.9% | 100.0% | 2.1% | 3.8% |
| **By Region[8]** | | | | | | | | | |
| FICO scores <620: | | | | | | | | | |
| North Central | 0.2% | 7.1% | 0.2% | 13.7% | 0.2% | 22.5% | 0.6% | 10.9% | 13.0% |
| Northeast | 0.5 | 9.4 | 0.3 | 19.9 | 0.2 | 30.5 | 1.0 | 10.7 | 14.5 |
| Southeast | 0.2 | 8.4 | 0.2 | 15.5 | 0.3 | 31.9 | 0.7 | 10.7 | 16.4 |
| Southwest | 0.3 | 5.9 | 0.1 | 12.7 | 0.1 | 24.1 | 0.5 | 7.6 | 9.2 |
| West | 0.2 | 5.6 | 0.1 | 13.5 | 0.3 | 28.0 | 0.6 | 12.3 | 15.8 |
| Total FICO scores < 620 | 1.4 | 7.6 | 0.9 | 15.3 | 1.1 | 27.9 | 3.4 | 10.4 | 13.9 |
| FICO scores of 620 to 659: | | | | | | | | | |
| North Central | 0.6 | 4.3 | 0.4 | 9.6 | 0.4 | 16.6 | 1.4 | 6.6 | 8.9 |
| Northeast | 0.9 | 5.4 | 0.6 | 13.7 | 0.3 | 23.2 | 1.8 | 6.4 | 9.6 |
| Southeast | 0.5 | 5.3 | 0.4 | 10.0 | 0.6 | 25.5 | 1.5 | 6.6 | 12.1 |
| Southwest | 0.6 | 3.4 | 0.3 | 8.1 | 0.1 | 15.3 | 1.0 | 4.5 | 5.6 |
| West | 0.5 | 3.5 | 0.3 | 9.6 | 0.8 | 23.7 | 1.6 | 8.5 | 12.7 |
| Total FICO scores of 620 to 659 | 3.1 | 4.5 | 2.0 | 10.3 | 2.2 | 22.0 | 7.3 | 6.5 | 9.9 |
| FICO scores ≥ 660: | | | | | | | | | |
| North Central | 8.9 | 0.7 | 4.9 | 2.8 | 2.3 | 7.9 | 16.1 | 1.2 | 2.1 |
| Northeast | 15.0 | 1.0 | 5.6 | 4.4 | 1.5 | 12.0 | 22.1 | 1.1 | 2.1 |
| Southeast | 7.4 | 1.2 | 4.1 | 3.0 | 3.6 | 15.1 | 15.1 | 1.4 | 4.1 |
| Southwest | 7.3 | 0.7 | 2.9 | 2.3 | 0.3 | 6.8 | 10.5 | 0.7 | 1.2 |
| West | 13.0 | 0.6 | 5.4 | 2.7 | 6.5 | 13.8 | 24.9 | 2.1 | 3.9 |
| Total FICO scores ≥ 660 | 51.6 | 0.8 | 22.9 | 3.1 | 14.2 | 12.6 | 88.7 | 1.3 | 2.7 |
| FICO scores not available | 0.4 | 4.6 | 0.1 | 11.9 | 0.1 | 23.7 | 0.6 | 4.1 | 8.8 |
| All FICO scores: | | | | | | | | | |
| North Central | 9.6 | 1.2 | 5.6 | 3.9 | 3.0 | 10.5 | 18.2 | 2.0 | 3.1 |
| Northeast | 16.6 | 1.6 | 6.4 | 6.0 | 2.0 | 15.4 | 25.0 | 1.9 | 3.2 |
| Southeast | 8.2 | 1.9 | 4.7 | 4.3 | 4.5 | 17.8 | 17.4 | 2.4 | 5.6 |
| Southwest | 8.2 | 1.2 | 3.4 | 3.6 | 0.5 | 10.9 | 12.1 | 1.5 | 2.1 |
| West | 13.9 | 0.9 | 5.8 | 3.4 | 7.6 | 15.5 | 27.3 | 2.7 | 4.7 |
| Total Single-family Credit Guarantee Portfolio[7] | 56.5% | 1.4% | 25.9% | 4.3% | 17.6% | 14.9% | 100.0% | 2.1% | 3.8% |

(1) The current LTV ratios are our estimates. See endnote (5) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information.
(2) Based on UPB of the single-family credit guarantee portfolio.
(3) See endnote (2) to "Table 39 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio."
(4) Includes balloon/resets and option ARM mortgage loans.
(5) Includes both fixed rate and adjustable rate loans. The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post modification), primarily due to delays in processing.
(6) Consist of FHA/VA and other government guaranteed mortgages.
(7) The total of all FICO scores categories may not sum due to the inclusion of loans where FICO scores are not available in the respective totals for all loans. See endnote (7) to "Table 32 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information about our use of FICO scores.
(8) Presentation with the following regional designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC,MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); and Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

73

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1724

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 41 presents delinquency and default rate information for loans in our single-family credit guarantee portfolio based on year of origination.

**Table 41 — Single-Family Credit Guarantee Portfolio by Year of Loan Origination**

| | As of June 30, 2011 | | | As of December 31, 2010 | | |
|---|---|---|---|---|---|---|
| Year of Loan Origination | Percentage of Portfolio | Serious Delinquency Rate | Foreclosure and Short Sale Rate(1) | Percentage of Portfolio | Serious Delinquency Rate | Foreclosure and Short Sale Rate(1) |
| 2011 | 6% | 0.01% | —% | —% | —% | —% |
| 2010 | 20 | 0.12 | 0.01 | 18 | 0.05 | — |
| 2009 | 20 | 0.34 | 0.09 | 21 | 0.26 | 0.04 |
| 2008 | 8 | 4.94 | 1.72 | 9 | 4.89 | 1.26 |
| 2007 | 10 | 11.04 | 6.19 | 11 | 11.63 | 4.92 |
| 2006 | 8 | 10.28 | 5.99 | 9 | 10.46 | 5.00 |
| 2005 | 9 | 6.01 | 3.51 | 10 | 6.04 | 2.95 |
| 2004 and prior(2) | 19 | 2.49 | 0.96 | 22 | 2.46 | 0.88 |
| Total | 100% | 3.50% | | 100% | 3.84% | |

(1) Calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries during the period from origination to June 30, 2011 and December 31, 2010, respectively, divided by the number of loans in our single-family credit guarantee portfolio originated in that year.

(2) The foreclosure and short sale rate for "2004 and prior" represents the rate associated with loans originated from 2000 to 2004.

At June 30, 2011, approximately 35% of our single-family credit guarantee portfolio consisted of mortgage loans originated from 2005 through 2008. Loans originated during these years experienced higher serious delinquency rates in the earlier years of their terms as compared to our historical experience. We attribute this serious delinquency performance to a number of factors, including: (a) the expansion of credit terms under which loans were underwritten during these years; (b) an increase in the origination and our purchase of interest-only and Alt-A mortgage products in these years; and (c) an environment of decreasing home sales and broadly declining home prices in the period shortly following the loans' origination. Interest-only and Alt-A products have higher inherent credit risk than traditional fixed-rate mortgage products.

The UPB of loans originated after 2008 comprised 46% of our portfolio as of June 30, 2011. Approximately 93% of the loans we purchased in our single-family credit guarantee portfolio during the six months ended June 30, 2011 were amortizing fixed-rate mortgage products.

*Multifamily Mortgage Credit Risk*

Portfolio diversification, particularly by product and geographical areas, is an important aspect of our strategy to manage mortgage credit risk for multifamily loans. We monitor a variety of mortgage loan characteristics that may affect the default experience on our multifamily mortgage portfolio, such as the LTV ratio, DSCR, geographic location and loan duration. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for more information about the loans in our multifamily mortgage portfolio. We also monitor the performance and risk concentrations of our multifamily loans and the underlying properties throughout the life of the loan.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1725

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 42 provides certain attributes of our multifamily mortgage portfolio at June 30, 2011 and December 31, 2010.

**Table 42 — Multifamily Mortgage Portfolio — by Attribute**

| | UPB[1] at | | Delinquency Rate[2] at | |
|---|---|---|---|---|
| | June 30, 2011 | December 31, 2010 | June 30, 2011 | December 31, 2010 |
| **Original LTV Ratio[3]** | (dollars in billions) | | | |
| Below 75% | $ 74.7 | $    72.0 | 0.19% | 0.08% |
| 75% to 80% | 29.5 | 29.8 | 0.15 | 0.24 |
| Above 80% | 6.5 | 6.6 | 2.45 | 2.30 |
| Total | $110.7 | $   108.4 | 0.31% | 0.26% |
| Weighted average LTV ratio at origination | 70% | 70% | | |
| | | | | |
| **Maturity Dates** | | | | |
| 2011 | $    1.0 | $     2.3 | 2.65% | 0.97% |
| 2012 | 3.8 | 4.1 | 0.20 | 0.82 |
| 2013 | 6.3 | 6.8 | 0.98 | — |
| 2014 | 8.2 | 8.5 | 0.03 | 0.02 |
| 2015 | 11.7 | 12.0 | 0.14 | 0.09 |
| Beyond 2015 | 79.7 | 74.7 | 0.29 | 0.29 |
| Total | $110.7 | $   108.4 | 0.31% | 0.26% |
| | | | | |
| **Year of Acquisition or Guarantee[4]** | | | | |
| 2004 and prior | $ 14.4 | $    15.9 | 0.33% | 0.31% |
| 2005 | 7.6 | 7.9 | — | — |
| 2006 | 11.1 | 11.6 | 0.33 | 0.25 |
| 2007 | 20.5 | 20.8 | 0.92 | 0.97 |
| 2008 | 22.1 | 23.0 | 0.33 | 0.03 |
| 2009 | 14.7 | 15.2 | — | — |
| 2010 | 13.1 | 14.0 | — | — |
| 2011 | 7.2 | N/A | — | N/A |
| Total | $110.7 | $   108.4 | 0.31% | 0.26% |
| | | | | |
| **Current Loan Size Distribution** | | | | |
| Above $25 million | $ 39.9 | $    39.6 | 0.22% | 0.07% |
| Above $5 million to $25 million | 61.4 | 59.4 | 0.34 | 0.38 |
| $5 million and below | 9.4 | 9.4 | 0.50 | 0.37 |
| Total | $110.7 | $   108.4 | 0.31% | 0.26% |
| | | | | |
| **Legal Structure** | | | | |
| Unsecuritized loans | $81.8 | $    85.9 | 0.18% | 0.11% |
| Non-consolidated Freddie Mac mortgage-related securities | 19.3 | 12.8 | 0.89 | 1.30 |
| Other guarantee commitments | 9.6 | 9.7 | 0.23 | 0.23 |
| Total | $110.7 | $   108.4 | 0.31% | 0.26% |
| **Credit Enhancement** | | | | |
| Credit-enhanced | $ 27.2 | $    20.9 | 0.70% | 0.85% |
| Non-credit-enhanced | 83.5 | 87.5 | 0.19 | 0.12 |
| Total | $110.7 | $   108.4 | 0.31% | 0.26% |

(1) Beginning in the second quarter of 2011, we exclude non-consolidated mortgage-related securities for which we do not provide our guarantee. The prior period has been revised to conform to the current period presentation.

(2) See *"Delinquencies"* below for more information about our multifamily delinquency rates.

(3) Original LTV ratios are calculated as the UPB of the mortgage, divided by the lesser of the appraised value of the property at the time of mortgage origination or, except for refinance loans, the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.

(4) Based on either: (a) the year of acquisition, for loans recorded on our consolidated balance sheets; or (b) the year that we issued our guarantee, for the remaining loans in our multifamily mortgage portfolio.

Our multifamily mortgage portfolio consists of product types that are categorized based on loan terms. Multifamily loans may be interest-only or amortizing, fixed or variable rate, or may switch between fixed and variable rate over time. However, our multifamily loans generally have balloon maturities ranging from five to ten years. Amortizing loans reduce our credit exposure over time because the UPB declines with each mortgage payment. As of June 30, 2011 and December 31, 2010, approximately 83% and 85%, respectively, of the multifamily loans on our consolidated balance sheets had fixed interest rates while the remaining loans had variable-rates.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1726

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Because most multifamily loans require a significant lump sum payment of unpaid principal at maturity, the inability to refinance or pay off the loan at maturity is a serious concern for lenders. Although property values have increased in recent quarters, in some instances they are still well below the highs of a few years ago and are lower than when the loans were originally underwritten, particularly in areas where economic conditions remain weak. As a result, if property values do not continue to improve, borrowers may experience significant difficulty refinancing as their loans approach maturity, which could increase borrower defaults or increase modification volumes. As of June 30, 2011, approximately 90% of UPB in our multifamily mortgage portfolio matures in 2014 and beyond.

In certain cases, we may provide short-term loan extensions of up to 12 months for certain borrowers. Modifications and extensions of loans are performed in an effort to minimize our losses and maximize our returns. During the first half of 2011, we extended and modified unsecuritized multifamily loans totaling $170 million in UPB, compared with $301 million during the six months ended June 30, 2010. Multifamily unsecuritized loan modifications during the first half of 2011 included: (a) $32 million in UPB for short-term loan extensions; and (b) $138 million in UPB for loan modifications. Where we have granted a concession to borrowers experiencing financial difficulties, we account for these loans as TDRs. When we execute a modification classified as a TDR, the loan is then classified as nonperforming for the life of the loan regardless of its delinquency status. At June 30, 2011, we had $988 million of multifamily loan UPB classified as TDRs on our consolidated balance sheets, all of which were current.

*Delinquencies*

Our multifamily delinquency rates include all multifamily loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancement provided by the U.S. government. We report multifamily delinquency rates based on UPB of mortgage loans that are two monthly payments or more past due or in the process of foreclosure. Our delinquency rates for multifamily loans are positively impacted to the extent we have been successful in working with troubled borrowers to modify their loans prior to becoming delinquent or by providing temporary relief through loan modifications, including short-term extensions. In addition, multifamily loans are not counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement. As of both June 30, 2011 and December 31, 2010, approximately $0.1 billion of multifamily loan UPB had been granted forbearance and were not included in the delinquency rate statistics. Some geographic areas in which we have investments in multifamily loans, including the states of Arizona, Georgia, and Nevada, continue to exhibit weaker than average fundamentals that increase our risk of future losses. We own or guarantee many loans in these states that are non-performing, or we believe are at risk of default. For further information regarding concentrations in our multifamily mortgage portfolio, including regional geographic composition, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS."

Our multifamily mortgage portfolio delinquency rate increased to 0.31% at June 30, 2011 from 0.26% at December 31, 2010. Our delinquency rate for credit-enhanced loans was 0.70% and 0.85% at June 30, 2011 and December 31, 2010, respectively, and for non-credit-enhanced loans was 0.19% and 0.12% at June 30, 2011 and December 31, 2010, respectively. As of June 30, 2011, more than one-half of our multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two monthly payments or more past due had credit enhancements that we currently believe will mitigate our expected losses on those loans. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections and other forms of credit enhancements covering loans in our multifamily mortgage portfolio as of June 30, 2011 and December 31, 2010.

*Non-Performing Assets*

Non-performing assets consist of single-family and multifamily loans that have undergone a TDR, single-family seriously delinquent loans, multifamily loans that are three or more payments past due or in the process of foreclosure, and REO assets, net. Non-performing assets also include multifamily loans that are deemed impaired based on management judgment. We place non-performing loans on non-accrual status when we believe the collectability of interest and principal on a loan is not reasonably assured, unless the loan is well secured and in the process of collection. When a loan is placed on non-accrual status, any interest income accrued but uncollected is reversed. Thereafter, interest income is recognized only upon receipt of cash payments. We did not accrue interest on any loans three monthly payments or more past due or if the loan is in the process of foreclosure during the three and six months ended June 30, 2011.

We classify TDRs as those loans we modified and granted the borrower a concession. TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 43 provides detail on non-performing loans and REO assets on our consolidated balance sheets and non-performing loans underlying our financial guarantees.

## Table 43 — Non-Performing Assets[1]

| | June 30, 2011 | As of December 31, 2010 | June 30, 2010 |
|---|---|---|---|
| | | (dollars in millions) | |
| Non-performing mortgage loans — on balance sheet: | | | |
| Single-family TDRs: | | | |
| Reperforming, or less than three monthly payments past due | $ 36,243 | $ 26,612 | $ 15,470 |
| Seriously delinquent | 3,884 | 3,144 | 1,836 |
| Multifamily TDRs[2] | 988 | 911 | 351 |
| Total TDRs | 41,115 | 30,667 | 17,657 |
| Other single-family non-performing loans[3] | 73,397 | 84,272 | 92,788 |
| Other multifamily non-performing loans[4] | 1,901 | 1,750 | 1,451 |
| Total non-performing mortgage loans — on balance sheet | 116,413 | 116,689 | 111,896 |
| Non-performing mortgage loans — off-balance sheet: | | | |
| Single-family loans | 1,295 | 1,450 | 1,664 |
| Multifamily loans | 221 | 198 | 157 |
| Total non-performing mortgage loans — off-balance sheet | 1,516 | 1,648 | 1,821 |
| Real estate owned, net | 5,932 | 7,068 | 6,298 |
| Total non-performing assets | $123,861 | $ 125,405 | $ 120,015 |
| Loan loss reserves as a percentage of our non-performing mortgage loans | 33.2% | 33.7% | 33.7% |
| Total non-performing assets as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | 6.4% | 6.4% | 6.0% |

(1) Mortgage loan amounts are based on UPB and REO, net is based on carrying values.
(2) As of June 30, 2011, all multifamily loans classified as TDRs were current.
(3) Represents loans recognized by us on our consolidated balance sheets, including loans purchased from PC trusts due to the borrower's serious delinquency.
(4) Of this amount, $1.7 billion, $1.6 billion, and $1.4 billion of UPB were current at June 30, 2011, December 31, 2010, and June 30, 2010, respectively.

The amount of non-performing assets declined to $123.9 billion as of June 30, 2011, from $125.4 billion at December 31, 2010, primarily due to a decline in the rate at which loans transitioned into serious delinquency. Although declining, our serious delinquency rate has remained high compared to historical levels due to the impact of continued weakness in home prices and persistently high unemployment, extended foreclosure timelines and foreclosure suspensions in many states, and challenges faced by servicers in processing large volumes of problem loans. The UPB of loans categorized as TDRs increased to $41.1 billion at June 30, 2011 from $30.7 billion at December 31, 2010, largely due to a continued high volume of loan modifications during the six months ended June 30, 2011 in which we decreased the contractual interest rate, deferred the balance on which contractual interest is computed, or made a combination of both of these changes. TDRs during the second quarter of 2011 include HAMP and non-HAMP loan modifications. In recent periods, our non-HAMP modifications comprised a greater portion of our loan modification volume and the volume of HAMP modifications declined. We expect this trend to continue in the remainder of 2011. We expect our non-performing assets, including loans deemed to be TDRs, to remain at elevated levels during the remainder of 2011.

Table 44 provides detail by region for REO activity. Our REO activity relates almost entirely to single-family residential properties. Consequently, our regional REO acquisition trends generally follow a pattern that is similar to, but

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

lags, that of regional serious delinquency trends of our single-family credit guarantee portfolio. See "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for information about regional serious delinquency rates.

## Table 44 — REO Activity by Region[1]

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|  | 2011 | 2010 | 2011 | 2010 |
|---|---|---|---|---|
|  | (number of properties) | | | |
| **REO Inventory** | | | | |
| Beginning property inventory | 65,174 | 53,839 | 72,093 | 45,052 |
| Adjustment to beginning balance[2] | — | — | — | 1,340 |
| Properties acquired by region: | | | | |
| Northeast | 1,921 | 3,086 | 3,406 | 5,730 |
| Southeast | 5,131 | 9,594 | 9,865 | 17,628 |
| North Central | 6,405 | 8,119 | 12,780 | 15,318 |
| Southwest | 3,388 | 3,601 | 6,501 | 6,691 |
| West | 7,954 | 10,267 | 16,956 | 18,716 |
| Total properties acquired | 24,799 | 34,667 | 49,508 | 64,083 |
| Properties disposed by region: | | | | |
| Northeast | (2,427) | (2,230) | (5,088) | (4,142) |
| Southeast | (7,540) | (6,874) | (16,754) | (12,136) |
| North Central | (6,801) | (5,938) | (14,093) | (10,835) |
| Southwest | (3,539) | (2,812) | (7,019) | (5,144) |
| West | (9,048) | (8,462) | (18,029) | (16,028) |
| Total properties disposed | (29,355) | (26,316) | (60,983) | (48,285) |
| Ending property inventory | 60,618 | 62,190 | 60,618 | 62,190 |

(1) See endnote (8) to "Table 40 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for a description of these regions.

(2) Represents REO assets associated with previously non-consolidated mortgage trusts recognized upon adoption of the amendment to the accounting guidance for consolidation of VIEs on January 1, 2010.

Our REO property inventory declined 16% from December 31, 2010 to June 30, 2011, primarily due to a decline in the volume of single-family foreclosures caused by temporary delays in the foreclosure process, including delays related to concerns about the foreclosure process, combined with continued strong levels of REO disposition activity during the period. Due to temporary suspensions, delays and other factors, the average length of time for foreclosure of a Freddie Mac loan significantly increased in recent years. The nationwide average for completion of a foreclosure (as measured from the date of the last scheduled payment made by the borrower) on our single-family delinquent loans, excluding those underlying our Other Guarantee Transactions, was 498 days and 451 days for foreclosures completed during the three months ended June 30, 2011 and 2010, respectively.

We expect the pace of our REO acquisitions will continue to be affected by delays in the foreclosure process in the remainder of 2011. However, we expect the volume of our REO acquisitions will likely remain elevated, in part due to the resumption earlier in the year of foreclosure activity by servicers following the temporary suspensions over concerns about documentation practices. We have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio, many of which will likely complete the foreclosure process and transition to REO during the next few quarters as our servicers work through their foreclosure-related issues. This inventory of seriously delinquent loans arose due to various factors and events that have lengthened the problem loan resolution process and delayed the transition of such loans to a workout or foreclosure transfer (and then, to REO). These factors and events include the effect of HAMP, temporary suspensions of foreclosure transfers, and the increasingly lengthy foreclosure process in many states.

Our single-family REO acquisitions during the six months ended June 30, 2011 were most significant in the states of California, Michigan, Arizona, Georgia, and Florida. The state with the most properties in our REO inventory is California. At June 30, 2011, our REO inventory in California comprised 13% of total REO property inventory, based on the number of properties.

We are limited in our REO disposition efforts by the capacity of the market to absorb large numbers of foreclosed properties. An increasing portion of our REO acquisitions are: (a) located in jurisdictions that require a period of time after foreclosure during which the borrower may reclaim the property; or (b) occupied and we have either retained the tenant under an existing lease or begun the process of eviction. During the period when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property. This generally extends our holding period for up to three additional months. As of June 30, 2011 and December 31, 2010, approximately 33% and 28%, respectively, of our REO property inventory was not marketable due to the above conditions. Our temporary suspension of certain REO sales during the fourth quarter of 2010 (for up to three months) due to concerns about deficiencies in foreclosure documentation practices also caused the holding period to increase. Primarily for these reasons,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1729                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

the average holding period of our REO property increased in recent periods, though it varies significantly in different states. Excluding any post-foreclosure period during which borrowers may reclaim a foreclosed property, the average holding period associated with our REO dispositions during the six months ended June 30, 2011 and 2010 was 193 days and 151 days, respectively. As of June 30, 2011 and December 31, 2010, the percentage of our single-family REO property inventory that had been held for sale longer than one year was 6.3% and 3.4%, respectively. We continue to actively market these properties through our established initiatives. All of these factors have resulted in an increase in the aging of our inventory.

The composition of interest-only and Alt-A loans in our single-family credit guarantee portfolio, based on UPB, was approximately 5% and 6%, respectively, at June 30, 2011 and was 9% on a combined basis. The percentage of our REO acquisitions in the six months ended June 30, 2011 that had been secured by either of these loan types represented approximately 32% of our total REO acquisitions, based on loan amount prior to acquisition.

*Credit Loss Performance*

Many loans that are seriously delinquent or in foreclosure result in credit losses. Table 45 provides detail on our credit loss performance associated with mortgage loans and REO assets on our consolidated balance sheets and underlying our non-consolidated mortgage-related financial guarantees.

**Table 45 — Credit Loss Performance**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | (dollars in millions) | | | |
| REO | | | | |
| REO balances, net: | | | | |
| Single-family | $5,834 | $6,228 | $ 5,834 | $ 6,228 |
| Multifamily | 98 | 70 | 98 | 70 |
| Total | $ 5,932 | $ 6,298 | $ 5,932 | $ 6,298 |
| REO operations (income) expense: | | | | |
| Single-family | $ 35 | $ (41) | $ 292 | $ 115 |
| Multifamily | (8) | 1 | (8) | 4 |
| Total | $ 27 | $ (40) | $ 284 | $ 119 |
| Charge-offs | | | | |
| Single-family: | | | | |
| Charge-offs, gross[1] (including $3.8 billion, $4.5 billion, $7.3 billion, and $7.8 billion relating to loan loss reserves, respectively) | $3,871 | $4,664 | $ 7,524 | $ 8,031 |
| Recoveries[2] | (800) | (772) | (1,484) | (1,388) |
| Single-family, net | $ 3,071 | $3,892 | $ 6,040 | $ 6,643 |
| Multifamily: | | | | |
| Charge-offs, gross[1] (including $29 million, $27 million, $41 million, and $45 million relating to loan loss reserves, respectively) | $ 29 | $ 27 | $ 41 | $ 45 |
| Recoveries[2] | — | — | — | — |
| Multifamily, net | $ 29 | $ 27 | $ 41 | $ 45 |
| Total Charge-offs: | | | | |
| Charge-offs, gross[1] (including $3.8 billion, $4.5 billion, $7.4 billion, and $7.8 billion relating to loan loss reserves, respectively) | $ 3,900 | $ 4,691 | $ 7,565 | $ 8,076 |
| Recoveries [2] | (800) | (772) | (1,484) | (1,388) |
| Total Charge-offs, net | $ 3,100 | $ 3,919 | $ 6,081 | $ 6,688 |
| Credit losses[3] | | | | |
| Single-family | $ 3,106 | $3,851 | $ 6,332 | $ 6,758 |
| Multifamily | 21 | 28 | 33 | 49 |
| Total | $ 3,127 | $3,879 | $ 6,365 | $ 6,807 |
| Total (in bps)[4] | 64.9 | 78.6 | 66.0 | 68.9 |

(1) Represent the carrying amount of a loan that has been discharged in order to remove the loan from our consolidated balance sheets at the time of resolution, regardless of when the impact of the credit loss was recorded on our consolidated statements of income and comprehensive income through the provision for credit losses or losses on loans purchased. Charge-offs primarily result from foreclosure transfers and short sales and are generally calculated as the recorded investment of a loan at the date it is discharged less the estimated value in final disposition or actual net sales in a short sale.

(2) Recoveries of charge-offs primarily result from foreclosure transfers and short sales on loans where a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements.

(3) Excludes foregone interest on non-performing loans, which reduces our net interest income but is not reflected in our total credit losses. In addition, excludes other market-based credit losses: (a) incurred on our investments in mortgage loans and mortgage-related securities; and (b) recognized in our consolidated statements of income and comprehensive income.

(4) Calculated as credit losses divided by the average carrying value of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates.

*Freddie Mac*

TREASURY-1730

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our credit loss performance metric generally measures losses at the conclusion of the loan and related collateral resolution process. There is a significant lag in time from the implementation of problem loan workout activities until the final resolution of seriously delinquent mortgage loans and REO assets. Our credit loss performance is based on our charge-offs and REO expenses. We record charge-offs at the time we take ownership of a property through foreclosure. We expect our credit losses to remain elevated in the remainder of 2011, as our short sale and REO acquisition volumes will likely remain high, due to high levels of seriously delinquent loans and pending foreclosures, and because market conditions, such as home prices and the rate of home sales, continue to remain weak. Suspensions and delays of foreclosure transfers, including as a result of concerns about the foreclosure process, and imposed delays by regulatory or governmental agencies have caused delays in the timing of our recognition of credit losses and may continue to do so in the future.

Single-family charge-offs, gross, for the three and six months ended June 30, 2011 were $3.9 billion and $7.5 billion, respectively, compared to $4.7 billion and $8.0 billion for the three and six months ended June 30, 2010, respectively. Our charge-offs in the three and six months ended June 30, 2011 remained elevated, but reflects suppression of activity due to delays in the foreclosure process. We believe that the level of our charge-offs will remain high in 2011 and may increase in 2012 due to the large number of single-family non-performing loans that will likely be resolved as our servicers work through their foreclosure-related issues. Our credit losses during the three months ended June 30, 2011 continued to be disproportionately high in those states that experienced significant declines in property values since 2006, such as California, Florida, Nevada and Arizona. California accounted for 16% of loans in our single-family credit guarantee portfolio as of June 30, 2011, and comprised approximately 32% of our total credit losses in both the three and six months ended June 30, 2011. In addition, although Alt-A loans comprised approximately 6% of our single-family credit guarantee portfolio at both June 30, 2011 and December 31, 2010, respectively, these loans accounted for approximately 29% and 30% of our credit losses for the three and six months ended June 30, 2011, respectively. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for information on REO disposition severity ratios, and see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about our credit losses.

*Credit Risk Sensitivity*

Under a 2005 agreement with FHFA, then OFHEO, we are required to disclose the estimated increase in the NPV of future expected credit losses for our single-family credit guarantee portfolio over a ten year period as the result of an immediate 5% decline in home prices nationwide, followed by a stabilization period and return to the base case. This sensitivity analysis is hypothetical and may not be indicative of our actual results. We do not use this analysis for determination of our reported results under GAAP. As shown in Table 46 below, our quarterly credit risk sensitivity estimates have increased in recent periods primarily due to declines in home prices during the last year.

**Table 46 — Single-Family Credit Loss Sensitivity**

| | Before Receipt of Credit Enhancements[1] | | After Receipt of Credit Enhancements[2] | |
|---|---|---|---|---|
| | NPV[3] | NPV Ratio[4] | NPV[3] | NPV Ratio[4] |
| | | (dollars in millions) | | |
| At: | | | | |
| June 30, 2011 | $10,203 | 56.5 bps | $ 9,417 | 52.2 bps |
| March 31, 2011 | $ 9,832 | 54.2 bps | $8,999 | 49.6 bps |
| December 31, 2010 | $ 9,926 | 54.9 bps | $ 9,053 | 50.0 bps |
| September 30, 2010 | $ 9,099 | 49.5 bps | $8,187 | 44.6 bps |
| June 30, 2010 | $ 8,327 | 44.5 bps | $ 7,445 | 39.8 bps |

(1) Assumes that none of the credit enhancements currently covering our mortgage loans has any mitigating impact on our credit losses.
(2) Assumes we collect amounts due from credit enhancement providers after giving effect to certain assumptions about counterparty default rates.
(3) Based on the single-family credit guarantee portfolio, excluding REMICs and Other Structured Securities backed by Ginnie Mae Certificates.
(4) Calculated as the ratio of NPV of increase in credit losses to the single-family credit guarantee portfolio, defined in note (3) above.

**Interest Rate and Other Market Risks**

For a discussion of our interest rate and other market risks, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

**Operational Risks**

We may face increased operational risk due to the requirement that we and Fannie Mae align certain single-family mortgage servicing practices for non-performing loans. On April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie Mae. The large scope of change required by this alignment will require significant management effort and attention. See "Credit Risk — *Mortgage Credit Risk — Single-family Mortgage*

TREASURY-1731

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Credit Risk — Single-Family Loan Workouts"* for more information. There also have been a number of other regulatory developments in recent periods impacting single-family mortgage servicing and foreclosure practices. The servicing model for single-family mortgages may face further significant changes in the future. As a result, we may be required to make additional significant changes to our practices, which could further increase our operational risk. See "LEGISLATIVE AND REGULATORY MATTERS —Developments Concerning Single-Family Servicing Practices" for more information.

Our risks related to employee retention are high. We have experienced elevated levels of voluntary turnover, and expect this to be the case for the remainder of 2011 as the public debate regarding the future role of the GSEs continues. This has led to concerns about staffing inadequacies and management depth. A number of senior officers left the company in 2011, including our Chief Operating Officer, our Executive Vice President — Single-Family Credit Guarantee, our Executive Vice President — Investments and Capital Markets and Treasurer, our Executive Vice President — Multifamily, our Senior Vice President — Operations & Technology, and our Executive Vice President — General Counsel & Corporate Secretary. In addition, our Executive Vice President — Chief Credit Officer will be leaving the company in October 2011. Because we maintain succession plans for our senior management positions, we have been able to fill most of these senior management positions quickly, or have eliminated them through reorganizations. However, disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in any of our operations, affect our execution capabilities, cause delays in the implementation of critical technology and other projects, and erode our business, modeling, internal audit, risk management, financial reporting, and compliance expertise and capabilities.

We made two significant internal reorganizations during the second quarter of 2011, as we combined our Single-Family Credit Guarantee, Single-Family Portfolio Management, and Operations & Technology divisions, and we merged our Credit Management division into our Enterprise Risk Management division. Over time, we expect these changes will improve our overall risk profile. However, in the near term, these changes could increase our operational risk.

Management, including the company's Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were not effective as of June 30, 2011, at a reasonable level of assurance, because our disclosure controls and procedures did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. We have not been able to update our disclosure controls and procedures to provide reasonable assurance that information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure. For additional information, see "CONTROLS AND PROCEDURES."

## LIQUIDITY AND CAPITAL RESOURCES

### Liquidity

Our business activities require that we maintain adequate liquidity to fund our operations, which may include the need to make payments of principal and interest on our debt securities, including securities issued by our consolidated trusts; make payments upon the maturity, redemption or repurchase of our debt securities; make net payments on derivative instruments; pay dividends on our senior preferred stock; purchase mortgage-related securities and other investments; and purchase mortgage loans, including modified or seriously delinquent loans from PC trusts. For more information on our liquidity needs and liquidity management, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES" in our 2010 Annual Report.

We fund our cash requirements primarily by issuing short-term and long-term debt. Other sources of cash include:

• receipts of principal and interest payments on securities or mortgage loans we hold;

• other cash flows from operating activities, including the management and guarantee fees we receive in connection with our guarantee activities;

• borrowings against mortgage-related securities and other investment securities we hold; and

• sales of securities we hold.

We have also received substantial amounts of cash from Treasury pursuant to draws under the Purchase Agreement, which are made to address deficits in our net worth, however, no cash was received from Treasury during the second quarter of 2011 due to our positive net worth at March 31, 2011.

We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

TREASURY-1732

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

On August 5, 2011, S&P lowered the long-term credit rating of the U.S. government to "AA+" from "AAA" and assigned a negative outlook to the rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating. This could adversely affect our liquidity, and the supply and cost of debt financing available to us. For more information, see *"Other Debt Securities — Credit Ratings."*

Recently we changed the composition of our portfolio of liquid assets by decreasing our holdings of short-term Treasury securities and money funds and increasing our holdings of cash and overnight investments given the recent market concerns about the potential for a downgrade in the credit rating of the U.S. government and the potential that the U.S. would exhaust its borrowing authority under the statutory debt limit. For more information, see "RISK FACTORS — *A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business. Our business could also be adversely affected if there is a downgrade in the credit ratings of the U.S. government or a payment default by the U.S. government."*

### Liquidity Management

Maintaining sufficient liquidity is of primary importance and we continually strive to enhance our liquidity management practices and policies. Under these practices and policies, we maintain an amount of cash and cash equivalent reserves in the form of liquid, high quality short-term investments that is intended to enable us to meet ongoing cash obligations for an extended period, in the event we do not have access to the short- or long-term unsecured debt markets. We also actively manage the concentration of debt maturities and closely monitor our monthly maturity profile. In the second quarter of 2011, we revised our liquidity management practices and policies such that they no longer require us to maintain a back-up core portfolio of liquid non-mortgage-related securities with a market value of $10 billion. This requirement was no longer deemed to be necessary due to improvements in our ability to forecast cash flows. Our remaining liquidity management policies remain in effect, including the requirement to maintain sufficient to cover our maximum cash liquidity needs for at least the following 35 calendar days. For a discussion of our liquidity management practices and policies, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Liquidity Management*" in our 2010 Annual Report.

Throughout the second quarter of 2011, we complied with all requirements under our liquidity management policies. Furthermore, the majority of the funds used to cover our short-term cash liquidity needs are invested in short-term assets with a rating of A-1/P-1 or AAA or are issued by a counterparty with that rating. In the event of a downgrade of a position or a counterparty, as applicable, below minimum rating requirements, our credit governance policies require us to exit from the position within a specified period.

We also continue to manage our debt issuances to remain in compliance with the aggregate indebtedness limits set forth in the Purchase Agreement.

To facilitate cash management, we forecast cash outflows. These forecasts help us to manage our liabilities with respect to asset purchases and runoff, when financial markets are not in crisis. For further information on our management of interest-rate risk associated with asset and liability management, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

Notwithstanding these practices and policies, our ability to maintain sufficient liquidity, including by pledging mortgage-related and other securities as collateral to other financial institutions, could cease or change rapidly and the cost of the available funding could increase significantly due to changes in market confidence and other factors. For more information, see "RISK FACTORS — Competitive and Market Risks — *Our business may be adversely affected by limited availability of financing and increased funding costs*" in our 2010 Annual Report.

### Actions of Treasury and FHFA

Since our entry into conservatorship, Treasury and FHFA have taken a number of actions that affect our cash requirements and ability to fund those requirements. The conservatorship, and the resulting support we received from Treasury, has enabled us to access debt funding on terms sufficient for our needs.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The Purchase Agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009). In the event we have a capital surplus at the end of 2012, then the amount

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                   Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year-end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year-end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws.

While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 2012. The costs of our debt funding could also increase due to the downgrades discussed above or in the event of any future downgrades in our credit ratings or the credit ratings of the U.S. government. Upon funding of the draw request that FHFA will submit to eliminate our net worth deficit at June 30, 2011, our aggregate funding received from Treasury under the Purchase Agreement will increase to $65.2 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. Commencing in the second quarter of 2011, our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. In addition, we are required to pay a quarterly commitment fee to Treasury under the Purchase Agreement, as discussed below.

For more information on these actions, see "BUSINESS — Conservatorship and Related Matters" and "— Regulation and Supervision" in our 2010 Annual Report and "RISK FACTORS" in this Form 10-Q.

### *Dividend Obligation on the Senior Preferred Stock*

Following funding of the draw request related to our net worth deficit at June 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $6.5 billion to $6.6 billion, which exceeds our annual historical earnings in all but one period. The senior preferred stock accrues quarterly cumulative dividends at a rate of 10% per year or 12% per year in any quarter in which dividends are not paid in cash until all accrued dividends have been paid in cash. We paid a quarterly dividend of $1.6 billion in cash on the senior preferred stock on June 30, 2011 at the direction of our Conservator. Through June 30, 2011, we paid aggregate cash dividends to Treasury of $13.2 billion, an amount equal to 21% of our aggregate draws received under the Purchase Agreement. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth and will increasingly drive future draws. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived in the future. Treasury has waived the fee for the first three quarters of 2011, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the fee has not yet been established and could be substantial.

The payment of dividends on our senior preferred stock in cash reduces our net worth. For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all.

As discussed in "Capital Resources," we expect to make additional draws under the Purchase Agreement in future periods. Further draws will increase the liquidation preference of and the dividends we owe on the senior preferred stock.

### *Other Debt Securities*

Spreads on our debt and our access to the debt markets remained favorable relative to historical levels during the three and six months ended June 30, 2011, due largely to support from the U.S. government. As a result, we were able to replace certain higher cost debt with lower cost debt. Our short-term debt was 28% of outstanding other debt at both June 30, 2011 and December 31, 2010 as compared to 27% at March 31, 2011.

Because of the debt limit under the Purchase Agreement, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Our debt cap under the Purchase Agreement is $972 billion in 2011. As of June 30, 2011, we estimate that the par value of our aggregate indebtedness totaled $695.2 billion, which was approximately $276.8 billion below the debt cap. As of December 31, 2010, we estimate that the par value of our aggregate indebtedness totaled $728.2 billion, which was approximately $351.8 billion below the then applicable limit of $1.08 trillion. Our

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1734

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

aggregate indebtedness is calculated as the par value of other debt. We disclose the amount of our indebtedness on this basis monthly under the caption "Other Debt Activities — Total Debt Outstanding" in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC.

### *Other Debt Issuance Activities*

Table 47 summarizes the par value of other debt securities we issued, based on settlement dates, during the three and six months ended June 30, 2011 and 2010.

**Table 47 — Other Debt Security Issuances by Product, at Par Value**[1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Other short-term debt: | | | | |
| Reference Bills® securities and discount notes | $ 104,200 | $ 103,331 | $ 208,046 | $256,934 |
| Medium-term notes — non-callable[2] | 250 | 565 | 450 | 1,065 |
| Total other short-term debt | 104,450 | 103,896 | 208,496 | 257,999 |
| Other long-term debt: | | | | |
| Medium-term notes — callable | 33,246 | 62,975 | 71,047 | 126,696 |
| Medium-term notes — non-callable | 18,482 | 23,958 | 47,657 | 51,200 |
| U.S. dollar Reference Notes® securities — non-callable | 8,000 | 7,000 | 18,000 | 17,500 |
| Total other long-term debt | 59,728 | 93,933 | 136,704 | 195,396 |
| Total other debt issued | $164,178 | $197,829 | $ 345,200 | $453,395 |

(1) Excludes federal funds purchased and securities sold under agreements to repurchase and lines of credit. Also excludes debt securities of consolidated trusts held by third parties.

(2) Includes $250 million and $565 million of medium-term notes — non-callable issued for the three months ended June 30, 2011 and 2010, respectively, which were accounted for as debt exchanges. For the six months ended June 30, 2011 and 2010, there were $0.5 billion and $1.1 billion accounted for as debt exchanges, respectively.

### *Other Debt Retirement Activities*

We repurchase, call, or exchange our outstanding medium- and long-term debt securities from time to time to help support the liquidity and predictability of the market for our other debt securities and to manage our mix of liabilities funding our assets.

Table 48 provides the par value, based on settlement dates, of other debt securities we repurchased, called, and exchanged during the three and six months ended June 30, 2011 and 2010.

**Table 48 — Other Debt Security Repurchases, Calls, and Exchanges**[1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Repurchases of outstanding €Reference Notes® securities | $ — | $ 192 | $ — | $ 262 |
| Repurchases of outstanding medium-term notes | 1,030 | 4,054 | 3,768 | 4,054 |
| Calls of callable medium-term notes | 45,697 | 81,560 | 85,532 | 138,734 |
| Exchanges of medium-term notes | 250 | 565 | 450 | 1,065 |

(1) Excludes debt securities of consolidated trusts held by third parties.

### *Credit Ratings*

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, is highly dependent upon our credit ratings. Table 49 indicates our credit ratings as of August 8, 2011.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Table 49 — Freddie Mac Credit Ratings**

| | Nationally Recognized Statistical Rating Organization | | |
|---|---|---|---|
| | S&P | Moody's | Fitch |
| Senior long-term debt(1) | AA+/Negative | Aaa/Negative | AAA |
| Short-term debt(2) | A-1+ | P-1 | F1+ |
| Subordinated debt(3) | A/Negative | Aa2/Negative | AA– |
| Preferred stock(4) | C | Ca | C/RR6 |

(1) Consists of medium-term notes, U.S. dollar Reference Notes® securities and €Reference Notes® securities.
(2) Consists of Reference Bills® securities and discount notes.
(3) Consists of Freddie SUBS® securities.
(4) Does not include senior preferred stock issued to Treasury.

Earlier this year, given concerns that the U.S. government's statutory debt limit would not be raised in a timely manner as well as uncertainty about achievement of a credible deficit reduction solution, certain major credit rating agencies took actions on the U.S. government's credit ratings. Due to the support we receive from Treasury, these rating agencies also took corresponding actions on certain of our credit ratings. On August 2, 2011, President Obama signed the "Budget and Control Act of 2011" which raised the U.S. government's statutory debt limit. The raising of the statutory debt limit and details outlined in the legislation to reduce the deficit resulted in further rating actions on our debt ratings and the ratings of the U.S. government.

- On July 15, 2011, S&P placed our senior long-term debt and short-term debt on CreditWatch with negative implications. This action followed S&P's placement of the long-term and short-term credit ratings of the United States on CreditWatch with negative implications on July 14, 2011. S&P subsequently lowered the long-term credit rating of the United States to "AA+" from "AAA" and affirmed the short-term rating of "A-1+" on August 5, 2011. S&P removed both the short- and long-term ratings of the U.S. government from CreditWatch negative and assigned a negative outlook to the long-term credit rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating.

- On August 2, 2011, Moody's confirmed our senior long-term debt and subordinated debt ratings and assigned a negative outlook to the ratings. This action accompanied Moody's confirmation of the U.S. government's long-term credit rating and assignment of a negative outlook to the ratings. Our debt ratings, as well as the long-term credit rating of the U.S. government, had previously been placed on review for possible downgrade on July 13, 2011.

For information about the potential impact of a downgrade in our credit ratings, see "RISK FACTORS — *A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business. Our business could also be adversely affected if there is a downgrade in the credit ratings of the U.S. government or a payment default by the U.S. government.*"

A security rating is not a recommendation to buy, sell or hold securities. It may be subject to revision or withdrawal at any time by the assigning rating organization. Each rating should be evaluated independently of any other rating.

### Cash and Cash Equivalents, Federal Funds Sold, Securities Purchased Under Agreements to Resell, and Non-Mortgage-Related Securities

Excluding amounts related to our consolidated VIEs, we held $56.7 billion in the aggregate of cash and cash equivalents, federal funds sold, securities purchased under agreements to resell, and non-mortgage-related securities at June 30, 2011. These investments are important to our cash flow and asset and liability management and our ability to provide liquidity and stability to the mortgage market. At June 30, 2011, our non-mortgage-related securities primarily consisted of FDIC-guaranteed corporate medium-term notes, Treasury notes, and Treasury bills that we could sell to provide us with an additional source of liquidity to fund our business operations. For additional information on these assets, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell" and "— Investments in Securities — *Non-Mortgage-Related Securities.*"

### Mortgage Loans and Mortgage-Related Securities

We invest principally in mortgage loans and mortgage-related securities, certain categories of which are largely unencumbered and highly liquid. Our primary source of liquidity among these mortgage assets is our holdings of agency securities. In addition, our unsecuritized performing single-family mortgage loans are also a potential source of liquidity. Our holdings of CMBS are less liquid than agency securities. Our holdings of non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans are not liquid due to market conditions and the continued

TREASURY-1736

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

poor credit quality of the underlying assets. Our holdings of unsecuritized seriously delinquent and modified single-family mortgage loans are also illiquid.

We are subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities"* for more information

## Cash Flows

Our cash and cash equivalents decreased approximately $19.5 billion to $17.5 billion during the six months ended June 30, 2011. Cash flows provided by operating activities during the six months ended June 30, 2011 were $7.8 billion, primarily driven by net interest income and net sales of multifamily held-for-sale mortgage loans. Cash flows provided by investing activities during the six months ended June 30, 2011 were $181.8 billion, primarily resulting from net proceeds received as a result of repayments of single-family held-for-investment mortgage loans. Cash flows used for financing activities during the six months ended June 30, 2011 were $209.1 billion, largely attributable to net repayments of debt securities of consolidated trusts held by third parties.

Our cash and cash equivalents decreased approximately $15.0 billion to $49.7 billion during the six months ended June 30, 2010. Cash flows provided by operating activities during the six months ended June 30, 2010 were $6.6 billion, primarily driven by net interest income and net sales of multifamily held-for-sale mortgage loans. Cash flows provided by investing activities during the six months ended June 30, 2010 were $133.9 billion, primarily resulting from net proceeds received on held-for-investment mortgage loans as we had more repayments of held-for-investment mortgage loans compared to purchases. Cash flows used for financing activities for the six months ended June 30, 2010 were $155.5 billion, largely attributable to repayments of debt securities of consolidated trusts held by third parties, net of proceeds from the issuance of debt securities of consolidated trusts held by third parties.

## Capital Resources

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA. To address our net worth deficit of $1.5 billion at June 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $1.5 billion, and will request that we receive these funds by September 30, 2011. See "BUSINESS — Regulation and Supervision — *Federal Housing Finance Agency — Receivership"* in our 2010 Annual Report for additional information on mandatory receivership. See also "RISK FACTORS — *If Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth, FHFA could be required to place us into receivership."*

We expect to make further draws under the Purchase Agreement in future periods. Given the substantial senior preferred stock dividend obligation to Treasury, which will increase with additional draws, senior preferred stock dividend payments will increasingly drive our future draw requests under the Purchase Agreement with Treasury.

The size and timing of our future draws will be determined by our dividend obligation on the senior preferred stock and a variety of other factors that could adversely affect our net worth. These other factors include how long and to what extent the housing market, including home prices, remains weak, which could increase credit expenses and cause additional other-than-temporary impairments of the non-agency mortgage-related securities we hold; foreclosure prevention efforts and foreclosure processing delays, which could increase our expenses; adverse changes in interest rates, the yield curve, implied volatility or mortgage-to-debt OAS, which could increase realized and unrealized mark-to-fair-value losses recorded in earnings or AOCI; required reductions in the size of our mortgage-related investments portfolio and other limitations on our investment activities that reduce the earnings capacity of our investment activities; quarterly commitment fees payable to Treasury; adverse changes to our funding costs and limited availability of financing; establishment of additional valuation allowances for our remaining net deferred tax asset; changes in accounting practices or guidance; the effect of the MHA Program and other government initiatives; limitations on our ability to develop new products; the introduction of additional public mission-related initiatives that may adversely impact our financial results; or changes in business practices resulting from legislative and regulatory developments.

For more information on the Purchase Agreement, its effect on our business and capital management activities, and the potential impact of making additional draws, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Dividend Obligation on the Senior Preferred Stock,"* "BUSINESS — Executive Summary — *Long-Term Financial Sustainability and Future Status"* and "RISK FACTORS" in our 2010 Annual Report.

TREASURY-1737

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### FAIR VALUE MEASUREMENTS AND ANALYSIS

**Fair Value Measurements**

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. For additional information regarding the fair value hierarchy and measurements, see "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS" in our 2010 Annual Report.

We categorize assets and liabilities measured and reported at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation process used to derive their fair values and our judgments regarding the observability of the related inputs. Those judgments are based on our knowledge and observations of the markets relevant to the individual assets and liabilities and may vary due to changes in market conditions. In making our judgments, we review ranges of third-party prices and transaction volumes, and hold discussions with dealers and pricing service vendors to understand and assess the extent of market benchmarks available and the judgments or modeling required in their processes. Based on these factors, we determine whether the inputs are observable and whether the principal markets are active or inactive.

Our Level 3 fair value measurements (*i.e.*, valued using significant inputs that are unobservable) primarily consist of non-agency mortgage-related securities and multifamily held-for-sale loans. The market for non-agency mortgage-related securities continued to be illiquid during the second quarter of 2011, with low transaction volumes, wide credit spreads, and limited transparency. We value the non-agency mortgage-related securities we hold based primarily on prices received from pricing services and dealers. The techniques used by these pricing services and dealers to develop the prices generally are either: (a) a comparison to transactions involving instruments with similar collateral and risk profiles; or (b) industry standard modeling, such as a discounted cash flow model. For a large majority of the securities we value using dealers and pricing services, we obtain multiple independent prices, which are non-binding both to us and our counterparties. When multiple prices are received, we use the median of the prices. The models and related assumptions used by the dealers and pricing services are owned and managed by them. However, we have an understanding of the processes they use to develop the prices provided to us based on our ongoing due diligence. We periodically have discussions with our dealers and pricing service vendors to maintain a current understanding of the processes and inputs they use to develop prices. We make no adjustments to the individual prices we receive from third-party pricing services or dealers for non-agency mortgage-related securities beyond calculating median prices and discarding certain prices that are determined not to be valid based on our validation processes. See "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS — Fair Value Measurements — *Controls over Fair Value Measurement*" in our 2010 Annual Report for information on our validation processes.

Table 50 below summarizes our assets and liabilities measured at fair value on a recurring basis at June 30, 2011 and December 31, 2010.

**Table 50 — Summary of Assets and Liabilities at Fair Value on a Recurring Basis**

| | June 30, 2011 | | December 31, 2010 | |
|---|---|---|---|---|
| | Total GAAP Recurring Fair Value | Percentage in Level 3 | Total GAAP Recurring Fair Value | Percentage in Level 3 |
| | | (dollars in millions) | | |
| **Assets:** | | | | |
| Investments in securities: | | | | |
| Available-for-sale, at fair value | $ 222,849 | 29% | $232,634 | 30% |
| Trading, at fair value | 54,764 | 6 | 60,262 | 5 |
| Mortgage loans: | | | | |
| Held-for-sale, at fair value | 4,463 | 100 | 6,413 | 100 |
| Derivative assets, net[1] | 246 | — | 143 | — |
| Other assets: | | | | |
| Guarantee assets, at fair value | 667 | 100 | 541 | 100 |
| Total assets carried at fair value on a recurring basis[1] | $282,989 | 24 | $299,993 | 25 |
| **Liabilities:** | | | | |
| Debt securities recorded at fair value | $ 3,998 | —% | $ 4,443 | —% |
| Derivative liabilities, net[1] | 408 | 2 | 1,209 | 3 |
| Total liabilities carried at fair value on a recurring basis[1] | $ 4,406 | 1 | $ 5,652 | 2 |

(1) Percentages by level are based on gross fair value of derivative assets and derivative liabilities before counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1738

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Changes in Level 3 Recurring Fair Value Measurements

At June 30, 2011 and December 31, 2010, we measured and recorded at fair value on a recurring basis $72.8 billion and $79.8 billion, respectively, or approximately 24% and 25% of total assets carried at fair value on a recurring basis, using significant unobservable inputs (Level 3), before the impact of counterparty and cash collateral netting. Our Level 3 assets at June 30, 2011 primarily consist of non-agency mortgage-related securities and multifamily held-for-sale loans. At June 30, 2011 and December 31, 2010, we also measured and recorded at fair value on a recurring basis Level 3 derivative liabilities of $0.4 billion and $0.8 billion, or 1% and 2%, respectively, of total liabilities carried at fair value on a recurring basis, before the impact of counterparty and cash collateral netting.

During the three and six months ended June 30, 2011, the fair value of our Level 3 assets decreased by $5.0 billion and $7.0 billion, respectively, mainly attributable to: (a) monthly remittances of principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) net sales of multifamily held-for-sale loans. In addition, the fair value of our investments in non-agency mortgage-related securities also decreased from the widening of OAS levels on these securities during the second quarter of 2011. During the three and six months ended June 30, 2011, we had a net transfer into Level 3 assets of $12 million and $160 million, respectively, resulting from a change in valuation method for certain mortgage-related securities due to a lack of relevant price quotes from dealers and third-party pricing services.

See "NOTE 18: FAIR VALUE DISCLOSURES — Table 18.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs" for the Level 3 reconciliation. For discussion of types and characteristics of mortgage loans underlying our mortgage-related securities, see "RISK MANAGEMENT — Credit Risk" and "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets."

### Consideration of Credit Risk in Our Valuation

We consider credit risk in the valuation of our assets and liabilities through consideration of credit risk of the counterparty in asset valuations and through consideration of our own institutional credit risk in liability valuations on our GAAP consolidated balance sheets.

We consider credit risk in our valuation of investments in securities based on fair value measurements that are largely the result of price quotes received from multiple dealers or pricing services. Some of the key valuation drivers of such fair value measurements can include the collateral type, collateral performance, credit quality of the issuer, tranche type, weighted average life, vintage, coupon, and interest rates. We also make adjustments for items such as credit enhancements or other types of subordination and liquidity, where applicable. In cases where internally developed models are used, we maximize the use of market-based inputs or calibrate such inputs to market data.

We also consider credit risk when we evaluate the valuation of our derivative positions. The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. For derivatives that are in an asset position, we hold collateral against those positions in accordance with agreed upon thresholds. The amount of collateral held depends on the credit rating of the counterparty and is based on our credit risk policies. Similarly, for derivatives that are in a liability position, we post collateral to counterparties in accordance with agreed upon thresholds. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties*" for a discussion of our counterparty credit risk.

See "NOTE 18: FAIR VALUE DISCLOSURES — Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information regarding the valuation of our assets and liabilities.

### Consolidated Fair Value Balance Sheets Analysis

Our consolidated fair value balance sheets present our estimates of the fair value of our financial assets and liabilities. See "NOTE 18: FAIR VALUE DISCLOSURES — Table 18.6 — Consolidated Fair Value Balance Sheets" for our fair value balance sheets. In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" in this Form 10-Q and our 2010 Annual Report, and "RISK FACTORS" and "RISK MANAGEMENT — Operational Risks" in our 2010 Annual Report for information concerning the risks associated with these models.

See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report and "NOTE 18: FAIR VALUE DISCLOSURES" in this Form 10-Q for more information on fair values.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                TREASURY-1739                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Discussion of Fair Value Results*

Table 51 summarizes the change in the fair value of net assets for the six months ended June 30, 2011 and 2010.

**Table 51 — Summary of Change in the Fair Value of Net Assets**

| | Six Months Ended June 30, | |
| | **2011** | **2010** |
|---|---|---|
| | (in billions) | |
| Beginning balance | $(58.6) | $(62.5) |
| Changes in fair value of net assets, before capital transactions | (1.7) | 8.2 |
| Capital transactions: | | |
| Dividends and share issuances, net(1) | (2.7) | 8.0 |
| Ending balance | $ (63.0) | $(46.3) |

(1) Includes the funds received from Treasury of $0.5 billion and $10.6 billion for the six months ended June 30, 2011 and 2010, respectively, under the Purchase Agreement, which increased the liquidation preference of our senior preferred stock.

During the six months ended June 30, 2011, the fair value of net assets, before capital transactions, decreased by $1.7 billion, compared to an $8.2 billion increase during the six months ended June 30, 2010. The decrease in the fair value of net assets, before capital transactions, was primarily due to a decrease in the fair value of our single-family loans due to a decline in forecasted home prices (on a seasonally adjusted basis) and a continued weak credit environment, as well as a decrease in the fair value of our investments in mortgage-related securities from the widening of OAS levels on our non-agency securities. The decrease in fair value was partially offset by an increase in fair value from a tightening of OAS levels on our agency and CMBS securities and high core spread income.

During the six months ended June 30, 2010, the increase in the fair value of net assets, before capital transactions, was primarily due to high core spread income and an increase in the fair value of our investments in mortgage-related securities driven by the tightening of the OAS levels of agency mortgage-related securities and CMBS. The fair value of net assets was also positively impacted by higher than previously expected home prices (on a seasonally adjusted basis) and an increase in prepayment speeds on our PC debt securities. The increase in fair value was partially offset by a change in the estimation of a risk premium assumption embedded in our model to apply credit costs, which led to a decrease in our fair value measurement of mortgage loans, as well as an increase in the risk premium related to our single-family loans in the continued weak credit environment.

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other market factors being equal. However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset. The reverse is true when the OAS on a given asset tightens — current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. However, as market conditions change, our estimate of expected fair value gains and losses from OAS may also change, and the actual core spread income recognized in future periods could be significantly different from current estimates.

**OFF-BALANCE SHEET ARRANGEMENTS**

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction. These off-balance sheet arrangements may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets.

**Securitization Activities and Other Guarantee Commitments**

We have off-balance sheet arrangements related to our securitization activities involving guaranteed mortgages and mortgage-related securities. As of June 30, 2011, our off-balance sheet arrangements related to these securitization activities primarily consisted of: (a) Freddie Mac mortgage-related securities backed by multifamily loans; and (b) certain single-family Other Guarantee Transactions. We also have off balance sheet arrangements related to other guarantee commitments, including long-term standby commitments and liquidity guarantees.

We guarantee the payment of principal and interest on Freddie Mac mortgage-related securities we issue and on mortgage loans covered by our other guarantee commitments. Therefore, our maximum potential off-balance sheet exposure to credit losses relating to these securitization activities and the other guarantee commitments is primarily represented by the UPB of the underlying loans and securities, which was $51.9 billion and $43.9 billion at June 30, 2011 and December 31, 2010, respectively. Our off-balance sheet arrangements related to securitization activity have been significantly reduced due to accounting guidance for transfers of financial assets and the consolidation of VIEs, which we

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1740                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

adopted on January 1, 2010. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report and "NOTE 9: FINANCIAL GUARANTEES" in this Form 10-Q for more information on our off-balance sheet securitization arrangements.

Our exposure to losses on the transactions described above would be partially mitigated by the recovery we would receive through exercising our rights to the collateral backing the underlying loans and the available credit enhancements, which may include recourse and primary insurance with third parties. In addition, we provide for incurred losses each period on these guarantees within our provision for credit losses.

**Other Agreements**

We own an interest in numerous entities that are considered to be VIEs for which we are not the primary beneficiary and which we do not consolidate on our balance sheets in accordance with the accounting guidance for the consolidation of VIEs. These VIEs relate primarily to our investment activity in mortgage-related assets and non-mortgage assets, and include LIHTC partnerships, certain Other Guarantee Transactions, and certain asset-backed investment trusts. Our consolidated balance sheets reflect only our investment in the VIEs, rather than the full amount of the VIEs' assets and liabilities. See "NOTE 3: VARIABLE INTEREST ENTITIES" for additional information related to our variable interests in these VIEs.

As part of our credit guarantee business, we routinely enter into forward purchase and sale commitments for mortgage loans and mortgage-related securities. Some of these commitments are accounted for as derivatives. Their fair values are reported as either derivative assets, net or derivative liabilities, net on our consolidated balance sheets. We also have purchase commitments primarily related to our mortgage purchase flow business, which we principally fulfill by issuing PCs in swap transactions, and, to a lesser extent, commitments to purchase or guarantee multifamily mortgage loans that are not accounted for as derivatives and are not recorded on our consolidated balance sheets. These non-derivative commitments totaled $241.7 billion, and $220.7 billion in notional value at June 30, 2011 and December 31, 2010, respectively.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts within our consolidated financial statements. Certain of our accounting policies, as well as estimates we make, are critical, as they are both important to the presentation of our financial condition and results of operations and require management to make difficult, complex, or subjective judgments and estimates, often regarding matters that are inherently uncertain. Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements.

Our critical accounting policies and estimates relate to: (a) allowances for loan losses and reserve for guarantee losses; (b) fair value measurements; (c) impairment recognition on investments in securities; and (d) realizability of net deferred tax assets. For additional information about our critical accounting policies and estimates and other significant accounting policies, including recently issued accounting pronouncements, see "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES" in our 2010 Annual Report and "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in this Form 10-Q.

## FORWARD-LOOKING STATEMENTS

We regularly communicate information concerning our business activities to investors, the news media, securities analysts and others as part of our normal operations. Some of these communications, including this Form 10-Q, contain "forward-looking statements," including statements pertaining to the conservatorship, our current expectations and objectives for our efforts under the MHA Program and other programs to assist the U.S. residential mortgage market, the servicing alignment initiative, future business plans, liquidity, capital management, economic and market conditions and trends, market share, the effect of legislative and regulatory developments, implementation of new accounting guidance, credit losses, internal control remediation efforts, and results of operations and financial condition on a GAAP, Segment Earnings, and fair value basis. Forward-looking statements are often accompanied by, and identified with, terms such as "objective," "expect," "trend," "forecast," "anticipate," "believe," "intend," "could," "future," and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties, including those described in the "RISK FACTORS"

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1741                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

sections of this Form 10-Q, our 2010 Annual Report, and our Quarterly Report on Form 10-Q for the first quarter of 2011, and:

- the actions FHFA, Treasury, the Federal Reserve, the Obama Administration, Congress, and our management may take;

- the impact of the restrictions and other terms of the conservatorship, the Purchase Agreement, the senior preferred stock, and the warrant on our business, including our ability to pay: (a) the dividend on the senior preferred stock; and (b) any quarterly commitment fee that we are required to pay to Treasury under the Purchase Agreement;

- our ability to maintain adequate liquidity to fund our operations, including following any changes in the support provided to us by Treasury or FHFA, a change in the credit ratings of our debt securities or a change in the credit rating of the U.S. government;

- changes in our charter or applicable legislative or regulatory requirements, including any restructuring or reorganization in the form of our company, whether we will remain a stockholder-owned company or continue to exist and whether we will be wound down or placed under receivership, regulations under the GSE Act, the Reform Act, or the Dodd-Frank Act, regulatory or legislative actions taken to implement the Obama Administration's plan to reform the housing finance system, changes to affordable housing goals regulation, reinstatement of regulatory capital requirements, or the exercise or assertion of additional regulatory or administrative authority;

- changes in the regulation of the mortgage and financial services industries, including changes caused by the Dodd-Frank Act, or any other legislative, regulatory, or judicial action at the federal or state level;

- enforcement actions against mortgage servicers and other mortgage industry participants by federal or state authorities;

- the extent to which borrowers participate in the MHA Program, modification efforts under the servicing alignment initiative, and other initiatives designed to help in the housing recovery and the impact of such programs on our credit losses, expenses, and the size and composition of our mortgage-related investments portfolio;

- the impact of any deficiencies in foreclosure documentation practices and related delays in the foreclosure process;

- the ability of our financial, accounting, data processing, and other operating systems or infrastructure, and those of our vendors to process the complexity and volume of our transactions;

- changes in accounting or tax guidance or in our accounting policies or estimates, and our ability to effectively implement any such changes in guidance, policies, or estimates;

- changes in general regional, national, or international economic, business, or market conditions and competitive pressures, including changes in employment rates and interest rates, and changes in the federal government's fiscal and monetary policy;

- changes in the U.S. residential mortgage market, including changes in the rate of growth in total outstanding U.S. residential mortgage debt, the size of the U.S. residential mortgage market, and home prices;

- our ability to effectively implement our business strategies, including our efforts to improve the supply and liquidity of, and demand for, our products, and restrictions on our ability to offer new products or engage in new activities;

- our ability to recruit and retain executive officers and other key employees;

- our ability to effectively identify and manage credit, interest-rate, operational, and other risks in our business, including changes to the credit environment and the levels and volatilities of interest rates, as well as the shape and slope of the yield curves;

- the effects of internal control deficiencies and our ability to effectively identify, assess, evaluate, manage, mitigate, or remediate control deficiencies and risks, including material weaknesses and significant deficiencies, in our internal control over financial reporting and disclosure controls and procedures;

- incomplete or inaccurate information provided by customers and counterparties;

- consolidation among, or adverse changes in the financial condition of, our customers and counterparties;

- the failure of our customers and counterparties to fulfill their obligations to us, including the failure of seller/servicers to meet their obligations to repurchase loans sold to us in breach of their representations and warranties;

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1742          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- changes in our judgments, assumptions, forecasts, or estimates regarding the volume of our business and spreads we expect to earn;

- the availability of options, interest-rate and currency swaps, and other derivative financial instruments of the types and quantities, on acceptable terms, and with acceptable counterparties needed for investment funding and risk management purposes;

- changes in pricing, valuation or other methodologies, models, assumptions, judgments, estimates and/or other measurement techniques, or their respective reliability;

- changes in mortgage-to-debt OAS;

- the potential impact on the market for our securities resulting from any sales by the Federal Reserve or Treasury of Freddie Mac debt and mortgage-related securities they have purchased;

- adverse judgments or settlements in connection with legal proceedings, governmental investigations, and IRS examinations;

- volatility of reported results due to changes in the fair value of certain instruments or assets;

- the development of different types of mortgage servicing structures and servicing compensation;

- preferences of originators in selling into the secondary mortgage market;

- changes to our underwriting or servicing requirements, or investment standards for mortgage-related products;

- investor preferences for mortgage loans and mortgage-related and debt securities compared to other investments;

- borrower preferences for fixed-rate mortgages or adjustable-rate mortgages;

- the occurrence of a major natural or other disaster in geographic areas in which our offices or portions of our total mortgage portfolio are concentrated;

- other factors and assumptions described in this Form 10-Q, in our 2010 Annual Report, and our Quarterly Report on Form 10-Q for the first quarter of 2011;

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their impacts; and

- market reactions to the foregoing.

We undertake no obligation to update any forward-looking statements we make to reflect events or circumstances occurring after the date of this Form 10-Q.

## RISK MANAGEMENT AND DISCLOSURE COMMITMENTS

In October 2000, we announced our adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with FHFA, then OFHEO, that updated these commitments and set forth a process for implementing them. A copy of the letters between us and OFHEO dated September 1, 2005 constituting the written agreement has been filed as an exhibit to our Registration Statement on Form 10, filed with the SEC on July 18, 2008, and is available on the Investor Relations page of our web site at www.freddiemac.com/investors/sec_filings/index.html.

In November 2008, FHFA suspended our periodic issuance of subordinated debt disclosure commitment during the term of conservatorship and thereafter until directed otherwise. In March 2009, FHFA suspended the remaining disclosure commitments under the September 1, 2005 agreement until further notice, except that: (a) FHFA will continue to monitor our adherence to the substance of the liquidity management and contingency planning commitment through normal supervision activities; and (b) we will continue to provide interest-rate risk and credit risk disclosures in our periodic public reports. For the six months ended June 30, 2011, our duration gap averaged zero months, PMVS-L averaged $433 million and PMVS-YC averaged $23 million. Our 2011 monthly average duration gap, PMVS results and related disclosures are provided in our Monthly Volume Summary reports, which are available on our web site, www.freddiemac.com/investors/volsum and in current reports on Form 8-K we file with the SEC. For disclosures concerning credit risk sensitivity, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Credit Risk Sensitivity.*"

92 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## LEGISLATIVE AND REGULATORY MATTERS

**Obama Administration Report on Reforming the U.S. Housing Finance Market**

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, stating that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Obama Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Obama Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements.

These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations and financial condition. We cannot predict the extent to which these recommendations will be implemented or when any actions to implement them may be taken. However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term.

**Legislation Related to Reforming Freddie Mac and Fannie Mae**

Congress continues to hold hearings and consider legislation on the future state of Freddie Mac and Fannie Mae. In the Senate, a comprehensive bill on the future state of Freddie Mac and Fannie Mae was introduced in March, but has yet to be scheduled for consideration. Under this bill, 24 months after the date of enactment, the Director of FHFA would be required to determine the financial viability of each company, based on standards for the appointment of a receiver for an enterprise under the GSE Act. If Freddie Mac or Fannie Mae were determined not to be financially viable, FHFA would immediately be appointed as receiver. If Freddie Mac or Fannie Mae were determined to be financially viable, the company's charter would be revoked after an additional three-year period and the company would be wound down over a subsequent ten-year period.

In the House, Congress continues to debate the approach to the long-term future of housing finance including the role of Freddie Mac and Fannie Mae. Several bills take a comprehensive approach that would wind down Freddie Mac and Fannie Mae while other bills take a more targeted approach that would impact the companies' operations.

The comprehensive bills include the House companion to the Senate bill, as well as two additional bills that were introduced in the second quarter of 2011. One bill would wind down and place Freddie Mac and Fannie Mae into receivership no later than one year after the time when FHFA has chartered five or more newly created, privately capitalized, federally chartered entities. Freddie Mac and Fannie Mae's role in the secondary market would be replaced by these entities which would, as secondary mortgage market participants, purchase conventional mortgage loans, issue mortgage-related securities, and sell the mortgage-related securities in the capital markets. The other bill would require the Secretary of the Treasury, in consultation with FHFA, to develop a plan to wind down Freddie Mac and Fannie Mae within 36 months and establish a Federal Secondary Market Facility for Residential Mortgages. The Facility would operate as a government instrumentality of the federal government but without capital stock.

In addition, the House Financial Services Subcommittee on Capital Markets and Government Sponsored Enterprises approved a number of bills affecting Freddie Mac and Fannie Mae's operations that, among other things, would require advance approval by the Secretary of the Treasury and notice to Congress for all debt issuances by the companies; require FHFA to direct the companies to increase guarantee fees; repeal our affordable housing goals; prohibit the companies from initially offering new products during conservatorship or receivership; accelerate reductions in our mortgage-related investments portfolio; require that Freddie Mac and Fannie Mae mortgages be treated the same as other mortgages for

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1744

Table of Contents

purposes of risk retention requirements in the Dodd-Frank Act;  grant the FHFA Inspector General direct access to our records and employees; place all Freddie Mac and Fannie Mae employees on  the federal government pay scale; authorize FHFA, as receiver,  to revoke the charters of Freddie Mac and Fannie Mae; prevent the Department of the Treasury from lowering the dividend  payment under the Purchase Agreement; abolish the Affordable Housing Trust Fund, the Capital Magnet Fund, and the HOPE  Reserve Fund; require disposition of non-mission critical assets; apply the Freedom of Information Act to Freddie Mac and  Fannie Mae; and set a cap on the funds received under the  Purchase Agreement.

We expect additional legislation relating to Freddie Mac and Fannie Mae to be introduced and considered by Congress; however,  we cannot predict whether or when any such legislation will be  enacted. Some of the bills discussed above, if enacted, would  materially affect the role of the company, our business model and our structure, and could have an adverse effect on our  financial results and operations as well as our ability to retain and recruit management and other valuable employees.  Under several of the bills, our charter would be revoked and/or  we would be wound down or placed into receivership. Such  legislation could impair our ability to issue securities in the  capital markets and therefore our ability to conduct our business, absent an explicit guarantee of our existing and  ongoing liabilities by the U.S. government. A number of the other bills would adversely affect our ability to conduct  business under our current business model, including by  subjecting us to new requirements that could increase costs,  reduce revenues and limit or prohibit current business  activities.

**Dodd-Frank Act**

The Dodd-Frank Act, which was signed into law on July 21,  2010, significantly changed the regulation of the financial  services industry, including creating new standards related to regulatory oversight of systemically important financial  companies, derivatives, capital requirements, asset-backed securitization, mortgage underwriting, and consumer financial  protection. The Dodd-Frank Act has and will directly affect the business and operations of Freddie Mac by subjecting us to new  and additional regulatory oversight and standards, including  with respect to our activities and products. We may also be affected by provisions of the Dodd-Frank Act and implementing  regulations that affect the activities of banks, savings institutions, insurance companies, securities dealers, and other  regulated entities that are our customers and counterparties.

At this time, it is difficult to assess fully the impact of the  Dodd-Frank Act on Freddie Mac and the financial services  industry. Implementation of the Dodd-Frank Act is being accomplished through numerous rulemakings, many of which are  still in process. The final effects of the legislation will not be known with certainty until these rulemakings are complete.  The Dodd-Frank Act also mandates the preparation of studies on a wide range of issues, which could lead to additional legislation  or regulatory changes.

Developments since the first quarter of 2011 with respect to  rulemakings that may have a significant impact on Freddie Mac  include actions taken by the CFTC and SEC to defer most  Dodd-Frank Act requirements regulating swaps and security-based swaps that  would otherwise have gone into effect on July 16, 2011.

We continue to review and assess the impact of rulemakings and  other activities under the Dodd-Frank Act. For more information,  see "RISK FACTORS — Legal and Regulatory Risks — *The Dodd-Frank Act and related regulation may adversely affect our business activities and financial results*" in our 2010 Annual Report.

**Conforming Loan Limits**

On September 30, 2010, Congress temporarily extended the  current higher loan limits in certain high-cost areas through  September 30, 2011. Actual conforming loan limits are  established by FHFA for each county (or equivalent) and the loan limits for specific high-cost areas may be lower than the maximum amounts. The report that the Obama Administration  delivered to Congress on February 11, 2011 recommends that Congress allow the temporary increase in loan limits to expire  as scheduled on September 30, 2011. If Congress allows the  temporary high-cost area loan limits to expire, the permanent  high-cost area loan limits set out in the Reform Act will apply. Certain of the bills discussed above in "Legislation Related to Reforming Freddie Mac and Fannie Mae" would also  terminate the permanent high-cost area loan limits entirely. Legislation has been introduced that would extend the current  temporary loan limits.

**Prudential Management and Operations Standards**

On June 20, 2011, FHFA published a proposed rule that would  establish prudential standards, in the form of guidelines,  relating to the management and operations of Freddie Mac, Fannie  Mae, and the FHLBs (the "Standards"). This proposed  rule implements the Housing and Economic Recovery Act amendments to the GSE Act. The proposed Standards address a number of  business, controls, and risk management areas. The Standards  specify the possible consequences for any entity that fails to  meet any of the Standards or otherwise fails to comply (including submission of a

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1745

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

corrective plan, limits on asset growth, increases in capital, limits on dividends and stock redemptions or repurchases, a minimum level of retained earnings or any other action that the FHFA Director determines will contribute to bringing the entity into compliance with the Standards). In addition, a failure to meet any Standard also may constitute an unsafe or unsound practice, which may form the basis for FHFA initiating an administrative enforcement action. Because FHFA proposes to adopt the Standards as guidelines, as authorized by the Housing and Economic Recovery Act, FHFA may modify, revoke or add to the Standards at any time by order.

**Conservatorship and Receivership Rule**

On June 20, 2011, FHFA published a final rule that addresses conservatorship and receivership operations of Freddie Mac, Fannie Mae and the FHLBs. The final rule establishes a framework to be used by FHFA when acting as conservator or receiver, supplementing and clarifying statutory authorities. Among other provisions, the final rule indicates that FHFA will not permit payment of securities litigation claims during conservatorship and that claims by current or former shareholders arising as a result of their status as shareholders would receive the lowest priority of claim in receivership. In addition, the final rule indicates that administrative expenses of the conservatorship will also be deemed to be administrative expenses of a subsequent receivership and that capital distributions may not be made during conservatorship, except as specified in the final rule.

**Developments Concerning Single-Family Servicing Practices**

There have been a number of regulatory developments in recent periods impacting single-family mortgage servicing and foreclosure practices, including those discussed below. These developments have caused delays in the foreclosure process for single-family mortgages, which have caused the volume of our single-family REO acquisitions to be less than it otherwise would have been. It is possible that these developments will result in significant changes to mortgage servicing and foreclosure practices that could adversely affect our business. New compliance requirements placed on servicers as a result of these developments could expose Freddie Mac to financial risk as a result of further extensions of foreclosure timelines if home prices remain weak or decline. We may need to make additional significant changes to our practices, which could increase our operational risk. It is difficult to predict other impacts on our business of these changes, though such changes could adversely affect our credit losses and costs of servicing, and make it more difficult for us to transfer mortgage servicing rights to a successor servicer should we need to do so. The regulatory developments and changes include the following:

• On April 13, 2011, the OCC, the Federal Reserve, the FDIC, and the Office of Thrift Supervision entered into consent orders with 14 large servicers regarding their foreclosure and loss mitigation practices. These institutions service the majority of the single-family mortgages we own or guarantee. The consent orders require the servicers to submit comprehensive action plans relating to, among other items, use of foreclosure documentation, staffing of foreclosure and loss mitigation activities, oversight of third parties, use of the Mortgage Electronic Registration System, or the MERS System, and communications with borrowers. We will not be able to assess the impact of these actions on our business until the servicers' comprehensive action plans are publicly available.

• On June 30, 2011, the OCC issued Supervisory Guidance regarding the OCC's expectations for the oversight and management of mortgage foreclosure activities by national banks. The Supervisory Guidance contains several elements from the consent orders with the 14 major servicers that will now be applied to all national banks. In the Supervisory Guidance, the OCC directs all national banks to conduct a self-assessment of foreclosure management practices by September 30, 2011. Additionally, the Guidance sets forth foreclosure management standards that mirror the broad categories of the servicing guidelines contained in the consent orders. During Congressional testimony on July 7, 2011, an OCC official indicated that there is an active interagency effort under way to develop comprehensive, nationally applicable mortgage servicing standards, and that this effort involves federal bank regulatory agencies, HUD and FHFA.

• A group consisting of state attorneys general and state bank and mortgage regulators is in discussions with a number of large seller/servicers concerning a global settlement of certain issues related to mortgage servicing practices. It has been reported that this settlement could include changes to mortgage servicing practices.

• On April 28, 2011, FHFA announced a new set of aligned standards for servicing delinquent mortgages owned or guaranteed by Freddie Mac and Fannie Mae. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts.*" FHFA has also directed us and Fannie Mae to work on a joint initiative to consider alternatives for future mortgage servicing structures and

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1746          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

__Table of Contents__

servicing compensation. The development of further alternatives could impact our ability to conduct current initiatives.

- On July 21, 2011, new MERS membership rules with respect to the foreclosure of mortgages registered on the MERS System were adopted. Subject to certain limited exceptions, these rules require the assignment of a mortgage out of MERS' name prior to the initiation of foreclosure or certain other legal proceedings. This may further extend Freddie Mac's foreclosure timelines.

For more information on operational risks related to these developments in mortgage servicing, see "RISK MANAGEMENT — Operational Risks."

96

*Freddie Mac*

---

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKETRISK

**Interest-Rate Risk and Other Market Risks**

Our investments in mortgage loans and mortgage-related securities expose us to interest-rate risk and other market risks arising primarily from the uncertainty as to when borrowers will pay the outstanding principal balance of mortgage loans and mortgage-related securities, known as prepayment risk, and the resulting potential mismatch in the timing of our receipt of cash flows related to our assets versus the timing of payment of cash flows related to our liabilities used to fund those assets. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" in our 2010 Annual Report for more information on our exposure to interest-rate and other market risks, including our use of derivatives as part of our efforts to manage certain of these risks.

*PMVS and Duration Gap*

Our primary interest-rate risk measures are PMVS and duration gap.

PMVS is an estimate of the change in the market value of our net assets and liabilities from an instantaneous 50 basis point shock to interest rates, assuming no rebalancing actions are undertaken and assuming the mortgage-to-LIBOR basis does not change. We do not actively manage overall basis risk, also referred to as mortgage-to-debt OAS risk or spread risk, arising from funding mortgage-related assets with our debt securities. Recently our agency-to-swap basis risk exposure has increased due to the increased use of floating rate debt. Agency-to-swap basis risk impacts the debt component of our mortgage-to-debt OAS risk. PMVS is measured in two ways, one measuring the estimated sensitivity of our portfolio market value to parallel movements in interest rates (PMVS-Level or PMVS-L) and the other to nonparallel movements (PMVS-YC).

The 50 basis point shift and 25 basis point change in slope of the LIBOR yield curve used for our PMVS measures reflect reasonably possible near-term changes that we believe provide a meaningful measure of our interest-rate risk sensitivity. Our PMVS measures assume instantaneous shocks. Therefore, these PMVS measures do not consider the effects on fair value of any rebalancing actions that we would typically expect to take to reduce our risk exposure.

Duration gap measures the difference in price sensitivity to interest rate changes between our assets and liabilities, and is expressed in months relative to the market value of assets. For example, assets with a six-month duration and liabilities with a five-month duration would result in a positive duration gap of one month. A duration gap of zero implies that the duration of our assets approximates the duration of our liabilities. Multiplying duration gap (expressed as a percentage of a year) by the fair value of our assets will provide an indication of the change in the fair value of our equity resulting from a 1% change in interest rates.

*Limitations of Market Risk Measures*

Our PMVS and duration gap estimates are determined using models that involve our best judgment of interest-rate and prepayment assumptions. Accordingly, while we believe that PMVS and duration gap are useful risk management tools, they should be understood as estimates rather than as precise measurements. While PMVS and duration gap estimate our exposure to changes in interest rates, they do not capture the potential impact of certain other market risks, such as changes in volatility, basis, and foreign-currency risk.

There are inherent limitations in any methodology used to estimate exposure to changes in market interest rates. Our sensitivity analyses for PMVS and duration gap contemplate only certain movements in interest rates and are performed at a particular point in time based on the estimated fair value of our existing portfolio. These sensitivity analyses do not consider other factors that may have a significant effect on our financial instruments, most notably business activities and strategic actions that management may take in the future to manage interest-rate risk. As such, these analyses are not intended to provide precise forecasts of the effect a change in market interest rates would have on the estimated fair value of our net assets.

In addition, it is more difficult to measure and manage the interest rate risk related to mortgage assets as risk for prepayment model error remains high due to uncertainty regarding foreclosures, loan modification, and the volatility and impact of home price movements on mortgage durations. Mis-estimation of prepayments could result in hedging-related losses.

*Duration Gap and PMVS Results*

Table 52 provides duration gap, estimated point-in-time and minimum and maximum PMVS-L and PMVS-YC results, and an average of the daily values and standard deviation for the three and six months ended June 30, 2011 and 2010. Table 52 also provides PMVS-L estimates assuming an immediate 100 basis point shift in the LIBOR yield curve.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We do not hedge the entire prepayment risk exposure embedded in our mortgage assets. The interest rate sensitivity of a mortgage portfolio varies across a wide range of interest rates. Therefore, the difference between PMVS at 50 basis points and 100 basis points is non-linear. Accordingly, as shown in Table 52, the PMVS-L results based on a 100 basis point shift in the LIBOR curve are disproportionately higher at June 30, 2011, than the PMVS-L results based on a 50 basis point shift in the LIBOR curve.

**Table 52 — PMVS Results**

| | PMVS-YC 25 bps | PMVS-L 50 bps | PMVS-L 100 bps |
|---|---|---|---|
| | | (in millions) | |
| Assuming shifts of the LIBOR yield curve: | | | |
| June 30, 2011 | $ 35 | $ 434 | $ 1,607 |
| December 31, 2010 | $ 35 | $588 | $1,884 |

| | Three Months Ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | | | 2010 | | |
| | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
| | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Average | 0.1 | $ 25 | $ 419 | 0.0 | $ 23 | $ 415 |
| Minimum | (0.2) | $ 4 | $ 288 | (0.6) | $ — | $ 156 |
| Maximum | 0.6 | $ 58 | $ 558 | 0.5 | $ 64 | $ 606 |
| Standard deviation | 0.2 | $ 13 | $ 62 | 0.2 | $ 16 | $ 92 |

| | Six Months Ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | | | 2010 | | |
| | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
| | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Average | (0.1) | $ 23 | $ 433 | 0.0 | $ 21 | $ 445 |
| Minimum | (1.0) | $ — | $ 280 | (0.7) | $ — | $ 156 |
| Maximum | 0.6 | $ 58 | $ 721 | 0.7 | $ 64 | $ 668 |
| Standard deviation | 0.3 | $ 13 | $ 84 | 0.3 | $ 16 | $ 92 |

Derivatives have historically enabled us to keep our interest-rate risk exposure at consistently low levels in a wide range of interest-rate environments. Table 53 shows that the PMVS-L risk levels for the periods presented would generally have been higher if we had not used derivatives to manage our interest-rate risk exposure.

**Table 53 — Derivative Impact on PMVS-L (50 bps)**

| | Before Derivatives | After Derivatives | Effect of Derivatives |
|---|---|---|---|
| | | (in millions) | |
| At: | | | |
| June 30, 2011 | $3,688 | $ 434 | $(3,254) |
| December 31, 2010 | $ 3,614 | $ 588 | $ (3,026) |

The disclosure in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC, reflects the average of the daily PMVS-L, PMVS-YC and duration gap estimates for a given reporting period (a month, quarter or year).

98

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## ITEM 4. CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC rules and forms and that such information is accumulated and communicated to senior management, as appropriate, to allow timely decisions regarding required disclosure. In designing our disclosure controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and we must apply judgment in implementing possible controls and procedures.

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of June 30, 2011. As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of June 30, 2011, at a reasonable level of assurance, because our disclosure controls and procedures did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. We have not been able to update our disclosure controls and procedures to provide reasonable assurance that information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure. Based on discussions with FHFA and the structural nature of this continued weakness, it is likely that we will not remediate this weakness in our disclosure controls and procedures while we are under conservatorship. As noted below, we also consider this situation to be a continuing material weakness in our internal control over financial reporting.

**Changes in Internal Control Over Financial Reporting During the Quarter Ended June 30, 2011**

We evaluated the changes in our internal control over financial reporting that occurred during the quarter ended June 30, 2011 and concluded that the following matters have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

A number of senior officers have left the company since March 31, 2011, including Donald J. Bisenius, Executive Vice President — Single-Family Credit Guarantee, Peter J. Federico, Executive Vice President — Investments and Capital Markets and Treasurer, Michael C. May, Executive Vice President — Multifamily, Joseph A. Rossi, Senior Vice President — Operations & Technology, and Robert E. Bostrom, Executive Vice President — General Counsel & Corporate Secretary. In addition, Raymond G. Romano, Executive Vice President — Chief Credit Officer will be leaving the company in October 2011. Because we maintain succession plans for our senior management positions, we have been able to fill many of these senior management positions quickly, or have eliminated them through reorganizations. However, disruptive levels of turnover at both the executive and employee levels could lead to breakdowns in any of our operations, affect our execution capabilities, cause delays in the implementation of critical technology and other projects, and erode our business, modeling, internal audit, risk management, financial reporting, and compliance expertise and capabilities.

We made two significant internal reorganizations during the second quarter of 2011, as we combined our Single-Family Credit Guarantee, Single-Family Portfolio Management, and Operations & Technology divisions, and we merged our Credit Management division into our Enterprise Risk Management division. Over time, we expect these changes will improve our overall risk profile. However, in the near term, these changes could increase our operational risk.

**Mitigating Actions Related to the Material Weakness in Internal Control Over Financial Reporting**

We have not remediated the material weakness in internal control over financial reporting related to our disclosure controls and procedures as of June 30, 2011. Given the structural nature of this continued weakness, we believe it is likely that we will not remediate this material weakness while we are under conservatorship. However, both we and FHFA have continued to engage in activities and employ procedures and practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws. These include the following:

- FHFA has established the Office of Conservator Affairs, which is intended to facilitate operation of the company with the oversight of the Conservator.

99 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- We provide drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also provide drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, review our SEC filings prior to filing, including this quarterly report on Form 10-Q, and engage in discussions regarding issues associated with the information contained in those filings. Prior to filing this quarterly report on Form 10-Q, FHFA provided us with a written acknowledgement that it had reviewed the quarterly report on Form 10-Q, was not aware of any material misstatements or omissions in the quarterly report on Form 10-Q, and had no objection to our filing the quarterly report on Form 10-Q.

- The Acting Director of FHFA is in frequent communication with our Chief Executive Officer, typically meeting (in person or by phone) on a weekly basis.

- FHFA representatives hold frequent meetings, typically weekly, with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, capital markets management, external communications and legal matters.

- Senior officials within FHFA's accounting group meet frequently, typically weekly, with our senior financial executives regarding our accounting policies, practices and procedures.

In view of our mitigating actions related to the material weakness, we believe that our interim consolidated financial statements for the quarter ended June 30, 2011 have been prepared in conformity with GAAP.

100

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

## ITEM 1. FINANCIAL STATEMENTS

101 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME**
**(UNAUDITED)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions, except share-related amounts) | | | |
| *Interest income* | | | | |
| Mortgage loans: | | | | |
| Held by consolidated trusts | $ 19,782 | $ 22,114 | $ 39,846 | $ 44,846 |
| Unsecuritized | 2,274 | 2,179 | 4,608 | 4,140 |
| *Total mortgage loans* | 22,056 | 24,293 | 44,454 | 48,986 |
| Investments in securities | 3,275 | 3,574 | 6,558 | 7,473 |
| Other | 18 | 34 | 52 | 67 |
| *Total interest income* | 25,349 | 27,901 | 51,064 | 56,526 |
| *Interest expense* | | | | |
| Debt securities of consolidated trusts | (17,261) | (19,048) | (34,664) | (38,691) |
| Other debt | (3,333) | (4,468) | (6,898) | (9,067) |
| *Total interest expense* | (20,594) | (23,516) | (41,562) | (47,758) |
| Expense related to derivatives | (194) | (249) | (401) | (507) |
| *Net interest income* | 4,561 | 4,136 | 9,101 | 8,261 |
| Provision for credit losses | (2,529) | (5,029) | (4,518) | (10,425) |
| *Net interest income (loss) after provision for credit losses* | 2,032 | (893) | 4,583 | (2,164) |
| *Non-interest income (loss)* | | | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (125) | 4 | 98 | (94) |
| Gains (losses) on retirement of other debt | 3 | (141) | 15 | (179) |
| Gains (losses) on debt recorded at fair value | (37) | 544 | (118) | 891 |
| Derivative gains (losses) | (3,807) | (3,838) | (4,234) | (8,523) |
| Impairment of available-for-sale securities: | | | | |
| Total other-than-temporary impairment of available-for-sale securities | (230) | (114) | (1,284) | (531) |
| Portion of other-than-temporary impairment recognized in AOCI | (122) | (314) | (261) | (407) |
| *Net impairment of available-for-sale securities recognized in earnings* | (352) | (428) | (1,545) | (938) |
| Other gains (losses) on investment securities recognized in earnings | 209 | (257) | 89 | (673) |
| Other income | 252 | 489 | 586 | 1,035 |
| *Non-interest income (loss)* | (3,857) | (3,627) | (5,109) | (8,481) |
| *Non-interest expense* | | | | |
| Salaries and employee benefits | (219) | (230) | (426) | (464) |
| Professional services | (64) | (67) | (120) | (148) |
| Occupancy expense | (15) | (15) | (30) | (31) |
| Other administrative expenses | (86) | (92) | (169) | (166) |
| *Total administrative expenses* | (384) | (404) | (745) | (809) |
| Real estate owned operations (expense) income | (27) | 40 | (284) | (119) |
| Other expenses | (135) | (115) | (214) | (218) |
| *Non-interest expense* | (546) | (479) | (1,243) | (1,146) |
| Loss before income tax benefit | (2,371) | (4,999) | (1,769) | (11,791) |
| Income tax benefit | 232 | 286 | 306 | 389 |
| *Net loss* | (2,139) | (4,713) | (1,463) | (11,402) |
| Other comprehensive income, net of taxes and reclassification adjustments: | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 903 | 4,097 | 2,844 | 8,743 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 135 | 184 | 267 | 356 |
| Changes in defined benefit plans | 1 | 2 | (8) | (8) |
| *Total other comprehensive income, net of taxes and reclassification adjustments* | 1,039 | 4,283 | 3,103 | 9,091 |
| Comprehensive income (loss) | (1,100) | (430) | 1,640 | (2,311) |
| Less: Comprehensive loss attributable to noncontrolling interest | — | — | — | 1 |
| *Total comprehensive income (loss) attributable to Freddie Mac* | $ (1,100) | $ (430) | $ 1,640 | $ (2,310) |
| *Net loss* | $ (2,139) | $ (4,713) | $ (1,463) | $ (11,402) |
| Less: Net loss attributable to noncontrolling interest | — | — | — | 1 |
| *Net loss attributable to Freddie Mac* | (2,139) | (4,713) | (1,463) | (11,401) |
| Preferred stock dividends | (1,617) | (1,296) | (3,222) | (2,588) |
| *Net loss attributable to common stockholders* | $ (3,756) | $ (6,009) | $ (4,685) | $ (13,989) |
| Loss per common share: | | | | |
| Basic | $ (1.16) | $ (1.85) | $ (1.44) | $ (4.30) |
| Diluted | $ (1.16) | $ (1.85) | $ (1.44) | $ (4.30) |
| Weighted average common shares outstanding (in thousands): | | | | |
| Basic | 3,244,967 | 3,249,198 | 3,245,970 | 3,250,241 |
| Diluted | 3,244,967 | 3,249,198 | 3,245,970 | 3,250,241 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1754

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED BALANCE SHEETS**
**(UNAUDITED)**

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| | *(in millions, except share-related amounts)* | |
| **Assets** | | |
| Cash and cash equivalents (includes $1 and $1, respectively, related to our consolidated VIEs) | $ 17,488 | $ 37,012 |
| Restricted cash and cash equivalents (includes $1,850 and $7,514, respectively, related to our consolidated VIEs) | 2,333 | 8,111 |
| Federal funds sold and securities purchased under agreements to resell (includes $13,950 and $29,350, respectively, related to our consolidated VIEs) | 33,609 | 46,524 |
| *Investments in securities:* | | |
| Available-for-sale, at fair value (includes $244 and $817, respectively, pledged as collateral that may be repledged) | 222,849 | 232,634 |
| Trading, at fair value | 54,764 | 60,262 |
| *Total investments in securities* | 277,613 | 292,896 |
| *Mortgage loans:* | | |
| Held-for-investment, at amortized cost: | | |
| By consolidated trusts (net of allowances for loan losses of $8,948 and $11,644, respectively) | 1,634,773 | 1,646,172 |
| Unsecuritized (net of allowances for loan losses of $29,919 and $28,047, respectively) | 198,568 | 192,310 |
| Total held-for-investment mortgage loans, net | 1,833,341 | 1,838,482 |
| Held-for-sale, at lower-of-cost-or-fair-value (includes $4,463 and $6,413 at fair value, respectively) | 4,463 | 6,413 |
| *Total mortgage loans, net* | 1,837,804 | 1,844,895 |
| Accrued interest receivable (includes $6,704 and $6,895, respectively, related to our consolidated VIEs) | 8,523 | 8,713 |
| Derivative assets, net | 246 | 143 |
| Real estate owned, net (includes $83 and $118, respectively, related to our consolidated VIEs) | 5,932 | 7,068 |
| Deferred tax assets, net | 3,866 | 5,543 |
| Other assets (Note 21) (includes $3,252 and $6,001, respectively, related to our consolidated VIEs) | 8,381 | 10,875 |
| *Total assets* | $2,195,795 | $ 2,261,780 |
| **Liabilities and equity (deficit)** | | |
| *Liabilities* | | |
| Accrued interest payable (includes $6,241 and $6,502, respectively, related to our consolidated VIEs) | $ 9,542 | $ 10,286 |
| *Debt, net:* | | |
| Debt securities of consolidated trusts held by third parties | 1,499,036 | 1,528,648 |
| Other debt (includes $3,998 and $4,443 at fair value, respectively) | 681,087 | 713,940 |
| *Total debt, net* | 2,180,123 | 2,242,588 |
| Derivative liabilities, net | 408 | 1,209 |
| Other liabilities (Note 21) (includes $3,821 and $3,851, respectively, related to our consolidated VIEs) | 7,200 | 8,098 |
| *Total liabilities* | 2,197,273 | 2,262,181 |
| Commitments and contingencies (Notes 9, 11, and 19) | | |
| *Equity (deficit)* | | |
| Senior preferred stock, at redemption value | 64,700 | 64,200 |
| Preferred stock, at redemption value | 14,109 | 14,109 |
| Common stock, $0.00 par value, 4,000,000,000 shares authorized, 725,863,886 shares issued and 649,706,712 shares and 649,179,789 shares outstanding, respectively | — | — |
| Additional paid-in capital | 1 | 7 |
| Retained earnings (accumulated deficit) | (67,449) | (62,733) |
| *AOCI, net of taxes, related to:* | | |
| Available-for-sale securities (includes $10,195 and $10,740, respectively, net of taxes, of other-than-temporary impairments) | (6,834) | (9,678) |
| Cash flow hedge relationships | (1,972) | (2,239) |
| Defined benefit plans | (122) | (114) |
| *Total AOCI, net of taxes* | (8,928) | (12,031) |
| Treasury stock, at cost, 76,157,174 shares and 76,684,097 shares, respectively | (3,911) | (3,953) |
| *Total equity (deficit)* | (1,478) | (401) |
| *Total liabilities and equity (deficit)* | $2,195,795 | $ 2,261,780 |

*The accompanying notes are an integral part of these consolidated financial statements.*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.
Powered by Morningstar® Document Research℠

TREASURY-1755

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT)**
**(UNAUDITED)**

| | Shares Outstanding | | | Freddie Mac Stockholders' Equity (Deficit) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Senior Preferred Stock | Preferred Stock | Common Stock | Senior Preferred Stock, at Redemption Value | Preferred Stock, at Redemption Value | Common Stock, at Par Value | Additional Paid-in Capital | Retained Earnings (Accumulated Deficit) | AOCI, Net of Tax | Treasury Stock, at Cost | Noncontrolling Interest | Total Equity (Deficit) |
| | | | | | | (in millions) | | | | | | |
| **Balance as of December 31, 2009** | 1 | 464 | 649 | $ 51,700 | $ 14,109 | $ — | $ 57 | $ (33,921) | $ (23,648) | $ (4,019) | $ 94 | $ 4,372 |
| Cumulative effect of change in accounting principle | — | — | — | — | — | — | — | (9,011) | (2,690) | — | (2) | (11,703) |
| Balance as of January 1, 2010 | 1 | 464 | 649 | 51,700 | 14,109 | — | 57 | (42,932) | (26,338) | (4,019) | 92 | (7,331) |
| *Comprehensive income (loss):* | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (11,401) | — | — | (1) | (11,402) |
| Other comprehensive income (loss), net of taxes | — | — | — | — | — | — | — | — | 9,091 | — | — | 9,091 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | (11,401) | 9,091 | — | (1) | (2,311) |
| Increase in liquidation preference | — | — | — | 10,600 | — | — | — | — | — | — | — | 10,600 |
| Stock-based compensation | — | — | — | — | — | — | 15 | — | — | — | — | 15 |
| Income tax benefit from stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | — | 1 |
| Common stock issuances | — | — | — | — | — | — | (65) | — | — | 64 | — | (1) |
| Noncontrolling interest purchase | — | — | — | — | — | — | (31) | — | — | — | (89) | (120) |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 23 | (23) | — | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (2,585) | — | — | — | (2,585) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (4) | — | — | — | (4) |
| Dividends and other | — | — | — | — | — | — | — | — | — | — | (2) | (2) |
| **Ending balance at June 30, 2010** | 1 | 464 | 649 | $ 62,300 | $ 14,109 | $ — | $ — | $ (56,945) | $ (17,247) | $ (3,955) | $ — | $ (1,738) |
| | | | | | | | | | | | | |
| **Balance as of December 31, 2010** | 1 | 464 | 649 | $ 64,200 | $ 14,109 | $ — | $ 7 | $ (62,733) | $ (12,031) | $ (3,953) | $ — | $ (401) |
| *Comprehensive income (loss):* | | | | | | | | | | | | |
| Net loss | — | — | — | — | — | — | — | (1,463) | — | — | — | (1,463) |
| Other comprehensive income (loss), net of taxes | — | — | — | — | — | — | — | — | 3,103 | — | — | 3,103 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | (1,463) | 3,103 | — | — | 1,640 |
| Increase in liquidation preference | — | — | — | 500 | — | — | — | — | — | — | — | 500 |
| Stock-based compensation | — | — | — | — | — | — | 7 | — | — | — | — | 7 |
| Income tax benefit from stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | — | 1 |
| Common stock issuances | — | — | 1 | — | — | — | (42) | — | — | 42 | — | 1 |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 28 | (28) | — | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (3,222) | — | — | — | (3,222) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (3) | — | — | — | (3) |
| **Ending balance at June 30, 2011** | 1 | 464 | 650 | $ 64,700 | $ 14,109 | $ — | $ 1 | $ (67,449) | $ (8,928) | $ (3,911) | $ — | $ (1,478) |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1756

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(UNAUDITED)**

| | Six Months Ended June 30, | |
|---|---|---|
| | 2011 | 2010 |
| | (in millions) | |
| **Cash flows from operating activities** | | |
| Net loss | $ (1,463) | $ (11,402) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Derivative losses | 1,632 | 5,963 |
| Asset related amortization — premiums, discounts, and basis adjustments | 595 | (48) |
| Debt related amortization — premiums and discounts on certain debt securities and basis adjustments | (311) | 1,099 |
| Net discounts paid on retirements of other debt | (469) | (1,041) |
| Net premiums received from issuance of debt securities of consolidated trusts | 1,927 | 1,225 |
| (Gains) losses on extinguishment of debt securities of consolidated trusts and other debt | (113) | 273 |
| Provision for credit losses | 4,518 | 10,425 |
| Losses on investment activity | 1,096 | 1,369 |
| Losses (gains) on debt recorded at fair value | 118 | (891) |
| Deferred income tax benefit | 15 | (268) |
| Purchases of held-for-sale mortgage loans | (5,298) | (2,795) |
| Sales of mortgage loans acquired as held-for-sale | 6,998 | 3,629 |
| Repayments of mortgage loans acquired as held-for-sale | 22 | 11 |
| Change in: | | |
| Accrued interest receivable | 190 | 279 |
| Accrued interest payable | (618) | (887) |
| Income taxes payable | (319) | 70 |
| Other, net | (726) | (348) |
| *Net cash provided by operating activities* | 7,794 | 6,663 |
| **Cash flows from investing activities** | | |
| Purchases of trading securities | (28,705) | (28,153) |
| Proceeds from sales of trading securities | 24,076 | 4,231 |
| Proceeds from maturities of trading securities | 10,122 | 21,477 |
| Purchases of available-for-sale securities | (7,687) | (626) |
| Proceeds from sales of available-for-sale securities | 2,107 | 606 |
| Proceeds from maturities of available-for-sale securities | 17,965 | 23,542 |
| Purchases of held-for-investment mortgage loans | (17,610) | (25,200) |
| Repayments of mortgage loans acquired as held-for-investment | 159,045 | 156,865 |
| Decrease in restricted cash | 5,778 | 8,714 |
| Net proceeds from mortgage insurance and acquisitions and dispositions of real estate owned | 6,782 | 5,654 |
| Net decrease (increase) in federal funds sold and securities purchased under agreements to resell | 12,915 | (27,568) |
| Derivative premiums and terminations and swap collateral, net | (2,965) | (5,646) |
| Purchase of noncontrolling interest | — | (23) |
| *Net cash provided by investing activities* | 181,823 | 133,873 |
| **Cash flows from financing activities** | | |
| Proceeds from issuance of debt securities of consolidated trusts held by third parties | 43,997 | 38,756 |
| Repayments of debt securities of consolidated trusts held by third parties | (217,330) | (206,991) |
| Proceeds from issuance of other debt | 521,779 | 602,116 |
| Repayments of other debt | (554,835) | (597,356) |
| Increase in liquidation preference of senior preferred stock | 500 | 10,600 |
| Payment of cash dividends on senior preferred stock | (3,222) | (2,585) |
| Excess tax benefits associated with stock-based awards | 1 | 1 |
| Payments of low-income housing tax credit partnerships notes payable | (31) | (83) |
| *Net cash used for financing activities* | (209,141) | (155,542) |
| Net decrease in cash and cash equivalents | (19,524) | (15,006) |
| Cash and cash equivalents at beginning of period | 37,012 | 64,683 |
| *Cash and cash equivalents at end of period* | $ 17,488 | $ 49,677 |
| **Supplemental cash flow information** | | |
| Cash paid (received) for: | | |
| Debt interest | $ 43,449 | $ 48,738 |
| Net derivative interest carry and swap collateral interest | 2,074 | 2,412 |
| Income taxes | (1) | (191) |
| Non-cash investing and financing activities: | | |
| Held-for-sale mortgage loans securitized and retained as trading securities | 448 | 371 |
| Underlying mortgage loans related to guarantor swap transactions | 143,324 | 142,146 |
| Debt securities of consolidated trusts held by third parties established for guarantor swap transactions | 143,324 | 142,146 |
| Transfers from held-for-investment mortgage loans to held-for-sale mortgage loans | — | 196 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Freddie Mac was chartered by Congress in 1970 to stabilize the nation's residential mortgage market and expand opportunities for home ownership and affordable rental housing. Our statutory mission is to provide liquidity, stability and affordability to the U.S. housing market. We are a GSE regulated by FHFA, the SEC, HUD, and the Treasury. For more information on the roles of FHFA and the Treasury, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" in this Form 10-Q and "NOTE 3: CONSERVATORSHIP AND RELATED MATTERS" in our Annual Report on our Form 10-K for the year ended December 31, 2010, or our 2010 Annual Report.

We are involved in the U.S. housing market by participating in the secondary mortgage market. We do not participate directly in the primary mortgage market. Our participation in the secondary mortgage market includes providing our credit guarantee for mortgages originated by mortgage lenders in the primary mortgage market and investing in mortgage loans and mortgage-related securities.

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Single-family Guarantee, Investments, and Multifamily. Our Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we acquire and securitize mortgage loans by issuing PCs to third-party investors and we also guarantee the payment of principal and interest on single-family mortgage loans and mortgage-related securities. We also resecuritize mortgage-related securities that are issued by us or Ginnie Mae as well as private (non-agency) entities. Our Investments segment reflects results from our investment, funding, and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family mortgage loans. These activities are funded by debt issuances. We manage the interest-rate risk associated with these investment and funding activities using derivatives. Our Multifamily segment reflects results from our investments (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. In our Multifamily segment, we purchase multifamily mortgage loans primarily for securitization. We also guarantee the payment of principal and interest on multifamily mortgage-related securities and mortgages underlying multifamily housing revenue bonds. See "NOTE 15: SEGMENT REPORTING" for additional information.

Under conservatorship, we are focused on the following primary business objectives: (a) meeting the needs of the U.S. residential mortgage market by making home ownership and rental housing more affordable by providing liquidity to mortgage originators and, indirectly, to mortgage borrowers; (b) working to reduce the number of foreclosures and helping to keep families in their homes, including through our role in the MHA Program initiatives, including HAMP and HARP, and through our non-HAMP workout programs; (c) minimizing our credit losses; (d) maintaining the credit quality of the loans we purchase and guarantee; and (e) strengthening our infrastructure and improving overall efficiency.

In addition to our primary business objectives discussed above, we have a variety of different, and potentially competing, objectives based on our charter, public statements from Treasury and FHFA officials, and other guidance from our Conservator. For information regarding these objectives, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Business Objectives."

Throughout our consolidated financial statements and related notes, we use certain acronyms and terms which are defined in the Glossary.

For additional information regarding our significant accounting policies, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

### Basis of Presentation

The accompanying unaudited consolidated financial statements have been prepared in accordance with GAAP for interim financial information and include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated. These unaudited consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes in our 2010 Annual Report. We are operating under the basis that we will realize assets and satisfy liabilities in the normal course of business as a going concern and in accordance with the delegation of authority from FHFA to our Board of Directors and management. Certain financial information that is normally included in annual financial statements prepared in conformity with GAAP but is not required for interim reporting purposes has been condensed or omitted. Certain amounts in prior periods' consolidated financial statements have been reclassified to conform to the current presentation. In the opinion of management, all adjustments, which include only normal recurring adjustments, have been recorded for a fair statement of our unaudited consolidated financial statements.

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We recorded the cumulative effect of certain miscellaneous errors related to previously reported periods as corrections in the three and six months ended June 30, 2011. We concluded that these errors are not material individually or in the aggregate to our previously issued consolidated financial statements for any of the periods affected, or to our estimated earnings for the full year ending December 31, 2011 or to the trend of earnings. The cumulative effect, net of taxes, of the errors corrected during the three and six months ended June 30, 2011 was $189 million and $28 million, respectively.

## Use of Estimates

The preparation of financial statements requires us to make estimates and assumptions that affect: (a) the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements; and (b) the reported amounts of revenues and expenses and gains and losses during the reporting period. Management has made significant estimates in preparing the financial statements, including, but not limited to, establishing the allowance for loan losses and reserve for guarantee losses, valuing financial instruments and other assets and liabilities, assessing impairments on investments, and assessing the realizability of net deferred tax assets. Actual results could be different from these estimates.

### Recently Issued Accounting Guidance, Not Yet Adopted Within These Consolidated Financial Statements

#### Fair Value Measurement

In May 2011, the FASB issued amendments to the accounting guidance pertaining to fair value measurement and disclosure. These amendments provide both: (a) clarification about the FASB's intent about the application of existing fair value measurement and disclosure requirements; and (b) changes to some of the principles or requirements for measuring fair value or for disclosing information about fair value measurements. These amendments are effective for interim and annual periods beginning after December 15, 2011 and are to be applied prospectively, with early adoption not permitted for public companies. We do not expect that the adoption of these amendments will have a material impact on our consolidated financial statements.

#### Reconsideration of Effective Control for Repurchase Agreements

In April 2011, the FASB issued an amendment to the guidance for transfers and servicing with regard to repurchase agreements and other agreements that both entitle and obligate a transferor to repurchase or redeem financial assets before their maturity. This amendment removes the criterion related to collateral maintenance from the transferor's assessment of effective control. It focuses the assessment of effective control on the transferor's rights and obligations with respect to the transferred financial assets and not whether the transferor has the practical ability to perform in accordance with those rights or obligations. The amendment is effective for interim and annual periods beginning on or after December 15, 2011. We do not expect that the adoption of this amendment will have a material impact on our consolidated financial statements.

#### A Creditor's Determination of Whether a Restructuring is a TDR

In April 2011, the FASB issued an amendment to the accounting guidance for receivables to clarify when a restructuring such as a loan modification is considered a TDR. This amendment clarifies the guidance regarding a creditor's evaluation of whether a debtor is experiencing financial difficulty and whether a creditor has granted a concession to a debtor for purposes of determining if a restructuring constitutes a TDR. The amendment is effective for interim and annual periods beginning on or after June 15, 2011 and applies retrospectively to restructurings occurring on or after the beginning of the fiscal year of adoption, with early adoption permitted. We are evaluating the impact of this amendment on our consolidated financial statements; however, we expect that the population of loan restructurings we account for and disclose as TDRs will increase.

## NOTE 2: CONSERVATORSHIP AND RELATED MATTERS

### Business Objectives

We continue to operate under the conservatorship that commenced on September 6, 2008, conducting our business under the direction of FHFA, as our Conservator. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations. Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets. The Conservator also succeeded to the title to all books, records, and assets of Freddie Mac held by any other legal custodian or third party. During the

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and management to conduct, day-to-day operations so that the company can continue to operate in the ordinary course of business. The directors serve on behalf of, and exercise authority as directed by, the Conservator.

We are also subject to certain constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent.

Our business objectives and strategies have in some cases been altered since we were placed into conservatorship, and may continue to change. These changes to our business objectives and strategies may not contribute to our profitability. Based on our charter, public statements from Treasury and FHFA officials and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives, including:

- providing liquidity, stability and affordability in the mortgage market;

- continuing to provide additional assistance to the struggling housing and mortgage markets;

- reducing the need to draw funds from Treasury pursuant to the Purchase Agreement;

- returning to long-term profitability; and

- protecting the interests of taxpayers.

In a letter to the Chairmen and Ranking Members of the Senate Banking and House Financial Services Committees dated February 2, 2010, the Acting Director of FHFA stated that the focus of the conservatorship is on conserving assets, minimizing corporate losses, ensuring Freddie Mac continues to serve its mission, overseeing remediation of identified weaknesses in corporate operations and risk management, and ensuring that sound corporate governance principles are followed. The Acting Director of FHFA stated that minimizing our credit losses is our central goal and that we will be limited to continuing our existing core business activities and taking actions necessary to advance the goals of the conservatorship. The Acting Director stated that permitting us to offer new products is inconsistent with the goals of the conservatorship.

These objectives create conflicts in strategic and day-to-day decision making that will likely lead to suboptimal outcomes for one or more, or possibly all, of these objectives. We regularly receive direction from our Conservator on how to pursue our objectives under conservatorship, including direction to focus our efforts on assisting homeowners in the housing and mortgage markets. The Conservator and Treasury have also not authorized us to engage in certain business activities and transactions, including the purchase or sale of certain assets, which we believe may have had a beneficial impact on our results of operations or financial condition, if executed. Our inability to execute such transactions may adversely affect our profitability, and thus contribute to our need to draw additional funds from Treasury. However, we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

Given the important role the Obama Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions and our public mission, we may be required to take additional actions that could have a negative impact on our business, operating results, or financial condition. The Acting Director of FHFA stated that FHFA does not expect we will be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio, except for purchases of seriously delinquent mortgages from PC trusts. We are also subject to limits on the amount of assets we can sell from our mortgage-related investments portfolio in any calendar month without review and approval by FHFA and, if FHFA determines, Treasury.

Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives, but may not contribute to our profitability. Some of these changes increase our expenses, while others require us to forego revenue or other opportunities. In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the Purchase Agreement, have adversely impacted and may continue to adversely impact our financial results, including our segment results. For example, our efforts to help struggling homeowners and the mortgage market, in line with our public mission, may help to mitigate our credit losses, but in some cases may increase our expenses or require us to forgo revenue opportunities in the near term. There is significant uncertainty as to the ultimate impact that our efforts to aid the housing and mortgage markets, including our efforts in connection with the MHA Program, will have on our future capital or liquidity needs. We are allocating significant internal resources to the implementation of the various initiatives under the MHA Program and to the servicing alignment initiative as directed by FHFA on April 28, 2011, which has increased, and will continue to increase, our expenses. We cannot currently estimate whether, or the extent to which, costs incurred

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1760

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of loan defaults and foreclosures due to these initiatives.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following our conservatorship, including whether we will continue to exist. Our future structure and role will be determined by the Obama Administration and Congress. We have no ability to predict the outcome of these deliberations.

On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, and states that the Obama Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Obama Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Obama Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements.

These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations and financial condition. We cannot predict the extent to which these recommendations will be implemented or when any actions to implement them may be taken. However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term.

Management is continuing its efforts to identify and evaluate actions that could be taken to reduce the significant uncertainties surrounding our business, as well as the level of future draws under the Purchase Agreement; however, our ability to pursue such actions may be limited by market conditions and other factors. Our future draws are dictated by the terms of the Purchase Agreement. Any actions we take will likely require approval by FHFA and possibly Treasury before they are implemented. FHFA will regulate any actions we take related to the uncertainties surrounding our business. In addition, FHFA, Treasury, or Congress may have a different perspective from management and may direct us to focus our efforts on supporting the mortgage markets in ways that make it more difficult for us to implement any such actions.

**Impact of the Purchase Agreement and FHFA Regulation on the Mortgage-Related Investments Portfolio**

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $810 billion as of December 31, 2010 and may not exceed $729 billion as of December 31, 2011. The UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation, was $685.0 billion at June 30, 2011. The annual 10% reduction in the size of our mortgage-related investments portfolio is calculated based on the maximum allowable size of the mortgage-related investments portfolio, rather than the actual UPB of the mortgage-related investments portfolio, as of December 31 of the preceding year. The limitation is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs.

**Government Support for our Business**

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

TREASURY-1761

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Significant recent developments with respect to the support we receive from the government include the following:

- On March 31, 2011, we received $500 million in funding from Treasury under the Purchase Agreement relating to our quarterly net worth deficit at December 31, 2010, which increased the aggregate liquidation preference of the senior preferred stock to $64.7 billion as of March 31, 2011. No cash was received from Treasury under the Purchase Agreement during the second quarter of 2011 due to our positive net worth at March 31, 2011.

- On both March 31, 2011 and June 30, 2011, we paid dividends of $1.6 billion in cash on the senior preferred stock to Treasury at the direction of the Conservator.

To address our net worth deficit of $1.5 billion at June 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $1.5 billion, and will request that we receive these funds by September 30, 2011. Commencing in the second quarter of 2011, our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. Following funding of the draw request related to our net worth deficit at June 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $6.5 billion to $6.6 billion, which exceeds our annual historical earnings in all but one period.

Through June 30, 2011, we paid $13.2 billion in cash dividends in the aggregate on the senior preferred stock. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth. In addition, cash payment of quarterly commitment fees payable to Treasury will negatively impact our future net worth over the long-term. Treasury waived the fee for the first three quarters of 2011. The amount of the fee has not yet been established and could be substantial. As a result of additional draws and other factors: (a) the liquidation preference of, and the dividends we owe on, the senior preferred stock would increase and, therefore, we may need additional draws from Treasury in order to pay our dividend obligations; and (b) there is significant uncertainty as to our long-term financial sustainability.

See "NOTE 3: CONSERVATORSHIP AND RELATED DEVELOPMENTS," "NOTE 9: DEBT SECURITIES AND SUBORDINATED BORROWINGS," and "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report for more information on the terms of the conservatorship and the Purchase Agreement.

## NOTE 3: VARIABLE INTEREST ENTITIES

We use securitization trusts in our securities issuance process, and are required to evaluate the trusts for consolidation. For VIEs, our policy is to consolidate all entities in which we hold a controlling financial interest and are therefore deemed to be the primary beneficiary. The accounting guidance related to the consolidation of VIEs states that an enterprise will be deemed to have a controlling financial interest in, and thus be the primary beneficiary of, a VIE if it has both: (a) the power to direct the activities of the VIE that most significantly impact the VIE's economic performance; and (b) the right to receive benefits from the VIE that could potentially be significant to the VIE or the obligation to absorb losses of the VIE that could potentially be significant to the VIE. We perform ongoing assessments of whether we are the primary beneficiary of a VIE. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Consolidation and Equity Method of Accounting" in our 2010 Annual Report for further information regarding the consolidation of certain VIEs.

Based on our evaluation, we determined that we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions. Therefore, we consolidate on our balance sheet the assets and liabilities of these trusts. In addition to our PC trusts, we are involved with numerous other entities that meet the definition of a VIE, as discussed below.

### VIEs for which We are the Primary Beneficiary

#### Single-family PC Trusts

Our single-family PC trusts issue pass-through securities that represent undivided beneficial interests in pools of mortgages held by these trusts. For our fixed-rate PCs, we guarantee the timely payment of interest and principal. For our ARM PCs, we guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage loans and the full and final payment of principal; we do not guarantee the timely payment of principal on ARM PCs. In exchange for providing this guarantee, we may receive a management and guarantee fee and up-front delivery fees. We issue most of our single-family PCs in transactions in which our customers exchange mortgage loans for PCs. We refer to these transactions as guarantor swaps.

PCs are designed so that we bear the credit risk inherent in the loans underlying the PCs through our guarantee of principal and interest payments on the PCs. The PC holders bear the interest rate or prepayment risk on the mortgage

110

<em>Freddie Mac</em>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                      Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

loans and the risk that we will not perform on our obligation as guarantor. For purposes of our consolidation assessments, our evaluation of power and economic exposure with regard to PC trusts focuses on credit risk because the credit performance of the underlying mortgage loans was identified as the activity that most significantly impacts the economic performance of these entities. We have the power to impact the activities related to this risk in our role as guarantor and master servicer.

Specifically, in our role as master servicer, we establish requirements for how mortgage loans are serviced and what steps are to be taken to avoid credit losses (*e.g.*, modification, foreclosure). Additionally, in our capacity as guarantor, we have the ability to purchase defaulted mortgage loans out of the PC trust to help manage credit losses. See "NOTE 5: INDIVIDUALLY IMPAIRED LOANS AND NON-PERFORMING LOANS" for further information regarding our purchase of mortgage loans out of PC trusts. These powers allow us to direct the activities of the VIE (*i.e.*, the PC trust) that most significantly impact its economic performance. In addition, we determined that our guarantee to each PC trust to provide principal and interest payments obligates us to absorb losses that could potentially be significant to the PC trusts. Accordingly, we concluded that we are the primary beneficiary of our single-family PC trusts.

At June 30, 2011 and December 31, 2010, we were the primary beneficiary of, and therefore consolidated, single-family PC trusts with assets totaling $1.6 trillion and $1.7 trillion, respectively, as measured using the UPB of issued PCs. The assets of each PC trust can be used only to settle obligations of that trust. In connection with our PC trusts, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancement. We also have credit protection for certain of our PC trusts that issue PCs backed by loans or certificates of federal agencies (such as FHA, VA, and USDA). See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for additional information regarding third-party credit enhancements related to our PC trusts.

### *Other Guarantee Transactions*

Other Guarantee Transactions are mortgage-related securities that we issue to third parties in exchange for non-Freddie Mac mortgage-related securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for information on the nature of Other Guarantee Transactions. The degree to which our involvement with securitization trusts that issue Other Guarantee Transactions provides us with power to direct the activities that most significantly impact the economic performance of these VIEs (*e.g.*, the ability to mitigate credit losses on the underlying assets of these entities) and exposure to benefits or losses that could potentially be significant to the VIEs (*e.g.*, the existence of third party credit enhancements) varies by transaction. Our consolidation determination took into consideration the specific facts and circumstances of our involvement with each of these entities, including our ability to direct or influence the performance of the underlying assets and our exposure to potentially significant variability based upon the design of each entity and its governing contractual arrangements. As a result, we have concluded that we are the primary beneficiary of certain Other Guarantee Transactions with underlying assets totaling $14.2 billion and $15.8 billion at June 30, 2011 and December 31, 2010, respectively. For those Other Guarantee Transactions that we do consolidate, the investors in these securities have recourse only to the assets of those VIEs.

### *Consolidated VIEs*

Table 3.1 represents the carrying amounts and classification of the assets and liabilities of consolidated VIEs on our consolidated balance sheets.

### Table 3.1 — Assets and Liabilities of Consolidated VIEs

| Consolidated Balance Sheets Line Item | June 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| Cash and cash equivalents | $ 1 | $ 1 |
| Restricted cash and cash equivalents | 1,850 | 7,514 |
| Federal funds sold and securities purchased under agreements to resell | 13,950 | 29,350 |
| Mortgage loans held-for-investment by consolidated trusts | 1,634,773 | 1,646,172 |
| Accrued interest receivable | 6,704 | 6,895 |
| Real estate owned, net | 83 | 118 |
| Other assets | 3,252 | 6,001 |
| Total assets of consolidated VIEs | $ 1,660,613 | $ 1,696,051 |
| Accrued interest payable | $ 6,241 | $ 6,502 |
| Debt securities of consolidated trusts held by third parties | 1,499,036 | 1,528,648 |
| Other liabilities | 3,821 | 3,851 |
| Total liabilities of consolidated VIEs | $ 1,509,098 | $ 1,539,001 |

111 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**VIEs for which We are not the Primary Beneficiary**

Table 3.2 represents the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Our involvement with VIEs for which we are not the primary beneficiary generally takes one of two forms: (a) purchasing an investment in these entities; or (b) providing a guarantee to these entities. Our maximum exposure to loss for those VIEs in which we have purchased an investment is calculated as the maximum potential charge that we would recognize in our consolidated statements of income and comprehensive income if that investment were to become worthless. This amount does not include other-than-temporary impairments or other write-downs that we previously recognized through earnings. Our maximum exposure to loss for those VIEs for which we have provided a guarantee represents the contractual amounts that could be lost under the guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements. We do not believe the maximum exposure to loss disclosed in the table below is representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation, including possible recoveries under credit enhancement arrangements.

112

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 3.2 — Variable Interests in VIEs for which We are not the Primary Beneficiary**

| | Asset-Backed Investment Trusts(1) | Mortgage-Related Security Trusts | | Unsecuritized Multifamily Loans(3) | Other(1)(4) |
| --- | --- | --- | --- | --- | --- |
| | | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | | |
| | | (in millions) | | | |
| **June 30, 2011** | | | | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 4,355 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 52 | — | 35 | 288 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 85,221 | 129,068 | — | — |
| Trading, at fair value | 164 | 16,997 | 18,216 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 76,759 | — |
| Held-for-sale | — | — | — | 4,463 | — |
| Accrued interest receivable | — | 519 | 462 | 345 | 5 |
| Derivative assets, net | — | — | — | — | 2 |
| Other assets | — | 358 | 3 | 193 | 411 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (1) | — | — | (40) |
| Other liabilities | — | (524) | (1) | (36) | (832) |
| **Maximum Exposure to Loss** | $ 4,519 | $ 32,568 | $ 163,800 | $ 81,795 | $ 11,344 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 51,779 | $ 36,610 | $ 1,023,005 | $131,227 | $25,264 |

| | Asset-Backed Investment Trusts(1) | Mortgage-Related Security Trusts | | Unsecuritized Multifamily Loans(3) | Other(1)(4) |
| --- | --- | --- | --- | --- | --- |
| | | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | | |
| | | (in millions) | | | |
| **December 31, 2010** | | | | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 9,909 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 52 | — | 34 | 464 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 85,689 | 137,568 | — | — |
| Trading, at fair value | 44 | 13,437 | 18,914 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 78,448 | — |
| Held-for-sale | — | — | — | 6,413 | — |
| Accrued interest receivable | — | 419 | 717 | 372 | 5 |
| Derivative assets, net | — | — | — | — | 2 |
| Other assets | — | 277 | 6 | 23 | 381 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (2) | — | — | (41) |
| Other liabilities | — | (408) | (3) | (36) | (1,034) |
| **Maximum Exposure to Loss** | $ 9,953 | $ 26,392 | $ 176,533 | $ 85,290 | $ 11,375 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 129,479 | $ 29,368 | $ 1,036,975 | $138,330 | $25,875 |

(1) For our involvement with non-consolidated asset-backed investment trusts, non-Freddie Mac security trusts, and certain other VIEs where we do not provide a guarantee, our maximum exposure to loss is computed as the carrying amount if the security is classified as trading or the amortized cost if the security is classified as available-for-sale for our investments and related assets recorded on our consolidated balance sheets, including any unrealized amounts recorded in AOCI for securities classified as available-for-sale.

(2) Freddie Mac securities include our variable interests in single-family multiclass REMICs and Other Structured Securities, multifamily PCs, multifamily Other Structured Securities, and Other Guarantee Transactions that we do not consolidate. For our variable interests in non-consolidated Freddie Mac security trusts for which we have provided a guarantee, our maximum exposure to loss is the outstanding UPB of the underlying mortgage loans or securities that we guarantee, which is the maximum contractual amount under such guarantees. However, our investments in single-family REMICs and Other Structured Securities that are not consolidated do not give rise to any additional exposure to loss as we already consolidate the underlying collateral.

(3) For unsecuritized multifamily loans, our maximum exposure to loss is based on the UPB of these loans, as adjusted for loan level basis adjustments, any associated allowance for loan losses, accrued interest receivable, and fair value adjustments on held-for-sale loans.

(4) For other non-consolidated VIEs where we have provided a guarantee, our maximum exposure to loss is the contractual amount that could be lost under the guarantee if the counterparty or borrower defaulted, without consideration of possible recoveries under credit enhancement arrangements.

(5) Represents the remaining UPB of assets held by non-consolidated VIEs using the most current information available, where our continuing involvement is significant. We do not include the assets of our non-consolidated trusts related to single-family REMICs and Other Structured Securities in this amount as we already consolidate the underlying collateral of these trusts on our consolidated balance sheets.

*Asset-Backed Investment Trusts*

We invest in a variety of non-mortgage-related, asset-backed investment trusts. These investments represent interests in trusts consisting of a pool of receivables or other financial assets, typically credit card receivables, auto loans, or student loans. These trusts act as vehicles to allow originators to securitize assets. Securities are structured from the

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1765                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the deal create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our asset-backed investments.

At June 30, 2011 and December 31, 2010, we had investments in 15 and 23 asset-backed investment trusts in which we had a variable interest but were not considered the primary beneficiary, respectively. Our investments in these asset-backed investment trusts as of June 30, 2011 were made in 2010 and 2011. At both June 30, 2011 and December 31, 2010, we were not the primary beneficiary of any such trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. As such, our investments in these asset-backed investment trusts are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report. Our investments in these trusts totaled $4.5 billion and $10.0 billion as of June 30, 2011 and December 31, 2010, respectively, and are included as cash and cash equivalents, available-for-sale securities or trading securities on our consolidated balance sheets. At both June 30, 2011 and December 31, 2010, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment.

### Mortgage-Related Security Trusts

#### Freddie Mac Securities

Freddie Mac securities related to our variable interests in non-consolidated VIEs primarily consist of our REMICs and Other Structured Securities and Other Guarantee Transactions. REMICs and Other Structured Securities are created by using PCs or previously issued REMICs and Other Structured Securities as collateral. Our involvement with the resecuritization trusts that issue these securities does not provide us with rights to receive benefits or obligations to absorb losses nor does it provide any power that would enable us to direct the most significant activities of these VIEs because the ultimate underlying assets are PCs for which we have already provided a guarantee (*i.e.*, all significant rights, obligations and powers are associated with the underlying PC trusts). As a result, we have concluded that we are not the primary beneficiary of these resecuritization trusts.

Other Guarantee Transactions are created by using non-Freddie Mac mortgage-related securities as collateral. At both June 30, 2011 and December 31, 2010, our involvement with certain Other Guarantee Transactions does not provide us with the power to direct the activities that most significantly impact the economic performance of these VIEs. As a result, we hold a variable interest in, but are not the primary beneficiary of, certain Other Guarantee Transactions.

For non-consolidated REMICs and Other Structured Securities and Other Guarantee Transactions, our investments are primarily included in either available-for-sale securities or trading securities on our consolidated balance sheets. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

#### Non-Freddie Mac Securities

We invest in a variety of mortgage-related securities issued by third-parties, including non-Freddie Mac agency securities, CMBS, other private-label securities backed by various mortgage-related assets, and obligations of states and political subdivisions. These investments typically represent interests in trusts that consist of a pool of mortgage-related assets and act as vehicles to allow originators to securitize those assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the deal create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our non-Freddie Mac securities.

Our investments in these non-Freddie Mac securities at June 30, 2011 were made between 1994 and 2011. We are not generally the primary beneficiary of non-Freddie Mac securities trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. At both June 30, 2011 and December 31, 2010, we were not the primary beneficiary of any non-Freddie Mac securities trusts. Our investments in non-consolidated non-Freddie Mac mortgage-related securities are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report. At both June 30, 2011 and December 31, 2010, we did not guarantee any obligations of these

114

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

investment trusts and our exposure was limited to the amount of our investment. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

### Unsecuritized Multifamily Loans

We purchase loans made to various multifamily real estate entities. We primarily purchase such loans for securitization, and to a lesser extent, investment purposes. These real estate entities are primarily single-asset entities (typically partnerships or limited liability companies) established to acquire, construct, rehabilitate, or refinance residential properties, and subsequently to operate the properties as residential rental real estate. The loans we acquire usually make up 80% or less of the value of the related underlying property at origination. The remaining 20% of value is typically funded through equity contributions by the partners or members of the borrower entity. In certain cases, the 20% not funded through the loan we acquire also includes subordinate loans or mezzanine financing from third-party lenders. We held more than 7,000 unsecuritized multifamily loans at both June 30, 2011 and December 31, 2010.

The UPB of our investments in these loans was $81.8 billion and $85.9 billion as of June 30, 2011 and December 31, 2010, respectively, and was included in unsecuritized held-for-investment mortgage loans, at amortized cost, and held-for-sale mortgage loans at fair value on our consolidated balance sheets. We are not generally the primary beneficiary of the multifamily real estate borrowing entities because the loans we acquire are passive in nature and do not provide us with the power to direct the activities of these entities that most significantly impact their economic performance. However, when a multifamily loan becomes delinquent, we may become the primary beneficiary of the borrowing entity depending upon the structure of this entity and the rights granted to us under the governing legal documents. At June 30, 2011 and December 31, 2010, the amount of loans for which we could be considered the primary beneficiary of the underlying borrowing entity was not material. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2010 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for more information.

### Other

Our involvement with other VIEs includes our investments in LIHTC partnerships, certain other mortgage-related guarantees, and certain short-term default and other guarantee commitments that we account for as derivatives:

- *Investments in LIHTC Partnerships:* We hold equity investments in various LIHTC partnerships that invest in lower-tier or project partnerships that are single asset entities. In February 2010, the Acting Director of FHFA, after consultation with Treasury, informed us that we may not sell or transfer our investments in LIHTC assets and that he sees no other disposition options. As a result, we wrote down the carrying value of our LIHTC investments to zero as of December 31, 2009, as we will not be able to realize any value from these investments either through reductions to our taxable income and related tax liabilities or through a sale to a third party.

- *Certain other mortgage-related guarantees:* We have other guarantee commitments outstanding on multifamily housing revenue bonds that were issued by third parties. As part of certain other mortgage-related guarantees, we also provide commitments to advance funds, commonly referred to as "liquidity guarantees," which require us to advance funds to enable third parties to purchase variable-rate multifamily housing revenue bonds, or certificates backed by such bonds, that cannot be remarketed within five business days after they are tendered by their holders.

- *Certain short-term default and other guarantee commitments accounted for as derivatives:* Our involvement in these VIEs includes our guarantee of the performance of interest-rate swap contracts in certain circumstances and credit derivatives we issued to guarantee the payments on multifamily loans or securities.

At June 30, 2011 and December 31, 2010, we were the primary beneficiary of two and three, respectively, credit-enhanced multifamily housing revenue bonds that were not deemed to be material. We were not the primary beneficiary of the remainder of other VIEs because our involvement in these VIEs is passive in nature and does not provide us with the power to direct the activities of the VIEs that most significantly impact their economic performance. See Table 3.2 for the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in these non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Also see "NOTE 9: FINANCIAL GUARANTEES" for additional information about our involvement with the VIEs related to mortgage-related guarantees and short-term default and other guarantee commitments discussed above.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                   Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES**

We own both single-family mortgage loans, which are secured by one to four family residential properties, and multifamily mortgage loans, which are secured by properties with five or more residential rental units. For a discussion of our significant accounting policies regarding our mortgage loans and loan loss reserves, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

Table 4.1 summarizes the types of loans on our consolidated balance sheets as of June 30, 2011 and December 31, 2010.

**Table 4.1 — Mortgage Loans**

| | June 30, 2011 | | | December 31, 2010 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Unsecuritized | Held by Consolidated Trusts | Total | Unsecuritized | Held by Consolidated Trusts | Total |
| | | | (in millions) | | | |
| Single-family:(1) | | | | | | |
| Fixed-rate | | | | | | |
|   Amortizing | $ 137,684 | $1,488,199 | $1,625,883 | $ 126,561 | $1,493,206 | $ 1,619,767 |
|   Interest-only | 3,512 | 16,986 | 20,498 | 4,161 | 19,616 | 23,777 |
|     Total fixed-rate | 141,196 | 1,505,185 | 1,646,381 | 130,722 | 1,512,822 | 1,643,544 |
| Adjustable-rate | | | | | | |
|   Amortizing | 3,844 | 62,945 | 66,789 | 3,625 | 59,851 | 63,476 |
|   Interest-only | 11,789 | 49,925 | 61,714 | 13,018 | 58,792 | 71,810 |
|     Total adjustable-rate | 15,633 | 112,870 | 128,503 | 16,643 | 118,643 | 135,286 |
| Other Guarantee Transactions backed by non-Freddie Mac securities | — | 14,090 | 14,090 | — | 15,580 | 15,580 |
| FHA/VA and other governmental | 1,319 | 3,476 | 4,795 | 1,498 | 3,348 | 4,846 |
| Total single-family | 158,148 | 1,635,621 | 1,793,769 | 148,863 | 1,650,393 | 1,799,256 |
| Multifamily:(1) | | | | | | |
|   Fixed-rate | 68,155 | — | 68,155 | 72,679 | — | 72,679 |
|   Adjustable-rate | 13,644 | — | 13,644 | 13,201 | — | 13,201 |
|   Other governmental | 3 | — | 3 | 3 | — | 3 |
| Total multifamily | 81,802 | — | 81,802 | 85,883 | — | 85,883 |
| Total UPB of mortgage loans | 239,950 | 1,635,621 | 1,875,571 | 234,746 | 1,650,393 | 1,885,139 |
| Deferred fees, unamortized premiums, discounts and other cost basis adjustments | (7,045) | 8,100 | 1,055 | (7,665) | 7,423 | (242) |
| Lower of cost or fair value adjustments on loans held-for-sale(2) | 45 | | 45 | (311) | | (311) |
| Allowance for loan losses on mortgage loans held-for-investment | (29,919) | (8,948) | (38,867) | (28,047) | (11,644) | (39,691) |
| Total mortgage loans, net | $ 203,031 | $1,634,773 | $1,837,804 | $ 198,723 | $1,646,172 | $1,844,895 |
| Mortgage loans, net: | | | | | | |
|   Held-for-investment | $ 198,568 | $1,634,773 | $1,833,341 | $ 192,310 | $1,646,172 | $1,838,482 |
|   Held-for-sale | 4,463 | | 4,463 | 6,413 | | 6,413 |
| Total mortgage loans, net | $ 203,031 | $1,634,773 | $1,837,804 | $ 198,723 | $1,646,172 | $1,844,895 |

(1) Based on UPB and excluding mortgage loans traded, but not yet settled.
(2) Includes fair value adjustments associated with mortgage loans for which we have made a fair value election.

We purchased UPB of $62.2 billion of single-family mortgage loans and $0.9 billion of multifamily loans that were classified as held-for-investment at purchase in the three months ended June 30, 2011. We purchased UPB of $158.0 billion of single-family mortgage loans and $1.7 billion of multifamily loans that were classified as held-for-investment at purchase in the six months ended June 30, 2011. Our sales of multifamily mortgage loans occur primarily through the issuance of multifamily Other Guarantee Transactions. See "NOTE 9: FINANCIAL GUARANTEES" for more information. We did not sell any held-for-investment loans during the three and six months ended June 30, 2011. We did not have significant reclassifications of mortgage loans into held-for-sale in the three and six months ended June 30, 2011.

**Credit Quality of Mortgage Loans**

We evaluate the credit quality of single-family loans using different criteria than the criteria we use to evaluate multifamily loans. The current LTV ratio is one key factor we consider when estimating our loan loss reserves for single-family loans. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1768

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

more likely to default than other borrowers. A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of June 30, 2011 and December 31, 2010, approximately 15% and 14%, respectively, of loans in our single-family credit guarantee portfolio had second lien financing at the time of origination of the first mortgage, and we estimate that these loans comprised 18% and 19%, respectively, of our seriously delinquent loans, based on UPB. However, borrowers are free to obtain second lien financing after origination, and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

Table 4.2 presents information on the estimated current LTV ratios of single-family loans on our consolidated balance sheets, all of which are held-for-investment. Our current LTV ratio estimates are based on available data through the end of each respective period.

**Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio**

| | As of June 30, 2011 | | | | As of December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Estimated Current LTV Ratio[1] | | | | Estimated Current LTV Ratio[1] | | | |
| | <= 80 | 81 – 100 | > 100[2] | Total | <= 80 | 81 – 100 | > 100[2] | Total |
| | | | | (in millions) | | | | |
| Single-family loans: | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[3] | $ 662,541 | $ 406,083 | $ 252,386 | $ 1,321,010 | $ 704,882 | $393,853 | $216,388 | $ 1,315,123 |
| 15-year amortizing fixed-rate | 235,387 | 19,103 | 3,010 | 257,500 | 233,422 | 16,432 | 2,523 | 252,377 |
| Adjustable-rate[3][4] | 37,507 | 13,614 | 9,792 | 60,913 | 34,252 | 13,273 | 9,149 | 56,674 |
| Alt-A, interest-only, and option ARM[5] | 35,719 | 34,957 | 84,714 | 155,390 | 45,068 | 44,540 | 85,213 | 174,821 |
| Total single-family loans | $ 971,154 | $473,757 | $ 349,902 | $1,794,813 | $1,017,624 | $468,098 | $ 313,273 | 1,798,995 |
| Multifamily loans | | | | 77,395 | | | | 79,178 |
| Total recorded investment of held-for-investment loans | | | | $1,872,208 | | | | $1,878,173 |

(1) The current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since that time. The value of a property at origination is based on the sales price for purchase mortgages and third-party appraisal for refinance mortgages. Estimates of the current LTV ratio include the credit-enhanced portion of the loan and exclude any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.

(2) The serious delinquency rate for the total of single-family mortgage loans with estimated current LTV ratios in excess of 100% was 12.6% and 14.9% as of June 30, 2011 and December 31, 2010, respectively.

(3) The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate for presentation even though they have a one-time rate adjustment provision, because the change in rate is determined at the time of the modification rather than at a future date.

(4) Includes balloon/reset mortgage loans and excludes option ARMs.

(5) We discontinued purchases of Alt-A loans on March 1, 2009 (or later, as customers' contracts permitted), and interest-only loans effective September 1, 2010, and have not purchased option ARM loans since 2007. Modified loans within the Alt-A category remain as such, even though the borrower may have provided full documentation of assets and income to complete the modification. Modified loans within the option ARM category remain as such even though the modified loan no longer provides for optional payment provisions.

For information about the payment status of single-family and multifamily mortgage loans, including the amount of such loans we deem impaired, see "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS." For a discussion of certain indicators of credit quality for the multifamily loans on our consolidated balance sheets, see "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Multifamily Mortgage Portfolio."

**Allowance for Loan Losses and Reserve for Guarantee Losses, or Loan Loss Reserve**

We maintain an allowance for loan losses on mortgage loans that we classify as held-for-investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage-related securities backed by multifamily loans, certain single-family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risks.

During the second quarter of 2010, we identified a backlog related to the processing of loan workouts reported to us by our servicers, principally loan modifications and short sales, which impacted our allowance for loan losses. For additional information, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Basis of Presentation — *Out-of-Period Accounting Adjustment*" in our 2010 Annual Report.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 4.3 summarizes loan loss reserve activity.

**Table 4.3 — Detail of Loan Loss Reserves**

|  | Three Months Ended June 30, | | | | | | | |
|  | 2011 | | | | 2010 | | | |
|  | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | Total | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | Total |
|  | Unsecuritized | Held By Consolidated Trusts | | | Unsecuritized | Held By Consolidated Trusts | | |
|  | (in millions) | | | | | | | |
| *Single-family:* | | | | | | | | |
| Beginning balance | $ 28,898 | $ 9,517 | $ 143 | $ 38,558 | $ 14,091 | $ 21,758 | $ 120 | $ 35,969 |
| Provision for credit losses | 318 | 2,203 | 21 | 2,542 | 2,364 | 2,533 | 13 | 4,910 |
| Charge-offs[3] | (3,570) | (195) | (3) | (3,768) | (3,969) | (548) | (3) | (4,520) |
| Recoveries[3] | 773 | 27 | — | 800 | 700 | 72 | — | 772 |
| Transfers, net[4][5] | 2,864 | (2,604) | (2) | 258 | 9,601 | (9,339) | (9) | 253 |
| Ending balance | $ 29,283 | $ 8,948 | $ 159 | $ 38,390 | $ 22,787 | $ 14,476 | $ 121 | $ 37,384 |
| *Multifamily:* | | | | | | | | |
| Beginning balance | $ 673 | $ — | $ 74 | $ 747 | $ 781 | $ — | $ 61 | $ 842 |
| Provision (benefit) for credit losses | (8) | — | (5) | (13) | 125 | — | (6) | 119 |
| Charge-offs[3] | (29) | — | — | (29) | (27) | — | — | (27) |
| Transfers, net[5] | — | — | — | — | — | — | 1 | 1 |
| Ending balance | $ 636 | $ — | $ 69 | $ 705 | $ 879 | $ — | $ 56 | $ 935 |
| *Total:* | | | | | | | | |
| Beginning balance | $ 29,571 | $ 9,517 | $ 217 | $ 39,305 | $ 14,872 | $ 21,758 | $ 181 | $ 36,811 |
| Provision for credit losses | 310 | 2,203 | 16 | 2,529 | 2,489 | 2,533 | 7 | 5,029 |
| Charge-offs[3] | (3,599) | (195) | (3) | (3,797) | (3,996) | (548) | (3) | (4,547) |
| Recoveries[3] | 773 | 27 | — | 800 | 700 | 72 | — | 772 |
| Transfers, net[4][5] | 2,864 | (2,604) | (2) | 258 | 9,601 | (9,339) | (8) | 254 |
| Ending balance | $ 29,919 | $ 8,948 | $ 228 | $ 39,095 | $ 23,666 | $ 14,476 | $ 177 | $ 38,319 |

|  | Six Months Ended June 30, | | | | | | | |
|  | 2011 | | | | 2010 | | | |
|  | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | Total | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | Total |
|  | Unsecuritized | Held By Consolidated Trusts | | | Unsecuritized | Held By Consolidated Trusts | | |
|  | (in millions) | | | | | | | |
| *Single-family:* | | | | | | | | |
| Beginning balance | $ 27,317 | $ 11,644 | $ 137 | $ 39,098 | $ 693 | $ — | $ 32,333 | $ 33,026 |
| Adjustments to beginning balance[2] | — | — | — | — | — | 32,006 | (32,192) | (186) |
| Provision for credit losses | 725 | 3,834 | 32 | 4,591 | 4,522 | 5,745 | 10 | 10,277 |
| Charge-offs[3] | (6,874) | (437) | (4) | (7,315) | (5,242) | (2,523) | (5) | (7,770) |
| Recoveries[3] | 1,437 | 47 | — | 1,484 | 966 | 422 | — | 1,388 |
| Transfers, net[4][5] | 6,678 | (6,140) | (6) | 532 | 21,848 | (21,174) | (25) | 649 |
| Ending balance | $ 29,283 | $ 8,948 | $ 159 | $ 38,390 | $ 22,787 | $ 14,476 | $ 121 | $ 37,384 |
| *Multifamily:* | | | | | | | | |
| Beginning balance | $ 730 | $ — | $ 98 | $ 828 | $ 748 | $ — | $ 83 | $ 831 |
| Provision (benefit) for credit losses | (53) | — | (20) | (73) | 176 | — | (28) | 148 |
| Charge-offs[3] | (41) | — | — | (41) | (45) | — | — | (45) |
| Transfers, net[5] | — | — | (9) | (9) | — | — | 1 | 1 |
| Ending balance | $ 636 | $ — | $ 69 | $ 705 | $ 879 | $ — | $ 56 | $ 935 |
| *Total:* | | | | | | | | |
| Beginning balance | $ 28,047 | $ 11,644 | $ 235 | $ 39,926 | $ 1,441 | $ — | $ 32,416 | $ 33,857 |
| Adjustments to beginning balance[2] | — | — | — | — | — | 32,006 | (32,192) | (186) |
| Provision for credit losses | 672 | 3,834 | 12 | 4,518 | 4,698 | 5,745 | (18) | 10,425 |
| Charge-offs[3] | (6,915) | (437) | (4) | (7,356) | (5,287) | (2,523) | (5) | (7,815) |
| Recoveries[3] | 1,437 | 47 | — | 1,484 | 966 | 422 | — | 1,388 |
| Transfers, net[4][5] | 6,678 | (6,140) | (15) | 523 | 21,848 | (21,174) | (24) | 650 |
| Ending balance | $ 29,919 | $ 8,948 | $ 228 | $ 39,095 | $ 23,666 | $ 14,476 | $ 177 | $ 38,319 |
| Total loan loss reserves as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | | | | 2.01% | | | | 1.91% |

(1)  All of these loans are collectively evaluated for impairments. Beginning January 1, 2010, our reserve for guarantee losses is included in other liabilities.

(2)  Adjustments relate to the adoption of the accounting guidance for transfers of financial assets and consolidation of VIEs. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information.

(3)  Charge-offs represent the carrying amount of a loan that has been discharged to remove the loan from our consolidated balance sheet due to either foreclosure transfers or short sales. Charge-offs exclude $103 million and $144 million for the three months ended June 30, 2011 and 2010, respectively, related to certain single-family loans purchased under financial guarantees and recorded as losses on loans purchased within other expenses on our consolidated statements of income and comprehensive income. Charge-offs exclude $209 million and $261 million for the six months ended June 30, 2011 and 2010, respectively, related to certain single-family loans purchased under financial guarantees and recorded as losses on loans purchased within other expenses on our consolidated statements of income and comprehensive income. Recoveries of charge-offs primarily result from foreclosure transfers and short sales on loans where a share of default risk has been assumed by mortgage insurers, servicers or other third parties through credit enhancements.

(4)  In February 2010, we announced that we would purchase substantially all single-family mortgage loans that are 120 days or more delinquent from our PC trusts. We purchased $10.6 billion and $40.2 billion in UPB of loans from PC trusts during the three months ended June 30, 2011 and 2010, respectively. We purchased $25.2 billion and $96.8 billion in UPB of loans from PC trusts during the six months ended June 30, 2011 and 2010, respectively. As a result of these purchases, related amounts of our loan loss reserves were transferred from the allowance for loan losses — held by consolidated trusts and the reserve for guarantee losses into the allowance for loan losses — unsecuritized.

(5)  Consist primarily of: (a) approximately $2.6 billion and $9.3 billion during the three months ended June 30, 2011 and 2010, respectively, of reclassified single-family reserves related to our purchases during the periods of loans previously held by consolidated trusts (as discussed in endnote (4) above); (b) amounts related to agreements with seller/servicers where the transfer represents recoveries received under these agreements to compensate us for previously incurred and recognized losses; (c) the transfer of a proportional amount of the recognized reserves for guarantee losses associated with loans purchased from non-consolidated Freddie Mac mortgage-related securities and other guarantee commitments; and (d) net amounts attributable to recapitalization of past due interest on modified mortgage loans.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 4.4 presents our allowance for loan losses and our recorded investment in mortgage loans, held-for-investment, by impairment evaluation methodology.

**Table 4.4 — Net Investment in Mortgage Loans**

| | June 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Single-family | Multifamily | Total | Single-family | Multifamily | Total |
| | (in millions) | | | | | |
| *Recorded investment:* | | | | | | |
| Collectively evaluated | $ 1,749,021 | $ 74,535 | $1,823,556 | $ 1,762,490 | $ 76,541 | $ 1,839,031 |
| Individually evaluated | 45,792 | 2,860 | 48,652 | 36,505 | 2,637 | 39,142 |
| Total recorded investment | 1,794,813 | 77,395 | 1,872,208 | 1,798,995 | 79,178 | 1,878,173 |
| *Ending balance of the allowance for loan losses:* | | | | | | |
| Collectively evaluated | (26,979) | (330) | (27,309) | (30,477) | (382) | (30,859) |
| Individually evaluated | (11,252) | (306) | (11,558) | (8,484) | (348) | (8,832) |
| Total ending balance of the allowance | (38,231) | (636) | (38,867) | (38,961) | (730) | (39,691) |
| Net investment in mortgage loans | $1,756,582 | $ 76,759 | $ 1,833,341 | $ 1,760,034 | $ 78,448 | $1,838,482 |

A significant number of unsecuritized single-family mortgage loans on our consolidated balance sheets are individually evaluated for impairment and all single-family mortgage loans held by our consolidated trusts are collectively evaluated for impairment. The ending balance of the allowance for loan losses associated with our held-for-investment unsecuritized mortgage loans represented approximately 13.1% and 12.7% of the recorded investment in such loans at June 30, 2011 and December 31, 2010, respectively. The ending balance of the allowance for loan losses associated with mortgage loans held by our consolidated trusts represented approximately 0.5% and 0.7% of the recorded investment in such loans as of June 30, 2011 and December 31, 2010, respectively.

**Credit Protection and Other Forms of Credit Enhancement**

In connection with many of our mortgage loans held-for-investment and other mortgage-related guarantees, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancements.

Table 4.5 presents the UPB of loans on our consolidated balance sheets or underlying our financial guarantees with credit protection and the maximum amounts of potential loss recovery by type of credit protection.

**Table 4.5 — Recourse and Other Forms of Credit Protection[1]**

| | UPB at | | Maximum Coverage[2] at | |
|---|---|---|---|---|
| | June 30, 2011 | December 31, 2010 | June 30, 2011 | December 31, 2010 |
| | (in millions) | | | |
| Single-family: | | | | |
| Primary mortgage insurance | $ 209,758 | $ 217,133 | $ 51,209 | $ 52,899 |
| Lender recourse and indemnifications | 9,280 | 10,064 | 8,885 | 9,566 |
| Pool insurance | 33,592 | 37,868 | 3,008 | 3,299 |
| HFA indemnification[3] | 9,057 | 9,322 | 3,170 | 3,263 |
| Subordination[4] | 3,677 | 3,889 | 724 | 825 |
| Other credit enhancements[4] | 131 | 223 | 111 | 118 |
| Total | $ 265,495 | $ 278,499 | $ 67,107 | $ 69,970 |
| Multifamily: | | | | |
| HFA indemnification[3] | $ 1,468 | $ 1,551 | $ 514 | $ 543 |
| Subordination[4] | 18,762 | 12,252 | 2,537 | 1,414 |
| Other credit enhancements | 8,795 | 9,004 | 2,704 | 2,930 |
| Total | $ 29,025 | $ 22,807 | $ 5,755 | $ 4,887 |

(1) Includes the credit protection associated with unsecuritized mortgage loans, loans held by our consolidated trusts as well as our non-consolidated mortgage guarantees and excludes FHA/VA and other governmental loans. Except for subordination coverage, these amounts exclude credit protection associated with $18.1 billion and $19.8 billion in UPB of single-family loans underlying Other Guarantee Transactions as of June 30, 2011 and December 31, 2010, respectively, for which the information was not available.
(2) Except for subordination, this represents the remaining amount of loss recovery that is available subject to terms of counterparty agreements.
(3) Represents the amount of potential reimbursement of losses on securities we have guaranteed that are backed by state and local HFA bonds, under which Treasury bears initial losses on these securities up to 35% of those issued by Freddie Mac and Fannie Mae under the HFA initiative on a combined basis. Treasury will also bear losses of unpaid interest.
(4) Represents Freddie Mac issued mortgage-related securities with subordination protection, excluding those backed by HFA bonds. Excludes mortgage-related securities where subordination coverage was exhausted or maximum coverage amounts were limited to the remaining UPB at that date. Prior period amounts have been revised to conform to current period presentation.

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. Pool insurance contracts generally provide insurance

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
TREASURY-1771
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

on a group, or pool, of mortgage loans up to a stated aggregate loss limit. We did not buy pool insurance during the first half of 2011. In recent periods, we also reached the maximum limit of recovery on certain of these contracts.

We also have credit protection for certain of the mortgage loans on our consolidated balance sheets that are covered by insurance or partial guarantees issued by federal agencies (such as FHA, VA, and USDA). The total UPB of these loans was $4.8 billion as of both June 30, 2011 and December 31, 2010.

## NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS

### Individually Impaired Loans

Individually impaired single-family loans include performing and non-performing TDRs, as well as loans acquired under our financial guarantees with deteriorated credit quality. Individually impaired multifamily loans include TDRs, loans three monthly payments or more past due, and loans that are impaired based on management judgment. For a discussion of our significant accounting policies regarding impaired and non-performing loans, which are applied consistently for multifamily loans and single-family loan classes, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report.

Total loan loss reserves consist of a specific valuation allowance related to individually impaired mortgage loans, and a general reserve for other probable incurred losses. Our recorded investment in individually impaired mortgage loans and the related specific valuation allowance are summarized in Table 5.1 by product class (for single-family loans).

### Table 5.1 — Individually Impaired Loans

| | Balance at June 30, 2011 | | | | For the Three Months Ended June 30, 2011 | | For the Six Months Ended June 30, 2011 | |
|---|---|---|---|---|---|---|---|---|
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized | Average Recorded Investment | Interest Income Recognized |
| | | | | (in millions) | | | | |
| Single-family — | | | | | | | | |
| *With no specific allowance recorded(1):* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 7,710 | $ 3,414 | $ — | $ 3,414 | $ 3,449 | $ 85 | $ 3,503 | $ 177 |
| 15-year amortizing fixed-rate(2) | 104 | 42 | | 42 | 43 | 2 | 45 | 4 |
| Adjustable rate(3) | 15 | 7 | — | 7 | 7 | — | 7 | — |
| Alt-A, interest-only, and option ARM(4) | 2,218 | 970 | — | 970 | 986 | 19 | 1,007 | 40 |
| Total with no specific allowance recorded | $ 10,047 | $ 4,433 | $ — | $ 4,433 | $ 4,485 | $ 106 | $ 4,562 | $ 221 |
| *With specific allowance recorded:* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $33,447 | $32,382 | $ (8,446) | $23,936 | $ 31,404 | $ 141 | $29,591 | $ 317 |
| 15-year amortizing fixed-rate(2) | 196 | 168 | (13) | $ 155 | 156 | 2 | 155 | 5 |
| Adjustable rate(3) | 133 | 119 | (18) | $ 101 | 105 | 1 | 102 | 2 |
| Alt-A, interest-only, and option ARM(4) | 8,983 | 8,690 | (2,775) | $ 5,915 | 8,279 | 21 | 7,777 | 54 |
| Total with specific allowance recorded | $42,759 | $41,359 | $(11,252) | $30,107 | $ 39,944 | $ 165 | $37,625 | $ 378 |
| *Combined single-family:* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 41,157 | $35,796 | $ (8,446) | $27,350 | $34,853 | $ 226 | $33,094 | $ 494 |
| 15-year amortizing fixed-rate(2) | 300 | 210 | (13) | 197 | 199 | 4 | 200 | 9 |
| Adjustable rate(3) | 148 | 126 | (18) | 108 | 112 | 1 | 109 | 2 |
| Alt-A, interest-only, and option ARM(4) | 11,201 | 9,660 | (2,775) | 6,885 | 9,265 | 40 | 8,784 | 94 |
| Total single-family | 52,806 | 45,792 | (11,252) | 34,540 | 44,429 | 271 | 42,187 | 599 |
| Total multifamily | 2,889 | 2,860 | (306) | 2,554 | 2,864 | 38 | 3,013 | 72 |
| Total single-family and multifamily | $55,695 | $48,652 | $(11,558) | $37,094 | $47,293 | $ 309 | $45,200 | $ 671 |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1772

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | UPB | Recorded Investment | Associated Allowance | Net Investment |
|---|---|---|---|---|
| | | | Balance at December 31, 2010 | |
| | | | (in millions) | |
| Single-family — | | | | |
| *With no specific allowance recorded(1):* | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 8,462 | $ 3,721 | $ — | $ 3,721 |
| 15-year amortizing fixed-rate(2) | 119 | 50 | — | 50 |
| Adjustable rate(3) | 20 | 9 | — | 9 |
| Alt-A, interest-only, and option ARM(4) | 2,525 | 1,098 | — | 1,098 |
| Total with no specific allowance recorded | $ 11,126 | $ 4,878 | $ — | $ 4,878 |
| *With specific allowance recorded:* | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 25,504 | $ 24,502 | $(6,283) | $ 18,219 |
| 15-year amortizing fixed-rate(2) | 229 | 198 | (17) | 181 |
| Adjustable rate(3) | 168 | 153 | (23) | 130 |
| Alt-A, interest-only, and option ARM(4) | 7,035 | 6,774 | (2,161) | 4,613 |
| Total with specific allowance recorded | $32,936 | $ 31,627 | $(8,484) | $ 23,143 |
| *Combined single-family:* | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $33,966 | $28,223 | $(6,283) | $ 21,940 |
| 15-year amortizing fixed-rate(2) | 348 | 248 | (17) | 231 |
| Adjustable rate(3) | 188 | 162 | (23) | 139 |
| Alt-A, interest-only, and option ARM(4) | 9,560 | 7,872 | (2,161) | 5,711 |
| Total single-family | 44,062 | 36,505 | (8,484) | 28,021 |
| Total multifamily | 2,661 | 2,637 | (348) | 2,289 |
| Total single-family and multifamily | $46,723 | $ 39,142 | $(8,832) | $ 30,310 |

(1) Individually impaired loans with no related specific valuation allowance primarily represent mortgage loans purchased from PC trusts and accounted for in accordance with the accounting guidance for loans and debt securities acquired with deteriorated credit quality that have not experienced further deterioration.

(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

(3) Includes balloon/reset mortgage loans and excludes option ARMs.

(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

The average recorded investment in individually impaired loans for the three and six months ended June 30, 2010 was approximately $24.8 billion and $21.6 billion, respectively. We recognized interest income on individually impaired loans of $291 million and $522 million for the three and six months ended June 30, 2010, respectively. Interest income foregone on individually impaired loans was approximately $328 million and $147 million for the three months ended June 30, 2011 and 2010, respectively. Interest income foregone on individually impaired loans was approximately $693 million and $339 million for the six months ended June 30, 2011 and 2010, respectively.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Mortgage Loan Performance

We do not accrue interest on loans three months or more past due.

Table 5.2 presents the recorded investment of our single-family and multifamily mortgage loans, held-for-investment, by payment status.

### Table 5.2 — Payment Status of Mortgage Loans[1]

| | June 30, 2011 | | | | | |
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 1,241,359 | $24,456 | $ 8,784 | $    46,411 | $ 1,321,010 | $ 46,298 |
| 15-year amortizing fixed-rate[2] | 254,164 | 1,509 | 391 | 1,436 | 257,500 | 1,431 |
| Adjustable rate[3] | 57,885 | 755 | 275 | 1,998 | 60,913 | 1,993 |
| Alt-A, interest-only, and option ARM[4] | 123,169 | 4,995 | 2,443 | 24,783 | 155,390 | 24,744 |
| Total single-family | 1,676,577 | 31,715 | 11,893 | 74,628 | 1,794,813 | 74,466 |
| Total multifamily | 77,217 | 34 | 12 | 132 | 77,395 | 1,945 |
| Total single-family and multifamily | $ 1,753,794 | $ 31,749 | $ 11,905 | $    74,760 | $1,872,208 | $ 76,411 |

| | December 31, 2010 | | | | | |
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
|---|---|---|---|---|---|---|
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $1,226,874 | $26,442 | $ 10,203 | $    51,604 | $ 1,315,123 | $ 51,507 |
| 15-year amortizing fixed-rate[2] | 248,572 | 1,727 | 450 | 1,628 | 252,377 | 1,622 |
| Adjustable rate[3] | 53,205 | 826 | 335 | 2,308 | 56,674 | 2,303 |
| Alt-A, interest-only, and option ARM[4] | 137,395 | 5,701 | 3,046 | 28,679 | 174,821 | 28,620 |
| Total single-family | 1,666,046 | 34,696 | 14,034 | 84,219 | 1,798,995 | 84,052 |
| Total multifamily | 79,044 | 41 | 7 | 86 | 79,178 | 1,751 |
| Total single-family and multifamily | $ 1,745,090 | $34,737 | $ 14,041 | $    84,305 | $1,878,173 | $ 85,803 |

(1) Based on recorded investment in the loan. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as past due as long as the borrower is current under the modified terms. The payment status of a loan may be affected by temporary timing differences, or lags, in the reporting of this information to us by our servicers. In addition, if a multifamily borrower has entered into a forbearance agreement and is abiding by the terms of the agreement the borrower's payment status is reflected as current, whereas single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower, if applicable. As of both June 30, 2011 and December 31, 2010, approximately $0.1 billion of multifamily loans had been granted forbearance and were not included in delinquency amounts.
(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."
(3) Includes balloon/reset mortgage loans and excludes option ARMs.
(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

We have the option under our PC agreements to purchase mortgage loans from the loan pools that underlie our PCs under certain circumstances to resolve an existing or impending delinquency or default. Since the first quarter of 2010, our practice generally results in our purchase of loans from PC trusts when the loans have been delinquent for four months or more. As of June 30, 2011, there were $2.9 billion in UPB of loans that were four monthly payments past due, and that met our repurchase criteria. Generally, we purchase these delinquent loans, and thereby extinguish the related PC debt, at the next scheduled PC payment date, unless the loans proceed to foreclosure transfer, complete a foreclosure alternative or are paid in full by the borrower before such date.

When we purchase mortgage loans from consolidated trusts, we reclassify the loans from mortgage loans held-for-investment by consolidated trusts to unsecuritized mortgage loans held-for-investment and record an extinguishment of the corresponding portion of the debt securities of the consolidated trusts. We purchased $10.6 billion and $40.2 billion in UPB of loans from PC trusts during the three months ended June 30, 2011 and 2010, respectively. We purchased $25.2 billion and $96.8 billion in UPB of loans from PC trusts during the six months ended June 30, 2011 and 2010, respectively.

122

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1774

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 5.3 summarizes the delinquency rates of mortgage loans within our single-family credit guarantee and multifamily mortgage portfolios.

## Table 5.3 — Delinquency Rates[1]

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| Delinquencies: | | |
| *Single-family:* | | |
| Non-credit-enhanced portfolio: | | |
| Serious delinquency rate | 2.71% | 2.97% |
| Total number of seriously delinquent loans | 270,065 | 296,397 |
| Credit-enhanced portfolio: | | |
| Serious delinquency rate | 7.23% | 7.83% |
| Total number of seriously delinquent loans | 126,415 | 144,116 |
| Total portfolio, excluding Other Guarantee Transactions | | |
| Serious delinquency rate | 3.38% | 3.73% |
| Total number of seriously delinquent loans | 396,480 | 440,513 |
| Other Guarantee Transactions:[2] | | |
| Serious delinquency rate | 10.14% | 9.86% |
| Total number of seriously delinquent loans | 20,977 | 21,926 |
| Total single-family: | | |
| Serious delinquency rate | 3.50% | 3.84% |
| Total number of seriously delinquent loans | 417,457 | 462,439 |
| *Multifamily:*[3] | | |
| Non-credit-enhanced portfolio: | | |
| Delinquency rate | 0.19% | 0.12% |
| UPB of delinquent loans (in millions) | $ 156 | $ 106 |
| Credit-enhance portfolio: | | |
| Delinquency rate | 0.70% | 0.85% |
| UPB of delinquent loans (in millions) | $ 192 | $ 182 |
| Total Multifamily: | | |
| Delinquency rate | 0.31% | 0.26% |
| UPB of delinquent loans (in millions) | $ 348 | $ 288 |

(1) Single-family mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as seriously delinquent if the borrower is less than three monthly payments past due under the modified terms. Serious delinquencies on single-family mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice. In addition, multifamily loans are not counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement, whereas single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower, if applicable. As of both June 30, 2011 and December 31, 2010, approximately $0.1 billion of multifamily loans had been granted forbearance and were not included in delinquency amounts.

(2) Other Guarantee Transactions generally have underlying mortgage loans with higher risk characteristics, but some Other Guarantee Transactions may provide inherent credit protections from losses due to underlying subordination, excess interest, overcollateralization and other features.

(3) Multifamily delinquency performance is based on UPB of mortgage loans that are two monthly payments or more past due or those in the process of foreclosure and includes multifamily Other Guarantee Transactions. Excludes mortgage loans whose contractual terms have been modified under an agreement with the borrower as long as the borrower is less than two monthly payments past due under the modified contractual terms.

We continue to implement a number of initiatives to modify and restructure loans, including the MHA Program. Our implementation of the MHA Program, for our loans, includes the following: (a) an initiative to allow mortgages currently owned or guaranteed by us to be refinanced without obtaining additional credit enhancement beyond that already in place for the loan (our relief refinance mortgage, which is our implementation of HARP); (b) an initiative to modify mortgages for both homeowners who are in default and those who are at risk of imminent default (HAMP); and (c) an initiative designed to permit borrowers who meet basic HAMP eligibility requirements to sell their homes in short sales or to complete a deed in lieu transaction (HAFA). As part of accomplishing certain of these initiatives, we pay various incentives to servicers and borrowers. We will bear the full costs associated with these loan workout and foreclosure alternatives on mortgages that we own or guarantee and will not receive a reimbursement for any component from Treasury. We cannot currently estimate whether, or the extent to which, costs incurred in the near term from HAMP or other MHA Program efforts may be offset, if at all, by the prevention or reduction of potential future costs of serious delinquencies and foreclosures due to these initiatives.

In February 2011, FHFA directed Freddie Mac and Fannie Mae to discuss with FHFA and with each other, and wherever feasible to develop, consistent requirements, policies and processes for the servicing of non-performing loans. This directive was designed to create greater consistency in servicing practices and to build on the best practices of each of the GSEs. Pursuant to this directive, on April 28, 2011, FHFA announced a new set of aligned standards for servicing by Freddie Mac and Fannie Mae, which are designed to help servicers do a better job of communicating and working with troubled borrowers and to bring greater accountability to the servicing industry. The aligned requirements include earlier and more frequent communication with borrowers, consistent requirements for collecting documents from borrowers, consistent timelines for responding to borrowers, a consistent approach to modifications and consistent timelines for processing foreclosures. This initiative will result in the alignment of the processes for both HAMP and non-

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1775                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

HAMP workout solutions, and will be implemented over the course of 2011 and into 2012. Servicers will also be subject to incentives and compensatory fee assessments with respect to performance under these standards.

## NOTE 6: REAL ESTATE OWNED

We obtain REO properties when we are the highest bidder at foreclosure sales of properties that collateralize non-performing single-family and multifamily mortgage loans owned by us or when a delinquent borrower chooses to transfer the mortgaged property to us in lieu of going through the foreclosure process. Upon acquiring single-family properties, we establish a marketing plan to sell the property as soon as practicable by either listing it with a sales broker or by other means, such as arranging a real estate auction. Upon acquiring multifamily properties, we may operate them with third-party property-management firms for a period to stabilize value and then sell the properties through commercial real estate brokers. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report for a discussion of our significant accounting policies for REO.

Table 6.1 provides a summary of the change in the carrying value of our combined single-family and multifamily REO balances. For the periods presented in Table 6.1, the weighted average holding period for our disposed properties was less than one year.

**Table 6.1 — REO**

| | Three Months Ended June 30, | | | | | |
| | 2011 | | | 2010 | | |
| | REO, Gross | Valuation Allowance | REO, Net | REO, Gross | Valuation Allowance | REO, Net |
| --- | --- | --- | --- | --- | --- | --- |
| | (in millions) | | | | | |
| Beginning balance | $ 7,149 | $ (773) | $ 6,376 | $ 6,042 | $ (574) | $ 5,468 |
| Additions | 2,408 | (163) | 2,245 | 3,561 | (253) | 3,308 |
| Change in holding period allowance, inventory | — | 5 | 5 | — | 21 | 21 |
| Dispositions | (3,024) | 330 | (2,694) | (2,748) | 249 | (2,499) |
| Ending balance | $ 6,533 | $ (601) | $ 5,932 | $ 6,855 | $ (557) | $ 6,298 |

| | Six Months Ended June 30, | | | | | |
| | 2011 | | | 2010 | | |
| | REO, Gross | Valuation Allowance | REO, Net | REO, Gross | Valuation Allowance | REO, Net |
| --- | --- | --- | --- | --- | --- | --- |
| | (in millions) | | | | | |
| Beginning balance | $ 7,908 | $ (840) | $ 7,068 | $ 5,125 | $ (433) | $ 4,692 |
| Adjustment to beginning balance[(1)] | — | — | — | 158 | (11) | 147 |
| Additions | 4,861 | (345) | 4,516 | 6,643 | (497) | 6,146 |
| Change in holding period allowance, inventory | — | (120) | (120) | — | (86) | (86) |
| Dispositions | (6,236) | 704 | (5,532) | (5,071) | 470 | (4,601) |
| Ending balance | $ 6,533 | $ (601) | $ 5,932 | $ 6,855 | $ (557) | $ 6,298 |

(1) Adjustment to the beginning balance relates to the adoption of new accounting guidance for transfers of financial assets and consolidation of VIEs. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information.

The REO balance, net at June 30, 2011 and December 31, 2010 associated with single-family properties was $5.8 billion and $7.0 billion, respectively, and the balance associated with multifamily properties was $98 million and $107 million, respectively. The West region represented approximately 32% and 30% of our single-family REO additions during the three months ended June 30, 2011 and 2010, respectively, based on the number of properties, and the state with the most REO properties in the West region is California. At June 30, 2011, our single-family REO inventory in California represented approximately 13% of our total REO inventory based on the number of properties. Our single-family REO inventory consisted of 60,599 properties and 72,079 properties at June 30, 2011 and December 31, 2010, respectively. The pace of our REO acquisitions slowed beginning in the fourth quarter of 2010 due to delays in the foreclosure process, including delays related to concerns about the foreclosure process. These delays in foreclosures continued in the first half of 2011, particularly in states that require a judicial foreclosure process. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Seller/Servicers" for additional information about delays in single-family foreclosures.

Our REO operations expenses includes REO property expenses, net losses incurred on disposition of REO properties, adjustments to the holding period allowance associated with REO properties to record them at the lower of their carrying amount or fair value less the estimated costs to sell, and insurance reimbursements and other credit enhancement recoveries. An allowance for estimated declines in the REO fair value during the period properties are held reduces the carrying value of REO property. Excluding holding period valuation adjustments, we recognized a loss of $56 million and

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

a gain of $39 million on single-family REO dispositions during the three months ended June 30, 2011 and 2010, respectively, and recognized a loss of $182 million and a gain of $26 million on single-family REO dispositions during the six months ended June 30, 2011 and 2010, respectively. We increased our valuation allowance for properties in our single-family inventory REO by $5 million and decreased our valuation allowance for properties in our single-family inventory REO by $20 million in the three months ended June 30, 2011 and 2010, respectively. We increased our valuation allowance for properties in our single-family inventory REO by $156 million and $117 million in the six months ended June 30, 2011 and 2010, respectively.

REO property acquisitions result from extinguishment of our mortgage loans held on our consolidated balance sheets and are treated as non-cash transfers. The amount of non-cash acquisitions of REO properties during the six months ended June 30, 2011 and 2010 was $8.2 billion and $11.2 billion, respectively.

## NOTE 7: INVESTMENTS IN SECURITIES

Table 7.1 summarizes amortized cost, estimated fair values, and corresponding gross unrealized gains and gross unrealized losses for available-for-sale securities by major security type. At June 30, 2011 and December 31, 2010, all available-for-sale securities are mortgage-related securities.

### Table 7.1 — Available-For-Sale Securities

| June 30, 2011 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses(1) | Fair Value |
|---|---|---|---|---|
| | | | (in millions) | |
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 79,417 | $ 5,919 | $ (115) | $ 85,221 |
| Subprime | 44,231 | 32 | (13,772) | 30,491 |
| CMBS | 55,881 | 2,482 | (716) | 57,647 |
| Option ARM | 9,661 | 29 | (3,099) | 6,591 |
| Alt-A and other | 14,546 | 50 | (2,387) | 12,209 |
| Fannie Mae | 19,675 | 1,338 | (2) | 21,011 |
| Obligations of states and political subdivisions | 8,825 | 50 | (315) | 8,560 |
| Manufactured housing | 880 | 15 | (51) | 844 |
| Ginnie Mae | 248 | 27 | — | 275 |
| Total available-for-sale securities | $233,364 | $ 9,942 | $(20,457) | $222,849 |

| December 31, 2010 | | | | |
|---|---|---|---|---|
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 80,742 | $ 5,142 | $ (195) | $ 85,689 |
| Subprime | 47,916 | 1 | (14,056) | 33,861 |
| CMBS | 58,455 | 1,551 | (1,919) | 58,087 |
| Option ARM | 10,726 | 16 | (3,853) | 6,889 |
| Alt-A and other | 15,561 | 58 | (2,451) | 13,168 |
| Fannie Mae | 23,025 | 1,348 | (3) | 24,370 |
| Obligations of states and political subdivisions | 9,885 | 31 | (539) | 9,377 |
| Manufactured housing | 945 | 13 | (61) | 897 |
| Ginnie Mae | 268 | 28 | — | 296 |
| Total available-for-sale securities | $247,523 | $ 8,188 | $(23,077) | $ 232,634 |

(1) Includes non-credit-related other-than-temporary impairments on available-for-sale securities recognized in AOCI and temporary unrealized losses.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Available-For-Sale Securities in a Gross Unrealized Loss Position**

Table 7.2 shows the fair value of available-for-sale securities in a gross unrealized loss position, and whether they have been in that position less than 12 months, or 12 months or greater, including the non-credit-related portion of other-than-temporary impairments which have been recognized in AOCI.

**Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position**

| June 30, 2011 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
| | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | |
| | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in millions) | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $ 2,488 | $ — | $ — | $ (29) | $ (29) | $ 1,877 | $ — | $ (86) | $ (86) | $ 4,365 | $ — | $ (115) |
| Subprime | 9 | (1) | — | (1) | 30,337 | (10,982) | (2,789) | (13,771) | 30,346 | (10,983) | (2,789) | (13,772) |
| CMBS | 409 | — | (14) | (14) | 4,384 | — | (702) | (702) | 4,793 | — | (716) | (716) |
| Option ARM | 19 | (2) | — | (2) | 6,438 | (2,974) | (123) | (3,097) | 6,457 | (2,976) | (123) | (3,099) |
| Alt-A and other | 882 | (48) | (3) | (51) | 10,317 | (1,641) | (695) | (2,336) | 11,199 | (1,689) | (698) | (2,387) |
| Fannie Mae | 12 | — | — | — | 14 | — | (2) | (2) | 26 | — | (2) | (2) |
| Obligations of states and political subdivisions | 2,855 | — | (81) | (81) | 2,974 | — | (234) | (234) | 5,829 | — | (315) | (315) |
| Manufactured housing | 38 | (1) | — | (1) | 452 | (36) | (14) | (50) | 490 | (37) | (14) | (51) |
| Total available-for-sale securities in a gross unrealized loss position | $ 6,712 | $ (52) | $ (127) | $ (179) | $ 56,793 | $ (15,633) | $ (4,645) | $ (20,278) | $ 63,505 | $ (15,685) | $ (4,772) | $ (20,457) |

| December 31, 2010 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
| | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | |
| | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in millions) | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $ 2,494 | $ — | $ — | $ (70) | $ (70) | $ 1,880 | $ — | $ (125) | $ (125) | $ 4,374 | $ — | $ (195) |
| Subprime | 6 | — | — | — | 33,839 | (10,041) | (4,015) | (14,056) | 33,845 | (10,041) | (4,015) | (14,056) |
| CMBS | 2,950 | — | (51) | (51) | 8,894 | (1,024) | (844) | (1,868) | 11,844 | (1,024) | (895) | (1,919) |
| Option ARM | 3 | (1) | — | (1) | 6,838 | (3,744) | (108) | (3,852) | 6,841 | (3,745) | (108) | (3,853) |
| Alt-A and other | 42 | — | (3) | (3) | 12,025 | (1,846) | (602) | (2,448) | 12,067 | (1,846) | (605) | (2,451) |
| Fannie Mae | 54 | — | — | — | 14 | — | (3) | (3) | 68 | — | (3) | (3) |
| Obligations of states and political subdivisions | 3,953 | — | (163) | (163) | 3,402 | — | (376) | (376) | 7,355 | — | (539) | (539) |
| Manufactured housing | 8 | (1) | — | (1) | 507 | (45) | (15) | (60) | 515 | (46) | (15) | (61) |
| Total available-for-sale securities in a gross unrealized loss position | $ 9,510 | $ (2) | $ (287) | $ (289) | $ 67,399 | $ (16,520) | $ (6,268) | $ (22,788) | $ 76,909 | $ (16,522) | $ (6,555) | $ (23,077) |

(1) Represents the pre-tax amount of non-credit-related other-than-temporary impairments on available-for-sale securities not expected to be sold which are recognized in AOCI.

(2) Represents the pre-tax amount of temporary impairments on available-for-sale securities recognized in AOCI.

At June 30, 2011, total gross unrealized losses on available-for-sale securities were $20.5 billion. The gross unrealized losses relate to 2,202 individual lots representing 2,121 separate securities, including securities with non-credit-related other-than-temporary impairments recognized in AOCI. We purchase multiple lots of individual securities at different times and at different costs. We determine gross unrealized gains and gross unrealized losses by specifically evaluating investment positions at the lot level; therefore, some of the lots we hold for a single security may be in an unrealized gain position while other lots for that security may be in an unrealized loss position, depending upon the amortized cost of the specific lot.

**Impairment Recognition on Investments in Securities**

We recognize impairment losses on available-for-sale securities within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other-than-temporary.

We conduct quarterly reviews to evaluate each available-for-sale security that has an unrealized loss for other-than-temporary impairment. An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis. We recognize other-than-temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security. If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recognize only the credit component of other-than-temporary impairment in earnings and the amounts attributable to all other factors are recognized in AOCI. The credit component represents the amount by which

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                     TREASURY-1778                     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

the present value of cash flows expected to be collected from the security is less than the amortized cost basis of the security.

Our net impairment of available-for-sale securities recognized in earnings on our consolidated statements of income and comprehensive income for the three and six months ended June 30, 2011 and 2010, includes amounts related to certain securities where we have previously recognized other-than-temporary impairments through AOCI, but upon the recognition of additional credit losses, these amounts were reclassified out of non-credit losses in AOCI and charged to earnings. In certain instances, we recognized credit losses in excess of unrealized losses in AOCI.

The determination of whether unrealized losses on available-for-sale securities are other-than-temporary involves the evaluation of numerous factors. We perform an evaluation on a security-by-security basis considering all available information. The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment. Important factors include, but are not limited to:

- whether we intend to sell the security and it is not more likely than not that we will be required to sell the security before sufficient time elapses to recover all unrealized losses;

- loan level default modeling for single-family residential mortgages that considers individual loan characteristics, including current LTV ratio, FICO score, and delinquency status, requires assumptions about future home prices and interest rates, and employs internal default models and prepayment assumptions. The modeling for CMBS employs third-party models that require assumptions about the economic conditions in the areas surrounding each individual property; and

- security loss modeling combining the modeled performance of the underlying collateral relative to its current and projected credit enhancements to determine the expected cash flows for each evaluated security.

For the majority of our available-for-sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other-than-temporary and is recorded within our consolidated statements of income and comprehensive income as net impairment of available-for-sale securities recognized in earnings.

See "Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position" for the length of time our available-for-sale securities have been in an unrealized loss position. Also see "Table 7.3 — Significant Modeled Attributes for Certain Non-Agency Mortgage-Related Securities" for the modeled default rates and severities that were used to determine whether our senior interests in certain non-agency mortgage-related securities would experience a cash shortfall.

### Freddie Mac and Fannie Mae Securities

We record the purchase of mortgage-related securities issued by Fannie Mae as investments in securities in accordance with the accounting guidance for investments in debt and equity securities. In contrast, our purchase of mortgage-related securities that we issued (*e.g.*, PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions) is recorded as either investments in securities or extinguishment of debt securities of consolidated trusts depending on the nature of the mortgage-related security that we purchase. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2010 Annual Report for additional information.

We hold these investments in securities that are in an unrealized loss position at least to recovery and typically to maturity. As the principal and interest on these securities are guaranteed and we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses, we consider these unrealized losses to be temporary.

### Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans

We believe the unrealized losses on the non-agency mortgage-related securities we hold are a result of poor underlying collateral performance, limited liquidity, and large risk premiums. We consider securities to be other-than-temporarily impaired when future credit losses are deemed likely.

Our review of the securities backed by subprime, option ARM, and Alt-A and other loans includes loan level default modeling and analyses of the individual securities based on underlying collateral performance, including the collectibility of amounts that would be recovered from primary monoline insurers. In the case of monoline insurers, we also consider factors such as the availability of capital, generation of new business, pending regulatory action, credit ratings, security

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1779
Powered by Morningstar® Document Research℠

Table of Contents

prices, and credit default swap levels traded on the insurers.  We consider loan level information including estimated current LTV ratios, FICO scores, and other loan level characteristics.  We also consider the differences between the loan level characteristics of the performing and non-performing loan populations.

Table 7.3 presents the modeled default rates and severities, without regard to subordination, that are used to  determine whether our senior interests in certain non-agency mortgage-related securities will experience a cash shortfall.  Our proprietary default model requires assumptions about future home prices, as defaults and severities are modeled at the loan  level and then aggregated. The model uses projections of future  home prices at the state level. Assumptions of voluntary  prepayment rates are also an input to the present value of  expected cash flows and are discussed below.

**Table 7.3 — Significant Modeled Attributes for Certain Non-Agency Mortgage-Related Securities**

| | June 30, 2011 | | | | |
| | | | | Alt-A(1) | |
| | Subprime first lien | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
| | | | (dollars in millions) | | |
| **Issuance Date** | | | | | |
| 2004 and prior: | | | | | |
| UPB | $  1,279 | $  123 | $  940 | $  548 | $ 2,287 |
| Weighted average collateral defaults(2) | 37% | 37% | 8% | 44% | 26% |
| Weighted average collateral severities(3) | 57% | 54% | 48% | 51% | 41% |
| Weighted average voluntary prepayment rates(4) | 6% | 7% | 10% | 7% | 8% |
| Average credit enhancement(5) | 41% | 17% | 14% | 18% | 15% |
| 2005: | | | | | |
| UPB | $  6,979 | $  3,009 | $1,269 | $  886 | $ 4,124 |
| Weighted average collateral defaults(2) | 56% | 54% | 25% | 52% | 40% |
| Weighted average collateral severities(3) | 67% | 63% | 54% | 58% | 49% |
| Weighted average voluntary prepayment rates(4) | 4% | 6% | 9% | 7% | 8% |
| Average credit enhancement(5) | 52% | 15% | 5% | 27% | 6% |
| 2006: | | | | | |
| UPB | $  20,720 | $  7,120 | $  586 | $  1,203 | $ 1,253 |
| Weighted average collateral defaults(2) | 65% | 68% | 40% | 63% | 53% |
| Weighted average collateral severities(3) | 71% | 70% | 61% | 64% | 57% |
| Weighted average voluntary prepayment rates(4) | 7% | 6% | 10% | 8% | 8% |
| Average credit enhancement(5) | 17% | 5% | 8% | 0% | 2% |
| 2007: | | | | | |
| UPB | $  22,092 | $  4,526 | $  165 | $  1,440 | $  358 |
| Weighted average collateral defaults(2) | 63% | 66% | 56% | 64% | 63% |
| Weighted average collateral severities(3) | 72% | 71% | 68% | 67% | 68% |
| Weighted average voluntary prepayment rates(4) | 7% | 7% | 8% | 8% | 8% |
| Average credit enhancement(5) | 18% | 13% | 14% | (4)% | 0% |
| Total: | | | | | |
| UPB | $  51,070 | $ 14,778 | $2,960 | $  4,077 | $ 8,022 |
| Weighted average collateral defaults(2) | 62% | 64% | 25% | 58% | 39% |
| Weighted average collateral severities(3) | 71% | 69% | 57% | 63% | 51% |
| Weighted average voluntary prepayment rates(4) | 6% | 6% | 9% | 8% | 8% |
| Average credit enhancement(5) | 23% | 10% | 9% | 7% | 8% |

(1) Excludes non-agency mortgage-related securities backed by other  loans, which are primarily comprised of securities backed by  home equity lines of credit.
(2) The expected cumulative default rate expressed as a percentage  of the current collateral UPB.
(3) The expected average loss given default calculated as the ratio  of cumulative loss over cumulative default rate for each  security.
(4) The security's voluntary prepayment rate represents the  average of the monthly voluntary prepayment rate weighted by the  security's outstanding UPB.
(5) Reflects the ratio of the current principal amount of the  securities issued by a trust that will absorb losses in the  trust before any losses are allocated to securities
    that we own. Percentage generally calculated based on: (a) the total UPB  of securities subordinate to the securities we own, divided by  (b) the total UPB of all of the
    securities issued by the trust (excluding notional balances). Only includes credit  enhancement provided by subordinated securities; excludes credit  enhancement
    provided by monoline bond insurance, overcollateralization and other forms of credit  enhancement.  Negative values are shown when collateral losses that have yet to
    be applied to the tranches exceed the remaining credit  enhancement, if any.

In evaluating the non-agency mortgage-related securities backed  by subprime, option ARM, and Alt-A and other loans for other-than-temporary impairment, we noted that  the percentage of securities that were AAA-rated and the percentage that were investment grade declined significantly since acquisition. While these ratings have  declined, the ratings themselves are not determinative that a  loss is more or less likely. While we consider credit ratings in our analysis, we believe that our detailed  security-by-security analyses provide a more consistent view of the ultimate collectibility of contractual amounts due to us. As such, we have impaired securities with current ratings ranging from CCC  to AAA and have determined that other securities within the same  ratings were not other-than-temporarily impaired. However, we  carefully consider individual ratings, especially those below  investment grade, including changes since June 30, 2011.

128

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                                          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our analysis is subject to change as new information regarding delinquencies, severities, loss timing, prepayments, and other factors becomes available. While it is reasonably possible that, under certain conditions, collateral losses on our remaining available-for-sale securities for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of June 30, 2011.

In addition, we considered fair values at June 30, 2011, as well as any significant changes in fair value since June 30, 2011 to assess if they were indicative of potential future cash shortfalls. In this assessment, we put greater emphasis on categorical pricing information than on individual prices. We use multiple pricing services and dealers to price the majority of the non-agency mortgage-related securities we hold. We observed significant dispersion in prices obtained from different sources. However, we carefully consider individual and sustained price declines, placing greater weight when dispersion is lower and less weight when dispersion is higher. Where dispersion is higher, other factors previously mentioned receive greater weight. For further information, see "NOTE 18: FAIR VALUE DISCLOSURES."

### Commercial Mortgage-Backed Securities

CMBS are exposed to stresses in the commercial real estate market. We use external models to identify securities that may have an increased risk of failing to make their contractual payments. We then perform an analysis of the underlying collateral on a security-by-security basis to determine whether we will receive all of the contractual payments due to us. During the second quarter of 2011, we recognized the unrealized fair value losses related to three investments in CMBS of $154 million as an impairment charge in earnings because we have the intent to sell these securities. While it is reasonably possible that, under certain conditions, collateral losses on our CMBS for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of June 30, 2011. We do not intend to sell the remaining CMBS and it is not more likely than not that we will be required to sell such securities before recovery of the unrealized losses.

### Obligations of States and Political Subdivisions

These investments consist of housing revenue bonds. We believe the unrealized losses on obligations of states and political subdivisions are primarily a result of movements in interest rates and liquidity and risk premiums. We have determined that the impairment of these securities is temporary based on our conclusion that we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses. We believe that any credit risk related to these securities is minimal because of the issuer guarantees provided on these securities.

### Monoline Bond Insurance

We rely on monoline bond insurance, including secondary coverage, to provide credit protection on some of our non-agency mortgage-related securities. Circumstances in which it is likely a principal and interest shortfall will occur and there is substantial uncertainty surrounding a primary monoline bond insurer's ability to pay all future claims can give rise to recognition of other-than-temporary impairment recognized in earnings. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

### Other-Than-Temporary Impairments on Available-for-Sale Securities

Table 7.4 summarizes our net impairments of available-for-sale securities recognized in earnings by security type.

### Table 7.4 — Net Impairment of Available-For-Sale Securities Recognized in Earnings

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings | | | |
| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| | (in millions) | | | |
| Available-for-sale securities: | | | | |
| Subprime | $ (70) | $ (17) | $ (804) | $ (349) |
| Option ARM | (65) | (48) | (346) | (150) |
| Alt-A and other | (32) | (333) | (72) | (352) |
| CMBS[1] | (183) | (17) | (318) | (72) |
| Manufactured housing | (2) | (13) | (5) | (15) |
| Total other-than-temporary impairments on available-for-sale securities | $ (352) | $ (428) | $(1,545) | $(938) |

(1) Includes $154 million of other-than-temporary impairments recognized in earnings for the three and six months ended June 30, 2011 as we have the intent to sell the related security before recovery of its amortized cost basis.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                   Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1781

Table of Contents

Table 7.5 presents the changes in the unrealized credit-related other-than-temporary impairment component of the amortized cost related to available-for-sale securities: (a) that we have written down for other-than-temporary impairment; and (b) for which the credit component of the loss is recognized in earnings. The credit-related other-than-temporary impairment component of the amortized cost represents the difference between the present value of expected future cash flows, including the estimated proceeds from bond insurance, and the amortized cost basis of the security prior to considering credit losses. The beginning balance represents the other-than-temporary impairment credit loss component related to available-for-sale securities for which other-than-temporary impairment occurred prior to January 1, 2011. Net impairment of available-for-sale securities recognized in earnings is presented as additions in two components based upon whether the current period is: (a) the first time the debt security was credit-impaired; or (b) not the first time the debt security was credit-impaired. The credit loss component is reduced if we sell, intend to sell or believe we will be required to sell previously credit-impaired available-for-sale securities. Additionally, the credit loss component is reduced if we receive cash flows in excess of what we expected to receive over the remaining life of the credit-impaired debt security or the security matures or is fully written down.

### Table 7.5 — Other-Than-Temporary Impairments Related to Credit Losses on Available-For-Sale Securities[1]

| | Six Months Ended June 30, 2011 |
|---|---|
| | (in millions) |
| Credit-related other-than-temporary impairments on available-for-sale securities recognized in earnings: | |
| Beginning balance — remaining credit losses to be realized on available-for-sale securities held at the beginning of the period where other-than-temporary impairments were recognized in earnings | $ 14,878 |
| Additions: | |
| Amounts related to credit losses for which an other-than-temporary impairment was not previously recognized | 49 |
| Amounts related to credit losses for which an other-than-temporary impairment was previously recognized | 1,342 |
| Reductions: | |
| Amounts related to securities which were sold, written off or matured | (558) |
| Amounts previously recognized in other comprehensive income that were recognized in earnings because we intend to sell the security or it is more likely than not that we will be required to sell the security before recovery of its amortized cost basis. | (161) |
| Amounts related to amortization resulting from increases in cash flows expected to be collected that are recognized over the remaining life of the security | (60) |
| Ending balance — remaining credit losses to be realized on available-for-sale securities held at period end where other-than-temporary impairments were recognized in earnings | $ 15,490 |

(1) Excludes other-than-temporary impairments on securities that we intend to sell or it is more likely than not that we will be required to sell before recovery of the unrealized losses.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Realized Gains and Losses on Sales of Available-For-Sale Securities

Table 7.6 below illustrates the gross realized gains and gross realized losses received from the sale of available-for-sale securities.

### Table 7.6 — Gross Realized Gains and Gross Realized Losses on Sales of Available-For-Sale Securities

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | | (in millions) | | |
| **Gross realized gains** | | | | |
| Mortgage-related securities: | | | | |
| Freddie Mac | $   — | $   26 | $   77 | $   26 |
| Fannie Mae | 14 | — | 14 | — |
| Obligations of states and political subdivisions | 3 | — | 4 | 1 |
| Total mortgage-related securities gross realized gains | 17 | 26 | 95 | 27 |
| Non-mortgage-related securities: | | | | |
| Asset-backed securities | (2) | — | — | — |
| Total non-mortgage-related securities gross realized gains | (2) | — | — | — |
| Gross realized gains | 15 | 26 | 95 | 27 |
| **Gross realized losses** | | | | |
| Mortgage-related securities:[1] | | | | |
| CMBS | (80) | — | (80) | — |
| Option ARM | — | (6) | — | (6) |
| Total mortgage-related securities gross realized losses | (80) | (6) | (80) | (6) |
| Gross realized losses | (80) | (6) | (80) | (6) |
| Net realized gains (losses) | $   (65) | $   20 | $   15 | $   21 |

(1) These individual sales do not change our conclusion that we do not intend to sell the majority of our remaining mortgage-related securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses.

### Maturities of Available-For-Sale Securities

Table 7.7 summarizes the remaining contractual maturities of available-for-sale securities.

### Table 7.7 — Maturities of Available-For-Sale Securities[1]

| June 30, 2011 | Amortized Cost | Fair Value |
|---|---|---|
| | (in millions) | |
| Available-for-sale securities: | | |
| Due within 1 year or less | $   41 | $   41 |
| Due after 1 through 5 years | 1,167 | 1,226 |
| Due after 5 through 10 years | 6,385 | 6,741 |
| Due after 10 years | 225,771 | 214,841 |
| Total available-for-sale securities | $   233,364 | $222,849 |

(1) Maturity information provided is based on contractual maturities, which may not represent expected life as obligations underlying these securities may be prepaid at any time without penalty.

### AOCI Related to Available-For-Sale Securities

Table 7.8 presents the changes in AOCI related to available-for-sale securities. The net unrealized holding gains represent the net fair value adjustments recorded on available-for-sale securities throughout the periods presented, after the effects of our federal statutory tax rate of 35%. The net reclassification adjustment for net realized losses represents the amount of those fair value adjustments, after the effects of our federal statutory tax rate of 35%, that have been recognized in earnings due to a sale of an available-for-sale security or the recognition of an impairment loss.

131                                                                 *Freddie Mac*

TREASURY-1783

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 7.8 — AOCI Related to Available-For-Sale Securities**

| | Six Months Ended June 30, | |
| | 2011 | 2010 |
|---|---|---|
| | (in millions) | |
| Beginning balance | $(9,678) | $(20,616) |
| Adjustment to initially apply the adoption of amendments to accounting guidance for transfers of financial assets and the consolidation of VIEs[1] | — | (2,683) |
| Net unrealized holding gains[2] | 1,849 | 8,146 |
| Net reclassification adjustment for net realized losses[3][4] | 995 | 597 |
| Ending balance | $(6,834) | $(14,556) |

(1) Net of tax benefit of $1.4 billion for the six months ended June 30, 2010.
(2) Net of tax expense of $1.0 billion and $4.4 billion for the six months ended June 30, 2011 and 2010, respectively.
(3) Net of tax benefit of $536 million and $321 million for the six months ended June 30, 2011 and 2010, respectively.
(4) Includes the reversal of previously recorded unrealized losses that have been recognized on our consolidated statements of income and comprehensive income as impairment losses on available-for-sale securities of $1.0 billion and $609 million, net of taxes, for the six months ended June 30, 2011 and 2010, respectively.

**Trading Securities**

Table 7.9 summarizes the estimated fair values by major security type for trading securities.

**Table 7.9 — Trading Securities**

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| Mortgage-related securities: | | |
| Freddie Mac | $ 16,997 | $ 13,437 |
| Fannie Mae | 17,982 | 18,726 |
| Ginnie Mae | 165 | 172 |
| Other | 82 | 31 |
| Total mortgage-related securities | 35,226 | 32,366 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 164 | 44 |
| Treasury bills | 250 | 17,289 |
| Treasury notes | 17,497 | 10,122 |
| FDIC-guaranteed corporate medium-term notes | 1,627 | 441 |
| Total non-mortgage-related securities | 19,538 | 27,896 |
| Total fair value of trading securities | $ 54,764 | $ 60,262 |

For the three months ended June 30, 2011 and 2010, we recorded net unrealized gains (losses) on trading securities held at June 30, 2011 and 2010 of $229 million and $(272) million, respectively. For the six months ended June 30, 2011 and 2010, we recorded net unrealized gains (losses) on trading securities held at June 30, 2011 and 2010 of $10 million and $(689) million, respectively.

Total trading securities include $2.2 billion and $2.5 billion, respectively, of hybrid financial assets as defined by the derivative and hedging accounting guidance regarding certain hybrid financial instruments as of June 30, 2011 and December 31, 2010. Gains (losses) on trading securities on our consolidated statements of income and comprehensive income include $11 million and $(30) million, respectively, related to these hybrid financial securities for the three and six months ended June 30, 2011. Gains (losses) on trading securities include gains of $36 million and $1 million related to these trading securities for the three and six months ended June 30, 2010, respectively.

**Collateral Pledged**

*Collateral Pledged to Freddie Mac*

Our counterparties are required to pledge collateral for securities purchased under agreements to resell transactions, and most derivative instruments are subject to collateral posting thresholds generally related to a counterparty's credit rating. We consider the types of securities being pledged to us as collateral when determining how much we lend related to securities purchased under agreements to resell transactions. Additionally, we subsequently and regularly review the market values of these securities compared to amounts loaned in an effort to ensure our exposure to losses is minimized. We had cash and cash equivalents pledged to us related to derivative instruments of $1.7 billion and $2.2 billion at June 30, 2011 and December 31, 2010, respectively. Although it is our practice not to repledge assets held as collateral, a portion of the collateral may be repledged based on master agreements related to our derivative instruments. At June 30, 2011 and December 31, 2010, we did not have collateral in the form of securities pledged to and held by us under these master agreements. Also at June 30, 2011 and December 31, 2010, we did not have securities pledged to us for securities

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

purchased under agreements to resell transactions that we had the right to repledge. From time to time we may obtain pledges of collateral from certain seller/servicers as additional security for their obligations to us, including their obligations to repurchase mortgages sold to us in breach of representations and warranties. These pledges may take the form of cash, cash equivalents, or agency securities.

In addition, we hold cash and cash equivalents as collateral in connection with certain of our multifamily guarantees as credit enhancements. The cash and cash equivalents held as collateral related to these transactions at June 30, 2011 and December 31, 2010 was $368 million and $550 million, respectively.

### *Collateral Pledged by Freddie Mac*

We are required to pledge collateral for margin requirements with third-party custodians in connection with secured financings and derivative transactions with some counterparties. The level of collateral pledged related to our derivative instruments is determined after giving consideration to our credit rating. As of June 30, 2011, we had one secured, uncommitted intraday line of credit with a third party in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs, in connection with our use of the Fedwire system. In certain circumstances, the line of credit agreement gives the secured party the right to repledge the securities underlying our financing to other third parties, including the Federal Reserve Bank. We pledge collateral to meet our collateral requirements under the line of credit agreement upon demand by the counterparty.

Table 7.10 summarizes all securities pledged as collateral by us, including assets that the secured party may repledge and those that may not be repledged.

### Table 7.10 — Collateral in the Form of Securities Pledged

|  | June 30, 2011 | December 31, 2010 |
|---|---|---|
|  | (in millions) | |
| Securities pledged with the ability for the secured party to repledge: | | |
| Debt securities of consolidated trusts held by third parties[1] | $ 10,345 | $ 9,915 |
| Available-for-sale securities | 244 | 817 |
| Securities pledged without the ability for the secured party to repledge: | | |
| Debt securities of consolidated trusts held by third parties[1] | 139 | 5 |
| Total securities pledged | $ 10,728 | $ 10,737 |

(1) Represents PCs held by us in our Investments segment mortgage investments portfolio and pledged as collateral which are recorded as a reduction to debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

### *Securities Pledged with the Ability of the Secured Party to Repledge*

At June 30, 2011, we pledged securities with the ability of the secured party to repledge of $10.6 billion, of which $10.5 billion was collateral posted in connection with our uncommitted intraday line of credit with a third party as discussed above.

At December 31, 2010, we pledged securities with the ability of the secured party to repledge of $10.7 billion, of which $10.5 billion was collateral posted in connection with our uncommitted intraday line of credit with a third party as discussed above.

There were no borrowings against the line of credit at June 30, 2011 or December 31, 2010. The remaining $0.1 billion and $0.2 billion of collateral posted with the ability of the secured party to repledge at June 30, 2011 and December 31, 2010, respectively, was posted in connection with our margin account related to futures transactions.

### *Securities Pledged without the Ability of the Secured Party to Repledge*

At June 30, 2011 and December 31, 2010, we pledged securities without the ability of the secured party to repledge of $139 million and $5 million, respectively, at a clearinghouse in connection with the trading and settlement of securities.

### *Collateral in the Form of Cash Pledged*

At June 30, 2011, we pledged $10.0 billion of collateral in the form of cash and cash equivalents, all but $109 million of which related to our derivative agreements as we had $10.1 billion of such derivatives in a net loss position. At December 31, 2010, we pledged $8.5 billion of collateral in the form of cash and cash equivalents, all but $40 million of which related to our derivative agreements as we had $9.3 billion of such derivatives in a net loss position. The remaining $109 million and $40 million was posted at clearinghouses in connection with our securities and other derivative transactions at June 30, 2011 and December 31, 2010, respectively.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                TREASURY-1785                                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS

Debt securities that we issue are classified on our consolidated balance sheets as either debt securities of consolidated trusts held by third parties or other debt. We issue other debt to fund our operations.

Under the Purchase Agreement, without the prior written consent of Treasury, we may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. Because of this debt limit, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Under the Purchase Agreement, the amount of our "indebtedness" is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs. Therefore, "indebtedness" does not include debt securities of consolidated trusts held by third parties. We also cannot become liable for any subordinated indebtedness, without the prior consent of Treasury.

Our debt cap under the Purchase Agreement is $972 billion in 2011. As of June 30, 2011, we estimate that the par value of our aggregate indebtedness totaled $695.2 billion, which was approximately $276.8 billion below the debt cap. Our aggregate indebtedness is calculated as the par value of other debt.

In Tables 8.1 and 8.2, the categories of short-term debt (due within one year) and long-term debt (due after one year) are based on the original contractual maturity of the debt instruments classified as other debt.

Table 8.1 summarizes the interest expense and the balances of total debt, net per our consolidated balance sheets.

### Table 8.1 — Total Debt, Net

| | Interest Expense for the | | | | Balance, Net[1] | |
| | Three Months Ended June 30, | | Six Months Ended June 30, | | | |
| | 2011 | 2010 | 2011 | 2010 | June 30, 2011 | December 31, 2010 |
| | (in millions) | | | | (in millions) | |
| Other debt: | | | | | | |
| Short-term debt | $ 95 | $ 137 | $ 210 | $ 278 | $ 189,092 | $ 197,106 |
| Long-term debt: | | | | | | |
| Senior debt | 3,232 | 4,320 | 6,670 | 8,766 | 491,634 | 516,123 |
| Subordinated debt | 6 | 11 | 18 | 23 | 361 | 711 |
| Total long-term debt | 3,238 | 4,331 | 6,688 | 8,789 | 491,995 | 516,834 |
| Total other debt | 3,333 | 4,468 | 6,898 | 9,067 | 681,087 | 713,940 |
| Debt securities of consolidated trusts held by third parties | 17,261 | 19,048 | 34,664 | 38,691 | 1,499,036 | 1,528,648 |
| Total debt, net | $20,594 | $23,516 | $41,562 | $47,758 | $2,180,123 | $ 2,242,588 |

(1) Represents par value, net of associated discounts, premiums and hedge-related basis adjustments, with $0.7 billion and $0.9 billion, respectively, of other short-term debt, and $3.2 billion and $3.6 billion, respectively, of other long-term debt that represents the fair value of debt securities with the fair value option elected at June 30, 2011 and December 31, 2010.

For the three and six months ended June 30, 2011, we recognized fair value gains (losses) of $(37) million and $(118) million, respectively, on our foreign-currency denominated debt, of which $(46) million and $(163) million, respectively, are gains (losses) related to our net foreign-currency translation.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1786

Table of Contents

## Other Debt

Table 8.2 summarizes the balances and effective interest rates for other debt. We had no balances in federal funds purchased and securities sold under agreements to repurchase at either June 30, 2011 or December 31, 2010.

### Table 8.2 — Other Debt

| | June 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] |
| Other short-term debt: | | | | | | |
| Reference Bills® securities and discount notes | $188,411 | $ 188,343 | 0.16% | $194,875 | $ 194,742 | 0.24% |
| Medium-term notes | 749 | 749 | 0.14 | 2,364 | 2,364 | 0.31 |
| Total other short-term debt | 189,160 | 189,092 | 0.16 | 197,239 | 197,106 | 0.25 |
| Other long-term debt: | | | | | | |
| Original maturities on or before December 31, | | | | | | |
| 2011 | 45,522 | 45,519 | 1.62% | 120,951 | 120,959 | 2.13% |
| 2012 | 132,695 | 132,653 | 1.75 | 138,474 | 138,418 | 1.79 |
| 2013 | 112,310 | 112,061 | 1.83 | 79,177 | 78,886 | 2.64 |
| 2014 | 60,997 | 60,816 | 2.57 | 36,328 | 36,142 | 3.46 |
| 2015 | 37,680 | 37,653 | 2.96 | 45,779 | 45,752 | 2.99 |
| Thereafter | 116,855 | 103,293 | 4.49 | 96,677 | 96,677 | 4.77 |
| Total other long-term debt[3] | 506,059 | 491,995 | 2.53 | 530,978 | 516,834 | 2.78 |
| Total other debt | $695,219 | $ 681,087 | | $728,217 | $ 713,940 | |

(1) Represents par value, net of associated discounts, premiums, and hedging-related adjustments.

(2) Represents the weighted average effective rate that remains constant over the life of the instrument, which includes the amortization of discounts or premiums, issuance costs and hedging-related basis adjustments.

(3) Balance, net for other long-term debt includes callable debt of $124.5 billion and $142.6 billion at June 30, 2011 and December 31, 2010, respectively.

### Debt Securities of Consolidated Trusts Held by Third Parties

Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated securitization trusts (*i.e.*, single-family PC trusts and certain Other Guarantee Transactions).

Table 8.3 summarizes the debt securities of consolidated trusts held by third parties based on underlying mortgage product type.

### Table 8.3 — Debt Securities of Consolidated Trusts Held by Third Parties[1]

| | June 30, 2011 | | | | December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Contractual Maturity[2] | UPB | Balance, Net | Weighted Average Coupon[2] | Contractual Maturity[2] | UPB | Balance, Net | Weighted Average Coupon[2] |
| | | (dollars in millions) | | | | (dollars in millions) | | |
| Single-family: | | | | | | | | |
| 30-year or more, fixed-rate | 2011 - 2048 | $ 1,074,301 | $1,084,346 | 5.00% | 2011-2048 | $1,110,943 | $ 1,118,994 | 5.03% |
| 20-year fixed-rate | 2012 - 2031 | 65,988 | 66,885 | 4.67 | 2012-2031 | 63,941 | 64,752 | 4.78 |
| 15-year fixed-rate | 2011 - 2026 | 234,548 | 237,480 | 4.29 | 2011-2026 | 227,269 | 229,510 | 4.41 |
| Adjustable-rate | 2011 - 2047 | 54,715 | 55,338 | 3.43 | 2011-2047 | 50,904 | 51,351 | 3.69 |
| Interest-only[3] | 2026 - 2041 | 52,669 | 52,757 | 5.15 | 2026-2040 | 61,773 | 61,830 | 5.30 |
| FHA/VA | 2011 - 2041 | 2,195 | 2,230 | 5.71 | 2011-2040 | 2,171 | 2,211 | 5.88 |
| Total debt securities of consolidated trusts held by third parties[4] | | $1,484,416 | $1,499,036 | | | $1,517,001 | $1,528,648 | |

(1) Debt securities of consolidated trusts held by third parties are prepayable without penalty.

(2) Based on the contractual maturity and interest rate of debt securities of our consolidated trusts held by third parties.

(3) Includes interest-only securities and interest-only mortgage loans that allow the borrowers to pay only interest for a fixed period of time before the loans begin to amortize.

(4) The effective rate for debt securities of consolidated trusts held by third parties was 4.57% as of both June 30, 2011 and December 31, 2010, respectively.

### Lines of Credit

At both June 30, 2011 and December 31, 2010, we had one secured, uncommitted intraday line of credit with a third party totaling $10 billion. We use this line of credit regularly to provide us with additional liquidity to fund our intraday activities through the Fedwire system in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs. No amounts were drawn on this line of credit at June 30, 2011 or

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1787

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

December 31, 2010. We expect to continue to use the current facility to satisfy our intraday financing needs; however, as the line is uncommitted, we may not be able to draw on it if and when needed.

**Subordinated Debt Interest and Principal Payments**

In a September 23, 2008 statement concerning the conservatorship, the Director of FHFA stated that we would continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels. As a result, the terms of any of our subordinated debt that provide for us to defer payments of interest under certain circumstances, including our failure to maintain specified capital levels, are no longer applicable.

## NOTE 9: FINANCIAL GUARANTEES

We securitize substantially all of the single-family mortgage loans we purchase and issue securities backed by such mortgage loans, which we guarantee. During the six months ended June 30, 2011 and 2010, we issued and guaranteed $155.5 billion and $163.7 billion, respectively, in UPB of Freddie Mac mortgage-related securities backed by single-family mortgage loans (excluding those backed by HFA bonds). Beginning January 1, 2010, we no longer recognize a financial guarantee for such arrangements as we instead recognize both the mortgage loans and the debt securities of these securitization trusts on our consolidated balance sheets. Table 9.1 presents our maximum potential exposure, our recognized liability, and the maximum remaining term of our financial guarantees that are not consolidated on our balance sheets.

**Table 9.1 — Financial Guarantees**

| | June 30, 2011 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Maximum Exposure(1) | Recognized Liability | Maximum Remaining Term | Maximum Exposure(1) | Recognized Liability | Maximum Remaining Term |
| | (dollars in millions, terms in years) | | | | | |
| Non-consolidated Freddie Mac securities(2) | $31,456 | $ 264 | 40 | $ 25,279 | $ 202 | 41 |
| Other guarantee commitments(3) | 20,409 | 431 | 38 | 18,670 | 427 | 38 |
| Derivative instruments | 41,729 | 820 | 34 | 37,578 | 301 | 35 |
| Servicing-related premium guarantees | 147 | — | 5 | 172 | — | 5 |

(1) Maximum exposure represents the contractual amounts that could be lost under the non-consolidated guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements, such as recourse provisions, third-party insurance contracts, or from collateral held or pledged. The maximum exposure disclosed above is not representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation. The maximum exposure for our liquidity guarantees is not mutually exclusive of our default guarantees on the same securities; therefore, these amounts are included within the maximum exposure of non-consolidated Freddie Mac securities and other guarantee commitments.

(2) As of June 30, 2011 and December 31, 2010, the UPB of non-consolidated Freddie Mac securities associated with single-family mortgage loans was $11.0 billion and $11.3 billion, respectively. The remaining balances relate to multifamily mortgage loans.

(3) As of June 30, 2011 and December 31, 2010, the UPB of other guarantee commitments associated with single-family mortgage loans was $10.4 billion and $8.6 billion, respectively. The remaining balances relate to multifamily mortgage loans.

**Non-consolidated Freddie Mac Securities**

We issue three types of mortgage-related securities: (a) PCs; (b) REMICs and Other Structured Securities; and (c) Other Guarantee Transactions. We guarantee the payment of principal and interest on these securities, which are backed by pools of mortgage loans, irrespective of the cash flows received from the borrowers. Commencing January 1, 2010, only our guarantees issued to non-consolidated securitization trusts are accounted for in accordance with the accounting guidance for guarantees (*i.e.*, a guarantee asset and guarantee obligation are recognized).

At June 30, 2011 and December 31, 2010, there were $1.5 trillion and $1.4 trillion, respectively, of securities we issued in resecuritizations of our PCs and other previously issued REMICs and Other Structured Securities. The securities issued in these resecuritizations consist of single-class and multiclass securities backed by PCs, REMICs, interest-only strips, and principal-only strips and do not increase our credit-related exposure. As a result, no guarantee asset or guarantee obligation is recognized for these transactions and they are excluded from the table above.

We recognize a guarantee asset, guarantee obligation and a reserve for guarantee losses, as necessary, for securities issued by non-consolidated securitization trusts and other guarantee commitments for which we are exposed to incremental credit risk. Our guarantee obligation represents the recognized liability, net of cumulative amortization, associated with our guarantee of PCs and certain Other Guarantee Transactions issued to non-consolidated securitization trusts. In addition to our guarantee obligation, we recognize a reserve for guarantee losses, which is included within other liabilities on our consolidated balance sheets, which totaled $0.2 billion at both June 30, 2011 and December 31, 2010, respectively. For many of the loans underlying our non-consolidated guarantees, there are credit protections from third parties, including subordination, covering a portion of our exposure. See "NOTE 4: MORTGAGE LOANS AND LOAN

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

LOSS RESERVES" for information about credit protections on loans we guarantee. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information about our accounting for financial guarantees.

During the three and six months ended June 30, 2011 we issued approximately $3.8 billion and $6.7 billion, respectively, compared to $2.2 billion and $3.7 billion for the three and six months ended June 30, 2010, respectively, in UPB of non-consolidated Freddie Mac securities primarily backed by multifamily mortgage loans, for which a guarantee asset and guarantee obligation were recognized. During the six months ended June 30, 2010, we also issued $4.1 billion in UPB of non-consolidated Other Guarantee Transactions backed by HFA bonds as part of the NIBP, for which a guarantee asset and guarantee obligation were recognized.

In connection with transfers of financial assets to non-consolidated securitization trusts that are accounted for as sales and for which we have incremental credit risk, we recognize our guarantee obligation in accordance with the accounting guidance for guarantees. Additionally, we may retain an interest in the transferred financial assets (e.g., a beneficial interest issued by the securitization trust). See "NOTE 10: RETAINED INTERESTS IN MORTGAGE-RELATED SECURITIZATIONS" for further information on these retained interests.

### Other Guarantee Commitments

We provide long-term standby commitments to certain of our customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements. During the three and six months ended June 30, 2011, we issued and guaranteed $0.7 billion and $2.5 billion, respectively, in UPB of long-term standby commitments. These other guarantee commitments totaled $7.5 billion and $5.5 billion of UPB at June 30, 2011 and December 31, 2010, respectively. We also had other guarantee commitments on multifamily housing revenue bonds that were issued by HFAs of $9.6 billion and $9.7 billion in UPB at June 30, 2011 and December 31, 2010, respectively. In addition, as of June 30, 2011 and December 31, 2010, respectively, we had issued guarantees under the TCLFP on securities backed by HFA bonds with UPB of $3.3 billion and $3.5 billion, respectively.

### Derivative Instruments

Derivative instruments include written options, written swaptions, interest-rate swap guarantees, and short-term default guarantee commitments accounted for as credit derivatives. See "NOTE 11: DERIVATIVES" for further discussion of these derivative guarantees.

We guarantee the performance of interest-rate swap contracts in two circumstances. First, we guarantee that a borrower will perform under an interest-rate swap contract linked to a borrower's adjustable-rate mortgage. And second, in connection with our issuance of certain REMICs and Other Structured Securities, which are backed by tax-exempt bonds, we guarantee that the sponsor of the transaction will perform under the interest-rate swap contract linked to the senior variable-rate certificates that we issued.

We also have issued REMICs and Other Structured Securities with stated final maturities that are shorter than the stated maturity of the underlying mortgage loans. If the underlying mortgage loans to these securities have not been purchased by a third party or fully matured as of the stated final maturity date of such securities, we will sponsor an auction of the underlying assets. To the extent that purchase or auction proceeds are insufficient to cover unpaid principal amounts due to investors in such REMICs and Other Structured Securities, we are obligated to fund such principal. Our maximum exposure on these guarantees represents the outstanding UPB of the REMICs and Other Structured Securities subject to stated final maturities.

### Servicing-Related Premium Guarantees

We provide guarantees to reimburse servicers for premiums paid to acquire servicing in situations where the original seller is unable to perform under its separate servicing agreement. The liability associated with these agreements was not material at June 30, 2011 and December 31, 2010.

### Other Indemnifications

In connection with certain business transactions, we may provide indemnification to counterparties for claims arising out of breaches of certain obligations (e.g., those arising from representations and warranties) in contracts entered into in the normal course of business. Our assessment is that the risk of any material loss from such a claim for indemnification is remote and there are no probable and estimable losses associated with these contracts. Therefore, we have not recorded any liabilities related to these indemnifications on our consolidated balance sheets at June 30, 2011 and December 31, 2010.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1789

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

As part of the guarantee arrangements pertaining to multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees." These guarantees require us to advance funds to enable others to repurchase any tendered tax-exempt and related taxable bonds that are unable to be remarketed. Any such advances are treated as loans and are secured by a pledge to us of the repurchased securities until the securities are remarketed. We hold cash and cash equivalents on our consolidated balance sheets for the amount of these commitments. No advances under these liquidity guarantees were outstanding at June 30, 2011 and December 31, 2010.

### NOTE 10: RETAINED INTERESTS IN MORTGAGE-RELATED SECURITIZATIONS

Beginning January 1, 2010, in accordance with the amendment to the accounting guidance for consolidation of VIEs, we consolidated our single-family PC trusts and certain Other Guarantee Transactions. As a result, a large majority of our transfers of financial assets that historically qualified as sales (*e.g.*, the transfer of mortgage loans to our single-family PC trusts) are no longer treated as such because the financial assets are transferred to a consolidated entity. In addition, to the extent that we receive newly-issued PCs or Other Guarantee Transactions in connection with such a transfer, we extinguish a proportional amount of the debt securities of the consolidated trust. See "NOTE 2: CHANGE IN ACCOUNTING PRINCIPLES" in our 2010 Annual Report for further information regarding the impacts of consolidation of our single-family PC trusts and certain Other Guarantee Transactions.

Certain of our transfers of financial assets to non-consolidated trusts and third parties may continue to qualify as sales. In connection with our transfers of financial assets that qualify as sales, we may retain certain interests in the transferred assets. Our retained interests are primarily beneficial interests issued by non-consolidated securitization trusts (*e.g.*, multifamily PCs and multiclass resecuritization securities). These interests are included in investments in securities on our consolidated balance sheets. In addition, our guarantee asset recognized in connection with non-consolidated securitization transactions also represents a retained interest. For more information about our retained interests in mortgage-related securitizations, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report. These transfers and our resulting retained interests are not significant to our consolidated financial statements in the first half of 2011 and 2010.

### NOTE 11: DERIVATIVES

#### Use of Derivatives

We use derivatives primarily to:

• hedge forecasted issuances of debt;

• synthetically create callable and non-callable funding;

• regularly adjust or rebalance our funding mix in order to more closely match changes in the interest-rate characteristics of our mortgage assets; and

• hedge foreign-currency exposure.

#### *Hedge Forecasted Debt Issuances*

When we commit to purchase mortgage investments, such commitments are typically for a future settlement ranging from two weeks to three months after the date of the commitment. To facilitate larger and more predictable debt issuances that contribute to lower funding costs, we use interest-rate derivatives to economically hedge the interest-rate risk exposure from the time we commit to purchase a mortgage to the time the related debt is issued.

#### *Create Synthetic Funding*

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. For example, the combination of a series of short-term debt issuances over a defined period and a pay-fixed interest rate swap with the same maturity as the last debt issuance is the substantive economic equivalent of a long-term fixed-rate debt instrument of comparable maturity. Similarly, the combination of non-callable debt and a call swaption, or option to enter into a receive-fixed interest rate swap, with the same maturity as the non-callable debt, is the substantive economic equivalent of callable debt. These derivatives strategies increase our funding flexibility and allow us to better match asset and liability cash flows, often reducing overall funding costs.

#### *Adjust Funding Mix*

We generally use interest-rate swaps to mitigate contractual funding mismatches between our assets and liabilities. We also use swaptions and other option-based derivatives to adjust the contractual terms of our debt funding in response

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1790

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

to changes in the expected lives of our investments in mortgage-related assets. As market conditions dictate, we take rebalancing actions to keep our interest-rate risk exposure within management-set limits. In a declining interest-rate environment, we typically enter into receive-fixed interest rate swaps or purchase Treasury-based derivatives to shorten the duration of our funding to offset the declining duration of our mortgage assets. In a rising interest-rate environment, we typically enter into pay-fixed interest rate swaps or sell Treasury-based derivatives in order to lengthen the duration of our funding to offset the increasing duration of our mortgage assets.

### Foreign-Currency Exposure

We use foreign-currency swaps to eliminate virtually all of our exposure to fluctuations in exchange rates related to our foreign-currency denominated debt by entering into swap transactions that effectively convert foreign-currency denominated obligations into U.S. dollar-denominated obligations.

### Types of Derivatives

We principally use the following types of derivatives:

- LIBOR- and Euribor-based interest-rate swaps;
- LIBOR- and Treasury-based options (including swaptions);
- LIBOR- and Treasury-based exchange-traded futures; and
- Foreign-currency swaps.

In addition to swaps, futures and purchased options, our derivative positions include the following:

### Written Options and Swaptions

Written call and put swaptions are sold to counterparties allowing them the option to enter into receive- and pay-fixed interest rate swaps, respectively. Written call and put options on mortgage-related securities give the counterparty the right to execute a contract under specified terms, which generally occurs when we are in a liability position. We use these written options and swaptions to manage convexity risk over a wide range of interest rates. Written options lower our overall hedging costs, allow us to hedge the same economic risk we assume when selling guaranteed final maturity REMICs with a more liquid instrument, and allow us to rebalance the options in our callable debt and REMICs portfolios. We may, from time to time, write other derivative contracts such as caps, floors, interest-rate futures and options on buy-up and buy-down commitments.

### Commitments

We routinely enter into commitments that include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts. Most of these commitments are considered derivatives and therefore are subject to the accounting guidance for derivatives and hedging.

### Swap Guarantee Derivatives

In connection with some of the guarantee arrangements pertaining to multifamily housing revenue bonds and multifamily pass-through certificates, we may also guarantee the sponsor's or the borrower's obligations as a counterparty on any related interest-rate swaps used to mitigate interest-rate risk, which are accounted for as swap guarantee derivatives.

### Credit Derivatives

We entered into credit-risk sharing agreements for certain credit enhanced multifamily housing revenue bonds held by third parties in exchange for a monthly fee. In addition, we have purchased mortgage loans containing debt cancellation contracts, which provide for mortgage debt or payment cancellation for borrowers who experience unanticipated losses of income dependent on a covered event. The rights and obligations under these agreements have been assigned to the servicers. However, in the event the servicer does not perform as required by contract, under our guarantee, we would be obligated to make the required contractual payments.

For a discussion of our significant accounting policies related to derivatives, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Derivatives" in our 2010 Annual Report.

TREASURY-1791

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Derivative Assets and Liabilities at Fair Value

Table 11.1 presents the location and fair value of derivatives reported in our consolidated balance sheets.

### Table 11.1 — Derivative Assets and Liabilities at Fair Value

| | At June 30, 2011 | | | At December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Notional or Contractual Amount | Derivatives at Fair Value Assets(1) | Liabilities(1) | Notional or Contractual Amount | Derivatives at Fair Value Assets(1) | Liabilities(1) |
| | | | (in millions) | | | |
| **Total derivative portfolio** | | | | | | |
| *Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging(2)* | | | | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed | $ 215,758 | $ 3,971 | $ (1,271) | $ 324,590 | $ 6,952 | $ (3,267) |
| Pay-fixed | 321,870 | 716 | (21,468) | 394,294 | 3,012 | (24,210) |
| Basis (floating to floating) | 3,275 | 5 | (1) | 2,375 | 6 | (2) |
| Total interest-rate swaps | 540,903 | 4,692 | (22,740) | 721,259 | 9,970 | (27,479) |
| Option-based: | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 103,825 | 8,260 | — | 114,110 | 8,391 | — |
| Written | 23,025 | — | (780) | 11,775 | — | (244) |
| Put swaptions | | | | | | |
| Purchased | 73,475 | 1,714 | — | 59,975 | 1,404 | — |
| Written | 6,000 | — | — | 6,000 | — | (8) |
| Other option-based derivatives(3) | 41,861 | 1,515 | (1) | 47,234 | 1,460 | (10) |
| Total option-based | 248,186 | 11,489 | (781) | 239,094 | 11,255 | (262) |
| Futures | 105,169 | 4 | (50) | 212,383 | 3 | (170) |
| Foreign-currency swaps | 2,184 | 327 | — | 2,021 | 172 | — |
| Commitments(4) | 34,361 | 121 | (66) | 14,292 | 103 | (123) |
| Credit derivatives | 11,383 | 2 | (4) | 12,833 | 12 | (5) |
| Swap guarantee derivatives | 3,733 | — | (36) | 3,614 | — | (36) |
| Total Derivatives not designated as hedging instruments | 945,919 | 16,635 | (23,677) | 1,205,496 | 21,515 | (28,075) |
| Netting adjustments(5) | | (16,389) | 23,269 | | (21,372) | 26,866 |
| Total derivative portfolio, net | $ 945,919 | $ 246 | $ (408) | $1,205,496 | $ 143 | $ (1,209) |

(1) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net.

(2) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.

(3) Primarily includes purchased interest rate caps and floors.

(4) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(5) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $8.2 billion and $6 million, respectively, at June 30, 2011. The net cash collateral posted and net trade/settle receivable were $6.3 billion and $1 million, respectively, at December 31, 2010. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.3) billion and $(0.8) billion at June 30, 2011 and December 31, 2010, respectively, which was mainly related to interest rate swaps that we have entered into.

The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable and net trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net asset position are reported as derivative assets, net. Similarly, derivatives in a net liability position are reported as derivative liabilities, net. Cash collateral we obtained from counterparties to derivative contracts that has been offset against derivative assets at June 30, 2011 and December 31, 2010 was $1.7 billion and $2.2 billion, respectively. Cash collateral we posted to counterparties to derivative contracts that has been offset against derivative liabilities at June 30, 2011 and December 31, 2010 was $9.9 billion and $8.5 billion, respectively. We are subject to collateral posting thresholds based on the credit rating of our long-term senior unsecured debt securities from S&P or Moody's. In the event our credit ratings fall below certain specified rating triggers or are withdrawn by S&P or Moody's, the counterparties to the derivative instruments are entitled to full overnight collateralization on derivative instruments in net liability positions. The aggregate fair value of all derivative instruments with credit-risk-related contingent features that were in a liability position on June 30, 2011, was $10.1 billion for which we have posted collateral of $9.9 billion in the normal course of business. If the credit-risk-related contingent features underlying these agreements were triggered on June 30, 2011, we would be required to post an additional $0.2 billion of collateral to our counterparties.

At June 30, 2011 and December 31, 2010, there were no amounts of cash collateral that were not offset against derivative assets, net or derivative liabilities, net, as applicable. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information related to our derivative counterparties.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1792

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Gains and Losses on Derivatives

Table 11.2 presents the gains and losses on derivatives reported in our consolidated statements of income and comprehensive income.

## Table 11.2 — Gains and Losses on Derivatives

**Three Months Ended June 30,**

| Derivatives in Cash Flow Hedging Relationships[1] | Amount of Gain or (Loss) Recognized in AOCI on Derivatives (Effective Portion) 2011 | 2010 | Amount of Gain or (Loss) Reclassified from AOCI into Earnings (Effective Portion) 2011 | 2010 | Amount of Gain or (Loss) Recognized in Other Income (Ineffective Portion and Amount Excluded from Effectiveness Testing) 2011 | 2010 |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Closed cash flow hedges[2] | $ — | $ — | $ (201) | $ (277) | $ — | $ — |

**Six Months Ended June 30,**

| Derivatives in Cash Flow Hedging Relationships[1] | Amount of Gain or (Loss) Recognized in AOCI on Derivatives (Effective Portion) 2011 | 2010 | Amount of Gain or (Losses) Reclassified from AOCI into Earnings (Effective Portion) 2011 | 2010 | Amount of Gain or (Loss) Recognized in Other Income (Ineffective Portion and Amount Excluded from Effectiveness Testing) 2011 | 2010 |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Closed cash flow hedges[2] | $ — | $ — | $ (398) | $ (536) | $ — | $ — |

| Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging[4] | Derivative Gains (Losses)[3] Three Months Ended June 30, 2011 | 2010 | Six Months Ended June 30, 2011 | 2010 |
|---|---|---|---|---|
| | | (in millions) | | |
| Interest-rate swaps: | | | | |
| Receive-fixed | | | | |
| Foreign-currency denominated | $ (3) | $ (57) | $ (40) | $ (65) |
| U.S. dollar denominated | 3,561 | 10,716 | 1,357 | 13,099 |
| Total receive-fixed swaps | 3,558 | 10,659 | 1,317 | 13,034 |
| Pay-fixed | (7,307) | (18,633) | (3,344) | (23,380) |
| Basis (floating to floating) | — | 36 | 1 | 74 |
| Total interest-rate swaps | (3,749) | (7,938) | (2,026) | (10,272) |
| Option based: | | | | |
| Call swaptions | | | | |
| Purchased | 2,026 | 6,531 | 1,342 | 7,031 |
| Written | (196) | (336) | (158) | (277) |
| Put swaptions | | | | |
| Purchased | (355) | (813) | (477) | (1,787) |
| Written | — | 84 | 7 | 79 |
| Other option-based derivatives[5] | 127 | 398 | 81 | 236 |
| Total option-based | 1,602 | 5,864 | 795 | 5,282 |
| Futures | (99) | 42 | (140) | (12) |
| Foreign-currency swaps[6] | 47 | (484) | 156 | (815) |
| Commitments[7] | (257) | (114) | (421) | (149) |
| Credit derivatives | — | 2 | 1 | 2 |
| Swap guarantee derivatives | 1 | — | 2 | 1 |
| Subtotal | (2,455) | (2,627) | (1,633) | (5,963) |
| Accrual of periodic settlements:[8] | | | | |
| Receive-fixed interest rate swaps[9] | 1,066 | 1,688 | 2,312 | 3,220 |
| Pay-fixed interest rate swaps | (2,428) | (2,906) | (4,932) | (5,790) |
| Foreign-currency swaps | 6 | 5 | 10 | 12 |
| Other | 4 | 2 | 9 | (2) |
| Total accrual of periodic settlements | (1,352) | (1,211) | (2,601) | (2,560) |
| Total | $ (3,807) | $ (3,838) | $(4,234) | $ (8,523) |

(1) Derivatives that meet specific criteria may be accounted for as cash flow hedges. Net deferred gains and losses on closed cash flow hedges (*i.e.*, where the derivative is either terminated or redesignated) are also included in AOCI until the related forecasted transaction affects earnings or is determined to be probable of not occurring.

(2) Amounts reported in AOCI related to changes in the fair value of commitments to purchase securities that were designated as cash flow hedges are recognized as basis adjustments to the related assets, which are amortized in earnings as interest income. Amounts linked to interest payments on long-term debt are recorded in other debt interest expense and amounts not linked to interest payments on long-term debt are recorded in expense related to derivatives.

(3) Gains (losses) are reported as derivative gains (losses) on our consolidated statements of income and comprehensive income.

(4) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.

(5) Primarily includes purchased interest rate caps and floors.

(6) Foreign-currency swaps are defined as swaps in which the net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars.

(7) Commitments include: (a) our commitments to purchase and sell investments in securities; (b) our commitments to purchase mortgage loans; and (c) our commitments to purchase and extinguish or issue debt securities of our consolidated trusts.

(8) For derivatives not in qualifying hedge accounting relationships, the accrual of periodic cash settlements is recorded in derivative gains (losses) on our consolidated statements of income and comprehensive income.

(9) Includes imputed interest on zero-coupon swaps.

141

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1793          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1794

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Hedge Designation of Derivatives

At June 30, 2011 and December 31, 2010, we did not have any derivatives in hedge accounting relationships; however, there are deferred net losses recorded in AOCI related to closed cash flow hedges. As shown in Table 11.3, the total AOCI related to derivatives designated as cash flow hedges was a loss of $2.0 billion and $2.6 billion at June 30, 2011 and 2010, respectively, composed of deferred net losses on closed cash flow hedges. Closed cash flow hedges involve derivatives that have been terminated or are no longer designated as cash flow hedges. Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI relating to losses on closed cash flow hedges.

The previous deferred amount related to closed cash flow hedges remains in our AOCI balance and will be recognized into earnings over the expected time period for which the forecasted transactions impact earnings. Over the next 12 months, we estimate that approximately $461 million, net of taxes, of the $2.0 billion of cash flow hedge losses in AOCI at June 30, 2011 will be reclassified into earnings. The maximum remaining length of time over which we have hedged the exposure related to the variability in future cash flows on forecasted transactions, primarily forecasted debt issuances, is 23 years. However, over 70% and 90% of AOCI relating to closed cash flow hedges at June 30, 2011, will be reclassified to earnings over the next five and ten years, respectively.

Table 11.3 presents the changes in AOCI related to derivatives designated as cash flow hedges. Net reclassifications of losses to earnings represents the AOCI amount that was recognized in earnings as the originally hedged forecasted transactions affected earnings, unless it was deemed probable that the forecasted transaction would not occur. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the hedge related to the forecasted transaction would be reclassified into earnings immediately.

## Table 11.3 — AOCI Related to Cash Flow Hedge Relationships

|  | Six Months Ended June 30, | |
|  | 2011 | 2010 |
| --- | --- | --- |
|  | (in millions) | |
| Beginning balance(1) | $(2,239) | $ (2,905) |
| Cumulative effect of change in accounting principle(2) | — | (7) |
| Net reclassifications of losses to earnings(3) | 267 | 356 |
| Ending balance(1) | $ (1,972) | $(2,556) |

(1) Represents net deferred gains and losses on closed (*i.e.*, terminated or redesignated) cash flow hedges.
(2) Represents adjustment to initially apply the accounting guidance for accounting for transfers of financial assets and consolidation of VIEs, as well as a change in the amortization method for certain related deferred items. Net of tax benefit of $4 million for the six months ended June 30, 2010.
(3) Net of tax benefit of $131 million and $180 million for the six months ended June 30, 2011 and 2010, respectively.

## NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)

### Senior Preferred Stock

To address our net worth deficit of $1.5 billion at June 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $1.5 billion. We received $500 million in March 2011 pursuant to a draw request that FHFA submitted to Treasury on our behalf to address the deficit in our net worth as of December 31, 2010. No cash was received from Treasury under the Purchase Agreement during the second quarter of 2011 due to our positive net worth at March 31, 2011. The aggregate liquidation preference on the senior preferred stock owned by Treasury was $64.7 billion and $64.2 billion as of June 30, 2011 and December 31, 2010, respectively. See "NOTE 16: REGULATORY CAPITAL" for additional information.

### Stock Repurchase and Issuance Programs

We did not repurchase or issue any of our common shares or non-cumulative preferred stock during the six months ended June 30, 2011, except for issuances of treasury stock as reported on our consolidated statements of equity (deficit) relating to stock-based compensation granted prior to conservatorship. Common stock delivered under these stock-based compensation plans consists of treasury stock. During the six months ended June 30, 2011, restrictions lapsed on 823,605 restricted stock units, all of which were granted prior to conservatorship. For a discussion regarding our stock-based compensation plans, see "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1795

Table of Contents

**Dividends Declared During 2011**

No common dividends were declared in 2011. On both March 31, 2011 and June 30 2011, we paid dividends of $1.6 billion in cash on the senior preferred stock at the direction of our Conservator. We did not declare or pay dividends on any other series of Freddie Mac preferred stock outstanding during the six months ended June 30, 2011.

## NOTE 13: INCOME TAXES

**Income Tax Benefit**

For the three months ended June 30, 2011 and 2010, we reported an income tax benefit of $232 million and $286 million, respectively, resulting in effective tax rates of 9.8% and 5.7%, respectively. For the six months ended June 30, 2011 and 2010, we reported an income tax benefit of $306 million and $389 million, respectively, representing effective tax rates of 17.3% and 3.3%, respectively. For the three and six months ended June 30, 2011 and 2010, our effective tax rate was different from the statutory rate of 35% primarily due to changes in the valuation allowance recorded against a portion of our net deferred tax assets.

**Deferred Tax Assets, Net**

We use the asset and liability method to account for income taxes in accordance with the accounting guidance for income taxes. Under this method, deferred tax assets and liabilities are recognized based upon the expected future tax consequences of existing temporary differences between the financial reporting and the tax reporting basis of assets and liabilities using enacted statutory tax rates. Valuation allowances are recorded to reduce net deferred tax assets when it is more likely than not that a tax benefit will not be realized. The realization of our net deferred tax assets is dependent upon the generation of sufficient taxable income in available carryback years from current operations and unrecognized tax benefits, and upon our intent and ability to hold available-for-sale debt securities until the recovery of any temporary unrealized losses.

In connection with our entry into conservatorship, we determined that it was more likely than not that a portion of our net deferred tax assets would not be realized due to our inability to generate sufficient taxable income and, therefore, we recorded a valuation allowance. After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, and related difficulty in forecasting future profit levels, we reached a similar conclusion in subsequent quarters, including the second quarter of 2011. Our valuation allowance increased by $658 million to $33.9 billion in the six months ended June 30, 2011, primarily attributable to an increase in temporary differences during the period. As of June 30, 2011, after consideration of the valuation allowance, we had a net deferred tax asset of $3.9 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities. We believe the deferred tax asset related to these unrealized losses is more likely than not to be realized because of our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered.

As of June 30, 2011, we had net operating loss and LIHTC carryforwards that will expire over multiple years beginning in 2027 and ending in 2031 and alternative minimum tax credit carryforwards that will not expire.

**Unrecognized Tax Benefits**

At June 30, 2011, we had total unrecognized tax benefits, exclusive of interest, of $1.2 billion. This amount relates to tax positions for which ultimate deductibility is highly certain, but for which there is uncertainty as to the timing of such deductibility. If favorably resolved, $1.2 billion of unrecognized tax benefits would have a positive impact on the effective tax rate due to the reversal of the valuation allowance established against deferred tax assets created by the uncertain tax positions. This favorable impact would be offset by a $186 million tax expense related to the establishment of a valuation allowance against credits that have been carried forward. A valuation allowance has not currently been recorded against this amount because a portion of the unrecognized tax benefits was used as a source of taxable income in our realization assessment of our net deferred tax assets.

We continue to recognize interest and penalties, if any, in income tax expense. There has been no material change during the quarter in total accrued interest payable allocable to unrecognized tax benefits.

The period for assessment under the statute of limitations for federal income tax purposes is open on corporate income tax returns filed for tax years 1998 to 2009. Prior to 2011, the IRS completed its examinations of tax years 1998 to 2007. We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices. The principal matter of controversy involves questions of timing and potential penalties regarding our tax

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                     TREASURY-1796                     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

accounting method for certain hedging transactions. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. On July 6, 2011, the U.S. Tax Court issued a Notice Setting Case for Trial and a Standing Pretrial Order. The trial date set forth in the Notice is December 12, 2011. We continue to seek resolution of the controversy by settlement. It is reasonably possible that the hedge accounting method issue will be resolved within the next 12 months. We believe adequate reserves have been provided for settlement on reasonable terms. However, changes could occur in the gross balance of unrecognized tax benefits within the next 12 months that could have a material impact on income tax expense in the period the issue is resolved if the outcome reached is not in our favor and the assessment is in excess of the amount currently reserved. We have no information that would enable us to estimate such impact at this time.

## NOTE 14: EMPLOYEE BENEFITS

### Defined Benefit Plans

We maintain a tax-qualified, funded defined benefit pension plan, or Pension Plan, covering substantially all of our employees. We also maintain a nonqualified, unfunded defined benefit pension plan for our officers as part of our SERP (we refer to this plan and the Pension Plan as our Defined Benefit Pension Plans). We also maintain a defined benefit postretirement health care plan, or Retiree Health Plan, that generally provides postretirement health care benefits on a contributory basis to retired employees age 55 or older who meet certain minimum service and other eligibility requirements. Our Retiree Health Plan is currently unfunded and the benefits are paid from our general assets. This plan and our Defined Benefit Pension Plans are collectively referred to as the Defined Benefit Plans.

In June 2011, we amended our Defined Benefit Pension Plans. Under those amendments, eligibility for the pension benefit under our Defined Benefit Pension Plans will be limited to eligible employees hired on or before December 31, 2011. The amendments are effective January 1, 2012.

Table 14.1 presents the components of the net periodic benefit cost with respect to pension and postretirement health care benefits for the three and six months ended June 30, 2011 and 2010. Net periodic benefit cost is included in salaries and employee benefits on our consolidated statements of income and comprehensive income.

### Table 14.1 — Net Periodic Benefit Cost Detail

| | Three Months Ended June 30, 2011 | | | | Six Months Ended June 30, 2011 | | | |
| | 2011 | | 2010 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | | |
| **Pension Benefits** | | | | | | | | |
| Service cost | $ | 8 | $ | 8 | $ | 17 | $ | 16 |
| Interest cost on benefit obligation | | 10 | | 10 | | 20 | | 19 |
| Expected return on plan assets | | (12) | | (10) | | (24) | | (20) |
| Recognized net actuarial loss | | 2 | | 2 | | 3 | | 5 |
| Net periodic benefit cost | $ | 8 | $ | 10 | $ | 16 | $ | 20 |
| **Postretirement Health Care Benefits** | | | | | | | | |
| Service cost | $ | 1 | $ | 1 | $ | 3 | $ | 3 |
| Interest cost on benefit obligation | | 3 | | 2 | | 5 | | 4 |
| Net periodic benefit cost | $ | 4 | $ | 3 | $ | 8 | $ | 7 |

### Cash Flows Related to Defined Benefit Plans

Our general practice is to contribute to our Pension Plan an amount equal to at least the minimum required contribution, if any, but no more than the maximum amount deductible for federal income tax purposes each year. A contribution to our Pension Plan is not required in calendar year 2011.

144

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 15: SEGMENT REPORTING

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for additional information about the conservatorship. The financial performance of our segments is measured based on each segment's contribution to GAAP net income (loss). In addition, our Investments segment is measured on its contribution to GAAP total comprehensive income (loss).

We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of income and comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments. These reclassifications and allocations are described in "NOTE 17: SEGMENT REPORTING" in our 2010 Annual Report.

We do not consider our assets by segment when evaluating segment performance or allocating resources. We conduct our operations solely in the U.S. and its territories. Therefore, we do not generate any revenue from geographic locations outside of the U.S. and its territories.

### Segments

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. The chart below provides a summary of our three reportable segments and the All Other category. As reflected in the chart, certain activities that are not part of a reportable segment are included in the All Other category. The All Other category consists of material corporate level expenses that are: (a) non-recurring in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods.

TREASURY-1798

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

| Segment | Description | Activities/Items |
|---|---|---|
| Investments | Segment Earnings for the Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans funded by other debt issuances and hedged using derivatives. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. The Investments segment also reflects the impact of changes in fair value of CMBS and multifamily held-for-sale loans associated with changes in interest rates. | • Investments in mortgage-related securities and single-family performing mortgage loans<br><br>• Investments in asset-backed securities<br><br>• All other traded instruments / securities, excluding CMBS and multifamily housing revenue bonds<br><br>• Debt issuances<br><br>• All asset / liability management returns<br><br>• Guarantee buy-ups / buy-downs, net of execution gains / losses<br><br>• Cash and liquidity management<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated administrative expenses and taxes |
| Single-Family Guarantee | Segment Earnings for the Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related security in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less the related credit costs (i.e., provision for credit losses), administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses. | • Management and guarantee fees on PCs, including those retained by us, and single-family mortgage loans in the mortgage investments portfolio<br><br>• Up-front credit delivery fees<br><br>• Adjustments for security performance<br><br>• Credit losses on all single-family assets<br><br>• Expected net float income or expense on the single-family credit guarantee portfolio<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated debt costs, administrative expenses and taxes |
| Multifamily | Segment Earnings for the Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans that we purchased for investment, we have not purchased significant amounts of these loans for investment since 2010. Currently, our primary strategy is to purchase multifamily mortgage loans for purposes of aggregation and then securitization. We guarantee the senior tranches of these securitizations. Although we hold CMBS that we purchased for investment, we have not purchased significant amounts of non-agency CMBS for investment since 2008. The Multifamily segment does not issue REMIC securities but does issue Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less allocated funding costs, the related credit costs (i.e. provision (benefit) for credit losses), and administrative expenses. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in the fair value of CMBS and held-for-sale loans associated only with factors other than changes in interest rates, such as liquidity and credit. | • Multifamily mortgage loans held-for-sale and associated securitization activities<br><br>• Investments in CMBS, multifamily housing revenue bonds, and multifamily mortgage loans held-for-investment<br><br>• Allocated debt costs, administrative expenses and taxes<br><br>• Other guarantee commitments on multifamily mortgage loans<br><br>• LIHTC and valuation allowance<br><br>• Deferred tax asset valuation allowance |
| All Other | The All Other category consists of corporate-level expenses that are material and infrequent in nature and based on management decisions outside the control of the reportable segments. | • LIHTC write-down<br><br>• Tax settlements, as applicable<br><br>• Legal settlements, as applicable<br><br>• The deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward. |

TREASURY-1799

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Segment Earnings**

The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac. However, the accounting principles we apply to present certain financial statement line items in Segment Earnings for our reportable segments, in particular Segment Earnings net interest income and management and guarantee income, differ significantly from those applied in preparing the comparable line items in our consolidated financial statements prepared in accordance with GAAP. Accordingly, the results of such line items differ significantly from, and should not be used as a substitute for, the comparable line items as determined in accordance with GAAP. For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "Table 15.2 — Segment Earnings and Reconciliation to GAAP Results."

In presenting Segment Earnings net interest income and management and guarantee income, we make adjustments to better reflect how management measures and assesses the performance of each segment and the company as a whole. These adjustments relate to amounts that, effective January 1, 2010, are no longer reflected in net income (loss) as determined in accordance with GAAP as a result of the adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. These adjustments are reversed through the segment adjustments line item within Segment Earnings, so that Segment Earnings (loss) for each segment equals GAAP net income (loss) attributable to Freddie Mac for each segment. Segment adjustments consist of the following:

- We adjust our Segment Earnings net interest income for the Investments segment to include the amortization of cash premiums and discounts and buy-up and buy-down fees on the consolidated Freddie Mac mortgage-related securities we purchase as investments. As of June 30, 2011, the unamortized balance of such premiums and discounts and buy-up and buy-down fees was $1.6 billion. These adjustments are necessary to reflect the economic yield realized on investments in consolidated Freddie Mac mortgage-related securities purchased at a premium or discount or with buy-up or buy-down fees.

- We adjust our Segment Earnings management and guarantee income for the Single-family Guarantee segment to include the amortization of delivery fees recorded in periods prior to the January 1, 2010 adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. As of June 30, 2011, the unamortized balance of such fees was $2.6 billion. We consider such fees to be part of the effective rate of the guarantee fee on guaranteed mortgage loans. This adjustment is necessary in order to better reflect the realization of revenue associated with guarantee contracts over the life of the underlying loans.

Table 15.1 presents Segment Earnings by segment.

**Table 15.1 — Summary of Segment Earnings and Total Comprehensive Income (Loss)[1]**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2011** | **2010** | **2011** | **2010** |
| | | (in millions) | | |
| Segment Earnings (loss), net of taxes: | | | | |
| Investments | $ 10 | $ (411) | $ 2,147 | $ (1,724) |
| Single-family Guarantee | (2,386) | (4,505) | (4,206) | (10,101) |
| Multifamily | 200 | 150 | 559 | 371 |
| All Other | 37 | 53 | 37 | 53 |
| Total Segment Earnings (loss), net of taxes | (2,139) | (4,713) | (1,463) | (11,401) |
| Net income (loss) attributable to Freddie Mac | $(2,139) | $(4,713) | $(1,463) | $(11,401) |
| Total comprehensive income (loss) of segments: | | | | |
| Investments | $ 643 | $ 3,203 | $ 3,906 | $ 5,010 |
| Single-family Guarantee | (2,385) | (4,504) | (4,209) | (10,104) |
| Multifamily | 605 | 818 | 1,906 | 2,731 |
| All Other | 37 | 53 | 37 | 53 |
| Total comprehensive income (loss) of segments | (1,100) | (430) | 1,640 | (2,310) |
| Total comprehensive income (loss) attributable to Freddie Mac | $ (1,100) | $ (430) | $ 1,640 | $ (2,310) |

(1) The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss) attributable to Freddie Mac. Likewise, the sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

147                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 15.2 presents detailed financial information by financial statement line item for our reportable segments and All Other.

## Table 15.2 — Segment Earnings and Reconciliation to GAAP Results

### Three Months Ended June 30, 2011

| | Net Interest Income | (Provision) Benefit for Credit Losses | Management and Guarantee Income | Security Impairments | Derivative Gains (Losses) | Other Non-Interest Income (Loss) | Administrative Expenses | REO Operations Income (Expense) | Other Non-Interest Expense | Segment Adjustments | Income Tax (Expense) Benefit | Net Income (Loss) | Less: Net (Income) Loss – Noncontrolling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in millions) | | | | | | | | | |
| Investments | $ 1,826 | $ — | $ — | $ (139) | $ (2,156) | $ 243 | $ (101) | $ — | $ (1) | $ 126 | $ 212 | $ 10 | $ — | $ 10 | $ 633 | $ 643 |
| Single-family Guarantee | (30) | (2,886) | 848 | — | — | 208 | (228) | (35) | (106) | (143) | (14) | (2,386) | — | (2,386) | 1 | (2,385) |
| Multifamily | 304 | 13 | 30 | (182) | 2 | 111 | (55) | 4 | (28) | — | (3) | 200 | — | 200 | 405 | 605 |
| All Other | — | — | — | — | — | — | — | — | — | — | 37 | 37 | — | 37 | — | 37 |
| Total Segment Earnings (loss), net of taxes | 2,100 | (2,873) | 878 | (321) | (2,154) | 562 | (384) | (27) | (135) | (17) | 232 | (2,139) | — | (2,139) | 1,039 | (1,100) |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications[1] | 2,335 | 344 | (694) | (31) | (1,653) | (301) | — | — | — | — | — | — | — | — | | |
| Segment adjustments[2] | 126 | — | (143) | — | — | — | — | — | — | 17 | — | — | — | — | | |
| Total reconciling items | 2,461 | 344 | (837) | (31) | (1,653) | (301) | — | — | — | 17 | — | — | — | — | | |
| Total per consolidated statements of income and comprehensive income | $ 4,561 | $ (2,529) | $ 41 | $ (352) | $ (3,807) | $ 261 | $ (384) | $ (27) | $ (135) | $ — | $ 232 | $ (2,139) | $ — | $ (2,139) | 1,039 | (1,100) |

### Six Months Ended June 30, 2011

| | Net Interest Income | (Provision) Benefit for Credit Losses | Management and Guarantee Income | Security Impairments | Derivative Gains (Losses) | Other Non-Interest Income (Loss) | Administrative Expenses | REO Operations Income (Expense) | Other Non-Interest Expense | Segment Adjustments | Income Tax (Expense) Benefit | Net Income (Loss) | Less: Net (Income) Loss – Noncontrolling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in millions) | | | | | | | | | |
| Investments | $ 3,479 | $ — | $ — | $ (1,168) | $ (1,053) | $ 479 | $ (196) | $ — | $ (1) | $ 329 | $ 278 | $ 2,147 | $ — | $ 2,147 | $ 1,759 | $ 3,906 |
| Single-family Guarantee | 70 | (5,170) | 1,718 | — | — | 419 | (443) | (292) | (172) | (328) | (8) | (4,206) | — | (4,206) | (3) | (4,209) |
| Multifamily | 583 | 73 | 58 | (317) | 4 | 298 | (106) | 4 | (41) | — | (1) | 559 | — | 559 | 1,347 | 1,906 |
| All Other | — | — | — | — | — | — | — | — | — | — | 37 | 37 | — | 37 | — | 37 |
| Total Segment Earnings (loss), net of taxes | 4,132 | (5,097) | 1,776 | (1,485) | (1,049) | 1,196 | (745) | (284) | (214) | 1 | 306 | (1,463) | — | (1,463) | 3,103 | 1,640 |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications[1] | 4,640 | 579 | (1,369) | (60) | (3,185) | (605) | — | — | — | — | — | — | — | — | | |
| Segment adjustments[2] | 329 | — | (328) | — | — | — | — | — | — | (1) | — | — | — | — | | |
| Total reconciling items | 4,969 | 579 | (1,697) | (60) | (3,185) | (605) | — | — | — | (1) | — | — | — | — | | |
| Total per consolidated statements of income and comprehensive income | $ 9,101 | $ (4,518) | $ 79 | $ (1,545) | $ (4,234) | $ 591 | $ (745) | $ (284) | $ (214) | $ — | $ 306 | $ (1,463) | $ — | $ (1,463) | 3,103 | 1,640 |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          TREASURY-1801          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Three Months Ended June 30, 2010**

| | Net Interest Income | Provision for Credit Losses | Management and Guarantee Income[1] | Security Impairments | Derivative Gains (Losses) | Other Non-Interest Income (Loss) | Administrative Expenses | REO Operations Income (Expense) | Other Non-Interest Expense | Segment Adjustments[2] | Income Tax Benefit | Net Income (Loss) | Less: Net (Income) Loss – Noncontrolling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in millions) | | | | | | | | | |
| Investments | $ 1,509 | $ — | $ — | $ (327) | $ (2,193) | $ 294 | $ (111) | $ — | $ (6) | $ 294 | $ 129 | $ (411) | $ — | $ (411) | $ 3,614 | $ 3,203 |
| Single-family Guarantee | 51 | (5,294) | 865 | — | (1) | 268 | (242) | 41 | (90) | (208) | 104 | (4,505) | — | (4,505) | 1 | (4,504) |
| Multifamily | 278 | (119) | 25 | (17) | (1) | 55 | (51) | (1) | (19) | — | — | 150 | — | 150 | 668 | 818 |
| All Other | — | — | — | — | — | — | — | — | — | — | 53 | 53 | — | 53 | — | 53 |
| Total Segment Earnings (loss), net of taxes | 1,838 | (5,413) | 890 | (344) | (2,194) | 617 | (404) | 40 | (115) | 86 | 286 | (4,713) | — | (4,713) | 4,283 | (430) |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications[1] | 2,004 | 384 | (645) | (84) | (1,644) | (15) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments[2] | 294 | — | (208) | — | — | — | — | — | — | (86) | — | — | — | — | — | — |
| Total reconciling items | 2,298 | 384 | (853) | (84) | (1,644) | (15) | — | — | — | (86) | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $ 4,136 | $ (5,029) | $ 37 | $ (428) | $ (3,838) | $ 602 | $ (404) | $ 40 | $ (115) | $ — | $ 286 | $ (4,713) | $ — | $ (4,713) | $ 4,283 | $ (430) |

**Six Months Ended June 30, 2010**

| | Net Interest Income | Provision for Credit Losses | Management and Guarantee Income[1] | Security Impairments | Derivative Gains (Losses) | Other Non-Interest Income (Loss) | Administrative Expenses | REO Operations Income (Expense) | Other Non-Interest Expense | Segment Adjustments[2] | Income Tax Benefit | Net Income (Loss) | Less: Net (Income) Loss – Noncontrolling Interests | Net Income (Loss) – Freddie Mac | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) – Freddie Mac |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (in millions) | | | | | | | | | |
| Investments | $ 2,820 | $ — | $ — | $ (703) | $ (4,895) | $ 272 | $ (233) | $ — | $ (13) | $ 804 | $ 226 | $ (1,722) | $ (2) | $ (1,724) | $ 6,734 | $ 5,010 |
| Single-family Guarantee | 110 | (11,335) | 1,713 | — | (4) | 478 | (471) | (4) | (169) | (421) | 109 | (10,101) | — | (10,101) | (3) | (10,104) |
| Multifamily | 516 | (148) | 49 | (72) | 4 | 163 | (105) | (4) | (36) | — | 1 | 368 | 3 | 371 | 2,360 | 2,731 |
| All Other | — | — | — | — | — | — | — | — | — | — | 53 | 53 | — | 53 | — | 53 |
| Total Segment Earnings (loss), net of taxes | 3,446 | (11,483) | 1,762 | (775) | (4,891) | 913 | (809) | (119) | (218) | 383 | 389 | (11,402) | 1 | (11,401) | 9,091 | (2,310) |
| Reconciliation to consolidated statements of income and comprehensive income: | | | | | | | | | | | | | | | | |
| Reclassifications[1] | 4,011 | 1,058 | (1,269) | (163) | (3,632) | (5) | — | — | — | — | — | — | — | — | — | — |
| Segment adjustments[2] | 804 | — | (421) | — | — | — | — | — | — | (383) | — | — | — | — | — | — |
| Total reconciling items | 4,815 | 1,058 | (1,690) | (163) | (3,632) | (5) | — | — | — | (383) | — | — | — | — | — | — |
| Total per consolidated statements of income and comprehensive income | $ 8,261 | $ (10,425) | $ 72 | $ (938) | $ (8,523) | $ 908 | $ (809) | $ (119) | $ (218) | $ — | $ 389 | $ (11,402) | $ 1 | $ (11,401) | $ 9,091 | $ (2,310) |

(1) Management and guarantee income total per consolidated statements of income and comprehensive income is included in other income on our GAAP consolidated statements of income and comprehensive income.

(2) See "Segment Earnings" for additional information regarding these adjustments.

(3) See "NOTE 17: SEGMENT REPORTING — Segment Earnings — *Investment Activity-Related Reclassifications*" and "— *Credit Guarantee Activity-Related Reclassifications*" in our 2010 Annual Report for information regarding these reclassifications.

149                                                                                           *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1802                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Table 15.3 presents total comprehensive income (loss) by segment.

**Table 15.3 — Total Comprehensive Income (Loss) of Segments[1]**

**Three Months Ended June 30, 2011**

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | | |
|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | | |
| Investments | $ 10 | $ 498 | $ 135 | $ — | | $ 633 | $ 643 |
| Single-family Guarantee | (2,386) | — | — | 1 | | 1 | (2,385) |
| Multifamily | 200 | 405 | — | — | | 405 | 605 |
| All Other | 37 | — | — | — | | — | 37 |
| Total per consolidated statements of income and comprehensive income | $ (2,139) | $ 903 | $ 135 | $ 1 | | $ 1,039 | $ (1,100) |

**Six Months Ended June 30, 2011**

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | | |
|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | | |
| Investments | $ 2,147 | $ 1,497 | $ 266 | $ (4) | | $ 1,759 | $ 3,906 |
| Single-family Guarantee | (4,206) | — | — | (3) | | (3) | (4,209) |
| Multifamily | 559 | 1,347 | 1 | (1) | | 1,347 | 1,906 |
| All Other | 37 | — | — | — | | — | 37 |
| Total per consolidated statements of income and comprehensive income | $ (1,463) | $ 2,844 | $ 267 | $ (8) | | $ 3,103 | $ 1,640 |

**Three Months Ended June 30, 2010**

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | | |
|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | | |
| Investments | $ (411) | $ 3,429 | $ 184 | $ 1 | | $ 3,614 | $ 3,203 |
| Single-family Guarantee | (4,505) | — | — | 1 | | 1 | (4,504) |
| Multifamily | 150 | 668 | — | — | | 668 | 818 |
| All Other | 53 | — | — | — | | — | 53 |
| Total per consolidated statements of income and comprehensive income | $ (4,713) | $ 4,097 | $ 184 | $ 2 | | $ 4,283 | $ (430) |

**Six Months Ended June 30, 2010**

| | Net Income (Loss) — Freddie Mac | Other Comprehensive Income (Loss), Net of Taxes | | | | Total Other Comprehensive Income (Loss), Net of Taxes | Total Comprehensive Income (Loss) — Freddie Mac |
| | | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | | | |
|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | | |
| Investments | $ (1,724) | $ 6,381 | $ 356 | $ (3) | | $ 6,734 | $ 5,010 |
| Single-family Guarantee | (10,101) | — | — | (3) | | (3) | (10,104) |
| Multifamily | 371 | 2,362 | — | (2) | | 2,360 | 2,731 |
| All Other | 53 | — | — | — | | — | 53 |
| Total per consolidated statements of income and comprehensive income | $ (11,401) | $ 8,743 | $ 356 | $ (8) | | $ 9,091 | $ (2,310) |

(1) The sum of total comprehensive income (loss) for each segment and the All Other category equals GAAP total comprehensive income (loss) attributable to Freddie Mac.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1803

**Table of Contents**

## NOTE 16: REGULATORY CAPITAL

On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship in light of the Purchase Agreement. FHFA continues to closely monitor our capital levels, but the existing statutory and FHFA-directed regulatory capital requirements are not binding during conservatorship. We continue to provide our submission to FHFA on minimum capital.

Our regulatory minimum capital is a leverage-based measure that is generally calculated based on GAAP and reflects a 2.50% capital requirement for on-balance sheet assets and 0.45% capital requirement for off-balance sheet obligations. Based upon our adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs, we determined that, under the new consolidation guidance, we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions and, therefore, effective January 1, 2010, we consolidated on our balance sheet the assets and liabilities of these trusts. Pursuant to regulatory guidance from FHFA, our minimum capital requirement was not automatically affected by adoption of these amendments. Specifically, upon adoption of these amendments, FHFA directed us, for purposes of minimum capital, to continue reporting single-family PCs and certain Other Guarantee Transactions held by third parties using a 0.45% capital requirement. FHFA reserves the authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities. On March 3, 2011, FHFA issued a final rule setting forth procedures and standards in the event FHFA were to make such a temporary increase in minimum capital levels. Table 16.1 summarizes our minimum capital requirements and deficits and net worth.

**Table 16.1 — Net Worth and Minimum Capital**

| | June 30, 2011 | December 31, 2010 |
|---|---|---|
| | (in millions) | |
| GAAP net worth[1] | $ (1,478) | $ (401) |
| Core capital (deficit)[2][3] | $ (57,250) | $ (52,570) |
| Less: Minimum capital requirement[2] | 24,901 | 25,987 |
| Minimum capital surplus (deficit)[2] | $ (82,151) | $ (78,557) |

(1) Net worth (deficit) represents the difference between our assets and liabilities under GAAP.
(2) Core capital and minimum capital figures for June 30, 2011 are estimates. FHFA is the authoritative source for our regulatory capital.
(3) Core capital excludes certain components of GAAP total equity (deficit) (*i.e.*, AOCI and liquidation preference of the senior preferred stock) as these items do not meet the statutory definition of core capital.

Following our entry into conservatorship, we have focused our risk and capital management, consistent with the objectives of conservatorship, on, among other things, maintaining a positive balance of GAAP equity in order to reduce the likelihood that we will need to make additional draws on the Purchase Agreement with Treasury, while returning to long-term profitability. The Purchase Agreement provides that, if FHFA determines as of quarter end that our liabilities have exceeded our assets under GAAP, Treasury will contribute funds to us in an amount equal to the difference between such liabilities and assets.

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has advised us that, if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination. If funding has been requested under the Purchase Agreement to address a deficit in our net worth, and Treasury is unable to provide us with such funding within the 60-day period specified by FHFA, FHFA would be required to place us into receivership if our assets remain less than our obligations during that 60-day period.

To address our net worth deficit of $1.5 billion at June 30, 2011, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $1.5 billion, and will request that we receive these funds by September 30, 2011. Commencing in the second quarter of 2011, our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. Upon funding of this draw request, our aggregate funding received from Treasury under the Purchase Agreement will increase to $65.2 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. As a result of the additional $1.5 billion draw request, the aggregate liquidation preference on the senior preferred stock owned by Treasury will increase from $64.7 billion at June 30, 2011 to $66.2 billion. We paid quarterly dividends of $1.6 billion on the senior preferred stock in cash on both March 31, 2011 and June 30, 2011 at the direction of the Conservator. Following funding of the draw request related to

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

our net worth deficit at June 30, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock will increase from $6.5 billion to $6.6 billion, which exceeds our annual historical earnings in all but one period.

## NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS

### Single-family Credit Guarantee Portfolio

Our business activity is to participate in and support the residential mortgage market in the United States, which we pursue by both issuing guaranteed mortgage securities and investing in mortgage loans and mortgage-related securities.

Table 17.1 summarizes the concentration by year of origination and geographical area of the approximately $1.8 trillion UPB of our single-family credit guarantee portfolio at both June 30, 2011 and December 31, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2010 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" and "NOTE 7: INVESTMENTS IN SECURITIES" for more information about credit risk associated with loans and mortgage-related securities that we hold.

**Table 17.1 — Concentration of Credit Risk — Single-Family Credit Guarantee Portfolio**

| | June 30, 2011 | | December 31, 2010 | | Percent of Credit Losses(1) Six Months Ended | |
| | Percentage of Portfolio(2) | Serious Delinquency Rate(3) | Percentage of Portfolio(2) | Serious Delinquency Rate(3) | June 30, 2011 | June 30, 2010 |
|---|---|---|---|---|---|---|
| **Year of Origination** | | | | | | |
| 2011 | 6% | <0.1% | N/A | N/A | —% | N/A |
| 2010 | 20 | 0.1 | 18% | 0.1% | — | —% |
| 2009 | 20 | 0.3 | 21 | 0.3 | 1 | — |
| 2008 | 8 | 4.9 | 9 | 4.9 | 8 | 6 |
| 2007 | 10 | 11.0 | 11 | 11.6 | 37 | 34 |
| 2006 | 8 | 10.3 | 9 | 10.5 | 29 | 30 |
| 2005 | 9 | 6.0 | 10 | 6.0 | 17 | 21 |
| 2004 and prior | 19 | 2.5 | 22 | 2.5 | 8 | 9 |
| Total | 100% | 3.5% | 100% | 3.8% | 100% | 100% |
| **Region**(4) | | | | | | |
| West | 28% | 3.8% | 27% | 4.7% | 56% | 47% |
| Northeast | 25 | 3.1 | 25 | 3.2 | 7 | 8 |
| North Central | 18 | 2.8 | 18 | 3.1 | 15 | 16 |
| Southeast | 17 | 5.4 | 18 | 5.6 | 18 | 25 |
| Southwest | 12 | 1.8 | 12 | 2.1 | 4 | 4 |
| Total | 100% | 3.5% | 100% | 3.8% | 100% | 100% |
| **State**(5) | | | | | | |
| California | 16% | 3.8% | 16% | 4.9% | 32% | 26% |
| Florida | 6 | 10.6 | 6 | 10.5 | 12 | 19 |
| Illinois | 5 | 4.5 | 5 | 4.6 | 4 | 5 |
| Georgia | 3 | 3.6 | 3 | 4.1 | 4 | 3 |
| Michigan | 3 | 2.4 | 3 | 3.0 | 5 | 6 |
| Arizona | 3 | 4.6 | 3 | 6.1 | 12 | 11 |
| Nevada | 1 | 10.6 | 1 | 11.9 | 6 | 5 |
| All other | 63 | N/A | 63 | N/A | 25 | 25 |
| Total | 100% | 3.5% | 100% | 3.8% | 100% | 100% |

(1) Credit losses consist of the aggregate amount of charge-offs, net of recoveries, and REO operations expense in each of the respective periods and exclude foregone interest on non-performing loans and other market-based losses recognized on our consolidated statements of income and comprehensive income.

(2) Based on the UPB of our single-family credit guarantee portfolio, which includes unsecuritized single-family mortgage loans held by us on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities, or covered by our other guarantee commitments.

(3) Serious delinquencies on mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice.

(4) Region designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

(5) States presented based on those with the highest percentage of credit losses during the six months ended June 30, 2011. Our top seven states based on the highest percentage of UPB as of June 30, 2011 are: California (16%), Florida (6%), Illinois (5%), New York (5%), Texas (5%), New Jersey (4%), and Virginia (4%), and comprised 45% of our single-family credit guarantee portfolio as of June 30, 2011.

### Credit Performance of Certain Higher Risk Single-Family Loan Categories

Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1805

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. However, there is no universally accepted definition of subprime or Alt-A. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as Alt-A in Table 17.2 because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred.

Although we do not categorize single-family mortgage loans we purchase or guarantee as prime or subprime, we recognize that there are a number of mortgage loan types with certain characteristics that indicate a higher degree of credit risk. For example, a borrower's credit score is a useful measure for assessing the credit quality of the borrower. Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores.

Presented below is a summary of the serious delinquency rates of certain higher-risk categories of single-family loans in our single-family credit guarantee portfolio. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Loans with a combination of these attributes will have an even higher risk of delinquency than those with isolated characteristics.

**Table 17.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio[1]**

| | Percentage of Portfolio[1] | | Serious Delinquency Rate | |
|---|---|---|---|---|
| | June 30, 2011 | December 31, 2010 | June 30, 2011 | December 31, 2010 |
| Interest-only | 5% | 5% | 17.7% | 18.4% |
| Option ARM | <1 | 1 | 21.6 | 21.2 |
| Alt-A[2] | 6 | 6 | 11.7 | 12.2 |
| Original LTV ratio greater than 90%[3] | 9 | 9 | 6.8 | 7.8 |
| Lower original FICO scores (less than 620) | 3 | 3 | 12.5 | 13.9 |

(1) Based on UPB.
(2) Alt-A loans may not include those loans that were previously classified as Alt-A and that have been refinanced as either a relief refinance mortgage or in another refinance mortgage initiative.
(3) Based on our first lien exposure on the property. Includes the credit-enhanced portion of the loan and excludes any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, increases the risk of default.

The percentage of borrowers in our single-family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 20% and 18% at June 30, 2011 and December 31, 2010, respectively. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. If a borrower has an estimated current LTV ratio greater than 100%, the borrower is "underwater" and is more likely to default than other borrowers. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 12.7% and 14.9% as of June 30, 2011 and December 31, 2010, respectively.

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on these categories and other concentrations in our investments in securities.

**Multifamily Mortgage Portfolio**

Table 17.3 summarizes the concentration of multifamily mortgages in our multifamily mortgage portfolio by certain attributes. Information presented for multifamily mortgage loans includes certain categories based on loan or borrower characteristics present at origination. The table includes a presentation of each category in isolation. A single loan may fall within more than one category (for example, a non-credit enhanced loan may also have an original LTV ratio greater than 80%).

153

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 17.3 — Concentration of Credit Risk — Multifamily Mortgage Portfolio**

| | June 30, 2011 | | December 31, 2010 | |
|---|---|---|---|---|
| | UPB(1) | Delinquency Rate(2) | UPB(1) | Delinquency Rate(2) |
| | | (dollars in billions) | | |
| **State** | | | | |
| California | $ 19.2 | 0.04% | $ 19.3 | 0.06% |
| Texas | 13.1 | 0.78 | 12.7 | 0.52 |
| New York | 9.3 | — | 9.2 | — |
| Florida | 6.8 | 0.42 | 6.4 | 0.56 |
| Virginia | 5.8 | — | 5.6 | — |
| Georgia | 5.6 | 1.09 | 5.5 | 0.98 |
| All other states | 50.9 | 0.29 | 49.7 | 0.24 |
| Total | $110.7 | 0.31% | $108.4 | 0.26% |
| | | | | |
| **Region(3)** | | | | |
| Northeast | $ 31.6 | 0.22% | $ 31.1 | —% |
| West | 28.5 | 0.06 | 28.3 | 0.07 |
| Southwest | 21.0 | 0.69 | 20.2 | 0.61 |
| Southeast | 20.0 | 0.51 | 19.2 | 0.59 |
| North Central | 9.6 | 0.12 | 9.6 | 0.30 |
| Total | $110.7 | 0.31% | $108.4 | 0.26% |
| | | | | |
| **Category(4)** | | | | |
| Original LTV ratio greater than 80% | $ 6.5 | 2.45% | $ 6.6 | 2.30% |
| Original DSCR below 1.10 | 3.0 | 2.05 | 3.2 | 1.22 |
| Non-credit enhanced loans | 83.5 | 0.19 | 87.5 | 0.12 |

(1) Beginning in the second quarter of 2011, we exclude non-consolidated mortgage-related securities for which we do not provide our guarantee. The prior period has been revised to conform to the current period presentation.

(2) Based on the UPB of multifamily mortgages two monthly payments or more delinquent or in foreclosure.

(3) See endnote (4) to "Table 17.1 — Concentration of Credit Risk — Single-family Credit Guarantee Portfolio" for a description of these regions.

(4) These categories are not mutually exclusive and a loan in one category may also be included within another.

One indicator of risk for mortgage loans in our multifamily mortgage portfolio is the amount of a borrower's equity in the underlying property. A borrower's equity in a property decreases as the LTV ratio increases. Higher LTV ratios negatively affect a borrower's ability to refinance or sell a property for an amount at or above the balance of the outstanding mortgage. The DSCR is another indicator of future credit performance. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

Our multifamily mortgage portfolio includes certain loans for which we have credit enhancement. Credit enhancement significantly reduces our exposure to a potential credit loss. As of June 30, 2011, more than one-half of the multifamily loans, measured both in terms of number of loans and on a UPB basis, that were two monthly payments or more past due had credit enhancements that we currently believe will mitigate our expected losses on those loans.

We estimate that the percentage of loans in our multifamily mortgage portfolio with a current LTV ratio of greater than 100% was approximately 8% at both June 30, 2011 and December 31, 2010, and our estimate of the current average DSCR for these loans was 1.2 and 1.1 as of June 30, 2011 and December 31, 2010, respectively. We estimate that the percentage of loans in our multifamily mortgage portfolio with a current DSCR less than 1.0 was 6% and 7% at June 30, 2011 and December 31, 2010, respectively, and the average current LTV ratio of these loans was 101% and 108%, respectively. Our estimates of current DSCRs are based on the latest available income information for these properties and our assessments of market conditions. Our estimates of the current LTV ratios for multifamily loans are based on values we receive from a third-party service provider as well as our internal estimates of property value, for which we may use changes in tax assessments, market vacancy rates, rent growth and comparable property sales in local areas as well as third-party appraisals for a portion of the portfolio. We periodically perform our own valuations or obtain third-party appraisals in cases where a significant deterioration in a borrower's financial condition has occurred, the borrower has applied for refinancing, or in certain other circumstances where we deem it appropriate to reassess the property value. Although we use the most recently available results of our multifamily borrowers to estimate a property's value, there may be a significant lag in reporting, which could be six months or more, as they complete their results in the normal course of business. Our internal estimates of property valuation are derived using techniques that include income capitalization, discounted cash flows, sales comparables, or replacement costs.

154

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1807

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Seller/Servicers

We acquire a significant portion of our single-family mortgage purchase volume from several large seller/servicers with whom we have entered into mortgage purchase volume commitments that provide for the lenders to deliver us a specified dollar amount of mortgages during a specified period of time. Our top 10 single-family seller/servicers provided approximately 85% of our single-family purchase volume during the six months ended June 30, 2011. Wells Fargo Bank, N.A., JPMorgan Chase Bank, N.A., Bank of America, N.A. and U.S. Bank, N.A. accounted for 29%, 14%, 11% and 10%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume during the six months ended June 30, 2011. We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated without replacement from other lenders.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our seller/servicers of their obligations to repurchase mortgages or (at our option) indemnify us in the event of: (a) breaches of the representations and warranties they made when they sold the mortgages to us; or (b) failure to comply with our servicing requirements. Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts. As of June 30, 2011 and December 31, 2010, the UPB of loans subject to our repurchase requests issued to our single-family seller/servicers was approximately $3.1 billion and $3.8 billion, and approximately 43% and 34% of these requests, respectively, were outstanding for more than four months since issuance of our initial repurchase request as measured by the UPB of the loans subject to the requests. During the three and six months ended June 30, 2011, respectively, we recovered amounts that covered losses with respect to $1.2 billion and $2.4 billion of UPB on loans subject to our repurchase requests.

On August 24, 2009, one of our single-family seller/servicers, Taylor, Bean & Whitaker Mortgage Corp., or TBW, filed for bankruptcy and announced its plan to wind down its operations. We had exposure to TBW with respect to its loan repurchase obligations. We also had exposure with respect to certain borrower funds that TBW held for the benefit of Freddie Mac. TBW received and processed such funds in its capacity as a servicer of loans owned or guaranteed by Freddie Mac. TBW maintained certain bank accounts, primarily at Colonial Bank, to deposit such borrower funds and to provide remittance to Freddie Mac. Colonial Bank was placed into receivership by the FDIC in August 2009.

With the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement was filed with the bankruptcy court on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011. We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors may file an action to recover certain funds paid to us prior to the TBW bankruptcy. See "NOTE 19: LEGAL CONTINGENCIES" for additional information on the settlement, our claims arising from TBW's bankruptcy, and Ocala's potential claims.

As previously disclosed, we joined an investor group that delivered a notice of non-performance in 2010 to The Bank of New York Mellon, as Trustee, and Countrywide Home Loans Servicing LP (now known as BAC Home Loans Servicing, LP), related to the possibility that certain mortgage pools backing certain mortgage-related securities issued by Countrywide Financial and related entities include mortgages that may have been ineligible for inclusion in the pools due to breaches of representations or warranties.

On June 29, 2011, Bank of America Corporation announced that it, BAC Home Loans Servicing, LP, Countrywide Financial Corporation and Countrywide Home Loans, Inc. entered into a settlement agreement with The Bank of New York Mellon, as trustee, to resolve all outstanding and potential claims related to alleged breaches of representations and warranties (including repurchase claims), substantially all historical loan servicing claims and certain other historical claims with respect to 530 Countrywide first-lien and second-lien residential mortgage-related securitization trusts. Bank of America indicated that the settlement is subject to final court approval and certain other conditions, including the receipt of a private letter ruling from the IRS. There can be no assurance that final court approval of the settlement will be obtained or that all conditions will be satisfied. Bank of America noted that, given the number of investors and the complexity of the settlement, it is not possible to predict whether and to what extent challenges will be made to the settlement or the timing or ultimate outcome of the court approval process, which could take a substantial period of time. We have investments in certain of these Countrywide securitization trusts and would expect to benefit from this settlement, if final court approval is obtained.

In connection with the settlement, Bank of America Corporation entered into an agreement with the investor group. Under this agreement, the investor group agreed, among other things, to use reasonable best efforts and to cooperate in good faith to effectuate the settlement, including to obtain final court approval. Freddie Mac was not a party to this

155

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

agreement, but agreed to retract any previously delivered notices of non-performance upon final court approval of the settlement.

The court has directed that any objections to the settlement be filed no later than August 30, 2011. FHFA, after considering input from us and others, will determine whether or not to object to the proposed settlement.

The ultimate amounts of recovery payments we received from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations. Our estimate of probable incurred losses for exposure to seller/servicers for their repurchase obligations is considered in our allowance for loan losses as of June 30, 2011 and December 31, 2010. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for further information. We believe we have adequately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at June 30, 2011 and December 31, 2010; however, our actual losses may exceed our estimates.

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loss mitigation efforts, including under the MHA Program, and therefore, we have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top five single-family loan servicers, Wells Fargo Bank N.A., Bank of America N.A., JPMorgan Chase Bank, N.A., Citimortgage, Inc., and U.S. Bank, N.A., together serviced approximately 67% of our single-family mortgage loans as of June 30, 2011. Wells Fargo Bank N.A., Bank of America N.A., and JPMorgan Chase Bank, N.A. serviced approximately 26%, 14% and 12%, respectively, of our single-family mortgage loans, as of June 30, 2011. Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

During the second half of 2010, a number of our seller/servicers, including several of our largest ones, temporarily suspended foreclosure proceedings in some or all states in which they do business. These seller/servicers announced these suspensions were necessary while they evaluated and addressed issues relating to the improper preparation and execution of certain documents used in foreclosure proceedings, including affidavits. While these servicers generally resumed foreclosure proceedings in the first quarter of 2011, the rate at which they are effecting foreclosures has been slower than prior to the suspensions. See "NOTE 7: REAL ESTATE OWNED" in our 2010 Annual Report for additional information.

As of June 30, 2011 our top four multifamily servicers, Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., CBRE Capital Markets, Inc., and Deutsche Bank Berkshire Mortgage, each serviced more than 10% of our multifamily mortgage portfolio and together serviced approximately 51% of our multifamily mortgage portfolio.

In our multifamily business, we are exposed to the risk that multifamily seller/servicers could come under financial pressure, which could potentially cause degradation in the quality of servicing they provide to us or, in certain cases, reduce the likelihood that we could recover losses through recourse agreements or other credit enhancements, where applicable. This risk primarily relates to multifamily loans that we hold on our consolidated balance sheets where we retain all of the related credit risk. We monitor the status of all our multifamily seller/servicers in accordance with our counterparty credit risk management framework.

## Mortgage Insurers

We have institutional credit risk relating to the potential insolvency of or non-performance by mortgage insurers that insure single-family mortgages we purchase or guarantee. We evaluate the recovery from insurance policies for mortgage loans that we hold for investment as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments as part of the estimate of our loan loss reserves. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2010 Annual Report for additional information. As of June 30, 2011, these insurers provided coverage, with maximum loss limits of $54.8 billion, for $259.9 billion of UPB, in connection with our single-family credit guarantee portfolio. Our top six mortgage insurer counterparties, Mortgage Guaranty Insurance Corporation (or MGIC), Radian Guaranty Inc., Genworth Mortgage Insurance Corporation, United Guaranty Residential Insurance Co., PMI Mortgage Insurance Co. (or PMI), and Republic Mortgage Insurance Co. (or RMIC) each accounted for more than 10% and collectively represented approximately 95% of our overall mortgage insurance coverage at June 30, 2011. All our mortgage insurance counterparties are rated BBB or below as of July 22, 2011, based on the lower of the S&P or Moody's rating scales and stated in terms of the S&P equivalent.

156 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We received proceeds of $1.3 billion and $0.7 billion during the six months ended June 30, 2011 and 2010, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers of $2.1 billion and $2.3 billion as of June 30, 2011 and December 31, 2010, respectively. The balance of our outstanding accounts receivable from mortgage insurers, net of associated reserves, was approximately $1.4 billion and $1.5 billion as of June 30, 2011 and December 31, 2010, respectively. Four of our mortgage insurers, including RMIC and PMI, have exceeded regulatory risk to capital ratios required by their state insurance regulators, and others may exceed regulatory limits in the future. Most, but not all, states have issued waivers to allow the companies to continue writing new business in their states, and Freddie Mac has, in certain circumstances, approved limited purpose affiliates to allow the companies to continue writing business in those states that have not issued waivers. Some of those state waivers are nearing their expiration dates.

On July 28, 2011, RMIC announced that its waiver of minimum state regulatory capital requirements will expire on August 31, 2011, and that it has not yet obtained necessary approvals to move production of new business to a separately capitalized subsidiary. RMIC stated that it is probable that its new business production will cease, at least temporarily, prior to August 31, 2011. RMIC also stated that, absent approval to underwrite new production through a separately capitalized subsidiary, it is most likely that RMIC's existing book of business would be placed into run off operating mode. We notified RMIC that they were suspended as an approved insurer for Freddie Mac loans effective August 1, 2011.

We evaluate the near term recovery from insurance policies for mortgage loans that we hold on our consolidated balance sheet as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities and covered by other guarantee commitments as part of the estimate of our loan loss reserves. Based upon currently available information, we believe that all of our mortgage insurance counterparties have the capacity to pay all claims as they become due in the normal course for the near term, except for claims obligations of Triad Guaranty Insurance Corporation (or Triad) that were partially deferred beginning June 1, 2009, under order of Triad's state regulator. However, we believe that certain of our other mortgage insurance counterparties may lack sufficient ability to fully meet all of their expected lifetime claims paying obligations to us over the long term as such claims emerge.

## Bond Insurers

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering some of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. At June 30, 2011, we had coverage, including secondary policies, on non-agency mortgage-related securities totaling $10.1 billion of UPB. At June 30, 2011, our top five bond insurers, Ambac Assurance Corporation (or Ambac), Financial Guaranty Insurance Company (or FGIC), MBIA Insurance Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp., each accounted for more than 10% of our overall bond insurance coverage and collectively represented approximately 99% of our total coverage.

We evaluate the recovery from primary monoline bond insurance policies as part of our impairment analysis for our investments in securities. FGIC and Ambac are currently not paying any claims. If a monoline bond insurer fails to meet its obligations on our investments in securities, then the fair values of our securities may further decline, which could have a material adverse effect on our results and financial condition. We recognized other-than-temporary impairment losses during 2010 and 2011 related to investments in mortgage-related securities covered by bond insurance as a result of our uncertainty over whether or not certain insurers will meet our future claims in the event of a loss on the securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on our evaluation of impairment on securities covered by bond insurance.

## Cash and Other Investments Counterparties

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. As of June 30, 2011 and December 31, 2010, there were $53.4 billion and $91.6 billion, respectively, of cash and other non-

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1810

Table of Contents

mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. As of June 30, 2011, these included:

- $14.4 billion of cash equivalents invested in 32 counterparties that had short-term credit ratings of A-1 or above on the S&P or equivalent scale;

- $6.0 billion of federal funds sold with four counterparties that had short-term S&P ratings of A-1 or above;

- $1.3 billion of federal funds sold with one counterparty that had a short-term S&P rating of A-2;

- $7.1 billion of securities purchased under agreements to resell with three counterparties that had short-term S&P ratings of A-1 or above;

- $19.2 billion of securities purchased under agreements to resell with eight counterparties that had short-term S&P ratings of A-2; and

- $4.9 billion of cash deposited with the Federal Reserve Bank.

**Derivative Portfolio**

*Derivative Counterparties*

    Our use of derivatives exposes us to institutional credit risk, which arises from the possibility that the derivative counterparty will not be able to meet its contractual obligations. Exchange-traded derivatives, such as futures contracts, do not measurably increase our institutional credit risk because changes in the value of open exchange-traded contracts are settled daily through a financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk because transactions are executed and settled between us and our counterparty. Our use of OTC interest-rate swaps, option-based derivatives, and foreign-currency swaps is subject to rigorous internal credit and legal reviews. All of our OTC derivatives counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

    On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

*Master Netting and Collateral Agreements*

    We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest-rate swaps, option-based derivatives, and foreign-currency swaps. Master netting agreements provide for the netting of amounts receivable and payable from an individual counterparty, which reduces our exposure to a single counterparty in the event of default. On a daily basis, the market value of each counterparty's derivatives outstanding is calculated to determine the amount of our net credit exposure, which is equal to derivatives in a net gain position by counterparty after giving consideration to collateral posted. Our collateral agreements require most counterparties to post collateral for the amount of our net exposure to them above the applicable threshold. Bilateral collateral agreements are in place for the majority of our counterparties. Collateral posting thresholds are tied to a counterparty's credit rating. Derivative exposures and collateral amounts are monitored on a daily basis using both internal pricing models and dealer price quotes. Collateral is typically transferred within one business day based on the values of the related derivatives. This time lag in posting collateral can affect our net uncollateralized exposure to derivative counterparties.

    Collateral posted by a derivative counterparty is typically in the form of cash, although U.S. Treasury securities, Freddie Mac mortgage-related securities, or our debt securities may also be posted. In the event a counterparty defaults on its obligations under the derivatives agreement and the default is not remedied in the manner prescribed in the agreement, we have the right under the agreement to direct the custodian bank to transfer the collateral to us or, in the case of non-cash collateral, to sell the collateral and transfer the proceeds to us.

    Our uncollateralized exposure to counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest-rate caps, after applying netting agreements and collateral, was $113 million and $32 million at June 30, 2011 and December 31, 2010, respectively. In the event that all of our counterparties for these derivatives were to have defaulted simultaneously on June 30, 2011, our maximum loss for accounting purposes would have been approximately $113 million. Four counterparties each accounted for greater than 10% and collectively accounted for 94% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at June 30,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1811

Table of Contents

2011. These counterparties were Barclays Bank PLC, Deutsche Bank, A.G., UBS A.G., and Goldman Sachs Bank USA, all of which were rated A or higher as of July 22, 2011.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives, was $121 million and $103 million at June 30, 2011 and December 31, 2010, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis to ensure that they continue to meet our internal risk-management standards.

**NOTE 18: FAIR VALUE DISCLOSURES**

**Fair Value Hierarchy**

The accounting guidance for fair value measurements and disclosures establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. Assets and liabilities are classified in their entirety within the fair value hierarchy based on the lowest level input that is significant to the fair value measurement. Table 18.1 sets forth by level within the fair value hierarchy assets and liabilities measured and reported at fair value on a recurring basis in our consolidated balance sheets at June 30, 2011 and December 31, 2010.

159

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**Table 18.1 — Assets and Liabilities Measured at Fair Value on a Recurring Basis**

| | Fair Value at June 30, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment(1) | Total |
| | | | (in millions) | | |
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $ — | $ 83,238 | $ 1,983 | $ — | $ 85,221 |
| Subprime | — | — | 30,491 | — | 30,491 |
| CMBS | — | 54,440 | 3,207 | — | 57,647 |
| Option ARM | — | — | 6,591 | — | 6,591 |
| Alt-A and other | — | 12 | 12,197 | — | 12,209 |
| Fannie Mae | — | 20,824 | 187 | — | 21,011 |
| Obligations of states and political subdivisions | — | — | 8,560 | — | 8,560 |
| Manufactured housing | — | — | 844 | — | 844 |
| Ginnie Mae | — | 261 | 14 | — | 275 |
| Total available-for-sale securities, at fair value | — | 158,775 | 64,074 | — | 222,849 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 14,375 | 2,622 | — | 16,997 |
| Fannie Mae | — | 17,139 | 843 | — | 17,982 |
| Ginnie Mae | — | 139 | 26 | — | 165 |
| Other | — | 64 | 18 | — | 82 |
| Total mortgage-related securities | — | 31,717 | 3,509 | — | 35,226 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 164 | — | — | 164 |
| Treasury bills | 250 | — | — | — | 250 |
| Treasury notes | 17,497 | — | — | — | 17,497 |
| FDIC-guaranteed corporate medium-term notes | — | 1,627 | — | — | 1,627 |
| Total non-mortgage-related securities | 17,747 | 1,791 | — | — | 19,538 |
| Total trading securities, at fair value | 17,747 | 33,508 | 3,509 | — | 54,764 |
| Total investments in securities | 17,747 | 192,283 | 67,583 | — | 277,613 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 4,463 | — | 4,463 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 4,646 | 46 | — | 4,692 |
| Option-based derivatives | 5 | 11,484 | — | — | 11,489 |
| Other | 4 | 444 | 6 | — | 454 |
| Subtotal, before netting adjustments | 9 | 16,574 | 52 | — | 16,635 |
| Netting adjustments(1) | — | — | — | (16,389) | (16,389) |
| Total derivative assets, net | 9 | 16,574 | 52 | (16,389) | 246 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 667 | — | 667 |
| Total assets carried at fair value on a recurring basis | $ 17,756 | $ 208,857 | $ 72,765 | $ (16,389) | $282,989 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ — | $ 3,998 | $ — | $ — | $ 3,998 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 22,423 | 317 | — | 22,740 |
| Option-based derivatives | — | 780 | 1 | — | 781 |
| Other | 50 | 53 | 53 | — | 156 |
| Subtotal, before netting adjustments | 50 | 23,256 | 371 | — | 23,677 |
| Netting adjustments(1) | — | — | — | (23,269) | (23,269) |
| Total derivative liabilities, net | 50 | 23,256 | 371 | (23,269) | 408 |
| Total liabilities carried at fair value on a recurring basis | $ 50 | $ 27,254 | $ 371 | $ (23,269) | $ 4,406 |

160

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Fair Value at December 31, 2010 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) (in millions) | Netting Adjustment(1) | Total |
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $ — | $ 83,652 | $ 2,037 | $ — | $ 85,689 |
| Subprime | — | — | 33,861 | — | 33,861 |
| CMBS | — | 54,972 | 3,115 | — | 58,087 |
| Option ARM | — | — | 6,889 | — | 6,889 |
| Alt-A and other | — | 13 | 13,155 | — | 13,168 |
| Fannie Mae | — | 24,158 | 212 | — | 24,370 |
| Obligations of states and political subdivisions | — | — | 9,377 | — | 9,377 |
| Manufactured housing | — | — | 897 | — | 897 |
| Ginnie Mae | — | 280 | 16 | — | 296 |
| Total available-for-sale securities, at fair value | — | 163,075 | 69,559 | — | 232,634 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 11,138 | 2,299 | — | 13,437 |
| Fannie Mae | — | 17,872 | 854 | — | 18,726 |
| Ginnie Mae | — | 145 | 27 | — | 172 |
| Other | — | 11 | 20 | — | 31 |
| Total mortgage-related securities | — | 29,166 | 3,200 | — | 32,366 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 44 | — | — | 44 |
| Treasury bills | 17,289 | — | — | — | 17,289 |
| Treasury notes | 10,122 | — | — | — | 10,122 |
| FDIC-guaranteed corporate medium-term notes | — | 441 | — | — | 441 |
| Total non-mortgage-related securities | 27,411 | 485 | — | — | 27,896 |
| Total trading securities, at fair value | 27,411 | 29,651 | 3,200 | — | 60,262 |
| Total investments in securities | 27,411 | 192,726 | 72,759 | — | 292,896 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 6,413 | — | 6,413 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 9,921 | 49 | — | 9,970 |
| Option-based derivatives | — | 11,255 | — | — | 11,255 |
| Other | 3 | 266 | 21 | — | 290 |
| Subtotal, before netting adjustments | 3 | 21,442 | 70 | — | 21,515 |
| Netting adjustments(1) | — | — | — | (21,372) | (21,372) |
| Total derivative assets, net | 3 | 21,442 | 70 | (21,372) | 143 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 541 | — | 541 |
| Total assets carried at fair value on a recurring basis | $ 27,414 | $ 214,168 | $ 79,783 | $ (21,372) | $ 299,993 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ — | $ 4,443 | $ — | $ — | $ 4,443 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 26,856 | 623 | — | 27,479 |
| Option-based derivatives | 8 | 252 | 2 | — | 262 |
| Other | 170 | 28 | 136 | — | 334 |
| Subtotal, before netting adjustments | 178 | 27,136 | 761 | — | 28,075 |
| Netting adjustments(1) | — | — | — | (26,866) | (26,866) |
| Total derivative liabilities, net | 178 | 27,136 | 761 | (26,866) | 1,209 |
| Total liabilities carried at fair value on a recurring basis | $ 178 | $ 31,579 | $ 761 | $ (26,866) | $ 5,652 |

(1) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $8.2 billion and $6 million, respectively, at June 30, 2011. The net cash collateral posted and net trade/settle receivable were $6.3 billion and $1 million, respectively, at December 31, 2010. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.3) billion and $(0.8) billion at June 30, 2011 and December 31, 2010, respectively, which was mainly related to interest rate swaps that we have entered into.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1814

Table of Contents

**Recurring Fair Value Changes**

For the three and six months ended June 30, 2011, we did not have any significant transfers between Level 1 and Level 2 assets or liabilities.

Our Level 3 items mainly consist of non-agency mortgage-related securities and multifamily held-for-sale loans. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy" for additional information about the valuation methods and assumptions used in our fair value measurements.

During the three and six months ended June 30, 2011, the fair value of our Level 3 assets decreased by $5.0 billion and $7.0 billion, respectively, mainly attributable to: (a) monthly remittances of principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) net sales of multifamily held-for-sale loans. In addition, the fair value of our investments in non-agency mortgage-related securities also decreased from the widening of OAS levels on these securities during the second quarter of 2011. During the three and six months ended June 30, 2011, we had a net transfer into Level 3 assets of $12 million and $160 million, respectively, resulting from a change in valuation method for certain mortgage-related securities due to a lack of relevant price quotes from dealers and third-party pricing services.

In the second quarter of 2010, our Level 3 assets decreased by $1.0 billion, mainly attributable to monthly remittances of principal repayments from the underlying collateral. For the six months ended June 30, 2010, our Level 3 assets decreased by $28.5 billion primarily due to the adoption of the amendments to the accounting standards for transfers of financial assets and consolidation of VIEs. These accounting changes resulted in the elimination of $28.8 billion of our Level 3 assets on January 1, 2010, including the elimination of certain mortgage-related securities issued by our consolidated trusts that are held by us and the guarantee asset for guarantees issued to our consolidated trusts. In addition, we transferred $0.3 billion of Level 3 assets to Level 2 during the six months ended June 30, 2010, resulting from improved liquidity and availability of the price quotes received from dealers and third-party pricing services.

Table 18.2 provides a reconciliation of the beginning and ending balances for assets and liabilities measured at fair value using significant unobservable inputs (Level 3).

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 18.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs**

| | Balance, March 31, 2011 | Realized and unrealized gains (losses) Three Months Ended June 30, 2011 | | | Purchases | Issuances | Sales | Settlements, net[5] | Net transfers in and/or out of Level 3[6] | Balance, June 30, 2011 | Unrealized gains (losses) still held[7] |
| | | Included in earnings[1][2][3][4] | Included in other comprehensive income | Total (in millions) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Investments in securities: | | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | $ 1,896 | $ — | $ 40 | $ 40 | $ 8 | $ — | $ — | $ (27) | $ 66 | $ 1,983 | $ — |
| Subprime | 33,344 | (70) | (1,255) | (1,325) | — | — | — | (1,528) | — | 30,491 | (70) |
| CMBS | 3,093 | — | 136 | 136 | — | — | — | (22) | — | 3,207 | — |
| Option ARM | 6,989 | (65) | 76 | 11 | — | — | — | (409) | — | 6,591 | (65) |
| Alt-A and other | 12,924 | (32) | (182) | (214) | — | — | — | (513) | — | 12,197 | (32) |
| Fannie Mae | 195 | — | — | — | — | — | — | (8) | — | 187 | — |
| Obligations of states and political subdivisions | 8,875 | 3 | 244 | 247 | — | — | (158) | (404) | — | 8,560 | — |
| Manufactured housing | 878 | (2) | (1) | (3) | — | — | — | (31) | — | 844 | (2) |
| Ginnie Mae | 15 | — | — | — | — | — | — | (1) | — | 14 | — |
| Total available-for-sale mortgage-related securities | 68,209 | (166) | (942) | (1,108) | 8 | — | (158) | (2,943) | 66 | 64,074 | (169) |
| Trading, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | 2,697 | (65) | — | (65) | 90 | — | — | (46) | (54) | 2,622 | (65) |
| Fannie Mae | 871 | (17) | — | (17) | — | — | — | (11) | — | 843 | (17) |
| Ginnie Mae | 26 | — | — | — | — | — | — | — | — | 26 | — |
| Other | 19 | (1) | — | (1) | — | — | — | — | — | 18 | (1) |
| Total trading mortgage-related securities | 3,613 | (83) | — | (83) | 90 | — | — | (57) | (54) | 3,509 | (83) |
| Mortgage Loans: | | | | | | | | | | | |
| Held-for-sale, at fair value | 5,304 | 298 | — | 298 | 3,270 | — | (4,400) | (9) | — | 4,463 | 94 |
| Net derivatives[8] | (757) | 522 | — | 522 | — | (9) | — | (77) | 2 | (319) | 407 |
| Other assets: | | | | | | | | | | | |
| Guarantee asset[9] | 597 | 6 | — | 6 | — | 77 | — | (13) | — | 667 | 6 |

163

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1816

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Balance, January 1, 2011 | Realized and unrealized gains (losses) | | | Purchases | Issuances (in millions) | Sales | Settlements, net(5) | Net transfers in and/or out of Level 3(6) | Balance, June 30, 2011 | Unrealized gains (losses) still held(7) |
| | | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income | Total | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Six Months Ended June 30, 2011** | | | | | | | | | | | |
| Investments in securities: | | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | $ 2,037 | $ — | $ 39 | $ 39 | $ 17 | $ — | $ — | $ (78) | $ (32) | $ 1,983 | $ — |
| Subprime | 33,861 | (804) | 315 | (489) | — | — | — | (2,881) | — | 30,491 | (804) |
| CMBS | 3,115 | — | 112 | 112 | — | — | — | (20) | — | 3,207 | — |
| Option ARM | 6,889 | (346) | 768 | 422 | — | — | — | (720) | — | 6,591 | (346) |
| Alt-A and other | 13,155 | (72) | 56 | (16) | — | — | — | (942) | — | 12,197 | (72) |
| Fannie Mae | 212 | — | 2 | 2 | — | — | — | (22) | (5) | 187 | — |
| Obligations of states and political subdivisions | 9,377 | 4 | 242 | 246 | 1 | — | (195) | (869) | — | 8,560 | — |
| Manufactured housing | 897 | (5) | 11 | 6 | — | — | — | (59) | — | 844 | (5) |
| Ginnie Mae | 16 | — | — | — | — | — | — | (2) | — | 14 | — |
| Total available-for-sale mortgage-related securities | 69,559 | (1,223) | 1,545 | 322 | 18 | — | (195) | (5,593) | (37) | 64,074 | (1,227) |
| Trading, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | 2,299 | (3) | — | (3) | 266 | — | (31) | (95) | 186 | 2,622 | (3) |
| Fannie Mae | 854 | (5) | — | (5) | — | — | — | (17) | 11 | 843 | (5) |
| Ginnie Mae | 27 | — | — | — | — | — | — | (1) | — | 26 | — |
| Other | 20 | (1) | — | (1) | — | — | — | (1) | — | 18 | (1) |
| Total trading mortgage-related securities | 3,200 | (9) | — | (9) | 266 | — | (31) | (114) | 197 | 3,509 | (9) |
| Mortgage Loans: | | | | | | | | | | | |
| Held-for-sale, at fair value | 6,413 | 359 | — | 359 | 5,434 | — | (7,721) | (22) | — | 4,463 | 81 |
| Net derivatives(8) | (691) | 395 | — | 395 | — | (23) | — | (2) | 2 | (319) | 293 |
| Other assets: | | | | | | | | | | | |
| Guarantee asset(9) | 541 | 5 | — | 5 | — | 145 | — | (24) | — | 667 | 5 |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1817

Table of Contents

| | Balance, March 31, 2010 | Three Months Ended June 30, 2010 | | | Purchases, issuances, sales and settlements, net(5) | Net transfers in and/or out of Level 3(6) | Balance, June 30, 2010 | Unrealized gains (losses) still held(7) |
| | | Realized and unrealized gains (losses) | | | | | | |
| | | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1)(2) | Total | | | | |
| | | | (in millions) | | | | | |
| Investments in securities: | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | |
| Mortgage-related securities: | | | | | | | | |
| Freddie Mac | $ 2,011 | $ — | $ 29 | $ 29 | $ (10) | $ 69 | $ 2,099 | $ — |
| Subprime | 35,835 | (17) | 715 | 698 | (1,979) | — | 34,554 | (17) |
| CMBS | 56,491 | (17) | 2,604 | 2,587 | (949) | — | 58,129 | (17) |
| Option ARM | 7,025 | (54) | 374 | 320 | (448) | — | 6,897 | (48) |
| Alt-A and other | 13,383 | (333) | 545 | 212 | (637) | — | 12,958 | (333) |
| Fannie Mae | 319 | — | — | — | (30) | — | 289 | — |
| Obligations of states and political subdivisions | 11,104 | — | 98 | 98 | (459) | — | 10,743 | — |
| Manufactured housing | 901 | (13) | 32 | 19 | (28) | — | 892 | (13) |
| Ginnie Mae | 3 | — | — | — | — | — | 3 | — |
| Total available-for-sale mortgage-related securities | 127,072 | (434) | 4,397 | 3,963 | (4,540) | 69 | 126,564 | (428) |
| Trading, at fair value: | | | | | | | | |
| Mortgage-related securities: | | | | | | | | |
| Freddie Mac | 2,821 | (328) | — | (328) | 590 | (42) | 3,041 | (328) |
| Fannie Mae | 1,182 | (248) | — | (248) | (14) | (2) | 918 | (248) |
| Ginnie Mae | 28 | — | — | — | — | — | 28 | — |
| Other | 25 | (2) | — | (2) | — | — | 23 | (2) |
| Total trading mortgage-related securities | 4,056 | (578) | — | (578) | 576 | (44) | 4,010 | (578) |
| Mortgage loans: | | | | | | | | |
| Held-for-sale, at fair value | 2,206 | 126 | — | 126 | (676) | — | 1,656 | 2 |
| Net derivatives(8) | (35) | 310 | — | 310 | (76) | — | 199 | 222 |
| Other assets: | | | | | | | | |
| Guarantee asset(9) | 482 | (4) | — | (4) | 7 | — | 485 | (4) |

TREASURY-1818

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Balance, December 31, 2009 | Cumulative effect of change in accounting principle(10) | Balance, January 1, 2010 | Six Months Ended June 30, 2010 | | | Purchases, issuances, sales and settlements, net(5) | Net transfers in and/or out of Level 3(6) | Balance, June 30, 2010 | Unrealized gains (losses) still held(7) |
| | | | | Realized and unrealized gains (losses) | | | | | | |
| | | | | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1)(2) (in millions) | Total | | | | |
| Investments in securities: | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | |
| Freddie Mac | $ 20,807 | $ (18,775) | $ 2,032 | $ — | $ 16 | $ 16 | $ (53) | 104 | $ 2,099 | $ — |
| Subprime | 35,721 | — | 35,721 | (349) | 3,265 | 2,916 | (4,083) | — | 34,554 | (349) |
| CMBS | 54,019 | — | 54,019 | (72) | 5,660 | 5,588 | (1,478) | — | 58,129 | (72) |
| Option ARM | 7,236 | — | 7,236 | (156) | 696 | 540 | (879) | — | 6,897 | (150) |
| Alt-A and other | 13,391 | — | 13,391 | (352) | 1,164 | 812 | (1,245) | — | 12,958 | (352) |
| Fannie Mae | 338 | — | 338 | — | (1) | (1) | (48) | — | 289 | — |
| Obligations of states and political subdivisions | 11,477 | — | 11,477 | 1 | 212 | 213 | (947) | — | 10,743 | — |
| Manufactured housing | 911 | — | 911 | (15) | 54 | 39 | (58) | — | 892 | (15) |
| Ginnie Mae | 4 | — | 4 | — | — | — | (1) | — | 3 | — |
| Total available-for-sale mortgage-related securities | 143,904 | (18,775) | 125,129 | (943) | 11,066 | 10,123 | (8,792) | 104 | 126,564 | (938) |
| Trading, at fair value: | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | |
| Freddie Mac | 2,805 | (5) | 2,800 | (627) | — | (627) | 1,151 | (283) | 3,041 | (631) |
| Fannie Mae | 1,343 | — | 1,343 | (398) | — | (398) | (25) | (2) | 918 | (398) |
| Ginnie Mae | 27 | — | 27 | 1 | — | 1 | — | — | 28 | 1 |
| Other | 28 | (1) | 27 | (2) | — | (2) | (2) | — | 23 | (2) |
| Total trading mortgage-related securities | 4,203 | (6) | 4,197 | (1,026) | — | (1,026) | 1,124 | (285) | 4,010 | (1,030) |
| Mortgage loans: | | | | | | | | | | |
| Held-for-sale, at fair value | 2,799 | — | 2,799 | 223 | — | 223 | (1,366) | — | 1,656 | 2 |
| Net derivatives(8) | (430) | — | (430) | 675 | — | 675 | (46) | — | 199 | 417 |
| Other assets: | | | | | | | | | | |
| Guarantee asset(9) | 10,444 | (10,024) | 420 | (8) | — | (8) | 73 | — | 485 | (8) |

(1) Changes in fair value for available-for-sale investments are recorded in AOCI, while gains and losses from sales are recorded in other gains (losses) on investments on our consolidated statements of income and comprehensive income. For mortgage-related securities classified as trading, the realized and unrealized gains (losses) are recorded in other gains (losses) on investments on our consolidated statements of income and comprehensive income.

(2) Changes in fair value of derivatives are recorded in derivative gains (losses) on our consolidated statements of income and comprehensive income for those not designated as accounting hedges.

(3) Changes in fair value of the guarantee asset are recorded in other income on our consolidated statements of income and comprehensive income.

(4) For held-for-sale mortgage loans with fair value option elected, gains (losses) on fair value changes and sale of mortgage loans are recorded in other income on our consolidated statements of income and comprehensive income.

(5) For non-agency mortgage-related securities, primarily represents principal repayments.

(6) Transfer in and/or out of Level 3 during the period is disclosed as if the transfer occurred at the beginning of the period.

(7) Represents the amount of total gains or losses for the period, included in earnings, attributable to the change in unrealized gains (losses) related to assets and liabilities classified as Level 3 that were still held at June 30, 2011 and 2010, respectively. Included in these amounts are credit-related other-than-temporary impairments recorded on available-for-sale securities.

(8) Net derivatives include derivative assets and derivative liabilities prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

(9) We estimate that all amounts recorded for unrealized gains and losses on our guarantee asset relate to those amounts still in position. The amounts reflected as included in earnings represent the periodic fair value changes of our guarantee asset.

(10) Represents adjustment to adopt the amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs.

166                                                                                                                                                                     *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Non-recurring Fair Value Changes**

Certain assets are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances. We consider the fair value measurement related to these assets to be non-recurring. These assets include impaired held-for-investment multifamily mortgage loans and REO, net. These fair value measurements usually result from the write-down of individual assets to current fair value amounts due to impairments.

The fair value of impaired multifamily held-for-investment mortgage loans is generally based on the value of the underlying property. Given the relative illiquidity in the markets for these impaired loans, and differences in contractual terms of each loan, we classified these loans as Level 3 in the fair value hierarchy. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Mortgage Loans, Held-for-Investment*" for additional details.

REO is initially measured at its fair value less costs to sell. In subsequent periods, REO is reported at the lower of its carrying amount or fair value less costs to sell. Subsequent measurements of fair value less costs to sell are estimated values based on relevant current and historical factors, which are considered to be unobservable inputs. As a result, REO is classified as Level 3 under the fair value hierarchy. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *REO, Net*" for additional details.

Table 18.3 presents assets measured and reported at fair value on a non-recurring basis in our consolidated balance sheets by level within the fair value hierarchy at June 30, 2011 and December 31, 2010, respectively.

**Table 18.3 — Assets Measured at Fair Value on a Non-Recurring Basis**

| | Fair Value at June 30, 2011 | | | | Fair Value at December 31, 2010 | | | |
|---|---|---|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| | | | (in millions) | | | | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | | | | | |
| Mortgage loans:(1) | | | | | | | | |
| Held-for-investment | $ — | $ — | $ 1,716 | $ 1,716 | $ — | $ — | $ 1,560 | $ 1,560 |
| REO, net(2) | — | — | 3,484 | 3,484 | — | — | 5,606 | 5,606 |
| Total assets measured at fair value on a non-recurring basis | $ — | $ — | $ 5,200 | $ 5,200 | $ — | $ — | $ 7,166 | $ 7,166 |

| | Total Gains (Losses)(3) | | | |
|---|---|---|---|---|
| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2011 | 2010 | 2011 | 2010 |
| | | (in millions) | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | |
| Mortgage loans:(1) | | | | |
| Held-for-investment | $ (4) | $ (109) | $ 5 | $ (132) |
| REO, net(2) | (24) | (7) | (90) | (58) |
| Total gains (losses) | $ (28) | $ (116) | $ (85) | $ (190) |

(1) Represents carrying value and related write-downs of loans for which adjustments are based on the fair value amounts. These loans include impaired multifamily mortgage loans that are classified as held-for-investment and have a related valuation allowance.

(2) Represents the fair value and related losses of foreclosed properties that were measured at fair value subsequent to their initial classification as REO, net. The carrying amount of REO, net was written down to fair value of $3.5 billion, less estimated costs to sell of $246 million (or approximately $3.3 billion) at June 30, 2011. The carrying amount of REO, net was written down to fair value of $5.6 billion, less estimated costs to sell of $406 million (or approximately $5.2 billion) at December 31, 2010.

(3) Represents the total net gains (losses) recorded on items measured at fair value on a non-recurring basis as of June 30, 2011 and 2010, respectively.

**Fair Value Election**

We elected the fair value option for certain types of securities, multifamily held-for-sale mortgage loans, foreign-currency denominated debt, and certain other debt.

*Certain Available-for-Sale Securities with Fair Value Option Elected*

We elected the fair value option for certain available-for-sale mortgage-related securities to better reflect the natural offset these securities provide to fair value changes recorded historically on our guarantee asset at the time of our election. In addition, upon adoption of the accounting guidance for the fair value option, we elected this option for available-for-sale securities within the scope of the accounting guidance for investments in beneficial interests in securitized financial assets to better reflect any valuation changes that would occur subsequent to impairment write-downs previously recorded

167

*Freddie Mac*

TREASURY-1820

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

on these instruments. By electing the fair value option for these instruments, we reflect valuation changes through our consolidated statements of income and comprehensive income in the period they occur, including any increases in value.

For mortgage-related securities and investments in securities that were selected for the fair value option and subsequently classified as trading securities, the change in fair value is recorded in other gains (losses) on investment securities recognized in earnings in our consolidated statements of income and comprehensive income. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding the net unrealized gains (losses) on trading securities, which include gains (losses) for other items that are not selected for the fair value option. Related interest income continues to be reported as interest income in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2010 Annual Report for additional information about the measurement and recognition of interest income on investments in securities.

### Debt Securities with Fair Value Option Elected

We elected the fair value option for foreign-currency denominated debt and certain other debt securities. In the case of foreign-currency denominated debt, we have entered into derivative transactions that effectively convert these instruments to U.S. dollar denominated floating rate instruments. The fair value changes on these derivatives were recorded in derivative gains (losses) in our consolidated statements of income and comprehensive income. We elected the fair value option on these debt instruments to better reflect the economic offset that naturally results from the debt due to changes in interest rates. We also elected the fair value option for certain other debt securities containing potential embedded derivatives that required bifurcation.

The changes in fair value of debt securities with the fair value option elected were $(37) million and $(118) million for the three and six months ended June 30, 2011, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of income and comprehensive income. The changes in fair value related to fluctuations in exchange rates and interest rates were $(44) million and $(116) million for the three and six months ended June 30, 2011, respectively. The remaining changes in the fair value of $7 million and $(2) million were attributable to changes in credit risk for the three and six months ended June 30, 2011, respectively.

The changes in fair value of debt securities with the fair value option elected were $544 million and $891 million for the three and six months ended June 30, 2010, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of income and comprehensive income. The changes in fair value related to fluctuations in exchange rates and interest rates were $539 million and $877 million for the three and six months ended June 30, 2010, respectively. The remaining changes in the fair value of $5 million and $14 million were attributable to changes in credit risk for the three and six months ended June 30, 2010, respectively.

The change in fair value attributable to changes in credit risk was primarily determined by comparing the total change in fair value of the debt to the total change in fair value of the interest-rate and foreign-currency derivatives used to hedge the debt. Any difference in the fair value change of the debt compared to the fair value change in the derivatives is attributed to credit risk.

The difference between the aggregate fair value and aggregate UPB for long-term debt securities with fair value option elected was $65 million and $108 million at June 30, 2011 and December 31, 2010, respectively. Related interest expense continues to be reported as interest expense in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Debt Securities Issued" in our 2010 Annual Report for additional information about the measurement and recognition of interest expense on debt securities issued.

### Multifamily Held-For-Sale Mortgage Loans with Fair Value Option Elected

We elected the fair value option for multifamily mortgage loans that were purchased for securitization. Through this channel, we acquire loans that we intend to securitize and sell to CMBS investors. While this is consistent with our overall strategy to expand our multifamily business, it differs from our traditional buy-and-hold strategy with respect to multifamily loans held-for-investment. Therefore, these multifamily mortgage loans were classified as held-for-sale mortgage loans in our consolidated balance sheets to reflect our intent to sell in the future.

We recorded $298 million and $359 million from the change in fair value in gains (losses) on mortgage loans recorded at fair value in other income in our consolidated statements of income and comprehensive income for the three and six months ended June 30, 2011, respectively. We recorded fair value changes of $126 million and $223 million in other income in our consolidated statements of income and comprehensive income for the three and six months ended

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1821

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

June 30, 2010, respectively. The changes in fair value of these loans were primarily attributable to changes in interest rates and other non-credit related items such as liquidity. The changes in fair value attributable to credit risk were not material given that these loans were generally originated within the past six to twelve months and have not seen a change in their credit characteristics.

The difference between the aggregate fair value and the aggregate UPB for multifamily held-for-sale loans with the fair value option elected was $45 million and $(311) million at June 30, 2011 and December 31, 2010, respectively. Related interest income continues to be reported as interest income in our consolidated statements of income and comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2010 Annual Report for additional information about the measurement and recognition of interest income on our mortgage loans.

### Valuation Methods and Assumptions Subject to Fair Value Hierarchy

We categorize assets and liabilities that we measure and report at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation process used to derive the fair value and our judgment regarding the observability of the related inputs.

#### *Investments in Securities*

##### <u>Agency Securities</u>

Fixed-rate agency securities are valued based on dealer-published quotes for a base TBA security, adjusted to reflect the measurement date as opposed to a forward settlement date ("carry") and pay-ups for specified collateral. The base TBA price varies based on agency, term, coupon, and settlement month. The carry adjustment converts forward settlement date prices to spot or same-day settlement date prices such that the fair value is estimated as of the measurement date, and not as of the forward settlement date. The carry adjustment uses our internal prepayment and interest rate models. A pay-up is added to the base TBA price for characteristics that are observed to be trading at a premium versus TBAs; this currently includes seasoning and low-loan balance attributes. Haircuts are applied to a small subset of positions that are less liquid and are observed to trade at a discount relative to TBAs; this includes securities that are not eligible for delivery into TBA trades.

Adjustable-rate agency securities are valued based on the median of prices from multiple pricing services. The key valuation drivers used by the pricing services include the interest rate cap structure, term, agency, remaining term, and months-to-next coupon reset, coupled with prevailing market conditions, namely interest rates.

Because fixed-rate and adjustable-rate agency securities are generally liquid and contain observable pricing in the market, they generally are classified as Level 2.

Multiclass structures are valued using a variety of methods, depending on the product type. The predominant valuation methodology uses the median prices from multiple pricing services. This method is used for structures for which there is typically significant, relevant market activity. Some of the key valuation drivers used by the pricing services are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. Other tranche types that are more challenging to price are valued using the median prices from multiple dealers. These include structured interest-only, structured principal-only, inverse floaters, and inverse interest-only structures. Some of the key valuation drivers used by the dealers are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. In addition, there is a subset of tranches for which there is a lack of relevant market activity that are priced using a proxy relationship where the position is matched to the closest dealer-priced tranche, then valued by calculating an OAS using our proprietary prepayment and interest rate models from the dealer-priced tranche. If necessary, our judgment is applied to estimate the impact of differences in prepayment uncertainty or other unique cash flow characteristics related to that particular security. We then determine the fair values for these securities by using the estimated OAS as an input to the valuation calculation in conjunction with interest-rate and prepayment models to calculate the NPV of the projected cash flows. These positions typically have smaller balances and are more difficult for dealers to value. There is also a subset of positions for which prices are published on a daily basis; these include trust interest-only and trust principal-only strips. These are fairly liquid tranches and are quoted on a regular settlement date basis. In order to align the regular settlement date price with the balance sheet date, the OAS is calculated based on the published prices. Then the tranche is valued using that OAS applied to the balance sheet date.

Multiclass agency securities are classified as Level 2 or 3 depending on the significance of the inputs that are not observable.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1822

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Commercial Mortgage-Backed Securities*

CMBS are valued based on the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the collateral type, collateral performance, capital structure, issuer, credit enhancement, coupon, and weighted average life, coupled with the observed spread levels on trades of similar securities. The weighted average coupon of the collateral underlying our CMBS investments was 5.7% as of both June 30, 2011 and December 31, 2010. The weighted-average life of the collateral underlying our CMBS investments was 4.0 years and 4.3 years, respectively, as of June 30, 2011 and December 31, 2010. Many of these securities have significant prepayment lockout periods or penalty periods that limit the window of potential prepayment to a relatively narrow band. These securities are primarily classified in Level 2.

*Subprime, Option ARM, and Alt-A and Other (Mortgage-Related)*

These private-label investments are valued using either the median of multiple dealer prices or the median prices from multiple pricing services. Some of the key valuation drivers used by the dealers and pricing services include the product type, vintage, collateral performance, capital structure, credit enhancements, and coupon, coupled with interest rates and spreads observed on trades of similar securities, where possible. The market for non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans is highly illiquid, resulting in wide price ranges as well as wide credit spreads. These securities are primarily classified in Level 3.

Table 18.4 below presents the fair value of subprime, option ARM, and Alt-A and other investments we held by origination year.

**Table 18.4 — Fair Value of Subprime, Option ARM, and Alt-A and Other Investments by Origination Year**

| Year of Origination | Fair Value at | |
|---|---|---|
| | June 30, 2011 | December 31, 2010 |
| | (in millions) | |
| 2004 and prior | $    4,702 | $    4,998 |
| 2005 | 11,860 | 13,126 |
| 2006 | 17,681 | 19,333 |
| 2007 | 15,048 | 16,461 |
| 2008 and beyond | — | — |
| Total | $  49,291 | $  53,918 |

*Obligations of States and Political Subdivisions*

These primarily represent housing revenue bonds, which are valued by taking the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the structure of the bond, call terms, cross-collateralization features, and tax-exempt features coupled with municipal bond rates, credit ratings, and spread levels. These securities are unique, resulting in low trading volumes and are classified as Level 3 in the fair value hierarchy.

*Manufactured Housing*

Securities backed by loans on manufactured housing properties are dealer-priced and we arrive at the fair value by taking the median of multiple dealer prices. Some of the key valuation drivers include the collateral's performance and vintage. These securities are classified as Level 3 in the fair value hierarchy because key inputs are unobservable in the market due to low levels of liquidity.

*Asset-Backed Securities (Non-Mortgage-Related)*

These private-label non-mortgage-related securities are dealer-priced. Some of the key valuation drivers include the discount margin, subordination level, and prepayment speed, coupled with interest rates. They are classified as Level 2 because of their liquidity and tight pricing ranges.

*Treasury Bills and Treasury Notes*

Treasury bills and Treasury notes are classified as Level 1 in the fair value hierarchy since they are actively traded and price quotes are widely available at the measurement date for the exact security we are valuing.

*FDIC-Guaranteed Corporate Medium-Term Notes*

Since these securities carry the FDIC guarantee, they are considered to have no credit risk. They are valued based on yield analysis. They are classified as Level 2 because of their high liquidity and tight pricing ranges.

TREASURY-1823

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                  Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Mortgage Loans, Held-for-Sale

Mortgage loans, held-for-sale represent multifamily mortgage loans with the fair value option elected. Thus, all held-for-sale mortgage loans are measured at fair value on a recurring basis.

The fair value of multifamily mortgage loans is generally based on market prices obtained from a third-party pricing service provider for similar actively traded mortgages, adjusted for differences in loan characteristics and contractual terms. The pricing service aggregates observable price points from two markets: agency and non-agency. The agency market consists of purchases made by the GSEs of loans underwritten by our counterparties in accordance with our guidelines while the non-agency market generally consists of secondary market trades between banks and other financial institutions of loans that were originated and initially held in portfolio by these institutions. The pricing service blends the observable price data obtained from these two distinct markets into a final composite price based on the expected probability that a given loan will trade in one of these two markets. This estimated probability is largely a function of the loan's credit quality, as determined by its current LTV ratio and DSCR. The result of this blending technique is that lower credit quality loans receive a lower percentage of agency price weighting and higher credit quality loans receive a higher percentage of agency price weighting.

Given the relative illiquidity in the marketplace for multifamily mortgage loans and differences in contractual terms, these loans are classified as Level 3 in the fair value hierarchy.

### Mortgage Loans, Held-for-Investment

Mortgage loans, held-for-investment measured at fair value on a non-recurring basis represent impaired multifamily mortgage loans, which are not measured at fair value on an ongoing basis but have been written down to fair value due to impairment. The valuation technique we use to measure the fair value of impaired multifamily mortgage loans, held-for-investment is based on the value of the underlying property and may include assessment of third-party appraisals, environmental, and engineering reports that we compare with relevant market performance to arrive at a fair value. Our valuation technique incorporates one or more of the following methods: income capitalization, discounted cash flow, sales comparables, and replacement cost. We consider the physical condition of the property, rent levels, and other market drivers, including input from sales brokers and the property manager. We classify impaired multifamily mortgage loans, held-for-investment as Level 3 in the fair value hierarchy as their valuation includes significant unobservable inputs.

### Derivative Assets, Net

Derivative assets largely consist of interest-rate swaps, option-based derivatives, futures, and forward purchase and sale commitments that we account for as derivatives. The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable, trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net unrealized gain position are reported as derivative assets, net. Similarly, derivatives in a net unrealized loss position are reported as derivative liabilities, net.

#### Interest-Rate Swaps and Option-Based Derivatives

The fair values of interest-rate swaps are determined by using the appropriate yield curves to discount the expected cash flows of both the fixed and variable rate components of the swap contracts. In doing so, we first observe publicly available market spot interest rates, such as money market rates, Eurodollar futures contracts and LIBOR swap rates. The spot curves are translated to forward curves using internal models. From the forward curves, the periodic cash flows are calculated on the pay and receive side of the swap and discounted back at the relevant forward rates to arrive at the fair value of the swap. Since the fair values of the swaps are determined by using observable inputs from active markets, these are generally classified as Level 2 under the fair value hierarchy.

Option-based derivatives include call and put swaptions and other option-based derivatives, the majority of which are European options. The fair values of the European call and put swaptions are calculated by using market observable interest rates and dealer-supplied interest rate volatility grids as inputs to our option-pricing models. Within each grid, prices are determined based on the option term of the underlying swap and the strike rate of the swap. Derivatives with embedded American options are valued using dealer-provided pricing grids. The grids contain prices corresponding to specified option terms of the underlying swaps and the strike rate of the swaps. Interpolation is used to calculate prices for positions for which specific grid points are not provided. Derivatives with embedded Bermudan options are valued based on prices provided directly by counterparties. Swaptions are classified as Level 2 under the fair value hierarchy. Other option-based derivatives include exchange-traded options that are valued by exchange-published daily closing prices. Therefore, exchange-traded options are classified as Level 1 under the fair value hierarchy. Other option-based

171                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

derivatives also include purchased interest-rate cap and floor contracts that are valued by using observable market interest rates and cap and floor rate volatility grids obtained from dealers, and cancellable interest rate swaps that are valued by using dealer prices. Cap and floor contracts are classified as Level 2 and cancellable interest rate swaps with fair values using significant unobservable inputs are classified as Level 3 under the fair value hierarchy.

Table 18.5 below shows the fair value, prior to counterparty and cash collateral netting adjustments, for our interest-rate swaps and option-based derivatives and the maturity profile of our derivative positions. It also provides the weighted-average fixed rates of our pay-fixed and receive-fixed swaps. As of June 30, 2011 and December 31, 2010 our option-based derivatives had a remaining weighted-average life of 4.2 years and 4.5 years, respectively.

**Table 18.5 — Fair Values and Maturities for Interest-Rate Swaps and Option-Based Derivatives**

| | June 30, 2011 | | | | | |
| | | | Fair Value(1) | | | |
| | Notional or Contractual Amount | Total Fair Value(2) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 199,851 | $ 2,260 | $ 151 | $ 590 | $ 931 | $ 588 |
| Weighted average fixed rate(3) | | | 1.31% | 1.22% | 2.21% | 3.60% |
| Forward-starting swaps(4) | 15,907 | 440 | — | | (1) | 441 |
| Weighted average fixed rate(3) | | | | 0.59% | 1.09% | 4.51% |
| Basis (floating to floating) | 3,275 | 4 | — | 1 | 3 | — |
| Pay-fixed: | | | | | | |
| Swaps | 302,831 | (18,263) | (136) | (1,261) | (4,880) | (11,986) |
| Weighted-average fixed rate(3) | | | 2.90% | 1.68% | 3.28% | 4.07% |
| Forward-starting swaps(4) | 19,039 | (2,489) | — | — | — | (2,489) |
| Weighted-average fixed rate(3) | | | | | | 5.37% |
| Total interest-rate swaps | $ 540,903 | $(18,048) | $ 15 | $ (670) | $ (3,947) | $(13,446) |
| Option-based derivatives: | | | | | | |
| Call swaptions | 126,850 | 7,480 | 4,066 | 1,307 | 748 | 1,359 |
| Put swaptions | 79,475 | 1,714 | 117 | 427 | 484 | 686 |
| Other option-based derivatives(5) | 41,861 | 1,514 | 5 | — | — | 1,509 |
| Total option-based | $ 248,186 | $ 10,708 | $4,188 | $ 1,734 | $ 1,232 | $ 3,554 |

| | December 31, 2010 | | | | | |
| | | | Fair Value(1) | | | |
| | Notional or Contractual Amount | Total Fair Value(2) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 302,178 | $ 3,314 | $ 137 | $ 534 | 1,269 | $ 1,374 |
| Weighted average fixed rate(3) | | | 1.54% | 1.12% | 2.39% | 3.66% |
| Forward-starting swaps(4) | 22,412 | 371 | — | 123 | (9) | 257 |
| Weighted average fixed rate(3) | | | | 3.47% | 1.88% | 4.19% |
| Basis (floating to floating) | 2,375 | 4 | — | — | 4 | — |
| Pay-fixed: | | | | | | |
| Swaps | 338,035 | (17,189) | (273) | (1,275) | (3,297) | (12,344) |
| Weighted-average fixed rate(3) | | | 3.11% | 2.21% | 3.04% | 4.02% |
| Forward-starting swaps(4) | 56,259 | (4,009) | — | — | — | (4,009) |
| Weighted-average fixed rate(3) | | | | | | 4.54% |
| Total interest-rate swaps | $ 721,259 | $ (17,509) | $ (136) | $ (618) | $ (2,033) | $(14,722) |
| Option-based derivatives: | | | | | | |
| Call swaptions | $ 125,885 | $ 8,147 | $ 2,754 | $ 2,661 | 1,246 | $ 1,486 |
| Put swaptions | 65,975 | 1,396 | 136 | 451 | 226 | 583 |
| Other option-based derivatives(5) | 47,234 | 1,450 | (8) | — | (1) | 1,459 |
| Total option-based | $ 239,094 | $ 10,993 | $2,882 | $ 3,112 | $ 1,471 | $ 3,528 |

(1) Fair value is categorized based on the period from June 30, 2011 and December 31, 2010, respectively, until the contractual maturity of the derivatives.

(2) Represents fair value for each product type, prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable adjustments.

(3) Represents the notional weighted average rate for the fixed leg of the swaps.

(4) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to fifteen years.

(5) Primarily includes purchased interest rate caps and floors.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1825

Table of Contents

*Other Derivatives*

Other derivatives mainly consist of exchange-traded futures, foreign-currency swaps, certain forward purchase and sale commitments, and credit derivatives. The fair value of exchange-traded futures is based on end-of-day closing prices obtained from third-party pricing services; therefore, they are classified as Level 1 under the fair value hierarchy. The fair value of foreign-currency swaps is determined by using the appropriate yield curves to calculate and discount the expected cash flows for the swap contracts; therefore, they are classified as Level 2 under the fair value hierarchy since the fair values are determined through models that use observable inputs from active markets.

Certain purchase and sale commitments are also considered to be derivatives and are classified as Level 2 or Level 3 under the fair value hierarchy, depending on the fair value hierarchy classification of the purchased or sold item, whether a security or loan. Such valuation techniques are further discussed in the *"Investments in Securities"* section above and "Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy — *Mortgage Loans.*"

Credit derivatives primarily include purchased credit default swaps and certain short-term default guarantee commitments, which are valued using prices from the respective counterparty and verified using third-party dealer credit default spreads at the measurement date. We classify credit derivatives as Level 3 under the fair value hierarchy due to the inactive market and significant divergence among prices obtained from the dealers.

*Consideration of Credit Risk in Our Valuation of Derivatives*

The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. Additionally, the fair value of derivative liabilities considers the impact of our institutional credit risk. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "NOTE 17: CONCENTRATION OF CREDIT AND OTHER RISKS" for a discussion of our counterparty credit risk.

### Other Assets, Guarantee Asset

Our guarantee asset is valued either through obtaining dealer quotes on similar securities or through an expected cash flow approach. Because of the broad range of liquidity discounts applied by dealers to these similar securities and because the expected cash flow valuation approach uses significant unobservable inputs, we classified the guarantee asset as Level 3.

### REO, Net

REO is carried at the lower of its carrying amount or fair value less costs to sell. The fair value of REO is calculated using an internal model that considers state and collateral level data to produce an estimate of fair value based on REO dispositions in the most recent three months. We use the actual disposition prices on REO and the current loan UPB to estimate the current fair value of REO. Certain adjustments, such as state specific adjustments, are made to the estimated fair value, as applicable. Due to the use of unobservable inputs, REO is classified as Level 3 under the fair value hierarchy.

### Debt Securities Recorded at Fair Value

We elected the fair value option for foreign-currency denominated debt instruments and certain other debt securities. See "Fair Value Election — *Debt Securities with Fair Value Option Elected"* for additional information. We determine the fair value of these instruments by obtaining multiple quotes from dealers. Since the prices provided by the dealers consider only observable data such as interest rates and exchange rates, these fair values are classified as Level 2 under the fair value hierarchy.

### Derivative Liabilities, Net

See discussion under *"Derivative Assets, Net"* above.

### Consolidated Fair Value Balance Sheets

The supplemental consolidated fair value balance sheets in Table 18.6 present our estimates of the fair value of our financial assets and liabilities at June 30, 2011 and December 31, 2010. The valuations of financial instruments on our consolidated fair value balance sheets are in accordance with the accounting guidance for fair value measurements and disclosures and the accounting guidance for financial instruments. The consolidated fair value balance sheets do not

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

purport to present our net realizable, liquidation, or market value as a whole. Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.

During the second quarter of 2010 our fair value results as presented in our consolidated fair value balance sheets were affected by a change in the estimation of a risk premium assumption embedded in our model to apply credit costs, which led to a decrease in our fair value measurement of mortgage loans. For more information concerning our approach to valuation related to our mortgage loans, see "Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy — *Mortgage Loans*."

### Table 18.6 — Consolidated Fair Value Balance Sheets

| | June 30, 2011 | | December 31, 2010 | |
| | Carrying Amount(1) | Fair Value | Carrying Amount(1) | Fair Value |
|---|---|---|---|---|
| | | (in billions) | | |
| **Assets** | | | | |
| Cash and cash equivalents | $ 17.5 | $ 17.5 | $ 37.0 | $ 37.0 |
| Restricted cash and cash equivalents | 2.3 | 2.3 | 8.1 | 8.1 |
| Federal funds sold and securities purchased under agreements to resell | 33.6 | 33.6 | 46.5 | 46.5 |
| *Investments in securities:* | | | | |
| Available-for-sale, at fair value | 222.8 | 222.8 | 232.6 | 232.6 |
| Trading, at fair value | 54.8 | 54.8 | 60.3 | 60.3 |
| Total investments in securities | 277.6 | 277.6 | 292.9 | 292.9 |
| *Mortgage loans:* | | | | |
| Mortgage loans held by consolidated trusts | 1,634.8 | 1,665.8 | 1,646.2 | 1,667.5 |
| Unsecuritized mortgage loans | 203.0 | 195.4 | 198.7 | 191.5 |
| Total mortgage loans | 1,837.8 | 1,861.2 | 1,844.9 | 1,859.0 |
| Derivative assets, net | 0.2 | 0.2 | 0.1 | 0.1 |
| Other assets | 26.8 | 27.1 | 32.3 | 37.2 |
| Total assets | $2,195.8 | $ 2,219.5 | $2,261.8 | $2,280.8 |
| **Liabilities** | | | | |
| *Debt, net:* | | | | |
| Debt securities of consolidated trusts held by third parties | $ 1,499.0 | $1,568.8 | $1,528.7 | $1,589.5 |
| Other debt | 681.1 | 696.9 | 713.9 | 729.7 |
| Total debt, net | 2,180.1 | 2,265.7 | 2,242.6 | 2,319.2 |
| Derivative liabilities, net | 0.4 | 0.4 | 1.2 | 1.1 |
| Other liabilities | 16.8 | 16.4 | 18.4 | 19.0 |
| Total liabilities | 2,197.3 | 2,282.5 | 2,262.2 | 2,339.4 |
| **Net assets** | | | | |
| Senior preferred stockholders | 64.7 | 64.7 | 64.2 | 64.2 |
| Preferred stockholders | 14.1 | 1.4 | 14.1 | 0.3 |
| Common stockholders | (80.3) | (129.1) | (78.7) | (123.1) |
| Total net assets | (1.5) | (63.0) | (0.4) | (58.6) |
| Total liabilities and net assets | $2,195.8 | $ 2,219.5 | $2,261.8 | $2,280.8 |

(1) Equals the amount reported on our GAAP consolidated balance sheets.

### Limitations

Our consolidated fair value balance sheets do not capture all elements of value that are implicit in our operations as a going concern because our consolidated fair value balance sheets only capture the values of the current investment and securitization portfolios as of the dates presented. For example, our consolidated fair value balance sheets do not capture the value of new investment and securitization business that would likely replace prepayments as they occur, nor do they include any estimation of intangible or goodwill values. Thus, the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets does not represent an estimate of our net realizable, liquidation or market value as a whole.

The fair value of certain financial instruments is based on our assumed current principal exit market as of the dates presented. As new markets are developed, our assumed principal exit market may change. The use of different assumptions and methodologies to determine the fair values of certain financial instruments, including the use of different principal exit markets, could have a material impact on the fair value of net assets attributable to stockholders presented on our consolidated fair value balance sheets.

We report certain assets and liabilities that are not financial instruments (such as property and equipment and REO), as well as certain financial instruments that are not covered by the disclosure requirements in the accounting guidance for

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                TREASURY-1827                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

financial instruments, such as pension liabilities, at their carrying amounts in accordance with GAAP on our consolidated fair value balance sheets. We believe these items do not have a significant impact on our overall fair value results. Other non-financial assets and liabilities on our GAAP consolidated balance sheets represent deferrals of costs and revenues that are amortized in accordance with GAAP, such as deferred debt issuance costs and deferred fees. Cash receipts and payments related to these items are generally recognized in the fair value of net assets when received or paid, with no basis reflected on our fair value balance sheets.

### Valuation Methods and Assumptions Not Subject to Fair Value Hierarchy

The following are valuation assumptions and methods for items not subject to the fair value hierarchy either because they are not measured at fair value other than on the fair value balance sheet or are only measured at fair value at inception.

### *Cash and Cash Equivalents*

Cash and cash equivalents largely consist of highly liquid investment securities with an original maturity of three months or less used for cash management purposes, as well as cash held at financial institutions and cash collateral posted by our derivative counterparties. Given that these assets are short-term in nature with limited market value volatility, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

### *Federal Funds Sold and Securities Purchased Under Agreements to Resell*

Federal funds sold and securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities and federal funds sold. Given that these assets are short-term in nature, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value.

### *Mortgage Loans*

Single-family mortgage loans are not subject to the fair value hierarchy since they are classified as held-for-investment and recorded at amortized cost. Certain multifamily mortgage loans are subject to the fair value hierarchy since these are either recorded at fair value with the fair value option elected or they are held for investment and recorded at fair value upon impairment, which is based upon the fair value of the collateral as multifamily loans are collateral-dependent.

#### *Single-Family Loans*

We determine the fair value of single-family mortgage loans as an estimate of the price we would receive if we were to securitize those loans, as we believe this represents the principal market for such loans. This includes both those held by consolidated trusts and unsecuritized loans and excludes single-family loans for which a contractual modification has been completed. Our estimate of fair value is based on comparisons to actively traded mortgage-related securities with similar characteristics. We adjust to reflect the excess coupon (implied management and guarantee fee) and credit obligation related to performing our guarantee.

To calculate the fair value, we begin with a security price derived from benchmark security pricing for similar actively traded mortgage-related securities, adjusted for yield, credit, and liquidity differences. This security pricing process is consistent with our approach for valuing similar securities retained in our investment portfolio or issued to third parties. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Investments in Securities.*"

We estimate the present value of the additional cash flows on the mortgage loan coupon in excess of the coupon on the mortgage-related securities. Our approach for estimating the fair value of the implied management and guarantee fee at June 30, 2011 used third-party market data as practicable. The valuation approach for the majority of implied management and guarantee fee that relates to fixed-rate loan products with coupons at or near current market rates involves obtaining dealer quotes on hypothetical securities constructed with collateral from our single-family credit guarantee portfolio. The remaining implied management and guarantee fee relates to underlying loan products for which comparable market prices were not readily available. These amounts relate specifically to ARM products, highly seasoned loans, or fixed-rate loans with coupons that are not consistent with current market rates. This portion of the implied management and guarantee fee is valued using an expected cash flow approach, including only those cash flows expected to result from our contractual right to receive management and guarantee fees.

The implied management and guarantee fee for single-family mortgage loans is also net of the related credit and other costs (such as general and administrative expense) and benefits (such as credit enhancements) inherent in our

175

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

guarantee obligation. We use entry-pricing information for all guaranteed loans that would qualify for purchase under current underwriting guidelines (used for the majority of the guaranteed loans, but accounts for a small share of the overall fair value of the guarantee obligation). For loans that do not qualify for purchase based on current underwriting guidelines, we use our internal credit models, which incorporate factors such as loan characteristics, loan performance status information, expected losses, and risk premiums without further adjustment (used for less than a majority of the guaranteed loans, but accounts for the largest share of the overall fair value of the guarantee obligation).

For single-family mortgage loans for which a contractual modification has been approved, we estimate fair value based on our estimate of prices we would receive if we were to sell these loans in the whole loan market, as this represents our current principal market for modified loans. These prices are obtained from multiple dealers who reference market activity, where available, for modified loans and use internal models and their judgment to determine default rates, severity rates, and risk premiums.

### _Multifamily Loans_

For a discussion of the techniques used to determine the fair value of held-for-sale, and both impaired and non-impaired held-for-investment multifamily loans, see "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — _Mortgage Loans, Held-for-Investment_" and "_— Mortgage Loans, Held-for-Sale,_" respectively.

### **Other Assets**

Our other assets are not financial instruments required to be valued at fair value under the accounting guidance for disclosures about the fair value of financial instruments, such as property and equipment. For most of these non-financial instruments in other assets, we use the carrying amounts from our GAAP consolidated balance sheets as the reported values on our consolidated fair value balance sheets, without any adjustment. These assets represent an insignificant portion of our GAAP consolidated balance sheets. Certain non-financial assets in other assets on our GAAP consolidated balance sheets are assigned a zero value on our consolidated fair value balance sheets. This treatment is applied to deferred items such as deferred debt issuance costs.

We adjust the GAAP-basis deferred taxes reflected on our consolidated fair value balance sheets to include estimated income taxes on the difference between our consolidated fair value balance sheets net assets attributable to common stockholders, including deferred taxes from our GAAP consolidated balance sheets, and our GAAP consolidated balance sheets equity attributable to common stockholders. To the extent the adjusted deferred taxes are a net asset, this amount is included in other assets. In addition, if our net deferred tax assets on our consolidated fair value balance sheets, calculated as described above, exceed our net deferred tax assets on our GAAP consolidated balance sheets that have been reduced by a valuation allowance, our net deferred tax assets on our consolidated fair value balance sheets are limited to the amount of our net deferred tax assets on our GAAP consolidated balance sheets. If the adjusted deferred taxes are a net liability, this amount is included in other liabilities.

Accrued interest receivable is one of the components included within other assets on our consolidated fair value balance sheets. On our GAAP consolidated balance sheets, we reverse accrued but uncollected interest income when a loan is placed on non-accrual status. There is no such reversal performed for the fair value of accrued interest receivable disclosed on our consolidated fair value balance sheets. Rather, we include in our disclosure the amount we deem to be collectible. As a result, there is a difference between the accrued interest receivable GAAP-basis carrying amount and its fair value disclosed on our consolidated fair value balance sheets.

### **Total Debt, Net**

Total debt, net represents debt securities of consolidated trusts held by third parties and other debt that we issued to finance our assets. On our consolidated GAAP balance sheets, total debt, net, excluding debt securities for which the fair value option has been elected, is reported at amortized cost, which is net of deferred items, including premiums, discounts, and hedging-related basis adjustments.

For fair value balance sheet purposes, we use the dealer-published quotes for a base TBA security, adjusted for the carry and pay-up price adjustments, to determine the fair value of the debt securities of consolidated trusts held by third parties. The valuation techniques we use are similar to the approach we use to value our investments in agency securities for GAAP purposes. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — _Investment in Securities — Agency Securities_" for additional information regarding the valuation techniques we use.

Other debt includes both non-callable and callable debt, as well as short-term zero-coupon discount notes. The fair value of the short-term zero-coupon discount notes is based on a discounted cash flow model with market inputs. The valuation of other debt securities represents the proceeds that we would receive from the issuance of debt and is generally

176

_Freddie Mac_

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

based on market prices obtained from broker/dealers, reliable third-party pricing service providers or direct market observations. We elected the fair value option for foreign-currency denominated debt and certain other debt securities and reported them at fair value on our GAAP consolidated balance sheets. See "Valuation Methods and Assumptions Subject to Fair Value Hierarchy — *Debt Securities Recorded at Fair Value*" for additional information.

### Other Liabilities

Other liabilities consist of accrued interest payable on debt securities, the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities, the reserve for guarantee losses on non-consolidated trusts, servicer advanced interest payable and certain other servicer liabilities, accounts payable and accrued expenses, payables related to securities, and other miscellaneous liabilities. We believe the carrying amount of these liabilities is a reasonable approximation of their fair value, except for the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities. The technique for estimating the fair value of our guarantee obligation related to the credit component of the loan's fair value is described in the "Mortgage Loans — Single-Family Loans" section.

Furthermore, certain deferred items reported as other liabilities on our GAAP consolidated balance sheets are assigned zero value on our consolidated fair value balance sheets, such as deferred fees. Also, as discussed in "Other Assets," other liabilities may include a deferred tax liability adjusted for fair value balance sheet purposes.

### Net Assets Attributable to Senior Preferred Stockholders

Our senior preferred stock held by Treasury in connection with the Purchase Agreement is recorded at the stated liquidation preference for purposes of the consolidated fair value balance sheets. As the senior preferred stock is restricted as to its redemption, we consider the liquidation preference to be the most appropriate measure for purposes of the consolidated fair value balance sheets.

### Net Assets Attributable to Preferred Stockholders

To determine the preferred stock fair value, we use a market-based approach incorporating quoted dealer prices.

### Net Assets Attributable to Common Stockholders

Net assets attributable to common stockholders is equal to the difference between the fair value of total assets and the sum of total liabilities reported on our consolidated fair value balance sheets, less the value of net assets attributable to senior preferred stockholders and the fair value attributable to preferred stockholders.

## NOTE 19: LEGAL CONTINGENCIES

We are involved as a party to a variety of legal and regulatory proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment-related litigation and other legal proceedings incidental to our business. We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures. From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and/or service mortgages for, us. In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories. In addition, we are sometimes sued in connection with the origination or servicing of mortgages. These suits typically involve claims alleging wrongful actions of seller/servicers. Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions with respect to mortgages sold to Freddie Mac.

Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction. In accordance with the accounting guidance for contingencies, we reserve for litigation claims and assessments asserted or threatened against us when a loss is probable and the amount of the loss can be reasonably estimated.

### Putative Securities Class Action Lawsuits

*Ohio Public Employees Retirement System ("OPERS") vs. Freddie Mac, Syron, et al.* This putative securities class action lawsuit was filed against Freddie Mac and certain former officers on January 18, 2008 in the U.S. District Court for the Northern District of Ohio purportedly on behalf of a class of purchasers of Freddie Mac stock from August 1, 2006 through November 20, 2007. The plaintiff alleges that the defendants violated federal securities laws by making false and misleading statements concerning our business, risk management and the procedures we put into place to protect the company from problems in the mortgage industry. On April 10, 2008, the Court appointed OPERS as lead plaintiff and approved its choice of counsel. On September 2, 2008, defendants filed a motion to dismiss plaintiff's amended

177

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

complaint. On November 7, 2008, the plaintiff filed a second amended complaint, which removed certain allegations against Richard Syron, Anthony Piszel, and Eugene McQuade, thereby leaving insider-trading allegations against only Patricia Cook. The second amended complaint also extends the damages period, but not the class period. The plaintiff seeks unspecified damages and interest, and reasonable costs and expenses, including attorney and expert fees. On November 19, 2008, the Court granted FHFA's motion to intervene in its capacity as Conservator. On April 6, 2009, defendants filed a motion to dismiss the second amended complaint, which motion remains pending.

*Kuriakose vs. Freddie Mac, Syron, Piszel and Cook.* Another putative class action lawsuit was filed against Freddie Mac and certain former officers on August 15, 2008 in the U.S. District Court for the Southern District of New York for alleged violations of federal securities laws purportedly on behalf of a class of purchasers of Freddie Mac stock from November 21, 2007 through August 5, 2008. The plaintiff claims that defendants made false and misleading statements about Freddie Mac's business that artificially inflated the price of Freddie Mac's common stock, and seeks unspecified damages, costs, and attorneys' fees. On February 6, 2009, the Court granted FHFA's motion to intervene in its capacity as Conservator. On May 19, 2009, plaintiffs filed an amended consolidated complaint, purportedly on behalf of a class of purchasers of Freddie Mac stock from November 30, 2007 through September 7, 2008. Freddie Mac filed a motion to dismiss the complaint on February 24, 2010. On March 30, 2011, the Court granted without prejudice Freddie Mac's motion to dismiss all claims, and allowed the plaintiffs the option to file a new complaint, which they did on July 15, 2011.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition, or results of operations.

## Shareholder Demand Letters

In late 2007 and early 2008, the Board of Directors received three letters from purported shareholders of Freddie Mac, which together contain allegations of corporate mismanagement and breaches of fiduciary duty in connection with the company's risk management, alleged false and misleading financial disclosures, and the alleged sale of stock based on material non-public information by certain current and former officers and directors of Freddie Mac. Collectively, the letters demanded that the board commence an independent investigation into the alleged conduct, institute legal proceedings to recover damages and unjust enrichment from board members, senior officers, Freddie Mac's outside auditors, and other parties who allegedly aided or abetted the improper conduct, and implement corporate governance initiatives to ensure that the alleged problems do not recur. Prior to the conservatorship, the Board of Directors formed a Special Litigation Committee, or SLC, to investigate the purported shareholders' allegations, and engaged counsel for that purpose. Pursuant to the conservatorship, FHFA, as the Conservator, has succeeded to the powers of the Board of Directors, including the power to conduct investigations such as the one conducted by the SLC of the prior Board of Directors. The counsel engaged by the former SLC continued the investigation pursuant to instructions from FHFA. As described below, each of these purported shareholders subsequently filed lawsuits against Freddie Mac.

On February 25, 2011, the counsel engaged by the former SLC submitted a report to the Conservator, in which the counsel concluded, among other things, that it "uncovered no evidence sufficient to demonstrate that any of the Company's current or former officers or directors engaged in willful misconduct, a knowing violation of criminal law or of any federal or state securities law, or any acts from which they derived improper personal benefit, including in connection with the Company's acceptance and management of credit risk from 2004 through 2007."

## Shareholder Derivative Lawsuits

On July 24, 2008 and August 15, 2008, purported shareholders, The Adams Family Trust, Kevin Tashjian and the Louisiana Municipal Police Employees Retirement System, or LMPERS, filed two derivative lawsuits in the U.S. District Court for the Eastern District of Virginia against certain current and former officers and directors of Freddie Mac, with Freddie Mac named as a nominal defendant in the actions. On October 15, 2008, the U.S. District Court for the Eastern District of Virginia consolidated these two cases. Previously, on March 10, 2008, a purported shareholder, Robert Bassman, had filed a similar shareholder derivative lawsuit in the U.S. District Court for the Southern District of New York, which was subsequently transferred to the Eastern District of Virginia and then, on December 12, 2008, consolidated with the cases filed by The Adams Family Trust, Kevin Tashjian, and LMPERS. While no consolidated complaint has been filed, the complaints collectively assert claims for breach of fiduciary duty, negligence, violations of federal securities laws, violations of the Sarbanes-Oxley Act of 2002 and unjust enrichment. Those claims are based on allegations that defendants failed to implement and/or maintain sufficient risk management and other controls; failed to adequately reserve for uncollectible loans and other risks of loss; and made false and misleading statements regarding the company's exposure to the subprime market, the strength of the company's risk management and internal controls, and the

178

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

company's underwriting standards in response to alleged abuses in the subprime market. The plaintiffs also allege that certain of the defendants breached their fiduciary duties and unjustly enriched themselves through their salaries, bonuses, benefits and other compensation, and sale of stock based on material non-public information. The complaints seek unspecified damages, equitable relief, the imposition of a constructive trust for the proceeds of alleged insider stock sales, an accounting, restitution, disgorgement, declaratory relief, an order requiring reform and improvement of corporate governance, punitive damages, costs, interest, and attorneys', accountants' and experts' fees.

After FHFA successfully intervened in these consolidated actions in its capacity as Conservator, it filed a motion to substitute for plaintiffs. On July 27, 2009, the District Court entered an order granting FHFA's motion, and on August 20, 2009, the plaintiffs filed an appeal of that order. On March 16, 2011, FHFA filed with the District Court a motion for voluntary dismissal without prejudice. On April 21, 2011, the District Court granted FHFA's motion for voluntary dismissal. On May 5, 2011, the Court of Appeals for the Fourth Circuit affirmed the District Court's ruling allowing FHFA to substitute for plaintiffs.

On June 6, 2008, a purported shareholder, the Esther Sadowsky Testamentary Trust, filed a shareholder derivative complaint in the U.S. District Court for the Southern District of New York against certain former officers and current and former directors of Freddie Mac. Plaintiff asserts claims for alleged breach of fiduciary duty and declaratory and injunctive relief, based on allegations that defendants caused the company to violate its charter by engaging in "unsafe, unsound and improper speculation in high risk mortgages to boost near term profits, report growth in the company's mortgage-related investments portfolio and guarantee business, and take market share away from its primary competitor, Fannie Mae." Among other things, plaintiff seeks an accounting, an order requiring that defendants remit all salary and compensation received during the periods they allegedly breached their duties, and an award of pre-judgment and post-judgment interest, attorneys' fees, expert fees and consulting fees, and other costs and expenses. On November 13, 2008, FHFA filed a motion to substitute for the Esther Sadowsky Testamentary Trust. On February 26, 2009, Robert Bassman filed a motion with the District Court to intervene or, in the alternative, to appear as amicus curiae. On May 6, 2009, the District Court granted FHFA's motion to substitute and denied Bassman's motion to intervene. The District Court subsequently stayed the case through March 2, 2011. On June 4, 2009, the Esther Sadowsky Testamentary Trust filed a notice of appeal of the May 6 order granting FHFA's substitution motion. On September 17, 2009, Bassman filed a notice of appeal of the May 6 order denying his motion to intervene or appear as amicus curiae. On March 10, 2010, the U.S. Court of Appeals for the Second Circuit granted FHFA's motion to dismiss the appeal of the Esther Sadowsky Testamentary Trust and dismissed that appeal on April 12, 2010 due to lack of jurisdiction. On March 4, 2011, the Second Circuit affirmed the District Court's decision denying Bassman's motion to intervene and dismissed Bassman's motion to appeal due to lack of jurisdiction. The Second Circuit issued its mandate to the District Court on April 11, 2011. Following the February 25, 2011 SLC counsel report, FHFA filed its status report with the District Court on March 2, 2011, stating that it intended to file a motion for voluntary dismissal without prejudice, which it did on March 16, 2011. On May 31, 2011, the District Court granted FHFA's motion to dismiss the case without prejudice.

**Energy Lien Litigation**

On July 14, 2010, the State of California filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging that Fannie Mae and Freddie Mac committed unfair business practices in violation of California law by asserting that property liens arising from government-sponsored energy initiatives such as California's Property Assessed Clean Energy, or PACE, program cannot take priority over a mortgage to be sold to Fannie Mae or Freddie Mac. The lawsuit contends that the PACE programs create liens superior to such mortgages and that, by affirming Fannie Mae and Freddie Mac's positions, FHFA has violated the National Environmental Policy Act, or NEPA, and the Administrative Procedure Act, or APA. The complaint seeks declaratory and injunctive relief, costs and such other relief as the court deems proper.

Similar complaints have been filed by other parties. On July 26, 2010, the County of Sonoma filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging similar violations of California law, NEPA, and the APA. In a filing dated September 23, 2010, the County of Placer moved to intervene in the Sonoma County lawsuit as a party plaintiff seeking to assert similar claims, which motion was granted on November 1, 2010. On October 1, 2010, the City of Palm Desert filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA in the Northern District of California. On October 8, 2010, Leon County and the Leon County Energy Improvement District filed a similar complaint against Fannie Mae, Freddie Mac, and others in the Northern District of Florida. On October 12, 2010, FHFA filed a motion before the Judicial Panel on Multi-District Litigation seeking an order transferring these cases as well as a related case filed only against FHFA, for coordination or consolidation of pretrial proceedings. This motion was denied on February 8, 2011. On October 14, 2010, the defendants

179                                                                                             *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1832

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

filed a motion to dismiss the lawsuits pending in the Northern District of California. Also on October 14, 2010, the County of Sonoma filed a motion for preliminary injunction seeking to enjoin the defendants from giving any force or effect in Sonoma County to certain directives by FHFA regarding energy retrofit loan programs and other related relief. On October 26, 2010, the Town of Babylon filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA, as well as the Office of the Comptroller of the Currency, in the U.S. District Court for the Eastern District of New York.

The defendants have filed motions to dismiss these lawsuits. The courts have entered stipulated orders dismissing the individual officers of Freddie Mac and Fannie Mae from the cases. On December 17, 2010, the judge handling the cases in the Northern District of California requested a position statement from the United States, which was filed on February 8, 2011. On June 13, 2011, the complaint filed by the Town of Babylon was dismissed.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition or results of operations.

**Government Investigations and Inquiries**

On September 26, 2008, Freddie Mac received a federal grand jury subpoena from the U.S. Attorney's Office for the Southern District of New York. The subpoena sought documents relating to accounting, disclosure, and corporate governance matters for the period beginning January 1, 2007. Subsequently, we were informed that the subpoena was withdrawn, and that an investigation was being conducted by the U.S. Attorney's Office for the Eastern District of Virginia. On June 1, 2011, the Federal Bureau of Investigation office assisting the investigation advised Freddie Mac's outside counsel that the investigation had been concluded.

On September 26, 2008, Freddie Mac received notice from the Staff of the Enforcement Division of the SEC that it is also conducting an inquiry to determine whether there has been any violation of federal securities laws, and directing the company to preserve documents. On October 21, 2008, the SEC issued to the company a request for documents. The SEC staff has also conducted interviews of company employees. Beginning January 23, 2009, the SEC issued subpoenas to Freddie Mac and certain of its employees pursuant to a formal order of investigation. Freddie Mac is cooperating fully in these matters.

Freddie Mac was informed by Donald J. Bisenius, former Executive Vice President — Single-Family Credit Guarantee, that on February 10, 2011, he received a "Wells Notice" from the SEC staff in connection with the investigation. The Wells Notice indicates that the staff is considering recommending that the SEC bring civil enforcement action against Mr. Bisenius for possible violations of the federal securities laws and related rules that are alleged to have occurred in 2007 and 2008.

Under the SEC's procedures, a recipient of a Wells Notice has an opportunity to respond in the form of a written submission that seeks to persuade the SEC staff that no action should be commenced. Mr. Bisenius has informed the company that he has made such a submission.

**Related Third Party Litigation and Indemnification Requests**

On December 15, 2008, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York against certain former Freddie Mac officers and others styled *Jacoby v. Syron, Cook, Piszel, Banc of America Securities LLC, JP Morgan Chase & Co., and FTN Financial Markets*. The complaint, as amended on December 17, 2008, contends that the defendants made material false and misleading statements in connection with Freddie Mac's September 2007 offering of non-cumulative, non-convertible, perpetual fixed-rate preferred stock, and that such statements "grossly overstated Freddie Mac's capitalization" and "failed to disclose Freddie Mac's exposure to mortgage-related losses, poor underwriting standards and risk management procedures." The complaint further alleges that Syron, Cook, and Piszel made additional false statements following the offering. Freddie Mac is not named as a defendant in this lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel. The case is currently dormant and we believe plaintiff may have abandoned it.

By letter dated October 17, 2008, Freddie Mac received formal notification of a putative class action securities lawsuit, *Mark v. Goldman, Sachs & Co., J.P. Morgan Chase & Co., and Citigroup Global Markets Inc.,* filed on September 23, 2008, in the U.S. District Court for the Southern District of New York, regarding the company's November 29, 2007 public offering of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock.

On January 29, 2009, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York styled *Kreysar v. Syron, et al.* On April 30, 2009, the Court consolidated the Mark case with the Kreysar case, and the plaintiffs filed a consolidated class action complaint on July 2, 2009. The consolidated complaint

TREASURY-1833

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                                 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

alleges that three former Freddie Mac officers, certain underwriters and Freddie Mac's auditor violated federal securities laws by making material false and misleading statements in connection with an offering by Freddie Mac of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock Series Z that commenced on November 29, 2007. The complaint further alleges that certain defendants and others made additional false statements following the offering. The complaint names as defendants Syron, Piszel, Cook, Goldman, Sachs & Co., JPMorgan Securities Inc., Banc of America Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Morgan Stanley & Co. Incorporated, UBS Securities LLC and PricewaterhouseCoopers LLP.

The defendants filed a motion to dismiss the consolidated class action complaint on September 30, 2009. On January 14, 2010, the Court granted the defendants' motion to dismiss the consolidated action with leave to file an amended complaint on or before March 15, 2010. On March 15, 2010, plaintiffs filed their amended consolidated complaint against these same defendants. The defendants moved to dismiss the amended consolidated complaint on April 28, 2010. On July 29, 2010, the Court granted the defendants' motion to dismiss, without prejudice, and allowed the plaintiffs leave to replead. On August 16, 2010, the plaintiffs filed their second amended consolidated complaint against these same defendants. The defendants moved to dismiss the second amended consolidated complaint on September 16, 2010. On October 22, 2010, the Court granted the defendants' motion to dismiss, without prejudice, again allowing the plaintiffs leave to replead. On November 14, 2010, the plaintiffs filed a third amended consolidated complaint against PricewaterhouseCoopers LLP, Syron and Piszel, omitting Cook and the underwriter defendants. On January 11, 2011, the Court granted the remaining defendants' motion to dismiss the complaint with respect to PricewaterhouseCoopers LLP, but denied the motion with respect to Syron and Piszel. On April 4, 2011, Piszel filed a motion for partial judgment on the pleadings. The Court granted that motion on April 28, 2011. Freddie Mac is not named as a defendant in the consolidated lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel. At present, it is not possible for us to predict the probable outcome of the lawsuit or any potential impact on our business, financial condition or results of operations.

On July 6, 2011, plaintiffs filed a lawsuit in the U.S. District Court for Massachusetts styled *Liberty Mutual Insurance Company, Peerless Insurance Company, Employers Insurance Company of Wausau, Safeco Corporation and Liberty Life Assurance Company of Boston v. Goldman, Sachs & Co*. The complaint alleges that Goldman, Sachs & Co. made materially misleading statements and omissions in connection with Freddie Mac's Series Z preferred stock offering that commenced on November 29, 2007. Freddie Mac is not named as a defendant in this lawsuit.

**Lehman Bankruptcy**

On September 15, 2008, Lehman filed a chapter 11 bankruptcy petition in the Bankruptcy Court for the Southern District of New York. Thereafter, many of Lehman's U.S. subsidiaries and affiliates also filed bankruptcy petitions (collectively, the "Lehman Entities"). Freddie Mac had numerous relationships with the Lehman Entities which give rise to several claims. On September 22, 2009, Freddie Mac filed proofs of claim in the Lehman bankruptcies aggregating approximately $2.1 billion. On April 14, 2010, Lehman filed its chapter 11 plan and disclosure statement, providing for the liquidation of the bankruptcy estate's assets over the next three years. On January 25, 2011, Lehman filed its first amended plan and disclosure statement. Lehman filed its second amended joint plan and disclosure statement on June 29, 2011. The plan and disclosure statement are subject to court approval.

**Taylor, Bean & Whitaker Bankruptcy**

On August 24, 2009, TBW filed for bankruptcy in the Bankruptcy Court for the Middle District of Florida. Prior to that date, Freddie Mac had terminated TBW's status as a seller/servicer of loans. On or about June 14, 2010, Freddie Mac filed a proof of claim in the TBW bankruptcy aggregating $1.78 billion. Of this amount, about $1.15 billion related to current and projected repurchase obligations and about $440 million related to funds deposited with Colonial Bank, or with the FDIC as its receiver, which were attributable to mortgage loans owned or guaranteed by us and previously serviced by TBW. The remaining $190 million represented miscellaneous costs and expenses incurred in connection with the termination of TBW's status as a seller/servicer.

With the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. The settlement, which is discussed below, was filed with the bankruptcy court on June 22, 2011. The court approved the settlement and confirmed TBW's proposed plan of liquidation on July 21, 2011.

Under the terms of the settlement, we have been granted an unsecured claim in the TBW bankruptcy estate in the amount of $1.022 billion, largely representing our claims to past and future loan repurchase exposures. We estimate that

181

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.
Powered by Morningstar® Document Research℠

Table of Contents

this claim may result in a distribution to us of approximately $40-45 million, which is based on the plan of liquidation and disclosure statement filed with the court by TBW indicating that general unsecured creditors are likely to receive a distribution of 3.3 to 4.4 cents on the dollar. We are also entitled to approximately $203 million on deposit in certain TBW bank accounts relating to our mortgage loans, $150 million of which we received on June 21, 2011 from the FDIC as receiver of Colonial Bank. We are required to assign ownership rights of certain escrow accounts associated with the serviced loans to TBW and certain of its creditors. The settlement also allows for our sale of TBW-related mortgage servicing rights and provides a formula for determining the amount of the proceeds, if any, to be allocated to third parties that have asserted interests in those rights. We estimate that during the third quarter of 2011, we will recognize approximately a $0.2 billion gain, representing the difference between the amounts we assign, or pay, to TBW and their creditors and the liability recorded on our consolidated balance sheet.

At June 30, 2011, we estimate our uncompensated loss exposure to TBW to be approximately $0.7 billion. This estimated exposure largely relates to outstanding repurchase claims that have already been adjusted in our financial statements to their net realizable value through our provision for loan losses. Our ultimate losses could exceed our recorded estimate. Potential changes in our estimate of uncompensated loss exposure or the potential for additional claims as discussed below could cause us to record additional losses in the future.

We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors may file an action to recover certain funds paid to us prior to the TBW bankruptcy. However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to recover assets. Based on court filings and other information, we understand that Ocala or its creditors may attempt to assert fraudulent transfer and other possible claims totaling approximately $840 million against us related to funds that were allegedly transferred from Ocala to Freddie Mac custodial accounts. We also understood that Ocala might attempt to make claims against us asserting ownership of a large number of loans that we purchased from TBW. The order approving the settlement provides that nothing in the settlement shall be construed to limit, waive or release Ocala's claims against Freddie Mac, except for TBW's claims and claims arising from the allocation of the loans discussed above to Freddie Mac.

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds insuring against loss resulting from dishonest acts by TBW's officers, directors, and employees. Several excess insurers on the bonds thereafter filed similar claims in that action. Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder. Discovery is proceeding.

## IRS Litigation

We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2005 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices. The IRS responded to our petition with the U.S. Tax Court on December 21, 2010. On July 6, 2011, the U.S. Tax Court issued a Notice Setting Case for Trial and a Standing Pretrial Order. The trial date set forth in the Notice is December 12, 2011. We continue to seek resolution of the controversy by settlement. We believe adequate reserves have been provided for settlement on reasonable terms. For information on this matter, see "NOTE 13: INCOME TAXES."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### NOTE 20: EARNINGS (LOSS) PER SHARE

We have participating securities related to options and restricted stock units with dividend equivalent rights that receive dividends as declared on an equal basis with common shares but are not obligated to participate in undistributed net losses. Consequently, in accordance with accounting guidance for earnings per share, we use the "two-class" method of computing earnings per share. Basic earnings per common share are computed by dividing net loss attributable to common stockholders by weighted average common shares outstanding — basic for the period. The weighted average common shares outstanding — basic during the three and six months ended June 30, 2011 and 2010 include the weighted average number of shares during the periods that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement since the warrant is unconditionally exercisable by the holder at a minimal cost. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for further information.

Diluted loss per common share is computed as net loss attributable to common stockholders divided by weighted average common shares outstanding — diluted for the period, which considers the effect of dilutive common equivalent shares outstanding. For periods with net income, the effect of dilutive common equivalent shares outstanding includes: (a) the weighted average shares related to stock options; and (b) the weighted average of restricted shares and restricted stock units. Such items are included in the calculation of weighted average common shares outstanding — diluted during periods of net income, when the assumed conversion of the share equivalents has a dilutive effect. Such items are excluded from the weighted average common shares outstanding — basic. For a discussion of our significant accounting policies regarding our calculation of earnings per common share, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Earnings Per Common Share" in our 2010 Annual Report.

### Table 20.1 — Loss Per Common Share — Basic and Diluted

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| | (dollars in millions, except per share amounts) | | | |
| Net loss attributable to Freddie Mac | $ (2,139) | $ (4,713) | $ (1,463) | $ (11,401) |
| Preferred stock dividends[1] | (1,617) | (1,296) | (3,222) | (2,588) |
| Net loss attributable to common stockholders | $ (3,756) | $ (6,009) | $ (4,685) | $ (13,989) |
| Weighted average common shares outstanding — basic (in thousands)[2] | 3,244,967 | 3,249,198 | 3,245,970 | 3,250,241 |
| Dilutive potential common shares (in thousands) | — | — | — | — |
| Weighted average common shares outstanding — diluted (in thousands) | 3,244,967 | 3,249,198 | 3,245,970 | 3,250,241 |
| Antidilutive potential common shares excluded from the computation of dilutive potential common shares (in thousands) | 3,229 | 5,020 | 3,808 | 5,729 |
| Basic loss per common share | $ (1.16) | $ (1.85) | $ (1.44) | $ (4.30) |
| Diluted loss per common share | $ (1.16) | $ (1.85) | $ (1.44) | $ (4.30) |

(1) Consistent with the covenants of the Purchase Agreement, we paid dividends on our senior preferred stock, but did not declare dividends on any other series of preferred stock outstanding subsequent to entering conservatorship.

(2) Includes the weighted average number of shares during the period that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included in shares outstanding — basic, since it is unconditionally exercisable by the holder at a minimal cost of $0.00001 per share.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 21: SELECTED FINANCIAL STATEMENT LINE ITEMS

Table 21.1 below presents the major components of other assets and other liabilities on our consolidated balance sheets.

**Table 21.1 — Other Assets and Other Liabilities on Consolidated Balance Sheets**

|  | June 30, 2011 | December 31, 2010 |
|---|---|---|
|  | (in millions) | |
| Other assets: |  |  |
| Guarantee asset | $ 667 | $ 541 |
| Accounts and other receivables | 6,268 | 8,734 |
| All other | 1,446 | 1,600 |
| Total other assets | $ 8,381 | $ 10,875 |
| Other liabilities: |  |  |
| Guarantee obligation | $ 733 | $ 625 |
| Servicer liabilities | 4,045 | 4,456 |
| Accounts payable and accrued expenses | 1,257 | 1,760 |
| All other | 1,165 | 1,257 |
| Total other liabilities | $ 7,200 | $ 8,098 |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**PART II OTHER INFORMATION**

**ITEM 1. LEGAL PROCEEDINGS**

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business. See "NOTE 19: LEGAL CONTINGENCIES" for more information regarding our involvement as a party to various legal proceedings.

**ITEM 1A. RISK FACTORS**

This Form 10-Q should be read together with the "RISK FACTORS" sections in our Form 10-Q for the quarter ended March 31, 2011 and our 2010 Annual Report, which describe various risks and uncertainties to which we are or may become subject, and is supplemented by the discussion below. These risks and uncertainties could, directly or indirectly, adversely affect our business, financial condition, results of operations, cash flows, strategies and/or prospects.

***A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business. Our business could also be adversely affected if there is a downgrade in the credit ratings of the U.S. government or a payment default by the U.S. government.***

Nationally recognized statistical rating organizations play an important role in determining, by means of the ratings they assign to issuers and their debt, the availability and cost of funding. We currently receive ratings from three nationally recognized statistical rating organizations for our unsecured borrowings. These ratings are largely based on the support we receive from Treasury, and therefore are influenced by the credit ratings of the U.S. government.

Our credit ratings are important to our liquidity. Actions by governmental entities or others, including changes in government support for us, additional GAAP losses, additional draws under the Purchase Agreement, a downgrade in the credit ratings of or outlook on the U.S. government, and other factors could adversely affect our debt credit ratings. Any downgrade in the credit ratings of the U.S. government would be expected to be followed or accompanied by a downgrade in our credit ratings. Such actions could lead to major disruptions in the mortgage market and to our business due to lower liquidity, higher borrowing costs, lower asset values and higher credit losses, and could cause us to experience much greater net losses and net worth deficits. The full range and extent of the adverse effects to our business that would result from any such ratings downgrades and market disruptions cannot be predicted with certainty. However, we expect that they would: (i) adversely affect our liquidity and cause us to limit or suspend new business activities that entail outlays of cash; (ii) make new issuances of debt significantly more costly, and potentially prohibitively expensive as well as adversely affect the supply of debt financing available to us; (iii) reduce the value of our guarantee to investors and adversely affect our ability to issue our guaranteed mortgage-related securities; (iv) reduce the value of Treasury and agency mortgage securities we hold; (v) increase the cost of mortgage financing for borrowers, thereby reducing the supply of mortgages available to us to purchase; (vi) adversely affect home prices, reducing the value of our REO and likely leading to additional borrower defaults on mortgage loans we guarantee; and (vii) trigger additional collateral requirements under our derivatives contracts.

Earlier this year, given concerns that the U.S. government's statutory debt limit would not be raised in a timely manner as well as uncertainty about achievement of a credible deficit reduction solution, certain major credit rating agencies took actions on the U.S. government's credit ratings. Due to the support we receive from Treasury, these rating agencies also took corresponding actions on certain of our credit ratings. On August 2, 2011, President Obama signed the "Budget and Control Act of 2011" which raised the U.S. government's statutory debt limit. The raising of the statutory debt limit and details outlined in the legislation to reduce the deficit resulted in further rating actions on our debt ratings and the ratings of the U.S. government.

On July 15, 2011, S&P placed our senior long-term debt and short-term debt on CreditWatch with negative implications given our direct reliance on the U.S. government. This action followed S&P's placement of the long-term and short-term credit ratings of the United States on CreditWatch with negative implications on July 14, 2011. S&P subsequently lowered the long-term credit rating of the United States to "AA+" from "AAA" and affirmed the short-term rating of "A-1+" on August 5, 2011. S&P removed both the short- and long-term ratings of the U.S. government from CreditWatch negative and assigned a negative outlook to the long-term credit rating. By assigning a negative outlook to the U.S. government's long-term credit rating, S&P indicated that the long-term rating could be lowered within the next two years if: (a) there are less reductions in spending than agreed to; (b) interest rates are higher; or (c) new fiscal pressures during the period result in a higher general government debt trajectory than currently assumed in its base case. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating.

185                                                                                   *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

On August 2, 2011, Moody's confirmed our senior long-term debt and subordinated debt ratings and assigned a negative outlook to the ratings. This action accompanied Moody's confirmation of the U.S. government's long-term credit rating and assignment of a negative outlook to the rating. By assigning a negative outlook to the government's long-term credit rating, Moody's indicated that there would be a risk of downgrade if: (a) there is a weakening in fiscal discipline in the coming year; (b) further fiscal consolidation measures are not adopted in 2013; (c) the economic outlook deteriorates significantly; or (d) there is an appreciable rise in the U.S. government's funding costs over and above what is currently expected.

On August 2, 2011, Fitch noted that it expects to conclude its scheduled review of the U.S. government's credit rating by the end of August 2011. Fitch had indicated in July 2011, that following resolution of the debt ceiling situation, the ratings of financial institutions that are directly underpinned by support from the U.S. government, such as Freddie Mac, would ultimately be aligned with whatever Fitch determines the U.S. government rating to be, either remaining at the current AAA–level or potentially a lower rating level.

***If Treasury is unable to provide us with funding requested under the Purchase Agreement to address a deficit in our net worth, FHFA could be required to place us into receivership.***

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are less than our obligations for a period of 60 calendar days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has also advised us that, if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination. If funding has been requested under the Purchase Agreement to address a deficit in our net worth, and Treasury is unable to provide us with such funding within the 60-day period specified by FHFA, FHFA would be required to place us into receivership if our assets remain less than our obligations during that 60-day period.

***We could incur significant credit losses and credit-related expenses in the event of a major natural disaster or other catastrophic event in geographic areas in which portions of our total mortgage portfolio are concentrated.***

We own or guarantee mortgage loans throughout the United States. The occurrence of a major natural or environmental disaster (such as an earthquake, hurricane, tsunami, or widespread damage caused to the environment by commercial entities), terrorist attack, pandemic, or similar catastrophic event in a regional geographic area of the United States could negatively impact our credit losses and credit-related expenses in the affected area.

The occurrence of a catastrophic event could negatively impact a geographic area in a number of different ways, depending on the nature of the event. A catastrophic event that either damaged or destroyed residential real estate underlying mortgage loans we own or guarantee or negatively impacted the ability of homeowners to continue to make principal and interest payments on mortgage loans we own or guarantee could increase our serious delinquency rates and average loan loss severity in the affected region or regions, which could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth. While we attempt to maintain a geographically diverse portfolio, there can be no assurance that a catastrophic event, depending on its magnitude, scope and nature, will not generate significant credit losses and credit-related expenses. We may not have insurance coverage for some of these catastrophic events. In some cases, we may be prohibited by state law from requiring such insurance as a condition to our purchasing or guaranteeing loans.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    TREASURY-1839                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

### ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

**Recent Sales of Unregistered Securities**

The securities we issue are "exempted securities" under the Securities Act of 1933, as amended. As a result, we do not file registration statements with the SEC with respect to offerings of our securities.

Following our entry into conservatorship, we suspended the operation of and ceased making grants under equity compensation plans. Previously, we had provided equity compensation under those plans to employees and members of our Board of Directors. Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms.

No stock options were exercised during the three months ended June 30, 2011. However, restrictions lapsed on 31,233 restricted stock units.

See "NOTE 13: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2010 Annual Report for more information.

**Dividend Restrictions**

Our payment of dividends on Freddie Mac common stock or any series of Freddie Mac preferred stock (other than senior preferred stock) is subject to certain restrictions as described in "MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES — Dividends and Dividend Restrictions" in our 2010 Annual Report.

**Information about Certain Securities Issuances by Freddie Mac**

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Freddie Mac's securities offerings are exempted from SEC registration requirements. As a result, we are not required to and do not file registration statements or prospectuses with the SEC with respect to our securities offerings. To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars (or supplements thereto) that we post on our web site or in a current report on Form 8-K, in accordance with a "no-action" letter we received from the SEC staff. In cases where the information is disclosed in an offering circular posted on our web site, the document will be posted on our web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The web site address for disclosure about our debt securities, other than debt securities of consolidated trusts, is www.freddiemac.com/debt. From this address, investors can access the offering circular and related supplements for debt securities offerings under Freddie Mac's global debt facility, including pricing supplements for individual issuances of debt securities.

Disclosure about the mortgage-related securities we issue, some of which are off-balance sheet obligations, can be found at www.freddiemac.com/mbs. From this address, investors can access information and documents about our mortgage-related securities, including offering circulars and related offering circular supplements.

### ITEM 6. EXHIBITS

The exhibits are listed in the Exhibit Index at the end of this Form 10-Q.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1840

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

**SIGNATURES**

    Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on  its behalf by the undersigned thereunto duly authorized.

Federal Home Loan Mortgage Corporation

By: /s/  Charles E. Haldeman, Jr.
    Charles E. Haldeman, Jr.
    Chief Executive Officer

Date: August 8, 2011

By: /s/  Ross J. Kari
    Ross J. Kari
    Executive Vice President — Chief Financial Officer
    (Principal Financial Officer)

Date: August 8, 2011

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses can not be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

# GLOSSARY

**Agency securities** — Generally refers to mortgage-related securities issued by the GSEs or government agencies.

**Alt-A loan** — Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. In determining our Alt-A exposure on loans underlying our single-family credit guarantee portfolio, we classified mortgage loans as Alt-A if the lender that delivers them to us classified the loans as Alt-A, or if the loans had reduced documentation requirements, as well as a combination of certain credit characteristics and expected performance characteristics at acquisition which, when compared to full documentation loans in our portfolio, indicate that the loan should be classified as Alt-A. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. For non-agency mortgage-related securities that are backed by Alt-A loans, we categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions.

**AOCI** — Accumulated other comprehensive income (loss), net of taxes

**ARM** — Adjustable-rate mortgage — A mortgage loan with an interest rate that adjusts periodically over the life of the mortgage loan based on changes in a benchmark index.

**BPS** — Basis points — One one-hundredth of 1%. This term is commonly used to quote the yields of debt instruments or movements in interest rates.

**Cash and other investments portfolio** — Our cash and other investments portfolio is comprised of our cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and investments in non-mortgage-related securities.

**Charter** — The Federal Home Loan Mortgage Corporation Act, as amended, 12 U.S.C. § 1451 et seq.

**CMBS** — Commercial mortgage-backed security — A security backed by mortgages on commercial property (often including multifamily rental properties) rather than one-to-four family residential real estate. Although the mortgage pools underlying CMBS can include mortgages financing multifamily properties and commercial properties, such as office buildings and hotels, the classes of CMBS that we hold receive distributions of scheduled cash flows only from multifamily properties. Military housing revenue bonds are included as CMBS within investments-related disclosures. We have not identified CMBS as either subprime or Alt-A securities.

**Conforming loan/Conforming jumbo loan/Conforming loan limit** — A conventional single-family mortgage loan with an original principal balance that is equal to or less than the applicable conforming loan limit, which is a dollar amount cap on the size of the original principal balance of single-family mortgage loans we are permitted by law to purchase or securitize. The conforming loan limit is determined annually based on changes in FHFA's housing price index. Any decreases in the housing price index are accumulated and used to offset any future increases in the housing price index so that conforming loan limits do not decrease from year-to-year. Since 2006, the base conforming loan limit for a one-family residence has been set at $417,000 with higher limits in certain "high-cost" areas.

Beginning in 2008, the conforming loan limits were increased for mortgages originated in certain "high-cost" areas above the conforming loan limits. In addition, conforming loan limits for certain high-cost areas were increased temporarily (up to $729,250 for a one-family residence). Actual loan limits are set by FHFA for each county (or equivalent) and the loan limit for specific high-cost areas may be lower than the maximum amounts. We refer to loans that we have purchased with UPB exceeding $417,000 as conforming jumbo loans.

**Conservator** — The Federal Housing Finance Agency, acting in its capacity as conservator of Freddie Mac.

**Convexity** — A measure of how much a financial instrument's duration changes as interest rates change.

**Core spread income** — Refers to a fair value estimate of the net current period accrual of income from the spread between mortgage-related investments and debt, calculated on an option-adjusted basis.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-1842

Table of Contents

**Credit enhancement** — Any number of different financial arrangements that are designed to reduce credit risk by partially or fully compensating an investor in the event of certain financial losses. Examples of credit enhancements include mortgage insurance, overcollateralization, indemnification agreements, and government guarantees.

**Credit losses** — Consists of charge-offs and REO operations income (expense), net of recoveries.

**Credit-related expenses** — Consists of our provision for credit losses and REO operations income (expense).

**Deed in lieu of foreclosure** — An alternative to foreclosure in which the borrower voluntarily conveys title to the property to the lender and the lender accepts such title (sometimes together with an additional payment by the borrower) in full satisfaction of the mortgage indebtedness.

**Delinquency** — A failure to make timely payments of principal or interest on a mortgage loan. For single-family mortgage loans, we generally report delinquency rate information for loans that are seriously delinquent. For multifamily loans, we report delinquency rate information based on the UPB of loans that are two monthly payments or more past due or in the process of foreclosure.

**Derivative** — A financial instrument whose value depends upon the characteristics and value of an underlying financial asset or index, such as a security or commodity price, interest or currency rates, or other financial indices.

**Dodd-Frank Act** — Dodd-Frank Wall Street Reform and Consumer Protection Act.

**DSCR** — Debt Service Coverage Ratio — An indicator of future credit performance for multifamily loans. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

**Duration** — The weighted average maturity of a financial instrument's cash flows. Duration is used as a measure of a financial instrument's price sensitivity to changes in interest rates.

**Duration gap** — One of our primary interest-rate risk measures. Duration gap is a measure of the difference between the estimated durations of our interest rate sensitive assets and liabilities. We present the duration gap of our financial instruments in units expressed as months. A duration gap of zero implies that the change in value of our interest rate sensitive assets from an instantaneous change in interest rates would be expected to be accompanied by an equal and offsetting change in the value of our debt and derivatives, thus leaving the net fair value of equity unchanged.

**Effective rent** — The average rent paid by the tenant over the term of a lease.

**Euribor** — Euro Interbank Offered Rate

**Exchange Act** — Securities and Exchange Act of 1934, as amended

**Fannie Mae** — Federal National Mortgage Association

**FDIC** — Federal Deposit Insurance Corporation

**Federal Reserve** — Board of Governors of the Federal Reserve System

**FHA** — Federal Housing Administration

**FHFA** — Federal Housing Finance Agency — FHFA is an independent agency of the U.S. government established by the Reform Act with responsibility for regulating Freddie Mac, Fannie Mae, and the FHLBs.

**FHLB** — Federal Home Loan Bank

**FICO score** — A credit scoring system developed by Fair, Isaac and Co. FICO scores are the most commonly used credit scores today. FICO scores are ranked on a scale of approximately 300 to 850 points with a higher value indicating a lower likelihood of credit default.

**Fixed-rate mortgage** — Refers to a mortgage originated at a specific rate of interest that remains constant over the life of the loan.

**Foreclosure alternative** — A workout option pursued when a home retention action is not successful or not possible. A foreclosure alternative is either a short sale or deed in lieu of foreclosure.

TREASURY-1843

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Foreclosure transfer** — Refers to our completion of a transaction provided for by the foreclosure laws of the applicable state, in which a delinquent borrower's ownership interest in a mortgaged property is terminated and title to the property is transferred to us or to a third party. State foreclosure laws commonly refer to such transactions as foreclosure sales, sheriff's sales, or trustee's sales, among other terms. When we, as mortgage holder, acquire a property in this manner, we pay for it by extinguishing some or all of the mortgage debt.

**Freddie Mac mortgage-related securities** — Securities we issue and guarantee, including PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions.

**GAAP** — Generally accepted accounting principles

**Ginnie Mae** — Government National Mortgage Association

**GSE Act** — The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Reform Act.

**GSEs** — Government sponsored enterprises — Refers to certain legal entities created by the U.S. government, including Freddie Mac, Fannie Mae, and the FHLBs.

**Guarantee fee** — The fee that we receive for guaranteeing the payment of principal and interest to mortgage security investors.

**HAFA** — Home Affordable Foreclosures Alternative program — In 2009, the Treasury Department introduced the HAFA program to provide an option for HAMP-eligible homeowners who are unable to keep their homes. The HAFA program took effect on April 5, 2010 and we implemented it effective August 1, 2010.

**HAMP** — Home Affordable Modification Program — Refers to the effort under the MHA Program whereby the U.S. government, Freddie Mac and Fannie Mae commit funds to help eligible homeowners avoid foreclosure and keep their homes through mortgage modifications.

**HARP** — Home Affordable Refinance Program — Refers to the effort under the MHA Program that seeks to help eligible borrowers with loans guaranteed by us or Fannie Mae refinance into loans with more affordable monthly payments and/or fixed-rate terms and is available until June 2012. Under HARP, we allow eligible borrowers who have mortgages with current LTV ratios from 80% up to 125% to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place. The relief refinance initiative is our implementation of HARP for our loans, under which we also allow borrowers with LTV ratios of 80% and below to participate.

**HFA** — State or local Housing Finance Agency

**HUD** — U.S. Department of Housing and Urban Development — Prior to the enactment of the Reform Act, HUD had general regulatory authority over Freddie Mac, including authority over our affordable housing goals and new programs. Under the Reform Act, FHFA now has general regulatory authority over us, though HUD still has authority over Freddie Mac with respect to fair lending.

**Implied volatility** — A measurement of how the value of a financial instrument changes due to changes in the market's expectation of potential changes in future interest rates. A decrease in implied volatility generally increases the estimated fair value of our mortgage assets and decreases the estimated fair value of our callable debt and options-based derivatives, while an increase in implied volatility generally has the opposite effect.

**Interest-only loan** — A mortgage loan that allows the borrower to pay only interest (either fixed-rate or adjustable-rate) for a fixed period of time before principal amortization payments are required to begin. After the end of the interest-only period, the borrower can choose to refinance the loan, pay the principal balance in total, or begin paying the monthly scheduled principal due on the loan.

**IRS** — Internal Revenue Service

**LIBOR** — London Interbank Offered Rate

**LIHTC partnerships** — Low-income housing tax credit partnerships — Prior to 2008, we invested as a limited partner in LIHTC partnerships, which are formed for the purpose of providing funding for affordable multifamily rental properties. These LIHTC partnerships invest directly in limited partnerships that own and operate multifamily rental properties that generate federal income tax credits and deductible operating losses.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1844

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Liquidation preference** — Generally refers to an amount that holders of preferred securities are entitled to receive out of available assets, upon liquidation of a company. The initial liquidation preference of our senior preferred stock was $1.0 billion. The aggregate liquidation preference of our senior preferred stock includes the initial liquidation preference plus amounts funded by Treasury under the Purchase Agreement. In addition, dividends and periodic commitment fees not paid in cash are added to the liquidation preference of the senior preferred stock. We may make payments to reduce the liquidation preference of the senior preferred stock only in limited circumstances.

**LTV ratio** — Loan-to-value ratio — The ratio of the unpaid principal amount of a mortgage loan to the value of the property that serves as collateral for the loan, expressed as a percentage. Loans with high LTV ratios generally tend to have a higher risk of default and, if a default occurs, a greater risk that the amount of the gross loss will be high compared to loans with lower LTV ratios. We report LTV ratios based solely on the amount of the loan purchased or guaranteed by us, generally excluding any second lien mortgages (unless we own or guarantee the second lien).

**MD&A** — Management's Discussion and Analysis of Financial Condition and Results of Operations

**MHA Program** — Making Home Affordable Program — Formerly known as the Housing Affordability and Stability Plan, the MHA Program was announced by the Obama Administration in February 2009. The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. The MHA Program includes HARP and HAMP.

**Monoline bond insurers** — Companies that provide credit insurance principally covering securitized assets in both the primary issuance and secondary markets.

**Mortgage assets** — Refers to both mortgage loans and the mortgage-related securities we hold in our mortgage-related investments portfolio.

**Mortgage-related investments portfolio** — Our investment portfolio, which consists principally of mortgage-related securities and single-family and multifamily mortgage loans. The size of our mortgage-related investments portfolio under the Purchase Agreement is determined without giving effect to the January 1, 2010 change in accounting guidance related to transfers of financial assets and consolidation of VIEs. Accordingly, for purposes of the portfolio limit, when PCs and certain Other Guarantee Transactions are purchased into the mortgage-related investments portfolio, this is considered the acquisition of assets rather than the reduction of debt.

**Mortgage-to-debt OAS** — The net OAS between the mortgage and agency debt sectors. This is an important factor in determining the expected level of net interest yield on a new mortgage asset. Higher mortgage-to-debt OAS means that a newly purchased mortgage asset is expected to provide a greater return relative to the cost of the debt issued to fund the purchase of the asset and, therefore, a higher net interest yield. Mortgage-to-debt OAS tends to be higher when there is weak demand for mortgage assets and lower when there is strong demand for mortgage assets.

**Multifamily mortgage** — A mortgage loan secured by a property with five or more residential rental units.

**Multifamily mortgage portfolio** — Consists of multifamily mortgage loans held by us on our consolidated balance sheets as well as those underlying non-consolidated Freddie Mac mortgage-related securities, and other guarantee commitments, but excluding those underlying our guarantees of HFA bonds under the HFA Initiative.

**Net worth (deficit)** — The amount by which our total assets exceed (or are less than) our total liabilities as reflected on our consolidated balance sheets prepared in conformity with GAAP.

**NIBP** — New Issue Bond Program

**NPV** — Net present value

**OAS** — Option-adjusted spread — An estimate of the incremental yield spread between a particular financial instrument (*e.g.*, a security, loan or derivative contract) and a benchmark yield curve (*e.g.*, LIBOR or agency or U.S. Treasury securities). This includes consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options.

**OCC —** Office of the Comptroller of the Currency

**OFHEO —** Office of Federal Housing Enterprise Oversight

**Option ARM loan** — Mortgage loans that permit a variety of repayment options, including minimum, interest-only, fully amortizing 30-year and fully amortizing 15-year payments. The minimum payment alternative for option ARM loans

192                                                                                                    *Freddie Mac*

TREASURY-1845

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

allows the borrower to make monthly payments that may be less than the interest accrued for the period. The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance. For our non-agency mortgage-related securities that are backed by option ARM loans, we categorize securities as option ARM if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM securities as either subprime or Alt-A securities.

**OTC** — Over-the-counter

**Other guarantee commitments** — Mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.

**Other Guarantee Transactions** — Transactions in which third parties transfer non-Freddie Mac mortgage-related securities to trusts specifically created for the purpose of issuing mortgage-related securities, or certificates, in the Other Guarantee Transactions.

**PCs** — Participation Certificates — Securities that we issue as part of a securitization transaction. Typically we purchase mortgage loans from parties who sell mortgage loans, place a pool of loans into a PC trust and issue PCs from that trust. The PCs are generally transferred to the seller of the mortgage loans in consideration of the loans or are sold to third party investors if we purchased the mortgage loans for cash.

**Pension Plan** — Employees' Pension Plan

**PMVS** — Portfolio Market Value Sensitivity — One of our primary interest-rate risk measures. PMVS measures are estimates of the amount of average potential pre-tax loss in the market value of our net assets due to parallel (PMVS-L) and non-parallel (PMVS-YC) changes in LIBOR.

**Primary mortgage market** — The market where lenders originate mortgage loans and lend funds to borrowers. We do not lend money directly to homeowners, and do not participate in this market.

**Purchase Agreement / Senior Preferred Stock Purchase Agreement** — An agreement the Conservator, acting on our behalf, entered into with Treasury on September 7, 2008, which was subsequently amended and restated on September 26, 2008 and further amended on May 6, 2009 and December 24, 2009.

**Recorded Investment** — The dollar amount of a loan or security recorded on our consolidated balance sheets, excluding any valuation allowance, such as the allowance for loan losses, but which does reflect direct write-downs of the investment. For mortgage loans, direct write-downs consist of valuation allowances associated with recording our initial investment in loans acquired with evidence of credit deterioration at the time of purchase.

**Reform Act** — The Federal Housing Finance Regulatory Reform Act of 2008, which, among other things, amended the GSE Act by establishing a single regulator, FHFA, for Freddie Mac, Fannie Mae, and the FHLBs.

**Relief refinance mortgage** — A single-family mortgage loan delivered to us for purchase or guarantee that meets the criteria of the Freddie Mac Relief Refinance Mortgagesm initiative. This initiative is our implementation of HARP for our loans. Although HARP is targeted at borrowers with current LTV ratios above 80% (and up to a maximum of 125%), our initiative also allows borrowers with LTV ratios of 80% and below to participate.

**REMIC** — Real Estate Mortgage Investment Conduit — A type of multiclass mortgage-related security that divides the cash flows (principal and interest) of the underlying mortgage-related assets into two or more classes that meet the investment criteria and portfolio needs of different investors.

**REMICs and Other Structured Securities** (or in the case of Multifamily securities, **Other Structured Securities**) — Single- and multiclass securities issued by Freddie Mac that represent beneficial interests in pools of PCs and certain other types of mortgage-related assets. REMICs and Other Structured Securities that are single-class securities pass through the cash flows (principal and interest) on the underlying mortgage-related assets. REMICs and Other Structured Securities that are multiclass securities divide the cash flows of the underlying mortgage-related assets into two or more classes designed to meet the investment criteria and portfolio needs of different investors. Our principal multiclass securities qualify for tax treatment as REMICs.

**REO** — Real estate owned — Real estate which we have acquired through foreclosure or through a deed in lieu of foreclosure.

**S&P** — Standard & Poor's

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**SEC** — Securities and Exchange Commission

**Secondary mortgage market** — A market consisting of institutions engaged in buying and selling mortgages in the form of whole loans (*i.e.*, mortgages that have not been securitized) and mortgage-related securities. We participate in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities for investment and by issuing guaranteed mortgage-related securities, principally PCs.

**Senior preferred stock** — The shares of Variable Liquidation Preference Senior Preferred Stock issued to Treasury under the Purchase Agreement.

**Seriously delinquent** — Single-family mortgage loans that are three monthly payments or more past due or in the process of foreclosure as reported to us by our servicers.

**SERP** — Supplemental Executive Retirement Plan

**Short sale** — Typically an alternative to foreclosure consisting of a sale of a mortgaged property in which the homeowner sells the home at market value and the lender accepts proceeds (sometimes together with an additional payment or promissory note from the borrower) that are less than the outstanding mortgage indebtedness.

**Single-family credit guarantee portfolio** — Consists of unsecuritized single-family loans, single-family loans held by consolidated trusts, and single-family loans underlying non-consolidated Other Guarantee Transactions and covered by other guarantee commitments. Excludes our REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates and our guarantees under the HFA Initiative.

**Single-family mortgage** — A mortgage loan secured by a property containing four or fewer residential dwelling units.

**Spread** — The difference between the yields of two debt securities, or the difference between the yield of a debt security and a benchmark yield, such as LIBOR.

**Strips** — Mortgage pass-through securities created by separating the principal and interest payments on a pool of mortgage loans. A principal-only strip entitles the security holder to principal cash flows, but no interest cash flows, from the underlying mortgages. An interest-only strip entitles the security holder to interest cash flows, but no principal cash flows, from the underlying mortgages.

**Subprime** — Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Subprime generally refers to the credit risk classification of a loan. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include, among other factors, a combination of high LTV ratios, low credit scores or originations using lower underwriting standards, such as limited or no documentation of a borrower's income. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk. Notwithstanding our historical characterizations of the single family credit guarantee portfolio, certain security collateral underlying our Other Guarantee Transactions have been identified as subprime based on information provided to Freddie Mac when the transactions were entered into. We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions.

**Swaption** — An option contract to enter into an interest-rate swap. In exchange for an option premium, a buyer obtains the right but not the obligation to enter into a specified swap agreement with the issuer on a specified future date.

**TBA** — To be announced

**TCLFP** — Temporary Credit and Liquidity Facility Program

**TDR** — Troubled debt restructuring — A type of loan modification in which the changes to the contractual terms result in concessions to borrowers that are experiencing financial difficulties.

**Total comprehensive income (loss)** — Consists of net income (loss) plus the after-tax changes in: (a) the unrealized gains and losses on available-for-sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans.

TREASURY-1847

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Total other comprehensive income (loss)** — Consists of the after-tax changes in: (a) the unrealized gains and losses on available-for-sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans.

**Total mortgage portfolio** — Includes mortgage loans and mortgage-related securities held on our consolidated balance sheets as well as the balances of our non-consolidated issued and guaranteed single-class and multiclass securities, and other mortgage-related financial guarantees issued to third parties.

**Treasury** — U.S. Department of the Treasury

**UPB** — Unpaid principal balance

**USDA** — U.S. Department of Agriculture

**VA** — U.S. Department of Veteran Affairs

**VIE** — Variable Interest Entity — A VIE is an entity: (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by another party; or (b) where the group of equity holders does not have: (i) the ability to make significant decisions about the entity's activities; (ii) the obligation to absorb the entity's expected losses; or (iii) the right to receive the entity's expected residual returns.

**Warrant** — Refers to the warrant we issued to Treasury on September 8, 2008 pursuant to the Purchase Agreement. The warrant provides Treasury the ability to purchase shares of our common stock equal to 79.9% of the total number of shares of Freddie Mac common stock outstanding on a fully diluted basis on the date of exercise.

**Workout, or loan workout** — A workout is either: (a) a home retention action, which is either a loan modification, repayment plan, or forbearance agreement; or (b) a foreclosure alternative, which is either a short sale or a deed in lieu of foreclosure.

**XBRL** — eXtensible Business Reporting Language

**Yield curve** — A graphical display of the relationship between yields and maturity dates for bonds of the same credit quality. The slope of the yield curve is an important factor in determining the level of net interest yield on a new mortgage asset, both initially and over time. For example, if a mortgage asset is purchased when the yield curve is inverted, with short-term rates higher than long-term rates, our net interest yield on the asset will tend to be lower initially and then increase over time. Likewise, if a mortgage asset is purchased when the yield curve is steep, with short-term rates lower than long-term rates, our net interest yield on the asset will tend to be higher initially and then decrease over time.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 3.1 | Bylaws of the Federal Home Loan Mortgage Corporation, as amended and restated June 3, 2011 (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K as filed on June 7, 2011) |
| 10.1 | Officer Severance Policy, dated April 11, 2011 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2011, as filed on May 4, 2011) |
| 10.2 | PC Master Trust Agreement dated June 20, 2011 |
| 10.3 | Second Amendment to the Federal Home Loan Mortgage Corporation Supplemental Executive Retirement Plan (as Amended and Restated January 1, 2008) (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K as filed on June 28, 2011) |
| 10.4 | Executive Management Compensation Program (as amended and restated as of June 2, 2011) |
| 10.5 | First Amendment To The Federal Home Loan Mortgage Corporation Mandatory Executive Deferred Base Salary Plan (As Effective January 1, 2009) |
| 12.1 | Statement re: computation of ratio of earnings to fixed charges and computation of ratio of earnings to combined fixed charges and preferred stock dividends |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101.INS | XBRL Instance Document[1] |
| 101.SCH | XBRL Taxonomy Extension Schema[1] |
| 101.CAL | XBRL Taxonomy Extension Calculation[1] |
| 101.LAB | XBRL Taxonomy Extension Labels[1] |
| 101.PRE | XBRL Taxonomy Extension Presentation[1] |
| 101.DEF | XBRL Taxonomy Extension Definition[1] |

(1) The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Freddie Mac, except to the extent, if any, expressly set forth by specific reference in such filing.

E-1

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 10.2

**Freddie Mac**

**PC MASTER TRUST AGREEMENT**

**THIS PC MASTER TRUST AGREEMENT** is entered into as of June 20, 2011, by and among Freddie Mac in its corporate capacity as Depositor, Administrator and Guarantor, Freddie Mac in its capacity as Trustee, and the Holders of the PCs offered from time to time pursuant to Freddie Mac's Offering Circular referred to herein.

**WHEREAS:**

(a) Freddie Mac is a corporation duly organized and existing under and by virtue of the Freddie Mac Act and has full corporate power and authority to enter into this Agreement and to undertake the obligations undertaken by it herein; and

(b) Freddie Mac may from time to time (i) purchase Mortgages, in accordance with the applicable provisions of the Freddie Mac Act, (ii) as Depositor, transfer and deposit such Mortgages into various trust funds that are established pursuant to this Agreement and that are referred to herein as "PC Pools," (iii) as Trustee, create and issue hereunder, on behalf of the related PC Pool, PCs representing undivided beneficial ownership interests in the assets of that PC Pool and otherwise act as trustee for each such PC Pool, (iv) as Guarantor, guarantee the payment of interest and principal for the benefit of the Holders of such PCs and (v) as Administrator, administer the affairs of each such PC Pool.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants contained in this Agreement, the parties to this Agreement, do hereby declare and establish this Agreement and do hereby undertake and otherwise agree as follows with respect to the transfer of the Mortgages to various PC Pools, the issuance of the PCs and the establishment of the rights and obligations of the parties.

**Definitions**

The following terms used in this Agreement have the respective meanings set forth below.

*Accrual Period:* As to any PC and any Payment Date, (i) the calendar month preceding the month of the Payment Date for Gold PCs or (ii) the second calendar month preceding the month of the Payment Date for ARM PCs.

*Administrator:* Freddie Mac, in its corporate capacity, as administrator of the PC Pools created under this Agreement.

*Agreement:* This PC Master Trust Agreement, dated as of June 20, 2011, by and among Freddie Mac in its corporate capacity as Depositor, Administrator and Guarantor, Freddie Mac in its capacity as Trustee, and the Holders of the various PCs, as originally executed, or as modified, amended or supplemented in accordance with the provisions set forth herein. Unless the context requires otherwise, the term "Agreement" shall be deemed to include any applicable Pool Supplement entered into pursuant to Section 1.01 of this Agreement.

*ARM:* An adjustable rate Mortgage.

1

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*ARM PC:* A PC with a Payment Delay of 75 days and which is backed by ARMs. ARM PCs include Deferred Interest PCs.

*Book-Entry Rules:* The provisions from time to time in effect, currently contained in Title 24, Part 81, Subpart H of the Code of Federal Regulations, setting forth the terms and conditions under which Freddie Mac may issue securities on the book-entry system of the Federal Reserve Banks and authorizing a Federal Reserve Bank to act as its agent in connection with such securities.

*Business Day:* A day other than (i) a Saturday or Sunday and (ii) a day when the Federal Reserve Bank of New York (or other agent acting as Freddie Mac's fiscal agent) is closed or, as to any Holder, a day when the Federal Reserve Bank that maintains the Holder's account is closed.

*Conventional Mortgage:* A Mortgage that is not guaranteed or insured by the United States or any agency or instrumentality of the United States.

*Custodial Account:* As defined in Section 3.05(e) of this Agreement.

*Deferred Interest:* The amount by which the interest due on a Mortgage exceeds the borrower's monthly payment, which amount is added to the unpaid principal balance of the Mortgage.

*Deferred Interest PC:* A PC representing an undivided beneficial ownership interest in a PC Pool that includes Mortgages providing for negative amortization.

*Depositor:* Freddie Mac, in its corporate capacity, as depositor of Mortgages into the PC Pools created under this Agreement.

*Eligible Investments:* Any one or more of the following obligations, securities or holdings maturing on or before the Payment Date applicable to the funds so invested:

(i) obligations of, or obligations guaranteed as to the full and timely payment of principal and interest by, the United States;

(ii) obligations of any agency or instrumentality of the United States (other than Freddie Mac) or taxable debt obligations of any state or local government (or political subdivision thereof) that have a long-term rating or a short-term rating, as applicable, from S&P, Moody's or Fitch in any case in one of its two highest rating categories for long-term securities or in its highest ratings category for short-term securities;

(iii) time deposits of any depository institution or trust company domiciled in the Cayman Islands or Nassau and affiliated with a financial institution that is a member of the Federal Reserve System, provided that the short-term securities of the depository institution or trust company are rated by S&P, Moody's or Fitch in the highest applicable ratings category for short-term securities;

(iv) federal funds, certificates of deposit, time deposits and bankers' acceptances with a fixed maturity of no more than 365 days of any depository institution or trust company, provided that the short-term securities of the depository institution or trust company are rated by S&P, Moody's or Fitch in the highest applicable ratings category for short-term securities;

(v) commercial paper with a fixed maturity of no more than 270 days, of any corporation that is rated by S&P, Moody's or Fitch in its highest short-term ratings category;

2

TREASURY-1851

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(vi) debt securities that have a long-term rating or a short-term rating, as applicable, from S&P, Moody's or Fitch, in any case in one of its two highest ratings categories for long-term securities or in its highest ratings category for short-term securities;

(vii) money market funds that are registered under the Investment Company Act of 1940, as amended, are entitled, pursuant to Rule 2a-7 of the Securities and Exchange Commission, or any successor to that rule, to hold themselves out to investors as money market funds, and are rated by S&P, Moody's or Fitch in one of its two highest ratings categories for money market funds;

(viii) asset-backed commercial paper that is rated by S&P, Moody's or Fitch in its highest short-term ratings category;

(ix) repurchase agreements on obligations that are either specified in any of clauses (i), (ii), (iv), (v), (vi) or (viii) above or are mortgage-backed securities insured or guaranteed by an entity that is an agency or instrumentality of the United States; provided that the counterparty to the repurchase agreement is an entity whose short-term debt securities are rated by S&P, Moody's or Fitch in its highest ratings category for short-term securities; and

(x) any other investment without options that is approved by Freddie Mac and is within the two highest ratings categories of the applicable rating agency for long-term securities or the highest ratings category of the applicable rating agency for short-term securities.

The rating requirement will be satisfied if the relevant security, issue or fund at the time of purchase receives at least the minimum stated rating from at least one of S&P, Moody's or Fitch. The rating requirement will not be satisfied by a rating that is the minimum rating followed by a minus sign or by a rating lower than Aa2 from Moody's.

*Event of Default:* As defined in Section 5.01 of this Agreement.

*FHA/VA Mortgage:* A Mortgage insured by the Federal Housing Administration or by the Department of Agriculture Rural Development (formerly the Rural Housing Service) or guaranteed by the Department of Veterans Affairs or the Department of Housing and Urban Development.

*Final Payment Date:* As to any PC, the first day of the latest month in which the related Pool Factor will be reduced to zero. The Administrator publishes the Final Payment Date upon formation of the related PC Pool.

*Fitch:* Fitch, Inc., also known as Fitch Ratings, or any successor thereto.

*Freddie Mac:* The Federal Home Loan Mortgage Corporation, a corporation created pursuant to the Freddie Mac Act for the purpose of establishing and supporting a secondary market in residential mortgages. Unless the context requires otherwise, the term "Freddie Mac" shall be deemed to refer to Freddie Mac acting in one or more of its corporate capacities, as specified or as provided in context, and not in its capacity as Trustee.

*Freddie Mac Act:* Title III of the Emergency Home Finance Act of 1970, as amended, 12 U.S.C. §§1451-1459.

*Gold PC:* A PC with a Payment Delay of 45 days and which is backed by fixed-rate Mortgages.

*Guarantor:* Freddie Mac, in its corporate capacity, as guarantor of the PCs issued by each PC Pool.

3

TREASURY-1852

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Guide:* Freddie Mac's Single-Family Seller/Servicer Guide, as supplemented and amended from time to time, in which Freddie Mac sets forth its mortgage purchase standards, credit, appraisal and underwriting guidelines and servicing policies.

*Holder:* With respect to any PC Pool, any entity that appears on the records of a Federal Reserve Bank as a holder of the related PCs.

*Monthly Reporting Period:* The period during which servicers report Mortgage payments to the Administrator, generally consisting of the calendar month preceding the related Payment Date for Gold PCs and the second calendar month preceding the related Payment Date for ARM PCs, which period the Administrator has the right to change as provided in Section 3.05(d) of this Agreement; *provided, however*, that with respect to prepayments on PCs issued before September 1, 1995, the Monthly Reporting Period generally is from the 16 th of a month through the 15th of the next month.

*Moody's:* Moody's Investors Service, Inc., or any successor thereto.

*Mortgage:* A mortgage loan or a participation interest in a mortgage loan that is secured by a first or second lien on a one-to-four family dwelling and that has been purchased by the Depositor and transferred by the Depositor to the Trustee for inclusion in the related PC Pool. With respect to each PC Pool, the Mortgages to be included therein shall be identified on the books and records of the Depositor and the Administrator.

*Mortgage Coupon:* The per annum fixed or adjustable interest rate of a Mortgage.

*MultiLender Swap Program:* A program under which Freddie Mac purchases Mortgages from one or more sellers in exchange for PCs representing undivided beneficial ownership interests in a PC Pool consisting of Mortgages that may or may not be those delivered by the seller(s).

*Negative Amortization Factor:* With respect to PCs backed by Mortgages providing for negative amortization, a truncated eight-digit decimal number that reflects the amount of Deferred Interest added to the principal balances of the related Mortgages in the preceding month.

*Offering Circular:* Freddie Mac's Mortgage Participation Certificates Offering Circular dated June 20, 2011, as amended and supplemented by any Supplements issued from time to time, or any successor thereto, as it may be amended and supplemented from time to time.

*Payment Date:* The 15th of each month or, if the 15th is not a Business Day, the next Business Day.

*Payment Delay:* The delay between the first day of the Accrual Period for a PC and the related Payment Date.

*PC:* With respect to each PC Pool, a Mortgage Participation Certificate issued pursuant to this Agreement, representing a beneficial ownership interest in such PC Pool. The term "PC'' includes a Gold PC or an ARM PC unless the context requires otherwise.

*PC Coupon:* The per annum fixed or adjustable rate of a PC calculated as described in the Offering Circular or the applicable Pool Supplement, computed on the basis of a 360-day year of twelve 30-day months.

*PC Issue Date:* With respect to each PC Pool, the date specified in the related Pool Supplement or, if not specified therein, the date on which Freddie Mac issues a PC in exchange for the Mortgages delivered by a dealer or other customer.

4

TREASURY-1853

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*PC Pool:* With respect to each PC, the corpus of the related trust fund created by this Agreement, consisting of (i) the related Mortgages and all proceeds thereof, (ii) amounts on deposit in the Custodial Account, to the extent allocable to such PC Pool, (iii) the right to receive payments under the related guarantee and (iv) any other assets specified in the related Pool Supplement, excluding any investment earnings on any of the assets of that PC Pool. With respect to each PC Pool, and unless expressly stated otherwise, the provisions of this Agreement will be interpreted as referring only to the Mortgages included in that PC Pool, the PCs issued by that PC Pool and the Holders of those PCs.

*Person:* Any legal person, including any individual, corporation, partnership, limited liability company, financial institution, joint venture, association, joint stock company, trust, unincorporated organization or governmental unit or political subdivision of any governmental unit.

*Pool Factor:* With respect to each PC Pool, a truncated eight-digit decimal calculated for each month by the Administrator which, when multiplied by the original principal balance of the related PCs, will equal their remaining principal amount. The Pool Factor for any month reflects the remaining principal amount after the payment to be made on the Payment Date in the same month for Gold PCs or in the following month for ARM PCs.

*Pool Supplement:* Any physical or electronic document or record (which may be a supplement to the Offering Circular or any other supplemental document prepared by Freddie Mac for the related PCs), which, together herewith, evidences the establishment of a PC Pool and modifies, amends or supplements the provisions hereof in any respect whatsoever. The Pool Supplement for a particular PC Pool shall be binding and effective upon formation of the related PC Pool and issuance of the related PCs, whether or not such Pool Supplement is executed, delivered or published by Freddie Mac.

*Purchase Documents:* The mortgage purchase agreements between Freddie Mac and its Mortgage sellers and servicers, which are the contracts that govern the purchase and servicing of Mortgages and which include, among other things, the Guide and any negotiated modifications, amendments or supplements to the Guide.

*Record Date:* As to any Payment Date, the close of business on the last day of (i) the preceding month for Gold PCs or (ii) the second preceding month for ARM PCs.

*S&P:* Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor thereto.

*Trustee:* Freddie Mac, in its capacity as trustee of each PC Pool formed under this Agreement, and its successors and assigns, which will have the trustee responsibilities specified in this Agreement, as amended or supplemented from time to time.

*Trustee Event of Default:* As defined in Section 6.06 of this Agreement.

TREASURY-1854

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# ARTICLE I

## Conveyance of Mortgages; Creation of PC Pools

**Section 1.01. Declaration of Trust; Transfer of Mortgages.** The Depositor, by delivering any Mortgages pursuant to this Agreement, unconditionally, absolutely and irrevocably hereby transfers, assigns, sets over and otherwise conveys to the Trustee, on behalf of the related Holders, all of the Depositor's right, title and interest in and to such Mortgages, including all payments of principal and interest thereon received after the month in which the PC Issue Date occurs. Once Mortgages have been identified as being part of a related PC Pool for which at least one PC has been issued, they shall remain in that PC Pool unless removed in a manner consistent with this Agreement. Concurrently with the Depositor's transferring, assigning, setting over and otherwise conveying the Mortgages to the Trustee for a PC Pool, the Trustee hereby accepts the Mortgages so conveyed and acknowledges that it holds the entire corpus of each PC Pool in trust for the exclusive benefit of the related Holders and shall deliver to, or on the order of, the Depositor, the PCs issued by such PC Pool. The Administrator agrees to administer the related PC Pool and such PCs in accordance with the terms of this Agreement. On the related PC Issue Date and upon payment to the Depositor for any such PC by a Holder, such Holder shall, by virtue thereof, acknowledge, accept and agree to be bound by all of the terms and conditions of this Agreement.

A Pool Supplement shall evidence the establishment of a particular PC Pool and shall relate to specific PCs representing the entire beneficial ownership interests in such PC Pool. If for any reason the creation of a Pool Supplement is delayed, Freddie Mac shall create one as soon as practicable, and such delay shall not affect the validity and existence of the PC Pool or the related PCs. With respect to each PC Pool, the collective terms hereof and of the related Pool Supplement shall govern the issuance and administration of the PCs related to such PC Pool, and all matters related thereto, and shall have no applicability to any other PC Pool or PCs. As applied to each PC Pool, the collective terms hereof and of the related Pool Supplement shall constitute an agreement as if the collective terms of those instruments were set forth in a single instrument. In the event of a conflict between the terms hereof and the terms of a Pool Supplement for a PC Pool, the terms of the Pool Supplement shall control with respect to that PC Pool. A Pool Supplement is not considered an amendment to this Agreement requiring approval pursuant to Section 7.05.

**Section 1.02. Identity of the Mortgages; Substitution and Repurchase.**

(a) In consideration for the transfer of the related Mortgages by the Depositor to a PC Pool, the Depositor (i) shall receive the PCs issued by such PC Pool and (ii) may retain such PCs or transfer them to the related Mortgage seller or otherwise, as the Depositor deems appropriate.

(b) After the PC Issue Date but prior to the first Payment Date, the Depositor may, in accordance with its customary mortgage purchase and pooling procedures, adjust the amount and identity of the Mortgages to be transferred to a PC Pool, the PC Coupon and/or the original unpaid principal balance of the PCs and the Mortgages in the PC Pool, provided that any changes to the characteristics of the PCs shall be evidenced by an amendment or supplement to the related Pool Supplement.

(c) Except as provided in this Section 1.02 or in Section 1.03, once the Depositor has transferred a Mortgage to a particular PC Pool, such Mortgage may not be transferred out of such PC Pool, except (x) if a mortgage insurer exercises an option under an insurance contract to purchase such Mortgage or (y) in the case of repurchase by the Guarantor, the Administrator or the related Mortgage seller or servicer, under the following circumstances:

(i) The Guarantor may repurchase from the related PC Pool a Mortgage in connection with a guarantee payment under Section 3.09(a)(ii).

6

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

(ii) The Administrator may repurchase from the related PC Pool, or require or permit a Mortgage seller or servicer to repurchase, any Mortgage if a repurchase is necessary or advisable (A) to maintain servicing of the Mortgage in accordance with the provisions of the Guide, or (B) to maintain the status of the PC Pool as a grantor trust for federal income tax purposes.

(iii) The Guarantor may repurchase from the related PC Pool, or require or permit a Mortgage seller or servicer to repurchase, any Mortgage if (A) such Mortgage is 120 or more days delinquent, or (B) the Guarantor determines, on the basis of information from the related borrower or servicer, that loss of ownership of the property securing a Mortgage is likely or default is imminent due to borrower incapacity, death or hardship or other extraordinary circumstances that make future payments on such Mortgage unlikely or impossible.

(iv) The Guarantor may repurchase from the related PC Pool a Mortgage if a bankruptcy court approves a plan that materially affects the terms of the Mortgage or authorizes a transfer or substitution of the underlying property.

(v) The Administrator may require or permit a Mortgage seller or servicer to repurchase from the related PC Pool any Mortgage or (within six months of the issuance of the related PCs) substitute for any Mortgage a Mortgage of comparable type, unpaid principal balance, remaining term and yield, if there is (A) a material breach of warranty by the Mortgage seller or servicer, (B) a material defect in documentation as to such Mortgage or (C) a failure by a seller or servicer to comply with any requirements or terms set forth in the Guide and, if applicable, other Purchase Documents.

(vi) The Administrator shall repurchase from the related PC Pool any Mortgage or (within two years of the issuance of the related PCs) substitute for any Mortgage a Mortgage of comparable type, unpaid principal balance, remaining term and yield, if (A) a court of competent jurisdiction or a federal government agency duly authorized to oversee or regulate Freddie Mac's mortgage purchase business determines that Freddie Mac's purchase of such Mortgage was unauthorized and Freddie Mac determines that a cure is not practicable without unreasonable effort or expense or (B) such court or government agency requires repurchase of such Mortgage.

(vii) To the extent a PC Pool includes convertible ARMs or Balloon/Reset Mortgages (each, as defined in the Offering Circular), the Administrator shall repurchase from the related PC Pool or require or allow the Mortgage seller or servicer to repurchase such Mortgages (a) when the borrower exercises its option to convert the related interest rate from an adjustable rate to a fixed rate, in the case of a convertible ARM; and (b) shortly before such Mortgage reaches its scheduled balloon repayment date, in the case of a Balloon/Reset Mortgage.

(d) The purchase price of a Mortgage repurchased by a Mortgage seller or servicer shall be equal to the then unpaid principal balance of such Mortgage, less any principal on such Mortgage that the Mortgage seller or servicer advanced to the Depositor or the Administrator. The purchase price of a Mortgage repurchased by the Administrator or the Guarantor under this Agreement shall be equal to the then unpaid principal balance of such Mortgage, less any outstanding advances of principal on such Mortgage that the Administrator, on behalf of the Trustee, distributed to Holders. The Administrator, on behalf of the Trustee, agrees to release any Mortgage from the PC Pool upon payment of the applicable purchase price.

(e) In determining whether a Mortgage shall be repurchased from the related PC Pool as described in this Section 1.02, the Guarantor and the Administrator may consider such factors as they deem appropriate, including the reduction of administrative costs (in the case of the Administrator) or possible exposure as Guarantor under its guarantee (in the case of the Guarantor).

7

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Section 1.03. Post-Settlement Purchase Adjustments**

(a) The Administrator shall make any post-settlement purchase adjustments necessary to reflect the actual aggregate unpaid principal balance of the related Mortgages or other Mortgage characteristics as of the date of their purchase by the Depositor or their delivery to the Trustee in exchange for PCs, as the case may be.

(b) Post-settlement adjustments may be made in such manner as the Administrator deems appropriate, but shall not adversely affect any Holder's rights to monthly payments of interest at the PC Coupon, any Holder's pro rata share of principal or any Holder's rights under the Guarantor's guarantees. Any reduction in the principal balance of the Mortgages held by a PC Pool shall be reflected by the Administrator as a corresponding reduction in the principal balance of the related PCs with a corresponding principal payment to the related Holders, on a pro rata basis.

**Section 1.04. Custody of Mortgage Documents.**  With respect to each PC Pool, the Administrator, a custodian acting as its agent (which may be a third party or a trust or custody department of the related seller or servicer), or the originator or seller of the Mortgage may hold the related Mortgage documents, including Mortgage notes and participation certificates evidencing the Trustee's legal ownership interest in the Mortgages. The Administrator may adopt and modify its policies and procedures for the custody of Mortgage documents at any time, provided such modifications are prudent and do not materially and adversely affect the Holders' interests.

**Section 1.05. Interests Held or Acquired by Freddie Mac.**  Freddie Mac shall have the right to purchase and hold for its own account any PCs. Subject to Section 7.06, PCs held or acquired by Freddie Mac from time to time and PCs held by other Holders shall have equal and proportionate benefits, without preference, priority or distinction. In the event that Freddie Mac retains any interest in a Mortgage, the remaining interest in which is part of a PC Pool, Freddie Mac's interest in such Mortgage shall rank equally with that of the related PC Pool, without preference, priority or distinction. No Holder shall have any priority over any other Holder.

**Section 1.06. Intended Characterization.**  It is intended that the conveyance, transfer, assignment and setting over of the Mortgages by the Depositor to the Trustee pursuant to this Agreement be a true, absolute and unconditional sale of the related Mortgages by the Depositor to the Trustee, and not a pledge of the Mortgages to secure a debt or other obligation of the Depositor, and that the Holders of the related PCs shall be the beneficial owners of such Mortgages. Notwithstanding this express intention, however, if the Mortgages are determined by a court of competent jurisdiction or other competent authority to be the property of the Depositor, then it is intended that: (a) this Agreement be deemed to be a security agreement within the meaning of Articles 8 and 9 of the Uniform Commercial Code; (b) the conveyances provided for in Section 1.01 shall be deemed to be (1) a grant by the Depositor to the Trustee on behalf of the related Holders of a security interest in all of the Depositor's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to the related Mortgages, any and all general intangibles consisting of, arising from or relating to any of the foregoing, and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts from time to time held or invested in the Custodial Account and allocable to such Mortgages, whether in the form of cash, instruments, securities or other property and (2) an assignment by the Depositor to the Trustee on behalf of the related Holders of any security interest in any and all of the Depositor's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to the property described in the foregoing clause (1); and (c) notifications to Persons holding such property, and acknowledgments, receipts or confirmations from Persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of the Trustee on behalf of the related Holders, for the purpose of perfecting such security interest under applicable law.

8

TREASURY-1857

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 1.07. Encumbrances.** Except as may otherwise be provided expressly in this Agreement, neither Freddie Mac nor the Trustee shall directly or indirectly, assign, sell, dispose of or transfer all or any portion of or interest in any PC Pool, or permit all or any portion of any PC Pool to be subject to any lien, claim, mortgage, security interest, pledge or other encumbrance of any other Person. This Section shall not be construed as a limitation on Freddie Mac's rights with respect to PCs held by it in its corporate capacity.

## ARTICLE II

### Administration and Servicing of the Mortgages

**Section 2.01. The Administrator as Primary Servicer.** With respect to each PC Pool, the Administrator shall service or supervise servicing of the related Mortgages and administer, on behalf of the Trustee, in accordance with the provisions of the Guide and this Agreement, including management of any property acquired through foreclosure or otherwise, all for the benefit of the related Holders. The Administrator shall have full power and authority to do or cause to be done any and all things in connection with such servicing and administration that the Administrator deems necessary or desirable. The Administrator shall seek from the Trustee, as representative of the related Holders, any consents or approvals relating to the control, management and servicing of the Mortgages included in any PC Pool and that are required hereunder.

**Section 2.02. Servicing Responsibilities.** With respect to each PC Pool, the Administrator shall service or supervise servicing of the related Mortgages in a manner consistent with prudent servicing standards and in substantially the same manner as the Administrator services or supervises the servicing of unsold mortgages of the same type in its portfolio. In performing its servicing responsibilities hereunder, the Administrator may engage servicers, subservicers and other independent contractors or agents. The Administrator may discharge its responsibility to supervise servicing of the Mortgages by monitoring servicers' performance on a reporting and exception basis. Except as provided in Articles V and VI and Sections 7.05 and 7.06 of this Agreement, Freddie Mac, as Administrator shall not be subject to the control of the Holders in the discharge of its responsibilities pursuant to this Article. Except with regard to its guarantee obligations pursuant to Section 3.09 with respect to a PC Pool, the Administrator shall have no liability to any related Holder for the Administrator's actions or omissions in discharging its responsibilities under this Article II other than for any direct damage resulting from its failure to exercise that degree of ordinary care it exercises in the conduct and management of its own affairs. In no event shall the Administrator have any liability for consequential damages.

**Section 2.03. Realization Upon Defaulted Mortgages.** With respect to each PC Pool, unless the Administrator deems that another course of action (e.g., charge-off) would be in the best economic interest of the Holders, the Administrator (or its authorized designee or representative) shall, as soon as practicable, foreclose upon (or otherwise comparably convert the ownership of) any real property securing a Mortgage which comes into and continues in default and as to which no satisfactory arrangements can be made for collection of delinquent payments. In connection with such foreclosure or conversion, the Administrator (or its authorized designee or representative) shall follow such practices or procedures as it deems necessary or advisable and consistent with general mortgage servicing standards.

**Section 2.04. Automatic Acceleration and Assumptions.**

(a) With respect to each PC Pool, to the extent provided in the Guide, the Administrator shall enforce the terms of each applicable Mortgage that gives the mortgagee the right to demand full payment of the unpaid principal balance of the Mortgage upon sale or transfer of the property securing the Mortgage regardless of the creditworthiness of the transferee (a right of "automatic acceleration"), subject to applicable state and federal law and the Administrator's then-current servicing policies.

9

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(b) With respect to each PC Pool, the Administrator shall permit the assumption by a new mortgagor of an FHA/VA Mortgage upon the sale or transfer of the underlying property, as required by applicable regulations. Any such assumption shall be in accordance with applicable regulations, policies, procedures and credit requirements and shall not result in loss or impairment of any insurance or guaranty.

**Section 2.05. Prepayment Penalties.**  Unless otherwise provided in the Pool Supplement for a PC Pool, the related Holders shall not be entitled to receive any prepayment penalties, assumption fees or other fees charged on the Mortgages included in such PC Pool, and either the related servicer or the Administrator shall retain such amounts.

**Section 2.06. Mortgage Insurance and Guarantees.**

(a) With respect to each PC Pool, if a Conventional Mortgage is insured by a mortgage insurer and the mortgage insurance policy is an asset of such PC Pool, the related Holders acknowledge that the insurer shall have no obligation to recognize or deal with any Person other than the Administrator, the Trustee, or their respective authorized designees or representatives regarding the mortgagee's rights, benefits and obligations under the related insurance contract.

(b) With respect to each PC Pool, each FHA/VA Mortgage shall have in full force and effect a certificate or other satisfactory evidence of insurance or guaranty, as the case may be, as may be issued by the applicable government agency from time to time. None of these agencies has any obligation to recognize or deal with any Person other than the Administrator, the Trustee, or their respective authorized designees or representatives with regard to the rights, benefits and obligations of the mortgagee under the contract of insurance or guaranty relating to each FHA/VA Mortgage included in such PC Pool.

**ARTICLE III**

**Distributions to Holders; Guarantees**

**Section 3.01. Monthly Reporting Period.**  For purposes of this Agreement with respect to any PC Pool, any payment or any event with respect to any Mortgage included in such PC Pool that is reported to the Administrator by the related servicer as having been made or having occurred within a Monthly Reporting Period shall be deemed to have been received by the Administrator or to have in fact occurred within such Monthly Reporting Period used by the Administrator for such purposes. Payments reported by servicers include all principal and interest payments made by a borrower, insurance proceeds, liquidation proceeds and repurchase proceeds. Events reported by servicers include foreclosure sales, payments of insurance claims and payments of guarantee claims.

**Section 3.02. Holder's Undivided Beneficial Ownership Interest.**  With respect to each PC Pool, the Holder of a PC on the Record Date shall be the owner of record of a pro rata undivided beneficial ownership interest in the remaining principal balance of the Mortgages in the related PC Pool as of such date and shall be entitled to interest at the PC Coupon on such pro rata undivided beneficial ownership interest, in each case on the related Payment Date. Such pro rata undivided beneficial ownership interest shall change accordingly if any Mortgage is added to or removed from such PC Pool in accordance with this Agreement. A Holder's pro rata undivided beneficial ownership interest in the Mortgages included in a PC Pool is calculated by dividing the original unpaid principal balance of the Holder's PC by the original unpaid principal balance of all the Mortgages in the related PC Pool.

**Section 3.03. Distributions of Principal.**  With respect to each PC Pool, the Administrator, on behalf of the Trustee, shall withdraw from the Custodial Account and shall distribute to each related Holder its pro rata share of principal collections with respect to the Mortgages in such PC Pool, including, if applicable, each Holder's pro rata share of the aggregate amount of any Deferred Interest that has been

10

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

added to the principal balance of the related Mortgages; *provided, however*, that with respect to guarantee payments, the Guarantor's obligations herein shall be subject to its subrogation rights pursuant to Section 3.10. The Administrator may retain from any prepayment or delinquent principal payment on any Mortgage, for reimbursement to the Guarantor, any amount not previously received with respect to such Mortgage but paid by the Guarantor to the related Holders under its guarantee. For Mortgages purchased by the Depositor in exchange for PCs under its MultiLender Swap Program, the Depositor shall retain principal payments made on such Mortgages in the amount of any difference between the aggregate unpaid principal balance of the Mortgages as of delivery by the seller and the aggregate unpaid principal balance as of the PC Issue Date, and the Depositor shall purchase additional Mortgages with such principal payments; such additional Mortgages may or may not be included in the related PC Pool represented by the PCs received by the seller.

**Section 3.04. Distributions of Interest.** With respect to each PC Pool, the Administrator, on behalf of the Trustee, shall withdraw from the Custodial Account and shall distribute to each related Holder its pro rata share of interest collections with respect to the Mortgages included in such PC Pool, at a rate equal to the PC Coupon (excluding, if applicable, each Holder's pro rata share of any Deferred Interest that has been added to the principal balance of the related Mortgages). Interest shall accrue during the applicable Accrual Periods. The Administrator may retain from any delinquent interest payment on any Mortgage, for reimbursement to the Guarantor, any amount not previously received with respect to such Mortgage but paid by the Guarantor to the related Holders under its guarantee. With respect to each PC Pool, a partial month's interest retained by Freddie Mac or remitted to the related Holders with respect to prepayments shall constitute an adjustment to the fee payable to the Administrator and the Guarantor pursuant to Section 3.08(a) for such PC Pool.

**Section 3.05. Payments.**

(a) With respect to each PC Pool, distributions of principal and interest on the related PCs shall begin in the month after issuance for Gold PCs and in the second month after issuance for ARM PCs. The Administrator, on behalf of the Trustee, shall calculate, or cause to be calculated, for each PC the distribution amount for the current calendar month.

(b) On or before each Payment Date, the Administrator, on behalf of the Trustee, shall instruct the Federal Reserve Banks to credit payments on PCs from the Custodial Account to the appropriate Holders' accounts. The related PC Pool's payment obligations shall be met upon transmittal of the Administrator's payment order to the Federal Reserve Banks provided sufficient funds are then on deposit in the Custodial Account. A Holder shall receive the payment of principal, if applicable, and interest on each Payment Date on each PC held by such Holder as of the related Record Date.

(c) The Administrator relies on servicers' reports of mortgage activity to prepare the Pool Factors. There may be delays or errors in processing mortgage information, such as a servicer's failure to file an accurate or timely report of its collections of principal or its having filed a report that cannot be processed. In these situations the Administrator's calculation of scheduled principal to be made on Gold PCs may not reflect actual payments on the related Mortgages. The Administrator shall account for and reconcile any differences as soon as practicable.

(d) The Administrator reserves the right to change the period during which a servicer may hold funds prior to payment to the Administrator, as well as the period for which servicers report payments to the Administrator, including adjustments to the Monthly Reporting Period. Either change may change the time at which prepayments are distributed to Holders. Any such change, however, shall not impair Holders' rights to payments as otherwise provided in this Section.

(e) The Administrator shall maintain one or more accounts (together, the "Custodial Account"), segregated from the general funds of Freddie Mac, in its corporate capacity, for the deposit of collections of

11

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

principal (including full and partial principal prepayments) and interest received from or advanced by the servicers in respect of the Mortgages. Mortgage collections in respect of the PC Pools established by Freddie Mac under this Agreement or trust funds established by Freddie Mac pursuant to any other trust agreements may be commingled in the Custodial Account, provided that the Administrator keeps, or causes to be kept, separate records of funds with respect to each such PC Pool and other trust fund. Collections due to Freddie Mac, in its corporate capacity as owner of mortgages held in its portfolio, may also be commingled in the Custodial Account, provided that the Administrator shall withdraw such amounts for remittance to Freddie Mac on a monthly basis. Funds on deposit in the Custodial Account may be invested by the Administrator in Eligible Investments. Investment earnings on deposits in the Custodial Account shall be for the benefit of the Administrator, and any losses on such investments shall be paid by the Administrator. On each Payment Date, amounts on deposit in the Custodial Account shall be withdrawn upon the order of the Administrator, on behalf of the Trustee, for the purpose of making distributions to the related Holders, in accordance with this Agreement.

**Section 3.06. Pool Factors.**

(a) The Administrator, on behalf of the Trustee, shall calculate and make payments to Holders on each Payment Date based on the monthly Pool Factors (including Negative Amortization Factors) until such time as the Administrator determines that a more accurate and practicable method for calculating such payments is available and implements that method. Pursuant to Section 7.05(e), the Administrator may modify the Pool Factor methodology from time to time, without the consent of Holders. With respect to each PC Pool, the Administrator, on behalf of the Trustee, shall do the following:

(i) The Administrator shall publish or cause to be published for each month a Pool Factor with respect to each PC Pool. Beginning in the month after formation of a PC Pool, Pool Factors shall be published on or about the fifth Business Day of the month, which Pool Factors may reflect prepayments reported to the Administrator after the end of the related Monthly Reporting Period and before the publication of the applicable Pool Factors. However, the Administrator may, in its own discretion, publish Pool Factors on any other Business Day. The Pool Factor for the month in which the PC Pool is established is 1.00000000 and need not be published.

(ii) The Administrator shall distribute principal each month to a Holder of a Gold PC in an amount equal to such Holder's pro rata share of such principal, calculated by multiplying the original principal balance of the Gold PC by the difference between its Pool Factors for the preceding and current months.

(iii) The Administrator shall distribute principal each month to a Holder of an ARM PC in an amount equal to such Holder's pro rata share of such principal, calculated by multiplying the original principal balance of the ARM PC by the difference between its Pool Factors for the two preceding months.

(iv) The Administrator shall distribute interest each month in arrears to a Holder (assuming no Deferred Interest) in an amount equal to 1/12th of the applicable PC Coupon multiplied by such Holder's pro rata share of principal, calculated by multiplying the original principal balance of such Holder's PC by the preceding month's Pool Factor for Gold PCs or by the second preceding month's Pool Factor for ARM PCs.

(v) For any month that Deferred Interest has accrued on a Deferred Interest PC, the Administrator shall distribute principal (if any is due) to a Holder in an amount equal to such Holder's pro rata share of principal, calculated by (A) subtracting the preceding month's Pool Factor from the second preceding month's Pool Factor, (B) adding to the difference the Negative Amortization Factor for the preceding month and (C) multiplying the resulting sum by the original PC principal balance. The interest payment on the Deferred Interest PC in that month shall be (i) 1/12th of the PC Coupon

12

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

multiplied by (ii) the original principal balance of the Holder's PC multiplied by (iii) the preceding month's Pool Factor minus the preceding month's Negative Amortization Factor.

(b) With respect to each PC Pool, a Pool Factor shall reflect prepayments reported for the applicable Monthly Reporting Period. The Administrator, on behalf of the Trustee, may also, in its discretion, reflect in a Pool Factor any prepayments reported after the end of the applicable Monthly Reporting Period. To the extent a given Pool Factor (adjusted as necessary for payments made pursuant to the Guarantor's guarantee of timely payment of scheduled principal on Gold PCs) does not reflect the actual unpaid principal balance of the related Mortgages, the Administrator shall account for any difference by adjusting subsequent Pool Factors as soon as practicable.

(c) In the case of a PC Pool that is comprised of ARMs, a Pool Factor shall be based upon the unpaid principal balance of the related Mortgages that servicers report to the Administrator for the Monthly Reporting Period that ended in the second month preceding the month in which the Pool Factor is published. The Administrator, on behalf of the Trustee, may also, in its discretion, include as part of the aggregate principal payment in any month any prepayments received after the Monthly Reporting Period that ended in the second month preceding the month in which the Pool Factor is published. To the extent a given Pool Factor does not reflect the actual aggregate unpaid principal balance of the Mortgages, the Administrator shall account for any difference by adjusting subsequent Pool Factors as soon as practicable.

(d) The Pool Factor method for a PC Pool may affect the timing of receipt of payments by related Holders but shall not affect the Guarantor's guarantee with respect to such PC Pool, as set forth in Section 3.09. The Guarantor's guarantee shall not be affected by the implementation of any different method for calculating and paying principal and interest for any PC Pool, as permitted by this Section 3.06.

**Section 3.07. Servicing Fees; Retained Interest.**

(a) To the extent provided by contractual arrangement with the Administrator, with respect to each PC Pool, the related servicer of each Mortgage included in such PC Pool shall be entitled to retain each month, as a servicing fee, any interest payable by the borrower on a Mortgage that exceeds the servicer's required remittance with respect to such Mortgage. Each servicer is required to pay all expenses incurred by it in connection with its servicing activities and shall not be entitled to reimbursement for those expenses, except as provided in Section 3.08(c). If a servicer advances any principal and/or interest on a Mortgage to the Administrator prior to the receipt of such funds from the borrower, the servicer may retain (i) from prepayments or collections of delinquent principal on such Mortgage any payments of principal so advanced, or (ii) from collections of delinquent interest on such Mortgage any payments of interest so advanced. To the extent permitted by its servicing agreement, the servicer is entitled to retain as additional compensation certain incidental fees related to Mortgages it services.

(b) With respect to a PC Pool, pursuant to the related Purchase Documents, a seller may retain each month as extra compensation a fixed amount of interest on a Mortgage included in such PC Pool. In such event, the related servicer shall retain each month as a servicing fee the excess of any interest payable by the borrower on such Mortgage (less the seller's retained interest amount) over the servicer's required remittance with respect to such Mortgage.

**Section 3.08. Administration Fee; Guarantee Fee.**

(a) Subject to any adjustments required by Section 3.04, with respect to any PC Pool, the Administrator and the Guarantor shall be entitled to receive from monthly interest payments on each related Mortgage a fee (to be allocated between the Administrator and the Guarantor as they may agree) equal to the excess of any interest received by the Administrator from the servicer over the amount of interest payable to the related Holders; *provided, however,* that the aggregate fee amount shall be automatically adjusted with respect to each PC Pool to the extent a Pool Factor does not reflect the unpaid principal

13

TREASURY-1862

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                                 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

balance of the Mortgages. Any such adjustment shall equal the difference between (i) interest at the applicable PC Coupon computed on the aggregate unpaid principal balance of the Mortgages for such month based on monthly principal payments actually received by the Administrator and (ii) interest at the applicable PC Coupon computed on the remaining balance of the Mortgages included in the PC Pool derived from the Pool Factor. The Administrator shall (i) withdraw the aggregate fee amount from the Custodial Account prior to distributions to the related Holders, (ii) retain its portion of the fee for the Administrator's own account and (iii) remit the remaining portion of the fee to the Guarantor as the guarantee fee. In addition, the Administrator is entitled to retain as additional compensation certain incidental fees on the Mortgages as provided in Section 2.05 and certain investment earnings as provided in Section 3.05(e).

(b) The Depositor shall pay all expenses incurred in connection with the transfer of the Mortgages, the establishment and administration of each PC Pool and the issuance of the PCs. Any amounts (including attorney's fees) expended by the Trustee or the Administrator (or the servicers on the Administrator's behalf) for the protection, preservation or maintenance of the Mortgages, or of the real property securing the Mortgages, or of property received in liquidation of or realization upon the Mortgages, shall be expenses to be borne pro rata by the Administrator and the Holders in accordance with their interests in each Mortgage. The Administrator, on behalf of the Trustee, may retain an amount sufficient to pay the portion of such expenses borne pro rata by the Depositor and the Holders from payments otherwise due to Holders, which may affect the timing of receipt of payments by Holders but shall not affect the Guarantor's obligations under Section 3.09.

(c) The Administrator shall reimburse a servicer for any amount (including attorney's fees) it expends (on the Administrator's behalf and with its approval) for the protection, preservation or maintenance of the Mortgages, or of the real property securing the Mortgages, or of property received in liquidation of or realization upon the Mortgages. Such expenses shall be reimbursable to the servicer from the assets of the related PC Pool, to the extent provided in the Guide.

(d) Any fees and expenses described above shall not affect the Guarantor's guarantee with respect to any PC Pool, as set forth in Section 3.09.

**Section 3.09. Guarantees.**

(a) With respect to each PC Pool, the Guarantor guarantees to the Trustee and to each Holder of a PC:

(i) the timely payment of interest at the applicable PC Coupon;

(ii) the full and final payment of principal on the underlying Mortgages on or before the Payment Date that falls (A) in the month of its Final Payment Date, for Gold PCs, or (B) in the month after its Final Payment Date, for ARM PCs; and

(iii) for Gold PCs only, the timely payment of scheduled principal on the underlying Mortgages.

In the case of Deferred Interest PCs, the Guarantor's guarantee of principal includes, and its guarantee of interest excludes, any Deferred Interest added to the principal balances of the related Mortgages. The Guarantor shall make payments of any guaranteed amounts by transfer to the Custodial Account for distribution to the related Holders, in accordance with Sections 3.03 and 3.04. The guarantees pursuant to this Section will inure to the benefit of each PC Pool and its related Holders, and shall be enforceable by the Trustee of that PC Pool and by such Holders, as provided in Article V of this Agreement.

(b) The Guarantor shall compute guaranteed scheduled monthly principal payments on any Gold PC, subject to any applicable adjustments, in accordance with procedures adopted by the Guarantor from time to time. With respect to each PC Pool, any payment the Guarantor makes to the Administrator, on behalf

14

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

of the Trustee, on account of the Guarantor's guarantee of scheduled principal payments shall be considered to be a payment of principal for purposes of calculating the Pool Factor for such PC Pool and the Holder's pro rata share of the remaining unpaid principal balance of the related Mortgages.

(c) The Guarantor's guarantees shall continue to be effective or shall be reinstated (i) in the event that any principal or interest payment made to a Holder is for any reason returned by the Holder pursuant to an order, decree or judgment of any court of competent jurisdiction that the Holder was not entitled to retain such payment pursuant to this Agreement and (ii) notwithstanding any provision hereof permitting fees, expenses, indemnities or other amounts to be paid from the assets of any PC Pool.

**Section 3.10. Subrogation.** With respect to each PC Pool, the Guarantor shall be subrogated to all the rights, interests, remedies, powers and privileges of each related Holder in respect of any Mortgage included in such PC Pool on which it has made guarantee payments of principal and/or interest to the extent of such payments. Nothing in this Section shall impair the Guarantor's right to receive distributions in its capacity as Holder, if it is a Holder of any PCs.

**Section 3.11. Termination Upon Final Payment.** Each PC Pool is irrevocable and will terminate only in accordance with the terms of this Agreement. Except as provided in Sections 3.05(e), 6.06 and 7.01, with respect to each PC Pool, Freddie Mac's and the Trustee's obligations and responsibilities under this Agreement shall terminate as to a PC Pool and its Holders upon (i) the full payment to such Holders of all principal and interest due to the Holders based on the Pool Factors or by reason of the Guarantor's guarantees or (ii) the payment to the Holder of all amounts held by Freddie Mac and the Trustee, respectively, and required to be paid hereunder; *provided, however,* that in no event shall any PC Pool created hereby continue beyond the expiration of 21 years from the death of the survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St. James's, living on the date hereof.

**Section 3.12. Effect of Final Payment Date.** The actual final payment on a PC may occur prior to the Payment Date specified in Section 3.09(a)(ii) due to prepayments of principal, including prepayments made in connection with the repurchase of any Mortgage from the related PC Pool.

**Section 3.13. Payment Error Corrections.** In the event of a principal or interest payment error, the Administrator, in its sole discretion, may effect corrections by the adjustment of payments to be made on future Payment Dates or in such other manner as it deems appropriate.

**ARTICLE IV**

**PCs**

**Section 4.01. Form and Denominations.** With respect to each PC Pool, the principal balances, PC Coupons and other characteristics of the PCs to be issued shall be specified in the related Pool Supplement. Delivery of the PCs of a PC Pool shall constitute the issuance of the PCs for that PC Pool. PCs shall be issued, held and transferable only on the book-entry system of the Federal Reserve Banks in minimum original principal amounts of $1,000 and additional increments of $1. PCs shall at all times remain on deposit with a Federal Reserve Bank in accordance with the provisions of the Book-Entry Rules. A Federal Reserve Bank will maintain a book-entry recordkeeping system for all transactions in PCs with respect to Holders.

**Section 4.02. Transfer of PCs.** PCs may be transferred only in minimum original principal amounts of $1,000 and additional increments of $1. PCs may not be transferred if, as a result of the transfer, the

15

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

transferor or the new Holder would have on deposit in its account PCs of the same issue with an original principal amount of less than $1,000.The transfer, exchange or pledge of PCs shall be governed by the fiscal agency agreement between Freddie Mac and a Federal Reserve Bank, the Book-Entry Rules and such other procedures as shall be agreed upon from time to time by Freddie Mac and a Federal Reserve Bank. A Federal Reserve Bank shall act only upon the instructions of the Holder in recording transfers of a PC. A charge may be made for any transfer of a PC and shall be made for any tax or other governmental charge imposed in connection with a transfer of a PC. Freddie Mac hereby assigns to the Trustee Freddie Mac's rights under each fiscal agency agreement with respect to PCs issued by any PC Pool.

**Section 4.03. Record Date.** The Record Date for each Payment Date shall be the close of business on the last day of the preceding month for Gold PCs and the second preceding month for ARM PCs. A Holder of a PC on the books and records of a Federal Reserve Bank on the Record Date shall be entitled to payment of principal and interest on the related Payment Date. A transfer of a PC made on or before the Record Date in a month shall be recognized as effective as of the first day of such month.

**ARTICLE V**

**Remedies**

**Section 5.01. Events of Default.** With respect to each PC Pool, an "Event of Default'' means any one of the following events:

(a) Default by the Guarantor or the Administrator in the payment of interest or principal to the related Holders as and when the same shall become due and payable as provided in this Agreement, and the continuance of such default for a period of 30 days.

(b) Failure by the Guarantor or the Administrator to observe or perform any other covenants of this Agreement relating to their respective obligations, and the continuance of such failure for a period of 60 days after the date of receipt by such party of written notice of such failure and a demand for remedy by the affected Holders representing not less than 65 percent of the remaining principal balance of any affected PC Pool.

(c) The entry by any court having jurisdiction over the Guarantor or the Administrator of a decree or order for relief in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or for the appointment of a receiver, liquidator, assignee, custodian or sequestrator (or other similar official) of the Guarantor or the Administrator or for any substantial part of its property, or for the winding up or liquidation of its affairs, if such decree or order remains unstayed and in effect for a period of 60 consecutive days.

(d) Commencement by the Guarantor or the Administrator of a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consent by the Guarantor or the Administrator to the entry of an order for relief in an involuntary case under any such law, or its consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian or sequestrator (or other similar official) of the Guarantor or the Administrator or for any substantial part of their respective properties, or any general assignment made by the Guarantor or the Administrator for the benefit of creditors, or failure by the Guarantor or the Administrator generally to pay their debts as they become due.

The appointment of a conservator (or other similar official) by a regulator having jurisdiction over the Guarantor or the Administrator, whether or not such party consents to such appointment, shall not constitute an Event of Default.

16

TREASURY-1865

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.
Powered by Morningstar® Document Research℠

**Section 5.02. Remedies.**

(a) If an Event of Default occurs and is continuing with respect to a PC Pool, the Holders of PCs representing a majority of the remaining principal balance of such PC Pool may, by written notice to Freddie Mac, remove Freddie Mac as Administrator and nominate its successor under this Agreement with respect to such PC Pool. The nominee shall be deemed appointed as Freddie Mac's successor as Administrator unless Freddie Mac objects within 10 days after such nomination. Upon such objection:

(i) The Administrator may petition any court of competent jurisdiction for the appointment of its successor; or

(ii) Any bona fide Holder that has been a Holder for at least six months may, on behalf of such Holder and all others similarly situated, petition any such court for appointment of the Administrator's successor.

(b) If a successor Administrator is appointed, the Administrator shall submit to its successor a complete written report and accounting of the Mortgages in the affected PC Pool and shall take all other steps necessary or desirable to transfer its interest in and administration of such PC Pool to its successor.

(c) Subject to the Freddie Mac Act, a successor may take any action with respect to the Mortgages as may be reasonable and appropriate in the circumstances. Prior to the designation of a successor, the Holders of PCs representing a majority of the remaining principal balance of any affected PC Pool may waive any past or current Event of Default.

(d) Appointment of a successor shall not relieve Freddie Mac, in its capacity as Guarantor, of its guarantee obligations as set forth in this Agreement.

**Section 5.03. Limitation on Suits by Holders.**

(a) With respect to any PC Pool, except as provided in Section 5.02, no Holder shall have any right to institute any action or proceeding at law or in equity or in bankruptcy or otherwise or seek any other remedy whatsoever against Freddie Mac or the Trustee with respect to this Agreement or the related PCs or Mortgages, unless:

(i) Such Holder previously has given the Trustee written notice of an Event of Default and the continuance thereof;

(ii) The Holders of PCs representing a majority of the remaining principal balance of any affected PC Pool have made a written request to the Trustee to institute an action or proceeding in its own name and have offered the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred;

(iii) The Trustee has failed to institute any such action or proceeding for 60 days after its receipt of the written notice, request and offer of indemnity described above; and

(iv) The Trustee has not received from such Holders any direction inconsistent with the written request described above during the 60-day period.

(b) No Holder shall have any right under this Agreement to prejudice the rights of any other Holder, to obtain or seek preference or priority over any other Holder or to enforce any right under this Agreement, except for the ratable and common benefit of all Holders of PCs representing interests in any affected PC Pool.

17

TREASURY-1866

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(c) For the protection and enforcement of the provisions of this Section, Freddie Mac, the Trustee and each and every Holder shall be entitled to such relief as can be given either at law or in equity. Notwithstanding the foregoing, no Holder's right to receive payment (or to institute suit to enforce payment) of principal and interest as provided herein on or after the due date of such payment shall be impaired or affected without the consent of the Holder.

**ARTICLE VI**

**Trustee**

**Section 6.01. Duties of Trustee.**

(a) If an Event of Default has occurred and is continuing with respect to a PC Pool, the Trustee shall exercise the rights and powers vested in it by this Agreement and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b) Except during the continuance of an Event of Default, the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Agreement and shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement and no implied covenants or obligations shall be read into this Agreement against the Trustee.

(c) The Trustee and its directors, officers, employees and agents may not be protected from liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of their respective duties or by reason of reckless disregard of obligations and duties under this Agreement, except that:

(i) this paragraph does not limit the effect of paragraph (b) of this Section;

(ii) the Trustee shall not be liable for any action taken, or not taken, by the Trustee in good faith pursuant to this Agreement or for errors in judgment; and

(iii) the Trustee shall not be required to take notice or be deemed to have notice or knowledge of any default or Event of Default, unless the Trustee obtains actual knowledge or written notice of such default or Event of Default. In the absence of such actual knowledge or notice, the Trustee may conclusively assume that there is no default or Event of Default.

(d) Every provision of this Agreement shall be subject to the provisions of this Section and Section 6.02.

(e) The Trustee shall not be liable for indebtedness evidenced by or arising under this Agreement, including principal of or interest on the PCs, or interest on any money received by it except as the Trustee may agree in writing.

(f) Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law or the terms of this Agreement.

(g) No provision of this Agreement shall require the Trustee to expend, advance or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

18

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(h) The Trustee may, but shall not be obligated to, undertake any legal action that it deems necessary or desirable in the interest of Holders. The Trustee may be reimbursed for the legal expenses and costs of such action from the assets of the related PC Pool.

**Section 6.02. Certain Matters Affecting the Trustee.**

(a) The Trustee, and any director, officer, employee or agent of the Trustee may rely in good faith on any certificate, opinion or other document of any kind which, prima facie, is properly executed and submitted by any appropriate Person respecting any matters arising hereunder. The Trustee may rely on any such documents believed by it to be genuine and to have been signed or presented by the proper Person and on their face conforming to the requirements of this Agreement. The Trustee need not investigate any fact or matter stated in such documents.

(b) Before the Trustee acts or refrains from acting, it may require an officer's certificate or an opinion of counsel, which shall not be at the expense of the Trustee. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on an officer's certificate or opinion of counsel. The right of the Trustee to perform any discretionary act enumerated in this Agreement shall not be construed as a duty and the Trustee shall not be answerable for other than its willful misfeasance, bad faith or gross negligence in the performance of such act.

(c) The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys or a custodian or nominee.

(d) The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; provided, that the Trustee's conduct does not constitute willful misfeasance, bad faith or gross negligence. In no event shall the Trustee have any liability for consequential damages.

(e) The Trustee may consult with and rely on the advice of counsel, accountants and other advisors and shall not be liable for errors in judgment or for anything it does or does not do in good faith if it so relies. Any opinion of counsel with respect to legal matters relating to this Agreement and the PCs shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with any opinion of such counsel.

(f) Any fees, expenses and indemnities payable from the assets of any PC Pool to Freddie Mac, in its capacity as Trustee, in the performance of its duties and obligations hereunder shall not affect Freddie Mac's guarantee with respect to that PC Pool, as set forth in Section 3.09.

**Section 6.03. Trustee's Disclaimer.** The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Agreement, the assets of the PC Pool or the PCs.

**Section 6.04. Trustee May Own PCs.** Subject to Section 7.06, the Trustee in its individual or any other capacity may become the owner or pledgee of PCs with the same rights as it would have if it were not the Trustee.

**Section 6.05. Indemnity.** Each PC Pool shall indemnify the Trustee and the Trustee's employees, directors, officers and agents, as provided in this Agreement, against any and all claims, losses, liabilities or expenses (including attorneys' fees) incurred by it in connection with the administration of this trust and the performance of its duties under this Agreement (to the extent not previously reimbursed above), including, without limitation, the execution and filing of any federal or state tax returns and information returns and being the mortgagee of record with respect to the related Mortgages. The Trustee shall notify the Administrator promptly of any claim for which it may seek indemnity. Failure by the Trustee to so

19

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

notify the Administrator shall not relieve the related PC Pool of its obligations hereunder. A PC Pool shall not be required to reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee through the Trustee's own willful misfeasance, bad faith or gross negligence.

The Trustee's rights pursuant to this Section shall survive the discharge of this Agreement.

**Section 6.06. Replacement of Trustee.** The Trustee may resign at any time. Any successor Trustee shall resign if it ceases to be eligible in accordance with the provisions of Section 6.09. In either case, the resignation of the Trustee shall become effective, and the resigning Trustee shall be discharged from its obligations with respect to the PC Pools created under this Agreement by giving 90 days' written notice of the resignation to the Depositor, the Guarantor and the Administrator and upon the effectiveness of an appointment of a successor Trustee, which may be as of a date prior to the end of the 90-day period. Upon receiving such notice of resignation, the Depositor shall promptly appoint one or more successor Trustees by written instrument, one copy of which is delivered to the resigning Trustee and one copy of which is delivered to the successor Trustee. The successor Trustee need not be the same Person for all PC Pools. If no successor Trustee has been appointed for a PC Pool, or one that has been appointed has not accepted the appointment within 90 days after giving such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee.

Prior to an Event of Default, or if an Event of Default has occurred and has been cured with respect to a PC Pool, Freddie Mac cannot be removed as Trustee with respect to that PC Pool. If an Event of Default has occurred and is continuing while Freddie Mac is the Trustee, at the direction of Holders of PCs representing a majority of the remaining principal balance of such PC Pool, Freddie Mac shall resign or be removed as Trustee, and to the extent permitted by law, all of the rights and obligations of the Trustee with respect to the related PC Pool only, will be terminated by notifying the Trustee in writing. Holders of PCs representing a majority of the remaining principal balance of the PC Pool will then be authorized to name and appoint one or more successor Trustees. Notwithstanding the termination of the Trustee, its liability under this Agreement and arising prior to such termination shall survive such termination.

If a successor Trustee is serving as the Trustee, the following events are "Trustee Events of Default" with respect to a PC Pool:

(i) the Trustee fails to comply with Section 6.09;

(ii) the Trustee is adjudged bankrupt or insolvent;

(iii) a receiver or other public officer takes charge of the Trustee or its property; or

(iv) the Trustee otherwise becomes incapable of acting.

If at any time a Trustee Event of Default has occurred and is continuing, the Guarantor (or if an Event of Default has occurred and is continuing, the Depositor) may, and if directed by Holders of PCs representing a majority of the remaining principal balance of such PC Pool, shall, remove the Trustee as to such PC pool and appoint a successor Trustee by written instrument, one copy of which shall be delivered to the Trustee so removed and one copy of which shall be delivered to the successor Trustee, and the Guarantor (or if an Event of Default has occurred and is continuing, the Depositor) shall give written notice of the successor Trustee to the Holders affected by the succession. Notwithstanding the termination of the Trustee, its liability under this Agreement arising prior to such termination will survive such termination.

If the Trustee resigns or is removed or if a vacancy exists in the office of the Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee), the Depositor shall promptly appoint a successor Trustee that satisfies the eligibility requirements of Section 6.09.

20

TREASURY-1869

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

The retiring Trustee agrees to cooperate with the Depositor and any successor Trustee in effecting the termination of the retiring Trustee's responsibilities and rights hereunder and shall promptly provide such successor Trustee all documents and records reasonably requested by it to enable it to assume the Trustee's functions hereunder.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Depositor, the Guarantor and the Administrator. Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Agreement with respect to such PC Pool. The successor Trustee shall mail a notice of its succession to the related Holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee.

If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee or the Depositor may petition any court of competent jurisdiction for the appointment of a successor Trustee.

**Section 6.07. Successor Trustee By Merger.** If a successor Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee; provided, that such corporation or banking association shall be otherwise qualified and eligible under Section 6.09.

**Section 6.08. Appointment of Co-Trustee or Separate Trustee.**

(a) Notwithstanding any other provisions of this Agreement, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of a PC Pool may at the time be located, the Trustee shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, of all or any part of such PC Pool and to vest in such Person or Persons, in such capacity and for the benefit of the related Holders, such title to such PC Pool, or any part thereof, and, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable. No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 6.09 and no notice to the related Holders of the appointment of any co-trustee or separate trustee shall be required under Section 6.06 hereof.

(b) With respect to each PC Pool, every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i) all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the related PC Pool or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

(ii) no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

21

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(iii) the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c) Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VI. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee.

(d) Any separate trustee or co-trustee may at any time constitute the Trustee, its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

**Section 6.09. Eligibility; Disqualification.** Freddie Mac is eligible to act as the Trustee and is initially the Trustee for the PC Pools created under this Agreement. Any successor to Freddie Mac (i) at the time of its appointment as Trustee, must be reasonably acceptable to Freddie Mac and (ii) must be organized as a corporation or association doing business under the laws of the United States or any State thereof, be authorized under such laws to exercise corporate trust powers, have combined capital and surplus of at least $50,000,000 and be subject to supervision or examination by federal or state financial regulatory authorities. If any successor Trustee shall cease to satisfy the eligibility requirements set forth in (ii) above, that successor Trustee shall resign immediately in the manner and with the effect specified in Section 6.06.

## ARTICLE VII

### Miscellaneous Provisions

**Section 7.01. Annual Statements.** Within a reasonable time after the end of each calendar year, the Administrator (or its agent) shall furnish to each Holder on any Record Date during such year information that the Administrator deems necessary or desirable to enable Holders and beneficial owners of PCs to prepare their United States federal income tax returns, if applicable.

**Section 7.02. Limitations on Liability.** Neither Freddie Mac in its corporate capacity, nor any of its directors, officers, employees, authorized designees, representatives or agents ("related persons'') shall be liable to Holders for any action taken, or not taken, by them or by a servicer in good faith pursuant to this Agreement or for errors in judgment. This provision shall not protect Freddie Mac or any related person against any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties under this Agreement. In no event shall Freddie Mac or any related person be liable for any consequential damages. Freddie Mac and any related person may rely in good faith on any document or other communication of any kind properly executed and submitted by any Person with respect to any matter arising under this Agreement. Freddie Mac has no obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service or supervise the servicing of the Mortgages in accordance with this Agreement and which in its opinion may involve any expense or liability for Freddie Mac. Freddie Mac may, in its discretion, undertake or participate in any action it deems necessary or

22

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

TREASURY-1871

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

desirable with respect to any Mortgage, this Agreement, the PCs or the rights and duties of the parties hereto and the interests of the Holders hereunder. In such event, the legal expenses and costs of such action and any resulting liability shall be expenses for the protection, preservation and maintenance of the Mortgages borne pro rata by Freddie Mac and Holders as provided in Section 3.08(b).

**Section 7.03. Limitation on Rights of Holders.**  The death or incapacity of any Person having an interest in a PC shall not terminate this Agreement or any PC Pool. Such death or incapacity shall not entitle the legal representatives or heirs of such Person, or any Holder for such Person, to claim an accounting, take any action or bring any proceeding in any court for a partition or winding up of the related PC Pool, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

**Section 7.04. Control by Holders.**  With respect to any PC Pool, except as otherwise provided in Articles V and VI and Sections 7.05 and 7.06, no Holder shall have any right to vote or to otherwise control in any manner the operation and management of the Mortgages included in such PC Pool, or the obligations of the parties hereto. This Agreement shall not be construed so as to make the Holders from time to time partners or members of an association. Holders shall not be liable to any third person by reason of any action taken by the parties to this Agreement pursuant to any provision hereof.

**Section 7.05. Amendment.**

(a) Freddie Mac and the Trustee may amend this Agreement (including any related Pool Supplement) from time to time without the consent of any Holders to (i) cure any ambiguity or correct or supplement any provision in this Agreement, *provided, however,* that any such amendment shall not have a material adverse effect on any Holder; (ii) maintain the classification of any PC Pool as a grantor trust for federal income tax purposes; or (iii) avoid the imposition of any state or federal tax on a PC Pool; it being understood that any amendment permitting the repurchase of a Mortgage by Freddie Mac due to a delinquency of less than 120 days, other than in the circumstances described in Section 1.02(c)(iii), may not be adopted under this clause (a).

(b) Except as provided in Section 7.05(c), Freddie Mac and the Trustee may amend this Agreement as to any PC Pool, with the consent of Holders representing not less than a majority of the remaining principal balance of the affected PC Pool.

(c) Freddie Mac and the Trustee may not amend this Agreement, without the consent of a Holder, if such amendment would impair or affect the right of such Holder to receive payment of principal and interest on or after the due date of such payment or to institute suit for the enforcement of any such payment on or after such date.

(d) To the extent that any provisions of this Agreement differ from the provisions of any Freddie Mac Mortgage Participation Certificates Agreement or PC Master Trust Agreement dated prior to the date of this Agreement, this Agreement shall be deemed to amend such provisions of the prior agreement, but only to the extent that Freddie Mac, under the terms of such prior agreement, could have effected such change as an amendment of such prior agreement without the consent of Holders of PCs thereunder; *provided, however,* that the trust declarations and related provisions set forth in Section 7.05(d) of the PC Master Trust Agreement dated as of December 31, 2007 are hereby reaffirmed with respect to each PC Pool created before December 31, 2007.

(e) Notwithstanding any other provision of this Section, (i) the Administrator (in its own discretion and in its own interest) and the Trustee (at the Administrator's direction) may amend this Agreement to reflect any modification in the Administrator's methodology of calculating payments to Holders, including any modifications described in Section 3.05(d) and Section 3.06(a) and the manner in which it distributes prepayments to Holders, (ii) the Administrator (in its own discretion and in its own interest) and the Trustee (at the Administrator's direction) may amend this Agreement to cure any inconsistency between this

23

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Agreement and the provisions of the Guide and (iii) the Depositor (in its own discretion and in its own interest) and the Trustee (at the Administrator's direction) may amend any Pool Supplement to make the adjustments described in Section 1.02(b) to the characteristics of the Mortgages to be transferred to a PC Pool or to the related PCs.

**Section 7.06. Voting Rights.**

If Freddie Mac is acting as Administrator or Trustee and an Event of Default has occurred and is continuing, any PCs held by Freddie Mac for its own account shall be disregarded and deemed not to be outstanding for purposes of exercising the remedies set forth in Section 5.02 and the second paragraph of Section 6.06.

**Section 7.07. Persons Deemed Owners.**  With respect to each PC Pool, Freddie Mac, the Trustee, the Administrator and a Federal Reserve Bank (or any agent of any of them) may deem and treat the related Holder(s) as the absolute owner(s) of a PC and the undivided beneficial ownership interests in the Mortgages included in the related PC Pool for the purpose of receiving payments and for all other purposes, and none of Freddie Mac, the Trustee, the Administrator or a Federal Reserve Bank (nor any agent of any of them) shall be affected by any notice to the contrary. All payments made to a Holder, or upon such Holder's order, shall be valid, and, to the extent of the payment, shall satisfy and discharge the related PC Pool's payment obligations with respect to the Holder's PC. None of Freddie Mac, the Trustee, the Administrator or any Federal Reserve Bank shall have any direct obligation to any beneficial owner unless it is also the Holder of a PC.

**Section 7.08. Governing Law.**  THIS AGREEMENT AND THE PARTIES' RIGHTS AND OBLIGATIONS WITH RESPECT TO PCs, SHALL BE GOVERNED BY THE LAWS OF THE UNITED STATES. INSOFAR AS THERE MAY BE NO APPLICABLE PRECEDENT, AND INSOFAR AS TO DO SO WOULD NOT FRUSTRATE THE PURPOSES OF THE FREDDIE MAC ACT OR ANY PROVISION OF THIS AGREEMENT OR THE TRANSACTIONS GOVERNED HEREBY, THE LOCAL LAWS OF THE STATE OF NEW YORK SHALL BE DEEMED REFLECTIVE OF THE LAWS OF THE UNITED STATES.

**Section 7.09. Grantor Trust Status.**  No provision in this Agreement shall be construed to grant Freddie Mac, the Trustee or any other Person authority to act in any manner which would cause a PC Pool not to be treated as a grantor trust for federal income tax purposes.

**Section 7.10. Payments Due on Non-Business Days.**  If the date fixed for any payment on any PC is a day that is not a Business Day, then such payment shall be made on the next succeeding Business Day, with the same force and effect as though made on the date fixed for such payment, and no interest shall accrue for the period after such date.

**Section 7.11. Successors.**  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, including any successor by operation of law, and permitted assigns.

**Section 7.12. Headings.**  The headings in this Agreement are for convenience only and shall not affect the construction of this Agreement.

**Section 7.13. Notice and Demand.**

(a) Any notice, demand or other communication required or permitted under this Agreement to be given to or served upon any Holder may be given or served (i) in writing by deposit in the United States mail, postage prepaid, and addressed to such Holder as such Holder's name and address may appear on the books and records of a Federal Reserve Bank or (ii) by transmission to such Holder through the communication system of the Federal Reserve Banks. Any notice, demand or other communication to or

24

TREASURY-1873

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

upon a Holder shall be deemed to have been sufficiently given or made, for all purposes, upon mailing or transmission.

(b) Any notice, demand or other communication which is required or permitted to be given to or served under this Agreement may be given in writing addressed as follows (i) in the case of Freddie Mac in its corporate capacity, to Freddie Mac, 8200 Jones Branch Drive, McLean, Virginia 22102, Attention: Executive Vice President — General Counsel and Secretary and (ii) in the case of the Trustee, to: Freddie Mac (as Trustee), 8200 Jones Branch Drive, McLean, Virginia 22102, Attention: Executive Vice President — General Counsel and Secretary.

(c) Any notice, demand or other communication to or upon Freddie Mac or the Trustee shall be deemed to have been sufficiently given or made only upon its actual receipt of the writing.

25

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

THE SALE OF A PC AND RECEIPT AND ACCEPTANCE OF A PC BY OR ON BEHALF OF A HOLDER, WITHOUT ANY SIGNATURE OR FURTHER MANIFESTATION OF ASSENT, SHALL CONSTITUTE THE UNCONDITIONAL ACCEPTANCE BY THE HOLDER AND ALL OTHERS HAVING A BENEFICIAL INTEREST IN SUCH PC OF ALL THE TERMS AND PROVISIONS OF THIS AGREEMENT (INCLUDING THE RELATED POOL SUPPLEMENT) AND THE AGREEMENT OF FREDDIE MAC, SUCH HOLDER AND SUCH OTHERS THAT THOSE TERMS AND PROVISIONS SHALL BE BINDING, OPERATIVE AND EFFECTIVE.

FEDERAL HOME LOAN MORTGAGE CORPORATION,
in its corporate capacity and as Trustee

/s/      Mark D. Hanson
Authorized Signatory

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 10.4**

**EXECUTIVE MANAGEMENT COMPENSATION PROGRAM**

**Program Description**
**Amended and Restated as of June 2, 2011**

| | |
|---|---|
| *Objective* | To provide a compensation structure that addresses the Company's and the Federal Housing Finance Agency's ("FHFA") shared interests of motivating, retaining, and, in some instances,  recruiting members of Executive Management while Freddie Mac is in conservatorship. |
| *Effective Period* | The Executive Management Compensation Program is intended to be  effective for calendar years 2009, 2010, and thereafter as long as Freddie Mac remains in Conservatorship. The specific  parameters of the Executive Management Compensation Program may be amended from time to time by the Compensation Committee of  Freddie Mac's Board of Directors (the "Committee"), if approved by FHFA after consulting with the U.S. Department of the Treasury ("Treasury"), as appropriate. |
| *Covered Positions* | Freddie Mac's Chief Executive Officer ("CEO"), Chief Operating  Officer ("COO"), Chief Financial Officer ("CFO"), Executive Vice Presidents ("EVPs"), and Senior Vice Presidents ("SVPs"),  collectively referred to as "Executive Management," and, individually referred to as a "Covered Officer." |
| *Covered Position Participation Requirement* | Participation of a Covered Officer in the Executive Management  Compensation Program is contingent upon the Covered Officer agreeing to be bound by the terms of the Executive Management  Compensation Recapture Policy (the "Recapture Policy") that has been approved by both the Committee and FHFA. |
| *Composition of Total Direct Compensation* | The total direct compensation ("TDC") shall be comprised of two  components, a "Base Salary" and a "Target Incentive Opportunity." Two-thirds (2/3) of the TDC amount shall be delivered in Base Salary and one-third (1/3) of the TDC shall be delivered in a Target Incentive Opportunity. The TDC for all participants will be approved by the Committee, FHFA, or the CEO, as appropriate, as of the effective date of this program.<br><br>For an employee hired or promoted into a Covered Officer position  subsequent to approval of the Executive Management Compensation Program, the Committee (for Executive Officers) or an Authorized  Officer (for Non-Executive Officers) will recommend a TDC for  such employee, which, for Executive Officers, will be subject to approval by FHFA after consulting with Treasury, as appropriate. |
| *Adjustments to TDC* | The Committee (for Executive Officers) or an Authorized Officer (for Non-Executive Officers) may recommend adjustments to TDC for Covered Officers. Any such recommendations for Executive  Officers are subject to approval by FHFA after consulting with Treasury, as appropriate. An approved adjustment to a Covered Officer's TDC shall become effective as of the date specified in  the approval document. |
| *Base Salary* | The Base Salary will consist of two components. One component  will be paid in cash on a semi-monthly basis during each calendar year (the "Semi-Monthly Base Salary") and the other component  will be earned on a semi-monthly basis during each calendar year,  but subject to a deferral and payment schedule (the "Deferred  Base Salary") as discussed below. |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 2 of 9
June 2, 2011

### Effective Date for Base Salary

For each employee who was a Covered Officer as of January 1, 2009, the Semi-Monthly Base Salary and Deferred Base Salary will be effective retroactive to January 1, 2009, subject to the exception provided in the section "Semi-Monthly Base Salary" below. For an employee who is hired into a Covered Officer position after January 1, 2009, the Semi-Monthly Base Salary and Deferred Base Salary shall be pro-rated effective as of the date of hire. For an employee who is promoted after January 1, 2009 into either a Covered Position or a Covered Position with increased scope and responsibility, the Semi-Monthly Base Salary and Deferred Base Salary shall be pro-rated effective as of the date of promotion.

*Semi-Monthly Base Salary*

Semi-Monthly Base Salary for any Covered Officer cannot exceed $500,000, except for the CEO, COO, and CFO, or other exceptions as approved from time to time by FHFA. In those instances, the Semi-Monthly Base Salary will be the amount approved by FHFA after consultation with Treasury, as appropriate, as of the Covered Officer's date of hire or promotion.

For any Covered Officer other than the CEO, COO, and CFO, with a Semi-Monthly Base Salary greater than $500,000 immediately prior to the adoption of the Executive Management Compensation Program, that Covered Officer's Semi-Monthly Base Salary will be reduced to $500,000 effective January 1, 2010.

### Form of Payout

Cash less applicable withholdings

### Treatment of Base Salary Under Freddie Mac's Benefit Plans

Semi-Monthly Base Salary will be considered compensation for purposes of the following Freddie Mac retirement or executive benefit plans that take base salary into consideration: the tax qualified Thrift/401(k) Savings Plan, the tax qualified Employees' Pension Plan, the non-qualified Supplemental Executive Retirement Plan, the Executive Deferred Compensation Plan, and the following welfare benefit plans: (1) the Flexible Benefits Plan (for purposes of calculating FlexDollars); (2) the Group Term Life Insurance Plan; (3) the Group Universal Life Insurance Program; (4) the Long-Term Disability Plan; (5) the Accidental Death and Personal Loss Plan; and (6) the purchase and payout of vacation.

*Deferred Base Salary*

The portion of Base Salary that is not paid in Semi-Monthly Base Salary shall be delivered in the form of Deferred Base Salary. The Deferred Base Salary, which is earned on a semi-monthly basis during each calendar year, shall be deferred and paid according to the applicable Approved Payment Schedule below.

### Approved Payment Schedule: Calendar Year 2009

Deferred Base Salary earned during each quarter of 2009 will be paid on the last business day of the corresponding quarter of 2010, provided the Covered Officer is actively employed by the Company on such payment date, or in the

TREASURY-1877

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 3 of 9
June 2, 2011

event that the Covered Officer dies, has a Long-Term Disability or Retires in 2010. For clarity, the 2009 Deferred Base Salary will not become non-forfeitable upon the Covered Officer's death, Long-Term Disability or Retirement, as provided below under "Treatment Upon Termination" if such event occurs in 2009. The 2009 Deferred Base Salary will, however, become non-forfeitable, subject to the Recapture Policy, if such event occurs in 2010.

**Approved Payment Schedule: Calendar Year 2010 and Subsequent Years**

Fifty percent (50%) of Deferred Base Salary earned during each quarter of a calendar year will be paid in a fixed amount on the last business day of the corresponding quarter of the immediately following calendar year.

The amount that will be paid for the remaining fifty percent (50%) of Deferred Base Salary earned during each quarter of a calendar year will be determined by the Committee's approved Deferred Base Salary funding level. The approved performance-based portion of the Deferred Base Salary funding level will be determined by the Committee's assessment of the following:

1. The Company's performance against the objectives on the short-term incentive ("STI") scorecard (i.e., for the STI plan applicable to employees at the level of Vice President and below for the performance year in which the performance-based portion of Deferred Base Salary is earned);

2. All other relevant internal and external factors and non-STI scorecard developments that affect our corporate condition and mission fulfillment; and,

3. Achievement of significant accomplishments beyond the STI scorecard objectives or adverse developments.

The approved funding level, expressed as a percentage that can range from 0% up to a maximum of 125%, will be equal to the aggregate amount of funds approved by the Committee for distribution to Covered Officers divided by the performance-based portion of Deferred Base Salary earned.

The amount of the performance-based portion of Deferred Base Salary that will be paid to a Covered Officer will be equal to the performance-based portion of Deferred Base Salary earned multiplied by Deferred Base Salary funding level.

For any Covered Officer for whom a separate division scorecard is approved by a Board committee, the performance-based portion of the Deferred Base Salary funding level will be based on the appropriate Board committee's assessment of performance against such separate division scorecard.

The performance-based portion of the Deferred Base Salary earned during each quarter of a calendar year will be adjusted in a manner consistent with the approved Deferred Base Salary funding level, and will be paid on the last business day of the corresponding quarter in the immediately following calendar year.

TREASURY-1878

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 4 of 9
June 2, 2011

**Form of Payout**

Cash less applicable withholdings.

**Treatment Under Freddie Mac's Benefit Plans**

Deferred Base Salary will be considered compensation for purposes of the Federal Home Loan Mortgage Corporation Supplemental Executive Retirement Plan (Thrift 401(k) and Pension SERP) when paid to an active Covered Officer, subject to the maximum described in "**Impact on Freddie Mac's Supplemental Executive Retirement Plan.**"

Deferred Base Salary will not be considered compensation for purposes of any of Freddie Mac's tax qualified retirement or executive benefit or welfare plans.

*Target Incentive Opportunity*

For each performance year, every Covered Officer will be provided an annual Target Incentive Opportunity, which will be equal to 1/3 of TDC.

**Effective Date for 2009 Target Incentive Opportunity**

For each employee who was in a Covered Officer position on January 1, 2009, the 2009 Target Incentive Opportunity will be effective retroactive to January 1, 2009 and will be equal to 1/3 of their TDC (i.e., the 2009 Target Incentive Opportunity will not be pro-rated).

For an employee who was hired into a Covered Officer position after January 1, 2009, the 2009 Target Incentive Opportunity shall be pro-rated based on their date of hire. For an employee who is promoted after January 1, 2009 into either a Covered Position or a Covered Position with increased scope and responsibility, the 2009 Target Incentive Opportunity shall be pro-rated effective as of the date of promotion.

**Effective Date for Target Incentive Opportunity in 2010 and Subsequent Years**

For each employee who is in a Covered Officer position as of January 1 of any calendar year, the Target Incentive Opportunity will be effective on January 1 of that calendar year and will be equal to 1/3 of their TDC.

For an employee who is hired into a Covered Officer position after January 1 of any calendar year, the Target Incentive Opportunity for that calendar year shall be pro-rated based on the date of promotion or hire. For an employee who is promoted after January 1 of any calendar year into either a Covered Position or a Covered Position with increased scope and responsibility, the Target Incentive Opportunity shall be pro-rated effective as of the date of promotion.

**Target Incentive Opportunity Payouts**

A Covered Officer will be eligible to be paid 50% of their annual Target Incentive Opportunity no later than March 15 of the calendar year immediately following the performance year (the "First Incentive Opportunity Payment"), and the remaining 50% no later than March 15 of the second calendar year immediately following the performance year (the "Second Incentive

TREASURY-1879

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 5 of 9
June 2, 2011

Opportunity Payment").

### 2009 Target Incentive Opportunity (Payouts in 2010 and 2011)

The amount of the annual Target Incentive Opportunity that is actually paid will be determined by the aggregate amount of funds approved by the Committee for distribution to Covered Officers for each payment. In determining the aggregate amount of funds approved for distribution, which can be greater than, less than, or equal to the aggregate Target Incentive Opportunity for the Covered Officers, the Committee will take into account the following:

1. The Company's performance against the objectives on the long-term incentive ("LTI") scorecard (i.e., for the LTI plan applicable to employees at the level of Vice President and below) for the LTI grant made in the same calendar year of the Covered Officers' annual Target Incentive Opportunity;

2. All other relevant internal and external factors and non-LTI scorecard developments that affect our corporate condition and mission fulfillment; and,

3. Achievement of significant accomplishments beyond the LTI scorecard objectives or adverse developments.

The approved funding level, expressed as a percentage that can range from 0% up to a maximum of 120%, will be equal to the aggregate amount of funds approved by the Committee for distribution to Covered Officers divided by the aggregate Target Incentive Opportunity for those same Covered Officers.

<u>First Incentive Opportunity Payment</u> — The amount actually paid will be equal 50% of the Covered Officer's annual Target Incentive Opportunity multiplied by the approved funding level for the first vesting.

<u>Second Incentive Opportunity Payment</u> — The amount actually paid will be equal 50% of the Covered Officer's annual Target Incentive Opportunity multiplied by the approved funding level for the second vesting.

For Covered Officers who are members of the Freddie Mac Management Committee on the date the Committee approves the funding level, the amount of the Target Incentive Opportunity that is paid is also subject to an assessment of division and/or individual performance as determined by the CEO, for Covered Officers other than the CEO. For the CEO, Freddie Mac's Board of Directors conducts the assessment. This assessment can result in an increase or decrease to the amount payable of up to 25%. However, in no event can the aggregate amount paid to the Covered Officers who are members of the Management Committee for any First or Second Incentive Opportunity Payment exceed the aggregate Target Incentive Opportunities for those Covered Officers multiplied by the funding level.

### 2010 and Subsequent Year Target Incentive Opportunities

The Committee or the CEO will determine the actual amount that is paid to a Covered Officer (other than the CEO) for either the First or the Second

TREASURY-1880

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 6 of 9
June 2, 2011

Incentive Opportunity Payments based on: (i) the aggregate amount of funds approved by the Committee for distribution to Covered Officers for each payment, (ii) an assessment of individual, group or enterprise performance; and (iii) any other relevant factors. For the CEO, the Committee determines the actual amount to be paid based on the same factors, after obtaining and considering the views of the other non-management members of the Board.

In determining the aggregate amount of funds approved for distribution, which can be greater than, less than, or equal to the aggregate Target Incentive Opportunity for the Covered Officers, the Committee will take into account the following:

1. The Company's performance against the objectives on the long-term incentive ("LTI") scorecard (i.e., for the LTI plan applicable to employees at the level of Vice President and below) for the LTI grant made in the same calendar year of the Covered Officers' annual Target Incentive Opportunity;

2. All other relevant internal and external factors and non-LTI scorecard developments that affect our corporate condition and mission fulfillment; and,

3. Achievement of significant accomplishments beyond the LTI scorecard objectives or adverse developments.

The actual amount paid to a Covered Officer for each of the First and Second Incentive Opportunity Payments can range from 0% to 150% of his/her Target Incentive Opportunity. However, in no event can the aggregate amount paid to the Covered Officers for any First or Second Incentive Opportunity Payment exceed the aggregate amount of funds approved for distribution.

**Form of Payout**

Cash less applicable withholdings

**Treatment Under Freddie Mac's Benefit Plans**

The Target Incentive Opportunity will not be considered compensation for purposes of any Freddie Mac retirement benefit or welfare plans.

*Impact on Freddie Mac's Supplemental Executive Retirement Plan*

The Supplemental Executive Retirement Plan ("SERP") shall be modified effective January 1, 2010 to provide that the maximum covered compensation, for purposes of the plan, relative to Covered Officers only, may not exceed two times the Covered Officer's Semi-Monthly Base Salary. It is the intent of Freddie Mac and FHFA that, upon the conclusion of Conservatorship, the definition of "compensation" for purposes of accruals under the SERP will revert to the definition of "compensation" in place prior to the amendment to the SERP made to conform its terms to this Executive Management Compensation Program.

*Treatment Upon Termination:*

Under all termination events except death, Semi-Monthly Base Salary will terminate as of the date employment terminates. In the event of death, Semi-Monthly Base Salary will terminate at the end of the month in which the death occurs.

*Semi-Monthly Base Salary*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 7 of 9
June 2, 2011

| | |
|---|---|
| ***Treatment Upon Termination:*** | **Death:** If a Covered Officer's employment is terminated due to death, any unpaid Deferred Base Salary will be paid as soon as administratively possible. If, at the time of the Covered Officer's death, the Deferred Base Salary funding level has not been determined, the performance-based portion of Deferred Base Salary will remain outstanding until such determination is made. The actual amount paid for the performance-based portion will be determined by the approved Deferred Base Salary funding level. |
| ***Deferred Base Salary*** | |

The date on which the Committee approves the Deferred Base Salary funding level is referred to as the "Deferred Base Salary Determination Date." Payment of any performance-based Deferred Base Salary will occur as soon as administratively possible after the Deferred Base Salary Determination Date.

**Long-Term Disability:** If a Covered Officer's employment is terminated due to Long-Term Disability, the Covered Officer's right to receive any unpaid Deferred Base Salary will become non-forfeitable, subject to the Recapture Policy, but will be paid no earlier than as called for in the Approved Payment Schedule above. The actual amount paid for the performance-based portion of Deferred Base Salary earned will be determined by the approved Deferred Base Salary funding level.

**Retirement:** If a Covered Officer terminates employment due to retirement (as defined in **Definitions**), the Covered Officer's right to receive any unpaid Deferred Base Salary will become non-forfeitable, subject to the Recapture Policy, and the Deferred Base Salary will be paid no earlier than as called for in the Approved Payment Schedule above. The actual amount paid for the performance-based portion of Deferred Base Salary will be determined by the approved Deferred Base Salary funding level.

**Involuntary Termination:** If a Covered Officer is involuntarily terminated, any unpaid Deferred Base Salary will be forfeited unless the Committee (for Executive Officers) or an Authorized Officer (for non-Executive Officers) recommends that the Covered Officer receive either all or a portion of the unpaid Deferred Base Salary. The Committee's recommendation for Executive Officers is subject to approval by FHFA after consulting with Treasury, as appropriate.

**Voluntary Termination:** If a Covered Officer voluntarily terminates employment, any unpaid Deferred Base Salary will be forfeited.

| | |
|---|---|
| ***Treatment Upon Termination:*** | **Minimum Service Required:** In order to be eligible to receive any portion of an annual Target Incentive Opportunity upon termination, a Covered Officer must have been employed for a minimum of four (4) whole calendar months during the performance year for which the incentive is being earned. |
| ***Target Incentive Opportunity*** | **Death and Long-Term Disability:** If a Covered Officer's employment is terminated due to either death or Long-Term Disability, any earned but unpaid portion of the Target Incentive Opportunity will be paid as soon as administratively possible following the date of death or the first day of Long-Term Disability. The actual amount that is paid will be determined consistent with the process under Target Incentive Opportunity Payouts. |

TREASURY-1882

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 8 of 9
June 2, 2011

If, at the time of the Covered Officer's death or Long-Term Disability, the Target Incentive Opportunity funding level has not been determined, the award will remain outstanding until such determination is made. As soon as administratively possible after the Target Incentive Opportunity Payment Determination Date (which is the date on which the Committee approves the LTI funding level), but no later than March 15 of the calendar year following each calendar year performance period, the Covered Officer, or the Covered Officer's beneficiary(ies), will receive all unpaid portions of their Target Incentive Opportunity determined consistent with the process under Target Incentive Opportunity Payouts.

**Retirement:** If a Covered Officer terminates employment due to Retirement (as defined in **Definitions**), any earned but unpaid portion of the Target Incentive Opportunity will be paid as soon as administratively possible. The actual amount paid will be determined consistent with the process under Target Incentive Opportunity Payouts.

If, at the time of the Covered Officer's termination, performance against the performance measure(s) has not been determined, the Target Incentive Opportunity will remain outstanding until the Target Incentive Opportunity Payment Determination Date. As soon as administratively possible after the Target Incentive Opportunity Determination Date, but no later than March 15 of the calendar year following each calendar year performance period, the Covered Officer's right to receive a pro-rata payment shall become non-forfeitable, subject to the Recapture Policy. The Covered Officer is eligible to receive a pro-rata payment for the performance year in which the Covered Officer was employed. If the Covered Officer is employed for less than four (4) whole calendar months during a performance year, the Covered Officer will forfeit the Target Incentive Opportunity payment for that performance year. The pro-rata payment shall be calculated using the following methodology:

Step 1. The number of whole months employed during the applicable performance year (minimum of four months required)

Step 2. Divided by twelve (12), the number of whole months in the performance year

Step 3. Multiplied by 50% of the Covered Officer's annual Target Incentive Opportunity and adjusted consistent with the process under Target Incentive Opportunity Payouts.

The above formula will be applied separately to each of the of the performance years for which a Covered Officer is eligible for a pro-rata payment of the Target Incentive Opportunity.

**Involuntary Termination:** If a Covered Officer is involuntarily terminated, any unpaid portion of the Target Incentive Opportunity will be forfeited unless the Committee (for Executive Officers) or an Authorized Officer (for non-Executive Officers) recommends that the Covered Officer receive either all or a portion of the unpaid Target Incentive Opportunity. The Committee's recommendation for Executive Officers is subject to approval by FHFA after consulting with Treasury, as appropriate.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Executive Management Compensation Program
Page 9 of 9
June 2, 2011

**Voluntary Termination:** If a Covered Officer voluntarily terminates employment, any unpaid portion of the Target Incentive Opportunity will be forfeited.

***Additional Forfeiture Provision***

Upon a "Forfeiture Event" (as defined in ***Definitions***), any unearned or any unpaid Total Incentive Opportunity will be cancelled and the Covered Officer or former Covered Officer will be required to immediately repay Freddie Mac the gross value of the Target Incentive Opportunity that was paid during the 12 month period immediately prior to the Forfeiture Event.

In the event that a repayment is triggered under a current or former Covered Officer's Recapture Policy, any earned but unpaid amounts that are subject to recapture under the terms of the Recapture Policy will be forfeited.

***Regulatory Approval and Reservation of Rights***

Actual payment of any Deferred Base Salary or any Target Incentive Opportunity at the time of termination is conditioned on the prior approval of FHFA at the time of any proposed payment.

Freddie Mac reserves the right, subject to FHFA approval, to modify the terms and conditions set forth herein so long as such modifications reasonably and in good faith are not detrimental to the rights of the employee.

The terms of this program are subject to and shall be construed in accordance with applicable law and any applicable regulation, guidance or interpretation issued by FHFA or Treasury.

***Definitions***

**Authorized Officers:** Those officers deemed Authorized Officers in the Board of Directors resolution delegating authority to management on human resources matters, as may be amended or restated from time to time.

**Executive Officer:** Those officers defined as Executive Officers in the Compensation Committee Charter then in effect.

**Forfeiture Event:** A Forfeiture Event shall mean the Covered Officer or former Covered Officer directly or indirectly seeks or accepts employment with, or provides professional services to, a "Competitor" in violation of any non-competition covenant agreement between the Covered Officer and Freddie Mac in effect as of the date the Covered Officer receives a Target Incentive Opportunity.

**Long-Term Disability:** A Long-Term Disability shall be as defined in Freddie Mac's Long-Term Disability Plan.

**Retirement:** A Covered Officer is eligible to retire when s/he has attained or exceeded the Normal Retirement Age in the Freddie Mac Employees' Pension Plan, which is currently 65 years of age.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 10.5

**FIRST AMENDMENT**
**TO THE**
**FEDERAL HOME LOAN MORTGAGE CORPORATION**
**MANDATORY EXECUTIVE DEFERRED BASE SALARY PLAN**
**(As Effective January 1, 2009)**

FIRST AMENDMENT TO THE FEDERAL HOME LOAN MORTGAGE CORPORATION MANDATORY EXECUTIVE DEFERRED BASE SALARY PLAN (the "Plan") by the FEDERAL HOME LOAN MORTGAGE CORPORATION (the "Corporation"), a corporation organized and existing under the laws of the United States of America.

**W I T N E S S E T H :**

WHEREAS, the Plan was adopted effective January 1, 2009;

WHEREAS, on June 2, 2011 the Compensation Committee of the Board of Directors of the Corporation (the "Committee"), is expected to approve an amendment to the Executive Management Compensation Program delegating to certain members of senior management (the "Authorized Officers") the authority to approve termination benefits under that program for officers at the level of Senior Vice President or above who are not Executive Officers under the Committee charter (as approved in Resolution FHLMC 2011-06, or successor thereto);

WHEREAS, *provided that* the Committee adopts the amendment to the Executive Management Compensation Program, and the Federal Housing Finance Agency ("FHFA") approves that amendment, a corresponding conforming amendment to the Plan is appropriate;

WHEREAS, FHFA has indicated that its approval of the above-referenced amendment to the Executive Management Compensation Program is subject to guidance or interpretations issued by FHFA pursuant to 12 C.F.R. § 1770.3(g)(1) relating to the definition of Executive Officer.

WHEREAS, pursuant to the authority granted to the Committee to amend the Plan under section 8.1 thereof, the Committee has determined that, in light of the expected amendment to the Executive Management Compensation Program, and contingent upon the finalization of that amendment (including FHFA approval thereof) it would be appropriate to similarly amend the Plan to reflect the delegation to Authorized Officers of the authority to determine whether to pay certain amounts under the Plan in the case of Involuntary Termination (as defined in the Plan); and

WHEREAS, the appropriate officer of the Corporation has been duly authorized to execute this amendment.

NOW, THEREFORE, the Plan is amended, as follows, effective June 2, 2011:

1. Section 5.3(b) is amended in full to read as follows:

"(b) All Other Plan Years. If a Participant experiences a Termination of Employment other than for death, Disability or Retirement, any earned but unpaid portion of the Participant's Account shall be forfeited to the Corporation as of the Participant's termination

**TREASURY-1885**

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

date; provided, however, that pursuant to Section 5.2(b)(3) in the event of an Involuntary Termination the Administrator (or its delegate) may provide that all or a part of the earned but unpaid portion of the Participant's Account shall not be forfeited, subject to FHFA approval for any Participant who is an Executive Officer (as defined in the charter of the Compensation Committee, as may be revised from time to time (the "Committee Charter") and consistent with FHFA guidance or interpretations issued pursuant to 12 C.F.R. § 1770.3(g)(1))."

2.   Section 7.1(b) and the text thereafter in Section 7.1 is amended to read as follows:

"(b) Delegate to designated employees or departments of the Corporation the authority to perform such of the Administrator's duties hereunder as may be delegated to such employees or departments.

Pursuant to this authority and subject, in each case, to the right of the Administrator to revoke such delegations in writing at any time, the recordkeeping and bookkeeping responsibilities under this Plan are hereby delegated to the Executive heading the Human Resources Division of the Corporation and/or such employees of that division as such Executive shall designate.

Further pursuant to this authority and subject to the right of the Administrator to revoke such delegation in writing at any time, the authority described in Section 5.2(b)(3) is hereby delegated to the Authorized Officers (as defined in the Executive Management Compensation Program, as amended from time to time) with respect to Participants who are not Executive Officers (as defined in the Committee Charter)."

IN WITNESS WHEREOF, the Corporation has caused this FIRST AMENDMENT TO THE FEDERAL HOME LOAN MORTGAGE CORPORATION MANDATORY EXECUTIVE DEFERRED BASE SALARY PLAN to be executed by its duly authorized representative this 29 day of July, 2011.

FEDERAL HOME
LOAN
MORTGAGE
CORPORATION


By: /s/ Scott Coolidge
Scott Coolidge
Vice President —
Compensation &
Benefits


ATTEST:

/s/ Alicia S. Myara
Alicia S. Myara
Assistant Secretary

2

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 12.1

## RATIO OF EARNINGS TO FIXED CHARGES AND
## RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

| | Six Months Ended June 30, | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2011 | 2010 | 2010 | 2009 | 2008 | 2007 | 2006 |
| | | | (dollars in millions) | | | | |
| Net income (loss) before income tax benefit (expense) and cumulative effect of changes in accounting principles | $ (1,769) | $(11,791) | $(14,882) | $(22,384) | $(44,564) | $ (5,989) | $ 2,340 |
| Add: | | | | | | | |
| Low-income housing tax credit partnerships | — | — | — | 4,155 | 453 | 469 | 407 |
| Total interest expense | 41,562 | 47,758 | 92,131 | 22,150 | 33,332 | 38,482 | 37,270 |
| Interest factor in rental expenses | 3 | 3 | 5 | 7 | 8 | 7 | 6 |
| Earnings (loss), as adjusted | $39,796 | $35,970 | $77,254 | $ 3,928 | $(10,771) | $32,969 | $40,023 |
| Fixed charges: | | | | | | | |
| Total interest expense | $41,562 | $47,758 | $ 92,131 | $ 22,150 | $ 33,332 | $38,482 | $37,270 |
| Interest factor in rental expenses | 3 | 3 | 5 | 7 | 8 | 7 | 6 |
| Capitalized interest | — | — | — | — | — | — | — |
| Total fixed charges | $41,565 | $47,761 | $ 92,136 | $ 22,157 | $ 33,340 | $38,489 | $37,276 |
| Senior preferred stock and preferred stock dividends(1) | 3,222 | 2,588 | 5,749 | 4,105 | 675 | 398 | 270 |
| Total fixed charges including preferred stock dividends | $44,787 | $ 50,349 | $ 97,885 | $ 26,262 | $ 34,015 | $38,887 | $37,546 |
| Ratio of earnings to fixed charges(2) | — | — | — | — | — | — | 1.07 |
| Ratio of earnings to combined fixed charges and preferred stock dividends(3) | — | — | — | — | — | — | 1.07 |

(1) Senior preferred stock and preferred stock dividends represent pre-tax earnings required to cover any senior preferred stock and preferred stock dividend requirements computed using our effective tax rate, whenever there is an income tax provision, for the relevant periods.

(2) Ratio of earnings to fixed charges is computed by dividing earnings (loss), as adjusted by total fixed charges. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $1.8 billion, $11.8 billion, $14.9 billion, $18.2 billion, $44.1 billion and $5.5 billion for the six months ended June 30, 2011 and 2010 and for the years ended December 31, 2010, 2009, 2008 and 2007, respectively.

(3) Ratio of earnings to combined fixed charges and preferred stock dividends is computed by dividing earnings (loss), as adjusted by total fixed charges including preferred stock dividends. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $5.0 billion, $14.4 billion, $20.6 billion, $22.3 billion, $44.8 billion and $5.9 billion for the six months ended June 30, 2011 and 2010 and for the years ended December 31, 2010, 2009, 2008 and 2007, respectively.

TREASURY-1887

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.1**

**CERTIFICATION**

**PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)**

I, Charles E. Haldeman, Jr., certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2011 of the Federal Home Loan Mortgage Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 8, 2011

/s/  Charles E. Haldeman, Jr.
Charles E. Haldeman, Jr.
Chief Executive Officer

TREASURY-1888

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.2**

**CERTIFICATION**

**PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)**

I, Ross J. Kari, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2011 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 8, 2011

/s/  Ross J. Kari
Ross J. Kari
Executive Vice President — Chief Financial Officer

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 32.1**

**CERTIFICATION**

**PURSUANT TO 18 U.S.C. SECTION 1350,**

**AS ENACTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q for the quarter ended June 30, 2011 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Charles E. Haldeman, Jr., Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date: August 8, 2011


/s/  Charles E. Haldeman, Jr.
Charles E. Haldeman, Jr.
Chief Executive Officer

TREASURY-1890

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 32.2**

**1 ECRTI TI FRTAO**

**NPCUP F OR RA S8 P .U1 . UE1 RTAO S350,**

**F U EOF1 RED BY UE1 RTAO 906 A1  RHE UFCBFOEU-AXLEY F 1 R AI  2002**

In connection with the Quarterly Report on Form 10-Q for the quarter ended June 30, 2011 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Ross J. Kari, Executive Vice President — Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date: August 8, 2011


/s/  Ross J. Kari
Ross J. Kari
Executive Vice President — Chief Financial Officer

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-1892

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 08, 2011

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.