Table of Contents

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended March 31, 2012**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from          to**

**Commission File Number: 001-34139**

# Federal Home Loan Mortgage Corporation
*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| **Federally chartered corporation** | **8200 Jones Branch Drive** McLean, Virginia 22102-3110 | **52-0904874** | **(703) 903-2000** |
|---|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(Address of principal executive offices, including zip code)* | *(I.R.S. Employer Identification No.)* | *(Registrant's telephone number, including area code)* |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                                                                          Accelerated filer ☒

Non-accelerated filer (Do not check if a smaller reporting company) ☐                    Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes ☒ No

As of April 23, 2012, there were 650,033,623 shares of the registrant's common stock outstanding.

TREASURY-3532

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| **PART I — FINANCIAL INFORMATION** | | |
| Item 1. | Financial Statements | 100 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 1 |
| | Executive Summary | 1 |
| | Selected Financial Data | 12 |
| | Consolidated Results of Operations | 13 |
| | Consolidated Balance Sheets Analysis | 30 |
| | Risk Management | 46 |
| | Liquidity and Capital Resources | 80 |
| | Fair Value Measurements and Analysis | 85 |
| | Off-Balance Sheet Arrangements | 88 |
| | Critical Accounting Policies and Estimates | 89 |
| | Forward-Looking Statements | 89 |
| | Risk Management and Disclosure Commitments | 91 |
| | Legislative and Regulatory Matters | 91 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 95 |
| Item 4. | Controls and Procedures | 97 |
| **PART II — OTHER INFORMATION** | | |
| Item 1. | Legal Proceedings | 183 |
| Item 1A. | Risk Factors | 183 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 183 |
| Item 6. | Exhibits | 185 |
| **SIGNATURES** | | 186 |
| **GLOSSARY** | | 187 |
| **EXHIBIT INDEX** | | E-1 |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| — | Selected Financial Data | 12 |
| 1 | Total Single-Family Loan Workout Volumes | 3 |
| 2 | Single-Family Credit Guarantee Portfolio Data by Year of Origination | 5 |
| 3 | Credit Statistics, Single-Family Credit Guarantee Portfolio | 6 |
| 4 | Mortgage-Related Investments Portfolio | 11 |
| 5 | Summary Consolidated Statements of Comprehensive Income | 13 |
| 6 | Net Interest Income/Yield and Average Balance Analysis | 14 |
| 7 | Derivative Gains (Losses) | 16 |
| 8 | Other Income | 17 |
| 9 | Non-Interest Expense | 18 |
| 10 | REO Operations Expense, REO Inventory, and REO Dispositions | 19 |
| 11 | Composition of Segment Mortgage Portfolios and Credit Risk Portfolios | 22 |
| 12 | Segment Earnings and Key Metrics — Investments | 23 |
| 13 | Segment Earnings and Key Metrics — Single-Family Guarantee | 25 |
| 14 | Segment Earnings Composition — Single-Family Guarantee Segment | 26 |
| 15 | Segment Earnings and Key Metrics — Multifamily | 29 |
| 16 | Investments in Securities | 31 |
| 17 | Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets | 32 |
| 18 | Additional Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets | 33 |
| 19 | Mortgage-Related Securities Purchase Activity | 34 |
| 20 | Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics | 35 |
| 21 | Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans | 36 |
| 22 | Net Impairment of Available-For-Sale Mortgage-Related Securities Recognized in Earnings | 37 |
| 23 | Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS | 39 |
| 24 | Mortgage Loan Purchase and Other Guarantee Commitment Activity | 41 |
| 25 | Derivative Fair Values and Maturities | 42 |
| 26 | Changes in Derivative Fair Values | 43 |
| 27 | Freddie Mac Mortgage-Related Securities | 44 |
| 28 | Issuances and Extinguishments of Debt Securities of Consolidated Trusts | 45 |
| 29 | Changes in Total Equity (Deficit) | 45 |
| 30 | Repurchase Request Activity | 47 |
| 31 | Mortgage Insurance by Counterparty | 50 |
| 32 | Bond Insurance by Counterparty | 51 |
| 33 | Derivative Counterparty Credit Exposure | 53 |
| 34 | Characteristics of the Single-Family Credit Guarantee Portfolio | 57 |
| 35 | Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio | 61 |
| 36 | Single-Family Home Affordable Modification Program Volume | 63 |
| 37 | Single-Family Refinance Loan Volume | 65 |
| 38 | Single-Family Loan Workouts, Serious Delinquency, and Foreclosures Volumes | 66 |
| 39 | Quarterly Percentages of Modified Single-Family Loans — Current and Performing | 67 |
| 40 | Single-Family Serious Delinquency Rates | 68 |
| 41 | Credit Concentrations in the Single-Family Credit Guarantee Portfolio | 69 |
| 42 | Single-Family Credit Guarantee Portfolio by Attribute Combinations | 70 |
| 43 | Single-Family Credit Guarantee Portfolio by Year of Loan Origination | 72 |
| 44 | Multifamily Mortgage Portfolio — by Attribute | 73 |
| 45 | Non-Performing Assets | 75 |
| 46 | REO Activity by Region | 76 |
| 47 | Credit Loss Performance | 78 |
| 48 | Single-Family Impaired Loans with Specific Reserve Recorded | 79 |
| 49 | Single-Family Credit Loss Sensitivity | 80 |
| 50 | Other Debt Security Issuances by Product, at Par Value | 83 |
| 51 | Other Debt Security Repurchases, Calls, and Exchanges | 83 |
| 52 | Freddie Mac Credit Ratings | 84 |
| 53 | Summary of Assets and Liabilities Measured at Fair Value on a Recurring Basis in Our Consolidated Balance Sheets | 86 |
| 54 | Summary of Change in the Fair Value of Net Assets | 87 |
| 55 | PMVS Results | 96 |
| 56 | Derivative Impact on PMVS-L (50 bps) | 96 |

TREASURY-3534

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3535

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Freddie Mac Consolidated Statements of Comprehensive Income | 101 |
| Freddie Mac Consolidated Balance Sheets | 102 |
| Freddie Mac Consolidated Statements of Equity (Deficit) | 103 |
| Freddie Mac Consolidated Statements of Cash Flows | 104 |
| Note 1: Summary of Significant Accounting Policies | 105 |
| Note 2: Conservatorship and Related Matters | 106 |
| Note 3: Variable Interest Entities | 109 |
| Note 4: Mortgage Loans and Loan Loss Reserves | 114 |
| Note 5: Individually Impaired and Non-Performing Loans | 118 |
| Note 6: Real Estate Owned | 124 |
| Note 7: Investments in Securities | 126 |
| Note 8: Debt Securities and Subordinated Borrowings | 134 |
| Note 9: Financial Guarantees | 136 |
| Note 10: Derivatives | 138 |
| Note 11: Freddie Mac Stockholders' Equity (Deficit) | 142 |
| Note 12: Income Taxes | 143 |
| Note 13: Segment Reporting | 143 |
| Note 14: Regulatory Capital | 147 |
| Note 15: Concentration of Credit and Other Risks | 148 |
| Note 16: Fair Value Disclosures | 154 |
| Note 17: Legal Contingencies | 176 |
| Note 18: Significant Components of Other Assets and Other Liabilities on our Consolidated Balance Sheets | 182 |

iii

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## PART I — FINANCIAL INFORMATION

*We continue to operate under the conservatorship that commenced on September 6, 2008, under the direction of FHFA as our Conservator. The Conservator succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any shareholder, officer or director thereof, with respect to the company and its assets. The Conservator has delegated certain authority to our Board of Directors to oversee, and management to conduct, day-to-day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator. See "BUSINESS — Conservatorship and Related Matters" in our Annual Report on Form 10-K for the year ended December 31, 2011, or 2011 Annual Report, for information on the terms of the conservatorship, the powers of the Conservator, and related matters, including the terms of our Purchase Agreement with Treasury.*

*This Quarterly Report on Form 10-Q includes forward-looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward-looking statements are made as of the date of this Form 10-Q and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Form 10-Q. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in: (a) "MD&A — FORWARD-LOOKING STATEMENTS" in this Form 10-Q and in the comparably captioned section of our 2011 Annual Report; and (b) the "BUSINESS" and "RISK FACTORS" sections of our 2011 Annual Report.*

*Throughout this Form 10-Q, we use certain acronyms and terms that are defined in the "GLOSSARY."*

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this MD&A in conjunction with our consolidated financial statements and related notes for the three months ended March 31, 2012 included in "FINANCIAL STATEMENTS," and our 2011 Annual Report.*

## EXECUTIVE SUMMARY

### Overview

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments. We are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures. We believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure, where feasible.

### *Summary of Financial Results*

Our financial performance in the first quarter of 2012 was impacted by the ongoing weakness in the economy, including in the mortgage market, and changes in interest rates. Our comprehensive income was $1.8 billion and $2.7 billion for the first quarters of 2012 and 2011, respectively, consisting of: (a) $577 million and $676 million of net income, respectively; and (b) $1.2 billion and $2.1 billion of total other comprehensive income, respectively.

Our total equity (deficit) was $(18) million at March 31, 2012, reflecting our comprehensive income of $1.8 billion for the first quarter of 2012 and our dividend payment of $1.8 billion on our senior preferred stock in March 2012. To address our deficit in net worth, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement for $19 million. Following receipt of the draw, the aggregate liquidation preference on the senior preferred stock owned by Treasury will be $72.3 billion.

### Our Primary Business Objectives

We are focused on the following primary business objectives: (a) developing mortgage market enhancements in support of a new infrastructure for the secondary mortgage market; (b) contracting the dominant presence of the GSEs in the marketplace; (c) providing credit availability for new or refinanced mortgages and maintaining foreclosure prevention activities; (d) minimizing our credit losses; (e) maintaining sound credit quality of the loans we purchase or guarantee; and (f) strengthening our infrastructure and improving overall efficiency while also focusing on retention of key employees.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                      Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our business objectives reflect direction we have received from the Conservator. On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that established objectives, performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan for Freddie Mac and Fannie Mae. We are aligning our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard. See "LEGISLATIVE AND REGULATORY MATTERS — FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard." Based on our charter, other legislation, public statements from Treasury and FHFA officials, and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives. For more information, see "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business*" in our 2011 Annual Report.

### Developing Mortgage Market Enhancements in Support of a New Infrastructure for the Secondary Mortgage Market

In the first quarter of 2012, we continued our efforts to build value for the industry and build the infrastructure for a future housing finance system. These efforts include the implementation of the Uniform Mortgage Data Program, or UMDP, which provides us with the ability to collect additional data that we believe will improve our risk management practices. The UMDP creates standard terms and definitions to be used throughout the industry and establishes standard reporting protocols. The UMDP is a key building block in developing a future secondary mortgage market. In the first quarter of 2012, we completed a key milestone of the UMDP with the launch of the Uniform Collateral Data Portal for the electronic submission of appraisal reports for conventional mortgages. We are also working with FHFA and others to develop a plan for the design and building of a single securitization platform that can be used in a future secondary mortgage market. FHFA also directed us and Fannie Mae to discuss harmonizing our seller/servicer contracts.

### Contracting the Dominant Presence of the GSEs in the Marketplace

We continue to take steps toward the goal of gradually shifting mortgage credit risk from Freddie Mac to private investors, while simplifying and shrinking certain of our operations. In the case of single-family credit guarantees, we are exploring several ways to accomplish this goal, including increasing guarantee fees, establishing loss-sharing arrangements, and evaluating new risk-sharing transactions beyond the traditional charter-required mortgage insurance coverage. In addition, we are studying the steps necessary for our competitive disposition of certain investment assets, including non-performing loans. To evaluate how to accomplish the goal of contracting our operations in the multifamily business, we are conducting a market analysis of the viability of our multifamily operations without government guarantees.

### Providing Credit Availability for New or Refinanced Mortgages and Maintaining Foreclosure Prevention Activities

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- Our support enables borrowers to have access to a variety of conforming mortgage products, including the prepayable 30-year fixed-rate mortgage, which historically has represented the foundation of the mortgage market.

- Our support provides lenders with a constant source of liquidity for conforming mortgage products. We estimate that we, Fannie Mae, and Ginnie Mae collectively guaranteed more than 90% of the single-family conforming mortgages originated during the first quarter of 2012.

- Our consistent market presence provides assurance to our customers that there will be a buyer for their conforming loans that meet our credit standards. We believe this liquidity provides our customers with confidence to continue lending in difficult environments.

- We are an important counter-cyclical influence as we stay in the market even when other sources of capital have withdrawn.

During the first quarters of 2012 and 2011, we guaranteed $105.1 billion and $97.6 billion in UPB of single-family conforming mortgage loans, respectively, representing approximately 491,000 and 461,000 loans, respectively.

Borrowers typically pay a lower interest rate on loans acquired or guaranteed by Freddie Mac, Fannie Mae, or Ginnie Mae. Mortgage originators are generally able to offer homebuyers and homeowners lower mortgage rates on conforming loan products, including ours, in part because of the value investors place on GSE-guaranteed mortgage-related securities. Prior to 2007, mortgage markets were less volatile, home values were stable or rising, and there were many sources of mortgage funds. We estimate that, for 20 years prior to 2007, the average effective interest rates on conforming, fixed-rate single-family mortgage loans were about 30 basis points lower than on non-conforming loans. Since 2007, this gap has widened, and, we estimate that interest rates on conforming, fixed-rate loans, excluding conforming jumbo loans, have been lower than those on non-conforming loans by as much as 184 basis points. In March 2012, we estimate that

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are caused by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

borrowers were paying an average of 54 basis points less on these conforming loans than on non-conforming loans. These estimates are based on data provided by HSH Associates, a third-party provider of mortgage market data.

We are focused on reducing the number of foreclosures and helping to keep families in their homes. In addition to our participation in HAMP, we introduced several new initiatives during the last few years to help eligible borrowers keep their homes or avoid foreclosure. Our relief refinance initiative, including HARP (which is the portion of our relief refinance initiative for loans with LTV ratios above 80%), is a significant part of our effort to keep families in their homes. Relief refinance loans have been provided to more than 565,000 borrowers with LTV ratios above 80% since the initiative began in 2009, including approximately 85,000 such loans during the first quarter of 2012.

A number of FHFA-directed changes to HARP were announced in late 2011. These changes are intended to allow more borrowers to participate in the program and benefit from refinancing their home mortgages. Since industry participation in HARP is not mandatory, implementation schedules have varied as individual lenders, mortgage insurers, and other market participants modify their processes. It is too early to estimate how many eligible borrowers are likely to refinance under the revised program.

We have also implemented the FHFA-directed servicing alignment initiative, which included a new non-HAMP standard loan modification initiative.

The table below presents our single-family loan workout activities for the last five quarters.

## Table 1 — Total Single-Family Loan Workout Volumes[1]

|  | For the Three Months Ended | | | | |
| --- | ---: | ---: | ---: | ---: | ---: |
|  | 03/31/2012 | 12/31/2011 | 09/30/2011 | 06/30/2011 | 03/31/2011 |
|  | | | (number of loans) | | |
| Loan modifications | 13,677 | 19,048 | 23,919 | 31,049 | 35,158 |
| Repayment plans | 10,575 | 8,008 | 8,333 | 7,981 | 9,099 |
| Forbearance agreements[2] | 3,656 | 3,867 | 4,262 | 3,709 | 7,678 |
| Short sales and deed in lieu of foreclosure transactions | 12,245 | 12,675 | 11,744 | 11,038 | 10,706 |
| Total single-family loan workouts | 40,153 | 43,598 | 48,258 | 53,777 | 62,641 |

(1) Based on actions completed with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment, and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent or effective, such as loans in modification trial periods. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period.

(2) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.

Highlights of our loan workout efforts include the following:

- We completed approximately 40,000 single-family loan workouts during the first quarter of 2012, including 13,677 loan modifications (HAMP and non-HAMP) and 12,245 short sales and deed in lieu of foreclosure transactions.

- Based on information provided by the MHA Program administrator, our servicers had completed 158,688 loan modifications under HAMP from the introduction of the initiative in 2009 through March 31, 2012.

- As of March 31, 2012, approximately 16,000 borrowers were in modification trial periods, consisting of approximately 5,000 borrowers in trial periods for our non-HAMP standard modification and approximately 11,000 borrowers in HAMP trial periods.

For more information about HAMP, the servicing alignment initiative and our non-HAMP standard loan modification, other loan workout programs, our relief refinance mortgage initiative (including HARP), and other initiatives to help eligible borrowers keep their homes or avoid foreclosure, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program.*"

### *Minimizing Our Credit Losses*

To help minimize the credit losses related to our guarantee activities, we are focused on:

- pursuing a variety of loan workouts, including foreclosure alternatives, in an effort to reduce the severity of losses we experience over time;

- managing foreclosure timelines to the extent possible, given the prolonged foreclosure process in many states;

- managing our inventory of foreclosed properties to reduce costs and maximize proceeds; and

- pursuing contractual remedies against originators, lenders, servicers, and insurers, as appropriate.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3539                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure.

We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans, and represent and warrant that those loans have been originated under specified underwriting standards. If we subsequently discover that the representations and warranties were breached (i.e., contractual standards were not followed), we can exercise certain contractual remedies to mitigate our actual or potential credit losses. These contractual remedies include the ability to require the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan. The amount we expect to collect on outstanding repurchase requests is significantly less than the UPB of the loans subject to the repurchase requests primarily because many of these requests will likely be satisfied by the seller/servicers reimbursing us for realized credit losses. Some of these requests also may be rescinded in the course of the contractual appeals process. As of March 31, 2012, the UPB of loans subject to repurchase requests issued to our single-family seller/servicers was approximately $3.2 billion, and approximately 38% of these requests were outstanding for more than four months since issuance of our initial repurchase request (this figure includes repurchase requests for which appeals were pending). Of the total amount of repurchase requests outstanding at March 31, 2012, approximately $1.2 billion were issued due to mortgage insurance rescission or mortgage insurance claim denial.

Our credit loss exposure is also partially mitigated by mortgage insurance, which is a form of credit enhancement. Primary mortgage insurance is required to be purchased, typically at the borrower's expense, for certain mortgages with higher LTV ratios. We received payments under primary and other mortgage insurance of $491 million and $587 million in the first quarters of 2012 and 2011, respectively, which helped to mitigate our credit losses. The financial condition of many of our mortgage insurers remained weak in the first quarter of 2012. We expect to receive substantially less than full payment of our claims from Triad Guaranty Insurance Corp., Republic Mortgage Insurance Company, and PMI Mortgage Insurance Co., which are three of our mortgage insurance counterparties. We believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as those claims emerge. Our loan loss reserves reflect our estimates of expected insurance recoveries related to probable incurred losses.

See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for further information on our agreements with our seller/servicers and our exposure to mortgage insurers.

### *Maintaining Sound Credit Quality of the Loans We Purchase or Guarantee*

We continue to focus on maintaining credit policies, including our underwriting standards, that allow us to purchase and guarantee loans made to qualified borrowers that we believe will provide management and guarantee fee income (excluding the amounts associated with the Temporary Payroll Tax Cut Continuation Act of 2011), over the long-term, that exceeds our expected credit-related and administrative expenses on such loans.

Approximately 95% of our single-family purchase volume in the first quarter of 2012 consisted of fixed-rate, first lien, amortizing mortgages. Approximately 87% and 85% of our single-family purchase volumes in the first quarters of 2012 and 2011, respectively, were refinance mortgages, and approximately 31% and 36%, respectively, of these refinance loans were relief refinance mortgages, based on UPB.

The credit quality of the single-family loans we acquired in the first quarter of 2012 (excluding relief refinance mortgages, which represented approximately 26% of our single-family purchase volume during the first quarter of 2012) is significantly better than that of loans we acquired from 2005 through 2008, as measured by original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. The improvement in credit quality of loans we have purchased since 2008 (excluding relief refinance mortgages) is primarily the result of: (a) changes in our credit policies, including changes in our underwriting standards; (b) fewer purchases of loans with higher risk characteristics; and (c) changes in mortgage insurers' and lenders' underwriting practices.

Our underwriting procedures for relief refinance mortgages are limited in many cases, and such procedures generally do not include all of the changes in underwriting standards we have implemented in the last several years. As a result, relief refinance mortgages generally reflect many of the credit risk attributes of the original loans. However, borrower participation in our relief refinance mortgage initiative may help reduce our exposure to credit risk in cases where borrower payments under their mortgages are reduced, thereby strengthening the borrower's potential to make their mortgage payments.

4 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012    TREASURY-3540    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Over time, relief refinance mortgages with LTV ratios above 80% (*i.e.*, HARP loans) may not perform as well as other refinance mortgages because the continued high LTV ratios of these loans increases the probability of default. In addition,  relief refinance mortgages may not be covered by mortgage insurance for the full excess of their UPB over 80%.  Approximately 16% and 15% of our single-family purchase volume in the first quarters of 2012 and 2011, respectively, was relief refinance mortgages with LTV ratios above 80%. Relief refinance  mortgages of all LTV ratios comprised approximately 13% and 11% of the UPB in our total single-family credit guarantee portfolio  at March 31, 2012 and December 31, 2011, respectively.

The table below presents the composition, loan characteristics,  and serious delinquency rates of loans in our single-family  credit guarantee portfolio, by year of origination at March 31, 2012.

**Table 2 — Single-Family Credit Guarantee Portfolio Data by Year of Origination[1]**

| | At March 31, 2012 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | % of Portfolio | Average Credit Score[2] | Original LTV Ratio[3] | Current LTV Ratio[4] | Current LTV Ratio >100%[4][5] | Serious Delinquency Rate[6] |
| **Year of Origination** | | | | | | |
| 2012 | 4% | 758 | 72% | 71% | 8% | —% |
| 2011 | 16 | 755 | 72 | 70 | 5 | 0.09 |
| 2010 | 18 | 754 | 71 | 72 | 6 | 0.32 |
| 2009 | 16 | 753 | 69 | 73 | 7 | 0.60 |
| 2008 | 6 | 724 | 74 | 93 | 37 | 5.94 |
| 2007 | 9 | 704 | 77 | 114 | 62 | 11.72 |
| 2006 | 7 | 709 | 75 | 112 | 57 | 10.92 |
| 2005 | 8 | 715 | 73 | 96 | 39 | 6.66 |
| 2004 and prior | 16 | 718 | 71 | 61 | 9 | 2.88 |
| Total | 100% | 736 | 72 | 80 | 20 | 3.51 |

(1) Based on the loans remaining in the portfolio at March 31,  2012, which totaled $1.7 trillion, rather than all loans  originally guaranteed by us and originated in the respective year. Includes loans acquired under our relief refinance  initiative, which began in 2009.

(2) Based on FICO score of the borrower as of the date of loan  origination and may not be indicative of the borrowers' creditworthiness at March 31, 2012. Excludes less than 1% of loans in the portfolio because the FICO scores at origination  were not available at March 31, 2012. As of March 31, 2011, the average credit score for all relief refinance loans was 743, compared to an average of 735 for all other loans in the  portfolio.

(3) See endnote (4) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original  LTV ratios.

(4) We estimate current market values by adjusting the value of the  property at origination based on changes in the market value of  homes in the same geographical area since origination. See endnote (5) to "Table 34 —  Characteristics of the Single-Family Credit Guarantee  Portfolio" for information on our calculation of current  LTV ratios. As of March 31, 2011, the average current LTV ratio for all relief refinance loans was 80%.

(5) Calculated as a percentage of the aggregate UPB of loans with  LTV ratios greater than 100% in relation to the total UPB of loans in the category.

(6) See "RISK MANAGEMENT— Credit Risk — *Mortgage Credit Risk  — Single-family Mortgage Credit Risk — Delinquencies*" for further information about our reported serious delinquency rates.

As of March 31, 2012 and December 31, 2011,  approximately 54% and 51%, respectively, of our single-family  credit guarantee portfolio consisted of mortgage loans  originated after 2008, which have experienced lower serious  delinquency trends in the early years of their terms than loans originated in 2005 through 2008.

***Strengthening Our Infrastructure and Improving Overall Efficiency While Also  Focusing On Retention of Key Employees***

We are working to both enhance the quality of our infrastructure  and improve our efficiency in order to preserve the taxpayers' investment. We are focusing our resources primarily on key projects, many of which will likely take  several years to fully implement, and on making significant improvements to our systems infrastructure in order to:  (a) implement mandatory initiatives from FHFA or other governmental bodies; (b) replace legacy hardware or  software systems at the end of their lives and to strengthen our  disaster recovery capabilities; and (c) improve our data collection and administration as well as our ability to oversee  the servicing of loans.

We continue to actively manage our general and administrative  expenses, while also continuing to focus on retaining key talent. Our general and administrative expenses declined in the  first quarter of 2012 compared to the first quarter of 2011,  largely due to a reduction in the number of our employees and changes in our compensation plans. We currently expect that our  general and administrative expenses for the full-year 2012 will be approximately equivalent to those we experienced in the  full-year 2011, with lower salaries and employee benefits  expense offset by increased professional services expense, in  part due to: (a) the continually changing mortgage market;  (b) an environment in which we are subject to increased regulatory oversight and mandates; and (c) strategic  arrangements that we may enter into with outside firms to  provide operational capability and staffing for key functions,  if needed. We believe the initiatives we are pursuing under the  2012 conservatorship scorecard and other FHFA-mandated initiatives may require additional resources and affect our  level of administrative expenses going forward.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          TREASURY-3541          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

We believe our risks related to employee turnover and low employee engagement remain elevated. Uncertainty surrounding our future business model, organizational structure, and compensation has contributed to elevated levels of voluntary employee turnover and low employee engagement. Disruptive levels of turnover at both the executive and non-executive levels and low employee engagement have contributed to a deterioration in our control environment and may lead to breakdowns in many of our operations. To help mitigate the uncertainty surrounding compensation, we introduced a new compensation program for employees. We continue to explore various strategic arrangements with outside firms to provide operational capability and staffing for key functions, if needed. However, these or other efforts to manage this risk to the enterprise may not be successful. For more information on the risks related to employee turnover, see "CONTROLS AND PROCEDURES," and for recent legislative and regulatory developments affecting these risks, see "LEGISLATIVE AND REGULATORY MATTERS — Legislative and Regulatory Developments Concerning Executive Compensation."

### Single-Family Credit Guarantee Portfolio

The UPB of our single-family credit guarantee portfolio declined approximately 1% during the first quarter of 2012, as the amount of single-family loan liquidations exceeded new loan purchase and guarantee activity. We believe this is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market and our competitive position compared to other market participants. The table below provides certain credit statistics for our single-family credit guarantee portfolio.

### Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio

| | As of | | | | |
|---|---|---|---|---|---|
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| Payment status — | | | | | |
| One month past due | 1.63% | 2.02% | 1.94% | 1.92% | 1.75% |
| Two months past due | 0.57% | 0.70% | 0.70% | 0.67% | 0.65% |
| Seriously delinquent[1] | 3.51% | 3.58% | 3.51% | 3.50% | 3.63% |
| Non-performing loans (in millions)[2] | $119,599 | $120,514 | $119,081 | $114,819 | $115,083 |
| Single-family loan loss reserve (in millions)[3] | $ 37,771 | $ 38,916 | $ 39,088 | $ 38,390 | $ 38,558 |
| REO inventory (in properties) | 59,307 | 60,535 | 59,596 | 60,599 | 65,159 |
| REO assets, net carrying value (in millions) | $  5,333 | $  5,548 | $  5,539 | $  5,834 | $  6,261 |

| | For the Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| | | | (in units, unless noted) | | |
| Seriously delinquent loan additions[1] | 80,815 | 95,661 | 93,850 | 87,813 | 97,646 |
| Loan modifications[4] | 13,677 | 19,048 | 23,919 | 31,049 | 35,158 |
| Foreclosure starts ratio[5] | 0.53% | 0.54% | 0.56% | 0.55% | 0.58% |
| REO acquisitions | 23,805 | 24,758 | 24,378 | 24,788 | 24,707 |
| REO disposition severity ratio:[6] | | | | | |
| California | 44.2% | 44.6% | 45.5% | 44.9% | 44.5% |
| Arizona | 45.0% | 46.7% | 48.7% | 51.3% | 50.8% |
| Florida | 48.6% | 50.1% | 53.3% | 52.7% | 54.8% |
| Nevada | 56.5% | 54.2% | 53.2% | 55.4% | 53.1% |
| Illinois | 49.3% | 51.2% | 50.5% | 49.4% | 49.5% |
| Total U.S. | 40.3% | 41.2% | 41.9% | 41.7% | 43.0% |
| Single-family credit losses (in millions) | $  3,435 | $  3,209 | $  3,440 | $  3,106 | $  3,226 |

(1) See "RISK MANAGEMENT — Credit Risk — Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Delinquencies" for further information about our reported serious delinquency rates.

(2) Consists of the UPB of loans in our single-family credit guarantee portfolio that have undergone a TDR or that are seriously delinquent. As of March 31, 2012 and December 31, 2011, approximately $46.1 billion and $44.4 billion in UPB of TDR loans, respectively, were no longer seriously delinquent.

(3) Consists of the combination of: (a) our allowance for loan losses on mortgage loans held for investment; and (b) our reserve for guarantee losses associated with non-consolidated single-family mortgage securitization trusts and other guarantee commitments.

(4) Represents the number of modification agreements with borrowers completed during the quarter. Excludes forbearance agreements, repayment plans, and loans in modification trial periods.

(5) Represents the ratio of the number of loans that entered the foreclosure process during the respective quarter divided by the number of loans in the single-family credit guarantee portfolio at the end of the quarter. Excludes Other Guarantee Transactions and mortgages covered under other guarantee commitments.

(6) States presented represent the five states where our credit losses were greatest during 2011 and the first quarter of 2012. Calculated as the amount of our losses recorded on disposition of REO properties during the respective quarterly period, excluding those subject to repurchase requests made to our seller/servicers, divided by the aggregate UPB of the related loans. The amount of losses recognized on disposition of the properties is equal to the amount by which the UPB of the loans exceeds the amount of sales proceeds from disposition of the properties. Excludes sales commissions and other expenses, such as property maintenance and costs, as well as applicable recoveries from credit enhancements, such as mortgage insurance.

In discussing our credit performance, we often use the terms "credit losses" and "credit-related expenses." These terms are significantly different. Our "credit losses" consist of charge-offs and REO operations income (expense), while our "credit-related expenses" consist of our provision for credit losses and REO operations income (expense).

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $75.0 billion, and have recorded an additional $4.2 billion in losses on loans

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3542                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

purchased from PC trusts, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred and, thus, have not yet been provisioned for, we believe that, as of March 31, 2012, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations.

Borrower payment performance (for all early stages of delinquency) improved at March 31, 2012, compared to December 31, 2011. In addition, the number of seriously delinquent loan additions declined during the first quarter of 2012. However, several factors, including delays in the foreclosure process, have resulted in loans remaining in serious delinquency for longer periods than prior to 2008, particularly in states that require a judicial foreclosure process. As of March 31, 2012 and December 31, 2011, the percentage of seriously delinquent loans that have been delinquent for more than six months was 73% and 70%, respectively.

The credit losses and loan loss reserves associated with our single-family credit guarantee portfolio remained elevated in the first quarter of 2012, due in part to:

- Losses associated with the continued high volume of foreclosures and foreclosure alternatives. These actions relate to the continued efforts of our servicers to resolve our large inventory of seriously delinquent loans. Due to the length of time necessary for servicers either to complete the foreclosure process or pursue foreclosure alternatives on seriously delinquent loans in our portfolio, we expect our credit losses will continue to remain high even if the volume of new serious delinquencies continues to decline.

- Continued negative impact of certain loan groups within the single-family credit guarantee portfolio, such as those underwritten with certain lower documentation standards and interest-only loans, as well as 2005 through 2008 vintage loans. These groups continue to be large contributors to our credit losses. Loans originated in 2005 through 2008 comprised approximately 30% and 36% of our single-family credit guarantee portfolio, based on UPB at March 31, 2012 and 2011, respectively; however, these loans accounted for approximately 88% and 91% of our credit losses during the three months ended March 31, 2012 and 2011, respectively.

- Cumulative decline in national home prices of 28% since June 2006, based on our own index. As a result of this price decline, approximately 20% of loans in our single-family credit guarantee portfolio, based on UPB, had estimated current LTV ratios in excess of 100% (*i.e.*, underwater loans) as of March 31, 2012.

- Weak financial condition of many of our mortgage insurers, which has reduced our estimates of expected recoveries from these counterparties.

Some of our loss mitigation activities create fluctuations in our delinquency statistics. For example, loans that we report as seriously delinquent before they enter a modification trial period continue to be reported as seriously delinquent until the modifications become effective and the loans are removed from delinquent status by our servicers. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Credit Performance — Delinquencies*" for further information about factors affecting our reported delinquency rates.

## Conservatorship and Government Support for our Business

We have been operating under conservatorship, with FHFA acting as our conservator, since September 6, 2008. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition, and results of operations.

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

While the conservatorship has benefited us, we are subject to certain constraints on our business activities imposed by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement and by FHFA, as our Conservator.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The $200 billion cap on Treasury's funding commitment will increase as necessary to eliminate any net worth deficits we may have during 2010, 2011, and 2012. We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

We received cash proceeds of $146 million from our draw under Treasury's funding commitment during the first quarter of 2012 related to a quarterly deficit in equity at December 31, 2011. To address our net worth deficit of

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

$18 million at March 31, 2012, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $19 million. FHFA will request that we receive these funds by June 30, 2012. Upon funding of the draw request: (a) our aggregate liquidation preference on the senior preferred stock owned by Treasury will be $72.3 billion; and (b) the corresponding annual cash dividend owed to Treasury will be $7.23 billion.

We pay cash dividends to Treasury at an annual rate of 10%. Through March 31, 2012, we paid aggregate cash dividends to Treasury of $18.3 billion, an amount equal to 26% of our aggregate draws received under the Purchase Agreement. As of March 31, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock exceeded our annual historical earnings in all but one period. As a result, we expect to make additional draws in future periods, even if our operating performance generates net income or comprehensive income.

Neither the U.S. government nor any other agency or instrumentality of the U.S. government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities or other obligations.

For more information on conservatorship and the Purchase Agreement, see "BUSINESS — Conservatorship and Related Matters" in our 2011 Annual Report.

## Consolidated Financial Results

Net income was $577 million and $676 million for the first quarters of 2012 and 2011, respectively. Key highlights of our financial results include:

- Net interest income was $4.5 billion for both the first quarters of 2012 and 2011, reflecting the impact of a reduction in the average balances of our higher-yielding mortgage-related assets offset by lower funding costs in the first quarter of 2012 compared to the first quarter of 2011.

- Provision for credit losses for the first quarter of 2012 declined to $1.8 billion, compared to $2.0 billion for the first quarter of 2011. The provision for credit losses for the first quarter of 2012 reflects stabilizing expected loss severity on single-family loans and a decline in the number of seriously delinquent loan additions.

- Non-interest income (loss) was $(1.5) billion for the first quarter of 2012, compared to $(1.3) billion for the first quarter of 2011, largely driven by an increase in derivative losses, partially offset by a decline in net impairments of available-for-sale securities recognized in earnings during the first quarter of 2012 compared to the first quarter of 2011.

- Non-interest expense declined to $596 million in the first quarter of 2012, from $697 million in the first quarter of 2011, primarily due to a reduction in REO operations expense.

- Comprehensive income was $1.8 billion for the first quarter of 2012 compared to $2.7 billion for the first quarter of 2011. Comprehensive income for the first quarter of 2012 was driven by the $577 million net income and a reduction in net unrealized losses related to our available-for-sale securities.

## Mortgage Market and Economic Conditions

### Overview

The U.S. real gross domestic product rose by 2.2% on an annualized basis during the first quarter of 2012, compared to 1.6% during 2011, according to the Bureau of Economic Analysis. The national unemployment rate was 8.2% in March 2012, compared to 8.5% in December 2011, based on data from the U.S. Bureau of Labor Statistics. In the data underlying the unemployment rate, an average of over 210,000 monthly net new jobs were added to the economy during the first quarter of 2012, which shows evidence of a slow, but steady positive trend for the economy and the labor market.

### Single-Family Housing Market

The single-family housing market continued to experience challenges in the first quarter of 2012 primarily due to continued weakness in the employment market and a significant inventory of seriously delinquent loans and REO properties in the market.

Based on data from the National Association of Realtors, sales of existing homes in the first quarter of 2012 averaged 4.57 million (at a seasonally adjusted annual rate), increasing from 4.37 million in the fourth quarter of 2011. Based on data from the U.S. Census Bureau and HUD, new home sales in the first quarter of 2012 averaged 337,000 (at a seasonally adjusted annual rate) increasing approximately 4% from approximately 325,000 in the fourth quarter of 2011. We estimate that home prices remained relatively stable during the first quarter of 2012, with our nationwide index registering approximately a 0.3% decline from December 2011 through March 2012 without adjustment for seasonality. This estimate was based on our own price index of mortgage loans on one-family homes funded by us or Fannie Mae.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-3544

Table of Contents

Other indices of home prices may have different results, as they are determined using different pools of mortgage loans and calculated under different conventions than our own.

The foreclosure process continues to experience delays, due to a number of factors, but particularly in states that require a judicial foreclosure process. Delays in the foreclosure process (and in certain cases the removal of such delays) may also adversely affect trends in home prices in certain geographic areas. There have been a number of regulatory developments in recent periods impacting single-family mortgage servicing and foreclosure practices. It is possible that these developments will result in significant changes to mortgage servicing and foreclosure practices that could adversely affect our business. For information on these matters, see "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report and "LEGISLATIVE AND REGULATORY MATTERS —Developments Concerning Single-Family Servicing Practices."

### *Multifamily Housing Market*

Multifamily market fundamentals continued to improve on a national level during the first quarter of 2012. This improvement continues a trend of favorable movements in key indicators such as vacancy rates and effective rents that generally began in early 2010. Vacancy rates and effective rents are important to loan performance because multifamily loans are generally repaid from the cash flows generated by the underlying property and these factors significantly influence those cash flows. These improving fundamentals and perceived optimism in recent periods about demand for multifamily housing have contributed to improvement in property values in most markets.

### Mortgage Market and Business Outlook

Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties. For example, a number of factors could cause the actual performance of the housing and mortgage markets and the U.S. economy during the remainder of 2012 to be significantly worse than we expect, including adverse changes in consumer confidence, national or international economic conditions and changes in the federal government's fiscal policies. See "FORWARD-LOOKING STATEMENTS" for additional information.

### *Overview*

We continue to expect key macroeconomic drivers of the economy — such as income growth, employment, and inflation — will affect the performance of the housing and mortgage markets in the remainder of 2012. Since we expect that economic and job growth will likely be stronger in 2012 than in 2011, we believe that housing affordability will remain relatively high in 2012 for potential home buyers. We also expect that the volume of home sales will likely increase in 2012, compared to the volume in 2011, but still remain relatively weak compared to historical levels. Important factors that we believe will continue to negatively impact single-family housing demand are the relatively high unemployment rate and relatively low consumer confidence measures. Consumer confidence measures, while up from recession lows, remain below long-term averages and suggest that households will likely continue to be cautious in home buying. We also expect interest rates on fixed-rate single-family mortgages to remain historically low in 2012, which may extend the recent high level of refinancing activity (relative to new purchase lending activity). The recently expanded and streamlined HARP initiative may result in a high level of refinancing, particularly for borrowers that are underwater on their current loans. For information on this initiative, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program.*"

While home prices remain at significantly lower levels from their peak in most areas, estimates of the inventory of unsold homes, including those held by financial institutions and financially distressed borrowers, remain high. To the extent a large volume of loans complete the foreclosure process in a short time period the resulting REO inventory could have a negative impact on the housing market. Due to these and other factors, our expectation for home prices, based on our own index, is that national average home prices will continue to remain weak and may decline on a seasonally adjusted basis over the near term before a long-term recovery in housing begins.

### *Single-Family*

Our provision for credit losses and charge-offs were elevated during the first quarter of 2012, and we expect they will likely remain elevated during the remainder of 2012. This is in part due to the substantial number of underwater mortgage

9

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

loans in our single-family credit guarantee portfolio, as well as the substantial inventory of seriously delinquent loans. For the near term, we also expect:

- REO disposition severity ratios to remain near their historical highs, as market conditions, such as home prices and the rate of home sales continue to remain weak;

- non-performing assets, which include loans, deemed TDRs, to continue to remain high;

- the volume of loan workouts to remain high; and

- continued high volume of loans in the foreclosure process as well as prolonged foreclosure timelines.

### Multifamily

The most recent market data available continues to reflect improving national apartment fundamentals, including decreasing vacancy rates and increasing effective rents. As a result, we expect our multifamily delinquency rate to remain relatively low during the remainder of 2012.

Our purchase and guarantee of multifamily loans increased to $5.8 billion for the first quarter of 2012, compared to $3.0 billion during the same period in 2011, as strong volumes from late in 2011 carried into the first quarter of 2012. However, we anticipate the growth in our purchase and guarantee volumes will slow for the remainder of the year, ultimately reflecting a more modest increase in 2012, compared to 2011.

### Long-Term Financial Sustainability

There is significant uncertainty as to our long-term financial sustainability. The Acting Director of FHFA stated on September 19, 2011 that "it ought to be clear to everyone at this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship."

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term.

There continues to be significant uncertainty in the current mortgage market environment, and continued high levels of unemployment, weakness in home prices, and adverse changes in interest rates, mortgage security prices, and spreads could lead to additional draws. For discussion of other factors that could result in additional draws, see "RISK FACTORS — Conservatorship and Related Matters — *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition*" in our 2011 Annual Report.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations. For a discussion of FHFA's strategic plan for us, see "LEGISLATIVE AND REGULATORY MATTERS —FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard."

### Limits on Investment Activity and Our Mortgage-Related Investments Portfolio

The conservatorship has significantly impacted our investment activity. Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 31, 2012. FHFA has indicated that such portfolio reduction targets should be viewed as minimum reductions and has encouraged us to reduce the mortgage-related investments portfolio at a faster rate than required, consistent with FHFA guidance, safety and soundness and the goal of conserving and preserving assets. We are also subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. We are working with FHFA to identify ways to prudently accelerate the rate of contraction of the portfolio.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents the UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation.

**Table 4 — Mortgage-Related Investments Portfolio**[1]

| | March 31, 2012 | | December 31, 2011 |
|---|---|---|---|
| | | (in millions) | |
| Investments segment — Mortgage investments portfolio | $ 417,015 | $ | 449,273 |
| Single-family Guarantee segment — Single-family unsecuritized mortgage loans[2] | 61,903 | | 62,469 |
| Multifamily segment — Mortgage investments portfolio | 139,380 | | 141,571 |
| Total mortgage-related investments portfolio | $ 618,298 | $ | 653,313 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Represents unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment.

FHFA has stated that we will not be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio. FHFA also stated that, given the size of our current mortgage-related investments portfolio and the potential volume of delinquent mortgages to be removed from PC pools, it expects that any net additions to our mortgage-related investments portfolio would be related to that activity. We expect that our holdings of unsecuritized single-family loans could increase in the remainder of 2012.

We consider the liquidity of our assets in our mortgage-related investments portfolio based on three categories: (a) agency securities; (b) assets that are less liquid than agency securities; and (c) illiquid assets. Assets that are less liquid than agency securities include unsecuritized performing single-family mortgage loans, multifamily mortgage loans, CMBS, and housing revenue bonds. Our less liquid assets collectively represented approximately 33% of the UPB of the portfolio at March 31, 2012, as compared to 32% as of December 31, 2011. Illiquid assets include unsecuritized seriously delinquent and modified single-family mortgage loans which we removed from PC trusts, and our investments in non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans. Our illiquid assets collectively represented approximately 30% of the UPB of the portfolio at March 31, 2012, as compared to 29% as of December 31, 2011. The changing composition of our mortgage-related investments portfolio to a greater proportion of illiquid assets may influence our decisions regarding funding and hedging. The description above of the liquidity of our assets is based on our own internal expectations given current market conditions. Changes in market conditions could adversely affect the liquidity of our assets at any given time.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3547

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## SELECTED FINANCIAL DATA[1]

The selected financial data presented below should be reviewed in conjunction with MD&A and our consolidated financial statements and related notes for the three months ended March 31, 2012.

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (dollars in millions, except share-related amounts) | |
| **Statements of Comprehensive Income Data** | | |
| Net interest income | $    4,500 | $    4,540 |
| Provision for credit losses | (1,825) | (1,989) |
| Non-interest income (loss) | (1,516) | (1,252) |
| Non-interest expense | (596) | (697) |
| Net income | 577 | 676 |
| Comprehensive income | 1,789 | 2,740 |
| Net loss attributable to common stockholders | (1,227) | (929) |
| Net loss per common share: | | |
| Basic | (0.38) | (0.29) |
| Diluted | (0.38) | (0.29) |
| Cash dividends per common share | — | — |
| Weighted average common shares outstanding (in thousands):[2] | | |
| Basic | 3,241,502 | 3,246,985 |
| Diluted | 3,241,502 | 3,246,985 |

| | March 31, 2012 | December 31, 2011 |
| --- | --- | --- |
| | (dollars in millions) | |
| **Balance Sheets Data** | | |
| Mortgage loans held-for-investment, at amortized cost by consolidated trusts (net of allowances for loan losses) | $ 1,555,067 | $ 1,564,131 |
| Total assets | 2,114,944 | 2,147,216 |
| Debt securities of consolidated trusts held by third parties | 1,481,622 | 1,471,437 |
| Other debt | 618,629 | 660,546 |
| All other liabilities | 14,711 | 15,379 |
| Total Freddie Mac stockholders' equity (deficit) | (18) | (146) |
| **Portfolio Balances**[3] | | |
| Mortgage-related investments portfolio | $ 618,298 | $ 653,313 |
| Total Freddie Mac mortgage-related securities[4] | 1,617,595 | 1,624,684 |
| Total mortgage portfolio[5] | 2,056,501 | 2,075,394 |
| Non-performing assets[6] | 127,951 | 129,152 |

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| **Ratios**[7] | | |
| Return on average assets[8] | 0.1% | 0.1% |
| Non-performing assets ratio[9] | 6.8 | 6.4 |
| Equity to assets ratio[10] | — | — |

(1) See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for information regarding our accounting policies and the impact of new accounting policies on our consolidated financial statements.

(2) Includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included in basic loss per share, because it is unconditionally exercisable by the holder at a cost of $0.00001 per share.

(3) Represents the UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(4) See "Table 27 — Freddie Mac Mortgage-Related Securities" for the composition of this line item.

(5) See "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios" for the composition of our total mortgage portfolio.

(6) See "Table 45 — Non-Performing Assets" for a description of our non-performing assets.

(7) The dividend payout ratio on common stock is not presented because we are reporting a net loss attributable to common stockholders for all periods presented.

(8) Ratio computed as net income divided by the simple average of the beginning and ending balances of total assets.

(9) Ratio computed as non-performing assets divided by the ending UPB of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities.

(10) Ratio computed as the simple average of the beginning and ending balances of total Freddie Mac stockholders' equity (deficit) divided by the simple average of the beginning and ending balances of total assets.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3548

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported results of operations.

### Impact of Legislated Increase to Guarantee Fees

Effective April 1, 2012, the guarantee fee on all single-family residential mortgages sold to Freddie Mac was increased by 10 basis points. Guarantee fees related to mortgage loans held by our consolidated trusts, including those attributable to the 10 basis point increase, will continue to be reported within our GAAP consolidated statements of comprehensive income in net interest income and the remittance of the additional fees to Treasury will be reported in non-interest expense. For additional information, see "LEGISLATIVE AND REGULATORY MATTERS — Legislated Increase to Guarantee Fees."

### Table 5 — Summary Consolidated Statements of Comprehensive Income

| | Three Months Ended March 31, | |
| --- | ---: | ---: |
| | 2012 | 2011 |
| | (in millions) | |
| Net interest income | $ 4,500 | $ 4,540 |
| Provision for credit losses | (1,825) | (1,989) |
| Net interest income after provision for credit losses | 2,675 | 2,551 |
| Non-interest income (loss): | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (4) | 223 |
| Gains (losses) on retirement of other debt | (21) | 12 |
| Gains (losses) on debt recorded at fair value | (17) | (81) |
| Derivative gains (losses) | (1,056) | (427) |
| Impairment of available-for-sale securities: | | |
| Total other-than-temporary impairment of available-for-sale securities | (475) | (1,054) |
| Portion of other-than-temporary impairment recognized in AOCI | (89) | (139) |
| Net impairment of available-for-sale securities recognized in earnings | (564) | (1,193) |
| Other gains (losses) on investment securities recognized in earnings | (288) | (120) |
| Other income | 434 | 334 |
| Total non-interest income (loss) | (1,516) | (1,252) |
| Non-interest expense: | | |
| Administrative expenses | (337) | (361) |
| REO operations expense | (171) | (257) |
| Other expenses | (88) | (79) |
| Total non-interest expense | (596) | (697) |
| Income before income tax benefit | 563 | 602 |
| Income tax benefit | 14 | 74 |
| Net income | 577 | 676 |
| Other comprehensive income, net of taxes and reclassification adjustments: | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | 1,147 | 1,941 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 111 | 132 |
| Changes in defined benefit plans | (46) | (9) |
| Total other comprehensive income, net of taxes and reclassification adjustments | 1,212 | 2,064 |
| Comprehensive income | $ 1,789 | $ 2,740 |

13                                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Net Interest Income**

The table below presents an analysis of net interest income, including average balances and related yields earned on assets and incurred on liabilities.

**Table 6 — Net Interest Income/Yield and Average Balance Analysis**

| | Three Months Ended March 31, | | | | | |
| | 2012 | | | 2011 | | |
| | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate |
| | (dollars in millions) | | | | | |
|---|---|---|---|---|---|---|
| Interest-earning assets: | | | | | | |
| Cash and cash equivalents | $ 51,029 | $ 4 | 0.03% | $ 37,561 | $ 16 | 0.17% |
| Federal funds sold and securities purchased under agreements to resell | 26,057 | 9 | 0.14 | 47,861 | 18 | 0.15 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities(3) | 383,227 | 4,363 | 4.55 | 456,972 | 5,316 | 4.65 |
| Extinguishment of PCs held by Freddie Mac | (125,363) | (1,441) | (4.60) | (167,528) | (2,063) | (4.93) |
| Total mortgage-related securities, net | 257,864 | 2,922 | 4.53 | 289,444 | 3,253 | 4.50 |
| Non-mortgage-related securities(3) | 28,464 | 16 | 0.23 | 29,309 | 30 | 0.41 |
| Mortgage loans held by consolidated trusts(4) | 1,559,823 | 17,468 | 4.48 | 1,650,567 | 20,064 | 4.86 |
| Unsecuritized mortgage loans(4) | 254,877 | 2,312 | 3.63 | 240,557 | 2,334 | 3.88 |
| Total interest-earning assets | $ 2,178,114 | $ 22,731 | 4.18 | $2,295,299 | $ 25,715 | 4.48 |
| Interest-bearing liabilities: | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 1,580,749 | $(16,694) | (4.22) | $ 1,665,608 | $ (19,466) | (4.67) |
| Extinguishment of PCs held by Freddie Mac | (125,363) | 1,441 | 4.60 | (167,528) | 2,063 | 4.93 |
| Total debt securities of consolidated trusts held by third parties | 1,455,386 | (15,253) | (4.19) | 1,498,080 | (17,403) | (4.65) |
| Other debt: | | | | | | |
| Short-term debt | 149,130 | (40) | (0.11) | 194,822 | (115) | (0.24) |
| Long-term debt(5) | 496,644 | (2,776) | (2.23) | 518,034 | (3,450) | (2.66) |
| Total other debt | 645,774 | (2,816) | (1.74) | 712,856 | (3,565) | (2.00) |
| Total interest-bearing liabilities | 2,101,160 | (18,069) | (3.44) | 2,210,936 | (20,968) | (3.79) |
| Expense related to derivatives(6) | — | (162) | (0.03) | — | (207) | (0.04) |
| Impact of net non-interest-bearing funding | 76,954 | — | 0.12 | 84,363 | — | 0.14 |
| Total funding of interest-earning assets | $ 2,178,114 | $(18,231) | (3.35) | $2,295,299 | $ (21,175) | (3.69) |
| Net interest income/yield | | $ 4,500 | 0.83 | | $ 4,540 | 0.79 |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) We calculate average balances based on amortized cost.
(3) Interest income (expense) includes accretion of the portion of impairment charges recognized in earnings where we expect a significant improvement in cash flows.
(4) Non-performing loans, where interest income is generally recognized when collected, are included in average balances.
(5) Includes current portion of long-term debt.
(6) Represents changes in fair value of derivatives in closed cash flow hedge relationships that were previously deferred in AOCI and have been reclassified to earnings when the associated hedged forecasted issuance of debt affects earnings.

Net interest income decreased by $40 million and net interest yield increased by 4 basis points during the three months ended March 31, 2012, compared to the three months ended March 31, 2011. The primary driver underlying the decrease in net interest income was the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations and limited purchase activity, partially offset by lower funding costs from the replacement of debt at lower rates. The increase in net interest yield was primarily due to the benefits of lower funding costs, partially offset by the negative impact of the reduction in the average balance of higher-yielding mortgage assets.

We do not recognize interest income on non-performing loans that have been placed on non-accrual status, except when cash payments are received. We refer to this interest income that we do not recognize as foregone interest income. Foregone interest income and reversals of previously recognized interest income, net of cash received, related to non-performing loans was $0.9 billion and $1.0 billion during the three months ended March 31, 2012 and 2011, respectively. This reduction was primarily due to the decreased volume of non-performing loans on non-accrual status.

During the three months ended March 31, 2012, spreads on our debt and our access to the debt markets remained favorable relative to historical levels. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          TREASURY-3550          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Provision for Credit Losses**

We maintain loan loss reserves at levels we believe are appropriate to absorb probable incurred losses on mortgage loans held-for-investment and loans underlying our financial guarantees. Our loan loss reserves are increased through the provision for credit losses and are reduced by net charge-offs.

Our provision for credit losses declined to $1.8 billion in the first quarter of 2012, compared to $2.0 billion in the first quarter of 2011. The provision for credit losses for the first quarter of 2012 reflects stabilizing expected loss severity on single-family loans and a decline in the number of seriously delinquent loan additions, while the first quarter of 2011 reflects worsening expected loss severity and higher modification volumes offset by a decline in the rate at which seriously delinquent loans ultimately transition to a loss event.

During the first quarter of 2012, our charge-offs, net of recoveries for single-family loans, exceeded the amount of our provision for credit losses. Our charge-offs in the first quarter of 2012 were less than they otherwise would have been because of the suppression of loan and collateral resolution activity due to delays in the foreclosure process. We believe the level of our charge-offs will continue to remain high and may increase in the remainder of 2012.

As of March 31, 2012 and December 31, 2011, the UPB of our single-family non-performing loans was $119.6 billion and $120.5 billion, respectively. These amounts include $46.1 billion and $44.4 billion, respectively, of single-family TDRs that are reperforming (*i.e.*, less than three months past due). TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, our loan loss reserves balance, and our non-performing assets.

The total number of seriously delinquent loans declined approximately 3% and 6% during the first quarters of 2012 and 2011, respectively. However, our serious delinquency rate remains high compared to historical levels due to the continued weakness in home prices, persistently high unemployment, extended foreclosure timelines, and continued challenges faced by servicers processing large volumes of problem loans. Our seller/servicers have an active role in our loan workout activities, including under the servicing alignment initiative and the MHA Program, and a decline in their performance could result in a failure to realize the anticipated benefits of our loss mitigation plans.

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $75.0 billion, and have recorded an additional $4.2 billion in losses on loans purchased from our PCs, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred, and thus have not been provisioned for, we believe that, as of March 31, 2012, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for certain quarterly credit statistics for our single-family credit guarantee portfolio.

Our provision for credit losses and amount of charge-offs in the future will be affected by a number of factors, including: (a) the actual level of mortgage defaults; (b) the impact of the MHA Program and other loss mitigation efforts, including any requirement to utilize principal forgiveness in our loan modification initiatives; (c) any government actions or programs that impact the ability of troubled borrowers to obtain modifications, including legislative changes to bankruptcy laws; (d) changes in property values; (e) regional economic conditions, including unemployment rates; (f) delays in the foreclosure process, including those related to the concerns about deficiencies in foreclosure documentation practices; (g) third-party mortgage insurance coverage and recoveries; and (h) the realized rate of seller/servicer repurchases. In addition, in April 2012, FHFA issued an advisory bulletin that could have an impact on our provision for credit losses in the future; however, we are still assessing the operational and accounting impacts of the bulletin. See "LEGISLATIVE AND REGULATORY DEVELOPMENTS— FHFA Advisory Bulletin" for additional information. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for information on mortgage insurers and seller/servicer repurchase obligations.

We recognized a benefit for credit losses associated with our multifamily mortgage portfolio of $19 million and $60 million for the first quarters of 2012 and 2011, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $525 million and $545 million as of March 31, 2012 and December 31, 2011, respectively. The decline in loan loss reserves for multifamily loans in the first quarter of 2012 was driven primarily by the increased seasoning of our portfolio and the lower level of estimated incurred credit losses based on our historical experience.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Non-Interest Income (Loss)**

### Gains (Losses) on Extinguishment of Debt Securities of Consolidated Trusts

When we purchase PCs that have been issued by consolidated PC trusts, we extinguish a pro rata portion of the outstanding debt securities of the related consolidated trusts. We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to extinguish the debt security differs from its carrying value. Gains (losses) on extinguishment of debt securities of consolidated trusts were $(4) million and $223 million for the three months ended March 31, 2012 and 2011, respectively. For the three months ended March 31, 2012 and 2011, we extinguished debt securities of consolidated trusts with a UPB of $692 million and $24.8 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount). The decrease in purchases of single-family PCs was primarily due to a lower volume of dollar roll transactions to support the market and pricing of our single-family PCs. See "Table 19 — Mortgage-Related Securities Purchase Activity" for additional information regarding purchases of mortgage-related securities, including those issued by consolidated PC trusts.

### Gains (Losses) on Retirement of Other Debt

Gains (losses) on retirement of other debt were $(21) million and $12 million during the three months ended March 31, 2012 and 2011, respectively. We recognized losses on debt retirements in the first quarter of 2012 primarily due to write-offs of unamortized deferred issuance costs. We recognized gains on debt retirements in the first quarter of 2011 primarily due to the repurchase of other debt securities at a discount. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Other Debt Securities — Other Debt Retirement Activities*."

### Gains (Losses) on Debt Recorded at Fair Value

Gains (losses) on debt recorded at fair value primarily relate to changes in the fair value of our foreign-currency denominated debt. During the first three months of 2012 and 2011, we recognized losses on debt recorded at fair value of $17 million and $81 million, respectively, primarily due to a combination of the U.S. dollar weakening relative to the Euro and changes in interest rates. We mitigate changes in the fair value of our foreign-currency denominated debt by using foreign currency swaps and foreign-currency denominated interest-rate swaps.

### Derivative Gains (Losses)

The table below presents derivative gains (losses) reported in our consolidated statements of comprehensive income. See "NOTE 10: DERIVATIVES — Table 10.2 — Gains and Losses on Derivatives" for information about gains and losses related to specific categories of derivatives. Changes in fair value and interest accruals on derivatives not in hedge accounting relationships are recorded as derivative gains (losses) in our consolidated statements of comprehensive income. At March 31, 2012 and December 31, 2011, we did not have any derivatives in hedge accounting relationships; however, there are amounts recorded in AOCI related to discontinued cash flow hedges. Amounts recorded in AOCI associated with these closed cash flow hedges are reclassified to earnings when the forecasted transactions affect earnings. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the forecasted transaction is reclassified into earnings immediately.

While derivatives are an important aspect of our strategy to manage interest-rate risk, they generally increase the volatility of reported net income because, while fair value changes in derivatives affect net income, fair value changes in several of the types of assets and liabilities being hedged do not affect net income. Beginning in the fourth quarter of 2011, we started issuing a higher percentage of long-term debt. This allows us to take advantage of attractive long-term rates while decreasing our reliance on interest-rate swaps.

### Table 7 — Derivative Gains (Losses)

| | Derivative Gains (Losses) | |
| | Three Months Ended March 31, | |
| | 2012 | 2011 |
| | (in millions) | |
| Interest-rate swaps | $ 1,208 | $ 1,723 |
| Option-based derivatives[1] | (1,077) | (807) |
| Other derivatives[2] | (111) | (94) |
| Accrual of periodic settlements[3] | (1,076) | (1,249) |
| Total | $ (1,056) | $ (427) |

(1) Primarily includes purchased call and put swaptions and purchased interest-rate caps and floors.
(2) Includes futures, foreign-currency swaps, commitments, swap guarantee derivatives, and credit derivatives.
(3) Includes imputed interest on zero-coupon swaps.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3552

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Gains (losses) on derivatives not accounted for in hedge accounting relationships are principally driven by changes in: (a) interest rates and implied volatility; and (b) the mix and volume of derivatives in our derivative portfolio.

During the three months ended March 31, 2012, we recognized losses on derivatives of $1.1 billion primarily due to losses related to the accrual of periodic settlements on interest-rate swaps as we were in a net pay-fixed swap position. We recognized fair value gains on our pay-fixed swaps of $3.8 billion, which were largely offset by: (a) fair value losses on our receive-fixed swaps of $2.6 billion; and (b) fair value losses on our option-based derivatives of $1.1 billion resulting from losses on our purchased call swaptions due to an increase in long-term interest rates. The fair value of derivatives during the three months ended March 31, 2012 reflects a decline in short-term interest rates and an increase in long-term interest rates compared to the three months ended March 31, 2011, when both short-term and long-term interest rates increased.

During the three months ended March 31, 2011, we recognized losses on derivatives of $0.4 billion primarily due to $1.2 billion of losses related to the accrual of periodic settlements on interest-rate swaps as we were in a net pay-fixed swap position, partially offset by the improvement in derivative fair values as interest rates increased. As a result, we recognized fair value gains of $4.0 billion on our pay-fixed swaps, partially offset by fair value losses on our receive-fixed swaps of $2.2 billion. We recognized fair value losses of $0.8 billion on our option-based derivatives, resulting from losses on our purchased call swaptions primarily due to the increase in interest rates.

### Investment Securities-Related Activities

#### Impairments of Available-For-Sale Securities

We recorded net impairments of available-for-sale securities recognized in earnings, which were related to non-agency mortgage-related securities, of $564 million and $1.2 billion during the three months ended March 31, 2012 and 2011, respectively. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" and "NOTE 7: INVESTMENTS IN SECURITIES" for information regarding the accounting principles for investments in debt and equity securities and the other-than-temporary impairments recorded during the three months ended March 31, 2012 and 2011.

#### Other Gains (Losses) on Investment Securities Recognized in Earnings

Other gains (losses) on investment securities recognized in earnings primarily consists of gains (losses) on trading securities. Trading securities mainly include Treasury securities, agency fixed-rate and variable-rate pass-through mortgage-related securities, and agency REMICs, including inverse floating-rate, interest-only and principal-only securities. We recognized $(377) million and $(200) million related to gains (losses) on trading securities during the three months ended March 31, 2012 and 2011, respectively.

Losses in both periods are primarily due to the movement of securities with unrealized gains towards maturity. The losses during the three months ended March 31, 2011 were partially offset by larger fair value gains, compared to the three months ended March 31, 2012, due to a tightening of OAS levels on agency securities.

### Other Income

The table below summarizes the significant components of other income.

### Table 8 — Other Income

| | Three Months Ended March 31, | |
| | 2012 | 2011 |
| | (in millions) | |
|---|---|---|
| Other income: | | |
| Gains (losses) on sale of mortgage loans | $ 40 | $ 95 |
| Gains (losses) on mortgage loans recorded at fair value | 139 | (33) |
| Recoveries on loans impaired upon purchase | 89 | 125 |
| Guarantee-related income, net[1] | 70 | 54 |
| All other | 96 | 93 |
| Total other income | $ 434 | $ 334 |

(1) Most of our guarantee-related income relates to securitized multifamily mortgage loans where we have not consolidated the securitization trusts on our consolidated balance sheets.

17                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Gains (Losses) on Sale of Mortgage Loans

In the first quarters of 2012 and 2011, we recognized $40 million and $95 million, respectively, of gains on sale of mortgage loans with associated UPB of $3.7 billion and $3.4 billion, respectively. All such amounts relate to our securitizations of multifamily loans which we had elected to carry at fair value while they were held on our consolidated balance sheet. We had lower gains on sale of mortgage loans in the first quarter of 2012, compared to the first quarter of 2011, as a significant portion of the improved fair value of the loans was instead recognized within gains (losses) on mortgage loans recorded at fair value during periods prior to the loans' securitization.

### Gains (Losses) on Mortgage Loans Recorded at Fair Value

In the first quarters of 2012 and 2011, we recognized $139 million and $(33) million, respectively, of gains (losses) on mortgage loans recorded at fair value. We held higher balances of multifamily loans on our consolidated balance sheets that were designated for subsequent securitization during the first quarter of 2012, compared to the first quarter of 2011 which, when combined with improving fair values on those loans, resulted in gains during the first quarter of 2012.

### Recoveries on Loans Impaired upon Purchase

Recoveries on loans impaired upon purchase represent the recapture into income of previously recognized losses associated with purchases of delinquent loans from our PCs in conjunction with our guarantee activities. Recoveries occur when a non-performing loan is repaid in full or when at the time of foreclosure the estimated fair value of the acquired property, less costs to sell, exceeds the carrying value of the loan. For impaired loans where the borrower has made required payments that return the loan to less than three months past due, the recovery amounts are instead recognized as interest income over time as periodic payments are received.

During the first quarters of 2012 and 2011, we recognized recoveries on loans impaired upon purchase of $89 million and $125 million, respectively. Our recoveries on loans impaired upon purchase declined in the first quarter of 2012, compared to the first quarter of 2011, due to a lower volume of foreclosure transfers and payoffs associated with loans impaired upon purchase.

### All Other

All other income consists primarily of transactional fees, fees assessed to our servicers, such as for technology use and late fees or other penalties, and other miscellaneous income.

**Non-Interest Expense**

The table below summarizes the components of non-interest expense.

**Table 9 — Non-Interest Expense**

| | Three Months Ended March 31, | |
| | 2012 | 2011 |
| | (in millions) | |
|---|---|---|
| Administrative expenses: | | |
| Salaries and employee benefits | $ 176 | $ 207 |
| Professional services | 71 | 56 |
| Occupancy expense | 14 | 15 |
| Other administrative expense | 76 | 83 |
| Total administrative expenses | 337 | 361 |
| REO operations expense | 171 | 257 |
| Other expenses | 88 | 79 |
| Total non-interest expense | $596 | $697 |

*Administrative Expenses*

Administrative expenses decreased during the three months ended March 31, 2012 compared to the three months ended March 31, 2011, largely due to a reduction in salaries and employee benefits expense. We currently expect that our general and administrative expenses for the full-year 2012 will be approximately equivalent to those we experienced in the full-year 2011, with lower salaries and employee benefits expense offset by increased professional services expense, in part due to: (a) the continually changing mortgage market; (b) an environment in which we are subject to increased regulatory oversight and mandates; and (c) strategic arrangements that we may enter into with outside firms to provide operational capability and staffing for key functions, if needed. We believe the initiatives we are pursuing under the 2012

TREASURY-3554

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

conservatorship scorecard and other FHFA-mandated initiatives may require additional resources and affect our level of administrative expenses going forward.

### REO Operations Expense

The table below presents the components of our REO operations expense, and REO inventory and disposition information.

**Table 10 — REO Operations Expense, REO Inventory, and REO Dispositions**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (dollars in millions) | |
| REO operations expense: | | |
| Single-family: | | |
| REO property expenses[1] | $ 378 | $ 308 |
| Disposition (gains) losses, net[2] | (78) | 126 |
| Change in holding period allowance, dispositions | (57) | (155) |
| Change in holding period allowance, inventory[3] | 1 | 151 |
| Recoveries[4] | (72) | (173) |
| Total single-family REO operations expense | 172 | 257 |
| Multifamily REO operations expense (income) | (1) | — |
| Total REO operations expense | $ 171 | $ 257 |
| REO inventory (in properties), at March 31: | | |
| Single-family | 59,307 | 65,159 |
| Multifamily | 16 | 15 |
| Total | 59,323 | 65,174 |
| REO property dispositions (in properties): | | |
| Single-family | 25,033 | 31,627 |
| Multifamily | 4 | 1 |
| Total | 25,037 | 31,628 |

(1) Consists of costs incurred to acquire, maintain or protect a property after it is acquired in a foreclosure transfer, such as legal fees, insurance, taxes, and cleaning and other maintenance charges.

(2) Represents the difference between the disposition proceeds, net of selling expenses, and the fair value of the property on the date of the foreclosure transfer.

(3) Represents the (increase) decrease in the estimated fair value of properties that were in inventory during the period.

(4) Includes recoveries from primary mortgage insurance, pool insurance and seller/servicer repurchases.

REO operations expense declined to $171 million in the first quarter of 2012, as compared to $257 million in the first quarter of 2011, primarily due to stabilizing home prices in certain geographical areas with significant REO activity, which resulted in gains on disposition of properties as well as lower write-downs of single-family REO inventory during the first quarter of 2012. However, we also experienced lower recoveries on REO properties during the first quarter of 2012, compared to the first quarter of 2011, primarily due to reduced recoveries from mortgage insurers, in part due to the continued weakness in the financial condition of our mortgage insurance counterparties, and a decline in reimbursements of losses from seller/servicers associated with repurchase requests.

Although our servicers have resumed the foreclosure process in most areas, we believe the volume of our single-family REO acquisitions during the first quarter of 2012 was less than it otherwise would have been due to delays in the foreclosure process, particularly in states that require a judicial foreclosure process. The lower acquisition rate, coupled with high disposition levels, led to a lower REO property inventory level at March 31, 2012, compared to March 31, 2011. We expect that the length of the foreclosure process will continue to remain above historical levels. See "RISK MANAGEMENT— Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

### Other Expenses

Other expenses were $88 million and $79 million in the first quarters of 2012 and 2011, respectively. Other expenses consist primarily of HAMP servicer incentive fees, costs related to terminations and transfers of mortgage servicing, and other miscellaneous expenses.

### Income Tax Benefit

For the three months ended March 31, 2012 and 2011, we reported an income tax benefit of $14 million and $74 million, respectively. See "NOTE 12: INCOME TAXES" for additional information.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3555

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## Comprehensive Income

Our comprehensive income was $1.8 billion and $2.7 billion for the three months ended March 31, 2012 and 2011, respectively, consisting of: (a) $577 million and $676 million of net income, respectively; and (b) $1.2 billion and $2.1 billion of total other comprehensive income, respectively, primarily due to a reduction in net unrealized losses related to our available-for-sale securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Total Equity (Deficit)" for additional information regarding total other comprehensive income.

## Segment Earnings

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. Certain activities that are not part of a reportable segment are included in the All Other category.

The Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans, which are funded by other debt issuances and hedged using derivatives. In our Investments segment, we also provide funding and hedging management services to the Single-family Guarantee and Multifamily segments. The Investments segment reflects changes in the fair value of the Multifamily segment assets that are associated with changes in interest rates. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses.

The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related securities in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses.

The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, our purchases of such multifamily mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008. The only CMBS that we have purchased since 2008 have been senior, mezzanine, and interest-only tranches related to certain of our securitization transactions, and these purchases have not been significant. Currently, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization. We guarantee the senior tranches of these securitizations in Other Guarantee Transactions. Our Multifamily segment also issues Other Structured Securities, but does not issue REMIC securities. Our Multifamily segment also enters into other guarantee commitments for multifamily HFA bonds and housing revenue bonds held by third parties. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less credit-related expenses, administrative expenses, and allocated funding costs. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated only with market factors other than changes in interest rates, such as liquidity and credit.

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. The financial performance of our Single-family Guarantee segment and Multifamily segment are measured based on each segment's contribution to GAAP net income (loss). Our Investments segment is measured on its contribution to GAAP comprehensive income (loss), which consists of the sum of its contribution to: (a) GAAP net income (loss); and (b) GAAP total other comprehensive income (loss), net of taxes. The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss). Likewise, the sum of comprehensive income (loss) for each segment and the All Other category equals GAAP comprehensive income (loss).

The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods. The All Other category also includes the deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In presenting Segment Earnings, we make significant reclassifications to certain financial statement line items in order to reflect a measure of net interest income on investments and a measure of management and guarantee income on guarantees that is in line with how we manage our business. We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments.

As a result of these reclassifications and allocations, Segment Earnings for our reportable segments differs significantly from, and should not be used as a substitute for, net income (loss) as determined in accordance with GAAP. Our definition of Segment Earnings may differ from similar measures used by other companies. However, we believe that Segment Earnings provides us with meaningful metrics to assess the financial performance of each segment and our company as a whole.

See "NOTE 14: SEGMENT REPORTING" in our 2011 Annual Report for further information regarding our segments, including the descriptions and activities of the segments and the reclassifications and allocations used to present Segment Earnings.

Beginning in 2012, under guidance from FHFA we began to curtail mortgage-related investments portfolio purchase and retention activities that are undertaken for the primary purpose of supporting the price performance of our PCs, which may result in a significant decline in the market share of our single-family guarantee business, lower comprehensive income, and a more rapid decline in the size of our total mortgage portfolio.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides information about our various segment mortgage portfolios at March 31, 2012 and December 31, 2011. For a discussion of each segment's portfolios, see "*Segment Earnings — Results*."

**Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios**[1]

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| | (in millions) | |
| **Segment mortgage portfolios:** | | |
| *Investments — Mortgage investments portfolio:* | | |
| Single-family unsecuritized mortgage loans[2] | $ 103,593 | $ 109,190 |
| Freddie Mac mortgage-related securities | 199,132 | 220,659 |
| Non-agency mortgage-related securities | 84,180 | 86,526 |
| Non-Freddie Mac agency securities | 30,110 | 32,898 |
| Total Investments — Mortgage investments portfolio | 417,015 | 449,273 |
| *Single-family Guarantee — Managed loan portfolio:*[3] | | |
| Single-family unsecuritized mortgage loans[4] | 61,903 | 62,469 |
| Single-family Freddie Mac mortgage-related securities held by us | 199,132 | 220,659 |
| Single-family Freddie Mac mortgage-related securities held by third parties | 1,390,328 | 1,378,881 |
| Single-family other guarantee commitments[5] | 12,498 | 11,120 |
| Total Single-family Guarantee — Managed loan portfolio | 1,663,861 | 1,673,129 |
| *Multifamily — Guarantee portfolio:* | | |
| Multifamily Freddie Mac mortgage-related securities held by us | 2,614 | 3,008 |
| Multifamily Freddie Mac mortgage related securities held by third parties | 25,521 | 22,136 |
| Multifamily other guarantee commitments[5] | 9,856 | 9,944 |
| Total Multifamily — Guarantee portfolio | 37,991 | 35,088 |
| *Multifamily — Mortgage investments portfolio* | | |
| Multifamily investment securities portfolio | 56,891 | 59,260 |
| Multifamily loan portfolio | 82,489 | 82,311 |
| Total Multifamily — Mortgage investments portfolio | 139,380 | 141,571 |
| Total Multifamily portfolio | 177,371 | 176,659 |
| Less: Freddie Mac single-family and certain multifamily securities[6] | (201,746) | (223,667) |
| Total mortgage portfolio | $ 2,056,501 | $ 2,075,394 |
| **Credit risk portfolios:**[7] | | |
| *Single-family credit guarantee portfolio:*[3] | | |
| Single-family mortgage loans, on-balance sheet | $ 1,714,182 | $ 1,733,215 |
| Non-consolidated Freddie Mac mortgage-related securities | 10,437 | 10,735 |
| Other guarantee commitments | 12,498 | 11,120 |
| Less: HFA-related guarantees[8] | (8,142) | (8,637) |
| Less: Freddie Mac mortgage-related securities backed by Ginnie Mae certificates[8] | (748) | (779) |
| Total single-family credit guarantee portfolio | $ 1,728,227 | $ 1,745,654 |
| *Multifamily mortgage portfolio:* | | |
| Multifamily mortgage loans, on-balance sheet | $ 82,489 | $ 82,311 |
| Non-consolidated Freddie Mac mortgage-related securities | 28,135 | 25,144 |
| Other guarantee commitments | 9,856 | 9,944 |
| Less: HFA-related guarantees[8] | (1,235) | (1,331) |
| Total multifamily mortgage portfolio | $ 119,245 | $ 116,068 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(2) Excludes unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment. However, the Single-family Guarantee segment continues to earn management and guarantee fees associated with unsecuritized single-family loans in the Investments segment's mortgage investments portfolio.

(3) The balances of the mortgage-related securities in the Single-family Guarantee managed loan portfolio are based on the UPB of the security, whereas the balances of our single-family credit guarantee portfolio presented in this report are based on the UPB of the mortgage loans underlying the related security. The differences in the loan and security balances result from the timing of remittances to security holders, which is typically 45 or 75 days after the mortgage payment cycle of fixed-rate and ARM PCs, respectively.

(4) Represents unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment.

(5) Represents the UPB of mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.

(6) Freddie Mac single-family mortgage-related securities held by us are included in both our Investments segment's mortgage investments portfolio and our Single-family Guarantee segment's managed loan portfolio, and Freddie Mac multifamily mortgage-related securities held by us are included in both the multifamily investment securities portfolio and the multifamily guarantee portfolio. Therefore, these amounts are deducted in order to reconcile to our total mortgage portfolio.

(7) Represents the UPB of loans for which we present characteristics, delinquency data, and certain other statistics in this report. See "GLOSSARY" for further description.

(8) We exclude HFA-related guarantees and our resecuritizations of Ginnie Mae certificates from our credit risk portfolios and most related statistics because these guarantees do not expose us to meaningful amounts of credit risk due to the credit enhancement provided on them by the U.S. government.

*Freddie Mac*

TREASURY-3558

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Segment Earnings — Results

#### Investments

The table below presents the Segment Earnings of our Investments segment.

**Table 12 — Segment Earnings and Key Metrics — Investments**[1]

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (dollars in millions) | |
| Segment Earnings: | | |
| Net interest income | $ 1,763 | $ 1,653 |
| Non-interest income (loss): | | |
| Net impairment of available-for-sale securities recognized in earnings | (496) | (1,029) |
| Derivative gains (losses) | 200 | 1,103 |
| Gains (losses) on trading securities | (398) | (234) |
| Gains (losses) on sale of mortgage loans | (14) | 12 |
| Gains (losses) on mortgage loans recorded at fair value | (38) | (83) |
| Other non-interest income | 513 | 541 |
| Total non-interest income (loss) | (233) | 310 |
| Non-interest expense: | | |
| Administrative expenses | (92) | (95) |
| Total non-interest expense | (92) | (95) |
| Segment adjustments[2] | 155 | 203 |
| Segment Earnings before income tax benefit | 1,593 | 2,071 |
| Income tax benefit | 35 | 66 |
| Segment Earnings, net of taxes | 1,628 | 2,137 |
| Total other comprehensive income, net of taxes | 335 | 1,126 |
| Comprehensive income | $ 1,963 | $ 3,263 |
| Key metrics: | | |
| Portfolio balances: | | |
| Average balances of interest-earning assets:[3][4] | | |
| Mortgage-related securities[5] | $ 330,593 | $ 399,113 |
| Non-mortgage-related investments[6] | 105,539 | 114,732 |
| Unsecuritized single-family loans[7] | 109,306 | 85,515 |
| Total average balances of interest-earning assets | $545,438 | $599,360 |
| Return: | | |
| Net interest yield — Segment Earnings basis (annualized) | 1.29% | 1.10% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13: SEGMENT REPORTING — Table 13.2 — Segment Earnings and Reconciliation to GAAP Results."

(2) For a description of our segment adjustments, see "NOTE 14: SEGMENT REPORTING — Segment Earnings" in our 2011 Annual Report.

(3) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(4) We calculate average balances based on amortized cost.

(5) Includes our investments in single-family PCs and certain Other Guarantee Transactions, which have been consolidated under GAAP on our consolidated balance sheet since January 1, 2010.

(6) Includes the average balances of interest-earning cash and cash equivalents, non-mortgage-related securities, and federal funds sold and securities purchased under agreements to resell.

(7) Excludes unsecuritized seriously delinquent single-family mortgage loans.

Segment Earnings for our Investments segment decreased by $509 million to $1.6 billion during the three months ended March 31, 2012, compared to $2.1 billion during the three months ended March 31, 2011, primarily due to decreased derivative gains, partially offset by a decrease in net impairments of available-for-sale securities recognized in earnings. Comprehensive income for our Investments segment decreased by $1.3 billion to $2.0 billion during the three months ended March 31, 2012, compared to $3.3 billion during the three months ended March 31, 2011, primarily due to a smaller improvement in the fair value of available-for-sale securities.

During the three months ended March 31, 2012, the UPB of the Investments segment mortgage investments portfolio decreased at an annualized rate of 28.7%. We held $229.2 billion of agency securities and $84.2 billion of non-agency mortgage-related securities as of March 31, 2012, compared to $253.6 billion of agency securities and $86.5 billion of non-agency mortgage-related securities as of December 31, 2011. The decline in UPB of agency securities is due mainly to liquidations, including prepayments and selected sales. The decline in UPB of non-agency mortgage-related securities is due mainly to the receipt of monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral, representing a partial return of our investments in these securities. Since the beginning of 2007, we have incurred actual principal cash shortfalls of $1.8 billion on impaired non-agency mortgage-related securities in the Investments segment. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for additional information regarding our mortgage-related securities.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                    TREASURY-3559                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Segment Earnings net interest income and net interest yield increased by $110 million and 19 basis points, respectively, during the three months ended March 31, 2012, compared to the three months ended March 31, 2011. The primary driver was lower funding costs, primarily due to the replacement of debt at lower rates. These lower funding costs were partially offset by the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations and limited purchase activity.

Segment Earnings non-interest income (loss) was $(233) million during the three months ended March 31, 2012, compared to $310 million during the three months ended March 31, 2011. This change was mainly due to decreased derivative gains, partially offset by a decrease in net impairments of available-for-sale securities recognized in earnings.

Impairments recorded in our Investments segment were $496 million during the three months ended March 31, 2012, compared to $1.0 billion during the three months ended March 31, 2011. Impairments recorded in both periods were primarily due to our expectation of slower prepayments, which resulted in higher credit losses, on our non-agency mortgage-related securities. Increasing interest rates also contributed to the impairments recorded during the three months ended March 31, 2011, while lower interest rates during the three months ended March 31, 2012 resulted in a slight benefit from expected structural credit enhancements on the available-for-sale securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" for additional information on our impairments.

We recorded losses on trading securities of $398 million during the three months ended March 31, 2012, compared to $234 million during the three months ended March 31, 2011. Losses in both periods were primarily due to the movement of securities with unrealized gains towards maturity. The losses during the three months ended March 31, 2011 were partially offset by larger fair value gains compared to the three months ended March 31, 2012, due to a tightening of OAS levels on agency securities.

We recorded derivative gains for this segment of $200 million during the three months ended March 31, 2012, compared to $1.1 billion during the three months ended March 31, 2011. While derivatives are an important aspect of our strategy to manage interest-rate risk, they generally increase the volatility of reported Segment Earnings, because while fair value changes in derivatives affect Segment Earnings, fair value changes in several of the types of assets and liabilities being hedged do not affect Segment Earnings. During both the three months ended March 31, 2012 and 2011, swap interest rate changes resulted in fair value gains on our pay-fixed swaps, largely offset by: (a) fair value losses on our receive-fixed swaps; and (b) fair value losses on our option-based derivatives resulting from losses on our purchased call swaptions, due to an increase in long-term interest rates. The fair value of derivatives during the three months ended March 31, 2012 reflects a decline in short-term interest rates and an increase in longer-term interest rates compared to the three months ended March 31, 2011, when both short-term and longer-term interest rates increased. See "Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for additional information on our derivatives.

Our Investments segment's total other comprehensive income was $335 million during the three months ended March 31, 2012, compared to $1.1 billion during the three months ended March 31, 2011. Net unrealized losses in AOCI on our available-for-sale securities decreased by $242 million during the three months ended March 31, 2012, primarily due to the impact of fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities, partially offset by fair value losses related to the movement of agency securities with unrealized gains towards maturity. Net unrealized losses in AOCI on our available-for-sale securities decreased by $1.0 billion during the three months ended March 31, 2011, primarily attributable to the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities. The changes in fair value of CMBS, excluding impacts from the changes in interest rates, are reflected in the Multifamily segment.

For a discussion of items that may impact our Investments segment net interest income over time, see "EXECUTIVE SUMMARY — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio."

24

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Single-Family Guarantee*

The table below presents the Segment Earnings of our Single-family Guarantee segment.

**Table 13 — Segment Earnings and Key Metrics — Single-Family Guarantee[1]**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (dollars in millions) | |
| Segment Earnings: | | |
| Net interest income (expense) | $    (32) | $    100 |
| Provision for credit losses | (2,184) | (2,284) |
| Non-interest income: | | |
| Management and guarantee income | 1,011 | 870 |
| Other non-interest income | 181 | 211 |
| Total non-interest income | 1,192 | 1,081 |
| Non-interest expense: | | |
| Administrative expenses | (193) | (215) |
| REO operations expense | (172) | (257) |
| Other non-interest expense | (73) | (66) |
| Total non-interest expense | (438) | (538) |
| Segment adjustments[2] | (196) | (185) |
| Segment Earnings (loss) before income tax (expense) benefit | (1,658) | (1,826) |
| Income tax (expense) benefit | (17) | 6 |
| Segment Earnings (loss), net of taxes | (1,675) | (1,820) |
| Total other comprehensive income (loss), net of taxes | (23) | (4) |
| Comprehensive income (loss) | $(1,698) | $(1,824) |
| Key metrics: | | |
| *Balances and Volume (in billions, except rate):* | | |
| Average balance of single-family credit guarantee portfolio and HFA guarantees | $  1,741 | $  1,819 |
| Issuance — Single-family credit guarantees[3] | $    111 | $    96 |
| Fixed-rate products — Percentage of purchases[4] | 95% | 94% |
| Liquidation rate — Single-family credit guarantees (annualized)[5] | 30% | 28% |
| *Management and Guarantee Fee Rate (in bps, annualized):* | | |
| Contractual management and guarantee fees | 14.3 | 13.6 |
| Amortization of delivery fees | 8.9 | 5.5 |
| Segment Earnings management and guarantee income | 23.2 | 19.1 |
| *Credit:* | | |
| Serious delinquency rate, at end of period | 3.51% | 3.63% |
| REO inventory, at end of period (number of properties) | 59,307 | 65,159 |
| Single-family credit losses, in bps (annualized)[6] | 78.6 | 71.0 |
| *Market:* | | |
| Single-family mortgage debt outstanding (total U.S. market, in billions)[7] | $ 10,291 | $ 10,453 |
| 30-year fixed mortgage rate[8] | 4.0% | 4.9% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13: SEGMENT REPORTING — Table 13.2 — Segment Earnings and Reconciliation to GAAP Results."

(2) For a description of our segment adjustments, see "NOTE 14: SEGMENT REPORTING — Segment Earnings" in our 2011 Annual Report.

(3) Based on UPB.

(4) Excludes Other Guarantee Transactions.

(5) Represents principal repayments relating to loans underlying Freddie Mac mortgage-related securities and other guarantee commitments, including those related to our removal of seriously delinquent and modified mortgage loans and balloon/reset mortgage loans out of PC pools.

(6) Calculated as the amount of single-family credit losses divided by the sum of the average carrying value of our single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees.

(7) Source: Federal Reserve Flow of Funds Accounts of the United States of America dated March 8, 2012. The outstanding amount for March 31, 2012 reflects the balance as of December 31, 2011.

(8) Based on Freddie Mac's Primary Mortgage Market Survey rate for the last week in the period, which represents the national average mortgage commitment rate to a qualified borrower exclusive of any fees and points required by the lender. This commitment rate applies only to financing on conforming mortgages with LTV ratios of 80%.

Segment Earnings (loss) for our Single-family Guarantee segment improved to $(1.7) billion in the first quarter of 2012 compared to $(1.8) billion in the first quarter of 2011, primarily due to an increase in management and guarantee income and a decline in Segment Earnings provision for credit losses.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3561

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides summary information about the composition of Segment Earnings (loss) for this segment for the three months ended March 31, 2012 and 2011.

**Table 14 — Segment Earnings Composition — Single-Family Guarantee Segment**

| | Three Months Ended March 31, 2012 | | | | | |
| | Segment Earnings Management and Guarantee Income(1) | | Credit Expenses(2) | | Net Amount(4) | |
| | Amount | Average Rate(3) | Amount | Average Rate(3) | | |
| | | | (dollars in millions, rates in bps) | | | |
| Year of origination:(5) | | | | | | |
| 2012 | $ 17 | 13.9 | $ (4) | 2.6 | $ 13 | |
| 2011 | 185 | 25.3 | (53) | 7.4 | 132 | |
| 2010 | 195 | 26.1 | (103) | 13.4 | 92 | |
| 2009 | 199 | 27.4 | (106) | 14.7 | 93 | |
| 2008 | 86 | 25.1 | (204) | 73.5 | (118) | |
| 2007 | 83 | 19.0 | (791) | 200.3 | (708) | |
| 2006 | 53 | 18.9 | (463) | 157.2 | (410) | |
| 2005 | 61 | 19.1 | (451) | 135.3 | (390) | |
| 2004 and prior | 132 | 20.4 | (181) | 25.4 | (49) | |
| Total | $ 1,011 | 23.2 | $(2,356) | 53.9 | $ (1,345) | |
| Administrative expenses | | | | | (193) | |
| Net interest income (expense) | | | | | (32) | |
| Other non-interest income and expenses, net | | | | | (105) | |
| Segment Earnings (loss), net of taxes | | | | | $ (1,675) | |

| | Three Months Ended March 31, 2011 | | | | | |
| | Segment Earnings Management and Guarantee Income(1) | | Credit Expenses(2) | | Net Amount(4) | |
| | Amount | Average Rate(3) | Amount | Average Rate(3) | | |
| | | | (dollars in millions, rates in bps) | | | |
| Year of origination:(5) | | | | | | |
| 2011 | $ 26 | 15.0 | $ (3) | 3.2 | $ 23 | |
| 2010 | 184 | 20.6 | (52) | 5.6 | 132 | |
| 2009 | 170 | 18.5 | (56) | 6.0 | 114 | |
| 2008 | 110 | 24.6 | (228) | 61.6 | (118) | |
| 2007 | 101 | 18.8 | (888) | 181.1 | (787) | |
| 2006 | 59 | 17.0 | (788) | 215.2 | (729) | |
| 2005 | 66 | 16.6 | (418) | 100.2 | (352) | |
| 2004 and prior | 154 | 18.4 | (108) | 11.7 | 46 | |
| Total | $ 870 | 19.1 | $(2,541) | 55.9 | $ (1,671) | |
| Administrative expenses | | | | | (215) | |
| Net interest income (expense) | | | | | 100 | |
| Other non-interest income and expenses, net | | | | | (34) | |
| Segment Earnings (loss), net of taxes | | | | | $ (1,820) | |

(1) Includes amortization of delivery fees of $388 million and $252 million for first quarters of 2012 and 2011, respectively.

(2) Consists of the aggregate of the Segment Earnings provision for credit losses and Segment Earnings REO operations expense. Historical rates of average credit expenses may not be representative of future results. In the first quarter of 2012, we enhanced our method of allocating credit expenses by loan origination year. Prior period amounts have been revised to conform to the current period presentation.

(3) Calculated as the annualized amount of Segment Earnings management and guarantee income or credit expenses, respectively, divided by the sum of the average carrying values of the single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees.

(4) Calculated as Segment Earnings management and guarantee income less credit expenses.

(5) Segment Earnings management and guarantee income is presented by year of guarantee origination, whereas credit expenses are presented based on year of loan origination.

As of March 31, 2012, loans originated after 2008 have, on a cumulative basis, provided management and guarantee fee income that has exceeded the credit-related and administrative expenses associated with these loans. We currently believe our management and guarantee fee rates for guarantee issuances after 2008, when coupled with the higher credit quality of the mortgages within these new guarantee issuances, will provide management and guarantee fee income, over the long term, that exceeds our expected credit-related and administrative expenses associated with the underlying loans. Nevertheless, various factors, such as continued high unemployment rates, further declines in home prices, or negative impacts of HARP loans originated in recent years (which may not perform as well as other refinance mortgages, due in part to the high LTV ratios of the loans), could require us to incur expenses on these loans beyond our current expectations.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012        TREASURY-3562        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Based on our historical experience, we expect that the performance of the loans in an individual origination year will vary over time. The aggregate UPB of the loans from an origination year will decline over time due to repayments, refinancing, and other liquidation events, resulting in declining management and guarantee fee income from the loans in that origination year in future periods. In addition, we expect that the credit-related expenses related to the remaining loans in the origination year will increase over time, as some borrowers experience financial difficulties and default on their loans. As a result, there will likely be periods when an origination year is not profitable, though it may remain profitable on a cumulative basis.

Our management and guarantee fee income associated with guarantee issuances in 2005 through 2008 has not been adequate to cover the credit and administrative expenses associated with such loans, primarily due to the high rate of defaults on the loans originated in those years coupled with a high volume of refinancing since 2008. High levels of refinancing and delinquency since 2008 have significantly reduced the balance of performing loans from those years that remain in our portfolio and consequently reduced management and guarantee income associated with loans originated in 2005 through 2008 (we do not recognize Segment Earnings management and guarantee income on non-accrual mortgage loans). We also believe that the management and guarantee fees associated with originations after 2008 will not be sufficient to offset the future expenses associated with our 2005 to 2008 guarantee issuances for the foreseeable future. Consequently, we expect to continue reporting net losses for the Single-family Guarantee segment throughout 2012.

Segment Earnings management and guarantee income increased in the first quarter of 2012, as compared to the first quarter of 2011, primarily due to an increase in amortization of delivery fees. This was driven by a higher volume of delivery fees and the lower interest rate environment during the first quarter of 2012, which increased refinance activity.

The UPB of the Single-family Guarantee managed loan portfolio was $1.7 trillion at both March 31, 2012 and December 31, 2011. The annualized liquidation rate on our securitized single-family credit guarantees was approximately 30% and 28% for the first quarters of 2012 and 2011, respectively, and remained high in the first quarter of 2012 due to significant refinancing activity. We expect the size of our Single-family Guarantee managed loan portfolio will continue to decline during 2012.

Refinance volumes were high during the first quarter of 2012 due to continued low interest rates, and represented 87% of our single-family mortgage purchase volume during the first quarter of 2012, compared to 85% of our single-family mortgage purchase volume during the first quarter of 2011, based on UPB. Relief refinance mortgages comprised approximately 31% and 36% of our total refinance volume during the first quarters of 2012 and 2011, respectively. Over time, relief refinance mortgages with LTV ratios above 80% (*i.e.*, HARP loans) may not perform as well as other refinance mortgages because the continued high LTV ratios of these loans increases the probability of default. Based on our historical experience, there is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80%. In addition, relief refinance mortgages may not be covered by mortgage insurance for the full excess of their UPB over 80%. Approximately 16% and 15% of our single-family purchase volume in the first quarters of 2012 and 2011, respectively, was relief refinance mortgages with LTV ratios above 80%. Relief refinance mortgages of all LTV ratios comprised approximately 13% and 11% of the UPB in our total single-family credit guarantee portfolio at March 31, 2012 and December 31, 2011, respectively.

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages. For more information about our relief refinance mortgage initiative, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program.*"

Similar to our purchases in 2009 through 2011, the credit quality of the single-family loans we acquired in the first quarter of 2012 (excluding relief refinance mortgages) is significantly better than that of loans we acquired from 2005 through 2008, as measured by original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. Mortgages originated after 2008, including relief refinance mortgages, represent more than half of the UPB of our single-family credit guarantee portfolio as of March 31, 2012, and their composition of that portfolio continues to grow.

Provision for credit losses for the Single-family Guarantee segment declined to $2.2 billion in the first quarter of 2012, compared to $2.3 billion in the first quarter of 2011. The provision for credit losses for the first quarter of 2012 reflects stabilizing expected loss severity and a decline in the number of seriously delinquent loan additions, while the first quarter of 2011 reflects worsening expected loss severity and higher modification volumes offset by a decline in the rate at which seriously delinquent loans ultimately transition to a loss event.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3563

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Single-family credit losses as a percentage of the average  balance of the single-family credit guarantee portfolio and  HFA-related guarantees were 79 basis points and 71 basis points for the first quarters of 2012 and 2011,  respectively. Charge-offs, net of recoveries, associated with single-family loans were $3.3 billion and $3.0 billion  in the first quarters of 2012 and 2011, respectively. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk"* for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, and our non-performing assets.

The serious delinquency rate on our single-family credit  guarantee portfolio was 3.51% and 3.58% as of March 31,  2012 and December 31, 2011, respectively, and declined during the first quarter of 2012 primarily due to a high volume  of foreclosure transfers and a slowdown in new serious delinquencies. Our serious delinquency rate remains high  compared to historical levels due to the continued weakness in  home prices, persistently high unemployment, extended  foreclosure timelines, and continued challenges faced by  servicers processing large volumes of problem loans. In addition, our serious delinquency rate was adversely impacted by  the decline in the size of our single-family credit guarantee portfolio in the first quarter of 2012 because this rate is  calculated on a smaller number of loans at the end of the period.

Segment Earnings REO operations expense was $172 million  and $257 million in the first quarters of 2012, and 2011,  respectively. The decrease in the first quarter of 2012,  compared to the first quarter of 2011, was primarily due to  stabilizing home prices in certain geographical areas with significant REO activity, which resulted in gains on disposition  of properties as well as lower write-downs of single-family REO inventory during the first quarter of 2012. However, we  experienced lower recoveries on REO properties during the first  quarter of 2012, compared to the first quarter of 2011, primarily due to reduced recoveries from mortgage insurers due,  in part to the continued weakness in the financial condition of our mortgage insurance counterparties, and a decline in  reimbursements of losses from seller/servicers associated with repurchase requests.

Our REO inventory (measured in number of properties) declined 2%  from December 31, 2011 to March 31, 2012 as the volume  of single-family REO dispositions exceeded the volume of  single-family REO acquisitions. We continued to experience high REO disposition severity ratios on sales of our REO inventory  during the first quarter of 2012. We believe our single-family REO acquisition volume and single-family credit losses in the  first quarter of 2012 have been less than they otherwise would  have been due to delays in the single-family foreclosure process, particularly in states that require a judicial  foreclosure process.

*Multifamily*

The table below presents the Segment Earnings of our Multifamily  segment.

28

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 15 — Segment Earnings and Key Metrics — Multifamily(1)**

| | Three Months Ended March 31, | |
| | 2012 | 2011 |
|---|---|---|
| | (dollars in millions) | |
| Segment Earnings: | | |
| Net interest income | $ 318 | $ 279 |
| (Provision) benefit for credit losses | 19 | 60 |
| Non-interest income (loss): | | |
| Management and guarantee income | 33 | 28 |
| Net impairment of available-for-sale securities recognized in earnings | (16) | (135) |
| Gains (losses) on sale of mortgage loans | 54 | 83 |
| Gains (losses) on mortgage loans recorded at fair value | 177 | 50 |
| Other non-interest income (loss) | 109 | 56 |
| Total non-interest income (loss) | 357 | 82 |
| Non-interest expense: | | |
| Administrative expenses | (52) | (51) |
| REO operations income (expense) | 1 | — |
| Other non-interest expense | (15) | (13) |
| Total non-interest expense | (66) | (64) |
| Segment Earnings before income tax benefit (expense) | 628 | 357 |
| Income tax benefit (expense) | (4) | 2 |
| Segment Earnings, net of taxes | 624 | 359 |
| Total other comprehensive income, net of taxes | 900 | 942 |
| Comprehensive income | $ 1,524 | $ 1,301 |
| Key metrics: | | |
| *Balances and Volume:* | | |
| Average balance of Multifamily loan portfolio | $ 83,130 | $85,779 |
| Average balance of Multifamily guarantee portfolio | $ 36,645 | $ 25,312 |
| Average balance of Multifamily investment securities portfolio | $58,028 | $62,842 |
| Multifamily new loan purchase and other guarantee commitment volume | $ 5,751 | $ 3,049 |
| Multifamily units financed from new volume activity | 86,431 | 52,641 |
| Multifamily Other Guarantee Transaction issuance | $ 3,139 | $ 2,906 |
| *Yield and Rate:* | | |
| Net interest yield — Segment Earnings basis (annualized) | 0.90% | 0.75% |
| Average Management and guarantee fee rate, in bps (annualized)(2) | 38.7 | 46.8 |
| *Credit:* | | |
| Delinquency rate: | | |
| Credit-enhanced loans, at period end | 0.39% | 0.75% |
| Non-credit-enhanced loans, at period end | 0.16% | 0.25% |
| Total delinquency rate, at period end(3) | 0.23% | 0.36% |
| Allowance for loan losses and reserve for guarantee losses, at period end | $ 525 | $ 747 |
| Allowance for loan losses and reserve for guarantee losses, in bps | 43.6 | 67.4 |
| Credit losses, in bps (annualized)(4) | — | 4.2 |
| REO inventory, at net carrying value | $ 121 | $ 115 |
| REO inventory, at period end (number of properties) | 16 | 15 |

(1) For reconciliations of Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13: SEGMENT REPORTING — Table 13.2 — Segment Earnings and Reconciliation to GAAP Results."

(2) Represents Multifamily Segment Earnings — management and guarantee income, excluding prepayment and certain other fees, divided by the sum of the average balance of the multifamily guarantee portfolio and the average balance of guarantees associated with the HFA initiative, excluding certain bonds under the NIBP.

(3) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Multifamily Mortgage Credit Risk*" for information on our reported multifamily delinquency rate.

(4) Calculated as the amount of multifamily credit losses divided by the sum of the average carrying value of our multifamily loan portfolio and the average balance of the multifamily guarantee portfolio, including multifamily HFA initiative guarantees.

Segment Earnings for our Multifamily segment increased to $624 million in the first quarter of 2012, compared to $359 million in the first quarter of 2011, primarily due to lower impairment associated with available-for-sale CMBS and higher gains on mortgage loans recorded at fair value in the first quarter of 2012. Our comprehensive income for our Multifamily segment was $1.5 billion in the first quarter of 2012, consisting of: (a) Segment Earnings of $0.6 billion; and (b) $0.9 billion of total other comprehensive income, which was mainly attributable to favorable changes in fair value of available-for-sale CMBS in the first quarter of 2012.

Our multifamily loan purchase and guarantee volume increased to $5.8 billion for first quarter of 2012, compared to $3.0 billion during the first quarter of 2011, as strong volumes from late in 2011 carried into the first quarter of 2012. However, we anticipate the growth in our purchase and guarantee volumes will slow for the remainder of the year, ultimately reflecting a more modest increase in 2012, compared to 2011. We completed Other Guarantee Transactions of $3.1 billion and $2.9 billion in UPB of multifamily loans in the first quarters of 2012 and 2011, respectively. The UPB of the total multifamily portfolio increased slightly to $177.4 billion at March 31, 2012 from $176.7 billion at December 31, 2011.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from this use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-3565

Table of Contents

Segment Earnings net interest income increased by $39 million, or 14%, to $318 million, in the first quarter of 2012 from $279 million in the first quarter of 2011, primarily due to the cumulative effect of new business volumes since 2008 which have higher yields relative to allocated funding costs. Net interest yield was 90 and 75 basis points in the first quarters of 2012 and 2011, respectively.

Segment Earnings non-interest income (loss) was $357 million and $82 million in the first quarters of 2012 and 2011, respectively. The increase in the first quarter of 2012 was primarily driven by lower security impairments on CMBS and increased gains recognized on mortgage loans recorded at fair value, reflecting favorable market spread movements and higher amounts of loans held for subsequent securitization. Segment Earnings gains (losses) on mortgage loans recorded at fair value are presented net of changes in fair value due to changes in interest rates.

While our Multifamily Segment Earnings management and guarantee income increased 18% in the first quarter of 2012 compared to the first quarter of 2011, the average management and guarantee fee rate on our guarantee portfolio declined to 39 basis points in the first quarter of 2012 from 47 basis points in the first quarter of 2011. The decline in our average management and guarantee fee rate in the first quarter of 2012 reflects the impact from our increased volume of Other Guarantee Transactions, which have lower credit risk associated with our guarantee (and thus we charge a lower rate) relative to other issued guarantees because these transactions contain significant levels of credit enhancement through subordination.

Multifamily credit losses as a percentage of the combined average balance of our multifamily loan and guarantee portfolios were 0 and 4 basis points in the first quarters of 2012 and 2011, respectively. Our Multifamily segment recognized a benefit for credit losses of $19 million and $60 million in the first quarters of 2012 and 2011, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $525 million and $545 million as of March 31, 2012 and December 31, 2011, respectively. The decline in our loan loss reserves in the first quarter of 2012 was primarily driven by the increased seasoning of our portfolio and the lower level of estimated incurred credit losses based on our historical experience.

The credit quality of the multifamily mortgage portfolio remains strong, as evidenced by low delinquency rates and credit losses, which we believe reflects prudent underwriting practices. The delinquency rate for loans in the multifamily mortgage portfolio was 0.23% and 0.22%, as of March 31, 2012 and December 31, 2011, respectively. As of March 31, 2012, approximately half of the multifamily loans that were two or more monthly payments past due, measured on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on those loans. We expect our multifamily delinquency rate to remain relatively low during the remainder of 2012. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Multifamily Mortgage Credit Risk*" for further information about our reported multifamily delinquency rates and credit enhancements on multifamily loans. For further information on delinquencies, including geographical and other concentrations, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

## CONSOLIDATED BALANCE SHEETS ANALYSIS

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also, see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported financial position.

### Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell

Cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and other liquid assets discussed in "Investments in Securities — *Non-Mortgage-Related Securities*," are important to our cash flow and asset and liability management, and our ability to provide liquidity and stability to the mortgage market. We use these assets to help manage recurring cash flows and meet our other cash management needs. We consider federal funds sold to be overnight unsecured trades executed with commercial banks that are members of the Federal Reserve System. Securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities.

The short-term assets on our consolidated balance sheets also include those related to our consolidated VIEs, which are comprised primarily of restricted cash and cash equivalents at March 31, 2012. These short-term assets, related to our consolidated VIEs, increased by $2.7 billion from December 31, 2011 to March 31, 2012, primarily due to an increase in the level of refinancing activity.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3566

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Excluding amounts related to our consolidated VIEs, we held $8.6 billion and $28.4 billion of cash and cash equivalents, no federal funds sold, and $21.3 billion and $12.0 billion of securities purchased under agreements to resell at March 31, 2012 and December 31, 2011, respectively. The aggregate decrease in these assets was primarily driven by a decline in funding needs for debt redemptions. In addition, excluding amounts related to our consolidated VIEs, we held on average $27.6 billion of cash and cash equivalents and $24.4 billion of federal funds sold and securities purchased under agreements to resell during the three months ended March 31, 2012.

For information regarding our liquidity management practices and policies, see "LIQUIDITY AND CAPITAL RESOURCES."

## Investments in Securities

The table below provides detail regarding our investments in securities as of March 31, 2012 and December 31, 2011. The table does not include our holdings of single-family PCs and certain Other Guarantee Transactions as of March 31, 2012 and December 31, 2011. For information on our holdings of such securities, see "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

## Table 16 — Investments in Securities

| | Fair Value | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (in millions) | |
| Investments in securities: | | |
| Available-for-sale: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | $ 76,163 | $ 81,092 |
| Subprime | 27,145 | 27,999 |
| CMBS | 54,753 | 55,663 |
| Option ARM | 5,818 | 5,865 |
| Alt-A and other | 11,094 | 10,879 |
| Fannie Mae | 18,897 | 20,322 |
| Obligations of states and political subdivisions | 7,565 | 7,824 |
| Manufactured housing | 748 | 766 |
| Ginnie Mae | 239 | 249 |
| Total available-for-sale mortgage-related securities | 202,422 | 210,659 |
| Total investments in available-for-sale securities | 202,422 | 210,659 |
| Trading: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | 14,504 | 16,047 |
| Fannie Mae | 13,692 | 15,165 |
| Ginnie Mae | 151 | 156 |
| Other | 153 | 164 |
| Total trading mortgage-related securities | 28,500 | 31,532 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 695 | 302 |
| Treasury bills | 3,000 | 100 |
| Treasury notes | 23,164 | 24,712 |
| FDIC-guaranteed corporate medium-term notes | 2,960 | 2,184 |
| Total trading non-mortgage-related securities | 29,819 | 27,298 |
| Total investments in trading securities | 58,319 | 58,830 |
| Total investments in securities | $ 260,741 | $ 269,489 |

(1) For information on the types of instruments that are included, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2011 Annual Report.

### Non-Mortgage-Related Securities

Our investments in non-mortgage-related securities provide an additional source of liquidity. We held investments in non-mortgage-related securities classified as trading of $29.8 billion and $27.3 billion as of March 31, 2012 and December 31, 2011, respectively. While balances may fluctuate from period to period, we continue to meet required liquidity and contingency levels.

### Mortgage-Related Securities

Our investments in mortgage-related securities consist of securities issued by Fannie Mae, Ginnie Mae, and other financial institutions. We also invest in our own mortgage-related securities. However, the single-family PCs and certain Other Guarantee Transactions we purchase as investments are not accounted for as investments in securities because we recognize the underlying mortgage loans on our consolidated balance sheets through consolidation of the related trusts.

TREASURY-3567

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                           Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides the UPB of our investments in mortgage-related securities classified as available-for-sale or trading on our consolidated balance sheets. The table below does not include our holdings of our own single-family PCs and certain Other Guarantee Transactions. For further information on our holdings of such securities, see "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

### Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets

| | March 31, 2012 | | | December 31, 2011 | | |
| | Fixed Rate | Variable Rate(1) | Total | Fixed Rate | Variable Rate(1) | Total |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Freddie Mac mortgage-related securities:(2) | | | | | | |
| Single-family | $68,545 | $9,064 | $77,609 | $72,795 | $9,753 | $82,548 |
| Multifamily | 859 | 1,755 | 2,614 | 1,216 | 1,792 | 3,008 |
| Total Freddie Mac mortgage-related securities | 69,404 | 10,819 | 80,223 | 74,011 | 11,545 | 85,556 |
| Non-Freddie Mac mortgage-related securities: | | | | | | |
| Agency securities:(3) | | | | | | |
| Fannie Mae: | | | | | | |
| Single-family | 14,859 | 14,908 | 29,767 | 16,543 | 15,998 | 32,541 |
| Multifamily | 47 | 76 | 123 | 52 | 76 | 128 |
| Ginnie Mae: | | | | | | |
| Single-family | 243 | 100 | 343 | 253 | 104 | 357 |
| Multifamily | 16 | — | 16 | 16 | — | 16 |
| Total Non-Freddie Mac agency securities | 15,165 | 15,084 | 30,249 | 16,864 | 16,178 | 33,042 |
| Non-agency mortgage-related securities: | | | | | | |
| Single-family:(4) | | | | | | |
| Subprime | 332 | 47,519 | 47,851 | 336 | 48,696 | 49,032 |
| Option ARM | — | 13,508 | 13,508 | — | 13,949 | 13,949 |
| Alt-A and other | 2,047 | 14,272 | 16,319 | 2,128 | 14,662 | 16,790 |
| CMBS | 19,113 | 33,122 | 52,235 | 19,735 | 34,375 | 54,110 |
| Obligations of states and political subdivisions(5) | 7,448 | 22 | 7,470 | 7,771 | 22 | 7,793 |
| Manufactured housing | 797 | 138 | 935 | 831 | 129 | 960 |
| Total non-agency mortgage-related securities(6) | 29,737 | 108,581 | 138,318 | 30,801 | 111,833 | 142,634 |
| Total UPB of mortgage-related securities | $114,306 | $134,484 | 248,790 | $121,676 | $139,556 | 261,232 |
| Premiums, discounts, deferred fees, impairments of UPB and other basis adjustments | | | (12,724) | | | (12,363) |
| Net unrealized (losses) on mortgage-related securities, pre-tax | | | (5,144) | | | (6,678) |
| Total carrying value of mortgage-related securities | | | $230,922 | | | $242,191 |

(1) Variable-rate mortgage-related securities include those with a contractual coupon rate that, prior to contractual maturity, is either scheduled to change or is subject to change based on changes in the composition of the underlying collateral.

(2) When we purchase REMICs and Other Structured Securities and certain Other Guarantee Transactions that we have issued, we account for these securities as investments in debt securities as we are investing in the debt securities of a non-consolidated entity. We do not consolidate our resecuritization trusts since we are not deemed to be the primary beneficiary of such trusts. We are subject to the credit risk associated with the mortgage loans underlying our Freddie Mac mortgage-related securities. Mortgage loans underlying our issued single-family PCs and certain Other Guarantee Transactions are recognized on our consolidated balance sheets as held-for-investment mortgage loans, at amortized cost. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2011 Annual Report for further information.

(3) Agency securities are generally not separately rated by nationally recognized statistical rating organizations, but have historically been viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities AAA-rated or equivalent.

(4) For information about how these securities are rated, see "Table 23 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS."

(5) Consists of housing revenue bonds. Approximately 36% and 37% of these securities held at March 31, 2012 and December 31, 2011, respectively, were AAA-rated as of those dates, based on the UPB and the lowest rating available.

(6) Credit ratings for most non-agency mortgage-related securities are designated by no fewer than two nationally recognized statistical rating organizations. Approximately 21% of total non-agency mortgage-related securities held at both March 31, 2012 and December 31, 2011 were AAA-rated as of those dates, based on the UPB and the lowest rating available.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          TREASURY-3568          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides the UPB and fair value of our investments in mortgage-related securities classified as available-for-sale or trading on our consolidated balance sheets.

**Table 18 — Additional Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets**

| | March 31, 2012 | | December 31, 2011 | |
| --- | --- | --- | --- | --- |
| | UPB | Fair Value | UPB | Fair Value |
| | | (in millions) | | |
| Agency pass-through securities(1) | $ 22,093 | $ 23,940 | $ 24,283 | $ 26,193 |
| Agency REMICs and Other Structured Securities: | | | | |
|   Interest-only securities(2) | — | 2,725 | — | 2,863 |
|   Principal-only securities(3) | 3,284 | 3,057 | 3,569 | 3,344 |
|   Inverse floating-rate securities(4) | 4,439 | 6,165 | 4,839 | 6,826 |
|   Other Structured Securities | 80,656 | 87,759 | 85,907 | 93,805 |
|    Total agency securities | 110,472 | 123,646 | 118,598 | 133,031 |
| Non-agency securities(5) | 138,318 | 107,276 | 142,634 | 109,160 |
| Total mortgage-related securities | $248,790 | $230,922 | $261,232 | $242,191 |

(1) Represents an undivided beneficial interest in trusts that hold pools of mortgages.
(2) Represents securities where the holder receives only the interest cash flows.
(3) Represents securities where the holder receives only the principal cash flows.
(4) Represents securities where the holder receives interest cash flows that change inversely with the reference rate ( *i.e.* higher cash flows when interest rates are low and lower cash flows when interest rates are high). Additionally, these securities receive a portion of principal cash flows associated with the underlying collateral.
(5) Includes fair values of $3 million and $2 million of interest-only securities at March 31, 2012 and December 31, 2011, respectively.

The total UPB of our investments in mortgage-related securities on our consolidated balance sheets decreased from $261.2 billion at December 31, 2011 to $248.8 billion at March 31, 2012, while the fair value of these investments decreased from $242.2 billion at December 31, 2011 to $230.9 billion at March 31, 2012. The reduction resulted from our purchase activity remaining less than liquidations, consistent with our efforts to reduce our mortgage-related investments portfolio, as described in "EXECUTIVE SUMMARY — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio."

The table below summarizes our mortgage-related securities purchase activity for the three months ended March 31, 2012 and 2011. The purchase activity includes single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated. Purchases of single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated are recorded as an extinguishment of debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 19 — Mortgage-Related Securities Purchase Activity(1)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in millions) | |
| Non-Freddie Mac mortgage-related securities purchased for resecuritization: | | |
| Ginnie Mae Certificates | $ 5 | $ 16 |
| Non-agency mortgage-related securities purchased for Other Guarantee Transactions | 3,124 | 2,879 |
| Total non-Freddie Mac mortgage-related securities purchased for resecuritization | 3,129 | 2,895 |
| Non-Freddie Mac mortgage-related securities purchased as investments in securities: | | |
| Agency securities: | | |
| *Fannie Mae:* | | |
| Fixed-rate | — | 1,019 |
| Variable-rate | 50 | 168 |
| *Total agency securities* | 50 | 1,187 |
| Non-agency mortgage-related securities: | | |
| *CMBS:* | | |
| Variable-rate | 10 | — |
| *Total non-agency mortgage-related securities* | 10 | — |
| *Total non-Freddie Mac mortgage-related securities purchased as investments in securities* | 60 | 1,187 |
| Total non-Freddie Mac mortgage-related securities purchased | $3,189 | $ 4,082 |
| Freddie Mac mortgage-related securities purchased: | | |
| *Single-family:* | | |
| Fixed-rate | $3,465 | $36,679 |
| Variable-rate | 132 | 2,542 |
| *Multifamily:* | | |
| Fixed-rate | — | 25 |
| *Total Freddie Mac mortgage-related securities purchased* | $3,597 | $39,246 |

(1) Based on UPB. Excludes mortgage-related securities traded but not yet settled.

During the three months ended March 31, 2012, we reduced our participation in dollar roll transactions, which were primarily used to support the market and pricing of our PCs, as compared to the three months ended March 31, 2011. When these transactions involve our consolidated PC trusts, the purchase and sale represents an extinguishment and issuance of debt securities, respectively, and impacts our net interest income and recognition of gain or loss on the extinguishment of debt on our consolidated statements of comprehensive income. These transactions can cause short-term fluctuations in the balance of our mortgage-related investments portfolio. The purchases during the three months ended March 31, 2011 reflected in "Table 19 — Mortgage-Related Securities Purchase Activity" are attributed primarily to these transactions. For more information, see "BUSINESS — Our Business Segments — *Investments Segment — PC Support Activities*" and "RISK FACTORS — Competitive and Market Risks — *Any decline in the price performance of or demand for our PCs could have an adverse effect on the volume and profitability of our new single-family guarantee business*" in our 2011 Annual Report.

*Unrealized Losses on Available-For-Sale Mortgage-Related Securities*

At March 31, 2012, our gross unrealized losses, pre-tax, on available-for-sale mortgage-related securities were $18.7 billion, compared to $20.1 billion at December 31, 2011. The decrease was primarily due to fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities. We believe the unrealized losses related to these securities at March 31, 2012 were mainly attributable to poor underlying collateral performance, limited liquidity and large risk premiums in the market for residential non-agency mortgage-related securities. All available-for-sale securities in an unrealized loss position are evaluated to determine if the impairment is other-than-temporary. See "Total Equity (Deficit)" and "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding unrealized losses on our available-for-sale securities.

*Higher-Risk Components of Our Investments in Mortgage-Related Securities*

As discussed below, we have exposure to subprime, option ARM, interest-only, and Alt-A and other loans as part of our investments in mortgage-related securities as follows:

- *Single-family non-agency mortgage-related securities:* We hold non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans.

34

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                TREASURY-3570                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- *Single-family Freddie Mac mortgage-related securities:*  We hold certain Other Guarantee Transactions as part of our investments in securities. There are subprime and option ARM loans underlying some of these Other Guarantee Transactions. For more information on single-family loans with certain higher-risk characteristics underlying our issued securities, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*."

*Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, and Alt-A Loans*

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. Since the first quarter of 2008, we have not purchased any non-agency mortgage-related securities backed by subprime, option ARM, or Alt-A loans. The two tables below present information about our holdings of our available-for-sale non-agency mortgage-related securities backed by subprime, option ARM and Alt-A loans.

**Table 20 — Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics[1]**

| | | | As of | | |
|---|---|---|---|---|---|
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| | | | (dollars in millions) | | |
| UPB: | | | | | |
| Subprime first lien[2] | $47,478 | $48,644 | $49,794 | $51,070 | $52,403 |
| Option ARM | 13,508 | 13,949 | 14,351 | 14,778 | 15,232 |
| Alt-A[3] | 13,885 | 14,260 | 14,643 | 15,059 | 15,487 |
| Gross unrealized losses, pre-tax:[4] | | | | | |
| Subprime first lien[2] | $ 12,661 | $ 13,401 | $ 14,132 | $ 13,764 | $ 12,481 |
| Option ARM | 2,909 | 3,169 | 3,216 | 3,099 | 3,170 |
| Alt-A[3] | 2,094 | 2,612 | 2,468 | 2,171 | 1,941 |
| Present value of expected future credit losses:[5] | | | | | |
| Subprime first lien[2] | $ 7,325 | $ 6,746 | $ 5,414 | $ 6,487 | $ 6,612 |
| Option ARM | 3,908 | 4,251 | 4,434 | 4,767 | 4,993 |
| Alt-A[3] | 2,237 | 2,235 | 2,204 | 2,310 | 2,401 |
| Collateral delinquency rate:[6] | | | | | |
| Subprime first lien[2] | 42% | 42% | 42% | 42% | 44% |
| Option ARM | 43 | 44 | 44 | 44 | 44 |
| Alt-A[3] | 25 | 25 | 25 | 26 | 26 |
| Average credit enhancement:[7] | | | | | |
| Subprime first lien[2] | 20% | 21% | 22% | 23% | 24% |
| Option ARM | 6 | 7 | 8 | 10 | 11 |
| Alt-A[3] | 6 | 7 | 7 | 8 | 8 |
| Cumulative collateral loss:[8] | | | | | |
| Subprime first lien[2] | 23% | 22% | 21% | 20% | 19% |
| Option ARM | 18 | 17 | 16 | 15 | 14 |
| Alt-A[3] | 9 | 8 | 8 | 7 | 7 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities.
(2) Excludes non-agency mortgage-related securities backed exclusively by subprime second liens. Certain securities identified as subprime first lien may be backed in part by subprime second liens, as the underlying loans of these securities were permitted to include a small percentage of subprime second liens.
(3) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.
(4) Represents the aggregate of the amount by which amortized cost, after other-than-temporary impairments, exceeds fair value measured at the individual lot level.
(5) Represents our estimate of future contractual cash flows that we do not expect to collect, discounted at the effective interest rate implicit in the security at the date of acquisition. This discount rate is only utilized to analyze the cumulative credit deterioration for securities since acquisition and may be lower than the discount rate used to measure ongoing other-than-temporary impairment to be recognized in earnings for securities that have experienced a significant improvement in expected cash flows since the last recognition of other-than-temporary impairment recognized in earnings.
(6) Determined based on the number of loans that are two monthly payments or more past due that underlie the securities using information obtained from a third-party data provider.
(7) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by bond insurance, overcollateralization and other forms of credit enhancement.
(8) Based on the actual losses incurred on the collateral underlying these securities. Actual losses incurred on the securities that we hold are significantly less than the losses on the underlying collateral as presented in this table, as non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements.

For purposes of our cumulative credit deterioration analysis, our estimate of the present value of expected future credit losses on our non-agency mortgage-related securities increased to $14.2 billion at March 31, 2012 from $14.0 billion at December 31, 2011. All of these amounts have been reflected in our net impairment of available-for-sale

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3571                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

securities recognized in earnings in this period or prior periods. The increase in the present value of expected future credit losses was primarily due to our expectation of slower prepayments on our non-agency mortgage-related securities.

**Table 21 — Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans**[1]

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| | | | (in millions) | | |
| Principal repayments and cash shortfalls:[2] | | | | | |
| Subprime: | | | | | |
| Principal repayments | $1,175 | $ 1,159 | $ 1,287 | $1,341 | $1,361 |
| Principal cash shortfalls | 6 | 7 | 6 | 10 | 14 |
| Option ARM: | | | | | |
| Principal repayments | $ 272 | $ 298 | $ 318 | $ 331 | $ 315 |
| Principal cash shortfalls | 169 | 103 | 109 | 123 | 100 |
| Alt-A and other: | | | | | |
| Principal repayments | $ 374 | $ 385 | $ 425 | $ 464 | $ 452 |
| Principal cash shortfalls | 97 | 80 | 81 | 84 | 81 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities.
(2) In addition to the contractual interest payments, we receive monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral of these securities representing a partial return of our investment in these securities.

Since the beginning of 2007, we have incurred actual principal cash shortfalls of $1.8 billion on impaired non-agency mortgage-related securities, of which $275 million related to the three months ended March 31, 2012. Many of the trusts that issued non-agency mortgage-related securities we hold were structured so that realized collateral losses in excess of structural credit enhancements are not passed on to investors until the investment matures. We currently estimate that the future expected principal and interest shortfalls on non-agency mortgage-related securities we hold will be significantly less than the fair value declines experienced on these securities.

The investments in non-agency mortgage-related securities we hold backed by subprime, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements. Bond insurance is an additional credit enhancement covering some of the non-agency mortgage-related securities. These credit enhancements are the primary reason we expect our actual losses, through principal or interest shortfalls, to be less than the underlying collateral losses in the aggregate. It is difficult to estimate the point at which structural credit enhancements will be exhausted and we will incur actual losses. During the three months ended March 31, 2012, we continued to experience the erosion of structural credit enhancements on many securities backed by subprime, option ARM, and Alt-A loans due to poor performance of the underlying collateral. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers.*"

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3572                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*

The table below provides information about the mortgage-related securities for which we recognized other-than-temporary impairments in earnings.

**Table 22 — Net Impairment of Available-For-Sale Mortgage-Related Securities Recognized in Earnings**

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings | | | | |
| | Three Months Ended | | | | |
| | 3/31/2012 | 12/31/2011 | 9/30/2011 (in millions) | 6/30/2011 | 3/31/2011 |
|---|---|---|---|---|---|
| Subprime:[1] | | | | | |
| 2006 & 2007 | $ 433 | $ 472 | $ 29 | $ 67 | $ 717 |
| Other years | 8 | 8 | 2 | 3 | 17 |
| Total subprime | 441 | 480 | 31 | 70 | 734 |
| Option ARM: | | | | | |
| 2006 & 2007 | 32 | 40 | 15 | 43 | 232 |
| Other years | 16 | 19 | 4 | 22 | 49 |
| Total option ARM | 48 | 59 | 19 | 65 | 281 |
| Alt-A: | | | | | |
| 2006 & 2007 | 16 | 22 | 29 | 16 | 15 |
| Other years | 36 | 21 | 10 | 15 | 23 |
| Total Alt-A | 52 | 43 | 39 | 31 | 38 |
| Other loans | 5 | 3 | 41 | 1 | 2 |
| Total subprime, option ARM, Alt-A and other loans | 546 | 585 | 130 | 167 | 1,055 |
| CMBS | 16 | 8 | 27 | 183 | 135 |
| Manufactured housing | 2 | 2 | 4 | 2 | 3 |
| Total available-for-sale mortgage-related securities | $ 564 | $ 595 | $ 161 | $ 352 | $ 1,193 |

(1) Includes all first and second liens.

We recorded net impairment of available-for-sale mortgage-related securities recognized in earnings of $564 million during the three months ended March 31, 2012, compared to $1.2 billion during the three months ended March 31, 2011. We recorded these impairments because our estimate of the present value of expected future credit losses on certain individual securities increased during the period. These impairments include $546 million related to securities backed by subprime, option ARM, and Alt-A and other loans during the three months ended March 31, 2012, compared to $1.1 billion during the three months ended March 31, 2011. For more information, see "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-for-Sale Securities."

While it is reasonably possible that collateral losses on our available-for-sale mortgage-related securities where we have not recorded an impairment charge in earnings could exceed our credit enhancement levels, we do not believe that those conditions were likely at March 31, 2012. Based on our conclusion that we do not intend to sell our remaining available-for-sale mortgage-related securities in an unrealized loss position and it is not more likely than not that we will be required to sell these securities before a sufficient time to recover all unrealized losses and our consideration of other available information, we have concluded that the reduction in fair value of these securities was temporary at March 31, 2012 and have recorded these fair value losses in AOCI.

The credit performance of loans underlying our holdings of non-agency mortgage-related securities has declined since 2007. This decline has been particularly severe for subprime, option ARM, and Alt-A and other loans. Economic factors negatively impacting the performance of our investments in non-agency mortgage-related securities include high unemployment, a large inventory of seriously delinquent mortgage loans and unsold homes, tight credit conditions, and weak consumer confidence during recent years. In addition, subprime, option ARM, and Alt-A and other loans backing the securities we hold have significantly greater concentrations in the states that are undergoing the greatest economic stress, such as California and Florida. Loans in these states undergoing economic stress are more likely to become seriously delinquent and the credit losses associated with such loans are likely to be higher than in other states.

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our investments in non-agency mortgage-related securities. We have determined that there is substantial uncertainty surrounding certain bond insurers' ability to pay our future claims on expected credit losses related to our non-agency mortgage-related security investments. This uncertainty contributed to the impairments recognized in earnings during the three months ended March 31, 2012 and 2011. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers*" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012
TREASURY-3573
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses may not be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our assessments concerning other-than-temporary impairment require significant judgment and the use of models, and are subject to potentially significant change. In addition, changes in the performance of the individual securities and in mortgage market conditions may also affect our impairment assessments. Depending on the structure of the individual mortgage-related security and our estimate of collateral losses relative to the amount of credit support available for the tranches we own, a change in collateral loss estimates can have a disproportionate impact on the loss estimate for the security. Additionally, servicer performance, loan modification programs and backlogs, bankruptcy reform and other forms of government intervention in the housing market can significantly affect the performance of these securities, including the timing of loss recognition of the underlying loans and thus the timing of losses we recognize on our securities. Impacts related to changes in interest rates may also affect our losses due to the structural credit enhancements on our investments in non-agency mortgage-related securities. Foreclosure processing suspensions can also affect our losses. For example, while defaulted loans remain in the trusts prior to completion of the foreclosure process, the subordinate classes of securities issued by the securitization trusts may continue to receive interest payments, rather than absorbing default losses. This may reduce the amount of funds available for the tranches we own. Given the extent of the housing and economic downturn, it is difficult to estimate the future performance of mortgage loans and mortgage-related securities with high assurance, and actual results could differ materially from our expectations. Furthermore, various market participants could arrive at materially different conclusions regarding estimates of future cash shortfalls.

For more information on risks associated with the use of models, see "RISK FACTORS — Operational Risks — *We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting purposes, to make business decisions, and to manage risks. Market conditions have raised these risks and uncertainties*" in our 2011 Annual Report. For more information on how delays in the foreclosure process, including delays related to concerns about deficiencies in foreclosure documentation practices, could adversely affect the values of, and the losses on, the non-agency mortgage-related securities we hold, see "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report.

For information regarding our efforts to mitigate losses on our investments in non-agency mortgage-related securities, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*."

*Ratings of Non-Agency Mortgage-Related Securities*

The table below shows the ratings of non-agency mortgage-related securities backed by subprime, option ARM, Alt-A and other loans, and CMBS held at March 31, 2012 based on their ratings as of March 31, 2012, as well as those held at December 31, 2011 based on their ratings as of December 31, 2011 using the lowest rating available for each security.

TREASURY-3574

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 23 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS**

| Credit Ratings as of March 31, 2012 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Bond Insurance Coverage(1) |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| **Subprime loans:** | | | | | |
| AAA-rated | $ 599 | 1% | $ 599 | $ (65) | $ 18 |
| Other investment grade | 2,292 | 5 | 2,292 | (291) | 383 |
| Below investment grade(2) | 44,960 | 94 | 36,859 | (12,310) | 1,603 |
| Total | $ 47,851 | 100% | $ 39,750 | $ (12,666) | $ 2,004 |
| **Option ARM loans:** | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 63 | — | 63 | (6) | 63 |
| Below investment grade(2) | 13,445 | 100 | 8,651 | (2,903) | 36 |
| Total | $ 13,508 | 100% | $ 8,714 | $ (2,909) | $ 99 |
| **Alt-A and other loans:** | | | | | |
| AAA-rated | $ 109 | 1% | $ 109 | $ (6) | $ 6 |
| Other investment grade | 2,395 | 14 | 2,413 | (302) | 296 |
| Below investment grade(2) | 13,815 | 85 | 10,723 | (1,945) | 2,067 |
| Total | $ 16,319 | 100% | $ 13,245 | $ (2,253) | $ 2,369 |
| **CMBS:** | | | | | |
| AAA-rated | $ 25,479 | 49% | $ 25,517 | $ (17) | $ 41 |
| Other investment grade | 23,801 | 45 | 23,754 | (220) | 1,584 |
| Below investment grade(2) | 2,955 | 6 | 2,833 | (463) | 1,695 |
| Total | $ 52,235 | 100% | $ 52,104 | $ (700) | $ 3,320 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS:** | | | | | |
| AAA-rated | $ 26,187 | 20% | $ 26,225 | $ (88) | $ 65 |
| Other investment grade | 28,551 | 22 | 28,522 | (819) | 2,326 |
| Below investment grade(2) | 75,175 | 58 | 59,066 | (17,621) | 5,401 |
| Total | $ 129,913 | 100% | $ 113,813 | $ (18,528) | $ 7,792 |
| Total investments in mortgage-related securities | $ 248,790 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 52% | | | | |
| **Credit Ratings as of December 31, 2011** | | | | | |
| **Subprime loans:** | | | | | |
| AAA-rated | $ 1,000 | 2% | $ 1,000 | $ (115) | $ 23 |
| Other investment grade | 2,643 | 5 | 2,643 | (399) | 383 |
| Below investment grade(2) | 45,389 | 93 | 37,704 | (12,894) | 1,641 |
| Total | $ 49,032 | 100% | $ 41,347 | $ (13,408) | $ 2,047 |
| **Option ARM loans:** | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 76 | 1 | 76 | (8) | 76 |
| Below investment grade(2) | 13,873 | 99 | 8,943 | (3,161) | 39 |
| Total | $ 13,949 | 100% | $ 9,019 | $ (3,169) | $ 115 |
| **Alt-A and other loans:** | | | | | |
| AAA-rated | $ 350 | 2% | $ 348 | $ (20) | $ 6 |
| Other investment grade | 2,237 | 13 | 2,260 | (371) | 310 |
| Below investment grade(2) | 14,203 | 85 | 11,053 | (2,421) | 2,139 |
| Total | $ 16,790 | 100% | $ 13,661 | $ (2,812) | $ 2,455 |
| **CMBS:** | | | | | |
| AAA-rated | $ 25,499 | 47% | $ 25,540 | $ (22) | $ 42 |
| Other investment grade | 25,421 | 47 | 25,394 | (346) | 1,585 |
| Below investment grade(2) | 3,190 | 6 | 2,851 | (180) | 1,697 |
| Total | $ 54,110 | 100% | $ 53,785 | $ (548) | $ 3,324 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS:** | | | | | |
| AAA-rated | $ 26,849 | 20% | $ 26,888 | $ (157) | $ 71 |
| Other investment grade | 30,377 | 23 | 30,373 | (1,124) | 2,354 |
| Below investment grade(2) | 76,655 | 57 | 60,551 | (18,656) | 5,516 |
| Total | $ 133,881 | 100% | $ 117,812 | $ (19,937) | $ 7,941 |
| Total investments in mortgage-related securities | $ 261,232 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 51% | | | | |

(1) Represents the amount of UPB covered by bond insurance. This amount does not represent the maximum amount of losses we could recover, as the bond insurance also covers interest.

(2) Includes securities with S&P equivalent credit ratings below BBB– and certain securities that are no longer rated.

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          TREASURY-3575          Powered by Morningstar® Document Research℠

Table of Contents

## Mortgage Loans

The UPB of mortgage loans on our consolidated balance sheets  declined to $1.80 trillion as of March 31, 2012, as  compared to $1.82 trillion as of December 31, 2011. This decline reflects that the amount of single-family loan  liquidations has exceeded new loan purchase and guarantee activity, which we believe is due, in part, to declines in the  amount of single-family mortgage debt outstanding in the market  and our competitive position compared to other market  participants.

The UPB of unsecuritized single-family mortgage loans declined  by $6.2 billion to $165.5 billion at March 31,  2012, from $171.7 billion at December 31, 2011, primarily due to our net loan securitization volume exceeding  the amount of delinquent loans we removed from PC trusts during the first quarter of 2012. We expect that our holdings  of unsecuritized single-family loans could increase in the  remainder of 2012.

Based on the amount of the recorded investment of single-family  loans on our consolidated balance sheets, approximately  $70.0 billion, or 4.1%, of these loans as of March 31, 2012 were seriously delinquent, as compared to  $72.4 billion, or 4.2%, as of December 31, 2011. This decline was primarily due to modifications, foreclosure  transfers, and short sale activity. The majority of these  seriously delinquent loans are unsecuritized, and were removed by us from our PC trusts. As guarantor, we have the right to  remove mortgages that back our PCs from the underlying loan pools under certain circumstances. See "NOTE 5:  INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information on our removal of single-family loans from PC trusts.

The UPB of unsecuritized multifamily mortgage loans was  $82.5 billion at March 31, 2012 and $82.3 billion  at December 31, 2011. Our multifamily loan activity in the  first quarters of 2012 and 2011 primarily consisted of purchases  of loans intended for securitization and subsequent sale through Other Guarantee Transactions. To pursue our primary multifamily  business strategy, we expect to continue to purchase and then securitize multifamily loans, which provides liquidity for the  multifamily market, supports affordability for multifamily  rental housing, and helps us manage our credit risks.

We maintain an allowance for loan losses on mortgage loans that  we classify as held-for-investment on our consolidated balance  sheets. Our reserve for guarantee losses is associated with  Freddie Mac mortgage-related securities backed by multifamily  loans, certain single-family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental  credit risk. Collectively, we refer to our allowance for loan losses and our reserve for guarantee losses as our loan loss  reserves. Our loan loss reserves were $38.3 billion and  $39.5 billion at March 31, 2012 and December 31, 2011, respectively, including $37.8 billion and $38.9 billion, respectively, related to single-family  loans. At March 31, 2012 and December 31, 2011, our  loan loss reserves, as a percentage of our total mortgage  portfolio, excluding non-Freddie Mac securities, were 2.0% and 2.1%, respectively, and as a percentage of the UPB associated  with our non-performing loans was 31.3% and 32.0%, respectively. See "RISK MANAGEMENT — Credit Risk —  *Mortgage Credit Risk"* and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further detail about the mortgage loans and associated allowance for loan  losses recorded on our consolidated balance sheets.

The table below summarizes our purchase and guarantee activity  in mortgage loans. This activity consists of: (a) mortgage  loans underlying consolidated single-family PCs issued in the  period (regardless of whether such securities are held by us or  third parties); (b) single-family and multifamily mortgage loans purchased, but not securitized, in the

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                             Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

period; and (c) mortgage loans underlying our mortgage-related financial guarantees issued in the period, which are not consolidated on our balance sheets.

**Table 24 — Mortgage Loan Purchase and Other Guarantee Commitment Activity(1)**

| | Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | UPB Amount | % of Total | UPB Amount | % of Total |
| --- | ---: | ---: | ---: | ---: |
| | | (dollars in millions) | | |
| Mortgage loan purchases and guarantee issuances: | | | | |
| Single-family: | | | | |
| 30-year or more amortizing fixed-rate | $ 61,847 | 56% | $62,898 | 62% |
| 20-year amortizing fixed-rate | 8,410 | 8 | 6,715 | 7 |
| 15-year amortizing fixed-rate | 29,574 | 26 | 22,110 | 22 |
| Adjustable-rate(2) | 5,152 | 5 | 5,741 | 6 |
| FHA/VA and other governmental | 90 | <1 | 87 | <1 |
| *Total single-family(3)* | 105,073 | 95 | 97,551 | 97 |
| Multifamily | 5,751 | 5 | 3,049 | 3 |
| *Total mortgage loan purchases and other guarantee commitment activity(4)* | $110,824 | 100% | $ 100,600 | 100% |
| Percentage of mortgage purchases and other guarantee commitment activity with credit enhancements(5) | 9% | | 7% | |

(1) Based on UPB. Excludes mortgage loans traded but not yet settled. Excludes the removal of seriously delinquent loans and balloon/reset mortgages out of PC trusts. Includes other guarantee commitments associated with mortgage loans. See endnote (4) for further information.

(2) Includes amortizing ARMs with 1-, 3-, 5-, 7-, and 10-year initial fixed-rate periods. We did not purchase any option ARM loans during the first quarters of 2012 or 2011.

(3) Includes $8.6 billion and $7.3 billion of mortgage loans in excess of $417,000, which we refer to as conforming jumbo mortgages, for the first quarters of 2012 and 2011, respectively.

(4) Includes issuances of other guarantee commitments on single-family loans of $2.3 billion and $1.8 billion and issuances of other guarantee commitments on multifamily loans of $0.1 billion and $0.2 billion during the first quarters of 2012 and 2011, respectively.

(5) See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for further details on credit enhancement of mortgage loans in our multifamily mortgage and single-family credit guarantee portfolios.

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Table 15.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio" for information about mortgage loans in our single-family credit guarantee portfolio that we believe have higher-risk characteristics.

**Derivative Assets and Liabilities, Net**

The composition of our derivative portfolio changes from period to period as a result of derivative purchases, terminations, or assignments prior to contractual maturity, and expiration of the derivatives at their contractual maturity. We classify net derivative interest receivable or payable, trade/settle receivable or payable, and cash collateral held or posted on our consolidated balance sheets in derivative assets, net and derivative liabilities, net. See "NOTE 10: DERIVATIVES" for additional information regarding our derivatives.

The table below shows the fair value for each derivative type, the weighted average fixed rate of our pay-fixed and receive-fixed swaps, and the maturity profile of our derivative positions reconciled to the amounts presented on our consolidated balance sheets as of March 31, 2012. A positive fair value in the table below for each derivative type is the estimated amount, prior to netting by counterparty, that we would be entitled to receive if the derivatives of that type were

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3577

terminated. A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if the derivatives of that type were terminated.

**Table 25 — Derivative Fair Values and Maturities**

| | Notional or Contractual Amount(2) | Total Fair Value(3) | Fair Value(1) | | | |
| | | | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
|---|---|---|---|---|---|---|
| | | | (dollars in millions) | | | |
| **Interest-rate swaps:** | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 236,803 | $ 9,080 | $ 59 | $ 519 | $ 3,538 | $ 4,964 |
| Weighted average fixed rate(4) | | | 1.52% | 0.92% | 2.24% | 3.10% |
| Forward-starting swaps(5) | 11,650 | 792 | — | — | — | 792 |
| Weighted average fixed rate(4) | | | —% | —% | —% | 3.83% |
| Total receive-fixed | 248,453 | 9,872 | 59 | 519 | 3,538 | 5,756 |
| Basis (floating to floating) | 2,400 | 2 | (1) | — | 3 | — |
| Pay-fixed: | | | | | | |
| Swaps | 280,869 | (26,292) | (38) | (2,647) | (5,112) | (18,495) |
| Weighted average fixed rate(4) | | | 0.95% | 3.11% | 2.83% | 3.68% |
| Forward-starting swaps(5) | 15,704 | (1,490) | — | — | — | (1,490) |
| Weighted average fixed rate(4) | | | —% | —% | —% | 3.80% |
| Total pay-fixed | 296,573 | (27,782) | (38) | (2,647) | (5,112) | (19,985) |
| Total interest-rate swaps | 547,426 | (17,908) | 20 | (2,128) | (1,571) | (14,229) |
| **Option-based:** | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 52,500 | 7,766 | 1,789 | 3,382 | 555 | 2,040 |
| Written | 12,025 | (886) | (172) | (557) | (157) | — |
| Put swaptions | | | | | | |
| Purchased | 49,450 | 527 | 6 | 35 | 134 | 352 |
| Written | 250 | (5) | (5) | — | — | — |
| Other option-based derivatives(6) | 34,365 | 2,029 | — | — | — | 2,029 |
| Total option-based | 148,590 | 9,431 | 1,618 | 2,860 | 532 | 4,421 |
| Futures | 44,281 | (66) | (66) | — | — | — |
| Foreign-currency swaps | 1,179 | 84 | 59 | 25 | — | — |
| Commitments | 22,298 | (37) | (37) | — | — | — |
| Swap guarantee derivatives | 3,631 | (36) | — | (1) | (1) | (34) |
| Subtotal | 767,405 | (8,532) | $ 1,594 | $ 756 | $ (1,040) | $ (9,842) |
| Credit derivatives | 9,338 | (4) | | | | |
| Subtotal | 776,743 | (8,536) | | | | |
| Derivative interest receivable (payable), net | | (1,089) | | | | |
| Trade/settle receivable (payable), net | | 299 | | | | |
| Derivative cash collateral (held) posted, net | | 9,212 | | | | |
| Total | $ 776,743 | $ (114) | | | | |

(1) Fair value is categorized based on the period from March 31, 2012 until the contractual maturity of the derivative.

(2) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.

(3) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net, and includes derivative interest receivable or (payable), net, trade/settle receivable or (payable), net and derivative cash collateral (held) or posted, net.

(4) Represents the notional weighted average rate for the fixed leg of the swaps.

(5) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to thirteen years as of March 31, 2012.

(6) Primarily includes purchased interest-rate caps and floors.

At March 31, 2012, the net fair value of our total derivative portfolio was $(114) million, as compared to $(317) million at December 31, 2011. During the three months ended March 31, 2012, the net fair value of our total derivative portfolio increased primarily due to the impact of an increase in long-term interest rates on our net pay-fixed swap portfolio, partially offset by the impact of the increase in long-term interest rates on our receive-fixed swap and option-based derivatives. See "NOTE 10: DERIVATIVES" for the notional or contractual amounts and related fair values of our total derivative portfolio by product type at March 31, 2012 and December 31, 2011, as well as derivative collateral posted and held.

42

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3578

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below summarizes the changes in derivative fair values.

## Table 26 — Changes in Derivative Fair Values

| | Three Months Ended March 31, | |
| | 2012[1] | 2011[2] |
| | (in millions) | |
|---|---|---|
| Beginning balance, at January 1 — Net asset (liability) | $(8,662) | $(6,560) |
| Net change in: | | |
| Commitments | 19 | 20 |
| Credit derivatives | — | (5) |
| Swap guarantee derivatives | 1 | — |
| Other derivatives:[3] | | |
| Changes in fair value | 76 | 986 |
| Fair value of new contracts entered into during the period[4] | — | 233 |
| Contracts realized or otherwise settled during the period | 30 | (291) |
| Ending balance, at March 31 — Net asset (liability) | $(8,536) | $(5,617) |

(1) Refer to "Table 25 — Derivative Fair Values and Maturities" for a reconciliation of net fair value to the amounts presented on our consolidated balance sheets as of March 31, 2012.

(2) At March 31, 2011, fair value in this table excludes derivative interest receivable or (payable), net of $(1.6) billion, trade/settle receivable or (payable), net of $3 million, and derivative cash collateral posted, net of $6.5 billion.

(3) Includes fair value changes for interest-rate swaps, option-based derivatives, futures, and foreign-currency swaps.

(4) Consists primarily of cash premiums paid or received on options.

See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for a description of gains (losses) on our derivative positions.

### REO, Net

We acquire properties, which are recorded as REO assets on our consolidated balance sheets, typically as a result of borrower default on mortgage loans that we own, or for which we have issued our financial guarantee. The balance of our REO, net, declined to $5.5 billion at March 31, 2012 from $5.7 billion at December 31, 2011. We believe the volume of our single-family REO acquisitions in the first quarter of 2012 was less than it otherwise would have been due to delays in the foreclosure process, particularly in states that require a judicial foreclosure process. We expect that the length of the foreclosure process will continue to remain above historical levels. Additionally, we expect our REO activity to remain at elevated levels, as we have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio. To the extent a large volume of loans completes the foreclosure process in a short period of time, the resulting REO inventory could have a negative impact on the housing market. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

### Deferred Tax Assets, Net

After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, related difficulty in forecasting future profit levels, and our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered, we continue to record a valuation allowance on a portion of our net deferred tax assets. See "NOTE 12: INCOME TAXES" for additional information.

### Other Assets

Other assets consist of the guarantee asset related to non-consolidated trusts and other guarantee commitments, accounts and other receivables, and other miscellaneous assets. Other assets increased to $10.8 billion as of March 31, 2012 from $10.5 billion as of December 31, 2011 primarily due to an increase in servicer receivables resulting from an increase in the proceeds of mortgage loans paid off by borrowers at the end of the quarter that had not yet been remitted to us. See "NOTE 18: SIGNIFICANT COMPONENTS OF OTHER ASSETS AND OTHER LIABILITIES ON OUR CONSOLIDATED BALANCE SHEETS" for additional information.

### Total Debt, Net

PCs and Other Guarantee Transactions issued by our consolidated trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets. Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated trusts. The debt securities of our consolidated trusts may be prepaid without penalty at any time.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Other debt consists of unsecured short-term and long-term debt securities we issue to third parties to fund our business activities. It is classified as either short-term or long-term based on the contractual maturity of the debt instrument. See "MD&A — LIQUIDITY AND CAPITAL RESOURCES" in our 2011 Annual Report for a discussion of our management activities related to other debt.

The table below presents the UPB for Freddie Mac issued mortgage-related securities by the underlying mortgage product type.

**Table 27 — Freddie Mac Mortgage-Related Securities[1]**

| | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total |
| | | | (in millions) | | | |
| Single-family: | | | | | | |
| 30-year or more amortizing fixed-rate | $ 1,103,277 | $      — | $ 1,103,277 | $ 1,123,105 | $      — | $ 1,123,105 |
| 20-year amortizing fixed-rate | 72,108 | — | 72,108 | 68,584 | — | 68,584 |
| 15-year amortizing fixed-rate | 262,377 | — | 262,377 | 252,563 | — | 252,563 |
| Adjustable-rate[2] | 70,641 | — | 70,641 | 69,402 | — | 69,402 |
| Interest-only[3] | 55,253 | — | 55,253 | 59,007 | — | 59,007 |
| FHA/VA and other governmental | 3,139 | — | 3,139 | 3,267 | — | 3,267 |
| *Total single-family* | 1,566,795 | — | 1,566,795 | 1,575,928 | — | 1,575,928 |
| Multifamily | — | 4,458 | 4,458 | — | 4,496 | 4,496 |
| *Total single-family and multifamily* | 1,566,795 | 4,458 | 1,571,253 | 1,575,928 | 4,496 | 1,580,424 |
| Other Guarantee Transactions: | | | | | | |
| HFA bonds:[4] | | | | | | |
| Single-family | — | 5,950 | 5,950 | — | 6,118 | 6,118 |
| Multifamily | — | 933 | 933 | — | 966 | 966 |
| Total HFA bonds | — | 6,883 | 6,883 | — | 7,084 | 7,084 |
| Other: | | | | | | |
| Single-family[5] | 12,228 | 3,739 | 15,967 | 12,877 | 3,838 | 16,715 |
| Multifamily | — | 22,744 | 22,744 | — | 19,682 | 19,682 |
| Total Other Guarantee Transactions | 12,228 | 26,483 | 38,711 | 12,877 | 23,520 | 36,397 |
| REMICs and Other Structured Securities backed by Ginnie Mae Certificates[6] | — | 748 | 748 | — | 779 | 779 |
| Total Freddie Mac Mortgage-Related Securities | $1,579,023 | $ 38,572 | $1,617,595 | $1,588,805 | $ 35,879 | $1,624,684 |
| Less: Repurchased Freddie Mac Mortgage-Related Securities[7] | (119,658) | | | (136,329) | | |
| Total UPB of debt securities of consolidated trusts held by third parties | $1,459,365 | | | $ 1,452,476 | | |

(1) Amounts are based on UPB of the securities and exclude mortgage-related debt traded, but not yet settled.

(2) Includes $1.1 billion and $1.2 billion in UPB of option ARM mortgage loans as of March 31, 2012 and December 31, 2011, respectively. See endnote (5) for additional information on option ARM loans that back our Other Guarantee Transactions.

(3) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed- and variable-rate interest-only loans.

(4) Consists of bonds we acquired and resecuritized under the NIBP.

(5) Backed by non-agency mortgage-related securities that include prime, FHA/VA, and subprime mortgage loans and also include $7.1 billion and $7.3 billion in UPB of securities backed by option ARM mortgage loans at March 31, 2012 and December 31, 2011, respectively.

(6) Backed by FHA/VA loans.

(7) Represents the UPB of repurchased Freddie Mac mortgage-related securities that are consolidated on our balance sheets and includes certain remittance amounts associated with our security trust administration that are payable to third-party mortgage-related security holders. Our holdings of non-consolidated Freddie Mac mortgage-related securities are presented in "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets."

Excluding Other Guarantee Transactions, the percentage of amortizing fixed-rate single-family loans underlying our consolidated trust debt securities, based on UPB, was approximately 92% at both March 31, 2012 and December 31, 2011. Freddie Mac single-family mortgage-related securities that we issued during the three months ended March 31, 2012 were backed by a significant proportion of refinance mortgages. During the three months ended March 31, 2012, the UPB of Freddie Mac mortgage-related securities issued by consolidated trusts declined approximately 0.6%, as the volume of our new issuances has been less than the volume of liquidations of these securities. The UPB of multifamily Other Guarantee Transactions, excluding HFA-related securities, increased to $22.7 billion as of March 31, 2012 from $19.7 billion as of December 31, 2011, due to multifamily loan securitization activity.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3580          Powered by Morningstar® Document Research℠
The information contained herein may be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents additional details regarding our issued  and guaranteed mortgage-related securities.

### Table 28 — Issuances and Extinguishments of Debt Securities of Consolidated  Trusts[1]

| | Three Months Ended March 31, | |
| | 2012 | 2011 |
| --- | --- | --- |
| | (in millions) | |
| Beginning balance of debt securities of consolidated trusts held  by third parties | $1,452,476 | $ 1,517,001 |
| Issuances to third parties of debt securities of consolidated  trusts: | | |
| Issuances based on underlying mortgage product type: | | |
| 30-year or more amortizing fixed-rate | 64,041 | 61,791 |
| 20-year amortizing fixed-rate | 8,395 | 6,243 |
| 15-year amortizing fixed-rate | 30,672 | 19,866 |
| Adjustable-rate | 5,148 | 5,646 |
| Interest-only | — | 152 |
| FHA/VA | — | 160 |
| Debt securities of consolidated trusts retained by us at issuance | (2,905) | (6,345) |
| Net issuances of debt securities of consolidated trusts | 105,351 | 87,513 |
| Reissuances of debt securities of consolidated trusts previously  held by us[2] | 11,642 | 24,576 |
| Total issuances to third parties of debt securities of consolidated trusts | 116,993 | 112,089 |
| Extinguishments, net[3] | (110,104) | (131,241) |
| Ending balance of debt securities of consolidated trusts held by  third parties | $1,459,365 | $1,497,849 |

(1) Based on UPB.
(2) Represents our sales of PCs and certain Other Guarantee  Transactions previously held by us.
(3) Represents: (a) UPB of our purchases from third parties of  PCs and Other Guarantee Transactions issued by our consolidated trusts; (b) principal repayments
    related to PCs and Other Guarantee Transactions issued by our consolidated trusts; and (c) certain remittance amounts associated with our trust  security
    administration that are payable to third-party  mortgage-related security holders as of March 31, 2012 and  2011.

### Other Liabilities

Other liabilities consist of the guarantee obligation, the  reserve for guarantee losses on non-consolidated trusts and  other mortgage-related
financial guarantees, servicer liabilities, accounts payable and accrued expenses, and other  miscellaneous liabilities. Other liabilities increased to
$6.3 billion as of March 31, 2012 from  $6.0 billion as of December 31, 2011 primarily because of an increase in: (a) credit loss-related
liabilities, largely due to third party sales adjustments for accrued  estimated losses on unsettled foreclosure alternative  transactions at quarter
end; and (b) real estate services  payable relating to estimated taxes and insurance on REO  properties held in inventory at quarter end. See
"NOTE 18: SIGNIFICANT COMPONENTS OF OTHER ASSETS AND  OTHER LIABILITIES ON OUR CONSOLIDATED BALANCE
SHEETS" for additional information.

### Total Equity (Deficit)

The table below presents the changes in total equity (deficit)  and certain capital-related disclosures.

### Table 29 — Changes in Total Equity (Deficit)

| | Three Months Ended | | | | |
| | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 3/31/2011 |
| --- | --- | --- | --- | --- | --- |
| | | | (in millions) | | |
| Beginning balance | $  (146) | $ (5,991) | $ (1,478) | $ 1,237 | $  (401) |
| Net income (loss) | 577 | 619 | (4,422) | (2,139) | 676 |
| Other comprehensive income (loss), net of taxes: | | | | | |
| Changes in unrealized gains (losses) related to  available-for-sale securities | 1,147 | 701 | (80) | 903 | 1,941 |
| Changes in unrealized gains (losses) related to cash flow hedge  relationships | 111 | 118 | 124 | 135 | 132 |
| Changes in defined benefit plans | (46) | 68 | 2 | 1 | (9) |
| Comprehensive income (loss) | 1,789 | 1,506 | (4,376) | (1,100) | 2,740 |
| Capital draw funded by Treasury | 146 | 5,992 | 1,479 | — | 500 |
| Senior preferred stock dividends declared | (1,807) | (1,655) | (1,618) | (1,617) | (1,605) |
| Other | — | 2 | 2 | 2 | 3 |
| Total equity (deficit)/Net worth | $   (18) | $   (146) | $ (5,991) | $ (1,478) | $ 1,237 |
| Aggregate draws under the Purchase Agreement (as of period  end)[1] | $ 71,317 | $ 71,171 | $ 65,179 | $ 63,700 | $63,700 |
| Aggregate senior preferred stock dividends paid to Treasury in  cash (as of period end) | $18,328 | $ 16,521 | $14,866 | $13,248 | $11,631 |
| Percentage of dividends paid to Treasury in cash to aggregate  draws (as of period end) | 26% | 23% | 23% | 21% | 18% |

(1) Does not include the initial $1.0 billion liquidation  preference of senior preferred stock that we issued to Treasury  in September 2008 as an initial commitment fee and
    for which no cash was received.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We will request a $19 million draw from Treasury under the Purchase Agreement to eliminate the quarterly equity deficit as of March 31, 2012. In addition, we paid cash dividends to Treasury of $1.8 billion during the three months ended March 31, 2012.

Net unrealized losses on our available-for-sale securities in AOCI decreased by $1.1 billion during the three months ended March 31, 2012. The decrease for the three months ended March 31, 2012 was primarily due to the impact of fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity and the impact of tightening OAS levels on our CMBS. Net unrealized losses on our closed cash flow hedge relationships in AOCI decreased by $111 million during the three months ended March 31, 2012, respectively, primarily attributable to the reclassification of losses into earnings related to our closed cash flow hedges as the originally forecasted transactions affected earnings.

## RISK MANAGEMENT

Our investment and credit guarantee activities expose us to three broad categories of risk: (a) credit risk; (b) interest-rate risk and other market risk; and (c) operational risk. See "RISK FACTORS" in our 2011 Annual Report for additional information regarding these and other risks.

### Credit Risk

We are subject primarily to two types of credit risk: institutional credit risk and mortgage credit risk. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee. We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment.

#### *Institutional Credit Risk*

Our exposure to single-family mortgage seller/servicers remained high during the first quarter of 2012 with respect to their repurchase obligations arising from breaches of representations and warranties made to us for loans they underwrote and sold to us. We rely on our single-family seller/servicers to perform loan workout activities as well as foreclosures on loans that they service for us. Our credit losses could increase to the extent that our seller/servicers do not fully perform these obligations in a timely manner. The financial condition of the mortgage insurance industry remained weak during the first quarter of 2012, and the substantial majority of our mortgage insurance exposure is concentrated with four counterparties, all of which are under significant financial stress. In addition, our exposure to derivatives counterparties remains highly concentrated as compared to historical levels. The failure of any of our significant counterparties to meet their obligations to us could have a material adverse effect on our results of operations, financial condition, and our ability to conduct future business.

##### Non-Agency Mortgage-Related Security Issuers

Our investments in securities expose us to institutional credit risk to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform their obligations. Our investments in non-Freddie Mac mortgage-related securities include both agency and non-agency securities. However, agency securities have historically presented minimal institutional credit risk due to the guarantee provided by those institutions, and the U.S. government's support of those institutions.

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non-agency mortgage-related securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. The effectiveness of our efforts is highly uncertain and any potential recoveries may take significant time to realize. See "MD&A — RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Non-Agency Mortgage-Related Security Issuers*" in our 2011 Annual Report for information about these efforts.

See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for information on credit risk associated with our investments in mortgage-related securities, including higher-risk components and impairment charges we recognized in the first quarters of 2012 and 2011 related to these investments. For information about institutional credit risk associated with our investments in non-mortgage-related securities, see "NOTE 7: INVESTMENTS IN SECURITIES — Table 7.9 — Trading Securities" as well as "Cash and Other Investments Counterparties" below.

46                                                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Single-family Mortgage Seller/Servicers*

We acquire a significant portion of our single-family mortgage purchase volume from several large lenders, or seller/servicers. Our top 10 single-family seller/servicers provided approximately 79% of our single-family purchase volume during the first quarter of 2012. Wells Fargo Bank, N.A. and U.S. Bank, N.A. accounted for 28% and 13%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume during the three months ended March 31, 2012. In recent periods, certain large seller/servicers curtailed their lending activities, which may impact the concentration of our purchase volume in the remainder of 2012.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our mortgage seller/servicers, including non-performance of their repurchase obligations arising from breaches of the representations and warranties made to us for loans they underwrote and sold to us or failure to honor their recourse and indemnification obligations to us. We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans, and represent and warrant that those loans have been originated under specified underwriting standards. If we subsequently discover that the representations and warranties were breached (*i.e.*, that contractual standards were not followed), we can exercise certain contractual remedies to mitigate our actual or potential credit losses. These contractual remedies include the ability to require the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan. As part of our expansion of HARP, we have agreed not to require lenders to provide us with certain representations and warranties that they would ordinarily be required to commit to in selling loans to us. As a result, we may face greater exposure to credit and other losses on these HARP loans. For more information, see "*Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program — Home Affordable Refinance Program.*"

Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal. In recent periods, some of our seller/servicers have failed to fully perform their repurchase obligations in a timely manner, and to a lesser extent, certain others have failed to perform on their obligations due to their weakened financial capacity. The table below provides a summary of our repurchase request activity for the three months ended March 31, 2012 and 2011.

**Table 30 — Repurchase Request Activity**[1]

| | Three Months Ended March 31, | |
| | 2012 | 2011 |
| | (in millions) | |
|---|---|---|
| Beginning balance, December 31, | $ 2,716 | $ 3,807 |
| New requests issued | 2,625 | 2,801 |
| Requests collected[2] | (854) | (1,248) |
| Requests cancelled[3] | (1,224) | (1,902) |
| Other[4] | (34) | (15) |
| Ending balance, March 31, | $ 3,229 | $ 3,443 |

(1) Beginning and ending balances represent the UPB of the loans associated with the repurchase requests. New requests issued and requests cancelled represent the amount of the request, while requests collected represent the amount of cash payment received.

(2) Requests collected include payments received upon fulfillment of the repurchase request, reimbursement of losses for requests associated with foreclosed mortgage loans, negotiated settlements, and other alternative remedies.

(3) Consists primarily of those requests that were resolved by the servicer providing missing documentation or a successful appeal of the request.

(4) Other includes items that affect the UPB of the loan while the repurchase request is outstanding, such as changes in UPB due to payments made on the loan. Also includes requests deemed uncollectible due to the insolvency or other failure of the counterparty.

As shown in the table above, the UPB of loans subject to open repurchase requests increased to approximately $3.2 billion as of March 31, 2012 from $2.7 billion as of December 31, 2011 because the volume of new request issuances exceeded the combined volume of requests collected and cancelled. As measured by UPB, approximately 38% and 39% of the repurchase requests outstanding at March 31, 2012 and December 31, 2011, respectively, were outstanding for four months or more since issuance of the initial request (these figures include repurchase requests for which appeals were pending). As of March 31, 2012, two of our largest seller/servicers had aggregate repurchase requests outstanding, based on UPB, of $1.7 billion, and approximately 47% of these requests were outstanding for four months or more since issuance of the initial request. The amount we expect to collect on the outstanding requests is significantly less than the UPB of the loans subject to the repurchase requests primarily because many of these requests will likely be satisfied by reimbursement of our realized credit losses by seller/servicers, instead of repurchase of loans at their UPB. Some of these requests also may be rescinded in the course of the contractual appeal process. Based on our historical loss experience and the fact that many of these loans are covered by credit enhancements (*e.g.*, mortgage insurance), we expect the actual

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3583                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

credit losses experienced by us should we fail to collect on these repurchase requests will also be less than the UPB of the loans.

Repurchase requests related to mortgage insurance rescission and claim denial tend to be outstanding longer than other repurchase requests. Of the total amount of repurchase requests outstanding at both March 31, 2012 and December 31, 2011, approximately $1.2 billion were issued due to mortgage insurance rescission or mortgage insurance claim denial. Our actual credit losses could increase should the mortgage insurance coverage not be reinstated and we fail to collect on these repurchase requests.

During 2010 and 2009, we entered into agreements with certain of our seller/servicers to release specified loans from certain repurchase obligations in exchange for one-time cash payments. As of March 31, 2012, loans totaling $155.8 billion in UPB, representing 9% of our single-family credit guarantee portfolio, were subject to such negotiated agreements. In a memorandum to the FHFA Office of Inspector General dated September 19, 2011, FHFA stated that in 2011 it had "suspended certain future repurchase agreements with seller/servicers concerning their repurchase obligations pending the outcome" of a review by Freddie Mac of its loan sampling methodology. We did not enter into any agreements with seller/servicers concerning release of their repurchase obligations during 2011 or the first quarter of 2012. During the first quarter of 2012, we revised our loan sampling methodology for 2012. Our methodology in 2012 expands the coverage of our loan reviews as compared to our prior sampling methodology and may result in higher levels of repurchase requests. We are continuing to discuss our loan sampling methodology with FHFA. We cannot predict when this process will be completed or whether or when FHFA will terminate or revise its suspension with respect to our entering into agreements concerning repurchase obligations with seller/servicers. It is possible that our loan sampling methodology could further change in ways that further increase our repurchase request volumes with our seller/servicers.

We meet with our larger seller/servicers with deficiencies identified during our performing loan sampling to help ensure they make appropriate changes to their underwriting processes. In addition, for all of our largest seller/servicers, we actively manage the current quality of loan originations by providing monthly written and oral communications regarding loan defect rates and the drivers of those defects as identified in our performing loan quality control sampling reviews. If necessary, we work with seller/servicers to develop an appropriate plan of corrective action. Our contracts with some seller/servicers give us the right to levy certain compensatory fees when mortgage loans delivered to us fail to meet our aggregate loan quality metrics.

Our estimate of recoveries from seller/servicer repurchase obligations is considered in our allowance for loan losses as of March 31, 2012 and December 31, 2011; however, our actual recoveries may be different than our estimates. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2011 Annual Report for further information. We believe we have appropriately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at March 31, 2012 and December 31, 2011; however, our actual losses may exceed our estimates.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top three single-family loan servicers, Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A. serviced approximately 26%, 12%, and 11%, respectively, of our single-family mortgage loans as of March 31, 2012, and together serviced approximately 49% of our single-family mortgage loans. Because we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, our business and financial results could be adversely affected. We also continue to be adversely affected by delays in the foreclosure process. See "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report and "LEGISLATIVE AND REGULATORY MATTERS —Developments Concerning Single-Family Servicing Practices."

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loan workout efforts, including under the MHA Program and the recent servicing alignment initiative, and therefore, we also have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans. We significantly revised our monitoring program for servicer performance during 2011. In March 2012, we announced changes to our monitoring program in order to provide for the assessment of certain fees to compensate us for deficiencies in servicer performance. These fees will go into effect on June 1, 2012 and September 1, 2012.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                              TREASURY-3584                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Multifamily Mortgage Seller/Servicers*

We are exposed to certain institutional credit risks arising from the potential non-performance by our multifamily mortgage servicers and our multifamily lenders, or customers. A significant portion of our multifamily mortgage loans are serviced by several large multifamily servicers. As of March 31, 2012, our top three multifamily servicers, Berkadia Commercial Mortgage LLC, CBRE Capital Markets, Inc., and Wells Fargo Bank, N.A., each serviced more than 10% of our multifamily mortgage portfolio, and together serviced approximately 40% of our multifamily mortgage portfolio. We acquire a significant portion of our multifamily purchase volume from several large customers. For the three months ended March 31, 2012, our top multifamily seller, CBRE Capital Markets, Inc., accounted for 26% of our multifamily purchase volume. Our top 10 multifamily lenders represented an aggregate of approximately 87% of our multifamily purchase volume for the three months ended March 31, 2012.

*Mortgage Insurers*

We have institutional credit risk relating to the potential insolvency of, or non-performance by, mortgage insurers that insure single-family mortgages we purchase or guarantee. As a guarantor, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. If any of our mortgage insurers that provide credit enhancement fail to fulfill their obligation, we could experience increased credit losses.

As part of the estimate of our loan loss reserves, we evaluate the recovery and collectability related to mortgage insurance policies for mortgage loans that we hold on our consolidated balance sheets as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities or covered by other guarantee commitments. We also evaluate the collectability of outstanding receivables from these counterparties related to outstanding and unpaid claims. We believe that many of our mortgage insurers are not sufficiently capitalized to withstand the stress of the current weak economic environment. Additionally, a number of our mortgage insurers have exceeded risk to capital ratios required by their state insurance regulators. In many cases, such states have issued waivers to allow the companies to continue writing new business in their states. Most waivers are temporary in duration or contain other conditions that the companies may be unable to continue to meet due to their weakened condition or other factors. Given the difficulties in the mortgage insurance industry, we believe it is likely that other mortgage insurers may exceed their regulatory capital limit in the future. As a result of these and other factors, we reduced our estimates of recovery associated with the expected amount of our claims for several of these insurers in determining our allowance for loan losses associated with our single-family loans on our consolidated balance sheets at March 31, 2012 and December 31, 2011.

The table below summarizes our exposure to mortgage insurers as of March 31, 2012. In the event that a mortgage insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses resulting from such failure. Our most significant exposure to these insurers is through primary mortgage insurance, and, as of March 31, 2012, we had primary mortgage insurance coverage on loans that represent approximately 11% of the UPB of our single-family credit guarantee portfolio.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 31 — Mortgage Insurance by Counterparty**

| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | As of March 31, 2012 | | |
|---|---|---|---|---|---|
| | | | Primary Insurance[2] | Pool Insurance[2] (in billions) | Coverage Outstanding[3] |
| Mortgage Guaranty Insurance Corporation (MGIC) | B | Negative | $ 46.0 | $ 23.1 | $ 11.8 |
| Radian Guaranty Inc | B | Negative | 35.8 | 6.6 | 9.9 |
| Genworth Mortgage Insurance Corporation | B | Negative | 28.6 | 0.8 | 7.2 |
| United Guaranty Residential Insurance Co. | BBB | Stable | 28.7 | 0.2 | 7.1 |
| PMI Mortgage Insurance Co. (PMI)[4] | CCC– | Negative | 22.5 | 0.8 | 5.7 |
| Republic Mortgage Insurance Company (RMIC)[5] | Not Rated | N/A | 18.2 | 1.7 | 4.6 |
| Triad Guaranty Insurance Corp (Triad)[6] | Not Rated | N/A | 7.7 | 0.5 | 1.9 |
| CMG Mortgage Insurance Co. | BBB | Negative | 3.0 | 0.1 | 0.7 |
| Essent Guaranty, Inc. | Not Rated | N/A | 1.3 | — | 0.3 |
| Total | | | $ 191.8 | $ 33.8 | $ 49.2 |

(1) Represents the rating and exposure for the corporate entity to which we have the greatest exposure. Coverage amounts may include coverage provided by consolidated affiliates and subsidiaries of the counterparty. Latest rating available as of April 23, 2012. Represents the lower of S&P and Moody's credit ratings and outlooks stated in terms of the S&P equivalent.

(2) Represents the amount of UPB at the end of the period for our single-family credit guarantee portfolio covered by the respective insurance type. These amounts are based on our gross coverage without regard to netting of coverage that may exist to the extent an affected mortgage is covered under both types of insurance. See "Table 4.5 — Recourse and Other Forms of Credit Protection" in "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further information.

(3) Represents the remaining aggregate contractual limit for reimbursement of losses under policies of both primary and pool insurance. These amounts are based on our gross coverage without regard to netting of coverage that may exist to the extent an affected mortgage is covered under both types of insurance.

(4) In October 2011, PMI began paying valid claims 50% in cash and 50% in deferred payment obligations under order of its state regulator.

(5) In January 2012, RMIC began paying valid claims 50% in cash and 50% in deferred payment obligations under order of its state regulator.

(6) In June 2009, Triad began paying valid claims 60% in cash and 40% in deferred payment obligations under order of its state regulator.

We received proceeds of $491 million and $587 million during the three months ended March 31, 2012 and 2011, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers, net of associated reserves, of $1.0 billion as of both March 31, 2012 and December 31, 2011.

The UPB of single-family loans covered by pool insurance declined approximately 15% during the three months ended March 31, 2012, primarily due to prepayments and other liquidation events. We did not purchase pool insurance on single-family loans during the three months ended March 31, 2012. In recent periods, we also reached the maximum limit of recovery on certain pool insurance policies.

Based on information we have received from MGIC, we understand that MGIC may challenge our current and future claims under certain of their pool insurance policies. We believe that our pool insurance policies with MGIC provide us with the right to obtain recoveries for losses up to the aggregate limit indicated in the table above. However, MGIC's interpretation of these policies would result in claims coverage approximately $0.6 billion lower than the amount of coverage outstanding set forth in the table above. This difference may increase, but we do not expect it to exceed approximately $0.7 billion.

In August 2011, we suspended PMI and its affiliates and RMIC and its affiliates as approved mortgage insurers, due to adverse developments concerning the companies. As a result, loans insured by either company (except relief refinance loans with pre-existing insurance) are ineligible for sale to Freddie Mac. Both PMI and RMIC recently instituted partial claim payment plans, under which claim payments will be made 50% in cash, with the remaining amount deferred. We and FHFA are in discussions with the state regulators of PMI and RMIC concerning future payments of our claims. It is not yet clear how the state regulators of PMI and RMIC will administer their respective deferred payment plans. In addition, to date, the state regulator has not allowed Triad to begin paying its deferred payment obligations, and it is uncertain when or if Triad will be permitted to do so. If Triad, PMI, and RMIC do not pay their deferred payment obligations, we would lose a significant portion of the coverage from these counterparties shown in the table above.

In addition to Triad, RMIC, and PMI, we believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as those claims emerge. In the future, we believe our mortgage insurance exposure will likely be concentrated among a smaller number of counterparties.

*Bond Insurers*

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering certain of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. Bond insurance exposes us to the risk that the bond insurer will be unable to satisfy claims.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          TREASURY-3586          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents our coverage amounts of bond insurance, including secondary coverage, for the non-agency mortgage-related securities we hold. In the event a bond insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses related to such a failure.

**Table 32 — Bond Insurance by Counterparty**

| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | As of March 31, 2012 | |
| | | | Coverage Outstanding[2] | Percent of Total[2] |
| --- | --- | --- | --- | --- |
| | | | (dollars in billions) | |
| Ambac Assurance Corporation (Ambac)[3] | Not Rated | N/A | $   4.2 | 45% |
| Financial Guaranty Insurance Company (FGIC)[3] | Not Rated | N/A | 1.7 | 18 |
| MBIA Insurance Corp. | B– | Under Review | 1.3 | 13 |
| Assured Guaranty Municipal Corp. | AA– | Negative | 1.1 | 11 |
| National Public Finance Guarantee Corp. | BBB | Negative | 1.1 | 12 |
| Syncora Guarantee Inc.[3] | CC | Developing | 0.1 | 1 |
| Radian Guaranty Inc. (Radian) | B | Negative | <0.1 | <1 |
| Total | | | $   9.5 | 100% |

(1) Represents the rating and exposure for the corporate entity to which we have the greatest exposure, which in some cases is a holding company. Coverage amounts may include coverage provided by consolidated affiliates and subsidiaries of the counterparty. Latest ratings available as of April 23, 2012. Represents the lower of S&P and Moody's credit ratings stated in terms of the S&P equivalent.
(2) Represents the remaining contractual limit for reimbursement of losses, including lost interest and other expenses, on non-agency mortgage-related securities.
(3) Ambac, FGIC, and Syncora Guarantee Inc. are currently operating under regulatory supervision.

We monitor the financial strength of our bond insurers in accordance with our risk management policies. Some of our larger bond insurers are in runoff mode where no new business is being written. We expect to receive substantially less than full payment of our claims from several of our bond insurers, including Ambac and FGIC, due to adverse developments concerning these companies. Ambac and FGIC are currently not paying any of their claims. We believe that we will likely receive substantially less than full payment of our claims from some of our other bond insurers, because we believe they also lack sufficient ability to fully meet all of their expected lifetime claims-paying obligations to us as such claims emerge. In the event one or more of our other bond insurers were to become subject to a regulatory order or insolvency proceeding, our ability to recover certain unrealized losses on our mortgage-related securities would be negatively impacted. We considered our expectations regarding our bond insurers' ability to meet their obligations in making our impairment determinations at March 31, 2012 and December 31, 2011. See "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-For-Sale Securities" for additional information regarding impairment losses on securities covered by bond insurers.

*Cash and Other Investments Counterparties*

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily major financial institutions and the Federal Reserve Bank. As of March 31, 2012 and December 31, 2011, there were $60.7 billion and $68.5 billion, respectively, of cash and other non-mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information on counterparty credit ratings and concentrations within our cash and other investments.

*Derivative Counterparties*

We use exchange-traded derivatives and OTC derivatives and are exposed to institutional credit risk with respect to both types of derivatives. We are an active user of exchange-traded derivatives, such as Treasury and Eurodollar futures, and are required to post initial and maintenance margin with our clearing firm in connection with such transactions. The posting of this margin exposes us to institutional credit risk in the event that our clearing firm or the exchange's clearinghouse fail to meet their obligations. However, the use of exchange-traded derivatives lessens our institutional credit risk exposure to individual counterparties because a central counterparty is substituted for individual counterparties, and changes in the value of open exchange-traded contracts are settled daily via payments made through the financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk to individual counterparties because transactions are executed and settled directly between us and each counterparty, exposing us to potential losses if a counterparty fails to meet its contractual obligations. When our net position with a counterparty in OTC derivatives subject to a master netting agreement has a market value above zero (*i.e.*, it is an asset reported as

51                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012        TREASURY-3587        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

derivative assets, net on our consolidated balance sheets), the  counterparty is obligated to deliver collateral in the form of  cash, securities, or a combination of both, in an amount equal to that market value (less a small unsecured "threshold" amount) as necessary to satisfy its net obligation to us under the master agreement.

All of our OTC derivative counterparties are major financial  institutions and are experienced participants in the OTC  derivatives market. A large number of OTC derivative counterparties had credit ratings of A+, A, or A− as of April 23, 2012. We require counterparties with such credit ratings to post collateral if our net exposure to them on  derivative contracts exceeds $1 million. See  "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

The relative concentration of our derivative exposure among our  primary derivative counterparties remains high. This  concentration has increased significantly since 2008 primarily  due to industry consolidation and the failure or weakening of  certain counterparties, and could further increase. The table below summarizes our exposure to our derivative counterparties,  which represents the net positive fair value of derivative contracts, related accrued interest and collateral held by us  from our counterparties, after netting by counterparty as  applicable (*i.e.*, net amounts due to us under derivative  contracts which are recorded as derivative assets). In addition,  we have derivative liabilities where we post collateral to counterparties. Pursuant to certain collateral agreements we  have with derivative counterparties, the amount of collateral  that we are required to post is based on the credit rating of  our long-term senior unsecured debt securities from S&P or  Moody's. The lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative  transactions. At March 31, 2012, our collateral posted  exceeded our collateral held. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Derivative Assets and Liabilities, Net" and "Table 25 — Derivative Fair Values and Maturities" for a reconciliation of fair value to the amounts presented on our consolidated balance sheets as  of March 31, 2012, which includes both cash collateral held  and posted by us, net.

52

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                                                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 33 — Derivative Counterparty Credit Exposure**

| Rating[1] | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
|---|---|---|---|---|---|---|
| | | As of March 31, 2012 | | | | |
| | | (dollars in millions) | | | | |
| AA– | 5 | $ 71,261 | $ 499 | $ 36 | 5.5 | $10 million or less |
| A+ | 6 | 307,792 | 1,668 | 25 | 6.2 | $1 million or less |
| A | 7 | 268,535 | 135 | 96 | 5.8 | $1 million or less |
| A– | 1 | 42,942 | — | — | 6.4 | $1 million or less |
| Subtotal[7] | 19 | 690,530 | 2,302 | 157 | 6.0 | |
| Futures and clearinghouse-settled derivatives | | 44,581 | 2 | 2 | | |
| Commitments | | 22,298 | 22 | 22 | | |
| Swap guarantee derivatives | | 3,631 | — | — | | |
| Other derivatives[8] | | 15,703 | 1 | 1 | | |
| Total derivatives | | $ 776,743 | $ 2,327 | $ 182 | | |

| Rating[1] | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
|---|---|---|---|---|---|---|
| | | As of December 31, 2011 | | | | |
| | | (dollars in millions) | | | | |
| AA– | 5 | $ 73,277 | $ 536 | $ 19 | 5.0 | $10 million or less |
| A+ | 6 | 337,013 | 2,538 | 1 | 5.8 | $1 million or less |
| A | 5 | 208,416 | 12 | 51 | 6.2 | $1 million or less |
| A– | 2 | 89,284 | — | — | 5.5 | $1 million or less |
| Subtotal[7] | 18 | 707,990 | 3,086 | 71 | 5.8 | |
| Futures and clearinghouse-settled derivatives | | 43,831 | 8 | 8 | | |
| Commitments | | 14,318 | 38 | 38 | | |
| Swap guarantee derivatives | | 3,621 | — | — | | |
| Other derivatives[8] | | 18,489 | 1 | 1 | | |
| Total derivatives | | $788,249 | $ 3,133 | $ 118 | | |

(1) We use the lower of S&P and Moody's ratings to manage collateral requirements. In this table, the Moody's rating of the legal entity is stated in terms of the S&P equivalent.

(2) Based on legal entities.

(3) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged.

(4) For each counterparty, this amount includes derivatives with a positive fair value (recorded as derivative assets, net), including the related accrued interest receivable/payable, when applicable. For counterparties included in the subtotal, positions are shown netted at the counterparty level including accrued interest receivable/payable and trade/settle fees.

(5) Calculated as Total Exposure at Fair Value less cash collateral held as determined at the counterparty level. Includes amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level. For derivatives settled through an exchange or clearinghouse, excludes consideration of maintenance margin posted by our counterparty.

(6) Counterparties are required to post collateral when their exposure exceeds agreed-upon collateral posting thresholds. These thresholds are typically based on the counterparty's credit rating and are individually negotiated.

(7) Consists of OTC derivative agreements for interest-rate swaps, option-based derivatives (excluding certain written options), foreign-currency swaps, and purchased interest-rate caps.

(8) Consists primarily of certain written options, and certain credit derivatives. Written options do not present counterparty credit exposure, because we receive a one-time up-front premium in exchange for giving the holder the right to execute a contract under specified terms, which generally puts us in a liability position.

Over time, our exposure to individual counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps varies depending on changes in fair values, which are affected by changes in period-end interest rates, the implied volatility of interest rates, foreign-currency exchange rates, and the amount of derivatives held. If all of our counterparties for these derivatives had defaulted simultaneously on March 31, 2012, the combined amount of our uncollateralized and overcollateralized exposure to these counterparties, or our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately $157 million. Our similar exposure as of December 31, 2011 was $71 million. Four counterparties each accounted for greater than 10% and collectively accounted for 83% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at March 31, 2012. These counterparties were BNP Paribas, Deutsche Bank, A.G., Royal Bank of Scotland, and UBS AG., all of which were rated "A" or above by S&P as of April 23, 2012.

Approximately 97% of our counterparty credit exposure for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps was collateralized at March 31, 2012 (excluding amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level). The remaining exposure was primarily due to exposure amounts below the applicable counterparty collateral posting threshold,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012      TREASURY-3589      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

as well as market movements during the time period between when a derivative was marked to fair value and the date we received the related collateral. In some instances, these market movements result in us having provided collateral that has fair value in excess of our obligation, which represents our overcollateralization exposure. Collateral is typically transferred within one business day based on the values of the related derivatives.

In the event a derivative counterparty defaults, our economic loss may be higher than the uncollateralized exposure of our derivatives if we are not able to replace the defaulted derivatives in a timely and cost-effective fashion. We could also incur economic loss if the collateral held by us cannot be liquidated at prices that are sufficient to recover the amount of such exposure. We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps will increase under certain adverse market conditions by performing daily market stress tests. These tests, which involve significant management judgment, evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties on OTC derivatives contracts assuming certain changes in the level and implied volatility of interest rates and certain changes in foreign currency exchange rates over a brief time period. Our actual exposure could vary significantly from amounts forecasted by these tests.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives for accounting purposes, was $22 million and $38 million at March 31, 2012 and December 31, 2011, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis in an effort to ensure that they continue to meet our internal risk-management standards.

*Selected European Sovereign and Non-Sovereign Exposures*

The sovereign debt of Spain, Italy, Ireland, Portugal, and Greece (which we refer to herein as the "troubled European countries") and the credit status of financial institutions with significant exposure to the troubled European countries has been adversely impacted due to weaknesses in the economic and fiscal situations of those countries. In recent periods, Moody's and S&P downgraded a number of European countries, including Italy, Spain, and Portugal. We are monitoring our exposures to these countries and institutions.

As of March 31, 2012, we did not hold any debt issued by the governments of the troubled European countries and did not hold any financial instruments entered into with sovereign governments in those countries. As of that date, we also did not hold any debt issued by corporations or financial institutions domiciled in the troubled European countries and did not hold any other financial instruments entered into with corporations or financial institutions domiciled in those countries. For purposes of this discussion, we consider an entity to be domiciled in a country if its parent entity is headquartered in that country.

Our derivative portfolio and cash and other investments portfolio counterparties include a number of major European and non-European financial institutions. Many of these institutions operate in Europe, and we believe that all of these financial institutions have direct or indirect exposure to the troubled European countries. For many of these institutions, their direct and indirect exposures to the troubled European countries change on a daily basis. We monitor our major counterparties' exposures to the troubled European countries, and adjust our exposures and risk limits to individual counterparties accordingly. Our exposures to derivative portfolio and cash and other investments portfolio counterparties are described in "Derivative Counterparties," "Cash and Other Investments Counterparties" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

We took a number of actions in 2011 designed to reduce our exposures to certain derivative portfolio and cash and other investments portfolio counterparties due to their exposure to the troubled European countries, including substantially reducing our derivative exposure limits, our limits on the amount of unsecured overnight deposits, and our limits for asset-backed commercial paper. For certain repurchase counterparties, we reduced the credit limit and restricted the term of such transactions to overnight. We also ceased investing in prime money funds that could hold substantial amounts of non-U.S. sovereign debt.

It is possible that continued adverse developments in Europe could significantly impact our counterparties that have direct or indirect exposure to the troubled European countries. In turn, this could adversely affect their ability to meet their obligations to us. For more information, see "RISK FACTORS — Competitive and Market Risks — *We depend on our institutional counterparties to provide services that are critical to our business, and our results of operations or*

54                                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*financial condition may be adversely affected if one or more of our institutional counterparties do not meet their obligations to us"* in our 2011 Annual Report.

### Mortgage Credit Risk

We are exposed to mortgage credit risk principally in our single-family credit guarantee and multifamily mortgage portfolios because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment. We are also exposed to mortgage credit risk related to our investments in non-Freddie Mac mortgage-related securities. All mortgages that we purchase or guarantee have an inherent risk of default. For information about our holdings of these securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities.*"

### Single-Family Mortgage Credit Risk

Single-family mortgage credit risk is primarily influenced by the credit profile of the borrower of the mortgage loan (*e.g.*, credit score, credit history, and monthly income relative to debt payments), documentation level, the number of borrowers, the features of the mortgage itself, the purpose of the mortgage, occupancy type, property type, the LTV ratio, and local and regional economic conditions, including home prices and unemployment rates. Through our delegated underwriting process, single-family mortgage loans and the borrowers' ability to repay the loans are evaluated using several critical risk characteristics, including, but not limited to, the borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the original LTV ratio, the type of mortgage product, and the occupancy type of the loan.

In the first quarter of 2012, we continued our efforts to build value for the industry and build the infrastructure for a future housing finance system. These efforts include the implementation of the UMDP which provides us with the ability to collect additional data that we believe will improve our risk management practices. The UMDP creates standard terms and definitions to be used throughout the industry and establishes standard reporting protocols. The UMDP is a key building block in developing a future secondary mortgage market. In the first quarter of 2012, we completed a key milestone of the UMDP with the launch of the Uniform Collateral Data Portal for the electronic submission of appraisal reports for conventional mortgages. FHFA also directed us and Fannie Mae to discuss harmonizing our seller/servicer contracts.

As part of our quality control process, after our purchase of the loans, we review the underwriting documentation for a sample of loans for compliance with our contractual standards. The most common underwriting deficiencies found in our reviews during 2011 were related to insufficient income and inadequate or missing documentation to support borrower qualification. The next most common deficiency was inaccurate data entered into Loan Prospector, our automated underwriting system. We are continuing to perform quality control sampling for loans we purchased in 2011 and have not yet compiled our results.

For loans with identified underwriting deficiencies, we may require immediate repurchase or allow performing loans to remain in our portfolio subject to our continued right to issue a repurchase request to the seller/servicers, depending on the facts and circumstances. Our right to request repurchase by seller/servicers is intended to protect us against deficiencies in underwriting by our seller/servicers. While this protection is intended to reduce our mortgage credit risk, it increases our institutional risk exposure to seller/servicers. See "*Institutional Credit Risk — Single-Family Mortgage Seller/Servicers*" for further information on repurchase requests.

Conditions in the mortgage market improved in certain geographical areas but continued to remain challenging during the first quarter of 2012. Most single-family mortgage loans, especially those originated from 2005 through 2008, have been affected by the compounding pressures on household wealth caused by significant declines in home values that began in 2006 and the ongoing weak employment environment. As of March 31, 2012 and December 31, 2011, the serious delinquency rate for loans originated in 2005 through 2008 in our single-family credit guarantee portfolio was 8.93% and 8.75%, respectively, whereas the serious delinquency rate for loans originated in 2009 through 2011 was 0.34% and 0.30%, respectively. Our serious delinquency rates remained high in the first quarter of 2012 compared to historical levels, as discussed in "Credit Performance — Delinquencies." The UPB of our single-family non-performing loans remained at high levels during the first quarter of 2012.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                TREASURY-3591                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Characteristics of the Single-Family Credit Guarantee Portfolio*

The average UPB of loans in our single-family credit guarantee portfolio was approximately $151,000 at both March 31, 2012 and December 31, 2011. We purchased or guaranteed approximately 491,000 and 461,000 single-family loans totaling $105.1 billion and $97.6 billion of UPB during the first quarters of 2012 and 2011, respectively. Our single-family credit guarantee portfolio predominately consists of first-lien, fixed-rate mortgage loans secured by the borrower's primary residence. Our guarantees related to second-lien mortgage loans in the single-family credit guarantee portfolio are insignificant.

The percentage of home purchase loans in our loan acquisition volume continued to remain at low levels and refinance activity remained high during the first quarter of 2012. Approximately 95% of the single-family mortgages we purchased in the first quarter of 2012 were fixed-rate amortizing mortgages, based on UPB. Approximately 87% of the single-family mortgages we purchased in the first quarter of 2012 were refinance mortgages, and approximately 31% of these refinance mortgages were relief refinance mortgages, based on UPB.

The table below provides additional characteristics of single-family mortgage loans purchased during the first quarters of 2012 and 2011, and of our single-family credit guarantee portfolio at March 31, 2012 and December 31, 2011.

56 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio[1]**

| | Purchases During the Three Months Ended March 31, | | Portfolio Balance at[2] | |
| --- | --- | --- | --- | --- |
| | 2012 | 2011 | March 31, 2012 | December 31, 2011 |
| **Original LTV Ratio Range[3][4]** | | | | |
| 60% and below | 33% | 33% | 23% | 23% |
| Above 60% to 70% | 18 | 18 | 15 | 16 |
| Above 70% to 80% | 40 | 42 | 42 | 42 |
| Above 80% to 90% | 5 | 4 | 10 | 9 |
| Above 90% to 100% | 4 | 3 | 8 | 8 |
| Above 100% | <1 | <1 | 2 | 2 |
| Total | 100% | 100% | 100% | 100% |
| Weighted average original LTV ratio | 66% | 66% | 72% | 72% |
| **Estimated Current LTV Ratio Range[5]** | | | | |
| 60% and below | | | 25% | 25% |
| Above 60% to 70% | | | 12 | 12 |
| Above 70% to 80% | | | 18 | 18 |
| Above 80% to 90% | | | 15 | 15 |
| Above 90% to 100% | | | 10 | 10 |
| Above 100% to 110% | | | 6 | 6 |
| Above 110% to 120% | | | 4 | 4 |
| Above 120% | | | 10 | 10 |
| Total | | | 100% | 100% |
| Weighted average estimated current LTV ratio: | | | | |
| Relief refinance mortgages[6] | | | 80% | 79% |
| All other mortgages | | | 80% | 80% |
| Total mortgages | | | 80% | 80% |
| **Credit Score[3][7]** | | | | |
| 740 and above | 78% | 74% | 55% | 55% |
| 700 to 739 | 15 | 18 | 21 | 21 |
| 660 to 699 | 6 | 7 | 14 | 14 |
| 620 to 659 | 1 | 1 | 7 | 7 |
| Less than 620 | <1 | <1 | 3 | 3 |
| Total | 100% | 100% | 100% | 100% |
| Weighted average credit score: | | | | |
| Relief refinance mortgages[6] | 743 | 745 | 743 | 744 |
| All other mortgages | 763 | 758 | 735 | 734 |
| Total mortgages | 758 | 754 | 736 | 735 |
| **Loan Purpose** | | | | |
| Purchase | 13% | 15% | 29% | 30% |
| Cash-out refinance | 16 | 19 | 26 | 27 |
| Other refinance[8] | 71 | 66 | 45 | 43 |
| Total | 100% | 100% | 100% | 100% |
| **Property Type** | | | | |
| Detached/townhome[9] | 95% | 94% | 92% | 92% |
| Condo/Co-op | 5 | 6 | 8 | 8 |
| Total | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | |
| Primary residence | 92% | 92% | 91% | 91% |
| Second/vacation home | 4 | 4 | 5 | 5 |
| Investment | 4 | 4 | 4 | 4 |
| Total | 100% | 100% | 100% | 100% |

(1) Purchases and ending balances are based on the UPB of the single-family credit guarantee portfolio. Other Guarantee Transactions with ending balances of $2 billion at March 31, 2012 and December 31, 2011, are excluded from portfolio balance data since these securities are backed by non-Freddie Mac issued securities for which the loan characteristics data was not available.

(2) Includes loans acquired under our relief refinance initiative, which began in 2009.

(3) Purchases columns exclude mortgage loans acquired under our relief refinance initiative, unless otherwise noted. See "Table 37 — Single-Family Refinance Loan Volume" for further information on the LTV ratios of these loans.

(4) Original LTV ratios are calculated as the amount of the mortgage we guarantee including the credit-enhanced portion, divided by the lesser of the appraised value of the property at the time of mortgage origination or the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation because we generally do not receive data about them. The existence of a second lien mortgage reduces the borrower's equity in the home and, therefore, can increase the risk of default.

(5) Current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination. Estimated current LTV ratio range is not applicable to purchase activity, and excludes any secondary financing by third parties.

(6) Relief refinance mortgages of all LTV ratios comprised approximately 13% and 11% of our single-family credit guarantee portfolio by UPB as of March 31, 2012 and December 31, 2011, respectively.

(7) Credit score data is based on FICO scores. Although we obtain updated credit information on certain borrowers after the origination of a mortgage, such as those borrowers seeking a modification, the scores presented in this table represent the credit score of the borrower at the time of loan origination and may not be indicative of borrowers' creditworthiness at March 31, 2012. Excludes less than 1% of loans in the portfolio because the FICO scores at origination were not available at March 31, 2012.

(8) Other refinance transactions include: (a) refinance mortgages with "no cash-out" to the borrower; and (b) refinance mortgages for which the delivery data provided was not sufficient for us to determine whether the mortgage was a cash-out or a no cash-out refinance transaction.

(9) Includes manufactured housing and homes within planned unit development communities. The UPB of manufactured housing mortgage loans purchased during the three months ended March 31, 2012 and 2011, was $139 million and $123 million, respectively.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or sell the property for an amount at or above the balance of the outstanding mortgage loan. Based on our historical experience, there is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80%. The UPB of mortgages in our single-family credit guarantee portfolio with estimated current LTV ratios greater than 100% was 20% of the total at both March 31, 2012 and December 31, 2011, and the serious delinquency rate for these loans was 12.6% and 12.8%, respectively. Due to declines in home prices since 2006, we estimate that as of March 31, 2012 and December 31, 2011, approximately 50% and 49%, respectively, of the loans originated in 2005 through 2008 that remained in our single-family credit guarantee portfolio as of those dates had current LTV ratios greater than 100%. In recent years, loans with current LTV ratios greater than 100% have contributed disproportionately to our credit losses.

A second lien mortgage reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of both March 31, 2012 and December 31, 2011, approximately 15% of loans in our single-family credit guarantee portfolio had second lien financing by third parties at the time of origination of the first mortgage, and we estimate that these loans comprised 17% of our seriously delinquent loans at both dates, based on UPB. However, borrowers are free to obtain second lien financing after origination and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

<u>Attribute Combinations</u>

Certain combinations of loan characteristics often can indicate a higher degree of credit risk. For example, single-family mortgages with both high LTV ratios and borrowers who have lower credit scores typically experience higher rates of serious delinquency and default. We estimate that there were $11.2 billion and $11.1 billion at March 31, 2012 and December 31, 2011, respectively, of loans in our single-family credit guarantee portfolio with both original LTV ratios greater than 90% and FICO scores less than 620 at the time of loan origination. Certain mortgage product types, including interest-only or option ARM loans, that have additional higher risk characteristics, such as lower credit scores or higher LTV ratios, will also have a higher risk of default than those same products without these characteristics. See "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for information about certain attribute combinations of single-family mortgage loans.

*Single-Family Mortgage Product Types*

Product mix affects the credit risk profile of our total mortgage portfolio. The primary mortgage products in our single-family credit guarantee portfolio are first lien, fixed-rate mortgage loans. In general, 15-year amortizing fixed-rate mortgages exhibit the lowest default rate among the types of mortgage loans we securitize and purchase, due to the accelerated rate of principal amortization on these mortgages and the credit profiles of borrowers who seek and qualify for them. In a rising interest rate environment, balloon/reset and ARM borrowers typically default at a higher rate than fixed-rate borrowers. However, in recent years, during which interest rates have generally remained relatively low, our delinquency and default rates on adjustable-rate and balloon/reset mortgage loans continue to be as high as, or higher than, those on fixed-rate loans because these borrowers also have been affected by declining housing and economic conditions and/or had other higher-risk characteristics. Interest-only and option ARM loans are higher-risk mortgage products based on the features of these types of loans. See "*Other Categories of Single-Family Mortgage Loans*" below for additional information on higher-risk mortgages in our single-family credit guarantee portfolio.

In recent periods, we experienced a high volume of loan modifications, as troubled borrowers were able to take advantage of the various programs that we offered. The majority of our loan modifications result in new terms that include predetermined interest rates for the remaining term of the loan. For example, our HAMP loan modifications result in an initial below-market interest rate that after five years gradually adjusts to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate products for presentation within this Form 10-Q and elsewhere in our reporting even though they have a rate adjustment provision because the future rates are determined at the time of modification rather than at a subsequent date.

The following paragraphs provide information on the interest-only, option ARM, and conforming jumbo loans in our single-family credit guarantee portfolio. Interest-only and option ARM loans have experienced significantly higher serious delinquency rates than fixed-rate amortizing mortgage products.

58

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Interest-Only Loans

Interest-only loans have an initial period during which the borrower pays only interest, and at a specified date the monthly payment increases to begin reflecting repayment of principal. Interest-only loans represented approximately 4% of the UPB of our single-family credit guarantee portfolio at both March 31, 2012 and December 31, 2011. We fully discontinued purchasing such loans on September 1, 2010.

Option ARM Loans

Most option ARM loans have initial periods during which the borrower has various options as to the amount of each monthly payment, until a specified date, when the terms are recast. At both March 31, 2012 and December 31, 2011, option ARM loans represented less than 1% of the UPB of our single-family credit guarantee portfolio. Included in this exposure was $7.1 billion and $7.3 billion of option ARM securities underlying certain of our Other Guarantee Transactions at March 31, 2012 and December 31, 2011, respectively. While we have not categorized these option ARM securities as either subprime or Alt-A securities for presentation within this Form 10-Q and elsewhere in our reporting, they could exhibit similar credit performance to collateral identified as subprime or Alt-A. We have not purchased option ARM loans in our single-family credit guarantee portfolio since 2007. For information on our exposure to option ARM loans through our holdings of non-agency mortgage-related securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Conforming Jumbo Loans

We purchased $8.6 billion and $7.3 billion of conforming jumbo loans during the first quarters of 2012 and 2011, respectively. The UPB of conforming jumbo loans in our single-family credit guarantee portfolio as of March 31, 2012 and December 31, 2011 was $52.5 billion and $49.8 billion, respectively, or 3% of the UPB of our single-family credit guarantee portfolio at both dates. The average size of these loans was approximately $541,000 and $545,000 at March 31, 2012 and December 31, 2011, respectively. For loans originated after September 30, 2011, conforming jumbo loans on a one-family residence have UPB at origination that is greater than $417,000 and up to $625,500 in certain "high-cost" areas. See "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments*" in our 2011 Annual Report for further information on the conforming loan limits.

*Other Categories of Single-Family Mortgage Loans*

While we have classified certain loans as subprime or Alt-A for purposes of the discussion below and elsewhere in this Form 10-Q, there is no universally accepted definition of subprime or Alt-A, and our classification of such loans may differ from those used by other companies. For example, some financial institutions may use FICO scores to delineate certain residential mortgages as subprime. In addition, we do not rely primarily on these loan classifications to evaluate the credit risk exposure relating to such loans in our single-family credit guarantee portfolio. For a definition of the subprime and Alt-A single-family loans and securities in this Form 10-Q, see "GLOSSARY."

Subprime Loans

Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see *Higher Risk Loans in the Single-Family Credit Guarantee Portfolio*" and "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for further information). In addition, we estimate that approximately $2.2 billion and $2.3 billion of security collateral underlying our Other Guarantee Transactions at March 31, 2012 and December 31, 2011, respectively, were identified as subprime based on information provided to us when we entered into these transactions.

We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions. At March 31, 2012 and December 31, 2011, we held $47.9 billion and $49.0 billion, respectively, in UPB of non-agency mortgage-related securities backed by subprime loans. These securities were structured to provide credit enhancements, and 6% and 7% of these securities were investment grade at March 31, 2012 and December 31, 2011, respectively. The credit performance of loans underlying these securities has deteriorated significantly since 2008 and further deteriorated during the first quarter of 2012. For more information on our exposure to subprime mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012            TREASURY-3595                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Alt-A Loans

Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. The UPB of Alt-A loans in our single-family credit guarantee portfolio declined to $89.4 billion as of March 31, 2012 from $94.3 billion as of December 31, 2011. The UPB of our Alt-A loans declined in the first quarter of 2012 primarily due to refinancing into other mortgage products, foreclosure transfers, and other liquidation events. As of March 31, 2012, for Alt-A loans in our single-family credit guarantee portfolio, the average FICO score at origination was 717. Although Alt-A mortgage loans comprised approximately 5% of our single-family credit guarantee portfolio as of March 31, 2012, these loans represented approximately 24% of our credit losses during the first quarter of 2012.

Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in one of these programs and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. From the time the relief refinance initiative began in 2009 to March 31, 2012, we purchased approximately $16.7 billion of relief refinance mortgages that were previously categorized as Alt-A loans in our portfolio, including $1.4 billion during the first quarter of 2012.

We also hold investments in non-agency mortgage-related securities backed by single-family Alt-A loans. At March 31, 2012 and December 31, 2011, we held investments of $16.3 billion and $16.8 billion, respectively, of non-agency mortgage-related securities backed by Alt-A and other mortgage loans and 15% of these securities were categorized as investment grade at both dates. The credit performance of loans underlying these securities has deteriorated significantly since 2008 and experienced further deterioration during the first quarter of 2012. We categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. For more information on our exposure to Alt-A mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Higher-Risk Loans in the Single-Family Credit Guarantee Portfolio

The table below presents information about certain categories of single-family mortgage loans within our single-family credit guarantee portfolio that we believe include certain higher-risk characteristics. These loans include categories based on product type and borrower characteristics present at origination. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%).

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          TREASURY-3596          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 35 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio[1]**

| | As of March 31, 2012 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | (dollars in billions) | | | |
| Loans with one or more specified characteristics | $342.2 | 105% | 7.3% | 9.0% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 89.4 | 107 | 9.4 | 11.8 |
| Interest-only[6] | 67.3 | 120 | 0.2 | 17.2 |
| Option ARM[7] | 8.1 | 117 | 6.1 | 19.6 |
| Original LTV ratio greater than 90%, non-HARP mortgages[8] | 105.2 | 107 | 8.4 | 8.3 |
| Original LTV ratio greater than 90%, HARP mortgages[8] | 70.0 | 105 | 0.1 | 1.3 |
| Lower FICO scores at origination (less than 620)[8] | 54.4 | 93 | 13.8 | 12.6 |

| | As of December 31, 2011 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | (dollars in billions) | | | |
| Loans with one or more specified characteristics | $342.9 | 105% | 7.2% | 9.3% |
| Categories (individual characteristics): | | | | |
| Alt-A[5] | 94.3 | 107 | 8.8 | 11.9 |
| Interest-only[6] | 72.0 | 120 | 0.2 | 17.6 |
| Option ARM[7] | 8.4 | 119 | 5.5 | 20.5 |
| Original LTV ratio greater than 90%, non-HARP mortgages[8] | 107.9 | 108 | 8.1 | 8.5 |
| Original LTV ratio greater than 90%, HARP mortgages[8] | 59.3 | 104 | 0.1 | 1.3 |
| Lower FICO scores at origination (less than 620)[8] | 55.6 | 93 | 13.4 | 12.9 |

(1) Categories are not additive and a single loan may be included in multiple categories if more than one characteristic is associated with the loan. Loans with a combination of these characteristics will have an even higher risk of default than those with an individual characteristic.

(2) See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of current LTV ratios.

(3) Represents the percentage of loans based on loan count in our single-family credit guarantee portfolio that have been modified under agreement with the borrower, including those with no changes in the interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan. Excludes loans underlying certain Other Guarantee Transactions for which data was not available.

(4) See "Credit Performance — Delinquencies" for further information about our reported serious delinquency rates.

(5) Loans within the Alt-A category continue to remain in that category following modification, even though the borrower may have provided full documentation of assets and income to complete the modification.

(6) The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post-modification), primarily due to delays in processing.

(7) Loans within the option ARM category continue to remain in that category following modification, even though the modified loan no longer provides for optional payment provisions.

(8) See endnotes (4) and (7) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios and our presentation of FICO scores, respectively.

A significant portion of the loans in the higher-risk categories presented in the table above were originated in 2005 through 2008. Except for HARP loans with LTV ratios greater than 90%, we purchased a limited amount of loans in the higher-risk categories presented above since the beginning of 2009, and have fully discontinued purchases of Alt-A (effective March 1, 2009), interest-only (effective September 1, 2010), and option ARM (since 2007) loans. The UPB of loans originated in 2005 to 2008 within our single-family credit guarantee portfolio, which have a higher composition of loans with higher-risk characteristics, continues to decline primarily due to repayments and other liquidations, including completed foreclosure alternatives and foreclosure transfers. We currently expect that, over time, the replacement (other than through relief refinance activity) of the 2005 to 2008 vintages should positively impact the serious delinquency rates and credit-related expenses of our single-family credit guarantee portfolio. However, the rate at which this replacement is occurring remains slow, primarily due to low volumes of home purchase mortgage originations and delays in the foreclosure process. For the first quarter of 2012, loans originated in 2005 through 2008 in our single-family credit guarantee portfolio comprised approximately 88% of our credit losses.

Loans within one or more of the higher-risk categories presented in the table above comprised approximately 20% of our single-family credit guarantee portfolio as of both March 31, 2012 and December 31, 2011. The total UPB of loans in our single-family credit guarantee portfolio with one or more of these characteristics declined slightly to $342.2 billion as of March 31, 2012 from $342.9 billion as of December 31, 2011. This decline was principally due to repayments and other liquidations, including completed foreclosure alternatives and foreclosure transfers, but was substantially offset by increases in loans with original LTV ratios greater than 90% due to significant relief refinance mortgage activity during the first quarter of 2012. The serious delinquency rates associated with loans with one or more of the above characteristics declined to 9.0% as of March 31, 2012 from 9.3% as of December 31, 2011.

TREASURY-3597

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                                   Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Credit Enhancements*

The portfolio information below excludes our holdings of non-Freddie Mac mortgage-related securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities*" for credit enhancement and other information about our investments in non-Freddie Mac mortgage-related securities.

Our charter requires that single-family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests. However, as discussed below, under HARP, we allow eligible borrowers who have mortgages with high current LTV ratios to refinance their mortgages without obtaining new mortgage insurance in excess of what was already in place. Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements. Our credit losses could increase if an entity that provides credit enhancement fails to fulfill its obligation, as this would reduce the amount of our recoveries.

At March 31, 2012 and December 31, 2011, our credit-enhanced mortgages represented 13% and 14%, respectively, of our single-family credit guarantee portfolio, excluding those backing Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative. Freddie Mac securities backed by Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative are excluded because we consider the incremental credit risk to which we are exposed to be insignificant.

We recognized recoveries (excluding reimbursements for our expenses) of $515 million and $684 million that reduced our charge-offs of single-family loans during the three months ended March 31, 2012 and 2011, respectively. These amounts include $298 million and $435 million during the three months ended March 31, 2012 and 2011, respectively, in recognized recoveries associated with our primary and pool mortgage insurance policies. We recognized additional recoveries associated with our primary and pool mortgage insurance policies that reduced our single-family REO operations expenses by $23 million and $86 million for the three months ended March 31, 2012 and 2011, respectively. During the three months ended March 31, 2012 and 2011, the percentage of our single-family loan purchases with credit enhancement coverage was lower than in periods before 2009, primarily as a result of high refinance activity. Refinance loans (other than relief refinance mortgages) typically have lower LTV ratios, and are more likely to have an LTV ratio below 80% and not require credit protection as specified in our charter. In addition, we have been purchasing significant amounts of relief refinance mortgages. These mortgages allow for the refinance of existing loans guaranteed by us under terms such that we may not have mortgage insurance for some or all of the UPB of the mortgage in excess of 80% of the value of the property.

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Credit Enhancements*" in our 2011 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for additional information about credit protection and other forms of credit enhancements covering loans in our single-family credit guarantee portfolio. See "Institutional Credit Risk" for information about our counterparties that provide credit enhancement on loans in our single-family credit guarantee portfolio.

*Single-Family Loan Workouts and the MHA Program*

Loan workout activities are a key component of our loss mitigation strategy for managing and resolving troubled assets and lowering credit losses. Our loan workouts consist of: (a) forbearance agreements; (b) repayment plans; (c) loan modifications; and (d) foreclosure alternatives (*e.g.*, short sales or deed in lieu of foreclosure transactions). Our single-family loss mitigation strategy emphasizes early intervention by servicers in delinquent mortgages and provides alternatives to foreclosure. Other single-family loss mitigation activities include providing our single-family servicers with default management tools designed to help them manage non-performing loans more effectively and to assist borrowers in maintaining home ownership where possible, or facilitate foreclosure alternatives when continued homeownership is not an option. See "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Loss Mitigation and Loan Workout Activities*" in our 2011 Annual Report for a general description of our loan workouts.

Loan workouts are intended to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the additional credit losses that likely would be incurred in a REO sale. While we incur costs in the short term to execute our loan workout initiatives, we believe that, overall, these initiatives could reduce our ultimate credit losses over the long term. During the three months ended March 31, 2012, we helped approximately 40,000 borrowers either stay in their homes or sell their properties and avoid foreclosures through our various workout programs, including HAMP, and we completed approximately 29,000 foreclosures. HAMP and our new non-HAMP standard loan modification

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

are important components of our loan workout program and have many similar features, including the initial incentive fees paid to servicers upon completion of a modification.

Our seller/servicers have a significant role in servicing loans in our single-family credit guarantee portfolio, which includes an active role in our loss mitigation efforts. Therefore, a decline in their performance could impact the overall quality of our credit performance (including through missed opportunities for mortgage modifications), which could adversely affect our financial condition or results of operations and have significant impacts on our ability to mitigate credit losses. The risk of such a decline in performance remains high.

The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts, and set market standards. Participation in the MHA Program is an integral part of our mission of providing stability to the housing market. Through our participation in this program, we help borrowers maintain home ownership. Some of the key initiatives of this program include HAMP and HARP, which are discussed below.

<u>Home Affordable Modification Program</u>

HAMP commits U.S. government, Freddie Mac and Fannie Mae funds to help eligible homeowners avoid foreclosures and keep their homes through mortgage modifications, where possible. Under this program, we offer loan modifications to financially struggling homeowners with mortgages on their primary residences that reduce the monthly principal and interest payments on their mortgages. HAMP requires that each borrower complete a trial period during which the borrower will make monthly payments based on the estimated amount of the modification payments. Trial periods are required for at least three months. After the final trial-period payment is received by our servicer and the borrower has provided necessary documentation, the borrower and servicer will enter into the modification. We bear the costs of these activities, including the cost of any monthly payment reductions. HAMP applies to loans originated on or before January 1, 2009.

On January 27, 2012, Treasury announced enhancements to HAMP, including extending the end date to December 31, 2013, expanding the program's eligibility criteria for modifications, increasing incentives paid to investors who engage in principal reduction, and extending to the GSEs the opportunity to receive investor incentives for principal reduction. Treasury has not yet published details about the incentives that will be available to the GSEs. FHFA announced that the GSEs will extend their use of HAMP until December 31, 2013, and continue to offer the standard modification under the servicing alignment initiative. FHFA noted that Treasury's expanded eligibility criteria for HAMP modifications are consistent with our standard non-HAMP modification.

FHFA announced that it has been asked to consider new HAMP incentives available to the GSEs for principal reduction. FHFA previously released an analysis concluding that principal forgiveness does not provide benefits that are greater than principal forbearance as a loss mitigation tool. FHFA stated that its assessment of the investor incentives now being offered by Treasury will follow its previous analysis, including consideration of the eligible universe, operational costs to implement such changes, and potential borrower incentive effects.

The table below presents the number of single-family loans that completed modification or were in trial periods under HAMP as of March 31, 2012 and December 31, 2011.

**Table 36 — Single-Family Home Affordable Modification Program Volume**[1]

| | As of March 31, 2012 | | As of December 31, 2011 | |
|---|---|---|---|---|
| | Amount[2] | Number of Loans | Amount[2] | Number of Loans |
| | | (dollars in millions) | | |
| Completed HAMP modifications[3] | $35,011 | 158,688 | $33,681 | 152,519 |
| Loans in the HAMP trial period | $ 2,359 | 11,038 | $ 2,790 | 12,802 |

(1) Based on information reported by our servicers to the MHA Program administrator.

(2) For loans in the HAMP trial period, this reflects the loan balance prior to modification. For completed HAMP modifications, the amount represents the balance of loans after modification under HAMP.

(3) Amounts presented represent completed HAMP modifications with effective dates since our implementation of HAMP in 2009 through March 31, 2012 and December 31, 2011, respectively.

As of March 31, 2012, the borrower's monthly payment was reduced on average by an estimated $565, which amounts to an average of $6,785 per year, and a total of $1.1 billion in annual reductions for all of our completed HAMP modifications (these amounts are calculated by multiplying the number of completed modifications by the average reduction in monthly payment, and have not been adjusted to reflect the actual performance of the loans following modification).

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                TREASURY-3599                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Approximately 32% of our loans in the HAMP trial period as of March 31, 2012 have been in the trial period for more than the minimum duration of three months. Based on information provided by the MHA Program administrator, the average length of the trial period for loans in the program as of March 31, 2012 was five months. When a borrower's HAMP trial period is cancelled, the loan is considered for our other workout activities. For information about the percentage of completed loan modifications that remained current, see "Table 39 — Quarterly Percentages of Modified Single-Family Loans — Current and Performing."

HAMP is one modification option for single-family loans, but we also have completed a large volume of modifications through our non-HAMP loan modification initiatives.

The costs we incur related to HAMP have been, and will likely continue to be, significant. We paid $46 million of servicer incentives during the first quarter of 2012, as compared to $39 million of such incentives during the first quarter of 2011. As of March 31, 2012, we accrued $79 million for both initial and recurring servicer incentives not yet due. We paid $30 million of borrower incentives during the first quarter of 2012, as compared to $21 million of these incentives during the first quarter of 2011. As of March 31, 2012, we accrued $63 million for borrower incentives not yet due. We also have the potential to incur additional servicer incentives and borrower incentives as long as the borrower remains current on a loan modified under HAMP. See "MD&A — RISK MANAGEMENT— Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*" in our 2011 Annual Report for additional information about the costs associated with HAMP.

Servicing Alignment Initiative and Non-HAMP Standard Modifications

Under the direction of FHFA, we recently implemented a new set of standards for servicing non-performing loans owned or guaranteed under Freddie Mac that aligns with standards for loans owned or guaranteed by Fannie Mae. The servicing alignment initiative provides for consistent ongoing processes for non-HAMP loan modifications. We believe that the servicing alignment initiative will ultimately: (a) change, among other things, the way servicers communicate and work with troubled borrowers; (b) bring greater consistency and accountability to the servicing industry; and (c) help more distressed homeowners avoid foreclosure. We provided standards to our servicers under this initiative that require they initiate earlier and more frequent communication with delinquent borrowers, employ consistent requirements for collecting documents from borrowers, and follow consistent timelines for responding to borrowers, and consistent timelines for processing foreclosures. These standards are expected to result in greater alignment of servicer processes for both HAMP and most non-HAMP workouts.

Under these new servicing standards, we will pay incentives to servicers that exceed certain performance standards with respect to servicing delinquent loans. We will also assess compensatory fees from servicers if they do not achieve a minimum performance benchmark with respect to servicing delinquent loans. These incentives may result in our payment of increased fees to our seller/servicers, the cost of which may be at least partially mitigated by the compensatory fees paid to us by our servicers that do not perform as required.

As part of the servicing alignment initiative, we have implemented a new non-HAMP standard loan modification initiative. This standard modification replaced our previous non-HAMP modification initiative beginning January 1, 2012. The standard modification requires a three-month trial period. Servicers were permitted to begin offering standard modification trial period plans with effective dates on or after October 1, 2011. As of March 31, 2012, approximately 400 borrowers had completed this type of modification with aggregate UPB of $78 million, and approximately 5,000 borrowers were in the modification trial period. We experienced a decline in completed modification volume in the first quarter of 2012 and expect continued relatively low volumes in the second quarter of 2012, below what otherwise would be expected, as servicers transition to the new standard modification initiative and borrowers complete the trial period. We expect to complete a significant number of these non-HAMP standard loan modifications in the future and the costs we incur related to these modifications will likely be significant. See "MD&A — RISK MANAGEMENT— Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*" in our 2011 Annual Report for information about the costs associated with our non-HAMP standard loan modifications. While we incur costs in the short-term to execute our non-HAMP standard loan modifications, we believe that, overall, our non-HAMP standard modifications could reduce our ultimate credit losses over the long-term.

Home Affordable Refinance Program and Relief Refinance Mortgage Initiative

Our relief refinance mortgage initiative, including HARP (which is the portion of our relief refinance initiative for loans with LTV ratios above 80%), gives eligible homeowners (whose monthly payments are current) with existing loans that are owned or guaranteed by us an opportunity to refinance into loans with more affordable monthly payments and/or

TREASURY-3600

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

fixed-rate terms. HARP is targeted at borrowers with current LTV ratios above 80%; however, our relief refinance initiative also allows borrowers with LTV ratios of 80% and below to participate.

A number of FHFA-directed changes to HARP were announced in late 2011. These changes are intended to allow more borrowers to participate in the program and benefit from refinancing their home mortgages. These revisions to HARP will help to reduce our exposure to credit risk to the extent that HARP refinancing strengthens the borrowers' capacity to repay their mortgages and, in some cases, reduce the payments under their mortgages. These revisions to HARP could also reduce our credit losses to the extent that the revised program contributes to bringing stability to the housing market. However, we may face greater exposure to credit and other losses on these HARP loans because we are not requiring lenders to provide us with certain representations and warranties on the refinanced HARP loans. As of March 31, 2012, we had purchased approximately $5 billion in UPB of HARP loans with reduced representations and warranties. We could also experience declines in the fair values of certain agency security investments classified as available-for-sale or trading resulting from changes in expectations of mortgage prepayments and lower net interest yields over time on other mortgage-related investments.

We began purchasing HARP loans under the expanded program in January 2012. However, since industry participation in HARP is not mandatory, implementation schedules have varied as individual lenders, mortgage insurers and other market participants modify their processes. It is too early to estimate how many eligible borrowers are likely to refinance under the revised program. There can be no assurance that the benefits from the revised program will exceed our costs.

Our underwriting procedures for relief refinance mortgages are limited in many cases, and such procedures generally do not include all of the changes in underwriting standards we have implemented in the last several years. As a result, relief refinance mortgages generally reflect many of the credit risk attributes of the original loans. However, borrower participation in our relief refinance mortgage initiative may help reduce our exposure to credit risk in cases where borrower payments under their mortgages are reduced, thereby strengthening the borrowers' potential to make their mortgage payments.

Over time, relief refinance mortgages with LTV ratios above 80% (*i.e.*, HARP loans) may not perform as well as other refinance mortgages because the continued high LTV ratios of these loans increase the probability of default. Our relief refinance initiative is only for qualifying mortgage loans that we already hold or guarantee. We continue to bear the credit risk for refinanced loans under this program, to the extent that such risk is not covered by existing mortgage insurance or other existing credit enhancements.

The table below presents the composition of our purchases of refinanced single-family loans during the three months ended March 31, 2012 and 2011.

**Table 37 — Single-Family Refinance Loan Volume**[1]

| | Three Months Ended March 31, 2012 | | | Three Months Ended March 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Amount | Number of Loans | Percent[2] | Amount | Number of Loans | Percent[2] |
| | | (dollars in millions) | | | | |
| Relief refinance mortgages: | | | | | | |
| Above 125% LTV ratio | $ 476 | 2,217 | 0.5% | $ — | — | —% |
| Above 105% to 125% LTV ratio | 4,447 | 21,113 | 5.0 | 2,527 | 10,747 | 3.1 |
| Above 80% to 105% LTV ratio | 12,331 | 61,954 | 13.8 | 12,006 | 54,974 | 14.7 |
| 80% and below LTV ratio | 10,218 | 66,824 | 11.5 | 14,573 | 87,025 | 17.8 |
| Total relief refinance mortgages | $ 27,472 | 152,108 | 30.8% | $ 29,106 | 152,746 | 35.6% |
| Total refinance loan volume[3] | $89,278 | 416,497 | 100% | $81,757 | 390,008 | 100% |

(1) Consists of all single-family refinance mortgage loans that we either purchased or guaranteed during the period, excluding those associated with other guarantee commitments and Other Guarantee Transactions.

(2) Based on UPB.

(3) Consists of relief refinance mortgages and other refinance mortgages.

Relief refinance mortgages comprised approximately 31% and 36% of our total refinance volume in the first quarter of 2012 and 2011, respectively, based on UPB. Relief refinance mortgages with LTV ratios above 80% represented approximately 16% and 15% of our total single-family credit guarantee portfolio purchases during the three months ended March 31, 2012 and 2011, respectively. Relief refinance mortgages of all LTV ratios comprised approximately 13% and 11% of the UPB in our total single-family credit guarantee portfolio at March 31, 2012 and December 31, 2011, respectively. As of March 31, 2012, the serious delinquency rates for relief refinance loans were as follows: (a) 0.3% for loans with LTV ratios of 80% or less; (b) 0.9% for loans with LTV ratios from 80% to 100%; (c) 1.4% for loans with LTV ratios of more than 100%; and (d) and 0.6% for the total of all relief refinance mortgages.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          TREASURY-3601          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

Loan Workout Volumes and Modification Performance

The table below presents volumes of single-family loan workouts, serious delinquency, and foreclosures for the three months ended March 31, 2012 and 2011.

**Table 38 — Single-Family Loan Workouts, Serious Delinquency, and Foreclosures Volumes**[1]

| | Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | Number of Loans | Loan Balances | Number of Loans | Loan Balances |
| | | (dollars in millions) | | |
|---|---|---|---|---|
| Home retention actions: | | | | |
| Loan modifications | | | | |
| with no change in terms[2] | 446 | $ 82 | 1,265 | $ 219 |
| with term extension | 1,171 | 222 | 5,280 | 961 |
| with reduction of contractual interest rate and, in certain cases, term extension | 8,863 | 1,908 | 22,968 | 5,167 |
| with rate reduction, term extension and principal forbearance | 3,197 | 863 | 5,645 | 1,505 |
| Total loan modifications[3] | 13,677 | 3,075 | 35,158 | 7,852 |
| Repayment plans[4] | 10,575 | 1,477 | 9,099 | 1,286 |
| Forbearance agreements[5] | 3,656 | 692 | 7,678 | 1,526 |
| Total home retention actions | 27,908 | 5,244 | 51,935 | 10,664 |
| Foreclosure alternatives: | | | | |
| Short sale | 12,052 | 2,731 | 10,621 | 2,488 |
| Deed in lieu of foreclosure transactions | 193 | 33 | 85 | 15 |
| Total foreclosure alternatives | 12,245 | 2,764 | 10,706 | 2,503 |
| Total single-family loan workouts | 40,153 | $8,008 | 62,641 | $13,167 |
| Seriously delinquent loan additions | 80,815 | | 97,464 | |
| Single-family foreclosures[6] | 28,954 | | 31,087 | |
| Seriously delinquent loans, at period end | 400,787 | | 436,314 | |

(1) Based on completed actions with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent or effective, such as loans in modification trial periods. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period (see endnote 5).
(2) Under this modification type, past due amounts are added to the principal balance and reamortized based on the original contractual loan terms.
(3) Includes completed loan modifications under HAMP; however, the number of such completions differs from that reported by the MHA Program administrator in part due to differences in the timing of recognizing the completions by us and the administrator.
(4) Represents the number of borrowers as reported by our seller/servicers that have completed the full term of a repayment plan for past due amounts. Excludes the number of borrowers that are actively repaying past due amounts under a repayment plan, which totaled 19,981 and 20,592 borrowers as of March 31, 2012 and 2011, respectively.
(5) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.
(6) Represents the number of our single-family loans that complete foreclosure transfers, including third-party sales at foreclosure auction in which ownership of the property is transferred directly to a third-party rather than to us.

We experienced declines in most home retention actions, particularly loan modifications, in the first quarter of 2012 compared to the first quarter of 2011, primarily due to declines in the number of seriously delinquent loan additions and in borrower participation in HAMP. The implementation of the non-HAMP standard modification also negatively impacted the number of completed modifications in the first quarter of 2012, as servicers have had to transition borrowers to the new modification initiative and borrowers now need to complete a trial period before receiving the final modification. The decline in loan modifications during the first quarter of 2012 is also due to a reduction in the volume of loans transitioning to serious delinquency, compared to the fourth quarter of 2011, which has contributed to a reduction in the inventory of problem loans in our single-family credit guarantee portfolio. Foreclosure alternative volume increased 14% in the first quarter of 2012, compared to the first quarter of 2011, and we expect the volume of foreclosure alternatives to remain high in the remainder of 2012 primarily because we offer incentives to servicers to complete short sales instead of foreclosures. We plan to introduce additional initiatives during the remainder of 2012 designed to help more distressed borrowers avoid foreclosure through short sales and deed in lieu of foreclosure transactions.

The UPB of loans in our single-family credit guarantee portfolio for which we have completed a loan modification increased to $70 billion as of March 31, 2012 from $69 billion as of December 31, 2011. The number of modified loans in our single-family credit guarantee portfolio continued to increase and such loans comprised approximately 3.0% and 2.9% of our single-family credit guarantee portfolio as of March 31, 2012 and December 31, 2011, respectively. The estimated current LTV ratio for all modified loans in our single-family credit guarantee portfolio was 123% and the serious delinquency rate on these loans was 17.1% as of March 31, 2012. Approximately $42 billion in UPB of our

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012      TREASURY-3602      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

completed loan modifications at March 31, 2012 had provisions for reduced interest rates that remain fixed for the first five years of the modification and then increase at a rate of one percent per year (or such lesser amount as may be needed) until the interest rate has been adjusted to a market rate (determined at the time of the modification).

The table below presents the percentage of modified single-family loans that were current and performing in each of the last eight quarterly periods.

### Table 39 — Quarterly Percentages of Modified Single-Family Loans — Current and Performing[1]

| HAMP loan modifications: | Quarter of Loan Modification Completion[2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 89% | 86% | 87% | 86% | 85% | 82% | 81% | 85% |
| 6 to 8 months | | 84 | 82 | 83 | 82 | 81 | 78 | 81 |
| 9 to 11 months | | | 82 | 79 | 78 | 78 | 79 | 78 |
| 12 to 14 months | | | | 80 | 76 | 76 | 76 | 79 |
| 15 to 17 months | | | | | 76 | 73 | 73 | 76 |
| 18 to 20 months | | | | | | 74 | 71 | 73 |
| 21 to 23 months | | | | | | | 72 | 71 |
| 24 to 26 months | | | | | | | | 72 |

| Non-HAMP loan modifications: | Quarter of Loan Modification Completion[2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 78% | 73% | 76% | 78% | 80% | 77% | 73% | 75% |
| 6 to 8 months | | 70 | 67 | 69 | 71 | 74 | 66 | 65 |
| 9 to 11 months | | | 67 | 63 | 66 | 68 | 65 | 59 |
| 12 to 14 months | | | | 64 | 61 | 64 | 61 | 60 |
| 15 to 17 months | | | | | 63 | 61 | 56 | 56 |
| 18 to 20 months | | | | | | 62 | 54 | 52 |
| 21 to 23 months | | | | | | | 56 | 50 |
| 24 to 26 months | | | | | | | | 52 |

| Total (HAMP and Non-HAMP): | Quarter of Loan Modification Completion[2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 | 1Q 2010 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 86% | 81% | 83% | 83% | 82% | 80% | 79% | 83% |
| 6 to 8 months | | 79 | 77 | 77 | 76 | 78 | 75 | 78 |
| 9 to 11 months | | | 76 | 73 | 72 | 74 | 75 | 74 |
| 12 to 14 months | | | | 73 | 68 | 71 | 71 | 75 |
| 15 to 17 months | | | | | 69 | 68 | 68 | 72 |
| 18 to 20 months | | | | | | 69 | 66 | 69 |
| 21 to 23 months | | | | | | | 68 | 67 |
| 24 to 26 months | | | | | | | | 68 |

(1) In the first quarter of 2012, we revised this presentation to reflect the percentage of loans that are current and performing (less than one month past due) or have been paid in full. Excludes loans in foreclosure status and loans in modification trial periods. Prior period amounts have been revised to conform to current period presentation.

(2) Loan modifications are recognized as completed in the quarterly period in which the servicer has reported the modification as effective and the agreement has been accepted by us. For loans that have been re-modified (e.g., where a borrower has received a new modification after defaulting on the prior modification) the rates reflect the status of each modification separately. For example, in the case of a remodified loan where the borrower is performing, the previous modification would be presented as being in default in the applicable period.

The redefault rate is the percentage of our modified loans that have become seriously delinquent (i.e., three months or more delinquent or in foreclosure), transitioned to REO, or completed a loss-producing foreclosure alternative. As of March 31, 2012, the redefault rate for all of our single-family loan modifications (including those under HAMP) completed during 2011, 2010 and 2009 was 11%, 21%, and 51%, respectively. Many of the borrowers that received modifications in 2009 were negatively affected by worsening economic conditions, including high unemployment rates during the last several years. As of March 31, 2012, the redefault rate for loans modified under HAMP in 2011, 2010, and 2009 was approximately 8%, 18%, and 20%, respectively. These redefault rates may not be representative of the future performance of modified loans, including those modified under HAMP. We believe the redefault rate for loans modified in the last three years, including those modified under HAMP, is likely to increase, particularly since the housing and economic environments remain challenging.

*Credit Performance*

Delinquencies

We report single-family serious delinquency rate information based on the number of loans that are three monthly payments or more past due or in the process of foreclosure, as reported by our servicers. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the

67

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          TREASURY-3603          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

borrower is current under the modified terms. Single-family loans for which the borrower is subject to a forbearance agreement will continue to reflect the past due status of the borrower. To the extent our borrowers participate in the HFA unemployment assistance initiatives and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency.

Our single-family delinquency rates include all single-family loans that we own, that back Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by either Ginnie Mae Certificates or HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancements provided on them by the U.S. government.

Some of our workout and other loss mitigation activities create fluctuations in our delinquency statistics. For example, single-family loans that we report as seriously delinquent before they enter a trial period under HAMP or our new non-HAMP standard modification continue to be reported as seriously delinquent for purposes of our delinquency reporting until the modifications become effective and the loans are removed from delinquent status by our servicers. However, under our previous non-HAMP modifications, the borrower would return to a current payment status sooner, because these modifications did not have trial periods. Consequently, the volume, timing, and type of loan modifications impact our reported serious delinquency rate. In addition, there may be temporary timing differences, or lags, in the reporting of payment status and modification completion due to differing practices of our servicers that can affect our delinquency reporting.

Our serious delinquency rates have been affected by delays, including those due to temporary actions to suspend foreclosure transfers of occupied homes, increases in foreclosure process timeframes, process requirements of HAMP, general constraints on servicer capacity (which affects the rate at which servicers modify or foreclose upon loans), and court backlogs (in states that require a judicial foreclosure process). These delays lengthen the period of time in which loans remain in seriously delinquent status, as the delays extend the time it takes for seriously delinquent loans to be modified, foreclosed upon or otherwise resolved and thus transition out of seriously delinquent status. As a result, we believe our single-family serious delinquency rates were higher in the first quarter of 2012 than they otherwise would have been. As of March 31, 2012 and December 31, 2011, the percentage of seriously delinquent loans that have been delinquent for more than six months was 73% and 70%, respectively.

The table below presents serious delinquency rates for our single-family credit guarantee portfolio.

**Table 40 — Single-Family Serious Delinquency Rates**

| | As of | | | |
| | March 31, 2012 | | December 31, 2011 | |
| | Percentage of Portfolio | Serious Delinquency Rate | Percentage of Portfolio | Serious Delinquency Rate |
|---|---|---|---|---|
| Single-family: | | | | |
| Non-credit-enhanced | 87% | 2.80% | 86% | 2.84% |
| Credit-enhanced[1] | 13 | 8.02 | 14 | 8.03 |
| Total single-family credit guarantee portfolio[2] | 100% | 3.51 | 100% | 3.58 |

(1) See "Institutional Credit Risk" for information about our counterparties that provide credit enhancement on loans in our single-family credit guarantee portfolio.
(2) As of March 31, 2012 and December 31, 2011, approximately 71% and 68%, respectively, of the single-family loans reported as seriously delinquent were in the process of foreclosure.

Serious delinquency rates of our single-family credit guarantee portfolio declined to 3.51% as of March 31, 2012 from 3.58% as of December 31, 2011. Our serious delinquency rate remains high compared to historical levels due to continued weakness in home prices, persistently high unemployment, extended foreclosure timelines, and continued challenges faced by servicers processing large volumes of problem loans. In addition, our serious delinquency rate was adversely impacted by the decline in the size of our single-family credit guarantee portfolio in the first quarter of 2012 because this rate is calculated on a smaller number of loans at the end of the period.

Serious delinquency rates for interest-only and option ARM products, which together represented approximately 4% of our total single-family credit guarantee portfolio at March 31, 2012, were 17.2% and 19.6%, respectively, as compared with 17.6% and 20.5% at December 31, 2011. Serious delinquency rates of single-family 30-year, fixed rate amortizing loans, a more traditional mortgage product, were approximately 3.9% at both March 31, 2012 and December 31, 2011.

The tables below present serious delinquency rates categorized by borrower and loan characteristics, including geographic region and origination year, which indicate that certain concentrations of loans have been more adversely affected by declines in home prices and weak economic conditions since 2006. In certain states, our single-family serious

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                TREASURY-3604                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

delinquency rates have remained persistently high. As of March 31, 2012, single-family loans in Arizona, California, Florida, and Nevada comprised 25% of our single-family credit guarantee portfolio, and the serious delinquency rate of loans in these states was 6.0%. During the three months ended March 31, 2012, we also continued to experience high serious delinquency rates on single-family loans originated between 2005 and 2008. We purchased significant amounts of loans with higher-risk characteristics in those years. In addition, those borrowers are more susceptible to the declines in home prices and weak economic conditions since 2006 than those homeowners that have built up equity in their homes over a longer period of time.

The table below presents credit concentrations for certain loan groups in our single-family credit guarantee portfolio.

**Table 41 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio**

| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio(1) | Percentage Modified(2) | Serious Delinquency Rate |
|---|---|---|---|---|---|---|
| | As of March 31, 2012 | | | | | |
| | | (dollars in billions) | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 36 | $ 404 | $ 440 | 91% | 4.8% | 6.0% |
| All other states | 53 | 1,235 | 1,288 | 76 | 2.6 | 2.8 |
| Year of origination: | | | | | | |
| 2012 | — | 61 | 61 | 71 | — | — |
| 2011 | — | 281 | 281 | 70 | — | <0.1 |
| 2010 | — | 304 | 304 | 72 | <0.1 | 0.3 |
| 2009 | <1 | 285 | 285 | 73 | 0.1 | 0.6 |
| 2008 | 7 | 103 | 110 | 93 | 4.9 | 5.9 |
| 2007 | 27 | 129 | 156 | 114 | 11.0 | 11.7 |
| 2006 | 24 | 93 | 117 | 112 | 10.0 | 10.9 |
| 2005 | 17 | 115 | 132 | 96 | 5.5 | 6.7 |
| 2004 and prior | 14 | 268 | 282 | 61 | 2.6 | 2.9 |

| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio(1) | Percentage Modified(2) | Serious Delinquency Rate |
|---|---|---|---|---|---|---|
| | As of December 31, 2011 | | | | | |
| | | (dollars in billions) | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 38 | $ 406 | $ 444 | 93% | 4.6% | 6.2% |
| All other states | 56 | 1,246 | 1,302 | 75 | 2.5 | 2.9 |
| Year of origination: | | | | | | |
| 2011 | — | 250 | 250 | 70 | — | 0.1 |
| 2010 | — | 324 | 324 | 71 | <0.1 | 0.3 |
| 2009 | <1 | 315 | 315 | 72 | 0.1 | 0.5 |
| 2008 | 7 | 113 | 120 | 92 | 4.4 | 5.7 |
| 2007 | 29 | 138 | 167 | 113 | 10.2 | 11.6 |
| 2006 | 25 | 99 | 124 | 112 | 9.3 | 10.8 |
| 2005 | 18 | 124 | 142 | 96 | 5.1 | 6.5 |
| 2004 and prior | 15 | 289 | 304 | 61 | 2.5 | 2.8 |

| | Three Months Ended March 31, 2012 | | | Three Months Ended March 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Alt-A | Non Alt-A | Total | Alt-A | Non Alt-A | Total |
| | (in millions) | | | (in millions) | | |
| **Credit Losses** | | | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 561 | $ 1,318 | $ 1,879 | $ 737 | $ 1,247 | $ 1,984 |
| All other states | 269 | 1,287 | 1,556 | 273 | 969 | 1,242 |
| Year of origination: | | | | | | |
| 2012 | — | — | — | | | |
| 2011 | — | 5 | 5 | — | — | — |
| 2010 | — | 32 | 32 | — | — | — |
| 2009 | — | 58 | 58 | <1 | 32 | 32 |
| 2008 | 27 | 273 | 300 | 28 | 222 | 250 |
| 2007 | 310 | 960 | 1,270 | 404 | 774 | 1,178 |
| 2006 | 294 | 588 | 882 | 364 | 568 | 932 |
| 2005 | 171 | 407 | 578 | 193 | 376 | 569 |
| 2004 and prior | 28 | 282 | 310 | 21 | 244 | 265 |

(1) See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of estimated current LTV ratios.

(2) Represents the percentage of loans, based on loan count, in our single-family credit guarantee portfolio that have been modified under agreement with the borrower, including those with no changes in interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012
TREASURY-3605
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents statistics for combinations of certain characteristics of the mortgages in our single-family credit guarantee portfolio as of March 31, 2012 and December 31, 2011.

**Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations**

| | As of March 31, 2012 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current LTV Ratio ≤ 80%[1] | | Current LTV Ratio of > 80 to 100%[1] | | Current LTV > 100%[1] | | Current LTV Ratio All Loans[6] | | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| 20 and 30-year or more amortizing fixed-rate | 0.9% | 7.9% | 0.8% | 12.9% | 1.0% | 23.3% | 2.7% | 17.1% | 13.9% |
| 15-year amortizing fixed-rate | 0.2 | 4.1 | <0.1 | 9.1 | <0.1 | 16.4 | 0.2 | 1.2 | 4.5 |
| ARMs/adjustable rate[4] | 0.1 | 10.4 | <0.1 | 17.0 | <0.1 | 24.9 | 0.1 | 10.2 | 15.0 |
| Interest-only[5] | <0.1 | 14.8 | <0.1 | 22.4 | <0.1 | 12.5 | 0.1 | 0.4 | 29.7 |
| Other[6] | <0.1 | 3.8 | <0.1 | 6.1 | <0.1 | 12.5 | <0.1 | 4.4 | 5.5 |
| Total FICO scores < 620 | 1.2 | 6.9 | 0.8 | 13.0 | 1.1 | 23.5 | 3.1 | 13.8 | 12.6 |
| FICO scores of 620 to 659: | | | | | | | | | |
| 20 and 30-year or more amortizing fixed-rate | 2.0 | 5.1 | 1.5 | 8.8 | 1.9 | 18.2 | 5.4 | 11.9 | 10.0 |
| 15-year amortizing fixed-rate | 0.5 | 2.4 | <0.1 | 6.4 | 0.1 | 14.3 | 0.6 | 0.6 | 2.8 |
| ARMs/adjustable rate[4] | 0.1 | 5.4 | 0.1 | 11.0 | 0.2 | 23.1 | 0.4 | 2.1 | 12.2 |
| Interest-only[5] | <0.1 | 10.7 | 0.1 | 17.6 | 0.2 | 30.7 | 0.3 | 0.3 | 26.4 |
| Other[6] | <0.1 | 2.2 | <0.1 | 4.6 | <0.1 | 4.2 | <0.1 | 1.6 | 3.6 |
| Total FICO scores of 620 to 659 | 2.6 | 4.3 | 1.7 | 9.0 | 2.4 | 19.1 | 6.7 | 9.3 | 9.3 |
| FICO scores of ≥ 660: | | | | | | | | | |
| 20 and 30-year or more amortizing fixed-rate | 34.7 | 1.0 | 19.9 | 2.4 | 12.5 | 9.2 | 67.1 | 2.9 | 2.8 |
| 15-year amortizing fixed-rate | 13.7 | 0.4 | 1.0 | 1.1 | 0.2 | 5.3 | 14.9 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 2.6 | 1.1 | 0.8 | 4.0 | 0.8 | 14.3 | 4.2 | 0.5 | 4.2 |
| Interest-only[5] | 0.4 | 3.5 | 0.7 | 9.0 | 2.3 | 20.2 | 3.4 | 0.1 | 15.8 |
| Other[6] | <0.1 | 1.8 | <0.1 | 1.5 | 0.1 | 1.9 | 0.1 | 0.5 | 1.8 |
| Total FICO scores ≥ 660 | 51.4 | 0.8 | 22.4 | 2.6 | 15.9 | 10.6 | 89.7 | 2.0 | 2.5 |
| FICO scores not available | 0.3 | 4.8 | 0.1 | 12.2 | 0.1 | 21.7 | 0.5 | 5.7 | 8.9 |
| All FICO scores: | | | | | | | | | |
| 20 and 30-year or more amortizing fixed-rate | 37.8 | 1.6 | 22.1 | 3.4 | 15.5 | 11.4 | 75.4 | 4.2 | 3.9 |
| 15-year amortizing fixed-rate | 14.4 | 0.6 | 1.1 | 1.5 | 0.2 | 6.5 | 15.7 | 0.1 | 0.7 |
| ARMs/adjustable rate[4] | 2.8 | 1.7 | 0.9 | 5.2 | 0.9 | 15.9 | 4.6 | 1.0 | 5.1 |
| Interest-only[5] | 0.4 | 4.3 | 0.8 | 10.2 | 2.7 | 21.6 | 3.9 | 0.2 | 17.2 |
| Other[6] | 0.1 | 9.0 | 0.1 | 8.2 | 0.2 | 8.2 | 0.4 | 7.0 | 8.6 |
| Total single-family credit guarantee portfolio[7] | 55.5% | 1.3% | 25.0% | 3.5% | 19.5% | 12.6% | 100.0% | 3.0% | 3.5% |
| **By Region[8]** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| North Central | 0.2% | 6.0% | 0.2% | 10.8% | 0.2% | 18.9% | 0.6% | 13.7% | 11.3% |
| Northeast | 0.4 | 9.2 | 0.2 | 18.7 | 0.2 | 29.4 | 0.8 | 14.7 | 15.0 |
| Southeast | 0.2 | 7.7 | 0.2 | 13.6 | 0.3 | 28.7 | 0.7 | 14.3 | 15.5 |
| Southwest | 0.2 | 5.0 | 0.1 | 10.5 | 0.1 | 18.8 | 0.4 | 9.6 | 7.7 |
| West | 0.2 | 4.5 | 0.1 | 8.9 | 0.3 | 19.1 | 0.6 | 16.7 | 11.5 |
| Total FICO scores < 620 | 1.2 | 6.9 | 0.8 | 13.0 | 1.1 | 23.5 | 3.1 | 13.8 | 12.6 |
| FICO scores of 620 to 659: | | | | | | | | | |
| North Central | 0.4 | 3.8 | 0.3 | 7.9 | 0.5 | 14.5 | 1.2 | 8.9 | 8.0 |
| Northeast | 0.8 | 5.8 | 0.5 | 13.0 | 0.4 | 24.2 | 1.7 | 9.4 | 10.6 |
| Southeast | 0.5 | 5.2 | 0.3 | 9.4 | 0.6 | 23.7 | 1.4 | 9.5 | 12.0 |
| Southwest | 0.5 | 3.0 | 0.3 | 7.0 | 0.1 | 13.2 | 0.9 | 6.1 | 4.9 |
| West | 0.4 | 3.0 | 0.3 | 6.8 | 0.8 | 19.1 | 1.5 | 12.4 | 9.6 |
| Total FICO scores of 620 to 659 | 2.6 | 4.3 | 1.7 | 9.0 | 2.4 | 19.1 | 6.7 | 9.3 | 9.3 |
| FICO scores ≥ 660: | | | | | | | | | |
| North Central | 8.6 | 0.7 | 4.6 | 2.2 | 2.9 | 7.1 | 16.1 | 1.6 | 1.9 |
| Northeast | 14.9 | 1.0 | 5.7 | 3.9 | 2.1 | 13.1 | 22.7 | 1.7 | 2.4 |
| Southeast | 7.2 | 1.2 | 3.9 | 2.8 | 3.7 | 14.1 | 14.8 | 2.2 | 4.1 |
| Southwest | 7.5 | 0.6 | 2.6 | 1.9 | 0.4 | 6.0 | 10.5 | 0.9 | 1.1 |
| West | 13.2 | 0.5 | 5.6 | 1.7 | 6.8 | 9.9 | 25.6 | 3.0 | 2.9 |
| Total FICO scores ≥ 660 | 51.4 | 0.8 | 22.4 | 2.6 | 15.9 | 10.6 | 89.7 | 2.0 | 2.5 |
| Total FICO scores not available | 0.3 | 4.8 | 0.1 | 12.2 | 0.1 | 21.7 | 0.5 | 5.7 | 8.9 |
| All FICO scores: | | | | | | | | | |
| North Central | 9.2 | 1.0 | 5.1 | 3.1 | 3.6 | 9.1 | 17.9 | 2.7 | 2.8 |
| Northeast | 16.3 | 1.6 | 6.4 | 5.3 | 2.7 | 16.3 | 25.4 | 2.8 | 3.5 |
| Southeast | 7.9 | 1.8 | 4.4 | 4.0 | 4.7 | 16.5 | 17.0 | 3.5 | 5.4 |
| Southwest | 8.2 | 1.0 | 3.1 | 3.0 | 0.6 | 9.0 | 11.9 | 1.9 | 1.8 |
| West | 13.9 | 0.7 | 6.0 | 2.2 | 7.9 | 11.0 | 27.8 | 3.9 | 3.5 |
| Total single-family credit guarantee portfolio[7] | 55.5% | 1.3% | 25.0% | 3.5% | 19.5% | 12.6% | 100.0% | 3.0% | 3.5% |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | As of December 31, 2011 | | | | | | | | |
| | Current LTV Ratio ≤ 80%[3] | | Current LTV Ratio of > 80 to 100%[3] | | Current LTV > 100%[3] | | Current LTV Ratio All Loans[3] | | |
| | Percentage of Portfolio[1] | Serious Delinquency Rate | Percentage of Portfolio[1] | Serious Delinquency Rate | Percentage of Portfolio[1] | Serious Delinquency Rate | Percentage of Portfolio[1] | Percentage Modified[1] | Serious Delinquency Rate |
|---|---|---|---|---|---|---|---|---|---|
| **By Product Type** | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| 20 and 30-year or more amortizing fixed-rate | 0.9% | 8.1% | 0.8% | 13.4% | 1.0% | 23.7% | 2.7% | 16.6% | 14.2% |
| 15-year amortizing fixed-rate | 0.2 | 4.2 | <0.1 | 10.1 | <0.1 | 17.6 | 0.2 | 1.2 | 4.7 |
| ARMs/adjustable rate[4] | 0.1 | 10.8 | <0.1 | 17.2 | <0.1 | 25.4 | 0.1 | 9.8 | 15.4 |
| Interest only[5] | <0.1 | 16.0 | <0.1 | 22.4 | 0.1 | 34.9 | 0.1 | 0.4 | 30.3 |
| Other[6] | <0.1 | 3.6 | <0.1 | 7.4 | 0.1 | 14.1 | 0.1 | 4.2 | 5.6 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.5 | 1.2 | 24.1 | 3.2 | 13.4 | 12.9 |
| FICO scores of 620 to 659: | | | | | | | | | |
| 20 and 30-year or more amortizing fixed-rate | 2.0 | 5.2 | 1.5 | 8.9 | 2.0 | 18.4 | 5.5 | 11.5 | 10.1 |
| 15-year amortizing fixed-rate | 0.6 | 2.5 | <0.1 | 6.1 | <0.1 | 15.1 | 0.6 | 0.6 | 2.8 |
| ARMs/adjustable rate[4] | 0.1 | 5.5 | 0.1 | 11.7 | 0.1 | 23.6 | 0.3 | 2.0 | 12.6 |
| Interest only[5] | <0.1 | 10.4 | 0.1 | 18.6 | 0.3 | 31.7 | 0.4 | 0.3 | 27.2 |
| Other[6] | <0.1 | 2.8 | <0.1 | 4.8 | <0.1 | 5.5 | <0.1 | 1.4 | 4.5 |
| Total FICO scores of 620 to 659 | 2.7 | 4.4 | 1.7 | 9.1 | 2.4 | 19.4 | 6.8 | 8.9 | 9.4 |
| FICO scores ≥ 660: | | | | | | | | | |
| 20 and 30-year or more amortizing fixed-rate | 34.6 | 1.0 | 20.3 | 2.4 | 12.4 | 9.2 | 67.3 | 2.7 | 2.8 |
| 15-year amortizing fixed-rate | 13.1 | 0.4 | 1.0 | 1.1 | 0.2 | 6.0 | 14.3 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 2.5 | 1.1 | 0.8 | 4.3 | 0.8 | 14.8 | 4.1 | 0.5 | 4.5 |
| Interest only[5] | 0.4 | 3.7 | 0.7 | 9.2 | 2.5 | 20.7 | 3.6 | 0.2 | 16.2 |
| Other[6] | <0.1 | 2.0 | <0.1 | 2.0 | 0.1 | 2.0 | 0.1 | 0.5 | 2.0 |
| Total FICO scores ≥ 660 | 50.6 | 0.8 | 22.8 | 2.6 | 16.0 | 10.8 | 89.4 | 1.9 | 2.6 |
| FICO scores not available | 0.3 | 4.8 | 0.2 | 11.9 | 0.1 | 21.4 | 0.6 | 5.5 | 8.9 |
| All FICO scores: | | | | | | | | | |
| 20 and 30-year or more amortizing fixed-rate | 37.7 | 1.6 | 22.5 | 3.4 | 15.6 | 11.5 | 75.8 | 4.1 | 3.9 |
| 15-year amortizing fixed-rate | 13.8 | 0.6 | 1.1 | 1.5 | 0.2 | 7.3 | 15.1 | 0.1 | 0.7 |
| ARMs/adjustable rate[4] | 2.7 | 1.8 | 1.0 | 5.5 | 0.9 | 16.4 | 4.6 | 1.0 | 5.5 |
| Interest only[5] | 0.5 | 4.4 | 0.8 | 10.5 | 2.8 | 22.2 | 4.1 | 0.2 | 17.6 |
| Other[6] | 0.1 | 8.9 | 0.1 | 8.4 | 0.2 | 8.4 | 0.4 | 6.8 | 8.6 |
| Total single-family credit guarantee portfolio[7] | 54.8% | 1.3% | 25.5% | 3.6% | 19.7% | 12.8% | 100.0% | 2.9% | 3.6% |
| **By Region**[8] | | | | | | | | | |
| FICO scores < 620: | | | | | | | | | |
| North Central | 0.2% | 6.3% | 0.2% | 11.7% | 0.2% | 20.1% | 0.6% | 13.4% | 12.0% |
| Northeast | 0.4 | 9.3 | 0.2 | 19.0 | 0.3 | 28.9 | 0.9 | 14.3 | 14.9 |
| Southeast | 0.2 | 7.9 | 0.2 | 13.9 | 0.3 | 29.5 | 0.7 | 13.9 | 15.9 |
| Southwest | 0.2 | 5.1 | 0.1 | 11.0 | 0.1 | 19.5 | 0.4 | 9.4 | 8.0 |
| West | 0.2 | 4.6 | 0.1 | 9.1 | 0.3 | 19.5 | 0.6 | 16.2 | 11.8 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.5 | 1.2 | 24.1 | 3.2 | 13.4 | 12.9 |
| FICO scores of 620 to 659: | | | | | | | | | |
| North Central | 0.5 | 4.0 | 0.3 | 8.2 | 0.5 | 15.1 | 1.3 | 8.7 | 8.4 |
| Northeast | 0.8 | 5.8 | 0.5 | 12.9 | 0.4 | 23.3 | 1.7 | 9.1 | 10.3 |
| Southeast | 0.5 | 5.2 | 0.3 | 9.5 | 0.6 | 24.1 | 1.4 | 9.1 | 12.2 |
| Southwest | 0.5 | 3.1 | 0.3 | 7.0 | 0.1 | 13.6 | 0.9 | 5.9 | 5.1 |
| West | 0.4 | 3.1 | 0.3 | 6.8 | 0.8 | 17.6 | 1.5 | 12.0 | 10.0 |
| Total FICO scores of 620 to 659 | 2.7 | 4.4 | 1.7 | 9.1 | 2.4 | 19.4 | 6.8 | 8.9 | 9.4 |
| FICO scores ≥ 660: | | | | | | | | | |
| North Central | 8.5 | 0.7 | 4.7 | 2.3 | 2.8 | 7.4 | 16.0 | 1.6 | 2.0 |
| Northeast | 14.9 | 1.0 | 5.7 | 3.9 | 2.0 | 12.6 | 22.6 | 1.6 | 2.3 |
| Southeast | 7.1 | 1.2 | 3.9 | 2.8 | 3.8 | 14.4 | 14.8 | 2.1 | 4.2 |
| Southwest | 7.4 | 0.6 | 2.7 | 2.0 | 0.4 | 6.2 | 10.5 | 0.9 | 1.1 |
| West | 12.7 | 0.5 | 5.8 | 1.7 | 7.0 | 10.1 | 25.5 | 2.9 | 3.0 |
| Total FICO scores ≥ 660 | 50.6 | 0.8 | 22.8 | 2.6 | 16.0 | 10.8 | 89.4 | 1.9 | 2.6 |
| Total FICO scores not available | 0.3 | 4.8 | 0.2 | 11.9 | 0.1 | 21.4 | 0.6 | 5.5 | 8.9 |
| All FICO scores: | | | | | | | | | |
| North Central | 9.1 | 1.0 | 5.3 | 3.2 | 3.6 | 9.5 | 18.0 | 2.6 | 2.9 |
| Northeast | 16.1 | 1.6 | 6.4 | 5.3 | 2.7 | 15.8 | 25.2 | 2.7 | 3.4 |
| Southeast | 7.9 | 1.8 | 4.4 | 4.0 | 4.7 | 16.8 | 17.0 | 3.4 | 5.5 |
| Southwest | 8.2 | 1.1 | 3.2 | 3.1 | 0.6 | 9.4 | 12.0 | 1.8 | 1.8 |
| West | 13.5 | 0.7 | 6.2 | 2.1 | 8.1 | 11.3 | 27.8 | 3.8 | 3.6 |
| Total single-family credit guarantee portfolio[7] | 54.8% | 1.3% | 25.5% | 3.6% | 19.7% | 12.8% | 100.0% | 2.9% | 3.6% |

(1) The current LTV ratios are our estimates. See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information.

(2) Based on UPB of the single-family credit guarantee portfolio.

(3) See endnote (2) to "Table 41 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio".

(4) Includes balloon/resets and option ARM mortgage loans.

(5) Includes both fixed rate and adjustable rate loans. The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post-modification), primarily due to delays in processing.

(6) Consist of FHA/VA and other government guaranteed mortgages.

(7) The total of all FICO scores categories may not sum due to the inclusion of loans where FICO scores are not available in the respective totals for all loans. See endnote (7) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information about our presentation of FICO scores.

(8) Presentation with the following regional designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC,MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL,IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); and Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

71

*Freddie Mac*

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents delinquency and default rate information for loans in our single-family credit guarantee portfolio based on year of origination.

**Table 43 — Single-Family Credit Guarantee Portfolio by Year of Loan Origination**

| Year of Loan Origination | As of March 31, 2012 | | As of December 31, 2011 | |
| --- | --- | --- | --- | --- |
| | Percentage of Portfolio | Foreclosure and Short Sale Rate(1) | Percentage of Portfolio | Foreclosure and Short Sale Rate(1) |
| 2012 | 4% | —% | N/A | N/A |
| 2011 | 16 | 0.01 | 14% | —% |
| 2010 | 18 | 0.08 | 19 | 0.05 |
| 2009 | 16 | 0.21 | 18 | 0.17 |
| 2008 | 6 | 2.49 | 7 | 2.23 |
| 2007 | 9 | 8.09 | 10 | 7.49 |
| 2006 | 7 | 7.41 | 7 | 6.95 |
| 2005 | 8 | 4.35 | 8 | 4.07 |
| 2000 through 2004 | 16 | 1.08 | 17 | 1.04 |
| Total | 100% | | 100% | |

(1) Calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries during the period from origination to March 31, 2012 and December 31, 2011, respectively, divided by the number of loans in our single-family credit guarantee portfolio originated in that year.

The UPB of loans originated after 2008 comprised 54% of our portfolio as of March 31, 2012, including 13% of our portfolio that were relief refinance mortgages (regardless of LTV ratio). At March 31, 2012, approximately 30% of our single-family credit guarantee portfolio consisted of mortgage loans originated from 2005 through 2008. Loans originated from 2005 through 2008 have experienced higher serious delinquency rates in the earlier years of their terms as compared to our historical experience. We attribute this serious delinquency performance to a number of factors, including: (a) the expansion of credit terms under which loans were underwritten during these years; (b) an increase in the origination and our purchase of interest-only and Alt-A mortgage products in these years; and (c) an environment of persistently high unemployment, decreasing home sales, and broadly declining home prices in the period following the loans' origination. Interest-only and Alt-A products have higher inherent credit risk than traditional fixed-rate mortgage products.

*Multifamily Mortgage Credit Risk*

To manage our multifamily mortgage portfolio credit risk, we focus on several key areas: (a) underwriting standards and quality control process; (b) selling significant portions of credit risk through subordination in our Other Guarantee Transactions; (c) portfolio diversification, particularly by product and geographical area; and (d) portfolio management activities, including loss mitigation and use of credit enhancements. We monitor the loan performance, the underlying properties and a variety of mortgage loan characteristics that may affect the default experience on our multifamily mortgage portfolio, such as the LTV ratio, DSCR, geographic location and loan maturity. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for more information about the loans in our multifamily mortgage portfolio.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides certain attributes of our multifamily mortgage portfolio at March 31, 2012 and December 31, 2011.

**Table 44 — Multifamily Mortgage Portfolio — by Attribute**

| | UPB at | | Delinquency Rate[1] at | |
| --- | --- | --- | --- | --- |
| | March 31, 2012 | December 31, 2011 | March 31, 2012 | December 31, 2011 |
| | (dollars in billions) | | | |
| **Original LTV ratio[2]** | | | | |
| Below 75% | $ 81.2 | $ 78.8 | 0.10% | 0.10% |
| 75% to 80% | 31.6 | 30.9 | 0.14 | 0.08 |
| Above 80% | 6.4 | 6.4 | 2.23 | 2.34 |
| Total | $ 119.2 | $ 116.1 | 0.23% | 0.22% |
| Weighted average LTV ratio at origination | 70% | 70% | | |
| **Maturity Dates** | | | | |
| 2012 | $ 2.6 | $ 3.0 | 0.44% | 1.35% |
| 2013 | 5.2 | 5.6 | — | — |
| 2014 | 7.5 | 7.6 | 0.38 | 0.03 |
| 2015 | 10.9 | 11.0 | 0.17 | 0.17 |
| 2016 | 13.3 | 13.5 | 0.21 | 0.06 |
| Beyond 2016 | 79.7 | 75.4 | 0.23 | 0.25 |
| Total | $ 119.2 | $ 116.1 | 0.23% | 0.22% |
| **Year of Acquisition or Guarantee[3]** | | | | |
| 2004 and prior | $ 11.7 | $ 12.4 | 0.18% | 0.40% |
| 2005 | 7.1 | 7.2 | 0.34 | 0.20 |
| 2006 | 10.5 | 10.8 | 0.46 | 0.25 |
| 2007 | 19.7 | 19.8 | 0.66 | 0.74 |
| 2008 | 20.3 | 20.6 | 0.22 | 0.09 |
| 2009 | 13.5 | 13.8 | — | — |
| 2010 | 12.5 | 12.7 | — | — |
| 2011 | 18.2 | 18.8 | — | — |
| 2012 | 5.7 | N/A | — | N/A |
| Total | $ 119.2 | $ 116.1 | 0.23% | 0.22% |
| **Current Loan Size Distribution** | | | | |
| Above $25 million | $ 44.2 | $ 42.8 | 0.12% | 0.06% |
| Above $5 million to $25 million | 65.7 | 64.0 | 0.29 | 0.31 |
| $5 million and below | 9.3 | 9.3 | 0.25 | 0.31 |
| Total | $ 119.2 | $ 116.1 | 0.23% | 0.22% |
| **Legal Structure** | | | | |
| Unsecuritized loans | $ 82.4 | $ 82.3 | 0.16% | 0.10% |
| Non-consolidated Freddie Mac mortgage-related securities | 27.2 | 24.2 | 0.45 | 0.64 |
| Other guarantee commitments | 9.6 | 9.6 | 0.18 | 0.18 |
| Total | $ 119.2 | $ 116.1 | 0.23% | 0.22% |
| **Credit Enhancement** | | | | |
| Credit-enhanced | $ 34.7 | $ 31.6 | 0.39% | 0.52% |
| Non-credit-enhanced | 84.5 | 84.5 | 0.16 | 0.11 |
| Total | $ 119.2 | $ 116.1 | 0.23% | 0.22% |

(1) See "Delinquencies" below for more information about our multifamily delinquency rates.
(2) Original LTV ratios are calculated as the UPB of the mortgage, divided by the lesser of the appraised value of the property at the time of mortgage origination or, except for refinance loans, the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.
(3) Based on either: (a) the year of acquisition, for loans recorded on our consolidated balance sheets; or (b) the year that we issued our guarantee, for the remaining loans in our multifamily mortgage portfolio.

Our multifamily mortgage portfolio consists of product types that are categorized based on loan terms. Multifamily loans may be interest-only or amortizing, fixed or variable rate, or may switch between fixed and variable rate over time. However, our multifamily loans generally have balloon maturities ranging from five to ten years. Amortizing loans reduce our credit exposure over time because the UPB declines with each mortgage payment. Fixed-rate loans may also create less risk for us because the borrower's payments are determined at origination, and, therefore, the risk that the monthly mortgage payment could increase if interest rates rise is eliminated. As of both March 31, 2012 and December 31, 2011, approximately 85% of the multifamily loans on our consolidated balance sheets had fixed interest rates while the remaining loans had variable interest rates.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          TREASURY-3609          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Because most multifamily loans require a significant lump sum (*i.e.*, balloon) payment of unpaid principal at maturity, the borrower's potential inability to refinance or pay off the loan at maturity is a serious concern for us. Borrowers may be less able to refinance their obligations during periods of rising interest rates, which could lead to default if the borrower is unable to find affordable refinancing. Loan size at origination does not generally indicate the degree of a loan's risk, but it does indicate our potential exposure to default.

We use credit enhancements to mitigate risk of loss on certain multifamily mortgages and housing revenue bonds. For example, we may require credit enhancements during construction or rehabilitation in cases where we commit to purchase or guarantee a permanent loan upon completion and in cases where occupancy has not yet reached a level that produces the operating income that was the basis for underwriting the mortgage.

Our primary business strategy in the multifamily segment is to purchase multifamily mortgage loans for aggregation and then securitization. Currently, our most significant multifamily securitization activity involves our guarantee of the senior tranches of these securitizations in Other Guarantee Transactions. The subordinate tranches, that we do not guarantee, provide credit loss protection to the senior classes that we do guarantee. Subordinated classes are allocated credit losses prior to the senior classes. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections and other forms of credit enhancements covering loans in our multifamily mortgage portfolio as of March 31, 2012 and December 31, 2011.

Although property values increased in recent quarters, they are still below the highs of 2007 and are lower than when many of the loans were originally underwritten, particularly in areas where economic conditions remain weak. As a result, if property values do not continue to improve, borrowers may experience significant difficulty refinancing as their loans approach maturity, which could increase borrower defaults or increase modification volumes. Of the $119.2 billion in UPB of our multifamily mortgage portfolio as of March 31, 2012, approximately 87% will mature in 2015 and beyond.

In certain cases, we may provide short-term loan extensions of up to 12 months for certain borrowers. Modifications of loans (including short-term loan extensions) are performed in an effort to minimize our losses. During the three months ended March 31, 2012, we modified unsecuritized multifamily loans totaling $82 million in UPB, compared with $13 million during the three months ended March 31, 2011. Multifamily unsecuritized loan modifications in the first quarter 2012 included: (a) $14 million in UPB for short-term loan extensions; and (b) $68 million in UPB for other loan modifications. Where we have granted a concession to borrowers experiencing financial difficulties, we account for these loans as TDRs. When we execute a modification classified as a TDR, the loan is then classified as nonperforming for the life of the loan regardless of its delinquency status. At March 31, 2012, we had $848 million in UPB of multifamily loans classified as TDRs on our consolidated balance sheets.

*Delinquencies*

Our multifamily delinquency rates include all multifamily loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancement provided by the U.S. government. We report multifamily delinquency rates based on UPB of mortgage loans that are two monthly payments or more past due or in the process of foreclosure, as reported by our servicers. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the borrower is current under the modified terms. In addition, multifamily loans are not counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement, whereas single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower, if applicable.

Our multifamily mortgage portfolio delinquency rate was 0.23% at March 31, 2012 and 0.22% at December 31, 2011. Our delinquency rate for credit-enhanced loans was 0.39% and 0.52% at March 31, 2012 and December 31, 2011, respectively, and for non-credit-enhanced loans was 0.16% and 0.11% at March 31, 2012 and December 31, 2011, respectively. As of March 31, 2012, approximately one-half of our multifamily loans that were two or more monthly payments past due, measured on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on those loans.

Our delinquency rates have remained relatively low compared to other industry participants, which we believe to be, in part, the result of our prudent underwriting standards versus those used by others in the industry. Our delinquency rates for multifamily loans are positively impacted to the extent we have been successful in working with troubled borrowers to modify their loans prior to becoming delinquent or by providing temporary relief through loan modifications, including short-term extensions. The most recent market data available continues to reflect improving national apartment

74

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

fundamentals, including decreasing vacancy rates and increasing effective rents. As a result we expect our multifamily delinquency rate to remain relatively low during the remainder of 2012. For further information regarding concentrations in our multifamily mortgage portfolio, including regional geographic composition, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

*Non-Performing Assets*

Non-performing assets consist of single-family and multifamily loans that have undergone a TDR, single-family seriously delinquent loans, multifamily loans that are three or more payments past due or in the process of foreclosure, and REO assets, net. Non-performing assets also include multifamily loans that are deemed impaired based on management judgment. We place non-performing loans on non-accrual status when we believe the collectability of interest and principal on a loan is not reasonably assured, unless the loan is well secured and in the process of collection. When a loan is placed on non-accrual status, any interest income accrued but uncollected is reversed. Thereafter, interest income is recognized only upon receipt of cash payments. We did not accrue interest on any loans three monthly payments or more past due during the three months ended March 31, 2012 and 2011, respectively.

We classify TDRs as those loans where we have granted a concession to a borrower that is experiencing financial difficulties. TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further information about our TDRs.

The table below provides detail on non-performing loans and REO assets on our consolidated balance sheets and non-performing loans underlying our financial guarantees.

**Table 45 — Non-Performing Assets[1]**

|  | March 31, 2012 | December 31, 2011 | March 31, 2011 |
|---|---|---|---|
|  | | (dollars in millions) | |
| Non-performing mortgage loans — on balance sheet: | | | |
| Single-family TDRs: | | | |
| Reperforming (*i.e.*, less than three monthly payments past due) | $ 46,118 | $ 44,440 | $ 32,205 |
| Seriously delinquent | 12,708 | 11,639 | 3,325 |
| Multifamily TDRs[2] | 848 | 893 | 897 |
| Total TDRs | 59,674 | 56,972 | 36,427 |
| Other non-accrual single-family loans[3] | 59,558 | 63,205 | 78,182 |
| Other non-accrual multifamily loans[4] | 1,782 | 1,819 | 1,874 |
| Total non-performing mortgage loans — on balance sheet | 121,014 | 121,996 | 116,483 |
| Non-performing mortgage loans — off-balance sheet: | | | |
| Single-family loans | 1,215 | 1,230 | 1,371 |
| Multifamily loans | 268 | 246 | 208 |
| Total non-performing mortgage loans — off-balance sheet | 1,483 | 1,476 | 1,579 |
| Real estate owned, net | 5,454 | 5,680 | 6,376 |
| Total non-performing assets | $127,951 | $ 129,152 | $124,438 |
| Loan loss reserves as a percentage of our non-performing mortgage loans | 31.3% | 32.0% | 33.3% |
| Total non-performing assets as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | 6.8% | 6.8% | 6.4% |

(1) Mortgage loan amounts are based on UPB and REO, net is based on carrying values.
(2) As of March 31, 2012, approximately $822 million in UPB of these loans were current.
(3) Represents loans recognized by us on our consolidated balance sheets, including loans removed from PC trusts due to the borrower's serious delinquency.
(4) Of this amount, $1.7 billion, $1.8 billion, and $1.7 billion of UPB were current at March 31, 2012, December 31, 2011, and March 31, 2011, respectively.

The amount of non-performing assets declined to $128.0 billion as of March 31, 2012, from $129.2 billion as of December 31, 2011, primarily due to a decline in the rate at which loans transitioned into serious delinquency during the first quarter of 2012 combined with continued high levels of foreclosures and REO dispositions. The UPB of loans categorized as TDRs increased to $59.7 billion at March 31, 2012 from $57.0 billion at December 31, 2011, largely due to the significant volume of loan modifications and loans entering a modification trial period during the first quarter of 2012. TDRs during the first quarter of 2012 include HAMP and non-HAMP loan modifications as well as loans in modification trial periods and certain other loss mitigation actions. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report, and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for information about TDRs, including our implementation of an amendment to the accounting

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                         Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

guidance on classification of loans as TDRs in the third quarter of 2011. We expect our non-performing assets, including loans deemed to be TDRs, to remain at elevated levels for the remainder of 2012.

The table below provides detail by region for REO activity. Our REO activity consists almost entirely of single-family residential properties. Consequently, our regional REO acquisition trends generally follow a pattern that is similar to, but lags, that of regional serious delinquency trends of our single-family credit guarantee portfolio. See "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for information about regional serious delinquency rates.

**Table 46 — REO Activity by Region**[1]

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (number of properties) | |
| **REO Inventory** | | |
| Beginning property inventory | 60,555 | 72,093 |
| Properties acquired by region: | | |
| Northeast | 1,825 | 1,485 |
| Southeast | 7,067 | 4,734 |
| North Central | 7,638 | 6,375 |
| Southwest | 2,770 | 3,113 |
| West | 4,505 | 9,002 |
| Total properties acquired | 23,805 | 24,709 |
| Properties disposed by region: | | |
| Northeast | (1,922) | (2,661) |
| Southeast | (6,287) | (9,214) |
| North Central | (6,837) | (7,292) |
| Southwest | (3,253) | (3,480) |
| West | (6,738) | (8,981) |
| Total properties disposed | (25,037) | (31,628) |
| Ending property inventory | 59,323 | 65,174 |

(1) See endnote (8) to "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for a description of these regions.

Our REO inventory (measured in number of properties) declined 2% from December 31, 2011 to March 31, 2012 as the volume of single-family REO dispositions exceeded the volume of single-family REO acquisitions. We believe our single-family REO acquisition volume in the first quarter of 2012 has been less than it otherwise would have been due to delays in the single-family foreclosure process, particularly in states that require a judicial foreclosure process. The average length of time for foreclosure of a Freddie Mac loan significantly increased in recent years due to temporary suspensions, delays, and other factors. During the first quarters of 2012 and 2011, the nationwide average for completion of a foreclosure (as measured from the date of the last scheduled payment made by the borrower) on our single-family delinquent loans, excluding those underlying our Other Guarantee Transactions, was 603 days and 456 days, respectively, which included: (a) an average of 770 days and 548 days, respectively, for foreclosures completed in states that require a judicial foreclosure process; and (b) an average of 464 days and 425 days, respectively, for foreclosures completed in states that do not require a judicial foreclosure process. We continue to experience significant variability in the average time for foreclosure by state. For example, during the three months ended March 31, 2012, the average time for completion of foreclosures associated with loans in our single-family credit guarantee portfolio, excluding Other Guarantee Transactions, ranged from 336 days in Wyoming to 1,007 days in Florida. As of March 31, 2012, our serious delinquency rate for the aggregate of those states that require a judicial foreclosure and all other states was 4.37% and 2.62%, respectively, compared to 4.47% and 2.74%, respectively, as of December 31, 2011.

We expect the pace of our REO acquisitions will continue to be affected by delays in the foreclosure process for the remainder of 2012, particularly in states with a judicial foreclosure process. However, we expect the volume of our REO acquisitions will likely remain elevated, as we have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio. Our single-family REO acquisitions in the first quarter of 2012 were most significant in the states of Florida, Illinois, California, Michigan, and Georgia, which collectively represented 43% of total REO acquisitions based on the number of properties. The states with the most properties in our REO inventory as of March 31, 2012 were Michigan and Illinois, which comprised 12% and 10%, respectively, of total REO property inventory, based on the number of properties.

The percentage of interest-only and Alt-A loans in our single-family credit guarantee portfolio, based on UPB, was approximately 4% and 5%, respectively, at March 31, 2012 and was 8% on a combined basis. The percentage of our REO

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3612                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

acquisitions in the first quarter of 2012 that had been financed by either of these loan types represented approximately 26% of our total REO acquisitions, based on loan amount prior to acquisition.

We are limited in our single-family REO disposition efforts by the capacity of the market to absorb large numbers of foreclosed properties. A significant portion of our REO acquisitions are: (a) located in jurisdictions that require a period of time after foreclosure during which the borrower may reclaim the property; or (b) occupied and we have either retained the tenant under an existing lease or begun the process of eviction. All of these factors resulted in an increase in the aging of our inventory. During the period when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property. As of March 31, 2012 and December 31, 2011, approximately 32% and 33%, respectively, of our REO properties were not marketable due to the above conditions. Though it varied significantly in different states, the average holding period of our single-family REO properties was little changed during the first quarter of 2012. Excluding any post-foreclosure period during which borrowers may reclaim a foreclosed property, the average holding period associated with our single-family REO dispositions during the first quarters of 2012 and 2011 was 201 days and 191 days, respectively. As of March 31, 2012 and December 31, 2011, the percentage of our single-family REO property inventory that had been held for sale longer than one year was 6.6% and 7.1%, respectively. We continue to actively market these properties through our established initiatives.

We also have a variety of alternative methods for REO sales that we employ from time to time, as appropriate, including bulk sales and auctions; however, we did not use bulk sales and auction sales represented an insignificant portion of our REO dispositions in the first quarter of 2012. We are continuing to participate in discussions with FHFA and other agencies on new options for sales and rentals of our single-family REO properties. It is too early to determine the impact any potential new initiatives may have on the levels of our REO property inventory, the process for disposing of REO property or our REO operations expense.

*Credit Loss Performance*

Many loans that are seriously delinquent, or in foreclosure, result in credit losses. The table below provides detail on our credit loss performance associated with mortgage loans and REO assets on our consolidated balance sheets and underlying our non-consolidated mortgage-related financial guarantees.

77                                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 47 — Credit Loss Performance**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (dollars in millions) | |
| REO | | |
| REO balances, net: | | |
| Single-family | $ 5,333 | $ 6,261 |
| Multifamily | 121 | 115 |
| Total | $ 5,454 | $ 6,376 |
| REO operations (income) expense: | | |
| Single-family | $ 172 | $ 257 |
| Multifamily | (1) | — |
| Total | $ 171 | $ 257 |
| Charge-offs | | |
| Single-family: | | |
| Charge-offs, gross[1] (including $3.7 billion and $3.5 billion, relating to loan loss reserves, respectively) | $3,778 | $3,653 |
| Recoveries[2] | (515) | (684) |
| Single-family, net | $3,263 | $2,969 |
| Multifamily: | | |
| Charge-offs, gross[1] (including $1 million and $12 million, relating to loan loss reserves, respectively) | $ 1 | $ 12 |
| Recoveries[2] | — | — |
| Multifamily, net | $ 1 | $ 12 |
| Total Charge-offs: | | |
| Charge-offs, gross[1] (including $3.7 billion and $3.6 billion, relating to loan loss reserves, respectively) | $3,779 | $3,665 |
| Recoveries[2] | (515) | (684) |
| Total Charge-offs, net | $3,264 | $2,981 |
| Credit Losses[3] | | |
| Single-family | $3,435 | $3,226 |
| Multifamily | — | 12 |
| Total | $3,435 | $3,238 |
| Total (in bps)[4] | 73.6 | 67.1 |

(1) Represent the carrying amount of a loan that has been discharged in order to remove the loan from our consolidated balance sheets at the time of resolution, regardless of when the impact of the credit loss was recorded on our consolidated statements of comprehensive income through the provision for credit losses or losses on loans purchased. Charge-offs primarily result from foreclosure transfers and short sales and are generally calculated as the recorded investment of a loan at the date it is discharged less the estimated value in final disposition or actual net sales in a short sale.

(2) Recoveries of charge-offs primarily result from foreclosure transfers and short sales on loans where a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements.

(3) Excludes foregone interest on non-performing loans, which reduces our net interest income but is not reflected in our total credit losses. In addition, excludes other market-based credit losses: (a) incurred on our investments in mortgage loans and mortgage-related securities; and (b) recognized in our consolidated statements of comprehensive income.

(4) Calculated as credit losses divided by the average carrying value of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates.

Our credit loss performance metric generally measures losses at the conclusion of the loan and related collateral resolution process. There is a significant lag in time from the implementation of problem loan workout activities until the final resolution of seriously delinquent mortgage loans and REO assets. Our credit loss performance is based on our charge-offs and REO expenses. We primarily record charge-offs at the time we take ownership of a property through foreclosure and at the time of settlement of foreclosure alternative transactions. Single-family charge-offs, gross, for the three months ended March 31, 2012 and 2011 were $3.8 billion and $3.7 billion, respectively, and were associated with approximately $7.4 billion and $8.0 billion, respectively, in UPB of loans. Our net charge-offs and credit losses in the first quarter of 2012 remained elevated, but were less than they otherwise would have been because of the suppression of loan and collateral resolution activity due to delays in the foreclosure process. We expect our charge-offs and credit losses to remain high in the remainder of 2012, and they may increase, due to the large number of single-family non-performing loans that will likely be resolved and because market conditions, such as home prices, continue to remain weak.

Our credit losses during the first quarter of 2012 continued to be disproportionately high in those states that experienced significant declines in property values since 2006, such as California, Florida, Nevada, and Arizona, which collectively comprised approximately 55% of our total credit losses during the three months ended March 31, 2012. Loans originated in 2005 through 2008 comprised approximately 30% and 36% of our single-family credit guarantee portfolio, based on UPB at March 31, 2012 and 2011, respectively; however, these loans accounted for approximately 88% and 91% of our credit losses during the three months ended March 31, 2012 and 2011, respectively. Due to declines in property values since 2006, we continued to experience high REO disposition severity ratios on sales of our REO inventory. In

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3614                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

addition, although Alt-A loans comprised approximately 5% and 6% of our single-family credit guarantee portfolio at March 31, 2012 and 2011, respectively, these loans accounted for approximately 24% and 31% of our credit losses during the three months ended March 31, 2012 and 2011, respectively. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for information on REO disposition severity ratios, and see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about our credit losses.

*Loan Loss Reserves*

We maintain mortgage-related loan loss reserves at levels we believe appropriate to absorb probable incurred losses on mortgage loans held-for-investment on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities and other guarantee commitments. Determining the loan loss reserves is complex and requires significant management judgment about matters that involve a high degree of subjectivity. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for additional information on our accounting policies for loan loss reserves and TDR loans, including our implementation of changes to the accounting guidance related to the classification of loans as TDRs. In recent periods, the portion of our loan loss reserves attributable to individually impaired loans has increased while the portion of our loan loss reserves determined on a collective basis has declined. As of March 31, 2012 and December 31, 2011, the recorded investment of individually impaired single-family mortgage loans was $62.4 billion and $60.0 billion, respectively, and the loan loss reserves associated with these loans was $15.9 billion and $15.1 billion, respectively. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for additional information about our TDR loans.

The table below summarizes our allowance for loan loss activity for individually impaired single-family mortgage loans on our consolidated balance sheets for which we have recorded a specific reserve.

**Table 48 — Single-Family Impaired Loans with Specific Reserve Recorded**

| | As of March 31, 2012 | |
|---|---|---|
| | # of Loans | Amount |
| | | (in millions) |
| TDRs (recorded investment): | | |
| December 31, 2011 balance | 252,749 | $ 53,494 |
| New additions | 19,380 | 3,642 |
| Repayments | (1,054) | (276) |
| Loss events[1] | (3,688) | (739) |
| Other | 552 | 65 |
| March 31, 2012 balance | 267,939 | 56,186 |
| Other (recorded investment)[2] | 24,308 | 2,289 |
| March 31, 2012 balance | 292,247 | 58,475 |
| Total allowance for loan losses of individually impaired single-family loans | | (15,851) |
| Net investment | | $ 42,624 |

(1) Consists of foreclosure transfer or foreclosures alternative, such as a deed in lieu of foreclosure or short sale transaction.
(2) Consists of loans impaired upon purchase which experienced further deterioration in borrower credit.

See "CONSOLIDATED RESULTS OF OPERATIONS — Provision for Credit Losses," for a discussion of our provision for credit losses and charge-off activity.

*Credit Risk Sensitivity*

Under a 2005 agreement with FHFA, then OFHEO, we are required to disclose the estimated increase in the NPV of future expected credit losses for our single-family credit guarantee portfolio over a ten year period as the result of an immediate 5% decline in home prices nationwide, followed by a stabilization period and return to the base case. This sensitivity analysis is hypothetical and may not be indicative of our actual results. We do not use this analysis for determination of our reported results under GAAP.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                TREASURY-3615                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 49 — Single-Family Credit Loss Sensitivity**

| | Before Receipt of Credit Enhancements(1) | | After Receipt of Credit Enhancements(2) | |
|---|---|---|---|---|
| | NPV(3) | NPV Ratio(4) | NPV(3) | NPV Ratio(4) |
| | | (dollars in millions) | | |
| At: | | | | |
| March 31, 2012 | $8,568 | 49.6 bps | $8,095 | 46.8 bps |
| December 31, 2011 | $8,328 | 47.7 bps | $7,842 | 44.9 bps |
| September 30, 2011 | $8,824 | 49.5 bps | $8,229 | 46.1 bps |
| June 30, 2011 | $10,203 | 56.5 bps | $9,417 | 52.2 bps |
| March 31, 2011 | $9,832 | 54.2 bps | $8,999 | 49.6 bps |

(1) Assumes that none of the credit enhancements currently covering  our mortgage loans has any mitigating impact on our credit  losses.
(2) Assumes we collect amounts due from credit enhancement providers  after giving effect to certain assumptions about counterparty  default rates.
(3) Based on the single-family credit guarantee portfolio, excluding  REMICs and Other Structured Securities backed by Ginnie Mae  Certificates.
(4) Calculated as the ratio of NPV of increase in credit losses for  the single-family credit guarantee portfolio, defined in note  (3) above.

## Interest Rate and Other Market Risks

For a discussion of our interest rate and other market risks,  see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

## Operational Risks

We face significant levels of operational risk, due to a variety  of factors, including: (a) employee turnover and low  employee engagement; (b) the level and pace of organizational change within our company; (c) the  complexity of our business operations; (d) weaknesses in  our core systems; and (e) the fact that we face a variety of different, and potentially  competing, business objectives and  new FHFA-mandated activities. For more information on these matters and other operational risks that we face, see  "MD&A — RISK MANAGEMENT — Operational Risks" and "RISK FACTORS — Operational Risks" in our 2011 Annual Report.

As a result of the elevated risk of employee turnover and low  employee engagement, we continue to explore various strategic  arrangements with outside firms to provide operational  capability and staffing for key functions, if needed. Should we  experience significant turnover in key areas, we may need to exercise these strategic arrangements and significantly increase  the number of outside firms and consultants used in our business operations, limit certain business activities,  and/or increase our operational costs. The use of outside firms and  consultants could increase our operational risk in the near term  as consultants become accustomed to new roles and  responsibilities. These or other efforts to manage this risk to the enterprise may not be successful. To help mitigate the  uncertainty surrounding compensation, we introduced a new compensation program for employees. For more information on  recent legislative and regulatory developments affecting these  risks, see "LEGISLATIVE AND REGULATORY MATTERS —Legislative and Regulatory Developments Concerning Executive  Compensation."

Our Executive Vice President — Single-Family Business,  Operations and Technology has informed us that he will resign  from his position effective May 11, 2012.

Management, including the company's Chief Executive Officer  and Chief Financial Officer, conducted an evaluation of the  effectiveness of our disclosure controls and procedures as of  March 31, 2012. As of March 31, 2012, we had two  material weaknesses in our internal control over financial reporting causing us to conclude that our disclosure controls  and procedures were not effective as of March 31, 2012, at  a reasonable level of assurance. For additional information, see  "CONTROLS AND PROCEDURES."

## LIQUIDITY AND CAPITAL RESOURCES

### Liquidity

Our business activities require that we maintain adequate  liquidity to fund our operations, which may include the need to  make payments of principal and interest on our debt securities,  including securities issued by our consolidated trusts, and  otherwise make payments related to our guarantees of mortgage assets; make payments upon the maturity, redemption or  repurchase of our other debt securities; make net payments on derivative instruments; pay dividends on our senior preferred  stock; purchase mortgage-related securities and other  investments; purchase mortgage loans; and remove modified or  seriously delinquent loans from PC trusts.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We fund our cash requirements primarily by issuing short-term and long-term debt. Other sources of cash include:

- receipts of principal and interest payments on securities or mortgage loans we hold;

- other cash flows from operating activities, including the management and guarantee fees we receive in connection with our guarantee activities (excluding those we must remit to Treasury pursuant to the Temporary Payroll Tax Cut Continuation Act of 2011, which commenced in April 2012);

- borrowings against mortgage-related securities and other investment securities we hold; and

- sales of securities we hold.

We have also received substantial amounts of cash from Treasury pursuant to draws under the Purchase Agreement, which are made to address deficits in our net worth. We received $146 million in cash from Treasury during the three months ended March 31, 2012 pursuant to a draw under the Purchase Agreement.

We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

### Liquidity Management

Maintaining sufficient liquidity is of primary importance and we continually strive to enhance our liquidity management practices and policies. Under these practices and policies, we maintain an amount of cash and cash equivalent reserves in the form of liquid, high quality short-term investments that is intended to enable us to meet ongoing cash obligations for an extended period, in the event we do not have access to the short- or long-term unsecured debt markets. We also actively manage the concentration of debt maturities and closely monitor our monthly maturity profile. For a discussion of our liquidity management practices and policies, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Liquidity Management*" in our 2011 Annual Report.

Throughout the three months ended March 31, 2012, we complied with all requirements under our liquidity management policies or FHFA guidance, as applicable. Furthermore, the majority of the funds used to cover our short-term cash liquidity needs was invested in short-term assets with a rating of A-1/P-1 or AAA or was issued by a counterparty with that rating. In the event of a downgrade of a position or counterparty, as applicable, below minimum rating requirements, our credit governance policies require us to exit from the position within a specified period.

We also continue to manage our debt issuances to remain in compliance with the aggregate indebtedness limits set forth in the Purchase Agreement.

We continue to monitor events related to the troubled European countries and took a number of actions in 2011 designed to reduce our exposures, including exposures related to certain derivative portfolio and cash and other investments portfolio counterparties. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Selected European Sovereign and Non-Sovereign Exposures.*"

To facilitate cash management, we forecast cash outflows. These forecasts help us to manage our liabilities with respect to asset purchases and runoff, when financial markets are not in crisis. For further information on our management of interest-rate risk associated with asset and liability management, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

Notwithstanding these practices and policies, our ability to maintain sufficient liquidity, including by pledging mortgage-related and other securities as collateral to other financial institutions, could cease or change rapidly and the cost of the available funding could increase significantly due to changes in market confidence and other factors. For more information, see "RISK FACTORS — Competitive and Market Risks — *Our investment activities may be adversely affected by limited availability of financing and increased funding costs*" in our 2011 Annual Report.

### Actions of Treasury and FHFA

Since our entry into conservatorship, Treasury and FHFA have taken a number of actions that affect our cash requirements and ability to fund those requirements. The conservatorship, and the resulting support we received from Treasury, has enabled us to access debt funding on terms sufficient for our needs.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The Purchase Agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. If we do not have a capital surplus (*i.e.*, positive net worth) at the end of 2012, then the amount of

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          TREASURY-3617          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009). In the event we have a capital surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year-end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year-end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws.

While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 2012. The costs of our debt funding could also increase in the event of any future downgrades in our credit ratings or the credit ratings of the U.S. government. Upon funding of the draw request that FHFA will submit to eliminate our net worth deficit at March 31, 2012, our aggregate funding received from Treasury under the Purchase Agreement will be $71.3 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. Our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million.

We are required to pay a quarterly commitment fee to Treasury under the Purchase Agreement, as discussed below in "*Dividend Obligation on the Senior Preferred Stock*."

For more information on these matters, see "BUSINESS — Conservatorship and Related Matters" and "— Regulation and Supervision" in our 2011 Annual Report.

### Dividend Obligation on the Senior Preferred Stock

Following funding of the draw request related to our net worth deficit at March 31, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock will be $7.23 billion, which exceeds our annual historical earnings in all but one period. The senior preferred stock accrues quarterly cumulative dividends at a rate of 10% per year or 12% per year in any quarter in which dividends are not paid in cash until all accrued dividends have been paid in cash. We paid dividends of $1.8 billion in cash on the senior preferred stock during the three months ended March 31, 2012 at the direction of our Conservator. Through March 31, 2012, we paid aggregate cash dividends to Treasury of $18.3 billion, an amount equal to 26% of our aggregate draws received under the Purchase Agreement. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth and will increasingly drive future draws. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived. Treasury waived the fee for all quarters of 2011 and the first and second quarters of 2012, but has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the fee has not yet been established and could be substantial.

The payment of dividends on our senior preferred stock in cash reduces our net worth. For periods in which our earnings and other changes in equity do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all.

As discussed in "Capital Resources," we expect to make additional draws under the Purchase Agreement in future periods. Further draws will increase the liquidation preference of and the dividends we owe on the senior preferred stock.

### Other Debt Securities

Spreads on our debt and our access to the debt markets remained favorable relative to historical levels during the three months ended March 31, 2012, due largely to support from the U.S. government. As a result, we were able to replace certain higher cost debt with lower cost debt. Our short-term debt was 22% of outstanding other debt at March 31, 2012 as compared to 24% at December 31, 2011. Beginning in the fourth quarter of 2011, we started issuing a higher percentage of long-term debt. This allows us to take advantage of attractive long-term rates while decreasing our reliance on interest-rate swaps.

TREASURY-3618

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                                          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Because of the debt limit under the Purchase Agreement, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Our debt cap under the Purchase Agreement is $874.8 billion in 2012 and will decline to $787.3 billion on January 1, 2013. As of March 31, 2012, we estimate that the par value of our aggregate indebtedness totaled $629.3 billion, which was approximately $245.5 billion below the applicable debt cap. As of December 31, 2011, we estimate that the par value of our aggregate indebtedness totaled $674.3 billion, which was approximately $297.7 billion below the then applicable limit of $972 billion. Our aggregate indebtedness is calculated as the par value of other debt. We disclose the amount of our indebtedness on this basis monthly under the caption "Other Debt Activities — Total Debt Outstanding" in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC.

### *Other Debt Issuance Activities*

The table below summarizes the par value of other debt securities we issued, based on settlement dates, during the three months ended March 31, 2012 and 2011.

### Table 50 — Other Debt Security Issuances by Product, at Par Value[1]

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in millions) | |
| Other short-term debt: | | |
| Reference Bills® securities and discount notes | $ 64,163 | $103,846 |
| Medium-term notes — non-callable[2] | — | 200 |
| Total other short-term debt | 64,163 | 104,046 |
| Other long-term debt: | | |
| Medium-term notes — callable | 37,498 | 37,801 |
| Medium-term notes — non-callable | 10,704 | 29,175 |
| U.S. dollar Reference Notes® securities — non-callable | 21,500 | 10,000 |
| Total other long-term debt | 69,702 | 76,976 |
| Total other debt issued | $133,865 | $ 181,022 |

(1) Excludes federal funds purchased and securities sold under agreements to repurchase, and lines of credit. Also excludes debt securities of consolidated trusts held by third parties.

(2) Includes $0 million and $200 million of medium-term notes — non-callable issued for the three months ended March 31, 2012 and 2011, respectively, which were related to debt exchanges.

### *Other Debt Retirement Activities*

We repurchase, call, or exchange our outstanding medium- and long-term debt securities from time to time to help support the liquidity and predictability of the market for our other debt securities and to manage our mix of liabilities funding our assets.

The table below provides the par value, based on settlement dates, of other debt securities we repurchased, called, and exchanged during the three months ended March 31, 2012 and 2011.

### Table 51 — Other Debt Security Repurchases, Calls, and Exchanges[1]

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in millions) | |
| Repurchases of outstanding medium-term notes | $ 1,697 | $ 2,738 |
| Calls of callable medium-term notes | 49,028 | 39,835 |
| Exchanges of medium-term notes | — | 200 |

(1) Excludes debt securities of consolidated trusts held by third parties.

*Freddie Mac*

TREASURY-3619

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Credit Ratings*

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, is highly dependent upon our credit ratings. The table below indicates our credit ratings as of April 23, 2012.

**Table 52 — Freddie Mac Credit Ratings**

| | Nationally Recognized Statistical Rating Organization | | |
| | S&P | Moody's | Fitch |
|---|---|---|---|
| Senior long-term debt(1) | AA+ | Aaa | AAA |
| Short-term debt(2) | A-1+ | P-1 | F1+ |
| Subordinated debt(3) | A | Aa2 | AA− |
| Preferred stock(4) | C | Ca | C/RR6 |
| Outlook | Negative (for senior long-term debt and subordinated debt) | Negative (for senior long-term debt and subordinated debt) | Negative (for AAA-rated long-term Issuer Default Rating) |

(1) Consists of medium-term notes, U.S. dollar Reference Notes® securities and €Reference Notes® securities.
(2) Consists of Reference Bills® securities and discount notes.
(3) Consists of Freddie SUBS® securities.
(4) Does not include senior preferred stock issued to Treasury.

For information about our ratings downgrade by S&P in 2011, factors that could lead to future ratings actions, and the potential impact of a downgrade in our credit ratings, see "RISK FACTORS — Competitive and Market Risks — *Any downgrade in the credit ratings of the U.S. government would likely be followed by a downgrade in our credit ratings. A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business*" in our 2011 Annual Report.

A security rating is not a recommendation to buy, sell or hold securities. It may be subject to revision or withdrawal at any time by the assigning rating organization. Each rating should be evaluated independently of any other rating.

***Cash and Cash Equivalents, Federal Funds Sold, Securities Purchased Under Agreements to Resell, and Non-Mortgage-Related Securities***

Excluding amounts related to our consolidated VIEs, we held $59.7 billion in the aggregate of cash and cash equivalents, securities purchased under agreements to resell, and non-mortgage-related securities at March 31, 2012. These investments are important to our cash flow and asset and liability management and our ability to provide liquidity and stability to the mortgage market. At March 31, 2012, our non-mortgage-related securities primarily consisted of FDIC-guaranteed corporate medium-term notes, Treasury bills, and Treasury notes that we could sell to provide us with an additional source of liquidity to fund our business operations. For additional information on these assets, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell" and "— Investments in Securities — *Non-Mortgage-Related Securities*."

***Mortgage Loans and Mortgage-Related Securities***

We invest principally in mortgage loans and mortgage-related securities, certain categories of which are largely unencumbered and highly liquid. Our primary source of liquidity among these mortgage assets is our holdings of agency securities. In addition, our unsecuritized performing single-family mortgage loans are also a potential source of liquidity. Our holdings of CMBS are less liquid than agency securities. Our holdings of non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans are not liquid due to market conditions and the continued poor credit quality of the underlying assets. Our holdings of unsecuritized seriously delinquent and modified single-family mortgage loans are also illiquid.

We are subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. See "EXECUTIVE SUMMARY — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio" for more information on the relative liquidity of our mortgage assets.

**Cash Flows**

Our cash and cash equivalents decreased $19.9 billion to $8.6 billion during the three months ended March 31, 2012 and decreased $2.7 billion to $34.3 billion during the three months ended March 31, 2011. Cash flows provided by operating activities during the three months ended March 31, 2012 and 2011 were $1.4 billion and $4.2 billion, respectively, primarily driven by cash proceeds from net interest income. Cash flows provided by investing activities during the three months ended March 31, 2012 and 2011 were $102.0 billion and $96.2 billion, respectively, primarily

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3620                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

resulting from net proceeds received as a result of repayments of single-family held-for-investment mortgage loans. Cash flows used for financing activities during the three months ended March 31, 2012 and 2011 were $123.2 billion and $103.2 billion, respectively, largely attributable to funds used to repay debt securities of consolidated trusts held by third parties. In addition, during the three months ended March 31, 2012, our net repayments of other debt were $42.1 billion.

## Capital Resources

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA. At March 31, 2012, our liabilities exceeded our assets under GAAP by $18 million. Accordingly, we must obtain funding from Treasury pursuant to its commitment under the Purchase Agreement in order to avoid being placed into receivership by FHFA. FHFA, as Conservator, will submit a draw request to Treasury under the Purchase Agreement in the amount of $19 million, which we expect to receive by June 30, 2012. See "BUSINESS — Regulation and Supervision — *Federal Housing Finance Agency — Receivership*" in our 2011 Annual Report for additional information on mandatory receivership.

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury on the senior preferred stock will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if Treasury does not continue to waive the fee. See "Liquidity — *Dividend Obligation on the Senior Preferred Stock*" for more information.

The size and timing of our future draws will be determined by our dividend obligation on the senior preferred stock and a variety of other factors that could adversely affect our net worth. For more information on these other factors, see "RISK FACTORS — Conservatorship and Related Matters — *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition*" in our 2011 Annual Report.

For more information on the Purchase Agreement, its effect on our business and capital management activities, and the potential impact of making additional draws, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Dividend Obligation on the Senior Preferred Stock*," "BUSINESS — Executive Summary — *Government Support for Our Business*" and "RISK FACTORS" in our 2011 Annual Report.

**FAIR VALUE MEASUREMENTS AND ANALYSIS**

## Fair Value Measurements

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. For additional information regarding the fair value hierarchy and measurements and validation processes, see "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS" in our 2011 Annual Report.

We categorize assets and liabilities measured and reported at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation processes used to derive their fair values and our judgment regarding the observability of the related inputs. Those judgments are based on our knowledge and observations of the markets relevant to the individual assets and liabilities and may vary based on current market conditions. In applying our judgments, we review ranges of third-party prices and transaction volumes, and hold discussions with dealers and pricing service vendors to understand and assess the extent of market benchmarks available and the judgments or modeling required in their processes. Based on these factors, we determine whether the inputs are observable and whether the principal markets are active or inactive.

Our Level 3 assets recorded at fair value primarily consist of non-agency mortgage-related securities. The non-agency mortgage-related securities market continued to be illiquid during the first quarter of 2012, with low transaction volumes, wide credit spreads, and limited transparency. We value the non-agency mortgage-related securities we hold based primarily on prices received from pricing services and dealers. The techniques used by these pricing services and dealers to develop the prices generally are either: (a) a comparison to transactions involving instruments with similar collateral and risk profiles; or (b) industry standard modeling, such as a discounted cash flow model. For a large majority of the securities we value using dealers and pricing services, we obtain multiple independent prices, which are non-binding both to us and our counterparties. When multiple prices are received, we use the median of the prices. The models and related

85

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

assumptions used by the dealers and pricing services are owned and managed by them. However, we have an understanding of their processes used to develop the prices provided to us based on our ongoing due diligence. We periodically have discussions with our dealers and pricing service vendors to maintain a current understanding of the processes and inputs they use to develop prices. We make no adjustments to the individual prices we receive from third-party pricing services or dealers for non-agency mortgage-related securities beyond calculating median prices and discarding certain prices that are determined not to be valid based on our validation processes.

The table below summarizes our assets and liabilities measured at fair value on a recurring basis in our consolidated balance sheets at March 31, 2012 and December 31, 2011.

**Table 53 — Summary of Assets and Liabilities Measured at Fair Value on a Recurring Basis in Our Consolidated Balance Sheets**

|  | March 31, 2012 | | December 31, 2011 | |
|  | Total GAAP Recurring Fair Value | Percentage in Level 3 | Total GAAP Recurring Fair Value | Percentage in Level 3 |
|---|---|---|---|---|
|  | (dollars in millions) | | | |
| **Assets:** | | | | |
| Investments in securities: | | | | |
| Available-for-sale, at fair value | $202,422 | 28% | $210,659 | 28% |
| Trading, at fair value | 58,319 | 4 | 58,830 | 4 |
| Mortgage loans: | | | | |
| Held-for-sale, at fair value | 11,337 | 100 | 9,710 | 100 |
| Derivative assets, net(1) | 182 | — | 118 | — |
| Other assets: | | | | |
| Guarantee asset, at fair value | 798 | 100 | 752 | 100 |
| All other, at fair value | 143 | 100 | 151 | 100 |
| Total assets carried at fair value on a recurring basis(1) | $273,201 | 25 | $280,220 | 23 |
| **Liabilities:** | | | | |
| Debt securities recorded at fair value | $ 2,221 | 100% | $ 3,015 | —% |
| Derivative liabilities, net(1) | 296 | — | 435 | — |
| Other liabilities: | | | | |
| All other, at fair value | 4 | 100 | — | — |
| Total liabilities carried at fair value on a recurring basis(1) | $ 2,521 | 7 | $ 3,450 | — |

(1) Percentages by level are based on gross fair value of derivative assets and derivative liabilities before counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

### Changes in Level 3 Recurring Fair Value Measurements

At March 31, 2012 and December 31, 2011, we measured and recorded at fair value on a recurring basis, assets of $72.1 billion and $72.5 billion, respectively, or approximately 25% and 23% of total assets carried at fair value on a recurring basis, using significant unobservable inputs (Level 3), before the impact of counterparty and cash collateral netting. Our Level 3 assets at March 31, 2012 primarily consist of non-agency mortgage-related securities. At March 31, 2012 and December 31, 2011, we also measured and recorded at fair value on a recurring basis, Level 3 liabilities of $2.3 billion and $0.1 billion, or 7% and less than 1%, respectively, of total liabilities carried at fair value on a recurring basis, before the impact of counterparty and cash collateral netting. Our Level 3 liabilities at March 31, 2012 primarily consist of foreign-currency denominated and certain other debt securities recorded at fair value.

See "NOTE 16: FAIR VALUE DISCLOSURES — Recurring Fair Value Changes" for a discussion of changes in our Level 3 assets and liabilities and "— Table 16.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs" for the Level 3 reconciliation. For discussion of types and characteristics of mortgage loans underlying our mortgage-related securities, see "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets" and "RISK MANAGEMENT — Credit Risk — Mortgage Credit Risk — Single-Family Mortgage Credit Risk."

### Consideration of Credit Risk in Our Valuation

We consider credit risk in the valuation of our assets and liabilities through consideration of credit risk of the counterparty in asset valuations and through consideration of our own institutional credit risk in liability valuations on our GAAP consolidated balance sheets.

We consider credit risk in our valuation of investments in securities based on fair value measurements that are largely the result of price quotes received from multiple dealers or pricing services. Some of the key valuation drivers of such fair value measurements can include the collateral type, collateral performance, credit quality of the issuer, tranche type,

TREASURY-3622

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                  Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

weighted average life, vintage, coupon, and interest rates. We also make adjustments for items such as credit enhancements or other types of subordination and liquidity, where applicable. In cases where internally developed models are used, we maximize the use of market-based inputs or calibrate such inputs to market data.

We also consider credit risk when we evaluate the valuation of our derivative positions. The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. For derivatives that are in an asset position, we hold collateral against those positions in accordance with agreed upon thresholds. The amount of collateral held depends on the credit rating of the counterparty and is based on our credit risk policies. Similarly, for derivatives that are in a liability position, we post collateral to counterparties in accordance with agreed upon thresholds. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, and substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties*" for a discussion of our counterparty credit risk.

See "NOTE 16: FAIR VALUE DISCLOSURES — Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets" for additional information regarding the valuation of our assets and liabilities.

**Consolidated Fair Value Balance Sheets Analysis**

Our consolidated fair value balance sheets present our estimates of the fair value of our financial assets and liabilities. See "NOTE 16: FAIR VALUE DISCLOSURES — Table 16.7 — Consolidated Fair Value Balance Sheets" for our fair value balance sheets. In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks," in this form 10-Q and our 2011 Annual Report, and "RISK FACTORS" and "RISK MANAGEMENT — Operational Risks" in our 2011 Annual Report for information concerning the risks associated with these models.

During the first quarter of 2012, our fair value results were impacted by several improvements in our approach for estimating the fair value of certain financial instruments. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report and "NOTE 16: FAIR VALUE DISCLOSURES" in this form 10-Q for more information on fair values.

*Discussion of Fair Value Results*

The table below summarizes the change in the fair value of net assets for the three months ended March 31, 2012 and 2011.

**Table 54 — Summary of Change in the Fair Value of Net Assets**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in billions) | |
| Beginning balance | $(78.4) | $(58.6) |
| Changes in fair value of net assets, before capital transactions | (9.1) | 3.3 |
| Capital transactions: | | |
| Dividends and share issuances, net[1] | (1.7) | (1.1) |
| Ending balance | $(89.2) | $(56.4) |

(1) Includes the funds received from Treasury of $0.1 billion and $0.5 billion for the three months ended March 31, 2012 and 2011, respectively, under the Purchase Agreement, which increased the liquidation preference of our senior preferred stock.

During the first quarter of 2012, the fair value of net assets, before capital transactions, decreased by $9.1 billion, compared to a $3.3 billion increase during the first quarter of 2011. The decrease in the fair value of net assets, before capital transactions, during the first quarter of 2012 was primarily due to a decrease of $13.8 billion in the fair value of our single-family mortgage loans as the result of the adoption of an amendment to the guidance pertaining to fair value measurements and disclosure. This was coupled with a decline in expected home prices that had a negative impact on the fair value of our single-family mortgage loans. The decrease in fair value was partially offset by high core spread income and a tightening of OAS levels on our agency securities, CMBS securities, and multifamily loans. See "NOTE 16: FAIR VALUE DISCLOSURES — Consolidated Fair Value Balance Sheets" for additional details.

For loans that have been refinanced under HARP, we value our guarantee obligation using the delivery and guarantee fees currently charged by us under that initiative. If, subsequent to delivery, the refinanced loan no longer qualifies for

87

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

purchase based on current underwriting standards (such as becoming past due or being modified as a part of a troubled debt restructuring), the fair value of the guarantee obligation is then measured using our internal credit models or third-party market pricing. See "NOTE 16: FAIR VALUE DISCLOSURES — Valuation Methods and Assumptions for Assets and Liabilities Not Measured at Fair Value in Our Consolidated Balance Sheets, but for Which the Fair Value is Disclosed — Mortgage Loans — *Single-Family Loans*" for additional details.

During the first quarter of 2011, the increase in the fair value of net assets, before capital transactions was primarily due to high core spread income and an increase in the fair value of our investments in mortgage-related securities driven by tightening of OAS levels of agency mortgage-related securities and CMBS. The increase in fair value was partially offset by an increase in the risk premium related to our single-family loans due to the continued weak credit environment and tightening of OAS levels on other debt related to agency mortgage-related securities.

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other market factors being equal. However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset. The reverse is true when the OAS on a given asset tightens — current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. However, as market conditions change, our estimate of expected fair value gains and losses from OAS may also change, and the actual core spread income recognized in future periods could be significantly different from current estimates.

## OFF-BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction. These off-balance sheet arrangements may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets.

### Securitization Activities and Other Guarantee Commitments

We have certain off-balance sheet arrangements related to our securitization activities involving guaranteed mortgages and mortgage-related securities, though most of our securitization activities are on-balance sheet. Our off-balance sheet arrangements related to these securitization activities primarily consist of: (a) Freddie Mac mortgage-related securities backed by multifamily loans; and (b) certain single-family Other Guarantee Transactions. We also have off-balance sheet arrangements related to other guarantee commitments, including long-term standby commitments and liquidity guarantees.

We guarantee the payment of principal and interest on Freddie Mac mortgage-related securities we issue and on mortgage loans covered by our other guarantee commitments. Therefore, our maximum potential off-balance sheet exposure to credit losses relating to these securitization activities and the other guarantee commitments is primarily represented by the UPB of the underlying loans and securities, which was $60.9 billion and $56.9 billion, at March 31,2012 and December 31, 2011, respectively. Our exposure to losses on securitization and other guarantee commitment activities would be partially mitigated by the recovery we would receive through exercising our rights to the collateral backing the underlying loans and the available credit enhancements, which may include recourse and primary insurance with third parties. We provide for incurred losses each period on these guarantees within our provision for credit losses. See "NOTE 9: FINANCIAL GUARANTEES" for more information on our off-balance sheet securitization activities and other guarantee commitments.

### Other Agreements

We own interests in numerous entities that are considered to be VIEs for which we are not the primary beneficiary and which we do not consolidate in accordance with the accounting guidance for the consolidation of VIEs. These VIEs relate primarily to our investment activity in mortgage-related assets and non-mortgage assets, and include LIHTC partnerships, certain Other Guarantee Transactions, and certain asset-backed investment trusts. Our consolidated balance sheets reflect only our investment in these VIEs, rather than the full amount of the VIEs' assets and liabilities. See "NOTE 3: VARIABLE INTEREST ENTITIES" for additional information related to our variable interests in these VIEs.

As part of our credit guarantee business, we routinely enter into forward purchase and sale commitments for mortgage loans and mortgage-related securities. Some of these commitments are accounted for as derivatives. Their fair values are reported as either derivative assets, net or derivative liabilities, net on our consolidated balance sheets. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties*." We also have purchase commitments primarily related to our mortgage purchase flow business, which we principally fulfill by issuing PCs in swap transactions, and, to a lesser extent, commitments to purchase or guarantee multifamily mortgage loans that are not accounted for as derivatives and are not recorded on our consolidated balance sheets. These non-

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012        TREASURY-3624        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

derivative commitments totaled $211.3 billion and $271.8 billion, in notional value at March 31, 2012 and December 31, 2011, respectively.

In connection with the execution of the Purchase Agreement, we, through FHFA, in its capacity as Conservator, issued a warrant to Treasury to purchase 79.9% of our common stock outstanding on a fully diluted basis on the date of exercise. See "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report for further information.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts within our consolidated financial statements. Certain of our accounting policies, as well as estimates we make, are critical, as they are both important to the presentation of our financial condition and results of operations and require management to make difficult, complex, or subjective judgments and estimates, often regarding matters that are inherently uncertain. Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements.

Our critical accounting policies and estimates relate to: (a) allowances for loan losses and reserve for guarantee losses; (b) fair value measurements; (c) impairment recognition on investments in securities; and (d) realizability of net deferred tax assets. For additional information about our critical accounting policies and estimates and other significant accounting policies, including recently issued accounting guidance, see "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES" in our 2011 Annual Report and "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in this Form 10-Q.

## FORWARD-LOOKING STATEMENTS

We regularly communicate information concerning our business activities to investors, the news media, securities analysts, and others as part of our normal operations. Some of these communications, including this Form 10-Q, contain "forward-looking statements," including statements pertaining to the conservatorship, our current expectations and objectives for our efforts under the MHA Program, the servicing alignment initiative and other programs to assist the U.S. residential mortgage market, future business plans, liquidity, capital management, economic and market conditions and trends, market share, the effect of legislative and regulatory developments, implementation of new accounting guidance, credit losses, internal control remediation efforts, and results of operations and financial condition on a GAAP, Segment Earnings, and fair value basis. Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. Forward-looking statements are often accompanied by, and identified with, terms such as "objective," "expect," "trend," "forecast," "anticipate," "believe," "intend," "could," "future," "may," "will," and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties, including those described in the "RISK FACTORS" section of our 2011 Annual Report, and:

- the actions FHFA, Treasury, the Federal Reserve, the SEC, HUD, the Administration, Congress, and our management may take, including actions related to implementing FHFA's strategic plan for Freddie Mac and Fannie Mae's conservatorships;

- the impact of the restrictions and other terms of the conservatorship, the Purchase Agreement, the senior preferred stock, and the warrant on our business, including our ability to pay: (a) the dividend on the senior preferred stock; and (b) any quarterly commitment fee that we are required to pay to Treasury under the Purchase Agreement;

- our ability to maintain adequate liquidity to fund our operations, including following any changes in the support provided to us by Treasury or FHFA, a change in the credit ratings of our debt securities or a change in the credit rating of the U.S. government;

- changes in our charter or applicable legislative or regulatory requirements, including any restructuring or reorganization in the form of our company, whether we will remain a stockholder-owned company or continue to exist and whether we will be wound down or placed under receivership, regulations under the GSE Act, the Reform Act, or the Dodd-Frank Act, regulatory or legislative actions taken to implement the Administration's plan to reform the housing finance system, regulatory or legislative actions that require us to support non-mortgage market initiatives, changes to affordable housing goals regulation, reinstatement of regulatory capital requirements, or the exercise or assertion of additional regulatory or administrative authority;

*Freddie Mac*

TREASURY-3625

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- changes in the regulation of the mortgage and financial services industries, including changes caused by the Dodd-Frank Act, or any other legislative, regulatory, or judicial action at the federal or state level;

- enforcement actions against mortgage servicers and other mortgage industry participants by federal or state authorities;

- the scope of various initiatives designed to help in the housing recovery (including the extent to which borrowers participate in the recently expanded HARP, the MHA Program and the non-HAMP standard loan modification initiative), and the impact of such programs on our credit losses, expenses, and the size and composition of our mortgage-related investments portfolio;

- the impact of any deficiencies in foreclosure documentation practices and related delays in the foreclosure process;

- the ability of our financial, accounting, data processing, and other operating systems or infrastructure, and those of our vendors to process the complexity and volume of our transactions;

- changes in accounting or tax guidance or in our accounting policies or estimates, and our ability to effectively implement any such changes in guidance, policies, or estimates;

- changes in general regional, national, or international economic, business, or market conditions and competitive pressures, including changes in employment rates and interest rates, and changes in the federal government's fiscal and monetary policy;

- changes in the U.S. residential mortgage market, including changes in the rate of growth in total outstanding U.S. residential mortgage debt, the size of the U.S. residential mortgage market, and home prices;

- our ability to effectively implement our business strategies, including any efforts to improve the supply and liquidity of, and demand for, our securities, and restrictions on our ability to offer new products or engage in new activities;

- our ability to recruit, retain, and engage executive officers and other key employees;

- our ability to effectively identify and manage credit, interest-rate, operational, and other risks in our business, including changes to the credit environment and the levels and volatilities of interest rates, as well as the shape and slope of the yield curves;

- the effects of internal control deficiencies and our ability to effectively identify, assess, evaluate, manage, mitigate, or remediate control deficiencies and risks, including material weaknesses and significant deficiencies, in our internal control over financial reporting and disclosure controls and procedures;

- incomplete or inaccurate information provided by customers and counterparties;

- consolidation among, or adverse changes in the financial condition of, our customers and counterparties;

- the failure of our customers and counterparties to fulfill their obligations to us, including the failure of seller/servicers to meet their obligations to repurchase loans sold to us in breach of their representations and warranties, and the potential cost and difficulty of legally enforcing those obligations;

- changes in our judgments, assumptions, forecasts, or estimates regarding the volume of our business and spreads we expect to earn;

- the availability of options, interest-rate and currency swaps, and other derivative financial instruments of the types and quantities, on acceptable terms, and with acceptable counterparties needed for investment funding and risk management purposes;

- changes in pricing, valuation or other methodologies, models, assumptions, judgments, estimates and/or other measurement techniques, or their respective reliability;

- changes in mortgage-to-debt OAS;

- the potential impact on the market for our securities resulting from any purchases or sales by the Federal Reserve of Freddie Mac debt or mortgage-related securities;

- adverse judgments or settlements in connection with legal proceedings, governmental investigations, and IRS examinations;

- volatility of reported results due to changes in the fair value of certain instruments or assets;

- the development of different types of mortgage servicing structures and servicing compensation;

- preferences of originators in selling into the secondary mortgage market;

TREASURY-3626

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                             Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- changes to our underwriting or servicing requirements (including servicing alignment efforts under the servicing alignment initiative), our practices with respect to the disposition of REO properties, or investment standards for mortgage-related products;

- investor preferences for mortgage loans and mortgage-related and debt securities compared to other investments;

- borrower preferences for fixed-rate mortgages versus ARMs;

- the occurrence of a major natural or other disaster in geographic areas in which our offices or portions of our total mortgage portfolio are concentrated;

- other factors and assumptions described in this Form 10-Q and our 2011 Annual Report, including in the "MD&A" sections;

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their impacts; and

- market reactions to the foregoing.

Forward-looking statements speak only as of the date they are made, and we undertake no obligation to update any forward-looking statements we make to reflect events or circumstances occurring after the date of this Form 10-Q.

## RISK MANAGEMENT AND DISCLOSURE COMMITMENTS

In October 2000, we announced our adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with FHFA, then OFHEO, that updated these commitments and set forth a process for implementing them. A copy of the letters between us and OFHEO dated September 1, 2005 constituting the written agreement has been filed as an exhibit to our Registration Statement on Form 10, filed with the SEC on July 18, 2008, and is available on the Investor Relations page of our web site at www.freddiemac.com/investors/sec_filings/index.html.

In November 2008, FHFA suspended our periodic issuance of subordinated debt disclosure commitment during the term of conservatorship and thereafter until directed otherwise. In March 2009, FHFA suspended the remaining disclosure commitments under the September 1, 2005 agreement until further notice, except that: (a) FHFA will continue to monitor our adherence to the substance of the liquidity management and contingency planning commitment through normal supervision activities; and (b) we will continue to provide interest-rate risk and credit risk disclosures in our periodic public reports.

For the three months ended March 31, 2012, our duration gap averaged zero months, PMVS-L averaged $223 million and PMVS-YC averaged $16 million. Our 2012 monthly average duration gap, PMVS results and related disclosures are provided in our Monthly Volume Summary reports, which are available on our web site, www.freddiemac.com/investors/volsum and in current reports on Form 8-K we file with the SEC. For disclosures concerning credit risk sensitivity, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Credit Risk Sensitivity*."

## LEGISLATIVE AND REGULATORY MATTERS

### Administration Report on Reforming the U.S. Housing Finance Market

On February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, stating that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Administration's belief that, under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3627                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements. These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations and financial condition. Recent developments include the following:

• As discussed below in "Legislated Increase to Guarantee Fees," we recently raised our guarantee fees at the direction of FHFA.

• The temporary high-cost area loan limits expired on September 30, 2011.

• We are working with FHFA to identify ways to prudently accelerate the rate of contraction of our mortgage-related investments portfolio.

We cannot predict the extent to which the other recommendations in the report will be implemented or when any actions to implement them may be taken. However, we are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. FHFA's strategic plan for us is described below.

## FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard

On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac and Fannie Mae. The plan sets forth objectives and steps FHFA is taking or will take to meet FHFA's obligations as Conservator. FHFA states that the steps envisioned in the plan are consistent with each of the housing finance reform frameworks set forth in the report delivered by the Administration to Congress in February 2011, as well as with the leading congressional proposals introduced to date. FHFA indicates that the plan leaves open all options for Congress and the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future.

FHFA's plan provides lawmakers and the public with an outline of how FHFA as Conservator intends to guide Freddie Mac and Fannie Mae over the next few years, and identifies three strategic goals:

• **Build.** Build a new infrastructure for the secondary mortgage market;

• **Contract.** Gradually contract Freddie Mac and Fannie Mae's dominant presence in the marketplace while simplifying and shrinking their operations; and

• **Maintain.** Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

The first of these goals establishes the steps FHFA, Freddie Mac, and Fannie Mae will take to create the necessary infrastructure, including a securitization platform and national standards for mortgage securitization, that Congress and market participants may use to develop the secondary mortgage market of the future. As part of this process, FHFA would determine how Freddie Mac and Fannie Mae can work together to build a single securitization platform that would replace their current separate proprietary systems.

The second goal describes steps that FHFA plans to take to gradually shift mortgage credit risk from Freddie Mac and Fannie Mae to private investors and eliminate the direct funding of mortgages by the enterprises. The plan states that the goal of gradually shifting mortgage credit risk from Freddie Mac and Fannie Mae to private investors could be accomplished, in the case of single-family credit guarantees, in several ways, including increasing guarantee fees, establishing loss-sharing arrangements and expanding reliance on mortgage insurance. To evaluate how to accomplish the goal of contracting enterprise operations in the multifamily business, the plan states that Freddie Mac and Fannie Mae will each undertake a market analysis of the viability of its respective multifamily operations without government guarantees.

For the third goal, the plan states that programs and strategies to ensure ongoing mortgage credit availability, assist troubled homeowners, and minimize taxpayer losses while restoring stability to housing markets continue to require energy, focus, and resources. The plan states that activities that must be continued and enhanced include: (a) successful implementation of HARP, including the significant program changes announced by FHFA in October 2011; (b) continued implementation of the Servicing Alignment Initiative; (c) renewed focus on short sales, deeds-in-lieu, and deeds-for-lease options that enable households and Freddie Mac and Fannie Mae to avoid foreclosure; and (d) further development and implementation of the REO disposition initiative announced by FHFA in 2011.

On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that established objectives and performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan for

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                      Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3628

Table of Contents

Freddie Mac and Fannie Mae. We are aligning our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard. See "OTHER INFORMATION — 2012 Conservatorship Scorecard" in our 2011 Annual Report for further information.

### Legislated Increase to Guarantee Fees

On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 10 basis points above the average guarantee fees charged in 2011 on single-family mortgage-backed securities. Under the law, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies. Effective April 1, 2012, at the direction of FHFA, the guarantee fee on all single-family residential mortgages sold to Freddie Mac and Fannie Mae was increased by 10 basis points.

Our business and financial condition will not benefit from the increases in guarantee fees under this law, as we must remit the proceeds from such increases to Treasury. It is currently unclear what effect this increase or any further guarantee fee increases or other fee adjustments associated with this law will have on the future profitability and operations of our single-family guarantee business. FHFA has informed us that, if we raise fees for other purposes in 2012, we will be allowed to retain the related revenue.

### Legislation Related to Reforming Freddie Mac and Fannie Mae

Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. Congress continues to hold hearings and consider legislation on the future state of Freddie Mac and Fannie Mae.

A number of bills were introduced in Congress in 2011 and early 2012 relating to reforming Freddie Mac and Fannie Mae, and the secondary mortgage market. See "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — Legislation Related to Reforming Freddie Mac and Fannie Mae*" in our 2011 Annual Report. We cannot predict whether or when any of the bills discussed therein might be enacted. We expect additional bills relating to Freddie Mac and Fannie Mae to be introduced and considered by Congress during the remainder of 2012. On February 2, 2012, the Administration announced that it expects to provide more detail concerning approaches to reform the U.S. housing finance market in the spring, and that it plans to begin exploring options for legislation more intensively with Congress.

### Legislative and Regulatory Developments Concerning Executive Compensation

Congress, the Administration, and FHFA recently took significant action related to compensation at Freddie Mac. These developments followed extensive public debate in Congress concerning our compensation structure, including whether senior executives should be entitled to bonuses or whether all employees should be placed on the government pay scale.

- On April 4, 2012, the President signed the Stop Trading on Congressional Knowledge Act of 2012, or STOCK Act, which became effective immediately. The STOCK Act includes a provision that expressly prohibits senior executives at Freddie Mac and Fannie Mae from receiving bonuses during any period of conservatorship.

- On March 8, 2012, as we reported in our 2011 Annual Report, FHFA approved a new executive compensation program for Freddie Mac. FHFA stated that the new compensation program strikes the balance between prudent executive pay, including the elimination of bonuses, with the need to safeguard quality staffing in order to protect the taxpayers' investment and achieve the objectives in FHFA's 2012 conservatorship scorecard.

We believe our risks related to employee turnover and employee engagement remain elevated. It is uncertain how the developments discussed above will affect our ability to manage these risks.

### Dodd-Frank Act

The Dodd-Frank Act, which was signed into law on July 21, 2010, significantly changed the regulation of the financial services industry, including by creating new standards related to regulatory oversight of systemically important financial companies, derivatives, capital requirements, asset-backed securitization, mortgage underwriting, and consumer financial protection. The Dodd-Frank Act has directly affected and will continue to directly affect the business and operations of Freddie Mac by subjecting us to new and additional regulatory oversight and standards, including with respect to our activities and products. We may also be affected by provisions of the Dodd-Frank Act and implementing regulations that affect the activities of banks, savings institutions, insurance companies, securities dealers, and other regulated entities that are our customers and counterparties.

TREASURY-3629

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Implementation of the Dodd-Frank Act is being accomplished through numerous rulemakings, many of which are still in process. Accordingly, it is difficult to assess fully the impact of the Dodd-Frank Act on Freddie Mac and the financial services industry at this time. The final effects of the legislation will not be known with certainty until these rulemakings are complete. The Dodd-Frank Act also mandates the preparation of studies on a wide range of issues, which could lead to additional legislation or regulatory changes.

Recent developments with respect to Dodd-Frank rulemakings that may have a significant impact on Freddie Mac include several final rules on derivatives promulgated by the Commodity Futures Trading Commission, or CFTC.

- On April 18, 2012, the CFTC, in conjunction with the SEC (collectively, the "Commissions"), approved a joint final rule further defining certain swap-related terms, including "major swap participant" (MSP), the text of which was released on April 27, 2012. We are analyzing the final rule, but have not yet determined whether Freddie Mac meets the criteria of an MSP. If Freddie Mac meets the criteria of an MSP, we would be required to register with the CFTC, and we would face significant regulations, including those relating to reporting, recordkeeping, and business conduct standards.

- The CFTC also recently promulgated final rules on real-time public reporting of swap transaction data, which might increase the costs of our swaps transactions. Furthermore, the CFTC released final rules relating to recordkeeping, reporting, and clearing customer documentation, each of which may increase Freddie Mac's administrative and compliance costs.

We continue to review and assess the impact of rulemakings and other activities under the Dodd-Frank Act. For more information, see "RISK FACTORS — Legal and Regulatory Risks — *The Dodd-Frank Act and related regulation may adversely affect our business activities and financial results*" in our 2011 Annual Report.

## Developments Concerning Single-Family Servicing Practices

There have been a number of regulatory developments in recent periods impacting single-family mortgage servicing and foreclosure practices, including those discussed below and in "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — Developments Concerning Single-Family Servicing Practices*" in our 2011 Annual Report. It is possible that these developments will result in significant changes to mortgage servicing and foreclosure practices that could adversely affect our business. New compliance requirements placed on servicers as a result of these developments could expose Freddie Mac to financial risk as a result of further extensions of foreclosure timelines if home prices remain weak or decline. We may need to make additional significant changes to our practices, which could increase our operational risk. It is difficult to predict other impacts on our business of these changes, though such changes could adversely affect our credit losses and costs of servicing, and make it more difficult for us to transfer mortgage servicing rights to a successor servicer should we need to do so. Recent regulatory developments and changes include the February 9, 2012 announcement from a coalition of state attorneys general and federal agencies that it had entered into a settlement with five large seller/servicers concerning certain issues related to mortgage servicing practices. Under the settlement, which is currently in effect, these companies agreed to changes in their mortgage servicing practices. Certain of these changes will apply to loans they service on our behalf.

For more information on operational risks related to these developments in mortgage servicing, see "MD&A — RISK MANAGEMENT — Operational Risks" in our 2011 Annual Report.

## Rule Concerning Private Transfer Fees

On March 16, 2012, FHFA issued a final rule that prohibits Freddie Mac, Fannie Mae, and the FHLBs from purchasing, investing, or otherwise dealing in mortgages on properties encumbered by certain types of private transfer fee covenants and in certain related securities. Private transfer fee covenants run with the land or bind current owners or their successors in title, and obligate the transferee or transferor of the property to pay a fee upon the transfer of the property. The rule becomes effective on July 16, 2012. The full impact of this regulation is unclear at this time.

## FHFA Advisory Bulletin

On April 9, 2012, FHFA issued an advisory bulletin, "Framework for Adversely Classifying Loans, Other Real Estate Owned, and Other Assets and Listing Assets for Special Mention," which was effective upon issuance and is applicable to Freddie Mac, Fannie Mae, and the FHLBs. The advisory bulletin establishes guidelines for adverse classification and identification of specified assets and off-balance sheet credit exposures. The Advisory Bulletin indicates that this guidance considers and is generally consistent with the *Uniform Retail Credit Classification and Account Management Policy* issued by the federal banking regulators in June 2000. Among other provisions, the advisory bulletin requires that we classify a single-family loan as "loss" when the loan is no more than 180 days delinquent. The advisory bulletin specifies that, once

TREASURY-3630

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

a loan is classified as "loss," we generally are required to charge-off the portion of the loan balance that exceeds the fair value of the property, less cost to sell. The advisory bulletin also specifies that, if we subsequently receive full or partial payment of a previously charged-off loan, we may report a recovery of the amount, either through our loan loss reserves or as a reduction in REO operations expenses. The accounting methods outlined in FHFA's advisory bulletin are significantly different from our current methods of accounting for single-family loans that are 180 days or more delinquent. We are currently assessing the operational and accounting impacts of this advisory bulletin, and have not yet determined when we will implement this bulletin or its impact on our consolidated financial statements.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

### Interest-Rate Risk and Other Market Risks

Our investments in mortgage loans and mortgage-related securities expose us to interest-rate risk and other market risks arising primarily from the uncertainty as to when borrowers will pay the outstanding principal balance of mortgage loans and mortgage-related securities, known as prepayment risk, and the resulting potential mismatch in the timing of our receipt of cash flows related to our assets versus the timing of payment of cash flows related to our liabilities used to fund those assets. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" in our 2011 Annual Report for a discussion of our market risk exposures, including those related to derivatives, institutional counterparties, and other market risks.

### PMVS and Duration Gap

Our primary interest-rate risk measures are PMVS and duration gap.

PMVS is an estimate of the change in the market value of our net assets and liabilities from an instantaneous 50 basis point shock to interest rates, assuming no rebalancing actions are undertaken and assuming the mortgage-to-LIBOR basis does not change. PMVS is measured in two ways, one measuring the estimated sensitivity of our portfolio market value to parallel movements in interest rates (PMVS-Level or PMVS-L) and the other to nonparallel movements (PMVS-YC).

Duration gap measures the difference in price sensitivity to interest rate changes between our assets and liabilities, and is expressed in months relative to the market value of assets. For example, assets with a six month duration and liabilities with a five month duration would result in a positive duration gap of one month. A duration gap of zero implies that the duration of our assets equals the duration of our liabilities. Multiplying duration gap (expressed as a percentage of a year) by the fair value of our assets will provide an indication of the change in the fair value of our equity to be expected from a 1% change in interest rates.

The 50 basis point shift and 25 basis point change in slope of the LIBOR yield curve used for our PMVS measures reflect reasonably possible near-term changes that we believe provide a meaningful measure of our interest-rate risk sensitivity. Our PMVS measures assume instantaneous shocks. Therefore, these PMVS measures do not consider the effects on fair value of any rebalancing actions that we would typically expect to take to reduce our risk exposure.

### Limitations of Market Risk Measures

Our PMVS and duration gap estimates are determined using models that involve our best judgment of interest-rate and prepayment assumptions. Accordingly, while we believe that PMVS and duration gap are useful risk management tools, they should be understood as estimates rather than as precise measurements. While PMVS and duration gap estimate our exposure to changes in interest rates, they do not capture the potential impact of certain other market risks, such as changes in volatility, basis, and foreign-currency risk. The impact of these other market risks can be significant.

There are inherent limitations in any methodology used to estimate exposure to changes in market interest rates. Our sensitivity analyses for PMVS and duration gap contemplate only certain movements in interest rates and are performed at a particular point in time based on the estimated fair value of our existing portfolio. These sensitivity analyses do not consider other factors that may have a significant effect on our financial instruments, most notably business activities and strategic actions that management may take in the future to manage interest-rate risk. As such, these analyses are not intended to provide precise forecasts of the effect a change in market interest rates would have on the estimated fair value of our net assets.

In addition, it has been more difficult in recent years to measure and manage the interest-rate risk related to mortgage assets as risk for prepayment model error remains high due to uncertainty regarding default rates, unemployment, loan modification, and the volatility and impact of home price movements on mortgage durations. Misestimation of prepayments could result in hedging-related losses.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-3631

Table of Contents

### Duration Gap and PMVS Results

The table below provides duration gap, estimated point-in-time and minimum and maximum PMVS-L and PMVS-YC results, and an average of the daily values and standard deviation for the three months ended March 31, 2012 and 2011. The table below also provides PMVS-L estimates assuming an immediate 100 basis point shift in the LIBOR yield curve. We do not hedge the entire prepayment risk exposure embedded in our mortgage assets. The interest-rate sensitivity of a mortgage portfolio varies across a wide range of interest rates. Therefore, the difference between PMVS at 50 basis points and 100 basis points is non-linear. Our PMVS-L (50 basis points) exposure at March 31, 2012 was $339 million; approximately half was driven by our duration exposure and the other half was driven by our negative convexity exposure. The PMVS-L at March 31, 2012 declined compared to December 31, 2011 primarily due to a decline in our duration exposure. On an average basis for the three months ended March, 31, 2012, our PMVS-L (50 basis points) was $223 million, which was primarily driven by our negative convexity exposure on our mortgage assets.

### Table 55 — PMVS Results

|  | PMVS-YC | PMVS-L | |
| --- | --- | --- | --- |
|  | 25 bps | 50 bps | 100 bps |
|  | (in millions) | | |
| Assuming shifts of the LIBOR yield curve: |  |  |  |
| March 31, 2012 | $ 14 | $339 | $ 1,051 |
| December 31, 2011 | $ 7 | $465 | $ 1,349 |

|  | Three Months Ended March 31, | | | | | |
|  | 2012 | | | 2011 | | |
|  | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
|  | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| --- | --- | --- | --- | --- | --- | --- |
| Average | 0.0 | $ 16 | $ 223 | (0.3) | $ 21 | $ 448 |
| Minimum | (0.3) | $ 1 | $ 130 | (1.0) | $ — | $ 280 |
| Maximum | 0.6 | $ 57 | $ 379 | 0.4 | $ 51 | $ 721 |
| Standard deviation | 0.2 | $ 12 | $ 47 | 0.3 | $ 13 | $ 101 |

Derivatives have historically enabled us to keep our interest-rate risk exposure at consistently low levels in a wide range of interest-rate environments. The table below shows that the PMVS-L risk levels for the periods presented would generally have been higher if we had not used derivatives. The derivative impact on our PMVS-L (50 basis points) was $(1.2) billion at March 31, 2012, a decline of $0.8 billion from December 31, 2011. The decline was primarily driven by an increase in the percentage of long-term debt we have been issuing, beginning in the fourth quarter of 2011. This allows us to take advantage of attractive long-term interest rates while decreasing our reliance on interest-rate swaps. In order to remain within our risk management limits, we rebalanced our mortgage-related investments portfolio with receive-fixed swaps, which lowered our derivative duration exposure.

### Table 56 — Derivative Impact on PMVS-L (50 bps)

|  | Before Derivatives | After Derivatives | Effect of Derivatives |
| --- | --- | --- | --- |
|  | (in millions) | | |
| At: |  |  |  |
| March 31, 2012 | $ 1,574 | $ 339 | $(1,235) |
| December 31, 2011 | $ 2,470 | $ 465 | $ (2,005) |

The disclosure in our Monthly Volume Summary reports, which are available on our website at www.freddiemac.com and in current reports on Form 8-K we file with the SEC, reflects the average of the daily PMVS-L, PMVS-YC and duration gap estimates for a given reporting period (a month, quarter or year).

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                   TREASURY-3632                         Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

## ITEM 4. CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Disclosure controls and procedures include, without limitation,  controls and procedures designed to ensure that the information  we are required to disclose in reports that we file or submit  under the Exchange Act is recorded, processed, summarized and  reported within the time periods specified by the SEC's rules and forms and that such information is accumulated and  communicated to management of the company, including the company's Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding  required disclosure. In designing our disclosure controls and  procedures, we recognize that any controls and procedures, no  matter how well designed and operated, can provide only  reasonable assurance of achieving the desired control  objectives, and we must apply judgment in implementing possible controls and procedures.

Management, including the company's Chief Executive Officer  and Chief Financial Officer, conducted an evaluation of the  effectiveness of our disclosure controls and procedures as of  March 31, 2012. As a result of management's evaluation, our  Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures  were not effective as of March 31, 2012, at a reasonable  level of assurance due to the two material weaknesses in our  internal control over financial reporting discussed below.

- The first material weakness relates to our inability to update  our disclosure controls and procedures in a manner that  adequately ensures the accumulation and communication to  management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws,  including disclosures affecting our consolidated financial  statements. We have not been able to update our disclosure controls and procedures to provide reasonable assurance that  information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure. Based on discussions with FHFA and the structural nature of this  continuing weakness, we believe it is likely that we will not  remediate this material weakness while we are under  conservatorship. We consider this situation to be a material weakness in our internal control over financial reporting.

- The second material weakness relates to our inability to  effectively manage information technology changes and maintain  adequate controls over information security monitoring,  resulting from elevated levels of employee turnover. We are finding it difficult to retain and engage critical employees and attract people with the skills and experience we need. While we  have been able to leverage succession plans and reassign responsibilities to maintain sound internal control over  financial reporting in most areas, as a result of elevated  levels of employee turnover, we experienced a significant  increase in the number of control breakdowns within certain  areas of our information technology division, specifically  within groups responsible for information change management and  information security. We identified deficiencies in the following areas: (a) approval and monitoring of changes to  certain technology applications and infrastructure; (b) monitoring of select privileged user activities; and  (c) monitoring user activities performed on certain  technology hardware systems. These control breakdowns could have  impacted applications which support our financial reporting  processes. Elevated levels of employee turnover contributed to  ineffective management oversight of controls in these areas  resulting in these deficiencies. We believe that these issues aggregate to a material weakness in our internal control over  financial reporting.

**Changes in Internal Control Over Financial Reporting During the Quarter  Ended March 31, 2012**

We evaluated the changes in our internal control over financial  reporting that occurred during the quarter ended March 31,  2012 and concluded that the following matters have materially  affected, or are reasonably likely to materially affect, our  internal control over financial reporting.

We have experienced elevated levels of voluntary turnover in the  first quarter of 2012 and earlier periods, and expect this trend  to continue as the public debate regarding the future role of the  GSEs continues. We continue to have concerns about staffing  inadequacies, management depth, and low employee engagement.  Disruptive levels of turnover at both the executive and  non-executive levels have contributed to a deterioration in our control environment and may lead to breakdowns in any of our  operations, affect our execution capabilities, cause delays in the  implementation of critical technology and other projects, and  erode our business, modeling, internal audit, risk  management, information security, financial reporting, legal, compliance, and other capabilities. For more information on  recent legislative and regulatory developments affecting these risks, see "MD&A — LEGISLATIVE AND REGULATORY MATTERS — Legislative and Regulatory Developments Concerning Executive Compensation."

Two Board members, John A. Koskinen (Chairman) and Robert R.  Glauber (Chairman, Governance and Nominating  Committee), reached the company's mandatory retirement age and stepped down from the Board in March 2012. In order

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

to promote a smooth transition, Christopher S. Lynch, previously the Chairman of the Audit Committee, assumed the position of Non-Executive Chairman of the Board effective at the December 2011 Board meeting. A third Board member, Laurence E. Hirsch, did not seek re-election to the Board when his term expired in March 2012. In addition, Clayton S. Rose (Chairman of the Audit Committee) resigned from the Board of Directors effective as of 6:00 pm Eastern Standard Time on March 9, 2012. Carolyn H. Byrd assumed the position of Chairperson of the Audit Committee effective March 15, 2012, on an interim basis. Subsequent to March 31, 2012, we were informed by Anthony N. Renzi, Executive Vice President — Single-Family Business, Operations and Technology, that he will resign from his position effective May 11, 2012.

**Mitigating Actions Related to the Material Weaknesses in Internal Control Over Financial Reporting**

As described under "Evaluation of Disclosure Controls and Procedures," we have two material weaknesses in internal control over financial reporting as of March 31, 2012 that we have not remediated.

Given the structural nature of the material weakness related to our inability to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, we believe it is likely that we will not remediate this material weakness while we are under conservatorship. However, both we and FHFA have continued to engage in activities and employ procedures and practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws. These include the following:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the Conservator.

- We provide drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also provide drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, review our SEC filings prior to filing, including this quarterly report on Form 10-Q, and engage in discussions regarding issues associated with the information contained in those filings. Prior to filing this quarterly report on Form 10-Q, FHFA provided us with a written acknowledgement that it had reviewed the quarterly report on Form 10-Q, was not aware of any material misstatements or omissions in the quarterly report on Form 10-Q, and had no objection to our filing the quarterly report on Form 10-Q.

- The Acting Director of FHFA is in frequent communication with our Chief Executive Officer, typically meeting (in person or by phone) on a weekly basis.

- FHFA representatives hold frequent meetings, typically weekly, with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, capital markets management, external communications, and legal matters.

- Senior officials within FHFA's accounting group meet frequently, typically weekly, with our senior financial executives regarding our accounting policies, practices, and procedures.

We have performed the following mitigating actions regarding the material weakness related to our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from increased levels of employee turnover:

- Reviewed potential unauthorized changes to applications supporting our financial statements for proper approvals.

- Reviewed and approved user access capabilities for applications supporting our financial reporting processes.

- Maintained effective business process controls over financial reporting.

- Filled the vacant positions or reassigned responsibilities within the information change management group.

- Took select actions targeted to reduce employee attrition in key control areas.

- Continued to explore various strategic arrangements with outside firms to provide operational capability and staffing for these functions, if needed.

We also intend to take the following remediation actions related to this material weakness:

- Assess staffing requirements to ensure appropriate staffing over information security controls and develop cross-training programs within this area to mitigate the risk to the internal control environment should we continue to experience high levels of employee turnover.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3634                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- Fill the vacant positions or reassign responsibilities within the information security monitoring group.

- Improve automation capabilities for the identification and resolution of potential unauthorized system changes.

- Update our policies and procedures to document control processes.

- Provide, on an on-going basis, additional training to IT individuals that execute or manage change management and security controls.

In view of our mitigating actions related to these material weaknesses, we believe that our interim consolidated financial statements for the quarter ended March 31, 2012 have been prepared in conformity with GAAP.

99

*Freddie Mac*

---

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**ITEM 1. FINANCIAL STATEMENTS**

100                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(UNAUDITED)**

| | Three Months Ended March 31, | |
| --- | ---: | ---: |
| | 2012 | 2011 |
| | (in millions, except share-related amounts) | |
| *Interest income* | | |
| Mortgage loans: | | |
|   Held by consolidated trusts | $ 17,468 | $ 20,064 |
|   Unsecuritized | 2,312 | 2,334 |
|     Total mortgage loans | 19,780 | 22,398 |
| Investments in securities | 2,938 | 3,283 |
| Other | 13 | 34 |
|     Total interest income | 22,731 | 25,715 |
| *Interest expense* | | |
| Debt securities of consolidated trusts | (15,253) | (17,403) |
| Other debt | (2,816) | (3,565) |
|     Total interest expense | (18,069) | (20,968) |
|   Expense related to derivatives | (162) | (207) |
| *Net interest income* | 4,500 | 4,540 |
| Provision for credit losses | (1,825) | (1,989) |
| *Net interest income after provision for credit losses* | 2,675 | 2,551 |
| *Non-interest income (loss)* | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (4) | 223 |
| Gains (losses) on retirement of other debt | (21) | 12 |
| Gains (losses) on debt recorded at fair value | (17) | (81) |
| Derivative gains (losses) | (1,056) | (427) |
| Impairment of available-for-sale securities: | | |
|   Total other-than-temporary impairment of available-for-sale securities | (475) | (1,054) |
|   Portion of other-than-temporary impairment recognized in AOCI | (89) | (139) |
|     Net impairment of available-for-sale securities recognized in earnings | (564) | (1,193) |
| Other gains (losses) on investment securities recognized in earnings | (288) | (120) |
| Other income | 434 | 334 |
| *Non-interest income (loss)* | (1,516) | (1,252) |
| *Non-interest expense* | | |
| Salaries and employee benefits | (176) | (207) |
| Professional services | (71) | (56) |
| Occupancy expense | (14) | (15) |
| Other administrative expenses | (76) | (83) |
|   Total administrative expenses | (337) | (361) |
| Real estate owned operations expense | (171) | (257) |
| Other expenses | (88) | (79) |
| *Non-interest expense* | (596) | (697) |
| Income before income tax benefit | 563 | 602 |
| Income tax benefit | 14 | 74 |
| *Net income* | 577 | 676 |
| Other comprehensive income, net of taxes and reclassification adjustments: | | |
|   Changes in unrealized gains (losses) related to available-for-sale securities | 1,147 | 1,941 |
|   Changes in unrealized gains (losses) related to cash flow hedge relationships | 111 | 132 |
|   Changes in defined benefit plans | (46) | (9) |
|     Total other comprehensive income, net of taxes and reclassification adjustments | 1,212 | 2,064 |
| Comprehensive income | $ 1,789 | $ 2,740 |
| *Net income* | $ 577 | $ 676 |
| Preferred stock dividends | (1,804) | (1,605) |
| *Net loss attributable to common stockholders* | $ (1,227) | $ (929) |
| Net loss per common share: | | |
|   Basic | $ (0.38) | $ (0.29) |
|   Diluted | $ (0.38) | $ (0.29) |
| Weighted average common shares outstanding (in thousands): | | |
|   Basic | 3,241,502 | 3,246,985 |
|   Diluted | 3,241,502 | 3,246,985 |

*The accompanying notes are an integral part of these consolidated financial statements.*

TREASURY-3637

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED BALANCE SHEETS**
**(UNAUDITED)**

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| | (in millions, except share-related amounts) | |
| **Assets** | | |
| Cash and cash equivalents (includes $1 and $2, respectively, related to our consolidated VIEs) | $ 8,569 | $ 28,442 |
| Restricted cash and cash equivalents (includes $27,332 and $27,675, respectively, related to our consolidated VIEs) | 27,790 | 28,063 |
| Federal funds sold and securities purchased under agreements to resell (includes $3,000 and $0, respectively, related to our consolidated VIEs) | 24,349 | 12,044 |
| *Investments in securities:* | | |
| Available-for-sale, at fair value (includes $187 and $204, respectively, pledged as collateral that may be repledged) | 202,422 | 210,659 |
| Trading, at fair value | 58,319 | 58,830 |
| Total investments in securities | 260,741 | 269,489 |
| *Mortgage loans:* | | |
| Held-for-investment, at amortized cost: | | |
| By consolidated trusts (net of allowances for loan losses of $7,139 and $8,351, respectively) | 1,555,067 | 1,564,131 |
| Unsecuritized (net of allowances for loan losses of $30,925 and $30,912, respectively) | 199,945 | 207,418 |
| Total held-for-investment mortgage loans, net | 1,755,012 | 1,771,549 |
| Held-for-sale, at lower-of-cost-or-fair-value (includes $11,337 and $9,710 at fair value, respectively) | 11,337 | 9,710 |
| *Total mortgage loans, net* | 1,766,349 | 1,781,259 |
| Accrued interest receivable (includes $6,079 and $6,242, respectively, related to our consolidated VIEs) | 7,820 | 8,062 |
| Derivative assets, net | 182 | 118 |
| Real estate owned, net (includes $67 and $60, respectively, related to our consolidated VIEs) | 5,454 | 5,680 |
| Deferred tax assets, net | 2,929 | 3,546 |
| Other assets (Note 18) (includes $6,227 and $6,083, respectively, related to our consolidated VIEs) | 10,761 | 10,513 |
| *Total assets* | $ 2,114,944 | $ 2,147,216 |
| **Liabilities and equity (deficit)** | | |
| *Liabilities* | | |
| Accrued interest payable (includes $5,832 and $5,943, respectively, related to our consolidated VIEs) | $ 8,129 | $ 8,898 |
| *Debt, net:* | | |
| Debt securities of consolidated trusts held by third parties | 1,481,622 | 1,471,437 |
| Other debt (includes $2,221 and $3,015 at fair value, respectively) | 618,629 | 660,546 |
| Total debt, net | 2,100,251 | 2,131,983 |
| Derivative liabilities, net | 296 | 435 |
| Other liabilities (Note 18) (includes $2 and $3, respectively, related to our consolidated VIEs) | 6,286 | 6,046 |
| *Total liabilities* | 2,114,962 | 2,147,362 |
| Commitments and contingencies (Notes 9, 10, and 17) | | |
| *Equity (deficit)* | | |
| Senior preferred stock, at redemption value | 72,317 | 72,171 |
| Preferred stock, at redemption value | 14,109 | 14,109 |
| Common stock, $0.00 par value, 4,000,000,000 shares authorized, 725,863,886 shares issued and 650,033,623 shares and 649,725,302 shares outstanding, respectively | — | — |
| Additional paid-in capital | — | 3 |
| Retained earnings (accumulated deficit) | (75,775) | (74,525) |
| *AOCI, net of taxes, related to:* | | |
| Available-for-sale securities (includes $9,625 and $10,334, respectively, related to net unrealized losses on securities for which other-than-temporary impairment has been recognized in earnings) | (5,066) | (6,213) |
| Cash flow hedge relationships | (1,619) | (1,730) |
| Defined benefit plans | (98) | (52) |
| Total AOCI, net of taxes | (6,783) | (7,995) |
| Treasury stock, at cost, 75,830,263 shares and 76,138,584 shares, respectively | (3,886) | (3,909) |
| Total equity (deficit) | (18) | (146) |
| Total liabilities and equity (deficit) | $ 2,114,944 | $ 2,147,216 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

TREASURY-3638

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## FREDDIE MAC
## CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT)
## (UNAUDITED)

| | Freddie Mac Stockholders' Equity (Deficit) | | | | | | | | | | |
| | Shares Outstanding | | | Senior Preferred Stock, at Redemption Value | Preferred Stock, at Redemption Value | Common Stock, at Par Value | Additional Paid-In Capital | Retained Earnings (Accumulated Deficit) | AOCI, Net of Tax | Treasury Stock, at Cost | Total Equity (Deficit) |
| | Senior Preferred Stock | Preferred Stock | Common Stock | | | (in millions) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2010** | 1 | 464 | 649 | $ 64,200 | $ 14,109 | $ — | $ 7 | $ (62,733) | $ (12,031) | $ (3,953) | $ (401) |
| *Comprehensive income:* | | | | | | | | | | | |
| Net income | — | — | — | — | — | — | — | 676 | — | — | 676 |
| Other comprehensive income, net of taxes | — | — | — | — | — | — | — | — | 2,064 | — | 2,064 |
| *Comprehensive income* | — | — | — | — | — | — | — | 676 | 2,064 | — | 2,740 |
| Increase in liquidation preference | — | — | — | 500 | — | — | — | — | — | — | 500 |
| Stock-based compensation | — | — | — | — | — | — | 6 | — | — | — | 6 |
| Common stock issuances | — | — | 1 | — | — | — | (41) | — | — | 41 | — |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 28 | (28) | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (1,605) | — | — | (1,605) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (3) | — | — | (3) |
| **Ending balance at March 31, 2011** | 1 | 464 | 650 | $ 64,700 | $ 14,109 | $ — | $ — | $ (63,693) | $ (9,967) | $ (3,912) | $ 1,237 |
| **Balance as of December 31, 2011** | 1 | 464 | 650 | $ 72,171 | $ 14,109 | $ — | $ 3 | $ (74,525) | $ (7,995) | $ (3,909) | $ (146) |
| *Comprehensive income:* | | | | | | | | | | | |
| Net income | — | — | — | — | — | — | — | 577 | — | — | 577 |
| Other comprehensive income, net of taxes | — | — | — | — | — | — | — | — | 1,212 | — | 1,212 |
| *Comprehensive income* | — | — | — | — | — | — | — | 577 | 1,212 | — | 1,789 |
| Increase in liquidation preference | — | — | — | 146 | — | — | — | — | — | — | 146 |
| Stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | 1 |
| Common stock issuances | — | — | — | — | — | — | (23) | — | — | 23 | — |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 19 | (19) | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (1,807) | — | — | (1,807) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (1) | — | — | (1) |
| **Ending balance at March 31, 2012** | 1 | 464 | 650 | $ 72,317 | $ 14,109 | $ — | $ — | $ (75,775) | $ (6,783) | $ (3,886) | $ (18) |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3639

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(UNAUDITED)**

| | Three Months Ended March 31, | |
| --- | ---: | ---: |
| | 2012 | 2011 |
| | (in millions) | |
| **Cash flows from operating activities** | | |
| Net income | $        577 | $        676 |
| Adjustments to reconcile net income to net cash provided by  operating activities: | | |
| Derivative gains | (19) | (822) |
| Asset related amortization — premiums, discounts, and  basis adjustments | 900 | 250 |
| Debt related amortization — premiums and discounts on  certain debt securities and basis adjustments | (1,030) | (190) |
| Net discounts paid on retirements of other debt | (136) | (251) |
| Net premiums received from issuance of debt securities of  consolidated trusts | 1,200 | 1,214 |
| Losses (gains) on extinguishment of debt securities of  consolidated trusts and other debt | 25 | (235) |
| Provision for credit losses | 1,825 | 1,989 |
| Losses on investment activity | 673 | 1,250 |
| Losses on debt recorded at fair value | 17 | 81 |
| Deferred income tax benefit | (54) | (65) |
| Purchases of held-for-sale mortgage loans | (5,367) | (2,164) |
| Sales of mortgage loans acquired as held-for-sale | 3,903 | 3,321 |
| Repayments of mortgage loans acquired as held-for-sale | 16 | 13 |
| Change in: | | |
| Accrued interest receivable | 242 | 53 |
| Accrued interest payable | (717) | (850) |
| Income taxes payable | 147 | (8) |
| Other, net | (798) | (48) |
| *Net cash provided by operating activities* | 1,404 | 4,214 |
| **Cash flows from investing activities** | | |
| Purchases of trading securities | (6,126) | (19,192) |
| Proceeds from sales of trading securities | 1,962 | 12,746 |
| Proceeds from maturities of trading securities | 4,237 | 4,609 |
| Purchases of available-for-sale securities | — | (5,868) |
| Proceeds from sales of available-for-sale securities | 644 | 958 |
| Proceeds from maturities of available-for-sale securities | 8,901 | 9,540 |
| Purchases of held-for-investment mortgage loans | (16,726) | (11,180) |
| Repayments of mortgage loans acquired as held-for-investment | 118,395 | 90,717 |
| Decrease in restricted cash | 273 | 1,927 |
| Net proceeds from mortgage insurance and acquisitions and  dispositions of real estate owned | 2,831 | 3,413 |
| Net (increase) decrease in federal funds sold and securities  purchased under agreements to resell | (12,305) | 8,732 |
| Derivative premiums and terminations and swap collateral, net | (125) | (155) |
| *Net cash provided by investing activities* | 101,961 | 96,247 |
| **Cash flows from financing activities** | | |
| Proceeds from issuance of debt securities of consolidated trusts  held by third parties | 30,641 | 27,152 |
| Repayments of debt securities of consolidated trusts held by  third parties | (110,135) | (130,729) |
| Proceeds from issuance of other debt | 196,918 | 264,444 |
| Repayments of other debt | (239,000) | (262,924) |
| Increase in liquidation preference of senior preferred stock | 146 | 500 |
| Payment of cash dividends on senior preferred stock | (1,807) | (1,605) |
| Excess tax benefits associated with stock-based awards | — | 1 |
| Payments of low-income housing tax credit partnerships notes  payable | (1) | (14) |
| *Net cash used in financing activities* | (123,238) | (103,175) |
| Net decrease in cash and cash equivalents | (19,873) | (2,714) |
| Cash and cash equivalents at beginning of period | 28,442 | 37,012 |
| *Cash and cash equivalents at end of period* | $    8,569 | $   34,298 |
| **Supplemental cash flow information** | | |
| Cash paid (received) for: | | |
| Debt interest | $   20,285 | $   22,479 |
| Net derivative interest carry | 1,058 | 472 |
| Income taxes | (108) | (1) |
| Non-cash investing and financing activities: | | |
| Underlying mortgage loans related to guarantor swap transactions | 89,741 | 85,035 |
| Debt securities of consolidated trusts held by third parties  established for guarantor swap transactions | 89,741 | 85,035 |

*The accompanying notes are an integral part of these  consolidated financial statements.*

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012       TREASURY-3640       Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Freddie Mac was chartered by Congress in 1970 to stabilize the nation's residential mortgage market and expand opportunities for home ownership and affordable rental housing. Our statutory mission is to provide liquidity, stability and affordability to the U.S. housing market. We are a GSE regulated by FHFA, the SEC, HUD, and the Treasury, and are currently operating under the conservatorship of FHFA. For more information on the roles of FHFA and the Treasury, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" in this Form 10-Q and in our Annual Report on our Form 10-K for the year ended December 31, 2011, or our 2011 Annual Report.

We are involved in the U.S. housing market by participating in the secondary mortgage market. We do not participate directly in the primary mortgage market. Our participation in the secondary mortgage market includes providing our credit guarantee for mortgages originated by mortgage lenders in the primary mortgage market and investing in mortgage loans and mortgage-related securities.

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Single-family Guarantee, Investments, and Multifamily. Our Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related securities in exchange for management and guarantee fees. Our Investments segment reflects results from our investment, funding, and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans, which are funded by debt issuances and hedged using derivatives. Our Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. In our Multifamily segment, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization. See "NOTE 13: SEGMENT REPORTING" for additional information.

We are focused on the following primary business objectives: (a) developing mortgage market enhancements in support of a new infrastructure for the secondary mortgage market; (b) contracting the dominant presence of the GSEs in the marketplace; (c) providing credit availability for new or refinanced mortgages and maintaining foreclosure prevention activities; (d) minimizing our credit losses; (e) maintaining sound credit quality of the loans we purchase or guarantee; and (f) strengthening our infrastructure and improving overall efficiency while also focusing on retention of key employees. Our business objectives reflect direction we have received from the Conservator. On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that established objectives, performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan for Freddie Mac and Fannie Mae. We are aligning our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard. Based on our charter, other legislation, public statements from Treasury and FHFA officials, and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives. For information regarding these objectives, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Business Objectives."

Throughout our consolidated financial statements and related notes, we use certain acronyms and terms which are defined in the "GLOSSARY."

## Basis of Presentation

The accompanying unaudited consolidated financial statements have been prepared in accordance with GAAP for interim financial information and include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated. These unaudited consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes in our 2011 Annual Report. We are operating under the basis that we will realize assets and satisfy liabilities in the normal course of business as a going concern and in accordance with the delegation of authority from FHFA to our Board of Directors and management. Certain financial statement information that is normally included in annual financial statements prepared in conformity with GAAP but is not required for interim reporting purposes has been condensed or omitted. Certain amounts in prior periods' consolidated financial statements have been reclassified to conform to the current presentation. In the opinion of management, all adjustments, which include only normal recurring adjustments, have been recorded for a fair statement of our unaudited consolidated financial statements.

We recorded the cumulative effect of certain miscellaneous errors related to previously reported periods as corrections in the first quarter of 2012. We concluded that these errors are not material individually or in the aggregate to

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

our previously issued consolidated financial statements for any of the periods affected, or to our estimated earnings for the full year ended December 31, 2012, or to the trend of earnings. The impact to earnings, net of taxes, for the quarter ended March 31, 2012 was $6 million.

### Use of Estimates

The preparation of financial statements requires us to make estimates and assumptions that affect: (a) the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements; and (b) the reported amounts of revenues and expenses and gains and losses during the reporting period. Management has made significant estimates in preparing the financial statements, including, but not limited to, establishing the allowance for loan losses and reserve for guarantee losses, valuing financial instruments and other assets and liabilities, assessing impairments on investments, and assessing the realizability of net deferred tax assets. Actual results could be different from these estimates.

### Earnings Per Common Share

Because we have participating securities, we use the "two-class" method of computing earnings per common share. Basic earnings per common share is computed as net income available to common stockholders divided by the weighted average common shares outstanding for the period. The weighted average common shares outstanding for the period includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury pursuant to the Purchase Agreement. This warrant is included since it is unconditionally exercisable by the holder at a minimal cost. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for further information.

Diluted earnings per common share is computed as net income attributable to common stockholders divided by the weighted average common shares outstanding during the period adjusted for the dilutive effect of common equivalent shares outstanding. For periods with net income, the calculation includes the effect of the following common equivalent shares outstanding: (a) the weighted average shares related to stock options; and (b) the weighted average of restricted shares and restricted stock units. During periods in which a net loss has been incurred, potential common equivalent shares outstanding are not included in the calculation because it would have an antidilutive effect. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Earnings Per Common Share" in our 2011 Annual Report for further discussion of our significant accounting policies regarding our calculation of earnings per common share.

### Recently Adopted Accounting Guidance

#### *Fair Value Measurement*

On January 1, 2012, we adopted an amendment to the accounting guidance pertaining to fair value measurement and disclosure. This amendment provided: (a) clarification about the application of existing fair value measurement and disclosure requirements; and (b) changes to the guidance for measuring fair value and disclosing information about fair value measurements. The adoption of this amendment did not have a material impact on our consolidated financial statements.

#### *Reconsideration of Effective Control for Repurchase Agreements*

On January 1, 2012, we adopted an amendment to the guidance for transfers and servicing with regard to repurchase agreements and other agreements that both entitle and obligate a transferor to repurchase or redeem financial assets before their maturity. This amendment removed the criterion related to collateral maintenance from the transferor's assessment of effective control. It focuses the assessment of effective control on the transferor's rights and obligations with respect to the transferred financial assets and not whether the transferor has the practical ability to perform in accordance with those rights or obligations. The adoption of this amendment did not have a material impact on our consolidated financial statements.

### NOTE 2: CONSERVATORSHIP AND RELATED MATTERS

### Business Objectives

We continue to operate under the conservatorship that commenced on September 6, 2008, conducting our business under the direction of FHFA, as our Conservator. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations. Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets. The Conservator also succeeded to the title to all books, records, and assets of Freddie Mac held by any other legal custodian or third party. During the

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and management to conduct, day-to-day operations so that the company can continue to operate in the ordinary course of business. The directors serve on behalf of, and exercise authority as directed by, the Conservator.

We are also subject to certain constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent. In addition, we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

While in conservatorship, we can, and have continued to, enter into and enforce contracts with third parties. The Conservator continues to direct the efforts of the Board of Directors and management to address and determine the strategic direction for the company. While the Conservator has delegated certain authority to management to conduct day-to-day operations, many management decisions are subject to review and approval by FHFA and Treasury. In addition, management frequently receives directions from FHFA on various matters involving day-to-day operations.

Our business objectives and strategies have, in some cases, been altered since we were placed into conservatorship, and may continue to change. These changes to our business objectives and strategies may not contribute to our profitability. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" in our 2011 Annual Report for further discussion.

On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac and Fannie Mae. The plan sets forth objectives and steps FHFA is taking or will take to meet FHFA's obligations as Conservator. FHFA states that the steps envisioned in the plan are consistent with each of the housing finance reform frameworks set forth in the report delivered by the Administration to Congress in February 2011, as well as with the leading congressional proposals introduced to date. FHFA indicates that the plan leaves open all options for Congress and the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future.

FHFA's plan provides lawmakers and the public with an outline of how FHFA, as Conservator, intends to guide Freddie Mac and Fannie Mae over the next few years, and identifies three strategic goals:

- **Build.** Build a new infrastructure for the secondary mortgage market;

- **Contract.** Gradually contract Freddie Mac and Fannie Mae's dominant presence in the marketplace while simplifying and shrinking their operations; and

- **Maintain.** Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that established objectives, performance targets, and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan. We are aligning our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard.

Given the important role the Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions and our public mission, we may be required to take additional actions that could have a negative impact on our business, operating results, or financial condition. Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives, but may not contribute to our profitability. Some of these changes increase our expenses, while others require us to forego revenue opportunities in the near term. In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the Purchase Agreement, have adversely impacted and may continue to adversely impact our financial results, including our segment results. For example, our efforts to help struggling homeowners and the mortgage market, in line with our public mission, may help to mitigate our credit losses, but in some cases may increase our expenses or require us to forgo revenue opportunities in the near term. There is significant uncertainty as to the ultimate impact that our efforts to aid the housing and mortgage markets, including our efforts in connection with the MHA Program, will have on our future capital or liquidity needs. We are allocating significant internal resources to the implementation of the various initiatives under the MHA Program and to the servicing alignment initiative as directed by FHFA on April 28, 2011, which has increased, and will continue to increase, our expenses.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. The Acting Director of FHFA stated on September 19, 2011 that "it ought to

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3643                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

be clear to everyone at this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship." The Acting Director of FHFA stated on November 15, 2011 that "the long-term outlook is that neither [Freddie Mac nor Fannie Mae] will continue to exist, at least in its current form, in the future." We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations.

On February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, and states that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements. These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations, and financial condition.

The temporary high-cost area limits expired on September 30, 2011. We are working with FHFA to identify ways to prudently accelerate the rate of contraction of our mortgage-related investments portfolio. In addition, as discussed below, we recently raised our guarantee fees at the direction of FHFA. We cannot predict the extent to which the other recommendations in the report will be implemented or when any actions to implement them may be taken.

On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no less than 10 basis points above the average guarantee fees charged in 2011 on single-family mortgage-backed securities. Under the law, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies. Effective April 1, 2012, at the direction of FHFA, the guarantee fee on all single-family residential mortgages sold to Freddie Mac and Fannie Mae was increased by 10 basis points.

On October 24, 2011, FHFA, Freddie Mac, and Fannie Mae announced a series of FHFA-directed changes to HARP in an effort to attract more eligible borrowers whose monthly payments are current and who can benefit from refinancing their home mortgages. The revisions to HARP will be available to borrowers with loans that were sold to Freddie Mac and Fannie Mae on or before May 31, 2009 and who have current LTV ratios above 80%.

### Impact of the Purchase Agreement and FHFA Regulation and Other Restrictions on the Mortgage-Related Investments Portfolio

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 31, 2012. The UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation, was $618.3 billion at March 31, 2012. The annual 10% reduction in the size of our mortgage-related investments portfolio is calculated based on the maximum allowable size of the mortgage-related investments portfolio, rather than the actual UPB of the mortgage-related investments portfolio, as of December 31 of the preceding year. The limitation is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs. FHFA has stated that we will

108

<em>Freddie Mac</em>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

not be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio. We are also subject to limits on the amount of assets we can sell from our mortgage-related investments portfolio in any calendar month without review and approval by FHFA and, if FHFA determines, Treasury.

**Government Support for our Business**

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

Significant recent developments with respect to the support we received from the government during the three months ended March 31, 2012 include the following:

- On March 30, 2012, we received $146 million in funding from Treasury under the Purchase Agreement, which increased the aggregate liquidation preference of the senior preferred stock to $72.3 billion as of March 31, 2012; and

- On March 30, 2012, we paid dividends of $1.8 billion in cash on the senior preferred stock to Treasury at the direction of the Conservator.

To address our net worth deficit of $18 million at March 31, 2012, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $19 million, and will request that we receive these funds by June 30, 2012. Our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. Following funding of the draw request related to our net worth deficit at March 31, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock will be $7.23 billion, which exceeds our annual historical earnings in all but one period.

Through March 2012, we paid $18.3 billion in cash dividends in the aggregate on the senior preferred stock. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth. In addition, cash payment of quarterly commitment fees payable to Treasury will negatively impact our future net worth over the long-term. Treasury waived the fee for all quarters of 2011 and the first and second quarters of 2012. The amount of the fee has not yet been established and could be substantial. As a result of additional draws and other factors: (a) the liquidation preference of, and the dividends we owe on, the senior preferred stock would increase and, therefore, we may need additional draws from Treasury in order to pay our dividend obligations; and (b) there is significant uncertainty as to our long-term financial sustainability.

See "NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS" and "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report for more information on the terms of the conservatorship and the Purchase Agreement.

## NOTE 3: VARIABLE INTEREST ENTITIES

We use securitization trusts in our securities issuance process, and are required to evaluate the trusts for consolidation on an ongoing basis. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Consolidation and Equity Method of Accounting" in our 2011 Annual Report for further information regarding the consolidation of certain VIEs.

Based on our evaluation of whether we hold a controlling financial interest in these VIEs, we determined that we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions. Therefore, we consolidate on our balance sheet the assets and liabilities of these trusts. In addition to our PC trusts, we are involved with numerous other entities that meet the definition of a VIE, as discussed below.

**VIEs for which We are the Primary Beneficiary**

*Single-family PC Trusts*

Our single-family PC trusts issue pass-through securities that represent undivided beneficial interests in pools of mortgages held by these trusts. For our fixed-rate PCs, we guarantee the timely payment of interest and principal. For our ARM PCs, we guarantee the timely payment of the weighted average coupon interest rate for the underlying mortgage loans and the full and final payment of principal; we do not guarantee the timely payment of principal on ARM PCs. In exchange for providing this guarantee, we may receive a management and guarantee fee and up-front delivery fees. We issue most of our single-family PCs in transactions in which our customers exchange mortgage loans for PCs. We refer to these transactions as guarantor swaps.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3645                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

PCs are designed so that we bear the credit risk inherent in the loans underlying the PCs through our guarantee of principal and interest payments on the PCs. The PC holders bear the interest rate or prepayment risk on the mortgage loans and the risk that we will not perform on our obligation as guarantor. For purposes of our consolidation assessments, our evaluation of power and economic exposure with regard to PC trusts focuses on credit risk because the credit performance of the underlying mortgage loans was identified as the activity that most significantly impacts the economic performance of these entities. We have the power to impact the activities related to this risk in our role as guarantor and master servicer.

Specifically, in our role as master servicer, we establish requirements for how mortgage loans are serviced and what steps are to be taken to avoid credit losses (*e.g.*, modification, foreclosure). Additionally, in our capacity as guarantor, we have the ability to remove defaulted mortgage loans out of the PC trust to help manage credit losses. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further information regarding our removal of mortgage loans out of PC trusts. These powers allow us to direct the activities of the VIE (*i.e.*, the PC trust) that most significantly impact its economic performance. In addition, we determined that our guarantee to each PC trust to provide principal and interest payments obligates us to absorb losses that could potentially be significant to the PC trusts. Accordingly, we concluded that we are the primary beneficiary of our single-family PC trusts.

At both March 31, 2012 and December 31, 2011, we were the primary beneficiary of, and therefore consolidated, single-family PC trusts with assets totaling $1.6 trillion, as measured using the UPB of issued PCs. The assets of each PC trust can be used only to settle obligations of that trust. In connection with our PC trusts, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancement. We also have credit protection for certain of our PC trusts that issue PCs backed by loans or certificates of federal agencies (such as FHA, VA, and USDA). See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for additional information regarding third-party credit enhancements related to our PC trusts.

### Other Guarantee Transactions

Other Guarantee Transactions are mortgage-related securities that we issue to third parties in exchange for non-Freddie Mac mortgage-related securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2011 Annual Report for information on the nature of Other Guarantee Transactions. The degree to which our involvement with securitization trusts that issue Other Guarantee Transactions provides us with power to direct the activities that most significantly impact the economic performance of these VIEs (*e.g.*, the ability to direct the servicing of the underlying assets of these entities) and obligation to absorb losses that could potentially be significant to the VIEs (*e.g.*, the existence of third-party credit enhancements) varies by transaction. For all Other Guarantee Transactions, our variable interest in these VIEs represents some form of credit guarantee, whether covering all the issued beneficial interests or only the most senior ones. The nature of our credit guarantee typically determines whether we have power over the activities that most significantly impact the economic performance of the VIE.

For those Other Guarantee Transactions where our credit guarantee is in a first loss position to absorb credit losses on the underlying assets of these entities as of the reporting date, we would also have the ability to direct servicing of the underlying assets, which is the power to direct the activities that most significantly impact the economic performance of these entities. As a result, we would be the primary beneficiary, and we would consolidate the VIE. For those Other Guarantee Transactions in which our credit guarantee is not in a first loss position to absorb credit losses on the underlying assets of these entities as of the reporting date (*i.e.*, our credit guarantee is in a secondary loss position), we would not have the ability to direct servicing of the underlying assets, so we would not be the primary beneficiary, and we would not consolidate the VIE.

Our consolidation determination took into consideration the specific facts and circumstances of our involvement with each of these entities. As a result, we have concluded that we are the primary beneficiary of certain Other Guarantee Transactions with underlying assets totaling $12.2 billion and $12.9 billion at March 31, 2012 and December 31, 2011, respectively. For those Other Guarantee Transactions that we do consolidate, the investors in these securities have recourse only to the assets of those VIEs.

TREASURY-3646

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Consolidated VIEs

The table below represents the carrying amounts and classification of the assets and liabilities of consolidated VIEs on our consolidated balance sheets.

### Table 3.1 — Assets and Liabilities of Consolidated VIEs

| Consolidated Balance Sheets Line Item | March 31, 2012 | December 31, 2011 |
|---|---|---|
| | (in millions) | |
| Cash and cash equivalents | $ 1 | $ 2 |
| Restricted cash and cash equivalents | 27,332 | 27,675 |
| Federal funds sold and securities purchased under agreements to resell | 3,000 | — |
| Mortgage loans held-for-investment by consolidated trusts | 1,555,067 | 1,564,131 |
| Accrued interest receivable | 6,079 | 6,242 |
| Real estate owned, net | 67 | 60 |
| Other assets | 6,227 | 6,083 |
| Total assets of consolidated VIEs | $ 1,597,773 | $ 1,604,193 |
| Accrued interest payable | $ 5,832 | $ 5,943 |
| Debt securities of consolidated trusts held by third parties | 1,481,622 | 1,471,437 |
| Other liabilities | 2 | 3 |
| Total liabilities of consolidated VIEs | $ 1,487,456 | $ 1,477,383 |

### VIEs for which We are not the Primary Beneficiary

The table below represents the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Our involvement with VIEs for which we are not the primary beneficiary generally takes one of two forms: (a) purchasing an investment in these entities; or (b) providing a guarantee to these entities. Our maximum exposure to loss for those VIEs in which we have purchased an investment is calculated as the maximum potential charge that we would recognize in earnings if that investment were to become worthless. This amount does not include other-than-temporary impairments or other write-downs that we previously recognized through earnings. Our maximum exposure to loss for those VIEs for which we have provided a guarantee represents the contractual amounts that could be lost under the guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements. We do not believe the maximum exposure to loss disclosed in the table below is representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation, including possible recoveries under credit enhancement arrangements.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 3.2 — Variable Interests in VIEs for which We are not the Primary Beneficiary**

| | | March 31, 2012 | | | |
|---|---|---|---|---|---|
| | | Mortgage-Related Security Trusts | | Unsecuritized | |
| | Asset-Backed Investment Trusts(1) | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | Multifamily Loans(3) | Other(1)(4) |
| | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 45 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 51 | — | 32 | 183 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 76,163 | 118,694 | — | — |
| Trading, at fair value | 695 | 14,504 | 13,986 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 70,874 | — |
| Held-for-sale | — | — | — | 11,337 | — |
| Accrued interest receivable | — | 440 | 409 | 349 | 6 |
| Derivative assets, net | — | — | — | — | 1 |
| Other assets | — | 455 | — | 467 | 418 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (5) | — | — | (41) |
| Other liabilities | — | (729) | (1) | (36) | (661) |
| **Maximum Exposure to Loss** | $ 740 | $ 39,143 | $ 146,731 | $ 83,059 | $ 11,142 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 26,002 | $ 44,843 | $ 853,285 | $ 136,229 | $22,467 |

| | | December 31, 2011 | | | |
|---|---|---|---|---|---|
| | | Mortgage-Related Security Trusts | | Unsecuritized | |
| | Asset-Backed Investment Trusts(1) | Freddie Mac Securities(2) | Non-Freddie Mac Securities(1) | Multifamily Loans(3) | Other(1)(4) |
| | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 447 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 53 | — | 33 | 167 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 81,092 | 121,743 | — | — |
| Trading, at fair value | 302 | 16,047 | 15,473 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 72,295 | — |
| Held-for-sale | — | — | — | 9,710 | — |
| Accrued interest receivable | — | 471 | 420 | 353 | 6 |
| Derivative assets, net | — | — | — | — | 1 |
| Other assets | — | 432 | 1 | 375 | 434 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (1) | — | — | (42) |
| Other liabilities | — | (585) | — | (39) | (675) |
| **Maximum Exposure to Loss** | $ 749 | $ 36,438 | $ 153,620 | $ 82,766 | $ 11,198 |
| **Total Assets of Non-Consolidated VIEs(5)** | $ 16,748 | $ 41,740 | $ 921,219 | $ 134,145 | $25,616 |

(1) For our involvement with non-consolidated asset-backed investment trusts, non-Freddie Mac security trusts and certain other VIEs where we do not provide a guarantee, our maximum exposure to loss is computed as the carrying amount if the security is classified as trading or the amortized cost if the security is classified as available-for-sale for our investments and related assets recorded on our consolidated balance sheets, including any unrealized amounts recorded in AOCI for securities classified as available-for-sale.

(2) Freddie Mac securities include our variable interests in single-family multiclass REMICs and Other Structured Securities, multifamily PCs, multifamily Other Structured Securities, and Other Guarantee Transactions that we do not consolidate. For our variable interests in non-consolidated Freddie Mac security trusts for which we have provided a guarantee, our maximum exposure to loss is the outstanding UPB of the underlying mortgage loans or securities that we have guaranteed, which is the maximum contractual amount under such guarantees. However, our investments in single-family REMICs and Other Structured Securities that are not consolidated do not give rise to any additional exposure to credit loss as we already consolidate the underlying collateral.

(3) For unsecuritized multifamily loans, our maximum exposure to loss is based on the UPB of these loans, as adjusted for loan level basis adjustments, any associated allowance for loan losses, accrued interest receivable, and fair value adjustments on held-for-sale loans.

(4) For other non-consolidated VIEs where we have provided a guarantee, our maximum exposure to loss is the contractual amount that could be lost under the guarantee if the counterparty or borrower defaulted, without consideration of possible recoveries under credit enhancement arrangements.

(5) Represents the remaining UPB of non-consolidated VIEs using the most current information available, where our continuing involvement is significant. We do not include the assets of our non-consolidated trusts related to single-family REMICs and Other Structured Securities in this amount as we already consolidate the underlying collateral of these trusts on our consolidated balance sheets.

*Asset-Backed Investment Trusts*

We invest in a variety of short-term non-mortgage-related, asset-backed investment trusts. These short-term investments represent interests in trusts consisting of a pool of receivables or other financial assets, typically auto and equipment loans. These trusts act as vehicles to allow originators to securitize assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the securities

*Freddie Mac*

TREASURY-3648

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3649

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

offering create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our asset-backed investments.

At March 31, 2012 and December 31, 2011, we had investments in 19 and 11 asset-backed investment trusts in which we had a variable interest but were not considered the primary beneficiary, respectively. Our investments in these asset-backed investment trusts as of March 31, 2012 were made in 2011 and 2012. At both March 31, 2012 and December 31, 2011, we were not the primary beneficiary of any such trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. As such, our investments in these asset-backed investment trusts are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report. Our investments in these trusts totaled $0.7 billion at both March 31, 2012 and December 31, 2011, and are included as cash and cash equivalents, available-for-sale securities, or trading securities on our consolidated balance sheets. At both March 31, 2012 and December 31, 2011, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment.

### Mortgage-Related Security Trusts

#### Freddie Mac Securities

Freddie Mac securities related to our variable interests in non-consolidated VIEs primarily consist of our REMICs and Other Structured Securities and Other Guarantee Transactions. REMICs and Other Structured Securities are created by using PCs or previously issued REMICs and Other Structured Securities as collateral. Our involvement with the resecuritization trusts that issue these securities does not provide us with rights to receive benefits or obligations to absorb losses nor does it provide any power that would enable us to direct the most significant activities of these VIEs because the ultimate underlying assets are PCs for which we have already provided a guarantee (*i.e.*, all significant rights, obligations and powers are associated with the underlying PC trusts). As a result, we have concluded that we are not the primary beneficiary of these resecuritization trusts.

Other Guarantee Transactions are created by using non-Freddie Mac mortgage-related securities as collateral. At both March 31, 2012 and December 31, 2011, our involvement with certain Other Guarantee Transactions does not provide us with the power to direct the activities that most significantly impact the economic performance of these VIEs. As a result, we hold a variable interest in, but are not the primary beneficiary of, certain Other Guarantee Transactions.

For non-consolidated REMICs and Other Structured Securities and Other Guarantee Transactions, our investments are primarily included in either available-for-sale securities or trading securities on our consolidated balance sheets. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2011 Annual Report for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

#### Non-Freddie Mac Securities

We invest in a variety of mortgage-related securities issued by third-parties, including non-Freddie Mac agency securities, CMBS, other private-label securities backed by various mortgage-related assets, and obligations of states and political subdivisions. These investments typically represent interests in trusts that consist of a pool of mortgage-related assets and act as vehicles to allow originators to securitize those assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. Primary risks include potential loss from the credit risk and interest-rate risk of the underlying pool. The originators of the financial assets or the underwriters of the securities offering create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our non-Freddie Mac securities.

Our investments in these non-Freddie Mac securities at March 31, 2012 were made between 1994 and 2012. We are not generally the primary beneficiary of non-Freddie Mac securities trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. We were not the primary beneficiary of any significant non-Freddie Mac securities trusts as of March 31, 2012 or December 31, 2011. Our investments in non-consolidated non-Freddie Mac mortgage-related securities are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report. At both March 31, 2012 and December 31, 2011, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Unsecuritized Multifamily Loans*

We purchase loans made to various multifamily real estate entities. We primarily purchase such loans for securitization, and to a lesser extent, investment purposes. These real estate entities are primarily single-asset entities (typically partnerships or limited liability companies) established to acquire, construct, rehabilitate, or refinance residential properties, and subsequently to operate the properties as residential rental real estate. The loans we acquire usually are, at origination, equal to 80% or less of the value of the related underlying property. The remaining 20% of value is typically funded through equity contributions by the partners or members of the borrower entity. In certain cases, the 20% not funded through the loan we acquire also includes subordinate loans or mezzanine financing from third-party lenders.

We held more than 7,000 unsecuritized multifamily loans at both March 31, 2012 and December 31, 2011. The UPB of our investments in these loans was $82.5 billion and $82.3 billion as of March 31, 2012 and December 31, 2011, respectively, and was included in unsecuritized held-for-investment mortgage loans, at amortized cost, and held-for-sale mortgage loans at fair value on our consolidated balance sheets. We are not generally the primary beneficiary of the multifamily real estate borrowing entities because the loans we acquire are passive in nature and do not provide us with the power to direct the activities of these entities that most significantly impact their economic performance. However, when a multifamily loan becomes delinquent, we may become the primary beneficiary of the borrowing entity depending upon the structure of this entity and the rights granted to us under the governing legal documents. At both March 31, 2012 and December 31, 2011, the amount of unsecuritized multifamily loans for which we could be considered the primary beneficiary of the underlying borrowing entity was not material. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2011 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for more information.

*Other*

Our involvement with other VIEs includes our investments in LIHTC partnerships, certain other mortgage-related guarantees, and certain short-term default and other guarantee commitments that we account for as derivatives:

- *Investments in LIHTC Partnerships:* We previously invested as a limited partner in various LIHTC partnerships that invest in lower-tier or project partnerships that are single asset entities. Our investments in these LIHTC partnerships are funded through non-recourse non-interest bearing notes payable. We wrote down the carrying value of our investments to zero as of December 31, 2009, as we will not be able to realize any value from these investments.

- *Certain other mortgage-related guarantees:* We have other guarantee commitments outstanding on multifamily housing revenue bonds that were issued by third parties. As part of certain other mortgage-related guarantees, we also provide commitments to advance funds, commonly referred to as "liquidity guarantees," which require us to advance funds to enable third parties to purchase variable-rate multifamily housing revenue bonds, or certificates backed by such bonds, that cannot be remarketed within a specified number of days after they are tendered by their holders.

- *Certain short-term default and other guarantee commitments accounted for as derivatives*: Our involvement in these VIEs includes our guarantee of the performance of interest-rate swap contracts in certain circumstances and credit derivatives we issued to guarantee the payments on multifamily loans or securities.

At both March 31, 2012 and December 31, 2011, we were the primary beneficiary of one real estate entity that invests in multifamily property, related to a credit-enhanced multifamily housing revenue bond that was not deemed to be material. We were not the primary beneficiary of the remainder of other VIEs because our involvement in these VIEs is passive in nature and does not provide us with the power to direct the activities of the VIEs that most significantly impact their economic performance. See Table 3.2 for the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Also see "NOTE 9: FINANCIAL GUARANTEES" for additional information about our involvement with the VIEs related to mortgage-related guarantees and short-term default and other guarantee commitments discussed above.

## NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES

We own both single-family mortgage loans, which are secured by one to four family residential properties, and multifamily mortgage loans, which are secured by properties with five or more residential rental units. Our single-family loans are predominately first lien, fixed-rate mortgages secured by the borrower's primary residence. For a discussion of

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

our significant accounting policies regarding our mortgage loans and loan loss reserves, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report.

The table below summarizes the types of loans on our consolidated balance sheets as of March 31, 2012 and December 31, 2011.

### Table 4.1 — Mortgage Loans

| | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Unsecuritized | Held by Consolidated Trusts | Total | Unsecuritized | Held by Consolidated Trusts | Total |
| | | | (in millions) | | | |
| Single-family:(1) | | | | | | |
| Fixed-rate | | | | | | |
| Amortizing | $ 147,841 | $ 1,409,553 | $1,557,394 | $ 153,177 | $1,418,751 | $ 1,571,928 |
| Interest-only | 3,077 | 13,575 | 16,652 | 3,184 | 14,758 | 17,942 |
| Total fixed-rate | 150,918 | 1,423,128 | 1,574,046 | 156,361 | 1,433,509 | 1,589,870 |
| Adjustable-rate | | | | | | |
| Amortizing | 3,292 | 69,406 | 72,698 | 3,428 | 68,362 | 71,790 |
| Interest-only | 9,734 | 40,916 | 50,650 | 10,376 | 43,655 | 54,031 |
| Total adjustable-rate | 13,026 | 110,322 | 123,348 | 13,804 | 112,017 | 125,821 |
| Other Guarantee Transactions backed by non-Freddie Mac securities | — | 12,117 | 12,117 | — | 12,776 | 12,776 |
| FHA/VA and other governmental | 1,552 | 3,119 | 4,671 | 1,494 | 3,254 | 4,748 |
| Total single-family | 165,496 | 1,548,686 | 1,714,182 | 171,659 | 1,561,556 | 1,733,215 |
| Multifamily:(1) | | | | | | |
| Fixed-rate | 69,749 | — | 69,749 | 69,647 | — | 69,647 |
| Adjustable-rate | 12,737 | — | 12,737 | 12,661 | — | 12,661 |
| Other governmental | 3 | — | 3 | 3 | — | 3 |
| Total multifamily | 82,489 | — | 82,489 | 82,311 | — | 82,311 |
| Total UPB of mortgage loans | 247,985 | 1,548,686 | 1,796,671 | 253,970 | 1,561,556 | 1,815,526 |
| Deferred fees, unamortized premiums, discounts and other cost basis adjustments | (5,984) | 13,520 | 7,536 | (6,125) | 10,926 | 4,801 |
| Lower of cost or fair value adjustments on loans held-for-sale(2) | 206 | — | 206 | 195 | — | 195 |
| Allowance for loan losses on mortgage loans held-for-investment | (30,925) | (7,139) | (38,064) | (30,912) | (8,351) | (39,263) |
| Total mortgage loans, net | $ 211,282 | $ 1,555,067 | $1,766,349 | $ 217,128 | $1,564,131 | $ 1,781,259 |
| Mortgage loans, net: | | | | | | |
| Held-for-investment | $ 199,945 | $ 1,555,067 | $ 1,755,012 | $ 207,418 | $1,564,131 | $ 1,771,549 |
| Held-for-sale | 11,337 | — | 11,337 | 9,710 | — | 9,710 |
| Total mortgage loans, net | $ 211,282 | $ 1,555,067 | $1,766,349 | $ 217,128 | $1,564,131 | $ 1,781,259 |

(1) Based on UPB and excluding mortgage loans traded, but not settled.
(2) Consists of fair value adjustments associated with mortgage loans for which we have made a fair value election.

During the three months ended March 31, 2012 and 2011, we purchased $102.8 billion and $95.7 billion, respectively, in UPB of single-family mortgage loans and $0.3 billion and $0.7 billion, respectively, in UPB of multifamily loans that were classified as held-for-investment at purchase. Our sales of multifamily mortgage loans occur primarily through the issuance of multifamily Other Guarantee Transactions. See "NOTE 9: FINANCIAL GUARANTEES" for more information. We did not have any reclassifications of mortgage loans into held-for-sale during the three months ended March 31, 2012. We did not sell any held-for-investment loans during the three months ended March 31, 2012.

### Credit Quality of Mortgage Loans

We evaluate the credit quality of single-family loans using different criteria than the criteria we use to evaluate multifamily loans. The current LTV ratio is one key factor we consider when estimating our loan loss reserves for single-family loans. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of both March 31, 2012 and December 31, 2011, approximately 15% of loans in our single-family credit guarantee portfolio had second lien financing by third parties at the time of origination of the first mortgage, and we estimate that these loans comprised 17% of our seriously delinquent loans at both dates, based on UPB. However,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012        TREASURY-3652        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

borrowers are free to obtain second lien financing after origination, and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages. For further information about concentrations of risk associated with our single-family and multifamily mortgage loans, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

The table below presents information on the estimated current LTV ratios of single-family loans on our consolidated balance sheets, all of which are held-for-investment. Our current LTV ratio estimates are based on available data through the end of each respective period presented.

**Table 4.2 — Recorded Investment of Held-For-Investment Mortgage Loans, by LTV Ratio**

| | As of March 31, 2012 | | | | As of December 31, 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Estimated Current LTV Ratio[1] | | | | Estimated Current LTV Ratio[1] | | | |
| | <= 80 | >80 to 100 | > 100[2] | Total | <= 80 | >80 to 100 | > 100[2] | Total |
| | | | | (in millions) | | | | |
| Single-family loans: | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[3] | $636,383 | $372,610 | $245,626 | $1,254,619 | $641,698 | $383,320 | $247,468 | $1,272,486 |
| 15-year amortizing fixed-rate[3] | 246,130 | 18,425 | 3,241 | 267,796 | 238,287 | 18,280 | 2,966 | 259,533 |
| Adjustable-rate[4] | 45,405 | 13,723 | 8,844 | 67,972 | 43,728 | 13,826 | 9,180 | 66,734 |
| Alt-A, interest-only, and option ARM[5] | 28,353 | 27,011 | 75,962 | 131,326 | 30,589 | 29,251 | 79,418 | 139,258 |
| Total single-family loans | $956,271 | $431,769 | $333,673 | 1,721,713 | $954,302 | $444,677 | $339,032 | 1,738,011 |
| Multifamily loans | | | | 71,363 | | | | 72,801 |
| Total recorded investment of held-for-investment loans | | | | $1,793,076 | | | | $1,810,812 |

(1) The current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since that time. The value of a property at origination is based on the sales price for purchase mortgages and third-party appraisal for refinance mortgages. Changes in market value are derived from our internal index which measures price changes for repeat sales and refinancing activity on the same properties since Freddie Mac and Fannie Mae single-family mortgage acquisitions, including foreclosure sales. Estimates of the current LTV ratio include the credit-enhanced portion of the loan and exclude any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.

(2) The serious delinquency rate for the total of single-family mortgage loans with estimated current LTV ratios in excess of 100% was 12.6% and 12.8% as of March 31, 2012 and December 31, 2011, respectively.

(3) The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts gradually after five years to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate for presentation even though they have a rate adjustment provision, because the future rates are determined at the time of the modification rather than at a subsequent date.

(4) Includes balloon/reset mortgage loans and excludes option ARMs.

(5) We discontinued purchases of Alt-A loans on March 1, 2009 (or later, as customers' contracts permitted), and interest-only loans effective September 1, 2010, and have not purchased option ARM loans since 2007. Modified loans within the Alt-A category remain as such, even though the borrower may have provided full documentation of assets and income to complete the modification. Modified loans within the option ARM category remain as such even though the modified loan no longer provides for optional payment provisions.

For information about the payment status of single-family and multifamily mortgage loans, including the amount of such loans we deem impaired, see "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS." For a discussion of certain indicators of credit quality for the multifamily loans on our consolidated balance sheets, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Multifamily Mortgage Portfolio."

**Allowance for Loan Losses and Reserve for Guarantee Losses, or Loan Loss Reserve**

We maintain an allowance for loan losses on mortgage loans that we classify as held-for-investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage-related securities backed by multifamily loans, certain single-family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 4.3 — Detail of Loan Loss Reserves**

| | Three Months Ended March 31, | | | | | | | |
| | 2012 | | | | 2011 | | | |
| | Allowance for Loan Losses | | | | Allowance for Loan Losses | | | |
| | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses(1) | Total | Unsecuritized | Held By Consolidated Trusts | Reserve for Guarantee Losses(1) | Total |
| | | | | (in millions) | | | | |
| **Single-family:** | | | | | | | | |
| Beginning balance | $ 30,406 | $ 8,351 | $ 159 | $38,916 | $ 27,317 | $ 11,644 | $ 137 | $ 39,098 |
| Provision for credit losses | 269 | 1,533 | 42 | 1,844 | 407 | 1,631 | 11 | 2,049 |
| Charge-offs(2) | (3,425) | (249) | (3) | (3,677) | (3,304) | (242) | (1) | (3,547) |
| Recoveries(2) | 499 | 16 | — | 515 | 664 | 20 | — | 684 |
| Transfers, net(3) | 2,687 | (2,512) | (2) | 173 | 3,814 | (3,536) | (4) | 274 |
| Ending balance | $ 30,436 | $ 7,139 | $ 196 | $37,771 | $ 28,898 | $ 9,517 | $ 143 | $38,558 |
| **Multifamily:** | | | | | | | | |
| Beginning balance | $ 506 | $ — | $ 39 | $ 545 | $ 730 | $ — | $ 98 | $ 828 |
| Provision (benefit) for credit losses | (16) | — | (3) | (19) | (45) | — | (15) | (60) |
| Charge-offs(2) | (1) | — | — | (1) | (12) | — | — | (12) |
| Transfers, net(3) | — | — | — | — | — | — | (9) | (9) |
| Ending balance | $ 489 | $ — | $ 36 | $ 525 | $ 673 | $ — | $ 74 | $ 747 |
| **Total:** | | | | | | | | |
| Beginning balance | $ 30,912 | $ 8,351 | $ 198 | $ 39,461 | $ 28,047 | $ 11,644 | $ 235 | $ 39,926 |
| Provision (benefit) for credit losses | 253 | 1,533 | 39 | 1,825 | 362 | 1,631 | (4) | 1,989 |
| Charge-offs(2) | (3,426) | (249) | (3) | (3,678) | (3,316) | (242) | (1) | (3,559) |
| Recoveries(2) | 499 | 16 | — | 515 | 664 | 20 | — | 684 |
| Transfers, net(3) | 2,687 | (2,512) | (2) | 173 | 3,814 | (3,536) | (13) | 265 |
| Ending balance | $ 30,925 | $ 7,139 | $ 232 | $38,296 | $ 29,571 | $ 9,517 | $ 217 | $ 39,305 |
| Total loan loss reserve as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | | | | 2.03% | | | | 2.02% |

(1) Loans associated with our reserve for guarantee losses are those that underlie our non-consolidated securitization trusts and other guarantee commitments and are evaluated for impairment on a collective basis. Our reserve for guarantee losses is included in other liabilities on our consolidated balance sheets.

(2) Charge-offs represent the amount of a loan that has been discharged to remove the loan from our consolidated balance sheet principally due to either foreclosure transfers or short sales. Charge-offs exclude $101 million and $106 million for the three months ended March 31, 2012 and 2011, respectively, related to certain loans purchased under financial guarantees and recorded as losses on loans purchased within other expenses on our consolidated statements of comprehensive income. We record charge-offs and recoveries on loans held by consolidated trusts when a loss event (such as a foreclosure transfer or foreclosure alternative) occurs on a loan while it remains in a consolidated trust. Recoveries of charge-offs primarily result from foreclosure alternatives and REO acquisitions on loans where: (a) a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements; or (b) we received a reimbursement of our losses from a seller/servicer associated with a repurchase request on a loan that experienced a foreclosure transfer or a foreclosure alternative.

(3) For the three months ended March 31, 2012 and 2011, consists of: (a) approximately $2.5 billion and $3.5 billion, respectively, of reclassified single-family reserves related to our removal of loans previously held by consolidated trusts; (b) approximately $171 million and $296 million, respectively, attributable to recapitalization of past due interest on modified mortgage loans; (c) $- million and $48 million, respectively, related to agreements with seller/servicers where the transfer relates to recoveries received under these agreements to compensate us for estimated credit losses; and (d) $1 million and $25 million, respectively, of other transfers.

The table below presents our allowance for loan losses and our recorded investment in mortgage loans, held-for-investment, by impairment evaluation methodology.

**Table 4.4 — Net Investment in Mortgage Loans**

| | March 31, 2012 | | | December 31, 2011 | | |
| | Single-family | Multifamily | Total | Single-family | Multifamily | Total |
| | | | (in millions) | | | |
| **Recorded investment:** | | | | | | |
| Collectively evaluated | $ 1,659,317 | $ 68,753 | $1,728,070 | $1,677,974 | $ 70,131 | $1,748,105 |
| Individually evaluated | 62,396 | 2,610 | 65,006 | 60,037 | 2,670 | 62,707 |
| Total recorded investment | 1,721,713 | 71,363 | 1,793,076 | 1,738,011 | 72,801 | 1,810,812 |
| **Ending balance of the allowance for loan losses:** | | | | | | |
| Collectively evaluated | (21,724) | (223) | (21,947) | (23,657) | (260) | (23,917) |
| Individually evaluated | (15,851) | (266) | (16,117) | (15,100) | (246) | (15,346) |
| Total ending balance of the allowance | (37,575) | (489) | (38,064) | (38,757) | (506) | (39,263) |
| Net investment in mortgage loans | $1,684,138 | $ 70,874 | $1,755,012 | $1,699,254 | $ 72,295 | $1,771,549 |

A significant number of unsecuritized single-family mortgage loans on our consolidated balance sheets are individually evaluated for impairment and substantially all single-family mortgage loans held by our consolidated trusts

117

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

are collectively evaluated for impairment. The ending balance of the allowance for loan losses associated with our held-for-investment unsecuritized mortgage loans represented approximately 13.4% and 13.0% of the recorded investment in such loans at March 31, 2012 and December 31, 2011, respectively. The ending balance of the allowance for loan losses associated with mortgage loans held by our consolidated trusts represented approximately 0.5% of the recorded investment in such loans as of both March 31, 2012 and December 31, 2011.

### Credit Protection and Other Forms of Credit Enhancement

In connection with many of our mortgage loans held-for-investment and other mortgage-related guarantees, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancements.

The table below presents the UPB of loans on our consolidated balance sheets or underlying our financial guarantees with credit protection and the maximum amounts of potential loss recovery by type of credit protection.

### Table 4.5 — Recourse and Other Forms of Credit Protection[1]

| | UPB at | | Maximum Coverage[2] at | |
| --- | --- | --- | --- | --- |
| | March 31, 2012 | December 31, 2011 | March 31, 2012 | December 31, 2011 |
| | (in millions) | | | |
| Single-family: | | | | |
| Primary mortgage insurance | $ 191,829 | $ 198,007 | $ 47,380 | $ 48,741 |
| Lender recourse and indemnifications | 8,434 | 8,798 | 8,146 | 8,453 |
| Pool insurance[3] | 22,692 | 26,754 | 1,793 | 1,855 |
| HFA indemnification[4] | 8,142 | 8,637 | 3,323 | 3,323 |
| Subordination[5] | 3,196 | 3,281 | 614 | 647 |
| Other credit enhancements | 135 | 133 | 86 | 99 |
| Total | $ 234,428 | $ 245,610 | $ 61,342 | $ 63,118 |
| Multifamily: | | | | |
| HFA indemnification[4] | $ 1,235 | $ 1,331 | $ 699 | $ 699 |
| Subordination[5] | 26,670 | 23,636 | 3,948 | 3,359 |
| Other credit enhancements | 8,286 | 8,334 | 2,598 | 2,554 |
| Total | $ 36,191 | $ 33,301 | $ 7,245 | $ 6,612 |

(1) Includes the credit protection associated with unsecuritized mortgage loans, loans held by our consolidated trusts as well as our non-consolidated mortgage guarantees and excludes FHA/VA and other governmental loans. Except for subordination coverage, these amounts exclude credit protection associated with $15.9 billion and $16.6 billion in UPB of single-family loans underlying Other Guarantee Transactions as of March 31, 2012 and December 31, 2011, respectively, for which the information was not available.

(2) Except for subordination, this represents the remaining amount of loss recovery that is available subject to terms of counterparty agreements.

(3) Maximum coverage amounts presented have been limited to the remaining UPB at period end. Prior period amounts have been revised to conform to current period presentation. Excludes approximately $11.1 billion and $13.5 billion in UPB at March 31, 2012 and December 31, 2011, respectively, where the related loans are also covered by primary mortgage insurance.

(4) Represents the amount of potential reimbursement of losses on securities we have guaranteed that are backed by state and local HFA bonds, under which Treasury bears initial losses on these securities up to 35% of the original UPB issued under the HFA initiative on a combined program-wide basis. Treasury will also bear losses of unpaid interest.

(5) Represents Freddie Mac issued mortgage-related securities with subordination protection, excluding those backed by HFA bonds. Excludes mortgage-related securities where subordination coverage was exhausted or maximum coverage amounts were limited to the remaining UPB at that date. Prior period amounts have been revised to conform to current period presentation.

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. Pool insurance contracts generally provide insurance on a group, or pool, of mortgage loans up to a stated aggregate loss limit. We did not buy pool insurance during the three months ended March 31, 2012. In recent periods, we also reached the maximum limit of recovery on certain pool insurance contracts. For information about counterparty risk associated with mortgage insurers, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Mortgage Insurers."

We also have credit protection for certain of the mortgage loans on our consolidated balance sheets that are covered by insurance or partial guarantees issued by federal agencies (such as FHA, VA, and USDA). The total UPB of these loans was $4.7 billion as of both March 31, 2012 and December 31, 2011.

### NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS

### Individually Impaired Loans

Individually impaired single-family loans include performing and non-performing TDRs, as well as loans acquired under our financial guarantees with deteriorated credit quality. Individually impaired multifamily loans include TDRs, loans three monthly payments or more past due, and loans that are impaired based on management judgment. For a discussion of our significant accounting policies regarding impaired and non-performing loans, which are applied

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                    TREASURY-3655                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

consistently for multifamily loans and single-family loan classes, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report.

Total loan loss reserves consist of a specific valuation allowance related to individually impaired mortgage loans, and a general reserve for other probable incurred losses. Our recorded investment in individually impaired mortgage loans and the related specific valuation allowance are summarized in the table below by product class (for single-family loans).

119                                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                              Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 5.1 — Individually Impaired Loans**

| | Balance at March 31, 2012 | | | | For the Three Months Ended March 31, 2012 | |
|---|---|---|---|---|---|---|
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized |
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| *With no specific allowance recorded*(1): | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 6,745 | $ 3,057 | $ — | $ 3,057 | $ 3,123 | $ 79 |
| 15-year amortizing fixed-rate(2) | 56 | 22 | — | 22 | 22 | 1 |
| Adjustable rate(3) | 12 | 6 | — | 6 | 5 | — |
| Alt-A, interest-only, and option ARM(4) | 1,873 | 836 | — | 836 | 856 | 16 |
| Total with no specific allowance recorded | 8,686 | 3,921 | | 3,921 | 4,006 | 96 |
| *With specific allowance recorded*(5): | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | 46,849 | 45,695 | (11,917) | 33,778 | 45,021 | 311 |
| 15-year amortizing fixed-rate(2) | 369 | 351 | (41) | 310 | 331 | 4 |
| Adjustable rate(3) | 290 | 278 | (58) | 220 | 257 | 2 |
| Alt-A, interest-only, and option ARM(4) | 12,487 | 12,151 | (3,835) | 8,316 | 11,913 | 69 |
| Total with specific allowance recorded | 59,995 | 58,475 | (15,851) | 42,624 | 57,522 | 386 |
| *Combined single-family:* | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | 53,594 | 48,752 | (11,917) | 36,835 | 48,144 | 390 |
| 15-year amortizing fixed-rate(2) | 425 | 373 | (41) | 332 | 353 | 5 |
| Adjustable rate(3) | 302 | 284 | (58) | 226 | 262 | 2 |
| Alt-A, interest-only, and option ARM(4) | 14,360 | 12,987 | (3,835) | 9,152 | 12,769 | 85 |
| Total single-family(6) | $ 68,681 | $ 62,396 | $ (15,851) | $ 46,545 | $ 61,528 | $ 482 |
| Multifamily — | | | | | | |
| *With no specific allowance recorded*(7) | $ 839 | $ 835 | $ — | $ 835 | $ 838 | $ 11 |
| *With specific allowance recorded* | 1,791 | 1,775 | (266) | 1,509 | 1,776 | 23 |
| Total multifamily | $ 2,630 | $ 2,610 | $ (266) | $ 2,344 | $ 2,614 | $ 34 |
| Total single-family and multifamily | $ 71,311 | $ 65,006 | $ (16,117) | $ 48,889 | $ 64,142 | $ 516 |

| | Balance at December 31, 2011 | | | | For the Three Months Ended March 31, 2011 | |
|---|---|---|---|---|---|---|
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized |
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| *With no specific allowance recorded*(1): | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | $ 7,073 | $ 3,200 | $ — | $ 3,200 | $ 3,585 | $ 92 |
| 15-year amortizing fixed-rate(2) | 57 | 23 | — | 23 | 45 | 2 |
| Adjustable rate(3) | 13 | 6 | — | 6 | 8 | — |
| Alt-A, interest-only, and option ARM(4) | 1,987 | 881 | — | 881 | 1,037 | 21 |
| Total with no specific allowance recorded | 9,130 | 4,110 | | 4,110 | 4,675 | 115 |
| *With specific allowance recorded*(5): | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | 44,672 | 43,533 | (11,253) | 32,280 | 27,638 | 176 |
| 15-year amortizing fixed-rate(2) | 367 | 347 | (43) | 304 | 178 | 3 |
| Adjustable rate(3) | 280 | 268 | (59) | 209 | 122 | 1 |
| Alt-A, interest-only, and option ARM(4) | 12,103 | 11,779 | (3,745) | 8,034 | 7,406 | 33 |
| Total with specific allowance recorded | 57,422 | 55,927 | (15,100) | 40,827 | 35,344 | 213 |
| *Combined single-family:* | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate(2) | 51,745 | 46,733 | (11,253) | 35,480 | 31,223 | 268 |
| 15-year amortizing fixed-rate(2) | 424 | 370 | (43) | 327 | 223 | 5 |
| Adjustable rate(3) | 293 | 274 | (59) | 215 | 130 | 1 |
| Alt-A, interest-only, and option ARM(4) | 14,090 | 12,660 | (3,745) | 8,915 | 8,443 | 54 |
| Total single-family(6) | $ 66,552 | $ 60,037 | $ (15,100) | $ 44,937 | $ 40,019 | $ 328 |
| Multifamily — | | | | | | |
| *With no specific allowance recorded*(7) | $ 1,049 | $ 1,044 | $ — | $ 1,044 | $ 773 | $ 10 |
| *With specific allowance recorded* | 1,644 | 1,626 | (246) | 1,380 | 1,972 | 24 |
| Total multifamily | $ 2,693 | $ 2,670 | $ (246) | $ 2,424 | $ 2,745 | $ 34 |
| Total single-family and multifamily | $ 69,245 | $ 62,707 | $ (15,346) | $ 47,361 | $ 42,764 | $ 362 |

(1) Individually impaired loans with no specific related valuation allowance primarily represent mortgage loans purchased out of PC pools and accounted for in accordance with the accounting guidance for loans and debt securities acquired with deteriorated credit quality that have not experienced further deterioration.

(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

(3) Includes balloon/reset mortgage loans and excludes option ARMs.

(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

(5) Consists primarily of mortgage loans classified as TDRs.

(6) As of March 31, 2012 and December 31, 2011 includes $60.0 billion and $57.4 billion, respectively, of UPB associated with loans for which we have recorded a specific allowance, and $8.7 billion and $9.1 billion, respectively, of UPB associated with loans that have no specific allowance recorded. See endnote (1) for additional information.

(7) Individually impaired multifamily loans with no specific related valuation allowance primarily represent those loans for which the collateral value is sufficiently in excess of the loan balance to result in recovery of the entire recorded investment if the property were foreclosed upon or otherwise subject to disposition.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-3657

Table of Contents

Interest income foregone on individually impaired loans was approximately $530 million and $365 million for the three months ended March 31, 2012 and 2011 respectively.

**Mortgage Loan Performance**

We do not accrue interest on loans three months or more past due.

The table below presents the recorded investment of our single-family and multifamily mortgage loans, held-for-investment, by payment status.

**Table 5.2 — Payment Status of Mortgage Loans[1]**

| | March 31, 2012 | | | | | |
|---|---|---|---|---|---|---|
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 1,181,260 | $ 20,035 | $ 7,452 | $ 45,872 | $ 1,254,619 | $ 45,760 |
| 15-year amortizing fixed-rate[2] | 264,937 | 1,221 | 311 | 1,327 | 267,796 | 1,321 |
| Adjustable-rate[3] | 65,445 | 580 | 215 | 1,732 | 67,972 | 1,728 |
| Alt-A, interest-only, and option ARM[4] | 104,682 | 3,742 | 1,846 | 21,056 | 131,326 | 21,027 |
| Total single-family | 1,616,324 | 25,578 | 9,824 | 69,987 | 1,721,713 | 69,836 |
| Total multifamily | 71,206 | 27 | 26 | 104 | 71,363 | 1,853 |
| Total single-family and multifamily | $1,687,530 | $ 25,605 | $ 9,850 | $ 70,091 | $ 1,793,076 | $ 71,689 |

| | December 31, 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
| | | | | (in millions) | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 1,191,809 | $24,964 | $ 9,006 | $ 46,707 | $1,272,486 | $ 46,600 |
| 15-year amortizing fixed-rate[2] | 256,306 | 1,499 | 361 | 1,367 | 259,533 | 1,361 |
| Adjustable-rate[3] | 63,929 | 724 | 239 | 1,842 | 66,734 | 1,838 |
| Alt-A, interest-only, and option ARM[4] | 109,967 | 4,617 | 2,172 | 22,502 | 139,258 | 22,473 |
| Total single-family | 1,622,011 | 31,804 | 11,778 | 72,418 | 1,738,011 | 72,272 |
| Total multifamily | 72,715 | 2 | 15 | 69 | 72,801 | 1,882 |
| Total single-family and multifamily | $1,694,726 | $ 31,806 | $11,793 | $ 72,487 | $ 1,810,812 | $ 74,154 |

(1) Based on recorded investment in the loan. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as past due as long as the borrower is current under the modified terms. The payment status of a loan may be affected by temporary timing differences, or lags, in the reporting of this information to us by our servicers.

(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

(3) Includes balloon/reset mortgage loans and excludes option ARMs.

(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

We have the option under our PC agreements to remove mortgage loans from the loan pools that underlie our PCs under certain circumstances to resolve an existing or impending delinquency or default. Our practice generally has been to remove loans from PC trusts when the loans have been delinquent for 120 days or more. As of March 31, 2012, there were $2.4 billion in UPB of loans underlying our PCs that were 120 days or more delinquent, and that met our criteria for removing the loan from the consolidated trust. Generally, we remove these delinquent loans from the PC trust, and thereby extinguish the related PC debt, at the next scheduled PC payment date, unless the loans proceed to foreclosure transfer, complete a foreclosure alternative or are paid in full by the borrower before such date.

When we remove mortgage loans from consolidated trusts, we reclassify the loans from mortgage loans held-for-investment by consolidated trusts to unsecuritized mortgage loans held-for-investment and record an extinguishment of the corresponding portion of the debt securities of the consolidated trusts. We removed $9.2 billion and $14.6 billion in UPB of loans from PC trusts (or purchased delinquent loans associated with other guarantee commitments) during the three months ended March 31, 2012 and 2011, respectively.

121

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                                 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below summarizes the delinquency rates of mortgage loans within our single-family credit guarantee and multifamily mortgage portfolios.

## Table 5.3 — Delinquency Rates[1]

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| *Single-family:* | | |
| Non-credit-enhanced portfolio: | | |
| Serious delinquency rate | 2.75% | 2.80% |
| Total number of seriously delinquent loans | 267,820 | 273,184 |
| Credit-enhanced portfolio: | | |
| Serious delinquency rate | 7.54% | 7.56% |
| Total number of seriously delinquent loans | 113,166 | 120,622 |
| Total portfolio, excluding Other Guarantee Transactions | | |
| Serious delinquency rate | 3.39% | 3.46% |
| Total number of seriously delinquent loans | 380,986 | 393,806 |
| Other Guarantee Transactions:[2] | | |
| Serious delinquency rate | 10.67% | 10.54% |
| Total number of seriously delinquent loans | 19,801 | 20,328 |
| Total single-family: | | |
| Serious delinquency rate | 3.51% | 3.58% |
| Total number of seriously delinquent loans | 400,787 | 414,134 |
| *Multifamily:*[3] | | |
| Non-credit-enhanced portfolio: | | |
| Delinquency rate | 0.16% | 0.11% |
| UPB of delinquent loans (in millions) | $ 139 | $ 93 |
| Credit-enhanced portfolio: | | |
| Delinquency rate | 0.39% | 0.52% |
| UPB of delinquent loans (in millions) | $ 137 | $ 166 |
| Total Multifamily: | | |
| Delinquency rate | 0.23% | 0.22% |
| UPB of delinquent loans (in millions) | $ 276 | $ 259 |

(1) Single-family mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as seriously delinquent if the borrower is less than three monthly payments past due under the modified terms. Serious delinquencies on single-family mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice.

(2) Other Guarantee Transactions generally have underlying mortgage loans with higher risk characteristics, but some Other Guarantee Transactions may provide inherent credit protections from losses due to underlying subordination, excess interest, overcollateralization and other features.

(3) Multifamily delinquency performance is based on UPB of mortgage loans that are two monthly payments or more past due or those in the process of foreclosure and includes multifamily Other Guarantee Transactions. Excludes mortgage loans whose contractual terms have been modified under an agreement with the borrower as long as the borrower is less than two monthly payments past due under the modified contractual terms.

We continue to implement a number of initiatives to modify and restructure loans, including the MHA Program. As part of accomplishing certain of these initiatives, we pay various incentives to servicers and borrowers. We bear the full costs associated with these loan workout and foreclosure alternatives on mortgages that we own or guarantee and do not receive a reimbursement for any component from Treasury.

### Troubled Debt Restructurings

On July 1, 2011, we adopted an amendment to the accounting guidance for receivables, which clarifies the guidance regarding a creditor's evaluation of when a restructuring is considered a TDR. While our adoption of this amendment did not have an impact on how we account for TDRs, it did have a significant impact on the population of loans that we account for as TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Adopted Accounting Guidance" in our 2011 Annual Report for further information on our implementation of this guidance.

### *Single-Family TDRs*

We require our single-family servicers to contact borrowers who are in default and to identify a loan workout in accordance with our requirements. We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure. We receive information related to loan workouts, such as modifications and loans in a modification trial period, and other alternatives to foreclosure from our servicers at the loan level on at least a monthly basis. For loans in a modification trial period under HAMP, we do not receive the terms of the expected completed modification until the modification is completed. For these loans, we only receive notification that they are in a modification trial period under HAMP.

In the case of borrowers considered for modifications, our servicers obtain information on income, assets, and other borrower obligations to determine modified loan terms. Under HAMP, the goal of a single-family loan modification is to

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                TREASURY-3659

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

reduce the borrower's monthly mortgage payments to a specified percentage of the borrower's gross monthly income, which may be achieved through a combination of methods, including: (a) interest rate reductions; (b) term extensions; and (c) principal forbearance. Principal forbearance is when a portion of the principal is non-interest-bearing, but this does not represent principal forgiveness. Although HAMP contemplates that some servicers will also make use of principal forgiveness to achieve reduced payments for borrowers, we have only used forbearance of principal and have not used principal forgiveness in modifying our loans. During the three months ended March 31, 2012, approximately 65% of completed modifications that were classified as TDRs involved interest rate reductions and term extensions, and approximately 23% involved principal forbearance in addition to interest rate reductions and term extensions. During the three months ended March 31, 2012, the average term extension was 93 months and the average interest rate reduction was 3.0% for completed modifications classified as TDRs.

### Multifamily TDRs

The assessment as to whether a multifamily loan restructuring is considered a TDR contemplates the unique facts and circumstances of each loan. This assessment considers qualitative factors such as whether the borrower's modified interest rate is consistent with that of a borrower having a similar credit profile at the time of modification. In certain cases, for maturing loans we may provide short-term loan extensions of up to one year with no changes to the effective borrowing rate. In other cases we may make more significant modifications of terms for borrowers experiencing financial difficulty, such as reducing the interest rate or extending the maturity for longer than one year. In cases where we do modify the contractual terms of the loan, the changes in terms may be similar to those of single-family loans, such as an extension of the term, reduction of contractual rate, principal forbearance, or some combination of these features.

### TDR Activity and Performance

The table below provides additional information about both our single-family and multifamily TDR activity during the three months ended March 31, 2012, based on the original category of the loan before the loan was classified as a TDR. Our presentation of TDR activity includes all loans that were newly classified as a TDR during the respective period. Prior to classification as a TDR, these loans were previously evaluated for impairment, including our estimation for loan losses, on a collective basis. Loans classified as a TDR in one period may be subject to further action (such as a modification or remodification) in a subsequent period. In such cases, the subsequent activity would not be reflected in the table below since the loan would already have been classified as a TDR.

### Table 5.4 — TDR Activity, by Segment

| | Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | # of Loans | Post-TDR Recorded Investment | # of Loans | Post-TDR Recorded Investment |
| | | (in millions, except for number of loans) | | |
| Single-family | | | | |
| 20 and 30-year or more, amortizing fixed-rate | 15,072 | $ 2,643 | 18,900 | $ 3,925 |
| 15-year amortizing fixed-rate | 962 | 87 | 856 | 98 |
| Adjustable-rate(1) | 451 | 85 | 497 | 107 |
| Alt-A, interest-only, and option ARM | 3,725 | 961 | 6,727 | 1,844 |
| Total Single-family | 20,210 | 3,776 | 26,980 | 5,974 |
| Multifamily | 4 | 22 | 2 | 3 |
| Total | 20,214 | $ 3,798 | 26,982 | $ 5,977 |

(1) Includes balloon/reset mortgage loans.

The measurement of impairment for TDRs is based on the excess of our recorded investment in the loans over the present value of the loans' expected future cash flows. Generally, restructurings that are TDRs have a higher allowance for loan losses than restructurings that are not considered TDRs because TDRs involve a concession being granted to the borrower. Our process for determining the appropriate allowance for loan losses for both single-family and multifamily loans considers the impact that our loss mitigation activities, such as loan restructurings, have on probabilities of default. For single-family loans evaluated individually and collectively for impairment that have been modified, the probability of default is impacted by the incidence of redefault that we have experienced on similar loans that have completed a modification. For multifamily loans, the incidence of redefault on loans that have been modified does not directly impact the allowance for loan losses as our multifamily loans are generally evaluated individually for impairment which is based on the fair value of the underlying collateral and contemplates the unique facts and circumstances of the loan. The process

TREASURY-3660

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

for determining the appropriate allowance for loan losses for multifamily loans evaluated collectively for impairment considers the incidence of redefault on loans that have completed a modification.

The table below presents the volume of payment defaults of our TDR modifications based on the original category of the loan before restructuring. Modified loans within the Alt-A category continue to remain in that category, even though the borrower may have provided full documentation of assets and income before completing the modification. Modified loans within the option ARM category continue to remain in that category even though the modified loan no longer provides for optional payment provisions. Substantially all of our completed single-family loan modifications classified as a TDR during the three months ended March 31, 2012 resulted in a modified loan with a fixed interest rate. Approximately $42 billion in UPB of our completed loan modifications at March 31, 2012 had provisions for reduced interest rates that remain fixed for the first five years of the modification and then increase at a rate of one percent per year (or such lesser amount as may be needed) until the interest rate has been adjusted to a market rate (determined at the time of the modification). The table below reflects only performance of completed modifications and excludes loans subject to other loss mitigation activity that were classified as TDRs.

**Table 5.5 — Payment Defaults of Completed TDR Modifications, by Segment[1]**

| | Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | # of Loans | Post-TDR Recorded Investment[2] | # of Loans | Post-TDR Recorded Investment[2] |
|---|---|---|---|---|
| | (in millions, except number of loans modified) | | | |
| *Single-family* | | | | |
| 20 and 30-year or more, amortizing fixed-rate | 4,888 | $  919 | 5,609 | $  1,074 |
| 15-year amortizing fixed-rate | 232 | 24 | 194 | 21 |
| Adjustable-rate | 98 | 22 | 123 | 26 |
| Alt-A, interest-only, and option ARM | 1,048 | 278 | 1,574 | 421 |
| Total single-family | 6,266 | $  1,243 | 7,500 | $  1,542 |
| *Multifamily* | 1 | $  2 | — | $  — |

(1) Represents TDR loans that experienced a payment default during the period and had completed a modification event during the year preceding the payment default. A payment default occurs when a borrower either: (a) became two or more months delinquent; or (b) completed a loss event, such as a short sale or foreclosure. We only include payment defaults for a single loan once during each quarterly period; however, a single loan will be reflected more than once if the borrower experienced another payment default in a subsequent quarter.

(2) Represents the recorded investment at the end of the period in which the loan was modified and does not represent the recorded investment as of March 31, 2012.

During the three months ended March 31, 2012, there were 783 loans with other loss mitigation activities (*i.e.*, repayment plan, forbearance agreement, or trial period modifications) initially classified as TDRs, with a post-TDR recorded investment of $121 million that returned to a current payment status, and then subsequently became two months delinquent. In addition, during the three months ended March 31, 2012, there were 1,598 loans with other loss mitigation activities initially classified as TDRs, with a post-TDR recorded investment of $262 million that subsequently experienced a loss event, such as a short sale or a foreclosure transfer.

### NOTE 6: REAL ESTATE OWNED

We obtain REO properties: (a) when we are the highest bidder at foreclosure sales of properties that collateralize non-performing single-family and multifamily mortgage loans owned by us; or (b) when a delinquent borrower chooses to transfer the mortgaged property to us in lieu of going through the foreclosure process. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for a discussion of our significant accounting policies for REO.

The table below provides a summary of the change in the carrying value of our combined single-family and multifamily REO balances. For the periods presented in the table below, the weighted average holding period for our disposed properties was less than one year.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012
TREASURY-3661
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 6.1 — REO**

| | Three Months Ended March 31, | |
| | 2012 | 2011 |
|---|---|---|
| | (in millions) | |
| Beginning balance — REO, gross | $ 6,244 | $ 7,908 |
| Additions | 2,135 | 2,453 |
| Dispositions | (2,444) | (3,212) |
| Ending balance — REO, gross | 5,935 | 7,149 |
| Beginning balance, valuation allowance | (564) | (840) |
| Change in valuation allowance | 83 | 67 |
| Ending balance, valuation allowance | (481) | (773) |
| Ending balance — REO, net | $ 5,454 | $ 6,376 |

The REO balance, net at March 31, 2012 and December 31, 2011 associated with single-family properties was $5.3 billion and $5.5 billion, respectively, and the balance associated with multifamily properties was $121 million and $133 million, respectively. The North Central region represented approximately 32% and 26% of our single-family REO additions during the three months ended March 31, 2012 and 2011, respectively, based on the number of properties, and the Southeast region represented approximately 30% and 19% of our single-family REO additions during these periods. Our single-family REO inventory consisted of 59,307 properties and 60,535 properties at March 31, 2012 and December 31, 2011, respectively. The pace of our REO acquisitions slowed beginning in the fourth quarter of 2010 due to delays in the foreclosure process. These delays in foreclosures continued in the first quarter of 2012, particularly in states that require a judicial foreclosure process. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Seller/Servicers" for information about regional concentration of our portfolio as well as further details about delays in the single-family foreclosure process.

Our REO operations expenses include REO property expenses, net losses incurred on disposition of REO properties, adjustments to the holding period allowance associated with REO properties to record them at the lower of their carrying amount or fair value less the estimated costs to sell, and recoveries from insurance and other credit enhancements. An allowance for estimated declines in the REO fair value during the period properties are held reduces the carrying value of REO property. Excluding holding period valuation adjustments, we recognized gains of $80 million and losses of $126 million on REO dispositions during the three months ended March 31, 2012 and 2011, respectively. We increased our valuation allowance for properties in our REO inventory by $2 million and $151 million during the three months ended March 31, 2012 and 2011, respectively.

REO property acquisitions that result from extinguishment of our mortgage loans held on our consolidated balance sheets are treated as non-cash transfers. The amount of non-cash acquisitions of REO properties during the three months ended March 31, 2012 and 2011 was $1.9 billion and $2.3 billion, respectively.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3662

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 7: INVESTMENTS IN SECURITIES

The table below summarizes amortized cost, estimated fair values, and corresponding gross unrealized gains and gross unrealized losses for available-for-sale securities by major security type. At March 31, 2012 and December 31, 2011, all available-for-sale securities are mortgage-related securities.

### Table 7.1 — Available-For-Sale Securities

| March 31, 2012 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| | | (in millions) | | |
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 70,422 | $ 5,790 | $ (49) | $ 76,163 |
| Subprime | 39,750 | 61 | (12,666) | 27,145 |
| CMBS | 51,976 | 3,477 | (700) | 54,753 |
| Option ARM | 8,714 | 13 | (2,909) | 5,818 |
| Alt-A and other | 13,243 | 104 | (2,253) | 11,094 |
| Fannie Mae | 17,648 | 1,252 | (3) | 18,897 |
| Obligations of states and political subdivisions | 7,459 | 132 | (26) | 7,565 |
| Manufactured housing | 795 | 7 | (54) | 748 |
| Ginnie Mae | 210 | 29 | — | 239 |
| Total available-for-sale securities | $ 210,217 | $10,865 | $(18,660) | $202,422 |

| December 31, 2011 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 74,711 | $ 6,429 | $ (48) | $ 81,092 |
| Subprime | 41,347 | 60 | (13,408) | 27,999 |
| CMBS | 53,637 | 2,574 | (548) | 55,663 |
| Option ARM | 9,019 | 15 | (3,169) | 5,865 |
| Alt-A and other | 13,659 | 32 | (2,812) | 10,879 |
| Fannie Mae | 19,023 | 1,303 | (4) | 20,322 |
| Obligations of states and political subdivisions | 7,782 | 108 | (66) | 7,824 |
| Manufactured housing | 820 | 6 | (60) | 766 |
| Ginnie Mae | 219 | 30 | — | 249 |
| Total available-for-sale securities | $220,217 | $ 10,557 | $ (20,115) | $ 210,659 |

126                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Available-For-Sale Securities in a Gross Unrealized Loss Position**

The table below shows the fair value of available-for-sale securities in a gross unrealized loss position, and whether they have been in that position less than 12 months, or 12 months or greater, including the non-credit-related portion of other-than-temporary impairments which have been recognized in AOCI.

**Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position**

| March 31, 2012 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
| | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | |
| | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in millions) | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $ 1,039 | $ — | $ (2) | $ (2) | $ 1,946 | $ — | $ (47) | $ (47) | $ 2,985 | $ — | $ (49) | $ (49) |
| Subprime | 36 | (4) | — | (4) | 26,865 | (10,239) | (2,423) | (12,662) | 26,901 | (10,243) | (2,423) | (12,666) |
| CMBS | 1,088 | (25) | (53) | (78) | 3,403 | (147) | (475) | (622) | 4,491 | (172) | (528) | (700) |
| Option ARM | 98 | (7) | — | (7) | 5,695 | (2,813) | (89) | (2,902) | 5,793 | (2,820) | (89) | (2,909) |
| Alt-A and other | 527 | (27) | — | (27) | 9,230 | (1,742) | (484) | (2,226) | 9,757 | (1,769) | (484) | (2,253) |
| Fannie Mae | 623 | — | (2) | (2) | 10 | — | (1) | (1) | 633 | — | (3) | (3) |
| Obligations of states and political subdivisions | 675 | — | (4) | (4) | 722 | — | (22) | (22) | 1,397 | — | (26) | (26) |
| Manufactured housing | 111 | (4) | — | (4) | 353 | (41) | (9) | (50) | 464 | (45) | (9) | (54) |
| Total available-for-sale securities in a gross unrealized loss position | $ 4,197 | $ (67) | $ (61) | $ (128) | $ 48,224 | $ (14,982) | $ (3,550) | $ (18,532) | $ 52,421 | $ (15,049) | $ (3,611) | $ (18,660) |

| December 31, 2011 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
| | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | |
| | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in millions) | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $ 2,196 | $ — | $ (4) | $ (4) | $ 1,884 | $ — | $ (44) | $ (44) | $ 4,080 | $ — | $ (48) | $ (48) |
| Subprime | 8 | (1) | — | (1) | 27,742 | (10,785) | (2,622) | (13,407) | 27,750 | (10,786) | (2,622) | (13,408) |
| CMBS | 997 | (20) | (41) | (61) | 3,573 | (9) | (478) | (487) | 4,570 | (29) | (519) | (548) |
| Option ARM | 95 | (13) | — | (13) | 5,743 | (3,067) | (89) | (3,156) | 5,838 | (3,080) | (89) | (3,169) |
| Alt-A and other | 1,197 | (114) | (4) | (118) | 9,070 | (2,088) | (606) | (2,694) | 10,267 | (2,202) | (610) | (2,812) |
| Fannie Mae | 1,144 | — | (2) | (2) | 14 | — | (2) | (2) | 1,158 | — | (4) | (4) |
| Obligations of states and political subdivisions | 292 | — | (6) | (6) | 2,157 | — | (60) | (60) | 2,449 | — | (66) | (66) |
| Manufactured housing | 197 | (5) | — | (5) | 345 | (44) | (11) | (55) | 542 | (49) | (11) | (60) |
| Total available-for-sale securities in a gross unrealized loss position | $ 6,126 | $ (153) | $ (57) | $ (210) | $ 50,528 | $ (15,993) | $ (3,912) | $ (19,905) | $ 56,654 | $ (16,146) | $ (3,969) | $ (20,115) |

(1) Represents the gross unrealized losses for securities for which we have previously recognized other-than-temporary impairments in earnings.

(2) Represents the gross unrealized losses for securities for which we have not previously recognized other-than-temporary impairments in earnings.

At March 31, 2012, total gross unrealized losses on available-for-sale securities were $18.7 billion. The gross unrealized losses relate to 1,453 individual lots representing 1,387 separate securities, including securities with non-credit-related other-than-temporary impairments recognized in AOCI. We purchase multiple lots of individual securities at different times and at different costs. We determine gross unrealized gains and gross unrealized losses by specifically evaluating investment positions at the lot level; therefore, some of the lots we hold for a single security may be in an unrealized gain position while other lots for that security may be in an unrealized loss position, depending upon the amortized cost of the specific lot.

**Impairment Recognition on Investments in Securities**

We recognize impairment losses on available-for-sale securities within our consolidated statements of comprehensive income as net impairment of available-for-sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other-than-temporary.

We conduct quarterly reviews to evaluate each available-for-sale security that has an unrealized loss for other-than-temporary impairment. An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis. We recognize other-than-temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security. If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recognize only the credit component of other-than-temporary impairment in earnings and the amounts attributable to all other factors are recognized in AOCI. The credit component represents the amount by which the present value of expected future cash flows to be collected from the security is less than the amortized cost basis of the security. The present value of expected future cash flows represents our estimate of future contractual cash flows that

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3664

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

we expect to collect, discounted at the effective interest rate implicit in the security at the date of acquisition or the effective interest rate determined based on significantly improved cash flows subsequent to initial impairment.

Our net impairment of available-for-sale securities recognized in earnings on our consolidated statements of comprehensive income for the three months ended March 31, 2012 and 2011, includes amounts related to certain securities where we have previously recognized other-than-temporary impairments through AOCI, but upon the recognition of additional credit losses, these amounts were reclassified out of non-credit losses in AOCI and charged to earnings. In certain instances, we recognized credit losses in excess of unrealized losses in AOCI.

The determination of whether unrealized losses on available-for-sale securities are other-than-temporary requires significant management judgments and assumptions and consideration of numerous factors. We perform an evaluation on a security-by-security basis considering all available information. The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment. Important factors include, but are not limited to:

- whether we intend to sell the security and it is not more likely than not that we will be required to sell the security before sufficient time elapses to recover all unrealized losses;

- loan level default modeling for single-family residential mortgages that considers individual loan characteristics, including current LTV ratio, FICO score, and delinquency status, requires assumptions about future home prices and interest rates, and employs internal default models and prepayment assumptions. The modeling for CMBS employs third-party models that require assumptions about the economic conditions in the areas surrounding each individual property; and

- security loss modeling combining the modeled performance of the underlying collateral relative to its current and projected credit enhancements to determine the expected cash flows for each evaluated security.

For the majority of our available-for-sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other-than-temporary and is recorded within our consolidated statements of comprehensive income as net impairment of available-for-sale securities recognized in earnings.

See "Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position" for the length of time our available-for-sale securities have been in an unrealized loss position. Also see "Table 7.3 — Significant Modeled Attributes for Certain Available-For-Sale Non-Agency Mortgage-Related Securities" for the modeled default rates and severities that were used to determine whether our senior interests in certain non-agency mortgage-related securities would experience a cash shortfall.

### Freddie Mac and Fannie Mae Securities

We record the purchase of mortgage-related securities issued by Fannie Mae as investments in securities in accordance with the accounting guidance for investments in debt and equity securities. In contrast, our purchase of mortgage-related securities that we issued (e.g., PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions) is recorded as either investments in securities or extinguishment of debt securities of consolidated trusts depending on the nature of the mortgage-related security that we purchase. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2011 Annual Report for additional information.

We hold these investments in securities that are in an unrealized loss position at least to recovery and typically to maturity. As the principal and interest on these securities are guaranteed and we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses, we consider these unrealized losses to be temporary.

### Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans

We believe the unrealized losses on the non-agency mortgage-related securities we hold are a result of poor underlying collateral performance, limited liquidity, and large risk premiums. We consider securities to be other-than-temporarily impaired when future credit losses are deemed likely.

Our review of the securities backed by subprime, option ARM, and Alt-A and other loans includes loan level default modeling and analyses of the individual securities based on underlying collateral performance, including the collectability of amounts from bond insurers. In the case of bond insurers, we also consider factors such as the availability of capital,

128

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

generation of new business, pending regulatory action, credit ratings, security prices, and credit default swap levels traded on the insurers. We consider loan level information including estimated current LTV ratios, FICO scores, and other loan level characteristics. We also consider the differences between the loan level characteristics of the performing and non-performing loan populations. For additional information regarding bond insurers, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers."

The table below presents the modeled default rates and severities, without regard to subordination, that are used to determine whether our senior interests in certain available-for-sale non-agency mortgage-related securities will experience a cash shortfall. Our proprietary default model incorporates assumptions about future home prices, as defaults and severities are modeled at the loan level and then aggregated. The model uses projections of future home prices at the state level. Assumptions about voluntary prepayment rates are also an input to the model and are discussed below.

**Table 7.3 — Significant Modeled Attributes for Certain Available-For-Sale Non-Agency Mortgage-Related Securities**

| | March 31, 2012 | | | | |
| | Subprime First Lien(2) | Option ARM | Fixed Rate | Alt-A(1) Variable Rate | Hybrid Rate |
| Issuance Date | | | (dollars in millions) | | |
| 2004 and prior: | | | | | |
| UPB | $ 1,191 | $ 114 | $ 830 | $ 499 | $ 2,155 |
| Weighted average collateral defaults(3) | 35% | 37% | 9% | 49% | 29% |
| Weighted average collateral severities(4) | 55% | 50% | 43% | 48% | 38% |
| Weighted average voluntary prepayment rates(5) | 5% | 7% | 17% | 7% | 8% |
| Average credit enhancement(6) | 43% | 13% | 14% | 18% | 15% |
| 2005: | | | | | |
| UPB | $ 5,959 | $ 2,795 | $ 1,169 | $ 816 | $ 3,870 |
| Weighted average collateral defaults(3) | 57% | 54% | 25% | 59% | 43% |
| Weighted average collateral severities(4) | 66% | 58% | 51% | 54% | 46% |
| Weighted average voluntary prepayment rates(5) | 4% | 6% | 12% | 6% | 7% |
| Average credit enhancement(6) | 52% | 11% | 2% | 25% | 5% |
| 2006: | | | | | |
| UPB | $ 19,393 | $ 6,432 | $ 529 | $ 1,082 | $ 1,152 |
| Weighted average collateral defaults(3) | 67% | 67% | 38% | 66% | 56% |
| Weighted average collateral severities(4) | 71% | 64% | 57% | 62% | 53% |
| Weighted average voluntary prepayment rates(5) | 5% | 5% | 12% | 7% | 6% |
| Average credit enhancement(6) | 14% | 1% | 6% | (2)% | —% |
| 2007: | | | | | |
| UPB | $ 20,935 | $ 4,167 | $ 156 | $ 1,319 | $ 308 |
| Weighted average collateral defaults(3) | 65% | 57% | 53% | 63% | 65% |
| Weighted average collateral severities(4) | 72% | 62% | 65% | 62% | 62% |
| Weighted average voluntary prepayment rates(5) | 5% | 6% | 10% | 8% | 6% |
| Average credit enhancement(6) | 16% | 10% | 10% | (8)% | —% |
| Total: | | | | | |
| UPB | $ 47,478 | $13,508 | $2,684 | $ 3,716 | $7,485 |
| Weighted average collateral defaults(3) | 64% | 61% | 24% | 61% | 42% |
| Weighted average collateral severities(4) | 71% | 62% | 53% | 59% | 47% |
| Weighted average voluntary prepayment rates(5) | 5% | 6% | 14% | 7% | 7% |
| Average credit enhancement(6) | 20% | 6% | 7% | 5% | 7% |

(1) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.
(2) Excludes non-agency mortgage-related securities backed exclusively by subprime second liens. Certain securities identified as subprime first lien may be backed in part by subprime second lien loans, as the underlying loans of these securities were permitted to include a small percentage of subprime second lien loans.
(3) The expected cumulative default rate expressed as a percentage of the current collateral UPB.
(4) The expected average loss given default calculated as the ratio of cumulative loss over cumulative default for each security.
(5) The security's voluntary prepayment rate represents the average of the monthly voluntary prepayment rate weighted by the security's outstanding UPB.
(6) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by bond insurance, overcollateralization and other forms of credit enhancement. Negative values are shown when collateral losses that have yet to be applied to the tranches exceed the remaining credit enhancement, if any.

In evaluating the non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans for other-than-temporary impairment, we noted that the percentage of securities that were AAA-rated and the percentage that were investment grade declined significantly since acquisition. While these ratings have declined, the ratings themselves are not determinative that a loss is more or less likely. While we consider credit ratings in our analysis, we believe that our detailed security-by-security analyses provide a more consistent view of the ultimate collectability of contractual amounts due to us.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our analysis is subject to change as new information regarding delinquencies, severities, loss timing, prepayments, and other factors becomes available. While it is reasonably possible that, under certain conditions, collateral losses on our remaining available-for-sale securities for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of March 31, 2012.

### Commercial Mortgage-Backed Securities

CMBS are exposed to stresses in the commercial real estate market. We use external models to identify securities that may have an increased risk of failing to make their contractual payments. We then perform an analysis of the underlying collateral on a security-by-security basis to determine whether we will receive all of the contractual payments due to us. While it is reasonably possible that, under certain conditions, collateral losses on our CMBS for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of March 31, 2012. We do not intend to sell the remaining CMBS and it is not more likely than not that we will be required to sell such securities before recovery of the unrealized losses.

### Obligations of States and Political Subdivisions

These investments consist of housing revenue bonds. We believe the unrealized losses on obligations of states and political subdivisions are primarily a result of movements in interest rates and liquidity and risk premiums. We have determined that the impairment of these securities is temporary based on our conclusion that we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses. We believe that any credit risk related to these securities is minimal because of the issuer guarantees provided on these securities.

### Bond Insurance

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our non-agency mortgage-related securities. Circumstances in which it is likely a principal and interest shortfall will occur and there is substantial uncertainty surrounding a bond insurer's ability to pay all future claims can give rise to recognition of other-than-temporary impairment recognized in earnings. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

### Other-Than-Temporary Impairments on Available-for-Sale Securities

The table below summarizes our net impairments of available-for-sale securities recognized in earnings by security type.

### Table 7.4 — Net Impairment of Available-For-Sale Securities Recognized in Earnings

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings For the Three Months Ended March 31, | |
| | 2012 | 2011 |
| | (in millions) | |
| Available-for-sale securities: | | |
| Subprime | $ (441) | $ (734) |
| Option ARM | (48) | (281) |
| Alt-A and other | (57) | (40) |
| CMBS | (16) | (135) |
| Manufactured housing | (2) | (3) |
| Total other-than-temporary impairments on available-for-sale securities | $ (564) | $ (1,193) |

The table below presents the changes in the unrealized credit-related other-than-temporary impairment component of the amortized cost related to available-for-sale securities: (a) that we have written down for other-than-temporary impairment; and (b) for which the credit component of the loss is recognized in earnings. The credit-related other-than-temporary impairment component of the amortized cost represents the difference between the present value of expected future cash flows, including the estimated proceeds from bond insurance, and the amortized cost basis of the security prior to considering credit losses. The beginning balance represents the other-than-temporary impairment credit loss component related to available-for-sale securities for which other-than-temporary impairment occurred prior to January 1, 2012, but will not be realized until the securities are sold, written off, or mature. Net impairment of available-for-sale securities recognized in earnings is presented as additions in two components based upon whether the current period is: (a) the first

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3667                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

time the debt security was credit-impaired; or (b) not the first time the debt security was credit-impaired. The credit loss component is reduced if we sell, intend to sell or believe we will be required to sell previously credit-impaired available-for-sale securities. Additionally, the credit loss component is reduced by the amortization resulting from significant increases in cash flows expected to be collected that are recognized over the remaining life of the security.

### Table 7.5 — Other-Than-Temporary Impairments Related to Credit Losses on Available-For-Sale Securities

| | Three Months Ended March 31, 2012 |
|---|---|
| | (in millions) |
| Credit-related other-than-temporary impairments on available-for-sale securities recognized in earnings: | |
| Beginning balance — remaining credit losses to be realized on available-for-sale securities held at the beginning of the period where other-than-temporary impairments were recognized in earnings | $ 15,988 |
| Additions: | |
| Amounts related to credit losses for which an other-than-temporary impairment was not previously recognized | 13 |
| Amounts related to credit losses for which an other-than-temporary impairment was previously recognized | 551 |
| Reductions: | |
| Amounts related to securities which were sold, written off or matured | (272) |
| Amounts previously recognized in other comprehensive income that were recognized in earnings because we intend to sell the security or it is more likely than not that we will be required to sell the security before recovery of its amortized cost basis | (14) |
| Amounts related to amortization resulting from significant increases in cash flows expected to be collected that are recognized over the remaining life of the security | (52) |
| Ending balance — remaining credit losses to be realized on available-for-sale securities held at period end where other-than-temporary impairments were recognized in earnings | $ 16,214 |

#### Realized Gains and Losses on Sales of Available-For-Sale Securities

The table below illustrates the gross realized gains and gross realized losses received from the sale of available-for-sale securities.

### Table 7.6 — Gross Realized Gains and Gross Realized Losses on Sales of Available-For-Sale Securities

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in millions) | |
| **Gross realized gains** | | |
| Mortgage-related securities: | | |
| Freddie Mac | $ — | $ 77 |
| Fannie Mae | 12 | — |
| CMBS | 76 | — |
| Obligations of states and political subdivisions | 1 | 1 |
| Total mortgage-related securities gross realized gains | 89 | 78 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | — | 2 |
| Total non-mortgage-related securities gross realized gains | — | 2 |
| Gross realized gains | 89 | 80 |
| **Gross realized losses** | | |
| Gross realized losses | — | — |
| Net realized gains (losses) | $ 89 | $ 80 |

#### Maturities of Available-For-Sale Securities

The table below summarizes the remaining contractual maturities of available-for-sale securities.

### Table 7.7 — Maturities of Available-For-Sale Securities[(1)]

| March 31, 2012 | Amortized Cost | Fair Value |
|---|---|---|
| | (in millions) | |
| Available-for-sale securities: | | |
| Due within 1 year or less | $ 37 | $ 37 |
| Due after 1 through 5 years | 2,174 | 2,286 |
| Due after 5 through 10 years | 3,746 | 3,961 |
| Due after 10 years | 204,260 | 196,138 |
| Total available-for-sale securities | $ 210,217 | $ 202,422 |

(1) Maturity information provided is based on contractual maturities, which may not represent expected life as obligations underlying these securities may be prepaid at any time without penalty.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012     TREASURY-3668     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### AOCI Related to Available-For-Sale Securities

The table below presents the changes in AOCI related to available-for-sale securities. The net unrealized holding gains represent the net fair value adjustments recorded on available-for-sale securities throughout the periods presented, after the effects of our federal statutory tax rate of 35%. The net reclassification adjustment for net realized losses represents the amount of those fair value adjustments, after the effects of our federal statutory tax rate of 35%, that have been recognized in earnings due to a sale of an available-for-sale security or the recognition of an impairment loss.

### Table 7.8 — AOCI Related to Available-For-Sale Securities

| | Three Months Ended March 31, | |
| | 2012 | 2011 |
| | (in millions) | |
|---|---|---|
| Beginning balance | $(6,213) | $(9,678) |
| Net unrealized holding gains[1] | 838 | 1,216 |
| Net reclassification adjustment for net realized losses[2][3] | 309 | 725 |
| Ending balance | $(5,066) | $(7,737) |

(1) Net of tax expense of $451 million and $655 million for the three months ended March 31, 2012 and 2011, respectively.
(2) Net of tax benefit of $166 million and $390 million for the three months ended March 31, 2012 and 2011, respectively.
(3) Includes the reversal of previously recorded unrealized losses that have been recognized on our consolidated statements of comprehensive income as impairment losses on available-for-sale securities of $367 million and $775 million, net of taxes, for the three months ended March 31, 2012 and 2011, respectively.

### Trading Securities

The table below summarizes the estimated fair values by major security type for trading securities.

### Table 7.9 — Trading Securities

| | March 31, 2012 | December 31, 2011 |
| | (in millions) | |
|---|---|---|
| Mortgage-related securities: | | |
| Freddie Mac | $ 14,504 | $ 16,047 |
| Fannie Mae | 13,692 | 15,165 |
| Ginnie Mae | 151 | 156 |
| Other | 153 | 164 |
| Total mortgage-related securities | 28,500 | 31,532 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 695 | 302 |
| Treasury bills | 3,000 | 100 |
| Treasury notes | 23,164 | 24,712 |
| FDIC-guaranteed corporate medium-term notes | 2,960 | 2,184 |
| Total non-mortgage-related securities | 29,819 | 27,298 |
| Total fair value of trading securities | $ 58,319 | $ 58,830 |

Trading securities mainly include Treasury securities, agency fixed-rate and variable-rate pass-through mortgage-related securities, and agency REMICs, including inverse floating rate, interest-only and principal-only securities. With the exception of principal-only securities, our agency securities, classified as trading, were at a net premium (i.e., have higher net fair value than UPB) as of March 31, 2012.

For the three months ended March 31, 2012 and 2011, we recorded net unrealized losses on trading securities held at those dates of $0.4 billion and $0.2 billion, respectively.

Total trading securities include $1.7 billion and $1.9 billion, respectively, of hybrid financial assets as defined by the derivative and hedging accounting guidance regarding certain hybrid financial instruments as of March 31, 2012 and December 31, 2011. Gains (losses) on trading securities on our consolidated statements of comprehensive income include losses of $51 million and $41 million, respectively, related to these hybrid financial securities for the three months ended March 31, 2012 and 2011.

### Collateral Pledged

#### Collateral Pledged to Freddie Mac

Our counterparties are required to pledge collateral for securities purchased under agreements to resell transactions, and most derivative instruments are subject to collateral posting thresholds generally related to a counterparty's credit rating. We consider the types of securities being pledged to us as collateral when determining how much we lend related to securities purchased under agreements to resell transactions. Additionally, we subsequently and regularly review the

132

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

market values of these securities compared to amounts loaned in an effort to minimize our exposure to losses. We had cash and cash equivalents pledged to us related to derivative instruments of $2.3 billion and $3.2 billion at March 31, 2012 and December 31, 2011, respectively. Although it is our practice not to repledge assets held as collateral, a portion of the collateral may be repledged based on master agreements related to our derivative instruments. At March 31, 2012 and December 31, 2011, we did not have collateral in the form of securities pledged to and held by us under these master agreements. Also at March 31, 2012 and December 31, 2011, we did not have securities pledged to us for securities purchased under agreements to resell transactions that we had the right to repledge. From time to time we may obtain pledges of collateral from certain seller/servicers as additional security for their obligations to us, including their obligations to repurchase mortgages sold to us in breach of representations and warranties. This collateral may take the form of cash, cash equivalents, or agency securities.

In addition, we hold cash and cash equivalents as collateral in connection with certain of our multifamily guarantees and mortgage loans as credit enhancements. The cash and cash equivalents held as collateral related to these transactions at March 31, 2012 and December 31, 2011 was $258 million and $246 million, respectively.

### *Collateral Pledged by Freddie Mac*

We are required to pledge collateral for margin requirements with third-party custodians in connection with secured financings and derivative transactions with some counterparties. The level of collateral pledged related to our derivative instruments is determined after giving consideration to our credit rating. As of March 31, 2012, we had one secured, uncommitted intraday line of credit with a third party in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs, in connection with our use of the Fedwire system. In certain circumstances, the line of credit agreement gives the secured party the right to repledge the securities underlying our financing to other third parties, including the Federal Reserve Bank. We pledge collateral to meet our collateral requirements under the line of credit agreement upon demand by the counterparty.

The table below summarizes all securities pledged as collateral by us, including assets that the secured party may repledge and those that may not be repledged.

### Table 7.10 — Collateral in the Form of Securities Pledged

| | March 31, 2012 | | December 31, 2011 |
| --- | --- | --- | --- |
| | | (in millions) | |
| Securities pledged with the ability for the secured party to repledge: | | | |
| Debt securities of consolidated trusts held by third parties[1] | $ 10,373 | $ | 10,293 |
| Available-for-sale securities | 187 | | 204 |
| Securities pledged without the ability for the secured party to repledge: | | | |
| Debt securities of consolidated trusts held by third parties[1] | 90 | | 88 |
| Total securities pledged | $ 10,650 | $ | 10,585 |

(1) Represents PCs held by us in our Investments segment mortgage investments portfolio and pledged as collateral which are recorded as a reduction to debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

### *Securities Pledged with the Ability of the Secured Party to Repledge*

At March 31, 2012, we pledged securities with the ability of the secured party to repledge of $10.6 billion, of which $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

At December 31, 2011, we pledged securities with the ability of the secured party to repledge of $10.5 billion, of which $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

The remaining $42 million and $25 million of collateral posted with the ability of the secured party to repledge at March 31, 2012 and December 31, 2011, respectively, was posted in connection with our margin account related to futures transactions.

### *Securities Pledged without the Ability of the Secured Party to Repledge*

At March 31, 2012 and December 31, 2011, we pledged securities, without the ability of the secured party to repledge, of $90 million and $88 million, respectively, at a clearinghouse in connection with the trading and settlement of securities.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                   TREASURY-3670                   Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Collateral in the Form of Cash Pledged*

At March 31, 2012, we pledged $11.7 billion of collateral in the form of cash and cash equivalents, of which $11.5 billion related to our derivative agreements as we had $11.5 billion of such derivatives in a net loss position. At December 31, 2011, we pledged $12.7 billion of collateral in the form of cash and cash equivalents, of which $12.6 billion related to our derivative agreements as we had $12.7 billion of such derivatives in a net loss position. The remaining $192 million and $133 million was posted at clearinghouses in connection with our securities transactions at March 31, 2012 and December 31, 2011, respectively.

## NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS

Debt securities that we issue are classified on our consolidated balance sheets as either debt securities of consolidated trusts held by third parties or other debt. We issue other debt to fund our operations.

Under the Purchase Agreement, without the prior written consent of Treasury, we may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. Because of this debt limit, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Under the Purchase Agreement, the amount of our "indebtedness" is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs. Therefore, "indebtedness" does not include debt securities of consolidated trusts held by third parties. We also cannot become liable for any subordinated indebtedness without the prior consent of Treasury.

Our debt cap under the Purchase Agreement is $874.8 billion in 2012 and will decline to $787.3 billion on January 1, 2013. As of March 31, 2012, we estimate that the par value of our aggregate indebtedness totaled $629.3 billion, which was approximately $245.5 billion below the applicable debt cap. Our aggregate indebtedness is calculated as the par value of other debt.

In the tables below, the categories of short-term debt (due within one year) and long-term debt (due after one year) are based on the original contractual maturity of the debt instruments classified as other debt.

The table below summarizes the interest expense and the balances of total debt, net per our consolidated balance sheets.

**Table 8.1 — Total Debt, Net**

| | Interest Expense for the Three Months Ended March 31, | | Balance, Net(1) | |
| | 2012 | 2011 | March 31, 2012 | December 31, 2011 |
| | (in millions) | | (in millions) | |
|---|---|---|---|---|
| Other debt: | | | | |
| Short-term debt | $ 40 | $ 115 | $ 134,825 | $ 161,399 |
| Long-term debt: | | | | |
| Senior debt | 2,769 | 3,438 | 483,432 | 498,779 |
| Subordinated debt | 7 | 12 | 372 | 368 |
| Total long-term debt | 2,776 | 3,450 | 483,804 | 499,147 |
| Total other debt | 2,816 | 3,565 | 618,629 | 660,546 |
| Debt securities of consolidated trusts held by third parties | 15,253 | 17,403 | 1,481,622 | 1,471,437 |
| Total debt, net | $ 18,069 | $ 20,968 | $ 2,100,251 | $ 2,131,983 |

(1) Represents par value, net of associated discounts, premiums, and hedge-related basis adjustments, with $0 and $0.2 billion, respectively, of other short-term debt, and $2.2 billion and $2.8 billion, respectively, of other long-term debt that represents the fair value of debt securities with the fair value option elected at March 31, 2012 and December 31, 2011.

During the three months ended March 31, 2012 and 2011, we recognized fair value gains (losses) of $(17) million and $(81) million, respectively, on our foreign-currency denominated debt, of which $(19) million and $(117) million, respectively, are gains (losses) related to our net foreign-currency translation.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Other Debt**

The table below summarizes the balances and effective interest rates for other debt. We had no balances in federal funds purchased and securities sold under agreements to repurchase at either March 31, 2012 or December 31, 2011.

**Table 8.2 — Other Debt**

| | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] |
| | | | (dollars in millions) | | | |
| Other short-term debt: | | | | | | |
| Reference Bills® securities and discount notes | $134,865 | $ 134,825 | 0.12% | $ 161,193 | $ 161,149 | 0.11% |
| Medium-term notes | — | — | — | 250 | 250 | 0.24 |
| Total other short-term debt | 134,865 | 134,825 | 0.12 | 161,443 | 161,399 | 0.11 |
| Other long-term debt: | | | | | | |
| Original maturities on or before December 31, | | | | | | |
| 2012 | 88,192 | 88,185 | 1.73% | 127,798 | 127,776 | 1.79% |
| 2013 | 126,809 | 126,659 | 1.57 | 142,943 | 142,759 | 1.46 |
| 2014 | 93,956 | 93,780 | 1.76 | 87,453 | 87,267 | 1.91 |
| 2015 | 44,395 | 44,356 | 2.28 | 33,897 | 33,870 | 2.89 |
| 2016 | 44,546 | 44,502 | 3.09 | 45,526 | 45,473 | 3.21 |
| Thereafter | 96,557 | 86,322 | 3.64 | 75,254 | 62,002 | 4.58 |
| Total other long-term debt[3] | 494,455 | 483,804 | 2.21 | 512,871 | 499,147 | 2.27 |
| Total other debt | $ 629,320 | $ 618,629 | | $ 674,314 | $ 660,546 | |

(1) Represents par value, net of associated discounts or premiums and hedge-related basis adjustments.

(2) Represents the weighted average effective rate that remains constant over the life of the instrument, which includes the amortization of discounts or premiums, issuance costs, and hedge-related basis adjustments.

(3) Balance, net for other long-term debt includes callable debt of $112.3 billion and $121.4 billion at March 31, 2012 and December 31, 2011, respectively.

**Debt Securities of Consolidated Trusts Held by Third Parties**

Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated securitization trusts (*i.e.*, single-family PC trusts and certain Other Guarantee Transactions).

The table below summarizes the debt securities of consolidated trusts held by third parties based on underlying mortgage product type.

**Table 8.3 — Debt Securities of Consolidated Trusts Held by Third Parties[1]**

| | March 31, 2012 | | | | December 31, 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Contractual Maturity[2] | UPB | Balance, Net[3] | Weighted Average Coupon[2] | Contractual Maturity[2] | UPB | Balance, Net[3] | Weighted Average Coupon[2] |
| | | | | (dollars in millions) | | | | |
| Single-family: | | | | | | | | |
| 30-year or more, fixed-rate | 2012 - 2048 | $1,027,889 | $1,042,879 | 4.83% | 2012 - 2048 | $ 1,034,680 | $ 1,047,556 | 4.92% |
| 20-year fixed-rate | 2012 - 2032 | 71,142 | 72,637 | 4.40 | 2012 - 2032 | 67,323 | 68,502 | 4.53 |
| 15-year fixed-rate | 2012 - 2027 | 253,146 | 257,850 | 3.94 | 2012 - 2027 | 242,077 | 246,023 | 4.09 |
| Adjustable-rate | 2012 - 2047 | 62,430 | 63,397 | 3.10 | 2012 - 2047 | 60,544 | 61,395 | 3.18 |
| Interest-only[4] | 2026 - 2041 | 42,803 | 42,874 | 4.79 | 2026 - 2041 | 45,807 | 45,884 | 4.91 |
| FHA/VA | 2012 - 2041 | 1,955 | 1,985 | 5.66 | 2012 - 2041 | 2,045 | 2,077 | 5.67 |
| Total debt securities of consolidated trusts held by third parties[5] | | $1,459,365 | $1,481,622 | | | $1,452,476 | $1,471,437 | |

(1) Debt securities of consolidated trusts held by third parties are prepayable without penalty.

(2) Based on the contractual maturity and interest rate of debt securities of our consolidated trusts held by third parties.

(3) Represents par value, net of associated discounts, premiums, and other basis adjustments.

(4) Includes interest-only securities and interest-only mortgage loans that allow the borrowers to pay only interest for a fixed period of time before the loans begin to amortize.

(5) The effective rate for debt securities of consolidated trusts held by third parties was 4.04% and 4.22% as of March 31, 2012 and December 31, 2011, respectively.

**Lines of Credit**

At both March 31, 2012 and December 31, 2011, we had one secured, uncommitted intraday line of credit with a third party totaling $10 billion. We use this line of credit regularly to provide us with additional liquidity to fund our intraday payment activities through the Fedwire system in connection with the Federal Reserve's payments system risk

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          TREASURY-3672          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

policy, which restricts or eliminates daylight overdrafts by the GSEs. No amounts were drawn on this line of credit at March 31, 2012 or December 31, 2011. We expect to continue to use the current facility to satisfy our intraday financing needs; however, as the line is uncommitted, we may not be able to draw on it if and when needed.

**Subordinated Debt Interest and Principal Payments**

The terms of certain of our subordinated debt securities provide for us to defer payments of interest in the event we fail to maintain specified capital levels. However, in a September 23, 2008 statement concerning the conservatorship, the Director of FHFA stated that we would continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels.

## NOTE 9: FINANCIAL GUARANTEES

When we securitize single-family mortgages that we purchase, we issue mortgage-related securities that can be sold to investors or held by us. During the three months ended March 31, 2012 and 2011, we issued and guaranteed $108.3 billion and $93.9 billion, respectively, in UPB of Freddie Mac mortgage-related securities backed by single-family mortgage loans (excluding those backed by HFA bonds).

Beginning January 1, 2010, we no longer recognize a financial guarantee for such arrangements as we instead recognize both the mortgage loans and the debt securities of these securitization trusts on our consolidated balance sheets. The table below presents our maximum potential exposure, our recognized liability, and the maximum remaining term of our financial guarantees that are not consolidated on our balance sheets.

**Table 9.1 — Financial Guarantees**

| | March 31, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Maximum Exposure[1] | Recognized Liability | Maximum Remaining Term | Maximum Exposure[1] | Recognized Liability | Maximum Remaining Term |
| | | | (dollars in millions, terms in years) | | | |
| Non-consolidated Freddie Mac securities[2] | $38,572 | $  321 | 41 | $35,879 | $  300 | 42 |
| Other guarantee commitments[3] | 22,354 | 493 | 37 | 21,064 | 487 | 37 |
| Derivative instruments | 19,998 | 931 | 33 | 37,737 | 2,977 | 34 |
| Servicing-related premium guarantees | 160 | — | 5 | 151 | — | 5 |

(1) Maximum exposure represents the contractual amounts that could be lost under the non-consolidated guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements, such as recourse provisions, third-party insurance contracts, or from collateral held or pledged. The maximum exposure disclosed above is not representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from collateral liquidation. The maximum exposure for our liquidity guarantees is not mutually exclusive of our default guarantees on the same securities; therefore, these amounts are included within the maximum exposure of non-consolidated Freddie Mac securities and other guarantee commitments.

(2) As of March 31, 2012 and December 31, 2011, the UPB of non-consolidated Freddie Mac securities associated with single-family mortgage loans was $10.4 billion and $10.7 billion, respectively. The remaining balances relate to multifamily mortgage loans.

(3) As of March 31, 2012 and December 31, 2011, the UPB of other guarantee commitments associated with single-family mortgage loans was $12.5 billion and $11.1 billion, respectively. The remaining balances relate to multifamily mortgage loans.

**Non-Consolidated Freddie Mac Securities**

We issue three types of mortgage-related securities: (a) PCs; (b) REMICs and Other Structured Securities; and (c) Other Guarantee Transactions. We guarantee the payment of principal and interest on these securities, which are backed by pools of mortgage loans, irrespective of the cash flows received from the borrowers. Commencing January 1, 2010, only our guarantees issued to non-consolidated securitization trusts are accounted for in accordance with the accounting guidance for guarantees (*i.e.*, a guarantee asset and guarantee obligation are recognized).

Our single-family securities issued in resecuritizations of our PCs and other previously issued REMICs and Other Structured Securities are not consolidated as they do not give rise to any additional exposure to credit loss as we already consolidate the underlying collateral. The securities issued in these resecuritizations consist of single-class and multiclass securities backed by PCs, REMICs, interest-only strips, and principal-only strips. Since these resecuritizations do not increase our credit-risk, no guarantee asset or guarantee obligation is recognized for these transactions and they are excluded from the table above.

We recognize a guarantee asset, guarantee obligation and a reserve for guarantee losses, as necessary, for securities issued by non-consolidated securitization trusts and other guarantee commitments for which we are exposed to incremental credit risk. Our guarantee obligation represents the recognized liability, net of cumulative amortization, associated with our guarantee of multifamily PCs and certain Other Guarantee Transactions issued to non-consolidated securitization trusts. In addition to our guarantee obligation, we recognize a reserve for guarantee losses, which is included within other liabilities on our consolidated balance sheets, which totaled $0.2 billion at both March 31, 2012 and

136

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

December 31, 2011. For many of the loans underlying our non-consolidated guarantees, there are credit protections from third parties, including subordination, covering a portion of our exposure. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections on loans we guarantee. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for further information about our accounting for financial guarantees.

During the three months ended March 31, 2012 and 2011, we issued approximately $3.1 billion and $2.9 billion, respectively, in UPB of non-consolidated Freddie Mac securities primarily backed by multifamily mortgage loans, for which a guarantee asset and guarantee obligation were recognized.

In connection with transfers of financial assets to non-consolidated securitization trusts that are accounted for as sales and for which we have incremental credit risk, we recognize our guarantee obligation in accordance with the accounting guidance for guarantees. Additionally, we may retain an interest in the transferred financial assets (e.g., a beneficial interest issued by the securitization trust).

**Other Guarantee Commitments**

We provide long-term standby commitments to certain of our customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements. During the three months ended March 31, 2012 and 2011, we issued and guaranteed $2.3 billion and $1.8 billion, respectively, in UPB of long-term standby commitments. These other guarantee commitments totaled $10.3 billion and $8.6 billion of UPB at March 31, 2012 and December 31, 2011, respectively. We also had other guarantee commitments on multifamily housing revenue bonds that were issued by HFAs of $9.6 billion in UPB at March 31, 2012 and December 31, 2011. In addition, as of March 31, 2012, and December 31, 2011, respectively, we had issued guarantees under the TCLFP on securities backed by HFA bonds with UPB of $2.5 billion, and $2.9 billion, respectively.

**Derivative Instruments**

Derivative instruments include written options, written swaptions, interest-rate swap guarantees, and short-term default guarantee commitments accounted for as credit derivatives. See "NOTE 10: DERIVATIVES" for further discussion of these derivative guarantees.

We guarantee the performance of interest-rate swap contracts in two circumstances. First, we guarantee that a borrower will perform under an interest-rate swap contract linked to a borrower's ARM. And second, in connection with our issuance of certain REMICs and Other Structured Securities, which are backed by tax-exempt bonds, we guarantee that the sponsor of the transaction will perform under the interest-rate swap contract linked to the senior variable-rate certificates that we issued.

We also have issued REMICs and Other Structured Securities with stated final maturities that are shorter than the stated maturity of the underlying mortgage loans. If the underlying mortgage loans to these securities have not been purchased by a third party or fully matured as of the stated final maturity date of such securities, we will sponsor an auction of the underlying assets. To the extent that purchase or auction proceeds are insufficient to cover unpaid principal amounts due to investors in such REMICs and Other Structured Securities, we are obligated to fund such principal. Our maximum exposure on these guarantees represents the outstanding UPB of the REMICs and Other Structured Securities subject to stated final maturities.

**Servicing-Related Premium Guarantees**

We provide guarantees to reimburse servicers for premiums paid to acquire servicing in situations where the original seller is unable to perform under its separate servicing agreement. The liability associated with these agreements was not material at March 31, 2012 and December 31, 2011.

**Other Indemnifications**

In connection with certain business transactions, we may provide indemnification to counterparties for claims arising out of breaches of certain obligations (e.g., those arising from representations and warranties) in contracts entered into in the normal course of business. Our assessment is that the risk of any material loss from such a claim for indemnification is remote and there are no significant probable and estimable losses associated with these contracts. In addition, we provided indemnification for litigation defense costs to certain former officers who are subject to ongoing litigation. See "NOTE 17: LEGAL CONTINGENCIES" for further information on ongoing litigation. The recognized liabilities on our consolidated balance sheets related to indemnifications were not significant at March 31, 2012 and December 31, 2011.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

As part of the guarantee arrangements pertaining to multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees." These guarantees require us to advance funds to enable others to repurchase any tendered tax-exempt and related taxable bonds that are unable to be remarketed. Any such advances are treated as loans and are secured by a pledge to us of the repurchased securities until the securities are remarketed. We hold cash and cash equivalents on our consolidated balance sheets for the amount of these commitments. No advances under these liquidity guarantees were outstanding at March 31, 2012 and December 31, 2011.

## NOTE 10: DERIVATIVES

### Use of Derivatives

We use derivatives primarily to:

- hedge forecasted issuances of debt;

- synthetically create callable and non-callable funding;

- regularly adjust or rebalance our funding mix in response to changes in the interest-rate characteristics of our mortgage-related assets; and

- hedge foreign-currency exposure.

### *Hedge Forecasted Debt Issuances*

When we commit to purchase mortgage investments, such commitments are typically for a future settlement ranging from two weeks to three months after the date of the commitment. To facilitate larger and more predictable debt issuances that contribute to lower funding costs, we use interest-rate derivatives to economically hedge the interest-rate risk exposure from the time we commit to purchase a mortgage to the time the related debt is issued.

### *Create Synthetic Funding*

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. For example, the combination of a series of short-term debt issuances over a defined period and a pay-fixed interest rate swap with the same maturity as the last debt issuance is the substantive economic equivalent of a long-term fixed-rate debt instrument of comparable maturity. Similarly, the combination of non-callable debt and a call swaption, or option to enter into a receive-fixed interest rate swap, with the same maturity as the non-callable debt, is the substantive economic equivalent of callable debt. These derivatives strategies increase our funding flexibility and allow us to better match asset and liability cash flows, often reducing overall funding costs.

### *Adjust Funding Mix*

We generally use interest-rate swaps to mitigate contractual funding mismatches between our assets and liabilities. We also use swaptions and other option-based derivatives to adjust the contractual terms of our debt funding in response to changes in the expected lives of our investments in mortgage-related assets. As market conditions dictate, we take rebalancing actions to keep our interest-rate risk exposure within management-set limits. In a declining interest-rate environment, we typically enter into receive-fixed interest rate swaps or purchase Treasury-based derivatives to shorten the duration of our funding to offset the declining duration of our mortgage assets. In a rising interest-rate environment, we typically enter into pay-fixed interest rate swaps or sell Treasury-based derivatives in order to lengthen the duration of our funding to offset the increasing duration of our mortgage assets.

### *Foreign-Currency Exposure*

We use foreign-currency swaps to eliminate virtually all of our exposure to fluctuations in exchange rates related to our foreign-currency denominated debt by entering into swap transactions that effectively convert foreign-currency denominated obligations into U.S. dollar-denominated obligations. Foreign-currency swaps are defined as swaps in which net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars.

### Types of Derivatives

We principally use the following types of derivatives:

- LIBOR- and Euribor-based interest-rate swaps;

- LIBOR- and Treasury-based options (including swaptions);

- LIBOR- and Treasury-based exchange-traded futures; and

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- Foreign-currency swaps.

In addition to swaps, futures, and purchased options, our derivative positions include the following:

### Written Options and Swaptions

Written call and put swaptions are sold to counterparties allowing them the option to enter into receive- and pay-fixed interest rate swaps, respectively. Written call and put options on mortgage-related securities give the counterparty the right to execute a contract under specified terms, which generally occurs when we are in a liability position. We use these written options and swaptions to manage convexity risk over a wide range of interest rates. Written options lower our overall hedging costs, allow us to hedge the same economic risk we assume when selling guaranteed final maturity REMICs with a more liquid instrument, and allow us to rebalance the options in our callable debt and REMICs portfolios. We may, from time to time, write other derivative contracts such as interest-rate futures.

### Commitments

We routinely enter into commitments that include our: (a) commitments to purchase and sell investments in securities; (b) commitments to purchase mortgage loans; and (c) commitments to purchase and extinguish or issue debt securities of our consolidated trusts. Most of these commitments are considered derivatives and therefore are subject to the accounting guidance for derivatives and hedging.

### Swap Guarantee Derivatives

In connection with some of the guarantee arrangements pertaining to multifamily housing revenue bonds and multifamily pass-through certificates, we may also guarantee the sponsor's or the borrower's obligations as a counterparty on any related interest-rate swaps used to mitigate interest-rate risk, which are accounted for as swap guarantee derivatives.

### Credit Derivatives

We entered into credit-risk sharing agreements for certain credit enhanced multifamily housing revenue bonds held by third parties in exchange for a monthly fee. In addition, we have purchased mortgage loans containing debt cancellation contracts, which provide for mortgage debt or payment cancellation for borrowers who experience unanticipated losses of income dependent on a covered event. The rights and obligations under these agreements have been assigned to the servicers. However, in the event the servicer does not perform as required by contract, under our guarantee, we would be obligated to make the required contractual payments.

For a discussion of our significant accounting policies related to derivatives, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Derivatives" in our 2011 Annual Report.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Derivative Assets and Liabilities at Fair Value**

The table below presents the location and fair value of derivatives reported in our consolidated balance sheets.

**Table 10.1 — Derivative Assets and Liabilities at Fair Value**

| | At March 31, 2012 | | | At December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Notional or Contractual Amount | Derivatives at Fair Value Assets(1) | Liabilities(1) | Notional or Contractual Amount | Derivatives at Fair Value Assets(1) | Liabilities(1) |
| | | | (in millions) | | | |
| Total derivative portfolio | | | | | | |
| *Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging*(2) | | | | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed | $248,453 | $ 10,391 | $ (519) | $ 211,808 | $ 12,998 | $ (108) |
| Pay-fixed | 296,573 | 444 | (28,226) | 289,335 | 19 | (34,507) |
| Basis (floating to floating) | 2,400 | 4 | (2) | 2,750 | 5 | (7) |
| Total interest-rate swaps | 547,426 | 10,839 | (28,747) | 503,893 | 13,022 | (34,622) |
| Option-based: | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 52,500 | 7,766 | — | 76,275 | 12,975 | — |
| Written | 12,025 | — | (886) | 27,525 | — | (2,932) |
| Put Swaptions | | | | | | |
| Purchased | 49,450 | 527 | — | 70,375 | 638 | — |
| Written | 250 | — | (5) | 500 | — | (2) |
| Other option-based derivatives(3) | 34,365 | 2,029 | — | 38,549 | 2,256 | (2) |
| Total option-based | 148,590 | 10,322 | (891) | 213,224 | 15,869 | (2,936) |
| Futures | 44,281 | — | (66) | 41,281 | 5 | — |
| Foreign-currency swaps | 1,179 | 84 | — | 1,722 | 106 | (9) |
| Commitments | 22,298 | 22 | (59) | 14,318 | 38 | (94) |
| Credit derivatives | 9,338 | 1 | (5) | 10,190 | 1 | (5) |
| Swap guarantee derivatives | 3,631 | — | (36) | 3,621 | — | (37) |
| Total derivatives not designated as hedging instruments | 776,743 | 21,268 | (29,804) | 788,249 | 29,041 | (37,703) |
| Netting adjustments(4) | | (21,086) | 29,508 | | (28,923) | 37,268 |
| Total derivative portfolio, net | $776,743 | $ 182 | $ (296) | $788,249 | $ 118 | $ (435) |

(1) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net.

(2) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.

(3) Primarily includes purchased interest-rate caps and floors.

(4) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $9.2 billion and $299 million, respectively, at March 31, 2012. The net cash collateral posted and net trade/settle receivable were $9.4 billion and $1 million, respectively, at December 31, 2011. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(1.1) billion at both March 31, 2012 and December 31, 2011, which was mainly related to interest-rate swaps that we have entered into.

The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable and net trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net asset position are reported as derivative assets, net. Similarly, derivatives in a net liability position are reported as derivative liabilities, net. Cash collateral we obtained from counterparties to derivative contracts that has been offset against derivative assets at March 31, 2012 and December 31, 2011 was $2.3 billion and $3.2 billion, respectively. Cash collateral we posted to counterparties to derivative contracts that has been offset against derivative liabilities at March 31, 2012 and December 31, 2011 was $11.5 billion and $12.6 billion, respectively. We are subject to collateral posting thresholds based on the credit rating of our long-term senior unsecured debt securities from S&P or Moody's. The lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative transactions.

The aggregate fair value of all derivative instruments with credit-risk-related contingent features that were in a liability position on March 31, 2012, was $11.5 billion for which we posted collateral of $11.5 billion in the normal course of business. Since we were fully collateralized as of March 31, 2012, we would not have to post additional collateral on that day if credit-risk-related contingent features underlying these agreements were triggered.

At March 31, 2012 and December 31, 2011, there were no amounts of cash collateral that were not offset against derivative assets, net or derivative liabilities, net, as applicable. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information related to our derivative counterparties.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Gains and Losses on Derivatives

The table below presents the gains and losses on derivatives reported in our consolidated statements of comprehensive income.

### Table 10.2 — Gains and Losses on Derivatives

| Derivatives in Cash Flow Hedging Relationships[1][2] | Amount of Gain or (Loss) Reclassified from AOCI into Earnings (Effective Portion) | | | |
| | Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | (in millions) | | | |
| Closed cash flow hedges[3] | $ | (165) | $ | (197) |

| Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging[5] | Derivative Gains (Losses)[4] | | | |
| | Three Months Ended March 31, | | | |
| | 2012 | | 2011 | |
| | (in millions) | | | |
| Interest-rate swaps: | | | | |
| Receive-fixed | | | | |
| Foreign-currency denominated | $ | (5) | $ | (37) |
| U.S. dollar denominated | | (2,583) | | (2,204) |
| Total receive-fixed swaps | | (2,588) | | (2,241) |
| Pay-fixed | | 3,792 | | 3,963 |
| Basis (floating to floating) | | 4 | | 1 |
| Total interest-rate swaps | | 1,208 | | 1,723 |
| Option based: | | | | |
| Call swaptions | | | | |
| Purchased | | (1,194) | | (684) |
| Written | | 370 | | 38 |
| Put swaptions | | | | |
| Purchased | | (34) | | (122) |
| Written | | 2 | | 7 |
| Other option-based derivatives[6] | | (221) | | (46) |
| Total option-based | | (1,077) | | (807) |
| Futures | | (65) | | (41) |
| Foreign-currency swaps[7] | | 9 | | 109 |
| Commitments | | (57) | | (164) |
| Credit derivatives | | — | | 1 |
| Swap guarantee derivatives | | 2 | | 1 |
| Subtotal | | 20 | | 822 |
| Accrual of periodic settlements:[8] | | | | |
| Receive-fixed interest-rate swaps[9] | | 779 | | 1,246 |
| Pay-fixed interest-rate swaps | | (1,858) | | (2,504) |
| Foreign-currency swaps | | 3 | | 4 |
| Other | | — | | 5 |
| Total accrual of periodic settlements | | (1,076) | | (1,249) |
| Total | $ | (1,056) | $ | (427) |

(1) Derivatives that meet specific criteria may be accounted for as cash flow hedges. Net deferred gains and losses on closed cash flow hedges (*i.e.*, where the derivative is either terminated or redesignated) are also included in AOCI until the related forecasted transaction affects earnings or is determined to be probable of not occurring.

(2) No amounts of gains or (losses) were recognized in AOCI on derivatives (effective portion) and in other income (ineffective portion and amount excluded from effectiveness testing).

(3) Amounts reported in AOCI linked to interest payments on long-term debt are recorded in other debt interest expense and amounts not linked to interest payments on long-term debt are recorded in expense related to derivatives.

(4) Gains (losses) are reported as derivative gains (losses) on our consolidated statements of comprehensive income.

(5) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.

(6) Primarily includes purchased interest-rate caps and floors.

(7) Foreign-currency swaps are defined as swaps in which the net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars.

(8) For derivatives not in qualifying hedge accounting relationships, the accrual of periodic cash settlements is recorded in derivative gains (losses) on our consolidated statements of comprehensive income.

(9) Includes imputed interest on zero-coupon swaps.

## Hedge Designation of Derivatives

At March 31, 2012 and December 31, 2011, we did not have any derivatives in hedge accounting relationships; however, there are deferred net losses recorded in AOCI related to closed cash flow hedges. As shown in "Table 10.3 —

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3678                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

AOCI Related to Cash Flow Hedge Relationships," the total AOCI related to derivatives designated as cash flow hedges was a loss of $1.6 billion and $2.1 billion at March 31, 2012 and 2011, respectively, composed of deferred net losses on closed cash flow hedges. Closed cash flow hedges involve derivatives that have been terminated or are no longer designated as cash flow hedges. Fluctuations in prevailing market interest rates have no impact on the deferred portion of AOCI relating to losses on closed cash flow hedges.

The previous deferred amount related to closed cash flow hedges remains in our AOCI balance and will be recognized into earnings over the expected time period for which the forecasted transactions impact earnings. Over the next 12 months, we estimate that approximately $393 million, net of taxes, of the $1.6 billion of cash flow hedge losses in AOCI at March 31, 2012 will be reclassified into earnings. The maximum remaining length of time over which we have hedged the exposure related to the variability in future cash flows on forecasted transactions, primarily forecasted debt issuances, is 22 years. However, over 70% and 90% of AOCI relating to closed cash flow hedges at March 31, 2012 will be reclassified to earnings over the next five and ten years, respectively.

The table below presents the changes in AOCI related to derivatives designated as cash flow hedges. Net reclassifications of losses to earnings represents the AOCI amount that was recognized in earnings as the originally hedged forecasted transactions affected earnings, unless it was deemed probable that the forecasted transaction would not occur. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the hedge related to the forecasted transaction would be reclassified into earnings immediately.

**Table 10.3 — AOCI Related to Cash Flow Hedge Relationships**

| | Three Months Ended March 31, | |
| | 2012 | 2011 |
| --- | --- | --- |
| | (in millions) | |
| Beginning balance(1) | $(1,730) | $(2,239) |
| Net reclassifications of losses to earnings(2) | 111 | 132 |
| Ending balance(1) | $(1,619) | $ (2,107) |

(1) Represents net deferred gains and losses on closed (*i.e.*, terminated or redesignated) cash flow hedges.
(2) Net of tax benefit of $54 million and $65 million for the three months ended March 31, 2012 and 2011, respectively.

## NOTE 11: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)

**Senior Preferred Stock**

We received $146 million in March 2012 pursuant to draw requests that FHFA submitted to Treasury on our behalf to address the deficits in our net worth as of December 31, 2011. In addition, we had a deficit in net worth of $18 million as of March 31, 2012. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Government Support for our Business" for additional information regarding the draw request that FHFA, as Conservator, will submit on our behalf to Treasury to address our deficit in net worth. The aggregate liquidation preference on the senior preferred stock owned by Treasury was $72.3 billion and $72.2 billion as of March 31, 2012 and December 31, 2011, respectively. See "NOTE 14: REGULATORY CAPITAL" for additional information.

**Stock-Based Compensation**

We did not repurchase or issue any of our common shares or non-cumulative preferred stock during the three months ended March 31, 2012, except for issuances of treasury stock as reported on our consolidated statements of equity (deficit) relating to stock-based compensation granted prior to conservatorship. Common stock delivered under these stock-based compensation plans consists of treasury stock or shares acquired in market transactions on behalf of the participants. During the three months ended March 31, 2012, restrictions lapsed on 460,846 restricted stock units, all of which were granted prior to conservatorship. For a discussion regarding our stock-based compensation plans, see "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report.

For purposes of the earnings-per-share calculation, all stock-based compensation plan options outstanding at March 31, 2012 and 2011 were out of the money and excluded from the computation of dilutive potential common shares for the three months ended March 31, 2012 and 2011, respectively. The weighted average common shares outstanding for the period includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury pursuant to the Purchase Agreement.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3679

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Dividends Declared During 2012**

No common dividends were declared during the three months ended March 31, 2012. In March 2012, we paid dividends of $1.8 billion in cash on the senior preferred stock at the direction of our Conservator. We did not declare or pay dividends on any other series of Freddie Mac preferred stock outstanding during the three months ended March 31, 2012.

## NOTE 12: INCOME TAXES

**Income Tax Benefit**

For the three months ended March 31, 2012 and 2011, we reported an income tax benefit of $14 million and $74 million, respectively, resulting in effective tax rates of (2.5)% and (12.3)%, respectively. For the three months ended March 31, 2012, the tax benefit recorded is related to the amortization of net deferred losses on pre-2008 closed cash flow hedges offset by an expense for alternative minimum tax. We continue to be in a tax loss carryforward position. Our effective tax rate was different from the statutory rate of 35% primarily due to changes in the valuation allowance recorded against a portion of our net deferred tax assets.

**Deferred Tax Assets, Net**

Our valuation allowance decreased by $33 million during the first quarter of 2012 to $35.6 billion primarily due to a decrease in temporary differences. After consideration of the valuation allowance, we had a net deferred tax asset of $2.9 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities.

***IRS Examinations and Unrecognized Tax Benefits***

We believe appropriate reserves have been provided for settlement on reasonable terms related to questions of timing and potential penalties raised by the IRS during examinations of the 1998 to 2007 tax years regarding our tax accounting method for certain hedging transactions. However, changes could occur in the balance of unrecognized tax benefits that could have a material impact on income tax expense in the period the issue is resolved if the outcome reached is not in our favor and the assessment is in excess of the amount currently reserved. Considering the Tax Court trial date of November 13, 2012, the fact that no settlement discussions have occurred for an extended period of time, and the information currently available, we do not believe it is reasonably possible that this issue will be resolved within the next 12 months.

The IRS is currently auditing our income tax returns for tax years 2008 and 2009. We believe appropriate reserves have been provided for all income tax uncertainties. However, it is reasonably possible that the 2008 to 2009 audit cycle will be completed during the next 12 months, which could result in a decrease in the balance of unrecognized tax benefits by as much as $373 million.

For additional information, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 13: INCOME TAXES" in our 2011 Annual Report.

## NOTE 13: SEGMENT REPORTING

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for additional information about the conservatorship.

We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments. These reclassifications and allocations are described in "NOTE 14: SEGMENT REPORTING" in our 2011 Annual Report.

We do not consider our assets by segment when evaluating segment performance or allocating resources. We conduct our operations solely in the U.S. and its territories. Therefore, we do not generate any revenue from geographic locations outside of the U.S. and its territories.

**Segments**

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. The chart below provides a summary of our three

143

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

reportable segments and the All Other category. As reflected in the chart, certain activities that are not part of a reportable segment are included in the All Other category. The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods.

| Segment | Description | Activities/Items |
|---|---|---|
| Investments | The Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans, which are funded by other debt issuances and hedged using derivatives. In our Investments segment, we also provide funding and hedging management services to the Single-family Guarantee and Multifamily segments. The Investments segment reflects changes in the fair value of the Multifamily segment assets that are associated with changes in interest rates. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. | • Investments in mortgage-related securities and single-family performing mortgage loans<br><br>• Investments in asset-backed securities<br><br>• All other traded instruments / securities, excluding CMBS and multifamily housing revenue bonds<br><br>• Debt issuances<br><br>• All asset / liability management returns<br><br>• Guarantee buy-ups / buy-downs, net of execution gains / losses<br><br>• Cash and liquidity management<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated administrative expenses and taxes |
| Single-Family Guarantee | The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related security in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses. | • Management and guarantee fees on PCs, including those retained by us, and single-family mortgage loans in the mortgage investments portfolio<br><br>• Up-front credit delivery fees<br><br>• Adjustments for security performance<br><br>• Credit losses on all single-family assets<br><br>• Expected net float income or expense on the single-family credit guarantee portfolio<br><br>• Deferred tax asset valuation allowance<br><br>• Allocated debt costs, administrative expenses and taxes |
| Multifamily | The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, our purchases of such multifamily mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008. The only CMBS that we have purchased since 2008 have been senior, mezzanine, and interest-only tranches related to certain of our securitization transactions, and these purchases have not been significant. Currently, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization. We guarantee the senior tranches of these securitizations in Other Guarantee Transactions. Our Multifamily segment also issues Other Structured Securities, but does not issue REMIC securities. Our Multifamily segment also enters into other guarantee commitments for multifamily HFA bonds and housing revenue bonds held by third parties. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less credit-related expenses, administrative expenses, and allocated funding costs. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated only with market factors other than changes in interest rates, such as liquidity and credit. | • Multifamily mortgage loans held-for-sale and associated securitization activities<br><br>• Investments in CMBS, multifamily housing revenue bonds, and multifamily mortgage loans held-for-investment<br><br>• Allocated debt costs, administrative expenses and taxes<br><br>• Other guarantee commitments on multifamily HFA bonds and housing revenue bonds<br><br>• LIHTC and valuation allowance<br><br>• Deferred tax asset valuation allowance |
| All Other | The All Other category consists of material corporate-level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. | • Tax settlements, as applicable<br><br>• Legal settlements, as applicable<br><br>• The deferred tax asset valuation allowance |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3681                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

| | | associated with previously recognized income tax credits carried forward. |
|---|---|---|

144                                                                      *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

## Segment Earnings

The financial performance of our Single-family Guarantee segment and Multifamily segment are measured based on each segment's contribution to GAAP net income (loss). Our Investments segment is measured on its contribution to GAAP comprehensive income (loss), which consists of the sum of its contribution to: (a) GAAP net income (loss); and (b) GAAP total other comprehensive income (loss), net of taxes.

The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss). Likewise, the sum of comprehensive income (loss) for each segment and the All Other category equals GAAP comprehensive income (loss). However, the accounting principles we apply to present certain financial statement line items in Segment Earnings for our reportable segments, in particular Segment Earnings net interest income and management and guarantee income, differ significantly from those applied in preparing the comparable line items in our consolidated financial statements prepared in accordance with GAAP. Accordingly, the results of such line items differ significantly from, and should not be used as a substitute for, the comparable line items as determined in accordance with GAAP. For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "Table 13.2 — Segment Earnings and Reconciliation to GAAP Results."

### Segment Adjustments

In presenting Segment Earnings net interest income and management and guarantee income, we make adjustments to better reflect how management measures and assesses the performance of each segment and the company as a whole. These adjustments relate to amounts that, effective January 1, 2010, are no longer reflected in net income (loss) as determined in accordance with GAAP as a result of the adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. These adjustments are reversed through the segment adjustments line item within Segment Earnings, so that Segment Earnings (loss) for each segment equals GAAP net income (loss) for each segment. Segment adjustments consist of the following:

- We adjust our Segment Earnings net interest income for the Investments segment to include the amortization of cash premiums and discounts and buy-up and buy-down fees on the consolidated Freddie Mac mortgage-related securities we purchase as investments. As of March 31, 2012, the unamortized balance of such premiums and discounts and buy-up and buy-down fees was $1.3 billion. These adjustments are necessary to reflect the economic yield realized on investments in consolidated Freddie Mac mortgage-related securities purchased at a premium or discount or with buy-up or buy-down fees.

- We adjust our Segment Earnings management and guarantee income for the Single-family Guarantee segment to include the amortization of delivery fees recorded in periods prior to the January 1, 2010 adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. As of March 31, 2012, the unamortized balance of such fees was $2.0 billion. We consider such fees to be part of the effective rate of the guarantee fee on guaranteed mortgage loans. This adjustment is necessary in order to better reflect the realization of revenue associated with guarantee contracts over the life of the underlying loans.

The table below presents Segment Earnings by segment.

## Table 13.1 — Summary of Segment Earnings and Comprehensive Income (Loss)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in millions) | |
| Segment Earnings (loss), net of taxes: | | |
| Investments | $ 1,628 | $ 2,137 |
| Single-family Guarantee | (1,675) | (1,820) |
| Multifamily | 624 | 359 |
| Total Segment Earnings, net of taxes | 577 | 676 |
| Net income | $ 577 | $ 676 |
| Comprehensive income (loss) of segments: | | |
| Investments | $ 1,963 | $ 3,263 |
| Single-family Guarantee | (1,698) | (1,824) |
| Multifamily | 1,524 | 1,301 |
| Comprehensive income of segments | 1,789 | 2,740 |
| Comprehensive income | $ 1,789 | $ 2,740 |

145                                                                                        *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

The table below presents detailed reconciliations between our GAAP financial statements and Segment Earnings by financial statement line item for our reportable segments and All Other.

**Table 13.2 — Segment Earnings and Reconciliation to GAAP Results**

| Three Months Ended March 31, 2012 | | | | | Reconciliation to Consolidated Statements of Comprehensive Income | | | |
|---|---|---|---|---|---|---|---|---|
| | Investments | Single-family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes (in millions) | Reclassifications[1] | Segment Adjustments[2] | Total Reconciling Items | Total per Consolidated Statements of Comprehensive Income |
| Net interest income | $ 1,763 | $ (32) | $ 318 | $ — | $ 2,049 | $ 2,296 | $ 155 | $ 2,451 | $ 4,500 |
| (Provision) benefit for credit losses | — | (2,184) | 19 | — | (2,165) | 340 | | 340 | (1,825) |
| Non-interest income (loss): | | | | | | | | | |
| Management and guarantee income[3] | — | 1,011 | 33 | — | 1,044 | (803) | (196) | (999) | 45 |
| Net impairment of available-for-sale securities recognized in earnings | (496) | — | (16) | — | (512) | (52) | — | (52) | (564) |
| Derivative gains (losses) | 200 | — | (1) | — | 199 | (1,255) | — | (1,255) | (1,056) |
| Gains (losses) on trading securities | (398) | — | 21 | — | (377) | — | — | — | (377) |
| Gains (losses) on sale of mortgage loans | (14) | — | 54 | — | 40 | — | — | — | 40 |
| Gains (losses) on mortgage loans recorded at fair value | (38) | — | 177 | — | 139 | — | — | — | 139 |
| Other non-interest income (loss) | 513 | 181 | 89 | — | 783 | (526) | — | (526) | 257 |
| Non-interest expense: | | | | | | | | | |
| Administrative expenses | (92) | (193) | (52) | — | (337) | | | | (337) |
| REO operations income (expense) | — | (172) | 1 | — | (171) | | | | (171) |
| Other non-interest expense | — | (73) | (15) | — | (88) | | | | (88) |
| Segment adjustments[2] | 155 | (196) | — | — | (41) | | 41 | 41 | 14 |
| Income tax (expense) benefit | 35 | (17) | (4) | — | 14 | | | | 14 |
| Net income (loss) | 1,628 | (1,675) | 624 | — | 577 | | | | 577 |
| Total other comprehensive income, net of taxes | 335 | (23) | 900 | — | 1,212 | | | | 1,212 |
| Comprehensive income (loss) | $ 1,963 | $ (1,698) | $ 1,524 | $ — | $ 1,789 | $ | $ | $ | $ 1,789 |

| Three Months Ended March 31, 2011 | | | | | Reconciliation to Consolidated Statements of Comprehensive Income | | | |
|---|---|---|---|---|---|---|---|---|
| | Investments | Single-family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes (in millions) | Reclassifications[1] | Segment Adjustments[2] | Total Reconciling Items | Total per Consolidated Statements of Comprehensive Income |
| Net interest income | $ 1,653 | $ 100 | $ 279 | $ — | $ 2,032 | $ 2,305 | $ 203 | $ 2,508 | $ 4,540 |
| (Provision) benefit for credit losses | — | (2,284) | 60 | — | (2,224) | 235 | | 235 | (1,989) |
| Non-interest income (loss): | | | | | | | | | |
| Management and guarantee income[3] | — | 870 | 28 | — | 898 | (675) | (185) | (860) | 38 |
| Net impairment of available-for-sale securities recognized in earnings | (1,029) | — | (135) | — | (1,164) | (29) | — | (29) | (1,193) |
| Derivative gains (losses) | 1,103 | — | 2 | — | 1,105 | (1,532) | — | (1,532) | (427) |
| Gains (losses) on trading securities | (234) | — | 34 | — | (200) | — | — | — | (200) |
| Gains (losses) on sale of mortgage loans | 12 | — | 83 | — | 95 | — | — | — | 95 |
| Gains (losses) on mortgage loans recorded at fair value | (83) | — | 50 | — | (33) | — | — | — | (33) |
| Other non-interest income (loss) | 541 | 211 | 20 | — | 772 | (304) | — | (304) | 468 |
| Non-interest expense: | | | | | | | | | |
| Administrative expenses | (95) | (215) | (51) | — | (361) | | | | (361) |
| REO operations expense | — | (257) | — | — | (257) | | | | (257) |
| Other non-interest expense | — | (66) | (13) | — | (79) | | | | (79) |
| Segment adjustments[2] | 203 | (185) | — | — | 18 | | (18) | (18) | — |
| Income tax benefit | 66 | 6 | 2 | — | 74 | | | | 74 |
| Net income (loss) | 2,137 | (1,820) | 359 | — | 676 | | | | 676 |
| Total other comprehensive income, net of taxes | 1,126 | (4) | 942 | — | 2,064 | | | | 2,064 |
| Comprehensive income (loss) | $ 3,263 | $ (1,824) | $ 1,301 | $ — | $ 2,740 | $ | $ | $ | $ 2,740 |

(1) See "NOTE 14: SEGMENT REPORTING — Segment Earnings — *Investment Activity-Related Reclassifications*" and "— *Credit Guarantee Activity-Related Reclassifications*" in our 2011 Annual Report for information regarding these reclassifications.

(2) See "Segment Earnings — *Segment Adjustments*" for additional information regarding these adjustments.

(3) Management and guarantee income total per consolidated statements of comprehensive income is included in other income on our GAAP consolidated statements of comprehensive income.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                TREASURY-3684                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents comprehensive income (loss) by segment.

**Table 13.3 — Comprehensive Income (Loss) of Segments**

| | | | Three Months Ended March 31, 2012 | | | | |
| | | | Other Comprehensive Income (Loss), Net of Taxes | | | | |
| | Net Income (Loss) | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss), Net of Taxes | Comprehensive Income (Loss) |
| | | | (in millions) | | | |
|---|---|---|---|---|---|---|
| Comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 1,628 | $ 242 | $ 111 | $ (18) | $ 335 | $ 1,963 |
| Single-family Guarantee | (1,675) | — | — | (23) | (23) | (1,698) |
| Multifamily | 624 | 905 | — | (5) | 900 | 1,524 |
| Total per consolidated statements of comprehensive income | $ 577 | $ 1,147 | $ 111 | $ (46) | $ 1,212 | $ 1,789 |

| | | | Three Months Ended March 31, 2011 | | | | |
| | | | Other Comprehensive Income (Loss), Net of Taxes | | | | |
| | Net Income (Loss) | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss), Net of Taxes | Comprehensive Income (Loss) |
| | | | (in millions) | | | |
|---|---|---|---|---|---|---|
| Comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 2,137 | $ 999 | $ 131 | $ (4) | $ 1,126 | $ 3,263 |
| Single-family Guarantee | (1,820) | — | — | (4) | (4) | (1,824) |
| Multifamily | 359 | 942 | 1 | (1) | 942 | 1,301 |
| Total per consolidated statements of comprehensive income | $ 676 | $ 1,941 | $ 132 | $ (9) | $ 2,064 | $ 2,740 |

## NOTE 14: REGULATORY CAPITAL

On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship in light of the Purchase Agreement. FHFA continues to closely monitor our capital levels, but the existing statutory and FHFA-directed regulatory capital requirements are not binding during conservatorship. We continue to provide our submission to FHFA on minimum capital, however we no longer provide our submission of risk-based capital to FHFA.

Our regulatory minimum capital is a leverage-based measure that is generally calculated based on GAAP and reflects a 2.50% capital requirement for on-balance sheet assets and 0.45% capital requirement for off-balance sheet obligations. Based upon our adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs, we determined that, under the new consolidation guidance, we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions and, therefore, effective January 1, 2010, we consolidated on our balance sheet the assets and liabilities of these trusts. Pursuant to regulatory guidance from FHFA, our minimum capital requirement was not automatically affected by adoption of these amendments. Specifically, upon adoption of these amendments, FHFA directed us, for purposes of minimum capital, to continue reporting single-family PCs and certain Other Guarantee Transactions held by third parties using a 0.45% capital requirement. FHFA reserves the authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities. On March 3, 2011, FHFA issued a final rule setting forth procedures and standards in the event FHFA were to make such a temporary increase in minimum capital levels. The table below summarizes our minimum capital requirements and deficits and net worth.

**Table 14.1 — Net Worth and Minimum Capital**

| | March 31, 2012 | December 31, 2011 |
| | (in millions) | |
|---|---|---|
| GAAP net worth(1) | $ (18) | $ (146) |
| Core capital (deficit)(2)(3) | $ (65,552) | $ (64,322) |
| Less: Minimum capital requirement(2) | 23,518 | 24,405 |
| Minimum capital surplus (deficit)(2) | $ (89,070) | $ (88,727) |

(1) Net worth (deficit) represents the difference between our assets and liabilities under GAAP.
(2) Core capital and minimum capital figures for March 31, 2012 are estimates. FHFA is the authoritative source for our regulatory capital.
(3) Core capital excludes certain components of GAAP total equity (deficit) (*i.e.*, AOCI, liquidation preference of the senior preferred stock) as these items do not meet the statutory definition of core capital.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Following our entry into conservatorship, we have focused our risk and capital management, consistent with the objectives of conservatorship, on, among other things, maintaining a positive balance of GAAP equity in order to reduce the likelihood that we will need to make additional draws on the Purchase Agreement with Treasury. The Purchase Agreement provides that, if FHFA determines as of quarter end that our liabilities have exceeded our assets under GAAP, Treasury will contribute funds to us in an amount equal to the difference between such liabilities and assets.

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has advised us that, if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination. If funding has been requested under the Purchase Agreement to address a deficit in our net worth, and Treasury is unable to provide us with such funding within the 60-day period specified by FHFA, FHFA would be required to place us into receivership if our assets remain less than our obligations during that 60-day period.

To address our net worth deficit of $18 million at March 31, 2012, FHFA will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $19 million, and will request that we receive these funds by June 30, 2012. Our draw request represents our net worth deficit at quarter-end rounded up to the nearest $1 million. Upon funding of this draw request, our aggregate funding received from Treasury under the Purchase Agreement will be $71.3 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. As a result of the additional $19 million draw request, the aggregate liquidation preference on the senior preferred stock owned by Treasury will be $72.3 billion at June 30, 2012. We paid a quarterly dividend of $1.8 billion on the senior preferred stock in cash in March 2012 at the direction of the Conservator. Following funding of the draw request related to our net worth deficit at March 31, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock will be $7.23 billion, which exceeds our annual historical earnings in all but one period.

## NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS

**Single-family Credit Guarantee Portfolio**

Our business activity is to participate in and support the residential mortgage market in the United States, which we pursue by both issuing guaranteed mortgage securities and investing in mortgage loans and mortgage-related securities.

The table below summarizes the concentration by year of origination and geographical area of the approximately $1.7 trillion UPB of our single-family credit guarantee portfolio at both March 31, 2012 and December 31, 2011. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" and "NOTE 7: INVESTMENTS IN SECURITIES" for more information about credit risk associated with loans and mortgage-related securities that we hold.

148                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 15.1 — Concentration of Credit Risk — Single-Family Credit Guarantee Portfolio**

| | March 31, 2012 | | December 31, 2011 | | Percent of Credit Losses(1) Three Months Ended | |
| --- | --- | --- | --- | --- | --- | --- |
| | Percentage of Portfolio(2) | Serious Delinquency Rate | Percentage of Portfolio(2) | Serious Delinquency Rate | March 31, 2012 | March 31, 2011 |
| **Year of Origination** | | | | | | |
| 2012 | 4% | —% | N/A | N/A | —% | N/A |
| 2011 | 16 | 0.1 | 14% | 0.1% | <1 | —% |
| 2010 | 18 | 0.3 | 19 | 0.3 | 1 | — |
| 2009 | 16 | 0.6 | 18 | 0.5 | 2 | 1 |
| 2008 | 6 | 5.9 | 7 | 5.7 | 9 | 8 |
| 2007 | 9 | 11.7 | 10 | 11.6 | 37 | 36 |
| 2006 | 7 | 10.9 | 7 | 10.8 | 25 | 29 |
| 2005 | 8 | 6.7 | 8 | 6.5 | 17 | 18 |
| 2004 and prior | 16 | 2.9 | 17 | 2.8 | 9 | 8 |
| Total | 100% | 3.5% | 100% | 3.6% | 100% | 100% |
| **Region(3)** | | | | | | |
| West | 28% | 3.5% | 28% | 3.6% | 45% | 56% |
| Northeast | 25 | 3.5 | 25 | 3.4 | 8 | 7 |
| North Central | 18 | 2.8 | 18 | 2.9 | 19 | 15 |
| Southeast | 17 | 5.4 | 17 | 5.5 | 24 | 18 |
| Southwest | 12 | 1.8 | 12 | 1.8 | 4 | 4 |
| Total | 100% | 3.5% | 100% | 3.6% | 100% | 100% |
| **State(4)** | | | | | | |
| California | 16% | 3.2% | 16% | 3.4% | 24% | 31% |
| Florida | 6 | 10.8 | 6 | 10.9 | 16 | 12 |
| Illinois | 5 | 4.5 | 5 | 4.7 | 8 | 4 |
| Georgia | 3 | 3.2 | 3 | 3.3 | 4 | 4 |
| Michigan | 3 | 2.1 | 3 | 2.3 | 4 | 5 |
| Arizona | 2 | 4.1 | 2 | 4.3 | 8 | 13 |
| Nevada | 1 | 9.1 | 1 | 9.8 | 7 | 5 |
| All other | 64 | 2.8 | 64 | 2.8 | 29 | 26 |
| Total | 100% | 3.5% | 100% | 3.6% | 100% | 100% |

(1) Credit losses consist of the aggregate amount of charge-offs, net of recoveries, and REO operations expense in each of the respective periods and exclude foregone interest on non-performing loans and other market-based losses recognized on our consolidated statements of comprehensive income.

(2) Based on the UPB of our single-family credit guarantee portfolio, which includes unsecuritized single-family mortgage loans held by us on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities, or covered by our other guarantee commitments.

(3) Region designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

(4) States presented are on those with the highest percentage of credit losses during the three months ended March 31, 2012. Our top seven states based on the highest percentage of UPB as of March 31, 2012 are: California (16%), Florida (6%), Illinois (5%), New York (5%), Texas (4%), New Jersey (4%), and Virginia (4%), which collectively comprised 44% of our single-family credit guarantee portfolio as of March 31, 2012.

**Credit Performance of Certain Higher Risk Single-Family Loan Categories**

Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. However, there is no universally accepted definition of subprime or Alt-A. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as Alt-A in the table below because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred.

Although we do not categorize single-family mortgage loans we purchase or guarantee as prime or subprime, we recognize that there are a number of mortgage loan types with certain characteristics that indicate a higher degree of credit risk. For example, a borrower's credit score is a useful measure for assessing the credit quality of the borrower.

149

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-3687

Table of Contents

Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores.

Presented below is a summary of the serious delinquency rates of certain higher-risk categories of single-family loans in our single-family credit guarantee portfolio. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Loans with a combination of these attributes will have an even higher risk of delinquency than those with isolated characteristics.

### Table 15.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio[1]

| | Percentage of Portfolio[1] | | Serious Delinquency Rate | |
|---|---|---|---|---|
| | March 31, 2012 | December 31, 2011 | March 31, 2012 | December 31, 2011 |
| Interest-only | 4% | 4% | 17.2% | 17.6% |
| Option ARM | <1 | <1 | 19.6 | 20.5 |
| Alt-A[2] | 5 | 5 | 11.8 | 11.9 |
| Original LTV ratio greater than 90%[3] | 10 | 10 | 6.3 | 6.7 |
| Lower FICO scores at origination (less than 620) | 3 | 3 | 12.6 | 12.9 |

(1) Based on UPB.
(2) Alt-A loans may not include those loans that were previously classified as Alt-A and that have been refinanced as either a relief refinance mortgage or in another refinance mortgage initiative.
(3) Based on our first lien exposure on the property. Includes the credit-enhanced portion of the loan and excludes any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, increases the risk of default.

The percentage of borrowers in our single-family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 20% at both March 31, 2012 and December 31, 2011. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 12.6% and 12.8% as of March 31, 2012 and December 31, 2011, respectively. Loans originated in the years 2005 through 2008 have been more affected by declines in home prices since 2006 than loans originated in other years. Loans originated in 2005 through 2008 comprised approximately 30% and 36% of our single-family credit guarantee portfolio, based on UPB at March 31, 2012 and 2011, respectively; however, these loans accounted for approximately 88% and 91% of our credit losses during the three months ended March 31, 2012 and 2011, respectively.

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on these categories and other concentrations in our investments in securities.

### Multifamily Mortgage Portfolio

The table below summarizes the concentration of multifamily mortgages in our multifamily mortgage portfolio by certain attributes. Information presented for multifamily mortgage loans includes certain categories based on loan or borrower characteristics present at origination. The table includes a presentation of each category in isolation. A single loan may fall within more than one category (for example, a non-credit enhanced loan may also have an original LTV ratio greater than 80%).

*Freddie Mac*

TREASURY-3688

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 15.3 — Concentration of Credit Risk — Multifamily Mortgage Portfolio**

| | March 31, 2012 | | December 31, 2011 | |
| | UPB | Delinquency Rate(1) | UPB | Delinquency Rate(1) |
| | | (in billions) | | |
|---|---|---|---|---|
| State(2) | | | | |
| California | $ 20.5 | 0.15% | $ 20.2 | 0.02% |
| Texas | 14.6 | 0.36 | 14.0 | 0.46 |
| New York | 10.1 | 0.10 | 9.6 | — |
| Florida | 7.4 | 0.05 | 7.1 | 0.05 |
| Virginia | 6.4 | — | 6.3 | — |
| Georgia | 5.9 | 1.40 | 5.6 | 1.99 |
| All other states | 54.3 | 0.17 | 53.3 | 0.14 |
| Total | $119.2 | 0.23% | $116.1 | 0.22% |
| Region(3) | | | | |
| Northeast | $ 33.9 | 0.10% | $ 33.1 | 0.01% |
| West | 30.4 | 0.19 | 29.9 | 0.07 |
| Southwest | 23.3 | 0.38 | 22.4 | 0.44 |
| Southeast | 21.4 | 0.43 | 20.7 | 0.65 |
| North Central | 10.2 | 0.01 | 10.0 | 0.01 |
| Total | $119.2 | 0.23% | $116.1 | 0.22% |
| Category(4) | | | | |
| Original LTV ratio greater than 80% | $ 6.4 | 2.23% | $ 6.4 | 2.34% |
| Original DSCR below 1.10 | 2.8 | 2.23 | 2.8 | 2.58 |
| Non-credit enhanced loans | 84.5 | 0.16 | 84.5 | 0.11 |

(1) Based on the UPB of multifamily mortgages two monthly payments or more delinquent or in foreclosure.

(2) Represents the six states with the highest geographic concentration by UPB at March 31, 2012.

(3) See endnote (4) to "Table 15.1 — Concentration of Credit Risk — Single-family Credit Guarantee Portfolio" for a description of these regions.

(4) These categories are not mutually exclusive and a loan in one category may also be included within another category.

One indicator of risk for mortgage loans in our multifamily mortgage portfolio is the amount of a borrower's equity in the underlying property. A borrower's equity in a property decreases as the LTV ratio increases. Higher LTV ratios negatively affect a borrower's ability to refinance or sell a property for an amount at or above the balance of the outstanding mortgage. The DSCR is another indicator of future credit performance. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

Our multifamily mortgage portfolio includes certain loans for which we have credit enhancement. Credit enhancement can significantly reduce our exposure to a potential credit loss. As of March 31, 2012, approximately one-half of the multifamily loans that were two monthly payments or more past due, based on UPB, had credit enhancements that we currently believe will mitigate our expected losses on those loans. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for additional information about credit enhancements on multifamily loans.

We estimate that the percentage of loans in our multifamily mortgage portfolio with a current LTV ratio of greater than 100% was approximately 4% and 5% at March 31, 2012 and December 31, 2011, respectively, and our estimate of the current average DSCR for these loans was 0.99 and 1.1, respectively. We estimate that the percentage of loans in our multifamily mortgage portfolio with a current DSCR less than 1.0 was 4% and 5% at March 31, 2012 and December 31, 2011, respectively, and the average current LTV ratio of these loans was 107% at both dates. Our estimates of current DSCRs are based on the latest available income information for these properties and our assessments of market conditions. Our estimates of the current LTV ratios for multifamily loans are based on values we receive from a third-party service provider as well as our internal estimates of property value, for which we may use changes in tax assessments, market vacancy rates, rent growth and comparable property sales in local areas as well as third-party appraisals for a portion of the portfolio. We periodically perform our own valuations or obtain third-party appraisals in cases where a significant deterioration in a borrower's financial condition has occurred, the borrower has applied for refinancing, or in certain other circumstances where we deem it appropriate to reassess the property value. Although we use the most recently available results of our multifamily borrowers to estimate a property's value, there may be a significant lag in reporting, which could be six months or more, as they complete their results in the normal course of business. Our internal estimates of property valuation are derived using techniques that include income capitalization, discounted cash flows, sales comparables, or replacement costs.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from the use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Non-Agency Mortgage-Related Security Issuers**

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non-agency mortgage-related securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. Many of the parties from which we seek recovery under these efforts are also our seller/servicers. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" in our 2011 Annual Report for further information.

**Seller/Servicers**

We acquire a significant portion of our single-family mortgage purchase volume from several large seller/servicers with whom we have entered into mortgage purchase volume commitments that provide for the lenders to deliver us up to a certain volume of mortgages during a specified period of time. Our top 10 single-family seller/servicers provided approximately 79% of our single-family purchase volume during the three months ended March 31, 2012. Wells Fargo Bank, N.A. and U.S. Bank, N.A., accounted for 28%, and 13%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume during the three months ended March 31, 2012. We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated without replacement from other lenders.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our seller/servicers of their obligations to repurchase mortgages or (at our option) indemnify us in the event of: (a) breaches of the representations and warranties they made when they sold the mortgages to us; or (b) failure to comply with our servicing requirements. Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts. As of March 31, 2012 and December 31, 2011, the UPB of loans subject to our repurchase requests issued to our single-family seller/servicers was approximately $3.2 billion and $2.7 billion, and approximately 38% and 39% of these requests, respectively, were outstanding for more than four months since issuance of our initial repurchase request as measured by the UPB of the loans subject to the requests (these figures included repurchase requests for which appeals were pending). As of March 31, 2012, two of our largest seller/servicers had aggregate repurchase requests outstanding, based on UPB, of $1.7 billion, and approximately 47% of these requests were outstanding for four months or more since issuance of the initial request. During the three months ended March 31, 2012 and 2011, we recovered amounts that covered losses with respect to $0.8 billion and $1.2 billion, respectively, of UPB on loans subject to our repurchase requests.

The ultimate amounts of recovery payments we receive from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations. Our estimate of probable incurred losses for exposure to seller/servicers for their repurchase obligations is considered in our allowance for loan losses as of March 31, 2012 and December 31, 2011. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2011 Annual Report for further information. We believe we have appropriately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at March 31, 2012 and December 31, 2011; however, our actual losses may exceed our estimates.

We are also exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loss mitigation efforts, including under the servicing alignment initiative and the MHA Program, and therefore, we have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top three single-family loan servicers, Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A. serviced approximately 26%, 12%, and 11%, respectively, of our single-family mortgage loans, as of March 31, 2012 and together serviced approximately 49% of our single-family mortgage loans. Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

As of March 31, 2012 our top three multifamily servicers, Berkadia Commercial Mortgage LLC, CBRE Capital Markets, Inc., and Wells Fargo Bank, N.A., each serviced more than 10% of our multifamily mortgage portfolio and together serviced approximately 40% of our multifamily mortgage portfolio.

TREASURY-3690

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Mortgage Insurers**

We have institutional credit risk relating to the potential insolvency of, or non-performance by, mortgage insurers that insure single-family mortgages we purchase or guarantee. As of March 31, 2012, these insurers provided coverage, with maximum loss limits of $49.2 billion, for $225.6 billion of UPB, in connection with our single-family credit guarantee portfolio. Our top five mortgage insurer counterparties, Mortgage Guaranty Insurance Corporation , Radian Guaranty Inc., Genworth Mortgage Insurance Corporation, United Guaranty Residential Insurance Co., and PMI Mortgage Insurance Co. each accounted for more than 10% and collectively represented approximately 85% of our overall mortgage insurance coverage at March 31, 2012. All our mortgage insurance counterparties are rated BBB or below as of April 23, 2012, based on the lower of the S&P or Moody's rating scales and stated in terms of the S&P equivalent.

We received proceeds of $0.5 billion and $0.6 billion during the three months ended March 31, 2012 and 2011, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers of $1.8 billion as of both March 31, 2012 and December 31, 2011. The balance of our outstanding accounts receivable from mortgage insurers, net of associated reserves, was approximately $1.0 billion as of both March 31, 2012 and December 31, 2011.

**Bond Insurers**

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering some of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. At March 31, 2012, we had coverage, including secondary policies, on non-agency mortgage-related securities totaling $9.5 billion of UPB. At March 31, 2012, our top five bond insurers, Ambac Assurance Corporation (or Ambac), Financial Guaranty Insurance Company (or FGIC), MBIA Insurance Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp., each accounted for more than 10% of our overall bond insurance coverage and collectively represented approximately 99% of our total coverage.

We evaluate the expected recovery from primary bond insurance policies as part of our impairment analysis for our investments in securities. FGIC and Ambac are currently not paying any claims. In addition, if a bond insurer fails to meet its obligations on our investments in securities, then the fair values of our securities may further decline, which could have a material adverse effect on our results and financial condition. We recognized other-than-temporary impairment losses during 2012 and 2011 related to investments in mortgage-related securities covered by bond insurance as a result of our uncertainty over whether or not certain insurers would be able to pay our future claims on expected credit losses on the securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on our evaluation of impairment on securities covered by bond insurance.

**Cash and Other Investments Counterparties**

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily major financial institutions and the Federal Reserve Bank. As of March 31, 2012 and December 31, 2011, including amounts related to our consolidated VIEs, there were $60.7 billion and $68.5 billion, respectively, of cash and other non-mortgage assets invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. As of March 31, 2012, these included:

- $4.9 billion of cash equivalents invested in 7 counterparties that had short-term credit ratings of A-1 or above on the S&P or equivalent scale;

- $24.3 billion of securities purchased under agreements to resell with 7 counterparties that had short-term S&P ratings of A-1 or above; and

- $30.3 billion of cash deposited with the Federal Reserve Bank (as a non-interest-bearing deposit).

**Derivative Portfolio**

*Derivative Counterparties*

Our use of exchange-traded derivatives and OTC derivatives exposes us to institutional credit risk. The requirement that we post initial and maintenance margin with our clearing firm in connection with exchange-traded derivatives such as futures contracts exposes us to institutional credit risk in the event that our clearing firm or the exchange's clearinghouse

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3691                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

fail to meet their obligations. However, the use of exchange-traded derivatives lessens our institutional credit risk exposure to individual counterparties, because a central counterparty is substituted for individual counterparties and changes in the value of open exchange-traded contracts are settled daily via payments through the financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk to individual counterparties because transactions are executed and settled between us and each counterparty, exposing us to potential losses if a counterparty fails to meet its contractual obligations.

Our use of OTC interest-rate swaps, option-based derivatives, and foreign-currency swaps is subject to rigorous internal credit and legal reviews. All of our OTC derivatives counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

### Master Netting and Collateral Agreements

We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest-rate swaps, option-based derivatives, and foreign-currency swaps. Master netting agreements provide for the netting of amounts receivable and payable from an individual counterparty, which reduces our exposure to a single counterparty in the event of default. On a daily basis, the market value of each counterparty's derivatives outstanding is calculated to determine the amount of our net credit exposure, which is equal to derivatives in a net gain position by counterparty after giving consideration to collateral posted. Our collateral agreements require most counterparties to post collateral for the amount of our net exposure to them above the applicable threshold. Bilateral collateral agreements are in place for all of our active OTC derivative counterparties. Collateral posting thresholds are tied to a counterparty's credit rating. Derivative exposures and collateral amounts are monitored on a daily basis using both internal pricing models and dealer price quotes. Collateral is typically transferred within one business day based on the values of the related derivatives. This time lag in posting collateral can affect our net uncollateralized exposure to derivative counterparties.

Collateral posted by a derivative counterparty is typically in the form of cash, although U.S. Treasury securities, Freddie Mac mortgage-related securities, or our debt securities may also be posted. In the event a counterparty defaults on its obligations under the derivatives agreement and the default is not remedied in the manner prescribed in the agreement, we have the right under the agreement to direct the custodian bank to transfer the collateral to us or, in the case of non-cash collateral, to sell the collateral and transfer the proceeds to us.

Our uncollateralized exposure to counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest-rate caps, after applying netting agreements and collateral, was $157 million and $71 million at March 31, 2012 and December 31, 2011, respectively. In the event that all of our counterparties for these derivatives were to have defaulted simultaneously on March 31, 2012, our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately $157 million. Four counterparties each accounted for greater than 10% and collectively accounted for 83% of our net uncollateralized exposure to derivative counterparties, excluding commitments, at March 31, 2012. These counterparties were BNP Paribas, Deutsche Bank, A.G., Royal Bank of Scotland, and UBS AG, all of which were rated "A" or above by S&P as of April 23, 2012.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives, was $22 million and $38 million at March 31, 2012 and December 31, 2011, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis to ensure that they continue to meet our internal risk-management standards.

### NOTE 16: FAIR VALUE DISCLOSURES

### Fair Value Hierarchy

The accounting guidance for fair value measurements and disclosures establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. Assets and liabilities are classified in their entirety within the fair value hierarchy based on the lowest level input that is significant to the fair value measurement.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    TREASURY-3692          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

During the first quarter of 2012, we adopted an amendment to the guidance pertaining to fair value measurements and disclosure. The amendment changed the definition of the principal market to the perspective of the overall market for the particular asset or liability being valued, with less emphasis on the perspective of the reporting entity. As a result of adopting this guidance, we made a change to our principal market assessment for certain single-family mortgage loans, primarily for loans that have not been modified and are delinquent four months or more or are in foreclosure. For these loans, we changed our principal market assessment to the whole loan market. The resulting impact was a decrease of $13.8 billion to our fair value of net assets on our fair value balance sheets.

During the fourth quarter of 2011, our fair value results as presented in our consolidated fair value balance sheets were affected by a change in estimate which increased the implied capital costs included in our valuation of single-family mortgage loans due to a change in the estimation of a risk premium assumption embedded in our modeled valuation of such loans. This change in estimate led to a $14.2 billion decrease in our fair value measurement of mortgage loans as of December 31, 2011.

155

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below sets forth by level within the fair value hierarchy assets and liabilities measured and reported at fair value on a recurring basis in our consolidated balance sheets at March 31, 2012 and December 31, 2011.

**Table 16.1 — Assets and Liabilities Measured at Fair Value on a Recurring Basis**

| | Fair Value at March 31, 2012 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) (in millions) | Netting Adjustment(1) | Total |
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $ — | $ 74,265 | $ 1,898 | $ — | $ 76,163 |
| Subprime | — | — | 27,145 | — | 27,145 |
| CMBS | — | 51,610 | 3,143 | — | 54,753 |
| Option ARM | — | — | 5,818 | — | 5,818 |
| Alt-A and other | — | 10 | 11,084 | — | 11,094 |
| Fannie Mae | — | 18,729 | 168 | — | 18,897 |
| Obligations of states and political subdivisions | — | — | 7,565 | — | 7,565 |
| Manufactured housing | — | — | 748 | — | 748 |
| Ginnie Mae | — | 228 | 11 | — | 239 |
| Total available-for-sale securities, at fair value | — | 144,842 | 57,580 | — | 202,422 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 12,779 | 1,725 | — | 14,504 |
| Fannie Mae | — | 13,214 | 478 | — | 13,692 |
| Ginnie Mae | — | 131 | 20 | — | 151 |
| Other | — | 140 | 13 | — | 153 |
| Total mortgage-related securities | — | 26,264 | 2,236 | — | 28,500 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 695 | — | — | 695 |
| Treasury bills | 3,000 | — | — | — | 3,000 |
| Treasury notes | 23,164 | — | — | — | 23,164 |
| FDIC-guaranteed corporate medium-term notes | — | 2,960 | — | — | 2,960 |
| Total non-mortgage-related securities | 26,164 | 3,655 | — | — | 29,819 |
| Total trading securities, at fair value | 26,164 | 29,919 | 2,236 | — | 58,319 |
| Total investments in securities | 26,164 | 174,761 | 59,816 | — | 260,741 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 11,337 | — | 11,337 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | 2 | 10,816 | 21 | — | 10,839 |
| Option-based derivatives | — | 10,322 | — | — | 10,322 |
| Other | — | 106 | 1 | — | 107 |
| Subtotal, before netting adjustments | 2 | 21,244 | 22 | — | 21,268 |
| Netting adjustments(1) | — | — | — | (21,086) | (21,086) |
| Total derivative assets, net | 2 | 21,244 | 22 | (21,086) | 182 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 798 | — | 798 |
| All other, at fair value | — | — | 143 | — | 143 |
| Total other assets | — | — | 941 | — | 941 |
| Total assets carried at fair value on a recurring basis | $ 26,166 | $ 196,005 | $ 72,116 | $ (21,086) | $273,201 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ — | $ — | $ 2,221 | $ — | $ 2,221 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | 2 | 28,739 | 6 | — | 28,747 |
| Option-based derivatives | — | 890 | 1 | — | 891 |
| Other | 66 | 55 | 45 | — | 166 |
| Subtotal, before netting adjustments | 68 | 29,684 | 52 | — | 29,804 |
| Netting adjustments(1) | — | — | — | (29,508) | (29,508) |
| Total derivative liabilities, net | 68 | 29,684 | 52 | (29,508) | 296 |
| Other liabilities: | | | | | |
| All other, at fair value | — | — | 4 | — | 4 |
| Total liabilities carried at fair value on a recurring basis | $ 68 | $ 29,684 | $ 2,277 | $ (29,508) | $ 2,521 |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

| | Fair Value at December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment(1) | Total |
| | | | (in millions) | | |
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $ — | $ 79,044 | $ 2,048 | $ — | $ 81,092 |
| Subprime | — | — | 27,999 | — | 27,999 |
| CMBS | — | 51,907 | 3,756 | — | 55,663 |
| Option ARM | — | — | 5,865 | — | 5,865 |
| Alt-A and other | — | 11 | 10,868 | — | 10,879 |
| Fannie Mae | — | 20,150 | 172 | — | 20,322 |
| Obligations of states and political subdivisions | — | — | 7,824 | — | 7,824 |
| Manufactured housing | — | — | 766 | — | 766 |
| Ginnie Mae | — | 237 | 12 | — | 249 |
| Total available-for-sale securities, at fair value | — | 151,349 | 59,310 | — | 210,659 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 14,181 | 1,866 | — | 16,047 |
| Fannie Mae | — | 14,627 | 538 | — | 15,165 |
| Ginnie Mae | — | 134 | 22 | — | 156 |
| Other | — | 74 | 90 | — | 164 |
| Total mortgage-related securities | — | 29,016 | 2,516 | — | 31,532 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 302 | — | — | 302 |
| Treasury bills | 100 | — | — | — | 100 |
| Treasury notes | 24,712 | — | — | — | 24,712 |
| FDIC-guaranteed corporate medium-term notes | — | 2,184 | — | — | 2,184 |
| Total non-mortgage-related securities | 24,812 | 2,486 | — | — | 27,298 |
| Total trading securities, at fair value | 24,812 | 31,502 | 2,516 | — | 58,830 |
| Total investments in securities | 24,812 | 182,851 | 61,826 | — | 269,489 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 9,710 | — | 9,710 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 12,976 | 46 | — | 13,022 |
| Option-based derivatives | 1 | 15,868 | — | — | 15,869 |
| Other | 5 | 110 | 35 | — | 150 |
| Subtotal, before netting adjustments | 6 | 28,954 | 81 | — | 29,041 |
| Netting adjustments(1) | — | — | — | (28,923) | (28,923) |
| Total derivative assets, net | 6 | 28,954 | 81 | (28,923) | 118 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 752 | — | 752 |
| All other, at fair value | — | — | 151 | — | 151 |
| Total other assets | — | — | 903 | — | 903 |
| Total assets carried at fair value on a recurring basis | $ 24,818 | $ 211,805 | $ 72,520 | $ (28,923) | $ 280,220 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ — | $ 3,015 | $ — | $ — | $ 3,015 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 34,601 | 21 | — | 34,622 |
| Option-based derivatives | 1 | 2,934 | 1 | — | 2,936 |
| Other | — | 103 | 42 | — | 145 |
| Subtotal, before netting adjustments | 1 | 37,638 | 64 | — | 37,703 |
| Netting adjustments(1) | — | — | — | (37,268) | (37,268) |
| Total derivative liabilities, net | 1 | 37,638 | 64 | (37,268) | 435 |
| Total liabilities carried at fair value on a recurring basis | $ 1 | $ 40,653 | $ 64 | $ (37,268) | $ 3,450 |

(1) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable and net deferred interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $9.2 billion and $299 million, respectively, at March 31, 2012. The net cash collateral posted and net trade/settle receivable were $9.4 billion and $1 million, respectively, at December 31, 2011. The net interest receivable (payable) of derivative assets and derivative liabilities were approximately $(1.1) billion at both March 31, 2012 and December 31, 2011, which was mainly related to interest rate swaps that we have entered into.

**Recurring Fair Value Changes**

For the three months ended March 31, 2012, our transfers between Level 1 and Level 2 assets or liabilities were less than $1 million.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3695

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our Level 3 items mainly consist of non-agency mortgage-related securities. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets" for additional information about the valuation methods and assumptions used in our fair value measurements.

During the three months ended March 31, 2012, the fair value of our Level 3 assets decreased primarily due to: (a) principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) the net transfer out of Level 3 assets of $0.3 billion, resulting from a change in valuation method for certain mortgage-related securities due to improved liquidity and availability of price quotes from dealers and third-party pricing services. These decreases are partially offset by an increased volume of our multifamily held-for-sale mortgage loans that we expect to securitize in future periods.

During the three months ended March 31, 2012, the fair value of our Level 3 liabilities increased primarily due to the transfer of $3.0 billion of foreign-currency denominated and certain other debt securities recorded at fair value from Level 2 to Level 3 given the lack of market depth as evidenced by low transaction volumes in these securities.

During the three months ended March 31, 2011, the fair value of our Level 3 assets decreased by $2.0 billion, mainly attributable to: (a) principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) net securitizations of multifamily held-for-sale loans. In addition, we had a net transfer into Level 3 assets of $0.1 billion during the first quarter of 2011, resulting from a change in valuation method due to a lack of relevant price quotes from dealers and third-party pricing services.

The table below provides a reconciliation of the beginning and ending balances for assets and liabilities measured at fair value using significant unobservable inputs (Level 3).

158                                                                                      *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 16.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs**

| | Balance, January 1, 2012 | Realized and unrealized gains (losses) | | | Purchases | Issues | Sales | Settlements, net(5) | Transfers into Level 3(6) | Transfers out of Level 3(6) | Balance, March 31, 2012 | Unrealized gains (losses) still held(7) |
| | | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1) | Total | | | | | | | | |
| | | | | | (in millions) | | | | | | | |
| **Assets** | | | | | | | | | | | | |
| Investments in securities: | | | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | | |
| Freddie Mac | $ 2,048 | $ — | $ (2) | $ (2) | $ — | $ — | $ — | $ (28) | $ — | $ (120) | $ 1,898 | $ — |
| Subprime | 27,999 | (441) | 743 | 302 | — | — | — | (1,156) | — | — | 27,145 | (441) |
| CMBS | 3,756 | 76 | (337) | (261) | — | — | (330) | (22) | — | — | 3,143 | |
| Option ARM | 5,865 | (48) | 258 | 210 | — | — | — | (257) | — | — | 5,818 | (48) |
| Alt-A and other | 10,868 | (57) | 631 | 574 | — | — | — | (358) | — | — | 11,084 | (57) |
| Fannie Mae | 172 | — | 1 | 1 | — | — | — | (5) | — | — | 168 | — |
| Obligations of states and political subdivisions | 7,824 | 1 | 63 | 64 | — | — | (7) | (316) | — | — | 7,565 | |
| Manufactured housing | 766 | (2) | 7 | 5 | — | — | — | (23) | — | — | 748 | (2) |
| Ginnie Mae | 12 | — | — | — | — | — | — | (1) | — | — | 11 | |
| Total available-for-sale mortgage-related securities | 59,310 | (471) | 1,364 | 893 | — | — | (337) | (2,166) | — | (120) | 57,580 | (548) |
| Trading, at fair value: | | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | | |
| Freddie Mac | 1,866 | 6 | — | 6 | — | 51 | (63) | (51) | 35 | (119) | 1,725 | 5 |
| Fannie Mae | 538 | 3 | — | 3 | (4) | — | 4 | (8) | — | (55) | 478 | 3 |
| Ginnie Mae | 22 | — | — | — | — | — | — | (2) | — | — | 20 | — |
| Other | 90 | — | — | — | — | — | — | (2) | — | (75) | 13 | — |
| Total trading mortgage-related securities | 2,516 | 9 | — | 9 | (4) | 51 | (59) | (63) | 35 | (249) | 2,236 | 8 |
| Mortgage loans: | | | | | | | | | | | | |
| Held-for-sale, at fair value | 9,710 | 179 | — | 179 | 5,367 | — | (3,903) | (16) | — | — | 11,337 | 104 |
| Other assets: | | | | | | | | | | | | |
| Guarantee asset(8) | 752 | 1 | — | 1 | — | 62 | — | (17) | — | — | 798 | 1 |
| All other | 151 | (8) | — | (8) | — | — | — | — | — | — | 143 | (8) |
| Total other assets | 903 | (7) | — | (7) | — | 62 | — | (17) | — | — | 941 | (7) |
| **Liabilities** | | | | | | | | | | | | |
| Debt securities recorded at fair value | — | 18 | — | 18 | — | — | — | (812) | 3,015 | — | 2,221 | (28) |
| Net derivatives(9) | (17) | 18 | — | 18 | — | — | — | (4) | — | 33 | 30 | (12) |
| Other liabilities: | | | | | | | | | | | | |
| All other, at fair value | — | 4 | — | 4 | — | — | — | — | — | — | 4 | (4) |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

|  | Balance, January 1, 2011 | Realized and unrealized gains (losses) | | | Purchases | Issues | Sales | Settlements, net(5) | Net transfers in and/or out of Level 3(6) | Balance, March 31, 2011 | Unrealized gains (losses) still held(7) |
|  |  | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1) | Total |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Three Months Ended March 31, 2011 | | | | | | | | | | | |
| | | | | | (in millions) | | | | | | |
| Investments in securities: | | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | $ 2,037 | $ — | $ — | $ — | $ — | $ — | $ — | $ (40) | $ (101) | $ 1,896 | $ — |
| Subprime | 33,861 | (734) | 1,569 | 835 | — | — | — | (1,352) | — | 33,344 | (734) |
| CMBS | 3,115 | — | (23) | (23) | — | — | — | — | 1 | 3,093 | — |
| Option ARM | 6,889 | (281) | 692 | 411 | — | — | — | (311) | — | 6,989 | (281) |
| Alt-A and other | 13,155 | (40) | 238 | 198 | — | — | — | (429) | — | 12,924 | (40) |
| Fannie Mae | 212 | — | 1 | 1 | — | — | — | (13) | (5) | 195 | — |
| Obligations of states and political subdivisions | 9,377 | 1 | (1) | — | — | — | (37) | (465) | — | 8,875 | — |
| Manufactured housing | 897 | (3) | 12 | 9 | — | — | — | (28) | — | 878 | (3) |
| Ginnie Mae | 16 | — | — | — | — | — | — | (1) | — | 15 | — |
| Total available-for-sale mortgage-related securities | 69,559 | (1,057) | 2,488 | 1,431 | — | — | (37) | (2,638) | (106) | 68,209 | (1,058) |
| Trading, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | 2,299 | 62 | — | 62 | 230 | — | (31) | (49) | 186 | 2,697 | 62 |
| Fannie Mae | 854 | 11 | — | 11 | — | — | — | (6) | 12 | 871 | 11 |
| Ginnie Mae | 27 | — | — | — | — | — | — | (1) | — | 26 | — |
| Other | 20 | — | — | — | — | — | — | (1) | — | 19 | — |
| Total trading mortgage-related securities | 3,200 | 73 | — | 73 | 230 | — | (31) | (57) | 198 | 3,613 | 73 |
| Mortgage loans: | | | | | | | | | | | |
| Held-for-sale, at fair value | 6,413 | 62 | — | 62 | 2,164 | — | (3,322) | (13) | — | 5,304 | (25) |
| Net derivatives(9) | (691) | (127) | — | (127) | — | (13) | — | 74 | — | (757) | (120) |
| Other assets: | | | | | | | | | | | |
| Guarantee asset(8) | 541 | (1) | — | (1) | 68 | — | — | (11) | — | 597 | (1) |
| All other | 235 | (5) | — | (5) | — | — | — | — | — | 230 | (5) |
| Total other assets | 776 | (6) | — | (6) | 68 | — | — | (11) | — | 827 | (6) |

(1) Changes in fair value for available-for-sale investments are recorded in AOCI, while gains and losses from sales are recorded in other gains (losses) on investments on our consolidated statements of comprehensive income. For mortgage-related securities classified as trading, the realized and unrealized gains (losses) are recorded in other gains (losses) on investments on our consolidated statements of comprehensive income.

(2) Changes in fair value of derivatives are recorded in derivative gains (losses) on our consolidated statements of comprehensive income for those not designated as accounting hedges.

(3) Changes in fair value of the guarantee asset are recorded in other income on our consolidated statements of comprehensive income.

(4) For held-for-sale mortgage loans with fair value option elected, gains (losses) on fair value changes and sale of mortgage loans are recorded in other income on our consolidated statements of comprehensive income.

(5) For non-agency mortgage-related securities, primarily represents principal repayments.

(6) Transfer in and/or out of Level 3 during the period is disclosed as if the transfer occurred at the beginning of the period.

(7) Represents the amount of total gains or losses for the period, included in earnings, attributable to the change in unrealized gains (losses) related to assets and liabilities classified as Level 3 that were still held at March 31, 2012 and 2011, respectively. Included in these amounts are credit-related other-than-temporary impairments recorded on available-for-sale securities.

(8) We estimate that all amounts recorded for unrealized gains and losses on our guarantee asset relate to those amounts still in position. The amounts reflected as included in earnings represent the periodic fair value changes of our guarantee asset.

(9) Net derivatives include derivative assets and derivative liabilities prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-3698

Table of Contents

**Non-recurring Fair Value Changes**

Certain assets are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances. We consider the fair value measurement related to these assets to be non-recurring. These assets include impaired held-for-investment multifamily mortgage loans and REO, net. These fair value measurements usually result from the write-down of individual assets to current fair value amounts due to impairments. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — *Mortgage Loans, Held-for-Investment*" and "*— REO, Net*" for additional details.

The table below presents assets measured and reported at fair value on a non-recurring basis in our consolidated balance sheets by level within the fair value hierarchy at March 31, 2012 and December 31, 2011, respectively.

**Table 16.3 — Assets Measured at Fair Value on a Non-Recurring Basis**

| | Fair Value at March 31, 2012 | | | | Fair Value at December 31, 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| | | | (in millions) | | | | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | | | | | |
| Mortgage loans:[1] | | | | | | | | |
| Held-for-investment | $ — | $ — | $ 1,469 | $ 1,469 | $ — | $ — | $ 1,380 | $ 1,380 |
| REO, net[2] | — | — | 2,303 | 2,303 | — | — | 3,146 | 3,146 |
| Total assets measured at fair value on a non-recurring basis | $ — | $ — | $ 3,772 | $ 3,772 | $ — | $ — | $ 4,526 | $ 4,526 |

| | Total Gains (Losses) Three Months Ended March 31,[3] | |
|---|---|---|
| | 2012 | 2011 |
| | (in millions) | |
| **Assets measured at fair value on a non-recurring basis:** | | |
| Mortgage loans:[1] | | |
| Held-for-investment | $ (26) | $ 11 |
| REO, net[2] | (15) | (135) |
| Total gains (losses) | $ (41) | $ (124) |

(1) Represents carrying value and related write-downs of loans for which adjustments are based on the fair value amounts. These loans include impaired multifamily mortgage loans that are classified as held-for-investment and have a related valuation allowance.

(2) Represents the fair value and related losses of foreclosed properties that were measured at fair value subsequent to their initial classification as REO, net. The carrying amount of REO, net was written down to fair value of $2.3 billion, less estimated costs to sell of $159 million (or approximately $2.1 billion) at March 31, 2012. The carrying amount of REO, net was written down to fair value of $3.1 billion, less estimated costs to sell of $221 million (or approximately $2.9 billion) at December 31, 2011.

(3) Represents the total net gains (losses) recorded on items measured at fair value on a non-recurring basis as of March 31, 2012 and 2011, respectively.

**Fair Value Election**

We elected the fair value option for certain types of securities, multifamily held-for-sale mortgage loans, foreign-currency denominated debt, and certain other debt.

*Certain Available-for-Sale Securities with Fair Value Option Elected*

We elected the fair value option for certain available-for-sale mortgage-related securities to better reflect the natural offset these securities provide to fair value changes recorded historically on our guarantee asset at the time of our election. In addition, upon adoption of the accounting guidance for the fair value option, we elected this option for available-for-sale securities within the scope of the accounting guidance for investments in beneficial interests in securitized financial assets to better reflect any valuation changes that would occur subsequent to impairment write-downs previously recorded on these instruments. By electing the fair value option for these instruments, we reflect valuation changes through our consolidated statements of comprehensive income in the period they occur, including any increases in value.

For mortgage-related securities and investments in securities that were selected for the fair value option and subsequently classified as trading securities, the change in fair value is recorded in other gains (losses) on investment securities recognized in earnings in our consolidated statements of comprehensive income. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding the net unrealized gains (losses) on trading securities, which include gains (losses) for other items that are not selected for the fair value option. Related interest

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                    TREASURY-3699                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

income continues to be reported as interest income in our consolidated statements of comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2011 Annual Report for additional information about the measurement and recognition of interest income on investments in securities.

### Debt Securities with Fair Value Option Elected

We elected the fair value option for foreign-currency denominated debt and certain other debt securities. In the case of foreign-currency denominated debt, we have entered into derivative transactions that effectively convert these instruments to U.S. dollar denominated floating rate instruments. The fair value changes on these derivatives were recorded in derivative gains (losses) in our consolidated statements of comprehensive income. We elected the fair value option on these debt instruments to better reflect the economic offset that naturally results from the debt due to changes in interest rates. We also elected the fair value option for certain other debt securities containing potential embedded derivatives that required bifurcation.

The changes in fair value of debt securities with the fair value option elected were $(17) million and $(81) million for the three months ended March 31, 2012 and 2011, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of comprehensive income. The changes in fair value related to fluctuations in exchange rates and interest rates were $(4) million and $(72) million for the three months ended March 31, 2012 and 2011, respectively. The remaining changes in the fair value of $(13) million and $(9) million were attributable to changes in credit risk for the three months ended March 31, 2012 and 2011, respectively.

The change in fair value attributable to changes in credit risk was primarily determined by comparing the total change in fair value of the debt to the total change in fair value of the interest-rate and foreign-currency derivatives used to hedge the debt. Any difference in the fair value change of the debt compared to the fair value change in the derivatives is attributed to credit risk.

The difference between the aggregate fair value and aggregate UPB for long-term debt securities with fair value option elected was $42 million and $43 million at March 31, 2012 and December 31, 2011, respectively. Related interest expense continues to be reported as interest expense in our consolidated statements of comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Debt Securities Issued" in our 2011 Annual Report for additional information about the measurement and recognition of interest expense on debt securities issued.

### Multifamily Held-For-Sale Mortgage Loans with Fair Value Option Elected

We elected the fair value option for multifamily mortgage loans that were purchased for securitization. Through this channel, we acquire loans that we intend to securitize and sell to CMBS investors. While this is consistent with our overall strategy to expand our multifamily business, it differs from our previous buy-and-hold strategy with respect to multifamily loans held-for-investment. Therefore, these multifamily mortgage loans were classified as held-for-sale mortgage loans in our consolidated balance sheets to reflect our intent to sell in the future.

We recorded $179 million and $62 million from the change in fair value in gains (losses) on mortgage loans recorded at fair value in other income in our consolidated statements of comprehensive income for the three months ended March 31, 2012 and 2011, respectively. The changes in fair value of these loans were primarily attributable to changes in interest rates and other items such as liquidity. The changes in fair value attributable to instrument-specific credit risk were not material given that these loans were generally originated within the past 12 months and have not seen a change in their credit characteristics.

The difference between the aggregate fair value and the aggregate UPB for multifamily held-for-sale loans with the fair value option elected was $206 million and $195 million at March 31, 2012 and December 31, 2011, respectively. Related interest income continues to be reported as interest income in our consolidated statements of comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2011 Annual Report for additional information about the measurement and recognition of interest income on our mortgage loans.

### Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets

We categorize assets and liabilities that we measure and report at fair value in our consolidated balance sheets within the fair value hierarchy based on the valuation processes used to derive the fair value and our judgment regarding the observability of the related inputs.

TREASURY-3700

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Investments in Securities

#### Agency Securities

Fixed-rate agency securities are valued based on dealer-published quotes for a base TBA security, adjusted to reflect the measurement date as opposed to a forward settlement date ("carry") and pay-ups for specified collateral. The base TBA price varies based on agency, term, coupon, and settlement month. The carry adjustment converts forward settlement date prices to spot or same-day settlement date prices such that the fair value is estimated as of the measurement date, and not as of the forward settlement date. The carry adjustment uses our internal prepayment and interest rate models. A pay-up is added to the base TBA price for characteristics that are observed to be trading at a premium versus TBAs; this currently includes seasoning and low-loan balance attributes. Haircuts are applied to a small subset of positions that are less liquid and are observed to trade at a discount relative to TBAs; this includes securities that are not eligible for delivery into TBA trades.

Adjustable-rate agency securities are valued based on the median of prices from multiple pricing services. The key valuation drivers used by the pricing services include the interest rate cap structure, term, agency, remaining term, and months-to-next coupon reset, coupled with prevailing market conditions, namely interest rates.

Because fixed-rate and adjustable-rate agency securities are generally liquid and contain observable pricing in the market, they generally are classified as Level 2.

Multiclass structures are valued using a variety of methods, depending on the product type. The predominant valuation methodology uses the median prices from multiple pricing services. This method is used for structures for which there is typically significant, relevant market activity. Some of the key valuation drivers used by the pricing services are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. Other tranche types that are more challenging to price are valued using the median prices from multiple dealers. These include structured interest-only, structured principal-only, inverse floating-rate, and inverse interest-only structures. Some of the key valuation drivers used by the dealers are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. There is also a subset of positions for which prices are published on a daily basis; these include trust interest-only and trust principal-only strips. These are fairly liquid tranches and are quoted on a regular settlement date basis. In order to align the regular settlement date price with the balance sheet date, the OAS is calculated based on the published prices. Then the tranche is valued using that OAS applied to the balance sheet date.

Multiclass agency securities are classified as Level 2 or 3 depending on the significance of the inputs that are not observable.

In addition, there is a subset of tranches for which there is a lack of relevant market activity. These are priced using either a proxy relationship, where the position is matched to the closest dealer-priced tranche, and then valued by calculating an OAS using our proprietary prepayment and interest rate models, or the position will be valued via a hedge ratio pricing method. The subset of agency residential mortgage-related securities classified as Level 3 is valued using unobservable inputs, including those valued using either OAS or hedge ratio prices.

For the subset of our positions that uses an OAS approach, we determine the fair values for these securities by using the estimated OAS as an input to the valuation calculation in conjunction with interest-rate and prepayment models to calculate the NPV of the projected cash flows. These positions typically have smaller balances and are more difficult for dealers to value. The OAS-based prices are predominantly associated with interest-only and principal-only securities. Dealers publish regular settlement date prices for many of these securities, which provide the necessary starting point to create an OAS-based valuation as of the valuation date. These securities are sensitive to changes in prepayment expectations, interest rates, and changes in housing policy that could affect the level and timing of cash flows. In aggregate, as the cash flow streams are shortened (lengthened), the fair value of principal-only securities would increase (decrease) while interest-only securities would decrease (increase).

For a subset of agency residential mortgage-backed securities, a hedge ratio pricing method is utilized as current information about cash flows is not readily available. The hedge ratio pricing method calculates a current period price from the prior period valuation and the associated risk metrics. Specifically, the securities' risk metrics, such as key rate durations, convexity, and volatility duration, are coupled with the market changes associated with each such metric to calculate the price change corresponding to that metric. The sum of the individual adjustments is added to the prior period valuation to produce the final valuation. If necessary, our judgment is applied to estimate the impact of differences in prepayment uncertainty or other unique cash flow characteristics related to that particular security. These valuations are sensitive to the market changes, specifically interest rate, spread, and volatility changes. As interest rates and/or volatility increase (decrease), the fair values of these securities will typically decrease (increase).

163

*Freddie Mac*

---

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Commercial Mortgage-Backed Securities*

CMBS are valued primarily based on the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the collateral type, collateral performance, capital structure, issuer, credit enhancement, coupon, weighted average life, and interest rates, coupled with the observed spread levels on trades of similar securities. Many of these securities have significant prepayment lockout periods or penalty periods that limit the window of potential prepayment to a relatively narrow band. These securities are primarily classified as Level 2.

There is a subset of CMBS comprised of military housing revenue bonds that is valued using a hedge ratio pricing method, and classified as Level 3 in the fair value hierarchy. These valuations are sensitive to market changes, specifically changes in interest rates and OAS. As interest rates increase (decrease) and/or OAS widens (tightens), fair values will typically decrease (increase).

*Subprime, Option ARM, and Alt-A and Other (Mortgage-Related)*

These private-label investments are valued using either the median of multiple dealer prices or the median prices from multiple pricing services. Some of the key valuation drivers used by the dealers and pricing services include the product type, vintage, collateral performance, capital structure, credit enhancement, and coupon, coupled with interest rates and spreads observed on trades of similar securities, where possible. The market for non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans is illiquid, resulting in wide price ranges as well as wide credit spreads. These securities are primarily classified as Level 3.

The techniques used by these pricing services and dealers to develop the prices generally are either: (a) a comparison to transactions involving instruments with similar collateral and risk profiles; or (b) a discounted cash flow model. For a large majority of the securities we value using dealers and pricing services, we obtain multiple external prices, which are non-binding both to us and our counterparties. When multiple prices are received, we use the median of the prices. The models and related assumptions used by the dealers and pricing services are owned and managed by them. However, we have an understanding of their processes used to develop the prices provided to us based on our ongoing due diligence. We have discussions with our dealers and pricing service vendors at least annually and often more frequently to maintain a current understanding of the processes and inputs they use to develop prices. We make no adjustments to the individual prices we receive from third-party pricing services or dealers for non-agency mortgage-related securities beyond calculating median prices and discarding certain prices that are determined not to be valid based on our validation processes. See "Valuation Process and Controls Over Fair Value Measurement" for additional information regarding our validation processes.

The non-agency mortgage-related security markets continued to be illiquid during the first quarter of 2012. We continue to utilize the prices on such securities provided to us by various pricing services and dealers and believe that the procedures executed by the pricing services and dealers, combined with our internal verification and analytical processes, help ensure that the prices used to develop our financial statements are in accordance with the accounting guidance for fair value measurement and disclosure.

The fair value measurements of these assets are sensitive to changes in assumptions regarding probability of default, loss severity in the event of default, forecasts of home prices, or significant activity or developments in the non-agency securities market. Significant changes in any of those inputs in isolation may result in significantly higher or lower fair value measurements. Generally, a change in the assumption used for forecasts of home price changes is accompanied by directionally similar changes in the assumptions used for probability of default and loss severity. Positive (negative) reaction to portfolio sales could trigger changes in investor sentiment leading to higher (lower) fair values.

The table below presents the fair value of subprime, option ARM, and Alt-A and other investments we held by origination year.

**Table 16.4 — Fair Value of Subprime, Option ARM, and Alt-A and Other Investments by Origination Year**

| Year of Origination | Fair Value at | |
| --- | --- | --- |
| | March 31, 2012 | December 31, 2011 |
| | (in millions) | |
| 2004 and prior | $ 4,294 | $ 4,287 |
| 2005 | 10,320 | 10,411 |
| 2006 | 15,899 | 16,155 |
| 2007 | 13,544 | 13,890 |
| 2008 and beyond | — | — |
| Total | $ 44,057 | $ 44,743 |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                TREASURY-3702                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Obligations of States and Political Subdivisions*

These primarily represent housing revenue bonds, which are valued by taking the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the structure of the bond, including call terms, cross-collateralization features, and tax-exempt features, coupled with municipal bond rates, credit ratings, and spread levels. These securities are unique, resulting in low trading volumes and are classified as Level 3 in the fair value hierarchy.

The investor base for most issues of municipal securities is fairly narrow, and within this investor base, there is only a subset that invests in housing revenue bonds, as these securities require an additional level of mortgage security expertise. Consequently, the market for these securities is fairly illiquid. These valuations are sensitive to trends in the broader municipal securities market, which includes credit risk. As market concerns associated with credit risk increase (decrease), the fair value of housing revenue bonds will generally decrease (increase). In addition, they also are subject to the same interest rate risk, prepayment risk, and house price levels as other non-agency mortgage-related securities. As interest rates increase (decrease) or projected home price forecasts decrease (increase), the fair value of housing revenue bonds will generally decrease (increase).

*Manufactured Housing*

Securities backed by loans on manufactured housing properties are dealer-priced and we arrive at the fair value by taking the median of multiple dealer prices. Some of the key valuation drivers include the overall market direction, the collateral's performance, and vintage. These securities are classified as Level 3 in the fair value hierarchy because key inputs are unobservable in the market due to low levels of liquidity.

The fair values of our manufactured housing securities rely on unobservable inputs as there is no new production, and outstanding securities are very thinly traded. In some instances, a security may be comprised of so few loans, that the concentration risk will further limit the number of potential investors. These private-label investments are valued using the median of multiple dealer prices. Due to the seasoned nature of these securities, their valuations tend to track overall market sentiment. The primary valuation driver for manufactured housing is market demand at a particular point in time. An increase (decrease) in selling activity will typically result in a decrease (increase) in fair values. A secondary driver of the overall fair value measurement is the macroeconomic drivers of the economy. As the broader economy improves (deteriorates), the fair values will tend to increase (decrease).

*Asset-Backed Securities (Non-Mortgage-Related)*

These private-label non-mortgage-related securities are valued based on prices from pricing services. Some of the key valuation drivers include the discount margin, subordination level, and prepayment speed, coupled with interest rates. They are classified as Level 2 because of their liquidity and tight pricing ranges.

*Treasury Bills and Treasury Notes*

Treasury bills and Treasury notes are classified as Level 1 in the fair value hierarchy since they are actively traded and price quotes are widely available at the measurement date for the exact security we are valuing.

*FDIC-Guaranteed Corporate Medium-Term Notes*

Since these securities carry the FDIC guarantee, they are considered to have no credit risk. They are valued based on yield analysis. They are classified as Level 2 because of their high liquidity and tight pricing ranges.

**Mortgage Loans, Held-for-Sale**

Mortgage loans, held-for-sale consist of multifamily mortgage loans with the fair value option elected. Thus, all held-for-sale mortgage loans are measured at fair value on a recurring basis.

The fair value of multifamily mortgage loans is generally based on market prices obtained from a third-party pricing service provider for similar actively traded mortgages, adjusted for differences in loan characteristics and contractual terms. The pricing service aggregates observable price points from two markets: agency and non-agency. The agency market consists of purchases made by the GSEs of loans underwritten by our counterparties in accordance with our guidelines while the non-agency market generally consists of secondary market trades between banks and other financial institutions of loans that were originated and initially held in portfolio by these institutions. The pricing service blends the observable price data obtained from these two distinct markets into a final composite price based on the expected probability that a given loan will trade in one of these two markets. This estimated probability is largely a function of the loan's credit quality, as determined by its current LTV ratio and DSCR. The result of this blending technique is that lower

165

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

credit quality loans receive a lower percentage of agency price weighting and higher credit quality loans receive a higher percentage of agency price weighting.

Given the relative illiquidity in the marketplace for multifamily mortgage loans and differences in contractual terms, these loans are classified as Level 3 in the fair value hierarchy.

These values are sensitive to changes in benchmark interest rates, market pricing spreads to benchmark interest rates for credit and liquidity risk factors, estimated prepayment speeds subsequent to the expiration of yield maintenance periods, and portfolio credit quality as represented by each loan's current estimated DSCR and LTV ratios. Significant increases in interest rates and credit and liquidity spreads and/or deterioration in portfolio credit quality (*e.g.*, increases in LTV ratios and/or decreases in DSCR) may result in significantly lower fair value measurement.

### *Mortgage Loans, Held-for-Investment*

Mortgage loans, held-for-investment measured at fair value on a non-recurring basis represent impaired multifamily mortgage loans, which are not measured at fair value on an ongoing basis but have been written down to fair value due to impairment. The valuation technique we use to measure the fair value of impaired multifamily mortgage loans, held-for-investment is based on the value of the underlying property and may include assessment of third-party appraisals, environmental, and engineering reports that we compare with relevant market performance to arrive at a fair value. Our valuation technique incorporates one or more of the following methods: income capitalization, discounted cash flow, sales comparables, and replacement cost. We consider the physical condition of the property, rent levels, and other market drivers, including input from sales brokers and the property manager. We classify impaired multifamily mortgage loans, held-for-investment as Level 3 in the fair value hierarchy as their valuation includes significant unobservable inputs.

### *Derivative Assets, Net*

Derivative assets largely consist of interest-rate swaps, option-based derivatives, futures, and forward purchase and sale commitments that we account for as derivatives. The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable, trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net unrealized gain position are reported as derivative assets, net. Similarly, derivatives in a net unrealized loss position are reported as derivative liabilities, net.

### *Interest-Rate Swaps and Option-Based Derivatives*

The fair values of interest-rate swaps are determined by using the appropriate yield curves to discount the expected cash flows of both the fixed and variable rate components of the swap contracts. In doing so, we first observe publicly available market spot interest rates, such as money market rates, Eurodollar futures contracts and LIBOR swap rates. The spot curves are translated to forward curves using internal models. From the forward curves, the periodic cash flows are calculated on the pay and receive side of the swap and discounted back at the relevant forward rates to arrive at the fair value of the swap. Since the fair values of the swaps are determined by using observable inputs from active markets, these are generally classified as Level 2 under the fair value hierarchy.

Option-based derivatives include call and put swaptions and other option-based derivatives, the majority of which are European options. The fair values of the European call and put swaptions are calculated by using market observable interest rates and dealer-supplied interest rate volatility grids as inputs to our option-pricing models. Within each grid, prices are determined based on the option term of the underlying swap and the strike rate of the swap. Derivatives with embedded American options are valued using dealer-provided pricing grids. The grids contain prices corresponding to specified option terms of the underlying swaps and the strike rate of the swaps. Interpolation is used to calculate prices for positions for which specific grid points are not provided. Derivatives with embedded Bermudan options are valued based on prices provided directly by counterparties. Swaptions are classified as Level 2 under the fair value hierarchy. Other option-based derivatives include exchange-traded options that are valued by exchange-published daily closing prices. Therefore, exchange-traded options are classified as Level 1 under the fair value hierarchy. Other option-based derivatives also include purchased interest-rate cap and floor contracts that are valued by using observable market interest rates and cap and floor rate volatility grids obtained from dealers, and cancellable interest rate swaps that are valued by using dealer prices. Cap and floor contracts are classified as Level 2 and cancellable interest rate swaps with fair values using significant unobservable inputs are classified as Level 3 under the fair value hierarchy.

Cancelable swaps, which are interest rate swaps where one counterparty has the option to terminate on one or more payment dates, comprise the largest component of the Level 3 derivatives population. These positions are priced using counterparty prices. The cancelable swap valuation is largely driven by changes in interest rates and volatility. As we are

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3704

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

in a net receive-fixed position with respect to cancelable swaps, we are effectively short a call option. As a result, an increase (decrease) in interest rates will result in a decrease (increase) to the fair value measurement. An increase (decrease) in volatility will generally result in a decrease (increase) to the fair value measurement. These impacts are highly dependent on the specific terms of each deal and the degree to which the holder of the option is in the money or out of the money, as a decrease in interest rates will increase the likelihood that the counterparty will exercise the call option. In addition, changes in our creditworthiness could impact the valuation, with a deterioration (improvement) in credit decreasing (increasing) the fair value measurement.

The table below shows the fair value, prior to counterparty and cash collateral netting adjustments, for our interest-rate swaps and option-based derivatives and the maturity profile of our derivative positions. It also provides the weighted-average fixed rates of our pay-fixed and receive-fixed swaps. As of March 31, 2012 and December 31, 2011, our option-based derivatives had a remaining weighted-average life of 5.4 years and 5.0 years, respectively.

## Table 16.5 — Fair Values and Maturities for Interest-Rate Swaps and Option-Based Derivatives

| | March 31, 2012 | | | | | |
| | | | Fair Value(1) | | | |
| | Notional or Contractual Amount | Total Fair Value(2) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 236,803 | $ 9,080 | $ 59 | $ 519 | $ 3,538 | $ 4,964 |
| Weighted average fixed rate(3) | | | 1.52% | 0.92% | 2.24% | 3.10% |
| Forward-starting swaps(4) | 11,650 | 792 | — | — | — | 792 |
| Weighted average fixed rate(3) | | | | | | 3.83% |
| Basis (floating to floating) | 2,400 | 2 | (1) | — | 3 | — |
| Pay-fixed: | | | | | | |
| Swaps | 280,869 | (26,292) | (38) | (2,647) | (5,112) | (18,495) |
| Weighted-average fixed rate(3) | | | 0.95% | 3.11% | 2.83% | 3.68% |
| Forward-starting swaps(4) | 15,704 | (1,490) | — | — | — | (1,490) |
| Weighted-average fixed rate(3) | | | | | | 3.80% |
| Total interest-rate swaps | $ 547,426 | $(17,908) | $ 20 | $(2,128) | $ (1,571) | $(14,229) |
| Option-based derivatives: | | | | | | |
| Call swaptions | $ 64,525 | $ 6,880 | $1,617 | $ 2,825 | $ 398 | $ 2,040 |
| Put swaptions | 49,700 | 522 | 1 | 35 | 134 | 352 |
| Other option-based derivatives(5) | 34,365 | 2,029 | — | — | — | 2,029 |
| Total option-based | $ 148,590 | $ 9,431 | $1,618 | $ 2,860 | $ 532 | $ 4,421 |

| | December 31, 2011 | | | | | |
| | | | Fair Value(1) | | | |
| | Notional or Contractual Amount | Total Fair Value(2) | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 195,716 | $ 10,651 | $ 22 | $ 390 | $ 2,054 | $ 8,185 |
| Weighted-average fixed rate(3) | | | 1.17% | 1.03% | 2.26% | 3.35% |
| Forward-starting swaps(4) | 16,092 | 2,239 | — | — | — | 2,239 |
| Weighted-average fixed rate(3) | | | | | | 3.96% |
| Basis (floating to floating) | 2,750 | (2) | — | (6) | 4 | — |
| Pay-fixed: | | | | | | |
| Swaps | 276,564 | (31,565) | (62) | (1,319) | (6,108) | (24,076) |
| Weighted-average fixed rate(3) | | | 1.59% | 2.20% | 3.13% | 3.84% |
| Forward-starting swaps(4) | 12,771 | (2,923) | — | — | — | (2,923) |
| Weighted-average fixed rate(3) | | | | | | 5.16% |
| Total interest-rate swaps | $ 503,893 | $ (21,600) | $ (40) | $ (935) | $ (4,050) | $(16,575) |
| Option-based derivatives: | | | | | | |
| Call swaptions | $ 103,800 | $ 10,043 | $5,230 | $ 1,339 | $ 558 | $ 2,916 |
| Put swaptions | 70,875 | 636 | 22 | 49 | 166 | 399 |
| Other option-based derivatives(5) | 38,549 | 2,254 | — | — | — | 2,254 |
| Total option-based | $ 213,224 | $ 12,933 | $5,252 | $ 1,388 | $ 724 | $ 5,569 |

(1) Fair value is categorized based on the period from March 31, 2012 and December 31, 2011, respectively, until the contractual maturity of the derivatives.

(2) Represents fair value for each product type, prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable adjustments.

(3) Represents the notional weighted average rate for the fixed leg of the swaps.

(4) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to thirteen years as of March 31, 2012.

(5) Primarily includes purchased interest rate caps and floors.

167

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### *Other Derivatives*

Other derivatives mainly consist of exchange-traded futures, foreign-currency swaps, certain forward purchase and sale commitments, and credit derivatives. The fair value of exchange-traded futures is based on end-of-day observed closing prices obtained from third-party pricing services; therefore, they are classified as Level 1 under the fair value hierarchy. The fair value of foreign-currency swaps is determined by using the appropriate yield curves to calculate and discount the expected cash flows for the swap contracts; therefore, they are classified as Level 2 under the fair value hierarchy since the fair values are determined through models that use observable inputs from active markets.

Certain purchase and sale commitments are also considered to be derivatives and are classified as Level 2 or Level 3 under the fair value hierarchy, depending on the fair value hierarchy classification of the purchased or sold item, whether a security or loan. Such valuation techniques are further discussed in the *"Investments in Securities"* section above and "Valuation Methods and Assumptions for Assets and Liabilities Not Measured at Fair Value in Our Consolidated Balance Sheets, but for Which the Fair Value is Disclosed — *Mortgage Loans*."

Credit derivatives primarily include short-term default guarantee commitments, which we value using a discounted cash flow approach and market-adjusted credit spreads. We classify fair value measurements related to credit derivatives as Level 3 under the fair value hierarchy because there are limited market benchmarks and significant unobservable inputs.

### *Consideration of Credit Risk in Our Valuation of Derivatives*

The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. Additionally, the fair value of derivative liabilities considers the impact of our institutional credit risk. Based on this evaluation, and because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, our fair value of derivatives is not adjusted for credit risk. Substantially all of our credit risk arises from counterparties with investment-grade credit ratings of A or above. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for a discussion of our counterparty credit risk.

### *Other Assets, Guarantee Asset and All Other Assets*

Our guarantee asset is valued either through obtaining dealer quotes on similar securities or through an expected cash flow approach. Because of the broad range of liquidity discounts applied by dealers to these similar securities and because the expected cash flow valuation approach uses significant unobservable inputs, we classified the guarantee asset as Level 3. Our guarantee asset is comprised mostly of guarantees on multifamily Freddie Mac securities. This asset is valued using a discounted cash flow approach that is sensitive to changes in benchmark interest rates and our current OAS to benchmark rates for the inception of new guarantees, which are in turn driven by changes in our view of credit risk and liquidity and changes in the credit profile of the guarantee portfolio. Significant increases in benchmark interest rates and credit and liquidity OAS and/or deterioration in portfolio credit quality may result in significantly lower fair value measurement.

All other assets at fair value consist of mortgage servicing rights, and are valued based on a valuation performed by a third-party vendor that specializes in valuing and brokering sales of mortgage servicing rights. These values are sensitive to changes in unobservable inputs, including: benchmark interest rates, cost of servicing performing and non-performing loans, estimated prepayment speeds and default rates, and expected ancillary income. Significant increases or decreases in any of these inputs may result in significantly different fair value measurements.

### *REO, Net*

REO is initially measured at its fair value less costs to sell, and is subsequently measured at the lower of cost or fair value less costs to sell. The fair value of REO is determined using an internal model that considers state and collateral level data to produce an estimate of fair value based on REO dispositions in the most recent three months. We use the actual disposition prices on REO and the current loan UPB at the state level to estimate the current fair value of REO. Certain adjustments, such as state specific adjustments, are made to the estimated fair value, as applicable. Due to the use of unobservable inputs, REO is classified as Level 3 under the fair value hierarchy.

TREASURY-3706

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Debt Securities Recorded at Fair Value

We elected the fair value option for foreign-currency denominated debt instruments and certain other debt securities. See "Fair Value Election — *Debt Securities with Fair Value Option Elected*" for additional information. We determine the fair value of these instruments by obtaining multiple quotes from dealers. Given the weakness in the market as evidenced by low transaction volumes in these securities, these fair values are classified as Level 3 in the fair value hierarchy at March 31, 2012.

Our foreign-currency denominated debt instruments are priced using counterparty dealer prices. The fair value measurement is dependent on forward interest rates and spot exchange rates for the foreign currency. As we are the debt issuer, an increase (decrease) in interest rates will result in a decrease (increase) in the fair value measurement, while the strengthening (weakening) of the foreign currency versus the U.S. dollar will increase (decrease) the fair value measurement.

Certain other debt securities represent our debt whose maturity can be lengthened at the option of the issuer. These products are callable in nature with an embedded option. In this case, the valuation behaves similarly to that of a callable bond. As we are the debt issuer, an increase (decrease) in interest rates will result in a decrease (increase) in the fair value measurement. An increase (decrease) in volatility will generally result in a decrease (increase) to fair value. These impacts are highly dependent on the specific terms of each deal and the degree to which the bond could be called back, as a decrease in interest rates will increase the likelihood that we will exercise our call option. In addition, changes in our creditworthiness could impact the valuation, with a deterioration (improvement) in credit reducing (increasing) the fair value measurement.

### Derivative Liabilities, Net

See discussion under *"Derivative Assets, Net"* above.

### Quantitative Information about Level 3 Fair Value Measurements for Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets

The table below provides valuation techniques, the range, and the weighted average of significant unobservable inputs for assets and liabilities measured at fair value on a recurring and non-recurring basis using unobservable inputs (Level 3) as of March 31, 2012.

169                                                                                      *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Table of Contents**

**Table 16.6 — Quantitative Information about Level 3 Fair Value Measurements**

| | Total Fair Value | Level 3 Fair Value | Predominant Valuation Technique(s) | Unobservable Inputs[1] Type | Range | Weighted Average |
|---|---|---|---|---|---|---|
| | (dollars in millions) | | | | | |
| **Recurring fair value measurements** | | | | | | |
| *Assets* | | | | | | |
| Investments in securities | | | | | | |
| Available-for-sale, at fair value | | | | | | |
| Mortgage-related securities | | | | | | |
| Agency securities: | | | | | | |
| Freddie Mac | $ 76,163 | $ 1,898 | Hedge ratio | Effective duration[2] | 1.7 - 1.7 years | 1.7 years |
| Fannie Mae | 18,897 | 168 | Median of external sources | External pricing sources | $102.8 - $104.8 | $103.6 |
| | | | Single external source | External pricing source | $115.5 - $115.5 | $115.5 |
| Ginnie Mae | 239 | 11 | Discounted cash flows | | | |
| Subprime, option ARM, and Alt-A: | | | | | | |
| Subprime | 27,145 | 27,145 | Median of external sources | External pricing sources | $51.3 - $61.8 | $56.8 |
| Option ARM | 5,818 | 5,818 | Median of external sources | External pricing sources | $38.9 - $47.5 | $43.3 |
| Alt-A and other | 11,094 | 11,084 | Median of external sources | External pricing sources | $62.5 - $72.0 | $67.9 |
| CMBS | 54,753 | 3,143 | Single external source | External pricing source | $88.0 - $88.0 | $88.0 |
| | | | Hedge ratio | Effective duration[2] | 9.5 - 15.3 years | 13.6 years |
| Obligation of states and political subdivisions | 7,565 | 7,565 | Median of external sources | External pricing sources | $101.0 - $102.0 | $101.5 |
| Manufactured housing | 748 | 748 | Median of external sources | External pricing sources | $76.7 - $83.6 | $80.1 |
| Total available-for-sale mortgage- related securities | 202,422 | 57,580 | | | | |
| Trading, at fair value | | | | | | |
| Mortgage-related securities | | | | | | |
| Agency securities: | | | | | | |
| Freddie Mac | 14,504 | 1,725 | Discounted cash flows | OAS | (3,105) - 11,117 bps | 677 bps |
| Fannie Mae | 13,692 | 478 | Discounted cash flows | OAS | (105) - 10,065 bps | 859 bps |
| Ginnie Mae | 151 | 20 | Discounted cash flows | | | |
| Other | | | Median of external sources | | | |
| | 153 | 13 | Discounted cash flows | | | |
| Total trading mortgage-related securities | 28,500 | 2,236 | | | | |
| Total investments in securities | $ 230,922 | $ 59,816 | | | | |
| Mortgage loans: | | | | | | |
| Held-for-sale, at fair value | | | Discounted cash flows | DSCR | 1.25 - 5.94 | 1.79 |
| | $ 11,337 | $ 11,337 | | Current LTV | 12% - 80% | 70% |
| Other assets: | | | | | | |
| Guarantee asset, at fair value | 798 | 798 | Discounted cash flows | OAS | 0 - 346 bps | 55 bps |
| All other, at fair value | | | Discounted cash flows | Prepayment rate[3] | 8.85% - 40.45% | 20.06% |
| | | | | Servicing income per loan | 0.19% - 0.49% | 0.25% |
| | 143 | 143 | | Cost to service per loan | $74 - $354 | $131 |
| Total other assets | $ 941 | $ 941 | | | | |
| *Liabilities* | | | | | | |
| Debt securities recorded at fair value | | | Median of external sources | External pricing sources | $103.2 - $103.9 | $103.6 |
| | $ 2,221 | $ 2,221 | Single external source | External pricing source | $100.0 - $100.0 | $100.0 |
| Net derivatives | | | Discounted cash flows | | | |
| | 114 | 30 | Counterparty marks | | | |
| All other, at fair value | 4 | 4 | Discounted cash flows | | | |
| **Non-recurring fair value measurements** | | | | | | |
| Mortgage loans | | | | | | |
| Held-for-investment | $ 1,469 | $ 1,469 | Income capitalization | Capitalization rates[4] | 5% - 10% | 7.1% |
| REO, net | | | Market comparable data[5] | Historical average sale proceeds by state per property[6] | $31,253 - $272,302 | $102,712 |
| | 2,303 | 2,303 | | | | |

(1) Certain unobservable input types, range, and weighted average  data are not disclosed in this table if they are associated with a  class: (a) that has a Level 3 fair value measurement that is not considered material; or (b) where we have  disclosed the predominant valuation technique with related  unobservable inputs for the most significant portion of that class.

(2) Effective duration is used as a proxy to represent the aggregate  impact of key rate durations.

(3) Represents the effective borrower prepayment and modeled  foreclosure rate based upon the principal balance weighted  expected life, derived from our prepayment model.

(4) The capitalization rate "Range" and "Weighted Average"  represent those loans that are valued using the  Income Capitalization approach, which is the predominant valuation technique used for this population. Certain loans in  this population are valued using other techniques, and the  capitalization rate for those is not represented in the "Range" or "Weighted Average" above.

(5) Represents internal models that use distressed property sales  proceeds by state based on a three month average to measure the  initial value of REO and the subsequent write-down to measure the current fair value for REO properties.

(6) Represents the average of three months of REO sales proceeds by  state.

**Valuation Processes and Controls Over Fair Value Measurement**

Groups within our Finance division, independent of our trading  and investing function, execute, and validate the valuation  processes. Our Enterprise Valuation Risk group, or EVR, provides independent risk governance over all valuation processes with  the goal of verifying that reasonable fair values are used for  financial reporting and risk management. EVR creates, maintains,  and updates corporate-wide valuation control policies related to our valuation

TREASURY-3708

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                      Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

processes, including providing notice to the business areas when updates are made and consulting with the business areas on policy implementation.

We employ control processes to validate the techniques and models we use to determine fair value including review and approval of new transaction types, valuation judgments, methods, models, process controls, and results. These processes are designed to help ensure that fair value measurements are appropriate, consistently applied, and reliable.

- Our control processes include performing monthly independent verification of fair value measurements by comparing the methodology driven price to other market source data (to the extent available), and using independent analytics to determine if assigned fair values are reasonable. This review covers all categories of products with increased attention given to higher risk/impact valuations.

- Our validation processes are intended to help ensure that the individual prices we receive from third parties are consistent with our observations of the marketplace and prices that are provided to us by other dealers or pricing services. Where applicable, prices are back-tested by comparing the settlement prices to our fair value measurements.

- Analytical procedures include automated checks of prices for reasonableness based on variations from prices in previous periods, comparisons of prices to internally calculated expected prices based on market moves, analysis of changes to pricing ranges, and relative value and yield comparisons based on specific characteristics of securities and our proprietary models.

Our valuation processes and related fair value hierarchy assessments require us to make judgments regarding the liquidity of the marketplace. These judgments are based on the volume of securities traded in the marketplace, the width of bid/ask spreads, and the dispersion of prices on similar securities.

Thresholds are set for each product class by EVR to identify exceptions that require further analysis. To the extent that we determine that a price is outside of established parameters, we will further examine the price, including follow up discussions with the specific pricing service or dealer and/or supplemental analytics and review, and ultimately will not use that price if we are unable to validate the price. These processes are executed prior to the completion of the financial statements.

Additionally, the Valuation & Finance Model Committee, or Valuation Committee, which includes senior representation from business areas and our Enterprise Risk Management and Finance divisions, provides senior management's governance over valuation methodologies and controls, and reviews exceptions and resolution from the review and validation processes.

Where models are employed to assist in the measurement of fair value, all changes made to those models during the periods presented are put through the corporate model change governance process and material changes are reviewed by the Valuation Committee. Inputs used by those models maximize the use of market based inputs, are regularly updated for changes in the underlying data, assumptions, valuation inputs, or market conditions, and are subject to the valuation controls noted above.

We also consider credit risk in the valuation of our assets and liabilities, with the credit risk of the counterparty considered in asset valuations and our own credit risk considered in liability valuations.

## Consolidated Fair Value Balance Sheets

The supplemental consolidated fair value balance sheets in the table below present our estimates of the fair value of our financial assets and liabilities at March 31, 2012 and December 31, 2011. The valuations of financial instruments on our consolidated fair value balance sheets are in accordance with the accounting guidance for fair value measurements and disclosures and the accounting guidance for financial instruments. The consolidated fair value balance sheets do not purport to present our net realizable, liquidation, or market value as a whole. Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3709

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 16.7 — Consolidated Fair Value Balance Sheets**

| | March 31, 2012 | | | | | | December 31, 2011 | |
| | | Fair Value | | | | | | |
| | Carrying Amount(1) | Level 1 | Level 2 | Level 3 | Netting Adjustments | Total | Carrying Amount(1) | Fair Value |
| | | | | | (in billions) | | | |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Cash and cash equivalents | $   8.6 | $ 5.5 | $   3.1 | $   — | $   — | $   8.6 | $   28.4 | $   28.4 |
| Restricted cash and cash equivalents | 27.8 | — | 27.8 | — | — | 27.8 | 28.1 | 28.1 |
| Federal funds sold and securities purchased under agreements to resell | 24.3 | — | 24.3 | — | — | 24.3 | 12.0 | 12.0 |
| *Investments in securities:* | | | | | | | | |
| Available-for-sale, at fair value | 202.4 | — | 144.8 | 57.6 | — | 202.4 | 210.7 | 210.7 |
| Trading, at fair value | 58.3 | 26.2 | 29.9 | 2.2 | — | 58.3 | 58.8 | 58.8 |
| *Total investments in securities* | 260.7 | 26.2 | 174.7 | 59.8 | — | 260.7 | 269.5 | 269.5 |
| *Mortgage loans:* | | | | | | | | |
| Mortgage loans held by consolidated trusts | 1,555.1 | — | 993.4 | 591.3 | — | 1,584.7 | 1,564.2 | 1,598.2 |
| Unsecuritized mortgage loans | 211.2 | — | 29.7 | 160.0 | — | 189.7 | 217.1 | 205.9 |
| *Total mortgage loans* | 1,766.3 | — | 1,023.1 | 751.3 | — | 1,774.4 | 1,781.3 | 1,804.1 |
| Derivative assets, net | 0.2 | — | 21.3 | — | (21.1) | 0.2 | 0.1 | 0.1 |
| Other assets | 27.0 | 0.1 | 1.1 | 25.8 | — | 27.0 | 27.8 | 28.5 |
| Total assets | $2,114.9 | $31.8 | $1,275.4 | $836.9 | $   (21.1) | $ 2,123.0 | $2,147.2 | $ 2,170.7 |
| **Liabilities** | | | | | | | | |
| *Debt, net:* | | | | | | | | |
| Debt securities of consolidated trusts held by third parties | $1,481.6 | $   — | $1,556.5 | $   2.8 | $   — | $ 1,559.3 | $1,471.4 | $ 1,552.5 |
| Other debt | 618.6 | — | 615.8 | 21.1 | — | 636.9 | 660.6 | 681.2 |
| *Total debt, net* | 2,100.2 | — | 2,172.3 | 23.9 | — | 2,196.2 | 2,132.0 | 2,233.7 |
| Derivative liabilities, net | 0.3 | 0.1 | 29.7 | — | (29.5) | 0.3 | 0.4 | 0.4 |
| Other liabilities | 14.4 | — | 8.4 | 7.3 | — | 15.7 | 14.9 | 15.0 |
| *Total liabilities* | 2,114.9 | 0.1 | 2,210.4 | 31.2 | (29.5) | 2,212.2 | 2,147.3 | 2,249.1 |
| **Net assets** | | | | | | | | |
| Senior preferred stockholders | 72.3 | — | — | 72.3 | — | 72.3 | 72.2 | 72.2 |
| Preferred stockholders | 14.1 | — | 0.6 | — | — | 0.6 | 14.1 | 0.6 |
| Common stockholders | (86.4) | — | — | (162.1) | — | (162.1) | (86.4) | (151.2) |
| Total net assets | — | — | 0.6 | (89.8) | — | (89.2) | (0.1) | (78.4) |
| *Total liabilities and net assets* | $2,114.9 | $ 0.1 | $2,211.0 | $ (58.6) | $   (29.5) | $ 2,123.0 | $2,147.2 | $ 2,170.7 |

(1) Equals the amount reported on our GAAP consolidated balance sheets.

**Limitations**

Our consolidated fair value balance sheets do not capture all elements of value that are implicit in our operations as a going concern because our consolidated fair value balance sheets only capture the values of the current investment and securitization portfolios as of the dates presented. For example, our consolidated fair value balance sheets do not capture the value of new investment and securitization business that would likely replace prepayments as they occur, nor do they include any estimation of intangible or goodwill values. Thus, the fair value of net assets presented on our consolidated fair value balance sheets does not represent an estimate of our net realizable, liquidation, or market value as a whole.

The fair value of certain financial instruments is based on our assumed current principal exit market as of the dates presented. As new markets evolve, our assumed principal exit market may change. The use of different assumptions and methodologies to determine the fair values of certain financial instruments, including the use of different principal exit markets, could have a material impact on the fair value of net assets presented on our consolidated fair value balance sheets.

We report certain assets and liabilities that are not financial instruments (such as property and equipment and REO), as well as certain financial instruments that are not covered by the disclosure requirements in the accounting guidance for financial instruments, such as pension liabilities, at their carrying amounts in accordance with GAAP on our consolidated fair value balance sheets. We believe these items do not have a significant impact on our overall fair value results. Other non-financial assets and liabilities on our GAAP consolidated balance sheets represent deferrals of costs and revenues that are amortized in accordance with GAAP, such as deferred debt issuance costs and deferred fees. Cash receipts and payments related to these items are generally recognized in the fair value of net assets when received or paid, with no basis reflected on our fair value balance sheets.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                TREASURY-3710                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Valuation Methods and Assumptions for Assets and Liabilities Not Measured at Fair Value in Our Consolidated Balance Sheets, but for Which the Fair Value is Disclosed

The following are valuation assumptions and methods for items not subject to the fair value hierarchy either because they are not measured at fair value other than on the fair value balance sheet or are only measured at fair value at inception.

### Cash and Cash Equivalents (including Restricted Cash and Cash Equivalents)

Cash and cash equivalents largely consist of highly liquid investment securities with an original maturity of three months or less used for cash management purposes, as well as cash held at financial institutions and cash collateral posted by our derivative counterparties. Given that these assets are short-term in nature with limited market value volatility, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value. Cash is classified as Level 1 except for restricted cash, which is classified as Level 2 primarily due to the restrictions on the cash. Cash equivalents that are highly liquid investments for which we can obtain unadjusted quoted prices are also classified as Level 1. Cash equivalents are primarily classified as Level 2 because we use observable inputs other than quoted prices to determine the fair value measurement.

### Federal Funds Sold and Securities Purchased Under Agreements to Resell

Federal funds sold and securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities and federal funds sold. Given that these assets are short-term in nature, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value. Federal funds sold and securities purchased under agreements to resell are classified as Level 2 because these are liquid, but there are no direct quotes available for our exact positions.

### Mortgage Loans

Single-family mortgage loans are classified as held-for-investment and recorded at amortized cost. Certain multifamily mortgage loans are recorded at fair value due to the election of the fair value option, or they are held for investment and recorded at fair value upon impairment, which is based upon the fair value of the collateral as multifamily loans are collateral-dependent.

#### Single-Family Loans

In determining the fair value of single-family mortgage loans, valuation outcomes can vary widely based on management judgments and decisions used in determining: (a) the principal market; (b) modeling assumptions, including default, severity, home prices, and risk premium; and (c) inputs used to determine variables including risk premiums, credit costs, security pricing, and implied management and guarantee fees. Our principal markets include the GSE securitization market and the whole loan market. To determine the principal market, we considered the market with the greatest volume and level of activity within the market, and our ability to access that market. In the absence of a market with active trading, we determined the market that would maximize the amount we would receive upon sale.

#### GSE Securitization Market as Principal Market

For single-family mortgage loans where we determined the principal market is the GSE securitization market, we estimate fair value based on the estimate of the price we would receive if we were to securitize these loans. This principal market assumption applies to both loans held by consolidated trusts and unsecuritized loans.

Our estimate of fair value is based on: (a) comparisons to actively traded mortgage-related securities with similar characteristics; (b) the excess coupon (implied management and guarantee fee); and (c) the credit obligation related to performing our guarantee.

The security price is derived from benchmark security pricing for similar actively traded mortgage-related securities, and is adjusted for yield, credit, and liquidity differences. This security pricing process is consistent with our approach for valuing similar securities retained in our investment portfolio or issued to third parties. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — Investments in Securities."

We derive the implied management and guarantee fees in excess of the coupon on the mortgage-related securities by estimating the present value of the additional cash flows from these elements. Our approach for estimating the fair value of the implied management and guarantee fees uses third-party market data as practicable. The valuation approach for the majority of implied management and guarantee fees relates to fixed-rate loan products with coupons at or near current market rates and involves obtaining dealer quotes on hypothetical securities constructed with collateral characteristics

173

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

from our single-family credit guarantee portfolio. The remaining portion of the implied management and guarantee fees relates to underlying loan products for which comparable market prices are not readily available. These relate specifically to ARM products, highly seasoned loans, and fixed-rate loans with coupons that are not consistent with current market rates. For this portion of the single-family credit guarantee portfolio, the implied management and guarantee fees are valued using an expected cash flow approach, leveraging the market information received on the more liquid portion of the population and including only those cash flows expected to result from our contractual right to receive management and guarantee fees.

The estimate of fair value is also net of the related credit and other costs (such as general and administrative expense) and benefits (such as credit enhancements) inherent in our guarantee obligation. We use delivery and guarantee fees charged by us as a market benchmark for all guaranteed loans that would qualify for purchase under current underwriting standards (used for the majority of the guaranteed loans, but accounts for a small share of the overall fair value of the guarantee obligation). For loans that do not qualify for purchase based on current underwriting standards, we use our internal credit models, which incorporate factors such as loan characteristics, loan performance status information, expected losses, and risk premiums without further adjustment (used for less than a majority of the guaranteed loans, but accounts for the largest share of the overall fair value of the guarantee obligation).

For loans that have been refinanced under HARP, we value our guarantee obligation using the delivery and guarantee fees currently charged by us under that initiative. If, subsequent to delivery, the refinanced loan no longer qualifies for purchase based on current underwriting standards (such as becoming past due or being modified as a part of a troubled debt restructuring), the fair value of the guarantee obligation is then measured using our internal credit models as described above, or third-party market pricing as described below.

The total compensation that we receive for the delivery of a HARP loan reflects the pricing that we are willing to offer because HARP is a part of a broader government program intended to provide assistance to homeowners and prevent foreclosures. When HARP ends, the beneficial pricing afforded to HARP loans will no longer be reflected in our delivery and guarantee fee pricing structure. If these benefits were not reflected in the pricing for these loans, the fair value of our mortgage loans would have decreased by $8.5 billion as of March 31, 2012. The total fair value of the loans in our portfolio that reflects the pricing afforded to HARP loans as of March 31, 2012 as presented in our consolidated fair value balance sheets is $117.9 billion.

*Whole Loan Market as Principal Market*

For single-family mortgage loans where we determined the principal market is the whole loan market, we estimate fair value based on our estimate of prices we would receive if we were to sell these loans in the whole loan market. Prices for these loans are obtained from multiple dealers who reference market activity, where available, for deeply delinquent and modified loans and use internal models and their judgment to determine default rates, severity rates, home prices, and risk premiums.

*Level in the Fair Value Hierarchy*

Single-family mortgage loans are classified as Level 2 or Level 3 depending on whether the inputs are observable. Single-family mortgage loans that would qualify for purchase under current underwriting standards are assigned to Level 2 as the key inputs used for the valuation of these loans such as TBA pricing, our externally-published credit pricing grids for delivery and guarantee fees, and third-party excess interest-only prices, are observable while modeled components comprise a small percentage of total value (*e.g.*, general and administrative expense, credit enhancement). Other single-family mortgage loans are classified in Level 3 if our credit cost is based on our internal credit model or if loans are valued using prices obtained from dealers. The internal model and the dealer prices are based on assumptions, which include significant unobservable inputs.

<u>Multifamily Loans</u>

For a discussion of the techniques used to determine the fair value of held-for-sale, and both impaired and non-impaired held-for-investment multifamily loans, see "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — *Mortgage Loans, Held-for-Investment*" and "*— Mortgage Loans, Held-for-Sale,*" respectively.

**Other Assets**

Most of our other assets are not financial instruments required to be valued at fair value under the accounting guidance for disclosures about the fair value of financial instruments, such as property and equipment. For most of these non-financial instruments in other assets, we use the carrying amounts from our GAAP consolidated balance sheets as the

TREASURY-3712

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

reported values on our consolidated fair value balance sheets, without any adjustment. These assets represent an insignificant portion of our GAAP consolidated balance sheets.

We adjust the GAAP-basis deferred taxes reflected on our consolidated fair value balance sheets to include estimated income taxes on the difference between our consolidated fair value balance sheets net assets attributable to common stockholders, including deferred taxes from our GAAP consolidated balance sheets, and our GAAP consolidated balance sheets equity attributable to common stockholders. To the extent the adjusted deferred taxes are a net asset, this amount is included in other assets. In addition, if our net deferred tax assets on our consolidated fair value balance sheets, calculated as described above, exceed our net deferred tax assets on our GAAP consolidated balance sheets that have been reduced by a valuation allowance, our net deferred tax assets on our consolidated fair value balance sheets are limited to the amount of our net deferred tax assets on our GAAP consolidated balance sheets. If the adjusted deferred taxes are a net liability, this amount is included in other liabilities.

Accrued interest receivable is one of the components included within other assets on our consolidated fair value balance sheets. On our GAAP consolidated balance sheets, we reverse accrued but uncollected interest income when a loan is placed on non-accrual status. There is no such reversal performed for the fair value of accrued interest receivable disclosed on our consolidated fair value balance sheets. Rather, we include in our fair value disclosure the amount we deem to be collectible. As a result, there is a difference between the accrued interest receivable GAAP-basis carrying amount and its fair value disclosed on our consolidated fair value balance sheets.

Other assets are classified primarily as Level 2 or Level 3 depending on whether unobservable inputs are significant to the fair value measurement.

### Total Debt, Net

Total debt, net represents debt securities of consolidated trusts held by third parties and other debt that we issued to finance our assets. On our consolidated GAAP balance sheets, total debt, net, excluding debt securities for which the fair value option has been elected, is reported at amortized cost, which is net of deferred items, including premiums, discounts, and hedging-related basis adjustments.

For fair value balance sheet purposes, we use the dealer-published quotes for a base TBA security, adjusted for the carry and pay-up price adjustments, to determine the fair value of the debt securities of consolidated trusts held by third parties. The valuation techniques we use are similar to the approach we use to value our investments in agency securities for GAAP purposes. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — *Investments in Securities — Agency Securities*" for additional information regarding the valuation techniques we use.

Other debt includes both non-callable and callable debt, as well as short-term zero-coupon discount notes. The fair value of the short-term zero-coupon discount notes is based on a discounted cash flow model with market inputs. The valuation of other debt securities represents the proceeds that we would receive from the issuance of debt and is generally based on market prices obtained from broker/dealers or reliable third-party pricing service providers. We elected the fair value option for foreign-currency denominated debt and certain other debt securities and reported them at fair value on our GAAP consolidated balance sheets. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — *Debt Securities Recorded at Fair Value*" for additional information.

The majority of our debt is classified in Level 2, as these are liquid securities and multiple pricing sources are generally available (through pricing and verification), historically with a tight price range including verification sources. A smaller population of debt, including debt where the fair value option is elected, is classified as Level 3 because these are illiquid securities with significant unobservable inputs and wide pricing ranges.

### Other Liabilities

Other liabilities consist of accrued interest payable on debt securities, the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities, the reserve for guarantee losses on non-consolidated trusts, servicer advanced interest payable and certain other servicer liabilities, accounts payable and accrued expenses, payables related to securities, and other miscellaneous liabilities. We believe the carrying amount of these liabilities is a reasonable approximation of their fair value, except for the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities. The technique for estimating the fair value of our

175                                                                 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

guarantee obligation related to the credit component of the loan's fair value is described in the "Mortgage Loans — Single-Family Loans" section.

As discussed in "Other Assets," other liabilities may include a deferred tax liability adjusted for fair value balance sheet purposes.

Other liabilities are classified primarily as Level 2 or Level 3 depending on whether unobservable inputs are significant to the fair value measurement.

### Net Assets Attributable to Senior Preferred Stockholders

Our senior preferred stock held by Treasury in connection with the Purchase Agreement is recorded at the stated liquidation preference for purposes of the consolidated fair value balance sheets, which is the same as the carrying value in our GAAP consolidated balance sheets, and does not reflect fair value. As the senior preferred stock is restricted as to its redemption, we consider the liquidation preference to be the most appropriate measure for purposes of the consolidated fair value balance sheets. Our senior preferred stock is classified as Level 3 because observable inputs are not available as this stock is not traded.

### Net Assets Attributable to Preferred Stockholders

To determine the preferred stock fair value, we use a market-based approach incorporating quoted dealer prices. Net Assets Attributable to Preferred Stockholders is classified as Level 2 because we receive multiple dealer quotes within a relatively narrow range, indicating an active market.

### Net Assets Attributable to Common Stockholders

Net assets attributable to common stockholders is equal to the difference between the fair value of total assets and total liabilities reported on our consolidated fair value balance sheets, less the value of net assets attributable to senior preferred stockholders and the fair value attributable to preferred stockholders. Our net assets attributable to common stockholders is classified as Level 3 because observable inputs are not available.

## NOTE 17: LEGAL CONTINGENCIES

We are involved as a party in a variety of legal and regulatory proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment-related litigation and other legal proceedings incidental to our business. We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures. From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and/or service mortgages for, us. In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories. In addition, we are sometimes sued in connection with the origination or servicing of mortgages. These suits typically involve claims alleging wrongful actions of seller/servicers. Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions with respect to mortgages sold to or serviced for Freddie Mac.

Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction. In accordance with the accounting guidance for contingencies, we reserve for litigation claims and assessments asserted or threatened against us when a loss is probable and the amount of the loss can be reasonably estimated.

During the three months ended March 31, 2012, we paid approximately $2 million for the advancement of legal fees and expenses of current and former officers and directors pursuant to our indemnification obligations to them. These fees and expenses related to some of the matters described below and to certain shareholder derivative lawsuits that were dismissed in April and May 2011. This figure does not include certain administrative support costs and certain costs related to document production and storage.

**Putative Securities Class Action Lawsuits**

*Ohio Public Employees Retirement System ("OPERS") vs. Freddie Mac, Syron, et al.* This putative securities class action lawsuit was filed against Freddie Mac and certain former officers on January 18, 2008 in the U.S. District Court for the Northern District of Ohio purportedly on behalf of a class of purchasers of Freddie Mac stock from August 1, 2006 through November 20, 2007. The plaintiff alleges that the defendants violated federal securities laws by making false and misleading statements concerning our business, risk management and the procedures we put into place to protect the company from problems in the mortgage industry. On April 10, 2008, the Court appointed OPERS as lead plaintiff and approved its choice of counsel. On September 2, 2008, defendants filed motions to dismiss plaintiff's amended complaint.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3714

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

On November 7, 2008, the plaintiff filed a second amended complaint, which removed certain allegations against Richard Syron, Anthony Piszel, and Eugene McQuade, thereby leaving insider-trading allegations against only Patricia Cook. The second amended complaint also extends the damages period, but not the class period. The plaintiff seeks unspecified damages and interest, and reasonable costs and expenses, including attorney and expert fees. On November 19, 2008, the Court granted FHFA's motion to intervene in its capacity as Conservator. On April 6, 2009, defendants filed motions to dismiss the second amended complaint. On January 23, 2012, the Court denied defendants' motions to dismiss and set a briefing schedule for plaintiff's motion for leave to amend its complaint. On February 13, 2012, plaintiff filed motion for leave to amend, which sought leave to file a third amended complaint and add allegations based on a non-prosecution agreement entered into between Freddie Mac and the SEC on December 15, 2011. On March 27, 2012, the Court granted the plaintiff's motion for leave to amend, and plaintiff filed its third amended complaint on March 28, 2012.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential impact on our business, financial condition, or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre-trial litigation; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

*Kuriakose vs. Freddie Mac, Syron, Piszel and Cook.* Another putative class action lawsuit was filed against Freddie Mac and certain former officers on August 15, 2008 in the U.S. District Court for the Southern District of New York for alleged violations of federal securities laws purportedly on behalf of a class of purchasers of Freddie Mac stock from November 21, 2007 through August 5, 2008. The plaintiffs claim that defendants made false and misleading statements about Freddie Mac's business that artificially inflated the price of Freddie Mac's common stock, and seek unspecified damages, costs, and attorneys' fees. On February 6, 2009, the Court granted FHFA's motion to intervene in its capacity as Conservator. On May 19, 2009, plaintiffs filed an amended consolidated complaint, purportedly on behalf of a class of purchasers of Freddie Mac stock from November 20, 2007 through September 7, 2008. Freddie Mac filed a motion to dismiss the complaint on February 24, 2010. On March 30, 2011, the Court granted without prejudice Freddie Mac's motion to dismiss all claims, and allowed the plaintiffs the option to file a new complaint, which they did on July 15, 2011. The defendants have filed motions to dismiss the second amended consolidated complaint. On February 17, 2012, plaintiff served a motion seeking leave to file a third amended consolidated complaint based on the non-prosecution agreement entered into between Freddie Mac and the SEC on December 15, 2011.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential impact on our business, financial condition, or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre-trial litigation; the fact that the Court has not yet ruled upon the defendants' motions to dismiss the second amended complaint or plaintiffs' motion seeking leave to file a third amended complaint; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

## Energy Lien Litigation

On July 14, 2010, the State of California filed a lawsuit against Freddie Mac, Fannie Mae, FHFA, and others in the U.S. District Court for the Northern District of California, alleging that Freddie Mac and Fannie Mae committed unfair business practices in violation of California law by asserting that property liens arising from government-sponsored energy initiatives such as California's Property Assessed Clean Energy, or PACE, program cannot take priority over a mortgage to be sold to Freddie Mac or Fannie Mae. The lawsuit contends that the PACE programs create liens superior to such mortgages and that, by affirming Freddie Mac and Fannie Mae's positions, FHFA has violated the National Environmental Policy Act, or NEPA, and the Administrative Procedure Act, or APA. The complaint seeks declaratory and injunctive relief, costs and such other relief as the court deems proper.

Similar complaints have been filed by other parties. On July 26, 2010, the County of Sonoma filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging similar violations of California law, NEPA, and the APA. In a filing dated September 23, 2010, the County of Placer moved to intervene in the Sonoma County lawsuit as a party plaintiff seeking to assert similar claims, which motion was granted on November 1, 2010. On October 1, 2010, the City of Palm Desert filed a similar complaint against Fannie Mae,

TREASURY-3715

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Freddie Mac, and FHFA in the Northern District of California. On October 8, 2010, Leon County and the Leon County Energy Improvement District filed a similar complaint against Fannie Mae, Freddie Mac, FHFA, and others in the Northern District of Florida. On October 12, 2010, FHFA filed a motion before the Judicial Panel on Multi-District Litigation seeking an order transferring these cases as well as a related case filed only against FHFA, for coordination or consolidation of pretrial proceedings. This motion was denied on February 8, 2011. On October 14, 2010, the defendants filed a motion to dismiss the lawsuits pending in the Northern District of California. Also on October 14, 2010, the County of Sonoma filed a motion for preliminary injunction seeking to enjoin the defendants from giving any force or effect in Sonoma County to certain directives by FHFA regarding energy retrofit loan programs and other related relief. On October 26, 2010, the Town of Babylon filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA, as well as the Office of the Comptroller of the Currency, in the U.S. District Court for the Eastern District of New York.

The defendants filed motions to dismiss these lawsuits. The courts have entered stipulated orders dismissing the individual officers of Freddie Mac and Fannie Mae from the cases. On December 17, 2010, the judge handling the cases in the Northern District of California requested a position statement from the United States, which was filed on February 8, 2011. On June 13, 2011, the complaint filed by the Town of Babylon was dismissed. On August 11, 2011, the Town of Babylon filed a notice of appeal to the U.S. Court of Appeals for the Second Circuit. On August 26, 2011, the California federal court granted in part defendants' motion to dismiss, leaving only plaintiffs' APA and NEPA claims against FHFA. The California federal district court cases were thereafter consolidated and the plaintiffs in those cases filed a joint motion for summary judgment on January 23, 2012. FHFA cross-moved for summary judgment on February 27, 2012.

Sonoma County's motion for preliminary injunction was granted in part, requiring FHFA to provide a notice and comment period with regard to its directives. FHFA filed an appeal of the injunction on September 15, 2011, and the District Court granted FHFA a 10-day stay of the injunction to allow FHFA to request a further stay from the U.S. Court of Appeals for the Ninth Circuit, which occurred on October 11, 2011. By order dated December 20, 2011, the Ninth Circuit denied the request for a stay with respect to the notice and comment period. Accordingly, on January 26, 2012, FHFA issued an advance notice of proposed rulemaking and notice of intent to prepare an environmental impact statement. On April 26, 2012, the Ninth Circuit issued an order stating that "the stay of the preliminary injunction remains in effect" and that it "will take no action on [the California plaintiffs'] appeal until after a decision on the summary judgment motions is issued."

On October 17, 2011 the City of Palm Desert voluntarily dismissed any remaining claims it might have had against Freddie Mac. The complaint filed by Leon County was dismissed by the Court on September 30, 2011. Leon County filed a notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit on November 28, 2011.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matters due to the following factors, among others: the inherent uncertainty of pre-trial litigation; and the fact that the appeals filed by the Town of Babylon and Leon County are still pending.

## Government Investigations and Inquiries

On December 16, 2011, the SEC announced that it had charged three former executives of Freddie Mac with securities laws violations. These executives are former Chairman of the Board and Chief Executive Officer Richard F. Syron, former Executive Vice President and Chief Business Officer Patricia L. Cook, and former Executive Vice President for the single-family guarantee business Donald J. Bisenius.

## Related Third Party Litigation and Indemnification Requests

On December 15, 2008, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York against certain former Freddie Mac officers and others styled *Jacoby vs. Syron, Cook, Piszel, Banc of America Securities LLC, JP Morgan Chase & Co., and FTN Financial Markets*. The complaint, as amended on December 17, 2008, contends that the defendants made material false and misleading statements in connection with Freddie Mac's September 2007 offering of non-cumulative, non-convertible, perpetual fixed-rate preferred stock, and that such statements "grossly overstated Freddie Mac's capitalization" and "failed to disclose Freddie Mac's exposure to mortgage-related losses, poor underwriting standards and risk management procedures." The complaint further alleges that Syron, Cook, and Piszel made additional false statements following the offering. Freddie Mac is not named as a defendant in this lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and

178                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel. The case is currently dormant and we believe plaintiff may have abandoned it.

By letter dated October 17, 2008, Freddie Mac received formal notification of a putative class action securities lawsuit, *Mark vs. Goldman, Sachs & Co., J.P. Morgan Chase & Co., and Citigroup Global Markets Inc.,* filed on September 23, 2008, in the U.S. District Court for the Southern District of New York, regarding the company's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock.

On January 29, 2009, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York styled *Kreysar vs. Syron, et al.* On April 30, 2009, the Court consolidated the Mark case with the Kreysar case, and the plaintiffs filed a consolidated class action complaint on July 2, 2009. The consolidated complaint alleged that three former Freddie Mac officers, certain underwriters and Freddie Mac's auditor violated federal securities laws by making material false and misleading statements in connection with the company's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock. The complaint further alleged that certain defendants and others made additional false statements following the offering. The complaint named as defendants Syron, Piszel, Cook, Goldman, Sachs & Co., JPMorgan Securities Inc., Banc of America Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Morgan Stanley & Co. Incorporated, UBS Securities LLC and PricewaterhouseCoopers LLP.

After the Court dismissed, without prejudice, the plaintiffs' consolidated complaint, amended consolidated complaint, and second consolidated complaint, the plaintiffs filed a third amended consolidated complaint against PricewaterhouseCoopers LLP, Syron and Piszel, omitting Cook and the underwriter defendants, on November 14, 2010. On January 11, 2011, the Court granted the remaining defendants' motion to dismiss the complaint with respect to PricewaterhouseCoopers LLP, but denied the motion with respect to Syron and Piszel. On April 4, 2011, Piszel filed a motion for partial judgment on the pleadings. The Court granted that motion on April 28, 2011. The plaintiffs moved for class certification on June 30, 2011, but withdrew this motion on July 5, 2011. The plaintiffs again moved for class certification on August 30, 2011, which motion was denied on March 27, 2012. Plaintiffs moved for reconsideration of this denial on April 11, 2012.

Freddie Mac is not named as a defendant in the consolidated lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the underwriting agreement in this case, including reimbursement of fees and disbursements of their legal counsel. At present, it is not possible for us to predict the probable outcome of the lawsuit or any potential impact on our business, financial condition or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the inherent uncertainty of pre-trial litigation and the fact that plaintiffs may appeal the denial of class certification. Absent the certification of a specified class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

On July 6, 2011, plaintiffs filed a lawsuit in the U.S. District Court for Massachusetts styled *Liberty Mutual Insurance Company, Peerless Insurance Company, Employers Insurance Company of Wausau, Safeco Corporation and Liberty Life Assurance Company of Boston vs. Goldman, Sachs & Co.* The complaint alleges that Goldman, Sachs & Co. made materially misleading statements and omissions in connection with Freddie Mac's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock. Freddie Mac is not named as a defendant in this lawsuit.

In an amended complaint dated February 17, 2012, Western and Southern Life Insurance Company and others asserted claims against GS Mortgage Securities Corp., Goldman Sachs Mortgage Company and Goldman Sachs & Co. in the Court of Common Pleas, Hamilton County, Ohio. The amended complaint asserts, among other things, that "Goldman Sachs" is liable to plaintiffs under the Ohio Securities Act for alleged misstatements and omissions in connection with $6 billion of preferred stock issued by Freddie Mac on December 4, 2007. Freddie Mac is not named as a defendant in this lawsuit.

## Lehman Bankruptcy

On September 15, 2008, Lehman filed a chapter 11 bankruptcy petition in the Bankruptcy Court for the Southern District of New York. Thereafter, many of Lehman's U.S. subsidiaries and affiliates also filed bankruptcy petitions (collectively, the "Lehman Entities"). Freddie Mac had numerous relationships with the Lehman Entities which give rise to several claims. On September 22, 2009, Freddie Mac filed proofs of claim in the Lehman bankruptcies aggregating

TREASURY-3717

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

approximately $2.1 billion. On April 14, 2010, Lehman filed its chapter 11 plan of liquidation and disclosure statement, providing for the liquidation of the bankruptcy estate's assets over the next three years. The plan and disclosure statement were subsequently modified several times. Hearings to consider confirmation of the plan were conducted on December 6, 2011 and, on that date, the plan was confirmed by the court. The plan sets aside $1.2 billion to be available for payment in full of our priority claim relating to losses incurred on short-term lending transactions with certain Lehman Entities if it is ultimately allowed as a priority claim, but leaves open for subsequent litigation whether our claim of priority status is proper. In the event that this claim is not ultimately accorded priority status, it will be treated as a senior unsecured claim under the plan, pursuant to which Freddie Mac would be entitled to receive an estimated distribution of approximately 21% (or approximately $250 million) over the next three years. The plan also provides that general unsecured claims, such as our claim relating to repurchase obligations of $868 million, will be entitled to a distribution of approximately 19.9% of the allowed amount, if any. The plan does not adjudge or allow our unsecured repurchase obligations claim, but permits claims allowance proceedings to continue. Finally, the plan entitles Freddie Mac to a distribution of approximately 39% (or about $6.4 million) payable over the next three years on our allowed claim exceeding $16 million relating to losses on derivative transactions.

### Taylor, Bean & Whitaker Bankruptcy

On August 24, 2009, TBW, which had been one of our single-family seller/servicers, filed for bankruptcy in the Bankruptcy Court for the Middle District of Florida. In 2011, with the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. See "NOTE 18: LEGAL CONTINGENCIES" in our 2011 Annual Report for information on the settlement.

We understand that Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, or its creditors, may file an action to recover certain funds paid to us prior to the TBW bankruptcy. However, no actions against Freddie Mac related to Ocala have been initiated in bankruptcy court or elsewhere to recover assets. Based on court filings and other information, we understand that Ocala or its creditors may attempt to assert fraudulent transfer and other possible claims totaling approximately $840 million against us related to funds that were allegedly transferred from Ocala to Freddie Mac custodial accounts. We also understood that Ocala might attempt to make claims against us asserting ownership of a large number of loans that we purchased from TBW. The order approving the settlement provides that nothing in the settlement shall be construed to limit, waive or release Ocala's claims against Freddie Mac, except for TBW's claims and claims arising from the allocation of the loans discussed above to Freddie Mac.

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding mortgage bankers bonds providing fidelity and errors and omissions insurance coverage. Several excess insurers on the bonds thereafter filed similar claims in that action. Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder. Discovery is proceeding.

### IRS Litigation

We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2007 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices for the 1998 to 2005 tax years. We paid the tax assessed in the Statutory Notice received for the years 2006 to 2007 of $36 million and will seek a refund through the administrative process, which could include filing suit in Federal District Court. A Tax Court trial date has been scheduled for November 13, 2012. We believe appropriate reserves have been provided for settlement on reasonable terms. For information on this matter, see "NOTE 12: INCOME TAXES."

### Lawsuits Involving Real Estate Transfer Taxes and Recordation Taxes

On June 20, 2011, Oakland County (Michigan) and the Oakland County Treasurer filed a lawsuit against Freddie Mac and Fannie Mae in the U.S. District Court for the Eastern District of Michigan alleging that the enterprises failed to pay real estate transfer taxes on transfers of real property in Oakland County where the enterprises were the grantors. FHFA later intervened as Conservator for Freddie Mac and Fannie Mae. On November 10, 2011, Genesee County (Michigan) and the Genesee County Treasurer filed a class action lawsuit in the same court on behalf of itself and the other 82 Michigan Counties raising similar claims against FHFA (as Conservator), Freddie Mac, and Fannie Mae. The Court later certified the class, with two Michigan counties opting out. The Michigan Department of Attorney General and the Michigan Department of Treasury intervened in both actions against the defendants. In both actions, FHFA, Freddie Mac and Fannie Mae asserted that they were not liable for the transfer taxes based on statutory tax exemptions applicable to each. On March 23, 2012, the Court granted summary judgment against FHFA (as Conservator), Freddie Mac, and

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                                 Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Fannie Mae in both actions, determining that the statutory exemptions did not exempt them from Michigan's state and county transfer tax. On April 24, 2012, the plaintiffs in the Oakland County case sought leave to file a second amended complaint to cover purportedly taxable transactions where the enterprises received property as grantees through a Michigan Sheriff's deed or a deed in lieu of foreclosure. Also on April 24, 2012, FHFA (as Conservator), Freddie Mac, and Fannie Mae requested that the Court certify its March 23, 2012 orders granting plaintiffs summary judgment for an interlocutory appeal to the U.S. Court of Appeals for the Sixth Circuit and stay the actions pending resolution of any resulting appeal. On April 26, 2012, the plaintiffs in the Genesee County case sought leave to file an amended complaint to cover purportedly taxable transactions where the enterprises received property as grantees through a Michigan Sheriff's deed or a deed in lieu of foreclosure. The Court has not yet ruled on the defendants' motion for certification of an interlocutory appeal and motion for a stay, the Oakland plaintiffs' motion to file a second amended complaint or the Genesee plaintiffs' motion to file an amended complaint, nor has it addressed the amount of damages the plaintiffs contend are owed in either case.

On or about June 22, 2011, Curtis Hertel (individually and as Register of Deeds of Ingham County, Michigan) filed suit in Michigan state court against Freddie Mac, Fannie Mae and others alleging, among other things, that the defendants failed to pay real estate transfer taxes on transfers of real property in Ingham County where the enterprises were the grantors and grantees. FHFA later intervened as Conservator for Freddie Mac and Fannie Mae, and the Michigan Department of Attorney General and the Michigan Department of Treasury intervened against the enterprises. The defendants removed the case to the U.S. District Court for the Western District of Michigan and then filed motions to dismiss and/or for summary judgment. The Court dismissed plaintiff Hertel from the case concluding that Hertel was not a proper plaintiff, but the Court has not yet ruled on the enterprises' and FHFA's motion to dismiss and/or for summary judgment as to the claims asserted by the Michigan Department of Attorney General and the Michigan Department of Treasury.

The plaintiffs in the Oakland County, Genesee County, and Ingham County cases are all seeking a declaration that the enterprises' statutory exemptions do not cover recording taxes such as the Michigan transfer taxes, damages against the enterprises for unpaid state transfer taxes, as well as penalties, interest, pre-judgment interest, costs and attorneys' fees.

On May 10, 2010, Andrew Ludel and Robert Hager (on behalf of the District of Columbia and District of Columbia Recorder of Deeds) filed a lawsuit against Freddie Mac, Fannie Mae, and Wells Fargo Home Mortgage, Inc. in the D.C. Superior Court alleging that the enterprises violated the D.C. False Claims Act by failing to pay D.C. recordation taxes. Plaintiffs voluntarily dismissed the complaint on November 10, 2010, refiled the complaint on January 24, 2011, and filed a second amended complaint on March 8, 2011. The case was removed to the U.S. District Court for the District of Columbia on November 23, 2011. FHFA later intervened as Conservator for Freddie Mac and Fannie Mae. The enterprises and FHFA filed a motion to dismiss the complaint based on their respective statutory tax exemptions and the plaintiffs failure to adequately allege a false claims act violation. The Court has not yet ruled on the motion. The plaintiffs are seeking, among other things, treble damages on all recordation taxes not paid for a ten year period, plus penalties, interest, liquated penalties, pre-judgment interest, costs and attorneys' fees.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential impact on our business, financial condition or results of operation. In addition, we are unable to reasonably estimate the possible loss or range of possible loss with respect to these lawsuits due to the following factors, among others: (a) none of the plaintiffs have demanded a stated amount of damages they believe are due; (b) with respect to the Oakland County and Genesee County lawsuits, the scope of permissible claims has not yet been determined and discovery regarding the amount of damages is still in the early stages; and (c) with respect to the Ingham County and Ludel lawsuits, discovery regarding the amount of damages has not yet begun.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### NOTE 18: SIGNIFICANT COMPONENTS OF OTHER ASSETS AND OTHER LIABILITIES ON OUR CONSOLIDATED BALANCE SHEETS

The table below presents the significant components of other assets and other liabilities on our consolidated balance sheets.

**Table 18.1 — Significant Components of Other Assets and Other Liabilities on Our Consolidated Balance Sheets**

|  | March 31, 2012 | December 31, 2011 |
|---|---|---|
|  | (in millions) | |
| Other assets: | | |
| Guarantee asset | $ 798 | $ 752 |
| Accounts and other receivables | 8,616 | 8,350 |
| All other | 1,347 | 1,411 |
| Total other assets | $ 10,761 | $ 10,513 |
| Other liabilities: | | |
| Guarantee obligation | $ 814 | $ 787 |
| Servicer liabilities | 3,571 | 3,600 |
| Accounts payable and accrued expenses | 942 | 845 |
| All other | 959 | 814 |
| Total other liabilities | $ 6,286 | $ 6,046 |

182                                                                                 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## PART II OTHER INFORMATION

### ITEM 1. LEGAL PROCEEDINGS

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business. See "NOTE 17: LEGAL CONTINGENCIES" for more information regarding our involvement as a party to various legal proceedings.

### ITEM 1A. RISK FACTORS

This Form 10-Q should be read together with the "RISK FACTORS" section in our 2011 Annual report, which describes various risks and uncertainties to which we are or may become subject. These risks and uncertainties could, directly or indirectly, adversely affect our business, financial condition, results of operations, cash flows, strategies, and/or prospects.

### ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

**Recent Sales of Unregistered Securities**

The securities we issue are "exempted securities" under the Securities Act of 1933, as amended. As a result, we do not file registration statements with the SEC with respect to offerings of our securities.

Following our entry into conservatorship, we suspended the operation of, and ceased making grants under, equity compensation plans. Previously, we had provided equity compensation under those plans to employees and members of our Board of Directors. Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations, or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms.

No stock options were exercised during the three months ended March 31, 2012. However, restrictions lapsed on 460,846 restricted stock units.

See "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report for more information.

**Dividend Restrictions**

Our payment of dividends on Freddie Mac common stock or any series of Freddie Mac preferred stock (other than senior preferred stock) is subject to certain restrictions as described in "MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES — Dividends and Dividend Restrictions" in our 2011 Annual Report.

**Information about Certain Securities Issuances by Freddie Mac**

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Freddie Mac's securities offerings are exempted from SEC registration requirements. As a result, we are not required to and do not file registration statements or prospectuses with the SEC with respect to our securities offerings. To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars (or supplements thereto) that we post on our web site or in a current report on Form 8-K, in accordance with a "no-action" letter we received from the SEC staff. In cases where the information is disclosed in an offering circular posted on our web site, the document will be posted on our web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The web site address for disclosure about our debt securities, other than debt securities of consolidated trusts, is www.freddiemac.com/debt. From this address, investors can access the offering circular and related supplements for debt securities offerings under Freddie Mac's global debt facility, including pricing supplements for individual issuances of debt securities.

183

*Freddie Mac*

TREASURY-3721

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Disclosure about the mortgage-related securities we issue, some of which are off-balance sheet obligations, can be found at www.freddiemac.com/mbs. From this address, investors can access information and documents about our mortgage-related securities, including offering circulars and related offering circular supplements.

184                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Table of Contents**

**ITEM 6. EXHIBITS**

The exhibits are listed in the Exhibit Index at the end of this Form 10-Q.

185

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on  its behalf by the undersigned thereunto duly authorized.

Federal Home Loan Mortgage Corporation

By: /s/  Charles E. Haldeman, Jr.
      Charles E. Haldeman, Jr.
      Chief Executive Officer

Date: May 3, 2012

By: /s/  Ross J. Kari
      Ross J. Kari
      Executive Vice President — Chief Financial Officer
      (Principal Financial Officer)

Date: May 3, 2012

186                      *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

# GLOSSARY

This Glossary includes acronyms and defined terms that are used throughout this Form 10-Q.

**Administration** — Executive branch of the U.S. Government.

**Agency securities** — Generally refers to mortgage-related securities issued by the GSEs or government agencies.

**Alt-A loan** — Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. In determining our Alt-A exposure on loans underlying our single-family credit guarantee portfolio, we classified mortgage loans as Alt-A if the lender that delivers them to us classified the loans as Alt-A, or if the loans had reduced documentation requirements, as well as a combination of certain credit characteristics and expected performance characteristics at acquisition which, when compared to full documentation loans in our portfolio, indicate that the loan should be classified as Alt-A. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. For non-agency mortgage-related securities that are backed by Alt-A loans, we categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions.

**AOCI** — Accumulated other comprehensive income (loss), net of taxes

**ARM** — Adjustable-rate mortgage — A mortgage loan with an interest rate that adjusts periodically over the life of the mortgage loan based on changes in a benchmark index.

**Board** — Board of Directors

**Bond insurers** — Companies that provide credit insurance principally covering securitized assets in both the primary issuance and secondary markets.

**BPS** — Basis points — One one-hundredth of 1%. This term is commonly used to quote the yields of debt instruments or movements in interest rates.

**Cash and other investments portfolio** — Our cash and other investments portfolio is comprised of our cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and investments in non-mortgage-related securities.

**Charter** — The Federal Home Loan Mortgage Corporation Act, as amended, 12 U.S.C. § 1451 et seq.

**CMBS** — Commercial mortgage-backed security — A security backed by mortgages on commercial property (often including multifamily rental properties) rather than one-to-four family residential real estate. Although the mortgage pools underlying CMBS can include mortgages financing multifamily properties and commercial properties, such as office buildings and hotels, the classes of CMBS that we hold receive distributions of scheduled cash flows only from multifamily properties. Military housing revenue bonds are included as CMBS within investments-related disclosures. We have not identified CMBS as either subprime or Alt-A securities.

**Comprehensive income (loss)** — Consists of net income (loss) plus total other comprehensive income (loss).

**Conforming loan/Conforming jumbo loan/Conforming loan limit** — A conventional single-family mortgage loan with an original principal balance that is equal to or less than the applicable conforming loan limit, which is a dollar amount cap on the size of the original principal balance of single-family mortgage loans we are permitted by law to purchase or securitize. The conforming loan limit is determined annually based on changes in FHFA's housing price index. Any decreases in the housing price index are accumulated and used to offset any future increases in the housing price index so that conforming loan limits do not decrease from year-to-year. Since 2006, the base conforming loan limit for a one-family residence has been set at $417,000, and higher limits have been established in certain "high-cost" areas (currently, up to $625,500 for a one-family residence). Higher limits also apply to two- to four-family residences, and for mortgages secured by properties in Alaska, Guam, Hawaii and the U.S. Virgin Islands.

187

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

Actual loan limits are set by FHFA for each county (or equivalent), and the loan limit for specific high-cost areas may be lower than the maximum amounts. We refer to loans that we have purchased with UPB exceeding the base conforming loan limit (*i.e.*, $417,000) as conforming jumbo loans.

Beginning in 2008, pursuant to a series of laws, our loan limits in certain high-cost areas were increased temporarily above the limits that otherwise would have been applicable (up to $729,750 for a one-family residence). The latest of these increases expired on September 30, 2011.

**Conservator** — The Federal Housing Finance Agency, acting in its capacity as conservator of Freddie Mac.

**Convexity** — A measure of how much a financial instrument's duration changes as interest rates change.

**Core spread income** — Refers to a fair value estimate of the net current period accrual of income from the spread between mortgage-related investments and debt, calculated on an option-adjusted basis.

**Credit enhancement** — Any number of different financial arrangements that are designed to reduce credit risk by partially or fully compensating an investor in the event of certain financial losses. Examples of credit enhancements include mortgage insurance, overcollateralization, indemnification agreements, and government guarantees.

**Credit losses** — Consists of charge-offs and REO operations income (expense).

**Credit-related expenses** — Consists of our provision for credit losses and REO operations income (expense).

**Deed in lieu of foreclosure** — An alternative to foreclosure in which the borrower voluntarily conveys title to the property to the lender and the lender accepts such title (sometimes together with an additional payment by the borrower) in full satisfaction of the mortgage indebtedness.

**Delinquency** — A failure to make timely payments of principal or interest on a mortgage loan. For single-family mortgage loans, we generally report delinquency rate information for loans that are seriously delinquent. For multifamily loans, we report delinquency rate information based on the UPB of loans that are two monthly payments or more past due or in the process of foreclosure.

**Derivative** — A financial instrument whose value depends upon the characteristics and value of an underlying financial asset or index, such as a security or commodity price, interest or currency rates, or other financial indices.

**Dodd-Frank Act** — Dodd-Frank Wall Street Reform and Consumer Protection Act.

**DSCR** — Debt Service Coverage Ratio — An indicator of future credit performance for multifamily loans. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

**Duration** — Duration is a measure of a financial instrument's price sensitivity to changes in interest rates.

**Duration gap** — One of our primary interest-rate risk measures. Duration gap is a measure of the difference between the estimated durations of our interest rate sensitive assets and liabilities. We present the duration gap of our financial instruments in units expressed as months. A duration gap of zero implies that the change in value of our interest rate sensitive assets from an instantaneous change in interest rates would be expected to be accompanied by an equal and offsetting change in the value of our debt and derivatives, thus leaving the net fair value of equity unchanged.

**Effective rent** — The average rent actually paid by the tenant over the term of a lease.

**Euribor** — Euro Interbank Offered Rate

**Exchange Act** — Securities and Exchange Act of 1934, as amended

**Fannie Mae** — Federal National Mortgage Association

**FASB** — Financial Accounting Standards Board

**FDIC** — Federal Deposit Insurance Corporation

**Federal Reserve** — Board of Governors of the Federal Reserve System

**FHA** — Federal Housing Administration

188

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**FHFA** — Federal Housing Finance Agency — FHFA is an independent agency of the U.S. government established by the Reform Act with responsibility for regulating Freddie Mac, Fannie Mae, and the FHLBs.

**FHLB** — Federal Home Loan Bank

**FICO score** — A credit scoring system developed by Fair, Isaac and Co. FICO scores are the most commonly used credit scores today. FICO scores are ranked on a scale of approximately 300 to 850 points with a higher value indicating a lower likelihood of credit default.

**Fixed-rate mortgage** — Refers to a mortgage originated at a specific rate of interest that remains constant over the life of the loan.

**Foreclosure alternative** — A workout option pursued when a home retention action is not successful or not possible. A foreclosure alternative is either a short sale or deed in lieu of foreclosure.

**Foreclosure transfer** — Refers to our completion of a transaction provided for by the foreclosure laws of the applicable state, in which a delinquent borrower's ownership interest in a mortgaged property is terminated and title to the property is transferred to us or to a third party. State foreclosure laws commonly refer to such transactions as foreclosure sales, sheriff's sales, or trustee's sales, among other terms. When we, as mortgage holder, acquire a property in this manner, we pay for it by extinguishing some or all of the mortgage debt.

**Freddie Mac mortgage-related securities** — Securities we issue and guarantee, including PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions.

**GAAP** — Generally accepted accounting principles

**Ginnie Mae** — Government National Mortgage Association

**GSE Act** — The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Reform Act.

**GSEs** — Government sponsored enterprises — Refers to certain legal entities created by the U.S. government, including Freddie Mac, Fannie Mae, and the FHLBs.

**Guarantee fee** — The fee that we receive for guaranteeing the payment of principal and interest to mortgage security investors.

**HAFA** — Home Affordable Foreclosures Alternative program — In 2009, the Treasury Department introduced the HAFA program to provide an option for HAMP-eligible homeowners who are unable to keep their homes. The HAFA program took effect on April 5, 2010 and we implemented it effective August 1, 2010.

**HAMP** — Home Affordable Modification Program — Refers to the effort under the MHA Program whereby the U.S. government, Freddie Mac and Fannie Mae commit funds to help eligible homeowners avoid foreclosure and keep their homes through mortgage modifications.

**HARP** — Home Affordable Refinance Program — Refers to the effort under the MHA Program that seeks to help eligible borrowers (whose monthly payments are current) with existing loans that are guaranteed by us or Fannie Mae to refinance into loans with more affordable monthly payments and/or fixed-rate terms. Through December 2011, under HARP, eligible borrowers who had mortgages sold to Freddie Mac or Fannie Mae on or before May 31, 2009 with current LTV ratios above 80% (and up to 125%) were allowed to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place. Beginning December 2011, HARP was expanded to allow eligible borrowers who have mortgages with current LTV ratios above 125% to refinance under the program. The relief refinance initiative, under which we also allow borrowers with LTV ratios of 80% and below to participate, is our implementation of HARP for our loans.

**HFA** — State or local Housing Finance Agency

**HUD** — U.S. Department of Housing and Urban Development — Prior to the enactment of the Reform Act, HUD had general regulatory authority over Freddie Mac, including authority over our affordable housing goals and new programs. Under the Reform Act, FHFA now has general regulatory authority over us, though HUD still has authority over Freddie Mac with respect to fair lending.

**Implied volatility** — A measurement of how the value of a financial instrument changes due to changes in the market's expectation of potential changes in future interest rates. A decrease in implied volatility generally increases the estimated

189                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

fair value of our mortgage assets and decreases the estimated fair value of our callable debt and options-based derivatives, while an increase in implied volatility generally has the opposite effect.

**Interest-only loan** — A mortgage loan that allows the borrower to pay only interest (either fixed-rate or adjustable-rate) for a fixed period of time before principal amortization payments are required to begin. After the end of the interest-only period, the borrower can choose to refinance the loan, pay the principal balance in total, or begin paying the monthly scheduled principal due on the loan.

**IRS** — Internal Revenue Service

**LIBOR** — London Interbank Offered Rate

**LIHTC partnerships** — Low-income housing tax credit partnerships — Prior to 2008, we invested as a limited partner in LIHTC partnerships, which are formed for the purpose of providing funding for affordable multifamily rental properties. These LIHTC partnerships invest directly in limited partnerships that own and operate multifamily rental properties that generate federal income tax credits and deductible operating losses.

**Liquidation preference** — Generally refers to an amount that holders of preferred securities are entitled to receive out of available assets, upon liquidation of a company. The initial liquidation preference of our senior preferred stock was $1.0 billion. The aggregate liquidation preference of our senior preferred stock includes the initial liquidation preference plus amounts funded by Treasury under the Purchase Agreement. In addition, dividends and periodic commitment fees not paid in cash are added to the liquidation preference of the senior preferred stock. We may make payments to reduce the liquidation preference of the senior preferred stock only in limited circumstances.

**LTV ratio** — Loan-to-value ratio — The ratio of the unpaid principal amount of a mortgage loan to the value of the property that serves as collateral for the loan, expressed as a percentage. Loans with high LTV ratios generally tend to have a higher risk of default and, if a default occurs, a greater risk that the amount of the gross loss will be high compared to loans with lower LTV ratios. We report LTV ratios based solely on the amount of the loan purchased or guaranteed by us, generally excluding any second lien mortgages (unless we own or guarantee the second lien).

**MD&A** — Management's Discussion and Analysis of Financial Condition and Results of Operations

**MHA Program** — Making Home Affordable Program — Formerly known as the Housing Affordability and Stability Plan, the MHA Program was announced by the Obama Administration in February 2009. The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. The MHA Program includes HARP and HAMP.

**Mortgage assets** — Refers to both mortgage loans and the mortgage-related securities we hold in our mortgage-related investments portfolio.

**Mortgage-related investments portfolio** — Our investment portfolio, which consists principally of mortgage-related securities and single-family and multifamily mortgage loans. The size of our mortgage-related investments portfolio under the Purchase Agreement is determined without giving effect to the January 1, 2010 change in accounting guidance related to transfers of financial assets and consolidation of VIEs. Accordingly, for purposes of the portfolio limit, when PCs and certain Other Guarantee Transactions are purchased into the mortgage-related investments portfolio, this is considered the acquisition of assets rather than the reduction of debt.

**Mortgage-to-debt OAS** — The net OAS between the mortgage and agency debt sectors. This is an important factor in determining the expected level of net interest yield on a new mortgage asset. Higher mortgage-to-debt OAS means that a newly purchased mortgage asset is expected to provide a greater return relative to the cost of the debt issued to fund the purchase of the asset and, therefore, a higher net interest yield. Mortgage-to-debt OAS tends to be higher when there is weak demand for mortgage assets and lower when there is strong demand for mortgage assets.

**Multifamily mortgage** — A mortgage loan secured by a property with five or more residential rental units.

**Multifamily mortgage portfolio** — Consists of multifamily mortgage loans held by us on our consolidated balance sheets as well as those underlying non-consolidated Freddie Mac mortgage-related securities, and other guarantee commitments, but excluding those underlying our guarantees of HFA bonds under the HFA Initiative.

**Net worth (deficit)** — The amount by which our total assets exceed (or are less than) our total liabilities as reflected on our consolidated balance sheets prepared in conformity with GAAP.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3728

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**NIBP** — New Issue Bond Program is a component of the Housing Finance Agency Initiative in which we and Fannie Mae issued partially-guaranteed pass-through securities to Treasury that are backed by bonds issued by various state and local HFAs. The program provides financing for HFAs to issue new housing bonds. Treasury is obligated to absorb any losses under the program up to a certain level before we are exposed to any losses.

**NPV** — Net present value

**OAS** — Option-adjusted spread — An estimate of the incremental yield spread between a particular financial instrument (*e.g.*, a security, loan or derivative contract) and a benchmark yield curve (*e.g.*, LIBOR or agency or U.S. Treasury securities). This includes consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options.

**OFHEO** — Office of Federal Housing Enterprise Oversight. The predecessor to FHFA.

**Option ARM loan** — Mortgage loans that permit a variety of repayment options, including minimum, interest-only, fully amortizing 30-year and fully amortizing 15-year payments. The minimum payment alternative for option ARM loans allows the borrower to make monthly payments that may be less than the interest accrued for the period. The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance. For our non-agency mortgage-related securities that are backed by option ARM loans, we categorize securities as option ARM if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM securities as either subprime or Alt-A securities.

**OTC** — Over-the-counter

**Other guarantee commitments** — Mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.

**Other Guarantee Transactions** — Transactions in which third parties transfer non-Freddie Mac mortgage-related securities to trusts specifically created for the purpose of issuing mortgage-related securities, or certificates, in the Other Guarantee Transactions.

**PCs** — Participation Certificates — Securities that we issue as part of a securitization transaction. Typically we purchase mortgage loans from parties who sell mortgage loans, place a pool of loans into a PC trust and issue PCs from that trust. The PCs are generally transferred to the seller of the mortgage loans in consideration of the loans or are sold to third party investors if we purchased the mortgage loans for cash.

**PMVS** — Portfolio Market Value Sensitivity — One of our primary interest-rate risk measures. PMVS measures are estimates of the amount of average potential pre-tax loss in the market value of our net assets due to parallel (PMVS-L) and non-parallel (PMVS-YC) changes in LIBOR.

**Primary mortgage market** — The market where lenders originate mortgage loans and lend funds to borrowers. We do not lend money directly to homeowners, and do not participate in this market.

**Purchase Agreement / Senior Preferred Stock Purchase Agreement** — An agreement the Conservator, acting on our behalf, entered into with Treasury on September 7, 2008, which was subsequently amended and restated on September 26, 2008 and further amended on May 6, 2009 and December 24, 2009.

**Recorded Investment** — The dollar amount of a loan recorded on our consolidated balance sheets, excluding any valuation allowance, such as the allowance for loan losses, but which does reflect direct write-downs of the investment. For mortgage loans, direct write-downs consist of valuation allowances associated with recording our initial investment in loans acquired with evidence of credit deterioration at the time of purchase. Recorded investment excludes accrued interest income.

**Reform Act** — The Federal Housing Finance Regulatory Reform Act of 2008, which, among other things, amended the GSE Act by establishing a single regulator, FHFA, for Freddie Mac, Fannie Mae, and the FHLBs.

**Relief refinance mortgage** — A single-family mortgage loan delivered to us for purchase or guarantee that meets the criteria of the Freddie Mac Relief Refinance Mortgage℠ initiative. Part of this initiative is our implementation of HARP for our loans, and relief refinance options are also available for certain non-HARP loans. Although HARP is targeted at borrowers with current LTV ratios above 80%, our initiative also allows borrowers with LTV ratios of 80% and below to participate.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                         Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**REMIC** — Real Estate Mortgage Investment Conduit — A type of multiclass mortgage-related security that divides the cash flows (principal and interest) of the underlying mortgage-related assets into two or more classes that meet the investment criteria and portfolio needs of different investors.

**REMICs and Other Structured Securities** (or in the case of Multifamily securities, **Other Structured Securities**) — Single- and multiclass securities issued by Freddie Mac that represent beneficial interests in pools of PCs and certain other types of mortgage-related assets. REMICs and Other Structured Securities that are single-class securities pass through the cash flows (principal and interest) on the underlying mortgage-related assets. REMICs and Other Structured Securities that are multiclass securities divide the cash flows of the underlying mortgage-related assets into two or more classes designed to meet the investment criteria and portfolio needs of different investors. Our principal multiclass securities qualify for tax treatment as REMICs.

**REO** — Real estate owned — Real estate which we have acquired through foreclosure or through a deed in lieu of foreclosure.

**S&P** — Standard & Poor's

**SEC** — Securities and Exchange Commission

**Secondary mortgage market** — A market consisting of institutions engaged in buying and selling mortgages in the form of whole loans (*i.e.*, mortgages that have not been securitized) and mortgage-related securities. We participate in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities for investment and by issuing guaranteed mortgage-related securities, principally PCs.

**Senior preferred stock** — The shares of Variable Liquidation Preference Senior Preferred Stock issued to Treasury under the Purchase Agreement.

**Seriously delinquent** — Single-family mortgage loans that are three monthly payments or more past due or in the process of foreclosure as reported to us by our servicers.

**Short sale** — Typically an alternative to foreclosure consisting of a sale of a mortgaged property in which the homeowner sells the home at market value and the lender accepts proceeds (sometimes together with an additional payment or promissory note from the borrower) that are less than the outstanding mortgage indebtedness in full satisfaction of the loan.

**Single-family credit guarantee portfolio** — Consists of unsecuritized single-family loans, single-family loans held by consolidated trusts, and single-family loans underlying non-consolidated Other Guarantee Transactions and covered by other guarantee commitments. Excludes our REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates and our guarantees under the HFA Initiative.

**Single-family mortgage** — A mortgage loan secured by a property containing four or fewer residential dwelling units.

**Spread** — The difference between the yields of two debt securities, or the difference between the yield of a debt security and a benchmark yield, such as LIBOR.

**Strips** — Mortgage pass-through securities created by separating the principal and interest payments on a pool of mortgage loans. A principal-only strip entitles the security holder to principal cash flows, but no interest cash flows, from the underlying mortgages. An interest-only strip entitles the security holder to interest cash flows, but no principal cash flows, from the underlying mortgages.

**Subprime** — Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Subprime generally refers to the credit risk classification of a loan. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include, among other factors, a combination of high LTV ratios, low credit scores or originations using lower underwriting standards, such as limited or no documentation of a borrower's income. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk. Notwithstanding our historical characterizations of the single family credit guarantee portfolio, certain security collateral underlying our Other Guarantee Transactions have been identified as subprime based on information provided to Freddie Mac when the transactions were entered into. We also categorize our investments in non-agency mortgage-related

TREASURY-3730

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

securities as subprime if they were identified as such based on information provided to us when we entered into these transactions.

**Swaption** — An option contract to enter into an interest-rate swap. In exchange for an option premium, a buyer obtains the right but not the obligation to enter into a specified swap agreement with the issuer on a specified future date.

**TBA** — To be announced

**TCLFP** — Temporary Credit and Liquidity Facility Program is a component of the Housing Finance Agency Initiative in which we and Fannie Mae issued credit guarantees to holders of variable-rate demand obligations issued by various state and local HFAs. Treasury is obligated to absorb any losses under the program up to a certain level before we are exposed to any losses. The program is scheduled to expire on December 31, 2012; however, Treasury has given participants the option to extend the program facility to December 31, 2015.

**TDR** — Troubled debt restructuring — A type of loan modification in which the changes to the contractual terms result in concessions to borrowers that are experiencing financial difficulties.

**Total other comprehensive income (loss)** — Consists of the after-tax changes in: (a) the unrealized gains and losses on available-for-sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans.

**Total mortgage portfolio** — Includes mortgage loans and mortgage-related securities held on our consolidated balance sheets as well as the balances of our non-consolidated issued and guaranteed single-class and multiclass securities, and other mortgage-related financial guarantees issued to third parties.

**Treasury** — U.S. Department of the Treasury

**UPB** — Unpaid principal balance

**USDA** — U.S. Department of Agriculture

**VA** — U.S. Department of Veteran Affairs

**VIE** — Variable Interest Entity — A VIE is an entity: (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by another party; or (b) where the group of equity holders does not have: (i) the ability to make significant decisions about the entity's activities; (ii) the obligation to absorb the entity's expected losses; or (iii) the right to receive the entity's expected residual returns.

**Warrant** — Refers to the warrant we issued to Treasury on September 8, 2008 pursuant to the Purchase Agreement. The warrant provides Treasury the ability to purchase shares of our common stock equal to 79.9% of the total number of shares of Freddie Mac common stock outstanding on a fully diluted basis on the date of exercise.

**Workout, or loan workout** — A workout is either: (a) a home retention action, which is either a loan modification, repayment plan, or forbearance agreement; or (b) a foreclosure alternative, which is either a short sale or a deed in lieu of foreclosure.

**XBRL** — eXtensible Business Reporting Language

**Yield curve** — A graphical display of the relationship between yields and maturity dates for bonds of the same credit quality. The slope of the yield curve is an important factor in determining the level of net interest yield on a new mortgage asset, both initially and over time. For example, if a mortgage asset is purchased when the yield curve is inverted, with short-term rates higher than long-term rates, our net interest yield on the asset will tend to be lower initially and then increase over time. Likewise, if a mortgage asset is purchased when the yield curve is steep, with short-term rates lower than long-term rates, our net interest yield on the asset will tend to be higher initially and then decrease over time.

193                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 10.1 | PC Master Trust Agreement dated January 4, 2012 (incorporated by reference to Exhibit 10.52 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2011, as filed on March 9, 2012) |
| 10.2 | Federal Home Loan Mortgage Corporation Global Debt Facility Agreement, dated March 9, 2012 |
| 12.1 | Statement re: computation of ratio of earnings to fixed charges and computation of ratio of earnings to combined fixed charges and preferred stock dividends |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101.INS | XBRL Instance Document[1] |
| 101.SCH | XBRL Taxonomy Extension Schema[1] |
| 101.CAL | XBRL Taxonomy Extension Calculation[1] |
| 101.LAB | XBRL Taxonomy Extension Labels[1] |
| 101.PRE | XBRL Taxonomy Extension Presentation[1] |
| 101.DEF | XBRL Taxonomy Extension Definition[1] |

(1) The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Freddie Mac, except to the extent, if any, expressly set forth by specific reference in such filing.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3732

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 10.2**

## FEDERAL HOME LOAN MORTGAGE CORPORATION

### GLOBAL DEBT FACILITY AGREEMENT

**AGREEMENT**, dated as of March 9, 2012, among the Federal Home Loan Mortgage Corporation (**"Freddie Mac"**) and Holders of Debt Securities (each as hereinafter defined).

Whereas:

(a) Freddie Mac is a corporation duly organized and existing under and by virtue of the laws of the United States (Title III of the Emergency Home Finance Act of 1970, as amended (the **"Freddie Mac Act"**)) and has full corporate power and authority to enter into this Agreement and to undertake the obligations undertaken by it herein;

(b) Pursuant to Section 306(a) of the Freddie Mac Act, Freddie Mac is authorized, upon such terms and conditions as it may prescribe, to borrow, to pay interest or other return, and to issue notes, bonds or other obligations or securities; and

(c) To provide funds to permit Freddie Mac to engage in activities consistent with its statutory purposes, Freddie Mac has established a Global Debt Facility (the **"Facility"**) and authorized the issuance, from time to time, pursuant to this Agreement, of unsecured general obligations of Freddie Mac or, if so provided in the applicable Supplemental Agreement (as hereinafter defined), secured obligations of Freddie Mac (**"Debt Securities"**).

**NOW, THEREFORE**, in consideration of the premises and mutual covenants herein contained, it is hereby agreed that the following terms and conditions of this Agreement (including, as to each issue of the Debt Securities, the applicable Supplemental Agreement) shall govern the Debt Securities and the rights and obligations of Freddie Mac and Holders with respect to the Debt Securities.

## ARTICLE I

### Definitions

Whenever used in this Agreement, the following words and phrases shall have the following meanings, unless the context otherwise requires.

*Additional Debt Securities:* Debt Securities issued by Freddie Mac with the same terms (other than Issue Date, interest commencement date and issue price) and conditions as Debt Securities for which settlement has previously occurred so as to form a single series of Debt Securities as specified in the applicable Supplemental Agreement.

*Agreement:* This Global Debt Facility Agreement dated as of March 9, 2012, as it may be amended or supplemented from time to time, and successors thereto pursuant to which Freddie Mac issues the Debt Securities.

*Amortizing Debt Securities:* Debt Securities on which Freddie Mac makes periodic payments of principal during the terms of such Debt Securities as described in the related Supplemental Agreement.

*Beneficial Owner:* The entity or individual that beneficially owns a Debt Security.

*Bonds:* Callable or non-callable Debt Securities with maturities of more than ten years.

*Book-Entry Rules:* The Department of Housing and Urban Development regulations (24 C.F.R. Part 81, Subpart H) applicable to the Fed Book-Entry Debt Securities and such procedures as to which Freddie Mac and the FRBNY may agree.

TREASURY-3733

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this
information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Business Day:* (i) With respect to Fed Book-Entry Debt Securities, any day other than (a) a Saturday, (b) a Sunday, (c) a day on which the FRBNY is closed, (d) as to any Holder of a Fed Book-Entry Debt Security, a day on which the Federal Reserve Bank that maintains the Holder's account is closed, or (e) a day on which Freddie Mac's offices are closed; and (ii) with respect to Registered Debt Securities, any day other than (a) a Saturday, (b) a Sunday, (c) a day on which banking institutions are closed in (1) the City of New York or (2) if the Specified Payment Currency is other than U.S. dollars or euros, the Principal Financial Center of the country of such Specified Payment Currency, (d) if the Specified Payment Currency is euros, a day on which the TARGET2 system is not open for settlements, or a day on which payments in euros cannot be settled in the international interbank market as determined by the Global Agent, (e) for any required payment, a day on which banking institutions are closed in the place of payment, or (f) a day on which Freddie Mac's offices are closed.

*Calculation Agent:* Freddie Mac or a bank or broker-dealer designated by Freddie Mac in the applicable Supplemental Agreement as the entity responsible for determining the interest rate on a Variable Rate Debt Security.

*Calculation Date:* In each year, each of those days in the calendar year that are specified in the applicable Supplemental Agreement as being the scheduled Interest Payment Dates regardless, for this purpose, of whether any such date is in fact an Interest Payment Date and, for the avoidance of doubt, a "Calculation Date" may occur prior to the Issue Date or after the last Principal Payment Date.

*Callable Reference Notes:* U.S. dollar denominated, callable Reference Securities with maturities of more than one year.

*Cap:* A maximum interest rate at which interest may accrue on a Variable Rate Debt Security during any Interest Reset Period.

*Citibank — London:* Citibank, N.A., London office, the Global Agent for Registered Debt Securities.

*Citigroup — Frankfurt:* Citigroup Global Markets Deutschland AG & Co. KGaA, the Registrar for Registered Debt Securities.

*Clearstream, Luxembourg:* Clearstream Banking, société anonyme, which holds securities for its participants and facilitates the clearance and settlement of securities transactions between its participants through electronic book-entry changes in accounts of its participants.

*CMS Determination Date:* The second New York Banking Day preceding the applicable Reset Date.

*CMS Rate:* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(N).

*CMT Determination Date:* The second New York Banking Day preceding the applicable Reset Date.

*CMT Rate:* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(M).

*Code:* The Internal Revenue Code of 1986, as amended.

*Common Depositary:* The common depositary for Euroclear, Clearstream, Luxembourg and/or any other applicable clearing system, which will hold Other Registered Debt Securities on behalf of Euroclear, Clearstream, Luxembourg and/or any such other applicable clearing system.

*Currency Exchange Bank:* The currency exchange bank specified in the applicable Supplemental Agreement that will convert any amounts paid by Freddie Mac in a Specified Payment Currency on DTC Registered Debt Securities to U.S. Holders into U.S. dollars.

2

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*CUSIP Number:*  A unique nine-character designation assigned to each Debt Security by the CUSIP Service Bureau and used to identify each issuance of Debt Securities on the records of the Federal Reserve Banks or DTC, as applicable.

*Day Rate:*  The arithmetic mean for each day in a Seven-Day Period as determined by the Calculation Agent in accordance with Section 2.07(i)(P)(2).

*Dealers:*  Firms that engage in the business of dealing or trading in debt securities as agents, brokers or principals.

*Debt Securities:*  Unsecured subordinated or unsubordinated notes, bonds and other debt securities issued from time to time by Freddie Mac under the Facility, or if so provided in the applicable Supplemental Agreement, secured obligation issued from time to time by Freddie Mac under the Facility.

*Deleverage Factor:*  A Multiplier of less than one by which an applicable Index is multiplied.

*Depository:*  DTC or any successor.

*Deposits:*  Deposits commencing on the applicable Reset Date.

*Designated EURIBOR Reuters Page:*  The display on Reuters Page EURIBOR01, or any successor page or such other page (or any successor page) on that service or any successor service specified in the applicable Supplemental Agreement for the purpose of displaying rates for Deposits in euros.

*Designated EUR-LIBOR Reuters Page:*  The display on Reuters Page LIBOR01 or any successor page or such other page (or any successor page) on that service or any successor service specified in the applicable Supplemental Agreement for the purpose of displaying rates for Deposits in euros.

*Designated Reuters Page:*  The display on Reuters Page LIBOR01 (or where the Index Currency is Australian dollars, Swiss francs or Yen, Page LIBOR02) or any successor page or such other page (or any successor page) on that service or any successor service specified in the applicable Supplemental Agreement for the purpose of displaying British Bankers' Association interest settlement rates for Deposits in the Index Currency.

*Determination Date:*  The date as of which the rate of interest applicable to an Interest Reset Period is determined.

*Determination Period:*  The period from, and including, one Calculation Date to, but excluding, the next Calculation Date.

*DTC:*  The Depository Trust Company, a limited-purpose trust company, which holds securities for DTC participants and facilitates the clearance and settlement of transactions between DTC participants through electronic book-entry changes in accounts of DTC participants.

*DTC Registered Debt Securities:*  Registered Debt Securities registered in the name of a nominee of DTC, which will clear and settle through the system operated by DTC.

EC: The European Community.

*EMU:*  European Economic and Monetary Union; the convergence of key features of the economies of certain participating European countries, including the adoption of a common monetary unit called the euro.

*EMU Event:*  As defined in Section 7.01(b).

*EURIBOR:*  The rate determined by the Calculation Agent in accordance with Section 2.07(i)(J).

3

TREASURY-3735

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*EURIBOR Determination Date:*  The second TARGET2 Business Day preceding the applicable Reset Date, unless EURIBOR is determined in accordance with Section 2.07(i)(J)(3), in which case it means the applicable Reset Date.

*EUR-LIBOR:*  The rate determined by the Calculation Agent in accordance with Section 2.07(i)(I).

*EUR-LIBOR Determination Date:*  The second TARGET2 Business Day preceding the applicable Reset Date.

*Euroclear:*  Euroclear System, a depositary that holds securities for its participants and clears and settles transactions between its participants through simultaneous electronic book-entry delivery against payment.

*Euro Representative Amount:*  A principal amount of not less than the equivalent of U.S. $1,000,000 in euros that, in the Calculation Agent's sole judgment, is representative for a single transaction in the relevant market at the relevant time.

*Euro-Zone:*  The region consisting of member states of the European Union that adopt the single currency in accordance with the Treaty.

*Event of Default:*  As defined in Section 7.01(a).

*Extendible Variable Rate Securities:*  Variable Rate Debt Securities, the maturity of which may be extended at a Beneficial Owner's option effective as of certain specified dates, subject to a final maturity date, and that bear interest at variable rates subject to different Spreads for different specified periods.

*Facility:*  The Global Debt Facility described in the Offering Circular dated March 9, 2012 under which Freddie Mac issues the Debt Securities.

*Fed Book-Entry Debt Securities:*  U.S. dollar denominated Debt Securities issued and maintained in book-entry form on the Fed Book-Entry System.

*Fed Book-Entry System:*  The book-entry system of the Federal Reserve Banks which provides book-entry holding and settlement for U.S. dollar denominated securities issued by the U.S. Government, certain of its agencies, instrumentalities, government-sponsored enterprises and international organizations of which the United States is a member.

*Federal Funds Rate (Daily):*  The rate determined by the Calculation Agent in accordance with Section 2.07(i)(O).

*Federal Funds Rate (Daily) Determination Date:*  The applicable Reset Date; provided, however, that if the Reset Date is not a Business Day, then the Federal Funds Rate (Daily) Determination Date means the Business Day immediately following the applicable Reset Date.

*Federal Funds Rate (Weekly Average):*  The rate determined by the Calculation Agent in accordance with Section 2.07(i)(P).

*Federal Reserve:*  The Board of Governors of the Federal Reserve System.

*Federal Reserve Bank:*  Each U.S. Federal Reserve Bank that maintains Debt Securities in book-entry form.

*Federal Reserve Banks:*  Collectively, the Federal Reserve Banks.

*Fiscal Agency Agreement:*  The Uniform Fiscal Agency Agreement between Freddie Mac and the FRBNY.

*Fiscal Agent:*  The FRBNY is fiscal agent for Fed Book-Entry Debt Securities.

4

TREASURY-3736

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Fixed Principal Repayment Amount:* An amount equal to 100% of the principal amount of a Debt Security, payable on the applicable Maturity Date or earlier date of redemption or repayment or a specified amount above or below such principal amount, as provided in the applicable Supplemental Agreement.

*Fixed Rate Debt Securities:* Debt Securities that bear interest at a single fixed rate.

*Fixed/Variable Rate Debt Securities:* Debt Securities that bear interest at a single fixed rate during one or more specified periods and at a variable rate determined by reference to one or more Indices, or otherwise, during one or more other periods. As to any such fixed rate period, the provisions of this Agreement relating to Fixed Rate Debt Securities shall apply, and, as to any such variable rate period, the provisions of this Agreement relating to Variable Rate Debt Securities shall apply.

*Floor:* A minimum interest rate at which interest may accrue on a Debt Security during any Interest Reset Period.

*Freddie Mac:* Federal Home Loan Mortgage Corporation, a stockholder-owned company chartered by Congress pursuant to the Freddie Mac Act.

*Freddie Mac Act:* Title III of the Emergency Home Finance Act of 1970, as amended, 12 U.S.C. § 1451-1459.

*FRBNY:* The Federal Reserve Bank of New York.

*Global Agency Agreement:* The agreement between Freddie Mac, the Global Agent and the Registrar.

*Global Agent:* The entity selected by Freddie Mac to act as its fiscal, transfer and paying agent for Registered Debt Securities.

*H.15(519):* The weekly statistical release entitled "Statistical Release H.15(519), Selected Interest Rates" as published by the Federal Reserve, or any successor publication of the Federal Reserve available on its website at http://www.federalreserve.gov/releases/h15/or any successor site.

*H.15 Daily Update:* The daily update of H.15(519), available on the website of the Federal Reserve at http://www.federalreserve.gov/releases/h15/update/default.htm, or any successor site or publication.

*Holder:* In the case of Fed Book-Entry Debt Securities, the entity whose name appears on the book-entry records of a Federal Reserve Bank as Holder; in the case of Registered Debt Securities in global registered form, the depository, or its nominee, in whose name the Registered Debt Securities are registered on behalf of a related clearing system; and, in the case of Registered Debt Securities in definitive registered form, the person or entity in whose name such Debt Securities are registered in the Register.

*Holding Institutions:* Entities eligible to maintain book-entry accounts with a Federal Reserve Bank.

*Index:* LIBOR, EUR-LIBOR, EURIBOR, Prime Rate, Treasury Rate, CMT Rate, CMS Rate, Federal Funds Rate (Daily), or Federal Funds (Weekly Average) or other specified interest rate, exchange rate or other index, as the case may be.

*Index Currency:* The currency or currency unit specified in the applicable Supplemental Agreement with respect to which an Index will be calculated for a Variable Rate Debt Security; provided, however, that if euros are substituted for such currency or currency unit, the Index Currency will be euros and, with respect to LIBOR, the determination provisions for EUR-LIBOR will apply to such Debt

TREASURY-3737

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Securities upon such substitution. If no such currency or currency unit is specified in the applicable Supplemental Agreement, the Index Currency will be U.S. dollars.

*Index Maturity:*  The period with respect to which an Index will be calculated for a Variable Rate Debt Security that is specified in the applicable Supplemental Agreement.

*Interest Component:*  Each future interest payment, or portion thereof, due on or prior to the Maturity Date, or if the Debt Security is subject to redemption or repayment prior to the Maturity Date, the first date on which such Debt Security is subject to redemption or repayment.

*Interest Payment Date:*  The date or dates on which interest on Debt Securities will be payable in arrears.

*Interest Payment Period:*  Unless otherwise provided in the applicable Supplemental Agreement, the period beginning on (and including) the Issue Date or the most recent Interest Payment Date, as the case may be, and ending on (but excluding) the earlier of the next Interest Payment Date or the Principal Payment Date.

*Interest Reset Period:*  The period beginning on the applicable Reset Date and ending on the calendar day preceding the next Reset Date.

*Issue Date:*  The date on which Freddie Mac wires an issue of Debt Securities to Holders or other date specified in the applicable Supplemental Agreement.

*Leverage Factor:*  A Multiplier of greater than one by which an applicable Index is multiplied.

*LIBOR:*  The rate determined by the Calculation Agent in accordance with Section 2.07(i)(H).

*LIBOR Determination Date:*  The second London Banking Day preceding the applicable Reset Date unless the Index Currency is Sterling, in which case it means the applicable Reset Date.

*London Banking Day:*  Any day on which commercial banks are open for business (including dealings in foreign exchange and deposits in the Index Currency) in London.

*Maturity Date:*  The date, one day or longer from the Issue Date, on which a Debt Security will mature unless extended, redeemed or repaid prior thereto.

*Mortgage Linked Amortizing Debt Securities:*  Amortizing Debt Securities on which Freddie Mac makes periodic payments of principal based on the rate of payments on referenced mortgage or mortgage-related assets, as described in the related Supplemental Agreement.

*Multiplier:*  A constant or variable number (which may be greater than or less than one) to be multiplied by the relevant Index for a Variable Rate Debt Security.

*Non-U.S. Currency:* Specified Currency other than U.S. dollars.

*Notes:*  Callable or non-callable Debt Securities with maturities of more than one day.

*New York Banking Day:*  Any day other than (a) a Saturday, (b) a Sunday, (c) a day on which banking institutions in the City of New York are required or permitted by law or executive order to close, or (d) a day on which the FRBNY is closed.

*Offering Circular:*  The Freddie Mac Global Debt Facility Offering Circular dated March 9, 2012 (including any related Offering Circular Supplement) and successors thereto.

*OID Determination Date:*  The last day of the last accrual period ending prior to the date of the meeting of Holders (or, for consents not at a meeting, prior to a date established by Freddie Mac). The

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

accrual period will be the same as the accrual period used by Freddie Mac to determine its deduction for accrued original issue discount under section 163 (e) of the Code.

*Other Registered Debt Securities:*  Registered Debt Securities that are not DTC Registered Debt Securities, that are deposited with a Common Depositary and that will clear and settle through the systems operated by Euroclear, Clearstream, Luxembourg and/or any such other applicable clearing system other than DTC.

*Pricing Supplement:*  A supplement to the Offering Circular that describes the specific terms, of, and provides pricing information and other information for, an issue of Debt Securities or which otherwise amends, modifies or supplements the terms of the Offering Circular.

*Prime Rate:*  The rate determined by the Calculation Agent in accordance with Section 2.07(i)(K).

*Prime Rate Determination Date:*  The New York Banking Day preceding the applicable Reset Date.

*Principal Component:*  The principal payment plus any interest payments that are either due after the date specified in, or are specified as ineligible for stripping in, the applicable Supplemental Agreement.

*Principal Financial Center:*  The capital city of the country of the Specified Payment Currency, or solely with respect to the calculation of LIBOR, the Index Currency, as the case may be, as specified in the applicable Supplemental Agreement except that with respect to U.S. dollars, Sterling, Yen, the euro and Swiss francs, the Principal Financial Center shall be the City of New York, London, Tokyo, Brussels and Zurich, respectively.

*Principal Payment Date:*  The Maturity Date, or the earlier date of redemption or repayment, if any (whether such redemption or repayment is in whole or in part).

*Range Accrual Debt Securities:*  Variable Rate Debt Securities on which no interest may accrue during periods when the applicable Index is outside a specified range as described in the related Supplemental Agreement.

*Record Date:*  As to Registered Debt Securities, the fifteenth calendar day preceding an Interest Payment Date. Interest on a Registered Debt Security will be paid to the Holder of such Registered Debt Security as of the close of business on the Record Date.

*Reference Bonds:*  U.S. dollar denominated, non-callable Reference Securities with maturities of more than ten years.

*Reference Notes:*  U.S. dollar denominated, non-callable Reference Securities with maturities of more than one year.

*Reference Securities:*  Scheduled U.S. dollar denominated issues of Debt Securities in large principal amounts, which may be either Callable Reference Notes, Reference Bonds or Reference Notes.

*Register:*  A register of the Holders of Registered Debt Securities maintained by the Registrar.

*Registered Debt Securities:*  Debt Securities issued and maintained in global registered or definitive registered form on the books and records of the Registrar.

*Registrar:*  The entity selected by Freddie Mac to maintain the Register.

*Representative Amount:*  A principal amount of not less than U.S. $1,000,000 (or, if the Index Currency is other than U.S. dollars, a principal amount not less than the equivalent in the Index Currency)

7

TREASURY-3739

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

that, in the Calculation Agent's sole judgment, is representative for a single transaction in the relevant market at the relevant time.

*Reset Date:*  The date on which a new rate of interest on a Debt Security becomes effective.

*Reuters:*  Reuters Group PLC or any successor service.

*Reuters USAUCTION10 Page:*  The display designated as "USAUCTION10" (or any successor page) provided by Reuters.

*Reuters USAUCTION11 Page:*  The display designated as "USAUCTION11" (or any successor page) provided by Reuters.

*Reuters US PRIME1 Page:*  The display designated as page "USPRIME1'" (or any successor page) provided by Reuters

*Seven-Day Period:*  As defined in Section 2.07(i)(P)(1).

*Specified Currency:*  The currency or currency unit in which a Debt Security may be denominated and in which payments of principal of and interest on a Debt Security may be made.

*Specified Interest Currency:*  The Specified Currency provided for the payment of interest on Debt Securities.

*Specified Payment Currency:*  The term to which the Specified Interest Currency and Specified Principal Currency are referred collectively.

*Specified Principal Currency:*  The Specified Currency provided for the payment of principal on Debt Securities.

*Spread:*  A constant or variable percentage or number to be added to or subtracted from the relevant Index for a Variable Rate Debt Security.

*Step Debt Securities:*  Debt Securities that bear interest at different fixed rates during different specified periods.

*Sterling:*  British pounds sterling.

*Supplemental Agreement:*  An agreement which, as to the related issuance of Debt Securities, supplements the other provisions of this Agreement and identifies and establishes the particular offering of Debt Securities issued in respect thereof. A Supplemental Agreement may be documented by a supplement to this Agreement, a Pricing Supplement, a confirmation or a terms sheet. A Supplemental Agreement may, as to any particular issuance of Debt Securities, modify, amend or supplement the provisions of this Agreement in any respect whatsoever. A Supplemental Agreement shall be effective and binding as of its publication, whether or not executed by Freddie Mac.

*TARGET2:*  The Trans-European Automated Real-Time Gross Settlement Express Transfer payment system which utilizes a single shared platform and which was launched on November 19, 2007.

*TARGET2 Business Day:*  A day on which the TARGET2 system or its successor is operating.

*Targeted Registered Debt Securities:*  Debt Securities "targeted to foreign markets" under Treasury Department regulations and offered or sold solely to persons outside the United States or its territories or possessions.

*Treaty:*  The treaty establishing the EC, as amended by the treaty on European Union.

*Treasury Auction:*  The most recent auction of Treasury Bills prior to a given Reset Date.

8

TREASURY-3740

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Treasury Bills:* Direct obligations of the United States.

*Treasury Department:* United States Department of the Treasury.

*Treasury Rate:* The rate determined by the Calculation Agent in accordance with Section 2.07(i)(L).

*Treasury Rate Determination Date:* The day of the week in which the Reset Date falls on which Treasury Bills would normally be auctioned or, if no auction is held for a particular week, the first Business Day of that week. Treasury Bills are normally sold at auction on Monday of each week, unless that day is a legal holiday, in which case the auction is normally held on the following Tuesday, except that the auction may be held on the preceding Friday; provided, however, that if an auction is held on the Friday of the week preceding the Reset Date, the Treasury Rate Determination Date will be that preceding Friday; and provided, further, that if the Treasury Rate Determination Date would otherwise fall on the Reset Date, that Reset Date will be postponed to the next succeeding Business Day.

*Variable Principal Repayment Amount:* The principal amount determined by reference to one or more Indices or otherwise, payable on the applicable Maturity Date or date of redemption or repayment of a Debt Security, as specified in the applicable Supplemental Agreement.

*Variable Rate Debt Securities:* Debt Securities that bear interest at a variable rate, and reset periodically, determined by reference to one or more Indices or otherwise. The formula for a variable rate may include a Spread.

*Yen:* Japanese yen.

*Zero Coupon Debt Securities:* Debt Securities that do not bear interest and are issued at a discount to their principal amount.


## ARTICLE II

### Authorization; Certain Terms

#### Section 2.01. Authorization.

Debt Securities shall be issued by Freddie Mac in accordance with the authority vested in Freddie Mac by Section 306(a) of the Freddie Mac Act. The indebtedness represented by the Debt Securities shall be unsecured general obligations of Freddie Mac, or, if so provided in the applicable Supplemental Agreement, secured obligations of Freddie Mac. Debt Securities shall be offered from time to time by Freddie Mac in an unlimited amount and shall be known by the designation given them, and have the Maturity Dates stated, in the applicable Supplemental Agreement. Freddie Mac, in its discretion and at any time, may offer Additional Debt Securities having the same terms and conditions as Debt Securities previously offered. The Debt Securities may be issued as Reference Securities, which includes Callable Reference Notes, Reference Notes and Reference Bonds, or may be issued as any other Debt Securities, denominated in U.S. dollars or other currencies, with maturities of one day or longer and may be in the form of Notes or Bonds or otherwise. Issuances may consist of new issues of Debt Securities or reopenings of an existing issue of Debt Securities.

#### Section 2.02. Other Debt Securities Issued Hereunder.

Freddie Mac may from time to time create and issue Debt Securities hereunder which contain terms and conditions not specified in this Agreement. Such Debt Securities shall be governed by the applicable Supplemental Agreement and, to the extent that the terms of this Agreement are not inconsistent with Freddie Mac's intent in creating and issuing such Debt Securities, by the terms of this Agreement. Such

9

TREASURY-3741

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Debt Securities shall be secured or unsecured obligations of Freddie Mac. If the Debt Securities are secured obligations of Freddie Mac, the provisions of Article V hereof shall apply to such Debt Securities.

**Section 2.03. Specified Currencies and Specified Payment Currencies.**

(a) Each Debt Security shall be denominated and payable in such Specified Currency as determined by Freddie Mac. Fed Book-Entry Debt Securities will be denominated and payable in U.S. dollars only.

(b) Except under the circumstances provided in Section 2.03(c)(i) and (ii) and Article VI hereof, Freddie Mac shall make payments of any interest on Debt Securities in the Specified Interest Currency and shall make payments of the principal of Debt Securities in the Specified Principal Currency. The Specified Currency for the payment of interest and principal with respect to any Debt Security shall be set forth in the applicable Supplemental Agreement.

(c) European Economic and Monetary Union and Unavailability

(i) *European Economic and Monetary Union.*  The Treaty contemplated that EMU would occur in three stages. On January 1, 1999 the third and final stage of the EMU commenced with the irrevocable fixing of the exchange rates of the currencies of the initial 11 participating member states for interbank transfers in a single currency, the **"euro"**. Complete replacement of member currencies was completed in 2002. As of the date of this Agreement, the participating member states in the EMU are Austria, Belgium, Cyprus, Estonia, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, Malta, The Netherlands, Portugal, Slovakia, Slovenia and Spain.

(ii) *Unavailability.*  Except as set forth below, if the principal of, premium, if any, or interest on, any Debt Security is payable in a Specified Currency other than U.S. dollars and such Specified Currency is not available to Freddie Mac for making required payments due to the imposition of exchange controls, its replacement or disuse or other circumstances beyond the control of Freddie Mac, then Freddie Mac shall be entitled to satisfy its obligations to Holders of the Debt Securities by making such payments in U.S. dollars on the basis of the noon U.S. dollar buying rate in New York City for cable transfers for such Specified Currency published by the FRBNY on the date of such payment, or, if such currency exchange rate is not available on such date, as of the most recent prior practicable date.  Notwithstanding the provisions of the preceding sentence, if euros have replaced such Specified Currency as described under Section 2.03(c)(i) above, Freddie Mac may, at its option (or shall, if so required by applicable law) without the consent of the Holders of such Debt Securities effect the payment of principal of, premium, if any, or interest on, any Debt Security denominated in such Specified Currency in euros in lieu of such Specified Currency, in conformity with legally applicable measures taken pursuant to, or by virtue of the Treaty or other applicable legal or regulatory requirements.

**Section 2.04. Minimum Denominations.**

The Debt Securities shall be issued and maintained in the minimum denominations of U.S. $1,000 and additional increments of U.S. $1,000 for U.S. dollar denominated Debt Securities, unless otherwise provided in the applicable Supplemental Agreement and as may be allowed or required from time to time by the relevant regulatory authority or any laws or regulations applicable to the relevant Specified Currency. In the case of Zero Coupon Debt Securities, denominations will be expressed in terms of the principal amount payable on the Maturity Date.

**Section 2.05. Maturity.**

(a) Each Debt Security shall mature on its Maturity Date, as provided in the applicable Supplemental Agreement, unless redeemed at the option of Freddie Mac or repaid at the option of the Holder

10

TREASURY-3742

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

prior thereto in accordance with the provisions described under Section 2.06. Debt Securities may be issued with minimum or maximum maturities or variable maturities allowed or required from time to time by the relevant regulatory or stock exchange authority or clearing systems or any laws or regulations applicable to the Specified Currency.

(b) If so provided in the applicable Supplemental Agreement, certain Debt Securities may have provision permitting their Beneficial Owner to elect to extend the initial Maturity Date specified in such Supplemental Agreement, or any later date to which the maturity of such Debt Securities has been extended, on specified dates. However, the maturity of such Debt Securities may not be extended beyond the final Maturity Date specified in the Supplemental Agreement.

(b) The principal amount payable on the Maturity Date of a Debt Security shall be a Fixed Principal Repayment Amount or a Variable Principal Repayment Amount, in each case as provided in the applicable Supplemental Agreement.

**Section 2.06. Optional Redemption and Optional Repayment.**

(a) The Supplemental Agreement for any particular issue of Debt Securities shall provide whether such Debt Securities may be redeemed at Freddie Mac's option or repayable at the Holder's option, in whole or in part, prior to their Maturity Date. If so provided in the applicable Supplemental Agreement, an issue of Debt Securities shall be subject to redemption at the option of Freddie Mac, or repayable at the option of the Holders, in whole or in part, on one or more specified dates, at any time on or after a specified date, or during one or more specified periods of time. The redemption or repayment price for such Debt Securities (or such part of such Debt Securities as is redeemed or repaid) shall be an amount provided in, or determined in a manner provided in, the applicable Supplemental Agreement, together with accrued and unpaid interest to the date fixed for redemption or repayment.

(b) Unless otherwise provided in the applicable Supplemental Agreement, notice of optional redemption shall be given to Holders of the related Debt Securities not less than 5 Business Days nor more than 60 calendar days prior to the date of redemption in the manner provided in Section 8.07.

(c) In the case of a partial redemption of an issue of Fed Book-Entry Debt Securities by Freddie Mac, such Fed Book-Entry Debt Securities shall be redeemed pro rata. In the case of a partial redemption of an issue of Registered Debt Securities by Freddie Mac, one or more of such Registered Debt Securities shall be reduced by the Global Agent in the amount of such redemption, subject to the principal amount of such Registered Debt Securities after redemption remaining in an authorized denomination. The effect of any partial redemption of an issue of Registered Debt Securities on the Beneficial Owners of such Registered Debt Securities will depend on the procedures of the applicable clearing system and, if such Beneficial Owner is not a participant therein, on the procedures of the participant through which such Beneficial Owner owns its interest.

(d) If so provided in the applicable Supplemental Agreement, certain Debt Securities shall be repayable, in whole or in part, by Freddie Mac at the option of the relevant Holders thereof or otherwise, on one or more specified dates, at any time on or after a specified date, or during one or more specified periods of time, upon terms and procedures provided in the applicable Supplemental Agreement. Unless otherwise provided in the applicable Supplemental Agreement, in the case of a Registered Debt Security, to exercise such option, the Holder shall deposit with the Global Agent (i) such Registered Debt Security; and (ii) a duly completed notice of optional repayment in the form obtainable from the Global Agent, in each case not more than the number of days nor less than the number of days specified in the applicable Supplemental Agreement prior to the date fixed for repayment. Unless otherwise specified in the applicable Supplemental Agreement, no such Registered Debt Security (or notice of repayment) so deposited may be withdrawn without the prior consent of Freddie Mac or the Global Agent. Unless

11

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

otherwise provided in the applicable Supplemental Agreement, in the case of a Fed Book-Entry Debt Security, if the Beneficial Owner wishes to exercise such option, then the Beneficial Owner shall give notice thereof to Freddie Mac through the relevant Holding Institution as provided in the applicable Supplemental Agreement.

(e) The principal amount payable upon redemption or repayment of a Debt Security shall be a Fixed Principal Repayment Amount or a Variable Principal Repayment Amount, in each case as provided in the applicable Supplemental Agreement.

**Section 2.07. Payment Terms of the Debt Securities.**

(a) Debt Securities shall bear interest at one or more fixed rates or variable rates or may not bear interest. If so provided in the applicable Supplemental Agreement, Debt Securities may be separated by a Holder into one or more Interest Components and Principal Components. The Offering Circular or the applicable Supplemental Agreement for such Debt Securities shall specify the procedure for stripping such Debt Securities into such Interest and Principal Components.

(b) The applicable Supplemental Agreement shall specify the frequency with which interest, if any, is payable on the related Debt Securities. Interest on Debt Securities shall be payable in arrears on the Interest Payment Dates specified in the applicable Supplemental Agreement and on each Principal Payment Date.

(c) Each issue of interest-bearing Debt Securities shall bear interest during each Interest Payment Period. No interest on the principal of any Debt Security will accrue on or after the Principal Payment Date on which such principal is repaid.

(d) The determination by the Calculation Agent of the interest rate on, or any Index in relation to, a Variable Rate Debt Security and the determination of any payment on any Debt Security (or any interim calculation in the determination of any such interest rate, index or payment) shall, absent manifest error, be final and binding on all parties. If a principal or interest payment error occurs, Freddie Mac may correct it by adjusting payments to be made on later Interest Payment Dates or Principal Payment Dates (as appropriate) or in any other manner Freddie Mac considers appropriate. If the source of an Index changes in format, but the Calculation Agent determines that the Index source continues to disclose the information necessary to determine the related interest rate substantially as required, the Calculation Agent will amend the procedure for obtaining information from that source to reflect the changed format. All Index values used to determine principal or interest payments are subject to correction within 30 days from the applicable payment. The source of a corrected value must be the same source from which the original value was obtained. A correction might result in an adjustment on a later date to the amount paid to the Holder.

(e) Payments on Debt Securities shall be rounded, in the case of U.S. dollars, to the nearest cent or, in the case of a Specified Payment Currency other than U.S. dollars, to the nearest smallest transferable unit (with one-half cent or unit being rounded upwards).

(f) In the event that any jurisdiction imposes any withholding or other tax on any payment made by Freddie Mac (or our agent or any other person potentially required to withhold) with respect to a Debt Security, Freddie Mac (or our agent or such other person) will deduct the amount required to be withheld from such payment, and Freddie Mac (or our agent or such other person) will not be required to pay additional interest or other amounts, or redeem or repay the Debt Securities prior to the applicable Maturity Date, as a result.

12

TREASURY-3744

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(g) *Fixed Rate Debt Securities*

Fixed Rate Debt Securities shall bear interest at a single fixed interest rate. The applicable Supplemental Agreement shall specify the fixed interest rate per annum on a Fixed Rate Debt Security. Unless otherwise specified in the applicable Supplemental Agreement, interest on a Fixed Rate Debt Security shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

(h) *Step Debt Securities*

Step Debt Securities shall bear interest from their Issue Date to a specified date at their initial fixed interest rate and from that date to their Maturity Date at one or more different fixed interest rates that shall be prescribed as of the Issue Date. A Step Debt Security will have one or more step periods. The applicable Supplemental Agreement shall specify the fixed interest rate per annum payable on Step Debt Securities for each related period from issuance to maturity. Unless otherwise specified in the applicable Supplemental Agreement, interest on a Step Debt Security shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

(i) *Variable Rate Debt Securities*

(A) Variable Rate Debt Securities shall bear interest at a variable rate determined on the basis of a direct or an inverse relationship to one or more specified Indices or otherwise, (x) plus or minus a Spread, if any, or (y) multiplied by one or more Leverage or Deleverage Factors, if any, as specified in the applicable Supplemental Agreement. Variable Rate Debt Securities also may bear interest in any other manner described in the applicable Supplemental Agreement.

(B) Variable Rate Debt Securities may have a Cap and/or a Floor.

(C) The applicable Supplemental Agreement shall specify the accrual method (i.e., the day count convention) for calculating interest or any relevant accrual factor on the related Variable Rate Debt Securities. The accrual method may incorporate one or more of the following defined terms:

"**Actual/360**" shall mean that interest or any other relevant accrual factor shall be calculated on the basis of the actual number of days elapsed in a year of 360 days.

"**Actual/365 (fixed)**" shall mean that interest or any other relevant accrual factor shall be calculated on the basis of the actual number of days elapsed in a year of 365 days, regardless of whether accrual or payment occurs during a calendar leap year.

"**Actual/Actual**" shall mean, unless otherwise indicated in the applicable Supplemental Agreement, that interest or any other relevant accrual factor shall be calculated on the basis of (x) the actual number of days elapsed in the Interest Payment Period divided by 365, or (y) if any portion of the Interest Payment Period falls in a calendar leap year, (A) the actual number of days in that portion divided by 366 plus (B) the actual number of days in the remaining portion divided by 365. If so indicated in the applicable Supplemental Agreement, "Actual/Actual" shall mean interest or any other relevant accrual factor shall be calculated in accordance with the definition of "Actual/Actual" adopted by the International Securities Market Association ("**Actual/Actual (ISMA)**"), which means a calculation on the basis of the following:

(1) where the number of days in the relevant Interest Payment Period is equal to or shorter than the Determination Period during which such Interest Payment Period ends, the number of days in such Interest Payment Period divided by the product of (A) the number of days in such Determination Period and (B) the number of Interest Payment Dates that would occur in one calendar year; or

13

TREASURY-3745

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

(2) where the Interest Payment Period is longer than the Determination Period during which the Interest Payment Period ends, the sum of (A) the number of days in such Interest Payment Period falling in the Determination Period in which the Interest Payment Period begins divided by the product of (X) the number of days in such Determination Period and (Y) the number of Interest Payment Dates that would occur in one calendar year; and (B) the number of days in such Interest Payment Period falling in the next Determination Period divided by the product of (X) the number of days in such Determination Period and (Y) the number of Interest Payment Dates that would occur in one calendar year.

(D) The applicable Supplemental Agreement shall specify the frequency with which the rate of interest on the related Variable Rate Debt Securities shall reset. The applicable Supplemental Agreement also shall specify the Reset Date. If the interest rate will reset within an Interest Payment Period, then the interest rate in effect on the sixth Business Day preceding an Interest Payment Date will be the interest rate for the remainder of that Interest Payment Period and the first day of each Interest Payment Period also will be a Reset Date. Variable Rate Debt Securities may bear interest prior to the initial Reset Date at an initial interest rate, if any, specified in the applicable Supplemental Agreement. If so, then the first day of the first Interest Payment Period will not be a Reset Date. The rate of interest applicable to each Interest Reset Period shall be determined as provided below or in the applicable Supplemental Agreement.

Except for a Variable Rate Debt Security as to which the rate of interest thereon is determined by reference to LIBOR, EUR-LIBOR, EURIBOR, Prime Rate, Treasury Rate, CMT Rate, CMS Rate, Federal Funds Rate (Daily), or Federal Funds Rate (Weekly Average) or as otherwise set forth in the applicable Supplemental Agreement, the Determination Date for a Variable Rate Debt Security means the second Business Day preceding the Reset Date applicable to an Interest Reset Period.

(E) If the rate of interest on a Variable Rate Debt Security is subject to adjustment within an Interest Payment Period, accrued interest shall be calculated by multiplying the principal amount of such Variable Rate Debt Security by an accrued interest factor. Unless otherwise specified in the applicable Supplemental Agreement, this accrued interest factor shall be computed by adding the interest factor calculated for each Interest Reset Period in such Interest Payment Period and rounding the sum to nine decimal places. The interest factor for each such Interest Reset Period shall be computed by (1) multiplying the number of days in the Interest Reset Period by the interest rate (expressed as a decimal) applicable to such Interest Reset Period; and (2) dividing the product by the number of days in the year referred to in the accrual method specified in the applicable Supplemental Agreement.

(F) If and so long as an issue of Variable Rate Debt Securities is admitted for trading on the Euro MTF Market and listed on the Official List of the Luxembourg Stock Exchange and such stock exchange so requires, the Calculation Agent shall cause the interest rate for the applicable Interest Reset Period and the amount of interest on the minimum denomination in respect of such issue that would accrue through the last day of such Interest Reset Period, as well as the last day of such Interest Reset Period, to be provided to such stock exchange as soon as practicable, but in no event later than the applicable Reset Date.

(G) For each issue of Variable Rate Debt Securities, the Calculation Agent shall also cause the interest rate for the applicable Interest Reset Period and the amount of interest accrued on the minimum denomination specified for such issue to be made available to Holders as soon as practicable after its determination but in no event later than two Business Days thereafter. Such interest amounts so made available may subsequently be amended (or appropriate alternative

14

TREASURY-3746

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

arrangements made by way of adjustment) without notice in the event of an extension or shortening of the Interest Reset Period.

(H) If the applicable Supplemental Agreement specifies LIBOR as the applicable Index for determining the rate of interest for the related Variable Rate Debt Security, the following provisions shall apply (unless otherwise specified in the applicable Supplemental Agreement):

"**LIBOR**" shall mean, with respect to any Reset Date (in the following order of priority):

(1) the rate (expressed as a percentage per annum) Deposits in the Index Currency having the Index Maturity that appears on the Designated Reuters Page at 11:00 a.m. (London time) on such LIBOR Determination Date;

(2) if such rate does not so appear pursuant to clause (1) above, the Calculation Agent shall request the principal London offices of four leading banks in the London interbank market selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to prime banks in the London interbank market for Deposits in the Index Currency having the Index Maturity at 11:00 a.m. (London time) on such LIBOR Determination Date and in a Representative Amount. If at least two quotations are provided, LIBOR shall be the arithmetic mean (if necessary rounded upwards) of such quotations;

(3) if fewer than two such quotations are provided as requested in clause (2) above, the Calculation Agent shall request four major banks in the applicable Principal Financial Center selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to leading European banks for a loan in the Index Currency for a period of time corresponding to the Index Maturity, commencing on such Reset Date, at approximately 11:00 a.m. in the Principal Financial Center on such LIBOR Determination Date and in a Representative Amount. If at least two such quotations are provided, LIBOR shall be the arithmetic mean (if necessary rounded upwards) of such quotations; and

(4) if fewer than two such quotations are provided as requested in clause (3) above, LIBOR shall be LIBOR determined with respect to the Reset Date immediately preceding such Reset Date or, in the case of the first Reset Date, shall be the rate for Deposits in the Index Currency having the Index Maturity at 11:00 a.m. (London time) on the most recent London Banking Day preceding the related LIBOR Determination Date for which such rate shall have been displayed on the Designated Reuters Page with respect to Deposits commencing on the second London Banking Day following such date (or, if the Index Currency is Sterling, commencing on such date).

(I) If the applicable Supplemental Agreement specifies EUR-LIBOR as the applicable Index for determining the rate of interest for the related Variable Rate Debt Security, the following provisions shall apply (unless otherwise specified in the applicable Supplemental Agreement):

"**EUR-LIBOR**" shall mean, with respect to any Reset Date (in the following order of priority):

(1) the rate (expressed as a percentage per annum) for Deposits in euros having the Index Maturity that appears on the Designated EUR-LIBOR Reuters Page at 11:00 a.m. (London time) on the related EUR-LIBOR Determination Date;

(2) if such rate does not so appear pursuant to clause (1) above, the Calculation Agent shall request the principal London offices of four leading banks in the London interbank market selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not

15

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to prime banks in the London interbank market for Deposits in euros having the Index Maturity at 11:00 a.m. (London time) on such EUR-LIBOR Determination Date and in a Euro Representative Amount. If at least two quotations are provided, EUR-LIBOR shall be the arithmetic mean (if necessary rounded upwards) of such quotations;

(3) if fewer than two such quotations are provided as requested in clause (2) above, the Calculation Agent shall request four major banks in London selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to leading European banks for a loan in euros for a period of time corresponding to the Index Maturity, commencing on such Reset Date, at approximately 11:00 a.m. (London time) on such EUR-LIBOR Determination Date and in a Euro Representative Amount. If at least two such quotations are provided, EUR-LIBOR shall be the arithmetic mean (if necessary rounded upwards) of such quotations; and

(4) if fewer than two such quotations are provided as requested in clause (3) above, EUR-LIBOR shall be EUR-LIBOR determined with respect to the Reset Date immediately preceding such Reset Date or, in the case of the first Reset Date, will be the rate for Deposits in euros having the Index Maturity at 11:00 a.m. (London time) on the most recent TARGET Business Day preceding the EUR-LIBOR Determination Date for which such rate was displayed on the Designated EUR-LIBOR Reuters Page for deposits starting on the second TARGET Business Day following such date.

(J) If the applicable Supplemental Agreement specifies EURIBOR as the applicable Index for determining the rate of interest for the related Variable Rate Debt Security, the following provisions shall apply (unless otherwise specified in the applicable Supplemental Statement):

"**EURIBOR**" shall mean, with respect to a Reset Date (in the following order of priority):

(1) the rate (expressed as a percentage per annum) for Deposits in euros having the Index Maturity that appears on the Designated EURIBOR Reuters Page at 11:00 a.m., Brussels time, on the relevant EURIBOR Determination Date;

(2) if such rate does not so appear pursuant to clause (1) above, then the Calculation Agent will request the principal offices of four major banks in the Euro-Zone selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide such banks' offered quotations (expressed as a percentage per annum) to prime banks in the Euro-Zone interbank market for Deposits in euros having the Index Maturity at 11:00 a.m. Brussels time on such EURIBOR Determination Date and in a Euro Representative Amount. If at least two quotations are provided, EURIBOR for that date will be the arithmetic mean (if necessary, rounded upwards) of the quotations;

(3) if fewer than two such quotations are provided as requested in clause (2) above, EURIBOR for that date will be the arithmetic mean (if necessary, rounded upwards) of the rates quoted by major banks in the Euro-Zone, selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent), at approximately 11:00 a.m., Brussels time, on the EURIBOR Determination Date for loans in euros to leading European banks for a period of time corresponding to the Index Maturity and in a Euro Representative Amount. If at least two quotations are provided, EURIBOR for that date will be the arithmetic mean (if necessary, rounded upwards) of the quotations; and

16

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

(4) if fewer than two quotations are provided as requested in clause (3) above, EURIBOR will be EURIBOR as determined for the immediately preceding Reset Date or, in the case of the first Reset Date, the interest rate payable for the new Interest Reset Period will be the initial interest rate.

(K) If the applicable Supplemental Agreement specifies the Prime Rate as the applicable Index for determining the rate of interest for the related Variable Rate Debt Securities, the following provisions shall apply:

The **"Prime Rate"** means, with respect to any Reset Date (in the following order of priority):

(1) the rate for the Prime Rate Determination Date, as published in H.15(519) Daily Update opposite the caption "Bank prime loan";

(2) if the rate is not published by 5:00 p.m., New York City time, on the Reset Date pursuant to clause (1), the rate for the Prime Rate Determination Date as published in H.15(519) opposite the caption "Bank prime loan";

(3) if the rate is not published in either H.15(519) or the H.15 Daily Update by 5:00 p.m., New York City time, on the Reset Date, then the Prime Rate will be the arithmetic mean, determined by the Calculation Agent, of the rates (after eliminating certain rates, as described below in this clause (3)) that appear, at 11:00 a.m., New York City time, on the Prime Rate Determination Date, on Reuters USPRIME1 Page as the U.S. dollar prime rate or base lending rate of each bank appearing on that page; provided, that at least three rates appear. In determining the arithmetic mean:

(i) if 20 or more rates appear, the highest five rates (or in the event of equality, five of the highest) and the lowest five rates (or in the event of equality, five of the lowest) will be eliminated,

(ii) if fewer than 20 but 10 or more rates appear, the highest two rates (or in the event of equality, two of the highest) and the lowest two rates (or in the event of equality, two of the lowest) will be eliminated, or

(iii) if fewer than 10 but five or more rates appear, the highest rate (or in the event of equality, one of the highest) and the lowest rate (or in the event of equality, one of the lowest) will be eliminated;

(4) if fewer than three rates so appear on Reuters USPRIME1 Page pursuant to clause (3) above, then the Calculation Agent will request five major banks in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide a quotation of such banks' U.S. dollar prime rates or base lending rates on the basis of the actual number of days in the year divided by 360 as of the close of business on the Prime Rate Determination Date. If at least three quotations are provided, then the Prime Rate will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or in the event of equality, one of the highest) and the lowest quotation (or in the event of equality, one of the lowest));

(5) if fewer than three quotations are so provided pursuant to clause (4) above, the Calculation Agent will request five banks or trust companies organized and doing business under the laws of the United States or any state, each having total equity capital of at least U.S. $500,000,000 and being subject to supervision or examination by federal or state authority, selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as

17

TREASURY-3749

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Calculation Agent), to provide a quotation of such banks' or trust companies' U.S. dollar prime rates or base lending rates on the basis of the actual number of days in the year divided by 360 as of the close of business on the Prime Rate Determination Date. In making such selection of five banks or trust companies, the Calculation Agent will include each bank, if any, that provided a quotation as requested in clause (4) above and exclude each bank that failed to provide a quotation as requested in clause (4). If at least three quotations are provided, then the Prime Rate will be the arithmetic mean determined by the Calculation Agent of the quotations obtained; and

(6) if fewer than three quotations are so provided pursuant to clause (5) above, then the Prime Rate will be the Prime Rate determined for the immediately preceding Reset Date. If the applicable Reset Date is the first Reset Date, then the Prime Rate will be the rate calculated pursuant to clause (1) or (2) for the most recent New York Banking Day preceding the Reset Date for which such rate was published in H.15(519) or H.15 Daily Update.

(L) If the applicable Supplemental Agreement specifies the Treasury Rate as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"Treasury Rate"** means, with respect to any Reset Date (in the following order of priority):

(1) the rate for the Treasury Determination Date of Treasury Bills having the Index Maturity, as published in H.15 Daily Update under the caption "U.S. government securities/Treasury bills/(secondary market)";

(2) if the rate described in clause (1) above does not appear in H.15 Daily Update by 5:00 p.m., New York City time, on the Reset Date, then the rate for the Treasury Rate Determination Date of Treasury Bills having the Index Maturity, as published in the H.15 (519), or other recognized electronic source used for the purpose of displaying that rate under the caption "U.S. government securities/Treasury bills(secondary market)";

(3) if the rate described in clause (2) above is not so published by 3.00 p.m., New York City time, on the Reset Date, then the rate from Treasury Auction of Treasury Bills having the Index Maturity, as that rate appears under the caption "INVEST RATE" on the display on Reuters USAUCTION10 Page or Reuters USAUCTION11 Page;

(4) if the rate described in clause (3) above is not published by 5:00 p.m., New York City time, on the Reset Date, then the auction average rate for Treasury Bills having the Index Maturity obtained from the applicable Treasury Auction as announced by the Treasury Department in the form of a press release under the heading "Investment Rate" by 5:00 p.m. on such Reset Date;

(5) if the rate describe in clause (4) above is not so announced by the Treasury Department by 5:00 p.m., New York City time, on the Reset Date, then auction average rate obtained from the Treasury Auction of the applicable Treasury Bills, as otherwise announced by the Treasury Department by 5:00 p.m., New York City time, on the Reset Date as determined by the Calculation Agent;

(6) if such rate described in clause (5) is not so announced by the Treasury Department by 5:00 p.m., New York City time, on the Reset Date, the Calculation Agent will request five leading primary United States government securities dealers in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) to provide a quotation of such dealers' secondary market bid

18

TREASURY-3750

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                           Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

yields, as of 3:00 p.m. on the Reset Date, for Treasury Bills with a remaining maturity closest to the Index Maturity (or, in the event that the remaining maturities are equally close, the longer remaining maturity). If at least three quotations are provided, then the Treasury Rate will be the arithmetic mean determined by the Calculation Agent of the quotations obtained; and

(7) if fewer than three quotations are so provided pursuant to clause (6) above, then the Treasury Rate for the immediately preceding Reset Date. If the applicable Reset Date is the first Reset Date, then the auction average rate for Treasury Bills having the Index Maturity from the most recent auction of Treasury Bills prior to the Reset Date for which such rate was announced by the Treasury Department in the form of a press release under the heading "Investment Rate."

The rate (including the auction average rate) for Treasury Bills and the secondary market bid yield for Treasury Bills will be obtained and expressed as a bond equivalent on the basis of a year of 365 or 366 days, as applicable (or, if not so expressed, will be converted by the Calculation Agent to such a bond equivalent yield).

(M) If the applicable Supplemental Agreement specifies the CMT Rate as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"CMT Rate"** means, with respect to any Reset Date (in the following order of priority):

(1) for any CMT Determination Date, the daily rate for the Index Maturity that appears on page "FRBCMT" on Reuters (or any other page that replaces the FRBCMT page on that service or any successor service) under the heading "...Treasury Constant Maturities. Federal Reserve Board Release H.15...Mondays Approximately 3:45 p.m.";

(2) if the applicable rate described in clause (1) is not displayed on Reuters page FRBCMT at 3:45 p.m., New York City time, on the CMT Determination Date, then the CMT Rate will be the Treasury constant maturity rate for the Index Maturity applicable for the CMT Determination Date as published in H.15 (519);

(3) if the CMT Rate is not determined pursuant to clause (1) and the applicable rate described in clause (2) does not appear in H.15 (519) at 3:45 p.m., New York City time, on the CMT Determination Date, then the CMT Rate will be the Treasury constant maturity rate, or other U.S. Treasury rate, applicable to an Index Maturity with reference to the CMT Determination Date, that:

(i) is published by the Federal Reserve or the Treasury Department; and

(ii) Freddie Mac has determined to be comparable to the applicable rate formerly displayed on Reuters page 7051 and published in H.15 (519);

(4) if the CMT Rate is not determined pursuant to clause (1) or (2) and the rate described in clause (3) above does not appear at 3:45 p.m., New York City time, on the CMT Determination Date, then the CMT Rate will be the yield to maturity of the arithmetic mean of the secondary market offered rates for U.S. Treasury securities with an original maturity of approximately the Index Maturity and a remaining term to maturity of no more than one year shorter than the Index Maturity, and in a Representative Amount, as of approximately 3:45 p.m., New York City time, on the CMT Determination Date, as quoted by three primary U.S. government securities dealers in New York City that Freddie Mac selects. In selecting these offered rates, Freddie Mac will request quotations from five primary dealers and will disregard the highest quotation or, if there is equality, one of the highest and the lowest quotation or, if there is equality, one of the lowest. If two U.S. Treasury securities with an original maturity longer than

19

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

TREASURY-3751

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

the Index Maturity have remaining terms to maturity that are equally close to the Index Maturity, Freddie Mac will obtain quotations for the U.S. Treasury security with the shorter remaining term to maturity;

(5) if the CMT Rate is not determined pursuant to clause (1), (2) or (3) and fewer than five but more than two primary dealers are quoting offered rates as described in clause (4), then the CMT Rate for the CMT Determination Date will be based on the arithmetic mean of the offered rates so obtained, and neither the highest nor the lowest of those quotations will be disregarded;

(6) if the CMT Rate is not determined pursuant to clause (1), (2), (3) or (4) and two or fewer primary dealers are quoting offered rates as described in clause (5), then the CMT Rate will be the yield to maturity of the arithmetic mean of the secondary market offered rates for U.S. Treasury securities having an original maturity longer than the Index Maturity and a remaining term to maturity closest to the Index Maturity, and in a Representative Amount, as of approximately 3:45 p.m., New York City time, on the CMT Determination Date, as quoted by three primary U.S. government securities dealers in New York City that Freddie Mac selects. In selecting these offered rates, Freddie Mac will request quotations from five primary dealers and will disregard the highest quotation, or, if there is equality, one of the highest and the lowest quotation or, if there is equality, one of the lowest;

(7) if the CMT Rate is not determined pursuant to clauses (1) through (6) above and fewer than five but more than two primary dealers are quoting offered rates as described in clause (6), then the CMT Rate for the CMT Determination date will be based on the arithmetic mean of the offered rates so obtained, and neither the highest nor the lowest of those quotations will be disregarded; and

(8) if the Calculation Agent obtains fewer than three quotations of the kind described in clause (6), the CMT Rate in effect for the new Interest Reset Period will be the CMT Rate in effect for the prior Interest Rate Period, or if the applicable Reset Date is the first Reset Date, the rate of interest payable for the new Interest Reset Period will be the initial interest rate.

(N) If the applicable Supplemental Agreement specifies the CMS Rate as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"CMS Rate"** means, with respect to any Reset Date:

(1) the most recent rate for U.S. dollar swap transactions for the applicable Index Currency and applicable Index Maturity, as specified in the applicable Supplemental Agreement for the Debt Securities, expressed as a percentage, which appears on the Reuters page "ISDAFIX1" (or such other page that may replace that page on that service or a successor service) at 11:00 a.m., New York City time, on the applicable CMS Determination Date;

(2) if the most recent CMS Rate as described in clause (1) above was first available prior to ten calendar days before the applicable CMS Determination Date, then the CMS Rate will be determined by the Calculation Agent on the basis of the mid-market semi-annual swap rate quotations provided by the five leading swaps dealers in the New York City interbank market (which may include Dealers and their affiliates), and for this purpose, "mid-market semi-annual swap rate" means the arithmetic mean of the bid and offered rate quotations for the semi-annual fixed leg, calculated on a 30/360 day count basis, of a fixed-for-floating United States dollars denominated interest rate swap transaction with the applicable Index Currency and Index Maturity, as specified in the applicable Supplemental Agreement for the Debt Securities, commencing on the Reset Date for the relevant Interest Period, and for a relevant representative amount in the relevant market at the relevant time, with an acknowledged dealer

20

TREASURY-3752

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

of good credit in the swap market, where the floating leg, calculated on an Actual/360 day count basis, is equivalent to USD-LIBOR-BBA (as defined in the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc.) with a designated maturity of three months. The Calculation Agent will request the principal New York City office of each of the five leading swaps dealers selected by the Calculation Agent to provide a quotation of its rate. If at least five quotations are provided, the rate for that CMS Determination Date will be the arithmetic mean of the quotations, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest);

(3) if two, three or four (and not five) of such swaps dealers are quoting as described in clause (2) above, then the CMS Rate will be based on the arithmetic mean of the bid prices obtained and neither the highest nor lowest of such quotations will be eliminated; and

(4) if fewer than two rate quotations are provided, then the CMS Rate for the Reset Date will be the CMS Rate in effect on the preceding Reset Date, or if the applicable Reset Date is the first Reset Date, the rate of interest payable for the new Interest Reset Period will be the initial interest rate.

(O) If the applicable Supplemental Agreement specifies the Federal Funds Rate (Daily) as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"Federal Funds Rate (Daily)"** means, with respect to any Reset Date:

(1) the rate for the Business Day preceding the Federal Funds Rate (Daily) Determination Date for U.S. dollar federal funds, as published in the latest H.15 Daily Update opposite the caption "Federal funds (effective)";

(2) if the rate specified in clause (1) is not published by 5:00 p.m., New York City Time, on the Federal Funds Rate (Daily) Determination Date, the Federal Funds Rate (Daily) will be the rate for that Fed Funds Rate (Daily) Determination Date as published in the H.15 Daily Update, or other recognized electronic source used for the purpose of displaying the applicable rate, opposite the caption "Federal funds (effective)";

(3) if the rate specified in clause (2) is not published by 5:00 p.m., New York City time, on the Federal Funds Rate Determination Date, then the Calculation Agent will request five leading brokers (which may include the related Dealers or their affiliates) of federal funds transactions in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) each to provide a quotation of the broker's effective rate for transactions in overnight federal funds arranged by the broker settling on the Business Day preceding the Federal Funds Rate (Daily) Determination Date. If at least two quotations are provided, then the Federal Funds Rate (Daily) will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest));

(4) if fewer than two quotations are so provided pursuant to clause (3) above, then the Calculation Agent will request five leading brokers (which may include the related Dealers or their affiliates) of federal funds transactions in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) each to provide a quotation of the broker's rates for the last transaction in overnight federal funds arranged by the broker as of 11:00 a.m., New York City time, on the

21

TREASURY-3753

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Business Day preceding the Federal Funds Rate (Daily) Determination Date. If at least two quotations are provided, then the Federal Funds Rate (Daily) will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest)); and

(5) if fewer than two quotations are so provided pursuant to clause (4) above, then the Federal Funds Rate (Daily) as of such Federal Funds Rate (Daily) Determination Date will be the Federal Funds Rate (Daily) determined for the immediately preceding Reset Date. If the applicable Reset Date is the first Reset Date, then the rate of interest payable for the new Interest Rate Period will be the initial interest rate.

(P) If the applicable Supplemental Agreement specifies the Federal Funds Rate (Weekly Average) as the applicable Index for determining the rate of interest for the related Variable Rate, the following provisions shall apply:

The **"Federal Funds Rate (Weekly Average)"** means, with respect to any Reset Date:

(1) the most recent rate published in the latest H.15(519) available by 5:00 p.m., New York City time, on the Reset Date, opposite the caption "Federal funds (effective)" and under the caption "Week Ending" for the Friday immediately preceding the Reset Date. (As described in the footnotes to the H.15(519), the rate shown for the week ending on a Friday preceding a Reset Date actually will be the rate for the week ending on (and including) the Wednesday preceding the Reset Date (the **"Seven-Day Period"**));

(2) if a rate is not so published pursuant to clause (1) above, then the Federal Funds Rate (Weekly Average) will be the arithmetic mean determined by the Calculation Agent of the rate, determined in the manner described in subclauses (y) and (z) below (as applicable), for each day in the Seven-Day Period (each a **"Day Rate"**); provided, that the Calculation Agent determines a Day Rate for each day in the Seven-Day Period;

(y) The Day Rate for a Business Day will be the rate that is published, by 5:00 p.m., New York City time, on the Reset Date, in the H.15 Daily Update or other recognized electronic source used for the purpose of displaying the applicable rate, opposite the caption "Federal funds (effective)" for that Business Day. If a rate for that Business Day does not appear on H.15 Daily Update by 5:00 p.m., New York City time, on the Reset Date, the Calculation Agent will request five leading brokers (which may include the related Dealers or their affiliates) of federal funds transactions in the City of New York selected by the Calculation Agent (after consultation with Freddie Mac, if Freddie Mac is not then acting as Calculation Agent) each to provide a quotation of the broker's rate for the last transaction in overnight federal funds arranged by the broker as of 11:00 a.m. on that Business Day. If at least two quotations are provided, then the Day Rate will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest)); and

(z) The Day Rate for a day other than a Business Day will be the rate for the preceding Business Day, whether or not the Business Day falls within the relevant Seven-Day Period, determined in accordance with the provisions of subclause (y) above; and

(3) if the Day Rate for each day in the Seven-Day Period is not so determined pursuant to either clause (1) or (2) above, then the Federal Funds Rate (Weekly Average) as of such Reset

22

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                                                 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Date will be the Federal Funds Rate (Weekly Average) determined for the immediately preceding Reset Date. If the applicable Reset Date is the first Reset Date, then the rate of interest payable for the new Interest Reset Period will be the initial interest rate.

(j) *Fixed/Variable Rate Debt Securities*

Fixed/Variable Rate Debt Securities shall bear interest at a single fixed rate for one or more specified periods and at a rate determined by reference to one or more Indices, or otherwise, for one or more other specified periods. Fixed/Variable Rate Debt Securities also may bear interest at a rate that Freddie Mac may elect to convert from a fixed rate to a variable rate or from a variable rate to a fixed rate, if so provided in the applicable Supplemental Agreement.

If Freddie Mac may convert the interest rate on a Fixed/Variable Rate Debt Security from a fixed rate to a variable rate, or from a variable rate to a fixed rate, accrued interest for each Interest Payment Period may be calculated using an accrued interest factor in the manner described in Section 2.07(i)(E).

(k) *Zero Coupon Debt Securities*

Zero Coupon Debt Securities shall not bear interest.

(l) *Amortizing Debt Securities*

Amortizing Debt Securities are those on which Freddie Mac makes periodic payments of principal during the terms of such Debt Securities as described in the related Supplemental Agreement. Amortizing Debt Securities may bear interest at fixed or variable rates.

(m) *Debt Securities with Variable Principal Repayment Amounts*

Variable Principal Repayment Amount Debt Securities are those on which the amount of principal payable is determined with reference to an Index specified in the related Supplemental Agreement.

(n) *Mortgage Linked Amortizing Debt Securities*

Mortgage Linked Amortizing Debt Securities are Amortizing Debt Securities on which Freddie Mac makes periodic payments of principal based on the rate of payments on referenced mortgage or mortgage-related assets, as described in the related Supplemental Agreement. Mortgage Linked Amortizing Debt Securities may bear interest at fixed or variable rates.

(o) *Range Accrual Debt Securities*

Range Accrual Debt Securities are Variable Rate Debt Securities on which no interest may accrue during periods when the applicable Index is outside a specified range as described in the related Supplemental Agreement.

(p) *Extendible Variable Rate Debt Securities*

Extendible Variable Rate Debt Securities' are Variable Rate Debt Securities, the maturity of which may be extended at a Beneficial Owner's option effective as of specified dates, subject to a final maturity date, and that bear interest at variable rates subject to different Spreads for different specified periods, as described in the related Supplemental Agreement.

**Section 2.08. Business Day Convention.**

Unless otherwise specified in the applicable Supplemental Agreement, in any case in which an Interest Payment Date or Principal Payment Date is not a Business Day, payment of any interest on or the principal of the Debt Securities shall not be made on such date but shall be made on the next Business Day with the same force and effect as if made on such Interest Payment Date or Principal Payment Date, as the

23

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

case may be. Unless otherwise provided in the applicable Supplemental Agreement, no interest on such payment shall accrue for the period from and after such Interest Payment Date or Principal Payment Date, as the case may be, to the actual date of such payment.

### Section 2.09. Targeted Registered Issues.

Any Debt Securities that are Targeted Registered Debt Securities shall be considered to be "targeted to foreign markets" as provided under Treasury Department regulations.

### Section 2.10. Reopened Issues and Repurchases.

Freddie Mac reserves the right, in its discretion and at any time, to offer additional Debt Securities which have the same terms (other than Issue Date, interest commencement date and issue price) and conditions as Debt Securities for which settlement has previously occurred or been scheduled so as to form a single series of Debt Securities as specified in the applicable Supplemental Agreement.

Freddie Mac reserves the right, in its discretion and at any time, to purchase Debt Securities or otherwise acquire (either for cash or in exchange for securities) some or all of an issue of Debt Securities at any price or prices in the open market or otherwise. Such Debt Securities may be held, resold or canceled by Freddie Mac.

## ARTICLE III

### Form; Clearance and Settlement Procedures

### Section 3.01. Form of Fed Book-Entry Debt Securities.

(a) *General*

Fed Book-Entry Debt Securities shall be issued and maintained only on the Fed Book-Entry System. Fed Book-Entry Debt Securities shall not be exchangeable for definitive Debt Securities. The Book-Entry Rules are applicable to Fed Book-Entry Debt Securities.

(b) *Title*

Fed Book-Entry Debt Securities shall be held of record only by Holding Institutions. Such entities whose names appear on the book-entry records of a Federal Reserve Bank as the entities to whose accounts Fed Book-Entry Debt Securities have been deposited shall be the Holders of such Fed Book-Entry Debt Securities. The rights of the Beneficial Owner of a Fed Book-Entry Debt Security with respect to Freddie Mac and the Federal Reserve Banks may be exercised only through the Holder of the Fed Book-Entry Debt Security. Freddie Mac and the Federal Reserve Banks shall have no direct obligation to a Beneficial Owner of a Fed Book-Entry Debt Security that is not also the Holder of the Fed Book-Entry Debt Security. The Federal Reserve Banks shall act only upon the instructions of the Holder in recording transfers of a Debt Security maintained on the Fed Book-Entry System. Freddie Mac and the Federal Reserve Banks may treat the Holders as the absolute owners of Fed Book-Entry Debt Securities for the purpose of making payments in respect thereof and for all other purposes, whether or not such Fed Book-Entry Debt Securities shall be overdue and notwithstanding any notice to the contrary.

The Holders and each other financial intermediary holding such Fed Book-Entry Debt Securities directly or indirectly on behalf of the Beneficial Owners shall have the responsibility of remitting payments for the accounts of their customers. All payments on Fed Book-Entry Debt Securities shall be subject to any applicable law or regulation.

24

TREASURY-3756

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(c) *Fiscal Agent*

The FRBNY shall be the Fiscal Agent for Fed Book-Entry Debt Securities.

In acting under the Fiscal Agency Agreement, the FRBNY shall act solely as Fiscal Agent of Freddie Mac and does not assume any obligation or relationship of agency or trust for or with any Holder of a Fed Book-Entry Debt Security.

**Section 3.02. Form of Registered Debt Securities.**

(a) *General*

As specified in the applicable Supplemental Agreement, Registered Debt Securities shall be deposited with (i) a custodian for, and registered in the name of a nominee of, DTC, or (ii) a Common Depositary, and registered in the name of such Common Depositary or a nominee of such Common Depositary.

(b) *Title*

The person in whose name a Registered Debt Security is registered in the Register shall be the Holder of such Registered Debt Security. Beneficial interests in a Registered Debt Security shall be represented, and transfers thereof shall be effected, only through book-entry accounts of financial institutions acting on behalf of the Beneficial Owners of such Registered Debt Security, as a direct or indirect participant in the applicable clearing system for such Registered Debt Security.

Freddie Mac, the Global Agent and the Registrar may treat the Holders as the absolute owners of Registered Debt Securities for the purpose of making payments and for all other purposes, whether or not such Registered Debt Securities shall be overdue and notwithstanding any notice to the contrary. Owners of beneficial interests in a Registered Debt Security shall not be considered by Freddie Mac, the Global Agent or the Registrar as the owner or Holder of such Registered Debt Security and, except as provided in Section 4.02(a), shall not be entitled to have Debt Securities registered in their names and shall not receive or be entitled to receive definitive Debt Securities. Any Beneficial Owner shall rely on the procedures of the applicable clearing system and, if such Beneficial Owner is not a participant therein, on the procedures of the participant through which such Beneficial Owner holds its interest, to exercise any rights of a Holder of such Registered Debt Securities.

Payments by DTC participants to Beneficial Owners of DTC Registered Debt Securities held through DTC participants shall be the responsibility of such participants. Payments with respect to Other Registered Debt Securities held through Euroclear, Clearstream, Luxembourg or any other applicable clearing system shall be credited to Euroclear participants, Clearstream, Luxembourg participants or participants of any other applicable clearing system in accordance with the relevant system's rules and procedures.

(c) *Global Agent*

In acting under the Global Agency Agreement, the Global Agent acts solely as a fiscal agent of Freddie Mac and does not assume any obligation or relationship of agency or trust for or with any Holder of a Registered Debt Security, except that any moneys held by the Global Agent for payment on a Registered Debt Security shall be held in trust for the Holder as provided in the Global Agency Agreement.

(d) *Registrar*

In acting under the Global Agency Agreement, the Registrar does not assume any obligation or relationship of agency or trust for, or with, any Holder of a Registered Debt Security.

25

TREASURY-3757

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 3.03. Clearance and Settlement Procedures.**

(a) *General*

Unless otherwise provided in the applicable Supplemental Agreement:

(i) Most Debt Securities denominated and payable in U.S. dollars and distributed within the United States shall clear and settle through the Fed Book-Entry System.

(ii) Most Debt Securities denominated and payable in U.S. dollars and distributed simultaneously within and outside of the United States, including all Reference Securities, shall clear and settle, within the United States, through the Fed Book-Entry System and, outside of the United States, through the systems operated by Euroclear, Clearstream, Luxembourg and/or any other designated clearing system.

(iii) Debt Securities denominated or payable in a Specified Currency other than U.S. dollars (and Debt Securities denominated and payable in U.S. dollars that are not cleared and settled in accordance with clauses (i) and (ii) above) and distributed solely within the United States shall clear and settle through the system operated by DTC.

(iv) Debt Securities denominated or payable in a Specified Currency other than U.S. dollars (and Debt Securities denominated and payable in U.S. dollars that are not cleared and settled in accordance with clauses (i) and (ii) above) and distributed simultaneously within and outside of the United States shall clear and settle through the systems operated by DTC, Euroclear, Clearstream, Luxembourg and/or any other designated clearing system.

(v) Debt Securities, irrespective of the Specified Currency in which such Debt Securities are denominated or payable, distributed solely outside of the United States shall clear and settle through the systems operated by Euroclear, Clearstream, Luxembourg and/or any other designated clearing system or, in certain cases, DTC.

(b) *Primary Distribution*

(i) *General.* On initial issue, Debt Securities shall be credited through one or more of the systems specified below or any other system specified in the applicable Supplemental Agreement.

(ii) *Federal Reserve Banks.* Fed Book-Entry Debt Securities shall be issued and settled through the Fed-Book-Entry System in same-day funds and shall be held by designated Holding Institutions. After initial issue, all Fed Book-Entry Debt Securities shall continue to be held by such Holding Institutions in the Fed Book-Entry System unless arrangements are made for the transfer thereof to another Holding Institution. Fed Book-Entry Debt Securities shall not be exchangeable for definitive Debt Securities.

(iii) *DTC.* DTC participants acting on behalf of investors holding DTC Registered Debt Securities through DTC shall follow the delivery practices applicable to securities eligible for DTC's Same-Day Funds Settlement System. DTC Registered Debt Securities shall be credited to DTC participants' securities accounts following confirmation of receipt of payment to Freddie Mac on the relevant Issue Date.

(iv) *Euroclear and Clearstream, Luxembourg.* Investors holding Other Registered Debt Securities through Euroclear, Clearstream, Luxembourg or such other clearing system shall follow the settlement procedures applicable to conventional Eurobonds in registered form. Such Other Registered Debt Securities shall be credited to Euroclear, Clearstream, Luxembourg or such other clearing system participants' securities accounts either on the relevant Issue Date or on the

26

TREASURY-3758

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

settlement day following the relevant Issue Date against payment in same-day funds (for value on the relevant Issue Date).

(c) *Secondary Market Transfers*

(i) *Fed Book-Entry Debt Securities.*   Transfers of Fed Book-Entry Debt Securities shall take place only in book-entry form on the Fed Book-Entry System. Such transfers shall occur between Holding Institutions in accordance with the rules of the Fed Book-Entry System.

(ii) *Registered Debt Securities.*   Transfers of beneficial interests in Registered Debt Securities within the various systems that may be clearing and settling interests therein shall be made in accordance with the usual rules and operating procedures of the relevant system applicable to the Specified Currency in which such Registered Debt Securities are denominated or payable and the nature of the transfer.

(iii) Freddie Mac shall not bear responsibility for the performance by any system or the performance of the system's respective direct or indirect participants or accountholders of the respective obligations of such participants or account holders under the rules and procedures governing such system's operations.

## ARTICLE IV

### Payments, Exchange for Definitive Debt Securities

**Section 4.01. Payments.**

(a) *Payments on Fed Book-Entry Debt Securities*

Payments of principal of and any interest on Fed Book-Entry Debt Securities shall be made in U.S. dollars (except as otherwise provided in the applicable Supplemental Agreement) on the applicable payment dates to Holders thereof as of the end of the Business Day preceding each such payment date. Payments on Fed Book-Entry Debt Securities shall be made by credit of the payment amount to the Holders' accounts at the relevant Federal Reserve Bank. All payments to or upon the order of a Holder shall be valid and effective to discharge the liability of Freddie Mac and the Fiscal Agent in respect of the related Fed Book-Entry Debt Securities.

(b) *Payments on Registered Debt Securities*

(i) Payments in respect of Registered Debt Securities shall be made in immediately available funds to DTC, Euroclear, Clearstream, Luxembourg or any other applicable clearing system, or their respective nominees, as the case may be, as the Holders thereof. Except as provided in Section 2.03(c) and Article VII hereof, such payments shall be made in the Specified Payment Currency. All payments to or upon the order of the Holder of a Registered Debt Security shall be valid and effective to discharge the liability of Freddie Mac in respect of such Registered Debt Security. Ownership positions within each system shall be determined in accordance with the normal conventions observed by such system. Freddie Mac, the Global Agent and the Registrar shall not have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Registered Debt Security or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

(ii) Interest on a Registered Debt Security shall be paid on the applicable Interest Payment Date. Such interest payment shall be made to the Holder of such Registered Debt Security as of the close of business on the related Record Date. The first payment of interest on any Registered Debt Security originally issued between a Record Date and the related Interest Payment Date shall be

27

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

made on the Interest Payment Date following the next Record Date to the Holder on such next Record Date. The principal of each Registered Debt Security, together with accrued and unpaid interest thereon, shall be paid to the Holder thereof against presentation and surrender of such Registered Debt Security.

(iii) All payments on Registered Debt Securities are subject to any applicable law or regulation. If a payment outside the United States is illegal or effectively precluded by exchange controls or other similar restrictions, payments in respect of the related Registered Debt Securities shall be made at the office of any paying agent in the United States.

### Section 4.02. Exchange for Definitive Debt Securities.

In the event that Freddie Mac issues definitive Debt Securities in exchange for Registered Debt Securities issued in global form, such definitive Debt Securities shall have terms identical to the Registered Debt Securities for which they were exchanged except as described below.

(a) *Issuance of Definitive Debt Securities*

Unless otherwise provided in the applicable Supplemental Agreement, beneficial interests in Registered Debt Securities issued in global form shall be subject to exchange for definitive Debt Securities only if such exchange is permitted by applicable law and (i) in the case of a DTC Registered Debt Security, DTC notifies Freddie Mac that it is no longer willing or able to discharge properly its responsibilities as depositary with respect to such DTC Registered Debt Security, or ceases to be a "clearing agency" registered under the Securities Exchange Act of 1934 (if so required), or is at any time no longer eligible to act as such, and in each case Freddie Mac is unable to locate a successor within 90 calendar days of receiving notice of such ineligibility on the part of DTC; (ii) in the case of any Other Registered Debt Security, if all of the systems through which it is cleared or settled are closed for business for a continuous period of 14 calendar days (other than by reason of holidays, statutory or otherwise) or are permanently closed for business or have announced an intention permanently to cease business and in any such situations Freddie Mac is unable to locate a single successor within 90 calendar days of such closure; (iii) a Holder has instituted a judicial proceeding in a court to enforce its rights under such Registered Debt Security and such Holder has been advised by counsel that in connection with such proceeding it is necessary for such Holder to obtain possession of definitive Debt Securities; (iv) Freddie Mac (at its discretion), upon the request of a Holder and at such Holder's expense, elects to issue definitive Debt Securities; or (v) Freddie Mac (at its discretion) elects to issue definitive Debt Securities. In such circumstances, Freddie Mac shall cause sufficient definitive Debt Securities to be executed and delivered as soon as practicable (and in any event within 45 calendar days of Freddie Mac's receiving notice of the occurrence of such circumstances) to the Global Agent or its agent for completion, authentication and delivery to the relevant registered holders of such definitive Debt Securities. A person having an interest in a DTC Registered Debt Security or Other Registered Debt Security issued in global form shall provide Freddie Mac or the Global Agent with a written order containing instructions and such other information as Freddie Mac or the Global Agent may require to complete, execute and deliver such definitive Debt Securities in authorized denominations.

(b) *Title*

The person in whose name a definitive Debt Security is registered in the Register shall be the **"Holder"** of such definitive Debt Security. Freddie Mac, the Global Agent and the Registrar may treat the Holders as the absolute owners of definitive Debt Securities for the purpose of making payments and for all other purposes, whether or not such definitive Debt Securities shall be overdue and notwithstanding any notice to the contrary.

28

TREASURY-3760

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(c) *Payments*

Interest on a definitive Debt Security shall be paid on the applicable Interest Payment Date. Such interest payments shall be made by check mailed to the Holder thereof at the close of business on the Record Date preceding such Interest Payment Date at such Holder's address appearing in the Register. The principal of each definitive Debt Security, together with accrued and unpaid interest thereon, shall be due on the Principal Payment Date (subject to the right of the Holder thereof on the related Record Date to receive interest due on an Interest Payment Date that is on or prior to such Principal Payment Date) and shall be paid against presentation and surrender of such definitive Debt Security at the offices of the Global Agent or other paying agent. Payments on the Principal Payment Date shall be made by check provided at the appropriate office of the Global Agent or other paying agent or mailed by the Global Agent to the Holder of such definitive Debt Security. U.S. dollar checks shall be drawn on a bank in the United States. Checks in a Specified Payment Currency other than U.S. dollars shall be drawn on a bank office located outside the United States.

Notwithstanding the provisions described in the preceding paragraph relating to payments by check, the Holder of an aggregate principal amount of at least $10,000,000 of an issue of Debt Securities of which definitive Debt Securities form a part (or, in the case of a definitive Debt Security denominated in a Specified Currency other than U.S. dollars, the Specified Currency equivalent of at least $10,000,000) may elect to receive payments thereon by wire transfer of immediately available funds in the Specified Payment Currency to an account in such Specified Payment Currency with a bank designated by such Holder that is acceptable to Freddie Mac; provided, that such bank has appropriate facilities therefor and accepts such transfer and such transfer is permitted by any applicable law or regulation and will not subject Freddie Mac to any liability, requirement or unacceptable charge. In order for such Holder to receive such payments, the relevant paying agent (including the Global Agent) must receive at its office from such Holder (i) in the case of payments on an Interest Payment Date, a written request therefor not later than the close of business on the related Record Date; or (ii) in the case of payments on the Principal Payment Date, a written request therefor not later than the close of business on the date 15 days prior to such Principal Payment Date and the related definitive Debt Security not later than two Business Days prior to such Principal Payment Date. Such written request must be delivered to the relevant paying agent (including the Global Agent) by mail, by hand delivery or by tested or authenticated telex. Any such request shall remain in effect until the relevant paying agent receives written notice to the contrary.

All payments on definitive Debt Securities shall be subject to any applicable law or regulation. If a payment outside the United States is illegal or effectively precluded by exchange controls or similar restrictions, payments in respect of the related definitive Debt Securities may be made at the office of any paying agent in the United States.

(d) *Partial Redemption*

Definitive Debt Securities subject to redemption in part by Freddie Mac shall be selected by the Global Agent by lot or in such other manner as the Global Agent deems fair and appropriate, subject to the requirement that the principal amount of each outstanding definitive Debt Security after such redemption is in an authorized denomination.

(e) *Transfer and Exchange*

Definitive Debt Securities shall be presented for registration of transfer or exchange (with the form of transfer included thereon properly endorsed, or accompanied by a written instrument of transfer, with such evidence of due authorization and guaranty of signature as may be required by the Registrar, duly executed) at the office of the Registrar or any other transfer agent upon payment of any taxes and other governmental charges and other amounts, but without payment of any service charge to the Registrar or

29

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

such transfer agent for such transfer or exchange. A transfer or exchange shall not be effective unless, and until, recorded in the Register.

A transfer or exchange of a definitive Debt Security shall be effected upon satisfying the Registrar with regard to the documents and identity of the person making the request and subject to such reasonable regulations as Freddie Mac may from time to time agree with the Registrar. Such documents may include forms prescribed by U.S. tax authorities to establish the applicability of, or the exemption from, withholding or other taxes regarding the transferee Holder. Definitive Debt Securities may be transferred or exchanged in whole or in part only in the authorized denominations of the DTC Registered Debt Securities or Other Registered Debt Securities issued in global form for which they were exchanged. In the case of a transfer of a definitive Debt Security in part, a new definitive Debt Security in respect of the balance not transferred shall be issued to the transferor. In addition, replacement of mutilated, destroyed, stolen or lost definitive Debt Securities also is subject to the conditions discussed above with respect to transfers and exchanges generally. Each new definitive Debt Security to be issued upon transfer of such a definitive Debt Security, as well as the definitive Debt Security issued in respect of the balance not transferred, shall be mailed to such address as may be specified in the form or instrument of transfer at the risk of the Holder entitled thereto in accordance with the customary procedures of the Registrar.

## ARTICLE V

### Secured Debt Securities

If so provided in the applicable Supplemental Agreement, the indebtedness represented by certain Debt Securities shall be secured obligations of Freddie Mac. In such event, the description of the security interest and the terms of the grant of the security interest shall be set forth in the applicable Supplemental Agreement.

## ARTICLE VI

### Currency Conversions

**Section 6.01. Currency Conversions for DTC Registered Debt Securities.**

(a) In the case of DTC Registered Debt Securities whose Specified Payment Currency is other than U.S. dollars, the Currency Exchange Bank specified in the applicable Supplemental Agreement, for Holders of such DTC Registered Debt Securities, shall convert any amounts paid by Freddie Mac in such Specified Payment Currency into U.S. dollars, unless such Holders elect to receive payments in such Specified Payment Currency as hereinafter described. Freddie Mac shall have no responsibility for the conversion of the Specified Payment Currency for such DTC Registered Debt Securities into U.S. dollars.

(b) The U.S. dollar amount to be received by a Holder of a DTC Registered Debt Security in respect of which payments are to be converted from the Specified Payment Currency into U.S. dollars shall be determined by the Currency Exchange Bank in the morning of the day that would be considered the date for "spot" settlement of the Specified Payment Currency on the applicable payment date in accordance with market convention (generally two New York business days prior to such payment date) at the market rate determined by the Currency Exchange Bank to accomplish the conversion on such payment date of the aggregate amount of the Specified Payment Currency payable in respect of DTC Registered Debt Securities scheduled to receive payments converted into U.S. dollars. All currency exchange costs shall be borne by the Holders of such DTC Registered Debt Securities (and, accordingly, by the related Beneficial Owners) by deductions from such payments. In the event all or any portion of a Specified

30

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Payment Currency is not convertible into U.S. dollars, Holders of such DTC Registered Debt Securities shall receive payment in the Specified Payment Currency.

(c) A Holder of a DTC Registered Debt Security to be paid in a Specified Payment Currency other than U.S. dollars shall have the option to receive payments of the principal of and any interest on such DTC Registered Debt Security in the Specified Payment Currency by notifying DTC no later than the third New York business day after the related Record Date, in the case of payments on an Interest Payment Date, or the date 12 days prior to the Principal Payment Date, in the case of payments on the Principal Payment Date.

## ARTICLE VII

### Events of Default and Remedies

**Section 7.01. Events of Default.**

(a) An "**Event of Default**" with respect to a specific issue of Debt Securities shall consist of (i) any failure by Freddie Mac to pay to Holders of such Debt Securities any required payment that continues unremedied for 30 days; (ii) any failure by Freddie Mac to perform in any material respect any other covenant or agreement in this Agreement, which failure continues unremedied for 60 days after the giving of notice of such failure to Freddie Mac by the Holders of not less than 25% of the outstanding principal amount (or notional principal amount) of such Debt Securities; (iii) a court having jurisdiction in the premises shall enter a decree or order for relief in respect of Freddie Mac in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or appoint a receiver, liquidator, assignee, custodian, or sequestrator (or other similar official) of Freddie Mac or for all or substantially all of its property, or order the winding up or liquidation of its affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days; or (iv) Freddie Mac shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, or sequestrator (or other similar official) of Freddie Mac or any substantial part of its property, or shall make any general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due.

The appointment of a conservator (or other similar official) by a regulator having jurisdiction over Freddie Mac, whether or not Freddie Mac consents to such appointment, will not constitute an Event of Default. Any payment made in U.S. dollars or in euros as provided under Section 2.03(c)(ii) shall not constitute an Event of Default.

(b) Any event associated with EMU (an "**EMU Event**") shall not give rise to an Event of Default. An EMU Event may include, without limitation, each (and any combination) of (i) the fixing of exchange rates between the currency of a member state of the European Union and euros or between the currencies of member states of the European Union; (ii) the introduction of euros as lawful currency in a member state of the European Union; or (iii) the disappearance or replacement of a relevant rate option or other price source for the national currency of any member state of the European Union, or the failure of the agreed sponsor (or a successor sponsor) to publish or display a relevant rate, index, price, page or screen.

**Section 7.02. Rights Upon Event of Default.**

(a) As long as an Event of Default under this Agreement remains unremedied, Holders of not less than 50% of the outstanding principal amount (or notional principal amount) of an issue of Debt Securities to which such Event of Default relates may, by written notice to Freddie Mac, declare such

31

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Debt Securities due and payable and accelerate the maturity of such Debt Securities. Upon such acceleration, the principal amount of such Debt Securities and the interest accrued thereon shall be due and payable.

(b) No Holder has any right under this Agreement to institute any action or proceeding at law or in equity or in bankruptcy or otherwise, or for the appointment of a receiver or trustee, or for any other remedy, unless (i) such Holder previously has given to Freddie Mac written notice of an Event of Default and of the continuance thereof; (ii) the Holders of not less than 50% of the outstanding principal amount (or notional principal amount) of an issue of Debt Securities to which such Event of Default relates have given written notice to Freddie Mac of such Event of Default; and (iii) such Event of Default continues uncured for a period of 60 days after such notice. No Holder of an issue of Debt Securities has any right in any manner whatsoever by virtue of or by availing itself of any provision of this Agreement to affect, disturb or prejudice the rights of any other such Holder, or to obtain or seek to obtain preference or priority over any other such Holder or to enforce any right under this Agreement, except in the manner provided in this Agreement and for the ratable and common benefit of all such Holders.

(c) Prior to or after the institution of any action or proceeding relating to an issue of Debt Securities, the Holders of not less than 50% of the outstanding principal amount (or notional principal amount) of such Debt Securities may waive an Event of Default, whether or not it has resulted in a declaration of an acceleration of the maturity of such Debt Securities, and may rescind and annul any previously declared acceleration.

(d) Whenever in this Agreement it is provided that the Holders of a specified percentage in outstanding principal amount (or notional principal amount) of an issue of Debt Securities may take any action (including the making of any demand or request, or the giving of any authorization, notice, consent or waiver), the fact that at the time of taking any such action the Holders of such specified percentage have joined therein may be evidenced by a writing, or any number of writings of similar tenor, executed by Holders in person, or by an agent or proxy appointed in writing.

## ARTICLE VIII

### Miscellaneous Provisions

#### Section 8.01. Limitations on Liability of Freddie Mac and Others.

Neither Freddie Mac nor any of its directors, officers, employees or agents shall be under any liability to the Holders or Beneficial Owners for any action taken, or not taken, by them in good faith under this Agreement or for errors in judgment. This provision will not protect Freddie Mac or any other related person against any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence or by reason of reckless disregard of obligations and duties under this Agreement. Freddie Mac and such related persons shall have no liability of whatever nature for special, indirect or consequential damages, lost profits or business, or any other liability or claim (other than for direct damages), even if reasonably foreseeable or Freddie Mac has been advised of the possibility of such loss, damage, liability or claim.

In performing its responsibilities under this Agreement, Freddie Mac may employ agents or independent contractors. Except upon an Event of Default (as defined herein), Freddie Mac shall not be subject to the control of Holders in any manner in the discharge of its responsibilities pursuant to this Agreement.

Freddie Mac shall not be under any obligation to appear in, prosecute or defend any legal action that is not incidental to its responsibilities under this Agreement and which in its opinion may involve it in any

32

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

expense or liability. However, Freddie Mac may in its discretion undertake any such legal action which it may deem necessary or desirable in the interests of the Holders. In such event, the legal expenses and costs of such action shall be expenses and costs of Freddie Mac.

### Section 8.02. Binding Effect of this Agreement.

(a) By receiving and accepting a Debt Security, each Holder, financial intermediary and Beneficial Owner of such Debt Security unconditionally agrees, without any signature or further manifestation of assent, to be bound by the terms and conditions of this Agreement, as supplemented, modified or amended pursuant to its terms.

(b) This Agreement shall be binding upon and inure to the benefit of any successor to Freddie Mac.

### Section 8.03. Replacement.

Any Registered Debt Security in definitive form that becomes mutilated, destroyed, stolen or lost shall be replaced by Freddie Mac at the expense of the Holder upon delivery to the Global Agent of evidence of the destruction, theft or loss thereof, and an indemnity satisfactory to Freddie Mac and the Global Agent. Upon the issuance of any substituted Registered Debt Security, Freddie Mac or the Global Agent may require the payment by the Holder of a sum sufficient to cover any taxes and expenses connected therewith.

### Section 8.04. Conditions to Payment, Transfer or Exchange.

Freddie Mac, its agent or any other person potentially required to withhold with respect to payments on a Debt Security shall have the right to require a Holder of a Debt Security, as a condition to payment of principal of or interest on such Debt Security, or as a condition to transfer or exchange of such Debt Security, to present at such place as Freddie Mac, its agent or such other person shall designate a certificate in such form as Freddie Mac, its agent or such other person may from time to time prescribe, to enable Freddie Mac, its agent or such other person to determine its duties and liabilities with respect to (i) any taxes, assessments or governmental charges which Freddie Mac, any Federal Reserve Bank, the Global Agent or such other person, as the case may be, may be required to deduct or withhold from payments in respect of such Debt Security under any present or future law of the United States or jurisdiction therein or any regulation or interpretation of any taxing authority thereof; and (ii) any reporting or other requirements under such laws, regulations or interpretations. Freddie Mac, its agent or such other person shall be entitled to determine its duties and liabilities with respect to such deduction, withholding, reporting or other requirements on the basis of information contained in such certificate or, if no certificate shall be presented, on the basis of any presumption created by any such law, regulation or interpretation, and shall be entitled to act in accordance with such determination.

### Section 8.05. Amendment.

(a) Freddie Mac may modify, amend or supplement this Agreement and the terms of an issue of Debt Securities, without the consent of the Holders or Beneficial Owners, (i) to cure any ambiguity, or to correct or supplement any defective provision or to make any other provision with respect to matters or questions arising under this Agreement or the terms of any Debt Security that are not inconsistent with any other provision of this Agreement or the Debt Security; (ii) to add to the covenants of Freddie Mac for the benefit of the Holders or surrender any right or power conferred upon Freddie Mac; (iii) to evidence the succession of another entity to Freddie Mac and its assumption of the covenants of Freddie Mac; (iv) to conform the terms of an issue of Debt Securities or cure any ambiguity or discrepancy resulting from any changes in the Book-Entry Rules or any regulation or document that are applicable to book-entry securities of Freddie Mac; (v) to increase the amount of an issue of Debt Securities as contemplated

33

TREASURY-3765

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

under Section 2.07; or (vi) in any other manner that Freddie Mac may determine and that will not adversely affect in any material respect the interests of Holders or Beneficial Owners at the time of such modification, amendment or supplement.

(b) In addition, either (i) with the written consent of the Holders of at least 50% of the aggregate then outstanding principal amount or notional principal amount of an issue of Debt Securities affected thereby, excluding any such Debt Securities owned by Freddie Mac; or (ii) by the adoption of a resolution at a meeting of Holders at which a quorum is present, by the Holders of at least 50% of the aggregate then outstanding principal amount or notional principal amount of an issue of Debt Securities represented at such meeting, excluding any such Debt Securities owned by Freddie Mac, Freddie Mac may from time to time and at any time modify, amend or supplement the terms of an issue of Debt Securities for the purpose of adding any provisions to or changing in any manner or eliminating any provisions of such Debt Securities or modifying in any manner the rights of the Holders; provided, however, that no such modification, amendment or supplement may, without the written consent or affirmative vote of each Holder of a Debt Security; (A) change the Maturity Date or any Interest Payment Date of such Debt Security; (B) materially modify the redemption or repayment provisions, if any, relating to the redemption or repayment price of, or any redemption or repayment date or period for, such Debt Security; (C) reduce the principal amount of, delay the principal payment of, or materially modify the rate of interest or the calculation of the rate of interest on, such Debt Security; (D) in the case of Registered Debt Securities only, change the Specified Payment Currency of such Registered Debt Security; or (E) reduce the percentage of Holders whose consent or affirmative vote is necessary to modify, amend or supplement the terms of the relevant issue of Debt Securities. A quorum at any meeting of Holders called to adopt a resolution shall be Holders entitled to vote a majority of the then aggregate outstanding principal amount or notional principal amount of an issue of such Debt Securities called to such meeting and, at any reconvened meeting adjourned for lack of a quorum, 25% of the then aggregate outstanding principal amount or notional principal amount of such issue of Debt Securities, in both cases excluding any such Debt Securities owned by Freddie Mac. It shall not be necessary for the Holders to approve the particular form of any proposed amendment, but it shall be sufficient if such consent or resolution approves the substance of such change. If any modification, amendment or supplement of the terms of an issue of Debt Securities that have been separated into Interest and Principal Components requires the consent of Holders, only the Holders of the Principal Components will be entitled to give or withhold that consent. Holders of Interest Components will have no right to give or withhold such consent.

(c) The "principal amount," for purposes of the preceding paragraph, for a Debt Security that is a Zero Coupon Debt Security or for a Debt Security issued at an "issue price" of 80% or less of its principal amount will be equal to (i) the issue price of such Debt Security; plus (ii) the original issue discount that has accrued from the Issue Date of such Debt Security to the OID Determination Date; minus (iii) any amount considered as part of the "stated redemption price at maturity" of such Debt Security that has been paid from the Issue Date of such Debt Security to the OID Determination Date.

The "principal amount," for purposes of the second preceding paragraph, of a Debt Security whose Specified Principal Currency is other than U.S. dollars will be the U.S. dollar equivalent, determined on the Issue Date, of the principal amount (or, in the case of the Debt Securities referred to in the preceding paragraph, the amount determined in accordance with the provisions described in such preceding paragraph) of such Debt Security. The "principal amount" of a Debt Security with principal determined by reference to an Index will be described in the applicable Supplemental Agreement.

(d) Freddie Mac may establish a record date for the determination of Holders entitled to vote at any meeting of Holders of Debt Securities, to grant any consent in respect of Debt Securities and to notice with respect to any such meeting or consent.

TREASURY-3766

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(e) Any instrument given by or on behalf of any Holder of a Debt Security in connection with any consent to any such modification, amendment or supplement shall be irrevocable once given and shall be conclusive and binding on all subsequent Holders of such Debt Security or any Debt Security issued, directly or indirectly, in exchange or substitution therefor, irrespective of whether or not notation in regard thereto is made thereon. Any modification, amendment or supplement of this Agreement or of the terms of Debt Securities shall be conclusive and binding on all Holders of Debt Securities affected thereby, whether or not they have given such consent or were present at any meeting (unless by the terms of this Agreement a written consent or an affirmative vote of such Holders is required), and whether or not notation of such modification, amendment or supplement is made upon the Debt Securities.

### Section 8.06. Securities Acquired by Freddie Mac.

Freddie Mac may, from time to time, repurchase or otherwise acquire (either for cash or in exchange for newly-issued Debt Securities) all or a portion of any issue of Debt Securities. Any Debt Securities owned by Freddie Mac shall have an equal and proportionate benefit under the provisions of this Agreement, without preference, priority or distinction as among such Debt Securities, except that in determining whether the Holders of the required percentage of the outstanding principal amount (or notional principal amount) of an issue of Debt Securities have given any required demand, authorization, notice, consent or waiver under this Agreement, any Debt Securities owned by Freddie Mac or any person directly or indirectly controlling or controlled by or under direct or indirect common control with Freddie Mac shall be disregarded and deemed not to be outstanding for the purpose of such determination.

### Section 8.07. Notice.

(a) Any notice, demand or other communication which by any provision of this Agreement is required or permitted to be given to or served upon any Holder may be given or served in writing by deposit thereof, postage prepaid, in the mail, addressed to such Holder as such Holder's name and address may appear in the records of Freddie Mac, a Federal Reserve Bank or the Registrar, as the case may be, or, in the case of a Holder of a Fed Book-Entry Debt Security, by transmission to such Holder through the communication system linking the Federal Reserve Banks, or, in the case of a Holder of a Debt Security maintained on DTC, by transmission to such Holder through the DTC communication system. Such notice, demand or other communication to or upon any Holder shall be deemed to have been sufficiently given or made, for all purposes, upon mailing or transmission.

(b) If and so long as an issue of Debt Securities is admitted for trading on the Euro MTF Market and listed on the Official List of the Luxembourg Stock Exchange and the rules of the Luxembourg Stock Exchange so require, notices with respect to such issue of Debt Securities also shall be published in a newspaper of general circulation in Luxembourg (which is expected to be *Luxemburger Wort*) or on the website of the Luxembourg Stock Exchange (http://www.bourse.lu) or, if such publication is not practical, elsewhere in Europe, if the rules of that exchange so require. Notice by publication shall be deemed to have been given on the date of publication or, if published more than once, on the date of first publication.

(c) Any notice, demand or other communication which by any provision of this Agreement is required or permitted to be given to or served upon Freddie Mac shall be given in writing addressed (until another address is published by Freddie Mac) as follows: Federal Home Loan Mortgage Corporation, 8200 Jones Branch Drive, McLean, Virginia 22102 Attention: General Counsel and Secretary. Such notice, demand or other communication to or upon Freddie Mac shall be deemed to have been sufficiently given or made only upon actual receipt of the writing by Freddie Mac.

TREASURY-3767

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 8.08. Governing Law.**

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE HOLDERS AND FREDDIE MAC WITH RESPECT TO THE DEBT SECURITIES SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE UNITED STATES. INSOFAR AS THERE MAY BE NO APPLICABLE PRECEDENT, AND INSOFAR AS TO DO SO WOULD NOT FRUSTRATE THE PURPOSES OF THE FREDDIE MAC ACT OR ANY PROVISION OF THIS AGREEMENT OR THE TRANSACTIONS GOVERNED THEREBY, THE LAWS OF THE STATE OF NEW YORK SHALL BE DEEMED REFLECTIVE OF THE LAWS OF THE UNITED STATES.

**Section 8.09. Headings.**

The Article, Section and Subsection headings are for convenience only and shall not affect the construction of this Agreement.

**FEDERAL HOME LOAN MORTGAGE CORPORATION**

36

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 12.1**

### RATIO OF EARNINGS TO FIXED CHARGES AND
### RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

| | Three Months Ended March 31, | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2012 | 2011 | 2011 | 2010 | 2009 | 2008 | 2007 |
| | | | (dollars in millions) | | | | |
| Net income (loss) before income tax benefit (expense) and cumulative effect of changes in accounting principles | $ 563 | $ 602 | $ (5,666) | $(14,882) | $(22,384) | $(44,564) | $ (5,989) |
| Add: | | | | | | | |
| Low-income housing tax credit partnerships | — | — | — | — | 4,155 | 453 | 469 |
| Total interest expense | 18,069 | 20,968 | 79,988 | 92,131 | 22,150 | 33,332 | 38,482 |
| Interest factor in rental expenses | 1 | 1 | 4 | 5 | 7 | 8 | 7 |
| Earnings (loss), as adjusted | $18,633 | $ 21,571 | $ 74,326 | $ 77,254 | $ 3,928 | $ (10,771) | $ 32,969 |
| Fixed charges: | | | | | | | |
| Total interest expense | $ 18,069 | $20,968 | $79,988 | $ 92,131 | $ 22,150 | $ 33,332 | $38,482 |
| Interest factor in rental expenses | 1 | 1 | 4 | 5 | 7 | 8 | 7 |
| Capitalized interest | — | — | — | — | — | — | — |
| Total fixed charges | $ 18,070 | $20,969 | $ 79,992 | $ 92,136 | $ 22,157 | $ 33,340 | $38,489 |
| Senior preferred stock and preferred stock dividends(1) | 1,804 | 1,605 | 6,498 | 5,749 | 4,105 | 675 | 398 |
| Total fixed charges including preferred stock dividends | $19,874 | $22,574 | $ 86,490 | $ 97,885 | $ 26,262 | $ 34,015 | $38,887 |
| Ratio of earnings to fixed charges(2) | 1.03 | 1.03 | — | — | — | — | — |
| Ratio of earnings to combined fixed charges and preferred stock dividends(3) | — | — | — | — | — | — | — |

(1) Senior preferred stock and preferred stock dividends represent pre-tax earnings required to cover any senior preferred stock and preferred stock dividend requirements computed using our effective tax rate, whenever there is an income tax provision, for the relevant periods.

(2) Ratio of earnings to fixed charges is computed by dividing earnings (loss), as adjusted by total fixed charges. For the ratio for any damages or losses (loss), as adjusted must increase by $5.7 billion, $14.9 billion, $18.2 billion, $44.1 billion, and $5.5 billion for the years ended December 31, 2011, 2010, 2009, 2008, and 2007, respectively.

(3) Ratio of earnings to combined fixed charges and preferred stock dividends is computed by dividing earnings (loss), as adjusted by total fixed charges including preferred stock dividends. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $1.2 billion, $1.0 billion, $12.2 billion, $20.6 billion, $22.3 billion, $44.8 billion, and $5.9 billion for the three months ended March 31, 2012 and 2011 and for the years ended December 31, 2011, 2010, 2009, 2008, and 2007, respectively.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.1**

**CERTIFICATION**

**PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)**

I, Charles E. Haldeman, Jr., certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 3, 2012

/s/ Charles E. Haldeman, Jr.
Charles E. Haldeman, Jr.
Chief Executive Officer

TREASURY-3770

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.2**

## CERTIFICATION

## PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Ross J. Kari, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 3, 2012

/s/ Ross J. Kari
_____
Ross J. Kari
Executive Vice President — Chief Financial Officer

**TREASURY-3771**

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

**Exhibit 32.1**

**CERTIFICATION**

**PURSUANT TO 18 U.S.C. SECTION 1350,**

**AS ENACTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Charles E. Haldeman, Jr., Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date: May 3, 2012




/s/ Charles E. Haldeman, Jr.
Charles E. Haldeman, Jr.
Chief Executive Officer

**TREASURY-3772**

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 32.2

**1 ECRTI TI FRTAO**

**NP CUP F OR RA S8 P .U1 . UE1 RTAO S350,**

**F U EOF1 RED BY UE1 RTAO 906 A1  RHE UFCBFOEU-AXLEY F 1 R AI  2002**

In connection with the Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 of the Federal Home  Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof  (the "Report"), I, Ross J. Kari, Executive Vice President — Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of  Section 13(a) or 15(d) of the Securities Exchange Act of  1934; and

2.  The information contained in the Report fairly presents, in all  material respects, the financial condition and results of  operations of the Company.

Date: May 3, 2012

/s/  Ross J. Kari
Ross J. Kari
Executive Vice President — Chief Financial Officer

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-3774

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, May 03, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠